KATTEN
DRAFT 5/22/13

### INDEMNIFICATION AGREEMENT

**THIS INDEMNIFICATION AGREEMENT** (this "Agreement") is entered into as of [_____], 2013, by and between Retrophin, Inc., a Delaware corporation (the "Company"), and [_____] ("Indemnitee").

### RECITALS

A.     The Company expects and intends for the Indemnitee to continue to be an officer of the Company and/or a member of the Board of Directors of the Company (the "Company Board").

B.     The statutes and judicial decisions regarding the duties of directors and officers are often difficult to apply, ambiguous or conflicting, and therefore may fail to provide directors and officers with adequate guidance regarding the legal risks to which they are exposed and/or the manner in which are expected to execute their fiduciary duties and responsibilities.

C.     The Company recognizes that plaintiffs often seek damages in such large amounts, and the costs of litigation may be so great (whether or not the litigation is meritorious), that the defense and/or settlement of such litigation can create an extraordinary burden on the personal resources of directors and officers.

D.     The Company's by-laws provide that the Company shall indemnify its officers and directors to the fullest extent permitted by the General Corporation Law of Delaware, but the rights conferred by the Company's by-laws are not exclusive of any other rights which any officer or director of the Company may have under any agreement with the Company, such as those set forth in this Agreement.

E.     The Company Board has determined that enhancing the ability of the Company to attract and retain qualified personnel to serve as directors and officers is in the best interests of the Company and in order to procure Indemnitee's service as a director and/or officer of the Company, and to enhance Indemnitee's ability to serve the Company in an effective manner, the Company seeks to assure Indemnitee that indemnification and insurance coverage is available.

F.     The Company desires and has requested Indemnitee to continue to serve as an officer or director of the Company, and Indemnitee is willing to continue to serve as an officer or director of the Company, if Indemnitee is furnished the indemnity provided for herein by the Company.

**NOW, THEREFORE,** in consideration of the foregoing premises and the mutual covenants and agreements set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

84718374

CONFIDENTIAL                                                                                                    R116047

1.   **Definitions**. For purposes of this Agreement, the following terms shall have the corresponding meanings set forth below.

"Affiliate" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Company.

"Control" (including the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of said Person, whether through the ownership of voting securities, appointment or designation as officer or director, as trustee or executor, by contract or credit arrangement or otherwise.

"Beneficial Owner" shall have the meaning given to such term in Rule 13d-3 under the Exchange Act.

"Business Day" means any day other than Saturday or Sunday or any day that banks in New York, New York are required or permitted to close.

"Change of Control" means the occurrence, after the date of this Agreement, of any of the following events: (i) any Person (other than the Company, a majority-owned Subsidiary of the Company or any of its subsidiaries, or an employee benefit plan (or related trust) sponsored or maintained by the Company), including a "group" as provided in Section 13(d)(3) of the Exchange Act, that was not previously the Beneficial Owner, directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the combined voting power of the Company's then-outstanding voting securities becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the combined voting power of the Company's then-outstanding voting securities; (ii) during any period of two (2) consecutive years (not including any period prior to the execution of this Agreement), individuals who at the beginning of such period constitute the Company Board, and any new director (other than a director designated by a Person who has entered into an agreement with the Company to effect a transaction described in clauses (i), (iii) or (v) of this sentence) whose election by the Company Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved (other than as a result of any settlement of a proxy or consent solicitation contest or any action taken to avoid such a contest), cease for any reason to constitute at least a majority of the members of the Board; (iii) the effective date of a merger or consolidation of the Company with any other entity, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than fifty percent (50%) of the combined voting power of the voting securities of the surviving entity outstanding immediately after such merger or consolidation and with the power to elect at least a majority of the Company Board or other governing body of such surviving entity; (iv) the approval by the stockholders of the Company of a complete liquidation of the Company or an agreement for the sale or

2

KAT_0069045

BA_0059754

CONFIDENTIAL

R116048

disposition by the Company of all or substantially all of the Company's assets; or (v) any event of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or a response to any similar item on any similar schedule or form) promulgated under the Exchange Act, whether or not the Company is then subject to such reporting requirement.

"Claim" means a claim or action asserted by a Person in a Proceeding or any other written demand for relief in connection with or arising from an Indemnification Event.

"Company Action" means a Proceeding in which a Claim has been brought by or in the name of the Company to procure a judgment in its favor.

"Covered Entity" means (i) the Company, (ii) any Subsidiary, (iii) any Affiliate or (iv) any other Person for which Indemnitee is or was (or may be deemed to be or have been) at any time serving at the request of the Company, or at the request of any Subsidiary or Affiliate, as a director, officer, employee, managing member, manager, member, controlling person, agent or fiduciary.

"Disinterested Director" means, with respect to any determination contemplated by this Agreement, any Person who, as of the time of such determination, is a member of the Company Board but is not a party to any Proceeding then pending with respect to any Indemnification Event.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any similar federal statute then in effect.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any similar federal statute then in effect.

"Expenses" means any and all direct and indirect fees, costs, retainers, court costs, transcript costs, expert fees, witness fees, travel expenses, duplicating costs, printing costs, binding costs, electronic delivery costs, telephone charges, postage, delivery service fees and all other disbursements or expenses of any type or nature whatsoever reasonably incurred by Indemnitee (including, subject to the limitations set forth in **Section 3(c)** below, reasonable attorneys' fees) in connection with or arising from an Indemnification Event, including: (i) the investigation or defense of a Claim; (ii) being, or preparing to be, a witness or otherwise participating, or preparing to participate, in any Proceeding; (iii) furnishing, or preparing to furnish, documents in response to a subpoena or otherwise in connection with any Proceeding; (iv) any appeal of any judgment, outcome or determination in any Proceeding (including any premium, security for and other costs relating to any cost bond, supersedeas bond or any other appeal bond or its equivalent); (v) establishing or enforcing any right to indemnification under this Agreement (including pursuant to **Section 2(c)** below), Delaware law or otherwise, regardless of whether Indemnitee is ultimately successful in such action, unless as a part of such action, a court of competent jurisdiction over such action determines that each of

KAT_0069046

CONFIDENTIAL

R116049

the material assertions made by Indemnitee as a basis for such action was not made in good faith or was frivolous; and (vi) any federal, state, local or foreign taxes imposed on Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, including all interest, assessments and other charges paid or payable with respect to such payments.   For purposes of clarification, Expenses shall not include Losses.

An "Indemnification Event" shall be deemed to have occurred if Indemnitee was, is or becomes, or is threatened to be made, a party to or witness or other participant in, or was, is or becomes obligated to furnish or furnishes documents in response to a subpoena or otherwise in connection with, any Proceeding by reason of the fact that Indemnitee is or was (or may be deemed to be or have been) a director, officer, employee, controlling person, agent or fiduciary of any Covered Entity, or by reason of any actual or alleged action or inaction on the part of Indemnitee while serving in any such capacity (including rendering any written statement that is a Required Statement or is made to another officer or employee of the Covered Entity to support a Required Statement).

"Independent Legal Counsel" means an attorney or firm of attorneys designated by the Disinterested Directors (or, if there are no Disinterested Directors, the Company Board) that is experienced in matters of corporate law and neither presently is, nor in the thirty-six (36) months prior to such designation has been, retained to represent (i) the Company or Indemnitee in any matter material to either such party, or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder.

"Losses" means any and all losses, claims, damages, liabilities, judgments, fines, penalties, settlement payments, awards and amounts of any type whatsoever incurred by Indemnitee in connection with or arising from an Indemnification Event.   For purposes of clarification, Losses shall not include Expenses.

"Organizational Documents" means any and all organizational documents, charters or similar agreements or governing documents, including (i) with respect to a corporation, its certificate of incorporation and by-laws, (ii) with respect to a limited liability company, its certificate of formation and operating (or limited liability company) agreement, and (iii) with respect to a partnership, its certificate of partnership and partnership agreement.

"Proceeding" means any threatened, pending or completed claim, action, suit, proceeding, arbitration, alternative dispute resolution mechanism, investigation, inquiry, administrative hearing or appeal, whether brought in the right of a Covered Entity or otherwise and whether of a civil (including intentional or unintentional tort claims), criminal, administrative or investigative nature.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, estate, a joint venture, an unincorporated organization, an employee benefit plan, any other entity or enterprise, or any government or agency or political subdivision thereof.

84718374

BA_0059756

CONFIDENTIAL

KAT_0069047

R116050

"Required Statement" means a written statement of a Person that is required to be, and is, filed with the SEC regarding (i) the design, adequacy or evaluation of a Covered Entity's internal control over financial reporting or disclosure controls and procedures or (ii) the accuracy, sufficiency or completeness of reports or statements filed by a Covered Entity with the SEC pursuant to federal law and/or administrative regulations, including any certification contemplated by Section 302 or Section 906 of the Sarbanes-Oxley Act of 2002, as amended, and any rules and regulations promulgated pursuant thereto.

"Reviewing Party" means, with respect to any determination contemplated by this Agreement, any one of the following: (i) a majority of all Disinterested Directors, even if such Disinterested Directors do not constitute a quorum of the Company Board; (ii) a committee of Disinterested Directors, even if such committee members do not constitute a quorum of the Company Board, so long as such committee was designated by a majority of all Disinterested Directors; (iii) if there are no Disinterested Directors, or if the Disinterested Directors so direct, Independent Legal Counsel, in which case the applicable determination shall be provided in a written opinion to the Company Board, with a copy provided to Indemnitee; (iv) the Company's stockholders, if there are no Disinterested Directors; or (v) if Indemnitee is not a director or officer of the Company at the time of such determination, the Company Board.

"SEC" means the United States Securities and Exchange Commission or any successor thereto.

"Securities Act" means the Securities Act of 1933, as amended, or any similar federal statute then in effect.

"Subsidiary" means any corporation of which more than ten percent (10%) of the outstanding voting securities is owned directly or indirectly by the Company, and one or more other Subsidiaries, taken as a whole.

5

84718374

BA_0059757

KAT_0069048

CONFIDENTIAL

R116051

**2.    Indemnification.**

(a)    <u>Indemnification of Losses and Expenses.</u>  If an Indemnification Event has occurred, then, subject to **Section 10** and the other provisions of this Agreement below, the Company shall indemnify and hold harmless Indemnitee, to the fullest extent permitted by law, against any and all Losses and Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with such Indemnification Event, but only if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in, or not opposed to, the best interests of the Company, and, with respect to any criminal Proceeding, only if Indemnitee had no reasonable cause to believe Indemnitee's conduct was unlawful.  The termination of any Proceeding by judgment, court order, settlement or conviction, or on plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that Indemnitee (i) did not act in good faith and in a manner which Indemnitee reasonably believed to be in, or not opposed to, the best interests of the Company, or (ii) with respect to any criminal Proceeding, had reasonable cause to believe that Indemnitee's conduct was unlawful.

(b)    <u>Limitation with Respect to Company Actions.</u>    Notwithstanding the foregoing, the Company shall not indemnify and hold harmless Indemnitee with respect to any Losses (as opposed to Expenses) in connection with, or arising from, any Company Action. Furthermore, the Company shall not indemnify and hold harmless Indemnitee with respect to any Expenses in connection with, or arising from, any Company Action as to which Indemnitee shall have been adjudged to be liable to the Company by a court of competent jurisdiction, unless, and then only to extent that, any court in which such Company Action was brought shall determine upon application that, despite the adjudication of liability, but in view of all of the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification for such Expenses as such court shall deem proper.

(c)    <u>Advancement of Expenses.</u>  To the fullest extent permitted by law and until a determination that Indemnitee is not entitled to be indemnified by the Company under the terms hereof, the Company shall advance Expenses to or on behalf of Indemnitee as soon as practicable, but in any event not later than thirty (30) days after written request therefor by Indemnitee, which request shall be accompanied by vouchers, invoices or similar evidence documenting in reasonable detail the Expenses incurred or to be incurred by Indemnitee. Indemnitee hereby undertakes to repay such amounts advanced if, and only to the extent that, it shall ultimately be determined that Indemnitee is not entitled to be indemnified by the Company for such Expenses under this Agreement.

(d)    <u>Contribution.</u>  If, and to the extent, the indemnification of Indemnitee provided for in **Section 2(a)** above for any reason is held by a court of competent jurisdiction not to be permissible for liabilities arising under federal securities laws or ERISA, then the Company, in lieu of indemnifying Indemnitee under this Agreement, shall contribute to the amount paid or payable by Indemnitee as a result of such Losses or Expenses (i) in such proportion as is appropriate to reflect the relative benefits received by the Covered Entities and all officers, directors or employees of the Covered Entities other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Proceeding), on the one hand, and Indemnitee, on the other hand, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative

6

benefits referred to in clause (i) above but also the relative fault of the Covered Entities and all officers, directors or employees of the Covered Entities other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Proceeding), on the one hand, and Indemnitee, on the other hand, in connection with the action or inaction that resulted in such Losses or Expenses, as well as any other relevant equitable considerations. The relative fault of the Covered Entities and all officers, directors or employees of the Covered Entities other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Proceeding), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary, and the degree to which their conduct is active or passive. Notwithstanding the foregoing, no Person found guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not found guilty of such fraudulent misrepresentation.

### 3. Indemnification Procedures.

(a) Notice of Indemnification Event. Indemnitee shall give the Company notice as soon as reasonably practicable of any Indemnification Event of which Indemnitee becomes aware and of any request for indemnification hereunder; provided, however, that any failure to so notify the Company shall not relieve the Company of any of its obligations under this Agreement, except if, and then only to the extent that, such failure increases the liability of the Company under this Agreement.

(b) Notice to Insurers. If, at the time the Company receives notice of an Indemnification Event pursuant to **Section 3(a)** above, the Company has liability insurance in effect that may cover such Indemnification Event, the Company shall give prompt written notice of such Indemnification Event to the applicable insurers in accordance with the procedures set forth in each of the applicable policies of insurance. The Company shall thereafter take all reasonably necessary or desirable action to cause such insurers to pay, for the benefit of Indemnitee, all amounts payable as a result of such Indemnification Event in accordance with the terms of such policies; provided, however, that nothing in this **Section 3(b)** shall affect the Company's obligations under this Agreement or the Company's obligations to comply with the provisions of this Agreement in a timely manner as provided herein.

(c) Selection of Counsel. If the Company shall be obligated hereunder to pay or advance Expenses or indemnify Indemnitee with respect to any Losses, the Company shall be entitled to assume the defense of any related Claims, with counsel selected by the Company; provided, however, that following a Change of Control, such counsel shall be subject to the prior written approval of Indemnitee, which approval shall not be unreasonably withheld, conditioned or delayed. After the retention of such counsel by the Company, the Company shall pay the fees and expenses of such counsel and will not be liable to Indemnitee under this Agreement for any other fees of counsel subsequently incurred by Indemnitee with respect to the defense of such Claims; provided, that (i) Indemnitee shall have the right to employ counsel in connection with any such Claim at Indemnitee's expense, and (ii) if (A) the employment of counsel by Indemnitee has been previously authorized by the Company with respect to the period after the Company has retained counsel to defend such Claim and such authorization has not been

84718374

KAT_0069050

CONFIDENTIAL

R116053

withdrawn, (B) counsel for Indemnitee shall have provided the Company with a written legal opinion that there is, or there is reasonably likely to be, a conflict of interest between the Company and Indemnitee in the conduct of any such defense, or (C) the Company shall not continue to retain such counsel to defend such Claim, then the fees and expenses of Indemnitee's counsel shall be at the expense of the Company.

(d)      Settlement of Claims. The Company shall not settle any Claim in which it takes the position that Indemnitee is not entitled to indemnification in connection with such settlement without the prior written consent of Indemnitee, nor shall the Company settle any Claim in any manner which would (i) impose any fine or obligation on Indemnitee that is not indemnified by the Company hereunder, (ii) impose any non-monetary sanction on Indemnitee, or (iii) require any admission of fault or culpability of Indemnitee, without Indemnitee's prior written consent.

**4.      Determination of Right to Indemnification.**

(a)      Successful Proceeding. To the extent Indemnitee has been successful, on the merits or otherwise, in defense of any Proceeding referred to in **Section 2(a)** or **2(b)**, the Company shall indemnify Indemnitee against all Losses and Expenses incurred by Indemnitee in connection therewith.   If Indemnitee is not wholly successful in such Proceeding, but is successful, on the merits or otherwise, as to one or more but less than all Claims in such Proceeding, the Company shall indemnify Indemnitee against all Losses and Expenses incurred by Indemnitee in connection with each successfully resolved Claim.

(b)      Other Proceedings. In the event that **Section 4(a)** is inapplicable, the Company shall nevertheless indemnify Indemnitee, unless and to the extent a Reviewing Party chosen pursuant to **Section 4(c)** determines that Indemnitee has not met the applicable standard of conduct set forth in **Section 2(a)** or **2(b)**, as applicable, as a condition to such indemnification.

(c)      Reviewing Party Determination. If, and to the extent, any applicable law requires the determination that Indemnitee has met the applicable standard of conduct set forth in **Section 2(a)** or **2(b)**, as applicable, as a condition to any such indemnification, a Reviewing Party chosen by the Company Board (provided, that following a Change of Control, such Reviewing Party shall, at the written election of Indemnitee, be an Independent Legal Counsel) shall make such determination in writing, subject to the following:

(i)      A Reviewing Party so chosen shall act in the utmost good faith to assure Indemnitee a complete opportunity to present to such Reviewing Party Indemnitee's evidence that Indemnitee has met the applicable standard of conduct.

(ii)      If the Reviewing Party pursuant to this **Section 4(c)** is to be an Independent Legal Counsel, the Independent Legal Counsel shall be selected as provided in this **Section 4(c)(ii)**.   The Independent Legal Counsel shall be selected by the Company Board, and the Company Board shall provide written notice of such selection to Indemnitee.   Indemnitee may, within ten (10) days after such written notice of selection shall have been given, deliver to the Company a written objection to such selection; provided, however, that such objection may be asserted only on the ground that

8

CONFIDENTIAL

the Independent Legal Counsel so selected does not meet the requirements of "Independent Legal Counsel" as defined in **Section 1** of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Legal Counsel. If a written objection is made and substantiated, the Independent Counsel selected may not serve as Independent Legal Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If, within twenty (20) days after the initial notice provided by the Company Board to Indemnitee of the initial selection of an Independent Legal Counsel, no Independent Legal Counsel shall have been selected by the Company Board and not objected to by Indemnitee, either the Company Board or the Indemnitee may petition the Court of Chancery of the State of Delaware or other court of competent jurisdiction for resolution of any objection which shall have been made by the Indemnitee to the Company Board's selection of Independent Legal Counsel and/or for the appointment as Independent Legal Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Legal Counsel and the Reviewing Party pursuant to this **Section 4(c)**. The Company shall pay any and all reasonable fees and expenses of Independent Legal Counsel incurred by such Independent Legal Counsel in connection with acting pursuant to this **Section 4(c)**, and the Company shall pay all reasonable fees and expenses incident to the procedures of this **Section 4(c)(ii)**, regardless of the manner in which such Independent Legal Counsel was selected or appointed.

(iii)     Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of a Covered Entity, including its financial statements, or on information supplied to Indemnitee by the officers or employees of a Covered Entity in the course of their duties, or on the advice of legal counsel for a Covered Entity or on information or records given, or reports made, to a Covered Entity by an independent certified public accountant or by an appraiser, investment banker or other expert selected by a Covered Entity, except, and then only to the extent, that Indemnitee knew or had reason to know that such records or books of account of a Covered Entity, information supplied by the officers or employees of a Covered Entity, advice of legal counsel or information or records given or reports made by an independent certified public accountant or by an appraiser, investment banker or other expert were materially false or materially inaccurate. In addition, the knowledge and/or actions, or failure to act, of any director, officer, agent or employee of a Covered Entity (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement. Whether or not the foregoing provisions of this **Section 4(c)(iii)** are satisfied, it shall in any event be presumed that Indemnitee has at all times acted in good faith and in a manner Indemnitee reasonably believed to be in, or not opposed to, the best interests of the Company. Any Person seeking to overcome this presumption shall have the burden of proof, and the burden of persuasion, by clear and convincing evidence.

(iv)     If a Reviewing Party chosen pursuant to this **Section 4(c)** shall not have made a determination whether Indemnitee is entitled to indemnification within thirty (30) days after being chosen as the Reviewing Party, the requisite determination of

84718374

KAT_0069052

CONFIDENTIAL

R116055

entitlement to indemnification shall be deemed to have been made, and Indemnitee shall be entitled to such indemnification, absent (A) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (B) a prohibition of such indemnification under applicable law; provided, however, that such thirty (30)-day period may be extended for a reasonable time, not to exceed an additional fifteen (15) days, if the Reviewing Party in good faith requires such additional time for obtaining or evaluating documentation and/or information relating thereto; and provided, further, that the foregoing provisions of this **Section 4(c)(iv)** shall not apply if pursuant to applicable law of the State of Delaware (I) the determination of entitlement to indemnification is to be made by the stockholders of the Company, (II) a special meeting of stockholders is called by the Company Board for such purpose within thirty (30) days after the stockholders are chosen as the Reviewing Party, (III) such meeting is held for such purpose within sixty (60) days after having been so called, and **(IV)** such determination is made thereat.

(d)     Appeal to Court. Notwithstanding a determination by a Reviewing Party chosen pursuant to **Section 4(c)** that Indemnitee is not entitled to indemnification with respect to a specific Claim or Proceeding (an **"Adverse Determination"**), Indemnitee shall have the right to apply to the court in which that Claim or Proceeding is or was pending or any other court of competent jurisdiction for the purpose of enforcing Indemnitee's right to indemnification pursuant to this Agreement, provided that Indemnitee commences any such Proceeding seeking to enforce Indemnitee's right to indemnification within one (1) year following the date upon which Indemnitee is notified in writing by the Company of the Adverse Determination. In the event of any dispute between the parties concerning their respective rights and obligations hereunder, the Company shall have the burden of proving that the Company is not obligated to make the payment or advance claimed by Indemnitee.

(e)     Presumption of Success. The Company hereby acknowledges that a settlement or other disposition short of final judgment shall be deemed a successful resolution for purposes of **Section 4(a)** if it permits a party to avoid expense, delay, distraction, disruption or uncertainty. In the event that any Proceeding to which Indemnitee is a party is resolved in any manner other than by adverse judgment against Indemnitee (including settlement of such Proceeding with or without payment of money or other consideration), it shall be presumed that Indemnitee has been successful on the merits or otherwise in such Proceeding, unless there has been a finding (either adjudicated or pursuant to **Section 4(c)** above) that Indemnitee (i) did not act in good faith, (ii) did not act in a manner reasonably believed to be in, or not opposed to, the best interests of the Company, or (iii) with respect to any criminal proceeding, had reasonable cause to believe his conduct was unlawful. Anyone seeking to overcome this presumption shall have the burden of proof, and the burden of persuasion, by clear and convincing evidence.

**5.     Non-Exclusivity;  Survival  of  Rights;  Primacy  of  Indemnification; Subrogation.**

(a)     The rights of indemnification as provided by this Agreement shall not be deemed exclusive of, but shall be in addition to, any other rights to which Indemnitee may at any time be entitled under the Organizational Documents of any Covered Entity (including the

10

84718374

CONFIDENTIAL

KAT_0069053

R116056

Company's bylaws), any other agreement, any vote of stockholders or Disinterested Directors, the laws of the State of Delaware or otherwise. No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by Indemnitee prior to such amendment, alteration or repeal. In the event of any change after the date of this Agreement in any applicable law, statute or rule that permits greater indemnification than would be afforded currently under the Organizational Documents of any Covered Entity and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy. The rights to indemnification, contribution and advancement of Expenses provided in this Agreement shall continue as to Indemnitee for any action Indemnitee took or did not take while serving in an indemnified capacity even though Indemnitee may have ceased to serve in such capacity.

(b)     The Company hereby agrees that it (i) is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary), (ii) shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Losses and Expenses to the extent legally permitted and as required by the terms of this Agreement and the Organizational Documents of any Covered Entity (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against any other Person and (iii) will fulfill all obligations under this Agreement notwithstanding whether (A) the Company elects to submit a claim to its Directors and Officers Insurance provider or (B) whether such Directors and Officers Insurance elects to reimburse the Company for such claim(s).

(c)     Except as provided in **Section 5(b)**, in the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

84718374

KAT_0069054

BA_0059763

CONFIDENTIAL                                                                                              R116057

**6.      Additional Indemnification Rights**.  In addition, the Company hereby agrees to indemnify (and advance Expenses to) Indemnitee to the fullest extent permitted by law, even if such indemnification and advancement of Expenses is not specifically authorized by the other provisions of this Agreement or any other agreement, the Organizational Documents of any Covered Entity or by applicable law.  In the event of any change after the date of this Agreement in any applicable law, statute or rule that expands the right of a Delaware corporation to indemnify a member of its board of directors or an officer, employee, controlling person, agent or fiduciary, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits afforded by such change.  In the event of any change in any applicable law, statute or rule that narrows the right of a Delaware corporation to indemnify a member of its board of directors or an officer, employee, controlling person, agent or fiduciary, such change, to the extent not otherwise required by such law, statute or rule to be applied to this Agreement, shall have no effect on this Agreement or the parties rights and obligations hereunder except as set forth in **Section 10(a)** hereof.

**7.      No Duplication of Payments.**  The Company shall not be liable under this Agreement to make any payment of any amount otherwise indemnifiable hereunder, or for which advancement is provided hereunder, if and to the extent Indemnitee has otherwise actually received such payment, whether pursuant to any insurance policy, the Organizational Documents of any Covered Entity or otherwise.

**8.      Mutual Acknowledgment.**  Both the Company and Indemnitee acknowledge that, in certain instances, federal law or public policy may override applicable state law and prohibit the Company from indemnifying its directors and officers under this Agreement or otherwise.  For example, the Company and Indemnitee acknowledge that the SEC has taken the position that indemnification by the Company is not permissible for liabilities arising under certain federal securities laws, and that federal legislation prohibits indemnification for certain ERISA violations.  Indemnitee understands and acknowledges that the Company has undertaken, or may be required in the future to undertake, with the SEC to submit the question of indemnification to a court in certain circumstances for a determination of the Company's right under public policy to indemnify Indemnitee, and that any right to indemnification hereunder shall be subject to, and conditioned upon, any such required court determination.

**9.      Liability Insurance.**  The Company shall obtain and maintain in full force and effect, at the Company's expense, liability insurance applicable to directors and officers from established and reputable insurers, in such amount, and otherwise on such terms, as are determined in good faith by the Company Board.  Indemnitee shall be covered by such policy or policies in such a manner as to provide Indemnitee the same rights and benefits as are accorded to the most favorably insured of the Company's directors, if Indemnitee is a director of the Company, or of the Company's officers, if Indemnitee is not a director of the Company.  The Company shall advise Indemnitee as to the terms of, and the amounts of coverage provided by, any liability insurance policy described in this **Section 9** and shall promptly notify Indemnitee if, at any time, any such insurance policy will expire or be terminated, the amount of coverage under any such insurance policy will be decreased or the terms of any such insurance policy will materially change.

12

84718374

KAT_0069055

CONFIDENTIAL

R116058

10.     **Exceptions.**  Any other provision herein to the contrary notwithstanding, the Company shall not be obligated pursuant to the terms of this Agreement to indemnify Indemnitee:

(a)     against any Losses or Expenses, or to advance Expenses to Indemnitee, with respect to Claims initiated or brought voluntarily by Indemnitee, and not by way of defense (including affirmative defenses and counter-claims), except (i) Claims to establish or enforce a right to indemnification, contribution or advancement with respect to an Indemnification Event, whether under this Agreement, any other agreement or insurance policy, the Organizational Documents of any Covered Entity, the laws of the State of Delaware or otherwise, or (ii) if the Company Board has approved specifically the initiation or bringing of such Claim; or

(b)     if, and to the extent, that a court of competent jurisdiction enters a judgment that such indemnification is not lawful, except to the extent such judgment is later reversed on appeal.

11.     **Miscellaneous.**

(a)     **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall constitute an original.  This Agreement and any other agreement or instrument entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or e-mail of a PDF file, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

(b)     **Binding Effect; Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of, and be enforceable by, the parties hereto, and their respective successors and assigns (including with respect to the Company, any direct or indirect successor, by purchase, merger, consolidation or otherwise, to all or substantially all of the business and/or assets of the Company) and with respect to Indemnitee, his or her spouse, heirs, and personal and legal representatives.  The Company shall require and cause any successor or assign (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all, or substantially all, of the business and/or assets of the Company, to assume and agree in writing to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession or assignment had taken place.  This Agreement shall continue in effect with respect to Claims relating to Indemnification Events regardless of whether Indemnitee continues to serve as a director, officer, employee, controlling person, agent or fiduciary of any Covered Entity.

(c)     **Notice.**  All notices and other communications required or permitted hereunder shall be in writing, shall be effective when given, and shall in any event be deemed to be given (a) five (5) days after deposit with the U.S. Postal Service or other applicable postal service, if delivered by first class mail, postage prepaid, (b) upon delivery, if delivered by hand, (c) one (1) Business Day after the Business Day of deposit with Federal Express or similar, nationally recognized overnight courier, freight prepaid, or (d) one (1) Business Day after the

13

84718374

KAT_0069056

CONFIDENTIAL

R116059

Business Day of delivery by confirmed facsimile transmission, if deliverable by facsimile transmission, with copy by other means permitted hereunder, and addressed, if to Indemnitee, to Indemnitee's address or facsimile number (as applicable) as set forth beneath Indemnitee's signature to this Agreement, or, if to the Company, at the address or facsimile number (as applicable) of its principal corporate offices (attention: Secretary), or to such other address or facsimile number (as applicable) as such party may designate to the other party hereto.

(d)     Enforceability.  The Company hereby represents and warrants that this Agreement is a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.  The Company agrees that it will not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of expenses under this Agreement.

(e)     Consent to Jurisdiction.  The Company and Indemnitee each hereby irrevocably consent to the jurisdiction and venue of the courts of the State of Delaware for all purposes in connection with any Proceeding that arises out of or relates to this Agreement and agree that any Proceeding instituted under this Agreement shall be commenced, prosecuted and continued only in the courts of the State of Delaware. **THE COMPANY AND INDEMNITEE HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.**

(f)     Severability.  The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any provision within a single section, paragraph or sentence) is held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law.  Further, to the fullest extent possible, the provisions of this Agreement (including each portion of this Agreement containing any provision held to be invalid, void or otherwise unenforceable that is not itself invalid, void or unenforceable) shall be construed so as to give effect to the purposes manifested by the provision held invalid, illegal or unenforceable.

(g)     Choice of Law.  This Agreement shall be governed by, and its provisions shall be construed and enforced in accordance with, the laws of the State of Delaware, without regard to the conflict of laws principles thereof.

(h)     Interpretation.  The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.  Whenever the context may require, any pronoun will include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" are not limiting and will be deemed to be followed by the phrase "without limitation."  The phrases "herein," "hereof," "hereunder" and words of similar import will be deemed to refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "or" will be inclusive and not exclusive unless the context requires otherwise.

(i)     Amendment and Termination.  No amendment, modification, termination or cancellation of this Agreement shall be effective unless it is in a writing signed by the parties to be bound thereby.  Notice of the same shall be provided to all parties hereto.  No waiver of any

14

84718374

KAT_0069057

BA_0059766

CONFIDENTIAL                                                                                                     R116060

of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver.

       (j)     No Construction as Employment Agreement. Nothing contained in this Agreement shall be construed as giving Indemnitee any right to be retained or to continue in the employ or service of any Covered Entity.

*[signature page follows]*

15

84718374

KAT_0069058

CONFIDENTIAL

R116061

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement on and as of the day and year first above written.

> **COMPANY:**
>
> **RETROPHIN, INC.**
>
>
> By: _____
>> Name:
>> Title:
>
>
> **INDEMNITEE:**
>
>
> _____
> [                    ]
>
> Fax: [_____-_____-_____]
> Address:   [_____]
>           [_____]
>           [_____]

[Signature Page to Indemnification Agreement]

84718374

KAT_0069059

CONFIDENTIAL

R116062

KATTEN
DRAFT 8/20/13

## CONSULTING AGREEMENT AND RELEASE

THIS AGREEMENT ("Agreement") is made as of _____, 2013 between Retrophin, Inc., a Delaware corporation ("Company"), and Alan Geller, an individual ("Consultant"). The Company and Consultant are at times referred to collectively as the "Parties" or as "Party" in this Agreement. The Parties, intending to be mutually bound, hereby agree as follows:

1. <u>Description of Services.</u> Consultant will serve as an advisor to the Company and provide consulting services (the "Services") on strategic and corporate governance matters to the management of the Company. Consultant shall be permitted to undertake other employment or activities provided that such employment and activities are not in violation of the terms of this Agreement or compete with the business or activities of the Company.

2. <u>Compensation.</u>

(a) In exchange for the Services, the Company shall issue to Consultant an aggregate of 300,000 shares (the "Shares") of common stock, par value $0.0001 per share (the "Common Stock"), of the Company and such Shares shall be payable and issued as follows: (i) 100,000 shares of Common Stock will be issued on the date hereof; (ii) 50,000 shares of Common Stock will be issued on September 30, 2013; (iii) 50,000 shares of Common Stock will; be issued on December 31, 2013; (iv) 50,000 shares of Common Stock will be issued on March 31, 2014 and (v) 50,000 shares of Common Stock will be issued on June 30, 2014.

(b) In addition to the Shares to be paid to Consultant pursuant to Section 2(a), the Company shall issue and deliver to Consultant 31,500 shares (the "Bonus Shares") of Common Stock following the execution of this Agreement.

3. <u>Term.</u> This initial term under this Agreement shall be for a the period beginning on the date of this Agreement (the "Effective Date") and ending on June 30, 2014. The Company shall have the sole option to extend this Agreement for successive one-year periods if it provides written notice to Consultant prior to June 30, 2014.

4. <u>Representation and Warranty.</u>

(a) Consultant represents and warrants to Company that:

(i) Services provided under this Agreement will be performed in a diligent and professional manner.

(ii) Consultant has full power to enter into and fully perform this Agreement without conflict with any other agreement or obligation. To the knowledge of Consultant, no service furnished under this Agreement will infringe upon or violate any rights of any third person, including intellectual property rights.

(iii) Consultant has no employees or subcontractors.

(iv) This Agreement is a valid and legally binding obligation of Consultant.

84712819

1

KAT_0069030

CONFIDENTIAL

R116063

(v)     Consultant has not been debarred pursuant to the Federal Food, Drug and Cosmetic Act.  The Consultant will not use, or work with, in any capacity the services of any individual, corporation, partnership or association which has been debarred under 21 U.S.C. 335a (a) or (b) or disqualified as a clinical investigator under the provisions of 21 C.F.R. 312.70. In the event Consultant becomes aware of the debarment or disqualification of any such individual, corporation, partnership or association Consultant shall promptly notify Company.

(vi)     Consultant is not under any legal obligation, including any obligation of confidentiality or non-competition, which prevents the Consultant from executing or fully performing this Agreement, or which would render such execution or performance a breach of contract with any third party.

(vii)     The Shares and the Bonus Shares are being acquired solely for investment for Consultant's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof.

(viii)     Consultant has no present intention of selling, granting a participation in, or otherwise distributing the Shares or the Bonus Shares.

(ix)     Consultant understands that the Shares and the Bonus Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act") by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Consultant's representations as expressed herein.

(x)     Consultant understands that the Shares and the Bonus Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Consultant must hold the Shares and the Bonus Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.

(xi)     Consultant is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(b)     The Company represents, warrants and covenants that:

(i)     The Company has the requisite corporate power and authority to enter into and to consummate the transactions set forth in this Agreement.

(ii)     The Shares and the Bonus Shares are duly authorized and, when issued, will be duly and validly issued, fully paid and non-assessable, free and clear of all liens imposed by the Company other than restrictions on transfer.

(iii)     The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware, and has the requisite corporate power and authority to own its properties and to carry on its business in all material respects as now being conducted.

(iv)     This Agreement has been duly executed and delivered by the Company and constitutes a legal, valid and binding obligation of the Company enforceable in accordance with its terms subject to bankruptcy, insolvency, reorganization or similar laws of general applicability affecting the rights and remedies of creditors and to general equity principles.

5.     Confidentiality.  Consultant acknowledges that this Agreement creates a confidential relationship between Consultant and Company that is the basis on which Company will allow

84712819

BA_0059770

CONFIDENTIAL

KAT_0069031

R116064

Consultant to have access to Company's commercially valuable, proprietary, and confidential information.  Consultant will hold such information in strict confidence and will not disclose such information to any third party or use such information in any way except as provided for in this Agreement or with Company's prior consent.  The confidentiality obligation in this paragraph 5 will survive for three years from the termination of this Agreement.

The confidentiality obligations in this paragraph 5 do not apply to information that: (i) was in the public domain at the time it was disclosed to Consultant, or later becomes part of the public domain other than through Consultant's disclosure of that information; (ii) becomes known to Consultant without restriction from a source other than Company, provided that such source is not known by Consultant after due inquiry to be bound by a confidentiality agreement with the Company or by contractual, legal or fiduciary obligations; (iii) must be disclosed pursuant to an order or requirement of a court, administrative agency or other governmental body, provided that, if permitted, Consultant will give Company prompt notice of any such order or requirement or (iv) is or was independently developed by Consultant without reliance on the information disclosed hereunder.

6.      Independent Contractor Status.  Services performed by Consultant for Company under this Agreement will be in Consultant's capacity as an independent contractor and not as agent or representative of Company.  Consultant is not authorized to enter into any contract or commitment on behalf of Company.  The Consultant shall not make any representation, warranty or guaranty on behalf of Company in the performance of the services. As an independent contractor, the Consultant agrees to comply with all applicable tax reporting and/or payment obligations arising from any payments made to Consultant or on Consultant's behalf.  Company will provide the Consultant with Internal Revenue Form 1099 as required. Consultant will assume all responsibility for payment of taxes or other amounts which may be due as the result of payments made by Company under this Agreement.

7.      Indemnification.

        (a)      During the Term and thereafter, Consultant shall indemnify and hold Company and its officers, agents, members, directors and employees harmless against all claims, losses, expenses (including reasonable attorney's fees) and injuries to person or property (including death) resulting in any way from any negligence or misconduct on the part of Consultant in performance of the Services under this Agreement, or any breach of Consultant's warranties set forth in Section 7 of this Agreement or alleged violation of the rights of others in and to any trade secret, know-how or other confidential information by reason of Company's receipt or use of the Consultant's Services, or otherwise in connection therewith; provided that such claims for losses, expenses or injuries did not result from the gross negligence or willful misconduct of the Company.

        (b)      During the Term and thereafter, Company shall indemnify and hold Consultant and its agents and employees harmless against all claims, losses, expenses (including reasonable attorney's fees) and injuries to person or property (including death) resulting in any way from any litigations or claims asserted by third parties against the Consultant due to the Services under

3

84712819

BA_0059771

CONFIDENTIAL

KAT_0069032

R116065

this Agreement; provided that such claims for losses, expenses or injuries did not result from the negligence or misconduct of Consultant.

8.    Non-Disparagement/Media.

    (a)    Consultant agrees not to make, publish, or communicate to any person or entity, any Disparaging remarks, comments, writings, or statements concerning the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents. "Disparaging" remarks, comments, writings, and/or statements are those that impugn, criticize, or denigrate (a) the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents and/or (b) the character, honesty, integrity, morality, business acumen, or abilities of the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents.

    (b)    Consultant further agrees that it will not make any statement whatsoever to the press or media (including but not limited to any reporter, national, regional, or local newspaper, magazine, internet blog or site, news organization, or radio or television station) any matter related to the Company, the Services, or any of the Company's affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents. If at any time Consultant receives a request for any statement or information from the press or other media, the Executive will direct that request to the Chief Executive Officer of the Company and will say nothing further.

9.    Company Property.  All correspondence, records, documents, software, promotional materials, and other Company property, including all copies, which come into Consultant's possession by, through or in the course of his employment, regardless of the source and whether created by Consultant, are the sole and exclusive property of the Company, and immediately upon the termination of this Agreement, or any time at the Company's reasonable request, Consultant shall return to the Company all such property of the Company.

10.    Release.   Based upon the mutual promises contained herein and other good and valuable consideration, Consultant, on his behalf and on behalf of all of his heirs, successors, assigns, agents, legal representatives and personal representatives (collectively, the "Releasor Parties"), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges Martin  Shkreli, the Company MSMB CAPITAL MANAGEMENT, LP, a Delaware limited partnership, MSMB CAPITAL MANAGEMENT LLC, a Delaware limited liability company, MSMB Healthcare LP, a Delaware limited partnership, MSMB Healthcare Investors LLC, a Delaware limited liability company, MSMB Healthcare Management LLC, and each of its or their respective officers, directors, shareholders, partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or chargeable with responsibility or liability (collectively, the "Releasees"), of any and all claims, obligations, liabilities, promises, agreements, controversies, damages,

84712819

4

KAT_0069033

CONFIDENTIAL

R116066

KATTEN
DRAFT 8/20/13

actions, causes of action, suits, judgments, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature (collectively, "Claims"), including all costs, expenses and attorneys' fees related thereto that Consultant now has, or which he may have against the Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses. The Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Section 10 and this Agreement. Consultant, on behalf of himself and the Releasor Parties, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims.

11.     Miscellaneous.  The Services to be provided by Consultant hereunder are of a personal nature and this Agreement will not be assigned by Consultant or Company without the written consent of the other party. This Agreement, including all attachments hereto, is the entire Agreement between the parties regarding the subject matter hereof, superseding all prior agreements, and cannot be amended or modified except in writing signed by both parties.

Given the nature of the obligations set forth in Sections 4, 5, 8 and 10 of this Agreement, Consultant acknowledges and agrees that Company may be irreparably damaged by Consultant's alleged breach or violation of such sections. Without prejudice to the rights and remedies otherwise available to Company, it shall be entitled, without the requirement of a posting of a bond or other security to seek equitable relief, including an injunction or specific performance, in the event of any breach of the provisions of Sections 4, 5, 8 or 10 of this Agreement.

This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof. Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS. Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party. Each Party shall bear its own attorneys fees and expenses. The Parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief as in the preceding paragraph of this Section 11. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE OR IF THE PARTIES ARE SEEKING INJUNCTIVE OR EQUITABLE RELIEF AS PROVIDED ABOVE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii)

84712819

KAT_0069034

CONFIDENTIAL

R116067

KATTEN
DRAFT 8/20/13

SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION.  Each party irrevocably and unconditionally waives any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the courts referred to in this Section 11.

*[Signature Page to Follow]*

84712819

6

KAT_0069035

BA_0059774

CONFIDENTIAL                                                                                                  R116068

KATTEN
DRAFT 8/20/13

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first set forth above.

RETROPHIN, INC.


By: _____
    Name:
    Title:


Consultant



_____
Alan Geller

7

84712819

KAT_0069036

BA_0059775

CONFIDENTIAL

R116069

**RETROPHIN, INC**

**TELEPHONIC MEETING OF THE BOARD OF DIRECTORS**

**AGENDA**

**MONDAY, SEPTEMBER 9, 2013**

**5:30 P.M. New York Time**

| Agenda Item | Dial-in:  917-962-0650 / Conference Code: 877380 | Exhibit |
|---|---|---|
| 1. | Call meeting to order | |
| 2. | Review and approve amendments to the 2012 10K and the 10Q for the quarter ended March 31, 2013 | A & B |
| 3. | Review Marcum LLP audit communication letter for June 30, 2013 quarterly review | C |
| 4. | Review and approval of 10Q for the quarter ended June 30, 2013 | D |
| 5. | Review and approval of stock option grants to new employees | E |
| 6. | Discuss appointment of Cornelius E. Golding and Dr. Jeff Paley's appointment to the Board | |
| 7. | Approval of Compensation Advisory Partners Board compensation Proposal and review of initial analysis | F |
| 8. | Review and approve Retrophin Insider Trading Policy and Code of Business Conduct and Ethics | G & H |
| 9. | Approve retaining Al Geller Ken Banta as Consultants | I & J |
| 10. | Review and approve Indemnification Agreement for Directors and Officers | K |
| 11. | Discuss status of Filing of S1 | |
| 12. | Management update | |
| 13. | Other business | |
| 14. | Adjournment | |

KAT_0068997

BA_0059776

CONFIDENTIAL

R116070

**Retrophin, Inc.**
**Employee Stock Option Grant Proposal**
**September 9 2013**

| Employee | Title | Hire Date | Proposed Option Grant | Vesting Terms | Strike Price |
|---|---|---|---|---|---|
| *Michael Harrison* | Controller | 1-Jul-13 | 15,000 | Quarterly over three years from Grant Date | 9/9/2013 Closing Price |
| *Steve Eby* | VP, Global Strategy & Program Management | 16-Aug-13 | 75,000 | Quarterly over three years from Grant Date | 9/9/2013 Closing Price |
| *Christine Giordano* | Executive Assistant to Martin Shkreli | 19-Aug-13 | 15,000 | Quarterly over three years from Grant Date | 9/9/2013 Closing Price |

**Retrophin, Inc.**

**Policy on Insider Trading**

This Insider Trading Policy provides the standards of Retrophin, Inc. (the "**Company**") on trading and causing the trading of the Company's securities or securities of other publicly-traded companies while in possession of confidential information. This policy is divided into two parts: the first part prohibits trading in certain circumstances and applies to all directors, officers, employees, temporary employees, contractors and consultants of the Company and the second part imposes special additional trading restrictions and applies to all (i) directors of the Company, (ii) executive officers of the Company and (iii) the employees listed on Appendix A (collectively, "**Covered Persons**").

One of the principal purposes of the federal securities laws is to prohibit so-called "insider trading." Simply stated, insider trading occurs when a person uses material non-public information obtained through involvement with the Company to make decisions to purchase, sell, give away or otherwise trade the Company's securities or to provide that information to others outside the Company. The prohibitions against insider trading apply to trades, tips and recommendations by virtually any person, including all persons associated with the Company, if the information involved is "material" and "non-public." These terms are defined in this Policy under Part I, Section 3 below. The prohibitions would apply to any director, officer or employee who buys or sells Company stock on the basis of material non-public information that he or she obtained about the Company, its customers, suppliers, or other companies with which the Company has contractual relationships or may be negotiating transactions.

**PART I**

**1. Applicability**

This Policy applies to all transactions in the Company's securities, including common stock, options and any other securities that the Company may issue, such as preferred stock, notes, bonds and convertible securities, as well as to derivative securities relating to any of the Company's securities, whether or not issued by the Company.

KAT_0069001

CONFIDENTIAL

R116072

This Policy applies to all ~~employees of the Company, all~~**directors,** officers ~~of the Company and all members of the Company's board of directors. This Policy also applies to all,~~ **employees, temporary employees, contractors and** consultants of the Company.

## 2. General Policy; No Trading or Causing Trading While in Possession of Material Non-public Information

**(a).** No director, officer, employee**, temporary employee, contractor** or consultant **of the Company** may purchase or sell any Company security, whether or not issued by the Company, while in possession of material non-public information about the Company. (The terms "material" and "non-public" are defined in Part I, Section 3(a) and (b) below.)

**(b).** No director, officer, employee**, temporary employee, contractor** or consultant **of the Company** who knows of any material non-public information about the Company may communicate that information to any other person, including family and friends.

**(c).** In addition, no director, officer, employee**, temporary employee, contractor** or consultant **of the Company** may purchase or sell any security of any other company, whether or not issued by the Company, while in possession of material non-public information about that company that was obtained in the course of his or her involvement with the Company. No director, officer, employee**, temporary employee, contractor** or consultant **of the Company** who knows of any such material non-public information may communicate that information to any other person, including family and friends.

**(d).** For compliance purposes, you should never trade, tip or recommend securities (or otherwise cause the purchase or sale of securities) while in possession of information that you have reason to believe is material and non-public unless you first consult with, and obtain the advance approval of, the Compliance Officer (which is defined in Part I, Section 3(c) below).

**(e).** Covered Persons must "pre-clear" all trading in securities of the Company in accordance with the procedures set forth in Part II, Section 3 below.

## 3. Definitions

**(a) Materiality.** Insider trading restrictions come into play only if the information you possess is "material." Materiality, however, involves a relatively low threshold. Information is generally regarded as "material" if it has market significance, that is, if its public dissemination is likely to affect the market price of securities, or if it otherwise is information that a reasonable investor would want to know before making an investment decision.

BA_0059779

KAT_0069002

CONFIDENTIAL

R116073

Information dealing with the following subjects is reasonably likely to be found material in particular situations:

(i) significant changes in the Company's prospects;

(ii) significant write-downs in assets or increases in reserves;

(iii) developments regarding significant litigation or government agency investigations;

(iv) liquidity problems;

(v) changes in earnings estimates or unusual gains or losses in major operations;

(vi) major changes in management;

(vii) changes in dividends;

(viii) extraordinary borrowings;

(ix) award or loss of a significant contract;

(x) changes in debt ratings;

(xi) proposals, plans or agreements, even if preliminary in nature, involving mergers, acquisitions, divestitures, recapitalizations, strategic alliances, licensing arrangements, or purchases or sales of substantial assets;

(xii) public offerings;

(xiii) financial results;

(xiv) new product announcements or policies of a significant nature;

(xv) stock splits;

(xvi) positive or negative developments in outstanding litigation;

(xvii) threatened litigation; and

KAT_0069003

CONFIDENTIAL

R116074

(xviii) pending statistical reports (such as, consumer price index, money supply and retail figures, or interest rate developments).

Material information is not limited to historical facts but may also include projections and forecasts. With respect to a future event, such as a merger, acquisition or introduction of a new product, the point at which negotiations or product development are determined to be material is determined by balancing the probability that the event will occur against the magnitude of the effect the event would have on a company's operations or stock price should it occur. Thus, information concerning an event that would have a large effect on stock price, such as a merger, may be material even if the possibility that the event will occur is relatively small. When in doubt about whether particular non-public information is material, presume it is material. **If you are unsure whether information is material, you should consult the Compliance Officer before making any decision to disclose such information (other than to persons who need to know it) or to trade in or recommend securities to which that information relates.**

**(b) Non-public Information.** Insider trading prohibitions come into play only when you possess information that is material and "non-public." The fact that information has been disclosed to a few members of the public does not make it public for insider trading purposes. To be "public" the information must have been disseminated in a manner designed to reach investors generally, and the investors must be given the opportunity to absorb the information. Even after public disclosure of information about the Company, you must wait until the close of business on the second trading day after the information was publicly disclosed before you can treat the information as public.

Non-public information may include:

(i) information available to a select group of analysts or brokers or institutional investors;

(ii) undisclosed facts that are the subject of rumors, even if the rumors are widely circulated; and

(iii) information that has been entrusted to the Company on a confidential basis until a public announcement of the information has been made and enough time has elapsed for the market to respond to a public announcement of the information (normally two or three days).

**As with questions of materiality, if you are not sure whether information is considered public, you should either consult with the Compliance Officer or assume that the information is "non-public" and treat it as confidential.**

KAT_0069004

BA_0059781

CONFIDENTIAL                                                                                     R116075

(c) **Compliance Officer.** The Company has appointed the Chief Financial Officer as the Compliance Officer for this Policy. The duties of the Compliance Officer include, but are not limited to, the following:

(i) assisting with implementation of this Policy;

(ii) circulating this Policy to all employees and ensuring that this Policy is amended as necessary to remain up-to-date with insider trading laws;

(iii) pre-clearing all trading in securities of the Company by Covered Persons in accordance with the procedures set forth in Part II, Section 3 below; and

(iv) providing approval of any transactions under Part II, Section 4 below.

(d) **Post-Termination Transactions.** The Policy continues to apply to transactions in the Company's securities even after a director, officer, employee, **temporary employee, contractor** or consultant has ~~terminated the~~**had its** services ~~of~~**to** the Company**, terminated**. If such a person is in possession of material non-public information, such person may not trade in the Company's securities until that information has become public or is no longer material.

**4. Violations of Insider Trading Laws**

Penalties for trading on or communicating material non-public information can be severe, both for individuals involved in such unlawful conduct and their employers and supervisors, and may include jail terms, criminal fines, civil penalties and civil enforcement injunctions. Given the severity of the potential penalties, compliance with this Policy is absolutely mandatory.

(a) **Legal Penalties.** A person who violates insider trading laws by engaging in transactions in a company's securities when he or she has material non-public information can be sentenced to a substantial jail term and required to pay a penalty of several times the amount of profits gained or losses avoided.

In addition, a person who tips others may also be liable for transactions by the tippees to whom he or she has disclosed material non-public information. Tippers can be subject to the same penalties and sanctions as the tippees, and the SEC has imposed large penalties even when the tipper did not profit from the transaction.

The SEC can also seek substantial penalties from any person who, at the time of an insider trading violation, "directly or indirectly controlled the person who committed

5

KAT_0069005

CONFIDENTIAL

R116076

such violation," which would apply to the Company and/or management and supervisory personnel. These control persons may be held liable for up to the greater of $1 million or three times the amount of the profits gained or losses avoided. Even for violations that result in a small or no profit, the SEC can seek a minimum of $1 million from a company and/or management and supervisory personnel as control persons.

**(b)  Company-imposed Penalties.** Employees who violate this Policy may be subject to disciplinary action by the Company, including dismissal for cause. Any exceptions to the Policy, if permitted, may only be granted by the Compliance Officer and must be provided before any activity contrary to the above requirements takes place.

## PART II

### 1. Blackout Periods

All Covered Persons are prohibited from trading in the Company's securities during blackout periods.

**(a)  Quarterly Blackout Periods.** Trading in the Company's securities is prohibited during the period beginning at the close of the market on the fourteenth (14th) day preceding the end of each fiscal quarter and ending at the close of business on the second (2nd) day following the date the Company's financial results are publicly disclosed and Form 10-Q or Form 10-K for such period is filed. During these periods, Covered Persons generally possess or are presumed to possess material non-public information about the Company's financial results.

**(b)  Other Blackout Periods.** From time to time, other types of material non-public information regarding the Company (such as negotiation of mergers, acquisitions or dispositions or new product developments) may be pending and not be publicly disclosed. While such material non-public information is pending, the Company may impose special blackout periods during which Covered Persons are prohibited from trading in the Company's securities. If the Company imposes a special blackout period, it will notify the Covered Persons affected.

**(c)  Exception.** These trading restrictions do not apply to transactions under a pre-existing written plan, contract, instruction, or arrangement under Rule 10b5-1 (an **"Approved 10b5-1 Plan"**) that:

(i) has been reviewed and approved at least one month in advance of any trades thereunder by the Compliance Officer (or, if revised or amended, such revisions or

6

KAT_0069006

CONFIDENTIAL

R116077

amendments have been reviewed and approved by the Compliance Officer at least one month in advance of any subsequent trades);

(ii) was entered into in good faith by the Covered Person at a time when the Covered Person was not in possession of material non-public information about the Company; and

(iii) gives a third party the discretionary authority to execute such purchases and sales, outside the control of the Covered Person, so long as such third party does not possess any material non-public information about the Company; or explicitly specifies the security or securities to be purchased or sold, the number of shares, the prices and/or dates of transactions, or other formula(s) describing such transactions.

## 2. Trading Window

Covered Persons are permitted to trade in the Company's securities when no blackout period is in effect. Generally this means that Covered Persons can trade during the period beginning on the third (3rd) day following the date the Company's financial results are publicly disclosed and Form 10-Q or Form 10-K for such period is filed and ending on the fifteenth (15th) day preceding the end of the next fiscal quarter. However, even during this trading window, a Covered Person who is in possession of any material non-public information should not trade in the Company's securities until the information has been made publicly available or is no longer material. In addition, the Company may close this trading window if a special blackout period under Part II, Section 1(b) above is imposed and will re-open the trading window once the special blackout period has ended.

## 3. Pre-clearance of Securities Transactions

(a). Because Covered Persons are likely to obtain material non-public information on a regular basis, the Company requires all such persons to refrain from trading, even during a trading window under Part II, Section 2 above, without first pre-clearing all transactions in the Company's securities.

(b). Subject to the exemption in subsection (d) below, no Covered Person may, directly or indirectly, purchase or sell (or otherwise make any transfer, gift, pledge or loan of) any Company security at any time without first obtaining prior approval from the Compliance Officer. These procedures also apply to transactions by such person's spouse, other persons living in such person's household and minor children and to transactions by entities over which such person exercises control.

(c). The Compliance Officer shall record the date each request is received and the date and time each request is approved or disapproved. Unless revoked, a grant of permission will normally remain valid until the close of trading two business days

KAT_0069007

CONFIDENTIAL

R116078

following the day on which it was granted. If the transaction does not occur during the two-day period, pre-clearance of the transaction must be re-requested.

**(d).** Pre-clearance is not required for purchases and sales of securities under an Approved 10b5-1 Plan. With respect to any purchase or sale under an Approved 10b5-1 Plan, the third party effecting transactions on behalf of the Covered Person should be instructed to send duplicate confirmations of all such transactions to the Compliance Officer.

## 4. Prohibited Transactions

**(a).** Directors and executive officers of the Company are prohibited from trading in the Company's equity securities during a blackout period imposed under an "individual account" retirement or pension plan of the Company, during which at least 50% of the plan participants are unable to purchase, sell or otherwise acquire or transfer an interest in equity securities of the Company, due to a temporary suspension of trading by the Company or the plan fiduciary.

**(b).** A Covered Person, including such person's spouse, other persons living in such person's household and minor children and entities over which such person exercises control, is prohibited from engaging in the following transactions in the Company's securities unless advance approval is obtained from the Compliance Officer:

(i) Short-term trading. Covered Persons who purchase Company securities may not sell any Company securities of the same class for at least six months after the purchase;

(ii) Short sales. Covered Persons may not sell the Company's securities short;

(iii) Options trading. Covered Persons may not buy or sell puts or calls or other derivative securities on the Company's securities;

(iv) Trading on margin. Covered Persons may not hold Company securities in a margin account or pledge Company securities as collateral for a loan; and

(v) Hedging. Covered Persons may not enter into hedging or monetization transactions or similar arrangements with respect to Company securities.

## 5. Acknowledgment and Certification

All Covered Persons are required to sign the attached acknowledgment and certification.

8

KAT_0069008

CONFIDENTIAL

R116079

## ACKNOWLEDGMENT AND CERTIFICATION

The undersigned does hereby acknowledge receipt of the Company's Insider Trading Policy. The undersigned has read and understands (or has had explained) such Policy and agrees to be governed by such Policy at all times in connection with the purchase and sale of securities and the confidentiality of non-public information.

_____
(Signature)

_____
(Please print name)

Date: _____

9

KAT_0069009

CONFIDENTIAL

R116080

## APPENDIX A

[INSERT LIST OF EMPLOYEES TO WHOM THE INSIDER TRADING
POLICY IS APPLICABLE]

10

KAT_0069010

CONFIDENTIAL

R116081

Document comparison by Workshare Compare on Monday, September 09, 2013 11:22:35 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://LOCAL/US/84724381/2 |
| Description | #84724381v2<US> - Retrophin Insider Trading Policy |
| Document 2 ID | interwovenSite://LOCAL/US/84724381/3 |
| Description | #84724381v3<US> - Retrophin Insider Trading Policy |
| Rendering set | Evan's Style |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 15 |
| Deletions | 4 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 19 |

KAT_0069011

CONFIDENTIAL

R116082

<u>CONSULTING AGREEMENT</u>

THIS AGREEMENT ("Agreement") is made as of _____, 2013 between Retrophin, Inc., a Delaware corporation ("Company"), and Ken Banta, an individual ("Consultant"). The parties, intending to be mutually bound, hereby agree as follows:

1.      <u>Description of Services.</u>

(a)      Consultant will serve as an advisor to the Company and provide consulting services (the "Services") on strategic and corporate governance matters to the management of the Company and other matters at the request of the management of the Company. For each project, Company and Consultant will agree upon the scope of services, deliverables and timetable.

(b)      Consultant agrees to observe and comply with the rules, policies and procedures of the Company as adopted by the Company from time to time. Consultant may, so long as such activities do not interfere with his duties and responsibilities hereunder, invest, participate or engage in (for Consultant's own account or for the account of others), or may possess an interest in, other financial ventures and investment and professional activities of any kind or description, independently or with others, including (i) charities and passive investments, (ii) investment in, or the acquisition or disposition of, securities or real estate, (iii) investment and management counseling, (iv) the provision of brokerage and investment banking services and (v) serving as officers, directors, representatives or agents of any entity, partners of any partnership, or trustees of any trust (and in each case may receive fees, commissions, remuneration, profits and reimbursement of expenses in connection with such ventures and activities), in each case provided that such Person does not expressly or implicitly represent that he is acting for the Company.

(c)      Consultant will perform the services described herein from the Company's principal place of business and Consultant shall travel to other locations as necessary for the performance of Consultant's duties and responsibilities hereunder.

2.      <u>Compensation.</u>

(a)      In exchange for the Services, the Company shall issue to Consultant an aggregate amount of 200,000 shares (the "Shares") of common stock, par value $0.0001 per share (the "Common Stock"), of the Company, which shall be payable and issued as follows: (i) 50,000 shares of Common Stock will be issued on the date hereof; (ii) 50,000 shares of Common Stock will be issued on December 31, 2013; (iii) 50,000 shares of Common Stock will be issued on March 30, 2014 and (iv) 50,000 shares of Common Stock will be issued on June 30, 2014. In addition, the Consultant shall receive a fee at a rate of Fifty Thousand Dollars ($50,000) per quarter, which shall be paid in accordance with the customary payroll practices of the Company.

(b)      <u>Expenses.</u> During the Term, the Company shall pay or reimburse Consultant for all reasonable travel and other business expenses actually incurred by him in the performance of

1

100025509

KAT_0069037

CONFIDENTIAL

R116083

KATTEN
DRAFT 9/4/13

his duties to the Company, in accordance with the Company's expense reimbursement policy in effect from time to time.

3.    Term.  This initial term under this Agreement (the "Initial Term") shall be for the period beginning on the date of this Agreement (the "Effective Date") and ending on the first anniversary thereof.  The term hereunder shall automatically be extended for successive one-year periods (collectively with the Initial Term, the "Term") unless either (a) the Consultant gives notice of non-extension to the Company no later than ninety (90) days prior to the expiration of the then applicable Term and subject to earlier termination as provided in Section 5, (b) this Agreement is terminated by the Company on thirty (30) days written notice to the Consultant or (c) the Company delivers notice to Consultant no later than thirty (30) days prior to the expiration of the then applicable Term that is does not elect to continue the Agreement. During the Term and following the expiration of the Initial Term, the Company shall make additional payments that are consistent with those set forth in Section 2(a).

4.    Representation and Warranty.

    (a)    Consultant represents and warrants to Company that:

        (i)    Services provided under this Agreement will be performed in a diligent and professional manner.

        (ii)    Consultant has full power to enter into and fully perform this Agreement without conflict with any other agreement or obligation.  No service furnished under this Agreement will infringe upon or violate any rights of any third person, including intellectual property rights.

        (iii)    Consultant has no employees or subcontractors.

        (iv)    This Agreement is a valid and legally binding obligation of Consultant.

        (v)    Consultant has not been debarred pursuant to the Federal Food, Drug and Cosmetic Act.  The Consultant will not use, or work with, in any capacity the services of any individual, corporation, partnership or association which has been debarred under 21 U.S.C. 335a (a) or (b) or disqualified as a clinical investigator under the provisions of 21 C.F.R. 312.70. In the event Consultant becomes aware of the debarment or disqualification of any such individual, corporation, partnership or association Consultant shall promptly notify Company.

        (vi)    Consultant is not under any legal obligation, including any obligation of confidentiality or non-competition, which prevents the Consultant from executing or fully performing this Agreement, or which would render such execution or performance a breach of contract with any third party.

        (vii)    The Shares are being acquired solely for investment for Consultant's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof.

        (viii)    Consultant has no present intention of selling, granting a participation in, or otherwise distributing the Shares.

        (ix)    Consultant understands that the Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act") by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona

2

KAT_0069038

BA_0059790

CONFIDENTIAL                                                                                      R116084

KATTEN
DRAFT 9/4/13

fide nature of the investment intent and the accuracy of Consultant's representations as expressed herein.

(x)     Consultant understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Consultant must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.

(xi)     Consultant is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(b)     The Company represents, warrants and covenants to the Consultant that:

(i)     The Company has the requisite corporate power and authority to enter into and to consummate the transactions set forth in this Agreement.

(ii)     The Shares are duly authorized and, when issued, will be duly and validly issued, fully paid and non-assessable, free and clear of all liens imposed by the Company other than restrictions on transfer.

5.     <u>Inventions/Work For Hire.</u>

(a) Consultant agrees to disclose to the Company all Inventions (as defined below) made, conceived, expressed, developed, or actually or constructively reduced to practice by the Consultant, whether solely or jointly with others, during its employment with the Company and in any way relating to the services, business, opportunities, or pursuits of the Company. "Inventions" shall mean all business plans, works of authorship, software (including, without limitation, source code(s)), databases, computer programs, designs, technologies, products, contraptions, ideas, discoveries, inventions, potential marketing and sales relationships, copyrightable expression(s), research, plans for products or services, marketing plans, know-how, trade secrets, data, developments, discoveries, systems, strategies and methodologies, improvements, modifications, technology, and algorithms, whether or not any such Invention is subject to patent or copyright protection.

(b)     The Inventions shall be the exclusive property of the Company. The Consultant acknowledges that all Inventions shall be deemed "work made for hire" as defined under the U.S. Copyright Act of 1976, and for all other purposes. In the event that any competent authority determines that any such Invention is not a work made for hire, the Executive hereby assign, grant, and transfer to the Company, without any further consideration, all rights, title, interests, and other incidents of ownership, including, without limitation, any copyright, other intellectual property rights, moral rights, all contract and licensing rights, and all claims and causes of action of any kind with respect to such Inventions throughout the world and in perpetuity. The Company shall have the exclusive right to use the Inventions, whether original or derivative, for all purposes, without additional compensation to the Consultant. The Consultant agrees to sign and deliver such further instruments of transfer and ownership of the Inventions as the Company may reasonably request. At the Company's expense, the Consultant will assist the Company in every proper way to perfect the Company's rights in the Inventions and protect the Inventions throughout the world including, without limitation, executing in favor of the Company or any

3

100025509

KAT_0069039

CONFIDENTIAL

R116085

KATTEN
DRAFT 9/4/13

designee(s) of the Company any and all patent, copyright, and other applications and assignments relating to the Inventions. The Consultant agrees not to challenge the validity of the Company's (or its designee's) ownership of the Inventions. Nothing herein shall obligate the Company to use or publish the Inventions.

6.      Protection of Confidential Information.

(a)      For purposes of this Section 6, "Confidential Information" shall mean non-public information concerning the financial data, strategic business plans, product development (or other proprietary product data), projects, customer lists, marketing plans, methodologies, business or vendor relationships, relationships with strategic or business partners, its high speed networks, or equipment, tools or other materials developed for use on such networks, and all information and know-how (whether or not patentable, copyrightable or otherwise able to be registered or protected under laws governing intellectual property) owned, possessed, or used by the Company, any affiliate or any customer, including, without limitation, any formula, method, procedures, composition, project, development, plan, market research, vendor information, customer or client lists or information, contacts at or knowledge of customers or clients, prospective customers and clients, business or strategic partners of the Company, trade secret, process, research, reports, financial data, technical data, test data, know-how, computer program, software, software documentation, source code, hardware design, technology, marketing or business plan, forecast, unpublished financial statement, budget, license, patent applications, contracts, joint ventures, price, cost and personnel data, any trade names, trademarks or slogans and other non-public, proprietary and confidential information of the Company, its affiliates or customers, that, in any case, is not otherwise available to the public (other than by the Consultant's breach of the terms hereof). Consultant agrees (i) that all Confidential Information, whether or not in writing, shall be treated as being confidential and/or proprietary information and is the exclusive property of the Company and (ii) to hold in a fiduciary capacity for the sole benefit of the Company all Confidential Information.

(b)      Confidential Information shall not include information that (i) is or becomes public knowledge through legal means without fault by the Consultant, (ii) is already public knowledge prior to the signing of this Agreement, or (iii) must be disclosed pursuant to applicable law or court order.

(c)      Consultant agrees that he will not at any time, either during the Term of this Agreement or after its termination, disclose to anyone any Confidential Information, or utilize such Confidential Information for his own benefit, or for the benefit of third parties without written approval by the Board. Consultant further agrees that all memoranda, notes, records, data, schematics, sketches, computer programs, prototypes, or written, photographic, magnetic or other documents or tangible objects compiled by him or made available to him during the Term of his employment concerning the business of the Company and/or its clients, including any copies of such materials, shall be the property of the Company and shall be delivered to the Company on the termination of his employment, or at any other time upon request of the Company.

(d)      Consultant also agrees that any breach of the covenants contained in this Section 6 would irreparably injure the Company. Accordingly, Consultant agrees that the Company may,

4

100025509

CONFIDENTIAL

KAT_0069040

R116086

KATTEN
DRAFT 9/4/13

in addition to pursuing any other remedies it may have in law or in equity, cease making any payments or providing any benefits otherwise required by this Agreement and obtain an injunction against Consultant from any court having jurisdiction over the matter restraining any further violation of this Agreement by Consultant.

7.   <u>Independent Contractor Status.</u>  Services performed by Consultant for Company under this Agreement will be in Consultant's capacity as an independent contractor and not as agent or representative of Company.  Consultant is not authorized to enter into any contract or commitment on behalf of Company.  The Consultant shall not make any representation, warranty or guaranty on behalf of Company in the performance of her services. As an independent contractor, the Consultant agrees to comply with all applicable tax reporting and/or payment obligations arising from any payments made to Consultant or on Consultant's behalf.  Company will provide the Consultant with Internal Revenue Form 1099 as required. Consultant will assume all responsibility for payment of taxes or other amounts which may be due as the result of payments made by Company under this Agreement.

8.   <u>Indemnification.</u>  During the Term and thereafter, Consultant shall indemnify and hold Company and its officers, agents, members, directors and employees harmless against all claims, losses, expenses (including reasonable attorney's fees) and injuries to person or property (including death) resulting in any way from any gross negligence or intentional misconduct on the part of Consultant in performance of the Services under this Agreement, or any breach of Consultant's warranties set forth in Section 7 of this Agreement or alleged violation of the rights of others in and to any trade secret, know-how or other confidential information by reason of Company's receipt or use of the Services, or otherwise in connection therewith.

9.   <u>Non-Disparagement/Media.</u>

(a)   Consultant agrees not to make, publish, or communicate to any person or entity, any Disparaging remarks, comments, writings, or statements concerning the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents. "<u>Disparaging</u>" remarks, comments, writings, and/or statements are those that impugn, criticize, or denigrate (a) the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents and/or (b) the character, honesty, integrity, morality, business acumen, or abilities of the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents.

(b)   Consultant further agrees that he will not make any statement whatsoever to the press or media (including but not limited to any reporter, national, regional, or local newspaper, magazine, internet blog or site, news organization, or radio or television station) any matter related to the Company, the Services, or any of the Company's affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents. If at any time Consultant receives a request for any statement or information from the press or other media, the Executive will direct that request to the Chief Executive Officer of the Company and will say nothing further.

5

100025509

KAT_0069041

CONFIDENTIAL                                                                          R116087

KATTEN
DRAFT 9/4/13

10.    <u>Miscellaneous.</u>  The services to be provided by Consultant hereunder are of a personal nature and this Agreement will not be assigned by Consultant or Company without the written consent of the other party.

Given the nature of the obligations set forth in Sections 4, 5, 8 and 9 of this Agreement, Consultant acknowledges and agrees that Company may be irreparably damaged by Consultant's alleged breach or violation of such sections.  Without prejudice to the rights and remedies otherwise available to Company, it shall be entitled, without the requirement of a posting of a bond or other security to seek equitable relief, including an injunction or specific performance, in the event of any breach of the provisions of Sections 4, 5, 8 and 9 of this Agreement.

This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.  Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS.  Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party.  Each Party shall bear its own attorneys fees and expenses.  The Parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive.  All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief as in the preceding paragraph of this Section 10.  IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE OR IF THE PARTIES ARE SEEKING INJUNCTIVE OR EQUITABLE RELIEF AS PROVIDED ABOVE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION.  Each party irrevocably and unconditionally waives any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the courts referred to in this Section 10.

This Agreement, including all attachments hereto, is the entire Agreement between the parties regarding the subject matter hereof, superseding all prior agreements, and cannot be amended or modified except in writing signed by both parties.

*[Signature Page to Follow]*

6

100025509

KAT_0069042

CONFIDENTIAL

R116088

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first set forth above.

RETROPHIN, INC.


By: _____
    Name:
    Title:


Consultant


_____
Ken Banta

7

100025509

KAT_0069043

BA_0059795

CONFIDENTIAL                                                                    R116089

| | |
|---|---|
| **From:** | Greebel, Evan L. [evan.greebel@kattenlaw.com] |
| **Sent:** | Thursday, February 07, 2013 2:02 PM |
| **To:** | Stephen Aselage; Martin@msmbcapital.com; Steve Richardson |
| **Subject:** | Board Meeting--1 pm est |
| **Attachments:** | RTRX SPA.3.doc; RTRX Warrant.3.doc; RTRX RRA.3.DOC; Retrophin Sabby Signed Term Sheet 1-31-130001.pdf |

Gentlemen, we are confirmed for a board meeting at 1pm est today (Thursday, 2/7/13). Attached are the current draft forms of the Stock Purchase Agreement, the Warrant and the Registration Rights Agreement. Also, for your convenience, I attached another copy of the term sheet that was circulated last week.

Please use the following dial-in number:

Dial-in 1-866-200-9051
Code 951567#

If you have any questions or comments, please call me at 212-940-6383.

Best regards,
Evan

**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)
**From:** Stephen Aselage [mailto:saselage@sbcglobal.net]
**Sent:** Wednesday, February 06, 2013 8:17 PM
**To:** Martin@msmbcapital.com; Greebel, Evan L.; Steve Richardson
**Subject:** Re: Board Meeting

I can do that.

--- On **Wed, 2/6/13, Steve Richardson <sgrichardson2@aol.com>** wrote:

From: Steve Richardson <sgrichardson2@aol.com>
Subject: Re: Board Meeting
To: saselage@sbcglobal.net, Martin@msmbcapital.com, evan.greebel@kattenlaw.com
Date: Wednesday, February 6, 2013, 5:13 PM

Hi Guys, I am at a dinner and cant do tonight.
Respecting the time difference with Steve will 1pm (ET) work tomorrow?
Cheers
Steve

-----Original Message-----
From: Stephen Aselage <saselage@sbcglobal.net>
To: Martin Shkreli (Martin@msmbcapital.com) <Martin@msmbcapital.com>; Steve Richardson

1

GOVERNMENT
EXHIBIT
**303**
15 CR 637 (KAM) (EG)

CONFIDENTIAL

<u>sgrichardson2@aol.com</u>; Evan L.Greebel <<u>evan.greebel@kattenlaw.com</u>>
Sent: Wed, Feb 6, 2013 7:34 pm
Subject: Re: Board Meeting

I'm available for the rest of the night.  If tomorrow, let me know when and I can probably accomodate.  I am 5 hours behind East Coast time.

Steve

--- On **Wed, 2/6/13, Greebel, Evan L. <_evan.greebel@kattenlaw.com_>** wrote:


From: Greebel, Evan L. <<u>evan.greebel@kattenlaw.com</u>>
Subject: Board Meeting
To: "Martin Shkreli (<u>Martin@msmbcapital.com)</u>" <<u>Martin@msmbcapital.com</u>>, "Steve Richardson"
<<u>sgrichardson2@aol.com</u>, "Stephen Aselage" <<u>saselage@sbcglobal.net</u>>
Date: Wednesday, February 6, 2013, 4:28 PM

Guys, are you available tonight or tomorrow for a board meeting to approve the proposed PIPE? If so, what time works for everyone? I will circulate draft documents under separate cover.

Thanks,
Evan


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

========================================================
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue
Service, any tax advice contained herein is not intended or written to be used and cannot be used
by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.
========================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive
use of the individual or entity to whom it is addressed and may contain information that is
proprietary, privileged, confidential and/or exempt from disclosure under applicable law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the original
message without making any copies.
========================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
========================================================

CONFIDENTIAL                                                                                       R023790

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement (this "Agreement") is dated as of February ____, 2013, between Desert Gateway, Inc., a Delaware corporation (the "Company"), and each purchaser identified on the signature pages hereto (each, including its successors and assigns, a "Purchaser" and collectively, the "Purchasers").

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act"), and Rule 506 promulgated thereunder, the Company desires to issue and sell to each Purchaser, and each Purchaser, severally and not jointly, desires to purchase from the Company, securities of the Company as more fully described in this Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and each Purchaser agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1      Definitions. In addition to the terms defined elsewhere in this Agreement, for all purposes of this Agreement, the following terms have the meanings set forth in this Section 1.1:

"Acquiring Person" shall have the meaning ascribed to such term in Section 4.5.

"Action" shall have the meaning ascribed to such term in Section 3.1(j).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 405 under the Securities Act.

"BHCA" shall have the meaning ascribed to such term in Section 3.1(ll).

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Closing" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

"Closing Date" means the Trading Day on which all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Purchasers' obligations to pay the Subscription Amount and (ii) the Company's obligations to deliver the Securities, in each case, have been

1

                                                                                                              R023791

satisfied or waived, but in no event later than the third Trading Day following the date hereof.

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" means the common stock of the Company, par value $0.0001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

"Common Stock Equivalents" means any securities of the Company or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, right, option, warrant or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"Company Counsel" means Katten Muchin Rosenman LLP, with offices located at 575 Madison Avenue, New York, New York 10022.

"Disclosure Schedules" shall have the meaning ascribed to such term in Section 3.1.

"Effective Date" means the earliest of the date that (a) a Registration Statement registering all of the Shares and Warrant Shares issued and issuable hereunder and pursuant to the Warrants has been declared effective by the Commission, (b) all of the Registrable Securities have been sold pursuant to Rule 144 or may be sold pursuant to Rule 144 without the requirement for the Company to be in compliance with the current public information required under Rule 144 and without volume or manner-of-sale restrictions or (c) following the one year anniversary of the Closing Date provided that a holder of Registrable Securities is not an Affiliate of the Company, all of the Registrable Securities may be sold pursuant to an exemption from registration under Section 4(1) of the Securities Act without volume or manner-of-sale restrictions and Company counsel has delivered to such holders a standing written unqualified opinion that resales may then be made by such holders of the Registrable Securities pursuant to such exemption which opinion shall be in form and substance reasonably acceptable to such holders.

"EGS" means Ellenoff Grossman & Schole LLP, with offices located at 150 East 42nd Street, New York, New York 10017.

"Evaluation Date" shall have the meaning ascribed to such term in Section 3.1(r).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Exempt Issuance" means the issuance of (a) shares of Common Stock or Common Stock Equivalents to employees, officers, directors or consultants of the Company pursuant to any plan or similar arrangement duly adopted by a majority of the non-employee members of the Board of Directors or a majority of the members of a committee of non-employee directors established for such purpose, (b) securities as a

2

dividend or distribution to the stockholders of the Company, including but not limited to stock splits, (c) securities in connection with any settlement approved by the Board of Directors, (d) securities in connection with a strategic partnership, (e) securities in lieu of cash fees for services rendered or provided, (f) securities upon the exercise or exchange of or conversion of any Securities issued hereunder and/or Common Stock Equivalents issued and outstanding on the date of this Agreement, provided that such securities have not been amended since the date of this Agreement to increase the number of such securities or to decrease the exercise price, exchange price or conversion price of such securities and (g) securities issued pursuant to acquisitions or strategic transactions approved by a majority of the disinterested directors of the Company, provided that for purposes of this clause (g), any such issuance shall only be to a Person (or to the equityholders of a Person) which is, itself or through its subsidiaries, an operating company or an owner of an asset in a business synergistic with the business of the Company (as determined by a majority of the disinterested directors of the Company in their sole discretion), but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities.  Notwithstanding the foregoing, issuances pursuant to clauses (b) – (e) shall not exceed 100,000 shares of Common Stock (subject to reverse and forward splits, combinations and the like), in the aggregate during any 12 month period.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"FDA" shall have the meaning ascribed to such term in Section 3.1(ii).

"FDCA" shall have the meaning ascribed to such term in Section 3.1(ii).

"Federal Reserve" shall have the meaning ascribed to such term in Section 3.1(ll).

"GAAP" shall have the meaning ascribed to such term in Section 3.1(h).

"Indebtedness" shall have the meaning ascribed to such term in Section 3.1(z).

"Intellectual Property Rights" shall have the meaning ascribed to such term in Section 3.1(o).

"knowledge" or "knowledge of the Company" means the actual knowledge that was, or would reasonably be expected to be, obtained after due inquiry of all officers of the Company.

"Legend Removal Date" shall have the meaning ascribed to such term in Section 4.1(c).

"Liens" means a lien, charge pledge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"Loss(es)" means any out of pocket losses, liabilities, damages, costs or expenses (including, without limitation, interest, penalties and reasonable attorneys' fees and

3

disbursements); provided, however, that "Losses" shall not include consequential, punitive or special damages or lost profits except to the extent payable by the Company in respect of a third party claim.

"Material Adverse Effect" shall have the meaning assigned to such term in Section 3.1(b).

"Material Permits" shall have the meaning ascribed to such term in Section 3.1(m).

"Money Laundering Laws" shall have the meaning ascribed to such term in Section 3.1(mm).

"OFAC" shall have the meaning ascribed to such term in Section 3.1(jj).

"Participation Maximum" shall have the meaning ascribed to such term in Section 4.11(a).

"Per Share Purchase Price" equals $_____[1], subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of this Agreement.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Pharmaceutical Product" shall have the meaning ascribed to such term in Section 3.1(ii).

"Pre-Notice" shall have the meaning ascribed to such term in Section 4.11(b).

"Pro Rata Portion" shall have the meaning ascribed to such term in Section 4.11(e).

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Public Information Failure" shall have the meaning ascribed to such term in Section 4.2(b).

"Public Information Failure Payments" shall have the meaning ascribed to such term in Section 4.2(b).

"Purchaser Party" shall have the meaning ascribed to such term in Section 4.8.

---

[1] 85% of the average of the VWAPS for the 10 Trading Days immediately prior to the date hereof.

4

R023794

"Registration Rights Agreement" means the Registration Rights Agreement, dated the date hereof, among the Company and the Purchasers, in the form of Exhibit A attached hereto.

"Registration Statement" means a registration statement meeting the requirements set forth in the Registration Rights Agreement and covering the resale by the Purchasers of the Shares and the Warrant Shares.

"Required Approvals" shall have the meaning ascribed to such term in Section 3.1(e).

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended or interpreted from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"Rule 424" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended or interpreted from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"SEC Reports" shall have the meaning ascribed to such term in Section 3.1(h).

"Securities" means the Shares, the Warrants and the Warrant Shares.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Shares" means the shares of Common Stock issued or issuable to each Purchaser pursuant to this Agreement.

"Short Sales" means all "short sales" as defined in Rule 200 of Regulation SHO under the Exchange Act (but shall not be deemed to include the location and/or reservation of borrowable shares of Common Stock).

"Subscription Amount" means, as to each Purchaser, the aggregate amount to be paid for Shares and Warrants purchased hereunder as specified below such Purchaser's name on the signature page of this Agreement and next to the heading "Subscription Amount," in United States dollars and in immediately available funds.

"Subsequent Financing" shall have the meaning ascribed to such term in Section 4.11(a).

"Subsequent Financing Notice" shall have the meaning ascribed to such term in Section 4.11(b).

5

R023795

"Subsidiary" means any subsidiary of the Company as set forth on Schedule 3.1(a) and shall, where applicable, also include any direct or indirect subsidiary of the Company formed or acquired after the date hereof.

"Trading Day" means a day on which the principal Trading Market is open for trading.

"Trading Market" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE MKT, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange, the OTC Bulletin Board, the OTCQX, the OTCQB or the "pink sheets" published by Pink OTC Market, Inc. (or any successors to any of the foregoing).

"Transaction Documents" means this Agreement, the Warrants, the Registration Rights Agreement, all exhibits and schedules thereto and hereto and any other documents or agreements executed in connection with the transactions contemplated hereunder.

"Transfer Agent" means Standard Registrar & Transfer Company Inc., the current transfer agent of the Company, with a mailing address of 12528 S 1840 E, Draper, Utah 84020 and a facsimile number of (801) 571-2551, and any successor transfer agent of the Company.

"Variable Rate Transaction" shall have the meaning ascribed to such term in Section 4.12(b).

"VWAP" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time)), (b) if the OTC Bulletin Board is not a Trading Market, the volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the OTC Bulletin Board, (c) if the Common Stock is not then listed or quoted for trading on the OTC Bulletin Board and if prices for the Common Stock are then reported in the "Pink Sheets" published by Pink OTC Markets, Inc. (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported, or (d) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Purchasers of a majority in interest of the Shares then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

"Warrants" means, collectively, the Common Stock purchase warrants delivered to the Purchasers at the Closing in accordance with Section 2.2(a) hereof, which Warrants shall be exercisable immediately and have a term of exercise equal to five years, in the form of Exhibit C attached hereto.

6

R023796

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

## ARTICLE II.
## PURCHASE AND SALE

2.1   Closing.  On the Closing Date, upon the terms and subject to the conditions set forth herein, substantially concurrent with the execution and delivery of this Agreement by the parties hereto, the Company agrees to sell, and the Purchasers, severally and not jointly,  agree to purchase, up to an aggregate of _____ Shares and Warrants to purchase up to an aggregate of _____ Shares, for an aggregate purchase price of $_____.  On or prior to the Closing Date, each Purchaser shall deliver to the Company, via wire transfer or a bank-certified check, in immediately available funds equal to such Purchaser's Subscription Amount as set forth on the signature page hereto executed by such Purchaser, and the Company shall deliver to each Purchaser its respective Shares and a Warrant, as determined pursuant to Section 2.2(a), and the Company and each Purchaser shall deliver the other items set forth in Section 2.2 deliverable at the Closing.  Upon satisfaction of the covenants and conditions set forth in Sections 2.2 and 2.3, the Closing shall occur at the offices of the Company Counsel or such other location as the parties shall mutually agree.

2.2   Deliveries.

(a)      On or prior to the Closing Date, the Company shall deliver or cause to be delivered to each Purchaser the following:

(i)      this Agreement duly executed by the Company;

(ii)      a legal opinion of Company Counsel, substantially in the form of Exhibit B attached hereto;

(iii)      a copy of the irrevocable instructions to the Transfer Agent instructing the Transfer Agent to deliver, on an expedited basis, a certificate evidencing a number of Shares equal to such Purchaser's Subscription Amount divided by the Per Share Purchase Price, registered in the name of such Purchaser;

(iv)      a Warrant registered in the name of such Purchaser to purchase up to a number of shares of Common Stock equal to 50% of such Purchaser's Shares, with an exercise price equal to $_____[2], subject to adjustment therein (such Warrant certificate may be delivered within three Trading Days of the Closing Date); and

(v)      the Registration Rights Agreement duly executed by the Company.

(b)      On or prior to the Closing Date, each Purchaser shall deliver or cause to be delivered to the Company the following:

---

[2] 120% of the Per Share Purchase Price

7

(i)     this Agreement duly executed by such Purchaser;

(ii)     such Purchaser's Subscription Amount by wire transfer to the account specified in writing by the Company; and

(iii)     the Registration Rights Agreement duly executed by such Purchaser.

2.3    <u>Closing Conditions.</u>

(a)     The obligations of the Company hereunder in connection with the Closing are subject to the following conditions being met:

(i)     the accuracy in all material respects on the Closing Date of the representations and warranties of the Purchasers contained herein (unless as of a specific date therein in which case they shall be accurate as of such date);

(ii)     all obligations, covenants and agreements of each Purchaser required to be performed at or prior to the Closing Date shall have been performed; and

(iii)     the delivery by each Purchaser of the items set forth in Section 2.2(b) of this Agreement.

(b) The respective obligations of the Purchasers hereunder in connection with the Closing are subject to the following conditions being met:

(i)     the accuracy in all material respects when made and on the Closing Date of the representations and warranties of the Company contained herein (unless as of a specific date therein);

(ii)     all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing Date shall have been performed;

(iii)     the delivery by the Company of the items set forth in Section 2.2(a) of this Agreement;

(iv)     there shall have been no Material Adverse Effect with respect to the Company since the date hereof; and

(v)     from the date hereof to the Closing Date, trading in the Common Stock shall not have been suspended by the Commission or the Company's principal Trading Market, and, at any time prior to the Closing Date, trading in securities generally as reported by Bloomberg L.P. shall not have been suspended or limited, or minimum prices shall not have been established on securities whose trades are reported by such service, or on any Trading Market, nor shall a banking moratorium have been declared either by the United States or New York State authorities nor shall there have occurred any material outbreak or escalation of

8

hostilities or other national or international calamity of such magnitude in its effect on, or any material adverse change in, any financial market which, in each case, in the reasonable judgment of such Purchaser, makes it impracticable or inadvisable to purchase the Securities at the Closing.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

3.1     <u>Representations and Warranties of the Company.</u>  Except as set forth in the Disclosure Schedules, the Company hereby makes the following representations and warranties to each Purchaser:

(a)     <u>Subsidiaries.</u>  All of the direct and indirect subsidiaries of the Company are set forth on <u>Schedule 3.1(a)</u>.  The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear of any Liens, and all of the issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities.  If the Company has no subsidiaries, all other references to the Subsidiaries or any of them in the Transaction Documents shall be disregarded.

(b)     <u>Organization and Qualification.</u>   The Company and each of the Subsidiaries is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted.  Neither the Company nor any Subsidiary is in violation nor default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents.  Each of the Company and the Subsidiaries is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, could not have or reasonably be expected to result in: (i) a material adverse effect on the legality, validity or enforceability of any Transaction Document, (ii) a material adverse effect on the results of operations, assets, business, or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) a material adverse effect on the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document (any of (i), (ii) or (iii), a <u>"Material Adverse Effect")</u> and, to the knowledge of the Company, no Proceeding has been instituted in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification.

(c)     <u>Authorization; Enforcement.</u>  The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by this Agreement and each of the other Transaction Documents and otherwise to carry out its obligations hereunder and thereunder.  The execution and delivery of each of this Agreement and the other Transaction Documents by the Company and the consummation

9

by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of the Company and no further action is required by the Company, the Board of Directors or the Company's stockholders in connection herewith or therewith other than in connection with the Required Approvals. This Agreement and each other Transaction Document to which it is a party has been (or upon delivery will have been) duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except: (i) as limited by general equitable principles and applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(d)     No Conflicts.  Subject to the Required Approvals, the execution, delivery and performance by the Company of this Agreement and the other Transaction Documents to which it is a party, the issuance and sale of the Securities and the consummation by it of the transactions contemplated hereby and thereby do not and will not: (i) conflict with or violate any provision of the Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or charter documents, (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of the Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing a Company or Subsidiary debt or otherwise) or other understanding to which the Company or any Subsidiary is a party or by which any property or asset of the Company or any Subsidiary is bound or affected, or (iii) subject to the Required Approvals, conflict with or result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Company or a Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of the Company or a Subsidiary is bound or affected; except in the case of each of clauses (ii) and (iii), such as could not have or reasonably be expected to result in a Material Adverse Effect.

(e)     Filings, Consents and Approvals.  The Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than: (i) the filings required pursuant to Section 4.4 of this Agreement, (ii) the filing of any Registration Statement (as such term is defined under the Registration Rights Agreement) with the Commission pursuant to the Registration Rights Agreement and the declaration by the Commission of the effectiveness of any Registration Statement filed with the Commission under the Registration Rights Agreement, (iii) the notice and/or application(s) to each applicable Trading Market for the issuance and sale of the Securities and the listing of the Shares and Warrant Shares for trading thereon in the time and manner required thereby, and

CONFIDENTIAL                                                                                                        R023800

applicable "Blue Sky" filings, (iv) any such consents, waivers, authorizations or orders as have already been obtained, (v) any other filings that have been made pursuant to applicable state securities laws and (vi) any post-sale filings pursuant to applicable state and federal securities laws (including, without limitation, the filing of Form D with the Commission) which the Company undertakes to file within the applicable time periods. (collectively, the "Required Approvals").

(f)     Issuance of the Securities.  The Securities are duly authorized and, when issued and paid for in accordance with the applicable Transaction Documents, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company other than restrictions on transfer provided for in the Transaction Documents.  The Warrant Shares, when issued in accordance with the terms of the Transaction Documents, will be validly issued, fully paid and nonassessable, free and clear of all Liens imposed by the Company other than restrictions on transfer provided for in the Transaction Documents.  The Company has reserved from its duly authorized capital stock the maximum number of shares of Common Stock issuable pursuant to this Agreement and the Warrants.

(g)     Capitalization.  The capitalization of the Company is as set forth on Schedule 3.1(g), which Schedule 3.1(g) shall also include the number of shares of Common Stock owned beneficially, and of record, by Affiliates of the Company as of the date hereof. Except as set forth on Schedule 3.1(g), the Company has not issued any capital stock since its most recently filed periodic report under the Exchange Act, other than pursuant to the exercise of employee stock options under any Company stock option plans, the issuance of shares of Common Stock to employees pursuant to the Company's employee stock purchase plans and pursuant to the conversion and/or exercise of Common Stock Equivalents outstanding as of the date of the most recently filed periodic report under the Exchange Act.  No Person has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated by the Transaction Documents.  Except as a result of the purchase and sale of the Securities or as set forth on Schedule 3.1(g), there are no outstanding options, warrants, scrip rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire any shares of Common Stock, or contracts, commitments, understandings or arrangements by which the Company or any Subsidiary is or may become bound to issue additional shares of Common Stock or Common Stock Equivalents.  The issuance and sale of the Securities will not obligate the Company to issue shares of Common Stock or other securities to any Person (other than the Purchasers) and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under any of such securities. All of the outstanding shares of capital stock of the Company are duly authorized, validly issued, fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities.  No further approval or authorization of any stockholder, the Board of Directors or others is required for the issuance and sale of the Securities.  Except as set forth on Schedule 3.1(g), there are no stockholders agreements, voting agreements or other similar agreements with

11

respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's stockholders.

(h)      SEC Reports; Financial Statements.  Except as set forth on Schedule 3.1(h), the Company has filed all reports, schedules, forms, statements and other documents required to be filed by the Company under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date hereof (or such shorter period as the Company was required by law or regulation to file such material) (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein, being collectively referred to herein as the "SEC Reports") on a timely basis or has received a valid extension of such time of filing and has filed any such SEC Reports prior to the expiration of any such extension.  Except as set forth on Schedule 3.1(h), as of their respective dates, the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Except as set forth on Schedule 3.1(h), the financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing.  Except as set forth on Schedule 3.1(h), such financial statements have been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved ("GAAP"), except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated Subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, year-end audit adjustments.

(i)      Material Changes; Undisclosed Events, Liabilities or Developments.  Since the date of the latest audited financial statements included within the SEC Reports, except as disclosed in a subsequent SEC Report filed prior to the date hereof or as set forth on Schedule 3.1(i): (i) there has been no event, occurrence or development that has had or that would reasonably be expected to result in a Material Adverse Effect, (ii) to the Company's knowledge, the Company has not incurred any material liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or disclosed in filings made with the Commission, (iii) the Company has not altered its method of accounting, (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock and (v) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to any existing Company stock option plans.  The Company does not have pending before the Commission any request for confidential treatment of information.

12

(j)     Litigation.  Except as set forth on Schedule 3.1(j), there is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which (i) adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities or (ii) could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect.  Neither the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty.  There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission involving the Company or any current or former director or officer of the Company.  The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by the Company or any Subsidiary under the Exchange Act or the Securities Act.

(k)     Labor Relations.  No material labor dispute exists or, to the knowledge of the Company, is imminent with respect to any of the employees of the Company, which could reasonably be expected to result in a Material Adverse Effect.   Neither the Company nor any Subsidiary is a party to or bound by any collective bargaining agreements or other agreements with labor organizations.  Neither the Company nor any Subsidiary has violated in any material respect any laws, regulations, orders or contract terms, affecting the collective bargaining rights of employees, labor organizations or any laws, regulations or orders affecting employment discrimination, equal opportunity employment, or employees' health, safety, welfare, wages and hours.  To the knowledge of the Company, no executive officer of the Company or any Subsidiary is, or is alleged to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant in favor of any former employer relating to the right of any such executive officer to be employed by the Company or any of its Subsidiaries, and the continued employment of each such executive officer does not subject the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters.  There is neither pending nor, to the Company's knowledge, threatened any actions, suits, proceedings or claims, or, to the Company's knowledge, any basis therefor or threat thereof with respect to any contract, agreement, covenant or obligation referred to in the preceding sentence.

(l)     Compliance.  Except as set forth on Schedule 3.1(l), neither the Company nor any Subsidiary: (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Company or any Subsidiary under), nor has the Company or any Subsidiary received notice of a claim that it is in default under or that it is in violation of, any indenture, loan or credit agreement or any other agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (ii) is in violation of any judgment, decree, or order of any court, arbitrator or other governmental authority or (iii) is or has been in violation of any

13

R023803

statute, rule, ordinance or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws relating to taxes, environmental protection, occupational health and safety, product quality and safety and employment and labor matters, except in each case as could not have or reasonably be expected to result in a Material Adverse Effect.

(m)   <u>Regulatory Permits</u>.   Except as disclosed in the SEC Reports or <u>Schedule 3.1(m)</u>, the Company and the Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses as described in the SEC Reports, except where the failure to possess such permits could not reasonably be expected to result in a Material Adverse Effect (<u>"Material Permits"</u>), and neither the Company nor any Subsidiary has received any notice of proceedings relating to the revocation or modification of any Material Permit.

(n)   <u>Title to Assets</u>.   The Company and the Subsidiaries have good and valid title in fee simple to all real property owned by them and good and valid title in all personal property owned by them that is material to the business of the Company and the Subsidiaries, in each case free and clear of all Liens, except for (i) Liens as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and the Subsidiaries and (ii) Liens for the payment of federal, state or other taxes, for which appropriate reserves have been made therefor in accordance with GAAP and the payment of which is neither delinquent nor subject to penalties.   Any real property and facilities held under lease by the Company and the Subsidiaries are held by them under valid, subsisting and enforceable leases with which the Company and the Subsidiaries are in compliance.

(o)   <u>Intellectual Property</u>.   Except as set forth in the SEC Reports or on <u>Schedule 3.1(o)</u>, to the Company's knowledge, the Company and the Subsidiaries have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and other intellectual property rights and similar rights as described in the SEC Reports as necessary or required for use in connection with their respective businesses and which the failure to so have could have a Material Adverse Effect (collectively, the <u>"Intellectual Property Rights"</u>).   Except as set forth on <u>Schedule 3.1(o)</u>, None of, and neither the Company nor any Subsidiary has received a notice (written or otherwise) that any of, the Intellectual Property Rights has expired, terminated or been abandoned, or is expected to expire or terminate or be abandoned, within two (2) years from the date of this Agreement.   Neither the Company nor any Subsidiary has received, since the date of the latest audited financial statements included within the SEC Reports, a written notice of a claim or otherwise has any knowledge that the Intellectual Property Rights violate or infringe upon the rights of any Person, except as could not have or reasonably br expected to not have a Material Adverse Effect.   To the knowledge of the Company, all such Intellectual Property Rights are enforceable and, to the knowledge of the Company, there is no existing infringement by another Person of any of the Intellectual Property Rights.   The Company and its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their intellectual properties, except

14

where failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(p)    Insurance.    The Company and the Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which the Company and the Subsidiaries are engaged, including, but not limited to, directors and officers insurance that the Board of Directors reasonably believe is appropriate.    Neither the Company nor any Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without a significant increase in cost.

(q)    Transactions With Affiliates and Employees.    Except as set forth in the SEC Reports or on Schedule 3.1(q), none of the officers or directors of the Company or any Subsidiary and, to the knowledge of the Company, none of the employees of the Company or any Subsidiary is presently a party to any transaction with the Company or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, providing for the borrowing of money from or lending of money to or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee, stockholder, member or partner, in each case in excess of $120,000 other than for: (i) payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company and (iii) other employee benefits, including stock option agreements under any stock option plan of the Company.

(r)    Sarbanes-Oxley; Internal Accounting Controls.    To the knowledge of the Company, it maintains a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability, and (iii) access to assets is permitted only in accordance with management's general or specific authorization.

(s)    Certain Fees.    Except as set forth on Schedule 3.1(s), no brokerage or finder's fees or commissions are or will be payable by the Company or any Subsidiary to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by the Transaction Documents.    The Purchasers shall have no obligation with respect to any fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this Section that may be due in connection with the transactions contemplated by the Transaction Documents.

(t)    Private Placement.    Assuming the accuracy of the Purchasers' representations and warranties set forth in Section 3.2, no registration under the Securities

15

Act is required for the offer and sale of the Securities by the Company to the Purchasers as contemplated hereby. Subject to the Required Approvals, the issuance and sale of the Securities hereunder does not contravene the rules and regulations of the Trading Market.

(u)     Investment Company. The Company is not, and is not an Affiliate of, and immediately after receipt of payment for the Securities, will not be or be an Affiliate of, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.  The Company shall conduct its business in a manner so that it will not become an "investment company" subject to registration under the Investment Company Act of 1940, as amended.

(v)     Registration Rights.  Other than each of the Purchasers, no Person has any right to cause the Company to effect the registration under the Securities Act of any securities of the Company or any Subsidiary.

(w)     Application of Takeover Protections.  The Company and the Board of Directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's certificate of incorporation (or similar charter documents) or the laws of its state of incorporation that is or could become applicable to the Purchasers as a result of the Purchasers and the Company fulfilling their obligations or exercising their rights under the Transaction Documents, including without limitation as a result of the Company's issuance of the Securities and the Purchasers' ownership of the Securities.

(x)     Disclosure.  Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company confirms that neither it nor any other Person acting on its behalf has provided any of the Purchasers or their agents or counsel with any information that it believes constitutes or might constitute material, non-public information.   The Company understands and confirms that the Purchasers will rely on the foregoing representation in effecting transactions in securities of the Company.   All of the disclosure furnished by or on behalf of the Company to the Purchasers regarding the Company and its Subsidiaries, their respective businesses and the transactions contemplated hereby, including the Disclosure Schedules to this Agreement, is true and correct and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. The Company acknowledges and agrees that no Purchaser makes or has made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in Section 3.2 hereof.

(y)     No Integrated Offering.  Assuming the accuracy of the Purchasers' representations and warranties set forth in Section 3.2, neither the Company, nor any of its Affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering of the Securities to be integrated with prior offerings by the Company for purposes of (i) the Securities Act which would require the

CONFIDENTIAL

R023806

registration of any such securities under the Securities Act, or (ii) any applicable shareholder approval provisions of any Trading Market on which any of the securities of the Company are listed or designated.

(z)     Solvency.  [Based on the consolidated financial condition of the Company, after giving effect to the receipt by the Company of the proceeds from the sale of the Securities pursuant to this Agreement, the current cash flow of the Company, together with the proceeds the Company would receive, were it to liquidate all of its assets, after taking into account all anticipated uses of the cash, would be sufficient to pay all amounts on or in respect of its liabilities when such amounts are required to be paid.]   The Company does not intend to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be payable on or in respect of its debt).  The Company has no knowledge of any facts or circumstances which lead it to believe that it will file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within one year from the Closing Date.  The SEC Reports sets forth as of the date hereof all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments.  For the purposes of this Agreement, "Indebtedness" means (x) any liabilities for borrowed money or amounts owed in excess of $50,000 (other than trade accounts payable incurred in the ordinary course of business), (y) all guaranties, endorsements and other contingent obligations in respect of indebtedness of others, whether or not the same are or should be reflected in the Company's balance sheet (or the notes thereto), except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (z) the present value of any lease payments in excess of $50,000 due under leases required to be capitalized in accordance with GAAP.  Except as set forth in Schedule 3.1(z), neither the Company nor any Subsidiary is in default with respect to any Indebtedness.

(aa)     Tax Status.  Except for matters that would not, individually or in the aggregate, have or reasonably be expected to result in a Material Adverse Effect, the Company and its Subsidiaries each (i) has made or filed all United States federal, state and local income and all foreign income and franchise tax returns, reports and declarations required by any jurisdiction to which it is subject, except where the failure to so pay could not have a Material Adverse Effect, (ii) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except where the failure to so pay could not have a Material Adverse Effect, and (iii) has set aside on its books provision reasonably adequate for the payment of all material taxes for periods subsequent to the periods to which such returns, reports or declarations apply.  There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and to the Company's knowledge, no state of facts exists or has existed which could constitute grounds for the assessment of any penalty or any further tax liability beyond that shown on the respective tax returns.

(bb)     No General Solicitation.  Neither the Company nor any person acting on behalf of the Company has offered or sold any of the Securities by any form of general solicitation or general advertising (as those terms are used in Regulation D promulgated

17

under the Securities Act).  To the Company's knowledge, the Company has offered the Securities for sale only to the Purchasers and certain other "accredited investors" within the meaning of Rule 501 under the Securities Act.

(cc)    Foreign Corrupt Practices.  Neither the Company nor any Subsidiary, nor, to the knowledge of the Company, any agent or other person acting on behalf of the Company or any Subsidiary, has: (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company or any Subsidiary (or made by any person acting on its behalf of which the Company is aware) which is in violation of law or (iv) violated in any material respect any provision of FCPA.

(dd)    Accountants.  The Company's accounting firm is set forth on Schedule 3.1(ee) of the Disclosure Schedules.  To the knowledge and belief of the Company, such accounting firm: (i) is a registered public accounting firm as required by the Exchange Act and (ii) shall express its opinion with respect to the financial statements to be included in the Company's Annual Report for the fiscal year ending February 28, 2013.

(ee)    No Disagreements with Accountants.  There are no disagreements of any kind presently existing between the Company and the accountants formerly or presently employed by the Company.

(ff)    Acknowledgment Regarding Purchasers' Purchase of Securities.    The Company acknowledges and agrees that each of the Purchasers is acting solely in the capacity of an arm's length purchaser with respect to the Transaction Documents and the transactions contemplated thereby. The Company further acknowledges that no Purchaser is acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated thereby and any advice given by any Purchaser or any of their respective representatives or agents in connection with the Transaction Documents and the transactions contemplated thereby is merely incidental to the Purchasers' purchase of the Securities.

(gg)    Acknowledgment Regarding Purchaser's Trading Activity.  Anything in this Agreement or elsewhere herein to the contrary notwithstanding (except for Sections 3.2(f) and 4.14 hereof), it is understood and acknowledged by the Company that: (i) none of the Purchasers has been asked by the Company to agree, nor has any Purchaser agreed, to desist from purchasing or selling, long and/or short, securities of the Company, or "derivative" securities based on securities issued by the Company or to hold the Securities for any specified term, (ii) past or future open market or other transactions by any Purchaser, specifically including, without limitation, Short Sales or "derivative" transactions, before or after the closing of this or future private placement transactions, may negatively impact the market price of the Company's publicly-traded securities, (iii) any Purchaser, and counter-parties in "derivative" transactions to which any such Purchaser is a party, directly or indirectly, may presently have a "short" position in the

18

Common Stock and (iv) each Purchaser shall not be deemed to have any affiliation with or control over any arm's length counter-party in any "derivative" transaction. The Company further understands and acknowledges that (y) one or more Purchasers may engage in hedging activities at various times during the period that the Securities are outstanding, including, without limitation, during the periods that the value of the Warrant Shares deliverable with respect to Securities are being determined, and (z) such hedging activities (if any) could reduce the value of the existing stockholders' equity interests in the Company at and after the time that the hedging activities are being conducted. The Company acknowledges that such aforementioned hedging activities do not constitute a breach of any of the Transaction Documents.

(hh)    Regulation M Compliance. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent in connection with the placement of the Securities.

(ii)    FDA. As to each product subject to the jurisdiction of the U.S. Food and Drug Administration ("FDA") under the Federal Food, Drug and Cosmetic Act, as amended, and the regulations thereunder ("FDCA") that is manufactured, packaged, labeled, tested, distributed, sold, and/or marketed by the Company or any of its Subsidiaries (each such product, a "Pharmaceutical Product"), to the Company's knowledge, such Pharmaceutical Product is being manufactured, packaged, labeled, tested, distributed, sold and/or marketed by the Company in compliance with all applicable requirements under FDCA and similar laws, rules and regulations relating to registration, investigational use, premarket clearance, licensure, or application approval, good manufacturing practices, good laboratory practices, good clinical practices, product listing, quotas, labeling, advertising, record keeping and filing of reports, except where the failure to be in compliance would not have a Material Adverse Effect. There is no pending, completed or, to the Company's knowledge, threatened, action (including any lawsuit, arbitration, or legal or administrative or regulatory proceeding, charge, complaint, or investigation) against the Company or any of its Subsidiaries, and none of the Company or any of its Subsidiaries has received any notice, warning letter or other communication from the FDA or any other governmental entity, which (i) contests the premarket clearance, licensure, registration, or approval of, the uses of, the distribution of, the manufacturing or packaging of, the testing of, the sale of, or the labeling and promotion of any Pharmaceutical Product, (ii) withdraws its approval of, requests the recall, suspension, or seizure of, or withdraws or orders the withdrawal of advertising or sales promotional materials relating to, any Pharmaceutical Product, (iii) imposes a clinical hold on any clinical investigation by the Company or any of its Subsidiaries, (iv) enjoins production at any facility of the Company or any of its Subsidiaries, (v) enters or proposes to enter into a consent decree of permanent injunction with the Company or any of its Subsidiaries, or (vi) otherwise alleges any violation of any laws, rules or regulations

19

by the Company or any of its Subsidiaries, and which, either individually or in the aggregate, would have a Material Adverse Effect.  The properties, business and operations of the Company have been and are being conducted in all material respects in accordance with all applicable laws, rules and regulations of the FDA.  The Company has not been informed by the FDA that the FDA will prohibit the marketing, sale, license or use in the United States of any product proposed to be developed, produced or marketed by the Company nor has the FDA expressed any concern as to approving or clearing for marketing any product being developed or proposed to be developed by the Company.

(jj)    Office of Foreign Assets Control.   Neither the Company nor any Subsidiary  nor, to the Company's knowledge, any director, officer, agent, employee or affiliate of the Company or any Subsidiary is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC").

(kk)    U.S. Real Property Holding Corporation.  The Company is not and has never been a U.S. real property holding corporation within the meaning of Section 897 of the Internal Revenue Code of 1986, as amended, and the Company shall so certify upon Purchaser's request.

(ll)    Bank Holding Company Act.   Neither the Company nor any of its Subsidiaries or Affiliates is subject to the Bank Holding Company Act of 1956, as amended (the "BHCA") and to regulation by the Board of Governors of the Federal Reserve System (the "Federal Reserve").   Neither the Company nor any of its Subsidiaries or Affiliates owns or controls, directly or indirectly, five percent (5%) or more of the outstanding shares of any class of voting securities or twenty-five percent or more of the total equity of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.  Neither the Company nor any of its Subsidiaries or Affiliates exercises a controlling influence over the management or policies of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.

(mm)    Money Laundering.  The operations of the Company and its Subsidiaries are and have been conducted at all times in compliance with applicable financial record-keeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, applicable money laundering statutes and applicable rules and regulations thereunder (collectively, the "Money Laundering Laws"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any Subsidiary with respect to the Money Laundering Laws is pending or, to the knowledge of the Company or any Subsidiary, threatened.

3.2    Representations and Warranties of the Purchasers.  Each Purchaser, for itself and for no other Purchaser, hereby represents and warrants as of the date hereof and as of the Closing Date to the Company as follows (unless as of a specific date therein):

(a)    Organization; Authority.  Such Purchaser is either an individual or an entity duly incorporated or formed, validly existing and in good standing under the laws

20

R023810

of the jurisdiction of its incorporation or formation with full right, corporate, partnership, limited liability company or similar power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution and delivery of the Transaction Documents and performance by such Purchaser of the transactions contemplated by the Transaction Documents have been duly authorized by all necessary corporate, partnership, limited liability company or similar action, as applicable, on the part of such Purchaser. Each Transaction Document to which it is a party has been duly executed by such Purchaser, and when delivered by such Purchaser in accordance with the terms hereof, will constitute the valid and legally binding obligation of such Purchaser, enforceable against it in accordance with its terms, except: (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(b)    <u>Own Account.</u>    Such Purchaser understands that the Securities are "restricted securities" and have not been registered under the Securities Act or any applicable state securities law and is acquiring the Securities as principal for its own account and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Securities in violation of the Securities Act or any applicable state securities law and has no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Securities in violation of the Securities Act or any applicable state securities law (this representation and warranty not limiting such Purchaser's right to sell the Securities pursuant to the Registration Statement or otherwise in compliance with applicable federal and state securities laws). Such Purchaser is acquiring the Securities hereunder in the ordinary course of its business.

(c)    <u>Purchaser Status.</u>    At the time such Purchaser was offered the Securities, it was, and as of the date hereof it is, and on each date on which it exercises any Warrants, it will be an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act.

(d)    <u>Experience of Such Purchaser.</u>    Such Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Such Purchaser is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(e)    <u>General Solicitation.</u>    Such Purchaser is not purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over

CONFIDENTIAL

R023811

television or radio or presented at any seminar or any other general solicitation or general advertisement.

(f)    Certain Transactions and Confidentiality.  Other than consummating the transactions contemplated hereunder, such Purchaser has not directly or indirectly, nor has any Person acting on behalf of or pursuant to any understanding with such Purchaser, executed any purchases or sales, including Short Sales, of the securities of the Company during the period commencing as of the time that such Purchaser first received a term sheet (written or oral) from the Company or any other Person representing the Company setting forth the material terms of the transactions contemplated hereunder and ending immediately prior to the execution hereof.  Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the representation set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement. Other than to other Persons party to this Agreement, such Purchaser has maintained the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction). Notwithstanding the foregoing, for avoidance of doubt, nothing contained herein shall constitute a representation or warranty, or preclude any actions, with respect to the identification of the availability of, or securing of, available shares to borrow in order to effect Short Sales or similar transactions in the future.

The Company acknowledges and agrees that the representations contained in Section 3.2 shall not modify, amend or affect such Purchaser's right to rely on the Company's representations and warranties contained in this Agreement or any representations and warranties contained in any other Transaction Document or any other document or instrument executed and/or delivered in connection with this Agreement or the consummation of the transaction contemplated hereby.

## ARTICLE IV.
## OTHER AGREEMENTS OF THE PARTIES

4.1    Transfer Restrictions.

(a)    The Securities may only be disposed of in compliance with state and federal securities laws.  In connection with any transfer of Securities other than pursuant to an effective registration statement or Rule 144, to the Company or to an Affiliate of a Purchaser or in connection with a pledge as contemplated in Section 4.1(b), the Company may require the transferor thereof to provide to the Company an opinion of counsel selected by the transferor and reasonably acceptable to the Company, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Securities under the Securities Act.  As a condition of transfer, any such transferee shall agree in writing to be bound by the terms of this Agreement and the Registration Rights Agreement and shall

22

have the rights and obligations of a Purchaser under this Agreement and the Registration Rights Agreement.

(b)      The Purchasers agree to the imprinting, so long as is required by this Section 4.1, of a legend on any of the Securities in the following form:

THIS SECURITY HAS NOT BEEN  REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY.  THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT WITH A REGISTERED BROKER-DEALER OR OTHER LOAN WITH A FINANCIAL INSTITUTION THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT OR OTHER LOAN SECURED BY SUCH SECURITIES.

The Company acknowledges and agrees that a Purchaser may from time to time pledge pursuant to a bona fide margin agreement with a registered broker-dealer or grant a security interest in some or all of the Securities to a financial institution that is an "accredited investor" as defined in Rule 501(a) under the Securities Act and who agrees to be bound by the provisions of this Agreement and the Registration Rights Agreement and, if required under the terms of such arrangement, such Purchaser may transfer pledged or secured Securities to the pledgees or secured parties.  Such a pledge or transfer would not be subject to approval of the Company and no legal opinion of legal counsel of the pledgee, secured party or pledgor shall be required in connection therewith.  Further, no notice shall be required of such pledge.  At the appropriate Purchaser's expense, the Company will execute and deliver such reasonable documentation as a pledgee or secured party of Securities may reasonably request in connection with a pledge or transfer of the Securities, including, if the Securities are subject to registration pursuant to the Registration Rights Agreement, the preparation and filing of any required prospectus supplement under Rule 424(b)(3) under the Securities Act or other applicable provision of the Securities Act to appropriately amend the list of Selling Stockholders (as defined in the Registration Rights Agreement) thereunder.

(c)      Certificates evidencing the Shares and Warrant Shares shall not contain any legend (including the legend set forth in Section 4.1(b) hereof), (i) while a registration statement (including the Registration Statement) covering the resale of such security is effective under the Securities Act, (ii) following any sale of such Shares or Warrant Shares pursuant to Rule 144, (iii) if such Shares or Warrant Shares are eligible for sale under Rule 144, without the requirement for the Company to be in compliance

23

with the current public information required under Rule 144 as to such Shares and Warrant Shares and without volume or manner-of-sale restrictions, or (iv) if such legend is not required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the staff of the Commission).  The Company shall cause its counsel to issue a legal opinion to the Transfer Agent promptly if required by the Transfer Agent to effect the removal of the legend hereunder.  If all or any portion of a Warrant is exercised at a time when there is an effective registration statement to cover the resale of the Warrant Shares, or if such Shares or Warrant Shares may be sold under Rule 144 and the Company is then in compliance with the current public information required under Rule 144, or if the Shares or Warrant Shares may be sold under Rule 144 without the requirement for the Company to be in compliance with the current public information required under Rule 144 as to such Shares or Warrant Shares or if such legend is not otherwise required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the staff of the Commission) then such Warrant Shares shall be issued free of all legends. The Company agrees that following such time as such legend is no longer required under this Section 4.1(c), it will, no later than three Trading Days following the delivery by a Purchaser to the Company or the Transfer Agent of a certificate representing Shares or Warrant Shares, as the case may be, issued with a restrictive legend (such third Trading Day, the "Legend Removal Date"), deliver or cause to be delivered to such Purchaser a certificate representing such shares that is free from all restrictive and other legends.  The Company may not make any notation on its records or give instructions to the Transfer Agent that enlarge the restrictions on transfer set forth in this Section 4.  Certificates for Securities subject to legend removal hereunder shall be transmitted by the Transfer Agent to the Purchaser by crediting the account of the Purchaser's prime broker with the Depository Trust Company System as directed by such Purchaser.

(d)     In addition to such Purchaser's other available remedies, the Company shall pay to a Purchaser, in cash, as partial liquidated damages and not as a penalty, for each $2,000 of Shares or Warrant Shares (based on the VWAP of the Common Stock on the date such Securities are submitted to the Transfer Agent) delivered for removal of the restrictive legend and subject to Section 4.1(c), $10 per Trading Day for each Trading Day after the Legend Removal Date until such certificate is delivered without a legend. Nothing herein shall limit such Purchaser's right to pursue actual damages for the Company's failure to deliver certificates representing any Securities as required by the Transaction Documents, and such Purchaser shall have the right to pursue all remedies available to it at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief.

(e)     Each Purchaser, severally and not jointly with the other Purchasers, agrees with the Company that such Purchaser will sell any Securities pursuant to either the registration requirements of the Securities Act, including any applicable prospectus delivery requirements, or an exemption therefrom, and that if Securities are sold pursuant to a Registration Statement, they will be sold in compliance with the plan of distribution set forth therein, and acknowledges that the removal of the restrictive legend from certificates representing Securities as set forth in this Section 4.1 is predicated upon the Company's reliance upon this understanding.

CONFIDENTIAL

R023814

4.2    <u>Furnishing of Information; Public Information.</u>

(a)    Until the time that no Purchaser owns Securities, the Company covenants to maintain the registration of the Common Stock under Section 12(b) or 12(g) of the Exchange Act and to timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to the Exchange Act even if the Company is not then subject to the reporting requirements of the Exchange Act.

(b)    At any time during the period commencing from the six (6) month anniversary of the date hereof and ending at such time that all of the Securities may be sold without the requirement for the Company to be in compliance with Rule 144(c)(1) and otherwise without restriction or limitation pursuant to Rule 144, if the Company shall fail for any reason to satisfy the current public information requirement under Rule 144(c) (a "<u>Public Information Failure</u>") then, in addition to such Purchaser's other available remedies, the Company shall pay to a Purchaser, in cash, as partial liquidated damages and not as a penalty, by reason of any such delay in or reduction of its ability to sell the Securities, an amount in cash equal to two percent (2.0%) of the aggregate Subscription Amount of such Purchaser's Securities on the day of a Public Information Failure and on every thirtieth (30th) day (pro rated for periods totaling less than thirty days) thereafter until the earlier of (a) the date such Public Information Failure is cured and (b) such time that such public information is no longer required for the Purchasers to transfer the Shares and Warrant Shares pursuant to Rule 144.  The payments to which a Purchaser shall be entitled pursuant to this Section 4.2(b) are referred to herein as "<u>Public Information Failure Payments.</u>"  Public Information Failure Payments shall be paid on the earlier of (i) the last day of the calendar month during which such Public Information Failure Payments are incurred and (ii) the third (3rd) Business Day after the event or failure giving rise to the Public Information Failure Payments is cured.  [In the event the Company fails to make Public Information Failure Payments in a timely manner, such Public Information Failure Payments shall bear interest at the rate of 1.0% per month (prorated for partial months) until paid in full.] Nothing herein shall limit such Purchaser's right to pursue actual damages for the Public Information Failure, and such Purchaser shall have the right to pursue all remedies available to it at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief.

4.3    <u>Integration.</u>  The Company shall not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Securities in a manner that would require the registration under the Securities Act of the sale of the Securities or that would be integrated with the offer or sale of the Securities for purposes of the rules and regulations of any Trading Market such that it would require shareholder approval prior to the closing of such other transaction unless shareholder approval is obtained before the closing of such subsequent transaction.

4.4    <u>Securities Laws Disclosure; Publicity.</u>  The Company shall (a) by 9:30 a.m. (New York City time) on the Trading Day immediately following the date hereof, issue a press release describing the transactions set forth herein, and (b) file a Current Report on Form 8-K, including the Transaction Documents as exhibits thereto, with the Commission within the time required by

25

the Exchange Act.  From and after the issuance of such press release, the Company represents to the Purchasers that it shall have publicly disclosed all material, non-public information delivered to any of the Purchasers by the Company or any of its Subsidiaries, or any of their respective officers, directors, employees or agents in connection with the transactions contemplated by the Transaction Documents.  The Company and each Purchaser shall consult with each other in issuing any other press releases with respect to the transactions contemplated hereby, and neither the Company nor any Purchaser shall issue any such press release nor otherwise make any such public statement without the prior written consent of the Company, with respect to any press release of any Purchaser, or without the prior consent of each Purchaser, with respect to any press release of the Company, which consent shall not unreasonably be withheld or delayed, except if such disclosure is required by law, in which case the disclosing party shall promptly provide the other party with prior notice of such public statement or communication. Notwithstanding the foregoing, the Company shall not publicly disclose the name of any Purchaser, or include the name of any Purchaser in any filing with the Commission or any regulatory agency or Trading Market, without the prior written consent of such Purchaser, except: (a) as required by federal securities law or interpretation thereof in connection with (i) any registration statement contemplated by the Registration Rights Agreement and (ii) the filing of final Transaction Documents with the Commission and (b) to the extent such disclosure is required by law or Trading Market regulations, in which case the Company shall provide the Purchasers with prior notice of such disclosure permitted under this clause (b).

 4.5 <u>Shareholder Rights Plan.</u>  No claim will be made or enforced by the Company or, with the consent of the Company, any other Person, that any Purchaser is an "Acquiring Person" under any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or similar anti-takeover plan or arrangement in effect or hereafter adopted by the Company, or that any Purchaser could be deemed to trigger the provisions of any such plan or arrangement, by virtue of receiving Securities under the Transaction Documents or under any other agreement between the Company and the Purchasers.

 4.6 <u>Non-Public Information.</u>  Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company covenants and agrees that neither it, nor any other Person acting on its behalf, will provide any Purchaser or its agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto such Purchaser shall have entered into a written agreement with the Company regarding the confidentiality and use of such information.  The Company understands and confirms that each Purchaser shall be relying on the foregoing covenant in effecting transactions in securities of the Company.

 4.7 <u>Use of Proceeds.</u>  Except as set forth on <u>Schedule 4.7</u> attached hereto, the Company shall use the net proceeds from the sale of the Securities hereunder for working capital purposes and shall not use such proceeds: (a)  for the satisfaction of any portion of the Company's debt (other than payment of trade payables in the ordinary course of the Company's business and prior practices), (b) for the redemption of any Common Stock or Common Stock Equivalents, (c) for the settlement of any outstanding litigation or (d) in violation of FCPA or OFAC regulations.

CONFIDENTIAL                                                                                                                                    R023816

    4.8    <u>Indemnification of Purchasers</u>.  Subject to the provisions of this Section 4.8, the Company will indemnify and hold each Purchaser and its directors, officers, shareholders, members, partners, employees and agents (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title), each Person who controls such Purchaser (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, shareholders, agents, members, partners or employees (and any other Persons with a functionally equivalent role of a Person holding such titles notwithstanding a lack of such title or any other title) of such controlling persons (each, a "<u>Purchaser Party</u>") harmless from any and all Losses that any such Purchaser Party may suffer or incur as a result of or relating to (a) except as disclosed in <u>Schedule 3.1(gg)</u>, any material breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or in the other Transaction Documents or (b) any action instituted against the Purchaser Parties in any capacity, or any of them or their respective Affiliates, by any stockholder of the Company who is not an Affiliate of such Purchaser Parties, with respect to any of the transactions contemplated by the Transaction Documents (unless such action is based upon a breach of such Purchaser Party's representations, warranties or covenants under the Transaction Documents or any agreements or understandings such Purchaser Parties may have with any such stockholder or any violations by such Purchaser Parties of state or federal securities laws or any conduct by such Purchaser Parties which constitutes fraud, gross negligence, willful misconduct or malfeasance).  If any action shall be brought against any Purchaser Party in respect of which indemnity may be sought pursuant to this Agreement, such Purchaser Party shall promptly notify the Company in writing, and the Company shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the Purchaser Party.  Any Purchaser Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Purchaser Party except to the extent that (i) the employment thereof has been specifically authorized by the Company in writing, (ii) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of counsel, a material conflict on any material issue between the position of the Company and the position of such Purchaser Party, in which case the Company shall be responsible for the reasonable fees and expenses of no more than one such separate counsel.  The Company will not be liable to any Purchaser Party under this Agreement (y) for any settlement by a Purchaser Party effected without the Company's prior written consent, which shall not be unreasonably withheld or delayed; or (z) to the extent, but only to the extent that a loss, claim, damage or liability is attributable to any Purchaser Party's breach of any of the representations, warranties, covenants or agreements made by such Purchaser Party in this Agreement or in the other Transaction Documents.  The indemnification required by this Section 4.8 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or are incurred. The indemnity agreements contained herein shall be in addition to any cause of action or similar right of any Purchaser Party against the Company or others and any liabilities the Company may be subject to pursuant to law.

    4.9    <u>Reservation of Common Stock.</u> As of the date hereof, the Company has reserved and the Company shall continue to reserve and keep available at all times, free of preemptive rights, a sufficient number of shares of Common Stock for the purpose of enabling the Company

27

to issue Shares pursuant to this Agreement and Warrant Shares pursuant to any exercise of the Warrants.

4.10    Listing of Common Stock. The Company hereby agrees to use best efforts to maintain the listing or quotation of the Common Stock on the Trading Market on which it is currently listed, and concurrently with the Closing, the Company shall apply to list or quote all of the Shares and Warrant Shares on such Trading Market and promptly secure the listing of all of the Shares and Warrant Shares on such Trading Market. The Company further agrees, if the Company applies to have the Common Stock traded on any other Trading Market, it will then include in such application all of the Shares and Warrant Shares, and will take such other action as is necessary to cause all of the Shares and Warrant Shares to be listed or quoted on such other Trading Market as promptly as possible.   The Company will then take all action reasonably necessary to continue the listing or quotation and trading of its Common Stock on a Trading Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Trading Market.

4.11    Participation in Future Financing.

(a)    From the date hereof until the date that the Warrants are no longer outstanding, upon any issuance by the Company or any of its Subsidiaries of Common Stock, Common Stock Equivalents for cash consideration, Indebtedness or a combination of units hereof (a "Subsequent Financing"), each Purchaser who has a Subscription Amount equal to at least [$2.5 million] shall have the right to participate in up to an amount of the Subsequent Financing equal to the ratio of such Purchaser's Shares purchased as of the Closing Date and the total number of issued and outstanding Common Stock as of the date immediately following the Closing Date (the "Participation Maximum") on the same terms, conditions and price provided for in the Subsequent Financing.

(b)    At least three (3) Trading Days prior to the closing of the Subsequent Financing, the Company shall deliver to each Purchaser a written notice of its intention to effect a Subsequent Financing ("Pre-Notice"), which Pre-Notice shall ask such Purchaser if it wants to review the details of such financing (such additional notice, a "Subsequent Financing Notice").  Upon the request of a Purchaser, and only upon a request by such Purchaser, for a Subsequent Financing Notice, the Company shall promptly, but no later than one (1) Trading Day after such request, deliver a Subsequent Financing Notice to such Purchaser.  The Subsequent Financing Notice shall describe in reasonable detail the proposed terms of such Subsequent Financing, the amount of proceeds intended to be raised thereunder and the Person or Persons through or with whom such Subsequent Financing is proposed to be effected and shall include a term sheet or similar document relating thereto as an attachment.

(c)    Any Purchaser desiring to participate in such Subsequent Financing must provide written notice to the Company, by not later than 5:30 p.m. (New York City time) on the third (3rd) Trading Day after the Company has distributed the Pre-Notice, that such Purchaser is willing to participate in the Subsequent Financing, the amount of such Purchaser's participation, and representing and warranting that such Purchaser has such

28

R023818

funds ready, willing, and available for investment on the terms set forth in the Subsequent Financing Notice.  If the Company receives no such notice from a Purchaser as of such third (3rd) Trading Day, such Purchaser shall be deemed to have notified the Company that it does not elect to participate.

(d)     If by 5:30 p.m. (New York City time) on the third (3rd) Trading Day after the Company has distributed the Pre-Notice, notifications by the Purchasers of their willingness to participate in the Subsequent Financing (or to cause their designees to participate) is, in the aggregate, less than the total amount of the Subsequent Financing, then the Company may effect the remaining portion of such Subsequent Financing on the terms and with the Persons set forth in the Subsequent Financing Notice.

(e)     If by 5:30 p.m. (New York City time) on the third (3rd) Trading Day after the Company has distributed the Pre-Notice, the Company receives responses to a Subsequent Financing Notice from Purchasers seeking to purchase more than the aggregate amount of the Participation Maximum, each such Purchaser shall have the right to purchase its Pro Rata Portion (as defined below) of the Participation Maximum.  "Pro Rata Portion" means the ratio of (x) the Subscription Amount of Securities purchased on the Closing Date by a Purchaser participating under this Section 4.11 and (y) the sum of the aggregate Subscription Amounts of Securities purchased on the Closing Date by all Purchasers participating under this Section 4.11.

(f)     The Company must provide the Purchasers with a second Subsequent Financing Notice, and the Purchasers will again have the right of participation set forth above in this Section 4.11, if the Subsequent Financing subject to the initial Subsequent Financing Notice is not consummated for any reason on the terms set forth in such Subsequent Financing Notice within thirty (30) Trading Days after the date of the initial Subsequent Financing Notice.

(g)     The Company and each Purchaser agree that if any Purchaser elects to participate in the Subsequent Financing, the transaction documents related to the Subsequent Financing shall not include any term or provision whereby such Purchaser shall be required to agree to any restrictions on trading as to any of the Securities purchased hereunder or be required to consent to any amendment to or termination of, or grant any waiver, release or the like under or in connection with, this Agreement, without the prior written consent of such Purchaser.

(h)     Notwithstanding anything to the contrary in this Section 4.11 and unless otherwise agreed to by such Purchaser, the Company shall either confirm in writing to such Purchaser that the transaction with respect to the Subsequent Financing has been abandoned or shall publicly disclose its intention to issue the securities in the Subsequent Financing, in either case in such a manner such that such Purchaser will not be in possession of any material, non-public information, by the fifth (5th) Business Day following delivery of the Subsequent Financing Notice.  If by such fifth (5th) Business Day, no public disclosure regarding a transaction with respect to the Subsequent Financing has been made, and no notice regarding the abandonment of such transaction has been received by such Purchaser, such transaction shall be deemed to have been

29

R023819

abandoned and such Purchaser shall not be deemed to be in possession of any material, non-public information with respect to the Company or any of its Subsidiaries.

(i)     Notwithstanding the foregoing, this Section 4.11 shall not apply in respect of an Exempt Issuance.

4.12    Subsequent Equity Sales.

(a)     From the date hereof until forty-five (45) days after the Effective Date, neither the Company nor any Subsidiary shall issue, enter into any agreement to issue or announce the issuance or proposed issuance of any shares of Common Stock or Common Stock Equivalents.

(b)     From the date hereof until such time as no Purchaser holds any of the Warrants, the Company shall be prohibited from effecting or entering into an agreement to effect any issuance by the Company or any of its Subsidiaries of Common Stock or Common Stock Equivalents (or a combination of units thereof) involving a Variable Rate Transaction. "Variable Rate Transaction" means a transaction in which the Company (i) issues or sells any debt or equity securities (other than warrants or preferred stock that contain anti-dilution provisions) that are convertible into, exchangeable or exercisable for, or include the right to receive, additional shares of Common Stock either (A) at a conversion price, exercise price or exchange rate or other price that is based upon, and/or varies with, the trading prices of or quotations for the shares of Common Stock at any time after the initial issuance of such debt or equity securities or (B) with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such debt or equity security or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or the market for the Common Stock or (ii) enters into any agreement, including, but not limited to, an equity line of credit, unless such equity line is for less than [$_____] in securities of the Company, in the aggregate during any 12 month period, whereby the Company may issue securities at a future determined price.  Any Purchaser shall be entitled to obtain injunctive relief against the Company to preclude any such issuance, which remedy shall be in addition to any right to collect damages.

(c)     Notwithstanding the foregoing, this Section 4.12 shall not apply in respect of an Exempt Issuance, except that no Variable Rate Transaction shall be an Exempt Issuance.

4.13    [Reserved]

4.14    Certain Transactions and Confidentiality.  Each Purchaser, severally and not jointly with the other Purchasers, covenants that neither it, nor any Affiliate acting on its behalf or pursuant to any understanding with it will execute any purchases or sales, including Short Sales, of any of the Company's securities during the period commencing with the execution of this Agreement and ending at such time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release as described in Section 4.4.  Each Purchaser, severally and not jointly with the other Purchasers, covenants that until such time as

30

the transactions contemplated by this Agreement are publicly disclosed by the Company pursuant to the initial press release as described in Section 4.4, such Purchaser will maintain the confidentiality of the existence and terms of this transaction and the information included in the Transaction Documents and the Disclosure Schedules. Notwithstanding the foregoing, and notwithstanding anything contained in this Agreement to the contrary, the Company expressly acknowledges and agrees that (i) no Purchaser makes any representation, warranty or covenant hereby that it will not engage in effecting transactions in any securities of the Company after the time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release as described in Section 4.4, (ii) no Purchaser shall be restricted or prohibited from effecting any transactions in any securities of the Company in accordance with applicable securities laws from and after the time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release as described in Section 4.4 and (iii) no Purchaser shall have any duty of confidentiality to the Company or its Subsidiaries after the issuance of the initial press release as described in Section 4.4. Notwithstanding the foregoing, in the case of a Purchaser that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Purchaser's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Purchaser's assets, the covenant set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement.

4.15    Form D; Blue Sky Filings.  The Company agrees to timely file a Form D with respect to the Securities as required under Regulation D and to provide a copy thereof, promptly upon request of any Purchaser. The Company shall take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Securities for, sale to the Purchasers at the Closing under applicable securities or "Blue Sky" laws of the states of the United States, and shall provide evidence of such actions promptly upon request of any Purchaser.

4.16    Acknowledgment of Dilution.  The Company acknowledges that the issuance of the Securities may result in dilution of the outstanding shares of Common Stock, which dilution may be substantial under certain market conditions. The Company further acknowledges that its obligations under the Transaction Documents, including, without limitation, its obligation to issue the Shares and Warrant Shares pursuant to the Transaction Documents, are unconditional and absolute and not subject to any right of set off, counterclaim, delay or reduction, regardless of the effect of any such dilution or any claim the Company may have against any Purchaser and regardless of the dilutive effect that such issuance may have on the ownership of the other stockholders of the Company.

## ARTICLE V.
## MISCELLANEOUS

5.1    Termination.  This Agreement may be terminated by any Purchaser, as to such Purchaser's obligations hereunder only and without any effect whatsoever on the obligations between the Company and the other Purchasers, by written notice to the other parties, if the

CONFIDENTIAL                                                                                                                    R023821

Closing has not been consummated on or before February 13, 2013; provided, however, that such termination will not affect the right of any party to sue for any breach by any other party (or parties).

5.2    Fees and Expenses.  At the Closing, the Company has agreed to reimburse Sabby Management, LLC's ("Sabby") legal counsel the non-accountable sum of $25,000 in the aggregate for its legal fees and expenses.  Except as expressly set forth in the Transaction Documents to the contrary, each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement.  The Company shall pay all Transfer Agent fees (including, without limitation, any fees required for same-day processing of any instruction letter delivered by the Company and any exercise notice delivered by a Purchaser), stamp taxes and other taxes and duties levied in connection with the delivery of any Securities to the Purchasers.

5.3    Entire Agreement.  The Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

5.4    Notices.   Any and all notices, requests, demands, instructions or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective at the time when hand delivered, delivered by express courier, sent by facsimile (with receipt confirmed by the sender's transmitting device) or by e-mail to the respective parties at the following addresses (or such other address as any party may have duly provided by notice given in accordance with this Section 5.3):

if to the Company:

Desert Gateway, Inc.
777 Third Avenue, 22nd Floor
New York, New York, 10017
Attention: Martin Shkreli, Chief Executive Officer
Email address:

with a copy (which shall not constitute notice) to:

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022
Attention: Evan L. Greebel, Esq.
Fax: (212) 894-5883
Email address:

5.5    if to a Purchaser, in accordance with the contact information set forth on such Purchaser's signature pages attached hereto.

32

5.6     Amendments; Waivers.   No provision of this Agreement may be waived, modified, supplemented or amended except in a written instrument signed, in the case of an amendment, by the Company and the Purchasers holding at least a majority in interest of the Shares then outstanding or, in the case of a waiver, by the party against whom enforcement of any such waived provision is sought.  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right.

5.7     Headings.   The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

5.8     Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.  The Company may not assign this Agreement or any rights or obligations hereunder without the prior written consent of each Purchaser (other than by merger).  Any Purchaser may assign any or all of its rights under this Agreement to any Person to whom such Purchaser assigns or transfers any Securities, provided that such transferee agrees in writing to be bound, with respect to the transferred Securities, by the provisions of the Transaction Documents that apply to the "Purchasers."

5.9     No Third-Party Beneficiaries.   This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, except as otherwise set forth in Section 4.8 and this Section 5.8.

5.10    Governing Law.   All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware, without regard to the principles of conflicts of law thereof.  Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, partners, members, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the County of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the County of New York, State of New York, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.   If either party shall commence an action or proceeding to enforce any provisions of the Transaction Documents, then in addition to the obligations of the Company under Section 4.8, the prevailing party in such action, suit or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding.

33

5.11    Survival.  The representations and warranties contained herein shall survive the Closing and the delivery of the Securities until the earlier of (i) the date that no Purchaser holds any Warrants or (ii) the 18 month anniversary of the Closing Date.

5.12    Execution.  This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to each other party, it being understood that the parties need not sign the same counterpart.  In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

5.13    Severability.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

5.14    Replacement of Securities.  If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof (in the case of mutilation), or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction.  The applicant for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs (including customary indemnity) associated with the issuance of such replacement Securities.

5.15    Remedies.  In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of the Purchasers and the Company will be entitled to specific performance under the Transaction Documents.  The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations contained in the Transaction Documents and hereby agree to waive and not to assert in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

5.16    Payment Set Aside.  To the extent that the Company makes a payment or payments to any Purchaser pursuant to any Transaction Document or a Purchaser enforces or exercises its rights thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other Person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or

34

R023824

equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

5.17   <u>Independent Nature of Purchasers' Obligations and Rights.</u>   The obligations of each Purchaser under any Transaction Document are several and not joint with the obligations of any other Purchaser, and no Purchaser shall be responsible in any way for the performance or non-performance of the obligations of any other Purchaser under any Transaction Document. Nothing contained herein or in any other Transaction Document, and no action taken by any Purchaser pursuant hereof or thereto, shall be deemed to constitute the Purchasers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Purchasers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. Each Purchaser shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement or out of the other Transaction Documents, and it shall not be necessary for any other Purchaser to be joined as an additional party in any proceeding for such purpose. Each Purchaser has been represented by its own separate legal counsel in its review and negotiation of the Transaction Documents. For reasons of administrative convenience only, each Purchaser and its respective counsel have chosen to communicate with the Company through EGS. EGS does not represent any of the Purchasers and only represents Sabby. The Company has elected to provide all Purchasers with the same terms and Transaction Documents for the convenience of the Company and not because it was required or requested to do so by any of the Purchasers.

5.18   <u>Liquidated Damages.</u>   The Company's obligations to pay any partial liquidated damages or other amounts owing under the Transaction Documents is a continuing obligation of the Company and shall not terminate until all unpaid partial liquidated damages and other amounts have been paid notwithstanding the fact that the instrument or security pursuant to which such partial liquidated damages or other amounts are due and payable shall have been canceled.

5.19   <u>Saturdays, Sundays, Holidays, etc.</u>   If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

5.20   <u>Construction.</u> The parties agree that each of them and/or their respective counsel have reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments thereto. In addition, each and every reference to share prices and shares of Common Stock in any Transaction Document shall be subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of this Agreement.

**5.21   <u>WAIVER OF JURY TRIAL.  IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER</u>**

CONFIDENTIAL

R023825

**PARTY, THE PARTIES EACH KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.**

*(Signature Pages Follow)*

36

CONFIDENTIAL

R023826

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**DESERT GATEWAY, INC.**

By: _____          ____
    Name:
    Title:

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOR PURCHASER FOLLOWS]

37

R023827

[PURCHASER SIGNATURE PAGES TO RTRX SECURITIES PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: _____

*Signature of Authorized Signatory of Purchaser*: _____

Name of Authorized Signatory: _____

Title of Authorized Signatory: _____

Email Address of Authorized Signatory: _____

Facsimile Number of Authorized Signatory: _____

Address for Notice to Purchaser:



Address for Delivery of Securities to Purchaser (if not same as address for notice):



Subscription Amount: $_____

Shares: _____

Warrant Shares: _____

EIN Number: _____

[SIGNATURE PAGES CONTINUE]

38

CONFIDENTIAL                                                                                      R023828

**EXHIBIT C**

NEITHER THIS SECURITY NOR THE SECURITIES FOR WHICH THIS SECURITY IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY.  THIS SECURITY AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY SUCH SECURITIES.

PURSUANT TO THE TERMS OF SECTION 2 OF THIS WARRANT, ALL OR A PORTION OF THIS WARRANT MAY HAVE BEEN EXERCISED, AND THEREFORE THE ACTUAL NUMBER OF WARRANT SHARES REPRESENTED BY THIS WARRANT MAY BE LESS THAN THE AMOUNT SET FORTH ON THE FACE HEREOF.

**COMMON STOCK PURCHASE WARRANT**

**DESERT GATEWAY, INC.**

Warrant Shares: _____                          Initial Exercise Date: February __, 2013

THIS COMMON STOCK PURCHASE WARRANT (the "Warrant") certifies that, for value received, _____ or its assigns (the "Holder") is entitled, upon the terms and subject to the limitations on exercise and the conditions hereinafter set forth, at any time on or after the date hereof (the "Initial Exercise Date") and on or prior to the close of business on the five (5) year anniversary of the Initial Exercise Date (the "Termination Date") but not thereafter, to subscribe for and purchase from Desert Gateway, Inc., a Delaware corporation (the "Company"), up to _____ shares (as subject to adjustment hereunder, the "Warrant Shares") of Common Stock.  The purchase price of one share of Common Stock under this Warrant shall be equal to the Exercise Price, as defined in Section 2(b).

Section 1.    Definitions.  Capitalized terms used and not otherwise defined herein shall have the meanings set forth in that certain Securities Purchase Agreement (the "Purchase Agreement"), dated February ___, 2013, among the Company and the purchasers signatory thereto.

1

R023829

Section 2.        Exercise.

a)        Exercise of Warrant.  Exercise of the purchase rights represented by this Warrant may be made, in whole or in part, at any time or times on or after the Initial Exercise Date and on or before the Termination Date by delivery to the Company (or such other office or agency of the Company as it may designate by notice in writing to the registered Holder at the address of the Holder appearing on the books of the Company) of a duly executed facsimile copy of the Notice of Exercise form annexed hereto and within three (3) Trading Days of the date said Notice of Exercise is delivered to the Company, the Company shall have received payment of the aggregate Exercise Price of the shares thereby purchased by wire transfer of immediately available funds or cashier's check drawn on a United States bank or, if available, pursuant to the cashless exercise procedure specified in Section 2(c) below.  No ink-original Notice of Exercise shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Notice of Exercise form be required.   Notwithstanding anything herein to the contrary, the Holder shall not be required to physically surrender this Warrant to the Company until the Holder has purchased all of the Warrant Shares available hereunder and the Warrant has been exercised in full, in which case, the Holder shall surrender this Warrant to the Company for cancellation within three (3) Trading Days of the date the final Notice of Exercise is delivered to the Company. Partial exercises of this Warrant resulting in purchases of a portion of the total number of Warrant Shares available hereunder shall have the effect of lowering the outstanding number of Warrant Shares purchasable hereunder in an amount equal to the applicable number of Warrant Shares purchased.   The Holder and the Company shall maintain records showing the number of Warrant Shares purchased and the date of such purchases. The Company shall deliver any objection to any Notice of Exercise Form within one (1) Business Day of receipt of such notice.  **The Holder and any assignee, by acceptance of this Warrant, acknowledge and agree that, by reason of the provisions of this paragraph, following the purchase of a portion of the Warrant Shares hereunder, the number of Warrant Shares available for purchase hereunder at any given time may be less than the amount stated on the face hereof.**

b)        Exercise Price.  The exercise price per share of the Common Stock under this Warrant shall be $_____[1], subject to adjustment hereunder (the "Exercise Price").

c)        Cashless Exercise.  If at any time after the four month anniversary of the date of the Purchase Agreement, there is no effective Registration Statement registering, or no current prospectus available for, the resale of the Warrant Shares by the Holder, then this Warrant may also be exercised, in whole or in part, at such time by means of a "cashless exercise" in which the Holder shall be entitled to receive a number of Warrant Shares equal to the quotient obtained by dividing [(A-B) (X)] by (A), where:

(A) = the VWAP on the Trading Day immediately preceding the date on which Holder elects to exercise this Warrant by means of a "cashless exercise," as set forth in the applicable Notice of Exercise;

---

[1] 120% of the Per Share Purchase Price

CONFIDENTIAL                                                                                                      R023830

(B) = the Exercise Price of this Warrant, as adjusted hereunder; and

(X) = the number of Warrant Shares that would be issuable upon exercise of this Warrant in accordance with the terms of this Warrant if such exercise were by means of a cash exercise rather than a cashless exercise.

Notwithstanding anything herein to the contrary, on the Termination Date, this Warrant shall be automatically exercised via cashless exercise pursuant to this Section 2(c).

d)    Mechanics of Exercise.

i.    Delivery of Warrant Shares Upon Exercise. Warrant Shares purchased hereunder shall be transmitted by the Transfer Agent to the Holder by crediting the account of the Holder's prime broker with The Depository Trust Company through its Deposit or Withdrawal at Custodian system ("DWAC") if the Company is then a participant in such system and either (A) there is an effective registration statement permitting the issuance of the Warrant Shares to or resale of the Warrant Shares by the Holder or (B) the shares are eligible for resale by the Holder pursuant to Rule 144, and otherwise by physical delivery to the address specified by the Holder in the Notice of Exercise by the date that is one (1) Trading Day after the latest of (A) the delivery to the Company of the Notice of Exercise and (B) surrender of this Warrant (if required) (including by cashless exercise, if permitted) (such date, the "Warrant Share Delivery Date"). The Warrant Shares shall be deemed to have been issued, and Holder or any other person so designated to be named therein shall be deemed to have become a holder of record of such shares for all purposes, as of the date the Warrant has been exercised, with payment to the Company of the Exercise Price (or by cashless exercise, if permitted) and all taxes required to be paid by the Holder, if any, pursuant to Section 2(d)(vi) prior to the issuance of such shares, having been paid. If the Company fails for any reason to deliver to the Holder the Warrant Shares subject to a Notice of Exercise by the Warrant Share Delivery Date, the Company shall pay to the Holder, in cash, as liquidated damages and not as a penalty, for each $2,000 of Warrant Shares subject to such exercise (based on the VWAP of the Common Stock on the date of the applicable Notice of Exercise), $10 per Trading Day for each Trading Day after such Warrant Share Delivery Date until such Warrant Shares are delivered or Holder rescinds such exercise. Notwithstanding anything to the contrary, for each failure to timely deliver the Warrant Shares, in the event that the Holder elects to receive payment of liquidated damages pursuant to this Section 2(d)(iv), then such Holder shall not be entitled to receive any Buy-In payments pursuant to Section 2(d)(iv) herein.

3

R023831

ii.     Delivery of New Warrants Upon Exercise.  If this Warrant shall have been exercised in part, the Company shall, at the request of a Holder and upon surrender of this Warrant, at the time of delivery of the Warrant Shares, deliver to the Holder a new Warrant evidencing the rights of the Holder to purchase the unpurchased Warrant Shares called for by this Warrant, which new Warrant shall in all other respects be identical with this Warrant.

iii.    Rescission Rights.   If the Company fails to cause the Transfer Agent to transmit to the Holder the Warrant Shares pursuant to Section 2(d)(i) by the Warrant Share Delivery Date, then the Holder will have the right to rescind such exercise.

iv.     Compensation for Buy-In on Failure to Timely Deliver Warrant Shares Upon Exercise.  In addition to any other rights available to the Holder, if the Company fails to cause the Transfer Agent to transmit to the Holder the Warrant Shares pursuant to an exercise on or before the Warrant Share Delivery Date, and if after such date the Holder is required by its broker to purchase (in an open market transaction or otherwise) or the Holder's brokerage firm otherwise purchases, shares of Common Stock to deliver in satisfaction of a sale by the Holder of the Warrant Shares which the Holder anticipated receiving upon such exercise (a "Buy-In"), then the Company shall (A) pay in cash to the Holder the amount, if any, by which (x) the Holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased exceeds (y) the amount obtained by multiplying (1) the number of Warrant Shares that the Company was required to deliver to the Holder in connection with the exercise at issue times (2) the price at which the sell order giving rise to such purchase obligation was executed, and (B) at the option of the Holder, either reinstate the portion of the Warrant and equivalent number of Warrant Shares for which such exercise was not honored (in which case such exercise shall be deemed rescinded) or deliver to the Holder the number of shares of Common Stock that would have been issued had the Company timely complied with its exercise and delivery obligations hereunder.  For example, if the Holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted exercise of shares of Common Stock with an aggregate sale price giving rise to such purchase obligation of $10,000, under clause (A) of the immediately preceding sentence the Company shall be required to pay the Holder $1,000. The Holder shall provide the Company written notice indicating the amounts payable to the Holder in respect of the Buy-In and, upon request of the Company, evidence of the amount of such loss.  Nothing herein shall limit a Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver

4

R023832

shares of Common Stock upon exercise of the Warrant as required pursuant to the terms hereof.  Notwithstanding anything to the contrary, for each failure to timely deliver Warrant Shares, in the event that the Holder elects to receive payment of Buy-In pursuant to this Section 2(d)(iv), then such Holder shall not be entitled to receive payment of liquidated damages pursuant to Section 2(d)(i).

v.    <u>No Fractional Shares or Scrip.</u>  No fractional shares or scrip representing fractional shares shall be issued upon the exercise of this Warrant.  As to any fraction of a share which the Holder would otherwise be entitled to purchase upon such exercise, the Company shall, at its election, either pay a cash adjustment in respect of such final fraction in an amount equal to such fraction multiplied by the Exercise Price or round up to the next whole share.

vi.    <u>Charges, Taxes and Expenses.</u>  Issuance of Warrant Shares shall be made without charge to the Holder for any issue or transfer tax or other incidental expense in respect of the issuance of Warrant Shares, all of which taxes and expenses shall be paid by the Company, and such Warrant Shares shall be issued in the name of the Holder or in such name or names as may be directed by the Holder; <u>provided, however,</u> that in the event that Warrant Shares are to be issued in a name other than the name of the Holder, this Warrant when surrendered for exercise shall be accompanied by the Assignment Form attached hereto duly executed by the Holder and the Company may require, as a condition thereto, the payment of a sum sufficient to reimburse it for any transfer tax incidental thereto.  The Company shall pay all Transfer Agent fees required for same-day processing of any Notice of Exercise.

vii.    <u>Closing of Books.</u>   The Company will not close its stockholder books or records in any manner which prevents the timely exercise of this Warrant, pursuant to the terms hereof.

e)    <u>Holder's Exercise Limitations.</u>  The Company shall not effect any exercise of this Warrant, and a Holder shall not have the right to exercise any portion of this Warrant, pursuant to Section 2 or otherwise, to the extent that after giving effect to such issuance after exercise as set forth on the applicable Notice of Exercise, the Holder (together with the Holder's Affiliates, and any other Persons acting as a group together with the Holder or any of the Holder's Affiliates), would beneficially own in excess of the Beneficial Ownership Limitation (as defined below).  For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Holder and its Affiliates shall include the number of shares of Common Stock issuable upon exercise of this Warrant with respect to which such determination is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (i) exercise of the remaining, nonexercised portion of this Warrant beneficially owned by the Holder or any of its Affiliates and (ii) exercise or

5

CONFIDENTIAL

R023833

conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any other   Common Stock Equivalents) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by the Holder or any of its Affiliates.  Except as set forth in the preceding sentence, for purposes of this Section 2(e), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, it being acknowledged by the Holder that the Company is not representing to the Holder that such calculation is in compliance with Section 13(d) of the Exchange Act and the Holder is solely responsible for any schedules required to be filed in accordance therewith.   To the extent that the limitation contained in this Section 2(e) applies, the determination of whether this Warrant is exercisable (in relation to other securities owned by the Holder together with any Affiliates) and of which portion of this Warrant is exercisable shall be in the sole discretion of the Holder, and the submission of a Notice of Exercise shall be deemed to be the Holder's determination of whether this Warrant is exercisable (in relation to other securities owned by the Holder together with any Affiliates) and of which portion of this Warrant is exercisable, in each case subject to the Beneficial Ownership Limitation, and the Company shall have no obligation to verify or confirm the accuracy of such determination.   In addition, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. For purposes of this Section 2(e), in determining the number of outstanding shares of Common Stock, a Holder may rely on the number of outstanding shares of Common Stock as reflected in (A) the Company's most recent periodic or annual report filed with the Commission, as the case may be, (B) a more recent public announcement by the Company or (C) a more recent written notice by the Company or the Transfer Agent setting forth the number of shares of Common Stock outstanding.  Upon the written or oral request of a Holder, the Company shall within two Trading Days confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding.  In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Warrant, by the Holder or its Affiliates since the date as of which such number of outstanding shares of Common Stock was reported.  The "Beneficial Ownership Limitation" shall be 9.99of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock issuable upon exercise of this Warrant.  The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 2(e) to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Beneficial Ownership Limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitations contained in this paragraph shall apply to a successor holder of this Warrant.

Section 3.        Certain Adjustments.

6

                                                                    R023834

a) <u>Stock Dividends and Splits</u>. If the Company, at any time while this Warrant is outstanding: (i) pays a stock dividend or otherwise makes a distribution or distributions on shares of its Common Stock or any other equity or equity equivalent securities payable in shares of Common Stock (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon exercise of this Warrant), (ii) subdivides outstanding shares of Common Stock into a larger number of shares, (iii) combines (including by way of reverse stock split) outstanding shares of Common Stock into a smaller number of shares or (iv) issues by reclassification of shares of the Common Stock any shares of capital stock of the Company, then in each case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding treasury shares, if any) outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event, and the number of shares issuable upon exercise of this Warrant shall be proportionately adjusted such that the aggregate Exercise Price of this Warrant shall remain unchanged.  Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

b) <u>Subsequent Equity Sales</u>. If the Company or any Subsidiary thereof, as applicable, at any time while this Warrant is outstanding, shall sell or grant any option to purchase, or sell or grant any right to reprice, or otherwise dispose of or issue (or announce any offer, sale, grant or any option to purchase or other disposition) any Common Stock or Common Stock Equivalents, at an effective price per share less than the Exercise Price then in effect (such lower price, the "<u>Base Share Price</u>" and such issuances collectively, a "<u>Dilutive Issuance</u>") (it being understood and agreed that if the holder of the Common Stock or Common Stock Equivalents so issued shall at any time, whether by operation of purchase price adjustments, reset provisions, floating conversion, exercise or exchange prices or otherwise, or due to warrants, options or rights per share which are issued in connection with such issuance, be entitled to receive shares of Common Stock at an effective price per share that is less than the Exercise Price, such issuance shall be deemed to have occurred for less than the Exercise Price on such date of the Dilutive Issuance at such effective price), then simultaneously with the consummation of each Dilutive Issuance the Exercise Price shall be reduced and only reduced to equal the Base Share Price.  Such adjustment shall be made whenever such Common Stock or Common Stock Equivalents are issued.  Notwithstanding the foregoing, no adjustments shall be made, paid or issued under this Section 3(b) in respect of an Exempt Issuance. The Company shall notify the Holder, in writing, no later than the Trading Day following the issuance or deemed issuance of any Common Stock or Common Stock Equivalents subject to this Section 3(b), indicating therein the applicable issuance price, or applicable reset price, exchange price, conversion price and other pricing terms (such notice, the "<u>Dilutive Issuance Notice</u>").  For purposes of clarification, whether or not the Company provides a Dilutive Issuance Notice pursuant to this Section 3(b), upon the occurrence of any Dilutive Issuance, the Holder is entitled to receive a number of Warrant Shares based upon the Base Share Price regardless of whether the Holder accurately refers to the Base Share Price in the Notice of Exercise. If the Company enters into a Variable Rate

7

Transaction, despite the prohibition thereon in the Purchase Agreement, the Company shall be deemed to have issued Common Stock or Common Stock Equivalents at the lowest possible conversion or exercise price at which such securities may be converted or exercised

c)    <u>Subsequent Rights Offerings.</u>  In addition to any adjustments pursuant to the other subsections of this Section 3, if at any time the Company grants, issues or sells any Common Stock Equivalents or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of shares of Common Stock (the "Purchase Rights"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof, including without limitation, the Beneficial Ownership Limitation) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights (provided, however, to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder exceeding the Beneficial Ownership Limitation, then the Holder shall not be entitled to participate in such Purchase Right to such extent (or beneficial ownership of such shares of Common Stock as a result of such Purchase Right to such extent) and such Purchase Right to such extent shall be held in abeyance for the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Beneficial Ownership Limitation).

d)    <u>Pro Rata Distributions.</u>  During such time as this Warrant is outstanding, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of shares of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "Distribution"), at any time after the issuance of this Warrant, then, in each such case, the Holder shall be entitled to participate in such Distribution to the same extent that the Holder would have participated therein if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof, including without limitation, the Beneficial Ownership Limitation) immediately before the date of which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution (provided, however, to the extent that the Holder's right to participate in any such Distribution would result in the Holder exceeding the Beneficial Ownership Limitation, then the Holder shall not be entitled to participate in such Distribution to such extent (or in the beneficial ownership of any shares of Common Stock as a result of such Distribution to such extent) and the portion of such Distribution shall be held in abeyance for the benefit of the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Beneficial Ownership Limitation).

8

R023836

e)      Fundamental Transaction. If, at any time while this Warrant is outstanding, (i) the Company, directly or indirectly, in one or more related transactions effects any merger or consolidation of the Company with or into another Person, (ii) the Company, directly or indirectly, effects any sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of its assets in one or a series of related transactions, (iii) any, direct or indirect, purchase offer, tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to sell, tender or exchange their shares for other securities, cash or property and has been accepted by the holders of 50% or more of the outstanding Common Stock, (iv) the Company, directly or indirectly, in one or more related transactions effects any reclassification, reorganization or recapitalization of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property, or (v) the Company, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person or group of Persons whereby such other Person or group acquires more than 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination) (each a "Fundamental Transaction"), then, upon any subsequent exercise of this Warrant, the Holder shall have the right to receive, for each Warrant Share that would have been issuable upon such exercise immediately prior to the occurrence of such Fundamental Transaction, at the option of the Holder (without regard to any limitation in Section 2(e) on the exercise of this Warrant), the number of shares of Common Stock of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration (the "Alternate Consideration") receivable as a result of such Fundamental Transaction by a holder of the number of shares of Common Stock for which this Warrant is exercisable immediately prior to such Fundamental Transaction (without regard to any limitation in Section 2(e) on the exercise of this Warrant).  For purposes of any such exercise, the determination of the Exercise Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Exercise Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration.  If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any exercise of this Warrant following such Fundamental Transaction.   The Company shall cause any successor entity in a Fundamental Transaction in which the Company is not the survivor (the "Successor Entity") to assume in writing all of the obligations of the Company under this Warrant and the other Transaction Documents in accordance with the provisions of this Section 3(e) pursuant to written agreements in form and substance reasonably satisfactory to the Holder and approved by the Holder (without unreasonable delay) prior to such Fundamental Transaction and shall, at the option of the Holder, deliver to the Holder in exchange for

9

this Warrant a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Warrant which is exercisable for a corresponding number of shares of capital stock of such Successor Entity (or its parent entity) equivalent to the shares of Common Stock acquirable and receivable upon exercise of this Warrant (without regard to any limitations on the exercise of this Warrant) prior to such Fundamental Transaction, and with an exercise price which applies the exercise price hereunder to such shares of capital stock (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction), and which is reasonably satisfactory in form and substance to the Holder. Upon the occurrence of any such Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Warrant and the other Transaction Documents referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Warrant and the other Transaction Documents with the same effect as if such Successor Entity had been named as the Company herein.

f)      Calculations. All calculations under this Section 3 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be. For purposes of this Section 3, the number of shares of Common Stock deemed to be issued and outstanding as of a given date shall be the sum of the number of shares of Common Stock (excluding treasury shares, if any) issued and outstanding.

g)      Notice to Holder.

i.      Adjustment to Exercise Price. Whenever the Exercise Price is adjusted pursuant to any provision of this Section 3, the Company shall promptly mail to the Holder a notice setting forth the Exercise Price after such adjustment and any resulting adjustment to the number of Warrant Shares and setting forth a brief statement of the facts requiring such adjustment..

ii.      Notice to Allow Exercise by Holder. If (A) the Company shall declare a dividend (or any other distribution in whatever form) on the Common Stock, (B) the Company shall declare a special nonrecurring cash dividend on or a redemption of the Common Stock, (C) the Company shall authorize the granting to all holders of the Common Stock rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights, (D) the approval of any stockholders of the Company shall be required in connection with any reclassification of the Common Stock, any consolidation or merger to which the Company is a party, any sale or transfer of all or substantially all of the assets of the Company, or any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property, or (E) the Company

10

R023838

shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Company, then, in each case, the Company shall cause to be mailed to the Holder at its last address as it shall appear upon the Warrant Register of the Company, at least 20 calendar days prior to the applicable record or effective date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of the Common Stock for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange; provided that the failure to mail such notice or any defect therein or in the mailing thereof shall not affect the validity of the corporate action required to be specified in such notice. The Holder shall remain entitled to exercise this Warrant during the period commencing on the date of such notice to the effective date of the event triggering such notice   except as may otherwise be expressly set forth herein.

**Section 4.**       **Transfer of Warrant.**

a)       **Transferability.**  Subject to compliance with any applicable securities laws and the conditions set forth in Section 4(d) hereof and to the provisions of Section 4.1 of the Purchase Agreement, this Warrant and all rights hereunder (including, without limitation, any registration rights) are transferable, in whole or in part, upon surrender of this Warrant at the principal office of the Company or its designated agent, together with a written assignment of this Warrant substantially in the form attached hereto duly executed by the Holder or its agent or attorney and funds sufficient to pay any transfer taxes payable upon the making of such transfer.  Upon such surrender and, if required, such payment, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees, as applicable, and in the denomination or denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant not so assigned, and this Warrant shall promptly be cancelled.  Notwithstanding anything herein to the contrary, the Holder shall not be required to physically surrender this Warrant to the Company unless the Holder has assigned this Warrant in full, in which case, the Holder shall surrender this Warrant to the Company within three (3) Trading Days of the date the Holder delivers an assignment form to the Company assigning this Warrant full.  The Warrant, if properly assigned in accordance herewith, may be exercised by a new holder for the purchase of Warrant Shares without having a new Warrant issued.

b)       **New Warrants.** This Warrant may be divided or combined with other Warrants upon presentation hereof at the aforesaid office of the Company, together with a

11

written notice specifying the names and denominations in which new Warrants are to be issued, signed by the Holder or its agent or attorney.  Subject to compliance with Section 4(a), as to any transfer which may be involved in such division or combination, the Company shall execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants to be divided or combined in accordance with such notice. All Warrants issued on transfers or exchanges shall be dated the Initial Exercise Date and shall be identical with this Warrant except as to the number of Warrant Shares issuable pursuant thereto.

c)      <u>Warrant Register.</u> The Company shall register this Warrant, upon records to be maintained by the Company for that purpose (the <u>"Warrant Register"</u>), in the name of the record Holder hereof from time to time.  The Company may deem and treat the registered Holder of this Warrant as the absolute owner hereof for the purpose of any exercise hereof or any distribution to the Holder, and for all other purposes, absent actual notice to the contrary.

d)      <u>Representation by the Holder.</u>   The Holder, by the acceptance hereof, represents and warrants that it is acquiring this Warrant and, upon any exercise hereof, will acquire the Warrant Shares issuable upon such exercise, for its own account and not with a view to or for distributing or reselling such Warrant Shares or any part thereof in violation of the Securities Act or any applicable state securities law, except pursuant to sales registered or exempted under the Securities Act.

Section 5.      <u>Miscellaneous.</u>

a)      <u>No Rights as Stockholder Until Exercise.</u>   This Warrant does not entitle the Holder to any voting rights, dividends or other rights as a stockholder of the Company prior to the exercise hereof as set forth in Section 2(d)(i), except as expressly set forth in Section 3.

b)      <u>Loss, Theft, Destruction or Mutilation of Warrant.</u> The Company covenants that upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant or any stock certificate relating to the Warrant Shares, and in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (which, in the case of the Warrant, shall not include the posting of any bond), and upon surrender and cancellation of such Warrant or stock certificate, if mutilated, the Company will make and deliver a new Warrant or stock certificate of like tenor and dated as of such cancellation, in lieu of such Warrant or stock certificate.

c)      <u>Saturdays, Sundays, Holidays, etc.</u>  If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Trading Day, then, such action may be taken or such right may be exercised on the next succeeding Trading Day.

d)      <u>Authorized Shares.</u>

12

CONFIDENTIAL                                                                   R023840

The Company covenants that, during the period the Warrant is outstanding, it will reserve from its authorized and unissued Common Stock a sufficient number of shares to provide for the issuance of the Warrant Shares upon the exercise of any purchase rights under this Warrant. The Company further covenants that its issuance of this Warrant shall constitute full authority to its officers who are charged with the duty of issuing the necessary Warrant Shares upon the exercise of the purchase rights under this Warrant. The Company will take all such reasonable action as may be necessary to assure that such Warrant Shares may be issued as provided herein without violation of any applicable law or regulation, or of any requirements of the Trading Market upon which the Common Stock may be listed. The Company covenants that all Warrant Shares which may be issued upon the exercise of the purchase rights represented by this Warrant will, upon exercise of the purchase rights represented by this Warrant and payment for such Warrant Shares in accordance herewith, be duly authorized, validly issued, fully paid and nonassessable and free from all taxes, liens and charges created by the Company in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously with such issue).

Except and to the extent as waived or consented to by the Holder, the Company shall not by any action, including, without limitation, amending its certificate of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of Holder as set forth in this Warrant against impairment. Without limiting the generality of the foregoing, the Company will (i) not increase the par value of any Warrant Shares above the amount payable therefor upon such exercise immediately prior to such increase in par value, (ii) take all such action as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable Warrant Shares upon the exercise of this Warrant and (iii) use commercially reasonable efforts to obtain all such authorizations, exemptions or consents from any public regulatory body having jurisdiction thereof, as may be, necessary to enable the Company to perform its obligations under this Warrant.

Before taking any action which would result in an adjustment in the number of Warrant Shares for which this Warrant is exercisable or in the Exercise Price, the Company shall obtain all such authorizations or exemptions thereof, or consents thereto, as may be necessary from any public regulatory body or bodies having jurisdiction thereof.

e)      Jurisdiction. All questions concerning the construction, validity, enforcement and interpretation of this Warrant shall be determined in accordance with the provisions of the Purchase Agreement.

13

R023841

f)      Restrictions.  The Holder acknowledges that the Warrant Shares acquired upon the exercise of this Warrant, if not registered and the Holder does not utilize cashless exercise, will have restrictions upon resale imposed by state and federal securities laws.

g)      Nonwaiver and Expenses.  No course of dealing or any delay or failure to exercise any right hereunder on the part of Holder shall operate as a waiver of such right or otherwise prejudice the Holder's rights, powers or remedies, notwithstanding the fact that all rights hereunder terminate on the Termination Date.  If the Company willfully and knowingly fails to comply with any provision of this Warrant, which results in any material damages to the Holder, the Company shall pay to the Holder such amounts as shall be sufficient to cover any costs and expenses including, but not limited to, reasonable attorneys' fees, including those of appellate proceedings, incurred by the Holder in collecting any amounts due pursuant hereto or in otherwise enforcing any of its rights, powers or remedies hereunder.

h)      Notices.  Any notice, request or other document required or permitted to be given or delivered to the Holder by the Company shall be delivered in accordance with the notice provisions of the Purchase Agreement.

i)      Limitation of Liability.  No provision hereof, in the absence of any affirmative action by the Holder to exercise this Warrant to purchase Warrant Shares, and no enumeration herein of the rights or privileges of the Holder, shall give rise to any liability of the Holder for the purchase price of any Common Stock or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

j)      Remedies.  The Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Warrant.  The Company agrees that monetary damages may not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Warrant and hereby agrees to waive and not to assert the defense in any action for specific performance that a remedy at law would be adequate.

k)      Successors and Assigns.  Subject to applicable securities laws, this Warrant and the rights and obligations evidenced hereby shall inure to the benefit of and be binding upon the successors and permitted assigns of the Company and the successors and permitted assigns of Holder.  The provisions of this Warrant are intended to be for the benefit of any Holder from time to time of this Warrant and shall be enforceable by the Holder or holder of Warrant Shares.

l)      Amendment.  This Warrant may be modified or amended or the provisions hereof waived with the written consent of the Company and the Holder.

m)      Severability.  Wherever possible, each provision of this Warrant shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant shall be prohibited by or invalid under applicable law, such

14

R023842

provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Warrant.

n)   <u>Headings.</u>   The headings used in this Warrant are for the convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Signature Page Follows)*

15

CONFIDENTIAL

R023843

IN WITNESS WHEREOF, the Company has caused this Warrant to be executed by its officer thereunto duly authorized as of the date first above indicated.

**DESERT GATEWAY, INC.**

By: _____
    Name:
    Title:

16

R023844

## NOTICE OF EXERCISE

TO:     DESERT GATEWAY, INC.

(1) The undersigned hereby elects to purchase _____ Warrant Shares of the Company pursuant to the terms of the attached Warrant (only if exercised in full), and tenders herewith payment of the exercise price in full, together with all applicable transfer taxes, if any.

(2) Payment shall take the form of (check applicable box):

[ ] in lawful money of the United States; or

[ ] [if permitted the cancellation of such number of Warrant Shares as is necessary, in accordance with the formula set forth in subsection 2(c), to exercise this Warrant with respect to the maximum number of Warrant Shares purchasable pursuant to the cashless exercise procedure set forth in subsection 2(c).

(3) Please issue said Warrant Shares in the name of the undersigned or in such other name as is specified below:

_____

The Warrant Shares shall be delivered to the following DWAC Account Number:

_____

_____

_____

(4)     Accredited Investor.   The undersigned is an "accredited investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

[SIGNATURE OF HOLDER]

Name of Investing Entity: _____
*Signature of Authorized Signatory of Investing Entity:* _____
Name of Authorized Signatory: _____
Title of Authorized Signatory: _____
Date: _____

R023845

## ASSIGNMENT FORM

(To assign the foregoing warrant, execute
this form and supply required information.
Do not use this form to exercise the warrant.)


       FOR VALUE RECEIVED, [\_\_\_\_ all of or [_____ shares of the foregoing Warrant and all rights evidenced thereby are hereby assigned to

_____ whose address is

_____.


_____

               Dated: _____, _____


Holder's Signature: _____

Holder's Address: _____

                   _____

R023846

EXHIBIT A

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (this "Agreement") is made and entered into as of February __, 2013, between Desert Gateway, Inc., a Delaware corporation (the "Company"), and each of the several purchasers signatory hereto (each such purchaser, a "Purchaser" and, collectively, the "Purchasers").

This Agreement is made pursuant to the Securities Purchase Agreement, dated as of the date hereof, between the Company and each Purchaser (the "Purchase Agreement").

The Company and each Purchaser hereby agrees as follows:

1.      Definitions.

**Capitalized terms used and not otherwise defined herein that are defined in the Purchase Agreement shall have the meanings given such terms in the Purchase Agreement.** As used in this Agreement, the following terms shall have the following meanings:

"Advice" shall have the meaning set forth in Section 6(d).

"Effectiveness Date" means, with respect to the Initial Registration Statement required to be filed hereunder, the 60th calendar day following the date hereof (or, in the event of a "full review" by the Commission, the 90th calendar day following the date hereof) and with respect to any additional Registration Statements which may be required pursuant to Section 2(c) or Section 3(c), the 60th calendar day following the date on which an additional Registration Statement is required to be filed hereunder (or, in the event of a "full review" by the Commission, the 90th calendar day following the date such additional Registration Statement is required to be filed hereunder); provided, however, that in the event the Company is notified by the Commission that one or more of the above Registration Statements will not be reviewed or is no longer subject to further review and comments, the Effectiveness Date as to such Registration Statement shall be the fifth Trading Day following the date on which the Company is so notified if such date precedes the dates otherwise required above, provided, further, if such Effectiveness Date falls on a day that is not a Trading Day, then the Effectiveness Date shall be the next succeeding Trading Day.

"Effectiveness Period" shall have the meaning set forth in Section 2(a).

"Event" shall have the meaning set forth in Section 2(d).

"Event Date" shall have the meaning set forth in Section 2(d).

84698344v4

R023847

"Filing Date" means, with respect to the Initial Registration Statement required hereunder, the 30th calendar day following the date hereof and, with respect to any additional Registration Statements which may be required pursuant to Section 2(c) or Section 3(c), the earliest practical date on which the Company is permitted by SEC Guidance to file such additional Registration Statement related to the Registrable Securities.

"Holder" or "Holders" means the holder or holders, as the case may be, from time to time of Registrable Securities.

"Indemnified Party" shall have the meaning set forth in Section 5(c).

"Indemnifying Party" shall have the meaning set forth in Section 5(c).

"Initial Registration Statement" means the initial Registration Statement filed pursuant to this Agreement.

"Loss(es)" means any out of pocket losses, liabilities, damages, claims costs or expenses (including, without limitation, interest, penalties and attorneys' fees and disbursements); provided, however, that "Losses" shall not include consequential, punitive or special damages or lost profits except to the extent payable in respect of a third party claim.

"Plan of Distribution" shall have the meaning set forth in Section 2(a).

"Prospectus" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated by the Commission pursuant to the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"Registrable Securities" means, as of any date of determination, (a) all Shares, (b) all Warrant Shares then issued and issuable upon exercise of the Warrants (assuming on such date the Warrants are exercised in full without regard to any exercise limitations therein), (c) any additional shares of Common Stock issuable in connection with any anti-dilution provisions in the Warrants (without giving effect to any limitations on exercise set forth in the Warrants) and (d) any securities issued or then issuable upon any stock split, dividend or other distribution, recapitalization or similar event with respect to the foregoing; provided, however, that any such Registrable Securities shall cease to be

2

CONFIDENTIAL

R023848

Registrable Securities (and the Company shall not be required to maintain the effectiveness of any, or file another, Registration Statement hereunder with respect thereto) for so long as (a) a Registration Statement with respect to the sale of such Registrable Securities is declared effective by the Commission under the Securities Act and such Registrable Securities have been disposed of by the Holder in accordance with such effective Registration Statement, (b) such Registrable Securities have been previously sold in accordance with Rule 144, or (c) such securities become eligible for resale without volume or manner-of-sale restrictions and without current public information pursuant to Rule 144 as set forth in a written opinion letter to such effect, addressed, delivered and acceptable to the Transfer Agent and the affected Holders (assuming that such securities and any securities issuable upon exercise, conversion or exchange of which, or as a dividend upon which, such securities were issued or are issuable, were at no time held by any Affiliate of the Company, and all Warrants are exercised by "cashless exercise" as provided in Section 2(c) of each of the Warrants), as reasonably determined by the Company, upon the advice of counsel to the Company.

"Registration Statement" means any registration statement required to be filed hereunder pursuant to Section 2(a) and any additional registration statements contemplated by Section 2(c) or Section 3(c), including (in each case) the Prospectus, amendments and supplements to any such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in any such registration statement.

"Rule 415" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended or interpreted from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"Rule 424" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended or interpreted from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"Selling Stockholder Questionnaire" shall have the meaning set forth in Section 3(a).

"SEC Guidance" means (i) any publicly-available written or oral guidance of the Commission staff, or any comments, requirements or requests of the Commission staff and (ii) the Securities Act.

2.     Registration.

(a)     On or prior to each Filing Date, the Company shall prepare and file with the Commission a Registration Statement covering the resale of all of the

CONFIDENTIAL                                                                              R023849

Registrable Securities that are not then registered on an effective Registration Statement for an offering to be made on a continuous basis pursuant to Rule 415. Each Registration Statement filed hereunder shall be on Form S-1 (except if the Company is not then eligible to register for resale the Registrable Securities on Form S-1, in which case such registration shall be on another appropriate form in accordance herewith, subject to the provisions of Section 2(e)) and shall contain (unless otherwise required in connection with comments from the staff of the Commission) substantially the "Plan of Distribution" attached hereto as Annex A. Subject to the terms of this Agreement, the Company shall use its reasonable efforts to cause a Registration Statement filed under this Agreement (including, without limitation, under Section 3(c)) to be declared effective under the Securities Act as promptly as possible after the filing thereof, but in any event no later than the applicable Effectiveness Date, and shall use its reasonable efforts to keep such Registration Statement continuously effective under the Securities Act until all Registrable Securities covered by such Registration Statement (i) have been sold, thereunder or pursuant to Rule 144, or (ii) may be sold without volume or manner-of-sale restrictions pursuant to Rule 144 and without the requirement for the Company to be in compliance with the current public information requirement under Rule 144, as determined by the counsel to the Company pursuant to a written opinion letter to such effect, addressed and acceptable to the Transfer Agent and the affected Holders (the "Effectiveness Period"). The Company shall telephonically request effectiveness of a Registration Statement as of 5:00 p.m. Eastern Time on a Trading Day. The Company shall immediately notify the Holders via facsimile or by e-mail of the effectiveness of a Registration Statement on the same Trading Day that the Company telephonically confirms effectiveness with the Commission, which shall be the date requested for effectiveness of such Registration Statement. The Company shall, by 9:30 a.m. Eastern Time on the Trading Day after the effective date of such Registration Statement, file a final Prospectus with the Commission as required by Rule 424. Failure to so notify the Holder within one (1) Trading Day of such notification of effectiveness or failure to file a final Prospectus as foresaid shall be deemed an Event under Section 2(d).

(b)     Notwithstanding the registration obligations set forth in Section 2(a), if the Commission informs the Company that all of the Registrable Securities cannot, as a result of the application of Rule 415, be registered for resale as a secondary offering on a single registration statement, the Company agrees to promptly inform each of the Holders thereof and use its commercially reasonable efforts to file amendments to the Initial Registration Statement as required by the Commission, covering the maximum number of Registrable Securities permitted to be registered by the Commission, on Form S-1 or such other form available to register for resale the Registrable Securities as a secondary offering, subject to the provisions of Section 2(e); provided, however, that prior to filing such amendment, the Company shall be obligated to use reasonable efforts to advocate with the Commission for the registration of all of the Registrable

CONFIDENTIAL

R023850

Securities in accordance with the SEC Guidance, including without limitation, Compliance and Disclosure Interpretation 612.09.

(c)     Notwithstanding any other provision of this Agreement and subject to the payment of liquidated damages pursuant to Section 2(d), if the Commission or any SEC Guidance sets forth a limitation on the number of Registrable Securities permitted to be registered on a particular Registration Statement as a secondary offering (and notwithstanding that the Company used diligent efforts to advocate with the Commission for the registration of all or a greater portion of Registrable Securities), unless otherwise directed in writing by a Holder as to its Registrable Securities, the number of Registrable Securities to be registered on such Registration Statement will be reduced as follows:

a.   First, the Company shall reduce or eliminate any securities to be included by any Person other than a Holder;

b.   Second, the Company shall reduce Registrable Securities represented by Warrant Shares (applied, in the case that some Warrant Shares may be registered, to the Holders on a pro rata basis based on the total number of unregistered Warrant Shares held by such Holders); and

c.   Third, the Company shall reduce Registrable Securities represented by Shares (applied, in the case that some Shares may be registered, to the Holders on a pro rata basis based on the total number of unregistered Shares held by such Holders).

In the event of a cutback hereunder, the Company shall give the Holder at least two (2) Trading Days prior written notice along with the calculations as to such Holder's allotment.  In the event the Company amends the Initial Registration Statement in accordance with the foregoing, the Company will use its reasonable efforts to file with the Commission, as promptly as allowed by Commission or SEC Guidance provided to the Company or to registrants of securities in general, one or more registration statements on Form S-1 or such other form available to register for resale those Registrable Securities that were not registered for resale on the Initial Registration Statement, as amended.

(d)     If: (i) the Initial Registration Statement is not filed on or prior to its Filing Date, or (ii) the Company fails to file with the Commission a request for acceleration of a Registration Statement in accordance with Rule 461 promulgated by the Commission pursuant to the Securities Act, within four Trading Days of the date that the Company is notified (orally or in writing, whichever is earlier) by the Commission that such Registration Statement will not be "reviewed" or will not be subject to further review, or (iii) prior to the effective date of a Registration Statement, the Company fails to file a pre-effective amendment and otherwise respond in writing to comments made by the Commission in respect of such Registration Statement within ten (10) Trading Days after the receipt of

CONFIDENTIAL                                                                                    R023851

comments by or notice from the Commission that such amendment is required in order for such Registration Statement to be declared effective, or (iv) a Registration Statement registering for resale all of the Registrable Securities is not declared effective by the Commission by the Effectiveness Date of the Initial Registration Statement, or (v) after the effective date of a Registration Statement, such Registration Statement ceases for any reason to remain continuously effective as to all Registrable Securities included in such Registration Statement, or the Holders are otherwise not permitted to utilize the Prospectus therein to resell such Registrable Securities, for more than ten (10) consecutive calendar days or more than an aggregate of fifteen (15) calendar days (which need not be consecutive calendar days) during any 12-month period (any such failure or breach being referred to as an "Event", and for purposes of clauses (i) and (iv), the date on which such Event occurs, and for purpose of clause (ii) the date on which such five (5) Trading Day period is exceeded, and for purpose of clause (iii) the date which such ten (10) Trading Day period is exceeded, and for purpose of clause (v) the date on which such ten (10) or fifteen (15) calendar day period, as applicable, is exceeded being referred to as "Event Date"), then, in addition to any other rights the Holders may have hereunder or under applicable law, on each such Event Date and on each monthly anniversary of each such Event Date (if the applicable Event shall not have been cured by such date) until the applicable Event is cured, the Company shall pay to each Holder an amount in cash, as partial liquidated damages and not as a penalty, equal to 2.0% of the aggregate Subscription Amount paid by such Holder pursuant to the Purchase Agreement. The parties agree that the maximum aggregate liquidated damages payable to a Holder under this Agreement shall be 10% of the aggregate Subscription Amount paid by such Holder pursuant to the Purchase Agreement.  If the Company fails to pay any partial liquidated damages pursuant to this Section in full within seven days after the date payable, the Company will pay interest thereon at a rate of 18% per annum (or such lesser maximum amount that is permitted to be paid by applicable law) to the Holder, accruing daily from the date such partial liquidated damages are due until such amounts, plus all such interest thereon, are paid in full. The partial liquidated damages pursuant to the terms hereof shall apply on a daily pro rata basis for any portion of a month prior to the cure of an Event.

(e)    If Form S-3 is not available for the registration of the resale of Registrable Securities hereunder, the Company shall (i) register the resale of the Registrable Securities on another appropriate form and (ii) undertake to register the Registrable Securities on Form S-3 as soon as such form is available, provided that the Company shall maintain the effectiveness of the Registration Statement then in effect until such time as a Registration Statement on Form S-3 covering the Registrable Securities has been declared effective by the Commission.

3.    Registration Procedures.

In connection with the Company's registration obligations hereunder, the Company shall:

CONFIDENTIAL                                                                                    R023852

(a)      Not less than two (2) Trading Days prior to the filing of each Registration Statement and not less than one (1) Trading Day prior to the filing of any related Prospectus or any amendment or supplement thereto (including any document that would be incorporated or deemed to be incorporated therein by reference), the Company shall (i) furnish to each Holder copies of all such documents proposed to be filed, which documents (other than those incorporated or deemed to be incorporated by reference) will be subject to the review of such Holders, and (ii) cause its officers and directors, counsel and independent registered public accountants to respond to such inquiries as shall be necessary, in the reasonable opinion of respective counsel to each Holder, to conduct a reasonable investigation within the meaning of the Securities Act. Notwithstanding the above, the Company shall not be obligated to provide the Holders advance copies of any universal shelf registration statement registering securities in addition to those required hereunder, or any Prospectus prepared thereto.   The Company shall not file a Registration Statement or any such Prospectus or any amendments or supplements thereto to which the Holders of a majority of the Registrable Securities shall reasonably object in good faith, provided that, the Company is notified of such objection in writing no later than two (2) Trading Days after the Holders have been so furnished copies of a Registration Statement or one (1) Trading Day after the Holders have been so furnished copies of any related Prospectus or amendments or supplements thereto. Each Holder agrees to furnish to the Company a completed questionnaire in the form attached to this Agreement as <u>Annex B</u> (a "<u>Selling Stockholder Questionnaire</u>") on a date that is not less than the earlier of (i) two (2) Trading Days prior to the Filing Date or (ii) by the end of the fourth (4th) Trading Day following the date on which such Holder receives the Selling Stockholder Questionnaire from the Company or its representative.

(b)      (i) Prepare and file with the Commission such amendments, including post-effective amendments, to a Registration Statement and the Prospectus used in connection therewith as may be necessary to keep a Registration Statement continuously effective as to the applicable Registrable Securities for the Effectiveness Period and prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities, (ii) cause the related Prospectus to be amended or supplemented by any required Prospectus supplement (subject to the terms of this Agreement), and, as so supplemented or amended, to be filed pursuant to Rule 424, (iii) respond as promptly as reasonably possible to any comments received from the Commission with respect to a Registration Statement or any amendment thereto and provide as promptly as reasonably possible to the Holders true and complete copies of all correspondence from and to the Commission relating to a Registration Statement (provided that, the Company shall excise any information contained therein which would constitute material non-public information regarding the Company or any of its Subsidiaries), and (iv) comply in all material respects with the applicable provisions of the Securities

CONFIDENTIAL                                                                                                   R023853

Act and the Exchange Act with respect to the disposition of all Registrable Securities covered by a Registration Statement during the applicable period in accordance (subject to the terms of this Agreement) with the intended methods of disposition by the Holders thereof set forth in such Registration Statement as so amended or in such Prospectus as so supplemented.

(c)    If during the Effectiveness Period, the number of Registrable Securities at any time exceeds 100% of the number of shares of Common Stock then registered in a Registration Statement, then the Company shall file as soon as reasonably practicable, but in any case prior to the applicable Filing Date, an additional Registration Statement covering the resale by the Holders of not less than the number of such Registrable Securities.

(d)    Notify the Holders of Registrable Securities to be sold (which notice shall, pursuant to clauses (iii) through (vi) hereof, be accompanied by an instruction to suspend the use of the Prospectus until the requisite changes have been made) as promptly as reasonably possible (and, in the case of (i)(A) below, not less than one (1) Trading Day prior to such filing) and (if requested by any such Person) confirm such notice in writing no later than one (1) Trading Day following the day (i)(A) when a Prospectus or any Prospectus supplement or post-effective amendment to a Registration Statement is proposed to be filed, (B) when the Commission notifies the Company whether there will be a "review" of such Registration Statement and whenever the Commission comments in writing on such Registration Statement, and (C) with respect to a Registration Statement or any post-effective amendment, when the same has become effective, (ii) of any request by the Commission or any other federal or state governmental authority for amendments or supplements to a Registration Statement or Prospectus or for additional information, (iii) of the issuance by the Commission or any other federal or state governmental authority of any stop order suspending the effectiveness of a Registration Statement covering any or all of the Registrable Securities or the initiation of any Proceedings for that purpose, (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose, (v) of the occurrence of any event or passage of time that makes the financial statements included in a Registration Statement ineligible for inclusion therein or any statement made in a Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires any revisions to a Registration Statement, Prospectus or other documents so that, in the case of a Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, and (vi) of the occurrence or existence of any pending corporate development with respect to the Company that the Company believes may be material and that, in the determination of the

CONFIDENTIAL                                                                                     R023854

Company, makes it not in the best interest of the Company to allow continued availability of a Registration Statement or Prospectus, provided, however, in no event shall any such notice contain any information which would constitute material, non-public information regarding the Company or any of its Subsidiaries.

(e)     Use its reasonable efforts to avoid the issuance of, or, if issued, obtain the withdrawal of (i) any order stopping or suspending the effectiveness of a Registration Statement, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, at the earliest practicable moment.

(f)     Furnish to each Holder, without charge, at least one conformed copy of each such Registration Statement and each amendment thereto, including financial statements and schedules, all documents incorporated or deemed to be incorporated therein by reference to the extent requested by such Person, and all exhibits to the extent requested by such Person (including those previously furnished or incorporated by reference) promptly after the filing of such documents with the Commission; provided that electronic delivery shall be sufficient and any such item which is available on the EDGAR system (or successor thereto) need not be furnished in physical form.

(g)     Subject to the terms of this Agreement, the Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto, except after the giving of any notice pursuant to Section 3(d).

(h)     The Company shall cooperate with any broker-dealer through which a Holder proposes to resell its Registrable Securities in effecting a filing with the FINRA Corporate Financing Department pursuant to FINRA Rule 5110, as requested by any such Holder, and the Company shall pay the filing fee required by such filing within two (2) Business Days of request therefor.

(i)     Prior to any resale of Registrable Securities by a Holder, use its commercially reasonable efforts to register or qualify or cooperate with the selling Holders in connection with the registration or qualification (or exemption from the Registration or qualification) of such Registrable Securities for the resale by the Holder under the securities or Blue Sky laws of such jurisdictions within the United States as any Holder reasonably requests in writing, to keep each registration or qualification (or exemption therefrom) effective during the Effectiveness Period and to do any and all other acts or things reasonably necessary to enable the disposition in such jurisdictions of the Registrable Securities covered by each Registration Statement; provided, that, the Company shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified, subject the Company to any material tax in any such

CONFIDENTIAL                                                                          R023855

jurisdiction where it is not then so subject or file a general consent to service of process in any such jurisdiction.

(j)      If requested by a Holder, cooperate with such Holder to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be delivered to a transferee pursuant to a Registration Statement, which certificates shall be free, to the extent permitted by the Purchase Agreement, of all restrictive legends, and to enable such Registrable Securities to be in such denominations and registered in such names as any such Holder may request.

(k)      Upon the occurrence of any event contemplated by Section 3(d), as promptly as reasonably possible under the circumstances taking into account the Company's good faith assessment of any adverse consequences to the Company and its stockholders of the premature disclosure of such event, prepare a supplement or amendment, including a post-effective amendment, to a Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, neither a Registration Statement nor such Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  If the Company notifies the Holders in accordance with clauses (iii) through (vi) of Section 3(d) above to suspend the use of any Prospectus until the requisite changes to such Prospectus have been made, then the Holders shall suspend use of such Prospectus.  The Company will use its reasonable efforts to ensure that the use of the Prospectus may be resumed as promptly as is practicable.  The Company shall be entitled to exercise its right under this Section 3(k) to suspend the availability of a Registration Statement and Prospectus, subject to the payment of partial liquidated damages otherwise required pursuant to Section 2(d), for a period not to exceed 60 calendar days (which need not be consecutive days) in any 12-month period.

(l)      Comply with all applicable rules and regulations of the Commission.

(m)      [INTENTIONALLY DELETED]

(n)      The Company may require each selling Holder to furnish to the Company a certified statement as to the number of shares of Common Stock beneficially owned by such Holder and, if required by the Commission, the natural persons thereof that have voting and dispositive control over the shares. During any periods that the Company is unable to meet its obligations hereunder with respect to the registration of the Registrable Securities solely because any Holder fails to furnish such information within three Trading Days of the Company's request, any liquidated damages that are accruing at such time as to

CONFIDENTIAL                                                                            R023856

such Holder only shall be tolled and any Event that may otherwise occur solely because of such delay shall be suspended as to such Holder only, until such information is delivered to the Company.

4.        Registration Expenses. All fees and expenses incident to the performance of or compliance with, this Agreement by the Company shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses of the Company's counsel and independent registered public accountants) (A) with respect to filings made with the Commission, (B) with respect to filings required to be made with any Trading Market on which the Common Stock is then listed for trading, (C) in compliance with applicable state securities or Blue Sky laws reasonably agreed to by the Company in writing (including, without limitation, fees and disbursements of counsel for the Company in connection with Blue Sky qualifications or exemptions of the Registrable Securities) and (D) if not previously paid by the Company in connection with an Issuer Filing, with respect to any filing that may be required to be made by any broker through which a Holder intends to make sales of Registrable Securities with FINRA pursuant to FINRA Rule 5110, so long as the broker is receiving no more than a customary brokerage commission in connection with such sale, (ii) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) Securities Act liability insurance, if the Company so desires such insurance, and (vi) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. In addition, the Company shall be responsible for all of its internal expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange as required hereunder. In no event shall the Company be responsible for any broker or similar commissions of any Holder or, except to the extent provided for in the Transaction Documents, any legal fees or other costs of the Holders.

5.        Indemnification.

(a)        Indemnification by the Company. The Company shall, notwithstanding any termination of this Agreement, indemnify and hold harmless each Holder, the officers, directors, members, partners, agents, brokers (including brokers who offer and sell Registrable Securities as principal as a result of a pledge or any failure to perform under a margin call of Common Stock), investment advisors and employees (and any other Persons with a functionally equivalent role of a Person holding such titles, notwithstanding a lack of such title or any other title) of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, members, stockholders, partners, agents

CONFIDENTIAL                                                                                                    R023857

and employees (and any other Persons with a functionally equivalent role of a Person holding such titles, notwithstanding a lack of such title or any other title) of each such controlling Person (each a "Holder Party"), to the fullest extent permitted by applicable law, from and against any and all Losses, as incurred, arising out of or relating to (1) any untrue or alleged untrue statement of a material fact contained in a Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading or (2) any violation or alleged violation by the Company of the Securities Act, the Exchange Act or any state securities law, or any rule or regulation thereunder, in connection with the performance of its obligations under this Agreement (the matters in the foregoing clauses (1) and (2) being, collectively, "Violations"); provided, however, that (i) the indemnification hereunder shall not apply to a Loss arising out of or based solely upon a Violation which occurs in reliance upon and in conformity with information regarding the applicable Holder furnished in writing to the Company by the Holder expressly for use in connection with the preparation of a Registration Statement or any such amendment thereof or supplement thereto (it being understood that the Holder has provided Annex A for this purpose) and (ii) in the case of an occurrence of an event of the type specified in Section 3(d)(iii)-(vi), the use by such Holder of an outdated, defective or otherwise unavailable Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated, defective or otherwise unavailable for use by such Holder and prior to the receipt by such Holder of the Advice contemplated in Section 6(d), but only if and to the extent that following the receipt of the Advice the misstatement or omission giving rise to such Loss would have been corrected.  The Company shall notify the Holders promptly of the institution, threat or assertion of any Proceeding arising from or in connection with the transactions contemplated by this Agreement of which the Company is aware. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such indemnified person and shall survive the transfer of any Registrable Securities by any of the Holders in accordance with Section 6(h).

(b) <u>Indemnification by Holders.</u> Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the officers, directors, members, stockholders, partners, agents and employees (and any other Persons with a functionally equivalent role of a Person holding such titles, notwithstanding a lack of such title or any other title) of each such controlling Person, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, to the extent arising out of or based solely upon: (x) such Holder's failure to comply with any applicable prospectus delivery

CONFIDENTIAL                                                                          R023858

requirements of the Securities Act through no fault of the Company or (y) any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading (i) to the extent that such untrue statement or omission is contained in any information so furnished in writing by such Holder to the Company expressly for inclusion in such Registration Statement or such Prospectus or (ii) to the extent that such information relates to such Holder's proposed method of distribution of Registrable Securities and was provided to such Holder prior to filing in the Registration Statement and expressly approved in writing by such Holder (it being understood that the Holder has approved <u>Annex A</u> hereto for this purpose), such Prospectus or in any amendment or supplement thereto or (iii) in the case of an occurrence of an event of the type specified in Section 3(d)(iii)-(vi), to the extent related to the use by such Holder of an outdated, defective or otherwise unavailable Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated, defective or otherwise unavailable for use by such Holder and prior to the receipt by such Holder of the Advice contemplated in Section 6(d), but only if and to the extent that following the receipt of the Advice the misstatement or omission giving rise to such Loss would have been corrected. In no event shall the liability of any selling Holder under this Section 5(b) be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

(c)     <u>Conduct of Indemnification Proceedings</u>. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "<u>Indemnified Party</u>"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "<u>Indemnifying Party</u>") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof; provided, that, the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that such failure shall have materially and adversely prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless:  (1) the Indemnifying Party has agreed in writing to pay such fees and expenses, (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding, or (3) the named parties to any such

CONFIDENTIAL                                                                                    R023859

Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and counsel to the Indemnified Party shall reasonably believe that a material conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and the reasonable fees and expenses of no more than one separate counsel shall be at the expense of the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld or delayed. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

(d)     Contribution. If the indemnification under Section 5(a) or 5(b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Party, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in this Agreement, any reasonable attorneys' or other fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in this Section was available to such party in accordance with its terms.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 5(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 5(d), no Holder shall be required to contribute pursuant to this Section 5(d), in the aggregate, any amount in excess of the amount by which the net proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of

CONFIDENTIAL                                                                          R023860

any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.

The indemnity and contribution agreements contained in this Section are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties.

6.      Miscellaneous.

(a)      Remedies.  In the event of a breach by the Company or by a Holder of any of their respective obligations under this Agreement, each Holder or the Company, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, shall be entitled to specific performance of its rights under this Agreement.  Each of the Company and each Holder agrees that monetary damages may not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and hereby further agrees that, in the event of any action for specific performance in respect of such breach, it shall not assert or shall waive the defense that a remedy at law would be adequate.

(b)      No Piggyback on Registrations; Prohibition on Filing Other Registration Statements.  Except as set forth on Schedule 6(b) attached hereto, neither the Company nor any of its security holders (other than the Holders in such capacity pursuant hereto) may include securities of the Company in any Registration Statements other than the Registrable Securities.  The Company shall not file any other registration statements until all Registrable Securities are registered pursuant to a Registration Statement that is declared effective by the Commission, provided that this Section 6(b) (i) shall not prohibit the Company from filing amendments to registration statements filed prior to the date of this Agreement and (ii) shall not prohibit the Company from filing a registration statement on Form S-1 for a primary offering by the Company, provided that the Company makes no offering of securities pursuant to such registration statement prior to the effective date of the Registration Statement required hereunder that includes all of the Registrable Securities.

(c)      Compliance.  Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it (unless an exemption therefrom is available) in connection with sales of Registrable Securities pursuant to a Registration Statement.

(d)      Discontinued Disposition.  By its acquisition of Registrable Securities, each Holder agrees that, upon receipt of a notice from the Company of the occurrence of any event of the kind described in Section 3(d)(iii) through (vi), such Holder will forthwith discontinue disposition of such Registrable Securities under a Registration Statement until it is advised in writing (the "Advice") by the Company that the use of the applicable Prospectus (as it may have been supplemented or amended) may be resumed. The Company will use its reasonable efforts to ensure that the use of the Prospectus may be resumed as promptly as is practicable.  The Company agrees and acknowledges that

CONFIDENTIAL                                                                          R023861

any periods during which the Holder is required to discontinue the disposition of the Registrable Securities hereunder shall be subject to the provisions of Section 2(d).

(e)      <u>Piggy-Back Registrations.</u> If, at any time during the Effectiveness Period, there is not an effective Registration Statement covering all of the Registrable Securities and the Company shall determine to prepare and file with the Commission a registration statement relating to an offering for its own account or the account of others under the Securities Act of any of its equity securities, other than on Form S-4 or Form S-8 (each as promulgated under the Securities Act) or their then equivalents relating to equity securities to be issued solely in connection with any acquisition of any entity or business or equity securities issuable in connection with the Company's stock option or other employee benefit plans, then the Company shall deliver to each Holder a written notice of such determination and, if within fifteen days after the date of the delivery of such notice, any such Holder shall so request in writing, the Company shall include in such registration statement all or any part of such Registrable Securities such Holder requests to be registered; <u>provided, however,</u> that the Company shall not be required to register any Registrable Securities pursuant to this Section 6(e) that are eligible for resale pursuant to Rule 144 (without volume restrictions or current public information requirements) promulgated by the Commission pursuant to the Securities Act or that are the subject of a then effective Registration Statement.

(f)      <u>Amendments and Waivers.</u> The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the same shall be in writing and signed by the Company and the Holders of 67% or more of the then outstanding Registrable Securities (for purposes of clarification, this includes any Registrable Securities issuable upon exercise or conversion of any Security).  If a Registration Statement does not register all of the Registrable Securities pursuant to a waiver or amendment done in compliance with the previous sentence, then the number of Registrable Securities to be registered for each Holder shall be reduced pro rata among all Holders and each Holder shall have the right to designate which of its Registrable Securities shall be omitted from such Registration Statement. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of a Holder or some Holders and that does not directly or indirectly affect the rights of other Holders may be given only by such Holder or Holders of all of the Registrable Securities to which such waiver or consent relates; <u>provided, however,</u> that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the first   sentence of this Section 6(f). No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of this Agreement unless the same consideration also is offered to all of the parties to this Agreement.

(g)      <u>Notices.</u> Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be delivered as set forth in the Purchase Agreement.

CONFIDENTIAL                                                                                                      R023862

(h)    <u>Successors and Assigns.</u>  This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties and shall inure to the benefit of each Holder. The Company may not assign (except by merger) its rights or obligations hereunder without the prior written consent of all of the Holders of the then outstanding Registrable Securities.  Each Holder may assign their respective rights hereunder in the manner and to the Persons as permitted under Section 5.7 of the Purchase Agreement.

(i)    <u>No Inconsistent Agreements.</u>  Neither the Company nor any of its Subsidiaries has entered, as of the date hereof, nor shall the Company or any of its Subsidiaries, on or after the date of this Agreement, enter into any agreement with respect to its securities, that would have the effect of impairing the rights granted to the Holders in this Agreement or otherwise conflicts with the provisions hereof.  Except as set forth on <u>Schedule 6(i),</u> neither the Company nor any of its Subsidiaries has previously entered into any agreement granting any registration rights with respect to any of its securities to any Person that have not been satisfied in full.

(j)    <u>Execution and Counterparts.</u>  This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart.  In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

(k)    <u>Governing Law.</u>   All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be determined in accordance with the provisions of the Purchase Agreement.

(l)    <u>Cumulative Remedies.</u>  The remedies provided herein are cumulative and not exclusive of any other remedies provided by law.

(m)    <u>Severability.</u>  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

CONFIDENTIAL                                                           R023863

(n)     <u>Headings</u>. The headings in this Agreement are for convenience only, do not constitute a part of the Agreement and shall not be deemed to limit or affect any of the provisions hereof.

(o)     <u>Independent Nature of Holders' Obligations and Rights</u>. The obligations of each Holder hereunder are several and not joint with the obligations of any other Holder hereunder, and no Holder shall be responsible in any way for the performance of the obligations of any other Holder hereunder. Nothing contained herein or in any other agreement or document delivered at any closing, and no action taken by any Holder pursuant hereto or thereto, shall be deemed to constitute the Holders as a partnership, an association, a joint venture or any other kind of group or entity, or create a presumption that the Holders are in any way acting in concert or as a group or entity with respect to such obligations or the transactions contemplated by this Agreement or any other matters, and the Company acknowledges that the Holders are not acting in concert or as a group, and the Company shall not asset any such claim, with respect to such obligations or transactions. Each Holder shall be entitled to protect and enforce its rights, including without limitation the rights arising out of this Agreement, and it shall not be necessary for any other Holder to be joined as an additional party in any proceeding for such purpose. The use of a single agreement with respect to the obligations of the Company contained was solely in the control of the Company, not the action or decision of any Holder, and was done solely for the convenience of the Company and not because it was required or requested to do so by any Holder.  It is expressly understood and agreed that each provision contained in this Agreement is between the Company and a Holder, solely, and not between the Company and the Holders collectively and not between and among Holders.

********************

*(Signature Pages Follow)*

CONFIDENTIAL                                                                     R023864

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**DESERT GATEWAY, INC.**


By:     _____          ____
      Name:
      Title:


[SIGNATURE PAGE OF HOLDERS FOLLOWS]

84698344v4

CONFIDENTIAL

R023865

[SIGNATURE PAGE OF HOLDERS TO RTRX RRA]

Name of Holder: _____

*Signature of Authorized Signatory of Holder*: _____

Name of Authorized Signatory: _____

Title of Authorized Signatory: _____

[SIGNATURE PAGES CONTINUE]

84698344v4

**Annex A**

<u>Plan of Distribution</u>

Each Selling Stockholder (the "<u>Selling Stockholders</u>") of the securities and any of their pledgees, assignees and successors-in-interest may, from time to time, sell any or all of their securities covered hereby on the principal Trading Market or any other stock exchange, market or trading facility on which the securities are traded or in private transactions. These sales may be at fixed or negotiated prices. A Selling Stockholder may use any one or more of the following methods when selling securities:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- block trades in which the broker-dealer will attempt to sell the securities as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- settlement of short sales;

- in transactions through broker-dealers that agree with the Selling Stockholders to sell a specified number of such securities at a stipulated price per security;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- a combination of any such methods of sale; or

- any other method permitted pursuant to applicable law.

The Selling Stockholders may also sell securities under Rule 144 under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), if available, rather than under this prospectus.

Broker-dealers engaged by the Selling Stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the Selling Stockholders (or, if any broker-dealer acts as agent for the purchaser of securities, from the purchaser) in amounts to be negotiated, but, except as

84698344v4

R023867

set forth in a supplement to this Prospectus, in the case of an agency transaction not in excess of a customary brokerage commission in compliance with FINRA Rule 2440; and in the case of a principal transaction a markup or markdown in compliance with FINRA IM-2440.

In connection with the sale of the securities or interests therein, the Selling Stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the securities in the course of hedging the positions they assume. The Selling Stockholders may also sell securities short and deliver these securities to close out their short positions, or loan or pledge the securities to broker-dealers that in turn may sell these securities. The Selling Stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or create one or more derivative securities which require the delivery to such broker-dealer or other financial institution of securities offered by this prospectus, which securities such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

The Selling Stockholders and any broker-dealers or agents that are involved in selling the securities may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the securities purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. Each Selling Stockholder has informed the Company that it does not have any written or oral agreement or understanding, directly or indirectly, with any person to distribute the securities. In no event shall any broker-dealer receive fees, commissions and markups which, in the aggregate, would exceed eight percent (8%).

The Company is required to pay certain fees and expenses incurred by the Company incident to the registration of the securities. The Company has agreed to indemnify the Selling Stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

Because Selling Stockholders may be deemed to be "underwriters" within the meaning of the Securities Act, they will be subject to the prospectus delivery requirements of the Securities Act including Rule 172 thereunder. In addition, any securities covered by this prospectus which qualify for sale pursuant to Rule 144 under the Securities Act may be sold under Rule 144 rather than under this prospectus. The Selling Stockholders have advised us that there is no underwriter or coordinating broker acting in connection with the proposed sale of the resale securities by the Selling Stockholders.

We agreed to keep this prospectus effective until the earlier of (i) the date on which the securities may be resold by the Selling Stockholders without registration and without regard to any volume or manner-of-sale limitations by reason of Rule 144, without the requirement for the Company to be in compliance with the current public information under Rule 144 under the Securities Act or any other rule of similar effect or (ii) all of the securities have been sold pursuant to this prospectus or Rule 144 under the

CONFIDENTIAL                                                                     R023868

Securities Act or any other rule of similar effect.  The resale securities will be sold only through registered or licensed brokers or dealers if required under applicable state securities laws. In addition, in certain states, the resale securities covered hereby may not be sold unless they have been registered or qualified for sale in the applicable state or an exemption from the registration or qualification requirement is available and is complied with.

Under applicable rules and regulations under the Exchange Act, any person engaged in the distribution of the resale securities may not simultaneously engage in market making activities with respect to the common stock for the applicable restricted period, as defined in Regulation M, prior to the commencement of the distribution.  In addition, the Selling Stockholders will be subject to applicable provisions of the Exchange Act and the rules and regulations thereunder, including Regulation M, which may limit the timing of purchases and sales of securities of the common stock by the Selling Stockholders or any other person.  We will make copies of this prospectus available to the Selling Stockholders and have informed them of the need to deliver a copy of this prospectus to each purchaser at or prior to the time of the sale (including by compliance with Rule 172 under the Securities Act).

CONFIDENTIAL                                                                              R023869

**Annex B**

# DESERT GATEWAY, INC.

### Selling Stockholder Notice and Questionnaire

The undersigned beneficial owner of common stock (the "Registrable Securities") of Desert Gateway, Inc., a Delaware corporation (the "Company"), understands that the Company has filed or intends to file with the Securities and Exchange Commission (the "Commission") a registration statement (the "Registration Statement") for the registration and resale under Rule 415 of the Securities Act of 1933, as amended (the "Securities Act"), of the Registrable Securities, in accordance with the terms of the Registration Rights Agreement (the "Registration Rights Agreement") to which this document is annexed. A copy of the Registration Rights Agreement is available from the Company upon request at the address set forth below. All capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Registration Rights Agreement.

Certain legal consequences arise from being named as a selling stockholder in the Registration Statement and the related prospectus. Accordingly, holders and beneficial owners of Registrable Securities are advised to consult their own securities law counsel regarding the consequences of being named or not being named as a selling stockholder in the Registration Statement and the related prospectus.

### NOTICE

The undersigned beneficial owner (the "Selling Stockholder") of Registrable Securities hereby elects to include the Registrable Securities owned by it in the Registration Statement.

84698344v3

The undersigned hereby provides the following information to the Company and represents and warrants that such information is accurate:

## QUESTIONNAIRE

1.    **Name.**

    (a)    Full Legal Name of Selling Stockholder

    _____

    (b)    Full Legal Name of Registered Holder (if not the same as (a) above) through which Registrable Securities are held:

    _____

    (c)    Full Legal Name of Natural Control Person (which means a natural person who directly or indirectly alone or with others has power to vote or dispose of the securities covered by this Questionnaire):

    _____

**2.  Address for Notices to Selling Stockholder:**

_____

_____

Telephone:_____

Fax:_____

Contact Person:_____

**3.  Broker-Dealer Status:**

    (a)    Are you a broker-dealer?

            Yes  ☐        No  ☐

    (b)    If "yes" to Section 3(a), did you receive your Registrable Securities as compensation for investment banking services to the Company?

            Yes  ☐        No  ☐

Note:  If "no" to Section 3(b), the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement.

CONFIDENTIAL                                                                       R023871

(c)      Are you an affiliate of a broker-dealer?

Yes  ☐          No  ☐

(d)      If you are an affiliate of a broker-dealer, do you certify that you purchased the Registrable Securities in the ordinary course of business, and at the time of the purchase of the Registrable Securities to be resold, you had no agreements or understandings, directly or indirectly, with any person to distribute the Registrable Securities?

Yes  ☐          No  ☐

Note:  If "no" to Section 3(d), the Commission's staff has indicated that you should be identified as an underwriter in the Registration Statement.

**4.  Beneficial Ownership of Securities of the Company Owned by the Selling Stockholder.**

*Except as set forth below in this Item 4, the undersigned is not the beneficial or registered owner of any securities of the Company other than the securities issuable pursuant to the Purchase Agreement.*

(a)      Type and Amount of other securities beneficially owned by the Selling Stockholder:

_____

_____

CONFIDENTIAL                                                                    R023872

**5.  Relationships with the Company:**

*Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (owners of 5% of more of the equity securities of the undersigned) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.*

State any exceptions here:

_____

_____

The undersigned agrees to promptly notify the Company of any inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof at any time while the Registration Statement remains effective.

By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to Items 1 through 5 and the inclusion of such information in the Registration Statement and the related prospectus and any amendments or supplements thereto.  The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the Registration Statement and the related prospectus and any amendments or supplements thereto.

IN WITNESS WHEREOF the undersigned, by authority duly given, has caused this Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Date: _____        Beneficial Owner: _____

By: _____

Name:

Title:

**PLEASE FAX A COPY (OR EMAIL A .PDF COPY) OF THE COMPLETED AND EXECUTED NOTICE AND QUESTIONNAIRE, AND RETURN THE ORIGINAL BY OVERNIGHT MAIL, TO:**

84698344v3

4

CONFIDENTIAL

R023873

SABBY MANAGEMENT, LLC                                    CONFIDENTIAL

## DESERT GATEWAY, INC.
## (OTCPK: RTRX)
## *Term Sheet for Offering of Common Stock*

*The purpose of this letter is to set forth the indicative terms pursuant to which, subject to certain conditions set forth herein, funds managed by Sabby Management, LLC (the "Investor") would purchase certain securities of Desert Gateway, Inc. (the "Company"), and the Company would sell such securities to the Investor (a "Transaction"). The terms and conditions set forth herein are subject to change and this letter does not constitute an offer. The issuance and sale of such securities is subject to completion of due diligence to the Investor's satisfaction, the preparation of definitive documentation to effect the Transaction that is mutually satisfactory to each party and, in the case of the Investor, that the Investor shall have determined that subsequent to the date hereof and prior to the closing of the Transaction, there shall have been no material adverse developments relating to the business, assets, operations, properties, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole. Neither this Term Sheet nor any discussion or negotiation of the Transaction constitutes an agreement or obligation on the part of any person to purchase securities of the Company or enter into any agreement to purchase securities of the Company.*

| | |
|---|---|
| **Issuer:** | Desert Gateway, Inc. (the "Company") |
| **Issue:** | A minimum of $10 million of common stock and common stock purchase warrants of the Company. |
| **Purchase Price:** | 85% of the average of the daily VWAPs for the 10 trading day period ending the day prior to the Closing Date. |
| **Investors:** | Funds managed by Sabby Management, LLC (collectively, "Sabby") and a small number of Qualified Institutional Buyers / Accredited Investors reasonably acceptable to the Company and to the Investor. Sabby will participate up to an amount that represents ownership of 9% of the outstanding common shares of the Company after consummation of the Transaction. |
| **Closing Date:** | Expected within ten days after the signing of a term sheet by the Company and the Investor. |
| **Warrants:** | Each Investor shall receive warrants to purchase shares of Common Stock with an exercise price equal to 120% of the Purchase Price, subject to adjustment as provided herein.  The total number of Warrants issued shall be equal to 50% of the number of shares purchased by such Investor. The Warrants shall have a term of exercise of 5 years beginning on the date of issuance (the "Warrants").  The warrants will only have a cashless exercise provision if the Investor is selling the Common Stock underlying the Warrants pursuant to Rule 144 under the Securities Act of 1933 because the Common Stock and the Common Stock into which the Warrants are exercisable was not registered prior to the four-month anniversary of the Closing Date. |
| **Registration Rights:** | The Company will file a registration statement with SEC (the "Registration Statement") to register for resale by the Investors no less than 100% of the shares of common stock issued and 100% of the Warrant shares 30 days of the Closing Date and will use its best efforts to cause such Registration Statement to become effective within 60 days of the closing date (or 90 days in the event of a regulatory review).  If (i) the Registration Statement is not filed or declared effective as indicated above, or (ii) the Company does not file pre-effective amendments or otherwise respond in writing to comments made by the SEC to such Registration Statement within 10 trading days of each such comment or request, or (iii) the Company does not file with the SEC a request for acceleration within 4 days of the date the Company is notified by the SEC that its Registration Statement will not be reviewed or will not be subject to further review or (iv) the Registration Statement is not declared effective  as indicated above and maintained effective thereafter, then the |

CONFIDENTIAL                                                              R023874

SABBY MANAGEMENT, LLC                                    CONFIDENTIAL

Company will pay liquidated cash damages of 2.0% of the aggregate purchase price for every month following the required filing or effective date (pro-rated for partial months); provided, however that the Company shall not be required to pay liquidated cash damages in excess of 10.0% of the aggregate purchase price.

**Anti-dilution:** In the event the Company, at any time while Warrants are still outstanding, issues or grants any right to re-price, common stock or any type of securities giving right to common stock at a price below the then effective exercise price, the Investor shall be extended full-ratchet anti-dilution protection on the Warrants (reduction in price only) then outstanding.

**Future Financings:** From the closing date to 45 days following the effective date of registration, (i) the Company must obtain the prior written consent of two-thirds (2/3) of the Investors before entering into any subsequent financing transaction, and (ii) at any time when any Warrants are outstanding, Investors that invested an amount that represents ownership of 8% or more of the outstanding common shares of the Company after consummation of the Transaction shall have a right to participate in any proposed financings for an amount up to their *pro rata* ownership in the Company (without giving effect to any Warrants that are outstanding).

**Additional Covenants:** The definitive agreements will contain provisions prohibiting the company from issuing variable priced equity or variable priced equity linked securities.

**Counsel:** The Investors shall use Ellenoff Grossman & Schole LLP, who shall initially draft the documents on behalf of the Investors, and following the closing of the transaction, the Company shall pay (or cause to be paid) the reasonable legal fees of the Investor's Counsel which shall not exceed $25,000 in the aggregate without the prior written consent of the Company. The Company shall retain Katten Muchin Rosenman LLP.

**Expiration Date:** The present term sheet will expire, unless signed by both parties or extended in writing, at the close of business on February 4, 2013.

## DESERT GATEWAY, INC.

Agreed: *Marty Shkreli*   Date: 1/31/13
Name: Martin Shkreli   Title: Chief Executive Officer

## Sabby Management, LLC

Agreed: ......................   Date: ......................
Name: ......................   Title: ......................

*The terms and conditions set forth herein are indicative and subject to change based on market conditions. Neither this Term Sheet nor any discussion or negotiation of the proposed transaction constitutes an agreement or obligation on the part of any person to purchase securities of the Company or enter into any agreement to purchase securities of the Company. Any such agreement or obligation shall arise solely upon execution and delivery to the Company by a Purchaser of definitive documents acceptable to such Purchaser.*

CONFIDENTIAL                                    R023875

**From:**          Greebel, Evan L. <evan.greebel@kattenlaw.com>
**Sent:**          Monday, December 31, 2012 12:20 AM
**To:**            'martin@msmbcapital.com'
**Subject:**       Re: heskett

Even better

-----------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

----- Original Message -----
From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Sunday, December 30, 2012 07:18 PM
To: Greebel, Evan L.
Subject: RE: heskett

Minimal stuff

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Sunday, December 30, 2012 4:36 PM
To: Martin Shkreli
Subject: Re: heskett

What do they want for it

-----------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

----- Original Message -----
From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Sunday, December 30, 2012 04:11 PM
To: Greebel, Evan L.
Subject: RE: heskett

Appears okay

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Sunday, December 30, 2012 3:34 PM
To: Martin Shkreli
Subject: Re: heskett

Did you ever square with ligan for next extension?

-----------------------------------------------------------

GOVERNMENT
EXHIBIT
**510**
15 CR 637 (KAM) (EG)

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

----- Original Message -----
From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Sunday, December 30, 2012 03:33 PM
To: Greebel, Evan L.
Subject: RE: heskett

yes

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Sunday, December 30, 2012 3:33 PM
To: Martin Shkreli
Subject: Re: heskett

More importantly, will aselage sign a resolution to do it?

--------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

----- Original Message -----
From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Sunday, December 30, 2012 03:32 PM
To: Greebel, Evan L.
Subject: RE: heskett

Great - I will do my best to get money in

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Sunday, December 30, 2012 3:32 PM
To: Martin Shkreli
Subject: Re: heskett

Not sure how its an if-i got that you want it filed and there is nothing holding that up

--------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

----- Original Message -----
From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Sunday, December 30, 2012 03:30 PM
To: Greebel, Evan L.
Subject: RE: heskett

CONFIDENTIAL

R049751

Still sounds like an if and im not sure for Retrophin's goals I can work with that - I am doing my best to get as much money as possible but I also need the thing filed

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Sunday, December 30, 2012 3:30 PM
To: Martin Shkreli
Subject: Re: heskett

Given the holiday it would be very difficult to get it filed tomorrow. On thurs/fri you told me you would have $ on wed. and I gave you the note and warrant to use. Follow that timeline through and you should be able to get me the money wed and file wed/thurs

--------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

----- Original Message -----
From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Sunday, December 30, 2012 03:27 PM
To: Greebel, Evan L.
Subject: RE: heskett

Wish I knew more... trying my best to get some $ in ASAP

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Sunday, December 30, 2012 3:27 PM
To: Martin Shkreli
Subject: Re: heskett

I can handle it--but i need some understanding on payment

--------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

----- Original Message -----
From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Sunday, December 30, 2012 03:26 PM
To: Greebel, Evan L.
Subject: RE: heskett

Im not expecting free but I need to get my name change done somehow

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Sunday, December 30, 2012 3:26 PM
To: Martin Shkreli
Subject: Re: heskett

CONFIDENTIAL

R049752

I dont make ultimatums and im not sure why you think that i am

As we discussed i have donethe documents, but it is not right to be expected to work for free

---------------------------------------------------------

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

----- Original Message -----
From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Sunday, December 30, 2012 03:24 PM
To: Greebel, Evan L.
Subject: RE: heskett

That's fine - I just have a full plate and if you won't help me without "xy or z", then it would be good to know that - I think we are clear - I will try to get our name change done one way or another

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Sunday, December 30, 2012 3:23 PM
To: Martin Shkreli
Subject: Re: heskett

That was never my position

We agreed to a plan 2 weeks ago which contemplated 100k being paid by year end. I did the work for the 8k and 13d based on that agreement. You paid 25 (when you said you would pay 50). How do you want to proceed?

---------------------------------------------------------

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

----- Original Message -----
From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Sunday, December 30, 2012 03:19 PM
To: Greebel, Evan L.
Subject: RE: heskett

Okay - so it is your position you will not do any work for us any longer until paid?

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Sunday, December 30, 2012 3:19 PM
To: Martin Shkreli
Subject: Re: heskett

Its not

---------------------------------------------------------

CONFIDENTIAL

R049753

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

----- Original Message -----
From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Sunday, December 30, 2012 03:18 PM
To: Greebel, Evan L.
Subject: RE: heskett

Okay - marek thinks I should find an attorney who will do it ASAP - seems trivial enough

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Sunday, December 30, 2012 3:18 PM
To: Martin Shkreli
Subject: Re: heskett

Sorry-didnt realize you changed topics; we can file once the other thing is addressed or partially addressed

-----------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

----- Original Message -----
From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Sunday, December 30, 2012 03:15 PM
To: Greebel, Evan L.
Subject: RE: heskett

Any way to get the docs filed?

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 8:40 PM
To: Martin Shkreli
Subject: RE: heskett

it is what it is, hopefully you can get me the promised money by wed....b/c at this point i need to be the top of the list and not waiting behind others anymore

re: name change, bloomberg, yahoo and finra will not be able to update their various sites until the necessary paper work is filed with delaware etc

From: Martin Shkreli [Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 7:24 PM
To: Greebel, Evan L.
Subject: RE: heskett

Retrophin owes msmb 900k - msmb is in the same position you are in

CONFIDENTIAL                                                                    R049754

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 8:24 PM
To: Martin Shkreli
Subject: RE: heskett

no, but msmb could pay its own bill (which retrophin had previously paid)

_____

From: Martin Shkreli [Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 7:21 PM
To: Greebel, Evan L.
Subject: RE: heskett

Msmb cannot pay retrophin's bills any further - I wish it could

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 8:21 PM
To: Martin Shkreli
Subject: RE: heskett

for a variety of reasons that is not true...is msmb in position to pay any money; as we have discussed retrophin paid a
portion of msmb bills at your direction

_____

From: Martin Shkreli [Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 7:17 PM
To: Greebel, Evan L.
Subject: RE: heskett

It's a pitch, I think he will do 250, I am speculating between him and other potential investors My back is as much against
the wall as yours

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 8:04 PM
To: Martin Shkreli
Subject: RE: heskett

didnt realoize you were pitching it-previously you said hje was in for 250

_____

From: Martin Shkreli [Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 6:46 PM
To: Greebel, Evan L.
Subject: RE: heskett

Im going to review it, think about my pitch, my ask you questions and then send it

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 7:37 PM

CONFIDENTIAL

R049755

To: Martin Shkreli
Subject: RE: heskett

did you send the note and warrant to the guy investing 250?

_____

From: Martin Shkreli [Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 6:33 PM
To: Greebel, Evan L.
Subject: RE: heskett

Still no news on the other thing
I am doing my best to get the funds

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 7:32 PM
To: Martin Shkreli
Subject: RE: heskett

not sure what you can do; he has the stock

please make wed a reality for the wire, im out of time and when we discussed 2 weeks ago you assured mde that you would ger me 100+ by yr end. last week you reiterated that and promised it sine you got the money from ron's guy

what happened on the other thing

_____

From: Martin Shkreli [Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 6:27 PM
To: Greebel, Evan L.
Subject: RE: heskett

I have to get my thoughts together regarding tim

-----Original Message-----
From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 6:59 PM
To: Martin Shkreli
Subject: RE: heskett

do you want to speak?

_____

From: Martin Shkreli [Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 5:00 PM
To: Greebel, Evan L.
Subject: RE: heskett

zero chance for monday. maybe wednesday but monday is tough

-----Original Message-----

CONFIDENTIAL                                                                                  R049756

From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 5:40 PM
To: Martin Shkreli
Subject: RE: heskett

i called you--i seriously need money on monday. This is a real problem for me. Pleasre confirm that you are sending the 100+ that we discussed.


I sent you the note and warrant you asked for

_____
From: Martin Shkreli [Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 4:21 PM
To: Greebel, Evan L.
Subject: RE: heskett

Lets chat when you get a second 646 217 2783

From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 11:28 AM
To: Martin Shkreli
Subject: Re: heskett

Im confirming with trandfer agent that there is no other freely trading stock

-------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 11:27 AM
To: Greebel, Evan L.
Subject: RE: heskett

hmmmm

From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 11:26 AM
To: Martin Shkreli
Subject: Re: heskett

I dont knoiw-there is no freely trading stock other than you guys and the 500k that fearnow has

-------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 11:18 AM

CONFIDENTIAL

R049757

To: Greebel, Evan L.
Subject: RE: heskett

The stock is trading like crazy - someone is selling the shit out of it

From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 11:18 AM
To: Martin Shkreli
Subject: Re: heskett

Someone had 30k or so, why?no one has freely trading stock though

---------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 11:14 AM
To: Greebel, Evan L.
Subject: RE: heskett

How much did he hold?

From: Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
Sent: Friday, December 28, 2012 11:14 AM
To: Martin Shkreli
Subject: Re: heskett

Cancelled a portion, he held a portion

---------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

From: Martin Shkreli [mailto:Martin@msmbcapital.com]
Sent: Friday, December 28, 2012 11:07 AM
To: Greebel, Evan L.
Subject: heskett

are we sure heskett/rosetta surrendered their shares to us?

CONFIDENTIAL

R049758

| | |
|---|---|
| **From:** | Greebel, Evan L. [evan.greebel@kattenlaw.com] |
| **Sent:** | Friday, February 22, 2013 7:56 PM |
| **To:** | Martin Shkreli |
| **Subject:** | RE: sarah hassan |

I figured, how much do they want

**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

**From:** Martin Shkreli [mailto:Martin@msmbcapital.com]
**Sent:** Friday, February 22, 2013 2:53 PM
**To:** Greebel, Evan L.
**Subject:** sarah hassan

sarah = same situation as lindsay
also fred hassan's daughter

==========================================================
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used
by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.
==========================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive
use of the individual or entity to whom it is addressed and may contain information that is
proprietary, privileged, confidential and/or exempt from disclosure under applicable law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the original
message without making any copies.
==========================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
==========================================================



GOVERNMENT
EXHIBIT
**525**
15 CR 637 (KAM) (EG)

1

CONFIDENTIAL

R023217

| | |
|---|---|
| **From:** | Martin Shkreli [Martin@retrophin.com] |
| **Sent:** | Wednesday, April 17, 2013 6:42 PM |
| **To:** | Greebel, Evan L. |
| **Subject:** | RE: Settlement and Release Agreement |

Couple nits – in section 1 the interest is in MSMB Capital Management LP
Next it should contemplate releasing any liability from Retrophin and that's one of the reasons or benefits of the exchange
Retrophin will be making the payment
Other than that we're good to go

**From:** Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
**Sent:** Wednesday, April 17, 2013 12:11 PM
**To:** Martin Shkreli
**Subject:** FW: Settlement and Release Agreement

This is what Sarah sent

**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

**From:** Martin Shkreli [mailto:Martin@retrophin.com]
**Sent:** Monday, April 08, 2013 4:18 PM
**To:** Greebel, Evan L.
**Subject:** FW: Settlement and Release Agreement

**From:** Sarah Hassan [mailto:sarah.hassan@dynagrowcapital.com]
**Sent:** Friday, April 5, 2013 2:12 PM
**To:** Martin Shkreli
**Subject:** Settlement and Release Agreement

Hi Martin,

Sorry for the delay. I was hoping to get this back to you yesterday.

Looking forward to hearing from you soon.

Best,
Sarah
=============================================================
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal
Revenue
Service, any tax advice contained herein is not intended or written to be used and cannot
be used

1

GOVERNMENT
EXHIBIT
**563**
15 CR 637 (KAM) (EG)

by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the
taxpayer.
============================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the
exclusive
use of the individual or entity to whom it is addressed and may contain information that
is
proprietary, privileged, confidential and/or exempt from disclosure under applicable
law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying,
disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please
notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the
original
message without making any copies.
============================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership
that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
============================================================

CONFIDENTIAL                                                                    R023256

| | |
|---|---|
| **From:** | Greebel, Evan L. [evan.greebel@kattenlaw.com] |
| **Sent:** | Friday, April 19, 2013 1:50 PM |
| **To:** | Martin Shkreli |
| **Subject:** | RE: Agreement |
| **Attachments:** | Form Consulting Agreement.doc |

Attached is a draft of a form—I think you should get blanket approval from the board for you to retain consultants who may be paid in cash or stock up to an aggregate amount of $_____

**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)

**From:** Martin Shkreli [mailto:Martin@msmbcapital.com]
**Sent:** Friday, April 19, 2013 9:04 AM
**To:** Greebel, Evan L.
**Subject:** RE: Agreement

Send me draft

**From:** Greebel, Evan L. [mailto:evan.greebel@kattenlaw.com]
**Sent:** Thursday, April 18, 2013 9:00 PM
**To:** Martin Shkreli
**Subject:** Fw: Agreement

Consulting agreement is done, i need the transfer numbers from you to tie up that piece

------------------------------------------------------------
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

**From:** Alan Geller [mailto:agtrading5@hotmail.com]
**Sent:** Thursday, April 18, 2013 08:45 PM Eastern Standard Time
**To:** Greebel, Evan L.
**Subject:** RE: Agreement

Evan,

Can we move on this agreement today--meaning Friday?

Al Geller

1

GOVERNMENT
EXHIBIT
**565**
15 CR 637 (KAM) (EG)

R023257

From: evan.greebel@kattenlaw.com
To: agtrading5@hotmail.com
CC: Martin@retrophin.com
Subject: Agreement
Date: Wed, 10 Apr 2013 17:05:18 +0000

Hi Al, Martin forwarded me your email. Are you available for a quick call?

Evan


**EVAN L. GREEBEL**
Partner
**Katten Muchin Rosenman LLP**
575 Madison Avenue
New York, NY 10022-2585
(212) 940-6383
(212) 894-5883 (f)
======================================================
CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue
Service, any tax advice contained herein is not intended or written to be used and cannot be used
by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.
======================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive
use of the individual or entity to whom it is addressed and may contain information that is
proprietary, privileged, confidential and/or exempt from disclosure under applicable law.  If you
are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or
distribution of this information may be subject to legal restriction or sanction.  Please notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the original
message without making any copies.
======================================================
NOTIFICATION:  Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
======================================================

CONFIDENTIAL

R023258

KATTEN
DRAFT 4/19/13

<u>CONSULTING AGREEMENT AND RELEASE</u>

THIS AGREEMENT ("<u>Agreement</u>") is made as of _____, 2013 between Retrophin, Inc., a Delaware corporation ("<u>Company</u>"), and _____, an individual ("<u>Consultant</u>"). The parties, intending to be mutually bound, hereby agree as follows:

1.      <u>Description of Services</u>.  Consultant will serve as an advisor to the Company and provide consulting services (the "<u>Services</u>") on strategic and corporate governance matters to the management of the Company.  For each project, Company and Consultant will agree upon the scope of services, deliverables and timetable.

2.      <u>Compensation</u>.  In exchange for the Services, the Company shall issue to Consultant an aggregate amount of [____] shares (the "<u>Shares</u>") of common stock, par value $0.0001 per share (the "<u>Common Stock</u>"), of the Company[ and such Shares shall be payable and issued as follows: (i) [____] shares of Common Stock will be issued on the date hereof; (ii) [____] shares of Common Stock will be issued on September 30, 2013 and (iii) [_____] shares of Common Stock will be issued on December 31, 2013].  [Company will reimburse Consultant for reasonable out-of-pocket expenses, such as travel and courier services  Consultant will bill Company by the 15th of each month for such expenses incurred in the prior month and any related expenses.]

3.      <u>Term</u>.  This initial term under this Agreement shall be for a the period beginning on the date of this Agreement (the "<u>Effective Date</u>") and ending on December 31, 2013.  The Company shall have the sole option to extend this Agreement for successive one-year periods if it provides written notice to Consultant prior to December 31, 2012.

4.      <u>Representation and Warranty</u>.

        (a)     Consultant represents and warrants to Company that:

                (i)     Services provided under this Agreement will be performed in a diligent and professional manner.

                (ii)    Consultant has full power to enter into and fully perform this Agreement without conflict with any other agreement or obligation.  No service furnished under this Agreement will infringe upon or violate any rights of any third person, including intellectual property rights.

                (iii)   Consultant has no employees or subcontractors.

                (iv)    This Agreement is a valid and legally binding obligation of Consultant.

                (v)     Consultant has not been debarred pursuant to the Federal Food, Drug and Cosmetic Act.  The Consultant will not use, or work with, in any capacity the services of any individual, corporation, partnership or association which has been debarred under 21 U.S.C. 335a (a) or (b) or disqualified as a clinical investigator under the provisions of 21 C.F.R. 312.70.  In the event Consultant becomes aware of the debarment or disqualification of any such individual, corporation, partnership or association Consultant shall promptly notify Company.

                (vi)    Consultant is not under any legal obligation, including any obligation of confidentiality or non-competition, which prevents the Consultant from executing or fully

1

84712642

CONFIDENTIAL                                                                                    R023259

KATTEN
DRAFT 4/19/13

performing this Agreement, or which would render such execution or performance a breach of contract with any third party.

(vii)    The Shares are being acquired solely for investment for Consultant's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof.

(viii)    Consultant has no present intention of selling, granting a participation in, or otherwise distributing the Shares.

(ix)    Consultant understands that the Shares have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**") by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Consultant's representations as expressed herein.

(x)    Consultant understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, Consultant must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.

(xi)    Consultant is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(b)    The Company represents, warrants and covenants that:

(i)    The Company has the requisite corporate power and authority to enter into and to consummate the transactions set forth in this Agreement.

(ii)    The Shares are duly authorized and, when issued, will be duly and validly issued, fully paid and non-assessable, free and clear of all liens imposed by the Company other than restrictions on transfer.

5.    Confidentiality.  Consultant acknowledges that this Agreement creates a confidential relationship between Consultant and Company that is the basis on which Company will allow Consultant to have access to Company's commercially valuable, proprietary, and confidential information.  Consultant will hold such information in strict confidence and will not disclose such information to any third party or use such information in any way except as provided for in this Agreement or with Company's prior consent.  The confidentiality obligation in this paragraph 5 will survive for three years from the termination of this Agreement.

The confidentiality obligations in this paragraph 5 do not apply to information that: (i) was in the public domain at the time it was disclosed to Consultant, or later becomes part of the public domain other than through Consultant's disclosure of that information; (ii) becomes known to Consultant without restriction from a source other than Company, provided that such source is not known by Consultant after due inquiry to be bound by a confidentiality agreement with the Company or by contractual, legal or fiduciary obligations; or (iii) must be disclosed pursuant to an order or requirement of a court, administrative agency or other governmental body, provided that, if permitted, Consultant will give Company prompt notice of any such order or requirement.

2

84712642

CONFIDENTIAL                                                                                      R023260

KATTEN
DRAFT 4/19/13

6.      <u>Independent Contractor Status</u>.  Services performed by Consultant for Company under this Agreement will be in Consultant's capacity as an independent contractor and not as agent or representative of Company.  Consultant is not authorized to enter into any contract or commitment on behalf of Company.  The Consultant shall not make any representation, warranty or guaranty on behalf of Company in the performance of her services. As an independent contractor, the Consultant agrees to comply with all applicable tax reporting and/or payment obligations arising from any payments made to Consultant or on Consultant's behalf.  Company will provide the Consultant with Internal Revenue Form 1099 as required. Consultant will assume all responsibility for payment of taxes or other amounts which may be due as the result of payments made by Company under this Agreement.

7.      <u>Indemnification</u>.  During the Term and thereafter, Consultant shall indemnify and hold Company and its officers, agents, members, directors and employees harmless against all claims, losses, expenses (including reasonable attorney's fees) and injuries to person or property (including death) resulting in any way from any gross negligence or intentional misconduct on the part of Consultant in performance of the Services under this Agreement, or any breach of Consultant's warranties set forth in Section 7 of this Agreement or alleged violation of the rights of others in and to any trade secret, know-how or other confidential information by reason of Company's receipt or use of the Consultant's Services, or otherwise in connection therewith.

8.      <u>Non-Disparagement/Media</u>.

        (a)      Consultant agrees not to make, publish, or communicate to any person or entity, any Disparaging remarks, comments, writings, or statements concerning the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents. "<u>Disparaging</u>" remarks, comments, writings, and/or statements are those that impugn, criticize, or denigrate (a) the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents and/or (b) the character, honesty, integrity, morality, business acumen, or abilities of the Company or any of its affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents.

        (b)      Consultant further agrees that it will not make any statement whatsoever to the press or media (including but not limited to any reporter, national, regional, or local newspaper, magazine, internet blog or site, news organization, or radio or television station) any matter related to the Company, the Services, or any of the Company's affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents. If at any time Consultant receives a request for any statement or information from the press or other media, the Executive will direct that request to the Chief Executive Officer of the Company and will say nothing further.

9.      <u>Company Property</u>.  All correspondence, records, documents, software, promotional materials, and other Company property, including all copies, which come into Consultant's possession by, through or in the course of his employment, regardless of the source and whether created by Consultant, are the sole and exclusive property of the Company, and immediately

3

84712642

R023261

upon the termination of this Agreement, or any time at the Company's reasonable request, Consultant shall return to the Company all such property of the Company.

10.    <u>Release</u>.   Based upon the mutual promises contained herein and other good and valuable consideration, Consultant, on his behalf and on behalf of all of his heirs, successors, assigns, agents, legal representatives and personal representatives (collectively, the "<u>Releasor Parties</u>"), hereby fully and expressly, knowingly, voluntarily, and unconditionally releases, acquits and forever discharges Martin  Shkreli, the Company MSMB CAPITAL MANAGEMENT, LP, a Delaware limited partnership, MSMB CAPITAL MANAGEMENT LLC, a Delaware limited liability company, MSMB Healthcare LP, a Delaware limited partnership, MSMB Healthcare Investors LLC, a Delaware limited liability company, MSMB Healthcare Management LLC, and each of its or their respective officers, directors, shareholders, partners, members, managers, owners, employees, representatives, consultants, contractors, subcontractors, suppliers, attorneys, insurers, affiliates and affiliated corporations, partnerships and limited liability companies, subsidiaries, predecessors, successors, heirs, assigns, agents, and any other person, firm or corporation charged or chargeable with responsibility or liability (collectively, the "<u>Releasees</u>"), of any and all claims, obligations, liabilities, promises, agreements, controversies, damages, actions, causes of action, suits, judgments, rights, demands, losses, debts, contracts, commitments or expenses of every kind and nature (collectively, "<u>Claims</u>"), including all costs, expenses and attorneys' fees related thereto that Consultant now has, or which he may have against the Releasees from the beginning of time up to, through, and including the date of this Agreement, or any claim of attorneys' fees, costs or expenses.  The Releasees shall have the benefit of, and the right to enforce, as intended third-party beneficiaries, the provisions of this Section 10 and this Agreement.  Consultant, on behalf of himself and the Releasor Parties, understands and acknowledges the significance and consequence of this release, including the specific release of unknown claims.

11.    <u>Miscellaneous</u>.   The services to be provided by Consultant hereunder are of a personal nature and this Agreement will not be assigned by Consultant or Company without the written consent of the other party.

Given the nature of the obligations set forth in Sections 4, 5, 8 and 10 of this Agreement, Consultant acknowledges and agrees that Company may be irreparably damaged by Consultant's alleged breach or violation of such sections.  Without prejudice to the rights and remedies otherwise available to Company, it shall be entitled, without the requirement of a posting of a bond or other security to seek equitable relief, including an injunction or specific performance, in the event of any breach of the provisions of Sections 4, 5, 8 or 10 of this Agreement.

This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.  Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof shall be settled solely and exclusively by binding arbitration in New York, New York administered by JAMS.  Such arbitration shall be conducted in accordance with the then prevailing JAMS Streamlined Arbitration Rules & Procedures, with the following exceptions to such rules if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each Party to the arbitration will pay an equal share of the expenses and fees of the arbitrator, together with other

4

CONFIDENTIAL                                                                                                                    R023262

expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any Party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such Party.  Each Party shall bear its own attorneys fees and expenses.  The Parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive.  All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief as in the preceding paragraph of this Section 11.  IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE OR IF THE PARTIES ARE SEEKING INJUNCTIVE OR EQUITABLE RELIEF AS PROVIDED ABOVE, THEN EACH PARTY, (i) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO, AND (ii) SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND EACH PARTY HERETO AGREES NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION.  Each party irrevocably and unconditionally waives any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the courts referred to in this Section 11.

This Agreement, including all attachments hereto, is the entire Agreement between the parties regarding the subject matter hereof, superseding all prior agreements, and cannot be amended or modified except in writing signed by both parties.

*[Signature Page to Follow]*

84712642

CONFIDENTIAL

R023263

KATTEN
DRAFT 4/19/13

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first set forth above.

RETROPHIN, INC.


By:_____
    Name:
    Title:


Consultant


_____

6

84712642

CONFIDENTIAL

R023264