

U.S. Department of Justice

United States Attorney
Eastern District of New York

AES/DCP/DKK                                271 Cadman Plaza East
F.#2014R00501                              Brooklyn, New York 11201

May 31, 2018

By Hand and ECF

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

          Re:   United States v. Evan Greebel
                  Criminal Docket No. 15-637 (KAM)

Dear Judge Matsumoto:

        The government respectfully submits this letter in response to the defendant Evan Greebel's recent filings, including a letter filed on May 28, 2018 (Dkt. No. 612) and three expert affidavits filed on May 30, 2018 (Dkt. No. 614), which describe the evidence the defendant may offer at the Fatico hearing scheduled for tomorrow, June 1, 2018.[1]  For the reasons set forth below, much of the evidence identified by the defendant should be precluded because (1) it is not relevant and/or lacks sufficient indicia of reliability, (2) the defendant has failed to provide adequate notice of the scope of the opinion and/or the bases on which such opinion rests, and/or (3) it is proffered by an individual who is not qualified to provide the opinion in question.

I.        Much of the Defendant's Proffered Evidence Is Not Relevant and/or Not Reliable

       A.        Applicable Law

        While the bar to the admissibility of evidence at a Fatico hearing is lower than during trial, proffered evidence must still be both relevant and reliable.  "In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial,

---

[1] The government acknowledges that the Court's May 29, 2018 order gave a 9:00am deadline to respond to the defendant's filings from yesterday afternoon, and deeply apologizes for the late filing, but the government needed the additional time to provide a complete response on all of the defendant's proffered evidence.

provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a), comment.

Here, the sole lawful purpose of the Fatico hearing is for the Court to consider evidence regarding the appropriate loss calculation for Counts Seven and Eight for the purposes of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."). As set forth in the government's earlier filings (see Dkt. Nos. 601, 606), both the government and Probation have concluded, based on the trial record, that the appropriate loss calculation for Count Seven is $10,447.979.00, representing the actual loss to Retrophin as a result of money and shares stolen by the defendant and his co-conspirators via the settlement and consulting agreements, and the appropriate loss calculation for Count Eight is $4 million, representing the intended loss resulting from the manipulation of the trading volume and price of Retrophin stock. The defendant has argued that the loss amount is "overstated" for Count Seven (because, inter alia, certain agreements purportedly were not fraudulent and others may have had some unidentified "value" to Retrophin) and that there is no actual or intended loss for Count Eight. (See Dkt. Nos. 602, 607, 612).

Significantly, the defendant has failed to proffer any legal basis in support of his arguments regarding the appropriate loss calculation; in fact, in all of his pre-hearing filings, the defendant has failed to cite a single Guidelines provision, statute, or case. That oversight is telling. The legal framework for loss calculation is essential to determining what evidence is relevant to how the loss in this case should be calculated. A convicted defendant is not permitted to assert conclusorily that, in his view, the actual or intended loss from his criminal conduct is "overstated," or to seek to re-litigate his guilt in the guise of discussing loss. He must engage with the facts proving his guilt within the governing legal framework under the Guidelines. The defendant does not even attempt to do so. As the government has set forth at length in its prior filings, it is well-settled that a defendant is responsible for all actual and intended losses stemming from all relevant conduct, both his own and that of co-conspirators, including losses of which he was not aware, but were reasonably foreseeable. (See Dkt. Nos. 601, 606). Once the scope of relevant conduct is determined, the court must make a "reasonable estimate" of the actual or intended loss amount (whichever is higher), which need not be calculated with certainty or precision. On the contrary, the Second Circuit has recognized the inherent imprecision of loss calculations in cases of large-scale or complex fraud, and emphasized the discretion accorded sentencing judges in estimating loss in such cases. (Id.). The loss need only be determined by a preponderance of the evidence. (Id.).

After making a determination of the appropriate loss amount, the Guidelines provide that a court may consider whether to reduce that loss amount by any "credits against loss." U.S.S.G. 2B1.1(b)(1) , comment. (n.3(E)). Due to the complete absence of legal citations in the defendant's filings, is not clear whether he is advancing such a "credits against loss" theory for Count Seven when he contends that aspects of the agreements "represented a benefit to the Company that should count against the value of the money and shares transferred as a result." (Dkt. No. 612 at 3). If the defendant is making such an argument, the Guidelines prescribe that the loss amount may be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant … to the victim before the offense was detected." U.S.S.G. 2B1.1(b)(1) , comment. (n.3(E)). The time of detection is

the earlier of (1) the time "the offense was discovered by a victim or government agency" or (2) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." Id.

Importantly, however, the consideration of whether to allow any offset against the applicable loss amount is the second step in a two-step process: "first, the [court must make a] determination of the foreseeable pecuniary harm resulting from the fraud, and second, the [court must make a] determination of any credits against loss from sale of the collateral, as required by Application Note 3(E)(ii)." United States v. Turk, 626 F.3d 743, 749 (2d Cir. 2010); see United States v. Crowe, 735 F.3d 1229, 1237 (10th Cir. 2013) ("[I]f we were to state the method for determining 'loss' for purposes of § 2B1.1(b)(1) as a mathematical equation, it would be as follows: loss equals actual loss (or intended loss) minus credits against loss."). Accordingly, the Court must first determine loss, and then determine any offset is warranted.

### B. Certain Proffered Expert Opinion Testimony Is Irrelevant

The defendant has stated that he intends to present opinion testimony from three purported experts—Gayle Klein, Stephen Ferruolo and Zachary Prensky. (See Dkt. Nos. 614-1 ("Ferruolo Report"), 614-2 ("Klein Report"), 614-3 ("Prensky Report").) The government objects to the following proposed expert testimony on the grounds that it is not relevant to the question of the appropriate loss calculation for Counts Seven and Eight:[2]

- Ferruolo's proposed testimony regarding "the role of outside corporate counsel, particularly when representing small and early-stage private and public companies." (Ferruolo Report at ¶ 9). The general "role of outside corporate counsel" is not remotely relevant to the question of how loss should be calculated with respect to Counts Seven or Eight. The jury concluded, based on overwhelming evidence that the defendant was not merely acting as "outside corporate counsel." He was a co-conspirator in schemes to defraud. There is no grounds to relitigate that verdict at the Fatico hearing.

- Ferruolo's proposed testimony regarding "the mechanics of settlement and consulting agreements entered into by companies, and the reasons companies choose to enter into such agreements." (Ferruolo Report at ¶ 9). These topics also not relevant to the question of which settlement and consulting agreements in this case were part of the conspiracy to defraud Retrophin, or to the proper way to calculate the loss to Retrophin from those agreements.

- Ferruolo's proposed testimony regarding "common terms and provisions contained in settlement and consulting agreements entered into by companies." (Ferruolo Report at ¶ 9). Terms and provisions contained in settlement and consulting agreements entered into

---

[2] As set forth in Section II, the government also objects to certain of the proffered expert testimony because it is not clear the experts are properly qualified to give such testimony; because the expert's opinion was not properly disclosed; and/or because the expert did not clearly articulate the bases for his or her opinions.

by other, unidentified companies are not relevant to which of the settlement and consulting agreements entered into <u>by Retrophin</u> here were a part of the conspiracy to defraud Retrophin, or to the proper way to calculate the loss to Retrophin.

- Ferruolo's proposed testimony regarding "the types of financing for companies, including Private Investment in Public Entity ("PIPE") transactions." (Ferruolo Report at ¶ 9). The various types of financing available to various companies at various times is not relevant to the loss calculation for either Count Seven or Count Eight, which turns on a specific company, and specific actions, at a specific time.[3]

- Ferruolo's proposed testimony that "while outside corporate counsel may act as Corporate Secretary and take notes during board meetings, it is not typically the responsibility of that person to set agendas for Board meetings. (Ferruolo Report at ¶ 13). Note-taking and agenda-setting practices at Board meetings are not remotely relevant to the question of the loss calculation for either Count Seven or Count Eight. This testimony is no more admissible than testimony as to what might be <u>a</u>typical would be admissible. The sole relevant question at the <u>Fatico</u> proceeding is what the defendant knew and foresaw with respect to the criminal schemes in which he participated—not what was "typical" for others, much less who generally "set[s]" the unidentified "agendas" for unidentified "Board meetings" at unidentified companies in unidentified industries at unidentified times.

- Ferruolo's proposed testimony that "a company's Board of Directors must sign certain SEC filings, including registration statements and annual reports, and are responsible for the disclosures in those reports." (Ferruolo Report at ¶ 14). Again, the sole relevant question at the <u>Fatico</u> proceeding is what the defendant knew and foresaw with respect to the criminal schemes in which he participated, not what an unidentified "company's Board of Directors" must do. The only conceivable basis for this proposed testimony is to suggest that others are the blame for the defendant's choices. That argument flies in the face of the jury's verdict. The defendant is responsible for what he chose to do, and under the Guidelines, he is responsible for all actual or intended loss that was reasonably foreseeable from the criminal schemes in which he participated. He cannot escape responsibility by suggesting that others are to blame or should have detected the schemes.

- Klein's proposed testimony that "Martin Shkreli as CEO had actual or apparent authority to cause funds and shares to be transferred and to enter into agreements on behalf of the company, and it would be a question of fact in any suit against Retrophin whether the

---

[3] These first four "opinions" proffered for Ferruolo also should be precluded because they represent not opinions but rather topic areas. The disclosures are therefore insufficient. <u>See, e.g.</u>, <u>United States v. Valle</u>, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions."); <u>United States v. Duvall</u>, 272 F.3d 825, 828 (7th Cir. 2001) ("The Rule requires a summary of the expected testimony, not a list of topics.").

4

CEO had exceeded his authority in so doing." (Klein Report at ¶ 12). This is a red herring. Whether Retrophin would been legally bound by the agreements on a theory of apparent authority—despite the fact that Shkreli and the defendant caused Retrophin to enter into those agreements without Board approval—is not relevant to the question of whether the defendant and others defrauded Retrophin by causing it to enter into the agreements in the first place. That question is all that matters. And on that question, Klein's testimony is irrelevant.

### C. The Defendant's Self-Serving Notes Are Irrelevant and Lack Indicia of Reliability

The defendant also states that he intends to offer documents purporting to be his handwritten notes from Retrophin Board meetings—specifically, DXs 2158, 2164-65, 2217 and 2219—which were not admitted at trial. (See Dkt. No. 612). The defendant provides no explanation as to how these notes are relevant to loss calculation for either count.

In any event, the notes lack "sufficient indicia of reliability to support [their] probable accuracy." U.S.S.G. § 6A1.3(a), comment. There is no way to tell who wrote the notes, when the various pages of notes were written,[4] or whether portions of the notes were deleted, edited or added to after they were initially drafted. Many of the notes are either partially or entirely illegible, and it is not clear what the notes which are legible are intended to convey. Consequently, the notes standing alone—without the testimony of the defendant to provide answers to these questions—are not reliable and should be precluded. The government is not aware of any authority—and the defendant offers none—for the proposition that a defendant may perform an end-run around cross-examination at a Fatico hearing by offering his own notes into evidence, much less notes that lack any indicia of reliability.

## II. Certain Proffered Expert Testimony, If Even Relevant, Should Be Precluded

In addition to the objections set forth above, the government also objects to certain of the defendant's proffered expert testimony because the Court-ordered expert disclosures are deficient in various ways.

### A. Klein Should Be Precluded From Opining on the "Value" of Avoiding Litigation, Because Such Opinion Was Not Disclosed and Klein is Not Qualified

The Court ordered the defendant to make a fulsome disclosure of the expert testimony to be offered at the Fatico hearing. Nevertheless, in apparent defiance of that order, the defendant states that Klein will offer the following opinion: "At the Fatico hearing, I intend to quantify the value to the company for avoiding protracted and public litigation." (Klein

---

[4] While some pages of notes have what appear to be dates or partial dates, others appear have no dates at all (see, e.g., DX 2164). Moreover, there is no way to tell whether all of the writing on a page with a date was in fact written on that date.

5

Report ¶ 15). This statement is not an opinion or a summary of an opinion or testimony. Instead, it is a promise to disclose an opinion <u>at a later date</u>. Klein does not provide a "quantification" of the supposed "value" of all or any agreement; she does not describe the methodology that she employed to calculate that "value"; and she does not identify the evidence she relied upon in arriving at this "value." The defendant offers no explanation for the willful decision to withhold this information from the Court and the government.

This Court should preclude Klein's opinion about "value" because the defendant failed to provide adequate and timely notice of this opinion, or the bases and reasons underlying it. See, e.g., <u>Valle</u>, 2013 WL 440687, at *5; <u>United States v. Mahaffy</u>, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007); <u>United States v. Ferguson</u>, No. 06 Cr. 137 (CFD), 2007 WL 4539646, at *1 (D. Conn. Dec. 14, 2007). The basis for expert disclosures is to allow opposing counsel the opportunity to challenge the admissibility of testimony, adequately prepare for cross-examination, and decide whether to retain and prepare rebuttal witnesses—in other words, to avoid litigation by ambush. See, e.g., <u>United States v. Rajaratnam</u>, No. 09 Cr. 1184 (RJH), 2011 WL 723530, at *3 (S.D.N.Y. Feb. 25, 2011) ("[T]he purpose of reciprocal expert disclosures is 'to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" (quoting Fed. R. Crim. P. 16 Advisory Committee's Note)); <u>Valle</u>, 2013 WL 440687, at *5 (same); <u>United States v. Day</u>, 524 F.3d 1361, 1372 (D.C. Cir. 2008) (same). Here, the government is unable to engage in these tasks based on a statement that Klein <u>will</u> offer a vague and unknown ambiguous opinion. Nor can the government determine whether to retain a witness to rebut this calculation.

Moreover—although it is impossible to properly challenge Klein's ability to provide a given opinion without any information about such opinion—it does not appear that Klein is qualified to give an expert opinion quantifying the alleged "value" to Retrophin from the litigation releases in the settlement and consulting agreements. According to a filing made by the defendant in October 2017, Klein has never previously testified as an expert. (Dkt. No. 401 at 4). There is nothing in her resume to indicate that she ever previously conducted a similar analysis to make an <u>ex post</u> determination of the precise dollar value of a given clause in a contract to a client; nor is there anything in her resume to indicate that she has any experience with probability analyses or mathematical modeling. Her proposed testimony thus should be precluded.

B.     **Prensky and Ferruolo Are Not Qualified to Opine on the Behavior of "Typical PIPE investors"**

The defendant noticed Zachary Prensky as an expert witness for the first time on May 28, 2018. At trial, Prensky was noticed by the defendant only as a fact witness, and was not called to testify. The defendant provided no resume for Prensky; did not indicate whether Prensky has ever previously testified as an expert; and furnished only sparse background information on his employment history and a statement, without any further information, that Prensky has personally participated in 15 PIPE transactions. (Prensky Report at ¶¶ 2-5). Based on those bare qualifications, the defendant offers Prensky as an expert to provide opinions on, <u>inter alia</u>, his "knowledge of investors that participate in PIPE transactions," including his

6

specific knowledge of the investors in the February 2013 Retrophin PIPE; the thought processes and preferences of a "typical PIPE investor"[5] and whether a typical PIPE investor would participate in a PIPE transaction if shares in the open market dropped below the offering price for the PIPE. (Prensky Report at ¶¶ 8-12).

The government objects to Prensky's qualification as an expert to provide these opinions. It is not clear whether Prensky has ever previously testified as an expert, and while he appears to have personal experience investing in PIPE transactions, there is nothing in his background to suggest that he himself is an expert on how a "typical PIPE investor" might behave in a given circumstance, let alone whether the investors in Retrophin's February 2013 PIPE were such investors.[6]

The government similarly objects to Ferruolo's opinion on how typical PIPE investors might behave in certain circumstances (see Ferruolo Report ¶ 16), as he is not qualified to present such an opinion. Ferruolo has stated only that he has "experience representing companies during PIPE transactions"—without any detail as to what kinds of companies he has represented during such transactions and on how many occasions—and does not say that he has any experience representing investors during such transactions.

C.  **The Defendant Failed to Adequately Disclose the Bases for Certain Experts' Opinions**

The government objects to the proffered opinions of Ferruolo and Klein, as the defendant has failed to disclose with any specificity the evidence that each reviewed and/or relied upon in reaching his/her opinions. Without this information, the government cannot adequately prepare for cross-examination of these experts.

Specifically, Ferruolo states that he relied on "the settlement and consulting agreements at issue, the SEC filings from the relevant period and the deal documents associated with Retrophin's February 2013 PIPE transaction." (Ferruolo Report ¶ 17). However, the defendant does not indicate the specific SEC filings or the specific deal documents from the February 2013 PIPE that were reviewed by Ferruolo. Klein states that she relied on the "Indictment and Superseding Indictment in this case, the settlement and consulting agreements at issue, trial testimony from some settling parties, and various communications between investors"

---

[5] At one point, Prensky opines about how "investors who specialize in participating in PIPE transactions as their primary investment strategy" might react to the presence/absence of certain benefits related to a PIPE, and then subsequently discusses the behavior of "typical PIPE investor." It is not clear if Prensky believes the "typical PIPE investor" is one who "specializes in participating in PIPE transactions" or if those are two separate categories of investors, and if so, if those two categories behave in the same manner.

[6] Several of Prensky's opinions also appear irrelevant and/or are not opinions so much as topic areas, and should also be precluded on those bases—for example, his statement that he can speak to "the details of documents associated with PIPE transactions" in general (Prensky Report ¶ 8) is neither relevant to the loss calculation for Counts Seven or Eight, nor is in fact an opinion.

and the defendant and/or Shkreli. (Klein Report ¶ 16). However, the defendant does not indicate the specific trial testimony or the specific "various communications" Klein reviewed. This is particularly problematic given that there were hundreds of documents containing communications between Shkreli and/or the defendant and MSMB investors, and more than 10,000 pages of trial testimony. Moreover, the defendant's May 28, 2018 letter about the <u>Fatico</u> hearing lists various documents that Klein might include in her testimony—including the defendant's purported notes—but those documents do not appear in the categories of documents Klein said she reviewed.

### III.   Conclusion

For the reasons set forth above, the government moves to preclude certain evidence the defendant has indicated he will seek to introduce at the <u>Fatico</u> hearing on June 1, 2018, including (1) evidence that is not relevant and/or has insufficient indicia of reliability, (2) expert opinions where the scope and/or bases were not properly disclosed; and (3) expert opinions where the expert lacks the qualification necessary to provide such opinions.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:  /s/
Alixandra E. Smith
David C. Pitluck
David K. Kessler
Assistant U.S. Attorneys
(718) 254-7000

cc:   All counsel (via ECF)