# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

June 28, 2018

<u>VIA ECF</u>

The Honorable Kiyo Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Greebel*, S1 15 Cr. 637 (E.D.N.Y.) (KAM)

Dear Judge Matsumoto:

## I.     INTRODUCTION

We respectfully submit this application to address the issue of calculating any actual loss suffered by Retrophin with respect to Count Seven and any intended loss with respect to Count Eight[1] for purposes of determining the amount of "loss" under Section 2B1.1(b)(1) of the United States Sentencing Guidelines.  Evan Greebel has been found guilty of both Count Seven and Count Eight.  The purpose of this application is not to contest the jury's verdict.  Instead, we proceed on the premise that those convictions will remain in place.  With that in mind, as to Count Seven we submit that the government has not proven that Mr. Greebel reasonably should have known that the actual losses to Retrophin total $10,447,979.  Further, with respect to Count Eight, we submit that the government has not proven that Mr. Greebel himself "purposefully sought to inflict" $4 million in losses.  Although it is not our burden to demonstrate any actual losses or intended losses, we propose alternative calculations for the Court's consideration.

## II.     SUMMARY

As outlined below, we respectfully submit the following:

- The government has failed to meet its burden of showing that Mr. Greebel "reasonably should have known" that Retrophin would suffer more than $10

---

[1]   As in previous filings, Mr. Greebel uses "Count Seven" and "Count Eight" herein to conform to the charged counts in the Superseding Indictment.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 2

million in harm as a result of the settlement and consulting agreements at issue in Count Seven.

- Any loss found as to Mr. Greebel on Count Seven should be reduced by the value of the release provisions contained within the agreements at issue, as they represent a real, quantifiable benefit to the company.

- The government has not met its burden of showing reasonably foreseeable loss as to each agreement at issue.

- Mr. Greebel held a reasonable belief—based on articulated threats and evidence of commingling—that investors would bring suit against Retrophin and, therefore, it was reasonable for him to believe that the settlement and consulting agreements would prevent harm.

- The government has not proven any proximate causal link between Mr. Greebel's conduct and any loss caused by the settlement and consulting agreements.

- The inclusion of Fearnow shares as Retrophin losses fails to consider the actual ownership of those shares, which rested with Troy Fearnow, not the company.

- The government has not shown that Mr. Greebel had purposeful, subjective intent to cause loss related to Count Eight, as is required under the Sentencing Guidelines when arguing intended loss.

- The government's theory as to Count Eight loss ignores the behavior and goals of a typical PIPE investor by arguing that they would have changed their investing behavior should the share price have fallen.

- The government argues for a loss amount that involves multiplying 2 million Fearnow shares by a $2 share-price differential that is wholly unrelated to the Fearnow shares.

- Should the Court not accept Mr. Greebel's position that there is no intended loss on Count Eight, an appropriate alternate calculation would be to multiply the volume of shares purchased between mid-December 2012 and the PIPE announcement in February 2013 by any subjective intended price inflation the government can show as to Mr. Greebel.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 3

## III.     ESTIMATING ACTUAL LOSSES ON COUNT SEVEN

### A.     Law Governing The Calculation Of Actual Losses

Pursuant to Application Note 3(A) of Section 2B1.1 of the United States Sentencing Guidelines, the generally applicable rule is that "loss is the greater of actual loss or intended loss." The government and Probation have submitted that Mr. Greebel should be held accountable for the actual loss caused as a result of the conspiracy in Count Seven related to sham settlement and consulting agreements. Under the Guidelines, an appropriate calculation of "actual loss" considers the "reasonably foreseeable pecuniary harm that resulted from the offense," App. Note 3(A)(i), which is "harm that is monetary or that otherwise is readily measurable in money." App. Note 3(A)(iii) ("Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm."). "For purposes of this guideline, 'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." App. Note 3(A)(iv).

The government has not met its burden of proving that Mr. Greebel "reasonably should have known" that Retrophin would suffer $10,447,979 in monetary harm as a result of the settlement and consulting agreements at issue in Count Seven. Although the Court may consider conduct of a co-conspirator under the Sentencing Guidelines, the Second Circuit has held that the scope of such conduct is "significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013) (citing *United States v. Perrone*, 936 F.2d 1403 (2d Cir. 1991). Thus, it is not enough for the government to rely on what Mr. Greebel's codefendant Martin Shkreli knew or reasonably foresaw as a result of his knowledge. As shown at trial, Mr. Greebel's understanding of the basis of and the need for the settlement and consulting agreements differed from that of Mr. Shkreli, and mere "knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those acts." *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995). Particularly where a defendant did not participate in the "design or develop[ment]" of the scheme, the Second Circuit has held that the full breadth of a co-participant's conduct should not be ascribed to the defendant for purposes of sentencing calculations. *Id.* Indeed, like the defendant in *Studley*, Mr. Greebel "was given instructions by [Shkreli] . . . [and] followed those instructions with some variation." *Id.* Given that role, the court found that it was not appropriate to hold the defendant accountable for more than his own conduct. Here, too, the loss attributed to Mr. Greebel should not go beyond what Mr. Greebel reasonably should have known would result from his own limited conduct. *See, e.g.*, GX 575 (Shkreli instructing Greebel to settle with Kocher); GX 563 (Shkreli instructing Greebel on terms of settlement with Hassan).

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 4


Independent of what was reasonably foreseeable to Mr. Greebel, whatever actual loss the Court finds as to him on Count Seven must account for the value Retrophin received from the release provisions contained within each settlement and consulting agreement. Regardless of whether the agreements were part of a fraud, there is a well-established default practice of netting loss amounts under Section 2B1.1 by subtracting the value of agreements or services rendered. This rule is subject to exception, but "the Sentencing Commission speaks clearly when it wants to exempt specific types of cases from the default practice of crediting against loss the value of services rendered by the defendant." *United States v. Harris*, 821 F.3d 589, 605 (5th Cir. 2016). *See also United States v. Nagle*, 803 F.3d 167, 182 (3d Cir. 2015) ("Had the Sentencing Commission intended to preclude crediting services rendered against loss for Note 3(F)(ii), it would have used similar language as it used in Note 3(F)(v)").

Application Notes 3(F)(v) and 3(F)(viii) are exceptions that prove the general rule that courts must subtract the value of agreements or services rendered from a gross amount of loss. Both Note 3(F)(v) and Note 3(F)(viii) state that crediting against loss does not apply in the special circumstances articulated therein. Note 3(F)(v) states that "[i]n a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, ***with no credit provided for the value of those items or services***" (emphasis added). Note 3(F)(viii) states "[i]n a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted." In other words, both of these provisions make clear that courts should not credit the value of services or goods in the special circumstances specified, none of which applies here.

Alternatively, pursuant to Application Note 3(E), the actual loss attributed to Mr. Greebel on Count Seven "[l] shall be reduced by the following: (i) . . . the fair market value of . . . the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." In this case, the fair market value of services rendered is equivalent to the value of the release provisions contained in the agreements. Mr. Greebel's work on the settlement and consulting

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 5

agreements prevented the company from having to defend against litigation brought by the settling parties; thus, his services represented real value to the company. Such value should be netted against the amount spent by Retrophin to satisfy the settlement and consulting agreements.

Finally, should the Court determine that there is an actual loss but be unable to reasonably calculate it, pursuant to Application Note 3(B) it should "use the gain that resulted from the offense as an alternative measure of loss."

### B.   Application Of Law To Settlement And Consulting Agreements

#### *1.   The Government Has Not Met Its Burden On Each Agreement*

The government has not met its burden of proving that Mr. Greebel "knew, or under the circumstances, reasonably should have known" that each and every settlement and consulting agreement at issue would result in pecuniary harm to Retrophin. As outside counsel to Retrophin, Mr. Greebel understood the impetus for the settlement and consulting agreements to be the threats of litigation made against the company by many of the settling parties. Even though Mr. Greebel was found guilty of Count Seven, the information presented to Mr. Greebel at the time led to his conclusion—as it would have led to the conclusion of any reasonable attorney—that the litigation threats were legitimate; and we understand from the Court's instructions to the jury that the jury could have found the litigation threats to be legitimate and yet simultaneously find that Mr. Greebel was guilty of Count Seven.

The government's response in its June 22, 2018 letter (at 16) to the Probation Department that a conviction of a conspiracy to misappropriate Retrophin's assets makes it "obviously foreseeable to the defendant that the conspiracy to misappropriate assets might succeed in misappropriating assets, thereby causing a loss to Retrophin" is a tautology. It merely states that a charged conspiracy to misappropriate makes it reasonably foreseeable that something might be misappropriated, but it does not prove that, with respect to each and every agreement, it was reasonably foreseeable to Mr. Greebel that the agreement would defraud Retrophin. The government cannot apply a sweeping monolithic rule to every agreement, as that would be contrary to law.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 6

     The record evidence supports a finding that Mr. Greebel reasonably believed that there were litigation threats[2]: multiple investors, either themselves or through counsel, made implicit or overt threats to take action against Retrophin unless their claims were resolved. Specifically, Mr. Greebel was aware that Dr. Lindsey Rosenwald's attorney had written to Mr. Shkreli in an attempt to "resolve Dr. Rosenwald's claims . . . prior to Dr. Rosenwald commencing litigation."  GX 100-16.  Dr. Rosenwald confirmed at trial that he threatened litigation against Mr. Shkreli, Retrophin, and the MSMB entities in early 2013, prior to the drafting and execution of his settlement agreement.  Trial Tr. 3495:11–16.  Mr. Greebel was also aware that Ms. Sarah Hassan had retained a well-regarded law firm in connection with her claims against the company, and that, per Mr. Shkreli, she represented the "same situation as Lindsay *[sic]*."  GX 525 ("sarah = same situation as lindsay  also fred hassan's daughter").  Schuyler Marshall, too, invoked the threat of litigation when he wrote to Mr. Shkreli that he "hope[d to] conclude this without the expense of litigation."  DX 112-8; *see also* Trial Tr. 3071:5–14.  And Mr. Greebel knew that Michael Lavelle had retained Linklaters LLP in seeking to recover his MSMB investment.  Mr. Lavelle's questions to Mr. Shkreli reflected that Mr. Lavelle was focused on the entanglements between Retrophin and MSMB entities, asking questions such as "[o]n what basis was the reverse of MSMB into Retrophin agreed," "I was not given an option to debate transfer from MSMB and want to understand it," "I do not understand what exactly was in MSMB," and "Retrophin was always pitched to me as additive to MSMB, not as an alternative to it."  DX 124-119.  In fact, Mr. Greebel wrote to Mr. Shkreli at the time that he understood Mr. Lavelle to be "very serious about pursuing" litigation.  GX 108-13.

     The remaining investors to ultimately reach settlement agreements—David Geller, Spencer Spielberg, and Richard Kocher—each conveyed their willingness to resort to legal action should they be unable to reach resolution elsewise, and each included Mr. Greebel on communications to that effect.  *See* GX 106-20 (David Geller told Mr. Shkreli that he was upset with his "investment situation in MSMB" and asked him "[p]lease don't force me to go to the next level"; Mr. Shkreli copied Mr. Greebel on his response); GX 107-7 (Spencer Spielberg copied Mr. Greebel on an email to Mr. Shkreli in which he wrote that he would prefer "settling this prior to having to take legal recourse"); and GX 104-5-A (Richard Kocher copied both his own attorney and Mr. Greebel on an email in which he conveyed his understanding that Mr. Shkreli's management of both MSMB and Retrophin represented a conflict of interest, and Kocher said that he has "been in touch with council *[sic]* that is versed in this kind of litigation").  Later, Mr. Greebel informed Mr. Shkreli that Mr. Kocher's lawyer was repeatedly calling him and had been instructed by Mr. Kocher "to

---

  [2]  Mr. Greebel has amassed evidence of such threats and his awareness thereof throughout his various post-trial filings—*see, e.g.*, Dkts. 530, 574—and incorporates such filings by reference herein.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 7

prepare papers." GX 575. To Mr. Greebel's mind, it was clear that resolving the investors'
claims by way of settlement and consulting agreements that required the company to pay far
less than its potential exposure should any of the investors make good on their litigation
threats represented the better financial outcome for the company. Ms. Klein's and Dean
Ferruolo's testimony corroborate that it was reasonable for external counsel in Mr. Greebel's
position to believe that settlements represented a better result for an early-stage life science
company. *See* Klein Testimony, June 1 Tr. 60:12–61:4 (discussing risk to nascent companies
of investors lawsuits); Ferruolo Testimony, June 1 Tr. 168:18–170:12 (discussing same).

    With respect to the consulting agreement with Darren Blanton, it was reasonable for
Mr. Greebel to believe that, as a co-founder of Retrophin, Mr. Blanton had potential claims
against Retrophin, and thus the broad release of claims against Retrophin was a benefit to the
company. *See* DX 1106 at R049367 (Mr. Blanton's consulting agreement, release
provisions). With respect to the consulting agreement with Al Geller, Mr. Greebel knew that
Mr. Geller had contributed significant value to Retrophin in the past and thus the broad
release of claims against Retrophin was a benefit to the company. *See* Tr. 6842:24–6843:2
(testimony that Mr. Geller provided services to Shkreli before and after his consulting
agreement); GX 59-A (Mr. Geller's consulting agreement). Moreover, given that Mr.
Shkreli had personally agreed to give Al Geller shares pursuant to a separate agreement, it
was reasonable for Mr. Greebel to believe that the consulting agreement with Al Geller was
legitimate for purposes of consulting services. Further, it was reasonable for Mr. Greebel to
believe that the Board of Directors had approved of the consulting agreement with Al Geller.
*See*, *e.g.*, DX 118-26A at R057678 (Board granting Mr. Shkreli authorization to execute
agreements). Among other things, the CFO Marc Panoff had signed the agreement on behalf
of Retrophin and participated in the Board meeting in September 2013 when Mr. Geller's
consulting agreement was discussed and approved. GX 59-A at 7 (Mr. Panoff's signature).
And the agreements were included in relevant SEC filings, including Retrophin's 2013 10-K,
DX 116-102, and Retrophin's 2013 S-1, DX 116-52. Finally, it was reasonable for Mr.
Greebel to believe that, even though not required pursuant to the bylaws and delegated
authority to Mr. Shkreli as Chief Executive Officer, Mr. Shkreli was going to obtain Board
approval for the consulting agreement with Mr. Blanton in light of Mr. Greebel's
recommendation that Mr. Shkreli obtain approval for this agreement. *See*, *e.g.*, GX 565 (Mr.
Greebel encouraging Mr. Shkreli to get approval from the Board for consulting agreements);
DX 8207 (showing Mr. Greebel's addition of Blanton and Geller agreements to the agenda
for the September Board meeting).

    Moreover, there is extensive evidence in the record that Mr. Greebel understood that
there was serious litigation risk to Retrophin arising from the commingling of assets, among
other things, between Retrophin and the MSMB entities. The best example of that evidence
was Mr. Greebel's warning to Mr. Shkreli's sister in writing on March 25, 2013, that she

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 8

should "not refer to Retrophin and MSMB Capital as the same personnel or the same company" because "there are significant legal implications which we want to avoid." DX 1902. This is undeniable and indisputable evidence that Mr. Greebel understood—at the same time that former MSMB investors were threatening to file lawsuits against Retrophin— there were adversarial legal consequences to Retrophin by commingling Retrophin, the public company, with the MSMB entities. Further, it is undisputed that Retrophin—as both a private company and from inception as a public company—and the MSMB entities commingled funds, employees, office space, assets, and management. When Mr. Shkreli decided to wind down MSMB, his email to MSMB investors offered to redeem them in Retrophin shares. *See* GX 102-2. Indeed, in the wind-down email, Mr. Shkreli said that Retrophin was "our MSMB-founded biotechnology operation." GX 102-2. Even Mr. Richardson, who had switched his investment from MSMB to Retrophin, testified that Mr. Shkreli's email in GX 102-2 was "consistent with what Mr. Shkreli had told [him] about giving MSMB Capital investors the opportunity to either redeem in cash or to move over their investment to Retrophin[.]." Trial Tr. 1764:7–10. Mr. Richardson also testified undisputedly that Retrophin and MSMB capital had the "same office space," were "sharing resources" and "sharing staff." Trial Tr. 2077:24–2078:7. Mr. Aselage testified similarly that Retrophin and MSMB were sharing rents; that Retrophin's public company office space was where MSMB existed; and that employees of MSMB overlapped with Retrophin employees. Trial Tr. 4639:2–10. When Mr. Asleage was announced as the Chief Executive Officer of Retrophin on or about September 10, 2012, the announcement's contact for Retrophin LLC was the "President (MSMB Capital)." DX 104-51. Jackson Su testified that Mr. Aselage told him there were "comingled monies" between Retrophin and MSMB which Mr. Su understood to mean that "the money of Retrophin was mixed in with the money of MSMB." Trial Tr. 5220:18–21. Timothy Pierotti testified that Retrophin and MSMB "were all interchangeable to me." Trial Tr. 5878:21–24. Corey Massella testified undisputedly that "leases and rent were being split between MSMB Capital and Retrophin" and those were "related party transactions," and that "there were other related party transactions between MSMB and Retrophin" with "[m]oney going both ways." Trial Tr. 4089:18–4099:1. Indeed, during the trial, this Court recognized that "Mr. Greebel was aware of the commingling of funds" between Retrophin and the MSMB entities. Trial. Tr. 8070:8–9.

Given that it was reasonably foreseeable to Mr. Greebel that the litigation threats were real, we respectfully submit that the government has not met its burden on an agreement-by-agreement basis of showing that Mr. Greebel reasonably foresaw a fraudulently induced loss to Retrophin from any of the agreements. Mere "knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those acts." *United States v. Studley*, 47 F.3d at 575. For example, the government has not demonstrated that Mr. Greebel reasonably should have known that the settlement agreement with Dr. Rosenwald, or anyone else, fraudulently caused a loss to Retrophin.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 9

Correspondingly, it was Mr. Greebel who insisted that the Board of Directors of Retrophin review and approve Mr. Geller's consulting agreement, and Mr. Greebel recommended to Mr. Shkreli that the Board of Directors review and approve Mr. Blanton's consulting agreement.  *See* GX 664 (Greebel writing to Mr. Shkreli on March 17, 2014 during a Board meeting with the subject "Blanton":  "Do you want to raise the consulting agreement during your business update?  It would be good to get board sign off on it."); DX 8207 (showing Mr. Greebel's addition of Blanton and Geller agreements to the agenda for the September Board meeting); *see also* Testimony of Steven Richardson, Trial Tr. 2418:1–14; DX 8281; GX 105-48.

Moreover, the government has not proven a proximate causal link between Mr. Greebel's conduct and any losses suffered by the Company, and there were superseding causes arising out of Mr. Shkreli's misconduct that were the predominant causes for any losses.  According to the official primer—which is issued by the Sentencing Commission— "courts have found that the actual loss must have a causal link to the defendant's conduct." *Primer: Loss Calculations Under § 2B1.1(b)(1)*, U.S. Sentencing Commission 3 (2015) (emphasis added).  In *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004), the Court held "the Sentencing Guidelines import the legal concept of a causal relationship between the defendant's conduct and the determined loss."  *See also United States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000) ("Like the other courts to consider this provision, we believe that the term 'resulted from' establishes a causation requirement."); *United States v. Marlatt*, 24 F.3d 1005, 1007 (7th Cir. 1994) (applying a causation analysis to the determination of loss caused by the defendant's failure to disclose that the titles to condominiums were heavily encumbered by liens).  The government must prove not only that "but for that act or omission, the injury would not have occurred"; the government must also prove that the actions by the defendant were "a procuring, efficient, and predominant cause" of the actual losses." *Rothwell*, 387 F.3d at 583; *see also Farwell v. Un*, 902 F.2d 282, 290 (4th Cir. 1990) (While "but for" causation is always a necessary condition of causation, the ultimate question is whether the cause in fact is legally sufficient "to warrant imposing liability upon the actor"); *Marlatt*, 24 F.3d at 1007 (stating that "the presence of but-for causation is ordinarily a necessary condition but rarely a sufficient one").

Mr. Greebel's allegedly fraudulent actions of not raising the settlement agreements with Board members Stephen Aselage and Steven Richardson prior to Mr. Shkreli causing Retrophin to enter into those agreements cannot reasonably be considered the "but for" cause and the "procuring, efficient, and predominant cause" (*i.e.* legal cause) of any actual losses to Retrophin arising from the settlement agreements.  In *United States v. Rothwell*, for example, Rothwell's act of fraudulently obtaining one or more progress payments from the government through lies "cannot reasonably be considered to have caused the SBA's loss under either a 'but for' or a legal cause analysis," because the SBA eventually incurred a loss

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 10

on the construction project when Rothwell was unable to make the loan repayments, not because of Rothwell's false statements to obtain one or more progress payments.  In other words, the government failed to prove that Rothwell's false statements in loan applications were the proximate cause of the losses SBA suffered after the government had to foreclose on the project.

Similarly, here, Mr. Greebel's allegedly fraudulent acts of failing to inform Messrs. Aselage and Richardson about the settlement agreements in advance of Mr. Shkreli signing them on Retrophin's behalf were not the proximate cause of any alleged losses that Retrophin ultimately suffered from entering into these agreements.  For one, Mr. Shkreli's failure to fulfill his obligation pursuant to the promissory notes to repay the money was not the result of any actions by Mr. Greebel, but rather the actions of Mr. Shkreli.  *See Retrophin, Inc. v. MSMB Capital Management LLC et al.*, Index No. 650813-2016 (N.Y. Cty. Sup. Ct. 2016) (Court enforcing and upholding the promissory notes and indemnification of Retrophin by Shkreli, entering judgment in the amount of $2,452,373 against MSMB Capital and Shkreli).  In addition, Mr. Greebel relied on Mr. Shkreli's representations, and Mr. Shkreli was the predominant cause for any losses.

In its June 22, 2018 letter to the Probation Department, the government's argument (at 16) that "[t]here is no evidence the defendant believed the notes would be honored" makes no sense and improperly shifts the burden of proof to Mr. Greebel.  The notes were contracts that MSMB signed and thus had to comply with according to the law, and they were obligations that Mr. Shkreli told Mr. Greebel, Mr. Panoff, and the Board he would stand behind.  Mr. Greebel, as outside counsel, had every reason to believe that the agreements were valid and enforceable; in fact, Mr. Greebel drafted the very provision pursuant to which Retrophin was able to successfully sue MSMB and Mr. Shkreli.  While the government points to GX 618 as proof that Mr. Greebel believed that Mr. Shkreli would not pay the loans, that is not what GX 618 states.  Even drawing all reasonable inferences in favor of the government, GX 618 states that MSMB would not be able to pay the note, but Mr. Shkreli would be able to pay the note and Mr. Shkreli's holdings of Retrophin shares had extraordinary value, both at the time of execution and the time the notes were due.

To the extent the government has argued that Retrophin would have failed and not been able to survive as a public company but for the settlement agreements (and that Retrophin would have gone into bankruptcy as the government argued in prior submissions had there not been an attempt to stabilize the price of the stock), Mr. Greebel's actions in connection with the settlement agreements—even presuming *arguendo* there was fraud by failing to inform Messrs. Aselage and Richardson about them in advance of Mr. Shkreli signing them—cannot be said to have caused Retrophin actual losses.  To do so would require the Court to find that actions that allegedly saved the Company, and allowed it to

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 11

achieve significant success and make a fortune for stockholders who had invested in 2012 and 2013, resulted in actual losses for purposes of calculating Mr. Greebel's Guidelines range. Indeed, the stock price of Retrophin did not decrease following Retrophin's restatement in 2015 relating to the settlement and consulting agreements, reflecting that the market did not view those disclosures as material to Retrophin's stock price. The Probation Department should not apply the government's view of the law and Sentencing Guidelines where it would lead to absurd results. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 325 n. 2 (1988) (Scalia, J., concurring in part, dissenting in part) ("it is a venerable principle that a law will not be interpreted to produce absurd results"); *Holy Trinity Church v. U.S.*, 143 U.S. 457, 459 (1892) ("frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of . . . the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act").

2.     *The Releases Provided Value to Retrophin*

Even assuming *arguendo* that the government had demonstrated that Mr. Greebel reasonably should have known that any of the agreements at issue were capable of causing a loss through fraud, we respectfully submit that this Court should discount the government's proposed loss amount by the value of each agreement's release of Retrophin from any lawsuit.

Expert testimony presented during the June 1, 2018 *Fatico* hearing on loss amounts supports Mr. Greebel's view at that time that the releases provided value to Retrophin. Gayle Klein, a prominent attorney experienced in investor lawsuits[3], testified that any one investor could have brought a nonfrivolous lawsuit against Retrophin that would have cost the company $1.1 million to defend. June 1 Tr. 80:6–12 (Ms. Klein testifying that she calculated a total cost of $1,107,850 in attorneys' fees should any one of the threatened investor lawsuits proceed through trial). The Probation Department's Presentence Investigation Report ("PSR") and the government's own assertion of appropriate loss amount for Count Seven fail to take into account any such calculation, despite the fact that these represent real costs avoided by Retrophin solely by virtue of having executed settlement and

---

[3]   The government repeatedly questioned—prior to, during, and following her testimony—Ms. Klein's expertise. *See* Dkts. 617 & 625; June 1 Tr. 35:2–7 (government requesting *voir dire* as to Ms. Klein's qualifications). Respectfully, Ms. Klein's qualifications as an expert are undisputable; as a nationally recognized litigator (both plaintiff- and defense-side) with multiple decades of bringing investor suits like the ones contemplated here and billing her fees for those suits, Ms. Klein is certainly qualified to opine on reasonable litigation risks and the expected costs of bringing suit.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 12

consulting agreements that contained broad general releases. As Ms. Klein testified,
Retrophin received significant value from the execution of agreements with these release
provisions: they "save[d] attorney's fees and costs," the release provided assurance that "the
investor is going away and is not going to bring any claims in the future," and Retrophin
"avoid[ed] liability." June 1 Tr. 82:2–7. These real, quantifiable cost savings should offset
any "damages" to Retrophin from the expenditures made as a result of the agreements. The
government's assertion in its June 22, 2018 letter (at 16) that Ms. Klein "did not offer any
specific estimate of costs saved" is inaccurate. Ms. Klein's expert testimony included
reasonable estimates of the amounts that Retrophin would have spent to defend itself at
multiple stages of one individual lawsuit. The government's pre-*Fatico* argument that Ms.
Klein's "testimony is irrelevant" as to the question whether "the defendant and others
defrauded Retrophin by causing it to enter into the agreements in the first place," Dkt. 617 at
5, simply does not hold weight. Her testimony goes directly to the benefit Retrophin gained
by entering into the agreements and the reasonably foreseeable costs had it chosen not to do
so.

In its June 22, 2018 letter to the Probation Department, the government appears to
concede that Retrophin did benefit from the settlement agreements. *Id.* at 16 ("Retrophin
would have received the very same benefit . . . ."). Ms. Klein's testimony that Retrophin
would have received the same benefit had Mr. Shkreli made the payments fails to recognize
that, had Mr. Shkreli and only Mr. Shkreli entered into the settlement agreements, it is not
necessarily the case that Mr. Shkreli would have included Retrophin within the releases.
Moreover, even had Mr. Shkreli personally paid the settlement amounts and incorporated a
release provision, it would not necessarily have prevented the investors from suing Retrophin
on a breach of duty theory. Thus, the government relies on pure speculation and assumes
that, had Mr. Shkreli made all of the payments, he would have also included Retrophin
within the releases. There is no basis for that government speculation.

In its June 22, 2018 letter to the Probation Department (at 16), the government also
argues that the Court should take Retrophin's post-Shkreli determination through Mr.
Aselage that the settlements and consulting agreements had no value. There are several
flaws in that argument. *First*, the government did not call Mr. Aselage or anyone else to
testify about whether the settlement agreements and the consulting agreements resulted in no
value to Retrophin. Indeed, Mr. Asleage's testimony at trial was that Retrophin made a
determination that the agreements were not reasonable—not that they did not result in any
value at all to Retrophin. *See* Trial Tr. 4487:1–4488:3 (Asked whether Retrophin determined
whether the settlement agreements were fair and reasonable to the company, Mr. Aselage
testified that "[t]he decision was made that they were not fair and reasonable to the
company" and Mr. Aselage testified to the same with respect to the consulting agreements at
issue). To be clear, testimony that the agreements were "not fair and reasonable" is a far cry

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 13

from testifying that they did not offer any value to Retrophin, and that they did not result in any value to Retrophin. *Second*, Mr. Aselage testified that "directors and officers insurance is critical in that if you are an officer of the company, you can be sued by anyone for something that you may have had nothing to do with. So D&O insurance, as it is called, is important to protect officers and directors, you know, from financial castrophe in the event of litigation against them." Trial Tr. 4327:10–18. By Mr. Aselage's own testimony, Retrophin does not dispute—and would not dispute had the government called any Retrophin officer at the *Fatico* hearing—that former MSMB investors could have sued Retrophin, and such lawsuits would have cost Retrophin millions of dollars to defend. Indeed, by Mr. Aselage's own admission, such investors could have filed lawsuits against Mr. Aselage himself—particularly given that he was the Chief Executive Officer of Retrophin for several months in late 2012, and that he was a member of the Board of Directors during the relevant period. To the extent the government speculates that Retrophin's insurance might have covered such costs, the government has offered no proof of such speculation. Indeed, we do not have any evidence to believe that Retrophin ever had a relevant Directors & Officers insurance policy during the applicable period or, if it did, that the company sought insurance coverage for the hundreds of thousands of dollars to millions of dollars in legal fees defending multiple litigations, including those by Jackson Su and George Huang against Retrophin. *Third*, Retrophin's Board of Directors has the authority to annul the settlement and consulting agreements at issue and could do so at any time. Yet, Retrophin's Board has decided not to annul them, and thus they are still benefitting from the releases in those agreements. While we do not raise that issue in an effort to "blame the victim," it helps demonstrate that Retrophin must believe the releases have *some* value; otherwise, the company would annul them and seek redress from the counterparties. *Finally*, it is indisputable that none of the settling parties and consultants at issue ever filed a lawsuit against Retrophin since they signed and received their money and shares. Accordingly, Retrophin has benefitted from the releases in these agreements.

Like Ms. Klein, Dean Stephen Ferruolo similarly testified that there is value to the resolution of all potential claims that comes from an agreement with a broad release like the ones at issue here. June 1 Tr. 168:9–22 (Dean Ferruolo testimony that the releases covered claims "as broad as they can be in terms of any claims known or unknown" such that they "resolved the issue with this individual once and for all and [the company] would never have to worry about the situation again."). Particularly for early-stage life science companies, which Retrophin was at the time of the agreements and on which Dean Ferruolo's law practice focused for several decades, such broad releases mean that instead of focusing on "continued threat of litigation," June 1 Tr. 168:25, Retrophin could "move forward with . . . financing" and other more pressing concerns. *Id.* at 168:22. Indeed, companies like Retrophin are at particular risk of reputational harm, given the "limited number of investors" and "limited universe of people who know one another"; a single dispute with one investor

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 14

could cause reputational harm throughout the industry that could be significantly damaging or even fatal to a nascent company.  *Id.* at 169:2–11; *see also id.* at 170:8–12 (Dean Ferruolo testimony that, were claims not resolved before a company went ahead with a financing event, they "would never be able to get the financing done.").  Thus, it is not only a matter of actual litigation costs saved, but the potential that Retrophin itself was saved by the execution of these agreements, and that value should be accounted for in any calculation of the actual loss reasonably foreseeable—and therefore attributable—to Mr. Greebel.  The government's questioning on cross-examination as to the "client" needing to weigh the costs of litigation is unavailing.  First, as Dean Ferruolo made clear on direct examination, the client in early-stage life science companies, as Retrophin was, is "the company and the company acting through its authorized  representative, which . . . was typically the CEO." June 1 Tr. 177:1–3.  Second, the issue here is not guilt or innocence (including whether Retrophin should have or would have entered into these agreements under different facts), but whether it nonetheless received value that is netted against the prices it paid for each agreement.

In this case, the standard of care displayed by Mr. Greebel is consistent with the expectations of an outside lawyer to an early-stage life-sciences company: identify and prevent potential risks from escalating into larger problems.  The fundamental issue for a loss calculation is not whether other entities or people may have also benefited from the agreements and releases, but whether Retrophin derived any benefit.  Based on the testimony of both Ms. Klein and Dean Ferruolo, the answer to that question is yes.  Further, whether anyone at Retrophin at the time of these agreements or a different CEO of Retrophin at a later date disagrees with whether Retrophin had any exposure or was the cause of the problem that warranted the releases, does not negate the view expressed by Ms. Klein and Dean Ferruolo about a reasonable lawyer confronted with a similar situation.

> 3.    *The PSR Incorrectly Included Fearnow Shares as Retrophin Losses*

The government's loss calculation includes the value of shares that were originally held by Troy Fearnow.  Those freely trading shares that Troy Fearnow sold to several parties were not the property of Retrophin.  We believe it is undisputed that:  (1) Prior to December 2012, Troy Fearnow was the rightful owner of the freely trading shares of Retrophin, *see, e.g.*, GX 480 (purchase agreements showing Troy Fearnow as owner of Desert Gateway shares); (2) On or about Dec. 11, 2012, Troy Fearnow sold the freely trading shares of Retrophin to seven individuals, *see id.*; (3) At the time of the reverse merger on or about December 17, 2012, Retrophin owed $100,000 to Michael Fearnow for the purchase of the Desert Gateway shell, *see* GX 910-E (Retrophin account records showing only one $100,000 payment on Dec. 13, 2012); (4) At the time of the reverse merger, Troy Fearnow held back approximately 400,000 freely trading shares pending Retrophin's payment of the outstanding

GIBSON DUNN

The Honorable Kiyo Matsumoto
June 28, 2018
Page 15

$100,000 to Michael Fearnow, *see* GX 479 (showing shares held back); (5) The purchasers of the shares from Troy Fearnow knew a portion of their shares were being held back as collateral for the outstanding amount owed, *see, e.g.*, Trial. Tr. 5949:18–5950:3; and (6) On or about Feb. 26, 2013, Retrophin paid the outstanding amount owed to Michael Fearnow. *See* GX 910-E (Retrophin transaction records showing payment of $100,000).

The mere fact that Troy Fearnow held back approximately 400,000 freely trading shares in escrow pending Retrophin's contractual obligation to pay the outstanding $100,000 to Michael Fearnow did not change the ownership of the freely trading shares. Indeed, it is settled law that the mere fact of holding shares in escrow does not change ownership. *See, e.g.*, *Press v. Marvalan Indus., Inc.*, 422 F. Supp. 346, 349 (S.D.N.Y. 1976) ("[T]he incidents of ownership remain in the person depositing the property into escrow until the conditions of the escrow agreement are fulfilled. *Alexander v. Quality Leather Goods Corp.*, 150 Misc. 577, 269 N.Y.S. 499 (Sup. Ct. 1934) (seller who deposits corporate shares in escrow to await payment of promissory notes is entitled to all rights of a shareholder); *Clark v. Campbell*, 23 Utah 569, 65 P. 496 (1901) (dividend on shares held in escrow *belongs to the seller* who deposited the shares in escrow and not to the buyer).") (emphasis added). The government does not point to any case law in support of its theory that Troy Fearnow's withholding of freely trading shares as collateral was somehow a change in the contractual rights and obligations of the parties to the Desert Gateway sale and/or the stock acquisition agreements between Troy Fearnow and the seven individuals who purchased the freely trading shares.

The government's theory that Retrophin was the owner of the freely trading shares suffers from the same flaw in the government's theory that Retrophin was defrauded as a result of the alleged backdated transfers of Retrophin LLC units from Martin Shkreli to others. *See, e.g.*, Trial Tr. 8112:2–4 (during Rule 29 oral argument, the Court questioned "how [those transactions] harm Retrophin?"). Just as Retrophin never owned units of Retrophin LLC that were subject of the alleged backdated transfers and thus could not be defrauded as a matter of law, Retrophin was never the owner of the freely trading shares and thus could not have suffered losses from the transfer of such shares to others. Because Retrophin was not the owner of the freely trading shares, the PSR incorrectly assigns losses to Retrophin for the value of 80,000 freely trading shares paid to Dr. Rosenwald and the value of 47,128 freely trading shares to Richard Kocher. Retrophin did not suffer any loss regarding the transfer of the freely trading shares because Retrophin never owned those shares and was never entitled to legal ownership of those shares. Based on the legally-binding agreements signed by Marek Biestek, Edmund Sullivan, and Andrew Vaino, each of these individuals knowingly and willfully transferred their shares of Retrophin to Dr. Rosenwald and Mr. Kocher, respectively, and Retrophin had no authority or role in their transfer and assignment. *See* GX 581 (Vaino authorizing transfer of 47,128 shares to

GIBSON DUNN

The Honorable Kiyo Matsumoto
June 28, 2018
Page 16

Kocher); GX 584 (executed purchase agreement transferring 47,128 shares); GX 115-25 (Biestek and Sullivan agreements authorizing transfer to Dr. Rosenwald).

Just because the government argues that "[i]t is obvious that Retrophin had a 'right' to the shares" in its June 22, 2018 letter to the Probation Department (at 17) does not make it so.  The government argued repeatedly prior to trial and during trial before the close of its case that it was also obvious that Retrophin was defrauded through the allegedly backdated share transfers from Mr. Shkreli to others.  But the government's statements that it was obvious were not backed up by basic contract law governing agreements and the undeniable fact that Mr. Shkreli was the owner of the Retrophin LLC units and could transfer them to anyone he wanted.  All of the reasons that the government argues now that executed purchase agreements between the Fearnow recipients and Troy Fearnow are not valid disregard the same basic contract law governing the enforceability of signed agreements. The government's assertion (at 17) that "[t]he only reason Fearnow made the Fearnow shares available to members of the Count Eight conspiracy and to Pierotti was that Retrophin paid Fearnow for the Desert Gateway shell" mixes up the names of Troy Fearnow, who was the rightful owner of the freely trading shares, and Michael Fearnow, the owner of the Desert Gateway shell.  Retrophin never paid Troy Fearnow for the Desert Gateway shell, and Michael Fearnow never sold the freely trading shares to Retrophin.  Indeed, Mr. Aselage, the then-CEO of Retrophin, learned that the freely trading shares were going to be sold to individuals rather than given to Retrophin and he never objected nor did anything about it. The government's statement that the "400,000 'escrowed' shares were held back until Retrophin had paid the second installment for the Desert Gateway shell" is true, but it does not change the fact that the individuals who purchased the freely trading share had every right to them.  Indeed, each of those individuals who purchased the freely trading shares agreed to allow Troy Fearnow to keep a certain amount in escrow, and their agreement was necessary.  Finally, the government's argument that our theory of "the Pierotti litigation, premised on the argument that Pierotti only obtained Fearnow shares as a result of some undocumented, contingent agreement with Mr. Shkreli" is "directly at odds" with our assertion that each purchaser of the freely trading shares had a right to control them is wrong. A critical question was why Mr. Shkreli arranged for Mr. Pierotti to purchase the freely trading shares, and the reason was, in our view, an understanding by Mr. Shkreli that Mr. Pierotti would contribute value to Retrophin just as it went public.  That is not "at odds" in any way with the contemporaneous evidence that Mr. Greebel understood that all holders of freely trading shares had the lawful ability to hold them, sell them, and do whatever they wanted with them.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 17

> 4.   *The PSR Incorrectly Values The Restricted Shares, Does Not Account For The After-Tax Costs, and Contains Inconsistencies with Retrophin's Own Filings*

The PSR incorrectly treats the financial impact of certain aspects of the settlement and consulting agreements.

First, only Dr. Rosenwald and Mr. Kocher received freely trading stock, yet the PSR ascribes the same value to that freely trading stock as it does to the restricted shares provided in Mr. Spielberg and Mr. Lavelle's settlement agreements and Mr. Geller and Mr. Blanton's consulting agreements.  According to the settlement agreements with Mr. Spielberg and Mr. Lavelle, Retrophin issued stock to each of these individuals, and such stock was subject to a one-year restriction unless the company issued a registration statement.  *See* GX 53 at 2 and GX 56 at 2 (Mr. Spielberg and Mr. Lavelle's settlement agreements, Releasor Representations).  The PSR recognizes that the shares to Messrs. Geller and Blanton were from Retrophin and thus, by definition, not freely trading stock.  In the absence of a registration statement, such stock was subject to a one-year restriction.  *See* GX 59-A at 1–2 (Mr. Geller's consulting agreement, representation statements); DX 1106 at 1–2 (Mr. Blanton's consulting agreement, representation statements). The PSR incorrectly values those shares as if they were freely trading.

The PSR ascribes a value to the restricted shares of Messrs. Spielberg, Lavelle, Geller, and Blanton as if they were freely trading and not restricted.  But it is beyond dispute that restricted shares are less valuable than freely trading shares.  The holder of unrestricted shares may trade freely as they please and thus that type of shares necessarily represents a higher value than restricted shares, which may not be transferred for a period of time and do not offer investors the same potential liquidity or flexibility as freely trading shares. Restricted stock is significantly less liquid (and therefore less valuable) than its unrestricted counterpart.  *See generally* Securities and Exchange Commission Fast Answers, *'Restricted' Securities: Removing the Restrictive Legend*, https://www.sec.gov/fast-answers/answersrestrichtm.html (noting the illiquidity of restricted securities).

The government has not offered any proof as to the value of the restricted shares of Messrs. Spielberg, Lavelle, Geller, and Blanton.  The government has not submitted any proof of the discounted value of those shares.  This burden is solely on the government and cannot be shifted to Mr. Greebel.  The government's contention in its June 22, 2018 letter (at 17) that Retrophin's auditors also valued the restricted shares based on "fair market value" overlooks that there is no indication in GX 114-25 that the auditors took into account and recognized that the shares were restricted.  Indeed, the auditors' spreadsheet reflects that they

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 18

were shares of Retrophin stock given to Messrs. Spielberg and Lavelle, but not that they were restricted for a significant period of time.

Second, the PSR also overlooks that, to the extent Retrophin took a charge for the settlement and consulting agreements, it would have reduced its tax liabilities for having expensed these agreements in the past. The true harm, then, should be the after-tax cost, as such any analysis of actual damages would have to be downward adjusted by 35% (the applicable corporate tax rate in 2013 to 2014), to reflect the after-tax cost related to the agreements. Although Retrophin then had not (nor has it now) generated taxable income, the amount of any loss (including charges associated with the agreements) would be considered a "Net Operating Loss" or "NOL," which is a future tax-offset and considered an asset for a company like Retrophin. As such, any increase in the NOL would actually be beneficial, and any increase due to the agreements referenced should be deducted from any calculation of intended loss.

Third, the PSR's calculation of the loss amounts relating to Al Geller's consulting agreement also appear to be *inconsistent* with the amount of money that Retrophin recorded as a charge to its operation for the cash and aggregate issuance date fair value of the shares under that agreement. Whereas the PSR proposes an actual loss calculation to Retrophin in the amount of $3,412,250 ($1,179,750 + $1,055,500 + $587,000 + $590,000), Retrophin announced in its restated Form 10-K/A, Amendment No. 1, for the fiscal year ended December 31, 2013, that it recorded a net charge of less than $2,334,750 for the shares issued to Mr. Geller.[4]  *See* Retrophin Form-10K/A, Amendment No. 1 at page 145 of 164 (at F-22).

---

[4]   We erred on the conservative side in calculating what Retrophin recorded as a net charge arising from the Al Geller consulting agreement. Based on two agreements which provided a total of 346,500 shares of common stock of the Company and a total of $200,000 in cash payments by the Company—of which only 331,500 shares were given to Al Geller—"[t]he Company recorded a $2,708,375 charge to operations for the cash and aggregate issuance date fair value of the shares issued/issuable under these agreements and subsequently marked the remaining share base payment liability to current fair value by recording a credit to operations of $173,625." Form 10-K/A, Amendment No. 1, at p. 145 of 164 (at F-22). The net charge for both agreements was $2,708,375 less the credit of $173,625, or $2,534,750; and then reducing that number by the $200,000 in cash payments made pursuant to the second agreement (which was not Al Geller), the net charge that Retrophin took with respect to Al Geller's agreement was $2,334,750.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 19

### C.    Proposed Alternative Calculations of Actual Loss on Count Seven

As an initial matter, and as Mr. Greebel has maintained throughout, the jury had no need to—and there is no evidence that it did—find Mr. Greebel guilty for misconduct as to each of the settlement and consulting agreements to convict him of the conspiracy charged in Count Seven.  Without a special verdict form, it is impossible to know for certain which agreements the jury relied upon; however, the government's focus during summation on the settlement agreement with Schuler Marshall provides a reasonable basis for loss determination.  The government itself singled out Schuyler Marshall's agreement, having already spent significant time earlier in its summation showing how different the circumstances of that agreement were, to make the point to the jury that they "can convict on Schuyler Marshall's settlement agreement alone." Trial Tr. 10767:1–5.  Given that the government argued that the jury could convict Mr. Greebel on Count Seven by finding that Mr. Marshall's agreement was fraudulent, the Court has a reasonable basis to use that agreement to compute actual loss (assuming arguendo the Court rejects our other arguments in favor of not finding any loss).  Under those circumstances, the actual loss to Retrophin for Mr. Marshall's agreement would be $300,000.  *See* PSR at 14 (noting the cost of Schuyler Marshall's settlement agreement).

Alternatively, Mr. Greebel respectfully submits that, rather than the $10,447,979 in actual loss proposed by the government, the actual loss to Retrophin attributed to Mr. Greebel should equal the cost to the company of any settlement or consulting agreements reduced by the value of the releases contained therein, which value represents the cost savings of Retrophin not having had to litigate any claims.  when Retrophin entered into each of the settlement and consulting agreements it faced threats by investors that they would proceed to litigation should their claims not be resolved.  As Ms. Klein testified, any of those investors had valid claims that would have supported a lawsuit; based on a conservative calculation, each such lawsuit would have cost Retrophin upwards of approximately $1.1 million.  June 1 Tr. 42:13–17 (Ms. Klein testifying that "in actuality . . . the number is probably a little bit low.").  Thus, the total cost of the settlement and consulting agreements as calculated in the PSR should be reduced by litigation cost per investor to arrive at the correct figure for actual loss.  Should the Court accept Ms. Klein's $1.1 million calculation, the appropriate value of actual loss attributable to Mr. Greebel would be $477,329—the difference between the $10,447,979 amount proposed in the PSR and the $9,970,650 ($1,107,850 expenses per lawsuit multiplied by nine) cost to defend against nine investor lawsuits (seven settlement agreements and two consulting agreements).[5]  This figure could

---

[5]  The Court could also take into account Ms. Klein's expert and undisputed testimony that a lawsuit by one former MSMB investor would reasonably likely cause other former MSMB investors to also file suits.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 20

be further reduced on the basis that Mr. Shkreli signed legally-binding agreements to indemnify Retrophin for the settlement amounts, and Retrophin's successful suit against MSMB and Mr. Shkreli based on those agreements is proof of the value of them.  *See Retrophin, Inc. v. MSMB Capital Management LLC et al.*, Index No. 650813-2016 (N.Y. Cty. Sup. Ct. 2016) (Court enforcing and upholding the promissory notes and indemnification of Retrophin by Shkreli, entering judgment in the amount of $2,452,373 against MSMB Capital and Shkreli).

Alternatively, pursuant to Application Note 3(B), this Court could use the "gain" that resulted from the offense as an alternative measure of loss if the loss cannot be reasonably determined.[6]  Under those circumstances, we respectfully submit that the Court could use the alleged "gain" that the Court is calculating pursuant to the government's motion for forfeiture as the "gain" for purposes of calculating the guidelines range under Section 2B1.1.

## IV.   ESTIMATING ACTUAL LOSSES ON COUNT EIGHT

### A.   Law Governing The Calculation Of Intended Losses

Unlike Count Seven, the government has argued that Mr. Greebel should be held accountable for *intended* loss as to Count Eight.  As amended in 2015, under the Guidelines, intended loss is pecuniary "loss that *the defendant purposely sought to inflict*."  U.S.S.G. Supp. to App. C, amend. 792 (2015) (emphasis added).  The Sentencing Commission noted that the reason for the amendment was to "better account for . . . individual culpability, and the offender's intent."  *Id.*   In amending to include the "purposely sought to inflict" language, the Sentencing Commission resolved a circuit split and affirmatively adopted the construction advanced by the Tenth Circuit that, "'Intended loss' does not mean a loss that the defendant merely knew would result from his scheme or a loss he might have *possibly and potentially* contemplated."  *United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir.

---

[6]   The government has never argued that it was seeking to calculate loss pursuant to Count Seven under an "intended loss" theory.  To the extent the government makes that argument for the first time in its opposition, we ask for the opportunity to address it.  We submit respectfully that the government cannot demonstrate that Mr. Greebel purposely sought to inflict any loss on Retrophin through the settlement and consulting agreements in light of the extensive evidence that Mr. Greebel reasonably believed that the former MSMB investors had threatened to file lawsuits against Retrophin and/or that such investors might file lawsuits against Retrophin.  The government would have to demonstrate that Mr. Greebel not only knew that losses might result or could potentially result from the settlement and consulting agreements, but that he purposefully sought to inflict such losses on Retrophin.  *See* U.S.S.G. Supp. to App. C, amend. 792 (2015).

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 21

2011) (emphasis in original).  The amendment does not materially change the Second
Circuit's method for calculating intended loss, and this Court should look to Mr. Greebel's
subjective intent in determining the loss attributed to him.  *See United States v. Confredo*,
528 F.3d 143, 152 (2d Cir. 2008) ("[T]he district judge should determine the extent, if any, to
which [defendant] has proven a subjective intent to cause a loss of less than the aggregate
amount of the loans."); *see also Fofanah v. United States,* 2017 WL 4564922, at *8
(S.D.N.Y. October 11, 2017) ("[T]he Sentencing Commission endorsed the local approach
by revising the definition of 'intended loss' in Amendment 792.").

      **B.**        **Application of Law to Count Eight**

              *1.*      *Government Has Not Proven Purposeful Subjective Intent*

      As addressed at length in post-trial and pre-*Fatico*-hearing briefing, there is no
evidence that Mr. Greebel had a purposeful, subjective intent to inflict loss related to Count
Eight, and the government has not so proven.  There is also no evidence that Mr. Greebel
even knew that Mr. Shkreli had the purposeful intent to inflate the stock price of Retrophin to
$5 per share, much less any inflated dollar value.  While we do not contest Mr. Greebel's
conviction for purposes of this submission, that does not diminish the absence of probative
evidence *as to Mr. Greebel*'s purposeful intent to inflict a specific loss.

      Indeed, the evidence adduced at trial shows the opposite: Mr. Greebel was not present
for the meeting when, according to Mr. Pierotti, Mr. Shkreli informed the people that they
would receive shares and then spoke "out of both sides of his mouth where he would say,
you know, these are your shares you do what you want with them.  But, you know, if we can
trade them and create some volume that would be great."  Pierotti Testimony, Trial Tr.
5944:4–20;  Tr. 6281:18–6282:8 (Greebel "wasn't" at the meeting to discuss the Fearnow
shares).  Mr. Greebel was also not on the email that Michael Smith sent to those purchasing
Fearnow shares, and Mr. Greebel was never forwarded or provided with a copy of the email.
GX 112-12.  Mr. Greebel knew that each of the purchasers of the Fearnow shares signed an
agreement to purchase the shares from Troy Fearnow.  *See* GX 480.  On December 9, 2013,
Mr. Greebel explained to Mr. Shkreli that Ron Tilles and his company "have a contractual
right to receive" the Fearnow shares.  GX 647.  On December 18, 2012, Mr. Biestek asked
Mr. Greebel in writing "[c]an any of us sell RTRX stock privately for the same price we
bought it for to someone else?" and Mr. Greebel responded less than an hour later in writing:
"You can sell the stock however and to whomever you want except to affiliates of the
company."  DX 1283.  On December 28, 2012, Mr. Greebel told Mr. Shkreli that Mr. Pierotti
controlled his own shares:  "not sure what you can do; he has the stock."  GX 510.  On
March 11, 2013, Mr. Shkreli told Mr. Greebel that he "[g]ot 4/5 okays for escrow stock"—
meaning that 4 purchasers of the Fearnow shares agreed to transfer their shares for purposes

GIBSON DUNN

The Honorable Kiyo Matsumoto
June 28, 2018
Page 22

of settling potential claims.  DX 124-88.  On March 14, 2013, Mr. Greebel asked Kevin
Mulleady's counsel in writing if Mr. Mulleady would be willing "to surrender any claims he
has to receive additional shares from Troy Fearnow and Retrophin will facilitate such shares
being transferred to certain investors in Retrophin."  DX 1307.  On May 13, 2013, Mr. Vaino
provided express authorization for use of the Fearnow shares held in escrow for purposes of
issuing them to Richard Kocher to resolve a potential claim.  GX 581.  With respect to the
non-escrowed shares, some purchasers of the Fearnow shares sold their stock (Andrew Vaino
sold 67,000 shares between 12/17/2012 and 2/28/2013; Tim Pierotti sold 132,125 during the
same period); and some neither sold nor purchased shares (Thomas Fernandez, Edmund
Sullivan, and Ron Tilles/Claridge between 12/17/2012 to 2/28/2013).

        More telling is the absence of certain evidence: the government has not been able to
point to any email that shows Mr. Greebel considering or suggesting a need to inflate the
stock price.  And, as reflected above, Mr. Greebel advised various individuals that they could
sell their shares.  If Mr. Greebel were subjectively intending to assist Mr. Shkreli in
controlling the shares to effect the market, he would not have instructed investors to do the
very opposite of what the government is alleging.

        The Probation Department's assertion in Paragraph 52 that "[t]he success of these
offerings depended in part on the defendant and his co-conspirators maintaining the price of
Retrophin stock at an artificially high price during this time period – approximately $5.00 per
share, which they were able to do" is not supported by the record relating to Mr. Greebel.
Nor is it supported by the share price data from the relevant time, which shows that the stock
did not stay at a $5.00 share price; rather, it hit that high point twice and quickly reverted.

        The fundamental flaw is that there is no evidence that Mr. Greebel had any idea of a
connection with the charged conspiracy and any PIPE.  If the stock price had fallen below
$3, Dean Ferruolo's expert testimony proves that private investors would not have purchased
shares on the open market, and they would have still invested in the PIPE.  Based on the
expert testimony of Dean Ferruolo, there is no connection between inflating the stock price
and causing accredited (*i.e.* wealthy sophisticated investors) to invest in the February 2013
PIPE.  As Dean Ferruolo explained, there were significant advantages to investing in a PIPE
rather than purchasing shares in the open market and a PIPE investor would not pay attention
to the market price of the security to determine whether to invest in the PIPE.  Among other
things, PIPE investors evaluate the Company's assets, not the trading price, to determine
whether to invest in a PIPE; PIPE investors want to purchase hundreds of thousands of
shares, and thus they cannot go into the general market to purchase such shares without
driving up the price of the stock; PIPE investors want the Company to give them warrants for
free which they can sell over the next five years; PIPE investors obtain anti-dilution and full
ratchet protection, meaning that if the public company engages in any further financings

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 23

where the stock is offered at a lower price, the PIPE investors will retroactively get that
lower price; and PIPE investors get highly valuable registration rights which enable them to
seek monetary damages against the company should the company fail to issue a registration
statement within a definite period of time.  All of this is laid out in GX 303—the PIPE
documents that Mr. Greebel provided to the Board of Directors in early February 2013 in
advance of the Board's approval of the PIPE.  Without question, Mr. Greebel was aware of
these terms as he sent them to the Board of Directors, and it is reasonable to infer that Mr.
Greebel had every reason to believe that PIPE investors would not be impacted by the market
price of Retrophin stock in December 2012 and January 2013.

Even assuming *arguendo* there was evidence that Mr. Greebel had a subjective intent
to stabilize (and/or inflate) the stock price of Retrophin, the intended loss to the market is not
"represented by the differential between the average artificial high of Retrophin stock of
$5.00 per share from approximately December 17, 2012, until February 28, 2013, and $3.00
per share, the price per share that the private placement investors paid when they invested in
Retrophin . . .," as the government argues.  It does not make sense that the "differential
between the average artificial high and the price per share that the private placement
investors paid when they invested in Retrophin (approximately $2.00 per share) represents"
the intended loss by Mr. Greebel to the market.  As explained above, there is no logical
connection between an allegedly inflated stock price and the PIPE at $3.00 per share—
indeed, the $5 artificial average high cited by the government occurred weeks before the
PIPE was priced and had no impact on the terms thereof.

Even assuming *arguendo* there was evidence that Mr. Greebel had a subjective intent
to stabilize (and/or inflate) the stock price of Retrophin, it does not make sense to "multiply[]
$2.00 per share by the 2 million Fearnow shares [allegedly] controlled by Shkreli."  There is
no connection between the purportedly $2.00-per-share inflated value and the two million
Fearnow shares.  The Probation Department's theory seems to suggest that somehow there
was intention to cause a loss to those holding the two million Fearnow shares, but the
government's theory is that Mr. Shkreli controlled those shares.  Thus, the two million
Fearnow shares cannot be used as part of any calculation of intended loss.  The government's
argument in its June 22, 2018 letter to the Probation Department (at 22) that the two million
Fearnow shares "were the very proxy and mechanism for the fraud, [and thus] they are an
appropriate basis to measure loss" makes no sense.  The proof of intended loss must be a
determination of the amount of loss, and not based on shares that purportedly never would
have suffered any loss because they were controlled by the alleged co-conspirators.  The
government cites no authority for its proposition that the determination of intended loss
should be based on a "proxy and mechanism" for the fraud, and we are not aware of any such
authority.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 24

The government has suggested the above-mentioned theory of multiplying $2.00 by the two million Fearnow shares is more "conservative" than alternative theories, but none of the alternative theories proposed by the government have any basis in law or fact.  The first alternative theory is that the Probation Department could value Retrophin stock below $3 per share and multiply a higher number than $2.00 by the two million Fearnow shares, but once again that theory relies on the same incorrect assumptions noted above.  Moreover, this theory of the government assumes that investors were unaware that Retrophin was on the brink of bankruptcy, and that it was closely controlled by Mr. Shkreli and others.  The public filings of Retrophin from the outset showed that it had zero revenues, it had millions of dollars in liabilities, that it was a "going concern" according to the outside accountants and thus on the brink of bankruptcy, and that expressly stated that Mr. Shkreli and other large shareholders were capable of controlling the company.  The second alternative theory of the government was that the Probation Department could use 2.4 million Fearnow shares in the calculation of "intended loss."  This suffers from the same flaws that arise from using the number of Fearnow shares for purposes of calculating intended loss.

> 2.   *The Proposed Calculations in the PSR Are Based on Flawed Theories*

Testimony during the *Fatico* hearing highlighted a basic flaw in Probation and the government's underlying theory on Count Eight loss: that PIPE investors would care enough about share price for it to inform their decision whether to invest.  As Dean Stephen Ferruolo testified, that is simply not true.[7]  Share price is not the determining factor for a typical PIPE investor as to whether to go forward with the transaction, and testimony made clear that, in fact, "in some respects one can say the actual market trading price of the stock is really not all that relevant to [PIPE investors]." June 1 Tr. 205:15–18.

Instead of providing countering testimony to support their theory, the government repeatedly attempted to evade the impact of this testimony by pointing out that Dean Ferruolo "does not say that he has any experience representing <u>investors</u> during such transactions." Dkt. 617 at 7 (emphasis in original).  Dean Ferruolo practiced law at "leading firms in the representation of early stage life science companies," June 1 Tr. 155:22–23, during which time he personally represented public companies in approximately 40 to 50

---

[7]   The government questioned Dean Ferruolo on his having been compensated for his time serving as an expert witness and the costs of his cross-country travel to appear in this case, particularly the costs of flying business-class as opposed to coach.  To the extent the government was attempting to suggest impropriety, the Court should reject any such implication.  There is nothing improper about an expert receiving compensation, and his method of travel certainly does not impact the credibility of his testimony.

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
June 28, 2018
Page 25

PIPEs, *id.* at 154:20–23, lead investors in one or two times, *id.* at 155:5–7, and "piggyback-type investor[s]" about a dozen times.  *Id.* at 155:7–11.  Even still, these numbers undersell the full depth of Dean Ferruolo's knowledge, and it is inexplicable that the government would attempt to represent him as lacking in expertise as to the behavior of typical PIPE investors—particularly when, as he testified, "[i]n the life sciences, it's a limited number of investors who do these deals. And they know one another's terms. It's your job to know what's standard and have a sense of what's going on in the market." *Id.* at 157:12–16.

Given his significant experience, the Court should give appropriate weight to Dean Ferruolo's testimony, which makes clear that, rather than simply move their purchases to the open market should a company's share price fall, a PIPE investor would at most renegotiate the terms of the deal.  That is contrary to the government's assertions on loss.  For one, Dean Ferruolo testified that the typical lead investor in a PIPE transaction could not simply move to the open market, because buying shares in the quantity they require would "drive the price up."  June 1 Tr. 204:12–19.  And he testified that PIPE investors would not want to do that regardless, because those investors are looking for advantages they wouldn't get in the ordinary market, including "discount to the market price, . . . some amount of downside protection, . . . [and] significant upside because typically these shares come with warrants." *Id.* at 205:15–25; *see also id.* at 206:1–207:5 (describing additional benefits to PIPE investors).  It does not make sense, then, to tie intended loss to a scheme to buoy the share price in an apparent effort to ensure a PIPE transaction's success, and the government has not met its burden of proving that this was Mr. Greebel's intent.

To the extent the government argues that Mr. Greebel had the subjective intent to purposely cause a loss to the PIPE investors, the government's theory would lack merit in several respects.  To begin with, such a theory would not be supported by any actual evidence in the record of Mr. Greebel's purposeful and subjective intent to cause any losses to PIPE investors.  Further, the government has not met its burden of proving what the PIPE investors would have paid had the stock price not been purportedly inflated.  The government has not been able to demonstrate actual loss in connection with Count Eight, and therefore the government cannot meet its burden of showing, had the stock been inflated, (1) what that inflation would have been, (2) that Mr. Greebel had the subjective intent to cause that dollar value of inflation, and (3) what price the PIPE investors would have paid but for the alleged inflation.

### C.    Proposed Alternative Calculation of Intended Loss on Count Eight

Mr. Greebel's position, even accepting the fact of his conviction for purposes of this submission, is that there should be no intended loss amount on Count Eight because the government has not shown that he purposely sought to cause specific harm.  Nevertheless,

GIBSON DUNN

The Honorable Kiyo Matsumoto
June 28, 2018
Page 26


should the Court find that Mr. Greebel did subjectively intend some loss as to Count Eight, an appropriate calculation would be based on the number of open-market purchasers between December 17, 2012 (the date the government alleges Mr. Greebel joined the conspiracy) and the PIPE announcement on or about February 12, 2013 (*see* DX 111-126), multiplied by the alleged intended inflation of the purchased stock. That is because the government's intended-loss theory is that the victims here would have been investors who bought shares on the open market at a time when Mr. Greebel intended that the market price be inflated above the stock's true value. For purposes of this calculation, the Court could use the government exhibit reflecting the volume of shares purchased between December 17, 2012 and February 12, 2013. *See* GX 955. This data shows that 254,440 shares[8] of Retrophin stock were traded during this period of time. For the sake of accuracy, any shares purchased by alleged co-conspirators, such as Mr. Shkreli, would have to be excluded from this calculation. Should the government not provide the Court with the numbers of shares purchased by co-conspirators, the Court could estimate the number of shares purchased by the alleged co-conspirators. Assuming that Mr. Shkreli and others did not purchase any shares during this time period (which we know is not the case) and assuming the Court found evidence that Mr. Greebel had the subjective intent to cause Retrophin's stock to be inflated by a certain dollar value per share, we submit that the maximum intended loss would be the 254,440 shares traded during the December 17, 2012 through February 12, 2013 time period multiplied by this allegedly subjectively intended dollar value per share of inflation.


Respectfully submitted,

*/s/ Reed Brodsky*

Reed Brodsky

---

[8]   In our submission of this filing yesterday, we mistakenly pointed to the number of buy-side transactions from the raw bluesheet data. *See* GX 950. As the government's expert Deborah Oremland testified, that data overstates the actual trading volume on any given day, because it includes market maker activity. *See* Trial Tr. 5749:14–5750:12 ("[T]he blue sheet data includes trades that are made by intermediary firms that are called market makers . . . [the data includes] double counting or maybe sometimes triple counting because sometimes the market makers have to get shares from other firms in order to put the buyer and the seller together."). The more accurate number of trades of Retrophin shares between December 17, 2012 and February 12, 2013 is the Bloomberg-reported figure of 254,440 (GX 955), and thus we have amended our submission to make that correction.