237

1             UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2
  - - - - - - - - - - - - - - X
3
  UNITED STATES OF AMERICA,      : 15-CR-00637(KAM)
4                                 :
                                  :
5        -against-                : United States Courthouse
                                  : Brooklyn, New York
6                                 :
                                  :
7  EVAN GREEBEL,                  : Monday, June 18, 2018
                                  : 9:00 a.m.
8           Defendant.            :
                                  :
9                                 :

10 - - - - - - - - - - - - - - X

11          TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
           BEFORE THE HONORABLE KIYO A. MATSUMOTO
12             UNITED STATES DISTRICT JUDGE

13               A P P E A R A N C E S:

14 For the Government:   RICHARD P. DONOGHUE, ESQ.
                         Acting United States Attorney
15                       Eastern District of New York
                         271 Cadman Plaza East
16                       Brooklyn, New York 11201
                    BY:  ALIXANDRA ELEIS SMITH, ESQ.
17                       DAVID PITLUCK, ESQ.
                         DAVID K. KESSLER, ESQ.
18                       Assistant United States Attorneys

19 For the Defendant:    GIBSON, DUNN & CRUTCHER
                         200 Park Avenue - 48th Fl
20                       New York, New York 10166
                    BY: REED M. BRODSKY, ESQ.
21                       RANDY MASTRO, ESQ.
                         ERIN GALLIHER, ESQ.

22

23
   Court Reporter:   Richard W. Barry, RPR
24                   Official Court Reporter
                     E-mail:  rwbarrycourtreporter@gmail.com
25          Proceedings recorded by computerized stenography.
           Transcript produced by Computer-aided Transcription.

RB        OCR

- Proceedings -                    238

1      THE COURT:  All counsel are present, this is the

2   continuing FATICO hearing, United States versus Evan Greebel,

3   15-CR-637.  Will the parties please state their appearances.

4      MS. SMITH:  Good morning, Your Honor, Alixandra

5   Smith, David Pitluck and David Kessler for the Government.

6      Also at counsel table Special Agent Sean Sweeney.

7      THE COURT:  Thank you.  Good morning.

8      MR. BRODSKY:  Good morning Your Honor, Reed Brodsky,

9   and Erin Galliher from Gibson Dunn & Crutcher on behalf of

10   Evan Greebel who is here present with us.

11      THE COURT:  Thank you, good morning.

12      I would like to get a preview of what today's --

13      MR. BRODSKY:  Mr. Mastro is here also.

14      THE COURT:  If you can give me an idea on the

15   record, as to how you intend to proceed today, and I think you

16   wanted to address an issue of the notebook.

17      MR. BRODSKY:  Your Honor, with respect to today's

18   proceeding, I believe the Government is cross examining Dean

19   Ferruolo, and our next potential witnesses is Zachery Prinsky,

20   and depending on the cross examination, we will then make a

21   decision as to whether we call Mr. Prinsky, he is here today,

22   and is available to testify.

23      The Government-- the Court ordered us to make

24   available the handwritten notes in the original form to the

25   Government.  The Government E-mailed me to ask for them.  I

- Proceedings -                              239

1   said I would make arrangements to do it.  I meant to

2   personally do it.  Last week I had sudden travel and

3   therefore, did not do it.  I apologize to the Court and to the

4   Government for that.

5        I will make them available at the Government's

6   convenience today or any time this week.  I unfortunately will

7   not be able to do it, but anybody -- we will have somebody

8   else do it, Ms. Galliher will be able to do it.

9        THE COURT:  Well, when you mentioned that this

10  morning Mr. Brodsky, I told you I was inclined to preclude

11  these notes because I had ordered this on June 1st, and

12  despite your travel schedule, whatever it was, in the past

13  18 days, I don't understand why you would not be willing to

14  comply with my order.  This is not the first time that you

15  have not followed my orders regarding deadlines.  I don't

16  think it is fair to the Government yet again to give them

17  documents that they have not yet seen and ask me to admit and

18  consider them.

19       I am happy to hear from the Government.  I don't

20  want to leave this hearing open another day.

21       So, that is my inclination.

22       MR. BRODSKY:  These are just the originals, they

23  have the handwritten notes that are copies, these are the

24  originals of them.  So we are only offering-- we are offering

25  the originals, as you know, as just fact that they are the

- Proceedings -                          240

1    originals.

2          The Court has the copies and as does the Government

3    with respect to the actual handwritten notes we are seeking to

4    offer, the handwritten notes taken during board meetings.

5          THE COURT:  I understand that.  They did raise

6    concerns that they wanted to see the originals and to look at

7    the entire books in context.

8          If that hasn't been done yet, I am disinclined to

9    admit them.  If the Government is willing to look at the

10   originals that they have not yet been-- that have not yet been

11   produced despite my order, I will consider it.  I am just--

12   really Mr. Brodsky, this is not the first time.

13         MR. PITLUCK:  Obviously we requested to see the

14   original in the hearing almost three weeks ago.  We have not

15   gotten them.  I think that sort of obfuscates the point, which

16   is we looked into this legally.  These are so problematic,

17   both the notes themselves, and the defendant's proffered

18   interpretation of the notes.  That even if we saw them, which

19   we have not, and which we understand the Court's concerns

20   about the delay.

21         There is-- we know that Your Honor has wide

22   discretion, but how are we to dispute what is written, how are

23   we to dispute the contents, how are we supposed to verify the

24   authenticity.  These are the defendant's interpretation of the

25   defendant's statements.  When they were created, even if we

- Proceedings -                       241

1  saw them, it would be completely inadmissible and irrelevant

2  for those reasons.

3          So, you know, if Your Honor orders us to look at

4  them, we will certainly do so.  But we think it was

5  unnecessary weeks ago, it is certainly unnecessary now both

6  legally and factually.

7          THE COURT:  I think you had asked to see the

8  original three weeks ago.  I had ordered that they be provided

9  so that you would have that opportunity.

10          I understand you have a more fundamental objection

11  to the admissibility period, whether or not you could see the

12  originals.  But, my concern is that as I recall, you had

13  raised the possibility that there was no way to really verify

14  when the entries were made, what was added, what was changed,

15  what if anything-- I think you had made a case for seeing the

16  originals, which is why I ordered it, before deciding in the

17  first place whether or not to admit them at all.

18          But, it is your position now you don't need to see

19  it.

20          MR. PITLUCK:  If the Court is inclined to consider

21  them.

22          THE COURT:  I ordered them.

23          MR. PITLUCK:  We are just doing our job and our

24  diligence as I am sure the Court understands to see if there

25  is anything on the face.  We have not seen them in the

- Proceedings -                                    242

1    context.  But I think it was such a minor point, that even if

2    we saw them, there is nothing that would authenticate them in

3    the time they were taken.  Maybe just things that were called

4    into question.

5            I think the point, Your Honor, is larger.  As we sit

6    here now three weeks later and we are now talking about

7    delaying this yet again, with a sentencing scheduled in

8    approximately seven or eight weeks.  We are just making the

9    point, Judge, even if we were to look at these now and the

10   Court wanted to look at them.  We would be further delayed and

11   would not advance us anywhere.

12           I think if the Court is going do consider them, the

13   Court would ask us to consider them.  We will look at them.

14   But, it creates a point of what we are we supposed to do about

15   the context and specifically sort of interpretation of what

16   they say.

17           THE COURT:  Well, in their letter the defense raises

18   two points.  I think one is that the hearsay rules should not

19   apply to this hearing, and second, that the notes are being

20   proffered in order to establish that Mr. Greebel's notes,

21   reflect the same content as the ultimate minutes that were

22   provided to Mr. Shkreli and Mr.--

23           MR. PITLUCK:  I think there are two points.  One is

24   that the hearsay issue is not the fundamental issue.  This is

25   a due process issue of the defendant's statements coming in.

- Proceedings -                            243

1    Effectively the defendant's testimony based on the

2    interpretation of the notes without us having any sort of

3    opportunity to cross examine.

4            As the Court saw in the trial, if somebody wants to

5    testify about their notes as the Court ordered, Mr. Richardson

6    was required to do, there is the opportunity to both direct,

7    cross examine and redirect him on what they said, when they

8    were made, how they were made, and in what context.  That was

9    very important because it shed light on a lot of things that

10   were not written on the page.

11           Your Honor, that is just a fraction of what we are

12   looking at here.  The defendant's notes, and then they are

13   trying to be compare them to later filed board minutes, that

14   are being used to try to justify what is included in the

15   notes.  We are saying there is a whole problem with all of it.

16   We can't establish the order or when things were prepared

17   without the opportunity to cross examine, it is all

18   meaningless.  It doesn't tell us anything.

19           So, Your Honor, we are happy to look at the notes if

20   the Court wants to consider them.  We can raise any

21   objections.  I think there has been ample opportunity to do

22   that.  But we are at a much more fundamental due process

23   basis.  Evidence is being proffered that the Government has no

24   opportunity to rebut whatsoever.

25           There is a way to do this, and even without the

- Proceedings -                                    244

1   hearsay rules in a FATICO hearing, this is far afield of that.

2          THE COURT:  Do you want to address their argument

3   Mr. Brodsky?

4          Regarding the argument that they don't have an

5   opportunity to cross examine anyone about your interpretation

6   of Mr. Greebel's notes.

7          MR. BRODSKY:  Your Honor, under the rules of

8   evidence, we believe they are admissible.  The first question,

9   threshold argument is whether or not they are authentic.  We

10  offered and the Government did not contest that they were

11  written by Mr. Greebel.  We had offered to call as Your Honor

12  may recall, Ms. Greebel to testify that those are--

13         THE COURT:  That is not the issue I asked you to

14  address.

15         MR. BRODSKY:  Well --

16         THE COURT:  What about that?

17         MR. BRODSKY:  Once you get over the threshold issue

18  of authenticity then the question becomes whether or not they

19  are admissible in some form.

20         We believe respectfully Your Honor that-- Your Honor

21  can consider them in a FATICO hearing.  Even if the rules of

22  hearsay apply, Your Honor can admit them as a business record.

23  They are contemporaneous documents taken during a Board

24  meeting.  Minutes of a Board meeting are classic business

25  records.  Even if Your Honor did not consider that, Your Honor

- Proceedings -                            245

1    should look at them to -- on their face, read them.

2            Now, whether the Government has a different

3    interpretation of the words, or we have a different

4    interpretation, that is for Your Honor to decide.  They don't

5    need a witness.

6            For example, an E-mail communication that they

7    offered into evidence, whether it became admissible that we

8    offered sometimes, between Mr. Greebel and Mr. Shkreli during

9    the trial.  They offered some, we offered some.

10           They had more exceptions than we did.  But we all

11   argued over the meaning of the words neither Mr. Shkreli was

12   testifying or Mr. Greebel.  So I don't believe the fundamental

13   objection that we have, which they have no way to argue about

14   the content of them, is valid under the rules of evidence.

15           I believe once a document becomes admitted, you

16   don't need an actual witness who participated in the

17   communication to further the basis to argue what the context

18   means.

19           THE COURT:  How are Mr. Greebel's notes relevant to

20   the issue of loss, which is the issue before me in the

21   hearing?

22           MR. BRODSKY:  One of the things we wanted to put

23   forth Your Honor, is that what is critical under 2B1.1, is

24   reasonable foreseeability to Mr. Greebel, as to the settlement

25   agreement, consulting agreements, what was reasonably

1   foreseeable to him with respect to each one, as to whether

2   they were, as the Government claims, shams or frauds.

3          And we believe that the handwritten notes will

4   corroborate the typewritten minutes that were provided to Mr.

5   Panoff, the CFO at the time of Retrophin, and also Mr.

6   Shkreli, the CEO, at the time of Retrophin, by Mr. Greebel.

7          And that they will help us demonstrate that it was

8   not reasonably foreseeable that certain agreements that the

9   Government claims to have been shams in furtherance of the

10  conspiracy, in Count One or Count Seven, we will use them to

11  argue they weren't reasonably foreseeable to Mr. Greebel, to

12  be fraudulent.

13         THE COURT:  So basically, you are asking me to make

14  findings that goes to the jury's determination after a 10-week

15  trial, to Count Seven.

16         MR. BRODSKY:  It is our position based on the case

17  law we cited in the Second Circuit, that just because it is a

18  conspiracy conviction, that scope of the conspiracy and the

19  charge that Your Honor gave the jury is a lot broader than

20  what Your Honor needs to find with respect to Section 2B1.1 of

21  the sentencing guidelines.

22         Under section 2B1.1 of the sentencing guidelines,

23  Your Honor has to make a two part finding with respect to

24  them.  On each, we believe, each agreement, at issue.  Either

25  settlement agreement or consulting agreement.

- Proceedings -                                        247

1          It is perfectly valid for Your Honor to find, even

2     though there is a charge of conspiracy, the Government has not

3     demonstrated by a preponderance of the evidence that Mr.

4     Greebel, believed it was reasonably foreseeable on each

5     agreement to be a fraud.

6          For example, if Your Honor found that Doctor

7     Rosenwald, Mr. Rosenwald, the biotech investor who testified,

8     that he had made real litigation threats and that it was

9     reasonably foreseeable -- that wasn't reasonably foreseeable

10    to Mr. Greebel to be part of a conspiracy.  Then it would be

11    perfectly valid for Your Honor to draw the conclusion that the

12    loss amount, any loss amount for that, would not be included

13    in the loss calculation.

14         And that we believe is the Second Circuit case law

15    that the scope of the conspiracy is far broader than what the

16    Court needs to find with respect to Section 2B1.1.

17         The Government did not ask for and did not get a

18    special verdict form, which listed out each settlement

19    agreement or consulting agreement.  So we do not know if the

20    jury actually found any particular order on settlement

21    agreement or if it was fraudulent.

22         What they were instructed by Your Honor, was that

23    all they needed to find was that they were -- meet the

24    elements, that two individuals or more, entered into a

25    conspiracy, with the intent to commit fraud, and with respect

- Proceedings -                                    248

1    to-- there was no-- there was-- and one overt act, in

2    furtherance of that conspiracy, which could be innocent, was

3    committed by anyone individually.

4          So there wasn't a finding by the jury that any

5    particular settlement agreement or consulting agreement was

6    fraudulent.  Had there been a substantive count of wire fraud

7    with respect to settlement agreement or consulting agreement

8    that would be a different story.

9          MR. PITLUCK:  So Your Honor, just without engaging

10   in oral argument on the motions, the fundamental issue here is

11   the admissibility of the notes.

12         While we certainly dispute these are business

13   records, even if they were, the only way to establish the

14   business record foundation is through the person who took the

15   notes.  Which we have no opportunity to cross examine about

16   how they were made, when they were made, getting back to the

17   fundamental question.

18         So, even assuming that is accurate, we had a lot of

19   debate about that at the trial, as I'm sure your Honor

20   remembers.  Even assuming we can do that, we don't have Mr.

21   Richardson on the stand.  We don't have a representative from

22   Retrophin.  We have the defendant, who is perfectly entitled

23   to exercise his Fifth Amendment right.  But he can't use that

24   as a sword and shield.

25         If he wants to put them in as a business record and

- Proceedings -                              249

1   he wants to establish when they were made and how they are

2   relevant to what we believe is the completely tangential issue

3   here, of what was foreseeable.  Then he can do so.  We will

4   cross examine based on that.

5            But, without that there is no way to establish even

6   the base level of admissibility, let alone relevance.  This is

7   not just a matter of putting words before the Court.  It is

8   actually reading them.  This is almost an understanding of

9   what they actually say, and without that-- without our

10  opportunity to argue that, we are looking at letters written

11  on a page with no basis, with nobody to cross examine what

12  they say.

13           That-- then just leaving aside, as the Court pointed

14  out, the reasonably foreseeable standard is low.  We have

15  demonstrated that by a preponderance at the trial many times.

16  The jury convicted on that basis.

17           Even if the notes were borderline admissible, even

18  if we had the basis to put them in, they are very little

19  relevance to loss.  So now we are really, you know, the

20  Government is up against it in terms of trying to pin down

21  something we can't establish a basis of, for virtually no

22  probative effect, other than to say the jury was wrong.

23           So, Your Honor, for that-- those reasons, we think

24  this is all much a do about nothing.  We are ready to continue

25  our cross examination of witnesses, whenever the Court wishes.

1    THE COURT:  All right.  Let's continue with the

2  cross.  I will think about this latest failure to follow my

3  orders and what effect it should have on the notes that the

4  defense seeks to admit.

5    Is the witness here?

6    MR. BRODSKY:  Yes, Your Honor.  He is right in the

7  back.

8    THE COURT:  Good morning, sir, you are still under

9  oath, we will have you sworn again to be sure.

10 STEPHEN FERRUOLO, having been first duly sworn, took the stand

11 and testified further as follows:

12 CROSS EXAMINATION BY MS. SMITH:(Cont'g.)

13 Q    Good morning, Mr. Ferruolo.

14 A    Morning.

15 Q    So, just to follow up on our discussion last time about

16 the fees that you are being paid.  Are you being paid $600 an

17 hour for your testimony here today?

18 A    That is correct.

19 Q    And defense counsel paid for your flight back from San

20 Diego; is that right?

21 A    They have not paid for it.  I expect to be reimbursed.

22 Q    You flew business class for that flight?

23 A    Yes, I did.

24 Q    And you estimated last time that is about a twelve

25 hundred to fourteen hundred dollar ticket?

Ferruolo - Cross - Smith                    251

1   A    It was more this time because it was summer, it was
2   seventeen hundred.
3   Q    And, defense counsel is paying for your hotel if you stay
4   overnight tonight?
5   A    I'm not--
6   Q    You are flying back?
7   A    Yes, I'm flying back.
8   Q    And since your testimony on June 1st, what contact have
9   you had with the defense counsel?
10  A    Very limited.  I had contact with him in preparing a list
11  of documents that I had consulted in preparation for my
12  testimony, and had a brief contact when I received a
13  reimbursement check about a week ago.
14  Q    So you didn't have any discussions about the content of
15  your testimony or anything else related to the case?
16  A    No.
17  Q    Regarding a list of items that you reviewed in connection
18  with your testimony, what steps did you take to put that list
19  together?
20  A    I went back and looked at my notes and I looked at what I
21  had in my files and on that Monday when I was back in my
22  office, I completed the list.
23  Q    Then how did you provide that list to the defense
24  counsel?
25  A    I E-mailed it.

Ferruolo - Cross - Smith                    252

1  Q    And, did you review the list that defense counsel
2  provided to the Court?
3  A    No, I did not.
4  Q    When you put that list together and E-mailed it to
5  defense counsel, did you make sure it was complete and
6  accurate?
7  A    I did, yes.
8  Q    So the list provided to defense counsel, provided by
9  defense counsel to the Court, on June 5th, said that you
10 reviewed Desert Gateway and Retrophin's SEC filings from 2012
11 and 2013, is that accurate?
12 A    That's correct.
13 Q    So, did you review any Retrophin SEC filings from 2014?
14 A    Well, the 10K for the period ending 12/31/2013, which was
15 filed in March of-- roughly March of 2014, so in essence that
16 was a 2014 document.  That had subsequent event disclosure
17 which went into 2014.
18 Q    When you testified here on June 1st, you said you
19 reviewed SEC filings from 2014.  So is it accurate that you
20 reviewed SEC filings from 2014, or not?
21 A    That's what I just tried to clarify.  The SEC filings
22 from 2014 that I reviewed was the 10K for the year ending
23 12/31/2013, which is filed in 2014.
24 Q    So you didn't review any SEC filings from Retrophin that
25 were filed in 2014?

1    A    I don't recall having done so, no.

2    Q    So, when you said that SEC filings went into 2014, last

3    time, because of the consulting agreements, you actually only

4    reviewed the 10K that was filed in 2013 with the subsequent

5    event footnote?

6    A    That's correct.

7    Q    With no additional SEC filings?

8    A    That is my recollection, yes.

9    Q    When we left off last time I asked you a few questions

10   about what you would do if you knew from personal experience

11   that there was an inaccuracy in a filing that you were

12   preparing.  Do you remember those questions?

13   A    Yes, I do.

14   Q    I also asked if you remember discussing that topic with

15   defense counsel in preparation for your trial or your

16   testimony here today and you said, no.

17          Do you remember saying that?

18   A    That is correct.

19   Q    I will show you what is marked as Government Exhibit H-3.

20   For the record it is also labeled 26.2SF-3.  It was provided

21   to the Government by defense counsel in December of 2017 and

22   it was represented to be notes of a call between Mr. Ferruolo

23   and defense counsel.

24          Permission to approach Your Honor?

25          THE COURT:  Sure.

1    Q    Have you ever seen these before Mr. Ferruolo?

2    A    No, I don't believe so.

3    Q    If you can take a look at the top section which is about

4    a 13G?

5    A    Yes.

6    Q    13G is a SEC filing; is that correct?

7    A    Yes.

8    Q    And then if you can look down to the seventh bullet

9    point, discussing the 13Gs which states:  If I knew from unit

10   SOF board meeting or documents, that there was an inaccuracy,

11   I would point that out.

12   A    Yes.

13   Q    Do you see that?

14   A    Yes.

15   Q    Does that refresh your recollection that you discussed

16   the subject of inaccuracies in SEC filings with defense

17   counsel?

18   A    This specifically relates to 13B or 13G?  When I answered

19   your question, I was referring to basically to 34 filings-- 34

20   filings, periodic filings, 10-K, 10-Qs and 8-K.

21   Q    So when you answered last time, you remember this

22   conversation, but you were thinking it was more-- my question

23   was more broad and this is more specific?

24   A    You asked a question about disclosure.  Am I correct?

25   Can you go back and repeat the question.

1  Q    Would you want to see your testimony from last time.  It

2  has been marked as Government Exhibit H-4.

3          THE COURT:  Why don't you show him.

4          MS. SMITH:  Yes, just for the record.

5          THE COURT:  This is Mr. Ferruolo's June 1st,

6  testimony?

7          MS. SMITH:  Yes, Your Honor.

8  Q    So if you wanted to take a look, the questions I was

9  asking you starts on page 229 of Government Exhibit H-4.

10 A    Yes.  Respectfully, this has nothing to do with SEC

11 filings, this has to do with representations and warrantees in

12 a stock purchase agreement for a PIPE transaction.

13 Q    So-- Mr. Ferruolo, just for the record, the question I

14 asked starting on page 229 at the bottom line 24 was, in the

15 process of helping to draft SEC filings for clients, if you

16 had personal knowledge that something in the SEC filing was

17 inaccurate, you would have said something to the client,

18 correct?

19          That was the question that was asked.

20 A    Okay.  Yes, again SEC filings, I was referring here to 34

21 Act filings that involved material disclosure and by which I--

22 as I said before, periodic filings, 10-Ks, 8-Q's, and 8-K's.

23 Q    So a 13G, a 13D, those are not SEC filings?

24 A    Yes, they are SEC filings but in my view they are not

25 disclosure filings, they are not things that I normally

1    reviewed.

2    Q     So, the question is, if you knew that there was an

3    inaccuracy in a SEC filing, would you have said something

4    about it to your client?

5    A     Yes.

6    Q     Last time you testified, you said it was only the second

7    time you have been in a courtroom and this is the third; is

8    that right?

9    A     That is correct.

10   Q     And the first time was as a witness in a SEC proceeding,

11   right?

12   A     That is correct, yes.

13   Q     And for the record, the SEC proceeding that you testified

14   at was SEC versus Michael Patterson in the Northern District

15   of California?

16   A     That is correct.

17   Q     And Michael Patterson was an executive of a company

18   called Embarcadero Technologies, right?

19   A     He was not an executive.  He was the controller.

20   Q     And the CFO of Embarcadero Technologies was Raj Sabhlok,

21   S-A-B-H-L-O-K?

22   A     That's right.

23   Q     And the CEO of Embarcadero was Steven Wong, W-O-N-G; is

24   that right?

25   A     That is correct.

1  Q    And in the late 2000's, around 2008, the SEC sued

2  Patterson, Wong and Sabhlok, for hiding payments of more than

3  $14 million from backdated stock options; is that right?

4  A    That's correct.

5  Q    Ultimately Wong and Sabhlok admitted guilt and Patterson

6  was found guilty?

7  A    That is correct.

8  Q    Embarcadero Technologies, was a client of yours, when you

9  were partner at Hellerman Ehrman, correct?

10 A    Yes.

11 Q    You personally served as outside counsel for Embarcadero

12 Technologies?

13 A    Yes, I did.

14 Q    In that engagement, your client was the company

15 Embarcadero Technologies; is that right?

16 A    That's correct.

17 Q    As outside counsel your duty of loyalty was to the

18 company, correct?

19 A    Yes.

20 Q    The individual executives that were charged, Patterson,

21 Wong, Sabhlok, those were not your clients, correct?

22 A    That is correct.

23 Q    And you previously testified you were not aware at the

24 time of any wrong doing by those executives; is that correct?

25 A    Yes.

Ferruolo - Cross - Smith                    258

1    Q    And if you had been aware of wrong doing by Patterson,

2    Wong and Sabhlok, you would have advised your client

3    Embarcadero Technologies of that wrong doing, correct?

4    A    Yes.

5    Q    So, let's turn to your opinions in this case.  Do you

6    have a copy of your report up there?

7    A    No, I do not.

8    Q    So, for the record, it is defense Exhibit 614-1.  I have

9    extra copies.

10             THE COURT:  This is already in evidence.  Thank you.

11   Q    So we can start by looking at paragraph 12.  One of your

12   opinions in paragraph 12 is that to the extent that outside

13   counsel is involved in settlement agreements, they act at the

14   direction of the client with respect to the parties to the

15   agreement and the material terms; is that right?

16   A    Yes.

17   Q    And it is also your opinion that the decision to enter

18   into a settlement agreement, or not to enter into a settlement

19   agreement, is a business judgment determination, and that

20   determination is left to the client, correct?

21   A    Yes.

22   Q    And that is because the company is best situated to make

23   the business judgment determination about whether a particular

24   settlement agreement or other agreement is in the best

25   interest of the company, correct?

Ferruolo - Cross - Smith                           259

1    A    Yes.

2    Q    And you would agree with me that when it comes to

3    settlement agreements, the role of outside counsel, is really

4    to provide advice to the client, about what counsel believes

5    is the best course of action, right?

6    A    Yes.

7    Q    Outside counsel helps the client weigh the pros and cons

8    of entering into a particular agreement, right?

9    A    In terms of the legal ramifications of the agreement,

10   yes.

11   Q    And may also help the client determine if they decide to

12   enter into the agreement what terms they should consider

13   including; is that right?

14   A    In terms of legal terms, yes.

15   Q    And advising a client about what a decision to make--

16   whether to enter or not enter into a settlement agreement, you

17   would provide as outside counsel, the client with all

18   information that you had that might impact on that decision,

19   correct?

20   A    That is correct.

21   Q    And in the course of your long career, 20 years in

22   private practice, you never withheld information from a

23   client, when advising that client on such a decision, did you?

24   A    No.

25   Q    And you certainly never entered into a settlement

1  agreement or other agreement on behalf of the client, without

2  making sure that your client agreed that that agreement was in

3  the best interests of the company?

4  A    Well, I don't know what you mean, enter into it.  It

5  would not be within my power to enter into an agreement, it is

6  the company's agreement.

7  Q    But you did not facilitate, for example, entering into an

8  agreement without ensuring that the company had determined

9  that that agreement was in the best interest of the company?

10 A    Yes.

11 Q    And in this case, you didn't review the board minutes, or

12 board documents or E-mails, or any testimony from any board

13 members, so you didn't engage in any analysis about whether

14 the settlement or consulting agreements you reviewed were in

15 fact in the best interest of Retrophin, correct?

16 A    The analysis I relied on was the SEC filings.

17 Q    But you yourself did not reach any independent decision

18 or conduct any independent analysis?

19 A    As I said, my opinion was based on my review of the SEC

20 documents and my experience representing life science

21 companies.  I did not review other documents.

22 Q    And your opinions in this report are not specific to

23 Retrophin, correct?

24 A    That is correct.

25 Q    Turning to paragraph 11 of your report.  You talk here

1  about resolving potential litigation against companies?

2  A    Yes.

3  Q    So, when a company decides whether or not to enter into a

4  settlement agreement, there are a lot of factors to consider,

5  correct?

6  A    Correct.

7  Q    And you don't necessarily settle every time someone

8  threatens litigation, correct?

9  A    Not every time, but rather often.

10  Q    But before you make a decision, you weigh the costs and

11  the benefits of entering into a settlement agreement?

12  A    The company does, yes.

13  Q    And that analysis includes the review of the legal merits

14  of the claim, correct?

15  A    Yes.

16  Q    And the factual merits of any potential claim?

17  A    Yes.

18  Q    You might be willing to pay more or less depending on the

19  strength of the claim; is that right?

20  A    That is correct.

21  Q    And the analysis might involve the likelihood that the

22  person who is threatening litigation will actually follow

23  through with that litigation, correct?

24  A    Yes.

25  Q    And in this case, you didn't include in your report any

1  specific opinions as to how consideration of these factors led

2  to the settlement and consulting agreements at issue for

3  Retrophin, correct?

4  A    No, it was largely based on the context of understanding

5  the situation at Retrophin was in at the time.

6  Q    But again, your opinions are not specific to Retrophin,

7  correct?

8  A    That's correct.

9  Q    And so, your-- you didn't conduct any analysis of the

10 specific factors that might have led to the consulting and

11 settlement agreements in this case, correct?

12 A    The specific analysis is understanding the general

13 situation of early stage life science companies seeking to

14 raise financing.

15 Q    So the answer is no?

16 A    Please repeat your question.

17 Q    In this case, you didn't provide any specific opinion as

18 to what the consideration of the factors were at Retrophin,

19 that led to the settlement and consulting agreements?

20 A    They were factors behind my opinion.

21 Q    Are you saying that you have opinions that are not in

22 your report?

23 A    No, I am saying that in rendering my opinion, I carefully

24 weighed my long experience in life science companies and

25 generally understanding the situation a company like Retrophin

Case 1:15-cr-00637-KAM   Document 633   Filed 07/05/18   Page 27 of 51 PageID #: 20495

1    was in, it did not come out of thin air, it was based on

2    experience and deep understanding of the industry.

3    Q    But you didn't review the board minutes, right?

4    A    I did not, no.

5    Q    And you didn't review any board documents or E-mails,

6    correct?

7    A    That is correct.

8    Q    No notes of board meetings?

9    A    I did not.

10   Q    No testimony of any board members?

11   A    No.

12   Q    And you said that you didn't understand when you

13   testified last time, the actual considerations that went into

14   the settlement agreement and consulting agreements here?

15   A    The considerations made by the board members, no.

16   Q    And so you don't know how those factors were weighed or

17   not weighed by the company in this case, correct?

18   A    That is correct.

19   Q    So the only thing you are relying on is your experience

20   and not anything specific that actually happened in connection

21   with how the Retrophin board members did or did not reach

22   these decisions?

23   A    That is correct.

24   Q    Turning to paragraph 11 again.  You talk about litigation

25   releases in settlement agreements.  Right?

1    A    Yes.

2    Q    And you said that ideally those releases are as broad as

3    possible?

4    A    Yes.

5    Q    And so that means, broad both in terms of claims that can

6    be brought and the parties that can be sued, right?

7    A    Yes.

8    Q    And, Mr. Brodsky walked you through a few hypotheticals.

9    With respect to settlement agreements, let's consider a

10   settlement agreement where party A agrees to pay party B, to

11   settle party B's potential claims against party A.

12           As part of that settlement agreement between party A

13   and B they can also agree to release claims against a third

14   party, say party C, correct?

15   A    That is correct.

16   Q    Even though party A is the only person actually paying

17   money to party B?

18   A    That is correct.

19   Q    So does that litigation release in the agreement have

20   value to party C, the party that is being released without

21   paying any any money?

22   A    Yes, it would.

23   Q    And if your client is party C, the entity that didn't pay

24   any money but had its claims released, you would have gotten a

25   pretty good deal for your client, correct?

1    A     It certainly would be good for that client, yes.

2    Q     You would have gotten protection for litigation without

3    actually paying for it, correct?

4    A     Party C, yes.

5    Q     Turning to paragraph 13 of your report.

6    A     Yes.

7    Q     You have a general opinion that while outside counsel may

8    act as corporate secretary and take notes during board

9    meetings, it is not typically the responsibility of that

10   person to set agendas for board meetings.  This is based

11   entirely on your experience, correct?

12   A     Correct.

13   Q     You didn't look at any documents related to the Retrophin

14   board, you don't know what the responsibilities were of

15   various parties in this particular case, correct?

16   A     The only documents I looked at were the-- I looked at the

17   relevant documents were the bylaws.

18   Q     Which bylaws did you look at?

19   A     The bylaws that were in effect in early 2013.

20   Q     Which bylaws were those?

21   A     The Desert Gateway bylaws.

22   Q     And so, is your opinion here based on those bylaws?

23   A     No, my opinion is based on experience.  But you asked me

24   if I looked at any Retrophin documents.  That was the document

25   I looked at that would be relevant.

1   Q    But your opinion is not actually based on that document?

2   A    That is correct.

3   Q    And when you were asked on direct, you were asked about

4   the role of outside counsel and you said it was to record the

5   minutes of board meetings when you are serving as corporate

6   secretary, correct?

7   A    It is the role of corporate secretary.

8   Q    So, when you are serving in the role of corporate

9   secretary, you personally served in that role, you were

10  serving as a scribe, right, taking down what happened at the

11  meeting, correct?

12  A    That is correct.

13  Q    And then when you were done taking those notes, you

14  turned them into typewritten minutes; is that correct?

15  A    That is correct.

16  Q    And then you forward them to either to the board or to

17  whatever committee of the board, the minutes that you were

18  taking of, and it was up to the board or that committee, to

19  actually review and formally approve the notes?

20  A    No, typically --

21       MR. BRODSKY:  Your Honor, I think the witness is

22  going to answer.  She is asking multiple questions.

23       MS. SMITH:  I can break it down.

24       THE WITNESS:  Please do, thank you.

25  Q    So we were talking about how when you served as corporate

1   secretary, are just a scribe, you take notes and then you turn

2   those notes into minutes, written, typewritten minutes?

3   A    That's correct.

4   Q    Then you forward them to the board or relevant board

5   committee, is that correct?

6   A    No.  Typically my practice and typical practice is to

7   send them to the person at the company, who interacts with the

8   board.

9   Q    From there, are you saying the board or the committee

10  approves those minutes; is that correct?

11  A    Well, shall I go through it sequentially.

12       So typically the process would be, I draft the

13  minutes, I would send them to the person at the company who

14  interacts with the board.

15  Q    Yes.

16  A    That would vary company by company.  But typically an

17  officer in the company, CFO or the CEO.  Okay.  And then what

18  would typically happen is, that that officer in terms of

19  preparing the agenda for the next board meeting or some

20  subsequent meeting, would put-- distribute those minutes to

21  the board members, or to the committee members for approval.

22  That was the normal process that I used and, it is pretty

23  typical practice.

24  Q    Was that the process you used when you were at

25  Embarcadero Technologies?

1    A    That's correct.

2    Q    I will show you what is marked as Government Exhibit H-6.

3    It is a trial transcript from one of the days in which you

4    testified in the SEC proceeding we discussed earlier.

5            Can you take a look at page-- you can look at any

6    portion you want.  I will focus you on page 1266 of that

7    proceeding.

8            Just for the record, this is a transcript from

9    September 14th, 2010, in the Northern District of California,

10   in the Matter of the SEC versus Raj Sabhlok, and Michael

11   Patterson.

12   A    Yes.

13   Q    If you can start with the question at the bottom of page

14   1266.  You were asked, it was?

15           THE COURT:  What line?

16           MS. SMITH:  Line 21.

17           THE COURT:  Thank you.

18   Q    You were asked, it was important to you that these notes,

19   you just told us you took these in the course and scope of

20   your work for Embarcadero Technologies, you made sure the

21   notes at the time, and you did your best to make sure they

22   were true and accurate.

23           Then, the questioner says, did I get that all right.

24   You said in response, that is correct.

25           And then the notes were sent to the committee and

- Sidebar -                                      269

1   the committee formally approved them.  It was up to the

2   committee to approve that the notes were consistent with what

3   happened at the meeting.

4          Was your testimony in this matter accurate?

5   A    Yes.

6   Q    You also gave some testimony on PIPE transactions?

7   A    Let me --

8   Q    That was the question.

9          MR. BRODSKY:  May I have the chance to redirect

10  given that this didn't come up and I know Your Honor said

11  there is no redirect at all.  Given that these are-- raising

12  new issues.

13         MS. SMITH:  We can argue about this at the sidebar.

14         THE COURT:  We will do that.

15         (Sidebar.)

16         MR. BRODSKY:  I know last time we were at the

17  hearing, you said that we would not have a chance to redirect.

18         THE COURT:  You agreed it is not that I directed.  I

19  said I wanted to make sure you have everything covered in your

20  direct.  We need to move this along, before you sit down,

21  because I'm not interested in having volleys of direct and

22  redirect and cross and recross.

23         MR. BRODSKY:  Understood.

24         THE COURT:  You agreed to it.

25         MR. BRODSKY:  Since I don't anticipate, never

1   anticipated these kinds of questions.  I believe some of them

2   are outside of the scope of the direct.  I will ask Your Honor

3   to redirect.  If Your Honor decides that I can't redirect, I

4   understand, I respect that.  I need to for the record, ask for

5   redirect.

6             It is clear Mr. Ferruolo wants the opportunity to

7   explain something, it is clear the Government is not letting

8   him explain.

9             This is a FATICO hearing to try to get right certain

10  things, not to try to cut somebody off who is trying to

11  explain something.  There are a series of questions in which

12  the Government has created a misimpression.  I believe that--

13  I am duty bound to correct that misimpression.

14            THE COURT:  All right.  Let's stop labeling what the

15  Government is doing.  They are not labeling what you are

16  doing.  Let's just stay with the testimony of the witness.

17            Do you want to be heard on the opportunity to

18  redirect?

19            MS. SMITH:  First of all, if Mr. Brodsky thinks

20  something is beyond the scope, he should object.  He doesn't

21  get to afterwards characterize portions of testimony that he

22  didn't object to as beyond the scope.

23            I don't think-- I mean everything is tied to the

24  opinions he has given.  I don't think that is a fair

25  characterization.  If he wants to make an objection, he should

- Sidebar -                                            271

1   make it at the time, otherwise we don't know what it is.

2          Secondly, Your Honor said, no redirect.  This is

3   very much within the scope of cross.  It goes to his-- he

4   talks-- everything is about his experience.  When you actually

5   look at his experience and what he has testified about before,

6   it is different than what he is saying now.

7          He is now inserting some additional step in between,

8   in terms of how he processed his notes, that he didn't testify

9   about eight years ago.  It is perfectly fair cross.  I don't

10  think there is any reason for redirect.  Obviously then if

11  there is redirect, then there is recross.  It doesn't sound

12  like Mr. Brodsky's redirect is limited to this one question.

13          THE COURT:  Well, I would perhaps give him latitude

14  for this one question on the one issue that Dean Ferruolo

15  seemed to want to say more.

16          MS. SMITH:  Right.

17          THE COURT:  That is it.

18          MS. SMITH:  I respectfully disagree.  I am sure Mr.

19  Ferruolo has lots of things he would like to volunteer, I

20  don't think that is necessarily appropriate.

21          MR. BRODSKY:  The other thing, I would ask for

22  redirect.  The Government has cross examined Mr. Ferruolo and

23  repeatedly asked questions, you would ask your client to do

24  this.  You would confer with your client, to weigh the risk

25  and benefits of litigation.

- Sidebar -                                    272

1        Dean Ferruolo, I expect would testify, if Your Honor

2   allowed me to redirect, was in those circumstances, with

3   respect to early stage life science companies, the founder and

4   the CEO, controlled company, basically.  And there was a small

5   board, as there was in Retrophin.

6        The client in that circumstance, was the CEO, or the

7   Chairman.  So, every time, Ms. Smith asked, you would ask the

8   client to weigh the positives and the negatives, the risk and

9   benefits, the client in that circumstance is the company, and

10  the company acted through somebody.

11       THE COURT:  Through a board.

12       MR. BRODSKY:  Dean Ferruolo would testify, early

13  stage life science companies, the board, who he spoke to was

14  the CEO or Chairman.  If the CEO said, this is in the best

15  interest of the company, he would follow it.  That is a very

16  different thing than an impression created by the Government,

17  through their cross.

18       THE COURT:  Mr. Brodsky, Mr. Ferruolo certainly had

19  whatever facts you chose to give him regarding the

20  circumstances of the Retrophin board and how it operated

21  regarding decisions to settle cases or to enter into

22  consulting agreements.

23       And his report could have discussed those specifics

24  with regard to Retrophin.  Or with regard to early stage life

25  science companies that were minimally or thinly staffed.  But

Ferruolo - Cross - Smith                    273

1   you know he didn't offer those opinions.  I don't think it is

2   appropriate now, on redirect to bring up what could have been

3   proffered in the first place.

4            MS. SMITH:  Frankly --

5            MR. BRODSKY:  He did testify on direct examination,

6   he did, that the person who he spoke to on the client, was the

7   Chairman or the CEO.  And the Chairman and the CEO told him

8   and made the decision.

9            THE COURT:  So his testimony speaks for itself.  You

10  have it on direct.  You don't need to redirect him on that.  I

11  will look at the whole transcript of the testimony.

12           Thank you.

13           (Open Court.)

14  BY MS. SMITH:

15  Q    Mr. Ferruolo, just turning to your opinions on PIPE

16  transactions which are paragraphs 15 and 16 in your report.

17           It is your opinion that PIPE investors get benefits

18  in addition to the actual stock that they receive in the PIPE,

19  correct?

20  A    That is correct.

21  Q    And those benefits are things like discount off the

22  market share price and warrants, right?

23  A    Among other things, yes.

24  Q    You also talk about the full protection last time?

25  A    There are also things, participation rights, there are

1   certain contractual rights relating to subsequent financings

2   and things like that.  There is a package of benefits, yes.

3   Q     For the February 2013 PIPE, what was the package of

4   benefits?

5   A     First of all, there was a discount to the market price, I

6   think that discount was fifteen percent.  Number two, there

7   was warrant coverage, I believe that warrant coverage was

8   fifty percent.  There were 5-year warrants and those warrants

9   were exercisable, I think at 360, twenty percent above the

10  market price.

11            They had full ratchet protection on the down side.

12  I did think one mistake that I made, when I talk more

13  generally.  In this case it was absolutely a full rachet.  If

14  there was subsequent financing, the warrant price was adjusted

15  back to that number.

16            Let's go next, there were registration rights and

17  those registration rights carried liquidated damages.  The

18  registration statements were not filed and made effective

19  during a certain period of time.

20            In addition to that, if I recall there was also

21  rights related to participation in future financings.  Rights

22  to participate in future finances, but not obligation.

23            And, there were also some provisions relating to

24  having a seat at the table in terms of being able to approve

25  subsequent PIPE transactions.

1          I believe that is the package of benefits that the

2    investors got.

3    Q    And the ratchet protection you talked about last time,

4    that means, if the price drops, there is a subsequent PIPE,

5    you have a right to the adjustment, correct?

6    A    Your warrant then becomes exercisable.  So instead of 360

7    whatever that price is.

8    Q    Those kinds of benefits, the discount off the stock

9    price, the warrant to-- sorry, just to be clear, a warrant is

10   an option to buy at a certain price, correct?

11   A    That's right.

12   Q    So, a discount, the warrants, the rachet protection, all

13   of those, the value of those additional benefits would vary

14   depending on the market price for the company's stock,

15   correct?

16   A    That is correct.

17   Q    And it is your opinion investors in a PIPE transaction

18   would not typically look to make their investment in the open

19   market, even if the company's share price were to drop; is

20   that correct?

21   A    If the time they are considering a PIPE transaction, yes.

22   Q    And that is your opinion in paragraph 16?

23   A    Yes.

24   Q    And you said if the price did drop, they would be likely

25   to renegotiate the terms of the PIPE; is that correct?

1   A     Yes.

2   Q     So, if the PIPE was originally offered say at $3 as it

3   was here, and then the share price dropped precipitously, the

4   PIPE investors would then want to renegotiate the buy in

5   price, correct?

6   A     I am assuming they have not completed the documentation.

7   They are in the process of talking about a potential

8   investment, yes.

9   Q     So the share price then would impact whether or not the

10  PIPE investor would buy in at a particular price in that case?

11  A     Yes.

12  Q     You also said that PIPE investors would not typically

13  make their investment in the open market.  To be clear, you

14  don't know one way or the other whether the investors in the

15  February 2013 Retrophin PIPE, also made purchases of Retrophin

16  shares in the open market, correct?

17  A     I do not, no.

18  Q     You don't know one way or another, whether investors in

19  later PIPEs, like the August 2013, Retrophin PIPE, also made

20  shares-- purchases of shares on the open market, correct?

21  A     I did not look at the stock purchase records of the

22  company, no.

23  Q     And so that would include you don't know whether or not

24  the lead investors in either of those two PIPEs, made

25  purchases of shares in the open market, right?

1  A    Those specific investors, no.

2  Q    And it would be important to all investors in Retrophin,

3  PIPE investors or otherwise, to know whether the share price

4  of the company was artificially inflated, correct?

5  A    I think there are a lot of assumptions behind that

6  question, but the answer would be, yes.

7  Q    And, you testified that you represented companies making

8  offerings via PIPE transactions and as well as investors in

9  those PIPEs, right?

10  A    That is correct.

11  Q    In the course of representing a company, making a PIPE,

12  or making offering via PIPE, you worked on documents like the

13  share purchase agreement, right?

14  A    It would be typical in a PIPE transaction for the lead

15  investors to draft those documents.  So if I were representing

16  the company, I might draft some of the documents.  But I would

17  review all the documents and mark up all the documents, things

18  like that, that is correct, yes.

19  Q    You testified before that it was important for the reps

20  and warrantees in the share purchase agreement to be accurate,

21  correct?

22  A    That is correct.

23  Q    You said you reviewed the share purchase agreement for

24  the February 2013 Retrophin PIPE; is that right?

25  A    Yes, I did.

Ferruolo - Cross - Smith                    278

1   Q    I will show you what is marked as Government Exhibit 303,

2   it was admitted during the trial.

3        Mr. Ferruolo, do you know if you reviewed this

4   particular document?

5   A    Yes, this looks like the document that I reviewed.

6   Q    For the record, it is an E-mail from the defendant sent

7   on February 7th, 2013, at-- has a number of attachments, which

8   are described in the E-mail as the current draft forms of the

9   stock purchase agreement, the warrant and the registration

10  rights agreement.

11  A    That is right.  There is also an attached term sheet.

12  Q    If you can just turn to the page that ends with Bates

13  number RO23791.

14  A    Yes.

15  Q    This is the first page of the securities purchase

16  agreement for the February 2013 PIPE?

17  A    Yes.

18  Q    When you reviewed this agreement, you didn't do any

19  additional work to determine how these reps and warrantees

20  were included or whether or not these representations and

21  warrantees were actually complied with by the company,

22  correct?

23  A    I did not have a copy, nor did I review the disclosure

24  schedule.

25  Q    Did you ask to review the disclosure schedule?

1    A    No.

2    Q    Can you turn to the page ending in 816.  For the record

3    the full Bates number is RO23816.

4    A    Yes.

5    Q    The title of the Section 4.7 is "Use of Proceeds",

6    correct?

7    A    Yes.

8    Q    And it sets forth the ways in which Retrophin can use the

9    proceeds from the February 2013 PIPE, correct?

10   A    Yes.

11   Q    You have no personal knowledge of how the proceeds from

12   the February 2013 PIPE were actually used, correct?

13   A    No direct knowledge-- these became part of the proceeds

14   of the company, I have reviewed.  When reviewing the 34

15   filings, I reviewed the financial statements and reviewed the

16   cash flows and things like that.

17   Q    But, you didn't review the bank records for the company,

18   correct?

19   A    I did not, no.

20            MR. BRODSKY:  All of this is outside of the scope of

21   direct.  When it comes to Exhibit 303 and comes to the bank

22   records, we provided a list of what he reviewed.  So now they

23   are going into documents that we did not show him and beyond

24   the scope of direct.  I am happy to redirect on it if Your

25   Honor allows the Government to cross examine him on documents

1    he has never reviewed before.

2              MS. SMITH:  Your Honor, the witness said he reviewed

3    this particular E-mail.  I am asking what other documents he

4    has been talking about, he also actually looked at.

5              THE COURT:  All right.  The objection is overruled,

6    Mr. Brodsky.

7              You can continue.

8    Q    So, Mr. Ferruolo, you didn't actually look at any of the

9    bank records reflecting how the proceeds of the February 2013

10   PIPE were used, correct?

11   A    No, I did not.

12             MS. SMITH:  No further questions, Your Honor.

13             THE COURT:  All right.  Mr. Brodsky is going to ask

14   you just a few questions regarding an issue that was brought

15   up during your cross regarding your testimony before the SEC,

16   specifically regarding page 1266, regarding your testimony

17   about notes that were sent to the committee for review.

18             This will be a very circumscribed cross.

19             MR. BRODSKY:  Thank you, Your Honor.

20             THE COURT:  You may proceed.

21             You wanted to say something more, that is your

22   opportunity to do so.

23             THE WITNESS:  Thank you.

24   REDIRECT EXAMINATION BY MR. BRODSKY:

25   Q    Mr. Ferruolo, you just to set it up.  To orient you, you

Ferruolo - Redirect - Brodsky                281

1   were asked questions by the Government on cross examination,

2   about sending draft minutes.  And you had testified that you

3   send draft minutes to an officer of the company, usually the

4   CFO or CEO.

5              MS. SMITH:  Objection Your Honor.

6              THE COURT:  Sustained.

7   Q    Were you then directed to--

8              THE COURT:  Just go to the page that we were

9   discussing regarding the sending of his notes to a committee

10  for review.  That is what I am giving you latitude for and

11  nothing else.

12  Q    Dean Ferruolo, would you explain your answer to the

13  Government, where you indicated by your body language, you

14  wanted-- you had more to say.  And you had testified you

15  usually sent the draft minutes to the CFO, CEO and then the

16  Government directed you to page-- Government Exhibit H6, SEC

17  the Sabhlok transcript, page?

18             THE COURT:  1266 lines 21.

19  Q    1266 lines 21 through the end of the page and then 1267.

20  A    Yes.

21             I used the procedure here that I described that I

22  always used.  I sent my draft minutes to Mr. Sabhlok in this

23  case, who is the CFO and Mr. Sabhlok sent those minutes to the

24  committee.

25             THE COURT:  When you said, "committee", who is that?

Ferruolo - Redirect - Brodsky                    282

1          THE WITNESS:  In this case, these were audit

2     committee minutes, but it would be typical-- my primary

3     contact at Embarcadero Technologies was the CFO.  He was the

4     one who mainly interacted with the Board and the Board

5     committees.  All my draft minutes went to Mr. Sabhlok.

6     Through the -- basically through most of the time in this

7     company until there was a special investigation.

8          During this period of time, normal practice in the

9     industry is basically you send it to an officer of the company

10    and the company sends it on.

11         THE COURT:  What, I'm sorry?

12         THE WITNESS:  You send the draft minutes to the

13    primary officer of the company who interacts with the Board.

14    The Board-- that person at the company prepares the Board

15    package and sends those minutes to the committee or to the

16    Board as appropriate.

17         THE COURT:  Thank you.

18         MR. BRODSKY:  I know you indicated before, as to

19    what's-- whether I could ask additional questions, may I ask

20    additional questions on redirect?

21         THE COURT:  No that is it.

22         Another subject or just this point?

23         MR. BRODSKY:  I believe the point with respect to

24    who he was referring to when he testified about who the client

25    was should be clarified on redirect.

1        MS. SMITH:  Your Honor, you already ruled it was

2   done on direct.

3        THE COURT:  It was done on direct.  I don't think we

4   have any more need for redirect.

5        Anything else for this witness?

6        I think you are excused sir, have a safe flight back

7   to San Diego.

8        (Witness excused.)

9        THE COURT:  Do you have another witness?

10       MR. BRODSKY:  May we take a five-minute break to

11  confer with the client?

12       THE COURT:  All right.

13       (Recess taken.)

14       THE COURT:  Counsel, I gave you five minutes, you

15  had over ten.  I summoned you through my courtroom deputy, you

16  refused to come.  Can you let me know how you are planning to

17  proceed?  I am either going to adjourn now, finish the hearing

18  or we will hear from your next witness.  What would you like

19  to do?

20       MR. BRODSKY:  We did come as soon as we were

21  summoned.

22       THE COURT:  You didn't.  Ms. Jackson went out and

23  Mr. Barry started to go out to retrieve you.

24       I want to know what we are doing here.  You have had

25  over five minutes, what would you like to do?

- Proceedings -                          284

1          MR. BRODSKY:  Yes, Your Honor.  I just want to know,

2    you did give the Government thirty or forty minutes each time

3    to make a determination as to whether they were going to cross

4    examine a witness, in the last FATICO hearing.  We are making

5    a very significant decision as to whether or not to call a

6    third witness.  We have been given ten minutes of time.

7          THE COURT:  I did not give them thirty or forty

8    minutes.  Don't forget, you gave them disclosures the day

9    before or something outrageous.

10         I am tired of your trying to mischaracterize the

11   record.  The lack of respect that you have shown for any of my

12   orders.  This has gone on long enough Mr. Brodsky.  Every time

13   you say, I'm sorry, you keep doing the same thing over and

14   over again.

15         All I want to know is whether you are calling your

16   last witness or not, or whether we are finished with this

17   hearing and we may all go back to our regular business.

18         MR. BRODSKY:  Your Honor, we will not be calling Mr.

19   Prinsky.

20         THE COURT:  All right.  You are certainly welcome

21   to, I set aside the morning for his testimony if you would

22   like to call him.

23         MR. BRODSKY:  I understand.  Given the time we have

24   had to confer, I--

25         THE COURT:  Now you are complaining about the time.

RB          OCR

- Proceedings -                    285

1   Really.

2          MR. BRODSKY:  No, Your Honor, we are not going to

3   call Mr. Prinsky.

4          THE COURT:  You identified him weeks ago.  You have

5   had more than enough time to figure out whether you are

6   calling him.  Today was just a courtesy, additional courtesy

7   that I have extended to you.

8          All right.  Anything else that you should address or

9   do the parties want to proceed based on this record and the

10  evidence in the record, or did you want an opportunity for

11  post hearing submissions?  How would you like to proceed?

12         MR. BRODSKY:  We would like an opportunity Your

13  Honor to submit something to Your Honor with respect to that.

14         THE COURT:  Can you do that next week?

15         MR. BRODSKY:  Yes.

16         THE COURT:  What date?

17         MR. BRODSKY:  May we submit it on Thursday,

18  June 28th.

19         THE COURT:  Yes.

20         When does the Government want to respond?

21         MS. SMITH:  Just one week, Your Honor, July 5th.

22         THE COURT:  Given it is a holiday, I will give you

23  till Friday the 6th.

24         MS. SMITH:  That would be great.

25         THE COURT:  So, I will receive the submissions.

- Proceedings -                                     286

1  Please provide two courtesy copies to my chambers and I will

2  hopefully have a decision for you.

3        I am concerned about the notes. I do feel that once

4  again, this was a situation where the notes appear to be of

5  fairly marginal relevance to the issue before the Court, which

6  is the loss, foreseeable loss caused by the conviction on

7  Count Seven.

8        As we know, these notes were ordered to be provided

9  on June 1st. Mr. Brodsky's excuse that he was not in a

10 position to review these personally, rings hollow frankly. He

11 has had more than enough time to comply with the Court's

12 orders and I believe that if these notes were so critical to

13 his position, he would have exercised more diligence to timely

14 provide the notes.

15       But that aside, I noted that the copy that I have of

16 these notes are largely illegible. There is no dispute that

17 Mr. Greebel wrote these notes, but I believe it is

18 fundamentally unfair to the Government to allow the defendant

19 years after the fact to provide an interpretation of his own

20 notes that are not subject to any sort of cross examination or

21 verification by the Government.

22       Again, as I note, I believe they are of marginal

23 relevance, therefore, I plan to preclude them.

24       Anything else?

25       MS. SMITH:  No, Your Honor.

RB        OCR

```
                         - Proceedings -                      287

  1            THE COURT:  Thank you.

  2            MR. BRODSKY:  No, Your Honor, thank you.

  3            (Hearing concluded.)

  4

  5                 -  -  o o O o o  -  -

  6

  7    I CERTIFY that the foregoing
       is a correct transcript from
  8    the record of proceedings
       in the above entitled matter.
  9
       s/Richard W. Barry
 10    _____
       Richard W. Barry, RPR
 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```