

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AES/DCP/DKK                                    *271 Cadman Plaza East*
F.#2014R00501                                  *Brooklyn, New York 11201*

July 6, 2018

<u>By Hand and ECF</u>

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

       Re:   United States v. Evan Greebel
           <u>Criminal Docket No. 15-637 (KAM)</u>

Dear Judge Matsumoto:

       The government respectfully submits this letter in response to the defendant Evan
Greebel's letter of June 29, 2018, disputing the loss calculations in the Pre-Sentence
Investigation Report ("PSR") in light of the recent <u>Fatico</u> hearing (see Dkt No. 631 ("Def.
Ltr.")).[1]  For the reasons in the government's prior briefing about the loss amount (<u>see</u> Dkt. Nos.
601, 606), in the government's responses to the defendant's objections to the PSR (provided to
the court via hand delivery on June 22, 2018), and as set forth below, the Court should adopt the
loss calculations in the PSR for both Count Seven and Count Eight.

       As detailed previously, pursuant to the United States Sentencing Guidelines
("U.S.S.G." or "Guidelines"), the appropriate calculation of the loss amount caused by the
defendant is approximately $14.4 million.  Specifically, the defendant caused a loss of
approximately $10,447,979.00 to Retrophin as a result of his participation in the conspiracy to
steal money and shares from Retrophin via the settlement and sham consulting agreements
(Count Seven), and the defendant caused approximately $4 million in intended losses as a result
of his participation in the conspiracy to control the price and trading volume of Retrophin stock
(Count Eight).  (See PSR ¶¶ 49-51).  This amount falls within the $9.5 million to $25 million
offense level bracket in Section 2B1.1(b)(1), and results in a 20-level increase in the applicable
offense level.  <u>See</u> U.S.S.G. § 2B1.1(b)(1)(k).  The loss calculation for Count Eight advanced by

---

[1] The defendant filed his initial response on June 28, 2018 (Dkt No. 628), and
subsequently filed an amended response on June 29, 2018 (Dkt No. 631), which corrected errors
in the defendant's proposed alternate calculation of loss on Count Eight that had appeared in the
initial letter.  (See Dkt. No. 630).

the government and Probation here also is identical to the loss calculation that this Court previously adopted in sentencing the defendant's co-conspirator Martin Shkreli, who was also convicted on Count Eight. (See Dkt. No. 535 at 90-95).

## I.    Relevant Procedural History

Following an eleven-week jury trial in the fall of 2017, the defendant was convicted on December 27, 2017 of two counts: (1) conspiracy to commit wire fraud, for conspiring to steal money and property from Retrophin via a series of settlement and consulting agreements ("Count Seven"), and (2) conspiracy to commit securities fraud, for conspiring to defraud investors and potential investors in Retrophin by manipulating the price and trading volume of Retrophin's stock ("Count Eight"). In the spring of 2018, the parties briefed and the Court subsequently heard oral argument on the defendant's Rule 29 and Rule 33 motions and the government's motion for forfeiture. (See Dkt Nos. 530, 563, 574, 588, 589 (Rule 29 and 33 motions); 573, 576, 577, 578, 579, 585, 586, 587, 592 (forfeiture)).

At oral argument on April 13, 2018, the defendant indicated that he would challenge Probation's calculation of loss for the purposes of the Guidelines on Counts Seven and Eight if it was the same calculation advanced by Probation in connection with Shkreli's sentencing. (April 13, 2018 Tr. at 146-49). A hearing date was set for June 1, 2018 (id.), and the Court subsequently ordered the parties to submit simultaneous submissions regarding loss amount one week the release of the PSR, with responses to follow three days later. The PSR was released to the parties on May 7, 2018, and the parties submitted their briefs on loss on May 14, 2018, with replies on May 17, 2018. (See Dkt Nos. 601, 602, 606, 607).

The parties were also ordered to submit any evidence bearing on loss no later than May 28, 2018. On that date, the defendant indicated that he planned to call three witnesses at the hearing—Gayle Klein, Stephen Ferruolo and Zachary Prensky, each of whom the defendant claimed was an "expert"—and listed certain documents that the defendant might introduce at the hearing. (See Dkt No. 612). The defendant was subsequently ordered to provide the opinions that his experts would proffer at the hearing, which were filed on May 30, 2018 (Dkt No. 614); the defendant filed exhibits that he may seek to introduce at the hearing on May 31, 2018 (Dkt. No. 615), and the government objected to certain proposed testimony and exhibits on May 31, 2018 (Dkt No. 617). On the evening of May 31, 2018, the defendant provided to the government via email an additional document from Klein containing calculations regarding her "valuation" of certain potential claims she alleged could have been brought by defrauded MSMB investors against Retrophin, which had not previously been disclosed. (June 1, 2018 Tr. at 13-16).

At the hearing itself—which took place on June 1, 2018 and June 18, 2018—the defendant elicited testimony from Klein and Ferruolo, and declined to elicit testimony from Prensky. During the course of the hearing, the defendant admitted only three documents: DX 614-2 (Klein's expert report), DX 7770 (a public filing by Catalyst Advisors against MSMB, Shkreli and Retrophin), and DX 614-1 (Ferruolo's expert report).

In the meantime, the defendant filed objections to the PSR on June 8, 2018 ("Def. Obj."), which advanced new arguments that were neither included in the defendant's initial filings to the Court regarding loss, nor addressed by the defendant's witnesses or exhibits at the

<u>Fatico</u> hearing.  For example, the defendant contended for the first time that Retrophin had, in 2013, adopted an accounting treatment of Alan Geller's consulting agreement that differed from the loss calculation advanced by the government for Guidelines purposes.  (<u>See</u> Def. Obj. at 14). The defendant subsequently filed his post-hearing submission on loss on June 29, 2018 (<u>see</u> <u>supra</u> n.1), which incorporated these new arguments (<u>see, e.g.</u>, Def. Let. at 18 (discussing accounting treatment of Alan Geller's consulting agreement)) and added yet additional ones.

## II.     Applicable Law

A.     <u>The Defendant is Responsible for Losses Caused By His Own Actions, Actions He Aided or Abetted and Actions Reasonably Foreseeable to Him</u>

A defendant who commits an offense involving fraud or deceit will be held accountable for the <u>greater</u> of his actual or intended loss.  U.S.S.G. § 2B1.1, comment. (n.3(A)) (emphasis added).  Actual loss "refers to the reasonably foreseeable pecuniary harm that resulted from the offense," while intended loss means the "pecuniary harm that the defendant purposely sought to inflict" and includes "intended pecuniary harm that would have been impossible or unlikely to occur."  <u>Id.</u>  The Guidelines further define "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money," and "reasonably foreseeable pecuniary harm" as that harm that the "defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  <u>Id.</u>

The amount of loss attributable to a particular defendant at sentencing includes <u>all</u> relevant conduct for which that defendant is responsible.  According to U.S.S.G. § 1B1.3(a), relevant conduct for sentencing purposes is assessed on the basis of:

(1)     (A)     all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)     in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3(a), comment. (n.2).

While the scope of a defendant's relevant conduct for loss calculation encompasses criminal actions taken by the defendant, aided by the defendant or reasonably foreseeable to the defendant, it is more restrictive than the scope of conduct that can be used to show membership in a conspiracy.  <u>United States v. Perrone</u>, 936 F.2d 1403, 1416 (2d Cir. 1991).  This is because to "obtain a conviction for conspiracy, the government must demonstrate that the accused had some knowledge of the unlawful aims of the conspiracy, but it is not necessary to demonstrate that the accused knew <u>all</u> of the unlawful aims of the scheme charged. Under the [G]uidelines, however, a defendant convicted of conspiracy can only be held accountable for what he could reasonably foreseen."  <u>Id.</u>  Consequently, a district court must

make a "particularized finding of the scope of [a defendant's] agreement to participate in the fraudulent scheme," as well as a finding as to whether losses caused by other participants in furtherance of the scheme were foreseeable to the defendant.  United States v. Studley, 47 F.3d 569, 576 (2d Cir. 1995).

In Studley, the defendant was convicted of mail fraud in connection with his employment as a telemarketer, during which he made false representations to customers to induce them to pay application fees for loans they would never actually receive.  47 F.3d at 570.  The district court held the defendant responsible not only for the losses he personally caused, but also losses caused by other salespersons who worked for the employer who ran the telemarketing scheme.  Id.  The Second Circuit analyzed the Guidelines and existing caselaw regarding how the scope of "jointly undertaken" criminal activity should be determined, and noted that a district court may consider the following factors:  (a) "any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others"; (b) "whether the defendant assisted in designing and executing the illegal scheme"; (c) "what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct"; and (d) "whether the participants pool their profits and resources, or whether they work independently."  Id. at 575.  In Studley, the Second Circuit concluded that the defendant did not agree to jointly undertake criminal activity with the other salespersons because the defendant:  (1) did not assist in designing the telemarketing scheme; (2) did not work to further the scheme other than through his own sales efforts; and (3) was paid for his fraud on a commission basis, competed against other salespersons for commissions and did not pool his profits or resources with the other salespersons to further the scheme.  Id. at 576.  As a result, the Second Circuit concluded that the proper loss amount attributable to the defendant for Guidelines purposes was limited to the losses suffered by the customers the defendant himself defrauded, and not losses caused by other salespersons employed by the same telemarketing scheme.  Id.

Courts in the Second Circuit have frequently looked to the factors in Studley when reaching a determination as to the scope of a defendant's agreement to participate in a scheme.  For example, in United States v. Zeneski, 912 F. Supp. 43 (E.D.N.Y. 1996), the defendant was involved in a scheme in which he hacked into hotel computer systems and downloaded credit card information; he then sold the stolen credit card information to his co-conspirator, who used that information to purchase computer equipment (at no cost) that was resold at a profit to the co-conspirator.  The defendant was paid by his co-conspirator in a small amount of computer equipment that had been purchased with the stolen information.  Id. at 44.  At sentencing, the defendant claimed that the loss amount attributable to him was limited to the computer equipment he personally received in exchange for the stolen credit card information (approximately $3500), and not the total losses caused by his co-conspirator in the course of the co-conspirator's subsequent use of the stolen credit card information for his own benefit (close to $200,000).  Id. at 45.  The district court disagreed, finding the facts in Studley distinguishable because while the defendant in Studley was just one of many salespersons and if he had never been "employed by the telemarketing company, the fraudulent scheme would have continued in his absence," in this case, the defendant "was an integral and indispensable component of the conspiracy."  Id. at 48.  The district court noted that the defendant provided the "single most critical resource to the conspiracy" and that without his "specialized computer knowledge and participation," the credit card information could not have been stolen.  Id.  The district court

4

further found that the co-conspirator's use of the fraudulent credit cards to purchase computer equipment was foreseeable to the defendant, and held him accountable for all of the losses caused by the overarching scheme.  Id.

Similarly, in United States v. Kissi, No. 03 CR 206 (LBS), 2004 WL 2903720 (S.D.N.Y. December 15, 2014), two defendants (Defendant A and Defendant B) were involved in a scheme to steal the names and social security numbers ("SSNs") of individuals over the Internet, and then use that information to file false tax returns that generated tax refund checks. Id. at *1.  Defendant A's role in the scheme included the sale of some SSNs herself; in addition, Defendant A drove a co-conspirator to a location where that person used the Internet to steal SSNs, retyped the SSNs that had been printed out, and accepted money from the sale of those SSNs by a second co-conspirator, including taking a share of the profits.  Id. at *2.  The district court concluded that Defendant A could be held responsible for losses attributable not just to the SSNs that she personally sold, but to the sale of the SSNs by the co-conspirator because it was within the scope of "jointly undertaken criminal activity" and foreseeable; specifically, the district court found that the agreement with the co-conspirators could be implied by Defendant A's conduct, and that Defendant A benefitted from the sale of the SSNs.  Id. at *3.  Defendant B, on the other hand, had personally sold SSNs and also directed a co-conspirator to sell SSNs to three people; then, while Defendant B was in jail, the co-conspirator expanded the operation to sell SSNs to others.  Id. at *4.  The district court found that the actions of the co-conspirator beyond the original agreement with Defendant B could not be considered "jointly undertaken criminal activity," and held Defendant B responsible for losses stemming only from his own sales and the sales of the co-conspirator to the agreed-upon individuals.  Id.

In sum, then, both the Guidelines and applicable Second Circuit law hold that a defendant is responsible for losses that result from: his or her own criminal actions; criminal actions that he or she aids or abets; and criminal actions within the scope of the agreed upon "jointly undertaken criminal activity" and reasonably foreseeable to him or her.  As detailed below in Sections III.A. and IV.A., the evidence at trial proved by at least a preponderance that (1) the defendant was directly involved and/or aided in the execution of the settlement and consulting agreements, which were in furtherance of the agreed-upon conspiracy to defraud Retrophin, and (2) the defendant was directly involved in the distribution of the Fearnow shares to associates of Shkreli and the concealment of the ownership of the Fearnow shares, and was either directly involved in and/or aided subsequent attempts to control the Fearnow shares, or such attempts were foreseeable to him, all of which were actions in furtherance of the agreed-upon conspiracy to manipulate the trading volume and price of Retrophin stock.

B.     The Court Must Make a "Reasonable Estimate" of the Loss Amount

After the scope of the defendant's relevant conduct is determined, a court must make a "reasonable estimate" of the loss amount attributable to the defendant's relevant conduct. U.S.S.G. § 2B1.1, comment. (n.3(C)).  A "court need only make a reasonable estimate of the loss resulting from the defendant's crime[s]."  United States v. Abiodun, 536 F.3d 162, 167 (2d Cir. 2008).  "The sentencing court is not required to calculate the amount of loss with certainty or precision."  United States v. Norman, 776 F.3d 67, 79 (2d Cir. 2015).  "In keeping with this philosophy, it is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from

known data and applying that average to transactions where the exact amount of loss is unknown." United States v. Bryant, 128 F.3d 74, 76 (2d Cir. 1997); see also U.S.S.G. § 2B1.1, comment (n.3(C)) (a court may consider, among other things, the "approximate number of victims multiplied by the average loss to each victim," and "general factors, such as the scope and duration of the offense").  In fact, in applying the Guidelines to cases involving large-scale or complex fraud, the Second Circuit has repeatedly recognized the inherent imprecision of loss computations and emphasized the discretion accorded sentencing judges in estimating loss based on the available facts.  See, e.g., United States v. Sutton, 13 F.3d 595 (2d Cir. 1994) (rejecting a challenge to the district court's use of estimates and assumptions derived from the available facts to approximate loss, noting that amount of loss "need not be determined with precision" and that the loss figure may "be based on the approximate number of victims and an estimate of the average loss to each victim") (quoting former language of U.S.S.G. § 2F1.1, comment. (n. 8)); United States v. Lohan, 945 F.2d 1214 (2d Cir. 1991) (upholding the district court's loss computation as reasonable where it was based on the number of investors called and the amount solicited from each as a measure of intended loss); United States v. Burns, 104 F.3d 529 (2d Cir. 1997) (upholding district court's loss computation based on estimates).

After making a determination of the appropriate loss amount, the Guidelines contemplate that a court may consider whether to reduce that loss amount by any "credits against loss." See U.S.S.G. 2B1.1(b)(1) , comment. (n.3(E)).  The Guidelines further prescribe that the loss amount may be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant … to the victim before the offense was detected."  Id.  The time of detection is the earlier of (1) the time "the offense was discovered by a victim or government agency" or (2) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." Id.  Importantly, the consideration of whether to allow any offset against the applicable loss amount is the second step in a two-step process:  "first, the [court must make a] determination of the foreseeable pecuniary harm resulting from the fraud, and second, the [court must make a] determination of any credits against loss from sale of the collateral, as required by Application Note 3(E)(ii)."  United States v. Turk, 626 F.3d 743, 749 (2d Cir. 2010); see United States v. Crowe, 735 F.3d 1229, 1237 (10th Cir. 2013) ("[I]f we were to state the method for determining 'loss' for purposes of § 2B1.1(b)(1) as a mathematical equation, it would be as follows: loss equals actual loss (or intended loss) minus credits against loss.").

Finally, like all facts pertinent to sentencing, a court need only determine the loss amount by a preponderance of the evidence.  See, e.g., United States v. Coppola, 671 F.3d 220, 250 (2d Cir. 2012).  This determination is reviewed for clear error and is entitled to deference, particularly where "the sentencing judge also presided over a weeks-long trial and heard a great deal of live testimony."  United States v. Lacey, 699 F.3d 710, 720 (2d Cir. 2012).

## III.     The Court Should Adopt the PSR's Loss Calculation for Count Seven

   A.     The Evidence at Trial Demonstrated that the Settlement and Consulting
          Agreements Were In Furtherance of the Conspiracy to Defraud Retrophin

The defendant contends that the government "has not met his burden of proving that" he knew that "each and every settlement and consulting agreement at issue would result in

pecuniary harm to Retrophin," and goes on to argue that the defendant did not in fact know that the settlement and consulting agreements were part of the conspiracy because (1) he believed there were credible litigation threats that justified the settlement agreements, and (2) he believed that the consultants were providing legitimate services.  (Def. Let. at 5-9).  These arguments are identical to those advanced in the defendant's initial filings on loss (see Dkt Nos. 602 and 608), and the defendant cites no new evidence from the Fatico hearing in support of these arguments (Def. Let. at 5-9).[2]  The government therefore refers the Court to its initial filing and its filing in response to the defendant's initial brief, and incorporates all of the arguments and evidence therein that demonstrates by a preponderance that the defendant knew the purpose of each settlement and consulting agreement at issue was to steal money and shares from Retrophin to repay Shkreli's defrauded investors.  (See Dkt No. 601 at 3-5; Dkt No. 606 at 6-8).  The government also refers the Court to its extensive response to the defendant's Rule 29 motion on Count Seven, which provides further support for its position.  (See Dkt No. 563 at 5-40).  The government only addresses only new arguments in the defendant's filing herein.

        1.      <u>The Losses Caused by the Agreements Were Within the "Joint Criminal Activity" Undertaken By the Defendant and Foreseeable to Him</u>

        The defendant appears to argue, for the first time, that the settlement and consulting agreements were not within the scope of the "jointly undertaken criminal activity" engaged in by the defendant and his co-conspirators, and also that the use of such agreements to defraud Retrophin was not foreseeable to him.  (Def. Let. at 3, 8-9).  The defendant argues that he should be held accountable only for losses stemming from what he "reasonably should have known would result from his own limited conduct." (Id. at 3).  Specifically, the defendant argues that because he was given instructions by Shkreli and followed such instructions, he is analogous to the defendant in Studley and he should not be responsible for losses beyond that "limited conduct." (Id.).  However, despite the fact that the defendant's conviction on Count Seven means that he must be responsible for some loss (either actual or intended) because the intent to cause loss to Retrophin was an element of the wire fraud conspiracy of which the defendant was convicted (see Court Exhibit 6 (Final Jury Instructions) at 43), the defendant makes no attempt to quantify what loss resulted from what he characterizes as his "own limited conduct," nor does he explain what constituted that "limited conduct."

---

[2] The defendant does state that the testimony of Klein and Ferruolo "corroborate that it was reasonable for external counsel in Mr. Greebel's position to believe that settlements represented a better result for an early-stage life science company." (Def. Let. at 7).  Neither Klein nor Ferruolo was qualified to testify to what the defendant in fact believed at the time that he entered into the settlement and consulting agreements, nor did they provide such testimony. More significantly, the fact that in some cases an attorney for a company may reach a reasoned decision as that it is better to settle a threatened lawsuit than to litigate—an analysis there is no evidence the defendant undertook, nor did Klein or Ferruolo—is completely irrelevant to the question here, which is whether the settlement and consulting agreements were part of a conspiracy to defraud Retrophin.

The defendant's argument that he, like the defendant in <u>Studley</u>, was merely following instructions to commit fraud given to him by Shkreli and thus cannot be held responsible for criminal conduct carried out by Shkreli or others beyond those instructions or without his knowledge is unavailing.  As an initial matter, even if the defendant acted only to follow Shkreli's directions to defraud Retrophin—and as detailed below, he did not—he would <u>still</u> be held responsible for all of the criminal conduct that he directly participated in by following those instructions.  In <u>Studley</u>, as detailed above, the defendant received instructions from his employer as to how to defraud customers and proceeded to do so; he was ultimately held responsible for the losses caused by the customers he directly defrauded.  Here, the defendant was a direct participant in the negotiation, drafting and execution of each and every settlement and consulting agreement that defrauded Retrophin, so he is clearly responsible for all losses resulting from those agreements.  The analogy to <u>Studley</u> fails.

Moreover, as established at trial, the defendant did not merely follow Shkreli's instructions with respect to the settlement and consulting agreements.  To the contrary, it was the defendant himself who suggested using consulting agreements on several occasions as a mechanism to steal money and shares from Retrophin without detection.  For example, the defendant suggested to Shkreli that, in order to take shares from Retrophin to repay Blanton, they should have Blanton enter into a consulting agreement.  (GX 643).  Shkreli questioned that decision, and the defendant advised him that "given [the auditor's] recent behavior they may require [a settlement agreement] to be disclosed in the financials," and explained that he was trying to "prevent that issue."  (<u>Id.</u>).  The defendant made a similar suggestion with respect to the consulting agreement offered to Alan Geller.  (GX 560, Tr. 6742).  And it was the defendant who drafted the Control Memo and suggested the promissory notes and indemnification agreements as a way to continue to shield the true purpose of the settlement agreements from the auditors, and to ensure that Shkreli would not have to repay Retrophin.  (GXs 618, 627).  These sorts of actions demonstrate that the defendant was not merely following Shkreli's instructions, but rather was part of "assist[ing] in designing and executing the illegal scheme," and thus is responsible for all losses resulting from the scheme.  <u>Studley</u>, 47 F.3d at 575.

Further consideration of <u>Studley</u> and its progeny only confirms that the defendant should be held responsible for all losses suffered by Retrophin in connection with the conspiracy in Count Seven.  Significant to this analysis is the trial evidence proving that the defendant "was an integral and indispensable component of the conspiracy" to defraud Retrophin.  <u>Zeneski</u>, 912 F. Supp. at 48; <u>see also</u> <u>Studley</u>, 47 F.3d at 575.  The defendant's expertise as an attorney was necessary to draft the settlement and consulting agreements, and his position of trust as Retrophin's own lawyer was necessary to ensure that the fraud would not be detected.[3]  The evidence also showed that the defendant, Shkreli and others had an agreement "fairly inferred" from the defendant's conduct—and, in some cases, explicitly stated—to loot Retrophin in order to repay the defrauded investors in the MSMB entities.  <u>Studley</u>, 47 F.3d at 575; <u>Kissi</u>, 2004 WL 2903720 at *3.

---

[3] The defendant does not and has not disputed the applicability of the "abuse of trust" enhancement.

For these reasons, the court should find that all of the settlement and consulting agreements were within the scope of the "jointly undertaken criminal activity" and foreseeable to the defendant.

2.      There Was a Causal Link Between the Defendant's Conduct and Retrophin's Losses

For the first time, the defendant also argues that he should not be held responsible for any loss to Retrophin because "the government has not proven a proximate causal link between [the defendant's] conduct and any losses suffered by the Company, and there were superseding causes arising out of Mr. Shkreli's misconduct that were the predominant causes for any losses." (Def. Let. at 9).  As an initial matter, this argument was not advanced in the defendant's original filings on loss (see Dkt. Nos. 602, 608) and is not grounded in the evidence presented by the defendant at the Fatico hearing.  Consequently, this argument should be disregarded—the defendant should not be permitted to continually raise new arguments untethered to the evidence he presented at the Fatico hearing, after already having the opportunity to raise such arguments on multiple occasions.

Even if the Court were to consider this novel argument, it is unavailing.  First, as noted above, the argument that the defendant is not responsible for "any loss" to Retrophin is irreconcilable with the jury's verdict that the defendant was guilty of Count Seven, because the intent to cause loss to Retrophin was an element of the wire fraud conspiracy of which the defendant was convicted.

Moreover, the defendant's argument that he was not the "proximate cause" of any loss to Retrophin because Shkreli's own criminal conduct was a "superseding cause" of any such loss is unpersuasive.  (See Def. Let. at 9).  The caselaw cited by the defendant discussing proximate cause and intervening causes addresses factual situations that are far different than those present here.  For example, in United States v. Hicks, 217 F. 3d 1038 (9th Cir. 2000), the defendant, convicted of making false statements to obtain a loan from a bank, claimed that he was not responsible for the losses suffered by the bank when it foreclosed on the loans and sold the properties that had been pledged as security, because the person whom the bank separately hired to sell the properties engaged in a separate scheme to sell the properties at unreasonably low prices.  Id. at 1047-48.  In other words, the defendant argued that "after his crime was complete and fully discovered, a new criminal showed up and committed a different crime, inflicting new losses on the bank."  Id. at 1048.  The court in Hicks found that "[n]ew losses inflicted independently by third-party criminals after the completion and discovery of a defendant's crime do not 'result from' that crime" for purposes of the Guidelines, and remanded the case to the district court for additional findings.  Id. at 1048-49.[4]

---

[4] The additional cases cited by the defendant are unpersuasive, as they stand for the simple proposition that a defendant's criminal actions must be the actual cause of a loss in order to hold that defendant responsible for the loss at sentencing.  In United States v. Marlatt, 24 F.3d 1005 (7th Cir. 2004), a defendant sold title insurance to a developer for properties he knew were encumbered; the developer later had to pay fees in order to clear the titles, and then subsequently determined to repurchase the properties because the value of the properties had plummeted, and

In this case, there is no third party who swept in and committed a "different crime" after the conspiracy to defraud Retrophin was "complete and fully discovered." To the contrary, all of the alleged "superseding causes" identified by the defendant were aspects of the wire fraud conspiracy itself and/or attempts to continue to conceal that conspiracy as it was ongoing.

For example, the defendant claims that his failure to tell the Retrophin Board about the settlement agreements was "not the proximate cause of any losses" because the losses were caused by Shkreli's failure to repay the promissory notes. (Def. Let. at 10). As an initial matter, the promissory notes for the settlement agreements were not even drafted until August 2013, and were not finalized in some cases until October 2013, after the settlement agreements had been signed and Retrophin was committed to repaying the defrauded investors and after Retrophin had already made such payments. (See GXs 612, 641 (promissory notes for each agreement finalized after payment made); GX 618 (in discussing whether to move forward with promissory notes, Shkreli suggested that they annul certain settlement agreements and re-sign them, and the defendant responded "they were already paid"). There were also no promissory notes for the Rosenwald or Marshall settlement agreements or the Blanton or Alan Geller consulting agreements, so Shkreli's failure to pay non-existing promissory notes cannot be considered an intervening cause of the losses to Retrophin from those agreements.

More significantly, Shkreli's failure to pay the promissory notes was not a separate criminal act unconnected to the conspiracy in Count Seven. Rather, while the conspiracy was ongoing, the defendant and Shkreli conspired to use the notes to appease Retrophin's auditors—who had discovered the settlement agreements after the fact and determined that they were not Retrophin's responsibility to pay—to make it appear that the MSMB entities would repay Retrophin for the settlement agreement payments and to ensure that the fraud would not be discovered. The evidence at trial showed that the defendant knew Shkreli's promises to repay Retrophin were lies because he knew both that the MSMB entities had no money to repay the settlements, and that Shkreli had already determined not to use his own assets to do so—that was the purpose of the fraud on Retrophin via the settlement agreements in the first place. As the defendant explained: "The current thinking is let RTRX pay, get a note from the fund and if the fund cant fulfill the note RTRX will write it off as bad debt. It is easier than the road you are referring to. Also marcum would get very spooked with

did so at a loss. The court found that the defendant was responsible for the fees incurred by the developer but not the losses associated with the developer's independent decision to repurchase the properties. Id. at 1007. Similarly, in United States v. Rothwell, 387 F.3d 579 (6th Cir. 2004), the defendant—who had lawfully obtained a loan—was convicted of making false statements on two occasions to obtain cash advances on that loan, which he subsequently defaulted on. Id. at 581. The court found that the defendant was responsible at sentencing for the losses related to the money that was advanced as a result of the false statements, but not for the bank's losses from his default on the loan, which was unrelated to the statements. Id. at 584. Finally, the defendant cited Farwell v. Un, 902 F.2d 282, 290 (4th Cir. 1990), which is entirely inapposite—it is a civil case that applied Maryland law and had nothing to do with the calculation of loss for purposes of the Guidelines.

what you are talking about." (GX 618).  Shortly after discussing with Shkreli how Retrophin could "write [the note] off as bad debt" if MSMB can't "fulfill the note"—in a conversation where Shkreli did not state that he himself would fulfill the note—the defendant directed Panoff to falsely reassure Marcum that Shkreli had promised he would "have the resources to pay the obligations set forth in the notes and the indemnification agreements … [and] provided documentation demonstrating that [Shkreli] owns securities with an estimated value in excess of $8 million." (GX 627).  The defendant and Shkreli were confident this plan would work because they had done it before with the Katten bills that Retrophin paid on behalf of Shkreli: when Shkreli and the MSMB entities refused to repay Retrophin for those bills, that debt was subsequently written off.  (GXs 113-43, 113-44, 114-16, 510).

    Finally, the defendant suggests his actions were not a "proximate cause" of Retrophin's actual losses because the theft of stock and cash from Retrophin to pay the settlement agreements allowed Retrophin to survive as a public company and achieve "significant success," which ultimately inured to Retrophin's benefit.  (Def. Let. at 10-11).  This "no ultimate harm" argument is legally infirm.  The Count Seven conspiracy aimed to take money and property from Retrophin by fraud; any money or property taken from Retrophin in the course of that conspiracy constitute actual losses to Retrophin.  That the defendant and Shkreli may have been motivated to commit that theft from Retrophin by a desire to hide Shkreli's prior frauds and to ensure Retrophin could continue to operate does not change the fact that the defendant and Shkreli in fact agreed to use the settlement and consulting agreements to take shares and cash from the company by fraud.

   B. <u>The Defendant Should Not Receive a Credit for Any "Value" of the Settlement and Consulting Agreements</u>

    The defendant contends that, even if the cost of the settlement and consulting agreements caused a loss to Retrophin, that loss should be offset by the supposed "value" of the agreements in helping Retrophin avoid being sued by the defrauded MSMB investors.  (Def. Ltr. at 11-14).  This argument—essentially, that Retrophin should thank the defendant for helping to steal its money—should be rejected.

    <u>First</u>, the defendant and Shkreli put Retrophin on the hook in the first place to pay the settlement and consulting agreements, although, as the defendant later admitted in the Control Memo, the responsibility lay with Shkreli and the MSMB entities.  As Ms. Klein conceded, whatever value the defendant asserts the agreements have, Retrophin would have received the same benefits had the defendant arranged for Mr. Shkreli, rather than Retrophin, to pay for the settlements.  (See June 1, 2018 Hearing Tr. at 113).  In response, the defendant asserts that "had Mr. Shkreli and only Mr. Shkreli entered into the settlement agreements, it is not necessarily the case that Mr. Shkreli would have included Retrophin within the releases."[5]

---

[5] The defense also states that, had Shkreli included Retrophin in some sort of release, "it would not necessarily have prevented the investors from suing Retrophin on a breach of duty theory." (Def. Ltr. at 12).  That makes no sense.  As reflected in the releases prepared <u>by the defendant</u>, the party that receives payment in a settlement agreement can agree to release whatever claims and/or parties he or she wants.

(Def. Ltr. at 12).  This is surprising.  Of course the defendant never thought or asked to structure an agreement with Shkreli paying, as the whole point of the conspiracy was to take Retrophin's assets, and not Shkreli's, to pay off defrauded investors and to hide those payments from the company.  Moreover, had Shkreli refused to pay, the next honest step would have been to confer with Retrophin.  The defendant cites no legal authority for the proposition that a victim does not "lose" money if a defendant steals it and then uses some of it purportedly for the victim's benefit.

Second, even assuming the agreements had some value to Retrophin and that the defendant might be entitled to a credit-against-loss, the defendant has utterly failed to quantify the "value" of any of the agreements.  See U.S.S.G. § 2B1.1(b)(1), comment. (n.3(E)).  The defendant does not deny it is his burden to calculate such a credit.  He just does not do it.  Instead, the defendant uses the $1.1 million per-case estimate that Gayle Klein developed the day before her testimony at the Fatico hearing.  That estimate is plainly inapplicable.  Although Klein provided an estimate of litigation costs at various stages of litigation, she made it clear that she was not offering a specific estimate of costs saved.  Nor is her estimate of the costs of litigation a useful proxy for costs saved, because it does not: (1) identify at what stage of each litigation Retrophin would choose to settle some or all of the claims; (2) account for "economies of scale" for litigating multiple cases; (3) account for any insurance Retrophin could have used; and (4) account for any recovery, including legal costs, Retrophin could have made against Shkreli.[6]  (See Fatico Tr. 115-119).  Even if Klein's estimates could be applied in some principled way, and the defendant had done so, the offset would be far smaller than the nearly $9.9 million the defendant proposes.  That amount represents the cost (according to Klein) in an alternate universe in which Retrophin blindly chose to fight every single investor lawsuit—including ones that were not even threatened—through trial.  (Def. Ltr. at 19).

The defendant's reliance on Ferruolo's testimony fares no better.  (Def. Ltr. at 13-14).  Ferruolo did not even attempt to quantify any "benefit" to Retrophin and appears to have reviewed virtually no documents related to the cost analysis in this case.

Third, Retrophin itself has determined that the agreements did not provide material value to Retrophin.  (See June 1, 2018 Hearing Tr. at 113 ("Q: You would agree that Retrophin is better suited than you to determine the value of settlement and consulting agreements to Retrophin, right?  A: Yes, I would.") (Klein)).  The defendant is correct that, in response to the defendant's efforts to argue at trial that Retrophin had received the "benefit of the bargain" for these agreements, Aselage testified that Retrophin believed the agreements were not "fair and reasonable."  His testimony on that front was limited as a result of extensive argument by the parties.  Furthermore, Retrophin's civil suit against Shkreli sought to recover the full cost

---

[6] To the extent Klein suggested that some lawsuits likely would survive a motion to dismiss or a motion for summary judgment, that analysis is based on the facts Klein was given— a cherry-picked subset of the trial and record evidence provided by defense counsel.  See Gov't 6/14/18 Ltr., Dkt. No. 625 (reviewing the limited record defense counsel provided to Klein).  In fact, Klein was given little information about most of the investors—in several cases a single document—and so does not even offer the opinion that each investor would have sued Retrophin, a necessary assumption for the defendant's alternative loss calculation, which includes the cost of defending lawsuits against every investor.

of the settlement and consulting agreements on the grounds that, among other things, those agreements "provided no benefit to Retrophin other than a release of claims relating to actions that Shkreli undertook in his capacity as the manager of the MSMB Funds." In other words, Retrophin valued that "benefit" as zero.

    C.    <u>The Fearnow Shares Used to Repay Defrauded Investors Should Be Included in the Loss Calculation.</u>

The defendant next suggests that the Fearnow shares used to pay Rosenwald and Kocher should not be included in the loss calculation because those shares were not owned or controlled by Retrophin. (Def. Ltr. at 15-16). The argument bears no connection to the record.

The defendant's argument about who "owned" the Fearnow Shares on paper at various points ignores the more fundamental issue that Retrophin should have had the opportunity to allocate those shares. The <u>only</u> reason the Fearnow Shares were made available to members of the Count Eight conspiracy and to Pierotti was that Retrophin made payments for the Desert Gateway shell. The evidence supports no other conclusion. The conspirators were able to allocate the Fearnow Shares only because, and only after, Retrophin had made the payments. And Shkreli himself acknowledged to the defendant that the value of the Desert Gateway shell was, in large part, because it came with free trading shares (or the ability to direct their allocation). (<u>See</u> GX 458 ("The 2.5m help a lot")). Retrophin's payments unlocked those free trading shares and gave Shkreli the (stolen) ability to deploy them.

The defendant also claims that Retrophin never suffered a loss from the transfer of Fearnow Shares to defrauded MSMB investors because it never actually owned those shares. That argument actually proves far too much. Retrophin never "owned" the shares only because they were stolen by the conspiracy. In other words, Retrophin actually suffered a loss as soon as Shkreli and the co-conspirators took assets for which Retrophin had, as a practical matter, purchased—the Fearnow Shares—and allocated them for purposes of the Count Eight conspiracy, as opposed to for Retrophin's benefit. The PSR's inclusion of the Fearnow Shares used to pay Rosenwald and Kocher is not just sensible, it is also a conservative reflection of the loss caused by the misappropriation of <u>all</u> the Fearnow Shares. But regardless of the rest of the Fearnow Shares, Retrophin certainly suffered an actual loss when those shares were transferred to Rosenwald and Kocher pursuant to the settlement agreements.

The defendant also argues, without citation, that Aselage did not object when he learned that the freely trading shares were going to the co-conspirators and not to Retrophin. There is no evidence, however, that Aselage or the other board members were presented with full information about the source and allocation of the free-trading shares. Nor is there any evidence that the defendant disclosed he was helping to arrange for freely trading shares to be allocated to Shkreli's friends and then used to repay defrauded investors. The defendant also contends that his theory of the Pierotti litigation—that Pierotti failed to follow-through on an undocumented promise to help Retrophin—does not contradict his supposed "understanding" that "all holders of free-trading shares had the lawful ability to hold them, to sell them, and <u>do whatever they wanted with them</u>." (Def. Ltr. at 16). It is not clear how the defendant apparently believed both that Pierotti could do "whatever he wanted" with the shares but also that Pierotti could rightfully be sued when he sold them.

The point here is simple:  Shkreli and the Count Eight conspirators could allocate free trading shares only as a result of Retrophin paying for the shell.  They made Retrophin pay, and then took the benefits for themselves.

### D.    The Defendant's Other Arguments Are Meritless

The defendant offers a grab-bag of other attacks on the PSR's reasonable estimate of the loss amount for Count Seven.  These should be rejected.

First, the defendant argues that the restricted stock received by certain defrauded investors through the settlement and consulting agreements is "incorrectly value[d]" in the PSR and that those shares were worth less than the market price because they were not freely trading. The defendant also blames the government for failing to offer "any proof" of the value of the restricted shares.  (Def. Ltr. at 17).  That assertion is curious, given that the government has explained why the market price is a good proxy for the value of the restricted shares, and has also shown that Retrophin's auditors actually valued those shares even more highly than does the PSR.[7]  Moreover, the alternative to the PSR's approach would be to use the market price of the restricted shares on the day they became freely trading, a price that would be higher than the price used in the PSR.

Second, the defendant asserts that any loss from the settlement and consulting agreements could have been used to offset Retrophin's future income tax liability, thereby creating a benefit to Retrophin that would offset the loss from the agreements.  (Def. Ltr. at 18). The Court should reject out of hand this hypothetical credit-against-loss, which the defendant fails to quantify in any way.  Moreover, having helped steal from Retrophin, the defendant should not now be heard to escape responsibility for the loss he caused because that loss might someday create value for Retrophin depending on its income tax analysis in the future.

Third, the defendant reiterates his objection to the PSR that the loss amount for the Alan Geller consulting agreement "appear[s] to be inconsistent" with the "charge[s] to its operation" Retrophin took as a result of that agreement.  (Def. Ltr. at 18).  The defendant provides no basis to discount the actual loss suffered by Retrophin because the company previously recorded a charge for the agreement in a particular manner for accounting purposes, and the defendant failed to offer any testimony at the Fatico hearing to support this argument.

---

[7] Retrophin's auditors used "fair market value" to value the shares in the Spielberg and Lavelle settlements, calculating their value as slightly more than did the Probation Department. Compare GX 114-25 (Spielberg – $44,400; Lavelle – $36,400) with PSR ¶ 39 at p. 14 (Spielberg – $43,500; Lavelle – $33,750).  In response to this, the defendant asserts that the auditors—on whose skill and judgment the defendant tried to rely extensively—must not have realized the shares were restricted.  (Def. Ltr. at 17-18).  That argument is pure speculation, motivated simply by the defendant's apparent disagreement with the auditor's analysis.

IV.     **The Court Should Adopt the PSR's Loss Calculation for Count Eight**

      A.     <u>The Evidence at Trial Demonstrated that the Defendant Intended to Cause Losses
By His Participation in the Criminal Conspiracy in Count Eight</u>

         The defendant contends that he did not have a "purposeful, subjective intent to
inflict loss related to Count Eight."  (Def. Let. at 21-24).  This argument is substantially similar
to the defendant's argument in his initial filing on loss (<u>see</u> Dkt No. 602), rehashes many of the
same points made in connection with his Rule 29 motion, and is not supported by any new
evidence from the <u>Fatico</u> hearing.  (Def. Let. at 21-24).  The government therefore refers the
Court to its initial filing and its response to the defendant's initial filing and incorporates all of
the arguments made therein (<u>see</u> Dkt No. 601 at 5; Dkt No. 606 at 6-7), as well as the
government's extensive response to the defendant's Rule 29 motion on Count Eight (<u>see</u> Dkt No.
563 at 40-52), and addresses only new arguments in the defendant's filing herein.

         The defendant argues that the law requires that the Court consider his "subjective
intent" in determining the loss amount for Count Eight, and argues that the evidence fails to
show he "purposefully" intended to cause a loss as a result of the securities fraud
conspiracy.  This argument over-reads the law.  In the Second Circuit, a Court may presume that
the defendant intended the full loss associated with his conduct, and a defendant is, in response,
entitled to offer evidence that he intended some lesser amount of loss.  <u>See, e.g.</u>, United States v.
Lacey, 699 F.3d 710, 719 (2d Cir. 2012); <u>United States v. Confredo</u>, 528 F.3d 143, 152 (2d Cir.
2008) ("We conclude that . . . the defendant should have an opportunity to persuade the
sentencing judge that the loss he intended was less than the face amount of the loans.").  But
although a defendant may present evidence of his subjective intent, the law "in no way limits the
role of *objective* evidence of intended loss."  <u>Lacey</u>, 699 F.3d at 719 (emphasis in
original).  Moreover, "the term 'intended loss' may be fairly read to encompass a defendant's
reasonable expectation of loss."  <u>Id.</u>

         Indeed, courts in the Second Circuit have made it clear that a defendant's
subjective intent can be demonstrated by objective evidence of his knowing participation in a
crime for which a defendant would have a reasonable expectation will result in loss.  For
example, in <u>Fofanah v. United States</u>, No. 11 CR. 721(JFK), 2017 WL 4564922, at *9 (S.D.N.Y.
Oct. 11, 2017), the district court observed that "the evidence at trial showed that [the defendant]
attempted to export various stolen high-priced cars that were going to be resold in Africa" and
that the defendant was in fact "convicted by a jury of conspiracy to transport stolen vehicles,
transportation of stolen vehicles, and possession of stolen vehicles."  <u>Id.</u>  Based on this evidence,
the court concluded that "[s]uch an endeavor is simply incompatible with the notion that [the
defendant] did not at the same time intend to deprive the true owners of the value of their
vehicles."  Similarly, in <u>Lacey</u>, the defendants participated in a mortgage fraud scheme wherein
the co-conspirators purchased properties at low prices in "short sale" transactions and then
flipped them to straw buyers who had no intention of living at the property or making loan
payments.  699 F.3d at 712.  The Second Circuit found that evidence of the "difference between
the short-sale price and the mortgage amount constitutes objective evidence of the amount that a
reasonable defendant might expect a bank would lose in the transaction."  <u>Id.</u> at 719.

Here, the defendant offers no new evidence of his alleged "subjective intent" to cause less (or no) loss. Instead, he asks the Court to divine such intent from the existing trial record. (Def. Let. at 21-24). This effort should be rejected out of hand. To the contrary, the trial record reflects—and the jury concluded—that the defendant was a knowing participant in the conspiracy to control the price and trading volume of Retrophin stock. That knowing participation included the defendant's use of his legal skills to draft the documents that apportioned the Fearnow shares among Shkreli's chosen associates, and then reassigned them to Shkreli's benefit; to conceal from the investing public Shkreli's beneficial ownership of the Fearnow shares by filing a false Form 13-D; and to help Shkreli exercise control over the Fearnow shares, including by going to great lengths to prevent Pierotti from selling his shares—specifically because he was acting contrary to the goals of the conspiracy and jeopardizing Retrophin's share price by dumping too many shares at once—to control the price and trading volume of Retrophin stock. (See Dkt No. 563 at 40-52). The reason that conspiracy to control the price and trading volume of Retrophin stock constitutes securities fraud is that it deceives investors into believing that the prices at which they purchase and sell securities are determined by the natural interplay of supply and demand; a defendant who participates in such a conspiracy therefore intends for investors to in fact be deceived, to buy or sell stock at prices other than what the stock in question is worth. As with the defendants in Fofaneh and Lacey, the evidence of the defendant's knowing participation in the conspiracy is also evidence of his subjective intent to cause harm to investors.

B.     The Calculation in the PSR is Accurate and Supported by Testimony from the Fatico Hearing

The loss calculation in the PSR for Count Eight is simple and reasonable. The conspiracy had the effect of propping up the market price of Retrophin shares to an average of $5 per share during the conspiracy. The calculation of intended loss is the difference between the market price caused by the conspiracy and the actual market price that would have existed without the conspiracy. The PSR reasonably uses the per-share price of the February PIPE offering, $3 per share, as a proxy for what the market price would have been absent the conspiracy. This is the same reasonable approach the Court used in connection with the Shkreli sentencing. Notably, nothing in this calculation assumes the PIPE investors were specifically the targets of the Count Eight conspiracy or its only victims, and the government does not understand the Court's calculation in the Shkreli sentencing to have made such an assumption either.

In this context, it is clear that the defendant's arguments about Count Eight are focused at the wrong target and rely on an expert who, even if he were qualified to opine on the issue, gave testimony that supports the PSR's loss calculation.

The defendant asserts that Ferruolo's testimony during the Fatico hearing "highlighted a basic flaw" in the loss calculation for Count Eight. To the contrary, as discussed below, Ferruolo's limited testimony on PIPE investors was largely irrelevant and actually supported the validity of the loss calculation for Count Eight, which has already been applied by the Court to the defendant's co-conspirator.

With regard to Ferruolo's qualifications, the defendant persists in trying to fit a square peg in a round hole. Ferruolo's past experience, ending in 2011, representing issuing companies in the life sciences area is largely inapplicable to the key issue here. While Ferruolo has represented a number of public companies when they issued PIPEs, he has only represented "a very limited number" of potential investors in PIPEs and some "piggyback" investors in PIPEs. (June 1, 2018 Tr. at 154-55). Consequently, Ferruolo has little experience with the key issue here: what PIPE investors will or will not do with respect to purchasing shares on the open market of a company in which they also are considering making a PIPE investment.

Given this limited relevant experience, and as the government pointed out in its responses to the defendant's objections to the PSR, Ferruolo was wrong about what typical investors will do when investing in a PIPE transaction. Ferruolo's testified that "in most instances" PIPE investors do not buy shares in the public market because it would drive the price of the stock up. (June 1, 2018 Tr. at 204). But, apparently unknown to Ferruolo, Zachary Prensky—the defendant's own proffered expert and the "single largest non-institutional investor" in the August 2013 Retrophin PIPE (see Dkt. No. 620, Def. Expert notice dated June 5, 2018) purchased thousands of shares in the open market, both before and after the August 2013 PIPE. (See, e.g., GX 951 (Blue Sheet data showing multiple purchases in April, May and August 2013); GX 954 (multiple purchases in May 2014)).[8]

But even assuming Ferruolo was qualified for purposes of this case, his common-sense testimony about PIPEs not only undercuts the defendant's criticism of the PSR's loss calculation (and his criticism of the Court's previous analysis), it also supports that calculation. Specifically, Ferruolo's testimony shows that fraud related to the price and volume of Retrophin stock has a critical impact on potential Retrophin investors, even the PIPE investors. On cross-examination, Ferruolo repeatedly highlighted the importance of a company's market price to PIPE investors who are considering an investment. When asked what benefits investors in Retrophin's February 2013 PIPE received, Ferruolo's first answer was the "discount to the market price." (See June 18, 2018 Tr. at 274 ("Q: For the February 2013 PIPE, what was the package of benefits? A" First of all, there was a discount to the market price, I think that discount was fifteen percent.")). Moreover, Ferruolo testified that market price is relevant to determine whether the PIPE price itself is reasonable, and to determine the appropriate pricing of warrants, discounts and other benefits received by the PIPE investors. (See, e.g., June 18, 2018 Tr. at 275 ("Q. So, a discount, the warrants, the ratchet protection, all of those, the value of those additional benefits would vary depending on the market price for the company's stock, correct? A. That is correct.")). Finally, as the defendant conceded after Ferruolo's testimony, if a company's stock price dropped below the PIPE price, then the price drop would impact an investor's decision to invest and would have led to a renegotiation of the investment price. (Id. at 275-76 ("Q And you said if the price did drop, they would be likely to renegotiate the terms of

---

[8] The defendant complains that the government elicited testimony about Ferruolo's business class travel at the Fatico hearing. What the government was eliciting, as parties routinely do, was that the defendant had paid tens of thousands of dollars in fees and business class travel to be an expert witness, which is both relevant to his credibility and his willingness to offer opinion testimony in areas where he lacks expertise.

the PIPE; is that correct?  A: Yes); <u>see also</u> <u>id.</u> at 276 ("Q And you said if the price did drop, they would be likely to renegotiate the terms of the PIPE; is that correct?  A: Yes.")).

Accordingly, Ferruolo's testimony highlights one effect of the defendant's conspiracy to manipulate the price and volume of Retrophin stock.  If the defendant and Shkreli had not been able to prop up the price of Retrophin stock, then the price of the February 2013 PIPE would have fallen, and the transaction might have collapsed or been renegotiated at terms that could have cost Retrophin millions of dollars of capital.  As a result, Ferruolo's testimony highlights the importance of the market price to all investors, including PIPE investors, and supports using the PIPE investment price as a reasonable proxy by which to calculate loss.

Nothing else in the defendant's loss submission provides a substantive response to the simple point that the PSR's loss estimate is both conservative and reasonable.  The Court should not be distracted from the defendant's efforts to call into question one piece of the loss calculation.

C.      <u>The Defendant's "Alternate" Calculation Is Legally and Factually Flawed</u>

The defendant also proposes an "appropriate" alternate calculation of loss for Count Eight.  For the reasons set forth below, the defendant's alternate loss calculation is legally and factually flawed and should be rejected.

First and foremost, the defendant's alternate loss calculations attempts to limit the loss amount to his view of Retrophin investors' <u>actual</u> loss.  That approach ignores the <u>intended</u> loss of the defendant's conspiracy: the difference between the actual valuation of the Retrophin shares and the price that Shkreli and his co-conspirators attempted to set in the market for those shares through their control of the price and trading volume of the free-trading shares during the critical time period for Retrophin's survival between December 2012 and February 2013.  (PSR ¶ 51).  This differential represents the loss the defendant and his co-conspirators intended to cause the market by artificially propping up the price of Retrophin shares.  (<u>Id.</u>).  Limiting the loss to the defendant's perceived assessment on actual harm that resulted from trading is legally inappropriate and fails to account for the full scope of the criminal scheme.

Second, even assuming that his proposed loss calculation was legally appropriate, the defendant makes absolutely no attempt to calculate that loss.  While the defendant is under no obligation to advance a theory of loss, he has advanced one, and his failure to explain it or to ascribe a value to that calculation is telling.  The defendant posits, very generally, that the Court should scour the blue sheet data to obtain the number of shares purchased in the open market between December 17, 2012 and February 12, 2013 and multiply it by "an allegedly subjectively intended dollar per share value of inflation."  (Def. Ltr. at 26).  Determining what the defendant's proclamation actually means in practice is another matter.  Is the Court supposed to take the shares purchased in each trade and determine the inflated value of that trade?  If so, how?  Is the Court supposed to multiply each purchase by some inflated price that the defendant believes is

accurate?  Whatever this approach is, it is far more convoluted and uncertain, and less accurate, than is the loss calculation used in the PSR. [9]

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    /s/_____
Alixandra E. Smith
David C. Pitluck
David K. Kessler
Assistant U.S. Attorneys
(718) 254-7000

cc:      All counsel (via ECF)

---

[9] The defendant's attempt to exclude from the loss calculation any shares purchased by his "alleged co-conspirators" demonstrates that his approach is both impractical and unreasonable.  The defendant does not explain why such shares should be excluded—other than to assert it should be done for the "sake of accuracy" (see Def. Br. at 26)—and he does not determine which specific shares should be excluded, instead leaving that to the government or the Court should determine which shares should be excluded.  And, in any event, excluding shares purchased by the "alleged co-conspirators" is inappropriate.  Shares traded by co-conspirators had an effect on the market, and that affect should be captured in the loss calculation.