# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

July 11, 2018

VIA ECF

The Honorable Kiyo Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Greebel*, S1 15 Cr. 637 (E.D.N.Y.) (KAM)

Dear Judge Matsumoto:

We respectfully submit this letter to briefly respond to a few points in the government's post-*Fatico* submission.  *See* Dkt. 634.

***First***, the government's repeated suggestion that Mr. Greebel should not be allowed to raise arguments that he did not present in his initial filings on loss, *see, e.g.*, Dkt. 634 at 2–3, 7, 9, is unavailing.  The purpose of a *Fatico* hearing is straightforward: it is to "develop evidence relevant to sentencing." *Bedoya-Cano v. United States*, 2008 WL 4200167, at *3 n.3 (S.D.N.Y. May 29, 2008), *report and recommendation adopted*, No. 07 CIV. 9276 (JSR), 2008 WL 4298498 (S.D.N.Y. Sept. 11, 2008).  Because the *Fatico* is a fact-finding hearing, the parties did not present oral argument; instead, the Court ordered briefing to be completed in the following weeks.  Were Mr. Greebel not allowed to make points in that submission that arose during the course of or as a result of evidence presented at the *Fatico* hearing—even if he did not make those points in the pre-*Fatico* submissions—this would be a futile exercise.  Moreover, the government's argument puts form ahead of substance.  The government should want this Court to determine the serious issues relating to loss based on the law and the facts, not based on procedural grounds.  We respectfully request that this Court consider all arguments presented in the parties' post-*Fatico* submissions.

***Second***, the government mischaracterizes certain facts concerning evidence introduced at trial.  The government asserts that Mr. Greebel suggested using a consulting agreement for Darren Blanton as a way to avoid problems with the auditor.  Dkt. 634 at 8.  But Retrophin began using consulting agreements, some of which were with former investors in MSMB, including Stephen Rosenfeld, as early as spring 2013, long before Marcum objected to settlement agreements or these perceived "issues" arose in the context of Mr. Blanton.  *See, e.g.*, DX 6745 (April 18, 2013 email exchange between Mr. Greebel, Ron Tilles, and Steven

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
July 11, 2018
Page 2

Rosenfeld regarding "preparing a Consulting Agreement and Release to resolve any open issues"); DX 6782A (April 19, 2013 email exchange between Mr. Greebel and Al Geller regarding a draft consulting agreement). And, while the government attempts to characterize the Control Memo as legal analysis conducted by Mr. Greebel, that document appears on Retrophin letterhead, not that of Katten Muchin Rosenman LLP; does not bear a "Privileged & Confidential" legend; was prepared with Marc Panoff, Retrophin's Chief Financial Officer and reflects Mr. Panoff's opinion; and was provided to Mr. Panoff for his review. Instead of legal analysis, it reflects the opinions of Mr. Panoff and possibly Retrophin, Mr. Greebel's client, and not Mr. Greebel's personal or professional judgment.

**_Third_**, the government drops a footnote asserting that Mr. Greebel does not contest the abuse of trust enhancement for sentencing purposes. Dkt. 634 at 8 n.3. The parties have not yet made their sentencing submissions, which are due to the Court in the coming weeks. To the extent the government is basing this conclusion on Mr. Greebel's objections to the Presentence Investigation Report ("PSR"), in his objection to the relevant paragraph Mr. Greebel argued for a two-level reduction for minor role, which should not be construed as conceding any other enhancement. *See* June 8 PSR Objections at 20.[1]

**_Fourth_**, the government's contention that Mr. Greebel was aware that "Shkreli's promises to repay Retrophin [via the promissory notes] were lies," Dkt. 634 at 10, is simply not true. The email cited by the government to support that proposition concerns the possibility that MSMB would not be able to pay; it does not discuss Mr. Shkreli's repayment promises. GX 618. The government's own witness testified that Mr. Shkreli jumped into a call with a "forceful intervention" to state that he was "standing by the promissory note." Trial Tr. 1916:11–13 (S. Richardson testimony). And when Retrophin ultimately obtained default judgment related to the notes, it was against the MSMB entities and Mr. Shkreli personally.

**_Fifth_**, the government's contentions surrounding the value of the settlement and consulting agreement releases fall flat. It is simply not the case that Mr. Greebel "put Retrophin on the hook in the first place to pay the settlement and consulting agreements." Dkt. 634 at 11. As detailed extensively throughout Mr. Greebel's prior filings, Retrophin's exposure to investor lawsuits—necessitating its participation in their resolution—came about because of the rampant commingling between MSMB and Retrophin including, but not limited to, office space, debts, accounts payable and employees.

---

[1] Mr. Greebel's PSR Objections were submitted concurrently to Probation and the government, and courtesy copies were delivered by courier to the Court.

The Honorable Kiyo Matsumoto
July 11, 2018
Page 3

The government also suggests that Mr. Greebel provided no "quantification" of the value of the releases, while at the same time acknowledging Ms. Klein's calculations of the expected costs to Retrophin to defend against investor lawsuits. Dkt. 634 at 12. Presenting a value that the government dislikes is not the same thing as "utterly fail[ing]" to do so. *Id.* The government's argument that Retrophin itself valued the releases at zero is similarly inapposite. The government does not point to any filing by Retrophin with the Securities and Exchange Commission under either the Securities Act of 1933 or the Securities Exchange Act of 1934, or under any other rule or regulation of the Securities and Exchange Commission, where Retrophin makes a claim that the releases had zero value, because none exists. And in the very language the government quotes, Retrophin clearly states that the releases had value by asserting that the agreements "provided no benefit to Retrophin *other than a release of claims . . . .*" *Id.* (emphasis added).

**Sixth**, the government argues for inclusion of the Fearnow shares used to pay Rosenwald and Kocher on the basis that the "only reason that the Fearnow shares were made available . . . was that Retrophin made payments." Dkt. 634 at 13 (emphasis in original). This makes no sense, and plainly overlooks the payments made to Troy Fearnow by the purchasers of those shares. Any expenditure by Retrophin to "unlock" the shares, as the government contends, does not somehow change the ownership of shares that were acquired in a standard transaction in which the purchasers paid monetary consideration and received shares.

**Seventh**, the government again highlights that its Count Eight loss calculation is the "same reasonable approach" used for Mr. Shkreli's sentencing. Dkt. 634 at 16. That may be so, but Mr. Greebel and Mr. Shkreli are not the same defendants, and their trials—though similar in many ways—did not involve identical evidence. Mr. Greebel is entitled to a finding of loss based on the evidence adduced at his own trial and, particularly given that Count Eight loss is based on a defendant's own purposeful, subjective intent, findings as to Mr. Shkreli cannot simply be duplicated wholesale and applied to Mr. Greebel.

**Finally**, the government takes aim at Mr. Zachary Prensky, a witness Mr. Greebel noticed for the *Fatico* hearing but ultimately did not call. See Dkt. 634 at 17. As an initial matter, the post-*Fatico* submission is an inappropriate vehicle for the government to attempt to cross-examine a witness who did not actually appear. And the government's contention that Mr. Prensky's behavior in the August 2013 PIPE contradicts the validity of Dean Stephen Ferruolo's testimony goes much too far and contradicts how Mr. Prensky intended to testify. The fact that one PIPE investor bought Retrophin stock on the open market before and after a PIPE transaction does not prove that all PIPE investors could simply move their purchases to the open market without consequence. Indeed, Mr. Prensky *himself* did not do that—he did not turn to the open market in August 2013 and purchase the quantity of shares that he bought during the PIPE transaction, but instead purchased shares *in addition* prior to and

GIBSON DUNN

The Honorable Kiyo Matsumoto
July 11, 2018
Page 4


following the transaction.  There is no contradiction between Mr. Prensky's open-market purchases in an amount far smaller than his PIPE investment and Dean Ferruolo's testimony about the market effect of a PIPE investor buying in their typical quantities.  Nor would Mr. Prensky's testimony have contradicted Dean Ferruolo:  in fact, as Mr. Prensky would testify, his open-market purchases did indeed drive up the Retrophin stock price such that he was unable to buy at the quantities he sought and needed to invest through the PIPE.  This attempted apples-to-oranges comparison should not be allowed to distract from Dean Ferruolo's expert testimony on the behavior and resultant market consequences of typical PIPE investors.


Respectfully submitted,

*/s/ Reed Brodsky*

Reed Brodsky