UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

EVAN GREEBEL,

Defendant.

S1 15 Cr. 637 (KAM)

**SENTENCING MEMORANDUM ON BEHALF OF
EVAN GREEBEL**

July 16, 2018

GIBSON, DUNN & CRUTCHER LLP

Reed Brodsky
Winston Chan
Mylan Denerstein
Randy M. Mastro
200 Park Avenue
New York, N.Y.  10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

*Attorneys for Evan Greebel*

# TABLE OF CONTENTS

Page

I.      Introduction ................................................................................................ 1

II.     Personal History and Character ................................................................ 4

        A.    Early Life and Education ................................................................ 4

        B.    Career ............................................................................................ 6

        C.    Family Life ..................................................................................... 9

        D.    Religious Life ............................................................................... 12

        E.    Charitable Work and Community Reputation ............................... 13

III.    Offense Level Computation ..................................................................... 18

        A.    Evan's Base Offense Level Is 7 ................................................... 18

        B.    The Offense Level Should Be Increased by at Most Twelve Points Based on an Accurate Loss Calculation ............................. 18

              1.    Count Seven Loss .............................................................. 19

              2.    Count Eight Loss ............................................................... 21

        C.    The Offense Level Should Not Be Enhanced for Use of a Sophisticated Means Under  § 2B1.1(b)(10)(C) ........................... 23

        D.    A 2-Level Downward Adjustment for Minor Role Is Appropriate ............................. 24

        E.    The Offense Level Should Not be Enhanced for Abuse of a Position of Trust ........... 32

        F.    The Appropriate Advisory Guidelines Range Is Thus 24–30 Months ......................... 33

IV.     Application of the Section 3553(a) Factors Counsels Strongly in Favor of a Probationary Sentence ............................................................................. 33

        A.    The Nature and Circumstances of the Offense ............................. 34

        B.    The History and Characteristics of the Defendant ....................... 34

        C.    The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant and to Provide the Defendant with Training and Correctional Treatment ............................................ 37

        D.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law and Adequate Deterrence, and to Provide Just Punishment ................................ 39

V.      The Love and Support of Evan's Family and Friends ............................... 43

        A.    Family ........................................................................................... 44

              1.    Evan's Support for Jodi After Her Brother's Death ........... 50

        B.    Relationship with Friends and Strength of Character ................... 52

              1.    Evan's Interest in Protecting the Bullied .......................... 56

        C.    Professional Life ........................................................................... 57

## TABLE OF CONTENTS
(continued)

Page

D.   Community Service .................................................................................. 62

E.   Effect of Conviction ................................................................................. 65

VI.   Conclusion ................................................................................................. 67

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Kimbrough v. United States*,
  552 U.S. 85 (2007)..................................................................................................39

*Pepper v. United States*,
  562 U.S. 476 (2011) ...........................................................................................2, 34

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006), *affirmed by United States v. Adelson*,
  301 F. App'x 93 (2d Cir. 2008) ...........................................................26, 28, 35, 37

*United States v. Adepoju*,
  756 F.3d 250 (4th Cir. 2014) ...............................................................................24

*United States v. Atilla*,
  15-cr-867 RMB, 2018 WL 791348 (S.D.N.Y. Feb. 7, 2018) ................................25

*United States v. Broderson*,
  67 F.3d 452 (2d Cir. 1995)....................................................................................32

*United States v. Capoccia*,
  247 F. App'x 311 (2d Cir. 2007) ..........................................................................32

*United States v. Carmona-Rodriguez*,
  No. 04-cr-667 (RWS), 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005)......................37

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008)..................................................................................33

*United States v. Collins*,
  No. 07-cr-01170-LAP, ECF No. 244 (S.D.N.Y. Oct. 17, 2013) ...........................40

*United States v. Confredo*,
  528 F.3d 143 (2d Cir. 2008)............................................................................19, 21

*United States v. Darden et al.*,
  No. 14-cr-00534-JSR, ECF No. 136, (S.D.N.Y. May 18, 2016) ...........................40

*United States v. Harris*,
  821 F.3d 589 (5th Cir. 2016) ...............................................................................19

*United States v. Jones*,
  531 F.3d 163 (2d Cir. 2008)..................................................................................34

*United States v. LaValley*,
  999 F.2d 663 (2d Cir. 1993)..................................................................................24

i

# TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Manatau*,
   647 F.3d 1048 (10th Cir. 2011) .............................................................21

*United States v. Preacely*,
   628 F.3d 72 (2d Cir. 2010).......................................................................33

*United States v. Schulman*,
   No. 16-cr-00442-JMA, ECF No. 155 (E.D.N.Y. Oct. 6 2017)..........................39, 40

**Statutes**

18 U.S.C. § 3553(a) ............................................................2, 3, 4, 5, 33, 34

U.S.S.G. § 2B1.1(a)(1)........................................................................18

U.S.S.G. § 2B1.1(a)(2)........................................................................18

U.S.S.G. § 2B1.1, App. Note 3(A) .........................................................19

U.S.S.G. § 2B1.1, App. Note 3(A)(i), (iv) ................................................19

U.S.S.G. § 2B1.1(b)(1) ........................................................................33

U.S.S.G. § 2B1.1(b)(1)(G)....................................................................23

U.S.S.G. § 2B1.1(b)(10)(C)...................................................................23

U.S.S.G. § 2B1.1, cmt. n.8....................................................................24

U.S.S.G. § 2X1.1(a) ...........................................................................18

U.S.S.G. § 3B1.2.............................................................................24, 25

U.S.S.G. § 3B1.3................................................................................33

U.S.S.G. § 3D1.2(d)............................................................................18

U.S.S.G. § 3D1.3(b)............................................................................18

U.S.S.G. Supp. to App. C, amend. 792 (2015) ...........................................21

## I.      Introduction

Evan Greebel respectfully submits this memorandum of law and the accompanying letters to assist the Court in determining the appropriate sentence to impose at the August 9, 2018 sentencing hearing.

This memorandum begins and ends with providing the Court with a better picture of Evan Greebel as a person.  He is a good man—a loving husband of 11 years to his best friend and partner in life, Jodi; a dedicated father of ████████████████████ ███████; a devoted son; a nurturing brother to younger siblings; and a friend to whom people turn for comfort and advice.  Evan has been fortunate to receive an outpouring of support from his family and people from every corner of his civic, professional, and religious communities, who have sought to explain to the Court exactly how loyal, caring, earnest, honest, hardworking, and charitable he is now and has been all his life.  We have ended this memorandum with some excerpts from those letters, but we urge the Court to consider as many of them as it can, since they speak in ways that we cannot to the person over whom the Court will have to pass judgment.  As those letters show, Evan is devoted to his immediate and extended family.  His friends rely on him not only for advice, but in times of their greatest need; his contributions to his community have truly made a difference.  And most importantly, given the recent tragic events that have impacted the Greebel family, Evan's family—his wife and young children—need him at home.

This memorandum will also address the sentencing guidelines.[1]  For the reasons set forth below, we submit that, based on the most accurate and reasonable estimation of loss in this case

---

[1]   In its addendum to the Presentence Investigation Report ("PSR"), the United States Probation Office states that given the two-day *Fatico* hearing held in this case, "the Probation Department defers to the Court's ruling on this advisory guideline issue [calculation of loss

and the circumstances, the total offense level under the United States Sentencing Guidelines ("U.S.S.G.") should be 17, which would result in an advisory Guidelines range of 24 to 30 months. Our calculation includes a 2-level decrease for minor role under U.S.S.G. Section 3B1.2(b). There is absolutely no question that any role Evan played in the conduct at issue was far less significant and far less involved than Martin Shkreli's, and a minor role reduction for Evan is thus highly warranted.

That being said, a Guidelines-range sentence in this case is far "greater than necessary[] to comply with the purposes" set forth in Section 3553. 18 U.S.C. § 3553(a). A sentence of probation is more than sufficient to comply with the purposes of sentencing, and therefore should be imposed. *Id.* Evan is a rock for his family, kids, friends, and community. And he has remained a rock throughout and even after the verdict in this trial—a verdict that has cost him his reputation and the end of a career in a profession that had always been his dream. Evan will never be able to practice law again. He will not be able to do what he loves to provide for his family. But, we submit, justice demands he be allowed to continue to provide for them emotionally and, however he can, financially. Sentencing him to a period of incarceration would harm his wife and children, to whom he has dedicated his life.

Because "the principle" underlying sentencing is that "'the punishment should fit the offender and not merely the crime,'" *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)), we end this memorandum by excerpting portions of the many letters Evan's family and friends from across his life have provided to the Court. Correspondingly, we will also examine the factors the Court has to

---

and restitution]." July 2, 2018 Addendum to the PSR at 3. Accordingly, by definition, the revised final PSR does not take a position on what the appropriate advisory Guidelines range is in this case.

consider under Title 18, United States Code, Section 3553(a). Evan has been a law-abiding person all his life, who was proud to follow his father and grandfather into the practice of law. His conviction in this case has wiped that away. His reputation is forever changed. And Evan has lost the ability to practice the profession that he loved.

Evan has been totally compliant with the Court throughout this case, showing an impeccable Pre-Trial Services record. His compliance is not surprising, given that Evan's legal life history before this case has been spotless, without even a hint of violence, cruelty, or deceit. The offenses of conviction are utterly inconsistent with his character and personality, as attested to by numerous friends, family, and work colleagues. As many of the letters explain, Evan loves the law and loves thinking about and applying it. He has always been a staunch advocate for proper regulation and compliance with regulation, as demonstrated by his focus on enhancing regulation in virtual currencies. And no matter how this case ultimately turns out, Evan has already suffered a great deal reputationally; he has already lost the ability to do the one thing that he has focused on for the entirety of his educational and professional life.

Finally, while the Court is aware of the challenges of sentencing a defendant with minor children, we further explain in Addendum A the unique circumstances that make this situation even more precarious than that facing most other similarly situated defendants. Due to the nature of that information, we ask the Court's permission to redact such Addendum and certain portions of this sentencing memorandum and the accompanying letters in order to protect the privacy of the people and situations described therein.

For all these reasons and for those stated below, we respectfully submit that a sentence of probation is sufficient but not greater than necessary to satisfy the factors set forth in Section 3553(a) and the interests of justice.

## II.      Personal History and Character

### A.      <u>Early Life and Education</u>

Evan Greebel was born in New York, New York on July 2, 1973.  (PSR ¶ 79.)  He has a younger brother, Robert, and a younger sister, Gennifer, both of whom live in New York.  Evan has a very close relationship with his siblings.  (*Id.* ¶ 80.)  Robert "idolizes his brother" (S. Winter), and spent a number of years "living on the couch in Evan's apartment" (N. Citrin).  His sister Gennifer, meanwhile, describes Evan as her "friend, [] mentor, and [] advisor" whose "warm and reassuring character fostered an unbreakable bond" even though Evan was seven years older. (G. Greebel.)  Robert recalls that Evan "set a great example" for his siblings.  (R. Greebel.)

Evan's father Charles is an attorney, and his mother Barbara is a retired teacher.  (PSR ¶ 79.)  Evan was raised in a middle-income household in the New York suburbs, earned the rank of Eagle Scout while in High School (*id.* ¶ 88), and worked as a lifeguard and swim instructor growing up to help pay for his education.  (*Id.* ¶¶ 81, 107; PSR Addendum ¶ 81.)  Evan's community involvement and sense of giving began even as a young boy, well before college: in grade school he was a cub scout and boy scout, and he raised money for charities ranging from Multiple Sclerosis to his local synagogue.  As a teenager, he "organized Midnight Runs, collecting and delivering food for the poor and homeless, manning stations at food kitchens and food pantries, and volunteering at homeless shelters in southern Westchester."  (L. Sorkin.)  Evan's parents' friend Laurence Sorkin remembers this service as "vintage Evan—the [runs] were meticulously organized; they provided much needed assistance to people in need; and they were acts of beneficent kindness, conducted with minimal publicity and without any expectation of personal gain or self-aggrandizement."  (*Id.*)

Evan attended college at The University of Michigan, where he earned a bachelor's degree in Political Science.  (PSR ¶ 99.)  After graduating, Evan "helped to establish a fund for students who needed to travel home for family emergencies who might otherwise not have been able to do so."  (M. Brooks.)  The Executive Director of the University of Michigan Hillel, Michael Brooks, remembers Evan as "a mensch, and a very solid one,"[2] who was "someone everyone could count on" and gave "much . . . back to our society."  (*Id.*)

Evan's next step was toward a law degree, a career path that Evan's mother recalls beginning as early as seventh grade, when Evan chose to defend Ryan White, who was denied public education on the basis of having AIDS, in a social studies mock trial.  Although Evan lost, she recalls that her son won as well: "Evan saw the injustice and absorbed the workings of our legal system.  His legal path was set." (B. Greebel.)  And indeed, after college, Evan earned a Juris Doctor degree from the Georgetown University Law Center.  (PSR ¶ 98.)  During law school, Evan was aware and concerned about the students around him, as evidenced by volunteering to be an anonymous note taker for a disabled student, which required him to perform at least 400 hours of service per year.  (PSR ¶ 89.)  Evan was a member of the Editorial Board for the Georgetown Journal of Law and Policy in International Business.  In addition to the note taking and being a member of a journal, "[d]uring law school[] Evan established a Jewish Group for Graduate Students and Young Professionals through Hillel of Greater DC."  (J. Blake.)  His classmates from the time remember him as "smart, honest and loyal," a student who "exhibited good judgment and impeccable character" and was "always the one lending a hand or helping others."  (*See*, *e.g.*, L. Gans and M. Sugar.)  One particular incident, as recalled by Lisa Gans, helps illustrate these qualities:

---

[2]  "Mensch" is a Yiddish word that refers to a person of integrity and honor.

[D]uring the first semester of my first year of law school, I was the victim of a crime in my apartment building in Washington, DC.  Not wanting to remain in my apartment after the incident, I tried to find alternative living arrangements as quickly as possible.  I was alone, in a strange city, far away from my family and I suddenly found myself needing a new apartment quickly.  Evan, overhearing my situation from a mutual friend, reached out and notified me that there was an apartment available in his building.  Without really knowing me at all, he helped facilitate the rental, box up my apartment and move my belongings from my old apartment to the new one.  And as if that wasn't enough, Evan also walked me to my car in our parking garage for months so that I did not have to walk there alone.  All of this effort from someone who barely knew me and it was done all out of the goodness of his heart.

(*Id.*)

B.      **Career**

After law school, Evan began his legal career at Fried, Frank, Harris, Shriver and Jacobson LLP, a law firm in New York.  (PSR ¶ 107.)  During this time, "Evan delayed his move into New York City and instead commuted each day from Westchester so he could help support [his] Mom during her period of grief," as his maternal grandmother suffered through a terminal illness.  (R. Greebel.)  Evan thus traveled to and from Westchester each day and "visited [his grandmother] every morning in the hospital before work," notwithstanding the fact that he "was a first year law firm associate working extreme hours."  (*Id.*)  What is more, Evan maintained this commitment to his family in a time of need despite being mocked for living at home by his work colleagues.  (J. Brookman.)

Evan eventually worked his way to becoming a partner, first at Katten Muchin Rosenman LLP and then at Kaye Scholer LLP.  (PSR ¶ 106.)  At both firms, Evan developed a reputation for having "standards [that] were the highest and beyond reproach."  (*See*, *e.g.*, M. Schwartz, D. Hertzog, H. Jacobs, E. Keller.)  His former colleagues stress how Evan "showed professional responsibility and integrity (and a lack of disappointment) even when faced with losing out on getting credit and attribution for substantial fees from a prospective client."  (E. Keller.)  "His

6

work was of the highest caliber . . . [and h]e painstakingly spent hours reviewing the honesty and forthrightness of his work." (D. Hertzog.) As but one example of these standards in action, Evan's former partner at Katten Muchin and a former Justice in the New York State court system, Murray Schwartz, recalls that Evan

> impressed me with his knowledge and skill and even more so with his ethical grounding. When representing a seller the due diligence task is arduous and complex. I have seen lawyers take shortcuts and fail in their ethical requirements to make full and fair disclosure. Some lawyers use a touchy feely test or "smell" test or start making "materiality" judgments to lighten the load. It took more than a year to complete the transaction and in that time Evan never took a shortcut. We could say both to the purchaser and our client that we had truly made full disclosure. The proof as it turned out was that no claims were made against the escrow. Everyone slept better with Evan at the helm.

(M. Schwartz.)

Evan's reputation among his clients was equally exemplary. Jason Auerbach, a residential mortgage banker, recounts how his bank

> once retained Evan and his firm to represent us on a lending transaction. When the borrower messed up the bill and over paid Katten, Evan advised everyone of this mistake and ensured it was corrected. He worked with the borrower to ensure a smooth closing. My bank was especially proud to work with Evan due to his honesty and forthrightness.

(J. Auerbach.) Other past clients describe Evan as "attentive," "thoughtful," and "cautious" (D. Acharya), and as a man with "the highest ethical standards" (B. King). Perhaps most revealingly, one former law partner of Evan's recalls how, before Evan met his wife, one of the partner's "long-time clients felt so strongly about Evan's decency that he set him up on a date with his daughter." (P. Pollock.)

Notable among Evan's professional traits is a focus on prioritizing the wellbeing of his clients over any interest he might have in his own, personal earnings. David Acharya, a former client of Evan's, recalls "a few instances where . . . Evan recommended that I seek the counsel of

other experts as opposed to engaging him." (D. Acharya.)  Mr. Acharya "appreciated that Evan was not trying to maximize his personal revenue despite the fact that he had helped us greatly with respect to the office space, and had made numerous billing concessions already. . . .  Evan was very much interested in our success, and we respected that enthusiasm." (*Id.*)  Chris Jahrmarkt, another former client, affirms that "Evan was always focused on our best interests despite its potential ramifications on his firm revenue." (C. Jahrmarkt.)  What is more, "[n]either Evan nor his law firms ever sought compensation for [] origination activities.  Rather he tried to help grow our business because that is who he is as a person." (*Id.*)

Finally, throughout his legal career, Evan has made time to mentor and assist others in their own careers.  Evan's cousin Rory Greebel underscores how Evan "demonstrate[ed] an overwhelming display of caring for my future" (Rory Greebel), and Rory's wife confirms that Evan "guided Rory through the process of the LSAT[s], Law School, and the job market" (M. Greebel).  Likewise, when Evan's cousin Dana Jacobson turned to Evan for career advice, "[i]nstead of just giving words of wisdom and pointers on how to write a resume, network and interview, Evan . . . reached out to one of his friends, who at the time worked for NBC, and secured [her] a summer internship."  Evan's college friend Jason Jun similarly relied on Evan as someone who could "provide[] the type of information and guidance you don't find in career office pamphlets," (J. Jun), and another college friend, Rob Entin, notes how Evan has provided him with "personal and professional advice" "over the past two decades" (R. Entin).  Ms. Jacobson describes this type of assistance as "emblematic of the person [Evan] is; he is caring, well intentioned and always wants to help others." (*Id.*)

C.   **Family Life**

Despite his busy and successful career, "Evan always made his family a priority."  (K.

Straker.)  Evan has been married to his wife Jodi for 11 years.  (PSR ¶ 83.)  Both Jodi and Evan

describe realizing within hours of meeting each other that they would spend their lives together;

their shared values, priorities, and goals were noticeable immediately.  Evan and Jodi now have

three children: ███████████████████████████████████  (*Id.* ¶ 84.)  As a father

and as a husband, Evan's friends and family describe him as a "role model" (L. Brucker), who is

"loving, devoted, caring, and hands on in every way" (N. Citrin).  Both "before and after his

arrest," Evan's friends have been "struck" by "his devotion as a father and husband."  (J. and L.

Perelman.)

As a father, Evan is "patient, loving and encouraging."  (R. Greebel.)  "Almost any time

Evan has, he is found with [his] children."  (J. Greebel.)  Evan's mother-in-law Nancy Citrin

describes him as "the kind of dad who is always outside playing with the children, running home

on Halloween to go trick or treating with them, or simply sitting with them reading a book.  He is

the dad who can be found taking the boys to buy sporting equipment yet he is also the one to

pitch in with a bath for the kids or a diaper change."  (N. Citrin.)  "He is the dad who made it to

nearly every one of [his] sons' lacrosse practices last spring, supporting not just [his son], but

any boy who made a good play, even on the coldest and rainiest days when [other parents] would

draw straws to be the one who could stay comfortably at home."  (J. and B. Keller.)  He is

"active in [his children's] school community" (S. Hendler), and has instilled in his children his

own philanthropic instincts, most notably by providing them with charity donation boxes each

week, encouraging them to donate birthday presents and Halloween candy to the Ronald

McDonald House, and helping his children collect dog food and other supplies to provide to a

no-kill animal shelter in Westchester (for which his family also raised $15,000) (PSR ¶ 90;

SPCA Letter.).

    Evan also devotes much of his time to coaching his sons' basketball and little league

teams. (*See*, *e.g.*, PSR ¶ 84.) Parents of other children on these teams describe Evan as a

"fantastic coach" and "great role model" (M. Tauber), "always making [the children] laugh and

sharing in their good time" (E. and B. Brucker). Jeff Gorman, the assistant coach of the

basketball team, sums up Evan's commitment to this undertaking in the following way:

> Over this past winter, I had the luxury of coaching little league basketball with
> Evan. Watching Evan in action was a pleasure. While coaching these young
> boys, it was blatantly obvious to see Evan's supreme qualities shine through.
> Evan is a great teacher, father and leader. He is funny and passionate, and through
> the season, whether at games or practices we held, the team had fun. Evan kept
> the environment tailored to third grade boys. There was never a moment in time
> where I felt that the boys were not enjoying themselves. In the end, it was Evan's
> personality that allowed these boys to begin loving the game of basketball. There
> is no doubt in my mind that each player will be returning for fourth grade
> basketball, in large part, thanks to Evan.

(J. Gorman.)

    As a husband, Evan has been "devoted" and "the kind of husband that any parent would

hope for their daughter . . . loving, respectful, conscientious, and very supportive." (N. Citrin.)

These qualities shone through when Evan and Jodi faced the tragic loss of Jodi's brother Mark in

2015. (PSR ¶ 86.) Jodi describes this traumatic period in the following words:

> A few weeks after our daughter was born, my brother passed away unexpectedly
> at the age of 27. I was devastated (and am still trying to cope) and did not know
> how I was going to survive. Getting out of bed to take care of three children, one
> of whom was just a baby, seemed too much to bare. Evan was my lifeline and
> helped me get up and put one foot in front of the other each day. In true Evan
> form, he offered for my parents (and their dog who he is highly allergic to) to
> come live with us as he thought that it would be better for their mental state to be
> around all of us all the time. Not once did he think of himself and the impact this
> would have on him. ████████████████████████████████████
> ████████████████████████████████████████████████████

██████████████████████████████

(J. Greebel.)

Jodi and Evan's friends confirm how devastating an effect this had on Jodi and the rest of

Evan's family, and the pivotal role Evan played in steering his family through this tragedy:

███████████████████████████

We had plans to see the Greebels that morning, but I was having trouble locating Jodi, who typically responds in a most prompt matter, only to start to worry if something was wrong. I have chills as I put this on paper as I remember where I was and how I felt when Evan reached out to Stefan to disclose what had happened earlier that morning. As a stay at home mom, Jodi kept track of the day to day activities of her busy family but during this tragic time Evan stepped in to offload so many of Jodi's responsibilities, so she could be there for her grieving parents and sister as well as tend to their newborn child. I can safely say that while Jodi has an extensive network of family and friends she could not have preserved through this tragedy without Evan at her side. The last three years of this poor woman's life have been decimated by the tragedies that have struck her. Not a day goes by when I [don't] question how she was given this lot in life. She is THE most giving, generous, thoughtful, hardworking, honest person I know. I cannot image the thought of her losing Evan after the calamities she has faced to date nor can I process how she will manage as a single mother to their three beautiful, young children.

(L. Malter.)

Dara Gruenberg, a friend of both Evan and Jodi, offers a similar assessment:

[w]hen Jodi suffered an unspeakable tragedy and lost her brother, Evan was a pillar of strength and comfort for her. Whether it was taking the kids to school or spending as much time with Jodi and the family as possible, he was a loving and supportive husband. When I attended shiva, Jodi was nursing her daughter, a newborn at the time, and coping with the shock of her loss. Evan did not leave her side tending to her every need.

(D. Gruenberg.)  Julie Potack, Jodi's college friend, echoes these sentiments:  she writes

that Evan was Jodi's "'rock[,]' and was there to care for the children while Jodi grieved."  (J.

Potack.) ███████████████████████████████████████████████████

████████████████.” (*Id.*)

This dedication to family has not wavered in the face of Evan's recent challenges.  Lara

Damashek recalls two emblematic evenings at the Greebel home:

> The first evening was the end of [a] long, exhausting week of the trial, this past
> winter, and it was a Friday evening.  I had brought my children over to the
> Greebel's house to celebrate the Jewish traditional Shabbat meal.  Evan walked in
> after a long, draining day in court, and you would never have known it.  He was
> all smiles and immediately refocused all of his energies towards his family.After
> we said the traditional prayers, which Evan led for all of us, he put on music to
> have in the background while we ate.  He chose Disney music from a soundtrack
> he knew his children loved—so much warmth and love filled the air; you never
> would have known the stress that he endured that day, and in the two years prior.
> A couple of weeks later, on the Friday prior to Martin Luther King day (his trial
> had ended by this time), we were all sitting down for Shabbat dinner, again at his
> house, with our children.  He asked the children to share what they were each
> learning in school about Martin Luther King and with each story, he reiterated the
> importance of what this admirable historical figure stood for, in a way that the
> children could understand and appreciate.

(L. Damashek.)

In sum, Evan is ultimately "a devoted, loving, hands on dad who would do anything for

his kids, his family and his friends."  (L. Brucker.)

### D.   <u>Religious Life</u>

Evan has been committed to his Jewish faith and the larger Jewish community since he

was a small child.  As his Rabbi, Jonathan Blake, describes,

> Evan's family has been affiliated with [Westchester Reform Temple] for close to
> forty years.  He was raised in our congregation, celebrating both Bar Mitzvah and
> Confirmation here, and was an officer in our temple Youth Group.  As a teenager,
> he received the *Ner Tamid* award, the highest distinction of merit for Jewish Boy
> Scouts. . .  Dedicated service to the Jewish community has been a theme
> throughout Evan's life.

(J. Blake.)

Since moving back to Scarsdale in 2014, Evan has rejoined the Westchester Reform Temple and has enrolled his children in the Temple's educational programs.  (*See id.*)  He and Jodi are "deeply invested in their family's Jewish heritage and education and are hands-on parents in all manner of temple activities."  (*Id.*)  Evan's friends describe him as an "involved congregant" who values "instill[ing] important Jewish values and traditions" in his children.  (E. and B. Brucker.)  To that end, Evan is a "constant face at . . . religious gatherings."  (M. and J. Anfang.).

Perhaps most notably, Evan has made a tradition of hosting weekly Shabbat dinners for friends and family.  Thus, "[o]n Friday nights [Evan] makes it his business to get home in time to celebrate Shabbat with the children in order to instill in the kids a love and understanding of religion and its importance in family life."  (N. Citrin.)  Nothing deters Evan from imparting the importance of his faith on his children and the children of his friends, as evident from Lara Damashek's story above and many other letters.

### E.    Charitable Work and Community Reputation

Evan devotes a significant amount of his time to charitable endeavors, which has earned him a stellar reputation in his community.  As documented in the PSR and as further described in a list attached hereto as Exhibit A, since a young child Evan "has been involved in extensive volunteer work and community service."  (PSR ¶ 84.)  In addition to the community service described in the previous sections, throughout his whole life Evan has volunteered.  For example, in high school he was a Hebrew tutor for children with special needs, and in college he helped homeless individuals develop job skills through his work with the H.E.R.O. organization and assisted at the Hebrew Union College Soup Kitchen.  (*Id.* ¶ 89.)  Evan is also "active in the New

York City chapter of the UJA-Federation, going through their emerging leaders training and eventually serving as the chair of the Loan Task Force which provided low- or zero-interest loans to underprivileged populations including women in Israel, Arab Israelis, and Ethiopian Israelis." (J. Blake.)  In his immediate community, while in high school Evan "worked tirelessly over many months" to produce a historic trail of Westchester County that was widely circulated; "[h]is enthusiasm was felt over the villages, cities and towns in [Westchester] county."  (E. Carnicelli.)  Additionally, Evan, along with his wife and children, raised nearly $15,000 for the SPCA of Westchester and hundreds of pounds of dog food.  (SPCA Letter.)

Most recently, since the fall of 2015, Evan has worked to help establish a 30-bed in-patient facility in Masonville, New York (PSR ¶ 89), a "rehab facility for people who have opioid and other drug and substance abuse related issues" (J. Paley).  The facility will also include a not-for-profit component to help local residents on an out-patient basis.  Evan, in the words of college friend Jonathan Lasner, "is not an investor, not a member of the board, and seemingly has nothing to gain from this [project] personally[;] . . . [h]e realized that there was an unmet need and he wanted to do something about it . . . out of the concern for others."  (J. Lasner.)  Brian King, a senior officer of one of Evan's former clients, notes that

> Evan has put in many hours on this transaction over several years without receiving any compensation.  He is driven primarily by his desire to make a positive contribution to the growing epidemic of opioid abuse and addiction impacting the country.  Evan experienced this crisis first hand through a family member and is truly motivated and committed to making a difference.

(B. King.)  Evan's childhood friend Jonathan Paley similarly echoes that "this has absolutely nothing to do with money.  This has to do with an issue [Evan] feels he can help with."  (J. Paley.)

In addition to this more formal service, Evan has consistently opened up his home and wallet to friends and family in need.  For instance, when his mother and father "needed financial help, Evan provided assistance for years, even though he went with less." (B. Greebel.)  When his "[g]randfather passed away, he slept at [his g]randmother Lucille's house often to help her cope with her grief and transition from a 50-year marriage to living alone for the first time in her life." (R. Greebel.)  While living in Manhattan, Evan gave a college friend the key to his apartment so that the friend and his "wife [could] stay there when we needed a place" (A. Nisman), and his cousin Dana recalls "countless times when [she] was in college that [she] would come into Manhattan for the evening and [] sleep on Evan's couch" (D. Jacobson).  During Hurricane Sandy, Evan, "without hesitation," welcomed his brother Robert and Robert's then-girlfriend (and now wife) Shelley "into [his] home where [they] stayed for a week." (S. Greebel.) ██████████████████████████

██████████████████████████████████████

███████████████████████████████

███████████████████████████████

██████ They had already put together all the necessities we would need for the baby, brought food to nourish and sustain us and most importantly they put everything else on hold to be with us—lifting us up and providing love and comfort during our most uncertain and stressful time." (*Id.*)

Evan strives equally hard to provide non-family with this same level of warmth and support, motivated by his belief that "life is a team sport" (G. Greebel).  In the words of Jill Later, a very close friend of Evan and Jodi, "To this day, I still seek out [Evan's] advice in matters of importance.  Two years ago, I left my corporate position [to form a new venture].

Evan took the time to talk through scenarios and to offer his thoughts.  He provided me with invaluable guidance to ensure I protected myself in this new endeavor.  His 'door' was always open for which I am grateful." (J. Later.)  Likewise, Jodi's friend Kerry Hsu recounts how "Evan spent time with [my husband] to help him think through" starting his own business "and made introductions . . . to help kickstart [his] new venture.  He had a genuine interest in seeing him succeed.  Evan extended the same always to me as well."  (K. Hsu.)  And Michael Weiskopf, Evan's college friend, was able to treat his lung cancer at an early stage only because Evan sat him down and insisted he seek medical attention for an undiagnosed illness.  Michael stresses that Evan was not only "instrumental in pushing me to seek the medical help I needed, but he constantly called to check on me, see how I was doing, and see what I might need.  He even bought me a year subscription to Netflix so I would have something to do while I recuperated."  (M. Weiskopf.)

Evan's childhood friend Noel Cimmino summarizes Evan's community spirit in the following way:

> Personally I can account for the scores of times that Evan has hopped on a plane or got in the car to rush to the sides of others when a personal tragedy happened. Several years ago when my younger sister was diagnosed with cancer it was Evan and his brother who rallied support for her and my parents as we were all facing down her diagnosis and treatment.  Evan is always the first one to be at major events for our group of friends, even though we're spread out throughout the country.

(N. Cimmino.)  Taryn Brill—who, together with her sister, have been welcomed into the Greebel home each holiday season after the Brills tragically lost both their parents—describes this dedication to others as simply "the Greebel way." (T. Brill.)  In the words of Brenda Stern, who is a social worker at the nursery school that the Greebel children have attended,

16

> [t]his is a wonderful family and I have always been impressed by Mr. and Mrs.
> Greebel's involvement with and devotion to their children.  Their warmth, caring
> and conscientiousness to their three young children is paramount in their lives—
> what fortunate children to have two such wonderful parents.  Not only is their
> caring and warmth evident with their children but it is also very evident in the
> way they relate to everyone in their path.  In a world where so many are uncaring,
> they are a refreshing antidote-always going out of their way to help people in the
> community.

(B. Stern.)

Ari Nisman, Evan's friend and client, agrees, and summarizes Evan in the following

terms:

> [Evan has] been the person that I always turn to for advice. That respect and
> admiration has never stopped, Judge—Evan has literally meant everything to me
> both in business and in life, and I don't know that I've ever told him this until
> now. . . .  He's never missed calling on my birthday in 25 years; not once.  He sat
> for hours by my side when my father died.  He never dismissed any phone call
> I've made to him about a business question.  He's amazing to his friends.  He's
> even better to his wife and family. . . .  His entire family, his beautiful children
> and his wonderful wife Jodi need him.  But many, many others need Evan around
> too.  I need Evan more than I can ever explain to you in this letter, and I ask and
> plead for your consideration to allow him to continue to make a positive effect on
> me, and on everyone around him, and on our society.

(A. Nisman.)

These are just some examples from the many letters that provide a picture of the myriad

of different ways that Evan has had a positive impact on his family and friends.  They show his

kindness, his fundamental decency, and his generosity of heart.

### III.   Offense Level Computation

#### A.   Evan's Base Offense Level Is 7

Evan stands convicted by a jury of two counts in the Superseding Indictment: (1) conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count Seven)[3] and (2) conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 (Count Eight).  These two counts are grouped together for purposes of Guideline calculations.  U.S.S.G. § 3D1.2(d).  Because the base offense level for Count Seven is 7, *see* U.S.S.G. § 2X1.1(a); U.S.S.G. § 2B1.1(a)(1), and the base offense level for Count Eight is 6, *see* U.S.S.G. § 2X1.1(a); U.S.S.G. § 2B1.1(a)(2), the appropriate base offense level applied to Evan is 7.  U.S.S.G. § 3D1.3(b) (courts should "apply the offense guideline that produces the highest offense level").

#### B.   The Offense Level Should Be Increased by at Most Twelve Points Based on an Accurate Loss Calculation

We have made extensive submissions on the appropriate loss amount in connection with the *Fatico* proceedings on loss and our objections to the PSR.[4]  Based on those submissions, we respectfully submit that the loss amount argued for by the government does not take into account a number of facts that serve to reduce—in the case of Count Seven—or wholly eliminate—in the case of Count Eight—any loss attributable to Evan Greebel.

Far from the more than $14 million in loss asserted by the government, which corresponds to a 20-level sentencing enhancement under the Guidelines, no more than $477,329 in combined actual and intended loss on both counts should be attributed to Evan, an amount that

---

[3]  As we have done throughout post-trial briefing, we use Counts Seven and Eight here to maintain consistency with the Superseding Indictment.

[4]  We incorporate those filings, along with the analysis and discussion contained within all other briefs and hearings since the conclusion of trial, by reference herein.

supports a 12-level enhancement.  That amount is equal to the maximum actual loss attributable to Evan on Count Seven—the "reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1, App. Note 3(A), which in this case is the money and shares paid out by Retrophin in conjunction with the settlement and consulting agreements at issue less the value of the release clauses therein (calculated as the amount Retrophin would have spent defending each threatened lawsuit through trial).  *See, e.g.*, *United States v. Harris*, 821 F.3d 589, 605 (5th Cir. 2016) (discussing the "default practice of crediting against loss the value of services rendered by the defendant").  The $477,329 amount represents the entirety of the loss attributable to Evan, because the government has not shown that Evan purposely intended to inflict loss related to Count Eight as required by the Sentencing Guidelines and Second Circuit precedent.[5] *See, e.g.*, *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) (holding that the district court must determine a defendant's subjective intent to cause loss).

### 1.     Count Seven Loss

Under the Guidelines, actual loss should be calculated based on the "reasonably foreseeable pecuniary harm that resulted from the offense"; to be reasonably foreseeable, the harm must be one that the defendant knew, or reasonably should have known, would result from his conduct.  U.S.S.G. § 2B1.1, App. Note 3(A)(i), (iv).  In other words, to support its theory of loss on Count Seven, the government would have needed to prove that Evan knew or should have known that the settlement and consulting agreements would cause $10,447,979 in loss to Retrophin.  That is simply not the case.  To the extent Evan worked on the settlement and

---

[5]  The government may try to respond that we are attempting to re-litigate the question of guilt or innocence.  We are not doing that here.  Rather, what we are saying is that the jury could have still convicted on the conspiracy count charged in Count Eight without determining that Evan intended to cause the loss described herein.

consulting agreements, he did so in the context of understanding that several MSMB investors had raised threats of litigation against Retrophin. *See, e.g.*, GX 100-16 (email from Dr. Lindsey Rosenwald's attorney about "commencing litigation"); GX 525 (email from Mr. Shkreli noting that "[S]arah [Hassan] = same situation as Lindsay *[sic]*"); DX 112-8 (Schuyler Marshall noting his hope that his dispute could be resolved without "the expense of litigation"); GX 108-13 (Mr. Greebel emailing Mr. Shkreli that he understood Michael Lavelle to be "very serious about pursuing" litigation); *see also* Dkts. 530, 574, 631 (cataloguing evidence of investor threats).

Evan knew these threats were valid, in large part because he was aware of the extensive commingling between Retrophin and the MSMB entities. *See, e.g.*, DX 1902 (Evan's email to Mr. Shkreli's sister addressing the legal implications of conflating Retrophin and MSMB Capital); *see also* Trial Tr. 2077:24–2078:7 (Steven Richardson's testimony that Retrophin and MSMB were sharing resources, office space, and employees); *id.* at 4639:2–10 (Stephen Aselage's testimony that Retrophin and MSMB were sharing rents and employees); *id.* at 4089:18–4099:1 (Corey Massella's testimony that there was "money going both ways" between MSMB and Retrophin).What was reasonably foreseeable to Evan, then, was that Retrophin would pay the amounts necessitated by the settlement and consulting agreements—and due to the releases contained in the agreements, Retrophin would *gain* the assurance that it would not be subject to the significant litigation costs that would accrue from defending against the impending investor suits.

The government entirely excludes the value of those releases from their calculation of loss, resulting in an exorbitantly high sum that misstates what Evan reasonably foresaw. As Gayle Klein testified at the *Fatico* hearing on June 1—and as discussed at length in our post-*Fatico* submission, Dkt. 631—each potential investor suit would have cost Retrophin

approximately $1.1 million to defend through trial.  June 1 Tr. 80:6–12.  Because there were seven settlement agreements and two consulting agreements, at minimum, the exposure to Retrophin from these suits would have equaled $9,970,650—the $1,107,850 in fees Ms. Klein calculated multiplied by the nine potential suits.  As addressed above and in prior submissions, Evan was fully aware of this exposure, and therefore equally aware of the benefit provided by the releases in the agreements.  Any accurate calculation of actual loss—the loss reasonably foreseeable by Evan—on Count Seven thus must credit the value of the releases against the amount paid out under the settlement and consulting agreements.  That differential equals $477,329, and is the maximum amount fairly attributable to Evan.

### 2.    Count Eight Loss

For purposes of Guideline calculations, the actual loss attributed to Evan on Count Seven must be combined with any intended loss for Count Eight.  However, as explained below, the government has failed to prove any intended loss on Count Eight.  Thus, the maximum amount for which Evan should be held accountable is $477,329.  Under the Sentencing Guidelines and Second Circuit precedent, intended loss is the pecuniary loss that "the defendant purposely sought to inflict."  U.S.S.G. Supp. to App. C, amend. 792 (2015).  As made clear by the Sentencing Commission, the definition of intended loss was clarified to "better account for . . . individual culpability, and the offender's intent."  *Id.*  Construed this way, intended loss does *not* include a loss that the defendant "*possibly and potentially* contemplated," *United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011) (emphasis in original), and tracks the Second Circuit's approach of considering a defendant's subjective intent.  *See United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008).

As discussed extensively in Evan's prior submissions on Count Eight loss, the government has not proven that Evan purposely sought, with any measure of subjective intent, to inflict loss related to Count Eight.  Indeed, the government's theory of Count Eight loss as to Evan fails on its face: the government has adduced no evidence, either at trial or during the *Fatico* proceedings, that Evan intended to inflate Retrophin's stock price at all, let alone to a certain dollar amount; relatedly, Evan was neither present at the meetings nor involved in the discussions where Mr. Shkreli and others discussed the so-called Fearnow scheme.  And, as Dean Stephen Ferruolo testified at the *Fatico* hearing, the alleged purpose of driving up the price to $3 a share—to ensure a successful PIPE—overlooks the fact that the typical PIPE investor does not make his or her investing decisions exclusively, or even primarily, on the basis of stock price.

Specifically, Dean Ferruolo testified that the typical investor in a PIPE cares about the benefits that adhere to such an investment beyond a certain share price. June 1 Tr. 205:15–18. Those benefits include warrants, full-ratchet protection, and anti-dilution provisions; were these investors to invest in the open market, as the government suggests would be their response to a drop in share price, they would lose all those benefits.  *Id.* at 205:15–25, 206:1–207:5.  And such an investment would not be practicable regardless, given the quantity at which the typical PIPE investor purchases shares: as Dean Ferruolo testified, a typical PIPE investor buying shares on the open market in the quantity they require would "drive the price up."  *Id.* at 204:12–19.

Even accepting *arguendo* that Mr. Shkreli was trying to drive Retrophin's share price up in order to have a successful PIPE, there is simply no evidence that Evan was involved in the creation or execution of that scheme.  At no point has the government been able to produce an email on which Evan discussed inflating the price of Retrophin stock, nor did any witness testify

22

to that effect.  The government's evidence in support of Mr. Shkreli's scheme to create trading volume or increase share price is similarly unavailing as to Evan.  As even the government's own witnesses Jackson Su and Timothy Pierotti testified, Evan was not present at the main meeting between Mr. Shkreli and the Fearnow purchasers.  Trial Tr. 6281:18–6282:8.  Evan was not copied on the email that Michael Smith sent to those purchasers.  GX 112-12.  And, in logical opposition to a scheme to control shares to increase price, Evan told investors that they could sell the shares in the way they wanted.  *See, e.g.*, DX 1283 (Evan responding to a question from Mr. Biestek about whether he can sell shares privately with the answer that he could "sell the stock however and to whomever you want except to affiliates of the company.").

This evidence undermines any effort by the government to show purposeful, subjective intent on Evan's part to cause loss related to the conspiracy charged in Count Eight, and thus does not support an enhancement related thereto under the Guidelines.  Therefore, the maximum total loss attributable to Evan is $477,329, which corresponds to a 12-level enhancement. U.S.S.G. § 2B1.1(b)(1)(G).

## C.      The Offense Level Should Not Be Enhanced for Use of a Sophisticated Means Under  § 2B1.1(b)(10)(C)

Section 2B1.1(b)(10)(C) of the Sentencing Guidelines contemplates a two-level enhancement only if "the offense [] involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(C).  In other words, the enhancement is only appropriate where there is an "*especially* complex or *especially* intricate offense conduct pertaining to the execution or concealment of an offense."  *Id.*, comment n.8 (emphases added).  While the Probation Office has applied this enhancement (*see* PSR ¶ 55), its application here is inappropriate.

Evan's alleged offense conduct was neither especially complex nor intricate.  To find a sophisticated-means enhancement appropriate here would effectively increase the base offense level for securities or wire fraud in any corporate setting.  The conduct alleged involved papering agreements that explicitly caused the transfer of funds or shares from Retrophin to MSMB investors and working to stabilize the market as to Retrophin.  By contrast, the commentary to Section 2B1.1 calls for the application of the enhancement when defendants use fictitious or offshore accounts to hide assets or transactions, or purposefully divide up unlawful conduct between different jurisdictions.  U.S.S.G. § 2B1.1, comment n.8.

Quite clearly, the government has not shown that Evan engaged in any especially intricate acts to facilitate or hide the crime beyond the conduct that is minimally required for securities and wire fraud.  *Cf. United States v. Adepoju*, 756 F.3d 250, 257–58 (4th Cir. 2014) (emphasizing that the burden of proving a sentencing enhancement falls on the government, and that the sophisticated means enhancement should not be used where "the facts concerning the crime of conviction do not affirmatively indicate that [the defendant] did anything especially intricate or complex").  As such, the Court should decline to apply this sentencing enhancement.

### D.    A 2-Level Downward Adjustment for Minor Role Is Appropriate

Evan is entitled to a 2-level adjustment downwards for his minor role in the criminal activity pursuant to U.S.S.G. § 3B1.2(b).  Section 3B1.2 "applies to a defendant who was 'substantially less culpable than the average participant' in the offense."  *United States v. LaValley*, 999 F.2d 663, 665 (2d Cir. 1993) (quoting *United States v. Adames*, 901 F.2d 11, 13 (2d Cir. 1990)).Per Application Note 3, whether Evan played a "minor role" is a determination based on the "totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case."  U.S.S.G. § 3B1.2.  The Court should consider

24

the following factors:  (1) the degree to which the defendant understood the scope and structure of the criminal activity; (2) the degree to which the defendant participated in planning or organizing the criminal activity; (3) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (4) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (5) the degree to which the defendant stood to benefit from the criminal activity. *Id.* The Application Notes specifically state that an example of when a minor role adjustment is warranted is "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks."  *Id.*  Moreover, "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative."  *Id.*

A review of other cases makes clear that a minor role adjustment is warranted in this case.  In *United States v. Atilla*, 15-cr-867 RMB, 2018 WL 791348 (S.D.N.Y. Feb. 7, 2018), Judge Berman sentenced the defendant, who had been found guilty at trial of multiple conspiracies in relation to a scheme to evade sanctions against Iran, to 32 months, which was well below the sentencing Guidelines range of 97 to 121 months.  In calculating the Guidelines range, the court found that defendant was entitled to the minor role reduction because the defendant, "though important to the success of the conspiracies or schemes," was "less culpable" than the "other participants" in the criminal activity and "appears to have been following orders in large measure from his boss."  Transcript of Sentencing Hearing ("Atilla Tr.") at 10:19-11:20, *United States v. Atilla*, 15-cr-867 RMB (S.D.N.Y. May 18, 2018).  The Court emphasized that the defendant "in large measure . . . appears to have been a person doing his job, sometimes reluctantly or hesitatingly, under the direction of the . . . general manager"  Atilla Tr. at 30:6-9.

The Court pointed to the fact that the defendant, "in one context, [] was not open to the idea they were discussing." *Id.* at 11:15-20.  With respect to a scheme involving a fraudulent food trade with Iran, a co-conspirator testified that he told the defendant's boss that the defendant "did not understand the matter completely" and following this exchange, the defendant's boss "gave orders" to the defendant to "carry out" the transaction.  *Id.* at 33:16-22.

In addition to the court's finding that the defendant was, in large measure, working under the direction of someone else, the court reasoned that other conspirators were "far more significant than" defendant because he was  "not a direct beneficiary of these schemes" and it was "undisputed that he was not the recipient of, nor did he solicit any bribes" to "facilitate the sanctions-evasion conspiracy or schemes." *Id.* at 28:21-30:5.  That the defendant was not a beneficiary of the schemes was "very significant in [the] sentencing." *Id.*  In short, the court found that the defendant was "neither a chief architect nor a beneficiary of the various schemes to evade sanctions upon Iran." *Id.* at 32:2-3.

In finding that a sentence should deviate downward from the Guidelines range, courts in the Second Circuit have also analyzed the defendant's role in the scheme. *United States v. Adelson*, 441 F. Supp. 2d 506, 507 (S.D.N.Y. 2006), *affirmed by United States v. Adelson*, 301 F. App'x 93 (2d Cir. 2008).  In *United States v. Adelson*, Judge Rakoff sentenced the defendant to three and a half years, as opposed to a sentence of life imprisonment calculated by the Sentencing Guidelines and the 25-30 years imprisonment proposed by the government, in part because the court observed that Adelson, the president of the bank, "ultimately became aware of the fraud toward its latter stages, but, rather than expose it, chose to conceal it and to participate in its continuation, thus leading to his conviction." *Id.*

Evan is irrefutably a minor participant in the conspiracies for which he was convicted. As argued in the government's summation in Evan's co-defendant's trial: "Martin was the dominant person in that relationship and that relationship was a criminal conspiracy." Shkreli Tr. at 5515:11-12. The government then reversed its position during Evan's trial to emphasize Evan's role, arguing in its opening statements that Evan and Mr. Shkreli "hatched a plan to pay the investors back by stealing the money from Retrophin," and "hatched a plan to control the trading of these free-trading shares to prevent a collapse." Trial Tr. at 1078:16-17; 1082:6-7 (Gov't Opening). The government even attempted to incorrectly suggest that Evan alone "negotiated . . . settlement agreements with some of the former hedge fund" investors. *Id.* at 1079:7-8. But the evidence presented at trial slammed the door on any argument that Evan had anything but a minor role in the schemes. *See, e.g.*, *id.* at 10218:4–8 (Gov't Summation).

First, though Evan was charged only in two of the eight counts in the Superseding Indictment, the government argued that the schemes that Evan participated in were interconnected with the earlier schemes, and were, in essence, an effort to cover up Mr. Shkreli's earlier lies to his hedge fund investors regarding the returns on their investment. In relation to the conspiracy to commit wire fraud, the government stated that "[t]o understand how this fraud worked we have to go back in time to those two hedge funds I mentioned before that Shkreli had been running." *Id.* at 1077:13-14. And in relation to the conspiracy to commit securities fraud, the government argued that the motivation to control the trading was that "[if] there was no company, there would be no money, no source of funds to pay back the defrauded investors." *Id.* at 1082:2-3. In other words, even accepting the government's theory on this point, Evan, like the defendant in *Adelson*, was not involved until later in the various schemes, and to the extent he

had knowledge of Mr. Shkreli's lies, his alleged involvement was limited to "conceal[ing]" and

"participat[ing] in its continuation," "rather than expos[ing] it."  *Adelson*, 441 F. Supp. 2d at 507.

The evidence throughout trial showed that Evan had limited, if any, knowledge of the

events that led to the settlement and consulting agreements.  For example, Evan had limited

knowledge of the operations and performance of the MSMB hedge funds.  *See e.g.* Trial Tr.

3515:10-14 (Schuyler Marshall Testimony) ("Q And during the time of your investment before

the wind down, during the time of the investment as you're getting these investment returns,

Evan had nothing to do with that, correct? A That's right."); DX 111-18 (Dec. 4, 2012 email

from Su to Aselage) ("I spoke with Evan about the 900k note and he didn't sound like he knew

about it").  Similarly, Evan was not involved in Mr. Shkreli's decision to liquidate the MSMB

hedge funds and did not learn of the decision until after the fact.  *See* GX 501 (Dec. 17, 2012

email exchange between Mr. Shkreli and Evan) ("If msmb capital is liquidating should we

discuss distribution of the retrophin stock (since its restricted)").  Furthermore, Evan was not

aware of a letter Mr. Shkreli sent to the hedge funds' investors until Richard Kocher sent him a

copy of the letter in March 2013.

Moreover, Evan did not "hatch" any plan in relation to repaying the hedge fund investors

with Retrophin funds.  Tellingly, when Mr. Shkreli forwarded the demand letter from Dr.

Lindsay Rosenwald—the first MSMB investor to threaten litigation and enter into a settlement

agreement with Mr. Shkreli, Retrophin, and the MSMB hedge funds—to Evan on February 19,

2013, Evan responded, "What is this about? You should alert msmb's carrier . . ."  Indeed it is

undisputed that Dr. Rosenwald's attorney, Mr. Kevin Stanfield, included a release of Retrophin

in his very first draft of the settlement agreement in relation to Dr. Rosenwald's investment in

the MSMB hedge funds.  When Ms. Sarah Hassan removed Retrophin as a released party from

the settlement agreement, Mr. Shkreli ordered Evan to include Retrophin.  *See* GX 563 (Email

from Mr. Shkreli to Evan) ("Next it should contemplate releasing any liability from Retrophin

and that's one of the reasons or benefits of the exchange").

As established by the evidence presented at trial, Evan's role in the settlement and

consulting agreements was limited to documenting the terms agreed upon by Mr. Shkreli and the

MSMB investors.  Each investor called by the government as a witness against Evan testified

that they had, at most, limited interactions with Evan in relation to the settlement or consulting

agreement, that they all had engaged counsel and that they had no interactions with him prior to

discussing the settlement agreements.  *See* Trial Tr. at 1621:20-23 (Hassan Testimony)

(testifying that all the telephone conversations about settlement agreements were "just" between

her and Mr. Shkreli); 3151:3-3152:14 (Schuyler Marshall Testimony) (testifying that he "only . .

. started to interact" with Evan after reaching an oral agreement with Mr. Shkreli); 3494:15-

3495:9 (Rosenwald Testimony) (testifying that Evan "worked with [his] attorneys to document

the settlement agreement" he had reached with Mr. Shkreli); 3676:6-17 (Darren Blanton

Testimony) (testifying that he only spoke with Evan in the context of being "the lawyer

documenting [his] agreement and release"); 6838:8-6839:20 (Alan Geller Testimony) (testifying

that "all" of his communications with Evan "had to do with documenting a consulting

agreement"); 2721:15-20 (Kocher Testimony) (testifying that he had never met nor seen Evan

before trial).  The emails submitted by the government also demonstrate that Mr. Shkreli did not

involve Evan until later in the negotiations, after Mr. Shkreli had extensive communications with

the investor, and that Evan often did not have a full understanding of the circumstances of the

agreement.  *See, e.g.*, DX 124-118 (April 8, 2013 email from Evan to Mr. Shkreli) ("I cannot

answer Lavelle's questions as I do not know a lot of the information.")

With respect to Count Eight, the conspiracy to commit securities fraud, the evidence also demonstrates Evan's limited role and that he certainly did not "hatch," plan, or direct the scheme. It is undisputed that Evan was *not present* during the key meeting at which Mr. Shkreli allegedly requested that the Fearnow share recipients work together to control the price of Retrophin shares, . 6281:18-6282:8 (Timothy Pierotti Testimony) (testifying about a meeting between the members of the "buying group" and noting that Evan "was not there" and was not on the phone). The government has not presented any evidence that Evan had any knowledge of this meeting or Mr. Shkreli's intentions in relation to the meeting.  It is also undisputed that Evan was not on the email from Mr. Michael Harrison to the Fearnow share recipients and Mr. Shkreli regarding the monitoring of their Retrophin holdings.  *See* GX 112-12.  Nor was Evan on the email from Mr. Shkreli requesting that the Fearnow share recipients help increase the trading volume in Retrophin's stock.  *See* GX 112-21.

To the extent Evan was involved in any of the schemes, his actions were all, like the defendant in *Atilla*, at the direction of Mr. Shkreli and typically were as a scrivener.  That Mr. Shkreli ordered Evan to take various actions is documented in multiple trial exhibits, *see, e.g.* GX 466 (Email from Evan to Mr. Shkreli) ("Per your prior instructions, Kevin is not an employee or consultant of [R]etrophin"); DX 8631 (Email from Evan to Mr. Shkreli and Mr. Marc Panoff ("As discussed, attached is a Form of a Consulting Agreement"), and testimony at trial also confirmed Evan's role as Mr. Shkreli's pawn.  Notably, when asked about Mr. Shkreli and Evan's relationship, Mr. Steven Aselage testified that "Mr. Shkreli seemed to be the *dominant personality*.  He gave orders and Evan, like most of the folks that worked for Mr. Shkreli, took those orders and tried to implement them."  Trial Tr. at 4458:10-4459:3 (Steven Aselage Testimony) (emphasis added).  Even when taking orders from Mr. Shkreli, Evan often

pushed back or questioned the legality of certain actions.  For example, despite Mr. Shkreli

wanting to hide the Fearnow shares from the post-money capitalization table, Evan insisted it

should be a line-item.  DX 5181; *see also* DX 1306 (Mr. Shkreli's reassuring Evan, in response

to his pushing back, that confidentiality agreements were in place for all Fearnow recipients).  In

addition, like the defendant in *Atilla*, Evan often demonstrated hesitation to do what Mr. Shkreli

was asking, which, among other ways, is evidenced by Mr. Shkreli's berating of Evan.

Similarly, in relation to the dispute between Mr. Shkreli and Mr. Timothy Pierotti's Fearnow

shares, Evan first told Mr. Shkreli to "leave it alone."  GX 505.  Once Evan was reluctantly

pulled into discussions between Mr. Shkreli and Mr. Pierotti, Mr. Shkreli instructed Evan "its

[sic] very important that you get personal and say exactly what I wrote—I am not messing

around."  GX 518; *see also* Trial Tr. 8684:6-17 (Michael Rosensaft Testimony) ("Q Okay. Well,

did you observe Mr. Shkreli? Well, how did you observe Mr. Shkreli treat Evan? A He treated

him poorly, often insulting him."); 4711:22-4712:4 (Jackson Su Testimony) ("Q. Based on your

own observations, both with your eyes and your ears, of the interactions between Mr. Shkreli and

Evan, what was your impression of their relationship?  A. My impression was professional most

of the time. There were times that Martin wasn't as professional. He screamed or at times, I

thought degraded Evan and unprofessional at others.  But that was my observation.").

   Finally, like the defendant in *Atilla*, but unlike the rest of the alleged co-conspirators,

Evan was "not a direct beneficiary of these schemes."  Atilla Tr. at 28:21-30:5.  Evan did not

own Retrophin stock, or have Retrophin stock options, or have some formulaic financial benefit

from any of the charged conspiracies.  Mr. Shkreli and the other alleged co-conspirators owned a

substantial amount of Retrophin shares and/or were direct employees of Retrophin, and all stood

to directly benefit from Retrophin's continued success.  Evan, on the other hand, owned no

Retrophin shares, worked solely as outside counsel, and was employed solely by Katten Muchin

Rosenman LLP.  Evan was "doing his job, sometimes reluctantly or hesitatingly, under the

direction" of Mr. Shkreli, and his firm received legal fees for the work that he and others

performed.  At no time, did Evan solicit or accept extra ordinary compensation from Retrophin,

Mr. Shkreli, or anyone associated or affiliated with either of them.  Furthermore, as a non-equity

partner, Evan did not directly receive a share of the legal fees he generated from Retrophin.

Trial Tr. 8166:4-6 (Howard Jacobs Testimony) (Q. Did non-equity partners or income partners

get any percentage of what was collected from any client? A No.")  Indeed, Evan's

compensation was determined using a "holistic approach."  Trial Tr. at 6619:26-6620:3 (Ross

Silverman Testimony); *see also* Trial Tr. 1272:17-25 (Bernadette Davida Testimony).  In short,

Evan did "not have any proprietary interest in the criminal activity and [was] simply being paid

to perform certain tasks."

　　　　For all these reasons, a 2-level reduction for minor role should be applied to Evan

Greebel's offense level.

### E.    The Offense Level Should Not be Enhanced for Abuse of a Position of Trust

　　　　Evan should also not receive a 2-level enhancement for abuse of a position of public or

private trust.  *See* PSR ¶ 63.  The Government is effectively arguing that Evan abused a position

of trust solely because he served as Retrophin's outside attorney.  This is plainly insufficient.  If

this were true, then nearly any attorney who commits a crime would be subject to the abuse of

trust enhancement.  Rather, the Government must demonstrate that Evan possessed

"unsupervised 'professional or managerial control,'" *United States v. Capoccia*, 247 F. App'x

311, 317 (2d Cir. 2007) (quoting U.S.S.G. § 3B1.3, cmt. 1), and that he used the discretion and

control entrusted to him by his victim to commit the offense, *United States v. Broderson*, 67 F.3d

452, 456 (2d Cir. 1995).  Evan neither enjoyed such control nor did he use it to commit the

offense.  Evan was acting on behalf of his client and at the direction of his client's principal

executive officer.  He was not, for example, serving as the guardian for a client account and

stealing funds from it, nor was he in a position akin to a doctor who abuses a patient.  *See*

U.S.S.G. § 3B1.3.  He was preparing agreements and answering questions within a narrowly

circumscribed universe of options defined by his client and its representative.  Moreover, as to

Count Eight specifically, the public in no way entrusted Evan with discretion or control that he in

turn used to commit fraud against them.  The sentencing enhancement is therefore inapplicable.

### F.       The Appropriate Advisory Guidelines Range Is Thus 24–30 Months

As addressed above, Evan's base offense level is **7**.  No loss is attributable to Evan as to

Count Eight, and as discussed above, at most $477,329 in loss can be attributed to Evan on

Count Seven.  Because that amount is more than $250,000 and less than $550,000, the

Guidelines support a loss-amount enhancement of **12 levels**.  U.S.S.G. § 2B1.1(b)(1).  The

record does not support a loss enhancement for sophisticated means.  Finally, a **minus-two level**

adjustment for a minor role is appropriate here.  Based on this calculation, the **total offense level**

**is 17** (7 plus 12 minus 2).  In combination with Evan's Criminal History Category of I, the

appropriate advisory Guidelines range is thus **24–30 months**.

### IV.       Application of the Section 3553(a) Factors Counsels Strongly in Favor of a Probationary Sentence

The Sentencing Guidelines are "truly advisory," *United States v. Preacely*, 628 F.3d 72,

79 (2d Cir. 2010), and "[a] district court may not presume that a Guidelines sentence is

reasonable," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).  Instead, the

Court must "make an individualized assessment of the appropriate sentence based on the facts

presented and the factors detailed in [18 U.S.C.] § 3553(a)."  *United States v. Jones*, 531 F.3d

163, 182 (2d Cir. 2008) (internal quotation marks omitted).   In so doing, the Court must ensure

that "the punishment [] fit[s] the offender and not merely the crime."  *Pepper v. United States*,

562 U.S. 476, 487–88 (2011).

We respectfully ask that the Court sentence Evan to a non-custodial sentence based on

the factors set forth in 18 U.S.C. § 3553(a).  As detailed below and further described in

Addendum A, each of those factors counsels in favor of a non-custodial sentence.

### A.      The Nature and Circumstances of the Offense

Title 18, United States Code, Section 3553(a)(1)(A) states that courts must consider "the

nature and circumstances of the offense and the history and characteristics of the defendant."

With respect to the offense at issue here, Evan stands convicted of two counts of conspiracy,

both of which were masterminded by Martin Shkreli, not Evan.  As emphasized above, Evan

played a minor role in both of these conspiracies.  He has not personally gained from these

conspiracies, and is not (nor has he ever been) accused of a crime of violence.  The nature and

circumstances of the instant offenses therefore strongly counsel in favor of a probationary

sentence.

### B.      The History and Characteristics of the Defendant

The second mandate of 18 U.S.C. § 3553(a)(1)—which requires courts to consider "the

history and characteristics of the defendant"—weighs particularly heavy among the sentencing

factors.  As noted by Judge Rakoff,

> surely, if ever a man is to receive credit for the good he has done, and his
> immediate misconduct assessed in the context of his overall life hitherto, it should
> be at the moment of his sentencing, when his very future hangs in the balance.
> This elementary principle of weighing the good with the bad, which is basic to all

the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006).  We respectfully submit that the good from Evan's life dramatically outweighs the bad and justifies a probationary sentence.

As discussed in detail above and in the letters excerpted at the end of this memorandum, Evan has been an exemplary son, husband, father, brother, in-law, and member of his community.  As noted by a family friend, Evan is a "role model" of a father, a "devoted, loving, hands on dad who would do anything for his kids, his family and his friends" (Brucker); a different friend pays Evan the "highest compliment [he] can give" by writing that "my children will [] become better people being around [Evan's] children" (M and J. Anfang).  Evan is an equally caring spouse, "the kind of husband that any parent would hope for their daughter . . . loving, respectful, conscientious, and very supportive."  (N. Citrin.)  There is no doubt that Evan is "the foundation to [his and Jodi's] family."  (M. Later.)

To his friends and extended family, Evan has "lift[ed them] up and provid[ed] love and comfort during [their] most uncertain and stressful time[s]."  (S. Greebel.)He has built a well-earned reputation for being "warm and caring and willing to help no matter what he is doing at the time." (L. Fields.).  This help has come in all sorts of forms, throughout his life, to friends and strangers alike.  Thus, just as Evan has taken close friends and family members into his home after natural disasters and the loss of loved ones (*see*, *e.g.*, S. Greebel, T. Brill, J. Brill), he has helped complete strangers who he heard were in need, "all out of the goodness of his heart" (L. Gans).  This selflessness has not wavered in the face of Evan's trial and conviction:  he has continued to "find[] time to reach out to [others] to see how [they are] doing and if there was anything [they] needed."  (P. Winston; *see also* T. Goldring, M. Merdinger.)  In the words of

Peter Winston, a friend and client of Evan's, "[t]here are not many people I know that would think of others while he was going through such a difficult time themselves."  (P. Winston.)

Nor has the challenge of this trial slowed Evan's longtime charitable endeavors.  To name just a few, throughout his life Evan has focused on helping others, including (i) "collect[ing] and deliver[ing] food for the poor and homeless, manning stations at food kitchens and food pantries, and volunteering at homeless shelters in southern Westchester" in his formative years (L. Sorkin); (ii) "establish[ing] a fund for students who needed to travel home for family emergencies who might otherwise not have been able to do so" after college (M. Brooks); (iii) "establish[ing] a Jewish Group for Graduate Students and Young Professionals through Hillel of Greater DC" during law school (J. Blake); (iv) volunteering as a Hebrew tutor for children with special needs while in high school (PSR ¶ 89); (v) helping homeless individuals develop job skills through his work with the H.E.R.O. organization during and after college (*id.*); (vi) currently assisting at the Hebrew Union College Soup Kitchen (*id.*); (vii) recently serving "in the New York City chapter of the UJA-Federation" (J. Blake); regularly volunteering as a little league and basketball coach (PSR ¶ 89); (viii) recently raising nearly $15,000 for the SPCA of Westchester; and (ix) dedicating himself to establishing a 30-bed drug and alcohol in-patient facility (*id.*).  He has passed this dedication to community service along to his children, who raise money for charity on a weekly basis and donate their own toys annually.  (PSR ¶ 90).

In the words of the Executive Director of the University of Michigan Hillel and Jewish chaplain at the Federal Prison in Milan, Michigan, Evan is "a mensch, and a very solid one." (M. Brooks.)  He is ultimately someone who has consistently engaged in "acts of beneficent kindness, conducted with minimal publicity and without any expectation of personal gain or self-aggrandizement."  (L. Sorkin.)

It is an unfortunate reality that, at a criminal sentencing, defendants must ask for credit for good deeds they did without pursuit of reward or recognition.  But Evan's friends, family, and colleagues bear witness to his tireless dedication to others.  He deserves credit at sentencing for a lifetime of giving.

C.   **The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant and to Provide the Defendant with Training and Correctional Treatment**

Title 18, United States Code, Section 3553(a)(2) calls for the sentencing courts to consider, among other factors, the need for the sentence imposed to "protect the public from further crimes of the defendant."  Here, it is not necessary to incarcerate Evan to ensure this objective.  First, and as further detailed in the following section, Evan has lost his law license, and his reputation has been destroyed; there is no doubt that his felony conviction alone will adequately deter him from committing any crimes in the future.  This reality can and should factor into this Court's sentencing decision.  *See*, *e.g.*, *Adelson*, 441 F. Supp. 2d at 514 (noting that, "[w]ith his reputation ruined by his conviction, it was extremely unlikely that [the defendant] would ever involve himself in future misconduct"); *see also United States v. Carmona-Rodriguez*, No. 04-cr-667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (emphasizing that defendants who, like Evan, are over 40 "exhibit markedly lower rates of recidivism in comparison to younger defendants").  And because the crimes of Evan's conviction relate specifically to his practice as a corporate lawyer and have resulted in the loss of his law license, it is impossible that he could reoffend in the same alleged manner.

Moreover, this case is not one in which the public faces any risk from the defendant.  Evan has no criminal history, is not accused of committing a violent crime, and the largest losses from the alleged conspiracies were suffered by Evan himself.  (*Cf.* PSR ¶ 132 (finding that Evan

"is a first-time offender, who has a long history of stable employment, as well as an extensive history of charitable works and voluntary community service").)  Indeed, as emphasized throughout the letters in support for Evan, "the conduct that led to his conviction . . . was an aberration contrary to his normal character."  (C. Citrin; *see also* P. Greenberger ("If the Court is looking for a rationalization between my impression of Evan and the verdict, only one word comes to mind, namely: anomaly.").)  His friends attest that they "remain proud to call him a colleague and friend" (*e.g.*, K. Noble), would let him "represent [them] any time" "without reservation" (*e.g.*, P. Greenberger), and would "not hesitate to offer him a job" (*e.g.*, C. Citrin). In his friends' eyes, Evan is ultimately "one of the last people [they] would believe to have carried out the behavior he was accused of" (L. Fields); the experience has been "devastating" and "surreal" for these friends (*e.g.*, C. Auerbach, B. Culang).

  This is also not a case in which there is a need to provide the defendant with training or correctional treatment.  Evan is a highly educated individual who earned a graduate degree from a top-ranked university and thereafter worked his way to becoming a partner at two prestigious law firms.  While Evan's conviction means he will never be able to put his law license to use again, he has the intellect and entrepreneurial spirit necessary to support himself in society. Evan has remained active since his arrest, working to open an in-patient drug and alcohol treatment facility in Masonville, New York and assisting his wife by preparing and delivering food to schools in Westchester and New York counties (PSR ¶¶ 89, 104).  After being sentenced, Evan intends to work as a consultant and help entrepreneurs starting businesses, a new path he has begun investigating over the last few months.  (*Id.* ¶ 113.)  The Court therefore need not fashion a sentence focused on vocational training or correctional treatment.

### D.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law and Adequate Deterrence, and to Provide Just Punishment

The crimes for which Evan stands convicted are undoubtedly serious crimes.  However, we respectfully submit that the loss and shame Evan has already suffered will provide adequate specific and general deterrence, and have sufficiently punished Evan for his conduct.  A non-custodial sentence can therefore serve the goals of 18 U.S.C. § 3553(a)(2)(A)–(C), and would be "sufficient, but not greater than necessary, to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks omitted).

Evan's arrest, trial, and conviction has shattered his life and career.  Evan has lost his law license and reputation, and will be unable to work in the legal world for the remainder of his career.  These consequences cannot be overlooked, since they represent significant and lasting effects on Evan's life.  Indeed, courts in this circuit have recognized that consequences like these amount to "substantial and meaningful punishment" for the lawyers who endure them.  *See, e.g.*, *United States v. Schulman*, No. 16-cr-00442-JMA, ECF No. 155, Sentencing Tr. 39:6 (E.D.N.Y. Oct. 6, 2017) ("Schulman Tr.").  For instance, in *United States v. Schulman*, No. 16-cr-00442-JMA, ECF No. 155, (E.D.N.Y. Oct. 6, 2017), lawyer Robert Schulman was convicted of securities fraud and conspiracy to commit securities fraud, and Judge Joan M. Azrack found an advisory guideline imprisonment range of 41 to 51 months. *Id.* at 26:22–24.  Despite that range, Judge Azrack imposed only a noncustodial sentence, basing her decision in large part on the particular effects Mr. Schulman experienced as a lawyer.  Judge Azrack specifically noted that, much like Evan, "[i]n addition to the social stigma that accompanies any felony conviction, the defendant faces the likely loss of his law license and his ability to work in a profession that he clearly loves.  By all accounts, this has been devastating to the defendant, and his emotional well-being has suffered as a result." *Id.* at 39:6–9.  Judge Azrack went on to say that the

"significant collateral effects of the defendant's conviction, including his likely disbarment, have already achieved the goal of deterrence," *id.* at 39:15–18, and she found that imposing a custodial sentence would serve no further purpose.

We respectfully submit that this Court should reach the same conclusion as to Evan. Judge Azrack's decision in *Schulman* is by no means an anomaly within this Circuit. Judge Loretta Preska in the Southern District relied on similar factors when she imposed a sentence of a year and a day on Joseph Collins, a former partner at a big law firm who was convicted on seven counts, including securities fraud and conspiracy. While Mr. Collins faced a significant custodial sentence—the government presented a 95-year advisory Guidelines range—Judge Preska reduced the sentence, noting that "Mr. Collins has lost his law license and his considerable standing in the legal community," and that those factors were deterrent enough. *United States v. Collins*, No. 07-cr-01170-LAP, ECF No. 244, Sentencing Tr. 31:9–10 (S.D.N.Y. Oct. 17, 2013) ("Collins Tr."). And Judge Rakoff, also in the Southern District, imposed a six-month sentence on Harvey Newkirk, a lawyer convicted of wire fraud related to his work for a client, despite a guideline range of 57 to 71 months. *United States v. Darden et al.*, No. 14-cr-00534-JSR, ECF No. 136, Sentencing Tr. 4:4–7 (S.D.N.Y. May 18, 2016). Like Messrs. Schulman and Collins, Evan has no criminal history, and he has "found positive ways to fill his time and give back to his community since his conviction." Schulman Tr. at 38:18–20. And the myriad of letters submitted by Evan's family, friends, former coworkers, former clients, and community members paint the same kind of picture that Judge Azrack saw in Mr. Schulman's case: that of "a kind, caring, compassionate man, who has made and continues to make a positive difference in the lives of those around him." *Id.* at 38:21–24. As Judge Preska

emphasized with Mr. Collins, Evan's "lifelong good works and charity [are] extraordinary."
Collins Tr. 29:18–19.

Yet the consequences of Evan's conviction and disbarment extend even beyond
reputational and emotional harm.  Unemployed since 2016 but tasked with mounting a defense in
a criminal trial, his financial situation is—and will likely remain—dire.  (*See*, *e.g.*, PSR ¶ 112,
114 (noting that Evan is unable to pay a fine, and has "a contingent liability of several million
dollars to the insurance company which paid for his legal defense").)  He has also suffered
extreme public shame and upheaval, as the press has broadcast his darkest moments—from arrest
to trial to sentencing—to the world.

These experiences have been devastating for Evan and his family.  In the words of Evan's
friends and family:

> Evan will not be able to practice law and it is unclear how he will support his
> family.  The study and practice of law was Evan's lifelong passion and all he
> wanted to do since he was a young child.  Losing his law license is a punishment
> he will suffer from every day for the rest of his life and directly links to the very
> conduct for which he was tried and convicted.  Depriving him of the ability to
> help clients is an on-going and extremely impactful punishment for Evan.

(C. Greebel.)

> Evan has lost so much already.  He resigned from his law firm and has worked
> sporadically for the past 2.5 years; never as an attorney.  Due to his felony
> conviction, you know he will be disbarred and a dismal future looms over him.

(B. Greebel.)

> [T]he charges and conviction have already punished him severely and adequately
> by destroying forever his reputation and—through the loss of his law license
> along with that reputation—his primary means of income and family support.

(M. Merdinger.)

41

The trial and conviction of Evan have been nothing short of traumatizing for the entire Greebel family.

(S. Winter.)

Incarcerating Evan would, moreover, cause tremendous pain on his family.  While young children are especially sensitive to the incarceration of a parent, as more fully described in Addendum A, his family is at greater risk.  Once again, the point is best expressed by Evan's friends and family:

> While he [Evan] will never be able to practice law again, Evan's concern for the future is not for himself but for his family. ████████████████████ deserve to grow up with their father in their lives.  Whether it is coaching baseball or watching a ballet recital, Evan is the rock of his family.  Due to the shocking and terribly sad death of her brother, Jodi has had to rely on Evan in unimaginable ways. ███████████████████████ if Evan is not there every day to wipe away the tears, teach their children about integrity and sometimes just sitting in the stands so those children know their father loves them.  No matter what work Evan did over the last 10 years, you always knew his family came first and I hope that you will show him the compassion this world so dearly needs to see in today's environment.

(J. Auerbach.)

> [Evan's] young children adore and rely on him.  His absence would have a devastating impact on his family.  As a spiritual leader, I would ask you to consider the needs of Evan's family as you evaluate his case.

(J. Blake.)

> We beg you to not only think about Evan at this time of sentencing but also to take into consideration the lives of his wife, Jodi, who has had her world turned upside down or his kids, who thus far have been shielded from the negativity of this case and to whom losing their father for a significant amount of time would be a devastating outcome.  Please think about all the lives impacted rather the outcome for one individual.

(E. Arbeter and A. Arbeter.)

> [Jodi] is extremely strong but has endured so much in the last three years.  From the death of her brother to Evan's arrest, she has tirelessly worked to create a

sense of normalcy for her kids while still running a business, supporting her extended family and being active in the Scarsdale community.  Evan is the foundation to their family and the reason why Jodi can be everything to everyone else.  In all aspects of their life together they are equal partners and it's hard to find the words to describe how his absence would impact her.

(M. Later.)

Jodi went through an incredibly difficult time when her brother unexpectedly passed away in the summer of 2015.  Evan was her rock.  He is truly an example to all who know him of what true love and support looks like.  It seems inconceivable that Evan could be taken away from Jodi, ███████████████ ████.  He is an integral and necessary part of their family unit.  Again, we desperately hope that you show Evan leniency, as he is very much loved and needed by his family, his friends, and his community.

(R. Kirschner & M. Kirschner.)

For all these reasons, as well as the reasons outlined in Addendum A, we ask this Court to sentence Evan to a non-custodial sentence.

## V.     The Love and Support of Evan's Family and Friends

As we promised at the beginning of this memorandum, we have elected to end this memorandum with a sampling of the tremendous outpouring of support that Evan's friends and family have provided him through their letters to the Court.  The simple fact that so many people from so many parts of Evan's life have chosen to write Your Honor says much about Evan's character.  But the contents of those letters say far more.  We know that the Court will consider them in deciding on a just sentence to impose on Evan.  But, given the sheer number of letters that have been received, we thought it would be useful to the Court to present some representative examples of the sentiments expressed in them, and to organize those examples around certain themes that recur throughout the letters.

Toward that end, please find below representative excerpts from the letters submitted to this Court asking for leniency.  These excerpts have been organized into reflections on, *first*,

Evan's relationship with his family; *second*, Evan's relationship with his friends, his integrity, and his ethics; *third*, Evan's professionalism and longstanding commitment to the rule of law; *fourth*, Evan's long history of community service; and *fifth*, the effect of Evan's arrest and conviction on him, his family, and his community.

### A.    Family

Dozens of letters have been submitted, both from Evan's family and his friends, discussing the integral role Evan plays in the lives of his wife, children, parents, siblings, and extended family members.  The letters highlight Evan's extraordinary dedication to creating a vibrant and close-knit family, whether by hosting weekly dinners for his siblings and their families, involving himself in his children's lives by coaching their sports teams and attending school functions, or simply being present and caring for his loved ones.

**Jodi Greebel (wife)**: "Evan makes it a point that we never miss any important event for any family member or friend. No matter how busy we were or how much I might have objected, Evan made sure we attended every baby naming, bris, wedding as well as every funeral, wake or condolence call for all our friends, their families and of course our own families no matter how far it was or what other obligations we had. *Being there for others is incredibly important to Evan.* Evan encouraged me to visit my grandmother with our oldest child frequently (our only child while she was alive). No matter how long it took to get to her at her assisted living facility, Evan felt it important that ████ visit her. He felt it a blessing that she should have a great-grandchild and again, no matter what it meant for our schedules, we were frequently driving out to visit her so that she could have time with ████. Sadly, she did not have the opportunity to meet our other children, but I am so thankful Evan encouraged frequent visits with her while she was alive."

**Barbara Greebel (mother)**: "I am proud to tell you that Evan Greebel is my 1st born son . . . While this may sound unorthodox, it is with tears in my eyes that I beg you to allow me to carry out your sentence in place of my wonderful son, Evan.  I am 72 years old and have had a fabulous life; fortunately the recipient of unconditional love and support from my whole family. When Charles and I needed financial help, Evan provided assistance for years, even though he went with less.  *Evan's family needs him.  His 3 young children (████████████████) need his excellent guidance and love.  His wife Jodi needs his support and care.*"

**Charles Greebel (father)**: "When Evan's maternal grandmother was dying from cancer, he visited her daily.  To support his mother, who was very depressed, he delayed moving for over

44

one year.  This meant he commuted an extra 40-60 minutes twice a day from Westchester to lower Manhattan . . . Evan is a very active and attentive father and husband.  He coaches sports for his children, helps them with their homework and leads by example.  His community demonstrates their faith in him and support by both attending his trial and entrusting him to coach their children."

**Gennifer Greebel, MD (sister)**: "During Evan's first year as a law associate he lived with our parents and helped our mother when her mother, Grandma Lucille, died. later, he moved into a small apartment in Manhattan. He welcomed me to live there on the weekends so I could enjoy living near my friends and temper the rigors of medical school. I slept on a roll away cot that he stored in his closet as Robert had already claimed the pullout couch. It was during this time that Evan initiated our tradition of Sunday dinners together and he often prepared my only home-cooked dinner of the week. During late nights at school, Evan would quiz me over the phone to help me study. He still claims that due to these hours he learned human anatomy and physiology as well as I. Evan did not have an older sibling to support him while in law school and he aimed to provide me with the assistance he had lacked. *To Evan, life is a team sport and I am very fortunate to be a member of his team . . .* Going through this difficult legal ordeal, when one might withdraw from society and become entirely preoccupied with one's own problems, Evan continues to care for others. Evan has three children, ████████████████. He coaches both of his sons' baseball teams and participates in Cub Scout pack activities. During my frequent visits to his home, my brother is busy playing games with his children, helping them with school projects, or making his traditional family breakfast of pancakes or waffles. He still invites everyone over for family dinners."

**Shelley Greebel (sister-in-law)**: "During Hurricane Sandy, Robert and I were dating and both of our apartments lost power.  Without hesitation Evan welcomed us into their home where we stayed for a week. Despite having just brought their second son, ████████, home from the hospital only 6 weeks earlier, Evan and Jodi could not have been more hospitable. I remember fondly arriving at their apartment and seeing Evan and ██████████████████ wearing matching super hero capes playing red light, green light. You could see the pure joy on both ██████ and Evan's faces as they ran down the hall . . . This past summer I gave birth to our daughter, ████████████████████████████. Since this is our first child, we had absolutely nothing for a baby, as we thought we still had almost two months to prepare. ████████████████████████ we were overwhelmed in every sense of the word. Evan and Jodi were at the hospital within hours of ████████ delivery to support us. They had already put together all the necessities we would need for the baby, brought food to nourish and sustain us and most importantly they put everything else on hold to be with us - lifting us up and providing love and comfort during our most uncertain and stressful time . . . Your honor, I hope that this can help you see what a caring, dependable, loyal and devoted man Evan Greebel is to his family. *He means everything to his family and imaging our world without him seems impossible.*"

**Nancy Citrin (mother-in-law)**: "Shortly after Jodi and Evan began dating it became apparent to me just how close Evan's family relationships were.  His brother, who was single and who had recently graduated from law school, was living on the couch in Evan's apartment.  He continued to live there for a few years, making a lasting impression on me by demonstrating to me what a truly genuine and good person Evan was.  It was also Evan's strong family values and his idea to

45

initiate the Citrin/Greebel family dinner, hosted weekly by Evan and Jodi, for their siblings. As a father Evan is very loving, devoted, caring, and hands on in every way . . .He is the kind of dad who is always outside playing with the children, running home on Halloween to go trick or treating with them, or simply sitting with them reading a book.  He is the dad who can be found taking the boys to buy sporting equipment yet he is also the one to pitch in with a bath for the kids or a diaper change.  On Friday nights he makes it his business to get home in time to celebrate Shabbat with the children in order to instill in the kids a love and understanding of religion and its importance in family life.  And he is the one to suggest inviting single friends and acquaintances to our family holiday parties, realizing that otherwise these individuals would be spending the holiday alone . . .  From the moment Evan joined our family he has been a wonderful husband to our daughter aside from a wonderful son-in-law to us. . . . He is a devoted husband and from the start  has been the kind of husband that any parent would hope for their daughter… loving, respectful, conscientious, and very supportive.”

**Elizabeth and Benjamin Brucker, MD (friends for 8 years)**: “Our five-year son ███████ and their five-year-old son ██████ have been best friends since birth. *We have raised our kids together, side-by-side and look up to the Greeb[el]s as parents and as role models . . . Evan is front and center coaching and cheering on all of the kids, giving them the confidence and motivation they need to succeed.* He connects with kids, always making them laugh and sharing in their good time. He is always taking his kids to their next activity, sharing in their joy. It makes him happy when he can watch his kids thrive. We have raised our kids together and observed Evan to be a devoted, loving, hands on dad who would do anything for his kids, his family and his friends.”

**Ilyssa Cimmino (wife of Evan’s childhood friend)**: “Professionally, I work in a family court in Michigan and I get the opportunity to see all sorts of family arrangements. Week in and week out I see multiple single-parent families that come before me that are raising their kids, because they have no other choice. *Over the past ten years, Evan has taken an active role in raising his three children,* ████████████████████████. *From the moment he found out that his wife was pregnant until today, Evan has always gone above and beyond for his wife and kids.* He is a hands-on father who has played an essential role in the raising and upbringing of his children. *I fear that any absence due to incarceration would create a huge hole in the Greebel family, create a tremendous burden on his wife and cause significant and irreparable harm to his children at crucial developmental stage of their lives.* After years of experience watching the effects of single-parent homes on children, it would really sadden me to see these three children grow up without the benefit of having their father present to continue to help them mature to adulthood.”

**Adam Conrad (friend for 15 years)**: “While traveling in New York many years ago, I was invited to Evan’s home on a Sunday evening for dinner with Evan, his wife Jodi, and his siblings Robert and Gennifer. It was my understanding that this was a standing family event held every Sunday evening, and I was honored to be included. *I very much enjoyed the banter among Evan and his siblings, and recall being struck by their strong sense of love and admiration for each other, and dedication to family and friends . . . Evan has always maintained family as his top priority in life. Despite being many years ago, I recall this evening vividly, and it has always been part of my personal ‘measuring stick’ with respect to my own family relationships. I strive*

*to emulate the qualities that I have witnessed Evan exhibit in his relationships with family and friends.*"

**Brian Dvoretz (cousin-in-law)**: "Perhaps most significant to me personally, is how Evan has made me a part of his immediate family. Since my brother and parents no longer live in the area, *Evan has always gone out of his way to invite my wife and me to holiday celebrations with his own parents and siblings. These gatherings have been an important way for me to remain in touch with my own Jewish heritage when I really had no other friends or family with whom I could celebrate, and I am so grateful.* I should add that my wife and I were not the only ones to experience such hospitality. These holiday gatherings were often attended by other 'wayward souls.' Childhood friends and friends of friends who have no other place to spend the holidays, all are welcome in Evan's home."

**Adam Forsted (friends for 12 years)**: "He was there to accompany ████████ (his oldest child) every Saturday to the boys first music/sports classes at the 92nd Street Y for the Mimi/Pepe class. He was there at soccer classes every week on the Brearley School roof. He was there to teach tee ball drills to our oldest boys in Central Park . . . And he was there for Jodi as well. He helped set tables and pour drinks for their guests at Shabbat dinners.  He supported her entrepreneurial talents as a chef/nutritionist/consultant. They were the couple that was always first on the dance floor with us at friends weddings, and last to leave.  Evan and Jodi are a great team, never far apart from each other, and always eager to be around their friends. No matter the occasion, Evan is always there to find the humor and lighten the moment. His kids respond to that by seeking his answers and attention, and relishing the time with their dad."

**Marissa Forsted (friend of Evan's wife)**: "He is a wonderful father, always ready to do whatever he could to make his children happy, and while whole children adored him, and always approached him with smiles, ready for the quirky humor Evan was quick to use. He was always eager to instill good values in his 3 children like good sportsmanship, honesty, loyalty and kindness. I have witnessed him advising my two boys, on how to be loving and kind to each other. He is the epitome of a family man. He is a wonderful son, interested brother and loving husband."

**Robert Greebel (younger brother)**: "As the oldest child, he set a great example of how his siblings should support our loved ones.  When our Grandfather passed away, he slept at our Grandmother Lucille's house often to help her cope with her grief and transition from a 50-year marriage to living alone for the first time in her life.  Then, almost a decade later, when Grandma Lucille became ill, he visited her every morning in the hospital before work.  While her predicament was grave, Evan thought his presence could help lift her spirits.  After she passed away, Evan delayed his move into New York City and instead commuted each day from Westchester so he could help support our Mom during her period of grief.  This was particularly notable because he was a first year law firm associate working extreme hours and elected to live in the suburbs to help his family.  Equally impressive was his financial support of our parents early on in his career when they needed assistance for a couple of years and helping pay for our sister's medical school education . . . Evan has a natural gift for working with children.  It has been obvious since his days as a swim instructor teaching children from 3-15 years of age how to swim.  Maybe he learned it from our Dad who coached nearly every sport we played during our childhood.  No matter where he learned it, he has it and it is evident now in the way he interacts

with ██████████████. He is patient, loving and encouraging. I'll share one story with you. For the past few years ████████, Evan's oldest son, has been trying to learn how to ride a bike. Evan was always willing to work with him and each time ████████ had a set-back, Evan would figure out another method of teaching him. Evan did not give up or let frustration overtake the experience. Rather, he adjusted his approach to fit the needs of his son. They recently sent-me a video of ████████ first successful ride and you could see the joy in both of their faces. There are numerous examples like this and many do not even involve his children."

**Susan Hendler (Kindergarten teacher for Evan's children)**: "I have known Evan for the past 4 years. I taught his oldest son, ██████████████, and I am ██████████████ kindergarten teacher now. (████████ is Evan's middle child.) Evan has been active in our school community by coming into the classroom for parent teacher conferences. He always showed an interest in the boy's well-being socially and academically . . . He cares what goes on in class for the boys. He is also concerned with their academics. One more note, ████████ is a bright ██████████████ who writes about his dad. I wanted to include some of his notes here. On Mondays we write about our weekends, ████████ writes about what he has done with his dad . . ."

**Douglas Heyman (friend for over 10 years)**: "Over the years, our families grew increasingly close, as my wife and Jodi became warm friends. We have two older boys and a daughter, just like Evan and Jodi, and our kids have played for years with ██████████████. From our earliest days meeting in the park to more recent BBQs in his backyard, the memories that stand out most are of Evan's care and focus on his family. *He is a doting father that showers* ██████████████ *with affection, teaches them proper table manners, and role-plays with* ████████ *when she hands Evan a doll. Evan is also so clearly in love with Jodi and is effusively proud of her as a mother and entrepreneur.* When Evan, Jodi and the kids moved to Westchester, we were sad to see them leave the neighborhood; however, we continue to visit with the family regularly, and every Thanksgiving, Evan drives the kids into the city to meet me and my boys to watch the parade. He walks across the park with ████████ on his shoulders, helping ████████ ride his scooter, and carrying breakfast for everyone. Evan brings so much hot chocolate, bagels and Dunkin' Donuts munchkins that he ends up sharing with strangers in the crowd along Central Park West. This is emblematic of his generous nature. He loves seeing the kids smile as he pours hot chocolate on a frigid November morning."

**Dana Jacobson (cousin)**: "While I was a sophomore in college I wasn't sure of my career path, so I reached out to Evan to see if he had any advice for me. Instead of just giving words of wisdom and pointers on how to write a resume, network and interview, Evan went three steps beyond what I had expected. He reached out to one of his friends, who at the time worked for NBC, and secured me a summer internship. Evan going above and beyond is emblematic of the person he is; he is caring, well intentioned and always wants to help others . . . Evan has always opened his home to me. There were countless times when I was in college that I would come into Manhattan for the evening and would sleep on Evan's couch—he would rather that I come back late, wake him up to get in, and have a place to sleep versus taking the train to Long Island at such a late hour. He wanted to make sure I was safe. Evan's protective instinct was on display well before he became a father and since that time I see first-hand on a regular basis how dutifully and lovingly he takes care of his wife and three children."

**Elan Keller (fellow partner at Kaye Scholer)**: "In the summer of 2015, Evan and I were working on a client project together, and we decided to put our pens down for the evening at around 6pm. I asked Evan if he wanted to get dinner before going home. *He responded, 'no thanks, the 15 minutes I get to tuck my kids in at night are what I live for, and I don't want to miss it if I can make it home in time.'* Evan's office was proudly decorated with pictures of his three children and his wife, and Evan spent many moments telling me stories about his family. It was clear that nothing was more important to Evan than his family, and Evan was very present in his wife's life and his children's life. It was very obvious that Evan had a deep and loving connection with his family. Your Honor, please allow Evan to continue to tuck his three young children in to bed at night. This is time that as a parent, you can never get back."

**Jeffrey and Samantha Reemer (friends for over 10 years)**: "Watching this process has broken our heart. While we have done as much as we can to support the Greebel's, *words can't describe the anxiety and pain that we feel by the prospect of Evan being taken away from his family. He is their foundation.* We have done everything we can think of to provide emotional, logistical, and spiritual support however there is no replacement for what Evan brings to his family and his friends."

**David and Stacie Schapiro (friends for 10 years)**: "Evan was so very proud of his family—his wife Jodi and each of their three children. You could see the smile on his face anytime he spoke about any one of them. Living just two blocks from each other in New York City, our worlds and our families became even more intertwined over the years . . . Evan's support of a Jewish education and upbringing for his family laid the foundation for the years that soon followed. While at Park Avenue Synagogue, Evan was both a leader and a role model. He became active in the school and synagogue and relished in the joy and everyday activities of his children. A few years ago, Evan and Jodi made the decision to move to Scarsdale . . . Although the move created a longer daily commute for Evan, he ALWAYS put the needs of his family FIRST as he knew family meant EVERYTHING. *We admire Evan for the father, husband and friend that he is. Always with a smile on his face, Evan is the first to offer advice or guidance on almost anything and he is ALWAYS there to support his family and friends. It would truly be a shame to see him taken away from the everyday activities of his family.* We urge the judge to please be very lenient in sentencing. Evan's wife and children NEED him by their side. In addition, he would do the community a far better better service being at home with his family. Think about those three little children, they need BOTH of their parents. Evan and Jodi Greebel are truly good people with tremendous hearts and we are confident they will do many great things in the years ahead. They have a lot of good to offer their community."

**Kim Straker (friend for 9 years)**: "I'll never forget meeting Evan for the first time in early Spring of 2009.  I was close to 9 months pregnant with my second daughter when I met Evan's mother in the lobby of our apartment building in Manhattan.  She approached me to tell me that her son and daughter-in-law had just had a baby, and by the looks of me, it was obvious that our children would be very close in age, living in the same apartment building.  She asked me if I would accompany her back to Evan and Jodi's apartment to meet them, to which I gladly agreed. When she rang the doorbell, Evan answered the door, with his baby ▮▮▮▮▮ in his arms, and as all first time parents look in the first month, Evan looked tired, slightly overwhelmed, but happy and proud to be a daddy.  As the hands-on Dad that Evan was (and still is to this day), Evan was about to change ▮▮▮▮▮ messy diaper, and then feed him, and I'm sure the last thing he

wanted to do was socialize with a total stranger.  Nevertheless, he smiled, very politely chatted with me, and took my contact information down.  From that day on, we became good friends with Jodi and Evan.  We lived in that same co-op apartment building together from 2009-2012, where we spent a lot of time together as families raising young children in Manhattan.  We witnessed first-hand the wonderful father that Evan was to ███████, and then ████████ ██████████████.  Whether it was music time, feeding time, nap time, sports time, or dress-up and Halloween, Evan was there as a hands-on, loving father to his boys, and as a nurturing supportive husband to Jodi.  As a lawyer at a big firm myself, I see many men who work late nights and do not get home to see their children at night.  Evan always made his family a priority, and continually tried his hardest to support Jodi and be an equal partner for her."

**Elise Citrin Swasey (sister-in-law)**: "*From the time Jodi and Evan began dating, I felt as though I had gained another brother. Evan expanded his circle of friends to include me and welcomed me into his family.* He and Jodi established Sunday night dinners at his apartment with his brother, his sister, and me. We would take turns cooking and share our weekly stories about the challenges of living, working and dating in Manhattan as a young adult. Somehow, despite the hours he worked, Evan managed to cook a number of these dinners (he was especially proud of his healthy honey mustard chicken) and more importantly, he always put down his work for these dinners. These dinners lasted through all of the years of their dating, engagement and into marriage, later including others such as our younger brother, who was in college at the time the dinners began, the boyfriends and girlfriends who became our spouses, and the children of the next generation."

**Dan Weiser (friend for 14 years)**: "[W]e went to the Greebel home for the day [during the trial].  We spent time with the family and spoke to Evan about the trial. As usual, he was honest about the realities of the circumstances and he was doing a good job staying positive. *Even under what I imagine to be the most stressful of circumstances, he was playing with his children, making arrangements for the kids' sports and activities over the next few days and just being a husband and a dad. I don't know that I would have held up as well under the same circumstances, but it did not surprise me that Evan was positive because he always knew how to stay strong and honest.*"

## 1.     Evan's Support for Jodi After Her Brother's Death

Perhaps the greatest testament to Evan's commitment to his family came just a few

months before his arrest nearly three years ago.  His wife's brother died suddenly and

unexpectedly.  Faced with the unimaginable trauma of this loss, Evan managed his own anguish

while simultaneously supporting his grieving wife, her devastated parents, and his young

children in every conceivable way.  The consensus is universal:  without Evan's help, his wife

and family would likely not have been able to survive this tragic and trying experience.

**Niles Citrin (father-in-law)**: "Almost three years ago, my son Mark (Jodi's brother) died at the age of 27, a tragedy from which we will likely never recover. *Evan really came through for all of us and was there every step of the way doing whatever he could to help us cope with our loss.* I don't know if my daughter Jodi, who was like a little mother to Mark when they were young, would have gotten through this tragedy without the love and support she received from Evan. Only a few months after Mark's tragic death, the FBI and the police shockingly and in an unnecessary display of force 'knocked on the door' at a much too early hour in the morning and arrested Evan. This is a horrible experience for anyone to have to endure, especially considering the people involved; a housewife, three young children, and a partner in a law firm indicted for a white collar crime, not some violent and dangerous person. *Needless to say, Jodi was devastated by Evan's arrest . . .* ███████████████. *Despite Evan's own plight, he was well aware of how much Jodi and his children needed him through this harrowing time in their lives; and he was there for them.* When you mete out Evan's sentence, please bear in mind that your decision will affect so many other people, but mostly his wife and his three small children. They too will suffer Evan's punishment."

**Nancy Citrin (mother-in-law)**: "When our son, Jodi's brother, suddenly passed away 3 years ago, Evan stepped in immediately trying to help us, Jodi, and his children cope with our loss. *Evan's very positive outlook on life has helped all of us cope with the last few very difficult years. I am not sure any of us could have done this without him. Jodi and his children need him to be a part of their lives each and every day, especially during these early childhood years as he is a vital part of their everyday existence.* Without his everyday presence there will be an enormous void and his young family will suffer tremendously."

**Brian Culang (friend for 10 years)**: "I can't understate how surreal the experience of writing this letter on behalf of Evan Greebel is for me and my wife, Randi. Evan is a loving father, caring and thoughtful friend and a respected member of our community . . . Evan has the ability to be a source of strength and support for those around him, particularly in difficult times. Unfortunately, I have seen this more than once over the last few years. When tragedy struck Jodi and her family two summers ago with the death of her brother, I witnessed Evan's compassion and strength first hand. He stepped up to care for a new born ████, while shielding his young boys from the difficult circumstances around them. Most importantly, he was a loving, caring and supportive partner to Jodi. Throughout the last couple of difficult years, Evan has remained focused and productive. Rather than retreat from our community, he and Jodi worked together to start at least two companies. Evan is currently working on a project to improve access to healthcare to those impacted by the recent opioid epidemic inflicting so many across the country."

**Kerry Hsu (friend for 15 years)**: She calls her mother every day, encouraging her to get up and face the day . . . Life will never be the way it was prior to 2015, and yet the family needs to continue to heal. Evan and Jodi are wonderful parents. They are so loving and so concerned about providing their children all they can. If Evan

spends considerable time away from his family, it would have a significant impact on the lives of so many, most importantly Evan's young family. Both Evan and Jodi have done everything in their control to shield their children from these events which unfortunately have been very public."

**Julie Potack (friend for 15 years)**: "While we grew up in the same town, I did not meet Evan until he started dating my good college friend, Jodi, who is now his wife . . . A few years ago, Jodi and her family suffered a terrible tragedy. At that time, Evan and Jodi had just welcomed their third child to the world. With two young boys, and a newborn baby girl, Jodi was trying to present as a mother, while simultaneously feeling immense grief. It was during that time that I saw how much Evan truly cared for Jodi. He was her 'rock' and was there to care for the children while Jodi grieved. ███████████████████████████████████████████████████
███████████████"

**Sue Tolchin (Early Childhood Development Director, Westchester Reform Temple)**: "A few years back Evan's wife's brother committed suicide and the ordeal was horrific for their family. *Evan was there to support Jodi and their children through the toughest of times. He has been the rock in this family.* This situation actually caused our staff to offer to help the Greebels with childcare if they needed it. The loss was so great and felt by all of us. We love and respect this family and wanted to help them in any way possible. It is my opinion that any change to this household would certainly have a negative effect on his children in particular. The Greebels are indeed such a close family."

### B. Relationship with Friends and Strength of Character

Evan's character shines beyond the relatively narrow circle of his family.  Friends who have known Evan for decades—from childhood friends to fraternity brothers to law school classmates—all attest to his longstanding and seemingly boundless desire to help.  Throughout his life, Evan has protected people from bullies and served as a role model to his peers.  To his friends, Evan has been a source of solace in times of tragedy, a trusted guide and mentor, and a committed and thoughtful person who never tires of checking in to see how things are going.

**Mark and Jessica Anfang (friends for 6 years)**: "The most important takeaway I would like you understand is that Evan is a very positive contributor to our community. He has been a positive influence on his kids as well as others in the community. Evan is a constant face at the kids functions, sporting events, and religious gatherings. My son ███ and Evan's son ███ have grown very close over the past three years. Evan is at all of Mathews activities, whether at football, basketball, or lacrosse. Evan is a staple at all their events. He is a positive role model for the kids, constantly pushing them with positive reinforcement. *His positive and reinforcing attitudes has translated into very respectful and well-rounded kids.* ████████████████ *are great kids who are kind, inclusive of others, and respectful of teachers and parents. I really*

*believe the best reflection of us as parents and people is how we raise and teach our children. In this sense Evan and Jodi have succeeded and are clearly doing something right* that a lot of us in the community can benefit from being around. I think my children will be become better people being around Greebel's children."

**Catherine Auerbach (wife of Evan's friend)**: "Evan always respected me while other husbands treated me like another wife.  Evan was even willing to talk to me about issues I didn't always understand.  He was caring and compassionate . . . Evan is my friend, a great friend."

**Matthew and Erin Bass (friends for 6 years)**: "Erin and I don't have family in the immediate area and are often in Scarsdale for the holidays including Thanksgiving, Passover, Yorn Kippur, etc. Evan welcomes us and others into his home as if we were family. It's never too short notice,

too many people or too late - *we always feel welcome in the Greebel house like we are family.*"

**Taryn Brill (friend for 10 years)**: "Sadly, I recently lost both of my parents, in their early 60s, to cancer back to back. Needless to say, the holidays have become a very difficult time of year. Evan and all of the Greebels welcome both my sister, and me every year into their home and treat us like family members. It's the Greebel way. Evan always makes us feel comfortable: what's theirs is ours. *It's a rare occurrence to go to a 'friend's' house, and feel like family. That's what it means to know Evan and his family.*"

**Adam Burk (friend of Evan's brother for 10 years)**: "Today our world and community is very much a better place with Evan actively present in it. He is selfless person who truly cares about his family, friends and community. He is a man of integrity who has numerous times provided me honest counsel and sought to help in anyway way. Today more than ever I support Evan and would seek his advice and counsel the same as I would at any time in the last ten years. I pray that my friend will continue to spend his days a part of his community helping his family and friends and being able to raise his children."

**Lauren Fields (childhood friend)**: "I have known Evan Greebel since we were teenagers. We grew up in Scarsdale together . . . Just a few days before his arrest, Evan helped out my then four-year old daughter. It was around dinnertime on a Sunday night and my daughter's eye became so swollen that she could barely open it and was in a lot of pain. Given that it was Sunday night, there were not many options of where I could take my daughter. She had previously seen Evan's sister, Gennifer, who is a local eye doctor. I called Evan to see if he could reach Gennifer so she could advise me where to take my daughter for immediate care. Evan was in the middle of a family holiday celebration with many extended family members when he took my phone call. Gennifer was at his house so he insisted that I bring my daughter over so Gennifer could help her. *Even in the middle of a family event, Evan open up his home to me and my daughter so she could get the help she needed. Evan came away from his guests to make sure we were ok and talk with us the entire time we were at his house. Evan is just that kind of person. He is warm and caring and willing to help no matter what he is doing at the time.*"

**Todd Goldring (friend for 10 years)**: "Importantly, he has been a caring friend while I endured my own personal challenges. Over the course of the past few years, my wife and I separated and then divorced. As anyone going through such a situation knows, there were periods of anger,

frustration and disappointment for me. Through it all, Evan was a supportive friend who helped lift my spirits and for that I am grateful."

**Gennifer Greebel, MD (sister)**: "Anyone who interacts with Evan knows his is a man with a warm heart and a strong sense of morals.  He values honesty and family above all, and strives to improve the lives of those around him.  If Evan is confined, his absence would be a disservice to his family and would deprive his community of a wonderful man.  My brother Evan has many strengths and a plethora of knowledge, all of which he could harness to serve his community.  Such service by Evan would have a far more positive impact on our society than any other sentence.  Please allow him to remain with his family and perform community service in order to compensate those who have been wronged, need assistance, or are trying to succeed in society.  Please consider giving him the shortest sentence possible."

**Alexander Harrison (family friend)**: "Evan's family enjoys celebrating many holidays and family gatherings at their home. Evan always is a gracious host, whether it's Friday night Shabbat teaching the children important Jewish traditions, a Sunday family brunch with a lively game of hide and go seek in the backyard, or a group of his son's friends playing basketball and eating pizza in their backyard. These events have created many great memories over the years which have made a positive impact on myself and my family.

**Jason Jun (friend for 25 years)**: "I recall reaching out to Evan to discuss my future plans. I had in theory decided that I would go to law school and become a lawyer. And notwithstanding having done my diligence and research, I didn't have any real idea of what the process was like, what law school would be like. And in that moment, Evan was the person who helped fill in the blanks. He provided the type of information and guidance you don't find in career office pamphlets. And even as I began to debate whether I would ultimately go through the process, it was an evening of drinks in downtown Manhattan with Evan and his colleagues from Fried Frank that convinced me to move forward."

**Marc Keslow (childhood friend)**: "I [] remember playing sports with Evan, sometimes on the same team and other times against each other. Evan was always a great teammate and a good sport. He was the kind of person that would run to help someone who had been knocked down on the basketball court and was always the first to shake someone's hand and say 'good game,' even when he was on the losing end."

**Stefan Malter (friend for 20 years)**: "The many honest and in depth conversations that we had during those years were influential in helping me to develop my own divergent career path. Although Evan may not realize it, I was encouraged to pursue a career outside of the practice of law in part because of the impossibly high standard he established."

**Ari Nisman (friend for 25 years)**: "After being accepted into the [fraternity] house, despite being a few years older than I, he immediately took me by the hand and under his wing. He was my 'big brother' in every way, shape and form as I tried to navigate the waters of college. What I didn't realize then was that he was also taking me under his wing for a lifetime of friendship, guidance, support, and inspiration. He quickly became the person that I admired and looked up to while attending Michigan. For these twenty-five years, he's been the person that I always turn to for advice. That respect and admiration has never stopped, Judge -- Evan has literally meant

everything to me both in business and in life, and I don't know that I've ever told him this until now . . . He's never missed calling on my birthday in 25 years; not once. He sat for hours by my side when my father died. He never dismissed any phone call I've ever made to him about a business question. He's amazing to his friends. He's even better to his wife and family."

**Jon Paley (childhood friend)**: "Evan was a great listener when we were kids, and that has never changed. *He has always been the type of guy where if you have a problem, he will be the first in line to help - not because he feels an obligation to, but because he genuinely wants to.* I remember a time years ago where we met for lunch and I started talking about a work problem I was having. He immediately offered to help. While it was a contract/legal situation, he sat and listened as a friend - not a lawyer. He gave me advice, told me that I could call him about this particular issue whenever, and that he'd help however he could for absolutely no charge. He always finds it important to make sure people know that he supports them. His heart is always in the right place."

**Justin and Sharon Smolkin (friends for 4 years)**: "Evan is central in the Scarsdale Recreational Sports Program for our kids. He is always one of the first to volunteer to be a coach for a team, regardless of how busy he may be with other responsibilities. One thing that always sticks out to us is how as a coach he treats all kids equally. He doesn't put his son or son's friends ahead of any of the other kids. He also gives every child an equal opportunity regardless of skill level or experience. He is fair and wants to make sure everyone understands the rules, follows protocol, and has a chance to learn and have fun. He wants to make every child feel like they have the opportunity to play their part and as long as everyone follows the rules; it will always be a fun time."

**Joshua Sussberg (friends for nearly 10 years)**: "On a more personal level, I dealt with significant health issues back in 2016 and I will never forget Evan both immediately reaching out and coming to visit with me in the midst of all the issues that he was dealing with. I was humbled and greatly admired Evan's compassion when we had an opportunity to sit together over lunch. I remember our conversation and was extremely appreciative of Evan's understanding and friendship at a very difficult time."

**Michael Weiskopf (college friend)**: "Another very personal example of how he takes care of his friends is when I became ill in 2009/10. I was not sure what was causing me to feel so poorly. I went to my general practitioner and we tried to find out what was going on over many months. I was content to go along this slow process. One football homecoming weekend, Evan, along with another of our close friends, sat me down and demanded I talk to our friend's father who happened to be a surgeon at the University of Michigan Medical Center. I did, and with his help and resource, very quickly discovered that I had a mild form of lung cancer. Within 6 months I would have part of my left lung removed. *Not only was Evan instrumental in pushing me to seek the medical help I needed, but he constantly called to check on me, see how I was doing, and see what I might need.* He even bought me a year subscription to Netflix so I would have something to do while I recuperated. To this day, he still checks up on my health and he asks me friendly questions about how I am doing, I assume evaluating my overall health every time he asks."

**Omer Wiczyk (friend for 2 years)**: "My family and I moved to the suburbs from New York City in June 2016. It was a major transition, and I had many concerns about how our young

daughters would adjust, and how my family would be welcome in our new community. Within a week of our move, I met Evan and his family when they introduced themselves to us – they are our neighbors and live three houses away. From our first conversation, Evan has never hesitated to allay my concerns about our move and owning a home, has given me incredible advice and guidance, and introduced me to many of his friends, whom I now call my own. *I've never had to ask Evan for anything; he's never hesitated to welcome me into his home and his life.* There's no doubt in my mind that, without Evan's support and friendship, the transition would have been far more difficult."

**Peter Winston (friend for 10 years)**: "*What I find remarkable about Evan is that during the period of his trial I was going through a very hard time in business and he would always contact me to see how I was doing.* I had always thought to myself here is a person that is going through an extremely difficult time in his life, yet he finds time to reach out to me to see how I was doing and if there was anything I needed. There are not many people I know that would think of others while he was going through such a difficult time themselves."

## 1.     Evan's Interest in Protecting the Bullied and Vulnerable

Evan has consistently taken particular interest in people who have been bullied, are

vulnerable or otherwise outcast from society.

**Vincent M. Cimmino (family friend)**:   "What quickly impressed be about Evan is that he became a close friend of my oldest son Noel, who at that time of his life was shy and did not befriend people easily.  Once I saw the union they developed I knew that Evan had to have some pretty special qualities to have become my son's friend."

**Jodi and Bill Keller (friend for four years)**:   ""My wife and I feel lucky to have been friends with Evan Greebel and his family since they moved to Scarsdale in 2014. His son, ██████, is in ██ grade with our son, ████, and the boys became fast friends when they met at day camp before kindergarten . . . Evan always made a point of making sure we felt included—whether it was for a father-son outing to see Star Wars or what has become an annual father-son Fantasy Football league. When he invited us for family dinner at their home, he was so concerned our daughter might feel left out while the boys played, he offered to let our daughter bring her own friend along. He is the dad who made it to nearly every one of our sons' lacrosse practices last spring, supporting not just ████, but any boy who made a good play, even on the coldest and rainiest days when my wife and I would draw straws to be the one who could stay comfortably at home with our daughter. We'd often see him rushing from there to Boy Scout meetings, which he told us were worth making time for because of the valuable skills they instilled in him as child, like discipline, honesty, and hard work.  He's also the dad who patiently volunteered to chaperone ██████████ and his friends when they begged to visit our neighborhood's "Haunted House" this past Halloween, while the rest of the dads waited outside, grateful to take a break after hours of trick-or-treating. *When our ██████████ son emerged crying (and embarrassed to have been scared), Evan was quick to reassure ████ that he was not the only boy who felt that way and he was brave to admit it. We were grateful for his steady demeanor,*

*and the way his kind words reminded all of the boys to treat each other sensitively and respectfully.*"

**Michael Merdinger (childhood friend)**:  "Evan and I met in summer camp when we were nine years old.  When I met Evan, he had befriended another boy who one day began to tease me.  My first impression of Evan was as the associate of a bully.  But when he realized that his first camp friend was a bully, Evan did a remarkable thing.  He turned his back on the mean boy and became friends with me.  He did not tolerate bullies or injustice."

**Jonathan Paley (childhood friend)**:  "In addition to putting others first, Evan was always able to let things go.  Like many of us did back then, Evan had insecurities.  He was bullied by the kids that bully and he always had the heart to move passed it.  He had the heart and maturity to continue being their friend."

**Steven Spivack (family friend)**: "I first met Evan Greebel at his Bar Mitzvah. His father Charles Greebel was my attorney in my divorce. I was granted temporary custody of my daughter ▆▆▆▆ after many years of going to court . . . ▆▆▆▆ was extremely withdrawn and insecure throughout this ordeal. During this time Evan was to have his Bar Mitzvah and Charles had suggested that it might be a good idea to have ▆▆▆▆ come to the Bar Mitzvah. She was very apprehensive about going since she knew no one and while living with her mother she was not allowed to have friends or to socialize with her peers. The night of the Bar Mitzvah arrived and ▆▆▆▆ in her new dress timidly walked in with me not knowing what to expect. Within minutes of arriving Evan and his dad came over and introduced himself to us and said 'come with me' taking her by the hand. He led her over to where all his friends were and literally spent a good part of the evening with her, dancing line dances, playing games and just having a great time . . . That night was meant to be Evan's but for ▆▆▆▆ and I it became her night as well."

### C. Professional Life

Those who have worked with Evan have experienced the same degree of care and

thoughtfulness that his friends and family are lucky enough to experience regularly.  His clients

praise the caliber of his legal counsel and integrity in a wide range of transactions, and his fellow

attorneys respect and admire his ability to achieve optimal yet ethical results for his clients.

**Paul J. Pollock (former partner at Katten)**:  "I watched Evan grow from a mid-level associate to a partner. Evan met all standards of excellence required of a law firm partner and I can unashamedly say that I was proud to be among the most ardent supporters of his elevation to the partnership at Katten . . . In thousands of interactions with lawyers over the years, I have seen numerous unscrupulous lawyers.  The Evan Greebel that I know is not one of those.  *Evan is a man of high intelligence, stellar character and ethical integrity—a man who is intensely devoted to the practice of law and practice excellence.  In my experience and observation, he is devoted to and zealously acts in the best interests of his clients.*  This is the man who I know and took under my wing and mentored as a young associate and saw grow into a fine attorney."

**Lawrence Greebel (cousin)**: "As an attorney with a general practice covering corporate and litigation matters, I know how important it is to rely on the representations of one's clients. Our responsibility is not to second guess their decisions or usurp their judgment. Rather, we are tasked with providing advice and guidance while taking directions and respecting their decisions. Corporate officers are our liaisons and their interactions with their own board members happen both within and outside our presence. Imposing a burden on an attorney to independently determine the path a company should take is far outside the norms of modern corporate practice. In the case at bar, directors are effectively permitted to ignore what is sent to them for review, selectively remember what is discussed at board meetings, and refrain from disclosing when they have concerns about the officers they have entrusted to run and manage a company while blaming an outside advisor for not exercising the oversight the board member was obligated to perform and paid to perform. This sets up an unsustainable dynamic that actually pits lawyers against their client. I struggle to see how this is a just and rational result."

**David Acharya (client)**: "I also appreciated that Evan always strived to 'add value' for us as a client by going above and beyond in his willingness to deliver high quality legal services as well as help us with our goals of networking with potential investors and sourcing investment opportunities. This was uncommon for lawyers to do and in many respects, should command a 'price premium', however, Evan was also attentive to our interests as a cost sensitive client. At times, even though there may have been an opportunity for Evan to charge significantly higher billings, he made concessions and advocated for our interests, even if that meant lower revenue for him. I can also recall a few instances where specialized expertise was required and Evan recommended that I seek the counsel of other experts as opposed to engaging him. I appreciated that Evan was not trying to maximize his personal revenue despite the fact that he had helped us greatly with respect to the office space, and had made numerous billing concessions already. I recall a particular transaction, where Evan was very thoughtful on his deal structuring advice that protected our interests and investors. In this transaction, Evan ultimately advised us to not proceed with the investment despite the material revenue opportunity it provided for him after our team discovered certain concerns in due diligence. Evan was very much interested in our success, and we respected that enthusiasm. . . . On a personal note, Evan recruited me to the Board of Directors of a middle market deal making association . . . . In addition to his board responsibilities, Evan also chaired the nominations committee which recruited the first female president in its 60-year history."

**Adam Burk (friend of Evan's brother for 10 years)**: "During my professional career, I have had the opportunity to explore several entrepreneurial opportunities and sought Evan's counsel on two occasions. One such opportunity was presented to me in 2013. An accomplished entrepreneur and I were looking at starting a financial guarantor insurance company to insure peer to peer loans. At the time, online peer to peer lending was a relatively new and emerging industry. We met with several law firms and most gave us the impression that we would be able to address the legal obstacles. The idea we proposed had numerous tax and structuring complexities. Evan is an excellent problem solver and strategic thinker so we met with him and he provided a straight forward and honest assessment of the proposal. After conferring with experts, he informed us that we would need a tax opinion to have the appropriate level of comfort to move forward. We appreciated the straightforward advice from the outset and decided not to proceed forward. In line with my personal interactions with Evan, he was honest and only had the best intentions for us."

**Joel Cooperman (client and friend for 11 years)**: "I currently serve as the firm's Chief Executive Officer. In that capacity, our Partners and I have worked closely with Evan together on several clients and I have always found his advice to be thoughtful and professional. I truly believe that Evan is a man of integrity and I know my partners and our common clients would agree."

**Troy Foster (former colleague)**: "As a practicing lawyer, I know well the pressures to perform in the setting of a large private law firm. The firm where I am currently a partner has over 1,000 attorneys. The velocity of our practice requires trust. We have to trust that our partners in specialized practice areas are giving sound guidance. We have to trust that our associates are performing the tasks that we assign them with diligence and due care. And, most importantly we need to trust our clients to give us accurate information and conduct themselves in accordance with the standards of basic decency. Evan's client apparently failed on every count, and the resulting fiasco swept Evan up into this case. Without trying to relitigate the merits of Evan 's case, I am requesting that the extenuating circumstances of Evan's situation be considered. I have known Evan to be an upstanding citizen, a good father, devoted husband and committed professional."

**Barbara Greebel (mother)**: "Evan loved his grandparents and my mother was his last surviving one.  He witnessed the benefits of innovative medical treatments.  He recognized how they could help families and loved ones.  Evan knows that Retrophin is the type of company we all want to succeed.  He worked tirelessly and unselfishly to support the growth of this company that is searching to cure many orphan diseases.  Let us hope that Retrophin succeeds in discovering so many needed magic bullets."

**Paul Greenberger (friend for 5 years)**: "We talked often about law and lawyering. That is how I came to know Evan as an attorney. From our first professional discussions, and at all times thereafter, *Evan has exemplified what I believe were all the qualities of a competent and ethical attorney. My impression of Evan has not changed despite the unfortunate verdict* . . . I am fully aware of the verdict in Evan's case. But, despite that result I can state to this Court unequivocally and without reservation that in each and every discussion I had with Evan - and there were many - the only impression I took away was that he could represent me any time. If the Court is looking for a rationalization between my impression of Evan and the verdict, only one word comes to mind, namely: anomaly."

**David Hennes (friend for 25 years)**: "To put it mildly, I was shocked when I heard of Evan's indictment and saddened by his conviction. This was not the Evan that I know. I always knew Evan to be a straight shooter, who wanted to succeed but was not driven by money, and who was, at his core, a good and kind person and, most fundamentally, an ethical lawyer. I do not know the detailed facts of the case that was tried before the Court and the Court will properly make its own judgment in that regard, but I cannot help but share my view that I find it difficult to believe that Evan would knowingly do anything dishonest."

**David Hertzog (fellow partner at Katten)**: "During all the times that I have known him, I can attest that Evan has always acted ethically and competently, demonstrating a work regimen that fostered his quality legal practice.  Evan worked with me on various corporate matters including matters involving a public biotech company (not related to Shkreli or Retrophin). *His work was*

*of the highest caliber, and all my clients liked working with him.  He painstakingly spent hours reviewing the honest and forthrightness of his work,* including the public disclosures of the biotech company."

**Seth Hirschel (client and friend for 20 years)**: "Additionally, Evan has served as counsel to several of my businesses over the years.I have always regarded Evan as an Intelligent, Understanding, Ethical and Fair person.  *Whether he is advising me about a business dealing or helping with a ruling on the golf course, he was always honest and acted with integrity.*  He is proud of his job, proud of his family and is a great friend and trusted attorney for me.Evan has helped me strategically consider legal concepts and has also reviewed specific documents that were central to my business dealings.  His opinion was always relevant and often very valuable to me.  There were even times that Evan told me things I could not do – and I valued his input even more in those cases.  His interest was always in helping me first and foremost."

**Arthur Hoffman (father of Evan's sister-in-law)**: "From my observations, Evan is a loving and dutiful son, husband, and father, devoted to his family and community, and by history, strove mightily to build a career in an honorable and ethical fashion. I have engaged in a number of conversations with him over the years, on a wide range of topics, and never once detected any hint of an individual who would sacrifice codes of proper conduct to achieve an objective, or speak ill or harshly of others, or demonstrate an exploitative mindset or orientation."

**Chris Jahrmarkt (client and friend for 9 years)**: "In my capacity as a Member of Northlight Financial, I have also had the pleasure of retaining Evan and his firm as outside counsel lawyer while he was a partner at Katten Muchin Rosenman LLP and later as a partner at Kaye Scholer LLP (now Arnold & Porter Kaye Scholer LLP). In this capacity I have always seen him to be careful and steadfastly diligent in his representation and in the service of the law, including when appropriate advising us not to proceed with proposed transactions if not in his opinion in our best interest. *Evan was always focused on our best interests despite its potential ramification on his firm revenue*."

**Elan Keller (fellow partner at Kaye Scholer)**: "In the fall of 2015, Evan and I went to a meeting with a prospective client. I am a tax partner and the meeting with this prospective client was to discuss a potential corporate and tax engagement with Kaye Scholer. During the meeting, the prospective client proposed an international operational structure and wanted to engage Kaye Scholer to write a tax opinion that his proposed structure would effectively mitigate U.S. federal income taxes. In addition, the prospective client wanted to engage Kaye Scholer to 'paper' the structure, and effectuate all of the corporate documentation, implementation, and execution. The overall corporate and tax engagement would have brought in substantial fees to Kaye Scholer, of which Evan would have been directly responsible for significant origination credit. After the prospective client proposed his structure, I explained to the prospective client that his proposed structure would not effectively mitigate U.S. federal income taxes, since it had no economic or commercial substance, even though it had the appearance of working in form (i.e., the structure looked like it worked on paper, but once the facts were revealed, it lacked economic and commercial substance). *As I was explaining my position to the prospective client that his structure lacked merit, he protested and reiterated that this engagement would bring in substantial fees to Kaye Scholer. Evan interrupted him and said that the 'amount of fees are irrelevant if the structure has no substance. I am sorry that we can not assist you with this*

*matter, but please let us know if you would want us to advise you on a structure that would have more substance.' The meeting ended and as we were walking back to the office, I remember apologizing to Evan that this potential engagement was not going to work out. Evan was very gracious and quickly stated that there was 'no need to apologize; it was clear from your advice that this structure wouldn't work, and so this outcome was the best result.' Evan showed professional responsibility and integrity (and a lack of disappointment) even when faced with losing out on getting credit and attribution for substantial fees from a prospective client.*"

**Mario Nigro (co-counsel on various matters over 6 years)**: "I have been practicing law for 20 years and have known Evan Greebel for over 6 years. One example of a transaction where we worked together that clearly demonstrated his exceptional character and high legal standards was in respect of setting up a business for a US client in a regulated space in Canada. At our client's request, we were trying to find a legal structure that would place the most minimal regulatory burden on our client but the option with the least Canadian regulatory burden came with the most risk of challenge at a later date by the regulators. The option we were considering was one that was undeveloped and could result in short term gain for greater longer term regulatory risk and liability. The alternative approach to setting up the Canadian entity required more legal work as it required engaging with the regulators to ensure that the path forward was acceptable to the regulators. Such a path forward also required more start-up costs and time to meet the regulatory standards, both of which our client was against. Evan was responsible for advising his clients on the options of setting up the business in Canada. He was very respectful of the Canadian regulatory regime and appreciated the regulatory risks. *He did not settle for the 'easy answer' but rather wanted to ensure that if his client was going to accept the riskier alternative they had all the facts and risks identified to them.* We presented under Evan's leadership a very fulsome analysis of the legal options in Canada. The client, based on Evan's leadership and direction decided it was better to invest in the effort to collaborate with the Canadian regulators and incur the additional upfront time and costs to set up the Canadian entity in a manner that provided regulatory certainty and minimized risk. *During our work together, Evan demonstrated a respect for legal practices and regulatory regimes that illustrated his commitment to the law and more importantly his commitment to the underlying principles of what makes a great lawyer, a willingness to 'drill down' on the facts and the law to ensure that his client was given all the information they needed to make a decision, even though the additional information may not be what his client may want to hear. Evan was determined to give his client the best legal advice.*"

**Kenneth E. Noble (former partner at Katten)**: "Evan was my 'go to' corporate partner for complicated restructurings . . . Evan was a valued member of the team . . . [H]e was always willing to take on the difficult project and put in the hard work . . . ."

**Gary C. Trief (former client)**: "During the summer of 2015, as I was considering the sale of my company--one of the biggest decisions of my life--I had another big decision to make.Who, amongst the many lawyers I knew in NYC, would I choose to represent me during this extremely stressful, cumbersome, and complicated process? *I interviewed and spoke with many lawyers, and I chose Evan.  I never regretted the decision.  During the 4-5 month sale and negotiation process, I was consistently impressed by Evan's intellect and integrity.  He saw angles of negotiation and value that I had not, was a ferocious advocate for my interests, and an overall fantastic attorney.*  He had tremendous attention to detail.  After the completion of the sale, the

acquiring company (for whom I worked for a while) mentioned to me multiple times that Evan had done a great job."

### D.   Community Service

Despite the many hours Evan spent working to serve the needs of his clients, he has still always found—and has since continued to find—time to give back to his community.  Since childhood, Evan has embraced the Jewish tradition of "tikkun olam," or working to repair the world.  He has used his skills and passion to help students travel home when family emergencies strike, support drug rehabilitation facilities, work on a regular basis in a soup kitchen, coach sports teams, and, perhaps most significantly, to mentor his children and their friends on the virtues of being kind, respectful, and generous.

**Jodi Greebel (wife)**: "When our children were young, Evan and I started a tradition where they had to select one birthday gift to donate to a child less fortunate. We teach them about taking some of their money that they receive from chores or gifts to give to others. *Evan has encouraged our children to participate in events throughout the community such as visiting old age homes, making challah for others, collecting food to donate and more. With each event, Evan makes sure the children are active participants, but also helps the children understand why they are doing these things.* No matter how hard Evan worked to support our family, he never complained. Whatever small amount of free time he had was always dedicated to our family or the community. Evan rarely takes time to do something just for himself. He can almost always be found surrounded by our immediate or extended family."

**Charles Greebel (father)**: "During [Evan's time in] law school, I received an unexpected phone call from an old college friend who was the general counsel for a Washington, DC based government agency. He told me that a local paper had written about Evan starting a Jewish graduate/young professional organization in the DC area for people that moved there from out-of-town.  Before my friend's call, Barbara and I were unaware of his efforts, and when we asked him, he said a number of people he knew were having trouble developing a friend and support system in Washington and he wanted to make it easier for them . . . *Even during the challenges of the past two and a half years, Evan and Jodi continue to teach their children about the importance of charity.  Although I mentioned Jodi and her parents are still grieving the loss of Jodi's brother, Jodi and Evan helped their children organize a fundraiser for the SPCA in memory of Jodi's brother because Jodi's brother loved animals.*"

**Matthew and Erin Bass (friends for 6 years)**: "Most fathers attempt coaching their kids in Little League at some point but few do it with the devotion and patience that Evan demonstrates. ███████████ were on the same Little League team last Spring that Evan coached. Evan would lead practice every Sunday morning at Quaker Ridge and always introduced new drills for

the kids to enjoy and learn more about the game. Evan would pay unique attention to all the kids on the team, focusing on their specific needs and how to help them improve and making them feel like they were part of the team."

**Michael Brooks (Executive Director of University of Michigan Hillel)**: "I was the Executive Director of University of Michigan Hillel for more than three decades, part of which time I also served as the Jewish chaplain at the Federal Prison in Milan, Michigan. While I am aware of the conduct that led to his conviction, *the Evan Greebel I knew was in every way what we call a mensch, and a very solid one. He helped to establish a fund for students who needed to travel home for family emergencies who might otherwise not have been able to do so.*"

**Elizabeth and Benjamin Brucker, MD (friends for 8 years)**: "Evan has demonstrated the importance of giving back to the community when he brought his kids to volunteer at a UJA event in the Bronx, at a facility where his grandmother used to live. My husband and Evan spent the afternoon with senior citizens, playing card games and chatting with them, which I'm sure was a real bright spot in their otherwise lonely day. He was not just telling his children how to be charitable but showing them first hand."

**Evelyn Carnicelli (worked with Evan on his Eagle Scout project)**: "Because of his interest in the history of Westchester County, Evan believed he could highlight and promote the wonderful historic sites, so he and I worked together on his project, which he called 'The Westchester County Historic Trail.' . . . After visiting numerous sites, together, we picked representative ones. The Westchester [H]istoric Trail was widely circulated. It went to schools, businesses (real estate especially loved it) and places where tourism material was available to the public. …Evan's idea was innovative and unique. He worked tirelessly over many months to produce the product. His enthusiasm was felt over the villages, cities and towns in our county."

**Noel Cimmino (childhood friend)**: "More importantly, Evan usually was our point person with many ofthe house's philanthropic endeavors. Needless to say getting a group of eighteen to twenty-one year college students to give time to something other than students and extracurriculars is not an easy task but Evan volunteered for the duty and always was successful in the daunting challenge of getting people to see the light and helping to do the right thing."

**Brian King (client for 5 years)**: "More recently *I have been involved with Evan as part of a group that is attempting to open a Drug Rehabilitation Facility in up-state New York. Evan has been a driving force behind locating a potential site for the facility, structuring the proposed transaction and identifying the key participants. Evan has put in many hours on this transaction over several years without receiving any compensation. He is driven primarily by his desire to make a positive contribution to the growing epidemic of opioid abuse and addiction impacting the country.* Evan experienced this crisis first hand through a family member and is truly motivated and committed to making a difference."

**Jonathan Lasner (friends for 25 years)**: "I recently met up with Evan. We hadn't seen each other in a while, but we were again able to pick up where we left off, even during this challenging time in his life. I could only imagine what Evan and his family have been through these past couple of years. It would be easy, and completely understandable, for someone in his situation to become wrapped up in their own problems and be indifferent to everything around

them.  But *Evan remained true to form, wanting first to know about me, my family, and my career.  When we finally got around to talking about Evan, I learned that he was raising capital to open a drug rehabilitation center.  I assumed that this was Evan's plan to earn a living in his life after practicing law.  I was surprised to learn (but in retrospect should not have been) that this was not his motivation at all.  He is not an investor, not a member of the board, and seemingly has nothing to gain from this personally.*  I gathered that something must have happened in Evan's personal life that spurred him to action.  He realized that there was an unmet need and he wanted to do something about it – not to find his next career, but out of the concern for others."

**Jon Paley (childhood friend)**: "Recently at lunch, Evan and I talked at length about a business he is getting involved in. This is a rehab facility for people who have opioid and other drug and substance abuse related issues. This hit home particularly hard for me because one of my close friends, ███████, recently died from this exact issue. Evan was particularly focused on this issue because of similar events on his life and he made it clear that he wanted to try and do something about it. Evan described this business with passion and purpose. *When I asked Evan about the details of the business, meaning how much he would own, he said nothing because this has absolutely nothing to do with money. This has to do with an issue he feels he can help with. This, your honor, is the Evan Greebel I have always known.*"

**Jeremy and Leslie Perelman (friend for 9 years)**: "*Despite what must be a constant stream of positive and negative thoughts going through his head, Evan had continued to be a constant fixture on the sidelines coaching his kid's sports teams* since moving to Scarsdale. Being a youth sports coach is a significant time commitment, requires endless amounts of patience, and requires being a positive role model to many kids, not just his own. *Evan's willingness to continue with this commitment, and to do so at the same time he has been fighting for his own freedom, I believe speaks volumes about his priorities in life.*"

**Susannah and Eric Perlyn (family friends)**: "Within the community, Evan has been highly engaged as a coach and mentor. One example of this is in Little League where he helped our son, and many other children in the community, understand the values around teamwork, commitment, and perseverance. As an educator myself, I have always been impressed with Evan's approach to coaching a group of children with a wide range of skills and abilities. Evan is inclusive and makes sure that each child feels comfortable with their place on the team. He also displays patience and understanding in mentoring a group of young boys. Most importantly ... the kids always have fun with Evan. Evan is approachable and always willing to help."

**Steven Rathbone (friend for 10 years)**: "Evan has always treated my family and I with respect and dignity, and he has consistently been involved in charitable events in the community. Whether it be the small things such as remembering my daughter's birthday and sending a gift, or going out of his way to provide a ride home after a corporate outing; to the larger, more important efforts such as Evan's direct and regular involvement in raising money for and sponsoring the Cure Carcinoid charity initiative which he was very passionate about, Evan's actions are those of a man of character."

**Michelle J. Shapiro (former colleague)**: "Evan is a hard-working, devoted family man who makes it a priority to give back to his community. When we worked together, no matter how

many hours he billed or projects he took on, Evan always made time for pro bono work and fundraising. I suspect he has gotten as much out of volunteering as have the beneficiaries of his efforts. To this day, Evan talks about his experience volunteering for NFTE, the Network for Teaching Entrepreneurship, an international non-profit organization providing entrepreneurship training and education programs to young people from low-income urban communities. Working with NFTE, in approximately 1999-2001, Evan mentored 3 or 4 different groups of high school students, helping them to understand the different business structures, draft operating agreements and prepare "pitch decks" and marketing materials.  He worked one on one with students who were trying to start a record label, a fashion label and a makeup company."

**SPCA of Westchester**: "It is with gratitude and much appreciation on behalf of our Board of Directors, staff and the animals, that we acknowledge Evan and Jodi Greebel, who with the help of their three children, collected hundreds of pounds dog food and much needed supplies for the SPCA of Westchester. In addition, they raised nearly $15,000 for our organization in 2017 and 2018."

**Laurence Sorkin (neighbor and family friend of the Greebels)**: "When Evan was a teenager, he was active in the Temple youth group at the Westchester Reform Temple . . . When he was in the Temple youth group, *Evan organized Midnight Runs, collecting and delivering food for the poor and homeless, manning stations at food kitchens and food pantries, and volunteering at homeless shelters in southern Westchester. The Midnight Runs were vintage Evan-they were meticulously organized; they provided much needed assistance to people in need; and they were acts of beneficent kindness, conducted with minimal publicity and without any expectation of personal gain or self-aggrandizement.*"

**Avner Tavori (UJA Federation employee)**: "In 2007 – 2011 I worked for the UJA Federation of New York, which is the primary philanthropic agency that serves the Jewish community of New York and also funds special initiatives in Israel. During that time I met Evan Greebel.  Evan Greebel was among a small group of volunteers who were active participants in the work of UJA . He was a member of a small committee that I managed, and which focused on creating small businesses in Israel as a tool for lifting people out of poverty. The committee met regularly to discuss new ways of helping people, and monitor existing programs. Evan was passionate about using his personal knowledge and experience to the benefit of the less fortunate in the Jewish community in New York and in Israel."

### E.   Effect of Conviction

As much as Evan has worked to improve the lives of his family, friends, colleagues, clients, and community, his own life since arrest has been a challenge.  He has been forced to resign from a profession that has been his life's passion (with the knowledge that he will never again practice law); he has had to find alternative means to support himself and his family; and he has had to cope with both his and his family's anxiety over his fate.

**Jodi Greebel (wife)**:  "The last 2 and a half years have been something I wouldn't wish on my worst enemy. The pain of losing my young, smart, funny and wonderful brother unexpectedly followed a few months later by having my honest, hard-working, incredibly moral husband arrested (without knowing he was being investigated) and later convicted of a crime that has shattered the career he loved has left a gaping hole in my heart. *Without Evan by my side, I am sure I would not have survived my brother's death and fear for what heavy burdens I would have placed on my young children. Evan has made sure I get up each day and keep our children's lives as normal as possible given what we have experienced. He has helped my children cope with my brother's death in ways I am not capable. Evan is more than my partner and my best friend. He is someone my children and I look up to, who participates in their lives to the fullest extent possible.* Evan attends every conference, performance, event and game no matter how trivial it may seem to others. Our family, both the 5 of us, and our extended families would suffer tremendously without him around. I beg of you to be lenient in your sentencing."

**Elise Citrin Swasey (sister-in-law)**: "Due to Evan's unwavering support and comfort, my sister has tackled each day and tried her best to raise my niece and nephews. I am very concerned about how, and whether, she will be able to provide the necessary care to her children if Evan is not around."

**Daniel Weiser (friends for 14 years)**: "To me, Evan not practicing law is difficult because he had such a passion for it, but the idea of him being separated from his family is unbearable. I feel that the punishment will be as much to Jodi, ██████████████████ as it would be to Evan."

**Robert and Ricki Weiser (friends for 13 years)**: "We met Evan Greebel approximately 13 years ago while he was dating our niece Jodi . . . However, one occasion stands out and it demonstrated to us the type of person Evan is.  Almost 3 years ago (in the summer of 2015), our nephew (and Jodi's younger brother) suddenly and tragically passed away.  From the moment it happened, Evan tried to be the support system for both his wife and his in-laws.  Evan was focused on making sure his and Jodi's children were taken care of and not causing too much commotion. He also tried to make sure that Jodi was not overwhelmed with their infant child as she was grieving for her brother. We also remember seeing their other children in the days following the funeral. I sadly remember seeing the look on their younger son's face as he tried to find his uncle.  I also remember Evan asking our thoughts on how to deal with the older child's anguish. ███████████████████████████████████████████████████████ Evan said that he continued to press the situation and that his son would not engage in conversation and was very withdrawn . . . In the days following the conclusion of his trial in December, I know that Evan and Jodi sought the opinion of many (including us), in how to discuss and update their children on the situation.  The nature of that conversation is one that I hope no parent has to have with young children. ██████████████████████████████████████████████████████████ *I am genuinely concerned about the impact that Evan's sentence will have on his kids given the trauma they already experienced at the sudden loss of their uncle.*"

*   *   *   *   *

While the selection we have highlighted in these pages is incredibly impressive, it is just that—a selection. Family members, friends, former colleagues and those who have witnessed his charity first-hand have written letters in support of Evan. These letters represent a truly remarkable outpouring of love and a show of solidarity from around the country and the world. The letters came from people who have known Evan his whole life, who have worked with him both professionally and on community service projects, and even those who have only known him for a brief time. The number and nature of the letters speak volumes about the type of person Evan is, and the impact he has had on so many people. These people, from a wide swath of his life, know Evan to be a good man—and, more importantly, they are willing to stand up for him at this time. We encourage this Court to recognize this love and support, understand the kind of man Evan is to earn such an outpouring, and consider leniency in his sentence.

## VI.    Conclusion

For all these reasons, we respectfully submit that a sentence of probation is the appropriate sentence in this case.

Dated:  New York, New York
        July 16, 2018

*/s/ Reed Brodsky*
Reed Brodsky
Winston Y. Chan
Mylan D. Denerstein
Randy M. Mastro

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000
rbrodsky@gibsondunn.com
*Counsel for Defendant Evan Greebel*
