UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                          15 CR 637 (KAM)

EVAN GREEBEL,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


<u>THE GOVERNMENT'S SENTENCING SUBMISSION</u>


                            RICHARD P. DONOGHUE
                            United States Attorney
                            Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201


ALIXANDRA E. SMITH
DAVID C. PITLUCK
DAVID K. KESSLER
Assistant U.S. Attorneys
      (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

I. FACTUAL BACKGROUND.......................................................................................... 4

   A.  The Defendant Evan Greebel................................................................................ 5

   B.  Shkreli's Hedge Fund Schemes ........................................................................... 6

   C.  Greebel's Crimes of Conviction ........................................................................... 7

   D.  Procedural History ............................................................................................... 14

II. APPLICABLE PENALTIES ......................................................................................... 15

   A.  The Applicable Guidelines Range is 108 to 135 Months' Imprisonment ........................ 16

   B.  Greebel's Objections to the Guidelines Calculation Are Unavailing ............................... 16

      1.  Key Background ............................................................................................... 17

      2.  The Appropriate Loss Amount Calculation is Approximately $14.4 Million ........... 19

      3.  Greebel Has Not and Cannot Show He Is Entitled to a Minor Role Reduction ........ 21

      4.  The Sentencing Enhancement For "Sophisticated Means" Is Warranted.................. 32

      5.  The Sentencing Enhancement for Abuse of Trust Is Warranted ............................... 36

   C.  The Court Should Order Forfeiture in the Amount of $476,249 ....................................... 40

   D.  The Court Should Order Restitution in the Amount of $10,447,979.00........................... 41

   E.  Greebel Has Refused To Provide To Probation Requested Information Regarding His Financial Resources and Cannot Demonstrate An Inability to Pay a Fine .......... 42

III. LEGAL STANDARD.................................................................................................... 45

IV. ARGUMENT ................................................................................................................. 47

   A.  The Nature and Seriousness of Greebel's Offenses Warrant a Sentence of Incarceration ........................................................................................................ 47

   B.  Greebel's History and Characteristics Warrant a Term of Incarceration ........................ 50

      2.  Greebel's Charitable Work Does Not Mitigate His Conduct ..................................... 57

3.   Greebel's Family Circumstances Do Not Warrant the Relief He Seeks ................... 60

C.  The Government's Proposed Sentence Would Reflect the Seriousness of the Offenses and Serve the Goals of Specific and General Deterrence................................ 71

1.   The Defendant's Attempt to Carve Out Special Treatment for White-Collar Criminals Should be Rejected ................................................................................ 71

2.   The Defendant's Loss of His Law License Is Not the Basis for a Probationary Sentence ........................................................................................................ 73

3.   The Government's Proposed Sentence Will Serve the Need for Specific Deterrence ..................................................................................................... 80

4.   The Government's Proposed Sentence Will Serve the Need for General Deterrence ..................................................................................................... 83

D.  The Government's Proposed Sentence Avoids Unwarranted Sentencing Disparities...... 85

CONCLUSION ............................................................................................................ 86

<u>PRELIMINARY STATEMENT</u>

As overwhelmingly proven at trial, the defendant Evan Greebel used his legal training and the trust placed in him by his client, Retrophin, to commit two separate, large-scale frauds to further his own interests and the interests of his co-defendant, Martin Shkreli. For years, Greebel held himself out as Retrophin's trusted legal advisor, a seemingly reputable attorney from a well-known law firm who, as he once told a Retrophin Board member, took his "ethical responsibilities seriously." But Greebel's statement was irreconcilable with his conduct. In reality, Greebel repeatedly violated his duty to Retrophin, working with Shkreli and others to steal millions of dollars' worth of cash and shares. He also used his position as Retrophin's attorney to help Shkreli and others manipulate the price and trading volume of Retrophin's stock. He betrayed his client, over and over again.

At every turn, Greebel placed his own interests in retaining Retrophin as a lucrative client and collecting large fees, and the interests of Shkreli in concealing his prior frauds and protecting his own wealth, before the interests of Retrophin. To maintain the façade of an attorney dedicated to his client, and to conceal his wrongdoing, Greebel deceived not only the Retrophin Board, but also the company's external accountants and auditors, and defrauded investors in Shkreli's hedge funds, his law firm colleagues and the investing public.

The defendant must be held to account for these serious crimes. His sentence must also send a message to other professionals who may be tempted to place their own interests above that of those they have the duty to protect. But the defendant's sentencing memorandum, and the many letters he has chosen to submit with it, seek to minimize his conduct and defy the jury's verdict. As the defendant would tell it, Shkreli was a "mastermind" and a "devil" who manipulated Greebel; the defendant was just "Shkreli's pawn," a functionary who followed orders, and, ultimately, the only true victim of the crimes. The defendant's sentencing submission

also reflects the life that he built prior to his conviction—a loving family, supportive friends, a close community, a reputation for honesty and a profitable and prestigious career with all of its attendant perks and privileges—and chose to gamble away when he agreed to commit crimes with Shkreli and others.  Based on the premise that Greebel was convicted solely because he was unlucky enough to encounter Shkreli, and that the loss of his pre-conviction life—particularly the loss of "his law license" and his "reputation"—is punishment enough, the defendant's sentencing submission takes the extraordinary step of seeking a non-incarceratory sentence, despite an applicable Guidelines range of almost 10 years in prison.

The defendant is not entitled to the truly extraordinary sentence that he seeks. Greebel was not a victim or a pawn.  He was a corrupt lawyer.  He committed his crimes knowingly and deliberately over several years.  He was convicted because of the actions he chose to take.  And the loss of some aspects of the defendant's pre-conviction life—a life that most defendants who come before courts in this district can only dream of having—is not sufficient punishment for his crimes.  This defendant is not entitled to special treatment because he has more wealth, or more supportive family and friends, than most defendants have.  Disbarment and reputational harm are natural consequences of the defendant's convictions, not punishment for them.  If anything, Greebel's use of his law license to commit crimes should increase, not replace his punishment.

The defendant's sentencing submission also makes clear that Greebel is not sorry for anything he did.  It is one thing, and perfectly understandable, for a defendant to preserve his appellate rights by not taking responsibility for his criminal conduct.  But it is quite another thing—an astonishing thing—for this defendant to admit no wrongdoing at all, to show no humility, to concede not even an error in judgment.

2

For his crimes, the defendant faces an advisory Guidelines range of 108 to 135 months' imprisonment.  This range appropriately reflects the serious nature of his extensive, deceptive and deliberate criminal conduct.  Although the government agrees that a sentence within the advisory Guidelines range is unwarranted in this instance, as set forth herein, the Court should reject the defendant's extraordinary request to avoid meaningful punishment.

For the reasons set forth below, the government urges the Court to sentence the defendant to a term of imprisonment of no less than 60 months.

I.    FACTUAL BACKGROUND[1]

  The government realizes that the Court is already familiar with the offense conduct in this case, having presided over both Greebel's eleven-week trial and the six-week trial of Greebel's co-defendant, Martin Shkreli.  In addition, the government has set forth the key evidence detailing the defendant's guilt on each count in its response to the defendant's Rule 29 motion.  (See Dkt. No. 563 at 5-40 (Count Seven) and 40-52 (Count Eight)).  A comprehensive overview of the offense conduct and relevant background information is also set forth in the Pre-Sentence Investigation Report dated May 7, 2018 ("PSR").  (See PSR ¶¶ 6-48).  The following sections are therefore intended to provide only a high-level overview of the basic facts of the MSMB Capital and MSMB Healthcare schemes carried out by Shkreli and others, which serve as important background information for the offense conduct, as well of the two crimes for which Greebel was convicted:  the conspiracy to steal money and shares from Retrophin via the settlement and consulting agreements (Count Seven) and the conspiracy to manipulate the price and trading volume of Retrophin stock (Count Eight).

---

[1] As detailed in the government's letter dated July 18, 2018 (Dkt. No. 642), Greebel filed a sealed addendum ("Addendum A") at the same time that he filed his sentencing memorandum. (See Dkt. No. 639).  To the government's knowledge, Greebel did not receive prior permission from the Court to file Addendum A under seal; moreover, the proposal to seal the entirety of Addendum A does not meet the legal standard that such redactions be "narrowly tailored." Consequently, the government will file a motion to unseal portions of Addendum A simultaneously with this sentencing submission.  In an abundance of caution, and given that the Court will not have a chance to rule on the unsealing motion prior to the filing of the government's sentencing submission, the government has temporarily redacted its sentencing memorandum to mirror the redactions in Greebel's sentencing memorandum and in Addendum A. However, the government's simultaneous motion also seeks to unredact the portions of this sentencing memorandum that reference any subsequently unredacted portions of Addendum A.

A.    <u>The Defendant Evan Greebel</u>

Evan Greebel is an attorney licensed to practice law in New York.  Following law school graduation, Greebel began work as an associate in the corporate department of the New York office of Katten Muchin Rosenman LLP ("Katten").

In June 2011, by which time Greebel was a non-equity partner in Katten's corporate department, another Katten partner was engaged to do work for Martin Shkreli's MSMB Capital hedge fund in connection with a transaction known as Seracare.  Greebel subsequently began to work on the matter, and ultimately did the majority of the work on it.  In June 2012, Greebel became Katten's Principal Attorney for all of Shkreli's MSMB entities following the other partner's departure from the firm.  Between June 2011 and the summer of 2012, Greebel completed additional work for the MSMB entities that Katten billed to MSMB Capital and to Shkreli's second hedge fund, MSMB Healthcare.

In January 2012, as a result of Greebel's efforts for the MSMB entities, Katten was engaged by Retrophin, a pharmaceutical company founded by Shkreli in 2011.  Between January 2012 and September 2014, Greebel was the Principal Attorney for all of Katten's work for Retrophin, and his work for Retrophin was the most significant driver of Greebel's salary.  In Fiscal Year ("FY") 2013, Greebel earned $355,000, but in FY 2014—following an increase in the realization rate for Retrophin-related work from 65% to 101.62%—Greebel earned $900,000.  As a result, Greebel was the top-paid income partner at the entire firm in FY 2014.  After Shkreli was removed as Chief Executive Officer ("CEO") of Retrophin in September 2014, the company determined that it would no longer retain Katten.  The loss of business from Retrophin was the primary driver in the decrease in Greebel's salary in FY 2015, when he earned only $463,751.

In approximately June 2015, Greebel left Katten and joined the law firm of Kaye Scholer.  He was offered a base salary of $800,000 to join the firm.  Shkreli remained Greebel's

client while he was employed at Kaye Scholer.  For example, Greebel represented Kalobios, the company that Shkreli founded after leaving Retrophin.

      B.    <u>Shkreli's Hedge Fund Schemes</u>

At a trial in the summer of 2017, Shkreli was convicted of securities fraud in connection with his operation of two hedge funds, MSMB Capital and MSMB Healthcare.  As proven at the trial, Shkreli made a series of material misrepresentations and omissions to convince investors to give him their money to invest in MSMB Capital, which purported to be a long-short hedge fund that invested in healthcare stocks, and additional material misrepresentations to prevent MSMB Capital investors from seeking a redemption of their invested funds, which Shkreli had lost but which investors believed had increased in value.  Ultimately, Shkreli induced seven MSMB Capital investors to invest a total of approximately $3 million in the fund.

After MSMB Capital failed in February 2011, Shkreli started MSMB Healthcare and recruited a new set of investors based on the same set of lies that had worked for the MSMB Capital investors.  Shkreli made a series of material misrepresentations and omissions to convince investors to invest in MSMB Healthcare, which purported to be a long-short hedge fund that invested in healthcare stocks, and later to prevent MSMB Healthcare investors from seeking a redemption of their invested funds, which Shkreli had largely used to fund Retrophin, without the knowledge or consent of those investors.  Ultimately, Shkreli induced twelve MSMB Healthcare investors to invest a total of approximately $3.4 million.

C.    Greebel's Crimes of Conviction

Greebel was convicted at trial for his role in two fraud schemes related to his client, Retrophin.

1.    Count Seven

With respect to Count Seven, the trial evidence showed that Shkreli and Greebel, together with others, defrauded Retrophin by causing it to: (a) enter into settlement agreements with defrauded MSMB Capital and MSMB Healthcare investors to settle liabilities owed by the MSMB entities and Shkreli; and (b) enter into sham consulting agreements with a defrauded MSMB Capital investor and a defrauded MSMB Healthcare investor to settle liabilities that were solely the responsibility of the MSMB entities and Shkreli.  This fraud scheme resulted in an actual loss to Retrophin of cash and shares totaling approximately $10.4 million.

In November and December 2012, Shkreli and Greebel orchestrated a series of transactions that were backdated to the summer of 2012 to create the appearance of an investment by MSMB Capital into Retrophin when, in fact, both knew that MSMB Capital had made no such investment.  Both Shkreli and Greebel described these transfers to Retrophin's outside accountant as "gifts," although they otherwise claimed the "transfers" actually represented investments. (Greebel Trial Transcript ("Trial Tr.") at 3313, 3347).  In December 2012, Greebel also drafted, and Shkreli filed, an SEC Form 13-D that falsely stated that MSMB Capital had invested in Retrophin.  (Greebel Government Exhibit ("GX") 503).

Between February 2013 and August 2013, the co-conspirators caused Retrophin to enter into settlement agreements with seven defrauded investors in MSMB Capital and MSMB Healthcare.  Each of these investors advised Greebel, either directly or indirectly, that they were seeking compensation for losses they suffered when Shkreli converted their MSMB investments into Retrophin stock without their permission or consent.  Shkreli and Greebel, who participated

7

in all relevant Retrophin Board of Directors meetings, neither advised the Board that defrauded MSMB investors were seeking repayment from Shkreli, nor sought or obtained Board authorization to enter into these agreements.  (See GX 618 (Shkreli to Greebel: "there were serious faults with the [settlement] agreements including lack of board approval").)  Greebel also omitted these agreements from litigation updates from Katten to Retrophin's external auditors.

In late July 2013—after all but one settlement agreement had been finalized—Retrophin's external auditor discovered the settlement agreements, and determined that Retrophin was not responsible for the claims resolved in those agreements and that Retrophin's public filings had to be restated and amended.  On August 23, 2013, Shkreli and Greebel discussed the impact of the auditor's determination in an email exchange.  When Shkreli suggested that the old agreements should be annulled, Greebel responded that the auditor "didn't like that idea." When Shkreli then admitted that "there were serious faults with the [settlement] agreements including lack of board approval" and that redoing the settlement agreements may be a good idea, Greebel responded: "That will open up some very big issues. The current thinking is let rtrx pay, get a note from the fund[,] and if the fund cant [sic] fulfill the note[,] rtrx will write it off as a bad debt. It would be easier than the road you are referring to. Also, [the auditor] would get very spooked with what you are talking about (which could also spook your investors and counter parties)."  In response, Shkreli stated, "[o]n current thinking: that works for me."  (GX 618).

Also in August 2013, Greebel drafted a memorandum (the "Control Memorandum") at the request of the external auditor, which was subsequently provided to the external auditor.  (GX 609-A).  In the Control Memorandum, Greebel admitted that the obligation to repay the MSMB investors was solely the responsibility of Shkreli and/or the MSMB entities. (Id.).  However, the Control Memorandum misleadingly stated that the MSMB investors had

"objected to the number and/or values of the shares of common stock … they received as a distribution from such funds," when in fact the MSMB investors had complained because Shkreli had converted their hedge fund investments into Retrophin stock without their permission after promising to make redemptions available in cash.  (Id.).  The Control Memorandum also falsely stated that Shkreli and/or the MSMB entities would repay the money and shares that Retrophin had paid via the settlement agreements.  (Id.).

       At the same time, in furtherance of that last false statement, Shkreli and Greebel caused MSMB Capital and MSMB Healthcare to execute indemnification agreements and promissory notes for the benefit of Retrophin, prepared by Greebel, in which the MSMB entities falsely promised to repay the shares and cash that Retrophin had paid out in connection with the settlement agreements.  In reality, Greebel knew that the MSMB entities were defunct and could not pay, and he knew that Shkreli had not and would not pay back Retrophin.

       In August 2013, Greebel and Shkreli caused Retrophin to enter into and pay for a settlement agreement with defrauded investor Schuyler Marshall, despite the fact that the Control Memorandum admitted that Retrophin was not responsible for paying defrauded MSMB investors and that controls would be put in place for any further agreements.  Greebel and Shkreli decided to circumvent the protocol in the Control Memorandum by dividing the Marshall settlement agreement into two agreements, one between Marshall and Retrophin (for $300,000) and a second between Marshall, Shkreli and the MSMB entities (for 6,000 shares).  In addition, after the Control Memorandum was drafted, Greebel and Shkreli continued to cause Retrophin to continue to pay out on the existing settlement agreements despite have admitted Retrophin should not do so.

Neither Greebel nor Shkreli disclosed the true nature of the settlement agreements to the Board, to Retrophin's external auditors, or to the investing public. When the need for the restatement of Retrophin's financials was raised at the September 2013 Board meeting, the settlement agreements were presented as an accounting issue that had been resolved.

In addition, between September 2013 and March 2014, Shkreli and Greebel also defrauded Retrophin by causing Retrophin to enter into two sham consulting agreements with defrauded MSMB investors Alan Geller and Blanton in order to repay them for Shkreli's earlier frauds using shares taken from Retrophin. Prior to entering into the consulting agreements, neither Alan Geller nor Blanton had ever considered being a consultant for Retrophin, nor had either man ever discussed with Shkreli, Greebel or anyone else at Retrophin the possibility of being a consultant. Alan Geller and Blanton also never discussed what tasks they might perform for Retrophin with Shkreli, Greebel or anyone else at Retrophin. Geller and Blanton both testified that the sham consulting agreements were simply a way for them to be repaid for their MSMB investments, and that neither had performed any consulting services pursuant to those agreements.

Shkreli and Greebel's intention to use sham consulting agreements to misappropriate resources from Retrophin was clear from their own correspondence. For example, after Greebel suggested using a consulting agreement to funnel shares to Blanton, Shkreli asked, "Why would it need to be a consulting agreement???! Have you heard of the term settlement?" (GX 643). In response, Greebel explained, "We can call it a settlement agreement, but given [the auditor's] recent behavior they may require it to be disclosed in the financials. I was trying to prevent that issue." (Id.). Similarly, Greebel drafted an email for Shkreli to send to Alan Geller, which explained that a consulting agreement would be the "quickest way to get the stock issued to you and satisfies any requests that the transfer agent may have." (GX 560). And, when Shkreli

10

and Greebel were considering how to send more shares to Schuyler Marshall in December 2013, Greebel suggested using a consulting agreement although there had been no discussions with Marshall about consulting and no discussion about the need for Marshall to consult.  (GX 655).

Shkreli and Greebel never presented Blanton's sham consulting agreement to the Board.  And, although a draft of the Geller agreement was circulated to the Board, it was never discussed at a Board meeting nor was it approved by the Board; furthermore, Shkreli and Greebel concealed from the Board that the purpose of that consulting agreement was to resolve Alan Geller's complaints about his MSMB Healthcare investment.

In addition, during the period that Greebel was involved in drafting, negotiating and executing these settlement and sham consulting agreements, Greebel knew that the MSMB entities were under investigation by the U.S. Securities and Exchange Commission ("SEC") for the fraud schemes.  He even arranged for another Katten partner, Michael Rosensaft, to represent Shkreli and the MSMB entities in that investigation.  Greebel directed Rosensaft to bill his time on the SEC investigation to a Retrophin billing matter titled "indemnification," and falsely advised Rosensaft that the Retrophin Board had agreed to indemnify Shkreli for Katten's work.  Greebel held back the "indemnification" bill for more than a year, only sending it after Greebel expected that Shkreli would take control of the Board in a coup Greebel was helping to orchestrate in September 2014.  Greebel also made false statements to Board member Steven Richardson about the SEC investigation.

2.   Retrophin Unrestricted Shares Scheme

With respect to Count Eight, Shkreli, Greebel, and others agreed to defraud investors and potential investors in Retrophin by controlling the price and trading volume of Retrophin's shares.[2]

In November 2012, Shkreli chose the Desert Gateway shell company to facilitate a "reverse marger" to take Retrophin public.  He told Greebel that he picked the shell because it had approximately 2.5 million unrestricted or free-trading shares pre-merger.  But, although Retrophin would pay $200,000 to buy the shell, it never got the 2.5 million free-trading shares.  Instead, Shkreli hand-selected seven associates to receive those shares—Marek Biestek, Tim Pierotti, Andrew Vaino, Thomas Fernandez, Kevin Mulleady, Ron Tilles and Edmund Sullivan—on the understanding that Shkreli would control the shares.  Greebel and Shkreli then arranged for those associates to "purchase," for a nominal amount, 2.4 million free-trading shares from Troy Fearnow, the seller and sole stockholder of Desert Gateway.  Greebel documented the "sales."

At the time of the merger, Retrophin could not pay the full $200,000.  Shkreli and Greebel therefore arranged for Fearnow to hold back in "escrow" 400,000 shares that had already been "sold" to the "purchasers," with the plan to release those shares when Retrophin could make the remaining payment.  At least one of the associates who received some of the remaining two million shares, Timothy Pierotti, never knew the reason the full amount of shares were not provided.

Following the reverse merger, Retrophin continued to struggle financially. Shkreli, Greebel and their co-conspirators needed Retrophin's share price to remain stable

---

[2] Shkreli was also convicted on this count at trial.

through the early part of 2013 to keep the company afloat and to attract investors to the company through a series of private placements ("PIPEs").

With Greebel's assistance, Shkreli exercised control over two million of the free-trading shares in an effort to manipulate the price and trading volume of Retrophin shares. For example, Shkreli sought to monitor the trades of individuals who received Fearnow shares, and on multiple occasions between December 2012 and February 2013, Shkreli sought to and/or did prevent the sale of the free-trading shares to prevent the price of Retrophin shares from falling. During this period, Shkreli also shored up the share price of Retrophin by seeking to have the recipients of the free-trading shares make those shares "unshortable"—that is, unavailable for others in the market to borrow so that the stock could not be shorted.

When one of the "purchasers," Timothy Pierotti, refused to go along with the conspiracy and sold a large number of shares into the market, Shkreli and Greebel took escalating steps to stop him and regain control of his shares.[3]

Among other things, Shkreli and Greebel discussed how to bring Pierotti "over the wall" against his will, that is, put him in possession of material non-public information about

---

[3] One exchange between Shkreli and Greebel prompted by Pierotti's sales provided powerful evidence of Greebel's knowledge of the conspiracy. In December 2012, Pierotti began selling his free-trading shares in large numbers. Email correspondence showed that Greebel and Shkreli noticed the sales and were able to deduce that Pierotti was the seller because of Shkreli's control over the free-trading shares. On December 28, 2012, Shkreli wrote to Greebel: "The stock is trading like crazy – someone is selling the shit out of it." Greebel wrote back: "I don't know–there is no freely trading stock other than you guys and the 500k that Fearnow has." (GX 510). The same day, Greebel received an email from Retrophin's transfer agent that confirmed that the number of free-trading shares was approximately 2.5 million (GX 115-51), and forwarded that email to Shkreli with the comment "fyi." Shkreli responded "[a]mazing, someone shorted 60k in the last two days." (GX 504). Greebel's immediate response was "how will they cover?" Shkreli responded, "I think it might be tim [Pierotti] selling." (Id.). Shkreli and Greebel's conversation indicates that they knew there should not have been 60,000 Retrophin shares available to cover a short because almost all of the free-trading shares were controlled by Shkreli.

Retrophin to force him to stop selling Retrophin shares.  When that failed to stop Pierotti from

trading, Shkreli had Pierotti's brokerage account frozen.  Shkreli then engaged in a campaign of

harassment against Pierotti, which included sending a letter that threatened Pierotti and his family

if he did not return the shares.  Although aware of these actions by Shkreli—a Retrophin

employee—Greebel concealed this information from the Board.  Then, in the spring of 2013,

Shkreli and Greebel forced Retrophin to sue Pierotti in an attempt to further restrict his ability to

sell the Retrophin shares.  Ultimately, a settlement was reached in which Retrophin paid money to

Pierotti in return for his 50,000 escrowed shares, which Shkreli and Greebel directed not to

Retrophin, but to Shkreli himself.

        In addition, and in furtherance of the scheme, Shkreli and Greebel concealed

Shkreli's beneficial control of those free-trading shares.  Form 13-Ds prepared by Greebel and

filed with the SEC on December 20, 2012 and February 19, 2013, failed to report Shkreli's

control over the 2.4 million free-trading shares.  (GX 962).

    D.    <u>Procedural History</u>

        On December 15, 2017, Greebel and Shkreli were indicted and charged with wire

fraud conspiracy for their efforts to misappropriate Retrophin's assets through sham settlement

and consulting agreements (Count Seven).  (<u>See</u> Dkt. No. 1).  Shkreli was also charged with

additional crimes related to the MSMB Capital scheme (Counts One, Two and Three) and the

MSMB Healthcare scheme (Counts Four, Five and Six).  (<u>Id.</u>).  On June 3, 2016, Greebel and

Shkreli were subsequently charged with securities fraud conspiracy for their illegal agreement to

control the price and trading volume of Retrophin shares (Count Eight).  (<u>See</u> Dkt. No. 60).  The

Court subsequently granted Shkreli and Greebel's motions for a severance.  (<u>See</u> Dkt. No. 198).

        On August 4, 2017, following a six-week jury trial, Shkreli was found guilty of

securities fraud on Counts Three and Six, and of securities fraud conspiracy on Count Eight.  The

14

Court later ruled that the government had proven Shkreli guilty of the conduct charged in Count Seven by a preponderance of the evidence at trial.  (See Dkt. No. 535 at 2).  On March 9, 2018, the Court sentenced Shkreli to 84 months' imprisonment, three years' supervised release and a $75,000 fine.  (See Dkt. No. 565).  The Court also ordered him to pay $2,998,000 in forfeiture on Count Three and $3,402,450 in forfeiture on Count Six (see Dkt. No. 541), as well as $388,336.49 in restitution to a defrauded MSMB investor (see Order Amending Judgment, Apr. 9, 2018).

On December 27, 2017, following an eleven-week jury trial, Greebel was found guilty of wire fraud conspiracy (Count Seven) and securities fraud conspiracy (Count Eight).  In the spring of 2018, the parties briefed and argued Greebel's Rule 29 and Rule 33 motions and the government's motion for forfeiture.  (See Dkt. Nos. 530, 563, 574, 588, 589 (Rule 29 and 33 motions); 573, 576, 577, 578, 579, 585, 586, 587, 589, 592 (forfeiture)).  The parties also briefed the appropriate loss calculation for the purposes of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") (see Dkt. Nos. 601, 602, 606, 607, 617, 628, 631, 634), and the Court held a two-day, two-witness Fatico hearing on June 1, 2018 and June 18, 2018.

## II.    APPLICABLE PENALTIES

For the reasons set forth below, (1) the Guidelines range of imprisonment of 108 months to 135 months calculated in the PSR is correct, (2) forfeiture is mandatory on the offenses of conviction and should be ordered in the amount of $476,249, and (3) restitution to Retrophin, the victim of Count Seven, is mandatory in the amount of $10,447,979.00.  In addition, Greebel has failed to show that he is unable to pay a fine because he refused to provide the Probation Department ("Probation") with the required information it requested regarding his financial resources.

A.      The Applicable Guidelines Range is 108 to 135 Months' Imprisonment

The government respectfully submits that the appropriate Guidelines calculation is set forth in the PSR and below (PSR ¶¶ 61-70):

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Plus:  Loss Greater Than $9.5 Million (§ 2B1.1(b)(1)(K)) | +20 |
| Plus:  Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 |
| Plus:  Abuse of Trust / Special Skill (§ 3B1.3) | +2 |
| Total Offense Level: | 31 |

Greebel has a criminal history score of zero, and thus a criminal history category of I.  (PSR ¶ 74).  Based on the total offense level of 31 and a criminal history category of I, Greebel's Guidelines range of imprisonment is 108 to 135 months.  (See id. ¶ 116).  Because this Guidelines range is in Zone D of the Sentencing Table, the Guidelines "do not authorize a sentence of probation."  U.S.S.G. § 5B1.1 cmt. 2; see also U.S.S.G. § 5C1.1(f) ("If the applicable guidelines range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment.").  As a result, Greebel "is ineligible for probation." (PSR ¶ 122).

B.      Greebel's Objections to the Guidelines Calculation Are Unavailing

In his sentencing memorandum, Greebel objects to each enhancement that Probation and the government have determined to be applicable, and also seeks a minor role reduction.  His objections should be rejected in their entirety.  There is clear evidence to show that, by at least a preponderance, Greebel abused his position of trust as Retrophin's attorney and employed his legal skills in committing his crimes; used sophisticated means to execute and conceal the conspiracies; and caused a combined actual and intended loss of approximately $14.4 million.  Moreover, Greebel cannot meet his burden to show that he qualifies for a minor role

reduction.  To the contrary, Greebel was an active and knowing participant in each conspiracy, using his unique status as the company's attorney to further the goals of the conspiracy.

1. Key Background

a. The Parties' Initial Objections and Probation's Response

Probation issued the PSR on May 7, 2018.  Two weeks later, pursuant to Federal Rule of Criminal Procedure ("FRCP") 32(f)(1), the government provided Probation with several factual corrections.  Greebel did not submit his objections to the PSR until June 8, 2018 ("PSR Objections").  In addition to a host of objections to factual statements in the PSR, Greebel made two objections to Probation's Guidelines calculation.  First, Greebel contended that Probation's calculation of loss—approximately $14.4 million, resulting in a twenty-level enhancement—was incorrect, but did not provide an alternate calculation pursuant to U.S.S.G. § 2B1.1(b).  (PSR Objections at 9-15, 17-19).  Second, Greebel contended he should receive a two-level offense level reduction pursuant to U.S.S.G. § 3B1.2(b) because he played a "minor role" in the crimes for which he was convicted (PSR Objections at 20).[4]  The government responded to Greebel's objections on June 22, 2018 ("Gov't. Response to Greebel PSR Objections"), and argued that the majority of Greebel's factual objections should be rejected, that Probation's initial loss calculation was accurate, and that Greebel did not qualify for a "minor role" reduction.[5]

_____

[4] Greebel also argued in his objections to the PSR that the Court should downwardly depart because the offense level "overstates" the seriousness of the offense.  (See PSR Objections at 20).  Probation did not address this argument in its addendum to the PSR, and Greebel did not make that argument to the Court in his sentencing memorandum, thus waiving that argument. Moreover, for reasons set forth in the government's response, such a downward departure is inappropriate.  (See Gov't. Response to Greebel PSR Objections at 25).

[5] The Court received a copy of the government's June 22, 2018 response by hand delivery. The government incorporates all of its arguments in that response herein.

On July 2, 2018, Probation issued an addendum to the PSR ("First PSR Addendum"), in which it accepted the government's corrections in their entirety. (First PSR Addendum at 1). Probation also rejected the majority of Greebel's factual objections to the PSR,[6] including Greebel's attempts to excise significant background information regarding Shkreli's hedge fund frauds, and to dramatically decrease the calculation of Greebel's estimated net worth by, inter alia, including only half the value of jointly-held assets. (See First PSR Addendum at 2, 5-6; see also infra Section II.E). In addition, as detailed below, Probation found that a minor role reduction was not warranted. (See First PSR Addendum at 3). Finally, Probation indicated that it would defer to the Court as to the appropriate calculation of loss and of restitution. (See id.)

b.   Greebel's New Objections in His Sentencing Memorandum

On July 16, 2018, Greebel filed his sentencing memorandum ("Def. Mem."). Almost two months after the deadline for objections set forth in FRCP 32(f)(1) and more than a month after making his initial objections, that memorandum raised two new objections to the PSR, that neither the "use of sophisticated means" enhancement (U.S.S.G. § 2B1.1(b)(10)(C)) nor the "abuse of trust" enhancement (U.S.S.G. § 3B1.3) is applicable. (Def. Mem. at 23-24, 32-33).[7]

---

[6] Probation only accepted Greebel's proposed changes to the following paragraphs, which were in large part either consented to or not objected to by the government: Paragraph 1 (amending list of attorneys); Paragraph 25 (adding language regarding defrauded investor Lindsay Rosenwald); Paragraph 27 (changing date); Paragraph 29 (clarifying that Greebel directed Marc Panoff to send false assurances to Retrophin's auditor); Paragraph 35 (adding language regarding Alan Geller's consulting agreement); Paragraph 37 (adding language regarding Greebel's knowledge of the SEC investigation of the MSMB entities); Paragraphs 98 and 130 (reflecting that the defendant will be suspended from the practice of law upon conviction); and Paragraphs 77, 81-85, 87, 88, 105, 108 (reflecting updated information regarding Greebel and family members provided by Greebel). (See First PSR Addendum).

[7] In his sentencing memorandum, Greebel fails to state whether he continues to advance his prior factual objections to the PSR, which Probation has rejected. To the extent that Greebel

Probation immediately issued a second addendum on July 17, 2018 ("Second PSR Addendum"), rejecting Greebel's new objections.  Probation found that both the sophisticated means and abuse of trust enhancements were applicable, and noted that Greebel's use of a "special skill" (his legal training) to commit his crimes separately supported the two-level enhancement pursuant to U.S.S.G. § 3B1.3.  (Second PSR Addendum at 1-3).

          c.     <u>Greebel's Proposed Guidelines Calculation</u>

Based on all of the defendant's objections, he argues for the following Guidelines calculation:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Plus:  Loss Greater Than $250,000 (§ 2B1.1(b)(1)(G)) | +12 |
| Minus:  Minor Role (§ 3B1.2(b)) | <u>-2</u> |
| Total Offense Level: | <u>17</u> |

That calculation results in a Guidelines range of 24 to 30 months' incarceration.  (Def. Mem. at 33).  Notably, even <u>this</u> range is in Zone D of the Sentencing Table, and, as such, the Guidelines "do not authorize a sentence of probation" even under Greebel's proposed calculation.  U.S.S.G. § 5B1.1 cmt. 2; <u>see also</u> U.S.S.G. § 5C1.1(f).

For the reasons set forth below, the Court should reject Greebel's Guidelines calculation and adopt the Guidelines calculation set forth in the PSR.

          2.     <u>The Appropriate Loss Amount Calculation is Approximately $14.4 Million</u>

As the government detailed in its prior filings (<u>see</u> Dkt. Nos. 601, 606, 617 and 634), which are hereby incorporated, the loss amount attributable to the defendant is

---

does seek a ruling from the Court on those factual objections to the PSR, the government refers the Court to its responses to those objections.  (<u>See</u> Gov't. Response to Greebel PSR Objections).

approximately $14.4 million.  Greebel caused Retrophin a loss of $10,447,979.00 as a result of

the conduct underlying Count Seven, and he is responsible for approximately $4 million in

intended loss as a result of the conduct underlying Count Eight.  (See PSR ¶¶ 49-51).  This

amount falls within the $9.5 million to $25 million bracket in Section 2B1.1(b)(1), and results in a

20-level increase in the offense level.  See U.S.S.G. § 2B1.1(b)(1)(K).  That approximately $4

million loss for Count Eight is the same one the Court adopted in sentencing co-conspirator

Shkreli, who was also convicted of Count Eight.  (See Dkt. No. 535 at 90-95).

       Greebel's sentencing memorandum raises no new substantive arguments regarding

the appropriate loss calculation.  (Def. Mem. at 18-23).  He does, for the first time, state his

position that the loss amount for Count Seven should be "no more than $477,329."  (Compare id.

and Dkt. Nos. 602, 607, 628, 631).  The defendant reaches that amount by taking the total loss to

Retrophin from the settlement and sham consulting agreements and subtracting $9,970,650,

which he contends is the "exposure to Retrophin" from hypothetical lawsuits that might have

been brought by defrauded MSMB investors.  (Def. Mem. at 19-21).[8]  He further contends that

there was no intended loss on Count Eight.  (Id. at 21-22).  Therefore, Greebel asserts that he

should receive only a 12-point enhancement for loss pursuant to U.S.S.G. § 2B1.1(b)(1)(G).

---

[8] Greebel has at various points taken the position that Retrophin has either suffered no
actual losses with respect to Count Seven (see PSR Objections at 9), as well as the position that
Retrophin suffered an actual loss of either $300,000 (the value of the Schuyler Marshall
settlement agreement) before arriving at $477,329 (as calculated above) (Dkt No. 631 at 19-20).
That number is, at best, wildly speculative, and is entirely unsupported by evidence.  As the
government pointed out at the Fatico hearing and in its post-hearing submission on the loss
calculation, defense witness Gayle Klein admitted that her estimate vastly overstates any potential
offset because it assumes that every lawsuit would have gone to trial, and does not account for
economies of scale, insurance or recovery Retrophin could have made against Shkreli.  (See Dkt.
No. at 11-13).  Indeed, Klein testified on cross-examination that 98 percent of civil cases settle,
and it is therefore likely that none of the "hypothetical" cases against Retrophin would have gone
to trial.  (06/01/18 Fatico Tr. at 74).

For the reasons set forth in its prior filings, Greebel's arguments regarding loss should be rejected in their entirety, and the Court should adopt the loss calculation set forth in the PSR.

    3.    <u>Greebel Has Not and Cannot Show He Is Entitled to a Minor Role Reduction</u>

U.S.S.G. 3B1.2(b) authorizes a two-point reduction in offense level if a defendant was a "minor participant in any criminal activity" and "substantially less culpable than the average participant" in that activity. <u>Id.</u> cmt. n.3(A). Greebel argues that he is "entitled" to that reduction because he was "irrefutably" a minor participant in the criminal activity in Count Seven and Count Eight. (Def. Mem. at 24-32). Probation has already rejected that argument. (First PSR Addendum at 3). Probation recognized that the "defendant was the attorney for Retrophin, and was intricately involved in assisting Shkreli in defrauding Retrophin," including by assisting with "drafting, negotiating and executing" the settlement and sham consulting agreements. (<u>Id.</u>). Probation also noted that Greebel was "fully aware of the scope and structure of the criminal activity" and "was involved in various email exchanges with Shkreli, which indicate that his role in executing and concealing the fraud and the scheme to control Retrophin free-trading shares was more than that of a minor participant." (<u>Id.</u>). The Court should similarly reject Greebel's arguments and find that Greebel has not met his burden to show that a minor role reduction is warranted for his criminal conduct in connection with either Count Seven or Count Eight.

It is the defendant who bears the burden of establishing by a preponderance of the evidence that he was a "minor participant." <u>United States v. Brunshtein</u>, 344 F.3d 91, 102 (2d Cir. 2003). Whether a minor role reduction is appropriate is a "fact-based determination" based on the "totality of the circumstances," and a court should consider the following "non-exhaustive list" of factors: (i) the defendant's understanding of the scope and structure of the criminal

activity, (ii) the degree to which the defendant participated in planning or organizing the criminal

activity, (iii) the degree to which the defendant either exercised decision-making authority or

influenced the degree of the exercise of such authority, (iv) the nature and extent of the

defendant's participation in the criminal activity, and (v) the degree to which the defendant stood

to benefit from the criminal activity.  U.S.S.G. § 3B1.2 cmt. n.3(C); see also United States v.

Ravelo, 370 F.3d 266, 270 (2d Cir. 2004) (district courts look to factors such as "the nature of the

defendant's relationship to other participants, the importance of the defendant's actions to the

success of the venture, and the defendant's awareness of the nature and scope of the criminal

enterprise") (quoting United States v. Yu, 285 F.3d 192, 200 (2d Cir. 2002)).

Historically, the Second Circuit has also held that a "reduction will not be

available simply because the defendant played a lesser role than his co-conspirators; to be eligible

for a reduction, the defendant's conduct must be 'minor' or 'minimal' as compared to the average

participant in such a crime."  United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999) (per

curiam).  However, as the Second Circuit observed in United States v. Kirk Tang Yuk, 885 F.3d

57, 88 n.16 (2d Cir. 2018), the Guidelines have been amended to explain that a role reduction is

appropriate if the defendant was "substantially less culpable than the average participant in the

criminal activity," and that the "average participant" specifically refers to the defendant's "co-

participants in the case at hand."  The Second Circuit further observed that the Sentencing

Commission's interpretation is given "controlling weight" and "undercuts" the prior Second

Circuit's interpretation in Rahman and its progeny.  Id.

Applying this standard to the evidence adduced at trial, it is clear that Greebel

cannot meet his burden to show that he should receive a minor role reduction.  To the contrary,

Greebel played a crucial role in both conspiracies, leveraging his position as Retrophin's attorney

and the trust placed in him by the Board of Directors to effectively execute and conceal the schemes, including by covering for Shkreli as needed.

For example, with respect to Count Seven, Greebel used his role as Retrophin's attorney to: (1) help draft, negotiate and execute all of the settlement and sham consulting agreements that defrauded Retrophin, including by dealing directly with the defrauded investors and their representatives; (2) direct Standard Registrar to have Retrophin issue shares to defrauded investors in satisfaction of the agreements; and (3) advise Shkreli that sham consulting agreements were the most expeditious way for Shkreli to steal a large volume of Retrophin shares from the company without attracting notice.  Greebel also used his position as Retrophin's attorney to draft and disseminate the documents containing false information—including the Form 13-D, the Control Memorandum, the promissory notes and the statements in the SEC disclosures regarding the settlement agreements—that concealed the true nature and purpose of those agreements from Retrophin's Board and external auditors, as well as the investing public.

With respect to Count Eight, Greebel used his position as Retrophin's attorney to: (1) direct the distribution of the Fearnow shares to individuals selected by Shkreli; (2) disguise those distributions as a series of arms-length transactions, when in fact the individuals were controlled by Shkreli; (3) draft the false Form 13-D that concealed from the public that Shkreli was the beneficial owner of the Fearnow shares; and (4) help Shkreli control or seek to control those shares post-distribution, including by seeking to prevent Pierotti from selling shares in contravention of the goals of the conspiracy and by orchestrating the reassignment of the Fearnow shares from other co-conspirators to Shkreli and certain defrauded MSMB investors.

For both schemes, Greebel uniquely took advantage of the Board of Directors' trust and counseled Shkreli about how best to execute the schemes (e.g., suggesting the

promissory notes and consulting agreements to further the scheme in Count Seven, and advising

Shkreli on how to avoid the "Pierotti problem"—e.g., losing control of certain Fearnow shares—

by structuring various transactions in Count Eight).  Greebel's unique and pivotal role in these

schemes weighs against a minor role reduction.  See, e.g., United States v. Yu, 285 F.3d 192, 200

(2d Cir. 2002) (defendant, whose "importance relative to the other co-conspirators was clearly

quite high" because he acted as a "trusted authority" and "removed an obstacle to the scheme" by

"vouching" for a co-conspirator, was not entitled to a minor role reduction); United States v.

Beckford, 545 F. App'x 12, 15–16 (2d Cir. 2013) (defendant who was close to and trusted by the

leader of the scheme, and had a "specialized role" relative to other scheme participants "because

he could be trusted as an intermediary," was not entitled to a minor role reduction).[9]

It is also clear that, even considering the relative culpability of Greebel as

compared to his co-conspirators on each count, Greebel has not met his burden to show that he is

entitled to a minor role reduction.  With respect to Count Eight, the government advocated for—

and the Court found—that Shkreli should receive a four-point enhancement pursuant to U.S.S.G.

§ 3B1.1 for being a leader or organizer of the criminal activity.  (03/09/18 Shkreli Sentencing Tr.

at 72).  An argument could be made that Greebel's actions also warrant an offense level

enhancement pursuant to U.S.S.G. § 3B1.1 on Count Eight, as the conspiracy had a large number

of participants and Greebel, like Shkreli, directed other participants to take steps in furtherance of

---

[9] Notably, the government has been unable to find a case in the Second Circuit where a
defendant who abused a position of trust or employed a special skill in furtherance of his/her
crimes, as the defendant did here (see Section II.B.5), also received a minor role reduction.  In
fact, the Guidelines contemplate the opposite—Section 3B1.3 specifically discusses when an
aggravating role can be employed in addition to the abuse of trust/special skill enhancement.  See
U.S.S.G. § 3B1.3.

the conspiracy.[10]  While the government is not seeking such an enhancement, Greebel's actions in directing other co-conspirators—whose role in the conspiracy was far more limited—could conceivably render an enhancement applicable but certainly disqualify him from receiving a minor role reduction.

With respect to Count Seven, Shkreli and Greebel are similarly culpable, and both are more culpable than other co-conspirators who had more limited roles in the conspiracy.  For example, Panoff—unlike Shkreli and Greebel—joined the conspiracy after he became Chief Financial Officer ("CFO"), and after all but one of the settlement agreements had been finalized. Similarly, Mulleady's role was limited to backdating share transfer documents and convincing MSMB investors that they had not been defrauded by Shkreli.  By contrast, Shkreli and Greebel played significant and complementary roles in the conspiracy.  For example, Shkreli directed defrauded MSMB investors to enter into settlement and sham consulting agreements with Retrophin, transferred funds from Retrophin's bank account in satisfaction of the agreements, concealed the true nature of the agreements from the Retrophin Board and falsely stated that he would repay the promissory notes, while Greebel was involved in negotiating, drafting and executing the settlement agreements and sham consulting agreements, drafted documents crucial to concealing the true nature of the agreements and directed Standard Registrar and the Fearnow share recipients to transfer Retrophin shares in satisfaction of certain agreements.

---

[10] For example, in the spring of 2013, Greebel and Shkreli discussed at length how the co-conspirators who held escrowed Fearnow shares should be directed to reassign those shares for Shkreli's benefit; Greebel formulated the plan to facilitate those transfers and subsequently directed the co-conspirators to execute the paperwork that resulted in the transfer of shares to Shkreli and/or certain defrauded MSMB investors.  (See, e.g., GXs 542, 543, 544, 579).

Greebel's myriad arguments that he is "entitled" to a minor role reduction are

unavailing.  First, Greebel contends that the government in the Shkreli trial argued that Greebel

was a minor participant but "reversed its position" during the Greebel trial.  (Def Mem. at 27).  As

an initial matter, attorney's arguments are not evidence, and are not an appropriate basis for a role

reduction.  Moreover, Greebel's characterization of the government's statements in summation at

each trial is incomplete and inaccurate.  At both trials, the government consistently argued that

Greebel and Shkreli schemed together to commit the crimes in Counts Seven and Eight.  For

example, in the portion of the government's summation which was mischaracterized in the

defendant's brief, the government argued that Shkreli and Greebel were partners in the criminal

conspiracies:

> And you've seen emails that were just between the defendant and
> Martin Shkreli, emails that they thought would never see the light
> of day. Emails that further reveal the true nature and role of the
> defendant. The man behind the scene.  The man behind the scene.
> The man who was scheming with Martin Shkreli to commit a fraud
> against his client that was paying the defendant's law firm millions
> of dollars in legal fees. The defendant did it for money, to move up
> the ranks in his firm, and he did it to please and to protect Martin
> Shkreli, the man who controlled the purse strings of Retrophin
> without Shkreli's stamp of approval, the defendant could have lost
> Retrophin, his biggest and most important client. To protect
> millions of dollars in fees, he committed these two crimes, and in
> doing so, the defendant crossed the line from legal adviser to
> criminal coconspirator.

Trial Tr. at 10218 (emphasis added).  That argument is entirely consistent with the portion of the

government's rebuttal in Shkreli the defendant cited in his sentencing memorandum, in which the

government similarly discussed how Shkreli and Greebel worked together to commit their crimes:

> Martin was the [dominant] person in that relationship and that
> relationship was a criminal conspiracy. There is no doubt about it.
> They worked together to defraud the company, to defraud the
> shareholders and the investors of Retrophin. [Greebel] was looking
> out for Martin. He was helping Martin be creative about how they

were going to steal the company's money so that Evan could keep getting paid. So that the MSMB investors would go away. They wouldn't sue. They wouldn't go to the SEC. They wouldn't expose Martin for the fraud that he is. [Shkreli] was not lead astray by a trusted legal adviser. There is no support in the evidence for that. None whatsoever. <u>They were co-conspirators. They schemed together and the evidence supports no other conclusion</u>.

(Shkreli Trial Tr. at 5515 (emphasis added)).

The reference to Shkreli as the "dominant" personality at the beginning of the above-cited passage was made specifically to rebut an argument from Shkreli's counsel that Shkreli had no criminal culpability with respect to Counts Seven and Eight because he was simply relying on Greebel's legal advice. <u>See</u> Shkreli Trial Tr. at 5514 ("I also want to just talk very briefly about Mr. Brafman's arguments regarding Mr. Shkreli relying on Evan Greebel for advice"). In other words, the government's point was that it was absurd for Shkreli to argue that Greebel was <u>solely</u> responsible for the crimes in Counts Seven and Eight, or that Greebel was "leading [Shkreli] around by the nose" (<u>id.</u>), since the evidence showed that Shkreli and Greebel were so clearly working as partners to commit those crimes. Moreover, while the government does not dispute that there was some evidence that Shkreli treated Greebel poorly by berating him in person or in writing (<u>see</u> Def. Mem. at 31), this interpersonal dynamic—as discussed in more detail below—does not transform Greebel into a "minor participant."

<u>Second</u>, Greebel argues he played a "minor role" because he had limited knowledge of the two MSMB hedge fund fraud schemes, which preceded the frauds in Counts Seven and Eight, he "was not involved until later in the various schemes." (Def. Mem. at 27-28). In support of this argument, Greebel cites <u>United States v. Adelson</u>, 441 F. Supp. 2d 506, 507 (S.D.N.Y. 2006). However, <u>Adelson</u> is inapposite for two reasons. As noted <u>supra</u>, the court in <u>Adelson</u> did not grant the defendant a minor role reduction; to the contrary, the court <u>granted</u> the

government's motion for a four-point role enhancement because the defendant in that case, "although not an originator of the fraud, ultimately played a leadership role." See id. at 510-511. Moreover, the Adelson court's observation that the defendant had "not participated in the fraudulent conspiracy until its final months," id. at 513, does not apply to this case, in which the defendant was involved in both schemes from the start, not just in the "final months."  The defendant's participation in the MSMB schemes is irrelevant.[11]

And, in any event, the evidence at trial demonstrated that Greebel did, in fact, know about the earlier MSMB frauds by the time he began taking steps in furtherance of the conspiracy in Count Seven, including his knowledge that: MSMB Capital had never invested in Retrophin, as shown in the "cap tables"; the statement that MSMB Capital did invest in Retrophin in the Form 13-D was false; Shkreli was funneling money from Retrophin to pay the Merrill Lynch settlement; and the SEC was investigating Shkreli's hedge fund frauds, including its evidence that investors believed they had been defrauded.  Even if Greebel's understanding of the full scope of the conspiracy developed only gradually—which the government disputes—that would still not be enough to warrant a minor role reduction.  See, e.g., Kirk Tang Yuk, 885 F.3d at 89 (finding that defendant who "progressed from being a conspirator whom the others 'kept in

---

[11] In fact, while the defendant states that a "review of other cases makes clear that a minor role adjustment is warranted in this case," the defendant discusses only two cases:  Adelson and United States v. Atilla, 15-cr-687 RMB, 2018 WL 791348 (S.D.N.Y. Feb. 7, 2018). (Def. Mem. at 25-31).  Adelson, as explained herein, is inapposite, and Atilla is also easily distinguishable.  The defendant in Atilla was a reluctant participant in the scheme, a banker who was following the direct orders of his supervisor at the bank and, at times, even refused to participate in the scheme.  Atilla Tr. at 28-31.  That is markedly different from the defendant, who, as discussed above, was acting independently and proactively, and served as the lawyer for the client he was defrauding.  As the Atilla transcript is not yet available on public court records and the defendant neglected to attach it to his filing, the government includes it as Exhibit A for the Court's review.

the dark' to a full-fledged conspirator who was 'on the same page'" as his co-conspirators was not

entitled to a minor role reduction).

Third, Greebel argues that he played a "minor role" with respect to the settlement

and consulting agreements because he merely served as "Mr. Shkreli's pawn," doing nothing

more than taking "direction" and acting as Shkreli's "scrivener." (Def. Mem. at 28-31). Greebel

points to evidence of instances where Shkreli directed Greebel to take certain actions, such as

memorializing certain terms in the settlement and consulting agreements, as well as evidence that

Shkreli sometimes treated him poorly. (Id.). Greebel's contention that he was only following

Shkreli's orders—even if it could be taken at face value—would not automatically entitle him to a

minor role reduction. See, e.g., Ravelo, 370 F.3d at 270 (defendant's "contention that he was

only following orders does not require" a minor role reduction).

But there is ample evidence that Greebel was not, in fact, a "pawn." On numerous

occasions Greebel helped Shkreli find creative solutions to ensure the success of the conspiracy.

For example, when the external auditors discovered the settlement agreements, Shkreli and

Greebel (and to some extent, Panoff) engaged in an extensive discussion about how to handle the

auditors' request for disclosure in a manner that would not expose their fraud. (See, e.g., GXs

616, 617, 618). Greebel advised Shkreli that he might "have a solution using notes" and Shkreli

urged him to "[b]e creative" in how he dealt with the issue. (Id.). Ultimately, it was Greebel who

outlined the best way forward that would protect both Shkreli and Greebel: the "current thinking

is let rtrx pay, get a note from the fund and if the fund cant fulfill the note rtrx will write it off as

bad debt." (GX 618). Similarly, it was Greebel who suggested using consulting agreements as a

means to extract shares from Retrophin to repay defrauded MSMB investors Alan Geller and

Blanton, so that Shkreli did not himself have to pay for the obligations and the agreements did not

have to be disclosed.  (See, e.g., GXs 643 (Greebel suggests consulting agreement because auditors might require a settlement agreement "to be disclosed in the financials.  I was trying to prevent that issue"; 560 (Greebel drafts email for Shkreli to send to Alan Geller, which states "would you be willing to sign a consulting agreement . . . ?  It would be the quickest way to get the stock issued to you and satisfies any requests that the transfer agent might have").[12]  Greebel also advised Shkreli on the best method for reassigning escrowed Fearnow shares to ensure that Shkreli retained control and to avoid a "hostage situation" and a "Pierotti problem," a situation where the recipient no longer agrees to participate in the conspiracy and refuses to allow Shkreli to control the shares.  (GX 542).  And while Shkreli sometimes gave Greebel specific directions, Shkreli also trusted Greebel to handle certain aspects of the conspiracies on his own.  For example, in discussing the reassignment of the escrowed Fearnow shares, Shkreli got frustrated and told Greebel to handle the situation on his own:  "Take from anyone – I don't care – do the math?"  (GX 579).

Fourth, Greebel argues that he played a "minor role" in Count Eight because, unlike Shkreli, he did not "hatch, plan or direct" the scheme to control the price and trading volume of Retrophin stock.  Greebel notes that he was not present for one meeting where the scheme was discussed, nor was he copied on two emails in which various aspects of the scheme

---

[12] The defendant's conduct in paying Shkreli's debts using company resources masked as consulting agreements was rampant.  As noted above, in December 2013, the defendant suggested to Shkreli that they use a consulting agreement to force Retrophin to pay 15,000 shares to Marshall for a debt owed to him by Shkreli.  (GX 655).  And in a document that the Court precluded at trial because it was related to Thomas Koestler (an individual who was not a defrauded MSMB investor), the defendant and Shkreli discussed the fact that Shkreli personally owed Koestler an additional 15,000 shares, and discussed where those shares should come from.  The defendant asked Shkreli, "[d]o you want the remaining 15k shares [for Koestler] to come from the freely-traded group?"  Shkreli responded, "I would rather the shares come from the company."  The defendant responded, "[s]o consulting agreement?"  (GX 613).

were discussed.  (Def. Mem. at 30).  This characterization of Greebel's role in Count Eight is inaccurate.  As discussed at length in the government's brief in opposition to the defendant's motion for acquittal (see Dkt. No. 563 at 40-52), the defendant orchestrated various aspects of the Count Eight scheme, including the allocation and reallocation of Fearnow shares and efforts to identify and neutralize Pierrotti.

Finally, Greebel argues that he should receive a minor role reduction because he was not a "direct beneficiary" of the criminal schemes.  (Def. Mem. at 31).  But "the degree to which the defendant stood to benefit from the criminal activity" is but one of many non-dispositive factors in the "minor role" analysis.  See U.S.S.G. § 3B1.2 cmt. n.3(C).  Moreover, Greebel did "stand to benefit" and did in fact benefit from his crimes through significant increased compensation from Katten, as detailed in the government's forfeiture filings.  (See Dkt. Nos. 573, 579, 585, which are incorporated herein.)  Specifically, Greebel's criminal conduct in connection with Count Seven helped conceal Shkreli's hedge fund frauds (and Greebel's allegiance to Shkreli at Retrophin's expense), allowing Shkreli to retain control of the company and continue to direct new work for Retrophin to Katten.  Greebel's Count Eight conduct ensured that Retrophin would be able to direct hundreds of thousands of dollars in legal fees to Katten at a time when Greebel desperately needed the company to pay its outstanding legal bills or his compensation and reputation would suffer.  Retrophin's payment of outstanding bills and its direction of additional legal work to Katten were two primary drivers of the dramatic increase in Greebel's salary from FY 2013, when he made just $355,000, to FY 2014, when he took home $900,000.  The direct benefit to Greebel from this conduct is $476,249, a substantial amount of money.

* * * * *

31

In sum, the Court is "not bound to accept [Greebel's] self-serving characterization[] of his role" in the criminal conspiracies as merely acting as "Shkreli's pawn," and should reject such a characterization as refuted by the evidence in the record.  United States v. Shonubi, 998 F.2d 84, 90 (2d Cir. 1993).  Greebel has not and cannot meet his burden for proving a minor role reduction because the evidence shows he played a significant role in both schemes.

        4.      The Sentencing Enhancement For "Sophisticated Means" Is Warranted

A defendant should receive a two-point offense level enhancement if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. 2B1.1(b)(10)(C).  "Sophisticated means" are "especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense."  Id. cmt. n. 9(B).  As detailed supra in Section II.B.1.c., Greebel argued in his sentencing memorandum that the "sophisticated means" enhancement should not apply because his "alleged offense conduct was neither especially complex nor intricate" and that to find a "sophisticated-means enhancement appropriate here would effectively increase the base offense level for securities or wire fraud in any corporate setting."  (Def. Mem. at 23-24).

Probation has already considered and rejected Greebel's arguments, maintaining that "the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  (Second PSR Addendum at 1).  Specifically, Probation concluded that Greebel's actions in "drafting, negotiating and executing a series of settlement agreements and sham consulting agreements that were used to steal Retrophin shares and money" to repay the victim investors in the MSMB entities, as well as his actions to conceal the "true nature and purpose" of those agreements from the Retrophin Board, the external auditors and the investing public, constituted sophisticated means with respect to Count Seven.  (Id. at 2).  Similarly, Probation concluded that Greebel's actions in distributing the free-trading

shares of Retrophin; subsequently attempting to, and in fact exercising, control over those shares; and concealing Shkreli's beneficial ownership of and control over those shares from the public by making false SEC filings, were all sophisticated means with respect to Count Eight.  (Id.).  The Court should similarly reject Greebel's arguments and apply the sophisticated means enhancement, which is applicable to the execution and the concealment of Greebel's criminal conduct for both Count Seven and Count Eight.

In determining when the "sophisticated means" enhancement should apply, the Second Circuit has held that "even if each step in [a fraudulent] scheme was not elaborate," the enhancement is appropriate if the "the total scheme was sophisticated in the way all the steps were linked together."  United States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003), adhered to on reh'g sub nom. United States v. Lauersen, 362 F.3d 160 (2d Cir. 2004), cert. granted, judgment vacated, 543 U.S. 1097, 125 S. Ct. 1109, 160 L. Ed. 2d 988 (2005); see also United States v. Lewis, 93 F.3d 1075, 1082 (2d Cir. 1996) (holding, in a tax case, that sophisticated means enhancement applied even when "each step in the planned tax evasion was simple, [because] when viewed together, the steps comprised a plan [that was] complex").[13]  In addition, while "repetitive conduct alone does not show that sophisticated means were employed," repetitive conduct is relevant to the Court's analysis when "it demonstrates that more than routine planning was involved."  Lewis, 93 F.3d at 1083.

---

[13] Greebel argues in part that he should not receive a "sophisticated means" enhancement because he did not use "fictitious or offshore accounts" and or divide his conduct over different jurisdictions, two examples of sophisticated means provided in the commentary to U.S.S.G. § 2B1.1.  (Def. Mem. at 24).  However, the examples in the commentary are "simply illustrative, not exclusive."  Lewis, 93 F.3d at 1082 (noting there is "nothing talismanic about the use of shell corporations"); see also Second PSR Addendum (the examples in the commentary are not "an exhaustive list").

Courts have also looked to factors such as the length of the scheme, evidence of advanced planning of the scheme, evidence of concealment of the scheme, and evidence of the creation and dissemination of false or misleading documents.  See, e.g., United States v. Stitsky, 536 F. App'x 98, 112 (2d Cir. 2013) (upholding sophisticated means enhancement where fraud scheme (1) "lasted several years"; (2) "reflected very careful planning"; (3) included a "careful effort to conceal the fraud by lying" to business partners, lawyers, and investors; (4) "relied on creating and disseminating marketing publications that contained material misrepresentations"; and (5) involved the "creation of fictitious documents"); United States v. Regensberg, 381 F. App'x 60, 62 (2d Cir. 2010) (upholding sophisticated means enhancement in a scheme involving securities fraud and wire fraud charges, where the scheme was perpetuated for three years and involved the creation of fraudulent documents and reporting of false information); United States v. Qualls, 25 F. Supp. 3d 248, 253-54 (E.D.N.Y. 2014) (applying the sophisticated means enhancement to a wire fraud and mail fraud scheme where the defendant, inter alia, "creat[ed] and disseminat[ed]" materials containing misrepresentations; engaged in "ongoing wrong that lasted several years"; and lied to "employees and investors in a careful effort to conceal the fraud").

With respect to Count Seven, it is clear that Greebel took steps that constituted sophisticated means, including a "careful effort to conceal the fraud" and advanced planning as evidenced by repetitive conduct.  Specifically, Greebel undertook a very "careful effort" to conceal the scheme from Retrophin's Board, its external auditors and the investing public, including failing to disclose Shkreli's hedge fund frauds to the Retrophin Board; failing to disclose the true nature of the settlement and sham consulting agreements to the Board; drafting documents containing false or misleading information such as the Form 13-D, the Control Memorandum, the promissory notes, and the misleading SEC filings regarding the settlement

agreements; and ghostwriting an email from Panoff that falsely advised the company's external auditors that Shkreli would repay the promissory notes.  Greebel even took steps to conceal the conspiracy from his own law partners at Katten.  For example, Greebel told never Michael Rosensaft that, in the spring and summer of 2013, Greebel was in direct contact with defrauded MSMB investors and was working to repay them with shares and money taken from Retrophin.[14]

In addition, Greebel engaged in "repetitive conduct," working to execute settlement agreement after settlement agreement after settlement agreement, and then two separate sham consulting agreements—even after admitting that the obligations to the MSMB investors were not the responsibility of Retrophin—over the course of more than a year.  This repetition shows Greebel's conduct was no accident or momentary lapse in judgment, but the result of careful and deliberate planning.  Even if such acts in isolation did not qualify as sophisticated means, "the total scheme was sophisticated in the way all the steps were linked together."  Jackson, 346 F.3d at 25.

With respect to Count Eight, the Court previously found that Shkreli employed sophisticated means to execute and conceal the scheme to manipulate the price and trading volume of Retrophin shares.  (03/09/08 Shkreli Sentencing Tr. at 70-72).[15]  Those "sophisticated

---

[14] For example, Greebel communicated directly with defrauded MSMB investor Alan Geller and reassured him that he had not been "scammed" by Shkreli (Trial Tr. at 2910-11), despite the fact that Rosensaft was, at that very same time, working on the SEC investigation into Shkreli's fraud against those investors.  Greebel also concealed from Rosensaft the fact that Greebel had communications with Richardson to discuss having Richardson meet with the SEC about the investigation.  (See, e.g., Trial Tr. at 8730, 8736 (Rosensaft Testimony)).

[15] The Court did not reach the question of whether Shkreli employed sophisticated means with respect to the scheme in Count Seven, as Shkreli was acquitted on that count and the Court found that the enhancement applied to his conduct in connection with Counts Three, Six and Eight (the counts of conviction).  (See 03/09/18 Shkreli Sentencing Tr. at 70-72).

means" included: selecting the Desert Gateway shell for the reverse merger to obtain the free-trading shares attached to the shell; arranging for Shkreli's friends and associates to serve as nominee shareholders by purchasing the Fearnow shares at a nominal cost; subsequently exercising control over the Fearnow shares in part by transferring them for Shkreli's benefit; and concealing the connection between the Fearnow shareholders and Retrophin.  (Id.).  The Court should similarly find that Greebel employed sophisticated means with respect to Count Eight. Many of the steps that Greebel took in furtherance of the scheme were identical to those taken by Shkreli and, standing alone, sufficient to constitute sophisticated means, including (i) his participation in the distribution of the free-trading shares from the Desert Gateway shell to a number of Shkreli's close friends and associates, followed by his work drafting agreements to make the distribution look like a series of arms-length sales, when in fact the recipients were intended to be nominee shareholders for Shkreli; (ii) his work in drafting and filing a Form 13-D with the SEC that falsely stated that Shkreli did not exercise beneficial ownership over those free-trading shares, such that his beneficial ownership of the vast majority of the free-trading shares of Retrophin was concealed from the public; and (iii) steps he took to assist Shkreli in controlling or seeking to control the Fearnow shares, including forcing Retrophin to file a sham lawsuit against Pierotti to recover Pierotti's escrowed Fearnow shares for Shkreli; and effecting the reassignment of other escrowed Fearnow shares either to Shkreli directly or for Shkreli's benefit.  And even if such acts in isolation did not qualify as sophisticated means, "the total scheme," which lasted more than a year, "was sophisticated in the way all the steps were linked together."  Jackson, 346 F.3d at 25.

     5.     The Sentencing Enhancement for Abuse of Trust Is Warranted

     U.S.S.G. § 3B1.3 states that a defendant should receive a two-point offense level enhancement if he "abused a position of public or private trust, or used a special skill, in a manner

that significantly facilitated the commission or concealment of the offense." Id. (emphasis

added).  As detailed supra in Section II.B.1.c., Greebel now contends that he should not receive

this enhancement because he did not "abuse a position of public or private trust" in the

commission of his crimes.  (Def. Mem. at 32-33).  Specifically, Greebel argues that it is improper

to apply the enhancement "solely because he served as Retrophin's outside attorney," and that he

neither possessed "unsupervised or managerial control" over Retrophin, nor did he use the

discretion and control entrusted to him by Retrophin to commit the offense.  (Id.).  Notably,

however, Greebel's memorandum fails to address the other basis for applying the two-point

enhancement under U.S.S.G. § 3B1.3, a defendant's use of a "special skill" in the commission of

his crimes.  (Id.).

   Probation correctly rejected Greebel's arguments regarding the "abuse of trust"

enhancement because the defendant's actions as Retrophin's attorney in furtherance of the

charged crimes—such as his decision to "prepare[] agreements knowing that those agreements

would result in substantial financial losses to Retrophin"—did constitute an abuse of Retrophin's

trust.  (Second PSR Addendum at 2-3).  In addition, Probation found that the enhancement was

separately applicable because Greebel also used a special skill not possessed by members of the

general public—his legal training—in the commission of his crimes.  (Id.).  The Court should

similarly find that the two-point enhancement pursuant to U.S.S.G. § 3B1.1 applies, for each of

the two reasons articulated by Probation:  (1) Greebel did abuse his position of trust with

Retrophin to commit his crimes, and (2) Greebel used his legal training to commit his crimes.

   First, the "abuse of trust" analysis has two components: "(1) whether the defendant

occupied a position of trust from the victim's perspective and (2) whether that abuse of trust

'significantly facilitated the commission or concealment of the offense.'" United States v. Thom,

446 F.3d 378, 388 (2d Cir. 2006).  A position of trust is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)" and is to be viewed from the perspective of the offense victims.  U.S.S.G. § 3B1.3 cmt. n. 1; see also United States v. Capoccia, 247 Fed. Appx. 311, 317 (2d Cir. 2007); United States v. Huggins, 844 F.3d 118, 124 (2d Cir. 2016).   A "purely arm's length contractual relationship between the defendant and the victims does not create a position of trust."  Huggins, 844 F.3d at 125 (citing United States v. Jolly, 102 F.3d 46 (2d Cir. 1996)).  Instead, a the defendant must have been afforded discretion and abused a position of "fiduciary or quasi-fiduciary status."  Id. at 124.  In sum, the "applicability of a § 3B1.3 enhancement turns on 'the extent to which the position provides the freedom to commit a difficult-to-detect wrong.'"  United States v. Allen, 201 F.3d 163, 166 (2d Cir. 2000) (quoting United States v. Viola, 35 F.3d 37, 45 (2d Cir. 1994)).

The evidence at trial clearly establishes by a preponderance that Greebel did occupy a "position of trust" with respect to his victim, Retrophin.  As counsel to Retrophin, Greebel owed a fiduciary duty to the company.  C.I.R. v. Banks, 543 U.S. 426, 436 (2005) ("The relationship between client and attorney, regardless of the variations in particular compensation agreements or the amount of skill and effort the attorney contributes, is a quintessential principal-agent relationship. Restatement (Second) of Agency § 1, Comment e (1957) (hereinafter Restatement); ABA Model Rules of Professional Conduct Rule 1.3, and Comment 1; Rule 1.7, and Comment 1 (2002)."); see generally United States v. Chestman, 947 F.2d 551, 568 (2d Cir. 1991) ("The common law has recognized that some associations are inherently fiduciary. Counted among these hornbook fiduciary relations are those existing between attorney and client . . . .");

see also 06/18/18 Fatico Tr. at 257 (Testimony of defense witness Stephen Ferruolo (explaining how as outside counsel to a company, an attorney owes a duty of loyalty to that company)).

The evidence also established that Retrophin, Greebel's victim, viewed Greebel as occupying such a position of trust.  Retrophin Board members Steven Richardson and Stephen Aselage testified that during the pendency of the conspiracies, they believed that Greebel would act in the best interests of Retrophin; would provide accurate legal advice; and would not conceal from the Retrophin Board any material concerns or issues (regarding Shkreli or otherwise).  (See, e.g., Trial Tr. at 1921-22, 1965-68, 2072-73, 2594 (Richardson Testimony); Trial Tr. at 4408-09, 4580 (Aselage counted on the "expertise and the integrity" of Greebel, Shkreli and Panoff), 6574 (Aselage Testimony)).  Greebel's position also gave him the "freedom to commit a difficult-to-detect wrong," Allen, 201 F.3d at 166, because the Retrophin Board members had no reason to question or suspect Greebel when he provided them with incorrect information and/or concealed material information from them regarding the schemes in Counts Seven and Eight.  Moreover, although counsel to a company does not generally have authority over how the affairs of the company are conducted, counsel such as Greebel are granted "substantial discretionary judgment that is ordinarily given considerable deference" with respect to their legal advice.  See U.S.S.G. § 3B1.3 cmt. n. 1.  There is also no question that Greebel's abuse of that position of trust "significantly facilitated" the crimes of conviction.  As detailed at length in Section II.B.3., Greebel used his position at Retrophin's attorney to take a number of actions that defrauded Retrophin and helped conceal those frauds from the Board, the auditors and the public.

Second, with respect to use of a "special skill," the alternative basis for applying an enhancement under U.S.S.G. § 3B1.3, courts employ a two-part analysis: (1) whether the defendant possessed a special skill, and (2) whether he or she used this skill or position "in a

manner to significantly facilitate" the offense(s) of conviction.  United States v. Downing, 297

F.3d 52, 64 (2d Cir. 2002).  The commentary to this Guidelines section identifies "lawyers" as

examples of persons possessing a "special skill not possessed by members of the general public

and usually requiring substantial education, training or licensing."  U.S.S.G. § 3B1.1 cmt. n.4; see

also Second PSR Addendum at 3.  And the evidence at trial established by a preponderance that

Greebel did use his "special skill" as an attorney to "significantly facilitate" the crimes of which

he was convicted in Counts Seven and Eight, as detailed above.  See, e.g., United States v. Harris,

38 F.3d 95, 99 (2d Cir. 1994) (upholding district court's imposition of "special skills"

enhancement where defendant, a disbarred attorney, "used lawyering skills instrumental to his

[mail and wire fraud] schemes," including executing a power of attorney, drafting a codicil to a

will and preparing documents for others to execute).

As a result, the Court should find that the two-point enhancement pursuant to

U.S.S.G. § 3B1.1 is applicable because Greebel both abused his position of trust as Retrophin's

outside counsel and also utilized his special skills as an attorney in committing the crimes.

C. The Court Should Order Forfeiture in the Amount of $476,249

For the reasons set forth in the government's prior filings about forfeiture and at

oral argument, all of which are incorporated herein, the government sought mandatory forfeiture

in the amount of $476,249.  (See Dkt. Nos. 573, 579, 585, 589).  This amount represents a

conservative computation of the monies that Greebel personally acquired as a result of his crimes

of conviction.[16]

---

[16] Greebel does not address the issue of forfeiture in his sentencing memorandum.  He previously argued that forfeiture should not be imposed and that, if it is, should be limited to $10,477.48.  (Dkt. No. 586).

D.    The Court Should Order Restitution in the Amount of $10,447,979.00

The Mandatory Victims Restitution Act ("MVRA") requires that a defendant convicted of specific offenses "in which an identifiable victim or victims has suffered a . . . pecuniary loss" be ordered to make restitution to the victim.  18 U.S.C. § 3663A(a)(1), (c)(1).  "[T]he purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury."  United States v. Boccagna, 450 F.3d 107, 115 (2d Cir. 2006).  The "primary and overarching" goal of the MVRA is "to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being."  Id. (quoting United States v. Simmonds, 235 F.3d 826, 831 (3d Cir. 2000)).  The Second Circuit has noted that it is "significant that the statute mandates that courts 'order restitution to each victim in the full amount of each victim's losses as determined by the court[.]'"  United States v. Quarashi, 634 F.3d 699, 703 (2d Cir. 2011) (quoting 18 U.S.C. § 3664(f)(1)(A)).  Thus, "when determining the appropriate amount of restitution, district courts must choose a valuation method that best accomplishes this purpose."  United States v. Scott, 321 F. App'x 71, 72 (2d Cir. 2009).  The Second Circuit "construe[s] 'value' as used in the MVRA to be a flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purpose."  Boccagna, 450 F.3d at 115.  "[A]ny dispute as the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."  United States v. Bahel, 662 F.3d 610, 647 (2d Cir. 2011) (quoting 18 U.S.C. § 3664(e)).

For the reasons set forth above in Section II.B.2 and in the government's prior filings on the appropriate loss calculation for Guidelines purposes, the evidence at trial has proven by at least a preponderance of the evidence that Retrophin was the victim of the Count Seven conspiracy and, as a result, suffered an actual loss of $10,447,979.00.  Consequently, the Court

should order Greebel to pay restitution to Retrophin in the amount of $10,447,979.00.  To the extent that the Court ultimately determines that Retrophin suffered an actual loss that is greater or lesser than the actual loss calculated by the government, the Court should order Greebel to pay restitution to Retrophin in the amount of that actual loss.  (See First PSR Addendum at 3 ("if the Court finds that Retrophin suffered an actual loss regarding Count 7, the Probation Department maintains that restitution is mandatory pursuant to 18 U.S.C. § 3663A and owed to Retrophin in the total amount of the actual loss determined by the Court")).[17]

E.    Greebel Has Refused To Provide To Probation Requested Information Regarding His Financial Resources and Cannot Demonstrate An Inability to Pay a Fine

Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a).  Those factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that a fine will impose upon the defendant and any dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment.  18 U.S.C. § 3572(a).

The Guidelines provide, in turn, that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a) (emphasis added).  The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with

---

[17] Greebel does not address restitution in his sentencing memorandum, though he appears to concede that Retrophin suffered $477,329 in actual losses as a result of the conduct in Count Seven.  (Def. Mem. at 19).  Greebel also did not address restitution in any of his filings related to the appropriate loss calculation for Guidelines purposes, other than to note in one letter that the government is seeking restitution in the amount of $10,447,979.00.  (See Dkt No. 612 at 1).

other sanctions imposed, is punitive." Id. The defendant bears the burden of demonstrating an

inability to pay a fine at present and in the future. See United States v. Camargo, 393 F. App'x

796, 798 (2d Cir. 2010) (upholding imposition of a fine despite the fact that Probation and the

defendant argued the defendant was currently unable to pay such a fine because court concluded

defendant was likely to be able to pay a fine in the future); United States v. Salameh, 261 F.3d

271, 276 (2d Cir. 2001).

The statutory maximum fine for Counts Seven and Eight is $250,000 on each

count (PSR ¶ 123), and the Guidelines fine range for the offenses of conviction is $15,000 to

$150,000 (PSR ¶ 125). See U.S.S.G. § 5E1.2(c)(4). As detailed above, it is the government's

position that Greebel should be ordered to pay $476,249 in forfeiture and $10,447,979.00 in

restitution, for a total penalty of approximately $10.9 million. By contrast, it is Greebel's position

that he should be ordered to pay no more than $10,477.48 in forfeiture (Dkt. No. 586) and no

more than $477,329 in restitution (Dkt. No. 631), for a total penalty of approximately $488,000.

As a result, the Court's consideration of "whether restitution is ordered"; whether a fine will

impose a "burden" on Greebel; and whether a fine, taken together with other sanctions, is

"punitive," will depend on the amount of forfeiture and restitution the Court ultimately imposes.

Regardless of the magnitude, Greebel has failed to demonstrate that he is unable to

pay a fine because he has refused to provide Probation with the required information necessary to

determine his financial resources. In the initial PSR, Probation estimated that Greebel had a net

worth of approximately $1 million (PSR ¶ 112). Probation noted that Greebel had self-reported

that he also owed a "contingent liability of several million dollars to the insurance company

which paid for his legal defense" if his conviction were not overturned, though he provided no

documentation to detail the exact amount of that liability or the specific conditions under which

some or all of that liability would need to be repaid.  (Id.).  For example, much of his reported

liabilities consist of undocumented loans from family members that could be forgiven the day

after sentencing.  Perhaps more significant, Greebel refused to report "his wife's independent

assets," which include bank accounts, retirement accounts and a trust.  (Id. ¶¶ 109, 112).

In his objections to the PSR, Greebel argued that his net worth was only $176,000,

including "only half" of the value of assets that he jointly held with his wife and asserting that

Probation had over-valued certain real estate properties he owns.  (PSR Objections at 21).

Probation subsequently rejected these arguments, explaining that its valuation of Greebel's real

estate properties was based, as per standard practice, on property values in the Lexis/Nexis

Accurint database.  (First PSR Addendum at 5-6).  In addition, Probation noted that, in order to

make a determination of a defendant's financial resources pursuant to 18 U.S.C.

§§ 3663(a)(1)(B)(i), 3664(d)(3) and 3664(f)(2) and FRCP 32(b)(4)(F), Probation must receive an

accounting of, among other things, any "assets or debts that are yours alone, assets or debts that

are jointly held by you and a spouse or significant other that you enjoy the benefits of or make

occasional contributions towards, assets held by a corporation in which you have an ownership

interest, and assets or debts that are held by a dependent living in your home that you enjoy the

benefits of or make occasional contributions toward."  (Id.).  Probation further noted that Greebel

and his counsel had been provided with these specific instructions prior to their provision of his

financial information to Probation.  (Id.).  Probation therefore concluded that "it is the position of

the Probation Department that for the purposes of accurately determining the ability to pay a fine,

the defendant is required to advise the Court of any assets owned by his wife, which he enjoys the benefit of." (Id.).[18]

To date, it is the government's understanding that the defendant has failed to provide Probation with any information about his wife's assets. Nor did he address the question of his ability to pay a fine in his sentencing memorandum, other than to state that his "financial situation is—and will likely remain—dire." (Def. Mem. at 46). The defendant cannot meet his burden to show that he is both currently unable to pay a fine, and will be unable to pay a fine in the future, by making broad statements about his financial health and refusing to provide information requested by Probation that is necessary to ascertain a complete picture of the defendant's financial resources. See Camargo, 393 F. App'x at 798; Salameh, 261 F.3d at 276. Consequently, the Court should impose a fine within the applicable Guidelines range.

III.   LEGAL STANDARD

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make

---

[18] In the PSR, Probation initially stated that, "based on the defendant's financial profile and the priority of restitution, he appears unable to pay a fine." (PSR ¶ 114). Not only has this conclusion been superseded by the First PSR Addendum, but at that time, Probation had concluded that restitution was mandatory in the amount of $10.4 million—an amount that Greebel has subsequently challenged and the Court has not yet ordered.

an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed—

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct; [and]

    (C)    to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should

first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

IV.    ARGUMENT

As explained in greater detail below, a sentence of incarceration is warranted given the nature and seriousness of Greebel's criminal offenses; Greebel's history and characteristics; the need for both specific and general deterrence; and the need to avoid unwarranted sentencing disparities.  See 18 U.S.C. § 3553(a).  For these reasons, the government respectfully submits that a sentence of imprisonment of no less than 60 months is sufficient, but not greater than necessary, to satisfy the goals of sentencing.  Id.[19]

A.    The Nature and Seriousness of Greebel's Offenses Warrant a Sentence of Incarceration

Despite a 67-page sentencing memorandum and more than 180 letters, Greebel allotted one paragraph to address the nature and circumstances of the offenses of conviction.  (See Def. Mem. at 34).  Tellingly, that paragraph persists in blaming Shkreli, characterizing the defendant as a minor player, and ignoring the actual nature or circumstances of the crimes.  In reality, however, Greebel was an integral and essential member of each conspiracy.

With respect to Count Seven, Greebel used his position as the nascent company's trusted outside counsel to pillage the limited cash and shares available to Retrophin to pay off Shkreli's defrauded investors.  (Although not part of the charged conduct, Greebel also arranged for Retrophin to pay MSMB's outstanding legal bills to Katten).  Greebel was involved in

_____

[19] Subsequent to the filing of their submission, and as recently as yesterday afternoon, the defendant submitted two additional letters of support.  (See Dkt. Nos. 644, 647).  To the extent that the defendant makes arguments based on those letters that were not part of the defendant's original submission, or any other new arguments that were not previously raised, the government respectfully reserves the right to respond.

negotiating and preparing the settlement agreements—using his skills as an attorney to hide the fraud in plain sight.  But he also concealed everything from the Board, who trusted him to bring important issues to their attention, and tried to conceal what happened from the external auditors, omitting material information about the settlement agreements from Board meetings, Board updates, litigation updates to the auditors, and in numerous other conversations.  At no time did Greebel ever tell anyone else who worked at Retrophin that Shkreli had defrauded the individuals who sought settlement agreements.

With respect to Count Eight, Greebel executed the transactions that shunted Retrophin's free-trading shares to his co-conspirators and Pierotti, and then took steps to help Shkreli retain control over Pierotti's shares once he refused to go along with the goals of the conspiracy, including by forcing Retrophin to initiate a baseless lawsuit against Pierotti, and then resolving the suit by forcing Retrophin to pay Pierotti for his escrowed Fearnow shares, which were returned not to Retrophin but to Shkreli.  Greebel protected Shkreli by concealing his harassment campaign against Pierotti from the Retrophin Board and even from his own law partners at Katten.  Greebel also helped Shkreli transfer other Fearnow shares to pay off Shkreli's defrauded investors and to enrich Shkreli.  At no time did Greebel explain to the Board, or to anyone else, that Shkreli controlled virtually all of the free-trading shares—in fact, he hid that control by filing a false Form 13-D.

In an effort to escape responsibility, the defense asserts that the conspiracies were "masterminded" by Shkreli.  (Def. Mem. at 34).  Shkreli surely played a key role.  But, as described in detail in Section II.B.3. above addressing Greebel's baseless request for a minor role reduction, the evidence at trial established that Greebel did not just help Shkreli; he conceived of and executed many aspects of the criminal conduct.  For example:

- Greebel devised the plan to pay off Alan Geller and Darren Blanton with sham consulting agreements, and convinced Geller that such an agreement was common and that Shkreli had not "scammed" him.  (Trial Tr. 6743).

- Greebel chose to provide false or misleading litigation updates to auditors, and filed with the SEC a Form 13-D containing false information (regarding the manner in which MSMB Capital acquired its Retrophin shares and Shkreli's beneficial ownership of the Fearnow shares).

- Greebel devised the plan to mislead the auditors through the Control Memorandum and disingenuous promissory notes.

- Greebel prepared all of the settlement and sham consulting agreements.

- Greebel vouched for Shkreli to at least two defrauded investors, Alan Geller and David Geller, despite his knowledge that Shkreli was under SEC investigation for his conduct.

- Greebel helped assign and control Fearnow shares that should have been used to benefit Retrophin, including by coming up with a solution to prevent a "Pierotti problem" if one of Shkreli's chosen straw owners refused to transfer the shares as directed.  (See GX 542).

- Greebel facilitated Shkreli's harassment against Pierotti, including by arranging for Katten to sue Pierotti and by concealing Shkreli's threats from the litigation team.

Underlying all of this conduct was Greebel's constant effort to protect Shkreli, his meal ticket, at the expense of Retrophin, his client.  Those efforts involved concealing material information even from his own law partners.  And the efforts culminated in Greebel helping Shkreli to try to oust the Retrophin Board as the Board began to question Shkreli's leadership and Greebel's loyalty to his purported client, the company.  Although the defendant strangely suggests that he did not "personally gain" from his crimes, he repeatedly fails to recognize that his professional relationship with Shkreli and his continued representation of Retrophin—facts boasted about in his compensation memos—netted him hundreds of thousands dollars in increased compensation.

The end result, as the defendant's own noticed expert pointed out, was that the defendant "crosse[d] the line" and "knew what his client wanted to do was illegal, and helped him do it."  Ashby Jones and Sara Randazzo, "Lawyer Linked to Martin Shkreli Arrested on Fraud

Charge," Wall Street Journal, December 17, 2015 (quoting defense expert Professor Stephen Gillers). For these reasons, the nature and seriousness of Greebel's offenses—which were complex, spanned years and involved the defendant's active participation, in violation of his obligations to his client—warrant a sentence of incarceration.

B.     Greebel's History and Characteristics Warrant a Term of Incarceration

The defendant's sentencing submission describes certain aspects of his history and characteristics at length. That submission is notable both for what it shows, and for what it leaves out. It shows a defendant who had what most defendants before this Court could only dream of having: a loving and supportive family, loyal friends, professional success, significant wealth, a country club membership, golf outings, cruises and vacations. It shows that the defendant had every reason not to commit crimes, and yet still decided to do so. It also shows that, as a result of his crimes, Greebel has caused pain to his family and friends, and has surrendered the advantages and opportunities of his former life. However, such consequences are not a reason to treat the defendant more leniently than other defendants, whose more modest circumstances meant that they did not have such advantages and opportunities to lose. Moreover, what the defendant's sentencing submission leaves out, notwithstanding its abstract praise of the defendant's integrity and ethical character, is that the defendant repeatedly engaged in unethical conduct in addition to the conduct underlying his conviction.[20]

---

[20] Several of the submissions by the defendant's family and friends criticize the manner in which the defendant was arrested and prosecuted in this case. Most notably, the defendant's father-in-law criticizes the defendant's arrest by the Federal Bureau of Investigation ("FBI") at his house early in the morning as "a horrible experience for anyone to have to endure, especially considering the people involved; a housewife, three young children, and a partner in a law firm indicted for a white collar crime, not some violent and dangerous person." (Dkt. No. 639-2 at 43). The manner in which the defendant's arrest was carried out is irrelevant for purposes of the sentencing hearing. Moreover, notwithstanding the suggestion that a "partner in a law firm" should receive special treatment, the defendant was treated exactly as other defendants are treated

1.   <u>Greebel Violated His Ethical Duties and Exploited His Client's Trust in Order to Commit the Crimes of Conviction</u>

A portion of the defendant's sentencing memorandum focuses on his professional conduct, touting "the caliber of his legal counsel and integrity in a wide range of transactions" and his reputation in the legal community for "his ability to achieve optimal yet ethical results." (Def. Mem. at 57). Yet the defendant entirely fails to address his professional conduct in the context of one of the most significant attorney-client relationships of his career: his work for Retrophin. During the course of that relationship, the defendant displayed—repeatedly, and over a significant period of time—a willingness to violate his duty to his client, to disregard his ethical responsibilities and to sacrifice his integrity for personal gain. These failures of character, which resulted in the defendant's violations of law, are aggravating factors weighing in favor of the sentence respectfully requested by the government.

As detailed above and established at trial, Retrophin became Katten's client as a result of Greebel's efforts in January 2012. During the relevant time period, Greebel functioned as Retrophin's outside counsel and corporate secretary; Retrophin had no in-house lawyers until the middle of 2014. Greebel's ethical obligations in this role were neither complicated nor controversial. He owed a duty of loyalty to his client, Retrophin—not to Shkreli, and not to any other member of management. Yet having been entrusted with this responsibility, Greebel proceeded to repeatedly and systematically violate that duty, sacrificing the interests of his client for his own interests and those of Shkreli. This conduct was not an oversight, nor was it the fault of Shkreli or the Retrophin Board. It was the product of the defendant's own choices.

---

by the FBI—professionally. Even defense counsel explained that he was "not criticizing" the FBI for the early morning arrest and that the FBI followed "standard operating procedure." (04/07/17 Status Conf. Tr. at 79).

The following is a non-exhaustive list of examples when, during the course of his attorney-client relationship with Retrophin, the defendant violated his ethical duties to his client:

(i)     The defendant never told the Board of Directors what he learned about Shkreli's conduct with regard to the shareholders of MSMB Capital and MSMB Healthcare. Although the defendant argued that the limited, misleading statements about the settlement agreements in the SEC filings amounted to informing the Board, the jury rejected that argument. Moreover, and there is no dispute about this, the defendant never told any members of the Board that MSMB shareholders were threatening to sue because Shkreli had defrauded them and Retrophin had paid and/or would pay for Shkreli's legal obligations.

(ii)    The defendant never told the Board of Directors about Shkreli's odious, repeated threats to Pierotti and Pierotti's family, despite the fact that Shkreli's actions were wholly unbefitting of a CEO of a public company, could have exposed the company to liability, and were relevant to the sham litigation that Shkreli pursued, and Retrophin paid for, to further the conspiracy in Count Eight. Of course, this is precisely why the defendant never disclosed the conduct to Retrophin. And although the threats ultimately were disclosed to the defendant's partners at Katten, the defendant learned of the threats far earlier and kept silent. (See, e.g., Trial Tr. 8895 (Testimony of Howard Cotton).)

(iii)   Greebel repeatedly lied to Retrophin's external accountant to advance his and Shkreli's interests at Retrophin's expense. For example, in an attempt to extract more money from Retrophin for Shkreli, Greebel suggested to Shkreli that they tell the company's external accountant that Shkreli's employment agreement contained a "misprint/typo," and that, as a result, Shkreli was due an extra $100,000. (See GXs 535, 537). Similarly, when an accountant discovered that Retrophin had overpaid Katten by $600,000 and asked Greebel what the

additional payments were for, Greebel refused to explain, even though he knew that Retrophin had paid Katten the $600,000 for legal fees accrued by Shkreli and the MSMB entities on unrelated matters. (GXs 113-43, 113-44). Subsequently, Greebel advised Retrophin's auditors to write the payment off as "bad debt" rather than forcing Shkreli to reimburse the company. In so doing, Greebel prioritized maximizing his own realization rate over his client's interests.

(iv)    As the Pierotti litigation was being resolved, Greebel allowed 50,000 free-trading shares to be transferred to Shkreli as part of the settlement although Retrophin had paid for the Desert Gateway shell company and its free-trading shares, and, even assuming Shkreli had allocated the shares to Pierotti to benefit Retrophin, there was no reason for the shares to go to Shkreli instead of to the company. Greebel also allowed Retrophin, not Shkreli, to pay Pierotti more than $165,000 to settle the litigation, knowing it had been instituted in bad faith, and even thought it included a payment to Pierotti to retract comments he had made about Shkreli to a reporter.

(v)    In late September 2014, <u>after</u> learning that the Retrophin Board had informed Shkreli of its decision to fire Shkreli as CEO, Greebel took various steps to help Shkreli and himself. <u>First</u>, he gave Shkreli legal advice as to how to take action against the Board, including directing Shkreli to his employment agreement and explaining that it contained a provision that prevented Retrophin from firing him unless he was convicted of a felony; registering several entities that Shkreli planned to set up as competing pharmaceutical companies; and, most significant, advising Shkreli about how to remove Retrophin's current Board and install a Board favorable to Shkreli. Greebel even went so far as to draft a resolution for Shkreli to use to remove the current Retrophin Board, and surreptitiously sent it to Shkreli's personal e-mail account. <u>Second</u>, Greebel sought to have Shkreli force Retrophin to pay Katten for legal work

related to the SEC's investigation of the MSMB entities, even though Greebel knew that Retrophin's Board had not agreed to indemnify Shkreli or the MSMB entities for those expenses. Specifically, immediately after learning that Shkreli was set to be fired, Greebel transferred hundreds of thousands of dollars in billable work on the SEC investigation from inactive status within Katten's billing system to a new billing code, generated a bill for the work and sent the bill to Shkreli at his personal e-mail address, requesting that it be paid by Retrophin.

(vi)    Finally, on October 4, 2014, when Aselage—having correctly ascertained that Greebel was "continuing to help Mr. Shkreli work against the company"—warned Greebel in an email that Greebel was "on very dangerous ground if [he] hope[d] to continue practicing law," Greebel lied to Aselage.  (Trial Tr. at 4485).  In his email response, which was sent only to Aselage and not to Shkreli, Greebel stated that he had "not advised Martin of anything" and that he "takes [his] ethical obligations very seriously."  (GX 290).  Greebel further claimed he could not have provided Shkreli advice because he was at temple for Yom Kippur, knowing full well that just days earlier he had provided Shkreli advice on his employment agreement, registering new companies, and overthrowing the Board.

The defendant's own actions after he stopped working for Retrophin and at Katten also emphasize how he looked out for himself rather than his client.  After he left Katten, the defendant continued to work as Martin Shkreli's attorney at one of Shkreli's new companies, KaloBios.  And, when he left Katten, the defendant improperly and inexplicably retained

hundreds of emails related to his work for Retrophin.  (See 10/06/17 e-mail from defense

counsel).[21]  He attempted to use some of these emails during the trial.

   In addition to violating his duty of loyalty to Retrophin, the defendant also

deceived other Katten partners who performed work for Retrophin.  Three of those law partners—

Howard Cotton, Howard Jacobs and Michael Rosensaft—testified as defense witnesses at trial.

Their testimony made clear that the defendant withheld critical information from them in an

attempt to hide his frauds, jeopardizing their ability to properly discharge their own duties to

Retrophin.  For example, the defendant never told Rosensaft that the defendant and Shkreli

discussed the payments Shkreli made to settle the Merrill Lynch arbitration prior to the payments

being made (Trial Tr. at 8721), that the defendant was in direct contact with defrauded MSMB

investors and arranged for Retrophin to repay those investors during the spring and summer of

2013 (Trial Tr. at 8730), that there was a restatement as a result of the settlement agreements

(Trial Tr. at 8726), or that the defendant had communications with Richardson about having

Richardson speak to the SEC in his capacity as a defrauded MSMB investor (Trial Tr. at

8736).[22]  Greebel also stood silently by when Shkreli affirmatively lied to Rosensaft, telling

Rosensaft that the Retrophin Board had agreed to indemnify Shkreli for Katten's work on the

SEC investigation but had not yet formally voted on the measure; Greebel later doubled down on

---

  [21] Only the defendant knows why he retained a series of e-mails related to his representation of Retrophin, but one obvious possibility is that the defendant believed that one day his conduct would be subject to further review.

  [22] In fact, as Richardson testified, the defendant convinced Richardson to speak to the SEC for what he represented to be a complaint by a disgruntled MSMB employee that had nothing to do with Retrophin.  (Trial Tr. at 1977, 1978).  Of course, the defendant knew that the investigation was also connected to Retrophin and, after Richardson expressed dismay that Retrophin had been discussed, the defendant feigned ignorance.  (Trial Tr. 2603).

the lie directly to Rosensaft, telling Rosensaft that Greebel was still waiting on the Board to vote

on the measure.  (<u>Compare</u> Trial Tr. at 8740-41 <u>with</u> Trial Tr. at 1979 (Board was never asked to

indemnify Shkreli in connection with the SEC investigation)).  Similarly, the defendant withheld

information from Cotton, failing to tell him prior to the filing of Retrophin's suit against Pierotti

that Shkreli had threatened Pierotti and his family (Trial Tr. at 8895), or the reason why, when the

lawsuit was resolved, Retrophin paid Pierotti but Pierotti provided the escrowed Fearnow shares

to Shkreli personally.  (Trial Tr. at 8988).  As for Jacobs, the defendant tried to claim that he

relied on advice from Jacobs, his mentor, in performing his work for Retrophin.  In reality, Jacobs

knew virtually nothing about Shkreli, MSMB or Retrophin, and billed only minimal time to

Retrophin or MSMB.  In fact, it is clear the defendant disregarded the general advice Jacobs gave

him regarding capitalization tables, board minutes and billing practices.  (Trial Tr. at 8201-8203,

8234, 8348).

   All of these actions show another side to the defendant, one that those people who

chose to write letters attesting to his character for honesty and integrity apparently did not know.

More important, if the letters are accurate, then it is clear that Greebel is capable of differentiating

right from wrong in the practice of law.  One letter even boasted that Greebel "showed

professional responsibility and integrity . . . even when faced with losing out on getting credit and

attribution for substantial fees . . . ."  (Dkt. No. 639-3 at 8).  That description contrasts sharply

with the defendant who worked to extract every penny from Retrophin.  In other words, these

letters show that the defendant knows what proper practice is—and they show that he chose to

disregard it and instead to commit fraud.  If the defendant is capable of making such a distinction

and acting appropriately in other areas of his legal practice, he then repeatedly made the conscious

choice to commit both frauds and to disregard his obligations to Retrophin.  It was not a one-time

decision, or aberrant behavior.  Time and again, over a period of years, he chose to violate the law and sacrifice his ethical integrity.

        2.     <u>Greebel's Charitable Work Does Not Mitigate His Conduct</u>

Greebel also points to his "charitable endeavors" and community service, arguing that he deserves "credit" at sentencing for these efforts.  (Def. Mem. at 13-17).  Of course the Court can, and should, consider the defendant's community service in determining the appropriate sentence pursuant to Section 3553(a), and the government's proposed sentence accounts for the defendant's community service, among other things.  But "[c]ivic, charitable or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."  U.S.S.G. § 5H1.11.  Instead, charitable work warrants a downward departure only where it is "present to an exceptional degree or in some other way makes the case different from the ordinary case where [charitable work] is present."  <u>United States v. Canova</u>, 412 F.3d 331, 358 (2d Cir. 2005).  Moreover, "more is expected" of those defendants "who enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities."  <u>United States v. Cooper</u>, 394 F.3d 172 (3d Cir. 2005) (internal quotation marks omitted).  <u>Cf., e.g.</u>, <u>United States v. Crouse</u>, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure warranted where a defendant's "community works," while "significant," are "not unusual for a prominent businessman").  These principles should similarly guide an analysis under Section 3553(a).

        Here, the defendant's charitable work is not so extraordinary such that it makes this case different from the ordinary case.  <u>See</u> <u>Canova</u>, 412 F.3d at 358.  As an initial matter, the record is entirely devoid of any <u>pro bono</u> legal work the defendant engaged in while a practicing attorney at Katten.  The defendant's timekeeper records make no mention of true <u>pro bono</u> work, and the defendant does not raise any.  And while the defendant certainly has engaged in

community service at times in his life, his sentencing submission, and in particular Exhibit A to that submission ("Greebel Ex. A"), attempts to bridge this gap by labelling certain activities as "community service" that are not accurately categorized as such.[23]

First, the defendant now classifies as community service the same efforts he told Katten were efforts at business development.  For example, the defendant lists as community service approximately 200 hours of "[v]arious Bitcoin/virtual currency related speaking engagements (all pro bono)" and drafting "various articles on legal issues."  (Greebel Ex. A at 5).  But during trial, the defendant's efforts to build a "digital currency" practice were central to his argument that his increased compensation was not due to his work for Shkreli, but rather for his work on that practice.  Indeed, in his FY 2014 compensation committee memorandum, the defendant stated:  "As a result of our work on virtual currencies, we are the leading legal throught leader in the space . . . we have received in-bound calls from potential clients due to the press coverage we have received."  (GX 121-7).  Similarly, although he claims to have provided almost 100 hours per year of "community service" to the "Association of Corporate Growth" (ACG), the defendant previously described the ACG as "an organization of investment funds" and explained that his "involvement with ACG has allowed me to expand my network and connections with growth investment funds."  (GX 121-7).  Thus the defendant himself—and he appears to be the author of Exhibit A, since it is written in the first person—now asks this Court to give him community service "credit" for the same activities for which he previously sought "credit" in the form of monetary compensation from Katten.

---

[23] The PSR—based on information the defendant submitted at the time—does not include many of the activities the defendant now claims to be community service.

Second, the defendant claims that he has dedicated 300-400 hours of community

service per year related to helping his wife start her new business.  (Greebel Ex. A at 5).  The PSR

identifies two such businesses, neither of which is a charitable endeavor.  (PSR ¶ 83).  Moreover,

the PSR notes that the defendant's family derives a modest income from these businesses.  (Id.).

It is certainly supportive for a husband to help his wife start a business, but it is not community

service.

Third, the defendant contends that "the challenge of this trial" has not "slowed" his

charitable work.  (Def. Mem. at 36).  Put another way, the defendant has engaged in a number of

charitable efforts after he was indicted in late 2015.[24]  (See Greebel Ex. A at 5 (soup kitchen,

caring committee, rehab center)).  These post-indictment efforts at painting the defendant in a

more sympathetic light should be discounted in any sentencing analysis.

Setting aside these efforts to inflate his community service, the defendant's record

does not constitute the kind of extreme efforts that might warrant a departure from the Guidelines

or other extraordinary relief at sentencing.  Cases within the Second Circuit indicate that a

defendant's charitable works and good deeds must be truly extraordinary to warrant a departure.

For example, in Canova, the court found the defendant's public service and good works

exceptional where he had served honorably for six years in the Marine Corps, had served for

seven years as a volunteer firefighter, sustaining injuries while trying to save lives, and on three

---

[24] The defendant alludes repeatedly to certain undocumented efforts to create a center
related to substance abuse.  The defendant advised Probation that these efforts began in
September 2015.  (PSR ¶ 89).  But according to letters submitted by the defendant, the bulk of the
work towards these efforts appears to have taken place recently.  (See, e.g., letters detailing that
conversations with the defendant about that center have taken place "just a week ago [i.e., a week
before July 1, 2018]" (D. Sinkman), "[r]ecently at lunch" (J. Paley, Dkt. No. 639-3 at 41),
"recently" (J. Lasner, Dkt. No. 639-3 at 15), "recently" (H. Jacobs, Dkt. No. 644-1 at 2), and
"since the day he was arrested" (G. Trief, Dkt. No. 639-3 at 104)).

occasions rushed to help others during emergencies as a Good Samaritan.  Id. at 358-

59.  Likewise, in United States v. Greene, the court found that the defendant was entitled to a

downward departure for his charitable works because his "contributions [we]re distinctly

different" from the typical white collar defendant.  249 F. Supp. 2d 262, 264 (S.D.N.Y.

2003).  Green—who, as a file clerk at a law firm, was at "the lowest end of the scale" among

white collar employees—had long volunteered as a foster father and eventually adopted six

underprivileged children.  Id.  The court found that Greene had "devoted his entire life, all day

every day, to parenting very disturbed and hard to place orphaned children.  Greene's level of

commitment to good works is truly extraordinary."  Id.

 In contrast to the defendants in Canova and Greene, the defendant here does not

have a "commitment to good works" that is "truly extraordinary."  Instead, the defendant's

submission reflects a profile that is similar to many professionals in the New York area—

community service efforts in college and graduate school; hours spent each month volunteering

with religious organizations, charities, and his children's athletics; and ongoing, earnest efforts to

raise children as good people and citizens.  These efforts are to be recognized and valued, but,

particularly with a lack of legal pro bono work that has fortunately become commonplace, they do

not distinguish the defendant from many others, and certainly not in a significant way.

 For these reasons, Greebel's charity work falls far short of the "exceptional

degree" required for a variance.

 3. Greebel's Family Circumstances Do Not Warrant the Relief He Seeks

 The defendant argues extensively that he should not be sentenced to prison

because imprisonment would "cause tremendous pain on his family," and particularly his

children.  (Def. Mem. at 42).  While the defendant's family circumstances are one factor the Court

should consider as part of its Section 3553(a) analysis, the law is clear that the very considerations

upon which the defendant relies—including the potential for his incarceration to impact his young children—are <u>not</u> proper grounds for a downward departure at sentencing.  Nor do they weigh heavily in a Section 3553(a) analysis, given that, as the case law and the Guidelines recognize, <u>any</u> imprisonment of <u>any</u> parent or supportive family member has adverse consequences for a defendant's family.  Absent extraordinary circumstances, a defendant with a family that will be adversely affected by his sentence should be treated no differently than other defendants with families.

Second Circuit courts "have consistently held that ordinary family responsibilities do not warrant [a downward] departure," in part because "innumerable defendants" could demonstrate that their parental responsibilities will be affected by incarceration.  <u>United States v. Johnson</u>, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration.").  The Guidelines also state that "family ties and responsibilities are not ordinarily relevant" to determining whether a downward departure is warranted.  U.S.S.G. § 5H1.6.  <u>See also</u> <u>Koon v. United States</u>, 518 U.S. 81, 95 (1996) ("the defendant's family ties and responsibilities" are a "discouraged" basis for a departure (citing U.S.S.G. § 5H1.6)).  Only "extraordinary family circumstances" may justify departure from the Guidelines, because courts are "reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing."  <u>Id.</u> at 129 (emphasis added).  Downward departures for "family circumstances" are "impermissible in less compelling circumstances, especially where other relatives could meet the family's needs."  <u>United States v. Selioutsky</u>, 409 F.3d 114, 119 (2d Cir. 2005).  Although the law related to "downward departures" largely developed in the pre-<u>Booker</u> era, the logic and reasoning of these decisions applies to a Section 3553(a) analysis as well—the

unfortunate fact that imprisoning a defendant will cause hardship to his family, including his children, is not a reason to reduce an otherwise appropriate sentence.  It is another consequence of a convicted defendant's choices.

As a result of the demanding standard, the Second Circuit repeatedly overturned a downward departure based on family circumstances, including where a defendant was the parent of small children.  See, e.g., United States v. Mateo-Ruiz, 112 F. App'x 790, 792 (2d Cir. 2004) (holding that the district court "acted outside of permissible limits" by granting a departure where the defendant was a single mother of a four-year-old); United States v. Madrigal, 331 F.3d 258, 260–61 (2d Cir. 2003) (district court abused its discretion in making a downward adjustment where the defendant had six children, the three youngest had "very serious problems," and the defendant's parents were having trouble taking care of the children because "the court did not conclude that [the defendant] was the only person capable of providing adequate care for the youngest children" and there was evidence that "the family as a whole remained cohesive," the older three children were doing well, and the defendant's "extended family was also available for caregiving"); United States v. Carrasco, 313 F.3d 750, 756–57 (2d Cir. 2002) (family circumstances were not a basis for departure where the defendant's father was ill and where the defendant provided "some support for his three children" because "being the father of three children is in no sense an exceptional circumstance" and because the defendant's siblings could help financially support the defendant's father); United States v. Ruttner, 4 F. App'x 66, 68–69 (2d Cir. 2001) (holding that the fact that the defendant "has three young children cannot, without more, give rise to a downward departure," and that the defendant "failed to demonstrate that there

is anything extraordinary about his family circumstances other than the presence of three young

children").[25]

        In the rare case where the Second Circuit affirmed a downward departure based on

family circumstances, or a district court adopted such a departure, the family circumstances were

truly dire, involving what would be tantamount to the complete destruction of a family and the

rendering of children without any care or support.  See, e.g., United States v. Galante, 111 F.3d

1029, 1034–36 (2d Cir. 1997) (defendant was the sole source of support for his wife and two

children, his father was "critically ill and on life support," and his mother, who earned $7,000 a

year working in a factory, could require financial support in the near future);  United States v.

Johnson, 964 F.2d 124, 129–30 (2d Cir. 1992) (defendant was a single parent and where "[t]he

number, age, and circumstances of [the] children all support[ed] the finding that [the defendant]

faced extraordinary parental responsibilities");  United States v. Alba, 933 F.2d 1117, 1122 (2d

Cir. 1991) (district court appropriately granted a downward adjustment where the defendant, his

———————————

[25] See also, e.g., United States v. Cutler, 520 F.3d 136, 164–66, 171–72 (2d Cir. 2008)
(downward adjustment not supported where defendant had three children who partially depended
on his financial support, a brother who suffered from mental retardation and cerebral palsy, and
an elderly mother-in-law because he was not the primary care-giver for either of them); United
States v. Khan, 94 F. App'x 33, 38 (2d Cir. 2004) (holding that the district court erroneously
departed from the Guidelines because the record did not suggest that the defendant "was the
primary—let alone sole—support of any of the many people that he claims to support"); United
States v. Osorio, 305 F. Supp. 2d 319, 322 (S.D.N.Y. 2004) (holding that because "the hardships
[the defendant] and his family must now face are no more extraordinary than those faced by any
defendant who is sentenced to a term of imprisonment and has a family that depends, in part, on
his or her financial support," and that "there is nothing so extraordinary in this case beyond what
may commonly befall the young children of incarcerated defendants"); United States v. Jimenez,
212 F. Supp. 2d 214, 216 (S.D.N.Y. 2002) (holding that family circumstances alone were not
grounds for departure where the defendant was "a single mother with three children who will
suffer grievously from her absence," one child had "significant disabilities," and the defendant's
family, who could care for the children, "are themselves so poor that they have been unable to
maintain a household in the United States for their own children").

wife, his mother, and his two daughters lived with his disabled father, who needed the defendant

to get him in and out of his wheelchair, and worked two jobs to support his family).[26]

           To read about other defendants who have—and have not—been found eligible for

special consideration related to "family circumstances" is to see how clearly this defendant does

not present "extraordinary circumstances" supporting a departure either from the Guidelines or as

part of the Section 3553(a) analysis.

---

    [26] See also, e.g., United States v. White, 301 F. Supp. 2d 289, 291–92 (S.D.N.Y. 2004)
(defendant was the sole caregiver of six children ranging from age five to age 14, one of whom
had a behavioral disorder and another of whom had asthma, and there were no adults "willing or
able to take care of the children"); United States v. Mateo, 299 F. Supp. 2d 201, 212–13
(S.D.N.Y. 2004) (defendant's "two young children have been thrust into the care of [the
defendant's] relatives," and "will be raised apart from both biological parents for as long as [the
defendant] is incarcerated," presenting an "especially acute" harm to the defendant's newborn);
United States v. Greene, 249 F. Supp. 2d 262, 266–67 (S.D.N.Y. 2003) (defendant was the sole
provider for three children: one who was born addicted to heroin and cocaine who was placed in
foster care at birth, one whose natural mother died of AIDS when he was a child, and one who
suffered from learning and mental disabilities); United States v. Rose, 885 F. Supp. 62, 63–66
(E.D.N.Y. 1995) (defendant helped support his 69-year-old retired grandmother, who did not have
Social Security or a pension and who had raised the defendant and was raising four children
whose parents were unable to care for them); United States v. Ekwunoh, 888 F. Supp. 369, 373
(E.D.N.Y. 1994) (defendant was the sole source of support for her three children and oldest child
was suffering from emotional difficulties); United States v. Rodriguez, No. 94 CR. 39 (RWS),
1994 WL 381488, at *1 (S.D.N.Y. July 19, 1994) (defendant's child had diabetes and the child's
father, a co-defendant, faced a "substantial prison sentence," noting that applying the guidelines
"could deprive a medically-disadvantaged child of the attention and care of both its parents");
United States v. Gerard, 782 F. Supp. 913, 914-16 (S.D.N.Y. 1992) (defendant, "a model parent,"
was the sole provider for her two children because the father "openly disavowed his responsibility
to pay child support and . . . had virtually no contact with his children for the past six years");
United States v. Mills, No. 88 CR. 956 (CSH), 1990 WL 8081, at *2–3 (S.D.N.Y. Jan. 17, 1990)
(probation officer had "never encountered a defendant so deprived of any other responsible adult
who could take over for the children" the defendant was caring for, noting the "extreme
vulnerability of very young children, and the quite startling lack of any other adult available to
help"); United States v. Gonzalez, No. S 88 CR. 559 (CSH), 1989 WL 86021, at *4 (S.D.N.Y.
July 27, 1989) (making a downward adjustment where the defendant had three children because it
"would place minor children at hazard" not to, because her children's father was incarcerated and
her limited family in the area could not care for them).

The defendant's children are fortunate enough to have a mother, a comfortable home in a safe neighborhood with excellent schools, a vast array of grandparents, aunts, and uncles, numerous family friends, and multiple sources of financial support aside from the defendant.  The very letters of support on which the defendant relies demonstrate the extraordinary network of family, friends and community members who are available and willing to support his wife and children.  For example, in terms of family support, the defendant has offered letters from each of his children's four grandparents, their aunts and uncles, as well as the defendant's aunt, uncle, and three cousins, virtually all of whom live in the New York area.  (See, e.g., Dkt. No. 639-2 at 86-116; see id. at 44 (N. Citrin: the defendant's "parents, my wife, and I will be there to do the best we can to help [the children]")).

Moreover, with respect to financial resources, although the defendant suggests his financial situation is "dire," that suggestion is not supported by the record.  As described above in Section II.E., the defendant has consistently refused to provide this Court with complete information about his family's financial situation.  For example, the defendant has acknowledged his wife has assets in her own name, including a trust, bank accounts and retirement accounts, but despite repeated requests from Probation, has refused to provide any information about those assets.  Any argument about his financial situation should therefore be disregarded.  In fact, that choice is but another example of the defendant's demands for special treatment—a refusal to provide financial information that all defendants are required to provide, compounded by a demand for special consideration related to his finances.  What we do know about the defendant's financial situation shows that he has millions of dollars in assets, including a house with eight bathrooms, and that he has taken numerous vacations and trips with his family since being arrested.  (See Dkt. Nos. 13 (two-week trip to Cancun), 30 (Vermont, Palm Beach, and Orlando),

134 (two-week trip to Cancun with 11 family members), 151 (multiple weekend ski trips to the

Northern District of New York ("NDNY")), 227 (Michigan for a family friend's bar mitzvah),

268 (one-week trip to Maine); 516 (two-week family trip to Florida and permission to travel to

NDNY for family trips every weekend in February and March); 641 (weekend family trip to

NDNY).[27]  Moreover, the PSR indicates that the defendant's family also possesses significant

wealth, having loaned him hundreds of thousands of dollars.  Even with the defendant in prison,

his family will have financial support far beyond the hopes of most defendants.

Ultimately, any difficulties faced by the defendant's family as a result of his

imprisonment will not be caused by this Court.  The blame will lie solely with the defendant.

This is unfortunate, but no different than in any of the hundreds of other cases in this district and

in this Circuit in which a spouse, a parent, and a friend decides to commit crimes.  The only

difference is that, in this case, unlike so many others, there is an extensive support network

already in place for the defendant's family.



---

[27] The defendant also filed a cryptic request to travel to Pennsylvania "to look at certain
pieces of real estate with the hopes that, if the property is utilized, it will lead to an employment
opportunity in the future."  (Dkt. No. 569.)  Nothing about this trip appears in the defendant's
sentencing submission.











C.    The Government's Proposed Sentence Would Reflect the Seriousness of the
      Offenses and Serve the Goals of Specific and General Deterrence

The deterrent effect of the defendant's sentence is critically important.  It will send

a message to both the defendant and similarly situated professionals that this type of criminal

conduct will not be tolerated.  Specific deterrence, which the defendant does not even address, is

important because the defendant has refused to acknowledge not just the criminality of his

conduct, but <u>any</u> mistakes or wrongdoing, and has repeatedly deflected blame to others.

Moreover, the defendant's attempt to limit his punishment to a non-incarceratory sentence

improperly seeks to impose a privileged punishment that runs counter to the law and improperly

attempts to substitute the loss of that privileged status with real punishment.

1.    The Defendant's Attempt to Carve Out Special Treatment for White-Collar
      Criminals Should be Rejected

The defendant's sentencing memorandum and letters of support make plain that he

asks the Court to take the extraordinary step of imposing a non-custodial sentence because he has

lost a lucrative career and faces reputational and financial harm.  (Def. Mem. at 39 ("Evan lost his

… reputation, and will be unable to work in the legal world for the rest of his career"); 41 ("the

consequences of Evan's conviction and disbarment extend even beyond reputational and emotional harm…his financial situation is—and will likely remain—dire.")).  These arguments should be categorically rejected.  Simply put, the defendant is not entitled to special treatment because he was a highly-compensated, well-educated professional whose conscious decision to commit crimes resulted in the loss of the perks and privileges associated with his former lifestyle.

   The law and the Guidelines make clear that there is no carve-out for white-collar criminals.  See 28 U.S.C. § 994(d) (requiring the Guidelines to be "entirely neutral as to the . . . socioeconomic status of offenders"); USSG §§ 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"), 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a departure is warranted"), 5H1.10 (socio-economic status is "not relevant in the determination of a sentence").  Courts across the country have agreed with this assessment.  See United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("it is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); see also United States v. Kuhlman, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); United States v. Bistline, 665 F.3d 758, 760 (6th Cir. 2012) ("[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.") (internal citations omitted).  As the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized.  Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our

> nature. Criminals who have the education and training that enables people
> to make a decent living without resorting to crime are more rather than less
> culpable than their desperately poor and deprived brethren in crime.

United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999).

While this Court may certainly consider collateral consequences in formulating the

appropriate sentence, Stewart, 590 F.3d at 141, it should reject the defendant's attempt to replace

the appropriate sentence with one specifically crafted for his privileged background.  As

discussed throughout this memorandum, the consequences the defendant may suffer as the result

of his criminal conduct are not unique to him.  They are faced by virtually every convicted

criminal who appears before the Court.  And in virtually every case, those consequences do not

replace a sentence of imprisonment.  Nor should they.

2.     <u>The Defendant's Loss of His Law License Is Not the Basis for a<br>Probationary Sentence</u>

In addition to pointing to the loss of perks and privileges and collateral

consequences of a felony conviction that apply to every white-collar defendant, the defendant also

argues that a probationary sentence is particularly appropriate for him because he will likely lose

his license to practice law as a result of his conviction.  (Def. Mem. at 39).  This argument should

also be rejected.  Not only does it run counter to applicable law and the Sentencing Guidelines,

and relies solely on a discrete set of distinguishable cases, but it amounts to yet another request

for special treatment from this Court.

As an initial matter, defendants fortunate enough to have obtained a professional

license should not be treated <u>more leniently</u> at sentencing than other defendants because they will

likely lose that license; to the contrary, their betrayal of trust is all the more egregious.   This is

especially true where, as in this case, a defendant <u>used that law license in the commission of

crimes</u>.  The defendant took an oath to faithfully discharge the duties of an attorney and

73

committed to being an officer of the courts.  Yet he used his skills as a lawyer to commit both frauds, and he repeatedly disregarded the ethical obligations incumbent on attorneys when he deceived his client and committed his crimes.  His status as an attorney made it more difficult to detect his frauds and gave his conduct, as well as Shkreli's conduct, a veneer of legitimacy.  He was also able to use his status as a lawyer to hide and misrepresent key facts from his client.  Greebel's behavior towards his own client drastically undermines not just future interactions between attorneys and clients, but it undermines the public trust in lawyers and the practice of law.

Despite all of this, the defendant now asserts that the likely loss of his status as an attorney should supplant all other punishment for his conduct.  That should not be permitted.  Losing his law license is an entirely appropriate and foreseeable consequence of the defendant's actions, but is not a substitute for punishment.  Indeed, disbarment is not designed to be punitive; rather, it is a disciplinary mechanism designed to protect the public from unethical and dishonest lawyers who, like in this instance, place their interests ahead of their clients.  Disbarment ensures that the privilege of practicing law is only in the hands of those who can abide by the stringent ethical standards with which lawyers are expected to comply.

Contrary to the defendant's position, the Guidelines are clearly designed to enhance punishment for those, like the defendant, who used a special skill and abused a position of trust.  As discussed above, both Guidelines enhancements apply to the defendant in this case.  See supra Section II.B.5.  It is ironic that the defendant would seek a less severe punishment because he cannot practice law when a more severe punishment is mandated under the Guidelines because he used his status as a lawyer and his legal skills to commit the crimes of conviction.  Ample precedent from this Circuit makes plain that this analysis is correct.  "When a lawyer uses

his status and privileges to facilitate a crime, it compounds the gravity of his crime." United States v. Orozco Mendez, 371 Fed.Appx. 159, 161 (2d Cir. 2010) (internal quotations omitted) (citing United States v. Stewart, 590 F.3d 93, 150 (2d Cir. 2009)).

In fact, a number of courts in this district have recently rejected the very argument the defendant now advances. In United States v. Sampson, No. 13-CR-269 (DLI), 2016 WL 756565 (E.D.N.Y. Feb. 26, 2016), the defendant, an attorney and New York State Senator, was convicted at trial of obstruction of justice and making false statements and sentenced to five years' imprisonment, above the applicable Guidelines range.[30] During the sentencing, Sampson's lawyers argued that the defendant had been disbarred, lost his livelihood and seat as a senator, and suffered reputational harm. United States v. Sampson, No. 13-CR-269 (DLI), ECF No. 268, Sentencing Tr. at 34 (Jan. 18, 2017). Chief Judge Irizarry specifically rejected that argument, remarking that offenses committed by lawyers need to be punished because "[t]here has to be a sense that we give to the public that we are going to safeguard the integrity of our system. That we are going to safeguard the constitutional principles that we hold dear…. That we will hold our attorneys to a higher standard." Id. at 62-63. Among other things, Chief Judge Irizarry based her sentence on the defendant's use of his law license to commit his crimes, stating "[a]nd at the root of all of this, the root of all of this is some idea that you picked up along the way that you had a right to dispense with your ethical obligations, to dispense with your duties as an officer of the court, [to commit the charged crimes]." Id. at 57-58.

---

[30] Notably, Sampson's applicable Guidelines range was 37-46 months' incarceration, and defense counsel requested a sentence of one year and one day, or a period of 18 months' incarceration with half of that time served in home detention. Id. at 47.

Similarly, in United States v. Flom, 256 F. Supp. 3d 253 (E.D.N.Y. 2017), Judge

Mauskopf sentenced attorney Jonathan Flom to 48 months' imprisonment after he was convicted

at trial of money laundering.[31]  Like the defendant, Flom used his skills as an attorney to

perpetuate the charged fraud and make it more difficult to detect.  When sentencing Flom, Judge

Mauskopf explained that: "lawyers need to be deterred when they abuse their license, their skill,

their position of trust, to help fraudsters carry out their fraud. . . . [F]raud is hard enough to detect,

it's even harder when a lawyer is willing to abuse his position of trust to shield that fraud from

detection, the crime is exacerbated when a defendant uses his appearance of trust to lure people

[to it]."  United States v. Flom, No. 1:14-cr-00507-RRM, ECF No. 112,  Sentencing Tr. at 55,

2017 WL 8233942 (E.D.N.Y.).  Notably, Flom was convicted as part of a "sting" conducted by an

undercover agent—Judge Mauskopf imposed that 48-month sentence notwithstanding the fact

that no victim actually lost money as a result of the charged criminal conduct.

Finally, in United States v. Little, No. 17-CR-450 (KPF), ECF No. 59 (S.D.N.Y.

Feb. 22, 2018), Judge Failla sentenced a former corporate law firm partner who pleaded guilty to

participating in an insider trading scheme to 27 months' imprisonment.  The court's sentence was

near the applicable Guidelines range of 37-46 months' imprisonment and was premised, in large

part, on the defendant's role as an attorney.  The court noted that "there were so many oaths that

were broken in the course of committing this offense. Not just his confidentiality oaths or the oath

he committed when he joined the Florida Bar, but the oaths that he made to the firm for which he

worked, the annual certifications he made regarding material nonpublic information, the implicit

---

[31] Flom's applicable Guidelines range was 63-78 months' imprisonment.  (Flom Tr. at 40).
Notably, Judge Mauskopf made plain that the slight departure from the bottom of the Guidelines
range was not due to Flom's loss of status as a lawyer or disbarment.  (Flom Tr. at 55).

oaths that he had to the clients of the firm, and as he recognized, and I really appreciated his candor in this regard, there really is no excuse for the conduct in which he engaged."  (Id. at 69). Judge Failla considered a number of mitigating factors, including the effect on the defendant's family and the defendant's mental health issues, but concluded that "[t]o give a nonincarceratory sentence would probably satisfy the goal of specific deterrence, but I don't believe it will satisfy the goals of general deterrence.  I certainly don't believe it would promote respect for the law, and it would not reflect the seriousness of the offense."  Judge Failla did not credit Little's arguments that he would be disbarred and suffer financial harm, id. at 51-52, and imposed the sentence in spite of the defendant's acceptance of responsibility and remorse, neither of which are present here.

The aforementioned cases are just a small sampling of the numerous cases in this Circuit in which lawyers were sentenced to terms of incarceration for their criminal conduct, particularly when the crimes were committed in connection with their legal duties.  See United States v. Sinnott, 523 F. App'x 807, 808 (2d Cir. 2013) (attorney sentenced to 188 months' imprisonment following his conviction of thirteen counts of conspiracy, mail and wire fraud, money laundering, and interstate transmittal of stolen property related to a consumer debt reduction scheme); United States v. Zornberg, No. 14-CR-59 (ADS) (E.D.N.Y. May 9, 2018) (attorney sentenced to 21 months' imprisonment for making false statements regarding his participation in mortgage fraud scheme); United States v. Weisberg, No. 08-CR-347 (NGG), 2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011) (former corporate partner at Baker & McKenzie LLP sentenced to 24 months' imprisonment on his conviction for money laundering and conspiracy to commit securities fraud); United States v. Harris, 38 F.3d 95, 96 (2d Cir. 1994) (attorney sentenced to 71 months of imprisonment for 25 counts of mail and wire fraud).

Ignoring this precedent, the defendant tries to justify his extreme request for a non-custodial sentence by cherry-picking language from three cases where courts have indicated a defendant's loss of a legal career is relevant to its determination of general and specific deterrence. As set forth above, the government firmly believes the defendant's status as a lawyer is an aggravating, not a mitigating, factor, and the caselaw cited above supports that proposition. To the extent any court has taken a contrary position, the government firmly disagrees. Moreover, the three cases cited by the defendant are largely inapplicable and do not support the non-custodial sentence the defendant seeks.

United States v. Schulman, No. 16-CR-442 (JMA), Sentencing Transcript, ECF No. 155 (E.D.N.Y. Sept. 26, 2017), does not bear the weight the defendant puts on it. (See Def. Mem. at 39-40). To the extent that Schulman stands for the proposition that the loss of a law license is sufficient punishment for lawyers, the government respectfully disagrees with the court's reasoning in that case. But more fundamentally, for purposes here, Schulman is of little value because the court's imposition of a non-custodial sentence was based on other critical factors that are not present here. Judge Azrack found the defendant's insider trading to be "truly aberrant" conduct, based on a single betrayal of trust by providing inside information to his investment adviser for the purpose of trading on that information, conduct that resulted in a personal profit of $15,000. (Schulman Tr. at 21-22, 38). By contrast, the defendant's conduct in this case was not aberrant, nor a one-time action, and instead involved his active participation in two multi-year fraud schemes that defrauded his client out of millions of dollars. Moreover, the defendant in Schulman was nearly 60 years old at the time of sentencing, at the end of his legal career, and he admitted that his conduct was unethical and wrong, if not criminal. (Id. at 9, 16). The Schulman court reasoned that these factors counseled in favor of a probationary sentence

because it achieved the goal of deterrence.  Here, conversely, the defendant is young and capable of working for many more years; more significantly, as discussed infra, he has refused to acknowledge that his conduct was in any way improper or wrong or that he placed his interests ahead of those of his client.

The defendant's reliance on United States v. Collins, No. 07-cr-01170-LAP, ECF No. 244, Sentencing Tr. at 31 (S.D.N.Y. Oct. 17, 2013) is similarly unavailing.  (Def. Mem. at 40).  Collins received a custodial sentence, and he and Greebel are differently situated.  The court in Collins focused on that defendant's advanced stage in his career and his total loss of income, which are not present here.  Id.  Finally, the defendant's citation to United States v. Newkirk, No. 14-CR-534 (JSR), ECF No. 136, Sentencing Tr. (S.D.N.Y. April 21, 2016) is puzzling.  (Def. CR. Mem. at 40).  The court did not even reference Newkirk's law license in imposing a custodial sentence, other than to say that the defendant may be entitled to reapply for admission seven years after being disbarred.  (Newkirk Tr. at 16).  Indeed, in imposing the custodial sentence, the court held that it could not ignore the fact that the "defendant used his position as a lawyer to commit a knowing and willful fraud."  (Id. at 16-17).

Moreover, the defendant's reliance on Schulman and Newkirk in an effort to obtain a non-incarceratory sentence glosses over the discrepancies in the applicable Guidelines calculations and the sentences imposed.  In Schulman, the only case where the defendant was given a non-incarceratory sentence, the advisory Guidelines range was 41-51 months' imprisonment, less than half of the defendant's applicable Guidelines range.  (Compare Schulman Tr. at 26 with PSR ¶ 116)).  Similarly, in Newkirk, the applicable Guidelines range was 57-71 months' imprisonment, approximately half the applicable Guidelines here, and the court imposed a sentence of six months in custody.  (Compare Newkirk Tr. at 4, 18 with PSR ¶ 116).

For each of these reasons, there is no basis in law or in precedent for the defendant's request for an extreme departure from the applicable Guidelines range and a non-custodial sentence based on the fact that he is likely to be disbarred.

3.    The Government's Proposed Sentence Will Serve the Need for Specific Deterrence

The Court must consider specific deterrence with regards to this defendant.  See 18 U.S.C. § 3553(a)(2)(B).  The government respectfully submits that specific deterrence requires strong consideration in this case.

The defendant has taken absolutely no responsibility for his conduct, in any way, at any point in this case.  The government understands and respects that the defendant wishes to preserve his appellate opportunities.  That said, in spite of all the evidence of repeated lies and breaches of trust, it is astonishing that the defendant has refused in his sentencing memorandum, or anywhere else, to acknowledge any wrongdoing on his part—no poor choice, no mistake, no unethical act.  The defendant's sentencing memorandum does not even consider specific deterrence.  Instead, the defendant has blamed everyone else—Shkreli, the Retrophin Board, his law partners, an associate at Katten, and the government.  (See, e.g., PSR Objections at 4 (claiming that a former associate at Katten is responsible for the contents of the fraudulent Form 13-D).  Far from admitting even the slightest failing, the defendant has brazenly portrayed himself as the only victim in this case.  (See id. at 19 ("the only person who has suffered an economic loss financially and professionally is Mr. Greebel.").  He has apologized for nothing and he has apologized to no one.  It is one thing for a defendant to maintain his innocence; it is quite another for him to show no remorse or humility for his mistakes.

The letters the defendant chose to submit as part of his sentencing memorandum clearly reflect what he himself believes and is communicating to his family and friends.  Those

letters are bereft of any acceptance of responsibility, showing the degree to which the defendant has tried to distance himself from his own criminal conduct by suggesting that he was led astray by Shkreli, let down by others, or simply unlucky.  (See, e.g., J. Brookman (the defendant had the "extreme bad luck of working for a preternaturally villainous individual"); N. Citrin ("I truly believe that Evan did not consciously or intentionally do anything that he knew or believed was improper or illegal."); R. Entin (the defendant did not have "mens rea" for "crimes committed by a client."); T. Foster ("Unfortunately for Evan, one of his clients appears to have been bent on engaging in criminal activity and dragging Evan unwittingly into his plans."); Reemers (the defendant acted in good faith and consistently with the role of a corporate lawyer, which is to "tak[e] instructions from a CEO of a client company."); M. Schwartz ("Evan Greebel had a terrible encounter with the Devil Incarnate and sadly the Devil often wins.").

   The perspective of these supporters—that Greebel was Shkreli's victim—is particularly strange given that it is inconsistent with the defendant's own conduct prior to indictment.  If Shkreli was the devil, Greebel happily made several deals with the devil.  Even after Shkreli was fired from Retrophin, even after Retrophin decided to part with Katten after the defendant's misconduct, and even after the defendant left Katten, the defendant wholeheartedly embraced his relationship with Shkreli to serve his own needs.  In June 2015, the defendant joined the law firm Kaye Scholer, where he was awarded an $800,000 base salary, nearly double his Katten compensation.  (PSR ¶¶ 105, 106).  It is utterly inconceivable, and the defendant certainly does not argue to the contrary, that the defendant did not tout Shkreli as a key client that he would be bringing to Kaye Scholer.  Indeed, after Greebel started working at Kaye Scholer, he represented Shkreli's new entity, KaloBios, in corporate transactions.  (Trial Tr. at 8046-8055, KaloBios Pharmaceuticals, Inc. SEC Form 8-K, Dec. 2, 2015, Exhibits 4.1, 10.1) (marked as GX

977).[32]  It was not until the defendant's criminal conduct was uncovered that the defendant switched course and abandoned Shkreli.

All of these considerations show that additional criminal conduct by the defendant is a real possibility.  After all, if the defendant believes his prior conduct was faultless, he will continue it.  This defendant has many more professional endeavors in front of him.  Even ignoring the defendant's incomplete portrayal of his family's financial situation, the defendant is not at the end of his professional career.  He is highly educated and has a great deal of experience in the financial and legal world.  Just because he may not be able to practice law again does not mean he cannot use the skills he learned as an attorney in another professional realm.[33]  Indeed, the defendant has asserted that he will continue to work and has told the Court that he has employment opportunities while on bail.  (See PSR ¶ 113 (discussing a "consulting opportunity" in Pennsylvania)).  He will likely be in the position again where he will have to differentiate right from wrong, ethical from unethical and legal from illegal.  All indications are that he will make the selfish choice again.

---

[32] In fact, SEC filings demonstrate that the defendant went to work for KaloBios when the board members consisted of a number of the defendant's unindicted co-conspirators in these frauds, including Biestek and Fernandez.  (See GX 977, KaloBios Pharmaceuticals, Inc. SEC Form 8-K, Dec. 2, 2015).

[33] Indeed, although "abuse of [a] law license is the basis for enhancing [a defendant's] sentence, its loss is not a basis for a reduction, at least with respect to the likelihood of recidivism."  United States v. Stewart, 597 F.3d 514, 516-17 (2d Cir. 2010) (Jacobs, C.J., concurring in the denial to rehear the sentencing en banc).  Future disbarment should be given no weight in the consideration of the 18 U.S.C. §3553(a) factors because there are many ways to engage in recidivist conduct, "few of which require a license to practice law."  Id. at 517.

4.      The Government's Proposed Sentence Will Serve the Need for General
Deterrence

Finally, the court should also consider the need for general deterrence.  As Judge

Garaufis recently recognized, "[t]he need for general deterrence is particularly acute in the context

of white-collar crime."  United States v. Johnson, No. 16-CR-457-1 (NGG), 2018 WL 1997975,

at *5 (E.D.N.Y. Apr. 27, 2018); see, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir.

2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259)

("Congress viewed [general] deterrence as 'particularly important in the area of white collar

crime.'"); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of

white-collar crime is "of central concern to Congress").  This is true, in part, because "[p]ersons

who commit white-collar crimes like defendant's are capable of calculating the costs and benefits

of their illegal activities relative to the severity of the punishments that may be imposed."

Johnson, 2018 WL 1997975 at *5; see, e.g., Martin, 455 F.3d at 1240 ("Because economic and

fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or

opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks

and citation omitted)); see also Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("since deterrent

effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less

grave but significantly more difficult to detect may warrant substantially higher penalties").

Despite the important role played by "general deterrence" in white-collar fraud

cases, the defendant's 67-page sentencing submission contains only a single, throw-away

reference to "general deterrence."  (Def. Mem. at 39).  That is not surprising, given that general

deterrence will not be furthered by giving the defendant special treatment in the form of a non-

incarceratory sentence after two serious felony convictions.  Indeed, leniency to this defendant

would send exactly the wrong message to other would-be fraudsters.  The individuals considering

the sort of complex, subtle frauds in which the defendant engaged can be expected to coolly calculate the benefits of those frauds against the costs, and a discounted sentence in this case may embolden, let alone fail to deter, such conduct.

General deterrence is also particularly important given that the defendant is a lawyer who used his law license to facilitate the crimes.  In speaking about this case, both defense counsel and other attorneys have attempted to minimize the seriousness of the defendant's crimes by invoking his status as a lawyer.  Defense counsel, for example, stated that the defendant's conviction "should send shockwaves throughout the legal community, that one of us could be convicted for doing what lawyers do every day on behalf of their corporate clients."  Bishop, "Ex-Katten Atty Conviction A Cautionary BigLaw Tale," Law360 (Jan. 2, 2018) (quoting defense counsel).  And multiple practicing lawyers submitted letters in support of the defendant in which they characterized him as a lawyer having been misled by his own client, not at all responsible for his own actions.[34]  A significant sentence in this case will particularly promote general deterrence by showing that these statements are wrong—agreeing to commit fraud, which the defendant did, is not something that "lawyers do every day," nor was what the defendant did merely misguided or unethical.  Individuals who consider conduct akin to the defendant's must realize that they are not victims, they are criminals who will be punished.  And lawyers who consider conduct akin to the defendant's must especially be made to realize that using a law license to commit any crime is a particularly grave offense.

---

[34] See https://www.law.com/2018/07/17/evan-greebel-shouldnt-go-to-jail-his-former-law-partners-say/?slreturn=20180621230400 (citing letters in the defendant's sentencing submission).

D.    The Government's Proposed Sentence Avoids Unwarranted Sentencing Disparities

        To the extent the defendant argues that a sentence of probation, or a very limited term of incarceration, is necessary to avoid "unwanted sentencing disparities" with other cases involving attorneys, the government has addressed those arguments above.  See 18 U.S.C. § 3553(a)(6).  But the defendant's sentence also should avoid created an unwarranted disparity with his co-conspirator Shkreli's seven-year sentence.  (See Dkt. No. 566; see, e.g., United States v. Fermin, 277 F. App'x 28, 39 (2d Cir. 2008) (analyzing disparity between defendant and sentences given to co-defendants and co-conspirators); cf. United States v. Stewart, 590 F.3d 93, 140 (2d Cir. 2009) ("The Guidelines were 'intended to eliminate national disparity,' but '[w]e do not, as a general matter, object to district courts' consideration of similarities and differences among co-defendants when imposing a sentence.'")).

        The defendant is not significantly less culpable than Shkreli.  See supra Section II.B.3. (refuting arguments for a minor role reduction).  To the contrary, his culpability is arguably greater given that he was the proverbial "adult in the room," the experienced corporate lawyer who should have and did know what was happening was wrong.  The government's recommended sentence of 60 months' imprisonment appropriately balances the defendant's relative culpability and particular personal history and characteristics in light of, among other things, the sentence imposed on Shkreli.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the Court

should sentence the defendant to a substantial sentence of no less than 60 months' imprisonment,

which is sufficient, but not greater than necessary, to advance the goals of sentencing.


Dated:  Brooklyn, New York
        July 25, 2018


                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York

                              By:        /s/
                                        Alixandra E. Smith
                                        David C. Pitluck
                                        David K. Kessler
                                        Assistant U.S. Attorneys
                                        (718) 254-7000


cc:    Clerk of the Court (KAM)
       Defense Counsel (By ECF and Email)