UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

EVAN GREEBEL,

Defendant.

S1 15 Cr. 637 (KAM)

**REPLY BRIEF ON BEHALF OF
EVAN GREEBEL**

August 1, 2018

GIBSON, DUNN & CRUTCHER LLP

Reed Brodsky
Winston Chan
Mylan Denerstein
Randy M. Mastro
200 Park Avenue
New York, N.Y.  10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

*Attorneys for Evan Greebel*

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................ 1

II.  THE APPLICABLE GUIDELINES RANGE IS 24–30 MONTHS ........................................ 2

    A.  The Maximum Loss Calculation Supported by the Evidence is $477,329 ..................... 4

    B.  The Evidence Supports a Reduction in Sentence for Minor Role .................................. 7

    C.  A Sophisticated Means Enhancement Is Unwarranted. ................................................. 11

    D.  Mr. Greebel Neither Abused a Position of Trust Nor Used Any "Special Skills,"
        Rendering Enhancements for Such Conduct Inappropriate. .......................................... 14

III.  THE LAW DOES NOT SUPPORT RESTITUTION AND FORFEITURE IN THE
AMOUNTS THE GOVERNMENT ASSERTS ...................................................................... 16

IV.  THE § 3553(A) FACTORS COUNSEL IN FAVOR OF A NON-CUSTODIAL
SENTENCE ............................................................................................................... 20

    A.  The Nature and Circumstances of the Offense Support a Non-Custodial
        Sentence. ........................................................................................................... 20

    B.  Mr. Greebel's History and Characteristics Support a Non-Custodial Sentence............. 21

    1.  *Mr. Greebel has earned a well-deserved reputation for honesty and integrity.* .............. 22

    2.  *Mr. Greebel's community service and charitable work warrant leniency and a
        lower sentence.* ................................................................................................... 24

    3.  *Mr. Greebel's family circumstances also warrant a non-custodial sentence.* ................. 27

    C.  The Goals of Specific and General Deterrence, As Well As Just Punishment, Are
        Best Accomplished Through a Non-Custodial Sentence. ............................................ 30

IV.  CONCLUSION.................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*United States v. Booker*,
   543 U.S. 220 (2005) .................................................................................................. 2

*United States v. Brown*,
   877 F. Supp. 2d 736 (D. Minn. 2012) ................................................................... 12

*United States v. Capoccia*,
   247 F. App'x 311 (2d Cir. 2007) ........................................................................... 14

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) ................................................................................... 27

*United States v. Cutler*,
   520 F.3d 136 (2d Cir. 2008) ................................................................................... 27

*United States v. DiMattina*,
   885 F. Supp. 2d 572 (E.D.N.Y. 2012) .................................................................. 24

*United States v. Edwards*,
   325 F.3d 1184 (10th Cir. 2003) ....................................................................... 14, 15

*United States v. Finazzo*,
   850 F.3d 94 (2d Cir. 2017) ..................................................................................... 19

*United States v. Galante*,
   111 F.3d 1029 (2d Cir. 1997) ........................................................................... 28, 29

*United States v. Johnson*,
   964 F.2d 124 (2d Cir. 1992) ............................................................................. 19, 27

*United States v. Lewis*,
   93 F.3d 1075 (2d Cir. 1996) ................................................................................... 14

*United States v. Nesbeth*,
   188 F. Supp. 3d 179 (E.D.N.Y. 2016) .................................................................. 33

*United States v. Niebuhr*,
   456 F. App'x 36 (2d Cir. 2012) ............................................................................... 4

*United States v. Preacely*,
   628 F.3d 72 (2d Cir. 2010) ....................................................................................... 2

*United States v. Qualls*,
   25 F. Supp. 3d 248 (E.D.N.Y. 2014) ............................................................... 12, 13

*United States v. Ravelo*,
  370 F.3d 266 (2d Cir. 2004)...........................................................................................7

*United States v. Regensberg*,
  381 F. App'x 60 (2d Cir. 2010) .....................................................................................13

*United States v. Rice*,
  52 F.3d 843 (10th Cir. 1995) .........................................................................................13

*United States v. Smathers*,
  879 F.3d 453 (2d Cir. 2018)...........................................................................................16

*United States v. Stewart*,
  590 F. 3d 93 (2d Cir. 2009)............................................................................................33

*United States v. Stitsky*,
  536 F. App'x 98 (2d Cir. 2013) ................................................................................12, 13

*United States v. Thom*,
  446 F.3 378 (2d Cir. 2006).............................................................................................14

*United States v. Thompson*,
  792 F.3d 273 (2d Cir. 2015)...........................................................................................19

*United States v. Tomko*,
  562 F.3d 558 (3d Cir. 2009) (en banc)......................................................................25, 26

*United States v. Walker*,
  2011 WL 3417110 (E.D. Pa. July 28, 2011) .................................................................12

## Statutes

18 U.S.C. § 3553(a) ...........................................................................................1, 20, 22, 24, 27

18 U.S.C. 3663A ........................................................................................................16, 17

U.S.S.G. § 2B1.1(b)(10)(C) ....................................................................................................11

U.S.S.G. § 3B1.2(b), cmt. n.3(A) .............................................................................................7

U.S.S.G. § 3B1.3, cmt. 1 .........................................................................................................14

U.S.S.G. Supp. to App. C, amend. 792 (2015) .........................................................................6

## I.   INTRODUCTION

We respectfully submit that the sentencing factors in Section 3553(a) warrant a non-custodial sentence for Evan Greebel in this case.  This trial was about aspects of Evan's representation of one client.  At sentencing, the Court can and should look at the broader picture of the man being judged.  The history and characteristics of the man in this case are reflected in the outpouring of support Evan has received from family, former law firm partners, community leaders, and friends in the form of letters to Your Honor.  They describe specific and general examples of Evan's integrity over a lifetime and numerous examples of charitable good deeds and community service.  The letters also describe the special and highly unusual circumstances that affect his wife and three young children and that require him to be present.  All of the letters should weigh heavily in sentencing this husband, father, son, brother, friend, and vital member of his community.  In short, the Court must balance the crimes of conviction against Evan's lifetime of positive contributions.  And, in considering the punishment to impose based on those crimes, we ask that the Court consider that Evan and his family have suffered immeasurably from the charges and subsequent conviction, and will continue to suffer for the rest of his life and the lives of his wife and children.

While Evan understands that sentencing represents a natural consequence of being convicted, the sentence argued for by the government is greater than what is "necessary" in this case.  *See* 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary . . . .").  Setting aside the loss calculations and applicable enhancements or reductions, Evan already stands to lose his law license and practically speaking has not been since his arrest and will never be hired as an attorney again, making any risk that he would even be in a similar situation one day in the future effectively nonexistent.  Evan has lost his

1

livelihood and the ability to work again in the profession that he loves and for which he spent

more than 20 years training and in school.  More importantly, he has a wife and three young

children who, for reasons highly unusual and far removed from this case, require his presence at

home and in their lives to a degree beyond the norm.  For these reasons and those detailed at

length in Evan's opening submission, a probationary sentence pursuant to all the factors in Title

18, United States Code, Section 3553(a) is sufficient but not greater than necessary.[1]

## II.  THE APPLICABLE GUIDELINES RANGE IS 24–30 MONTHS

We respectfully submit, as argued in our opening sentencing submission, that the

appropriate Guidelines calculation results in a total offense level of 17, which equates to an

advisory Guidelines range of 24 to 30 months' imprisonment.  As this Court is well aware, the

Guidelines are advisory, and circumstances may justify a court's imposition of a non-Guidelines

sentence.  *See United States v. Booker*, 543 U.S. 220 (2005) ("[T]he federal sentencing statute

. . . makes the Guidelines effectively advisory.");  *United States v. Preacely*, 628 F.3d 72, 79 (2d

Cir. 2010).  We respectfully submit that this is one such case, and that the circumstances

discussed here and in Evan's opening sentencing memorandum justify the imposition of a

probationary sentence.[2]

---

[1]  The government ascribes a lack of humility to Evan on the ground that his sentencing submission preserves his appellate rights and does not accept responsibility for criminal conduct.  To the contrary, Evan has been preparing a letter to the Court that he intends to submit in advance of sentencing, as well as a statement he will make during the sentencing, in which he will express remorse and apologize for the pain he has caused his family while, of course, preserving his appellate rights and not conceding that his conduct was criminal.

[2]  As acknowledged by Probation in the Presentence Investigation Report ("PSR"), Evan's "contributions to his community may be considered by the Court as a mitigating sentencing factor." May 7, 2018 PSR at 36.

The government reaches its proposed Guidelines range by arguing for (1) a finding of a loss amount of more than $14 million (which, we submit, vastly overstates any actual or intended loss attributable to Evan); (2) an enhancement for use of sophisticated means[3]; (3) an enhancement for abuse of trust; and (4) rejection of a reduction for minor role.  In doing so, the government overlooks that Evan's particular role in the charged scheme paled in comparison to that of Mr. Shkreli and that Evan derived no financial gain.  Evan served as outside counsel to Retrophin, Inc., a role in which he was expected to—and did—advise his client and its representatives on legal matters and take direction in the execution of decisions.  He was neither a decision-maker for Retrophin nor its in-house lawyer, and he was not responsible for divining the schemes and goals in Mr. Shkreli's mind.  The Court should reject attempts to attribute heightened knowledge and culpability to Evan, and should adopt the Guidelines calculation proposed in Evan's opening sentencing memorandum and reiterated herein.

---

[3]  Any suggestion that Evan waived any objections to abuse of trust and sophisticated means enhancements or that Evan has waived an argument in support of downward departure is incorrect.  *See, e.g.*, Dkt. 648 at 17 n.4, 18, and 18 n.7.  Evan has and continues to preserve these objections.  As addressed in his reply to the government's post-*Fatico* response, at which point the parties had not yet made their sentencing submissions, "[t]o the extent the government is basing this conclusion [that Evan does not object to certain enhancements] on Mr. Greebel's objections to the Presentence Investigation Report ('PSR'), in his objection to the relevant paragraph Mr. Greebel argued for a two-level reduction for minor role, which should not be construed as conceding any other enhancement.  *See* June 8 PSR Objections at 20."  Dkt. 637 at 2.

**A.  The Maximum Loss Calculation Supported by the Evidence is $477,329**

The parties have engaged in extensive briefing, testimony, and oral argument on appropriate loss calculation.  Evan therefore responds only briefly to the government's arguments on loss here, and incorporates all previous submissions on loss by reference herein. *See* Dkt. Nos. 602, 607, 612, 628.  As he has consistently maintained throughout those submissions, the maximum combined actual and intended loss attributable to Evan on Counts Seven and Eight is $477,329, an amount equal to the government's estimate of Retrophin's expenditures in relation to the settlement and consulting agreements reduced by the value of the releases contained therein.  *See, e.g.*, Dkt. 628 at 19.  That figure does not include any loss for Count Eight, because we maintain that Evan did not have any subjective intent to cause loss on that count.  The Court could, of course, find in its discretion a lower loss amount—and it is for that reason that Evan has provided plausible alternative calculations in prior submissions.

The fact remains, however, that proving loss is the government's burden, and it is one that it has failed to meet.  *United States v. Niebuhr*, 456 F. App'x 36, 39 (2d Cir. 2012) ("The Government has the burden of proving, by the preponderance of the evidence, both the amount of restitution and the loss amount.") (internal citations omitted).  While it raises no new arguments in its sentencing submission, the government does make the perplexing assertion that in his own sentencing submission Evan, "for the first time, state[d] his position that the loss amount for Count Seven should be 'no more than $477,329.'" Dkt. 648 at 20.  Evan articulated this exact argument and proposed amount in his post-*Fatico* submission—Dkt. 628 at 19 ("[T]he total cost of the settlement and consulting agreements as calculated in the PSR should be reduced by litigation cost per investor to arrive at the correct figure for actual loss.  Should the Court accept [the] $1.1 million calculation, the appropriate value of actual loss attributable to Mr. Greebel would be $477,329 . . . .")—and has not wavered from it in his sentencing papers.  Nor

4

is it a "wildly speculative" number, as the government suggests; it is based on the government's

calculation of costs expended by Retrophin as part of the settlement and consulting agreements

reduced by the real potential costs of investor litigation, as testified to by expert witness Gayle

Klein, a prominent litigator and shareholder at law firm McKool Smith.

 The government has taken great pains in previous filings to attempt to discredit Ms.

Klein's expertise—unfairly, inaccurately, and without any basis—and now asserts that her

calculation is "vastly overstate[d]" because not every lawsuit would go to trial.  Dkt. 648 at 20

n.8.  But this does not undercut Evan's argument:  98% of lawsuits settle, as the government

argues, in part because doing so avoids the potential costs and uncertainties of litigation.  *Id.*

This is exactly what happened here—by understanding the risks of threatened litigation to

Retrophin and assisting in settling potential claims, Evan was protecting Retrophin and helping it

avoid the large monetary expense and exposure it would otherwise face.  Including broad

liability releases in the agreements meant, in particular, that Retrophin would never bear the

costs of trial—a "savings" that can and should be deducted from the government's estimate of

the loss associated with the settlement and consulting agreements themselves.  Moreover, Ms.

Klein's estimate of litigation costs for each lawsuit was conservative for several reasons: it

reduced the standard billable rate attributable to the anticipated work; it did not include an

estimated cost of settlement once the trial started or adverse judgment (which could have been

significant for each case); it did not include the costs of any appeal; it did not include the

associated financial costs of litigation, such as the impact on a company's stock price (and the

distraction to Retrophin's management and board); it did not include the costs associated with

hiring a public relations firm; and it did not include the costs associated with copycat lawsuits

and class actions based on these investor lawsuits.

The great irony here is that, but for the settlement of these threats and disputed claims made by multiple investors regarding investments in MSMB and Retrophin, there was a substantial risk that Retrophin would not have survived as a public company.  If that had happened, the losses to shareholders, employees, and others would have been in the tens of millions of dollars, and the members of the Board, the shareholders, and the employees would not have made the millions of dollars from which they have now benefitted.

As to Count Eight, the government's sentencing submission restates its position that Evan is "responsible for approximately $4 million in intended loss," Dkt. 648 at 20, but does not present any argument (new or otherwise) that proves that amount.  Instead, the government merely announces that the amount "is the same one the Court adopted in sentencing co-conspirator Shkreli, who was also convicted of Count Eight."  *Id*.  But that is the entire problem: Shkreli was convicted of Count Eight based on different facts and evidence, and the findings the Court made as to *Shkreli's subjective* intended loss—which is what the government argues for Count Eight—cannot be borrowed wholesale and applied to Evan.  The Court affirmed this very position during oral argument on motions for acquittal and forfeiture.  April 13, 2018 Hrg. Tr. 55:25–56:3 ("Looking at that evidence [in the Court's Order on loss] with regard to Mr. Shkreli's culpability in the Shkreli trial, and I have to do the same for this trial.  And there was different evidence.").

Intended loss requires the government to proof a loss amount that a defendant "purposely sought to inflict"; by its nature, this is a person-specific calculation that cannot be merely transposed from one defendant to another.  U.S.S.G. Supp. to App. C, amend. 792 (2015).  Unlike Shkreli, who was instrumental in the creation and execution of the Fearnow scheme, Evan was absent from all the crucial meetings and conversations.  He operated with limited

information; the information he had from others was, at times, inaccurate; and he counseled

behavior fundamentally inconsistent with Mr. Shkreli's activities.  There is no evidence that

Evan himself had the subjective intent to cause loss on Count Eight.  For these reasons, and all

others previously asserted, the Court should find that the maximum total loss attributable to Evan

on Counts Seven and Eight is $477,329.

**B.  The Evidence Supports a Reduction in Sentence for Minor Role**

Under the Sentencing Guidelines, Evan is eligible for a two-point reduction for minor

role if he was "substantially less culpable than the average participant" in the conduct.  U.S.S.G.

§ 3B1.2(b), cmt. n.3(A).  As the government acknowledges, this is a "fact-based determination,"

most of which rests on the person's understanding, awareness, and degree of participation—

particularly in planning and decision-making—in the activity at issue.  *Id.* cmt. n.3(C); *see also*

*United States v. Ravelo*, 370 F.3d 266, 270 (2d Cir. 2004).  It is the defendant's burden to justify

the reduction, and here, the totality of the facts shows that Evan's knowledge and understanding

of Mr. Shkreli's goals were imperfect at best and far from on par with Mr. Shkreli's own

knowledge.  Evan's role in the schemes was concomitantly narrower, making him precisely the

type of "substantially less culpable" participant reflected in the Guidelines.

The Guidelines and Second Circuit precedent require an assessment of minor role to be

made in the context of the culpability of the "average participant," which, as the government

points out, includes a defendant's "co-participants in the case at hand."  Dkt. 648 at 22.  That

makes Mr. Shkreli the measuring stick against which Evan's role must be determined, and the

evidence at trial persuasively shows there is simply no comparison.  Unlike the defendant in

*United States v. Kirk Tang Yuk*, upon which the government relies, the facts do not support the

conclusion that Evan had "knowledge of and participat[ed] in the full scope of the conspiracy."

885 F.3d 57, 89 (2d Cir. 2018).  Evan did not make the same progression as the defendant in that

case from "being a conspirator whom the others 'kept somewhat in the dark' to a full-fledged conspirator who was 'on the same page.'" *Id.* Instead, Evan remained "somewhat in the dark" at all times—as evidenced by Mr. Shkreli's excluding him from the meeting at the MSMB/Retrophin office at the heart of the Count Eight conspiracy. Trial Tr. 6281:18–6282:8 (testimony of Timothy Pierotti that Evan "was not there" and was not on the phone at the meeting between Mr. Shkreli and members of the Fearnow "buying group"); *see also* GX 112-21 (email from Mr. Shkreli to the Fearnow share recipients about increasing Retrophin's trading volume, on which Evan also does not appear).

Where Mr. Shkreli was the architect—crafting, designing, implementing, and directing his schemes—Evan was the scribe. The government's own language illuminates this contrast, despite its conclusory statements that Evan "played a crucial role." Dkt. 648 at 22. The government describes Evan as being "involved in negotiating, drafting and executing" agreements, and then describes Mr. Shkreli as having "*transferred* funds from Retrophin's bank account, "*concealed* the true nature of the agreements from the Retrophin Board," and "*falsely stated* that he would repay the promissory notes." *Id.* at 25 (emphasis added). As addressed in our opening brief, and as testified to by investor witness after investor witness, Evan's primary role was papering and executing the agreements. *See* Trial Tr. 1621:20–23 (testimony of Sarah Hassan that she had conversations about settlement agreements "just" with Mr. Shkreli); 3151:3–3152:14 (Schuyler Marshall testifying that he "only . . . started to interact" with Evan upon reaching an agreement with Mr. Shkreli"); 6838:8–6839:20 (Alan Geller testifying that the extent of his communications with Evan were in the process of "documenting a consulting agreement"); *see also* Dkt. 639 at 29 (compiling evidence).

The government goes on to paint Evan's behavior with a broad and uncareful brush and ascribes intent to him in a way that misconstrues the evidence and markedly overstates his actual role.  The government writes that Evan somehow "took advantage of the Board of Directors' trust," Dkt. 648 at 23, but fails to acknowledge that Evan advising Mr. Shkreli to disclose the the settlement and consulting agreements to the Board, that Evan sent draft public filings with disclosures relating to the settlement and consulting agreements, or that, in fact, there was no evidence that Evan was even required to take that step.  *See, e.g.*, DX 8207 (Evan's addition of Blanton and Geller agreements to the Board of Directors agenda); GX 664 (Evan writing to Mr. Shkreli suggesting that he should "raise [Blanton's] consulting agreement" to the Board).  The government asserts that Evan "deal[t] directly with the defrauded investors and their representatives," Dkt. 648 at 23, but as addressed above, these direct interactions were at the end-stage of the agreements already structured and negotiated by Mr. Shkreli.  And the government analogizes Evan to the defendant in *United States v. Beckford*, who was denied a minor role reduction because he was close to and "trusted" by the scheme's leader in that case. 545 F. App'x 12, 15–16 (2d Cir. 2013).  But this ignores the evidence that Mr. Shkreli abused and berated Evan, *see* Trial Tr. 4711:22–4712:4 (testimony of Jackson Su that Mr. Shkreli at times "degraded Evan"); 8684:6–17 (Michael Rosensaft testifying that Mr. Shkreli "treated [Evan] poorly, often insulting him"), and frequently kept him in the dark as to key elements of each scheme.  *See, e.g.*, DX 124-118 (email from Evan to Mr. Shkreli that he "cannot answer [Michael] Lavelle's questions [about the settlement agreement] as I do not know a lot of the information").

Finally, the government points to Evan's Katten Muchin Rosenman LLP ("Katten") compensation as evidence of the "direct benefit"—one of many factors relevant to a role

9

determination—that Evan received from his participation in the schemes.  As it did in briefing and argument on forfeiture, the government draws a line from Evan's retention of Retrophin as a client to the increase in his salary between Fiscal Years 2013 and 2014, and asserts that the "direct benefit" to Evan was thus $476,249.  The government's inferences were highly attenuated.  April 14, 2018 Tr. 143:25–144:3 (The Court: "I have to say I think your approach to forfeiture [the difference in Evan's salary] is a little bit overbroad and I would be very uncomfortable accepting that theory that everything during this period is forfeitable.").  Moreover, Evan and other partners at Katten did a significant amount of work for Retrophin that was *wholly unrelated* to the conduct at issue here, the proceeds from which could not possibly be considered a "direct" benefit of the schemes.

But even leaving that aside, compensation at Katten and other similar law firms simply does not work in such a linear manner.  Payments Retrophin made to Katten did not show up untouched in Evan's personal paycheck.  There are many breaks in the chain—from processing by Katten's business office to compensation decisions made based on a spectrum of factors, including determinations of proportionate compensation among partners and evaluation of Evan's performance, *see, e.g.*, Trial Tr. 6596:7–12, 6614:21–23, 6619:22–6620:3 (testimony of Ross Silverman that compensation at Katten involved a "holistic approach" and that Evan's work on virtual currency "played a material role in [his salary] increase")—that prevent any payment of legal bills from being appropriately characterized as a "direct benefit" to Evan.

In sum, any alleged role of Evan in these schemes was a minor one befitting his status as outside corporate counsel—someone who followed the orders and directives of his client's Chief Executive, and was not privy to the thoughts and plans inside that person's head or the knowledge and conversations that person chose not to share.  For purposes of a minor role

10

reduction, Evan's culpability must be assessed against Mr. Shkreli's at the time the schemes occurred, rather than by accepting the government's attempt to ascribe perfect retrospective knowledge to Evan.  In that context, Evan's role and Mr. Shkreli's role are simply not even close to being on par with each other.

## C.  A Sophisticated Means Enhancement Is Unwarranted.

The Sentencing Guidelines permit a "sophisticated means" enhancement only where "the offense [] involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(C).  "Sophisticated means" is limited to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.*, comment n.8.  The relative simplicity of Evan's conduct renders application of this enhancement wholly inappropriate.

Evan's alleged conduct falls much closer to those cases where courts *declined* to apply the "sophisticated means" enhancement.  For instance, in *United States v. Garcia*, the district court held that "fraudulently dr[a]w[ing] down funds on seven occasions from two lending institutions" through the use of "false invoices" did not warrant application of a sentencing enhancement.  939 F. Supp. 2d 1155, 1214–15.  There, the district court reasoned that although the defendant "created false invoices, he does not seem to have done so in a particularly complex fashion that made detection of the offense difficult," but instead did the "functional equivalent" of lying about work that was performed.  *Id.* at 1215.  Similarly here, Evan's alleged conduct was relatively limited in scope.

At least one court has concluded that a scheme involving the "creat[ion] of a South Dakota LLC, open[ing] separate bank accounts at two banks, solicit[ing] funds from victims in at least four states, and forg[ing] documents to orchestrate a fraudulent scheme" did not warrant the sophisticated means enhancement because the scheme only lasted eight months and investors'

funds were placed in "readily identifiable accounts." *United States v. Brown*, 877 F. Supp. 2d 736, 782 (D. Minn. 2012).

The purported schemes in Counts Seven and Eight were decidedly less elaborate than the conduct in *Brown*. As the government admits, the alleged scheme barely lasted more than a year, Dkt. 648 at 35, and, as the evidence demonstrates, the purported fraud was not well-concealed, since the settlement and consulting agreements were disclosed to Retrophin's Board, outside financial advisors, newly hired officers, and external auditors. A short scheme, absent the use of particularly sophisticated means to conceal, simply does not warrant application of the "sophisticated means" enhancement. The mere falsification of documents is not enough. *Cf. United States v. Walker*, 2011 WL 3417110 (E.D. Pa. July 28, 2011) (finding no enhancement was justified when the defendant used an employer-provided credit card to make fraudulent purchases, generated falsified requisition requests over a two year period, and concealed the scheme from his employer).

Each of the cases on which the Government relies involved far more complex and intricate conduct than Evan's alleged actions. For instance, the government contends that Evan "undertook a very 'careful effort' to conceal the scheme." Dkt. 648 at 34. But the primary "concealment" that the governments points to is a mere "fail[ure] to disclose." (*Id.*) This is a far cry from the affirmative lies told by the defendants in the cases cited by the Government. *See United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013) ("careful effort to conceal the fraud by lying"); *United States v. Qualls*, 25 F. Supp. 3d 248, 253-54 (E.D.N.Y. 2014) (lied to "employees and investors"). Similarly, the government points to the length of the scheme alleged in Counts Seven and Eight—"over the course of more than a year," Dkt. 648 at 35, but the schemes in each of the cases on which the government relies were significantly longer. *See*

*United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013) ("lasted several years"); *United States v. Regensberg*, 381 F. App'x 60, 62 (2d Cir. 2010) ("three years"); *United States v. Qualls*, 25 F. Supp. 3d 248, 254 (E.D.N.Y. 2014) ("lasted several years").

The government also argues that Evan "drafted documents containing false or misleading information." Dkt. 648 at 34.  But inserting false information into a document on its own has been held insufficient to support a sophisticated means enhancement.  *See United States v. Rice*, 52 F.3d 843, 849 (10th Cir. 1995) (rejecting application of the sophisticated means enhancement to a scheme that consisted solely of claiming to have paid taxes that were not actually paid).  In the cases relied on by the government, by contrast, the defendant did not merely insert false information into a document, but crafted entirely fake documents, reports, or even whole entities—conduct far more complex than the acts at issue here.  *See Stitsky*, 536 F. App'x at 112 ("creation of fictitious documents . . .[and a] fictitious corporate officer"); *Regensberg*, 381 F. App'x at 62 ("creation of fraudulent loan documents . . . [and] use of Ponzi scheme payments . . .and alteration of an account statement"); *Qualls*, 25 F. Supp. 3d at 254 ("creating fictitious account statement documents").  And the "ghostwritt[en]" email to which the government points as evidence that Evan was responsible for concealing Mr. Shkreli's lack of intent to repay the promissory notes is a red herring.  Dkt. 648 at 34–35.  Mr. Shkreli himself asserted his intent and ability to repay, including by "forceful[ly] intervene[ing]" on a call, and Evan was none the wiser.  *See, e.g.*, Trial Tr. 1916:11– 3 (S. Richardson testimony).

The government states a number of times that the asserted fraud was "evidenced by repetitive conduct" as demonstrated by Evan's alleged execution of "settlement agreement after settlement agreement after settlement agreement, and then two separate sham consulting agreements."  Dkt. 648 at 34, 35.  But the opinion cited by the government for the "repetitive

conduct" standard involved a defendant who wrote nearly 200 checks to 26 different bank accounts involving "numerous fictitious entities." *United States v. Lewis*, 93 F.3d 1075, 1082 (2d Cir. 1996). Comparing the handful of agreements at issue here to the conduct in *Lewis* is an exercise in hyperbole and simply unfair. The asserted fraud here consisted of settlement and consulting agreements that the government charges were improperly withheld from Retrophin's Board. That is not a sophisticated fraud.

## D. Mr. Greebel Neither Abused a Position of Trust Nor Used Any "Special Skills," Rendering Enhancements for Such Conduct Inappropriate.

In order to establish the applicability of the "abuse of trust" enhancement, two elements must be demonstrated: first, that the defendant must possess "unsupervised 'professional or managerial *control*,'" *United States v. Capoccia*, 247 F. App'x 311, 317 (2d Cir. 2007) (emphasis added) (quoting U.S.S.G. § 3B1.3, cmt. 1), and, second, such discretion and control must have been used to "significantly facilitate[] the commission or concealment of the offense," *United States v. Thom*, 446 F.3 378, 388 (2d Cir. 2006). The government has proven neither element.

The government's analysis effectively amounts to "counsel . . . owe[s] a fiduciary duty to the company," so attorneys are always in a position of trust. Dkt. 648 at 38. And yet, the government also admits that "counsel to a company does not generally have *authority* over how the affairs of the company are conducted." *Id.* at 39 (emphasis added). The fact that Evan acted as counsel to Retrophin is insufficient in itself to establish the imposition of this sentencing enhancement. Evan did not exert the kind of managerial control mandated by the Guidelines for this enhancement to apply. *See United States v. Edwards*, 325 F.3d 1184, 1187–88 (10th Cir. 2003) ("opportunity and access do not equate to authority"). The testimony cited by the government does not indicate otherwise: nowhere does the government point to testimony

14

showing that Evan exercised *control* over any of Retrophin's activities.  *See* Dkt. 648 at 39.

Rather, he provided legal advice to the representatives of Retrophin and through such

representatives Retrophin chose to act.

      The cases relied on by the government demonstrate that this Court should not apply an

"abuse of trust" enhancement in this case.  For example, in *United States v. Allen*, the critical

factor was that the defendant "had control over the company's banking and its budget

preparation" and that "[s]he had no regular or direct supervision."  201 F.3d at 166–67.  Despite

acknowledging that counsel typically does not possess such unsupervised control, the

government concludes without citation to evidence that "counsel such as Greebel are granted

'substantial discretionary judgment.'"  Dkt. 648 at 39.  This conclusory statement is not

supported by any evidence or testimony, nor does it rise to the level of proof of independent

discretionary action laid out in *Allen*.

      Moreover, even if it did, the government still fails to demonstrate that Evan used such a

position to "significantly facilitate[] the commission of concealment of the offense." *Id.* at 37.

Evan was not in a position of control over finances or decision-making as the defendant in *Allen*

was, and therefore could not "facilitate" the commission of any offense.  He was an advisor; all

control remained in the hands of the officers and representatives of Retrophin as well as

Retrophin's Board of Directors, to whom the officers and representatives reported, and, most

significantly, Martin Shkreli.

      The government's additional argument that Evan used his "special skills" as an attorney

to warrant an "abuse of trust" enhancement also misses the mark.  *See* Dkt. 648 at 39–40.  Not

only would the government's arguments mean that all lawyers will invariably have to receive

this enhancement for their involvement in any fraud with a client, which would be impermissible

15

under the Guidelines, the government fails to explain how Evan might have used his "special skills" to facilitate the commission of any offense. Nothing Evan purportedly did rises to the level of using a "special skill." Accordingly, Evan's alleged drafting of fraudulent agreements cannot satisfy the special skills requirement, rendering application of this enhancement inappropriate in this case.

### III. THE LAW DOES NOT SUPPORT RESTITUTION AND FORFEITURE IN THE AMOUNTS THE GOVERNMENT ASSERTS

The government reasserts its position that Evan should be ordered to pay forfeiture in the amount of $476,249. Dkt. 648 at 40. That issue has been fully briefed and argued before the Court, and Evan incorporates his previous filings and arguments herein by reference. *See* Dkt. Nos. 576, 586. In particular, and as addressed above, the government did not meet its burden of proving that the increase in Evan's Katten salary was directly traceable to any violation in Counts Seven and Eight. Instead, and at most, this Court should impose forfeiture in the amount of $10,477.48, which amounts to the total of the attorneys' fees for the discrete conduct relating to Counts Seven and Eight as reflected in time entries for Retrophin work. *See* Dkt. 586 at 2.

The government also seeks restitution from Evan under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, in the amount of $10,447,979.00, equivalent to the amount it argues represents the actual loss suffered by Retrophin on Count Seven. The restitution the government seeks under the MVRA is barred for multiple reasons.

First, as with actual loss on Count Seven, proving restitution is the government's burden to bear, and as with actual loss, it has failed to meet that burden. *Id.* § 3664(e); *United States v. Smathers*, 879 F.3d 453, 460 (2d Cir. 2018).

Second, the MVRA requires a district court to order restitution for "offense[s] against property . . . including any offense committed by fraud or deceit" where "an identifiable victim

or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(A)–(B).  The statute

defines victim as a "person directly and proximately harmed as a result of the commission of an

offense for which restitution may be ordered."  *Id.* § 3663A(a)(2).  We respectfully submit that

the government has not demonstrated that the alleged loss here was for an "offense against

property" and it makes no sense to apply the statute to the circumstances of this case.

Third, the government's contention that, for purposes of restitution, "Retrophin was the

victim of the Count Seven conspiracy,"  Dkt. 648 at 41, and should be awarded restitution is not

supported by the plain language and legislative history of the statute. The government does not

present any analysis or support for why Retrophin should be considered a "victim" under the

MVRA, and its argument that Retrophin amounts to a compensable "victim" for purposes of the

statute impermissibly broadens the statute's plain language and is not consistent with Congress's

intent in the legislative history.

The Supreme Court's recent decision in *Lagos v. United States* and its reasoning in

interpreting the statutory terms of the MVRA based on the plain language is a sea change in how

the MVRA should be construed by this Court and reverses a number of Second Circuit decisions

interpreting the statute.  *See* 138 S. Ct. 1684, 1689 (2018) ("To interpret the [MVRA] broadly is

to invite controversy . . . our narrower construction avoids it.").   In *Lagos*, the Court narrowly

interpreted a provision in Section 3663A on the basis of "the statute's wording, both its

individual words and the text taken as a whole."  *Id.*  In particular, the Court looked to "*noscitur

a sociis*, the well-worn Latin phrase that tells us that statutory words are often known by the

company they keep . . . [and found] both the presence of company that suggests limitation and

the absence of company that suggests breadth."  *Id.* at 1688–89.  The statutory phrase at issue

included "three specific items" that were "precisely the kind of expenses that a victim would be

likely to incur" in the course of participating in a government investigation, but "sa[id] nothing" about expenses related to a private investigation. *Id.* The Court used this contrast to give meaning to the words "investigation" and "proceedings" as used elsewhere in the statute, and found that the context supported its holding that those words should be narrowly construed and limited to government investigations.

Applying the Supreme Court's reasoning and methodology to reading the MVRA's plain terms, the term "victim" under the MVRA's plain language must be an individual and cannot be a corporate entity. To begin with, Section 3663A(a)(2) states that "the term 'victim' means a person" and, while pursuant to Section 1, Title 1 of the United States Code "person" includes corporate entities, the MVRA uses precise language and context that excludes a corporate entity from the definition of "person." In particular, the second sentence of Section 3663A(a)(2) specifically refers to "the case of a victim who is under 18 years of age"; because a corporate entity cannot be a person "under 18 years of age," the language necessarily excludes corporate entities. As in *Lagos*, there is no additional specific language tying "victim" to a corporation, and nothing in the language or context supports such a broad reading.

Construing the plain language of the MVRA to exclude corporate entities from the definition of "victim" is consistent with congressional intent when drafting the MVRA. Throughout the Senate Report from the Bill's initial stages, the focus is on individuals and U.S. households as victims; the Report does not contemplate corporate victims at all. *See* S. Rep. 104-179, at 14 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 928. Refusing to order restitution paid to Retrophin thus fully comports with the purposes of the statute. *Lagos*, 138 S. Ct. at 1689 ("[A] broad general purpose of this kind [ensuring that victims receive restitution] does not always require us to interpret a restitution statute in a way that favors an award.").

Finally, should this Court nonetheless determine that Retrophin is appropriately a "victim" for purposes of the MVRA such that restitution is warranted, the burden still rests on the government to prove the appropriate amount. *See United States v. Finazzo*, 850 F.3d 94, 117 (2d Cir. 2017). And "[s]ince the purpose of restitution is compensatory and the MVRA limits restitution to the amount of each victim's losses, 'a restitution order must be tied to the victim's actual, provable, loss.'" *Id.* (internal citation omitted). In this case, that amount cannot exceed $477,329, which, as discussed above, is the maximum amount of actual loss attributable to Evan (after giving effect to the benefits Retrophin received). Of course, given the stated purpose of restitution as "compensatory," this amount would need to be further reduced by any funds recovered by Retrophin in the course of a judgment against Mr. Shkreli or the MSMB entities related to the settlement and consulting agreements (or offset in payments it is required to make to Mr. Shkreli if Mr. Shkreli prevails in such dispute) in order to prevent Retrophin from receiving a windfall in the guise of restitution. *See United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) (the MVRA is not meant to award a victim "more in restitution than he actually lost") (internal citations omitted).

The Court should also take into consideration that Retrophin signed a settlement agreement with Katten Muchin Rosenman LLP (attached hereto as Exhibit A) in January 2016, after Evan was indicted, in which Retrophin released Katten and all "present and former partners" (which would also include Evan) from any and all claims. This release further supports the position that Retrophin should not be considered a victim requiring compensation as a result of the actions of Katten, its present and former partners in general and Evan specifically.

## IV.  THE § 3553(A) FACTORS COUNSEL IN FAVOR OF A NON-CUSTODIAL SENTENCE

"The United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom."  *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992).  But in attempting to rebut the myriad reasons why the Section 3553(a) factors counsel in favor of a non-custodial sentence, the government overlooks just that.  For the reasons articulated below, the government's arguments defy existing precedent and ignore both the key facts of this case and key findings from the Probation Department.  In short, this Court should find that a probationary sentence is sufficient but not greater than necessary to satisfy the interests of justice and all factors in Section 3553(a).

### A.  The Nature and Circumstances of the Offense Support a Non-Custodial Sentence.

In arguing that the nature and seriousness of Evan's offense warrant the imposition of a five-year sentence, the government parrots its statements relating to the underlying offense conduct.  *See* Dkt. 648 at 47–50.  Tellingly, however, the government does not and cannot claim that Evan was, or has ever been, convicted of a crime of violence; that Evan has committed any prior unindicted or bad acts; or that Evan has defied the Court, the Court's orders, or his conditions of bail.  Instead, the government labels Evan as "corrupt" as if that were his character trait without indication of what makes him so, and on the basis of the charged conduct alone.[4]

---

[4]  The government speculates about Evan in a number of instances—including that he retained emails following his departure from Katten because he "believed" his conduct would "one day" come under review.  Dkt. 648 at 55 n.21.  That is pure speculation regarding Evan's intent or actions.  Moreover, preserving documents and emails is the opposite of what someone would do if she/he believed that such documents reflected an intent to commit a crime.  Indeed, it is normally the government which argues that the destruction of documents evinces an intent to cover up a crime.  The polar opposite—preserving documents—evinces the exact opposite intent, that is, a reflection of not believing that one has done anything wrong.

What is more, the government does not contest that the largest losses from the conspiracy were borne by Evan. *See* Dkt. 639 at 37 ("the largest losses from the alleged conspiracies were suffered by Evan himself"). And while the government attempts to fault Evan for allegedly allotting only "one paragraph to address the nature and circumstances of the offenses of conviction," Dkt. 648 at 47, it overlooks the eight pages in Evan's opening memorandum detailing exactly why Evan played a minor role in the conspiracies in which he allegedly participated. Dkt. 639 at 24–32. Indeed, the government effectively concedes the merit of Evan's position when it is forced to cite to conduct entirely separate from the relevant conspiracy to make its point. Dkt. 648 at 47 (acknowledging that the information on which the argument relies is "not part of the charged conduct").[5]

For these reasons and those further articulated in Evan's opening memorandum (*see* Opening Memo 24–32; 34), this Court should conclude that the nature and circumstances of Evan's offense do not merit more than a non-custodial sentence.

## B.  Mr. Greebel's History and Characteristics Support a Non-Custodial Sentence.

On the day the Court sits in judgment of a defendant, both the statute and fundamental justice counsel that the Court should weigh all of a person's conduct over decades on the one side of the ledger against the charged conduct on the other. The government overlooks and unfortunately discounts the outpouring of support Evan has received from his community and family that recount a history of honesty, charitable work, and good deeds. We ask the Court to take the substance of those letters into account in assessing Evan's history and characteristics.

---

[5]  In fact, not only was the government's asserted conduct—that Evan "arranged for Retrophin to pay MSMB's outstanding legal bills to Katten—not charged, there was also no testimony nor information presented to indicate that Evan had any knowledge of which entities paid money to Katten until after the fact when he was asked to look into it by Retrophin's outside financial advisor.

*1. Mr. Greebel has earned a well-deserved reputation for honesty and integrity.*

The government's request for a long sentence is based substantially on its allegation that the charged conduct means he must be an unethical person throughout his other relationships and dealings. But the Court's analysis of a defendant's history and characteristics under Section 3553(a) must look beyond the charged conduct to the defendant's lifetime of behavior and work. Therefore, the letters requesting leniency from the many colleagues and clients who have written to this Court attesting to Evan's character and integrity, *see* Dkt. 639 at 57–62, and the numerous others who have stressed that Evan's alleged offense conduct can only be understood to be "an aberration contrary to his normal character" (C. Citrin; *see generally* Dkt. 639 at 38), should weigh heavily.

Next, the government's claims that Evan "deceived other Katten partners who performed work for Retrophin," Dkt. 648 at 55, is disproven by the support that Evan has received from many Katten partners. For example, according to Howard Cotton—whom the government explicitly cites as one of those whom Evan deceived (*id.*)—this is simply not true. Mr. Cotton testified that Evan was "extremely diligent, smart, hard-working" and that he never observed him do anything wrong or unethical, *see, e.g.*, Trial Tr. 8853:25–8854:10; correspondingly, in the sentencing letter that he submitted to the Court after the government filed its sentencing memorandum, Mr. Cotton describes Evan as an "honest, extremely diligent, smart, hard-working attorney" who "conducted himself with the highest moral and ethical standards, and consistently exhibited sound judgement in this regard." (H. Cotton.) Indeed, contrary to the government's assertions, Mr. Cotton affirms that "Evan always acted ethically and honestly," "including for the pharmaceutical client that was at issue in this trial." (*Id.*) Mr. Cotton's sentencing letter, therefore, contradicts the heart of the government's allegation that Evan "deceived other Katten

22

partners" and demonstrates that pure speculation and unreasonable inferences should not be the basis of the imposition of a lengthy sentence.

Just like Mr. Cotton, Michael Gordon has a similar recollection of Evan as having "the fiercest work ethic of any attorney I have known in my 26 years of practice" and "consistently honoring his ethical obligations." (M. Gordon.) Mr. Gordon's sentencing letter is yet another good example of a testimonial that contradicts the government's inaccurate assertion that Evan deceived Mr. Gordon and others at Katten. And Howard Jacobs notes, consistent with his trial testimony, that "Evan's ethics and integrity outweighed his own financial gains." (H. Jacobs; *see also* Trial Tr. 8158:7–18 (Mr. Jacobs testimony that Evan "was an excellent lawyer . . . ethical, honest and always trying to do a good job").) The government overlooked this letter—and Mr. Jacobs' testimony—in asserting in its sentencing letter that Evan had deceived Mr. Jacobs.

The government's suggestion that Evan somehow victimized his colleagues is thus baseless, contrary to the sentencing letters of Mr. Cotton and Mr. Gordon, and an unfair portrayal of the facts. *See also* Trial Tr. 1238:24–1239:24 (testimony of Bernadette Davida that Evan was "respected internally at Katten" and that she "never observed [him] lying to anyone at the firm" or to "any client"); *id.* at 8588:21–23 (testimony of Michael Rosensaft that he never observed Evan do anything wrong), 8695:19–23 (Mr. Rosensaft testifying that there was never an instance when Evan went against Mr. Rosensaft's advice).

Finally, the government illogically and dangerously attempts to *fault Evan* for the very fact that so many people were willing to write letters on his behalf; according to the government, Evan's sterling reputation should be held against him because it shows that he is "capable of differentiating right from wrong," Dkt. 648 at 56. Quite clearly, this is not how the Section 3553(a) factors work. Courts routinely credit defendants' good character as well as

23

evidence showing that the offense conduct was out of the ordinary.  *See*, *e.g.*, *United States v. DiMattina*, 885 F. Supp. 2d 572, 581–82 (E.D.N.Y. 2012) (acknowledging the defendant's "good character and many acts of charity"—together with the fact that the "crime seem[ed] to have resulted from aberrant behavior"—in sentencing the defendant to a below-Guidelines sentence after trial).  To somehow find that, for instance, a past client's willingness to write to this Court and express his sincere view that Evan is a man "with the highest ethical standards" (B. King) is an *aggravating* factor would belie common sense and discourage anyone from submitting letters of support and proof that an individual has a history of good deeds and conduct.  If the government's argument were correct, then an individual would be penalized for submitting letters attesting to a history of honesty, and simultaneously penalized for not doing so because the government would then argue that the person had no history of honesty.  We thus ask the Court to credit—not fault—Evan for the fact that he was, and remains, a man of the highest integrity in the eyes of the many people who know him, who attested to a history of specific instances and general statements of Evan's integrity, and were willing to attest to his character to this Court—including those who told the Court they would continue to work with Evan without hesitation.

>    2.  *Mr. Greebel's community service and charitable work warrant leniency and a lower sentence.*

The government does not given Evan sufficient credit for his history of charitable work—even in the face of extensive evidence of such work as compiled by Probation (PSR ¶¶ 81, 84, 90, 132 (documenting Evan's history of charitable works and his efforts to instill the same values in his children)).  Instead, the government seems to suggest that Evan's history of charitable work should not play a role in determining his sentence.  This argument has no merit as applied to Evan.  The crux of the government's position appears to be a distinction between

"community service" and "charitable work," under which "community service" "can, and should" lead this Court to impose a lesser sentence, Dkt. 648 at 57, but "charitable work" "warrants a downward departure only where it is present to an exceptional degree." Dkt. 648 at 57. That distinction makes little sense and would incorrectly attribute a lesser value to community service. Moreover, in seeking to draw this distinction, the government fails to note Evan's current and historic extensive community service, including (i) coaching children's sports teams for hundreds of hours a year (*see, e.g.*, J. Sussberg, M. Tauber, M. Bass), (ii) developing a drug rehabilitation facility with in-patient and out-patient components[6], (iii) volunteering in a soup kitchen, (iv) meeting with state and federal law enforcement to discuss bitcoin-related legal issues, (v) volunteering with Cub Scouts and other organizations in monthly service projects, and (vi) heading a fund that provided low and no-interest loans to minority and women-owned businesses in Israel.

In any event, the PSR—which the government recognizes does not include many of Evan's activities, Dkt. 648 at 58 n.23—affirmatively acknowledges that Evan has an "*extensive history of charitable works*" (PSR ¶ 132 (emphasis added)). This exact description of the scope of a defendant's charitable work has been upheld by the Third Circuit, sitting *en banc*, as warranting the imposition of a non-custodial sentence. *See United States v. Tomko*, 562 F.3d 558, 571–72 (3d Cir. 2009) (en banc) (citing to the "[s]everal dozen letters written on [the defendant's] behalf . . . demonstrating [his] community ties and *extensive charitable work*" as the

---

[6] The government attempts to impeach the Probation Department's conclusion about Evan's work in connection with a drug rehabilitation center, as well as various statements in our opening brief about that work, by referencing specific words in certain letters from D. Sinkman, J. Paley, J. Lasner, H. Jacobs, and G. Trief. However, the government overlooks that multiple people familiar with when Evan started working on the project refer to the work beginning in the Fall 2015, before Evan was arrested. (*See, e.g.*, M. Gordon.)

primary reason for why the district court "did not abuse its discretion" in imposing a sentence of probation (emphasis added)).  Thus, even accepting the government's distinction between community service and charitable work, Evan has demonstrated that he is deserving of a non-custodial sentence on both fronts.

Discounting and overlooking all of the statements and proof regarding Evan's history of charitable contributions, the government attacks Evan's devotion to his community by arguing that "the record is entirely devoid of any pro bono legal work the defendant engaged in while a practicing attorney at Katten."  Dkt. 648 at 57; *see also id.* at 60.  This point is illogical, inaccurate, and internally inconsistent.  For one, the government seems to be cabining the definition of "pro bono" to exclude any pro bono work not done in direct service to the poor and, in so doing, exclude the pro bono work that Evan did.  *Contrast id. with, e.g.*, K. Hsu, A. Burk, J. Later.  Furthermore, the government offers *no* reason why this Court should discredit the community service and charitable work of a corporate attorney because that attorney did not perform a different kind of community service and charitable work in one aspect of his life. Additionally, the government spends a whole page of its submission arguing that certain community service efforts undertaken by Evan in the legal community are not, in fact, community service.  *See* Dkt. 648 at 58.  While Evan maintains that, for example, devoting hundreds of hours over multiple years to the Association of Corporate Growth is best understood as community service, *see id.*, to the extent it is not, this service clearly qualifies as pro bono legal work.

In sum, we respectfully ask the Court to consider Evan's "extensive volunteer work and community service" (PSR ¶ 84) and "extensive history of charitable works" (PSR ¶ 132).

*3.  Mr. Greebel's family circumstances also warrant a non-custodial sentence.*

In attempting to steer this Court away from considering the devastation a sentence of incarceration would wreak on Evan's family, the government cites almost exclusively to pre-*Booker* case law that is of little import given the current, discretionary nature of the Sentencing Guidelines.  *See* Dkt. 648 at 61–64.  The only post-*Booker* case the government cites is *United States v. Cutler*, 520 F.3d 136 (2d Cir. 2008), but the Second Circuit has explicitly "depart[ed] from" that case and emphasized that "we will not substitute our own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).  Thus, the government is plainly incorrect in arguing that this Court does not have the discretion to consider Evan's family circumstances when imposing a sentence.

Nevertheless, the outdated framework from the government's cases still supports consideration of Evan's family situation.  In *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992), the Second Circuit emphasized that "the rationale for a downward departure" based on family circumstances" is not that they "decrease [the defendant's culpability], but that we [the Court] are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing."  *Id.* at 129.  Sentencing Evan to a period of incarceration would do exactly that.  Evan has three young children who are dependent on him, as recognized by Probation.  (PSR ¶ 84 (Evan is "very involved in [his children's] upbringing."))  Likewise, various friends and family have questioned whether ██████████████████████████ ██████—let alone the Greebel children—without Evan's supportive presence.  In the words of these friends,

- [Jodi was] decimated by the tragedies that have struck her. Not a day goes by when I [don't] question how she was given this lot in life. She is THE most giving, generous, thoughtful, hardworking, honest person I know. I cannot image the thought of her losing Evan after the

calamities she has faced to date nor can I process how she will manage as a single mother to their three beautiful, young children.  (L. Malter.)

- Jodi had great difficulty in handling this totally unexpected event . . . coming on the heels of her brother's death. Despite Evan's own plight, he was well aware of how much Jodi and his children needed him through this harrowing time in their lives; and he was there for them. When you mete out Evan's sentence, please bear in mind that your decision will affect so many other people, but mostly his wife and his three small children. They too will suffer Evan's punishment.  (Niles Citrin.)

- Evan's very positive outlook on life has helped all of us cope with the last few very difficult years. I am not sure any of us could have done this without him. Jodi and his children need him to be a part of their lives each and every day, especially during these early childhood years as he is a vital part of their everyday existence. Without his everyday presence there will be an enormous void and his young family will suffer tremendously.  (Nancy Citrin.)

- Evan was there to support Jodi and their children through the toughest of times. He has been the rock in this family. This situation actually caused my staff to offer to help the Greebels with childcare if they needed it. The loss was so great and felt by all of us. We love and respect this family and wanted to help them in any way possible. It is my opinion that any change to this household would certainly have a negative effect on his children in particular. The Greebels are indeed such a close family.  (Sue Tolchin.)

The significant scale of familial damage that a period of incarceration would produce in this particular case is more than sufficient to warrant consideration by this Court.  Thus, in *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997), the Second Circuit upheld a downward variance based off of family circumstances, notwithstanding the fact that (i) the defendant's children—ages eight and nine—would have been left in the care of their college-educated and employed mother, and (ii) the children's grandparents—at least on father's side—were both still alive (and, in the case of the grandmother, employed).  *Id.* at 1035.  The delicate emotional and psychological state of Evan's family following the recent, tragic death of his wife's brother— combined with the well-documented concern of friends, family, and community leaders that the nuclear family might not be able to survive without Evan's love, care, and support—easily clears the *Galante* threshold.

In attempting to avoid this conclusion, the government spends five pages criticizing the

credibility and conclusions of ██████████████ . ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████   ████████████████

███████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

The government has similarly offered no basis for this Court to discount the Department

of Probation's finding that Evan's financial situation is dire, including that he has a "contingent

liability of several million dollars" and is "unable to pay a fine."  (*E.g.*, PSR ¶¶ 112, 114.)  The

government effectively concedes as much when it acknowledges that Evan has had to pursue

"hundreds of thousands of dollars" in loans from his family.[7]  Dkt. 648 at 66.  And contrary to

---

[7]  The government also makes the assertion that loans from his family "could be forgiven the
day after sentencing." Dkt. 648 at 44.  Setting aside the complete lack of factual basis for this

the government's claims, Evan has been fully forthcoming in his financial disclosures to the Department of Probation, as reflected by the PSR's five-page-long discussion of his finances. (*See* PSR ¶ 109–14.)  That discussion simply does not square with the government's contention that Evan "has consistently refused to provide this Court with complete information about his family's financial situation."  Dkt. 648 at 65.  Its highlighting of Jodi's "assets in her own name" is similarly unavailing; those are Jodi's personal finances, which were accumulated prior to the marriage, not provided by Evan, and to which Evan does not have access.  As such, they do not calculate into Evan's own liabilities or ability to pay a fine. Evan's financial and family situation therefore support a probationary sentence.

Especially in light of the above, the government's claim that Evan is seeking special treatment given the comparable material comforts of his family is misplaced.  Dkt. 648 at 64–66. It is also wrong; Evan is not asking for special treatment.  It is simply, and sadly, the fact of the matter that his immediate family members face significant psychological, medical, and developmental hardships.  These hardships are unrelated to the type of community his family lives in.  Nor can they be ameliorated by the assistance from elderly parents or the fact that his current residence is sizable.  *Id.*  They may be able to be ameliorated, however, by Evan receiving a non-custodial sentence, which is why we ask the Court to consider imposing one.

## C.  The Goals of Specific and General Deterrence, As Well As Just Punishment, Are Best Accomplished Through a Non-Custodial Sentence.

The government's insistence that a sentence of five years is necessary to sufficiently deter Evan and the public at large ignores the tremendous, life-long consequences this prosecution and conviction has and will continue to have on Evan.  Moreover, in advocating for

---

statement, these are *bona fide*, recorded loans, and simply forgiving them would have an adverse financial impact on those people who loaned the money.

a five-year sentence, the government disregards the concept of just punishment, which strongly supports a non-custodial sentence in this case.

The government first argues that Evan has not been specifically deterred, and faults the defense for allegedly "not even address[ing]" the concept. Dkt. 648 at 71. Both claims are transparently false. As documented throughout Evan's sentencing memorandum (*see*, *e.g.*, Opening Memo 37, 39–43, 65–66), the trial and conviction have had a devastating effect on Evan. He has lost the ability to practice law and pursue his passion, been subjected to tremendous public shame, and has suffered through an extremely trying time with his family. In the words of his family and friends, these consequences have served as an "extremely impactful punishment for Evan" (C. Greebel), "destroying forever his reputation" and promising a "dismal future" (M. Merdinger, B. Greebel). There is simply no basis for the government to claim that these experiences and consequences will not have a strong deterrent effect on Evan.

The government attempts to use the fact that Evan is maintaining his appellate rights by maintaining his innocence and not acknowledging his guilt as "evidence" that Evan has not been specifically deterred and therefore deserves a greater sentence. Dkt. 648 at 80–81. This argument is troubling and wrong, particularly when the government faults Evan's friends and family who have written to the Court attesting to the fact that they—on their own, not on the basis of any of Evan's own statements or beliefs—believe Evan is innocent.[8] *See* Dkt. 648 at 81 (compiling letters). Those letters are a testament to Evan's good character and reflect that,

---

[8]   The government similarly faults letter writers for their belief that Evan fell victim to Mr. Shkreli's maneuverings, and speculates (again) that "[i]t is utterly inconceivable . . . that the defendant did not tout Shkreli as a key client that he would be bringing to Kaye Scholer." Dkt. 648 at 81. In truth and in fact, when Evan moved to Kaye Scholer he did not list Mr. Shkreli or any of his entities as potential future business.

because he has exhibited high moral character throughout his life, those who know him simply cannot believe that he committed a crime.

With respect to general deterrence, the government disproves its own point by citing to an article, published immediately after Evan's conviction, entitled "Ex-Katten Atty Conviction A Cautionary BigLaw Tale."  Dkt. 648 at 84.  Evan has, as we have repeatedly emphasized, suffered sweeping consequences due to his actions, and will continue to suffer these consequences for the rest of his life as a convicted felon.  These consequences, moreover, have been made known to the national legal community (and beyond) through the extensive press coverage generated by his arrest, trial, and conviction.  *See*, *e.g.*, Stewart Bishop, *Ex-Katten Atty Conviction A Cautionary BigLaw Tale*, Law360 (Jan. 2, 2018) ("The conviction of former Katten Muchin Rosenman LLP partner Evan Greebel for conspiring with "Pharma Bro" Martin Shkreli to defraud Retrophin Inc. and its investors is a *harsh reminder to lawyers of the importance of knowing when to walk away from a dangerous client . . . .*  Greebel's fall from a onetime promising corporate attorney for Katten and later Kaye Scholer LLP to convicted criminal *serves as a lesson for lawyers that they need to be ready to let go of even very lucrative client engagements when red lines are crossed*."  (emphases added); *Martin Shkreli's Ex-Lawyer Is Convicted of Fraud*, N.Y. Times (Dec. 28, 2017) (noting the statement of the Acting United States Attorney for the E.D.N.Y. that "the *verdict sent a message to lawyers* that they would be held accountable when they 'use their legal expertise to facilitate the commission of crime' (emphasis added)).

Respectfully, we submit that Evan need not be incarcerated to effectively communicate to the legal community and broader public that such conduct will not be tolerated.  There is precedent in this Circuit for sentencing of lawyers in this manner; as addressed in our opening

brief, Judge Preska markedly departed from the Guidelines range in sentencing Joseph Collins to

a year and a day.  She noted that this sentence, in combination with the loss of Mr. Collins' law

license, was deterrent enough, and imposed it despite the fact that the chief executive and

president of the company, who were indicted in the same scheme as Mr. Collins, received

sixteen- and ten-year sentences, respectively.  Casey Sullivan, *Lawyer sentenced to prison for

role in $2.4 billion fraud at Refco*, Reuters (July 15, 2013).

   The above arguments underscore that Evan has already been justly punished.  Contrary to

the government's characterization, *see* Dkt. 648 at 71–73, Evan is not seeking "special

treatment" because he is a lawyer.  Indeed, the government acknowledges that there is precedent

supporting the imposition of a non-custodial sentence for a lawyer whose crime amounted to

"aberrant conduct," but it simply "disagrees with the court's reasoning in that case."  Dkt. 648 at

78.  We do not; we contend that Evan's character and charitable works—combined with the

painful losses Evan has suffered and will continue to suffer—make him an appropriate candidate

for a probationary sentence.  Finally, this Court may absolutely consider such collateral

consequences like Evan's loss of his law license and his "dismal" future as a convicted criminal

in fashioning its sentence.  *Contra* Dkt. 648 at 73–74.  "The effects of [] collateral consequences

can be devastating" and "amount to a form of civil death," *United States v. Nesbeth,* 188 F. Supp.

3d 179, 180 (E.D.N.Y. 2016).  The Second Circuit has thus stressed that "[i]t is difficult to see

how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects

of a particular sentence." *United States v. Stewart*, 590 F. 3d 93, 141 (2d Cir. 2009); *see also id.*

(concluding that district court did not abuse its discretion in granting a substantially below-

guidelines sentence because, *inter alia*, the conviction made it "doubtful that the defendant could

pursue his career as an academic or translator, and therefore [] the need for further deterrence

and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant" (internal quotation marks omitted)).  Looking at the totality of the consequences that Evan has faced and will continue to face for his actions, this Court should find that a non-custodial sentence is appropriate.[9]

## IV.  CONCLUSION

For all these reasons, we respectfully submit that a sentence of probation, along with no restitution and forfeiture in an amount not to exceed $10,477.48, are the appropriate sentence and punishment in this case.

Dated:  New York, New York
        August 1, 2018

>                            */s/ Reed Brodsky*
>                            Reed Brodsky
>                            Winston Y. Chan
>                            Mylan D. Denerstein
>                            Randy M. Mastro
>
>                            GIBSON, DUNN & CRUTCHER LLP
>                            200 Park Avenue
>                            New York, NY 10166
>                            (212) 351-4000
>                            rbrodsky@gibsondunn.com
>                            *Counsel for Defendant Evan Greebel*

---

[9]  Finally, the government's concern about sentencing disparities, *see* Dkt. 648 at 85, is misplaced.  It is appropriate for courts to consider "differences among co-defendants when imposing a sentence."  *United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007).  As we have repeatedly emphasized, Mr. Shkreli is far more culpable than Evan in the charged conspiracies and, unlike Evan, Mr. Shkreli could not point to a background of honest and ethical behavior.