UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

UNITED STATES OF AMERICA                    **MEMORANDUM AND ORDER**

        - against -                          15-cr-637(KAM)

EVAN GREEBEL,

            Defendant.

------------------------------------X

**MATSUMOTO, United States District Judge:**

        Before the court is defendant Evan Greebel's motion for a judgment of acquittal or in the alternative for a new trial, pursuant to Federal Rules of Criminal Procedure 29 ("Rule 29") and 33 ("Rule 33").  (ECF No. 530 ("Mem."); ECF No. 563 ("Gov. Opp."); ECF No. 574 ("Def. Reply").)  The court heard argument on defendant's motions and the government's motion for forfeiture on April 13, 2018, and ordered further briefing on forfeiture.  (Government's Letter, ECF No. 585 (Gov. Letter); Defendant's Letter, ECF No. 587 (Def. Letter).)

        For the reasons set forth below, the court denies Mr. Greebel's motions for judgment of acquittal or a new trial pursuant to Rule 29 and Rule 33.

## Background

### I.   The Charges

        Counts One through Six of the June 3, 2016 Superseding Indictment charged Mr. Greebel's co-defendant, Martin Shkreli,

with six counts of securities fraud, conspiracy to commit
securities fraud, and conspiracy to commit wire fraud in
relation to two hedge funds, MSMB Capital and MSMB Healthcare.
Counts Seven and Eight, respectively, charged Mr. Greebel and
Mr. Shkreli of conspiring, along with others, to commit wire
fraud and conspiring to commit securities fraud in relation to a
pharmaceutical company known as Retrophin.[1]  (Superseding
Indictment, ECF No. 60.)

        The Superseding Indictment described the charged
conduct as follows:

### A. Counts One through Six: the MSMB Capital and MSMB Healthcare Schemes

        Counts One and Four charged Mr. Shkreli with
Conspiracy to Commit Securities Fraud, in violation of Title 18,
United States Code Section 371; Counts Two and Five charged Mr.
Shkreli with Conspiracy to Commit Wire Fraud, in violation of
Title 18, United States Code Section 1349; and Counts Three and
Six charged Mr. Shkreli with Securities Fraud in violation of
Title 15, United States Code Sections 78j(b) and 78ff.

        These counts related to Mr. Shkreli's solicitation of,
and communications with, investors in two hedge funds he
founded, MSMB Capital and MSMB Healthcare.  Counts One through

---

[1]  At Mr. Greebel's trial, the court and parties referred to Counts Seven
    and Eight as Counts One and Two, to avoid alerting the jury to the fact of Mr.
    Shkreli's prior trial.

Three charged Mr. Shkreli with offense conduct related to MSMB Capital and were referred to in the Superseding Indictment as the "MSMB Capital Scheme"; Counts Four through Six charged Conduct related to MSMB Healthcare and were referred to as the "MSMB Healthcare Scheme."

**B. Count Seven: the Retrophin Misappropriation Scheme**

Mr. Shkreli founded Retrophin, a biopharmaceutical company, in the Spring of 2011. Mr. Greebel, then a corporate lawyer at the firm Katten Muchin Rosenman, was Retrophin's outside counsel from approximately December 2012 to September 2014. In Count Seven, the Superseding Indictment charged Mr. Shkreli and Mr. Greebel with a conspiracy to commit wire fraud against Retrophin, based on three theories: (1) that they caused Retrophin to transfer Retrophin shares to MSMB Capital even though MSMB Capital had not invested in Retrophin; (2) that they caused Retrophin to enter into, and pay for, settlement agreements with disgruntled MSMB Capital and MSMB Healthcare investors; and (3) that they caused Retrophin to enter into "sham" consulting agreements with disgruntled investors in MSMB Capital, MSMB Healthcare, and Elea Capital (a prior hedge fund founded by Mr. Shkreli) as a mechanism to settle liabilities the investors claim were owed to them by Mr. Shkreli or his MSMB or Elea Capital hedge funds.

**C. Count Eight: the Unrestricted Shares Scheme**

In Count Eight, the Superseding Indictment charged Mr. Shkreli and Mr. Greebel, along with others, with Conspiracy to Commit Securities Fraud.  The Superseding Indictment charged that Mr. Shkreli, Mr. Greebel, and others conspired to control the price and trading of Retrophin stock.

## II.  Mr. Shkreli's Trial

The defendants jointly moved for severance, and the court granted their motion on April 19, 2017.  (Order Granting Motions for Severance, ECF No. 198.)  Mr. Shkreli proceeded to a jury trial on June 26, 2017.  On August 4, 2017, the jury found Mr. Shkreli guilty of Count Three, Securities Fraud in relation to MSMB Capital; Count Six, Securities Fraud in relation to MSMB Healthcare; and Count Eight, Conspiracy to Commit Securities Fraud in relation to Retrophin.  (Verdict, ECF No. 305, at 1-3.)  On February 26, 2018, the court denied Mr. Shkreli's motion for a judgment of acquittal.  The court concluded that based on the government's evidence, the jury reasonably found that Mr. Shkreli had made numerous, intentional and material false statements about, *inter alia*, the size, investment strategy, and performance of his MSMB Capital (Count Three) and MSMB Healthcare (Count Six) hedge funds, and also that there was sufficient evidence to support the jury's verdict that Mr. Shkreli and Mr. Greebel had conspired to commit securities fraud with regard to Retrophin (Count Eight).  (ECF No. 535.)  On

March 9, 2018, the court sentenced Mr. Shkreli to eighty-four months in custody and three years of supervised release.

## III.    Mr. Greebel's Trial

Jury selection for the trial of Mr. Greebel commenced on October 16, 2017, and trial began on October 20, 2017.  The government called as witnesses former MSMB Capital and MSMB Healthcare investors and employees, Retrophin employees and board members, accountants, and summary fact witnesses.  The government rested on December 6, 2017.  (Tr. 8064:3-6.)  Mr. Greebel presented a defense case, calling, among others, Mr. Greebel's former colleagues from Katten and expert witnesses. The court instructed the jury on the morning of December 22, 2017, and the jury began deliberations later that day.  On December 26, 2017, the court dismissed a juror on an unopposed defense application (Tr. 10968:6-9), and deliberations began again with an alternate juror.

The jury returned its verdict on December 27, 2017, on the second day of deliberations.  The jury found Mr. Greebel guilty of both Count Seven, Conspiracy to Commit Wire Fraud in relation to Retrophin, and Count Eight, Conspiracy to Commit Securities Fraud in relation to Retrophin.  (ECF No. 502.)

### A. Evidence at Trial

The following summary is limited to the trial testimony and documentary evidence necessary to discuss issues

5

raised in defendant's Rule 29 and Rule 33 motions.  Defendant

first made a Rule 29 motion after the government rested, and the

court reserved decision.  (Tr. 8150:11.)  Pursuant to Rule

29(b), the court will "decide the motion on the basis of the

evidence at the time the ruling was reserved."  The government

called multiple witnesses not specifically discussed below,

including the case agent, who introduced a number of significant

documents, including communications between Mr. Greebel and Mr.

Shkreli and others.

     In summarizing the evidence, the court is mindful that

it "'must review the evidence in the light most favorable to the

government, drawing all reasonable inferences in its favor.'"

*United States v. Cain*, 671 F.3d 271, 302 (2d Cir. 2012) (quoting

*United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004)).  In

addition, except as necessary to give context to the counts for

which Mr. Greebel was charged and convicted, the court does not

discuss in detail evidence that showed that Mr. Shkreli

defrauded investors in the MSMB hedge funds by falsely

representing his educational background, the funds' assets under

management ("AUM"), investment strategy, the relationship

between the funds and Retrophin, the funds' liquidity, or the

funds' investment performance, as the substance of the charges

against Mr. Shkreli is not contested in defendant's motion.

1.    *MSMB Investor Witnesses*

**Sarah Hassan**

In January 2011, Ms. Hassan invested $300,000 from her personal funds into MSMB Capital.  (Tr. 14398:25-1439:7.)  In April 2011, Ms. Hassan invested $150,000 from her family's investing fund, Dynagrow Capital, into Retrophin, which Ms. Hassan understood to be a "pharmaceutical bio-type company" Mr. Shkreli founded that "focused on orphan drugs," which are "drugs for a disease state[] that has a small number of patients." (Tr. 1444:10-1446:20.)  She viewed Retrophin and MSMB Capital as "very much different" and did not understand that MSMB Capital had invested in Retrophin.  (Tr. 1447:4-14.)  Through 2011, Ms. Hassan received periodic performance reports regarding her investments in MSMB Capital, which indicated that her investment was "really outpacing the market.  (Tr. 1447:15-1448:23; *see, e.g.* GX 80-13 (December 2011 performance update).) On March 16, 2012, Mr. Shkreli sent Ms. Hassan a capitalization table for Retrophin, which had been forwarded to Mr. Shkreli by Mr. Greebel, and which did not include any investment into Retrophin by MSMB Capital.  (GX 101-9.)

On September 9, 2012, Ms. Hassan received two emails from Mr. Shkreli.  The first was a performance update for the month of June 2012, indicating that Ms. Hassan had earned an approximately $135,000.00 return on her $300,000 investment in

MSMB Capital, for a total investment value of $435,266.00 "net of fees." (Tr. 1459:3-13; GX 80-19.) Ms. Hassan was "very happy" with this update. (Tr. 1459:19.) In the second email, Mr. Shkreli stated that he was planning to "wind down" the "hedge fund partnership with the goal of completing the liquidation of the fund by November or December 1, 2012." (Tr. 1460:9-1461:20; GX 101-15 (the "wind-down" email).) The wind-down email stated that investors would have the choice of redeeming their investment in cash or in Retrophin shares. (*Id.*) Based on these emails, Ms. Hassan anticipated that her investment in MSMB Capital was worth approximately $435,000.00, and on September 28, 2012, she requested repayment in cash "with the possibility that [she might] reinvest some of it in Retrophin." (Tr. 1463:1-5; GX 101-16.)

On December 18, 2012, Mr. Shkreli sent Ms. Hassan a press release about Retrophin's anticipated "reverse merger" with a public shell company, known as Desert Gateway, in December 2012. (GX 101-18.) She had not yet received any redemption of her MSMB Capital investment. Ms. Hasan continued to email with Mr. Shkreli about the status of her request to redeem her investment from MSMB Capital. Mr. Shkreli responded to her inquiries, but did not send her the cash. (*E.g.*, GX 101-19; 101-20.) At some point after the reverse merger, and without any agreement or notice, Ms. Hasan received 58,306

8

Desert Gateway shares, which at the time were worth less than $200,000 and were not liquid because the shares were subject to a six-month trading restriction. (Tr. 1479:10-1482:15.)

Mr. Shkreli represented to Ms. Hassan on January 21, 2013 that MSMB Capital "continued to invest in Retrophin" and that Retrophin "is the only investment in the fund at this moment" such that "[t]here is no longer any cash at the fund level." (GX 101-20.) He explained that "the plan . . . is to distribute the fund's holding (Retrophin stock)" after which "Retrophin can buy back your Retrophin stock . . . I can see your cash returned in the next two weeks." (*Id.*) Ms. Hasan was concerned because Mr. Shkreli was essentially stating that MSMB Capital's funds were entirely invested in Retrophin, but he had never asked permission to convert her MSMB Capital hedge fund investment into an investment into Retrophin. (Tr. 1474:6-1476:7.)

On February 22, 2013, following further discussion concerning the return of Ms. Hassan's funds, Mr. Shkreli introduced Ms. Hassan to Mr. Greebel over email, referring to Mr. Greebel as "our attorney." (GX 101-24.) Mr. Greebel wrote to Ms. Hassan on March 8, 2013, stating that "we are arranging for you to get the additional shares that you discussed with Martin" and asking for her address and delivery information. (*Id.*) On March 27, 2013, Ms. Hassan and Mr. Shkreli negotiated

an agreement in which Mr. Shkreli would wire approximately $300,000 to her account, and she would also receive approximately $200,000 in Retrophin stock. (GX 101-25.)

On March 29, 2013, Mr. Shkreli wrote in an email to Ms. Hassan that "unfortunately my lawyers think we should sign an agreement to document the transaction"; Mr. Greebel was copied on the email. (GX 101-27; Tr. 1489:1-12.) Ms. Hassan was "a little frustrated" because Mr. Shkreli had already "committed to sending those funds to [her] account." (Tr. 1489:1-12.) Mr. Shkreli sent a "Settlement and Release Agreement" to Ms. Hassan on April 4, 2013, which surprised Ms. Hassan because "[t]ypically you see a settlement agreement when you are trying to stay out of court . . . . Even though [Ms. Hassan] was frustrated, [she] never once implied that [she] was going to sue [Mr. Shkreli]." (Tr. 1490:17-21; GX 101-41.) The draft agreement had a notation that it was a "Katten draft" and named the settling parties as Martin Shkreli, MSMB Capital Management LP, MSMB Capital Management, LLC, MSMB Healthcare, LP; MSMB Healthcare Investors, LLC; MSMB Healthcare Management LLC; and Retrophin, Inc. (Tr. 1491:12-1492:1; GX 101-41.) In the initial draft, the party responsible for paying the settlement was listed as "[Mr.] Shkreli, the MSMB Entities, or Retrophin." (GX 101-41.)

Ms. Hassan continued to email directly with Mr. Shkreli regarding her comments on the draft Settlement and Release agreement, and Mr. Shkreli's emails in response indicate that he was passing her comments to Mr. Greebel. (GX 101-31; GX 101-32.) On April 19, 2013, Mr. Greebel simultaneously sent Ms. Hassan and Mr. Shkreli a revised Settlement and Release Agreement, in which only Retrophin was listed as responsible for paying a settlement amount of $400,000 in cash in exchange for releasing Mr. Shkreli, the MSMB entities, and Retrophin from any claims against them. (GX 101-34.) On April 26, 2013, Mr. Greebel circulated an executed copy of the Settlement and Release, in which Mr. Shkreli signed for himself, the MSMB Entities, and Retrophin. (GX 52.) Ms. Hassan received $400,000.00 and was permitted to keep the 58,306 restricted Desert Gateway shares she had previously received. (*Id.*)

**Richard Kocher**

Richard Kocher, a contractor and builder, invested $200,000 in Mr. Shkreli's MSMB Healthcare fund. (Tr. 2648:10-2661:23.) Mr. Kocher invested in MSMB Healthcare based on the representations of Mr. Mulleady, whom Mr. Kocher understood worked for Mr. Shkreli at MSMB Healthcare. (*Id.*) Mr. Kocher initially invested $100,000.00, but at Mr. Mulleady's request, invested an additional $100,000.00 on May 1, 2012 on the

11

condition that the fund "would also be able to return [the] money quickly if [Mr. Kocher] needed it."  (*Id.*)

Mr. Kocher received performance updates which purported to show that his investment in MSMB Healthcare was performing well.  (*E.g.* GX 83-1 - 83-4.)  On September 9, 2012, Mr. Shkreli, copying Mr. Mulleady, sent Mr. Kocher a copy of a July 2012 performance statement, showing that Mr. Kocher's $200,000 investment in MSMB Healthcare was worth $231,000.  Like Ms. Hassan, Mr. Kocher also received the wind-down email from Mr. Shkreli on September 10, 2012.  (GX 104-1.)

Over the following months, based on conversations with Mr. Mulleady, Mr. Kocher came to believe that his investment in MSMB Healthcare was worth $280,000, and that although Mr. Kocher wanted a cash redemption, the fund did not have cash available and "the easiest way to get [his] money out was through stock in Retrophin."  (*Id.*)  From Mr. Shkreli's wind-down email, Mr. Kocher believed that "Retrophin was doing well and that a lot of the money that was MSMB had gone to Retrophin."  (*Id.*)

After Mr. Mulleady informed Mr. Kocher that he was no longer working at MSMB Healthcare and that Mr. Kocher should contact Mr. Shkreli directly regarding redemption of his investment, Mr. Kocher wrote an email to Mr. Shkreli on March 11, 2013, copying Mr. Mulleady and Mr. Greebel, based on his understanding that Mr. Greebel represented Mr. Shkreli.

12

(GX 104-5-A.)  Mr. Kocher also copied his real estate attorney,
Jim Burke.  (*Id.*)  In the email, Mr. Kocher stated his belief
that the value of his MSMB investment was "approximately
$280,000" and that "our hedge fund, which funded Retrophin
directly, should benefit directly because of this."  (*Id.*)  Mr.
Kocher then stated his intent to exercise his rights to
redemption within a week, based on a side-letter agreement he
received in connection with his second investment into MSMB
Healthcare.  (*Id.*)  Mr. Shkreli acknowledged receipt of Mr.
Kocher's March 11, 2013 email and promised a response within 24
hours, but did not respond in that timeframe.  (*Id.*)  After a
follow-up email from Mr. Kocher, Mr. Shkreli stated that "[w]e
are distributing the fund's holdings to you.  You should receive
a stock certificate this week."  (GX 104-5-A; 2687:4-14.)  Mr.
Kocher responded on March 12, 2013, writing that "If my
redemption is in Retrophin shares, which are thinly traded, then
I would assume my account value would be higher to compensate
for illiquidity."  (GX 104-5-A; Tr. 2688:6-18.)  On March 14,
2014, in an email that did not include Mr. Greebel, Mr. Shkreli
notified Mr. Kocher that he had sent a certificate for 23,654
Retrophin shares, which was "not the full redemption."  (GX 104-
7.)  On March 15, 2013, Mr. Kocher wrote to Mr. Shkreli, not
copying Mr. Greebel, stating that he was "counting on" the wind-
down email "that we would be taken care of before the end of the

year and we would be able to be taken out in cash or
stock . . . . I expect to get in addition to this (insulting)
untradeable stock at least $200,000.00 which you owe me in
cash." (*Id.*) Mr. Kocher also noted that he had "already been
in touch with council [*sic*] that is versed in this kind of
litigation . . . . Also, I will make sure that this does go
public and will also go to the appropriate agencies." (*Id.*)
Mr. Shkreli responded with his office and cell phone contact
information, and copied both Mr. Greebel and Howard Cotton, also
a lawyer at Katten, on his response. (*Id.*)

After additional emails between Mr. Shkreli and
Mr. Kocher, on which Mr. Greebel was not copied, Mr. Kocher told
Mr. Shkreli on April 3, 2013 that "[i]f I don't see an agreement
from you by tomorrow, then the deal we have agreed to will be
off and I will be forced to have you deal with my lawyer." (GX-
104-16; GX 104-18.) On April 3, 2013, Mr. Shkreli emailed
Mr. Kocher with the "first draft of the settlement," attaching a
"Settlement and Release Agreement" bearing a "Katten Draft
4/2/13" stamp on the upper-right hand corner. (GX 104-19.)
Mr. Shkreli followed up on April 8, 2013, copying Mr. Greebel,
asking if Mr. Kocher had "looked at the settlement agreement"
and stating that "[w]e are ready to move forward." (GX 104-20.)
On May 8, 2013, Mr. Greebel sent an email to David G.
Trachtenberg, Mr. Kocher's attorney, copying Mr. Shkreli, with

"a draft of the settlement agreement." (GX 104-21.) Pursuant to the draft agreement, "[t]he MSMB Entities or Retrophin" would pay $123,711.00, and Mr. Shkreli would "deliver or cause to be delivered" 47,128 Retrophin shares to Mr. Kocher, in return for release of all claims against Mr. Shkreli, Retrophin, and the MSMB entities. (*Id.*) On approximately May 13, 2013, Mr. Kocher executed the final draft of the settlement agreement, which included the same payment provisions as the draft agreement. (GX 54.) Mr. Kocher testified that, although the agreement released any claims against Retrophin, he did not have any claims against Retrophin, had not threatened to sue Retrophin, and had not directed his lawyer to sue Retrophin. (Tr. 2716:25-2717:6.)

### David Geller

David Geller, who invested $200,000 in MSMB Healthcare, learned about the hedge fund from his brother, Alan Geller. (Tr. 2837:1-2848:1.) David Geller was seeking "a liquid-type" hedge fund, so that he could "change [his] mind" and "cash out within the month." (*Id.*) Based on representations concerning MSMB Healthcare's liquidity in the partnership agreement and from Mr. Shkreli, David Geller invested $200,000 in MSMB Healthcare on June 29, 2011. (*Id.*; GX 28.) David Geller received a number of investor statements

purporting to show a positive return on his investment in MSMB Healthcare. (*See* GX 91-1 - 91-10.)

David Geller received the "wind-down" letter on September 10, 2012. (GX 106-10.) Based on the performance statements, he planned "to take out the original investment, $200,000, and . . . put the rest in Retrophin." (Tr. 2877:17-28.) David Geller had conveyed this intention to Mr. Mulleady and Mr. Shkreli at a meeting in the summer of 2012, where they notified him that the fund would be winding down. (Tr. 2871:2-12; 2888:6.) David Geller's final performance statement, sent on September 10, 2012, but reporting on July 2012, stated that his investment in MSMB Healthcare was worth $299,343.00. (GX 99-10.)

David Geller initially waited for redemption instructions, but after he did not receive them, tried to contact both Mr. Mulleady, who had been his primary contact at MSMB Healthcare, and Mr. Shkreli. (Tr. 2877:6-16.) Although he could not get in touch with Mr. Shkreli, he got in contact with Mr. Mulleady in late November 2012, but Mr. Mulleady "couldn't . . . get any answers" from Mr. Shkreli. (*Id.*; 2884:14-17.)

On March 13, 2013, David Geller received a FedEx envelope sent by Leonora Izerne, with whom he was not familiar, containing only a stock certificate for 30,514 restricted Retrophin shares. (Tr. 2885:20-2886:21.) David Geller got in

touch with Mr. Mulleady, but "he really didn't have any answers." (Tr. 2889:11-12.) David Geller also emailed Mr. Shkreli on March 25, 2013, asking "how much of [his] original investment is in the fund and how much is in Retrophin." (GX 106-12; Tr. 2891:11-17.) Mr. Shkreli and David Geller exchanged additional emails in late March and early April 2013 regarding the request for redemption. On April 25, 2013, David Geller expressed his disappointment with his "investment situation in MSMB" and asked Mr. Shkreli not to "force [him] to go to the next level." (GX 106-20.) Mr. Shkreli copied Mr. Greebel on the email, and suggested that Mr. Greebel could "expedite this process significantly." (*Id.*) Mr. Shkreli and David Geller also verbally discussed a possible agreement, which would consist of $300,000 in cash and 20,000 Retrophin shares. (GX 106-18.)

Between April 26, 2013 and May 2, 2013, David Geller spoke several times with Mr. Greebel. (Tr. 2909:8-2911:21.) David Geller told Mr. Greebel that he had invested in MSMB Healthcare and understood that his stock had been "converted to Retrophin." (*Id.*) David Geller did not threaten to sue Mr. Shkreli, MSMB, or Retrophin, but did express a concern that he had been scammed by Mr. Shkreli. Mr. Greebel reassured him that Mr. Shkreli was working on a "payment plan." (*Id.*) David Geller characterized his conversations with Mr. Greebel as "very

professional [and] cordial" and knew that Mr. Greebel worked at a "very reputable law firm," which made him feel "a little more secure." (*Id.*)

The email discussions between Mr. Shkreli and David Geller continued into May; on May 7, 2013, Mr. Shkreli asked him to "call [E]van[.]" (GX 106-21.) Between May 13, 2013, and May 22, 2013, Mr. Shkreli and David Geller had an email conversation, on which Mr. Greebel was copied, in which David Geller expressed his displeasure at the delay in being paid and requested an additional 10,000 Retrophin shares.[2] (GX 106-23.) On May 22, 2013, Mr. Greebel sent Mr. Geller a "Katten Draft" settlement agreement and release, in which "[t]he MSMB Entities or Retrophin" were to pay David Geller $300,000 in exchange for his release of claims against Mr. Shkreli, Retrophin, or the MSMB funds. (GX 106-24.) The release portion of the agreement also noted that Mr. Geller had received 30,154 Retrophin shares "from the MSMB Entities," and those shares were part of the compensation for the agreement. (*Id.*) On May 30, 2013, Mr. Greebel distributed the executed settlement agreement, which included the same payment provision as the draft. (GX 55.)

---

[2] In the email, Mr. Geller explained that his initial written request for 20,000 shares was based on an incorrect recollection of his verbal discussion with Mr. Shkreli, and that they had actually agreed to 30,000 shares. (*Id.*) As he had already received 30,514 shares in March, he proposed that he simply keep those shares rather than returning them and receiving a new certificate for 30,000 shares. (*Id.*)

Despite receiving the executed settlement agreement, David Geller did not receive the $300,000. After additional emails with Mr. Shkreli and a meeting with Mr. Shkreli during which Mr. Shkreli committed to making a partial payment of $150,000, David Geller wrote an email on June 12, 2013 expressing his disappointment that he had not received the partial payment and stating that he would "pursue all means to fulfill the settle[ment] agreement." (GX 106-27.) David Geller also wrote that "[t]here are plenty of lawyers who will take this case on a contingency basis." (*Id.*) Mr. Shkreli responded by copying Mr. Greebel and asking Mr. Geller not to contact him "directly any more" because "we have an explicit way to deal with threats[.]" (*Id.*) On July 11, 2013, David Geller wrote directly to Mr. Greebel, stating that he had "retained counsel to start legal action" and would "be contacting the SEC and certain media outlets." (GX 106-28.) Following his July 11, 2013 email, David Geller had a phone conversation with Mr. Greebel, in which Mr. Greebel "made some assurances . . . that everything would work out" and that Mr. Geller would be paid. (Tr. 2939:25-2940:2.)

Following an additional call with Mr. Greebel and Mr. Shkreli in late August, and additional emails with Mr. Greebel and Mr. Shkreli, David Geller ultimately received the $300,000 in October 2013. (GX 106-29; 106-32; Tr. 2948:9-

14.)  Based on an August phone conversation with both Mr.
Shkreli and Mr. Greebel, Mr. Geller understood that payment was
delayed because "[a]nother deal had to be completed" and "the
10-Q had to come out" with "a footnote in it that said . . . we
have prior obligations that we have to make up to our
shareholders . . . ."  (Tr. 2947:21-24.)  Mr. Greebel showed
David Geller the related disclosure in the company's 10-Q
filing.  (Tr. 2947:25-2948:1.)

### Schuyler Marshall

     Schuyler Marshall, formerly CEO and now Chairman of
the Board of the Rosewood Corporation and a former lawyer,
invested $200,000 into MSMB Capital in January 2011.
(Tr. 3042:8-3049:6.)  He received sporadic performance
statements from Mr. Shkreli, from March 2, 2011 through
September 10, 2012.  (GX 81-1-81-8.)  His June 2012 performance
report, sent on September 10, 2012, showed that his $200,000
investment was worth $282,237.  (GX 81-8.)  Like other MSMB
investors, Mr. Marshall received the September 2012 "wind-down"
email.  (GX 102-2.)  After some discussion with Mr. Shkreli
about Retrophin in December 2012, Mr. Marshall asked for a cash
redemption of his investment in MSMB Capital.  (Tr. 3055:21-23.)
By February 27, 2013, Mr. Marshall had received a certificate
for approximately 37,000 shares of Retrophin stock, which had
not been accompanied by any explanation.  (Tr. 3056:8-19; GX

102-4.)  The shares were unregistered, which meant that they could not be sold for one year unless the company registered the shares.  (GX 102-4; Tr. 3058:5-21.)  In an email to Mr. Marshall on March 4, 2013 about the share certificate, Mr. Shkreli stated that "[t]he fund focused primarily on growing Retrophin and as such this is the only remaining asset."  (GX 102-4.)  Mr. Shkreli offered to "buy back" Mr. Marshall's Retrophin shares or to "give [Mr. Marshall] more shares of [Mr. Shkreli's] personal shares to true up your account value."  (*Id.*)

On May 31, 2013, Mr. Shkreli emailed Mr. Marshall and copied Mr. Greebel, with a set of terms for an agreement: "issue 6300 shares of stock and wire 300K in cash."  (GX 102-6.)  At the time, Mr. Marshall had not threatened litigation.  (Tr. 3063:22.)  On June 18, 2013, Mr. Greebel emailed Mr. Marshall a draft Settlement and Release agreement, which provided that, in exchange for a release of any claims against Mr. Shkreli, Retrophin, or the MSMB Entities, the "MSMB Entities or Retrophin" would pay Mr. Marshall $300,000 in cash, and Mr. Shkreli would deliver 6,300 Retrophin shares.  (GX 102-7.)  This draft agreement was not executed.  On June 24, 2013, Mr. Marshall wrote to Mr. Greebel that he was "disappointed" that "no one is responding to calls or emails concerning getting the release executed and our agreement performed."  (GX 102-8.) He told Mr. Greebel that, "in order to ensure preservation of

documents in case they are needed, this [email] confirms my request to be provided" various categories of documents, including those "related to the fund's and Martin's investment in Desert Gateway/Retrophin." (*Id.*) Mr. Marshall testified that he "expected" that his request for a "litigation hold" would prompt settlement, because the process of preserving documents is "a hassle . . . and I thought rather than go through that, they just go ahead and perform the agreement." (Tr. 3071:1-9.) He also noted that, "if this agreement didn't get performed, they would have been notified that these documents should be retained." (Tr. 3071:10-13.)

After additional discussion and emails with Mr. Shkreli and Mr. Greebel, on August 29, 2013, Mr. Greebel sent Mr. Marshall an email, copying Mr. Shkreli, attaching two agreements: "One between [Mr. Marshall] and Retrophin contemplating the payment of money, and the second between [Mr. Marshall] and [Mr. Shkreli] and MSMB relating to the delivery of the shares." (GX 102-13.) As Mr. Greebel described in his email, the two attached agreements included one Settlement and Release between Mr. Marshall and Retrophin, whereby Mr. Marshall would release claims against Retrophin for Retrophin's payment of $300,000, and one Settlement and Release between Mr. Marshall and Mr. Shkreli and the MSMB entities, whereby Mr. Marshall would release his claims against Mr. Shkreli and MSMB in return

for Mr. Shkreli's delivery of 6,300 Retrophin shares. (GX 102-13.) Mr. Marshall executed the versions of the two agreements, each still marked as a "draft" version. (GX 57A, 57B.) Mr. Marshall received a $300,000 wire at "[a]bout the time" he signed the agreements, but never received the 6,300 Retrophin shares. (Tr. 3085:18-21.)

### Lindsay Rosenwald

Dr. Lindsay Rosenwald, a biotechnology entrepreneur, invested $100,000 in MSMB Capital in October 2009. (GX 21; 76-1-76-26; 102-2; Tr. 3445:9-3460:13.) He received performance reports regarding his investment by email from Mr. Shkreli, which showed positive returns. (*Id.*) In August 2012, Dr. Rosenwald and Mr. Shkreli discussed exchanging Dr. Rosenwald's MSMB Capital investment for a stake in Retrophin, but Dr. Rosenwald did not pursue the exchange. (*Id.*) On September 10, 2012, Dr. Rosenwald received the "wind-down" email, as well as a final performance report from Mr. Shkreli, which stated that, as of June 2012 Dr. Rosenwald's investment was worth $179,493, or nearly $80,000 more than his initial investment. (*Id.*)

After receiving the wind-down email, Dr. Rosenwald requested redemption in cash, but as of January 2013, had not received a redemption. (GX 100-15; Tr. 3461:15-3473:8.) Helen Shvedkova, Dr. Rosenwald's chief financial officer, emailed with Mr. Shkreli regarding Dr. Rosenwald's redemption. (GX 100-15.)

Mr. Shkreli sent a stock certificate for 24,046 restricted Desert Gateway shares to Dr. Rosenwald, claiming that Dr. Rosenwald had verbally agreed to a conversion of his investment into Retrophin stock, but Dr. Rosenwald testified that he did not recall that agreement. (*Id.*; Tr. 3463.) Mr. Shkreli subsequently advised Dr. Rosenwald that Retrophin "represents almost all of the [MSMB Capital's] value" and that the value of the fund had fallen since Dr. Rosenwald's investment. (*Id.*) After speaking with Dr. Rosenwald, Mr. Shkreli offered to "transfer [his] personal shares to Dr. Rosenwald" to compensate Dr. Rosenwald for the fund's losses. (GX 100-13; Tr. 3472.) In early February 2013, Mr. Shkreli offered to purchase Dr. Rosenwald's Retrophin stock, converted in the Desert Gateway reverse merger, for $165,000. (GX 100-13.)

On February 14, 2013, Dr. Rosenwald emailed Mr. Shkreli, stating that "[i]f we don't speak and resolve matters today, then I have to turn it over to my attorneys." (GX 100-14; GX 100-16; GX 100-22; GX 100-23; GX 51; GX 100-27; Tr. 3474:16-3493:7.) On February 19, 2013, Kevin Stanfield, a lawyer for Dr. Rosenwald, sent Mr. Shkreli an email with the subject line "Your unauthorized conversion of Dr. Rosenwald's investment." (*Id.*) The attached letter included a "Re" line captioned "Lindsay A. Rosenwald v. Martin Shkreli, MSMB Capital Management and Retrophin, Inc." (*Id.*) The letter stated that

"[w]e have serious concerns that your unauthorized conversion of Dr. Rosenwald's investment violates Federal and State Securities Law, the Martin Act" and various New York State causes of action. (*Id.*) In addition, the letter included a "Notice of litigation hold," and stated that "any potential evidence, electronic or hard copy, must be maintained and preserved." (*Id.*) On February 22, 2013, Mr. Greebel emailed Mr. Stanfield regarding an anticipated draft of a settlement agreement from Mr. Stanfeld, which Mr. Greebel stated "will contain a full release of Martin, MSMB, and Retrophin"; Mr. Greebel stated that "Martin is trying to arrange for a total of 80,000 freely-trading shares of Retrophin stock to be delivered to Dr. Rosenwald." (*Id.*) On February 25, 2013, Mr. Stanfield sent Mr. Greebel a draft of the settlement agreement. (*Id.*) On February 27, 2013, Mr. Stanfield again emailed Mr. Greebel, noting that "Dr. Rosenwald would like to get the agreement finalized and executed as soon as possible." (*Id.*) Mr. Greebel responded to Mr. Stanfield, stating that he had "a variety of thoughts and comments on the terms, as well as the statements." (*Id.*)

On March 1, 2013, Mr. Greebel emailed Mr. Stanfield and another of Dr. Rosenwald's lawyers, copying Mr. Shkreli, attaching a revised "Katten Draft" settlement agreement, with tracked changes. (*Id.*) The parties to the agreement were Dr. Rosenwald, Mr. Shkreli, MSMB Capital Management, and Retrophin.

The draft Mr. Greebel circulated struck out the "whereas" clauses of the draft agreement prepared by Dr. Rosenwald which described the dispute over Dr. Rosenwald's MSMB Capital investment. (*Id.*) The agreement stated that "[Mr.] Shkreli agrees to deliver or cause to be delivered to Rosenwald the total amount of 80,000 shares" of free-trading Retrophin common stock. (*Id.*) The final version of the settlement agreement included the same payment term. (*Id.*) On April 18, 2013, Mr. Greebel sent Dr. Rosenwald a share certificate for 80,000 free-trading Retrophin shares, and on May 10, 2013, Dr. Rosenwald returned the 24,046 Desert Gateway shares to Retrophin. (*Id.*)

**Darren Blanton**

Darren Blanton, who invests through his "family office investment company," Colt Ventures, invested $1.25 million in MSMB Capital, based in part on Mr. Shkreli's representations regarding the fund's assets under management and third-party oversight. (GX 103 (Mr. Shkreli stating in an email to Mr. Blanton that MSMB Capital had $35 million in assets under management in December 2010); GX 79-1 - 79-2; Tr. 3550:11-3571:3.) Mr. Blanton relied on the performance reports Mr. Shkreli circulated regarding MSMB Capital, which showed "good" returns. (*Id.*)

Mr. Shkreli told Mr. Blanton about Retrophin after they had "discussed starting a company to go after rare diseases

for children." (GX 103-6; 103-7; 103-8; Tr. 3586:19-3589:9.)
On February 9, 2011, Mr. Shkreli emailed Mr. Blanton with a tax
identification number for Retrophin, and offered Mr. Blanton all
of the shares in the company. (GX 103-6.) Mr. Blanton
explained that Mr. Shkreli "was trying to give me all the
company and [Mr. Shkreli] said that [Mr. Blanton] could just
give him whatever . . . he deserves after it gets going" but Mr.
Blanton "thought that was not . . . the way it should be"
because Mr. Shkreli would be doing the work. (Tr. 3587:11-25,
3588:1-9.) Mr. Blanton proposed that Mr. Shkreli give him "30
percent or something" and split the remainder between "future
investors and shareholders." (*Id.*) In the early stages of
Retrophin, Mr. Blanton helped "strategize and find direction"
and evaluate potential investors in the company. (*Id.*)

In November 2011, Mr. Blanton requested redemption of
his investment in MSMB Capital, because he "just started feeling
like [Mr. Shkreli] was not being straightforward with me and not
telling me the truth about certain things." (GX 103-9; GX 103-
15; Tr. 3593:8-3612:21.) He testified that his
"controller/CFO[] had started looking into some of the details
of the fund and it wasn't checking out." (*Id.*) Because
Mr. Blanton "started thinking [Mr. Shkreli was not as
trustworthy as someone I would want to be representing," he
declined Mr. Shkreli's offer to join the board of Retrophin.

(*Id.*)  It was difficult for Mr. Blanton to reach Mr. Shkreli over the following weeks, but after some further discussions, Mr. Shkreli agreed in February 2012 to send $250,000 by wire to Mr. Blanton.  Separately, Mr. Blanton sought his "founding shares" of Retrophin, which Mr. Shkreli had promised him.  Also in February 2012, Mr. Greebel sent Mr. Blanton a letter on behalf of Retrophin, stating that due to Mr. Blanton's failure to execute certain documents, Retrophin withdrew the offer of founding shares.  (*Id.*)  Mr. Blanton testified that he had not executed the documents because he was "losing confidence in Martin and didn't want to be on the board" of Retrophin.  (*Id.*) Nevertheless, Mr. Blanton had continued to discuss his "founders' shares" with Mr. Shkreli.  Although Mr. Blanton and Mr. Shkreli discussed converting some of Mr. Blanton's MSMB investment into Retrophin stock, Mr. Blanton never executed any documents to effectuate the conversion.  (*Id.*)

In June 2012, Mr. Shkreli sent Mr. Blanton an email stating that MSMB Capital was suspending capital withdrawals by the fund's limited partners.  (GX 103-22; GX 103-18; Tr. 3613:12-3622:4.)  Mr. Blanton requested an audit of the fund's books and records; Mr. Shkreli provided a "pretty insufficient" set of documents.  (*Id.*)  Mr. Blanton was "[s]urprised" because he "was by far the largest investor and there wasn't [$]35 or

$50 million" in assets under management. (*Id.*) Mr. Blanton's attorney filed a whistleblower complaint with the SEC. (*Id.*)

Mr. Blanton did not receive the September "wind-down" email from Mr. Shkreli, but did receive a copy from Schuyler Marshall. (GX 103-25; GX 103-26; GX 103-29; GX 103-30; Tr. 3623:3-3638:2.) Mr. Blanton felt "further confusion and frustration" when he saw the email, as he was still in communication with Mr. Shkreli regarding the redemption request he had filed in November 2011. After Mr. Blanton learned that Retrophin had become a public company, Mr. Blanton asked Mr. Shkreli how many shares of Retrophin he owned. Mr. Shkreli responded that "[i]t is a lot" and told Mr. Blanton that he would "calculate how much stock and get back to you." (*Id.*) On December 20, 2012, Mr. Shkreli forwarded a copy of Retrophin's 13D to Mr. Blanton, stating that MSMB Capital "owns 375,000 shares of RTRX" and that Mr. Blanton was, "at [that] point, approximately 40[-]60% of that fund." (*Id.*) Mr. Blanton's CFO requested physical certificates for the stock holding, and Mr. Shkreli responded that the certificates could be provided in "just a few days." (*Id.*)

On February 19, 2013, Mr. Shkreli sent Mr. Blanton a certificate for 160,318 restricted Retrophin shares. (*Id.*) Mr. Shkreli did not explain how he calculated that amount for Mr. Blanton's distribution, and Mr. Blanton testified that the

shares were not enough in light of the size of his investment into MSMB Capital and the "founders' shares" he believed he owned. (*Id.*)

In August 2013, Mr. Shkreli and Mr. Blanton emailed regarding Mr. Blanton's redemption. (GX 103-38; 103-42; Tr. 3638:18-3646:13.) On August 10, 2013, Mr. Shkreli sent Mr. Blanton an email, copying Mr. Greebel and Mr. Rosensaft, a Katten litigation partner. Mr. Shkreli explained that he and Mr. Blanton "have agreed that I will give him 100,000 shares of my stock. Please effect this transaction and send him documents ASAP." (GX 103-42.) After Mr. Blanton emailed on August 15, 2013, asking "[i]s there anything we need to be doing," Mr. Greebel responded with a "Katten Draft" of an "Option Agreement" in which Mr. Shkreli would grant Mr. Blanton an option to acquire 100,000 Retrophin shares, and Mr. Blanton would provide Mr. Shkreli, Retrophin, and the MSMB entities a release of claims. (*Id.*) Mr. Blanton testified that he had never threatened to sue Retrophin, that he "didn't understand" the option grant, and had not had a discussion with Mr. Shkreli about an option grant. (*Id.*) Mr. Shkreli did not transfer Mr. Blanton 100,000 of his own shares. (*Id.*)

On September 4, 2013, Mr. Shkreli sent Mr. Greebel an email on which Mr. Blanton was copied, asking Mr. Greebel to send Mr. Blanton a consulting agreement. (GX 103-44; GX 103-62;

Tr. 3646:14-3652:18.) Mr. Blanton had not discussed working as a consultant for Retrophin with either Mr. Shkreli or Mr. Greebel. (*Id.*) On September 12, 2013, Mr. Greebel sent Mr. Blanton a "Katten Draft" Consulting Agreement and Release, marked as a September 12, 2013 draft from Katten. (*Id.*) Mr. Greebel explained to Mr. Blanton that under the agreement, Retrophin would pay Mr. Blanton "300,000 shares of [Retrophin] common stock each year and $300,000 each year as compensation for your consulting services" and that "[t]he agreement also contains standard boilerplate provisions which are in all of [Retrophin's] Consultant Agreements." (*Id.*) Per the agreement, Retrophin would be responsible for making the payments to Mr. Blanton for "consulting services on strategic and corporate governance matters to the management of the company." (*Id.*) Mr. Blanton "had no idea" why he would receive shares and money for a consulting agreement with Retrophin. (*Id.*) Neither the August option agreement nor the September consulting agreement was ever signed. (*Id.*)

On October 24, 2013, Mr. Greebel sent Mr. Blanton a "Katten Draft" settlement agreement, copying Mr. Shkreli. (GX 103-46; Tr. 3653:10-3655:24.) Pursuant to the agreement, Mr. Blanton would receive 100,000 Retrophin shares in return for releasing Retrophin and "its current or former affiliates." (*Id.*) Mr. Blanton did not understand why Mr. Greebel was

31

sending a draft settlement agreement.  (*Id.*)  The settlement agreement was not executed, and Mr. Blanton did not receive any redemption payments for his MSMB Capital investment in 2013.

In February 2014, Mr. Blanton continued to discuss the redemption of his MSMB Capital investment with Mr. Shkreli.  (GX 61; 103-51; 103-52; Tr. 3656:4-3671:4.)  Mr. Blanton spoke with Mr. Greebel, and on February 17, 2014, Mr. Greebel sent Mr. Blanton a "Katten Draft" consulting agreement, pursuant to which Retrophin would issue 200,000 shares to Mr. Blanton in return for consulting services on "strategic and corporate governance matters" and a release of any claims against Mr. Shkreli, the MSMB entities, and Retrophin.  (GX 103-52.)  Mr. Blanton was focused on "[t]rying to get [his] money back and [his] founding shares."  (Tr. 3659.)  On March 6, 2014, Mr. Blanton signed a consulting agreement with Retrophin, which had the same terms as the February 17, 2014 draft agreement.  (GX 61; Tr. 3660.)  Mr. Blanton testified that he never performed consulting services for Retrophin.  (Tr. 3664:21 - 3665:2.)

### Alan Geller

Alan Geller, who operates three thrift stores in the south Florida area and trades stocks, invested $1 million in MSMB Healthcare in March of 2011.  (Tr. 6664:3-6672:5.)  He learned about the fund and about Mr. Shkreli from Mr. Mulleady, whom he first met when Mr. Mulleady worked as a broker.  (*Id.*)

32

Alan Geller received performance statements regarding his MSMB Healthcare investments, which were often "late." (GX 84-1 – 84-13; Tr. 6677:11-6687:10.) The July 2012 statement, which Alan Geller received on September 10, 2012, showed that his investment in MSMB Healthcare was worth $1,539,847, for a return of $539,847 on his initial investment. (*Id.*)

In April 2012, following discussions between Alan Geller, Mr. Mulleady and Mr. Shkreli, Mr. Geller invested $200,000 in Retrophin, because he "thought [he] was adding on to a good investment" and "[i]t just seemed like a good opportunity." (GX 105-1; GX 105-2; 6689:8-6705:20.) Mr. Geller invested an additional $100,000 in Retrophin in May 2012 at Mr. Shkreli's request, and another $200,000 in Retrophin in November 2012, when Mr. Mulleady called regarding what Alan Geller perceived as "a real liquidity type of bind[.]" (*Id.*) After Alan Geller received the "wind-down" email in September 2012 regarding his initial $1 million MSMB Healthcare investment, he decided to "roll over and stay with them and put the money into this Retrophin." (*Id.*) The MSMB Healthcare and Retrophin investments "were all the same for [him]"; in his view at the time, "whatever they were doing, I was with them" because he believed "the investment was going very well" and he "had a good relationship with them." (*Id.*) At the time he agreed to "roll" his MSMB Healthcare investment into Retrophin, he believed,

33

based on Mr. Mulleady's representations that his total investments with MSMB Healthcare and Retrophin were worth $2.1 million. (*Id.*)

On December 18, 2012, after Alan Geller inquired about his Retrophin stock ownership, Mr. Shkreli claimed that Mr. Geller was currently listed as owning 108,500 shares, but would own 140,000 shares after a "reset" of the purchase price of some of those shares. (*Id.*) This total did not include "any hedge fund involvement/investment." (GX 105-4; Tr. 6709:4-6712:13.) In March or early April of 2013, Alan Geller received two certificates for restricted Retrophin shares within "a few days or a week" of each other, one for 108,500 and one for approximately 156,000, for a total of 264,500 shares. (*Id.*) Alan Geller determined that the value of this stock was approximately $900,000, which was "a complete shock" and "really bad" compared to his understanding that his investment was worth $2.1 million. (*Id.*)

Alan Geller initially reached out to Mr. Mulleady, who explained that he was no longer working with the company. (Tr. 6712:14-23.) Alan Geller then reached out to Mr. Shkreli, but initially could not reach Mr. Shkreli by either phone or email. (GX 105-24; GX 105-25; GX 105-7; GX 105-8; Tr. 6721:7-6737:22.) "Much to [Mr. Geller's] surprise," Mr. Shkreli proposed that Alan Geller should receive more shares than he had

requested to make up the "shortfall" between what Mr. Geller believed his investment was worth and the shares he had been sent; Mr. Shkreli proposed that he should receive between 400,000 and 600,000 shares. (Tr. 6722:4-24.)

With regard to Alan Geller's direct investment of $500,000 into Retrophin, on April 1, 2013, Mr. Shkreli emailed Mr. Greebel and Alan Geller, asking Mr. Greebel to issue 28,000 shares of stock "as per a prior agreement[.]" (*Id.*) On April 5, 2013, Alan Geller asked for "follow through on this so we can continue to move forward[.]" (*Id.*) Shortly thereafter on the same day, Alan Geller emailed Mr. Shkreli to note that the "balance" he was owed for his direct investment into Retrophin was 31,500, not 28,000 shares. (*Id.*)

On April 10, 2013, Mr. Shkreli emailed Mr. Greebel and Alan Geller, asking Mr. Greebel to "have the transfer agent" issue 31,500 shares to Alan Geller and "perhaps add a specific release on shares associated with his direct investments into Retrophin." (*Id.*) Alan Geller responded on April 11, 2013, stating that he could not get in touch with Mr. Greebel and asking "[w]hat is necessary to move forward on the bigger issue[,]" by which he meant "the larger bunch of shares that were owed to [him]" from his $1 million MSMB Healthcare investment. (*Id.*) Approximately two hours later, Mr. Shkreli responded, asking if Mr. Geller would be "willing to sign a

35

consulting agreement in connection with the issuance of the 31,500 shares" and explaining that "it would be the quickest way to get the stock issued to you and satisfies any requests the transfer agent may have."  (*Id.*) Alan Geller responded "[w]hat does that mean? And what are the ramifications of that?"  (*Id.*) He testified that he had never discussed serving as a consultant to Mr. Shkreli or to Retrophin.  (*Id.*)

In approximately early April 2013, Alan Geller had a phone conversation with Mr. Greebel, in which he asked Mr. Greebel "am I in trouble here?  Is this guy a real scam artist? Can you help me out?"  (Tr. 6741:25-6746:3.)  Mr. Greebel "was pretty reassuring" and told Alan Geller that consulting agreements are "a rather common type of thing . . . almost like a way of getting something done, like have no worries about this."  (*Id.*)  On April 19, 2013, Mr. Greebel circulated a consulting agreement involving a "compensation" of 300,000 shares spread across six payments and a "signing bonus" of the 31,500 shares.  (GX 105-12.)  Alan Geller testified that he then had a conversation with Mr. Shkreli, who agreed to a payment of an additional 300,000 shares on top of the 300,000 in the agreement, but Mr. Shkreli stated he did not "want them all to come from him" and wanted "some other people" to contribute some shares.  (Tr. 6786:1-6.)  On April 23, 2013, Alan Geller noted that he had an attorney reviewing the April 19, 2013 draft

agreement and asked if the agreement could incorporate "the other 300,000 shares" that he had discussed with Mr. Shkreli. (Tr. 6741:25-6746:3.)  Alan Geller noted that "[i]f that other 300,000 shares are privately transferred as Martin mentioned from him and the other insiders, that would be fine with me if those were un-restricted . . . ."  (*Id.*)  Thus, by late April 2013, Mr. Shkreli, Mr. Greebel, and Alan Geller had discussed a transfer of a total of 600,000 shares for Alan Geller's MSMB investment, and 31,500 shares for his direct investment into Retrophin.  Of those, transfers of 300,000 and 31,500 shares were reflected in the draft consulting agreement.

From early May to late June 2013, Alan Geller, Mr. Greebel, and Mr. Shkreli continued to discuss drafts of the consulting agreement.  (GX 105-13 – 105-16; GX 105-27; GX 105-33; Tr. 6787:2-.)  Alan Geller continued to follow up regarding the agreement, including an email to Mr. Greebel and Mr. Shkreli complaining that Mr. Greebel was not returning his calls.  (*Id.*)  At the time, Alan Geller's son was planning to spend a week with Retrophin for an internship.  (*Id.*)

Either Mr. Shkreli or Mr. Greebel told Alan Geller that, beginning in June 2013, the delay in executing a settlement agreement was because the agreement "had to be approved by the board of Retrophin" but the approval was delayed.  (GX 105-29; GX 105-35; GX 105-48; GX 105-49; Tr.

6807:1-.)  On September 9, 2013, Mr. Greebel sent Alan Geller a message stating that "[t]he board approved, and requested I add a concept that you will provide the Servives [*sic*] as and when reasonably requested, but not in excess of 20% of your time." (*Id.*)  Alan Geller viewed these as "technicalities" and did not have any concerns about the requests.  (*Id.*)  On September 10, 2013, Mr. Greebel sent Alan Geller a revised copy of the consulting agreement and marked changes, and copied Mr. Shkreli and Marc Panoff, Retrophin's CFO.  (*Id.*)  The revised draft contemplated the payment of 300,000 Retrophin shares over five periods as well as a bonus of 31,500 shares, and included a provision limiting Alan Geller's consulting "services" to not "more than 20%" of his time.  (*Id.*)  On September 20, 2013, Mr. Greebel circulated an executed version of the consulting agreement to Alan Geller, Mr. Shkreli, and Mr. Panoff.  (GX 59A.)  On October 1, 2013, Mr. Greebel sent an executed "option agreement," only to Alan Geller, which provided that Alan Geller could acquire 300,000 Retrophin shares from Mr. Shkreli for $0.01 per share.  (GX 59B.)  Alan Geller remained in touch with Mr. Shkreli, and invested in, and served on the board of, Turing Pharmaceuticals, the company Mr. Shkreli started after leaving Retrophin.  (Tr. 6823:10-6824:3.)

In April 2015, Alan Geller was interviewed by FBI agents, who questioned him about the legitimacy of the

consulting agreements, and asked him to confirm that he was not actually a consultant and that he did not intend to be a consultant when he signed the agreement. (Tr. 6824:4-6835:18.) At the time, Alan Geller "held out" and "just said, yeah, it was" but acknowledged at trial that his statements to the FBI were not truthful. (*Id.*) He explained that his testimony at trial was pursuant to a proffer agreement and a non-prosecution agreement with the government resulting from his misstatements to the FBI. (*Id.*)

### 2. *Other Fact Witnesses*

**Bernadette Davida**

The government presented testimony by Bernadette Davida that she practiced law as an income partner at the law firm Katten Muchin Rosenman ("Katten") from May 2007 to June 20, 2012. (Tr. 1185:25-1186:5.) She explained that an income partner was a "salaried lawyer," in contrast to an equity partner, who buys into the firm and is compensated based on the firm's profits and losses. (Tr. 1186:13-16.)

While she worked at Katten, Ms. Davida was friends with Kevin Mulleady, who at the time was a wealth manager at Merrill Lynch. In April 2011, Mr. Mulleady informed Ms. Davida that he had switched jobs to a company called MSMB Capital, which was "related to health care and pharmaceutical type companies." (Tr. 1187:16-18.) Mr. Mulleady informed Ms. Davida

that the "MSMB" in MSMB Capital stood for the initials of individuals named Martin Shkreli and Marek Biestek. (Tr. 1189:23-1.) Ms. Davida and Mr. Mulleady discussed MSMB Capital's legal needs, specifically with regard to real estate leasing, but Ms. Davida "got the impression that there would be some [] pharmaceutical or FDA type work" as well. (Tr. 1189:4-9.) Later in April 2011, Ms. Davida and some of her colleagues, including Mr. Greebel, held a meeting with Mr. Shkreli and Mr. Mulleady to discuss MSMB Capital as a "prospective client" – "the types of businesses that they were [] doing, their pharmaceuticals, their possible hedge funds," and possible acquisition targets. (Tr. 1190-13-1192:13.) Following subsequent meetings, Katten took on MSMB as a client in June 2011. (Tr. 1193:1-4.)

Ms. Davida also testified regarding Katten's system for allocating credit for client work. The lawyer "originating" a client would receive credit, which was important for partners because "[b]ringing a new client to the firm is . . . what's expected of you." (Tr. 1209:8-25.) The firm also recognized what was called "production credit," for partners who did work for a client they did not originate. (Tr. 1210:20-25.) Origination credit could be shared or allocated based on the amount of work a partner did or the role they had in originating a client. (Tr. 1209:21-1210:25.) In order for Katten's

40

compensation committee to evaluate income partners and consider them for equity partnership, the lawyer would "write a memo listing [his or her] accomplishments, which included things like origination, bringing in clients, good citizenship with pro bono." (Tr. 1227:2-8.)

With regard to billing for MSMB Capital matters, Ms. Davida explained that she worked on MSMB Capital's lease of office space, but Mr. Greebel did "most of the work" on MSMB's failed acquisition of a company called SeraCare, and "did the majority of the work, if not all of it[,]" on MSMB's subsequent corporate transactions, which were known as Project Iron Man and Project Cranium. (Tr. 1212:3-18; 1214:6-7.) Thus, although Ms. Davida received 100% percent of the origination credit for Katten's first MSMB Capital engagement on the SeraCare acquisition, she and Mr. Greebel agreed to share origination credit equally on Project Iron Man and Project Cranium because he was doing the actual legal work. (Tr. 1202:10-13; 1214:4; 1217:8-10.) Ms. Davida later learned that Mr. Greebel had opened a new client matter for a company called Retrophin, but did not recall if Mr. Greebel told her if Retrophin had any relationship to MSMB Capital, and did not learn anything about Retrophin while she was at Katten. (Tr. 1222:2-25.) Ms. Davida testified that she did not think Mr. Greebel did anything wrong by opening a new client matter for Retrophin, as it was a

different company, and she agreed on cross examination by the defense that it was a "nice thing" for Mr. Greebel to have given her 15 percent credit when he opened the matter. (Tr. 1242:18-23; 1246:9.) On cross-examination, Ms. Davida also agreed that she had "never observed Mr. Greebel doing anything wrong for any client at Katten" and that, based on what she knew, she had never observed Mr. Greebel deceiving any client. (Tr. 1238:17-1241:12.)

### Steven Richardson

Steven Richardson, a former human resources executive at American Express, invested in both MSMB Capital and Retrophin, and eventually became Chairman of the Board of Retrophin. Mr. Richardson invested $200,000 in MSMB Capital at the end of October 2009, and then invested an additional $200,000 in the fund in February 2010, based on what he believed was the fund's "strong performance." (Tr. 1696:14-25.) Following the second of Mr. Richardson's investments, Mr. Shkreli continued to send Mr. Richardson performance reports that purported to show the fund's "sustained performance." (Tr. 1717:15-16; GX 77-11-77-13.)

In the spring of 2011, Mr. Richardson and Mr. Shkreli discussed Retrophin, which Mr. Richardson understood to be a pharmaceutical company which Mr. Shkreli would manage "in parallel" with MSMB Capital. (Tr. 1719:18-24.) Mr. Shkreli

invited Mr. Richardson to join Retrophin's board of directors, and asked Mr. Richardson to "[c]onvert" $100,000 of Mr. Richardson's MSMB Capital investment into an investment into Retrophin, and invest an additional $50,000 to $100,000 in the Retrophin. (Tr. 1721:20-25; GX 207.) Mr. Richardson's MSMB Capital performance report for March 2011 showed that his $400,000 was worth/valued at $506,123 after fees. *Id.* In April 2011, Mr. Richardson decided to "redeem" $50,000 of his MSMB Capital investment and reinvest the proceeds into Retrophin, and to invest an additional $50,000 into Retrophin, for a total investment in Retrophin of $100,000. (Tr. 1724:16-19.) Mr. Richardson also joined the Retrophin board in 2011. (Tr. 1724:22-24.)

In November or December of 2011, Mr. Richardson invested $50,000 each into two additional MSMB funds, one called MSMB Consumer, managed by Timothy Pierotti, and one called MSMB Surepoint, managed by Frank Delaney. (Tr. 1728:6-23.) Mr. Richardson testified that, due to poor performance, he lost approximately $10,000 of his investment in MSMB Consumer and $3,000 of his investment in MSMB Surepoint before redeeming his interest in those funds. (Tr. 1729:4-9.)

Mr. Richardson first became aware of Mr. Greebel in connection with an acquisition that MSMB Capital had contemplated in 2011. Mr. Shkreli also copied Mr. Greebel on

emails related to the formal establishment of Retrophin's Board of Directors in March 2012. (GX 219, 220.) Until June 2012, Mr. Richardson continued to receive performance updates from Mr. Shkreli, generally reflecting positive returns on his MSMB Capital investments. (GX 77-14, 77-20, 77-21-77-26.) Based on a February 2012 performance report sent on May 20, 2012, Mr. Richardson believed that his $400,000 investment into MSMB Capital, including the $50,000 of his MSMB Capital investment which had been redeemed and reinvested in Retrophin, was worth "$583,482.00 net of fees" (GX 77-25.) Based on this report, Mr. Richardson agreed to convert his entire remaining MSMB Capital investment, which he believed to be $583,482.00, into 14,361 Retrophin units. (GX 221.)

Although Mr. Richardson was no longer an MSMB investor in September 2012, he received the "wind down" email sent to Sarah Hassan and other investors in the MSMB Capital and MSMB Healthcare funds. (Tr. 1761:17-23; GX 222.) Mr. Richardson testified that, during the "September 2012 time period," the Retrophin Board of Directors did not meet in person, but instead would use unanimous written consent to take Board action. (Tr. 1769:4-10.) The written consents used by the Retrophin board were drafted by Mr. Greebel. (Tr. 1769:15-17.)

In the fall of 2012, the Retrophin Board approved Mr. Shkreli's negotiations with the pharmaceutical company Valeant

to license two drugs.  (Tr. 1775:14-20.)  After the deal fell
through, Retrophin decided to pursue a reverse merger
transaction, in which it would merge with a public shell company
called Desert Gateway, and thereby would become a public
company.  (Tr. 1775:14-1776:24.)  Mr. Greebel and Katten were
retained by Retrophin as its counsel.  (Tr. 1843:9-13.)

        Prior to the completion of the reverse merger, Mr.
Shkreli told Mr. Richardson that, due to Mr. Richardson's
"active role" in Retrophin, Mr. Richardson would receive five
percent of the shares in the company.  (Tr. 1785:10-13.)  After
the reverse merger in December 2012, as a member of the Board of
Directors of Retrophin, Mr. Richardson had to register his stock
holdings on what is known as a "Form 4."  (Tr. 1807:6-9.)  In
March 2013, Mr. Greebel's "team" prepared Mr. Richardson's Form
4, but reported that Mr. Richardson held only 99,055 shares of
Retrophin.  (Tr. 1806:17-1807:5; GX 234.)  Mr. Richardson
emailed Mr. Shkreli because, based on Mr. Shkreli's
representations, Mr. Richardson believed that he "clearly [had]
a lot more" than the number of shares Mr. Greebel's team had
recorded, and wanted to clarify his Retrophin holdings before he
submitted the Form 4.  (*Id.*)  After "extensive back and forth"
regarding Mr. Richardson's actual Retrophin share holdings, Mr.
Richardson requested a "forensic accounting review of [his]
investments and the transaction pricing decisions taken at each

decision point." (Tr. 1808:22-1813:18.)  Mr. Shkreli

acknowledged some "miscommunication" regarding share

distributions, and promised to "discuss a solution with Evan

[Greebel.]"  (Tr. 1815:4-12.)  Mr. Shkreli promised to "top up"

Mr. Richardson from his own personal holdings, but told Mr.

Richardson that other MSMB investors had also "moved their funds

over from MSMB to Retrophin," and that Mr. Shkreli was also

planning on "topping them up" from his personal shares.  (Tr.

1816:6-1818:5.)

   In 2013, Retrophin's Board began meeting over the

telephone; Mr. Greebel attended the meetings, would provide the

Board with an agenda and meeting materials, and was responsible

for drafting Board meeting minutes.  (Tr. 1845:15-17; Tr.

1847:18-20; 1854:12-17.)  Mr. Richardson testified that in 2013,

"it was a recurring problem" that the Board was "receiving

[Board meeting] materials very, very close to the start of the

Board meeting, not giving [the Board] adequate time to do

justice to the content[.]"  (Tr. 1847:13-17.)  Mr. Richardson

also testified that Mr. Greebel would have been responsible for

providing the Board with "litigation updates" on pending or

anticipated litigation against Retrophin, but that in 2013, Mr.

Greebel did not discuss "any anticipated or ongoing lawsuits"

against Retrophin.  (Tr. 1848:1-5; 1854:25-1853:2.)  Although

Mr. Greebel was responsible since 2013 for drafting Board

meeting minutes, Mr. Greebel did not circulate minutes to the Board until September 2014. (Tr. 1861:22-24.)

Mr. Richardson recalled that at a Board meeting in July 2013, Marc Panoff, who had "just joined as the CFO . . . was surprised [at] how quickly . . . [the company was] burning through" $10 million dollars which had been raised in the spring of 2013 through a Private Investment in Public Equity ("PIPE") financing. (Tr. 1865:21-1866:16.) Mr. Panoff also explained to Mr. Richardson that "during the fairly lengthy period where MSMB and Retrophin were operating in parallel but using some shared resources and shared facilities . . . a lot of the expenses had to be corrected and rationalized" to address "which expenses should have gone to the MSMB entity, which expenses should have gone to the Retrophin entity." (Tr. 1874:20-1875:2.) The July 2013 board agenda included an attachment regarding the company's "Summary Cash Flow" for the six-month period ending in June 2013. (GX 239.) The cash-flow summary included a line item for "MSMB Settlements", but Mr. Richardson did not believe that the board had discussed the settlements at the July 2013 meeting, or that Mr. Shkreli or Mr. Greebel had raised them for discussion. (Tr. 1866:20-1867:5; GX 239.) The cash-flow summary also listed several names in connection with the "MSMB Settlements" line – Spencer Spielberg, Sarah Hassan, Trachtenberg Rhodes – but at the time,

Mr. Richardson did not know who those individuals were.
(Tr. 1867:7-10; GX 239.)

On September 9, 2013, the Board held another call,
with representatives of an external audit firm, Marcum.
(Tr. 1912:3-11.)  Mr. Greebel also attended by telephone.  (*Id.*)
The September 9, 2013 "Board call was one of the numerous ones
where . . . [the Board was] getting material so close to the
start of the call [it] couldn't actually do justice to reading
all the materials before we could get to the subjects," so Mr.
Shkreli agreed to "focus on the time-sensitive" issues.
(Tr. 1914:1-9.)  On the September 9, 2013 call, the Board and
Marcum discussed amendments to Retrophin's 10-K and 10-Q
corporate filings, which were necessitated because of the need
to properly account for "a number of agreements" created during
the period when "MSMB and Retrophin were operating in parallel."
(Tr. 1916:10-21.)  The auditors had explained that "[d]uring the
second quarter of 2013, [Retrophin], its chief executive officer
and MSMB Capital . . . became parties to a series of agreements
to settle up to $2,286,511 of liabilities which company
management believes are the primary obligation of MSMB.  The
company [,Retrophin,]and MSMB have entered into indemnification
agreements whereby MSMB has agreed to defend and hold
[Retrophin] harmless against all such obligations . . . arising
from these agreements."  (GX 247; Tr. 1917:8-17.)  The auditors

48

noted that $593,111 of cash and non-cash consideration had been paid immediately pursuant to the indemnification agreement to "settle a portion of the agreement" but the $1,691,400 remainder was "past due . . . and there is uncertainty as to whether [] MSMB will have sufficient liquidity to repay the company or fund the indemnification agreements . . . . Concurrent with the execution of such settlement agreements, [Retrophin] received promissory notes from MSMB whereby MSMB agreed to pay [Retrophin] . . . reimbursement for the payments that . . . [Retrophin] made to settle a portion of the agreements."  (GX 247.)

Mr. Richardson's understanding was that the settlement agreements were "with MSMB investors . . . who had redeemed and moved money into Retrophin" and that Mr. Shkreli would pay the money back "from his own stock."  (Tr. 1918:25-1919:5.)  During the call, when the Marcum partner addressed the "headlines" of their audit letter regarding the settlement agreement, "Mr. Shkreli jumped in verbally quite forcefully . . . saying this has been discussed a number of times" and stating that "[he was] MSMB" and would stand by the promissory note.  (Tr. 1916:4-12.) Mr. Greebel did not say anything regarding the MSMB investor settlement agreements at the meeting.  (Tr. 1920:4-7.)

The government directed Mr. Richardson to Retrophin's 2013 10-Q filing for the second quarter of 2013, which describes

the settlement agreements as "a series of agreements" involving a related party, but did not identify the related party as MSMB or identify the purpose or recipients of the settlement agreements. (GX 247; Tr. 1922:7-1926:4.) The 10-Q also stated that "[Retrophin has] no material proceedings pending, nor are we aware of any pending investigation or threatened litigation by any third party." (*Id.*) Mr. Richardson understood that as Retrophin counsel, Mr. Greebel and Katten provided the information for the section regarding pending or threatened litigation. (*Id.*) Mr. Richardson testified that the board never approved "settlement agreements that were being used to repay MSMB investors with money or shares from Retrophin." (Tr. 1926:5-8.) He also testified that the Board never approved consulting agreements between Retrophin and Alan Geller or Darren Blanton. (Tr. 1928:1-1932:3.)

On October 25, 2013, Mr. Panoff circulated a copy of a form S-1 the company planned to file in connection with a PIPE financing, along with a signature sheet for the Board members to execute for filing the S-1. (GX 250.) Mr. Richardson believed that Mr. Panoff would only request the Board members' signatures if he viewed the S-1 "as the final document." (Tr. 1947:23-25.) At the request of the government, Mr. Richardson compared the S-1 circulated by Mr. Panoff in the October 25, 2013 letter with the version filed with the SEC. (Tr. 1947:7-1950:18; GX 978.)

Mr. Richardson testified that, in contrast to the version circulated by Mr. Panoff in October 2013, the version filed with the SEC included a draft form settlement agreement. (*Id.*) Mr. Richardson never reviewed the publicly-filed S-1 to compare it to the version he had been sent by Mr. Panoff. (*Id.*)

In connection with a November 2013 Board meeting, Mr. Panoff sent Mr. Richardson an agenda and attachments, which included a letter from Marcum, the auditing firm. (Tr. 1935:22-1938:12.) The letter disclosed that, "[i]n August 2013, [Retrophin] entered an additional settlement agreement for $300,000." (*Id.*) The August settlement agreement was not brought to the board's attention. (*Id.*)

Prior to the February 2014 Board of Directors meeting, the Board held a dinner to give the Board members an opportunity to meet. (Tr. 1965:10-1968:17.) Mr. Greebel also attended the dinner, and Mr. Richardson and Mr. Greebel discussed Mr. Richardson's expectations for Mr. Greebel's role as counsel to Retrophin. (*Id.*) Mr. Richardson explained that, now that Retrophin was publicly listed, the company had to "up [its] game on the administrative items" such as distribution of board agenda documents and meeting minutes. (*Id.*) Mr. Greebel apologized for the "lateness of the documents." (*Id.*) In addition, Mr. Richardson expressed an expectation that, as "Mr. Shkreli was a fast-charging CEO," Mr. Greebel had to ensure

that, "if there is anything that [Mr. Greebel was] seeing that the Board need[ed] to be made aware of, [Mr. Greebel] need[ed] to bring it to [the Board's] attention." (*Id.*)  Mr. Greebel agreed, and "understood that he had an obligation to raise anything with the Board should he see anything that . . . should be brought to the Board's attention." (*Id.*)  Mr. Richardson testified, however, that Mr. Greebel had not brought any issues to the Board's attention "other than the litigation updates that he did during Board meetings." (*Id.*)  Mr. Richardson did not specify that the updates related to MSMB investors.

In late February 2014, Mr. Shkreli told Mr. Richardson that "one or two disgruntled employees . . . had filed a complaint with the SEC and it related to MSMB, and that he understood that it would be very valuable if one or two of the MSMB investors would be voluntarily willing to go and be interviewed by the SEC." (Tr. 1977:8-22.)  Mr. Richardson stated that he "would be willing to be one of the investors that would be interviewed" by the SEC (Tr. 1977:25-1978:23.)  In discussing the SEC complaint with Mr. Greebel, Mr. Greebel "felt it would be very useful for [Mr. Richardson] and one or two other MSMB investors to go [meet with the SEC]." (*Id.*)  Mr. Greebel "was clear that this was just purely an MSMB matter." (*Id.*)  At the SEC interview, "the majority of the discussion was related to MSMB" but the SEC also asked whether Mr. Richardson

"was involved at all in how the Retrophin stock was priced."
(Tr. 1978:21-1981:2.)  Mr. Richardson was "surprised" and
"disturbed" about the SEC's questions regarding Retrophin stock
pricing, and discussed his concerns with Mr. Greebel in a call
shortly after the SEC interview.  (*Id.*)  Mr. Greebel expressed
surprise that the SEC inquired about Retrophin pricing, but Mr.
Greebel "assured [Mr. Richardson] that this was still an MSMB
matter only and there were no disclosure requirements on
Retrophin."  (*Id.*)  Mr. Richardson testified that his
conversation with Mr. Greebel following the SEC interview left
him "doubting" Mr. Greebel's "independent voice."  (Tr. 1982:4-
12.)

In May 2014, after Retrophin's general meeting, the
Retrophin Board of Directors held a board meeting.  Mr. Greebel
presented a litigation update, and for one of the updates, had a
colleague from Katten sit in as well.  (Tr. 1990:19-1991:21.)
During one of the updates, regarding litigation with an
individual named Timothy Pierotti, "Mr. Shkreli explained his
version of what happened . . . where Mr. Shkreli said he had
given some of his own [Retrophin] shares to Mr. Pierotti because
Mr. Pierotti and his family were . . . having some tough times,
and then when Mr. Shkreli tried to get those shares back, Mr.
Pierotti refused to give them back."  (*Id.*)  Mr. Greebel did not

say anything about Mr. Shkreli's version of events related to the Pierotti litigation.  (*Id.*)

### Corey Massella

Corey Massella, an accountant, had performed SEC compliance and accounting work for companies that planned to go public through his accounting firm, SEC Solutions.  (Tr. 3267:10-15.)  SEC Solutions was acquired by Citrin Cooperman, the accounting firm founded by Niles Citrin, Mr. Greebel's father-in-law.  (Tr. 3269:3-25.)  Mr. Massella learned about Retrophin from Mr. Greebel and David Buckson, a partner at Marcum, a national accounting firm.  (*Id.*)  After interviewing in January 2012 with Mr. Shkreli and Jackson Su, Retrophin's Chief Operating Officer, SEC Solutions was engaged by Retrophin to help "get[] their books together" and prepare financial statements such as "a balance sheet, income statement of cash flow" and "supporting work papers that an auditor can audit." (Tr. 3271:23-3272:4.)

Mr. Massella found Retrophin's financial records to be "[a] little bit chaotic [and] unorganized" with "a significant amount . . . of *de minimis* transactions."  (Tr. 3279:15-18.) Mr. Massella mostly worked with Mr. Su, and had "[l]imited" discussions with Mr. Greebel until SEC Solutions began working on the equity ownership of Retrophin LLC.  (Tr. 3280:3.)  There were "a lot of discrepancies that [SEC Solutions] were trying to

work through." (Tr. 3280:10-15.) Mr. Massella testified
regarding capitalization tables from December 2011 and February
2012, which showed, among other things, a February 1, 2012
$900,000 investment from MSMB Healthcare into Retrophin, in
exchange for 22,500 preferred Retrophin shares. (Tr. 3285:17-
22.) The February 2012 capitalization table was provided to SEC
Solutions by David Kravitz, an associate of Mr. Greebel. (GX
111-4; Tr. 3281:14-3282:4.) In a September 30, 2012
capitalization table, Mr. Shkreli's "voting percentage" of
Retrophin was 46.49%. As with the December 2011 and February
2012 capitalization tables, the only MSMB entity listed in the
September 30, 2012 capitalization table as owning shares in
Retrophin was MSMB Healthcare. (GX 111-12; Tr. 3295:18-3298:4.)

On November 29, 2012, Retrophin Chief Operating
Officer, Mr. Su wrote an email to Mr. Massella, his colleague,
Mr. Greebel, and Susan Chew, an SEC Solutions employee,
regarding a Retrophin share "Transfer from Marek Biestek." (GX
111-15; 113-3; Tr. 3308:10-3314:2.) Mr. Biestek was then an
employee of Retrophin, who eventually took over Mr. Su's role in
managing Retrophin's relationship with SEC Solutions. (*Id.*)
Mr. Su's email attached a document recording a November 29, 2012
transfer of 4,167 Retrophin shares from Marek Biestek to Mr.
Shkreli. (*Id.*) Mr. Massella testified that "it was unusual for
. . . an employee to transfer shares to the CEO who controls the

company," and that the transfer would change Mr. Shkreli's ownership percentage in Retrophin and would have to be recorded properly. (*Id.*) "At some point," Mr. Massella discussed the transfer with Mr. Greebel, who told Mr. Massella that the Rettrophin share transfer from Mr. Biestek to Mr. Shkreli was "outside the company" and was a "gift" which would "not be disclosed because it's between two individuals and . . . not a transaction related to the company." (*Id.*)

Mr. Massella also testified regarding a set of stock transfer documents in December 2012, which were attached to a December 3, 2012 email from Mr. Su to Mr. Massella. (GX 111-26, 111-27, 113-5; Tr. 3334:5-3347:19.) In these transfers, Mr. Mulleady and an individual named Thomas Fernandez[3] transferred Retrophin shares to Mr. Shkreli, and Mr. Shkreli transferred the Retrophin shares to MSMB Capital. (*Id.*) In addition, the December 3, 2012 email from Mr. Su to Mr. Masella included a second version of the transfer document recording a transfer of 4,167 shares from Mr. Biestek to Mr. Shkreli, except that the date was changed from November 29, 2012 to June 1, 2012. (*Id.*) At the time, Mr. Massella did not notice the change in date. Mr. Massella understood from Mr. Greebel that these share

---

[3] Although Mr. Massella could not recall Mr. Fernandez's job title, Jackson Su identified Mr. Fernandez as the President of MSMB Capital. (Tr. 4708:15-20.)

transfers were gifts "outside the company between individuals."
(*Id.*)

On December 10, 2012, Mr. Massella emailed Mr. Su,
regarding payments made by Retrophin on behalf of the MSMB
entities, which Mr. Massella characterized as "related party
transactions." (GX 113-7, Tr. 3347:21-3351:13.) Mr. Shkreli
responded that "[t]hese companies will pay what they owe
Retrophin." (*Id.*)

Mr. Massella testified that Citrin Cooperman was
unable to "match up the payments made by Retrophin with invoices
from Katten," with the result that there was an approximately
$600,000 discrepancy between the amount paid by Retrophin to
Katten and the invoices for Katten's legal work on Retrophin.
(GX 113-15; Tr. 3372:15-3376:6.) Although Mr. Massella "brought
the discrepancy to [Mr. Greebel's] attention," Mr. Greebel was
unable to provide additional documentation to support the
$600,000 in payments to Katten. "[I]n order to move forward,
[Citrin Cooperman] recorded [the discrepancy] as a related-party
transaction." (*Id.*)

### Jackson Su

Jackson Su began working for Retrophin and the hedge
funds managed by Mr. Shkreli on January 4, 2012. (Tr. 4694:2-
4697:14.) Mr. Su observed that Mr. Greebel and Mr. Shkreli
"interacted a lot." (Tr. 4172:6-4712:4.) He testified that Mr.

Shkreli's interactions with Mr. Greebel were "professional most of the time" although "there were times that [Mr. Shkreli] wasn't as professional" and "degraded [Mr. Greebel.]" (*Id.*)

Mr. Su testified that in February 2012, MSMB Healthcare made a $900,000 investment into Retrophin, in exchange for 22,500 units of Retrophin LLC. (GX 114-2 (subscription agreement); Tr. 4715:24-4716:25.) The $900,000 investment by MSMB Healthcare was reflected on Retrophin's February 16, 2012, June 30, 2012,[4] August 30, 2012 and November 8, 2012 capitalization tables and stock ledgers. (GX 111-4 (February 16, 2012 Capitalization Table and Stock Ledger); 111-10 (August 30, 2012 email attaching stock ledger reflecting investments through August 2012); 111-12 (Capitalization Table and Stock Ledger circulated November 8, 2012); Tr. 4723:19-4725:15; 4733:18-4734:23; 4738:23-4379:24.) These stock ledgers did not reflect an investment by MSMB Capital. (*Id.*)

On May 14, 2012, Mr. Shkreli emailed Mr. Su, Mr. Greebel, and Mr. Kravitz a summary of personal stock transfers, showing that Mr. Shkreli had transferred, among other things, 50,000 Retrophin units to Mr. Fernandez and 30,000 units to Mr. Mulleady. (GX 111-9, 111-43; Tr. 4727:10-18.) In subsequent capitalization tables and stock ledgers, Mr. Mulleady and Mr.

---

[4] Although the ledger stated that it was "as of June 30, 2012," it included investments from August 2012. (GX 111-10; Tr. 4733:18-20.)

Ferndandez were respectively listed as owning 50,000 and 30,000 Retrophin units; in the November ledger, Mr. Biestek was also listed as owning 4,167 Retrophin units.  (GX 111-10; 111-12.) Also in May 2012, Mr. Su filed a complaint with the SEC regarding the MSMB hedge funds, because he was concerned that Mr. Shkreli and Mr. Mulleady "were giving prospective investors different numbers every time they spoke on the phone." (Tr. 4731:3-8.)  Mr. Su continued working for Retrophin, however, because "there was nothing that was confirmed that anything was wrong at the companies that [he] was working for." (Tr. 4732:11-12.)

In November 2012, Mr. Shkreli "dropped off at [Mr. Su's] desk" a promissory note, memorializing an agreement whereby Retrophin, listed as the "borrower," promised to pay $900,000 to MSMB Healthcare.  (GX 111-35; Tr. 4746:3-4750:10.) The note was dated February 1, 2012.  (4747:6-8.)  Mr. Su was not previously aware of this promissory note, and was surprised, because it was "a reclassification of an equity investment that was made at the time and [Mr. Shkreli] was going back in time to change something that had already occurred."[5]  (*Id*. 4746:20-4747:22.)  Mr. Shkreli confirmed that the $900,000 promissory

---

[5] On November 16, 2012, Susan Chew from Citrin Cooperman emailed Mr. Su regarding the note, because the bank accounts only recorded one $900,000 transaction between MSMB Healthcare and Retrophin – the equity investment by MSMB Healthcare recorded on capitalization tables.  (GX 111-14.)

note by Retrophin to MSMB Healthcare was a reclassification of the $900,000 equity investment by MSMB Healthcare and Retrophin that had been listed in the previous Retrophin capitalization tables. (*Id.*) In his experience in finance, Mr. Su had never seen an equity investment reclassified as a loan in this manner. (*Id.*) Mr. Shkreli testified that Mr. Greebel knew about the promissory note. (*Id.*) In late November 2012, Mr. Su called Mr. Greebel regarding the $900,000 promissory note. (*Id.* 4748:22-4749:22.) In Mr. Su's first conversation, Mr. Greebel did not respond to Mr. Su's questions, because Mr. Shkreli had not paid Mr. Greebel. (*Id.*) Several days later, approximately November 30, 2012 or December 1, 2012, Mr. Su again talked to Mr. Greebel. In the second conversation, Mr. Su "asked [Mr. Greebel] if [the] promissory note to replace the investment from February was okay. And [Mr. Greebel] said yes." (*Id.* 4750.) As a result of the promissory note, the $900,000 equity investment by MSMB Healthcare for 22,500 units of Retrophin was removed from the capitalization tables. (*Id.*)

Mr. Su testified that in November 2012, Retrophin employees searched for a shell company to purchase in a reverse merger. In December 2012, Retrophin ultimately purchased a shell company from Troy Fearnow called Desert Gateway in the reverse merger, the price of which was $200,000. (Tr. 4743:13-20.) Mr. Su's understanding was that, as of December 17, 2012,

Retrophin had only paid off $100,000 of the $200,000 cost to purchase the Desert Gateway shell. (Tr. 4788:14-18.)

On November 29, 2012, Mr. Shkreli gave Mr. Su an executed share transfer agreement, reflecting a transfer from Mr. Biestek to Mr. Shkreli of 4,167 Retrophin units. (GX 111-15-111-19; Tr. 4751:22-4763:24.) The transfer document was not dated, so Mr. Su added a date of November 29, 2012 next to Mr. Shkreli's signature, because "it [was] a legal document and the accountants would have needed a date on it" and "[Mr. Su] assumed that it was signed" on November 29, 2012, which is the date Mr. Shkreli dropped it off at his desk. (*Id.*) Consistent with Mr. Massella's testimony, Mr. Su also testified that, by email dated November 29, 2012, Mr. Su circulated the executed Retrophin share transfer agreement, dated November 29, 2012, to Mr. Greebel, Mr. Massella, and Ms. Chew, along with an updated capitalization table and stock ledger, which showed that Mr. Biestek no longer had the 4,167 units listed on prior tables. (GX 111-15.) By email dated November 29, 2012, Mr. Greebel responded to Mr. Su's email, removing Mr. Massella and Ms. Chew from the email, and adding Mr. Biestek, and asking Mr. Su to "re-execute the transfer agreement" because "the one [Mr. Su] sent was for Retrophin LLC and Class B common [units], however, [Retrophin] LLC has not existed since mid-September." (GX 111-17.) Mr. Shkreli responded on the email "that agreement was

61

signed in [J]une[.]" (*Id.*)  Mr. Shkreli then gave Mr. Su a second version of the transfer agreement, with a date of July 2, 2012 written over what Mr. Su testified "looks like whiteout tape" covering the November 29, 2012 date Mr. Su had initially written.  (*Id.* 4758:22-4759:25)  Mr. Su scanned and circulated this revised version of the transfer agreement via email to Mr. Shkreli, Mr. Greebel, and Mr. Biestek.  (*Id.*)  Mr. Greebel then responded, asking Mr. Su to "please call [him.]"  (GX 111-18.) Mr. Su and Mr. Greebel spoke over the phone, but Mr. Su was "confused on what [Mr. Greebel and Mr. Shkreli] were talking about" regarding the dates of the agreement, and told Mr. Greebel to speak with Mr. Shkreli.  (*Id.*)  Mr. Shkreli then gave Mr. Su another version of the document, but in this version, a date of June 1, 2012 was typed onto the document.  Mr. Su then scanned the agreement and circulated it to Mr. Shkreli, Mr. Greebel, and Mr. Biestek.  (*Id.*)

On December 3, 2012, four days after Mr. Su's November 29, 2012 email threads regarding the transfer of 4,167 Retrophin shares from Mr. Biestek to Mr. Shkreli, Mr. Su again emailed Mr. Greebel attaching additional Retrophin share transfer documents, which Mr. Su had received from Mr. Shkreli. (GX 111-26-A; 111-26; Tr. 4763:25-4771:8.)  In addition to the 4,167 share transfer agreement between Mr. Biestek and Mr. Shkreli discussed above, Mr. Su attached (1) a transfer from Mr. Mulleady to Mr.

Shkreli of 10,000 Retrophin class B common units, dated July 1, 2012; (2) a transfer from Mr. Fernandez to Mr. Shkreli of 50,000 Retrophin class A common units, dated July 1, 2012; (3) a document executed by Mr. Mulleady, stating that Mr. Mulleady "acknowledge[d] that [his] receipt of 30,000 Class A Common Units from Martin Shkreli was invalid due to failure to sign the Adjoiner to Founders' Agreement," dated July 1, 2012; and (4) a transfer from Mr. Shkreli to MSMB Capital Management LLC of 75,000 Retrophin class B common units, also dated July 1, 2012. (*Id.*) Before December 2012, when Mr. Su first saw this document, Mr. Su was not aware of any transfer of 75,000 Retrophin shares from Mr. Shkreli to MSMB Capital, and MSMB Capital had never appeared on the Retrophin capitalization table. (*Id.*)

After Mr. Su sent Mr. Greebel the Retrophin share transfer agreements between Mr. Shkreli, Mr. Mulleady, and Mr. Fernandez, Mr. Shkreli emailed Mr. Greebel and Mr. Su a revised Retrophin capitalization table on December 3, 2012. (GX 111-28; Tr. 4771:9-4775:13.) MSMB Capital appeared on the table, listed as owning 75,000 shares. (*Id.*) Mr. Mulleady, Mr. Fernandez, and Mr. Biestek were not listed on the table as owning "pre-merger" shares, but were listed on a section of the stock ledger entitled "Fearnow Stock," which had not appeared on prior capitalization tables. (*Id.*) In the "Fearnow Stock" section of

the ledger, Mr. Shkreli was listed as owning 1,075,000 shares, and Mr. Mulleady, Mr. Fernandez, and Mr. Biestek were each listed as owning 475,000 shares. (*Id.*) Mr. Su explained that Fearnow stock (or "Fearnow shares") were 2.5 million "freely tradable" shares which, unlike other Retrophin shares, could be traded "on day one" when Retrophin became a public company. (*Id.*)

Before December 3, 2012, when Mr. Su received the email attaching the capitalization table and ledger listing distribution of the Fearnow stock, Mr. Su had not heard of the Fearnow stock. (Tr. 4775:14.) At some point in the beginning of December 2012, Mr. Shkreli offered to allocate Mr. Su a portion of the Fearnow stock, explaining that "[Mr. Shkreli] would allocate certain individuals this Fearnow stock and there would be a profit split after the stock was sold . . . a portion of that percentage would go to the individual receiving the stock and then the rest would go back into a company that he would create called MSMB Wealth Management." (Tr. 4777:6-4778:12.) Mr. Shkreli "said that he would control the selling of the stock and that when he sold it, [] the person would get the profit share . . . he would be the one that would control what happens with that stock, even though it was in that individual's name." (*Id.*) Mr. Su "didn't have a reaction to the proposal" because he believed that "like most of what [Mr.

Shkreli] says, it just doesn't really happen." (*Id.*) Mr. Su did not ultimately receive any Fearnow stock. (*Id.*)

On December 4, 2012, Mr. Su and Mr. Greebel discussed Katten's legal bills for Retrophin in two telephone conversations. (Tr. 4789:8-4792:25.) Retrophin had paid more than Katten had billed to Retrophin, and Mr. Greebel told Mr. Su that the bills related to a "completely different matter," but did not elaborate on what he meant. (*Id.*) In a subsequent conversation, Mr. Greebel told Mr. Su that the excess "should be marked against the $900,000 note" which committed Retrophin to repaying a purported loan from MSMB Healthcare.[6] (*Id.*) Mr. Su explained his understanding that "Retrophin overpaid [Katten] . . . and that overpayment was, from . . . one other [] entity [that] owed money to Retrophin, that's where that difference would be made up from." (*Id.*)

On December 12, 2012, Mr. Greebel emailed Mr. Su, asking for a "current/correct cap table" and stating that "[t]he version I have has [Mr. Shkreli] getting Fearnow stock, which he did not." (GX 111-40; 111-41; 111-48; Tr. 4780:3-4788:9.)

---

[6] The court notes that GX 111-32, an email between Mr. Su and Mr. Aselage concerning this overpayment, may have been incorrectly included in the set of exhibits sent back to the jury for deliberation. The document was used to refresh Mr. Su's recollection, but does not appear to have been entered into evidence. (Tr. 4791:1-9.) The court concludes that there was no prejudice to Mr. Greebel from the inclusion of this document in the jury exhibits, as Mr. Su's testimony was consistent with the document. Furthermore, defense counsel conferred and coordinated with the government regarding the final exhibit list and exhibits to be sent to the jury, and did not identify GX 111-32 as having been inadvertently included in the admitted exhibits.

Mr. Su responded to Mr. Greebel and copied Mr. Shkreli, asking for the "split on the Fearnow stock." (*Id.*) Mr. Shkreli responded to both Mr. Greebel and Mr. Su that "evan has it." Thereafter, Mr. Greebel emailed Mr. Su directly with a list of individuals and amounts: Kevin Mulleady (400,000); Thomas E. Fernandez (400,000); Marek Lucjian Biestek (350,000); Timothy J. Pierotti (400,000); Claridge Capital LLC[7] (400,000); Andrew J. Vaino (300,000); Edmund J. Sullivan (150,000). (*Id.*) Based on his understanding that there were 2.5 million Fearnow shares, Mr. Su responded that the list was "missing 100k [shares] to get to 2.5m," and Mr. Greebel explained that "100k was being held back[.]" (*Id.*) Mr. Su understood Mr. Greebel to mean that "a hundred thousand shares was not being allocated to anyone." (*Id.*) Mr. Su then responded to Mr. Greebel and a Retrophin employee, George Huang, with an updated capitalization table including the revised Fearnow share distribution of 2.4 million shares described above and a 100,000 share entry for "DGTE Legacy." (*Id.*) Mr. Su explained that this entry indicated that 100,000 of the Fearnow shares were being "allocated or left back for the previous owner" of Desert Gateway. (*Id.*)

On December 17, 2012, Mr. Greebel sent Mr. Su a revised version of the Fearnow stock recipient list, with each

---

[7] Mr. Su explained that Claridge Capital "is a company run by Ron Tilles, the marketer for Retrophin and MSMB." (Tr. 4784:1-2.)

Fearnow share recipient receiving fewer shares than before: Kevin Mulleady (350,000); Thomas E. Fernandez (300,000); Marek Lucjian Biestek (300,000); Timothy J. Pierotti (350,000); Claridge Capital LLC (350,000); Andrew J. Vaino (250,000); Edmund J. Sullivan (100,000). (GX 111-48; Tr. 4788:21-4789:13.) Mr. Su was not told why the Fearnow share recipients were receiving fewer shares than before. (*Id.*)

### Stephen Aselage

Stephen Aselage, the current CEO of Retrophin, first joined the company as CEO in September 2012. (GX 223; Tr. 4284:16-4312:13.) Mr. Aselage, who has a background in pharmaceuticals and sales, joined Retrophin with the belief that he was "going to be putting together commercial structures to launch the products that [Retrophin was] going to be acquiring from Valeant Pharmaceuticals." (*Id.*) Shortly after joining the company, however, Mr. Aselage "found out that the money that [he] had been told was committed was not actually committed, that funds had been interested in investing but no commitments had been made," and so "much of [his] time in the fall of 2014 was then spent with Mr. Shkreli to get funds to finish the purchase" of two of the drugs. (*Id.*)

Mr. Aselage had "[m]inimal" involvement in the reverse merger process. (Tr. 4321:3-4330:5.) Mr. Aselage testified that in approximately early December 2013, "[t]here were discussions

about a Fearnow note," which he described as "an attachment or part of the reverse merger process in which additional shares would be made available to the company, or, as it turned out, they were made available to Mr. Shkreli personally." (*Id.*)  By December 2012, it had "become clear to [Mr. Aselage] . . . that Mr. Shkreli was actually going to run the company" and that Mr. Aselage had been hired to act as "kind of a false face of the company" as "someone who had significant pharmaceutical experience[.]" (*Id.*)  Mr. Aselage was not comfortable with this, and the "final straw" was Retrophin's failure to pay premiums on the company's Director and Officer insurance, which he described as "critical" for officers of the company. (*Id.*)  Mr. Aselage resigned as CEO, but decided to stay on as a board member, because as a board member Mr. Shkreli would not be in a position to direct Mr. Aselage, and because Mr. Shkreli was "one of the brightest intellects [he] had ever seen" and "the company still had a chance to be very successful." (*Id.*)

Mr. Aselage testified that the February 2013 PIPE was successful "to an extent," raising $10 million for completion of a licensing agreement or "to find additional assets for the company to acquire." (Tr. 4397:20-4405:25.)  Mr. Aselage explained that during board meetings, Mr. Greebel would be responsible for taking notes providing a litigation update, in which he would "update the board" on pending litigation,

including "what has happened, what the issues are" and would "sometimes make recommendations on what to do with the litigation." (*Id.*) Mr. Aselage testified that the general process by which board minutes are reviewed is that "handwritten notes . . . are put into electronic form, summarized, cleaned up and then presented to the board at the following board meeting for review and approval," but that Mr. Greebel did not follow that process in 2013 or 2014 and that Mr. Greebel did not circulate meeting notes for the board's review and approval. (*Id.*) Mr. Aselage's "understanding of Mr. Greebel's primary role was representing the company" although at the time Mr. Aselage also believed that Mr. Greebel "was doing some side work for Mr. Shkreli." (*Id.*) Mr. Aselage also testified that the board did not approve granting Mr. Shkreli "blanket" authority to enter into consulting agreements on behalf of the company. (*Id.*)

The Retrophin board had a telephonic meeting on July 3, 2013. (GX 239; GX 245-247; Tr. 4406:5-4419:17.) Mr. Panoff, the company's CFO, circulated the agenda and "related exhibits" the night before the call, including the "Summary Cash Flow For the Six Months Ended June 30, 2013" discussed above with regard to Mr. Richardson's testimony, which showed that, of "Net Financings" in the amount of $9,275,459 in the first quarter of 2013, Retrophin had spent $548,711 on "MSMB Settlements" in the

second quarter of 2013.  (*Id.*)  Like Mr. Richardson, Mr. Aselage recalled that there was no discussion of that line item at the board meetings, and at the time, Mr. Aselage did not know what the reference to "MSMB Settlements" meant.  (*Id.*)

At a September 9, 2013 board meeting, the board discussed a restatement of Retrophin's 2012 10-K and first quarter 2013 10-Q filings.  Mr. Aselage understood "[o]nly that there were some accounting issues that needed to be rectified" and that the situation had been "resolved per the auditor's recommendations."  There was no discussion that Retrophin was entering settlement agreements with MSMB investors, using its own money and shares, and Mr. Aselage testified that the board never reviewed or approved settlement agreements used to compensate MSMB investors using Retrophin's money or shares. (*Id.*)  Mr. Aselage also testified that the board was not informed that settlement agreements with MSMB investors might be necessary to protect Retrophin or Mr. Shkreli from suit.  (*Id.*) Mr. Aselage explained that at the time, he believed, based on Mr. Shkreli's representations, that Mr. Shkreli and his investors had "made a lot of money at MSMB" and that "MSMB had been a success."  (*Id.*)  Neither Mr. Shkreli, Mr. Greebel, nor Mr. Panoff mentioned or raised concerns regarding the settlement agreements with the board at the September 9, 2013 meeting. (*Id.*)

As described above with regard to Mr. Richardson's testimony, also included in the materials Mr. Panoff circulated to the board for the September 2013 board call was the draft letter from Marcum, Retrophin's auditors, describing the "series of agreements to settle up to $2,286,511 of liabilities which . . . are the primary obligation of MSMB." (*Id.*) In the same email in which he circulated the Marcum letter to the board, Mr. Panoff circulated a draft of Retrophin's 10-Q filing for the quarter ending June 30, 2013. That filing included a note regarding "related party transactions" that had "very similar" language to the Marcum letter, but did not mention MSMB specifically and instead referred to it only as a "related party." (*Id.*) The filing also did not disclose any pending or threatened litigation. (*Id.*)

In the spring of 2014, the board was "increasingly concerned about behaviors [they] observed in Mr. Shkreli" and asked Mr. Aselage to "step into the company in an operating role as a chief operating officer[.]" (Tr. 4456:3-4487:8.) Among other responsibilities, the legal department would be under Mr. Aselage's control, because Mr. Aselage wanted "more independence within [Retrophin's] legal group, and over the course of 2013 and 2014, came to feel that Mr. Greebel and Mr. Shkreli were too close." (*Id.*) When Mr. Aselage observed Mr. Greebel and Mr. Shkreli interact in 2013 and 2014, "Mr. Shkreli seemed to be the

dominant personality." (*Id.*) When Mr. Aselage received board minutes from 2013 and 2014 from Mr. Greebel, he found them to be inaccurate. (*Id.*) Mr. Aselage also testified that he "lost significant faith in Mr. Panoff to be able to function in his capacity" and that Mr. Panoff "seemed weak." (*Id.*) Mr. Aselage recalled that he "had discussions with Mr. Panoff in which he would convey that he was really concerned, he was worried" and remembered "one discussion in which [Mr. Panoff] said he's scared bad things are happening, but then, at the same time would not share any details on what bad things he was referencing." (*Id.*) After Mr. Shkreli left Retrophin in 2014, the company "felt that it was necessary to have a fresh start on the legal side" and also felt that the company's legal bills for Katten were "fairly excessive." (*Id.*) Retrophin ultimately determined that the settlement agreements "were not fair and reasonable to the company." (*Id.*)

### Standard of Review

**I.    Rule 29 Motion for a Judgment of Acquittal**

"The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) (citing *In re Winship*, 397 U.S. 358, 364 (1970)). Consequently, a "mere modicum" of evidence is insufficient to

meet the Due Process requirement of proof of guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 320 (1979), *superseded on other grounds by* 28 U.S.C. § 2254(d).

In resolving a Rule 29 motion, a court should "avoid usurping the role of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). A court must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." *United States v. Bala*, 236 F.3d 87, 93-94 (2d Cir. 2000). Moreover, a court cannot "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129 (citation and quotation omitted). Therefore, the jury's verdict will be upheld even when it is based entirely on inferences from circumstantial evidence. *Glenn*, 312 F.3d at 64. Furthermore, "the task of choosing among permissible competing inferences is for the jury, not a reviewing court," *United States v. Salmonese*, 352 F.3d 608, 618 (2d Cir. 2003) (citation omitted), and "in assessing whether the government has met its burden, [the court must] view pieces of evidence 'not in isolation but in conjunction.'" *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 978 (2d Cir. 1990)). In addition, the court "must draw all favorable inferences and resolve all issues of credibility in favor of the prosecution." *United States v.*

*Jespersen*, 65 F.3d 993, 998 (2d Cir. 1995) (quoting *United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986)).

In order to grant a motion for a judgment of acquittal pursuant to Rule 29 made and reserved at the close of the government's case, the court must find, based on the evidence at the time the ruling was served (Fed. R. Crim. P. 29(6)), that "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna,* 183 F.3d at 130 (internal quotation marks and citations omitted); *see also United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003) (district court may grant Rule 29 motion for judgment of acquittal on grounds of insufficient evidence only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt"). Accordingly, a conviction must be upheld if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Consequently, "[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002) (citing *United States v. Samaria*, 239 F.3d 228, 233 (2d Cir. 2001)).

## II. Rule 33 Motion for a New Trial

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted); *see also United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009) ("The test is whether it would be a manifest injustice to let the guilty verdict stand." (quoting *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir. 1992))); *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (citing *Smith v. Lightning Bolt Productions, Inc.* 861 F.2d 363, 370 (2d Cir. 1988) ( A district court should grant a Rule 33 motion only if it, "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.")). "While [the Second Circuit] generally allow[s] district courts greater deference to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, courts must nonetheless exercise Rule 33 authority sparingly and in the most extraordinary circumstances." *Cote*, 544 F.3d at 101 (internal quotation marks

omitted).  "The [c]ourt must defer to the jury's resolution of
the weight of the evidence and the credibility of the
witnesses."  *United States v. Shellef*, 732 F. Supp. 2d 42, 49
(E.D.N.Y. 2010) (citing *Sanchez,* 969 F.2d at 1414 (quotation
omitted)).

## Discussion

### I.    The Sufficiency of the Evidence on Count Eight[8]

Count Eight charged Mr. Greebel with conspiracy to
commit securities fraud in relation to Retrophin.  The court
charged the jury, *inter alia*, that "a conspiracy requires that
the government prove beyond a reasonable doubt . . . that two or
more persons entered into an agreement to commit . . .
securities fraud; and . . . that . . . Mr. Greebel[] knowingly
and intentionally became a member of the conspiracy."  (Tr.
10905:14-24.)  In addition, the court instructed that a member
of the conspiracy Mr. Greebel had joined must have committed at
least one of the overt acts charged in the Superseding
Indictment, and that the overt act was "in furtherance of some
object or purposes of the conspiracy as charged in the
Superseding Indictment."  (Tr. 10906:5-19.)  The court also
instructed that "there is no need for the government to prove
that [Mr. Greebel] or any other conspirator actually succeeded

---

[8] The court addresses Count Eight first to provide necessary background for
  its discussion of Count Seven.

in their criminal goals or even that they could have succeed[ed]," and described the venue requirement for fraud. (Tr. 10907:15-10908:5.)

The court then instructed the jury on the elements of securities fraud. The court also instructed that, in order for the jury to find a defendant guilty of a conspiracy to commit securities fraud, "the government must prove, beyond a reasonable doubt, that the defendant conspired knowingly, willfully, and with intent to defraud." (Tr. 10905:14-25-10907:5.)

## A.     The Government's Evidence

The government described Count Eight as comprising, *inter alia*, "the distribution of the free-trading . . . Fearnow shares, to a group of associates and Mr. Shkreli with the intention of controlling those shares, the form 13D that failed to disclose Mr. Shkreli's beneficial ownership of those shares, and then the ways in which the defendant and Mr. Shkreli sought to control the free-trading shares in order to control the price and volume of Retrophin stock." (Tr. 10326:23-10327:6.) The government explained in their closing, "at the beginning of December [2012], which is Government Exhibit 468, . . . [Mr. Greebel and Mr. Shkreli] decided they're going to buy the shell, Retrophin's going to buy Desert Gateway, and the defendant and Mr. Shkreli are going to distribute the [Fearnow] shares that

come along with the shell to a group of people that they're associated with, and that Mr. Shkreli thinks he can control. (Tr. 10333:12-25; GX 468.)

### 1. Allocating the Fearnow Shares

On November 22, 2012, weeks before the reverse merger between Retrophin and Desert Gateway, Mr. Greebel asked Mr. Shkreli if there was "any reason other than the 2.5m that you want this shell? A new 'clean' shell will definitely be cheaper . . . i[' ]ve told you I have some capitalization concerns." (GX 458.) Mr. Shkreli responded that "[t]he 2.5m help a lot[.]" (*Id.*) Based on the evidence at trial, the jury could reasonably conclude that Mr. Shkreli and Mr. Greebel were discussing the 2.5 million free-trading shares in Desert Gateway.

In 2008, Troy Fearnow had loaned Desert Gateway $25,000 pursuant to a convertible note, which gave him the "right to convert the debt" into 2.5 million shares of Desert Gateway stock. (GX 115-4; 115-5.) Prior to the reverse merger in December 2012, the 2.5 million free-trading shares were held by Troy Fearnow, pursuant to the exercise of a promissory note held by Troy Fearnow, who was a relative of Michael Fearnow, the seller of Desert Gateway. As discussed below, shortly prior to the reverse merger, Troy Fearnow sold, for a nominal amount, 2.4 million of the free-trading shares underlying the note – the

"Fearnow shares" – to specific recipients chosen by Mr. Shkreli.
(*See id.*)  The remaining 100,000 free-trading shares were "held
back" by Mr. Fearnow.  (GX 477.)

        Mr. Greebel exercised his legal training to help Mr.
Shkreli distribute, allocate and control the Fearnow shares to
specific recipients.  As Mr. Greebel was aware, in May 2012, Mr.
Shkreli had transferred 50,000 Retrophin units to Mr. Fernandez
and 30,000 units to Mr. Mulleady, and Mr. Biestek held 4,167
Retrophin units.  (GX 111-9, 111-10; 111-12; 111-43; Tr.
4727:10-18.)  As described at pp. 61-62, *supra*, Mr. Su testified
that on November 29, 2012, Mr. Su forwarded Mr. Greebel a copy
of a transfer agreement, which Mr. Su had received from Mr.
Shkreli and had dated November 29, 2012, showing a transfer of
Mr. Biestek's 4,167 Retrophin shares to Mr. Shkreli.  Mr.
Greebel asked for the agreement to be re-executed, noting that
"[Retrophin] LLC has not existed since mid-[S]eptember[.]"  (GX
461.)  Subsequently, the Biestek to Shkreli share transfer was
re-dated twice first to July 1, 2012 using white-out tape, and
then creating a new document with a typed date of June 1, 2012.
(Tr. 4751:22-4763:24.)

        On December 3, 2012, Mr. Su sent Mr. Greebel
additional transfers, in which Mr. Mulleady transferred 10,000
Retrophin units to Mr. Shkreli, and Mr. Fernandez transferred
50,000 Retrophin units to Mr. Shkreli.  Mr. Mulleady also signed

a statement "acknowledge[ing] that [his] receipt of 30,000 [Retrophin] Units from Martin Shkreli was invalid[.]"  (GX 111-26-A.)

The transfers from Mr. Mulleady, Mr. Fernandez, and Mr. Biestek to Mr. Shkreli were purportedly executed in June and July 2012, but were not circulated until late November and December 2012.  The transfers were also not reflected on any Retrophin capitalization tables in the summer and fall of 2012.  Furthermore, also on December 3, 2012 – the same day Mr. Su circulated the stock transfer documents – Mr. Shkreli circulated a "Final Capitalization Table" to Mr. Greebel and Mr. Su, in which Mr. Mulleady, Mr. Fernandez, and Mr. Biestek were no longer listed as owning common or preferred Retrophin stock, but were listed, along with Mr. Shkreli, as owning "Fearnow Stock." The jury could therefore reasonably conclude that Mr. Shkreli had Mr. Fernandez and Mr. Mulleady transfer back the Retrophin shares Mr. Shkreli had given them in May, in exchange for Fearnow stock, and then falsely backdated the transfer documents to June and July 2012.[9]  Furthermore, from the emails related to

_____

[9] Email exchanges between Mr. Shkreli and Mr. Fernandez, and Mr. Shkreli and Mr. Mulleady, on November 30, 2012 makes this plan explicit.  Mr. Shkreli proposed that Mr. Fernandez "surrender all of your stock to me and have zero[.]  You will buy from troy fearnow, for a nominal amount . . . approximately 5% of the post-merger outstanding common shares of Retrophin."  (GX 462.)  On the same day, he emailed Mr. Mulleady a draft transfer agreement, stating that "[t]his will reverse the 10,000 shares I gave you.  The 30,000 shares I gave you were transferred invalidly (the auditors and lawyers just determined this)."  (GX 447.)  As with Mr. Fernandez, Mr. Shkreli told Mr. Mulleady that "Michael Fearnow will sell you

80

the share transfers, the jury could conclude that Mr. Greebel was aware of these transfers. Indeed, on December 12, 2012, Mr. Greebel instructed Mr. Su to send him a "current/correct cap table" because Mr. Shkreli's December 3, 2012 version "has [Mr. Shkreli] getting Fearnow stock which he did not[.]" (GX 111-40.) The capitalization table Mr. Greebel reviewed in catching this error was the same capitalization table that showed that Mr. Mulleady, Mr. Fernandez, and Mr. Biestek owned Fearnow stock, and were no longer owners of Retrophin common stock. (*Id.*, *see also GX 111-*.)

On December 7, 2012, before reverse merger closed, Mr. Greebel emailed a lawyer for Mr. Fearnow, asking him to confirm agreement with a process whereby "[t]he [Troy Fearnow] Note will be converted into 2.5m shares," "Troy Fearnow and certain buyers will execute purchase agreements . . . prior to the closing of the DGTE/Retrophin transaction"; and "[t]he transfer agent will send the stock certificates to the individual identified on the purchase agreement . . ." (GX 468.) On December 11, 2012, Mr. Greebel asked Mr. Shkreli to "send me the name buyers [of the Fearnow shares] . . . and the amount they are acquiring." (GX 473.) Mr. Shkreli responded with a list of names of buyers and

---

stock for a nominal amount . . . that equal[s] . . . 5% of the common stock . . . of Retrophin Inc . . . ." (*Id.*) Mr. Greebel was not on these email exchanges, but the jury could reasonably conclude that he knew of the plan through the evidence discussed above.

amounts of Fearnow shares purchased: Kevin P. Mulleady (400,000); Thomas E. Fernandez (400,000); Marek Lucjan Biestek (350,000); Timothy J. Pierotti (400,000); Claridge Capital LLC (400,000); Andrew R. Vaino (300,000); Edmund J. Sullivan (150,000) (together, the "Fearnow shareholders" or "Fearnow recipients"). (*Id.*) Mr. Shkreli confirmed that "they will all have <5%[.]"[10] (*Id.*) Mr. Greebel explained "[u]nder the securities laws, stockholders can act by written consent . . . as long as no more than 6 stockholders represent 50% of the outstanding equity[,] and that he "want[ed] to confirm that the numbers work so that [Mr. Shkreli] +5=at least 50% (ie a majority)[.]" (*Id.*)

The Fearnow recipients, identified in the emails by and between Mr. Greebel and Mr. Shkreli, acquired their free-trading stock, which represented 96% of the free-trading Retrophin shares from Troy Fearnow,[11] for nominal prices – $0.0001 per share.[12] (GX 480.) Retrophin was not a party to the purchase agreements between the Fearnow recipients and Troy

---

[10] Financial Industry Regulatory Authority ("FINRA") employee Deborah Oremland testified that 5% stock ownership is the threshold beyond which shareholders are required to "file a disclosure document with the SEC." (Tr. 5732:20-22.)

[11] The 2 million free-trading shares actually distributed to the Fearnow recipients were 80% of the company's free-trading shares (Tr. 5735:19), and, as discussed below, Mr. Greebel and Mr. Shkreli also controlled the 400,000 "escrow" or "held back" shares, which represented 16% of the free-trading stock.

[12] By comparison, Retophin's share price on December 17, 2012, the first day of trading, was $7.69. (GX 955.)

Fearnow.  Nevertheless, Mr. Greebel, in consultation with Mr. Shkreli and with Mr. Biestek's help, coordinated the execution of the purchase agreements by Fearnow recipients and the distribution of the Fearnow stock certificates, and kept Mr. Shkreli apprised of his progress.  (GX 475 (Mr. Greebel asking Mr. Biestek to have the Fearnow recipients execute the purchase agreements); GX 476 (Mr. Greebel notifying Mr. Shkreli that the purchase agreements had been signed); GX 486 (Mr. Greebel collecting social security numbers from the Fearnow purchasers); GX 487-489, 492-494, 495 (Mr. Greebel's response to a request from Mr. Fearnow's lawyer, seeking written confirmation that the Fearnow purchasers were not affiliates of Retrophin); GX 497 (Mr. Greebel collecting proof of mailing from the transfer agent).)

Mr. Greebel and Mr. Shkreli arranged for a portion of Fearnow shares to be "held back" or "escrowed" under Mr. Shkreli's control from each of the selected Fearnow purchasers selected by Mr. Shkreli.  On December 13, 2012, Mr. Greebel emailed Mr. Shkreli with the names of the Fearnow recipients and the number of shares they had nominally purchased.  (GX 479 (December 13, 2012 email listing names and share allocations); compare with GX 480 (executed share purchase agreements, showing the number of shares purchased by each Fearnow recipient).)  Mr. Shkreli responded two minutes later, reducing each Fearnow

recipient's share holdings by between 50,000 and 100,000 shares, thus gaining control of the "hold back" shares in escrow. (GX 479.) On December 14, 2012, the transfer agent mailed certificates in the reduced amounts to all of the Fearnow share recipients, except for the share certificate for Ron Tilles's Claridge Capital, which was sent directly to Mr. Greebel. (GX 497; GX 115-4; Tr. 5585:13-19.) There was a 400,000-share difference between the shares purchased by the Fearnow recipients and the shares that were actually distributed to them. These 400,000 remaining shares (the "escrow shares" or "escrow stock")[13] were sent by Amy at Standard Register at the direction of Mr. Greebel to Troy Fearnow's attorney. (GX 497; GX 115-4.)

Based on the foregoing evidence, the jury could reasonably conclude that Mr. Greebel knew that Mr. Shkreli wanted to purchase Desert Gateway – as opposed to a cheaper shell company – in order to have 2.4 million free-trading shares under his control. The jury could also conclude that, by enabling Mr. Shkreli's designated associates to purchase the Fearnow shares for "nominal" prices while at the same time causing Retrophin to pay for the shell company, Mr. Greebel and Mr. Shkreli defrauded Retrophin's investors of the Fearnow

---

[13] There was no formal escrow agreement, but Mr. Shkreli and Mr. Greebel referred to the 400,000 shares as the "escrowed stock." (*E.g.* GX 541.)

shares, which represented 96% of the company's free-trading shares, with the goal of controlling the price and trading of Retrophin stock.

## 2. *Control of the Fearnow Shares*

After arranging for distribution of the Fearnow shares to Mr. Shkreli's associates, the evidence supports the jury's finding beyond a reasonable doubt, that Mr. Greebel conspired with Mr. Shkreli to control the Fearnow shares, and, thereby control the price and trading of Retrophin stock, in two ways. First, as described above, Mr. Greebel and Mr. Shkreli had permitted Troy Fearnow to retain 400,000 of the 2.4 million shares, which Troy Fearnow had nominally sold to the Fearnow recipients, all of whom were associated with Mr. Shkreli and/or Retrophin. The evidence sufficiently established that in the Spring of 2013, Mr. Greebel and Mr. Shkreli conspired to exercise control over those "escrow" shares, if possible without the knowledge of the Fearnow recipients who had nominally purchased the shares. Second, with regard to the 2 million shares that had been distributed, Mr. Greebel and Mr. Shkreli tried to ensure that the Fearnow recipients only traded with Mr. Shkreli's knowledge, specifically targeting one Fearnow shareholder, Timothy Pierotti, when Mr. Pierotti began to sell his shares without permission. Mr. Shkreli's control over the

Fearnow shares was not disclosed in the Form 13D that Mr.
Greebel drafted.  (GX 503.)

### 3.    Control Over the "Escrowed" Stock

As discussed below with regard to Count Seven,
Mr. Shkreli and Mr. Greebel directed the use of some of the
400,000 "escrowed" Fearnow shares to satisfy dissatisfied MSMB
investors, and particularly discussed using some of the escrow
shares to compensate Dr. Rosenwald and Ms. Hassan.  Mr. Shkreli
and Mr. Greebel also discussed if, and how much, of the
remaining "escrow" stock would be available for Mr. Shkreli
personally.  Their emails are unambiguous: on March 7, 2013,
Mr. Greebel asked Mr. Shkreli how to allocate the escrowed
stock.  (GX 538.)  Mr. Shkreli responded that he wanted to "1)
[g]et as many people to forgo their holdings – make sure that we
can still deem who they will eventually go to . . . [,]  2)
Transfer from [F]earnow to [Dr. Rosenwald, Sarah Hassan] and
consultant immediately[,] 3) Over time transfer to others if
necessary[,] 4) After a period of time, transfer the rest to
me[.]"  (*Id.*)  After some additional discussion, Mr. Greebel
proposed "five choices":

> 1. Let[']s set up a llc owned by "someone" you
> trust and assign all stock there;
> 2. Assign what you need now and have fearnow
> keep the rest till later date-there is
> fearnow risk;

>3. Assign what you can now and have remainder
>assigned to you-this will cause such stock to
>be restricted, but it[']s protected;
>4. Assign what you can now, let the 5 guys get
>remainder and going forward they can transfer
>it – risk is whether they will assign when you
>ask; or
>5. Assign what you can now, have portion
>assigned to llc and portion assigned to you or
>the company-protects stock, leaves some
>freely trading and protects (but restricts)
>other, also will increase your ownership by
>retiring portion[.]

(*Id.*)  Mr. Shkreli responded that "#2 or #3 or #4 is fine especially as it related to Marek [Biestek.]  He just can[']t cross 5%[.]"  (*Id.*)  In a follow-up email to Mr. Greebel, Mr. Shkreli wrote that "[t]he preference is it becomes mine," to which Mr. Greebel responded "i[']ll have it go to [Dr. Rosenwald, Sarah Hassan] and remainder to you . . . .  I will finalize the doc . . . and then circulate to the 5 guys."  (*Id.*)

On March 8, 2013, Mr. Greebel sent Mr. Shkreli a proposed "Fearnow breakdown," listing proposed transfers by "Sources" and "Uses."[14]  (GX 542.)  The "Sources," included Mr. Fearnow, Mr. Biestek, Mr. Tilles, Mr. Vaino, and Mr. Sullivan; the "Uses" described the recipients who were MSMB Capital and MSMB Healthcare investors, and how much each would get:  for example, Dr. Rosenwald would get 80,000

---

[14] As with other discussions between Mr. Shkreli and Mr. Greebel, the "Sources" and "Uses" were listed by initials of the individual Fearnow shareholders.

shares from Mr. Biestek and Mr. Sullivan and would return
the 24,046 restricted shares he received from MSMB; Mr.
Fearnow would keep 50,000 shares; Ms. Hassan would get
20,000 shares from Mr. Sullivan; and Mr. Shkreli would
receive 75,000 shares from Mr. Fearnow and Mr. Tilles,
which "will become restricted on receipt[.]" (*Id.*) Mr.
Shkreli responded that the proposed transfers "look[] good"
but asked how the transfers could be made "since
technically fearnow owns them[.]" (*Id.*) Mr. Greebel
responded that "Troy Fearnow and the 'purchasers' are
signing an amendment to their purchase agreement and in the
amendment the 'purchaser' is directing Troy to have the
stock delivered to the designated people." (*Id.*) Mr.
Greebel also warned Mr. Shkreli that "any stock you get
becomes disclosable and more difficult to transfer." (*Id.*)
Mr. Greebel explained that, under his proposed approach,
"[e]ach of the individuals [*i.e.*, the Fearnow shareholders]
will know where [the stock] goes as will Fearnow. The
alternative is to let it go to the individuals and then
they transfer it to [Dr. Rosenwald, Sarah Hassan, and
Thomas Koestler]. We will have no way to ensure they
transfer (ie a Pierotti problem).[15] I was trying to

---

[15] As discussed below, Timothy Pierotti was a Fearnow recipient who began to
sell his Fearnow shares against Mr. Shkreli's wishes. The jury could
reasonably infer that a "Pierotti problem" referenced the risk that a

protect you from a hostage situation." (*Id.*)  Mr. Shkreli
expressed his preference that the Fearnow shareholders not
know the identities of the ultimate recipients of their
escrowed stock – "the marek et al group would just reassign
their stock to fearnow and he would then assign/sell it to
the parties . . . so its anonymous and the 5 people doing
it don't know exactly where it[']s going[.]"  Mr. Greebel
agreed that Mr. Shkreli's approach "may work" although it
could create a "tax issue" for Troy Fearnow.  (*Id.*)

        In a related email exchange on the same day, Mr.
Shkreli suggested that Mr. Greebel "use [Troy Fearnow,
Andrew Vaino, Ron Tilles] first to satisfy the folks who
need it" but that "[y]ou can hold on to [Edmund
Sullivan/Marek Biestek's stock] because they will do as
directed at some point down the road[.]"  (GX 544.)  Mr.
Shkreli and Mr. Greebel continued to revise the allocations
of the "escrowed" Fearnow shares.  On March 11, 2013,
Mr. Shkreli proposed a distribution of the Fearnow shares
in which 50,000 of Mr. Biestek's stock would go to MSMB
investors "Koestler/[R]osenwald"; 50,000 of Mr. Tille's
stock would go to "msmb healthcare lp"; 50,000 of Mr.
Vaino's stock would go to "whoever you want (sarah?

---

Fearnow shareholder, if given access to their "escrow" share allocation,
would trade those shares rather than use them for Mr. Shkreli's purposes.

Msmbhealthcare lp)"; and 50,000 of Mr. Sullivan's stock would go to Dr. Rosenwald.  (GX 548.)

Considered in connection with all the evidence at trial, the jury could reasonably have viewed these email exchanges as evidence that proved beyond a reasonable doubt that Mr. Greebel and Mr. Shkreli carefully conspired to ensure that Mr. Shkreli could control the "escrowed" Fearnow stock.  Mr. Greebel and Mr. Shkreli then used these "escrowed" shares when it became necessary to pacify disgruntled MSMB investors, as discussed below with regard to Count Seven.

### 4. *Control of the Distributed Shares*

In addition to controlling the 400,000 "escrow" stock, Mr. Greebel conspired with Mr. Shkreli to control the 2 million Fearnow shares that had been distributed to the Fearnow shareholders.  Fearnow recipient Timothy Pierotti was the former manager of the MSMB Consumer fund, and had been terminated from MSMB in November 2012.  (Tr. 5899:2-5904:7; 5962:3-5974:18.) Mr. Pierotti never worked for Retrophin.  (*Id.*)  In December 2012, he was working with Marek Biestek on developing a company called Wentworth, and "[o]ccasionally" worked from the Retrophin offices.  (Tr. 5891:22-5892:5; 5906:1-19.)  Mr. Shkreli approached Mr. Pierotti through Mr. Biestek in mid-December 2012, to offer him the opportunity to purchase the Fearnow

shares.  (Tr. 5930:23-25.)  Mr. Shkreli told Mr. Pierotti two
things that made Mr. Pierotti "nervous":  that "people who have
experience trading could trade the shares back and create more
volume" and that "if [Retrophin does] a pipe [the Fearnow
shareholders] could buy back in[.]"  (Tr. 5944:22-5945:3.)

On December 17, 2012, Mr. Shkreli sent an email to,
Mr. Pierotti and the Fearnow recipients among others, which
noted that only Mr. Shkreli, Ms. Izerne, Mr. Su, and an
individual named Michael Smith were employees of Retrophin.
(GX 112-19.)  Mr. Greebel also received a copy of this December
17, 2012 email, which specifically showed that Mr. Shkreli had
sent his email to the Fearnow recipients, including
Mr. Pierotti.  (GX 501.)  Mr. Shkreli subsequently attempted to
convince Mr. Pierotti to return to the Retrophin office where
Mr. Pierotti sometimes worked on the Wentworth project, but Mr.
Pierotti – who had prior experience with insider trading issues
– was concerned that if he worked from Retrophin's office he
might be exposed to material non-public information about
Retrophin.  (Tr. 5971:8-24.)  In mid-December 2012, Mr. Greebel
and Mr. Pierotti discussed Mr. Pierotti's concerns about being
exposed to non-public information if he worked on the Wentworth
project from Retrophin's offices.  (Tr. 5972:1-5973:11.)  Mr.
Greebel told Mr. Pierotti that he could simply "keep [his] door

shut" but Mr. Pierotti believed that this was "insufficient."
(*Id.*)

In late December 2012, Mr. Pierotti began selling his
Fearnow shares, trying to sell "slowly and carefully and over a
period of time" to avoid "injur[ing] the share price."  (Tr.
5974:15-74.)  Mr. Shkreli emailed Mr. Greebel, writing that "the
stock is trading like crazy — someone is selling the shit out of
it[.]"  (GX 510.)  Mr. Greebel responded "I don't kn[]ow—there
is no freely trading stock other than you guys and the 500k that
fearnow has," which he then confirmed with the transfer agent.
(*Id.*)  Later that day, Mr. Shkreli emailed Mr. Greebel that "it
might be tim selling[.]"  (GX 504.)  Mr. Shkreli then tried to
meet with Mr. Pierotti, but Mr. Pierotti declined, telling Mr.
Shkreli to go through Mr. Biestek.  (GX 505.)  Mr. Shkreli
forwarded his exchange with Mr. Pierotti to Mr. Greebel, who
told him to "leave it alone—you are an affiliate and it will
only create problems[.]"  (*Id.*)  The next day, Mr. Shkreli sent
Mr. Greebel a draft email, titled "OVER-THE-WALL and
CONFIDENTIAL: Retrophin (RTRX) raising $1m in a convertible note
followed by $10m+ in a PIPE – comments requested."  (GX 507.)
Mr. Shkreli's draft email had a proposed recipient list of all
of the Fearnow shareholders.  (*Id.*)  As Mr. Pierotti explained,
putting someone "over the wall" refers to a process whereby a
person is voluntarily made aware of material non-public

information about a company and thereby prevented from trading in the stock.  (Tr. 6035:21-6036:13.)  Mr. Greebel said that Mr. Shkreli's proposed email was an "Interesting idea—I don[']t know what happens if he deletes and doesn[']t read." (GX 507.) Mr. Shkreli stated that "[t]he subject line is enough to put everyone [over the wall.]"[16]  (*Id.*)

> After the "over the wall" email was sent and failed to stop Mr. Pierotti from trading, Mr. Greebel and Mr. Shkreli attempted to use threats of litigation to force Mr. Pierotti to sell his Fearnow shares to Mr. Shkreli, and to assign his portion of the "escrowed stock" to Retrophin.  On January 2, 2013, Mr. Shkreli sent Mr. Greebel a draft of an email to Mr. Pierotti, which stated that "I have decided to commence litigation against you for failing to honor the agreement we made . . . You agreed to work for MSMB, growing and managing its investments and engaging with me on new opportunities."  (GX 511.)  Mr. Greebel wrote that the email was "[v]ery risky given what you[r] agreement was—could be opening a much bigger can of worms[.]"  (*Id.*)  Mr. Shkreli asked Mr. Greebel to call.  (*Id.*) Later that day, Mr. Shkreli sent a modified version of his email

---

[16] Mr. Greebel's counsel suggested at oral argument, without citing any evidence, that Mr. Greebel believed that this email was a genuine attempt to get the Fearnow shareholders' help regarding the PIPE.  Instead, however, the jury could reasonably have concluded from Mr. Shkreli's and Mr. Greebel's comments that the email was targeted at one individual – specifically Mr. Pierotti. (*See* GX 507)

to Mr. Pierotti and included a draft purchase agreement for sale

of Retrophin stock by Mr. Pierotti to Mr. Shkreli.  (GX 112-25.)

The revised version of the email omitted any mention of MSMB,

and instead stated that Mr. Shkreli was going to commence

litigation because Mr. Pierotti had "agreed to work for me . . .

.  In connection with that, you had the opportunity to purchase

Retrophin stock on favorable terms.  Instead, you have failed to

come to the office, [and] have failed to perform the necessary

work on 'the Wentworth transaction' . . .  This is classic 'cut

bait fraud.'"[17]  (*Id.*)

     Mr. Greebel continued to assist Mr. Shkreli in his

attempt to obtain Mr. Pierotti's free trading Fearnow even after

Mr. Pierotti notified Mr. Greebel that Mr. Shkreli had, among

other things, threatened Mr. Pierotti's wife.  (GX 518.)  On

---

[17] At oral argument, Mr. Greebel's counsel suggested, again without citation
to evidence, that Mr. Greebel relied on the allegations in the January 2,
2013 email as being true, and therefore believed that Mr. Pierotti did, in
fact, agree to work for Retrophin in exchange for the Fearnow shares.
Counsel also argued that Mr. Pierotti "absconded" with the Fearnow shares
received in return for an agreement to work with Retrophin.  With regard to
any argument that Mr. Pierotti had actually promised to work for Retrophin
and "absconded" with shares he received in return, the jury was entitled to
credit Mr. Pierotti's testimony that he never worked for Retrophin and that
he paid for his Fearnow shares.  (Tr. 5903:12-5904:7.)  In addition, the
draft January 2, 2013 email Mr. Shkreli sent Mr. Greebel to review did not
mention Mr. Pierotti working for Retrophin; it referenced an agreement to
work for MSMB.  (GX 511.)  The email Mr. Shkreli actually sent Mr. Pierotti
also did not reference Mr. Pierotti working for Retrophin.  (GX 112-25.)
Mr. Greebel also knew that Wentworth, which Mr. Shkreli referenced as a
"transaction" in the January 2, 2013 email, was a "corporate identity"
distinct from MSMB and Retrophin, not a "transaction."  (*See* GX 112-36
(describing Wentworth to Mr. Greebel as a "medical technology company" and a
"LLC like Retrophin," and confirming that it was "not an affiliate" of
Retrophin); GX 501 (describing "Marek Biestek's Wentworth" as a separate
"corporate identity" from MSMB and Retrophin).)

February 14, 2013, Mr. Greebel emailed Mr. Pierotti that Mr. Pierotti did not "currently own, nor have title to the 50,000 shares held by Fearnow" – Pierotti's portion of the "escrow" stock – despite the purchase agreement that Mr. Pierotti had signed with Mr. Fearnow, which included those 50,000 shares. (GX 112-28.)  At Mr. Shkreli's direction, Mr. Greebel turned the matter over to litigation partners at Katten, who commenced a lawsuit against Mr. Pierotti on behalf of Retrophin.  (GX 526.)

Mr. Pierotti's testimony and the related documentary evidence were sufficient to establish that Mr. Greebel knew that Mr. Pierotti was not a Retrophin employee, and that Mr. Greebel conspired with Mr. Shkreli to improperly control Mr. Pierotti's trading.  First, Mr. Greebel had seen Mr. Shkreli's email specifically notifying Mr. Pierotti and others of the identities of Retrophin's four employees, and did not include Mr. Pierotti in the list of employees.  (GX 501.)  Second, Mr. Greebel had himself discussed Mr. Pierotti's concerns about exposure to inside information with Mr. Pierotti – a conversation which would have made little sense if Mr. Pierotti were actually working for Retrophin at the time.  Furthermore, when the Pierotti litigation came up before the Retrophin board in May 2013, Mr. Greebel stayed silent as Mr. Shkreli misled the board by stating that the dispute concerned shares that Mr. Shkreli had given Mr. Pierotti when Mr. Pierotti was dealing with

financial troubles – a story that contradicted Mr. Shkreli's emails to Mr. Pierotti acknowledging that Mr. Pierotti had purchased his Fearnow shares from Mr. Fearnow.  (*See* Tr. 1991:7-21 (testimony of Mr. Richardson).)

The jury could reasonably infer from all of the evidence that Mr. Greebel conspired with Mr. Shkreli to control the Fearnow shares, for the purpose of controlling the price and trading of Retrophin stock – and that when Mr. Pierotti began to sell his shares, Mr. Greebel assisted Mr. Shkreli to protect the conspiracy, by attempting to regain control over Mr. Pierotti's shares.

## B.  Defendant's Arguments

Mr. Greebel argues that (1) the government failed to prove the "alleged conspiracy involved a shared objective that was in itself illegal"; (2) the government's evidence of the Fearnow recipients' trading behavior "was entirely inconsistent with the existence of the conspiracy alleged in Count Eight"; and (3) that the evidence was insufficient to show that Mr. Greebel "entered into the conspiracy alleged in Count Eight." (Mem. at 24-27.)

### 1.  *Illegality of the Shared Objective*

Mr. Greebel argues that "an agreement for owners of a company's stock to *hold* stock – rather than to sell or buy such stock – is not itself improper" and cites Securities and

Exchange Commission guidance concerning "lockup agreements" between a company's "insiders" and its IPO underwriters. (Mem. at 24-25 (citations omitted).)

The conduct at issue in Count Eight did not involve a "lockup agreement," and no evidence of a lockup agreement was introduced. The purchase agreements between Mr. Fearnow and the Fearnow recipients made no mention of a lockup period or a lockup agreement, and Retrophin was not a party to those agreements. The charged conduct involved Mr. Shkreli, as Retrophin's founder, Mr. Greebel, the company's outside counsel, and other associates of Mr. Shkreli conspiring to distribute 80% of the company's free trading shares to Mr. Shkreli's associates, attempting to control the trading of those shares, and concealing that control from the investing public. Mr. Greebel and Mr. Shkreli also retained control over an additional 16% of the free-trading Retrophin shares. That their ultimate objective – to control the price and trading of Retrophin shares – may have shared some attributes with an entirely distinguishable, and non-existent lockup agreement does not change the illegal nature of their conspiracy.

Furthermore, Mr. Greebel's attempt to recast the illegal agreement at issue into a "lockup" agreement contradicts his own words and actions at the time of the conspiracy. As Mr. Greebel knew, three of the Fearnow shareholders had entered into

backdated share transfer agreements, whereby they transferred their Retrophin shares to Mr. Shkreli, in exchange for the opportunity to "purchase" the Fearnow shares.  And, as Mr. Greebel was also aware, Mr. Shkreli purportedly terminated the employment of the Fearnow shareholders on December 17, 2013, shortly after Retrophin became public.  Mr. Greebel also discussed the Fearnow shares with Mr. Pierotti, when Mr. Pierotti explained his concerns about being exposed to inside information if he continued to work at the Retrophin offices. Mr. Greebel also played an active role in ensuring that Mr. Shkreli could control and benefit from the "escrowed" stock, proposing, among other things, that Mr. Shkreli "set up an llc owned by 'someone' you trust and assign all stock there," or transfer the shares in a manner that would "protect" the shares and increase Mr. Shkreli's ownership percentage of Retrophin. (*See* GX 543.)  In contrast, there was simply no evidence that the Fearnow shareholders purchased shares that were subject to some form of "lockup" or other legitimate agreement.

### 2. *Evidence of Trading Behavior*

Mr. Greebel next argues that the government's evidence of the Fearnow shareholders' trading behavior was "inconsistent" with the government's theory of Count Eight.  (Mem. at 26.)  As a threshold matter, it has been established that a conspiracy need not succeed in its object in order to be a crime.  *United*

*States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) (describing conspiracies as "a distinct evil, which may exist and be punished whether or not the substantive crime ensues." (citations and quotation marks omitted)).  Thus, even if the defense is correct and the Fearnow shareholders' trading patterns did not reflect Mr. Shkreli's attempts to control their trading, the jury's verdict could stand as long as there was sufficient other evidence of the illegal agreement.  In this trial, however, there was sufficient evidence that the conspiracy succeeded in its object, at least in part. Specifically, Mr. Greebel's and Mr. Shkreli's emails show that, when Mr. Shkreli first suspected that "someone" was selling the Fearnow shares, Mr. Greebel's reaction was disbelief, because the only individuals he knew of who held free-trading stock were Mr. Shkreli's associates and Troy Fearnow.  He went so far as to contact the stock transfer agent to confirm that it could not be anyone else selling.  (GX 510.)

Defendant relies on the testimony and trading behavior of Mr. Pierotti, arguing that Mr. Pierotti's sales of the Fearnow shares undermine the government's theory.  (Mem. at 26.) Mr. Pierotti, however, was *not* a co-conspirator in Count Eight, as defendant acknowledges (*id.*); instead, Mr. Pierotti *ignored* Mr. Shkreli's instructions and began to sell his shares.  When Mr. Shkreli and Mr. Greebel learned about Mr. Pierotti's

disobedience, Mr. Shkreli began a campaign of threats to force
Mr. Pierotti to stop selling his shares.  Although Mr. Greebel
was Retrophin's lawyer – and Mr. Pierotti's purchase agreement
with Troy Fearnow did not involve Retrophin – Mr. Greebel
negotiated on Mr. Shkreli's behalf and worked to prevent Mr.
Pierotti from accessing the "escrowed" portion of his Fearnow
stock.  The evidence related to Mr. Pierotti, therefore,
supports the government's theory that Mr. Greebel and Mr.
Shkreli conspired to control the price and trading of Retrophin
stock, and that they took steps to conceal and protect their
conspiratorial objective when Mr. Pierotti refused to do as he
was told.

   *3.   Mr. Greebel's Agreement to the Charged Conspiracy*

         The defense argues that there is insufficient evidence
in the record to support the government's position that
Mr. Greebel entered into a conspiracy with the object of
controlling the price and trading of Retrophin stock.  The
defense asserts that Mr. Greebel was not present for the
conversation in which Mr. Shkreli told Mr. Pierotti and others
his plan for the Fearnow stock.

         The court notes that a member of a conspiracy need not
"be aware of all acts committed in furtherance of the
conspiracy."  *United States v. Vanwort*, 887 F.2d 375, 383 (2d
Cir. 1989.)  As discussed above, there was ample evidence in the

record that Mr. Greebel was not only aware of, but actively participated in the charged conspiracy, though he was not present for all conversations between Mr. Shkreli and Mr. Pierotti or other Fearnow recipients.  In particular, as the evidence established, Mr. Greebel helped Mr. Shkreli conduct a reverse merger with Desert Gateway, knowing that Mr. Shkreli chose that shell for the 2.5 million free-trading shares underlying the Fearnow note.  Next, although Retrophin funded the reverse merger with Desert Gateway, Mr. Greebel arranged for and coordinated the Fearnow share purchases by Mr. Shkreli's hand-picked insiders.  Once the Fearnow stock had been distributed, Mr. Shkreli and Mr. Greebel took action to stop Mr. Pierotti and to retain control over the "escrowed stock" purchased by and held in Mr. Pierotti's name.  In addition, Mr. Greebel helped Mr. Shkreli control the "escrowed" shares nominally owned by the other Fearnow shareholders, and redistributed those shares to MSMB investors in a manner that did not disclose or obtain consent of Retrophin or the nominal owners of those shares.  When Mr. Greebel, as Retrophin's outside counsel, drafted Retrophin's Form 13D, Mr. Shkreli's control of the Fearnow shares – which represented the vast majority of the company's free-trading stock – was not disclosed to the investing public.

The foregoing evidence is more than sufficient to support the jury's guilty verdict as to Count Eight that Mr. Greebel and Mr. Shkreli conspired to control the price and trading of Retrophin stock.

## II.  Count Seven

In Count Seven, the Superseding Indictment charged conspiracy to commit wire fraud by, *inter alia*, alleging that Mr. Shkreli and Mr. Greebel, "together with others, engaged in a scheme to defraud Retrophin by misappropriating Retrophin's assets through material misrepresentations and omissions in an effort to satisfy [Mr. Shkreli's] personal and unrelated professional debts and obligations."  (Superseding Indictment at ¶ 21.)

Count Seven of the Superseding Indictment charged three means by which Mr. Shkreli and Mr. Greebel, together with others, engaged in wire fraud conspiracy to defraud Retrophin. First, they caused Retrophin to "transfer Retrophin shares to MSMB Capital even though MSMB Capital never invested in Retrophin" (the "Fabricated MSMB Capital Interest"); second, they caused Retrophin to "enter into settlement agreements with defrauded MSMB Capital and MSMB Healthcare investors to settle liabilities owed by the MSMB Funds and [Mr. Shkreli]"; and third, they caused Retrophin to "enter into sham consulting agreements with other defrauded MSMB Capital, MSMB Healthcare

and Elea Capital investors as an alternative means to settle liabilities owed by the MSMB Funds and [Mr. Shkreli]." (*Id.*)

With regard to the "Fabricated MSMB interest" component of the alleged fraudulent conduct, the government introduced evidence that, as discussed above with regard to Count Eight, Mr. Biestek, Mr. Fernandez, and Mr. Mulleady transferred their Retrophin shares to Mr. Shkreli in late November and early December 2012, in return for the opportunity to purchase the Fearnow shares. Mr. Shkreli then transferred 75,000 pre-merger Retrophin units to MSMB Capital, which until that point did not have any Retrophin shares. This transfer resulted in MSMB Capital owning 375,000 post-merger shares. The transfer documents were backdated to appear as though the transfers had taken place in the summer of 2012. (*See* Section I.A.1, *supra*.) The government argued in summation that these transfers were backdated so as to make it appear that MSMB Capital had invested in Retrophin in the summer of 2012, before it notified investors in September 2012 the purported "wind down" process. (Tr. 10237:15-10238:7; *See* GX 103-29 (letter to Darren Blanton attaching 13D reflecting MSMB Capital stake in Retrophin); GX 503 (Retrophin 13D reflecting 375,000 shares held by MSMB Capital).)

The defense argued that the backdated transfers could not have defrauded Retrophin, because the shares involved came

from individuals – Mr. Fernandez, Mr. Biestek, and Mr. Mulleady – not Retrophin. (Tr. 8773:12-16.) During the charging conference, the government agreed not to "argue that. . . the fact that a backdated[] interest was created in and of itself defrauded Retrophin, but rather, was part of [a] longer course of conduct that created an interest for MSMB Capital in Retrophin . . . in order to create the appearance that MSMB Capital had actually invested in Retrophin and that was in part the basis for the negotiations around the settlement and consulting agreements." (Tr. 9600:7-16.)

The court instructed the jury on the law of conspiracy, as well as the underlying substantive crime of wire fraud. (Tr. 10885:9-10899:5.) The court also instructed the jury that "for the purpose of the conspiracy charged in Count [Seven] . . . the government must prove that [Mr. Greebel] intended to deceive and thereby to deprive Retrophin of money and property." (*Id.*) With regard to the backdated transfers, the court instructed the jury that "[t]he government does not allege that these transfers defrauded Retrophin and you cannot find Mr. Greebel guilty of Count [Seven] solely on the basis of evidence about these transfers and the dates that the transfers occurred." (Tr. 10900:2-5.)

**A. The Government's Evidence**

**1.    Settlement Agreements**

At trial, the government called three MSMB Capital investors and two MSMB Healthcare investors who received settlement agreements:  Dr. Lindsay Rosenwald, Sarah Hassan, Schuyler Marshall, David Geller, and Richard Kocher.  In addition, the jury was presented with evidence regarding the settlement agreements between Retrophin and MSMB investors Spencer Spielberg and Michael Lavelle.  (GX 53 (Spielberg Agreement), GX 56 (Lavelle Agreement).)

In the spring of 2013, numerous MSMB investors complained that Mr. Shkreli had, without permission, "converted" their investments in MSMB into shares of Retrophin.  (GX 100-16 (Dr. Rosenwald's lawyer's email regarding the "unauthorized conversion" of his investment); GX 525 (Mr. Shkreli's email stating that Ms. Hassan was in the "same situation as [L]indsay [Rosenwald]"); GX 104-5-A (Mr. Kocher's March 12, 2013 email); GX 108-10 (Mr. Lavelle's March 27, 2013 email).)  Mr. Greebel and Mr. Shkreli then used the Fearnow shares and cash payments and stock from Retrophin to compensate these dissatisfied MSMB investors.

Mr. Greebel first learned of Dr. Rosenwald's complaint regarding his MSMB investment on February 19, 2013.  (GX 520.)  On March 13, 2013, as described above, Dr. Rosenwald agreed to a settlement agreement in exchange for 80,000 free-trading Retrophin shares.  (GX 51, GX 550.)  Mr. Greebel edited a

version of a draft settlement agreement from Dr. Rosenwald by deleting references to Mr. Shkreli' misconduct.  (GX 100-23.) Mr. Greebel forwarded a revised version of the Rosenwald settlement agreement to Mr. Shkreli for execution, Mr. Greebel noted that "I wasn't sure who else knows about it so I did not cc your assistants."  (GX 550.)  On April 10, 2013, Mr. Greebel emailed Michael Fearnow and Mr. Shkreli, instructing Mr. Fearnow that all 50,000 of the shares "owed to Edmund Sullivan" and 30,000 of the 50,000 shares "owed to Marek Biestek," should "be issued in the name of Lindsay A. Rosenwald" and delivered to Mr. Greebel at Katten's offices; Mr. Greebel also instructed that "[t]he transfer agent can combine the two certificates for Rosenwald into once certificate for 80k shares."  (GX 558.)  On April 18, 2013, Mr. Greebel sent Dr. Rosenwald a share certificate for 80,000 free-trading Retrophin shares.  In return, Mr. Greebel had Dr. Rosenwald return the 24,046 restricted Retrophin shares Mr. Shkreli had sent him from MSMB Capital, which was the entity that was actually responsible for Dr. Rosenwald's losses.  Mr. Greebel then told Mr. Shkreli that the 24,046 returned shares could "go anywhere" although they would remain restricted.  (GX 546; *see* GX 543 (discussing plans for shares to go to Mr. Shkreli).)  Although the Retrophin shares used to satisfy Dr. Rosenwald were nominally owned by Mr. Biestek and Mr. Sullivan pursuant to their purchase agreements

with Troy Fearnow, the jury could have reasonably concluded that they had been misappropriated from Retrophin, because Retrophin paid for the Fearnow shares as part of the agreement to purchase the Desert Gateway shell.

Following the settlement agreement with Dr. Rosenwald, Mr. Shkreli and Mr. Greebel worked on securing settlement agreements with the other dissatisfied MSMB investors, regardless of whether the investors threatened litigation against Retrophin.[18]  Moreover, Mr. Greebel neither alerted the Retrophin Board or its auditors about any serious threats of litigation from MSMB investors. Nor did he disclose settlements that used Retrophin assets to resolve the obligations to MSMB entities and Mr. Shkreli until after the settlements had been executed and they were discovered in July 2013 by Marcum.  (GX 239 (July 3, 2013 Retrophin Board Documents with reference to "MSMB Settlement Agreements"); Tr. 1866-1867 , 5381-5382.)

---

[18] Mr. Greebel argues that "[a] lawyer should not be encouraged to wait as long as possible" before addressing litigation risks, and therefore that Mr. Greebel acted properly in seeking to settle potential claims against Retrophin even before specific litigation threats were made.  (Reply Mem. at 8.)  The court agrees that whether or not an investor actually threatened litigation against Retrophin would not be dispositive of Mr. Greebel's guilt.  As discussed in this section of this Memorandum and Order, however, the evidence of Mr. Greebel's conduct with regard to the settlement agreements was sufficient for the jury to find that Mr. Greebel and Mr. Shkreli used the settlement and consulting agreements not to head off potential litigation, but instead to protect Mr. Shkreli and the MSMB entities and to prevent disgruntled MSMB investors from alerting the authorities to possible irregularities at MSMB.

On February 22, 2013, Mr. Shkreli sent Mr. Greebel an email, titled "[S]arah [H]assan," and reading "[S]arah = same situation as lindsay[.] also fred hassan's daughter[.]" (GX 525.)[19]  Mr. Greebel responded, asking "I figured, how much do they want[?]"  (*Id.*)  On March 7, following their email discussion of how to best control the "escrowed" stock, Mr. Greebel wrote that "SH [*i.e.*, Sarah Hassan] wants 20[.]"  (GX 543.)  During this time period, of February through early March 2013, Ms. Hassan "understood there was no cash, so there was no point in requesting cash at that point."  (Tr. 1484:24-25, 1483:25-1485:3.)

In late March 2013, Mr. Shkreli agreed to a transaction in which Retrophin would buy back part of what he claimed was Ms. Hassan's stake in Retrophin for $300,000, in addition to $200,000 of stock.  (GX 101-25.)  On March 29, 2013, after Ms. Hassan asked if Mr. Shkreli was "still on target" for wiring her the $300,000, Mr. Shkreli responded "[u]nfortunately my lawyers think we should sign an agreement to document the transaction."  (GX 101-27.)  On April 3, 2013, Mr. Shkreli sent Ms. Hassan a "first draft" of the Settlement and Release

---

[19] Mr. Greebel suggests that based on this email, Mr. Greebel had reason to believe that, like Dr. Rosenwald, Ms. Hassan was threatening litigation and therefore that a settlement agreement was necessary to protect the company. (Mem. at 9.)  The jury could have instead reasonably construed this email to convey only that Ms. Hassan, like Dr. Rosenwald, was a dissatisfied investor seeking compensation.

agreement.  (GX 101-41.)  Mr. Greebel's draft agreement made
"[Shkreli,] the MSMB Entities, or Retrophin" responsible for
payment.  (*Id.* (brackets in the original).)  Ms. Hassan's
revisions to Mr. Greebel's draft, removed Retrophin as one of
the parties being released and made Mr. Shkreli or MSMB
responsible for payment.  (GX 563; GX 683.)  On April 17, 2013,
Mr. Greebel forwarded Mr. Shkreli Ms. Hassan's revisions  and
Mr. Shkreli responded to Mr. Greebel with a few "nits" –
instructing Mr. Greebel that the agreement should "contemplate
releasing any liability from Retrophin and that's one of the
reasons or benefits of the exchange" and "Retrophin will be
making the payment."  (*Id.*)  On April 19, 2013, Mr. Greebel sent
Ms. Hassan an edited Settlement and Release Agreement,
indicating the changes he had made to her draft.  (GX 101-34.)
Among the proposed changes were an edit to the "Payment Terms"
section of the document, removing "Shkreli or the MSMB Entities"
as the entities responsible for payment, and replacing them with
Retrophin, and adding Retrophin to the entities listed in the
"Release" section.  (*Id.*)  The proposed agreement, like the
final executed agreement, required Retrophin to pay Ms. Hassan
in cash, not Fearnow shares.  (*Id.*; *see* GX 52.)

Based on this series of documents, there was
sufficient evidence for the jury to conclude that Mr. Greebel
and Mr. Shkreli first conspired, in early March, covertly to

allocate a portion of the Fearnow shares – which should have instead been available for Retrophin's corporate purposes – to Ms. Hassan, just as they did for Dr. Rosenfeld. When Mr. Shkreli committed to wiring Ms. Hassan cash from Retrophin as compensation, the jury could find that Messrs. Shkreli and Greebel determined that a Settlement and Release agreement would provide a justification for causing Retrophin to satisfy Ms. Hassan's claims against Mr. Shkreli and MSMB Capital, despite the fact that Ms. Hassan had not threatened litigation against Mr. Shkreli, MSMB Capital or Retrophin. (Tr. 1504, 1519, 1627.) Mr. Shkreli's email telling Mr. Greebel to include Retrophin in the release provision is also evidence that the settlement agreements were not a product of Mr. Greebel's good-faith efforts to protect Retrophin in his capacity as outside counsel, as he needed to be reminded by Mr. Shkreli that the release was "one of the reasons or benefits for the exchange." (GX 563.)

Mr. Greebel knew that Mr. Shkreli personally had the ability to repay the MSMB investors because Mr. Shkreli had over 2 million restricted Retrophin shares at the time of the reverse merger in December 2012 and maintained his interest until January 2014. (GX 115-1.) Mr. Greebel was also aware that in early 2013, Mr. Shkreli had transferred cash from Retrophin to himself and MSMB. (GX 113-17.) Yet, Mr. Greebel helped Mr. Shkreli avoid personal responsibility for the settlement

agreements, despite the personal benefit Mr. Shkreli received from the release provisions.  On May 23, 2013, Michael Lavelle, an MSMB investor who did not testify, emailed Mr. Greebel, stating that "[i]f MSMB winds down and Retrophin does not have sufficient funds I do not want to be in a position where Retrophin does not pay, but that MS has the capacity."  (GX-590.)  Mr. Greebel forwarded Mr. Lavelle's email to Mr. Shkreli, explaining that "Lavelle wants the obligation to pay to be guaranteed by you personally" and stating that "I do not think this should be your personal obligation."  (*Id.*)  Mr. Shkreli agreed, writing "[y]eah just resist – that is nonsense[.]"  (*Id.*)  The final settlement agreement with Mr. Lavelle, executed by Mr. Shkreli on Retrophin's behalf on approximately June 7, 2013, did not include a provision making Mr. Shkreli personally liable in the event Retrophin was unable to make payment.  (GX 56, GX 56A.)

### 2.    The *"Control Memo"* and Indemnification Agreements

On May 31, 2013, Katten issued a letter to Marcum, as auditors of Retrophin, stating that from January 1, 2012 to May 31, 2013, the firm had not worked on any "material loss contingencies" relating to "overtly threatened or pending litigation."  (GX 124-2.)  On July 24, 2013, Mr. Greebel confirmed to Mr. Panoff that no "material litigation events" had

occurred since the last update to the 10-K.  (GX 124-3.)

Subsequently, a Marcum staffer alerted Sunil Jain, a Marcum

manager, that there was "significantly higher" variance, "in the

ballpark of about $2 million," between reporting periods.  (GX

114-25; Tr. 5380:23-5391:2 (testimony of Sunil Jain).)

Mr. Panoff told Mr. Jain that the variance was related to

settlement agreements.  (Tr. 5382:5-24)  Mr. Jain put together a

spreadsheet calculating the financial impact of the agreements

for Mr. Spielberg, Ms. Hassan, Mr. Kocher, Mr. Geller, and

Mr. Lavelle; the total "Settlement Amount" was $2,203,711.  (Tr.

5383:25-5384:19; GX 114-25.)  Mr. Jain was not aware of a

settlement with Dr. Rosenwald.  (Tr. 5384:20-5385:3.)

Marcum's view was that these settlement agreements

constituted "related party transactions," in which "MSMB was the

primary oblig[o]r or primary entity responsible" but "Retrophin

was paying on behalf of MSMB[.]"  (Tr. 5386:16-5387.)  Marcum's

engagement manager communicated in a conference call to

Retrophin's management that the company's financials would need

to be restated to address the settlement agreements; Mr. Greebel

was on the call.  (Tr. 5387:14-5389:12.)  On July 30, 2013, Mr.

Greebel edited draft disclosure language regarding the

settlement agreements which stated that Retrophin had entered

into settlement agreements "with certain shareholders of

[Retrophin]" who "disputed the value of Company shares they

received . . . following the consummation of the [reverse merger.]"  (GX 601.)

On August 19, 2013, Mr. Greebel prepared a draft memorandum (the "Control Memo") regarding "Certain Payments by Retrophin," which stated that "In April and May 2013, certain investors in funds affiliated with MSMB, advised MSMB that they objected to the number and/or value of the shares . . . that they received as distribution from such funds."  (GX 609-A.) Mr. Greebel's draft Control Memo did not disclose the use of Retrophin assets to placate MSMB investors who were dissatisfied that their requests to redeem their MSMB investments for cash were dishonored.  (See id.)  The draft Control Memo noted that "Retrophin determined that . . . [the settlement and consulting agreements] should be reclassified as obligations that should have been borne solely by MSMB and its related funds."  (*Id.*) Retrophin received promissory notes and indemnification agreements from MSMB for the Spielberg, Kocher, Hassan, Lavelle, and David Geller agreements, and Retrophin determined that "any future agreement that includes [Retrophin] and MSMB or any of its related funds [would] require the signature of the Chief Financial Officer of the Company," i.e. Retrophin  (*Id.*; *see* GX 612 (email from Mr. Greebel to Mr. Panoff attaching Notes and Indemnification Agreements).)

Although Mr. Greebel acknowledged in the draft Control Memo that the settlement agreements were "obligations that should have been borne solely by MSMB and its related funds," and knew that Mr. Shkreli personally benefitted from the agreements through their release provisions, Mr. Greebel never sought to have the MSMB entities or Mr. Shkreli pay for the settlement agreements, despite knowing that Mr. Shkreli would be able to do so. Instead, shortly after drafting the Control Memo, he described the "current thinking" to Mr. Shkreli as "let [Retrophin] pay, get a note from the fund and if the fund cant fulfill the note [Retrophin] will write it off as bad debt." (GX 618.) Mr. Greebel knew that MSMB would not "fulfill the note" and that Retrophin would have to "write it off as bad debt," because Retrophin had already decided to write off other MSMB expenses. Specifically, Retrophin had already "decided to write off $563,380 in Katten bills for services to MSMB but paid for by Retrophin" in June 2013 because company management was aware that MSMB would not be able to pay back the debt. (GX 114-16 (draft of letter by Sunil Jain, seeking Mr. Greebel's confirmation); Tr. 5371:7-5373:20 (testimony of Sunil Jain).) Nevertheless, in September 2013, Mr. Greebel proposed advising Marcum that "MSMB has advised us that it has received assurances from its managing member that it will have the resources to pay the obligations set forth in the notes and the indemnification

agreements.  MSMB advised us that the managing member provided
documentation demonstrating that it owns securities with an
estimated value in excess of $8 million."  (GX 627.)

In August 2013, as Mr. Greebel and Mr. Shkreli were
discussing Marcum's determination that the settlement agreements
had to be disclosed, Mr. Marshall repeatedly emailed Mr. Shkreli
and Mr. Greebel to "finalize the agreement" they made earlier in
the summer. (GX 611.)  Mr. Greebel emailed Mr. Shkreli regarding
Mr. Marshall on August 21, 2013, asking "[h]ow . . . to handle
given the new approach?"  (*Id.*; *see* GX 617 (discussing the
threshold of what size settlement would be "material" to the
company).)  Mr. Marshall's settlement agreement was then
presented in two agreements, both bearing a "Katten Draft
8/28/13" notation.  (GX 57-A.)  In one, between Mr. Marshall and
Retrophin alone, Mr. Marshall would be paid $300,000; in the
other, between Mr. Marshall and the MSMB entities and Mr.
Shkreli, Mr. Shkreli agreed to "deliver or cause to be
delivered" 6,300 Retrophin shares.  (GX 57A, 57B.)  Notably,
although the Control Memo drafted by Mr. Greebel provided that
any settlement agreement "that includes [Retrophin] and MSMB or
any of its related funds" would require the signature of
Retrophin's CFO, there was no such requirement for settlement
agreements that – like Schuyler Marshall's agreement for
$300,000 in cash – did not mention MSMB.  (GX 609-A.)

Based on the foregoing evidence, there was sufficient evidence for the jury to have determined that Mr. Greebel helped draft the settlement agreements not to serve and protect the interests of his client, Retrophin, but rather to help Mr. Shkreli avoid the scrutiny of a lawsuit or investigation into the MSMB entities. Based on the evidence, the jury could also reasonably have concluded that Mr. Greebel knew – despite his carefully-phrased representation to the contrary – that MSMB did not have $8 million in assets, and would be unable to "fulfill" the promissory notes and indemnification agreements created to satisfy Marcum, with the result that Retrophin would write off MSMB's obligations as bad debt. The jury could also reasonably conclude, based on the evidence, that Mr. Shkreli and Mr. Greebel structured the Schuyler Marshall settlement agreements to avoid alerting Marcum that they were using Retrophin money to pay for settlements with MSMB investors that, in Mr. Greebel's words "should have been borne solely by MSMB and its related funds." (GX 609-A.)

Evidence was presented from which the jury could find that Mr. Greebel and Mr. Shkreli agree to first hide, and then misrepresent the settlement agreements, their purpose, and the use of Retrophin assets. Not only did Mr. Greebel's Control Memo and the public filings he prepared misrepresent that the settlement agreements were merely accounting issues that arose

because MSMB investors were dissatisfied with the shares they received in their redemptions, but Mr. Greebel and Mr. Shkreli also misrepresented their plan that Mr. Shkreli's promissory note to repay Retrophin would not be honored and, instead, Mr. Greebel advised Mr. Shkreli that the note would be written off by Retrophin.  Thus, based on sufficient trial evidence of the wire fraud conspiracy concerning the settlement agreements, the court respectfully denies defendant's post-trial motion as to Count Seven.

### 3. Consulting agreements

At trial, the government presented evidence in further support of its Count Seven contentions that the Blanton and Alan Geller consulting agreements were "shams" intended to defraud Retrophin of shares.  Mr. Shkreli emailed Mr. Greebel, copying Alan Geller, an MSMB Healthcare investor,  regarding the "Geller Shares" on April 10, 2013, asking Mr. Greebel to "have the transfer agent issue" "an additional 31,500 [Retrophin] shares" to Alan Geller.  (GX 105-8.)  Mr. Greebel emailed Mr. Shkreli with draft language that he could send to Alan Geller, asking if Alan Geller would be "willing to sign a consultant agreement in connection with the issuance of the 31,500 shares to you" and explaining that "[i]t would be the quickest way to get the stock issued to you and satisfies any requests that the transfer agent may have."  (GX 560.)  Mr. Shkreli sent the email to Alan Geller

less than 2 minutes after Mr. Greebel sent him the draft. (GX 105-7.) Alan Geller responded by asking "[w]hat does that mean? and what are the ramifications of that?" (*Id*.) The jury could reasonably conclude from this sequence of emails that it was Mr. Greebel who proposed the consulting agreement not to benefit Retrophin through any legitimate consulting work, but rather as a means of creating a justification for Retrophin to issue stock to Alan Geller, which should have been approved by the board. (*See* Tr. 2566:24-2567:1 (Mr. Richardson's testimony that the board needed to approve shares issued by the company).) Notwithstanding the requirement that the board approve share issuance, the board never discussed or approved a consulting agreement for Alan Geller, contrary to Mr. Greebel's representations to Alan Geller. (GX 105-48; Tr. 1927:11-1931:10; Tr. 4430:24-4432:10.)

The jury could also conclude that Mr. Shkreli and Mr. Greebel used the Blanton consulting agreement to avoid scrutiny from the auditors. In November 2011, after Mr. Blanton requested a cash redemption of his $1.25 million MSMB Capital investment, he had difficulty obtaining information or his redemption from Mr. Shkreli. In February 2013 Mr. Blanton first received from Mr. Shkreli a certificate for 160,318 restricted Retrophin shares, which Mr. Blanton considered insufficient. In August 2013, Mr. Greebel sent Mr. Blanton an option agreement

modeled on the Alan Geller consulting agreement, in which Mr. Blanton would have an option to buy 100,000 shares from Mr. Shkreli in exchange. (GX 606., ) In early September, at Mr. Shkreli's request, Mr. Greebel sent Mr. Blanton a consulting agreement, although Mr. Blanton had not discussed serving as a consultant with either Mr. Shkreli or Mr. Greebel. (GX 103-44; GX 103-62; Tr. 3646:14-3652:18.) On October 16, 2013, after one of Mr. Blanton's associates called Mr. Greebel to tell him that Mr. Blanton did not want an option agreement or a consulting agreement, and wanted 100,000 shares of Retrophin stock. (GX 643.) Mr. Greebel told Mr. Shkreli that if the 100,000 shares were going to come "from the company it would need to be in a consulting agreement[.]" (*Id.*) Mr. Shkreli asked why they could not use a settlement agreement, and Mr. Greebel responded that "given Marcum's recent behavior they may require it to be disclosed in the financials. I was trying to prevent that issue[.]" (*Id.*) Shortly after Mr. Shkreli responded to Mr. Greebel that it did not "matter even if it is disclosed" but it was "preferable that it is not," Mr. Greebel sent Mr. Blanton a settlement agreement, which was never executed. (*Id.*) Ultimately, Mr. Blanton received another consulting agreement from Mr. Greebel, through which he received 200,000 shares from Retrophin. (GX 61.) From the foregoing sequence of events, established by the trial evidence, the jury reasonably could

conclude that, in furtherance of the wire fraud conspiracy charged in Count Seven, Mr. Greebel proposed using a consulting agreement to prevent disclosure of the agreement to Retrophin in Retrophin's financial statements, and not out of any belief that Mr. Blanton might actually provide consulting services to Retrophin. (GX 643.)

## B. Defense Arguments

Mr. Greebel's primary argument is that he believed that the settlement agreements were legitimate, because he believed Retrophin was vulnerable to lawsuits due to "significant commingling of assets between the MSMB Entities and Retrophin[.]" (Mem. at 8.) Mr. Greebel also lists the MSMB investors who received settlement agreements, arguing that each made threats that suggested that they might sue Retrophin.[20] (Mem. at 9-10.) With regard to the consulting agreements, Mr. Greebel argues that he reasonably believed that Alan Geller and Mr. Blanton were to provide consulting services, and that consulting agreements are frequently used in the industry to settle claims.[21] (Mem at 11-1

---

[20] In its motion, the defense mis-identifies Mr. Panoff as an "investor" in the MSMB entities. (Mem. at 9-10 (listing investors in the MSMB entities who "threatened" consequences including litigation).) Mr. Panoff was Retrophin's Chief Financial Officer, not an MSMB investor. Furthermore, Mr. Panoff did not write GX 621, the email defendant cites in his motion – Mr. Shkreli did.

[21] In support of this argument, defendant cites to the testimony of Alan Johnson, a defense expert witness who testified after the court reserved its ruling on defendant's Rule 29 motion. (Mem. 121.) The jury could reasonably have disregarded this testimony, however, as Mr. Johnson was not

The jury could reasonably find, based on the evidence, that Mr. Greebel conspired with Mr. Shkreli and Mr. Panoff to use the settlement and consulting agreements to defraud Retrophin, and that Mr. Greebel's actions were inconsistent with those of an attorney trying to prevent potentially damaging litigation. Indeed, based on the evidence, the jury could have concluded that it was the settlement and consulting agreements themselves which threatened Retrophin's survival, as by June 30, 2013. the company had committed over 20% of the cash it made through the PIPE transaction to compensate MSMB investors. (GX 114-25.)

As described above, Mr. Greebel and Mr. Shkreli discussed how to compensate Ms. Hassan and others with the Fearnow shares *before* discussing a settlement agreement involving cash compensation. (GX 541 (March 7, 2013 email from Mr. Greebel to Mr. Shkreli, noting that Sarah Hassan "wants 20" and that "[t]here is a remainder for you in there although not high if others want stock." The jury could reasonably infer that the settlement agreements were simply justifications for using Retrophin assets to settle claims with MSMB investors and to obtain releases for Mr. Shkreli.

---

familiar with the unique facts underlying the settlement agreements in this case – notably that Alan Geller and Mr. Blanton had never worked for Retrophin.

Through Mr. Greebel's actions, Retrophin entered into settlement agreements which provided Mr. Shkreli and the MSMB entities litigation releases and satisfied the MSMB investors so they would not contact the authorities, which could have led to discovery of the fraud at the MSMB funds. (*See* GX 599 (Mr. Greebel's email to Mr. Shkreli that David Geller's threat to "contact[] the SEC" "concerns [Mr. Greebel] given the other issue").)[22] Indeed, Mr. Greebel helped Mr. Shkreli benefit from the settlement and consulting agreements, at Retrophin's expense. When Dr. Rosenwald returned 24,046 Desert Gateway shares which were sent to him by Mr. Shkreli from MSMB in exchange for the 80,000 Fearnow shares, Mr. Greebel suggested that Mr. Shkreli take those shares. (GX 541 (in discussing how many Fearnow shares were available to Mr. Shkreli, noting that "[Mr. Shkreli] will also get the stock that MSMB previously gave [Lindsay Rosenwald]").) In addition, as discussed, when Mr. Lavelle proposed that Mr. Shkreli be personally liable for the

---

[22] The jury could reasonably conclude, based on all of the evidence at trial, that Mr. Greebel was aware of the frauds at MSMB, and that he acted to protect Mr. Shkreli to avoid losing a key client and substantial legal fees. (*See* GX 121-7 (Compensation Memo for the year ending January 31, 2014).) The government established that Mr. Greebel was the most highly compensated income partner at Katten during one year of the period charged in Counts Seven and Eight. As described above, numerous investors had reported concerns with their MSMB investments, Mr. Greebel himself knew that the MSMB funds were not able to pay for Katten's legal bills, and knew that MSMB Capital's interest in Retrophin was actually the result of backdated transfers, and not an actual investment by MSMB Capital.

settlement agreement, Mr. Greebel helped Mr. Shkreli avoid that liability.

Furthermore, at every step of the settlement and consulting agreement process, Mr. Greebel helped Mr. Shkreli conceal the effort to use Retrophin assets to pay off MSMB investors.[23] Mr. Greebel did not disclose the settlement agreements to the auditors when asked about material litigation contingencies, and did not provide the Retrophin board with "litigation updates" related to the settlements with MSMB investors. After the detection of the settlement agreements by Marcum caused the company to restate its financials, Mr. Greebel did not explain or defend the need for the settlement agreements to the board. Instead, he and Mr. Shkreli, aided by Mr. Panoff, structured the Marshall settlement so that it was not apparent that Retrophin's cash was being used to satisfy MSMB-related obligations.

With regard to the consulting agreements, as discussed above, the government presented sufficient evidence for the jury to conclude that Mr. Greebel knew that neither Alan Geller nor Mr. Blanton were going to serve or provide service as consultants to Retrophin, and that the Geller and Blanton consulting agreements were a means of causing Retrophin to issue

---

[23] As discussed with regard to defendant's Rule 33 motion, the jury could also conclude that Mr. Panoff conspired with Mr. Shkreli and Mr. Greebel to defraud Retrophin.

stock. Mr. Greebel did not circulate the board minutes after meetings despite requests from Mr. Richardson and Mr. Aselage, and when Mr. Greebel did ultimately circulate those minutes, they did not consider the minutes to be accurate. (Tr. 1965:10-1968:17; Tr. 4456:3-4487:8) The board therefore could not easily discover that Mr. Greebel and Mr. Shkreli had caused the company to issue stock to Alan Geller and Mr. Blanton without the required board approval. As discussed with regard to defendant's Rule 33 motion, below, Mr. Panoff, who knew about the settlement and consulting agreements, helped Mr. Shkreli and Mr. Greebel keep the board in the dark.

With regard to the purported litigation risk posed by MSMB investors, Mr. Greebel did not impose a litigation hold or take any other action to prepare for what he purportedly perceived to be threatened litigation. And Mr. Greebel – who was a transactional attorney and not a litigator – did not seek to involve the firm's litigators in the resolution of the purported threats against Retrophin or the drafting of the settlement or consulting agreements.[24] Of course, as

_____

[24] There is no evidence in the record that Mr. Greeble disclosed the settlement or consulting agreements to his partners, Howard Jacobs or Howard Cotton, who were working on Retrophin and MSMB matters. (Tr. 8345, 8964.) Michael Rosensaft, a Katten partner, became aware of Mr. Shkreli's dispute with Mr. Blanton in August 2013, however, he did not draft the Blanton consulting agreement. (Tr. 8682-8692, 8730-8731; DX 7917.) However, Mr. Rosensaft testified that it was his understanding that Mr. Shkreli was going to give Mr. Blanton Mr. Shkreli's own Retrophin shares to resolve the dispute. (Tr. 8731; DX 7917.) Mr. Rosensaft also testified that he conveyed to Mr. Greebel and Mr. Shkreli that Mr. Blanton "needed to be

Mr. Greebel's counsel noted at oral argument, an attorney's negligence or failure to "get the best deal" for a client is not sufficient to prove guilt of a conspiracy to commit wire fraud. The jury could have reasonably concluded, however, that in light of all of the evidence, Mr. Greebel's actions and omissions were inconsistent with innocence and were further circumstantial evidence of his culpable state of mind.

Based on the foregoing sufficient evidence, the jury reasonably concluded that Mr. Greebel conspired with Mr. Shkreli and Mr. Panoff to commit wire fraud, as charged in Count Seven, by causing Retrophin to enter into the settlement and consulting agreements, with the specific intent of defrauding Retrophin of shares and funds in order to pay off and silence MSMB investors and to protect Mr. Shkreli.

## III. Rule 33

Mr. Greebel moves, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. Several of Mr. Greebel's arguments in support of his motion merely resurrect issues already presented to and decided by the court. To the extent Mr. Greebel simply retreads old ground, the court incorporates the reasoning articulated in its prior written and oral rulings on these issues. In deciding the defendant's Rule

---

actually consulting for Retrophin" and "be providing actual services to the company." (Tr. 8731.)

33 motion, the court must determine if a manifest injustice would result from allowing Mr. Greebel's guilty verdict to stand. *United States v. James*, 712 F.3d 79, 107 (2d Cir 2013) (citations omitted). Again, as in a Rule 29 motion, the court must defer to the jury's determinations as to the weight of the evidence and the credibility of the witnesses, and must exercise its "Rule 33 authority sparingly and in the most extraordinary circumstance." *U.S. v. Ferguson,* 46 F.3d 129-134 *(*2d Cir. 2001) (internal quotation marks and citations omitted).

## A. The Court's Jury Instructions

### 1. *Alter Ego and Veil-Piercing*

The defense requested that the court instruct the jury on alter-ego and veil-piercing liability, arguing that MSMB investors might have sought to use these theories to hold Retrophin liable for Mr. Shkreli's conduct at MSMB, and that Mr. Greebel, as a lawyer, "knew that sloppy bookkeeping; mixed bank accounts and 'comingled monies'. . . overlapping employees, management, and decision makers; share office space . . . and other factors exposed Retrophin to liability for MSMB's actions."[25]  (Mem. at 32; Tr. 8809:12-16.)  The court initially declined to instruct the jury on those legal theories, and at the charging conference, noted that the defendant's proposed

---

[25] Counsel's statements about what their client knew or did not know are not evidence.

instructions could lead to jury confusion.  Tr. 8812:13-

8814:29.)  The court noted the lack of trial evidence that Mr.

Greebel considered veil piercing and alter ego theories when he

structured the settlement agreements to mollify MSMB investors

with Retrophin assets.  (Tr. 8812:113-8814:24.)  Defense counsel

asked to consider the issue and to discuss it with defendant

over the following weekend.  (Tr. 8813:12-24; 8814:12-15;

8815:4-9.)

On April 9, 2018, in his post-trial submissions, Mr.

Greebel filed additional briefing enumerating the trial evidence

that MSMB and Retrophin assets were commingled.[26]  (ECF No. 588.)

The court concludes that defendant's proposed instructions were

improper, that the trial record lacked evidence of Mr. Greebel's

state of mind regarding counsel's proffered alter-ego and veil

piercing theories, that defendant's proposed change would have

led to significant jury confusion, and that, in any event,

defendant waived his challenge to the court's decision not to

give the requested instruction.  If a requested instruction is

---

[26] As in the Rule 33 submission, defense counsel lists numerous examples of
MSMB's commingling of assets with Retrophin.  The court's request for record
citations, however, was far more limited: the court requested "specific
evidence that Mr. Greebel *considered* veil piercing and *alter ego*."  (Tr.
April 13, 2018 Tr. 75:13-22 (emphasis added); *see* Tr. 8813:12-25 (In
response to counsel's assertion that commingling was "definitely part of Mr.
Greebel's state of mind in 2013," the court explaining that "[t]he key that
you are missing is that there isn't evidence about what was in Mr. Greebel's
head about what is clear.")  Evidence that MSMB and Retrophin assets were
commingled is not evidence that Mr. Greebel believed that Retrophin was
vulnerable to suit through an alter ego or veil piercing theory.

not legally correct and is unsupported by the evidentiary record, as the court found here, the court should not give the instruction. *See United States v. Coplan*, 703 F.3d 46, 87 (2d Cir. 2012).

As the court noted at the charging conference, the pertinent issue for the jury's determination was a question of fact regarding *what Mr. Greebel knew or believed* about MSMB investor litigation threats against Retrophin. (Tr. 8811:16-8812:3.) The court did not preclude Mr. Greebel from introducing evidence of his state of mind or his beliefs, such as the Katten time record from July 15, 2013 billing for "confer[ring] with E. Greebel re: alter ego allegations" and a related Katten invoice from August 23, 2013.[27] (ECF No. 588 at 4 (citing GX 844).) Neither of these exhibits, however, indicate any relation to the MSMB settlements which had, for the most part, already been finalized by the dates on the exhibits. Nor did the court preclude Mr. Greebel from calling an expert witness regarding the concepts of alter ego liability and veil piercing. In fact, defense counsel noticed an expert witness named Gayle Klein to address those concepts, (Tr. at 7652:10-7660:10, 8309:18-8323:25), but then decided not to call her. Mr. Greebel's counsel's arguments regarding what he knew or

---

[27] Notably, most of the settlement agreements were executed *prior* to July 15, 2013; there is also no evidence that this time record related to Retrophin's alter ego liability from the settling MSMB investors.

believed about alter ego and veil piercing are just that: arguments by counsel that may be appropriate for summation but not for jury charges on the law.

Further, instructing the jury on alter ego and veil piercing would have risked significant jury confusion, because there was no evidence in the record at trial regarding Mr. Greebel's belief in the viability of a potential alter ego or veil-piercing litigation strategy.[28]  Instead, the jury was tasked with making a factual finding regarding Mr. Greebel's intent to conspire to commit wire fraud.  As the court instructed the jury, "if . . . Mr. Greebel believed, in good faith, that he was acting properly, even if he was mistaken in that belief . . . there would be no crime."  (Tr. 10919:10-13.)  Thus, if the trial record contained evidence – and it did not – that Mr. Greebel subjectively believed that MSMB investors would use an alter-ego or veil-piercing litigation strategy to reach Retrophin assets, and that settlement was a better outcome, evidence of that belief would have supported a good-faith

---

[28]    Even if the record at trial did include evidence that Mr. Greebel had considered, knew of, or believed that Retrophin was vulnerable under a veil-piercing or alter ego litigation theory, before he engineered the settlement agreements and consulting agreements, a jury instruction about a legal theory that Mr. Greebel may or may not have been considering in relation to the MSMB settlements and consulting agreements would have improperly supplanted trial evidence on a question of fact.  Instructing the jury on veil-piercing and alter ego law in the abstract would have improperly suggested, with no basis in the evidentiary record, that Mr. Greebel was aware of that law, correctly understood that law, and sought to apply it to the factual situations at issue in the case.

defense to Count Seven *even if his beliefs about Retrophin's vulnerability to an alter-ego or veil-piercing litigation strategy were incorrect*.  Furthermore, such an instruction could have led the jury to improperly consider whether or not Retrophin was objectively vulnerable to a veil-piercing or alter ego litigation theory, rather than consider Mr. Greebel's subjective beliefs and state of mind as to the specific theories.

Additionally, defendant himself waived the issue of an alter ego and veil-piercing jury charge.  After the court noted its concerns about the risk of jury confusion and lack of evidence, defendant's counsel represented that Mr. Greebel "has heard [the court's concerns] and would like to think about it" and that Mr. Greebel and his counsel would discuss the issue over the weekend following the initial charging conference. (Tr. 8814:12-8815:9.)  Defendant did not re-raise the issue or clearly request the charge after the court published revised draft jury instructions and heard additional argument at a continued charging conference on December 12, 2017.  (*See* Draft Jury Instructions, ECF No. 485; Transcript of December 12, 2018.)  Counsel now states that they "feel the Court had rejected our request and [] decided not to raise it again." (ECF No. 588 at 6.)  At the time, defendant and defense counsel had stated that they would discuss the court's concern about

jury confusion, and could have attempted to renew and further support the request for an alter ego and veil-piercing instruction at the subsequent conference. Defendant did not do so.

2. *Request for a* Rodriguez *Jury Instruction*

After Mr. Shkreli was acquitted at his trial on Count Seven by jury verdict, Mr. Greebel moved the court to dismiss Count Seven, citing *United States v. Rodriguez*, 983 F.2d 455 (2d Cir. 1993) for the proposition that "inconsistent conspiracy verdicts are prohibited where there is no probative evidence demonstrating beyond a reasonable doubt that the defendant conspired with anyone else to commit the crime." (ECF No. 327 at 10.) Defendant now argues that, consistent with the approach the Second Circuit approved in *Rodriguez*, the court should have instructed the jury "that Mr. Shkreli . . . was acquitted of the very same charges," and should also have instructed the jury that "it could not consider" Mr. Shkreli as a possible co-conspirator of Mr. Greebel's for the purposes of Count Seven. (Mem. at 34.)

This argument is not persuasive, for reasons discussed in the court's previous order denying Mr. Greebel's motion to dismiss Count Seven. As the court explained, in *Rodriguez*, it was Judge Nickerson, not a jury, who had concluded that there was insufficient evidence against Rodriguez's alleged co-

conspirator, Maria Taveras. (Order, ECF No. 402 at 5-6.) This distinction was critical on appeal, where the Second Circuit acknowledged "the Supreme Court's admonition in *United States v. Powell*, 469 U.S. 57 (1984), that a jury acquittal cannot necessarily be equated with a finding that the Government failed to prove guilt beyond a reasonable doubt," but noted that "[c]ourts have been less tolerant . . . of inconsistent *judicial* determinations." *Rodriguez*, 983 F.2d at 459 (citations omitted) (emphasis in the original). Because Judge Nickerson, and not a jury, had determined that the government had failed to submit sufficient trial evidence with regard to Ms. Rodriguez's alleged co-conspirator Ms. Taveras, the jury was properly charged not to consider Ms. Taveras as a co-conspirator. *Id.* In *United States v. Shkreli*, a jury, not the court, acquitted Mr. Shkreli of the conspiracy charged in Count Seven, and "one defendant's conspiracy conviction does not become infirm by reason of jury verdicts of not guilty against all of his alleged coconspirators." *United States v. Acosta*, 17 F.3d 538, 545 (2d Cir. 1994) (citing, *inter alia*, *Powell*, 469 U.S. at 67).

Furthermore, the court is aware of no legal authority – and defendant cites none – that would permit the court to instruct the *United States v. Greebel* jury about the jury verdict in *United States v. Shkreli*. Such an instruction would have injected irrelevant and unfairly prejudicial issues into

Mr. Greebel's trial, such as the nature of the evidence presented to the *Shkreli* jury and the jury's verdict that Mr. Shkreli was guilty of the conspiracy charged in Count Eight, for which Mr. Greebel was also charged. The *Greebel* jury was presented with additional evidence, which the jury found persuasive, regarding the conduct of Mr. Greebel, Mr. Shkreli, and others relevant to, and in furtherance of, the conspiracy charged in Count Seven. Moreover, the jury in *United States v. Greebel*, like the jury in *Shkreli*, was properly instructed to consider the evidence introduced against Mr. Greebel at each defendant's own that trial, and only that evidence.

### B. Alleged *Brady* and *Giglio* Violations

Under *Brady v. Maryland,* 373 U.S. 83 (1963),"[t]he prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citing *Brady,* 373 U.S. at 87.) "This duty covers not only exculpatory material, but also information that could be used to impeach a key government witness." *Id*. (citing *See Giglio v. United States,* 405 U.S. 150, 154 (1972). However, this obligation only extends to material that, if not disclosed, "would deprive the defendant of a fair trial." *Id*. (citing *United States v. Bagley,* 473 U.S. 667, 675 (1985). In the

context of *Brady,* a defendant is deprived of a fair trial only where there is a reasonable probability that the government's suppression affected the outcome of the case, *see id.* at 682, or where the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Kyles v. Whitley,* 514 U.S. 419, 435 (1995).

The government must disclose all *Brady* and *Giglio* material "in time for its effective use at trial." *Id.* (citing *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001). The required timing for disclosure depends on the materiality of the evidence and the circumstances of each case. Accordingly, because the Second Circuit has "declined to specify a precise meaning for the phrase 'in time for effective use' . . . a district court has the discretion to order *Brady/Giglio* disclosure at any time as a matter of sound case management." *United States v. Taylor,* No. 10-CR-268 (DLI), 2014 WL 1653194, at *10 (E.D.N.Y. Apr.24, 2014) (citing *United States v. Nogbou,* No. 07-CR-814 (JFK), 2007 WL 4165683, at *3-4 (S.D.N.Y. Nov. 19, 2007), *appeal filed sub nom. United States v. Yelverton*, 16-4088 (2d Cir. Dec. 6, 2016); *United States v. Giffen,* 379 F. Supp.2d 337, 347 (S.D.N.Y. 2004)), *appeal dismissed on other grounds*, 473 F.3d 30 (2d Cir. 2006).

Mr. Greebel's motion alleges generally that "[t]he government's pattern and practice of *Brady* and *Giglio* violations resulted in an unfair trial." (See ECF No. 530 at 37.) As the Court previously explained in its 12/16/2016 Memorandum and Order, ECF No. 138, Brady requires that:

> To the extent that the prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant. . . . Information coming within the scope of this principle . . . includes not only evidence that is exculpatory, *i.e.*, going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.*, having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.

*United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (citing *Kyles v. Whitley*, 514 U.S. 419, 431(1995); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States,* 405 U.S. 150, 154-55 (1972); *Napue v. Illinois,* 360 U.S. 264, 269 (1959)). The prosecution has a "due process obligation to disclose" both exculpatory and impeachment evidence. *United States v. Shkreli*, No. 15-CR-637, 2016 WL 8711065 at *2 (E.D.N.Y. Dec. 16, 2016) (citing *Ranta v. Bennett*, 189 Fed. App'x 54, 56(2d Cir. 2006) (summary order)). However, with regards to *Giglio* material, "[t]here is no pretrial right to

*Giglio* material, which specifically concerns impeachment." *Id.*
at *23 (E.D.N.Y. Dec. 16, 2016).

    To collaterally challenge a conviction based on a
Brady violation, the *defendant* must show: [1.] "[t]he evidence
at issue [is] favorable to the accused, either because it is
exculpatory, or because it is impeaching; [2.] that evidence
must have been suppressed by the State, either willfully or
inadvertently; and [3.] prejudice must have ensued." *United
States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004) (citing
*Strickler v. Greene,* 527 U.S. 263, 281-282 (1999)). Further
the evidence at issue must have been "material": and "there is
a reasonable probability that, had the evidence been disclosed
to the defense, the result of the proceeding would have been
different. A 'reasonable probability' is a probability
sufficient to undermine confidence in the outcome." *United
States v. Bagley*, 473 U.S. 667, 682 (1985).

    The court notes that, as to each of the alleged *Brady*
and *Giglio* violations listed below, defendant has failed to
identify the sort of prejudice that might require a new trial.
Instead, for each witness, the alleged exculpatory or
impeachment material was known to the defendant in sufficient
time for use during cross-examination. For each witness, except

for Dr. Rosenwald,[29] the jury was able to incorporate the information that was presented in weighing the credibility of the witness and the proof against Mr. Greebel. Thus, even if Mr. Greebel had shown that the government violated its *Brady* or *Giglio* obligations – and the court concludes that he has not – there would be no grounds for a new trial. *United States v. Rittweger*, 524 F.3d 171, 182 (2d Cir. 2008) (finding that where government disclosed exculpatory material in time for it to be admitted as evidence at trial, there was no Brady violation, even if the government could have disclosed the Brady material in a "more timely fashion," as, "there was no reasonable probability that [the] delay affected the outcome of the case.")

### 1. Bernadette Davida

As discussed above, *see* supra. at 42, Ms. Davida testified on cross-examination that she "never observed Mr. Greebel doing anything wrong for any client at Katten" and that, based on what she knew, she had never observed Mr. Greebel deceiving any client. (Tr. 1238:17-1241:12.) She also confirmed that she told these "positive things" to the

---

[29] As discussed below, the defense itself determined that unproven allegations of misconduct against Dr. Rosenwald were irrelevant, and, "although this Giglio material would ordinarily be appropriate to use to challenge the witness's credibility or veracity, we do not expect this witness to have any direct testimony of relevance to this case, based on his prior testimony in the Shkreli trial and his Section 3500 material produced by the government here. We therefore have no present intention to use any of this information at this trial." (Greebel's October 29, 2017 Letter (ECF No. 432 at 1.) The defense now argues, inexplicably, that this information is *Brady* or *Giglio* material.

prosecution team.  (Tr. 1269:6-16.)  The defendant notes that "none of this information was reflected in Ms. Davida's 3500 material or in correspondence from the government," and argues that Ms. Davida's lack of observations "should have been disclosed under *Brady* and its progeny."  (Mem. 38.)

Ms. Davida's statements are not "exculpatory" as defined by *Brady*.  First, Ms. Davida did not work at all on Katten's representation of Retrophin; indeed, as the defense elicited on cross examination, she did not know that Retrophin and MSMB Capital had the same management.  (*See* Tr. 1249:24-1250:2; Tr. 1246:4-9 (on cross examination, testifying that she did not "handl[e] anything related to" Katten's first matter with Retrophin and that it was "nice" of Mr. Greebel to give her some credit for the relationship).)  Although Ms. Davida, a real estate partner, worked on MSMB matters briefly with Mr. Greebel, and was the originating partner for MSMB's relationship with Katten, her involvement in corporate transactional work was limited, and she testified that Mr. Greebel did most of the work.  (Tr. 1212:9-1213:11 (testifying, *inter alia*, that she "initially reviewed some press releases and things like that to see if there was anything related to real estate" and "specifically worked on [MSMB's] lease" for office space).)

Second, Ms. Davida left Katten in June 2012, before the reverse merger and the period that Mr. Greebel and

Mr. Shkreli conspired regarding either the Fearnow shares or the settlement and consulting agreements as charged in counts Eight and Seven. (Tr. 1241:13-14.) Third, as discussed above with regard to Mr. Greebel's Rule 29 motion, one of the aspects of the conspiracies charged in Counts Seven and Eight were Mr. Greebel's and Mr. Shkreli's efforts to conceal their fraudulent conduct, not only from Retrophin but also from Mr. Greebel's associates and partners at Katten. At most, then, Ms. Davida's statement that she did not observe Mr. Greebel deceiving a client is evidence of her lack of observation, but is not exculpatory as to the charged conduct.

Ms. Davida's statements about Mr. Greebel's unremarkable conduct, based on her limited observations of his work while she was at Katten, were not "material evidence" "going to the heart of the defendant's guilt or innocence" *United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998), and defendant has not explained, because he cannot, how earlier disclosure of Ms. Davida's lack of observation would have "create[d] a reasonable probability of altering the outcome" of the trial, *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001).

### 2. Testimony of Corey Massella

As discussed above, Mr. Massella worked at Citrin Cooperman, a firm founded by Niles Citrin, Mr. Greebel's father-

in-law.  At trial, the defense elicited from Mr. Massella that, while a partner at Citrin Cooperman, he had made a $200,000 loan to a Citrin Cooperman client, and that the client had not paid Mr. Massella back.  (Tr. 4197:13-4203:13.)  Mr. Massella sued the client.  When Citrin Cooperman learned of this loan, they entered into an exit agreement with Mr. Massella, which included a confidentiality provision.  (*Id.*)  Mr. Greebel asserts that the prosecution team was aware of at least some of this information, but failed to disclose it in the 3500 materials and further asserts that the evidence provides a basis to argue that Mr. Masella is biased against Mr. Greebel, Mr. Greebel's father-in-law, Mr. Citrin, and his accounting firm, Citrin Cooperman.

First, defendant's portrayal of Mr. Massella's separation from the Citrin firm was presented through arguments of counsel and is not supported by the record.  Defendant argues that Mr. Massella "intentionally misled his employer," and refers to Mr. Massella's "attempts to deceive his employer." (Mem. at 39.)  Mr. Massella's testimony at trial, however, was that he "had a settlement agreement" and "was not forced out,"[30] and that he was "not required" to notify the Citrin partnership of his loan to the client.  (Tr. 3403:7-18.)  Although the

---

[30] When later asked "[w]ere you forced to leave as a result of the situation with the money and the client of the firm," Mr. Massella again responded "There was a settlement agreement and we came upon a settlement that I would leave, yes."  (Tr. 3407:2-5.)

defense may disagree with Mr. Massella's characterization of his separation from Citrin Cooperman, this factual disagreement is unrelated to the government's disclosure obligations.[31]  The parties had a full opportunity to argue about the weight of this evidence in their summations.

Second, although Mr. Greebel's counsel cross-examined Mr. Massella at length regarding the substance of his disclosures to the prosecution, the court respectfully disagrees with the defense's assertion that "it became clear during the cross-examination . . . that [Mr. Massella] had informed the government about the circumstances of his departure from Citrin Cooperman . . . ."  (Mem. at 39.)  Mr. Massella's testimony is not clear as to when he discussed his departure from Citrin Cooperman with the government.  (*See* Tr. 4194:12-4206:3.) During cross-examination, counsel for Mr. Greebel did not clearly distinguish between conversations between the prosecution team and Mr. Massella that took place before trial, and those that took place during trial when Mr. Massella was extensively cross-examined by defense counsel on the circumstances of his departure from Citrin.  (*See id.*)  It is

---

[31] As defendant's counsel acknowledged, "[Mr. Massella] is obviously the source of the Government's information about what happened," asserting that Mr. Massella's version of events was "clearly not the truth."  (Tr. 3387:6-8.)  After further cross examination, counsel for Mr. Greebel confirmed that Mr. Massella gave the prosecution "limited information about the circumstances of [his] departure from Citrin Cooperman."  (Tr. 4195:6-9.)

therefore unclear what information, if any, Mr. Massella provided the government prior to trial.

Furthermore, as at trial, defendant appeared to have more information about the separation between Mr. Massella and Citrin Cooperman than the government or Mr. Massella himself.[32] (*Compare* Tr. 3385:2-7 (counsel for Mr. Greebel stating that "Niles Citrin, among other people . . . made a decision that [Mr. Massella] had to leave as a result of his misconduct."); 3390:12-13 (counsel for Mr. Greebel stating that "Mr. Citrin, along with other partners of Citrin Cooperman, made a decision to fire him.") *with* Tr. 3407:9-14 (Mr. Brodsky: "There was a vote, sir, to require you to leave the firm, correct?" Mr. Massella: "I don't know." (objection and ruling omitted).) Thus, even if the court were to find that the government should have disclosed more information than it did – and the court does not so find because there is no evidence that the government had more information – there was no *Brady* violation. *See Turner v. United States*, 137 S. Ct. 1885, 1895 (2017) (holding that a Brady violation does not exist where the jury is already made aware of information that petitioner cites as improperly

---

[32] The government suggests that Mr. Greebel obtained far more detailed information regarding Mr. Massella's departure from Niles Citrin in violation of the confidentiality clause in Mr. Massella's exit agreement, however, defense counsel refused to reveal the source of his information. The court need not address the source of defendant's information; regardless of source, defendant cannot show that *the government* withheld impeachment material by reference to extrinsic evidence that was not in the government's possession.

withheld).  Mr. Greebel had a full opportunity to examine Mr. Massella regarding his separation from Citrin Cooperman and the circumstances of the loan to the Citrin client.  Mr. Greebel was also never precluded from probing Mr. Massella's alleged bias against Mr. Greebel.  (Tr. 3402:5-7.)  Thus, the jury was able to weigh Mr. Massella's credibility and to determine whether or not his separation from Citrin Cooperman resulted in bias towards Mr. Greebel or otherwise affected his ability to fairly and adequately perform his work on Retrophin.

Finally, to the extent Mr. Massella's testimony implicated Mr. Greebel, that testimony was corroborated by members of Mr. Massella's team, and Jackson Su, who worked at MSMB and Retrophin during most of the relevant period and who testified regarding Katten's legal bills, the recharacterization of the $900,000 MSMB Healthcare investment into Retrophin, the backdated transfers between Mr. Fernandez, Mr. Biestek, Mr. Mulleady, and Mr. Shkreli, and the proposal by Mr. Shkreli to select recipients of Fearnow shares.  Mr. Massella's testimony was further corroborated by documentary evidence.

### 3.    *Mr. Pierotti's Non-Prosecution Agreement*

Prior to working for MSMB Consumer, Mr. Pierotti worked for Raj Rajaratnam at the Galleon Group.  In connection with the investigation of Galleon and trial of Mr. Rajaratnam, by the U.S. Attorney's Office of the Southern District of New

York, , Mr. Pierotti was interviewed by the FBI and Southern District of New York prosecutors, including Mr. Greebel's defense counsel, Reed Brosdky, who was then a prosecutor in that district.  Mr. Pierotti signed a non-prosecution agreement, in connection with his work at the Galleon Group, a hedge fund. Mr. Brodsky, Mr. Greebel's counsel, was a member of the prosecution team investigating Raj Rajaratnam, and was involved in the office's non-prosecution agreement with Mr. Pierotti.

The court respectfully disagrees with defendant's characterization that "the government's conduct with respect to Timothy Pierotti's prior statements to the United States Attorney's Office for the Southern District of New York . . . raises grave concerns regarding the government's compliance with its *Brady* and *Giglio* obligations."[33]  (Mem. at 40.)  The government explained that it advised Mr. Greebel's counsel in July 2017, more than a year before trial, that Mr. Pierotti had entered into a non-prosecution agreement with the Southern District of New York, and that neither Mr. Pierotti nor the Southern District of New York could locate a signed copy of Mr. Pierotti's non-prosecution agreement.  (Tr. 5825-5826.) The government also provided detailed information regarding its efforts to locate Mr. Pierotti's executed non-prosecution

---

[33] As the government notes, Mr. Brodsky, lead counsel for Mr. Greebel, was a federal prosecutor present when Mr. Pierotti made certain of those statements.

agreement.  After the court ordered the government to produce

Mr. Pierotti's Section 3500 materials to the defense, the

government obtained from the Southern District of New York and

produced an unsigned version of Mr. Pierotti's non-prosecution

agreement with the Southern District, as well as Mr. Pierotti's

statements to the FBI in connection with the Galleon

investigation.

Defendant has failed to explain how Mr. Pierotti's

statements qualify as either *Brady* or *Giglio* material.  The

disputed materials were unrelated to the Eastern District

prosecution of Mr. Greebel, were not in the possession of

Eastern District prosecutors, and were not exculpatory.  Mr.

Pierotti's testimony at trial was consistent with his statements

to the Southern District prosecutors.  Mr. Pierotti has stated

that, while at Galleon, he did trade on non-public information

about the Smuckers company, but that the information was not

material.

Furthermore, defendant has not explained how any

government failure to disclose Mr. Pierotti's statements – of

which this defense team was uniquely aware long before Mr.

Greebel's trial, given Mr. Brodsky's role as a prosecutor in the

*Rajaratnam* investigation and trial – should give rise to a new

trial for Mr. Greebel.  Mr. Greebel fully utilized the materials

to cross-examine Mr. Pierotti.  Vague assertions that the

government has failed to comply with its "*Brady* and *Giglio*" are insufficient to support a motion for a new trial.

### 4.    *Dr. Rosenfeld*

The defense argues that the government failed to disclose that an Eastern District of New York prosecutor allegedly contacted Dr. Steven Rosenfeld, a defense witness, during the government's investigation, in order to "pressure [Dr. Rosenfeld] to (i) recant his story regarding the legitimate consulting services [Dr. Rosenfeld] provided to Retrophin; (ii) drop his pending arbitration against Retrophin relating to unpaid fees for those services; and (iii) pay Retrophin $170,000."  (Mem. at 41.)  The defense also argues that the government failed to disclose that, in light of this alleged encounter, Dr. Rosenfeld steadfastly insisted that he "performed legitimate consulting services" for Retrophin.  (*Id.*)  The "government adamantly denies" that a prosecutor impermissibly contacted Dr. Rosenfeld, and asserts that it is not required to provide disclosure of a conversation that did not occur  (Gov. Mem. at 68.)  The court has no basis to believe that an Eastern District prosecutor would imperil a case by directly contacting a represented witness and demanding that the witness recant his story.

Furthermore, the defense cannot, and does not, explain how this alleged conversation would be relevant, let alone

material, to Mr. Greebel's defense.  Even if this alleged

conversation between Dr. Rosenfeld and the AUSA did occur, it is

reflective of misconduct on the part of the unnamed prosecutor,

but has no relevance to Mr. Greebel's actions in relation to

Retrophin during the period charged in Count Seven.

In *United States v. Malpeso*, the defendant discovered

alleged misconduct on the part of an FBI squad member tasked

with investigating the defendant.  *United States v. Malpeso*, 115

F.3d 155, 162 (2d Cir. 1997).  The defendant sought to admit

information regarding the potential FBI misconduct, and the

government moved *in limine* to preclude defendants from

suggesting information or eliciting testimony related to the

misconduct.  *Id.*  The district court found that the evidence was

not relevant, and even if it was, the risk of prejudice

outweighed any possible relevance.  *Id.*  The Second Circuit

affirmed, stating, "[t]he likely (and presumably intended)

effect of admitting evidence of the [FBI misconduct] issue would

have been to shift the focus away from the relevant evidence of

the defendants' wrongdoing to the tangentially related misdeeds

of one government agent."  *Id*. at 163.

Finally, although the government was initially unaware

of an alleged improper conversation and later "adamantly" denied

that an improper conversation occurred between an AUSA and Dr.

Rosenfeld, Mr. Greebel's defense team was clearly aware of this

alleged conversation, and as such there is no *Brady* or *Giglio*
violation. The government produced 3500 material regarding Dr.
Rosenfeld well before the trial of Mr. Shkreli, which commenced
in June 2017, and Mr. Greebel's trial which commenced in October
2017. That material disclosed that Dr. Rosenfeld consistently
maintained that he had provided legitimate consulting services
to Retrophin. (Mem. 41-42; Gov. Mem. At 71-73.) For example,
Mr. Greebel's team was well aware that Dr. Rosenfeld had engaged
in, and ultimately prevailed at, an arbitration against
Retrophin in which one of the issues was the legitimacy of the
consulting services. Indeed, the defense moved *in limine* to
admit evidence of that arbitration, and the court granted the
motion in part. (*See* ECF No. 330, Motion in Limine to Admit the
Steven Rosenfeld Arbitration and the Thomas Koestler
Arbitration; October 6, 2017 Text Only Docket Entry ("The court
granted in part and denied in part Mr. Greebel's motion and the
government's cross-motion regarding the Rosenfeld and Koestler
arbitrations.") The Rosenfeld allegation regarding an unnamed
prosecutor was irrelevant and prejudicial and therefore excluded
pursuant to F.R.E. 401 and 403. Consequently, Mr. Greebel was
not prejudiced by what he now asserts is the government's
failure to comply with its disclosure obligations to disclose
alleged information about which the government was unaware, and,

when it became aware in the middle of trial, adamantly denied it ever occurred.

### 5. Dr. Rosenwald

Defendant asserts that the government did not timely disclose information relating to allegations of misconduct against government witness Dr. Lindsay Rosenwald. (Mem. at 41.) Defendant presents *no* basis for how evidence of such allegations would have been admissible against Dr. Rosenwald under Federal Rule of Evidence 608(b) or 403. Indeed, when the government notified the defense of this evidence, it indicated that it planned to move to exclude the evidence under Rule 608(b) and Rule 403. (Government's Motion to Exclude Cross-Examination about Certain Limited Topics (ECF No. 423).) In response to the government motion seeking to preclude cross examination of Dr. Rosenwald on Certain Issues, the defense stated,

> [A]lthough this Giglio material would ordinarily be appropriate to use to challenge the witness's credibility or veracity, we do not expect this witness to have any direct testimony of relevance to this case, based on his prior testimony in the Shkreli trial and his Section 3500 material produced by the government here. We therefore have no present intention to use any of this information at this trial.

(Greebel's October 29, 2017 Letter, ECF No. 432 at 1.) Defendant has thus waived any argument that he was unfairly prejudiced by the exclusion of this evidence. Finally, even if the allegations of misconduct relating to Dr. Rosenwald were

*Giglio* material, the defense had ample time to prepare for cross examination, as the government did not call Dr. Rosenwald until a week after the October 24, 2017 disclosure. Consequently, the defense therefore has no basis on which to claim the sort of "manifest injustice" that would warrant a new trial.

## C. Constructive Amendment

### 1. Count Seven

"To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (citations omitted); *see also United States v. Weiss*, 752 F.2d 777, 787 (2d Cir. 1985) (finding that an impermissible alteration of the government's proof or the court's charge must affect an essential element of the offense to be considered a constructive amendment); *United States v. Dove*, 884 F.3d.138, 146 (2d Cir. 2018)(internal citations omitted) ("A constructive amendment occurs either where (1) an additional element, sufficient for conviction, is added, or (2) an element essential to the crime charged is altered.").

There is no constructive amendment where a charge is constructively narrowed or an indictment that was framed in

general terms "encompasses the specific legal theory or evidence used at trial."  *Salmonese*, 352 F.3d at 621(citations omitted). It has been firmly established in the Second Circuit that as long as the defendant has sufficient notice of the "core of criminality" to be proved at trial, there is no constructive amendment*. See United States v. Frank*, 156 F.3d 332, 338 (2d Cir. 1998)(citations omitted)("[B]ecause proof at trial need not, indeed cannot, be a precise replica of the charges contained in the indictment, this court has consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial."); *United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992) (citing *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983)( "The government's obligation in the indictment is only to provide the defendant with sufficient notice of the charges brought up against him or the "core of criminality to be proven at trial.").  The core of criminality is, "the essence of a crime, in general terms; *the particulars of how a defendant effected the crime falls outside that purview*."  *United States v. Agrawal*, 726 F.3d 235, 260 (2d Cir. 2013) (citing *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012) (emphasis added).

Mr. Greebel argues that the government impermissibly broadened the Superseding Indictment, and that "at the pretrial

conference, the government changed its theory, arguing that the alleged backdating was no longer an attempt to avoid SEC inquiry but 'a pretext to give Retrophin shares to various investors.'" (Mem. at 47.) However, the government did not "amend" the Superseding Indictment. The Superseding Indictment clearly alleges, and the government argued consistently, that Mr. Shkreli's backdating of an MSMB Capital interest in Retrophin, facilitated by Mr. Greebel, was intended *both* (1) to "defraud Retrophin by misappropriating Retrophin's assets through material misrepresentations and omissions in an effort to satisfy SHKRELI's personal and unrelated professional debts and obligations" (Superseding Indictment at ¶ 21) *and* (2) to make it appear to the Securities and Exchange Commission that MSMB Capital had assets (*see* Superseding Indictment at ¶ 25 ("Faced with an SEC inquiry, the defendants MARTIN SHKRELI and EVAN GREEBEL, together with others, engaged in a scheme to fabricate an investment by MSMB Capital into Retrophin LLC")). The evidence established that Mr. Shkreli was motivated to backdate the transfers to prior to September 2012 because he had represented to his investors that MSMB Capital was winding down in early September; it would have made little sense to either MSMB Capital investors or to the SEC had the fund shown a new investment in Retrophin in December 2012.

As discussed above, the government stated that it would not "argue that . . . the fact that a backdated interest was created in and of itself defraud[ed] Retrophin, but rather, was part of [a] longer course of conduct that created an interest for MSMB Capital in Retrophin . . . in order to create the appearance that MSMB Capital had actually invested in Retrophin and that was in part the basis for the negotiations and the settlement and consulting agreements." (Tr. 9600:7-16.) With respect to the allegedly backdated share transfers, the court also instructed the jurors that they "cannot find Mr. Greebel guilty of Count [Seven] solely on the basis of evidence about these transfers and the dates that the transfers occurred." (Tr. 10900:2-5.)

There was therefore no prejudice to Mr. Greebel – indeed, he benefitted from having a narrowed government case. See *United States v. Dove*, 884 F.3d at 149 ("[A] defendant alleging a constructive amendment must establish that the evidence or the jury charge on which he was tried broadens the possible bases for conviction beyond the indictment.") The evidence of backdating, however, was essential both to explain why investors like Darren Blanton were led to believe – incorrectly – that their investments in MSMB Capital represented an investment in Retrophin. (GX 503.) The defendant made a motion addressing this exact issue on October 19, 2017, the day

before trial, and the Court denied the motion.  Tr. 935-940.
The court clearly stated that "in terms of the prohibitions
against modifications or amending or constructively amending an
indictment, I do not see how this description of the backdated
share transfers modifies the essential elements of the offense
charges, which is conspiracy to commit wire fraud." *Id*.  at
940.  Further, later in the trial, the government advised that
it would not argue that the backdating was a sufficient
independent basis on which that defendant could be convicted of
the wire fraud and the Court reiterated its pretrial ruling that
the evidence regarding backdating, as alleged in the indictment,
was relevant and admissible. (Tr. 9612:2-20).

### 2.    Panoff

The defense vaguely asserts that naming Mr.
Panoff a co-conspirator "broadened the possible bases for
conviction."  (Mem. at 49 (citing *United States v. Milstein*, 401
F.3d at 65).)  However, Mr. Greebel does not explain how naming
Mr. Panoff as a co-conspirator "broadened" the Superseding
Indictment, since the Superseding Indictment specifically says
that "MARTIN SHKRELI and EVAN GREEBEL, *together with others*"
engaged in the conduct alleged in Count Seven.  (Superseding
Indictment at ¶ 26 (settlement agreements) (emphasis added); ¶
31 (consulting agreements).)  Moreover, as summarized, *infra*, in
the government's memorandum of law, there is ample evidence, the

admission of which was based on proper evidentiary grounds, that Mr. Panoff was a co-conspirator. (Gov. Mem. 91-103 and exhibits referenced or annexed therein.)

### 3. *Yaffe*

Mr. Greebel argues that "the government's theories regarding former MSMB investor Lee Yaffe changed drastically" because Mr. Yaffe was improperly named both as a "victim" and as a co-conspirator because Mr. Yaffe received or was a party to one of the fraudulent consulting agreements. (Mem. at 49.) They argue that because the government identified Mr. Yaffe as an "Elea Capital investor," and therefore a victim, Mr. Yaffe cannot also be a co-conspirator. However, it is not inconsistent for the government to argue that those who were defrauded by Mr. Shkreli in either Elea or his MSMB funds later became co-conspirators in order to get their money back from Retrophin. (*Id.*)

The defense fails to cite any requirement or law stating that the government must prove every co-conspirator it knows about. "[I]t is well settled law that an individual need not know the identities of all coconspirators in order to be found guilty of being a member of a conspiracy. The removal of four of the five names thus [does' not constructively amend the indictment because the government [does] not have to prove the identities of those named in order to secure a conviction [ ]

for participating in the conspiracy alleged in the indictment."
*United States v. Dove*, 884 F.3d 138, 147 (2d Cir. 2018); *see
also Slevin v. United States*, No. 98-CV-0904 (PKL), 1999 WL
549010, at *8 (S.D.N.Y. July 28, 1999) (finding no constructive
amendment where "the indictment charged petitioner together with
others known and unknown . . . the Government did not
constructively amend or vary from the indictment by presenting
evidence that certain contractors . . . were co-conspirators in
petitioner's scheme to defraud," and, "[a]t trial, the
Government presented evidence that certain employees of the
contractors had conspired with petitioner, but did not diverge
from its theory that the contractors were nonetheless also
victims of the fraudulent scheme.").

In any event, there was no harm to Mr. Greebel,
because the government did not argue at Mr. Greebel's trial that
Lee Yaffe was a co-conspirator. Lee Yaffe's name was only
mentioned on two occasions during the twelve-week trial, and he
was not described to the jury as a co-conspirator. (See, Tr.
73:6-74:12 (THE COURT:"[T]he government has represented as
officers of the Court that it has evidence that it did not
present at the Shkreli trial, that they are prepared to present
against Mr. Greebel, and that there are other co-conspirators
besides Mr. Shkreli and Mr. Yaffe *[sic]* that they are prepared
to present evidence on); Tr. 9349:24-25 (THE COURT: "Yaffe is

not – there's no evidence about him in this trial, so you are
not going to be bring anything out about Mr. Yaffe.")). Given
the minimal evidence regarding Mr. Yaffe, available to the jury,
the court cannot find that the jury convicted Mr. Greebel of
conspiring Mr. Yaffe.

### D. Juror Misconduct

Federal Rule of Evidence 606(b) prohibits a juror from
testifying "about any statement made or incident that occurred
during the jury's deliberations; the effect of anything on that
juror's or another juror's vote; or any juror's mental processes
concerning the verdict or indictment," with exceptions for
testimony about improper "extraneous prejudicial information,"
outside influences, or mistakes on the verdict form.  F.R.E.
606(b).  The Supreme Court has held that Rule 606(b) may be
breached only in cases of "juror bias so extreme that, almost by
definition, the jury trial right has been abridged."  *Pena-
Rodriguez v. Colorado*, 137 S. Ct. 855, 866-869 (2017).  The
Supreme Court has identified only one such circumstance – when
"a juror makes a clear statement that indicates he or she relied
on racial stereotypes or animus to convict a criminal
defendant."  *Id.*  The Second Circuit has suggested, in *dicta*,
that "credible allegations of threats of violence" might create
an exception under Rule 606(b), in addition to the "racial

stereotypes or animus" grounds identified in *Pena-Rodriguez* and the grounds articulated in F.R.E. 606(b)(2). *Anderson v. Miller*, 346 F.3d 315, 327 (2d Cir. 2003).

The jury returned a guilty verdict on both counts on December 27, 2017. The foreperson provided the court with a signed and dated verdict sheet, which indicated the jury found Mr. Greebel guilty of both counts. (Tr. 10993). After the court read the verdict sheet into the record, the court polled the jury. (Tr. 10993-95). Each individual juror, including Mr. Sakar, stated affirmatively that their verdict was guilty. *Id*. The jurors did not express concerns at that time. After the jury reached its verdict, the court met the jurors in the jury room to thank them for their service and advise them to obtain jury certificates from the jury clerk. The court also advised that media and counsel may wish to speak with them and doing so was their choice. All of the jurors were in agreement that they wished to be escorted together by the court security office directly to the jury assembly to obtain their service documentation. The jurors appeared to the court to be interacting pleasantly amongst themselves during this brief period.

On December 28, 2017, the day after the verdict, Mr. Sankar, also known as Juror No. 6, called the court and spoke to one of the court's law clerks, Vivek Tata. Mr. Sankar requested

to speak to the judge, and Mr. Tata asked the Mr. Sankar what he wished to speak to the judge about. Based on Mr. Tata's understanding, the juror wished to let the judge know that the juror wanted to review more evidence during the trial, but felt pressured into voting after he was told by other jurors that if he did not vote, the jurors would tell the court and have him removed. Mr. Tata had difficulty understanding the juror due to the juror's accent and did not feel it appropriate to inquire further given the nature of the inquiry.

The court advised the parties of the call from Mr. Sakar on December 29, 2017 and defendant requested a hearing to question Mr. Sankar. The government opposed the hearing and the court set a hearing to address the juror issue. On January 5, 2018 the court held oral argument as to whether a juror inquiry would take place. After argument, the court decided to conduct a limited inquiry of the juror and specifically inquired into the three areas contemplated by Rule 606(b), *Pena-Rodriguez*, and *Anderson*, to determine whether Mr. Sankar was threatened with physical violence, whether the jury considered extrinsic evidence, and whether the jury considered Mr. Greebel's race or religion in deciding the verdict. On January 5, 2018, in the presence of government and defense counsel, Mr. Sankar testified under oath that he was never physically threatened, there was no extrinsic evidence considered by the jury, and the jury did not

159

consider Mr. Greebel's race or religion in deciding on its verdict. (January 5, 2018 Hearing Re: Juror, Tr. 30:7-25, 31:1-24.)  The foregoing areas of testimony are the *only* grounds on which a judge may further inquire into a verdict and none apply.[34] (Tr. 34:11-25, 35:1-17.)

Although defendant alleges that recently discovered facts bolster their accusations of misconduct, Mr. Sankar's affidavit submitted by defendant, and based on defense counsel's interview with Mr. Sankar that excluded the court and government counsel, does not raise any new basis for the court to re-open the verdict. (*See* Mem. at 50-52; see ECF No.).  Further, the circumstances under which Mr. Sankar's affidavit was procured have not been provided to the court, which gives the court pause as to the reliability of the affidavit.  Defendant filed Mr. Sankar's affidavit which purports to describe Mr. Sakar's opinions regarding the evidence, jury deliberations, and statements made among jurors prior to and during deliberations, all of which are prohibited by F.R.E. 606(b).  The affidavit is typewritten, each page appears to be initialed by Mr. Sankar, and the final page is signed by Mr. Sankar but defendant fails to provide any information regarding the circumstances under which it was prepared and who prepared it.  It is not clear who

---

[34] Mr. Sankar was advised by the court that if he wanted to explain his answers further, he could do so.

drafted the affidavit and what facts or allegations the author relied on or was provided before doing so. The Second Circuit typically disfavors inquiries by a party without court supervision, as they can be biased in favor of the party conducting the inquiry. The court noted this concern at the hearing. (See Hearing re Juror Misconduct, January 5. 2018, Tr. 36.) Mr. Sankar's affidavit goes so far as to state that Mr. Sankar does not believe defendant was guilty and believes defendant "should not have been charged." (See ECF No. 533 ¶6.) Yet, the only factual basis presented by defendant for vacating the verdict based on juror misconduct are alleged statements other jurors made to Mr. Sankar prior to deliberation regarding defendant's innocence or a potential hung jury. (See Mem. at 50-51.) This is plainly insufficient.

Defendant cites no case law in support of his claim. In contrast, there is substantial controlling case law explaining that the type of purported "misconduct" alleged by defendant provides insufficient grounds for a new trial. The allegations rise at most to Mr. Sankar experiencing pressure to vote from fellow jurors and jurors expressing opinions prior to deliberations, which do not warrant a new trial. *See United States v. Yeagley*, 706 F. Supp. 2d 431, 435 (S.D.N.Y. 2010) (concluding that "vague and conclusory" allegations of "extreme pressure" and "badgering" did not warrant a post-verdict hearing

as "an allegation of intrajury pressure that does not rise to the level of physical coercion is insufficient to require a post-verdict jury inquiry" under *Anderson v. Miller*, 346 F.3d 315, 327 (2d Cir. 2003)); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1233-34 (2d Cir. 1983) (holding that evidence "that the jury might have been exposed to extraneous prejudicial information and improper outside influences" was insufficient to hold a general inquiry regarding deliberations); *United States v. Sattar*, 395 F. Supp. 2d 66, 76 (S.D.N.Y. 2005), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009)(holding that a post-verdict inquiry was barred by Rule 606(b) where a juror wrote a letter complaining of "fear and intimidation I was made to feel for my life," but where that letter did not include specific allegations except for instances of verbal harassment).

In addition, the fact that the jury may have violated the court's rules not to discuss the case until deliberations is not a basis to reopen the verdict. *United States v. Carmona*, 858 F.2d 66, 69 (2d Cir. 1988)(holding that the trial court did not abuse its discretion in denying appellant's motion for a new trial following a disclosure that certain jurors had discussed the case among themselves during trial); *United States v. Sabhnani*, 529 F. Supp. 2d 384, 393 (E.D.N.Y. 2008), aff'd, 599 F.3d 215 (2d Cir. 2010) (denying a request for a new trial based

on allegations that a juror was overheard saying "guilty, guilty" prior to jury deliberations).

### E. The Admission of Statements by Marc Panoff Was Proper as Panoff Was a Co-conspirator

"To admit a statement pursuant to Federal Rule of Evidence 801(d)(2)(E), this Court must find that: (1) there was a conspiracy; (2) the members included the declarant and the party against whom the statement is offered; and (3) the statement was made both during the course of and in furtherance of the conspiracy." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). The government bears the burden of proving that a conspiracy exists and the declarant and party who the statement will be used against are part of the conspiracy by a preponderance of the evidence. *Id.* Moreover, the government must show that the declarant and defendant had a "unity of interests stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E)." *United States v. Gigante*, 166 F.3d 75, 83 (2d Cir. 1999).

The defense argues that Panoff was not a co-conspirator, and that the Judge made the finding that the government had shown him to be a conspirator when it lacked sufficient evidence to do so. (Mem. at 52-55.) Further, the defense argues that, "the only new evidence offered by the government after the Court's initial finding that Mr. Panoff was

not a co-conspirator consisted of miscellaneous emails admitted through the government's case agent." (*Id*. at 54.)  The defendant emphasizes that of documents admitted between the Court's provisional ruling on November 28, 2017, to admit evidence containing statements by Mr. Panoff and its subsequent finding that the evidence established by a preponderance of evidence that Mr. Panoff *was* a co-conspirator on December 4, 2017, Mr. Panoff was only on twelve of them.  (*Id*.)  The defense posits that as a result, the verdict is based on "evidence that should have been stricken from the record."  (*Id*. at 55.)

However, the defense's argument fails to allege any prejudice or actual harm and should fail on that ground alone, because simply asserting that evidence was improperly admitted is far below the "manifest injustice" standard required for success on a Rule 33 motion.  Even were that not the case, the government did show, by a preponderance of the evidence, that Panoff was a co-conspirator.  (Tr. 7408:9–11.)

Of the twelve exhibits cited by the defense (attached as Exhibits F-Q of the defendant's memorandum) that mention Panoff, none were offered into evidence pursuant to the co-conspirator hearsay exception provided in F.R.E 801(d)(2)(E). The court acknowledged during the trial that many of the Panoff documents admitted through Special Agent Delzotto would be offered based on evidentiary reasons other than F.R.E

801(d)(2)(E), the co-conspirator hearsay exception. (Tr. 7063-64.) Instead those documents add context and background to the relationship between Panoff, Shkreli and Greebel. In Exhibit C to the government's brief, the government provides the bases on which each of the twelve exhibits were offered and admitted. Government Exhibits 601 and 608 contained statements made by Panoff that were not offered for their truth. (*See* Gov. Br., Ex. C., ECF No. 563.3 at 2; Tr. 7322-7329, 7332.) Government Exhibits 609A, 610, 612, 614 and 627 contained statements made by Mr. Greebel and were accepted into evidence with *no* objection from defense counsel. (*See* Gov. Br, Ex. C at 2-3; Tr.7369, 7374-7378, 7382.) Government Exhibits 691 and 692 were statements by co-conspirator Shkreli and in some cases continuations of other admitted email conversations that were admissible pursuant to F.R.E. 611. (*See* Gov. Br, Ex. C at 3-4; Tr. 7371-7372.) They, too, were admitted without objection. (*Id.*) Government Exhibit 609 was a continuation of GX 609A and was admitted without objection. (*See* Gov. Br, Ex. C at 2; Tr. 7370-7371.). Government Exhibit 690, which included an email from Mr. Panoff and statements from Mr. Greebel, faced a hearsay objection from the defense, but the court admitted the exhibit for completeness and context purposes. (*See* Gov. Br, Ex. C at 4; Tr. 7324-7325.).

Although none of the twelve exhibits cited by the defense were admitted pursuant to the co-conspirator exception, they provided support for the applying the exception.  The defense failed to cite any exhibits admitted pursuant to the co-conspirator exception, but the government was able to locate two:  Government Exhibits 619 and 621.  Government Exhibit 619 contains a single statement from Panoff that was admitted pursuant to FRE 801(d)(2)(E) over the defense's objection.  (*See* Tr. 7401-09).  Government Exhibit 621 is a continuation of the same email chain as GX 619, and contains two statements from Panoff that were admitted pursuant to FRE 801(d)(2)(E). (See Tr. 7410).  Both email chains include Mr. Greebel and are plainly relevant as they discuss MSMB investments and the charged sham settlement agreements.  Moreover, defense has failed to move for a new trial on the basis, of Government Exhibits 619 and 621, the only two documents containing a statement from Panoff that was admitted pursuant to F.R.E. 801(d)(2)(E), and the court will not grant a motion for a new trial on that basis.

### F. Evidentiary Rulings

It is established in the Second Circuit that a court, ". . . will not grant a new trial unless we find that the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that [the court] [is] 'convinced that the jury has reached

a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Phillips v. Bowen*, 278 F.3d 103, 111 (2d Cir. 2002) (citing *Luciano v. Olsten Corp.*, 110 F.3d 210, 217 (2d Cir.1997)); see also *S.E.C. v. Stamoulis*, 350 F. App'x 499, 501 (2d Cir. 2009); *Patrolmen's Benevolent Ass'n. of City of New York v. City of New York*, 310 F.3d 43, 54 (2d Cir. 2002). This prejudice is not measured by reference to each individual determination of admissibility, but "by assessing error in light of the record as a whole." 278 F.3d at 111.

### 1. Consciousness of Innocence

In his motion, Mr. Greebel argues that the jury was deprived of "highly probative evidence" related to the fact that Mr. Greebel was willing to meet with the FBI without counsel in the hours following his arrest. The court did preclude certain evidence Mr. Greebel argued was related to "consciousness of innocence," based on F.R.E. 403, which precludes the admission of evidence where the "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." F.R.E. 403. However, the court's limited ruling did not lead to wholesale preclusion of "consciousness of innocence" evidence. Although Mr. Greebel chose not to raise the issue of "conscious of innocence" evidence in a motion in

limine, the evidence and issues surrounding it were litigated during trial. (*See*, *e.g.*, Letter re Admissibility of Defendant's Miranda Waiver, ECF No. 472 (government letter about "consciousness of innocence" evidence); Letter re Miranda Waiver, ECF. No. 476 (defense letter about same); Tr. 7849-7899, 7918-27, 7978-8005). Further counsel for Mr. Greebel was allowed to cross-examine FBI Special Agent Delzotto to elicit testimony regarding the fact that Mr. Greebel had a post-arrest conversation with law enforcement.

The court precluded additional evidence under F.R.E. 403 because it might confuse the jury, prejudice *both* parties and offer evidence collateral to the issues to be litigated at trial. The court addressed these issues on the record during trial.

> With regard to consciousness of innocence, I believe that, again, the parties have been fully heard and what we have in the record now is the fact that Mr. Greebel spoke to the FBI at length. . . . I continue to be concerned that there could be extreme prejudice to Mr. Greebel and the government, A, if the government cannot cross-examine appropriately and, B, the jury draws an inference that if Mr. Greebel doesn't testify at trial, it's consciousness of guilt. So, I'm not going to allow extensive evidence about his post-arrest sessions with the FBI. As I said, we have a record that clearly indicates that he did speak to the FBI and that I think Agent Delzotto testified that during the course of time he was interviewing Mr. Shkreli he would walk by and see that Mr. Greebel was speaking to the agents. Also, it would probably open up evidence collateral to this case which is that many times people do speak to law enforcement following their arrest and then may or may not always

> be truthful with the law enforcement after an
> arrest. The jury has enough evidence that is
> relevant, probative and non-prejudicial under Rule 403
> to make a determination of the disputed facts and
> about Mr. Greebel's state of mind and it does seem to
> me that we would be treading into very dangerous
> waters if we allowed testimony on Mr. Greebel's post-
> arrest statements.

(Tr. 8828-8829). For the reasons previously stated by the Court on the record, the Court's evidentiary decision stands.

### 2. Threat Evidence Related to Pierotti

Mr. Greebel seeks reconsideration in his Rule 33 motion of the court's ruling *in limine* that the government was permitted to introduce evidence regarding Martin Shkreli's threats against Pierotti and Pierotti's family as Mr. Greebel alleges it was highly prejudicial. (Mem. at 57; *see also* Shkreli Letter to Pierotti, FX 112-27.) In support of its argument, it cites an "audible gasp" from the jury when Mr. Shkreli's threats to Mr. Pierotti's family were revealed as evidence that the letter was "graphic and profane" and toxic to the jury's evaluation of Mr. Greebel. (Def. Br. at 57 (citing *United States v. Morgan*, 786 F.3d 227, 234 (2d Cir. 2015)). However, after reviewing the parties' briefing on the threats by Mr. Shkreli to Mr. Pierotti and his wife before trial and in oral argument on that briefing, the court determined the probative value of the evidence outweighed the risk of prejudice

under F.R.E. 403.  (Motions in Limine Hearing October 6, 2018, Tr. 138-39.)

Further, the government made clear to the jury during summation that the threat evidence was relevant to show the defendant's state of mind as a Shkreli co-conspirator, not to show that Mr. Greebel made the threat himself.  (Tr. 10355:4-25, 10356:1-25.)  The case Mr. Greebel cites in his memorandum is also distinguishable.  In *Morgan*, the court admitted testimony regarding a letter where the defendant threatened to murder another individual if an informant was not killed.  *United States v. Morgan*, 786 F.3d 227, 229-230 (2d Cir. 2015).  The Second Circuit found the evidence should have been precluded as it was not relevant to the offenses for which the defendant was being tried, and based in part on that finding, granted the defendant a new trial.  *Morgan*, 786 F.3d at 232.  However, the Second Circuit made clear that such evidence would be admissible where the threats were "inextricably intertwined with the evidence regarding the charged offense" and the threats were used to show "guilty knowledge" or membership in a conspiracy, as was the case at Mr. Greebel's trial.  *Id*.  The government made as much clear in the closing, stating the letter was admitted, "("Not to try to ascribe to Mr. Shkreli's bad conduct [in threatening Pierotti's family] to the defendant. Never said he wrote it. It's a horrific letter. But it shows that the

defendant learned about this shocking accusation for the company that he represented the CEO.  He doesn't tell anyone about it. . . . He didn't tell Retrophin. He didn't tell the board. This is really shocking conduct. He's protecting Mr. Shkreli." (*See* Tr. 10812.)  The evidence was properly admitted for the purpose of demonstrating that Greebel's knowledge of the letter and subsequent behavior were entirely consistent with his membership and participation in the conspiracy charged in Count Eight.

   *3. Evidence Relating to MSMB Capital and MSMB Healthcare*

       Mr. Greebel argues that the government's actions eliciting testimony and admitting documents relating to, "Mr. Shkreli's operation of the MSMB hedge funds; the representations made by Mr. Shkreli in soliciting fund investors; and the alleged losses suffered by MSMB investors" violated F.R.E. 404(b)because it was evidence of uncharged acts and it was "undisputed that Mr. Greebel had absolutely no involvement in the operation of the MSMB funds . . . [or] the alleged frauds charged in Counts One through Six in Mr. Shkreli's trial.

       Mr. Greebel's argument is problematic for three reasons: (1) the defense did not move to preclude evidence related to this entire category of evidence at trial, nor does the defense cite any specific evidence that it believes should have been precluded; (2) the defense also introduced evidence

related to Mr. Shkreli's fraud and dishonesty in the MSMB schemes, and used the MSMB fraud as a theme of its defense in its motion for severance, but now seeks to preclude that evidence; and (3) Mr. Greebel's argument fails to cite any law supporting the court's authority to grant a Rule 33 Motion based on Rule 404.

The evidence described in remarkably general terms by Mr. Greebel is relevant and is admissible as it provides important context and background for how certain victims of the MSMB frauds became in the impetus for the conduct charged in the Count Seven fraud, via the settlement and consulting agreements. Mr. Greebel does not identify specific exhibits or sections of testimony that he failed to challenge and instead relied upon, but now believes should have been precluded, making it impossible for the court to perform a detailed analysis of the evidentiary issues. (*See* Mem. at 57-59.) Looking at this category of evidence more generally, it is clear that Mr. Greebel sought to minimize his participation in his conspiracy with Mr. Shkreli on Counts 7 and 8 by introducing evidence of Shkreli's extensive deception of the MSMB investors. (See e.g. Def.'s Mot. to Sever, ECF No. 163 at 1 ("We will also demonstrate through the evidence obtained during discovery that Mr. Shkreli is seeking to have Mr. Greebel found responsible for his misconduct in the same way that, over the years, he has

repeatedly shifted the blame from himself to anyone and everyone around him."); Tr. 1089 (Defense opening: "There's no question that Mr. Shkreli duped sophisticated and wealthy investors. You'll see some of them take the stand. Business leaders and sophisticated people, extremely wealthy people who make lots of investments; Mr. Shkreli duped them, he lied to them, he omitted significant information from them. You'll learn not one of those investors lost any money, not a dime. You'll learn they made a lot of money. You'll learn and see direct evidence that Martin Shkreli knowingly, willfully, intentionally deceived them."); Tr. 10460-61 (Def. Summation: "This is a fundamental problem with the prosecution's case, you know that [Shkreli] lied time after time after time to sophisticated investors, to sophisticated business people. . . . Martin Shkreli lied to and deceived the very best. Shkreli is lying to everyone.").

F.R.E. 404 does not prohibit the evidence the defense seeks to exclude after the fact of admission and the verdict. The category of evidence does not consist of prior unrelated bad acts or evidence regarding Mr. Greebel's or Mr. Shkreli's character used to show that on a particular occasion one or both of them acted in accordance with the bad character. Instead the evidence provides background information and context helpful to the jury's understanding of the charges in Count Seven and Count Eight.

*4. Jackson Su's Testimony Regarding Global Relay*

After voluntarily leaving Retrophin at the end of December 2012, Mr. Su continued to access the company's Global Relay email system. The defense argues that it was unfairly precluded from asking Mr. Su whether his access of Retrophin's email system "constituted a crime," and that "the jury should have been informed that his actions constitute potentially criminal conduct." (Mem. at 59.) Mr. Su's testimony would necessarily have been speculative testimony from a lay witness and an issue of criminal law. The defense has not, and cannot, explain how Mr. Su's opinion about whether his actions violated federal law would have been admissible. Further, the defense was not precluded from cross-examining Mr. Su to establish that he did continue to access the Global Relay system after leaving Retrophin, and the jury was free to evaluate Mr. Su's credibility based on his conduct. (*See e.g.* Tr. 5029:4-25, 5030:1-9. [DEFENSE COUNSEL]: You understand, sir -- do you understand this, Mr. Su, that accessing the Global Relay system after you left without authorization to obtain copies of documents from Retrophin is a crime? [GOVERNMENT]: Objection. THE COURT: I will allow the question. [MR SU]: I don't understand that. [DEFENSE COUNSEL]: You believe that you had the right, it was not a crime, sir, to go into the Global Relay system after you were terminated, let's say after March of 2013,

174

to access documents from Retrophin?  [MR.SU]: I didn't think it was a crime.)  Whether Mr. Su's conduct constituted a crime, however, was not before this jury, and an additional in-depth inquiry into that legal issue would have entailed a speculative and distracting mini-trial into an entirely collateral issue.

### G. Venue Was Established in the Eastern District of New York on Counts 7 and 8

In defendant's Rule 33 motion, he argues for the first time that the government failed to prove that venue was properly established in the Eastern District of New York by a preponderance of the evidence.  (Mem. at 60-61.)  This argument is not supported by the evidence in the record and defendant cites no case law to support this argument.

Venue lies "in a district where the offense was committed." Fed. R. Crim. P.  Further, under 18 U.S.C. § 3237 (a),

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

The Second Circuit has held that, "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue [and it does]." *United States v.*

*Royer*, 549 F.3d 886, 894 (2d Cir. 2008) (citing *United States v. Svoboda,* 347 F.3d 471, 483 (2d Cir.2003)).

The government met its burden to establish venue with regards to the wire-fraud conspiracy charged in Count Seven. Alan Geller, an investor in MSMB Healthcare was one of a few investors who was offered a settlement agreement structured as a consulting agreement. Mr. Geller testified that he flies through LaGuardia when he visits NYC from his home in Florida and did so when he visited Mr. Shkreli to discuss his investments, including the events leading to his consulting agreement. (Tr. 6697:5-6698:23.) Dr. Rosenwald, another signatory to a consulting agreement at issue in the instant case lives in the Eastern District of New York, in Lawrence, New York on Long Island, and does investment work from his home. (Tr. 3445:15-3446:23.) Defendant arranged for Mr. Biestek's and Mr. Sullivan's Retrophin shares to be sent to Dr. Rosenwald. Though the shares were initially sent by the transfer agent to Mr. Greebel (*see* GX 558), they were eventually sent to Dr. Rosenwald.

The government also proved by a preponderance of the evidence that venue was proper with regards to Count 8. The conspiracy consisted, in part, of allocating Fearnow Shares to co-conspirators. Mr. Greebel directed that the Fearnow shares be sent to Mr. Biestek and Mr. Sullivan, both of whom live in

the Eastern District (GX 497; *see also* Tr. 10368-69; GX 115-4).

Mr. Greebel's role in directing the shares be mailed to the co-conspirators was in furtherance of the conspiracy.

## Conclusion

For the reasons set forth above, the court respectfully denies defendant's motions pursuant to Rules 29 and 33 for a judgment of acquittal and for a new trial.

**SO ORDERED.**

Dated: August 14, 2018
Brooklyn, New York

/s/
_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York
