1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - -    X
 3
    UNITED STATES OF AMERICA,    :    15-CR-637(KAM)
 4
             Plaintiff ,         :
 5                                    United States Courthouse
        -against-                :    Brooklyn, New York
 6
    EVAN GREEBEL,                 :
 7                                    November 14, 2017
             Defendant.          :    5:15 o'clock p.m.
 8
    - - - - - - - - - - - -    X
 9
                 TRANSCRIPT OF DAUBERT HEARING
10          BEFORE THE HONORABLE KIYO A. MATSUMOTO
                 UNITED STATES DISTRICT JUDGE.
11
    APPEARANCES:
12
    For the Government:          BRIDGET M. ROHDE
13                               Acting United States Attorney
                                 BY: ALIXANDRA E. SMITH
14                                   DAVID PITLUCK
                                     DAVID K. KESSLER
15                               Assistant United States Attorneys
                                 271 Cadman Plaza East
16                               Brooklyn, New York
17  For the Defendant:           GIBSON DUNN & CRUTCHER
                                 200 Park Avenue, 48th Floor
18                               New York, New York
19                               BY: REED M. BRODSKY, ESQ.
                                     RANDY MASTRO, ESQ.
20                                   WINSTON Y. CHAN, ESQ.
                                     MYLAN LEE DENERSTEIN, ESQ.
21                                   JOSHUA E. DUBIN, ESQ.
                                     GRACE TSOU, ESQ.
22
    Court Reporter:              Charleane M. Heading
23                               225 Cadman Plaza East
                                 Brooklyn, New York
24                               (718) 613-2643
25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
```

                                                                    2

1                (In open court - jury not present.)

2                THE COURT:  So, this is a separate matter, the same

3    case but not part of the trial transcript.  It is a Daubert

4    hearing on the defense's proposed expert and his name is Mr.

5    Alan Johnson.

6                Are you ready to proceed, Mr. Chan?

7                MR. CHAN:  Yes.

8                Can we take a five-minute break to set up.  We

9    didn't take a bathroom break all afternoon.

10               THE COURT:  Okay.

11               (Recess taken.)

12               MR. KESSLER:  So this is a separate proceeding in

13   this case?

14               THE COURT:  Yes.

15               MR. KESSLER:  To the extent exhibits are being

16   entered, my understanding is these are not exhibits that would

17   go to the jury or anything like that, they are just exhibits

18   for purposes of the record of this hearing; is that right?

19               THE COURT:  Yes.  Any exhibits that may be admitted

20   here would have to be separately admitted at trial.

21               The rules of evidence are a little looser in this

22   kind of hearing, am I correct?

23               MR. KESSLER:  Yes, I think it is much closer to --

24   it's like a suppression hearing.

25               MR. CHAN:  That's fine, Your Honor.  Ready to start

1   whenever you are.

2              THE COURT:  I am ready.

3              MR. CHAN:  Defense calls, Mr. Johnson.

4              THE COURT:  Sir, would you raise your right hand.

5              (Witness sworn.)

6              THE COURT:  Please have a seat.  State and spell

7   your full name for the record.  Thank you.

8              THE WITNESS:  Alan M. Johnson.  A-L-A-N, M,

9   J-O-H-N-S-O-N.

10             THE COURT:  Please proceed, Mr. Chan.

11  **ALAN M. JOHNSON**,

12       called by the Defendant, having been duly

13       sworn, was examined and testified as follows:

14  DIRECT EXAMINATION

15  BY MR. CHAN:

16  Q    Good evening, sir.

17  A    Good evening.

18  Q    What do you do for a living?

19  A    I am a compensation consultant.

20  Q    What does that mean?

21  A    I advise corporations on their compensation programs, the

22  amount of compensation, if it's market competitive, plus the

23  design and characteristics of the different programs.

24  Q    How long have you done that?

25  A    My entire professional career, 37 years.

1    Q     Since you graduated from school?

2    A     Since I graduated from school.

3    Q     What education background do you have?

4    A     I have an M.B.A. from the University of Chicago.   I

5    studied graduate economics from the University of Virginia and

6    I have a B.A. from the University of Florida.

7    Q     Have you worked for a number of different organizations

8    since school?

9    A     I did.   Before forming my own firm 25 years ago, I worked

10   for several the larger well-known compensation and human

11   resources consulting firms.

12   Q     What is the name of your own firm?

13   A     Johnson Associates.

14   Q     How big is it?

15   A     Ten people.

16   Q     Approximately how much business do you do a year?

17   A     We usually advise about 100 to 125 or 130 clients in a

18   year.

19   Q     Where are you based?

20   A     New York City.

21   Q     Where do your clients come from geographically speaking?

22   A     Most of them the United States, across the United States,

23   but we have some foreign clients as well.

24   Q     Are your clients companies, people or both?

25   A     Almost all of our work is companies rather than

1    individuals.  We do -- occasionally we will do an individual,

2    but it is almost always corporations, companies.

3    Q    The companies, are they public or private?

4    A    They would be both.

5    Q    Do you specialize in one versus the other?

6    A    We probably do slightly more private firms than public

7    firms, but essentially about equal.

8    Q    And going back to executive compensation consulting, what

9    would you say are sort of the main areas of your work?

10   A    We spend a lot of time on the amounts of compensation,

11   that's probably, if I were to guess, 40 percent of our work

12   and the other 60 percent is around designs.  It would be

13   annual and long-term incentive plans, looking at different

14   kinds of agreements, employment agreements, but all kinds of

15   structures and programs.  So it is probably 40 percent data

16   and roughly 60 percent kind of the design of different

17   programs.

18   Q    With respect to when an executive comes to work for a

19   company, do you get involved in that side of things?

20   A    Sometimes we do.  When our clients, particularly a

21   senior, a highly paid executive, we will get involved in

22   perhaps both the amount of compensation and also we will often

23   provide an opinion on the design, if there is an agreement.

24   Q    So when you refer to design, what are you talking about?

25   A    The elements.  If there's an employment agreement or an

1    economic agreement, often will be asked to provide an opinion:

2    Are these terms competitive?  Are they generous?  Which ones

3    are generous or more frugal when someone is coming in.

4    Q    Who are you giving that opinion to about the potential

5    employment agreement?

6    A    It could be senior executives.  It could be, for example,

7    the head of human resources at a big company.  It could be the

8    chief executive, or if they're hiring a very senior executive,

9    it might be the compensation committee, the board of

10   directors.

11   Q    Have you done work for both sides, for the executives

12   that are being hired and for the board itself?

13   A    We rarely get involved in representing the individuals,

14   so it would be -- almost all of it would be representing

15   either the company or the board.

16   Q    Do you work with counsel in those situations?

17   A    Almost always.

18   Q    Counsel for who?

19   A    Well, often will be part of the team that's negotiating

20   with an incoming executive, he'll usually have his own

21   attorney.  We will either be working with outside counsel to

22   the company or the general counsel.  He works up the different

23   legal terms.

24   Q    In your 37 years in the field, approximately how many

25   executive employment agreements have you reviewed?

1   A    Well, that's a broader question than you asked.

2   Thousands.   Maybe tens of thousands, but well in the

3   thousands.

4   Q    Of those, how many did you advise on?

5   A    Either high hundreds or 1,000, maybe.

6   Q    And included in that would be public companies too;

7   right?

8   A    Yes.

9   Q    Now, switching from the beginning of hiring somebody to a

10  company to when you are terminating somebody from the company,

11  does your consulting work have you involved in the termination

12  of an executive?

13  A    Yes.  Yes, we do.

14  Q    How so?

15  A    Well, many, many times the termination of the senior

16  executive is fraught with economic and disturbance-type

17  issues.   People -- either the board or senior management will

18  again ask our opinions on whatever agreements are going to

19  come up with, particularly the economics, how much economics

20  is the individual going to be receiving as they leave, are

21  there restrictive covenants, is the company concerned about

22  non-compete or  non-solicit or other covenants.   Often, it's a

23  back and forth between the counsel representing the

24  individual, the company and we're sometimes in the middle.

25  Q    How many times would you estimate you've been involved in

1    providing consulting in connection with an executive being

2    dismissed or separated from a company?

3    A    At least hundreds of times, if not more.

4    Q    Who are you usually advising in that context?

5    A    It will be -- in almost all cases it will be representing

6    the company, either working with outside counsel but often it

7    is outside counsel and the general counsel of the company, but

8    it could also involve the board or CEO.

9    Q    Earlier you described that moment in time when a company

10   is seeking to potentially dismiss an executive, I think the

11   word you used was potentially distraught.  Was that the word

12   you used?

13   A    That's a good word.  I'm not sure that's the one I used.

14   That's fair.

15   Q    Can you explain more and expand on that topic, please?

16   A    Well, it's usually a very emotional chaotic period.  You

17   are trying to often bring in a new executive or promote

18   somebody, a parting executive is obviously distressed.  Often

19   you want to get the individual to leave in a reasonable state.

20   You may be concerned about reputational risk.  You may be

21   concerned about trade secrets or business secrets.  You don't

22   want to be sued.

23            Often with senior executives you want this to go as

24   smoothly as you can.  There can be threats or implicit threats

25   of litigation or badmouthing the company, disparagement or

1    other types of issues.  So companies are -- clients are quite

2    sensitive to the parting executive and trying to have this go

3    reasonable smoothly.

4    Q    You referenced the potential for litigation.  Why is that

5    a potential issue in connection with a departing executive?

6    A    Well, I think most, or many senior executives will retain

7    an attorney and the individual may believe he has claims or at

8    least he will asserts claims, he may believe there is age

9    discrimination, sex discrimination, whistleblower issues, a

10   variety of state and local types of things that he may decide

11   that he's going to assert and the company in almost all cases

12   doesn't want that to happen.

13   Q    Can that include issues in connection with the person's

14   employment agreement?

15   A    Sure.  Depending on how well the document is written, it

16   may not provide a basis for that type of termination, that the

17   company may not have given notice.  There could be all types,

18   both small and large issues that the company is concerned about.

19   Q    And in these situations, are we talking mostly about a

20   situation where there is an involuntary separation by the

21   executive?

22   A    In most cases we are talking involuntary, but many times

23   there is a gray area.  Sometimes voluntary is halfway kind of

24   being pushed out the door.  So there's -- there can be a

25   bright line between voluntary and voluntary, but often there

1    is a fair amount in the middle.

2    Q    And in the consulting work that you have done for your

3    clients, have you taken -- have you advised companies to take

4    steps to deal with the potential litigation risks that come

5    with a separating executive?

6    A    Well, again, I'm not a lawyer, but working with counsel,

7    we will try to ascertain what they're concerned about, what

8    issues they believe are important to them and try to -- try to

9    have an economically viable agreement that protects the

10   company for the things they're worried about.

11   Q    And do these things usually end up in an agreement?

12   A    Almost always end up in some type of agreement.

13   Q    Are there more common types of agreement that you have

14   experience with in the executive separation context?

15   A    The most common would be a simple release for some

16   economics that we -- you would have -- again, you'd have a

17   release, you would have a bunch of covenants that go along

18   with that and then there would be usually a series of payments

19   for getting that release and agreeing not to sue or other

20   factors.

21   Q    Are those sometimes called settlement agreements?

22   A    Could be called a settlement agreement.

23   Q    What are the release provisions like in those agreements

24   in your experience?

25   A    They're almost always very broad.

1    Q    Why is that?

2    A    I think most clients believe they don't want to revisit

3    this, this is usually painful enough that they don't want to

4    have to come back and have a different agreement with an

5    individual.  So I guess I observed for a very long time people

6    want to settle this once and for all, any claims they know

7    about or claims that they're not even aware of yet they want

8    to do this just once.

9    Q    Have you been involved in situations where the companies

10   that you're advising need to resort to something more than

11   just a settlement agreement?

12   A    Yes.  Absolutely.

13   Q    Can you please describe those circumstances?

14   A    It -- they may decide that a settlement agreement is not

15   enough.  The individual may negotiate something that they're

16   not comfortable providing just for a settlement agreement.

17   They may go down the road of a consulting agreement or other

18   feature they believe can justify either the board or

19   shareholders that they're willing to go beyond what would be a

20   more straightforward settlement agreement to something else,

21   which is a consulting agreement.

22   Q    In your experience, how are these consulting agreements

23   structured?

24   A    In most cases, the consulting agreement in the context

25   we're talking about, the consulting element is vague.  It says

1    you must be available, it says that you must use your

2    expertise.  There is usually very little standards for the

3    accomplishments that you have to do.  There is almost never a

4    statement of how much work is really required of you.  It's

5    usually stated as a maximum, that you can't work more than --

6    that you shouldn't work more than 20 percent of your time or

7    be available or some other provisions.  So the consulting

8    element of it is usually quite modest.  It provides the

9    company some optionality for using this executive as they see

10   fit.  But really what you're trying to get is get the release,

11   what the settlement agreement would provide, perhaps some

12   enhanced covenants, non-disparagement, non-solicit,

13   non-compete, confidentiality, of course.  You are really

14   pushing for the covenants.

15              THE COURT:  Would those covenants be in the

16   consulting agreement or the settlement agreement?

17              THE WITNESS:  Your Honor, it will be both.  It will

18   be both.  Usually many people would start with a settlement

19   agreement, and then if that, for whatever reason wasn't

20   significant enough or they couldn't get the parties to agree,

21   they would probably go beyond that to some type of consulting

22   agreement.  In almost all cases, really what you're trying to

23   get is the covenants rather than, for example, the consulting

24   aspects.

25   Q     So in the consulting agreement it could still have a

1    settlement aspect to it, is that what you're saying?

2    A     Absolutely.

3    Q     For lack of terminology, I will call that a

4    consulting/settlement agreement.  If I say that, you will

5    understand what I am talking about?

6    A     Yes.

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. CHAN:   (Continuing)

2   Q     In the consulting/settlement agreement context, how many

3   in the course of your career have you personally advised

4   companies to enter into or not?

5   A     I probably reviewed personally somewhere of a hundred

6   maybe, 200 maybe.  Something like that.

7   Q     And, in general, what do you advise your clients, the

8   companies, can be the benefit of entering into a

9   consulting/settlement agreement as opposed to a straight

10  settlement agreement?

11  A     Well, I think it provides the company with some

12  optionality.  They can use this individual.  Sometimes they

13  have a clear idea of what they might want to use this

14  individual for.  More often, it provides some option.  Three

15  months from now, six months from now, a year from now, there

16  may be an issue, we want their advice, we want them to help us

17  deal with an issue either internally or externally, so it

18  provides a little bit of value.

19          It also provides some optical benefits for a public

20  company.  You can put forth truthfully to your shareholders if

21  there's some value here that we're not only getting a

22  settlement, but we're getting this executive to be available

23  for a period of time to advise us if we need them.  So

24  that's -- it's a little bit of both.

25  Q     And in the context of a consulting/settlement agreement,

1    which is driving that agreement, which component, the

2    consulting component or the settlement component?

3    A    In almost all cases, the settlement portion is by far the

4    largest.

5    Q    With respect to the agreements that you've been involved

6    with, the consulting/settlement agreements, before those

7    agreements were entered into, how typical is it that the

8    executive in question, prior to discussing whether or not to

9    do the settlement/consulting agreement, had already been in

10   discussions about being a consultant with the company?

11   A    That would be unusual.  It's usually not, not the first

12   thing people think about.

13   Q    Why is that?

14   A    Well, they were an executive.  They weren't a consultant.

15   Many of them have never been a consultant so it's not

16   something they thought about.  They usually -- if you're a

17   corporate executive, you're thinking of moving from one

18   corporate job to another.  That's what you've done in your

19   career, either internally or cross companies, so people don't

20   usually think about being an advisor or a consultant.  At

21   least the first thing, they don't think about that.

22   Q    In your experience, which party is it that usually raises

23   the idea of inserting a consultancy into the settlement?

24   A    Well, it's going to be a lawyer.  It's going to be a

25   lawyer for either the executive or the company.  I guess I've

Johnson - direct - Chan                          16

1    seen both.  Maybe, I would probably say it's more the -- I

2    don't know.  It's one of the two lawyers who bring it up.

3    Q    And then in the agreements that you had experience with,

4    is it the case that in each and every agreement, there was an

5    expectation that consulting work would definitely be done by

6    the departing executive?

7    A    No, that would be an unusual assumption.  I think in most

8    agreements, the assumption, the working assumption is that

9    little or no, little or no work will need to be performed.

10              THE COURT:  That's on both sides?

11              THE WITNESS:  On both sides.

12   Q    And, in fact, after these agreements have been entered

13   into, in your experience, how often has the actual consulting

14   provisions been invoked by the company?

15   A    That would be unusual.

16   Q    Now we're talking about these agreements in the context

17   of a departing executive.  Do you have any experience with

18   these agreements being used with respect to a departing board

19   member?

20   A    Rarely.  Rarely.

21   Q    In the instances in which you have used them, were you

22   involved in advising the board member or the company?

23   A    The company.

24   Q    Despite the fact that you used, you've seen it done less

25   in the board context, are the principles that you've

1    articulated any less applicable to a departing board member?

2    A    No, it's the same, same idea.

3    Q    What about a, in the context of a private company where

4    you have a dispute between the founders and there's some sort

5    of resolution as to how to deal with one sort of founder

6    that's exiting the investment?

7    A    Same fact pattern.

8    Q    Do you have any experience in that situation --

9    A    Yes.

10   Q    -- with a conflict that arises between founders of the

11   company?

12   A    Yes.

13   Q    And specifically experience where that results in a

14   settlement/consulting agreement?

15   A    Yes.

16   Q    All right.  So before I get into specific documents, as

17   an aside, have you testified before?

18   A    Yes, I have.

19   Q    As an expert?

20   A    Yes.

21   Q    What kind of expert have you testified as before?

22   A    I've testified as a compensation expert, different kinds

23   of cases, many years ago in bankruptcy court, on the different

24   programs that bankruptcy has to approve.  I've testified in

25   divorce cases and then a few cases in arbitration around pay

1    disputes around, between a company and an individual.

2    Q     But in the field of executive compensation?

3    A     Yes.

4    Q     Approximately how many times do you think you've

5    testified?

6    A     Probably about 30 times.

7    Q     Is that in federal court and state court?

8    A     Yes.

9    Q     And arbitrations you've mentioned?

10   A     Yes.

11   Q     Other than -- have there been instances in which you've

12   been retained as an consulting expert but you didn't have to

13   testify but you served as an expert?

14   A     I've done that as well.

15   Q     Typically on behalf of what kind of client?

16   A     It would be that, certainly not bankruptcy court, but it

17   would be involved in either arbitration or some other dispute.

18   Q     And in connection with this matter, were you asked to

19   search for publicly available examples involving the

20   consulting/settlement agreements that we've discussed here

21   today?

22   A     Yes, yes, I was.

23   Q     And you were asked to search for examples that don't

24   involve clients, correct?

25   A     Yes.

1   Q    How did you go about conducting that search?

2   A    We started -- we did a Google search to identify the kind

3   of examples we're going to talk about, do a simple Google

4   search, trying to come up with reasonably recognizable

5   companies that had similar designs for their settlement

6   consulting agreements.

7   Q    When you say "we," you have a staff?

8   A    I have a staff.

9   Q    And you had a staff member assist you, with you as to the

10  search?

11  A    Yes.

12  Q    But the staff member was under your direction?

13  A    Absolutely.

14  Q    And you reviewed sort of everything that the staff member

15  did as to this public record search?

16  A    Yes.

17  Q    Did you intend for your search to be an exhaustive

18  search?

19  A    No.

20  Q    What kind of search did you intend it to be?

21  A    I think it -- examples.  I think it would be impossible

22  to do a truly exhaustive search of what we're talking about

23  just through disclosure and other rules.  I thought it would

24  be helpful to have some real world examples but it would not

25  be possible or a good idea to try to have some exhaustive

1    search.

2    Q    And so you ultimately came up with a list of nine

3    examples of a consulting/settlement agreement?

4    A    Yes.

5    Q    I'm going to show you what's been marked as Government,

6    sorry, as Defense Exhibit 119-11.

7              Mr. Johnson, is this the list of the nine example

8    consulting/settlement agreements you identified?

9    A    Yes, it is.

10   Q    They all involve other companies?

11   A    Yes.

12   Q    And so can you explain to the Court what the column

13   "Filing Type" is?

14   A    It's the public source, the filings.  These companies

15   have to make filings with the government.  These are the

16   different forms they had filed with.

17   Q    Are these, in your opinion, examples of the kinds of

18   consulting/settlement agreements that you were involved in in

19   your past?

20   A    Yes.

21   Q    As a general matter, for, across these nine agreements,

22   would you say were some of the common characteristics as to

23   these consulting/settlement agreements?

24   A    Well, the consulting aspect is generally vague and where

25   it's not vague, it's, there's no real parameters about the

1   work to be performed.  In a different type of consulting

2   agreement, there would be specificity.  You are going to be

3   working so many days a week, you are going to work on these

4   things, you are going to review your work.  There's really

5   none of those aspects here.  So, the consulting is either

6   quite opaque where it's very broad and general, but there

7   really is no parameters around the work that's going to be

8   performed.  There's no standards.  There's really no

9   parameters.

10          Again, as we said, as I said earlier, it provides

11   the company some option to use this executive with the

12   expectation on both sides that it's likely not to happen, but

13   also embedded in these agreements is a significant release.

14   It can be very long and detailed.  The company wants to get a

15   release from all potential claims against itself, its

16   directors, its executives and anybody else they can think of.

17   There will be usually a number of other features, a

18   non-disparagement, confidentiality, since it's an executive it

19   may include noncompete, non-solicit.  I think several of them

20   had a provision not to sue us and on.

21          So, it's really the focus, as we said earlier, is on

22   the covenants rather than the consulting part of the

23   agreement.

24   Q    And by covenants, you mean the settlement aspects of the

25   agreement?

1    A    The settlement aspects of it.

2    Q    What about, to the extent that these agreements each has

3    a consulting aspect to it, in general, what have you found

4    about these agreements and the compensation that goes with the

5    consulting aspect?

6    A    Well, it's generally pretty significant.  Hundreds of

7    thousands or millions of dollars to abide by this consulting

8    agreement, you know, for relatively little expectation of

9    relatively little work and, you know, some kind of meaningful

10   economics but, again, I think the real reality is you're not

11   paying too much probably for the consulting aspect.  You're

12   paying much more for the different releases and other

13   covenants.

14   Q    And in these agreements, are there -- is the payment of

15   the consulting fee conditioned upon the completion of any

16   amount of consulting work?

17   A    Almost never.  It, it may be that you have to be willing

18   and able or be available to do things, but there's no

19   parameters around what you must complete or the quality of

20   what you do.  And, again, going back to the expectation,

21   they're probably never going to call you.

22   Q    And that's true based on your experience dealing with

23   these agreements in your professional background?

24   A    Yes, it is.

25   Q    All right.  I'm going to give you copies of the

1    agreements but for purposes of today's hearing, I'm going to

2    focus on one unless the Court wants me to focus on all of

3    them.

4              THE COURT:   No.  You said a half an hour to 45, so

5    choose your best one.

6    Q    I'll distribute these to the Court afterwards, but for

7    the purposes of today, I'd like to focus on the Tyson Foods

8    agreement, please, which is marked as Defense Exhibit 119-15.

9              Mr. Johnson, this is one of the agreements you

10   identified, correct?

11   A    Yes, it is.

12   Q    What's Tyson Foods?

13   A    Big food company based in Arkansas.

14   Q    Turning your attention to the first two lines of the

15   agreement under paragraph one, did you take note of how this

16   agreement begins?

17   A    Yes.  It says you're being separated from the company as

18   of December 31, 2016 and we're going to settle and all claims

19   and issues that have been raised by you.

20   Q    What conclusions do you reach from the way this agreement

21   is structured and the language of that provision?

22   A    Well, I think going back to your terminology, it's a

23   settlement agreement.  It's a settlement agreement that also

24   has a consulting aspect, but just from the plain language,

25   there's been issues raised and we're trying to reach a

Case 1:15-cr-00637-KAM  Document 685  Filed 10/17/18  Page 24 of 99 PageID #: 21927

1   settlement.

2   Q     In looking at paragraph two which focuses on the

3   consideration, it talks about things like accrued but unpaid

4   base salary, accrued but unpaid expenses, accrued vacation,

5   accrued benefits, do you usually see provisions relating to

6   those kinds of payments in the context of these agreements?

7   A     Yes.   These agreements are on top of what individuals

8   usually have.   Senior executives will have a variety of

9   accrued benefits, compensation, long-term awards, equities,

10  options and on and on.   So this is saying that you get to keep

11  what you got and if you've fulfilled the terms here, you'll

12  get more.

13  Q     What about 2, sub I, what is that provision about in your

14  experience?

15  A     It says we're going to give you a severance benefit

16  explicitly, that if you -- we're going to pay you a million,

17  in this example, 1,175,000 a year for three years or

18  $3.5 million, you know, over three years.

19  Q     And then on the next page, it talks about other benefits

20  accruing to the departing executive.

21         By the way, who is it in this case?

22  A     The CEO, the former CEO of Tyson Foods.

23  Q     It talks about these other benefits accruing to the CEO

24  including subsidized health care and conditional vesting of

25  equity.   Is subsidized health care usually a discussion point

1   in these separation agreements?

2   A    Surprisingly it often is.

3   Q    And what's conditional vesting of restricted stock,

4   what's that?

5   A    They're going beyond -- you know, you'll get to keep your

6   restricted stock you've been awarded or a portion of it and on

7   this page, they go through the three types of awards they had,

8   performance shares and then they had stock options.  So it

9   lays out the conditions on when you'll get this or how much of

10  this equity you'll actually receive.

11  Q    Why, in general, does an executive want this as part of

12  the terms of their leaving?

13  A    It can be a very significant amount of money so, and

14  often, there will be other plans, but this is just referencing

15  some of the other plans and the economics that they're going

16  to want to take or are entitled to take with them.

17  Q    So, in your experience, these provisions that go towards

18  employment benefits or other ancillary benefits that the

19  executive is getting, are those part of or separate from

20  whatever fees the executive is getting from the consulting

21  arrangement?

22  A    He's separate.  He's already got most of that already in

23  place.  Again, this type of agreement is on top of what they

24  already have.

25  Q    So, consulting money is on top of whatever financial

1  benefits that he will be getting as part of his employment?

2  A    Exactly.

3  Q    Turning to page three which refers to the consulting

4  provision, what term of time does this consulting arrangement

5  provide for?

6  A    This is a three year agreement after he departs the

7  company.

8  Q    And in your experience with consulting arrangements and

9  in the separation context, what time period do you typically

10 see?

11 A    Three years is at the longer end.  I think most common is

12 probably a year, two years would be less common and three

13 years would be probably more the exception.

14 Q    When you give advice to clients about how long to have a

15 consulting arrangement with the departing executive, what kind

16 of advice do you give, in general, about the duration?

17 A    Don't pay for things you don't want or need.  If a year

18 is sufficient, only pay for a year.  Don't pay for more than

19 the company needs or wants.

20 Q    And how much does this particular agreement call for in

21 terms of the total consulting fees?

22 A    It's 2.3 million a year or 6.9 million over the

23 three year period.

24 Q    Do you see any language in this agreement that conditions

25 the payment of any of that money on the actual performance of

1  consulting work?

2  A     No.

3  Q     And is that consistent with your experience?

4  A     Yes.

5  Q     Turning to the definition of duties, how does this

6  agreement define the duties of the consultant?

7  A     Well, it's very general and broad.  You may provide

8  advice if asked as a former CEO.  In any event, it won't be

9  more than eight hours a week or 33 hours a month.  It doesn't

10 specify what those duties are or any standard for evaluating

11 them, any written reports.  It just says be available.  In any

12 event, it won't be very much work.

13 Q     It says you will have such duties and responsibilities as

14 assigned to you from time to time, right?

15 A     Exactly.

16 Q     And it also goes on to say that in addition to the, to

17 the cap on the time, the executive here can work at places

18 other than at the offices of the company?

19 A     Yes.

20 Q     Is that consistent with your experience with these

21 agreements?

22 A     Yes.  Usually you're not required to come into the

23 office.

24 Q     What is -- when you have provided advice on these

25 agreements, what is the reasoning that you've explained as to

1   why the description of the consulting work should be more open

2   than specific?

3   A    Well, from a company's perspective, we are not quite sure

4   what the issues are that you may want to utilize this

5   individual for.  Particularly, in today's world, in a

6   complicated regulatory legal shareholder customer environment,

7   you could conjure up all kinds of things that you might have a

8   remote chance of asking about.

9         So, I think from the company's standpoint, they're

10  loathe to put down too many things that, because they don't

11  know what it's going to be, but I think the reality, they also

12  know that it's seldom or unlikely to ever actually be used.

13  From the executive standpoint, they're typically negotiating

14  for as little work as possible or no work.  They're usually

15  willing to be available, but they certainly aren't going to be

16  held to any, you know, significant standards.

17  Q    Is it fair to say the executive is more concerned about

18  what he's being paid than actually doing consulting work?

19  A    Absolutely.

20  Q    Turning to page four of this agreement, the paragraph

21  that starts, "In the event."  "In the event the consulting

22  term terminates pursuant to subsection 2 of this section, you

23  shall continue to receive installments of the consulting fee

24  through the second anniversary of the employment separation

25  date, together with a lump sum payment of 2.3 million payable

1   to you on the second anniversary of the employment separation

2   date."

3          What does that term mean to you?

4   A    If you die or get disabled, you get all the money.

5   Q    And also it refers to subsection 2 which, if you turn

6   back the page, describes it as being the date the board

7   notifies you that it no longer requires your provision of the

8   consulting services for any reason.  Does it not?

9   A    Yes.

10  Q    So, in this agreement, if the board ends the consulting

11  arrangement, the executive still gets the full payment, right?

12  A    Exactly.

13  Q    And in that circumstance, the executive would have done

14  no work for that additional balloon payment, correct?

15  A    Right.

16  Q    And is that consistent with your experience with these

17  kinds of agreements?

18  A    Yes.

19  Q    Okay.  So, and the last thing I'll point your attention

20  to is the release language which is page five, paragraph four.

21         Do you agree with me that this is a very general and

22  open release?

23  A    Yes.

24  Q    To the extent that it provides specific examples of

25  potential statutes and claims, what kinds of statutes and

1    claims are at issue?

2    A    It, I think as we talk -- again, I'm not a lawyer here

3    but they talk about protecting older employees, so the age

4    discrimination, all kinds of medical issues in paragraph A

5    there.  The first paragraph goes into significant detail on

6    who you can't sue.  So I think they, looking at this, they

7    were trying to think of every statute conceivable they didn't

8    want to be litigated over.

9    Q    Is it fair to say we're talking about a circumstance

10   where the executive is being terminated against their will,

11   right?

12   A    Yes.

13   Q    All right.  So, across these other eight example

14   consulting/settlement agreements, did you see that the

15   provisions that we discussed here today and highlighted with

16   the Tyson agreement are similar with the other agreements?

17   A    Yes.

18   Q    Were you also asked to look at consulting agreements

19   related to this case?

20   A    Yes.

21   Q    I'm going to put before you -- you looked at more than

22   one, right?

23   A    Yes.

24   Q    For purposes of today, I'm going to draw your attention

25   to one of them, the agreement involving someone named Darren

1    Blanton which is, for purposes of today's hearing, we'll use

2    what's marked as DX 119-6.

3              THE COURT:  Mr. Chan, did you want to move into

4    evidence any of these exhibits that you've talked about so

5    far, specifically Defense Exhibit 119-11, 119-15 and the other

6    agreements?

7              MR. CHAN:  Sure, I'll do that.

8              MR. KESSLER:  Your Honor, I think, frankly, all the

9    exhibits at the hearing should go into evidence.

10             MR. CHAN:  We'll agree at the end that they'll all

11   go into the record.

12             THE COURT:  Okay.  I just wanted to make sure.

13   Q    All right.  Mr. Johnson, were you asked to review a

14   number of consulting agreements at issue in this case

15   including this one I put before you?

16   A    Yes.

17   Q    And did you compare this agreement with the example

18   agreements that you collected that we just discussed?

19   A    Yes.

20   Q    Did you also compare this agreement with agreements that

21   you have experience with from your professional background?

22   A    Yes.  Yes.

23   Q    Did you develop -- did you form an opinion as to any

24   similarities, if any, between this agreement and those other

25   agreements?

Johnson - direct - Chan                    32

1    A    I think the general theme is the same.  The consulting

2    description of services is quite broad and not specific.  This

3    is, again, as I would have generally expected.  There's

4    compensation here for this agreement, there's a period of term

5    which is toward the shorter end of what we talked about as the

6    normal, but there's a significant amount of covenants here,

7    confidentiality, non-disparagement, that I would have expected

8    to see, you know, from these types of agreements.  Then on

9    page four, there's a very lengthy release which is, again,

10   it's not quite as long as the one we were just looking at but

11   to my eye, seems to be a very broad general release.

12          So, I think, I think the substance of this is

13   similar to what we were talking about before.  It's not as

14   long an agreement, but the work, the description of services

15   is very general and vague, likely not to actually, in my

16   experience, to be enforced.  There's certainly compensation

17   for this agreement and then it goes through the release and

18   all the different covenants that you would expect to see.

19   Q    So, this agreement looks like the agreements that you

20   have experience with where the driver is the settlement

21   portion as opposed to the consulting portion?

22   A    Yes.

23   Q    In fact, the agreement before you is entitled Consulting

24   Agreement and Release, correct?

25   A    Yes, it is.

1    Q    Did one of the nine agreements that you found as an

2    example agreement also have that in its title?

3    A    I think so, yes.

4    Q    For the record that is the Renaissance Re Holdings

5    agreement that's on the list.

6            Okay.  So, now I'm going to turn quickly to another

7    topic which is on, focusing now back in time again to the

8    instances in which executives are being employed by companies,

9    and you testified that you had experience with the on-boarding

10   process of executives and it's true, right?  You advised on

11   the agreements that companies enter into with new executives,

12   right?

13   A    Yes.

14   Q    In the context of those agreements, do you have

15   experience when employment agreements with executives define

16   the termination for cause provisions in those employment

17   agreements in reference to the conviction for a felony of some

18   kind?

19   A    Yes.

20   Q    And what has your experience been?

21   A    That's very often included in the cause definition for

22   executive agreements.

23   Q    Do you have experience with agreements where the

24   termination for cause ground is solely based on a felony

25   conviction for some kind of felony?

1   A     I've seen those.  Those are less common today.  You had

2   seen those more in the past but, yes, I have seen those.

3   Q     Let me put what you have in front of you on the system,

4   it's in evidence already from the trial, it's GX 251, because

5   we don't have hard copies of it.

6              Could you turn to the attachment that is the

7   employment agreement which is R168759.  251 and the Bates

8   number page we're looking for is R168759.  And then can you

9   turn to the third page of this exhibit.  Let's highlight the

10  termination for cause provision, number three.

11             Mr. Johnson, were you asked to review this

12  termination for cause provision in this agreement?

13  A     Yes.

14  Q     Have you seen in your experience executive employment

15  agreements with similar, similarly narrow termination for

16  cause provisions?

17  A     Yes, I have.

18  Q     And you were just saying, I think, that it is not as

19  common nowadays as it used to be?

20  A     Yes, it's unusual today.  It was more common before the

21  financial crisis.

22  Q     And do you have a sense as to why it is less common now

23  than it used to be?

24  A     I think many companies or their attorneys felt

25  uncomfortable with language that is narrow as this.  I think

1   they've added a number of provisions to go beyond this,

2   although you could be somewhat skeptical, are they actually

3   ever going to happen, for example, willful malfeasance,

4   willful disregarding the actions of the board, a variety of

5   terms that began with the word "willful" which I think are

6   probably unlikely to happen or at least be provable, but you

7   do see.  This would be a skinny version of what you would see

8   today.  You would see generally a longer list of willful type

9   renditions.

10  Q    In your experience, what circumstances would you advise

11  companies that the company should agree to a narrow provision

12  like this?

13  A    I think it's part of the whole agreement.  I'm a stickler

14  on this particular cause.  I have been aggressive trying to

15  get my clients to have as fulsome a term as possible, but it's

16  part of the whole agreement so this is unlikely in the real

17  world to be triggered.  The economics are certainly much more

18  likely to be paid so it's a tradeoff.

19          I've been a stickler on this agreement but clients

20  have made decisions.  They can only push on so many aspects of

21  an agreement and this may not be one that they feel is worth

22  it so that, I think as part of the negotiating process, you

23  end up with this particular term.  I would be uncomfortable

24  with it but I see it and I understand why clients get there.

25          (Continued on next page.)

1    BY MR. CHAN:

2    Q    So, similar to the consulting class settlement agreements

3    where you were asked to do a public record search to identify

4    examples of employment agreements with executives involving

5    similarly narrow termination for cause language as in this

6    agreement that's on the screen?

7    A    Yes.

8    Q    And how many did you identify for that process?

9    A    We came up with four examples.

10   Q    DX 119-21.  Is this the list of your four examples?

11   A    Yes, it is.

12   Q    For purposes ever today, I would like to focus on the

13   first one, the Volition RX agreement, which is DX 119-22.

14   I've put up on the screen the termination for cause provision?

15        How would you compare the termination for cause

16   definition in this agreement with the agreement that we looked

17   at that is part of this case?

18   A    I think it's very similar.  It talks about your

19   conviction of a felony, of theft, embezzlement or some other

20   major felony involving moral turpitude and then I guess it

21   also narrows it, if you are convicted that reflects adversely

22   upon the standing of the company in the community.  So you

23   have to have committed of a major felony involving moral

24   turpitude and it has to impact the reputation of the company.

25        So I would consider this quite narrow.

Johnson - direct - Chan                    37

1   Q    In fact, this one is more narrow because it only counts

2   as a ground of cause, a felony that's theft or embezzlement or

3   one involving moral turpitude, whereas the agreement in this

4   case counts any felony or crime involving moral turpitude,

5   correct?

6   A    Yes.  I guess that's true.

7   Q    And then, without going through the other three

8   agreements, did they all have similarly narrow termination for

9   cause provisions?

10  A    Yes.

11  Q    And they are all similar to the ones that you have seen

12  in the course of your career?

13  A    I have seen those, yes.

14           MR. CHAN:  I think that's it, your Honor.

15           THE COURT:  All right.

16           MR. KESSLER:  If I could have one minute, your

17  Honor.

18           THE COURT:  Sure.

19  CROSS-EXAMINATION

20  BY MR. KESSLER:

21  Q    Good evening, Mr. Johnson.

22  A    Good evening.

23  Q    Thanks for being here?

24           I want as to ask you some questions about the

25  opinions you intend to offer in this case and the methodology

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Case 1:15-cr-00637-KAM Document 685 Filed 10/17/18 Page 38 of 99 PageID #: 21941

1  by which you got to those opinions.

2        But let me just ask a couple of basic things first.

3  Are you an expert in all consulting agreements.

4  A    No.

5  Q    So what are the opinions that you intend to offer in this

6  case?

7             MR. CHAN:  Objection.

8             THE COURT:  Well, I think that the witness  -- part

9  of his analysis is the bases and the underlying data upon

10 which he relies.  We have the data, which is what he pulled

11 from publicly available information.  I'm not sure what the

12 opinion is that he's offering.

13            MR. CHAN:  I'm objecting to the form of the

14 question.  He just testified to what his opinions are.  If

15 Mr. Kessler wants to point him to a specific area, that's

16 fair.  To ask him a blanket question what is your opinion is

17 essentially to retread the entire direct testimony.

18            MR. KESSLER:  Let me ask it this way and maybe we

19 can speed it up.

20 Q    Mr. Johnson, do you intend to offer any opinion beyond

21 those that you have testified to today?

22 A    I don't know.  I'll respond to questions from either side

23 here.  So I don't know.  I'll speak to what I believe in my

24 expertise.  I think it would be the two things we briefly

25 talked about.  I guess I would just have to respond to what

1   people ask me.

2   Q    Right?

3        And the two things that you were just asked about

4   relate to your comparison of the nine executive settlement

5   consulting agreements with the  -- the consulting agreements

6   at issue in this case, that one thing.

7   A    I think, as I said earlier, I think those are examples of

8   what I've seen in the marketplace for these types of

9   agreements.  I think it's my expertise in having done this a

10  long time, supplemented by some publicly available examples.

11  Q    I'm going to show you what's been marked as Government's

12  Exhibit 1307.  This is the defendant's September 19, 2017

13  disclosure related to the Daubert hearing.  Mr. Johnson, I'll

14  bring you a copy, but I'm going to put it up on the screen?

15       Looking at page ten, do you see that?  And there's a

16  summary of opinions related to Mr. Johnson and then you see

17  there are a number of opinions.

18  A    Okay.

19  Q    I'm just going to ask you about each one of them.

20  A    Okay.

21  Q    Item A, do you see that?  It begins consult agreements

22  are frequently utilized.  Is that an opinion you intend to

23  offer in this case?

24  A    Yes.  I think so.

25  Q    And that opinion relates to consulting agreements in

1  general?

2  A    Well, I think it's talking about the consulting

3  agreements that we're talking about here.  These are not what

4  I would call kind of plain vanilla consulting agreements where

5  there's a specific amount of work or so many days a week,

6  you're helping to design something or whatever.  This is, I

7  think in my thinking, this is regarding the types of

8  consulting agreements that are at issue here.

9  Q    What are the consulting agreements that are at issue

10 here?

11 A    I think of consulting agreements in two parts.  There's

12 the consulting agreement that's quite specific about specific

13 work to be performed, the hours that are required, the

14 specific tasks that will be done, a standard of excellence is

15 expected, the ability to the end the agreement with a certain

16 amount of notice.  So it's I think the  -- certainly much more

17 common in the world a standard consulting or contractor type

18 of agreement.

19         I think what we've been talking about here is a

20 different kind of agreement where the title is the same.  It

21 says consulting agreement, but the underlying work is little

22 or none.  It's little because it provides the company with

23 some option to actually utilize the agreements.  But the

24 expectation is that it's not likely to ever be used.

25 Q    So are you an expert in all of the second kind of

1  consulting agreements?

2  A    All is a very broad term.  I've seen lots and lots of

3  these over a career.  We have some examples.  But I certainly

4  would not say I'm familiar with every consulting agreement in

5  the world, no.

6  Q    I'm asking are you an expert in the all consulting

7  agreements of the second category that you talked about or are

8  you an expert in a subset those consulting agreements?

9  A    I think I'm an expert  -- an expert.  I'm an expert on

10 the subset that we're talking about.  I don't know if it's a

11 subset or the subset.  There's a subset that we were talking

12 about which is agreements that are used for  -- to settle some

13 type of dispute and the consulting agreement doesn't require a

14 lot of specific work.

15 Q    So that's the category of consulting agreements about

16 which you are an expert?

17 A    I believe so.  You're confusing me a little bit.  There

18 may be a subset that I'm just not thinking about.  The subset

19 we've been talking about I think I'm quite knowledgeable

20 about.

21 Q    I'm trying to get a definition for the area of consulting

22 agreements in which you actually believe you are an expert.

23 A    Well, I think the agreement in shorthand would be ones

24 that are used for departing senior executives usually that

25 require little or no work and where the significant substance

Johnson - cross - Kessler                    42

1   of the agreement is in the covenants.  I would say I'm an

2   expert in that definition.

3   Q    That's helpful.  If you just look at the opinions listed

4   here in A, B and C and you see there are references to

5   consulting agreements generally?

6   A    It says consulting agreements, yes.

7   Q    Is it fair to interpret consulting agreement as limited

8   to the specific set that you just explained is your expertise?

9   A    That's all I'm going as to testify about I believe.

10  Q    So that subset that you just told us about?

11  A    Yes.

12  Q    And then if we turn the page.  We see B, D, E, F and G

13  opinion.  G is a little bit different.  G is the comparison

14  you were talking about with Mr. Chan.  But for D, E and F is

15  it also fair to read the reference to consulting agreements or

16  consultants as a reference just to the specific subset you

17  talked about before?

18  A    I believe that's right, yes.

19  Q    All right.  Now, and again with respect to G -- strike

20  that.  We'll come back.

21          So next I want to talk to you a little bit about the

22  bases and reasons that you used to reach the opinions you

23  intend to offer in this case.  And you see there's two

24  paragraphs that are highlighted here under bases and reason;

25  do you see that.

1    A    Yes.

2    Q    So this says that your opinions will be based on your

3    extensive professional experience.  Do you see that?

4    A    Yes.

5    Q    Your academic research and literature, that's the second

6    category.  Do you see that?

7    A    Yes.

8    Q    Your review of the consulting agreements at issue in this

9    case; do you see that?

10   A    Yes.

11   Q    And your education?

12   A    Yes.

13   Q    So you also talked today about this -- these searches you

14   did for consulting agreements and then employment agreements.

15   Do you remember that?

16   A    Yes.

17   Q    So other than the results of those searches and what's in

18   this paragraph I just talked about, are you basing your

19   opinions on anything else?

20   A    Sitting here today, no.  I guess the examples we've come

21   up with in my professional experience.

22   Q    So there's a reference to academic research and

23   literature in this defense disclosure; do you see that?

24   A    Yes.

25   Q    What academic research and literature are you relying on

1    for your opinions in this case?

2    A    I don't think I will rely on that.

3    Q    And then there's a reference to your review of the

4    consulting agreements at issue in this case.  Do you see that?

5    A    Yes.

6    Q    Did you look at any other documents related to this case?

7    A    I've seen the charges in the case.  You point out here

8    some of the disclosures about my testimony and some of the

9    larger stuff back and forth.  I may have seen other legal

10   documents in this case.  Those are the ones that come to me.

11   Q    I may have asked an improper question.  Setting aside

12   communications with the defense team or that kind of thing  --

13   A    I wasn't referring to that.  I was referring to filings

14   for this hearing for this document and other things in the

15   legal process.  I'm not talking about between me and the

16   attorneys.  But just I reviewed those documents.  I certainly

17   saw the charges in this case.  I think that's it.

18   Q    So you read the indictment in this case?

19   A    Yes, I did.

20   Q    All right.  And you've looked at various legal filings

21   made in the last year?

22   A    I don't think I've looked at filings in the last year.  I

23   think the last two or three months perhaps.

24   Q    Okay.  So other than the consulting agreements that you

25   reviewed, did you look at any documents related to this case

1    that were sent or created or pertaining to 2012 through 2015?

2    A    I don't think I've looked at any of those documents, no.

3    Q    Your opinions aren't based on any of those?

4    A    I don't believe so, no.

5    Q    Are you basing your opinions on any facts you've been

6    given by defense counsel?

7    A    No.

8    Q    Facts relate to this case?

9    A    No.

10   Q    Okay.  So you have not taken any steps to familiarize

11   yourself with the business of Retrophin?

12   A    I think I was familiar a little bit from the prior trial.

13   I heard a little bit about the business.  But besides what I

14   might have picked up in the public press, no.

15   Q    Do you know who Darren Blanton is?

16   A    He's one of the board  -- no.

17   Q    It seems like you started saying something?

18   A    I thought  -- I don't want to guess.

19   Q    So you do not know who Darren Blanton is?

20   A    I don't believe so.

21   Q    Do you know who Lee Yaffe is?

22   A    No.

23   Q    Do you know who Steven Rosenfeld is?

24   A    No.

25   Q    Do you know who Allen Geller is?

Johnson - cross - Kessler                46

1   A    No.

2   Q    Do you know the relationship between any of those people

3   and Retrophin?

4   A    No.

5   Q    Do you think  -- sorry.  Let me ask you this:  Do any of

6   your opinions depend on the relationship between any of those

7   four people and Retrophin?

8   A    No.

9   Q    So whether Mr. Blanton is departing CEO of Retrophin or a

10  janitor of Retrophin your opinion is no different?

11  A    Well, I think the  -- yes.  I think that will be true.

12  Q    And whether Mr. Geller was the CEO of Retrophin or an

13  investor in a hedge fund that invested in Retrophin, none of

14  your opinions are any different?

15  A    I think that's going to be true, yes.

16  Q    That is true, right?

17  A    I believe so, yes.

18  Q    Did you, in preparing your opinions, other than looking

19  at these example consulting agreements, did you write any

20  report, take any notes, send any substantive e-mails about any

21  of your opinions?

22  A    No.

23  Q    Mr. Chan asked you some questions about how many kinds of

24  various agreements you've seen?

25  A    Yes.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Johnson - cross - Kessler                    47

1    Q    So I think you said that you  -- you'd seen many of the

2    specific type of settlement agreements in which you're a

3    expert for departing executives, is that right?

4    A    Yes.

5    Q    And then he asked you about board members and you said

6    you rarely have seen those?

7    A    Yes.

8    Q    And then he asked you about founders exiting investments?

9    A    Yes.  He asked about founders, yes.

10   Q    How many of the specific type of consulting agreements in

11   which you are an expert have you seen that involved a founder

12   exiting an investment?

13   A    Founder exiting an investment or exiting a company?

14   Q    So you tell me.

15   A    Well, I think I've seen a fair number where a founder

16   would leave an organization and they would work out some type

17   of agreement, similar to what we're talking about here with a

18   founder.  So he would be exiting a company or a business.

19   Q    How many?

20   A    20 times, maybe.

21   Q    20?

22   A    Yes.

23   Q    And in all of those cases was the founder also an officer

24   or a board member at the point they were leaving?

25   A    Probably, yes.

1    Q    You can't recall any where the founder was not  -- did

2    not also have some other role at the company?

3    A    Usually he would have an active role.  I don't recall.

4    But he could have been an emeritus, he could have been partly

5    retired or something.  Usually he would have all those titles

6    and more.

7    Q    In the cases where he didn't have an active role, he or

8    she had previously had an active role at some point?

9    A    Yes.

10   Q    So founded the company, had a role as an officer or

11   director and then transitioned to some emeritus title?

12   A    Yes.

13   Q    So have you ever seen one of the specific type of

14   settlement consulting agreements on which you're offering an

15   expert opinion in which the person getting the consulting

16   agreement had never been an officer or a director of the

17   company?

18   A    Yes.  My expertise  -- I have not.  Again, the work that

19   I do, I have not seen it used for people that never had an

20   employment arrangement at some time with the company.

21   Q    The founder is sort of an extra thing that might also

22   relate to one of the people who had an employment

23   relationship?

24   A    The founder usually would have had an employment

25   relationship at some point.

1  Q    So let's just spend a couple of more minutes on these

2  general opinions.  If we look at opinion A, opinion A, is that

3  the specific type of settlement agreement in which you are

4  expert are frequently use utilized by private and public

5  companies in the context of a threat or concern about

6  litigation.

7           Do you see that.

8  A    Yes.

9  Q    And the threats or concerns about litigation you're

10 talking about are the ones you gave to Mr. Chan on your direct

11 examination, right?

12 A    I don't know what you are referring to.  I'm sorry.

13 Q    Age discrimination, right, was one you listed?  Age

14 discrimination lawsuits?

15 A    I'm not a lawyer.  But there's a whole range of

16 litigation opportunities.  I cited a couple that came to mind.

17 My experience is that litigation is a broad category.

18 Q    That's fair.  So are the threats or concerns about

19 litigation you're talking about here threats or concerns about

20 litigation arising out of the employment relationship with the

21 company?

22 A    It may have started prior to the termination of

23 employment.  But it usually would have carried through the

24 termination of employment.  The seeds of this agreement could

25 have been disagreements and litigation could have been months

1    or years in the past, but it usually would carry through the

2    separation.

3    Q    They had some relationship to the employment status of

4    the consultant at some point?

5    A    Yes, I believe that's true.

6    Q    So if we look at the next opinion  -- I'm not going to

7    read all of this or go through every line of it.  What I want

8    to focus on is the last sentence.  You say that because of the

9    importance of the company in obtaining these favorable terms

10   in the context of a threat or concern about litigation more of

11   the agreement in that context discusses these terms and

12   compared to consulting agreements in other circumstances.  Do

13   you see that?

14   A    Yes.

15   Q    So is that a reference to what you talked about before,

16   where with the specific set of consulting agreements with

17   which you are an expert, the settlement provision is more

18   important as opposed to other kinds of consulting agreements

19   with the consulting portion is more important?

20   A    Yes.

21   Q    And if I just have a consulting agreement, you know, it

22   says consulting agreement, and has the name of the person and

23   it has the entity that's giving the consulting agreement, how

24   do I tell from the face of the document which category the

25   consultant falls in?

1  A    I think the first thing I would do is to analyze the work

2  required.  If it's a plain vanilla consulting agreement, as we

3  all understand in the real world, it will be quite specific

4  about the duties, how many days a week you work, where you

5  work, how much you're going to get paid per hour, are you

6  going to get a vacation, are you  -- what are you going to be

7  doing, who are you going to work for?  As we're all familiar,

8  it would be the standard employment terms as a consultant or

9  contractor, but there will be usually a variety of very

10  specific employment terms.

11         So I think I would look, first, at the specificity

12  and demands of the job itself as a consultant and I think at

13  least in the world there's at least two broad categories.  One

14  is quite specific and it's something we're all familiar with.

15  And the second is quite generally opaque and I think

16  reasonably obvious that that's not what is primarily being

17  paid for.

18  Q    Tell me if this is not fair:  You know it when you see

19  it, right?  If it's a big fulsome description of services,

20  that's much more likely to be a consultant, heavy consulting

21  agreement, and if it's a small description of consulting

22  services, that's more likely to be on the other side?

23  A    I guess like Potter Stewart said, when you see it.

24  There's probably also some gray area in the middle where it

25  might be difficult to parse that out.  It's written by

1    lawyers.  Yes, if the two broad categories, I think you know

2    it when you see it.

3    Q    It would probably be helpful to have a lawyer to help

4    determine in the gray area which side the agreement falls?

5    A    Well, you know what I have seen, at some point the issues

6    merge where a company may in the gray want the consulting, it

7    may be atypical, they may want more consulting.  It may be a

8    bigger attribute that they are thinking about.  But I think

9    there's some in the gray area.  But I think what we are

10   talking about here is pretty clear.

11   Q    If you look at the document you can tell by looking at

12   it?

13   A    Certainly the ones here you can tell.

14   Q    The ones here meaning your examples or the ones from the

15   case?

16   A    Both.

17   Q    So you can tell just from looking at the four consulting

18   agreements at issue in this case that they fall in one

19   category or another?

20   A    I would, again, just looking at them and putting them

21   into the typical categories, yes.  I don't know if the number

22   is three or four or five in dispute here.  But two of them are

23   labeled consulting agreements.  Three are label consulting

24   agreements and release.  I think they have a significant

25   flavor of there's other things that are being purchased,

1  certainly in the three release agreements than consulting

2  services.

3  Q    They have the significant flavor of something being

4  purchased other than the consulting services?

5  A    Exactly.

6  Q    Is significant flavor a scientific analysis of some sort?

7  A    No.  That's not a scientific term, no.

8  Q    Can I or the defense counsel or Judge Matsumoto apply the

9  significant flavor test to an agreement?

10 A    Okay.  You can have some fun with me.  I was trying to

11 use the Potter Stewart example.  I think the judge, certainly

12 a jury or certainly lawyers in this room would generally know

13 it when they see it.

14 Q    Then let me just ask you about item F here.  Common

15 practice for outside consultants like Mr. Johnson and others

16 who advise on such consulting agreements that you primarily

17 communicate with the CEO of the company who is on the board,

18 not with the entire board, about the terms of the agreement.

19 Do you see that?

20 A    Yes.

21 Q    Again, this opinion is limited to the specific kinds of

22 the settlement agreements that you identified as being your

23 area of expertise?

24 A    This is probably a broader statement.  I think the

25 negotiating pay for senior executives is much more common to

1   work through CEO, if it's not involving them personally, than

2   it is to work with the whole board.

3   Q    This is the reference to outside consultants like you who

4   advise on such consulting agreements, mean the consulting

5   agreements in which you are an expert, right?

6   A    Well, I'm an expert on compensation in general.  Maybe

7   the language is ambiguous.  But people like me who advise on

8   these things, we primarily communicate with the CEO rather

9   than the whole board.  On these kinds of agreements I think it

10  would also be true as well.

11  Q    So this item F is a more general opinion about

12  compensation discussions in general?

13  A    At least sitting here reading it, yes, it appears that

14  way.

15  Q    Is this an opinion that you are offering in this case?

16  A    If that question is posed about these agreements, I would

17  say my experience that the consulting agreements that we're

18  talking about here would generally be the primary

19  communications is going to be with the CEO rather than the

20  whole board.

21       THE COURT:  You say primary communication, you mean

22  communications about executing the agreement or communications

23  about actually performing under the agreement?

24       THE WITNESS:  More the terms, your Honor.  My

25  experience is it's very difficult to get a whole board

1    together to actually go through the details of the an

2    agreement.  Generally the communication is with the advisor or

3    lawyer who is coming up with this is with the CEO, the primary

4    negotiating or drafting.  It's just too hard to get a whole

5    board together.

6              THE COURT:  If a consulting agreement provided for

7    terms where a consultant would receive, you know, six figures

8    or seven figures under the agreement, are you saying that the

9    CEO generally is the one who is the point person for the

10   consultant's lawyer or the departing employee lawyer to deal

11   with and not the board?

12             THE WITNESS:  In my original testimony it's the CEO

13   or it could be he could delegate the general counsel or

14   someone else.  It would be management rather than the board.

15   It's just too hard to get a board together to work out all

16   this stuff.

17             (Continued on next page.)

18

19

20

21

22

23

24

25

1           THE COURT:  To work it out, but how about the

2    ultimate decision for the corporation to pay money to this

3    consultant or departing employee, is that something that the

4    CEO, in your experience, generally approves without the board?

5    So, for example, in the Tyson agreement, is that the right

6    one?  Yes, I think there were terms that required several

7    million dollars over three years.  Is that a situation where

8    the CEO would generally negotiate and authorize that without

9    board approval?

10          THE WITNESS:  Again, I'm not a governance lawyer

11   expert, but what I have seen is that, in giant public

12   companies like Tyson, they will run the final agreement by the

13   board just because it is a matter of practice.  My experience

14   has been at smaller companies the Government -- the governance

15   procedures are less clear and they may either appropriately or

16   inappropriately delegate that to the CEO.  My experience with

17   smaller companies, these governance provisions are less clear.

18          THE COURT:  Governance, what do you mean by

19   governance?

20          THE WITNESS:  The approval of pay or contracts for

21   executives, the CEO just approves.  He may tell them later

22   that he has already approved.  He may not even tell them

23   later.  They have delegated the running of the company to the

24   CEO.  They meet quarterly.  They may be quite disengaged from

25   some of these important details.

Johnson - cross - Kessler                    57

1          THE COURT:  So how do your corporate clients

2    delegate that authority to the CEO?  Is there a mechanism for

3    doing that?

4          THE WITNESS:  I think there is a vacuum created in

5    the decisionmaking in many -- again, I'm speaking as my

6    experience -- not as a lawyer, but my experience is there is a

7    vacuum of decisionmaking.  The board meets sporadically,

8    quarterly, there are decisions that have to be made.  They

9    have de facto delegated that responsibility to the CEO to make

10   these decisions on leases, hiring, products.  They may discuss

11   it, but there is not -- at least my experience is there is not

12   a smooth, clean set of approvals.

13         THE COURT:  Thank you.

14   BY MR. KESSLER:

15   Q    So, Mr. Johnson, let's talk about the public consulting

16   agreements that you looked at.  So I have a disclosure about

17   the methodology you used that may now be out of date, so I

18   first just want to confirm that it is, in fact, out of date at

19   this point.  Originally, my understanding is that your final

20   opinion, you know, Opinion G here in Government Exhibit 1307

21   on page 11, was based on your comparison of the consulting

22   agreements from this case with consulting agreements you

23   located through searches of Edgar, the SEC database, and then

24   also through Google?

25   A    Right.

Johnson - cross - Kessler                    58

1   Q    That's what you originally did; right?

2   A    Sequentially, but, yes.

3   Q    So first you looked in Edgar?

4   A    First, I looked at Google and then Edgar.

5   Q    First you looked at Google and then Edgar?

6   A    I believe so.

7   Q    You don't remember?

8   A    It's all kind of jumbled together, it's about the same

9   time.

10  Q    Did you run the Edgar searches yourself?

11  A    One of my associates did.

12  Q    Did you run the Google searches yourself?

13  A    No.

14  Q    So your Edgar searches generated 1,600 documents; is that

15  right?

16            MR. CHAN:  Objection as beyond the scope.  We didn't

17  offer this portion of his opinion.

18            MR. KESSLER:  It goes to the reliability of his

19  methodology.  I'm happy to establish that.

20            MR. CHAN:  A methodology of opinion he is not

21  offering.

22            THE COURT:  I think he just said that was -- is

23  Opinion G no longer an opinion you are offering?

24            THE WITNESS:  Well, I think the opinion here is

25  based on the nine that we have been talking about, the subset

MDL   RPR

1    of nine.

2              THE COURT:  So, I think it is a fair question then.

3              MR. KESSLER:  So that's sort of what I am trying to

4    get at.

5    Q    So opinion G was disclosed to us on September 19, 2017.

6    Okay.  At that point had you decided not to use your Edgar

7    analysis?

8    A    We had done the work.  It had not been decided what we

9    would do with it.

10   Q    Okay.  So when, on September 19, your opinion was given

11   as Opinion G, that was based on both your Edgar analysis and

12   the Google analysis; right?

13   A    I think those are examples that we were prepared to use

14   in this case from both sources.

15   Q    So the opinion that the consulting agreements in this

16   case have multiple similarities to consulting agreements

17   entered into by a variety of companies was based on the

18   examples you found through Edgar and the examples you found

19   through Google?

20   A    I think, as I said earlier, the primary source of this is

21   my experience having done this a long time and seeing a lot of

22   agreements, that the purpose of G and some other things was

23   just to provide some examples of what I was saying.  It wasn't

24   the foundation of what I believe.

25   Q    Okay.  So Opinion G is not based on any analysis you did

Johnson - cross - Kessler                    60

1   using Google and Edgar, it's based on your experience?

2   A    I think it's based on, as I said, it is based on my

3   experience and some examples from the public domain.

4   Q    And those examples were examples you found originally

5   from both Edgar and Google?

6   A    Yes.

7   Q    Okay.  And now you are no longer relying on any examples

8   you located through Edgar?

9   A    I don't think we are presenting the results of the Edgar

10  search.

11  Q    I just want to know are you, Allan Johnson, relying on

12  anything related to the Edgar search?

13  A    No, I'm not.

14  Q    Okay.

15  A    At least, unless something changes.  Right now I am not,

16  no.

17  Q    Well, here we are.  So, as of right now, you are not

18  relying on it; right?

19  A    No, I'm not.

20  Q    Originally there were 50 examples you used; right?

21  A    There were 50 examples we were prepared to use as

22  examples, yes.

23  Q    Right, 41 of those came from Edgar?

24  A    Yes.

25  Q    You distilled those 41 from 1,600 documents you found in

1  your initial Edgar search?

2  A    The 1,600 documents, there weren't all documents.  It was

3  a wide search that did not include a lot of documents and

4  agreements.  So that is somewhat misleading numbers.  There

5  was never a universe of 1,600 anything.

6  Q    That's fine.  1,600 hits?

7  A    1,600 hits, that's a good way of putting it.

8  Q    Did you review all 1,600 hits?

9  A    We reviewed as many as we could.

10  Q    Did you, Allan Johnson?

11  A    I did not review 1,600 hits, no.

12  Q    So regardless of what was reviewed, there were 50

13  examples, 41 of which came from Edgar; right?

14  A    Yes.

15  Q    So 80 percent of the examples came from Edgar?

16  A    Yes.

17  Q    You are no longer relying on any of those?

18  A    I didn't say I was relying on any of them.  I'm relying

19  on my knowledge.  We were going to show -- potentially show

20  more examples than we are going to show now.

21  Q    I'm sorry if I am struggling to get this opinion right.

22  Is Opinion G, to reach Opinion G, are you relying on any

23  examples from Edgar searches or Google searches or any other

24  kind of searches you ran for this case?

25  A    Fundamentally, I am relying on my knowledge in this space

Johnson - cross - Kessler                    62

1    and we are prepared to present examples of -- you know, the

2    comparisons of examples of the contracts in question.

3    Q    Okay.  So Opinion -- tell me if this is fair.  Opinion G

4    is based on your 37 years of experience, you then also located

5    examples that you believe illustrate this opinion?

6    A    Yes.

7    Q    But whether you have zero examples or 100 examples,

8    Opinion G would not change?

9    A    Exactly.

10   Q    Now, Opinion G says that the consulting agreements at

11   issue have multiple similarities to consulting agreements

12   entered into by a variety of companies.  Do you see that?

13   A    Yes.

14   Q    Does multiple mean one, two, three, four, five; is there

15   a number?

16   A    Like I said, it would have to depend on what you're

17   talking about the agreement.  Probably -- it depends on what

18   we are talking about, I guess.  It will be --

19   Q    I am talking about your Opinion G.  Your opinion is that

20   the consulting agreements in this case have multiple

21   similarities?

22   A    Well, maybe it will take them off.  I guess, the first

23   we've talked about the little or no work feature, that is

24   obviously extremely important.  The release is often a part of

25   this.  You would have non-disparagement.  You could have

Johnson - cross - Kessler                    63

1    confidentiality.  That's four big ones.  You might have other
2    things.
3              So there's probably, in parsing it out, there is
4    probably a half dozen multiple similarities generally between
5    the different agreements.
6    Q    Now, in the disclosure we were provided dated October
7    13th, one of the key provisions identified was the title of
8    the agreement.  Do you recall that being an important
9    consideration in your analysis?
10   A    Is that on here?
11   Q    I'm sorry, I'll show it to you.
12             Well, actually, let me just ask, what were the key
13   provisions on which you focused for your analysis?
14   A    I think the content of the agreement, there's perhaps
15   half dozen or so substantive similarities.
16   Q    So a half dozen or so provisions that you focused on?
17   A    Yes.
18   Q    Was the title one?
19   A    I don't think the title is -- it can be helpful, but I
20   don't think the title -- there's many titles used for these
21   agreements.
22   Q    Was the fact that the consultant was going to be paid
23   something an important consideration?
24   A    Yes.  I mean, maybe the list is now up to seven, but,
25   yes, that was kind of a baseline provision that you would be

1  paid to do something.

2  Q    Have you seen a consulting agreement where the consultant

3  was not going to be paid something?

4  A    That would be unusual.  Sometimes the agreement will be

5  as needed or as used, so if we call you, we will pay you $500

6  an hour, but we may not call you, so it's agreeing to agree if

7  we ever do something.  So yes, you will see that from time to

8  time.

9  Q    But you will see a fee specified.  It'll just be if it's

10 one hour, it's $100, if it's two hours, it's $200?

11 A    Well, sometimes it will say we'll negotiate, we have

12 agreed that your expertise in a certain area and we will agree

13 to agree and even that may not be.  But it would be most

14 common to have we have agreed on how you're going to get paid.

15 Q    I think you said one of the other provisions or one of

16 the other things you try to determine from the face of the

17 document is that there little expectation of work?

18 A    Yes.

19 Q    Do you recall that?

20 A    Yes.

21 Q    And in the disclosure that was made to the Government,

22 the description is that the publicly available consulting

23 agreements are comparable because there was little expectation

24 of work based on the description of the work and the

25 circumstances.  Do you see that?

1    A    Yes.

2    Q    Is that your opinion?

3    A    Yes.  There is little expectation of work, yes.

4    Q    Based on the description of the work and the

5    circumstances?

6    A    I think it is more about the description.  Well, it's the

7    whole paragraph.  It will describe the work, it will describe

8    I guess the circumstances, if you have to come into the

9    office, the details.  So I think it will be both of the

10   description of the content of the work that is expected and

11   then the circumstances of how and if you are actually going to

12   perform something.

13   Q    So that statement, the little expectation of work based

14   on the description of the work and circumstances, that refers

15   solely to the text of the agreement?

16   A    Yes.

17   Q    Okay.  You are not considering what the company actually

18   intended, right, for the consultant?  You know, how much work

19   the company actually intended the consultant to do; right?

20   A    I think technically that's true, but I think the

21   agreements we are talking about here, there is such a

22   departure from the plain vanilla type of agreement, I think

23   that can reasonably be figured out.

24   Q    How much work did Retrophin expected Darren Blanton to

25   do?

1    A    My reading of the document is relatively little to none.

2    Q    Other than your reading of the document, do you have any

3    idea of how much work Retrophin expected Darren Blanton to do?

4    A    No.

5    Q    Other than your reading of the document, do you have any

6    idea of how much work Retrophin expected Al Geller to do?

7    A    No.

8    Q    Other than your reading of the document, do you have any

9    idea what Retrophin expected Lee Yaffe or Steve Rosenfeld to

10   do?

11   A    No.

12   Q    We will talk about the Google search again in a minute,

13   but let me just ask you about Defendant's Exhibit 119-11.

14   These are the nine documents that you located through Google.

15   Do you remember that?

16   A    Yes.

17   Q    Other than reading the Mattel, Inc. agreement -- do you

18   see that, item No. 1?

19   A    Right.

20   Q    Do you have any idea what Mattel intended for its

21   departing executive to do, how much work Mattel actually

22   expected its departing executive to do?

23   A    Besides the agreement, no.

24   Q    What about McDonald's, any idea?

25   A    No.

1    Q    Williams Sonoma?

2    A    No.

3    Q    Do you have any idea what any of these companies expected

4    their departing executives to do, who much work they expected

5    them to do?

6    A    Besides reading the agreement, no.

7    Q    Besides reading the agreement, do you have any idea what

8    sort of concerns about litigation any of these companies had

9    about the individuals in the agreements?

10   A    Well, I think in several of the agreements, it starts out

11   with we're settling something, there is clearly a dispute.

12   Several of them have you won't sue us as a key provision.  But

13   besides what's in the agreement, no, I don't have direct

14   knowledge of the circumstances, but there are provisions in

15   there that certainly will suggest some things.

16   Q    Other than reading the provisions in the document, you

17   have no idea what the litigation concerns were related to any

18   of these agreements; right?

19   A    Besides what's in the agreement, no.

20   Q    And that also goes for the consulting agreements at issue

21   in this case; you have no idea what litigation concerns there

22   were related to those four consultants?

23   A    No.

24   Q    Now, when you did the Google search to find these nine

25   documents, what did you type in to the search bar?

1   A    I think that was somewhere in the disclosure.  We had

2   some search terms, I can't remember.  It was something to the

3   effect of kind of a consulting agreement with...

4   Q    Is it these five words?

5   A    That says Edgar, so I'm not sure.

6   Q    Well, I will show you something in a minute, but it's

7   your opinion, they are your examples.  Sitting here today,

8   what Google search did you prompt?

9   A    I don't remember the terms in using Google.

10  Q    Do you remember any of the terms you used?

11  A    It would have involved -- I'm not going to guess, no.

12  Q    And you didn't run the search yourself, you had someone

13  else run it?

14  A    I didn't run the original search, no.

15  Q    How many consulting agreements did the original search

16  turn up?

17  A    We were -- we stopped at nine.  I don't remember how many

18  we originally looked at.  It wasn't that many.

19  Q    So basically you went out to look for examples of the

20  kind of consulting agreement in which you told us you had

21  specific expertise in?

22  A    That's exactly what I have said several times, yes.

23  Q    You didn't do anything other than that with respect to

24  these searches?

25  A    The objective was to have some examples to use based on

Johnson - cross - Kessler                    69

1    my knowledge of these agreements.  We were looking for

2    examples.

3    Q    The disclosure says that you searched for and reviewed

4    media reports of high-profile executive separation consulting

5    agreements through Google.  Is that what you did?

6    A    We were trying to find examples of large visible kinds of

7    companies.

8    Q    So you were specifically looking not just for consulting

9    agreements of the kind of which you are an expert, but ones

10   related to high profile companies?

11   A    I don't think those are mutually exclusive.  We were

12   looking for examples, as we are talking about here, of high

13   profile companies that somebody could recognize the names,

14   that was all.

15   Q    Then you see there is a footnote 2 next to the word

16   Google?  Sorry, it's a little hard to read.  Footnote 2?

17   A    Yes.

18   Q    And then you see there are the citation to several

19   articles.  There is a <u>Business Insider</u> article, <u>Wall Street</u>

20   <u>Journal</u>, London School of Economics article?

21   A    Yes.

22   Q    In fact, did you review these three articles and then go

23   looking for those consulting agreements?

24   A    I think we had -- I had read these articles.  I don't

25   know if that led to the search or not, I just don't recall.

1   But certainly I had seen these articles.

2   Q    Do these articles have anything to do one way or another

3   with your methodology?

4   A    No.

5   Q    Looking very briefly at the Tyson Foods agreement, this

6   is Defense Exhibit 119-15.  Do you see that?

7   A    Yes.

8   Q    Forgive my handwriting, I wrote the former CEO at the

9   top, and this agreement was with the former CEO of Tyson

10  Foods; right?

11  A    Yes.

12  Q    It is a transition, non-compete and consulting agreement;

13  right?

14  A    Yes.

15  Q    And that is -- those words capture the primary motivating

16  factors behind the kinds of agreements that you have been

17  talking about; right?

18          MR. CHAN:  Objection to form.

19          THE COURT:  Wait for me.  Try to rephrase.

20          You don't have to answer until he rephrases.

21          MR. KESSLER:  Sure.  I will come back to this.

22  Q    Let me turn for a minute to -- sorry.

23          MR. KESSLER:  I'm just looking for one specific

24  thing.

25  Q    So one other question on the consulting agreements.  This

1   is Government Exhibit 60, the consulting agreement for Lee

2   Yaffe.  Do you see that?

3   A    Yes.

4   Q    This is one of the agreements that you reviewed?

5   A    Yes.

6   Q    You analyzed this agreement using the same methodology

7   you have been describing for the other agreements?

8   A    Yes.

9   Q    If you look at Description of Services 1A, the

10  description says:  "Consultant will serve as an advisor to the

11  company and provide consulting services on cluster headache

12  drug development and other matters."

13            Do you see that?

14  A    Yes.

15  Q    Is that an example of a broad or a specific of consulting

16  services?

17  A    It is somewhere in between.  The services themselves are

18  somewhat specific, but, again, there is no specificity about

19  the actual services to be provided, the time commitment, the

20  actual output.  So it includes a little of both.

21  Q    And before we move on to the employment agreement, let me

22  just ask you one more thing about Opinion G.  It is the

23  opinion related to the multiple similarities.  Do you remember

24  that?

25  A    Yes.

1    Q    So your opinion is that there are multiple similarities

2    between the consulting agreements in this case and the

3    specific consulting agreements with which you have expertise;

4    right?

5    A    Yes.  Yes.

6    Q    Are you offering any opinion about the significance of

7    those similarities, you know, are you drawing a conclusion

8    about what we should take away from the fact that there are

9    similarities or are you just saying there are similarities?

10   A    I think the bottom-line is that these agreements are used

11   in the corporate world for a variety of purposes and I think

12   it's my professional opinion that they're part of the

13   mainstream tool kit that corporations consider when they want

14   to settle something.  So that's the bottom-line to me, that

15   yes, there are similarities here and I have seen, throughout

16   my career, that these agreements have been used as a

17   mainstream vehicle to settle disputes and -- to settle disputes.

18   Q    So it is your opinion that the four consulting agreements

19   at issue in this case are examples of a mainstream vehicle to

20   settle disputes?

21   A    I think if we ultimately get there in the testimony, yes,

22   that I have seen agreements like this used, and we have a few

23   examples where they're part of the mainstream tool kit that

24   corporations can and do use, to settle disputes.

25              (Continued on next page.)

1   BY MR. KESSLER:  (Continuing)

2   Q    That's all based on the comparison of the text of the

3   consulting agreements --

4   A    And having, having worked on these kinds of things

5   throughout my career.  So, it's not just a theoretical

6   discussion.  I've seen what people actually use these things

7   for.  The agreements in question, my professional opinion have

8   enough similarities to say this is part of the mainstream

9   toolkit that corporations use.

10  Q    Use to settle disputes?

11  A    Settle disputes.

12  Q    Okay.  So, let's finally turn to the employment agreement

13  opinion.  That's what you talked about at the end with

14  Mr. Chan?

15  A    Yes.

16  Q    Okay.  I understand that's an opinion that wasn't in the

17  initial set of disclosures we got.

18        When did you first review Mr. Shkreli's employment

19  agreement?

20  A    I don't think I've ever reviewed his employment

21  agreement.

22  Q    Do you remember Mr. Chan showed you an employment

23  agreement and asked you a number of questions about the

24  for-cause termination provision?

25  A    The only part I've reviewed is the for-cause termination

1  provision.

2  Q    I'm sorry.  So then I'll back up.

3         Whose employment agreement was that that you

4  reviewed?

5  A    I assume it was Mr. Shkreli's, but I haven't read the

6  agreement.

7  Q    Do you assume that just because I used his name?

8  A    I, I'm inferring it from the, this case, but it may have

9  been some other person, but that's who I assumed it was but I

10 have not reviewed his employment agreement.

11 Q    And so you didn't read the first page of the employment

12 agreement?

13 A    The only provision I focused on is the termination for

14 cause.

15 Q    Is that because you were asked to look only at the

16 termination for cause provision or because you decided that's

17 the only provision you needed to look at for purposes of your

18 analysis?

19 A    For this case, I was asked to make comparisons or

20 opinions or, only on the clause dealing with termination for

21 cause.

22 Q    So it didn't matter to your opinion who the employment

23 agreement or, I'm sorry, whose employment agreement it was?

24 A    I think my testimony was pretty straightforward that I

25 was focusing on the termination provision and I mentioned I

Johnson - cross - Kessler                    75

1  think several times that you would look at this provision in

2  the context of the agreement and the negotiation.  I said that

3  I think, I think my opinion is pretty clear that it focused on

4  the termination for cause recognizing this is part of a

5  broader agreement that's negotiated.

6  Q    So, when you looked at the termination for cause

7  provision, did you know whether this is an employment

8  agreement for an executive or some other kind of employee?

9  A    I assumed it's for an executive.

10 Q    Well, you assumed.  Did you know?

11 A    As I said, I didn't review the entire agreement, no.

12 Q    And that didn't matter for your analysis?

13 A    Well, most employees don't get employment agreements.

14 There's generally employment agreements for executives of some

15 sort or senior employees.  If I could expand more, Mr. Chan,

16 we had a brief discussion, certainly I can talk about these

17 provisions more, but I focused clearly on the termination for

18 cause provision.

19       MR. KESSLER:  If we could -- I'm sorry.  If I can

20 prevail on Mr. Carter to perhaps pull that up quickly so we

21 can look at it.  Government Exhibit 251, I believe page 63.

22 All right.  Let's go to the third page, page 65.  Thank you.

23 You can stop there.

24 Q    So, Mr. Johnson, this is the page from the document you

25 reviewed, right?

Johnson - cross - Kessler                    76

1   A    If you say so.  Okay.

2   Q    Well, you see the termination for cause provision which

3   you were just asked about?

4   A    I don't know if it's the same agreement but the provision

5   looks the same, yes.

6             THE COURT:  Well, can we just clarify the record

7   that this is the --

8             MR. KESSLER:  This is the exact same agreement that

9   Mr. Chan showed Mr. Johnson.

10            THE COURT:  Mr. Chan, you don't dispute that, do

11  you?

12            MR. CHAN:  No, I don't.

13  Q    And Mr. Johnson, you looked at the termination for cause

14  provision, right?

15  A    Yes.

16  Q    Did you consider the termination without cause provision

17  in this agreement?

18  A    No, I wasn't asked to.

19  Q    Do you know that there is no termination without cause

20  provision in this agreement?

21  A    I wasn't asked to look at that so I'm not aware of that.

22            MR. KESSLER:  Okay.  If you could just click out so

23  we can see it.

24  Q    Were you aware that the only three ways which Mr. Shkreli

25  or, sorry, the executive receiving this agreement could be

Johnson - cross - Kessler                    77

1  removed was for death, incapacity or conviction by a felony?

2  A    You're stating that as a fact or I'm supposed to read it

3  or what -- I haven't read the agreement.

4  Q    I guess what I'm trying to figure out is for purposes of

5  your analysis, comparing this agreement with other agreements,

6  did it matter to you whether the other agreements also allowed

7  the executive to be terminated without cause?

8  A    I was asked to look at the termination for cause

9  provision.  I don't -- are you asking me should I read the

10 whole agreement?  I'm not sure what you're asking me.

11      THE COURT:  Just listen to the question and, please,

12 as best you can, answer the question.

13 Q    So, Mr. Johnson, let me try it this way.

14      My understanding is that your opinion is that this

15 agreement has a termination for cause provision for a felony,

16 correct?

17 A    Yes.

18 Q    That's the only way to terminate this executive for

19 cause, right?

20      MR. CHAN:  Objection.  Misstates --

21 A    Yes, well, it says --

22      THE COURT:  Well, okay.  You can rephrase the

23 question.

24 Q    Sorry.  A felony or a crime involving moral turpitude?

25 A    Yes.

1   Q     And it's a final conviction?

2   A     Yes.

3   Q     And you went and found examples of other employment

4   agreements where there was also a termination for cause

5   provision that was substantially similar to this one?

6   A     Yes.

7   Q     What you were not doing or -- strike that.

8         You were not trying to figure out all the ways in

9   which an employee could be terminated in either, in this

10  agreement, right, in the agreement on the screen?

11  A     No, I was not.

12  Q     And you were not trying to determine all the way if an

13  employee could be terminated in any of the other agreements

14  that you looked at?

15  A     No, I was not.

16  Q     So, in fact, if this agreement allows the executive to be

17  terminated only for final conviction, and there were other

18  agreements that allowed the executive to be terminated because

19  of a final conviction, or from any other reasons without

20  cause, your analysis would say those agreements are the same?

21  A     No, I'm not -- I would not -- I wasn't comparing the

22  agreements, all of the provisions in the agreements.  I was

23  asked to look at that, the provision termination for cause.

24  I'm not -- I think I've said repeatedly I haven't analyzed

25  this contract to whether that -- I haven't analyzed the

1    contract.

2    Q    So, basically what you're saying is this is not the only

3    agreement you've seen in which there is a termination for

4    cause provision limited to a final conviction for a felony or

5    crime of moral turpitude?

6    A    That's what I said before, yes.

7    Q    That's the only opinion on, on this point?

8    A    Well, I think Mr. Chan asked a number of questions but it

9    focused -- all of my opinion so far has been asked to focus on

10   the termination for cause provision in isolation.

11   Q    Were you asked to compare this agreement with the

12   employment agreement for Stephen Aselage, Steve Aselage?

13   A    I was not.

14   Q    Do you know who he is?

15   A    No.

16   Q    Would it have been helpful to compare this employment

17   agreement to another employment agreement for a similar

18   executive at the same company?

19   A    Again, I was asked to focus solely on the termination for

20   cause provision.  I was not asked to analyze different

21   agreements.

22   Q    Okay.  And then you went out after you read this

23   termination for cause provision and you conducted some more

24   Google searches, right?

25               MR. KESSLER:  Is that a sign?  Strike all of my

                    Johnson - cross - Kessler              80

1    commentary.  I'll ask another question.

2    Q    After you read this termination for cause provision in

3    Government Exhibit 251, you then conducted some Google

4    searches, is that right?

5    A    Yes.

6    Q    Did you conduct the Google searches or did someone else?

7    A    Someone else did.

8    Q    What did they type in the search bar?

9    A    We were trying to come up with terminations that were

10   essentially, as you said earlier, as narrow as the one that

11   we're looking at here.

12   Q    Okay.  But you don't remember what you actually typed or

13   what you actually had someone else type in the search bar?

14   A    Sitting here, I don't.

15   Q    So if I wanted to replicate your search, how would I do

16   it?

17   A    Well, I think you would try to find agreements that have

18   a narrow definition for cause, cause termination.

19   Q    So I would go out and I would look for agreements that

20   looked similar to this one?

21   A    Well, not agreements.  That provision, that separate

22   provision.

23   Q    Provisions?

24   A    Yes.

25   Q    But, again, you don't actually know what was searched

1    for?

2    A    I don't remember sit, sitting here, no.

3              MR. KESSLER:  If I can just have a moment?

4              THE COURT:  Yes.

5              (Pause.)

6              MR. KESSLER:  Thank you very much, Mr. Johnson.

7              THE COURT:  All right.  Any redirect, Mr. Chan?

8              MR. CHAN:  Just one brief question based on this

9    last topic.

10   REDIRECT EXAMINATION

11   BY MR. CHAN:

12   Q    Mr. Johnson, in your experience, if an employment

13   agreement for an executive does not set forth the basis for a

14   termination without cause, can management still terminate that

15   executive without cause?

16   A    Again, I'm not a lawyer, but in agreements that have not

17   had that provision, I have been told that you can always fire,

18   under corporate law, you can always fire somebody.

19   Q    What's your understanding of the difference or the

20   necessity to define or distinguish between terminations with

21   cause versus terminations without cause?

22   A    Typically, terminations without cause, there's a

23   significant economics to the executive or employee that

24   they're going to receive if they're terminated without cause.

25   Typically, treatment under termination for cause is quite

Johnson - recross - Kessler                    82

1   harsh.  You receive little or nothing.  So it's not whether

2   you can be terminated or not.  It's an economic, economic

3   issue.

4            MR. CHAN:  No other questions, Your Honor.

5            THE COURT:  Just so I understand, so if you are

6   terminated without cause, the executive can expect greater

7   compensation?

8            THE WITNESS:  Exactly, Your Honor, severance,

9   equity, whatever.  Termination for cause, intentionally the

10  treatment is quite harsh.

11           THE COURT:  So any benefits or payments would be

12  either not existent or much reduced?

13           THE WITNESS:  Absolutely.

14           THE COURT:  Thank you.

15           MR. KESSLER:  Your Honor, if I could ask just a

16  couple more questions based on that.  I'll be very brief.

17           THE COURT:  Sure.

18  RECROSS-EXAMINATION

19  BY MR. KESSLER:

20  Q    Mr. Johnson, you're not an attorney?

21  A    I'm not an attorney, no.

22  Q    So your understanding as to whether or what extent an

23  individual can be fired without cause pursuant to an employee

24  agreement is not based on legal training, right?

25  A    Not based on legal training.

CMH      OCR      RMR      CRR      FCRR

1   Q    Based on things you've been told by lawyers or your

2   experience for a number of years?

3   A    Yes.

4   Q    And so if we just take, for example, the employment

5   agreement that we've been looking at, Government Exhibit 251,

6   just assume that there's no written out provision for without

7   cause, okay?  Can you do that?  Because I don't want you to

8   have to read the whole thing.

9   A    I'll assume that, yes.

10  Q    So, based on your answers to Mr. Chan's question, is it

11  your professional opinion that the executive still could have

12  been fired?

13  A    I, in those situations -- most -- yes, I've been told and

14  I have seen that people can always be fired.

15  Q    Okay.  So that employment agreement did not prevent the

16  executive from being fired at any point by the board?

17  A    That's my nonlegal -- you asked a generality.

18  Q    I understand.

19  A    And that's my nonlegal understanding of corporate law

20  but, again, I'm not a lawyer.

21  Q    And if a lawyer had a different view, would you defer to

22  the lawyer?

23  A    I, I usually defer to lawyers.

24  Q    Not a good idea in this courtroom.

25  A    There's too many of you.

1    Q      Thank you very much.

2            THE COURT:  Good timing.  All right.  Can we try to

3    get the lights back on.

4            I'm sorry.  Just try to take care leaving the

5    courtroom.  They shut out the lights on a lot of the areas.

6            All right.  So you are excused.  Have a good night

7    and be careful leaving the courtroom and the courthouse.

8    There might be some darkness.

9            (Witness excused.)

10           THE COURT:  All right.  So is there anything else

11   you want to address?

12           MR. KESSLER:  Nothing tonight.  I imagine we may

13   want to make a very brief supplemental --

14           THE COURT:  Post-hearing?

15           MR. KESSLER:  Yes, supplemental submission based on

16   the witness' testimony.

17           THE COURT:  Do you want to do them simultaneously?

18           MR. KESSLER:  I think that makes sense.

19           MR. CHAN:  This is the government's motion so I

20   think we should be entitled to respond to their motion to

21   preclude our expert.

22           THE COURT:  That's fine.  I don't really care what

23   order it comes in.  When do you want to make your supplemental

24   submission?  I think this expert would be called, if at all,

25   in the defense case.

85

1          MR. KESSLER:  That's correct.

2          THE COURT:  Which is projected to --

3          MR. KESSLER:  I think there's, correct me if I'm

4   wrong, no risk that this expert will testify before

5   Thanksgiving or very, very little risk that this expert will

6   testify before Thanksgiving.

7          THE COURT:  Well, I would like something to do over

8   Thanksgiving since I'm not going anywhere thanks to this trial

9   so why don't you try to make submissions before Thanksgiving

10  and then I'll work on it.

11         MR. KESSLER:  Do you mind if we confer and then

12  tomorrow morning, propose a schedule?

13         THE COURT:  Yes.  Have a good night, everybody.

14         MR. KESSLER:  Thank you.

15         THE COURT:  Sorry about the lights.

16         Let's put this on the record.

17         We are stipulating to admission of all of the

18  exhibits that the parties have offered?

19         MR. CHAN:  Yes, Your Honor.  Thank you.

20         MR. KESSLER:  Yes.

21         THE COURT:  And you will provide copies to us,

22  please?

23         MR. KESSLER:  I think what makes the most sense

24  since I was not keeping careful attention on the stand is

25  we'll take a look at the transcript tonight or tomorrow and

1    we'll just give you a set.

2            THE COURT:  Okay.  Thank you.  With your submission?

3            MR. KESSLER:  We can give you the set of exhibits

4    tomorrow.

5            THE COURT:  All right.

6            You can do that too, Mr. Chan?

7            MR. CHAN:  I am going to do that now.

8            MR. KESSLER:  He's more organized.

9            THE COURT:  Thank you.  Good night, everyone.

10           (Matter concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

87

1                        I N D E X

2  WITNESSES:

3

4      ALAN M. JOHNSON                          3

5           DIRECT EXAMINATION                  3

6           CROSS-EXAMINATION                   37

7           REDIRECT EXAMINATION                81

8           RECROSS-EXAMINATION                 82

9

10

11

12

13

14                *     *     *     *     *

15

16

17

18

19

20

21

22

23

24

25

CMH      OCR      RMR      CRR      FCRR

USA v. Greebel - Daubert Hearing                                            1

**$**

**$100** [1] - 64:10
**$200** [1] - 64:10
**$500** [1] - 64:5

**1**

**1** [1] - 66:18
**1,000** [1] - 7:5
**1,175,000** [1] - 24:17
**1,600** [8] - 58:14, 60:25, 61:2, 61:5, 61:6, 61:7, 61:8, 61:11
**100** [2] - 4:17, 62:7
**11** [1] - 57:21
**119-11** [3] - 20:6, 31:5, 66:13
**119-15** [3] - 23:8, 31:5, 70:6
**119-21** [1] - 36:10
**119-22** [1] - 36:13
**119-6** [1] - 31:2
**125** [1] - 4:17
**130** [1] - 4:17
**1307** [2] - 39:12, 57:20
**13th** [1] - 63:7
**14** [1] - 1:7
**15-CR-637(KAM** [1] - 1:3
**19** [3] - 39:12, 59:5, 59:10
**1A** [1] - 71:9

**2**

**2** [5] - 24:13, 28:22, 29:5, 69:15, 69:16
**2.3** [2] - 26:22, 28:25
**20** [3] - 12:6, 47:20, 47:21
**200** [2] - 1:17, 14:6
**2012** [1] - 45:1
**2015** [1] - 45:1
**2016** [1] - 23:18
**2017** [3] - 1:7, 39:12, 59:5
**225** [1] - 1:23
**25** [1] - 4:9
**251** [5] - 34:4, 34:7, 75:21, 80:3, 83:5
**271** [1] - 1:15

**3**

**3** [2] - 87:4, 87:5
**3.5** [1] - 24:18
**30** [1] - 18:6

**31** [1] - 23:18
**33** [1] - 27:9
**37** [4] - 3:25, 6:24, 62:4, 87:6

**4**

**40** [2] - 5:11, 5:15
**41** [3] - 60:23, 60:25, 61:13
**45** [1] - 23:4
**48th** [1] - 1:17

**5**

**50** [3] - 60:20, 60:21, 61:12
**5:15** [1] - 1:7

**6**

**6.9** [1] - 26:22
**60** [3] - 5:12, 5:16, 71:1
**613-2643** [1] - 1:24
**63** [1] - 75:21
**65** [1] - 75:22

**7**

**718** [1] - 1:24

**8**

**80** [1] - 61:15
**81** [1] - 87:7
**82** [1] - 87:8

**A**

**abide** [1] - 22:7
**ability** [1] - 40:15
**able** [1] - 22:18
**absolutely** [5] - 11:12, 13:2, 19:13, 28:19, 82:13
**academic** [3] - 43:5, 43:22, 43:25
**accomplishments** [1] - 12:3
**accrued** [5] - 24:3, 24:4, 24:5, 24:9
**accruing** [2] - 24:20, 24:23
**Acting** [1] - 1:13
**actions** [1] - 35:4
**active** [3] - 48:3, 48:7, 48:8
**actual** [4] - 16:13, 26:25, 71:19, 71:20

**added** [1] - 35:1
**addition** [1] - 27:16
**additional** [1] - 29:14
**address** [1] - 84:11
**admission** [1] - 85:17
**admitted** [2] - 2:19, 2:20
**adversely** [1] - 36:21
**advice** [5] - 14:16, 26:14, 26:16, 27:8, 27:24
**advise** [9] - 3:21, 4:17, 7:4, 14:7, 14:23, 35:10, 53:16, 54:4, 54:7
**advised** [3] - 10:3, 14:3, 33:10
**advising** [3] - 8:4, 11:10, 16:22
**advisor** [1] - 15:20, 55:2, 71:10
**afternoon** [1] - 2:9
**afterwards** [1] - 23:6
**age** [4] - 9:8, 30:3, 49:13
**aggressive** [1] - 35:14
**ago** [2] - 4:9, 17:23
**agree** [7] - 12:20, 29:21, 31:10, 35:11, 64:6, 64:12, 64:13
**agreed** [2] - 64:12, 64:14
**agreeing** [2] - 10:19, 64:6
**Agreement** [1] - 32:24
**agreement** [160] - 5:23, 5:25, 6:1, 6:5, 9:14, 10:9, 10:11, 10:12, 10:13, 10:22, 11:4, 11:11, 11:14, 11:16, 11:17, 11:20, 11:21, 11:24, 12:11, 12:16, 12:19, 12:22, 12:25, 13:4, 14:2, 14:9, 14:10, 14:25, 15:1, 15:9, 16:4, 17:14, 20:3, 21:2, 21:23, 21:25, 22:8, 23:8, 23:15, 23:16, 23:20, 23:23, 25:23, 26:6, 26:20, 26:24, 27:6, 28:20, 29:10, 30:16, 30:25, 31:17, 31:20, 31:24, 32:4, 32:14, 32:17, 32:19, 32:23, 33:2, 33:5, 34:7, 34:12, 35:13,

35:16, 35:19, 35:21, 36:6, 36:13, 36:16, 37:3, 40:12, 40:15, 40:18, 40:20, 40:21, 41:4, 41:13, 41:23, 42:1, 42:7, 47:17, 48:16, 49:3, 49:24, 50:11, 50:21, 50:22, 50:23, 51:2, 51:21, 52:4, 53:9, 53:18, 54:22, 54:23, 55:2, 55:6, 55:8, 56:5, 56:12, 62:17, 63:8, 63:14, 64:2, 64:4, 65:15, 65:22, 66:17, 66:23, 67:6, 67:7, 67:13, 67:19, 68:3, 68:20, 70:5, 70:9, 70:12, 71:1, 71:6, 71:21, 73:12, 73:19, 73:21, 73:23, 74:3, 74:6, 74:10, 74:12, 74:23, 75:2, 75:5, 75:8, 75:11, 76:4, 76:8, 76:17, 76:20, 76:25, 77:3, 77:5, 77:10, 77:15, 78:10, 78:16, 79:3, 79:11, 79:12, 79:17, 81:13, 82:24, 83:5, 83:15
**agreements** [150] - 5:14, 6:25, 7:18, 10:21, 10:23, 11:22, 15:5, 15:6, 15:7, 16:3, 16:8, 16:12, 16:16, 16:18, 18:20, 19:6, 20:8, 20:18, 20:21, 20:23, 21:13, 22:2, 22:4, 22:14, 22:23, 23:1, 23:9, 24:6, 24:7, 25:1, 27:21, 27:25, 29:17, 30:14, 30:16, 30:18, 31:6, 31:14, 31:18, 31:20, 31:25, 32:8, 32:19, 33:1, 33:11, 33:14, 33:15, 33:17, 33:22, 33:23, 34:15, 36:2, 36:4, 37:8, 38:3, 39:5, 39:9, 39:21, 39:25, 40:3, 40:4, 40:8, 40:9, 40:11, 40:23, 41:1, 41:7, 41:8, 41:12, 41:15, 41:22, 42:5, 42:6, 42:15, 43:8, 43:14, 44:4, 44:24, 46:19, 46:24, 47:2, 47:10, 48:14, 50:12, 50:16, 50:18, 52:18, 52:23, 52:24, 53:1, 53:16, 53:22, 54:4,

**54:5, 54:9, 54:16,**
54:17, 57:16, 57:22, 59:15, 59:16, 59:22, 61:4, 62:10, 62:11, 62:20, 63:5, 63:21, 64:23, 65:21, 67:9, 67:10, 67:18, 67:20, 68:15, 69:1, 69:5, 69:9, 69:23, 70:16, 70:25, 71:4, 71:7, 72:2, 72:3, 72:10, 72:16, 72:18, 72:22, 73:3, 73:7, 75:13, 75:14, 77:5, 77:6, 78:4, 78:13, 78:18, 78:20, 78:22, 79:21, 80:17, 80:19, 80:21, 81:16
**aided** [1] - 1:25
**AI** [1] - 66:6
**Alan** [2] - 2:5, 3:8
**ALAN** [3] - 3:8, 3:11, 87:4
**ALIXANDRA** [1] - 1:13
**Allan** [2] - 60:11, 61:10
**Allen** [1] - 45:25
**allowed** [2] - 77:6, 78:18
**allows** [1] - 78:16
**almost** [12] - 4:25, 5:2, 6:14, 6:17, 8:5, 9:11, 10:12, 10:25, 12:3, 12:22, 15:3, 22:17
**ambiguous** [1] - 54:7
**AMERICA** [1] - 1:3
**amount** [8] - 3:22, 5:22, 10:1, 22:16, 25:13, 32:6, 40:5, 40:16
**amounts** [1] - 5:10
**analysis** [12] - 38:9, 53:6, 59:7, 59:11, 59:12, 59:25, 63:9, 63:13, 74:18, 75:12, 77:5, 78:20
**analyze** [2] - 51:1, 79:20
**analyzed** [3] - 71:6, 78:24, 78:25
**ancillary** [1] - 25:18
**anniversary** [2] - 28:24, 29:1
**annual** [1] - 5:13
**answer** [2] - 70:20, 77:12
**answers** [1] - 83:10
**APPEARANCES** [1] -

1:11
**applicable** [1] - 17:1
**apply** [1] - 53:8
**appropriately** [1] - 56:15
**approval** [2] - 56:9, 56:20
**approvals** [1] - 57:12
**approve** [1] - 17:24
**approved** [1] - 56:22
**approves** [2] - 56:4, 56:21
**arbitration** [2] - 17:25, 18:17
**arbitrations** [1] - 18:9
**area** [8] - 9:23, 38:15, 41:21, 51:24, 52:4, 52:9, 53:23, 64:12
**areas** [2] - 5:9, 84:5
**arises** [1] - 17:10
**arising** [1] - 49:20
**Arkansas** [1] - 23:13
**arrangement** [5] - 25:21, 26:4, 26:15, 29:11, 48:20
**arrangements** [1] - 26:8
**article** [2] - 69:19, 69:20
**articles** [5] - 69:19, 69:22, 69:24, 70:1, 70:2
**articulated** [1] - 17:1
**ascertain** [1] - 10:7
**Aselage** [2] - 79:12
**aside** [2] - 17:17, 44:11
**aspect** [6] - 13:1, 20:24, 22:3, 22:5, 22:11, 23:24
**aspects** [5] - 12:24, 21:5, 21:24, 22:1, 35:20
**assert** [1] - 9:11
**asserts** [1] - 9:8
**assigned** [1] - 27:14
**assist** [1] - 19:9
**Assistant** [1] - 1:15
**Associates** [1] - 4:13
**associates** [1] - 58:11
**assume** [4] - 74:5, 74:7, 83:6, 83:9
**assumed** [2] - 74:9, 75:9, 75:10
**assumption** [3] - 16:7, 16:8
**attachment** [1] - 34:6

**attention** [4] - 23:14, 29:19, 30:24, 85:24
**attorney** [4] - 6:21, 9:7, 82:20, 82:21
**Attorney** [1] - 1:13
**attorneys** [2] - 34:24, 44:16
**Attorneys** [1] - 1:15
**attribute** [1] - 52:8
**atypical** [1] - 52:7
**authority** [1] - 57:2
**authorize** [1] - 56:8
**available** [10] - 12:1, 12:7, 14:22, 18:19, 22:18, 27:11, 28:15, 38:11, 39:10, 64:22
**Avenue** [1] - 1:17
**awarded** [1] - 25:6
**awards** [2] - 24:9, 25:7
**aware** [3] - 11:7, 76:21, 76:24

## B

**B.A** [1] - 4:6
**background** [3] - 4:3, 22:23, 31:21
**badmouthing** [1] - 8:25
**balloon** [1] - 29:14
**bankruptcy** [3] - 17:23, 17:24, 18:16
**bar** [3] - 67:25, 80:8, 80:13
**base** [1] - 24:4
**based** [27] - 4:19, 22:22, 23:13, 33:24, 43:2, 45:3, 57:21, 58:25, 59:11, 59:17, 59:25, 60:1, 60:2, 62:4, 64:24, 65:4, 65:13, 68:25, 73:2, 81:8, 82:16, 82:24, 82:25, 83:1, 83:10, 84:15
**baseline** [1] - 63:25
**bases** [3] - 38:9, 42:22, 42:24
**basic** [1] - 38:2
**basing** [2] - 43:18, 45:5
**basis** [2] - 9:16, 81:13
**Bates** [1] - 34:7
**bathroom** [1] - 2:9
**BEFORE** [1] - 1:10
**began** [1] - 35:5
**beginning** [1] - 7:9
**begins** [2] - 23:16,

39:21
**behalf** [1] - 18:15
**behind** [1] - 70:16
**benefit** [2] - 14:8, 24:15
**benefits** [9] - 14:19, 24:5, 24:9, 24:19, 24:23, 25:18, 26:1, 82:11
**best** [2] - 23:5, 77:12
**between** [13] - 7:23, 9:25, 17:4, 17:10, 18:1, 31:24, 44:15, 46:2, 46:6, 63:4, 71:17, 72:2, 81:20
**beyond** [6] - 11:19, 12:21, 25:5, 35:1, 38:20, 58:16
**big** [5] - 4:14, 6:7, 23:13, 51:19, 63:1
**bigger** [1] - 52:8
**bit** [7] - 14:18, 14:24, 41:17, 42:13, 42:21, 45:12, 45:13
**blanket** [1] - 38:16
**Blanton** [6] - 31:1, 45:15, 45:19, 46:9, 65:24, 66:3
**board** [31] - 6:9, 6:12, 6:15, 7:17, 8:8, 11:18, 16:18, 16:22, 16:25, 17:1, 29:6, 29:10, 35:4, 45:16, 47:5, 47:24, 53:17, 53:18, 54:2, 54:9, 54:20, 54:25, 55:5, 55:11, 55:14, 55:15, 56:4, 56:9, 56:13, 57:7, 83:16
**boarding** [1] - 33:9
**bottom** [2] - 72:10, 72:14
**bottom-line** [2] - 72:10, 72:14
**break** [2] - 2:8, 2:9
**BRIDGET** [1] - 1:12
**brief** [4] - 75:16, 81:8, 82:16, 84:13
**briefly** [2] - 38:24, 70:5
**bright** [1] - 9:25
**bring** [3] - 8:17, 16:2, 39:14
**broad** [10] - 10:25, 21:6, 27:7, 32:22, 32:11, 41:2, 49:17, 51:13, 52:1, 71:15
**broader** [3] - 7:1, 53:24, 75:5
**BRODSKY** [1] - 1:19

**Brooklyn** [3] - 1:5, 1:16, 1:23
**bunch** [1] - 10:17
**Business** [1] - 69:19
**business** [5] - 4:16, 8:21, 45:11, 45:13, 47:18
**BY** [10] - 1:13, 1:19, 3:15, 14:1, 36:1, 37:20, 57:14, 73:1, 81:11, 82:19

## C

**Cadman** [2] - 1:15, 1:23
**cap** [1] - 27:17
**capture** [1] - 70:15
**care** [4] - 24:24, 24:25, 84:4, 84:22
**career** [7] - 3:25, 14:3, 15:19, 37:12, 41:3, 72:16, 73:5
**careful** [2] - 84:7, 85:24
**carried** [1] - 49:23
**carry** [1] - 50:1
**Carter** [1] - 75:20
**case** [37] - 2:3, 2:13, 16:4, 24:21, 30:19, 31:14, 36:17, 37:4, 37:25, 38:6, 39:6, 39:23, 42:23, 43:9, 44:1, 44:4, 44:6, 44:7, 44:10, 44:17, 44:18, 44:25, 45:8, 52:15, 52:18, 54:15, 57:22, 59:14, 59:16, 61:24, 62:20, 67:21, 72:2, 72:19, 74:8, 74:19, 84:25
**cases** [11] - 8:5, 9:11, 9:22, 11:24, 12:22, 15:3, 17:23, 17:25, 47:23, 48:7
**categories** [3] - 51:13, 52:1, 52:21
**category** [6] - 41:7, 41:15, 43:6, 49:17, 50:24, 52:19
**CEO** [23] - 8:8, 24:22, 24:23, 27:8, 46:9, 46:12, 53:17, 54:1, 54:8, 54:19, 55:3, 55:9, 55:12, 56:4, 56:8, 56:16, 56:21, 56:24, 57:2, 57:9, 70:8, 70:9
**certain** [2] - 40:15, 64:12

**certainly** [14] - 18:16, 28:15, 32:16, 35:17, 40:16, 41:3, 44:16, 51:23, 53:1, 53:11, 53:12, 67:15, 70:1, 75:16
**CHAN** [23] - 1:20, 2:7, 2:25, 3:3, 3:15, 14:1, 31:7, 31:10, 36:1, 37:14, 38:7, 38:13, 58:16, 58:20, 70:18, 76:12, 77:20, 81:8, 81:11, 82:4, 84:19, 85:19, 86:7
**Chan** [14] - 2:6, 3:10, 31:3, 42:14, 46:23, 49:10, 73:14, 73:22, 75:15, 76:9, 76:10, 79:8, 81:7, 86:6
**Chan's** [1] - 83:10
**chance** [1] - 28:8
**change** [1] - 62:8
**changes** [1] - 60:15
**chaotic** [1] - 8:16
**characteristics** [2] - 3:23, 20:22
**charges** [2] - 44:7, 44:17
**Charleane** [1] - 1:22
**Chicago** [1] - 4:4
**chief** [1] - 6:8
**choose** [1] - 23:5
**circumstance** [2] - 29:13, 30:9
**circumstances** [9] - 11:13, 35:10, 50:12, 64:25, 65:5, 65:8, 65:11, 65:14, 67:14
**citation** [1] - 69:18
**cited** [1] - 49:16
**City** [1] - 4:20
**claims** [8] - 9:7, 9:8, 11:6, 11:7, 21:15, 23:18, 29:25, 30:1
**clarify** [1] - 76:6
**class** [1] - 36:2
**clause** [1] - 74:20
**clean** [1] - 57:12
**clear** [5] - 14:13, 52:10, 56:15, 56:17, 75:3
**clearly** [2] - 67:11, 75:17
**click** [1] - 76:22
**client** [1] - 18:15
**clients** [15] - 4:17, 4:21, 4:23, 4:24, 5:20, 9:1, 10:3, 11:2, 14:7, 18:24, 26:14, 35:15, 35:19, 35:24, 57:1

**closer** [1] - 2:23
**cluster** [1] - 71:11
**collected** [1] - 31:18
**column** [1] - 20:12
**comfortable** [1] - 11:16
**coming** [2] - 6:3, 55:3
**commentary** [1] - 80:1
**commitment** [1] - 71:19
**committed** [1] - 36:23
**committee** [1] - 6:9
**common** [13] - 10:13, 10:15, 20:22, 26:11, 26:12, 34:1, 34:19, 34:20, 34:22, 40:17, 53:14, 53:25, 64:14
**communicate** [2] - 53:17, 54:8
**communication** [2] - 54:21, 55:2
**communications** [4] - 44:12, 54:19, 54:22
**community** [1] - 36:22
**companies** [29] - 4:24, 4:25, 5:2, 5:3, 7:6, 9:1, 10:3, 11:9, 14:4, 14:8, 15:19, 19:5, 20:10, 20:14, 33:8, 33:11, 34:24, 35:11, 49:5, 56:12, 56:14, 56:17, 59:17, 62:12, 67:3, 67:8, 69:7, 69:10, 69:13
**company** [54] - 5:19, 6:7, 6:15, 6:22, 7:10, 7:21, 7:24, 8:2, 8:6, 8:7, 8:9, 8:25, 9:11, 9:17, 9:18, 10:10, 12:9, 14:11, 14:20, 15:10, 15:25, 16:14, 16:22, 16:23, 17:3, 17:11, 18:1, 21:11, 21:14, 23:13, 23:17, 26:7, 26:19, 27:18, 35:11, 36:22, 36:24, 40:22, 47:13, 47:18, 48:2, 48:10, 48:17, 48:20, 49:21, 50:9, 52:6, 53:17, 56:23, 65:17, 65:19, 71:11, 79:18
**company's** [2] - 28:3, 28:9
**comparable** [1] -

64:23
**compare** [5] - 31:17, 31:20, 36:15, 79:11, 79:16
**compared** [1] - 50:12
**comparing** [2] - 77:5, 78:21
**comparison** [4] - 39:4, 42:13, 57:21, 73:2
**comparisons** [2] - 62:2, 74:19
**compensation** [17] - 3:19, 3:21, 3:22, 4:10, 5:8, 5:10, 5:22, 6:9, 17:22, 18:2, 22:4, 24:9, 32:4, 32:16, 54:6, 54:12, 82:7
**compete** [3] - 7:22, 12:13, 70:12
**competitive** [2] - 3:22, 6:2
**complete** [1] - 22:19
**completion** [1] - 22:15
**complicated** [1] - 28:6
**component** [3] - 15:1, 15:2
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**conceivable** [1] - 30:7
**concern** [2] - 49:5, 50:10
**concerned** [6] - 7:21, 8:20, 8:21, 9:18, 10:7, 28:17
**concerns** [6] - 49:9, 49:18, 49:19, 67:8, 67:17, 67:21
**concluded** [1] - 86:10
**conclusion** [1] - 72:7
**conclusions** [1] - 23:20
**conditional** [1] - 24:24, 25:3
**conditioned** [1] - 22:15
**conditions** [2] - 25:9, 26:24
**conduct** [1] - 80:6
**conducted** [2] - 79:23, 80:3
**conducting** [1] - 19:1
**confer** [1] - 85:11
**confidentiality** [4] -

12:13, 21:18, 32:7, 63:1
**confirm** [1] - 57:18
**conflict** [1] - 17:10
**confusing** [1] - 41:17
**conjure** [1] - 28:7
**connection** [4] - 8:1, 9:5, 9:13, 18:18
**consider** [3] - 36:25, 72:13, 76:16
**consideration** [3] - 24:3, 63:9, 63:23
**considering** [1] - 65:17
**consistent** [3] - 27:3, 27:20, 29:16
**consult** [1] - 39:21
**consultancy** [1] - 15:23
**consultant** [18] - 3:19, 15:10, 15:14, 15:15, 15:20, 27:6, 50:4, 50:25, 51:8, 51:12, 51:20, 55:7, 56:3, 63:22, 64:2, 65:18, 65:19, 71:10
**consultant's** [1] - 55:10
**consultants** [4] - 42:16, 53:15, 54:3, 67:22
**consulting** [129] - 4:11, 5:8, 7:11, 8:1, 10:2, 11:17, 11:21, 11:22, 11:24, 11:25, 12:7, 12:16, 12:21, 12:23, 12:25, 15:2, 16:5, 16:13, 18:12, 19:6, 20:24, 21:1, 21:5, 21:22, 22:3, 22:5, 22:7, 22:11, 22:15, 22:16, 23:24, 25:20, 25:25, 26:3, 26:4, 26:8, 26:15, 26:21, 27:1, 28:1, 28:18, 28:21, 28:23, 29:8, 29:10, 30:18, 31:14, 32:1, 32:21, 36:2, 38:3, 39:5, 39:25, 40:2, 40:4, 40:8, 40:9, 40:11, 40:12, 40:17, 40:21, 41:1, 41:4, 41:6, 41:8, 41:13, 41:15, 41:21, 42:5, 42:6, 42:7, 42:15, 43:8, 43:14, 44:4, 44:24, 46:19, 47:14, 48:14, 48:15, 50:12, 50:16, 50:18, 50:19, 50:21, 50:22,

50:23, 51:2, 51:20, 51:21, 52:6, 52:7, 52:17, 52:23, 53:1, 53:4, 53:16, 54:4, 54:17, 55:6, 57:15, 57:21, 57:22, 59:15, 59:16, 62:10, 62:11, 62:20, 64:2, 64:22, 67:20, 68:3, 68:15, 68:20, 69:4, 69:8, 69:23, 70:12, 70:25, 71:1, 71:11, 71:15, 72:2, 72:3, 72:18, 73:3
**Consulting** [1] - 32:23
**consulting/ settlement** [11] - 13:4, 14:2, 14:9, 14:25, 15:6, 18:20, 20:3, 20:8, 20:18, 20:23, 30:14
**content** [2] - 63:14, 65:10
**context** [15] - 8:4, 10:14, 11:24, 14:2, 14:25, 16:16, 16:25, 17:3, 24:6, 26:9, 33:14, 49:5, 50:10, 50:11, 75:2
**continue** [1] - 28:23
**continued** [2] - 35:25, 55:17
**Continued** [2] - 13:7, 72:25
**Continuing** [2] - 14:1, 73:1
**contract** [2] - 78:25, 79:1
**contractor** [2] - 40:17, 51:9
**contracts** [2] - 56:20, 62:2
**convicted** [1] - 36:21
**conviction** [8] - 33:17, 33:25, 36:19, 77:1, 78:1, 78:17, 78:19, 79:4
**copies** [3] - 22:25, 34:5, 85:21
**copy** [1] - 39:14
**corporate** [6] - 15:17, 15:18, 57:1, 72:11, 81:18, 83:19
**corporation** [1] - 56:2
**corporations** [5] - 3:21, 5:2, 72:13, 72:24, 73:9
**correct** [9] - 2:22,

18:24, 23:10, 29:14, 32:24, 37:5, 77:16, 85:1, 85:3
**counsel** [12] - 6:16, 6:18, 6:21, 6:22, 7:23, 8:6, 8:7, 10:6, 45:6, 53:8, 55:13
**counts** [2] - 37:1, 37:4
**couple** [4] - 38:2, 49:1, 49:16, 82:16
**course** [3] - 12:13, 14:3, 37:12
**Court** [4] - 1:22, 20:12, 23:2, 23:6
**COURT** [49] - 1:1, 2:2, 2:10, 2:14, 2:19, 3:2, 3:4, 3:6, 3:10, 12:15, 16:10, 23:4, 31:3, 31:12, 37:15, 37:18, 38:8, 54:21, 55:6, 56:1, 56:18, 57:1, 57:13, 58:22, 59:2, 70:19, 76:6, 76:10, 77:11, 77:22, 81:4, 81:7, 82:5, 82:11, 82:14, 82:17, 84:2, 84:10, 84:14, 84:17, 84:22, 85:2, 85:7, 85:13, 85:15, 85:21, 86:2, 86:5, 86:9
**court** [5] - 2:1, 17:23, 18:7, 18:16
**courthouse** [1] - 84:7
**Courthouse** [1] - 1:5
**courtroom** [3] - 83:24, 84:5, 84:7
**covenants** [13] - 7:21, 7:22, 10:17, 12:12, 12:14, 12:15, 12:23, 21:22, 21:24, 22:13, 32:6, 32:18, 42:1
**created** [2] - 45:1, 57:4
**crime** [3] - 37:4, 77:24, 79:5
**crisis** [1] - 34:21
**cross** [1] - 15:19
**CROSS** [2] - 37:19, 87:6
**CROSS-EXAMINATION** [2] - 37:19, 87:6
**CRUTCHER** [1] - 1:17
**customer** [1] - 28:6

## D

**darkness** [1] - 84:8
**Darren** [5] - 30:25, 45:15, 45:19, 65:24, 66:3
**data** [3] - 5:15, 38:9, 38:10
**database** [1] - 57:23
**date** [5] - 28:25, 29:2, 29:6, 57:17, 57:18
**dated** [1] - 63:6
**DAUBERT** [1] - 1:9
**Daubert** [2] - 2:3, 39:13
**DAVID** [2] - 1:14, 1:14
**days** [3] - 21:3, 40:5, 51:4
**de** [1] - 57:9
**deal** [4] - 10:4, 14:17, 17:5, 55:10
**dealing** [2] - 22:22, 74:20
**death** [1] - 77:1
**December** [1] - 23:18
**decide** [2] - 9:10, 11:14
**decided** [3] - 59:6, 59:8, 74:16
**decision** [1] - 56:2
**decisionmaking** [2] - 57:5, 57:7
**decisions** [3] - 35:20, 57:8, 57:10
**Defendant** [3] - 1:7, 1:17, 3:12
**Defendant's** [1] - 66:13
**defendant's** [1] - 39:12
**defense** [6] - 3:3, 43:23, 44:12, 45:6, 53:8, 84:25
**Defense** [4] - 20:6, 23:8, 31:5, 70:6
**defense's** [1] - 2:4
**defer** [2] - 83:21, 83:23
**define** [3] - 27:6, 33:15, 81:20
**definitely** [1] - 16:5
**definition** [6] - 27:5, 33:21, 36:16, 41:21, 42:2, 80:18
**delegate** [2] - 55:13, 56:16, 57:2
**delegated** [2] -

56:23, 57:9
**demands** [1] - 51:12
**DENERSTEIN** [1] - 1:20
**departing** [15] - 9:5, 16:6, 16:17, 16:18, 17:1, 24:20, 26:15, 41:24, 46:9, 47:3, 55:10, 56:3, 66:21, 66:22, 67:4
**departs** [1] - 26:6
**departure** [1] - 65:22
**describe** [3] - 11:13, 65:7
**described** [1] - 8:9
**describes** [1] - 29:6
**describing** [1] - 71:7
**description** [12] - 28:1, 32:2, 32:14, 51:19, 51:21, 64:22, 64:24, 65:4, 65:6, 65:10, 65:14, 71:10
**Description** [1] - 71:9
**design** [5] - 3:23, 5:16, 5:23, 5:24, 40:6
**designs** [2] - 5:12, 19:5
**despite** [1] - 16:24
**detail** [1] - 30:5
**detailed** [1] - 21:14
**details** [3] - 55:1, 56:25, 65:9
**determine** [3] - 52:4, 64:16, 78:12
**develop** [1] - 31:23
**development** [1] - 71:12
**die** [1] - 29:4
**difference** [1] - 81:19
**different** [19] - 3:23, 4:7, 5:13, 5:16, 6:22, 11:4, 17:22, 17:23, 20:16, 21:1, 22:12, 32:18, 40:20, 42:13, 46:10, 46:14, 63:5, 79:20, 83:21
**difficult** [2] - 51:25, 54:25
**direct** [3] - 38:17, 49:10, 67:13
**DIRECT** [2] - 3:14, 87:5
**direction** [1] - 19:12
**director** [2] - 48:11, 48:16
**directors** [2] - 6:10, 21:16
**disabled** [1] - 29:4
**disagreements** [1] -

49:25
**disclosed** [1] - 59:5
**disclosure** [8] - 19:23, 39:13, 43:23, 57:16, 63:6, 64:21, 68:1, 69:3
**disclosures** [2] - 44:8, 73:17
**discrimination** [5] - 9:9, 30:4, 49:13, 49:14
**discuss** [1] - 57:10
**discussed** [3] - 18:20, 30:15, 31:18
**discusses** [1] - 50:11
**discussing** [1] - 15:8
**discussion** [3] - 24:25, 73:6, 75:16
**discussions** [2] - 15:10, 54:12
**disengaged** [1] - 56:24
**dismiss** [1] - 8:10
**dismissed** [1] - 8:2
**disparagement** [5] - 8:25, 12:12, 21:18, 32:7, 62:25
**dispute** [6] - 17:4, 18:17, 41:13, 52:22, 67:11, 76:10
**disputes** [7] - 18:1, 72:17, 72:20, 72:24, 73:10, 73:11
**disregarding** [1] - 35:4
**distilled** [1] - 60:25
**distinguish** [1] - 81:20
**distraught** [1] - 8:11
**distressed** [1] - 8:18
**distribute** [1] - 23:6
**DISTRICT** [3] - 1:1, 1:1, 1:10
**disturbance** [1] - 7:16
**disturbance-type** [1] - 7:16
**divorce** [1] - 17:25
**document** [11] - 9:15, 44:14, 50:24, 52:11, 64:17, 66:1, 66:2, 66:5, 66:8, 67:16, 75:24
**documents** [13] - 44:10, 44:16, 44:25, 45:2, 61:3, 66:14, 67:25
**dollars** [2] - 22:7,

56:7
**domain** [1] - 60:3
**done** [12] - 3:24, 6:11, 10:2, 15:18, 16:5, 16:24, 18:14, 29:13, 39:9, 40:14, 59:8, 59:21
**door** [1] - 9:24
**down** [2] - 11:17, 28:10
**dozen** [2] - 63:4, 63:15, 63:16
**drafting** [1] - 55:4
**draw** [1] - 30:24
**drawing** [1] - 72:7
**driver** [1] - 32:20
**driving** [1] - 15:1
**drug** [1] - 71:12
**DUBIN** [1] - 1:21
**duly** [1] - 3:12
**DUNN** [1] - 1:17
**duration** [1] - 26:16
**duties** [5] - 27:5, 27:6, 27:10, 27:13, 51:4
**DX** [3] - 31:2, 36:10, 36:13

## E

**e-mails** [1] - 46:20
**East** [2] - 1:15, 1:23
**EASTERN** [1] - 1:1
**economic** [4] - 6:1, 7:16, 82:2
**economically** [1] - 10:9
**Economics** [1] - 69:20
**economics** [8] - 4:5, 7:19, 10:16, 22:10, 25:15, 35:17, 81:23
**Edgar** [20] - 57:23, 58:3, 58:4, 58:5, 58:10, 58:14, 59:6, 59:11, 59:18, 60:1, 60:5, 60:8, 60:9, 60:12, 60:23, 61:1, 61:13, 61:15, 61:23, 68:5
**education** [2] - 4:3, 43:11
**effect** [1] - 68:3
**eight** [2] - 27:9, 30:13
**either** [15] - 6:15, 6:21, 7:5, 7:17, 8:6, 11:18, 14:17, 15:19, 15:25, 18:17, 21:5, 38:22, 56:15, 78:9,

82:12
**element** [2] - 11:25, 12:8
**elements** [1] - 5:25
**embedded** [1] - 21:13
**embezzlement** [2] - 36:19, 37:2
**emeritus** [2] - 48:4, 48:11
**emotional** [1] - 8:16
**employed** [1] - 33:8
**employee** [7] - 55:10, 56:3, 75:8, 78:9, 78:13, 81:23, 82:23
**employees** [3] - 30:3, 75:13, 75:15
**employment** [44] - 5:14, 5:25, 6:5, 6:25, 9:14, 25:18, 26:1, 28:24, 29:1, 33:15, 33:16, 34:7, 34:14, 36:4, 43:14, 48:20, 48:22, 48:24, 49:20, 49:23, 49:24, 50:3, 51:8, 51:10, 71:21, 73:12, 73:18, 73:20, 73:22, 74:3, 74:10, 74:11, 74:22, 74:23, 75:7, 75:13, 75:14, 78:3, 79:12, 79:16, 79:17, 81:12, 83:4, 83:15
**end** [8] - 10:11, 10:12, 26:11, 31:10, 32:5, 35:23, 40:15, 73:13
**ends** [1] - 29:10
**enforced** [1] - 32:16
**enhanced** [1] - 12:12
**enter** [2] - 14:4, 33:11
**entered** [5] - 2:16, 15:7, 16:12, 59:17, 62:12
**entering** [1] - 14:8
**entire** [4] - 3:25, 38:17, 53:18, 75:11
**entitled** [3] - 25:16, 32:23, 84:20
**entity** [1] - 50:23
**environment** [1] - 28:6
**equal** [1] - 5:7
**equities** [1] - 24:9
**equity** [3] - 24:25, 25:10, 82:9
**ESQ** [6] - 1:19, 1:19, 1:20, 1:20, 1:21, 1:21

essentially [3] - 5:7, 38:17, 80:10
establish [1] - 58:19
estimate [1] - 7:25
evaluating [1] - 27:10
EVAN [1] - 1:6
evening [4] - 3:16, 3:17, 37:21, 37:22
event [4] - 27:8, 27:12, 28:21
evidence [4] - 2:21, 31:4, 31:9, 34:4
exact [1] - 76:8
exactly [7] - 26:2, 27:15, 29:12, 53:5, 62:9, 68:22, 82:8
EXAMINATION [8] - 3:14, 37:19, 81:10, 82:18, 87:5, 87:6, 87:7, 87:8
examination [1] - 49:11
examined [1] - 3:13
example [13] - 6:6, 12:23, 20:7, 24:17, 30:13, 31:17, 33:2, 35:3, 46:19, 53:11, 56:5, 71:15, 83:4
examples [45] - 18:19, 18:23, 19:3, 19:21, 19:24, 20:3, 20:17, 29:24, 36:4, 36:9, 36:10, 39:7, 39:10, 41:3, 43:20, 52:14, 59:13, 59:18, 59:23, 60:3, 60:4, 60:7, 60:20, 60:21, 60:22, 61:13, 61:15, 61:20, 61:23, 62:1, 62:2, 62:5, 62:7, 68:7, 68:19, 68:25, 69:2, 69:6, 69:12, 72:19, 72:23, 78:3
excellence [1] - 40:14
exception [1] - 26:13
exclusive [1] - 69:11
excused [2] - 84:6, 84:9
executing [1] - 54:22
executive [60] - 5:8, 5:18, 5:21, 6:8, 6:20, 6:25, 7:12, 7:16, 8:1, 8:10, 8:17, 8:18, 9:2, 9:5, 9:21, 10:5, 10:14, 12:9, 14:22, 15:8, 15:14, 15:17, 15:25, 16:6, 16:17, 18:2, 21:11, 21:18, 24:20,

25:11, 25:19, 25:20, 26:15, 27:17, 28:13, 28:17, 29:11, 29:13, 30:10, 33:22, 34:14, 39:4, 66:21, 66:22, 69:4, 75:8, 75:9, 76:25, 77:7, 77:18, 78:16, 78:18, 79:18, 81:13, 81:15, 81:23, 82:6, 83:11, 83:16
executives [17] - 6:6, 6:11, 8:23, 9:6, 21:16, 24:8, 33:8, 33:10, 33:11, 33:15, 36:4, 41:24, 47:3, 53:25, 56:21, 67:4, 75:14
exhaustive [3] - 19:17, 19:22, 19:25
exhibit [1] - 34:9
Exhibit [11] - 20:6, 23:8, 31:5, 39:12, 57:20, 66:13, 70:6, 71:1, 75:21, 80:3, 83:5
exhibits [8] - 2:15, 2:16, 2:17, 2:19, 31:4, 31:9, 85:18, 86:3
existent [1] - 82:12
exiting [6] - 17:6, 47:8, 47:12, 47:13, 47:18
expand [2] - 8:15, 75:15
expect [2] - 32:18, 82:6
expectation [9] - 16:5, 21:12, 22:8, 22:20, 40:24, 64:17, 64:23, 65:3, 65:13
expected [11] - 32:3, 32:7, 40:15, 65:10, 65:24, 66:3, 66:6, 66:9, 66:22, 67:3, 67:4
expenses [1] - 24:4
experience [42] - 10:14, 10:24, 11:22, 15:22, 16:3, 16:13, 16:17, 17:8, 17:13, 22:22, 24:14, 25:17, 26:8, 27:3, 27:20, 29:16, 31:21, 32:16, 32:20, 33:9, 33:15, 33:20, 33:23, 34:14, 35:10, 43:3, 43:21, 49:17, 54:17, 54:25, 56:4, 56:13, 56:16, 56:19, 57:11, 59:21, 60:1, 60:3, 62:4, 81:12, 83:2

expert [29] - 2:4, 17:19, 17:21, 17:22, 18:12, 18:13, 38:3, 40:25, 41:6, 41:8, 41:9, 41:16, 41:22, 42:2, 47:3, 47:11, 48:15, 49:4, 50:17, 54:5, 54:6, 56:11, 69:9, 84:21, 84:24, 85:4, 85:5
expertise [9] - 12:2, 38:24, 39:9, 42:8, 48:18, 53:23, 64:12, 68:21, 72:3
explain [2] - 8:15, 20:12
explained [2] - 27:25, 42:8
explicitly [1] - 24:16
extensive [1] - 43:3
extent [1] - 2:15, 22:2, 29:24, 82:22
externally [1] - 14:17
extra [1] - 48:21
extremely [1] - 62:24
eye [1] - 32:11

## F

face [2] - 50:24, 64:16
fact [11] - 16:12, 16:24, 17:7, 32:23, 37:1, 57:18, 63:22, 69:22, 72:8, 77:2, 78:16
facto [1] - 57:9
factors [1] - 10:20, 70:16
facts [2] - 45:5, 45:8
fair [12] - 8:14, 10:1, 28:17, 30:9, 38:16, 42:7, 42:15, 47:15, 49:18, 51:18, 59:2, 62:3
fall [1] - 52:18
falls [2] - 50:25, 52:4
familiar [4] - 41:4, 45:12, 51:7, 51:14
familiarize [1] - 45:10
far [3] - 15:3, 31:5, 79:9
favorable [1] - 50:9
feature [2] - 11:18, 62:23
features [1] - 21:17
federal [1] - 18:7
fee [3] - 22:15, 28:23, 64:9

fees [2] - 25:20, 26:21
felony [12] - 33:17, 33:24, 33:25, 36:19, 36:20, 36:23, 37:2, 37:4, 77:1, 77:15, 77:24, 79:4
felt [1] - 34:24
few [1] - 17:25, 72:22
field [2] - 6:24, 18:2
figure [2] - 77:4, 78:18
figured [1] - 65:23
figures [2] - 55:7, 55:8
filed [1] - 20:16
Filing [1] - 20:13
filings [5] - 20:14, 20:15, 44:13, 44:20, 44:22
final [6] - 56:12, 57:19, 78:1, 78:17, 78:19, 79:4
finally [1] - 73:12
financial [2] - 25:25, 34:21
fine [3] - 2:25, 61:6, 84:22
fire [2] - 81:17, 81:18
fired [4] - 82:23, 83:12, 83:14, 83:16
firm [2] - 4:9, 4:12
firms [3] - 4:11, 5:6, 5:7
first [15] - 15:11, 15:21, 23:14, 30:5, 36:13, 38:2, 51:1, 51:11, 57:18, 58:3, 58:4, 58:5, 62:22, 73:18, 74:11
fit [1] - 12:10
five [5] - 2:8, 29:20, 52:22, 62:14, 68:4
five-minute [1] - 2:8
flavor [4] - 52:25, 53:3, 53:6, 53:9
Floor [1] - 1:17
Florida [1] - 4:6
focus [8] - 21:21, 23:2, 23:7, 36:12, 50:8, 79:9, 79:19
focused [6] - 63:13, 63:16, 74:13, 75:3, 75:17, 79:9
focuses [1] - 24:2
focusing [2] - 33:7, 74:25
follows [1] - 3:13
food [1] - 23:13
Foods [5] - 23:7, 23:12, 24:22, 70:5,

70:10
footnote [2] - 69:15, 69:16
for-cause [2] - 73:24, 73:25
foreign [1] - 4:23
forgive [1] - 70:8
form [3] - 31:23, 38:13, 70:18
former [4] - 24:22, 27:8, 70:8, 70:9
forming [1] - 4:9
forms [1] - 20:16
forth [4] - 7:23, 14:20, 44:9, 81:13
foundation [1] - 59:24
founded [1] - 48:10
founder [9] - 17:5, 47:11, 47:13, 47:15, 47:18, 47:23, 48:1, 48:21, 48:24
founders [1] - 17:4, 17:10, 47:8, 47:9
four [12] - 28:20, 29:20, 32:9, 36:9, 36:10, 46:7, 52:17, 52:22, 62:14, 63:1, 67:22, 72:18
frankly [1] - 31:8
fraught [1] - 7:16
frequently [2] - 39:22, 49:4
front [1] - 34:3
frugal [1] - 6:3
fulfilled [1] - 24:11
full [2] - 3:7, 29:11
fulsome [2] - 35:15, 51:19
fun [1] - 53:10
fund [1] - 46:13
fundamentally [1] - 61:25

## G

Geller [3] - 45:25, 46:12, 66:6
general [19] - 6:22, 8:7, 14:7, 20:21, 21:6, 22:3, 25:11, 26:16, 27:7, 29:21, 32:1, 32:11, 32:15, 40:1, 49:2, 54:6, 54:11, 54:12, 55:13
generality [1] - 83:17
generally [14] - 20:24, 22:6, 32:3, 35:8, 42:5, 51:15, 53:12, 54:18, 55:2,

55:9, 56:4, 56:8, 63:4, 75:14
  **generated** [1] - 58:14
  **generous** [2] - 6:2, 6:3
  **geographically** [1] - 4:21
  **giant** [1] - 56:11
  **GIBSON** [1] - 1:17
  **given** [3] - 9:17, 45:6, 59:10
  **Google** [21] - 19:2, 19:3, 57:24, 58:4, 58:5, 58:12, 59:12, 59:19, 60:1, 60:5, 61:23, 66:12, 66:14, 67:24, 68:8, 68:9, 69:5, 69:16, 79:24, 80:3, 80:6
  **governance** [4] - 56:10, 56:14, 56:17, 56:19
  **Governance** [1] - 56:18
  **government** [2] - 20:15, 75:21
  **Government** [8] - 1:12, 20:5, 56:14, 57:20, 64:21, 71:1, 80:3, 83:5
  **Government's** [1] - 39:11
  **government's** [1] - 84:19
  **GRACE** [1] - 1:21
  **graduate** [1] - 4:5
  **graduated** [2] - 4:1, 4:2
  **gray** [5] - 9:23, 51:24, 52:4, 52:6, 52:9
  **greater** [1] - 82:6
  **GREEBEL** [1] - 1:6
  **ground** [2] - 33:24, 37:2
  **guess** [14] - 5:11, 11:5, 15:25, 36:20, 37:6, 38:25, 43:20, 45:18, 51:23, 62:18, 62:22, 65:8, 68:11, 77:4
  **GX** [1] - 34:4

## H

  **half** [4] - 23:4, 63:4, 63:15, 63:16
  **halfway** [1] - 9:23
  **hand** [1] - 3:4
  **handwriting** [1] -

70:8
  **happy** [1] - 58:19
  **hard** [4] - 34:5, 55:4, 55:15, 69:16
  **harsh** [2] - 82:1, 82:10
  **head** [1] - 6:7
  **headache** [1] - 71:11
  **Heading** [1] - 1:22
  **health** [2] - 24:24, 24:25
  **heard** [1] - 45:13
  **HEARING** [1] - 1:9
  **hearing** [10] - 2:4, 2:18, 2:22, 2:24, 23:1, 31:1, 31:9, 39:13, 44:14, 84:14
  **heavy** [1] - 51:20
  **hedge** [1] - 46:13
  **held** [1] - 28:16
  **help** [2] - 14:16, 52:3
  **helpful** [5] - 19:24, 42:3, 52:3, 63:19, 79:16
  **helping** [1] - 40:6
  **high** [4] - 7:5, 69:4, 69:10, 69:12
  **high-profile** [1] - 69:4
  **highlight** [1] - 34:9
  **highlighted** [2] - 30:15, 42:24
  **highly** [1] - 5:21
  **hired** [1] - 6:12
  **hiring** [3] - 6:8, 7:9, 57:10
  **hits** [4] - 61:6, 61:7, 61:8, 61:11
  **Holdings** [1] - 33:4
  **Honor** [10] - 2:25, 12:17, 31:8, 37:14, 37:17, 54:24, 82:4, 82:8, 82:15, 85:19
  **HONORABLE** [1] - 1:10
  **hour** [4] - 23:4, 51:5, 64:6, 64:10
  **hours** [4] - 27:9, 40:13, 64:10
  **human** [2] - 4:10, 6:7
  **hundred** [1] - 14:5
  **hundreds** [3] - 7:5, 8:3, 22:6

## I

  **idea** [14] - 14:13, 15:23, 17:2, 19:25, 66:3, 66:6, 66:9, 66:20, 66:24, 67:3,

67:7, 67:17, 67:21, 83:24
  **identified** [4] - 20:8, 23:10, 53:22, 63:7
  **identify** [3] - 19:2, 36:3, 36:8
  **illustrate** [1] - 62:5
  **imagine** [1] - 84:12
  **impact** [1] - 36:24
  **implicit** [1] - 8:24
  **importance** [1] - 50:9
  **important** [7] - 10:8, 50:18, 50:19, 56:25, 62:24, 63:8, 63:23
  **impossible** [1] - 19:21
  **improper** [1] - 44:11
  **inappropriately** [1] - 56:16
  **Inc** [1] - 66:17
  **incapacity** [1] - 77:1
  **incentive** [1] - 5:13
  **include** [3] - 9:13, 21:19, 61:3
  **included** [2] - 7:6, 33:21
  **includes** [1] - 71:20
  **including** [2] - 24:24, 31:15
  **incoming** [1] - 6:20
  **indictment** [1] - 44:18
  **individual** [12] - 5:1, 7:20, 7:24, 8:19, 9:7, 11:5, 11:15, 14:12, 14:14, 18:1, 28:5, 82:23
  **individuals** [4] - 5:1, 6:13, 24:7, 67:9
  **inferring** [1] - 74:8
  **information** [1] - 38:11
  **initial** [2] - 61:1, 73:17
  **inserting** [1] - 15:23
  **Insider** [1] - 69:19
  **installments** [1] - 28:23
  **instances** [3] - 16:21, 18:11, 33:8
  **intend** [7] - 19:17, 19:20, 37:25, 38:5, 38:20, 39:22, 42:23
  **intended** [3] - 65:18, 65:19, 66:20
  **intentionally** [1] - 82:9
  **internally** [2] - 14:17, 15:19

  **interpret** [1] - 42:7
  **invested** [1] - 46:13
  **investment** [3] - 17:6, 47:12, 47:13
  **investments** [1] - 47:8
  **investor** [1] - 46:13
  **invoked** [1] - 16:14
  **involuntary** [2] - 9:20, 9:22
  **involve** [3] - 8:8, 18:24, 20:10
  **involved** [12] - 5:19, 5:21, 6:13, 7:11, 7:25, 11:9, 15:5, 16:22, 18:17, 20:18, 47:11, 68:11
  **involving** [9] - 18:19, 30:25, 36:4, 36:20, 36:23, 37:3, 37:4, 54:1, 77:24
  **isolation** [1] - 79:10
  **issue** [15] - 9:5, 14:16, 14:17, 30:1, 31:14, 39:6, 40:8, 40:9, 43:8, 44:4, 52:18, 62:11, 67:20, 72:19, 82:3
  **issues** [11] - 7:17, 9:1, 9:9, 9:13, 9:18, 10:8, 23:19, 23:25, 28:4, 30:4, 52:5
  **it'll** [1] - 64:9
  **item** [4] - 39:21, 53:14, 54:11, 66:18
  **itself** [3] - 6:12, 21:15, 51:12

## J

  **J-O-H-N-S-O-N** [1] - 3:9
  **janitor** [1] - 46:10
  **job** [2] - 15:18, 51:12
  **Johnson** [23] - 2:5, 3:3, 3:8, 4:13, 20:7, 23:9, 31:13, 34:11, 37:21, 38:20, 39:13, 39:16, 53:15, 57:15, 60:11, 61:10, 75:24, 76:9, 76:13, 77:13, 81:6, 81:12, 82:20
  **JOHNSON** [2] - 3:11, 87:4
  **JOSHUA** [1] - 1:21
  **Journal** [1] - 69:20
  **JUDGE** [1] - 1:10
  **Judge** [1] - 53:8
  **judge** [1] - 53:11
  **jumbled** [1] - 58:8

  **jury** [3] - 2:1, 2:17, 53:12
  **justify** [1] - 11:18

## K

  **keep** [2] - 24:10, 25:5
  **keeping** [1] - 85:24
  **Kessler** [1] - 38:15
  **KESSLER** [33] - 1:14, 2:12, 2:15, 2:23, 31:8, 37:16, 37:20, 38:18, 57:14, 58:18, 59:3, 70:21, 70:23, 73:1, 75:19, 76:8, 76:22, 79:25, 81:3, 81:6, 82:15, 82:19, 84:12, 84:15, 84:18, 85:1, 85:3, 85:11, 85:14, 85:20, 85:23, 86:3, 86:8
  **key** [2] - 63:7, 63:12, 67:12
  **kind** [22] - 2:22, 5:16, 9:23, 17:21, 18:15, 19:2, 19:20, 22:9, 26:15, 33:18, 33:25, 40:4, 40:20, 40:25, 44:12, 58:8, 61:24, 63:25, 68:3, 68:20, 69:9, 75:8
  **kinds** [16] - 5:14, 17:22, 20:17, 24:6, 28:7, 29:17, 29:25, 30:4, 46:23, 50:18, 53:21, 54:9, 69:6, 70:16, 73:4
  **kit** [2] - 72:13, 72:23
  **KIYO** [1] - 1:10
  **knowledge** [4] - 61:19, 61:25, 67:14, 69:1
  **knowledgeable** [1] - 41:19
  **known** [1] - 4:10

## L

  **label** [1] - 52:23
  **labeled** [1] - 52:23
  **lack** [1] - 13:3
  **language** [7] - 23:21, 23:24, 26:24, 29:20, 34:25, 36:5, 54:7
  **large** [2] - 9:18, 69:6
  **larger** [2] - 4:10, 44:9
  **largest** [1] - 15:4
  **last** [6] - 29:19, 44:21, 44:22, 44:23, 50:8, 81:9

law [2] - 81:18, 83:19
lawsuits [1] - 49:14
lawyer [15] - 10:6, 15:24, 15:25, 30:2, 49:15, 52:3, 55:3, 55:10, 56:10, 57:6, 81:16, 83:20, 83:21, 83:22
lawyers [5] - 16:2, 52:1, 53:12, 83:1, 83:23
lays [1] - 25:9
leases [1] - 57:10
least [9] - 8:3, 9:8, 15:21, 35:6, 51:13, 54:13, 57:11, 60:15
leave [3] - 7:20, 8:19, 47:16
leaving [4] - 25:12, 47:24, 84:4, 84:7
led [1] - 69:25
Lee [3] - 45:21, 66:9, 71:1
LEE [1] - 1:20
legal [7] - 6:23, 28:6, 44:9, 44:15, 44:20, 82:24, 82:25
lengthy [1] - 32:9
less [7] - 16:24, 17:1, 26:12, 34:1, 34:22, 56:15, 56:17
lights [3] - 84:3, 84:5, 85:15
likely [6] - 21:12, 32:15, 35:18, 40:24, 51:20, 51:22
limited [3] - 42:7, 53:21, 79:4
line [4] - 9:25, 50:7, 72:10, 72:14
lines [1] - 23:14
list [6] - 20:2, 20:7, 33:5, 35:8, 36:10, 63:24
listed [2] - 42:3, 49:13
listen [1] - 77:11
literature [3] - 43:5, 43:23, 43:25
litigated [1] - 30:8
litigation [14] - 8:25, 9:4, 10:4, 49:6, 49:9, 49:16, 49:17, 49:19, 49:20, 49:25, 50:10, 67:8, 67:17, 67:21
living [1] - 3:18
loathe [1] - 28:10
local [1] - 9:10
located [2] - 57:23, 60:8, 62:4, 66:14

London [1] - 69:20
long-term [2] - 5:13, 24:9
look [19] - 30:18, 42:3, 44:6, 44:25, 49:2, 50:6, 51:11, 52:11, 68:19, 71:9, 74:15, 74:17, 75:1, 75:21, 76:21, 77:8, 78:23, 80:19, 85:25
looked [14] - 30:21, 36:16, 44:20, 44:22, 45:2, 57:16, 58:3, 58:4, 58:5, 68:18, 75:6, 76:13, 78:14, 80:20
looking [18] - 5:13, 24:2, 30:6, 32:10, 34:8, 39:15, 46:18, 52:11, 52:17, 52:20, 69:1, 69:8, 69:12, 69:23, 70:5, 70:23, 80:11, 83:5
looks [2] - 32:19, 76:5
looser [1] - 2:21
lump [1] - 28:25

**M**

M.B.A [1] - 4:4
mails [1] - 46:20
main [1] - 5:9
mainstream [5] - 72:13, 72:17, 72:19, 72:23, 73:8
major [2] - 36:20, 36:23
malfeasance [1] - 35:3
management [3] - 7:17, 55:14, 81:14
marked [4] - 20:5, 23:8, 31:2, 39:11
market [1] - 3:22
marketplace [1] - 39:8
MASTRO [1] - 1:19
MATSUMOTO [1] - 1:10
Matsumoto [1] - 53:8
Mattel [3] - 66:17, 66:20, 66:21
matter [2] - 2:2, 18:18, 20:21, 56:13, 74:22, 75:12, 77:6
Matter [1] - 86:10
matters [1] - 71:12
maximum [1] - 12:5
McDonald's [1] -

66:24
mean [8] - 3:20, 21:24, 29:3, 54:4, 54:21, 56:18, 62:14, 63:24
meaning [1] - 52:14
meaningful [1] - 22:9
mechanical [1] - 1:25
mechanism [1] - 57:2
media [1] - 69:4
medical [1] - 30:4
meet [1] - 56:24
meets [1] - 57:7
member [7] - 16:19, 16:22, 17:1, 19:9, 19:12, 19:14, 47:24
members [1] - 47:5
mentioned [2] - 18:9, 74:25
merge [1] - 52:6
methodology [6] - 37:25, 57:17, 58:19, 58:20, 70:3, 71:6
middle [3] - 7:24, 10:1, 51:24
might [8] - 6:9, 14:13, 28:7, 45:14, 48:21, 51:25, 63:1, 84:8
million [6] - 24:16, 24:18, 26:22, 28:25, 56:7
millions [1] - 22:7
mind [2] - 49:16, 85:11
minute [5] - 2:8, 37:16, 66:12, 68:6, 70:22
minutes [1] - 49:1
misleading [1] - 61:4
misstates [1] - 77:20
modest [1] - 12:8
moment [2] - 8:9, 81:3
money [5] - 25:13, 25:25, 26:25, 29:4, 56:2
month [1] - 27:9
months [4] - 14:15, 44:23, 49:25
moral [6] - 36:20, 36:23, 37:3, 37:4, 77:24, 79:5
morning [1] - 85:12
most [13] - 4:22, 9:6, 9:22, 10:15, 11:2, 11:24, 16:7, 25:22, 26:11, 64:13, 75:13,

83:13, 85:23
mostly [1] - 9:19
motion [2] - 84:19, 84:20
motivating [1] - 70:15
move [2] - 31:3, 71:21
moving [1] - 15:17
MR [54] - 2:7, 2:12, 2:15, 2:23, 2:25, 3:3, 3:15, 14:1, 31:7, 31:8, 31:10, 36:1, 37:14, 37:16, 37:20, 38:7, 38:13, 38:18, 57:14, 58:16, 58:18, 58:20, 59:3, 70:18, 70:21, 70:23, 73:1, 75:19, 76:8, 76:12, 76:22, 77:20, 79:25, 81:3, 81:6, 81:8, 81:11, 82:4, 82:15, 82:19, 84:12, 84:15, 84:18, 84:19, 85:1, 85:3, 85:11, 85:14, 85:19, 85:20, 85:23, 86:3, 86:7, 86:8
multiple [7] - 59:16, 62:11, 62:14, 62:20, 63:4, 71:23, 72:1
must [2] - 12:1, 22:19
mutually [1] - 69:11
MYLAN [1] - 1:20

**N**

name [5] - 2:4, 3:7, 4:12, 50:22, 74:7
named [1] - 30:25
names [1] - 69:13
narrow [9] - 34:15, 34:25, 35:11, 36:5, 36:25, 37:1, 37:8, 80:10, 80:18
narrows [1] - 36:21
necessity [1] - 81:20
need [4] - 11:10, 14:23, 16:9, 26:17
needed [2] - 64:5, 74:17
needs [1] - 26:19
negotiate [3] - 11:15, 56:8, 64:11
negotiated [1] - 75:5
negotiating [5] - 6:19, 28:13, 35:22, 53:25, 55:4
negotiation [1] - 75:2

never [7] - 12:3, 15:15, 22:17, 22:21, 48:16, 48:19, 61:5
new [2] - 8:17, 33:11
NEW [1] - 1:1
New [6] - 1:5, 1:16, 1:18, 1:23, 4:20
next [8] - 13:7, 24:19, 35:25, 42:21, 50:6, 55:17, 69:15, 72:25
night [3] - 84:6, 85:13, 86:9
nine [10] - 20:2, 20:7, 20:21, 33:1, 39:4, 58:25, 59:1, 66:14, 67:24, 68:17
non [10] - 7:22, 12:12, 12:13, 21:18, 21:19, 32:7, 62:25, 70:12
non-compete [3] - 7:22, 12:13, 70:12
non-disparagement [4] - 12:12, 21:18, 32:7, 62:25
non-solicit [3] - 7:22, 12:12, 21:19
noncompete [1] - 21:19
none [4] - 21:5, 40:22, 46:13, 66:1
nonlegal [2] - 83:17, 83:19
normal [1] - 32:6
note [1] - 23:15
notes [1] - 46:20
nothing [2] - 82:1, 84:12
notice [2] - 9:17, 40:16
notifies [1] - 29:7
November [1] - 1:7
nowadays [1] - 34:19
number [13] - 4:7, 21:17, 31:14, 34:8, 34:10, 35:1, 39:17, 47:15, 52:21, 62:15, 73:23, 79:8, 83:2
numbers [1] - 61:4

**O**

o'clock [1] - 1:7
objecting [1] - 38:13
objection [4] - 38:7, 58:16, 70:18, 77:20
objective [1] - 68:25

observed [1] - 11:5
obtaining [1] - 50:9
obvious [1] - 51:16
obviously [2] - 8:18, 62:24
occasionally [1] - 5:1
October [1] - 63:6
OF [3] - 1:1, 1:3, 1:9
offer [6] - 37:25, 38:5, 38:20, 39:23, 42:23, 58:17
offered [1] - 85:18
offering [6] - 38:12, 48:14, 54:15, 58:21, 58:23, 72:6
office [2] - 27:23, 65:9
officer [3] - 47:23, 48:10, 48:16
offices [1] - 27:18
often [15] - 5:22, 6:1, 6:19, 7:22, 8:6, 8:17, 8:18, 8:23, 9:25, 14:14, 16:13, 25:2, 25:14, 33:21, 62:24
older [1] - 30:3
on-boarding [1] - 33:9
once [2] - 11:6, 11:8
One [1] - 58:11
one [44] - 5:5, 8:13, 15:17, 16:2, 17:5, 23:2, 23:5, 23:9, 23:15, 30:22, 30:25, 31:15, 32:10, 33:1, 35:21, 36:13, 37:1, 37:3, 37:16, 39:6, 39:19, 45:16, 48:13, 48:22, 49:13, 51:13, 52:18, 55:9, 56:6, 62:14, 63:7, 63:18, 64:10, 64:15, 70:2, 70:23, 70:25, 71:4, 71:22, 78:5, 80:10, 80:20, 81:8
ones [10] - 6:2, 37:11, 41:23, 44:10, 49:10, 52:13, 52:14, 63:1, 69:9
opaque [2] - 21:6, 51:15
open [3] - 2:1, 28:1, 29:22
Opinion [11] - 57:20, 58:23, 59:11, 59:25, 61:22, 62:3, 62:8, 62:10, 62:19, 71:22
opinion [47] - 5:23, 6:1, 6:4, 20:17, 31:23,

38:12, 38:16, 38:20, 39:22, 39:25, 42:13, 46:10, 48:15, 49:2, 50:6, 53:21, 54:11, 54:15, 57:20, 58:17, 58:20, 58:23, 58:24, 59:5, 59:10, 59:15, 61:21, 62:3, 62:5, 62:19, 65:2, 68:7, 71:23, 72:1, 72:6, 72:12, 72:18, 73:7, 73:13, 73:16, 74:22, 75:3, 77:14, 79:7, 79:9, 83:11
opinions [20] - 7:18, 37:25, 38:1, 38:5, 38:14, 39:16, 39:17, 42:3, 42:22, 43:2, 43:19, 44:1, 45:3, 45:5, 46:6, 46:14, 46:18, 46:21, 49:2, 74:20
opportunities [1] - 49:16
opposed [3] - 14:9, 32:21, 50:18
optical [1] - 14:19
option [3] - 14:14, 21:11, 40:23
optionality [2] - 12:9, 14:12
options [2] - 24:10, 25:8
order [1] - 84:23
organization [1] - 47:16
organizations [1] - 4:7
organized [1] - 86:8
original [3] - 55:12, 68:14, 68:15
originally [5] - 57:19, 58:1, 60:4, 60:20, 68:18
output [1] - 71:20
outside [5] - 6:21, 8:6, 8:7, 53:15, 54:3
own [3] - 4:9, 4:12, 6:20

## P

p.m [1] - 1:7
page [21] - 13:7, 24:19, 25:7, 26:3, 28:20, 29:6, 29:20, 32:9, 34:8, 34:9, 35:25, 39:15, 42:12, 55:17, 57:21, 72:25, 74:11, 75:21, 75:22,

75:24
paid [9] - 5:21, 28:18, 35:18, 51:5, 51:17, 63:22, 64:1, 64:3, 64:14
painful [1] - 11:3
paragraph [8] - 23:15, 24:2, 28:20, 29:20, 30:4, 30:5, 43:18, 65:7
paragraphs [1] - 42:24
parameters [4] - 20:25, 21:7, 21:9, 22:19
Park [1] - 1:17
parse [1] - 51:25
parsing [1] - 63:3
part [17] - 2:3, 6:19, 21:22, 25:11, 25:19, 26:1, 35:13, 35:16, 35:22, 36:17, 38:8, 62:24, 72:12, 72:23, 73:8, 73:25, 75:4
particular [3] - 26:20, 35:14, 35:23
particularly [3] - 5:20, 7:19, 28:5
parties [2] - 12:20, 85:18
parting [2] - 8:18, 9:2
partly [1] - 48:4
parts [1] - 40:11
party [1] - 15:22
past [3] - 20:19, 34:2, 50:1
pattern [1] - 17:7
Pause [1] - 81:5
pay [9] - 17:25, 24:16, 26:17, 26:18, 53:25, 56:2, 56:20, 64:5
payable [1] - 28:25
paying [2] - 22:11, 22:12
payment [5] - 22:14, 26:25, 28:25, 29:11, 29:14
payments [3] - 10:18, 24:6, 82:11
people [15] - 4:15, 4:24, 7:17, 11:5, 12:18, 15:12, 15:19, 39:1, 46:2, 46:7, 48:19, 48:22, 54:7, 73:6, 83:14
per [1] - 51:5
percent [6] - 5:11, 5:12, 5:15, 5:16, 12:6, 61:15

perform [1] - 65:12
performance [2] - 25:8, 26:25
performed [4] - 16:9, 21:1, 21:8, 40:13
performing [1] - 54:23
perhaps [5] - 5:22, 12:11, 44:23, 63:14, 75:20
period [5] - 8:16, 14:23, 26:9, 26:23, 32:4
person [4] - 48:15, 50:22, 55:9, 74:9
person's [1] - 9:13
personally [3] - 14:3, 14:5, 54:1
perspective [1] - 28:3
pertaining [1] - 45:1
picked [1] - 45:14
PITLUCK [1] - 1:14
place [1] - 25:23
places [1] - 27:17
plain [2] - 23:24, 40:4, 51:2, 65:22
Plaintiff [1] - 1:4
plans [3] - 5:13, 25:14, 25:15
Plaza [2] - 1:15, 1:23
plus [1] - 3:22
point [14] - 24:25, 29:19, 38:15, 44:7, 47:24, 48:8, 48:25, 50:4, 52:5, 55:9, 57:19, 59:6, 79:7, 83:16
portion [6] - 15:3, 25:6, 32:21, 50:19, 58:17
posed [1] - 54:16
possible [3] - 19:25, 28:14, 35:15
post [1] - 84:14
post-hearing [1] - 84:14
potential [6] - 6:4, 9:4, 9:5, 10:4, 21:15, 29:25
potentially [3] - 8:10, 8:11, 61:19
Potter [2] - 51:23, 53:11
practice [2] - 53:15, 56:13
preclude [1] - 84:21
prepared [2] - 59:13, 60:21, 62:1
preparing [1] - 46:18

present [2] - 2:1, 62:1
presenting [1] - 60:9
press [1] - 45:14
pretty [4] - 22:6, 52:10, 74:24, 75:3
prevail [1] - 75:20
prevent [1] - 83:15
previously [1] - 48:8
primarily [3] - 51:16, 53:16, 54:8
primary [3] - 54:18, 54:21, 55:3, 59:20, 70:15
principles [1] - 16:25
private [4] - 5:3, 5:6, 17:3, 49:4
procedures [1] - 56:15
proceed [2] - 2:6, 3:10
proceeding [1] - 2:12
Proceedings [1] - 1:25
process [4] - 33:10, 35:22, 36:8, 44:15
produced [1] - 1:25
products [1] - 57:10
professional [8] - 3:25, 22:23, 31:21, 43:3, 43:21, 72:12, 73:7, 83:11
profile [3] - 69:4, 69:10, 69:13
programs [5] - 3:21, 3:23, 5:15, 5:17, 17:24
projected [1] - 85:2
promote [1] - 8:17
prompt [1] - 68:8
propose [1] - 85:12
proposed [1] - 2:4
protecting [1] - 30:3
protects [1] - 10:9
provable [1] - 35:6
provide [9] - 5:23, 6:1, 9:16, 12:11, 26:5, 27:7, 59:23, 71:11, 85:21
provided [4] - 27:24, 55:6, 63:6, 71:19
provides [8] - 12:8, 14:11, 14:14, 14:18, 14:19, 21:10, 29:24, 40:22
providing [2] - 8:1, 11:16
provision [39] - 21:20, 23:21, 24:13,

26:4, 29:7, 34:10,
34:12, 35:11, 36:14,
50:17, 63:25, 67:12,
73:24, 74:1, 74:13,
74:16, 74:17, 74:25,
75:1, 75:7, 75:18,
76:2, 76:4, 76:14,
76:16, 76:20, 77:9,
77:15, 78:5, 78:23,
79:4, 79:10, 79:20,
79:23, 80:2, 80:21,
80:22, 81:17, 83:6
**provisions** [20] -
10:23, 12:7, 16:14,
24:5, 25:17, 30:15,
33:16, 34:16, 35:1,
37:9, 56:17, 63:7,
63:13, 63:16, 64:15,
67:14, 67:16, 75:17,
78:22, 80:23
**public** [12] - 5:3, 5:6,
7:6, 14:19, 19:15,
20:14, 36:3, 45:14,
49:4, 56:11, 57:15,
60:3
**publicly** [4] - 18:19,
38:11, 39:10, 64:22
**pull** [1] - 75:20
**pulled** [1] - 38:10
**purchased** [2] -
52:25, 53:4
**purpose** [1] - 59:22
**purposes** [9] - 2:18,
23:1, 23:7, 30:24,
31:1, 36:12, 72:11,
74:17, 77:4
**pursuant** [2] - 28:22,
82:23
**push** [1] - 35:20
**pushed** [1] - 9:24
**pushing** [1] - 12:14
**put** [8] - 14:20,
28:10, 30:21, 31:15,
34:3, 36:14, 39:14,
85:16
**putting** [2] - 52:20,
61:7

## Q

**quality** [1] - 22:19
**quarterly** [2] - 56:24,
57:8
**questions** [7] -
37:24, 38:22, 46:23,
73:23, 79:8, 82:4,
82:16
**quickly** [2] - 33:6,
75:20
**quite** [15] - 9:1, 12:8,

21:6, 28:3, 32:2,
32:10, 36:25, 40:12,
41:19, 51:3, 51:14,
51:15, 56:24, 81:25,
82:10

## R

**R168759** [2] - 34:7,
34:8
**raise** [1] - 3:4
**raised** [2] - 23:19,
23:25
**raises** [1] - 15:22
**ran** [1] - 61:24
**RANDY** [1] - 1:19
**range** [1] - 49:15
**rarely** [4] - 6:13,
16:20, 47:6
**rather** [6] - 4:25,
12:23, 21:22, 54:8,
54:19, 55:14
**Re** [1] - 33:4
**reach** [4] - 23:20,
23:25, 42:22, 61:22
**read** [13] - 42:15,
44:18, 50:7, 69:16,
69:24, 74:5, 74:11,
77:2, 77:3, 77:9,
79:22, 80:2, 83:8
**reading** [9] - 54:13,
66:1, 66:2, 66:5, 66:8,
67:16, 67:6, 67:7,
67:16
**ready** [3] - 2:6, 2:25,
3:2
**real** [5] - 19:24,
20:25, 22:10, 35:16,
51:3
**reality** [2] - 22:10,
28:11
**really** [9] - 12:4,
12:10, 12:13, 12:22,
21:4, 21:7, 21:8,
21:21, 84:22
**reason** [3] - 12:19,
29:8, 42:24
**reasonable** [2] -
8:19, 9:3
**reasonably** [3] -
19:4, 51:16, 65:23
**reasoning** [1] - 27:25
**reasons** [2] - 42:22,
78:19
**receive** [5] - 25:10,
28:23, 55:7, 81:24,
82:1
**receiving** [2] - 7:20,
76:25
**Recess** [1] - 2:11

**recognizable** [1] -
19:4
**recognize** [1] - 69:13
**recognizing** [1] -
75:4
**record** [8] - 2:18, 3:7,
19:15, 31:11, 33:4,
36:3, 76:6, 85:16
**recorded** [1] - 1:25
**RECROSS** [2] -
82:18, 87:8
**RECROSS-
EXAMINATION** [2] -
82:18, 87:8
**redirect** [1] - 81:7
**REDIRECT** [2] -
81:10, 87:7
**reduced** [1] - 82:12
**REED** [1] - 1:19
**refer** [1] - 5:24
**reference** [7] - 33:17,
42:15, 42:16, 43:22,
44:3, 50:15, 54:3
**referenced** [1] - 9:4
**references** [1] - 42:4
**referencing** [1] -
25:14
**referring** [3] - 44:13,
49:12
**refers** [3] - 26:3,
29:5, 65:14
**reflects** [1] - 36:21
**regarding** [1] - 40:7
**regardless** [1] -
61:12
**regulatory** [1] - 28:6
**relate** [3] - 39:4,
45:8, 48:22
**related** [10] - 30:19,
39:13, 39:16, 44:6,
44:25, 60:12, 67:17,
67:22, 69:10, 71:23
**relates** [1] - 39:25
**relating** [1] - 24:5
**relationship** [6] -
46:2, 46:6, 48:23,
48:25, 49:20, 50:3
**relatively** [3] - 22:8,
22:9, 66:1
**release** [15] - 10:15,
10:17, 10:19, 10:23,
12:10, 21:13, 21:15,
29:20, 29:22, 32:9,
32:11, 32:17, 52:24,
53:1, 62:24
**Release** [1] - 32:24
**releases** [1] - 22:12
**reliability** [1] - 58:18
**relies** [1] - 38:10
**rely** [1] - 44:2

**relying** [9] - 43:25,
60:7, 60:11, 60:18,
61:17, 61:18, 61:22,
61:25
**remember** [11] -
43:15, 58:7, 66:15,
68:2, 68:9, 68:10,
68:17, 71:23, 73:22,
80:12, 81:2
**remote** [1] - 28:8
**removed** [1] - 77:1
**Renaissance** [1] -
33:4
**renditions** [1] - 35:9
**repeatedly** [1] -
78:24
**rephrase** [2] - 70:19,
77:22
**rephrases** [1] - 70:20
**replicate** [1] - 80:15
**report** [1] - 46:20
**Reporter** [1] - 1:22
**reports** [2] - 27:11,
69:4
**representing** [4] -
6:13, 6:14, 7:23, 8:5
**reputation** [1] -
36:24
**reputational** [1] -
8:20
**require** [2] - 41:13,
41:25
**required** [5] - 12:4,
27:22, 40:13, 51:2,
56:6
**requires** [1] - 29:7
**research** [3] - 43:5,
43:22, 43:25
**resolution** [1] - 17:5
**resort** [1] - 11:10
**resources** [2] - 4:11,
6:7
**respect** [5] - 5:18,
15:5, 16:18, 42:19,
68:23
**respond** [3] - 38:22,
38:25, 84:20
**responsibilities** [1] -
27:13
**responsibility** [1] -
57:9
**restricted** [2] - 25:3,
25:6
**restrictive** [1] - 7:21
**results** [3] - 17:13,
43:17, 60:9
**retain** [1] - 9:6
**retained** [1] - 18:12
**retired** [1] - 48:5
**retread** [1] - 38:17

**Retrophin** [11] -
45:11, 46:3, 46:7,
46:9, 46:10, 46:12,
46:13, 65:24, 66:3,
66:6, 66:9
**review** [10] - 21:4,
31:13, 34:11, 43:8,
44:3, 61:8, 61:11,
69:22, 73:18, 75:11
**reviewed** [14] - 6:25,
14:5, 19:14, 44:16,
44:25, 61:9, 61:12,
69:3, 71:4, 73:20,
73:25, 74:4, 74:10,
75:25
**revisit** [1] - 11:2
**risk** [3] - 8:20, 85:4,
85:5
**risks** [1] - 10:4
**road** [1] - 11:17
**ROHDE** [1] - 1:12
**role** [5] - 48:2, 48:3,
48:7, 48:8, 48:10
**room** [1] - 53:12
**Rosenfeld** [2] -
45:23, 66:9
**roughly** [1] - 5:16
**rules** [2] - 2:21,
19:23
**run** [6] - 56:12,
58:10, 58:12, 68:12,
68:13, 68:14
**running** [1] - 56:23
**RX** [1] - 36:13

## S

**salary** [1] - 24:4
**saw** [1] - 44:17
**schedule** [1] - 85:12
**School** [1] - 69:20
**school** [3] - 4:1, 4:2,
4:8
**scientific** [2] - 53:6,
53:7
**scope** [1] - 58:16
**screen** [4] - 36:6,
36:14, 39:14, 78:10
**search** [29] - 18:19,
18:23, 19:1, 19:2,
19:4, 19:10, 19:15,
19:17, 19:18, 19:20,
19:22, 20:1, 36:3,
60:10, 60:12, 61:1,
61:3, 66:12, 67:24,
67:25, 68:2, 68:8,
68:12, 68:14, 68:15,
69:25, 80:8, 80:13,
80:15
**searched** [2] - 69:3,

80:25
**searches** [13] - 43:13, 43:17, 57:23, 58:10, 58:12, 58:14, 61:23, 61:24, 68:24, 79:24, 80:4, 80:6
**seat** [1] - 3:6
**SEC** [1] - 57:23
**second** [6] - 28:24, 29:1, 40:25, 41:7, 43:5, 51:15
**secrets** [2] - 8:21
**section** [1] - 28:22
**see** [42] - 12:9, 24:5, 26:10, 26:24, 30:14, 32:8, 32:18, 35:7, 35:8, 35:24, 39:15, 39:16, 39:21, 42:4, 42:12, 42:23, 42:25, 43:3, 43:6, 43:9, 43:23, 44:4, 49:7, 50:13, 51:18, 51:23, 52:2, 53:13, 53:19, 62:12, 64:7, 64:9, 64:25, 66:18, 69:15, 69:18, 70:6, 71:2, 71:13, 76:2, 76:23
**seeds** [1] - 49:24
**seeing** [1] - 59:21
**seeking** [1] - 8:10
**seldom** [1] - 28:12
**send** [1] - 46:20
**senior** [11] - 5:21, 6:6, 6:8, 7:15, 7:17, 8:23, 9:6, 24:8, 41:24, 53:25, 75:15
**sense** [3] - 34:22, 84:18, 85:23
**sensitive** [1] - 9:2
**sent** [1] - 45:1
**sentence** [1] - 50:8
**separate** [5] - 2:2, 2:12, 25:19, 25:22, 80:21
**separated** [2] - 8:2, 23:17
**separately** [1] - 2:20
**separating** [1] - 10:5
**separation** [8] - 9:20, 10:14, 25:1, 26:9, 28:24, 29:1, 50:2, 69:4
**September** [3] - 39:12, 59:5, 59:10
**sequentially** [1] - 58:2
**series** [1] - 10:18
**serve** [1] - 71:10
**served** [1] - 18:13
**services** [11] - 29:8,

32:2, 32:14, 51:19, 51:22, 53:2, 53:4, 71:11, 71:16, 71:17, 71:19
**Services** [1] - 71:9
**set** [8] - 2:8, 42:8, 50:16, 57:12, 73:17, 81:13, 86:1, 86:3
**setting** [1] - 44:11
**settle** [10] - 11:6, 23:18, 41:12, 72:14, 72:17, 72:20, 72:24, 73:10, 73:11
**settlement** [29] - 10:21, 10:22, 11:11, 11:14, 11:16, 11:20, 12:11, 12:16, 12:18, 13:1, 14:10, 14:22, 15:2, 15:3, 15:23, 19:5, 21:24, 22:1, 23:23, 24:1, 32:20, 36:2, 39:4, 47:2, 48:14, 49:3, 50:17, 53:22
**settlement/ consulting** [2] - 15:9, 17:14
**settling** [1] - 67:11
**seven** [2] - 55:8, 63:24
**several** [8] - 4:10, 21:19, 56:6, 67:10, 67:12, 68:22, 69:18, 75:1
**severance** [2] - 24:15, 82:8
**sex** [1] - 9:9
**shall** [1] - 28:23
**shareholder** [1] - 28:6
**shareholders** [2] - 11:19, 14:20
**shares** [1] - 25:8
**Shkreli** [1] - 76:24
**Shkreli's** [2] - 73:18, 74:5
**shorter** [1] - 32:5
**shorthand** [1] - 41:23
**show** [7] - 20:5, 39:11, 61:19, 61:20, 63:11, 68:6
**showed** [2] - 73:22, 76:9
**shut** [1] - 84:5
**side** [4] - 5:19, 38:22, 51:22, 52:4
**sides** [4] - 6:11, 16:10, 16:11, 21:12
**sign** [1] - 79:25

**significance** [1] - 72:6
**significant** [13] - 12:20, 21:13, 22:6, 25:13, 28:16, 30:5, 32:6, 41:25, 52:24, 53:3, 53:6, 53:9, 81:23
**similar** [11] - 19:5, 30:16, 32:13, 34:15, 36:2, 36:18, 37:11, 47:17, 78:5, 79:17, 80:20
**similarities** [13] - 31:24, 59:16, 62:11, 62:21, 63:4, 63:15, 71:23, 72:1, 72:7, 72:9, 72:15, 73:8
**similarly** [3] - 34:15, 36:5, 37:8
**simple** [2] - 10:15, 19:3
**simultaneously** [1] - 84:17
**sit** [1] - 81:2
**sitting** [5] - 43:20, 54:13, 68:7, 80:14, 81:2
**situation** [3] - 9:20, 17:8, 56:7
**situations** [4] - 6:16, 9:19, 11:9, 83:13
**six** [2] - 14:15, 55:7
**skeptical** [1] - 35:2
**skinny** [1] - 35:7
**slightly** [1] - 5:6
**small** [2] - 9:18, 51:21
**smaller** [2] - 56:14, 56:17
**SMITH** [1] - 1:13
**smooth** [1] - 57:12
**smoothly** [2] - 8:24, 9:3
**solely** [3] - 33:24, 65:15, 79:19
**solicit** [3] - 7:22, 12:12, 21:19
**someone** [7] - 6:3, 30:25, 55:14, 68:12, 80:6, 80:7, 80:13
**sometimes** [7] - 5:20, 7:24, 9:23, 10:21, 14:12, 64:4, 64:11
**somewhat** [3] - 35:2, 61:4, 71:18
**somewhere** [3] - 14:5, 68:1, 71:17
**Sonoma** [1] - 67:1

**sorry** [14] - 20:6, 46:5, 49:12, 61:21, 63:11, 69:16, 70:22, 74:2, 74:23, 75:19, 76:25, 77:24, 84:4, 85:15
**sort** [9] - 5:9, 17:4, 17:5, 19:14, 48:21, 53:6, 59:3, 67:8, 75:15
**source** [2] - 20:14, 59:20
**sources** [1] - 59:14
**space** [1] - 61:25
**speaking** [2] - 4:21, 57:5
**specialize** [1] - 5:5
**specific** [26] - 17:16, 28:2, 29:24, 32:2, 38:15, 40:5, 40:12, 40:14, 41:14, 42:8, 42:16, 47:2, 47:10, 48:13, 49:3, 50:16, 51:3, 51:10, 51:14, 53:21, 68:21, 70:23, 71:15, 71:18, 72:3
**specifically** [3] - 17:13, 31:5, 69:8
**specificity** [3] - 21:2, 51:11, 71:18
**specified** [1] - 64:9
**specify** [1] - 27:10
**speed** [1] - 38:19
**spell** [1] - 3:6
**spend** [2] - 5:10, 49:1
**sporadically** [1] - 57:7
**staff** [5] - 19:7, 19:8, 19:9, 19:12, 19:14
**stand** [1] - 85:24
**standard** [4] - 27:10, 40:14, 40:17, 51:8
**standards** [3] - 12:2, 21:8, 28:16
**standing** [1] - 36:22
**standpoint** [2] - 28:9, 28:13
**start** [2] - 2:25, 12:18
**started** [3] - 19:2, 45:17, 49:22
**starts** [1] - 28:21, 67:10
**state** [4] - 3:6, 8:19, 9:10, 18:7
**statement** [3] - 12:4, 53:24, 65:13
**STATES** [3] - 1:1, 1:3, 1:10
**States** [5] - 1:5, 1:13,

1:15, 4:22
**stating** [1] - 77:2
**status** [1] - 50:3
**statute** [1] - 30:7
**statutes** [2] - 29:25
**stenography** [1] - 1:25
**Stephen** [1] - 79:12
**steps** [2] - 10:4, 45:10
**Steve** [2] - 66:9, 79:12
**Steven** [1] - 45:23
**Stewart** [2] - 51:23, 53:11
**stickler** [2] - 35:13, 35:19
**still** [4] - 12:25, 29:11, 81:14, 83:11
**stipulating** [1] - 85:17
**stock** [3] - 25:3, 25:6, 25:8
**stop** [1] - 75:23
**stopped** [1] - 68:17
**straight** [1] - 14:9
**straightforward** [2] - 11:20, 74:24
**Street** [1] - 69:19
**strike** [3] - 42:19, 78:7, 79:25
**structured** [2] - 11:23, 23:21
**structures** [1] - 5:15
**struggling** [1] - 61:21
**studied** [1] - 4:5
**stuff** [2] - 44:9, 55:16
**sub** [1] - 24:13
**submission** [3] - 84:15, 84:24, 86:2
**submissions** [1] - 85:9
**subsection** [2] - 28:22, 29:5
**subset** [10] - 41:8, 41:10, 41:11, 41:18, 42:10, 42:16, 58:25
**subsidized** [2] - 24:24, 24:25
**substance** [2] - 32:12, 41:25
**substantially** [1] - 78:5
**substantive** [2] - 46:20, 63:15
**sue** [4] - 10:19, 21:20, 30:6, 67:12
**sued** [1] - 8:22
**sufficient** [1] - 26:18

**suggest** [1] - 67:15
**sum** [1] - 28:25
**summary** [1] - 39:16
**supplemental** [3] - 84:13, 84:15, 84:23
**supplemented** [1] - 39:10
**supposed** [1] - 77:2
**suppression** [1] - 2:24
**surprisingly** [1] - 25:2
**switching** [1] - 7:9
**sworn** [2] - 3:5, 3:13
**system** [1] - 34:3

**T**

**talks** [4] - 24:3, 24:19, 24:23, 36:18
**tasks** [1] - 40:14
**team** [2] - 6:19, 44:12
**technically** [1] - 65:20
**ten** [2] - 4:15, 39:15
**tens** [1] - 7:2
**term** [10] - 5:13, 24:9, 26:4, 28:22, 29:3, 32:4, 35:15, 35:23, 41:2, 53:7
**terminate** [2] - 77:18, 81:14
**terminated** [9] - 30:10, 77:7, 78:9, 78:13, 78:17, 78:18, 81:24, 82:2, 82:6
**terminates** [1] - 28:22
**terminating** [1] - 7:10
**termination** [40] - 7:11, 7:15, 9:16, 33:16, 33:24, 34:10, 34:12, 34:15, 36:5, 36:14, 36:15, 37:8, 49:22, 49:24, 73:24, 73:25, 74:13, 74:16, 74:20, 74:25, 75:4, 75:6, 75:17, 76:2, 76:13, 76:16, 76:19, 77:8, 77:15, 78:4, 78:23, 79:3, 79:10, 79:19, 79:23, 80:2, 80:18, 81:14, 81:25, 82:9
**terminations** [4] - 80:9, 81:20, 81:21, 81:22
**terminology** [2] -

13:3, 23:22
**terms** [17] - 6:2, 6:23, 24:11, 25:12, 26:21, 35:5, 50:9, 50:11, 51:8, 51:10, 53:18, 54:24, 55:7, 56:6, 68:2, 68:9, 68:10
**test** [1] - 53:9
**testified** [9] - 3:13, 17:17, 17:21, 17:22, 17:24, 18:5, 33:9, 38:14, 38:21
**testify** [4] - 18:13, 42:9, 85:4, 85:6
**testimony** [6] - 38:17, 44:8, 55:12, 72:21, 74:24, 84:16
**text** [2] - 65:15, 73:2
**Thanksgiving** [4] - 85:5, 85:6, 85:8, 85:9
**THE** [60] - 1:10, 2:2, 2:10, 2:14, 2:19, 3:2, 3:4, 3:6, 3:8, 3:10, 12:15, 12:17, 16:10, 16:11, 23:4, 31:3, 31:12, 37:15, 37:18, 38:8, 54:21, 54:24, 55:6, 55:12, 56:1, 56:10, 56:18, 56:20, 57:1, 57:4, 57:13, 58:22, 58:24, 59:2, 70:19, 76:6, 76:10, 77:11, 77:22, 81:4, 81:7, 82:5, 82:8, 82:11, 82:13, 82:14, 82:17, 84:2, 84:10, 84:14, 84:17, 84:22, 85:2, 85:7, 85:13, 85:15, 85:21, 86:2, 86:5, 86:9
**theft** [2] - 36:19, 37:2
**theme** [1] - 32:1
**themselves** [1] - 71:17
**theoretical** [1] - 73:5
**they've** [1] - 35:1
**thinking** [4] - 15:17, 40:7, 41:18, 52:8
**third** [2] - 34:9, 75:22
**thousands** [4] - 7:2, 7:3, 22:7
**threat** [2] - 49:5, 50:10
**threats** [5] - 8:24, 49:9, 49:18, 49:19
**three** [19] - 14:14, 24:17, 24:18, 25:7, 26:3, 26:6, 26:11, 26:12, 26:23, 34:10,

37:7, 44:23, 52:22, 52:23, 53:1, 56:7, 62:14, 69:22, 76:24
**throughout** [2] - 72:15, 73:5
**timing** [1] - 84:2
**title** [7] - 33:2, 40:20, 48:11, 63:7, 63:18, 63:19, 63:20
**titles** [2] - 48:5, 63:20
**today** [12] - 18:21, 23:7, 30:15, 30:24, 34:1, 34:20, 35:8, 36:12, 38:21, 43:13, 43:20, 68:7
**today's** [3] - 23:1, 28:5, 31:1
**together** [5] - 28:25, 55:1, 55:5, 55:15, 58:8
**tomorrow** [3] - 85:12, 85:25, 86:4
**tonight** [2] - 84:12, 85:25
**tool** [2] - 72:13, 72:23
**toolkit** [1] - 73:9
**top** [4] - 24:7, 25:23, 25:25, 70:9
**topic** [3] - 8:15, 33:7, 81:9
**total** [1] - 26:21
**toward** [1] - 32:5
**towards** [1] - 25:17
**trade** [1] - 8:21
**tradeoff** [1] - 35:18
**training** [2] - 82:24, 82:25
**TRANSCRIPT** [1] - 1:9
**transcript** [3] - 1:25, 2:3, 85:25
**transcription** [1] - 1:25
**transition** [1] - 70:12
**transitioned** [1] - 48:11
**treatment** [2] - 81:25, 82:10
**trial** [5] - 2:3, 2:20, 34:4, 45:12, 85:8
**triggered** [1] - 35:17
**true** [9] - 22:22, 33:10, 37:6, 46:11, 46:15, 46:16, 50:5, 54:10, 65:20
**truly** [1] - 19:22
**truthfully** [1] - 14:20
**try** [11] - 10:7, 10:8,

19:25, 64:16, 70:19, 77:13, 80:17, 84:2, 84:4, 85:9
**trying** [16] - 8:17, 9:2, 12:10, 12:22, 19:4, 23:25, 30:7, 35:14, 41:21, 53:10, 59:3, 69:6, 77:4, 78:8, 78:12, 80:9
**TSOU** [1] - 1:21
**turn** [8] - 29:5, 33:6, 34:6, 34:9, 42:12, 68:16, 70:22, 73:12
**turning** [4] - 23:14, 26:3, 27:5, 28:20
**turpitude** [6] - 36:20, 36:24, 37:3, 37:4, 77:24, 79:5
**two** [14] - 16:2, 23:14, 24:2, 26:12, 38:24, 39:3, 40:11, 42:23, 44:23, 51:13, 52:1, 52:22, 62:14, 64:10
**Type** [1] - 20:13
**type** [18] - 7:16, 9:16, 10:12, 12:21, 21:1, 25:23, 35:8, 40:17, 41:13, 47:2, 47:10, 47:16, 48:13, 49:3, 65:22, 67:25, 80:8, 80:13
**typed** [1] - 80:12
**types** [8] - 9:1, 9:10, 9:17, 10:13, 25:7, 32:8, 39:8, 40:7
**typical** [2] - 15:7, 52:21
**typically** [5] - 18:15, 26:9, 28:13, 81:22, 81:25
**Tyson** [8] - 23:7, 23:12, 24:22, 30:16, 56:5, 56:12, 70:5, 70:9

**U**

**ultimate** [1] - 56:2
**ultimately** [2] - 20:2, 72:21
**uncomfortable** [2] - 34:25, 35:23
**under** [7] - 19:12, 23:15, 42:24, 54:23, 55:8, 81:18, 81:25
**underlying** [2] - 38:9, 40:21
**UNITED** [3] - 1:1, 1:3, 1:10

**United** [5] - 1:5, 1:13, 1:15, 4:22
**universe** [1] - 61:5
**University** [3] - 4:4, 4:5, 4:6
**unless** [2] - 23:2, 60:15
**unlikely** [3] - 28:12, 35:6, 35:16
**unpaid** [2] - 24:3, 24:4
**unusual** [5] - 15:11, 16:7, 16:15, 34:20, 64:4
**up** [22] - 2:8, 6:22, 7:19, 10:11, 10:12, 16:2, 19:4, 20:2, 28:7, 35:23, 36:9, 36:14, 38:19, 39:14, 43:21, 45:14, 55:3, 63:24, 68:16, 74:2, 75:20, 80:9
**utilize** [2] - 28:4, 40:23
**utilized** [2] - 39:22, 49:4

**V**

**vacation** [2] - 24:4, 51:6
**vacuum** [2] - 57:4, 57:7
**vague** [4] - 11:25, 20:24, 20:25, 32:15
**value** [2] - 14:18, 14:21
**vanilla** [3] - 40:4, 51:2, 65:22
**variety** [7] - 9:10, 24:8, 35:4, 51:9, 59:17, 62:12, 72:11
**various** [2] - 44:20, 46:24
**vehicle** [2] - 72:17, 72:19
**version** [1] - 35:7
**versus** [2] - 5:5, 81:21
**vesting** [2] - 24:24, 25:3
**viable** [1] - 10:9
**view** [1] - 83:21
**Virginia** [1] - 4:5
**visible** [1] - 69:6
**Volition** [1] - 36:13
**voluntary** [3] - 9:23, 9:25

## W

**wait** [1] - 70:19
**Wall** [1] - 69:19
**wants** [4] - 21:14, 23:2, 26:19, 38:15
**ways** [2] - 76:24, 78:8
**week** [4] - 21:3, 27:9, 40:5, 51:4
**well-known** [1] - 4:10
**whereas** [1] - 37:3
**whistleblower** [1] - 9:9
**whole** [11] - 35:13, 35:16, 49:15, 54:2, 54:9, 54:20, 54:25, 55:4, 65:7, 77:10, 83:8
**wide** [1] - 61:3
**willful** [4] - 35:3, 35:4, 35:5, 35:8
**Williams** [1] - 67:1
**willing** [3] - 11:19, 22:17, 28:15
**WINSTON** [1] - 1:20
**with..** [1] - 68:3
**witness** [3] - 3:5, 38:8, 84:9
**WITNESS** [11] - 3:8, 12:17, 16:11, 54:24, 55:12, 56:10, 56:20, 57:4, 58:24, 82:8, 82:13
**witness'** [1] - 84:16
**WITNESSES** [1] - 87:2
**word** [5] - 8:11, 8:13, 35:5, 69:15
**words** [2] - 68:4, 70:15
**works** [1] - 6:22
**world** [8] - 19:24, 28:5, 35:17, 40:17, 41:5, 51:3, 51:13, 72:11
**worried** [1] - 10:10
**worth** [1] - 35:21
**write** [1] - 46:19
**written** [4] - 9:15, 27:11, 51:25, 83:6
**wrote** [1] - 70:8

## Y

**Yaffe** [3] - 45:21, 66:9, 71:2
**year** [12] - 4:16, 4:18, 14:15, 24:17, 26:6,

26:12, 26:17, 26:18, 26:22, 26:23, 44:21, 44:22
**years** [13] - 3:25, 4:9, 6:24, 17:23, 24:17, 24:18, 26:11, 26:12, 26:13, 50:1, 56:7, 62:4, 83:2
**YORK** [1] - 1:1
**York** [6] - 1:5, 1:16, 1:18, 1:23, 4:20
**yourself** [4] - 45:11, 58:10, 58:12, 68:12

## Z

**zero** [1] - 62:7