4658

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - -    X
 3
      UNITED STATES OF AMERICA,   :   15-CR-637(KAM)
 4
              Plaintiff ,         :
 5                                    United States Courthouse
         -against-                :   Brooklyn, New York
 6
      EVAN GREEBEL,               :
 7                                    November 13, 2017
              Defendant.         :   9:00 o'clock a.m.
 8
      - - - - - - - - - - - -    X
 9
                      TRANSCRIPT OF TRIAL
10          BEFORE THE HONORABLE KIYO A. MATSUMOTO
            UNITED STATES DISTRICT JUDGE, and a jury.
11
      APPEARANCES:
12
      For the Government:        BRIDGET M. ROHDE
13                               Acting United States Attorney
                                 BY: ALIXANDRA E. SMITH
14                                   DAVID PITLUCK
                                     DAVID K. KESSLER
15                               Assistant United States Attorneys
                                 271 Cadman Plaza East
16                               Brooklyn, New York
17    For the Defendant:         GIBSON DUNN & CRUTCHER
                                 200 Park Avenue, 48th Floor
18                               New York, New York
19                               BY: REED M. BRODSKY, ESQ.
                                     RANDY MASTRO, ESQ.
20                                   WINSTON Y. CHAN, ESQ.
                                     MYLAN LEE DENERSTEIN, ESQ.
21                                   JOSHUA E. DUBIN, ESQ.
                                     GRACE TSOU, ESQ.
22
      Court Reporter:            Charleane M. Heading
23                               225 Cadman Plaza East
                                 Brooklyn, New York
24                               (718) 613-2643
25    Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.
```

CMH      OCR      RMR      CRR      FCRR

4659

```
1              (In open court; outside the presence of the jury.)
2         THE COURT:  I did have a preliminary question about
3    tomorrow's Daubert hearing.  I was wondering if the parties
4    came any closer to resolving any of their disputes and if not,
5    what exactly, which particular witnesses are still in
6    contention.
7              MR. CHAN:  Mr. Kessler is not here but I'll talk to
8    him more and see where we are.  There's only one witness at
9    issue at the Daubert hearing, that's Mr. Johnson, but I'll
10   talk to David but as of now, the government's objections are
11   to his experience, qualifications, and the methodology
12   employed.  So that's what we intend to focus on for the
13   Daubert hearing.
14             THE COURT:  All right.  Thank you.  How long do the
15   parties think this will last?
16             MR. CHAN:  I think direct will be 30 to 45 minutes
17   because it's been limited to those issues.
18             MR. PITLUCK:  Judge, I think we can probably do it,
19   the whole thing in under two hours.
20             THE COURT:  So by 7:30?
21             MR. PITLUCK:  Yes.
22             THE COURT:  I'm trying to figure out because I did
23   have an 8 o'clock commitment.
24             MR. PITLUCK:  I'll talk to Mr. Kessler and see if
25   there is any way we can streamline it.
```

4660

1          THE COURT:  Also, has there been any further thought

2    about Juror Number 16?

3          MR. PITLUCK:  Well, Judge, I think our position is

4    we'd like to keep that juror until the end of the week, you

5    know, given that we'll have a really good sense at that point.

6    As we've discussed last week, I don't think our case is, if

7    it's done by Thanksgiving, it will just be finished, it might

8    go into the next week, and it all depends on how quickly we

9    move this week, but I think to avoid this risk of an avalanche

10   of jurors trying to depart based on the estimate the Court

11   gives at the end of the day, we would like to keep her as long

12   as possible.

13         THE COURT:  All right.

14         MR. DUBIN:  We agree.

15         THE COURT:  All right.  There are a couple of other

16   issues regarding trial subpoenas.

17         I received a submission from the defense dated

18   November 10th submitting in camera and ex parte reasons for

19   its subpoena.  This is with regard to certain telephone

20   numbers and items 2 and 3 are numbers that are unknown to me

21   and I have no idea why they would be relevant or admissible.

22   They are certainly specific but I have no idea whose numbers

23   these are, so it would be helpful for me to have those numbers

24   identified.

25         I think those numbers are identified in the

4661

1    subpoena, but I'm just not sure whose numbers they are.  Does
2    anybody care to tell me?  (917)922-4166 and (917)716-0699.
3    Without knowing whose numbers they are, I can't determine
4    whether they are relevant or admissible.
5              MR. KESSLER:  Judge, we don't know.
6              MR. BRODSKY:  Your Honor, we will get back to you on
7    the specific numbers.  There are -- I believe what we put here
8    was an example of one of our telephone company subpoenas so
9    what we can do for Your Honor is provide you with a list of
10   the numbers that we've subpoenaed and a corresponding list of
11   the party that we identify with it.  So we put an example of
12   the attachment A that we used for all subpoenas except for
13   one, but with respect to these two numbers on 2 and 3, there
14   are other numbers that we requested.
15             So, my suggestion is that perhaps we submit to
16   Your Honor a chart containing, we're happy to share that chart
17   with the government because they have the subpoenas with the
18   numbers, with the, a list of the numbers and the associated
19   party.
20             THE COURT:  All right.  Thank you.
21             So that one is on hold until we hear more from the
22   defense.
23             The next issue was a submission dated November 12th,
24   docket number 446, that was submitted yesterday by the defense
25   regarding Rule 17 subpoenas to Retrophin and an ex parte in

4662

1    camera submission of four documents that it proposes to

2    attempt to admit at the trial.

3           Again, until the defense makes a decision to proffer

4    and the government has a chance to review and decide whether

5    objections will be made or whether they will agree to the

6    admission I think remains to be seen.

7           Then, finally, we have the defense letter dated

8    November 9th, document number 441, in which it asks for relief

9    in the form of being afforded greater latitude on

10   cross-examination of the government's witnesses.  The defense

11   was asked to submit specific examples of what it believed were

12   attempts by the government to thwart its cross-examination of

13   government witnesses and the defense relies, in large measure,

14   not just on general Supreme Court admonitions about the

15   importance of cross-examination, but on the Second Circuit's

16   decision in Wolfson in which the District Judge was reversed

17   for completely disallowing a line of cross-examination that

18   would bear on a particular witness' credibility.

19          I do not think that that is what happened here.  I

20   think that over strenuous government objection, the defense

21   has been allowed to cross-examine witnesses on a variety of

22   topics that go to credibility and bias but, if necessary, and

23   since it seems to be necessary, I am prepared to address those

24   particular examples that the defense was asked to identify

25   where it believed that the government had inappropriately

4663

1    attempted to thwart its cross-examination.

2          First, with regard to Darren Blanton, the defense

3    objects to questions that were posed by Mr. Mastro when he

4    asked:

5          Question:  Do you know, sir, who put the strings and

6    releases into the option agreement that was drafted and sent

7    to you?

8          Answer, referring to the e-mail's language:  He says

9    it was him.

10         Question:  "Him" being Evan Greebel, correct?

11         Answer:  I don't want to get assumptive.

12         Now, there's a bracket that the defense has added

13   with the word "laughing."  I believe what happened to the best

14   of my recollection is that question, that response drew

15   laughter from the jury and it was because both the Court and

16   Mr. Mastro had repeatedly admonished Mr. Blanton not to assume

17   and when that response was made, I don't recall Mr. Blanton

18   laughing out loud.  I think he smiled once the jury reacted in

19   the way that it did.

20         But the follow-on question was:

21         Sir, this is -- strike that.  Do you find it funny

22   who the "him" is in that e-mail?

23         There was an objection to that and it was sustained.

24         Now, the Court has, in fact, admonished the defense

25   team about making jokes in the record and, you know, trying to

4664

1   appreciate the gravity of this proceeding both for Mr. Greebel

2   and the government.

3           This question was -- I sustained the objection

4   because it was just an unintelligible question.  Do you find

5   it funny who the "him" is in the e-mail?  That question to me

6   was incomprehensible asking the witness who the "him" is in

7   the e-mail when the witness had said he was not wishing to

8   identify or try to guess who the writer of that e-mail was

9   referring to when he used the word "him."

10          There was also an objection to another question

11  where Mr. Mastro was asking Mr. Blanton about an e-mail that

12  he wrote to Mr. Shkreli quoting the e-mail asking the witness

13  whether he had written that and the witness affirmed, asking

14  the witness whether the use of the term RTRX was Retrophin

15  which he affirmed.

16          Then the question was:  And that was not actually a

17  question that you put the double question marks after, right?

18  There was an objection which was sustained.

19          I think that what might have been helpful to the

20  defense would have been a one word basis from the government

21  as to why the objection was made, but my understanding of it

22  was that it was a question that was asking the witness to

23  affirm that his use of the question mark did not mean that it

24  was really a question and I think that certainly if the, if

25  the witness had been asked whether he intended to ask a

1   question or whether, or what part of that statement was meant

2   to be a question, it would have been acceptable.

3         There were two parts to this e-mail.  First, getting

4   RTRX 75, I believe the witness could have legitimately asked a

5   question as to whether or not that was going to happen, that

6   was something he had hoped for, and then the other part of it

7   was, And buy one together.  I'm not sure what that referred

8   to, I don't recall, but I think, again, this was an e-mail

9   that had two different concepts in it and I don't know what

10   part of the examiner, the cross-examiner's question was

11   targeted to, whether the RTRX was a question or whether a

12   question to Mr. Shkreli as to whether they would buy one

13   together was meant to be a question.

14         So, to me, it was just a confusing question.  I

15   think that when we've had an objection based on form, at least

16   that is what I interpret it as, an objection based on form,

17   and then I will try to, I mean, certainly the examiner,

18   whether it is the government or the defense, has an

19   opportunity to try to rephrase the question.

20         There was a similar issue regarding Mr. Massella and

21   on this, I do believe the defense was given very wide latitude

22   to cross-examine Mr. Massella on credibility and bias.  He had

23   previously testified before the exchange quoted as follows:

24         Question, and this is as transcript 3405, lines 4 to

25   7:  And you knew, sir, after obtaining a judgment against this

4666

1    former client that you were putting your interests above

2    everyone else in the firm, correct?

3              Answer:  Absolutely incorrect.

4              So, the question came, as cited in the letter of the

5    defense:  And is it not true that as the engagement partner,

6    you put your other personal interests above the firm and above

7    the client loaning that client money without disclosing it to

8    the Citrin Cooperman?  There was an objection that was

9    sustained.

10             My initial read on that when I was hearing it was

11   that it was a very compound question.  There were, again,

12   parts that were not established.  One, was he the engagement

13   partner?  Two, did he put his interest above the firm?  Three,

14   did he put his interest above the client?  Four, did he

15   disclose the loan to the Citrin Cooperman firm?

16             I thought it was a compound question.  That was what

17   I understood the objection to be.  Whether that was the

18   government's intent I don't know, but it did seem, again, a

19   compound question and I am confident that despite that

20   objection being sustained, the defense was given wide latitude

21   to probe this witness and confront this witness about his work

22   for that client, whether he disclosed the loan and whether he

23   made the loan.  So, all of that was fully vetted and I'm not

24   seeing how the defense could reasonably complain that, could

25   complain that it was thwarted somehow in probing the potential

4667

1    bias and veracity of this witness.

2           Now, again, had the government stated a one word

3    basis, I agree that perhaps we all would have been on the same

4    page as to understanding the nature of the objection.  I don't

5    think that that is a constitutional infirmity.  These are

6    fluid situations and when an objection is lodged, certainly I

7    try to rule on it before the answer comes out of the witness's

8    mouth.

9           The next issue involved cross-examination of

10   Mr. Richardson and Ms. Hassan.

11          First, with regard to Mr. Richardson, there was a Q

12   and A about Mr. Panoff, the chief financial officer who joined

13   in May of 2013, receiving board meeting minutes or draft board

14   meeting minutes in December of 2013.

15          The identical question and the identical objection

16   is quoted twice.  The question itself I thought was ambiguous.

17   First of all, I think Mr. Richardson had said he was not aware

18   that these e-mails with board minutes had been sent, but the

19   question itself asks whether he was aware that Mr. Greebel

20   sent an e-mail to Mr. Panoff in December 2013 attaching all

21   the board minutes, drafts of all the board minutes.

22          I'm not sure whether the question was targeted to

23   all the board minutes in final or whether it was targeted to

24   drafts.  Certainly, it's a compound question.  I don't know

25   that that was something that thwarted, again, thwarted

4668

1    Mr. Richardson being probed about whether he was aware that
2    anything had been sent by Mr. Greebel in the nature of either
3    final board minutes or draft board minutes.  I don't know what
4    the intent of the question was, but it did seem to me to be a
5    compound question.
6           Maybe someone on the defense side could have given
7    me a better idea about what that question was geared toward,
8    but it did seem to be compound because certainly all the board
9    minutes suggest final board minutes.  Drafts of board minutes
10   is not final, obviously.  So I am just not sure what that
11   question was seeking, but I did sustain it because I thought
12   it was not particularly clear.
13          Now, the next issue was during the cross-examination
14   of Sarah Hassan who was the first investor witness to testify
15   in this case.  Again, when the question was posed as follows:
16          You have no idea prior to having e-mail
17   communications with you and being copied and e-mails with
18   you --
19          Again, I have no idea what that means.  The phrase
20   "prior to having e-mail communications with you," I don't know
21   who the sender is or who the recipient is.  We know that
22   Ms. Hassan is somehow involved in the communications.  Then
23   the next part of the question says, "and being copied," I
24   don't know who's being copied, "and e-mails with you, that
25   another investor in MSMB named Lindsay Rosenwald made a direct

4669

1   threat to sue Retrophin."

2          So, the question in full reads as follows:

3          Question:  You have no idea that prior to having

4   e-mail communications with you and being copied and e-mails

5   with you that another investor in MSMB named Lindsay Rosenwald

6   made a direct threat to sue Retrophin, did you know that?

7          There are a lot of problems with the question

8   itself.  It is just confusing.  It is not clear who is being

9   copied, who the communications on the e-mail are with and I

10  think at that stage in the proceedings, there was no evidence

11  in the record that Mr. Rosenwald made a direct threat to sue

12  Retrophin.  And also, I am just not sure whether it is

13  relevant that Ms. Hassan knew or didn't know that, but that

14  issue regarding Mr. Rosenwald's threat was not anywhere in the

15  record.  It had not been floated to the jury at that point.

16  So, I think that, you know, given the form of the question,

17  the vagueness of the question and the stage of the proceedings

18  at that point and the questionable relevance, it seemed a

19  sustainable objection.

20         Ms. Hassan was allowed to ask over the government's

21  objection whether she gave the money back, whether she thought

22  she got a good deal.  All of those were areas where there was

23  full opportunity given to the defendant to probe Ms. Hassan

24  about what she viewed as the ultimate outcome of her

25  settlement.  Again, questionable relevance but I allowed it.

4670

1           The other issues have to do with apparent

2    characterizing past testimony and that seemed to draw

3    objections.  I mean, I don't know how much more I should go

4    into if the defense --

5           Do you still need an explanation?  Hello?

6           MR. BRODSKY:  No.  I think, Your Honor, that's been

7    helpful and, with those examples.

8           THE COURT:  I mean, the Massella business about the

9    e-mail, his "WTF" e-mail response, he had testified previously

10   about what he thought was somewhat unusual and I think it was

11   the idea of employees giving shares to a CEO and I think, I

12   think there was an objection as to how that prior, that

13   testimony was characterized.

14          So, I think it's, you know, again, we've been trying

15   to give fair and full opportunity to the defense to

16   cross-examine witnesses.  I think Mr. Massella was probed in

17   depth about this e-mail, the "WTF" e-mail.  That particular

18   sustaining of the objection did not prohibit or limit the

19   cross-examination of Mr. Massella on this issue.  He was asked

20   additional questions when he resumed his cross.

21          So, I am not seeing a broad --

22          MR. BRODSKY:  May I ask a question?

23          THE COURT:  I, mean I respectfully disagree that

24   these particular examples are points where the defense was

25   thwarted from probing a witness on bias or credibility.

1           MR. BRODSKY:  May I ask you a question, Your Honor?

2           THE COURT:  Yes.

3           MR. BRODSKY:  If we're cross-examining a witness and

4    we believe the witness has lied to the jury, am I correct that

5    we can confront the witness and say, sir, you lied to this

6    jury about, you know, whatever it may be, that as I understand

7    it --

8           THE COURT:  Well, if you have something to confront

9    the witness with, I think that is usually the way it is done.

10   Would you confront the witness with prior testimony or what?

11          MR. BRODSKY:  Let's say, hypothetically, the witness

12   has made statements on direct examination that we believe to

13   be lies and we can prove them, we feel that we should be able

14   to, at any moment, say to the witness -- of course it has to

15   be in good faith, it has to be backed up, but as defense

16   counsel, if you suggest a witness has lied and you can't back

17   it up, that's not helpful to you.  So, it's in our interest,

18   of course, to back it up.

19          There are occasions during cross-examination when it

20   is effective for us that if a witness makes a statement on

21   direct examination that's untrue and we can prove it, it's

22   often effective for us to confront that witness immediately

23   and say, When you testified this way on direct examination,

24   that was a lie, and then the witness normally, some witnesses

25   will acknowledge, most witnesses will insist that their answer

4672

1    is true, they will commit in full force to their prior answer

2    tends to be what human nature is, and then having committed in

3    full force to their answer, it's often effective then to

4    confront the witness with the evidence that demonstrates the

5    lie.

6             I just remember reading and practicing this in the

7    techniques of trial practice, you know, you commit the witness

8    to something, you confront them and we feel that that's an

9    important technique that's tried and true in cross-examination

10   and so I just wanted to raise it and make sure Your Honor is

11   okay with it.  If we have evidence a witness has made

12   statements during direct examination that are lies under oath,

13   we want to be able to confront a witness, or during

14   cross-examination, we want to be able to confront them

15   directly and say, You have lied to this jury, and then

16   proceed.

17            THE COURT:  Without confronting the witness with the

18   proof that makes what the witness said a lie?

19            MR. BRODSKY:  No.  We would then confront them, of

20   course, with the proof.

21            THE COURT:  Because, you know, it did prompt my

22   question about confronting Mr. Aselage with the statement that

23   you were doing something else during this telephone board call

24   which seemed surprising to me.  Was it Mr. Aselage or someone

25   else?

4673

1          MR. BRODSKY:  It was Mr. Aselage.

2          THE COURT:  It was surprising to me.  I let the

3    question go, obviously, and he denied doing something else

4    during the board call, but I did want to ask you after the

5    jury was out what evidence you had and I think you said it was

6    more of an assumption based on other circumstances but not

7    really having, for example, a long e-mail that he wrote during

8    the board call on some other issue where he wasn't actually

9    paying attention.

10          MR. BRODSKY:  Well, Your Honor, I actually think

11    that there was both direct and indirect evidence with respect

12    to that question, that Mr. Aselage was doing other things.  He

13    had sent an e-mail to Chris Shelling in 2013, I think it was

14    June or July of 2013, a former colleague in the pharmaceutical

15    industry saying he was, quote, "farting around."

16          THE COURT:  Yes, but that doesn't mean on this

17    particular phone call he was preoccupied by making eggs or

18    doing laundry or on the phone with his kids.  I mean that's

19    the kind of implication and I was surprised by that because

20    you were saying during this board call, you were not, you were

21    doing something else other than the board call, weren't you,

22    and he said no.

23          I know the argument is, yes, in his own words, he's

24    "farting around," but I think with that particular board call,

25    the question was somewhat surprising to me because maybe you

CMH        OCR        RMR        CRR        FCRR

4674

1  do have an e-mail or some good faith basis for asking the

2  question in the manner that you did.

3          MR. BRODSKY:  What we think, Your Honor, and,

4  respectfully, with respect to the case --

5          THE COURT:  I am not curtailing it.  I was just

6  curious.

7          MR. BRODSKY:  No, I know you didn't curtail it.

8          THE COURT:  I let it go.

9          MR. BRODSKY:  We think we can, it is perfectly a

10 proper question to ask the witness.  We don't have a chance to

11 depose this person like in a civil case before the trial.

12          Mr. Aselage would never meet with us before the

13 trial.  Our first time in confronting and questioning

14 Mr. Aselage is here in this courtroom.  So that is one of

15 the -- and when, when someone is accused, is faced with an

16 accuser who is saying they should have done this or they

17 should have done that, there's great latitude for that reason

18 given to a defense lawyer to cross-examine a witness in a

19 criminal case.

20          So, hypothetically, assuming that Mr. Aselage didn't

21 have an e-mail where he said he was farting around, and

22 assuming he had not testified as he did which was he didn't

23 remember a single thing from the call and he didn't remember

24 Ed Hackert or Sunil Jain providing an outline of their letter

25 that they had submitted prior to the board call relating to

4675

1   the significant unusual transactions, assuming all that wasn't

2   the case, based on his demeanor, based on his general

3   testimony.

4         We believe we have the latitude to, without having

5   an e-mail or a document backing us up, we have the latitude to

6   cross-examine a person and say you were doing other things,

7   your mind was elsewhere during this board call.

8         THE COURT:  I think the second question would be

9   fair.

10        The first one, I'm not so sure unless you have a

11  good faith basis to ask it, you know, that he was not

12  attentive or that his mind was elsewhere, he wasn't paying

13  attention because, yes, you can make a reasonable argument to

14  the jury that certainly some of this, he should have

15  remembered, but to suggest that he was doing something else

16  other than participating in the board call, again, would be a

17  perfectly valid question if you had a good faith basis for

18  asking it.

19        MR. BRODSKY:  I understand, Your Honor.

20        THE COURT:  In my view.

21        MR. BRODSKY:  Thank you, Your Honor.

22        THE COURT:  All right.

23        MR. BRODSKY:  Thank you.

24        THE COURT:  Did the government want to be heard on

25  any of this?

4676

1              MR. PITLUCK:  No.

2              THE COURT:  All right.  Are we ready to bring the

3    jury?

4              And, Ms. Jackson, is everybody here?

5              MR. PITLUCK:  We have one issue we need to raise.

6    It affects the trial going forward for the next couple of

7    days.

8              THE COURT:  Okay.

9              MR. PITLUCK:  Last night at 9:15, we got a letter

10   from defense counsel seeking expert disclosures relating to

11   Deborah Oremland.

12             THE COURT:  From who?

13             MR. PITLUCK:  From who --

14             THE COURT:  Expert disclosures regarding what?

15             MR. PITLUCK:  Deborah Oremland, the FINRA witness

16   who the government has identified as an expert in August of

17   this year who was scheduled to testify last week but because

18   of the pace of the trial, is now testifying this week as soon

19   as Tuesday and we, and these, this request is for, is for what

20   has already been litigated for a number of experts over the

21   last few months and we believe this request says at the end,

22   they may seek a Daubert hearing related to the proffered

23   testimony.

24             As the Court is aware, Ms. Oremland who testified in

25   the last trial, there was some issues related to what the

4677

1    Court did and did not want her to testify to so we rectified

2    that, we noticed her as an expert to provide some very limited

3    opinion testimony.  The defense moved to preclude her as an

4    expert witness.  We responded.  The Court then declined to

5    preclude her as an expert witness and now, you know, 24 hours

6    before she's going to testify or 36 hours before she's going

7    to testify, they're demanding disclosures which is

8    ridiculously untimely.

9            They've had notification of this for literally three

10   months.  Ms. Oremland is traveling here.  She traveled here

11   last week and was ready to testify.  There is -- there's no

12   basis for this request.  This is coming on.  She can be

13   cross-examined, but the Court is aware of Ms. Oremland's

14   qualifications and her testimony in the last trial.  What she

15   is going to say, we proffered the scope of her testimony to,

16   excuse me, to the defense in disclosure and in briefing and,

17   Judge, we're just utterly perplexed.

18           This is simply another attempt to delay the trial or

19   disrupt something that should have been done months ago.  We

20   intend to call her tomorrow.  We don't think any further

21   disclosures are necessary and, certainly, any requests are

22   untimely.  We wanted to apprise the Court of that because we

23   think that these are, these are improper requests and this

24   testimony is scheduled for tomorrow and we're trying to get

25   this trial done.  We planned for our witnesses based on

4678

1    travel.  You know, she's coming and she was, and as I said,

2    she was noticed last week, too.

3            So, you know, I'm curious -- I'm sure there's going

4    to be some slight to the government as we didn't do this or we

5    didn't do that, but this has been out there and, you know,

6    we're trying to be open, we're trying to give them our

7    witnesses.  We've given Ms. Oremland as early as two weeks ago

8    and we got this last night at 9:30 with a demand for

9    disclosures by the close of business today, a trial day.

10           So, Judge, we're, we don't -- we don't know what to

11   do so we're bringing it to you.

12           (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

4679

1          MS. DENERSTEIN:  Good morning, your Honor.

2          I had a conversation with Mr. Pitluck yesterday

3    where he advised that the government intends to proffer

4    Ms. Oremland as an expert from the very beginning of her

5    testimony and then he went through some of the categories to

6    which she was going to testify.  In particular, he said that

7    she was going to testify as to  -- as you recall from the

8    Shkreli trial, Ms. Oremland testified to Rule 13D, what it is,

9    but your Honor precluded her from testifying as to why 13D was

10   important and noted that that could  -- was very closely

11   aligned to the charges in count eight and shouldn't be part of

12   her testimony.

13         Mr. Pitluck informed me that she was going to

14   testify as to the why for various regulations and we haven't

15   received her opinion for the why for 13D or Rule 144.  In

16   other words, her testimony would be different from the Shkreli

17   trial.

18         At the October 6 hearing your Honor said that you

19   didn't find any reason to exclude Ms. Oremland's testimony.

20   You thought that she was appropriate.  She's testified to an

21   area that I think was helpful to the fact-finders, whether or

22   not she was designated an expert or not.  But I'm not going to

23   preclude her testimony.

24         The difference being here the government is seeking

25   to do something different than in Mr. Shkreli's trial by

4680

1    having her opine on what various laws mean.  So given that and
2    we have not received exactly what she's going to say about
3    those various laws, we don't have the information we need.
4    Mr. Pitluck can point his finger and say we should have asked
5    earlier.  We have asked for the same exact disclosures that we
6    have made regarding our experts, to the government, at various
7    times.  In addition, in their December discovery letter, 2105,
8    they said they would provide us in information.  I don't think
9    that the fact that  -- actually I had the discussion with
10   Mr. Pitluck to avoid situations where we were on Tuesday when
11   she was here and I think he would agree to that, where we were
12   not discussing this with you.
13          I sent the letter to him last night asking  -- to
14   the government  -- asking for disclosures on the basis of why.
15   And then based on that we can obviously assess whether or not
16   we think a hearing is necessary and request your Honor's
17   permission to do so.
18          I think what is at the heart of this we don't
19   believe it's appropriate for her to testify as to what is the
20   purpose of the law.  You don't tell the jury the purpose of
21   wire fraud is to rid society of fraudsters.  The court will
22   explain to them the elements of the offense and the jury will
23   apply the facts to the law.  There's no need for Ms. Oremland
24   to opine on why it's important that certain things are
25   disclosed or not disclosed.  That touches on the essence of

4681

1        count eight and it's in the province of the jury, your Honor.

2               MR. PITLUCK:  Judge, this was all laid out very

3        clearly in our August response which the court ruled on, the

4        purposes underlying the disclosure.  I said although we

5        respectfully disagreed with the court's decision and that was

6        opinion testimony, she was going to offer that testimony and

7        we said it forth very clearly and that's why we're noticing

8        her as an expert.

9               There was no request for this disclosure until last

10       night.  This has been out there for months.  We have

11       litigated, as the court is aware, experts back and forth for

12       the last two and a half months.  We have a Daubert hearing

13       scheduled for tomorrow that has taken weeks and months to

14       prepare for.

15              The notion that there was a request for this that we

16       didn't provide is just inaccurate, your Honor.  This was set

17       forth.  I notified Ms. Denerstein as early as last week that

18       Ms. Oremland was going to be offered as an expert witness.

19       It's clearly written in our August disclosure, the October

20       motions.  I don't know what else we could do.  There was no

21       other request.

22              Now it comes at the zero hour to have a very narrow

23       part of Ms. Oremland's testimony, particularly when they have

24       everything she has testified to.  In good faith I tried to

25       walk Ms. Denerstein through the areas of opinion testimony we

4682

1    were going to proffer and at 9:15 at night we get this request

2    for additional expert disclosures, which they could have made

3    months ago, and a potential Daubert hearing.  This is just

4    becoming absurd.

5                 MS. DENERSTEIN:  I don't think it's absurd.  First

6    of all, I reached out to Mr. Pitluck yesterday.  Our

7    conversation was at 4:00 p.m.   I sent him a letter and the

8    court a letter, that said I was hopeful the government would

9    comply.  Specifically in their December 15 letter they say

10   they will provide a summary of the expert's opinion.  The

11   matter is they have not said the why, what is the purpose of

12   the rule.  They have not said what opinion she is going to

13   give.  So we don't have that information and that is their

14   obligation that they chose to make in their December 15

15   letter.

16                 So they should disclose what they intend to do.

17   Yes, Mr. Pitluck mentioned it to me last week and that's why I

18   followed up with him.

19                 I don't think that we are able  -- we are not acting

20   in bad faith.  We brought this to the attention of the

21   government and now here we are before your Honor.

22                 THE COURT:   I honestly don't know that I have time

23   to schedule a Daubert hearing given our schedule, our already

24   lengthy trial schedule.  To the extent these issues were fully

25   briefed and vetted and decided upon previously, I don't

4683

1    believe that the defense has been precluded in any regard in

2    raising its issues before the court.  This was fully briefed.

3            We had a conference on this issue and I don't know

4    whether Mr. Pitluck's conversation with Ms. Denerstein

5    yesterday rang out the extent of the testimony, revealed the

6    details that she seeks now.  But I just don't know that we

7    have the ability to schedule a Daubert hearing and more

8    briefings on this issue.

9            With a defense team of seven and a prosecution team

10   of ten and trying to handle all the multiple submissions that

11   each party has been putting in out of time, way past the

12   court's pretrial scheduling orders, I've done the best I can

13   physically to deal with each of the multiple motions that get

14   filed each week by the parties.

15           But we are at the point where this case has to move

16   forward and I've already adjourned three other trials.  I

17   think the parties had a full opportunity to raise issues

18   before me in a timely way and I am just not able at this point

19   and in my discretion I believe the appellate courts will

20   uphold my scheduling or my desire to continue this trial

21   without further interruptions.

22           If we look back on the number of submissions that

23   have been made since the start of the trial, it would probably

24   surprise most judges, and there are just limits, with ten

25   lawyers bombarding me constantly with motions and cross

4684

1   motions, there's just a limit.  I've given plenty of latitude

2   to the parties and really, this has to stop.

3           In my discretion, I think that the government ought

4   to give the defense as much as it can on Ms. Oremland's

5   testimony.  She has testified fully at a prior trial.  Yes.

6   She's now being proffered as an expert which she wasn't being

7   proffered as such in the prior trial.  So she was somewhat

8   limited.  Experts are allowed to give opinions.

9           And, Mr. Pitluck, I hope you have given

10  Ms. Denerstein a full idea about what opinions she will be

11  giving and we just have to move forward.  No more Daubert

12  hearings.  We have one scheduled.  We're squeezing it in

13  tomorrow.  I've had to reschedule numerous court related and

14  personal matters to accommodate all these late filings and

15  this just has to stop.  So we will proceed with Ms. Oremland

16  tomorrow.  I would just urge you to give Ms. Denerstein as

17  much information as you can on the Daubert opinions.

18          MR. PITLUCK:  I did give Ms. Denerstein the

19  opinions.  The specific questions why.  I would note for the

20  record they have noticed an expert to offer these same type of

21  opinions, and the why of Mr. Dean Fulvio was based on his

22  experience.  That's what we're offering.  We're offering the

23  same thing.

24          MS. DENERSTEIN:  Your Honor, so the record is clear:

25  That's not correct.  I'm asking for her basis and what she's

4685

1   going to say is the purpose of the various rules and

2   regulations.  That has not been provided to the defense

3   period.

4        MR. PITLUCK:  Judge, I'm not aware of any expert

5   witness which we have gotten the full basis of their opinions

6   -- the full answers to their opinions.  In fact, it has been

7   specifically held from us.  We don't have to tell them what

8   our witnesses are going to testify to.  I have told

9   Ms. Denerstein the areas she was going to offer opinions

10  specifically and why those opinions are offered.  I've not

11  advanced what the opinions are going to be.

12        It's not complicated.  These are SEC rules and

13  regulations and we've disclosed she's going to be doing that

14  and it's based on her training and experience.

15        MS. DENERSTEIN:  Not complicated, one, it should be

16  easy for him to provide.  Two, the point of expert opinion is

17  to provide opinions.  They are to provide us with an opinion.

18  The failure to do so I believe does create an issue and they

19  are choosing not to.  If they want to say she's relying on her

20  experience that's one thing.  That's still not disclosing to

21  us exactly her opinion is.

22        MR. CHAN:  Just to clarify, the government did ask

23  us to provide the answer as to our experts.  We noticed that

24  one of our experts would testify about the purpose of

25  regulations.  They said that was insufficient.  Please tell us

4686

1    what the actual purpose  -- what he will say the purpose is.

2    We disclosed that.  So it's not true that we did not give them

3    the actual substance, the purpose testimony of one of our own

4    experts which the government has failed to give us.

5         Secondly, Mr. Kessler asked us for supplemental

6    disclosures for Mr. Johnson to be given to the government by

7    noon today.  So the government has itself asked us to provide

8    additional expert disclosure even though they had a full and

9    fair opportunity to ask us to do.

10        I want to clarify for the record the government is

11   not doing what we have done and is refusing to do what they

12   are asking us to do.

13        MR. PITLUCK:  Judge, the request for additional

14   disclosures was in the context of the Daubert hearing.  We

15   asked for 26.2 material and any additional disclosures that

16   were necessary.  We've gone back and forth.  Judge, this is a

17   first request.  I think the court is aware of the issues and

18   the scope of the issues.  I will try to talk to Ms. Denerstein

19   to see if we can provide enough comfort to h er.  I respect

20   the court's ruling.  We will have Ms. Oremland here and ready

21   to testify tomorrow.

22        THE COURT:  All right.  We'll bring the jury in.

23        MR. KESSLER:  Your Honor, should we put the next

24   witness on the stand?

25        THE COURT:  Either way.  We can bring the witness in

                    Su - direct - Kessler                    4687

 1   and swear the witness once the jurors are in.

 2              (Pause.)

 3              (Jury present.)

 4              THE COURT:  Good morning, members of the jury.  All

 5   jurors are present.  Please, have a seat.  Ms. Jackson, would

 6   you swear the witness, please.

 7   J A C K S O N     S U,

 8              having been duly sworn was examined and

 9                 testified as follows:

10              THE CLERK:  State your name and spell it.

11              THE WITNESS:  Jackson, J A C K S O N, S U, last

12   name.

13              THE COURT:  Please proceed.

14              MR. KESSLER:  The government calls Jackson Su.

15   DIRECT EXAMINATION

16   BY MR. KESSLER:

17   Q    Mr. Su, there's a microphone in front of you, if you

18   would lean into it.

19   A    Okay.  How is this?

20   Q    Excellent.

21              All right.  Between January 2012 and December 2012

22   did you work for Retrophin and certain hedge funds managed by

23   Martin Shkreli?

24   A    Yes.

25   Q    How old are you?

Su - direct - Kessler                4688

1   A    I am 42?

2   Q    Are you married?

3   A    Yes.

4   Q    Are you expecting a child?

5   A    In a couple of weeks, yes, December 18.

6   Q    Are you currently employed?

7   A    Yes.

8   Q    What do you do?

9   A    We do real estate investments.  Myself and my company.

10  Q    Where is your company located?

11  A    Dallas, Texas.

12  Q    Do you run that company with an individual named Jordan

13  Wang?

14  A    Yes, he's my business partner.

15  Q    Is he someone you met during the time you worked at

16  Retrophin?

17  A    Yes.

18  Q    Will you briefly describe your education for us?

19  A    I graduated Syracuse University with a bachelor of

20  science in finance in 1997.

21  Q    After you graduated from Syracuse, where did you go to

22  work?

23  A    I went as to work at Goldman Sachs & Company in New York.

24  Q    What did you do at Goldman Sachs?

25  A    I was an analyst in their asset management division.

1    Q     How long did you work at Goldman?

2    A     I was there for a little bit less than two years.

3    Q     How did you come to leave?

4    A     I incorrectly filled out a form and I was dismissed for

5    incorrectly filling out that form.

6    Q     How did you fill out the form incorrectly?

7    A     There was a license that I had to get to perform part of

8    my duties, which was called the series 7, and in that form it

9    asked if you were ever charged with a felony and I put no.

10   Q     Okay.  And to the best of your knowledge had you been

11   charged with a felony?

12   A     To the best of my knowledge, at that point I was not and

13   it was because of a dispute or a fight that I got into in

14   Manhattan with a cab driver here in New York City and I got

15   into a fight.  I thought it was just a misdemeanor and just

16   let it go.

17          When that form came out I thought it was just a

18   misdemeanor because it was just a fight.  If anything, it was

19   just more of a tug between shirts.  I fell on top of him and I

20   got  -- went to jail overnight until the court came out and I

21   thought it was just simply a fight.

22          But it turned out it wasn't.  It was charged as a

23   felony, assault felony.  And then several months later it got

24   ultimately dismissed the whole charge was completely

25   dismissed.  But I did fill out that form incorrectly and it

Su - direct - Kessler                    4690

1   was an oversight on my part.

2   Q    After you left Goldman Sachs where did you go to work?

3   A    I went to work at Weiss Peck & Greer for the head trader

4   at Goldman Sachs.  He left Goldman Sachs at approximately the

5   same  time -- I'm sorry -- a little bit before I left and

6   it was for Weiss Peck & Greer he hired me.

7   Q    What kind of firm is Weiss Peck & Greer?

8   A    It was another financial firm, similar to Goldman Sachs.

9   Q    What kind of trading did you do?

10  A    I was trading for an equity long short hedge fund, its

11  products like their mutual funds for a portfolio for a company

12  or a pension fund.

13  Q    How did you come to leave Weiss Peck & Greer?

14  A    I was there for like three and a half years.  There was a

15  miscommunication between myself and a portfolio manager.  At

16  the time there was a loss in the account.  It was about

17  $30,000 I believe was the loss.  It was an internal loss that

18  I thought the firm should take because it was a

19  miscommunication between myself and my portfolio manager and

20  they wanted me to put it into the customer's account at the

21  time, which was a hedge fund, and I didn't.  I refused to do

22  that.  And the subsequent fallout was them asking me to leave.

23  Q    Where did you go after you left Weiss Peck & Greer?

24  A    I went to Kramer Rosenthal McGlynn, which was an as  --

25  another asset manager.

Su - direct - Kessler                          4691

1    Q     How long did you work there?

2    A     I was is there for two years and I left because there was

3    another opportunity in Dallas, Texas that I took.  My

4    portfolio manager that I was working for at the time decided

5    to retire and I had an opportunity to stay on with the firm

6    and I declined it and started another job in Dallas, Texas.

7    Q     Where did you work when you went to Dallas, Texas?

8    A     A firm called Bonanza Capital.  They are a long short

9    equity hedge fund and I was for trading their portfolio.

10   Q     How long did you work there?

11   A     I was there from 2004 through 2006.  So a period of two

12   years.

13   Q     Then where did you go?

14   A     Then I started my own fund, called Othello Capital.

15   Q     What kind of fund was that?

16   A     And that was a long short equity hedge fund.

17   Q     How long did you manage the Othello fund?

18   A     For a period of five years.

19   Q     During that period did you engage in a short trade

20   related to a company called Typhoon Touch Technology?

21   A     Yes.  It was two years into it.  I believe it was in

22   2008, into my hedge fund firm, I shorted a stock called

23   Typhoon Touch Technology.

24   Q     What does it mean to short a stock?

25   A     To short a stock is to put an investment into a stock

Su - direct - Kessler                    4692

1   hoping that it would fall and after it falls you buy it back

2   for a profit.  If it went up, you would  -- there would be a

3   loss.  So it's a reverse of buying a stock, holding it like a

4   traditional person would do and hoping to sell it when the

5   stock goes up.  We did it the reverse and it's a way to either

6   hedge off a portfolio exposure or bet against the stock

7   itself, meaning you would think that earnings or some type of

8   event might happen with the stock for it to decrease and you

9   would profit that way.

10  Q     What happened with the short you put in own Typhoon

11  Touch?

12  A     The regular process for shorting stock you would need to

13  get a borrow, you would have to borrow from a person who

14  actually had the stock.  They would lend it to you and you

15  would be able to short the stock in the marketplace.  I went

16  to my prime broker, who facilitated our account, asked them

17  for the borrow, which they in turn on my behalf go out to the

18  street to borrow the stock.

19          They told me they had the borrow.  It was done

20  electronically and I proceeded to short the stock.  Then when

21  it was  -- as the investment was going on the person who lent

22  me the stock said they wanted the stock back.  My prime broker

23  said to buy the stock back.  The liquidity of someone trading

24  the stock wasn't able for me to go and buy back.  The

25  subsequent events, the prime broker went out and hired a bunch

Su - direct - Kessler                          4693

1    of lawyers, spent six hundred thousand dollars in legal fees

2    within a matter of three weeks and I took issue with that.

3    The stock was closed out.  The position was closed out.

4    Everything was fine.  I took issue with that and I started an

5    arbitration with the financial company that did that, my prime

6    broker.

7                In the meantime I gave my clients, who wanted their

8    money back, their money.  Because I didn't feel that it was

9    right to hold on to their money while this process was going

10   on, even though they had made a decent return from the

11   investment as it stands right now.  I gave them back their

12   money and then went through arbitration with my prime broker.

13   We won.  And that was the end of that trade.

14   Q    Did the fund continue after that trade?

15   A    I had several clients that insisted on keeping money with

16   me.  Yes, it did.  So it progressed up until 2011.

17   Q    After 2011 did you go to work for Retrophin and hedge

18   funds managed by Martin Shkreli?

19   A    Yes.

20   Q    You left in December 2012?

21   A    That's correct.

22   Q    So after you left did you start the real estate

23   investment company you told us about?

24   A    Yes.

25   Q    So let's turn to your time working at Retrophin and those

Su - direct - Kessler                              4694

1    hedge funds?

2         How did you come to have a job working for Retrophin

3    and hedge funds managed by Martin Shkreli.

4    A    He reached out to me September or August September time

5    frame of 2011.  He asked me if I was interested in working for

6    him and his hedge funds and we set up a couple of interviews

7    and I started January 4, 2012.

8    Q    Before you started working there had Mr. Shkreli told you

9    anything about the hedge funds he was managing?

10   A    Yes.  He said it was healthcare focused.  It managed 70

11   million dollars and its performance did really well.  He said

12   he went through a couple of mergers which I looked up on my

13   own to do some research and due diligence on the company

14   himself and some of the mergers he pointed to.

15   Q    Now, when you told us your career history, is it fair to

16   say that most of that career was in trading stocks?

17   A    Yes, all of it at that point.

18   Q    Was it your understanding when you went to work at

19   Retrophin and these hedge funds you were going to be trading

20   stock?

21   A    No.  When I closed up Othello Capital I was on a

22   transition to take a break away from equity investments myself

23   and actually run the business side of it.  I didn't want to be

24   responsible for day-to-day investments and investors, which

25   can really take a toll, which did take a toll on me at that

Su - direct - Kessler                    4695

1    point, especially after the Typhoon Touch Technology trade.

2    So I wanted to really focus on anything but the front office

3    part of the business.

4    Q    All right.  So approximately when did you start working

5    at Retrophin and these various hedge funds?

6    A    The first day after the holidays in 2012 which I believe

7    was January 4 I believe that was the first day.

8                 (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Su - direct - Kessler                                4696

1    (Continuing)

2              MR. KESSLER:  Okay.  Now, you have a binder of

3    documents up on the ledge there.  If you take it out and turn

4    to tab one, I'd like to show you what's been marked for

5    identification as Government's Exhibit Exhibit 111-1.

6              THE WITNESS:  Sorry, there's two binders here.

7              MR. KESSLER:  The larger one.

8              THE WITNESS:  Okay.

9    Q    Do you see tab one, it's also up on your screen?

10   A    I think it's this one.

11             Yes.

12   Q    Okay.  What is Government's Exhibit 111-1?

13   A    It is my employment contract with Retrophin and its

14   various different hedge funds that I worked for.

15   Q    Okay.

16             MR. KESSLER:  I offer Government's Exhibit 111-1.

17             MR. BRODSKY:  No objection, Your Honor.

18             THE COURT:  We receive 111-1.

19             (Government's Exhibit 111-1 received in evidence.)

20             (Exhibit published to jury.)

21   Q    So, Mr. Su, at the top of the page, there are two words

22   in bold.

23             Can you read those?

24   A    Term of employment guaranteed salary.

25   Q    No, no, the very top of the page.

Su - direct - Kessler                                 4697

1   A     Sorry.

2         Employment agreement.

3   Q     This is your employment agreement?

4   A     Yes.

5   Q     Now, in the first paragraph can you read, who are the

6   parties to this employment agreement?

7   A     Martin Shkreli, MSMB Capital Management LLC, MSMB

8   Healthcare Management LLC, MSMB Isotope LLC, SurePoint Fund

9   Management LLC, Retrophin LLC, and its affiliated entities,

10  the companies, and Jackson Su.

11  Q     So, Martin Shkreli himself was a party to this contract?

12  A     Yes.

13  Q     And then there are a number of legal entities?

14  A     Correct.

15  Q     Then Retrophin?

16  A     Correct.

17  Q     And then you?

18  A     That's correct.

19  Q     Did you have an understanding about the relationship

20  between the various entities other than Retrophin?

21  A     I did not.

22  Q     Okay.  The first entity listed is MSMB Capital Management

23  LLC.

24        Do you see that?

25  A     Yes.

VB      OCR      CRR

1    Q    Did you do any work, as far as you knew, for MSMB Capital

2    Management LLC itself?

3    A    I did not.

4    Q    Did you know what MSMB Capital Management LLC, the deal

5    entity, did?

6    A    I did not.

7    Q    All right.  And what was your understanding of Retrophin

8    when you started?

9    A    It was a biotech company.

10   Q    So, not a hedge fund?

11   A    It was not a hedge fund, no.

12   Q    During the course of your work for these various

13   entities, did you develop an understanding of whether they had

14   different bank accounts?

15   A    Yes.  And they did.

16   Q    Do you know what an EIN number is?

17   A    Yes.

18   Q    What is that?

19   A    It's an employer identification number.

20   Q    Who issues it?

21   A    This is issued by the IRS, so it is a tax ID that every

22   company has and it identifies -- to be able to pay taxes,

23   similar to, I guess, my personal Social Security number as an

24   individual.  That's what I would use to report my taxes.

25   Companies have an EIN number to report their taxes.

Su - direct - Kessler                                    4699

1   Q    And with respect to the various entities for which you

2   did work, did you have an understanding of whether they had

3   different EIN numbers or shared an EIN number?

4   A    As far as I understood no one, no companies shared EIN

5   numbers.

6   Q    Okay.  Now, if we look at number, paragraph 2 in your

7   employment agreement, term of employment.  The agreement

8   states that the agreement will be retroactive to January 1st,

9   2012.

10           Do you see that?

11  A    Yes.

12  Q    What does it mean to be retroactive to January 1st, 2012?

13  A    That means going back in time.  It was January 1st start

14  date, but it wasn't signed or agreed to at that point, so it

15  just goes back and notates that on the contract.

16  Q    Okay.  And if you just take a look at page 3 of the

17  document, can you let us know when the document was actually

18  signed?

19  A    It was signed the 12th day of January 2012.

20  Q    Okay.  If you go back to the first page, can you just

21  tell us what your salary was?

22  A    It was $150,000 per year.

23  Q    All right.  And then, below the provision for salary,

24  there's a provision for incentive payments.

25           Do you see that?

VB        OCR       CRR

1    A    Yes.

2    Q    What's an incentive payment?

3    A    It is a bonus based on performance of a company.

4    Q    Okay.  And for which entities were you entitled to

5    receive incentive payments?

6    A    MSMB Isotope, MSMB Consumer, MSMB Healthcare and

7    Retrophin LLC.

8    Q    So, were you, did your contract provide for an incentive

9    payment related to MSMB Capital Management LLC?

10   A    It did not.

11   Q    What were MSMB Isotope and MSMB Consumer?

12   A    MSMB Isotope was $100,000 hedge fund that invested in

13   healthcare stocks.

14   Q    Okay.

15   A    MSMB Consumer was a, another hedge fund that invested in

16   consumer retail-type stocks; meaning, retailers, clothes,

17   things like Target, Gap.

18   Q    Paragraph 4-D refers to 2,500 units of Retrophin LLC.

19         Do you see that?

20   A    Yes.

21   Q    So, were you entitled to those 2,500 units on the day you

22   signed the contract?

23   A    I was entitled to it, but you have to go through a

24   vesting period.

25   Q    What's a vesting period?

1    A    The 2,500 units would be given to you after that length

2    of time, so in this instance, this 2,500 units was vested or

3    given to you during every quarter; a certain amount will be

4    given and released to you to own.

5    Q    So, you didn't have the 2,500 shares when you started.

6         You got them over time?

7    A    Correct.

8    Q    Okay.  Did you have a separate agreement that governed

9    those 2,500 incentive units?

10   A    Yes.

11        MR. KESSLER:  If you look at tab 2 in your binder

12   and if we can show the witness Government's Exhibit 111-2.

13   Q    Mr. Su, is this document the incentive agreement that

14   governed those 2,500 shares?

15   A    Yes, it is.

16   Q    Okay.

17        MR. KESSLER:  I offer Government's Exhibit 111-2.

18        MR. BRODSKY:  No objection, Your Honor.

19        THE COURT:  We receive 111-2.

20        (Government's Exhibit 111-2 received in evidence.)

21        (Exhibit published to jury.)

22        MR. KESSLER:  If we just go to the top.

23   Q    Mr. Su, can you just read the words in bold at the very

24   top?

25   A    Incentive unit agreement.

1   Q    And who's a party to the agreement?

2        The top of the page.

3   A    It's between Retrophin LLC and myself.

4   Q    Okay.  All right.  So, the last thing I want to look

5   at -- I'm sorry.

6             MR. KESSLER:  If we can go back to your employment

7   agreement for one more minute, that's Government's

8   Exhibit 111-1.  Paragraph 6 says duties and position.

9   Q    Do you see that?

10  A    Yes.

11  Q    For what position were you being hired?

12  A    For chief operating officer.

13  Q    All right.  Now, did you do any work for Martin Shkreli

14  personally?

15  A    No.

16  Q    Okay.  So, I want to talk about the work you did as chief

17  operating officer for various other companies, or entities in

18  your agreement.  Let's start with MSMB Consumer and

19  MSMB Isotope.

20       Did you have responsibilities related to those two

21  funds?

22  A    Yes.

23  Q    What were those responsibilities?

24  A    Included technology, administration, fund accounting,

25  administration, there was a lot of administrative work.  Bank

1    accounts.

2    Q    What about MSMB Healthcare?  Did you have any

3    responsibilities related to MSMB Healthcare?

4    A    I did not.

5    Q    Were you told why not?

6    A    Yes.  When I first started in the first month of January,

7    I did work and try to get up to speed with all the companies.

8    And at one point I asked about MSMB Healthcare and I was told

9    by the principal there that you should create a good solid

10   platform and infrastructure for the two funds that I've given

11   you, which is MSMB Consumer and MSMB Isotope.

12           And after you create that infrastructure and

13   third-party vendors, we would lay over on top and incorporate

14   that into MSMB Healthcare.  But before then, don't worry about

15   that fund.

16           MR. BRODSKY:  Your Honor, identity of principal?

17           THE COURT:  Do you mind?

18           MR. KESSLER:  I was going to ask as the next

19   question.

20   Q    And who was the person who told you that?

21   A    Martin Shkreli.

22   Q    All right.  Did you ever have access to MSMB Healthcare

23   bank accounts or brokerage accounts?

24   A    I did not.

25   Q    Did you ever send any performance statements for MSMB

Su - direct - Kessler                                    4704

1   Healthcare to investors?

2   A    No.

3   Q    All right.  So, let's turn to MSMB Capital Management

4   LLP -- LLC, I'm sorry.

5           Did you have any responsibilities for MSMB Capital

6   Management LLC?

7   A    No.

8   Q    Had you heard of a hedge fund that contained the name

9   MSMB Capital Management?

10  A    No.

11  Q    Did you ever have access to bank account statements for

12  MSMB Capital Management?

13  A    No.

14  Q    Did you ever send any performance statements related to

15  MSMB Capital Management LLC?

16  A    No.

17  Q    Now let's turn to Retrophin.

18          What were your responsibilities for that company?

19  A    Again, technology, administration, human resource,

20  administration, being a point-person for accounting and audit,

21  not necessarily doing it but hiring the third-party vendors to

22  be able to coordinate that.

23  Q    Did you have access to Retrophin's bank accounts?

24  A    I did, yes.

25  Q    And what did you do with that information from bank

1    accounts?

2    A    A lot of times, give the statements over to the necessary

3    parties, which is usually our accountant, to reconcile the

4    statements.

5    Q    And when you started in January 2012 working for these

6    various entities, who else was working for those entities, one

7    or more of those entities?

8    A    When I started, we were in a side-by-side shared office

9    space, separated by a wall.  So, there were four desks in one

10   office, which included Martin Shkreli, Allison Russo, Tim

11   Pierotti and Marek Biestek, and in the office which is where I

12   was, in the smaller room, office space, was myself and a desk

13   for Kevin Mulleady.  And then there was Andy Vaino in

14   San Diego office.

15   Q    All right.  You mentioned Allison Russo.

16        Who is she?

17   A    She was Martin Shkreli's administrative assistant.

18   Q    You mentioned Tim Pierotti.

19        For which entities did Tim Pierotti do work?

20   A    MSMB Consumer.  He was the portfolio manager for

21   MSMB Consumer.

22   Q    Did you ever see Tim Pierotti do any work for Retrophin?

23   A    No.

24   Q    You mentioned Andrew Vaino or Andy Vaino.

25        What was his job?

1  A    He was research.  He did research for Retrophin and he

2  did research for MSMB Capital.

3  Q    You mentioned Kevin Mulleady.

4        What kind of work did Kevin Mulleady do?

5  A    He was the marketing person for Retrophin and MSMB

6  Healthcare.

7  Q    And you mentioned Marek Biestek.

8        Is he the MB in the various MSMB funds?

9  A    Yes, he's the MB.

10  Q    Where did Marek Biestek live?

11  A    He lived in Far Rockaway, as far as some of the documents

12  that I saw him sign.

13  Q    All right.  Now, you stalked about Kevin Mulleady a

14  minute ago.

15        During the time between January 2012 and

16  December 2012, was Kevin Mulleady continuously doing work for

17  these various entities?

18  A    No.  He and Martin had a very odd relationship.  There

19  were periods of time where Kevin Mulleady would work for the

20  companies and then he would be fired, and then he would get

21  re-hired, and then fired again.  I mean, within that 12-month

22  period I think this happened at least five, six times.  And

23  there was like, an office pool at some times when he left

24  when, how many days would it take for him to come back.

25  Q    Office pool -- P-O-O-L?

1    A    Yes.

2    Q    The people were having a casual bet about when

3    Mr. Mulleady would return?

4    A    Yes.

5    Q    You mentioned there were two shared offices that various

6    people sat in.

7         Do you remember that?

8    A    Yes.

9    Q    What was the address where the shared office was located?

10   A    330 Madison Avenue, New York.

11   Q    Now, during the time that you worked for these various

12   entities, did additional people come to do work for them?

13   A    Yes.

14   Q    All right.  So, who were those people?

15   A    Chris James who was the chief scientific officer, Tom

16   Fernandez who was the president of MSMB.

17            THE COURT:  I'm sorry, MSMB what?  What entity's

18   president?

19            THE WITNESS:  I believe on his employment contract

20   it says MSMB Capital.

21            THE COURT:  Okay.

22            What about Mr. James?

23            THE WITNESS:  He was the chief scientific officer

24   for Retrophin LLC.

25            THE COURT:  Thank you.

1   A    And then there was the analyst for Retrophin, Chun Yi

2   Huang.

3   Q    Is that the same George Huang that you now run a company

4   with?

5   A    Yes.

6   Q    Okay.  So, you told us about Chris James, Tom Fernandez,

7   George Huang.

8            Were there others?

9   A    There was Adam Gifford, it was someone that was --

10  reached out to Martin on a financial web blog site called

11  Seeking Alpha, which he was on for a short period of time, it

12  was less than a month that he was there before Martin let him

13  go.

14           And there was Steve Aselage, who was hired to be the

15  CEO and director for Retrophin.

16  Q    Did someone named Ron Tilles do work for one or more of

17  those entities?

18  A    Ron Tilles was described to me a long time marketer for

19  Martin.  And I'm not sure which funds or companies that he

20  marketed for, but in the October-November time frame, we hired

21  him for Retrophin, full-time, and he was sitting up in a new

22  office with us as a marketer for the company.

23  Q    And then did someone named Michael Smith come to do some

24  work for these entities?

25  A    Yes.  Michael Smith came on after Allison Russo quit as

1    the administrative assistant.

2    Q    So, we now talked about a number of people who were

3    working for these entities when you started or came to work

4    for them at some point when you were also doing work.

5          Was it always clear to you whether these individuals

6    were being classifies as employees or consultants for

7    accounting or tax purposes?

8    A    Yes.

9          I'm sorry, could you repeat the beginning of the

10   question.

11   Q    Was it always clear whether these people doing work for

12   these entities were considered employees or consultants?

13   A    Yeah, they were employees.

14   Q    Okay.  And do you know what sort of forms were used to

15   pay them?

16   A    It varied.  So, there were some people that were paid

17   through a normal payroll processor.  I believe at the time it

18   was ADP.  And then there were others that were paid straight

19   from the bank account and issued a 1099.

20   Q    What's a 1099?

21   A    1099 is paid to people who aren't regular employees.

22   Q    And who decided who was paid one way or another?

23   A    Martin did.

24   Q    Now, during your time working for Retrophin, did you ever

25   work with an outside lawyer for Retrophin?

Su - direct - Kessler                                4710

1   A    Yes.

2   Q    And did Retrophin ever employ a lawyer on its own

3   payroll?

4   A    No.

5   Q    All right.  So, who was the outside lawyer you came to

6   work with during the course of your work for Retrophin?

7   A    Evan Greebel.

8   Q    Did you come to --

9          MR. KESSLER:  Strike that.

10  Q    Did you interact with him in person?

11  A    Several occasions, I believe I -- yes, I did.

12  Q    And did you interact with him on the phone?

13  A    Yes.

14  Q    Did you interact with him more frequently over the phone

15  than in person?

16  A    Yes.

17  Q    Now, did you also observe Mr. Shkreli interact with

18  Mr. Greebel?

19  A    Yes.

20  Q    Did you observe them interact in person?

21  A    Yes.

22  Q    Did you also observe them interact over the phone?

23  A    Yes.

24  Q    Now, how did that happen?

25  A    It was either through a conference call that the three or

Su - direct - Kessler                    4711

1    a number of parties were on or a open speaker because the

2    offices were so open space.  There was really no privacy, even

3    me being in a separate office, I'd be here and know who's on

4    the other side of the line.  And at times, we would just be on

5    a open speaker mic and we would all interact together.

6    Q    How frequently did Mr. Shkreli talk to Mr. Greebel based

7    on your observation?

8    A    Throughout the course of the day, a lot.

9         THE COURT:  Can you give us an idea what that means?

10        THE WITNESS:  There were times five, six phone

11   calls.  There would be other days that would be only one, but

12   those days were, infrequent.  So, they interacted a lot.

13   Q    Based on your observations of their interactions, did you

14   have an impression of the relationship between Mr. Shkreli and

15   Mr. Greebel?

16        MR. BRODSKY:  Objection, Your Honor.

17        MR. KESSLER:  Based on his impression.

18        THE COURT:  Based on his observations?

19        MR. KESSLER:  Absolutely.

20        THE COURT:  Overruled.

21   A    Can you repeat the question, please.

22   Q    Sure.

23        Based on your own observations, both with your eyes

24   and your ears, of the interactions between Mr. Shkreli and

25   Mr. Greebel, what was your impression of their relationship?

1  A    My impression was professional most of the time.  There

2  were times that Martin wasn't as professional.  He screamed or

3  at times, I thought degraded Evan and unprofessional at

4  others.  But that was my observation.

5  Q    Do you recall interacting with any -- well, I'm sorry.

6            MR. KESSLER:  Strike that.

7  Q    Do you know which law firm Mr. Greebel worked for?

8  A    Yes.

9  Q    Which law firm?

10 A    Katten Muchen.

11 Q    During the course of your work at Retrophin, did you

12 interact with any other lawyers from Katten, other than

13 Mr. Greebel?

14 A    Infrequent, but from time to time at the beginning it was

15 Dave Kravitz that I interacted just through a couple of

16 e-mails.  Outside of that, there was some lawyers down the

17 road in the October-November time frame that I saw some

18 e-mails come from that I was cc'd on.  But mostly it was with

19 Evan.

20 Q    Now, in your role as COO for these various entities, did

21 you institute any policy or process for monitoring e-mails?

22 A    Yes.

23 Q    How did that happen?

24 A    During the summer or middle months of the year, Martin

25 and Marek, said because they were going through a lot of

Su - direct - Kessler                              4713

1    transactions, they didn't want anybody to do any insider

2    trading.  So, in order to do that, they wanted to institute a

3    policy to monitor e-mails.  And I reached out to a third-party

4    vendor called Global Relay and enlisted their services.

5    Q    So, how did the Global Relay system work?

6    A    It was an archiving system that any e-mail that was sent

7    or received from anyone with that .com domain name would be

8    archived in their system and the two e-mails that we had on

9    there was MSMB Capital and Retrophin.

10   Q    So, you were archiving the MSMBCapital.com e-mails and

11   the Retrophin.com e-mails?

12   A    Yes.

13   Q    And was this a program that automatically just grabbed

14   e-mails and put them in an archive?

15   A    Correct.

16   Q    Did you access it from time to time?

17   A    Yes.

18   Q    Could this archive system be accessed remotely?

19   A    Yes.

20   Q    Did you access it remotely from time to time?

21   A    Yes.

22   Q    How frequently did you access the archiving system while

23   you worked for Retrophin and those various hedge funds?

24   A    At least once a day.

25   Q    Did you also print out e-mails that were stored in this

Su - direct - Kessler                              4714

1    archiving system from time to time?

2    A    Yes.

3    Q    And what did you do with those?

4    A    Some of them I kept in the office, some I would work from

5    home also, so I printed some at home.

6    Q    So, let me direct your attention to January and

7    February of 2012 when you started work for these various

8    entities.

9            In that time period, were you aware of Retrophin's

10   financial health?

11   A    Yes.

12   Q    And what was it?

13   A    It was running on fumes, if that's a good terminology for

14   it.  We didn't have a -- Retrophin did not have a lot of

15   money.  It was basically living or surviving day-to-day from

16   the expenses that it was incurring, including the bills that

17   it had, it just didn't have a lot of money.

18   Q    Were there times when the Retrophin bank account would

19   receive money from an account associated with MSMB Healthcare?

20   A    Yes.

21   Q    Now, during your work for Retrophin, was one of your

22   responsibilities to keep track of money that was coming in to

23   Retrophin?

24   A    Yes.

25   Q    Was MSMB Healthcare the largest investor in Retrophin?

1  A    Yes.

2  Q    Now, did MSMB Healthcare make an investment in Retrophin

3  in February 2012?

4  A    Yes.

5  Q    Are you familiar with the subscription agreement?

6  A    Yes.

7  Q    What is a subscription agreement?

8  A    It's a legal document that investor would sign to say

9  that they want to invest into -- make an investment into a

10  certain company.

11  Q    And as a general matter when an investment came in to

12  Retrophin, was there an accompanying subscription agreement?

13  A    There was.

14        MR. KESSLER:  Could you take a look in your binder

15  at what's behind tab number 3, Government's Exhibit 114-2 for

16  identification.

17        THE WITNESS:  Yes.

18        MR. KESSLER:  Turn to the last page.

19  Q    You see there is some handwriting there?

20  A    Yes.

21  Q    Is this the subscription agreement that accompanied the

22  February 2012 investment by MSMB Healthcare in Retrophin?

23  A    Yes.

24  Q    And do you recall receiving this subscription agreement

25  around the time that the investment took place?

1    A    Yes.

2            MR. KESSLER:  Okay.  I offer Government's

3    Exhibit 114-2.

4            MR. BRODSKY:  No objection, Your Honor.

5            THE COURT:  We receive 114-2.

6            (Government's Exhibit 114-2 received in evidence.)

7            (Exhibit published to jury.)

8    Q    Mr. Su, we are looking at the first page of Government's

9    Exhibit 114-2.

10           Do you see the middle top of the page, there's

11   written Retrophin LLC, investment unit subscription agreement?

12           Do you see that?

13   A    Yes.

14   Q    And now if we go to the last page.

15           How many units did MSMB Healthcare purchase in

16   February of 2012?

17   A    22,500.

18   Q    How much money did MSMB Healthcare pay for those units?

19   A    $900,000.

20   Q    And who signed on behalf of MSMB Healthcare?

21   A    Martin Shkreli.

22   Q    And there's an address there of 330 Madison Avenue.

23           Is that the address where the shared office space

24   was?

25   A    Yes.

1   Q    Now in January and February 2012, were there discussions
2   about making Retrophin into a public company?
3   A    Yes.
4   Q    Okay.  During the time that these discussions began, did
5   you also meet or attend a meeting where Evan Greebel was
6   present?
7   A    Yes.
8   Q    All right.  What happened at that meeting?
9   A    It was when I first started working there.  I met Evan
10  and I was called into the conference room of -- and Evan
11  Greebel, that's where I was introduced to Evan.  And Martin
12  was there.  They asked me to come in and we discussed
13  Retrophin's plan on going public.
14  Q    Okay.  And what were you told about the steps that were
15  necessary to take Retrophin public?
16        MR. BRODSKY:  Objection, Your Honor, identity of the
17  speaker.
18        THE COURT:  Why don't you try to rephrase,
19  Mr. Kessler, please.
20        MR. KESSLER:  Sure.
21  Q    Did Mr. Greebel tell you anything about what was
22  necessary to take Retrophin public?
23  A    Yes.
24  Q    What did he say?
25  A    First, we had to get our financial statements in order.

Su - direct - Kessler                                    4718

1    And he recommended several third-parties and Citrin Cooperman

2    was hired.  They -- it was Corey Massella that was the

3    accountant and he, it was SEC Solutions/Citrin Cooperman.  I

4    think it was one and the same company.

5            And then there was a third-party auditor by the name

6    of Marcum.

7    Q    During the meeting we are talking about did Mr. Greebel

8    tell you anything about an auditor?

9    A    Yes.

10

11           (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. KESSLER:   (Continuing)

2   Q     What did he say?

3   A     It would be to use this auditor, Marcum.

4   Q     So as a result of that meeting, was Citrin Cooperman or

5   SEC Solutions retained to be the accountant for Retrophin?

6   A     Yes.

7   Q     And as a result of the meeting, was Marcum retained to be

8   the auditor for Retrophin?

9   A     Yes.

10  Q     Who was your primary contact at Marcum?

11  A     It was Ed Hackert.

12  Q     Was Corey Massella your primary point of contact at SEC

13  Solutions?

14  A     Yes.

15  Q     Now, let's talk about the work you did with SEC

16  Solutions.

17          After they were retained to be Retrophin's

18  accountant, what sort of work did you do with respect to SEC

19  Solutions?

20  A     It was a lot of data gathering.  Retrophin didn't have

21  their, all their documents in one place and I really had to go

22  into their network folders, had to ask Martin, and really just

23  look around and piece these things like subscription documents

24  and bank account statements and provide that to the accountant

25  so they could piece together financial statements.

Su - direct - Kessler                                      4720

1    Q    During the course of your interactions with SEC

2    Solutions, did you send documents like subscription agreements

3    from time to time?

4    A    Yes.

5    Q    At one point, did you send Retrophin's certificate of

6    incorporation to SEC Solutions?

7    A    Yes.

8    Q    All right.  I'd like to show you what's been marked for

9    identification as Government Exhibit 111-6 and this is behind

10   tab 4A in your binder.

11        Do you see that?

12   A    Yes.

13   Q    Is this an e-mail in which you send Cory Massella and

14   Susan Chew documents related to Retrophin's incorporation?

15   A    Yes.

16   Q    Is that incorporation as an LLC?

17   A    It was not.  The very big set, first set of documents

18   that I found in the folder was Retrophin Inc., I-N-C, and then

19   I subsequently sent Retrophin LLC after Corey made that

20   statement that it was for an Inc. versus an LLC.  So I asked

21   Martin when the LLC was founded and sent him the LLC for

22   Retrophin.

23   Q    Take a look at what's been marked for identification as

24   Government Exhibit 111-6.  Is the attachment here related to

25   Retrophin LLC?  Take a look at the second page.

1    A     This is for Retrophin LLC.

2    Q     Okay.  This is the e-mail that you sent to Retrophin LLC?

3    A     Correct.

4              MR. KESSLER:  So I offer Government Exhibit 111-6.

5              MR. BRODSKY:  No objection, Your Honor.

6              THE COURT:  We receive Government Exhibit 111-6.

7              (So marked.)

8    Q     And, Mr. Su, if you can go to the second page of this

9    document -- third page, sorry.  You see here there's a

10   document with "Delaware" in big letters at the top of the

11   page?

12   A     Yes.

13   Q     Was Retrophin LLC formed in Delaware?

14   A     Yes.

15   Q     And what was the date of the formation of Retrophin LLC?

16   A     March 14th, 2011.

17   Q     Sorry.  I should have asked you not about what's at the

18   bottom, but what does the certificate state in the center as

19   formation date of Retrophin LLC?

20   A     The 11th day of March 2011.

21   Q     All right.  So you can set that aside.

22              In addition to finding documents for SEC Solutions,

23   did you play any role in a document called a capitalization

24   table?

25   A     Yes.

Su - direct - Kessler                                4722

1   Q    So what's a capitalization table?

2   A    A capitalization table is a document that tells anyone

3   that looks at it the certain number of, type of ownership that

4   you would have in a specific company.

5   Q    Are you also familiar with a document called a stock

6   ledger?

7   A    Yes.

8   Q    What's that?

9   A    It was a investment, it was a ledger that let anybody

10  that looked at the document know where the investments were

11  coming from, when, that investment date, that person, number

12  of shares and the amount of money that they contributed or

13  invested into the company.

14  Q    So that capitalization table shows everyone who owned

15  shares in the company?

16  A    Correct.

17          MR. BRODSKY:  Objection, Your Honor.  Leading.

18          THE COURT:  Try to rephrase your question,

19  Mr. Kessler.

20          MR. KESSLER:  Sure.

21  Q    What's the relationship between the capitalization table

22  and the stock?

23  A    So the capitalization table gives an overview of the

24  entire company so there will be ownership in a company through

25  either, either, because you are a founder of a company or that

Su - direct - Kessler                    4723

1    you are an employee of a company or if you are an investor in

2    a company, so it will give you the overall picture.

3              The stock ledger would only take that last portion

4    of what I said regarding investments and break down the date,

5    the shares, the person and the amount invested.

6    Q    All right.  Did you play a role in maintaining some or

7    all of the capitalization table on the stock ledger?

8    A    Yes.  I maintained the stock ledger because I had access

9    to the bank accounts.  Any investment that came in to

10   Retrophin's bank account, I would be able to see in either

11   that subscription document was given to me prior or I would

12   have to go look for that subscription agreement because there

13   was an investment made and it had to be documented.

14   Q    And did you from time to time review the entire

15   capitalization table?

16   A    I did, yes.

17   Q    Okay.  I'd like to show you what's in evidence as

18   Government Exhibit 111-4.

19             So, if we look at the top two e-mails, do you see

20   that the bottom of those top two e-mails is a Thursday,

21   February 16th e-mail from Mr. Kravitz to you and Mr. Greebel

22   copying Mr. Shkreli?

23   A    Yes.

24   Q    What does Mr. Kravitz write?

25   A    Jackson, the most recent cap table is attached.  Regards.

CMH        OCR        RMR        CRR        FCRR

Su - direct - Kessler                                    4724

1    Q    Did you receive capitalization tables from attorneys at

2    Katten from time to time?

3    A    Yes.

4    Q    And then is the top e-mail you forwarding that

5    capitalization table to SEC Solutions employees?

6    A    Yes.

7    Q    So if we turn to the third page of Government

8    Exhibit 111-4, is this the capitalization table as of

9    February 16, 2012?

10   A    Yes.

11   Q    This is the document you received from Mr. Kravitz in the

12   e-mail copied to Mr. Greebel?

13   A    Yes.

14   Q    Okay.  So where is the stock ledger on this document?

15   A    It would be on the bottom portion which starts with the

16   Series A Preferred units.

17   Q    Okay.  So the Series A Preferred units, those are the

18   shares that come from investments of money?

19   A    Correct.

20   Q    And then the -- what are the top two categories?

21   A    The top two?  The Class A, actually I don't know where

22   those shares would derive from.  The Class B, I'm not

23   100 percent sure where those would derive from either though

24   some of it appears to be employees of Retrophin at the time.

25   Q    All right.  And so I just want to go through two items on

CMH        OCR        RMR        CRR        FCRR

1    the stock ledger at the bottom.

2         You see there's an entry on January 19, 2012?

3    A    Yes.

4    Q    So can you tell us what that entry for January 19, 2012

5    means?

6    A    It was made by an investor MSMB Healthcare LP for $80,000

7    and it entitled them to 2,000 units.

8    Q    Right.  And then let's look at one more.  If you look at

9    three more down, there's a February 1st entry.  What is that?

10   A    That was an investment made by MSMB Healthcare LP as an

11   investor for $900,000 which entitled them to 22,500 units of

12   Retrophin.

13   Q    Is that the $900,000 investment for which we looked at

14   the subscription agreement a few minutes ago?

15   A    Yes.

16   Q    Do you see any reference to MSMB Capital Management LLC

17   or LP anywhere on this document?

18   A    I do not.

19   Q    All right.  Now, in between January and May of 2012, did

20   Mr. Shkreli sometimes transfer shares to or from himself?

21   A    Yes.

22        MR. BRODSKY:  Objection to the leading, Your Honor.

23        THE COURT:  Overruled.

24   Q    And when those transfers occurred, did you receive any

25   documentation related to them?

1    A    From time to time, yes.

2    Q    All right.  Take a look at what is in your binder behind

3    tab 5 and what we can show to the witness as Government

4    Exhibit 111-9.

5             Mr. Su, do you see this document?

6    A    Yes.

7    Q    This is an e-mail from Martin Shkreli to David Kravitz,

8    Evan Greebel and you?

9    A    Yes.

10   Q    May 14, 2012?

11   A    Yes.

12   Q    Does this relate to share transfers?

13   A    Yes.

14            MR. KESSLER:  I offer Government Exhibit 111-9.

15            MR. BRODSKY:  No objection.

16            THE COURT:  We receive Government's Exhibit 111-9.

17            (So marked.)

18   Q    So, Mr. Su, do you see that Mr. Shkreli writes:  This

19   sums up the transfers I have made personally.  You should have

20   all confirming and completely executed documents.  Do you see

21   that?

22   A    Yes.

23   Q    What's your understanding of "confirming and completely

24   executed documents"?

25   A    Means that we received these documents and that all

1   parties signed and agreed to it.

2   Q    All right.  And there are a number of names listed

3   followed by amounts.  Do you see that?

4   A    Yes.

5   Q    What was your understanding of what was listed with the

6   names and amounts?

7   A    It was a transfer between Martin and the various people

8   listed.

9   Q    Right.  And can you just read the names of people?

10  A    Yes.  Brent Saunders for 60,000 shares, Tom Fernandez for

11  50,000 shares, Tom Koestler for 35,000 shares, Kevin Mulleady

12  for 30,000, Dynagrow LLP for 5,000 shares and Robert Bertolini

13  for 5,000 shares.

14  Q    Now, from time to time, did Mr. Shkreli send you actual

15  transfers agreements related to his transfers?

16  A    Yes.

17  Q    Take a look at what's behind tab 6 in your binder and

18  what we can show the witness as Government Exhibit 111-43.

19          Do you see this document, Mr. Su?

20  A    Yes.

21  Q    And there's an e-mail chain, is that right?

22  A    Yes.

23  Q    And does this relate to a share transfer document that

24  Mr. Shkreli sent you in May of 2012?

25  A    Yes.

1           MR. KESSLER:  I offer government Exhibit 111-43.

2           MR. BRODSKY:  One moment, Your Honor.

3           (Pause.)

4           MR. BRODSKY:  No objection.

5           THE COURT:  We receive Government Exhibit 111-43.

6           (So marked.)

7    Q    As I said, Mr. Su, the top of this document is an e-mail

8    from Evan Greebel to you on November 20, 2012.  Do you see

9    that?

10   A    Yes.

11   Q    And what document is Mr. Greebel forwarding to you on

12   November 20th?

13   A    It was the transfer of 50,000 shares between Martin and

14   Tom Fernandez.

15   Q    And Mr. Greebel is forwarding you the e-mail, is that

16   right?

17   A    Yes, he forwarded it to me.

18   Q    And what's the e-mail he forwarded -- strike that.

19   That's a bad question.

20           Is the e-mail below the e-mail he forwarded to you?

21   A    Yes.

22   Q    That's an e-mail from Martin Shkreli to Mr. Greebel,

23   Mr. Kravitz and you?

24   A    Yes.

25   Q    May 14, 2012?

Su - direct - Kessler                                    4729

1    A    Yes.

2    Q    What's the subject of that e-mail?

3    A    Retrophin Shkreli Fernandez transfer.

4    Q    What does Mr. Shkreli write?

5    A    I transferred 50,000 of my Retrophin units to Tom.  See

6    attached.

7    Q    If we go to the next page, is this the attachment to the

8    e-mail?

9    A    Yes.

10   Q    All right.  And can you just read the title of the

11   document?

12   A    Retrophin, LLC Transfer and Donee Representation Letter.

13   Q    Okay.  And if we go to the second to the last page of the

14   document, who's signing the document?

15   A    Martin Shkreli and Thomas Fernandez.

16   Q    And if we go to the very last page, there's something

17   called an adoption agreement.  Do you see that?

18   A    Yes.

19   Q    Can you just read the first sentence of the adoption

20   agreement?

21   A    This adoption agreement, adoption agreement, is executed

22   as of May 1, 2012 by the undersigned, the holder, pursuant to

23   the terms of that certain founders agreement dated as of

24   March 31, 2011.

25   Q    You can stop there.

CMH      OCR      RMR      CRR      FCRR

Su - direct - Kessler                          4730

1          So it says the adoption agreement was executed as of

2    May 1, 2012?

3    A    Correct.

4    Q    And it was sent to you originally in a May 14th e-mail,

5    is that right?

6    A    Yes.

7    Q    So if we can go back to the first page of the document,

8    we said in November, Mr. Greebel sent this document to you?

9    A    Correct.

10   Q    Do you know why he was sending it to you?

11   A    I do not recall.

12   Q    Okay.  So we just looked at two share transfer or e-mails

13   related to share transfers in May of 2012.

14          Are you familiar with the Securities and Exchange

15   Commission?

16   A    Yes.

17   Q    And what is that?

18   A    It is a government body that -- it's a U.S. Government

19   governing body for anything that has to do with securities in

20   the United States.

21   Q    So in -- I'm sorry.

22   A    And abroad as well.

23   Q    Is it sometimes referred to as the SEC?

24   A    It is referred to as the SEC.

25   Q    In May 2012, did you file a complaint or a report with

1    the SEC?

2    A    Yes.

3    Q    What was the nature of your report or complaint?

4    A    I was concerned about the amount of assets that the

5    various hedge funds actually managed at the time.  I was

6    concerned because Martin and Kevin Mulleady were giving

7    prospective investors different numbers every time they spoke

8    on the phone.

9              MR. BRODSKY:  Your Honor, move to strike the

10   eliciting of hearsay with respect to Mr. Mulleady.

11             MR. KESSLER:  It's not being offered for the truth.

12             THE COURT:  No, I would overrule it.  It's really

13   based on what motivated Mr. Su.

14   Q    So, Mr. Su, is that in sum and substance the information

15   you conveyed to the SEC in your complaint?

16   A    Yes.

17   Q    Was that a written document?

18   A    Yes.

19   Q    Did you also have a conversation with someone at the SEC

20   in the May or June 2012 time period?

21   A    Yes.

22   Q    Do you recall who that was?

23   A    Eric Schmidt and there was another gentleman that I do

24   not recall the name.

25   Q    And did you talk to them about the same subjects that

1    were the subject in your report?

2    A    Yes.

3    Q    Did you report any concerns about Retrophin in this SEC

4    complaint?

5    A    I did not at the time.

6    Q    Okay.  Now, after you filed a complaint and you talked to

7    Mr. Schmidt, did you continue working for Retrophin and the

8    various hedge funds we talked about?

9    A    Yes.

10   Q    Why?

11   A    Because there was nothing that was confirmed that

12   anything was wrong at the companies that I was working for.

13   Q    So, let's move to August 2012 and I'd like to show you

14   what's been marked for identification as Government

15   Exhibit 111-10.

16          Do you see that?

17   A    Yes.

18   Q    That's also behind tab 7 in your binder.

19          Is this an August 30th e-mail from you to

20   Mr. Shkreli about a capitalization table?

21   A    Yes.

22   Q    Does the capitalization table or -- I'm sorry.  Strike

23   that.

24          Does the e-mail include an attachment?

25   A    Yes, for Retrophin's capitalization table.

Su - direct - Kessler                                    4733

1   Q    And does that attachment include the stock ledger that

2   you were keeping track of?

3   A    Yes.

4           MR. KESSLER:  I offer Government Exhibit 111-10.

5           MR. BRODSKY:  No objection, Your Honor.

6           THE COURT:  We receive Government Exhibit 111-10.

7           (So marked.)

8   Q    So, Mr. Su, in the second line of the e-mail you sent to

9   Mr. Shkreli, you wrote, Attached is the full cap table.  Do

10  you see that?

11  A    Yes.

12  Q    So if we turn the page, is this document the attachment

13  that you had sent to Mr. Shkreli?

14  A    Yes.

15  Q    Right at the top of the page, can you read what the "as

16  of" date is?

17  A    As of June 30, 2012.

18  Q    Now, although it says as of June 30, 2012, are there

19  investments on the stock ledger that run through August 2012?

20  A    Yes.

21  Q    Okay.  So, the first question I have is do you see any

22  reference on this capitalization table to MSMB Capital

23  Management LLC or LP?

24  A    No.

25  Q    If we look next in the, towards the center of the Class B

CMH        OCR        RMR        CRR        FCRR

Su - direct - Kessler                                    4734

1   Common Incentive unit, do you see there's an entry for Jackson

2   Su?

3   A     Yes.

4   Q     And how many incentive units are listed for you?

5   A     2,500.

6   Q     Is that the 2,500 from the incentive unit agreement we

7   looked at at the beginning of your testimony?

8   A     Yes.

9   Q     Then in the next column, there's a number 208.  Do you

10  see that?

11  A     Yes.

12  Q     What does that represent?

13  A     That is what, represents a number that's invested and

14  those are shares or units that I actually owned at the time.

15  Q     So, a portion of your 2,500 units have now vested and

16  become yours?

17  A     That's correct.

18  Q     So, if we look at the stock ledger and if we go down to

19  the entry for February 1, 2012?

20  A     Yes.

21  Q     All right.  Let's just highlight that.

22        Is this the same $900,000 investment we saw on the

23  previous cap tables?

24  A     Yes.

25  Q     And if we scroll down to the bottom, you see there's a

1    May 14th investment from MSMB Healthcare of $90,000?

2    A    Yes.

3    Q    Can you just read the entities that invested money in

4    Retrophin after May 14th through August 30th?

5    A    MSMB Healthcare LP, Richard Heinick, Frank Pomerantz,

6    Elizabeth Knowles.

7    Q    Another nine different investments or transfers of money

8    by MSMB Healthcare LP in that time period?

9    A    Yes.

10   Q    Okay.  So this cap table was attached to an August 2012

11   e-mail.  I want to turn to September.

12              In September 2012, did Retrophin have to make a

13   payment for a drug it had licensed?

14   A    Yes.

15   Q    From whom had licensed the drug?

16   A    Ligand Pharmaceuticals.

17   Q    Do you remember the name of the drug?

18   A    I believe it was Dara.

19   Q    Do you recall whether Retrophin had enough money to make

20   the payment to Ligand in September 2012?

21   A    It had not.

22   Q    So did it end up making the payment?

23   A    It ended up making the payment, yes.

24   Q    Where did the money come from?

25   A    The last $30,000 that was short Retrophin was given by an

Su - direct - Kessler                           4736

1    employee George Wong, George Wong.  He lent the company money

2    to satisfy the payment to Ligand.

3    Q    So, in September 2012, was George Wong working for

4    Retrophin?

5    A    Yes.

6    Q    He also lent Retrophin $30,000?

7    A    Yes.

8    Q    In October 2012, did Retrophin and the various hedge

9    funds we've been discussing move offices?

10   A    Yes.

11   Q    What happened with that move?

12   A    We were looking for an office space for a while but then

13   one day in October, most of us walked into the office and

14   Martin and Michael Smith was there with backpacks and he said

15   that we're, we moved most of the night, most of the essential

16   things in the middle of the night, now you get your personal

17   belongings and your hardware, your computer desktop and move

18   what you can because we were skipping out on rent that was due

19   to the office because we were behind.

20   Q    And what was the address of the new office to which you

21   moved?

22   A    777 Third Avenue, 22nd floor.

23   Q    Do you recall who paid the rent at the 777 Third Avenue

24   office?

25   A    Yes.  Retrophin did.

Su - direct - Kessler                                          4737

1    Q    Do you recall the name of the entity that was on the
2    lease?
3    A    It was MSMB Capital.  I'm not sure which entity.
4    Q    So after the move in November 2012, were you still
5    responsible for updating portions of the capitalization table
6    and the stock ledger?
7    A    Yes.
8    Q    Take a look at what is in your binder -- I'm sorry.
9    Let's just show you what is already in evidence as Government
10   Exhibit 111-12.
11            Is this an e-mail from you on November 8, 2012?
12   A    Yes.
13   Q    Who did you send the e-mail to?
14   A    To Corey Massella, Evan Greebel, Di Jia Liang.
15   Q    Who is Di Jia Liang?
16   A    She worked at Citrin Cooperman with Corey who is now my
17   wife.
18   Q    She is now your wife?
19   A    She is now my wife.
20   Q    So you met your wife while you were doing your work?
21   A    Yes.
22   Q    What is the subject of your e-mail?
23   A    Retrophin post-capitalization table stockholder ledger.
24   Q    Can you read the text of your e-mail?
25   A    Hi, guys.  Attached is an updated cap table.  We're

CMH      OCR      RMR      CRR      FCRR

1    changing the price for investors who came in at 80 and selling

2    to them at 25.  They're signing all new sub docks at 25 and

3    I'll send them to you once I get them all back.

4    Q    Can you explain what you meant by that?

5    A    Yes.  In 2011, Retrophin was selling shares of the

6    company at $20.  In January of 2012, they revised the price

7    and upped the price to $40.  And at some point during the

8    October-November time frame 2012, they increased the price

9    again doubling from 40 to 80.  And at 80, there was no, not

10   enough investors that were willing to pay $80 for this stock

11   so it was determined by Martin and I'm not sure who else, he

12   told me that we were going to go, to decrease the price back

13   down to 25 to attract more stockholders and investments

14   investors.  And during that time, we did get several investors

15   that invested 80 so we had to re-sign any document and sell to

16   them at a lower price but they got more shares.

17   Q    The same amount of money came in but they got more

18   shares?

19   A    Correct.

20   Q    If we look at the second page of the document, this is a

21   capitalization table.  I just want to ask you about two things

22   on this one, sorry, three things on this one.

23             First of all, do you see any reference to MSMB

24   Capital Management LP or LLC?

25   A    No.

1    Q     Now, if we look at the line for Jackson Su, do you see

2    that there are now 10,000 shares listed in the Class A

3    converted column?

4    A     Yes.

5    Q     Where did the 10,000 shares come from?

6    A     Martin gave it to me from his personal stock as a bonus

7    for working for the company.

8    Q     Did you sign a document that memorialized that transfer?

9    A     Yes.

10   Q     All right.  And then toward the bottom, actually the very

11   last entry, there's an entry for Stephen Aselage.  Do you see

12   that?

13   A     Yes.

14   Q     How many shares is Stephen Aselage listed as having?

15   A     50,000.

16   Q     And this is the cap table you sent on November 8th, is

17   that right?

18   A     That's correct.

19   Q     So if we go to the next page, there's a stock ledger.  Do

20   you see that?

21   A     Yes.

22   Q     And is that February 1, 2012 $900,000 investment still

23   there?

24   A     Yes.

25   Q     And then if we scroll down to the bottom of this first

Su - direct - Kessler                          4740

1    page, is there a September 20th entry?

2    A    Yes.

3    Q    And what's the information in that entry?

4    A    Stephen Aselage has 1,600 shares.  He invested $40,000

5    into Retrophin, it hit the bank account and it was priced at

6    $25 per share.

7    Q    All right.  So, in November 2012, were there

8    conversations about -- strike that.

9            As of the date of this cap table in early

10   November 2012, is Retrophin a private company?

11   A    Yes, it was a private company.

12   Q    Were there discussions about making it into a public

13   company?

14   A    Yes.

15   Q    Was there a discussion about a reverse merger?

16   A    Yes.

17   Q    Were there discussions about finding a shell company to

18   make that reverse merger happen?

19   A    Yes.

20            (Continued on next page.)

21

22

23

24

25

Su - direct - Kessler                                    4741

1          THE COURT:  Sorry.  I think there has been a request

2   from a juror to break so I would like to accommodate them.

3          Please, ladies and gentlemen of the jury, don't talk

4   about the case and we will come retrieve you as soon as the

5   break is over.  Sorry to interrupt.

6          MR. KESSLER:  Not a problem.

7          THE COURT:  You may take a break as well, Mr. Su.

8          (Witness steps down.)

9          (Jury exits.)

10         (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        Su - direct - Kessler                    4742

1              THE COURT:  Sir, you can step out.

2              Ten minutes.

3              MR. DUBIN:  Was there a particular juror that

4    signaled for a break?

5              THE COURT:  Yes.

6              MR. DUBIN:  Can you tell which one?

7              THE COURT:  No, I can't tell you, because I don't

8    know.  My case manager noticed it.

9              Is there anything else?

10             MR. DUBIN:  No, your Honor.

11             THE COURT:  All right.  Ten minutes.

12             (Recess taken.)

13             (In open court; jury not present.)

14             THE COURT:   Are we ready to bring the jury back?

15             THE CLERK:  Yes, your Honor.

16             (Pause.)

17             (Jury present.)

18             THE COURT:  All right.  All jurors are present.

19   Please, have a seat.  You may resume.

20             MR. KESSLER:  Thank you, your Honor.

21   BY MR. KESSLER:

22   Q    Mr. Su, before we had broken we were talking about

23   reverse mergers and shells.  What is a shell company?

24   A    A shell company is a company that's publicly listed but

25   does not conduct any business or activities.

                 ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - direct - Kessler                                    4743

1    Q    In the November 2012 time frame were you involved in a

2    search for a shell to use for the Retrophin reverse merger?

3    A    Yes.

4    Q    Who else do you recall being involved in that search?

5    A    Ron Tilles was involved with the search and I don't

6    recall the individuals, but Martin did instruct everybody to

7    look for a shell.

8    Q    Did you locate a shell corporation?

9    A    I did.

10   Q    And was that the shell corporation that was ultimately

11   used?

12   A    It was not.

13   Q    Do you recall the name of the corporation that was

14   ultimately used as a shell in the reverse merger?

15   A    Desert Gateway.

16   Q    Were you told by Martin Shkreli why the Desert Gateway

17   had been selected?

18   A    No.

19   Q    Do you recall the price of the Desert Gateway shell?

20   A    $200,000.

21   Q    In the context of a reverse merger, what were your

22   responsibilities?

23   A    Getting the due diligence out to the auditor and the

24   accountant.

25   Q    Was part of that process continuing to review the cap

Su - direct - Kessler                    4744

1    table and deal with the subscription documents?

2    A    Yes.  It was more of an urgency now to tie up all the

3    loose ends because it was now going to become a public

4    company.

5    Q    All right?

6              If we could put Government's Exhibit 111-12 back up.

7    It's already in evidence.  This is the November 8

8    capitalization table we have been looking at.  I just want to

9    ask you a couple of more things about it.  If we go to one

10   page before this one, the second page of the document.

11             Are the Kevin Mulleady, Thomas Fernandez and Marek

12   Biestek listed on this cap table.

13   A    Yes.

14   Q    And if we go back to that stock ledger again on the next

15   page.  If we go to the stock transfer ledger on the second

16   page.  I want to focus again on that February 1, 2012 MSMB

17   Healthcare investment.  That's the nine hundred thousand

18   dollar one.  Do you see that?

19   A    Yes.

20   Q    Was there a time in November 2012 when Martin Shkreli

21   informed you about a promissory note between Retrophin and

22   MSMB Healthcare?

23   A    Yes.

24   Q    What's a promissory note?

25   A    It's a document that promises, that memorializes a

Su - direct - Kessler                    4745

1   promise, to pay one party to another.

2   Q    And for how much was this promissory note?

3   A    It was for $900,000.

4   Q    And who were the parties to the promissory note?

5   A    Retrophin LLC and MSMB Healthcare.

6   Q    Did Martin actually give you a promissory note or did he

7   just tell you about one?

8   A    He gave it to me.  He dropped it off on my desk.

9   Q    So now let's take a look at Government's Exhibit 111-35 A

10  for identification.  That's behind tab eleven in your binder?

11       Take a look at the document and let me know if this

12  is the promissory note that Martin Shkreli brought to you in

13  November 2012.

14  A    Yes, it is.

15            MR. KESSLER:  I offer Government's Exhibit 111-35-A.

16            MR. BRODSKY:  No objection, your Honor.

17            THE COURT:  We receive Government's Exhibit 111-35 A

18  in evidence.

19            (So marked.)

20  Q    Mr. Su, if you look toward the top of the page there are

21  the words secured promissory note.  Do you see that?

22  A    Yes.

23  Q    What's the date of issuance listed on the document?

24  A    February 1, 2012.

25  Q    Before November 2012 had anyone told you about this

Su - direct - Kessler                               4746

1    secured promissory note?

2    A    No.

3    Q    Had anyone told you about a nine hundred thousand dollar

4    loan from MSMB Healthcare to Retrophin?

5    A    No.

6    Q    Is this promissory note for $900,000?

7    A    Yes.

8    Q    And if you read just the first clause that starts with

9    for value received?  Can you read that out loud?

10   A    For value received Retrophin LLC, a Delaware limited

11   liability company, borrower, hereby promises to pay to the

12   order of MSMB Healthcare LP, a Delaware limited partnership,

13   lender.

14   Q    And then it goes on to say the initial principal amount

15   of $900,000?

16   A    Yes.

17   Q    Who is obligated to pay whom based on this promissory

18   note?

19   A    Retrophin LLC is obligated to pay MSMB Healthcare.

20   Q    Now, when Martin Shkreli brought this promissory note to

21   you, what was your reaction?

22   A    I was a bit surprised that he brought this note over to

23   me.

24   Q    Why were you surprised?

25   A    Because this was a reclassification of an equity

Su - direct - Kessler                4747

1   investment that was made at that time and he was going back in

2   time to change something that had already occurred.

3   Q    You used the word reclassification.  Did he tell you that

4   this was a reclassification?

5   A    Yes.  It was a replacement.

6   Q    The nine hundred thousand dollar investment we had seen

7   on those cap tables for February 1 was being changed to a

8   loan?

9   A    Correct.

10  Q    In your experience in finance had you ever seen an equity

11  investment reclassified as a loan like this?

12  A    I have not.

13  Q    Now, when you received this promissory note  -- sorry.

14  Strike that.

15       After you received this promissory note, did you

16  have any conversation with Evan Greebel about promissory

17  notes.

18  A    Yes.  So when Martin handed me the note I questioned him,

19  Why is this being reclassified?  He said, That it just is.

20  And I said, Does Evan know about this?  And he said, Yes.

21       So after he left my office I picked up the phone and

22  called Evan Greebel.

23  Q    And what happened during that phone conversation with

24  Evan Greebel?

25  A    I explained to him this nine hundred thousand dollar

Su - direct - Kessler                    4748

1  note.  Do you know anything about it?  And did you approve

2  this?  And asked him if it was okay.  He didn't respond to me.

3  He said Martin hasn't paid him, so he can't talk to me.

4  Q    And did you have a subsequent conversation with Evan

5  Greebel about the nine hundred thousand dollar promissory

6  note?

7  A    Yes.  Of after several  --

8            MR. BRODSKY:  Your Honor, time frame, subsequent?

9            THE COURT:  When did you speak to Mr. Greebel after

10  receiving a copy of this promissory note, approximate month

11  and year?

12            THE WITNESS:   It was approximately two, maybe

13  three, days after I received the note from Martin that was

14  given to me on my desk.

15            THE COURT:  Was that in or about February of 2012,

16  the date of this document or when?

17            THE WITNESS:  No.  This document was given to me in

18  November of 2012.

19            MR. KESSLER:  I think I can further clarify.

20  Q    Mr. Su, do you remember the exact date on which you had

21  the conversation with Evan Greebel?

22  A    Exact day?  I would give you an approximate time frame,

23  which was in November 2012.

24  Q    If you can just take a look for yourself at the document

25  that's behind tab 21.  It's been marked for identification as

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - direct - Kessler                    4749

1   Government's Exhibit 111-29.  Take a look at the top and first

2   two paragraphs of that document and see if it refreshes your

3   recollection of the approximate time in which you talked to

4   Evan Greebel about this promissory note.

5          MR. BRODSKY:   Your Honor, is this the first

6   conversation or the second conversation?

7          THE COURT:  Let him finish his examination.

8   A    So the approximate time frame would be several days

9   before December 4.

10  Q    Several days before December 4?

11  A    2012.  And it would be the same time period that Martin

12  gave me the document, the same day I called Evan and two or

13  three days later, which would put the time frame December 1,

14  November 30 time frame is when I had that second conversation

15  with Evan.

16  Q    And what happened during the second conversation?

17  A    It was a normal conversation about the things that we

18  needed to do for the investment and reverse merger and I again

19  asked Evan, because he was talking to us at the time again, if

20  this investment for nine hundred thousand was okay.  And he

21  said yes.

22  Q    So the second conversation he said yes?

23  A    Correct.

24         THE COURT:  When you say investment, do you mean the

25  investment of MSMB Healthcare into Retrophin or are you

Su - direct - Kessler                    4750

1   referring to this promissory note which is a loan?  What's

2   okay?

3           THE WITNESS:  The promissory note.  I asked him if

4   that promissory note to replace the investment from February

5   was okay.  And he said yes.

6   Q    Subsequent to your getting this promissory note for

7   $900,000, was the nine hundred thousand dollar investment from

8   MSMB Healthcare that we seen in several of the cap tables

9   removed from the cap tables?

10  A    Yes, it was removed.

11  Q    Now, was there a second promissory note involving

12  Retrophin and MSMB Healthcare?

13  A    Yes.

14  Q    If you would take a look behind tab nine of your binder.

15  There's a document that has been marked for identification as

16  Government's Exhibit 111-3.  Do you see that document?

17  A    Yes.

18  Q    It's another promissory note involving Retrophin and MSMB

19  Healthcare?

20  A    Yes.

21  Q    This one is with MSMB Healthcare Management, LLC instead

22  of MSMB Healthcare Management, LP, correct?

23  A    Correct says.

24          MR. KESSLER:  I offer Government's Exhibit 111-3.

25          MR. BRODSKY:  No objection, your Honor.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

                        Su - direct - Kessler                    4751

1              THE COURT:  We received Government's Exhibit 111-3.
2         (So marked.)
3    Q    Mr. Su, in this promissory note which entity owes which
4    entity money?
5    A    According to the promissory note, Retrophin loaned MSMB
6    Healthcare Management $200,000.
7    Q    So it is the opposite direction of the previous loan we
8    looked at?
9    A    That's correct.
10   Q    What's the date of the promissory note?
11   A    This is dated February 3, 2012.
12   Q    Were you aware of this promissory note in February 2012?
13   A    I was not.
14   Q    So I would like to transition now to a different set of
15   questions about the cap table?
16             I had asked you some questions before about whether
17   MSMB Capital Management had appeared on any of the cap tables.
18   Do you recall that.
19   A    Yes.
20   Q    So I would like to show you to start with what's  --
21   strike that.
22             I would like to show you what's in evidence as
23   Government's Exhibit 111-15.  And that is behind your binder
24   in tab twelve.  So this is a November 29, 2012 e-mail from you
25   to Evan Greebel and Corey Massella and Susan Chew.

Su - direct - Kessler                     4752

1   A    That's correct.

2   Q    And what's the subject?

3   A    Updated capital table.

4   Q    Looks like there are two attachments, is that right?

5   A    Yes.

6   Q    What is the first attachment?

7   A    Transfer from Marek Biestek, 4,167 shares and Retrophin

8   post conversion capitalization table stockholder ledger.

9   Q    What do you write to Mr. Greebel and the other recipients

10  of the e-mail?

11  A    Marek Biestek transfer to Martin Shkreli attached.

12  Q    Do you recall why you were sending Mr. Greebel and the

13  SEC Solutions employees the share transfer and the updated cap

14  table?

15  A    Because it was a document that Martin dropped off on my

16  desk that would require the attention for the attorney and the

17  accountant.

18  Q    What was the document that Martin had dropped off on your

19  desk?

20  A    It was the transfer agreement between the two principals,

21  Martin Shkreli and Marek Biestek.

22  Q    If we turn to the second page of the document, is this

23  the share transfer document you referred to?

24  A    Yes.

25  Q    This is a transfer between from Marek Biestek to Martin

1    Shkreli for 4,167 class B common units?

2    A    Correct.

3    Q    Now, if we go to the third page of the document.  It's

4    slanted.  Do you see that?

5    A    Yes.

6    Q    Is this the signature page?

7    A    Correct.

8    Q    Now, if you see below where Martin Shkreli signed as

9    transferee, the date?

10   A    Yes.

11   Q    That's handwritten?

12   A    Yes.

13   Q    Who wrote the date?

14   A    That looks like my handwriting, so that would be me.

15   Q    Is that the same date as the date of the e-mail, where

16   you are sending these documents?

17   A    Yes.

18   Q    When you received the share transfer document, did it

19   have a date on it?

20   A    It did not.

21   Q    So why did you put the current date on the document?

22   A    It was  -- it's a legal document and the accountants

23   would have needed a date on it so they could book the transfer

24   properly.

25   Q    Why did you put the date you received the document as the

Su - direct - Kessler                              4754

1    date?

2    A    Because that's the date I assumed that it was signed and

3    that's the date it was given to me also.  So it was signed on

4    that date.

5    Q    If we turn to the next page of Government's Exhibit

6    111-15.  Is this the cap table you attached?

7    A    Yes.

8    Q    Is there any reference to MSMB Capital Management, LP on

9    this cap table?

10   A    There is not.

11   Q    If we turn to the next page, we see a stock ledger.  If

12   you could blow up the entry between January 25, 2012 and

13   February 9, 2012?

14          Mr. Su, before we looked at several cap tables that

15   had that February 1, $900,000 investment by MSMB Healthcare;

16   do you remember that.

17   A    Yes.

18   Q    Is that investment on this stock ledger that you sent on

19   November 29 to Evan Greebel?

20   A    No, it's gone.

21   Q    Is it gone as a result of that promissory note

22   reclassification?

23          MR. BRODSKY:  Objection, leading.

24          THE COURT:  Well, try to rephrase the question.

25   Just ask him the question.

Su - direct - Kessler                    4755

1    Q    Do you know why the February 1 investment was removed

2    from this document?

3    A    Because of the promissory note that replaced the equity

4    investment in February.

5    Q    What's the difference between an equity investment and a

6    loan?

7    A    An equity investment takes on risks and if there is a

8    profit that person would have captured a profit.  If there was

9    a loss in the company, they would have shared in that loss.

10            A promissory note is a loan, a loan that is  --

11   that's to be repaid, whether the company made a profit or not.

12   It was something that had to be repaid from one party to the

13   other.

14   Q    So if you could now look at what is in your binder behind

15   tab 13 as Government's Exhibit 111-16.  Is this another e-mail

16   -- strike that.  Is this an e-mail from you to Martin Shkreli

17   and Evan Greebel on November 29, 2012?

18   A    Yes.

19   Q    If you look at the bottom of this page, do you see the

20   e-mail we just looked at before with the share transfer?

21   A    Yes.

22   Q    And did the other e-mails in this chain relate to that

23   share transfer?

24   A    Yes.

25            MR. KESSLER:  I offer Government's Exhibit 111-16.

Su - direct - Kessler                        4756

1           MR. BRODSKY:  No objection.

2           THE COURT:  We receive Government's Exhibit 111-16.

3           (So marked.)

4    Q    Mr. Su, as I said before, if you look at the bottom

5    e-mail, this is the e-mail we just looked at, is that right?

6    A    Yes.

7    Q    Now, the time stamp on this e-mail says sent Thursday,

8    November 29, 2012 at 3:20 p.m.

9    A    Yes.

10   Q    If you just take a look back to tab twelve in your

11   binder, can you tell me what the time stamp is for the e-mail

12   that you just looked at before?

13          THE COURT:  Can we refer to the exhibit number.

14          MR. KESSLER:  Government's Exhibit 111-15.  We don't

15   have to put it up.

16   Q    What's the time stamp on that e-mail?

17   A    8:20 p.m.

18   Q    Are they the same e-mail?

19   A    It is the same e-mail.

20   Q    But one is five hours ahead of the other?

21   A    Correct.

22   Q    Do you know why that is?

23   A    I just assume that it's somebody's computer that was set

24   in the wrong time zone.

25          MR. BRODSKY:  Objection.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - direct - Kessler                              4757

1          THE COURT:  Okay.  No assumptions.  It's only what
2    you know, sir.
3    A    I don't know why the time stamps are different.
4    Q    Any doubt in your mind that it's the same e-mail?
5    A    No doubt in my mind it's the same e-mail.
6    Q    If we scroll up in Government's Exhibit 111-16, the
7    defendant Evan Greebel writes you, please, re-execute the
8    transfer agreement for Retrophin Inc. and a transfer of the
9    common stock, the one you sent was for Retrophin LLC and class
10   B common, however, LLC has not existed since mid-September.
11   Do you see that?
12   A    Yes.
13   Q    Then Mr. Shkreli replies to both of you  -- Mr. Biestek
14   is also on this e-mail  -- the agreement was signed in June.
15   Do you see that?
16   A    Yes.
17   Q    What do you respond?
18   A    I respond my mistake.  I'll correct date.
19          THE COURT:  May I just ask for the record which time
20   stamp Mr. Su believes is the correct one with regard to his
21   e-mail sent November 29?  There's two time stamps as we said,
22   one at 3:20 p.m. and one at 8:20 p.m.  which is the correct
23   time based on your recollection and knowledge?
24          THE WITNESS:  It would be 3:20 p.m.
25          THE COURT:  Thank you.

Su - direct - Kessler                                    4758

1    BY MR. KESSLER:

2    Q    Is your memory that these initial e-mails were sent

3    during the day or in the evening?

4    A    During the day.

5    Q    So, now, I would like you to turn to tab fourteen in your

6    binder.  I'll show you what's been marked for identification

7    as Government's Exhibit 111-17.  Do you see that?

8    A    Yes.

9    Q    Is this a continuation of the same e-mail chain we just

10   looked at?

11   A    Yes.

12   Q    In Government's Exhibit 111-16?

13   A    Correct.

14          MR. KESSLER:  I offer Government's Exhibit 111-17.

15          MR. BRODSKY:  No objection, your Honor.

16          THE COURT:  We receive Government's Exhibit 111-17.

17          (So marked.)

18   Q    Mr. Su, if we focus on the top two e-mails.  The bottom

19   e-mail is that one we just saw that said that agreement was

20   signed in June, is that right?

21   A    Yes.

22   Q    And now the top e-mail on November 29 is you replying to

23   Mr. Shkreli, Mr. Greebel and Mr. Biestek, is that right?

24   A    That's correct.

25   Q    What are you attaching?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - direct - Kessler                              4759

1   A     The transfer agreement with Marek, between Marek and

2   Martin.

3   Q     So let's take a look at the attachment that begins on the

4   third page of the document.  Go to the fifth page of the

5   document.  We see the signature lines.  Do you see that?

6   A     Yes.

7   Q     What date is listed on this signature page?

8   A     July 1, 2012.

9   Q     And at the bottom July 1, 2012, next to Mr. Shkreli, is

10  that about the same location on the page as where you had

11  previously written November 29, 2012?

12  A     Yes.

13  Q     And you see there's kind of a square or rectangle behind

14  the handwritten date?

15  A     Yes.

16  Q     Do you know what that was?

17  A     It looks like whiteout tape.

18  Q     Now, is this your handwriting that wrote the 7/1/12?

19  A     It is not.

20  Q     How did you get this share transfer document that you

21  sent to Martin Shkreli and Evan Greebel?

22  A     Martin came to my desk with this document.  He gave it to

23  me physically.

24  Q     Did you scan it?

25  A     I scanned it.

Su - direct - Kessler                    4760

1   Q    So now take a look at what's in your binder behind tab

2   fifteen, Government's Exhibit 111-18 for identification.

3   Actually strike that.  I want to show you one thing first?

4         If we can do a split screen, where you put

5   Government's Exhibit 111-15 on left and Government's Exhibit

6   111-17 on the right.  For Government's Exhibit 111-15 we can

7   go to the fourth page of the document and for Government's

8   Exhibit 111-17, if we could go to the fifth page of the

9   document and can you just blow up the two handwritten dates,

10  the November 29, 2012 on the left and the July 1, 2012 on the

11  right.

12        Do you see those dates, Mr. Su.

13  A    Yes.

14  Q    Your handwriting is on the left, Government's Exhibit

15  111-15, is that right?

16  A    That's correct.

17  Q    And your handwriting is not on the right, Government's

18  Exhibit 111-17?

19  A    It is not.

20  Q    Now, please take a look at Government's Exhibit 111-18

21  for identification.  Is this another e-mail continuing the

22  chain related to the Marek Biestek share transfer?

23  A    Yes.

24        MR. KESSLER:  I offer Government's Exhibit 111-18.

25        MR. BRODSKY:  No objection.

Su - direct - Kessler                           4761

1          THE COURT:  We receive Government's Exhibit 111-18

2    in evidence.

3               (So marked) .

4    Q    Mr. Su, if you see on the first page there's the same

5    e-mail chain we have been looking at except the top e-mail is

6    now from Evan Greebel just to you, is that correct?

7    A    Correct.

8    Q    And what does Mr. Greebel write?

9    A    Please call me.

10   Q    Did you call Mr. Greebel?

11   A    Yes.

12   Q    What do you recall during that conversation?

13   A    He proceeded to tell me that the LLC hasn't existed at

14   that time and also that Inc. existed at a certain date and I

15   don't remember the whole conversation, but it related to this

16   portion of this text that you are showing me and I just said,

17   You and Martin just need to talk.  You guys, you call him,

18   then we hung up the phone.

19               (Continued on next page.)

20

21

22

23

24

25

Su - direct - Kessler                    4762

1    (Continuing)

2    Q    Okay.

3              THE COURT:  Can I just ask; when LLC did not exist

4    at that time, what do you mean at that time?

5              THE WITNESS:  They -- there was a conversion from an

6    LLC to an Inc.

7              Retrophin LLC became Retrophin, Inc. during a time

8    frame between that time, so I actually wasn't part of that

9    conversion.  So I wasn't up to date on when the dates were.

10   So I was confused on what they were talking about.  So I just

11   told them to speak to each other.

12             THE COURT:  Thank you.

13             MR. KESSLER:  All right.  So now take a look at

14   Government's Exhibit 111-19, which is in your binder behind

15   tab 16.

16   Q    Is this another e-mail in the same chain about the Marek

17   Biestek share transfer agreement?

18   A    Yes.

19   Q    This one's dated November 29th, 2012 at 9:32 p.m.?

20   A    Right.

21             MR. KESSLER:  I offer Government's Exhibit 111-19.

22             MR. BRODSKY:  No objection, Your Honor.

23             THE COURT:  All right.  We admit 111-19.

24             (Government's Exhibit 111-19 received in evidence.)

25             (Exhibit published to jury.)

Su - direct - Kessler                          4763

BY MR. KESSLER:

Q    All right.  And we just focus at the -- sorry.

Are all the e-mails below the top one e-mails we've already seen in the e-mail chain?

A    Yes.

Q    And then in the top e-mail, what do you write to Mr. Shkreli, Mr. Greebel and Mr. Biestek?

A    Correction.  Please see attached for date of transfer.

Q    Okay.  If we look at the attachment, is that another version of the transfer and donee representation letter we've been looking at?

A    Yes.

Q    If we turn to the last page, is there a date on the document?

A    Yes.  June 1st, 2012.

Q    And is it handwritten, like the July 1st, 2012, date we saw previously?

A    No.  It's typewritten.

Q    How did you get this copy of the share transfer agreement that you sent to Mr. Shkreli and Mr. Greebel?

A    Again, Martin dropped it off on my desk.

Q    All of these e-mails were on November 29th, 2012; is that right?

A    That's correct.

MR. KESSLER:  I'd now like you to take a look at

VB        OCR        CRR

Su - direct - Kessler                    4764

1   what's been marked for identification as Government's

2   Exhibit 111-26-A.  And it's in your binder behind tab 7.

3   Q    Do you see that?

4   A    Yes.

5   Q    Is this a December 3rd, e-mail from you to Mr. Greebel

6   attaching various share transfer documents?

7   A    Yes.

8   Q    Is one of those share transfer documents that Marek

9   Biestek one we've been rooking at?

10  A    Yes.

11  Q    There are others as well?

12  A    Correct.

13          MR. KESSLER:  I offer Government's Exhibit 111-26-A.

14          MR. BRODSKY:  No objection, Your Honor.

15          THE COURT:  We receive 111-26-A.

16          (Government's Exhibit 111-26-A received in

17  evidence.)

18          (Exhibit published to jury.)

19  BY MR. KESSLER:

20  Q    Mr. Su, this e-mail is four days later than the e-mail

21  chains we were looking at previously about the Marek Biestek

22  transfer agreement; is that right?

23  A    Correct.

24  Q    Do you recall why you were sending this group of transfer

25  documents to Mr. Greebel?

Su - direct - Kessler                                    4765

1    A    I don't remember, but it would be normal course of

2    business or procedure for me to send these transfer agreements

3    to the accountants and legal.

4    Q    All right.  And how did you get -- setting aside the

5    Marek Biestek agreement, how did you get the other transfer

6    agreements that you sent on December 3rd?

7    A    It would be this -- it would be through Martin putting it

8    on my desk and -- it would be Martin putting it on my desk.

9    Q    Are these agreements that you had before approximately

10   December 3rd, 2012?

11   A    No.

12   Q    All right.  So let's look at the attachments.

13          If we go to the second page and we look at the first

14   paragraph.

15          Is this a share transfer from Kevin Mulleady to

16   Martin Shkreli for 10,000 class B common units?

17   A    Yes.

18   Q    If you look at the third page of the attachment, fourth

19   page of this Government exhibit, what is the date on this

20   share transfer?

21   A    July 1st, 2012.

22   Q    Is that same date that had been handwritten on one of the

23   Marek Biestek share transfer documents?

24   A    Yes.

25   Q    Were you aware of this share transfer agreement in

VB        OCR        CRR

Su - direct - Kessler                           4766

1   July of 2012?

2   A    No.

3        MR. KESSLER:  Go to the next page.  See the next

4   attachment.

5   Q    Is this the Marek Biestek to Martin Shkreli transfer that

6   we looked at before?

7   A    Yes.

8        MR. KESSLER:  If we go two pages forward.

9   Q    Do you see the June 1st, 2012, date that we saw

10  previously?

11  A    Yes.

12       MR. KESSLER:  All right.  If we go to the next page,

13  next attachment.

14  Q    Is this a share transfer agreement from Tom Fernandez to

15  Martin Shkreli for 50,000 class A common units?

16  A    Yes.

17  Q    By the way, before Mr. Fernandez's name there, the words

18  for value received.

19       Do you see that?

20  A    Yes.

21  Q    Did anyone tell you what the value received was for any

22  of these share transfers?

23  A    No.

24  Q    All right.

25       MR. KESSLER:  If we move two pages ahead.

1   Q    What's the date on the share transfer agreement between

2   Mr. Fernandez and Mr. Shkreli?

3   A    July 1, 2012.

4   Q    Is that typed or handwritten?

5   A    That is handwritten.

6        MR. KESSLER:  And Ms. Balbin, before we go forward

7   in this document, can we do a split screen where we also put

8   up Government's Exhibit 111-17.

9        (Exhibit published to jury.)

10  BY MR. KESSLER:

11  Q    Mr. Su, Government's Exhibit 111-17 is the original Marek

12  Biestek share transfer agreement that had the handwritten date

13  and the whiteout?

14  A    Yes.

15  Q    Okay.  And so we've got the Tom Fernandez agreement with

16  the handwritten date on the left, and the Marek Biestek

17  agreement with the handwritten date on the right; is that

18  right?

19  A    Yes.

20  Q    Are either of those sets of handwritten dates your

21  handwriting?

22  A    It is not.

23  Q    Okay.

24       MR. KESSLER:  So we take down the Marek Biestek one

25  and go back to Government's Exhibit 111-26-A.

Su - direct - Kessler                    4768

1   Q    All right.  So we looked at the Tom Fernandez agreement.

2         If we go to the next page, now we have a transfer

3   agreement from Martin Shkreli to MSMB Capital Management; is

4   that right?

5   A    Yes.

6   Q    How many shares does this document say Mr. Shkreli is

7   transferring to MSMB Capital?

8   A    75,000.

9         MR. KESSLER:  If we go two pages ahead to the

10  signature page.

11  Q    Do you see another set of handwritten dates for July 1st,

12  2012?

13  A    Yes.

14  Q    Is that your handwriting?

15  A    It is not.

16  Q    As of July 2012, did you know about a share transfer from

17  Mr. Shkreli to MSMB Capital Management for 75,000 shares?

18  A    No.

19  Q    Before you saw this share transfer agreement, were you

20  aware of any transfer from Mr. Shkreli to MSMB Capital

21  Management for 75,000 shares?

22  A    No.

23  Q    Had you seen on the cap table any reference to

24  MSMB Capital Management before approximately December 3rd,

25  2012?

Su - direct - Kessler                                    4769

1    A    No.

2         MR. KESSLER:  Go to the next page.

3    Q    There's a transfer from Mr. Shkreli to you; is that

4    right?

5    A    Yes.

6    Q    For 10,000 shares?

7    A    Yes.

8    Q    Do you recall before we were looking at a cap table where

9    we saw that you had 10,000 shares?

10   A    Yes.

11   Q    I think you said that Mr. Shkreli had given those you to

12   you as a bonus; is that right?

13   A    Yes.

14   Q    Is this the document for which you got the 10,000 shares?

15   A    Yes.

16        MR. KESSLER:  So we go to the third page of this

17   document.

18   Q    This is the signature page.  Is there a date written in?

19   A    No.

20   Q    Now, if we go to the fourth page of this document, you

21   see there's an adoption agreement?

22   A    Yes.

23   Q    Is that signed by you and Mr. Shkreli?

24   A    Correct.

25   Q    And you see that there's a phone number and an address

1  written below your signature?

2  A    Yes.

3  Q    Is that your handwriting?

4  A    That is my handwriting.

5  Q    What's the date of the adoption agreement attached to the

6  share transfer?

7  A    November 2nd, 2012.

8  Q    And was that share transfer effective on or about

9  November 2nd, 2012?

10  A    Yes.

11          MR. KESSLER:  Finally, if we go to the last page of

12  Government's Exhibit 111-26-A.

13  Q    This is a one-page document; is that right?

14  A    Yes.

15  Q    Can you just read what's at the top of the page.

16  A    I, Kevin Mulleady, do acknowledge that my receipt of

17  30,000 class A common units from Martin Shkreli was invalid

18  due to failure to sign the adjoiner to founders' agreement.

19  Q    And what's the date on this?

20  A    July 1st, 2012.

21  Q    Okay.  So were all the attachments we just looked at

22  documents you sent to Mr. Greebel on December 3rd, 2012?

23  A    Yes.

24  Q    Did you also send all of those documents except the share

25  transfer involving you to Mr. Massella on December 3rd, 2012?

Su - direct - Kessler                          4771

1    A    Yes.

2    Q    I can show you what's already in evidence as -- what's

3    already in evidence as Government's Exhibit 111-26.

4         So is this the e-mail where you sent those same

5    share transfer documents involving Kevin Mulleady, Tom

6    Fernandez, Marek Biestek and MSMB Capital Management LP to

7    Mr. Massella?

8    A    Yes.

9         MR. KESSLER:  Now I'd like you to take a look at

10   what's been marked for identification as Government's

11   Exhibit 111-28.  It's behind tab 20 in your binder.

12   Q    Is this an e-mail from Mr. Shkreli to Mr. Greebel and you

13   on December 3rd?

14   A    Yes.

15   Q    Does it attach a capitalization table?

16   A    Yes.

17        MR. KESSLER:  I offer Government's Exhibit 111-28.

18        MR. BRODSKY:  No objection, Your Honor.

19        THE COURT:  We receive 111-28.

20        (Government's Exhibit 111-28 received in evidence.)

21        (Exhibit published to jury.)

22   BY MR. KESSLER:

23   Q    Mr. Su, is this e-mail on the same day as the day on

24   which you sent all those share transfers to Mr. Greebel?

25   A    Yes.

1           MR. KESSLER:  Let's turn to the capitalization table

2    and ask you some questions about it.

3    Q    The first thing is, you see there's a set of numbers in

4    the upper left under the heading common stock, post-money,

5    post-merger?

6    A    Yes.

7    Q    And then below that, on the left side, there's another

8    set of entries for common stock pre-money and then pre dash

9    something.

10          Do you see that?

11   A    Yes.

12   Q    Do you understand that be to pre-money pre-merger?

13   A    Yes.

14   Q    What's the difference between the pre-merger shares on

15   the bottom and the post-merger shares on the top?

16   A    There would be a difference because of a ratio.  I'm not

17   sure how that ratio was actually calculated, but that's the

18   difference between the pre- and post-money.

19   Q    Okay.  So basically if you had one share before the

20   merger, you'd have two or three or four or five times as many

21   shares after the merger, depending on what the conversion

22   ratio was?

23   A    That's correct.

24   Q    So if we look down at the bottom on the left side of

25   pre-money pre-merger shares.

Su - direct - Kessler                                          4773

1          Do you now see an entry for MSMB Capital Management

2    LLP on this capitalization table?

3    A    Yes; for 75,000 shares.

4    Q    Is that the same number of shares we saw on that share

5    transfer agreement you signed on December 3rd?

6    A    Yes.

7    Q    Do you see an entry for Kevin Mulleady on this pre-money

8    pre-merger cap table?

9    A    No.

10   Q    Do you see an entry for Thomas Fernandez?

11   A    No.

12   Q    Do you see an entry for Marek Biestek?

13   A    No.

14   Q    And were those the three individuals for whom we saw

15   share transfer agreements in your December 3rd e-mail?

16   A    Yes.

17          MR. KESSLER:  Now if we can zoom out, Ms. Balbin.

18   Q    Mr. Su on the right side there's what appears to be the

19   stock ledger.

20          Do you see that?

21   A    Yes.

22   Q    And below that, there's a section called Fearnow stock.

23          Do you see that?

24   A    Yes.

25   Q    Was this section on any of the earlier cap tables we saw?

1  A    No.

2  Q    What is Fearnow stock?

3  A    Fearnow stock was two-and-a-half million shares that was

4  freely-tradable because of the shell that Retrophin bought.

5         So what makes these Fearnow stocks unrestricted was

6  based on a note that was defaulted, because if there was a

7  default in a note, there was a conversion from a debt to a

8  number of shares, which would make it equity.  So that's how

9  the two-and-a-half million shares were derived.

10         And they did not follow the same restrictions as

11  other certain stock would for an employee or however else it

12  was given.  There usually are restriction periods between six

13  months to a year, or maybe longer, depending on the

14  registration with the SEC.  And because these shares didn't

15  have that restriction, that's what made it tradable on day

16  one, when it went public.

17  Q    So the Fearnow stock is free-trading shares; is that

18  correct?

19  A    Correct.

20  Q    And before Retrophin was considering merging with the

21  Desert Gateway shell, did Retrophin have Fearnow stock on its

22  own?

23  A    It did not.

24  Q    It's a product of the reverse merger discussion.

25  A    Correct.

Su - direct - Kessler                    4775

1  Q    All right.  Now, who are the individuals who are listed

2  on this cap table as receiving Fearnow stock?

3  A    Martin Shkreli, Kevin Mulleady, Thomas Fernandez, Marek

4  Biestek.

5  Q    Are Kevin Mulleady, Thomas Fernandez and Marek Biestek

6  the same three people whose share transfers we saw in your

7  December 3rd e-mail?

8  A    Yes.

9  Q    And how many shares of free-trading stock is Mr. Shkreli

10 supposed to get?

11 A    1,075,000 shares.

12 Q    Now, this e-mail is dated December 3rd, 2012, or the

13 e-mail attaching this cap table is dated December 3rd, 2012.

14        Before approximately December 3rd, 2012, had you

15 heard about this Fearnow stock allocation?

16 A    I have not.

17 Q    Okay.  We will come back to that.

18        On approximately December 5th, 2012, did you receive

19 some additional Retrophin shares from Mr. Shkreli?

20 A    Yes.

21 Q    How did you come to receive those shares?

22 A    Martin gave those shares to us as a bonus.  There was

23 several of us; myself, Andrew Vaino and Chun Yi George Huang

24 received those shares.

25 Q    Do you recall how many shares Mr. Shkreli gave you on

1  December 5th, 2012?

2  A    Yes; it was 15,000.

3  Q    Were those 15,000 shares reflected on subsequent cap

4  tables after the one we just looked at?

5          MR. BRODSKY:  Objection, Your Honor.  Form.

6          THE COURT:  Try to rephrase, Mr. Kessler.

7          MR. KESSLER:  Sure.  We'll do it this way.

8          Ms. Balbin, if you could blow up that cap table

9  again.  That is Government's Exhibit 111-28.

10 Q    If we look in the bottom left, Mr. Su, on the cap table,

11 how many shares are you lifted as having?

12 A    11,667 vested and unvested shares.

13 Q    And that's as of this December 3rd e-mail?

14 A    Correct.

15 Q    Okay.  So we will come back to your shares in a moment.

16         But focusing on these Fearnow shares for a minute.

17 We saw the allocation that Mr. Shkreli was getting

18 approximately a million, and Mr. Biestek, Mr. Fernandez and

19 Mr. Mulleady, would get some as well.

20         Do you recall that?

21 A    Yes.

22 Q    Was that the final allocation of free-trading shares?

23 A    No, it was not.

24 Q    All right.  In December 2012, did you have any

25 conversations with Martin Shkreli about whether you would

Su - direct - Kessler                              4777

1   receive Fearnow stock?

2   A    Yes.

3   Q    All right.  And approximately when was that conversation?

4   A    At the beginning of December.

5   Q    And what did Mr. Shkreli tell you?

6   A    He came into my office.  He said there were these

7   free-trading stock.  He would allocate certain individuals

8   this Fearnow stock and there would be a profit split after the

9   stock was sold.  So a portion of that percentage would go to

10  the individual receiving the stock and then the rest would go

11  back into a company that he would create called MSMB Wealth

12  Management.

13  Q    So he was proposing to allocate to you Fearnow stock?

14  A    Yes.

15  Q    Did he say an amount of Fearnow stock that he allocated

16  to you?

17  A    He did not.

18  Q    Did he tell you whether these would be your shares to buy

19  and sell as you would like?

20        MR. BRODSKY:  Objection to the leading, Your Honor.

21        THE COURT:  Try to rephrase it, Mr. Kessler.

22  Q    What did Mr. Shkreli tell you about who would control the

23  buying and selling of the shares?

24        MR. BRODSKY:  Objection, Your Honor, to the form.

25        THE COURT:  Overruled.  Go ahead.  You can answer.

Su - direct - Kessler                    4778

1   A     Martin said that he would control the selling of the

2   stock and that when he sold it, and the person would get the

3   profit share.  And, basically, he would be the one that would

4   control what happens with that stock, even though it was in

5   that individual's name.

6   Q     Did you accept it as a proposal?

7   A     I didn't have a reaction to the proposal, like most of

8   what Martin says, it just doesn't really happen.  So I dismiss

9   it until something actually happens.

10  Q     Now, did you ultimately receive any Fearnow or

11  free-trading stock?

12  A     No, I didn't.

13  Q     Did you have any conversations with Mr. Shkreli about why

14  you did not receive Fearnow stock?

15  A     Yes.  He came to my office and he explained that I would

16  be going down to --

17             MR. BRODSKY:  Your Honor, I'm sorry to interrupt.

18  Time period?

19             THE COURT:  Can you please state when you had this

20  conversation with Mr. Shkreli, the subsequent conversation

21  that you were starting to describe.

22             THE WITNESS:  Sure.  It was five days after the

23  initial conversation, within five days of the initial

24  conversation that when Martin came into my office and talked

25  about allocation.

Su - direct - Kessler                    4779

1          THE COURT:  Do you have an approximate date?  Are we

2    still in December?

3          THE WITNESS:  Yes.  It would be the first two weeks

4    of December of 2012.

5    BY MR. KESSLER:

6    Q    So in that subsequent conversation, in the first two

7    weeks of December 2012, what did Mr. Shkreli tell you about

8    why you were not receiving Fearnow shares?

9    A    In between that time we -- Steve Aselage, the new CEO

10   invited me to join him in Retrophin in San Diego and move the

11   company down there.  So he would be managing it.

12         And Martin said, based on that, because I would be

13   considered a company insider, I wouldn't be able to be

14   allocated any of that stock.

15   Q    So he said because you would be considered a company

16   insider, you could not receive free-trading stock?

17   A    Correct.

18   Q    Do you understand what company insider means?

19   A    Yes.  Because I work for the company, I would have inside

20   knowledge of the ongoing activities of the company, and an

21   insider wouldn't be able to freely trade a stock because of

22   that privileged -- because of that inside information and they

23   would have to wait for a holding period.  And any stock that

24   person received would have a restriction period.

25   Q    So were you told at some point after December 3rd what a

Su - direct - Kessler                    4780

1  revised allocation of the free-trading shares would be?

2  A    Yes.

3         MR. KESSLER:  Take a look in your binder behind tab

4  22, the Exhibit it's been marked for identification as

5  Government's Exhibit 111-40.

6  Q    Do you see that?

7  A    Yes.

8  Q    Is this a December 12th e-mail chain between Mr. Shkreli,

9  you and Mr. Greebel?

10 A    Yes.

11 Q    Okay.  Does this relate to the allocation of Fearnow

12 stock?

13 A    Yes.

14        MR. KESSLER:  I offer Government's Exhibit 111-40.

15        MR. BRODSKY:  No objection, Your Honor.

16        THE COURT:  We receive 111-40.

17        (Government's Exhibit 111-40 received in evidence.)

18        (Exhibit published to jury.)

19 BY MR. KESSLER:

20 Q    All right, Mr. Su.  If we focus first on the bottom

21 e-mail, this is from you to Mr. Greebel, or Massella, Susan

22 Chew, Ed Hackert and George Huang on December 12, 2012.

23        What do you write to Mr. Greebel?

24 A    Evan, please circulate the fully-executed merger

25 agreement when available.

Su - direct - Kessler                                    4781

1    Q    And what merger agreement are you talking about?

2    A    This is the merger agreement between Retrophin and Desert

3    Gateway.

4              MR. KESSLER:  If we scroll up to the next e-mail.

5    Q    Mr. Greebel responds to you:  Please send me a

6    current/correct cap table.  The version I have has Martin

7    getting Fearnow stock, which he did not.

8              Do you see that?

9    A    Yes.

10   Q    Okay.  And do you recall the previous cap table we looked

11   at that listed a distribution of Fearnow stock?

12   A    Yes.

13   Q    Was Mr. Shkreli listed on that?

14   A    Yes.

15   Q    Okay.  So after Mr. Greebel told you that Mr. Shkreli is

16   not getting Fearnow stock, what did you write to him?

17   A    What is the split on the Fearnow stock?

18   Q    All right.  And then did Mr. Greebel respond or did

19   Mr. Shkreli respond?

20   A    Martin Shkreli responded.

21   Q    Did he copy Mr. Greebel?

22   A    He cc'd Evan Greebel.

23   Q    What did he tell you?

24   A    Evan has it.

25   Q    Evan has it?

Su - direct - Kessler                              4782

1    A    Yes.

2    Q    And what did you understand the it to be?

3    A    The split on the Fearnow stock.

4         MR. KESSLER:  Ms. Balbin, if we could show that top.

5    Q    Okay.  Now, at some point after this e-mail, did

6    Mr. Greebel provide you with a split of the Fearnow stock?

7    A    Yes.

8         MR. KESSLER:  If you take a look in your binder

9    behind tab 23, there's a document that's been marked for

10   identification as Government's Exhibit 111-41.

11   Q    Do you see that?

12   A    Yes.

13   Q    Is this a December 12th, e-mail chain related to the

14   split of the Fearnow stock?

15   A    Yes.

16   Q    If you look at the second page, do you see that e-mails

17   we were looking at in the previous exhibit that include your

18   question, what is the split on the Fearnow stock?

19   A    Yes.

20   Q    And do the subsequent e-mails address that question?

21   A    Yes, it does.

22        MR. KESSLER:  I offer Government's Exhibit 111-41.

23        MR. BRODSKY:  No objection, Your Honor.

24        THE COURT:  We receive Government's Exhibits 111-41.

25        (Government's Exhibit 111-41 received in evidence.)

Su - direct - Kessler                          4783

1              (Exhibit published to jury.)

2    BY MR. KESSLER:

3    Q    Mr. Su, if we look at the second --

4              MR. KESSLER:  Show the jury the second page of the

5    document.

6    Q    At the top, that's the e-mail we were talking about with

7    the what is the split on the Fearnow stock; is that right?

8    A    Correct.

9    Q    Okay.  Now if we go forward in time to the first page, do

10   you see on December 12th, at 5:17 p.m., Mr. Greebel e-mails

11   you a list of names and numbers.

12             Do you see that?

13   A    Yes.

14   Q    What did you understand this list of names and numbers to

15   be?

16   A    That was the split for the Fearnow stock that I asked for

17   previously.

18   Q    All right.  Can you read the individual and the amount of

19   stock each of them is to be allocated?

20   A    Kevin P. Mulleady, 400,000 shares; Thomas E. Fernandez,

21   400,000 shares; Marek Lucjan Biestek, 350,000 shares; Timothy

22   J. Pierotti, 400,000 shares; Claridge Capital LLC, 400,000

23   shares; Andrew R. Vaino, 300,000 shares; Edmund J. Sullivan,

24   150,000 shares.

25   Q    What is Claridge Capital LLC?

VB        OCR        CRR

1  A    That is a company run by Ron Tilles, the marketer for

2  Retrophin and MSMB.

3          MR. KESSLER:  So if we go to the next e-mail up.

4  Q    What do you write to Mr. Greebel?

5  A    Missing 100,000 to get to two-and-a-half-million.

6  Q    Why did you write that?

7  A    Because my understanding there was two-and-a-half million

8  Fearnow stock and what Evan provided only added up to 2.4

9  million shares.

10         MR. KESSLER:  So if we go to the next e-mail.

11 Q    Mr. Greebel writes you:  100K was being held back?

12         Do you see that?

13 A    Yes.

14 Q    What was your understanding of what he meant?

15 A    That a hundred thousand shares was not being allocated to

16 anyone.

17         MR. KESSLER:  If we look at the top e-mail.

18 Q    You write:  Official cap table.  And you attach a

19 Retrophin capitalization table.

20         Do you see that?

21 A    Yes.

22         MR. KESSLER:  Okay.  So let's look at that

23 attachment.  It's on page 4 of Government's Exhibit 111-41.

24         So Ms. Balbin, if we first zoom in on the far left.

25 BY MR. KESSLER:

Su - direct - Kessler                          4785

1    Q    Mr. Su, you see a list of individuals and shares under

2    the heading common stock pre-money pre-merger?

3    A    Yes.

4    Q    Is that a similar chart to what we've seen in previous

5    cap tables?

6    A    Yes.

7    Q    All right.  How many shares are listed for Jackson Su?

8    A    26,667 vested and unvested shares.

9    Q    Is that 15,000 more shares than the previous cap table we

10   looked at when you had 11,667?

11   A    Yes.

12

13                (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Su - direct - Kessler                    4786

1    BY MR. KESSLER:   (Continued)

2    Q    Does this reflect the 15,000 shares Shkreli gave you?

3    A    Yes.

4    Q    So if we zoom out now and if we look at the center

5    portion of the document just at the bottom, there's a set of

6    entries on the bottom.

7              Mr. Su, do you see there's a heading that says

8    Fearnow stock?

9    A    Yes.

10   Q    Below that, there's a list of names and amounts of

11   shares?

12   A    Yes.

13   Q    Except for the bottom entry, are those the same names and

14   amounts of shares that Mr. Greebel sent you?

15   A    Yes.

16   Q    And those add up to 2.4 million shares?

17   A    Correct.

18   Q    What's the last entry?

19   A    DGTE Legacy.  That is Desert Gateway previous owner,

20   100,000 shares was allocated or left back for the previous

21   owner.

22   Q    DGTE refers to the Desert Gateway company?

23   A    Correct.

24   Q    Now, after this December 12th e-mail in which you

25   received a cap table, did you receive additional information

CMH      OCR      RMR      CRR      FCRR

Su - direct - Kessler                          4787

1   from Mr. Greebel about the allocation of your options?

2   A    Yes.

3   Q    Take a look at what's behind tab 24 in your binder and

4   what's been marked for identification as Government

5   Exhibit 111-48.

6            Do you see this is a December 17th e-mail from

7   Mr. Greebel to you?

8   A    Yes.

9   Q    Does that relate to the allegation of the Fearnow stock?

10  A    Yes.

11           MR. KESSLER:  I offer Government Exhibit 111-48.

12           MR. BRODSKY:  We're still trying to locate a copy of

13  that, Your Honor.

14           THE COURT:  Do you have a copy you can give to --

15           MR. BRODSKY:  No objection, Your Honor.  No

16  objection.

17           THE COURT:  Okay.  We will admit Government's

18  111-48.

19           (So marked.)

20  Q    It's behind tab 24.  I'll put it up for the jury.

21           Mr. Su, if you look at this e-mail from Mr. Greebel

22  to you, do you see there's a series of letters with numbers

23  next to them?

24  A    Yes.

25  Q    What do these represent?

Su - direct - Kessler                                    4788

1    A    It's initials and share amounts.

2    Q    Can you just tell us what's represented by each of the

3    initials?

4    A    Kevin Mulleady $350,000, Tom Fernandez 300,000, Marek

5    Biestek 300,000, Tim Pierotti 350,000, Claridge Capital

6    350,000, Andrew Vaino 250,000, Ed Sullivan 100,000.

7    Q    Are these allocations lower than the allocations we just

8    saw?

9    A    Yes.

10   Q    Did anyone explain to you why these individuals were

11   receiving fewer shares than were indicated in the

12   December 12th e-mail?

13   A    No.

14   Q    Did you have any understanding one way or the other

15   whether Retrophin had paid all $200,000 for the Desert Gateway

16   shell as of December 17th?

17   A    My understanding is this it did not pay the full 200,000.

18   It only paid off, paid $100,000 of that.

19   Q    Did anyone ever tell you that these Fearnow shares were

20   being allocated as incentive compensation?

21   A    No.

22   Q    Did anyone ever tell you that these Fearnow shares were

23   being given to these individuals instead of salary payments?

24   A    No.

25   Q    Now, during November and December 2012 -- we can take

Su - direct - Kessler                              4789

1    this exhibit down.

2              During November and December 2012, did you

3    communicate with Mr. Greebel about bills for legal services

4    submitted by Katten?

5    A    Yes.

6    Q    Did you talk to him in person or on the phone?

7    A    On the phone.

8    Q    Do you recall a conversation you had with him on

9    December 4, 2012?

10   A    Yes.

11   Q    Okay.  What happened during that conversation?

12   A    I asked Evan to send his legal bills and he did and we

13   discussed the contents of the legal bills and the parties

14   associated with the legal bills.

15   Q    And was there a difference between the amount Retrophin

16   had been billed and Retrophin had paid?

17   A    Yes.

18   Q    Okay.  Did Mr. Greebel tell you anything about what to do

19   about that difference?

20   A    He at one point told me to mark it off against the

21   $900,000 note that was from MSMB Healthcare.

22   Q    And you say he eventually told you to mark the excess

23   against the $900,000 note?

24              MR. BRODSKY:  Objection, Your Honor.  I think

25   Mr. Kessler is mistaken in the testimony.

Su - direct - Kessler                                            4790

1          MR. KESSLER:  Not my intention.  Let me rephrase it.

2    Q    Did you have one or two conversations with Mr. Greebel on

3    December 4, 2012?

4    A    I had two conversations.

5    Q    Okay.  What happened during the first conversation with

6    Mr. Greebel on December 4, 2012?

7    A    I had a conversation with him on the phone.  We talked

8    about the legal bills that he sent over.  I said to reconcile

9    those bills and the bills that was associated with Retrophin

10   didn't amount to what we actually paid or what Retrophin

11   actually paid Katten for Retrophin services and that the other

12   outstanding bills was for a different entity that Retrophin

13   shouldn't be responsible for.

14          His response was, well, that's a completely

15   different matter, and the subsequent phone call during the

16   same day --

17   Q    Let me just ask -- let's break it down.

18          So, in the first conversation, what did Mr. Greebel

19   tell you about this difference in the bills?

20   A    That it was different completely matter.

21   Q    A completely different matter?

22   A    Sorry.

23   Q    Let me ask it this way.  Do you recall every word that

24   was said during this conversation on December 4th?

25   A    Not word for word but the subject, I do recall, yes.

1    Q    Okay.  Take a look at what's been marked for

2    identification as Government Exhibit 111-32, 111-32, behind

3    tab 26 in your binder.  Just take a look at that, read it to

4    yourself and let me know if it refreshes your recollection

5    about what was said during your call to Mr. Greebel on

6    December 4th.

7              (Pause.)

8    Q    Does it refresh your recollection?

9    A    Yes.

10   Q    Okay.  So, during the first conversation you had with

11   Mr. Greebel on December 4, 2012, what was discussed?

12   A    I discussed the legal bills between what Retrophin paid

13   and legal bills that were marked towards Retrophin.

14   Q    And had Retrophin paid more to Katten than it had been

15   billed?

16   A    Yes.

17              MR. BRODSKY:  Objection.  Leading.

18              THE COURT:  Overruled.

19   Q    And what did Mr. Greebel tell you about that?

20   A    He said that's a whole completely different matter.

21   Q    Did he elaborate on what he meant when he said that's a

22   whole completely different matter?

23   A    He did not.

24   Q    All right.  Now, did you have a subsequent conversation

25   with Mr. Greebel that day, on December 4th?

Su - direct - Kessler                    4792

1   A    Yes.

2   Q    What happened during that conversation?

3   A    He said that the balance, if you will, should be marked

4   against the $900,000 note that we talked about earlier for

5   MSMB Healthcare.

6   Q    So the $900,000 loan that you were handed in

7   November 2012?

8   A    Yes.

9   Q    What does it mean to mark something against a note?

10  A    It means ask that note, whatever it was supposed to be

11  repaid back from that note, take it from there.

12             THE COURT:  So, the fees were to be taken against

13  the note?

14             THE WITNESS:  So, Retrophin overpaid and should have

15  credit from Katten's bills and that credit needed to either be

16  paid back from Katten or Katten had to give Retrophin credit

17  for the overpayment and that overpayment was, from my

18  conversation with them, is that because that one other person,

19  entity owed money to Retrophin, that's where that difference

20  would be made up from.

21  Q    So, when Mr. Greebel said that the difference should be

22  marked against the $900,000 note on December 4th, was that the

23  same $900,000 note that a few days earlier he told you he

24  didn't know about?

25  A    Yes.

1    Q    The same $900,000 note that he told you a few days before

2    was okay?

3    A    Yes.

4    Q    And just so we're all clear on this marking, let me see

5    if I can make this clear.

6          Your understanding was that Retrophin had paid more

7    money than it owed, is that correct?

8          MR. BRODSKY:  Objection to the leading, Your Honor.

9    It's just asked and answered.

10         THE COURT:  All right.  Try not to retread old

11   ground if you already established facts.  It's fine to seek

12   clarification if you think it's necessary.

13         MR. KESSLER:  I'll move on.

14   Q    Mr. Su, we've looked at recently an e-mail from

15   December 12th and December 17th.  Do you remember that?

16   A    Yes.

17   Q    When did you leave Retrophin?

18   A    A week before Christmas so it would be some, 20th time

19   frame.

20   Q    December 20th, 2012?

21   A    Of 2012, yes.

22   Q    So a few days after these e-mails we've been looking at?

23   A    Yes.

24   Q    During the last week or two weeks in which you were still

25   working at Retrophin, were you working on the reverse merger?

1    A    Yes.

2    Q    Did you do work on the 8-K filing?

3    A    Yes.

4    Q    What kind of work were you doing in the last week or two

5    before you left on the 8-K filing?

6    A    Same thing, working with the auditors, the accountants,

7    legal, to, again, tie everything up so the public company has

8    the correct records from the private company conversion.

9    Q    Why did you leave Retrophin?

10   A    I felt uncomfortable there leading up, many small things

11   that just added up that didn't seem right to me to stay there.

12   I think the last straw was the day I walked out, Martin took

13   $10,000.  We were already public at that time, and there was

14   only $20,000 in Retrophin's bank account and he moved half of

15   it, 10,000, to his personal bank account and that was just --

16   there was no documentation for it and I just, I said that's

17   it, I just can't do this anymore.

18   Q    On the day you left, was Andrew Vaino still doing work

19   for Retrophin for these MSMB hedge funds?

20   A    Yes, yes.

21   Q    On the day you left, was Kevin Mulleady still doing work

22   for Retrophin and the MSMB hedge funds?

23              MR. BRODSKY:  Objection.  Foundation.

24              THE COURT:  Why don't you just, if you could, ask

25   him who was doing work on Retrophin, if anybody.

Su - direct - Kessler                                    4795

1    Q     In the week before you left, so the week before
2    December 20, 2012, did you interact with Andrew Vaino at all?
3    A     Yes.
4    Q     And was that interaction related to work for Retrophin or
5    the MSMB hedge funds?
6    A     Yes.
7    Q     On the day you left -- sorry, in the week before you
8    left, did you interact with Kevin Mulleady?
9    A     I did.
10   Q     And were those interactions related to work for Retrophin
11   for the MSMB hedge funds?
12   A     Yes.
13   Q     In the week before you left, did you interact with Tom
14   Fernandez?
15   A     Yes.
16   Q     Were those interactions related to work for Retrophin or
17   the MSMB hedge funds?
18   A     Yes.
19   Q     In the week before you left, did you interact with Ron
20   Tilles?
21   A     Yes.
22   Q     And were those interactions related to work being done
23   for Retrophin or the MSMB hedge funds?
24   A     Yes.
25   Q     In the week before you left, did you interact with Marek

Su - direct - Kessler                                    4796

1    Biestek?

2    A    Yes.

3    Q    Were those interactions related to work being done for

4    Retrophin or MSMB, or the MSMB hedge fund?

5    A    Yes.

6    Q    Did any of those individuals tell you they had been fired

7    by Mr. Shkreli in the week or two before you left?

8    A    No.

9    Q    Now, at the time you left, had you been paid all the

10   salary you were owed?

11   A    No.

12   Q    And at the time you left, had you -- well, strike that.

13        Do you recall early on we talked about this e-mail

14   archive system?

15   A    Yes.

16   Q    And you said you believe that you printed certain

17   documents and took them home with you?

18   A    Yes.

19   Q    After you left Retrophin on or about December 20th, did

20   you keep those documents that you took home with you?

21   A    Yes.

22   Q    And did you continue to access that on line e-mail

23   archive system?

24   A    Infrequently but yes.

25   Q    For how long did you continue to access that e-mail

Su - direct - Kessler                                    4797

1   archive system?

2   A     Through March 2013.

3   Q     And did you save or print some of the e-mails you saw?

4   A     Yes.

5             MR. KESSLER:  Your Honor, I'm moving to kind of the

6   final area.  I'm happy to keep going or I'm happy to break for

7   lunch, whatever would be convenient.

8             THE COURT:  What would you jurors like to do?  Would

9   you like to keep going for a little while longer or would you

10  like to break for lunch?

11            THE JUROR:  Keep going.

12            THE JUROR:  Keep going.

13            THE COURT:  All right.  We'll keep going.

14  Q     All right.  So after you left, did you have

15  communications with Mr. Shkreli about the money or that salary

16  you had not been paid?

17  A     Yes.

18  Q     Okay.  Take a look at what's been marked for

19  identification as Government Exhibit 682-B.  It's in your

20  binder behind tab 27.  It's a series of e-mails between you

21  and Mr. Shkreli in February and March of 2013.

22  A     Yes.

23  Q     Do these e-mails relate to you not being paid?

24  A     Yes.

25  Q     All right.

Su - direct - Kessler                    4798

1          MR. KESSLER:  I offer Government Exhibit 682-B.

2          MR. BRODSKY:  One moment, Your Honor.

3          (Pause.)

4          MR. BRODSKY:  No objection, Your Honor.

5          THE COURT:  We receive Government Exhibit 682-B.

6          (So marked.)

7   Q    All right.  Mr. Su, if we look at the bottom of

8   Government Exhibit 682-B, there's a February 12th e-mail from

9   you to Mr. Shkreli?

10  A    Yes.

11  Q    What did you write to him?

12  A    Hope all is well.  I'd like to discuss the bonus from the

13  funds last year during my employment with MSMB and Retrophin.

14  Attached is the contract we signed in January 2017.  It calls

15  for performance-related bonus paid to me every year for the

16  next five years.  MSMB Healthcare LP fund enjoyed over a

17  34 percent return since July 31, 2012 according to an investor

18  letter.  With $100 million in assets, that's a great turn for

19  you and the firm.  Congrats.

20  Q    Did Mr. Shkreli write back?

21  A    No, he did not.

22  Q    Did you send him another e-mail on March 5th?

23  A    Yes.

24  Q    Is that the e-mail in the middle of the page?

25  A    Yes.

Su - direct - Kessler                                    4799

1    Q    Can you read that first paragraph?

2    A    Martin, I'm disappointed not hearing back from you.  The

3    company would have had little chance of continuing to be

4    public without the super 8-K filing in December which I worked

5    nonstop for weeks to complete and file.  Along with your

6    repeated e-mails and phone messages to me saying this will

7    work, I promise, which I took to heart.

8    Q    What were the repeated e-mails and phone messages to

9    which you were referring?

10   A    He continuously e-mailed me and texted me and called me

11   to finish the 8-K.

12   Q    What did you write in the next paragraph?

13   A    Only thing I'm requesting is the fulfillment of the

14   contractual requirement.  I don't want to escalate the

15   situation to lawyers which would trigger a number of things

16   outside my control including reaching out to investors for

17   final numbers for MSMB, i.e., Spencer Spielberg, Sarah Hassan,

18   Lindsay Rosenwald, Rob Johnson, Steve Rosenfeld and the likes,

19   SEC and other enforcement notification, media exposure, asking

20   the company to spend unnecessary money on full audits on each

21   and every entity, tracking funds that may have come in and out

22   of different accounts, share transfers and other measures an

23   attorney would demand.

24   Q    What were you referring to when you talked about

25   triggering a number of things and then you talked about

1  reaching out to MSMB investors and the SEC and so forth?

2  A    That would be part of any lawsuit from my understanding

3  on how lawsuits work.  Lawyers would demand every type of

4  document available that is under the control of that subject.

5  Q    Why were you referring to, final numbers for MSMB, i.e.,

6  and then you have a list of names including Sarah Hassan and

7  Lindsay Rosenwald?

8  A    Because I did see e-mails that, with statements with

9  their names being sent out and they were good performance

10 numbers that based on my contract, it allowed me to capture

11 part of that performance.

12 Q    And then at the end of the paragraph, you refer to other

13 measures an attorney would demand.  Do you see that?

14 A    Yes.

15 Q    Why are you referring to an attorney?

16 A    If I hired an attorney, they would demand all these

17 things I just listed.

18 Q    And in the last sentence of the e-mail, you wrote, if,

19 however, I don't hear back before end of Friday, March 8th,

20 then I'll have to assume you don't care and I'll have to take

21 the next steps to protect myself.  Do you see that?

22 A    Yes.

23 Q    So what did you refer to when you wrote "next steps to

24 protect myself"?

25 A    It would be to file a formal complaint with the courts.

Su - direct - Kessler                                    4801

1    Q    Now, there's a PS.  Do you see that?

2    A    Yes.

3    Q    Can you read the PS?

4    A    I was very disappointed you went against my

5    recommendation by trusting and giving Tim help and all these

6    shares over me.  It's come back to be a bad decision.

7    Q    And what were you referring to?

8    A    I was referring to Tim not returning Martin's repeated

9    calls.  There was some -- after Tim Pierotti received his

10   shares, he completely ignored Martin and did not come back to

11   the office so I was poking at him saying this is the kind of

12   trouble that you got into with Tim.

13   Q    After you sent this e-mail in which you referred to an

14   attorney and taking steps to protect myself, did someone offer

15   you a settlement agreement?

16   A    I filed suit with this attorney that I used and it went

17   into arbitration and there was a proposed settlement from

18   Retrophin and Martin.

19   Q    And I'll ask you more about that in a minute, but I just

20   mean in the week or two after you sent this e-mail referring

21   to attorneys, did anyone offer you a settlement?

22            MR. BRODSKY:  Objection, Your Honor.

23            THE COURT:  Overruled.

24   A    There was no settlement after I sent this e-mail.

25   Q    Now, that was a March 5, 2013 e-mail.  In early

CMH        OCR        RMR        CRR        FCRR

Su - direct - Kessler                              4802

1  March 2013, were you still from time to time accessing that

2  e-mail archive system?

3  A    Yes.

4  Q    All right.  Take a look at what's been marked for

5  identification as Government Exhibit 685.  It's behind tab 28.

6             Have you reviewed that?

7  A    Yes.

8  Q    Is this an e-mail chain you accessed and printed on

9  March 6, 2013 from the e-mail archive system?

10 A    Yes.

11 Q    Does the e-mail chain relate to the e-mail we just saw

12 where you talked about MSMB investors and the SEC and your

13 attorney?

14 A    Yes.

15             (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

4803

1          MR. KESSLER:  I offer Government Exhibit 685.

2          MR. BRODSKY:  Your Honor, may we have a side bar for

3     a moment?

4          THE COURT:  Yes.

5          MR. BRODSKY:  I apologize.

6          THE COURT:  Now might be a good time to give the

7     jurors lunch just because I have a 1 o'clock conference call

8     that I adjourned a couple of times I need to take at 1:00, so

9     we will do a side bar and give the jurors lunch.

10         Please don't talk about the case amongst yourselves

11    or anyone else.  Please remain open-minded and have a good

12    lunch.

13         Why don't you come back at 2:10 into the jury room.

14         Thank you.

15         Sir, you can step down and leave the courtroom and

16    have lunch.  Thanks.

17         (Witness steps down.)

18         (Jury exits.)

19         MR. KESSLER:  We'll ask Mr. Su to leave.

20         THE COURT:  Okay.  Mr. Su is leaving the courtroom.

21         MR. BRODSKY:  Government Exhibit 685 for

22    identification has a number of problems with it.

23         The first problem is, as we understand it, Retrophin

24    has not waived privileged communications relating to Mr. Su's

25    litigation and this relates to that litigation.

4804

1              Second, Your Honor, if you notice on the top of the

2    page, this was produced -- this is a Su document.  He produced

3    it.  At the top of the page, this is the Global Relay System.

4    It's dated March 6, 2013.

5              As Your Honor knows, Mr. Su left Retrophin on

6    December, on or about December 21, 2012.  Mr. Su then

7    committed several federal crimes hacking into the Global Relay

8    System.  Three individuals had passwords to the Global Relay

9    System as he testified during Mr. Shkreli's trial:  Mr. Su had

10   a password, Mr. Shkreli had a password and Mr. Biestek had a

11   password.

12             After he left, after he sent his first threatening

13   letter seeking a performance bonus which was on or about

14   February 27, 2013 that the government introduced into evidence

15   a moment ago, and when Mr. Shkreli did not respond to his

16   threat with respect to he wanted a performance bonus based on

17   $100 million in assets in MSMB and based on the so-called

18   34 percent return, he then proceeded to enter into the Global

19   Relay System which violates the Computer Fraud and Abuse Act

20   and it violates several other federal statutes.

21             THE COURT:  Well, was he -- was his access denied

22   upon his departure?  Did somebody at Retrophin cut him off?

23             MR. BRODSKY:  Regardless of whether he --

24             THE COURT:  Well, it's just the question I'm asking.

25             MR. BRODSKY:  I do not know the answer to that,

4805

1    Your Honor.

2          THE COURT:  So you don't know whether his access was

3    denied and yet he circumvented any denial of access and got in

4    there?

5          MR. BRODSKY:  It's my position, Your Honor, that

6    when someone leaves, for example, a law firm or a company and

7    then they send a threatening letter saying give me a

8    performance bonus, here's the -- he walked out in December of

9    2012.  He was not there in January of 2013.  He was not there

10   in February of 2013.  On February 27th, Mr. Su sent an e-mail

11   threatening Mr. Shkreli.  He's no longer employed there.

12          In his lawsuit that he filed against Katten Muchin

13   on counterclaims in the Schwab litigation, Mr. Su on behalf of

14   his lawyers stated he was no longer employed at Retrophin,

15   this is paragraph 24 of the Charles Schwab, before Judge

16   Edgardo Ramos in the Southern District of New York, Charles

17   Schwab had filed a lawsuit against Mr. Su and other entities.

18   Mr. Su counterclaimed and he filed suit against Retrophin and

19   he filed suit against Katten Muchin.  His, and it's a

20   complaint that he filed with his lawyer and he said he was no

21   longer employed in paragraph 24 of his counterclaims by

22   Retrophin.

23          THE COURT:  What was the allegation by Charles

24   Schwab against Mr. Su?

25          MR. BRODSKY:  If you may recall, Your Honor, from

CMH      OCR      RMR      CRR      FCRR

4806

1   the, Mr. Shkreli's trial --

2             THE COURT:  I don't really recall.  That's why I'm

3   asking.

4             MR. BRODSKY:  In or about December of 2013, Mr. Su

5   sold approximately 126,000, a little bit more than 126,000

6   shares of his stock in Retrophin and Charles Schwab went to

7   Retrophin to get the restriction lifted so that they could

8   give the, they can have the shares and give it to the counter

9   party.  He sold them at approximately $7.10 per share for a

10  profit of approximately $900,000, I should say, proceeds in

11  the amount of $900,000.

12            Charles Schwab went to Retrophin to get the shares.

13  Retrophin said there was a stop order on it.  Charles Schwab

14  filed a lawsuit -- Charles Schwab then had to go in the

15  marketplace and purchase the shares of Retrophin's stock.  It

16  purchased them at about $11 and change because at the time

17  Charles Schwab purchased them, the stock had gone up, which

18  resulted in a $1.5 million cost to Charles Schwab.

19            Charles Schwab then filed suit against a number of

20  entities and individuals including Mr. Su and Mr. Wang.

21  Charles Schwab reached a settlement with Mr. Su in which

22  Mr. Su agreed to pay back $900,000 approximately and Mr. Su

23  then borrowed the money from Mr. Wang and paid back the

24  approximate $900,000.

25            Mr. Su, in this lawsuit before Judge Ramos in the

4807

1    Southern District of New York, then filed a counterclaim which

2    still survived the settlement.  In the counterclaims, he said

3    he had left the employment of Retrophin in paragraph 24 of his

4    counterclaims --

5              THE COURT:  Is it counterclaim or a third-party

6    claim?

7              MR. BRODSKY:  I believe it was both a counterclaim

8    and a third-party claim.

9              THE COURT:  Against Schwab?

10             MR. BRODSKY:  There was a counterclaim, no, against

11   Retrophin.

12             THE COURT:  That's a third-party claim.

13             MR. BRODSKY:  I believe Schwab had sued Retrophin,

14   but maybe it's a third-party claim.

15             THE COURT:  Cross-claim.

16             MR. KESSLER:  They sued everyone.  They sued

17   Retrophin.

18             THE COURT:  Su filed a cross-claim against Retrophin

19   who was also a defendant in the Schwab litigation.

20             MR. BRODSKY:  And he brought in as a third party

21   Katten Muchin and sued Katten Muchin as a third party.

22             THE COURT:  Okay.

23             MR. BRODSKY:  In that counterclaim and third party

24   claim suit, Mr. Su stated in paragraph 24 that he had left the

25   employment of Retrophin in December of 2012.

4808

1              So, we have a situation, here, Your Honor, where

2    Mr. Su used the password without authorization and under the

3    Computer Fraud and Abuse Act which is a criminal statute, the

4    Stored Communications Act and a number of other federal

5    statutes, when you enter into your former employer's computer

6    system and you access it without authorization and you

7    intercept electronic communications or you take those

8    communications, you are committing a number of federal crimes

9    and that is exactly what Mr. Su did.

10             What the government just elicited is that Mr. Su did

11   go in after December of 2012 and he went into the Global Relay

12   System which he had set up and he had used, this didn't come

13   out, but he probably used his password.  There are e-mail

14   communications in or about --

15             THE COURT:  Excuse me.  I just have to call.  I have

16   a conference call at one as I told you.  Just one moment.

17             MR. BRODSKY:  Yes.

18             (Pause.)

19             THE COURT:  Go ahead.

20             MR. BRODSKY:  So, Your Honor, our objection is on a

21   number of grounds.

22             First, the government should not be permitted to use

23   documents that are the result of federal crimes.  I believe

24   that that is an impermissible use of these documents and the

25   government has not given Mr. Su, as I understand it, a

4809

1    non-prosecution agreement for any of these federal crimes.

2            THE COURT:  Did you move in limine against use of

3    these documents timely?

4            MR. BRODSKY:  We did not know, Your Honor, whether

5    or not the government would use it.  There are hundreds of,

6    thousands of exhibits, hundreds of exhibits on the

7    government's witness list.

8            THE COURT:  Did you use this in that prior trial?

9            MR. KESSLER:  I don't believe we used this one.  We

10   certainly used the SU Bates stamped document and there are

11   only 700 pages of those.

12           MR. BRODSKY:  Your Honor, they never used any of

13   these.

14           THE COURT:  He said he didn't use this particular.

15           MR. BRODSKY:  And he didn't use any of the Global

16   Relay documents.  And if Your Honor remembers, there was a

17   side bar with respect to Mr. Su's use of hacking, of materials

18   where he hacked in and during the side bar conversation,

19   Mr. Shkreli's attorneys objected to the use of any such

20   materials and the government said they would not use them and

21   they did not use the Global Relay documents.

22           So, and then the second alternative, you know -- so

23   I think that in and of itself should preclude the government

24   from using this.  It is surprising the government did not file

25   a motion in limine pursuant to Your Honor's schedule, consider

4810

1    the controversy surrounding this in light of what happened at

2    Mr. Shkreli's trial, but they didn't pursue a motion in limine

3    to use these documents.

4            THE COURT:  Well, I guess neither party did but I am

5    not going to entertain any motion from any party forward.

6            MR. BRODSKY:  And, secondly, Your Honor, I'm not

7    certain that this privilege has been waived with respect to

8    these documents.  They are privileged communications and we

9    just don't have certainty with respect to the waiver of the

10   privilege regarding this document.

11           (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    4811

1   (Continuing)

2            MR. KESSLER:  So with respect to privilege, we

3   have -- there are, I won't say hundreds, but at least a

4   hundred documents where Mr. Shkreli and Mr. Greebel and other

5   attorneys discuss the Su litigation; private investigators

6   pursuing Mr. Su; all sorts of things.  They've all been

7   produced by Retrophin.  We have them all.

8            THE COURT:  And did they assert a privilege over

9   those documents?

10           MR. KESSLER:  I don't know if they originally did,

11  but they do not at this point.  But we were going to confirm

12  with Retrophin again to make sure the privilege is waived on

13  this one, assuming it wouldn't be covered by a crime fraud

14  exemption anyway.  So we will just check on privilege.

15           With respect to everything else, you know, setting

16  aside whatever allegations Mr. Brodsky wants to make, the

17  e-mail itself suggests Mr. Shkreli and Mr. Greebel are not

18  clear whether Mr. Su had been terminated.  They discuss

19  various ways of terminating him.

20           So setting aside any accusations of Federal crimes,

21  which I'm not going to get into here, there is no basis to

22  suppress the document.  I mean, this is just a suppression

23  motion that could have been made long ago.  You don't normally

24  have a motion in limine not to suppress something.  Normally,

25  there is a suppression motion to suppress something, and that

Proceedings                          4812

1    has not been made.  They were clearly aware of the issues from

2    the Shkreli trial.  They're clearly aware of the documents.

3    They've been on our exhibit list.  There's a hundred e-mails

4    with the 600 series.

5           We're not talking about a huge number of Exhibits.

6    So there's been no suppression possession.  Other than

7    privilege, I have heard no evidentiary basis, not to use this

8    document and we'll confirm the privilege; but my understanding

9    is there is no privilege.

10          THE COURT:  All right.  Why don't you confirm that

11   and I will look at this e-mail.

12          MR. KESSLER:  I guess I should just say for the

13   record, Your Honor, because I don't think I have so far, the

14   e-mail chain is an e-mail chain between Mr. Greebel and

15   Mr. Shkreli, where Mr. Greebel is in the top e-mail.  He's the

16   top of the e-mail chain.  So the whole thing is a statement by

17   the defendant.

18          So there's no hearsay objection; no relevance

19   objection.  We'll check on privilege, just to be extra

20   certain.

21          THE COURT:  Well, March 5th e-mail -- March 5, 2013,

22   at 8:06 p.m., states:  Alternative would be saying that we are

23   hereby terminating him with cause and he gets nothing.

24          So it does not -- I mean, I guess I am not clear

25   what date he was actually terminated.

Proceedings                                          4813

1          MR. BRODSKY:  Your Honor --

2          THE COURT:  I do not know.

3          MR. BRODSKY:  -- under the Federal statutes,

4   Your Honor, for computer fraud and abuse, if you leave

5   employment, if you leave employment, regardless of whether the

6   circumstances are uncertain and you go in and access

7   documents, electronically, you have committed a Federal crime.

8          THE COURT:  What section is that?

9          MR. KESSLER:  18 U.S.C. 1030.  It does not say that.

10  There are a number of different provisions.

11          Furthermore, I don't see any basis for Mr. Brodsky

12  to litigate that Mr. Su did or did not commit a crime at this

13  point.  The question is, is there a valid evidentiary basis

14  for introducing this document.

15          MR. BRODSKY:  Your Honor, the Computer Fraud and

16  Abuse Act, under Section 1030(a)(2):  If a person

17  intentionally accesses a computer:  (1) intentionally; (2)

18  accesses a computer; (3) without authorization and in such a

19  way -- or in such a way that exceeded his authorized access;

20  (4) obtained information; (5) from any protected computer,

21  which has a definition of password access; (6) resulting in a

22  loss to one or more persons during any one-year period

23  aggregating at least $5,000 in value, the criminal statute

24  does not require the loss in value.  This is Worldwide LLC

25  versus Cuellar, 2017 Westlaw 931617, Eastern District of

Proceedings                                              4814

1   Virginia, March 9th, 2017.

2           Under Section 1030-A(4):  If you knowingly and with

3   the intent to defraud access a protected computer without

4   authorization, or you exceed authorization, and you intend to

5   commit fraud, or you obtain anything of value, then you've

6   committed a crime.

7           And there are a number of cases, Your Honor, that

8   would clearly apply here.

9           THE COURT:  Okay.  So that is why I asked you,

10  Mr. Brodsky, whether Retrophin had ever denied Mr. Su's access

11  to the global access system after he left and while his

12  employment status with Retrophin remained in play.  It was

13  uncertain whether he was going to be terminated, or with

14  cause, or without cause, as late as March of 2013.

15          In any event, I have to get upstairs and do my

16  conference call.  So why don't we get answers to questions:

17          Did Retrophin ever deny access after December 2012,

18  to Mr. Su?

19          Was there some sort of notification or some sort of

20  steps that were taken by the corporation to cut off Mr. Su's

21  access or to notify him that he no longer had access since

22  intentionality seems to be part of the statute that

23  Mr. Brodsky is quoting?

24          And also, whether Retrophin has waived privilege

25  over these documents?  All right?

```
                        Proceedings                    4815

1              And I will come back; what time?  I told the jurors

2     to come back at 10 after 2:00.  So, why don't you be ready to

3     talk about this at 20 of 2:00.  And I will try to get my

4     conference call finished in that short time and, hopefully,

5     have some lunch.

6              Thank you.

7              ALL:  Thank you, Your Honor.

8

9              (Continued on following page with AFTERNOON

10    SESSION.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings                                4816

1           THE COURT:  What has the Government found out

2     regarding privilege?

3           All parties are present.  All counsel are present.

4     This is a continuation of the issue regarding proposed

5     Government Exhibit 685.

6           MR. KESSLER:  We are still waiting to hear back from

7     Retrophin.  We have talked to an associate at Cooley, who is

8     checking with the partner on the matter.  So our proposal is,

9     I guess it sorts of depends on one additional fact, if the

10    defense is not objecting to the authenticity of the document,

11    then this is a document that we could, if we needed to,

12    introduce through another witness.

13          THE COURT:  My concern is asking this witness to

14    possibly admit to whether he violated what Mr. Brodsky says is

15    a federal law.  I'm thinking I should appoint counsel for him.

16    If he can't afford counsel, then he should have counsel to

17    advise him whether he should be testifying on this line.

18          MR. BRODSKY:  Your Honor, I am going to

19    cross-examine him on it.

20          THE COURT:  I am going to appoint counsel then.  I

21    think he should have advice of counsel if he is going to talk

22    about things that could implicate his Fifth Amendment right

23    against self-incrimination.  I have had to do that in other

24    cases where the witness appears to be testifying about

25    possible violations of federal law, as Mr. Brodsky contends.

MDL   RPR

Proceedings                                          4817

1    I don't know what the facts are regarding all of this.  It

2    does appear that at the time of this e-mail exchange Mr.

3    Shkreli and Mr. Greebel were not clear whether or not Mr. Su

4    was no longer an employee.  There's a suggestion here by Mr.

5    Greebel that he be terminated for cause and Mr. Shkreli states

6    that they informed him that he was terminated without cause.

7    So I'm not sure what his status is.  But I do think he ought

8    to have counsel if he is going to be examined at all on this

9    subject of whether he could have broken federal law, as Mr.

10   Brodsky contends.

11        I think that if this were the Government that had

12   asked Mr. Su to retrieve this document, then we could have an

13   issue regarding whether it could be suppressed.  But there is

14   no basis in law that I know of to suppress this document that

15   would otherwise be admissible.  I don't know of any case law

16   that would require that it be precluded from admission, but I

17   do think that we have a Fifth Amendment issue for Mr. Su that

18   ought to be perhaps examined and he ought to consult with a

19   lawyer.  I can try to get a miscellaneous duty CJRA lawyer to

20   see.  I don't want to slow down this trial.

21        MR. BRODSKY:  Your Honor, he continued even after --

22   let's assume hypothetically he was terminated in March, he

23   continued after his termination.  We proffered to Your Honor,

24   the Government may have heard a different story from Mr. Su,

25   but it is our view that he continued after March of 2013 to

Proceedings                                                    4818

1    use a backdoor to get into the Global Relay system.  We will

2    be cross-examining him about that.

3             THE COURT:  All right.  Well, I do think then it

4    probably would be prudent for me to appoint a CJRA lawyer at

5    this point just to confer with him about how much of anyone's

6    questions he is going to answer on this subject, as I said,

7    the defense alleges he has violated federal law.

8             Is he under any kind of agreement with the

9    Government?

10            MR. KESSLER:  No.

11            THE COURT:  We will call down to the miscellaneous

12   CJRA counsel and see who would be available.

13            Is there anything else you can cover with this

14   witness at this time?

15            MR. KESSLER:  Yes.

16            THE COURT:  Let me see if I can get an attorney.

17            MR. BRODSKY:  We can cross in other areas.

18            THE COURT:  I would say otherwise, if we didn't have

19   this possible Fifth Amendment issue with Mr. Su, I don't think

20   that there's a basis to exclude this exhibit, as long as the

21   Government did not have a hand in obtaining it or encouraging

22   an agent, so to speak, of unlawfully hacking in.  It's just

23   not precludable on the ground that you cite, Mr. Brodsky,

24   unless you have some case, but we have not found any cases

25   that would warrant preclusion.  Do you know of any?

Proceedings                                    4819

1      MR. BRODSKY:  Standing here right now, Your Honor, I

2  don't have a case to cite to you.  I was surprised that the

3  Government was doing this.  It's not what they did in the

4  Shkreli trial.  I thought they were going to use exhibits like

5  they did with others to refresh recollection.  I didn't know

6  they were going to offer this in their case-in-chief.  So,

7  caught unaware, I'm sorry, Your Honor, I don't have a case for

8  you.

9      THE COURT:  Do one of your other six colleagues with

10  their computers have any access to legal research during the

11  lunch period that would provide some basis to exclude?

12      MR. BRODSKY:  We will look, Your Honor.  At this

13  point, standing before you right now, I don't have a case to

14  cite to you.

15      THE COURT:  It is not untypical that employees have

16  documents that their employer wishes they did not have and

17  they are sometimes used by prosecutors in criminal trials.

18  They are not necessarily excludable on the ground that an

19  employer may not have approved.  I don't even know whether

20  Retrophin ever did shut this access down.

21      MR. BRODSKY:  Well, Your Honor --

22      THE COURT:  Do we know?

23      MR. BRODSKY:  -- during cross-examination, I think

24  the Government will learn the facts that we know.  I don't

25  want to layout my cross-examination regarding how he accessed

Proceedings                                 4820

1    it and what he did.  Based on what the Government elicited in

2    direct examination, I don't believe Mr. Su has told the

3    Government the full story of his access.  That's my view.  I

4    don't see it anywhere in the 3500 material.  The only

5    discussion in the 3500 material was in July of 2014 -- well,

6    to the best of my recollection sitting here right now, in July

7    of 2014, you may remember from Mr. Shkreli's trial when the

8    FBI Agent Delzotto spoke to Mr. Su, Mr. Su had said he had

9    retained, in a safe deposit box, approximately 250 pages of

10   e-mails.  During Mr. Shkreli's trial, he testified those are

11   the documents that he had.  He never testified about his

12   access to Global Relay or his use of Global Relay either on

13   direct or cross-examination when he was asked about access to

14   documents.  So that also goes to further questions we plan to

15   challenge him with on cross-examination.

16             MR. KESSLER:  Your Honor, two things, first of all,

17   Retrophin has reported that the document is not privileged and

18   they have a copy.  There is a Retrophin copy.  So to the

19   extent it won't be introduced through Mr. Su, we could have an

20   authentic version that can come in from someone else.

21             The second thing is Mr. Brodsky has a 10-page

22   memorandum on the Computer Fraud and Abuse Act, 18 U.S.C.

23   1030.  He clearly planned to cross-examine Mr. Su at length

24   about his access to the Global Relay system.

25             MR. BRODSKY:  Sure.

Proceedings                                          4821

1          MR. KESSLER:  He has had the Global Relay documents

2    for months.  I'm not saying the cross-examination is improper.

3    What I'm saying to hear now that at the last minute the

4    defense never expected any of these documents to be used and

5    so did no research and filed no motions, rings a little

6    hollow.

7          MR. BRODSKY:  Your Honor, with all respect to Mr.

8    Kessler, he neither raised a motion or raised it with the

9    Court and having received stolen material and hacked material

10   one would think he would have done it.

11         Also, one would think that it would have been

12   disclosed in the 3500 material, which it is not.  We have had

13   issues with respect to Government disclosures regarding the

14   conduct of witnesses.  This is yet another instance, I want to

15   put on the record, where the Government, prior to today, has

16   never disclosed in 3500 material or Giglio disclosures that

17   Mr. Su hacked into the Global Relay system.  We have our own

18   investigators.  We have found evidence with respect to his

19   hacking.

20         Second, we believe it was on the Government to raise

21   this with the Court.

22         Third, in Mr. Shkreli's trial, the Government never

23   sought to introduce these hacked materials and, in fact, made

24   it clear they were not doing so when Mr. Shkreli's counsel

25   objected.  So we had every reason to believe that the

Proceedings                                    4822

1   Government would not behave differently from that trial to

2   this trial.

3            THE COURT:  Is it hacked if Retrophin introduces the

4   exhibit?

5            MR. BRODSKY:  That would not be this exhibit.

6            THE COURT:  I take it you are not going to introduce

7   it through Mr. Su, right?

8            MR. KESSLER:  Given the concerns, we are happy to

9   introduce it through someone else.

10           THE COURT:  The document cannot be considered

11  improperly hacked if a Retrophin witness is the basis for

12  introduction; correct?

13           MR. BRODSKY:  You're correct, Your Honor.

14           THE COURT:  I'm just trying to make sure that we

15  don't have -- I'm looking for our CJRA number so I can make

16  sure he has a chance to talk to a lawyer before he goes any

17  further with his examination in the event that either the

18  Government or the defense is planning to elicit potentially

19  incriminating admissions from him.  I am just looking here.

20  Just bear with me.

21           Do you have another witness here?

22           MR. KESSLER:  Here, no.  That we can get, yes.

23           THE COURT:  I just asked if there was another

24  witness in case we have to temporarily suspend.

25           MR. BRODSKY:  I'm sorry, we thought it was on this

Proceedings                                           4823

1    issue.  I apologize.

2           MR. KESSLER:  So the next witness on tap is in

3    Manhattan.  We are keeping them updated.  We can ask them to

4    come here.

5           THE COURT:  So far I have struck out, but I am still

6    trying.  I don't know how much more I should allow this

7    witness to testify until we get this cleared up.

8           The CJRA who is on duty is in Garden City right now.

9           (Pause.)

10          THE COURT:  So one of our CJRA attorneys can be here

11   in ten minutes.

12          MR. BRODSKY:  Great.

13          THE COURT:  Is there any other area of inquiry that

14   you can cover?

15          MR. KESSLER:  Yes.

16          THE COURT:  Or should we wait?

17          MR. KESSLER:  I think, frankly, if the Court's

18   inclination is to appoint counsel and the counsel is ten

19   minutes away, we might as well just wait.

20          THE COURT:  All right.  Then we will have to tell

21   the jurors they will have to wait for a bit.

22          MR. BRODSKY:  Can Mr. Greebel have quick bathroom

23   break?

24          THE COURT:  Yes.

25          MR. BRODSKY:  Thank you.

```
                        Proceedings                    4824
```

 1          THE COURT:  So I want the parties to propose to me

 2   how I can communicate to Mr. Burke what the issue is so that

 3   he can have a conversation with Mr. Su when Mr. Greebel

 4   returns.  I will wait for Mr. Greebel to return.  But why

 5   doesn't the Government confer with defense counsel and figure

 6   out what might be the best approach for framing the issue for

 7   Mr. Burke.

 8          I have asked the attorneys to confer about how they

 9   would like to frame the issue for the attorney.  His name is

10   John Burke, he is on the Court CJRA panel.  He will be here

11   within the next ten minutes and he will speak to Mr. Su.

12          Are there any other documents that the Government

13   would like to proffer that are in the same category of access

14   that Mr. Su downloaded and kept and provided later to the

15   Government?

16          MR. KESSLER:  No, Your Honor, there is one

17   additional document also on our exhibit list that Mr. Su sends

18   to Mr. Greebel and then it gets passed along to other people

19   that contains documents that he had.  But as the Court may

20   recall, he also had documents that he, you know, printed out

21   or kept with him over time.  I guess in an abundance of

22   caution, we can inform Mr. Burke of that document as well.

23          THE COURT:  Are the attached documents in that

24   e-mail documents that were accessed in or around March of

25   2013?

```
                        Proceedings                    4825
```

1          MR. KESSLER:  They don't have any of the header

2     information.

3          THE COURT:  Okay.

4          MR. KESSLER:  They appear not to be.  They don't

5     have the headers, but I don't know for certain.

6          THE COURT:  Were you able to find out from Retrophin

7     whether they at any time either shutdown access or notified

8     Mr. Su that he is no longer to have access to their Global

9     system?

10         MR. KESSLER:  I'm sorry, Your Honor.

11         MS. SMITH:  We will have to double-check, but I

12    think at some point after this, it does get shut off because

13    -- but I don't know, to be perfectly honest.  I don't know

14    whether Retrophin's counsel would know that, but we can ask.

15         THE COURT:  Thank you.

16         May I just ask Mr. Brodsky, I am reading 18 U.S.C.

17    Code Section 1030(a)(4) which seems to focus on the access of

18    a protected computer without authorization or exceeding

19    authorized access with the intent to defraud or obtain

20    anything of value.

21         Did you intend to cite that subsection of the

22    statute?  I think my reading of Section 1030 of Title 18 is

23    that you may have an argument under (a)(2) regarding accessing

24    a computer that is deemed to be protected, 1030(a)(2)(C), but

25    you also cited I think 1030(a)(4), which goes to an intent to

Proceedings                                    4826

1    defraud and obtain anything of value that is within a dollar

2    amount of $5,000 in a one-year period.

3              MR. BRODSKY:  Yes, Your Honor, I would point Your

4    Honor to (a)(2), (a)(4), (a)(5), and (a)(6), which have

5    different standards.  So, for example, (a)(6), if somebody

6    knowingly, with the intent to defraud, traffics in a computer

7    password or similar information with a computer through which

8    they could access a computer without authorization in a manner

9    affecting interstate commerce.  That might be applicable.

10             Under (a)(5), if you access a protected computer

11   without authorization intentionally and cause damage, that is

12   another section, damage or loss.

13             I would also, since we are talking statutes, Your

14   Honor, identify for you the Stored Communications Act, which

15   is Title 18, United States Code Section 2701.  As I understand

16   the elements there, if you intentionally access without

17   authorization a facility through which an electronic

18   communication service is provided and you obtain, alter, or

19   prevent authorized access to a wire or electronic

20   communication while it is in electronic storage, that's a

21   violation of law.

22             Also, Your Honor, as we understand it, the identity

23   theft statute might be applicable.

24             THE COURT:  I want to know what you think is

25   applicable, not might be.  I'm not going to do the research

Proceedings                                        4827

1    for you.  So what are you contending was violating so that we

2    can be clear about your allegations?

3              MR. BRODSKY:  Understood, Your Honor.  My view is

4    that there's evidence that he violated Title 18, United States

5    Code Section 1030(a)(2), 1030(a)(4), 1030(a)(5), and

6    1030(a)(6).

7              I think there's evidence that he may have violated

8    Title 18, United States Code Section 2701.  Title 18, United

9    States Code Section 1028, and Title 18, United States Code

10   Section 2511, Subsection (1)(a).

11             THE COURT:  Well, that is something different than

12   what you told me at lunch.  I guess we will give these

13   statutes to Mr. Burke and he can sit with the witness and

14   figure out which way to go forward.  In the meantime, the

15   Government, is it possible to get another witness in here?

16             MR. KESSLER:  Yes, we will do our best.

17             THE COURT:  Mr. Kessler, did you want to be heard?

18   You are standing.

19             MR. KESSLER:  I was standing because I looking up

20   the phone number for the next witness.  Is there something

21   that the Court would like me to address?

22             THE COURT:  I don't know if you have a response to

23   these statutes.  I am just now looking them up.  I am not

24   convinced that they are all applicable.

25             MR. KESSLER:  I think it's probably better if we

Proceedings                                                4828

1   don't get into litigating Mr. Brodsky's view of these

2   statutes.

3            MR. BRODSKY:  Your Honor, although I point those

4   statutes to you, I am not an expert in the area and I don't

5   want to --

6            THE COURT:  This is causing a huge delay in the

7   trial, so you better be sure in good faith these are the

8   statutes that you contend are being violated so we can make

9   sure that this witness is aware what, if any, exposure he has

10  by testifying on direct or cross about what you contend are

11  violations of numerous federal laws, right.

12           MR. BRODSKY:  I understand.

13           THE COURT:  I am probing you to tell me so that we

14  can tell the lawyer when he walks in what he needs to be aware

15  of.

16           MR. BRODSKY:  Understood, Your Honor.  Those are the

17  ones that I am aware of.  I don't want to represent that they

18  can be all of them.  I never met with Mr. Su.

19           THE COURT:  I know.  But you have the document and

20  you know that the motions in limine were due months ago.  You

21  are asking again and again to indulge the parties'

22  applications that the defense has made.

23           Mr. Burke, thank you for coming.  This is a criminal

24  case.  There is a witness who is on direct examination.  He

25  has testified about certain acts that he has taken and the

Proceedings                                    4829

1  defense has raised an allegation that he has violated a number

2  of federal statutes.  I can write those sections down or

3  if you want to take a moment to grab a pen, I will read off

4  what the defense contends he has violated.

5            MR. BURKE:  One moment, please.

6            THE COURT:  This is Mr. Burke, who is one of your

7  CJRA lawyers.  Thank you for coming on short notice.  Ready.

8            MR. BURKE:  Go.  Maybe tell me the title of the

9  section too, in addition to the number.

10            THE COURT:  Title 18 U.S. Code Section

11  1030(a)(2)(C), 1030(a)(4), 1030 (a)(5), 1030 (a)(6), 18 U.S.

12  Code Section 2701, 18 U.S. Code Section 1028, and 18 U.S. Code

13  Section 2511(1)(a).

14            Did I cite those right, Mr. Brodsky?

15            MR. BRODSKY:  Yes, Your Honor.

16            THE COURT:  So, as I said, he is on direct.  I am

17  concerned that before further testimony is elicited either on

18  direct or during cross that this witness, to the extent that

19  he is now -- it has been brought to my attention that there is

20  a belief that he has violated federal law, I would like to

21  have him consult with a lawyer.

22            MR. BURKE:  Was he or she called by the prosecution

23  or the defense?

24            THE COURT:  Yes.  He was called by the prosecution.

25            Is there anything anyone else wants to add to Mr.

Proceedings                                    4830

1   Burke's understanding of the issues?

2           MR. KESSLER:  One thing that Mr. Brodsky and I

3   talked about was, we will give Mr. Burke a copy of the e-mail

4   that sort of started this so he has a better sense of the

5   document.

6           MR. BRODSKY:  Sure.

7           THE COURT:  This individual testified that he was

8   the chief operating officer of a company called Retrophin.  He

9   has testified that he has walked out the door of Retrophin in

10  December of 2012.  As part of his job while at Retrophin, he

11  was to set up a system called Global Relay archive, which is a

12  third-party vendor that provides access to certain individuals

13  to the corporate e-mails.  So this witness was one.  There

14  were two other people, apparently, he has testified to who has

15  had access:  Martin Shkreli and a fellow named Marek Biestek.

16  This is an e-mail that has been marked as Government 685 that

17  is dated in March of 2013 between Mr. Shkreli and the

18  defendant, Mr. Evan Greebel, who at the time was outside

19  counsel to Retrophin.  I know this is a lot.

20          MR. BURKE:  I have no idea what is going on.  I'm

21  happy to talk to the witness right at this juncture.

22          THE COURT:  So the question is I would like him to

23  speak to a lawyer to see what you would counsel him regarding

24  continued testimony.

25          MR. BURKE:  Sure.

```
                        Proceedings                    4831

1              THE COURT:  Do you know where the witness is?

2              MR. KESSLER:  I believe he is in the witness room

3       outside the door.

4              THE COURT:  Is he alone?

5              MR. KESSLER:  Yes, we haven't talked to him since

6       the Court raised this question.

7              THE COURT:  He is in the room to the right or the

8       left?

9              MR. KESSLER:  To the right on the way out.

10             MR. BURKE:  Now, this is the Government has called

11      this witness; correct?

12             MR. KESSLER:  Yes.

13             MR. BURKE:  I would like to confer with the

14      Government for five minutes, if I could.

15             THE COURT:  I don't have any problem with that.

16             Does the defense.

17             MR. BURKE:  I will talk to them too.

18             THE COURT:  Mr. Burke can speak to both of you and

19      then he can speak to the witness.

20             MR. KESSLER:  So we are happy to talk with him.

21             (Pause.)

22             (Continued on next page.)

23

24

25
```

4832

1          (In open court; outside the presence of the jury.)

2          THE COURT:  Yes, sir.

3          MR. BURKE:  I'm going to speak to the witness for a

4   few minutes.

5          THE COURT:  Thank you.  I appreciate you coming here

6   on short notice.

7          MR. KESSLER:  So, Your Honor, I don't know if

8   Ms. Smith told you, but we called the attorney for the next

9   witness who said they will, he would gather her and head here.

10         THE COURT:  Okay.  Did you tell the defense who this

11  witness is?

12         MR. KESSLER:  Yes.  It's the witness we said would

13  be next.

14         THE COURT:  Would you tell me?

15         MR. KESSLER:  Kris Marsilio, K-R-I-S, and she is

16  head of the billing system at Katten.

17         THE COURT:  Okay.  Thank you.  So she's coming from

18  where, midtown?

19         MR. KESSLER:  Midtown, I think, east.  They

20  estimated 45-ish minutes when we called.

21         THE COURT:  Okay.  What should I do about the jury,

22  just have them sit there and wait?

23         MR. KESSLER:  Yes.  I don't think -- obviously, I

24  don't think we should dismiss them.  I think we'll be able to

25  have another witness in even if we don't proceed with this

4833

1    witness.

2              THE COURT:  All right.

3              MR. KESSLER:  I think we're probably half an hour

4    away.

5              THE COURT:  All right.  Thank you.

6              (Recess taken.)

7              THE COURT:  Are we ready to go back on the record?

8              MR. BURKE:  Can I speak to the prosecution and

9    defense first, Judge?

10             THE COURT:  Sure.

11             (Pause.)

12             THE COURT:  Are we ready to go back on the record,

13   Mr. Burke?

14             MR. BURKE:  Good afternoon, Judge.

15             THE COURT:  Good afternoon, Mr. Burke.

16             MR. BURKE:  Judge, I've been able to speak to Mr. Su

17   quickly regarding the issue before the Court and it's Mr. Su's

18   position at this time that any questions directed to him

19   regarding his access to Global --

20             What's the name?

21             MS. SMITH:  The Global Relay archive.

22             MR. BURKE:  -- Global Relay system after he left in

23   2012 he would not want to respond to those questions and he

24   will be asserting his Fifth Amendment privilege.

25             THE COURT:  All right.  Well, I think we have to

4834

1   figure out how we move forward, if at all, from here and also

2   give the defense an opportunity to cross-examine him --

3            MR. KESSLER:  Understood.

4            THE COURT:  -- on matters that he's already --

5   withdrawn, I'm sorry -- matters that he's already testified

6   to.  How do we propose moving forward?

7            MR. KESSLER:  I think one way to proceed is we'll

8   just pause Mr. Su for today and we can take out of turn the

9   witness who is about to be here and we can figure out what to

10  do tonight.

11           MR. BRODSKY:  Your Honor, we think we can proceed.

12  I will, on cross, not address this issue this afternoon, but I

13  think it's prejudicial to us to allow this witness to testify

14  the way he did and not allow us to cross-examine about the

15  other areas.

16           I do think that if he's going to take the Fifth

17  Amendment to these questions, clearly there is a risk to the

18  government that his testimony -- we'll have to do the

19  research, Your Honor -- there's a risk that his testimony

20  could be stricken.  There is a risk that he has to take Five

21  in front of the jury.  There is that issue whether or not he

22  has to take Five in front of the jury.

23           He's already, the government elicited his accessing

24  of the Global Relay, they elicited significant evidence

25  relating to it and we have to confront that, we have to be

4835

1  able to challenge that and, Your Honor, the problem here is

2  that we do feel prejudiced if we don't do some

3  cross-examination.

4          So, the government can continue their direct outside

5  this area and I will do my cross-examination outside this area

6  and then after court today -- I have more than enough time,

7  Your Honor, to go through the end of the day no matter what

8  time Mr. Kessler stops -- and then after court, we can go from

9  there.

10         MR. KESSLER:  We don't object to that if the idea is

11 to proceed with the direct on whatever the remaining topics

12 are other than this topic and then to proceed to

13 cross-examination about whatever else Mr. Brodsky wants to

14 cross-examine him about.

15         THE COURT:  One thing that I thought I heard you

16 say, Mr. Brodsky, and maybe I'm wrong, I just want to be

17 clear, I thought you had stated your intention to

18 cross-examine this witness on his violation of his these

19 various federal statutes.

20         So, were you going to say to him isn't it true that

21 you violated or that your access violated X, Y, Z statute, or

22 were you just going to ask him what he did and ask whether

23 those acts or whether he was aware whether those acts violated

24 numerous federal statutes according to you?  I am just trying

25 to understand the cross that you had envisioned.

4836

1          MR. BRODSKY:  In this particular area, Your Honor?

2          THE COURT:  Yes.

3          MR. BRODSKY:  I was going to confront him with our

4    evidence of what he did post-December 2012 with respect to

5    accessing Global Relay.  I believe that we have the evidence

6    of what he did and that evidence is inconsistent with what

7    Mr. Su has testified to on direct examination.

8          I don't believe based on what I've heard today from

9    the government, government's statements to the Court and

10   Mr. Su's statements under oath that Mr. Su has disclosed what

11   he did and the full breadth of what he did and how he did it,

12   so we, I was going to cross-examine him on the full breadth of

13   what he did, how he did it and when he did it.

14         And, Your Honor, as you may recall, Mr. Su filed a

15   lawsuit in New York County Supreme Court in or about May of

16   2013.  That case was dismissed because it was subject to

17   arbitration.  There was an arbitration proceeding in 2013

18   which led to, as Your Honor knows from Mr. Shkreli's trial, a

19   settlement in principle in or about August of 2013 which

20   subsequently Mr. Su sold over 126,000 shares of stock which we

21   already discussed earlier.  The Charles Schwab lawsuit takes

22   place and in or about April of 2014, the arbitrator in the

23   arbitration upheld the settlement in principle between the

24   parties and then Judge Ramos' decision came out a few months

25   later in 2014 dismissing all of Mr. Su and Mr. Wang's

4837

1    counterclaims and third-party claims.

2          So, there is relevant overlap in 2013 and 2014

3    between Mr. Su's hacking or, in our view, illegal interception

4    of the Global Relay system and his lawsuits and his conduct

5    and his allegations.  As Your Honor knows, also in 2014, he

6    filed the second complaint with the SEC.  So those are all

7    factors that relate to his, they all go to his credibility,

8    they all go to his motives, they all go to his bias, and his

9    credibility is now at stake with respect to his prior

10   statements under oath elicited by the government with respect

11   to what he did in accessing the Global Relay system.

12         MR. KESSLER:  So I'm not aware of the relationship

13   between the hacking and the Charles Schwab arbitration.

14   Certainly the Schwab arbitration and the employment

15   litigation, those are all fair game, and we were going to talk

16   about them, I'm sure Mr. Brodsky was going to talk about them,

17   so I'm not exactly sure what the link is but --

18         THE COURT:  All right.  So, with regard to what you

19   think you can cover with Mr. Su today, and I would ask

20   Mr. Burke to remain present in the courtroom just to continue

21   his representation, is Mr. Su willing to -- you said, first,

22   Mr. Burke that he would not be willing to talk about his

23   access of Global Relay after he left in December 2012.

24         Would he be willing to testify to any matters

25   involving Retrophin after December 2012 or would he intend to

4838

1    take the Fifth on that or would you advise him to do so?

2          MR. BURKE:  I did not speak with him about that,

3    Judge.  I'm not sure.

4          THE COURT:  I thought I had heard you say that.  I

5    just wanted to make sure that was true.

6          MR. BURKE:  Forgive me.  I may have spoke in a vague

7    manner.

8          The only thing I wanted to put on the record was any

9    questions as to Mr. Su regarding his accessing the computers

10   or what's called the electronic network at Global Relay, he

11   would be taking the Fifth Amendment.  He would not be

12   answering those questions.

13         As to the other areas, I don't really have any

14   information on this.  I don't know.

15         THE COURT:  All right.  Well, if we can go forward,

16   I'd like to.  Is it possible?

17         MR. KESSLER:  I don't see why not.

18         MR. BRODSKY:  Yes, Your Honor.  We're doing research

19   now on the issue.  I'm sure the government is doing research.

20         THE COURT:  I, again, wish like crazy that you had

21   done the research before today in the middle of the witness's

22   testimony.  I'm just not able any more to indulge tardy

23   applications, but I will happy to look at any law that you

24   find in support of your position.

25         MR. BRODSKY:  No, Your Honor, the research --

4839

1          THE COURT:  I just --

2          MR. BRODSKY:  The research that we're addressing is

3  something that we never anticipated or expected.

4          THE COURT:  Well, I've heard that many times before.

5          MR. BRODSKY:  Well, Mr. Su's taking the Fifth

6  Amendment is not at all what we expected so we do need to

7  research that issue.

8          THE COURT:  I did, unfortunately -- I mean, look,

9  when somebody like you did very forcefully accuse somebody of

10 violating federal law and use that as the basis to exclude

11 evidence that would otherwise be admissible, I believe, under

12 the rules of evidence and also argues that you intend to

13 cross-examine him on these numerous acts of violating federal

14 law, I felt that it was a matter of prudence that I appoint an

15 attorney to make sure he wasn't going to be in a position to

16 incriminate himself by either testifying on direct or on

17 cross.

18         MR. BRODSKY:  Understood, Your Honor.  I'm not being

19 critical at all of that.

20         THE COURT:  No.  I'm just --

21         MR. BRODSKY:  I totally understand it.

22         THE COURT:  I understand that Mr. Su did not,

23 certain documents did not come in in the Shkreli case.

24         Can the jurors be lined up?

25         MR. BRODSKY:  Sure.

4840

1          THE COURT:  You know, I am concerned that we move

2    the case forward to the extent possible but that the parties

3    come to some reasonable way of proceeding in consultation with

4    one another and with Mr. Burke to finish the testimony.

5          Now, I don't think that Mr. Brodsky, your cross is

6    being interrupted because he is still testifying on direct.

7          MR. BRODSKY:  Yes.

8          THE COURT:  But it may require that the government

9    retool its direct and avoid problem areas at this point and

10   that they work and consult with you and Mr. Burke to try to

11   make sure that you have a full opportunity to cross-examine

12   Mr. Su, but that he not be in a position to have to -- I mean,

13   are you comfortable with Mr. Su invoking the fifth in front of

14   the jury?

15         MS. SMITH:  Your Honor, I just, you know, given what

16   Mr. Brodsky said about a linkage between this and the Schwab

17   litigation which we're not aware of and I, I wouldn't -- I

18   need to look at the transcript to see exactly what he said.  I

19   don't think he elaborated what that linkage was.

20         I don't think he's suggesting there's additional

21   access of the system later in time at the time of the Schwab

22   litigation, but I certainly don't think we want to proceed

23   with direct without giving Mr. Burke full information about

24   what Mr. Brodsky is alleging at the very least.  I don't fully

25   understand it.  We do have the other witness here who we can

4841

1   get on and off today and then we can proceed with Mr. Su

2   tomorrow.

3          I think maybe at this point -- and, frankly, making

4   sure we get our options for what can happen on

5   cross-examination so that the defense has the right to fully

6   cross-examine to the extent that they're permitted and that

7   Mr. Su's rights are protected as well.

8          So, I think maybe it makes sense, since the other

9   witness is here, that we can put her on and deal with these

10  issues tonight because, again, I'm not even sure Mr. Brodsky

11  is suggesting there are other areas where he is going to be

12  alleging Mr. Su committed some crime.  We obviously need to

13  make Mr. Burke aware of that.

14             MR. BRODSKY:  Your Honor --

15             MS. SMITH:  It's not in the Schwab litigation but I

16  think that maybe is the most prudent course of conduct both to

17  make sure the defense can do their robust cross the way they

18  want and maybe we can come to an agreement or discuss with

19  defense what areas they think are problematic and as you said,

20  resume our direct as a result.  In the meantime, since the

21  jury is waiting, we can proceed with that witness.

22             MR. BRODSKY:  Your Honor, respectfully, that's

23  extraordinarily prejudicial to us.

24             THE COURT:  How?

25             MR. BRODSKY:  Because the jury has heard certain

4842

1    testimony today.  We should be allowed to confront the witness
2    on that very same day.
3              THE COURT:  It may not have happened today in any
4    event.  I mean, the direct is not complete.  I don't know how
5    far from complete Mr. Kessler was.
6              MR. BRODSKY:  Based on their prior representations
7    to us, they didn't have much more to go.  They had expected to
8    complete during lunch time, before lunch time.
9              Second, Your Honor, we are not going to allege that
10   his Charles Schwab lawsuit against him or his counterclaims or
11   his third party claims was somehow a violation of the law.
12   We're not going to allege that his conduct in connection with
13   the arbitration was a violation of the law.  His conduct with
14   respect to Global Relay which we've already proffered is what
15   we informed Your Honor with respect to a document.
16             We are not going to, of course, share with either
17   the government or his counsel the extent to which we know
18   about his access and use of the Global Relay system.  Mr. Su
19   has already indicated that he'll take the Fifth Amendment for
20   anything relating to his access of the Global Relay system
21   after December of 2012.  So, the government, as I understand
22   it, based on their prior direct examination of Mr. Su in the
23   last trial, is going to be concluding shortly and we should be
24   allowed to get up and cross-examine the witness today.
25             There's been, you know -- we are willing to hold off

4843

1    any cross in any area where we are going to allege he violated

2    law in what he did.  So I will not cross-examine him on any

3    areas.  I will limit it to prior to the end of 2012 -- prior

4    to his departure from Retrophin and MSMB Capital on or about

5    December 21st.

6              THE COURT:  Well, when you say you are going to hold

7    off, do you mean you are going to give up crossing him on

8    anything after December of 2012?

9              MR. BRODSKY:  No.

10             THE COURT:  Because if you are not, and I am not

11   telling you you should, I just want to be clear what you mean.

12             MR. BRODSKY:  Understood.

13             THE COURT:  Because do you envision calling him back

14   and having him come back so that there would be more cross or

15   more direct at some later time?  If that's the case, it makes

16   sense to stop now, get this other witness on and finish for

17   the day and have, you know -- respectfully, I do not believe

18   this is prejudicial because the government has not finished

19   its direct.  They are going to have to, I think, rethink their

20   direct based on what has happened and consult with you and

21   Mr. Burke and I am not telling you you have to tell them what

22   your game plan is, but I think obviously people want to avoid

23   problem areas.

24             So, it does seem to me that at this point, the

25   prudent thing to be would be to adjourn Mr. Su's testimony

4844

1    because I do not want you to have to say at this point as you

2    stand here now that you are going to hold off on some line of

3    cross until you resolve it.  All right?

4            MR. BRODSKY:  What I'm saying, Your Honor, what I'm

5    saying is this afternoon, after Mr. Kessler is finished with

6    the rest of his direct, which I don't believe is very long and

7    I don't believe goes into the problem area that we've been

8    discussing which is the access to Global Relay which is where

9    the problem area is, I will cross-examine him about

10   non-problem areas this afternoon.  The non-problem areas will

11   relate to what he testified to today between January of 2012

12   and December, on or about December 21, 2012.  They don't

13   relate to areas outside of that.  And I do believe, Your

14   Honor, that the case law in this area, we will apprise Your

15   Honor of what it is and we should continue with the

16   cross-examination tomorrow and Your Honor will be able to

17   make --

18           THE COURT:  I really can't consider motions tonight.

19           MR. BRODSKY:  Understood.

20           THE COURT:  All right.  I can't.  I am not going to

21   keep considering motions that are brought on at the night

22   before testimony.  I just -- I am not going to do it any more.

23   It is just not appropriate.  I have given everybody ample time

24   and opportunities to raise motions before me.  You have both

25   had documents and, you know, we just cannot keep going like

4845

1   this.  We will never finish.  We have already lost two hours

2   because of this and so I would like to proceed in a prudent

3   way and not have a witness start and come back.

4            I just, you know, I am really at a loss.  I am

5   trying to do the right thing here, but I cannot keep dealing

6   with things late at night and on weekends.  There are ten of

7   you.  There is one of me and my clerk and that's it.

8            MR. BRODSKY:  I understand.

9            THE COURT:  Enough is enough.

10           MR. BRODSKY:  But we're being prejudiced, Your

11   Honor --

12           THE COURT:  You're not being prejudiced.

13           MR. BRODSKY:  We are.

14           THE COURT:  You have not even started your cross.

15           MR. BRODSKY:  That is why we're being prejudiced.

16           There was significant testimony today that I should

17   be able to confront Mr. Su about today on the same day and

18   what the government -- this is a problem of the government's

19   own making, not ours.  We did not put Mr. Su on the stand.  We

20   did not not ask, decide not to ask Mr. Su questions about how

21   he accessed documents or what he did.  That was their decision

22   and they had that decision.

23           THE COURT:  You know what, pointing fingers at each

24   other is not resolving issues.  I want to decide this case

25   based on the law.

4846

1           MR. BRODSKY:  I understand.

2           THE COURT:  Every time we have a situation like

3    this, there is finger pointing.  That is not a way to resolve

4    issues.  What resolves issues is what the Circuit or the

5    Supreme Court have said about whether or not something is

6    appropriate and I am not aware of any Supreme Court case or

7    Second Circuit case that forbids a court from suspending

8    testimony of a witness when in the middle of the direct, an

9    accusation has been made that this witness has violated eight,

10   nine different sections of federal law, criminal law.

11           So, I am not laying blame but I just think that at

12   this point, to continue in a ground where I don't know what

13   Mr. Su's counsel is going to advise him to take the Fifth on

14   or what other testimony or how much other, how many other

15   areas Mr. Kessler is going to inquire of this witness, I think

16   it is better to try to resolve this so that we can start fresh

17   and have a reasonable continuation rather than try to just

18   muddle through and wonder whether a land mine is going to be

19   suddenly brought to my attention which is how I feel this case

20   has been.

21           I'm getting lobbed with grenades right and left and

22   these are things that I think, again, could have been raised

23   earlier but, unfortunately, they were not and I am trying my

24   best to keep this case on track.  You are already way over

25   time on this trial.

4847

1          MR. BRODSKY:  I'm committing to you, Your Honor, not

2    to go into any area this afternoon in cross-examination with

3    Mr. Su that comes anywhere close to an area where he'll need

4    consultation with Mr. Burke.  I'm not going into areas where

5    he accessed -- the only area where I know where he potentially

6    violated federal law is with respect to his access to the

7    Global Relay system and when he did it and how he did it.

8    That's the area.  And now that's been -- the government is not

9    going to go into that area anymore.  They're going to try to

10   obtain, get evidence of that document that they wanted to get

11   in evidence through another way.

12          So, there is no reason why we shouldn't continue

13   with Mr. Su's testimony, having it been fresh in the mind of

14   the jury and I, with that freshness in the mind of the jury, I

15   can confront Mr. Su about areas of his testimony that don't

16   infringe on the Global Relay system and that's all we're

17   asking and, otherwise, what the suggestion would be is that

18   we're going to put off Mr. Su for multiple days.

19          THE COURT:  No, until tomorrow, I think.

20          MR. BRODSKY:  But tomorrow morning, Your Honor,

21   we'll all be well positioned to inform Your Honor in the

22   morning because we'll confirm with the government as to what

23   the potential options are for Your Honor tomorrow morning with

24   respect to Mr. Su's testimony, but there's no reason not to

25   continue with his direct and allow me to cross-examine for

4848

1    some short period of time before the end of the day and it

2    won't go into any of the problematic areas which is the one

3    problematic area of Global Relay.

4              And, respectfully, Your Honor, that is our desire,

5    that is our wish, and nothing prevents that from happening and

6    we feel like if Your Honor asked Mr. Su to step down and not

7    continue to testify, there are some consequences to that.

8              THE COURT:  I'm not asking him to do anything.  I'm

9    saying if his counsel is giving him advice to straighten this

10   out before he proceeds, and the government wants to, in light

11   of what has happened this afternoon before the lunch break to

12   try to retool its direct to avoid problem areas, I don't see

13   any prejudice whatsoever to Mr. Greebel because I'm not even

14   sure that your cross would start today anyway.

15             So, this overnight gap between the direct and cross

16   is really something that's unavoidable in any trial.  It

17   happens sometimes.  There is no case that says that this is

18   constitutionally infirmed.

19             I don't know how much more time you have,

20   Mr. Kessler, with this witness, but I feel like we have burned

21   up three hours on this issue that was just dropped on my lap

22   during the lunch, just before lunch.

23             MR. KESSLER:  Your Honor, the direct I had planned

24   is not much longer.  I mean, my primary concern is Mr. Burke

25   has spent only a few minutes with Mr. Su on one very discrete

4849

1    issue and Mr. Burke hasn't had the background of knowing what

2    the case is about so we would be putting the witness back on

3    the stand to continue testifying and then to be cross-examined

4    without having a chance to confer with his attorney about

5    whatever else he wanted, you know, it is that he wants to

6    confer about.  And, you know, I don't foresee my direct

7    implicating some other issue, but, you know, I can't be sure

8    of that and I'm certain Mr. Burke can't be sure of that.

9              THE COURT:  Well, Mr. Burke, do you have any issues

10   or difficulties with the proposal of Mr. Brodsky, that we

11   continue his direct with Mr. Brodsky's representation that

12   neither the government nor the defense will explore issues

13   about accessing Global Relay after December 21, 2012?

14             MR. BURKE:  No, Judge, I do not.  I'm thinking of

15   defense counsel's statement that, essentially, the only

16   federal laws they feel that were broken were accessing,

17   possible accessing of Global Relay's communication system and

18   if they're not going to ask about that, I don't see a reason

19   why Mr. Su cannot proceed with his testimony and that's up to

20   the Court as to the scheduling, Judge.  I have some scheduling

21   issues of my own.  I won't take them up now.

22             THE COURT:  This afternoon?

23             MR. BURKE:  No.  I'm here and we can talk about it

24   later.  Whatever you want to do, Judge.

25             MR. BRODSKY:  Just to be clear for Mr. Burke, I

4850

1   don't plan on going into Global Relay access this afternoon.
2   I won't touch it, but it's still an open issue with respect to
3   Your Honor what we do tomorrow.
4           MR. BURKE:  Sure, I understand.
5           THE COURT:  And there is a bank statement that we
6   know about from the prior trial which I think you had raised
7   as an issue potentially, the bank statement of Mr. Shkreli's
8   that Mr. Su has.
9           MR. BRODSKY:  I think Mr. Shkreli's counsel had
10  raised that issue at the last trial.  I'm not sure when I
11  raised it, Your Honor, but it is an issue we should discuss
12  but not -- we don't have to do it for this afternoon.
13          MR. KESSLER:  Your Honor, so there are some other
14  issues also which my colleagues have brought up.
15          First of all, there's the potential about striking
16  testimony as a remedy to how Mr. Su reacts or what the
17  ultimate decision is.  So we would be eliciting additional
18  testimony now that we wouldn't know if the defense would seek
19  to strike it.  So that's an additional concern with moving
20  forward now.
21          In addition, I take Mr. Brodsky at his word that he
22  doesn't intend to elicit any testimony on cross that doesn't
23  implicate something, but, you know, I don't understand the
24  interaction between Global Relay and the Schwab litigation
25  the employment litigation which is what Mr. Brodsky brought up

4851

1    and I don't think Mr. Burke does.

2         So, again, I am concerned that this is potentially

3    putting the witness in a risky situation that he would not be

4    in if we just continued tomorrow morning.

5         MR. BRODSKY:  Your Honor, this is the government --

6    with respect, Your Honor, the government called this witness.

7    They put him on for direct.  This is the order of the

8    witnesses and we are ready to proceed with cross-examination

9    after they finish.  We will not go into an area with Global

10   Relay.  His lawyer is here, who has time to be here has not

11   objected, and I think we should continue with the

12   cross-examination and let the government finish their direct

13   and we will proceed respectfully.

14        THE COURT:  Well, if the government proceeds in good

15   faith to avoid the problem areas, are you going to be moving

16   to strike testimony that's elicited today or are you not?

17        MR. BRODSKY:  If they go into, which is what I

18   expect they will do, the arbitration and the Schwab lawsuit

19   and things like that, I'm not moving to strike that.

20        I believe the only areas we would be moving to

21   strike, Your Honor, would be areas, and we have to look at the

22   law, but there are issues with respect to somebody taking the

23   Fifth Amendment and I haven't confronted this situation before

24   and our team has not confronted this situation before, but the

25   testimony that surrounds the Global Relay and his access is

4852

1    the area that I think we need to do research on to figure out

2    what are Your Honor's, what does Your Honor do with respect to

3    somebody who takes the Fifth Amendment in a particular area.

4              THE COURT:  I mean, I do think it raises an

5    interesting question.  I have not confronted it before but it

6    would be unfair to the defendant to allow that testimony to

7    stand unconfronted and whether or not this is testimony that

8    should be stricken.

9              You know, I guess my concern is if more testimony

10   comes out today and then there's an application to strike that

11   additional testimony, I do think that the defense really, it's

12   appropriate to put any party in a position to have to go

13   forward in order to have that application to strike that

14   testimony because we think it falls within a forbidden area.

15   I think it would be most prudent to have the parties try to

16   come to an understanding about what the parameters are, what

17   the remedies are if the defense cannot get a fulsome

18   cross-examination on issues because this witness is going to

19   take the Fifth and that we proceed in that manner rather than

20   have more testimony that ultimately there may be an

21   application to strike.

22             It just -- I think it is really a problem because

23   the jury is going to hear it and, yes, I would instruct them

24   appropriately if I agreed that it should be stricken but, you

25   know, I just think that this is an avoidable problem as we sit

4853

1    here right now, an avoidable problem that anything this

2    afternoon, if Mr. Su were to continue testifying, could be the

3    subject of an application to strike.  It is absolutely

4    avoidable and I just think it is foolhardy to proceed because

5    I understand that you may have a motion to strike some of this

6    morning's testimony but how much more, I don't know, and I do

7    not think you are willing to say in exchange for going

8    forward, we would not move to strike, and I would not ask you

9    to do that.

10                   (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    4854

1        MR. BRODSKY:  Your Honor, we may also -- we have to

2   look at the case law.  Somebody who takes the Fifth Amendment

3   in particular areas, they may have to take the Fifth in front

4   of the jury on those areas.  We may still have the right to

5   confront Mr. Su with respect to his access to Global Relay,

6   when he did it, how he did it.  And if he takes the Fifth to

7   that, he takes the Fifth to it.  But I do believe, Your Honor,

8   that that goes to the heart of his truthfulness and his

9   candor.

10       THE COURT:  If someone takes the Fifth, that is a

11  reflection on truthfulness?  That's extraordinary.

12       MR. BRODSKY:  Absolutely not.  I'm not saying that

13  at all, Your Honor.  I'm saying his testimony already, which I

14  believe is false, and I say that with all seriousness, when I

15  believe a witness has testified falsely about a particular

16  area that the Government has elicited and I don't believe -- I

17  believe based on the 3500 material that in Mr. Su's statements

18  to the FBI he has lied to them about his access to Global

19  Relay.  I believe that is -- the most important thing when it

20  comes to a witness' testimony is their veracity and their

21  honesty.  If he has lied about that, we should have the right

22  to confront him about that.  If he takes the Fifth, he takes

23  the Fifth.  There are inferences to be drawn from that.  We

24  can all argue about that in summation.

25       THE COURT:  So, if you wanted to come back tomorrow

Proceedings                                          4855

1   and continue your cross or start your cross, I'm going to need

2   to know before that starts whether or not I allow him to not

3   take the Fifth in front of the jury or whether I force him to

4   take the Fifth in front of the jury.  These are issues that

5   have to be aired.  I think that given my concern that we not

6   have a record that has already been made more complicated then

7   need be had motions been made in a timely way, that it would

8   be prudent to suspend Mr. Su's testimony, both the remainder

9   of the direct and the cross, until I have a handle on what the

10  defense is going to ask.  You don't know yet whether you are

11  going to ask him to take the Fifth in front of the jurors.

12  You don't legally whether it is appropriate.  I don't know

13  that either.  So that is something that we have to find out

14  about.

15          I will tell you that I do have to start a meeting

16  this afternoon with a court-related matter involving our CJRA

17  panel at six o'clock and I'm not going to be available to

18  spend wee hours of the morning researching.  It seems to me it

19  would be prudent to suspend Mr. Su for now and to have him

20  come back when the parties have had a full opportunity to

21  submit their legal submissions to me as to what they

22  anticipate happening, because you know best, the Government

23  and Mr. Brodsky know best where this is to lead.  I'm the most

24  in the dark, okay, on that because nobody wants to share with

25  one another, and certainly nobody is sharing with the Court.

Proceedings                                      4856

1   So I would like to be fully informed on the law and the plan

2   to proceed.

3           MR. DUBIN:  We understand Your Honor's ruling.  I

4   want to make sure that the record is clear on one thing,

5   because it very well might be that once we do the research

6   further tonight or right now as soon as we are done speaking

7   to Your Honor that we may well be asking relief from the Court

8   if he takes the Fifth that the entirety of his testimony might

9   have to be, in our view, struck.  I want to make sure that the

10  record is clear that we are not waiving that.

11          Would it help the Court if we came in early tomorrow

12  so that we could discuss this and not have Your Honor up late?

13          THE COURT:  No.  I will read it.  I will be up late

14  or up early reading this.  I am just saying I'm not sure I am

15  really going to be in a position to understand fully -- you

16  better lay it all out.

17          MR. DUBIN:  We will, Your Honor.  We intend to.

18          THE COURT:  I ask for things to be laid out and they

19  are not always laid out to my satisfaction.

20          MR. DUBIN:  We understand the seriousness of this as

21  well, indeed.

22          Would you like us to come in an hour early tomorrow,

23  so we don't keep the jury waiting in the morning?

24          THE COURT:  Sure.  I will be here at 8 o'clock.

25          MR. BURKE:  Your Honor, forgive me for putting more

Proceedings                          4857

1   things on your plate.  I have a discreet sentencing issue for

2   tomorrow.  I have a sentence in this building at 10 o'clock.

3   I don't anticipate it being a lengthy affair.  I'm available.

4   I can come in early, whatever you want to do.

5            THE COURT:  If 8 o'clock is fine with everybody, I'm

6   happy to come in at 8 o'clock.

7            MR. BURKE:  Sure.

8            THE COURT:  And all of you ought to be talking to

9   each other tonight, including Mr. Burke.  You have his phone

10  number.  Please communicate so everyone is on the same page

11  about what is anticipated and what the possible bumps in the

12  road would be.

13           MR. BURKE:  So the Court understands, I have a very

14  limited position here.  I think it is up to the Court if he is

15  taking the Fifth outside the presence of the jury, in front of

16  the jury.  He is a witness.  I'm his lawyer.  If he is asked

17  questions in a discreet area, he takes the Fifth, everything

18  else is not really in my ballpark.

19           THE COURT:  That's fine.  I am not asking you to

20  submit any briefs to me.  I do think you should be fully

21  aware --

22           MR. BURKE:  Sure.

23           THE COURT:  -- that questions may come up that you

24  may need to advise your client.

25           MR. BURKE:  I can be here tomorrow, whatever you

Proceedings                                          4858

1   need.

2           THE COURT:  Do you have access to our docket?  Maybe

3   we can give you access.

4           MS. SMITH:  We can also forward them.

5           MR. DUBIN:  I spoke too soon.  I apologize.  My

6   client advises it is physically impossible for him to be here

7   at 8 o'clock, so we will have to start at 9:00.  I apologize,

8   I got ahead of myself.  My fault.

9           THE COURT:  All right.  We are going to inform them

10  on Friday of scheduling and Wednesday we have a juror who

11  needs to leave at 4:30 and I also told Mr. Greebel he could

12  leave at whatever time is necessary on Friday.  We do need to

13  inform the jury.  Maybe you can give me an idea about Friday

14  what time of Mr. Greebel needs to leave.

15          MR. BRODSKY:  Yes, Your Honor.

16          THE COURT:  So 8 o'clock is off the table

17  completely?

18          MR. BRODSKY:  It takes our client about two hours,

19  Your Honor, so depending on the subway system to arrive.  He

20  has three young children.  It is a challenge.

21          THE COURT:  Okay.  I guess I will have to tell the

22  jury they don't have to come in at 9 o'clock tomorrow.

23          MR. BRODSKY:  Your Honor, may I make this

24  application, which is that -- and I understand Your Honor's

25  ruling with respect to not going forward with Mr. Su, normally

Proceedings                                                4859

1   we would be in a situation where Mr. Su would be on

2   cross-examination and he wouldn't be meeting with the

3   Government tonight and meeting with the Government after court

4   today to go over areas that he has already testified to, so my

5   request is that since the Government has requested this delay,

6   the Government should not be meeting with Mr. Su tonight to go

7   over areas of testimony that he will be testifying to, either

8   that he has already testified to or the areas of testimony

9   that he will be asked to testify about tomorrow.

10              THE COURT:  Is the Government going to respond to

11  the request?

12              MR. KESSLER:  We are certainly not going to go back

13  over things that have nothing to do with this Global Relay

14  issue, but frankly I don't know how we can all make an

15  informed decision without conferring with Mr. Burke and

16  potentially the witness about these specific issues.

17              MR. BRODSKY:  I think they can confer with Mr.

18  Burke, but I don't think they should be allowed to confer with

19  Mr. Su and prepare him for testimony tomorrow morning.  This

20  is their request.  He would be on cross-examination this

21  afternoon.  He has testified this morning.  We should be

22  allowed to have that as a record that we can use.

23              THE COURT:  So you don't want the Government to make

24  sure that they don't ask questions -- I mean, the only way

25  they can find out about particular questions that they might

MDL   RPR

Proceedings                                    4860

1   want to re-tool or recast would be to confer with I guess the

2   defense and with Mr. Burke, and if there are certain things

3   that Mr. Su should not say to trigger some claim of, I don't

4   know what to expect, but I am a little concerned with that

5   request.

6           MR. BRODSKY:  Mr. Su can't go into areas, as I

7   understand it, with the government sitting in a room somewhere

8   tonight that are potentially -- could incriminate him.  And

9   his lawyer would never allow him to do that.  So I think the

10  only way they can probe which areas they're not allowed to

11  probe related to Global Relay is talking through their lawyer,

12  because if they are sitting in a room with an FBI agent and

13  the prosecutors and he's talking about what he did with Global

14  Relay and what else he did, or any other areas that implicate

15  his Fifth Amendment rights, he won't be able to do that.

16          THE COURT:  I thought the parties just said they

17  weren't going to go into that.  Is that not the case?  Why

18  would they meet with him if he is going to take the Fifth?

19          MR. BRODSKY:  If they are going to meet with him on

20  other areas where he's not going to take the Fifth, then that

21  is what I'm asking for.  There is no reason --

22          THE COURT:  Were you going to meet with Mr. Su

23  tonight?

24          MR. KESSLER:  Certainly not before this came up and

25  certainly not about areas that we don't think implicate any of

Proceedings                                        4861

1   this.  But based on Mr. Brodsky's proffers, I'm not sure which

2   areas necessarily implicate this.

3              MR. BRODSKY:  They have to get through his lawyer.

4   They can give the direct to his lawyer and his lawyer could

5   talk to Mr. Su.  They have already sat in a room with Mr. Su

6   and prepared him for his direct and he knows exactly where

7   they are going.  So they could talk to Mr. Su's lawyer, give

8   him the same information, and Mr. Su can review that with his

9   lawyer.  But, respectfully, that gives the Government, Your

10  Honor, a benefit from a delay that we are not seeking and it

11  is at the Government's request.

12             THE COURT:  So you are saying that if a witness is

13  on direct and if a lawyer who's presenting the direct wanted

14  to speak to the witness that he or she is presenting, that

15  that would not be acceptable?

16             MR. BRODSKY:  I'm saying they can speak to Mr. Su's

17  lawyer in this unusual circumstance, but because we normally

18  would be on cross-examination this afternoon but for the

19  Government's request of a delay, which Your Honor has ruled on

20  it, then the Government should not be able to meet with Mr. Su

21  tonight to go over areas that they're going to ask him about

22  tomorrow.

23             MR. KESSLER:  I'm just not sure what the basis for

24  that request is.  In addition, my sense is that this

25  adjournment of Mr. Su's testimony is based on concerns not

Proceedings                                    4862

1    that the Government has raised but certainly that the Court

2    shares and to try to get to the right answer and to try to do

3    the right things.

4          We certainly have no intention of going back over

5    things that were testified to or altering portions of direct

6    that have nothing to do with any of this, but we want to make

7    sure we are being careful.

8          THE COURT:  All right.

9          MR. BRODSKY:  I do think, Your Honor, if they meet

10   with him tonight, I should be allowed to go into exactly what

11   they met with him about and exactly what they discussed and we

12   should get a report of notes from the FBI agent who attends to

13   learn exactly what was discussed because it is certainly an

14   area that I will go into on cross in connection with this

15   delay.

16         MR. KESSLER:  They are certainly entitled to

17   whatever 3500 material, and other related disclosures we have,

18   of course.

19         THE COURT:  Are you going to be meeting with Mr. Su

20   and his counsel tonight?

21         MR. KESSLER:  We have to talk about it and then talk

22   to Mr. Su, I mean.

23         THE COURT:  All right.  Certainly to the extent Mr.

24   Su makes statements that could be either going to his bias,

25   his credibility or would tend to exculpate Mr. Greebel, you

MDL   RPR

1  have to give that information to counsel whether or not any

2  agent or any prosecutor writes it down.

3          MR. KESSLER:  Understood.

4          THE COURT:  Okay.

5          MR. BRODSKY:  We would ask, Your Honor, that under

6  Giglio it would be anything inconsistent or anything new.

7          THE COURT:  Well, I'm sure the Government is aware

8  of its obligations, you need to give fulsome disclosure to the

9  defense if you do meet with Mr. Su and his lawyer tonight.

10         MR. KESSLER:  I understand.

11         THE COURT:  I think we should then call another

12 witness, if there is another one, and I will explain to the

13 jury that we are going to take a temporary break of Mr. Su and

14 we will hear from another witness at this time.

15         Now, is this witness going to finish today?

16         MR. KESSLER:  I certainly expect so.  Certainly the

17 direct.  Defense counsel and I have had several conversations

18 about exhibits.  There are a number of bills that are going to

19 be admitted through this witness.  We have already talked

20 about them.  We have agreed on redactions.

21         THE COURT:  Thank you.

22         MR. BURKE:  Judge, I am going to speak to Mr. Su and

23 tell him to stick around.

24         THE COURT:  All right.  Maybe you would like to talk

25 to him further, because he has testified before.

Proceedings                                              4864

1          Is there any objection to giving Mr. Burke a prior

2    transcript?

3          MS. SMITH:  No, I can give him the 3500.

4          THE COURT:  And the 3500 material.  You ought to

5    look at that and maybe go over with your client and see if

6    there are other problem areas.

7          (Jury enters the courtroom.)

8          THE COURT:  We have all jurors present.  We will

9    wait until all counsel and Mr. Greebel are present.

10         In the meantime, I want to thank the jury for their

11   patience and their attention.

12         Mr. Greebel and Mr. Brodsky are back.  All jurors

13   are present.  I'm thanking the jurors for their ongoing

14   patience and attention.

15         Sometimes matters arise unexpectedly during the

16   course of a trial which require attention.  At this time, we

17   are going to temporarily interrupt Mr. Su's testimony and the

18   Government is going to call another witness.

19         If you are prepared to do that, Mr. Kessler, we will

20   hear from your witness.

21         MR. KESSLER:  So the Government will call Kris

22   Marsilio and her attorney went to get her.

23         THE COURT:  Hello, good afternoon.  Please come on

24   up to the witness stand.

25         THE COURTROOM DEPUTY:  Raise your right hand.

1          (Witness sworn.)

2          THE COURTROOM DEPUTY:  State and spell your name.

3          THE WITNESS:  Kristine Marsilo, K-R-I-S-T-I-N-E,

4   M-A-R-S-I-L-I-O.

5          THE COURT:  Thank you.  Please proceed.

6          MR. KESSLER:  Thank you.

7   **KRISTINE MARSILIO**,

8        called by the Government, having been duly

9        sworn, was examined and testified as follows:

10  DIRECT EXAMINATION

11  BY MR. KESSLER:

12  Q    Good afternoon, Ms. Marsilo.  Where do you work?

13  A    I work at Katten.

14  Q    Katten, the law firm?

15  A    Yes.

16  Q    What is your responsibility at Katten?

17  A    I'm the manager of the financial accounting system.

18  Q    What is the financial accounting system?

19  A    The financial accounting system is the system that stores

20  all of the data for the billing and the finance associated

21  with clients and matters of our firm.

22  Q    How long have you held your current position?

23  A    I've been at Katten for 22 years.  My current position,

24  probably 20 of those 22 years.

25  Q    You mentioned the billing system.  Is the Katten billing

Marsilio - direct - Kessler                4866

1   system organized by client?

2   A    Yes.

3   Q    And then associated with each client, are there a number

4   of matters?

5   A    Yes.

6   Q    And those are different cases related to the same client

7   that the firm has been engaged to work on?

8   A    Yes.

9   Q    How is a new client added to the financial system?

10  A    A new client, normally it goes through a conflict search,

11  which is a system separate from our accounting system, and it

12  goes through the process of conflict searches, pertinent

13  information associated with the client, and after it clears

14  conflicts, that information gets passed to the accounting

15  system.

16  Q    All right.  Now, how does an attorney keep track of the

17  work that he or she does for a specific client on a particular

18  matter?

19  A    They are required to record the time that they work on a

20  matter in a third-party system that is not part of the

21  accounting system to record their daily time entries

22  associated with the clients' matters.

23  Q    What is the name of that system?

24  A    Carpe Diem.

25  Q    And from time to time is an invoice generated for a

Marsilio - direct - Kessler                4867

1    particular client?

2    A    An invoice would be generated for a client after an

3    attorney has reviewed what we internally call a pre- bill,

4    where they could review the charges that have been associated

5    with their client and matter in which they're responsible for.

6    Q    Okay.  And is the information in that pre-bill taken from

7    the time-keeping system?

8    A    It comes from the time-keeping system into the accounting

9    system.  The pre-bill is from the accounting system.

10   Q    Got it.

11        And in between the time that a pre-bill is generated

12   and an invoice is actually sent to a client, does someone

13   review the pre-bill?

14   A    The attorney responsible for billing the matter.

15   Q    So there is an attorney responsible for billing for each

16   matter?

17   A    Yes.

18   Q    And that attorney reviews the pre-bill?

19   A    Yes.

20   Q    Can that attorney edit the pre-bill?

21   A    They can make adjustments if time was incorrectly billed

22   or if a narrative needed to be adjusted.

23   Q    When you refer to a narrative, what do you mean?

24   A    The description of work that was entered associated with

25   the date.

Marsilio - direct - Kessler                    4868

1    Q    Okay.  So now I want to take you through some specific

2    documents related to particular Katten clients.  Between 2012

3    and 2014, was Retrophin a Katten client?

4    A    Yes.

5    Q    All right.  And are there multiple matters for Retrophin

6    in the Katten systems?

7    A    Yes.

8    Q    So you have in front of you several binders, one of them,

9    not the biggest one but the second biggest one in front of

10   you.  Do you see that?  Yes, that one.

11              I believe if you look behind tab one of that binder,

12   you will have a series of documents that are labeled Exhibit

13   125-1-A, 125-1-B, and so forth.  Do you see that?

14   A    Yes.

15   Q    Are these all documents related to starting new matters

16   for the Retrophin or MSMB clients at Katten?

17   A    Yes.

18              MR. KESSLER:  Your Honor, I offer Government Exhibit

19   125-1-A through Government Exhibit 125-1-CC.  So it is A

20   through Z, then AA, double B, double C.

21              THE COURT:  Any objection?

22              MS. DENERSTEIN:  One minute, Your Honor.

23              No objection.

24              THE COURT:  We will receive Government Exhibits

25   125-1A through 125-1-CC.

Marsilio - direct - Kessler                    4869

1          (Government's Exhibits 125-1-A through 125-1-CC

2     received in evidence.)

3     Q    Ms. Marsilo, in the middle of this set of documents that

4     you have there is a document labeled Government Exhibit

5     125-1-J, and it is maybe a third of the way through that first

6     tab in your binder.  It's also going to be in the screen in

7     front of you.  If we can zoom in.  Right there.

8               So is this a list of the first 11 matters that were

9     opened under the Retrophin client ID?

10    A    Yes.

11    Q    And on the left-hand side of the screen, there's a

12    heading that says "request information" and then you see the

13    client name is Retrophin, Inc.  Do you see that?

14    A    Yes.

15    Q    Okay.  Can you just read the names of the 11 matters that

16    are listed in this system?

17    A    License agreement, Project Candlestick, Pierotti

18    litigation, general representation, Project Tortoise, QCOR,

19    public offering, Manchester Acquisition, note offering, senior

20    financing, Schwab.

21    Q    The next column in this chart says principal attorney.

22    Do you see that?

23    A    Yes.

24    Q    What does that mean?

25    A    The definition of principal attorney is the attorney that

Marsilio - direct - Kessler                    4870

1  originated the business.

2  Q    Is this also the attorney who is responsible for

3  reviewing the pre-bill?

4  A    Yes.

5  Q    And who is the attorney listed for each of those 11

6  matters?

7  A    Evan Greebel.

8  Q    Now, for each of these matters 00001 through 00011, are

9  there associated opening or matter opening documents?

10  A    The first exhibit that you had me go through, that's

11  where they are located.

12  Q    Got it.  I want to talk about a couple of examples.  If

13  you see matter 0002, it is called Project Candlestick.

14  A    Yes.

15  Q    If you turn in this first exhibit to the Government

16  Exhibit 125-1-T, as in Thomas, it's a couple of pages forward.

17  We will also put that up on the screen.

18         So is this the new client matter form for that

19  Project Candlestick matter?

20  A    Yes.

21         (Continued on next page.)

22

23

24

25

1    (Continuing)

2    Q    And what's the description of the matter?

3    A    Merger with Telik, Inc.

4    Q    And who is the requesting attorney listed on this form?

5    A    Evan Greebel.

6              MR. KESSLER:  All right.  If you go forward to

7    Government's Exhibit 125-1-W, also put that up on the screen.

8              (Exhibit published to jury.)

9              MR. KESSLER:  We zoom in here.

10   BY MR. KESSLER:

11   Q    So this is the -- some of that information for the

12   Pierotti litigation matter.

13             Do you see that?

14   A    Yes.

15   Q    Okay.  And who are the parties listed for the Pierotti

16   litigation?

17   A    The client, Retrophin, and Tim Pierotti, an individual.

18   Adverse.

19             MR. KESSLER:  And finally, let's go ahead to

20   Exhibit 125-1-X, which we will also put up on the screen.

21             (Exhibit published to jury.)

22   Q    Is this the -- some of the opening information related to

23   general representation matter number?

24   A    Yes.

25   Q    And then if you see in the middle of the page, on the

1    right-hand side, there is some information under client

2    information with alias type.

3             Do you see those words?

4    A    Yes.

5    Q    So does this show that the Retrophin, Inc. client was

6    formerly known as Retrophin LLC and Desert Gateway, Inc.?

7    A    Yes.

8    Q    Now, these are all documents related to the Retrophin

9    client.

10            MR. KESSLER:  I'd now like you to look at

11   Government's Exhibit 125-2 for identification.

12   Q    And that is the second tab in your big binder, in the

13   binder that's in front of you.

14            Is this a list of matters for the client

15   MSMB Capital Management LLC?

16   A    Yes.

17   Q    Did you actually create this list?

18   A    I created the list.

19            THE COURT:  I am sorry.  Did you intend to move

20   125-1-X into evidence?

21            MR. KESSLER:  I believe -- I'm sorry, Your Honor.  I

22   thought I had already moved 125-1-A through double C.

23            THE COURT:  You are correct, I am so sorry.

24            MR. KESSLER:  So at this point I offer Government's

25   Exhibit 125-2.

1          MS. DENERSTEIN:  Your Honor, I believe it was

2     already in evidence early on.

3          THE COURT:  Well, somebody can verify that and

4     125-2, Ms. Jackson?

5          THE COURTROOM DEPUTY:  I am looking.

6          (Pause in the proceedings.)

7          THE COURTROOM DEPUTY:  I don't have that exhibit.

8          THE COURT:  She does not show it being admitted.

9          MS. DENERSTEIN:  We have no objection.

10          THE COURT:  All right.  We will admit Government's

11     Exhibits 125-2 in evidence.

12          (Government's Exhibit 125-2 received in evidence.)

13          (Exhibit published to jury.)

14     BY MR. KESSLER:

15     Q    All right.  So, Ms. Marsilio, this is a list of eight

16     different matters for the client MSMB Capital Management LLC?

17     A    Yes.

18     Q    Is that a different client in the Katten system from

19     Retrophin, Inc., which is the client we were just looking at?

20     A    It's a different client.

21     Q    Okay.  I'm sorry if I've asked this already.  But how

22     many matters are there for MSMB Capital Management LLC?

23     A    Eight.

24     Q    All right.  And who is the principal attorney listed for

25     each of the eight matters?

1    A    Bernadette Davida.

2    Q    Is there any record in the Katten financial system that

3    Martin Shkreli was ever a client of Katten?

4              MS. DENERSTEIN:  Objection.

5              THE COURT:  Overruled.

6    A    The only record is a billing contact associated with both

7    MSMB and Retrophin.  We have no record of a client.

8    Q    And what's a billing contact?

9    A    It would be your attention associated with a billing

10   address --

11   Q    The person you --

12   A    -- the bill went to.

13   Q    The person you address to.

14             I'm sorry.

15   A    Yes.

16   Q    All right.

17             So let's move to a different subject.

18             When there's a new matter commenced at Katten, are

19   there sometimes engagement letters signed between the client

20   and Katten?

21   A    Engagement letters usually are with the first matter

22   that's opened for a client, unless a different engagement

23   would be needed as additional matters get opened.

24             MR. KESSLER:  Okay.  So if you take a look at tabs

25   3, 4, 5, 6, and 7 in your binder, Government Exhibits 120-1

Marsilio - direct - Kessler                4875

1   through 120-5.

2   Q    Just let me know if these are engagement letters related

3   to MSMB Capital Management or to Retrophin.

4   A    Tabs 3, 4 and 5 related to MSMB.

5   Q    So that's Government's Exhibits 120-1, 120-2 and 120-3?

6   A    Yes.

7   Q    And then are the next two related to Retrophin?

8   A    Yes.

9   Q    Okay.

10          MR. KESSLER:  So I offer Government's Exhibits 120-1

11  through 120-5.

12          MS. DENERSTEIN:  Your Honor, the Government has no

13  objection -- I'm sorry, the defense has no objection.

14          THE COURT:  All right.  We will receive Government's

15  Exhibits 120-1 through 120-5.

16          (Government's Exhibits 120-1 through 120-5 received

17  in evidence.)

18          MR. KESSLER:  So let's just take a look at 120-4 for

19  a minute.  That's binder tab 6, Ms. Marsilio.

20          (Exhibit published to jury.)

21  BY MR. KESSLER:

22  Q    Is this a January 13th, 2012, letter related to an

23  engagement with Retrophin LLC?

24  A    Yes.

25  Q    And who signed this letter?

1  A    Evan Greebel.

2  Q    And who's the letter directed to?  Who's attention is it

3  directed to?

4  A    Martin.

5  Q    If you look above the Dear Martin, what is the full name

6  there?

7  A    I don't know how to pronounce the last name.

8  Q    S-H-K --

9  A    R-E-L-I.

10 Q    Martin Shkreli?

11 A    Yes.

12 Q    All right.

13        And then is there a set of terms of engagement

14 attached to this letter starting on the third page of the

15 document?

16 A    Yes.

17 Q    Okay.  And could you just read the sentence that's in

18 bold in this first paragraph.

19 A    Individuals or entities that are related to or affiliated

20 with you, such as partners, officers, directors, stockholders,

21 parent companies, related companies, or family members, are

22 not clients, unless we otherwise agree in writing.

23 Q    All right.

24        MR. KESSLER:  So you can take that down, Ms. Balbin

25 and we will move on to the next topic.

1   Q    Ms. Marsilio, you have some other large binders in front

2   of you.  One of them contains Government's Exhibits 801 to

3   822.  And I believe it's labeled Katten bills-MSMB.

4          Then you have a second binder starting with

5   Exhibit 826.  It's an even larger binder.

6   A    Yes.

7   Q    So just take a look at -- let me know, if -- it's in that

8   smaller binder with Government's Exhibits 801 to Government's

9   Exhibit 822 -- contains the bills in the Katten system related

10  to the MSMB Capital Management client.

11  A    Yes.

12         MR. KESSLER:  I offer Government's Exhibits 801

13  to 822.

14         MS. DENERSTEIN:  Your Honor, may I have one moment

15  to confer?

16         THE COURT:  Yes.

17         (Pause in the proceedings.)

18         MR. KESSLER:  So, Your Honor, my understanding is

19  that subject to the addition of a few cover sheets, which are

20  not on the versions of the Government's exhibit that the

21  defense has, there is no objection to their admission.

22         MS. DENERSTEIN:  Correct, Your Honor.

23         THE COURT:  All right.

24         We will admit Government's Exhibits 801 through 822

25  subject to additional cover sheets on concern of the exhibits.

Marsilio - direct - Kessler                    4878

1          MR. KESSLER:  And we have no objection to that.

2          THE COURT:  Okay.

3          (Government's Exhibits 801 through 822 received in

4    evidence.)

5    BY MR. KESSLER:

6    Q    And then, Ms. Marsilio, to make this efficient, the other

7    even larger binder in front of you contains Government's

8    Exhibits 826 through 850, and then a series of exhibits above

9    850 that have a dash A after them.  So, that's Government's

10   Exhibits 851-A, 852-A, 853-A, 854-A, 855-A, 856-A, 857-A, 858

11   no A, 859-A and 860 with no A.

12         Can you just confirm that these are the Retrophin

13   bills from the Katten system.

14         MR. KESSLER:  Or let me put it this way.  I believe

15   there is no objection, Your Honor, that these are the

16   Retrophin bills from the Katten system.

17         MS. DENERSTEIN:  One moment, Your Honor.

18         (Pause in the proceedings.)

19         MR. KESSLER:  So Your Honor, I believe there's no

20   objection to admitting the specific documents that I just read

21   as the Retrophin bills.  So it's Government's Exhibits 826

22   through 850, and then the 851-A, 852-A, 853-A, 854-A, 855-A,

23   856-A, 857-A, 858, 859-A and 860.

24         THE COURT:  All right.  We will admit Government's

25   Exhibits 826 through 850, and the listed exhibits read by

VB        OCR        CRR

Marsilio - direct - Kessler                4879

1    Mr. Kessler letter twice into the record.

2          MR. KESSLER:  Thank you.

3          (Government's Exhibits 826 through 850, and then the

4    851-A, 852-A, 853-A, 854-A, 855-A, 856-A, 857-A, 858, 859-A

5    and 860 received in evidence.)

6          MR. KESSLER:  And so the record is clear, the dash A

7    exhibits contain a few redactions that the Government and the

8    defense have agreed on.

9          THE COURT:  All right.  Thank you.

10   BY MR. KESSLER:

11   Q    All right.  So Ms. Marsilio, I just want to look at one

12   example bill.

13         MR. KESSLER:  If we can go to Government's

14   Exhibit 848, and that is behind tab 48 in your giant binder,

15   and we will also put it up on the screen.

16         (Exhibit published to jury.)

17   Q    So we have the first page of Government's Exhibit 848 up

18   on the screen.

19         Is this a December 16th, 2013, cover letter from

20   Mr. Greebel attaching invoices related to various matters?

21   A    Yes.

22   Q    And they are invoices for services rendered through

23   November 30th, 2013; is that correct?

24   A    Yes.

25   Q    And then without reading every sentence, is it fair to

Marsilio - direct - Kessler                          4880

1   say that there are sentences listing the matters as well as

2   what the current charges and outstanding balances are?

3   A    Yes.

4   Q    All right.  So what is the aggregate amount owed,

5   according to this letter, by Retrophin on November 30th, 2013?

6   A    For the matters listed, 876,257.35.

7   Q    Dollars?

8   A    Dollars.

9   Q    And then if we turn the page, there are a series, as we

10  said, of invoices related to specific matters; is that

11  correct?

12  A    Yes.

13  Q    So here we're looking at the first page of one invoice

14  for the license agreement matter; is that correct?

15  A    Yes.

16  Q    And then what's the total for this particular invoice for

17  the license matter?

18  A    Including the outstanding?

19  Q    We will do both.  So first the current bill.

20  A    The current is $50,693.15.

21  Q    And then is there an unpaid balance as well for that

22  matter?

23  A    Yes.

24  Q    What is that?  What amount is that?

25  A    $70,483.73.

Marsilio - direct - Kessler                 4881

1    Q    What's the total balance due just for this particular

2    matter?

3    A    $121,176.88.

4    Q    Is it fair to say there's a cover sheet similar to this

5    one for each of the invoices in these exhibits?

6    A    Yes.

7    Q    Okay.

8              MR. KESSLER:  So now if we go to the second --

9    sorry, third page, of Government's Exhibit 848, okay?

10   Q    Is this the detail of professional services being billed

11   within that particular invoice?

12   A    Yes.

13   Q    Okay.  So the first column here says date.

14             Is that the date whatever work is being described

15   was done?

16   A    Yes.

17   Q    And there's attorney or assistant.

18             Do you see that?

19   A    Yes.

20   Q    Is that the attorney or the assistant who was doing the

21   work that's listed?

22   A    Yes.

23   Q    Then there's a description.

24             Does the field for each of these entries contain a

25   description of the work being done for that particular entry?

Marsilio - direct - Kessler                    4882

1    A    Yes.

2    Q    Is that text written by the attorney who's doing the

3    work?

4    A    Yes.

5    Q    And then the last column is hours.

6              Do you see that?

7    A    Yes.

8    Q    And does hours refer to the amount of time spent doing

9    whatever particular task is being described?

10   A    Yes.

11   Q    And just in this first entry here on November 1st, 2013,

12   for Evan Greebel.  The hours listed are 1.4.

13             Do you see that?

14   A    Yes.

15   Q    What does the .4 mean?

16   A    One hour and it's six-minute increments.  So 24 minutes,

17   so 1.4.

18   Q    Okay.  So the number after the point is multiplied by six

19   and you get the total number of extra minutes; is that right?

20   A    Yes.

21   Q    So this is one hour and 24 minutes?

22   A    Yes.

23   Q    If we turn the page.

24             MR. KESSLER:  You can go to the next page.

25             THE COURT:  Let's just read these numbers.

VB        OCR        CRR

1    Page R-048736.

2              MR. KESSLER:  Yes.  And now we are looking at the

3    page ending 737.

4    Q    Is this page just a summary of the hours worked for each

5    of the attorneys who billed time to this matter in this

6    period?

7    A    On that invoice, yes.

8    Q    There's a column for rate.

9              Do you see that?

10   A    Yes.

11   Q    What does that column mean?

12   A    That's the rate assigned to that timekeeper for that

13   specific client matter.  And then it would be hours times

14   rate.

15   Q    So if we look at the third entry for Evan Greebel.  Does

16   this show that green Greebel billed 42.7 hours to the license

17   agreement matter during this invoice period?

18   A    Yes.

19   Q    What was his rate?

20   A    $675.

21   Q    To be clear, that's the rate that's being billed to the

22   client; correct?

23   A    Yes.

24             MR. KESSLER:  Now, if we go to the next page, ending

25   738.  There's a series of disbursements.

1   Q    Do you see that?

2   A    Yes.

3   Q    Are these payments made to vendors or for food or copying

4   or mailing or other charges like that?

5   A    Yes.

6   Q    Okay.

7            MR. KESSLER:  If we go to the next page.

8   Q    Is this the final page of an invoice for a particular

9   matter?

10  A    Yes.

11  Q    All right.  And so on this invoice, the attorney listed

12  is Evan Greebel; is that right?

13  A    Yes.

14  Q    The client is Retrophin?

15  A    Yes.

16  Q    The matter is license agreement?

17  A    Yes.

18  Q    And then there's a summary of the balance due?

19  A    Yes.

20  Q    All right.

21           And just to be clear, are all the bills formatted in

22  this same general way?

23  A    The bills for Evan that he prepared or in general?

24  Q    These general invoices that are generated for each matter

25  each month -- sorry.

                    Marsilio - direct - Kessler              4885

1            Let me ask a different question.

2            Rather than going through every single invoice in

3    this binder, are they all going to have a similar setup?

4    A    Yes.

5    Q    All right.

6            Now, I want to look at a couple more bills.

7            MR. KESSLER:  If we go to Government's Exhibit 836,

8    we will just put it up on the screen.

9            (Exhibit published to jury.)

10   BY MR. KESSLER:

11   Q    This is a bill for services rendered through

12   November 30th, 2012.

13           Do you see that?

14   A    Yes.

15   Q    Related to the Project Candle Stick matter.

16   A    Yes.

17   Q    Okay.  If we go to the next page, keep going one more

18   page.

19           So this is the page ending in Bates Stamp 471.

20           Do you see that?

21   A    Yes.

22   Q    Did Mr. Greebel bill any time in November 2012 for this

23   matter?

24   A    No.

25           MR. KESSLER:  All right.  If we could now to

                    VB      OCR      CRR

Marsilio - direct - Kessler                4886

1   Government's Exhibit 837.

2   Q    So this is a bill for services rendered through

3   December 31st, 2012?

4        Do you see that?

5   A    Yes.

6   Q    For license agreements?

7   A    Yes.

8        MR. KESSLER:  All right.  If we go to the next page

9   ending in Bates Stamp 476.

10  Q    Do you see that?

11  A    Yes.

12  Q    Did Mr. Greebel bill any time in December 2012 to this

13  matter?

14  A    No.

15        THE COURT:  Can you identify what this matter is,

16  please.

17        MR. KESSLER:  Sure.

18  Q    So, Ms. Marsilio, does this say matter 00001 license

19  agreements?

20  A    Yes.

21        MR. KESSLER:  Okay.  And then if we go to

22  Government's Exhibit 838.

23  Q    Does this reflect Project Candle Stick invoices for

24  services rendered through January 31st, 2013?

25  A    Yes.

VB        OCR        CRR

1          MR. KESSLER:  Go to the second page of this

2    document.

3    Q    Did Mr. Greebel bill any time to this matter, the Project

4    Candle Stick matter, in the January 2013 time frame?

5    A    No.

6    Q    Okay.  All right.  I now want to switch topics.

7          Are you familiar with the phrases working timekeeper

8    and principal timekeeper?

9    A    Yes.

10   Q    Okay.  What do those mean?

11   A    Working timekeeper is the actual time worked on a matter

12   by an individual attorney, regardless of who is responsible

13   for that matter, or any matters that they work on.

14          A principal attorney is who originates the business.

15   And they don't necessarily work on -- have to work on their

16   matters, but they're responsible for those matters.

17   Q    And does the billing system generate a report for

18   principal timekeeper listing all of the hours billed on the

19   matter for which that attorney is the principal timekeeper?

20   A    Yes.

21          MR. KESSLER:  Okay.  So take a look in your binder

22   behind tab 8 and tab 9.  There's Government's Exhibits 122-1

23   through Government's Exhibit 122-6, and then Government's

24   Exhibits 123-1 to Government's Exhibit 123-6.

25          I will come show you.

Side-Bar                                        4888

1          May I approach, Your Honor.

2          THE COURT:  Yes.

3          (Pause in the proceedings.)

4          THE WITNESS:  Thank you.

5    BY MR. KESSLER:

6    Q    So are Government's Exhibits 122-1 through 122-6 the

7    principal timekeeper records for Evan Greebel for the period

8    from February 2010 to January 2016?

9    A    Yes.

10   Q    Okay.  And then are Government's Exhibits 123-1 to 123-6

11   the working timekeeper reports for those same time periods?

12   A    Yes.

13          MR. KESSLER:  I offer Government's Exhibits 122-1

14   through Government's Exhibit 122-6, and Government's

15   Exhibits 123-1 to 123-6.

16          MS. DENERSTEIN:  Your Honor, we object to some of

17   the exhibits and may I approach, please.

18          THE COURT:  Yes.

19          Do I need to bring the binder with me?

20          MS. DENERSTEIN:  Yes, Your Honor.

21          (Side-bar conference held on the record out of the

22   hearing of the jury.)

23

24          (Side-bar.)

25          MS. DENERSTEIN:  Your Honor, respectfully,

Side-Bar                                    4889

1   Exhibit 122-1 is from the time period February 2010 to

2   January 2011.  That is outside of the time frame and of the

3   charges.

4          And number two, there are exhibits, and I will refer

5   to the number the momentarily for Your Honor, that state that

6   there has been a write-off of Retrophin's bill, and the amount

7   is in excess of $3.7 million.  That write-off happens outside

8   of the time frame of the conspiracy, and is extremely

9   prejudicial, because under 401, 403, because it makes it

10  appear as if Mr. Greebel has done something wrong and we're

11  getting into, again, the trial within the trial about the

12  whole idea that if Katten -- if Retrophin didn't pay the bill,

13  that means that Mr. Greebel did something wrong when, as the

14  Government knows, there is a whole other negotiation between

15  Katten and Retrophin that is not relevant to these charges.

16         So I think it's incredibly prejudicial.

17         MR. KESSLER:  So the reason we included the earliest

18  and the latest bill in this series is to set a baseline,

19  because if the Court recalls from the Pre-Trial Conference and

20  I believe in Mr. Brodsky's opening, but it might have been in

21  the Pre-Trial Conference, there's an argument about how

22  Mr. Greebel's compensation changes over time and what it's

23  driven by.

24         And so without getting into that argument, we wanted

25  to put in the data to establish a baseline.  So that's the

1    earliest bill.

2           The latest bill, the one that has the write-off, I

3    take Ms. Denerstein's objection that we could have probably

4    worked this out before the side-bar.  I just didn't know there

5    was an objection to it.

6           And so why don't we just not put in the most recent

7    bill for now, and we can think about whether we want to

8    address that in some other way.

9           MS. DENERSTEIN:  I just --

10          THE COURT:  So can I just ask.

11          Is it $3.7 million in billing though?  Is that

12   accrued during the conspiracy period, but it is written off

13   after the charged conspiracy or is it --

14          MR. KESSLER:  Yes, some of it certainly relates to

15   work that was done before September 2014.

16          MS. DENERSTEIN:  Some of it.

17          THE COURT:  Okay.

18          So how do you want to work that out?

19          MR. KESSLER:  Well, so my understanding is there

20   isn't going to be an objection to the authenticity of the

21   documents, or to these business records, or anything like

22   that.  And so to the extent that's the case, and we later

23   determine that we believe there's a strong basis that would

24   overcome the objection to put those latest bills in, we will

25   offer them later.  But I think to move this exam along, we

Side-Bar                                              4891

1   don't have to offer those most recent ones right now.

2              THE COURT:  So you will tell me what you are

3   offering?

4              MR. KESSLER:  Yes.  So I believe what we're talking

5   about is 122-6 and 123-6; is that right?

6              MS. DENERSTEIN:  I just want to check.

7              THE COURT:  Okay.

8              MS. DENERSTEIN:  Sorry.

9              (Pause in the proceedings.)

10             MS. DENERSTEIN:  I have 122-5, I just want you to

11  look at it.

12             MR. KESSLER:  That's the one with the write-off.

13  The problem is that contains a lot of... okay.  Let's just

14  redact those.  The hours in this period.

15             MS. DENERSTEIN:  Okay.

16             They are going to redact the columns; is that

17  acceptable?

18             (Pause in the proceedings.)

19

20             (Continued on following page.)

21

22

23

24

25

```
                           Side Bar                        4892
```

1           (Side bar conference continues.)

2           MR. KESSLER:  All right, Your Honor.  So, we will

3    offer these exhibits subject to redactions to remove the

4    columns that refer to the write-offs including the totals for

5    the 122-5 and 123-5 series which is the year in which those

6    write-offs took place.

7           THE COURT:  Okay.  So, you are going to offer all of

8    them and then just say subject to redactions?

9           MR. KESSLER:  Exactly.

10          THE COURT:  And give that specific information?

11          MR. KESSLER:  And I was not going to show the jury

12   the year with the write-offs.

13          MS. DENERSTEIN:  That still leaves us with the first

14   exhibit.

15          MR. KESSLER:  Sure.  Also, my position is we want to

16   put in the 2010 to 2011 to set a baseline and explain the

17   billing pattern.  So I think that's just a relevance objection

18   at this point, not a 403 objection.

19          MS. DENERSTEIN:  I think it is actually a 403

20   objection as well because it's using information from a

21   different time period to talk about Mr. Greebel's work period.

22   It's not relevant to the charges.

23          THE COURT:  What's the time period?

24          MS. DENERSTEIN:  2010 to January 2011.

25          MR. KESSLER:  So, my concern is that there will be,

Side Bar                                                    4893

1   and we can also do this in term of door opening, that there is

2   going to be an argument over how Mr. Greebel's compensation

3   changes over time and that argument may not be fully addressed

4   without having the baseline of the period before he does work

5   for Retrophin and so that's the reason we're putting these in.

6              MS. DENERSTEIN:  I mean, it's actually not a

7   baseline because you're saying it's computations based on the

8   prior year.  It's one year.  I don't think it's a baseline.

9   It says hours.  I mean, compensation isn't based on just

10  billings.  It's based on a variety of factors so I don't think

11  that makes any sense.

12             THE COURT:  Well, are you objecting to any

13  information about what his compensation was, you know, in the

14  year prior to the conspiracy and through the alleged charged

15  conspiracy?

16             Is there -- can you just agree on a number or

17  something?

18             MS. DENERSTEIN:  I'm actually objecting to this

19  record itself.

20             THE COURT:  122-1?

21             MS. DENERSTEIN:  Yes.  It's for the period from

22  February 2010 to January 2011 and it's talking about

23  Mr. Greebel's clients in a period that predates the conspiracy

24  and it's talking about the hours for the principal timekeeper.

25  That's just not relevant and I think for the government to try

Side Bar                                    4894

1    to make the argument that those hours mean he's engaged in a

2    fraud later makes no sense.

3             MR. KESSLER:  They show how his compensation and his

4    client mix changed over time.

5             THE COURT:  Why don't we just exclude it.  122-1

6    will be excluded.

7             MR. KESSLER:  And 123-1.

8             THE COURT:  And 123-1 will be excluded as outside

9    the charged period.

10            MR. KESSLER:  Okay.

11            THE COURT:  And you can make whatever arguments you

12   respectively think should be made regarding the billing during

13   the charged period.

14            MR. KESSLER:  And I just want to be clear that in

15   the cross-examination of other witnesses about Mr. Greebel's

16   compensation, that may open the door to evidence about prior

17   periods or changes in billing.  I'm not saying it will.  I'm

18   saying it might and then we would ask to revisit this.

19            THE COURT:  All right.  Sure.  We will revisit if

20   the doors are opened.

21            MS. DENERSTEIN:  Thank you, Your Honor.

22            (Side bar conference ends.)

23            (Continued on next page.)

24

25

1          MR. KESSLER:  So, Your Honor, subject to the

2     conversation at side bar, the government offers 122-2 to 122-6

3     and 123-2 to 123-6.

4          THE COURT:  All right.  We will admit 122-2 through

5     122-6 and 123-2 through 123-6 subject to the side bar

6     conversations.

7          (So marked.)

8     BY MR. KESSLER:

9     Q    So, if we can look at Government Exhibit 122-2 first,

10    Ms. Marsilio, is this the principal -- I'm sorry -- 122-4, is

11    this one of the principal timekeeper reports that you

12    mentioned before?

13    A    Yes.

14    Q    And what's the period for which this report covers?

15    A    February of 2013 to January of 2014.

16    Q    And who's the principal timekeeper who is the subject of

17    this report?

18    A    Evan Greebel.

19    Q    Okay.  And can you just tell us what each of these column

20    headings means?  So we'll start with Hours of Time Input.

21    A    Hours of time input would be all timekeepers that worked

22    on any matter for that client in which Evan was the principal

23    attorney.  It doesn't necessarily need to be Evan's time.

24    It's all timekeepers.

25          THE COURT:  When you say "timekeepers," are you

Masilio - direct - Kessler                    4896

1   talking about lawyers only or paralegals and anyone else who
2   might --
3              THE WITNESS:  All timekeepers including paralegals.
4              THE COURT:  Who else is included in the timekeeper
5   category?
6              THE WITNESS:  Timekeeper can be administrative, IT.
7              THE COURT:  Thank you.
8   Q    So, just looking at this example, what's on the screen
9   for the client 381907, does this show that there were
10  91.3 hours billed by all timekeepers for that year?
11  A    91.3 hours recorded to that client.
12  Q    And then the next column is Value of Time Input Regional
13  Firm Rates, what does that mean?
14  A    That's the value of time based upon the rate assigned to
15  each timekeeper that worked on the matters.
16  Q    The next column is Fee Billings.  What does that mean?
17  A    Actual fees billed for those matters associated with that
18  client.
19  Q    And Fee Receipts?
20  A    Actual fees received for that client for that time frame.
21  Q    Then Fee and DISB Premiums/Write-Offs?
22  A    Fee and Disbursement Write-Offs and Premiums, that would
23  be all types of write-offs associated with that client in that
24  time frame, whether it was done when the bill went out the
25  door, whether it was discounted rates or write-offs of bills

Masilio - direct - Kessler                    4897

1    that had already gone to the client.

2    Q    And the next column is Value of Billed Time At Regional

3    Firm Rates.  What does that mean?

4    A    That's the value of the time that was relieved when the

5    billing was done.

6    Q    And then Realization Percentage?

7    A    A billing realization.

8    Q    What does that mean?

9    A    That is the value of the billed time at regional firm

10   standard rates, less all the write-offs, and that result would

11   be divided by your value of time billed at regional rates.

12   Q    So it's -- strike that.

13        And then the Write-Offs column that you talked

14   about, who decides the write-off on a particular bill?

15   A    Write-offs on a particular bill would be the person

16   responsible, the attorney responsible for doing the actual

17   billing.

18   Q    All right.  So if we can zoom out and if you look about

19   two-thirds down the page, there's a line for Retrophin Inc.

20   We don't have to actually zoom in.

21        How many hours of time were billed by all

22   timekeepers to Retrophin in the February 2013 to January 2014

23   period?

24   A    Can you make it bigger?

25   Q    We can try.

Masilio - direct - Kessler                    4898

1  A    $5,684.70 hours.

2  Q    And that's for the, that fiscal year basically?

3  A    Yes.

4  Q    Okay.  All right.

5         Now, let's look at 123-4, Government Exhibit 123-4.

6  Is this the working timekeeper report for Evan Greebel for

7  February 2013 to January 2014?

8  A    Yes.

9  Q    And there are similar headings in the various columns?

10 A    Yes.

11 Q    All right.  And if we look on the second page of the

12 document which ends Bates stamped 093, do you see there's an

13 entry for Retrophin?

14 A    Yes.

15 Q    And how many hours of time are listed there?

16 A    1,116.5 hours.

17 Q    So that time or -- strike that.

18        Does that time represent the hours that Mr. Greebel

19 himself billed to Retrophin?

20 A    Yes.

21 Q    Okay.  And if we looked at the other reports for the

22 various periods that are now in evidence, are they set up the

23 same way?

24 A    Yes.

25 Q    Okay.  So I want to turn to a final subject.

CMH      OCR      RMR      CRR      FCRR

Masilio - direct - Kessler                    4899

1          First, let's go back to Government Exhibit, I think
2   it's 856-A, 856 or 856-A.  Let me just confirm.  856-A -- I'm
3   being told it's Government Exhibit 856.  I'm sorry.
4          So, this is a series of invoices with a letter dated
5   August 20, 2014.  Do you see that?
6   A    Yes.
7   Q    And there are a number of matters listed in the cover
8   letter?
9   A    Yes.
10  Q    Do you see a matter called Indemnification?
11  A    No.
12  Q    Okay.  And this covers work done through the date ending
13  July 31, 2014, is that correct?
14  A    Yes.
15  Q    So now let's look at Government Exhibit 858.  This is a
16  Retrophin invoice cover letter dated October 16, 2014.
17         Do you see that?
18  A    Yes.
19  Q    And this covers services rendered through August 31,
20  2014, is that right?
21  A    Yes.
22  Q    Okay.  Do you see any reference to an indemnification
23  matter?
24  A    No.
25  Q    Now, if we look at Government Exhibit 857, do you see

Masilio - direct - Kessler                    4900

1   this is a September 30, 2014 letter?

2   A    Yes.

3            MS. DENERSTEIN:  Your Honor, I think he means 857-A.

4            MR. KESSLER:  I'm sorry.  857-A.

5            THE COURT:  Thank you.

6   Q    My mistake.  Government Exhibit 57-A.  Is this dated,

7   this is September 30, 2014?

8   A    Yes.

9   Q    So this letter is dated in between the August 20, 2014

10  letter and the October 16, 2014 letter we just looked at,

11  correct?

12  A    Yes.

13  Q    And this also covers services rendered through August 31,

14  2014?

15  A    Yes.

16  Q    Okay.  And what is the matter reported here?

17  A    The reference is SEC Inquiry.

18  Q    Had that been referenced in either the cover letter from

19  the prior period or the subsequent period?

20  A    No.

21  Q    Okay.  And what's the current charge on this SEC Inquiry

22  matter?

23  A    $224,324.67.

24  Q    If we go to the next page, Government Exhibit 857, do you

25  see -- 857-A.  So this is the page of Government Exhibit 857-A

CMH      OCR      RMR      CRR      FCRR

Masilio - direct - Kessler                    4901

1   ending in Bates stamp -- sorry, I can't see the Bates

2   stamp -- 128.  What is the name of this matter?

3   A    Indemnification.

4   Q    Who's the client?

5   A    Retrophin.

6   Q    Are you aware of any other invoices for the

7   indemnification matter other than the September 30, 2014?

8   A    No.

9   Q    Let's go to the next page.

10        You see the first date is in June 2013?

11  A    Yes.

12  Q    Now, if we scroll forward to the next page, next page,

13  next page, next page, next page, next page, next page --

14            THE COURT:  Just give her the page number.

15            MR. KESSLER:  I believe it ends in 138, Your Honor.

16            THE COURT:  Okay.

17            MR. KESSLER:  139 -- I'm sorry.  I'm doing this on

18  the screen.  I think there's one after that.  140 -- 142.

19  There we go.

20  Q    So, we saw that the first date was June, in June 2013,

21  Ms. Marsilio, is that correct?

22  A    Yes.

23  Q    And the final date in all the entries listed

24  approximately ten pages later is July 2014?

25  A    Yes.

1   Q    So that's almost a year -- strike that.

2        That's more than a year's worth of entries captured

3   in a single invoice?

4   A    Yes.

5   Q    Okay.  Now, you mentioned that the cover letter was dated

6   September 30, 2014.  What's the date of the invoice?

7   A    September 30, 2014.

8   Q    And if we look at Government Exhibit 125-1-H, is this a

9   form related to the opening of the indemnification matter for

10  Retrophin?

11  A    Yes.

12  Q    And you see in the middle of the, or towards the top of

13  the first page, there's a matter name, Indemnification?

14  A    Yes.

15  Q    There's a matter description?

16  A    Yes.

17  Q    What does the matter description say?

18  A    Indemnification of Martin Shkreli, CEO, in connection

19  with SEC inquiries.

20  Q    If we go to the next page, second page of the document

21  ending 186, do you see there's a create date?

22  A    Yes.

23  Q    What's the create date?

24  A    September 29, 2014.

25  Q    Is that one day before the invoice we just saw?

Masilio - direct - Kessler                 4903

1    A     Yes.

2    Q     And who's the requesting attorney for this matter

3    creation?

4    A     Evan Greebel.

5    Q     All right.  If we go back to the first page, one last

6    thing, there's an entry listed right near the bottom for

7    someone who's first name appears to be Riannon.  Do you see

8    that?

9    A     Yes.

10   Q     And then in the next column, there's Senior Conflicts

11   Analyst Preliminary Review?

12   A     Yes.

13   Q     Can you just read what's listed next to that starting

14   with Michael Rosensaft?

15   A     Michael Rosensaft is to be added as the handling

16   attorney.  Per attorney, the SEC is conducting the

17   investigation and Martin Shkreli is a non-party witness.  Both

18   were added as adverse/PIP respectively.  Routing back to

19   supervisor queue for search, but please do not open if new

20   client matter.  Deputy conflicts counsel should review the

21   parties since Martin Shkreli is the billing contact.

22   Q     Okay.  So now I'd also like to look at Government

23   Exhibit 125-1-I.

24         This is one of those reports about a client matter

25   similar to the ones we looked at before, is that right?

CMH      OCR      RMR      CRR      FCRR

Masilio - direct - Kessler                    4904

1    A    Yes.

2    Q    And who's the client listed?

3    A    Retrophin.

4    Q    Is this for the indemnification matter we've been talking

5    about?

6    A    Yes.

7    Q    And you see above Retrophin, there's a "created on" date?

8    A    Yes.

9    Q    What's that date?

10   A    September 29, 2014.

11   Q    Again, that's one day before the invoice we looked at for

12   the Indemnification matter?

13   A    Yes.

14   Q    Okay.  And there's an entry to the right under name of

15   "party" for Martin Shkreli, do you see that?

16   A    Yes.

17   Q    How is he described?

18   A    Potentially interested party, Relation in the matter, a

19   witness.

20   Q    All right.

21            THE COURT:  What exhibit was that, 125-1-

22            MR. KESSLER:  I.

23            THE COURT:  I.  Thank you.

24   Q    So, Ms. Marsilio, was this indemnification matter created

25   on or about September 24, 2014?

Masilio - direct - Kessler                    4905

1   A     Yes.

2   Q     You mentioned toward the beginning of your testimony this

3   idea about pre-bill.  Can you remind us what a pre-bill is?

4   A     A pre-bill is a document, an internal working document

5   for attorneys responsible for a matter to review the time

6   that's been recorded to the matter and the disbursements

7   recorded to the matter prior to billing.

8   Q     Okay.  So, in August 2014, the month before the September

9   invoice we just saw, was all of the time in that

10  indemnification invoice allocated to a matter number in a

11  pre-bill?

12  A     Yes.

13  Q     All right.  So, let's look at, take a look at Government

14  Exhibit 127-2 for identification which is in tab 11 in your

15  binder.

16        All right.  Are you done?

17  A     Uh-huh.

18  Q     Is this the August pre-bill associated with those

19  $224,000 in charges that showed up on the September 30th

20  invoice for the Indemnification matter?

21  A     Yes.

22        MR. KESSLER:  I offer Government Exhibit 127-2.

23        MS. DENERSTEIN:  No objection.

24        THE COURT:  No objection?

25        MS. DENERSTEIN:  No objection.

Masilio - direct - Kessler                    4906

1          THE COURT:  Oh, okay.  Government Exhibit 127-2 is

2    admitted.  Thank you.

3          (So marked.)

4    Q    All right.  Ms. Marsilio, are we now looking at the first

5    page of the pre-bill for those $224,000 in charges?

6    A    Yes.

7    Q    Who is listed as the principal attorney and the

8    responsible attorney?

9    A    Evan Greebel.

10   Q    If you look at the top right of the document, to what

11   matter is all of, are all of these charges assigned on this

12   pre-bill?

13   A    Matter to Project Candlestick.

14   Q    And this is the August 2014 pre-bill, correct?

15   A    Yes.

16   Q    Now, take a look in your binder under tab 10, a document

17   that's been marked for identification as Government

18   Exhibit 127-1.

19          Is this another pre-bill that was generated related

20   to those $224,000 in charges?

21   A    Yes.

22          MR. KESSLER:  Okay.  I offer Government

23   Exhibit 127-1.

24          MS. DENERSTEIN:  No objection.

25          THE COURT:  We receive 127-1.

CMH     OCR     RMR     CRR     FCRR

Masilio - direct - Kessler                    4907

1          (So marked.)

2   Q    What's the date of this pre-bill in the upper left?

3   A    September 30, 2014.

4   Q    That's after the other pre-bill we looked at, Government

5   Exhibit 127-2?

6   A    Yes.

7   Q    Okay.  Now, to what matter are these $224,000 assigned?

8   A    Matter 12, Indemnification.

9   Q    And that's the matter that we saw was created about one

10  day earlier?

11  A    Yes.

12  Q    Are you aware of an invoice that was sent under the

13  Project Candlestick matter for those $224,000?

14  A    No.

15  Q    And who has the authority to move charges from one matter

16  to a different matter?

17  A    The actual timekeeper that recorded the time or the

18  attorney responsible for billing the matter.

19  Q    And who's the attorney responsible for billing this

20  matter?

21  A    Evan Greebel.

22          MR. KESSLER:  Just one minute, Your Honor.

23          (Pause.)

24          MR. KESSLER:  No further questions.

25          THE COURT:  All right.  Ms. Denerstein?

Masilio - cross - Denerstein                    4908

1          MS. DENERSTEIN:  Yes, Your Honor.

2    CROSS-EXAMINATION

3    BY MS. DENERSTEIN:

4    Q     Good afternoon.

5    A     How are you?

6    Q     Good.  Thank you.

7          Ms. Marsilio, you have known Evan Greebel since

8    approximately 2007, 2008, after he became a partner at Katten?

9    A     Yes.

10   Q     And so, basically, you've known him almost ten years,

11   nearly ten years?

12   A     Yes.

13   Q     And you knew he was a corporate attorney?

14   A     Yes.

15   Q     So he didn't go to court to represent clients?

16   A     Yes.

17   Q     He worked on deals and transactions?

18   A     Yes.

19   Q     And you knew him to be professional?

20   A     Yes.

21   Q     And hard working?

22   A     Yes.

23   Q     And Katten is a big law firm?

24   A     Yes.

25   Q     And it has many lawyers in the New York office?

Masilio - cross - Denerstein                    4909

1   A    Yes.

2   Q    How many attorneys are there in the New York office?

3   A    I would be guessing.

4   Q    More than 100?

5   A    Yes.

6   Q    And where is the New York office located?

7   A    575 Madison Avenue.

8   Q    And you've been discussing billing practice and in your

9   many years, you've reviewed a lot of bills?

10  A    Yes.

11  Q    Attorneys work on matters with each other all the time?

12  A    Yes.

13  Q    And is it fair to say that it is rare for an attorney at

14  Katten to actually work on a matter alone?

15  A    Yes.

16  Q    And bills list all of the attorneys who are working on a

17  matter and have billed to that matter?

18  A    No.  That would be if I wrote off and didn't want the

19  time to show, so no.

20  Q    Okay.  But bills typically list attorneys who have

21  entered time on that matter?

22  A    Yes.

23  Q    And you said that you're familiar with the process of

24  opening a new matter earlier?

25  A    Yes.

Masilio - cross - Denerstein                    4910

1    Q    And for a new matter paperwork, a department head has to

2    sign off?

3    A    Yes.

4    Q    And you also mentioned earlier that for new matters, if

5    it's an existing client, you don't always need a new

6    engagement letter?

7    A    Yes.

8    Q    Can we please publish Government Exhibit 125-2 in

9    evidence.  This is a list that you said listed MSMB Capital

10   Management matters, correct?

11   A    Yes.

12   Q    And on all of these matters, there were not engagement

13   letters, is that correct?

14        MR. KESSLER:  Objection to the form.

15        THE COURT:  Try to rephrase, Ms. Denerstein.

16   Q    Earlier when Mr. Kessler reviewed with you various

17   engagement letters, there was not an engagement letter for

18   each of these matters, is that correct?

19   A    I just reviewed a few that were in the exhibit.  I don't

20   know if there was one for every single matter.

21   Q    But, again, clients don't always need engagement letters

22   for every matter?

23   A    No, they do not.

24   Q    You mentioned earlier that law firms bill by the hour for

25   an attorney's time or another timekeeper's time, is that

1    correct?

2    A    Can you please repeat that?

3    Q    Sure.  Katten bills by the hour for an attorney's time or

4    a timekeeper's time?

5    A    In increments of six minutes.

6    Q    Increments of six minutes.  So 12 minutes of 1 hour is

7    .2 hours?

8    A    Yes.

9    Q    And each lawyer is responsible for entering their own

10   time?

11   A    Yes.

12   Q    And time is entered in electronically?

13   A    Yes.

14   Q    And you talked about how attorneys provide descriptions

15   of their work that they were doing for a particular client?

16   A    Yes.

17   Q    So if they do write something like review e-mails?

18   A    Yes.

19   Q    Confer with a client?

20   A    Yes.

21   Q    And some lawyers write very detailed descriptions?

22   A    Yes.

23   Q    And others' descriptions are not so detailed?

24   A    Yes.

25   Q    So there are variations in how lawyers describe the work

Masilio - cross - Denerstein                    4912

```
1   that they do?

2   A     Yes.

3   Q     Some people can actually do the same thing and describe

4   it differently?

5   A     Yes.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Marsilo - cross - Denerstein                4913

1    CROSS EXAMINATION

2    BY MS. DENERSTEIN:  (Continuing)

3    Q    So I am going to show you Government Exhibit 857-A in

4    evidence.

5             MS. DENERSTEIN:  Oh, we don't have it.  Okay.

6             THE COURT:  Government, can you please help out.

7             MS. DENERSTEIN:  Thank you.

8    Q    I'm going to ask you to go to Bates stamp number R

9    049134.  If you could zoom in on entries January 7, 2014,

10   January 7, 2014 for Mr. Rosensaft and Ms. Mochizuki.

11            So if we can go up just one more to the prior entry

12   before Mr. Rosensaft.  Okay, so this is an example of an entry

13   by Ms. Mochizuki where she has a more detailed description

14   than Mr. Rosensaft who appears -- his entry appears later.

15            MR. KESSLER:  Objection.

16            MS. DENERSTEIN:  I can rephrase, Your Honor.

17            THE COURT:  Okay.  Thank you.

18   Q    Ms. Tenley's description contains a fair amount of detail

19   about the work she is doing; is that fair to say?

20   A    Yes.

21   Q    And Mr. Rosensaft simply says e-mail with SEC and prepare

22   for final production?

23   A    Yes.

24   Q    So there are different descriptions?

25   A    Yes.

Marsilo - cross - Denerstein                    4914

1   Q    Now, you mentioned that --
2        MS. DENERSTEIN:  Thank you for the assistance.
3   Q    You mentioned that, at the end of the month, there are
4   pre-bills and the purpose of a pre-bill is for partners for
5   the responsible attorney to review them?
6   A    Yes.
7   Q    And partners review the pre-bill and then the responsible
8   partner, I think as you described, would return it to the
9   billing department?
10  A    The person responsible for billing, the attorney
11  responsible for billing would return it to the billing
12  department.
13  Q    It's fair to say that partners may ask other partners to
14  review the bills?
15  A    Yes.
16  Q    And is it fair to say partners may ask associates who
17  worked on the matter to review the bill?
18  A    Yes.
19  Q    And those individuals may provide comments on the bill?
20  A    Yes.
21  Q    And during the preview review, as you testified to
22  earlier, changes can be made?
23  A    Yes.
24  Q    So partners have authority to edit the bills?
25  A    The partner responsible for billing the matter, yes.

1   Q    So the partner responsible for billing the matter may

2   also change time between different matters?

3   A    Yes.

4   Q    A partner or responsible -- responsible for the matter,

5   or the bill reviewer for that matter, can change the

6   narrative, that's perfectly normal?

7   A    Yes.

8   Q    And I believe you testified that partners can also

9   write-off time?  The responsible partner for the bill?

10  A    Yes.

11  Q    And this means that they're actually not charging the

12  client for certain things that they have done?

13  A    Yes.

14  Q    So you can do work for somebody, but then, as the

15  responsible partner viewing the bill, may decide it is

16  appropriate to not charge the client for that work?

17  A    Yes.

18  Q    And there are a variety of reasons why time could be --

19  strike that.

20          So there are valid reasons for moving time from one

21  matter to another?

22          MR. KESSLER:  Objection to the form.

23          THE COURT:  Sustained.  Just try to rephrase.

24          MS. DENERSTEIN:  Sure.

25  Q    Partners responsible for the bill have valid reasons for

1   moving time from one matter to another?

2            MR. KESSLER:  Objection to the form.

3            THE COURT:  Sustained.

4   Q    You testified that -- I believe you testified earlier

5   that partners had the authority to -- the partner responsible

6   for the bill has authority to transfer time between matters?

7   A    Yes.

8   Q    Now, just to be clear, not all matters are billed on a

9   monthly basis?

10  A    Matters that are considered transactional would not be

11  billed on a monthly basis.

12  Q    Some clients prefer to pay quarterly?

13  A    Yes.

14  Q    And they may work out an arrangement on that basis with

15  the firm?

16  A    Yes.

17  Q    And as you said, some clients will agree to pay after a

18  certain event happens and that's typically in the

19  transactional context?

20  A    Yes.

21  Q    Some clients may negotiate a fixed fee for a particular

22  service?

23  A    Yes.

24  Q    Some clients get a discount off the hourly rate, if

25  they're lucky?

1    A    Yes.

2    Q    So not all clients are -- not all Katten clients are

3    billed the exact hourly amount?

4    A    Yes.

5    Q    And not all Katten clients receive a bill every month?

6    A    Yes.

7    Q    I want to go to -- is it fair to say that some partners

8    do not like dealing with bills?

9    A    Yes.

10   Q    And some partners dislike reviewing bills and sending

11   them to clients?

12   A    Yes.

13   Q    And some partners dislike chasing clients to pay bills?

14   A    Yes.

15   Q    Katten's fiscal year ends on January -- when does

16   Katten's fiscal year end?

17   A    January 31st.

18   Q    Is it especially common to put pressure on clients to pay

19   outstanding bills towards the end of the fiscal year?

20   November --

21   A    Say that one more time, please?

22   Q    Is it common to ask clients to pay outstanding bills

23   towards the end of each fiscal year?

24   A    Yes.

25   Q    And there is usually a big push between October and

Marsilo - cross - Denerstein                    4918

1    January 31st to collect as much revenue as possible on the

2    outstanding bills; is that correct?

3    A    Yes.

4    Q    And is there an actual committee involved in overseeing

5    bill collections during this time period?

6    A    Yes.

7    Q    What is that committee called?

8    A    The billing and collections committee.

9    Q    And who is on that committee?

10            THE COURT:  Then or now?

11            MS. DENERSTEIN:  Then.  I'm sorry.

12   Q    Between 2012 and 2014, but you could just tell me the

13   types of persons that would serve on that committee?

14   A    Partners from each office; executive, administration, the

15   CFO, the COO.

16   Q    Is the purpose of that committee to look at bills and see

17   that they are collected during that time period?

18   A    The purpose is to manage the cash-flow and managing the

19   receivables.

20   Q    By managing the receivables, do you mean that come

21   November or December and January there are inquiries that are

22   made to responsible partners about their outstanding

23   receivables?

24   A    Yes.

25   Q    And in part, the more revenue that gets in, the more an

Marsilo - cross - Denerstein                          4919

1    equity partner would get paid?

2    A    I'm not familiar with the compensation.

3    Q    Is it common to e-mail lawyers about collecting bills

4    towards the end of the fiscal year?

5    A    Yes.

6    Q    Is it common for the firm to e-mail lawyers about

7    collecting bills at the end of the fiscal year?

8    A    By firm, you mean?

9    Q    At Katten is it common for the billing committee to

10   e-mail a particular lawyer who has an outstanding receivable

11   to say when are we going to get paid, what's going on, what's

12   the status?

13   A    Yes.

14   Q    And it's common for the responsible partner for the bills

15   to then follow up to clients, call them or e-mail them, to ask

16   them where the money is?

17   A    Yes.

18   Q    And just to be clear, asking a client to pay a bill does

19   not mean that the attorney is asking to be paid personally?

20   A    Yes.

21   Q    The money that comes into the firm goes into the firm's

22   account?

23   A    Yes.

24   Q    I'd like to show you Government Exhibit 426 in evidence.

25             MR. KESSLER:   Your Honor, objection, as beyond the

Marsilo - cross - Denerstein                4920

1    scope.

2            THE COURT:  Well, let's do this.  I think -- this is

3    beyond the scope.  I think this is beyond the scope,

4    especially given our conversation at sidebar about the scope

5    of the billing that would be appropriate in this case.

6            Do you want to have a sidebar?  What I think I will

7    do is dismiss the jury at this time because it is 5:30 and we

8    can decide, once the jury has stepped out for the evening, how

9    to resolve this issue, if there needs to be a discussion.

10           I would ask the members of the jury to please come

11   tomorrow -- we are going to be dealing with an issue tomorrow

12   morning, so I think it would be safe to say that you show up

13   tomorrow at 10:00, that would be safe.  Even 10:15 would be

14   safe, just given that we have to resolve some issues in the

15   morning.  I'd ask you please not to discuss the case or please

16   avoid any media attention, if there is any.  Please get home

17   safely and thank you again for your attention.

18           (Jury exits the courtroom.)

19           THE COURT:  You can step down.

20           (Witness leaves stand.)

21           THE COURT:  All right.  I guess we will ask the

22   witness to step out so we can discuss the exhibit.  It was

23   Government Exhibit -- what was it?

24           MS. DENERSTEIN:  426.

25           THE COURT:  Is 10:15 all right to bring the witness

Proceedings                                    4921

1    back tomorrow?

2         MR. KESSLER:  Yes.

3         THE COURT:  Thank you very much.  Have a good

4    evening.

5         May I ask someone to put that exhibit up?

6         Go ahead, Mr. Kessler.

7         MR. KESSLER:  My objection was just that this is an

8    e-mail between Mr. Shkreli and Mr. Greebel from October 2011,

9    and it is unrelated to the witness's direct.  I would be

10   astonished if the witness has ever seen this document before,

11   but I'm happy to take a proffer that she has or we can voir

12   dire her and ask if she has ever seen this before.  But again,

13   I would be astonished if she did.  Asking her about e-mails

14   between Mr. Shkreli and Mr. Greebel is just unrelated to the

15   testimony she gave.

16        MS. DENERSTEIN:  In response, Your Honor, this

17   document is in evidence, so, I mean, we are permitted to show

18   it to whoever we want.  I don't have to -- I'm not proffering

19   that Ms. Marsilo has seen this e-mail; however, I do think

20   this is relevant because the Government offered this in with

21   their first agent who testified and entered certain e-mails

22   between Mr. Greebel and Mr. Shkreli about the bills.  This is

23   from 2011 and, in it, it says, "my billing committee is

24   meeting today and asking for an update."

25        Ms. Marsilo knows that's what the billing committee

Proceedings                                    4922

1    does, so she can provide the context, without saying she knows

2    about this specific e-mail, that, in fact, the billing

3    committee does do things like this and does ask partners to

4    collect bills.  And just in candor, I also wanted to ask about

5    Government Exhibit 433 in evidence, which was also offered

6    through Agent, I think, Polonitza --

7              MR. KESSLER:  Yes.

8              MS. DENERSTEIN:  -- testimony very early on in the

9    trial because, similarly, it discusses a schedule for payment,

10   and this is January 12, 2012, which is the exact time of year

11   where there is incredible pressure on -- and inquiries from

12   the firm about getting their bills paid.  But she is not on

13   the e-mail, so I am not making that representation.

14             THE COURT:  So what do you want her to say, has she

15   seen it, and if not, what would you ask her about it?

16             MS. DENERSTEIN:  I would want to ask her was it

17   common for e-mails like this to be sent by Katten partners at

18   this time of year before the end of fiscal year.

19             MR. KESSLER:  There were already multiple questions

20   about sending e-mails and phone calls and various things to

21   clients to collect bills.

22             MS. DENERSTEIN:  And this is just an example of

23   that.  The Government offered it in evidence in furtherance of

24   their purported conspiracy I want to be able to debunk.

25             MR. KESSLER:  That's an argument that certainly can

Proceedings                                        4923

1    be made to the jury, but the question is whether it is within

2    the scope of Ms. Marsilo's direct examination testimony.  It

3    is not.

4              THE COURT:  Well, it is loosely within the scope in

5    terms of her testimony that the billing committee would issue

6    e-mails to all the --

7              MR. KESSLER:  That was her cross testimony.

8              THE COURT:  All right.

9              MR. KESSLER:  If she has some personal knowledge

10   about this e-mail, I am happy to withdraw the objection.  My

11   objection is to having her generally discuss an e-mail that

12   she has never seen before on a topic that is beyond the scope

13   of her direct.

14             MS. DENERSTEIN:  I don't think it is beyond the

15   scope of her direct because she was asked about billing, the

16   billing practices, the monthly billing and all the bills were

17   offered into evidence.

18             THE COURT:  I would assume -- well, I shouldn't

19   assume, but I am going to, that these amounts stated here on

20   this e-mail are amounts that were billed by Katten to

21   Retrophin.

22             MR. KESSLER:  I think that is unlikely.  I suspect

23   what happens is there were a certain amount of bills

24   outstanding and then this is a payment plan that discusses the

25   amounts that will be paid, but I don't think there is a basis

Proceedings                                                    4924

1   to believe that these numbers will match up to an invoice or a

2   combination of invoices.  Certainly there has been no

3   testimony or documents to suggest that they match up.  I think

4   the point of a payment plan is, you know, you get some money

5   at some different point toward an outstanding debt.

6              MS. DENERSTEIN:  Even the Government had Wendy

7   Spaulding testify to the banking record and made a show of the

8   fact that there were several bills in wire amounts of 20,000,

9   30,000, and they were even numbers and they didn't line up to

10  invoices, this is just an illustration of that.  And having

11  Ms. Marsilo comment this is something that is common with

12  that, and she won't say this is true or not true, I expect.  I

13  have not shown those to her, I have not talked to her about

14  them, but I don't -- it is entirely appropriate cross.

15             THE COURT:  I think I am going to give the defense

16  latitude.  If the idea is to ask the witness whether A, the

17  billing attorney gets in touch with clients and asks to be

18  paid for bills that have been issued and whether they, from

19  time to time, agree on a payment schedule for those

20  outstanding bills, which can come in round numbers or be

21  rounded up or down --

22             MR. KESSLER:  And I don't have an objection to those

23  questions.  It is to the vouching for or not vouching or

24  analyzing a specific e-mail she has never seen before.

25             THE COURT:  Well, we will assume that she hasn't

Proceedings                                    4925

1    seen it, I guess, if this is just the argument.

2              MS. DENERSTEIN:  Your Honor, I am certainly allowed

3    to display the e-mail and it is in evidence.

4              MR. KESSLER:  It doesn't mean that it is within the

5    scope of the direct examination or the cross-examination.

6              MS. DENERSTEIN:  I'm not asking her to authenticate

7    it.  I'm not asking her --

8              THE COURT:  Well, could you ask the questions that

9    go to the point that you want to make?

10             MS. DENERSTEIN:  Yes.

11             THE COURT:  Without actually using this document?

12   Although it is in evidence, she is not going to have seen it,

13   so she would be probably inappropriately being asked to

14   comment on it, which she neither wrote nor received a copy of

15   the document.  I think generally it is within her direct that

16   bills were generated by the responsible partner, that bills

17   have to be paid and that partners are responsible for

18   collecting money.  Now, I understand that some of this came in

19   through cross, but I think it is relevant to what she has

20   testified to so far and the other billing records that were

21   entered through this witness.  This is already in evidence and

22   the defense should be allowed to argue at some point what the

23   significance is.  But I think without asking her to comment on

24   any knowledge about a document she has never seen or to verify

25   that it is true that Mr. Greebel's comments or Mr. Shkreli's

Proceedings                                        4926

1    comments are true really would be not appropriate.

2            So she can show the witness the document, it is in

3    evidence, and ask the witness if she has ever seen it before.

4    There is no harm in showing the jury the document.  She can

5    ask questions that don't go necessarily to the exact substance

6    of the document, but relate to the matters she has been

7    raising with the witness.

8            MS. DENERSTEIN:  Thank you, Your Honor.

9            THE COURT:  So let's figure this out for tomorrow.

10   I have a CJRA meeting until about eight.  I was going to

11   review all of the Daubert material for the hearing tomorrow.

12   What is the timing going to be on this other submission

13   regarding Mr. Su because, as I said, I just don't want to be

14   here all night.  I've done that before and I don't want to do

15   it again.

16           MR. DUBIN:  Understood, Your Honor, that was what I

17   was going to ask you.  I know that you have indicated that

18   your schedule wouldn't permit you to look at anything until I

19   think Your Honor said 8 o'clock?

20           THE COURT:  Yes, except that right after the

21   meeting, I am going to go look at the Daubert materials which

22   I think is also on for tomorrow.  I think Mr. Su is going to

23   be coming back after this witness.

24           What do you want me to do, stay up all night?

25           MR. DUBIN:  Absolutely not, Your Honor.

```
                      Proceedings                    4927
```

1          THE COURT:  What should I do, I want to be ready to

2     go.  I don't want any more delays.

3          MR. DUBIN:  Understood.

4          THE COURT:  When can you give me something?

5          I think the Government then has to respond, so we

6     have to be reasonable.  The earlier the better, I think, even

7     if I can't look at it, because the Government then has to

8     respond.  I would like to think that, after my meeting and

9     after I review the Daubert materials, I can return to this and

10    I will have everything fully briefed.

11         MR. DUBIN:  One moment, Your Honor, I just want to

12    make sure.

13         MR. KESSLER:  Your Honor, while they are thinking

14    about that, just to bring something to your attention then.

15    One thing that may not have registered on the docket today,

16    the defendant has withdrawn part of one opinion that the

17    expert who is the subject of the Daubert hearing was going to

18    offer and has added one additional opinion.  So I just wanted

19    to make sure that, when the Court reviews material, the Court

20    doesn't review, or spends less time reviewing, things that

21    have been removed and is not caught unaware of something that

22    was added.

23         THE COURT:  So, with regard to what was added, do

24    you have an objection?

25         MR. KESSLER:  I mean we have -- we want the

Proceedings                                        4928

1   testimony to be the subject of the Daubert hearing.

2            THE COURT:  Okay.

3            MR. KESSLER:  So all of the objections, you know, we

4   have a relevance objection, we have a Daubert objection, you

5   know, it is not clear to us why the new opinion could not have

6   been offered earlier, but I understand the point in the

7   defendant's letter that it is being offered to address

8   something that came up during trial.  So I think, for purposes

9   of today, we don't have to get into whether the process of

10  adding the new opinion is proper or not.  We will just ask

11  that the opinion be rolled into the Daubert hearing and that

12  our relevance objection to Mr. Johnson's testimony be extended

13  to that opinion, as well, and it can all be worked out during

14  and after the hearing.

15           MR. CHAN:  The hearing will be net shorter.

16           THE COURT:  That's nice.

17           MR. KESSLER:  You now don't have to read 50

18  contracts, if you were so inclined.

19           THE COURT:  Do we have any hope this is going to end

20  before 8:00?  I did have an outstanding...

21           MR. KESSLER:  I think we can probably have it done

22  before that.

23           MR. CHAN:  Like I said, Your Honor, I think our

24  direct will be no more than an hour.

25           THE COURT:  Okay.  Starting at 5:30?

MDL   RPR

```
                       Proceedings                    4929
```

1           MR. CHAN:  Well, we're scheduled to start at 5:00.

2           MR. DUBIN:  Your Honor, with regard to the letter,

3      9:00 p.m.?  Earlier?

4           THE COURT:  Yes, earlier, please.

5           MR. DUBIN:  8:00 p.m.

6           THE COURT:  8:00, and then can I get somebody from

7      the Government by 9:30, is that pushing the envelope?

8           MR. KESSLER:  We will do everything we can.

9           THE COURT:  The earlier the better, because, as I

10     said, I would like to turn to it right away.

11          MR. DUBIN:  Understood, Your Honor.

12          THE COURT:  Hi, Mr. Burke.

13          MR. BURKE:  Judge, how are you doing?  Judge, I

14     don't mean to make anything more difficult, do you anticipate

15     finishing Mr. Su's issues tomorrow?

16          THE COURT:  Well, what we are going to do is convene

17     here at 9:00 and discuss Mr. Su's issues.  They are just

18     talking about a briefing schedule, which you will have copies

19     of respectively at 8:00 and 9:30.  Hopefully, it will be

20     earlier than 8:00.

21          MR. DUBIN:  I will try my best, Your Honor.

22          THE COURT:  I want to be able to focus on it.  There

23     is a lot to be ready for, for tomorrow.

24          MR. DUBIN:  I have been sending e-mails to the team

25     trying to target with very efficient specificity what we think

Proceedings                                            4930

1    the issue is and what we think we are entitled to.

2            THE COURT:  So, Mr. Burke, you will get copies of

3    all of this from the defense and from the Government.

4            Somebody needs to just e-mail him copies of whatever

5    you submit to me.

6            MR. DUBIN:  Sure.

7            THE COURT:  I really am not going to accept anything

8    that is later than 8:00 and 9:30 because I just think there

9    are reasonable limits that I can and should have placed on you

10   all a long time ago, frankly.

11           MR. BURKE:  Judge, I will be here at 9 o'clock

12   tomorrow and so will Mr. Su.

13           THE COURT:  Thank you.  Based on the submissions

14   that you receive, if you have additional matters to raise with

15   me and the lawyers, I'd be happy to hear from you.

16           MR. BURKE:  Sure.  Hopefully, I don't.  We will see.

17           THE COURT:  Hopefully there are no other big land

18   mines that anyone is aware of, or that they are aware of but

19   they haven't bothered to tell me about.

20           (Continued on following page.)

21

22

23

24

25

```
                        Proceedings                    4931
```

1   (continuing)

2          MR. BURKE:  And I'm just mentioning this, Judge,

3   because I may be forced to leave town for two days to go to

4   Virginia towards Wednesday, Thursday, Friday.  I'm not sure

5   yet.  But I'm here tomorrow.

6          THE COURT:  Okay.

7          MR. BURKE:  I have a 10:00 o'clock sentence with

8   Judge Cogan, which should not be too long, but I will be here

9   at 9:00.

10          THE COURT:  All right.

11          How much longer do we have for crossing Ms. Marsilio

12   and then redirect?

13          MS. DENERSTEIN:  I believe 30 minutes, Your Honor.

14          THE COURT:  Thirty more minutes?

15          MR. KESSLER:  And 30 seconds.

16          THE COURT:  Okay.

17          Well, we might have a little bit of a gap then

18   between Ms. Marsilio and Mr. Su's testimony, if Mr. Burke is

19   indisposed due to the sentencing.

20          That will take about an hour.  My sentencing takes

21   an hour.

22          MR. BURKE:  I think like a half-hour, maybe 20

23   minutes.  It's not, the issues are not that complex.

24          THE COURT:  Okay.

25          MR. BURKE:  But famous last words.

```
              VB       OCR      CRR
```

Proceedings                                     4932

1          MR. DUBIN:  Perhaps I am being optimistic but I

2    think we should be through the Su issues in a half-hour or so.

3    Based on what we read so far, we don't think they're that the

4    complicated.

5          THE COURT:  The jury is not coming back until 10:15

6    because I thought we would need the time.  Whenever I tell

7    them to be here, we go well-past the appointed time and I am

8    getting concerned about asking them to hurry up and wait.

9          So, I will see you tomorrow at 9:00.

10         MR. BURKE:  I will be here.

11         THE COURT:  Thank you, Mr. Burke.

12         ALL:  Thank you.

13         THE COURT:  Thank you.

14

15         (Matter adjourned to Tuesday, November 14th, 2017 at

16   9:00 a.m.)

17

18                          ooo0ooo

19

20

21

22

23

24

25

                    VB       OCR       CRR

4933

1                     I N D E X

2     WITNESSES:

3          JACKSON SU

4               DIRECT EXAMINATION                    4687

5          KRISTINE MARSILIO

6               DIRECT EXAMINATION                    4865

7               CROSS-EXAMINATION                     4908

8

9                     EXHIBITS:

10              111-1                      4696
                111-2                      4701
11              114-2                      4716
                111-6                      4721
12              111-9                      4726
                111-43                     4728
13              111-10                     4733
                111-35 A                   4745
14              111-3                      4751
                111-16                     4756
15              111-17                     4758
                111-18                     4761
16              111-19                     4762
                111-26-A                   4764
17              111-28                     4771
                111-40                     4780
18              111-41                     4782
                111-48                     4787
19              682-B                      4798
                125-1-A through 125-1-CC   4869
20              125-2                      4873
                120-1 through 120-5        4875
21              801 through 822            4878
                826 through 850, 851-A,    4879
22              852-A, 853-A, 854-A, 855-A,
                856-A, 857-A, 858, 859-A,860
23              122-2 through 122-6        4895
                123-2 through 123-6        4895
24              127-2                      4906
                127-1                      4906
25

                    *      *      *

CMH     OCR     RMR     CRR     FCRR

**$**

**$10,000** [1] - 4793:13
**$100** [2] - 4797:18, 4803:17
**$100,000** [2] - 4699:12, 4787:18
**$11** [1] - 4805:16
**$121,176.88** [1] - 4880:3
**$150,000** [1] - 4698:22
**$20** [1] - 4737:6
**$20,000** [1] - 4793:14
**$200,000** [3] - 4742:20, 4750:6, 4787:15
**$224,000** [5] - 4904:19, 4905:5, 4905:20, 4906:7, 4906:13
**$224,324.67** [1] - 4899:23
**$25** [1] - 4739:6
**$30,000** [3] - 4689:17, 4734:25, 4735:6
**$350,000** [1] - 4787:4
**$40** [1] - 4737:7
**$40,000** [1] - 4739:4
**$5,000** [2] - 4812:23, 4825:2
**$5,684.70** [1] - 4897:1
**$50,693.15** [1] - 4879:20
**$675** [1] - 4882:20
**$7.10** [1] - 4805:9
**$70,483.73** [1] - 4879:25
**$80** [1] - 4737:10
**$80,000** [1] - 4724:6
**$90,000** [1] - 4734:1
**$900,000** [21] - 4715:19, 4724:11, 4724:13, 4733:22, 4738:22, 4744:3, 4745:6, 4745:15, 4749:7, 4753:15, 4788:21, 4788:23, 4791:4, 4791:6, 4791:22, 4791:23, 4792:1, 4805:10, 4805:11, 4805:22, 4805:24

**0**

**00001** [2] - 4869:8, 4885:18

**00011** [1] - 4869:8
**0002** [1] - 4869:13
**049134** [1] - 4912:9
**093** [1] - 4897:12

**1**

**1** [17] - 4728:22, 4729:2, 4733:19, 4738:22, 4743:16, 4744:24, 4746:7, 4748:13, 4753:15, 4754:1, 4758:8, 4758:9, 4759:10, 4766:3, 4802:7, 4812:17, 4910:6
**1)(a)** [1] - 4826:10
**1,075,000** [1] - 4774:11
**1,116.5** [1] - 4897:16
**1,600** [1] - 4739:4
**1.4** [2] - 4881:12, 4881:17
**1.5** [1] - 4805:18
**10** [3] - 4814:2, 4856:2, 4905:16
**10,000** [7] - 4738:2, 4738:5, 4764:16, 4768:6, 4768:9, 4768:14, 4793:15
**10-page** [1] - 4819:21
**100** [2] - 4723:23, 4908:4
**100,000** [3] - 4783:5, 4785:20, 4787:6
**100K** [1] - 4783:11
**1028** [2] - 4806:22, 4828:12
**1030** [5] - 4812:9, 4819:23, 4824:22, 4828:11
**1030(a)(2** [2] - 4812:16, 4826:5
**1030(a)(2)(C** [2] - 4824:24, 4828:11
**1030(a)(4** [4] - 4824:17, 4824:25, 4826:5, 4828:11
**1030(a)(5** [1] - 4826:5
**1030(a)(6)** [1] - 4826:6
**1030-A4** [1] - 4813:2
**1099** [3] - 4708:19, 4708:20, 4708:21
**10:00** [2] - 4919:13, 4930:7
**10:15** [3] - 4919:13, 4919:25, 4931:5

**10th** [1] - 4659:18
**11** [4] - 4868:8, 4868:15, 4869:5, 4904:14
**11,667** [2] - 4775:12, 4784:10
**111-1** [7] - 4695:5, 4695:12, 4695:16, 4695:18, 4695:19, 4701:8, 4932:10
**111-10** [4] - 4731:15, 4732:4, 4732:6, 4932:13
**111-12** [2] - 4736:10, 4743:6
**111-15** [6] - 4750:23, 4753:6, 4755:14, 4759:5, 4759:6, 4759:15
**111-16** [6] - 4754:15, 4754:25, 4755:2, 4756:6, 4757:12, 4932:14
**111-17** [9] - 4757:7, 4757:14, 4757:16, 4759:6, 4759:8, 4759:18, 4766:8, 4766:11, 4932:15
**111-18** [5] - 4759:2, 4759:20, 4759:24, 4760:1, 4932:15
**111-19** [5] - 4761:14, 4761:21, 4761:23, 4761:24, 4932:16
**111-2** [5] - 4700:12, 4700:17, 4700:19, 4700:20, 4932:10
**111-26** [1] - 4770:3
**111-26-A** [7] - 4763:2, 4763:13, 4763:15, 4763:16, 4766:25, 4769:12, 4932:16
**111-28** [6] - 4770:11, 4770:17, 4770:19, 4770:20, 4775:9, 4932:17
**111-29** [1] - 4748:1
**111-3** [4] - 4749:16, 4749:24, 4750:1, 4932:14
**111-32** [1] - 4790:2
**111-35** [3] - 4744:9, 4744:17, 4932:13
**111-35-A** [1] - 4744:15
**111-4** [2] - 4722:18, 4723:8
**111-40** [5] - 4779:5, 4779:14, 4779:16,

**4779:17, 4932:17
**111-41** [6] - 4781:10, 4781:22, 4781:24, 4781:25, 4783:23, 4932:18
**111-43** [4] - 4726:18, 4727:1, 4727:5, 4932:12
**111-48** [4] - 4786:5, 4786:11, 4786:18, 4932:18
**111-6** [5] - 4719:9, 4719:24, 4720:4, 4720:6, 4932:11
**111-9** [4] - 4725:4, 4725:14, 4725:16, 4932:12
**114-2** [6] - 4714:15, 4715:3, 4715:5, 4715:6, 4715:9, 4932:11
**11th** [1] - 4720:20
**12** [4] - 4779:22, 4906:8, 4910:6, 4921:10
**12-month** [1] - 4705:21
**120-1** [6] - 4873:25, 4874:5, 4874:10, 4874:15, 4874:16, 4932:20
**120-2** [1] - 4874:5
**120-3** [1] - 4874:5
**120-4** [1] - 4874:18
**120-5** [5] - 4874:1, 4874:11, 4874:15, 4874:16, 4932:20
**122-1** [6] - 4886:22, 4887:6, 4887:13, 4888:1, 4892:20, 4893:5
**122-2** [4] - 4894:2, 4894:4, 4894:9, 4932:23
**122-4** [1] - 4894:10
**122-5** [2] - 4890:10, 4891:5
**122-6** [7] - 4886:23, 4887:6, 4887:14, 4890:5, 4894:2, 4894:5, 4932:23
**123-1** [5] - 4886:24, 4887:10, 4887:15, 4893:7, 4893:8
**123-2** [3] - 4894:3, 4894:5, 4932:23
**123-4** [2] - 4897:5
**123-5** [1] - 4891:5
**123-6** [7] - 4886:24, 4887:10, 4887:15,

**4890:5, 4894:3, 4894:5, 4932:23
**125-1** [1] - 4903:21
**125-1-A** [5] - 4867:13, 4867:19, 4868:1, 4871:22, 4932:19
**125-1-B** [1] - 4867:13
**125-1-CC** [4] - 4867:19, 4867:25, 4868:1, 4932:19
**125-1-H** [1] - 4901:8
**125-1-I** [1] - 4902:23
**125-1-J** [1] - 4868:5
**125-1-T** [1] - 4869:16
**125-1-W** [1] - 4870:7
**125-1-X** [2] - 4870:20, 4871:20
**125-1A** [1] - 4867:25
**125-2** [7] - 4871:11, 4871:25, 4872:4, 4872:11, 4872:12, 4909:8, 4932:20
**126,000** [4] - 4805:5, 4835:20
**127-1** [4] - 4905:18, 4905:23, 4905:25, 4932:24
**127-2** [5] - 4904:14, 4904:22, 4905:1, 4906:5, 4932:24
**128** [1] - 4900:2
**12th** [9] - 4660:23, 4698:19, 4779:8, 4781:13, 4782:10, 4785:24, 4787:12, 4792:15, 4797:8
**13** [2] - 4657:7, 4754:15
**138** [1] - 4900:15
**139** [1] - 4900:17
**13D** [3] - 4678:8, 4678:9, 4678:15
**13th** [1] - 4874:22
**14** [2] - 4725:10, 4727:25
**140** [1] - 4900:18
**142** [1] - 4900:18
**144** [1] - 4678:15
**14th** [5] - 4720:16, 4729:4, 4734:1, 4734:4, 4931:15
**15** [2] - 4681:9, 4681:14
**15,000** [4] - 4775:2, 4775:3, 4784:9, 4785:2
**15-CR-637(KAM** [1] - 4657:3
**150,000** [1] - 4782:24

**16** [5] - 4659:2,
4723:9, 4761:15,
4898:16, 4899:10
**16th** [2] - 4722:21,
4878:19
**17** [1] - 4660:25
**17th** [3] - 4786:6,
4787:16, 4792:15
**18** [14] - 4687:5,
4812:9, 4819:22,
4824:16, 4824:22,
4825:15, 4826:4,
4826:8, 4826:9,
4828:10, 4828:11,
4828:12
**186** [1] - 4901:21
**19** [2] - 4724:2,
4724:4
**1997** [1] - 4687:20
**1:00** [1] - 4802:8
**1st** [11] - 4698:8,
4698:12, 4698:13,
4724:9, 4762:15,
4762:16, 4764:21,
4765:9, 4767:11,
4769:20, 4881:11

## 2

**2** [6] - 4659:20,
4660:13, 4698:6,
4700:11, 4812:17,
4910:7
**2,000** [1] - 4724:7
**2,500** [10] - 4699:18,
4699:21, 4700:1,
4700:2, 4700:5,
4700:9, 4700:14,
4733:5, 4733:6,
4733:15
**2.4** [2] - 4783:8,
4785:16
**20** [8] - 4727:8,
4770:11, 4794:2,
4814:3, 4864:24,
4898:5, 4899:9,
4930:22
**20,000** [1] - 4923:8
**200** [1] - 4657:17
**200,000** [1] - 4787:17
**2004** [1] - 4690:11
**2006** [1] - 4690:11
**2007** [1] - 4907:8
**2008** [2] - 4690:22,
4907:8
**2010** [5] - 4887:8,
4888:1, 4891:16,
4891:24, 4892:22
**2011** [13] - 4692:16,
4692:17, 4693:5,

4720:16, 4720:20,
4728:24, 4737:5,
4888:2, 4891:16,
4891:24, 4892:22,
4920:8, 4920:23
**2012** [129] - 4686:21,
4692:20, 4693:7,
4694:6, 4698:9,
4698:12, 4698:19,
4704:5, 4705:15,
4705:16, 4713:7,
4714:3, 4714:22,
4715:16, 4716:1,
4723:9, 4724:2,
4724:4, 4724:19,
4725:10, 4726:24,
4727:8, 4727:25,
4728:22, 4729:2,
4729:13, 4729:25,
4730:20, 4731:13,
4732:17, 4732:18,
4732:19, 4733:19,
4734:10, 4734:12,
4734:20, 4735:3,
4735:8, 4736:4,
4736:11, 4737:6,
4737:8, 4738:22,
4739:7, 4739:10,
4742:1, 4743:16,
4743:20, 4744:13,
4744:24, 4744:25,
4747:15, 4747:18,
4747:23, 4748:11,
4750:11, 4750:12,
4750:24, 4753:12,
4753:13, 4754:17,
4755:8, 4758:8,
4758:9, 4758:11,
4759:10, 4761:19,
4762:15, 4762:16,
4762:22, 4764:10,
4764:21, 4765:1,
4765:9, 4766:3,
4767:12, 4767:16,
4767:25, 4769:7,
4769:9, 4769:20,
4769:22, 4769:25,
4774:12, 4774:13,
4774:14, 4774:18,
4775:1, 4775:24,
4778:4, 4778:7,
4779:22, 4787:25,
4788:2, 4788:9,
4789:3, 4789:6,
4790:11, 4791:7,
4792:20, 4792:21,
4794:2, 4797:17,
4803:6, 4804:9,
4806:25, 4807:11,
4813:17, 4829:10,
4832:23, 4835:4,

4836:23, 4836:25,
4841:21, 4842:3,
4842:8, 4843:11,
4843:12, 4848:13,
4867:2, 4874:22,
4884:12, 4884:22,
4885:3, 4885:12,
4917:12, 4921:10
**2013** [35] - 4666:13,
4666:14, 4666:20,
4672:13, 4672:14,
4796:2, 4796:21,
4800:25, 4801:1,
4801:9, 4803:4,
4803:14, 4804:9,
4804:10, 4805:4,
4811:21, 4813:14,
4816:25, 4823:25,
4829:17, 4835:16,
4835:17, 4835:19,
4836:2, 4878:19,
4878:23, 4879:5,
4881:11, 4885:24,
4886:4, 4894:15,
4896:22, 4897:7,
4900:10, 4900:20
**2014** [33] - 4819:5,
4819:7, 4835:22,
4835:25, 4836:2,
4836:5, 4867:3,
4889:15, 4894:15,
4896:22, 4897:7,
4898:5, 4898:13,
4898:16, 4898:20,
4899:1, 4899:7,
4899:9, 4899:10,
4899:14, 4900:7,
4900:24, 4901:6,
4901:7, 4901:24,
4903:10, 4903:25,
4904:8, 4905:14,
4906:3, 4912:9,
4912:10, 4917:12
**2016** [1] - 4887:8
**2017** [5] - 4657:7,
4797:14, 4812:25,
4813:1, 4931:15
**208** [1] - 4733:9
**20th** [5] - 4727:12,
4739:1, 4792:18,
4792:20, 4795:19
**21** [4] - 4747:25,
4803:6, 4843:12,
4848:13
**2105** [1] - 4679:7
**21st** [1] - 4842:5
**22** [3] - 4779:4,
4864:23, 4864:24
**22,500** [2] - 4715:17,
4724:11

**225** [1] - 4657:23
**22nd** [1] - 4735:22
**23** [1] - 4781:9
**24** [10] - 4676:5,
4786:3, 4786:20,
4804:15, 4804:21,
4806:3, 4806:24,
4881:16, 4881:21,
4903:25
**25** [4] - 4737:2,
4737:13, 4753:12
**250** [1] - 4819:9
**250,000** [1] - 4787:6
**2511** [1] - 4826:10
**2511(1)(a)** [1] -
4828:13
**26** [1] - 4790:3
**26,667** [1] - 4784:8
**26.2** [1] - 4685:15
**27** [2] - 4796:20,
4803:14
**2701** [3] - 4825:15,
4826:8, 4828:12
**271** [1] - 4657:15
**27th** [1] - 4804:10
**28** [1] - 4801:5
**29** [10] - 4750:24,
4753:19, 4754:17,
4755:8, 4756:21,
4757:22, 4758:11,
4759:10, 4901:24,
4903:10
**29th** [2] - 4761:19,
4762:22
**2:00** [2] - 4814:2,
4814:3
**2:10** [1] - 4802:13
**2nd** [2] - 4769:7,
4769:9

## 3

**3** [8] - 4659:20,
4660:13, 4698:16,
4714:15, 4750:11,
4812:18, 4873:25,
4874:4
**3.7** [2] - 4888:7,
4889:11
**30** [12] - 4658:16,
4732:17, 4732:18,
4748:14, 4899:1,
4899:7, 4900:7,
4901:6, 4901:7,
4906:3, 4930:13,
4930:15
**30,000** [2] - 4726:12,
4769:17, 4923:9
**300,000** [3] -
4782:23, 4787:4,

**4787**:5
**30th** [6] - 4731:19,
4734:4, 4878:23,
4879:5, 4884:12,
4904:19
**31** [5] - 4728:24,
4797:17, 4898:13,
4898:19, 4899:13
**31st** [4] - 4885:3,
4885:24, 4916:17,
4917:1
**330** [2] - 4706:10,
4715:22
**34** [2] - 4797:17,
4803:18
**3405** [1] - 4664:24
**35,000** [1] - 4726:11
**350,000** [3] -
4782:21, 4787:5,
4787:6
**3500** [8] - 4819:4,
4819:5, 4820:12,
4820:16, 4853:17,
4861:17, 4863:3,
4863:4
**36** [1] - 4676:6
**381907** [1] - 4895:9
**3:20** [3] - 4755:8,
4756:22, 4756:24
**3rd** [15] - 4763:5,
4764:6, 4764:10,
4767:24, 4769:22,
4769:25, 4770:13,
4772:5, 4772:15,
4774:7, 4774:12,
4774:13, 4774:14,
4775:13, 4778:25

## 4

**4** [14] - 4664:24,
4693:7, 4694:7,
4748:9, 4748:10,
4783:23, 4788:9,
4789:3, 4789:6,
4790:11, 4812:20,
4873:25, 4874:4,
4881:15
**4,167** [2] - 4751:7,
4752:1
**4-D** [1] - 4699:18
**40** [1] - 4737:9
**400,000** [4] -
4782:20, 4782:21,
4782:22
**401** [1] - 4888:9
**403** [3] - 4888:9,
4891:18, 4891:19
**42** [1] - 4687:1
**42.7** [1] - 4882:16

**426** [2] - 4918:24, 4919:24
**433** [1] - 4921:5
**441** [1] - 4661:8
**446** [1] - 4660:24
**45** [1] - 4658:16
**45-ish** [1] - 4831:20
**4686** [1] - 4932:4
**4695** [1] - 4932:10
**4700** [1] - 4932:10
**471** [1] - 4884:19
**4715** [1] - 4932:11
**4720** [1] - 4932:11
**4725** [1] - 4932:12
**4727** [1] - 4932:12
**4732** [1] - 4932:13
**4744** [1] - 4932:13
**4750** [1] - 4932:14
**4755** [1] - 4932:14
**4757** [1] - 4932:15
**476** [1] - 4885:9
**4760** [1] - 4932:15
**4761** [1] - 4932:16
**4763** [1] - 4932:16
**4770** [1] - 4932:17
**4779** [1] - 4932:17
**4781** [1] - 4932:18
**4786** [1] - 4932:18
**4797** [1] - 4932:19
**48** [1] - 4878:14
**4864** [1] - 4932:6
**4868** [1] - 4932:19
**4872** [1] - 4932:20
**4874** [1] - 4932:20
**4877** [1] - 4932:21
**4878** [1] - 4932:21
**4894** [2] - 4932:23, 4932:23
**48th** [1] - 4657:17
**4905** [2] - 4932:24, 4932:24
**4907** [1] - 4932:7
**4:00** [1] - 4681:7
**4:30** [1] - 4857:11
**4A** [1] - 4719:10
**4th** [4] - 4789:24, 4790:6, 4790:25, 4791:22

## 5

**5** [6] - 4725:3, 4800:25, 4811:21, 4812:20, 4873:25, 4874:4
**5,000** [2] - 4726:12, 4726:13
**50** [1] - 4927:17
**50,000** [5] - 4726:11,

4727:13, 4728:5, 4738:15, 4765:15
**57-A** [1] - 4899:6
**575** [1] - 4908:7
**5:00** [1] - 4928:1
**5:17** [1] - 4782:10
**5:30** [2] - 4919:7, 4927:25
**5th** [4] - 4774:18, 4775:1, 4797:22, 4811:21

## 6

**6** [8] - 4678:18, 4701:8, 4726:17, 4801:9, 4803:4, 4812:21, 4873:25, 4874:19
**60,000** [1] - 4726:10
**600** [1] - 4811:4
**613-2643** [1] - 4657:24
**682-B** [5] - 4796:19, 4797:1, 4797:5, 4797:8, 4932:19
**685** [5] - 4801:5, 4802:1, 4802:21, 4815:5, 4829:16

## 7

**7** [7] - 4664:25, 4688:8, 4731:18, 4763:2, 4873:25, 4912:9, 4912:10
**7/1/12** [1] - 4758:18
**70** [1] - 4693:10
**700** [1] - 4808:11
**718** [1] - 4657:24
**737** [1] - 4882:3
**738** [1] - 4882:25
**75** [1] - 4664:4
**75,000** [4] - 4767:8, 4767:17, 4767:21, 4772:3
**777** [2] - 4735:22, 4735:23
**7:30** [1] - 4658:20

## 8

**8** [10] - 4658:23, 4736:11, 4743:7, 4855:24, 4856:5, 4856:6, 4857:7, 4857:16, 4886:22, 4925:19
**8-K** [4] - 4793:2, 4793:5, 4798:4,

4798:11
**80** [4] - 4737:1, 4737:9, 4737:15
**801** [6] - 4876:2, 4876:8, 4876:12, 4876:24, 4877:3, 4932:21
**822** [6] - 4876:3, 4876:9, 4876:13, 4876:24, 4877:3, 4932:21
**826** [6] - 4876:5, 4877:8, 4877:21, 4877:25, 4878:3, 4932:21
**836** [1] - 4884:7
**837** [1] - 4885:1
**838** [1] - 4885:22
**848** [3] - 4878:14, 4878:17, 4880:9
**850** [6] - 4877:8, 4877:9, 4877:22, 4877:25, 4878:3, 4932:21
**851-A** [4] - 4877:10, 4877:22, 4878:4, 4932:21
**852-A** [4] - 4877:10, 4877:22, 4878:4, 4932:22
**853-A** [4] - 4877:10, 4877:22, 4878:4, 4932:22
**854-A** [4] - 4877:10, 4877:22, 4878:4, 4932:22
**855-A** [4] - 4877:10, 4877:22, 4878:4, 4932:22
**856** [2] - 4898:2, 4898:3
**856-A** [7] - 4877:10, 4877:23, 4878:4, 4898:2, 4932:22
**857** [2] - 4898:25, 4899:24
**857-A** [9] - 4877:10, 4877:23, 4878:4, 4899:3, 4899:4, 4899:25, 4912:3, 4932:22
**858** [5] - 4877:10, 4877:23, 4878:4, 4898:15, 4932:22
**859-A** [3] - 4877:11, 4877:23, 4878:4
**859-A,860** [1] - 4932:22
**860** [3] - 4877:11, 4877:23, 4878:5

**876,257.35** [1] - 4879:6
**8:00** [6] - 4927:20, 4928:5, 4928:6, 4928:19, 4928:20, 4929:8
**8:06** [1] - 4811:22
**8:20** [2] - 4755:17, 4756:22
**8th** [2] - 4738:16, 4799:19

## 9

**9** [4] - 4753:13, 4857:22, 4886:22, 4929:11
**91.3** [2] - 4895:10, 4895:11
**917)716-0699** [1] - 4660:2
**917)922-4166** [1] - 4660:2
**931617** [1] - 4812:25
**9:00** [7] - 4657:7, 4857:7, 4928:3, 4928:17, 4930:9, 4931:9, 4931:16
**9:15** [2] - 4675:9, 4681:1
**9:30** [4] - 4677:8, 4928:7, 4928:19, 4929:8
**9:32** [1] - 4761:19
**9th** [2] - 4661:8, 4813:1

## A

**a)(2** [2] - 4824:23, 4825:4
**a)(4** [1] - 4825:4
**a)(5** [3] - 4825:4, 4825:10, 4828:11
**a)(6** [3] - 4825:4, 4825:5, 4828:11
**a.m** [2] - 4657:7, 4931:16
**AA** [1] - 4867:20
**ability** [1] - 4682:7
**able** [23] - 4670:13, 4671:13, 4671:14, 4681:19, 4682:18, 4691:15, 4691:24, 4697:22, 4703:22, 4722:10, 4778:13, 4778:21, 4824:6, 4831:24, 4832:16, 4834:1, 4837:22, 4843:16, 4844:17,

4859:15, 4860:20, 4921:24, 4928:22
**abroad** [1] - 4729:22
**absolutely** [4] - 4665:3, 4710:19, 4852:3, 4853:12
**Absolutely** [1] - 4925:25
**absurd** [2] - 4681:4, 4681:5
**abundance** [1] - 4823:21
**abuse** [1] - 4812:4
**Abuse** [4] - 4803:19, 4807:3, 4812:16, 4819:22
**accept** [2] - 4777:6, 4929:7
**acceptable** [3] - 4664:2, 4860:15, 4890:17
**access** [53] - 4702:22, 4703:11, 4703:23, 4712:16, 4712:20, 4712:22, 4722:8, 4795:22, 4795:25, 4803:21, 4804:2, 4804:3, 4807:6, 4812:6, 4812:19, 4812:21, 4813:3, 4813:10, 4813:11, 4813:17, 4813:21, 4818:10, 4818:20, 4819:3, 4819:12, 4819:13, 4819:24, 4823:13, 4824:7, 4824:8, 4824:17, 4824:19, 4825:8, 4825:10, 4825:16, 4825:19, 4829:12, 4829:15, 4832:19, 4834:21, 4836:23, 4839:21, 4841:18, 4841:20, 4843:8, 4846:6, 4849:1, 4850:25, 4853:5, 4853:18, 4857:2, 4857:3
**accessed** [6] - 4712:18, 4801:8, 4818:25, 4823:24, 4844:21, 4846:5
**accesses** [2] - 4812:17, 4812:18
**accessing** [9] - 4801:1, 4824:23, 4833:23, 4835:5, 4836:11, 4837:9, 4848:13, 4848:16, 4848:17

**accommodate** [2] - 4683:14, 4740:2
**accompanied** [1] - 4714:21
**accompanying** [1] - 4714:12
**according** [4] - 4750:5, 4797:17, 4834:24, 4879:5
**account** [13] - 4689:16, 4689:20, 4691:16, 4703:11, 4708:19, 4713:18, 4713:19, 4718:24, 4722:10, 4739:5, 4793:14, 4793:15, 4918:22
**accountant** [7] - 4704:3, 4717:3, 4718:5, 4718:18, 4718:24, 4742:24, 4751:17
**accountants** [3] - 4752:22, 4764:3, 4793:6
**accounting** [11] - 4701:24, 4703:20, 4708:7, 4864:17, 4864:18, 4864:19, 4865:11, 4865:14, 4865:21, 4866:8, 4866:9
**accounts** [8] - 4697:14, 4702:1, 4702:23, 4703:23, 4704:1, 4722:9, 4798:22
**accrued** [1] - 4889:12
**accusation** [1] - 4845:9
**accusations** [1] - 4810:20
**accuse** [1] - 4838:9
**accused** [1] - 4673:15
**accuser** [1] - 4673:16
**acknowledge** [2] - 4670:25, 4769:16
**Acquisition** [1] - 4868:19
**Act** [6] - 4803:19, 4807:3, 4807:4, 4812:16, 4819:22, 4825:14
**acting** [1] - 4681:19
**Acting** [1] - 4657:13
**activities** [2] - 4741:25, 4778:20

**acts** [4] - 4827:25, 4834:23, 4838:13
**actual** [9] - 4685:1, 4685:3, 4726:14, 4886:11, 4895:17, 4895:20, 4896:16, 4906:17, 4917:4
**Adam** [1] - 4707:9
**add** [2] - 4785:16, 4828:25
**added** [9] - 4662:12, 4783:8, 4793:11, 4865:9, 4902:15, 4902:18, 4926:18, 4926:22, 4926:23
**adding** [1] - 4927:10
**addition** [6] - 4679:7, 4720:22, 4828:9, 4849:21, 4860:24, 4876:19
**additional** [18] - 4669:20, 4681:2, 4685:8, 4685:13, 4685:15, 4706:12, 4774:19, 4785:25, 4815:9, 4823:17, 4839:20, 4849:17, 4849:19, 4851:11, 4873:23, 4876:25, 4926:18, 4929:14
**address** [13] - 4661:23, 4706:9, 4715:22, 4715:23, 4735:20, 4768:25, 4781:20, 4826:21, 4833:12, 4873:10, 4873:13, 4889:8, 4927:7
**addressed** [1] - 4892:3
**addressing** [1] - 4838:2
**adjoiner** [1] - 4769:18
**adjourn** [1] - 4842:25
**adjourned** [3] - 4682:16, 4802:8, 4931:15
**adjournment** [1] - 4860:25
**adjusted** [1] - 4866:22
**adjustments** [1] - 4866:21
**administration** [5] - 4701:24, 4701:25, 4703:19, 4703:20, 4917:14
**administrative** [4] - 4701:25, 4704:17,

4708:1, 4895:6
**admissible** [4] - 4659:21, 4660:4, 4816:15, 4838:11
**admission** [3] - 4661:6, 4816:16, 4876:21
**admissions** [1] - 4821:19
**admit** [8] - 4661:2, 4761:23, 4786:17, 4815:14, 4872:10, 4876:24, 4877:24, 4894:4
**admitted** [3] - 4862:19, 4872:8, 4905:2
**admitting** [1] - 4877:20
**admonished** [2] - 4662:16, 4662:24
**admonitions** [1] - 4661:14
**adoption** [7] - 4728:17, 4728:19, 4728:21, 4729:1, 4768:21, 4769:5
**ADP** [1] - 4708:18
**advanced** [1] - 4684:11
**adverse** [1] - 4870:18
**adverse/PIP** [1] - 4902:18
**advice** [2] - 4815:21, 4847:9
**advise** [4] - 4815:17, 4837:1, 4845:13, 4856:24
**advised** [1] - 4678:3
**advises** [1] - 4857:6
**affair** [1] - 4856:3
**affecting** [1] - 4825:9
**affects** [1] - 4675:6
**affiliated** [2] - 4696:9, 4875:19
**affirm** [1] - 4663:23
**affirmed** [2] - 4663:13, 4663:15
**afford** [1] - 4815:16
**afforded** [1] - 4661:9
**afternoon** [17] - 4832:14, 4832:15, 4833:12, 4843:5, 4843:10, 4846:2, 4847:11, 4848:22, 4849:1, 4849:12, 4852:2, 4854:16, 4858:21, 4860:18, 4863:23, 4864:12,

4907:4
**AFTERNOON** [1] - 4814:9
**Agent** [2] - 4819:8, 4921:6
**agent** [5] - 4817:22, 4859:12, 4861:12, 4862:2, 4920:21
**aggregate** [1] - 4879:4
**aggregating** [1] - 4812:23
**ago** [9] - 4676:19, 4677:7, 4681:3, 4705:14, 4724:14, 4803:15, 4810:23, 4827:20, 4929:10
**agree** [8] - 4659:14, 4661:5, 4666:3, 4679:11, 4875:22, 4892:16, 4915:17, 4923:19
**agreed** [6] - 4698:14, 4726:1, 4805:22, 4851:24, 4862:20, 4878:8
**agreement** [61] - 4662:6, 4696:2, 4696:3, 4696:6, 4698:7, 4698:8, 4700:8, 4700:13, 4700:25, 4701:1, 4701:7, 4701:18, 4714:5, 4714:7, 4714:12, 4714:21, 4714:24, 4715:11, 4722:12, 4724:14, 4728:17, 4728:20, 4728:21, 4728:23, 4729:1, 4733:6, 4751:20, 4756:8, 4756:14, 4757:19, 4758:1, 4761:17, 4762:19, 4763:22, 4764:5, 4764:25, 4765:14, 4766:1, 4766:12, 4766:15, 4766:17, 4767:1, 4767:3, 4767:19, 4768:21, 4769:5, 4769:18, 4772:5, 4779:25, 4780:1, 4780:2, 4800:15, 4808:1, 4817:8, 4840:18, 4868:17, 4879:14, 4882:17, 4883:16
**agreements** [8] - 4719:2, 4726:15, 4764:2, 4764:6,

4764:9, 4772:15, 4885:6, 4885:19
**ahead** [8] - 4755:20, 4765:25, 4767:9, 4776:25, 4807:19, 4857:8, 4870:19, 4920:6
**aided** [1] - 4657:25
**aired** [1] - 4854:5
**alias** [1] - 4871:2
**aligned** [1] - 4678:11
**ALIXANDRA** [1] - 4657:13
**ALL** [2] - 4814:7, 4931:12
**allegation** [3] - 4786:9, 4804:23, 4828:1
**allegations** [3] - 4810:16, 4826:2, 4836:5
**allege** [3] - 4841:9, 4841:12, 4842:1
**alleged** [1] - 4892:14
**alleges** [1] - 4817:7
**alleging** [2] - 4839:24, 4840:12
**Allison** [3] - 4704:10, 4704:15, 4707:25
**allocate** [2] - 4776:7, 4776:13
**allocated** [7] - 4776:15, 4778:14, 4782:19, 4783:15, 4785:20, 4787:20, 4904:10
**allocation** [7] - 4774:15, 4775:17, 4775:22, 4777:25, 4779:1, 4779:11, 4786:1
**allocations** [2] - 4787:7
**allow** [7] - 4822:6, 4833:13, 4833:14, 4846:25, 4851:6, 4854:2, 4859:9
**allowed** [13] - 4661:21, 4668:20, 4668:25, 4683:8, 4799:10, 4841:1, 4841:24, 4858:18, 4858:22, 4859:10, 4861:10, 4924:2, 4924:22
**almost** [2] - 4901:1, 4907:10
**alone** [2] - 4830:4, 4908:14
**Alpha** [1] - 4707:11

alter [1] - 4825:18
altering [1] - 4861:5
alternative [2] -
4808:22, 4811:22
ambiguous [1] -
4666:16
Amendment [12] -
4815:22, 4816:17,
4817:19, 4832:24,
4833:17, 4837:11,
4838:6, 4841:19,
4850:23, 4851:3,
4853:2, 4859:15
AMERICA [1] -
4657:3
amount [19] -
4700:3, 4721:12,
4722:5, 4730:4,
4737:17, 4745:14,
4776:15, 4782:18,
4788:15, 4789:10,
4805:11, 4825:2,
4879:4, 4879:24,
4881:8, 4888:6,
4912:18, 4916:3,
4922:23
amounts [9] -
4726:3, 4726:6,
4785:10, 4785:14,
4787:1, 4922:19,
4922:20, 4922:25,
4923:8
ample [1] - 4843:23
analyst [2] -
4687:25, 4707:1
Analyst [1] - 4902:11
analyzing [1] -
4923:24
Andrew [6] -
4704:24, 4774:23,
4782:23, 4787:6,
4793:18, 4794:2
Andy [2] - 4704:13,
4704:24
Answer [3] - 4662:8,
4662:11, 4665:3
answer [9] - 4666:7,
4670:25, 4671:1,
4671:3, 4684:23,
4776:25, 4803:25,
4817:6, 4861:2
answered [1] -
4792:9
answering [1] -
4837:12
answers [2] -
4684:6, 4813:16
anticipate [3] -
4854:22, 4856:3,
4928:14

anticipated [2] -
4838:3, 4856:11
anyway [2] -
4810:14, 4847:14
apologize [4] -
4802:5, 4822:1,
4857:5, 4857:7
apparent [1] - 4669:1
appear [3] - 4816:2,
4824:4, 4888:10
APPEARANCES [1] -
4657:11
appeared [1] -
4750:17
appellate [1] -
4682:19
applicable [4] -
4825:9, 4825:23,
4825:25, 4826:24
application [5] -
4851:10, 4851:13,
4851:21, 4852:3,
4857:24
applications [2] -
4827:22, 4837:23
apply [2] - 4679:23,
4813:8
appoint [5] -
4815:15, 4815:20,
4817:4, 4822:18,
4838:14
appointed [1] -
4931:7
appreciate [2] -
4663:1, 4831:5
apprise [2] -
4676:22, 4843:14
approach [3] -
4823:6, 4887:1,
4887:17
appropriate [10] -
4678:20, 4679:19,
4843:23, 4845:6,
4851:12, 4854:12,
4914:16, 4919:5,
4923:14, 4925:1
appropriately [1] -
4851:24
approve [1] - 4747:1
approved [1] -
4818:19
approximate [6] -
4747:10, 4747:22,
4748:3, 4748:8,
4778:1, 4805:24
April [1] - 4835:22
arbitration [10] -
4692:5, 4692:12,
4800:17, 4835:17,
4835:23, 4836:13,

4836:14, 4841:13,
4850:18
arbitrator [1] -
4835:22
archive [9] -
4712:14, 4712:18,
4795:14, 4795:23,
4796:1, 4801:2,
4801:9, 4829:11,
4832:21
archived [1] - 4712:8
archiving [4] -
4712:6, 4712:10,
4712:22, 4713:1
area [24] - 4678:21,
4796:6, 4822:13,
4827:4, 4834:5,
4835:1, 4842:1,
4843:7, 4843:9,
4843:14, 4846:2,
4846:3, 4846:5,
4846:8, 4846:9,
4847:3, 4850:9,
4851:1, 4851:3,
4851:14, 4853:16,
4856:17, 4861:14
areas [35] - 4668:22,
4680:25, 4684:9,
4817:17, 4833:15,
4837:13, 4839:9,
4840:11, 4840:19,
4842:3, 4842:23,
4843:10, 4843:13,
4845:15, 4846:4,
4846:15, 4847:2,
4847:12, 4850:15,
4850:20, 4850:21,
4853:3, 4853:4,
4858:4, 4858:7,
4858:8, 4859:6,
4859:10, 4859:14,
4859:20, 4859:25,
4860:2, 4860:21,
4863:6
argue [2] - 4853:24,
4924:22
argues [1] - 4838:12
argument [10] -
4672:23, 4674:13,
4824:23, 4888:21,
4888:24, 4892:2,
4892:3, 4893:1,
4921:25, 4924:1
arguments [1] -
4893:11
arise [1] - 4863:15
arrangement [1] -
4915:14
arrive [1] - 4857:19
Aselage [12] -

4671:22, 4671:24,
4672:1, 4672:12,
4673:12, 4673:14,
4673:20, 4707:14,
4738:11, 4738:14,
4739:4, 4778:9
aside [4] - 4720:21,
4764:4, 4810:16,
4810:20
assault [1] - 4688:23
assert [1] - 4810:8
asserting [1] -
4832:24
assess [1] - 4679:15
asset [2] - 4687:25,
4689:25
assets [3] - 4730:4,
4797:18, 4803:17
assigned [1] -
4882:12, 4895:14,
4905:11, 4906:7
assistance [1] -
4913:2
assistant [4] -
4704:17, 4708:1,
4880:17, 4880:20
Assistant [1] -
4657:15
associate [1] -
4815:7
associated [16] -
4660:18, 4713:19,
4788:14, 4789:9,
4864:20, 4865:3,
4865:13, 4865:22,
4866:4, 4866:24,
4869:9, 4873:6,
4873:9, 4895:17,
4895:23, 4904:18
associates [1] -
4913:16
assume [7] -
4662:16, 4755:23,
4799:20, 4816:22,
4922:18, 4922:19,
4923:25
assumed [1] -
4753:2
assuming [4] -
4673:20, 4673:22,
4674:1, 4810:13
assumption [1] -
4672:6
assumptions [1] -
4756:1
assumptive [1] -
4662:11
astonished [2] -
4920:10, 4920:13
attach [2] - 4770:15,

4783:18
attached [10] -
4722:25, 4728:6,
4734:10, 4736:25,
4751:11, 4753:6,
4762:8, 4769:5,
4823:23, 4875:14
Attached [2] -
4732:9, 4797:14
attaching [5] -
4666:20, 4757:25,
4763:6, 4774:13,
4878:20
attachment [13] -
4660:12, 4719:24,
4728:7, 4731:24,
4732:1, 4732:12,
4751:6, 4758:3,
4762:9, 4764:18,
4765:4, 4765:13,
4783:23
attachments [3] -
4751:4, 4764:12,
4769:21
attempt [2] - 4661:2,
4676:18
attempted [1] -
4662:1
attempts [1] -
4661:12
attend [1] - 4716:5
attends [1] - 4861:12
attention [15] -
4672:9, 4674:13,
4681:20, 4713:6,
4751:16, 4828:19,
4845:19, 4863:11,
4863:14, 4863:16,
4873:9, 4875:2,
4919:16, 4919:17,
4926:14
attentive [1] -
4674:12
attorney [49] -
4751:16, 4798:23,
4799:13, 4799:15,
4799:16, 4800:14,
4800:16, 4801:13,
4817:16, 4823:9,
4831:8, 4838:15,
4848:4, 4863:22,
4865:16, 4866:3,
4866:14, 4866:15,
4866:18, 4866:20,
4868:21, 4868:25,
4869:2, 4869:5,
4870:4, 4872:24,
4880:17, 4880:20,
4881:2, 4883:11,
4886:12, 4886:14,

4886:19, 4894:23, 4896:16, 4902:2, 4902:16, 4905:7, 4905:8, 4906:18, 4906:19, 4907:13, 4908:13, 4913:5, 4913:10, 4918:19, 4923:17
**Attorney** [1] - 4657:13
**attorney's** [2] - 4909:25, 4910:3
**Attorneys** [1] - 4657:15
**attorneys** [13] - 4723:1, 4800:21, 4808:19, 4810:5, 4822:10, 4823:8, 4882:5, 4904:5, 4908:2, 4908:11, 4908:16, 4908:20, 4910:14
**attract** [1] - 4737:13
**audit** [1] - 4703:20
**auditor** [5] - 4717:5, 4717:8, 4718:3, 4718:8, 4742:23
**auditors** [1] - 4793:6
**audits** [1] - 4798:20
**August** [17] - 4675:16, 4680:3, 4680:19, 4693:4, 4731:13, 4731:19, 4732:19, 4734:4, 4734:10, 4835:19, 4898:5, 4898:19, 4899:9, 4899:13, 4904:8, 4904:18, 4905:14
**authentic** [1] - 4819:20
**authenticate** [1] - 4924:6
**authenticity** [2] - 4815:10, 4889:20
**authority** [4] - 4906:15, 4913:24, 4915:5, 4915:6
**authorization** [9] - 4807:2, 4807:6, 4812:18, 4813:4, 4824:18, 4825:8, 4825:11, 4825:17
**authorized** [3] - 4812:19, 4824:19, 4825:19
**automatically** [1] - 4712:13
**available** [5] - 4779:25, 4799:4,

4817:12, 4854:17, 4856:3
**avalanche** [1] - 4659:9
**Avenue** [6] - 4657:17, 4706:10, 4715:22, 4735:22, 4735:23, 4908:17
**avoid** [7] - 4659:9, 4679:10, 4839:9, 4842:22, 4847:12, 4850:15, 4919:16
**avoidable** [3] - 4851:25, 4852:1, 4852:4
**aware** [28] - 4666:17, 4666:19, 4667:1, 4675:24, 4676:13, 4680:11, 4684:4, 4685:17, 4713:9, 4750:12, 4764:25, 4767:20, 4811:1, 4811:2, 4827:9, 4827:14, 4827:17, 4834:23, 4836:12, 4839:17, 4840:13, 4845:6, 4856:21, 4862:7, 4900:6, 4906:12, 4929:18

## B

**bachelor** [1] - 4687:19
**backdoor** [1] - 4817:1
**backed** [1] - 4670:15
**background** [1] - 4848:1
**backing** [1] - 4674:5
**backpacks** [1] - 4735:14
**bad** [3] - 4681:20, 4727:19, 4800:6
**balance** [4] - 4791:3, 4879:21, 4880:1, 4883:18
**balances** [1] - 4879:2
**Balbin** [6] - 4766:6, 4772:17, 4775:8, 4781:4, 4783:24, 4875:24
**ballpark** [1] - 4856:18
**bank** [16] - 4697:14, 4701:25, 4702:23, 4703:11, 4703:23, 4703:25, 4708:19, 4713:18, 4718:24,

4722:9, 4722:10, 4739:5, 4793:14, 4793:15, 4849:5, 4849:7
**banking** [1] - 4923:7
**bar** [11] - 4802:2, 4802:9, 4808:17, 4808:18, 4887:21, 4887:24, 4889:4, 4891:1, 4893:22, 4894:2, 4894:14
**based** [39] - 4659:10, 4664:15, 4664:16, 4672:6, 4674:2, 4676:25, 4679:15, 4683:21, 4684:14, 4699:3, 4710:6, 4710:13, 4710:17, 4710:18, 4710:23, 4730:13, 4745:17, 4756:23, 4773:6, 4778:12, 4799:10, 4803:16, 4803:17, 4819:1, 4835:8, 4841:6, 4841:22, 4842:20, 4844:25, 4853:17, 4860:1, 4860:25, 4892:7, 4892:9, 4892:10, 4895:14, 4929:13, 4931:3
**baseline** [6] - 4888:18, 4888:25, 4891:16, 4892:4, 4892:7, 4892:8
**basis** [24] - 4663:20, 4666:3, 4673:1, 4674:11, 4674:17, 4676:12, 4679:14, 4683:25, 4684:5, 4810:21, 4811:7, 4812:11, 4812:13, 4816:14, 4817:20, 4818:11, 4821:11, 4838:10, 4860:23, 4889:23, 4915:9, 4915:11, 4915:14, 4922:25
**Bates** [7] - 4808:10, 4884:19, 4885:9, 4897:12, 4900:1, 4912:8
**bathroom** [1] - 4822:22
**bear** [2] - 4661:18, 4821:20
**became** [2] - 4761:7, 4907:8
**become** [2] - 4733:16, 4743:3

**becoming** [1] - 4681:4
**BEFORE** [1] - 4657:10
**began** [1] - 4716:4
**beginning** [6] - 4678:4, 4708:9, 4711:14, 4733:7, 4776:4, 4904:2
**begins** [1] - 4758:3
**behalf** [3] - 4691:17, 4715:20, 4804:13
**behave** [1] - 4821:1
**behind** [26] - 4714:15, 4719:9, 4725:2, 4726:17, 4731:18, 4735:19, 4744:10, 4747:25, 4749:14, 4750:23, 4754:14, 4758:13, 4759:1, 4761:14, 4763:2, 4770:11, 4779:3, 4781:9, 4786:3, 4786:20, 4790:2, 4796:20, 4801:5, 4867:11, 4878:14, 4886:22
**belief** [1] - 4828:20
**believes** [1] - 4756:20
**belongings** [1] - 4735:17
**below** [8] - 4698:23, 4727:20, 4752:8, 4762:3, 4769:1, 4771:7, 4772:22, 4785:10
**benefit** [1] - 4860:10
**Bernadette** [1] - 4873:1
**Bertolini** [1] - 4726:12
**best** [11] - 4662:13, 4682:12, 4688:10, 4688:12, 4819:16, 4823:6, 4826:16, 4845:24, 4854:22, 4854:23, 4928:21
**bet** [2] - 4691:6, 4706:2
**better** [8] - 4667:7, 4826:25, 4827:7, 4829:4, 4845:16, 4855:16, 4926:6, 4928:9
**between** [52] - 4686:21, 4688:19, 4689:15, 4689:19, 4696:20, 4701:3, 4705:15, 4710:14,

4710:24, 4721:21, 4724:19, 4726:7, 4727:13, 4743:21, 4751:20, 4751:25, 4753:12, 4754:5, 4758:1, 4761:8, 4766:1, 4771:14, 4771:18, 4773:12, 4778:9, 4779:8, 4780:2, 4788:15, 4790:12, 4796:20, 4811:14, 4829:17, 4835:23, 4836:3, 4836:13, 4839:16, 4843:11, 4847:15, 4849:24, 4866:11, 4867:2, 4873:19, 4888:14, 4899:9, 4914:2, 4915:6, 4916:25, 4917:12, 4920:8, 4920:14, 4920:22, 4930:18
**beyond** [5] - 4918:25, 4919:3, 4922:12, 4922:14
**bias** [6] - 4661:22, 4664:22, 4666:1, 4669:25, 4836:8, 4861:24
**Biestek** [31] - 4704:11, 4705:7, 4705:10, 4743:12, 4751:7, 4751:11, 4751:21, 4751:25, 4756:13, 4757:23, 4759:22, 4761:17, 4762:7, 4763:9, 4763:21, 4764:5, 4764:23, 4765:5, 4766:12, 4766:16, 4766:24, 4770:6, 4772:12, 4774:4, 4774:5, 4775:18, 4782:21, 4787:5, 4795:1, 4803:10, 4829:15
**big** [6] - 4719:17, 4720:10, 4871:12, 4907:23, 4916:25, 4929:17
**bigger** [1] - 4896:24
**biggest** [2] - 4867:9
**bill** [49] - 4866:3, 4866:6, 4866:9, 4866:11, 4866:13, 4866:18, 4866:20, 4869:3, 4873:12, 4878:12, 4879:19, 4884:11, 4884:22, 4885:2, 4885:12,

4886:3, 4888:6, 4888:12, 4888:18, 4889:1, 4889:2, 4889:7, 4895:24, 4896:14, 4896:15, 4904:3, 4904:4, 4904:11, 4904:18, 4905:5, 4905:12, 4905:14, 4905:19, 4906:2, 4906:4, 4909:24, 4913:4, 4913:7, 4913:17, 4913:19, 4914:5, 4914:9, 4914:15, 4914:25, 4915:6, 4916:5, 4917:5, 4918:18

**Billed** [1] - 4896:2
**billed** [19] - 4788:16, 4790:15, 4866:21, 4880:10, 4882:5, 4882:16, 4882:21, 4886:18, 4895:10, 4895:17, 4896:9, 4896:11, 4896:21, 4897:19, 4908:17, 4915:8, 4915:11, 4916:3, 4922:20

**billing** [40] - 4831:16, 4864:20, 4864:25, 4866:14, 4866:15, 4873:6, 4873:8, 4873:9, 4886:17, 4889:11, 4891:17, 4893:12, 4893:17, 4896:5, 4896:7, 4896:17, 4902:21, 4904:7, 4906:18, 4906:19, 4908:8, 4913:9, 4913:10, 4913:11, 4913:25, 4914:1, 4917:8, 4918:9, 4919:5, 4920:23, 4920:25, 4921:2, 4922:5, 4922:15, 4922:16, 4923:17, 4924:20

**billings** [1] - 4892:10
**Billings** [1] - 4895:16
**bills** [52] - 4713:16, 4788:3, 4788:12, 4788:13, 4788:14, 4789:8, 4789:9, 4789:12, 4789:19, 4790:12, 4790:13, 4791:15, 4862:18, 4876:3, 4876:9, 4877:13, 4877:16, 4877:21, 4883:21, 4883:23, 4884:6,

4889:24, 4895:25, 4908:9, 4908:16, 4908:20, 4910:3, 4913:4, 4913:14, 4913:24, 4916:8, 4916:10, 4916:13, 4916:19, 4916:22, 4917:2, 4917:16, 4918:3, 4918:7, 4918:14, 4920:22, 4921:4, 4921:12, 4921:21, 4922:16, 4922:23, 4923:8, 4923:18, 4923:20, 4924:16

**bills-MSMB** [1] - 4876:3
**binder** [39] - 4695:2, 4700:11, 4714:14, 4719:10, 4725:2, 4726:17, 4731:18, 4736:8, 4744:10, 4749:14, 4750:23, 4754:14, 4755:11, 4757:6, 4759:1, 4761:14, 4763:2, 4770:11, 4779:3, 4781:8, 4786:3, 4790:3, 4796:20, 4867:11, 4868:6, 4871:12, 4871:13, 4873:25, 4874:19, 4876:4, 4876:5, 4876:8, 4877:7, 4878:14, 4884:3, 4886:21, 4887:19, 4904:15, 4905:16

**binders** [3] - 4695:6, 4867:8, 4876:1
**biotech** [1] - 4697:9
**bit** [6] - 4688:2, 4689:5, 4745:22, 4805:5, 4822:21, 4930:17
**blame** [1] - 4845:11
**Blanton** [4] - 4662:2, 4662:16, 4662:17, 4663:11
**blog** [1] - 4707:10
**blow** [1] - 4753:12, 4759:9, 4775:8
**board** [20] - 4666:13, 4666:18, 4666:21, 4666:23, 4667:3, 4667:8, 4667:9, 4671:23, 4672:4, 4672:8, 4672:20, 4672:21, 4672:24, 4673:25, 4674:7, 4674:16

**body** [2] - 4729:18, 4729:19
**bold** [3] - 4695:22, 4700:23, 4875:18
**bombarding** [1] - 4682:25
**Bonanza** [1] - 4690:8
**bonus** [9] - 4699:3, 4738:6, 4768:12, 4774:22, 4797:12, 4797:15, 4803:13, 4803:16, 4804:8
**book** [1] - 4752:23
**borrow** [5] - 4691:13, 4691:17, 4691:18, 4691:19
**borrowed** [1] - 4805:23
**borrower** [1] - 4745:11
**bothered** [1] - 4929:19
**bottom** [20] - 4720:18, 4722:20, 4723:15, 4724:1, 4733:25, 4738:10, 4738:25, 4754:19, 4755:4, 4757:18, 4758:9, 4771:15, 4771:24, 4775:10, 4779:20, 4785:5, 4785:6, 4785:13, 4797:7, 4902:6
**bought** [1] - 4773:4
**box** [1] - 4819:9
**bracket** [1] - 4662:12
**breadth** [2] - 4835:11, 4835:12
**break** [12] - 4693:22, 4722:4, 4740:2, 4740:5, 4740:7, 4741:4, 4789:17, 4796:6, 4796:10, 4822:23, 4847:11, 4862:13
**Brent** [1] - 4726:10
**BRIDGET** [1] - 4657:12
**briefed** [3] - 4681:25, 4682:2, 4926:10
**briefing** [2] - 4676:16, 4928:18
**briefings** [1] - 4682:8
**briefly** [1] - 4687:18
**briefs** [1] - 4856:20
**bring** [7] - 4675:2, 4685:22, 4685:25, 4741:14, 4887:19, 4919:25, 4926:14
**bringing** [1] -

4677:11
**broad** [1] - 4669:21
**Brodsky** [24] -
4810:16, 4812:11, 4813:10, 4813:23, 4815:14, 4815:25, 4816:10, 4817:23, 4819:21, 4824:16, 4828:14, 4829:2, 4834:13, 4834:16, 4836:16, 4839:5, 4839:16, 4839:24, 4840:10, 4848:10, 4849:21, 4849:25, 4854:23, 4863:12
**BRODSKY** [143] -
4657:19, 4660:6, 4669:6, 4669:22, 4670:1, 4670:3, 4670:11, 4671:19, 4672:1, 4672:10, 4673:3, 4673:7, 4673:9, 4674:19, 4674:21, 4674:23, 4695:17, 4700:18, 4702:16, 4710:16, 4715:4, 4716:16, 4720:5, 4721:17, 4724:22, 4725:15, 4727:2, 4727:4, 4730:9, 4732:5, 4744:16, 4747:8, 4748:5, 4749:25, 4753:23, 4755:1, 4755:25, 4757:15, 4759:25, 4761:22, 4763:14, 4770:18, 4775:5, 4776:20, 4776:24, 4777:17, 4779:15, 4781:23, 4786:12, 4786:15, 4788:24, 4790:17, 4792:8, 4793:23, 4797:2, 4797:4, 4800:22, 4802:2, 4802:5, 4802:21, 4803:23, 4803:25, 4804:5, 4804:25, 4805:4, 4806:7, 4806:10, 4806:13, 4806:20, 4806:23, 4807:17, 4807:20, 4808:4, 4808:12, 4808:15, 4809:6, 4812:1, 4812:3, 4812:15, 4815:18, 4816:21, 4817:17, 4818:1, 4818:12, 4818:21, 4818:23, 4819:25, 4820:7, 4821:5, 4821:13,

4821:25, 4822:12, 4822:22, 4822:25, 4825:3, 4826:3, 4827:3, 4827:12, 4827:16, 4828:15, 4829:6, 4833:11, 4835:1, 4835:3, 4837:18, 4837:25, 4838:2, 4838:5, 4838:18, 4838:21, 4838:25, 4839:7, 4840:14, 4840:22, 4840:25, 4841:6, 4842:9, 4842:12, 4843:4, 4843:19, 4844:8, 4844:10, 4844:13, 4844:15, 4845:1, 4846:1, 4846:20, 4848:25, 4849:9, 4850:5, 4850:17, 4853:1, 4853:12, 4857:15, 4857:18, 4857:23, 4858:17, 4859:6, 4859:19, 4860:3, 4860:16, 4861:9, 4862:5
**Brodsky's** [4] -
4827:1, 4848:11, 4860:1, 4888:20
**broken** [3] - 4741:22, 4816:9, 4848:16
**broker** [5] - 4691:16, 4691:22, 4691:25, 4692:6, 4692:12
**brokerage** [1] -
4702:23
**Brooklyn** [3] -
4657:5, 4657:16, 4657:23
**brought** [10] -
4681:20, 4744:12, 4745:20, 4745:22, 4806:20, 4828:19, 4843:21, 4845:19, 4849:14, 4849:25
**building** [1] - 4856:2
**bumps** [1] - 4856:11
**bunch** [1] - 4691:25
**Burke** [34] - 4823:2, 4823:7, 4823:10, 4823:22, 4826:13, 4827:23, 4828:6, 4829:3, 4830:18, 4832:13, 4832:15, 4836:20, 4836:22, 4839:4, 4839:10, 4839:23, 4840:13, 4842:21, 4846:4, 4847:24, 4848:1,

4848:8, 4848:9,
4848:25, 4850:1,
4856:9, 4858:15,
4858:18, 4859:2,
4863:1, 4928:12,
4929:2, 4930:18,
4931:11

**BURKE** [32] -
4828:5, 4828:8,
4828:22, 4829:20,
4829:25, 4830:10,
4830:13, 4830:17,
4831:3, 4832:8,
4832:14, 4832:16,
4832:22, 4837:2,
4837:6, 4848:14,
4848:23, 4849:4,
4855:25, 4856:7,
4856:13, 4856:22,
4856:25, 4862:22,
4928:13, 4929:11,
4929:16, 4930:2,
4930:7, 4930:22,
4930:25, 4931:10

**Burke's** [1] - 4829:1
**burned** [1] - 4847:20
**business** [10] -
4669:8, 4677:9,
4687:14, 4693:23,
4694:3, 4741:25,
4764:2, 4869:1,
4886:14, 4889:21

**buy** [6] - 4664:7,
4664:12, 4691:1,
4691:23, 4691:24,
4776:18

**buying** [2] - 4691:3,
4776:23

**BY** [26] - 4657:13,
4657:19, 4686:16,
4718:1, 4741:21,
4757:1, 4762:1,
4763:19, 4766:10,
4770:22, 4778:5,
4779:19, 4782:2,
4783:25, 4785:1,
4864:11, 4870:10,
4872:14, 4874:21,
4877:5, 4878:10,
4884:10, 4887:5,
4894:8, 4907:3,
4912:2

---

# C

**cab** [1] - 4688:14
**Cadman** [2] -
4657:15, 4657:23
**calculated** [1] -
4771:17

---

**camera** [2] -
4659:18, 4661:1
**Candle** [3] - 4884:15,
4885:23, 4886:4
**Candlestick** [5] -
4868:17, 4869:13,
4869:19, 4905:13,
4906:13
**candor** [2] - 4853:9,
4921:4
**cannot** [5] - 4821:10,
4843:25, 4844:5,
4848:19, 4851:17
**cap** [33] - 4722:25,
4732:9, 4733:23,
4734:10, 4736:25,
4738:16, 4739:9,
4742:25, 4743:12,
4746:7, 4749:8,
4749:9, 4750:15,
4750:17, 4751:13,
4753:6, 4753:9,
4753:14, 4767:23,
4768:8, 4772:8,
4772:25, 4774:2,
4774:13, 4775:3,
4775:8, 4775:10,
4780:6, 4780:10,
4783:18, 4784:5,
4784:9, 4785:25
**Capital** [39] - 4690:8,
4690:14, 4693:21,
4696:7, 4696:22,
4697:1, 4697:4,
4699:9, 4703:3,
4703:5, 4703:9,
4703:12, 4703:15,
4705:2, 4706:20,
4712:9, 4724:16,
4732:22, 4736:3,
4737:24, 4750:17,
4753:8, 4767:3,
4767:7, 4767:17,
4767:20, 4767:24,
4770:6, 4772:1,
4782:22, 4782:25,
4787:5, 4842:4,
4871:15, 4872:16,
4872:22, 4874:3,
4876:10, 4909:9
**capital** [1] - 4751:3
**capitalization** [24] -
4720:23, 4721:1,
4721:2, 4721:14,
4721:21, 4721:23,
4722:7, 4722:15,
4723:1, 4723:5,
4723:8, 4731:20,
4731:22, 4731:25,
4732:22, 4736:5,

---

4736:23, 4737:21,
4743:8, 4751:8,
4770:15, 4771:1,
4772:2, 4783:19
**capture** [1] - 4799:10
**captured** [2] -
4754:8, 4901:2
**care** [2] - 4660:2,
4799:20
**career** [2] - 4693:15,
4693:16
**careful** [1] - 4861:7
**Carpe** [1] - 4865:24
**case** [35] - 4659:6,
4667:15, 4673:4,
4673:11, 4673:19,
4674:2, 4682:15,
4740:4, 4741:8,
4802:10, 4816:15,
4817:24, 4818:2,
4818:6, 4818:7,
4818:13, 4821:24,
4827:24, 4835:16,
4838:23, 4839:2,
4842:15, 4843:14,
4844:24, 4845:6,
4845:7, 4845:19,
4845:24, 4847:17,
4848:2, 4853:2,
4859:17, 4889:22,
4919:5, 4919:15
**case-in-chief** [1] -
4818:6
**cases** [4] - 4813:7,
4815:24, 4817:24,
4865:6
**cash** [1] - 4917:18
**cash-flow** [1] -
4917:18
**casual** [1] - 4706:2
**categories** [2] -
4678:5, 4723:20
**category** [2] -
4823:13, 4895:5
**caught** [2] - 4818:7,
4926:21
**causing** [1] - 4827:6
**caution** [1] - 4823:22
**cc'd** [2] - 4711:18,
4780:22
**center** [3] - 4720:18,
4732:25, 4785:4
**CEO** [4] - 4669:11,
4707:15, 4778:9,
4901:18
**certain** [24] -
4659:19, 4679:24,
4686:22, 4700:3,
4714:10, 4721:3,
4728:23, 4760:14,

---

4773:11, 4776:7,
4795:16, 4809:7,
4811:20, 4824:5,
4827:25, 4829:12,
4838:23, 4840:25,
4848:8, 4859:2,
4914:12, 4915:18,
4920:21, 4922:23
**certainly** [26] -
4659:22, 4663:24,
4664:17, 4666:6,
4666:24, 4667:8,
4674:14, 4676:21,
4808:10, 4836:14,
4839:12, 4854:25,
4858:12, 4859:24,
4859:25, 4861:1,
4861:4, 4861:13,
4861:16, 4861:23,
4862:16, 4889:14,
4921:25, 4923:2,
4924:2
**certainty** [1] - 4809:9
**certificate** [2] -
4719:5, 4720:18
**CFO** [1] - 4917:15
**chain** [14] - 4726:21,
4754:22, 4757:9,
4759:22, 4760:5,
4761:16, 4762:4,
4779:8, 4781:13,
4801:8, 4801:11,
4811:14, 4811:16
**chains** [1] - 4763:21
**challenge** [3] -
4819:15, 4834:1,
4857:20
**CHAN** [7] - 4657:20,
4658:7, 4658:16,
4684:22, 4927:15,
4927:23, 4928:1
**chance** [5] - 4661:4,
4673:10, 4798:3,
4821:16, 4848:4
**change** [4] - 4746:2,
4805:16, 4914:2,
4914:5
**changed** [2] -
4746:7, 4893:4
**changes** [4] -
4888:22, 4892:3,
4893:17, 4913:22
**changing** [1] -
4737:1
**characterized** [1] -
4669:13
**characterizing** [1] -
4669:2
**charge** [3] - 4688:24,
4899:21, 4914:16

---

**charged** [7] - 4688:9,
4688:11, 4688:22,
4889:13, 4892:14,
4893:9, 4893:13
**charges** [12] -
4678:11, 4866:4,
4879:2, 4883:4,
4888:3, 4888:15,
4891:22, 4904:19,
4905:5, 4905:11,
4905:20, 4906:15
**charging** [1] -
4914:11
**Charleane** [1] -
4657:22
**Charles** [14] -
4804:15, 4804:16,
4804:23, 4805:6,
4805:12, 4805:13,
4805:14, 4805:17,
4805:18, 4805:19,
4805:21, 4835:21,
4836:13, 4841:10
**chart** [4] - 4660:16,
4784:4, 4868:21
**chasing** [1] -
4916:13
**check** [4] - 4810:14,
4811:19, 4824:11,
4890:6
**checking** [1] -
4815:8
**Chew** [3] - 4719:14,
4750:25, 4779:22
**chief** [7] - 4666:12,
4701:12, 4701:16,
4706:15, 4706:23,
4818:6, 4829:8
**child** [1] - 4687:4
**children** [1] -
4857:20
**choosing** [1] -
4684:19
**chose** [1] - 4681:14
**Chris** [3] - 4672:13,
4706:15, 4707:6
**Christmas** [1] -
4792:18
**Chun** [3] - 4707:1,
4774:23
**Circuit** [2] - 4845:4,
4845:7
**Circuit's** [1] -
4661:15
**circulate** [1] -
4779:24
**circumstance** [1] -
4860:17
**circumstances** [2] -
4672:6, 4812:6

---

circumvented [1] - 4804:3
cite [5] - 4817:23, 4818:2, 4818:14, 4824:21, 4828:14
cited [2] - 4665:4, 4824:25
Citrin [5] - 4665:8, 4665:15, 4717:1, 4718:4, 4736:16
City [2] - 4688:14, 4822:8
civil [1] - 4673:11
CJRA [10] - 4816:19, 4817:4, 4817:12, 4821:15, 4822:8, 4822:10, 4823:10, 4828:7, 4854:16, 4925:10
claim [8] - 4806:6, 4806:8, 4806:12, 4806:14, 4806:15, 4806:18, 4806:24, 4859:3
claims [2] - 4836:1, 4841:11
Claridge [3] - 4782:22, 4782:25, 4787:5
clarification [1] - 4792:12
clarify [3] - 4684:22, 4685:10, 4747:19
class [5] - 4752:1, 4756:9, 4764:16, 4765:15, 4769:17
Class [4] - 4723:21, 4723:22, 4732:25, 4738:2
classifies [1] - 4708:6
clause [1] - 4745:8
clear [24] - 4667:12, 4668:8, 4683:24, 4708:5, 4708:11, 4792:4, 4792:5, 4810:18, 4811:24, 4816:3, 4820:24, 4826:2, 4834:17, 4842:11, 4848:25, 4855:4, 4855:10, 4878:6, 4882:21, 4883:21, 4893:14, 4915:8, 4918:18, 4927:5
cleared [1] - 4822:7
clearly [8] - 4680:3, 4680:7, 4680:19, 4811:1, 4811:2, 4813:8, 4819:23,

4833:17
clears [1] - 4865:13
clerk [1] - 4844:7
CLERK [2] - 4686:10, 4741:15
client [59] - 4665:1, 4665:7, 4665:14, 4665:22, 4856:24, 4857:6, 4857:18, 4863:5, 4865:1, 4865:3, 4865:6, 4865:9, 4865:10, 4865:13, 4865:17, 4866:1, 4866:2, 4866:5, 4866:12, 4867:3, 4868:9, 4868:13, 4869:18, 4870:17, 4871:1, 4871:5, 4871:9, 4871:14, 4872:16, 4872:18, 4872:19, 4872:20, 4873:3, 4873:7, 4873:19, 4873:22, 4876:10, 4882:13, 4882:22, 4883:14, 4893:4, 4894:22, 4895:9, 4895:11, 4895:18, 4895:20, 4895:23, 4896:1, 4900:4, 4902:20, 4902:24, 4903:2, 4909:5, 4910:15, 4910:19, 4914:12, 4914:16, 4918:18
clients [23] - 4692:7, 4692:15, 4864:21, 4867:2, 4867:16, 4875:22, 4892:23, 4907:15, 4909:21, 4915:12, 4915:17, 4915:21, 4915:24, 4916:2, 4916:5, 4916:11, 4916:13, 4916:18, 4916:22, 4918:15, 4921:21, 4923:17
clients' [1] - 4865:22
close [2] - 4677:9, 4846:3
closed [3] - 4692:3, 4693:21
closely [1] - 4678:10
closer [1] - 4658:4
clothes [1] - 4699:16
Code [10] - 4824:17, 4825:15, 4826:5, 4826:8, 4826:9, 4828:10, 4828:12
Cogan [1] - 4930:8

colleague [1] - 4672:14
colleagues [2] - 4818:9, 4849:14
collect [3] - 4917:1, 4921:4, 4921:21
collected [1] - 4917:17
collecting [3] - 4918:3, 4918:7, 4924:18
collections [2] - 4917:5, 4917:8
column [13] - 4733:9, 4738:3, 4868:21, 4880:13, 4881:5, 4882:8, 4882:11, 4894:19, 4895:12, 4895:16, 4896:2, 4896:13, 4902:10
columns [3] - 4890:16, 4891:4, 4897:9
com [1] - 4712:7
combination [1] - 4923:2
comfort [1] - 4685:19
comfortable [1] - 4839:13
coming [10] - 4676:12, 4677:1, 4713:22, 4721:11, 4827:23, 4828:7, 4831:5, 4831:17, 4925:23, 4931:5
commenced [1] - 4873:18
comment [3] - 4923:11, 4924:14, 4924:23
comments [3] - 4913:19, 4924:25, 4925:1
commerce [1] - 4825:9
Commission [1] - 4729:15
commit [4] - 4671:1, 4671:7, 4812:12, 4813:5
commitment [1] - 4658:23
committed [5] - 4671:2, 4803:7, 4812:7, 4813:6, 4840:12
committee [11] - 4917:4, 4917:7,

4917:8, 4917:9, 4917:13, 4917:16, 4918:9, 4920:23, 4920:25, 4921:3, 4922:5
committing [2] - 4807:8, 4846:1
Common [1] - 4733:1
common [17] - 4752:1, 4756:9, 4756:10, 4764:16, 4765:15, 4769:17, 4771:4, 4771:8, 4784:2, 4916:18, 4916:22, 4918:3, 4918:6, 4918:9, 4918:14, 4921:17, 4923:11
communicate [3] - 4788:3, 4823:2, 4856:10
communication [3] - 4825:18, 4825:20, 4848:17
communications [11] - 4667:17, 4667:20, 4667:22, 4668:4, 4668:9, 4796:15, 4802:24, 4807:7, 4807:8, 4807:14, 4809:8
Communications [2] - 4807:4, 4825:14
companies [10] - 4696:10, 4697:25, 4698:4, 4701:17, 4702:7, 4705:20, 4707:19, 4731:12, 4875:21
company [55] - 4660:8, 4687:9, 4687:10, 4687:12, 4689:11, 4690:20, 4692:5, 4692:23, 4693:13, 4697:9, 4697:22, 4699:3, 4703:18, 4707:3, 4707:22, 4714:10, 4716:2, 4717:4, 4721:4, 4721:13, 4721:15, 4721:24, 4721:25, 4722:1, 4722:2, 4735:1, 4737:6, 4738:7, 4739:10, 4739:11, 4739:13, 4739:17, 4741:23, 4741:24, 4743:4, 4745:11, 4754:9, 4754:11,

4776:11, 4778:11, 4778:13, 4778:15, 4778:18, 4778:19, 4778:20, 4783:1, 4785:22, 4793:7, 4793:8, 4798:3, 4798:20, 4804:6, 4829:8
Company [1] - 4687:23
compensation [8] - 4787:20, 4888:22, 4892:2, 4892:9, 4892:13, 4893:3, 4893:16, 4918:2
complain [2] - 4665:24, 4665:25
complaint [8] - 4729:25, 4730:3, 4730:15, 4731:4, 4731:6, 4799:25, 4804:20, 4836:6
complete [4] - 4798:5, 4841:4, 4841:5, 4841:8
completely [11] - 4661:17, 4688:24, 4725:20, 4725:23, 4789:14, 4789:20, 4789:21, 4790:20, 4790:22, 4800:10, 4857:17
complex [1] - 4930:23
complicated [4] - 4684:12, 4684:15, 4854:6, 4931:4
comply [1] - 4681:9
compound [6] - 4665:11, 4665:16, 4665:19, 4666:24, 4667:5, 4667:8
computations [1] - 4892:7
computer [15] - 4657:25, 4735:17, 4755:23, 4807:5, 4812:4, 4812:17, 4812:18, 4812:20, 4813:3, 4824:18, 4824:24, 4825:6, 4825:7, 4825:8, 4825:10
Computer [4] - 4803:19, 4807:3, 4812:15, 4819:22
computer-aided [1] - 4657:25
computers [2] - 4818:10, 4837:9

**concepts** [1] - 4664:9
**concern** [7] - 4815:13, 4847:24, 4849:19, 4851:9, 4854:5, 4876:25, 4891:25
**concerned** [7] - 4730:4, 4730:6, 4828:17, 4839:1, 4850:2, 4859:4, 4931:8
**concerns** [3] - 4731:3, 4821:8, 4860:25
**concluding** [1] - 4841:23
**conduct** [6] - 4741:25, 4820:14, 4836:4, 4840:16, 4841:12, 4841:13
**conducting** [1] - 4902:16
**confer** [11] - 4817:5, 4823:5, 4823:8, 4830:13, 4848:4, 4848:6, 4858:17, 4858:18, 4859:1, 4876:15, 4910:19
**conference** [10] - 4682:3, 4709:25, 4716:10, 4802:7, 4807:16, 4813:16, 4814:4, 4887:21, 4891:1, 4893:22
**Conference** [2] - 4888:19, 4888:21
**conferring** [1] - 4858:15
**confident** [1] - 4665:19
**confirm** [6] - 4810:11, 4811:8, 4811:10, 4846:22, 4877:12, 4898:2
**confirmed** [1] - 4731:11
**confirming** [2] - 4725:20, 4725:23
**conflict** [2] - 4865:10, 4865:12
**Conflicts** [1] - 4902:10
**conflicts** [2] - 4865:14, 4902:20
**confront** [17] - 4665:21, 4670:5, 4670:8, 4670:10, 4670:22, 4671:4, 4671:8, 4671:13,

4671:14, 4671:19, 4833:25, 4835:3, 4841:1, 4844:17, 4846:15, 4853:5, 4853:22
**confronted** [3] - 4850:23, 4850:24, 4851:5
**confronting** [3] - 4671:17, 4671:22, 4673:13
**confused** [1] - 4761:10
**confusing** [2] - 4664:14, 4668:8
**Congrats** [1] - 4797:19
**connection** [3] - 4841:12, 4861:14, 4901:18
**consequences** [1] - 4847:7
**consider** [2] - 4808:25, 4843:18
**considered** [5] - 4708:12, 4778:13, 4778:15, 4821:10, 4915:10
**considering** [2] - 4773:20, 4843:21
**conspiracy** [7] - 4888:8, 4889:12, 4889:13, 4892:14, 4892:15, 4892:23, 4921:24
**constantly** [1] - 4682:25
**constitutional** [1] - 4666:5
**constitutionally** [1] - 4847:18
**consult** [4] - 4816:18, 4828:21, 4839:10, 4842:20
**consultants** [2] - 4708:6, 4708:12
**consultation** [2] - 4839:3, 4846:4
**Consumer** [7] - 4699:6, 4699:11, 4699:15, 4701:18, 4702:11, 4704:20, 4704:21
**consumer** [1] - 4699:16
**contact** [5] - 4718:10, 4718:12, 4873:6, 4873:8, 4902:21
**contain** [2] - 4878:7,

4880:24
**contained** [1] - 4703:8
**containing** [1] - 4660:16
**contains** [6] - 4823:19, 4876:2, 4876:9, 4877:7, 4890:13, 4912:18
**contend** [2] - 4827:8, 4827:10
**contending** [1] - 4826:1
**contends** [3] - 4815:25, 4816:10, 4828:4
**contention** [1] - 4658:6
**contents** [1] - 4788:13
**context** [4] - 4685:14, 4742:21, 4915:19, 4921:1
**continuation** [3] - 4757:9, 4815:4, 4845:17
**continue** [17] - 4682:20, 4692:14, 4731:7, 4795:22, 4795:25, 4834:4, 4836:20, 4843:15, 4845:12, 4846:12, 4846:25, 4847:7, 4848:3, 4848:11, 4850:11, 4852:2, 4854:1
**continued** [12] - 4677:12, 4694:8, 4740:10, 4760:19, 4809:11, 4816:21, 4816:23, 4816:25, 4829:24, 4850:4, 4852:10, 4911:6
**Continued** [11] - 4717:11, 4739:20, 4784:13, 4785:1, 4801:15, 4814:9, 4830:22, 4869:21, 4890:20, 4893:23, 4929:20
**continues** [1] - 4891:1
**Continuing** [4] - 4695:1, 4761:1, 4810:1, 4870:1
**continuing** [6] - 4718:1, 4742:25, 4759:21, 4793:3, 4912:2, 4930:1
**continuously** [2] -

4705:16, 4798:10
**contract** [8] - 4695:13, 4696:11, 4698:15, 4699:8, 4699:22, 4706:19, 4797:14, 4799:10
**contracts** [1] - 4927:18
**contractual** [1] - 4798:14
**contributed** [1] - 4721:12
**control** [5] - 4776:22, 4777:1, 4777:4, 4798:16, 4799:4
**controversy** [1] - 4809:1
**convene** [1] - 4928:16
**convenient** [1] - 4796:7
**conversation** [36] - 4678:2, 4681:7, 4682:4, 4730:19, 4746:16, 4746:23, 4747:4, 4747:21, 4748:6, 4748:14, 4748:16, 4748:17, 4748:22, 4760:12, 4760:15, 4776:3, 4777:20, 4777:23, 4777:24, 4778:6, 4788:8, 4788:11, 4789:5, 4789:7, 4789:18, 4789:24, 4790:10, 4790:24, 4791:2, 4791:18, 4808:18, 4823:3, 4894:2, 4919:4
**conversations** [7] - 4739:8, 4775:25, 4777:13, 4789:2, 4789:4, 4862:17, 4894:6
**conversion** [6] - 4751:8, 4761:5, 4761:9, 4771:21, 4773:7, 4793:8
**converted** [1] - 4738:3
**conveyed** [1] - 4730:15
**convinced** [1] - 4826:24
**COO** [2] - 4711:20, 4917:15
**Cooley** [1] - 4815:7
**Cooperman** [6] - 4665:8, 4665:15, 4717:1, 4717:3,

4718:4, 4736:16
**coordinate** [1] - 4703:22
**copied** [6] - 4667:17, 4667:23, 4667:24, 4668:4, 4668:9, 4723:12
**copies** [3] - 4928:18, 4929:2, 4929:4
**copy** [9] - 4747:10, 4762:19, 4780:21, 4786:12, 4786:14, 4819:18, 4829:3, 4924:14
**copying** [2] - 4722:22, 4883:3
**Corey** [6] - 4717:2, 4718:12, 4719:19, 4736:14, 4736:16, 4750:25
**corporate** [2] - 4829:13, 4907:13
**corporation** [4] - 4742:8, 4742:10, 4742:13, 4813:20
**correct** [68] - 4662:10, 4665:2, 4670:4, 4683:25, 4692:21, 4696:14, 4696:16, 4696:18, 4700:7, 4712:15, 4720:3, 4721:16, 4723:19, 4729:3, 4729:9, 4733:17, 4737:19, 4738:18, 4746:9, 4748:23, 4749:22, 4749:23, 4750:9, 4751:1, 4752:2, 4752:7, 4755:21, 4756:18, 4756:20, 4756:22, 4757:13, 4757:24, 4759:16, 4760:6, 4760:7, 4762:24, 4763:12, 4763:23, 4768:24, 4771:23, 4773:18, 4773:19, 4773:25, 4775:14, 4778:17, 4782:8, 4785:17, 4785:23, 4792:7, 4793:8, 4821:12, 4821:13, 4830:11, 4871:23, 4876:22, 4878:23, 4879:11, 4879:14, 4882:22, 4898:13, 4899:11, 4900:21, 4905:14, 4909:10, 4909:13, 4909:18, 4910:1, 4917:2

correction [1] - 4762:8

corresponding [1] - 4660:10

Cory [1] - 4719:13

cost [1] - 4805:18

counsel [26] - 4670:16, 4675:10, 4815:3, 4815:15, 4815:16, 4815:20, 4815:21, 4816:8, 4817:12, 4820:24, 4822:18, 4823:5, 4824:14, 4829:19, 4829:23, 4841:17, 4845:13, 4847:9, 4849:9, 4861:20, 4862:1, 4862:17, 4863:9, 4902:20

counsel's [1] - 4848:15

count [2] - 4678:11, 4680:1

counter [1] - 4805:8

counterclaim [5] - 4806:1, 4806:5, 4806:7, 4806:10, 4806:23

counterclaimed [1] - 4804:18

counterclaims [6] - 4804:13, 4804:21, 4806:2, 4806:4, 4836:1, 4841:10

County [1] - 4835:15

couple [11] - 4659:15, 4675:6, 4687:5, 4693:6, 4693:12, 4711:15, 4743:9, 4802:8, 4869:12, 4869:16, 4884:6

course [13] - 4670:14, 4670:18, 4671:20, 4697:12, 4709:6, 4710:8, 4711:11, 4719:1, 4764:1, 4840:16, 4841:16, 4861:18, 4863:16

Court [31] - 4657:22, 4659:10, 4661:14, 4662:15, 4662:24, 4675:24, 4676:1, 4676:4, 4676:13, 4676:22, 4820:9, 4820:21, 4823:10, 4823:19, 4826:21, 4830:6, 4832:17, 4835:9, 4835:15,

4845:5, 4845:6, 4848:20, 4854:25, 4855:7, 4855:11, 4856:13, 4856:14, 4861:1, 4888:19, 4926:19

COURT [330] - 4657:1, 4658:2, 4658:14, 4658:20, 4658:22, 4659:1, 4659:13, 4659:15, 4660:20, 4669:8, 4669:23, 4670:2, 4670:8, 4671:17, 4671:21, 4672:2, 4672:16, 4673:5, 4673:8, 4674:8, 4674:20, 4674:22, 4674:24, 4675:2, 4675:8, 4675:12, 4675:14, 4681:22, 4685:22, 4685:25, 4686:4, 4686:13, 4695:18, 4700:19, 4702:17, 4706:17, 4706:21, 4706:25, 4710:9, 4710:18, 4710:20, 4715:5, 4716:18, 4720:6, 4721:18, 4724:23, 4725:16, 4727:5, 4730:12, 4732:6, 4740:1, 4740:7, 4741:1, 4741:5, 4741:7, 4741:11, 4741:14, 4741:18, 4744:17, 4747:9, 4747:15, 4748:7, 4748:24, 4750:1, 4753:24, 4755:2, 4755:13, 4756:1, 4756:19, 4756:25, 4757:16, 4760:1, 4761:3, 4761:12, 4761:23, 4763:15, 4770:19, 4775:6, 4776:21, 4776:25, 4777:19, 4778:1, 4779:16, 4781:24, 4786:14, 4786:17, 4790:18, 4791:12, 4792:10, 4793:24, 4796:8, 4796:13, 4797:5, 4800:23, 4802:4, 4802:6, 4802:20, 4803:21, 4803:24, 4804:2, 4804:23, 4805:2, 4806:5, 4806:9, 4806:12, 4806:15, 4806:18, 4806:22,

4807:15, 4807:19, 4808:2, 4808:8, 4808:14, 4809:4, 4810:8, 4811:10, 4811:21, 4812:2, 4812:8, 4813:9, 4815:1, 4815:13, 4815:20, 4817:3, 4817:11, 4817:16, 4817:18, 4818:9, 4818:15, 4818:22, 4821:3, 4821:6, 4821:10, 4821:14, 4821:23, 4822:5, 4822:10, 4822:13, 4822:16, 4822:20, 4822:24, 4823:1, 4823:23, 4824:3, 4824:6, 4824:15, 4825:24, 4826:11, 4826:17, 4826:22, 4827:6, 4827:13, 4827:19, 4828:6, 4828:10, 4828:16, 4828:24, 4829:7, 4829:22, 4830:1, 4830:4, 4830:7, 4830:15, 4830:18, 4831:2, 4831:5, 4831:10, 4831:14, 4831:17, 4831:21, 4832:2, 4832:5, 4832:7, 4832:10, 4832:12, 4832:15, 4832:25, 4833:4, 4834:15, 4835:2, 4836:18, 4837:4, 4837:15, 4837:20, 4838:1, 4838:4, 4838:8, 4838:20, 4838:22, 4839:1, 4839:8, 4840:24, 4841:3, 4842:6, 4842:10, 4842:13, 4843:18, 4843:20, 4844:9, 4844:12, 4844:14, 4844:23, 4845:2, 4846:19, 4847:8, 4848:9, 4848:22, 4849:5, 4850:14, 4851:4, 4853:10, 4853:25, 4855:13, 4855:18, 4855:24, 4856:5, 4856:8, 4856:19, 4856:23, 4857:2, 4857:9, 4857:16, 4857:21, 4858:10, 4858:23, 4859:16, 4859:22, 4860:12, 4861:8, 4861:19,

4861:23, 4862:4, 4862:7, 4862:11, 4862:21, 4862:24, 4863:4, 4863:8, 4863:23, 4864:5, 4867:21, 4867:24, 4871:19, 4871:23, 4872:3, 4872:8, 4872:10, 4873:5, 4874:14, 4876:16, 4876:23, 4877:7, 4877:24, 4878:9, 4881:25, 4885:15, 4887:2, 4887:18, 4889:10, 4889:17, 4890:2, 4890:7, 4891:7, 4891:10, 4891:23, 4892:12, 4892:20, 4893:5, 4893:8, 4893:11, 4893:19, 4894:4, 4894:25, 4895:4, 4895:7, 4899:5, 4900:14, 4900:16, 4903:21, 4903:23, 4904:24, 4905:1, 4905:25, 4906:25, 4909:15, 4912:6, 4912:17, 4914:23, 4915:3, 4917:10, 4919:2, 4919:19, 4919:21, 4919:25, 4920:3, 4921:14, 4922:4, 4922:8, 4922:18, 4923:15, 4923:25, 4924:8, 4924:11, 4925:9, 4925:20, 4926:1, 4926:4, 4926:23, 4927:2, 4927:16, 4927:19, 4927:25, 4928:4, 4928:6, 4928:9, 4928:12, 4928:16, 4928:22, 4929:2, 4929:7, 4929:13, 4929:17, 4930:6, 4930:10, 4930:14, 4930:16, 4930:24, 4931:5, 4931:11, 4931:13

court [17] - 4658:1, 4679:21, 4680:3, 4680:11, 4681:8, 4682:2, 4683:13, 4685:17, 4688:20, 4741:13, 4831:1, 4834:6, 4834:8, 4845:7, 4854:16, 4858:3, 4907:15

court's [3] - 4680:5, 4682:12, 4685:20

Court's [1] - 4822:17

court-related [1] - 4854:16

Courthouse [1] - 4657:5

COURTROOM [4] - 4863:25, 4864:2, 4872:5, 4872:7

courtroom [6] - 4673:14, 4802:15, 4802:20, 4836:20, 4863:7, 4919:18

courts [2] - 4682:19, 4799:25

cover [11] - 4817:13, 4822:14, 4836:19, 4876:19, 4876:25, 4878:19, 4880:4, 4898:7, 4898:16, 4899:18, 4901:5

covered [1] - 4810:13

covers [4] - 4894:14, 4898:12, 4898:19, 4899:13

crazy [1] - 4837:20

create [7] - 4684:18, 4702:9, 4702:12, 4776:11, 4871:17, 4901:21, 4901:23

created [4] - 4871:18, 4903:7, 4903:24, 4906:9

creation [1] - 4902:3

credibility [7] - 4661:18, 4661:22, 4664:22, 4669:25, 4836:7, 4836:9, 4861:25

credit [3] - 4791:15, 4791:16

crime [5] - 4810:13, 4812:7, 4812:12, 4813:6, 4840:12

crimes [5] - 4803:7, 4807:8, 4807:23, 4808:1, 4810:20

criminal [6] - 4673:19, 4807:3, 4812:23, 4818:17, 4827:23, 4845:10

critical [1] - 4838:19

cross [80] - 4661:10, 4661:12, 4661:15, 4661:17, 4661:21, 4662:1, 4664:10, 4664:22, 4666:9, 4667:13, 4669:16, 4669:19, 4669:20, 4670:3, 4670:19,

4671:9, 4671:14,
4673:18, 4674:6,
4676:13, 4682:25,
4806:15, 4806:18,
4815:19, 4817:2,
4817:17, 4818:23,
4818:25, 4819:13,
4819:15, 4819:23,
4820:2, 4827:10,
4828:18, 4833:2,
4833:12, 4833:14,
4834:3, 4834:5,
4834:13, 4834:14,
4834:18, 4834:25,
4835:12, 4838:13,
4838:17, 4839:5,
4839:11, 4840:5,
4840:6, 4840:17,
4841:24, 4842:1,
4842:2, 4842:14,
4843:3, 4843:9,
4843:16, 4844:14,
4846:2, 4846:25,
4847:14, 4847:15,
4848:3, 4849:22,
4850:8, 4850:12,
4851:18, 4854:1,
4854:9, 4858:2,
4858:20, 4860:18,
4861:14, 4893:15,
4922:7, 4923:14,
4924:5, 4924:19
**CROSS** [3] - 4907:2,
4912:1, 4932:7
**cross-claim** [2] -
4806:15, 4806:18
**cross-examination**
[30] - 4661:10,
4661:12, 4661:15,
4661:17, 4662:1,
4666:9, 4667:13,
4669:19, 4670:19,
4671:9, 4671:14,
4818:23, 4818:25,
4819:13, 4819:15,
4820:2, 4834:3,
4834:5, 4834:13,
4840:5, 4843:16,
4846:2, 4850:8,
4850:12, 4851:18,
4858:2, 4858:20,
4860:18, 4893:15,
4924:5
**CROSS-**
**EXAMINATION** [2] -
4907:2, 4932:7
**cross-examine** [19] -
4661:21, 4664:22,
4669:16, 4673:18,
4674:6, 4815:19,

4819:23, 4833:2,
4833:14, 4834:14,
4834:18, 4835:12,
4838:13, 4839:11,
4840:6, 4841:24,
4842:2, 4843:9,
4846:25
**cross-examined** [2]
- 4676:13, 4848:3
**cross-examiner's**
[1] - 4644:10
**cross-examining** [2]
- 4670:3, 4817:2
**crossing** [2] -
4842:7, 4930:11
**CRUTCHER** [1] -
4657:17
**Cuellar** [1] - 4812:25
**curious** [2] - 4673:6,
4677:3
**current** [7] -
4752:21, 4864:22,
4864:23, 4879:2,
4879:19, 4879:20,
4899:21
**current/correct** [1] -
4780:6
**curtail** [1] - 4673:7
**curtailing** [1] -
4673:5
**customer's** [1] -
4689:20
**cut** [2] - 4803:22,
4813:20

# D

**daily** [1] - 4865:21
**Dallas** [4] - 4687:11,
4690:3, 4690:6,
4690:7
**damage** [2] -
4825:11, 4825:12
**Dara** [1] - 4734:18
**dark** [1] - 4854:24
**Darren** [1] - 4662:2
**dash** [3] - 4771:8,
4877:9, 4878:6
**data** [3] - 4718:20,
4864:20, 4888:25
**date** [56] - 4698:14,
4720:15, 4720:19,
4721:11, 4722:4,
4732:16, 4739:9,
4744:23, 4747:16,
4747:20, 4750:10,
4752:9, 4752:13,
4752:15, 4752:19,
4752:21, 4752:23,
4752:25, 4753:1,

4753:2, 4753:3,
4753:4, 4756:18,
4758:7, 4758:14,
4760:14, 4761:9,
4762:8, 4762:13,
4762:16, 4764:19,
4764:22, 4765:9,
4766:1, 4766:12,
4766:16, 4766:17,
4768:18, 4769:5,
4769:19, 4778:1,
4811:25, 4866:25,
4880:13, 4880:14,
4898:12, 4900:10,
4900:20, 4900:23,
4901:6, 4901:21,
4901:23, 4903:7,
4903:9, 4906:2
**dated** [15] - 4659:17,
4660:23, 4661:7,
4728:23, 4750:11,
4761:19, 4774:12,
4774:13, 4803:4,
4829:17, 4898:4,
4898:16, 4899:6,
4899:9, 4901:5
**dates** [5] - 4759:9,
4759:12, 4761:9,
4766:20, 4767:11
**Daubert** [18] -
4658:3, 4658:9,
4658:13, 4675:22,
4680:12, 4681:3,
4681:23, 4682:7,
4683:11, 4683:17,
4685:14, 4925:11,
4925:21, 4926:9,
4926:17, 4927:1,
4927:4, 4927:11
**Dave** [1] - 4711:15
**DAVID** [2] - 4657:14,
4657:14
**David** [2] - 4658:10,
4725:7
**Davida** [1] - 4873:1
**day-to-day** [2] -
4693:24, 4713:15
**days** [16] - 4675:7,
4705:24, 4710:11,
4710:12, 4747:13,
4748:8, 4748:10,
4748:13, 4763:20,
4777:22, 4777:23,
4791:23, 4792:1,
4792:22, 4846:18,
4930:3
**deal** [5] - 4668:22,
4682:13, 4697:4,
4743:1, 4840:9
**dealing** [3] - 4844:5,

4916:8, 4919:11
**deals** [1] - 4907:17
**dean** [1] - 4683:21
**Dear** [1] - 4875:5
**Deborah** [2] -
4675:11, 4675:19
**debt** [2] - 4773:7,
4923:5
**debunk** [1] - 4921:24
**December** [79] -
4666:14, 4666:20,
4679:7, 4681:9,
4681:14, 4686:21,
4687:5, 4692:20,
4705:16, 4748:9,
4748:10, 4748:13,
4763:5, 4764:6,
4764:10, 4767:24,
4769:22, 4769:25,
4770:13, 4772:5,
4772:15, 4774:7,
4774:12, 4774:13,
4774:14, 4774:18,
4775:1, 4775:13,
4775:24, 4776:4,
4778:2, 4778:4,
4778:7, 4778:25,
4779:8, 4779:22,
4781:13, 4782:10,
4785:24, 4786:6,
4787:12, 4787:16,
4787:25, 4788:2,
4788:9, 4789:3,
4789:6, 4789:24,
4790:6, 4790:11,
4790:25, 4791:22,
4792:15, 4792:20,
4794:2, 4795:19,
4798:4, 4803:6,
4804:8, 4805:4,
4806:25, 4807:11,
4813:17, 4829:10,
4835:4, 4836:23,
4836:25, 4841:21,
4842:5, 4842:8,
4843:12, 4848:13,
4878:19, 4885:3,
4885:12, 4917:21
**decent** [1] - 4692:10
**decide** [5] - 4661:4,
4844:20, 4844:24,
4914:15, 4919:8
**decided** [3] -
4681:25, 4690:4,
4708:22
**decides** [1] -
4896:14
**decision** [9] -
4661:3, 4661:16,
4680:5, 4800:6,

4835:24, 4844:21,
4844:22, 4849:17,
4858:15
**declined** [2] -
4676:4, 4690:6
**decrease** [2] -
4691:8, 4737:12
**deemed** [1] -
4824:24
**default** [1] - 4773:7
**defaulted** [1] -
4773:6
**defendant** [7] -
4668:23, 4756:7,
4806:19, 4811:17,
4829:18, 4851:6,
4926:16
**Defendant** [2] -
4657:7, 4657:17
**defendant's** [1] -
4927:7
**defense** [62] -
4659:17, 4660:22,
4660:24, 4661:3,
4661:7, 4661:10,
4661:13, 4661:20,
4661:24, 4662:2,
4662:12, 4662:24,
4663:20, 4664:18,
4664:21, 4665:5,
4665:20, 4665:24,
4667:6, 4669:4,
4669:15, 4669:24,
4670:15, 4673:18,
4675:10, 4676:3,
4676:16, 4682:1,
4682:9, 4683:4,
4684:2, 4815:10,
4817:7, 4820:4,
4821:18, 4823:5,
4827:22, 4828:1,
4828:4, 4828:23,
4830:16, 4831:10,
4832:9, 4833:2,
4840:5, 4840:17,
4840:19, 4848:12,
4848:15, 4849:18,
4851:11, 4851:17,
4854:10, 4859:2,
4862:9, 4862:17,
4874:13, 4876:21,
4878:8, 4923:15,
4924:22, 4929:3
**definition** [2] -
4812:21, 4868:25
**defraud** [4] - 4813:3,
4824:19, 4825:1,
4825:6
**degraded** [1] -
4711:3

Delaware [4] - 4720:10, 4720:13, 4745:10, 4745:12
delay [6] - 4676:18, 4827:6, 4858:5, 4860:10, 4860:19, 4861:15
delays [1] - 4926:2
Delzotto [1] - 4819:8
demand [5] - 4677:8, 4798:23, 4799:3, 4799:13, 4799:16
demanding [1] - 4676:7
demeanor [1] - 4674:2
demonstrates [1] - 4671:4
Denerstein [10] - 4680:17, 4680:25, 4682:4, 4683:10, 4683:16, 4683:18, 4684:9, 4685:18, 4906:25, 4909:15
DENERSTEIN [54] - 4657:20, 4678:1, 4681:5, 4683:24, 4684:15, 4867:22, 4872:1, 4872:9, 4873:4, 4874:12, 4876:14, 4876:22, 4877:17, 4887:16, 4887:20, 4887:25, 4889:9, 4889:16, 4890:6, 4890:8, 4890:10, 4890:15, 4891:13, 4891:19, 4891:24, 4892:6, 4892:18, 4892:21, 4893:21, 4899:3, 4904:23, 4904:25, 4905:24, 4907:1, 4907:3, 4912:2, 4912:5, 4912:7, 4912:16, 4913:2, 4914:24, 4917:11, 4919:24, 4920:16, 4921:8, 4921:16, 4921:22, 4922:14, 4923:6, 4924:2, 4924:6, 4924:10, 4925:8, 4930:13
Denerstein's [1] - 4889:3
denial [1] - 4804:3
denied [4] - 4672:3, 4803:21, 4804:3, 4813:10
deny [1] - 4813:17
depart [1] - 4659:10

department [3] - 4909:1, 4913:9, 4913:12
departure [2] - 4803:22, 4842:4
depose [1] - 4673:11
deposit [1] - 4819:9
depth [1] - 4669:17
deputy [1] - 4902:20
DEPUTY [4] - 4863:25, 4864:2, 4872:5, 4872:7
derive [2] - 4723:22, 4723:23
derived [1] - 4773:9
describe [4] - 4687:18, 4777:21, 4910:25, 4911:3
described [5] - 4707:18, 4880:14, 4881:9, 4903:17, 4913:8
description [8] - 4866:24, 4870:2, 4880:23, 4880:25, 4901:15, 4901:17, 4912:13, 4912:18
descriptions [4] - 4910:14, 4910:21, 4910:23, 4912:24
Desert [9] - 4742:15, 4742:16, 4742:19, 4773:21, 4780:2, 4785:19, 4785:22, 4787:15, 4871:6
designated [1] - 4678:22
desire [2] - 4682:20, 4847:4
desk [9] - 4704:12, 4744:8, 4747:14, 4751:16, 4751:19, 4758:22, 4762:21, 4764:8
desks [1] - 4704:9
desktop [1] - 4735:17
despite [1] - 4665:19
detail [2] - 4880:10, 4912:18
detailed [3] - 4910:21, 4910:23, 4912:13
details [1] - 4682:6
determine [2] - 4660:3, 4889:23
determined [1] - 4737:11
develop [1] - 4697:13

DGTE [2] - 4785:19, 4785:22
Di [2] - 4736:14, 4736:15
Diego [2] - 4704:14, 4778:10
Diem [1] - 4865:24
difference [10] - 4678:24, 4754:5, 4771:14, 4771:16, 4771:18, 4788:15, 4788:19, 4789:19, 4791:19, 4791:21
different [34] - 4664:9, 4678:16, 4678:25, 4695:14, 4697:14, 4698:3, 4730:7, 4734:7, 4750:14, 4756:3, 4789:12, 4789:15, 4789:20, 4789:21, 4790:20, 4790:22, 4798:22, 4812:10, 4816:24, 4825:5, 4826:11, 4845:10, 4865:6, 4872:16, 4872:18, 4872:20, 4873:17, 4873:22, 4884:1, 4891:21, 4906:16, 4912:24, 4914:2, 4923:5
differently [2] - 4821:1, 4911:4
difficult [1] - 4928:14
difficulties [1] - 4848:10
diligence [2] - 4693:13, 4742:23
dire [1] - 4920:12
DIRECT [4] - 4686:15, 4864:10, 4932:4, 4932:6
direct [53] - 4658:16, 4667:25, 4668:6, 4668:11, 4670:12, 4670:21, 4670:23, 4671:12, 4672:11, 4713:6, 4819:2, 4819:13, 4827:10, 4827:24, 4828:16, 4828:18, 4834:4, 4834:11, 4835:7, 4838:16, 4839:6, 4839:9, 4839:23, 4840:20, 4841:4, 4841:22, 4842:15, 4842:19, 4842:20, 4843:6, 4845:8, 4846:25, 4847:12, 4847:15, 4847:23,

4848:6, 4848:11, 4850:7, 4850:12, 4854:9, 4860:4, 4860:6, 4860:13, 4861:5, 4862:17, 4920:9, 4922:2, 4922:13, 4922:15, 4924:5, 4924:15, 4927:24
directed [3] - 4832:18, 4875:2, 4875:3
direction [4] - 4750:7
directly [1] - 4671:15
director [1] - 4707:15
directors [1] - 4875:20
disagree [1] - 4669:23
disagreed [1] - 4680:5
disallowing [1] - 4661:17
disappointed [2] - 4798:2, 4800:4
DISB [1] - 4895:21
Disbursement [1] - 4895:22
disbursements [2] - 4882:25, 4904:6
disclose [2] - 4665:15, 4681:16
disclosed [8] - 4665:22, 4679:25, 4684:13, 4685:2, 4820:12, 4820:16, 4835:10
disclosing [2] - 4665:7, 4684:20
disclosure [6] - 4676:16, 4680:4, 4680:9, 4680:19, 4685:8, 4862:8
disclosures [14] - 4675:10, 4675:14, 4676:7, 4676:21, 4677:9, 4679:5, 4679:14, 4681:2, 4685:6, 4685:14, 4685:15, 4820:13, 4820:16, 4861:17
discount [1] - 4915:24
discounted [1] - 4895:25
discovery [1] - 4679:7
discreet [2] - 4856:1, 4856:17

discrete [1] - 4847:25
discretion [2] - 4682:19, 4683:3
discuss [10] - 4797:12, 4810:5, 4810:18, 4840:18, 4849:11, 4855:12, 4919:15, 4919:22, 4922:11, 4928:17
discussed [8] - 4659:6, 4716:12, 4788:13, 4790:11, 4790:12, 4835:21, 4861:11, 4861:13
discusses [2] - 4921:9, 4922:24
discussing [4] - 4679:12, 4735:9, 4843:8, 4908:8
discussion [5] - 4679:9, 4739:15, 4773:24, 4819:5, 4919:9
discussions [4] - 4716:1, 4716:4, 4739:12, 4739:17
dislike [2] - 4916:10, 4916:13
dismiss [3] - 4777:8, 4831:24, 4919:7
dismissed [4] - 4688:4, 4688:24, 4688:25, 4835:16
dismissing [1] - 4835:25
display [1] - 4924:3
dispute [1] - 4688:13
disputes [1] - 4658:4
disrupt [1] - 4676:19
distribution [1] - 4780:11
District [4] - 4661:16, 4804:16, 4806:1, 4812:25
DISTRICT [3] - 4657:1, 4657:1, 4657:10
divided [1] - 4896:11
division [1] - 4687:25
docket [3] - 4660:24, 4857:2, 4926:15
docks [1] - 4737:2
document [104] - 4661:8, 4674:5, 4698:17, 4700:13, 4714:8, 4720:9, 4720:10, 4720:23, 4721:2, 4721:5,

4721:10, 4722:11, 4723:11, 4723:14, 4724:17, 4725:5, 4726:19, 4726:23, 4727:7, 4727:11, 4728:11, 4728:14, 4729:7, 4729:8, 4730:17, 4732:12, 4737:15, 4737:20, 4738:8, 4743:10, 4743:25, 4744:11, 4744:23, 4747:16, 4747:17, 4747:24, 4748:2, 4748:12, 4749:15, 4749:16, 4751:15, 4751:18, 4751:22, 4751:23, 4752:3, 4752:18, 4752:21, 4752:22, 4752:25, 4754:2, 4758:4, 4758:5, 4758:20, 4758:22, 4759:7, 4759:9, 4762:14, 4766:7, 4767:6, 4768:14, 4768:17, 4768:20, 4769:13, 4781:9, 4782:5, 4785:5, 4799:4, 4803:2, 4808:10, 4809:10, 4810:22, 4811:8, 4812:14, 4815:10, 4815:11, 4816:12, 4816:14, 4819:17, 4821:10, 4823:17, 4823:22, 4827:19, 4829:5, 4841:15, 4846:10, 4868:4, 4875:15, 4886:2, 4897:12, 4901:20, 4904:4, 4905:10, 4905:16, 4920:10, 4920:17, 4924:11, 4924:15, 4924:24, 4925:2, 4925:4, 4925:6

**documentation** [2] - 4724:25, 4793:16
**documented** [1] - 4722:13
**documents** [57] - 4661:1, 4695:3, 4705:11, 4718:21, 4718:23, 4719:2, 4719:14, 4719:17, 4720:22, 4725:20, 4725:24, 4725:25, 4743:1, 4752:16, 4763:6, 4763:8, 4763:25, 4764:23, 4769:22, 4769:24,

4770:5, 4795:17, 4795:20, 4807:23, 4807:24, 4808:3, 4808:16, 4808:21, 4809:3, 4809:8, 4810:4, 4810:9, 4811:2, 4812:7, 4813:25, 4818:16, 4819:11, 4819:14, 4820:1, 4820:4, 4823:12, 4823:19, 4823:20, 4823:23, 4823:24, 4838:23, 4843:25, 4844:21, 4867:2, 4867:12, 4867:15, 4868:3, 4869:9, 4871:8, 4877:20, 4889:21, 4923:3
**dollar** [7] - 4743:18, 4745:3, 4746:6, 4746:25, 4747:5, 4749:7, 4825:1
**dollars** [4] - 4692:1, 4693:11, 4879:7, 4879:8
**domain** [1] - 4712:7
**done** [25] - 4659:7, 4670:9, 4673:16, 4673:17, 4676:19, 4676:25, 4682:12, 4685:11, 4691:19, 4794:22, 4795:3, 4820:10, 4837:21, 4855:6, 4880:15, 4880:25, 4888:10, 4889:15, 4895:24, 4896:5, 4898:12, 4904:16, 4914:12, 4925:14, 4927:21
**donee** [1] - 4762:10
**Donee** [1] - 4728:12
**door** [5] - 4829:9, 4830:3, 4892:1, 4893:16, 4895:25
**doors** [1] - 4893:20
**double** [5] - 4663:17, 4824:11, 4867:20, 4871:22
**double-check** [1] - 4824:11
**doubling** [1] - 4737:9
**doubt** [2] - 4756:4, 4756:5
**down** [26] - 4711:16, 4722:4, 4724:9, 4733:18, 4733:25, 4737:13, 4738:25, 4740:8, 4766:24, 4771:24, 4777:16,

4778:11, 4788:1, 4789:17, 4802:15, 4802:17, 4816:20, 4817:11, 4818:20, 4828:2, 4847:6, 4862:2, 4875:24, 4896:19, 4919:19, 4923:21
**downloaded** [1] - 4823:14
**draft** [2] - 4666:13, 4667:3
**drafted** [1] - 4662:6
**drafts** [3] - 4666:21, 4666:24, 4667:9
**draw** [1] - 4669:2
**drawn** [1] - 4853:23
**drew** [1] - 4662:14
**driven** [1] - 4888:23
**driver** [1] - 4688:14
**dropped** [5] - 4744:8, 4751:15, 4751:18, 4762:21, 4847:21
**drug** [3] - 4734:13, 4734:15, 4734:17
**DUBIN** [20] - 4657:21, 4659:14, 4741:3, 4741:6, 4741:10, 4855:3, 4855:17, 4855:20, 4857:5, 4925:16, 4925:25, 4926:3, 4926:11, 4928:2, 4928:5, 4928:11, 4928:21, 4928:24, 4929:6, 4931:1
**due** [8] - 4693:13, 4735:18, 4742:23, 4769:18, 4827:20, 4880:1, 4883:18, 4930:19
**duly** [2] - 4686:8, 4864:8
**DUNN** [1] - 4657:17
**during** [60] - 4667:13, 4670:19, 4671:12, 4671:13, 4671:23, 4672:4, 4672:7, 4672:20, 4674:7, 4687:15, 4690:19, 4697:12, 4700:3, 4705:15, 4706:11, 4708:24, 4709:6, 4711:11, 4711:24, 4713:21, 4716:4, 4717:7, 4719:1, 4737:7, 4737:14, 4746:23, 4748:16, 4757:3,

4757:4, 4760:12, 4761:7, 4787:25, 4788:2, 4788:11, 4789:5, 4789:15, 4789:24, 4790:5, 4790:10, 4791:2, 4792:24, 4797:13, 4803:9, 4808:18, 4812:22, 4818:10, 4818:23, 4819:10, 4828:18, 4841:8, 4847:22, 4863:15, 4882:17, 4889:12, 4893:12, 4913:21, 4917:5, 4917:17, 4927:8, 4927:13
**duties** [2] - 4688:8, 4701:8
**duty** [2] - 4816:19, 4822:8
**Dynagrow** [1] - 4726:12

# E

**e-mail** [142] - 4662:22, 4663:5, 4663:7, 4663:8, 4663:11, 4663:12, 4664:3, 4664:8, 4666:20, 4667:16, 4667:20, 4668:4, 4668:9, 4669:9, 4669:17, 4672:7, 4672:13, 4673:1, 4673:21, 4674:5, 4712:6, 4719:13, 4720:2, 4722:21, 4723:4, 4723:12, 4725:7, 4726:21, 4727:7, 4727:15, 4727:18, 4727:20, 4727:22, 4728:2, 4728:8, 4729:4, 4731:19, 4731:24, 4732:8, 4734:11, 4736:11, 4736:13, 4736:22, 4736:24, 4750:24, 4751:10, 4752:15, 4754:15, 4754:16, 4754:20, 4755:5, 4755:7, 4755:11, 4755:16, 4755:18, 4755:19, 4756:4, 4756:5, 4756:14, 4756:21, 4757:9, 4757:19, 4757:22, 4759:21, 4760:5, 4761:16, 4762:4, 4762:6, 4763:5, 4763:20,
**e-mail's** [1] - 4662:8
**e-mailed** [1] - 4798:10
**e-mails** [42] - 4666:18, 4667:17, 4667:24, 4668:4, 4711:16, 4711:18, 4711:21, 4712:3, 4712:8, 4712:10, 4712:11, 4712:14, 4712:25, 4722:19, 4722:20, 4729:12, 4754:22, 4757:2, 4757:18, 4762:3, 4762:22, 4781:16, 4781:20, 4782:10, 4792:22, 4796:3, 4796:20, 4796:23, 4798:6, 4798:8, 4799:8, 4811:3, 4819:10, 4829:13, 4910:17, 4920:13, 4920:21, 4921:17, 4921:20, 4922:6, 4928:24
**earliest** [2] - 4888:17, 4889:1
**early** [11] - 4677:7,

4770:4, 4770:12, 4770:23, 4772:15, 4774:7, 4774:12, 4774:13, 4775:13, 4779:8, 4779:21, 4780:4, 4781:5, 4781:13, 4782:6, 4783:3, 4783:10, 4783:17, 4785:24, 4786:6, 4786:21, 4787:12, 4792:14, 4795:13, 4795:22, 4795:25, 4797:8, 4797:22, 4797:24, 4799:18, 4800:13, 4800:20, 4800:24, 4800:25, 4801:2, 4801:8, 4801:9, 4801:11, 4804:10, 4807:13, 4810:17, 4811:11, 4811:14, 4811:15, 4811:16, 4811:21, 4816:2, 4823:24, 4829:3, 4829:16, 4912:21, 4918:3, 4918:6, 4918:10, 4918:15, 4920:8, 4920:19, 4921:2, 4921:13, 4922:10, 4922:11, 4922:20, 4923:24, 4924:3, 4929:4

4680:17, 4739:9,
4795:13, 4800:25,
4855:11, 4855:14,
4855:22, 4856:4,
4872:2, 4921:8
**earnings** [1] - 4691:7
**ears** [1] - 4710:24
**East** [2] - 4657:15,
4657:23
**east** [1] - 4831:19
**Eastern** [1] - 4812:25
**EASTERN** [1] -
4657:1
**easy** [1] - 4684:16
**Ed** [4] - 4673:24,
4718:11, 4779:22,
4787:6
**Edgardo** [1] -
4804:16
**edit** [2] - 4866:20,
4913:24
**Edmund** [1] -
4782:23
**education** [1] -
4687:18
**effective** [4] -
4670:20, 4670:22,
4671:3, 4769:8
**efficient** [2] - 4877:6,
4928:25
**eggs** [1] - 4672:17
**eight** [7] - 4678:11,
4680:1, 4845:9,
4872:15, 4872:23,
4872:25, 4925:10
**EIN** [5] - 4697:16,
4697:25, 4698:3,
4698:4
**either** [20] - 4667:2,
4685:25, 4691:5,
4709:25, 4721:25,
4722:10, 4723:23,
4766:20, 4791:15,
4819:12, 4821:17,
4824:7, 4828:17,
4838:16, 4841:16,
4854:13, 4858:7,
4861:24, 4899:18
**elaborate** [1] -
4790:21
**elaborated** [1] -
4839:19
**electronic** [5] -
4807:7, 4825:17,
4825:19, 4825:20,
4837:10
**electronically** [3] -
4691:20, 4812:7,
4910:12
**elements** [2] -

4679:22, 4825:16
**eleven** [1] - 4744:10
**elicit** [2] - 4821:18,
4849:22
**elicited** [8] -
4807:10, 4819:1,
4828:17, 4833:23,
4833:24, 4836:10,
4850:16, 4853:16
**eliciting** [2] -
4730:10, 4849:17
**Elizabeth** [1] -
4730:4
**elsewhere** [2] -
4674:7, 4674:12
**employ** [1] - 4709:2
**employed** [5] -
4658:12, 4687:6,
4804:11, 4804:14,
4804:21
**employee** [4] -
4722:1, 4735:1,
4773:11, 4816:4
**employees** [9] -
4669:11, 4708:6,
4708:12, 4708:13,
4708:21, 4723:5,
4723:24, 4751:13,
4818:15
**employer** [3] -
4697:19, 4818:16,
4818:19
**employer's** [1] -
4807:5
**employment** [17] -
4695:13, 4695:24,
4696:2, 4696:3,
4696:6, 4698:7,
4701:6, 4706:19,
4797:13, 4806:3,
4806:25, 4812:5,
4813:12, 4836:14,
4849:25
**encouraging** [1] -
4817:21
**end** [18] - 4659:4,
4659:11, 4675:21,
4692:13, 4734:22,
4799:12, 4799:19,
4834:7, 4842:3,
4847:1, 4913:3,
4916:16, 4916:19,
4916:23, 4918:4,
4918:7, 4921:18,
4927:19
**ended** [1] - 4734:23
**ending** [7] - 4882:3,
4882:24, 4884:19,
4885:9, 4898:12,
4900:1, 4901:21

**ends** [5] - 4743:3,
4893:22, 4897:12,
4900:15, 4916:15
**enforcement** [1] -
4798:19
**engage** [1] - 4690:19
**engaged** [2] -
4865:7, 4893:1
**engagement** [13] -
4665:5, 4665:12,
4873:19, 4873:21,
4873:22, 4874:2,
4874:23, 4875:13,
4909:6, 4909:12,
4909:17, 4909:21
**enjoyed** [1] -
4797:16
**enlisted** [1] - 4712:4
**enter** [2] - 4803:18,
4807:5
**entered** [5] -
4866:24, 4908:21,
4910:12, 4920:21,
4924:21
**entering** [1] - 4910:9
**enters** [1] - 4863:7
**entertain** [1] - 4809:5
**entire** [2] - 4721:24,
4722:14
**entirely** [1] - 4923:14
**entirety** [1] - 4855:8
**entities** [23] - 4696:9,
4696:13, 4696:20,
4697:13, 4698:1,
4699:4, 4701:17,
4704:6, 4704:7,
4704:19, 4705:17,
4706:12, 4707:17,
4707:24, 4708:3,
4708:12, 4711:20,
4733:8, 4734:3,
4804:17, 4805:20,
4875:19
**entitled** [7] - 4699:4,
4699:21, 4699:23,
4724:7, 4724:11,
4861:16, 4929:1
**entity** [9] - 4696:22,
4697:5, 4736:1,
4736:3, 4750:3,
4750:4, 4789:12,
4791:19, 4798:21
**entity's** [1] - 4706:17
**entries** [7] - 4771:8,
4785:6, 4865:21,
4880:24, 4900:23,
4901:2, 4912:9
**entry** [25] - 4724:2,
4724:4, 4724:9,
4733:1, 4733:19,

4738:11, 4739:1,
4739:3, 4753:12,
4772:1, 4772:7,
4772:10, 4772:12,
4785:13, 4785:18,
4880:25, 4881:11,
4882:15, 4897:13,
4902:6, 4903:14,
4912:11, 4912:12,
4912:14
**envelope** [1] -
4928:7
**envision** [1] -
4842:13
**envisioned** [1] -
4834:25
**equity** [11] - 4689:10,
4690:9, 4690:16,
4693:22, 4745:25,
4746:10, 4754:3,
4754:5, 4754:7,
4773:8, 4918:1
**er** [1] - 4685:19
**Eric** [1] - 4730:23
**escalate** [1] -
4798:14
**especially** [3] -
4694:1, 4916:18,
4919:4
**ESQ** [6] - 4657:19,
4657:19, 4657:20,
4657:20, 4657:21,
4657:21
**essence** [1] -
4679:25
**essential** [1] -
4735:15
**essentially** [1] -
4848:15
**establish** [1] -
4888:25
**established** [2] -
4665:12, 4792:11
**estate** [2] - 4687:9,
4692:22
**estimate** [1] -
4659:10
**estimated** [1] -
4831:20
**Evan** [49] - 4662:10,
4709:7, 4711:3,
4711:19, 4716:5,
4716:9, 4716:10,
4716:11, 4725:8,
4727:8, 4736:14,
4746:16, 4746:20,
4746:22, 4746:24,
4747:4, 4747:21,
4748:4, 4748:12,
4748:15, 4748:19,

4750:25, 4753:19,
4754:17, 4756:7,
4758:21, 4760:6,
4779:24, 4780:22,
4780:24, 4780:25,
4783:8, 4788:12,
4829:18, 4869:7,
4870:5, 4875:1,
4881:12, 4882:15,
4883:12, 4883:23,
4887:7, 4894:18,
4894:22, 4897:6,
4902:4, 4905:9,
4906:21, 4907:7
**EVAN** [1] - 4657:6
**Evan's** [1] - 4894:23
**evening** [4] - 4757:3,
4919:8, 4920:4
**event** [5] - 4691:8,
4813:15, 4821:17,
4841:4, 4915:18
**events** [1] - 4691:25
**eventually** [1] -
4788:22
**evidence** [54] -
4668:10, 4671:4,
4671:11, 4672:5,
4672:11, 4695:19,
4700:20, 4715:6,
4722:17, 4736:9,
4743:7, 4744:18,
4750:22, 4760:2,
4761:24, 4763:17,
4770:2, 4770:3,
4770:20, 4779:17,
4781:25, 4803:14,
4820:18, 4826:4,
4826:7, 4833:24,
4835:4, 4835:5,
4835:6, 4838:11,
4838:12, 4846:10,
4846:11, 4868:2,
4871:20, 4872:2,
4872:11, 4872:12,
4874:17, 4877:4,
4878:5, 4893:16,
4897:22, 4909:9,
4912:4, 4918:24,
4920:17, 4921:5,
4921:23, 4922:17,
4924:3, 4924:12,
4924:21, 4925:3
**evidentiary** [2] -
4811:7, 4812:13
**ex** [2] - 4659:18,
4660:25
**exact** [6] - 4679:5,
4747:20, 4747:22,
4916:3, 4921:10,
4925:5

**exactly** [11] - 4658:5, 4679:2, 4684:21, 4807:9, 4836:17, 4839:18, 4860:6, 4861:10, 4861:11, 4861:13, 4891:9

**exam** [1] - 4889:25

**examination** [42] - 4661:10, 4661:12, 4661:15, 4661:17, 4662:1, 4666:9, 4667:13, 4669:19, 4670:12, 4670:19, 4670:21, 4670:23, 4671:9, 4671:12, 4671:14, 4748:7, 4818:23, 4818:25, 4819:2, 4819:13, 4819:15, 4820:2, 4821:17, 4827:24, 4834:3, 4834:5, 4834:13, 4835:7, 4840:5, 4841:22, 4843:16, 4846:2, 4850:8, 4850:12, 4851:18, 4858:2, 4858:20, 4860:18, 4893:15, 4922:2, 4924:5

**EXAMINATION** [7] - 4686:15, 4864:10, 4907:2, 4912:1, 4932:4, 4932:6, 4932:7

**examine** [19] - 4661:21, 4664:22, 4669:16, 4673:18, 4674:6, 4815:19, 4819:23, 4833:2, 4833:14, 4834:14, 4834:18, 4835:12, 4838:13, 4839:11, 4840:6, 4841:24, 4842:2, 4843:9, 4846:25

**examined** [6] - 4676:13, 4686:8, 4816:8, 4816:18, 4848:3, 4864:9

**examiner** [2] - 4664:10, 4664:17

**examiner's** [1] - 4664:10

**examining** [2] - 4670:3, 4817:2

**example** [9] - 4660:8, 4660:11, 4672:7, 4804:6, 4825:5, 4878:12, 4895:8, 4912:12,

4921:22

**examples** [5] - 4661:11, 4661:24, 4669:7, 4669:24, 4869:12

**exceed** [1] - 4813:4

**exceeded** [1] - 4812:19

**exceeding** [1] - 4824:18

**excellent** [1] - 4686:20

**except** [5] - 4660:12, 4760:5, 4769:24, 4785:13, 4925:20

**excess** [2] - 4788:22, 4888:7

**Exchange** [1] - 4729:14

**exchange** [3] - 4664:23, 4816:2, 4852:7

**excludable** [1] - 4818:18

**exclude** [5] - 4678:19, 4817:20, 4818:11, 4838:10, 4893:5

**excluded** [2] - 4893:6, 4893:8

**exculpate** [1] - 4861:25

**excuse** [2] - 4676:16, 4807:15

**execute** [1] - 4756:7

**executed** [5] - 4725:20, 4725:24, 4728:21, 4729:1, 4779:24

**executive** [1] - 4917:14

**exemption** [1] - 4810:14

**Exhibit** [151] - 4695:5, 4695:12, 4695:16, 4695:19, 4695:20, 4700:12, 4700:17, 4700:20, 4700:21, 4701:8, 4714:15, 4715:3, 4715:6, 4715:7, 4715:9, 4719:9, 4719:24, 4720:4, 4720:6, 4722:18, 4723:8, 4725:4, 4725:14, 4725:16, 4726:18, 4727:1, 4727:5, 4731:15, 4732:4, 4732:6, 4736:10, 4743:6,

4744:9, 4744:15, 4744:17, 4748:1, 4749:16, 4749:24, 4750:1, 4750:23, 4753:5, 4754:15, 4754:25, 4755:2, 4755:14, 4756:6, 4757:7, 4757:12, 4757:14, 4757:16, 4759:2, 4759:5, 4759:6, 4759:8, 4759:14, 4759:18, 4759:20, 4759:24, 4760:1, 4761:14, 4761:21, 4761:24, 4761:25, 4763:2, 4763:13, 4763:16, 4763:18, 4766:8, 4766:9, 4766:11, 4766:25, 4769:12, 4770:3, 4770:11, 4770:17, 4770:20, 4770:21, 4775:9, 4779:4, 4779:5, 4779:14, 4779:17, 4779:18, 4781:10, 4781:22, 4781:25, 4782:1, 4783:23, 4786:5, 4786:11, 4790:2, 4796:19, 4797:1, 4797:5, 4797:8, 4801:5, 4802:1, 4802:21, 4815:5, 4867:12, 4867:18, 4867:19, 4868:4, 4869:16, 4870:7, 4870:8, 4870:20, 4870:21, 4871:11, 4871:25, 4872:12, 4872:13, 4874:20, 4876:5, 4876:9, 4878:14, 4878:16, 4878:17, 4880:9, 4884:7, 4884:9, 4885:1, 4885:22, 4886:23, 4886:24, 4887:14, 4888:1, 4894:9, 4897:5, 4898:1, 4898:3, 4898:15, 4898:25, 4899:6, 4899:24, 4899:25, 4901:8, 4902:23, 4904:14, 4904:22, 4905:1, 4905:18, 4905:23, 4906:5, 4909:8, 4912:3, 4918:24, 4919:23, 4921:5

**exhibit** [18] - 4755:13, 4764:19,

4781:17, 4788:1, 4811:3, 4817:20, 4821:4, 4821:5, 4823:17, 4869:10, 4869:15, 4872:7, 4876:20, 4891:14, 4903:21, 4909:19, 4919:22, 4920:5

**EXHIBITS** [12] - 4932:9

**Exhibits** [26] - 4781:24, 4811:5, 4867:24, 4868:1, 4872:11, 4873:25, 4874:5, 4874:10, 4874:15, 4874:16, 4876:2, 4876:8, 4876:12, 4876:24, 4877:3, 4877:8, 4877:10, 4877:21, 4877:25, 4878:3, 4886:22, 4886:24, 4887:6, 4887:10, 4887:13, 4887:15

**exhibits** [12] - 4808:6, 4818:4, 4862:18, 4876:25, 4877:8, 4877:25, 4878:7, 4880:5, 4887:17, 4888:4, 4891:3

**exist** [1] - 4761:3

**existed** [3] - 4756:10, 4760:13, 4760:14

**existing** [1] - 4909:5

**exits** [3] - 4740:9, 4802:18, 4919:18

**expect** [4] - 4850:18, 4859:4, 4862:16, 4923:12

**expected** [4] - 4820:4, 4838:3, 4838:6, 4841:7

**expecting** [1] - 4687:4

**expenses** [1] - 4713:16

**experience** [5] - 4658:11, 4683:22, 4684:14, 4684:20, 4746:10

**expert** [18] - 4675:10, 4675:14, 4675:16, 4676:2, 4676:4, 4676:5, 4678:4, 4678:22, 4680:8, 4680:18, 4681:2, 4683:6, 4683:20, 4684:4,

4684:16, 4685:8, 4827:4, 4926:17

**expert's** [1] - 4681:10

**experts** [7] - 4675:20, 4679:6, 4680:11, 4683:8, 4684:23, 4684:24, 4685:4

**explain** [5] - 4679:22, 4737:4, 4787:10, 4862:12, 4891:16

**explained** [2] - 4746:25, 4777:15

**explanation** [1] - 4669:5

**explore** [1] - 4848:12

**exposure** [3] - 4691:6, 4798:19, 4827:9

**extended** [1] - 4927:12

**extent** [9] - 4681:24, 4682:5, 4819:19, 4828:18, 4839:2, 4840:6, 4841:17, 4861:23, 4889:22

**extra** [2] - 4811:19, 4881:19

**extraordinarily** [1] - 4840:23

**extraordinary** [1] - 4853:11

**extremely** [1] - 4888:8

**eyes** [1] - 4710:23

---

# F

**faced** [1] - 4673:15

**facilitated** [1] - 4691:16

**facility** [1] - 4825:17

**fact** [8] - 4662:24, 4678:21, 4679:9, 4684:6, 4815:9, 4820:23, 4921:2, 4923:8

**fact-finders** [1] - 4678:21

**factors** [2] - 4836:7, 4892:10

**facts** [4] - 4679:23, 4792:11, 4816:1, 4818:24

**failed** [1] - 4685:4

**failure** [2] - 4684:18, 4769:18

**fair** [13] - 4669:15,

4674:9, 4685:9, 4693:15, 4836:15, 4878:25, 4880:4, 4908:13, 4912:18, 4912:19, 4913:13, 4913:16, 4916:7

**faith** [8] - 4670:15, 4673:1, 4674:11, 4674:17, 4680:24, 4681:20, 4827:7, 4850:15

**fall** [1] - 4691:1

**fallout** [1] - 4689:22

**falls** [2] - 4691:14, 4851:14

**false** [1] - 4853:14

**falsely** [1] - 4853:15

**familiar** [6] - 4714:5, 4721:5, 4729:14, 4886:7, 4908:23, 4918:2

**family** [1] - 4875:21

**famous** [1] - 4930:25

**Far** [1] - 4705:11

**far** [9] - 4697:1, 4698:4, 4705:11, 4783:24, 4811:13, 4822:5, 4841:5, 4924:20, 4931:3

**farting** [3] - 4672:15, 4672:24, 4673:21

**fault** [1] - 4857:8

**FBI** [4] - 4819:8, 4853:18, 4859:12, 4861:12

**Fearnow** [32] - 4772:22, 4773:2, 4773:3, 4773:5, 4773:17, 4773:21, 4774:2, 4774:15, 4775:16, 4776:1, 4776:8, 4776:13, 4776:15, 4777:10, 4777:14, 4778:8, 4779:11, 4780:7, 4780:11, 4780:16, 4780:17, 4781:3, 4781:6, 4781:14, 4781:18, 4782:7, 4782:16, 4783:8, 4785:8, 4786:9, 4787:19, 4787:22

**February** [32] - 4713:7, 4714:3, 4714:22, 4715:16, 4716:1, 4722:21, 4723:9, 4724:9, 4733:19, 4738:22, 4743:16, 4744:24, 4746:7, 4747:15,

4749:4, 4750:11, 4750:12, 4753:13, 4753:15, 4754:1, 4754:4, 4796:21, 4797:8, 4803:14, 4804:10, 4887:8, 4888:1, 4892:22, 4894:15, 4896:22, 4897:7

**federal** [20] - 4803:7, 4803:20, 4807:4, 4807:8, 4807:23, 4808:1, 4815:15, 4815:25, 4816:9, 4817:7, 4827:11, 4822:4, 4828:20, 4834:19, 4834:24, 4838:10, 4838:13, 4845:10, 4846:6, 4848:16

**Federal** [3] - 4810:20, 4812:3, 4812:7

**Fee** [3] - 4895:16, 4895:19, 4895:21

**fee** [2] - 4895:22, 4915:21

**fees** [4] - 4692:1, 4791:12, 4895:17, 4895:20

**fell** [1] - 4688:19

**fellow** [1] - 4829:15

**felony** [4] - 4688:9, 4688:11, 4688:23

**felt** [2] - 4793:10, 4838:14

**Fernandez** [19] - 4706:16, 4707:6, 4726:10, 4727:14, 4728:3, 4728:15, 4743:11, 4765:14, 4766:2, 4766:15, 4767:1, 4770:6, 4772:10, 4774:3, 4774:5, 4775:18, 4782:20, 4787:4, 4794:14

**Fernandez's** [1] - 4765:17

**few** [11] - 4675:21, 4724:14, 4791:23, 4792:1, 4792:22, 4831:4, 4835:24, 4847:25, 4876:19, 4878:7, 4909:19

**fewer** [1] - 4787:11

**field** [1] - 4880:24

**fifteen** [1] - 4759:2

**Fifth** [29] - 4815:22, 4816:17, 4817:19,

4832:24, 4833:16, 4837:1, 4837:11, 4838:5, 4841:19, 4845:13, 4850:23, 4851:3, 4851:19, 4853:2, 4853:3, 4853:6, 4853:7, 4853:10, 4853:22, 4853:23, 4854:3, 4854:4, 4854:11, 4855:8, 4856:15, 4856:17, 4859:15, 4859:18, 4859:20

**fifth** [3] - 4758:4, 4759:8, 4839:13

**fight** [4] - 4688:13, 4688:15, 4688:18, 4688:21

**figure** [7] - 4658:22, 4823:5, 4826:14, 4833:1, 4833:9, 4851:1, 4925:9

**file** [4] - 4729:25, 4798:5, 4799:25, 4808:24

**filed** [15] - 4682:14, 4731:6, 4800:16, 4804:12, 4804:17, 4804:18, 4804:19, 4804:20, 4805:14, 4805:19, 4806:1, 4806:18, 4820:5, 4835:14, 4836:6

**filing** [2] - 4793:2, 4793:5, 4798:4

**filings** [1] - 4683:14

**fill** [2] - 4688:6, 4688:25

**filled** [1] - 4688:4

**filling** [1] - 4688:5

**final** [12] - 4666:23, 4667:3, 4667:9, 4667:10, 4775:22, 4796:6, 4798:17, 4799:5, 4883:8, 4897:25, 4900:23, 4912:22

**finally** [3] - 4661:7, 4769:11, 4870:19

**finance** [3] - 4687:20, 4746:10, 4864:20

**financial** [12] - 4666:12, 4689:8, 4692:5, 4707:10, 4713:10, 4716:25, 4718:25, 4864:17, 4864:18, 4864:19, 4865:9, 4873:2

**financing** [1] -

4868:20

**finders** [1] - 4678:21

**fine** [4] - 4692:4, 4792:11, 4856:5, 4856:19

**finger** [2] - 4679:4, 4845:3

**fingers** [1] - 4844:23

**finish** [8] - 4748:7, 4798:11, 4839:4, 4842:16, 4844:1, 4850:9, 4850:12, 4862:15

**finished** [4] - 4659:7, 4814:4, 4842:18, 4843:5

**finishing** [1] - 4928:15

**FINRA** [1] - 4675:15

**fired** [3] - 4705:20, 4705:21, 4795:6

**Firm** [2] - 4895:13, 4896:3

**firm** [24] - 4665:2, 4665:6, 4665:13, 4665:15, 4689:7, 4689:8, 4689:18, 4690:5, 4690:8, 4690:22, 4711:7, 4711:9, 4797:19, 4804:6, 4864:14, 4864:21, 4865:7, 4896:9, 4907:23, 4915:15, 4918:6, 4918:8, 4918:21, 4921:12

**firm's** [1] - 4918:21

**firms** [1] - 4909:24

**first** [70] - 4662:2, 4664:3, 4666:11, 4666:17, 4667:14, 4673:13, 4674:10, 4681:5, 4685:17, 4694:6, 4694:7, 4696:5, 4696:22, 4698:20, 4702:6, 4715:8, 4716:9, 4716:25, 4719:17, 4728:19, 4729:7, 4732:21, 4737:23, 4738:25, 4745:8, 4748:1, 4748:5, 4751:6, 4759:3, 4760:4, 4764:13, 4771:3, 4778:3, 4778:6, 4779:20, 4782:9, 4783:24, 4789:5, 4789:18, 4790:10, 4798:1, 4802:23, 4803:12,

4807:22, 4819:16, 4832:9, 4836:21, 4849:15, 4868:5, 4868:8, 4869:10, 4869:15, 4873:21, 4875:18, 4878:17, 4879:13, 4879:19, 4880:13, 4881:11, 4891:13, 4894:9, 4898:1, 4900:10, 4900:20, 4901:13, 4902:5, 4902:7, 4905:4, 4920:21

**fiscal** [8] - 4897:2, 4916:15, 4916:16, 4916:19, 4916:23, 4918:4, 4918:7, 4921:18

**Five** [2] - 4833:20, 4833:22

**five** [9] - 4690:18, 4705:22, 4710:10, 4755:20, 4771:20, 4777:22, 4777:23, 4797:16, 4830:14

**fixed** [1] - 4915:21

**floated** [1] - 4668:15

**floor** [1] - 4735:22

**Floor** [1] - 4657:17

**flow** [1] - 4917:18

**fluid** [1] - 4666:6

**focus** [8] - 4658:12, 4694:2, 4743:16, 4757:18, 4762:2, 4779:20, 4824:17, 4928:22

**focused** [1] - 4693:10

**focusing** [1] - 4775:16

**folder** [1] - 4719:18

**folders** [1] - 4718:22

**follow** [3] - 4662:20, 4773:10, 4918:15

**follow-on** [1] - 4662:20

**followed** [2] - 4681:18, 4726:3

**following** [5] - 4717:11, 4784:13, 4814:9, 4890:20, 4929:20

**follows** [5] - 4664:23, 4667:15, 4668:2, 4686:9, 4864:9

**food** [1] - 4883:3

**foolhardy** [1] - 4852:4

**forbidden** [1] -

4851:14
**forbids** [1] - 4845:7
**force** [3] - 4671:1, 4671:3, 4854:3
**forced** [1] - 4930:3
**forcefully** [1] - 4838:9
**foresee** [1] - 4848:6
**forgive** [2] - 4837:6, 4855:25
**form** [18] - 4661:9, 4664:15, 4664:16, 4668:16, 4688:4, 4688:5, 4688:6, 4688:8, 4688:17, 4688:25, 4775:5, 4776:24, 4869:18, 4870:4, 4901:9, 4909:14, 4914:22, 4915:2
**formal** [1] - 4799:25
**formation** [2] - 4720:15, 4720:19
**formatted** [1] - 4883:21
**formed** [1] - 4720:13
**former** [3] - 4665:1, 4672:14, 4807:5
**formerly** [1] - 4871:6
**forms** [1] - 4708:14
**forth** [6] - 4680:7, 4680:11, 4680:17, 4685:16, 4799:1, 4867:13
**forward** [20] - 4675:6, 4682:16, 4683:11, 4765:8, 4766:6, 4782:9, 4809:5, 4826:14, 4833:1, 4833:6, 4837:15, 4839:2, 4849:20, 4851:13, 4852:8, 4857:4, 4857:25, 4869:16, 4870:6, 4900:12
**forwarded** [3] - 4727:17, 4727:18, 4727:20
**forwarding** [3] - 4723:4, 4727:11, 4727:15
**foundation** [1] - 4793:23
**founded** [1] - 4719:21
**founder** [1] - 4721:25
**founders** [1] - 4728:23
**founders'** [1] -

4769:18
**four** [5] - 4661:1, 4665:14, 4704:9, 4763:20, 4771:20
**fourteen** [1] - 4757:5
**fourth** [3] - 4759:7, 4764:18, 4768:20
**frame** [18] - 4693:5, 4707:20, 4711:17, 4737:8, 4742:1, 4747:8, 4747:22, 4748:8, 4748:13, 4748:14, 4761:8, 4792:19, 4823:9, 4886:4, 4888:2, 4888:8, 4895:20, 4895:24
**framing** [1] - 4823:6
**Frank** [1] - 4734:5
**frankly** [4] - 4822:17, 4840:3, 4858:14, 4929:10
**Fraud** [4] - 4803:19, 4807:3, 4812:15, 4819:22
**fraud** [5] - 4679:21, 4810:13, 4812:4, 4813:5, 4893:22
**fraudsters** [1] - 4679:21
**free** [7] - 4773:17, 4774:9, 4775:22, 4776:7, 4777:11, 4778:16, 4779:1
**free-trading** [7] - 4773:17, 4774:9, 4775:22, 4776:7, 4777:11, 4778:16, 4779:1
**freely** [2] - 4773:4, 4778:21
**freely-tradable** [1] - 4773:4
**frequently** [3] - 4709:14, 4710:6, 4712:22
**fresh** [2] - 4845:16, 4846:13
**freshness** [1] - 4846:14
**Friday** [5] - 4799:19, 4857:10, 4857:12, 4857:13, 4930:4
**front** [16] - 4686:17, 4694:2, 4833:21, 4833:22, 4839:13, 4853:3, 4854:3, 4854:4, 4854:11, 4856:15, 4867:8, 4867:9, 4868:7,

4871:13, 4876:1, 4877:7
**fulfillment** [1] - 4798:13
**full** [21] - 4668:2, 4668:23, 4669:15, 4671:1, 4671:3, 4682:17, 4683:10, 4684:5, 4684:6, 4685:8, 4707:21, 4732:9, 4787:17, 4798:20, 4819:3, 4835:11, 4835:12, 4839:11, 4839:23, 4854:20, 4875:5
**full-time** [1] - 4707:21
**fully** [12] - 4665:23, 4681:24, 4682:2, 4683:5, 4779:24, 4839:24, 4840:5, 4855:1, 4855:15, 4856:20, 4892:3, 4926:10
**fully-executed** [1] - 4779:24
**fulsome** [2] - 4851:17, 4862:8
**Fulvio** [1] - 4683:21
**fumes** [1] - 4713:13
**fund** [19] - 4689:10, 4689:12, 4689:21, 4690:9, 4690:14, 4690:15, 4690:16, 4690:17, 4690:22, 4692:14, 4697:10, 4697:11, 4699:12, 4699:15, 4701:24, 4702:15, 4703:8, 4795:4, 4797:16
**Fund** [1] - 4696:8
**funds** [26] - 4686:22, 4689:11, 4692:18, 4693:1, 4693:3, 4693:6, 4693:9, 4693:19, 4694:5, 4695:14, 4701:21, 4702:10, 4705:8, 4707:19, 4712:23, 4730:5, 4731:8, 4735:9, 4793:19, 4793:22, 4794:5, 4794:17, 4794:23, 4797:13, 4798:21
**funny** [2] - 4662:21, 4663:5
**furtherance** [1] - 4921:23
**furthermore** [1] -

4812:11

**G**

**game** [2] - 4836:15, 4842:22
**gap** [2] - 4847:15, 4930:17
**Gap** [1] - 4699:17
**Garden** [1] - 4822:8
**Gateway** [9] - 4742:15, 4742:16, 4742:19, 4773:21, 4780:3, 4785:19, 4785:22, 4787:15, 4871:6
**gather** [1] - 4831:9
**gathering** [1] - 4718:20
**geared** [1] - 4667:7
**general** [8] - 4661:14, 4674:2, 4714:11, 4868:18, 4870:23, 4883:22, 4883:23, 4883:24
**generally** [2] - 4922:11, 4924:15
**generate** [1] - 4886:17
**generated** [6] - 4865:25, 4866:2, 4866:11, 4883:24, 4905:19, 4924:16
**gentleman** [1] - 4730:23
**gentlemen** [1] - 4740:3
**George** [7] - 4707:3, 4707:7, 4735:1, 4735:3, 4774:23, 4779:22
**giant** [1] - 4878:14
**GIBSON** [1] - 4657:17
**Gifford** [1] - 4707:9
**Giglio** [2] - 4820:16, 4862:6
**given** [32] - 4659:5, 4664:21, 4665:20, 4667:6, 4668:16, 4668:23, 4673:18, 4677:7, 4679:1, 4681:23, 4683:1, 4683:9, 4685:6, 4700:1, 4700:3, 4700:4, 4702:10, 4722:11, 4734:25, 4747:14, 4747:17, 4753:3, 4768:11, 4773:12, 4787:23,

4807:25, 4821:8, 4839:15, 4843:23, 4854:5, 4919:4, 4919:14
**Global** [44] - 4712:4, 4712:5, 4803:3, 4803:7, 4803:8, 4803:18, 4807:11, 4808:15, 4808:21, 4817:1, 4819:12, 4819:24, 4820:1, 4820:17, 4824:8, 4829:11, 4832:19, 4832:21, 4832:22, 4833:24, 4835:5, 4836:4, 4836:11, 4836:23, 4837:10, 4841:14, 4841:18, 4841:20, 4843:8, 4846:7, 4846:16, 4847:3, 4848:13, 4848:17, 4849:1, 4849:24, 4850:9, 4850:25, 4853:5, 4853:18, 4858:13, 4859:11, 4859:13
**global** [1] - 4813:11
**Goldman** [7] - 4687:23, 4687:24, 4688:1, 4689:2, 4689:4, 4689:8
**governed** [2] - 4700:8, 4700:14
**governing** [1] - 4729:19
**Government** [101] - 4657:12, 4719:9, 4719:24, 4720:4, 4720:6, 4722:18, 4723:7, 4725:3, 4725:14, 4726:18, 4727:5, 4729:18, 4731:14, 4732:4, 4732:6, 4736:9, 4764:19, 4786:4, 4786:11, 4790:2, 4796:19, 4797:1, 4797:5, 4797:8, 4801:5, 4802:1, 4815:1, 4815:5, 4816:11, 4816:24, 4817:9, 4817:21, 4818:3, 4818:24, 4819:1, 4819:3, 4820:13, 4820:15, 4820:20, 4820:22, 4821:1, 4821:18, 4823:5, 4823:12, 4823:15, 4826:15, 4829:16, 4830:10,

4830:14, 4853:16,
4854:22, 4858:3,
4858:5, 4858:6,
4858:10, 4858:23,
4860:9, 4860:20,
4861:1, 4862:7,
4863:18, 4863:21,
4864:8, 4867:18,
4867:19, 4867:24,
4868:4, 4869:15,
4873:25, 4874:12,
4878:7, 4888:14,
4894:9, 4897:5,
4898:1, 4898:3,
4898:15, 4898:25,
4899:24, 4899:25,
4901:8, 4902:22,
4904:13, 4904:22,
4905:17, 4905:22,
4906:4, 4909:8,
4912:3, 4912:6,
4918:24, 4919:23,
4920:20, 4921:5,
4921:23, 4923:6,
4926:5, 4926:7,
4928:7, 4929:3

**government** [61] -
4660:17, 4661:4,
4661:12, 4661:13,
4661:20, 4661:25,
4663:2, 4663:20,
4664:18, 4666:2,
4674:24, 4675:16,
4677:4, 4678:3,
4678:24, 4679:6,
4679:14, 4681:8,
4681:21, 4683:3,
4684:22, 4685:4,
4685:6, 4685:7,
4685:10, 4686:14,
4727:1, 4729:18,
4802:21, 4803:14,
4807:10, 4807:22,
4807:25, 4808:5,
4808:20, 4808:23,
4808:24, 4833:18,
4833:23, 4834:4,
4835:9, 4836:10,
4837:19, 4839:8,
4841:17, 4841:21,
4842:18, 4844:18,
4846:8, 4846:22,
4847:10, 4848:12,
4850:5, 4850:6,
4850:12, 4850:14,
4859:7, 4892:25,
4894:2, 4899:6,
4905:1

**government's** [7] -
4658:10, 4661:10,
4665:18, 4668:20,

4807:8, 4835:9,
4844:18

**Government's** [105] -
4695:5, 4695:12,
4695:16, 4695:19,
4700:12, 4700:17,
4700:20, 4701:7,
4714:15, 4715:2,
4715:6, 4715:8,
4725:16, 4743:6,
4744:9, 4744:15,
4744:17, 4748:1,
4749:16, 4749:24,
4750:1, 4750:23,
4753:5, 4754:15,
4754:25, 4755:2,
4755:14, 4756:6,
4757:7, 4757:12,
4757:14, 4757:16,
4759:2, 4759:5,
4759:6, 4759:7,
4759:14, 4759:17,
4759:20, 4759:24,
4760:1, 4761:14,
4761:21, 4761:24,
4763:1, 4763:13,
4763:16, 4766:8,
4766:11, 4766:25,
4769:12, 4770:3,
4770:10, 4770:17,
4770:20, 4775:9,
4779:5, 4779:14,
4779:17, 4781:10,
4781:22, 4781:24,
4781:25, 4783:23,
4786:17, 4860:11,
4860:19, 4868:1,
4870:7, 4871:11,
4871:24, 4872:10,
4872:12, 4874:5,
4874:10, 4874:14,
4874:16, 4876:2,
4876:8, 4876:12,
4876:20, 4876:24,
4877:3, 4877:7,
4877:9, 4877:21,
4877:24, 4878:3,
4878:13, 4878:17,
4880:9, 4884:7,
4885:1, 4885:22,
4886:22, 4886:23,
4886:24, 4887:6,
4887:10, 4887:13,
4887:14

**grab** [1] - 4828:3
**grabbed** [1] -
4712:13
**GRACE** [1] - 4657:21
**graduated** [2] -
4687:19, 4687:21

**gravity** [1] - 4663:1
**great** [3] - 4673:17,
4797:18, 4822:12
**greater** [1] - 4661:9
**GREEBEL** [1] -
4657:6
**Greebel** [116] -
4662:10, 4663:1,
4666:19, 4667:2,
4709:7, 4709:18,
4710:6, 4710:15,
4710:25, 4711:7,
4711:13, 4716:5,
4716:11, 4716:21,
4717:7, 4722:21,
4723:12, 4725:8,
4727:8, 4727:11,
4727:15, 4727:22,
4729:8, 4736:14,
4746:16, 4746:22,
4746:24, 4747:5,
4747:9, 4747:21,
4748:4, 4750:25,
4751:9, 4751:12,
4753:19, 4754:17,
4756:7, 4757:23,
4758:21, 4760:6,
4760:8, 4760:10,
4762:7, 4762:20,
4763:5, 4763:25,
4769:22, 4770:12,
4770:24, 4779:9,
4779:21, 4779:23,
4780:5, 4780:15,
4780:18, 4780:21,
4780:22, 4781:6,
4782:10, 4783:4,
4783:11, 4785:14,
4786:1, 4786:7,
4786:21, 4788:3,
4788:18, 4789:2,
4789:6, 4789:18,
4790:5, 4790:11,
4790:19, 4790:25,
4791:21, 4810:4,
4810:17, 4811:14,
4811:15, 4816:3,
4816:5, 4822:22,
4823:3, 4823:4,
4823:18, 4829:18,
4847:13, 4857:11,
4857:14, 4861:25,
4863:9, 4863:12,
4869:7, 4870:5,
4875:1, 4878:20,
4881:12, 4882:15,
4882:16, 4883:12,
4884:22, 4885:12,
4886:3, 4887:7,
4888:10, 4888:13,

4894:18, 4897:6,
4897:18, 4902:4,
4905:9, 4906:21,
4907:7, 4920:8,
4920:14, 4920:22
**Greebel's** [6] -
4888:22, 4891:21,
4892:2, 4892:23,
4893:15, 4924:25
**green** [1] - 4882:16
**Greer** [5] - 4689:3,
4689:6, 4689:7,
4689:13, 4689:23
**grenades** [1] -
4845:21
**ground** [4] -
4792:11, 4817:23,
4818:18, 4845:12
**grounds** [1] -
4807:21
**group** [1] - 4763:24
**guaranteed** [1] -
4695:24
**guess** [13] - 4663:8,
4697:23, 4809:4,
4811:12, 4811:24,
4815:9, 4823:21,
4826:12, 4851:9,
4857:21, 4859:1,
4919:21, 4924:1
**guessing** [1] -
4908:3
**guys** [2] - 4736:25,
4760:17

# H

**hacked** [6] -
4808:18, 4820:9,
4820:17, 4820:23,
4821:3, 4821:11
**Hackert** [3] -
4673:24, 4718:11,
4779:22
**hacking** [6] - 4803:7,
4808:17, 4817:22,
4820:19, 4836:3,
4836:13
**half** [10] - 4680:12,
4689:14, 4773:3,
4773:9, 4783:5,
4783:7, 4793:14,
4832:3, 4930:22,
4931:2
**half-hour** [2] -
4930:22, 4931:2
**hand** [4] - 4817:21,
4863:25, 4868:11,
4871:1
**handed** [2] -

4746:18, 4791:6
**handle** [2] - 4682:10,
4854:9
**handling** [1] -
4902:15
**handwriting** [9] -
4714:19, 4752:14,
4758:18, 4759:14,
4759:17, 4766:21,
4767:14, 4769:3,
4769:4
**handwritten** [12] -
4752:11, 4758:14,
4759:9, 4762:16,
4764:22, 4766:4,
4766:5, 4766:12,
4766:16, 4766:17,
4766:20, 4767:11
**happy** [11] - 4660:16,
4796:6, 4821:8,
4829:21, 4830:20,
4837:23, 4856:6,
4920:11, 4922:10,
4929:15
**hard** [1] - 4907:21
**hardware** [1] -
4735:17
**harm** [1] - 4925:4
**Hassan** [8] -
4666:10, 4667:14,
4667:22, 4668:13,
4668:20, 4668:23,
4798:17, 4799:6
**head** [4] - 4689:3,
4831:9, 4831:16,
4909:1
**header** [1] - 4824:1
**headers** [1] - 4824:5
**heading** [4] - 4771:4,
4784:2, 4785:7,
4868:12
**Heading** [1] -
4657:22
**headings** [2] -
4894:20, 4897:9
**health** [1] - 4713:10
**Healthcare** [38] -
4696:8, 4699:6,
4702:2, 4702:3,
4702:8, 4702:14,
4702:22, 4703:1,
4705:6, 4713:19,
4713:25, 4714:2,
4714:22, 4715:15,
4715:18, 4715:20,
4724:6, 4724:10,
4734:1, 4734:5,
4734:8, 4743:17,
4743:22, 4744:5,
4745:4, 4745:12,

Case 1:15-cr-00637-KAM   Document 686   Filed 10/17/18   Page 296 of 320 PageID #: 22298

4745:19, 4748:25, 4749:8, 4749:12, 4749:19, 4749:21, 4749:22, 4750:6, 4753:15, 4788:21, 4791:5, 4797:16
**healthcare** [2] - 4693:10, 4699:13
**hear** [8] - 4660:17, 4799:19, 4815:6, 4820:3, 4851:23, 4862:14, 4863:20, 4929:15
**heard** [11] - 4674:24, 4703:8, 4774:15, 4811:7, 4816:24, 4826:17, 4834:15, 4835:8, 4837:4, 4838:4, 4840:25
**hearing** [20] - 4658:3, 4658:9, 4658:13, 4665:10, 4675:22, 4678:18, 4679:16, 4680:12, 4681:3, 4681:23, 4682:7, 4685:14, 4798:2, 4887:22, 4925:11, 4926:17, 4927:1, 4927:11, 4927:14, 4927:15
**hearings** [1] - 4683:12
**hearsay** [2] - 4730:10, 4811:18
**heart** [3] - 4679:18, 4798:7, 4853:8
**hedge** [31] - 4686:22, 4689:10, 4689:21, 4690:9, 4690:16, 4690:22, 4691:6, 4692:17, 4693:1, 4693:3, 4693:6, 4693:9, 4693:19, 4694:5, 4695:14, 4697:10, 4697:11, 4699:12, 4699:15, 4703:8, 4712:23, 4730:5, 4731:8, 4735:8, 4793:19, 4793:22, 4794:5, 4794:11, 4794:17, 4794:23, 4795:4
**Heinick** [1] - 4734:5
**held** [4] - 4684:7, 4783:11, 4864:22, 4887:21
**hello** [2] - 4669:5, 4863:23
**help** [3] - 4800:5, 4855:11, 4912:6

**helpful** [5] - 4659:23, 4663:19, 4669:7, 4670:17, 4678:21
**hereby** [2] - 4745:11, 4811:23
**hi** [2] - 4736:25, 4928:12
**highlight** [1] - 4733:21
**himself** [5] - 4693:14, 4696:11, 4724:20, 4838:16, 4897:19
**hired** [8] - 4689:6, 4691:25, 4701:11, 4705:21, 4707:14, 4707:20, 4717:2, 4799:16
**hiring** [1] - 4703:21
**history** [1] - 4693:15
**hit** [1] - 4739:5
**hold** [5] - 4660:21, 4692:9, 4841:25, 4842:6, 4843:2
**holder** [1] - 4728:22
**holding** [2] - 4691:3, 4778:23
**holidays** [1] - 4694:6
**hollow** [1] - 4820:6
**home** [5] - 4713:5, 4795:17, 4795:20, 4919:16
**honest** [1] - 4824:13
**honestly** [1] - 4681:22
**honesty** [1] - 4853:21
**Honor** [181] - 4660:6, 4660:9, 4660:16, 4669:6, 4670:1, 4671:10, 4672:10, 4673:3, 4674:19, 4674:21, 4678:1, 4678:9, 4678:18, 4680:1, 4680:16, 4681:21, 4683:24, 4685:23, 4695:17, 4700:18, 4702:16, 4710:16, 4715:4, 4716:16, 4720:5, 4721:17, 4724:22, 4727:2, 4730:9, 4732:5, 4741:10, 4741:15, 4741:20, 4744:16, 4747:8, 4748:5, 4749:25, 4757:15, 4761:22, 4763:14, 4770:18, 4775:5, 4776:20, 4776:24, 4777:17,

4779:15, 4781:23, 4786:13, 4786:15, 4788:24, 4792:8, 4796:5, 4797:2, 4797:4, 4800:22, 4802:2, 4803:1, 4803:5, 4804:1, 4804:5, 4804:25, 4807:1, 4807:20, 4808:4, 4808:12, 4808:16, 4809:6, 4811:13, 4812:1, 4812:4, 4812:15, 4813:7, 4814:7, 4815:18, 4816:21, 4816:23, 4818:1, 4818:7, 4818:12, 4818:21, 4819:16, 4820:7, 4821:13, 4823:16, 4824:10, 4825:3, 4825:4, 4825:14, 4825:22, 4826:3, 4827:3, 4827:16, 4828:15, 4831:7, 4833:11, 4833:19, 4834:1, 4834:7, 4835:1, 4835:14, 4835:18, 4836:5, 4837:18, 4837:25, 4838:18, 4839:15, 4840:14, 4840:22, 4841:9, 4841:15, 4843:4, 4843:14, 4843:15, 4843:16, 4844:11, 4846:1, 4846:20, 4846:21, 4846:23, 4847:4, 4847:6, 4847:23, 4849:3, 4849:11, 4849:13, 4850:5, 4850:6, 4850:21, 4851:2, 4853:1, 4853:7, 4853:13, 4855:7, 4855:12, 4855:17, 4855:25, 4857:15, 4857:19, 4857:23, 4860:10, 4860:19, 4861:9, 4862:5, 4867:18, 4867:22, 4871:21, 4872:1, 4874:12, 4876:14, 4876:18, 4876:22, 4877:15, 4877:17, 4877:19, 4887:1, 4887:16, 4887:20, 4887:25, 4888:5, 4891:2, 4893:21, 4894:1, 4899:3, 4900:15, 4906:22, 4907:1, 4912:16,

4918:25, 4920:16, 4924:2, 4925:8, 4925:16, 4925:19, 4925:25, 4926:11, 4926:13, 4927:23, 4928:2, 4928:11, 4928:21, 4930:13
**Honor's** [5] - 4679:16, 4808:25, 4851:2, 4855:3, 4857:24
**HONORABLE** [1] - 4657:10
**hope** [3] - 4683:9, 4797:12, 4927:19
**hoped** [1] - 4664:6
**hopeful** [1] - 4681:8
**hopefully** [4] - 4814:4, 4928:19, 4929:16, 4929:17
**hoping** [2] - 4691:1, 4691:4
**hour** [13] - 4680:22, 4832:3, 4855:22, 4881:16, 4881:21, 4909:24, 4910:3, 4910:6, 4927:24, 4930:20, 4930:21, 4930:22, 4931:2
**hourly** [2] - 4915:24, 4916:3
**hours** [28] - 4658:19, 4676:5, 4676:6, 4755:20, 4844:1, 4847:21, 4854:18, 4857:18, 4881:5, 4881:8, 4881:12, 4882:4, 4882:13, 4882:16, 4886:18, 4890:14, 4892:9, 4892:24, 4893:1, 4894:21, 4895:10, 4895:11, 4896:21, 4897:1, 4897:15, 4897:16, 4897:18, 4910:7
**Hours** [1] - 4894:20
**Huang** [5] - 4707:2, 4707:3, 4707:7, 4774:23, 4779:22
**huge** [2] - 4811:5, 4827:6
**human** [2] - 4671:2, 4703:19
**hundred** [11] - 4692:1, 4743:17, 4745:3, 4746:6, 4746:25, 4747:5, 4748:20, 4749:7, 4783:15, 4810:4,

4811:3
**hundreds** [3] - 4808:5, 4808:6, 4810:3
**hung** [1] - 4760:18
**hurry** [1] - 4931:8
**hypothetically** [3] - 4670:11, 4673:20, 4816:22

## I

**i.e** [2] - 4798:17, 4799:5
**ID** [2] - 4697:21, 4868:9
**idea** [15] - 4659:21, 4659:22, 4667:7, 4667:16, 4667:19, 4668:3, 4669:11, 4683:10, 4710:9, 4829:20, 4834:10, 4857:13, 4888:12, 4904:3, 4923:16
**identical** [2] - 4666:15
**identification** [24] - 4695:5, 4697:19, 4714:16, 4719:9, 4719:23, 4731:14, 4744:10, 4747:25, 4749:15, 4757:6, 4759:2, 4759:21, 4763:1, 4770:10, 4779:4, 4781:10, 4786:4, 4790:2, 4796:19, 4801:5, 4802:22, 4871:11, 4904:14, 4905:17
**identified** [3] - 4659:24, 4659:25, 4675:16
**identifies** [1] - 4697:22
**identify** [5] - 4660:11, 4661:24, 4663:8, 4825:14, 4885:15
**identity** [3] - 4702:16, 4716:16, 4825:22
**ignored** [1] - 4800:10
**illegal** [1] - 4836:3
**illustration** [1] - 4923:10
**immediately** [1] - 4670:22
**impermissible** [1] - 4807:24
**implicate** [5] -

4815:22, 4849:23, 4859:14, 4859:25, 4860:2
**implicating** [1] - 4848:7
**implication** [1] - 4672:19
**importance** [1] - 4661:15
**important** [4] - 4671:9, 4678:10, 4679:24, 4853:19
**impossible** [1] - 4857:6
**impression** [4] - 4710:14, 4710:17, 4710:25, 4711:1
**improper** [2] - 4676:23, 4820:2
**improperly** [1] - 4821:11
**inaccurate** [1] - 4680:16
**inappropriately** [2] - 4661:25, 4924:13
**Inc** [12] - 4719:18, 4719:20, 4756:8, 4760:14, 4761:6, 4761:7, 4868:13, 4870:3, 4871:5, 4871:6, 4872:19, 4896:19
**INC** [1] - 4719:18
**incentive** [10] - 4698:24, 4699:2, 4699:5, 4699:8, 4700:9, 4700:13, 4700:25, 4733:4, 4733:6, 4787:20
**Incentive** [1] - 4733:1
**inclination** [1] - 4822:18
**inclined** [1] - 4927:18
**include** [3] - 4731:24, 4732:1, 4781:17
**included** [4] - 4701:24, 4704:10, 4888:17, 4895:4
**including** [8] - 4713:16, 4798:16, 4799:6, 4805:20, 4856:9, 4879:18, 4891:4, 4895:3
**incomprehensible** [1] - 4663:6
**inconsistent** [2] - 4835:6, 4862:6

**incorporate** [1] - 4702:13
**incorporation** [3] - 4719:6, 4719:14, 4719:16
**incorrect** [1] - 4665:3
**incorrectly** [5] - 4688:4, 4688:5, 4688:6, 4688:25, 4866:21
**increased** [1] - 4737:8
**incredible** [1] - 4921:11
**incredibly** [1] - 4888:16
**increments** [3] - 4881:16, 4910:5, 4910:6
**incriminate** [2] - 4838:16, 4859:8
**incriminating** [1] - 4821:19
**incrimination** [1] - 4815:23
**incurring** [1] - 4713:16
**indeed** [1] - 4855:21
**Indemnification** [5] - 4898:10, 4901:13, 4903:12, 4904:20, 4906:8
**indemnification** [8] - 4898:22, 4900:3, 4900:7, 4901:9, 4901:18, 4903:4, 4903:24, 4904:10
**indicated** [3] - 4787:11, 4841:19, 4925:17
**indirect** [1] - 4672:11
**indisposed** [1] - 4930:19
**individual** [7] - 4687:12, 4697:24, 4776:10, 4782:18, 4829:7, 4870:17, 4886:12
**individual's** [1] - 4777:5
**individuals** [14] - 4708:5, 4742:6, 4772:14, 4774:1, 4776:7, 4784:1, 4787:10, 4787:23, 4795:6, 4803:8, 4805:20, 4829:12, 4875:19, 4913:19
**indulge** [2] -

4827:21, 4837:22
**industry** [1] - 4672:15
**inferences** [1] - 4853:23
**infirmed** [1] - 4847:18
**infirmity** [1] - 4666:5
**inform** [4] - 4823:22, 4846:21, 4857:9, 4857:13
**information** [27] - 4679:3, 4679:8, 4681:13, 4683:17, 4703:25, 4730:14, 4739:3, 4778:22, 4785:25, 4812:20, 4824:2, 4825:7, 4837:14, 4839:23, 4860:8, 4862:1, 4865:13, 4865:14, 4866:6, 4868:12, 4870:11, 4870:22, 4871:1, 4871:2, 4891:10, 4891:20, 4892:13
**informed** [6] - 4678:13, 4743:21, 4816:6, 4841:15, 4855:1, 4858:15
**infrastructure** [2] - 4702:10, 4702:12
**infrequent** [2] - 4710:12, 4711:14
**infrequently** [1] - 4795:24
**infringe** [1] - 4846:16
**initial** [5] - 4665:10, 4745:14, 4757:2, 4777:23
**initials** [2] - 4787:1, 4787:3
**Input** [2] - 4894:20, 4895:12
**input** [1] - 4894:21
**inquire** [1] - 4845:15
**inquiries** [3] - 4901:19, 4917:21, 4921:11
**inquiry** [1] - 4822:13
**Inquiry** [2] - 4899:17, 4899:21
**inside** [2] - 4778:19, 4778:22
**insider** [5] - 4712:1, 4778:13, 4778:16, 4778:18, 4778:21
**insist** [1] - 4670:25
**insisted** [1] - 4692:15

**instance** [2] - 4700:2, 4820:14
**instead** [1] - 4749:21, 4787:23
**institute** [2] - 4711:21, 4712:2
**instruct** [2] - 4742:6, 4851:23
**insufficient** [1] - 4684:25
**intend** [10] - 4658:12, 4676:20, 4681:16, 4813:4, 4824:21, 4836:25, 4838:12, 4849:22, 4855:17, 4871:19
**intended** [2] - 4663:25
**intends** [1] - 4678:3
**intent** [6] - 4665:18, 4667:4, 4813:3, 4824:19, 4824:25, 4825:6
**intention** [3] - 4789:1, 4834:17, 4861:4
**intentionality** [1] - 4813:22
**intentionally** [4] - 4812:17, 4825:11, 4825:16
**interact** [13] - 4709:10, 4709:12, 4709:14, 4709:17, 4709:20, 4709:22, 4710:5, 4711:12, 4794:2, 4794:8, 4794:13, 4794:19, 4794:25
**interacted** [2] - 4710:12, 4711:15
**interacting** [1] - 4711:5
**interaction** [2] - 4794:4, 4849:24
**interactions** [7] - 4710:13, 4710:24, 4719:1, 4794:10, 4794:16, 4794:22, 4795:3
**intercept** [1] - 4807:7
**interception** [1] - 4836:3
**interest** [3] - 4665:13, 4665:14, 4670:17
**interested** [2] - 4693:5, 4903:18
**interesting** [1] - 4851:5

**interests** [2] - 4665:1, 4665:6
**internal** [2] - 4689:17, 4904:4
**internally** [1] - 4866:3
**interpret** [1] - 4664:16
**interrupt** [3] - 4740:5, 4777:17, 4863:17
**interrupted** [1] - 4839:6
**interruptions** [1] - 4682:21
**interstate** [1] - 4825:9
**interviews** [1] - 4693:6
**introduce** [4] - 4815:12, 4820:23, 4821:6, 4821:9
**introduced** [3] - 4716:11, 4803:14, 4819:19
**introduces** [1] - 4821:3
**introducing** [1] - 4812:14
**introduction** [1] - 4821:12
**invalid** [1] - 4769:17
**invest** [1] - 4714:9
**invested** [8] - 4699:12, 4699:15, 4721:13, 4722:5, 4733:13, 4734:3, 4737:15, 4739:4
**investigation** [1] - 4902:17
**investigators** [2] - 4810:5, 4820:18
**investment** [35] - 4690:25, 4691:21, 4692:11, 4692:23, 4714:2, 4714:9, 4714:11, 4714:22, 4714:25, 4715:11, 4721:9, 4721:11, 4722:9, 4722:13, 4724:10, 4724:13, 4733:22, 4734:1, 4738:22, 4743:17, 4746:1, 4746:6, 4746:11, 4748:18, 4748:20, 4748:24, 4748:25, 4749:4, 4749:7, 4753:15, 4753:18, 4754:1, 4754:4, 4754:5,

4754:7
**investments** [9] -
4687:9, 4693:22,
4693:24, 4721:10,
4722:4, 4723:18,
4732:19, 4734:7,
4737:13
**investor** [9] -
4667:14, 4667:25,
4668:5, 4713:25,
4714:8, 4722:1,
4724:6, 4724:11,
4797:17
**investors** [10] -
4693:24, 4703:1,
4730:7, 4737:1,
4737:10, 4737:14,
4798:16, 4799:1,
4801:12
**invited** [1] - 4778:10
**invoice** [21] -
4865:25, 4866:2,
4866:12, 4879:13,
4879:16, 4880:11,
4882:7, 4882:17,
4883:8, 4883:11,
4884:2, 4898:16,
4901:3, 4901:6,
4901:25, 4903:11,
4904:9, 4904:10,
4904:20, 4906:12,
4923:1
**invoices** [10] -
4878:20, 4878:22,
4879:10, 4880:5,
4883:24, 4885:23,
4898:4, 4900:6,
4923:2, 4923:10
**invoking** [1] -
4839:13
**involved** [6] -
4666:9, 4667:22,
4742:1, 4742:4,
4742:5, 4917:4
**involving** [6] -
4749:11, 4749:18,
4769:25, 4770:5,
4836:25, 4854:16
**IRS** [1] - 4697:21
**Isotope** [6] - 4696:8,
4699:6, 4699:11,
4699:12, 4701:19,
4702:11
**issuance** [1] -
4744:23
**issue** [40] - 4658:9,
4660:23, 4664:20,
4666:9, 4667:13,
4668:14, 4669:19,
4672:8, 4675:5,

4682:3, 4682:8,
4684:18, 4692:2,
4692:4, 4815:4,
4816:13, 4816:17,
4817:19, 4822:1,
4823:2, 4823:6,
4823:9, 4832:17,
4833:12, 4833:21,
4837:19, 4838:7,
4847:21, 4848:1,
4848:7, 4849:2,
4849:7, 4849:10,
4849:11, 4856:1,
4858:14, 4919:9,
4919:11, 4922:5,
4929:1
**issued** [3] - 4697:21,
4708:19, 4923:18
**issues** [30] -
4658:17, 4659:16,
4669:1, 4675:25,
4681:24, 4682:2,
4682:17, 4685:17,
4685:18, 4697:20,
4811:1, 4820:13,
4829:1, 4840:10,
4844:24, 4845:4,
4848:9, 4848:12,
4848:21, 4849:14,
4850:22, 4851:18,
4854:4, 4858:16,
4919:14, 4928:15,
4928:17, 4930:23,
4931:2
**IT** [1] - 4895:6
**items** [2] - 4659:20,
4723:25
**itself** [9] - 4666:16,
4666:19, 4668:8,
4685:7, 4691:7,
4697:2, 4808:23,
4810:17, 4892:19

## J

**JACKSON** [1] -
4932:3
**Jackson** [10] -
4675:4, 4686:5,
4686:11, 4686:14,
4696:10, 4722:25,
4733:1, 4738:1,
4784:7, 4872:4
**jail** [1] - 4688:20
**Jain** [1] - 4673:24
**James** [3] - 4706:15,
4706:22, 4707:6
**January** [37] -
4686:21, 4693:7,
4694:7, 4698:8,

4698:12, 4698:13,
4698:19, 4702:6,
4704:5, 4705:15,
4713:6, 4716:1,
4724:2, 4724:4,
4724:19, 4737:14,
4753:12, 4797:14,
4804:9, 4843:11,
4874:22, 4885:24,
4886:4, 4887:8,
4888:2, 4891:24,
4892:22, 4894:15,
4896:22, 4897:7,
4912:9, 4912:10,
4916:15, 4916:17,
4917:1, 4917:21,
4921:10
**Jia** [2] - 4736:14,
4736:15
**job** [4] - 4690:6,
4693:2, 4704:25,
4829:10
**John** [1] - 4823:10
**Johnson** [3] -
4658:9, 4685:6,
4798:18
**Johnson's** [1] -
4927:12
**join** [1] - 4778:10
**joined** [1] - 4666:12
**jokes** [1] - 4662:25
**Jordan** [1] - 4687:12
**JOSHUA** [1] -
4657:21
**judge** [8] - 4658:18,
4660:5, 4680:2,
4684:4, 4685:13,
4685:16, 4832:16,
4929:11
**JUDGE** [1] - 4657:10
**Judge** [18] - 4659:3,
4661:16, 4676:17,
4677:10, 4804:15,
4805:25, 4832:9,
4832:14, 4835:24,
4837:3, 4848:14,
4848:20, 4848:24,
4862:22, 4928:13,
4930:2, 4930:8
**judges** [1] - 4682:24
**judgment** [1] -
4664:25
**July** [16] - 4672:14,
4758:8, 4758:9,
4759:10, 4762:16,
4764:21, 4765:1,
4766:3, 4767:11,
4767:16, 4769:20,
4797:17, 4819:5,
4819:6, 4898:13,

4900:24
**juncture** [1] -
4829:21
**June** [11] - 4672:14,
4730:20, 4732:17,
4732:18, 4756:14,
4757:20, 4762:15,
4765:9, 4900:10,
4900:20
**Juror** [1] - 4659:2
**JUROR** [2] -
4796:11, 4796:12
**juror** [4] - 4659:4,
4740:2, 4741:3,
4857:10
**jurors** [14] - 4659:10,
4686:1, 4686:5,
4741:18, 4796:8,
4802:7, 4802:9,
4814:1, 4822:21,
4838:24, 4854:11,
4863:8, 4863:12,
4863:13
**jury** [69] - 4657:10,
4658:1, 4662:15,
4662:18, 4668:15,
4670:4, 4670:6,
4671:15, 4672:5,
4674:14, 4675:3,
4679:20, 4679:22,
4680:1, 4685:22,
4686:3, 4686:4,
4695:20, 4700:21,
4715:7, 4740:3,
4741:13, 4741:14,
4741:17, 4761:25,
4763:18, 4766:9,
4770:21, 4779:18,
4782:1, 4782:4,
4786:20, 4802:13,
4802:18, 4831:1,
4831:21, 4833:21,
4833:22, 4839:14,
4840:21, 4840:25,
4846:14, 4851:23,
4853:4, 4854:3,
4854:4, 4855:23,
4856:15, 4856:16,
4857:13, 4857:22,
4862:13, 4863:7,
4863:10, 4870:8,
4870:21, 4872:13,
4874:20, 4878:16,
4884:9, 4887:22,
4891:11, 4919:7,
4919:8, 4919:10,
4922:1, 4925:4,
4931:5
**Jury** [2] - 4740:9,
4919:18

## K

**Katten** [42] -
4711:10, 4711:12,
4723:2, 4788:4,
4789:11, 4790:14,
4791:16, 4804:12,
4804:19, 4806:21,
4831:16, 4864:13,
4864:14, 4864:16,
4864:23, 4864:25,
4867:2, 4867:3,
4867:6, 4867:16,
4872:18, 4873:2,
4873:3, 4873:18,
4873:20, 4876:3,
4876:9, 4877:13,
4877:16, 4888:12,
4888:15, 4907:8,
4907:23, 4908:14,
4910:3, 4916:2,
4916:5, 4918:9,
4921:17, 4922:20
**Katten's** [3] -
4791:15, 4916:15,
4916:16
**keep** [16] - 4659:4,
4659:11, 4713:22,
4795:20, 4796:6,
4796:9, 4796:11,
4796:12, 4796:13,
4843:21, 4843:25,
4844:5, 4845:24,
4855:23, 4865:16,
4884:17
**keeping** [5] -
4692:15, 4732:2,
4822:3, 4866:7,
4866:8
**kept** [3] - 4713:4,
4823:14, 4823:21
**Kessler** [19] -
4658:7, 4658:24,
4685:5, 4716:19,
4721:19, 4775:6,
4776:21, 4788:25,
4820:8, 4826:17,
4834:8, 4841:5,
4843:5, 4845:15,
4847:20, 4863:19,
4878:1, 4909:16,
4920:6
**KESSLER** [223] -
4657:14, 4660:5,
4685:23, 4686:14,
4686:16, 4695:2,
4695:7, 4695:16,
4700:11, 4700:17,
4700:22, 4701:6,
4702:18, 4709:9,

4710:17, 4710:19,
4711:6, 4714:14,
4714:18, 4715:2,
4716:20, 4718:1,
4720:4, 4721:20,
4725:14, 4727:1,
4730:11, 4732:4,
4740:6, 4741:20,
4741:21, 4744:15,
4747:19, 4749:24,
4754:25, 4755:14,
4757:1, 4757:14,
4759:24, 4761:13,
4761:21, 4762:1,
4762:25, 4763:13,
4763:19, 4765:3,
4765:8, 4765:12,
4765:25, 4766:6,
4766:10, 4766:24,
4767:9, 4768:2,
4768:16, 4769:11,
4770:9, 4770:17,
4770:22, 4771:1,
4772:17, 4775:7,
4778:5, 4779:3,
4779:14, 4779:19,
4780:4, 4781:4,
4781:8, 4781:22,
4782:2, 4782:4,
4783:3, 4783:10,
4783:17, 4783:22,
4783:25, 4785:1,
4786:11, 4789:1,
4792:13, 4796:5,
4797:1, 4802:1,
4802:19, 4806:16,
4808:9, 4810:2,
4810:10, 4811:12,
4812:9, 4815:6,
4817:10, 4817:15,
4819:16, 4820:1,
4821:8, 4821:22,
4822:2, 4822:15,
4822:17, 4823:16,
4824:1, 4824:4,
4824:10, 4826:16,
4826:19, 4826:25,
4829:2, 4830:2,
4830:5, 4830:9,
4830:12, 4830:20,
4831:7, 4831:12,
4831:15, 4831:19,
4831:23, 4832:3,
4833:3, 4833:7,
4834:10, 4836:12,
4837:17, 4847:23,
4849:13, 4858:12,
4859:24, 4860:23,
4861:16, 4861:21,
4862:3, 4862:10,
4862:16, 4863:21,

4864:6, 4864:11,
4867:18, 4870:6,
4870:9, 4870:10,
4870:19, 4871:10,
4871:21, 4871:24,
4872:14, 4873:24,
4874:10, 4874:18,
4874:21, 4875:24,
4876:12, 4876:18,
4877:1, 4877:5,
4877:14, 4877:19,
4878:2, 4878:6,
4878:10, 4878:13,
4880:8, 4881:24,
4882:2, 4882:24,
4883:7, 4884:7,
4884:10, 4884:25,
4885:8, 4885:17,
4885:21, 4886:1,
4886:21, 4887:5,
4887:13, 4888:17,
4889:14, 4889:19,
4890:4, 4890:12,
4891:2, 4891:9,
4891:11, 4891:15,
4891:25, 4893:3,
4893:7, 4893:10,
4893:14, 4894:1,
4894:8, 4899:4,
4900:15, 4900:17,
4903:22, 4904:22,
4905:22, 4906:22,
4906:24, 4909:14,
4912:15, 4914:22,
4915:2, 4918:25,
4920:2, 4920:7,
4921:7, 4921:19,
4921:25, 4922:7,
4922:9, 4922:22,
4923:22, 4924:4,
4926:13, 4926:25,
4927:3, 4927:17,
4927:21, 4928:8,
4930:15

**Kevin** [19] - 4704:13,
4705:3, 4705:4,
4705:13, 4705:16,
4705:19, 4726:11,
4730:6, 4743:11,
4764:15, 4769:16,
4770:5, 4772:7,
4774:3, 4774:5,
4782:20, 4787:4,
4793:21, 4794:8
**kids** [1] - 4672:18
**kind** [10] - 4672:19,
4689:7, 4689:9,
4690:15, 4705:4,
4758:13, 4793:4,
4796:5, 4800:11,
4817:8

**KIYO** [1] - 4657:10
**knowing** [2] -
4660:3, 4848:1
**knowingly** [2] -
4813:2, 4825:6
**knowledge** [6] -
4688:10, 4688:12,
4756:23, 4778:20,
4922:9, 4924:24
**Knowles** [1] - 4734:6
**known** [3] - 4871:6,
4907:7, 4907:10
**knows** [7] - 4803:5,
4835:18, 4836:5,
4860:6, 4888:14,
4920:25, 4921:1
**Koestler** [1] -
4726:11
**Kramer** [1] - 4689:24
**Kravitz** [6] - 4711:15,
4722:21, 4722:24,
4723:11, 4725:7,
4727:23
**Kris** [2] - 4831:15,
4863:21
**KRIS** [1] - 4831:15
**Kristine** [1] - 4864:3
**KRISTINE** [3] -
4864:3, 4864:7,
4932:5

# L

**labeled** [3] -
4867:12, 4868:4,
4876:3
**ladies** [1] - 4740:3
**laid** [3] - 4680:2,
4855:18, 4855:19
**land** [2] - 4845:18,
4929:17
**language** [1] -
4662:8
**lap** [1] - 4847:21
**large** [2] - 4661:13,
4876:1
**larger** [3] - 4695:7,
4876:5, 4877:7
**largest** [1] - 4713:25
**last** [39] - 4658:15,
4659:6, 4675:9,
4675:17, 4675:21,
4675:25, 4676:11,
4676:14, 4677:2,
4677:8, 4679:13,
4680:9, 4680:12,
4680:17, 4681:17,
4686:11, 4701:4,
4714:18, 4715:14,
4722:3, 4728:13,

4728:16, 4734:25,
4738:11, 4762:13,
4769:11, 4785:18,
4792:24, 4793:4,
4793:12, 4797:13,
4799:18, 4820:3,
4841:23, 4849:10,
4875:7, 4881:5,
4902:5, 4930:25
**late** [5] - 4683:14,
4813:14, 4844:6,
4855:12, 4855:13
**latest** [3] - 4858:18,
4889:2, 4889:24
**latitude** [8] - 4661:9,
4664:21, 4665:20,
4673:17, 4674:4,
4674:5, 4683:1,
4923:16
**laughing** [2] -
4662:13, 4662:14
**laughter** [1] -
4662:15
**laundry** [1] - 4672:18
**law** [30] - 4679:20,
4679:23, 4711:7,
4711:9, 4804:6,
4815:15, 4815:25,
4816:9, 4816:14,
4816:15, 4817:7,
4825:21, 4828:20,
4837:23, 4838:10,
4838:14, 4841:11,
4841:13, 4842:2,
4843:14, 4844:25,
4845:10, 4846:6,
4850:22, 4853:2,
4855:1, 4864:14,
4907:23, 4909:24
**laws** [4] - 4679:1,
4679:3, 4827:11,
4848:16
**lawsuit** [9] - 4799:2,
4804:12, 4804:17,
4805:14, 4805:25,
4835:15, 4835:21,
4841:10, 4850:18
**lawsuits** [2] -
4799:3, 4836:4
**lawyer** [26] -
4673:18, 4708:25,
4709:2, 4709:5,
4804:20, 4816:19,
4817:4, 4821:16,
4827:14, 4828:21,
4829:23, 4850:10,
4856:16, 4859:9,
4859:11, 4860:3,
4860:4, 4860:7,
4860:9, 4860:13,

4860:17, 4862:9,
4910:9, 4918:10
**lawyers** [15] -
4682:25, 4692:1,
4711:12, 4711:16,
4798:15, 4799:3,
4804:14, 4828:7,
4895:1, 4907:25,
4910:21, 4910:25,
4918:3, 4918:6,
4929:15
**lay** [2] - 4702:13,
4855:16
**laying** [1] - 4845:11
**layout** [1] - 4818:25
**lead** [1] - 4854:23
**leading** [7] -
4721:17, 4724:22,
4753:23, 4776:20,
4790:17, 4792:8,
4793:10
**lean** [1] - 4686:18
**learn** [2] - 4818:24,
4861:13
**lease** [1] - 4736:2
**least** [6] - 4664:15,
4705:22, 4712:24,
4810:3, 4812:23,
4839:24
**leave** [13] - 4688:3,
4689:13, 4689:22,
4792:17, 4793:9,
4802:15, 4802:19,
4812:4, 4812:5,
4857:11, 4857:12,
4857:14, 4930:3
**leaves** [3] - 4804:6,
4891:13, 4919:20
**leaving** [1] - 4802:20
**led** [1] - 4835:18
**ledge** [1] - 4695:3
**ledger** [19] - 4721:6,
4721:9, 4722:3,
4722:7, 4722:8,
4723:14, 4724:1,
4732:1, 4732:19,
4733:18, 4736:6,
4736:23, 4738:19,
4743:14, 4743:15,
4751:8, 4753:11,
4753:18, 4772:19
**LEE** [1] - 4657:20
**left** [44] - 4689:2,
4689:4, 4689:5,
4689:23, 4690:2,
4692:20, 4692:22,
4705:23, 4746:21,
4759:5, 4759:10,
4759:14, 4766:16,
4771:4, 4771:7,

4771:24, 4775:10, 4783:24, 4785:20, 4793:5, 4793:18, 4793:21, 4794:1, 4794:7, 4794:8, 4794:13, 4794:19, 4794:25, 4795:7, 4795:9, 4795:12, 4795:19, 4796:14, 4803:5, 4803:12, 4806:3, 4806:24, 4813:11, 4830:8, 4832:22, 4836:23, 4845:21, 4868:11, 4906:2

**left-hand** [1] - 4868:11

**Legacy** [1] - 4785:19

**legal** [15] - 4692:1, 4696:13, 4714:8, 4752:22, 4764:3, 4788:3, 4788:12, 4788:13, 4788:14, 4789:8, 4790:12, 4790:13, 4793:7, 4818:10, 4854:21

**legally** [1] - 4854:12

**legitimately** [1] - 4664:4

**lend** [1] - 4691:14

**lender** [1] - 4745:13

**length** [2] - 4700:1, 4819:23

**lengthy** [2] - 4681:24, 4856:3

**lent** [3] - 4691:21, 4735:1, 4735:6

**less** [4] - 4688:2, 4707:12, 4896:10, 4926:20

**Letter** [1] - 4728:12

**letter** [34] - 4661:7, 4665:4, 4673:24, 4675:9, 4679:7, 4679:13, 4681:7, 4681:8, 4681:9, 4681:15, 4762:10, 4797:18, 4803:13, 4804:7, 4874:22, 4874:25, 4875:2, 4875:14, 4878:1, 4878:19, 4879:5, 4898:4, 4898:8, 4898:16, 4899:1, 4899:9, 4899:10, 4899:18, 4901:5, 4909:6, 4909:17, 4927:7, 4928:2

**letters** [8] - 4720:10, 4786:22, 4873:19,

4873:21, 4874:2, 4909:13, 4909:17, 4909:21

**liability** [1] - 4745:11

**Liang** [2] - 4736:14, 4736:15

**license** [8] - 4688:7, 4868:17, 4879:14, 4879:17, 4882:16, 4883:16, 4885:6, 4885:18

**licensed** [2] - 4734:13, 4734:15

**lie** [3] - 4670:24, 4671:5, 4671:18

**lied** [6] - 4670:4, 4670:5, 4670:16, 4671:15, 4853:18, 4853:21

**lies** [2] - 4670:13, 4671:12

**lifted** [2] - 4775:11, 4805:7

**Ligand** [4] - 4734:16, 4734:20, 4735:2

**light** [2] - 4809:1, 4847:10

**limine** [5] - 4808:2, 4808:25, 4809:2, 4810:24, 4827:20

**limit** [3] - 4669:18, 4683:1, 4842:3

**limited** [6] - 4658:17, 4676:2, 4683:8, 4745:10, 4745:12, 4856:14

**limits** [2] - 4682:24, 4929:9

**Lindsay** [4] - 4667:25, 4668:5, 4798:18, 4799:7

**line** [9] - 4661:17, 4710:4, 4732:8, 4738:1, 4795:22, 4815:17, 4843:2, 4896:19, 4923:9

**lined** [1] - 4838:24

**lines** [2] - 4664:24, 4758:5

**link** [1] - 4836:17

**linkage** [2] - 4839:16, 4839:19

**liquidity** [1] - 4691:23

**list** [16] - 4660:9, 4660:10, 4660:18, 4782:11, 4782:14, 4784:1, 4785:10, 4799:6, 4808:7, 4811:3, 4823:17,

4868:8, 4871:14, 4871:17, 4871:18, 4872:15, 4908:16, 4908:20, 4909:9

**listed** [34] - 4696:22, 4726:2, 4726:5, 4726:8, 4733:4, 4738:2, 4738:14, 4741:24, 4743:12, 4744:23, 4758:7, 4774:1, 4780:11, 4780:13, 4784:7, 4799:17, 4868:16, 4869:5, 4870:4, 4870:15, 4872:24, 4877:25, 4879:6, 4880:21, 4881:12, 4883:11, 4897:15, 4898:7, 4900:23, 4902:6, 4902:13, 4903:2, 4905:7, 4909:9

**listing** [2] - 4879:1, 4886:18

**literally** [1] - 4676:9

**litigate** [1] - 4812:12

**litigated** [2] - 4675:20, 4680:11

**litigating** [1] - 4827:1

**litigation** [14] - 4802:25, 4804:13, 4806:19, 4810:5, 4836:15, 4839:17, 4839:22, 4840:15, 4849:24, 4849:25, 4868:18, 4870:12, 4870:16

**live** [1] - 4705:10

**lived** [1] - 4705:11

**living** [1] - 4713:15

**LLC** [50] - 4696:7, 4696:8, 4696:9, 4696:23, 4697:2, 4697:4, 4697:7, 4699:9, 4699:18, 4701:3, 4703:4, 4703:6, 4703:15, 4706:24, 4715:11, 4719:16, 4719:19, 4719:20, 4719:21, 4719:25, 4720:1, 4720:2, 4720:13, 4720:15, 4720:19, 4724:16, 4728:12, 4732:23, 4737:24, 4744:5, 4745:10, 4745:19, 4749:21, 4756:9, 4756:10, 4760:13, 4761:3, 4761:6, 4761:7,

4782:22, 4782:25, 4812:24, 4871:6, 4871:15, 4872:16, 4872:22, 4874:23

**LLP** [3] - 4703:4, 4726:12, 4772:2

**loan** [12] - 4665:15, 4665:22, 4665:23, 4745:4, 4746:8, 4746:11, 4749:1, 4750:7, 4754:6, 4754:10, 4791:6

**loaned** [1] - 4750:5

**loaning** [1] - 4665:7

**lobbed** [1] - 4845:21

**locate** [2] - 4742:8, 4786:12

**located** [4] - 4687:10, 4706:9, 4869:11, 4908:6

**location** [1] - 4758:10

**lodged** [1] - 4666:6

**look** [92] - 4682:22, 4698:6, 4698:16, 4700:11, 4701:4, 4714:14, 4718:23, 4719:23, 4719:25, 4722:12, 4722:19, 4724:8, 4725:2, 4726:17, 4732:25, 4733:18, 4736:8, 4737:20, 4738:1, 4742:7, 4744:9, 4744:11, 4744:20, 4747:24, 4748:1, 4749:14, 4754:14, 4754:19, 4755:4, 4755:10, 4758:3, 4759:1, 4759:20, 4761:13, 4762:9, 4762:25, 4764:12, 4764:13, 4764:18, 4770:9, 4771:24, 4775:10, 4779:3, 4781:8, 4781:16, 4782:3, 4783:17, 4783:22, 4785:4, 4786:3, 4786:21, 4790:1, 4790:3, 4796:18, 4797:7, 4801:4, 4811:11, 4818:12, 4837:23, 4838:8, 4839:18, 4850:21, 4853:2, 4863:5, 4867:11, 4871:10, 4873:24, 4874:18, 4875:5, 4876:7, 4878:11, 4882:15, 4884:6,

4886:21, 4890:11, 4894:9, 4896:18, 4897:5, 4897:11, 4898:15, 4898:25, 4901:8, 4902:22, 4904:13, 4905:10, 4905:16, 4917:16, 4925:18, 4925:21, 4926:7

**looked** [23] - 4693:12, 4721:10, 4724:13, 4729:12, 4733:7, 4750:8, 4753:14, 4754:20, 4755:5, 4755:12, 4757:10, 4765:6, 4767:1, 4769:21, 4775:4, 4780:10, 4784:10, 4792:14, 4897:21, 4899:10, 4902:25, 4903:11, 4906:4

**looking** [19] - 4715:8, 4735:12, 4743:8, 4760:5, 4762:11, 4763:21, 4768:8, 4781:17, 4792:22, 4821:15, 4821:19, 4826:19, 4826:23, 4872:5, 4872:19, 4879:13, 4882:2, 4895:8, 4905:4

**looks** [4] - 4721:3, 4751:4, 4752:14, 4758:17

**loose** [1] - 4743:3

**loosely** [1] - 4922:4

**loss** [10] - 4689:16, 4689:17, 4691:3, 4754:9, 4812:22, 4812:24, 4825:12, 4844:4

**lost** [1] - 4844:1

**loud** [2] - 4662:18, 4745:9

**lower** [2] - 4737:16, 4787:7

**LP** [12] - 4724:6, 4724:10, 4724:17, 4732:23, 4734:5, 4734:8, 4737:24, 4745:12, 4749:22, 4753:8, 4770:6, 4797:16

**Lucjan** [1] - 4782:21

**lucky** [1] - 4915:25

**lunch** [14] - 4796:7, 4796:10, 4802:7, 4802:9, 4802:12,

4802:16, 4814:5, 4818:11, 4826:12, 4841:8, 4847:11, 4847:22

## M

**M-A-R-S-I-L-I-O** [1] - 4864:4
**Madison** [3] - 4706:10, 4715:22, 4908:7
**mail** [142] - 4662:22, 4663:5, 4663:7, 4663:8, 4663:11, 4663:12, 4664:3, 4664:8, 4666:20, 4667:16, 4667:20, 4668:4, 4668:9, 4669:9, 4669:17, 4672:7, 4672:13, 4673:1, 4673:21, 4674:5, 4712:6, 4719:13, 4720:2, 4722:21, 4723:4, 4723:12, 4725:7, 4726:21, 4727:7, 4727:15, 4727:18, 4727:20, 4727:22, 4728:2, 4728:8, 4729:4, 4731:19, 4731:24, 4732:8, 4734:11, 4736:11, 4736:13, 4736:22, 4736:24, 4750:24, 4751:10, 4752:15, 4754:15, 4754:16, 4754:20, 4755:5, 4755:7, 4755:11, 4755:16, 4755:18, 4755:19, 4756:4, 4756:5, 4756:14, 4756:21, 4757:9, 4757:19, 4757:22, 4759:21, 4760:5, 4761:16, 4762:4, 4762:6, 4763:5, 4763:20, 4770:4, 4770:12, 4770:23, 4772:15, 4774:7, 4774:12, 4774:13, 4775:13, 4779:8, 4779:21, 4780:4, 4781:5, 4781:13, 4782:6, 4783:3, 4783:10, 4783:17, 4785:24, 4786:6, 4786:21, 4787:12, 4792:14, 4795:13, 4795:22, 4795:25, 4797:8, 4797:22,

4797:24, 4799:18, 4800:13, 4800:20, 4800:24, 4800:25, 4801:2, 4801:8, 4801:9, 4801:11, 4804:10, 4807:13, 4810:17, 4811:11, 4811:14, 4811:15, 4811:16, 4811:21, 4816:2, 4823:24, 4829:3, 4829:16, 4912:21, 4918:3, 4918:6, 4918:10, 4918:15, 4920:8, 4920:19, 4921:2, 4921:13, 4922:10, 4922:11, 4922:20, 4923:24, 4924:3, 4929:4
**mail's** [1] - 4662:8
**mailed** [1] - 4798:10
**mailing** [1] - 4883:4
**mails** [42] - 4666:18, 4667:17, 4667:24, 4668:4, 4711:16, 4711:18, 4711:21, 4712:3, 4712:8, 4712:10, 4712:11, 4712:14, 4712:25, 4722:19, 4722:20, 4729:12, 4754:22, 4757:2, 4757:18, 4762:3, 4762:22, 4781:16, 4781:20, 4782:10, 4792:22, 4796:3, 4796:20, 4796:23, 4798:6, 4798:8, 4799:8, 4811:3, 4819:10, 4829:13, 4910:17, 4920:13, 4920:21, 4921:17, 4921:20, 4922:6, 4928:24
**maintained** [1] - 4722:8
**maintaining** [1] - 4722:6
**manage** [2] - 4690:17, 4917:18
**managed** [5] - 4686:22, 4692:18, 4693:3, 4693:10, 4730:5
**Management** [33] - 4696:7, 4696:8, 4696:9, 4696:22, 4697:2, 4697:4, 4699:9, 4703:3, 4703:6, 4703:9, 4703:12, 4703:15,

4724:16, 4732:23, 4737:24, 4749:21, 4749:22, 4750:6, 4750:17, 4753:8, 4767:3, 4767:17, 4767:21, 4767:24, 4770:6, 4772:1, 4776:12, 4871:15, 4872:16, 4872:22, 4874:3, 4876:10, 4909:10
**management** [1] - 4687:25
**manager** [7] - 4689:15, 4689:19, 4689:25, 4690:4, 4704:20, 4741:8, 4864:17
**managing** [4] - 4693:9, 4778:11, 4917:18, 4917:20
**Manchester** [1] - 4868:19
**Manhattan** [2] - 4688:14, 4822:3
**manner** [4] - 4673:2, 4825:8, 4837:7, 4851:19
**March** [19] - 4720:16, 4720:20, 4728:24, 4796:2, 4796:21, 4797:22, 4799:19, 4800:25, 4801:1, 4801:9, 4803:4, 4811:21, 4813:1, 4813:14, 4816:22, 4816:25, 4823:24, 4829:17
**Marcum** [4] - 4717:6, 4718:3, 4718:7, 4718:10
**Marek** [29] - 4704:11, 4705:7, 4705:10, 4711:25, 4743:11, 4751:7, 4751:11, 4751:21, 4751:25, 4758:1, 4759:22, 4761:16, 4763:8, 4763:21, 4764:5, 4764:23, 4765:5, 4766:11, 4766:16, 4766:24, 4770:6, 4772:12, 4774:3, 4774:5, 4782:21, 4787:4, 4794:25, 4829:15
**mark** [4] - 4663:23, 4788:20, 4788:22, 4791:9
**marked** [34] -

4695:4, 4719:8, 4719:23, 4720:7, 4725:17, 4727:6, 4731:14, 4732:7, 4744:19, 4747:25, 4749:15, 4750:2, 4755:3, 4757:6, 4757:17, 4760:3, 4763:1, 4770:10, 4779:4, 4781:9, 4786:4, 4786:19, 4790:1, 4790:13, 4791:3, 4791:22, 4796:18, 4797:6, 4801:4, 4829:16, 4894:7, 4905:3, 4905:17, 4906:1
**marketed** [1] - 4707:20
**marketer** [3] - 4707:18, 4707:22, 4783:1
**marketing** [1] - 4705:5
**marketplace** [2] - 4691:15, 4805:15
**marking** [1] - 4792:4
**marks** [1] - 4663:17
**married** [1] - 4687:2
**Marsilio** [15] - 4831:15, 4863:22, 4872:15, 4874:19, 4876:1, 4877:6, 4878:11, 4885:18, 4894:10, 4900:21, 4903:24, 4905:4, 4907:7, 4930:11, 4930:18
**MARSILIO** [2] - 4864:7, 4932:5
**Marsilo** [6] - 4864:3, 4864:12, 4868:3, 4920:19, 4920:25, 4923:11
**Marsilo's** [1] - 4922:2
**Martin** [80] - 4686:23, 4692:18, 4693:3, 4696:7, 4696:11, 4701:13, 4702:21, 4704:10, 4704:17, 4705:18, 4707:10, 4707:12, 4707:19, 4708:23, 4711:2, 4711:24, 4715:21, 4716:11, 4718:22, 4719:21, 4725:7, 4726:7, 4727:13, 4727:22, 4728:15, 4730:6,

4735:14, 4737:11, 4738:6, 4742:6, 4742:16, 4743:20, 4744:6, 4744:12, 4745:20, 4746:18, 4747:3, 4747:13, 4748:11, 4751:11, 4751:15, 4751:18, 4751:21, 4751:25, 4752:8, 4754:16, 4758:2, 4758:21, 4758:22, 4760:17, 4762:21, 4764:7, 4764:8, 4764:16, 4765:5, 4765:15, 4767:3, 4769:17, 4774:3, 4774:22, 4775:25, 4777:1, 4777:8, 4777:24, 4778:12, 4780:6, 4780:20, 4793:12, 4798:2, 4800:10, 4800:18, 4829:15, 4873:3, 4875:4, 4875:5, 4875:10, 4901:18, 4902:17, 4902:21, 4903:15
**Martin's** [1] - 4800:8
**Massella** [13] - 4664:20, 4664:22, 4669:8, 4669:16, 4669:19, 4717:2, 4718:12, 4719:13, 4736:14, 4750:25, 4769:25, 4770:7, 4779:21
**MASTRO** [1] - 4657:19
**Mastro** [3] - 4662:3, 4662:16, 4663:11
**match** [2] - 4923:1, 4923:3
**material** [12] - 4685:15, 4819:4, 4819:5, 4820:9, 4820:12, 4820:16, 4853:17, 4861:17, 4863:4, 4925:11, 4926:19
**materials** [5] - 4808:17, 4808:20, 4820:23, 4925:21, 4926:9
**MATSUMOTO** [1] - 4657:10
**Matter** [1] - 4931:15
**matter** [94] - 4681:11, 4692:2, 4714:11, 4789:15, 4789:20, 4789:21,

4790:20, 4790:22, 4815:8, 4834:7, 4838:14, 4854:16, 4865:18, 4865:20, 4866:5, 4866:14, 4866:16, 4869:9, 4869:13, 4869:18, 4869:19, 4870:2, 4870:12, 4870:23, 4873:18, 4873:21, 4879:14, 4879:17, 4879:22, 4880:2, 4882:5, 4882:13, 4882:17, 4883:9, 4883:16, 4883:24, 4884:15, 4884:23, 4885:13, 4885:15, 4885:18, 4886:3, 4886:4, 4886:11, 4886:13, 4886:19, 4894:22, 4898:10, 4898:23, 4899:16, 4899:22, 4900:2, 4900:7, 4901:9, 4901:13, 4901:15, 4901:17, 4902:2, 4902:20, 4902:24, 4903:4, 4903:12, 4903:18, 4903:24, 4904:5, 4904:6, 4904:7, 4904:10, 4904:20, 4905:11, 4905:13, 4906:7, 4906:8, 4906:9, 4906:13, 4906:15, 4906:16, 4906:18, 4906:20, 4908:14, 4908:17, 4908:21, 4908:24, 4909:1, 4909:20, 4909:22, 4913:17, 4913:25, 4914:1, 4914:4, 4914:5, 4914:21, 4915:1

**matters** [40] - 4683:14, 4833:4, 4833:5, 4836:24, 4863:15, 4864:21, 4865:4, 4865:22, 4867:5, 4867:15, 4868:8, 4868:15, 4869:6, 4869:8, 4871:14, 4872:16, 4872:22, 4872:25, 4873:23, 4878:20, 4879:1, 4879:6, 4879:10, 4886:13, 4886:16, 4895:15, 4895:17, 4898:7, 4908:11, 4909:4, 4909:10, 4909:12,

4909:18, 4914:2, 4915:6, 4915:8, 4915:10, 4925:6, 4929:14
**MB** [2] - 4705:8, 4705:9
**McGlynn** [1] - 4689:24
**mean** [45] - 4663:23, 4664:17, 4669:3, 4669:8, 4669:23, 4672:16, 4672:18, 4679:1, 4690:24, 4698:12, 4705:21, 4748:24, 4761:4, 4791:9, 4800:20, 4810:22, 4811:24, 4838:8, 4839:12, 4841:4, 4842:7, 4842:11, 4847:24, 4851:4, 4858:24, 4861:22, 4866:23, 4868:24, 4881:15, 4882:11, 4886:10, 4892:6, 4892:9, 4893:1, 4895:13, 4895:16, 4896:3, 4896:8, 4917:20, 4918:8, 4918:19, 4920:17, 4924:4, 4926:25, 4928:14
**meaning** [2] - 4691:7, 4699:16
**means** [11] - 4667:19, 4698:13, 4710:9, 4724:5, 4725:25, 4778:18, 4791:10, 4888:13, 4894:20, 4899:3, 4914:11
**meant** [5] - 4664:1, 4664:13, 4737:4, 4783:14, 4790:21
**meantime** [4] - 4692:7, 4826:14, 4840:20, 4863:10
**measure** [1] - 4661:13
**measures** [2] - 4798:22, 4799:13
**mechanical** [1] - 4657:25
**media** [2] - 4798:19, 4919:16
**meet** [4] - 4673:12, 4716:5, 4859:18, 4859:19, 4859:22, 4860:20, 4861:9, 4862:9
**meeting** [16] -

4666:13, 4666:14, 4716:5, 4716:8, 4717:7, 4718:4, 4718:7, 4854:15, 4858:2, 4858:3, 4858:6, 4861:14, 4920:24, 4925:10, 4925:21, 4926:8
**members** [3] - 4686:4, 4875:21, 4919:10
**memorandum** [1] - 4819:22
**memorialized** [1] - 4738:8
**memorializes** [1] - 4743:25
**memory** [1] - 4757:2
**mentioned** [15] - 4681:17, 4704:15, 4704:18, 4704:24, 4705:3, 4705:7, 4706:5, 4864:25, 4894:12, 4901:5, 4904:2, 4909:4, 4909:24, 4913:1, 4913:3
**mentioning** [1] - 4930:2
**merger** [21] - 4739:15, 4739:18, 4742:2, 4742:14, 4742:21, 4748:18, 4771:5, 4771:12, 4771:14, 4771:15, 4771:20, 4771:21, 4771:25, 4772:8, 4773:24, 4779:24, 4780:1, 4780:2, 4784:2, 4792:25, 4870:3
**mergers** [3] - 4693:12, 4693:14, 4741:23
**merging** [1] - 4773:20
**messages** [2] - 4798:6, 4798:8
**met** [5] - 4687:15, 4716:9, 4736:20, 4827:18, 4861:11
**methodology** [1] - 4658:11
**mic** [1] - 4710:5
**Michael** [5] - 4707:23, 4707:25, 4735:14, 4902:14, 4902:15
**microphone** [1] - 4686:17

**mid** [1] - 4756:10
**mid-September** [1] - 4756:10
**middle** [9] - 4711:24, 4715:10, 4735:16, 4797:24, 4837:21, 4845:8, 4868:3, 4870:25, 4901:12
**midtown** [2] - 4831:18, 4831:19
**might** [16] - 4659:7, 4663:19, 4691:8, 4802:6, 4822:19, 4823:6, 4825:9, 4825:23, 4825:25, 4855:5, 4855:8, 4858:25, 4888:20, 4893:18, 4895:2, 4930:17
**million** [13] - 4693:11, 4773:3, 4773:9, 4775:18, 4783:5, 4783:7, 4783:9, 4785:16, 4797:18, 4803:17, 4805:18, 4888:7, 4889:11
**mind** [7] - 4674:7, 4674:12, 4702:17, 4756:4, 4756:5, 4846:13, 4846:14
**minded** [1] - 4802:11
**mine** [1] - 4845:18
**mines** [1] - 4929:18
**minute** [9] - 4701:7, 4705:14, 4775:16, 4800:19, 4820:3, 4867:22, 4874:19, 4881:16, 4906:22
**minutes** [31] - 4658:16, 4666:13, 4666:14, 4666:18, 4666:21, 4666:23, 4667:3, 4667:9, 4724:14, 4741:2, 4741:11, 4822:11, 4822:19, 4823:11, 4830:14, 4831:4, 4831:20, 4847:25, 4881:16, 4881:19, 4881:21, 4910:5, 4910:6, 4930:13, 4930:14, 4930:23
**miscellaneous** [2] - 4816:19, 4817:11
**miscommunication** [2] - 4689:15, 4689:19
**misdemeanor** [2] - 4688:15, 4688:18
**missing** [1] - 4783:5

**mistake** [2] - 4756:18, 4899:6
**mistaken** [1] - 4788:25
**mix** [1] - 4893:4
**Mochizuki** [2] - 4912:10, 4912:13
**moment** [12] - 4670:14, 4727:2, 4775:15, 4797:2, 4802:3, 4803:15, 4807:16, 4828:3, 4828:5, 4876:14, 4877:17, 4926:11
**momentarily** [1] - 4888:5
**money** [37] - 4665:7, 4668:21, 4692:8, 4692:9, 4692:12, 4692:15, 4713:15, 4713:17, 4713:19, 4713:22, 4715:18, 4721:12, 4723:18, 4734:3, 4734:7, 4734:19, 4734:24, 4735:1, 4737:17, 4750:4, 4771:4, 4771:8, 4771:12, 4771:18, 4771:25, 4772:7, 4784:2, 4791:19, 4792:7, 4796:15, 4798:20, 4805:23, 4918:16, 4918:21, 4923:4, 4924:18
**monitor** [1] - 4712:3
**monitoring** [1] - 4711:21
**month** [7] - 4702:6, 4707:12, 4747:10, 4883:25, 4904:8, 4913:3, 4916:5
**monthly** [3] - 4915:9, 4915:11, 4922:16
**months** [13] - 4675:21, 4676:10, 4676:19, 4680:10, 4680:12, 4680:13, 4681:3, 4688:23, 4711:24, 4773:13, 4820:2, 4827:20, 4835:24
**morning** [12] - 4678:1, 4686:4, 4846:20, 4846:22, 4846:23, 4850:4, 4854:18, 4855:23, 4858:19, 4858:21, 4919:12, 4919:15
**morning's** [1] -

4852:6
**most** [15] - 4670:25, 4682:24, 4693:16, 4711:1, 4722:25, 4735:13, 4735:15, 4777:7, 4840:16, 4851:15, 4853:19, 4854:23, 4889:6, 4890:1
**mostly** [1] - 4711:18
**motion** [8] - 4808:25, 4809:2, 4809:5, 4810:23, 4810:24, 4810:25, 4820:8, 4852:5
**motions** [10] - 4680:20, 4682:13, 4682:25, 4683:1, 4820:5, 4827:20, 4843:18, 4843:21, 4843:24, 4854:7
**motivated** [1] - 4730:13
**motives** [1] - 4836:8
**mouth** [1] - 4666:8
**move** [21] - 4659:9, 4682:15, 4683:11, 4730:9, 4731:13, 4735:9, 4735:11, 4735:17, 4736:4, 4765:25, 4778:10, 4792:13, 4808:2, 4833:1, 4839:1, 4852:8, 4871:19, 4873:17, 4875:25, 4889:25, 4906:15
**moved** [5] - 4676:3, 4735:15, 4735:21, 4793:14, 4871:22
**moving** [8] - 4796:5, 4833:6, 4849:19, 4850:15, 4850:19, 4850:20, 4914:20, 4915:1
**MR** [434] - 4658:7, 4658:16, 4658:18, 4658:21, 4658:24, 4659:3, 4659:14, 4660:5, 4660:6, 4669:6, 4669:22, 4670:1, 4670:3, 4670:11, 4671:19, 4672:1, 4672:10, 4673:3, 4673:7, 4673:9, 4674:19, 4674:21, 4674:23, 4675:1, 4675:5, 4675:9, 4675:13, 4675:15, 4680:2, 4683:18, 4684:4,

4684:22, 4685:13, 4685:23, 4686:14, 4686:16, 4695:2, 4695:7, 4695:16, 4695:17, 4700:11, 4700:17, 4700:18, 4700:22, 4701:6, 4702:16, 4702:18, 4709:9, 4710:16, 4710:17, 4710:19, 4711:6, 4714:14, 4714:18, 4715:2, 4715:4, 4716:16, 4716:20, 4718:1, 4720:4, 4720:5, 4721:17, 4721:20, 4724:22, 4725:14, 4725:15, 4727:1, 4727:2, 4727:4, 4730:9, 4730:11, 4732:4, 4732:5, 4740:6, 4741:3, 4741:6, 4741:10, 4741:20, 4741:21, 4744:15, 4744:16, 4747:8, 4747:19, 4748:5, 4749:24, 4749:25, 4753:23, 4754:25, 4755:1, 4755:14, 4755:25, 4757:1, 4757:14, 4757:15, 4759:24, 4759:25, 4761:13, 4761:21, 4761:22, 4762:1, 4762:25, 4763:13, 4763:14, 4763:19, 4765:3, 4765:8, 4765:12, 4765:25, 4766:6, 4766:10, 4766:24, 4767:9, 4768:2, 4768:16, 4769:11, 4770:9, 4770:17, 4770:18, 4770:22, 4771:1, 4772:17, 4775:5, 4775:7, 4776:20, 4776:24, 4777:17, 4778:5, 4779:3, 4779:14, 4779:15, 4779:19, 4780:4, 4781:4, 4781:8, 4781:22, 4781:23, 4782:2, 4782:4, 4783:3, 4783:10, 4783:17, 4783:22, 4783:25, 4785:1, 4786:11, 4786:12, 4786:15, 4788:24, 4789:1, 4790:17, 4792:8, 4792:13, 4793:23,

4796:5, 4797:1, 4797:2, 4797:4, 4800:22, 4802:1, 4802:2, 4802:5, 4802:19, 4802:21, 4803:23, 4803:25, 4804:5, 4804:25, 4805:4, 4806:7, 4806:10, 4806:13, 4806:16, 4806:20, 4806:23, 4807:17, 4807:20, 4808:4, 4808:9, 4808:12, 4808:15, 4809:6, 4810:2, 4810:10, 4811:12, 4812:1, 4812:3, 4812:9, 4812:15, 4815:6, 4815:18, 4816:21, 4817:10, 4817:15, 4817:17, 4818:1, 4818:12, 4818:21, 4818:23, 4819:16, 4819:25, 4820:1, 4820:7, 4821:5, 4821:8, 4821:13, 4821:22, 4821:25, 4822:2, 4822:12, 4822:15, 4822:17, 4822:22, 4822:25, 4823:16, 4824:1, 4824:4, 4824:10, 4825:3, 4826:3, 4826:16, 4826:19, 4826:25, 4827:3, 4827:12, 4827:16, 4828:5, 4828:19, 4828:15, 4828:22, 4829:2, 4829:6, 4829:20, 4829:25, 4830:2, 4830:5, 4830:9, 4830:10, 4830:12, 4830:13, 4830:17, 4830:20, 4831:3, 4831:7, 4831:12, 4831:15, 4831:19, 4831:23, 4832:3, 4832:8, 4832:14, 4832:16, 4832:22, 4833:3, 4833:7, 4833:11, 4834:10, 4835:1, 4835:3, 4836:12, 4837:2, 4837:6, 4837:17, 4837:18, 4837:25, 4838:2, 4838:5, 4838:18, 4838:21, 4838:25, 4839:7, 4840:14, 4840:22, 4840:25, 4841:6, 4842:9,

4842:12, 4843:4, 4843:19, 4844:8, 4844:10, 4844:13, 4844:15, 4845:1, 4846:1, 4846:20, 4847:23, 4848:14, 4848:23, 4848:25, 4849:4, 4849:9, 4849:13, 4850:5, 4850:17, 4853:1, 4853:12, 4855:3, 4855:17, 4855:20, 4855:25, 4856:7, 4856:13, 4856:22, 4856:25, 4857:5, 4857:15, 4857:18, 4857:23, 4858:12, 4858:17, 4859:6, 4859:19, 4859:24, 4860:3, 4860:16, 4860:23, 4861:9, 4861:16, 4861:21, 4862:3, 4862:5, 4862:10, 4862:16, 4862:22, 4863:21, 4864:6, 4864:11, 4867:18, 4870:6, 4870:9, 4870:10, 4870:19, 4871:10, 4871:21, 4871:24, 4872:14, 4873:24, 4874:10, 4874:18, 4874:21, 4875:24, 4876:12, 4876:18, 4877:1, 4877:5, 4877:14, 4877:19, 4878:2, 4878:6, 4878:10, 4878:13, 4880:8, 4881:24, 4882:2, 4882:24, 4883:7, 4884:7, 4884:10, 4884:25, 4885:8, 4885:17, 4885:21, 4886:1, 4886:21, 4887:5, 4887:13, 4888:17, 4889:14, 4889:19, 4890:4, 4890:12, 4891:2, 4891:9, 4891:11, 4891:15, 4891:25, 4893:3, 4893:7, 4893:10, 4893:14, 4894:1, 4894:8, 4899:4, 4900:15, 4900:17, 4903:22, 4904:22, 4905:22, 4906:22, 4906:24, 4909:14, 4912:15, 4914:22, 4915:2, 4918:25, 4920:2, 4920:7,

4921:7, 4921:19, 4921:25, 4922:7, 4922:9, 4922:22, 4923:22, 4924:4, 4925:16, 4925:25, 4926:3, 4926:11, 4926:13, 4926:25, 4927:3, 4927:15, 4927:17, 4927:21, 4927:23, 4928:1, 4928:2, 4928:5, 4928:8, 4928:11, 4928:13, 4928:21, 4928:24, 4929:6, 4929:11, 4929:16, 4930:2, 4930:7, 4930:15, 4930:22, 4930:25, 4931:1, 4931:10
**MS** [59] - 4678:1, 4681:5, 4683:24, 4684:15, 4824:11, 4832:21, 4839:15, 4840:15, 4857:4, 4863:3, 4867:22, 4872:1, 4872:9, 4873:4, 4874:12, 4876:14, 4876:22, 4877:17, 4887:16, 4887:20, 4887:25, 4889:9, 4889:16, 4890:6, 4890:8, 4890:10, 4890:15, 4891:13, 4891:19, 4891:24, 4892:6, 4892:18, 4892:21, 4893:21, 4899:3, 4904:23, 4904:25, 4905:24, 4907:1, 4907:3, 4912:2, 4912:5, 4912:7, 4912:16, 4913:2, 4914:24, 4917:11, 4919:24, 4920:16, 4921:8, 4921:16, 4921:22, 4922:14, 4923:6, 4924:2, 4924:6, 4924:10, 4925:8, 4930:13
**MSMB** [109] - 4667:25, 4668:5, 4696:7, 4696:8, 4696:22, 4697:1, 4697:4, 4699:6, 4699:9, 4699:11, 4699:12, 4699:15, 4701:18, 4701:19, 4702:2, 4702:3, 4702:8, 4702:11, 4702:14, 4702:22, 4702:25, 4703:3,

4703:5, 4703:9, 4703:12, 4703:15, 4704:20, 4704:21, 4705:2, 4705:5, 4705:8, 4706:16, 4706:17, 4706:20, 4712:9, 4713:19, 4713:25, 4714:2, 4714:22, 4715:15, 4715:18, 4715:20, 4724:6, 4724:10, 4724:16, 4732:22, 4734:1, 4734:5, 4734:8, 4736:3, 4737:23, 4743:16, 4743:22, 4744:5, 4745:4, 4745:12, 4745:19, 4748:25, 4749:8, 4749:12, 4749:18, 4749:21, 4749:22, 4750:5, 4750:17, 4753:8, 4753:15, 4767:3, 4767:7, 4767:17, 4767:20, 4767:24, 4770:6, 4772:1, 4776:11, 4783:2, 4788:21, 4791:5, 4793:19, 4793:22, 4794:5, 4794:11, 4794:17, 4794:23, 4795:4, 4797:13, 4797:16, 4798:17, 4799:1, 4799:5, 4801:12, 4803:17, 4842:4, 4867:16, 4871:15, 4872:16, 4872:22, 4873:7, 4874:3, 4874:4, 4876:3, 4876:10, 4909:9
**MSMBCapital.com** [1] - 4712:10
**Muchen** [1] - 4711:10
**Muchin** [4] - 4804:12, 4804:19, 4806:21
**muddle** [1] - 4845:18
**Mulleady** [22] - 4704:13, 4705:3, 4705:4, 4705:13, 4705:16, 4705:19, 4706:3, 4726:11, 4730:6, 4730:10, 4743:11, 4764:15, 4769:16, 4770:5, 4772:7, 4774:3, 4774:5, 4775:19, 4782:20, 4787:4,

4793:21, 4794:8
**multiple** [5] - 4682:10, 4682:13, 4846:18, 4867:5, 4921:19
**multiplied** [1] - 4881:18
**mutual** [1] - 4689:11
**MYLAN** [1] - 4657:20

**N**

**name** [22] - 4686:10, 4686:12, 4703:8, 4712:7, 4717:5, 4730:24, 4734:17, 4736:1, 4742:13, 4765:17, 4777:5, 4823:9, 4832:20, 4864:2, 4865:23, 4868:13, 4875:5, 4875:7, 4900:2, 4901:13, 4902:7, 4903:14
**named** [6] - 4667:25, 4668:5, 4687:12, 4707:16, 4707:23, 4829:15
**names** [10] - 4726:2, 4726:6, 4726:9, 4782:11, 4782:14, 4785:10, 4785:13, 4799:6, 4799:9, 4868:15
**narrative** [3] - 4866:22, 4866:23, 4914:6
**narrow** [1] - 4680:22
**nature** [4] - 4666:4, 4667:2, 4671:2, 4730:3
**near** [1] - 4902:6
**nearly** [1] - 4907:11
**necessarily** [4] - 4703:21, 4818:18, 4860:2, 4886:15, 4894:23, 4925:5
**necessary** [10] - 4661:22, 4661:23, 4676:21, 4679:16, 4685:16, 4704:2, 4716:15, 4716:22, 4792:12, 4857:12
**need** [23] - 4669:5, 4675:5, 4679:3, 4679:23, 4691:12, 4760:17, 4802:8, 4838:6, 4839:18, 4840:12, 4846:3, 4851:1, 4854:1,

4854:7, 4856:24, 4857:1, 4857:12, 4862:8, 4887:19, 4894:23, 4909:5, 4909:21, 4931:6
**needed** [6] - 4748:18, 4752:23, 4791:15, 4815:11, 4866:22, 4873:23
**needs** [5] - 4827:14, 4857:11, 4857:14, 4919:9, 4929:4
**negotiate** [1] - 4915:21
**negotiation** [1] - 4888:14
**net** [1] - 4927:15
**network** [2] - 4718:22, 4837:10
**never** [13] - 4673:12, 4808:12, 4819:11, 4820:4, 4820:16, 4820:22, 4827:18, 4838:3, 4844:1, 4859:9, 4922:12, 4923:24, 4924:24
**NEW** [1] - 4657:1
**new** [17] - 4707:21, 4735:20, 4737:2, 4778:9, 4862:6, 4865:9, 4865:10, 4867:15, 4869:18, 4873:18, 4902:19, 4908:24, 4909:1, 4909:4, 4909:5, 4927:5, 4927:10
**New** [14] - 4657:5, 4657:16, 4657:18, 4657:23, 4687:23, 4688:14, 4706:10, 4804:16, 4806:1, 4835:15, 4907:25, 4908:2, 4908:6
**next** [70] - 4659:8, 4660:23, 4666:9, 4667:13, 4667:23, 4675:6, 4677:12, 4685:23, 4694:8, 4702:18, 4728:7, 4732:25, 4733:9, 4738:19, 4739:20, 4740:10, 4743:14, 4753:5, 4753:11, 4758:9, 4760:19, 4765:3, 4765:12, 4765:13, 4767:2, 4768:2, 4780:4, 4783:3, 4783:10, 4786:23, 4797:16, 4798:12, 4799:21,

4799:23, 4801:15, 4809:11, 4822:2, 4823:11, 4826:20, 4830:22, 4831:8, 4831:13, 4852:10, 4868:21, 4869:21, 4874:7, 4875:25, 4881:24, 4882:24, 4883:7, 4884:17, 4885:8, 4893:23, 4895:12, 4895:16, 4896:2, 4899:24, 4900:9, 4900:12, 4900:13, 4901:20, 4902:10, 4902:13, 4911:6
**nice** [1] - 4927:16
**night** [11] - 4675:9, 4677:8, 4679:13, 4680:10, 4681:1, 4735:15, 4735:16, 4843:21, 4844:6, 4925:14, 4925:24
**nine** [10] - 4734:7, 4743:17, 4745:3, 4746:6, 4746:25, 4747:5, 4748:20, 4749:7, 4749:14, 4845:10
**nobody** [2] - 4854:24, 4854:25
**non** [4] - 4808:1, 4843:10, 4902:17
**non-party** [1] - 4902:17
**non-problem** [2] - 4843:10
**non-prosecution** [1] - 4808:1
**nonstop** [1] - 4798:5
**noon** [1] - 4685:7
**normal** [4] - 4708:17, 4748:17, 4764:1, 4914:6
**normally** [6] - 4670:24, 4810:23, 4810:24, 4857:25, 4860:17, 4865:10
**notates** [1] - 4698:15
**note** [47] - 4683:19, 4743:21, 4743:24, 4744:2, 4744:4, 4744:6, 4744:12, 4744:21, 4745:1, 4745:6, 4745:18, 4745:20, 4745:22, 4746:13, 4746:15, 4746:18, 4747:1, 4747:6, 4747:10, 4747:13, 4748:4,

4749:1, 4749:3, 4749:4, 4749:6, 4749:11, 4749:18, 4750:3, 4750:5, 4750:10, 4750:12, 4753:21, 4754:3, 4754:10, 4773:6, 4773:7, 4788:21, 4788:23, 4791:4, 4791:9, 4791:10, 4791:11, 4791:13, 4791:22, 4791:23, 4792:1, 4868:19
**noted** [1] - 4678:10
**notes** [2] - 4746:17, 4861:12
**nothing** [5] - 4731:11, 4811:23, 4847:5, 4858:13, 4861:6
**notice** [3] - 4803:1, 4828:7, 4831:6
**noticed** [5] - 4676:2, 4677:2, 4683:20, 4684:23, 4741:8
**noticing** [1] - 4680:7
**notification** [3] - 4676:9, 4798:19, 4813:19
**notified** [2] - 4680:17, 4824:7
**notify** [1] - 4813:21
**notion** [1] - 4680:15
**November** [46] - 4657:7, 4659:18, 4660:23, 4661:8, 4707:20, 4711:17, 4727:8, 4727:12, 4729:8, 4736:4, 4736:11, 4737:8, 4738:16, 4739:7, 4739:10, 4742:1, 4743:7, 4743:20, 4744:13, 4744:25, 4747:18, 4747:23, 4748:14, 4750:24, 4753:19, 4754:17, 4755:8, 4756:21, 4757:22, 4758:11, 4759:10, 4761:19, 4762:22, 4769:7, 4769:9, 4787:25, 4788:2, 4791:7, 4878:23, 4879:5, 4881:11, 4884:12, 4884:22, 4916:20, 4917:21, 4931:15
**number** [50] - 4660:24, 4661:8, 4675:20, 4682:22,

4696:13, 4697:16,
4697:19, 4697:23,
4697:25, 4698:3,
4698:6, 4708:2,
4710:1, 4714:15,
4721:3, 4721:11,
4726:2, 4733:9,
4733:13, 4755:13,
4768:25, 4772:4,
4773:8, 4798:15,
4798:25, 4802:22,
4805:19, 4807:4,
4807:8, 4807:21,
4811:5, 4812:10,
4813:7, 4821:15,
4826:20, 4828:1,
4828:9, 4856:10,
4862:18, 4865:3,
4870:23, 4881:18,
4881:19, 4888:4,
4888:5, 4892:16,
4898:7, 4900:14,
4904:10, 4912:8

**Number** [1] - 4659:2

**numbers** [27] -
4659:20, 4659:22,
4659:23, 4659:25,
4660:1, 4660:3,
4660:7, 4660:10,
4660:13, 4660:14,
4660:18, 4698:3,
4698:5, 4730:7,
4771:3, 4782:11,
4782:14, 4786:22,
4798:17, 4799:5,
4799:10, 4881:25,
4923:1, 4923:9,
4923:20

**numerous** [4] -
4683:13, 4827:11,
4834:24, 4838:13

## O

**o'clock** [14] - 4657:7,
4658:23, 4802:7,
4854:17, 4855:24,
4856:2, 4856:5,
4856:6, 4857:7,
4857:16, 4857:22,
4925:19, 4929:11,
4930:7

**oath** [3] - 4671:12,
4835:10, 4836:10

**object** [2] - 4834:10,
4887:16

**objected** [2] -
4808:19, 4820:25,
4850:11

**objecting** [3] -
4815:10, 4892:12,

4892:18

**objection** [90] -
4661:20, 4662:23,
4663:3, 4663:10,
4663:18, 4663:21,
4664:15, 4664:16,
4665:8, 4665:17,
4665:20, 4666:4,
4666:6, 4666:15,
4668:19, 4668:21,
4669:12, 4669:18,
4695:17, 4700:18,
4710:16, 4715:4,
4716:16, 4720:5,
4721:17, 4724:22,
4725:15, 4727:4,
4732:5, 4744:16,
4749:25, 4753:23,
4755:1, 4755:25,
4757:15, 4759:25,
4761:22, 4763:14,
4770:18, 4775:5,
4776:20, 4776:24,
4779:15, 4781:23,
4786:15, 4786:16,
4788:24, 4790:17,
4792:8, 4793:23,
4797:4, 4800:22,
4807:20, 4811:18,
4811:19, 4863:1,
4867:21, 4867:23,
4872:9, 4873:4,
4874:13, 4876:21,
4877:1, 4877:15,
4877:20, 4889:3,
4889:5, 4889:20,
4889:24, 4891:17,
4891:18, 4891:20,
4904:23, 4904:24,
4904:25, 4905:24,
4909:14, 4912:15,
4914:22, 4915:2,
4918:25, 4920:7,
4922:10, 4922:11,
4923:22, 4926:24,
4927:4, 4927:12

**objections** [4] -
4658:10, 4661:5,
4669:3, 4927:3

**objects** [1] - 4662:3

**obligated** [2] -
4745:17, 4745:19

**obligation** [1] -
4681:14

**obligations** [1] -
4862:8

**observation** [2] -
4710:7, 4711:4

**observations** [3] -
4710:13, 4710:18,

4710:23

**observe** [3] -
4709:17, 4709:20,
4709:22

**obtain** [5] - 4813:5,
4824:19, 4825:1,
4825:18, 4846:10

**obtained** [1] -
4812:20

**obtaining** [2] -
4664:25, 4817:21

**obviously** [6] -
4667:10, 4672:3,
4679:15, 4831:23,
4840:12, 4842:22

**occasions** [2] -
4670:19, 4709:11

**occurred** [2] -
4724:24, 4746:2

**October** [11] -
4678:18, 4680:19,
4707:20, 4711:17,
4735:8, 4735:13,
4737:8, 4898:16,
4899:10, 4916:25,
4920:8

**October-November**
[3] - 4707:20, 4711:17,
4737:8

**odd** [1] - 4705:18

**OF** [3] - 4657:1,
4657:3, 4657:9

**of..** [1] - 4890:13

**offense** [1] - 4679:22

**offer** [38] - 4680:6,
4683:20, 4684:9,
4695:16, 4700:17,
4715:2, 4720:4,
4725:14, 4727:1,
4732:4, 4744:15,
4749:24, 4754:25,
4757:14, 4759:24,
4761:21, 4763:13,
4770:17, 4779:14,
4781:22, 4786:11,
4797:1, 4800:14,
4800:21, 4802:1,
4818:6, 4867:18,
4871:24, 4874:10,
4876:12, 4887:13,
4889:25, 4890:1,
4891:3, 4891:7,
4904:22, 4905:22,
4926:18

**offered** [9] - 4680:18,
4684:10, 4730:11,
4920:20, 4921:5,
4921:23, 4922:17,
4927:6, 4927:7

**offering** [5] -

4683:22, 4868:19,
4890:3

**offers** [1] - 4894:2

**office** [27] - 4694:2,
4704:8, 4704:10,
4704:11, 4704:12,
4704:14, 4705:23,
4705:25, 4706:9,
4707:22, 4710:3,
4713:4, 4715:23,
4735:12, 4735:13,
4735:19, 4735:20,
4735:24, 4746:21,
4776:6, 4777:15,
4777:24, 4800:11,
4907:25, 4908:2,
4908:6, 4917:14

**officer** [6] - 4666:12,
4701:12, 4701:17,
4706:15, 4706:23,
4829:8

**officers** [1] - 4875:20

**offices** [3] - 4706:5,
4710:2, 4735:9

**official** [1] - 4783:18

**offs** [7] - 4891:4,
4891:6, 4891:12,
4895:23, 4895:25,
4896:10, 4896:15

**Offs** [3] - 4895:21,
4895:22, 4896:13

**often** [2] - 4670:22,
4671:3

**old** [2] - 4686:25,
4792:10

**once** [6] - 4662:18,
4686:1, 4712:24,
4737:3, 4855:5,
4919:8

**one** [130] - 4658:8,
4660:8, 4660:13,
4660:21, 4663:20,
4664:7, 4664:12,
4665:12, 4666:2,
4673:14, 4674:10,
4675:5, 4683:12,
4684:15, 4684:20,
4684:24, 4685:3,
4695:4, 4695:7,
4695:9, 4695:10,
4698:4, 4701:7,
4702:8, 4704:6,
4704:9, 4707:16,
4708:22, 4710:11,
4713:21, 4717:4,
4718:21, 4719:5,
4724:8, 4727:2,
4735:13, 4737:22,
4741:6, 4743:9,
4743:10, 4743:18,

4744:1, 4744:7,
4749:21, 4754:12,
4755:20, 4756:19,
4756:20, 4756:22,
4757:19, 4759:3,
4762:3, 4763:8,
4763:9, 4764:22,
4766:24, 4769:13,
4771:19, 4773:16,
4775:4, 4777:3,
4787:14, 4788:20,
4789:2, 4791:18,
4797:2, 4807:16,
4808:9, 4810:13,
4812:22, 4815:9,
4818:9, 4820:10,
4820:11, 4822:10,
4823:16, 4825:2,
4828:5, 4828:6,
4829:2, 4829:13,
4833:7, 4834:15,
4839:4, 4844:7,
4847:2, 4847:25,
4854:25, 4855:4,
4862:12, 4867:8,
4867:9, 4867:10,
4867:11, 4867:22,
4876:2, 4876:14,
4877:17, 4878:11,
4879:13, 4880:5,
4881:16, 4881:21,
4884:17, 4889:2,
4890:12, 4892:8,
4894:11, 4900:18,
4901:25, 4902:5,
4902:24, 4903:11,
4906:9, 4906:15,
4906:22, 4909:20,
4912:11, 4914:20,
4915:1, 4916:21,
4926:11, 4926:15,
4926:16, 4926:18

**one's** [1] - 4761:19

**one-page** [1] -
4769:13

**one-year** [2] -
4812:22, 4825:2

**ones** [3] - 4827:17,
4890:1, 4902:25

**ongoing** [2] -
4778:20, 4863:13

**oooOooo** [1] -
4931:18

**open** [11] - 4658:1,
4677:6, 4710:1,
4710:2, 4710:5,
4741:13, 4802:11,
4831:1, 4849:2,
4893:16, 4902:19

**open-minded** [1] -

4802:11
**opened** [4] - 4868:9, 4873:22, 4873:23, 4893:20
**opening** [7] - 4869:9, 4870:22, 4888:20, 4892:1, 4901:9, 4908:24
**operating** [3] - 4701:12, 4701:17, 4829:8
**opine** [2] - 4679:1, 4679:24
**opinion** [15] - 4676:3, 4678:15, 4680:6, 4680:25, 4681:10, 4681:12, 4684:16, 4684:17, 4684:21, 4926:16, 4926:18, 4927:5, 4927:10, 4927:11, 4927:13
**opinions** [11] - 4683:8, 4683:10, 4683:17, 4683:19, 4683:21, 4684:5, 4684:6, 4684:9, 4684:10, 4684:11, 4684:17
**opportunities** [1] - 4843:24
**opportunity** [10] - 4664:19, 4668:23, 4669:15, 4682:17, 4685:9, 4690:3, 4690:5, 4833:2, 4839:11, 4854:20
**opposite** [1] - 4750:7
**optimistic** [1] - 4931:1
**option** [1] - 4662:6
**options** [3] - 4786:1, 4840:4, 4846:23
**order** [6] - 4712:2, 4716:25, 4745:12, 4805:13, 4850:7, 4851:13
**orders** [1] - 4682:12
**Oremland** [11] - 4675:11, 4675:15, 4675:24, 4676:10, 4677:7, 4678:4, 4678:8, 4679:23, 4680:18, 4683:15, 4685:20
**Oremland's** [4] - 4676:13, 4678:19, 4680:23, 4683:4
**organized** [1] - 4865:1

**original** [1] - 4766:11
**originally** [2] - 4729:4, 4810:10
**originated** [1] - 4869:1
**originates** [1] - 4886:14
**Othello** [3] - 4690:14, 4690:17, 4693:21
**others'** [1] - 4910:23
**otherwise** [5] - 4816:15, 4817:18, 4838:11, 4846:17, 4875:22
**ought** [6] - 4683:3, 4816:7, 4816:18, 4856:8, 4863:4
**outcome** [1] - 4668:24
**outline** [1] - 4673:24
**outside** [15] - 4658:1, 4708:25, 4709:5, 4711:16, 4798:16, 4829:18, 4830:3, 4831:1, 4834:4, 4834:5, 4843:13, 4856:15, 4888:2, 4888:7, 4893:8
**outstanding** [13] - 4789:12, 4879:2, 4879:18, 4916:19, 4916:22, 4917:2, 4917:22, 4918:10, 4922:24, 4923:5, 4923:20
**outstanding..** [1] - 4927:20
**overall** [1] - 4722:2
**overcome** [1] - 4889:24
**overlap** [1] - 4836:2
**overnight** [2] - 4688:20, 4847:15
**overpaid** [1] - 4791:14
**overpayment** [2] - 4791:17
**overrule** [1] - 4730:12
**Overruled** [3] - 4710:20, 4776:25, 4873:5
**overruled** [3] - 4724:23, 4790:18, 4800:23
**overseeing** [1] - 4917:4
**oversight** [1] -

4689:1
**overview** [1] - 4721:23
**owed** [4] - 4791:19, 4792:7, 4795:10, 4879:4
**owes** [1] - 4750:3
**own** [13] - 4672:23, 4685:3, 4690:14, 4691:10, 4693:13, 4700:4, 4709:22, 4710:23, 4773:22, 4820:17, 4844:19, 4848:21, 4910:9
**owned** [2] - 4721:14, 4733:14
**owner** [2] - 4785:19, 4785:21
**ownership** [2] - 4721:3, 4721:24

## P

**p.m** [11] - 4681:7, 4755:8, 4755:17, 4756:22, 4756:24, 4761:19, 4782:10, 4811:22, 4928:3, 4928:5
**pace** [1] - 4675:18
**page** [119] - 4666:4, 4677:12, 4694:8, 4695:21, 4695:25, 4698:16, 4698:20, 4701:2, 4714:18, 4715:8, 4715:10, 4715:14, 4717:11, 4719:25, 4720:8, 4720:9, 4720:11, 4723:7, 4728:7, 4728:13, 4728:16, 4729:7, 4732:12, 4732:15, 4737:20, 4738:19, 4739:1, 4739:20, 4740:10, 4743:10, 4743:15, 4743:16, 4744:20, 4751:22, 4752:3, 4752:6, 4753:5, 4753:11, 4754:19, 4758:4, 4758:7, 4758:10, 4759:7, 4759:8, 4760:4, 4760:19, 4762:13, 4764:13, 4764:18, 4764:19, 4765:3, 4765:12, 4767:2, 4767:10, 4768:2, 4768:16, 4768:18, 4768:20, 4769:11,

4769:13, 4769:15, 4781:16, 4782:4, 4782:9, 4783:23, 4784:13, 4797:24, 4801:15, 4803:2, 4803:3, 4809:11, 4814:9, 4830:22, 4852:10, 4856:10, 4869:21, 4870:25, 4875:14, 4878:17, 4879:9, 4879:13, 4880:9, 4881:23, 4881:24, 4882:1, 4882:3, 4882:4, 4882:24, 4883:7, 4883:8, 4884:17, 4884:18, 4884:19, 4885:8, 4886:1, 4890:20, 4893:23, 4896:19, 4897:11, 4899:24, 4899:25, 4900:9, 4900:12, 4900:13, 4900:14, 4901:13, 4901:20, 4902:5, 4905:5, 4911:6, 4929:20
**pages** [7] - 4765:8, 4765:25, 4767:9, 4808:11, 4819:9, 4869:16, 4900:24
**paid** [28] - 4708:16, 4708:18, 4708:21, 4708:22, 4735:23, 4747:3, 4787:15, 4787:18, 4788:16, 4789:10, 4789:11, 4790:12, 4790:14, 4791:16, 4792:6, 4795:9, 4796:16, 4796:23, 4797:15, 4805:23, 4918:1, 4918:11, 4918:19, 4921:12, 4922:25, 4923:18, 4924:17
**panel** [2] - 4823:10, 4854:17
**Panoff** [2] - 4666:12, 4666:20
**paperwork** [1] - 4909:1
**paragraph** [13] - 4696:5, 4698:6, 4699:18, 4701:8, 4764:14, 4798:1, 4798:12, 4799:12, 4804:15, 4804:21, 4806:3, 4806:24, 4875:18
**paragraphs** [1] - 4748:2

**paralegals** [2] - 4895:1, 4895:3
**parameters** [1] - 4851:16
**parent** [1] - 4875:21
**Park** [1] - 4657:17
**part** [18] - 4664:1, 4664:6, 4664:10, 4667:23, 4678:11, 4680:23, 4688:7, 4689:1, 4694:3, 4742:25, 4761:8, 4799:2, 4799:11, 4813:22, 4829:10, 4865:20, 4917:25, 4926:16
**parte** [2] - 4659:18, 4660:25
**participating** [1] - 4674:16
**particular** [29] - 4658:5, 4661:18, 4661:24, 4669:17, 4669:24, 4672:17, 4672:24, 4678:6, 4741:3, 4808:14, 4835:1, 4851:3, 4853:3, 4853:15, 4858:25, 4865:17, 4866:1, 4867:2, 4879:16, 4880:1, 4880:11, 4880:25, 4881:9, 4883:8, 4896:14, 4896:15, 4910:15, 4915:21, 4918:10
**particularly** [2] - 4667:12, 4680:23
**parties** [21] - 4658:3, 4658:15, 4682:14, 4682:17, 4683:2, 4696:6, 4704:3, 4710:1, 4717:1, 4726:1, 4744:4, 4788:13, 4815:3, 4823:1, 4835:24, 4839:2, 4851:15, 4854:20, 4859:16, 4870:15, 4902:21
**parties'** [1] - 4827:21
**partner** [15] - 4665:5, 4665:13, 4687:14, 4815:8, 4907:8, 4913:8, 4913:25, 4914:1, 4914:4, 4914:9, 4914:15, 4915:5, 4918:1, 4918:14, 4924:16
**partners** [18] - 4875:20, 4913:4,

4913:7, 4913:13,
4913:16, 4913:24,
4914:8, 4914:25,
4915:5, 4916:7,
4916:10, 4916:13,
4917:14, 4917:22,
4921:3, 4921:17,
4924:17
**partnership** [1] -
4745:12
**parts** [2] - 4664:3,
4665:12
**party** [29] - 4660:11,
4660:19, 4682:11,
4696:11, 4701:1,
4702:13, 4703:21,
4712:3, 4717:5,
4744:1, 4754:12,
4805:9, 4806:5,
4806:8, 4806:12,
4806:14, 4806:20,
4806:21, 4806:23,
4809:4, 4809:5,
4829:12, 4836:1,
4841:11, 4851:12,
4865:20, 4902:17,
4903:15, 4903:18
**passed** [2] -
4823:18, 4865:14
**password** [7] -
4803:10, 4803:11,
4807:2, 4807:13,
4812:21, 4825:7
**passwords** [1] -
4803:8
**past** [3] - 4669:2,
4682:11, 4931:7
**patience** [2] -
4863:11, 4863:14
**pattern** [1] - 4891:17
**Pause** [15] - 4686:2,
4727:3, 4741:16,
4790:7, 4797:3,
4807:18, 4830:21,
4832:11, 4872:6,
4876:17, 4877:18,
4887:3, 4890:9,
4890:18, 4906:23
**pause** [2] - 4822:9,
4833:8
**pay** [17] - 4697:22,
4708:15, 4715:18,
4737:10, 4744:1,
4745:11, 4745:17,
4745:19, 4787:17,
4805:22, 4888:12,
4915:12, 4915:17,
4916:13, 4916:18,
4916:22, 4918:18
**paying** [2] - 4672:9,

4674:12
**payment** [11] -
4699:2, 4699:9,
4734:13, 4734:20,
4734:22, 4734:23,
4735:2, 4921:9,
4922:24, 4923:4,
4923:19
**payments** [4] -
4698:24, 4699:5,
4787:23, 4883:7
**payroll** [2] - 4708:17,
4709:3
**Peck** [5] - 4689:3,
4689:6, 4689:7,
4689:13, 4689:23
**pen** [1] - 4828:3
**pension** [1] -
4689:12
**people** [15] - 4706:2,
4706:6, 4706:12,
4706:14, 4708:2,
4708:11, 4708:16,
4708:21, 4726:7,
4726:9, 4774:6,
4823:18, 4829:14,
4842:22, 4911:3
**per** [4] - 4698:22,
4739:6, 4805:9,
4902:16
**percent** [3] -
4723:23, 4797:17,
4803:18
**percentage** [1] -
4776:9
**Percentage** [1] -
4896:6
**perfectly** [4] -
4673:9, 4674:17,
4824:13, 4914:6
**perform** [1] - 4688:7
**performance** [10] -
4693:11, 4699:3,
4702:25, 4703:14,
4797:15, 4799:9,
4799:11, 4803:13,
4803:16, 4804:8
**performance-
related** [1] - 4797:15
**perhaps** [4] -
4660:15, 4666:3,
4816:18, 4931:1
**period** [39] - 4684:3,
4690:11, 4690:18,
4690:19, 4699:24,
4699:25, 4705:22,
4707:11, 4713:9,
4730:20, 4734:8,
4748:11, 4777:18,
4778:23, 4778:24,

4812:22, 4818:11,
4825:2, 4847:1,
4882:6, 4882:17,
4887:7, 4888:1,
4889:12, 4890:14,
4891:21, 4891:23,
4892:4, 4892:21,
4892:23, 4893:9,
4893:13, 4894:14,
4896:23, 4899:19,
4917:5, 4917:17
**periods** [5] -
4705:19, 4773:12,
4887:11, 4893:17,
4897:22
**permission** [1] -
4679:17
**permit** [1] - 4925:18
**permitted** [3] -
4807:22, 4840:6,
4920:17
**perplexed** [1] -
4676:17
**person** [23] -
4673:11, 4674:6,
4691:4, 4691:13,
4691:21, 4702:20,
4703:20, 4705:5,
4709:10, 4709:15,
4709:20, 4721:11,
4722:5, 4754:8,
4777:2, 4778:24,
4788:6, 4791:18,
4812:16, 4873:11,
4873:13, 4896:15,
4913:10
**personal** [7] -
4665:6, 4683:14,
4697:23, 4735:16,
4738:6, 4793:15,
4922:9
**personally** [3] -
4701:14, 4725:19,
4918:19
**persons** [2] -
4812:22, 4917:13
**pertinent** [1] -
4865:12
**pharmaceutical** [1] -
4672:14
**Pharmaceuticals** [1]
- 4734:16
**phone** [20] -
4672:17, 4672:18,
4709:12, 4709:14,
4709:22, 4710:10,
4730:8, 4746:21,
4746:23, 4760:18,
4768:25, 4788:6,
4788:7, 4789:7,

4789:15, 4798:6,
4798:8, 4826:20,
4856:9, 4921:20
**phrase** [1] - 4667:19
**phrases** [1] - 4886:7
**physically** [3] -
4682:13, 4758:23,
4857:6
**picked** [1] - 4746:21
**picture** [1] - 4722:2
**piece** [2] - 4718:23,
4718:25
**Pierotti** [11] -
4704:11, 4704:18,
4704:19, 4704:22,
4782:22, 4787:5,
4800:9, 4868:17,
4870:12, 4870:15,
4870:17
**PITLUCK** [14] -
4657:14, 4658:18,
4658:21, 4658:24,
4659:3, 4675:1,
4675:5, 4675:9,
4675:13, 4675:15,
4680:2, 4683:18,
4684:4, 4685:13
**Pitluck** [7] - 4678:2,
4678:13, 4679:4,
4679:10, 4681:6,
4681:17, 4683:9
**Pitluck's** [1] - 4682:4
**place** [4] - 4714:25,
4718:21, 4835:22,
4891:6
**placed** [1] - 4929:9
**Plaintiff** [1] - 4657:4
**plan** [7] - 4716:13,
4819:14, 4842:22,
4849:1, 4855:1,
4922:24, 4923:4
**planned** [3] -
4676:25, 4819:23,
4847:23
**planning** [1] -
4821:18
**plate** [1] - 4856:1
**platform** [1] -
4702:10
**play** [3] - 4720:23,
4722:6, 4813:12
**Plaza** [2] - 4657:15,
4657:23
**plenty** [1] - 4683:1
**point** [40] - 4659:5,
4668:15, 4668:18,
4679:4, 4682:15,
4682:18, 4684:16,
4688:12, 4693:17,
4694:1, 4698:14,

4702:8, 4703:20,
4708:4, 4718:12,
4719:5, 4737:7,
4778:25, 4781:5,
4788:20, 4810:11,
4812:13, 4817:5,
4818:13, 4824:12,
4823:5, 4827:3,
4839:9, 4840:3,
4842:24, 4843:1,
4845:12, 4871:24,
4881:18, 4891:18,
4923:4, 4923:5,
4924:9, 4924:22,
4927:6
**point-person** [1] -
4703:20
**pointed** [1] - 4693:14
**pointing** [2] -
4844:23, 4845:3
**points** [1] - 4669:24
**poking** [1] - 4800:11
**policy** [2] - 4711:21,
4712:3
**Polonitza** [1] -
4921:6
**Pomerantz** [1] -
4734:5
**pool** [2] - 4705:23,
4705:25
**POOL** [1] - 4705:25
**portfolio** [7] -
4689:11, 4689:15,
4689:19, 4690:4,
4690:9, 4691:6,
4704:20
**portion** [6] - 4722:3,
4723:15, 4733:15,
4760:16, 4776:9,
4785:5
**portions** [2] -
4736:5, 4861:5
**posed** [2] - 4662:3,
4667:15
**position** [15] -
4659:3, 4692:3,
4701:8, 4701:11,
4804:5, 4832:18,
4837:24, 4838:15,
4839:12, 4851:12,
4855:15, 4856:14,
4864:22, 4864:23,
4891:15
**positioned** [1] -
4846:21
**possession** [1] -
4811:6
**possible** [9] -
4659:12, 4815:25,
4817:19, 4826:15,

4837:16, 4839:2, 4848:17, 4856:11, 4917:1

**possibly** [1] - 4815:14

**post** [7] - 4736:23, 4751:8, 4771:4, 4771:5, 4771:15, 4771:18, 4835:4

**post-capitalization** [1] - 4736:23

**post-December** [1] - 4835:4

**post-merger** [2] - 4771:5, 4771:15

**post-money** [2] - 4771:4, 4771:18

**potential** [4] - 4665:25, 4681:3, 4846:23, 4849:15

**potentially** [7] - 4821:18, 4846:5, 4849:7, 4850:2, 4858:16, 4859:8, 4903:18

**practice** [2] - 4671:7, 4908:8

**practices** [1] - 4922:16

**practicing** [1] - 4671:6

**Pre** [2] - 4888:19, 4888:21

**pre** [34] - 4771:8, 4771:12, 4771:14, 4771:18, 4771:25, 4772:7, 4772:8, 4784:2, 4866:3, 4866:6, 4866:9, 4866:11, 4866:13, 4866:18, 4866:20, 4869:3, 4904:3, 4904:4, 4904:11, 4904:18, 4905:5, 4905:12, 4905:14, 4905:19, 4906:2, 4906:4, 4913:4, 4913:7

**pre-bill** [20] - 4866:6, 4866:9, 4866:11, 4866:13, 4866:18, 4866:20, 4869:3, 4904:3, 4904:4, 4904:11, 4904:18, 4905:5, 4905:12, 4905:14, 4905:19, 4906:2, 4906:4, 4913:4, 4913:7

**pre-bills** [1] - 4913:4

**pre-merger** [5] -

4771:12, 4771:14, 4771:25, 4772:8, 4784:2

**pre-money** [5] - 4771:8, 4771:12, 4771:25, 4772:7, 4784:2

**Pre-Trial** [2] - 4888:19, 4888:21

**precludable** [1] - 4817:23

**preclude** [4] - 4676:3, 4676:5, 4678:23, 4808:23

**precluded** [3] - 4678:9, 4682:1, 4816:16

**preclusion** [1] - 4817:25

**predates** [1] - 4892:23

**prefer** [1] - 4915:12

**Preferred** [2] - 4723:16, 4723:17

**prejudice** [1] - 4847:13

**prejudiced** [4] - 4834:2, 4844:10, 4844:12, 4844:15

**prejudicial** [5] - 4833:13, 4840:23, 4842:18, 4888:9, 4888:16

**Preliminary** [1] - 4902:11

**preliminary** [1] - 4658:2

**Premiums** [1] - 4895:22

**Premiums/Write** [1] - 4895:21

**Premiums/Write-Offs** [1] - 4895:21

**preoccupied** [1] - 4672:17

**prepare** [3] - 4680:14, 4858:19, 4912:21

**prepared** [4] - 4661:23, 4860:6, 4863:19, 4883:23

**presence** [3] - 4658:1, 4831:1, 4856:15

**present** [12] - 4686:3, 4686:5, 4716:6, 4741:13, 4741:17, 4741:18, 4815:3, 4836:20, 4863:8, 4863:9,

4863:13

**presenting** [2] - 4860:13, 4860:14

**president** [2] - 4706:16, 4706:18

**pressure** [2] - 4916:18, 4921:11

**pretrial** [1] - 4682:12

**prevent** [1] - 4825:19

**prevents** [1] - 4847:5

**preview** [1] - 4913:21

**previous** [8] - 4733:23, 4750:7, 4780:10, 4781:17, 4784:4, 4784:9, 4785:19, 4785:20

**previously** [8] - 4664:23, 4669:9, 4681:25, 4758:11, 4762:17, 4763:21, 4765:10, 4782:17

**price** [7] - 4737:1, 4737:6, 4737:7, 4737:8, 4737:12, 4737:16, 4742:19

**priced** [1] - 4739:5

**primary** [3] - 4718:10, 4718:12, 4847:24

**prime** [5] - 4691:16, 4691:22, 4691:25, 4692:5, 4692:12

**principal** [17] - 4702:9, 4702:16, 4745:14, 4868:21, 4868:25, 4872:24, 4886:8, 4886:14, 4886:18, 4886:19, 4887:7, 4892:24, 4894:10, 4894:11, 4894:16, 4894:22, 4905:7

**principals** [1] - 4751:20

**principle** [2] - 4835:19, 4835:23

**print** [2] - 4712:25, 4796:3

**printed** [4] - 4713:5, 4795:16, 4801:8, 4823:20

**privacy** [1] - 4710:2

**private** [4] - 4739:10, 4739:11, 4793:8, 4810:5

**privilege** [13] - 4809:7, 4809:10, 4810:2, 4810:8, 4810:12, 4810:14,

4811:7, 4811:8, 4811:9, 4811:19, 4813:24, 4815:2, 4832:24

**privileged** [4] - 4778:22, 4802:24, 4809:8, 4819:17

**probe** [4] - 4665:21, 4668:23, 4859:10, 4859:11

**probed** [2] - 4667:1, 4669:16

**probing** [3] - 4665:25, 4669:25, 4827:13

**problem** [18] - 4740:6, 4802:23, 4830:15, 4834:1, 4839:9, 4842:23, 4843:7, 4843:9, 4843:10, 4844:18, 4847:12, 4850:15, 4851:22, 4851:25, 4852:1, 4863:6, 4890:13

**problematic** [3] - 4840:19, 4847:2, 4847:3

**problems** [2] - 4668:7, 4802:22

**procedure** [1] - 4764:2

**proceed** [19] - 4671:16, 4683:15, 4686:13, 4831:25, 4833:7, 4833:11, 4834:11, 4834:12, 4839:22, 4840:1, 4840:21, 4844:2, 4848:19, 4850:8, 4850:13, 4851:19, 4852:4, 4855:2, 4864:5

**proceeded** [3] - 4691:20, 4760:13, 4803:18

**proceeding** [3] - 4663:1, 4835:17, 4839:3

**Proceedings** [1] - 4657:25

**proceedings** [8] - 4668:10, 4668:17, 4872:6, 4876:17, 4877:18, 4887:3, 4890:9, 4890:18

**proceeds** [3] - 4805:10, 4847:10, 4850:14

**process** [7] -

4691:12, 4692:9, 4711:21, 4742:25, 4865:12, 4908:23, 4927:9

**processor** [1] - 4708:17

**produced** [4] - 4657:25, 4803:2, 4810:7

**product** [1] - 4773:24

**production** [1] - 4912:22

**products** [1] - 4689:11

**professional** [4] - 4711:1, 4711:2, 4880:10, 4907:19

**proffer** [5] - 4661:3, 4678:3, 4681:1, 4823:13, 4920:11

**proffered** [6] - 4675:22, 4676:15, 4683:6, 4683:7, 4816:23, 4841:14

**proffering** [1] - 4920:18

**proffers** [1] - 4860:1

**profit** [8] - 4691:2, 4691:9, 4754:8, 4754:11, 4776:8, 4777:3, 4805:10

**program** [1] - 4712:13

**progressed** [1] - 4692:16

**prohibit** [1] - 4669:18

**Project** [9] - 4868:17, 4868:18, 4869:13, 4869:19, 4884:15, 4885:23, 4886:3, 4905:13, 4906:13

**promise** [2] - 4744:1, 4798:7

**promises** [2] - 4743:25, 4745:11

**promissory** [30] - 4743:21, 4743:24, 4744:2, 4744:4, 4744:6, 4744:12, 4744:21, 4745:1, 4745:6, 4745:17, 4745:20, 4746:13, 4746:15, 4746:16, 4747:5, 4747:10, 4748:4, 4749:1, 4749:3, 4749:4, 4749:6, 4749:11, 4749:18, 4750:3,

4750:5, 4750:10, 4750:12, 4753:21, 4754:3, 4754:10
**prompt** [1] - 4671:21
**pronounce** [1] - 4875:7
**proof** [2] - 4671:18, 4671:20
**proper** [2] - 4673:10, 4927:10
**properly** [1] - 4752:24
**proposal** [4] - 4777:6, 4777:7, 4815:8, 4848:10
**propose** [2] - 4823:1, 4833:6
**proposed** [2] - 4800:17, 4815:4
**proposes** [1] - 4661:1
**proposing** [1] - 4776:13
**prosecution** [5] - 4682:9, 4808:1, 4828:22, 4828:24, 4832:8
**prosecutor** [1] - 4862:2
**prosecutors** [2] - 4818:17, 4859:13
**prospective** [1] - 4730:7
**protect** [3] - 4799:21, 4799:24, 4800:14
**protected** [6] - 4812:20, 4813:3, 4824:18, 4824:24, 4825:10, 4840:7
**prove** [2] - 4670:13, 4670:21
**provide** [18] - 4660:9, 4676:2, 4679:8, 4680:16, 4681:10, 4684:16, 4684:17, 4684:23, 4685:7, 4685:19, 4699:8, 4718:24, 4781:6, 4818:11, 4910:14, 4913:19, 4921:1
**provided** [4] - 4684:2, 4783:8, 4823:14, 4825:18
**provides** [1] - 4829:12
**providing** [1] - 4673:24
**province** [1] - 4680:1
**provision** [2] -

4698:23, 4698:24
**provisions** [1] - 4812:10
**prudence** [1] - 4838:14
**prudent** [7] - 4817:4, 4840:16, 4842:25, 4844:2, 4851:15, 4854:8, 4854:19
**PS** [2] - 4800:1, 4800:3
**public** [11] - 4716:2, 4716:13, 4716:15, 4716:22, 4739:12, 4743:3, 4773:16, 4793:7, 4793:13, 4798:4, 4868:19
**publicly** [1] - 4741:24
**publish** [1] - 4909:8
**published** [15] - 4695:20, 4700:21, 4715:7, 4761:25, 4763:18, 4766:9, 4770:21, 4779:18, 4782:1, 4870:8, 4870:21, 4872:13, 4874:20, 4878:16, 4884:9
**purchase** [2] - 4715:15, 4805:15
**purchased** [2] - 4805:16, 4805:17
**purported** [1] - 4921:24
**purpose** [11] - 4679:20, 4681:11, 4684:1, 4684:24, 4685:1, 4685:3, 4913:4, 4917:16, 4917:18
**purposes** [3] - 4680:4, 4708:7, 4927:8
**pursuant** [2] - 4728:22, 4808:25
**pursue** [1] - 4809:2
**pursuing** [1] - 4810:6
**push** [1] - 4916:25
**pushing** [1] - 4928:7
**put** [40] - 4660:7, 4660:11, 4662:5, 4663:17, 4665:6, 4665:13, 4665:14, 4685:23, 4688:9, 4689:20, 4690:25, 4691:10, 4712:14, 4743:6, 4748:13, 4752:21, 4752:25,

4755:15, 4759:4, 4766:7, 4786:20, 4820:15, 4837:8, 4840:9, 4844:19, 4846:18, 4850:7, 4851:12, 4869:17, 4870:7, 4870:20, 4877:14, 4878:15, 4884:8, 4888:25, 4889:6, 4889:24, 4891:16, 4916:18, 4920:5
**putting** [8] - 4665:1, 4682:11, 4764:7, 4764:8, 4848:2, 4850:3, 4855:25, 4892:5

## Q

**QCOR** [1] - 4868:18
**qualifications** [2] - 4658:11, 4676:14
**quarter** [1] - 4700:3
**quarterly** [1] - 4915:12
**questionable** [2] - 4668:18, 4668:25
**questioned** [1] - 4746:18
**questioning** [1] - 4673:13
**questions** [24] - 4662:3, 4669:20, 4683:19, 4750:15, 4750:16, 4771:2, 4813:16, 4817:6, 4819:14, 4832:18, 4832:23, 4833:17, 4837:9, 4837:12, 4844:20, 4856:17, 4856:23, 4858:24, 4858:25, 4906:24, 4921:19, 4923:23, 4924:8, 4925:5
**queue** [1] - 4902:19
**quick** [1] - 4822:22
**quickly** [2] - 4659:8, 4832:17
**quit** [1] - 4707:25
**quote** [1] - 4672:15
**quoted** [2] - 4664:23, 4666:16
**quoting** [2] - 4663:12, 4813:23

## R

**R-048736** [1] - 4882:1

**R-E-L-I** [1] - 4875:9
**raise** [7] - 4671:10, 4675:5, 4682:17, 4820:20, 4843:24, 4863:25, 4929:14
**raised** [9] - 4820:8, 4828:1, 4830:6, 4845:22, 4849:6, 4849:10, 4849:11, 4861:1
**raises** [1] - 4851:4
**raising** [2] - 4682:2, 4925:7
**Ramos** - 4804:16, 4805:25
**Ramos'** [1] - 4835:24
**RANDY** [1] - 4657:19
**rang** [1] - 4682:5
**rare** [1] - 4908:13
**rate** [7] - 4882:8, 4882:12, 4882:14, 4882:19, 4882:21, 4895:14, 4915:24
**Rates** [2] - 4895:13, 4896:3
**rates** [3] - 4895:25, 4896:10, 4896:11
**rather** [3] - 4845:17, 4851:19, 4884:2
**ratio** [3] - 4771:16, 4771:17, 4771:22
**re** [4] - 4705:21, 4737:15, 4756:7, 4859:1
**re-execute** [1] - 4756:7
**re-hired** [1] - 4705:21
**re-sign** [1] - 4737:15
**re-tool** [1] - 4859:1
**reached** [5] - 4681:6, 4693:4, 4707:10, 4712:3, 4805:21
**reaching** [2] - 4798:16, 4799:1
**reacted** [1] - 4662:18
**reaction** [2] - 4745:21, 4777:7
**reacts** [1] - 4849:16
**read** [27] - 4665:10, 4695:23, 4696:5, 4700:23, 4726:9, 4728:10, 4728:19, 4732:15, 4734:3, 4736:24, 4745:8, 4745:9, 4769:15, 4782:18, 4790:3, 4798:1, 4800:3, 4828:3, 4855:13, 4868:15, 4875:17,

4877:20, 4877:25, 4881:25, 4902:13, 4927:17, 4931:3
**reading** [5] - 4671:6, 4824:16, 4824:22, 4855:14, 4878:25
**reads** [1] - 4668:2
**ready** [11] - 4675:2, 4676:11, 4685:20, 4741:14, 4814:2, 4828:7, 4832:7, 4832:12, 4850:8, 4866:1, 4928:23
**real** [2] - 4687:9, 4692:22
**Realization** [1] - 4896:6
**realization** [1] - 4896:7
**really** [23] - 4659:5, 4663:24, 4672:7, 4683:2, 4693:11, 4693:25, 4694:2, 4710:2, 4718:21, 4718:22, 4730:12, 4777:8, 4805:2, 4837:13, 4843:18, 4844:4, 4847:16, 4851:11, 4851:22, 4855:15, 4856:18, 4925:1, 4929:7
**reason** [9] - 4673:17, 4678:19, 4820:25, 4846:12, 4846:24, 4848:18, 4859:21, 4888:17, 4892:5
**reasonable** [5] - 4814:3, 4839:3, 4845:17, 4926:6, 4929:9
**reasonably** [1] - 4665:24
**reasons** [4] - 4659:18, 4914:18, 4914:20, 4914:25
**recast** [1] - 4859:1
**receipt** [1] - 4769:16
**Receipts** [1] - 4895:19
**receivable** [1] - 4918:10
**receivables** [3] - 4917:19, 4917:20, 4917:23
**receive** [32] - 4695:18, 4699:5, 4700:19, 4713:19, 4715:5, 4720:6, 4723:1, 4724:24, 4725:16, 4727:5,

4732:6, 4744:17, 4755:2, 4757:16, 4760:1, 4763:15, 4770:19, 4774:18, 4774:21, 4776:1, 4777:10, 4777:14, 4778:16, 4779:16, 4781:24, 4785:25, 4797:5, 4867:24, 4874:14, 4905:25, 4916:5, 4929:14

**received** [36] - 4659:17, 4678:15, 4679:2, 4695:19, 4700:20, 4712:7, 4715:6, 4723:11, 4725:25, 4745:9, 4745:10, 4746:13, 4746:15, 4747:13, 4750:1, 4752:18, 4752:25, 4761:24, 4763:16, 4765:18, 4765:21, 4770:20, 4774:24, 4778:24, 4779:17, 4781:25, 4785:25, 4800:9, 4820:9, 4868:2, 4872:12, 4874:16, 4877:3, 4878:5, 4895:20, 4924:14

**receiving** [7] - 4666:13, 4714:24, 4747:10, 4774:2, 4776:10, 4778:8, 4787:11

**recent** [3] - 4722:25, 4889:6, 4890:1

**recently** [1] - 4792:14

**Recess** [1] - 4832:6

**recess** [1] - 4741:12

**recipient** [1] - 4667:21

**recipients** [1] - 4751:9

**reclassification** [4] - 4745:25, 4746:3, 4746:4, 4753:22

**reclassified** [2] - 4746:11, 4746:19

**recollection** [7] - 4662:14, 4748:3, 4756:23, 4790:4, 4790:8, 4818:5, 4819:6

**recommendation** [1] - 4800:5

**recommended** [1] - 4717:1

**reconcile** [2] -

4704:3, 4789:8

**record** [26] - 4662:25, 4668:11, 4668:15, 4683:20, 4683:24, 4685:10, 4756:19, 4811:13, 4820:15, 4832:7, 4832:12, 4837:8, 4854:6, 4855:4, 4855:10, 4858:22, 4865:19, 4865:21, 4873:2, 4873:6, 4873:7, 4878:1, 4878:6, 4887:21, 4892:19, 4923:7

**recorded** [5] - 4657:25, 4895:11, 4904:6, 4904:7, 4906:17

**records** [4] - 4793:8, 4887:7, 4889:21, 4924:20

**rectangle** [1] - 4758:13

**rectified** [1] - 4676:1

**redact** [2] - 4890:14, 4890:16

**redactions** [4] - 4862:20, 4878:7, 4891:3, 4891:8

**redirect** [1] - 4930:12

**REED** [1] - 4657:19

**refer** [7] - 4755:13, 4799:12, 4799:23, 4866:23, 4881:8, 4888:4, 4891:4

**reference** [7] - 4724:16, 4732:22, 4737:23, 4753:8, 4767:23, 4898:22, 4899:17

**referenced** [1] - 4899:18

**referred** [5] - 4664:7, 4729:23, 4729:24, 4751:23, 4800:13

**referring** [10] - 4662:8, 4669:3, 4749:1, 4798:9, 4798:24, 4799:5, 4799:15, 4800:7, 4800:8, 4800:20

**refers** [2] - 4699:18, 4785:22

**reflect** [2] - 4785:2, 4885:23

**reflected** [1] - 4775:3

**reflection** [1] - 4853:11

**refresh** [2] - 4790:8,

4818:5

**refreshes** [2] - 4748:2, 4790:4

**refused** [1] - 4689:21

**refusing** [1] - 4685:11

**regard** [8] - 4659:19, 4662:2, 4666:11, 4682:1, 4756:20, 4836:18, 4926:23, 4928:2

**regarding** [21] - 4659:16, 4660:25, 4664:20, 4668:14, 4675:14, 4679:6, 4722:4, 4809:10, 4815:2, 4815:4, 4816:1, 4816:13, 4818:25, 4820:13, 4824:23, 4829:23, 4832:17, 4832:19, 4837:9, 4893:12, 4925:13

**regardless** [3] - 4803:23, 4812:5, 4886:12

**regards** [1] - 4722:25

**Regional** [2] - 4895:12, 4896:2

**regional** [2] - 4896:9, 4896:11

**registered** [1] - 4926:15

**registration** [1] - 4773:14

**regular** [2] - 4691:12, 4708:21

**regulations** [4] - 4678:14, 4684:2, 4684:13, 4684:25

**relate** [11] - 4725:12, 4726:23, 4754:22, 4779:11, 4786:9, 4796:23, 4801:11, 4836:7, 4843:11, 4843:13, 4925:6

**related** [42] - 4675:22, 4675:25, 4683:13, 4690:20, 4699:9, 4701:20, 4702:3, 4703:14, 4719:14, 4719:24, 4724:25, 4726:15, 4729:13, 4759:22, 4760:15, 4781:13, 4794:4, 4794:10, 4794:16, 4794:22, 4795:3, 4797:15, 4854:16, 4859:11, 4861:17, 4865:6,

4867:2, 4867:15, 4870:22, 4871:8, 4874:2, 4874:4, 4874:7, 4874:22, 4875:19, 4875:21, 4876:9, 4878:20, 4879:10, 4884:15, 4901:9, 4905:19

**relates** [2] - 4802:25, 4889:14

**relating** [5] - 4673:25, 4675:10, 4802:24, 4833:25, 4841:20

**Relation** [1] - 4903:18

**relationship** [6] - 4696:19, 4705:18, 4710:14, 4710:25, 4721:21, 4836:12

**Relay** [41] - 4712:4, 4712:5, 4803:3, 4803:7, 4803:8, 4803:19, 4807:11, 4808:16, 4808:21, 4817:1, 4819:12, 4819:24, 4820:1, 4820:17, 4829:11, 4832:21, 4832:22, 4833:24, 4835:5, 4836:4, 4836:11, 4836:23, 4837:10, 4841:14, 4841:18, 4841:20, 4843:8, 4846:7, 4846:16, 4847:3, 4848:13, 4849:1, 4849:24, 4850:10, 4850:25, 4853:5, 4853:19, 4858:13, 4859:11, 4859:14

**Relay's** [1] - 4848:17

**released** [1] - 4700:4

**releases** [1] - 4662:6

**relevance** [3] - 4668:18, 4668:25, 4811:18, 4891:17, 4927:4, 4927:12

**relevant** [9] - 4659:21, 4660:4, 4668:13, 4836:2, 4888:15, 4891:22, 4892:25, 4920:20, 4924:19

**relief** [2] - 4661:8, 4855:7

**relies** [1] - 4661:13

**relieved** [1] - 4896:4

**relying** [1] - 4684:19

**remain** [2] - 4802:11,

4836:20

**remainder** [1] - 4854:8

**remained** [1] - 4813:12

**remaining** [1] - 4834:11

**remains** [1] - 4661:6

**remedies** [1] - 4851:17

**remedy** [1] - 4849:16

**remember** [11] - 4671:6, 4673:23, 4706:7, 4734:17, 4747:20, 4753:16, 4760:15, 4764:1, 4792:15, 4819:7

**remembered** [1] - 4674:15

**remembers** [1] - 4808:16

**remind** [1] - 4904:3

**remotely** [2] - 4712:18, 4712:20

**remove** [1] - 4891:3

**removed** [4] - 4749:9, 4749:10, 4754:1, 4926:21

**rendered** [6] - 4878:22, 4884:11, 4885:2, 4885:24, 4898:19, 4899:13

**rent** [2] - 4735:18, 4735:23

**repaid** [3] - 4754:11, 4754:12, 4791:11

**repeat** [3] - 4708:9, 4710:21, 4910:2

**repeated** [3] - 4798:6, 4798:8, 4800:8

**repeatedly** [1] - 4662:16

**rephrase** [10] - 4664:19, 4716:18, 4721:18, 4753:24, 4775:6, 4776:21, 4789:1, 4909:15, 4912:16, 4914:23

**replace** [1] - 4749:4

**replaced** [1] - 4754:3

**replacement** [1] - 4746:5

**replies** [1] - 4756:13

**replying** [1] - 4757:22

**report** [11] - 4697:24, 4697:25, 4729:25, 4730:3, 4731:1, 4731:3, 4861:12,

4886:17, 4894:14,
4894:17, 4897:6
**reported** [2] -
4819:17, 4899:16
**Reporter** [1] -
4657:22
**reports** [4] -
4887:11, 4894:11,
4897:21, 4902:24
**represent** [5] -
4733:12, 4786:25,
4827:17, 4897:18,
4907:15
**Representation** [1] -
4728:12
**representation** [6] -
4762:10, 4836:21,
4848:11, 4868:18,
4870:23, 4921:13
**representations** [1] -
4841:6
**represented** [1] -
4787:2
**represents** [1] -
4733:13
**request** [19] -
4675:19, 4675:21,
4676:12, 4679:16,
4680:9, 4680:15,
4680:21, 4681:1,
4685:13, 4685:17,
4740:1, 4858:5,
4858:11, 4858:20,
4859:5, 4860:11,
4860:19, 4860:24,
4868:12
**requested** [2] -
4660:14, 4858:5
**requesting** [3] -
4798:13, 4870:4,
4902:2
**requests** [2] -
4676:21, 4676:23
**require** [5] - 4751:16,
4812:24, 4816:16,
4839:8, 4863:16
**required** [1] -
4865:19
**requirement** [1] -
4798:14
**reschedule** [1] -
4683:13
**research** [16] -
4693:13, 4705:1,
4705:2, 4818:10,
4820:5, 4825:25,
4833:19, 4837:18,
4837:19, 4837:21,
4837:25, 4838:2,
4838:7, 4851:1,

4855:5
**researching** [1] -
4854:18
**resolve** [5] - 4843:3,
4845:3, 4845:16,
4919:9, 4919:14
**resolves** [1] - 4845:4
**resolving** [2] -
4658:4, 4844:24
**resource** [1] -
4703:19
**respect** [29] -
4660:13, 4672:11,
4673:4, 4685:19,
4698:1, 4718:18,
4730:10, 4803:16,
4808:17, 4809:7,
4809:9, 4810:2,
4810:15, 4820:7,
4820:13, 4820:18,
4835:4, 4836:9,
4836:10, 4841:14,
4841:15, 4846:6,
4846:24, 4849:2,
4850:6, 4850:22,
4851:2, 4853:5,
4857:25
**respectfully** [9] -
4669:23, 4673:4,
4680:5, 4840:22,
4842:17, 4847:4,
4850:13, 4860:9,
4887:25
**respectively** [3] -
4893:12, 4902:18,
4928:19
**respond** [10] -
4747:2, 4756:17,
4756:18, 4780:18,
4780:19, 4803:15,
4832:23, 4858:10,
4926:5, 4926:8
**responded** [2] -
4676:4, 4780:20
**responds** [1] -
4780:5
**response** [7] -
4662:14, 4662:17,
4669:9, 4680:3,
4789:14, 4826:22,
4920:16
**responsibilities** [7] -
4701:20, 4701:23,
4702:3, 4703:5,
4703:18, 4713:22,
4742:22
**responsibility** [1] -
4864:16
**responsible** [32] -
4693:24, 4736:5,

4789:13, 4866:5,
4866:14, 4866:15,
4869:2, 4886:12,
4886:16, 4896:16,
4904:5, 4905:8,
4906:18, 4906:19,
4910:9, 4913:5,
4913:7, 4913:10,
4913:11, 4913:25,
4914:1, 4914:4,
4914:9, 4914:15,
4914:25, 4915:5,
4917:22, 4918:14,
4924:16, 4924:17
**rest** [2] - 4776:10,
4843:6
**restriction** [4] -
4773:12, 4773:15,
4778:24, 4805:7
**restrictions** [1] -
4773:10
**result** [6] - 4718:4,
4718:7, 4753:21,
4807:23, 4840:20,
4896:10
**resulted** [1] -
4805:18
**resulting** [1] -
4812:21
**resume** [2] -
4741:19, 4840:20
**resumed** [1] -
4669:20
**retail** [1] - 4699:16
**retail-type** [1] -
4699:16
**retailers** [1] -
4699:16
**retained** [4] - 4718:5,
4718:7, 4718:17,
4819:9
**rethink** [1] - 4842:19
**retire** [1] - 4690:5
**retool** [2] - 4839:9,
4847:12
**retread** [1] - 4792:10
**retrieve** [2] - 4740:4,
4816:12
**retroactive** [2] -
4698:8, 4698:12
**Retrophin** [196] -
4660:25, 4663:14,
4668:1, 4668:6,
4668:12, 4686:22,
4687:16, 4692:17,
4692:25, 4693:2,
4693:19, 4694:5,
4695:13, 4696:9,
4696:15, 4696:20,
4697:7, 4699:7,

4699:18, 4701:3,
4703:17, 4704:22,
4705:1, 4705:5,
4706:24, 4707:1,
4707:15, 4707:21,
4708:24, 4708:25,
4709:2, 4709:6,
4711:11, 4712:9,
4712:23, 4713:14,
4713:18, 4713:21,
4713:23, 4713:25,
4714:2, 4714:12,
4714:22, 4715:11,
4716:2, 4716:15,
4716:22, 4718:5,
4718:8, 4718:20,
4719:18, 4719:19,
4719:22, 4719:25,
4720:1, 4720:2,
4720:13, 4720:15,
4720:19, 4723:24,
4724:12, 4728:3,
4728:5, 4728:12,
4731:3, 4731:7,
4734:4, 4734:12,
4734:19, 4734:25,
4735:4, 4735:6,
4735:8, 4735:25,
4736:23, 4737:5,
4739:5, 4739:10,
4742:2, 4743:21,
4744:5, 4745:4,
4745:10, 4745:19,
4748:25, 4749:12,
4749:18, 4750:5,
4751:7, 4756:8,
4756:9, 4761:7,
4773:4, 4773:20,
4773:21, 4774:19,
4778:10, 4780:2,
4783:2, 4783:19,
4787:15, 4788:15,
4788:16, 4789:9,
4789:10, 4789:11,
4789:12, 4790:12,
4790:13, 4790:14,
4791:14, 4791:16,
4791:19, 4792:6,
4792:17, 4792:25,
4793:9, 4793:19,
4793:22, 4793:25,
4794:4, 4794:10,
4794:16, 4794:23,
4795:4, 4795:19,
4797:13, 4800:18,
4802:23, 4803:5,
4803:22, 4804:14,
4804:18, 4804:22,
4805:6, 4805:7,
4805:12, 4805:13,
4806:3, 4806:11,

4806:13, 4806:17,
4806:18, 4806:25,
4810:7, 4810:12,
4813:10, 4813:12,
4813:17, 4813:24,
4815:7, 4818:20,
4819:17, 4819:18,
4821:3, 4821:11,
4824:6, 4829:8,
4829:9, 4829:10,
4829:19, 4836:25,
4842:4, 4867:3,
4867:5, 4867:16,
4868:9, 4868:13,
4870:17, 4871:5,
4871:6, 4871:8,
4872:19, 4873:7,
4874:3, 4874:7,
4874:23, 4877:12,
4877:16, 4877:21,
4879:5, 4883:14,
4888:12, 4888:15,
4892:5, 4896:19,
4896:22, 4897:13,
4897:19, 4898:16,
4900:5, 4901:10,
4903:3, 4903:7,
4922:21
**Retrophin's** [12] -
4703:23, 4713:9,
4716:13, 4718:17,
4719:5, 4719:14,
4722:10, 4731:25,
4793:14, 4805:15,
4824:14, 4888:6
**Retrophin.com** [1] -
4712:11
**return** [8] - 4692:10,
4706:3, 4797:17,
4803:18, 4823:4,
4913:8, 4913:11,
4926:9
**returning** [1] -
4800:8
**returns** [1] - 4823:4
**revealed** [1] - 4682:5
**revenue** [2] - 4917:1,
4917:25
**reverse** [11] -
4691:3, 4691:5,
4739:15, 4739:18,
4741:23, 4742:2,
4742:14, 4742:21,
4748:18, 4773:24,
4792:25
**reversed** [1] -
4661:16
**Review** [1] - 4902:11
**review** [17] - 4661:4,
4722:14, 4742:25,

4860:8, 4866:4,
4866:13, 4902:20,
4904:5, 4910:17,
4913:5, 4913:7,
4913:14, 4913:17,
4913:21, 4925:11,
4926:9, 4926:20
**reviewed** [5] -
4801:6, 4866:3,
4908:9, 4909:16,
4909:19
**reviewer** [1] - 4914:5
**reviewing** [3] -
4869:3, 4916:10,
4926:20
**reviews** [2] -
4866:18, 4926:19
**revised** [2] - 4737:6,
4779:1
**revisit** [2] - 4893:18,
4893:19
**Riannon** [1] - 4902:7
**Richard** [1] - 4734:5
**Richardson** [4] -
4666:10, 4666:11,
4666:17, 4667:1
**rid** [1] - 4679:21
**ridiculously** [1] -
4676:8
**right-hand** [1] -
4871:1
**rights** [2] - 4840:7,
4859:15
**rings** [1] - 4820:5
**risk** [4] - 4659:9,
4833:17, 4833:19,
4833:20
**risks** [1] - 4754:7
**risky** [1] - 4850:3
**road** [2] - 4711:17,
4856:12
**Rob** [1] - 4798:18
**Robert** [1] - 4726:12
**robust** [1] - 4840:17
**Rockaway** [1] -
4705:11
**ROHDE** [1] - 4657:12
**role** [3] - 4711:20,
4720:23, 4722:6
**rolled** [1] - 4927:11
**Ron** [5] - 4707:16,
4707:18, 4742:5,
4783:1, 4794:19
**rooking** [1] - 4763:9
**room** [8] - 4704:12,
4716:10, 4802:13,
4830:2, 4830:7,
4859:7, 4859:12,
4860:5
**Rosenfeld** [1] -

4798:18
**Rosensaft** [6] -
4902:14, 4902:15,
4912:10, 4912:12,
4912:14, 4912:21
**Rosenthal** [1] -
4689:24
**Rosenwald** [5] -
4667:25, 4668:5,
4668:11, 4798:18,
4799:7
**Rosenwald's** [1] -
4668:14
**round** [1] - 4923:20
**rounded** [1] -
4923:21
**routing** [1] - 4902:18
**RTRX** [3] - 4663:14,
4664:4, 4664:11
**rule** [2] - 4666:7,
4681:12
**Rule** [3] - 4660:25,
4678:8, 4678:15
**ruled** [2] - 4680:3,
4860:19
**rules** [3] - 4684:1,
4684:12, 4838:12
**ruling** [3] - 4685:20,
4855:3, 4857:25
**run** [5] - 4687:12,
4693:23, 4707:3,
4732:19, 4783:1
**running** [1] -
4713:13
**Russo** [3] - 4704:10,
4704:15, 4707:25

---

## S

**Sachs** [6] - 4687:23,
4687:24, 4689:2,
4689:4, 4689:8
**safe** [4] - 4819:9,
4919:12, 4919:13,
4919:14
**safely** [1] - 4919:17
**salary** [6] - 4695:24,
4698:21, 4698:23,
4787:23, 4795:10,
4796:15
**San** [2] - 4704:14,
4778:10
**Sarah** [3] - 4667:14,
4798:17, 4799:6
**sat** [2] - 4706:6,
4860:5
**satisfaction** [1] -
4855:19
**satisfy** [1] - 4735:2
**Saunders** [1] -

4726:10
**save** [1] - 4796:3
**saw** [20] - 4705:12,
4711:17, 4733:22,
4757:19, 4762:17,
4765:9, 4767:19,
4768:9, 4772:4,
4772:14, 4772:25,
4774:6, 4775:17,
4787:8, 4796:3,
4801:11, 4900:20,
4901:25, 4904:9,
4906:9
**scan** [1] - 4758:24
**scanned** [1] -
4758:25
**schedule** [9] -
4681:23, 4681:24,
4682:7, 4808:25,
4921:9, 4923:19,
4925:18, 4928:18
**scheduled** [5] -
4675:17, 4676:24,
4680:13, 4683:12,
4928:1
**scheduling** [5] -
4682:12, 4682:20,
4848:20, 4857:10
**Schmidt** [2] -
4730:23, 4731:7
**Schwab** [25] -
4804:13, 4804:15,
4804:17, 4804:24,
4805:6, 4805:12,
4805:13, 4805:14,
4805:17, 4805:18,
4805:19, 4805:21,
4806:9, 4806:13,
4806:19, 4835:21,
4836:13, 4836:14,
4839:16, 4839:21,
4840:15, 4841:10,
4849:24, 4850:18,
4868:20
**science** [1] - 4687:20
**scientific** [2] -
4706:15, 4706:23
**scope** [11] - 4676:15,
4685:18, 4919:1,
4919:3, 4919:4,
4922:2, 4922:4,
4922:12, 4922:15,
4924:5
**screamed** [1] -
4711:2
**screen** [13] - 4695:9,
4759:4, 4766:7,
4868:6, 4868:11,
4869:17, 4870:7,
4870:20, 4878:15,

4878:18, 4884:8,
4895:8, 4900:18
**scroll** [5] - 4733:25,
4738:25, 4756:6,
4780:4, 4900:12
**search** [5] - 4742:2,
4742:4, 4742:5,
4865:10, 4902:19
**searches** [1] -
4865:12
**seat** [2] - 4686:5,
4741:19
**SEC** [27] - 4684:12,
4717:3, 4718:5,
4718:12, 4718:15,
4718:18, 4719:1,
4719:6, 4720:22,
4723:5, 4729:23,
4729:24, 4730:1,
4730:15, 4730:19,
4731:3, 4751:13,
4773:14, 4798:19,
4799:1, 4801:12,
4836:6, 4899:17,
4899:21, 4901:19,
4902:16, 4912:21
**second** [31] - 4674:8,
4719:25, 4720:8,
4728:13, 4732:8,
4737:20, 4743:10,
4743:15, 4748:6,
4748:14, 4748:16,
4748:22, 4749:11,
4751:22, 4764:13,
4781:16, 4782:3,
4782:4, 4803:1,
4808:22, 4819:21,
4820:20, 4836:6,
4841:9, 4867:9,
4871:12, 4876:4,
4880:8, 4886:1,
4897:11, 4901:20
**Second** [2] -
4661:15, 4845:7
**secondly** [2] -
4685:5, 4809:6
**seconds** [1] -
4930:15
**Section** [13] -
4812:16, 4813:2,
4824:17, 4824:22,
4825:15, 4826:5,
4826:8, 4826:9,
4826:10, 4828:10,
4828:12, 4828:13
**section** [5] -
4772:22, 4772:25,
4812:8, 4825:12,
4828:9
**sections** [2] -

4828:2, 4845:10
**secured** [2] -
4744:21, 4745:1
**Securities** [1] -
4729:14
**securities** [1] -
4729:19
**Security** [1] -
4697:23
**see** [132] - 4658:8,
4658:24, 4685:19,
4695:9, 4696:24,
4698:10, 4698:25,
4699:19, 4701:9,
4704:22, 4714:19,
4715:10, 4715:12,
4719:11, 4720:9,
4722:10, 4722:19,
4724:2, 4724:16,
4725:5, 4725:18,
4725:20, 4726:3,
4726:19, 4727:8,
4728:5, 4728:17,
4731:16, 4732:10,
4732:21, 4733:1,
4733:10, 4733:25,
4737:23, 4738:1,
4738:11, 4738:20,
4743:18, 4744:21,
4748:2, 4749:16,
4752:4, 4752:8,
4753:11, 4754:19,
4756:11, 4756:15,
4757:7, 4758:5,
4758:13, 4759:12,
4760:4, 4762:8,
4763:3, 4765:3,
4765:9, 4765:19,
4767:11, 4768:21,
4768:25, 4771:3,
4771:10, 4772:1,
4772:7, 4772:10,
4772:12, 4772:20,
4772:23, 4779:6,
4780:8, 4781:11,
4781:16, 4782:10,
4782:12, 4783:12,
4783:20, 4784:1,
4785:7, 4786:6,
4786:22, 4792:4,
4799:8, 4799:13,
4799:21, 4800:1,
4812:11, 4816:20,
4817:12, 4817:16,
4819:4, 4829:23,
4837:17, 4839:18,
4847:12, 4848:18,
4863:5, 4867:10,
4867:13, 4868:12,
4868:13, 4868:22,

4869:13, 4870:13,
4870:25, 4871:3,
4880:18, 4881:6,
4881:13, 4882:9,
4883:1, 4884:13,
4884:20, 4885:4,
4885:10, 4897:12,
4898:5, 4898:10,
4898:17, 4898:22,
4898:25, 4899:25,
4900:1, 4900:10,
4901:12, 4901:21,
4902:7, 4903:7,
4903:15, 4917:16,
4929:16, 4931:9
  **seeing** [2] - 4665:24,
4669:21
  **seek** [3] - 4675:22,
4792:11, 4849:18
  **Seeking** [1] -
4707:11
  **seeking** [5] -
4667:11, 4675:10,
4678:24, 4803:13,
4860:10
  **seeks** [1] - 4682:6
  **seem** [5] - 4665:18,
4667:4, 4667:8,
4793:11, 4842:24
  **selected** [1] -
4742:17
  **self** [1] - 4815:23
  **self-incrimination**
[1] - 4815:23
  **sell** [3] - 4691:4,
4737:15, 4776:19
  **selling** [4] - 4737:1,
4737:5, 4776:23,
4777:1
  **send** [14] - 4702:25,
4703:14, 4719:2,
4719:5, 4719:13,
4726:14, 4736:13,
4737:3, 4764:2,
4769:24, 4780:5,
4788:12, 4797:22,
4804:7
  **sender** [1] - 4667:21
  **sending** [7] -
4729:10, 4751:12,
4752:16, 4763:24,
4916:10, 4921:20,
4928:24
  **sends** [1] - 4823:17
  **Senior** [1] - 4902:10
  **senior** [1] - 4868:19
  **sense** [7] - 4659:5,
4829:4, 4840:8,
4842:16, 4860:24,
4892:11, 4893:2

  **sent** [39] - 4662:6,
4666:18, 4666:20,
4667:2, 4672:13,
4679:13, 4681:7,
4712:6, 4719:19,
4719:21, 4720:2,
4726:24, 4729:4,
4729:8, 4732:8,
4732:13, 4738:16,
4753:18, 4755:7,
4756:9, 4756:21,
4757:2, 4758:21,
4762:20, 4764:6,
4769:22, 4770:4,
4770:24, 4785:14,
4798:8, 4799:9,
4800:13, 4800:20,
4800:24, 4803:12,
4804:10, 4866:12,
4906:12, 4921:17
  **sentence** [6] -
4728:19, 4799:18,
4856:2, 4875:17,
4878:25, 4930:7
  **sentences** [1] -
4879:1
  **sentencing** [3] -
4856:1, 4930:19,
4930:20
  **separate** [3] -
4700:8, 4710:3,
4865:11
  **separated** [1] -
4704:9
  **September** [20] -
4693:4, 4734:11,
4734:12, 4734:20,
4735:3, 4739:1,
4756:10, 4889:15,
4899:1, 4899:7,
4900:7, 4901:6,
4901:7, 4901:24,
4903:10, 4903:25,
4904:8, 4904:19,
4906:3
  **Series** [2] - 4723:16,
4723:17
  **series** [11] - 4688:8,
4786:22, 4796:20,
4811:4, 4867:12,
4877:8, 4879:9,
4882:25, 4888:18,
4891:5, 4898:4
  **seriousness** [2] -
4853:14, 4855:20
  **serve** [1] - 4917:13
  **service** [2] -
4825:18, 4915:22
  **services** [10] -
4712:4, 4788:3,

4789:11, 4878:22,
4880:10, 4884:11,
4885:2, 4885:24,
4898:19, 4899:13
  **SESSION** [1] -
4814:10
  **set** [18] - 4680:16,
4693:6, 4719:17,
4720:21, 4750:14,
4755:23, 4767:11,
4771:3, 4771:8,
4785:5, 4807:12,
4829:11, 4868:3,
4875:13, 4888:18,
4891:16, 4897:22
  **sets** [1] - 4766:20
  **setting** [3] - 4764:4,
4810:15, 4810:20
  **settlement** [9] -
4668:25, 4800:15,
4800:17, 4800:21,
4800:24, 4805:21,
4806:2, 4835:19,
4835:23
  **setup** [1] - 4884:3
  **seven** [1] - 4682:9
  **several** [16] -
4688:23, 4692:15,
4709:11, 4717:1,
4737:14, 4747:7,
4748:8, 4748:10,
4749:8, 4753:14,
4774:23, 4803:7,
4803:20, 4862:17,
4867:8, 4923:8
  **share** [42] - 4660:16,
4725:12, 4726:23,
4729:12, 4729:13,
4739:6, 4751:13,
4751:23, 4752:18,
4754:20, 4754:23,
4758:20, 4759:22,
4761:17, 4762:19,
4763:6, 4763:8,
4764:15, 4764:20,
4764:23, 4764:25,
4765:14, 4765:22,
4766:1, 4766:12,
4767:16, 4767:19,
4769:6, 4769:8,
4769:24, 4770:5,
4770:24, 4771:19,
4772:4, 4772:15,
4774:6, 4777:3,
4777:22, 4782:12,
4805:9, 4841:16,
4854:24
  **shared** [7] - 4698:3,
4698:4, 4704:8,
4706:5, 4706:9,

4715:23, 4754:9
  **shares** [87] -
4669:11, 4700:5,
4700:14, 4721:12,
4721:15, 4722:5,
4723:18, 4723:22,
4724:20, 4726:10,
4726:11, 4726:12,
4726:13, 4727:13,
4733:14, 4737:5,
4737:16, 4737:18,
4738:2, 4738:5,
4738:14, 4739:4,
4751:7, 4767:6,
4767:17, 4767:21,
4768:6, 4768:9,
4768:14, 4771:14,
4771:15, 4771:21,
4771:25, 4772:3,
4772:4, 4773:3,
4773:8, 4773:9,
4773:14, 4773:17,
4774:9, 4774:11,
4774:19, 4774:21,
4774:22, 4774:24,
4774:25, 4775:3,
4775:11, 4775:12,
4775:15, 4775:16,
4775:22, 4776:18,
4776:23, 4778:8,
4779:1, 4782:20,
4782:21, 4782:22,
4782:23, 4782:24,
4783:9, 4783:15,
4784:1, 4784:7,
4784:8, 4784:9,
4785:2, 4785:11,
4785:14, 4785:16,
4785:20, 4787:11,
4787:19, 4787:22,
4800:6, 4800:10,
4805:6, 4805:8,
4805:12, 4805:15,
4835:20, 4861:2
  **sharing** [1] - 4854:25
  **sheet** [1] - 4880:4
  **sheets** [2] - 4876:19,
4876:25
  **shell** [12] - 4739:17,
4741:23, 4741:24,
4742:2, 4742:7,
4742:8, 4742:10,
4742:14, 4742:19,
4773:4, 4773:21,
4787:16
  **Shelling** [1] -
4672:13
  **shells** [1] - 4741:23
  **shirts** [1] - 4688:19
  **SHK** [1] - 4875:8

  **Shkreli** [103] -
4663:12, 4664:12,
4678:8, 4678:16,
4686:23, 4692:18,
4693:3, 4693:8,
4696:7, 4696:11,
4701:13, 4702:21,
4704:10, 4709:17,
4710:6, 4710:14,
4710:24, 4715:21,
4722:22, 4724:20,
4725:7, 4725:18,
4726:14, 4726:24,
4727:22, 4728:3,
4728:4, 4728:15,
4731:20, 4732:9,
4732:13, 4742:16,
4743:20, 4744:12,
4745:20, 4751:11,
4751:21, 4752:1,
4752:8, 4754:16,
4756:13, 4757:23,
4758:9, 4758:21,
4762:7, 4762:20,
4764:16, 4765:5,
4765:15, 4766:2,
4767:3, 4767:6,
4767:17, 4767:20,
4768:3, 4768:11,
4768:23, 4769:17,
4770:12, 4774:3,
4774:9, 4774:19,
4774:25, 4775:17,
4775:25, 4776:5,
4776:22, 4777:13,
4777:20, 4778:7,
4779:8, 4780:13,
4780:15, 4780:19,
4780:20, 4785:2,
4795:7, 4796:15,
4796:21, 4797:9,
4797:20, 4803:10,
4803:15, 4804:11,
4810:4, 4810:17,
4811:2, 4811:15,
4816:3, 4816:5,
4818:4, 4829:15,
4829:17, 4838:23,
4873:3, 4875:10,
4901:18, 4902:17,
4902:21, 4903:15,
4920:8, 4920:14,
4920:22
  **Shkreli's** [14] -
4678:25, 4704:17,
4803:9, 4805:1,
4808:19, 4809:2,
4819:7, 4819:10,
4820:22, 4820:24,
4835:18, 4849:7,
4849:9, 4924:25

**short** [15] - 4689:10, 4690:8, 4690:16, 4690:19, 4690:24, 4690:25, 4691:10, 4691:15, 4691:20, 4707:11, 4734:25, 4814:4, 4828:7, 4831:6, 4847:1
  **shorted** [1] - 4690:22
**shorter** [1] - 4927:15
**shorting** [1] - 4691:12
**shortly** [1] - 4841:23
**show** [29] - 4695:4, 4700:12, 4719:8, 4722:17, 4725:3, 4726:18, 4731:13, 4736:9, 4750:20, 4750:22, 4757:6, 4759:3, 4770:2, 4781:4, 4782:4, 4871:5, 4872:8, 4882:16, 4886:25, 4891:11, 4893:3, 4895:9, 4908:19, 4912:3, 4918:24, 4919:12, 4920:17, 4923:7, 4925:2
  **showed** [1] - 4904:19
**showing** [2] - 4760:16, 4925:4
**shown** [1] - 4923:13
**shows** [1] - 4721:14
**shut** [2] - 4818:20, 4824:12
**shutdown** [1] - 4824:7
**Side** [3] - 4887:21, 4887:24, 4893:22
**side** [18] - 4667:6, 4693:23, 4704:8, 4710:4, 4771:7, 4771:24, 4772:18, 4802:2, 4802:9, 4808:17, 4808:18, 4868:11, 4871:1, 4889:4, 4891:1, 4894:2, 4894:5
**Side-bar** [2] - 4887:21, 4887:24
  **side-bar** [1] - 4889:4
**side-by-side** [1] - 4704:8
**sidebar** [2] - 4919:4, 4919:6
**sign** [6] - 4705:12, 4714:8, 4737:15, 4738:8, 4769:18, 4909:2

**signaled** [1] - 4741:4
**signature** [6] - 4752:6, 4758:5, 4758:7, 4767:10, 4768:18, 4769:1
**signed** [16] - 4698:14, 4698:18, 4698:19, 4699:22, 4715:20, 4726:1, 4752:8, 4753:2, 4753:3, 4756:14, 4757:20, 4768:23, 4772:5, 4797:14, 4873:19, 4874:25
**significance** [1] - 4924:23
**significant** [3] - 4674:1, 4833:24, 4844:16
**signing** [2] - 4728:14, 4737:2
**similar** [9] - 4664:20, 4689:8, 4697:23, 4784:4, 4825:7, 4880:4, 4884:3, 4897:9, 4902:25
**similarly** [1] - 4921:9
**simply** [3] - 4676:18, 4688:21, 4912:21
**single** [4] - 4673:23, 4884:2, 4901:3, 4909:20
**sit** [3] - 4826:13, 4831:22, 4851:25
**site** [1] - 4707:10
**sitting** [4] - 4707:21, 4819:6, 4859:7, 4859:12
**situation** [7] - 4798:15, 4807:1, 4845:2, 4850:3, 4850:23, 4850:24, 4858:1
**situations** [2] - 4666:6, 4679:10
**six** [10] - 4692:1, 4705:22, 4710:10, 4773:12, 4818:9, 4854:17, 4881:16, 4910:5, 4910:6
**six-minute** [1] - 4881:16
**skipping** [1] - 4735:18
**slanted** [1] - 4752:4
**slight** [1] - 4677:4
**slow** [1] - 4816:20
**small** [1] - 4793:10
**smaller** [2] -

4704:12, 4876:8
**smiled** [1] - 4662:18
**SMITH** [7] - 4657:13, 4824:11, 4832:21, 4839:15, 4840:15, 4857:4, 4863:3
  **Smith** [4] - 4707:23, 4707:25, 4735:14, 4831:8
**so-called** [1] - 4803:17
**Social** [1] - 4697:23
**society** [1] - 4679:21
**sold** [5] - 4776:9, 4777:2, 4805:5, 4805:9, 4835:20
**solid** [1] - 4702:9
**Solutions** [9] - 4718:5, 4718:13, 4718:16, 4718:19, 4719:2, 4719:6, 4720:22, 4723:5, 4751:13
**Solutions/Citrin** [1] - 4717:3
**someone** [17] - 4667:6, 4671:24, 4673:15, 4687:15, 4691:23, 4707:9, 4707:16, 4707:23, 4730:19, 4800:14, 4804:6, 4819:20, 4821:9, 4853:10, 4866:12, 4902:7, 4920:5
**sometimes** [6] - 4724:20, 4729:23, 4818:17, 4847:17, 4863:15, 4873:19
**somewhat** [3] - 4669:10, 4672:25, 4683:7
**somewhere** [1] - 4859:7
**soon** [4] - 4675:18, 4740:4, 4855:6, 4857:5
**sorry** [40] - 4689:5, 4695:6, 4696:1, 4701:5, 4703:4, 4706:17, 4708:9, 4711:5, 4720:9, 4720:17, 4729:21, 4731:22, 4736:8, 4737:22, 4740:1, 4740:5, 4746:13, 4762:2, 4777:17, 4789:22, 4794:7, 4818:7, 4821:25, 4824:10, 4833:5,

4871:19, 4871:21, 4871:23, 4872:21, 4873:14, 4874:13, 4880:9, 4883:25, 4890:8, 4894:10, 4898:3, 4899:4, 4900:1, 4900:17, 4917:11
**sort** [5] - 4708:14, 4718:18, 4813:19, 4829:4
**sorts** [2] - 4810:6, 4815:9
**sought** [1] - 4820:23
**Southern** [2] - 4804:16, 4806:1
**space** [5] - 4704:9, 4704:12, 4710:2, 4715:23, 4735:12
**Spaulding** [1] - 4923:7
**speaker** [3] - 4710:1, 4710:5, 4716:17
**speaking** [1] - 4855:6
**specific** [14] - 4659:22, 4660:7, 4661:11, 4683:19, 4721:4, 4858:16, 4865:17, 4867:1, 4877:20, 4879:10, 4882:13, 4891:10, 4921:2, 4923:24
**specifically** [3] - 4681:9, 4684:7, 4684:10
**specificity** [1] - 4928:25
**speed** [1] - 4702:7
**spell** [2] - 4686:10, 4864:2
**Spencer** [1] - 4798:17
**spend** [2] - 4798:20, 4854:18
**spends** [1] - 4926:20
**spent** [3] - 4692:1, 4847:25, 4881:8
**Spielberg** [1] - 4798:17
**split** [10] - 4759:4, 4766:7, 4776:8, 4780:17, 4781:3, 4781:6, 4781:14, 4781:18, 4782:7, 4782:16
  **square** [1] - 4758:13
**squeezing** [1] - 4683:12
**stage** [2] - 4668:10,

4668:17
**stake** [1] - 4836:9
**stalked** [1] - 4705:13
**Stamp** [2] - 4884:19, 4885:9
**stamp** [7] - 4755:7, 4755:11, 4755:16, 4756:20, 4900:1, 4900:2, 4912:8
**stamped** [2] - 4808:10, 4897:12
**stamps** [2] - 4756:3, 4756:21
**stand** [7] - 4685:24, 4843:2, 4844:19, 4848:3, 4851:7, 4863:24, 4919:20
**standard** [1] - 4896:10
**standards** [1] - 4825:5
**standing** [4] - 4818:1, 4818:13, 4826:18, 4826:19
**stands** [1] - 4692:11
**start** [14] - 4682:23, 4692:22, 4694:4, 4698:13, 4701:18, 4750:20, 4844:3, 4845:16, 4847:14, 4854:1, 4854:15, 4857:7, 4894:20, 4928:1
**started** [15] - 4690:6, 4690:14, 4692:4, 4693:7, 4693:8, 4697:8, 4700:5, 4702:6, 4704:5, 4704:8, 4708:3, 4713:7, 4716:9, 4829:4, 4844:14
**starting** [6] - 4777:21, 4867:15, 4875:14, 4876:4, 4902:13, 4927:25
**starts** [2] - 4723:15, 4745:8, 4854:2
**state** [5] - 4686:10, 4720:18, 4777:19, 4864:2, 4888:5
**statement** [8] - 4664:1, 4670:20, 4671:22, 4719:20, 4811:16, 4848:15, 4849:5, 4849:7
**statements** [16] - 4670:12, 4671:12, 4702:25, 4703:11, 4703:14, 4704:2, 4704:4, 4716:25,

4718:24, 4718:25, 4799:8, 4835:9, 4835:10, 4836:10, 4853:17, 4861:24
**states** [3] - 4698:8, 4811:22, 4816:5
**STATES** [3] - 4657:1, 4657:3, 4657:10
**States** [9] - 4657:5, 4657:13, 4657:15, 4729:20, 4825:15, 4826:4, 4826:8, 4826:9
**status** [3] - 4813:12, 4816:7, 4918:12
**statute** [6] - 4807:3, 4812:23, 4813:22, 4824:22, 4825:23, 4834:21
**statutes** [12] - 4803:20, 4807:5, 4812:3, 4825:13, 4826:13, 4826:23, 4827:2, 4827:4, 4827:8, 4828:2, 4834:19, 4834:24
**stay** [3] - 4690:5, 4793:11, 4925:24
**stenography** [1] - 4657:25
**step** [5] - 4741:1, 4802:15, 4847:6, 4919:19, 4919:22
**Stephen** [3] - 4738:11, 4738:14, 4739:4
**stepped** [1] - 4919:8
**steps** [7] - 4716:14, 4740:8, 4799:21, 4799:23, 4800:14, 4802:17, 4813:20
**Steve** - 4707:14, 4778:9, 4798:18
**stick** [1] - 4862:23
**Stick** [3] - 4884:15, 4885:23, 4886:4
**still** [18] - 4658:5, 4669:5, 4684:20, 4736:4, 4738:22, 4778:2, 4786:12, 4792:24, 4793:18, 4793:21, 4801:1, 4806:2, 4815:6, 4822:5, 4839:6, 4849:2, 4853:4, 4891:13
**stock** [85] - 4690:22, 4690:24, 4690:25, 4691:3, 4691:5, 4691:6, 4691:8,

4691:12, 4691:14, 4691:15, 4691:18, 4691:20, 4691:22, 4691:23, 4691:24, 4692:3, 4693:20, 4721:5, 4721:22, 4722:3, 4722:7, 4722:8, 4723:14, 4724:1, 4732:1, 4732:19, 4733:18, 4736:6, 4737:10, 4738:6, 4738:19, 4743:14, 4743:15, 4753:11, 4753:18, 4756:9, 4771:4, 4771:8, 4772:19, 4772:22, 4773:2, 4773:3, 4773:11, 4773:17, 4773:21, 4774:2, 4774:9, 4774:15, 4776:1, 4776:7, 4776:8, 4776:9, 4776:10, 4776:13, 4776:15, 4777:2, 4777:4, 4777:11, 4777:14, 4778:14, 4778:16, 4778:21, 4778:23, 4779:12, 4780:7, 4780:11, 4780:16, 4780:17, 4781:3, 4781:6, 4781:14, 4781:18, 4782:7, 4782:16, 4782:19, 4783:8, 4784:2, 4785:8, 4786:9, 4805:6, 4805:15, 4805:17, 4835:20
**stockholder** [2] - 4736:23, 4751:8
**stockholders** [2] - 4737:13, 4875:20
**stocks** [4] - 4693:16, 4699:13, 4699:16, 4773:5
**stolen** [1] - 4820:9
**stop** [5] - 4683:2, 4683:15, 4728:25, 4805:13, 4842:16
**stops** [1] - 4834:8
**storage** [1] - 4825:20
**Stored** [1] - 4807:4, 4825:14
**stored** [1] - 4712:25
**stores** [1] - 4864:19
**story** [2] - 4816:24, 4819:3
**straight** [1] - 4708:18
**straighten** [1] - 4847:9

**straw** [1] - 4793:12
**streamline** [1] - 4658:25
**street** [1] - 4691:18
**strenuous** [1] - 4661:20
**stricken** [3] - 4833:20, 4851:8, 4851:24
**strike** [26] - 4662:21, 4709:9, 4711:6, 4727:18, 4730:9, 4731:22, 4739:8, 4746:14, 4750:21, 4754:16, 4759:3, 4795:12, 4849:19, 4850:16, 4850:19, 4850:21, 4851:10, 4851:13, 4851:21, 4852:3, 4852:5, 4852:8, 4896:12, 4897:17, 4901:1, 4914:19
**striking** [1] - 4849:15
**strings** [1] - 4662:5
**strong** [1] - 4889:23
**struck** [2] - 4822:5, 4855:9
**SU** [2] - 4808:10, 4932:3
**su** [1] - 4820:17
**Su** [138] - 4686:14, 4686:17, 4695:21, 4696:10, 4700:13, 4700:23, 4715:8, 4720:8, 4725:5, 4725:18, 4726:19, 4727:7, 4730:13, 4730:14, 4732:8, 4733:2, 4738:1, 4740:7, 4741:22, 4744:20, 4747:20, 4750:3, 4753:14, 4755:4, 4756:20, 4757:18, 4759:12, 4760:4, 4763:20, 4766:11, 4770:23, 4772:18, 4775:10, 4779:20, 4782:3, 4784:1, 4784:7, 4785:7, 4786:21, 4792:14, 4797:7, 4802:19, 4802:20, 4803:2, 4803:5, 4803:6, 4803:9, 4804:10, 4804:13, 4804:17, 4804:18, 4804:24, 4805:4, 4805:20, 4805:21, 4805:22, 4805:25,

4806:18, 4806:24, 4807:2, 4807:9, 4807:10, 4807:25, 4810:5, 4810:6, 4810:18, 4812:12, 4813:18, 4816:3, 4816:12, 4816:17, 4816:24, 4817:19, 4819:2, 4819:8, 4819:19, 4819:23, 4821:7, 4823:3, 4823:11, 4823:14, 4823:17, 4824:8, 4827:18, 4832:16, 4833:8, 4835:7, 4835:10, 4835:14, 4835:20, 4835:25, 4836:19, 4836:21, 4837:9, 4838:22, 4839:12, 4839:13, 4840:1, 4840:12, 4841:18, 4841:22, 4844:17, 4844:19, 4844:20, 4846:3, 4846:15, 4846:18, 4847:6, 4847:25, 4848:19, 4849:8, 4849:16, 4852:2, 4853:5, 4854:19, 4857:25, 4858:1, 4858:6, 4858:19, 4859:3, 4859:6, 4859:22, 4860:5, 4860:8, 4860:20, 4861:19, 4861:22, 4861:24, 4862:9, 4862:13, 4862:22, 4925:13, 4925:22, 4929:12, 4931:2
**Su's** [22] - 4802:24, 4808:17, 4813:10, 4813:20, 4832:17, 4835:10, 4836:3, 4838:5, 4840:7, 4842:25, 4845:13, 4846:13, 4846:24, 4853:17, 4854:8, 4860:7, 4860:16, 4860:25, 4863:17, 4928:15, 4928:17, 4930:18
**sub** [1] - 4737:2
**subject** [21] - 4728:2, 4731:1, 4736:22, 4751:2, 4789:25, 4799:4, 4816:9, 4817:6, 4835:16, 4852:3, 4873:17, 4876:19, 4876:25, 4891:3, 4891:8, 4894:1, 4894:5,

4894:16, 4897:25, 4926:17, 4927:1
**subjects** [1] - 4730:25
**submission** [4] - 4659:17, 4660:23, 4661:1, 4925:12
**submissions** [4] - 4682:10, 4682:22, 4854:21, 4929:13
**submit** [5] - 4660:15, 4661:11, 4854:21, 4856:20, 4929:5
**submitted** [3] - 4660:24, 4673:25, 4788:4
**submitting** [1] - 4659:18
**subpoena** [2] - 4659:19, 4660:1
**subpoenaed** [1] - 4660:10
**subpoenas** [5] - 4659:16, 4660:8, 4660:12, 4660:17, 4660:25
**subscription** [12] - 4714:5, 4714:7, 4714:12, 4714:21, 4714:24, 4715:11, 4718:23, 4719:2, 4722:11, 4722:12, 4724:14, 4743:1
**subsection** [1] - 4824:21
**Subsection** [1] - 4826:10
**subsequent** [12] - 4689:22, 4691:25, 4747:4, 4747:8, 4749:6, 4775:3, 4777:20, 4778:6, 4781:20, 4789:15, 4790:24, 4899:19
**subsequently** [2] - 4719:19, 4835:20
**substance** [3] - 4685:3, 4730:14, 4925:5
**subway** [1] - 4857:19
**suddenly** [1] - 4845:19
**sue** [3] - 4668:1, 4668:6, 4668:11
**sued** [4] - 4806:13, 4806:16, 4806:21
**suggest** [4] - 4667:9, 4670:16, 4674:15, 4923:3
**suggesting** [2] -

4839:20, 4840:11
**suggestion** [3] - 4660:15, 4816:4, 4846:17
**suggests** [1] - 4810:17
**suit** [5] - 4800:16, 4804:18, 4804:19, 4805:19, 4806:24
**Sullivan** [2] - 4782:23, 4787:6
**sum** [1] - 4730:14
**summary** [3] - 4681:10, 4882:4, 4883:18
**summation** [1] - 4853:24
**summer** [1] - 4711:24
**sums** [1] - 4725:19
**Sunil** [1] - 4673:24
**super** [1] - 4798:4
**supervisor** [1] - 4902:19
**supplemental** [1] - 4685:5
**support** [1] - 4837:24
**supposed** [2] - 4774:10, 4791:10
**suppress** [4] - 4810:22, 4810:24, 4810:25, 4816:14
**suppressed** [1] - 4816:13
**suppression** [3] - 4810:22, 4810:25, 4811:6
**Supreme** [4] - 4661:14, 4835:15, 4845:5, 4845:6
**SurePoint** [1] - 4696:8
**surprise** [1] - 4682:24
**surprised** [4] - 4672:19, 4745:22, 4745:24, 4818:2
**surprising** [4] - 4671:24, 4672:2, 4672:25, 4808:24
**surrounding** [1] - 4809:1
**surrounds** [1] - 4850:25
**survived** [1] - 4806:2
**surviving** [1] - 4713:15
**Susan** [3] - 4719:14, 4750:25, 4779:21

**suspect** [1] - 4922:22
**suspend** [3] - 4821:24, 4854:8, 4854:19
**suspending** [1] - 4845:7
**sustain** [1] - 4667:11
**sustainable** [1] - 4668:19
**Sustained** [2] - 4914:23, 4915:3
**sustained** [5] - 4662:23, 4663:3, 4663:18, 4665:9, 4665:20
**sustaining** [1] - 4669:18
**swear** [2] - 4686:1, 4686:6
**switch** [1] - 4886:6
**sworn** [3] - 4686:8, 4864:1, 4864:9
**Syracuse** [2] - 4687:19, 4687:21
**System** [5] - 4803:3, 4803:8, 4803:9, 4803:19, 4807:12
**system** [53] - 4712:5, 4712:6, 4712:8, 4712:18, 4712:22, 4713:1, 4795:14, 4795:23, 4796:1, 4801:2, 4801:9, 4807:6, 4813:11, 4817:1, 4819:24, 4820:17, 4824:9, 4829:11, 4831:16, 4832:22, 4836:4, 4836:11, 4839:21, 4841:18, 4841:20, 4846:7, 4846:16, 4848:17, 4857:19, 4864:17, 4864:18, 4864:19, 4864:25, 4865:1, 4865:9, 4865:11, 4865:15, 4865:20, 4865:21, 4865:23, 4866:7, 4866:8, 4866:9, 4868:16, 4872:18, 4873:2, 4876:9, 4877:13, 4877:16, 4886:17
**systems** [1] - 4867:6

# T

**tab** [35] - 4695:4, 4695:9, 4700:11,

4714:15, 4719:10, 4725:3, 4726:17, 4731:18, 4744:10, 4747:25, 4749:14, 4750:24, 4754:15, 4755:10, 4757:5, 4759:1, 4761:15, 4763:2, 4770:11, 4779:3, 4781:9, 4786:3, 4786:20, 4790:3, 4796:20, 4801:5, 4867:11, 4868:6, 4871:12, 4874:19, 4878:14, 4886:22, 4904:14, 4905:16
**table** [49] - 4720:24, 4721:1, 4721:2, 4721:14, 4721:21, 4721:23, 4722:7, 4722:15, 4722:25, 4723:5, 4723:8, 4731:20, 4731:22, 4731:25, 4732:9, 4732:22, 4734:10, 4736:5, 4736:23, 4736:25, 4737:21, 4738:16, 4739:9, 4743:1, 4743:8, 4743:12, 4750:15, 4751:3, 4751:8, 4751:14, 4753:6, 4753:9, 4767:23, 4768:8, 4770:15, 4771:1, 4772:2, 4772:8, 4774:2, 4774:13, 4775:8, 4775:10, 4780:6, 4780:10, 4783:18, 4783:19, 4784:9, 4785:25, 4857:16
**tables** [10] - 4723:1, 4733:23, 4746:7, 4749:8, 4749:9, 4750:17, 4753:14, 4772:25, 4775:4, 4784:5
**tabs** [2] - 4873:24, 4874:4
**tap** [1] - 4822:2
**tape** [1] - 4758:17
**tardy** [1] - 4837:22
**Target** [1] - 4699:17
**target** [1] - 4928:25
**targeted** [3] - 4664:11, 4666:22, 4666:23
**task** [1] - 4881:9
**tax** [2] - 4697:21, 4708:7

**taxes** [3] - 4697:22, 4697:24, 4697:25
**team** [4] - 4662:25, 4682:9, 4850:24, 4928:24
**technique** [1] - 4671:9
**techniques** [1] - 4671:7
**technology** [2] - 4701:24, 4703:19
**Technology** [3] - 4690:20, 4690:23, 4694:1
**telephone** [3] - 4659:19, 4660:8, 4671:23
**Telik** [1] - 4870:3
**temporarily** [2] - 4821:24, 4863:17
**temporary** [1] - 4862:13
**ten** [11] - 4682:10, 4682:24, 4741:2, 4741:11, 4822:11, 4822:18, 4823:11, 4844:6, 4900:24, 4907:10, 4907:11
**tend** [1] - 4861:25
**tends** [1] - 4671:2
**Tenley's** [1] - 4912:18
**term** [4] - 4663:14, 4695:24, 4698:7, 4892:1
**terminated** [6] - 4810:18, 4811:25, 4813:13, 4816:5, 4816:6, 4816:22
**terminating** [2] - 4810:19, 4811:23
**termination** [1] - 4816:23
**terminology** [1] - 4713:13
**terms** [3] - 4728:23, 4875:13, 4922:5
**testified** [33] - 4664:23, 4669:9, 4670:23, 4673:22, 4675:24, 4678:8, 4678:20, 4680:24, 4683:5, 4686:9, 4803:9, 4819:10, 4819:11, 4827:25, 4829:7, 4829:9, 4829:14, 4833:5, 4835:7, 4843:11, 4853:15, 4858:4, 4858:8, 4858:21,

**taxes** 4861:5, 4862:25, 4864:9, 4913:21, 4914:8, 4915:4, 4920:21, 4924:20
**testify** [19] - 4667:14, 4675:17, 4676:1, 4676:6, 4676:7, 4676:11, 4678:6, 4678:7, 4678:14, 4679:19, 4684:8, 4684:24, 4685:21, 4822:7, 4833:13, 4836:24, 4847:7, 4858:9, 4923:7
**testifying** [10] - 4675:18, 4678:9, 4815:17, 4815:24, 4827:10, 4838:16, 4839:6, 4848:3, 4852:2, 4858:7
**testimony** [70] - 4669:2, 4669:13, 4670:10, 4674:3, 4675:23, 4676:3, 4676:14, 4676:15, 4676:24, 4678:5, 4678:12, 4678:16, 4678:19, 4678:23, 4680:6, 4680:23, 4680:25, 4682:5, 4683:5, 4685:3, 4733:7, 4788:25, 4828:17, 4829:24, 4833:18, 4833:19, 4837:22, 4839:4, 4841:1, 4842:25, 4843:22, 4844:16, 4845:8, 4845:14, 4846:13, 4846:15, 4846:24, 4848:19, 4849:16, 4849:18, 4849:22, 4850:16, 4850:25, 4851:6, 4851:7, 4851:9, 4851:11, 4851:14, 4851:20, 4852:6, 4853:13, 4853:20, 4854:8, 4855:8, 4858:7, 4858:8, 4858:19, 4860:25, 4863:17, 4904:2, 4920:15, 4921:8, 4922:2, 4922:5, 4922:7, 4923:3, 4927:1, 4927:12, 4930:18
**Texas** [4] - 4687:11, 4690:3, 4690:6, 4690:7
**text** [3] - 4736:24,

4760:16, 4881:2
**texted** [1] - 4798:10
**thanking** [1] - 4863:13
**Thanksgiving** [1] - 4659:7
**THE** [357] - 4657:10, 4658:2, 4658:14, 4658:20, 4658:22, 4659:1, 4659:13, 4659:15, 4660:20, 4669:8, 4669:23, 4670:2, 4670:8, 4671:17, 4671:21, 4672:2, 4672:16, 4673:5, 4673:8, 4674:8, 4674:20, 4674:22, 4674:24, 4675:2, 4675:8, 4675:12, 4675:14, 4681:22, 4685:22, 4685:25, 4686:4, 4686:10, 4686:11, 4686:13, 4695:6, 4695:8, 4695:18, 4700:19, 4702:17, 4706:17, 4706:19, 4706:21, 4706:23, 4706:25, 4710:9, 4710:10, 4710:18, 4710:20, 4714:17, 4715:5, 4716:18, 4720:6, 4721:18, 4724:23, 4725:16, 4727:5, 4730:12, 4732:6, 4740:1, 4740:7, 4741:1, 4741:5, 4741:7, 4741:11, 4741:14, 4741:15, 4741:18, 4744:17, 4747:9, 4747:12, 4747:15, 4747:17, 4748:7, 4748:24, 4749:3, 4750:1, 4753:24, 4755:2, 4755:13, 4756:1, 4756:19, 4756:24, 4756:25, 4757:16, 4760:1, 4761:3, 4761:5, 4761:12, 4761:23, 4763:15, 4770:19, 4775:6, 4776:21, 4776:25, 4777:19, 4777:22, 4778:1, 4778:3, 4779:16, 4781:24, 4786:14, 4786:17, 4790:18, 4791:12, 4791:14, 4792:10, 4793:24, 4796:8, 4796:11,

4796:12, 4796:13, 4797:5, 4800:23, 4802:4, 4802:6, 4802:20, 4803:21, 4803:24, 4804:2, 4804:23, 4805:2, 4806:5, 4806:9, 4806:12, 4806:15, 4806:18, 4806:22, 4807:15, 4807:19, 4808:2, 4808:8, 4808:14, 4809:4, 4810:8, 4811:10, 4811:21, 4812:2, 4812:8, 4813:9, 4815:1, 4815:13, 4815:20, 4817:3, 4817:11, 4817:16, 4817:18, 4818:9, 4818:15, 4818:22, 4821:3, 4821:6, 4821:10, 4821:14, 4821:23, 4822:5, 4822:10, 4822:13, 4822:16, 4822:20, 4822:24, 4823:1, 4823:23, 4824:3, 4824:6, 4824:15, 4825:24, 4826:11, 4826:17, 4826:22, 4827:6, 4827:13, 4827:19, 4828:6, 4828:10, 4828:16, 4828:24, 4829:7, 4829:22, 4830:1, 4830:4, 4830:7, 4830:15, 4830:18, 4831:2, 4831:5, 4831:10, 4831:14, 4831:17, 4831:21, 4832:2, 4832:5, 4832:7, 4832:10, 4832:12, 4832:15, 4832:25, 4833:4, 4834:15, 4835:2, 4836:18, 4837:4, 4837:15, 4837:20, 4838:1, 4838:4, 4838:8, 4838:20, 4838:22, 4839:1, 4839:8, 4840:24, 4841:3, 4842:6, 4842:10, 4842:13, 4843:18, 4843:20, 4844:9, 4844:12, 4844:14, 4844:23, 4845:2, 4846:19, 4847:8, 4848:9, 4848:22, 4849:5, 4850:14, 4851:4, 4853:10, 4853:25,

4855:13, 4855:18, 4855:24, 4856:5, 4856:8, 4856:19, 4856:23, 4857:2, 4857:9, 4857:16, 4857:21, 4858:10, 4858:23, 4859:16, 4859:22, 4860:12, 4861:8, 4861:19, 4861:23, 4862:4, 4862:7, 4862:11, 4862:21, 4862:24, 4863:4, 4863:8, 4863:23, 4863:25, 4864:2, 4864:3, 4864:5, 4867:21, 4867:24, 4871:19, 4871:23, 4872:3, 4872:5, 4872:7, 4872:8, 4872:10, 4873:5, 4874:14, 4876:16, 4876:23, 4877:2, 4877:24, 4878:9, 4881:25, 4885:15, 4887:2, 4887:4, 4887:18, 4889:10, 4889:17, 4890:2, 4890:7, 4891:7, 4891:10, 4891:23, 4892:12, 4892:20, 4893:5, 4893:8, 4893:11, 4893:19, 4894:4, 4894:25, 4895:3, 4895:4, 4895:6, 4895:7, 4895:9, 4900:14, 4900:16, 4903:21, 4903:23, 4904:24, 4905:1, 4905:25, 4906:25, 4909:15, 4912:6, 4912:17, 4914:23, 4915:3, 4917:10, 4919:2, 4919:19, 4919:21, 4919:25, 4920:3, 4921:14, 4922:4, 4922:8, 4922:18, 4923:15, 4923:25, 4924:8, 4924:11, 4925:9, 4925:20, 4926:1, 4926:4, 4926:23, 4927:2, 4927:16, 4927:19, 4927:25, 4928:4, 4928:6, 4928:9, 4928:12, 4928:16, 4928:22, 4929:2, 4929:7, 4929:13, 4929:17, 4930:6, 4930:10, 4930:14, 4930:16,

4930:24, 4931:5, 4931:11, 4931:13
**theft** [1] - 4825:23
**they've** [3] - 4676:9, 4810:6, 4811:3
**thinking** [3] - 4815:15, 4848:14, 4926:13
**Third** [2] - 4735:22, 4735:23
**third** [27] - 4702:13, 4703:21, 4712:3, 4717:1, 4717:5, 4720:9, 4723:7, 4752:3, 4758:4, 4764:18, 4768:14, 4806:5, 4806:8, 4806:12, 4806:14, 4806:20, 4806:21, 4806:23, 4820:22, 4829:12, 4836:1, 4841:11, 4865:20, 4868:5, 4875:14, 4880:9, 4882:15
**third-parties** [1] - 4717:1
**third-party** [11] - 4702:13, 4703:21, 4712:3, 4717:5, 4806:5, 4806:8, 4806:12, 4806:14, 4829:12, 4836:1, 4865:20
**thirds** [1] - 4896:19
**thirty** [1] - 4930:14
**Thomas** [7] - 4728:15, 4743:11, 4772:10, 4774:3, 4774:5, 4782:20, 4869:16
**thousand** [9] - 4692:1, 4743:17, 4745:3, 4746:6, 4746:25, 4747:5, 4748:20, 4749:7, 4783:15
**thousands** [1] - 4808:6
**threat** [5] - 4668:1, 4668:6, 4668:11, 4668:14, 4803:16
**threatening** [3] - 4803:12, 4804:7, 4804:11
**three** [16] - 4665:13, 4676:9, 4682:16, 4689:14, 4692:2, 4709:25, 4724:9, 4737:22, 4747:13, 4748:13, 4771:20,

4772:14, 4774:6, 4803:8, 4847:21, 4857:20
**throughout** [1] - 4710:8
**Thursday** [3] - 4722:20, 4755:7, 4930:4
**thwart** [2] - 4661:12, 4662:1
**thwarted** [4] - 4665:25, 4666:25, 4669:25
**tie** [2] - 4743:2, 4793:7
**Tilles** [5] - 4707:16, 4707:18, 4742:5, 4783:1, 4794:20
**Tim** [10] - 4704:10, 4704:18, 4704:19, 4704:22, 4787:5, 4800:5, 4800:8, 4800:9, 4800:12, 4870:17
**time-keeping** [2] - 4866:7, 4866:8
**timekeeper** [16] - 4882:12, 4886:7, 4886:8, 4886:11, 4886:18, 4886:19, 4887:7, 4887:11, 4892:24, 4894:11, 4894:16, 4895:4, 4895:6, 4895:15, 4897:6, 4906:17
**timekeeper's** [2] - 4909:25, 4910:4
**timekeepers** [6] - 4894:21, 4894:24, 4894:25, 4895:3, 4895:10, 4896:22
**timely** [3] - 4682:18, 4808:3, 4854:7
**timing** [1] - 4925:12
**Timothy** [1] - 4782:21
**Title** [7] - 4824:22, 4825:15, 4826:4, 4826:8, 4826:9, 4828:10
**title** [2] - 4728:10, 4828:8
**today** [23] - 4677:9, 4685:7, 4820:15, 4833:8, 4834:6, 4835:8, 4836:19, 4837:21, 4840:1, 4841:1, 4841:3, 4841:24, 4843:11, 4844:16, 4844:17,

4847:14, 4850:16,
4851:10, 4858:4,
4862:15, 4920:24,
4926:15, 4927:9
**together** [4] -
4664:7, 4664:13,
4710:5, 4718:25
**toll** [2] - 4693:25
**Tom** [12] - 4706:15,
4707:6, 4726:10,
4726:11, 4727:14,
4728:5, 4765:14,
4766:15, 4767:1,
4770:5, 4787:4,
4794:13
**tomorrow** [34] -
4676:20, 4676:24,
4680:13, 4683:13,
4683:16, 4685:21,
4840:2, 4843:16,
4846:19, 4846:20,
4846:23, 4849:3,
4850:4, 4853:25,
4855:11, 4855:22,
4856:2, 4856:25,
4857:22, 4858:9,
4858:19, 4860:22,
4919:11, 4919:13,
4920:1, 4925:9,
4925:11, 4925:22,
4928:15, 4928:23,
4929:12, 4930:5,
4931:9
**tomorrow's** [1] -
4658:3
**tonight** [13] -
4833:10, 4840:10,
4843:18, 4855:6,
4856:9, 4858:3,
4858:6, 4859:4,
4859:23, 4860:21,
4861:10, 4861:20,
4862:9
**took** [9] - 4690:3,
4692:2, 4692:4,
4714:25, 4793:12,
4795:17, 4795:20,
4798:7, 4891:6
**tool** [1] - 4859:1
**top** [34] - 4688:19,
4695:21, 4695:25,
4700:22, 4700:24,
4701:2, 4702:13,
4715:10, 4720:10,
4722:19, 4722:20,
4723:4, 4723:20,
4723:21, 4727:7,
4732:15, 4744:20,
4748:1, 4757:18,
4757:22, 4760:5,

4762:3, 4762:6,
4769:15, 4771:15,
4781:4, 4782:6,
4783:17, 4803:1,
4803:3, 4811:15,
4811:16, 4901:12,
4905:10
**topic** [3] - 4834:12,
4875:25, 4922:12
**topics** [3] - 4661:22,
4834:11, 4886:6
**Tortoise** [1] -
4868:18
**total** [3] - 4879:16,
4880:1, 4881:19
**totally** [1] - 4838:21
**totals** [1] - 4891:4
**Touch** [4] - 4690:20,
4690:23, 4691:11,
4694:1
**touch** [2] - 4849:2,
4923:17
**touches** [1] -
4679:25
**toward** [5] - 4667:7,
4738:10, 4744:20,
4904:2, 4923:5
**towards** [7] -
4732:25, 4790:13,
4901:12, 4916:19,
4916:23, 4918:4,
4930:4
**town** [1] - 4930:3
**track** [4] - 4713:22,
4732:2, 4845:24,
4865:16
**tracking** [1] -
4798:21
**tradable** [2] - 4773:4,
4773:15
**trade** [5] - 4690:19,
4692:13, 4692:14,
4694:1, 4778:21
**trader** [1] - 4689:3
**trading** [14] - 4689:9,
4689:10, 4690:9,
4691:23, 4693:16,
4693:19, 4712:2,
4773:17, 4774:9,
4775:22, 4776:7,
4777:11, 4778:16,
4779:1
**traditional** [1] -
4691:4
**traffics** [1] - 4825:6
**training** [1] - 4684:14
**transactional** [2] -
4915:10, 4915:19
**transactions** [3] -
4674:1, 4712:1,

4907:17
**TRANSCRIPT** [1] -
4657:9
**transcript** [4] -
4657:25, 4664:24,
4839:18, 4863:2
**transcription** [1] -
4657:25
**transfer** [53] -
4724:20, 4726:7,
4726:23, 4727:13,
4728:3, 4729:12,
4738:8, 4743:15,
4751:7, 4751:11,
4751:13, 4751:20,
4751:23, 4751:25,
4752:18, 4752:23,
4754:20, 4754:23,
4756:8, 4758:1,
4758:20, 4759:22,
4761:17, 4762:8,
4762:10, 4762:19,
4763:6, 4763:8,
4763:22, 4763:24,
4764:2, 4764:5,
4764:15, 4764:20,
4764:23, 4764:25,
4765:5, 4765:14,
4766:1, 4766:12,
4767:2, 4767:16,
4767:19, 4767:20,
4768:3, 4769:6,
4769:8, 4769:25,
4770:5, 4772:5,
4772:15, 4915:6
**Transfer** [1] -
4728:12
**transferee** [1] -
4752:9
**transferred** [1] -
4728:5
**transferring** [1] -
4767:7
**transfers** [11] -
4724:24, 4725:12,
4725:19, 4726:15,
4729:13, 4734:7,
4765:22, 4770:24,
4774:6, 4798:22
**transition** [2] -
4693:22, 4750:14
**travel** [1] - 4677:1
**traveled** [1] -
4676:10
**traveling** [1] -
4676:10
**TRIAL** [1] - 4657:9
**trial** [44] - 4659:16,
4661:2, 4671:7,
4673:11, 4673:13,

4675:6, 4675:18,
4675:25, 4676:14,
4676:18, 4676:25,
4677:9, 4678:8,
4678:17, 4678:25,
4681:24, 4682:20,
4682:23, 4683:5,
4683:7, 4803:9,
4805:1, 4808:8,
4809:2, 4811:2,
4816:20, 4818:4,
4819:7, 4819:10,
4820:22, 4821:1,
4821:2, 4827:7,
4835:18, 4841:23,
4845:25, 4847:16,
4849:6, 4849:10,
4863:16, 4888:11,
4921:9, 4927:8
**Trial** [2] - 4888:19,
4888:21
**trials** [2] - 4682:16,
4818:17
**tried** [2] - 4671:9,
4680:24
**trigger** [2] - 4798:15,
4859:3
**triggering** [1] -
4798:25
**trouble** [1] - 4800:12
**true** [10] - 4665:5,
4671:1, 4671:9,
4685:2, 4834:20,
4837:5, 4923:12,
4924:25, 4925:1
**trusting** [1] - 4800:5
**truth** [1] - 4730:11
**truthfulness** [2] -
4853:8, 4853:11
**try** [27] - 4663:8,
4664:17, 4664:19,
4666:7, 4685:18,
4702:7, 4716:18,
4721:18, 4753:24,
4775:6, 4776:21,
4792:10, 4814:3,
4816:19, 4839:10,
4845:16, 4845:17,
4846:9, 4847:12,
4851:15, 4861:2,
4892:25, 4896:25,
4909:15, 4914:23,
4928:21
**trying** [15] - 4658:22,
4659:10, 4662:25,
4669:14, 4676:24,
4677:6, 4682:10,
4786:12, 4821:14,
4822:6, 4834:24,
4844:5, 4845:23,

4928:25
**TSOU** [1] - 4657:21
**Tuesday** [3] -
4675:19, 4679:10,
4931:15
**tug** [1] - 4688:19
**turn** [22] - 4691:17,
4692:25, 4695:3,
4703:3, 4703:17,
4714:18, 4723:7,
4732:12, 4734:11,
4751:22, 4753:5,
4753:11, 4757:5,
4762:13, 4771:1,
4797:18, 4833:8,
4869:15, 4879:9,
4881:23, 4897:25,
4928:10
**turned** [1] - 4688:22
**twelve** [1] - 4750:24,
4755:10
**twice** [2] - 4666:16,
4878:1
**two** [57] - 4658:19,
4660:13, 4664:3,
4664:9, 4665:13,
4677:7, 4680:12,
4684:16, 4688:2,
4690:2, 4690:11,
4690:21, 4695:6,
4695:21, 4701:20,
4702:10, 4706:5,
4712:8, 4722:19,
4722:20, 4723:20,
4723:21, 4723:25,
4729:12, 4737:21,
4747:12, 4748:2,
4748:12, 4751:4,
4751:20, 4756:21,
4757:18, 4759:9,
4765:8, 4765:25,
4767:9, 4771:20,
4773:3, 4773:9,
4778:3, 4778:6,
4783:5, 4783:7,
4789:2, 4789:4,
4792:24, 4793:4,
4795:7, 4800:20,
4819:16, 4829:14,
4844:1, 4857:18,
4874:7, 4888:4,
4896:19, 4930:3
**two-and-a-half** [3] -
4773:3, 4773:9,
4783:7
**two-and-a-half-
million** [1] - 4783:5
**two-thirds** [1] -
4896:19
**type** [6] - 4683:20,

4691:7, 4699:16,
4721:3, 4799:3,
4871:2
  **typed** [1] - 4766:4
  **types** [2] - 4895:23,
4917:13
  **typewritten** [1] -
4762:18
  **Typhoon** [4] -
4690:20, 4690:23,
4691:10, 4694:1
  **typically** [2] -
4908:20, 4915:18

## U

  **U.S** [5] - 4729:18,
4828:10, 4828:11,
4828:12
  **U.S.C** [3] - 4812:9,
4819:22, 4824:16
  **ultimate** [2] -
4668:24, 4849:17
  **ultimately** [5] -
4688:24, 4742:10,
4742:14, 4777:10,
4851:20
  **unavoidable** [1] -
4847:16
  **unaware** [2] -
4818:7, 4926:21
  **uncertain** [2] -
4812:6, 4813:13
  **uncomfortable** [1] -
4793:10
  **unconfronted** [1] -
4851:7
  **under** [22] - 4658:19,
4671:12, 4771:4,
4784:1, 4799:4,
4807:2, 4812:3,
4812:16, 4813:2,
4817:8, 4824:23,
4825:10, 4835:10,
4836:10, 4838:11,
4862:5, 4868:9,
4871:1, 4888:9,
4903:14, 4905:16,
4906:12
  **underlying** [1] -
4680:4
  **undersigned** [1] -
4728:22
  **Understood** [1] -
4926:3
  **understood** [11] -
4665:17, 4698:4,
4826:3, 4827:16,
4833:3, 4838:18,
4842:12, 4843:19,

4862:3, 4925:16,
4928:11
  **unexpectedly** [1] -
4863:15
  **unfair** [1] - 4851:6
  **unfortunately** [2] -
4838:8, 4845:23
  **unintelligible** [1] -
4663:4
  **unit** [4] - 4700:25,
4715:11, 4733:1,
4733:6
  **UNITED** [3] - 4657:1,
4657:3, 4657:10
  **United** [9] - 4657:5,
4657:13, 4657:15,
4729:20, 4825:15,
4826:4, 4826:8,
4826:9
  **units** [19] - 4699:18,
4699:21, 4700:1,
4700:2, 4700:9,
4715:15, 4715:18,
4723:16, 4723:17,
4724:7, 4724:11,
4728:5, 4733:4,
4733:14, 4733:15,
4752:1, 4764:16,
4765:15, 4769:17
  **University** [1] -
4687:19
  **unknown** [1] -
4659:20
  **unlawfully** [1] -
4817:22
  **unless** [4] - 4674:10,
4817:24, 4873:22,
4875:22
  **unlikely** [1] -
4922:22
  **unnecessary** [1] -
4798:20
  **unpaid** [1] - 4879:21
  **unprofessional** [1] -
4711:3
  **unrelated** [2] -
4920:9, 4920:14
  **unrestricted** [1] -
4773:5
  **untimely** [2] -
4676:8, 4676:22
  **untrue** [1] - 4670:21
  **untypical** [1] -
4818:15
  **unusual** [3] -
4669:10, 4674:1,
4860:17
  **unvested** [2] -
4775:12, 4784:8
  **up** [78] - 4670:15,

4670:17, 4670:18,
4674:5, 4681:18,
4691:2, 4691:5,
4692:16, 4693:6,
4693:12, 4693:21,
4695:3, 4695:9,
4702:7, 4707:21,
4725:19, 4734:22,
4734:23, 4743:2,
4743:6, 4746:21,
4753:12, 4755:15,
4756:6, 4759:9,
4760:18, 4761:9,
4766:8, 4775:8,
4780:4, 4783:3,
4783:8, 4785:16,
4786:20, 4791:20,
4793:7, 4793:10,
4793:11, 4805:17,
4807:12, 4822:7,
4826:19, 4826:23,
4829:11, 4838:24,
4841:24, 4842:7,
4847:21, 4848:19,
4848:21, 4849:14,
4849:25, 4855:12,
4855:13, 4855:14,
4856:14, 4856:23,
4859:24, 4863:24,
4869:17, 4870:7,
4870:20, 4878:15,
4878:17, 4884:8,
4897:22, 4904:19,
4912:11, 4918:15,
4919:12, 4920:5,
4923:1, 4923:3,
4923:9, 4923:21,
4925:24, 4927:8,
4931:8
  **update** [1] - 4920:24
  **updated** [4] -
4736:25, 4751:3,
4751:13, 4822:3
  **updating** [1] - 4736:5
  **upheld** [1] - 4835:23
  **uphold** [1] - 4682:20
  **upped** [1] - 4737:7
  **upper** [4] - 4771:4,
4906:2
  **upstairs** [1] -
4813:15
  **urge** [1] - 4683:16
  **urgency** [1] - 4743:2
  **utterly** [1] - 4676:17

## V

  **vague** [1] - 4837:6
  **vagueness** [1] -
4668:17

  **Vaino** [8] - 4704:13,
4704:24, 4774:23,
4782:23, 4787:6,
4793:18, 4794:2
  **valid** [4] - 4674:17,
4812:13, 4914:20,
4914:25
  **value** [13] - 4745:9,
4745:10, 4765:18,
4765:21, 4812:23,
4812:24, 4813:5,
4824:20, 4825:1,
4895:14, 4896:4,
4896:9, 4896:11
  **Value** [2] - 4895:12,
4896:2
  **variations** [1] -
4910:25
  **varied** [1] - 4708:16
  **variety** [3] - 4661:21,
4892:10, 4914:18
  **various** [31] -
4678:14, 4679:1,
4679:3, 4679:6,
4684:1, 4694:5,
4695:14, 4696:20,
4697:12, 4698:1,
4701:17, 4704:6,
4705:8, 4705:17,
4706:5, 4706:11,
4711:20, 4712:23,
4713:7, 4726:7,
4730:5, 4731:8,
4735:8, 4763:6,
4810:19, 4834:19,
4878:20, 4897:9,
4897:22, 4909:16,
4921:20
  **vendor** [2] - 4712:4,
4829:12
  **vendors** [3] -
4702:13, 4703:21,
4883:3
  **veracity** [2] - 4666:1,
4853:20
  **verify** [2] - 4872:3,
4924:24
  **version** [3] -
4762:10, 4780:6,
4819:20
  **versions** [1] -
4876:20
  **versus** [2] - 4719:20,
4812:25
  **vested** [4] - 4700:2,
4733:15, 4775:12,
4784:8
  **vesting** [2] -
4699:24, 4699:25
  **vetted** [2] - 4665:23,

4681:25
  **view** [7] - 4674:20,
4816:25, 4819:3,
4826:3, 4827:1,
4836:3, 4855:9
  **viewed** [1] - 4668:24
  **viewing** [1] - 4914:15
  **violated** [14] -
4815:14, 4817:7,
4826:4, 4826:7,
4827:8, 4828:1,
4828:4, 4828:20,
4834:21, 4834:23,
4842:1, 4845:9,
4846:6
  **violates** [2] -
4803:19, 4803:20
  **violating** [3] -
4826:1, 4838:10,
4838:13
  **violation** [4] -
4825:21, 4834:18,
4841:11, 4841:13
  **violations** [2] -
4815:25, 4827:11
  **Virginia** [2] - 4813:1,
4930:4
  **voir** [1] - 4920:11
  **vouching** [2] -
4923:23

## W

  **wait** [8] - 4778:23,
4822:16, 4822:19,
4822:21, 4823:4,
4831:22, 4863:9,
4931:8
  **waiting** [3] - 4815:6,
4840:21, 4855:23
  **waived** [4] - 4802:24,
4809:7, 4810:12,
4813:24
  **waiver** [1] - 4809:9
  **waiving** [1] - 4855:10
  **walk** [1] - 4680:25
  **walked** [4] - 4735:13,
4793:12, 4804:8,
4829:9
  **walks** [1] - 4827:14
  **wall** [1] - 4704:9
  **Wang** [3] - 4687:13,
4805:20, 4805:23
  **Wang's** [1] - 4835:25
  **wants** [6] - 4810:16,
4828:25, 4834:13,
4847:10, 4848:5,
4854:24
  **warrant** [1] - 4817:25
  **ways** [1] - 4810:19

**Wealth** [1] - 4776:11
**web** [1] - 4707:10
**Wednesday** [2] - 4857:10, 4930:4
**wee** [1] - 4854:18
**week** [22] - 4659:4, 4659:6, 4659:8, 4659:9, 4675:17, 4675:18, 4676:11, 4677:2, 4680:17, 4681:17, 4682:14, 4792:18, 4792:24, 4793:4, 4794:1, 4794:7, 4794:13, 4794:19, 4794:25, 4795:7, 4800:20
**weekends** [1] - 4844:6
**weeks** [8] - 4677:7, 4680:13, 4687:5, 4692:2, 4778:3, 4778:7, 4792:24, 4798:5
**Weiss** [5] - 4689:3, 4689:6, 4689:7, 4689:13, 4689:23
**well-past** [1] - 4931:7
**Wendy** [1] - 4923:6
**Westlaw** [1] - 4812:25
**whatsoever** [1] - 4847:13
**whiteout** [2] - 4758:17, 4766:13
**whole** [8] - 4658:19, 4688:24, 4760:15, 4790:20, 4790:22, 4811:16, 4888:12, 4888:14
**wide** [2] - 4664:21, 4665:20
**wife** [4] - 4736:17, 4736:18, 4736:19, 4736:20
**willing** [6] - 4737:10, 4836:21, 4836:22, 4836:24, 4841:25, 4852:7
**WINSTON** [1] - 4657:20
**wire** [3] - 4679:21, 4825:19, 4923:8
**wish** [2] - 4837:20, 4847:5
**wishes** [1] - 4818:16
**wishing** [1] - 4663:7
**withdraw** [1] - 4922:10
**withdrawn** [2] -

4833:5, 4926:16
**WITNESS** [19] - 4686:11, 4695:6, 4695:8, 4706:19, 4706:23, 4710:10, 4714:17, 4747:12, 4747:17, 4749:3, 4756:24, 4761:5, 4777:22, 4778:3, 4791:14, 4864:3, 4887:4, 4895:3, 4895:6
**witness** [118] - 4658:8, 4663:6, 4663:7, 4663:12, 4663:13, 4663:14, 4663:22, 4663:25, 4664:4, 4665:21, 4666:1, 4667:14, 4669:25, 4670:3, 4670:4, 4670:5, 4670:9, 4670:10, 4670:11, 4670:14, 4670:16, 4670:20, 4670:22, 4670:24, 4671:4, 4671:7, 4671:11, 4671:13, 4671:17, 4671:18, 4673:10, 4673:18, 4675:15, 4676:4, 4676:5, 4680:18, 4684:5, 4685:24, 4685:25, 4686:1, 4686:6, 4700:12, 4725:3, 4726:18, 4740:8, 4802:17, 4808:7, 4815:12, 4815:13, 4815:24, 4817:14, 4821:11, 4821:21, 4821:24, 4822:2, 4822:7, 4826:13, 4826:15, 4826:20, 4827:9, 4827:24, 4828:18, 4829:13, 4829:21, 4830:1, 4830:2, 4830:11, 4830:19, 4831:3, 4831:9, 4831:11, 4831:12, 4831:25, 4832:1, 4833:9, 4833:13, 4834:18, 4839:25, 4840:9, 4840:21, 4841:1, 4841:24, 4842:16, 4844:3, 4845:8, 4845:9, 4845:15, 4847:20, 4848:2, 4850:3, 4850:6, 4851:18, 4853:15, 4856:16, 4858:16, 4860:12,

4860:14, 4862:12, 4862:14, 4862:15, 4862:19, 4863:18, 4863:20, 4863:24, 4864:1, 4902:17, 4903:19, 4919:20, 4919:22, 4919:25, 4920:10, 4923:16, 4924:21, 4925:2, 4925:3, 4925:7, 4925:23
**witness'** [2] - 4661:18, 4853:20
**witness's** [3] - 4666:7, 4837:21, 4920:9
**witnesses** [13] - 4658:5, 4661:10, 4661:13, 4661:21, 4669:16, 4670:24, 4670:25, 4676:25, 4677:7, 4684:8, 4820:14, 4850:8, 4893:15
**WITNESSES** [1] - 4932:2
**Wolfson** [1] - 4661:16
**won** [1] - 4692:13
**wonder** [1] - 4845:18
**wondering** [1] - 4658:3
**Wong** [3] - 4735:1, 4735:3
**word** [9] - 4662:13, 4663:9, 4663:20, 4666:2, 4746:3, 4789:23, 4789:25, 4849:21
**words** [8] - 4672:23, 4678:16, 4695:21, 4700:23, 4744:21, 4765:17, 4871:3, 4930:25
**Worldwide** [1] - 4812:24
**worry** [1] - 4702:14
**worth** [1] - 4901:2
**Write** [2] - 4895:22, 4896:13
**write** [29] - 4722:24, 4728:4, 4751:9, 4760:8, 4762:6, 4779:23, 4780:16, 4783:4, 4783:6, 4783:18, 4797:11, 4797:20, 4798:12, 4828:2, 4888:6, 4888:7, 4889:2, 4890:12, 4891:4,

4891:6, 4891:12, 4895:23, 4895:25, 4896:10, 4896:14, 4896:15, 4910:17, 4910:21, 4914:9
**write-off** [6] - 4888:6, 4888:7, 4889:2, 4890:12, 4896:14, 4914:9
**Write-Offs** [2] - 4895:22, 4896:13
**write-offs** [7] - 4891:4, 4891:6, 4891:12, 4895:23, 4895:25, 4896:10, 4896:15
**writer** [1] - 4663:8
**writes** [4] - 4725:18, 4756:7, 4783:11, 4862:2
**writing** [1] - 4875:22
**written** [9] - 4663:13, 4680:19, 4715:11, 4730:17, 4758:11, 4768:18, 4769:1, 4881:2, 4889:12
**wrote** [9] - 4663:12, 4672:7, 4732:9, 4752:13, 4758:18, 4799:18, 4799:23, 4908:18, 4924:14
**WTF** [2] - 4669:9, 4669:17

# Y

**year** [26] - 4675:17, 4698:22, 4711:24, 4747:11, 4773:13, 4797:13, 4797:15, 4812:22, 4825:2, 4891:5, 4891:12, 4892:8, 4892:14, 4895:10, 4897:2, 4901:1, 4916:15, 4916:16, 4916:19, 4916:23, 4918:4, 4918:7, 4921:10, 4921:18
**year's** [1] - 4901:2
**years** [12] - 4688:2, 4689:14, 4690:2, 4690:12, 4690:18, 4690:21, 4797:16, 4864:23, 4864:24, 4907:10, 4907:11, 4908:9
**yesterday** [4] - 4660:24, 4678:2, 4681:6, 4682:5

**Yi** [2] - 4707:1, 4774:23
**YORK** [1] - 4657:1
**York** [14] - 4657:5, 4657:16, 4657:18, 4657:23, 4687:23, 4688:14, 4706:10, 4804:16, 4806:1, 4835:15, 4907:25, 4908:2, 4908:6
**young** [1] - 4857:20
**yourself** [2] - 4747:24, 4790:4
**yourselves** [1] - 4802:10

# Z

**zero** [1] - 4680:22
**zone** [1] - 4755:24
**zoom** [8] - 4772:17, 4783:24, 4785:4, 4868:7, 4870:9, 4896:18, 4896:20, 4912:9