4934

                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF NEW YORK

     - - - - - - - - - - - -     X

     UNITED STATES OF AMERICA,    :    15-CR-637(KAM)

                 Plaintiff ,      :
                                       United States Courthouse
          -against-              :    Brooklyn, New York

     EVAN GREEBEL,                :
                                       November 14, 2017
                 Defendant.       :    9:00 o'clock a.m.

     - - - - - - - - - - - -     X

                             TRANSCRIPT OF TRIAL
                   BEFORE THE HONORABLE KIYO A. MATSUMOTO
                   UNITED STATES DISTRICT JUDGE, and a jury.

     APPEARANCES:

     For the Government:        BRIDGET M. ROHDE
                                Acting United States Attorney
                                BY: ALIXANDRA E. SMITH
                                    DAVID PITLUCK
                                    DAVID K. KESSLER
                                Assistant United States Attorneys
                                271 Cadman Plaza East
                                Brooklyn, New York

     For the Defendant:         GIBSON DUNN & CRUTCHER
                                200 Park Avenue, 48th Floor
                                New York, New York

                                BY: REED M. BRODSKY, ESQ.
                                    RANDY MASTRO, ESQ.
                                    WINSTON Y. CHAN, ESQ.
                                    MYLAN LEE DENERSTEIN, ESQ.
                                    JOSHUA E. DUBIN, ESQ.
                                    GRACE TSOU, ESQ.

     Court Reporter:            Charleane M. Heading
                                225 Cadman Plaza East
                                Brooklyn, New York
                                (718) 613-2643

     Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

                    CMH      OCR      RMR      CRR      FCRR

4935

1            (In open court; outside the presence of the jury.)

2            THE COURT:  Good morning, everybody.  All counsel

3    are present and all parties.  Please have a seat.

4            I just want to find out where we stand.  I think

5    there was a hint in the government's letter of last evening

6    that they might try to speak to the defense today and work

7    something out.  I do not know whether any resolution has been

8    reached.

9            MS. SMITH:  Your Honor, unfortunately, the witness

10   was stuck a very long line downstairs.  He's speaking with his

11   lawyer right now and we may speak to him briefly and I think

12   we may have a resolution but we may need 10, 15 minutes.  I

13   apologize for that.

14           THE COURT:  All right.  Thank you.

15           I guess, Mr. Brodsky, did you want to be heard?

16           MR. BRODSKY:  Yes, Your Honor.

17           I think what the government is suggesting is they

18   may give him a non-prosecution agreement.  If that's what

19   they're planning, we would like to know as soon as possible.

20   Our understanding from them is that they didn't meet with

21   Mr. Su last night.

22           THE COURT:  They did not?

23           MS. SMITH:  No.  Unfortunately, his lawyer was not

24   available.  So, we did not meet with Mr. Su.  We haven't

25   talked to him yet.  We've discussed the possibility of an NPA

4936

1  or something along those lines with his attorney and then his

2  attorney is speaking to him.  Then if that's the case, we will

3  have a conversation with him where we'll take notes and then

4  we can let the Court know what the resolution is.  But I just,

5  unfortunately, because of the line, we didn't quite get that

6  in before 9 o'clock, but we should be able to do it in the

7  next 10 to 15 minutes.

8          THE COURT:  All right.  So I guess you will call me

9  when you are ready?

10          MS. SMITH:  I think that makes sense, Your Honor.

11          THE COURT:  I mean, if he does have the non-pros.,

12  then the defense could make a full cross-examination without a

13  concern about the Fifth Amendment.

14          MS. SMITH:  That's right.  Your Honor, I do think

15  that I have to see what the outcome is.  I still think the

16  government has some concerns about the manner in which the

17  cross-examination would take place and some of the

18  acquisitions that have been thrown around in terms of

19  violations of federal law and whether that kind of, that

20  question is permissible under 608 and 609.  So, I think that

21  piece of it may be left to discuss, but I think that would be

22  the only piece that would be left.

23          THE COURT:  Should we discuss that now?

24          MR. BRODSKY:  I think so.

25          THE COURT:  I don't see why we can't.

4937

1        MR. BRODSKY:  I think it's the government's motion,

2    Your Honor.  If they have arguments --

3        MS. SMITH:  So, obviously, you know, the

4    government's position as in our letter last night, you know,

5    the defense has been throwing around a lot of accusations that

6    this conduct constituted a federal crime.

7        You know, we've taken a look at it and I think it's

8    very unclear whether that is, in fact, the case, you know,

9    given the Valley case and the fact that the defendant --

10   sorry -- the witness did have authorized access, that he was

11   not officially terminated, that he continued to use that

12   access.  Whether or not that exceeded the scope of his

13   authorized access is a question of fact.  So is the question

14   of whether or not any computers that were accessed were, in

15   fact, protected computers.  From our reading of 1030, the only

16   arguable, you know, without getting into whether or not there

17   is a violation, would be 1030 I believe it's (a)(2)(C) which

18   actually does not have as an element an intent to defraud and

19   is a misdemeanor.

20       So, the idea that this is a crime, I think, is up

21   for question.  I think, you know, as we put in our letter, we

22   don't actually think it goes to truthfulness or

23   untruthfulness, given the elements of that alleged offense.  I

24   recognize that Mr. Brodsky has represented that he believes

25   that the witness has lied.  Obviously, if they had a good

4938

1   faith basis to question the witness about that, that is fair

2   game.

3           In terms of the conduct, accessing the computer

4   after the witness left or stopped working for Retrophin, to

5   the extent that they can argue that goes to bias and then that

6   would be the benefit of having him be able to be

7   cross-examined on that, we understand that that is fair game.

8   I think it's the ability to kind of suggest then as an extra

9   step to the jury that this, in fact, constituted a federal

10  crime is completely inappropriate.

11          You know, 608 and 609 need to be read together.  608

12  references 609.  609 is the only mechanism for actually

13  putting in an actual conviction of a crime and 608 allows

14  conduct that goes to truthfulness or untruthfulness to be the

15  subject of cross-examination, but it doesn't necessarily allow

16  the defense to then categorize it as a crime, suggest the

17  witness has committed a crime and cross-examine the witness on

18  committing the crime.  That's why 609 is so circumscribed.

19          So, it's the underlying conduct the defense wants to

20  cross on because they believe it goes to truthfulness or

21  untruthfulness and convince Your Honor of that or there's

22  another lie in connection with that or bias, that would be

23  acceptable, but getting up there and saying "And don't you

24  know that's a federal crime" is completely inappropriate.

25          You know, the way in which we use 608 and 609, you

4939

1    know, you could commit a crime as, you know, defining it as a

2    crime is only permissible if you have a conviction and so it's

3    that piece of it that we think is inappropriate.

4           We don't know what the good faith basis is for the

5    defense's argument that the witness either has lied or I think

6    there was a suggestion that maybe there was some additional

7    access beyond the use of the password.  So, you know, I don't

8    know what that basis is so I don't know what the scope of the

9    cross is, but I'm concerned the way Mr. Brodsky framed it

10   yesterday that the questions are going to be, you know, "And

11   you did this, that's a crime, it's a crime under this statute,

12   it's a crime under that statute" which is completely

13   inappropriate under 403 and not allowable under 608 and 609.

14          THE COURT:  All right.  Mr. Brodsky, I think if I

15   understand you correctly when I asked you this question

16   whether you are going to argue that this violated particular

17   statutes, you said no although I thought earlier you had made

18   a suggestion that you might.

19          I do think that the weight of the case law as well

20   as the Supreme Court cases hold that you really can't confront

21   a witness with having committed a crime based on an arrest but

22   there has to be a conviction.  And I think that you will be

23   able to effectively cross-examine Mr. Su, assuming that, you

24   know, we can put to rest the Fifth Amendment issue, but you

25   will be able to cross-examine him and question his credibility

4940

1    and any bias he may have without characterizing his actions

2    with regard to the Global system, access to the Global system

3    as a crime.

4           I think it would be all right to tell him or to

5    argue that maybe he did this without authority, that he did

6    this covertly, that he did this without permission from

7    Mr. Shkreli, that he took documents after he left the place of

8    work and used them and misappropriated them or took them for

9    his own purposes, but I think, ultimately, to say "and this is

10   a crime" would not be appropriate.

11          MR. BRODSKY:  Well, Your Honor, the government is

12   about to give him a non-prosecution agreement because he's

13   going to take the Fifth.

14          THE COURT:  And you can question him about the

15   non-pros.

16          MR. BRODSKY:  Definitely, Your Honor, but clearly

17   the government knows there's a good faith basis because Mr. Su

18   has consulted counsel and taken the Fifth so there's clearly a

19   good faith basis for us to go in this direction.

20          Second, the government is about to give him a

21   non-prosecution agreement without meeting with him.  They're

22   going to meet with him --

23          MS. SMITH:  That's right.

24          MR. BRODSKY:  They're going to meet with him and

25   then they're going to give it to him in ten minutes.  Then,

1     Your Honor, they don't even know the extent of what he did but

2     that's fine because it will come out on cross-examination.

3          I certainly don't believe they're -- Mr. Su is going

4     to tell the government the truth in that room back there when

5     they meet with them because he hasn't told them the truth to

6     date about what he did and I'm not going to reveal it to them.

7     So I'm highly suspicious that he will now come clean and tell

8     them everything he did, but maybe he will.

9          THE COURT:  Good morning, Mr. Burke.

10         MR. BURKE:  Good morning, Your Honor.

11         MR. BRODSKY:  Next, Your Honor, if somebody

12    committed the crime of robbery, even if they were not charged

13    and that robbery related to the very charges in the case, or

14    insider trading and somebody was on the witness stand who was

15    a member of the board of directors who said, "I didn't leak

16    the material," and you had evidence in cross-examining them,

17    when the defendant was on trial for insider trading, and you

18    had evidence the person had leaked, without question, under

19    Rule 608, even though they haven't been convicted, you can't

20    admit a conviction.

21         Without question, you can challenge this witness and

22    say, "Sir, you know committing, leaking information as a

23    member of the board of directors to somebody to have them

24    trade on the information is against the law."  That goes

25    directly to their credibility.  They may say, "Absolutely not,

4942

1    it's not against the law, I do it all the time."  They may

2    say, "Absolutely, I know it's against the law."  But whether

3    or not they believe what they did is against the law or

4    permissible is certainly a valid realm of cross-examination.

5              Take the example of a robbery.  There are people who

6    have testified before in cases and they say, "Yeah, I went

7    into the bank and, yeah, I used the mask and I just threatened

8    the person in a really strong voice but I didn't use a gun or

9    a weapon" and they take the stand.  You can cross-examine them

10   on the fact that they committed a robbery.  You can use the

11   word "robbery."  You can say, "Sir, you know what you did was

12   against the law" because it goes directly to the heart of

13   their credibility and their truthfulness.

14             This is not collateral in any sense because, one,

15   the government elicited on their direct examination that

16   Global Relay system; two, the government elicited that he left

17   in December of 2012; three, the government elicited that after

18   he left in December of 2012, he used the Global Relay system

19   to get documents; four, the government admitted exhibits, at

20   least one exhibit which has threats to Mr. Shkreli in February

21   of 2013 and March of 2013 based entirely on, in part, on

22   stolen material, and they elicited all the things that Mr. Su

23   is claiming he knew having been the chief operating officer.

24   So, then, Your Honor, it moves forward.  There are other

25   indents as well that are relevant.

4943

1           So, the government, cannot cabin us in our

2    cross-examination by saying, You can't accuse him of

3    committing a crime.  Absolutely, we can.  Absolutely,

4    especially if he gets a non-prosecution agreement which

5    protects him, as long as he tells the government the truth, it

6    protects him from committing a crime, from being prosecuted

7    for a crime.

8           So, for example, Mr. Pierotti we know got a

9    non-prosecution agreement, we debated this before, but we

10   certainly can challenge Mr. Pierotti when we cross-examine him

11   and say, "You got a non-prosecution because you committed

12   insider trading, sir, right?"  There is no question we can do

13   that.  Anybody who gets a non-prosecution agreement can be

14   challenged on cross-examination that the reason they got the

15   non-prosecution agreement was because it protects them because

16   they have committed a crime.

17          The reason the government is giving him a

18   non-prosecution agreement is to cure this incredible problem

19   they're facing which is that Mr. Su is about to take the Fifth

20   Amendment to areas in which he testified about on direct

21   examination.  They want to prevent the jury from learning that

22   he was taking the Fifth.  Fine, they can give him a

23   non-prosecution agreement for that to help protect him, but we

24   are certainly allowed to go into the fact that he, what he

25   did, the extent of what he did and this non-prosecution

4944

1    agreement incentivizes him to testify and help the government

2    to testify in ways that help the government and the

3    non-prosecution agreement, as classic cross-examination, it

4    allows us to say, "So you got the non-prosecution agreement

5    because you committed a crime."

6              THE COURT:  Let's assume he's not going to get a

7    non-pros.  So we are back to where we were last night --

8              MR. BRODSKY:  Yes, Your Honor.

9              THE COURT:  -- which is basically, if you, you

10   know -- I do think that the cross-examination as to his

11   conduct is appropriate.  I don't think it is collateral.  I

12   think it is directly relevant to what he testified to on

13   direct and that the defense should have a full opportunity.

14             My concern is that some of the Second Circuit case

15   law indicates that, you know, generally it is absolutely

16   inappropriate to ask a jury to draw an adverse inference

17   against a witness who invokes his Fifth because of this

18   spillover concern that they will draw the same inference as to

19   the defendant and the defendant, if we go down that route

20   without a non-pros., I will want him to allocute and to make

21   sure that he understands that he is giving up the protection

22   that he currently has under the Fifth Amendment and the risk

23   that a jury will draw the same inferences, adverse inferences

24   against his decision should it be to remain silent as he is

25   entitled to do and not testify.

4945

1        My concern, again, is always that the jury may be
2   confused and it may prejudice Mr. Greebel.  So, I think that,
3   you know, if there is not a non-pros., and maybe there won't
4   be, maybe you have raised enough alarm bells that the
5   government is not going to want to go forward with a
6   non-pros., I think we have to talk about what happens next.
7        If he invokes his Fifth Amendment and if there is an
8   instruction, I think it is going to be somewhat risky for your
9   client and I hope, you know, I am sure you discussed the full
10  scope of that risk to him, but I think that those are issues
11  that, in my view, a non-pros. would avoid, frankly.
12       Yes, Mr. Mastro?
13       MR. MASTRO:  Just on this Fifth Amendment
14  invocation --
15       THE COURT:  Yes.
16       MR. MASTRO:  -- and whether there should be an
17  instruction to the jury, I think the distinction, Your Honor,
18  that the cases make in the Second Circuit case like Brink's
19  and Lizza, Lizza cited by the government, they involved the
20  prosecution questioning a defense witness.
21       THE COURT:  Yes, I understand.
22       MR. MASTRO:  That's exactly why in the Southern
23  District, in Calasuonno, where it was the opposite.  It was
24  the defense questioning a prosecution witness, that an adverse
25  inference, if the defense wanted it, was found to be perfectly

4946

1   appropriate because it is the opposite situation.

2           The concern in Lizza and Brink's in the Second

3   Circuit was that the prosecution questioning a defense witness

4   who takes the Fifth Amendment, that that has implications for

5   the defendant since it was the defendant's witness called by

6   the defense.  Those same considerations, especially if the

7   defendant wants the adverse inference to be drawn, aren't in

8   play when it is the prosecution's witness who, under

9   questioning by the defense, has invoked the Fifth Amendment.

10          Now, we don't have to decide that question right now

11  but I just wanted Your Honor to understand there is a very

12  strong principled distinction and many judges have found that

13  to be a principled distinction when it is, in fact, the

14  prosecution, putting someone on the stand, who then on

15  cross-examination has to take the Fifth Amendment.

16          THE COURT:  I am not disputing anything you are

17  saying.  I well understand the distinction.  I am just saying

18  that a jury could become confused and could easily make the

19  same assumption about Mr. Greebel's Fifth Amendment right

20  which is absolute and should be protected and I think that

21  there should be just a recognition that there is a risk that

22  the jury could be confused and make a similar assumption about

23  Mr. Greebel and that is my concern.

24          MR. MASTRO:  Understood, Your Honor.  I think it

25  goes to what the instruction would be, not to whether an

4947

1   instruction would be appropriate under those circumstances

2   when it's a prosecution witness who, on cross-examination, had

3   to invoke Fifth Amendment rights.

4           Thank you, Your Honor.

5           MR. BRODSKY:  Your Honor, one other -- I just wanted

6   to follow up and make sure that it was clear and I want to

7   make sure Your Honor rules on this in advance of Mr. Su,

8   because I believe Mr. Kessler is meeting with Mr. Su now and

9   giving him a non-prosecution agreement.

10          I intend to tell Mr. Su or question Mr. Su on

11  cross-examination questions to the effect that he has received

12  the non-prosecution agreement for protection from the

13  commission of a crime, that will he not be prosecuted for

14  committing crimes in connection with his access to Global

15  Relay and I will, you know, certainly question him that use

16  the word "crime" and say, That is the purpose or the only

17  reason you're speaking about this today is because you have

18  this non-prosecution agreement that you received and it is

19  protecting you, the government is giving you protection

20  because you fear or, you know, words to the effect that you've

21  committed a crime, you've done the following things that are

22  wrong, and this agreement protects you.  And at the same time,

23  I'm going to question him that it incentivizes him to go out

24  of his way to help the prosecution.

25          THE COURT:  I think that's fair.  I think that's

4948

1    fair.  No one is disputing that.

2         MR. BRODSKY:  Okay.  I just didn't want an

3    interruption.  There could be an objection but I wanted to

4    make sure I had Your Honor's position and obviously that I can

5    directly challenge him that he has committed a crime and that

6    he's receiving this non-prosecution agreement because of his

7    conduct and he needs protection for his criminal conduct.  I

8    do want to challenge him directly on that.

9         MS. SMITH:  Your Honor, I'm very disturbed by

10   statements that Mr. Brodsky has made both yesterday and today

11   that the fact that an individual might take the Fifth suggests

12   either that he's lying or that he's committed a crime.  I

13   think that's particularly inappropriate for a defense counsel

14   to make that sort of argument.  And the suggestion that the

15   only reason that he's speaking is because he has an NPA or

16   some other form of protection is inappropriate to suggest that

17   otherwise he would take the Fifth.  It's just an end run

18   around the witness taking the Fifth.

19        THE COURT:  You're not going to do that, are you?

20        MS. SMITH:  He just said that.

21        MR. BRODSKY:  No, no, I was inarticulate about it.

22   I am going to challenge him to the fact that he committed a

23   crime in his conduct and that the non-prosecution agreement he

24   received protects him from being prosecuted for all sorts of

25   crimes.

4949

1          THE COURT:  I think nobody -- I mean, frankly,

2    unless you give me a good reason, I don't think anybody should

3    be mentioning that he would otherwise take the Fifth.

4          MR. BRODSKY:  I'm not going to do that, Your Honor.

5          MS. SMITH:  He said something about only speaking

6    about it because of X, Y, Z which would suggest that otherwise

7    he would take the Fifth.

8          I want to be very careful because although I do

9    think that Mr. Brodsky said he was inarticulate, that the

10   words matter.  I think the suggestion that he committed a

11   crime is inappropriate but I certainly don't think that

12   Mr. Brodsky should go into a whole litany of what crimes he

13   believes in his mind based on the facts the witness may or may

14   not have committed.  That's completely inappropriate.

15         THE COURT:  Well, look, I think on direct or cross,

16   facts could be elicited from this witness --

17         MS. SMITH:  The facts are fine.

18         THE COURT:  -- whether or not Mr. Su's access was

19   ever, you know, terminated, whether he gave formal notice that

20   he left or whether he just walked out, whether he had any

21   conversations with his, with Retrophin CEO or counsel that he

22   had in his mind quit or whether or not in their mind based on

23   these e-mails that it appears they believed he was still in a

24   position to be fired.

25         I think there is ambiguity.  There is no clear

4950

1   evidence before me about what the facts are, but I do think

2   that generally when someone does get a non-pros. or some sort

3   of a cooperation agreement, there is vigorous

4   cross-examination as to the fact that the defendant is, you

5   know, taken somewhat out of legal exposure for criminal

6   conduct.

7           So, certainly with a cooperation agreement, they've

8   pled guilty but with a non-pros., it's a little bit even, I

9   would say it's even more ripe for cross-examination.

10          MR. BRODSKY:  Thank you, Your Honor.

11          MS. SMITH:  I completely agree that there can be a

12  cross on the non-pros.  I just think the suggestion that this

13  is so that the witness can speak or some of the other language

14  that Mr. Brodsky was using was inappropriate and certainly

15  we'll object to questions along those lines to the extent that

16  that's the way it's phrased as an end run around getting this

17  witness to take the Fifth in front of the jury.

18          THE COURT:  Well, Mr. Brodsky --

19          MR. BRODSKY:  I'm not going to elicit anything

20  related to the Fifth Amendment, Your Honor.

21          THE COURT:  Or that he would otherwise --

22          MR. BRODSKY:  Correct.

23          THE COURT:  That this is a non-pros. that is subject

24  to cross-examination and you're doing this because you are

25  perhaps now incentivized to speak and testify in a manner

4951

1    favorable to the government in exchange for a non-pros.

2              MR. BRODSKY:  Thank you, Your Honor.

3              THE COURT:  Okay.  So how much more time do we need

4    here?

5              MS. SMITH:  I think we're going to go check now.

6              THE COURT:  Okay.

7              MS. SMITH:  I mean, I know that the jury is not

8    coming in until 10:00.

9              THE COURT:  Yes.

10             MS. SMITH:  Probably another 15 minutes.  And to the

11   extent there were any notes taken, we'll obviously provide

12   them to defense counsel.

13             THE COURT:  So, I will then just return upstairs and

14   tell the court reporters if they leave their phone numbers,

15   we'll call them when we're ready.

16             (Recess taken.)

17

18

19

20

21

22

23

24

25

4952

1           (In open court; jury not present.)

2           THE COURT:  All right.

3           All counsel and Mr. Greebel are present.  I

4   understand that the parties have reached some sort of an

5   understanding as to how they intend to proceed regarding

6   Mr. Su.

7           MS. SMITH:  Yes, your Honor.

8           The government has provided Mr. Su with letter

9   immunity for the conduct related to accessing Retrophin

10  computer systems to the extent that he did after stopping work

11  at Retrophin in December of 2012, provided a copy of the

12  letter immunity to defense counsel and in connection with the

13  decision to provide letter immunity we did ask Mr. Su some

14  additional questions about that conduct, took notes on that

15  conversation and provided the notes to defense counsel as

16  well.

17          THE COURT:  All right.

18          Yes, Mr. Brodsky.

19          MR. BRODSKY:  Yes, your Honor.  We received an

20  unsigned copy, but we understand we'll at some point receive a

21  signed copy of the two paragraph letter dated November 14,

22  2017 from the U.S. Attorney's Office to John Burke and the re:

23  line is immunity for trial testimony for Jackson Su and it

24  states  "As we have discussed your client Jackson Su will give

25  testimony in United States v. Evan Greebel criminal docket

4953

1   number 15-637 KAM, including regarding his access of the
2   computer systems of Retrophin, beginning following his
3   departure from Retrophin on or about and between December 2012
4   and June 2013, the conduct, and then quotation marks.  This
5   letter confirms our agreement that any testimony given by your
6   client at trial in United States v. Evan Greebel regarding the
7   conduct will not be used against him by the United States
8   Attorneys Office in any criminal case, except that his
9   testimony could be used against him in a prosecution for
10  perjury, false statements or obstruction of justice, if he
11  intentionally provides false information."
12          So, we hope to get a signed copy, your Honor, and
13  then I think it doesn't appear that Mr. Su needs to take the
14  Fifth or is fine proceeding without taking the Fifth
15  Amendment.
16          THE COURT:  All right.  Thank you.
17          MR. KESSLER:  Your Honor, on the signed copy
18  question, the only signed copy is in Mr. Burke's possession.
19  At some point we will get it from him and get photocopies so
20  everyone can have one.
21          MR. BRODSKY:  Would they mind signing this one,
22  which we can use and mark as an exhibit.
23          MR. KESSLER:  We don't object to using the one
24  signed copy.  I don't think we need multiple original
25  versions.  If we get to the point where the only way

4954

1  Mr. Brodsky can examine is we sign another one, we'll sign it.

2          THE COURT:  Is Mr. Burke still here?

3          MR. KESSLER:  Yes.  He's in Judge Cogan's courtroom.

4          THE COURT:  All right.  We can start with

5  Ms. Marsilio who we started yesterday.

6          Are all the jurors here yet, Ms. Jackson?  If they

7  are here, we'll get started and by the time Mr. Burke gets

8  back, hopefully, we'll be able to continue with Mr. Su.

9          MR. KESSLER:  That's fine.  I believe Ms. Marsilio

10  was told to be back by 10:15.  I anticipate they will be back

11  by 10:15.  It's not yet 10:15.

12          THE COURT:  I appreciate the parties have been able

13  to work this out.

14          (Pause.)

15          THE CLERK:  Your Honor, five jurors are still

16  missing.

17          THE COURT:  Thank you.

18          (Pause.)

19          MR. KESSLER:  We're ready to proceed.  The witness

20  is here.

21          THE COURT:  We are still missing five jurors,

22  unfortunately.

23          MR. KESSLER:  Then, we'll wait.

24          (Pause.)

25          THE COURT:  Good morning.  You can come up and sit

Marsilio - cross - Denerstein                4955

1    on the stand.  Nice to see you.

2    KRISTINE MARSILIO, resumed.

3              THE COURT:  All right.  Everybody is back.

4              MR. BRODSKY:  Yes, your Honor.

5              MR. BRODSKY:  Your Honor, there are a couple of

6    agents in the audience that are on witness list that are not

7    case agents.  If they are not going to be called as witnesses,

8    that's fine.  Normally, they wouldn't be attending as any

9    witness.  I do remember when the government objected to

10   Mr. Greebel's wife being here as a potential witness.

11             MR. KESSLER:  Which agent?

12             MR. BRODSKY:  I thought there were agents here.  Are

13   there no agents?  I'm sorry, your Honor.

14             MR. MASTRO:  They look like agents.

15             (Pause.)

16             (Jury present.)

17             THE COURT:  We have all our jurors present.  Please,

18   have a seat.  Ms. Denerstein, you may continue your

19   cross-examination.  Ma'am, you are still under oath.

20   CROSS-EXAMINATION

21   BY MS. DENERSTEIN:  (Continued)

22   Q    Good morning, Ms. Marsilio.

23   A    Good morning.

24   Q    If we could please publish Government's Exhibit 426 in

25   evidence.

Marsilio - cross - Denerstein                    4956

1        Ms. Marsilio, please, tell me if you can't hear me.

2    A    Sure.

3    Q    Thank you?

4        So, we're looking at Government's Exhibit in

5    evidence 426, which is an e-mail exchange between Martin

6    Shkreli and Evan Greebel on October 25, 2011; is that correct?

7    A    Yes.

8    Q    And you're not a party to this e-mail, are you?

9    A    No.

10   Q    Now, it's dated October 25, 2011 and that is a time

11   period where the billing committee may begin asking partners

12   about the status of various bills; is that correct?

13   A    It's around that time.

14   Q    And Plasma was a matter that was related to MSMB; is that

15   correct?

16   A    Yes.

17   Q    And that was a matter, if you recall, that Ms. DeVita

18   that opened?

19   A    Yes.

20   Q    And it is Ms. DeVita that signed that engagement letter?

21   A    Yes.

22   Q    Let's move to Government's Exhibit in evidence 433.

23       Now, this is an e-mail between Martin Shkreli and

24   Evan Greebel dated January 12, 2012, an e-mail chain,

25   actually, correct.

Marsilio - cross - Denerstein                4957

1   A      Yes.

2   Q      You are also not a party to this e-mail; is that correct?

3   A      Yes.

4   Q      The e-mail states, describes the payment schedule?

5   A      Yes.

6   Q      Going back to the date January 12, 2012, that's about two

7   weeks before the end of the fiscal year, correct?

8   A      Yes.

9   Q      And that is a time period when partners are trying to get

10  payments on bills?

11  A      Yes.

12  Q      And it's also a time period where partners would work out

13  a payment schedule on a bill?

14  A      With the approval of the billing and collections

15  committee, yes.

16  Q      And that's not limited to just Mr. Greebel, correct, that

17  applies to other partners at Katten as well?

18  A      Yes.

19  Q      I would like to now approach the witness and show

20  Defendant's Exhibit DX 106-5, DX 106-4 and DX 3346?

21          Have you had an opportunity to look at the three

22  exhibits.

23  A      Yes.

24  Q      And are these exchanges between you  -- do they include

25  exchanges between you and Mr. Greebel?

Marsilio - cross - Denerstein                    4958

1    A    Yes.

2    Q    And are they exchanges that occurred from your Katten

3    e-mail to his Katten e-mail?

4    A    Yes.

5    Q    And are they regarding bill payments?

6    A    Yes.

7              MS. DENERSTEIN:  Your Honor, at this time the

8    defense Defendant's Exhibit 106-5, 106-4 and 3346.

9              MR. KESSLER:  No objection.

10             THE COURT:   We receive Defendant's Exhibit 106-4,

11   106-5 and 3346.

12             (So marked.)

13   Q    Mr. Carter, can you put 106-4 up, please?

14             Ms. Marsilio, if you go to the bottom of the e-mail,

15   the very bottom, is an e-mail communication between Martin

16   Shkreli and Evan Greebel on November 8, 2011; is that correct.

17   A    Yes.

18   Q    And it refers to a wire to the Katten Muchin account,

19   correct?

20   A    Yes.

21   Q    The wire is for $10,000, is that correct?

22   A    Yes.

23   Q    And that e-mail  -- Mr. Greebel in the e-mail above

24   forwards to a Mr. Steven Cook and you are copied, correct?

25   A    Correct.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Marsilio - cross - Denerstein                    4959

1  Q    And then you respond to Mr. Greebel asking him balance to

2  Plasma, correct?

3  A    Yes.

4  Q    Then he responds to you, telling you yes?

5  A    Correct.

6  Q    And this is just an example of ordinary communications

7  about billing at Katten, correct?

8  A    And how payments are applied, yes.

9  Q    Okay.  Let's turn to Defendant's Exhibit DX 106-5.  Go up

10  to the next e-mail?

11         It's an e-mail from Martin Shkreli on August 31  --

12  on October 31, 2011 to Mr. Greebel stating here is 30,000, the

13  rest is coming in another wire; correct?

14  A    Yes.

15  Q    If we go up to the next e-mail Mr. Greebel is asking

16  Mr. Shkreli how much is the second wire?

17  A    Yes.

18  Q    And then in the next e-mail Martin Shkreli tells

19  Mr. Greebel that the amount is going to be seventy thousand

20  dollars; is that correct?

21  A    Yes.

22  Q    Then going up Mr. Greebel e-mails you and says can you

23  please advise when the wire is received; is that correct?

24  A    Yes.

25  Q    Go back to the top of chain, please?

Marsilio - cross - Denerstein                    4960

1        And then you e-mail Mr. Greebel and explain that you

2    haven't received it yet but you will let him know when you get

3    it; correct?

4    A    We received a portion and that we were waiting on the

5    balance, yes.

6    Q    And again you asked should it be applied to the Plasma

7    matter?

8    A    Yes.

9    Q    And he replies correct?  Correct?

10   A    Not a yes.  It's just that we're receiving the balance.

11   Q    Correct.  And then in the very top of the chain it says

12   -- if you can stop where it says November 1, 945 a.m.

13   Mr. Greebel is telling you that they have received 30,000 this

14   morning, which will be applied to the client Plasma and he did

15   not ever receive the remainder of the seventy thousand,

16   correct?

17   A    I'm responded to him.

18   Q    Pardon me.  You are responding to him, correct?

19   A    Yes.

20   Q    And then in the top e-mail he tells you you should be

21   receiving the rest today as well?

22   A    Yes.

23   Q    Again, the time period is November 1, 2011 and that is

24   closing in on close to the end of the fiscal year that ends on

25   January 31, 2012?

Marsilio - cross - Denerstein                          4961

1   A    Yes, during the normal collection push.

2   Q    And this is just a normal communication you would have

3   with a partner about bills and billing?

4   A    And how allow to apply funds, yes.

5   Q    Thank you?

6        Let's talk a little bit about bills.  So the lawyer

7   who is the principal attorney is not necessarily the lawyer

8   who does all of the work on the matter.

9   A    Correct.

10  Q    Sometimes the relationship lawyer will do a lot of work

11  and sometimes they do no work at all?

12  A    It's possible, yes.

13  Q    And sometimes they do very little work?

14  A    Sure.

15  Q    Looking at the Government's Exhibit in evidence 120-1,

16  this is an engagement letter with MSMB Capital Management LLC,

17  correct?

18  A    Yes.

19  Q    And it's dated June 19, 2011?

20  A    Yes.

21  Q    And if you go to the next page, which I think the ending

22  Bates stamp number is 568, it is signed by Martin Shkreli the

23  managing member; correct?

24  A    Yes.

25  Q    And it is also signed by Bernadette DeVita; correct?

Marsilio - cross - Denerstein                4962

1    A    Yes.

2    Q    This was another partner at Katten Muchin?

3    A    Yes.

4    Q    She did real estate work; correct?

5    A    Yes.

6    Q    Now, if you go to Government's Exhibit 802, which is one

7    of the government binders with a big green Post-it.  There's

8    two.  Let me know when you find it?

9         This is a bill dated August 5, 2011 for Project

10   Plasma; correct?

11   A    Yes.

12   Q    And for a total balance due of $1,154.94; correct?

13   A    Yes.

14   Q    Now, if you turn page five, which has the Bates stamp

15   ending in 144 and you go down to summary of professional

16   services, during this period of time  -- Mr. Carter, can you

17   move it over a little bit.  Move it a little bit to the left?

18        It says that Bernadette DeVita billed  .4 hours for

19   this period of time.

20   A    Yes.

21   Q    And that is how many minutes?

22   A    24.

23   Q    And the total number of hours at the bottom were 151

24   hours and  -- 151.7 hours?

25   A    Yes.

Marsilio - cross - Denerstein                    4963

1   Q    And there were a total of nine people billing on this

2   matter this month?

3   A    Yes.

4   Q    And Mr. Greebel billed for a period of time this month?

5   A    Yes.

6   Q    And Mrs. Griswold billed for a period of time this month?

7   A    Yes.

8   Q    And Mr. Kravitz billed for a period of time this month?

9   A    Yes.

10  Q    Now, Ms. DeVita was the principal attorney on this

11  matter; correct?

12  A    Yes.

13  Q    So she had responsibility for reviewing the bill but she

14  actually did very little work on this matter for this month?

15  A    Yes.

16  Q    So this is an example of when the principal attorney is

17  responsible for the bill but is not billing a lot of time?

18  A    Yes.

19  Q    Let's turn to Government's Exhibit 843.  That's the other

20  green Post-it.  And the cover letter states that this is for

21  work performed on three matters, license agreements, Pierotti

22  litigation and general representation; is that correct?

23  A    Yes.

24  Q    So I want to direct your attention to Bates stamp number

25  RO 48592.

Marsilio - cross - Denerstein                    4964

1          THE COURT:  Ms. Denerstein, I'm sorry.  Can you

2    please give the date of that letter.  I didn't see it on the

3    screen.

4          MS. DENERSTEIN:  August 1, 2013, your Honor.

5          THE COURT:  Thank you.

6    Q    Mr. Carter, if we can go back to Bates stamp number 582.

7    And the date of this is July 31, 2013, correct?

8    A    Yes.

9    Q    And it refers to Pierotti litigation, correct?

10   A    Yes.

11   Q    And if you go to Bates page 48587, summary of

12   professional services?

13   A    Yes.

14   Q    There are nine timekeepers billed during this period on

15   this matter; is that correct?

16   A    Yes.

17   Q    And they billed the total is 92.2 hours, correct?

18   A    Yes.

19   Q    And Evan Greebel billed during that period of time .08;

20   is that correct?

21   A    Yes.

22   Q    And he billed the least amount of time during this time

23   period on this matter; correct?

24   A    Yes.

25   Q    Michael Gordon is a litigation partner, is that correct?

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

Marsilio - cross - Denerstein                    4965

1    A      I'm not aware.

2    Q      He billed 47 hours?

3    A      Yes.

4    Q      Howard Cotton billed 13.3 hours?

5    A      Yes.

6    Q      Lots of people billed different amounts of the time?

7    A      Yes.

8    Q      This was a matter that Mr. Greebel was the principal

9    attorney for; correct?

10   A      Yes.

11   Q      So he was responsible for the bill even though he did

12   very little work this month?

13   A      Yes.

14   Q      And if we can back to the cover page.  The matter is

15   Pierotti litigation; correct?

16   A      Yes.

17   Q      And Mr. Greebel, as you previously testified, is a

18   corporate partner; correct?

19   A      Yes.

20   Q      Now, I want to direct your attention to three different

21   exhibits in evidence.  So you can put the green sticky Post-it

22   big book to the side.  There should be a binder before you

23   with Government Exhibits in evidence 127-1, 127-2?

24          Also I think on the top open, on the perimeter in

25   front of you, in front of the water bottle, is a binder that

Marsilio - cross - Denerstein                    4966

1   has Government's Exhibit in evidence 857?

2   A     Yes.

3   Q     So, Government's Exhibit 127-1 is the pre bill for the

4   SEC indemnification matter dated September 30, 2014, correct?

5   A     Yes.

6   Q     Government's Exhibit 127-2 is the pre bill for the

7   Project Candlestick matter dated September 4, 2014?

8   A     Correct.

9   Q     Government's Exhibit 857 A is the final bill for the SEC

10  indemnification matter, dated September 30, 2014?

11  A     Yes.

12  Q     Now, on these three exhibits the time entries are

13  identical?

14  A     Yes.

15  Q     Not a single change, correct, to the time entry?

16  A     No.

17  Q     So all description of the work performed in the pre bills

18  are the exact same as on the final bill?

19  A     Yes.

20              (Continued on next page.)

21

22

23

24

25

Marsilo - cross - Denerstein                    4967

1   CROSS EXAMINATION

2   BY MS. DENERSTEIN: (Continuing)

3   Q    And, in fact, the only difference between the Project

4   Candlestick bill, which is Government Exhibit 127-1 and the

5   SEC indemnification bill is approximately $148; is that

6   correct?

7            MR. KESSLER:  Just objection to the form.

8   A    Correct.

9            MR. KESSLER:  The only difference.

10           THE COURT:  Try to rephrase.

11           MS. DENERSTEIN:  Sorry, Your Honor.

12  Q    There is a $148 difference between the Project

13  Candlestick bills, which is Government Exhibit 127-1, and the

14  SEC indemnification bill, which is Government Exhibit 127-2?

15  A    $148 difference.

16  Q    And that reflects an adjustment of rates?

17  A    Yes.

18  Q    I want to show you now what is marked as Defense Exhibit

19  106-41.  Ms. Marsilo, have you had an opportunity to look at

20  it?

21  A    Yes.

22  Q    And is the cover to the attachment an e-mail exchange

23  between Mr. Greebel and Mr. Shkreli?

24  A    Yes.

25  Q    And attached is the bill for services rendered through

Marsilo - cross - Denerstein                    4968

1    August 31, 2014 in connection with the SEC inquiry?

2    A    Yes.

3              MS. DENERSTEIN:  Your Honor, at this time I would

4    offer Defense Exhibit 106-41.

5              MR. KESSLER:  Objection.  It is hearsay.

6              THE COURT:  I will have to sustain the objection.

7              MS. DENERSTEIN:  Your Honor, may I proceed but

8    perhaps we can come back to it later so I could just ask other

9    questions?

10             THE COURT:  Okay.

11             MS. DENERSTEIN:  Thank you.

12   Q    Now, referring you to Government Exhibit 125-1-8.  And

13   this is a document that you previously described as the

14   opening matter for the SEC indemnification matter?

15             MR. KESSLER:  Objection.

16             Misstates the testimony as to 125-1-8*.

17             THE COURT:  Rephrase.

18             MS. DENERSTEIN:  I'm sorry, H as in hear.

19             THE COURT:  125-1-H in evidence.  You can rephrase

20   your question, Ms. Denerstein, please.

21   Q    Turning to the page 186, it shows that this was approved

22   by Mark Grossman; correct?

23   A    Yes.

24   Q    And he was the corporate head -- head of the corporate

25   department that signed off on this matter?

Marsilo - cross - Denerstein                    4969

1    A    Yes.

2    Q    And to open a matter, you need a corporate head's

3    approval?  You need the approval of your department head?

4    A    Yes and no.  Yes, you need department head approval, but

5    it is based upon the law type that is identified in the

6    matter.

7            MR. BRODSKY:  We are having a hard time hearing.

8            THE WITNESS:  Yes or no, it is a department head

9    approval but based upon the law type that is identified when

10   opening the matter.

11           MR. BRODSKY:  Thank you.

12           THE COURT:  I'm sorry.  All the lights are down.  We

13   are trying to get them fixed.

14   Q    If we can take a look at Government Exhibit 857-A and

15   this is dated September 30, 2014; correct?

16   A    Yes.

17   Q    And it says via e-mail and refers to Martin Shkreli;

18   correct?

19   A    Yes.

20   Q    And this is in connection with the SEC inquiry; correct?

21   A    Yes.

22           MS. DENERSTEIN:  If we can go to the bill, to page

23   with the summary at the end of the bill where it lists the

24   summary of hours, Mr. Carter, 142.  Keep going back.  Summary

25   professional services.

Marsilo - cross - Denerstein                4970

1   Q    So on this matter, there are over seven people billing

2   time to this matter; correct?

3   A    Yes.

4   Q    And the did you believe entries for Rick Brady, does that

5   refer to a change in the hourly rate based on the year?

6   A    The invoice covers two different calendar years, so two

7   different rates.

8   Q    And Evan Greebel, during this period of time of

9   approximately 147 months, billed 7 hours and 18 minutes in

10  this matter?

11  A    Yes.

12  Q    And Mike Rosensaft billed over 150 hours to this matter

13  over this span of time?

14  A    Yes.

15  Q    If you look at -- so Rosensaft did way more work on this

16  matter than Mr. Greebel; correct?

17          MR. KESSLER:  Objection to the form.

18          THE COURT:  Yes.

19  Q    Mr. Rosensaft billed approximately 172 hours for this

20  matter; correct?

21  A    Yes.

22  Q    And Mr. Greebel billed 7.3 hours for this?

23          MR. KESSLER:  Objection as asked and answered.

24          THE COURT:  That is all right.  Overruled.  Just

25  move to your next question, please.

Marsilo - cross - Denerstein                    4971

1   Q    And if you look to the various entries on this matter, is

2   it fair to say Evan Greebel only billed four times during this

3   period of time?

4   A    Yes.

5   Q    Now, MSMB was a client of Katten; correct?

6   A    Yes.

7   Q    And Retrophin was a client of Katten; correct?

8   A    Yes.

9   Q    And Martin Shkreli was the CEO of Retrophin?

10  A    I have him listed as a billing contact in our accounting

11  system.

12  Q    I think if we look at one of the bills in evidence, it

13  states that he -- so you have Martin Shkreli listed as a

14  contact for both MSMB and Retrophin?

15  A    I'd have to look at the bills for MSMB.  There was a

16  Kevin....

17  Q    I think we discussed earlier that Martin Shkreli signed

18  the Plasma engagement letter?

19  A    Correct.

20  Q    And on the e-mail communications that are in evidence

21  between you and Mr. Greebel that have exchanges forwarded from

22  Martin Shkreli, they are discussing billing for these matters?

23  A    Payment, yes.

24  Q    Are you aware that it is common for a lawyer to represent

25  a company and its officers and executives at the same tame?

Marsilo - cross - Denerstein                    4972

1          MR. KESSLER:  Objection.  Beyond the scope and the

2     form.

3          THE COURT:  Well, I think, Ms. Denerstein, you can

4     try to rephrase.  I do believe that the scope of the question

5     should be narrowed.

6     Q    I am going to turn to -- Martin Shkreli was an executive

7     of Retrophin; correct?

8     A    Based on the engagement letters, yes.

9     Q    And Martin Shkreli was the managing member for MSMB;

10    correct?

11    A    Based on the engagement letters, yes.

12    Q    And is it your understanding that lawyers can represent a

13    company and its officers?

14         MR. KESSLER:  Objection as beyond the scope.

15         THE COURT:  I think I am going to sustain the

16    objection, Ms. Denerstein.

17    Q    Let's turn to Government Exhibit 123-2.  Now, these are

18    working timekeeper reports for the period February 2011 to

19    January 2012; correct?

20    A    Yes.

21    Q    And this is for Mr. Greebel; correct?

22    A    Yes.

23    Q    And as working timekeeper, this refers to time he billed?

24    A    Time he recorded to those clients, yes.

25    Q    During this time period, Mr. Greebel is working --

Marsilo - cross - Denerstein                    4973

1           MS. DENERSTEIN:  Can we scroll down.  Keep going.

2    Q    -- for numerous clients?

3    A    Yes.

4    Q    There are over 40 clients listed here; is that correct?

5    A    I'd have to count them.

6    Q    There are over 20 clients listed here; is that correct?

7    A    Yes.

8    Q    And he bills during this time period a total of 2,061.4

9    hours; correct?

10   A    Yes.

11   Q    And, again, he's working on a variety of matters?

12   A    Yes.

13   Q    Turning to Government Exhibit 123-3 in evidence.  This is

14   for the time period February 2012 to January 2013; is that

15   correct?

16   A    Yes.

17   Q    And if we scroll down, this lists time billed by Mr.

18   Greebel to all these matters; correct?

19   A    Yes.

20   Q    And, again, it is over 20 different matters?

21   A    Yes.

22   Q    And the time billed is a total of 1,903.6 hours; correct?

23   A    Yes.

24   Q    And for this time period, if we zoom in on First

25   Southwest Securities, which is 089, the Bates stamps, that

Marsilo - cross - Denerstein                    4974

1   reflects 177.4 hours for this time period?

2   A    Yes.

3   Q    You can see by looking at this exhibit there is a range

4   of time periods billed for these various matters; correct?

5   A    Can you ask again?

6   Q    Mr. Greebel is billing different amounts for different

7   matters of time?

8   A    He is recording different hours for different clients,

9   yes.

10  Q    And 1,900 hours is not that different from 2000 hours is

11  it?

12           MR. KESSLER:  Objection to the form.

13           THE COURT:  Sustained.

14  Q    Mr. Greebel in Government Exhibit 123-2 billed over 2,000

15  hours; correct?

16  A    Yes.

17  Q    And Mr. Greebel, in Government Exhibit 123, billed over

18  1,900 hours; correct?

19  A    Yes.

20  Q    Going to Government Exhibit 123-4 --

21           MS. DENERSTEIN:  Again, can we scroll down, Mr.

22  Carter, showing various matters Mr. Greebel recorded time for.

23  We will get to the total, please.

24  Q    -- So for fiscal year February 2013 to January 2014, Mr.

25  Greebel billed 2 -- sorry, recorded time for 2,243.6 hours?

Marsilo - cross - Denerstein                    4975

1   A   Yes.

2   Q   Again, he is billing time to over 20 matters?

3   A   Yes.

4   Q   So multiple clients Mr. Greebel is reporting time for,

5   doing work for?

6   A   Yes.

7               MS. DENERSTEIN:  One moment, Your Honor.

8               THE COURT:  Sure.

9               (Pause.)

10              MS. DENERSTEIN:  Your Honor, the only further matter

11  is the objection you sustained.  I don't have any additional

12  questions.

13              THE COURT:  Would you like to go to sidebar quickly

14  so we can resolve this.  With the jury's indulgence, I think

15  we should resolve it.

16              MS. DENERSTEIN:  Yes, Your Honor.

17              THE COURT:  Unfortunately, our white noise is down.

18  Would you like a midmorning break.

19              THE JURORS:  No.

20              THE COURT:  We will go out in the hall.

21              (Sidebar held outside the hearing of the jury.)

22              (Continued on the following page.)

23

24

25

```
                            Sidebar                    4976
```

1          (The following sidebar held outside of the hearing

2    of the jury.)

3          THE COURT:  So, was there an exhibit?

4          MR. KESSLER:  Yes.

5          MS. DENERSTEIN:  Yes.

6          THE COURT:  That was between Mr. Greebel and Mr.

7    Shkreli dated September 30, 2014, Defense Exhibit DX-106-41,

8    and the objection was hearsay.

9          MS. DENERSTEIN:  Correct.  Number one, this is on

10   the Government's list of exhibits as 677 with the e-mail.

11         MS. SMITH:  Just because the Government can put it

12   in doesn't mean the defense.

13         MS. DENERSTEIN:  Let me finish, please.

14         Two, we admitted a variety of bills under the

15   business records exception and some of them had cover letters

16   to the front of them.  This is a business record.  It is from

17   Mr. Greebel's work e-mail sending the bill to Mr. Shkreli at

18   his AOL account and it is a record maintained by Katten and

19   made in its regular course, and Mr. Greebel generally wrote a

20   letter -- or did an e-mail if he was sending a bill to

21   somebody.  So it is just a classic business record and it

22   shows where he sent the bill and that is relevant and

23   admissible and it is not hearsay, especially since the

24   underlying document has been admitted.  This is identical to

25   the Government bill.

```
                        Sidebar                        4977
```

1            MR. KESSLER:  So we are not objecting to the

2    admission of the bill itself, which is already in evidence

3    with the cover letter that Ms. Denerstein referred to.  The

4    e-mail is from Mr. Greebel to Mr. Shkreli.  It is an

5    out-of-court-statement.  It is being offered to prove the

6    truth of the matter asserted in the e-mail, because if they

7    just wanted the bills, the bills are in evidence.  So the

8    e-mail is being admitted to introduce the truth of whatever is

9    contained in the exhibit.  It is hearsay.  This e-mail is not

10   a business record.  We have litigated this repeatedly.  If

11   they want to prove the five requirements of 803(6) through a

12   custodian, they can offer it that way.  But I don't believe

13   any of the elements of 803(6) has been established with

14   respect to this document.  The fact it is on the Government's

15   Exhibit list says nothing either way about whether it's

16   relevant or admissible at all, or certainly through the

17   defense.  So, it's hearsay and it's not admissible.

18           THE COURT:  Go ahead.

19           MS. DENERSTEIN:  Go ahead, Your Honor.

20           THE COURT:  Well, I was thinking to the extent that

21   she has elicited testimony in this time frame Katten billing

22   attorneys often undertake to contact their clients and seek

23   payment of bills, you know, it is certainly consistent with

24   that.

25           I think what is maybe at issue is the second

Sidebar                                            4978

1   sentence of this e-mail, which is some sort of advice or

2   statement that Mr. Greebel is making with regard to how may --

3   he request that Retrophin pay the invoice for the SEC inquiry.

4          And this is the inquiry that concerned MSMB

5   purportedly?

6          MR. KESSLER:  Well, there is a question about the

7   scope of the inquiry, but that is the inquiry one way or

8   another.

9          MS. DENERSTEIN:  Correct.

10          THE COURT:  Because there is only this, right?

11          MR. KESSLER:  This is the only bill related to that

12   matter.

13          Your Honor, just a couple of points.  Certainly, the

14   first sentence is also at issue.  If this e-mail is going to

15   be used to prove that there was a discussion with Mr.

16   Rosensaft about the invoice, obviously that would be an

17   improper hearsay purpose.

18          Second of all, Mr. Shkreli was removed as the CEO or

19   -- I'm sorry, placed on administrative leave as the CEO on

20   September 29th.  This is after that fact.  But more to the

21   point, Ms. Marsilo, who is the witness on the stand, has not

22   identified this as a business record.  If Ms. Denerstein wants

23   to lay the foundation with the 803(6) elements and ask Ms.

24   Marsilo if she has personal knowledge that can satisfy each

25   of those elements and she's a custodian of Katten e-mails,

Sidebar                                           4979

1   then we don't to object to the laying of that foundation.  But

2   the foundation hasn't been laid.  General testimony that

3   attorneys send bills to their clients is not sufficient to

4   establish this particular e-mail attaching this particular

5   bill is a business record.  The whole thing we went through in

6   this briefing about the business record exception is that it's

7   a document-by-document inquiry.  So we're not objecting to the

8   foundational question that would or would not establish this

9   as a business record.  We're just objecting to the assumption

10  that it is a business record.

11          THE COURT:  Do you want to do that with this

12  witness, since your argument is a business record?

13          MS. DENERSTEIN:  I guess I would propose two things:

14  I will definitely try that and the other thing is, I

15  respectfully disagree with Mr. Kessler about whether or not

16  this is a business record because, as we have all discussed,

17  it is a case-by-case basis.  There isn't a blanket answer to

18  that question.  This is indeed, I think, as Your Honor pointed

19  out a communication about billing that is quite common for

20  firms and responsible partners to do.

21          But I would also say, we can also offer it not for

22  the truth but the fact that the bill was sent and I don't

23  think there is any dispute about the authenticity of these

24  documents or the fact that there is no dispute about that came

25  from their production to us.

```
              Sidebar                        4980
```

1          MR. KESSLER:  The fact that the bill was sent, I

2   don't think is relevant.  This is the last day of the charge

3   period as the defense has pointed out repeatedly.  It

4   certainly hasn't been presented what the relevance of Mr.

5   Greebel sending this bill to Mr. Shkreli is, and we can redact

6   the text if the only point is to show that the bill was sent.

7   That's okay.

8          MS. SMITH:  There is a cover letter underneath that

9   says the bill was sent.

10          MS. DENERSTEIN:  It doesn't have that it was sent to

11   Mr. Shkreli's e-mail address.

12          THE COURT:  It says via e-mail.

13          MS. DENERSTEIN:  But it doesn't list this e-mail

14   address.

15          Just two points:  The Government on direct made the

16   point that this was not included in Retrophin's bills after

17   the fact, that this bill wasn't included in the later bills.

18          MR. KESSLER:  In the subsequent.

19          MS. DENERSTEIN:  Correct.

20          MR. KESSLER:  That's true.

21          THE COURT:  You mean this particular bill --

22          MS. DENERSTEIN:  That's correct.

23          THE COURT:  -- that was included in this exhibit was

24   not included?

25          MR. KESSLER:  It was sent separately.  This was sent

Sidebar                                                4981

1   on September 30th and then there is an October 16th bill which

2   has other matters.

3             THE COURT:  But not this?

4             MR. KESSLER:  No.

5             MS. DENERSTEIN:  Correct.  So it is important and

6   relevant to show that the bill was sent to Mr. Shkreli.

7             THE COURT:  You can certainly do that.

8             MS. SMITH:  The cover letter says that it was sent

9   to Mr. Shkreli.

10            THE COURT:  The objection is to the first e-mail,

11  the first page of this exhibit, and I do think really the way,

12  if you want to pursue admission, is to establish the hallmarks

13  of admissibility under the business record exception.  You

14  know what those are.  I'm just saying I think the bills

15  themselves and the form of the bill under the cover letter on

16  page 2 of this exhibit is consistent with the business

17  records, but I would not be able to say at this point based on

18  what I haven't heard that the first e-mail is, in fact, a

19  business record.

20            MR. KESSLER:  The only other thing I would add, Your

21  Honor, I don't know this with 100 percent certainty, but my

22  recollection is that Ms. Marsilo may actually have knowledge

23  personal knowledge that this bill was sent.

24            MS. DENERSTEIN:  That makes it even --

25            MR. KESSLER:  No, no, that the bill was sent, not

Sidebar                                                4982

1    the manner in which the bill was sent.  If the question is to

2    establish the bill was sent, she may just be able to say that

3    the bill was sent.

4              MR. BRODSKY:  Your Honor, one suggestion, if I may,

5    if Ms. Denerstein tries to meet the business record exception

6    and assuming it does not work, may we offer the document and

7    redact this first paragraph?  So we will get this in a

8    different way, but we do want the from, sent, to, subject, and

9    attachments, and the fact that it was sent by e-mail.  I don't

10   think there could be any objection.

11             MR. KESSLER:  We are not objecting to that.

12             THE COURT:  So there is option one or option two.

13             MS. DENERSTEIN:  We will go to option two.

14             (Sidebar concluded.)

15             (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  You may proceed.

2     BY MS. DENERSTEIN:

3     Q    Ms. Marsilio, I'm going to ask you to look at Defense

4     Exhibit 106-41.  It was handed up to you.

5          Now, this is an e-mail between, this is an e-mail

6     from Mr. Greebel's work e-mail, correct?

7     A    Yes.

8     Q    And it's about -- the attachment is a bill, correct?

9     A    Yes.

10    Q    And the attachment says via e-mail, correct?

11    A    Yes.

12    Q    And bills are, in the ordinary course, are sent to

13    clients from Katten e-mails, correct?

14    A    Yes.

15    Q    And in the e-mail that would go to a client, a partner

16    would write a preliminary note to the client the bill was

17    going to?

18         MR. KESSLER:  Objection to the form.

19         THE COURT:  Try to rephrase.  You can refer to the

20    document if you wish in asking your question in terms of the

21    page.

22    Q    When a bill is sent to a client via e-mail, in the

23    e-mail, in the ordinary course, a partner writes a brief note

24    to a client?

25         MR. KESSLER:  Same objection.

Marsilio - cross - Denerstein                    4984

1           THE COURT:  Do you want to refer the witness to a

2    particular page of this exhibit so that she will know what you

3    are referring to?

4    Q    Referring to the first page of the exhibit which has the

5    bill attached for September 30, 2014, is it in the ordinary

6    course that Mr. Greebel would write an e-mail to the person

7    who's receiving the bill?

8           MR. KESSLER:  Objection to what Mr. Greebel would

9    do.

10          THE COURT:  Well, if the witness knows what

11   Mr. Greebel would do in the ordinary course, she may answer.

12   With reference to the first page, is that what you're

13   referring to, Ms. Denerstein?

14          MS. DENERSTEIN:  Yes.

15   A    During Evan Greebel's billing, I wasn't copied on bills

16   that he would send via e-mail to clients so I'm not familiar

17   with what he would have written.

18   Q    With respect to -- do you have personal knowledge that he

19   sent e-mails to clients with bills attached?

20   A    Yes.

21   Q    And he did it from his Katten business account?

22   A    Yes.

23   Q    And those records are maintained by Katten, the e-mails?

24   A    Yes.

25   Q    And that they're maintained in the ordinary course of

1   business?

2   A    Yes.

3            MS. DENERSTEIN:  Your Honor, I offer government,

4   Defense Exhibit 106-41.

5            MR. KESSLER:  So, Your Honor, same objection.  The

6   elements of 803(6), particularly, the preamble sentence, have

7   not been established and I would also request a brief voir

8   dire under 803(6)(D).

9            THE COURT:  All right.  Why don't you voir dire and

10  then we'll see if Ms. Denerstein can establish the preamble

11  portion of the rule 803(6).

12  VOIR DIRE EXAMINATION

13  BY MR. KESSLER:

14  Q    Ms. Marsilio, are you an authorized custodian of Katten

15  e-mails?

16  A    No.

17  Q    Were you authorized today to testify about the

18  recordkeeping for Katten e-mails as opposed to bills?

19  A    No.

20           MR. KESSLER:  Same objection.

21           THE COURT:  All right.

22           Did you want to try to establish the preamble or

23  would you like --

24           MS. DENERSTEIN:  One more time.

25           THE COURT:  Okay.

Marsilio - cross - Denerstein                    4986

1  CROSS-EXAMINATION (Continued)

2  BY MS. DENERSTEIN:

3  Q    The bill's date, the attachment on the next page,

4  September 20, 2014, is the same date as the e-mail on the

5  first page, correct?

6  A    Yes.

7  Q    So they are made close in time, the e-mail is close in

8  time to the document that's attached, correct?

9  A    Yes.

10  Q    The dates are the same?

11  A    Yes.

12  Q    And you may not be the e-mail expert for Katten, but you

13  are aware that Katten maintains e-mails of its employees?

14          MR. KESSLER:  Objection.

15          MS. DENERSTEIN:  Strike the first part.

16  Q    You are aware that Katten maintains e-mails for its

17  employees?

18          MR. KESSLER:  Object to "maintain."

19  Q    Keeps?

20          THE COURT:  Overruled.  You may answer if you know

21  the answer.

22  A    If the employee of Katten doesn't delete their e-mail,

23  it's recorded, it's saved for a period of time.

24  Q    And this is a Katten e-mail, correct?

25          THE COURT:  Which one, the whole thing?

Marsilio - cross - Denerstein                    4987

1          MS. DENERSTEIN:  The first page, sorry, with the

2     attachment, the bill.

3     A     I don't know.  Based upon his signature, yes, the

4     signature block.

5          MS. DENERSTEIN:  Your Honor, I'm going to try again

6     to offer Defense Exhibit 106-41.

7          MR. KESSLER:  Your Honor, I have the same objection.

8     The preamble issues have not been established.

9          MS. DENERSTEIN:  Can we not do a speaking objection,

10    please?

11         THE COURT:  All right.

12         MR. KESSLER:  Same objection.

13         THE COURT:  I would say that the first page of this

14    document is still suffering from the issues we discussed at

15    side bar in terms of the basis on which the defense offers

16    Exhibit 106-41.

17         MS. DENERSTEIN:  We are then going to offer it

18    subject to our prior discussion at side bar.

19         MR. KESSLER:  No objection to that.

20         THE COURT:  All right.  Just check it with Kessler,

21    Mr. Brodsky, please?  Thank you.

22         (Pause.)

23         THE COURT:  All right.  So the government has

24    approved the form in which Defense Exhibit 106-41 is being

25    offered and you may publish it.  It is admitted.

Marsilio - cross - Denerstein                4988

1              (So marked.)

2   Q    Ms. Marsilio, this is an e-mail from Evan Greebel,

3   correct?

4   A    Yes.

5   Q    And it's to Martin Shkreli, correct?

6   A    Yes.

7   Q    And it's to Martin Shkreli at his AOL.com account,

8   correct?

9   A    Yes.

10  Q    And at the bottom is Mr. Greebel's business address,

11  correct?

12  A    Yes.

13  Q    And if you turn the page, the bill that is attached is

14  the September 30, 2014 bill, correct?

15  A    Yes.

16  Q    And this is the bill that is related, if we read the

17  sentence:  Enclosed is our invoice for services rendered

18  through August 31, 2014 in connection with the SEC inquiry.

19  Correct?

20  A    Yes.

21  Q    And this bill was sent to Mr. Shkreli on September 30,

22  2014, correct, if you look at the front page of the e-mail?

23  A    Yes.

24         MS. DENERSTEIN:  No further questions.

25         THE COURT:  All right.  Thank you.

1           Any redirect?

2           MR. KESSLER:  Yes, very briefly, Your Honor.

3    REDIRECT EXAMINATION

4    BY MR. KESSLER:

5    Q    Ms. Denerstein, was this bill --

6           MS. DENERSTEIN:  I'm Ms. Denerstein.  She is

7    Ms. Marsilio.  It's confusing.

8           MR. KESSLER:  So many names.

9    Q    Ms. Marsilio, I'm sorry, you were asked a bunch of

10   questions about this bill and it being sent to Martin Shkreli?

11   A    Yes.

12   Q    Is this being sent to Martin Shkreli's MSMB Capital

13   e-mail account?

14   A    No.

15   Q    Is it being sent to Martin Shkreli's Retrophin e-mail

16   account?

17   A    No.

18   Q    What's the e-mail account the he sent it to?

19   A    A personal e-mail account, AOL.

20   Q    It's a bill going to the AOL.com address?

21   A    Yes.

22   Q    All right.  If we can switch to the laptop.

23           Yesterday, you recall early on in your testimony,

24   you were asked some questions about how different people can

25   write bills that describe the same thing differently?

Marsilio - redirect - Kessler                4990

1    A    Yes.

2    Q    All right.  We can put up Government Exhibit 857-A.  This

3    is the bill that you were shown in the context of those

4    questions.  And if we go to page eight, toward the bottom,

5    there's a couple of entries for July 7th -- I'm sorry --

6    January 7th.

7            You were asked about the entry for Tenley Mochizuki

8    and then Michael Rosensaft?

9    A    Yes.

10   Q    Those are both entries that correspond to January 7th,

11   correct?

12   A    Yes.

13   Q    Do they have different times being billed?

14   A    Yes.

15   Q    Different descriptions?

16   A    Yes.

17   Q    Do you have any idea whether these are describing the

18   same events or different events?

19   A    Not my expertise.  I wouldn't know.

20   Q    So it's possible for two individuals to bill on the same

21   day and not be describing the same work?

22   A    Yes.

23   Q    Okay.  Finally, you were asked a number of questions

24   about the working timekeeper reports.  Do you recall that?

25   A    Yes.

Marsilio - redirect - Kessler                4991

1   Q    And you were asked about various matters and a number of

2   matters that Mr. Greebel worked on?

3   A    Yes.

4   Q    Okay.  So I just want to go into that quickly.

5        First, let's go to Government Exhibit 123-2 which is

6   the timekeeper report from February 2011 to January 2012.  If

7   we go to the second page, there's an entry from MSMB Capital

8   for 869 hours.  Do you see that?

9   A    Yes.

10  Q    And then I believe if we go to a page after that, there

11  is also an entry for Retrophin.  Yes, Retrophin, 57.6 hours.

12  Do you see that?

13  A    Yes.

14  Q    So that's more than 900 hours for Retrophin and MSMB

15  combined?

16  A    Yes.

17  Q    If you can scroll down a little bit, Ms. Balbin, to the

18  total.  The total is 2,000 hours?

19  A    Yes.

20  Q    Almost 2,100 hours?

21  A    Yes.

22  Q    So, Mr. Greebel billed approximately slightly less than

23  half his hours to Retrophin and MSMB that year?

24  A    Yes.

25  Q    If we can go to Government Exhibit 123-3.  This is the

Marsilio - redirect - Kessler                    4992

1    working timekeeper period for February 2012 to January 2013.

2    Do you see that?

3    A    Yes.

4    Q    If you look at the second page, there's an entry for

5    Retrophin that is 505 hours?

6    A    Yes.

7    Q    There's also an entry for MSMB Capital negative 70 hours?

8    A    Yes.

9    Q    So if we add those together, that's about 430 hours?

10   A    Approximately.

11   Q    If we go to the total on the third page, there's

12   1,903 hours, is that right?

13   A    Yes.

14   Q    So Mr. Greebel worked between 20 and 25 percent of his

15   time on Retrophin and MSMB matters that year?

16   A    Yes.

17   Q    I'm sorry.  Strike that.

18        Mr. Greebel billed approximately 20 to 25 percent of

19   his time?

20   A    Recorded his time.

21   Q    Recorded.

22        All right.  If we go to Government Exhibit 123-4,

23   this is the working timekeeper report for February 2013 to

24   January 2014.  Do you see that?

25   A    Yes.

Marsilio - redirect - Kessler                    4993

1   Q    Okay.  If you look at the entry for Retrophin on the

2   second page, there's 1,100 hours.  Is that right?

3   A    Yes.

4   Q    If you go to the total on the third page, the total is

5   2,243 hours?

6   A    Yes.

7   Q    So Mr. Greebel billed approximately, recorded

8   approximately half his time to Retrophin that year?

9   A    Yes.

10  Q    Finally, in the -- I'm not going to put an exhibit up on

11  the screen, but in the binder in front of you that had those

12  working timekeeper reports, I think they're behind tab 9.

13  A    Yes.

14  Q    If you go to Government Exhibit 123-5 which is the

15  exhibit for January 2014 to January 2015, do you see that?

16       So, by my count, there is 1,164 hours billed to

17  Retrophin that year.  Can you just check that?  Sorry,

18  recorded to Retrophin that year.

19  A    1,164.4 hours, yes.

20  Q    The total is 2,127?

21  A    Yes.

22  Q    So, again, Mr. Greebel recorded slightly more than half

23  of his time to Retrophin matters?

24  A    Yes.

25       MR. KESSLER:  No further questions.

4994

1          THE COURT:  Ms. Denerstein, do you have any recross?

2          MS. DENERSTEIN:  One moment, Your Honor.

3          (Pause.)

4          MS. DENERSTEIN:  No further questions.

5          THE COURT:  All right.  Ma'am, you are excused.

6     Thank you and have a good day.

7          THE WITNESS:  Thank you.

8          (Witness excused.)

9          THE COURT:  Are you prepared to call your next

10    witness?

11         MR. KESSLER:  Yes, we're prepared to recall Jackson

12    Su.  I don't know if we want to take a break or just keep

13    going.

14         THE COURT:  Well, we are going to allow the jurors

15    to go home tonight at 5:00 and we did get a late start.

16         So, would the jurors like to take their lunch now?

17         THE JUROR:  No.

18         THE JUROR:  No.

19         THE COURT:  Okay.  Do you want to take care of the

20    witness?

21         MR. KESSLER:  Yes.  Yes.

22         (Pause.)

23         THE COURT:  All right.  Mr. Su, you are still under

24    oath.

25         And Mr. Kessler, you may continue your direct

CMH      OCR      RMR      CRR      FCRR

4995

1    examination.

2            MR. KESSLER:  Thank you, Your Honor.  One moment.

3            (Pause.)

4            THE COURT:  Try not to hit that mic too hard.  It is

5    very fragile.

6            MR. KESSLER:  So if we can first put Government

7    Exhibit 682-B in evidence back up.

8            (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  JACKSON  SU      ,

2       the witness, having been previously duly sworn,

3       resumed as follows:

4  DIRECT EXAMINATION (Continued)

5  BY MR. KESSLER:

6  Q     Good afternoon, Mr. Su.

7  A     Good afternoon.

8  Q     Before we broke yesterday, do you recall we discussed

9  this March 5, 2013 e-mail from you to Mr. Shkreli?

10 A     Yes.

11 Q     This is an e-mail in which you talked about reaching out

12 to MSMB investors, is that right?

13 A     Correct.

14 Q     And to the SEC and other enforcement notifications?

15 A     Correct.

16 Q     And you made various references to attorneys.  Do you

17 recall that?

18 A     Yes.

19 Q     Now, also at the end of your testimony yesterday, I had

20 asked you some questions about the Global Relay e-mail archive

21 system.  Do you remember that?

22 A     Yes.

23 Q     And I think you testified that you accessed that system

24 both while were you doing work at Retrophin and then at points

25 after you stopped working for Retrophin in December of 2012.

Su - direct - Kessler                              4997

1   Is that right?

2   A    Yes.

3   Q    So when you stopped working at Retrophin in

4   December 2012, did anyone tell you you were fired?

5   A    No.

6   Q    Did anyone tell you that you no longer had access to the

7   Global Relay system?

8   A    No.

9           MR. BRODSKY:  Objection to the leading, Your Honor.

10          THE COURT:  Try to rephrase it, Mr. Kessler, please.

11  Q    Who, if anyone, told you you no longer had access to the

12  Global Relay system?

13  A    No one.

14  Q    Who, if anyone, changed your password to the Global Relay

15  system?

16  A    No one.

17  Q    Now, in connection with your testimony about the, your

18  access of the Global Relay e-mail archive system after you

19  stopped working at Retrophin in December 2012, have you

20  entered into or -- I'm sorry, strike that -- have you received

21  an agreement from the government?

22  A    Yes.

23  Q    Okay.  What does that agreement do?

24  A    It's an agreement -- sorry.  I need to pull it out.  I

25  don't remember the title of the agreement.

CMH      OCR      RMR      CRR      FCRR

Su - direct - Kessler                              4998

1    Q     Sure.

2    A     May I?

3    Q     Let me just give you -- let me just give you a copy.

4          THE COURT:  It has to come through the proper

5    channels for evidence.  So Mr. Kessler will give you a copy.

6          MR. KESSLER:  Sure.

7    Q     Let me give you a copy of a one-page document.  I will

8    get the government exhibit in a minute for it.

9    A     Thank you.

10   Q     So, Mr. Su, take a second to look at that document and

11   let me know if it refreshes your recollection about your

12   agreement with the government.

13   A     Yes.

14   Q     So what does your agreement with the government do?

15   A     It's immunity for trial testimony for testimony I'm

16   giving today and yesterday regarding the case here.

17   Q     Regarding the case or just about your access of the

18   Global Relay archive system?

19   A     My access for the Global Relay archive system.

20   Q     And is it limited to access between December 2012 and

21   June 2013?

22   A     Yes.

23   Q     Okay.  And so what does the agreement say about your

24   testimony on that topic?

25   A     Testimony that I'm giving in the case will not be used to

Su - direct - Kessler                           4999

1    prosecute me but only the testimony in the case.  If I give

2    any false statements or I'm untrue about it or obstruction of

3    justice, I can still be prosecuted for my testimony, but my

4    testimony here doesn't preclude me from getting prosecuted by,

5    by the U.S. Government.

6    Q    So the agreement applies to your testimony about the

7    global or about your access to the Retrophin archive system,

8    correct?

9    A    Correct.

10   Q    It doesn't apply to any other content, correct?

11   A    Correct.

12   Q    And does it apply if you lie or make a false statement?

13   A    It does not apply.

14   Q    Okay.  So, we took Government Exhibit 682-B down.  So,

15   Government Exhibit 682-B was a March 5th e-mail from you to

16   Mr. Shkreli.

17            Did you also have e-mail communications with

18   Mr. Greebel in this time period?

19   A    Yes.

20   Q    All right.  If you turn to tab 29 in your binder, I'll

21   show you what's been marked for identification as Government

22   Exhibit 111-45.

23            THE COURT:  When you say "in this period," can you

24   define it so we all understand it?

25            MR. KESSLER:  Yes.  I'm sorry.  In March 2013.

Su - direct - Kessler                          5000

1   Q    So, I will show you what's been marked for identification

2   as Government Exhibit 111-45.

3             All right.  Mr. Su, do you see Government

4   Exhibit 111-45?

5   A    Yes.

6             MR. KESSLER:  And, Your Honor, I'm sorry, I'd just

7   inform for the record that the document I showed Mr. Su for

8   identification and to refresh his recollection is Government

9   Exhibit 111-49.

10            THE COURT:  All right.  Thank you.

11  Q    Sorry for that, Mr. Su.  We'll go back to 111-45.

12            Is this an e-mail from you to Mr. Greebel copying

13  Mr. Shkreli on March 12, 2013?

14  A    Yes.

15  Q    And is this a continuation of the communications we were

16  discussing in which you were seeking your back pay and other

17  compensation?

18  A    Yes.

19            MR. KESSLER:  I offer Government Exhibit 111-45.

20            MR. BRODSKY:  Objection.  Hearsay.  It's not a

21  continuation, Your Honor, of the last e-mail.

22            MR. KESSLER:  I'm sorry, yes.

23            THE COURT:  Sorry.

24            MR. KESSLER:  I'm happy to clarify it.

25            THE COURT:  Yes.

Su - direct - Kessler                                    5001

1   Q     Mr. Su, is this e-mail on the same topic as the previous

2   e-mail chain, your requests to be paid?

3   A     Yes.

4   Q     Back pay and other compensation?  Okay.

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Su - direct - Kessler                    5002

1              MR. BRODSKY:  Same objection.  Objection on hearsay

2       grounds, Your Honor.

3              THE COURT:  Do you want to offer it for a

4       non-hearsay reason, Mr. Kessler?

5              MR. KESSLER:  Yes.

6              THE COURT:  What is that?

7              MR. KESSLER:  For the effect on the recipient.  I

8       guess when I say "effect," I mean for the knowledge of the

9       recipient and the fact that the recipient received certain

10      information.

11             MR. BRODSKY:  Same objection, Your Honor.  The offer

12      is the declarant.

13             THE COURT:  All right.  Well, the offer is the

14      declarant.  This is being offered for the effect on the

15      recipient?

16             MR. KESSLER:  For the individual that received the

17      e-mail, that he was provided with certain information that is

18      in the content of the e-mail.  It's not being offered for the

19      truth of what's stated in the e-mail.

20             THE COURT:  All right.

21             MR. BRODSKY:  Your Honor, the declarant can testify,

22      the declarant is testifying and can testify about anything.

23             MR. KESSLER:  Your Honor, I'm happy to continue this

24      at side bar.

25             THE COURT:  All right.  Why don't we have a side

Side Bar                                        5003

1   bar.

2            Excuse us.

3            (The following occurred at side bar.)

4            THE COURT:  Okay.

5            MR. KESSLER:  So, Your Honor, this is an e-mail sent

6    from Mr. Su to Mr. Greebel.

7            THE COURT:  Yes.

8            MR. KESSLER:  There's no question about its

9    authenticity.  It's being offered to show that on March 12,

10   2013, Mr. Greebel was provided with certain information

11   including that there was a Merrill Lynch settlement, that

12   Mr. Su reported that Mr. Shkreli's assets under management

13   were very different than what they said, that Mr. Shkreli

14   engaged in a communication with Eric Schmidt at the SEC on

15   November 2012.

16           THE COURT:  So this is not being offered for the

17   truth?

18           MR. KESSLER:  No, absolutely not.

19           THE COURT:  It's just to say that this is

20   information that Mr. Su conveyed to Mr. Greebel, whether or

21   not it was true and whether or not he chose to leave it to be

22   true.

23           MR. KESSLER:  Exactly.  The sole relevance or the

24   central relevance, I should say, is that Mr. Greebel received

25   this document and received the statements.  There can be

Side Bar                                5004

1    arguments about whether the statements are true and what

2    Mr. Greebel should or should not have done with the

3    information but, obviously, a central question in this case is

4    what information Mr. Greebel had at what point.  I believe

5    both openings talked about when Mr. Greebel learned about an

6    SEC investigation, various things like that.

7             So, this is being offered to show that Mr. Greebel

8    was being provided with certain information.  We're free to

9    argue about whether it should have been believed or not and

10   what it means, but that is why the document is being offered

11   and the document is relevant independent of Mr. Su.  There's

12   no hearsay rule that says just because the person who sent an

13   e-mail is on the stand, the e-mail can't come in.

14            MR. BRODSKY:  Respectfully, Your Honor, Mr. Kessler

15   is wrong on the law.  When the declarant is on the witness

16   stand and can be asked and be used, given documents to refresh

17   his recollection, which is the whole purpose of refreshing the

18   recollection by using documents, the witness has to make

19   statements about what he or she said and that witness is on

20   the stand and is able to make such statements.

21            This document is being offered by the government

22   because Mr. Su, respectfully, they don't -- they would prefer

23   to have the declarant's written communication in and that is

24   impermissible under the hearsay rules.  Had they not called

25   Mr. Su, they might have an argument, but they have Mr. Su on

Side Bar                                          5005

1    the stand.  He can be cross-examined about, he can be asked on

2    direct examination what did you tell Mr. Greebel, what did you

3    say.  They can use this document to refresh his recollection,

4    but they can't put the document in.

5              MR. KESSLER:  Your Honor, I'm not aware of case law

6    or a rule of evidence that says when the declarant is on the

7    stand, you can't introduce an e-mail they sent.  I'm happy to

8    look at the rule of evidence or Second Circuit case.

9              MR. BRODSKY:  There have been a number of occasions

10   where the government has objected to documents we wanted to

11   put in where the declarant was on the stand and they said it

12   doesn't matter.  The declarant is on the stand, the declarant

13   can testify to it.  We were shut down.  There were other

14   occasions where we weren't able to put in the documents where

15   there were inconsistent statements or there were statements

16   made by the declarant that impeached his credibility or

17   impeached his testimony.

18             MR. KESSLER:  Your Honor, this is -- each document

19   is taken separately.  I don't know the specific examples

20   Mr. Brodsky is talking about.  It sounds like there is no rule

21   of evidence that precludes an e-mail that declarant sent from

22   being offered assuming there's an appropriate non-hearsay and

23   authentic and relevant basis.  I'm happy to look at any

24   authority that says we can't do that but I'm not aware of any.

25             THE COURT:  I think that there have been documents

Side Bar                                    5006

1    in the past that the defense wanted to offer, documents were

2    offered by the witness who was testifying that they wanted to

3    admit, but there had been a hearsay objection made and it was

4    sustained.  I just have that recollection.  But in terms of a

5    specific document or the basis for the --

6              MR. PITLUCK:  Your Honor, not to interrupt, I'm

7    sorry, but there were also a number of documents that defense

8    admitted under this same purpose, for a non-hearsay purpose.

9    Our hearsay objections weren't offered for the truth.  This

10   court is very well aware of that.  This is for a non-hearsay

11   purpose.  The defense has admitted multiple exhibits on that

12   basis.

13             THE COURT:  Okay.

14             MR. BRODSKY:  The very last exhibit, Your Honor, we

15   offered for non-hearsay purpose of what information

16   Mr. Greebel sent out and the government at side bar objected

17   and we weren't able to overcome the business records

18   exception.  This is not a business record.  It's just being

19   offered because Mr. Su is on the stand and they don't believe,

20   respectfully, I don't think Mr. Su will be able to articulate

21   this the way they want him to.

22             MR. KESSLER:  Your Honor, that's not an objection.

23   A hearsay objection is whether there's a document that's an

24   out-of-court statement that's being offered to prove the truth

25   of the matter asserted.  That's not what this is.  This is a

Side Bar                          5007

1   relevant non-hearsay purpose.

2          I'm happy to go back and look at the transcript and

3   see if there are other examples where there was a declarant on

4   the stand and an e-mail written by a declarant and offered for

5   non-hearsay purposes and the government still objected.  We

6   can look for examples.  I'm not aware of them.

7          MR. PITLUCK:  The point is that's the purpose for

8   this document.

9          THE COURT:  I mean, they are not offering this for

10  the truth.  They are offering it for, the reason is that they

11  want to show what Mr. Su informed Mr. Greebel of and not

12  necessarily that what he's informing him of is true but just

13  Mr. Su is emoting to Mr. Greebel and telling him certain

14  things about his history and understandings with regard to his

15  tenure at Retrophin.  So I would admit this, you know, because

16  it is not being offered for the truth.

17         MR. KESSLER:  Thank you.

18         MR. BRODSKY:  Will you instruct the jury, Your

19  Honor, about this specific document because it is important to

20  us that because it contains lots of serious allegations, that

21  Your Honor instruct the jury this is not being offered for the

22  truth.

23         MR. PITLUCK:  A number of times --

24         MR. BRODSKY:  But this is an important one, Your

25  Honor.  We don't say it for every one and they are all not

Side Bar                                5008

1   important.  This is a series of allegations that's being put

2   before the jury and they're going, the jury is going to

3   believe it is being offered for the truth when specifically

4   the exception the government is relying on, and it's specious

5   and we object to it, but the objection they're relying on is

6   that the information was given to Mr. Greebel.  The whole

7   point they say is that it's not for the truth.

8           THE COURT:  I will instruct the jury on this one it

9   is not being offered for the truth but, rather, to show what

10  information Mr. Su was conveying to Mr. Greebel.

11          MR. KESSLER:  That's fine.

12          MR. PITLUCK:  Your Honor, that's fine, but when we

13  make the same objections, we'll try to do it carefully.

14          THE COURT:  Yes.  Thank you.

15          (Side bar conference ends.)

16          (Continued on next page.)

17

18

19

20

21

22

23

24

25

5009

1          (In open court.)

2          MR. KESSLER:  Your Honor, I offer Government's

3    Exhibit 111-45, subject to our conversation.

4          THE COURT:  All right.

5          Members of the jury, I instruct you that

6    Government's Exhibit 111-45 is not being admitted for the

7    truth of the statements in this document but rather to show

8    what was being conveyed to the recipients of this e-mail.

9          (So marked.)

10   Q    Mr. Su, is this a March 12, 2013 e-mail from you to Evan

11   Greebel copying Martin Shkreli?

12   A    Yes.

13   Q    If we go to the second page of the document, do you see

14   that you are responding to a letter from Mr. Greebel?

15   A    Yes.

16   Q    What do you recall about that letter?

17   A    It was a termination letter from Evan Greebel and

18   Retrophin to me.

19   Q    Okay.  So now let's look at your response.  Can you read

20   the first paragraph of your response?

21   A    Evan, I performed and carried out my duties as COO under

22   the employment agreement at all times.

23          My contract entitles me to three weeks of paid

24   vacation throughout the year which I used a portion of on

25   12-21; 12-24, 12-26, 12/26-12/31/2012 which was approved by

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

5010

1    Martin and well documented within company attendance files.  I

2    am also owed vacation pay that was not used, eight days

3    according to records.  The company was and is currently in

4    breach of my contract after failing to pay me at the beginning

5    of the calendar quarter as stipulated in section 3 of my

6    employment agreement.  There are certain expectations each

7    employee has from their employer which is to be paid on a

8    timely basis.

9    Q    Let me just stop you there.  You don't have to read

10   everything?

11            When you wrote that the company is currently in

12   breach of my contract after failing to pay me at the beginning

13   of the calendar quarter, do you recall how much money you were

14   owed at this point.

15   A    I do not recall at the moment.

16   Q    If you can keep reading the rest of this paragraph,

17   starting with having to chase.

18   A    Having to chase your employer down for a salary every

19   period should not be the norm, especially in light of

20   observing your employer maneuver funds from company accounts

21   to personal ones to satisfy personal and unrelated company

22   debts, Merrill Communication, Complete Discovery/Coface,

23   Merrill Lynch settlement, etcetera, to just name a few at the

24   moment, before paying company salaries.  The situations are

25   well documented along with 500 plus other pages of documents

5011

1    and e-mails.  Your determination of unexcused absence is

2    inaccurate and invalid.

3    Q    You referred to the situations are well documented along

4    with 500 plus other pages of documents and e-mails.  Do you

5    see that?

6    A    Yes.

7    Q    What was that a reference to?

8    A    A reference to contracts, e-mails, documents that the

9    company had.

10   Q    And are those documents that you also had in your

11   possession?

12   A    I had some.

13   Q    Were they all documents you had seen?

14   A    Those are documents I have seen.

15   Q    Then, a couple of lines up you referred to your employer

16   maneuvering funds from company accounts to personal ones to

17   satisfy personal and unrelated company debts.  Do you see

18   that?

19   A    Yes.

20   Q    And then there are a couple of entities listed in

21   parenthesis.  Do you see that?

22   A    Yes.

23   Q    What were each of those entities?

24   A    Merrill Communications from my recollection is a

25   forensics computer company that did forensics for one of

5012

1    Martin's entities during a SEC investigation.

2            Complete Discovery/Coface, I do not know what that

3    is from memory now.

4            Merrill Lynch settlement was a settlements agreement

5    that I saw that there was a trade that Martin and Marek

6    entered into where they lost a lot of money.  I believe it was

7    seven and a half million dollars.  They negotiated down

8    through a settlement and it got reduced down to 1.5 million

9    and Martin was using Retrophin funds to pay for that

10   settlement.

11   Q    Can you read the next paragraph?  Actually, just read the

12   first three sentences in that paragraph.

13   A    I did not have multiple conversations in 2012 regarding

14   Martin's transfer if stock to me, George Huang or Andrew

15   Vaino.  Martin's transfer was on his own free will without any

16   contingency or expectation, documented or verbal.  If he did

17   have one, he would surely have asked you or another attorney

18   to memorialize the contents in the stock transfer agreement as

19   he did so many other times.

20   Q    The reference to Martin's transfer of stock to me, George

21   Huang and to Vaino, does that relate to the 15,000 shares we

22   talked about you receiving on December 5?

23           MR. BRODSKY:  Objection to the leading, your Honor.

24           THE COURT:  Overruled.  He's just trying to frame

25   the and guide.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

5013

1   A     It refers to the 15,000 shares I received.

2   Q     When you received them were there any contingencies or

3   restrictions placed on those shares from Mr. Shkreli?

4   A     No, there were not.

5   Q     Can you read the first few sentences of the next

6   paragraph?

7   A     However, fraudulently inducement was on Martin's part

8   where he enticed me to join his companies as Chef Operating

9   Officer claiming to managing in excess of 100 million dollars

10  in hedge fund assets.  Martin claimed these alleged assets

11  verbally and in e-mail documents to other individuals as well.

12  Q     Read the next sentence.

13  A     When, in fact, Martin did not manage that amount at the

14  time, nor any time in the past according to his correspondence

15  with Eric M. Schmidt with the Securities & Exchange Commission

16  on November 4, 2012.

17  Q     So when you referred to a correspondence with Eric

18  Schmidt at the SEC on November 4, 2012, had you actually seen

19  a document between Mr. Shkreli and Mr. Schmidt on November 4,

20  2012?

21  A     Yes.  It listed the assets that Martin supposedly

22  managed.

23              MR. BRODSKY:  Time period for when he saw it?

24              THE COURT:  Can you give us a time period, sir?

25  Q     Do you recall when you saw the November 4, 2012

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

5014

1  communication between Mr. Schmidt  -- Mr. Shkreli and

2  Mr. Schmidt?

3  A    Around that time frame, November 4, 2012.

4  Q    Can you read the sentence after November 4, 2012?

5  A    The mere sum of less than five million dollars, which he

6  managed, is a far cry from collecting performance and

7  management fees on 100 million dollars in which he conveyed.

8  Martin holds himself out to be this wildly successful hedge

9  fund manager and a Forbes 30 under 30 brilliant when the truth

10  is highly disputable given the facts at hand.

11  Q    Then in the last paragraph of the letter do you request

12  certain compensation?

13  A    Yes.

14  Q    Now, after you sent this e-mail to Mr. Greebel copying

15  Mr. Shkreli, did you have a conversation with Mr. Greebel on

16  the phone?

17  A    I did.

18  Q    What happened during that conversation on the phone?

19  A    Evan passed me what company documents I had.  He asked me

20  to send him some company documents that I had and that he

21  would talk to his client and get back to me.

22  Q    Do you recall if he asked any questions about your

23  statements relating to the amount of assets that Mr. Shkreli

24  said he was managing?

25  A    I don't recall.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

5015

1   Q    After that conversation did you, in fact, send

2   Mr. Greebel various documents?

3   A    Yes.

4   Q    Were some Merrill Lynch settlement documents one of them?

5   A    Yes.

6   Q    Now, I think you testified about this last time, but

7   let's just reorient.  Did you end up receiving the

8   compensation you'd asked for in this letter?

9   A    No.

10  Q    So what happens then?

11  A    I gave the company and Evan a time frame in which to

12  respond to my e-mail that was just on the board.  I didn't get

13  a response.  And in the later part of March or April of 2013 I

14  filed suit with  -- an employment suit asking for my salary,

15  vacation pay, healthcare benefits back in state court with an

16  attorney and it got pushed to arbitration.

17  Q    So what happened when the proceeding moved from state

18  court to arbitration?

19  A    The arbitrator -- in between that time the arbitration

20  was going on it was just very preliminary and then Martin's

21  attorney proposed a settlement that included my one hundred

22  twenty-six thousand shares.  In August I refused at first to

23  even discuss my shares and then I asked the attorney  -- but

24  they kept on coming back with giving my shares in exchange for

25  a price.  The stock was somewhere around 3 dollars and 50

5016

1    cents.  They wanted to pay me 7 a cents for my shares.  I

2    September on saying no.  Then which increased the price a

3    little bit, but I continuously said no.

4    Q    Let me pause you for a minute, so we understand what you

5    are talking about.  You had sued for your backpay and

6    compensation under your contract, is that right?

7    A    Correct.

8    Q    And as part of negotiation related to that were you asked

9    to return all of the Retrophin shares that you also had?

10   A    Yes.

11   Q    Okay.  So I think you were testifying about the

12   arbitration proceeding and there was a discussion about what

13   you would be paid and whether you were going to return these

14   shares or not, is that right?

15   A    That's correct.

16   Q    So what happened after that?

17   A    After that, we went into arbitration  -- sorry.  It went

18   to arbitration and then there were discussions in December.

19   For the first time I heard from my attorney at that point.  He

20   said the other side is asking or the Retrophin is asking the

21   attorney or the arbitrator that I settle and agree to a

22   settlement when in fact I never did.

23        So the attorney fought that point and, however, the

24   arbitrator ruled that because of the words that attorney at

25   the time used bound me to that settlement.  So he agreed on my

5017

1   behalf even though I didn't authorize him to agree to any

2   settlement.  I never signed anything and in defense of in

3   front of the arbitrator I wrote a letter that said I never

4   authorized anybody to give away my shares or for me to accept

5   any money for the shares or anything.

6          The arbitrator rule legally that my attorney at the

7   time through the use of e-mail agreed to the settlement and

8   that I was bound to the settlement.

9   Q   So what happened after the arbitrator determined that you

10  had been bound by the settlement your lawyer agreed to?

11  A   In exchange for my vacation pay, so my vacation pay, my

12  backpay, healthcare benefits and one hundred twenty-six

13  thousand shares that was worth seven dollars or eight dollars

14  at the time, I was forced to give up that amount, which

15  amounted to over seven, eight hundred thousand dollars at that

16  moment for 150,000, 160,000.  I can't remember the exact

17  amount.  That was for a lot less.  It was like one hundred

18  sixty thousand dollars in cash.

19  Q   So far we have been talking about your state lawsuit and

20  your arbitration.  Did there come a time before the resolution

21  of that arbitration that you sold your Retrophin shares?

22  A   I did.  So when I had my shares I was restricted for a

23  period of time that I wasn't allowed to sell my shares.  So my

24  restricted stock I thought that I would have to carry it six

25  months from the date of issue and I would be able to sell them

5018

1  in June of 2013, because it was issued when I left the

2  December of 2012.

3          So I went to try to sell it.  The company said you

4  can't sell it through Evan.  I said I could sell it because it

5  was restricted stock.  You have a holding period, what's call

6  a 144 restriction on stock, and it would carry out for a year

7  instead of the six months that I thought it was.  So I had to

8  wait for a year to sell my stock.

9          When I went to sell that stock through Charles

10 Schwab, I asked for permission through Charles Schwab because

11 they would have to get proper clearance and I went to a broker

12 and Charles Schwab did also to get approval from the company

13 and Evan to be able to sell the stock.

14         Charles Schwab said they recorded all the calls.

15 They said they got the call recorded.  The company and Evan

16 gave approval to sell the stock.

17         I explained to Charles Schwab that it was a

18 contentious employment departure, termination.  I told them

19 all that.  They said we got approval.  I subsequently sold it

20 when Charles Schwab gave me approval to do so.

21 Q    What happened after you sold the stock?

22 A    After I sold the stock the money was in my account and

23 then I got a call from Charles Schwab saying that the company

24 reneged and that  -- the company or Evan reneged and I wasn't

25 able to sell my stock.  They took away the permission that

5019

1  they granted earlier to sell my stock, even though I had

2  already sold it.

3        The stock went up in price, meaning I had to buy

4  back the stock I already sold, which resulted in I think

5  500,000 going into my savings account, not everybody having

6  that five hundred thousand, having that taken away and being

7  in deficit for over $900,000 right now, which I owe over

8  $900,000, plus lawyer fees because of that.

9  Q    Now, you previously mentioned George Huang, someone you

10  were in business with?

11 A    Yes.

12 Q    Did Mr. Huang also try to sell his shares around the time

13 you did?

14 A    Yes.

15        MR. BRODSKY:  Objection, your Honor, hearsay.

16        THE COURT:  Sustained.

17 Q    Did Charles Schwab file a lawsuit against you and

18 Mr. Huang and various other parties related to these sales of

19 stock?

20 A    Charles Schwab filed a lawsuit against me, against George

21 Huang, who had the same situation, exactly the same scenario

22 that happened to me, filed a lawsuit against Retrophin, the

23 company, filed a lawsuit --

24        MR. BRODSKY:  Sorry, your Honor.

25        THE COURT:  All in one lawsuit?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

5020

1        THE WITNESS:  Yes, ma'am.

2        MR. BRODSKY:   Your Honor, I was objecting and

3   moving to strike the last statement regarding Mr. Huang having

4   the same situation.  That's hearsay.

5        MR. KESSLER:  I'm happy to rephrase.

6        THE COURT:  All right.

7   Q    What did Charles Schwab say in its lawsuit about you and

8   Mr. Huang?

9   A    That we sold the stock when we didn't have possession of

10  the stock and we were not allowed to sell the stock and the

11  lawsuit included all those entities I said, sorry, George

12  Huang, me, Retrophin, the company  -- basically everybody that

13  they sued.  They sued everybody.

14  Q    Did they also sue the transfer agent who actually does

15  the mechanics of the moving the stock around?

16  A    Yes.  They sued the transfer agents.

17  Q    Did you and Mr. Huang assert various counterclaims?

18  A    Yes, because we said that Charles Schwab gave us

19  permission and that permission was granted through the company

20  and the law firm Katten.

21  Q    And was this whole lawsuit in the Southern District of

22  New York across the river in Manhattan?

23  A    Yes.

24  Q    What was the ultimate resolution of the lawsuit?

25  A    The ultimate resolution was George or the company would

5021

1   allow George Huang to sell his shares.

2          THE COURT:  Can we say the company who we are

3   talking about?

4          THE WITNESS:   Retrophin.

5          THE COURT:  Thank you.

6   A    Retrophin, the company, allowed George Huang to sell his

7   shares.  At that time the price of the shares appreciated to

8   30 dollars a share approximately.  George was allowed to sell

9   his shares to cover a loss that Charles Schwab sustained

10  between my sale and George's sale and they cancelled the

11  lawsuit or dismissed the lawsuit against all the parties that

12  they filed against.

13  Q    So as a result of all of this, do you owe George Huang

14  money?

15  A    I owe him a lot of money.  I owe him $900,000, plus legal

16  fees.

17  Q    Do you owe anyone else money related to this litigation?

18  A    I can't remember off the top of my head right now.  I

19  can't keep track.

20  Q    All right?

21         Now, shifting gears a little bit:  In January 2014

22  did you post a document on the internet.

23  A    Yes.

24  Q    I should have said on or about January 24, did you post a

25  document on the internet?

5022

1    A    Yes.

2    Q    What did you post?

3    A    I posted the SEC inquiry for Martin Shkreli.

4    Q    Was it for Martin Shkreli or for MSMB Capital Management?

5    A    I don't recall.

6    Q    Okay.  Why did you post this SEC inquiry document on the

7    internet?

8    A    Because the company Retrophin was raising funds in the

9    capital markets, raising money from public money, from public

10   institutions and individuals and there was a document they

11   needed to file with the SEC stating certain things that needed

12   to be true.  One of those things were asking if the principals

13   of the company were under investigation or had been convicted

14   of certain things and that form that the company filled out

15   wasn't accurate, meaning Martin was under investigation,

16   according to that document from the SEC and I didn't think it

17   was proper for the company to raise money.  It was just

18   inaccurate and they didn't want to tell the public or the SEC

19   the truth.

20           MR. BRODSKY:  Your Honor, objection as to the lay

21   opinion testimony.

22           MR. KESSLER:  He's testifying as to why he did

23   something.

24           THE COURT:  He's trying to explain his actions.

25           The jury, again, ultimately, you are the finders of

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

5023

1    fact and this is a witness testifying about why he did what he

2    did.  The jury is not obligated to accept that as true.  It's

3    up to you to decide what weight to give it.  So I will not

4    disallow the testimony.

5    Q    Mr. Su, what happened after you posted this SEC document?

6    A    I got an e-mail from a Katten Muchin attorney asking me

7    to take that document down.

8    Q    Do you remember which attorney in Katten sent you an

9    e-mail?

10   A    Michael Rosensaft at Katten.

11   Q    Did you take the document down?

12   A    I did not.

13   Q    Was the document ultimately taken down?

14   A    I believe I checked a couple of days after and it was

15   taken down.

16   Q    Now, we talked about the SEC inquiry.  Can you take a

17   look at what's behind tab 31 in your binder, the document that

18   has been marked for identification as Government's Exhibit

19   448-A and I just want to see if this refreshes your

20   recollection as to the entity that was listed in the SEC

21   inquiry.

22   A    Yes.  This is the document I posted.

23   Q    Does it refresh your recollection as to which entity was

24   the subject of the SEC inquiry?

25   A    Yes.  This says MSMB Capital Management LLC.

5024

1   Q    Now, Mr. Su, in June of 2014 do you recall whether the

2   arbitration and the various litigations we talked about had

3   concluded by June of 2014?

4   A    Yes.  It concluded, yes.

5   Q    In June of 2014 did you make another report to the SEC?

6   A    Yes.

7   Q    What did you tell the SEC in June of 2014?

8   A    I told them the things that were going on within

9   Retrophin that I saw as being irregular, the funds that were

10  being transferred around, shares that were being parked, in my

11  view, illegally by Martin to his friends.

12           MR. BRODSKY:  Your Honor, I object and move to

13  strike.

14           MR. KESSLER:  I'll rephrase.

15           MR. BRODSKY:  I move to strike.  He's testifying

16  about what is legal and illegal and drawing legal inferences.

17           THE COURT:  We can qualify it as in his view.

18  Again, this is the witness' explanation as to why he took

19  certain actions.

20           MR. KESSLER:  I'm happy to rephrase.

21           MR. BRODSKY:  Your Honor, since they are going to

22  rephrase, would you mind striking the portion, the legal

23  conclusion that a lay witness has drawn.

24           THE COURT:  All right.  The word illegally will be

25  removed from the record.  I will instruct you on the law to

5025

1   the extent it's relevant to the facts in the case.  You may

2   rephrase, Mr. Kessler.

3   BY MR. KESSLER:

4   Q    Mr. Su, without using the words legal or illegal or

5   making a judgment about what was legal or illegal, what is the

6   conduct, the actions, that you told the SEC was occurring?

7   A    One of the conducts that I told the SEC about is Martin

8   was hiding control of shares by giving his friends the shares

9   and telling them when they could sell it.

10  Q    Were those Retrophin shares?

11  A    Those were Retrophin shares, yes.

12  Q    Now, at the time that you contacted the SEC did you know

13  whether you might be able to  -- might be eligible for some

14  sort of monetary reward as a result of filing your complaint?

15  A    I filed a whistleblower claim.  That was not what was on

16  my mind when I filed it.  But, yes, I'm aware of that part of

17  whistleblower program.

18  Q    And the whistle blower program meaning in theory,

19  depending on what the SEC did with your information, you could

20  receive a monetary reward?

21  A    That's my understanding.

22          MR. KESSLER:  One minute, your Honor.

23          THE COURT:  Do you mind if I ask a clarifying

24  question?

25          MR. KESSLER:  Go right ahead.

5026

1          THE COURT:  Mr. Su, you testified that certain

2   friends were given Retrophin shares.  We've heard a lot of

3   names.  Can you identify who those folks are that you

4   perceived as Mr. Shkreli's friends who received Retrophin

5   shares?

6          THE WITNESS:   Yes.  It would be the same recipients

7   for the Fearnow stock that I testified yesterday, which

8   included Tim Pierotti, Tom Fernandez, Kevin Mulleady, Andrew

9   Vaino, Ed Sullivan, Claridge Capital and Marek Biestek and

10  anyone else that received Fearnow stock.  I believe I included

11  all of them.

12          THE COURT:  All right.  Thank you.

13  BY MR. KESSLER:

14  Q    If we could put up Government's Exhibit 111-48 one more

15  time.  Mr. Su, this is in evidence.  It's Mr. Greebel's

16  December 17 e-mail to you.  Do you remember that?

17  A    Yes.

18  Q    Just following up on the court's question, are these

19  individuals and the entities cc'd that Mr. Greebel has listed,

20  the entities and the individuals that you were just referring

21  to when you answered court's question?

22  A    Yes, these are the same people.

23          MR. KESSLER:  No further questions, your Honor.

24          (Continued on next page.)

25

Su - cross - Mr. Brodsky                    5027

1        THE COURT:  Would you like to do cross, Mr. Brodsky?

2        MR. BRODSKY:  Yes, Your Honor.

3   CROSS EXAMINATION

4   BY MR. BRODSKY:

5   Q    Mr. Su, good afternoon.

6   A    Hi.

7   Q    So we broke yesterday during the middle of your -- or

8   towards the end of your testimony, correct, on direct

9   examination?

10  A    Yes.

11  Q    And you didn't meet with the prosecution team last night;

12  correct?

13  A    No, I did not.

14  Q    But this morning you met with the prosecution team for

15  about 15 minutes; correct?

16  A    Approximately, yes.

17  Q    And they handed you a two-paragraph letter today;

18  correct?

19  A    Yes.

20  Q    And they gave you what's called a non-prosecution

21  agreement; correct?

22        MR. KESSLER:  Objection.

23        THE COURT:  Sustained.  Rephrase.

24  Q    They gave you a letter, Mr. Su, the prosecution team,

25  immunizing you for your testimony today with respect to your

Su - cross - Mr. Brodsky                          5028

1   access to the Global Relay system between December 2012 and

2   June 2013; correct?

3   A    Yes, it says immunity for trial testimony for Jackson Su.

4   Q    Putting aside the letter, Mr. Su, which is not in

5   evidence yet, this morning, in 15 minutes of a meeting with

6   the prosecution team, you told the prosecution team that you

7   did not believe you had access to the Global Relay system

8   after March 2013; correct?

9   A    I don't remember those specific words.

10  Q    Putting aside the specific words, in sum and substance,

11  sir, you told the prosecution team that you did not access the

12  Global Relay system after March 2013; correct?

13  A    On or around that time frame.

14  Q    On or around, so let's try to narrow the time frame.  No

15  later than your termination letter that you received from

16  Retrophin; correct?

17  A    Like I said, on or around.

18  Q    April 2013, did you access the Global Relay system?

19  A    I don't recall.

20  Q    May 2013, did you access the Global Relay system?

21  A    Don't recall.

22  Q    June 2013, did you access the Global Relay system?

23  A    I don't recall.

24  Q    July 2013, did you access the Global Relay system?

25  A    Again, I don't recall.

1   Q    You understand that the letter you've been given, the

2   immunity letter, only covers you until June of 2013; correct?

3   A    That's what the letter says.

4   Q    You understand that when you left Retrophin in December

5   of 2012, you had created two passwords for yourself to access

6   the Global Relay system; correct?

7   A    I don't remember that, no.

8   Q    You understand, sir -- do you understand this, Mr. Su,

9   that accessing the Global Relay system after you left without

10  authorization to obtain copies of documents from Retrophin is

11  a crime?

12          MR. KESSLER:  Objection.

13          THE COURT:  I will allow the question.

14  A    I don't understand that.

15  Q    You believe that you had the right, it was not a crime,

16  sir, to go into the Global Relay system after you were

17  terminated, let's say after March of 2013, to access documents

18  from Retrophin?

19  A    I didn't think it was a crime.

20          MR. KESSLER:  Your Honor, I'm sorry, the question

21  asked both whether he had the right and it was not a crime, so

22  I object to the form.

23          THE COURT:  All right.  Try to break it down, Mr.

24  Brodsky, please.

25  Q    Mr. Su, you just testified you did not believe it was

1  illegal for you, after being terminated from Retrophin, to go

2  into the Global Relay system of Retrophin and access

3  electronic communications?

4  A    I didn't think it was a crime.

5  Q    You thought it was perfectly permissible; correct?

6  A    I didn't see anything wrong with it.

7  Q    And the prosecution team has given immunity to you for

8  accessing Global Relay between December 2012 and June 2013;

9  correct?

10         MR. KESSLER:  Objection, misstates the document.

11         THE COURT:  Sustained.

12         MR. BRODSKY:  Well, let's put the document in.  May

13  I approach, Your Honor?

14         THE COURT:  Yes.

15  Q    Let me show you Defense Exhibit 111-151 for

16  identification.

17         Do you recognize it, Mr. Su?

18  A    Yes.

19  Q    And that's your letter that you received today, November

20  14, 2017?

21  A    I received this letter today, yes.

22  Q    After meeting with the prosecution team for 15 minutes;

23  right?

24  A    No, they handed this to me when they walked into the

25  room.

Su - cross - Mr. Brodsky                    5031

1    Q    And when they handed it to you when they walked in the

2    room, the dates between December 2012 and June 2013 were

3    already written there; right?

4    A    Yes.

5    Q    Isn't it true, sir, that you did not tell the prosecution

6    team in 2014, when you spoke to the FBI, that you had accessed

7    the Global Relay system and obtained documents after you were

8    terminated?

9    A    Sorry, could you clarify the question again.

10   Q    In July 2014, you spoke to the FBI by telephone; correct?

11   A    Yes.

12   Q    And during that conversation, you told them that you had

13   retained about 250 pages of documents; right?

14   A    Right.

15   Q    You told them that you had retained it from the time you

16   worked at Retrophin in 2012; right?

17   A    Yes.

18   Q    And you did not tell them that --

19   A    Not tell who, I'm sorry?

20   Q    Did not tell the FBI during your July 2014 telephone

21   conversation with them that you, after you left in December of

22   2012, continued to access and copy Retrophin documents?

23   A    I don't know if that question was asked of me.

24   Q    So you voluntarily told them that you had retained 250

25   pages of documents; right?

Su - cross - Mr. Brodsky                              5032

1   A    I don't know if they asked me a question and I told them

2   that, or I don't know in what context the question came about.

3   Q    You remember leaving out from that conversation that you

4   accessed the Global Relay system after you left and you copied

5   documents; correct?

6   A

7               MR. KESSLER:  Objection to the form.

8               THE COURT:  Sustained.  Rephrase.

9   Q    You remember not telling the FBI during your conversation

10  with them in July 2014 that you accessed the Global Relay

11  system after you were terminated and obtained documents?

12  A    I do not remember that.

13  Q    You don't remember whether you told them or you didn't

14  tell them?

15  A    I don't remember not -- not telling them.

16  Q    You believe you told them?

17  A    No.  I don't remember a conversation with that specific

18  point about documents, whether it was before, after, I don't

19  remember.

20  Q    In 2015, you met with the prosecution several times;

21  right?

22  A    Yes.

23  Q    And not once did you tell them you had accessed the

24  Global Relay system after you had departed and took documents;

25  right?

Su - cross - Mr. Brodsky                    5033

1   A    No.

2   Q    So you did not tell them; right?  That's a yes, you did

3   not tell them?

4   A    I did tell the prosecutors.

5   Q    You told the prosecution team that you had went into the

6   Global Relay system and pulled down and copied Retrophin

7   documents?

8   A    At some point, yes, I did tell them.

9   Q    When did you tell them?

10  A    I can't remember specific dates.

11  Q    Was the prosecution team taking notes when you said this?

12  A    I don't think the prosecutors ever took notes.

13  Q    Did the FBI agents take notes when you said this to them?

14  A    I believe the FBI took notes from time to time during

15  meetings, but I don't know -- I can't remember which meetings

16  they took notes in and didn't take notes in.

17  Q    And now, you had two -- you don't remember having two

18  passwords to access Global Relay, one called Jackson at MSMB

19  Capital.com; do you remember using that one?

20  A    No.  I think -- I don't recall.  I only recall having one

21  login for the entire system.

22  Q    One login that you had was Jackson at MSMB Capital.com;

23  correct?

24  A    I don't remember what the login credentials were.

25  Q    Was there any other Jackson at MSMB Capital or Retrophin

1    in 2012, sir?

2    A      No.

3    Q      Was there anyone other than you, Mr. Biestek and Mr.

4    Shkreli with access to the Global Relay system in 2012?

5    A      No, I don't believe so, but I don't know who they might

6    have given access to.

7    Q      You also had access through what's called admin at MSMB

8    Capital.com; correct?

9    A      Again, I can't remember which login credential I used.  I

10   only remember using one.

11   Q      Do you remember one of them being shut down after you

12   left in January of 2013?

13   A      I don't remember that.  I don't, no.

14   Q      Do you remember that the company did not shut down admin

15   at MSMB Capital.com until January of 2014?

16   A      I don't know.

17   Q      Do you remember masking your identity, your IP address --

18   withdrawn.

19          Do you remember masking where your IP address was

20   accessing the documents when you entered the Global Relay

21   system in 2013?

22   A      No, I don't remember.

23   Q      Do you remember masking it so it created an appearance

24   that somebody from Amsterdam was accessing documents from the

25   Global Relay system, getting documents?

Su - cross - Mr. Brodsky                          5035

1    A    Again, I don't remember.

2    Q    Do you remember accessing passwords?  There was a

3    document called Various Passwords in March of 2013.  Do you

4    remember pulling that document down and copying it?

5    A    I do not.

6    Q    Do you remember generally trying to get access to

7    passwords in March of 2013 on Retrophin's e-mail system?

8    A    Again, I do not, no.

9    Q    Now, each time, after you were terminated -- withdrawn.

10        After you received your termination letter, that was

11   in March of 2013; right?

12   A    Yes.

13   Q    You continued to access Global Relay system; correct?

14   A    Afterwards, I don't remember.  I don't remember.

15   Q    Well, the SEC posting that you posted, do you remember

16   accessing information and posting two subpoenas?

17   A    I posted one subpoena from the SEC.

18   Q    Just one?

19   A    From --

20   Q    From the SEC?

21   A    From what I remember, just one.

22   Q    You don't remember accessing the Global Relay system,

23   obtaining a subpoena and then posting that subpoena?

24   A    Are you referring to the subpoena we went through --

25   Q    No.

Su - cross - Mr. Brodsky                              5036

1   A    -- earlier.  I don't know which subpoena you are talking

2   about.

3   Q    Do you remember if you accessed documents after June of

4   2013 on the Global Relay system?

5   A    I don't remember.

6   Q    Your purpose for accessing the documents, January 2013,

7   February 2013, and March of 2013, was not in connection with

8   your compliance functions at Retrophin; right?

9   A    No.

10  Q    You were given access through Global Relay because you

11  were the chief compliance officer; right, in 2012?

12  A    I set the system up.

13  Q    And you set the system up with the purpose that you would

14  have a compliance function as the chief compliance officer of

15  looking at people's e-mails to identify trading; correct?

16  A    No.  The original purpose of that was to have Martin and

17  Marek wanted to set that system up to monitor people's

18  e-mails.  I asked who was going to be the compliance officer.

19  I asked Marek to do it or Martin to do it, they just didn't

20  assign anybody, and it just got defaulted to me.  It just got

21  defaulted to me.

22  Q    Mr. Su, yes or no, sir.  It's a yes-or-no question.

23  A    Okay.

24  Q    In 2012, as chief compliance officer, you had access to

25  the Global Relay system --

Su - cross - Mr. Brodsky                      5037

1   A     Yes.

2   Q     -- as part of your compliance functions; correct?

3   A     Yes.

4   Q     When you left, in December of 2012, and you walked out,

5   do you remember that?

6   A     I walked out, yes.

7   Q     You no longer, after you walked out, had a compliance

8   function; correct?

9   A     Yes.

10  Q     So every time after you left in December of 2012, when

11  you accessed the Global Relay system, you were doing it

12  without authorization; correct?

13  A     Nobody ever said no, so nobody turned off the password.

14  Q     Since nobody turned off the password, you interpreted

15  that as consent from the company that you could continue to go

16  in and access electronic records?

17  A     There was no consent or non-consent.

18  Q     And you did it through a backdoor; correct?

19  A     Don't recall that.

20  Q     You didn't tell the prosecution team this morning, before

21  they gave you this immunity letter, about the entire extent of

22  your access to the Global Relay system, did you?

23  A     I told them everything I had remembered.

24  Q     The only thing you remembered is you could not remember

25  accessing any documents after March of 2013?

Su - cross - Mr. Brodsky                    5038

1          MR. KESSLER:  Objection to the form.

2          THE COURT:  Sustained.

3   Q    What you told them was that you didn't remember; correct?

4   A    Correct.

5   Q    Did the prosecution team show you any documents

6   whatsoever reflecting your access to the Global Relay system?

7          MR. KESSLER:  Objection, relevance.

8          THE COURT:  I will overrule the objection.

9   Q    Mr. Su?

10  A    Can you repeat the question.

11  Q    Did the prosecution team this morning show you any

12  documents whatsoever about reflecting your access to the

13  Global Relay system?

14  A    They did not, no.

15  Q    Now, isn't it true, sir, that on July 29, 2013 you went

16  into the Global Relay system and accessed a document called,

17  quote, Hopan Experiment Protocol, end quote?

18         THE COURT:  Excuse me, may I ask for a sidebar,

19  please.

20         MR. BRODSKY:  Yes, Your Honor.

21         THE COURT:  Mr. Burke, do you mind coming up to

22  sidebar, too.

23         MR. BURKE:  Yes.

24         (Sidebar held outside the hearing of the jury.)

25         (Continued on the following page.)

```
                          Sidebar                        5039
 1            (The following sidebar held outside the hearing of
 2    the jury.)
 3            THE COURT:  This letter covers the period up through
 4    March.
 5            MR. KESSLER:  June.
 6            MR. BURKE:  June.
 7            THE COURT:  He is in July now.  So I am concerned
 8    about whether you are trying to get him to take the Fifth for
 9    everything after June.
10            MR. BRODSKY:  No.  He has testified that he didn't
11    think he did anything wrong, it wasn't a crime.  The
12    prosecution decided to give him coverage until June 2013.
13    That should not preclude me from cross-examining him about the
14    full extent of his conduct.  And the prosecution has given him
15    a letter that said in or about, so.  It is not specifically --
16    it says, I believe, in there -- I don't have the exhibit with
17    me.  It says, "On or about and between December 2012 and June
18    2013," so the "on or about" part I believe probably covers
19    him, but obviously that's in the eye of the prosecution.
20            THE COURT:  Yes, and his counsel.
21            Are we going into July, beyond the dates set forth
22    in the letter?  That's my question.  I think you started
23    asking questions month by month in 2013 and I think you went
24    up to July, if I am not mistaken.
25            MR. BRODSKY:  Yes, Your Honor.
```

```
                         Sidebar                      5040
```

1          THE COURT:  My concern is that he has this letter

2    that covers him through June and we are past June and getting

3    into July.

4          MR. BRODSKY:  I understand that, Your Honor, and I

5    think that's a decision between the prosecution and Mr. Su.

6          MR. BURKE:  Look, I think the documents indicates on

7    or about.  Mr. Su indicated that he doesn't remember ending on

8    a specific date, so I think we're okay.

9          MR. DUBIN:  I just want to make sure to address Your

10   Honor's concerns and to make sure that Mr. Su's counsel is

11   fully informed.  We feel that we do have evidence that he

12   accessed the Global Relay system beyond the date.

13         THE COURT:  Beyond June 30th?

14         MR. DUBIN:  Yes, and intend to confront him with it.

15   If now is a good time for lunch and he wants to consult with

16   his counsel as to whether or not the Government's letter

17   covers him up through the period that we intend to confront

18   him with, we are happy to let him do that.  But nothing should

19   preclude Mr. Brodsky from confronting him with evidence,

20   especially given his testimony just now that -- I think he is

21   saying he doesn't remember, which certainly doesn't mean it

22   didn't happen.  We intend to show him that it did, in fact,

23   happen which might refresh his recollection that it actually

24   was going on beyond the coverage period.

25         MR. BURKE:  Let's cut to the quick.  To what date?

```
                        Sidebar                      5041
```

 1   How many times?  I'm happy to discuss it with him.

 2          MR. BRODSKY:  I don't want to lay out the

 3   cross-examination.

 4          MS. SMITH:  First of all, we have no idea what the

 5   basis is.  They've suggested that he is masking an IP address.

 6   We haven't gotten any forensic analysis.  We haven't gotten

 7   any expert report.  We have no idea what the defense is

 8   talking about.  So before we go throwing wild allegations

 9   around, I think we should have a better sense of what the

10   actual basis is for the questions.

11          THE COURT:  I'm sure Mr. Brodsky will tell me he has

12   a good faith basis for asking about the masking.

13          MR. BRODSKY:  I do.

14          MS. SMITH:  He has a good-faith basis on Mr.

15   Shkreli.  Mr. Shkreli himself is a known hacker who has masked

16   his IP address at different points, who has hacked into

17   multiple people's accounts.  He has confessed to that,

18   including to Mr. Greebel, has a history of laying various

19   electronic trails and so --

20          MR. KESSLER:  He has confessed to hacking to Mr.

21   Gordon, who then talked about it with Mr. Greebel.  Mr.

22   Shkreli, as far as we know, did not confess directly to Mr.

23   Greebel.

24          THE COURT:  Mr. Gordon is?

25          MR. KESSLER:  Another partner at Katten.

```
                         Sidebar                        5042
```

 1          THE COURT:  Who handled the litigation?

 2          MS. SMITH:  He handled the Pierotti litigation.

 3          So to the extent that the basis is for Mr. Shkreli,

 4   they can confront the witness all they want, but they can't

 5   prove anything with extrinsic evidence and I am concerned

 6   about the basis being something that Mr. Shkreli might have

 7   cooked up, keeping in mind that he and Mr. Su were engaged in

 8   litigation, and he was causing the company to sue him at

 9   various points.

10          MR. KESSLER:  There were a number of e-mails that

11   were exchanged between Mr. Shkreli, Mr. Gordon.

12          THE COURT:  Can you just listen rather than have all

13   of the whispering.

14          MR. BRODSKY:  Yes, Your Honor.

15          MR. KESSLER:  We are aware that there were e-mails

16   exchanged between Mr. Shkreli, Mr. Gordon, Mr. Cotton, and I

17   believe Mr. Greebel on some of them, and possibly Mr.

18   Rosensaft where Mr. Shkreli makes various suggestions that

19   people are hacking into things and accessing things

20   inappropriately.  Maybe those are true, maybe they're not.

21   But in a world where I think Mr. Shkreli's veracity is

22   certainly in question on a number of subjects, for the good

23   faith basis to accuse someone, even if he is protected by a

24   letter, of a federal crime, if the good faith basis is

25   something Mr. Shkreli communicated to Katten, we have a

Sidebar                                          5043

1    concern about that.

2         MR. DUBIN:  That is not the case, Your Honor, simply

3    not the case.  It is not Mr. Shkreli.  And especially in light

4    of Mr. Su's testimony that he set up the system, we have a

5    very strong basis, let alone a good faith basis.

6         THE COURT:  Well, with a contractor that he

7    contracted; correct?  Global --

8         MR. DUBIN:  Global Relay, yes.  But I can assure the

9    Court as an officer of the Court that having worked on this

10   with Mr. Brodsky and our team, we have a good faith basis it

11   does not come from Martin Shkreli.

12        MS. SMITH:  We also know that Mr. Shkreli had access

13   to the system after Mr. Su left.  What Mr. Shkreli may or may

14   not have put in place to make things look what he wanted

15   things to look like at various points, you know, I think it's

16   up for debate.  The idea Mr. Brodsky has -- I don't know what

17   he has, if he thinks he is going to accuse Mr. Su is doing

18   something, it doesn't mean it is true.  I think we are very

19   far afield.

20        THE COURT:  Look, he does have the right to test his

21   veracity, his bias and credibility.  I think that if he is

22   going to present or confront him with evidence that

23   contradicts his testimony, that's fine.  I was thinking June

24   30, 2013 is the date and we are beyond that and I just didn't

25   know what Mr. Burke's view would be of going beyond the

```
                            Sidebar                    5044
```

1   protections in the letter --

2           MS. SMITH:  We can discuss.

3           THE COURT:  -- and advise Mr. Su to do with regard

4   to invoking or not invoking the Fifth.

5           MR. BURKE:  Once again, just to get back to the

6   clause, on or about March to June --

7           MR. BRODSKY:  December of 2012 to June.

8           MR. BURKE:  Right.  I really can't advise him

9   because I don't know what they are going to ask him.  I don't

10  know what their proof is.  Obviously if they are going to want

11  to assert -- I'm making this up now -- a document signed by

12  Mr. Su, he downloaded in 2015, that's a different story.

13  Right now they have been asking him about things he has no

14  memory of and I don't know what they intend to ask him.  Until

15  someone tells me what they are going to ask him --

16          THE COURT:  I think he is leading into confronting

17  him with a document in July of 2013.  I just think I need to

18  know whether he is going to be invoking the Fifth or not.

19          MR. BURKE:  At this juncture, for any document in

20  July, no.

21          THE COURT:  All right.

22          MR. PITLUCK:  We are mindful and we are going to be

23  watching, as I think the Court will, impeaching him with

24  extrinsic evidence.  To read a document in and to explain it

25  to the jury -- to read a document in, similar to what we saw

Sidebar                                        5045

1   with Mr. Massella, everything it is, but not introduce it, is

2   impeaching with extrinsic evidence.  They are explaining to

3   the jury with the document about why they believe he testified

4   to that.  We have to watch that very closely.  If it doesn't

5   refresh Mr. Su's recollection, it is not admissible.  We are

6   cognizant of, isn't this this, isn't this that, and doesn't

7   this show that you hack, the jury then knows what the document

8   is without it being introduced into evidence.

9              MS. SMITH:  It is Mr. Brodsky's representations of

10  whatever it is which is not in evidence.

11             MR. BRODSKY:  I just want to put on the record the

12  eye rolling by the prosecution.  The shaking of the head and

13  the eye rolling.  Your Honor, I take very it seriously.  The

14  Government is suggesting that my representations are not in

15  good faith.

16             MS. SMITH:  No, we are suggesting they are not

17  evidence.  That is what I am suggesting.

18             MR. BRODSKY:  Then I withdraw my comment.  We do

19  have a good faith basis.

20             MR. PITLUCK:  My point is only that they have a good

21  faith basis to proceed with confronting him with documents.

22  Our objection is to how those documents will be used if they

23  are not in evidence and we want to put the Court on notice of

24  that.

25             THE COURT:  Look, I want to say I have observed eye

Sidebar                                                        5046

1   rolling, smirking and gestures at both tables that shouldn't

2   be happening.  I also just heard now a loud outburst, like a

3   snicker, from the gallery.  I was trying to figure out who it

4   was.  I have an idea of who it was.  I am going to remove

5   anybody who becomes disruptive.  That kind of audible outburst

6   that I can hear all the way up here is unacceptable.  We don't

7   do that in this courtroom or anywhere in this courthouse.

8           MR. BRODSKY:  Agreed.  We will remind -- Your Honor,

9   I don't know if it was anybody who we are familiar with, but

10  we will remind anybody who we are familiar with that there are

11  no outbursts in court.

12          THE COURT:  Right.  Everybody maintain a

13  professional decorum and to the extent it may be perceived

14  that lawyers are smirking and making faces and rolling their

15  eyes, that should not be happening.

16          MR. BRODSKY:  Thank you, Your Honor.

17          MR. KESSLER:  Thanks.

18          THE COURT:  We are going to continue until we take

19  the lunch break?

20          MR. KESSLER:  Yes.

21          (Sidebar concluded.)

22          (Continued on the following page.)

23

24

25

1          (In open court.)

2          THE COURT:  All right.  You may continue.

3    BY MR. BRODSKY:

4    Q    Mr. Su, you don't deny before this jury that after you

5    left Retrophin in December 2012, you accessed the Global Relay

6    system many times, correct?

7    A    I don't deny that.

8    Q    You don't deny that after you received the termination

9    letter from Retrophin that you continued to access the Global

10   Relay system?

11   A    I don't recall when I stopped accessing the system.

12   Q    You don't recall but you're not denying it, correct?

13   A    I'm not agreeing with that either.

14   Q    Do you remember accessing a document called RTRX stock

15   reconciliation spreadsheet?

16   A    I don't recall.

17   Q    Do you remember obtaining through the Global Relay system

18   after you left bank records?

19   A    I don't recall.

20   Q    But you're not denying that you did obtain bank records

21   after you left in December of 2012?

22   A    Again, I don't agree that I did.  I already had bank

23   statements from Retrophin that I've seen so I don't agree.

24   Q    You just have no memory of it, sir, zero memory of

25   accessing the Global Relay system after you received your

1    termination letter?

2    A    I don't remember when the last time I, during that time

3    period, I accessed the system.

4              MR. BRODSKY:  Why don't we move in DX, we'll move in

5    DX 111-151 into evidence.

6              MR. PITLUCK:  No objection.

7              THE COURT:  We will receive DX 111-151.

8              MR. BRODSKY:  Can we blow this up?

9    Q    Mr. Su, this is the letter you received today, correct,

10   this morning?

11   A    Yes.

12   Q    Dated today, correct?

13   A    Yes.

14   Q    And the "Re" column -- this is to your counsel,

15   Mr. Burke, John Burke?

16   A    Yes.

17   Q    You met him for the first time yesterday, right?

18   A    Correct.

19   Q    Now, prior to yesterday, prior to being represented by

20   Mr. Burke, you had been represented by other counsel in

21   meetings with the prosecution in 2015, correct?

22   A    Yes.

23   Q    And you met with the prosecution multiple times this

24   year, correct?

25   A    I can't remember how many times but, yes, I did meet the

1    prosecution a number of times.

2    Q    More than five, correct?

3    A    I don't know what the number is.

4    Q    You don't have any idea what the number is when you met

5    with the prosecution team this year?

6    A    This year?  I don't know how many times I met with them.

7    Q    When did you start meeting with them this year?

8    A    In 2017, I don't remember.

9    Q    When you met with the prosecution team in 2017, you had

10   to come to New York, correct?

11   A    On occasions, yes.

12   Q    Because you live in Texas, right?

13   A    I live in Texas three-quarters of the time, but my, my

14   wife is here in New York.

15   Q    And so when you met with the prosecution team -- you work

16   in Texas, correct?

17   A    Correct.

18   Q    So when you met with the prosecution team, you had to

19   come to New York, correct?

20   A    Either that or I was already here.

21   Q    And you had to go down to the U.S. Attorney's Office a

22   few blocks from here, correct?

23   A    Correct.

24   Q    And each time you had to sign in, correct?

25   A    There was no sign-in.  I just gave them my -- I'm sorry.

1    They might have signed me in.  I just gave them my license.

2    What they do with that, I guess they sign me in, I'm not sure.

3    Q    And you're not in that building very often, correct?

4    A    No.

5    Q    Are you in that building, the U.S. Attorney's Office for

6    any reason other than this case?

7    A    No.

8    Q    So, provide an estimate for this jury today as to how

9    many times you went to that building, the U.S. Attorney's

10   Office, just a few blocks from here.

11   A    A handful of times.

12   Q    A handful?

13        And when you went, you were represented by a

14   different lawyer, right?

15   A    Yes.

16   Q    All right.  So, this says, in the "Re" line, Immunity for

17   trial testimony for Jackson Su.  Right?

18   A    Yes.

19   Q    And that was important for you to get that immunity,

20   right, Mr. Su?

21   A    No.

22   Q    You didn't care about having that immunity at all?

23   A    I really didn't have a chance to think about it.  It was

24   given to me this morning and my attorney said this is --

25   Q    Well, don't tell us about your communications with your

Su - cross - Brodsky                              5051

1   lawyer, Mr. Su.

2          THE COURT:  Those are privileged communications.

3   A    Okay.  I really didn't have a chance to think about this.

4   It was given to me and that's it.  That was this morning.

5   Q    So, there was nothing that you were worried about that

6   caused you to accept the immunity?

7   A    I was not worried.

8   Q    And the first paragraph here says, As we have discussed,

9   your client, Jackson Su, will give testimony in United States

10  v. Evan Greebel -- with the criminal docket number --

11  including regarding his access of the computer systems of

12  Retrophin following his departure from Retrophin on or about

13  and between December 2012 and June 2013, the conduct.  Right?

14  A    That's what it reads, yes.

15  Q    And then the next paragraph:  This letter confirms our

16  agreement that any testimony given by your client at trial in

17  United States v. Evan Greebel regarding the conduct will not

18  be used against him by the United States Attorney's Office in

19  any criminal case, except that his testimony could be used

20  against him in a prosecution for perjury, false statements, or

21  obstruction of justice, if he intentionally provides false

22  information.  Right?

23  A    Right.

24  Q    So you did not tell the government this morning or at any

25  time prior to your testimony right now that you accessed the

CMH     OCR     RMR     CRR     FCRR

1   Global Relay system after you were terminated in March of

2   2013, right?

3   A    No.  I told them specifically that I had accessed the

4   system after I left Retrophin in December of 2012.

5   Q    And you told them you didn't believe you accessed it

6   after March of 2013 when you received your termination letter?

7   A    I don't remember the last time I accessed the system but

8   it was in or around that time frame.

9   Q    And Mr. Su, you accessed the Global Relay system because

10  you had, you were in a litigation fight with Retrophin and

11  Martin Shkreli, correct?

12  A    No, that's not why I accessed the system.

13  Q    You did it for good reasons, humanitarian reasons, is

14  that your testimony?

15  A    No, that's not what I testified.

16  Q    Let me --

17  A    I did it because --

18  Q    That was a "yes" or "no" question, Mr. Su.

19        Mr. Su, let me ask you something before we -- let me

20  move to this topic.

21        It's your testimony, sir, you never personally

22  backdated any documents at Retrophin, right?  That's your

23  testimony?

24  A    I never personally backdated --

25  Q    Correct?

Su - cross - Brodsky                    5053

1   A    Yes.

2   Q    And you told the prosecution in July 2015 at a meeting

3   with them that you personally never backdated any documents at

4   Retrophin, right?

5   A    I don't remember what I told them.  I mean -- is there

6   something that says I did?  I mean, show it to me.  I can't go

7   from memory.  This is two years ago.

8   Q    And --

9   A    So sorry.

10  Q    And you don't remember two years ago because those events

11  are far from now, correct?

12  A    Right.

13  Q    So you have trouble remembering what happened two years

14  ago.  Isn't it a fact you have trouble remembering what

15  happened five years ago?

16          MR. KESSLER:  Objection to the form.

17          THE COURT:  Try to rephrase, Mr. Brodsky.

18  Q    Mr. Su, you just testified you have trouble remembering

19  about two years ago when you spoke to the FBI and the

20  prosecution team in July of 2015, that's your testimony,

21  right?

22  A    Yes.

23  Q    Isn't it fair to say you have trouble remembering what

24  happened in 2012?  Yes or no.

25  A    No.

Su - cross - Brodsky                                    5054

1   Q    And it's your testimony you never knowingly helped
2   Mr. Shkreli backdate any documents, right?
3   A    No, that's not true.
4   Q    You knowingly helped them if you knew he was backdating a
5   document and you intentionally helped him do it?
6   A    If it was in my mind legitimate and it was to memorialize
7   something, yes.
8   Q    So there were occasions where it was in your view okay to
9   backdate a document so long as it memorialized what occurred
10  in the past?
11          MR. KESSLER:  Objection to the form.  "Back date" is
12  a vague term.
13          THE COURT:  Well, Mr. Brodsky can define what he
14  means and recast his question.
15  Q    Mr. Su, there were occasions in 2012 where you dated a
16  document or you assisted -- withdrawn.
17          There were cases in 2012 where you put, you helped
18  Mr. Shkreli put a date on a document that was months earlier?
19  A    Yes.
20  Q    Because you understood that the transaction reflected in
21  the document had occurred months before?
22  A    Yes.
23  Q    And there is nothing wrong, Mr. Su, nothing wrong with
24  putting a date on a document that's months earlier knowing
25  that's the transaction that occurred?

Su - cross - Brodsky                          5055

1    A    If it then happened, yes.

2    Q    And when you did that, you informed the external auditors

3    you were doing it at Marcum?

4    A    I informed them of what?

5    Q    You informed them that you were memorializing something

6    that happened months ago but dating it today?

7    A    Is there a specific event that we're referring to because

8    I'm not sure which event you're speaking of?

9    Q    Generally, Mr. Su, I'm asking you generally from 2012, in

10   connection with 2012, do you remember you worked with Marcum?

11   A    Yes.

12   Q    Do you remember they requested documents from you?

13   A    All the time.

14   Q    And some of those documents, they asked you for

15   supporting documentation for transactions?

16   A    Correct.

17   Q    And some of those transactions occurred months earlier?

18   A    Yes.

19   Q    And sometimes you helped Mr. Shkreli put a date on a

20   document for a transaction that occurred months earlier?

21   A    Yes.

22   Q    And the date you put was a date of months earlier?

23   A    Right.

24   Q    Now, prior to today, you never told the prosecution team

25   this, right?

Su - cross - Brodsky                                 5056

1    A    I don't remember what I told them or not.

2    Q    Well, do you ever remember in any one of your meetings --

3    A    All right.  Sorry.

4    Q    Mr. Su, do you ever remember in any one of your meetings

5    in 2014, 2015, 2016 and 2017, explaining to the prosecution

6    that you put dates on documents of, dates that occurred months

7    earlier for transactions that occurred months earlier?

8    A    Yes.

9    Q    And you told the prosecution team that you used an "as

10   of" date, is that right?

11   A    I don't recall if I said that or not.

12   Q    Did you use an "as of" date on the document?

13   A    I don't recall.

14   Q    So, there were -- do you generally recall there were

15   occasions where you helped Mr. Shkreli sign a document and

16   date it months earlier without putting the date, this was the

17   date, this is an agreement as of some date months earlier?

18        MR. KESSLER:  Object to the form.

19        THE COURT:  I guess I'll ask you, Mr. Brodsky, if

20   you can rephrase.

21        MR. BRODSKY:  Sure.

22        THE COURT:  I'm not clear.

23        MR. BRODSKY:  I'll take it step by step.

24   Q    Mr. Su, you're familiar with the term "as of"?

25   A    Yes.

1  Q    And when you sign a document, let's say it was today, and

2  we had an agreement, you had an agreement with the prosecution

3  team yesterday, are you with me so far?

4  A    Uh-huh.

5  Q    Yes?  Is that a "yes"?

6  A    Yes.  Sorry.

7  Q    You can put on the document an agreement between the

8  parties as of, and put yesterday's date, do you understand

9  that?

10 A    Yes.

11 Q    And there's nothing wrong with that?

12 A    As long as they, the event happened around the same time

13 frame, there's nothing wrong, me, personally, I don't see

14 there's anything wrong with it.

15 Q    And you told that to the prosecution team, right, prior

16 to today?

17 A    I did for, for a document, yes.

18 Q    For one document or more than one document?

19 A    I don't remember if it was more than one.

20 Q    Which document did you tell them was okay with an "as of"

21 date?

22 A    It pertained to one with an auditor on it, Marcum, the

23 auditor.

24 Q    Do you remember the month or the year?

25 A    I do not.

1   Q    Do you remember whether the prosecution team was taking

2   notes when you said that?

3   A    Again, I've never seen any of the prosecutors at those

4   meeting that would take notes.

5   Q    Let me put up Government Exhibit 111-4 in evidence and if

6   you could go to the capitalization table.

7          MR. BRODSKY:  Keep scrolling through, Mr. Carter.

8   Keep scrolling.  Let's go to the stock ledger.  This is good.

9   If you could highlight -- keep going a little bit.  If you

10  would highlight where it says, 1/19/2012, MSMB Healthcare,

11  $80,000, 2,000 units.

12  Q    Do you remember the prosecution team showed you this

13  yesterday?

14  A    Yes, I remember seeing this.

15  Q    And this is an investment that occurred on January 19,

16  2012, by MSMB Healthcare into Retrophin, right?

17  A    Yes.

18  Q    And you, in December of 2012, helped Mr. Shkreli create a

19  subscription agreement for that investment, correct?

20  A    Yes, we memorialized that investment.

21  Q    And when you memorialized it, you helped Mr. Shkreli fill

22  out the subscription agreement, right?

23  A    I can't remember what, if I filled it out.

24  Q    You provided Mr. Shkreli with all the details to fill

25  out, correct?

Su - cross - Brodsky                     5059

1    A     Correct.

2    Q     You gave him a blank form?

3    A     Yes.

4    Q     And then Mr. Shkreli took the information from your form

5    that you provided and put it in the document?

6    A     Yes.

7    Q     And there was no indication on the document that the

8    document was being dated in December of, that you were writing

9    this in December of 2012, right?

10   A     I don't believe there was.

11   Q     And there was nothing wrong with that, right, sir?

12   A     I didn't see anything wrong with it.

13   Q     But you didn't tell Marcum about it, right?

14   A     I don't recall whether I told them or not.

15   Q     You don't recall telling them to just, because there was

16   a lack of supporting documentation for it, just delete it?

17   A     Sorry.  I don't follow you.

18   Q     Well, Marcum asked about that document.  Do you remember

19   them asking about it?

20   A     Yes.

21   Q     The backup support for it?

22   A     Yes.

23   Q     And do you remember responding to them and saying just

24   delete it?

25   A     No.  The transaction actually occurred so I wouldn't

1   delete it.

2   Q    And do you remember who you were talking to at Marcum?

3   A    Several people that work with their -- names that come up

4   in mind is Ed Hackert, Mariel, I don't know her last name,

5   Sunil I worked with at some point.

6   Q    And is this the document that you told the government

7   about?

8   A    Is this the document that we talked about?

9   Q    You testified there was a document that you remember

10  dating, putting in a prior date for a transaction.  Is this

11  the transaction that you told the government about?

12  A    Sorry.  I'm confused on which document you're referring

13  to.

14  Q    All right.  Let me show you DX 111-149.

15        MR. BRODSKY:  May I approach, Your Honor?

16        THE COURT:  Yes.

17  Q    Mr. Su, I'm showing you a document from you to Mariel

18  Schlecht, Corey Massella, Susan Chew, copied to Ed Hackert

19  dated December 12, 2012 at 8:53 a.m.  Do you recognize it?

20  A    Yes.

21  Q    Does this relate to the dating of an investment reflected

22  on January 19, 2012?

23  A    Yes.

24  Q    And this is your communication to Marcum and Citrin

25  Cooperman about that transaction, right?

1     A     Correct.

2                MR. BRODSKY:  Your Honor, we offer it.

3                MR. KESSLER:  No objection.

4                THE COURT:  We receive Defense Exhibit 111-149.

5                (So marked.)

6     Q     Mr. Greebel is not on this e-mail, right?

7     A     No, he's not.

8     Q     And Mariel Schlecht, you see below, Mariel Schlecht is

9     sending you an e-mail, Mr. Su, along with Mr. Massella and

10    Ms. Chew?

11    A     Yes.

12    Q     And one of the things they're asking for -- if we can

13    scroll up a little bit, Mr. Carter -- there's PPMs and there's

14    a statement:  There are still various PPMs I did not see

15    uploaded which address the following issues.

16                Do you see that?

17    A     Yes.

18    Q     And one of the PPMs they're looking for is they're

19    looking for the subscription agreement in the first one,

20    January 19, 2012, they're looking for MSMB Healthcare's

21    subscription agreement, and if we scroll over, $40, at 80,000,

22    for $80,000, 2000 units, and then they put agreement for 4K

23    units at $80 a unit, $20 a unit.  Right?

24    A     Yes.

25    Q     And those comments in red are you, right?  Do you say,

Su - cross - Brodsky                          5062

1   PPM should be for 80K at $20 for share, delete the 2,000

2   shares at 40?

3   A    Yes.

4   Q    And then after receiving this, Mr. Su, doesn't

5   Mr. Schlecht respond to you and tell you that he actually

6   needs the agreement that's reflected on the equity schedule?

7             This is an e-mail, for the record, DX 111-129, for

8   identification.  Jackson Su, December 13, 2012, e-mail to

9   Corey Massella, Mariel Schlecht and Susan Chew.

10            MR. KESSLER:  Sorry, Your Honor.  Is this being

11  offered?

12            MR. BRODSKY:  We'll offer it.

13            MR. KESSLER:  I don't object.

14            THE COURT:  All right.  We will receive Defense

15  Exhibit 111-129.

16            (So marked.)

17  Q    Mr. Su?

18  A    Yes.

19  Q    Let's go to the bottom of the e-mail chain.

20            Does Mariel Schlecht respond, December 12, 2012,

21  directed to you:  Hi, Jackson, this is the agreement which I

22  am missing.  I can delete the 2,000 at $40 because it is part

23  of the equity schedule, and supposedly part of the 1-25-2012

24  PPM.  Right?

25  A    Yes.

Su - cross - Brodsky                      5063

1   Q    So he's basically saying that I can't just delete it, I

2   need the backup support for the investment?

3   A    Right.  I think it's a she.

4   Q    She.  I apologize.

5        And then you say:  Susan and Corey, please double

6   check to see if I have it wrong, but I believe this should

7   have been done at $20.  Right?

8   A    Yes.

9   Q    You're suggesting that the investment that took place in

10  January of 2012 should have been done at $20 a share, not $40

11  a share, correct?

12  A    I don't remember that part and that's why I was writing

13  that because I think I was out of the office, if I'm reading

14  this correctly and it's jogging my memory.  I'm not in the

15  office, I do not know what the new share price was.  That's

16  why I wrote that.

17  Q    You say on December 13th:  I won't be in the office

18  Thursday or Friday.

19        So, that's December 13th, Thursday, correct?

20  A    Yes.

21  Q    And then in response, Corey Massella says:  Jackson, if

22  it occurred in January of 2012, the PPM was set at $40.

23  Right?

24  A    Yes.

25  Q    And you say:  My mistake.  Right?

1   A    Yes.

2   Q    Isn't that same phrase -- can we pull up Government

3   Exhibit 111-15.  Let's put it alongside this one -- no, not

4   111-15.  111-16.

5            MR. BRODSKY:  One moment, Your Honor.  I'm sorry.

6   It's one -- let me look.  Sorry.

7            (Pause.)

8            MR. BRODSKY:  111-16.  I'm sorry.  It's GX.  It's GX

9   111-16.  So, if we can scroll it over so we can see the "my

10  mistake" on both documents, can we do that, Mr. Carter?

11  Q    It's the same phrase you used in GX 111-16, right, in

12  evidence?

13  A    Yes.

14  Q    "My mistake."

15           And so, you see, if we go back to 111-129:  My

16  mistake.  The agreement was 2,000 shares at $40.  I will send

17  you the document when I return to the office possibly as late

18  as Monday.  Right?

19  A    Yes.

20  Q    And then what do you do next?  Do you remember what you

21  did on Sunday, December 16th?

22           MR. BRODSKY:  May I approach, Your Honor?

23           THE COURT:  Yes.

24  Q    Let me show you DX 111-130 for identification.

25           For the record, it's an e-mail from Jackson Su,

Su - cross - Brodsky                      5065

1   December 16, 2012, to Martin Shkreli, copied to Michael Smith.

2           Do you recognize the document?

3   A    Yes.

4           MR. BRODSKY:  We offer it, Your Honor.

5           MR. KESSLER:  No objection.

6           THE COURT:  We receive 111-130, defense exhibit.

7           (So marked.)

8   Q    And so the subject says, you're sending this to

9   Mr. Shkreli, right?

10  A    Yes.

11  Q    And you're saying in the subject line:  Sign and return

12  first thing in morning.  Right?

13  A    Yes.

14  Q    And the attachment which we'll look at in just a moment

15  is a blank Retrophin subscription agreement at $40, right?

16  A    Yes.

17  Q    And you're telling him here that he should put the date

18  of the subscription down as 1/19/2012, right?

19  A    Yes.

20  Q    And you tell him to put down the price of $40?

21  A    Yes.

22  Q    And you tell him to put down 2,000 shares?

23  A    Yes.

24  Q    And you tell him it should be a subscription for MSMB

25  Healthcare LP?

1  A    Yes.

2  Q    At $80,000?

3  A    Yes.

4  Q    And then scrolling up a little bit, you say the date for

5  acceptance should be 11/25/2012, right?

6  A    Yes.

7  Q    So you're giving him -- 1/25, sorry, 1/25/2012.

8          You're giving him the date of the subscription,

9  1/19/2012, as the date that should be put on the subscription

10  agreement 11 months before, correct?

11  A    Yes.

12  Q    And nothing wrong with that, sir?

13  A    That, no.

14  Q    Because it reflects what actually happened?

15  A    Yes.

16  Q    And then if you see the attachment, let's go to the

17  attachment on the first page.  This is the Retrophin LLC

18  Investment Unit Subscription agreement, right?

19  A    Yes.

20  Q    And if we scroll, this is a subscription agreement in the

21  front part which it says addressed to Retrophin, LLC, right?

22  A    Yes.

23  Q    That's when you were at 330 Madison Avenue before you

24  moved, correct?

25  A    Correct.

Su - cross - Brodsky                          5067

1    Q    You moved to 777 Third Avenue later in the year?

2    A    Yes.

3    Q    And the first paragraph says, Ladies and gentlemen, and

4    it's got the amount which is $40 per investment unit, right?

5    A    Yes.

6    Q    And then if you scroll to the last, second to last page,

7    it's blank.  It's Bates number RGREEBEL6997.  It's totally

8    blank, right?

9    A    Yes.

10   Q    There's no date, right?  In Witness Whereof, the

11   undersigned has executed this subscription agreement.  It has

12   a blank date?

13   A    It's blank, yes.

14   Q    There's no "as of" language in this document, sir,

15   correct?

16   A    I did not see one, no.

17   Q    Okay.

18            MR. BRODSKY:  And why don't we go to Defense

19   Exhibit 111-73 -- may I approach, Your Honor?

20            THE COURT:  Yes.

21            MR. BRODSKY:  -- for identification.

22   Q    Mr. Su, this is a Jackson Su e-mail December 17, 2012 to

23   Mariel Schlecht copied to Ed Hackert, correct?

24   A    Yes.

25   Q    And this relates to the same MSMB Healthcare LP

Su - cross - Brodsky                    5068

1   investment on January 19, 2012, right?

2   A    Yes.

3           MR. BRODSKY:  Your Honor, we offer 111-73.

4           MR. KESSLER:  No objection.

5           THE COURT:  We receive 111-73, defense exhibit.

6           (So marked.)

7   Q    So here, in response to Ms. Schlecht's December 14, 2012

8   e-mail to you, copied to Ed Hackert, do you see that?

9   A    Yes.

10  Q    This is Ms. Schlecht on behalf of Marcum, the external

11  auditor, seeking documents from you, correct?

12  A    Yes.

13  Q    And one of the documents is, again, in that big box, the

14  first box, they're asking for that same subscription

15  agreement, right?

16  A    Yes.

17  Q    They want the support, right?

18  A    Yes.

19  Q    There's no Evan Greebel on this e-mail, right?

20  A    No.

21  Q    Evan Greebel is not anywhere -- withdrawn.

22          Ms. Schlecht is asking you for the information,

23  correct?

24  A    Yes.

25  Q    Because you're management of Retrophin at this time,

1   right?

2          MR. KESSLER:  Objection to why Ms. Schlecht is doing

3   something.

4          THE COURT:  Sustained.

5   Q    Your understanding, sir, is that Ms. Schlecht is asking

6   you for the information because you're the chief operating

7   officer of Retrophin?

8          MR. KESSLER:  Objection.  Relevance.

9          THE COURT:  Overruled.

10  Q    Correct?

11  A    I'm the point person for the auditor for, for Retrophin,

12  so I provided her the documents, yes.

13  Q    And then if we scroll up, what you do is you say, MSMB

14  Healthcare LP, 1/19/2012 PPM, right?  If we can scroll to the

15  top, you attach it, right?

16  A    Yes.

17  Q    What you attach, Mr. Su, is a filled out form.  The blank

18  form we were looking at is now filled out, right?

19          Do you want to look at it?

20  A    Yes, it's filled out.

21          MR. BRODSKY:  If we go to the RTRX15551 page, if we

22  go to the page RTRX15551, Mr. Carter, which is the fourth page

23  of the document.  Why don't we start there.

24  Q    This is the same investment unit subscription agreement

25  to Retrophin, LLC at 330 Madison Avenue for $40 per investment

1  unit, right?

2  A    Yes.

3  Q    It's the same one you sent Mr. Shkreli, right?

4  A    Yes.

5  Q    And then if we go to the second to last page, it's filled

6  out, right?

7  A    Yes.

8          MR. BRODSKY:  Can we line this up with the last

9  exhibit, DX 111-130, and can we blow up the information in

10 130, DX 111-130, the information in the e-mail on the first

11 page, scroll it over a little bit and line it up next to the

12 information, can we scroll a little bit, Mr. Carter, on DX

13 111-73.  Make that a little bit -- can we put them lined up?

14 Great.  So can we highlight the date of subscription,

15 1/19/2012.

16 Q    That's the date you gave to Mr. Shkreli, right?

17 A    Yes, everything there matches.

18          (Continued on next page.)

19

20

21

22

23

24

25

Su - cross - Brodsky                    5071

1  BY MR. BRODSKY:

2  Q    Everything that matches, he put in witness thereof.  He

3  said,  "In witness thereof the undersigned has executed the

4  subscription agreement on the 19 day of January 2012, right?

5  A    Yes.

6  Q    Now, this says it's actually executed, the undersigned

7  has executed the agreement on the 19 of January, right?

8  A    Yes.

9  Q    There's no date there that says this is as of January 19,

10 2012, right?

11 A    Right.

12 Q    But there's nothing wrong with this because you know this

13 investment happened?

14 A    Yes.

15 Q    And then if we can highlight the forty dollars per share.

16 That's in the first paragraph of the agreement, right?

17           We don't have to go to it, Mr. Carter.

18           That's in the first paragraph, forty per share

19 agreement, right.

20 A    Yes.

21 Q    And then the shares of 2,000, can you highlight them in

22 both documents, GX 111-73 and GX 111-130, the same number,

23 right?

24 A    It all matches, yes.

25 Q    Did you put the handwriting of 2,000 in and the date of

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                    5072

1   19 of January 2012?

2   A    I did not.

3   Q    Mr. Shkreli did?

4   A    I assume he did.

5   Q    He sent it to you, right?  You sent it to him a blank

6   form?

7   A    Yes.

8   Q    With all the information in DX 111-130, right?

9   A    Yes.

10  Q    And he must have sent it back to you, right?

11  A    He sent it back, right.

12  Q    Did he hand it to you or did he send it to you by e-mail?

13  A    I don't remember.

14  Q    And was this one of the one documents he dropped off on

15  your desk?

16  A    It's possible.  I don't remember.

17  Q    It's for MSMB Healthcare, right?  That information is

18  filled in, correct, Mr. Su?

19  A    Yes.

20  Q    And total of eighty thousand that's filled in?

21  A    Yes.

22  Q    And you recognize Mr. Shkreli's signature, right?

23  A    Yes.

24  Q    And then on the next page, RTRX Bates 1558 of DX 111-73

25  in evidence, it's essentially the same information, right?

Su - cross - Brodsky                                    5073

1   A    Yes.

2   Q    And this says  "The subscription agreement of the

3   subscriber indicated herein below with respect to Retrophin

4   LLC is hereby accepted and said subscriber is hereby allocated

5   the investment units indicated below, correct?

6   A    Correct.

7   Q    And the date on it is January 25, 2012?

8   A    Correct.

9   Q    But that's not the date it was filled out?

10  A    No.

11  Q    The date it was filled out was on or about December 16 or

12  December 17, 2012?

13  A    Around the time I sent him that e-mail with those

14  instructions, yes.

15  Q    Did you tell Marcum that you were  -- you had created

16  this document in December of 2012 for an investment in January

17  of 2012?

18  A    I don't remember whether I told them or not.  But, yes, I

19  don't remember if I told them or not.

20  Q    Whether told them or not, you have no problem with this

21  because it reflects an actual investment that was made?

22  A    Yes.  After reviewing the cap table, verifying that the

23  funds from the bank account did hit during that time frame.

24           THE COURT:  That being what time frame?

25           THE WITNESS:   The January time frame when the

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    investment was actually made.  This was to memorialize that

2    actual event that happened.

3    Q    You did a little shortcut, right, Mr. Su?

4    A    What are you referring to?

5    Q    You didn't tell Marcum that you were creating the

6    document then, right?

7    A    I don't know what happened to the original agreement.  I

8    don't know if it was signed, it was in a drawer, if it was

9    scanned, got lost, I don't know if there was actually a

10   document.  So it wasn't there.  No, I didn't tell Marcum, from

11   my recollection, if I actually  -- if I told them that we

12   executed this specific document here in December.

13   Q    You were shown other subscription agreements from the

14   government yesterday, right?

15   A    What in particular?

16   Q    The nine hundred thousand dollar investment?

17   A    Yes.

18   Q    You were shown the actual investment document, right, the

19   subscription agreement?

20   A    Yes.

21   Q    Do you have a recollection sitting here today whether

22   that one was created in January of 2012 or December of 2012?

23   A    The nine hundred thousand subscription agreement for an

24   equity investment was created in February 1 of 2012.

25   Q    You have a distinct recollection of creating that

1    subscription agreement on February 1, 2012?

2    A    I have a distinct memory of having that subscription

3    document in the folders and it was during that time period

4    February 1, when the investment was actually made.

5    Q    And this is an investment that actually affects

6    Retrophin, right?  It's -- withdrawn.

7            This is an investment of eighty thousand dollars in

8    Retrophin, right?

9    A    It was invested into Retrophin, yes.

10   Q    And it's reflected on the stock ledger as MSMB

11   Healthcare, LP actually getting 2000 units from Retrophin LLC,

12   right?

13   A    In exchange for eighty thousand dollars, yes.

14   Q    You didn't inform Mr. Greebel about this creation of this

15   subscription agreement, right?

16   A    I don't recall if I did or not.  But  --

17   Q    Sitting here today you have no reason to believe that you

18   did, right?

19   A    I have no reason to believe I did.

20   Q    You can't point to any e-mail or document that suggests

21   you informed Mr. Greebel you were creating a subscription

22   agreement in December of 2012 for January of  -- for an

23   investment that occurred in January 2012, right?

24   A    Right.

25   Q    And this is not the only document you were involved in

Su - cross - Brodsky                    5076

1  with respect to dating it prior to the event -- dating the

2  document -- withdrawn.

3           This is not the only example where you created a

4  document and put a date on it that occurred months before?

5  A    I'm not sure what you are referring to.

6  Q    I'm referring to other subscription agreements, other

7  transaction documents.

8  A    Can you clarify, show me?

9  Q    Just generally, sir, do you remember there were other

10 incidents in 2012 in which you worked with Mr. Shkreli to

11 create subscription agreements and put dates on them for

12 events that occurred months earlier?

13 A    If the event actually happened and we're missing

14 subscription documents like in this case and an event actually

15 did occur, backed by supporting documents such as an

16 investment hitting the bank account which I had access to, and

17 I can see, that would be a possibility as like in this case.

18 The event had to happen.

19           THE COURT:  If this is a good point to break?

20           MR. BRODSKY:  Yes, your Honor.

21           THE COURT:   The cafeteria is closing in about a

22 minute.  So I think the jurors, if you can get down there, if

23 not, I'm happy to give you a little bit of extra time because

24 you may have to go outside to get your lunch.

25           Did we ask them to hold it open?

1              We're asking them today open for you.

2              So, please, don't talk about the case.  Keep an open

3    mind and will you try to come back to the jury room by five

4    after three, please.

5              (Jury excused.)

6              THE COURT:  Mr. Su, you can step down.

7              (Witness excused.)

8              THE COURT:  All right.  So I'll see you back in the

9    courtroom at 3:00 o'clock.  Thank you.

10             (Lunch recess taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               AFTERNOON SESSION

2

3           (In open court; jury not present.)

4           THE COURT:  Good afternoon.  Have a seat, please.

5    Can you come up to the front, please, so we can all hear you.

6           MR. BRODSKY:  Mr. Su testified according to the

7    rough transcript --

8           THE COURT:  Is his lawyer here?

9           THE CLERK:  Mr. Burke.

10          THE COURT:  Has someone tried to reach him?

11          MR. BRODSKY:  We'll look for him.

12          MR. KESSLER:  Is this a matter that involves him?

13          MR. BRODSKY:  About Mr. Su, yes.

14          THE COURT:  Let's wait for his lawyer to come back.

15          In the meantime I would like to report a couple of

16   things.  One, Juror No. Two is not being paid.  So she's asked

17   me to contact her employer to see if she can be paid.

18          Number two, you know, we don't know what the status

19   is of Juror No. 16.

20          And number three, do the parties have an updated

21   view as to when this case will be over because I have

22   scheduled, rescheduled twice my multi-week trial in a civil

23   case.  It's really not fair to those parties.  I pushed it

24   most recently from December 4 to December 11.

25          MR. PITLUCK:  Your Honor, can we confer tonight and

1  report tomorrow morning?  I think the first two days of this

2  week have sort of been telling and we need to think about it

3  and look at our case and we respect the court's request and

4  we'll certain come back with an informed view.

5          THE COURT:  Is there any possibility it's going to

6  go past December 8?

7          MR. PITLUCK:  Sure.

8          THE COURT:  All right.  I do have a trial starting

9  December 11.  And then after that I have more trials right

10 after that.  Some of them are criminal cases and I cannot

11 adjourn them.

12         MR. PITLUCK:  We understand.  I should say we hope

13 not, but we thought this week would go faster than it is, it's

14 not.  We're trying to take a conservative view rather than a

15 hopeful view.

16         THE COURT:  All right.

17         Can somebody reach out for Mr. Burke?

18         (Pause.)

19         THE COURT:   Mr. Burke could not be reached by

20 Ms. Jackson.

21         MR. BRODSKY:  We can continue, your Honor, and maybe

22 on the next break we can address it.  I'm happy to tell you

23 what the issue is.

24         THE COURT:  This has to do with Mr. Su, right?

25         MR. BRODSKY:  Yes.

1              THE COURT:  You can continue his examination?

2              MR. BRODSKY:  Yes.

3              MR. DUBIN:  Your Honor, did Juror No. Two express

4    that we he she wanted to be dismissed?

5              THE COURT:  No.  She would like to stay on the jury.

6    She's just not being paid.  She asked if we could somehow

7    intervene and I'll try.

8              MR. DUBIN:  Thank you, your Honor.

9              THE COURT:  We're missing three jurors.

10             (Pause.)

11             THE COURT:  All right.  We can get started.

12             Mr. Burke, the defense apparently wants to raise an

13   issue regarding Mr. Su's testimony.  So we wanted you to be

14   present before we started hearing about that.

15             MR. BURKE:  Great.

16             MR. BRODSKY:  Your Honor, it's with respect to this

17   part of Mr. Su's testimony and this is from the rough

18   transcript:

19             I had given him the letter dated November 14, 2017

20   from the government.  And to Mr. Burke.

21             "QUESTION:   And that was important for you to get

22   that immunity?

23             "ANSWER:  No.

24             "QUESTION:   You didn't care about having that

25   immunity at all?

Su - cross - Brodsky                          5081

1          "ANSWER:   I really didn't have a chance to think

2    about it.  It was given to me this morning."

3          He started talking about his lawyer and then he said

4    -- your Honor instructed him not to disclose communications

5    and then he said okay.

6          THE COURT:  I think we both did, didn't we?

7          MR. BRODSKY:  Yes.  I just wanted to stop him.

8          And then:  Okay.  I really didn't have a chance to

9    think about this.  It was given to me and that's it.  That was

10   the morning.

11         "QUESTION:   So there was nothing that you were

12   worried about that caused you to accept the immunity?

13         "ANSWER:   I was not worried."

14         This is inconsistent directly with Mr. Su's

15   representation through counsel yesterday that he was going to

16   assert the Fifth Amendment if questioned regarding access to

17   Global Relay.  And our application is that we be allowed to

18   challenge Mr. Su's testimony this morning, the credibility of

19   it, that he wasn't worried and he didn't think he did anything

20   wrong and he says that it wasn't important for him to get that

21   immunity.

22         From our perspective the representation that he was

23   going to assert the fifth and not answer questions relating to

24   his access after leaving Retrophin in December of 2012 is

25   inconsistent with that.

Su - cross - Brodsky                            5082

1          THE COURT:  So how do you propose to challenge him?

2          MR. BRODSKY:  I propose to say that isn't it a fact

3     that you represented through counsel that you would not answer

4     questions today with respect to  -- I won't invoke the Fifth

5     Amendment.  I'm not going to ask for an adverse inference.

6     That I would say to him isn't it true through your counsel you

7     represented to the court that you were going to refuse to

8     answer questions about access to Global Relay after you left

9     Retrophin in December 2012?  I can't think of another way to

10    challenge his credibility.

11         MR. BURKE:  Let me respond first, even though I

12    don't think I have to.

13         First of all, this is not inconsistent.  He can take

14    the Fifth Amendment and be innocent, right?  He can take an

15    immunity letter and be totally innocent and have no concerns

16    for his own well-being based on counsel's advice.

17         Even assuming arguendo the government's position,

18    it's not an inconsistent statement.  That's what I have to say

19    and now I'll let the government respond.

20         MR. KESSLER:  He said it better than I did.  What we

21    heard last night and I would be happy to look at the

22    transcript Mr. Brodsky hasn't read.  Mr. Burke came in and

23    said having quickly conferred with his client his advice at

24    that point was that Mr. Su would decline to answer questions

25    in furtherance of his Fifth Amendment right.  That's what the

Su - cross - Brodsky                    5083

1   record was.

2           Then Mr. Su gave the approximate testimony that

3   Mr. Brodsky read.  There's nothing inconsistent about that.

4   There's nothing inappropriate about that.  There is absolutely

5   no inference to be drawn from a witness' consideration,

6   especially through his counsel, of considering invoking the

7   Fifth Amendment.

8           MR. BURKE:  This is part of charge when someone

9   takes the Fifth, the judge explains as to the jury, well, even

10  innocent people can take the Fifth Amendment.  I don't see,

11  even accepting the government's statement, how there's an

12  inconsistency here.  If he's not worried, that's his state of

13  mind.

14          MR. BRODSKY:  It's the I'm not worried part, that it

15  wasn't important to me to get that immunity that strikes us as

16  inconsistent.  You're right, taking the Fifth Amendment is

17  something everybody has the right to do and they don't have to

18  answer questions when the questions could incriminate them

19  under any possibility.  But the answers that he gave that it

20  wasn't important for him to get the immunity and he wasn't

21  worried about it, appear to us to be inconsistent with his

22  plan today to refuse to answer questions in that area.

23          MR. BURKE:  Again this is not inconsistent to me and

24  it's not necessarily his plan.  He's responding to the advice

25  of counsel.  I just don't see where the inconsistency lays.  I

Su - cross - Brodsky                    5084

1   don't see it.  You know, he could take the Fifth on his

2   lawyer's advice and the next day still not be worried about

3   getting an immunity letter, right?  I think he's testified on

4   the stand today that he didn't think he did thinking wrong.

5   I'm paraphrasing and generalizing the record.

6            THE COURT:  We got the general gist of it.

7            MR. BURKE:  That's what we are saying.

8            THE COURT:  Did you want to be heard, Mr. Kessler?

9            MR. KESSLER:  I don't have anything more to add.

10           THE COURT:  Look.  I think, Mr. Brodsky, you have

11   had the opportunity and no one has stopped you from fully

12   exploring with Mr. Su his post December 12, 2012 conduct and

13   whether or not, you know, he had the current state of mind of

14   believing then or now that he's done anything wrong and

15   whether he's worried.  But because of the statements that you

16   made yesterday that Mr. Su may well have violated  --

17   committed federal felonies, I thought it was prudent to

18   appoint counsel and based on advice of counsel, counsel

19   informed us that his client would follow his advice to invoke

20   the Fifth.

21           Now, that is not inconsistent, as you know.

22           MR. BRODSKY:  Okay, your Honor.

23           THE COURT:  And we will instruct the jury that they

24   cannot infer anything from the fact that somebody doesn't

25   testify.  It's fundamental.

Su - cross - Brodsky                    5085

1          MR. BRODSKY:  Understood, your Honor.

2          Thank you for considering the application.

3          THE COURT:  Okay:

4          Let's see if all our jurors are back and whether we

5     can bring them in to resume the cross-examination.

6          (Pause.)

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury enters the courtroom.)

2           THE COURT:  All jurors are present.

3           Please have a seat.

4           Mr. Su, you are still under oath, and Mr. Brodsky,

5      you may resume your cross.

6           MR. BRODSKY:  Can you put up Government Exhibit 223

7      in evidence.  Can you blow up the document through the top,

8      through the first paragraph.

9      CROSS EXAMINATION

10     BY MR. BRODSKY:  (Continuing)

11     Q    So, Mr. Su, looking at Government Exhibit 223 in

12     evidence, do you remember when Retrophin named Mr. Aselage as

13     the chief executive officer?

14     A    Yes.

15     Q    On September 10, 2012, you were still the chief operating

16     officer of Retrophin?

17     A    Yes.

18     Q    And in the first paragraph there, it says that Mr.

19     Aselage will be its new chief executive officer effective

20     October 16th; correct?

21     A    Yes.

22     Q    And Mr. Aselage wasn't going to actually start working

23     until October 16th; correct?

24     A    Yes.

25     Q    And the next sentence says the company also announced

1    that it was moving its headquarters from New York City to San

2    Diego, California, where it already has an office; right?

3    A    Yes.

4    Q    And on the next page, down at the bottom --

5         MR. BRODSKY:  If you can blow that up.

6    Q    -- the second to the last sentence there, the company's

7    lead compound RE-021, formerly known as DARA, is scheduled to

8    begin enrollment in a Phase 2 clinical trial for FSGS in the

9    near future.  Do you see that?

10   A    Yes.

11   Q    Now, that was the license that Retrophin obtained from

12   Ligand?

13   A    Yes.

14   Q    And that was a significant development in the life of

15   Retrophin; correct?

16   A    Yes.

17   Q    Yes or no, sir, the money that MSMB Healthcare invested

18   in Retrophin was used, in part, to pay for the Ligand license?

19   A    Yes.

20   Q    Without the MSMB Healthcare money invested in Retrophin

21   LLC, Retrophin LLC would not have been able to pay for that

22   license in 2012?

23   A    I wasn't part of the fundraising, so I wouldn't know what

24   capabilities Retrophin had.

25   Q    You remember testifying yesterday that Retrophin was

1  running on fumes; right?

2  A    Yes.

3  Q    And you testified that, in 2012, Mr. Huang had to take

4  $30,000 out of his own pocket to pay a portion of the royalty

5  fee to continue to use the license for Ligand?

6  A    Correct.

7  Q    So based on that experience, sir, you knew that in 2012

8  Retrophin would not have been able to afford both the license

9  and the royalty payments for this Ligand DARA compound without

10 the investment of MSMB Healthcare?

11         MR. KESSLER:  Object to the form with respect to the

12 time frame.

13         THE COURT:  Try to rephrase, Mr. Brodsky.

14         MR. BRODSKY:  Sure.

15 Q    You knew, sir, in 2012 that, without the investment of

16 MSMB Healthcare into Retrophin LLC that Retrophin would not

17 have been able to finance the licensing for Ligand?

18 A    Again, I just want to be very clear from my perspective

19 as what I saw, okay, in terms of marketing or fundraising,

20 again, this is in February 1, of 2012 when I first joined, so

21 I do not know what the capabilities of fundraising, people

22 doing the fundraising, Martin's ability to raise money, would

23 have been at that time.

24         The $900,000 that did come in was used to pay for

25 that license with Ligand February 1st.

1   Q    And subsequently, when Mr. Huang took money out of his

2   own pocket to pay for a portion of the royalty payment to

3   continue to have the license for Ligand -- you remember that;

4   correct?

5   A    Yes.

6   Q    That occurs in the latter half of 2012; right?

7   A    Correct.

8   Q    MSMB Healthcare's continued investment in Retrophin

9   helped Retrophin with these royalty payments?

10  A    Uhm.

11  Q    Yes or no?

12  A    There were several investors.  I don't know, unless you

13  give me I guess the stock ledger of when that royalty payment

14  was due, when George's payment was due, I don't know whose

15  money came in because there were other investors' money that

16  came in, too, which may have been used to pay the royalties.

17          MSMB Healthcare was the largest investor into

18  Retrophin, but with specific to the royalty payment in

19  reference to what George Huang paid for the last $30,000, I

20  don't know what the royalty payment was in total and what

21  portion at the beginning, which investor paid for it when the

22  money came in.

23  Q    The last sentence here in Government Exhibit 223 in

24  evidence says:  "Retrophin Series A financing was led by MSMB

25  Capital and several current and former senior executives at

1  global pharmaceutical and healthcare companies."

2       Do you see that?

3  A    Yes.

4  Q    That was accurate; correct?

5  A    I don't know what MSMB Capital is.  MSMB Healthcare

6  invested into Retrophin and that was what was on the

7  capitalization table that I saw.

8  Q    Your signature block for a lot of your e-mails said -- in

9  2012, had MSMB Capital underneath it; right?

10 A    Correct.

11 Q    Now, you remember sending to Mr. Massella and Ms. Liang,

12 in November 2012, Mr. Aselage's employment agreement and Mr.

13 Aselage's share transfer agreement?

14 A    I don't recall if I did.  If you show it to me.

15       MR. BRODSKY:  May I approach, Your Honor?

16       THE COURT:  Yes.

17 Q    I'm showing you DX-111-103 for identification, which for

18 the record is an e-mail from Jackson Su to Corey Massella and

19 Ms. Liang, dated November 8, 2012?

20       Do you see that, Mr. Su?

21 A    Yes.  And, just going back to your prior question about

22 MSMB Capital, it's not on here.  It just says my e-mail which

23 is Jackson at MSMB Capital, just to clarify.

24 Q    Understood.  There are other signature -- regardless,

25 this document is not in evidence yet, DX-111-103, but you do

MDL   RPR

1   remember other e-mails in which MSMB Capital was used under

2   your signature block?

3   A    If you show me that document.

4   Q    Sitting here today, you don't remember?

5   A    I don't remember.

6   Q    So fair to say five years ago, right, a long time ago to

7   remember what your signature block looked like in 2012?

8   A    I wouldn't remember specifically.

9   Q    Okay.

10              MR. BRODSKY:  We offer 111-103, Your Honor.

11              MR. KESSLER:  No objection.

12              THE COURT:  We receive DX-111-103.

13              (Defendant's Exhibit 111-103 was received in

14   evidence.)

15   Q    You are providing this to Mr. Massella and Ms. Liang in

16   November because they need documentation for Mr. Aselage's

17   employment; correct?

18   A    Yes.

19   Q    And they need documentation for his share transfer;

20   right?

21   A    They would, yes.

22   Q    If we go first to the employment agreement, which is

23   attached, and this is DX-111-103, Bates stamp numbered Citrin

24   896611, do you see the first paragraph there where it says

25   employment agreement?

Su - cross - Brodsky                    5092

1   A    Yes.

2   Q    It says this employment agreement:  "This agreement is

3   made as of 9/7/2012 by and among Retrophin, LLC, a Delaware

4   limited liability company, and Stephen Aselage and shall

5   become effective as set forth in Section 1 hereof."

6           You see that; correct?

7   A    Yes.

8   Q    So you agree that this is an agreement that is going to

9   be made as of September 7th; correct?

10  A    Yes.

11  Q    And if you turn to the last page of the agreement, you

12  see Mr. Aselage's signature; correct?  Do you recognize it?

13          MR. BRODSKY:  If we go to Citrin, Mr. Carter,

14  896624.

15  Q    This is Mr. Aselage's signature.  Do you recognize it?

16  A    I don't.  I don't see that much of the signatures, so I

17  wouldn't recognize his specific signature, but it is signed

18  and it says Steve Aselage below that.

19  Q    You recognize Mr. Shkreli's signature?

20  A    Yes.

21  Q    It says above that:  "In witness whereof the parties

22  hereto have executed this employment agreement on the date

23  first written above."

24          Do you see that?

25  A    I see that.

Su - cross - Brodsky                          5093

1   Q    Do you know whether or not this agreement was actually

2   executed and signed by the parties on September 7, 2012?

3   A    I would not know.

4   Q    And do you remember -- and then, if we go to the transfer

5   and donee representation letter, the second page of

6   DX-111-103, Citrin 896608 is the Bates stamp number, do you

7   see this?

8   A    Yes.

9   Q    Mr. Su, and this is Mr. Shkreli giving -- assigning,

10  conveying to Mr. Aselage his interest in 50,000 Class B units;

11  correct?

12  A    Yes.

13  Q    And does it have a date on that first page anywhere?

14  A    What kind of date are you looking for?  There is a date

15  on the second paragraph, all the way on the bottom, that says

16  June 30, 2011 for agreement.

17  Q    You mean the third paragraph of the document number

18  two --

19  A    Yes.

20  Q    -- where it talks about, it says:  "The amended and

21  restated limited liability company agreement of the company

22  dated as of June 30, 2011?

23  A    Yes, that's the only date I see on this page.

24  Q    That's not the date that this transfer became effective;

25  right?

MDL   RPR

1  A    I don't believe so.

2  Q    And if you scroll to this page No. 2, is there any date

3  there as to when this agreement became effective?

4  A    There is not.

5  Q    And then on the third page, is there any date there?

6  A    No, I don't see a date there.

7            MR. BRODSKY:  If we can blow up the first part of

8  this.

9  Q    It says:  "In witness whereof, the undersigned has

10  executed this vest instrument under seal as of the date set

11  forth above."

12            Do you see that?

13  A    Yes.

14  Q    But there is no date above; right?

15  A    We didn't see one.

16  Q    Still an effective agreement even though there is no date

17  set forth above; right?

18            MR. KESSLER:  Objection to the legal conclusion.

19            THE COURT:  Try to rephrase, Mr. Brodsky.

20            MR. BRODSKY:  Yes, Your Honor.

21  Q    As the chief operating officer who sent this agreement to

22  Mr. Massella and Ms. Liang on November 8, 2012, you were

23  representing to Citrin Cooperman that this donee and transfer

24  from Mr. Aselage -- withdrawn -- from Mr. Shkreli to Mr.

25  Aselage was a valid agreement; right?

Su - cross - Brodsky                    5095

1    A    I thought it was valid.

2    Q    Even though it didn't have a date set forth above; right?

3    A    I couldn't make that conclusion.  It was in the folder.

4    It was an executed transfer agreement.  Whether it was legal

5    or not, I don't know, but it was in the folder.  They asked

6    for an employment agreement -- or a transfer of shares.  I

7    went there, saw it, gave it to them.

8    Q    And there was no reason for you to believe that Mr.

9    Aselage and Mr. Shkreli didn't have this transfer; correct?

10   A    Correct.

11   Q    Do you remember being asked about this agreement by Ms.

12   Chew shortly after you sent it to them?

13   A    I don't remember.

14        MR. BRODSKY:  May I approach, Your Honor?

15        THE COURT:  Yes.

16   Q    I am going to show you DX-111-104 for identification.

17        So do you recognize DX-111-104 for identification,

18   Mr. Su?

19   A    I see the e-mail, yes.

20   Q    And this relates to the -- in part, to Mr. Aselage's --

21   Mr. Shkreli's transfer of shares to Mr. Aselage?

22   A    It is the transfer of shares that I see on the last three

23   pages.

24   Q    Yes?

25   A    So, yes.

1            MR. BRODSKY:  We offer it, Your Honor.

2            MR. KESSLER:  No objection except that there appear

3    to be a number of blank or oddly printed pages which perhaps

4    can be fixed.

5            THE COURT:  Are we missing pages, Mr. Brodsky?

6            MR. BRODSKY:  It is just how the document printed

7    when we printed it out.  We didn't want to cut off the blank

8    pages.  We are happy to tear off the blank pages, there is

9    nothing on them.

10           THE COURT:  So the numbers that were placed on this

11   document, the page numbers, are those placed by the source or

12   by you?

13           MR. BRODSKY:  Not by us.

14           THE COURT:  So these numbers were --

15           MR. BRODSKY:  When we received it from the

16   Government in discovery, this is how we received it.

17           THE COURT:  Okay.

18           Well, do you object, Mr. Kessler?

19           MR. KESSLER:  No.

20           THE COURT:  We will receive Defense Exhibit 111-104.

21           (Defendant's Exhibit 111-104 was received in

22   evidence.)

23   Q    Here, Mr. Su, it says, from Ms. Chew, Jackson -- first

24   there is a question about your agreement; right?

25           Mr. Su?

Su - cross - Brodsky                          5097

1   A    Yes.

2   Q    And she is asking about your agreement where you're going

3   to get 2,500 units of Retrophin; right?

4   A    Yes.

5   Q    And she was under the understanding, based on the

6   information she had, that there was no vesting?

7            MR. KESSLER:  Objection to Ms. Chu's understanding.

8            THE COURT:  Sustained.

9   Q    What you understand Ms. Chew to be asking here is that

10  she says the incentive schedule says no vesting for your

11  units?

12  A    I'm not sure what schedule that she was -- what investing

13  schedule she was looking at.

14  Q    Right.

15  A    But I have that unit agreement and it should just be

16  followed by whatever that agreement says.

17  Q    And then she has a clarification question on Mr.

18  Aselage's transfers; right?

19  A    That's what appeared here on her e-mail, yes.

20  Q    She is asking whether he received Class B incentive units

21  or just Class B common; right?

22  A    That's the question, yes.

23  Q    You send back to her Steve received Class B common and

24  you attached the agreement; correct?

25  A    Yes.

1   Q    If we go to the last page of that agreement, Citrin

2   834079 on DX-111-104, that's the transfer agreement that we

3   were just looking at.

4           MR. BRODSKY:  The last page, Mr. Carter.

5   Q    That's the transfer agreement that we were just looking

6   at; right?

7   A    Yes.

8   Q    No date on it; right?

9   A    It's the same one that we looked at previously.  There

10  would be no date.

11  Q    Okay.  Let me ask you, you understood that Mr. Aselage

12  was getting 50,000 Class B common units from Mr. Shkreli's

13  personal holdings; right?

14  A    If this e-mail is correct, and I don't have any doubt

15  that it's correct, I just don't have any memory of it sitting

16  here, but, going by this e-mail, that's what it says.

17  Q    Going on your e-mail forwarding the agreement to Ms. Chew

18  and Mr. Massella, and what you attached, that's what it says?

19  A    Yes.

20  Q    And that's coming from, again, Mr. Shkreli's personal

21  holdings?

22  A    According to this, yes.

23  Q    The same way that you received, you testified about

24  receiving 10,000 shares from Mr. Shkreli at a certain point?

25  A    10,000 and 15,000 from him personally.

Su - cross - Brodsky                    5099

1    Q     Let's take the 10,000 first.  You testified about

2    receiving 10,000 shares?

3    A     Yes.

4    Q     And that was from Mr. Shkreli's personal holdings; right?

5    A     Yes.

6    Q     And Mr. Shkreli transferred those to you, your

7    understanding was, because he wanted to incentivize you to

8    continue to work hard for Retrophin; right?

9    A     Yes.

10   Q     He wanted to align your interests with the interests of

11   Retrophin; right?

12   A     Yes.

13   Q     Nothing wrong with that; right?

14   A     I didn't see anything improper about that.

15   Q     And there is nothing wrong with Mr. Aselage getting

16   50,000 Class B common units from Mr. Shkreli; right?

17   A     It was under the same circumstances as mine, I wouldn't

18   think so.

19   Q     Now, you could have given your shares that you received

20   from Mr. Shkreli to anybody you wanted; right?

21   A     If it wasn't prohibited within the agreement, I don't

22   know what the agreement had said, I don't recall, but if there

23   was nothing in there that barred me from doing that, it should

24   be my personal holding as far as I understand.

25   Q     As far as you understood, you can give it to anybody you

1    want?

2    A     If it allowed for it, yeah.

3    Q     So do you remember, after receiving this e-mail, Ms. Chew

4    followed up -- or Ms. Liang followed up and asked you for

5    information -- actually, it was Ms. Chew asked you a question

6    relating to Mr. Aselage's shares.  Do you remember that?

7    A     Is that in this e-mail that you are referring to?

8    Q     No.  Let me give you the next one.

9              MR. BRODSKY:  May I approach, Your Honor?

10             THE COURT:  Yes.

11             MR. BRODSKY:  This is DX-111-105 for identification.

12   Q     For the record, this is an e-mail at the top from Jackson

13   Su to Susan Chew, Corey Massella, dated November 21, 2012;

14   right?

15   A     Yes.

16   Q     This is in connection with Mr. Aselage's agreement;

17   correct?

18   A     It appears that way on this e-mail.

19   Q     And if you go to the last three pages, Mr. Aselage's

20   transfer and donee representation letter is there; correct?

21   A     Yes.

22             MR. BRODSKY:  Your Honor, we offer it.

23             MR. KESSLER:  No objection.

24             THE COURT:  We receive Defense Exhibit 111-105.

25             (Defendant's Exhibit 111-105 was received in

Su - cross - Brodsky                          5101

1   evidence.)

2   Q    So here, if I direct your attention to -- Mr. Su, to your

3   e-mail to Susan Chew and Corey Massella on November 20, 2012

4   at 3:00 p.m., do you see that?

5   A    Yes.

6   Q    You are saying here's mine and then you say, quote, Steve

7   Aselage's share transfer agreement was for Common B stock and

8   I was told no need for adoption agreement, end quote.

9         Do you see that?

10  A    Yes.

11  Q    And then above that, Ms. Chew then asks you, quote, how

12  do I validate the date in which the transfer happened for

13  Steve, question mark, question mark; right?

14  A    Yes.

15  Q    So you understood she was asking you what's the date of

16  this agreement?

17  A    Yes.

18  Q    Between Mr. Shkreli transferring 50,000 Class B common

19  units to Mr. Aselage; right?

20  A    Yes.

21  Q    And your response was should clear up; right?

22  A    Yes.

23  Q    And you attached the share transfer agreement; correct?

24  A    Yes.

25  Q    If we go to the last three pages --

1              MR. BRODSKY:  There is a number of, Your Honor,

2      blank pages again because they appear as attachments to the

3      e-mail.  Where it says image, there are four attachments.

4      Q    So the last three pages contains the Retrophin transfer

5      and donee representation letter; right?

6      A    Yes.

7      Q    And this was when Retrophin was an LLC; correct,

8      according to this?

9      A    That's what the agreement says.

10     Q    And it is 50,000 Class B common units; right?

11     A    Yes.

12             MR. BRODSKY:  Let's go to the last page.

13     Q    This one is dated, correct, Mr. Su?

14     A    Yes.

15     Q    You put that date there?

16     A    It looks like my handwriting.

17     Q    You don't remember putting it on?

18     A    I don't remember putting it on.

19     Q    But it looks like yours?

20     A    It looks like my handwriting.

21     Q    And you sent it to Ms. Chew and Mr. Massella on November

22     21st, 2012 and said should clear up, that is what you wrote?

23     A    Yes.

24     Q    And it cleared it up, correct, because it had the date of

25     September 20, 2012?

Su - cross - Brodsky                                    5103

1    A    That's what I wrote.  I don't know if there was

2    subsequent e-mails after that question.

3    Q    That's what you wrote; right?

4    A    That appears to be my handwriting, yes.

5    Q    Now, from this page Citrin 834589, Defense Exhibit

6    111-105, somebody looking at this document would have no way

7    of knowing you wrote that date, right?

8    A    No, it wouldn't identify my handwriting if I did write

9    that.

10   Q    Correct, it would appear that Mr. Aselage wrote that

11   date?

12            MR. KESSLER:  Objection to how it would appear.

13            THE COURT:  Sustained.

14   Q    Above, it says:  "In witness whereof the undersigned has

15   executed this instrument under seal as of the date set forth

16   above."

17            Do you see that?

18   A    I see that.

19   Q    You wrote the date below, Mr. Su; right?

20   A    Okay.

21   Q    So there is no date.  You can look, you have the document

22   Defense Exhibit 111-105.  Do you want to take a look at page 1

23   and 2 of Mr. Aselage's transfer and donee representation

24   letter, take a look if you want, there is no date there above?

25            MR. KESSLER:  Your Honor, asked and answered as to

Su - cross - Brodsky                                    5104

1    where the dates are.

2         THE COURT:  Yes, we have been over this with the

3    other documents.  We agree this is the same document.

4    Q    You agree with me, Mr. Su, that although it says set

5    forth above, what you meant was the undersigned has executed

6    this instrument under seal as of date set forth right there,

7    September 20, 2012?

8    A    Can you clarify your question?  I don't know what your

9    question is.

10   Q    Ms. Chew is asking you how does she validate the date for

11   when the transfer happened; right?

12   A    Right.

13   Q    She is looking for the date of the transfer?

14   A    Correct.

15   Q    Above the signature block there is in witness whereof,

16   the undersigned has executed this instrument under seal as of

17   a certain date; right?

18   A    Yes.

19   Q    So the as of date of when this was executed is September

20   20, 2012; correct?

21   A    Right.

22   Q    That's what you're telling her?

23   A    Yes.

24   Q    And there is nothing wrong with that, Mr. Su; right?

25   A    No.

1    Q    It was your understanding that the transfer between Mr.

2    Shkreli to Mr. Aselage was effective as of September 20, 2012?

3    A    Correct.

4    Q    And then Ms. Liang asked you, in November, for the

5    reasons the shares were transferred to Mr. Aselage, do you

6    remember that?

7    A    No.

8              MR. BRODSKY:  May I approach, Your Honor?

9              THE COURT:  Yes.

10   Q    This is Defense Exhibit 111-66 for identification, Mr.

11   Su.  For the record, this is an e-mail from you, Mr. Su, to

12   Ms. Liang on November 8, 2012.

13   A    Yes.

14             MR. BRODSKY:  We offer it, Your Honor.

15             MR. KESSLER:  No objection.

16             THE COURT:  We receive Defense Exhibit 111-66.

17             (Defendant's Exhibit 111-66 was received in

18   evidence.)

19   Q    So November 8, 2012, 2:55 p.m., Ms. Liang is asking you:

20   Hi Jackson, the shares transferred to Steve are for

21   consideration of employment, question mark; right?

22   A    Yes.

23   Q    And about eight minutes later you say yeah; right?

24   A    Yes.

25   Q    Between 2:55 p.m. and 3:02 p.m. and 3:03 p.m., you didn't

Su - cross - Brodsky                    5106

1   check with anybody; right?

2   A    No.  Not that I know of, I mean.

3   Q    You understood that this was a transfer in connection

4   with Mr. Aselage's employment; right?

5   A    Yes.

6   Q    And, again, nothing wrong with that, right, Mr. Su?

7   A    To my un-legal-trained person, no.

8   Q    Okay.

9        MR. BRODSKY:  Let's put up Government Exhibit

10  111-15.

11  Q    You were shown this Government Exhibit 111-15, right?

12  This is the Marek Biestek transfer of 4,167 shares Class B

13  common units to Mr. Shkreli?

14  A    Yes.

15  Q    And you wrote down, if we go to the last page of the

16  document, it was your testimony --

17       MR. BRODSKY:  I'm sorry, not the very last page.

18  Yes, that page.  The crooked page.

19  Q    This is R012812 on Government Exhibit 111-15, you wrote

20  11/29/2012; correct?

21  A    Yes.

22            (Continued on next page.)

23

24

25

Case 1:15-cr-00637-KAM   Document 687   Filed 10/17/18   Page 174 of 256 PageID #: 22496

1    BY MR. BRODSKY:   (Continuing)

2    Q    The same way you wrote September 2012 for Mr. Aselage,

3    right?

4    A    Yes.

5    Q    And you wrote it below, correct?  You wrote it below,

6    next to the signature block, correct?

7    A    Yes.

8    Q    In the same way you did for Mr. Shkreli's transfer to

9    Mr. Aselage, right?

10   A    Yes.

11   Q    And your understanding was that -- your testimony is that

12   Mr. Shkreli dropped it off on your desk or your office?

13   A    Yes.

14   Q    And you dated it.  It was missing a date and you dated

15   it?

16   A    Yes.

17   Q    Mr. Aselage's -- Mr. Shkreli's transfer to Mr. Aselage

18   was missing a date, right?

19   A    Yes.

20   Q    That was in November, right?

21   A    Transfer?

22   Q    The one we were just looking at.  Mr. Shkreli's transfer

23   of 50,000 common, Class B common units to Mr. Aselage, was an

24   undated donee and transfer representation letter, right?

25              MR. KESSLER:  I just object to the form.  Are we

1    talking about the agreement or the e-mail?

2         THE COURT:  You used a November date.  It's unclear

3    what you're referring to.

4         MR. BRODSKY:  I'll try again.  I'll ask a better

5    question.

6         THE COURT:  Okay.

7    Q    Mr. Su, we just saw minutes ago Mr. Shkreli transfer

8    50,000 Class B common units to Mr. Aselage, right?

9    A    Yes.

10   Q    And we saw it was undated, right?

11   A    Correct.

12   Q    And you didn't put a November date, November 2012 date on

13   the document, right?

14   A    Right.  That's not when it happened.

15   Q    You put a date -- you got the document and it was blank,

16   right?  It didn't have a date on it?

17   A    No.

18   Q    And you put a date of September 20, 2012, right?

19   A    Yes.

20   Q    When you got this document, it was dropped off in your

21   office; you just assumed it was November 29th, right, nobody

22   told you?

23   A    Yes.

24   Q    You didn't go looking for Mr. Shkreli, you didn't go

25   looking for Mr. Biestek to ask him what the date was, right?

Su - cross - Brodsky                                5109

1   A    No.

2   Q    And you understood -- well, let's go to 111-16.

3        This was the e-mail exchange where Mr. Greebel

4   responds, correct?  Do you see that, Mr. Su?

5   A    Yes, on the bottom.

6   Q    And he's telling you -- do you understand him to be

7   telling you that you, that you sent a transfer from

8   Mr. Biestek to Mr. Shkreli with a document that says Retrophin

9   LLC dated November 29, 2012, and that's incorrect?

10  A    I sent the agreement that was scanned, that was, had a

11  date that I put on to all the third-party vendors including

12  the attorneys at Katten.  I believe the accountant was there

13  also.  So that's the e-mail that I sent out.

14  Q    Yes.  But you understand, sir, if we turn back to the

15  agreement that you sent out, 111-15, on the second page -- if

16  we can put that up side by side with this document, Bates

17  numbered R012810.

18        Do you see them side by side?

19  A    Yes.

20  Q    And you understood Mr. Greebel to be telling you that the

21  Marek Biestek transfer and donee representation letter is

22  about Retrophin LLC Class B common units, right?

23  A    Can you go back to the e-mail on what he wrote?

24  Q    It's right next to it on your screen.  I already pulled

25  it up.  He says:  Please re-execute the transfer agreement for

1    Retrophin, Inc., and a transfer of common stock.

2              Do you see that?

3    A    Yes.

4    Q    The one you sent was for Retrophin LLC.  That's correct,

5    right?

6    A    Yes.

7    Q    And Class B common however LLC has not existed since

8    mid-September.  Correct?  That's what he's telling you?

9    A    That's what he's telling me.

10   Q    Because you put a November 29, 2012 date on it, right?

11   A    I put a November 29, 2012 date on it.

12   Q    So, based on the date you put, Mr. Greebel, based on your

13   understanding of the document, was correct?

14             MR. KESSLER:  Objection to what Mr. Greebel thought

15   or whether Mr. Greebel was correct or not.

16             THE COURT:  Rephrase, Mr. Brodsky.

17   Q    Mr. Su, when you received Mr. Greebel's e-mail, you

18   understood that what he was saying was correct based on the

19   fact that you put the November 29, 2012 date on the document

20   and it was a document saying Retrophin LLC?

21             MR. KESSLER:  I'm still objecting to Mr. Su's

22   opinion about whether some other statement is accurate or not

23   with respect to this document.  The document says what it

24   says.

25             MR. BRODSKY:  I'm asking for his understanding.

Su - cross - Brodsky                                    5111

1        THE COURT:  Are you asking him for his understanding

2   about Retrophin LLC versus Retrophin Inc. or are you focusing

3   on the date of November 29th in connection with Retrophin LLC

4   versus Retrophin Inc.?  I'm not sure --

5        MR. BRODSKY:  I'll try a better question.

6        THE COURT:  What are you asking?

7        MR. BRODSKY:  I'll try another way.

8   Q    With some help from my colleague, Mr. Su, isn't it a fact

9   that on November 29, 2012, Retrophin LLC did not exist?

10  A    From my understanding, that would be correct.

11  Q    And since you dated the document November 29th of 2012,

12  you understood Mr. Greebel was pointing out to you that a

13  November 29, 2012 agreement cannot talk about Retrophin LLC?

14       MR. KESSLER:  Objection to what Mr. Greebel is

15  pointing out.

16       THE COURT:  Sustained.  Can you rephrase the

17  question?

18  Q    You understood -- I'm not asking for Mr. Greebel's

19  mentality or what Mr. Greebel is thinking -- when you received

20  the e-mail from Mr. Greebel -- you received the e-mail from

21  Mr. Greebel on November 29th at 3:29 p.m. approximately,

22  right?

23  A    Yes.

24  Q    You received it, correct?

25  A    Yes.

CMH      OCR      RMR      CRR      FCRR

Su - cross - Brodsky                    5112

1    Q    And you understood what he was saying to you?

2    A    No.

3    Q    Do you understand the words, "The one you sent was for

4    Retrophin LLC"?

5              What do you understand those words to mean?

6    A    Exactly what's written up there.

7    Q    Which means what?

8    A    Which the one I sent was for Retrophin LLC.

9    Q    And when it says, "Class B common however LLC has not

10   existed since mid-September," you understood Mr. Greebel to be

11   saying to you, your understanding, not Mr. Greebel's

12   understanding, that your understanding of what Mr. Greebel was

13   saying to you was Class B common for an LLC has not existed?

14   A    Right, I had no idea what he was talking about.  As I sit

15   here today or at that time, I remember when he sent that to me

16   I had no idea what he was talking about and that's why I told

17   him, You and Martin get on the phone, you guys talk it out

18   because I don't understand it.

19   Q    Mr. Shkreli then sent you and Mr. Greebel and copied

20   Mr. Biestek saying the agreement was signed in June, correct?

21   A    Yes.

22   Q    Now, when we discussed your dating, your assistance with

23   Mr. Shkreli dating the MSMB Healthcare subscription agreement

24   this morning, do you remember that?

25   A    Yes.  Which one?

Su - cross - Brodsky                                5113

1    Q    January 19, 2012.

2    A    For 2,000 shares at --

3    Q    $80,000?

4    A    $80,000, yes.

5    Q    You remember you said that that was a real agreement

6    because it reflected, it was corroborated by bank, by a bank

7    transfer.  Do you remember that?

8    A    Yes.

9    Q    So, here on this document, in a transfer between

10   Mr. Biestek transferring 4,167 shares, Mr. Biestek

11   transferring 4,167 shares to Mr. Shkreli, both Mr. Biestek and

12   Mr. Shkreli are on the e-mail, correct?

13   A    Yes.

14   Q    The two people party to the agreement are on the e-mail

15   being sent to you and Mr. Greebel, right?

16   A    Yes.

17   Q    And there, Mr. Shkreli is saying the agreement was signed

18   in June, right?

19   A    Yes.

20   Q    So you understood when you saw this that when you, you

21   made a mistake, correct?

22   A    At the time, I thought I made the mistake, yes.

23   Q    Because Mr. Shkreli, with Mr. Biestek on the e-mail, is

24   saying the agreement was in June and you, Mr. Su, dated it

25   November, right?

1   A    Yes.

2   Q    And you had no reason to believe that Mr. Shkreli hadn't

3   transferred 4,167 shares to Mr. Biestek in June, right?

4   A    Right.

5   Q    And then you say you'll correct the date, right?

6   A    I said:  My mistake.  I'll correct date.

7   Q    But it's your testimony that you didn't actually correct

8   the date.

9   A    Correct.

10  Q    And what happened, you say, is that about --

11       MR. BRODSKY:  If we could put up 111-16 next to

12  111-17, GX 111-16 and GX 111-17, put them side by side and

13  blow up just the top.

14  Q    So, Mr. Su, and we know that date is inaccurate, right?

15  It's not 8:46 p.m.  It's 3:46 p.m.  Is that right?

16  A    I'm assuming that it is the, a new date or, rather,

17  daylight outside type time.

18  Q    Understood.  But whatever time it is, it's a ten-minute

19  differential between the time you said, My mistake, I'll

20  correct the date, and the time you then send -- 9 minute

21  differential, sorry, and the time you send the new agreement?

22  A    I'm sorry.

23  Q    You send the agreement with the new date?

24  A    Sorry.  I didn't understand your question.  Yes.

25  Q    So in 9 minutes, it's 9 minutes between the time you say,

Su - cross - Brodsky                                    5115

1   My mistake, and the time you send a new or -- withdrawn -- you

2   send an agreement with the redacting tape, correct?

3   A    Yes.

4   Q    And you say that you don't know who put the redacting

5   tape on it?

6   A    I don't remember who.

7   Q    Is it you don't know or you don't remember?

8   A    I don't remember.

9   Q    So, in 9 minutes, sir, you don't remember how, who

10  printed out the agreement, right, that you sent on

11  November 29th earlier, the agreement with the slanted page?

12          MR. KESSLER:  Objection to the form with "in 9

13  minutes, you don't remember."

14          THE COURT:  He'll rephrase.

15          MR. BRODSKY:  I'll rephrase it.

16          THE COURT:  I was going to -- I thought he was going

17  to object based on the printing of the agreement.

18          MR. BRODSKY:  Understood, Your Honor.

19  Q    So, Mr. Su, before you could send the agreement at, well,

20  it says 8:56 p.m. which we believe is 3:56 p.m., before you

21  could send it, you had to scan it, right?

22  A    To e-mail it out?

23  Q    Yes.

24  A    Yes, I would have to scan it.  Either myself or someone

25  in the office scanned it to me.

1   Q     So either you or somebody else scanned it?

2   A     Right.

3   Q     Right?  And either somebody else, not you, put the

4   redacting tape on it?

5   A     Correct, it was not me.

6   Q     It was not you.  And somebody else wrote July 1st?

7   A     Correct.

8   Q     And then somebody sent it to you or handed it to you?

9   A     Correct.

10  Q     And then you either scanned it or forwarded the scanned

11  document 9 minutes later?

12  A     Yes.

13  Q     But sitting here today, you just don't remember, right?

14  A     I don't remember, which?

15  Q     You don't remember who wrote it, who put the redacting

16  tape on, who put July 1st?

17  A     I don't.  I don't.  It would -- just looking at reference

18  on, the signatures or the handwriting would be Martin.

19  Q     Whoever did it, it wasn't Mr. Greebel, right?

20  A     No.

21  Q     And then we move forward.  Government Exhibit 111-18.

22  This is -- one thing is also for certain, Mr. Su.  When you

23  sent the document with the redacting tape and the July 1st

24  date to Mr. Greebel, Mr. Shkreli, copied to Mr. Biestek, you

25  didn't say anything to Mr. Greebel about there being something

Su - cross - Brodsky                                    5117

1   wrong, right?

2   A    I don't see anything on that e-mail chain that you showed

3   me.

4   Q    And then Government Exhibit 111-18, Mr. Greebel says,

5   Please call me, right, to you, right?

6   A    Yes.

7   Q    And you called him and you spoke to him, right?

8   A    I'm assuming that I did.  I don't remember but, yes, I

9   would have called him.

10  Q    Well, yesterday, you remembered some part of this

11  conversation, do you remember that?

12  A    Yes.

13  Q    You do remember yesterday that you said you remembered

14  part of the conversation?

15  A    Yes, I remember part of the conversation.

16  Q    And today, do you remember the conversation or today, you

17  don't remember?

18  A    I remember the conversation that we had.

19  Q    Now, is it fair to say that when you testified today, you

20  added something about the conversation that you had not

21  testified to in a prior proceeding?

22  A    I don't remember what you're -- I don't know what you're

23  referring to.

24  Q    Well, today, sir, did you not say that there was a

25  discussion between you and Mr. Greebel about LLC versus Inc.,

1  right?

2  A    Right.

3  Q    And then you also said that you and, you told Mr. Greebel

4  that you and Martin just need to talk, you guys, you call

5  them, you call each other and you hung up the phone, that was

6  your testimony, right?

7  A    Yes.

8  Q    Well, didn't you add something to this conversation that

9  just a few short months ago, you, on your sworn testimony, you

10  did not say?

11          MR. KESSLER:  Objection to the form.

12          THE COURT:  It is sustained.

13          MR. BRODSKY:  One moment, Your Honor.

14          May I approach, Your Honor?

15          THE COURT:  Yes.

16  Q    Showing you a transcript from a prior proceeding, Mr. Su,

17  showing you page 2224 and directing your attention to lines 18

18  to 24.

19          (Pause.)

20  A    Okay.

21  Q    Did you not say -- you were sworn under oath during that

22  proceeding, right?

23  A    Yes.

24  Q    Did you not testify as follows?

25          MR. BRODSKY:  Your Honor, should I pause?

1           THE COURT:  No.  I'm going to stand for a moment.

2           MR. KESSLER:  Before Mr. Brodsky reads, are we

3    refreshing recollection?  Is this a prior --

4           MR. BRODSKY:  Prior inconsistent, Your Honor.

5           MR. KESSLER:  Then I object to that

6    characterization.

7           MR. BRODSKY:  I'll show Your Honor the transcript.

8           THE COURT:  Okay.

9           MR. BRODSKY:  And directing your attention to lines

10   18 to 24.

11          THE COURT:  And you want to read it in?

12          MR. BRODSKY:  Yes, particularly 23 and 24 where it

13   doesn't make sense without reading the prior.

14          (Pause.)

15          THE COURT:  All right.  I'm going to allow it to be

16   read in.

17   Q    Mr. Su, you were sworn and testified in a prior

18   proceeding under oath, correct?

19   A    Yes.

20   Q    And directing your attention to line 18:

21          Question:  Do you recall that conversation?

22          Answer -- let me know if I'm reading it correctly:

23   I recall we talked about the share transfer and I recall him

24   explaining to me the difference in LLC and it was replaced by

25   the Inc. for Retrophin and that's what I remember from the

Su - cross - Brodsky                              5120

1    conversation.

2              Question:  Do you recall anything else?

3              Answer:  From that phone call, I don't.

4              Did I read that accurately?

5    A    That's what it says, yes.

6              MR. KESSLER:  I just renew my objection to the

7    matter for the characterization of the statement.

8              THE COURT:  Okay.  Thank you.  Noted.  Overruled.

9    Q    And then, Mr. Su, you sent out Government Exhibit 111-19.

10             MR. BRODSKY:  Can we put that up?

11   Q    And you send this at 4:32 p.m., correct?  It says date

12   stamp 9:32 p.m., correct?

13   A    Yes.

14   Q    It's 36 minutes later after the last one, last e-mail,

15   correct?

16   A    Correct.

17   Q    And --

18   A    Sorry.  Are we done with this part?

19   Q    Yes.  Yes.

20             And in that 36 minute period, you don't remember

21   sitting here today over five years later how this agreement

22   with the date of June 1, 2012 was dated, correct?

23   A    How it was dated --

24   Q    Yes.

25   A    -- is the question?

CMH        OCR        RMR        CRR        FCRR

1   Q     That's the question.

2   A     What the --

3   Q     If you go to 111-19, Mr. Carter, last page, RO2354, and

4   you see it's dated June 1, 2012, right?

5   A     Yes.

6   Q     And sitting here today, again, five years later, over

7   five years later, you don't know in 36 minutes how this

8   June 1, 2012 date appeared?

9          MR. KESSLER:  Objection.  Mischaracterizes his

10  testimony.

11         MR. BRODSKY:  I'm asking.

12         THE COURT:  All right.  So, that was a question,

13  does he know how June 1, 2012 appeared.

14         MR. BRODSKY:  Yes.

15  Q     Mr. Su, you don't know how that appeared, correct?

16         You didn't put it there, Mr. Su?

17  A     I did not put it there.

18  Q     And you don't remember the 36 minute period resulting in

19  this being sent by you, correct?

20  A     It was given to me on my desk and I scanned it to

21  whatever e-mail this is attached to.

22  Q     Right.  So before it was given to you on your desk, you

23  don't remember who actually gave it to you on your desk,

24  right, sitting here today?

25  A     All these were given to me by Martin.

1   Q    So you do remember Mr. Shkreli handing it to you?

2   A    Yes.

3   Q    And do you remember whether or not Mr. Shkreli signed

4   this agreement?

5        Is it the same signature or a different signature

6   from the last document we looked at?

7   A    That appears to be Martin Shkreli's signature.

8   Q    Well, let's compare.

9        MR. BRODSKY:  If we can put up GX 111-17 and if we

10  can put it on the first page, Mr. Carter, 111-17.  Just --

11  yes, 111-17.

12  Q    And this is -- so that's either 8:33 p.m.  or 3:55 p.m.?

13  Sorry.  8:56 p.m. or 3:56 p.m., right, Mr. Carter?  I mean

14  Mr. Su?

15       THE COURT:  55.

16       MR. BRODSKY:  I'm sorry.  My eyesight is getting

17  worse.

18  Q    8:55?

19  A    That's what it says, 8:55.

20  Q    Or 3:55?

21  A    Or 3:55 p.m.

22       MR. BRODSKY:  And if we go to the last page of that

23  document, 111-17, and just blow up the signature, correct, of

24  Mr. Shkreli, Mr. Biestek, to the left.  If we blow up the next

25  e-mail that's sent out and that's GX 111-18 -- sorry, it's not

Su - cross - Brodsky                          5123

18.   It's 19.   And we blow up, and why don't we blow up, go on

111-19 to the last page.   And on the -- yes, blow up that.

Thank you.   And compare that to this.

Q     They're not the same signatures, sir, right, Mr. Su?

A     What isn't?

Q     Well, if you compare Mr. Biestek's signature on the left

with the redacting tape of July 1, 2012, do you see that?

A     On the left, okay.

Q     And you compare it to Marek Biestek's signature --

          MR. KESSLER:   Your Honor, I object to asking the

witness to compare various handwriting.

          THE COURT:   Yes.   I think, you know --

          MR. BRODSKY:   Well, he knows the signatures, Your

Honor.   He was the COO.

          THE WITNESS:   No.

          THE COURT:   Well, why don't you lay a foundation to

see if he recognizes -- he has testified he recognizes

Mr. Shkreli's signature.   I don't know that he has testified

with Mr. Biestek, but in any event, he is not a handwriting

expert.

Q     You were familiar with Mr. Shkreli's signature, right?

A     Yes.

Q     And you recognized, sir, that Mr. Shkreli's signature in

GX 111-17 sent at 3:55 p.m. is different from 111-117 sent at

4:32 p.m. in GX 111-19, right?

Su - cross - Brodsky                                    5124

1  A     I'm sorry.  I can't compare two signatures.  I mean, I

2  know, okay, and recognize it somewhat what Martin's signature

3  almost is identical to, but I can't compare and see if he

4  signed or somebody forge it.  Sorry.

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Su - cross - Brodsky                                    5125

1    BY MR. BRODSKY:

2    Q    All right.  Thank you, Mr. Su.  Thanks for that?

3            If you turn to GX 111-19, the last page, where it

4    has the June 1, 2012 date and blow up from the top, the very

5    top, in witness whereof.  Do you see that?

6    A    Yes.

7    Q    Again we see the same language that we saw in

8    Mr. Shkreli's transfer to Mr. Aselage, correct?

9    A    Yes.

10   Q    In witness whereof the undersigned has executed this

11   instrument under seal as of the date set forth above, right?

12   A    Yes.

13   Q    But there is no date set forth above when these parties

14   signed the agreement?

15   A    It was the same document and the same format we went

16   through, there was no date.

17   Q    You have 111-19 in front of you?  Do you have it?  Let me

18   move forward?

19           Mr. Su, GX 111-26 in evidence.  You saw this credit

20   by Mr. Su, right?Yes.

21   Q    And these are additional share transfers, correct?

22   A    Yes.

23   Q    And after sending this e-mail am I correct that you

24   didn't tell  -- you didn't call Mr. Greebel and say anything

25   was wrong with it, right?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                          5126

1        MR. KESSLER:  Your Honor  --

2        MR. BRODSKY:  I withdraw it.

3   Q    You didn't call Ms. Chew or Mr. Massella and say there

4   was anything wrong with the share transfers, right?

5   A    I didn't call  -- I don't recall calling them.  I don't

6   believe I did.

7   Q    Okay.  If we go to RO 12847, that share transfer.  This

8   is Retrophin LLC transferring donee representation letter from

9   Mr. Shkreli to MSMB Capital, right?

10  A    Yes.

11  Q    MSMB Capital Management, LP?

12  A    Yes.

13  Q    And this is from Mr. Shkreli's personal holdings, right?

14  A    Yes.

15  Q    It's not taking anything away from Retrophin, correct?

16       MR. KESSLER:  Objection to the form.

17       THE COURT:  Try to rephrase, please.

18  Q    Are these shares coming from Retrophin or Mr. Shkreli?

19  A    It says Mr. Shkreli transferor.

20  Q    All right.  Now, at some point Mr. Shkreli on December 3

21  sends a capitalization table to Mr. Greebel and you, correct?

22  A    Can you show me  --

23  Q    On the same date of these transfers, do you remember that

24  happening?

25  A    I don't remember that happening.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                    5127

1        MR. BRODSKY:  May I approach, your Honor?

2        THE COURT:  Yes.

3   Q    Showing you DX 111-148 and DX 111-27 for identification.

4   Take a moment to look at those?

5        (Pause.)

6        MR. BRODSKY:  We offer both of them.

7        MR. KESSLER:  Again, I don't believe I have an

8   objection to this document.  But the second page of DX 111-148

9   says document produced in native format.  Then there's another

10  what I suspect is an excerpt from an Excel Spreadsheet behind

11  it.  We just ask that the actual attachment with all its pages

12  be admitted and shown to the witness.

13       THE COURT:   Do you have a complete copy?  Does

14  anybody in the courtroom have a complete copy?

15       MR. BRODSKY:  We're looking at it electronically,

16  your Honor.

17       MR. DUBIN:  Your Honor, that exhibit that

18  Mr. Kessler is talking about, that's the way it was produced.

19  We get the native file and that's the way it prints.

20       MR. BRODSKY:  We printed it exactly as it was

21  produced to us.

22       MR. KESSLER:  So the native Excel Spreadsheet that's

23  attached has only two pages, and if that's the only two pages

24  of the document I have no objection.

25       THE COURT:  So it's complete.

Su - cross - Brodsky                    5128

1          MR. BRODSKY:  It's as we received it.

2          THE COURT:  We receive DX 111-148.

3          (So marked.)

4          MR. BRODSKY:  I have 111-27 we offer as well.

5          THE COURT:  Mr. Kessler, did you have an objection

6    to  --

7          MR. KESSLER:  I thought I said I had no objection

8    other than that.

9          THE COURT:  We'll receive DX 111-27 as well.

10         (So marked.)

11   Q    So, Mr. Su, looking at DX 111-148, Mr. Shkreli sent to

12   you and Mr. Greebel on December 3, 2012 the final  -- what's

13   attached and called in subject line final capitalization

14   table, right?

15   A    Yes.

16   Q    And it says here is what the final cap table will look

17   like with all the conversions put into effect.  Do you see

18   that?

19   A    Yes.

20   Q    And then if you look at the attachment, the third page,

21   it has MSMB Capital Management with two hundred twenty-five

22   thousand shares, correct?

23   A    Yes.

24   Q    That's post-conversion, correct?

25   A    This says pre-money and post-money.  This common stock

Su - cross - Brodsky                5129

1    pre-money and post-money.

2    Q    Right.  So you see Mr. Aselage has him having 250,000

3    shares?

4    A    Yes.

5    Q    But you know he received 50,000 class B common units,

6    right?

7    A    Yes.

8    Q    And so there's a multiplier that results in Mr. Aselage

9    on this capitalization table receiving 250,000 shares,

10   correct?

11   A    Yes.

12   Q    That same multiplier is applied, correct, to the 75,000

13   shares that Mr. Shkreli gave as to MSMB Capital, right?

14            MR. KESSLER:  Objection.  Sorry.  I'm sorry.

15   Objection.  We're trying to keep up.

16            THE COURT:  At the time Mr. Shkreli gave whatever he

17   gave to MSMB Capital, were those shares or units?

18            MR. BRODSKY:  I'm sorry, your Honor, units.

19            THE COURT:  So, at this time in December 2012

20   Retrophin hadn't become incorporated?

21            MR. BRODSKY:  Correct.

22            THE COURT:  They were still only giving units, not

23   shares, because the merger hadn't happened, is that what's

24   going on?

25            MR. BRODSKY:   Your Honor, what I believe is that

Su - cross - Brodsky                              5130

1   Mr. Shkreli --

2           MR. KESSLER:  Your Honor, can we ask the witness a

3   question or have the discussion at sidebar?  Sorry.

4           THE COURT:  I was confused by the question, the

5   nomenclature that's being used.  I was asking for a

6   clarification.

7           MR. BRODSKY:  I can do this through Mr. Su.

8   Q    Mr. Su, on DX 111-148, you understand from Mr. Shkreli,

9   you understood what he was saying to you conversions were

10  being put into effect?

11  A    That's what the e-mail says.

12  Q    You understood that units would be converted to shares,

13  right?  Not looking at the document, just in general, Mr. Su.

14  Did you understand that with respect to a capitalization

15  table?

16          MR. KESSLER:  Your Honor, I'm sorry.  I still object

17  to the form.  Are we talking about the conversion from a

18  public to a private company or the conversion of the share

19  ratio that might accompany that merger?

20          MR. BRODSKY:  I'll do both.

21  Q    Mr. Su, there's a conversion of units to shares, correct?

22  LLC units to Inc. shares, right?

23  A    At some point, yes.

24  Q    And then at some point, before going public, there's a

25  multiplier conversion for every share that's an investment

Su - cross - Brodsky                                    5131

1   there's a multiplier that comes into effect?

2   A    Yes.  Not just investment but also included employee

3   shares or founder shares.  Whatever shares there were, the

4   multiplier applied to everyone.

5   Q    Whatever it may be, you see MSMB Capital Management on

6   this list, right?  On this cap table, correct?

7   A    That's two hundred twenty-five thousand shares.

8   Q    Then Mr. Greebel sends an e-mail to you and Mr. Shkreli

9   saying, please, call me to discuss, right?

10  A    Yes.

11  Q    You don't remember this conversation, right?

12  A    I don't remember.

13  Q    And is it fair to say that later, a few hours later,

14  Mr. Greebel e-mailed you and Mr. Shkreli and says, Guys, can

15  the three of us talk?  These numbers are not adding up?

16  A    I don't remember that.

17  Q    Let me show you Defendant's Exhibit 111-28 for

18  identification.

19            MR. BRODSKY:  We offer it, your Honor.

20            MR. KESSLER:  No objection.

21            THE COURT:  All right.  We receive DX 111-28.

22            (So marked) .

23  Q    Mr. Su, this is Mr. Greebel e-mailing you and Mr. Shkreli

24  this same day saying, Guys, can the three of us talk?  These

25  numbers are not matching up.  Right?

Su - cross - Brodsky                    5132

1   A    That's what it says, yes.

2   Q    You don't remember whether or not there was a subsequent

3   conversation, correct?

4   A    That's correct.

5   Q    And you don't know whether or not Mr. Shkreli spoke to

6   Mr. Greebel, correct?

7   A    Correct.

8   Q    And not once on this day, December 3, 2012, did you pick

9   up the phone and call Mr. Greebel and say there's something

10  wrong with these stock transfers, right?

11  A    I don't know if I did or not.

12  Q    You certainly don't remember doing it, right?

13  A    No.

14  Q    And there's no document, there's no e-mail, that you can

15  point to, not a single one or a handwriting or a note to

16  Mr. Greebel saying there's something wrong, there's a problem

17  here with these stock transfers on December 3, right?

18  A    I don't remember doing that.

19         THE COURT:  May I just ask a question:  These stock

20  transfers being which ones, please?

21         MR. BRODSKY:  The ones being sent December 3, 2012,

22  that are attached to Government's Exhibit 111-26-A.

23         THE COURT:  Thank you.

24         (Pause.)

25  Q    Now, you see where it says on DX 111-28, Guys, can the

Su - cross - Brodsky                    5133

1   three of us talk?  These numbers are not matching up.  Right?

2   A    Yes.

3   Q    Isn't it the case that after Mr. Greebel sends that

4   message you then send the transfer  -- the Mulleady transfer

5   of shares to Mr. Shkreli, the Mr. Biestek transfer of shares

6   to Mr. Shkreli, the Mr. Fernandez transfer of shares to

7   Mr. Shkreli and some of the other  -- and Mr. Shkreli's

8   transfer of shares to MSMB Capital?  You don't remember that?

9   A    No.  Are you showing me something that matches it up?

10  Q    Do you see what time this is that Mr. Greebel is sending

11  it out?

12  A    December 3, 10:54 p.m.

13  Q    And then let's put up GX 111-26-A?

14       You then send these share transfer agreements to

15  Mr. Greebel, correct?

16  A    That was done 11:23 p.m.

17  Q    Right.  No matter what time it is, whether it's Eastern

18  time or GMT time, you send the share transfer agreements after

19  Mr. Greebel e-mails when he says Guys, can the three of us

20  talk?  These numbers are not matching up; right?

21  A    I don't know if it was in relation to his e-mail that he

22  sent.

23  Q    The share transfer agreements that you sent to him less

24  than an hour later, after he sent the e-mail, Guys, can the

25  three of us talk?  These numbers are not adding up.  It's

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                    5134

1   approximately 29 minutes later.  So if you put up DX 111-28,

2   on the left-hand side where Mr. Greebel is saying, Guys, can

3   the three of us talk?  The numbers are not matching up.  It's

4   29 minutes later that you send him the share transfers,

5   correct?

6   A    Yes.

7   Q    And you know these share transfers affect the

8   capitalization table, correct?

9   A    Share transfers do, yes.

10  Q    Does it refresh your memory that, your e-mail sending the

11  share transfers is in response to Mr. Greebel's message to

12  you, these numbers are not matching up?

13  A    No.  That does not refresh my memory.  I don't know if

14  it's in relation to that prior e-mail.  The numbers don't

15  match up that he caught, it may have been or may not have

16  been.  I just don't recall that.

17  Q    Let me turn now to Fearnow stock.  If we can put up

18  Government's Exhibit 111-28 in evidence?

19            So this is the December 3, 2012 capitalization table

20  that Mr. Shkreli sent to Mr. Greebel and you, correct?

21  A    That's what the subject line says, yes.

22  Q    And it's your testimony this is the first time you saw

23  the Fearnow shares were part of the capitalization table?

24  A    Yes, in or around that time.

25  Q    Well, was it in response to getting this or was it

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                    5135

1   before?

2   A    What was?

3   Q    Was your learning about the Fearnow shares the result of

4   reading this capitalization table?

5   A    There were a lot of capitalization tables going around.

6   There was a lot of numbers going around.  What's the

7   attachment on this?

8   Q    You don't remember, sir?

9   A    I don't know what you are referring to.

10  Q    All right.  Let's go to the capitalization table, if we

11  can scroll through it and on the bottom right-hand corner do

12  you see where it says Fearnow stock?

13  A    These were the first sets of numbers I saw relating to

14  the Fearnow stock.

15  Q    After receiving this e-mail, this being GX 111-28, is the

16  first time you saw Fearnow stock, correct?

17  A    Yes.

18  Q    And you saw that from this table Mr. Shkreli was going to

19  obtain 1,075,000 Fearnow shares, correct?

20  A    Yes.

21  Q    And that was about 45 or 46 percent of what's called

22  Fearnow stock on this table, correct?

23  A    If that's the math, yes.

24  Q    Yesterday you described two conversations with

25  Mr. Shkreli about Fearnow shares, right?

1    A     Yes.

2    Q     Was your first conversation  -- your first conversation

3    was after you received this, correct?

4    A     I don't know it was my first conversation or the date or

5    the timing relating to this.

6    Q     You said the first conversation Martin Shkreli came to

7    your office?

8    A     Yes.

9    Q     This was when you were at 777 Third Avenue?

10   A     Yes.

11   Q     This is just you and Mr. Shkreli, right?

12   A     Yes.

13   Q     Nobody else present, right?

14   A     Came to my office, yes.

15   Q     How long was the conversation?

16   A     No more than five minutes, maybe less.

17   Q     And it only related to Fearnow or did it include other

18   subjects?

19   A     From what I can recall it was only about Fearnow stock.

20   Q     And you didn't write down what Mr. Shkreli told you,

21   right?

22   A     No.

23   Q     And you didn't e-mail anybody about what Mr. Shkreli told

24   you?

25   A     No.

Su - cross - Brodsky                            5137

1    Q    And Mr. Shkreli told you there was a plan in place to

2    sell the Fearnow shares for a profit, right?

3    A    At some point, yes.

4    Q    And then split the profits?

5    A    Correct.

6    Q    You testified you didn't have a reaction?

7    A    Right.

8    Q    You said like most of what Martin says it just doesn't

9    really happen?  That's what you testified?

10   A    In those  -- in around those words, yes.

11   Q    That's because Mr. Shkreli said a lot of things, right?

12   A    He did.

13   Q    And a lot of those things made no sense, correct?

14   A    A lot of those things didn't happen versus not making

15   sense.

16   Q    So Mr. Shkreli tended to have wild ideas?

17   A    Yes.

18   Q    Crazy ideas?

19   A    To me as an individual, yes.

20   Q    And one day he'd have a crazy idea and then it would just

21   disappear, nothing would happen?

22   A    Yes.

23   Q    And that happened over and over and over again, correct?

24   A    Yes.

25   Q    So when he came into your office and in five minutes or

Su - cross - Brodsky                           5138

1   less told you about some plan with respect to Fearnow stock,

2   you dismissed it, right?

3   A    I don't know if I would use the word dismiss.  But I

4   didn't pay any attention to it.  When things happened, then

5   -- and it becomes a realization and that's when it becomes

6   real.

7   Q    Yesterday didn't you testified  "you dismiss it until

8   something else  --

9              MR. KESSLER:  Can I have a transcript cite?

10              MR. BRODSKY:  Sure.

11              MR. BRODSKY:  It's 4777 or 4778.  I believe it's

12   4778.

13   Q    And you testified  "you dismiss it" until something

14   actually happens, right?

15   A    Yes.

16   Q    Dismiss was your word yesterday?

17   A    Okay.

18   Q    Mr. Shkreli in that five minute conversation or less

19   wasn't firing you, right?

20   A    He was not what?

21   Q    He was not firing you?

22   A    No.

23   Q    He wasn't telling you you're dismissed as the chief

24   operating officer, right?

25   A    Correct.

Su - cross - Brodsky                          5139

1   Q    You were still going to be the chief operating officer of

2   Retrophin?

3   A    At that moment, yes.

4   Q    And he was at this time, according to you, begging you to

5   continue to do your hard work on the Super 8K, right?

6   A    Yes.

7   Q    And you were working every day on the Super 8K?

8   A    The majority of the time, yes.

9   Q    You were working weekends?

10  A    Yes, normally, I do.

11  Q    You were working nights?

12  A    Normally, I do.

13  Q    You were putting a lot of effort into it?

14  A    Yes.

15  Q    And it's fair to say it was the hardest work you had ever

16  done, the longest hours?

17  A    No.

18  Q    And you didn't agree to Mr. Shkreli's plan, right?

19  A    Agree to what plan?

20  Q    Whatever conversation he had with you in five minutes.

21  A    For the Fearnow stock?

22  Q    Yes.

23  A    I didn't disagree.

24  Q    You just didn't react?

25  A    There was nothing to react to.

Su - cross - Brodsky                                        5140

1   Q    And then you didn't tell Marcum about the conversation,
2   right?
3   A    No.
4   Q    You didn't tell Mr. Aselage about the conversation?
5   A    No.
6   Q    You didn't sell Citrin Cooperman about the conversation?
7   A    I didn't tell anybody about the conversation.
8   Q    Including Mr. Greebel, you did not tell Mr. Greebel about
9   the conversation?
10  A    No.
11  Q    And it's fair to say that the very next day you actually
12  communicated with Mr. Aselage about Fearnow shares?
13  A    Okay.  Is there an e-mail, if you can show it to me?
14  Q    Yes, there happens to be.
15            MR. BRODSKY:  May I approach, your Honor?
16            THE COURT:  Yes.
17  Q    Showing you Defendant's Exhibit 111-18 for
18  identification?
19            MR. BRODSKY:  For the record, it's a two-page
20  document, Bates stamp SU 520 to 521.  The top e-mail is
21  Jackson Su, December 4, 2012 to Steven Aselage, copy to George
22  Huang.
23  Q    Do you see that, sir?
24  A    Yes.
25  Q    You actually produced this document in discovery?  You

Su - cross - Brodsky                                    5141

1   produced this document to the government, right?

2   A     Yes.

3   Q     And it came from your files, you printed it out from

4   Bridge Tower, right?

5   A     Yes.

6   Q     Is that your real estate business in Texas?

7   A     That's the name of the company.

8   Q     You redacted the second page here and the bottom of the

9   first page?

10  A     I did not.

11  Q     Your lawyer did?

12  A     I don't know who did.

13  Q     You don't know who did.  And this is a communication with

14  Mr. Aselage in connection with Fearnow shares, correct?

15  A     Yes.

16  Q     Among other things, right?

17  A     Yes.

18        MR. BRODSKY:  Your Honor, we offer it.

19        MR. KESSLER:  No objection.

20        THE COURT:  The court receives Defendant's Exhibit

21  111-18.

22  Q     So if we start at the bottom e-mail, Mr. Huang is telling

23  Mr. Aselage  -- Mr. Aselage on December 3, 2012 was the CEO,

24  right?

25  A     I believe he was still CEO at the time.  And he was on

Su - cross - Brodsky                    5142

1  the board of directors, since day one of when he joined the

2  company.  I believe he never left that directorship.

3  Q    There's no higher authority to talk to in Retrophin than

4  Mr. Aselage on December 3, 2012?

5              MR. KESSLER:  Objection to the form.

6              THE COURT:  Sustained.

7  Q    There's nobody with more power in terms of position than

8  Mr. Aselage on December 3, 2012?

9  A    No.  That would be incorrect.  It would be Martin.

10  Q    That was because Mr. Shkreli had more shares?

11  A    No.  It's just because it's Martin.

12  Q    I see?

13              And Mr. Huang says to Mr. Aselage, December 3, 2012,

14  at 7:31 p.m., Steve, Jackson and I just finished the table.

15  Was that the capitalization table that we just looked at?

16  A    Yes.

17  Q    Based on numbers Martin gave us, that's Martin Shkreli?

18  A    Yes.

19  Q    Plus the terms of the investor term sheet.  Please note a

20  couple of things.  One, your ownership position has changed.

21  Do you see that?

22  A    Yes.

23  Q    Did you understand Mr. Huang to mean that Mr. Aselage's

24  ownership position had decreased?

25  A    I don't know what he meant.

Su - cross - Brodsky                              5143

1   Q    Two, there is a Fearnow note that gets converted into 2.5

2   million shares tradeable stock.  Do you see that?

3   A    Yes.

4   Q    And then Mr. Huang ends it:  Let us know if you have

5   comments and we can discuss tomorrow, right?

6   A    Yes.

7   Q    Now, Mr. Aselage says in response, well, I'm confused,

8   which is probably not a surprise.  This is not my area of

9   expertise and this seems pretty tea convoluted.  I have no

10  idea what the Fearnow note is.  Frankly, I'm going to need you

11  guys to explain this to me.

12         Do you see that.

13  A    Yes.

14  Q    You were the chief operating officer and reported to

15  Mr. Aselage in some sense?

16  A    I reported to Martin and Steve Aselage.

17  Q    Okay.  In response on December 4, 2012 you then tell

18  Mr. Aselage about the Fearnow note, the Fearnow shares, right?

19  A    Yes.

20  Q    You say  "This note is a piece of paper within the shell

21  that converts to 2.5 million free tradeable shares from day

22  one."  Do you see that?

23  A    Yes.

24  Q    This note defaulted in the past and allows for this

25  conversion, right?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                                   5144

1    A    Yes.

2    Q    You go on to say, Martin wanted this shell specifically

3    for the freely tradeable stock, correct?

4    A    Yes.

5    Q    Do you have an understanding that shell companies with

6    freely tradeable stock have more value once you go public?  Do

7    you have an understanding one way or the other?

8    A    I don't.

9             (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS EXAMINATION

2    BY MR. BRODSKY:  (Continuing)

3    Q    And it says -- you say that, Mr. Aselage, quote, this

4    allows any holders of the shares to sell without restriction,

5    end quote.  Do you see that?

6    A    Yes.

7    Q    So you understood at this time, December 4, 2012, you are

8    explaining to Mr. Aselage that these Fearnow freely tradeable

9    shares allow the holder of it to sell without restriction;

10   right?

11   A    Yes.

12   Q    You then say, quote, The ownership part and conversion

13   ratio is something of a surprise to all of us; correct?

14   A    Yes.

15   Q    The ownership part, meaning that Mr. Shkreli was going to

16   take 1 million -- buy 1,075,000 of the Fearnow shares, right?

17   Correct?

18   A    I don't know specifically what I meant at that time

19   regarding the conversion -- the ownership part.

20   Q    And you go on to say, he diluted everyone so he could

21   keep as much shares for himself as possible, end quote.  Do

22   you see that?

23   A    Yes.

24   Q    So you were not too happy with Mr. Shkreli at this time;

25   correct?

1  A    No.

2  Q    You felt you deserved more shares, didn't you?

3  A    No.

4  Q    You felt Mr. Shkreli was being greedy in diluting

5  everybody else, so keeping more shares for himself; right?

6  A    I thought he treated shareholders unfairly, but it wasn't

7  specifically towards me.

8  Q    He had gifted you, according to you, he had gifted you at

9  least 10,000 shares by this time; right?

10 A    He did gift to me at that time, yes.

11 Q    From his own personal holdings; right?

12 A    Yes.

13 Q    He didn't have to do that, he could have had Retrophin

14 issue shares to you; right?

15 A    Could have.

16 Q    Right?

17 A    He could have done anything.

18 Q    He could have done anything, but he took it out of his

19 own personal holdings; right?

20 A    He did.

21 Q    We are going to get back to the next paragraph where it

22 talks about I spoke with Evan about the 900confidentiality

23 note.  We will talk about that in a moment.

24          So you then learn, shortly after this, that you were

25 not going to get any Fearnow shares; right?  Shortly after

1    that e-mail to Mr. Aselage?

2    A    Yes.

3    Q    You learned Mr. Shkreli is not going to be taking any of

4    the Fearnow shares; right?

5    A    According to that capitalization table, he had Fearnow

6    stock.

7    Q    Well, let's look at 111-41 in evidence, GX 111-41.  So

8    this was on December 12, Mr. Greebel sends you the list of

9    Fearnow recipients; right, sir?

10   A    Can you scroll down?

11        Yes.

12   Q    And you understood they were going to buy the Fearnow

13   shares at a deeply discounted price?

14   A    Yes.

15   Q    And they were going to enter into a stock purchase

16   agreement, right, each one of them?

17   A    From what I read on the e-mails, yes.

18   Q    Okay.  And then you send this to Mr. Greebel and Mr.

19   Huang, the official cap table, right?  GX 111-41; correct?

20        Mr. Su?  I'm sorry.

21        MR. BRODSKY:  Let's go to the first page, Mr.

22   Carter.

23   Q    You send this to him, right, the official cap table?

24   A    Yes.

25   Q    But that cap table changes after December 12, 2012,

1   doesn't it?

2   A    It changed a lot.

3   Q    It changed a lot.  And then didn't you send an e-mail to

4   Mr. Huang right after Mr. Greebel sent you the list of

5   expected people who were going to buy the Fearnow shares?

6   A    Can you show me the e-mail.

7   Q    Yes.  Sure.

8   A    Please.

9   Q    It's fair to say you were disappointed to learn you

10  weren't going to get any Fearnow shares?

11  A    Yes, since it was discussed.

12  Q    Because Martin had discussed giving them to you and you

13  expected to get them?

14  A    I was one of the recipients.

15  Q    And you were going to buy them; correct?

16  A    I don't know -- we didn't get to those details.  He just

17  told me the general plan that he had of people who received

18  them.

19  Q    And you thought you deserved it --

20          MR. KESSLER:  Your Honor, it is hard to hear with

21  Mr. Brodsky over there.

22          MR. BRODSKY:  Sorry.

23  Q    You thought you had deserved it because you had worked so

24  hard?

25  A    I don't know if I actually deserved it.  He was giving it

Brodsky - cross - Su                                    5149

1    out to people.  I don't think I deserved any more than what I

2    was given already.  I mean I had $150,000 salary.  I had 2,500

3    shares.  I thought I was fairly compensated.  If he was going

4    to give more to people, sure.  It's a Lotto ticket.  Who

5    doesn't want to win the Lotto ticket, right?  But if he was

6    going to give it to me, fine.

7    Q    You wanted to be part of the lottery?

8    A    Sure.

9    Q    And upon seeing the list of the people who could buy the

10   Fearnow shares, for you, it seemed like everybody who was at

11   Retrophin or part of the company had some; correct?

12   A    Yes, but the company wasn't that big, so.

13   Q    And your friend and business partner George Huang also

14   wasn't going to be able to buy any Fearnow shares; right?

15   A    He didn't receive any either, but there were a number of

16   people that received.

17   Q    Mr. Aselage, for example?

18   A    Steve Aselage didn't receive any, Michael Smith didn't

19   receive any.  Leonora --

20   Q    Leonora Izerne?

21   A    Yeah, I think it's Martin's sister, she didn't receive

22   any.

23   Q    She was working in 2012 there, wasn't she?

24        MR. KESSLER:  Your Honor, again, the microphone.

25        MR. BRODSKY:  I'm sorry.

Brodsky - cross - Su                    5150

1    THE COURT:  I don't want you so close to somebody.

2    Q    Leonora Izerne was working there in 2012; correct, sir?

3    A    Yes.

4    Q    Let me show you DX 111-2.

5         MR. BRODSKY:  We offer this.

6         MR. KESSLER:  No objection.

7         THE COURT:  We receive Defense Exhibit 111-2 in

8    evidence.

9         (Defendant's Exhibit 111-2 received in evidence.)

10   Q    Mr. Su, upon receiving the list, you wrote to Mr. Huang

11   on December 20, 2012, and you said, FYI, quote, glad we were

12   able to help everyone else, end quote?

13   A    Yes.

14   Q    What you meant was you were unhappy; correct?

15   A    I wouldn't interpret it that way.

16   Q    You were actually glad that you were able to help

17   everyone else, is that what you meant?  You were glad everyone

18   else was able to buy Fearnow shares but you and Mr. Huang?

19   A    I was sarcastic.

20   Q    Okay.  And you have seen copies of these stock purchase

21   agreements; correct?

22   A    For the Fearnow stock, you're referring to?

23   Q    Yes.

24   A    Yes.

25   Q    So let me show you DX 111-31 to DX-111-37?

Brodsky - cross - Su                    5151

1          MR. BRODSKY:  May I approach, Your Honor?

2          THE COURT:  Yes.  Is this going to be awhile?  It is

3    about six minutes before the 5:00 and we have the hearing at

4    5:00.

5          MR. BRODSKY:  This is a good way to end.

6          THE COURT:  Do you want to just put these in?

7          MR. BRODSKY:  Put these in and that's fine.

8    DX-111-31 for identification.  I'm sorry, DX 111-31 through DX

9    111-37.

10          THE COURT:  Any objection, Mr. Kessler?

11          MR. KESSLER:  I just want to confirm these are

12   actually the documents that he saw.  Mr. Brodsky asked the

13   question in the abstract and then he handed Mr. Su a number of

14   exhibits.

15   Q    Mr. Su, would you look through and see if you recognize

16   these as the stock transfer agreements?

17   A    Yes, I saw these in shape or form in the company folders

18   at some point in time, yes.

19          MR. BRODSKY:  We offer them.

20          MR. KESSLER:  I don't object to these documents

21   assuming there is no cover e-mail or transmittal e-mail or

22   something that should be included with them.  Obviously we

23   want the whole thing put into evidence if there is a cover

24   e-mail or some other part of the document.

25          MR. BRODSKY:  Well, sitting here right now, I don't

5152

1   know the answer to that, Your Honor.  We can have a

2   conversation about it.  But at a minimum, he recognizes these

3   stock transfer agreements, so since he was the chief operating

4   officer, we offer them.

5           MR. KESSLER:  He said he saw documents in some shape

6   or form at Retrophin at some point.  If there's an e-mail

7   attachment, we should put it in.

8           THE COURT:  Since we are breaking today, you can

9   look for them tonight and we can renew the application to

10  admit tomorrow and you can confirm either that there is no

11  other cover sheet on these or not.

12          MR. BRODSKY:  Sure.

13          THE COURT:  Okay.

14          MR. KESSLER:  Thank you.

15          THE COURT:  Members of the jury, I want to thank you

16  again for your attention.  We will sit tomorrow, a full day.

17  Please don't talk about the case amongst yourselves or with

18  anyone else.  We will see you tomorrow.  Keep an open mind.

19  Have a good, safe trip home.

20          You can step down.

21          (Witness leaves stand.)

22          MR. PITLUCK:  Your Honor, just so we can have some

23  visibility tomorrow, Mr. Brodsky, do you have any sense of

24  timing so we can make sure we have the appropriate amount of

25  witnesses to fill the day?

1          MR. BRODSKY:  I want to finish in an hour to an hour

2     and a half.  That's my goal.  I will try to.  I think I can

3     accomplish that goal.  I am optimistic, in an hour and a half.

4     I see my team smiling at me because they know me.

5          MR. PITLUCK:  They are not the only ones smiling at

6     Mr. Brodsky.  It's all good natured.  Based on that.  We will

7     try to figure out today and we will make sure we have

8     witnesses and try to figure out who they are actually.

9          THE COURT:  All right.  Just so I can be apprised,

10    Ms. Oremland is going to come tomorrow.

11         MR. PITLUCK:  I think tomorrow or Thursday.  More

12    likely Thursday.

13         THE COURT:  Good afternoon Mr. Burke.

14         MR. BURKE:  Good afternoon, Judge.  Just on the

15    scheduling issues.  Counsel indicated they think maybe an

16    hour, hour and a half on cross.

17         MR. BRODSKY:  My best estimate is an hour and a

18    half.

19         MR. BURKE:  I have a murder case on tomorrow.  I

20    have a murder case on tomorrow in state court.  I can probably

21    delay my appearance to maybe 11:30, 12:00.  I will try to

22    contact the judge.  You will start at 9:00?

23         THE COURT:  Yes, I hope we will start without any

24    delays.

25         MR. BURKE:  Of course, I will be here, but it will

5154

1   be a certain point that I will be in deep problems.

2           THE COURT:  Well, if that happens, I suppose Mr.

3   Brodsky or Mr. Kessler, you are going to have to deal with the

4   fact that you may have to break while Mr. Burke goes to state

5   court.  How long will that take?

6           MR. BURKE:  State court, and it is an insanity plea,

7   anywhere from ten minutes, if it's not happening, to it could

8   spin out.  I will try to call the judge in the morning.  Maybe

9   I can get an afternoon call, but I don't know.

10          THE COURT:  Is it in Brooklyn?

11          MR. BURKE:  Yes.  Across the street.  It is not a

12  usual appearance.  There is a delicacy to it.

13          THE COURT:  Okay.

14          MR. BURKE:  I will be here, I will try to call

15  chambers.  Usually people are not there until a little bit

16  later.

17          THE COURT:  Well, we will accommodate you.

18          MR. BURKE:  I will be here.  We will work it out.

19          THE COURT:  Thank you, Mr. Burke.  Have a good

20  evening.

21          (Matter adjourned to November 15, 2017 at 9:00 a.m.)

22

23                         ooo0ooo

24

25

5155

```
                          I N D E X


WITNESSES:

      KRISTINE MARSILIO

            CROSS-EXAMINATION                    4955

            VOIR DIRE EXAMINATION                4985

            CROSS-EXAMINATION (Continued)        4986

            REDIRECT EXAMINATION                 4989

      JACKSON  SU

            DIRECT EXAMINATION (Continued)       4996

            CROSS EXAMINATION                    5027


                       EXHIBITS:


            DX 106-4, 106-5 and 3346        4958
            DX 106-41                       4987
            DX 111-151                      5048
            DX 111-149                      5061
            DX 111-129                      5062
            DX 111-130                      5065
            DX 111-73                       5068
            DX 111-103                      5091
            DX 111-104                      5096
            DX 111-105                      5100
            DX 111-66                       5105
            DX 111-148                      5128
            DX 111-27                       5128
            DX 111-28                       5131
            DX 111-2                        5150



                    *     *     *
```

**$**

**$1,154.94** [1] - 4962:12
**$10,000** [1] - 4958:21
**$148** [3] - 4967:5, 4967:12, 4967:15
**$150,000** [1] - 5149:2
**$20** [4] - 5061:23, 5062:1, 5063:7, 5063:10
**$30,000** [2] - 5088:4, 5089:19
**$40** [9] - 5061:21, 5062:22, 5063:10, 5063:22, 5064:16, 5065:15, 5065:20, 5067:4, 5069:25
**$80** [1] - 5061:23
**$80,000** [5] - 5058:11, 5061:22, 5066:2, 5113:3, 5113:4
**$900,000** [4] - 5019:7, 5019:8, 5021:15, 5088:24

**0**

**08** [1] - 4964:19
**089** [1] - 4973:25

**1**

**1** [16] - 4960:12, 4960:23, 4964:4, 5074:24, 5075:1, 5075:4, 5088:20, 5092:5, 5103:22, 5120:22, 5121:4, 5121:8, 5121:13, 5123:7, 5125:4, 5145:16
**1,075,000** [2] - 5135:19, 5145:16
**1,100** [1] - 4993:2
**1,164** [1] - 4993:16
**1,164.4** [1] - 4993:19
**1,900** [2] - 4974:10, 4974:18
**1,903** [1] - 4992:12
**1,903.6** [1] - 4973:22
**1-25-2012** [1] - 5062:23
**1.5** [1] - 5012:8
**1/19/2012** [5] - 5058:10, 5065:18, 5066:9, 5069:14, 5070:15
**1/25** [1] - 5066:7

**1/25/2012** [1] - 5066:7
**10** [3] - 4935:12, 4936:7, 5086:15
**10,000** [5] - 5098:24, 5098:25, 5099:1, 5099:2, 5146:9
**100** [3] - 4981:21, 5013:9, 5014:7
**1030** [2] - 4937:15, 4937:17
**106-4** [5] - 4957:20, 4958:8, 4958:10, 4958:13, 5155:13
**106-41** [8] - 4967:19, 4968:4, 4983:4, 4985:4, 4987:6, 4987:16, 4987:24, 5155:14
**106-5** [5] - 4957:20, 4958:8, 4958:11, 4959:9, 5155:13
**10:00** [1] - 4951:8
**10:15** [3] - 4954:10, 4954:11
**10:54** [1] - 5133:12
**11** [3] - 5066:10, 5078:24, 5079:9
**11/25/2012** [1] - 5066:5
**11/29/2012** [1] - 5106:20
**111-103** [3] - 5091:10, 5091:13, 5155:17
**111-104** [3] - 5096:20, 5096:21, 5155:17
**111-105** [5] - 5100:24, 5100:25, 5103:6, 5103:22, 5155:18
**111-117** [1] - 5123:24
**111-129** [4] - 5062:7, 5062:15, 5064:15, 5155:15
**111-130** [7] - 5064:24, 5065:6, 5070:9, 5070:10, 5071:22, 5072:8, 5155:16
**111-148** [6] - 5127:3, 5127:8, 5128:2, 5128:11, 5130:8, 5155:19
**111-149** [3] - 5060:14, 5061:4, 5155:15
**111-15** [6] - 5064:3,

5064:4, 5106:10, 5106:11, 5106:19, 5109:15
**111-151** [4] - 5030:15, 5048:5, 5048:7, 5155:14
**111-16** [7] - 5064:4, 5064:8, 5064:9, 5064:11, 5109:2, 5114:11, 5114:12
**111-17** [7] - 5114:12, 5122:9, 5122:10, 5122:11, 5122:23, 5123:24
**111-18** [5] - 5116:21, 5117:4, 5122:25, 5140:17, 5141:21
**111-19** [6] - 5120:9, 5121:3, 5123:2, 5123:25, 5125:3, 5125:17
**111-2** [4] - 5150:4, 5150:7, 5150:9, 5155:20
**111-26** [1] - 5125:19
**111-26-A** [2] - 5132:22, 5133:13
**111-27** [4] - 5127:3, 5128:4, 5128:9, 5155:19
**111-28** [7] - 5131:17, 5131:21, 5132:25, 5134:1, 5134:18, 5135:15, 5155:20
**111-31** [2] - 5150:25, 5151:8
**111-37** [1] - 5151:9
**111-4** [1] - 5058:5
**111-41** [3] - 5147:7, 5147:19
**111-45** [7] - 4999:22, 5000:2, 5000:4, 5000:11, 5000:19, 5000:3, 5009:6
**111-48** [1] - 5026:14
**111-49** [1] - 5000:9
**111-66** [4] - 5105:10, 5105:16, 5105:17, 5155:18
**111-73** [7] - 5067:19, 5068:3, 5068:5, 5070:13, 5071:22, 5072:24, 5155:16
**11:23** [1] - 5133:16
**11:30** [1] - 5153:21
**12** [10] - 4956:24, 4957:6, 5000:13, 5003:9, 5009:10, 5060:19, 5062:20, 5084:12, 5147:8,

5147:25
**12-21** [1] - 5009:25
**12-24** [1] - 5009:25
**12-26** [1] - 5009:25
**12/26-12/31/2012** [1] - 5009:25
**120-1** [1] - 4961:15
**123** [1] - 4974:17
**123-2** [3] - 4972:17, 4974:14, 4991:5
**123-3** [2] - 4973:13, 4991:25
**123-4** [2] - 4974:20, 4992:22
**123-5** [1] - 4993:14
**125-1-8** [1] - 4968:12
**125-1-8*** [1] - 4968:16
**125-1-H** [1] - 4968:19
**127-1** [4] - 4965:23, 4966:3, 4967:4, 4967:13
**127-2** [3] - 4965:23, 4966:6, 4967:14
**12847** [1] - 5126:7
**12:00** [1] - 5153:21
**13** [1] - 5062:8
**13.3** [1] - 4965:4
**130** [1] - 5070:10
**13th** [2] - 5063:17, 5063:19
**14** [5] - 4934:7, 4952:21, 5030:20, 5068:7, 5080:19
**142** [1] - 4969:24
**144** [2] - 4962:15, 5018:6
**147** [1] - 4970:9
**15** [7] - 4935:12, 4936:7, 4951:10, 5027:15, 5028:5, 5030:22, 5154:21
**15,000** [3] - 5012:21, 5013:1, 5098:25
**15-637** [1] - 4953:1
**15-CR-637(KAM** [1] - 4934:3
**150** [1] - 4970:12
**150,000** [1] - 5017:16
**151** [1] - 4962:23
**151.7** [1] - 4962:24
**1558** [1] - 5072:24
**16** [3] - 5065:1, 5073:11, 5078:19
**160,000** [1] - 5017:16
**16th** [4] - 4981:1, 5064:21, 5086:20, 5086:23
**17** [3] - 5026:16, 5067:22, 5073:12

**172** [1] - 4970:19
**177.4** [1] - 4974:1
**18** [5] - 4970:9, 5118:17, 5119:10, 5119:20, 5123:1
**186** [1] - 4968:21
**19** [11] - 4961:19, 5058:15, 5060:22, 5061:20, 5068:1, 5071:4, 5071:7, 5071:9, 5072:1, 5113:1, 5123:1
**1st** [4] - 5088:25, 5116:6, 5116:16, 5116:23

**2**

**2** [5] - 4974:25, 4981:16, 5087:8, 5094:2, 5103:23
**2,000** [10] - 4974:14, 4991:18, 5058:11, 5062:1, 5062:22, 5064:16, 5065:22, 5071:21, 5071:25, 5113:2
**2,061.4** [1] - 4973:8
**2,100** [1] - 4991:20
**2,127** [1] - 4993:20
**2,243** [1] - 4993:5
**2,243.6** [1] - 4974:25
**2,500** [2] - 5097:3, 5149:2
**2.5** [2] - 5143:1, 5143:21
**20** [13] - 4973:6, 4973:20, 4975:2, 4986:4, 4992:14, 4992:18, 5101:3, 5102:25, 5104:7, 5104:20, 5105:2, 5108:18, 5150:11
**200** [1] - 4934:17
**2000** [3] - 4974:10, 5061:22, 5075:11
**2011** [11] - 4956:6, 4956:10, 4958:16, 4959:12, 4960:23, 4961:19, 4962:9, 4972:18, 4991:6, 5093:16, 5093:22
**2012** [133] - 4942:17, 4942:18, 4952:11, 4953:3, 4956:24, 4957:6, 4960:25, 4972:19, 4973:14, 4991:6, 4992:1, 4996:25, 4997:4, 4997:19, 4998:20,

5003:15, 5012:13, 5013:16, 5013:18, 5013:20, 5013:25, 5014:3, 5014:4, 5018:2, 5028:1, 5029:5, 5030:8, 5031:2, 5031:16, 5031:22, 5034:1, 5034:4, 5036:11, 5036:24, 5037:4, 5037:10, 5039:17, 5044:7, 5047:5, 5047:21, 5051:13, 5052:4, 5053:24, 5054:15, 5054:17, 5055:9, 5055:10, 5058:16, 5058:18, 5059:9, 5060:19, 5060:22, 5061:20, 5062:8, 5062:20, 5063:10, 5063:22, 5065:1, 5067:22, 5068:1, 5068:7, 5071:4, 5071:10, 5072:1, 5073:7, 5073:12, 5073:16, 5073:17, 5074:22, 5074:24, 5075:1, 5075:22, 5075:23, 5076:10, 5081:24, 5082:9, 5084:12, 5086:15, 5087:22, 5088:3, 5088:7, 5088:15, 5088:20, 5089:6, 5090:9, 5090:12, 5090:19, 5091:7, 5093:2, 5094:22, 5100:13, 5101:3, 5102:22, 5102:25, 5104:7, 5104:20, 5105:2, 5105:12, 5105:19, 5107:2, 5108:12, 5108:18, 5109:9, 5110:10, 5110:11, 5110:19, 5111:9, 5111:11, 5111:13, 5113:1, 5120:22, 5121:4, 5121:8, 5121:13, 5123:7, 5125:4, 5128:12, 5129:19, 5132:8, 5132:21, 5134:19, 5140:21, 5141:23, 5142:4, 5142:8, 5142:13, 5143:17, 5145:7, 5147:25, 5149:23, 5150:2, 5150:11
**2013** [47] - 4942:21, 4953:4, 4964:4,

4964:7, 4973:14, 4974:24, 4992:1, 4992:23, 4996:9, 4998:21, 4999:25, 5000:13, 5003:10, 5009:10, 5015:13, 5018:1, 5028:2, 5028:8, 5028:12, 5028:18, 5028:20, 5028:22, 5028:24, 5029:2, 5029:17, 5030:8, 5031:2, 5034:12, 5034:21, 5035:3, 5035:7, 5035:11, 5036:4, 5036:6, 5036:7, 5037:25, 5038:15, 5039:12, 5039:18, 5039:23, 5043:24, 5044:17, 5051:13, 5052:2, 5052:6
**2014** [25] - 4966:4, 4966:7, 4966:10, 4968:1, 4969:15, 4974:24, 4976:7, 4984:5, 4986:4, 4988:14, 4988:18, 4988:22, 4992:24, 4993:15, 5021:21, 5024:1, 5024:3, 5024:5, 5024:7, 5031:6, 5031:10, 5031:20, 5032:10, 5034:15, 5056:5
**2015** [7] - 4993:15, 5032:20, 5044:12, 5048:21, 5053:2, 5053:20, 5056:5
**2016** [1] - 5056:5
**2017** [8] - 4934:7, 4952:22, 5030:20, 5049:8, 5049:9, 5056:5, 5080:19, 5154:21
**21** [1] - 5100:13
**21st** [1] - 5102:22
**2224** [1] - 5118:17
**223** [3] - 5086:6, 5086:11, 5089:23
**225** [1] - 4934:23
**23** [1] - 5119:12
**24** [5] - 4962:22, 5021:24, 5118:18, 5119:10, 5119:12
**25** [5] - 4956:6, 4956:10, 4992:14, 4992:18, 5073:7
**250** [2] - 5031:13, 5031:24
**250,000** [2] - 5129:2,

5129:9
**271** [1] - 4934:15
**29** [10] - 4999:20, 5038:15, 5109:9, 5110:10, 5110:11, 5110:19, 5111:9, 5111:13, 5134:1, 5134:4
**29th** [6] - 4978:20, 5108:21, 5111:3, 5111:11, 5111:21, 5115:11
**2:55** [2] - 5105:19, 5105:25

---

### 3

**3** [13] - 5010:5, 5015:25, 5126:20, 5128:12, 5132:8, 5132:17, 5132:21, 5133:12, 5134:19, 5141:23, 5142:4, 5142:8, 5142:13
**30** [13] - 4966:4, 4966:10, 4969:15, 4976:7, 4984:5, 4988:14, 4988:21, 5014:9, 5021:8, 5043:24, 5093:16, 5093:22
**30,000** [2] - 4959:12, 4960:13
**30th** [2] - 4981:1, 5040:13
**31** [7] - 4959:11, 4959:12, 4960:25, 4964:7, 4968:1, 4988:18, 5023:17
**330** [2] - 5066:23, 5069:25
**3346** [4] - 4957:20, 4958:8, 4958:11, 5155:13
**36** [4] - 5120:14, 5120:20, 5121:7, 5121:18
**30** [2] - 5077:9, 5101:4
**3:02** [1] - 5105:25
**3:03** [1] - 5105:25
**3:29** [1] - 5111:21
**3:46** [1] - 5114:9
**3:55** [4] - 5122:12, 5122:20, 5122:21, 5123:24
**3:56** [2] - 5115:20, 5122:13

---

### 4

**4** [12] - 4962:18, 4966:7, 5013:16, 5013:18, 5013:19, 5013:25, 5014:3, 5014:4, 5078:24, 5140:21, 5143:17, 5145:7
**4,167** [4] - 5106:12, 5113:10, 5113:11, 5114:3
**40** [2] - 4973:4, 5062:2
**403** [1] - 4939:13
**426** [2] - 4955:24, 4956:5
**430** [1] - 4992:9
**433** [1] - 4956:22
**448-A** [1] - 5023:19
**45** [1] - 5135:21
**46** [1] - 5135:21
**47** [1] - 4965:2
**4777** [1] - 5138:11
**4778** [2] - 5138:11, 5138:12
**48587** [1] - 4964:11
**48592** [1] - 4963:25
**48th** [1] - 4934:17
**4955** [1] - 5155:4
**4958** [1] - 5155:13
**4985** [1] - 5155:5
**4986** [1] - 5155:6
**4987** [1] - 5155:14
**4989** [1] - 5155:7
**4996** [1] - 5155:9
**4:32** [2] - 5120:11, 5123:25
**4K** [1] - 5061:22

---

### 5

**5** [3] - 4962:9, 4996:9, 5012:22
**50** [1] - 5015:25
**50,000** [8] - 5093:10, 5098:12, 5099:16, 5101:18, 5102:10, 5107:23, 5108:8, 5129:5
**500** [2] - 5010:25, 5011:4
**500,000** [1] - 5019:5
**5027** [1] - 5155:10
**5048** [1] - 5155:14
**505** [1] - 4992:5
**5061** [1] - 5155:15
**5062** [1] - 5155:15
**5065** [1] - 5155:16
**5068** [1] - 5155:16

**5091** [1] - 5155:17
**5096** [1] - 5155:17
**5100** [1] - 5155:18
**5105** [1] - 5155:18
**5128** [2] - 5155:19, 5155:19
**5131** [1] - 5155:20
**5150** [1] - 5155:20
**520** [1] - 5140:20
**521** [1] - 5140:20
**55** [1] - 5122:15
**568** [1] - 4961:22
**57.6** [1] - 4991:11
**582** [1] - 4964:6
**5:00** [3] - 4994:15, 5151:3, 5151:4
**5th** [1] - 4999:15

---

### 6

**608** [7] - 4936:20, 4938:11, 4938:13, 4938:25, 4939:13, 4941:19
**609** [7] - 4936:20, 4938:11, 4938:12, 4938:18, 4938:25, 4939:13
**613-2643** [1] - 4934:24
**677** [1] - 4976:10
**682-B** [3] - 4995:7, 4999:14, 4999:15

---

### 7

**7** [3] - 4970:9, 5016:1, 5093:2
**7.3** [1] - 4970:22
**70** [1] - 4992:7
**718** [1] - 4934:24
**75,000** [1] - 5129:12
**777** [2] - 5067:1, 5136:9
**7:31** [1] - 5142:14
**7th** [4] - 4990:5, 4990:6, 4990:10, 5092:9

---

### 8

**8** [6] - 4958:16, 5079:6, 5090:19, 5094:22, 5105:12, 5105:19
**80,000** [1] - 5061:21
**802** [1] - 4962:6
**803(6** [4] - 4977:11, 4977:13, 4978:23, 4985:6

---

**803(6)** [1] - 4985:11
**803(6)(D)** [1] - 4985:8
**80K** [1] - 5062:1
**834079** [1] - 5098:2
**834589** [1] - 5103:5
**843** [1] - 4963:19
**857** [2] - 4966:1, 4966:9
**857-A** [2] - 4969:14, 4990:2
**869** [1] - 4991:8
**896608** [1] - 5093:6
**896611** [1] - 5091:24
**896624** [1] - 5092:14
**8:33** [1] - 5122:12
**8:46** [1] - 5114:15
**8:53** [1] - 5060:19
**8:55** [2] - 5122:18, 5122:19
**8:56** [2] - 5115:20, 5122:13
**8K** [2] - 5139:5, 5139:7

## 9

**9** [8] - 4936:6, 4993:12, 5114:20, 5114:25, 5115:9, 5115:12, 5116:11
**9/7/2012** [1] - 5092:3
**900** [1] - 4991:14
**900confidentiality** [1] - 5146:22
**92.2** [1] - 4964:17
**945** [1] - 4960:12
**9:00** [3] - 4934:7, 5153:22, 5154:21
**9:32** [1] - 5120:12

## A

**a)(2)(C** [1] - 4937:17
**a.m** [4] - 4934:7, 4960:12, 5060:19, 5154:21
**ability** [2] - 4938:8, 5088:22
**able** [23] - 4936:6, 4938:6, 4939:23, 4939:25, 4954:8, 4954:12, 4981:17, 4982:2, 5004:20, 5005:14, 5006:17, 5006:20, 5017:25, 5018:13, 5018:25, 5025:13, 5087:21, 5088:8, 5088:17, 5149:14, 5150:12,

**5150:16, 5150:18**
**absence** [1] - 5011:1
**absolute** [1] - 4946:20
**Absolutely** [2] - 4941:25, 4942:2
**absolutely** [5] - 4943:3, 4944:15, 5003:18, 5083:4
**abstract** [1] - 5151:13
**accept** [4] - 5017:4, 5023:2, 5051:6, 5081:12
**acceptable** [1] - 4938:23
**acceptance** [1] - 5066:5
**accepted** [1] - 5073:4
**accepting** [1] - 5083:11
**access** [45] - 4937:10, 4937:12, 4937:13, 4939:7, 4940:2, 4947:14, 4949:18, 4953:1, 4997:6, 4997:11, 4997:18, 4998:17, 4998:19, 4998:20, 4999:7, 5028:1, 5028:7, 5028:11, 5028:18, 5028:20, 5028:22, 5028:24, 5029:5, 5029:17, 5030:2, 5031:22, 5033:18, 5034:4, 5034:6, 5034:7, 5035:6, 5035:13, 5036:10, 5036:24, 5037:16, 5037:22, 5038:6, 5038:12, 5043:12, 5047:9, 5051:11, 5076:16, 5081:16, 5081:24, 5082:8
**accessed** [18] - 4937:14, 4996:23, 5031:6, 5032:4, 5032:10, 5032:23, 5036:3, 5037:11, 5038:16, 5040:12, 5047:5, 5048:3, 5051:25, 5052:3, 5052:5, 5052:7, 5052:9, 5052:12
**accessing** [15] - 4938:3, 4952:9, 5029:9, 5030:8, 5034:20, 5034:24,

**5035:2, 5035:16,**
**5035:22, 5036:6,**
**5037:25, 5042:19,**
**5047:11, 5047:14,**
**5047:25**
**accommodate** [1] - 5154:17
**accompany** [1] - 5130:19
**accomplish** [1] - 5153:3
**according** [9] - 5010:3, 5013:14, 5022:16, 5078:6, 5098:22, 5102:8, 5139:4, 5146:8, 5147:5
**account** [12] - 4958:18, 4976:18, 4984:21, 4988:7, 4989:13, 4989:16, 4989:18, 4989:19, 5018:22, 5019:5, 5073:23, 5076:16
**accountant** [1] - 5109:12
**accounting** [1] - 4971:10
**accounts** [3] - 5010:20, 5011:16, 5041:17
**accurate** [3] - 5022:15, 5090:4, 5110:22
**accurately** [1] - 5120:4
**accusations** [1] - 4937:5
**accuse** [3] - 4943:2, 5042:23, 5043:17
**acquisitions** [1] - 4936:18
**Acting** [1] - 4934:13
**actions** [4] - 4940:1, 5022:24, 5024:19, 5025:6
**actual** [6] - 4938:13, 5041:10, 5073:21, 5074:2, 5074:18, 5127:11
**add** [4] - 4981:20, 4992:9, 5084:9, 5118:8
**added** [1] - 5117:20
**adding** [2] - 5131:15, 5133:25
**additional** [4] - 4939:6, 4952:14, 4975:11, 5125:21
**address** [11] -

**4980:11, 4980:14,**
**4988:10, 4989:20,**
**5034:17, 5034:19,**
**5040:9, 5041:5,**
**5041:16, 5061:15,**
**5079:22**
**addressed** [1] - 5066:21
**adjourn** [1] - 5079:11
**adjourned** [1] - 5154:21
**adjustment** [1] - 4967:16
**admin** [2] - 5034:7, 5034:14
**administrative** [1] - 4978:19
**admissibility** [1] - 4981:13
**admissible** [4] - 4976:23, 4977:16, 4977:17, 5045:5
**admission** [2] - 4977:2, 4981:12
**admit** [4] - 4941:20, 5006:3, 5007:15, 5152:10
**admitted** [9] - 4942:19, 4976:14, 4976:24, 4977:8, 4987:25, 5006:8, 5006:11, 5009:6, 5127:12
**adoption** [1] - 5101:8
**advance** [1] - 4947:7
**adverse** [5] - 4944:16, 4944:23, 4945:24, 4946:7, 5082:5
**advice** [7] - 4978:1, 5082:16, 5082:23, 5083:24, 5084:2, 5084:18, 5084:19
**advise** [1] - 4959:23, 5044:3, 5044:8
**affect** [1] - 5134:7
**affects** [1] - 5075:5
**afford** [1] - 5088:8
**afield** [1] - 5043:19
**afternoon** [7] - 4996:6, 4996:7, 5027:5, 5078:4, 5153:13, 5153:14, 5154:9
**AFTERNOON** [1] - 5078:1
**afterwards** [1] - 5035:14
**agent** [2] - 4955:11, 5020:14

**agents** [7] - 4955:6, 4955:7, 4955:12, 4955:13, 4955:14, 5020:16, 5033:13
**ago** [10] - 5053:7, 5053:10, 5053:14, 5053:15, 5053:19, 5055:6, 5091:6, 5108:7, 5118:9
**agree** [10] - 4950:11, 5016:21, 5017:1, 5047:22, 5047:23, 5092:8, 5104:3, 5104:4, 5139:18, 5139:19
**agreed** [4] - 5016:25, 5017:7, 5017:10, 5046:8
**agreeing** [1] - 5047:13
**agreement** [123] - 4935:18, 4940:12, 4940:21, 4943:4, 4943:9, 4943:13, 4943:15, 4943:18, 4943:23, 4944:1, 4944:3, 4944:4, 4947:9, 4947:12, 4947:18, 4947:22, 4948:6, 4948:23, 4950:3, 4950:7, 4953:5, 4997:21, 4997:23, 4997:24, 4997:25, 4998:12, 4998:14, 4998:23, 4999:6, 5009:22, 5010:6, 5012:4, 5012:18, 5027:21, 5051:16, 5056:17, 5057:2, 5057:7, 5058:19, 5058:22, 5061:19, 5061:21, 5061:22, 5062:6, 5062:21, 5064:16, 5065:15, 5066:10, 5066:18, 5066:20, 5067:11, 5068:15, 5069:24, 5071:4, 5071:7, 5071:16, 5071:19, 5073:2, 5074:7, 5074:19, 5074:23, 5075:1, 5075:15, 5075:22, 5090:12, 5090:13, 5091:22, 5091:25, 5092:2, 5092:8, 5092:11, 5092:22, 5093:1, 5093:16, 5093:21, 5094:3, 5094:16, 5094:21,

5094:25, 5095:4, 5095:6, 5095:11, 5096:24, 5097:2, 5097:15, 5097:16, 5097:24, 5098:1, 5098:2, 5098:5, 5098:17, 5099:21, 5099:22, 5100:16, 5101:7, 5101:8, 5101:16, 5101:23, 5102:9, 5108:1, 5109:10, 5109:15, 5109:25, 5111:13, 5112:20, 5112:23, 5113:5, 5113:14, 5113:17, 5113:24, 5114:21, 5114:23, 5115:2, 5115:10, 5115:11, 5115:17, 5115:19, 5120:21, 5122:4, 5125:14, 5147:16

**agreements** [10] - 4963:21, 5074:13, 5076:6, 5076:11, 5133:14, 5133:18, 5133:23, 5150:21, 5151:16, 5152:3

**ahead** [3] - 4977:18, 4977:19, 5025:25

**aided** [1] - 4934:25

**alarm** [1] - 4945:4

**align** [1] - 5099:10

**ALIXANDRA** [1] - 4934:13

**allegations** [3] - 5007:20, 5008:1, 5041:8

**alleged** [2] - 4937:23, 5013:10

**allocated** [1] - 5073:4

**allocute** [1] - 4944:20

**allow** [7] - 4938:15, 4961:4, 4994:14, 5021:1, 5029:13, 5119:15, 5145:9

**allowable** [1] - 4939:13

**allowed** [7] - 4943:24, 5017:23, 5020:10, 5021:6, 5021:8, 5081:17, 5100:2

**allows** [4] - 4938:13, 4944:4, 5143:24, 5145:4

**almost** [2] - 4991:20, 5124:3

**alone** [1] - 5043:5

**alongside** [1] - 5064:3

**ambiguity** [1] - 4949:25

**amended** [1] - 5093:20

**Amendment** [20] - 4936:13, 4939:24, 4943:20, 4944:22, 4945:7, 4945:13, 4946:4, 4946:9, 4946:15, 4946:19, 4947:3, 4950:20, 4953:15, 5081:16, 5082:5, 5082:14, 5082:25, 5083:7, 5083:10, 5083:16

**AMERICA** [1] - 4934:3

**amount** [8] - 4959:19, 4964:22, 5013:13, 5014:23, 5017:14, 5017:17, 5067:4, 5152:24

**amounted** [1] - 5017:15

**amounts** [2] - 4965:6, 4974:6

**Amsterdam** [1] - 5034:24

**analysis** [1] - 5041:6

**Andrew** [2] - 5012:14, 5026:8

**announced** [1] - 5086:25

**Answer** [2] - 5119:22, 5120:3

**answer** [11] - 4979:17, 4984:11, 4986:20, 4986:21, 5081:23, 5082:3, 5082:8, 5082:24, 5083:18, 5083:22, 5152:1

**ANSWER** [3] - 5080:23, 5081:1, 5081:13

**answered** [3] - 4970:23, 5026:21, 5103:25

**answers** [1] - 5083:19

**anticipate** [1] - 4954:10

**AOL** [2] - 4976:18, 4989:19

**AOL.com** [2] - 4988:7, 4989:20

**apologize** [2] -

4935:13, 5063:4

**appear** [6] - 4953:13, 5083:21, 5096:2, 5102:2, 5103:10, 5103:12

**appearance** [3] - 5034:23, 5153:21, 5154:12

**APPEARANCES** [1] - 4934:11

**appeared** [4] - 5097:19, 5121:8, 5121:13, 5121:15

**application** [3] - 5081:17, 5085:2, 5152:9

**applied** [5] - 4959:8, 4960:6, 4960:14, 5129:12, 5131:4

**applies** [2] - 4957:17, 4999:6

**apply** [4] - 4961:4, 4999:10, 4999:12, 4999:13

**appoint** [1] - 5084:18

**appreciate** [1] - 4954:12

**appreciated** [1] - 5021:7

**apprised** [1] - 5153:9

**approach** [13] - 4957:19, 5030:13, 5060:15, 5064:22, 5067:19, 5090:15, 5095:14, 5100:9, 5105:8, 5118:14, 5127:1, 5140:15, 5151:1

**appropriate** [6] - 4940:10, 4944:11, 4946:1, 4947:1, 5005:22, 5152:24

**approval** [9] - 4957:14, 4969:3, 4969:4, 4969:9, 5018:12, 5018:16, 5018:19, 5018:20

**approved** [3] - 4968:21, 4987:24, 5009:25

**approximate** [1] - 5083:2

**April** [2] - 5015:13, 5028:18

**arbitration** [9] - 5015:16, 5015:18, 5015:19, 5016:12, 5016:17, 5016:18, 5017:20, 5017:21, 5024:2

**arbitrator** [6] - 5015:19, 5016:21, 5016:24, 5017:3, 5017:6, 5017:9

**archive** [5] - 4996:20, 4997:18, 4998:18, 4998:19, 4999:7

**area** [2] - 5083:22, 5143:8

**areas** [1] - 4943:20

**arguable** [1] - 4937:16

**argue** [4] - 4938:5, 4939:16, 4940:5, 5004:9

**arguendo** [1] - 5082:17

**argument** [4] - 4939:5, 4948:14, 4979:12, 5004:25

**arguments** [2] - 4937:2, 5004:1

**arrest** [1] - 4939:21

**articulate** [1] - 5006:20

**Aselage** [42] - 5086:12, 5086:19, 5086:22, 5092:4, 5092:18, 5093:10, 5094:24, 5094:25, 5095:9, 5095:21, 5098:11, 5099:15, 5101:19, 5103:10, 5105:2, 5105:5, 5107:2, 5107:9, 5107:17, 5107:23, 5108:8, 5125:8, 5129:2, 5129:8, 5140:4, 5140:12, 5140:21, 5141:14, 5141:23, 5142:4, 5142:8, 5142:13, 5143:7, 5143:15, 5143:16, 5143:18, 5145:3, 5145:8, 5147:1, 5149:17, 5149:18

**Aselage's** [15] - 5090:12, 5090:13, 5091:16, 5092:12, 5092:15, 5095:20, 5097:18, 5100:6, 5100:16, 5100:19, 5101:7, 5103:23, 5106:4, 5107:17, 5142:23

**aside** [2] - 5028:4, 5028:10

**assert** [4] - 5020:17,

5044:11, 5081:16, 5081:23

**asserted** [2] - 4977:6, 5006:25

**assets** [5] - 5003:12, 5013:10, 5013:21, 5014:23

**assign** [1] - 5036:20

**assigning** [1] - 5093:9

**assistance** [1] - 5112:22

**Assistant** [1] - 4934:15

**assisted** [1] - 5054:16

**assume** [2] - 4944:6, 5072:4

**assumed** [1] - 5108:21

**assuming** [7] - 4939:23, 4982:6, 5005:22, 5082:17, 5114:16, 5117:8, 5151:21

**assumption** [3] - 4946:19, 4946:22, 4979:9

**assure** [1] - 5043:8

**attach** [2] - 5069:15, 5069:17

**attached** [13] - 4967:25, 4984:5, 4984:19, 4986:8, 4988:13, 5091:23, 5097:24, 5098:18, 5101:23, 5121:21, 5127:23, 5128:13, 5132:22

**attaching** [1] - 4979:4

**attachment** [12] - 4967:22, 4983:8, 4983:10, 4986:3, 4987:2, 5065:14, 5066:16, 5066:17, 5127:11, 5128:20, 5135:7, 5152:7

**attachments** [3] - 4982:9, 5102:2, 5102:3

**attendance** [1] - 5010:1

**attending** [1] - 4955:8

**attention** [8] - 4963:24, 4965:20, 5101:2, 5118:17, 5119:9, 5119:20, 5138:4, 5152:16

**attorney** [18] - 4936:1, 4936:2, 4961:7, 4963:10, 4963:16, 4965:9, 5012:17, 5015:16, 5015:21, 5015:23, 5016:19, 5016:21, 5016:23, 5016:24, 5017:6, 5023:6, 5023:8, 5050:24
**Attorney** [1] - 4934:13
**Attorney's** [5] - 4952:22, 5049:21, 5050:5, 5050:9, 5051:18
**attorneys** [4] - 4977:22, 4979:3, 4996:16, 5109:12
**Attorneys** [2] - 4934:15, 4953:8
**audible** [1] - 5046:5
**audience** [1] - 4955:6
**auditor** [4] - 5057:22, 5057:23, 5068:11, 5069:11
**auditors** [1] - 5055:2
**August** [6] - 4959:11, 4962:9, 4964:4, 4968:1, 4988:18, 5015:22
**authentic** [1] - 5005:23
**authenticity** [2] - 4979:23, 5003:9
**authority** [3] - 4940:5, 5005:24, 5142:3
**authorization** [2] - 5029:10, 5037:12
**authorize** [1] - 5017:1
**authorized** [5] - 4937:10, 4937:13, 4985:14, 4985:17, 5017:4
**available** [1] - 4935:24
**Avenue** [5] - 4934:17, 5066:23, 5067:1, 5069:25, 5136:9
**avoid** [1] - 4945:11
**aware** [10] - 4965:1, 4971:24, 4986:13, 4986:16, 5005:5, 5005:24, 5006:10, 5007:6, 5025:16, 5042:15

**awhile** [1] - 5151:2

# B

**backdate** [2] - 5054:2, 5054:9
**backdated** [3] - 5052:22, 5052:24, 5053:3
**backdating** [1] - 5054:4
**backdoor** [1] - 5037:18
**backed** [1] - 5076:15
**backpay** [2] - 5016:5, 5017:12
**backup** [2] - 5059:21, 5063:2
**balance** [4] - 4959:1, 4960:5, 4960:10, 4962:12
**Balbin** [1] - 4991:17
**bank** [8] - 4942:7, 5047:18, 5047:20, 5047:22, 5073:23, 5076:16, 5113:6
**bar** [7] - 4987:15, 4987:18, 5002:24, 5003:1, 5003:3, 5006:16, 5008:15
**barred** [1] - 5099:23
**based** [21] - 4939:21, 4942:21, 4949:13, 4949:22, 4969:5, 4969:9, 4970:5, 4972:8, 4972:11, 4981:17, 4987:3, 5082:16, 5084:18, 5088:7, 5097:5, 5110:12, 5110:18, 5115:17, 5142:17, 5153:6
**basis** [24] - 4938:1, 4939:4, 4939:8, 4940:17, 4940:19, 4979:17, 4987:15, 5005:23, 5006:5, 5006:12, 5008:18, 5041:5, 5041:10, 5041:12, 5041:14, 5042:3, 5042:6, 5042:23, 5042:24, 5043:5, 5043:10, 5045:19, 5045:21
**Bates** [12] - 4961:22, 4962:14, 4963:24, 4964:6, 4964:11, 4973:25, 5067:7, 5072:24, 5091:23, 5093:6, 5109:16,

5140:20
**became** [2] - 5093:24, 5094:3
**become** [3] - 4946:18, 5092:5, 5129:20
**becomes** [3] - 5046:5, 5138:5
**BEFORE** [1] - 4934:10
**begging** [1] - 5139:4
**begin** [2] - 4956:11, 5087:8
**beginning** [4] - 4953:2, 5010:4, 5010:12, 5089:21
**behalf** [2] - 5017:1, 5068:10
**behind** [3] - 4993:12, 5023:17, 5127:10
**believes** [2] - 4937:24, 4949:13
**bells** [1] - 4945:4
**below** [7] - 5061:8, 5073:3, 5073:5, 5092:18, 5103:19, 5107:5
**benefit** [1] - 4938:6
**benefits** [2] - 5015:15, 5017:12
**Bernadette** [2] - 4961:25, 4962:18
**best** [1] - 5153:17
**better** [4] - 5041:9, 5082:20, 5108:4, 5111:5
**between** [34] - 4953:3, 4956:7, 4956:23, 4957:24, 4957:25, 4958:15, 4967:3, 4967:12, 4967:23, 4971:21, 4976:6, 4983:5, 4992:14, 4998:20, 5013:19, 5014:1, 5015:19, 5021:10, 5028:1, 5030:8, 5031:2, 5039:17, 5040:5, 5042:11, 5042:16, 5051:13, 5057:7, 5101:18, 5105:1, 5105:25, 5113:9, 5114:19, 5114:25, 5117:25
**beyond** [9] - 4939:7, 4972:1, 4972:14, 5039:21, 5040:12, 5040:13, 5040:24, 5043:24, 5043:25
**bias** [4] - 4938:5,

4938:22, 4940:1, 5043:21
**Biestek** [16] - 5026:9, 5034:3, 5106:12, 5108:25, 5109:8, 5109:21, 5112:20, 5113:10, 5113:11, 5113:23, 5114:3, 5116:24, 5122:24, 5123:19, 5133:5
**Biestek's** [2] - 5123:6, 5123:9
**big** [4] - 4962:7, 4965:22, 5068:13, 5149:12
**bill** [53] - 4957:13, 4958:5, 4962:9, 4963:13, 4963:17, 4965:11, 4966:3, 4966:6, 4966:9, 4966:18, 4967:4, 4967:5, 4967:14, 4967:25, 4969:22, 4969:23, 4976:17, 4976:20, 4976:22, 4976:25, 4977:2, 4978:11, 4979:5, 4979:22, 4980:1, 4980:5, 4980:6, 4980:9, 4980:17, 4980:21, 4981:1, 4981:6, 4981:15, 4981:23, 4981:25, 4982:1, 4982:2, 4982:3, 4983:8, 4983:16, 4983:22, 4984:5, 4984:7, 4987:2, 4988:13, 4988:14, 4988:16, 4988:21, 4989:5, 4989:10, 4989:20, 4990:3, 4990:20
**bill's** [1] - 4986:3
**billed** [28] - 4962:18, 4963:4, 4963:6, 4963:8, 4964:14, 4964:17, 4964:19, 4964:22, 4965:2, 4965:4, 4965:6, 4970:9, 4970:12, 4970:19, 4970:22, 4971:2, 4972:23, 4973:17, 4973:22, 4974:4, 4974:14, 4974:17, 4974:25, 4990:13, 4991:22, 4992:18, 4993:7, 4993:16
**billing** [14] - 4956:11,

4957:14, 4959:7, 4961:3, 4963:1, 4963:17, 4970:1, 4971:10, 4971:22, 4974:6, 4975:2, 4977:21, 4979:19, 4984:15
**bills** [22] - 4956:12, 4957:10, 4961:3, 4961:6, 4966:17, 4967:13, 4971:12, 4971:15, 4973:8, 4976:14, 4977:7, 4977:23, 4979:3, 4980:16, 4980:17, 4981:14, 4983:12, 4984:15, 4984:19, 4985:18, 4989:25
**binder** [5] - 4965:22, 4965:25, 4993:11, 4999:20, 5023:17
**binders** [1] - 4962:7
**bit** [15] - 4950:8, 4961:6, 4962:17, 4991:17, 5016:3, 5021:21, 5058:9, 5061:13, 5066:4, 5070:11, 5070:12, 5070:13, 5076:23, 5154:15
**blank** [13] - 5059:2, 5065:15, 5067:7, 5067:8, 5067:12, 5067:13, 5069:17, 5072:5, 5096:3, 5096:7, 5096:8, 5102:2, 5108:15
**blanket** [1] - 4979:17
**block** [6] - 4987:4, 5090:8, 5091:2, 5091:7, 5104:15, 5107:6
**blocks** [2] - 5049:22, 5050:10
**blow** [12] - 5048:8, 5070:9, 5086:7, 5087:5, 5094:7, 5114:13, 5122:23, 5122:24, 5123:1, 5123:2, 5125:4
**blower** [1] - 5025:18
**board** [4] - 4941:15, 4941:23, 5015:12, 5142:1
**book** [1] - 4965:22
**bottle** [1] - 4965:25
**bottom** [12] - 4958:14, 4958:15, 4962:23, 4988:10, 4990:4, 5062:19,

5087:4, 5093:15, 5109:5, 5135:11, 5141:8, 5141:22

**bound** [3] - 5016:25, 5017:8, 5017:10

**box** [2] - 5068:13, 5068:14

**Brady** [1] - 4970:4

**breach** [2] - 5010:4, 5010:12

**break** [7] - 4975:18, 4994:12, 5029:23, 5046:19, 5076:19, 5079:22, 5154:4

**breaking** [1] - 5152:8

**Bridge** [1] - 5141:4

**BRIDGET** [1] - 4934:12

**brief** - 4983:23, 4985:7

**briefing** [1] - 4979:6

**briefly** [2] - 4935:11, 4989:2

**brilliant** [1] - 5014:9

**bring** [1] - 5085:5

**Brink's** [2] - 4945:18, 4946:2

**Brodsky** [36] - 4935:15, 4937:24, 4939:9, 4939:14, 4948:10, 4949:9, 4949:12, 4950:14, 4950:18, 4952:18, 4954:1, 4987:21, 5005:20, 5027:1, 5029:24, 5040:19, 5041:11, 5043:10, 5043:16, 5053:17, 5054:13, 5056:19, 5082:22, 5083:3, 5084:10, 5086:4, 5088:13, 5094:19, 5096:5, 5110:16, 5119:2, 5148:21, 5151:12, 5152:23, 5153:6, 5154:3

**BRODSKY** [169] - 4934:19, 4935:16, 4936:24, 4937:1, 4940:11, 4940:16, 4940:24, 4941:11, 4944:8, 4947:5, 4948:2, 4948:21, 4949:4, 4950:10, 4950:19, 4950:22, 4951:2, 4952:19, 4953:21, 4955:4, 4955:5, 4955:12, 4969:7, 4969:11, 4982:4, 4997:9,

5000:20, 5002:1, 5002:11, 5002:21, 5004:14, 5005:9, 5006:14, 5007:18, 5007:24, 5012:23, 5013:23, 5019:15, 5019:24, 5020:2, 5022:20, 5024:12, 5024:15, 5024:21, 5027:2, 5027:4, 5030:12, 5038:20, 5039:10, 5039:25, 5040:4, 5041:2, 5041:13, 5042:14, 5044:7, 5045:11, 5045:18, 5046:8, 5046:16, 5047:3, 5048:4, 5048:8, 5056:21, 5056:23, 5058:7, 5060:15, 5061:2, 5062:12, 5064:5, 5064:8, 5064:22, 5065:4, 5067:18, 5067:21, 5068:3, 5069:21, 5070:8, 5071:1, 5076:20, 5078:6, 5078:11, 5078:13, 5079:21, 5079:25, 5080:2, 5080:16, 5081:7, 5082:2, 5083:14, 5084:22, 5085:1, 5086:6, 5086:10, 5087:5, 5088:14, 5090:15, 5091:10, 5092:13, 5094:7, 5094:20, 5095:14, 5096:1, 5096:6, 5096:13, 5096:15, 5098:4, 5100:9, 5100:11, 5100:22, 5102:1, 5102:12, 5105:8, 5105:14, 5106:9, 5106:17, 5107:1, 5108:4, 5110:25, 5111:5, 5111:7, 5114:11, 5115:15, 5115:18, 5118:13, 5118:25, 5119:4, 5119:7, 5119:9, 5119:12, 5120:10, 5121:11, 5121:14, 5122:9, 5122:16, 5122:22, 5123:13, 5125:1, 5126:2, 5127:1, 5127:6, 5127:15, 5127:20, 5128:1, 5128:4, 5129:18, 5129:21, 5129:25, 5130:7,

5130:20, 5131:19, 5132:21, 5138:10, 5138:11, 5140:15, 5140:19, 5141:18, 5145:2, 5147:21, 5148:22, 5149:25, 5150:5, 5151:1, 5151:5, 5151:7, 5151:19, 5151:25, 5152:12, 5153:1, 5153:17

**Brodsky's** [1] - 5045:9

**broke** [2] - 4996:8, 5027:7

**broker** [1] - 5018:11

**Brooklyn** [4] - 4934:5, 4934:16, 4934:23, 5154:10

**building** [3] - 5050:3, 5050:5, 5050:9

**bunch** [1] - 4989:9

**Burke** [17] - 4941:9, 4952:22, 4954:2, 4954:7, 5038:21, 5048:15, 5048:20, 5078:9, 5079:17, 5079:19, 5080:12, 5080:20, 5082:22, 5153:13, 5154:4, 5154:19

**BURKE** [20] - 4941:10, 5038:23, 5039:6, 5040:6, 5040:25, 5044:5, 5044:8, 5044:19, 5080:15, 5082:11, 5083:8, 5083:23, 5084:7, 5153:14, 5153:19, 5153:25, 5154:6, 5154:11, 5154:14, 5154:18

**Burke's** [2] - 4953:18, 5043:25

**business** [23] - 4976:15, 4976:16, 4976:21, 4977:10, 4978:22, 4979:5, 4979:6, 4979:9, 4979:10, 4979:12, 4979:16, 4981:13, 4981:16, 4981:19, 4982:5, 4984:21, 4985:1, 4988:10, 5006:17, 5006:18, 5019:10, 5141:6, 5149:13

**buy** [8] - 5019:3, 5145:16, 5147:12, 5148:5, 5148:15,

5149:9, 5149:14, 5150:18

**BY** [18] - 4934:13, 4934:19, 4955:21, 4967:2, 4983:2, 4985:13, 4986:2, 4989:4, 4996:5, 5025:3, 5026:13, 5027:4, 5047:3, 5071:1, 5086:10, 5107:1, 5125:1, 5145:2

---

## C

**cabin** [1] - 4943:1

**Cadman** [2] - 4934:15, 4934:23

**cafeteria** [1] - 5076:21

**Calasuonno** [1] - 4945:23

**calendar** [3] - 4970:6, 5010:5, 5010:13

**California** [1] - 5087:2

**cancelled** [1] - 5021:10

**Candlestick** [3] - 4966:7, 4967:4, 4967:13

**cannot** [4] - 4943:1, 5079:10, 5084:24, 5111:13

**cap** [6] - 5073:22, 5128:16, 5131:6, 5147:19, 5147:23, 5147:25

**capabilities** [2] - 5087:24, 5088:21

**Capital** [21] - 4961:16, 4989:12, 4991:7, 4992:7, 5022:4, 5023:25, 5026:9, 5033:25, 5089:25, 5090:5, 5090:9, 5090:22, 5090:23, 5091:1, 5126:9, 5126:11, 5128:21, 5129:13, 5129:17, 5131:5, 5133:8

**capital** [1] - 5022:9

**Capital.com** [4] - 5033:19, 5033:22, 5034:8, 5034:15

**capitalization** [14] - 5058:6, 5090:7, 5126:21, 5128:13,

5129:9, 5130:14, 5134:8, 5134:19, 5134:23, 5135:4, 5135:5, 5135:10, 5142:15, 5147:5

**care** [3] - 4994:19, 5050:22, 5080:24

**careful** [1] - 4949:8

**carefully** [1] - 5008:13

**carried** [1] - 5009:21

**carry** [2] - 5017:24, 5018:6

**Carter** [17] - 4958:13, 4962:16, 4964:6, 4969:24, 4974:22, 5058:7, 5061:13, 5064:10, 5069:22, 5070:12, 5071:17, 5092:13, 5098:4, 5121:3, 5122:10, 5122:13, 5147:22

**case** [33] - 4936:2, 4937:8, 4937:9, 4939:19, 4941:13, 4944:14, 4945:18, 4953:8, 4955:7, 4979:17, 4998:16, 4998:17, 4998:25, 4999:1, 5004:3, 5005:5, 5005:8, 5025:1, 5043:2, 5043:3, 5050:6, 5051:19, 5076:14, 5076:17, 5077:2, 5078:21, 5078:23, 5079:3, 5133:3, 5152:17, 5153:19, 5153:20

**case-by-case** [1] - 4979:17

**cases** [5] - 4939:20, 4942:6, 4945:18, 5054:17, 5079:10

**cash** [1] - 5017:18

**categorize** [1] - 4938:16

**caught** [1] - 5134:15

**caused** [2] - 5051:6, 5081:12

**causing** [1] - 5042:8

**cc'd** [1] - 5026:19

**central** [2] - 5003:24, 5004:3

**cents** [2] - 5016:1

**CEO** [6] - 4949:21, 4971:9, 4978:18, 4978:19, 5141:23, 5141:25

**certain** [16] - 5002:9,

5002:17, 5003:10, 5004:8, 5007:13, 5010:6, 5014:12, 5022:11, 5022:14, 5024:19, 5026:1, 5079:4, 5098:24, 5104:17, 5116:22, 5154:1

**certainly** [16] - 4941:3, 4942:4, 4943:10, 4943:24, 4947:15, 4949:11, 4950:7, 4950:14, 4977:16, 4977:23, 4978:13, 4980:4, 4981:7, 5040:21, 5042:22, 5132:12

**certainty** [1] - 4981:21

**chain** [6] - 4956:24, 4959:25, 4960:11, 5001:2, 5062:19, 5117:2

**challenge** [8] - 4941:21, 4943:10, 4948:5, 4948:8, 4948:22, 5081:18, 5082:1, 5082:10

**challenged** [1] - 4943:14

**chambers** [1] - 5154:15

**CHAN** [1] - 4934:20

**chance** [4] - 5050:23, 5051:3, 5081:1, 5081:8

**change** [2] - 4966:15, 4970:5

**changed** [4] - 4997:14, 5142:20, 5148:2, 5148:3

**changes** [1] - 5147:25

**channels** [1] - 4998:5

**characterization** [2] - 5119:6, 5120:7

**characterizing** [1] - 4940:1

**charge** [2] - 4980:2, 5083:8

**charged** [1] - 4941:12

**charges** [1] - 4941:13

**Charleane** [1] - 4934:22

**Charles** [12] - 5018:9, 5018:10, 5018:12, 5018:14,

5018:17, 5018:20, 5018:23, 5019:17, 5019:20, 5020:7, 5020:18, 5021:9

**chase** [2] - 5010:17, 5010:18

**check** [5] - 4951:5, 4987:20, 4993:17, 5063:6, 5106:1

**checked** [1] - 5023:14

**Chef** [1] - 5013:8

**Chew** [13] - 5060:18, 5062:9, 5095:12, 5096:23, 5097:9, 5098:17, 5100:3, 5100:5, 5100:13, 5101:3, 5101:11, 5102:21, 5104:10

**chew** [2] - 5061:10, 5126:3

**chief** [13] - 4942:23, 5036:11, 5036:14, 5036:24, 5069:6, 5086:13, 5086:15, 5086:19, 5094:21, 5138:23, 5139:1, 5143:14, 5152:3

**chose** [1] - 5003:21

**Chu's** [1] - 5097:7

**Circuit** [4] - 4944:14, 4945:18, 4946:3, 5005:8

**circumscribed** [1] - 4938:18

**circumstances** [2] - 4947:1, 5099:17

**cite** [1] - 5138:9

**cited** [1] - 4945:19

**Citrin** [8] - 5060:24, 5091:23, 5092:13, 5093:6, 5094:23, 5098:1, 5103:5, 5140:6

**City** [1] - 5087:1

**civil** [1] - 5078:22

**claim** [1] - 5025:15

**claimed** [1] - 5013:10

**claiming** [2] - 4942:23, 5013:9

**Claridge** [1] - 5026:9

**clarification** [2] - 5097:17, 5130:6

**clarify** [5] - 5000:24, 5031:9, 5076:8, 5090:23, 5104:8

**clarifying** [1] - 5025:23

**class** [1] - 5129:5

**Class** [15] - 5093:10, 5097:20, 5097:21, 5097:23, 5098:12, 5099:16, 5101:18, 5102:10, 5106:12, 5107:23, 5108:8, 5109:22, 5110:7, 5112:9, 5112:13

**classic** [2] - 4944:3, 4976:21

**clause** [1] - 5044:6

**clean** [1] - 4941:7

**clear** [6] - 4947:6, 4949:25, 5056:22, 5088:18, 5101:21, 5102:22

**clearance** [1] - 5018:11

**cleared** [1] - 5102:24

**clearly** [2] - 4940:16, 4940:18

**CLERK** [2] - 4954:15, 5078:9

**client** [15] - 4945:9, 4952:24, 4953:6, 4960:14, 4971:5, 4971:7, 4983:15, 4983:16, 4983:22, 4983:24, 5014:21, 5051:9, 5051:16, 5082:23, 5084:19

**clients** [11] - 4972:24, 4973:2, 4973:4, 4973:6, 4974:8, 4975:4, 4977:22, 4979:3, 4983:13, 4984:16, 4984:19

**clinical** [1] - 5087:8

**close** [4] - 4960:24, 4986:7, 5150:1

**closely** [1] - 5045:4

**closing** [2] - 4960:24, 5076:21

**Cogan's** [1] - 4954:3

**cognizant** [1] - 5045:6

**collateral** [2] - 4942:14, 4944:11

**colleague** [1] - 5111:8

**collecting** [1] - 5014:6

**collection** [1] - 4961:1

**collections** [1] - 4957:14

**column** [1] - 5048:14

**combined** [1] - 4991:15

**coming** [6] - 4951:8, 4959:13, 5015:24, 5038:21, 5098:20, 5126:18

**comment** [1] - 5045:18

**comments** [2] - 5061:25, 5143:5

**commission** [1] - 4947:13

**Commission** [1] - 5013:15

**commit** [1] - 4939:1

**committed** [14] - 4938:17, 4939:21, 4941:12, 4942:10, 4943:11, 4943:16, 4944:5, 4947:21, 4948:5, 4948:12, 4948:22, 4949:10, 4949:14, 5084:17

**committee** [2] - 4956:11, 4957:15

**committing** [5] - 4938:18, 4941:22, 4943:3, 4943:6, 4947:14

**common** [19] - 4971:24, 4979:19, 5097:21, 5097:23, 5098:12, 5099:16, 5101:18, 5102:10, 5106:13, 5107:23, 5108:8, 5109:22, 5110:1, 5110:7, 5112:9, 5112:13, 5128:25, 5129:5

**Common** [1] - 5101:7

**communicated** [2] - 5042:25, 5140:12

**Communication** [1] - 5010:22

**communication** [8] - 4958:15, 4961:2, 4979:19, 5003:14, 5004:23, 5014:1, 5060:24, 5141:13

**Communications** [1] - 5011:24

**communications** [8] - 4959:6, 4971:20, 4999:17, 5000:15, 5030:3, 5050:25, 5051:2, 5081:4

**companies** [3] - 5013:8, 5090:1, 5144:5

**company** [43] - 4971:25, 4972:13,

5010:1, 5010:3, 5010:11, 5010:20, 5010:21, 5010:24, 5011:9, 5011:16, 5011:17, 5011:25, 5014:19, 5014:20, 5015:11, 5018:3, 5018:12, 5018:15, 5018:23, 5018:24, 5019:23, 5020:12, 5020:19, 5020:25, 5021:2, 5021:6, 5022:8, 5022:13, 5022:14, 5022:17, 5034:14, 5037:15, 5042:8, 5086:25, 5092:4, 5093:21, 5130:18, 5141:7, 5142:2, 5149:11, 5149:12, 5151:17

**company's** [1] - 5087:6

**compare** [7] - 5122:8, 5123:3, 5123:6, 5123:9, 5123:11, 5124:1, 5124:3

**compensated** [1] - 5149:3

**compensation** [5] - 5000:17, 5001:4, 5014:12, 5015:8, 5016:6

**complaint** [1] - 5025:14

**Complete** [1] - 5010:22

**complete** [4] - 5012:2, 5127:13, 5127:14, 5127:25

**completely** [5] - 4938:10, 4938:24, 4939:12, 4949:14, 4950:11

**compliance** [8] - 5036:8, 5036:11, 5036:14, 5036:18, 5036:24, 5037:2, 5037:7

**compound** [2] - 5087:7, 5088:9

**computer** [6] - 4934:25, 4938:3, 4952:10, 4953:2, 5011:25, 5051:11

**computer-aided** [1] - 4934:25

**computers** [2] - 4937:14, 4937:15

**concern** [8] -

4936:13, 4944:14, 4944:18, 4945:1, 4946:2, 4946:23, 5040:1, 5043:1

**concerned** [4] - 4939:9, 4978:4, 5039:7, 5042:5

**concerns** [3] - 4936:16, 5040:10, 5082:15

**concluded** [4] - 4982:14, 5024:3, 5024:4, 5046:21

**conclusion** [3] - 5024:23, 5094:18, 5095:3

**conduct** [18] - 4937:6, 4938:3, 4938:14, 4938:19, 4944:11, 4948:7, 4948:23, 4950:6, 4952:9, 4952:14, 4953:4, 4953:7, 5025:6, 5039:14, 5051:13, 5051:17, 5084:12

**conducts** [1] - 5025:7

**confer** [1] - 5078:25

**conference** [1] - 5008:15

**conferred** [1] - 5082:23

**confess** [1] - 5041:22

**confessed** [2] - 5041:17, 5041:20

**confirm** [2] - 5151:11, 5152:10

**confirms** [2] - 4953:5, 5051:15

**confront** [5] - 4939:20, 5040:14, 5040:17, 5042:4, 5043:22

**confronting** [3] - 5040:19, 5044:16, 5045:21

**confused** [6] - 4945:2, 4946:18, 4946:22, 5060:12, 5130:4, 5143:7

**confusing** [1] - 4989:7

**connection** [13] - 4938:22, 4947:14, 4952:12, 4968:1, 4969:20, 4988:18, 4997:17, 5036:7, 5055:10, 5100:16,

5106:3, 5111:3, 5141:14

**consent** [3] - 5037:15, 5037:17

**conservative** [1] - 5079:14

**consideration** [2] - 5083:5, 5105:21

**considerations** [1] - 4946:6

**considering** [2] - 5083:6, 5085:2

**consistent** [2] - 4977:23, 4981:16

**constituted** [2] - 4937:6, 4938:9

**consult** [1] - 5040:15

**consulted** [1] - 4940:18

**contact** [5] - 4971:10, 4971:14, 4977:22, 5078:17, 5153:22

**contacted** [1] - 5025:12

**contained** [1] - 4977:9

**contains** [2] - 5007:20, 5102:4

**content** [2] - 4999:10, 5002:18

**contentious** [1] - 5018:18

**contents** [1] - 5012:18

**context** [2] - 4990:3, 5032:2

**contingencies** [1] - 5013:2

**contingency** [1] - 5012:16

**continuation** [2] - 5000:15, 5000:21

**continue** [13] - 4954:8, 4955:18, 4994:25, 5002:23, 5037:15, 5046:18, 5047:2, 5079:21, 5080:1, 5088:5, 5089:3, 5099:8, 5139:5

**continued** [12] - 4937:11, 4966:20, 5008:16, 5026:24, 5031:22, 5035:13, 5047:9, 5070:18, 5085:7, 5089:8, 5124:5, 5144:9

**Continued** [12] - 4955:21, 4975:22,

4982:15, 4986:1, 4995:8, 4996:4, 5001:5, 5038:25, 5046:22, 5106:22, 5155:6, 5155:9

**Continuing** [1] - 5107:1

**continuing** [3] - 4967:2, 5086:10, 5145:2

**continuously** [1] - 5016:3

**contract** [4] - 5009:23, 5010:4, 5010:12, 5016:6

**contracted** [1] - 5043:7

**contractor** [1] - 5043:6

**contracts** [1] - 5011:8

**contradicts** [1] - 5043:23

**control** [1] - 5025:8

**conversation** [35] - 4936:3, 4952:15, 5009:3, 5014:15, 5014:18, 5015:1, 5031:12, 5031:21, 5032:3, 5032:9, 5032:17, 5117:11, 5117:14, 5117:15, 5117:16, 5117:18, 5117:20, 5118:8, 5119:21, 5120:1, 5131:11, 5132:3, 5136:2, 5136:4, 5136:6, 5136:15, 5138:18, 5139:20, 5140:1, 5140:4, 5140:6, 5140:7, 5140:9, 5152:2

**conversations** [3] - 4949:21, 5012:13, 5135:24

**conversion** [8] - 5128:24, 5130:17, 5130:18, 5130:21, 5130:25, 5143:25, 5145:12, 5145:19

**conversions** [2] - 5128:17, 5130:9

**converted** [2] - 5130:12, 5143:1

**converts** [1] - 5143:21

**conveyed** [3] - 5003:20, 5009:8, 5014:7

**conveying** [2] -

5008:10, 5093:10

**convicted** [2] - 4941:19, 5022:13

**conviction** [4] - 4938:13, 4939:2, 4939:22, 4941:20

**convince** [1] - 4938:21

**convoluted** [1] - 5143:9

**COO** [2] - 5009:21, 5123:14

**Cook** [1] - 4958:24

**cooked** [1] - 5042:7

**cooperation** [2] - 4950:3, 4950:7

**Cooperman** [3] - 5060:25, 5094:23, 5140:6

**copied** [10] - 4958:24, 4984:15, 5032:4, 5033:6, 5060:18, 5065:1, 5067:23, 5068:8, 5112:19, 5116:24

**copies** [2] - 5029:10, 5150:20

**copy** [14] - 4952:11, 4952:20, 4952:21, 4953:12, 4953:17, 4953:18, 4953:24, 4998:3, 4998:5, 4998:7, 5031:22, 5127:13, 5127:14, 5140:21

**copying** [4] - 5000:12, 5009:11, 5014:14, 5035:4

**Corey** [7] - 5060:18, 5062:9, 5063:5, 5063:21, 5090:18, 5100:13, 5101:3

**corner** [1] - 5135:11

**corporate** [4] - 4965:18, 4968:24, 4969:2

**correct** [261] - 4950:22, 4956:6, 4956:12, 4956:15, 4956:25, 4957:2, 4957:7, 4957:16, 4958:16, 4958:19, 4958:21, 4958:24, 4958:25, 4959:2, 4959:5, 4959:7, 4959:13, 4959:20, 4959:23, 4960:3, 4960:9, 4960:11, 4960:16, 4960:18, 4961:9, 4961:17,

4961:23, 4961:25, 4962:4, 4962:10, 4962:12, 4963:11, 4963:22, 4964:7, 4964:9, 4964:15, 4964:17, 4964:20, 4964:23, 4964:25, 4965:9, 4965:15, 4965:18, 4966:4, 4966:8, 4966:15, 4967:6, 4967:8, 4968:22, 4969:15, 4969:18, 4969:20, 4970:2, 4970:16, 4970:20, 4971:5, 4971:7, 4971:19, 4972:7, 4972:10, 4972:19, 4972:21, 4973:4, 4973:6, 4973:9, 4973:15, 4973:18, 4973:22, 4974:4, 4974:15, 4974:18, 4976:9, 4978:9, 4980:19, 4980:22, 4981:5, 4983:6, 4983:8, 4983:10, 4983:13, 4986:5, 4986:8, 4986:24, 4988:3, 4988:5, 4988:8, 4988:11, 4988:14, 4988:19, 4988:22, 4990:11, 4996:13, 4996:15, 4999:8, 4999:9, 4999:10, 4999:11, 5016:7, 5016:15, 5027:8, 5027:12, 5027:15, 5027:18, 5027:21, 5028:2, 5028:8, 5028:12, 5028:16, 5029:2, 5029:6, 5030:5, 5030:9, 5031:10, 5032:5, 5033:23, 5034:8, 5035:13, 5036:15, 5037:2, 5037:8, 5037:12, 5037:18, 5038:3, 5038:4, 5043:7, 5047:6, 5047:12, 5048:9, 5048:12, 5048:18, 5048:21, 5048:24, 5049:2, 5049:10, 5049:16, 5049:17, 5049:19, 5049:22, 5049:23, 5049:24, 5050:3, 5052:11, 5052:25, 5053:11, 5055:16, 5058:19, 5058:25, 5059:1,

5061:1, 5063:11, 5063:19, 5066:10, 5066:24, 5066:25, 5067:15, 5067:23, 5068:11, 5068:23, 5069:10, 5072:18, 5073:5, 5073:6, 5073:8, 5086:20, 5086:23, 5087:15, 5088:6, 5089:4, 5090:4, 5091:17, 5092:6, 5092:9, 5092:12, 5093:11, 5095:9, 5095:10, 5097:24, 5098:14, 5098:15, 5100:17, 5100:20, 5101:23, 5102:7, 5102:13, 5102:24, 5104:14, 5104:20, 5105:3, 5106:20, 5107:5, 5107:6, 5108:11, 5109:4, 5110:4, 5110:8, 5110:13, 5110:15, 5110:18, 5111:10, 5111:24, 5112:20, 5113:12, 5113:21, 5114:5, 5114:6, 5114:7, 5114:9, 5114:20, 5115:2, 5116:5, 5116:7, 5116:9, 5119:18, 5120:11, 5120:12, 5120:15, 5120:16, 5120:22, 5121:15, 5121:19, 5122:23, 5125:8, 5125:21, 5125:23, 5126:15, 5126:21, 5128:22, 5128:24, 5129:10, 5129:12, 5129:21, 5130:21, 5131:6, 5132:3, 5132:4, 5132:6, 5132:7, 5133:15, 5134:5, 5134:8, 5134:20, 5135:16, 5135:19, 5135:22, 5136:3, 5137:5, 5137:13, 5137:23, 5138:25, 5141:14, 5144:3, 5145:13, 5145:17, 5145:25, 5147:19, 5148:15, 5149:11, 5150:2, 5150:14, 5150:21
**Correct** [3] - 5089:7, 5090:10, 5103:10
**correctly** [3] - 4939:15, 5063:14, 5119:22

**correspond** [1] - 4990:10
**correspondence** [2] - 5013:14, 5013:17
**corroborated** [1] - 5113:6
**Cotton** [2] - 4965:4, 5042:16
**Counsel** [1] - 5153:15
**counsel** [21] - 4935:2, 4940:18, 4948:13, 4949:21, 4951:12, 4952:3, 4952:12, 4952:15, 5039:20, 5040:10, 5040:16, 5048:14, 5048:20, 5081:15, 5082:3, 5082:6, 5083:6, 5083:25, 5084:18
**counsel's** [1] - 5082:16
**count** [2] - 4973:5, 4993:16
**counterclaims** [1] - 5020:17
**couple** [8] - 4955:5, 4978:13, 4990:5, 5011:15, 5011:20, 5023:14, 5078:15, 5142:20
**course** [7] - 4976:19, 4983:12, 4983:23, 4984:6, 4984:11, 4984:25, 5153:25
**Court** [7] - 4934:22, 4936:4, 4939:20, 5043:9, 5044:23, 5045:23
**COURT** [264] - 4934:1, 4935:2, 4935:14, 4935:22, 4936:8, 4936:11, 4936:23, 4936:25, 4939:14, 4940:14, 4941:9, 4944:6, 4944:9, 4945:15, 4945:21, 4946:16, 4947:25, 4948:19, 4949:1, 4949:15, 4949:18, 4950:18, 4950:21, 4950:23, 4951:3, 4951:6, 4951:9, 4951:13, 4952:2, 4952:17, 4953:16, 4954:2, 4954:4, 4954:12, 4954:17, 4954:21, 4954:25, 4955:3,

4955:17, 4958:10, 4964:1, 4964:5, 4967:10, 4968:6, 4968:10, 4968:17, 4968:19, 4969:12, 4970:18, 4970:24, 4972:3, 4972:15, 4974:13, 4975:8, 4975:13, 4975:17, 4975:20, 4976:3, 4976:6, 4977:18, 4977:20, 4978:10, 4979:11, 4980:12, 4980:21, 4980:23, 4981:3, 4981:7, 4981:10, 4982:12, 4983:1, 4983:19, 4984:1, 4984:10, 4985:9, 4985:21, 4985:25, 4986:20, 4986:25, 4987:11, 4987:13, 4987:20, 4987:23, 4988:25, 4994:1, 4994:5, 4994:9, 4994:14, 4994:19, 4994:23, 4995:4, 4997:10, 4998:4, 4999:23, 5000:10, 5000:23, 5000:25, 5002:3, 5002:6, 5002:13, 5002:20, 5002:25, 5003:4, 5003:7, 5003:16, 5003:19, 5005:25, 5006:13, 5007:9, 5008:8, 5008:14, 5009:4, 5012:24, 5013:24, 5019:16, 5019:25, 5020:6, 5021:2, 5021:5, 5022:24, 5024:17, 5024:24, 5025:23, 5026:1, 5026:12, 5027:1, 5027:23, 5029:13, 5029:23, 5030:11, 5030:14, 5032:8, 5038:2, 5038:8, 5038:18, 5038:21, 5039:3, 5039:7, 5039:20, 5040:1, 5040:13, 5041:11, 5041:24, 5042:1, 5042:12, 5043:6, 5043:20, 5044:3, 5044:16, 5044:21, 5045:25, 5046:12, 5046:18, 5047:2, 5048:7, 5051:2, 5053:17, 5054:13, 5056:19, 5056:22,

5060:16, 5061:4, 5062:14, 5064:23, 5065:6, 5067:20, 5068:5, 5069:4, 5069:9, 5073:24, 5076:19, 5076:21, 5077:6, 5077:8, 5078:4, 5078:8, 5078:10, 5078:14, 5079:5, 5079:8, 5079:16, 5079:19, 5079:24, 5080:1, 5080:5, 5080:9, 5080:11, 5081:6, 5082:1, 5084:6, 5084:8, 5084:10, 5084:23, 5085:3, 5086:2, 5088:13, 5090:16, 5091:12, 5094:19, 5095:15, 5096:5, 5096:10, 5096:14, 5096:17, 5096:20, 5097:8, 5100:10, 5100:24, 5103:13, 5104:2, 5105:9, 5105:16, 5108:2, 5108:6, 5110:16, 5111:1, 5111:6, 5111:16, 5115:14, 5115:16, 5118:12, 5118:15, 5119:1, 5119:8, 5119:11, 5119:15, 5120:8, 5121:12, 5122:15, 5123:12, 5123:16, 5126:17, 5127:2, 5127:13, 5127:25, 5128:2, 5128:5, 5128:9, 5129:16, 5129:19, 5129:22, 5130:4, 5131:21, 5132:19, 5132:23, 5140:16, 5141:20, 5142:6, 5150:1, 5150:7, 5151:2, 5151:6, 5151:10, 5152:8, 5152:13, 5152:15, 5153:9, 5153:13, 5153:23, 5154:2, 5154:10, 5154:13, 5154:17, 5154:19
**court** [17] - 4935:1, 4951:14, 4952:1, 4977:5, 5006:10, 5006:24, 5009:1, 5015:15, 5015:18, 5046:11, 5047:1, 5078:3, 5082:7, 5141:20, 5153:20, 5154:5, 5154:6

**court's** [3] - 5026:18, 5026:21, 5079:3
**courthouse** [1] - 5046:7
**Courthouse** [1] - 4934:5
**courtroom** [5] - 4954:3, 5046:7, 5077:9, 5086:1, 5127:14
**cover** [12] - 4963:20, 4965:14, 4967:22, 4976:15, 4977:3, 4980:8, 4981:8, 4981:15, 5021:9, 5151:21, 5151:23, 5152:11
**coverage** [2] - 5039:12, 5040:24
**covers** [6] - 4970:6, 5029:2, 5039:3, 5039:18, 5040:2, 5040:17
**covertly** [1] - 4940:6
**crazy** [2] - 5137:18, 5137:20
**create** [2] - 5058:18, 5076:11
**created** [6] - 5029:5, 5034:23, 5073:15, 5074:22, 5074:24, 5076:3
**creating** [3] - 5074:5, 5074:25, 5075:21
**creation** [1] - 5075:14
**credential** [1] - 5034:9
**credentials** [1] - 5033:24
**credibility** [7] - 4939:25, 4941:25, 4942:13, 5005:16, 5043:21, 5081:18, 5082:10
**credit** [1] - 5125:19
**crime** [36] - 4937:6, 4937:20, 4938:10, 4938:13, 4938:16, 4938:17, 4938:18, 4938:24, 4939:1, 4939:2, 4939:11, 4939:12, 4939:21, 4940:3, 4940:10, 4941:12, 4943:3, 4943:6, 4943:7, 4943:16, 4944:5, 4947:13, 4947:16, 4947:21, 4948:5, 4948:12, 4948:23,

4949:11, 5029:11,
5029:15, 5029:19,
5029:21, 5030:4,
5039:11, 5042:24
**crimes** [3] - 4947:14,
4948:25, 4949:12
**criminal** [7] - 4948:7,
4950:5, 4952:25,
4953:8, 5051:10,
5051:19, 5079:10
**crooked** [1] -
5106:18
**CROSS** [9] -
4955:20, 4967:1,
4986:1, 5027:3,
5086:9, 5145:1,
5155:4, 5155:6,
5155:10
**cross** [34] - 4936:1,
4936:17, 4938:7,
4938:15, 4938:17,
4938:20, 4939:9,
4939:23, 4939:25,
4941:2, 4941:16,
4942:4, 4942:9,
4943:2, 4943:10,
4943:14, 4944:3,
4944:10, 4946:15,
4947:2, 4947:11,
4949:15, 4950:4,
4950:9, 4950:12,
4950:24, 4955:19,
5005:1, 5027:1,
5039:13, 5041:3,
5085:5, 5086:5,
5153:16
**CROSS-
EXAMINATION** [4] -
4955:20, 4986:1,
5155:4, 5155:6
**cross-examination**
[18] - 4936:12,
4936:17, 4938:15,
4941:2, 4942:4,
4943:2, 4943:14,
4944:3, 4944:10,
4946:15, 4947:2,
4947:11, 4950:4,
4950:9, 4950:24,
4955:19, 5041:3,
5085:5
**cross-examine** [5] -
4938:17, 4939:23,
4939:25, 4942:9,
4943:10
**cross-examined** [2]
- 4938:7, 5005:1
**cross-examining**
- 4941:16, 5039:13
**CRUTCHER** [1] -

4934:17
**cry** [1] - 5014:6
**cure** [1] - 4943:18
**current** [2] -
5084:13, 5089:25
**custodian** [3] -
4977:12, 4978:25,
4985:14
**cut** [2] - 5040:25,
5096:7

---

**D**

---

**DARA** [2] - 5087:7,
5088:9
**date** [102] - 4941:6,
4957:6, 4964:2,
4964:7, 4986:3,
4986:4, 5017:25,
5040:8, 5040:12,
5040:25, 5043:24,
5054:11, 5054:18,
5054:24, 5055:19,
5055:22, 5056:10,
5056:12, 5056:16,
5056:17, 5057:8,
5057:21, 5060:10,
5065:17, 5066:4,
5066:8, 5066:9,
5067:10, 5067:12,
5070:14, 5070:16,
5071:9, 5071:25,
5073:7, 5073:9,
5073:11, 5076:4,
5092:22, 5093:13,
5093:14, 5093:23,
5093:24, 5094:2,
5094:5, 5094:6,
5094:10, 5094:14,
5094:16, 5095:2,
5098:8, 5098:10,
5101:12, 5101:15,
5102:15, 5102:24,
5103:7, 5103:11,
5103:15, 5103:19,
5103:21, 5103:24,
5104:6, 5104:10,
5104:13, 5104:17,
5104:19, 5107:14,
5107:18, 5108:2,
5108:12, 5108:15,
5108:16, 5108:18,
5108:25, 5109:11,
5110:10, 5110:11,
5110:12, 5110:19,
5111:3, 5114:5,
5114:6, 5114:8,
5114:14, 5114:16,
5114:20, 5114:23,
5116:24, 5120:11,
5120:22, 5121:8,

5125:4, 5125:11,
5125:13, 5125:16,
5126:23, 5136:4
**dated** [27] - 4952:21,
4956:10, 4956:24,
4961:19, 4962:9,
4966:4, 4966:7,
4966:10, 4969:15,
4976:7, 5048:12,
5054:15, 5059:8,
5060:19, 5080:19,
5090:19, 5093:22,
5100:13, 5102:13,
5107:14, 5109:9,
5111:11, 5113:24,
5120:22, 5120:23,
5121:4
**dates** [8] - 4986:10,
5031:2, 5033:10,
5039:21, 5056:6,
5076:11, 5104:1
**dating** [7] - 5055:6,
5060:10, 5060:21,
5076:1, 5112:22,
5112:23
**DAVID** [2] - 4934:14,
4934:14
**daylight** [1] -
5114:17
**days** [3] - 5010:2,
5023:14, 5079:1
**deal** [1] - 5154:3
**debate** [1] - 5043:16
**debated** [1] - 4943:9
**debts** [2] - 5010:22,
5011:17
**December** [68] -
4942:17, 4942:18,
4952:11, 4953:3,
4996:25, 4997:4,
4997:19, 4998:20,
5012:22, 5016:18,
5018:2, 5026:16,
5028:1, 5029:4,
5030:8, 5031:2,
5031:21, 5037:4,
5037:10, 5039:17,
5044:7, 5047:5,
5047:21, 5051:13,
5052:4, 5058:18,
5059:8, 5059:9,
5060:19, 5062:8,
5062:20, 5063:17,
5063:19, 5064:21,
5065:1, 5067:22,
5068:7, 5073:11,
5073:12, 5073:16,
5074:12, 5074:22,
5075:22, 5078:24,
5079:6, 5079:9,

5081:24, 5082:9,
5084:12, 5126:20,
5128:12, 5129:19,
5132:8, 5132:17,
5132:21, 5133:12,
5134:19, 5140:21,
5141:23, 5142:4,
5142:8, 5142:13,
5143:17, 5145:7,
5147:8, 5147:25,
5150:11
**decide** [2] - 4946:10,
5023:3
**decided** [1] -
5039:12
**decision** [3] -
4944:24, 4952:13,
5040:5
**declarant** [13] -
5002:12, 5002:14,
5002:21, 5002:22,
5004:15, 5005:6,
5005:11, 5005:12,
5005:16, 5005:21,
5007:3, 5007:4
**declarant's** [1] -
5004:23
**decline** [1] - 5082:24
**decorum** [1] -
5046:13
**decreased** [1] -
5142:24
**deep** [1] - 5154:1
**deeply** [1] - 5147:13
**defaulted** [3] -
5036:20, 5036:21,
5143:24
**Defendant** [2] -
4934:7, 4934:17
**defendant** [7] -
4937:9, 4941:17,
4944:19, 4946:5,
4946:7, 4950:4
**Defendant's** [12] -
4957:20, 4958:8,
4958:10, 4959:9,
5091:13, 5096:21,
5100:25, 5105:17,
5131:17, 5140:17,
5141:20, 5150:9
**defendant's** [1] -
4946:5
**defense** [29] -
4935:6, 4936:12,
4937:5, 4938:16,
4938:19, 4944:13,
4945:20, 4945:24,
4945:25, 4946:3,
4946:6, 4946:9,
4948:13, 4951:12,

5081:24, 5082:9,
4952:12, 4952:15,
4958:8, 4976:12,
4977:17, 4980:3,
4987:15, 5006:1,
5006:7, 5006:11,
5017:2, 5041:7,
5065:6, 5068:5,
5080:12
**Defense** [18] -
4967:18, 4968:4,
4976:7, 4983:3,
4985:4, 4987:6,
4987:24, 5030:15,
5061:4, 5062:14,
5067:18, 5096:20,
5100:24, 5103:5,
5103:22, 5105:10,
5105:16, 5150:7
**defense's** [1] -
4939:5
**deficit** [1] - 5019:7
**define** [2] - 4999:24,
5054:13
**defining** [1] - 4939:1
**definitely** [2] -
4940:16, 4979:14
**defraud** [1] - 4937:18
**Delaware** [1] -
5092:3
**delay** [1] - 5153:21
**delays** [1] - 5153:24
**delete** [7] - 4986:22,
5059:16, 5059:24,
5060:1, 5062:1,
5062:2, 5063:1
**delicacy** [1] -
5154:12
**Denerstein** [13] -
4955:18, 4964:1,
4968:20, 4972:3,
4972:16, 4977:3,
4978:22, 4982:5,
4984:13, 4985:10,
4989:5, 4989:6,
4994:1
**DENERSTEIN** [43] -
4934:20, 4955:21,
4958:7, 4964:4,
4967:2, 4967:11,
4968:3, 4968:7,
4968:11, 4968:18,
4969:22, 4973:1,
4974:21, 4975:7,
4975:10, 4975:16,
4976:5, 4976:9,
4976:13, 4977:19,
4978:9, 4979:13,
4980:10, 4980:13,
4980:19, 4980:22,
4981:5, 4981:24,

4982:13, 4983:2, 4984:14, 4985:3, 4985:24, 4986:2, 4986:15, 4987:1, 4987:5, 4987:9, 4987:17, 4988:24, 4989:6, 4994:2, 4994:4

**deny** [3] - 5047:4, 5047:7, 5047:8

**denying** [2] - 5047:12, 5047:20

**departed** [1] - 5032:24

**department** [4] - 4968:25, 4969:3, 4969:4, 4969:8

**departure** [3] - 4953:3, 5018:18, 5051:12

**describe** [1] - 4989:25

**described** [2] - 4968:13, 5135:24

**describes** [1] - 4957:4

**describing** [2] - 4990:17, 4990:21

**description** [1] - 4966:17

**descriptions** [1] - 4990:15

**deserved** [5] - 5146:2, 5148:19, 5148:23, 5148:25, 5149:1

**desk** [5] - 5072:15, 5107:12, 5121:20, 5121:22, 5121:23

**details** [2] - 5058:24, 5148:16

**determination** [1] - 5011:1

**determined** [1] - 5017:9

**development** [1] - 5087:14

**DeVita** [5] - 4956:17, 4956:20, 4961:25, 4962:18, 4963:10

**Diego** [1] - 5087:2

**difference** [5] - 4967:3, 4967:9, 4967:12, 4967:15, 5119:24

**different** [21] - 4965:6, 4965:20, 4970:6, 4970:7, 4973:20, 4974:6, 4974:8, 4974:10,

4982:8, 4989:24, 4990:13, 4990:15, 4990:18, 5003:13, 5041:16, 5044:12, 5050:14, 5122:5, 5123:24

**differential** [2] - 5114:19, 5114:21

**differently** [1] - 4989:25

**diluted** [1] - 5145:20

**diluting** [1] - 5146:4

**dire** [2] - 4985:8, 4985:9

**DIRE** [2] - 4985:12, 5155:5

**DIRECT** [2] - 4996:4, 5155:9

**direct** [11] - 4942:15, 4943:20, 4944:13, 4949:15, 4963:24, 4965:20, 4980:15, 4994:25, 5005:2, 5027:8, 5101:2

**directed** [1] - 5062:21

**directing** [3] - 5118:17, 5119:9, 5119:20

**direction** [1] - 4940:19

**directly** [7] - 4941:25, 4942:12, 4944:12, 4948:5, 4948:8, 5041:22, 5081:14

**directors** [3] - 4941:15, 4941:23, 5142:1

**directorship** [1] - 5142:2

**disagree** [2] - 4979:15, 5139:23

**disallow** [1] - 5023:4

**disappear** [1] - 5137:21

**disappointed** [1] - 5148:9

**disclose** [1] - 5081:4

**discounted** [1] - 5147:13

**discovery** [2] - 5096:16, 5140:25

**Discovery/Coface** [2] - 5010:22, 5012:2

**discuss** [7] - 4936:21, 4936:23, 5015:23, 5041:1, 5044:2, 5131:9, 5143:5

**discussed** [11] - 4935:25, 4945:9, 4952:24, 4971:17, 4979:16, 4987:14, 4996:8, 5051:8, 5112:22, 5148:11, 5148:12

**discussing** [2] - 4971:22, 5000:16

**discussion** [5] - 4978:15, 4987:18, 5016:12, 5117:25, 5130:3

**discussions** [1] - 5016:18

**dismiss** [4] - 5138:3, 5138:7, 5138:13, 5138:16

**dismissed** [4] - 5021:11, 5080:4, 5138:2, 5138:23

**disputable** [1] - 5014:10

**dispute** [2] - 4979:23, 4979:24

**disputing** [2] - 4946:16, 4948:1

**disruptive** [1] - 5046:5

**distinct** [2] - 5074:25, 5075:2

**distinction** [4] - 4945:17, 4946:12, 4946:13, 4946:17

**DISTRICT** [3] - 4934:1, 4934:1, 4934:10

**District** [2] - 4945:23, 5020:21

**disturbed** [1] - 4948:9

**docket** [2] - 4952:25, 5051:10

**document** [124] - 4968:13, 4976:24, 4977:14, 4979:7, 4982:6, 4983:20, 4986:8, 4987:14, 4998:7, 4998:10, 5000:7, 5003:25, 5004:10, 5004:11, 5004:21, 5005:3, 5005:4, 5005:18, 5006:5, 5006:23, 5007:8, 5007:19, 5009:7, 5009:13, 5013:19, 5021:22, 5021:25, 5022:6, 5022:10, 5022:16, 5023:5, 5023:7,

5023:11, 5023:13, 5023:17, 5023:22, 5030:10, 5030:12, 5035:3, 5035:4, 5038:16, 5044:11, 5044:17, 5044:19, 5044:24, 5044:25, 5045:3, 5045:7, 5047:14, 5054:5, 5054:9, 5054:16, 5054:18, 5054:21, 5054:24, 5055:20, 5056:12, 5056:15, 5057:1, 5057:7, 5057:17, 5057:18, 5057:20, 5059:5, 5059:7, 5059:8, 5059:18, 5060:6, 5060:8, 5060:9, 5060:12, 5060:17, 5064:17, 5065:2, 5067:14, 5069:23, 5073:16, 5074:6, 5074:10, 5074:12, 5074:18, 5075:3, 5075:20, 5075:25, 5076:2, 5076:4, 5086:7, 5090:25, 5091:3, 5093:17, 5096:6, 5096:11, 5103:6, 5103:21, 5104:3, 5106:16, 5108:13, 5108:15, 5108:20, 5109:8, 5109:16, 5110:13, 5110:19, 5110:20, 5110:23, 5111:11, 5113:9, 5116:11, 5116:23, 5122:6, 5122:23, 5125:15, 5127:8, 5127:9, 5127:24, 5130:13, 5132:14, 5140:20, 5140:25, 5141:1, 5151:24

**document-by-document** [1] - 4979:7

**documentation** [4] - 5055:15, 5059:16, 5091:16, 5091:19

**documented** [4] - 5010:1, 5010:25, 5011:3, 5012:16

**documents** [62] - 4940:7, 4942:19, 4979:24, 5004:16, 5004:18, 5005:10, 5005:14, 5005:25, 5006:1, 5006:7, 5010:25, 5011:4,

5011:8, 5011:10, 5011:13, 5011:14, 5013:11, 5014:19, 5014:20, 5015:2, 5015:4, 5029:10, 5029:17, 5031:7, 5031:13, 5031:22, 5031:25, 5032:5, 5032:11, 5032:18, 5032:24, 5033:7, 5034:20, 5034:24, 5034:25, 5036:3, 5036:6, 5037:25, 5038:5, 5038:12, 5040:6, 5045:21, 5045:22, 5052:22, 5053:3, 5054:2, 5055:12, 5055:14, 5056:6, 5064:10, 5068:11, 5068:13, 5069:12, 5071:22, 5072:14, 5076:7, 5076:14, 5076:15, 5104:3, 5151:12, 5151:20, 5152:5

**dollar** [1] - 5074:16

**dollars** [14] - 4959:20, 5012:7, 5013:9, 5014:5, 5014:7, 5015:25, 5017:13, 5017:15, 5017:18, 5021:8, 5071:15, 5075:7, 5075:13

**done** [10] - 4947:21, 5004:2, 5063:7, 5063:10, 5084:14, 5120:18, 5133:16, 5139:16, 5146:17, 5146:18

**donee** [8] - 5093:5, 5094:23, 5100:20, 5102:5, 5103:23, 5107:24, 5109:21, 5126:8

**double** [1] - 5063:5

**doubt** [1] - 5098:14

**down** [33] - 4944:19, 4962:15, 4969:12, 4973:1, 4973:17, 4974:21, 4975:17, 4991:17, 4999:14, 5005:13, 5010:18, 5012:7, 5012:8, 5023:7, 5023:11, 5023:13, 5023:15, 5029:23, 5033:6, 5034:11, 5034:14, 5035:4, 5049:21, 5065:18, 5065:20,

5065:22, 5076:22, 5077:6, 5087:4, 5106:15, 5136:20, 5147:10, 5152:20
**downloaded** [1] - 5044:12
**downstairs** [1] - 4935:10
**draw** [3] - 4944:16, 4944:18, 4944:23
**drawer** [1] - 5074:8
**drawing** [1] - 5024:16
**drawn** [3] - 4946:7, 5024:23, 5083:5
**dropped** [3] - 5072:14, 5107:12, 5108:20
**DUBIN** [8] - 4934:21, 5040:9, 5040:14, 5043:2, 5043:8, 5080:3, 5080:8, 5127:17
**due** [3] - 4962:12, 5089:14
**duly** [1] - 4996:2
**DUNN** [1] - 4934:17
**during** [21] - 4961:1, 4962:16, 4964:14, 4964:19, 4964:22, 4970:8, 4971:2, 4972:25, 4973:8, 4984:15, 5012:1, 5014:18, 5027:7, 5031:12, 5031:20, 5032:9, 5033:14, 5048:2, 5073:23, 5075:3, 5118:21
**duties** [1] - 5009:21
**DX** [44] - 4957:20, 4959:9, 5048:4, 5048:5, 5048:7, 5060:14, 5062:7, 5064:24, 5070:9, 5070:10, 5070:12, 5072:8, 5072:24, 5127:3, 5127:8, 5128:2, 5128:9, 5128:11, 5130:8, 5131:21, 5132:25, 5134:1, 5150:4, 5150:25, 5151:8, 5155:13, 5155:14, 5155:14, 5155:15, 5155:15, 5155:16, 5155:16, 5155:17, 5155:17, 5155:18, 5155:18, 5155:19, 5155:19, 5155:20, 5155:20

**DX-106-41** [1] - 4976:7
**DX-111-103** [5] - 5090:17, 5090:25, 5091:12, 5091:23, 5093:6
**DX-111-104** [3] - 5095:16, 5095:17, 5098:2
**DX-111-105** [1] - 5100:11
**DX-111-31** [1] - 5151:8
**DX-111-37** [1] - 5150:25

---

# E

**e-mail** [148] - 4956:5, 4956:8, 4956:23, 4956:24, 4957:2, 4957:4, 4958:3, 4958:14, 4958:15, 4958:23, 4959:10, 4959:11, 4959:15, 4959:18, 4960:1, 4960:20, 4967:22, 4969:17, 4971:20, 4976:10, 4976:17, 4976:20, 4977:4, 4977:6, 4977:8, 4977:9, 4978:1, 4978:14, 4979:4, 4980:11, 4980:12, 4980:13, 4981:10, 4981:18, 4982:9, 4983:5, 4983:6, 4983:10, 4983:15, 4983:22, 4983:23, 4984:6, 4984:16, 4986:4, 4986:7, 4986:12, 4986:22, 4986:24, 4988:2, 4988:22, 4989:13, 4989:15, 4989:18, 4989:19, 4996:9, 4996:11, 4996:20, 4997:18, 4999:15, 4999:17, 5000:12, 5000:21, 5001:1, 5001:2, 5002:17, 5002:18, 5002:19, 5003:5, 5004:13, 5005:7, 5005:21, 5007:4, 5009:8, 5009:10, 5013:11, 5014:14, 5015:12, 5017:7, 5023:6, 5023:9, 5026:16, 5035:7, 5061:6, 5061:9, 5062:7,
**e-mailed** [1] - 5131:14
**e-mailing** [1] - 5131:23
**e-mails** [22] - 4949:23, 4959:22, 4978:25, 4983:13, 4984:19, 4984:23, 4985:15, 4985:18, 4986:13, 4986:16, 5011:1, 5011:4, 5011:8, 5036:15, 5036:18, 5042:10, 5042:15, 5090:8, 5091:1, 5103:2, 5133:19, 5147:17
**early** [1] - 4989:23
**easily** [1] - 4946:18
**East** [2] - 4934:15, 4934:23
**Eastern** [1] - 5133:17
**EASTERN** [1] - 4934:1
**Ed** [5] - 5026:9, 5060:4, 5060:18, 5067:23, 5068:8
**effect** [8] - 4947:11, 4947:20, 5002:7, 5002:8, 5002:14, 5128:17, 5130:10, 5131:1

**effective** [6] - 5086:19, 5092:5, 5093:24, 5094:3, 5094:16, 5105:2
**effectively** [1] - 4939:23
**effort** [1] - 5139:13
**eight** [5] - 4990:4, 5010:2, 5017:13, 5017:15, 5105:23
**eighty** [3] - 5072:20, 5075:7, 5075:13
**either** [12] - 4939:5, 4948:12, 4977:15, 5047:13, 5049:20, 5115:24, 5116:1, 5116:3, 5116:10, 5122:12, 5149:15, 5152:10
**electronic** [3] - 5030:3, 5037:16, 5041:19
**electronically** [1] - 5127:15
**element** [1] - 4937:18
**elements** [5] - 4937:23, 4977:13, 4978:23, 4978:25, 4985:6
**elicit** [1] - 4950:19
**elicited** [6] - 4942:15, 4942:16, 4942:17, 4942:22, 4949:16, 4977:21
**eligible** [1] - 5025:13
**emoting** [1] - 5007:13
**employee** [3] - 4986:22, 5010:7, 5131:2
**employees** [2] - 4986:13, 4986:17
**employer** [5] - 5010:7, 5010:18, 5010:20, 5011:15, 5078:17
**employment** [13] - 5009:22, 5010:6, 5015:14, 5018:18, 5090:12, 5091:17, 5091:22, 5091:25, 5092:2, 5092:22, 5095:6, 5105:21, 5106:4
**enclosed** [1] - 4988:17
**end** [14] - 4948:17, 4950:16, 4957:7, 4960:24, 4969:23,

**effective** [6] -
**4996:19, 5015:7, 5027:8, 5038:17, 5101:8, 5145:5, 5145:21, 5150:12, 5151:5
**ending** [3] - 4961:21, 4962:15, 5040:7
**ends** [3] - 4960:24, 5008:15, 5143:4
**enforcement** [1] - 4996:14
**engaged** [2] - 5003:14, 5042:7
**engagement** [6] - 4956:20, 4961:16, 4971:18, 4972:8, 4972:11
**enrollment** [1] - 5087:8
**enter** [1] - 5147:15
**entered** [3] - 4997:20, 5012:6, 5034:20
**enters** [1] - 5086:1
**enticed** [1] - 5013:8
**entire** [2] - 5033:21, 5037:21
**entirely** [1] - 4942:21
**entities** [6] - 5011:20, 5011:23, 5012:1, 5020:11, 5026:19, 5026:20
**entitled** [1] - 4944:25
**entitles** [1] - 5009:23
**entity** [2] - 5023:20, 5023:23
**entries** [5] - 4966:12, 4970:4, 4971:1, 4990:5, 4990:10
**entry** [7] - 4966:15, 4990:7, 4991:7, 4991:11, 4992:4, 4992:7, 4993:1
**equity** [3] - 5062:6, 5062:23, 5074:24
**Eric** [3] - 5003:14, 5013:15, 5013:17
**especially** [7] - 4943:4, 4946:6, 4976:23, 5010:19, 5040:20, 5043:3, 5083:6
**ESQ** [6] - 4934:19, 4934:19, 4934:20, 4934:20, 4934:21, 4934:21
**essentially** [1] - 5072:25
**establish** [6] - 4979:4, 4979:8,

4981:12, 4982:2, 4985:10, 4985:22
**established** [3] - 4977:13, 4985:7, 4987:8
**estate** [2] - 4962:4, 5141:6
**estimate** [2] - 5050:8, 5153:17
**etcetera** [1] - 5010:23
**Evan** [24] - 4952:25, 4953:6, 4956:6, 4956:24, 4958:16, 4964:19, 4970:8, 4971:2, 4984:15, 4988:2, 5009:10, 5009:17, 5009:21, 5014:19, 5015:11, 5018:4, 5018:13, 5018:15, 5018:24, 5051:10, 5051:17, 5068:19, 5068:21, 5146:22
**EVAN** [1] - 4934:6
**evening** [2] - 4935:5, 5154:20
**event** [9] - 5055:7, 5055:8, 5057:12, 5074:2, 5076:1, 5076:13, 5076:14, 5076:18, 5123:19
**events** [4] - 4990:18, 5053:10, 5076:12
**evidence** [51] - 4941:16, 4941:18, 4950:1, 4955:25, 4956:5, 4956:22, 4961:15, 4965:21, 4965:23, 4966:1, 4968:19, 4971:12, 4971:20, 4973:13, 4977:2, 4977:7, 4995:7, 4998:5, 5005:6, 5005:8, 5005:21, 5026:15, 5028:5, 5040:11, 5040:19, 5042:5, 5043:22, 5044:24, 5045:2, 5045:8, 5045:10, 5045:17, 5045:23, 5048:5, 5058:5, 5064:12, 5072:25, 5086:7, 5086:12, 5089:24, 5090:25, 5091:14, 5096:22, 5101:1, 5105:18, 5125:19, 5134:18, 5147:7, 5150:8, 5150:9,

5151:23
**exact** [2] - 4966:18, 5017:16
**exactly** [5] - 4945:22, 5003:23, 5019:21, 5112:6, 5127:20
**EXAMINATION** [15] - 4955:20, 4967:1, 4985:12, 4986:1, 4989:3, 4996:4, 5027:3, 5086:9, 5145:1, 5155:4, 5155:5, 5155:6, 5155:7, 5155:9, 5155:10
**examination** [24] - 4936:12, 4936:17, 4938:15, 4941:2, 4942:4, 4942:15, 4943:2, 4943:14, 4943:21, 4944:3, 4944:10, 4946:15, 4947:2, 4947:11, 4950:4, 4950:9, 4950:24, 4955:19, 4995:1, 5005:2, 5027:9, 5041:3, 5080:1, 5085:5
**examine** [6] - 4938:17, 4939:23, 4939:25, 4942:9, 4943:10, 4954:1
**examined** [2] - 4938:7, 5005:1
**examining** [2] - 4941:16, 5039:13
**example** [6] - 4942:5, 4943:8, 4959:6, 4963:16, 5076:3, 5149:17
**examples** [3] - 5005:19, 5007:3, 5007:6
**exceeded** [1] - 4937:12
**Excel** [2] - 5127:10, 5127:22
**except** [3] - 4953:8, 5051:19, 5096:2
**exception** [6] - 4976:15, 4979:6, 4981:13, 4982:5, 5006:18, 5008:4
**excerpt** [1] - 5127:10
**excess** [1] - 5013:9
**exchange** [7] - 4951:1, 4956:5, 4967:22, 5015:24, 5017:11, 5075:13, 5109:3

**Exchange** [1] - 5013:15
**exchanged** [2] - 5042:11, 5042:16
**exchanges** [4] - 4957:24, 4957:25, 4958:2, 4971:21
**excuse** [2] - 5003:2, 5038:18
**excused** [4] - 4994:5, 4994:8, 5077:5, 5077:7
**execute** [1] - 5109:25
**executed** [14] - 5067:11, 5071:3, 5071:6, 5071:7, 5074:12, 5092:22, 5093:2, 5094:10, 5095:4, 5103:15, 5104:5, 5104:16, 5104:19, 5125:10
**executive** [3] - 4972:6, 5086:13, 5086:19
**executives** [2] - 4971:25, 5089:25
**exhibit** [19] - 4942:20, 4953:22, 4974:3, 4976:3, 4977:9, 4980:23, 4981:11, 4981:16, 4984:2, 4984:4, 4993:10, 4993:15, 4998:8, 5006:14, 5039:16, 5065:6, 5068:5, 5070:9, 5127:17
**Exhibit** [82] - 4955:24, 4956:4, 4956:22, 4957:20, 4958:8, 4958:10, 4959:9, 4961:15, 4962:6, 4963:19, 4966:1, 4966:3, 4966:6, 4966:9, 4967:4, 4967:13, 4967:14, 4967:18, 4968:4, 4968:12, 4969:14, 4972:17, 4973:13, 4974:14, 4974:17, 4974:20, 4976:7, 4977:15, 4983:4, 4985:4, 4987:6, 4987:16, 4987:24, 4990:2, 4991:5, 4991:25, 4992:22, 4993:14, 4995:7, 4999:14, 4999:15, 4999:22,

5000:2, 5000:4, 5000:9, 5000:19, 5009:3, 5009:6, 5023:18, 5026:14, 5030:15, 5058:5, 5061:4, 5062:15, 5064:3, 5067:19, 5086:6, 5086:11, 5089:23, 5091:13, 5096:20, 5096:21, 5100:24, 5100:25, 5103:5, 5103:22, 5105:10, 5105:16, 5105:17, 5106:9, 5106:11, 5106:19, 5116:21, 5117:4, 5120:9, 5131:17, 5132:22, 5134:18, 5140:17, 5141:20, 5150:7, 5150:9
**Exhibits** [1] - 4965:23
**EXHIBITS** [1] - 5155:12
**exhibits** [7] - 4942:19, 4957:22, 4965:21, 4966:12, 4976:10, 5006:11, 5151:14
**exist** [1] - 5111:9
**existed** [3] - 5110:7, 5112:10, 5112:13
**expectation** [1] - 5012:16
**expectations** [1] - 5010:6
**expected** [2] - 5148:5, 5148:13
**experience** [1] - 5088:7
**Experiment** [1] - 5038:17
**expert** [3] - 4986:12, 5041:7, 5123:20
**expertise** [2] - 4990:19, 5143:9
**explain** [4] - 4960:1, 5022:24, 5044:24, 5143:11
**explained** [1] - 5018:17
**explaining** [4] - 5045:2, 5056:5, 5119:24, 5145:8
**explains** [1] - 5083:9
**explanation** [1] - 5024:18
**exploring** [1] - 5084:12
**exposure** [1] -

4950:5
**express** [1] - 5080:3
**extent** [12] - 4938:5, 4941:1, 4943:25, 4950:15, 4951:11, 4952:10, 4977:20, 5025:1, 5037:21, 5039:14, 5042:3, 5046:13
**external** [2] - 5055:2, 5068:10
**extra** [2] - 4938:8, 5076:23
**extrinsic** [3] - 5042:5, 5044:24, 5045:2
**eye** [4] - 5039:19, 5045:12, 5045:13, 5045:25
**eyes** [1] - 5046:15
**eyesight** [1] - 5122:16

**F**

**faces** [1] - 5046:14
**facing** [1] - 4943:19
**fact** [32] - 4937:8, 4937:9, 4937:13, 4937:15, 4938:9, 4942:10, 4943:24, 4946:13, 4948:11, 4948:22, 4950:4, 4967:3, 4977:14, 4978:20, 4979:22, 4979:24, 4980:1, 4980:17, 4981:18, 4982:9, 5002:9, 5013:13, 5015:1, 5016:22, 5023:1, 5040:22, 5053:14, 5082:2, 5084:24, 5110:19, 5111:8, 5154:4
**facts** [6] - 4949:13, 4949:16, 4949:17, 4950:1, 5014:10, 5025:1
**failing** [2] - 5010:4, 5010:12
**fair** [13] - 4938:1, 4938:7, 4947:25, 4948:1, 4971:2, 5053:23, 5078:23, 5091:6, 5117:19, 5131:13, 5139:15, 5140:11, 5148:9
**fairly** [1] - 5149:3
**faith** [13] - 4938:1, 4939:4, 4940:17,

4940:19, 5041:12, 5041:14, 5042:23, 5042:24, 5043:5, 5043:10, 5045:15, 5045:19, 5045:21
**false** [6] - 4953:10, 4953:11, 4999:2, 4999:12, 5051:20, 5051:21
**familiar** [5] - 4984:16, 5046:9, 5046:10, 5056:24, 5123:21
**far** [8] - 5014:6, 5017:19, 5041:22, 5043:19, 5053:11, 5057:3, 5099:24, 5099:25
**faster** [1] - 5079:13
**favorable** [1] - 4951:1
**FBI** [7] - 5031:6, 5031:10, 5031:20, 5032:9, 5033:13, 5033:14, 5053:19
**fear** [1] - 4947:20
**Fearnow** [35] - 5026:7, 5026:10, 5134:17, 5134:23, 5135:3, 5135:12, 5135:14, 5135:16, 5135:19, 5135:22, 5135:25, 5136:17, 5136:19, 5137:2, 5138:1, 5139:21, 5140:12, 5141:14, 5143:1, 5143:10, 5143:18, 5145:8, 5145:16, 5146:25, 5147:4, 5147:5, 5147:9, 5147:12, 5148:5, 5148:10, 5149:10, 5149:14, 5150:18, 5150:22
**February** [13] - 4942:20, 4972:18, 4973:14, 4974:24, 4991:6, 4992:1, 4992:23, 5036:7, 5074:24, 5075:1, 5075:4, 5088:20, 5088:25
**federal** [6] - 4936:19, 4937:6, 4938:9, 4938:24, 5042:24, 5084:17
**fee** [1] - 5088:5
**fees** [3] - 5014:7, 5019:8, 5021:16
**felonies** [1] -

5084:17
**felt** [2] - 5146:2, 5146:4
**Fernandez** [2] - 5026:8, 5133:6
**few** [6] - 5010:23, 5013:5, 5049:22, 5050:10, 5118:9, 5131:13
**Fifth** [37] - 4936:13, 4939:24, 4940:13, 4940:18, 4943:19, 4943:22, 4944:17, 4944:22, 4945:7, 4945:13, 4946:4, 4946:9, 4946:15, 4946:19, 4947:3, 4948:11, 4948:17, 4948:18, 4949:3, 4949:7, 4950:17, 4950:20, 4953:14, 5039:8, 5044:4, 5044:18, 5081:16, 5082:4, 5082:14, 5082:25, 5083:7, 5083:9, 5083:10, 5083:16, 5084:1, 5084:20
**fifth** [1] - 5081:23
**fight** [1] - 5052:10
**figure** [3] - 5046:3, 5153:7, 5153:8
**file** [3] - 5019:17, 5022:11, 5127:19
**filed** [7] - 5015:14, 5019:20, 5019:22, 5019:23, 5021:12, 5025:15, 5025:16
**files** [2] - 5010:1, 5141:3
**filing** [1] - 5025:14
**fill** [3] - 5058:21, 5058:24, 5152:25
**filled** [10] - 5022:14, 5058:23, 5069:17, 5069:18, 5069:20, 5070:5, 5072:18, 5072:20, 5073:9, 5073:11
**final** [5] - 4966:9, 4966:18, 5128:12, 5128:13, 5128:16
**finally** [2] - 4990:23, 4993:10
**finance** [1] - 5088:17
**financing** [1] - 5089:24
**finders** [1] - 5022:25
**fine** [11] - 4941:2, 4943:22, 4949:17,

4953:14, 4954:9, 4955:8, 5008:11, 5008:12, 5043:23, 5149:6, 5151:7
**finish** [2] - 4976:13, 5153:1
**finished** [1] - 5142:14
**fired** [2] - 4949:24, 4997:4
**firing** [2] - 5138:19, 5138:21
**firm** [1] - 5020:20
**firms** [1] - 4979:20
**First** [1] - 4973:24
**first** [52] - 4978:14, 4981:10, 4981:11, 4981:18, 4982:7, 4984:4, 4984:12, 4986:5, 4986:15, 4987:1, 4987:13, 4991:5, 4995:6, 5009:20, 5012:12, 5013:5, 5015:22, 5016:19, 5041:4, 5048:17, 5051:8, 5061:19, 5065:12, 5066:17, 5067:3, 5068:14, 5070:10, 5071:16, 5071:18, 5079:1, 5082:11, 5082:13, 5086:8, 5086:18, 5088:20, 5091:22, 5091:24, 5092:23, 5093:13, 5094:7, 5096:23, 5099:1, 5122:10, 5134:22, 5135:13, 5135:16, 5136:2, 5136:4, 5136:6, 5141:9, 5147:21
**fiscal** [3] - 4957:7, 4960:24, 4974:24
**five** [19] - 4954:15, 4954:21, 4962:14, 4977:11, 5014:5, 5019:6, 5049:2, 5053:15, 5077:3, 5091:6, 5120:21, 5121:6, 5121:7, 5128:21, 5131:7, 5136:16, 5137:25, 5138:18, 5139:20
**fixed** [2] - 4969:13, 5096:4
**Floor** [1] - 4934:17
**focusing** [1] - 5111:2
**folder** [2] - 5095:3, 5095:5
**folders** [2] - 5075:3,

5151:17
**folks** [1] - 5026:3
**follow** [3] - 4947:6, 5059:17, 5084:19
**followed** [3] - 5097:16, 5100:4
**following** [12] - 4947:21, 4953:2, 4975:22, 4976:1, 4982:15, 5003:3, 5026:18, 5038:25, 5039:1, 5046:22, 5051:12, 5061:15
**follows** [2] - 4996:3, 5118:24
**Forbes** [1] - 5014:9
**forced** [1] - 5017:14
**forensic** [1] - 5041:6
**forensics** [2] - 5011:25
**forge** [1] - 5124:4
**form** [29] - 4948:16, 4967:7, 4970:17, 4972:2, 4974:12, 4981:15, 4983:18, 4987:24, 5022:14, 5029:22, 5032:7, 5038:1, 5053:16, 5054:11, 5056:18, 5059:2, 5059:4, 5069:17, 5069:18, 5072:6, 5088:11, 5107:25, 5115:12, 5118:11, 5126:16, 5130:17, 5142:5, 5151:17, 5152:6
**formal** [1] - 4949:19
**format** [2] - 5125:15, 5127:9
**former** [1] - 5089:25
**formerly** [1] - 5087:7
**forth** [10] - 5039:21, 5092:5, 5094:11, 5094:17, 5095:2, 5103:15, 5104:5, 5104:6, 5125:11, 5125:13
**forty** [2] - 5071:15, 5071:18
**forward** [4] - 4942:24, 4945:5, 5116:21, 5125:18
**forwarded** [2] - 4971:21, 5116:10
**forwarding** [1] - 5098:17
**forwards** [1] - 4958:24
**fought** [1] - 5016:23
**foundation** [4] -

4978:23, 4979:1, 4979:2, 5123:16
**foundational** [1] - 4979:8
**founder** [1] - 5131:3
**four** [3] - 4942:19, 4971:2, 5102:3
**fourth** [1] - 5069:22
**fragile** [1] - 4995:5
**frame** [12] - 4977:21, 5012:24, 5014:3, 5015:11, 5028:13, 5028:14, 5052:8, 5057:13, 5073:23, 5073:24, 5073:25, 5088:12
**framed** [1] - 4939:9
**frankly** [3] - 4945:11, 4949:1, 5143:10
**fraudulently** [1] - 5013:7
**free** [3] - 5004:8, 5012:15, 5143:21
**freely** [3] - 5144:3, 5144:6, 5145:8
**Friday** [1] - 5063:18
**friend** [1] - 5149:13
**friends** [4] - 5024:11, 5025:8, 5026:2, 5026:4
**front** [10] - 4950:17, 4965:25, 4976:16, 4988:22, 4993:11, 5017:3, 5066:21, 5078:5, 5125:17
**FSGS** [1] - 5087:8
**full** [5] - 4936:12, 4944:13, 4945:9, 5039:14, 5152:16
**fully** [2] - 5040:11, 5084:11
**fumes** [1] - 5088:1
**function** [2] - 5036:14, 5037:8
**functions** [2] - 5036:8, 5037:2
**fund** [2] - 5013:10, 5014:9
**fundamental** [1] - 5084:25
**fundraising** [4] - 5087:23, 5088:19, 5088:21, 5088:22
**funds** [7] - 4961:4, 5010:20, 5011:16, 5012:9, 5022:8, 5024:9, 5073:23
**furtherance** [1] - 5082:25
**future** [1] - 5087:9

**FYI** [1] - 5150:11

## G

**gallery** [1] - 5046:3
**game** [2] - 4938:2, 4938:7
**gears** [1] - 5021:21
**general** [5] - 4963:22, 4979:2, 5084:6, 5130:13, 5148:17
**generalizing** [1] - 5084:5
**generally** [8] - 4944:15, 4950:2, 4976:19, 5035:6, 5055:9, 5056:14, 5076:9
**gentlemen** [1] - 5067:3
**George** [13] - 5012:14, 5012:20, 5019:9, 5019:20, 5020:11, 5020:25, 5021:1, 5021:6, 5021:8, 5021:13, 5089:19, 5140:21, 5149:13
**George's** [2] - 5021:10, 5089:14
**gestures** [1] - 5046:1
**GIBSON** [1] - 4934:17
**gift** [1] - 5146:10
**gifted** [2] - 5146:8
**gist** [1] - 5084:6
**given** [24] - 4937:9, 4937:23, 4953:5, 5004:16, 5008:6, 5014:10, 5026:2, 5029:1, 5030:7, 5034:6, 5036:10, 5039:14, 5040:20, 5050:24, 5051:4, 5051:16, 5080:19, 5081:2, 5081:9, 5099:19, 5121:20, 5121:22, 5121:25, 5149:2
**glad** [3] - 5150:11, 5150:16, 5150:17
**Global** [54] - 4940:2, 4942:16, 4942:18, 4947:14, 4996:20, 4997:7, 4997:12, 4997:14, 4997:18, 4998:18, 4998:19, 5028:1, 5028:7, 5028:12, 5028:18,

5028:20, 5028:22, 5028:24, 5029:6, 5029:9, 5029:16, 5030:2, 5030:8, 5031:7, 5032:4, 5032:10, 5032:24, 5033:6, 5033:18, 5034:4, 5034:20, 5034:25, 5035:13, 5035:22, 5036:4, 5036:10, 5036:25, 5037:11, 5037:22, 5038:6, 5038:13, 5038:16, 5040:12, 5043:7, 5043:8, 5047:5, 5047:9, 5047:17, 5047:25, 5052:1, 5052:9, 5081:17, 5082:8
**global** [2] - 4999:7, 5090:1
**GMT** [1] - 5133:18
**goal** [2] - 5153:2, 5153:3
**good-faith** [1] - 5041:14
**Gordon** [5] - 4964:25, 5041:21, 5041:24, 5042:11, 5042:16
**government** [40] - 4935:17, 4936:16, 4940:11, 4940:17, 4940:20, 4941:4, 4942:15, 4942:16, 4942:17, 4942:19, 4943:1, 4943:5, 4943:17, 4944:1, 4944:2, 4945:5, 4945:19, 4947:19, 4951:1, 4952:8, 4955:9, 4962:7, 4985:3, 4987:23, 4997:21, 4998:8, 4998:12, 4998:14, 5004:21, 5005:10, 5006:16, 5007:5, 5008:4, 5051:24, 5060:6, 5060:11, 5074:14, 5080:20, 5082:19, 5141:1
**Government** [42] - 4934:12, 4965:23, 4967:4, 4967:13, 4967:14, 4968:12, 4969:14, 4972:17, 4973:13, 4974:14, 4974:17, 4974:20, 4976:11, 4976:25, 4980:15, 4990:2,

4991:5, 4991:25, 4992:22, 4993:14, 4995:6, 4999:5, 4999:14, 4999:15, 4999:21, 5000:2, 5000:3, 5000:8, 5000:19, 5045:14, 5058:5, 5064:2, 5086:6, 5086:11, 5089:23, 5096:16, 5106:9, 5106:11, 5106:19, 5116:21, 5117:4, 5120:9
**government's** [5] - 4935:5, 4937:1, 4937:4, 5082:17, 5083:11
**Government's** [19] - 4955:24, 4956:4, 4956:22, 4961:15, 4962:6, 4963:19, 4966:1, 4966:3, 4966:6, 4966:9, 4976:10, 4977:14, 5009:2, 5009:6, 5023:18, 5026:14, 5040:16, 5132:22, 5134:18
**GRACE** [1] - 4934:21
**granted** [2] - 5019:1, 5020:19
**great** [2] - 5070:14, 5080:15
**GREEBEL** [1] - 4934:6
**Greebel** [126] - 4945:2, 4946:23, 4952:3, 4952:25, 4953:6, 4956:6, 4956:24, 4957:16, 4957:25, 4958:16, 4958:23, 4959:1, 4959:12, 4959:15, 4959:19, 4959:22, 4960:1, 4960:13, 4963:4, 4964:19, 4965:8, 4965:17, 4967:23, 4970:8, 4970:16, 4970:22, 4971:2, 4971:21, 4972:21, 4972:25, 4973:18, 4974:6, 4974:14, 4974:17, 4974:22, 4974:25, 4975:4, 4976:6, 4976:19, 4977:4, 4978:2, 4980:5, 4984:6, 4984:8, 4984:11, 4988:2, 4991:2, 4991:22,

4992:14, 4992:18, 4993:7, 4993:22, 4999:18, 5000:12, 5003:6, 5003:10, 5003:20, 5003:24, 5004:2, 5004:4, 5004:5, 5004:7, 5005:2, 5006:16, 5007:11, 5007:13, 5008:6, 5008:10, 5009:11, 5009:14, 5009:17, 5014:14, 5014:15, 5015:2, 5026:19, 5041:18, 5041:21, 5041:23, 5042:17, 5051:10, 5051:17, 5051:6, 5061:6, 5068:19, 5068:21, 5075:14, 5075:21, 5109:3, 5109:20, 5110:12, 5110:14, 5110:15, 5111:12, 5111:14, 5111:19, 5111:20, 5111:21, 5112:10, 5112:12, 5112:19, 5113:15, 5116:19, 5116:24, 5116:25, 5117:4, 5117:25, 5118:3, 5125:24, 5126:21, 5128:12, 5131:8, 5131:14, 5131:23, 5132:6, 5132:9, 5132:16, 5133:3, 5133:10, 5133:15, 5133:19, 5134:2, 5134:20, 5140:8, 5147:8, 5147:18, 5148:4
**Greebel's** [11] - 4946:19, 4955:10, 4976:17, 4983:6, 4984:15, 4988:10, 5026:15, 5110:17, 5111:18, 5112:11, 5134:11
**greedy** [1] - 5146:4
**green** [3] - 4962:7, 4963:20, 4965:21
**Griswold** [1] - 4963:6
**Grossman** [1] - 4968:22
**grounds** [1] - 5002:2
**guess** [7] - 4935:15, 4936:8, 4979:13, 5002:8, 5050:2, 5056:19, 5089:13
**guide** [1] - 5012:25
**guilty** [1] - 4950:8

**gun** [1] - 4942:8
**guys** [3] - 5112:17, 5118:4, 5143:11
**Guys** [6] - 5131:14, 5131:24, 5132:25, 5133:19, 5133:24, 5134:2
**GX** [17] - 5064:8, 5064:11, 5071:22, 5114:12, 5122:9, 5122:25, 5123:24, 5123:25, 5125:3, 5125:19, 5133:13, 5135:15, 5147:7, 5147:19

## H

**hack** [1] - 5045:7
**hacked** [1] - 5041:16
**hacker** [1] - 5041:15
**Hackert** [4] - 5060:4, 5060:18, 5067:23, 5068:8
**hacking** [2] - 5041:20, 5042:19
**half** [9] - 4991:23, 4993:8, 4993:22, 5012:7, 5089:6, 5153:2, 5153:3, 5153:16, 5153:18
**hall** [1] - 4975:20
**hallmarks** [1] - 4981:12
**hand** [4] - 5014:10, 5072:12, 5134:2, 5135:11
**handed** [6] - 4983:4, 5027:17, 5030:24, 5031:1, 5116:8, 5151:13
**handful** [2] - 5050:11, 5050:12
**handing** [1] - 5122:1
**handled** [2] - 5042:1, 5042:2
**handwriting** [9] - 5071:25, 5102:16, 5102:20, 5103:4, 5103:8, 5116:18, 5123:11, 5123:19, 5132:15
**happy** [14] - 5000:24, 5002:23, 5005:7, 5005:23, 5007:2, 5020:5, 5024:20, 5040:18, 5041:1, 5076:23, 5079:22, 5082:21, 5096:8, 5145:24

**hard** [6] - 4969:7, 4995:4, 5099:8, 5139:5, 5148:20, 5148:24

**hardest** [1] - 5139:15

**head** [7] - 4968:24, 4969:3, 4969:4, 4969:8, 5021:18, 5045:12

**head's** [1] - 4969:2

**Heading** [1] - 4934:22

**headquarters** [1] - 5087:1

**healthcare** [3] - 5015:15, 5017:12, 5090:1

**Healthcare** [14] - 5058:10, 5058:16, 5065:25, 5067:25, 5069:14, 5072:17, 5075:11, 5087:17, 5087:20, 5088:10, 5088:16, 5089:17, 5090:5, 5112:23

**Healthcare's** [2] - 5061:20, 5089:8

**hear** [5] - 4956:1, 4968:18, 5046:6, 5078:5, 5148:20

**heard** [7] - 4935:15, 4981:18, 5016:19, 5026:2, 5046:2, 5082:21, 5084:8

**hearing** [7] - 4969:7, 4975:21, 4976:1, 5038:24, 5039:1, 5080:14, 5151:3

**hearsay** [22] - 4968:5, 4976:8, 4976:23, 4977:9, 4977:17, 4978:17, 5000:20, 5002:1, 5002:4, 5004:12, 5004:24, 5005:22, 5006:3, 5006:8, 5006:9, 5006:10, 5006:15, 5006:23, 5007:1, 5007:5, 5019:15, 5020:4

**heart** [1] - 4942:12

**hedge** [2] - 5013:10, 5014:8

**held** [4] - 4975:21, 4976:1, 5038:24, 5039:1

**help** [7] - 4943:23, 4944:1, 4944:2, 4947:24, 5111:8, 5150:12, 5150:16

**helped** [9] - 5054:1, 5054:4, 5054:5, 5054:17, 5055:19, 5056:15, 5058:18, 5058:21, 5089:9

**hereby** [2] - 5073:4

**herein** [1] - 5073:3

**hereof** [1] - 5092:5

**hereto** [1] - 5092:22

**hi** [2] - 5027:6, 5105:20

**Hi** [1] - 5062:21

**hiding** [1] - 5025:8

**higher** [1] - 5142:3

**highlight** [5] - 5058:9, 5058:10, 5070:14, 5071:15, 5071:21

**highly** [2] - 4941:7, 5014:10

**himself** [4] - 5014:8, 5041:15, 5145:21, 5146:5

**hint** [1] - 4935:5

**history** [2] - 5007:14, 5041:18

**hit** [2] - 4995:4, 5073:23

**hitting** [1] - 5076:16

**hold** [2] - 4939:20, 5076:25

**holder** [1] - 5145:9

**holders** [1] - 5145:4

**holding** [2] - 5018:5, 5099:24

**holdings** [6] - 5098:13, 5098:21, 5099:4, 5126:13, 5146:11, 5146:19

**holds** [1] - 5014:8

**home** [2] - 4994:15, 5152:19

**Honor** [143] - 4935:9, 4935:16, 4936:10, 4936:14, 4937:2, 4938:21, 4940:11, 4940:16, 4941:1, 4941:10, 4941:11, 4942:24, 4944:8, 4945:17, 4946:11, 4946:24, 4947:4, 4947:5, 4947:7, 4948:9, 4949:4, 4950:10, 4950:20, 4951:2, 4952:7, 4952:19, 4953:12, 4953:17, 4954:15, 4955:4, 4955:5, 4955:13, 4958:7, 4964:4, 4967:11,

4968:3, 4968:7, 4975:7, 4975:10, 4975:16, 4977:19, 4978:13, 4979:18, 4981:21, 4982:4, 4985:3, 4985:5, 4987:5, 4987:7, 4989:2, 4994:2, 4995:2, 4997:9, 5000:6, 5000:21, 5002:2, 5002:11, 5002:21, 5002:23, 5003:5, 5004:14, 5005:5, 5005:18, 5006:6, 5006:14, 5006:22, 5007:19, 5007:21, 5007:25, 5008:12, 5009:2, 5012:23, 5019:15, 5019:24, 5020:2, 5022:20, 5024:12, 5024:21, 5025:22, 5026:23, 5027:2, 5029:20, 5030:13, 5038:20, 5039:25, 5040:4, 5042:14, 5043:2, 5045:13, 5046:8, 5046:16, 5060:15, 5061:2, 5062:10, 5064:5, 5064:22, 5065:4, 5067:19, 5068:3, 5076:20, 5078:25, 5079:21, 5080:3, 5080:8, 5080:16, 5081:4, 5084:22, 5085:1, 5090:15, 5091:10, 5094:20, 5095:14, 5096:1, 5100:9, 5100:22, 5102:1, 5103:25, 5105:8, 5105:14, 5115:18, 5118:13, 5118:14, 5118:25, 5119:4, 5119:7, 5123:10, 5123:14, 5126:1, 5127:1, 5127:16, 5127:17, 5129:18, 5129:25, 5130:2, 5130:16, 5131:19, 5140:15, 5141:18, 5148:20, 5149:24, 5151:1, 5152:1, 5152:22

**Honor's** [2] - 4948:4, 5040:10

**HONORABLE** [1] - 4934:10

**Hopan** [1] - 5038:17

**hope** [4] - 4945:9, 4953:12, 5079:12,

5153:23

**hopeful** [1] - 5079:15

**hopefully** [1] - 4954:8

**hour** [7] - 5133:24, 5153:1, 5153:3, 5153:16, 5153:17

**hourly** [1] - 4970:5

**hours** [37] - 4962:18, 4962:23, 4962:24, 4964:17, 4965:2, 4965:4, 4969:24, 4970:9, 4970:12, 4970:19, 4970:22, 4973:9, 4973:22, 4974:1, 4974:8, 4974:10, 4974:15, 4974:18, 4974:25, 4991:8, 4991:11, 4991:14, 4991:18, 4991:20, 4991:23, 4992:5, 4992:7, 4992:9, 4992:12, 4993:2, 4993:5, 4993:16, 4993:19, 5131:13, 5139:16

**Howard** [1] - 4965:4

**Huang** [26] - 5012:14, 5012:21, 5019:9, 5019:12, 5019:18, 5019:21, 5020:3, 5020:8, 5020:12, 5020:17, 5021:1, 5021:6, 5021:13, 5088:3, 5089:1, 5089:19, 5140:22, 5141:22, 5142:13, 5142:23, 5143:4, 5147:19, 5148:4, 5149:13, 5150:10, 5150:18

**humanitarian** [1] - 5052:13

**hundred** [9] - 5015:21, 5017:12, 5017:15, 5017:17, 5019:6, 5074:16, 5074:23, 5128:21, 5131:7

**hung** [1] - 5118:5

**I**

**idea** [11] - 4937:20, 4990:17, 5041:4, 5041:7, 5043:16, 5046:4, 5049:4, 5112:14, 5112:16, 5137:20, 5143:10

**ideas** [2] - 5137:16,

5137:18

**identical** [3] - 4966:13, 4976:24, 5124:3

**identification** [17] - 4999:21, 5000:1, 5000:8, 5023:18, 5030:16, 5062:8, 5064:24, 5067:21, 5090:17, 5095:16, 5095:17, 5100:11, 5105:10, 5127:3, 5131:18, 5140:18, 5151:8

**identified** [3] - 4969:5, 4969:9, 4978:22

**identify** [3] - 5026:3, 5036:15, 5103:8

**identity** [1] - 5034:17

**illegal** [5] - 5024:16, 5025:4, 5025:5, 5030:1

**illegally** [2] - 5024:11, 5024:24

**image** [1] - 5102:3

**immunity** [20] - 4952:9, 4952:12, 4952:13, 4952:23, 4998:15, 5028:3, 5029:2, 5030:7, 5037:21, 5050:19, 5050:22, 5051:6, 5080:22, 5080:25, 5081:12, 5081:21, 5082:15, 5083:15, 5083:20, 5084:3

**Immunity** [1] - 5050:16

**immunizing** [1] - 5027:25

**impeached** [2] - 5005:16, 5005:17

**impeaching** [2] - 5044:23, 5045:2

**impermissible** [1] - 5004:24

**implications** [1] - 4946:4

**important** [9] - 4981:5, 5007:19, 5007:24, 5008:1, 5050:19, 5080:21, 5081:20, 5083:15, 5083:20

**improper** [2] - 4978:17, 5099:14

**inaccurate** [3] - 5011:2, 5022:18, 5114:14

**inappropriate** [11] - 4938:10, 4938:24, 4939:3, 4939:13, 4944:16, 4948:13, 4948:16, 4949:11, 4949:14, 4950:14, 5083:4

**inappropriately** [1] - 5042:20

**inarticulate** [2] - 4948:21, 4949:9

**Inc** [6] - 5110:1, 5111:2, 5111:4, 5117:25, 5119:25, 5130:22

**incentive** [2] - 5097:10, 5097:20

**incentivize** [1] - 5099:7

**incentivized** [1] - 4950:25

**incentivizes** [2] - 4944:1, 4947:23

**incidents** [1] - 5076:10

**include** [2] - 4957:24, 5136:17

**included** [10] - 4980:16, 4980:17, 4980:23, 4980:24, 5015:21, 5020:11, 5026:8, 5026:10, 5131:2, 5151:22

**including** [6] - 4953:1, 5003:11, 5041:18, 5051:11, 5109:11, 5140:8

**inconsistency** [2] - 5083:12, 5083:25

**inconsistent** [11] - 5005:15, 5081:14, 5081:25, 5082:13, 5082:18, 5083:3, 5083:16, 5083:21, 5083:23, 5084:21, 5119:4

**incorporated** [1] - 5129:20

**incorrect** [2] - 5109:9, 5142:9

**increased** [1] - 5016:2

**incredible** [1] - 4943:18

**incriminate** [1] - 5083:18

**indeed** [1] - 4979:18

**indemnification** [5] - 4966:4, 4966:10, 4967:5, 4967:14,

4968:14

**indents** [1] - 4942:25

**independent** [1] - 5004:11

**indicated** [4] - 5040:7, 5073:3, 5073:5, 5153:15

**indicates** [2] - 4944:15, 5040:6

**indication** [1] - 5059:7

**individual** [3] - 4948:11, 5002:16, 5137:19

**individuals** [5] - 4990:20, 5013:11, 5022:10, 5026:19, 5026:20

**inducement** [1] - 5013:7

**indulgence** [1] - 4975:14

**infer** [1] - 5084:24

**inference** [6] - 4944:16, 4944:18, 4945:25, 4946:7, 5082:5, 5083:5

**inferences** [3] - 4944:23, 5024:16

**inform** [2] - 5000:7, 5075:14

**information** [27] - 4941:22, 4941:24, 4953:11, 5002:10, 5002:17, 5003:10, 5003:20, 5004:3, 5004:4, 5004:8, 5006:15, 5008:6, 5008:10, 5025:19, 5035:16, 5051:22, 5059:4, 5068:22, 5069:6, 5070:9, 5070:10, 5070:12, 5072:8, 5072:17, 5072:25, 5097:6, 5100:5

**informed** [8] - 5007:11, 5040:11, 5055:2, 5055:4, 5055:5, 5075:21, 5079:4, 5084:19

**informing** [1] - 5007:12

**innocent** [3] - 5082:14, 5082:15, 5083:10

**inquiry** [13] - 4968:1, 4969:20, 4978:3, 4978:4, 4978:7, 4979:7, 4988:18,

5022:3, 5022:6, 5023:16, 5023:21, 5023:24

**insanity** [1] - 5154:6

**insider** [3] - 4941:14, 4941:17, 4943:12

**instead** [1] - 5018:7

**institutions** [1] - 5022:10

**instruct** [6] - 5007:18, 5007:21, 5008:8, 5009:5, 5024:25, 5084:23

**instructed** [1] - 5081:4

**instruction** [4] - 4945:8, 4945:17, 4946:25, 4947:1

**instructions** [1] - 5073:14

**instrument** [5] - 5094:10, 5103:15, 5104:6, 5104:16, 5125:11

**intend** [6] - 4947:10, 4952:5, 5040:14, 5040:17, 5040:22, 5044:14

**intent** [1] - 4937:18

**intentionally** [3] - 4953:11, 5051:21, 5054:5

**interest** [1] - 5093:10

**interests** [2] - 5099:10

**internet** [3] - 5021:22, 5021:25, 5022:7

**interpret** [1] - 5150:15

**interpreted** [1] - 5037:14

**interrupt** [1] - 5006:6

**interruption** [1] - 4948:3

**intervene** [1] - 5080:7

**introduce** [3] - 4977:8, 5005:7, 5045:1

**introduced** [1] - 5045:8

**invalid** [1] - 5011:2

**invested** [4] - 5075:9, 5087:17, 5087:20, 5090:6

**investigation** [4] - 5004:6, 5012:1, 5022:13, 5022:15

**investing** [1] -

5097:12

**Investment** [1] - 5066:18

**investment** [28] - 5058:15, 5058:19, 5058:20, 5060:21, 5063:2, 5063:9, 5067:4, 5068:1, 5069:24, 5069:25, 5071:13, 5073:5, 5073:16, 5073:21, 5074:1, 5074:16, 5074:18, 5074:24, 5075:4, 5075:5, 5075:7, 5075:23, 5076:16, 5088:10, 5088:15, 5089:8, 5130:25, 5131:2

**investor** [3] - 5089:17, 5089:21, 5142:19

**investors** [2] - 4996:12, 5089:12

**investors'** [1] - 5089:15

**invocation** [1] - 4945:14

**invoice** [4] - 4970:6, 4978:3, 4978:16, 4988:17

**invoke** - 4947:3, 5082:4, 5084:19

**invoked** [1] - 4946:9

**invokes** [2] - 4944:17, 4945:7

**invoking** [4] - 5044:4, 5044:18, 5083:6

**involved** [2] - 4945:19, 5075:25

**involves** [1] - 5078:12

**IP** [4] - 5034:17, 5034:19, 5041:5, 5041:16

**irregular** [1] - 5024:9

**issue** [7] - 4939:24, 4977:25, 4978:14, 5017:25, 5079:23, 5080:13, 5146:14

**issued** [1] - 5018:1

**issues** [5] - 4945:10, 4987:8, 4987:14, 5061:15, 5153:15

**itself** [1] - 4977:2

**Izerne** [2] - 5149:20, 5150:2

**J**

**Jackson** [23] - 4952:23, 4952:24, 4954:6, 4994:11, 5028:3, 5033:18, 5033:22, 5033:25, 5050:17, 5051:9, 5062:8, 5062:21, 5063:21, 5064:25, 5067:22, 5079:20, 5090:18, 5090:23, 5096:23, 5100:12, 5105:20, 5140:21, 5142:14

**JACKSON** [2] - 4996:1, 5155:8

**January** [35] - 4956:24, 4957:6, 4960:25, 4972:19, 4973:14, 4974:24, 4990:6, 4990:10, 4991:6, 4992:1, 4992:24, 4993:15, 5021:21, 5021:24, 5034:12, 5034:15, 5036:6, 5058:15, 5060:22, 5061:20, 5063:10, 5063:22, 5068:1, 5071:4, 5071:7, 5071:9, 5072:1, 5073:7, 5073:16, 5073:25, 5074:22, 5075:22, 5075:23, 5113:1

**jogging** [1] - 5063:14

**John** [2] - 4952:22, 5048:15

**join** [1] - 5013:8

**joined** [2] - 5088:20, 5142:1

**JOSHUA** [1] - 4934:21

**judge** [3] - 5083:9, 5153:22, 5154:8

**Judge** - 4954:3, 5153:14

**JUDGE** [1] - 4934:10

**judges** [1] - 4946:12

**judgment** [1] - 5025:5

**July** [19] - 4964:7, 4990:5, 5028:24, 5031:10, 5031:20, 5032:10, 5038:15, 5039:7, 5039:21, 5039:24, 5040:3, 5044:17, 5044:20, 5053:2, 5053:20, 5116:6, 5116:16,

5116:23, 5123:7
**juncture** [1] - 5044:19
**June** [37] - 4953:4, 4961:19, 4998:21, 5018:1, 5024:1, 5024:3, 5024:5, 5024:7, 5028:2, 5028:22, 5029:2, 5030:8, 5031:2, 5036:3, 5039:5, 5039:6, 5039:9, 5039:12, 5039:17, 5040:2, 5040:13, 5043:23, 5044:6, 5044:7, 5051:13, 5093:16, 5093:22, 5112:20, 5113:18, 5113:24, 5114:3, 5120:22, 5121:4, 5121:8, 5121:13, 5125:4
**JUROR** [2] - 4994:17, 4994:18
**Juror** [3] - 5078:16, 5078:19, 5080:3
**JURORS** [1] - 4975:19
**jurors** [10] - 4954:6, 4954:15, 4954:21, 4955:17, 4994:14, 4994:16, 5076:22, 5080:9, 5085:4, 5086:2
**jury** [39] - 4934:10, 4935:1, 4938:9, 4943:21, 4944:16, 4944:23, 4945:1, 4945:17, 4946:18, 4946:22, 4950:17, 4951:7, 4952:1, 4955:16, 4975:21, 4976:2, 5007:18, 5007:21, 5008:2, 5008:8, 5009:5, 5022:25, 5023:2, 5038:24, 5039:2, 5044:25, 5045:3, 5045:7, 5047:4, 5050:8, 5077:3, 5077:5, 5078:3, 5080:5, 5083:9, 5084:23, 5086:1, 5152:15
**jury's** [1] - 4975:14
**justice** [3] - 4953:10, 4999:3, 5051:21

## K

**KAM** [1] - 4953:1
**Katten** [28] - 4957:17, 4958:2, 4958:3, 4958:18, 4959:7, 4962:2, 4971:5, 4977:7, 4976:18, 4977:21, 4978:25, 4983:13, 4984:21, 4984:23, 4985:14, 4985:18, 4986:12, 4986:13, 4986:16, 4986:22, 4986:24, 5020:20, 5023:6, 5023:8, 5023:10, 5041:25, 5042:25, 5109:12
**keep** [12] - 4969:24, 4973:1, 4994:12, 5010:16, 5021:19, 5058:7, 5058:8, 5058:9, 5077:2, 5129:15, 5145:21, 5152:18
**keeping** [2] - 5042:7, 5146:5
**keeps** [1] - 4986:19
**kept** [1] - 5015:24
**Kessler** [15] - 4947:8, 4979:15, 4987:20, 4994:25, 4997:10, 4998:5, 5002:4, 5004:14, 5025:2, 5084:8, 5096:18, 5127:18, 5128:5, 5151:10, 5154:3
**KESSLER** [146] - 4934:14, 4953:17, 4953:23, 4954:3, 4954:9, 4954:19, 4954:23, 4955:11, 4958:9, 4967:7, 4967:9, 4968:5, 4968:15, 4970:17, 4970:23, 4972:1, 4972:14, 4974:12, 4976:4, 4977:1, 4978:6, 4978:11, 4980:1, 4980:18, 4980:20, 4980:25, 4981:4, 4981:20, 4981:25, 4982:11, 4983:18, 4983:25, 4984:8, 4985:5, 4985:13, 4985:20, 4986:14, 4986:18, 4987:7, 4987:12, 4987:19, 4989:2,
4989:4, 4989:8, 4993:25, 4994:11, 4994:21, 4995:2, 4995:6, 4996:5, 4998:6, 4999:25, 5000:6, 5000:19, 5000:22, 5000:24, 5002:5, 5002:7, 5002:16, 5002:23, 5003:5, 5003:8, 5003:18, 5003:23, 5005:5, 5005:18, 5006:22, 5007:17, 5008:11, 5009:2, 5020:5, 5022:22, 5024:14, 5024:20, 5025:3, 5025:22, 5025:25, 5026:13, 5026:23, 5027:22, 5029:12, 5029:20, 5030:10, 5032:7, 5038:1, 5038:7, 5039:5, 5041:20, 5041:25, 5042:10, 5042:15, 5046:17, 5046:20, 5053:16, 5054:11, 5056:18, 5061:3, 5062:10, 5062:13, 5065:5, 5068:4, 5069:2, 5069:8, 5078:12, 5082:20, 5084:9, 5088:11, 5091:11, 5094:18, 5096:2, 5096:19, 5097:7, 5100:23, 5103:12, 5103:25, 5105:15, 5107:25, 5110:14, 5110:21, 5111:14, 5115:12, 5118:11, 5119:2, 5119:5, 5120:6, 5121:9, 5123:10, 5126:1, 5126:16, 5127:7, 5127:22, 5128:7, 5129:14, 5130:2, 5130:16, 5131:20, 5138:9, 5141:19, 5142:5, 5148:20, 5149:24, 5150:6, 5151:11, 5151:20, 5152:5, 5152:14
**Kevin** [1] - 5026:8
**Kevin...** [1] - 4971:16
**kind** [4] - 4936:19, 4938:8, 5046:5, 5093:14
**KIYO** [1] - 4934:10
**knowing** [2] - 5054:24, 5103:7

**knowingly** [2] - 5054:1, 5054:4
**knowledge** [5] - 4978:24, 4981:22, 4981:23, 4984:18, 5002:8
**known** [2] - 5041:11, 5087:7
**knows** [4] - 4940:17, 4984:10, 5045:7, 5123:13
**Kravitz** [1] - 4963:8
**KRISTINE** [2] - 4955:2, 5155:3

## L

**lack** [1] - 5059:16
**Ladies** [1] - 5067:3
**laid** [1] - 4979:2
**language** [3] - 4950:13, 5067:14, 5125:7
**laptop** [1] - 4989:22
**largest** [1] - 5089:17
**last** [39] - 4935:5, 4935:21, 4937:4, 4944:7, 4980:2, 5000:21, 5006:14, 5014:11, 5015:6, 5020:3, 5027:11, 5048:2, 5052:7, 5060:4, 5067:6, 5070:5, 5070:8, 5082:21, 5087:6, 5089:19, 5089:23, 5092:11, 5095:22, 5098:1, 5098:4, 5100:19, 5101:25, 5102:4, 5102:12, 5106:15, 5106:17, 5120:14, 5121:3, 5122:6, 5122:22, 5123:2, 5125:3
**late** [2] - 4994:15, 5064:17
**latter** [1] - 5089:6
**law** [14] - 4936:19, 4939:19, 4941:24, 4942:1, 4942:2, 4942:3, 4942:12, 4944:15, 4969:5, 4969:9, 5004:15, 5005:5, 5020:20, 5024:25
**lawsuit** [12] - 5017:19, 5019:17, 5019:20, 5019:22, 5019:23, 5019:25, 5020:7, 5020:11,

5020:21, 5020:24, 5021:11
**lawyer** [14] - 4935:11, 4935:23, 4961:6, 4961:7, 4961:10, 4971:24, 5017:10, 5019:8, 5050:14, 5051:1, 5078:8, 5078:14, 5081:3, 5141:11
**lawyer's** [1] - 5084:2
**lawyers** [2] - 4972:12, 5046:14
**lay** [5] - 4978:23, 5022:20, 5024:23, 5041:2, 5123:16
**laying** [2] - 4979:1, 5041:18
**lays** [1] - 5083:25
**lead** [1] - 5087:7
**leading** [3] - 4997:9, 5012:23, 5044:16
**leak** [1] - 4941:15
**leaked** [1] - 4941:18
**leaking** [1] - 4941:22
**learn** [2] - 5146:24, 5148:9
**learned** [2] - 5004:5, 5147:3
**learning** [2] - 4943:21, 5135:3
**least** [3] - 4942:20, 4964:22, 5146:9
**leave** [3] - 4951:14, 4978:19, 5003:21
**leaves** [1] - 5152:21
**leaving** [2] - 5032:3, 5081:24
**led** [1] - 5089:24
**ledger** [3] - 5058:8, 5075:10, 5089:13
**LEE** [1] - 4934:20
**left** [27] - 4936:21, 4936:22, 4938:4, 4940:7, 4942:16, 4942:18, 4949:20, 4962:17, 5018:1, 5029:4, 5029:9, 5031:21, 5032:4, 5034:12, 5037:4, 5037:10, 5043:13, 5047:5, 5047:18, 5047:21, 5052:4, 5082:8, 5122:24, 5123:6, 5123:8, 5134:2, 5142:2
**left-hand** [1] - 5134:2
**legal** [10] - 4950:5, 5021:15, 5024:16, 5024:22, 5025:4,

5025:5, 5094:18, 5095:4, 5106:7
**legally** [1] - 5017:6
**legitimate** [1] - 5054:6
**Leonora** [3] - 5149:19, 5149:20, 5150:2
**less** [7] - 4991:22, 5014:5, 5017:17, 5133:23, 5136:16, 5138:1, 5138:18
**letter** [57] - 4935:5, 4937:4, 4937:21, 4952:8, 4952:12, 4952:13, 4952:21, 4953:5, 4956:20, 4961:16, 4963:20, 4964:2, 4971:18, 4976:20, 4977:3, 4980:8, 4981:8, 4981:15, 5009:14, 5009:16, 5009:17, 5014:11, 5015:8, 5017:3, 5027:17, 5027:24, 5028:4, 5028:15, 5029:1, 5029:2, 5029:3, 5030:19, 5030:21, 5035:10, 5037:21, 5039:3, 5039:15, 5039:22, 5040:1, 5040:16, 5042:24, 5044:1, 5047:9, 5048:1, 5048:9, 5051:15, 5052:6, 5080:19, 5082:15, 5084:3, 5093:5, 5100:20, 5102:5, 5103:24, 5107:24, 5109:21, 5126:8
**letters** [3] - 4972:8, 4972:11, 4976:15
**liability** [2] - 5092:4, 5093:21
**Liang** [8] - 5090:11, 5090:19, 5091:15, 5094:22, 5100:4, 5105:4, 5105:12, 5105:19
**license** [9] - 4963:21, 5050:1, 5087:11, 5087:18, 5087:22, 5088:5, 5088:8, 5088:25, 5089:3
**licensing** [1] - 5088:17
**lie** [2] - 4938:22, 4999:12
**lied** [2] - 4937:25,

4939:5
**life** [1] - 5087:14
**Ligand** [7] - 5087:12, 5087:18, 5088:5, 5088:9, 5088:17, 5088:25, 5089:3
**light** [2] - 5010:19, 5043:3
**lights** [1] - 4969:12
**likely** [1] - 5153:12
**limited** [4] - 4957:16, 4998:20, 5092:4, 5093:21
**line** [10] - 4935:10, 4936:5, 4952:23, 5050:16, 5065:11, 5070:8, 5070:11, 5119:20, 5128:13, 5134:21
**lined** [1] - 5070:13
**lines** [5] - 4936:1, 4950:15, 5011:15, 5118:17, 5119:9
**list** [9] - 4955:6, 4976:10, 4977:15, 4980:13, 5131:6, 5147:8, 5148:4, 5149:9, 5150:10
**listed** [8] - 4971:10, 4971:13, 4973:4, 4973:6, 5011:20, 5013:21, 5023:20, 5026:19
**listen** [1] - 5042:12
**lists** [2] - 4969:23, 4973:17
**litany** [1] - 4949:12
**litigated** [1] - 4977:10
**litigation** [9] - 4963:22, 4964:9, 4964:25, 4965:15, 5021:17, 5042:1, 5042:2, 5042:8, 5052:10
**litigations** [1] - 5024:2
**live** [2] - 5049:12, 5049:13
**Lizza** [3] - 4945:19, 4946:2
**LLC** [29] - 4961:16, 5023:25, 5066:17, 5066:21, 5069:25, 5073:4, 5075:11, 5087:21, 5088:16, 5092:3, 5102:7, 5109:9, 5109:22, 5110:4, 5110:7, 5110:20, 5111:2,

5111:3, 5111:9, 5111:13, 5112:4, 5112:8, 5112:9, 5112:13, 5117:25, 5119:24, 5126:8, 5130:22
**login** [4] - 5033:21, 5033:22, 5033:24, 5034:9
**longest** [1] - 5139:16
**Look** [1] - 5040:6
**look** [41] - 4937:7, 4949:15, 4955:14, 4957:21, 4967:19, 4969:14, 4970:15, 4971:1, 4971:12, 4971:15, 4983:3, 4988:22, 4992:4, 4993:1, 4998:10, 5005:8, 5005:23, 5007:2, 5007:6, 5009:19, 5023:17, 5043:14, 5043:15, 5043:20, 5045:25, 5064:6, 5065:14, 5069:19, 5078:11, 5079:3, 5082:21, 5084:10, 5103:22, 5103:24, 5127:4, 5128:16, 5128:20, 5147:7, 5151:15, 5152:9
**looked** [4] - 5091:7, 5098:9, 5122:6, 5142:15
**looking** [22] - 4956:4, 4961:15, 4974:3, 5036:15, 5061:18, 5061:19, 5061:20, 5069:18, 5086:11, 5093:14, 5097:13, 5098:3, 5098:5, 5103:6, 5104:13, 5107:22, 5108:24, 5108:25, 5116:17, 5127:15, 5128:11, 5130:13
**looks** [3] - 5102:16, 5102:19, 5102:20
**loss** [1] - 5021:9
**lost** [2] - 5012:6, 5074:9
**lottery** [1] - 5149:7
**Lotto** [2] - 5149:4, 5149:5
**loud** [1] - 5046:2
**LP** [5] - 5065:25, 5067:25, 5069:14, 5075:11, 5126:11
**lunch** [5] - 4994:16,

5040:15, 5046:19, 5076:24, 5077:10
**lying** [1] - 4948:12
**Lynch** [4] - 5003:11, 5010:23, 5012:4, 5015:4

**M**

**ma'am** [3] - 4955:19, 4994:5, 5020:1
**Madison** [2] - 5066:23, 5069:25
**mail** [148] - 4956:5, 4956:8, 4956:23, 4956:24, 4957:2, 4957:4, 4958:3, 4958:14, 4958:15, 4958:23, 4959:10, 4959:11, 4959:15, 4959:18, 4960:1, 4960:20, 4967:22, 4969:17, 4971:20, 4976:10, 4976:17, 4976:20, 4977:4, 4977:6, 4977:8, 4977:9, 4978:1, 4978:14, 4979:4, 4980:11, 4980:12, 4980:13, 4981:10, 4981:18, 4982:9, 4983:5, 4983:6, 4983:10, 4983:15, 4983:22, 4983:23, 4984:6, 4984:16, 4986:4, 4986:7, 4986:12, 4986:22, 4986:24, 4988:2, 4988:22, 4989:13, 4989:15, 4989:18, 4989:19, 4996:9, 4996:11, 4996:20, 4997:18, 4999:15, 4999:17, 5000:12, 5000:21, 5001:1, 5001:2, 5002:17, 5002:18, 5002:19, 5003:5, 5004:13, 5005:7, 5005:21, 5007:4, 5009:8, 5009:10, 5013:11, 5014:14, 5015:12, 5017:7, 5023:6, 5023:9, 5026:16, 5035:7, 5061:6, 5061:9, 5062:7, 5062:8, 5062:19, 5064:25, 5067:22, 5068:8, 5068:19, 5070:10, 5072:12, 5073:13, 5075:20,

5090:18, 5090:22, 5095:19, 5097:19, 5098:14, 5098:16, 5098:17, 5100:3, 5100:7, 5100:12, 5100:18, 5101:3, 5102:3, 5105:11, 5108:1, 5109:3, 5109:13, 5109:23, 5110:17, 5111:20, 5113:12, 5113:14, 5113:23, 5115:22, 5117:2, 5120:14, 5121:21, 5122:25, 5125:23, 5130:11, 5131:8, 5132:14, 5133:21, 5133:24, 5134:10, 5134:14, 5135:15, 5136:23, 5140:13, 5140:20, 5141:22, 5147:1, 5148:3, 5148:6, 5151:21, 5151:24, 5152:6
**mailed** [1] - 5131:14
**mailing** [1] - 5131:23
**mails** [22] - 4949:23, 4959:22, 4978:25, 4983:13, 4984:19, 4984:23, 4985:15, 4985:18, 4986:13, 4986:16, 5011:1, 5011:4, 5011:8, 5036:15, 5036:18, 5042:10, 5042:15, 5090:8, 5091:1, 5103:2, 5133:19, 5147:17
**maintain** [2] - 4986:18, 5046:12
**maintained** [3] - 4976:18, 4984:23, 4984:25
**maintains** [2] - 4986:13, 4986:16
**majority** [1] - 5139:8
**manage** [1] - 5013:13
**managed** [2] - 5013:22, 5014:6
**Management** [6] - 4961:16, 5022:4, 5023:25, 5126:11, 5128:21, 5131:5
**management** [3] - 5003:12, 5014:7, 5068:25
**manager** [1] - 5014:9
**managing** [4] - 4961:23, 4972:9,

5013:9, 5014:24
**maneuver** [1] -
5010:20
**maneuvering** [1] -
5011:16
**Manhattan** [1] -
5020:22
**manner** [3] -
4936:16, 4950:25,
4982:1
**March** [20] - 4942:21,
4996:9, 4999:15,
4999:25, 5000:13,
5003:9, 5009:10,
5015:13, 5028:8,
5028:12, 5029:17,
5035:3, 5035:7,
5035:11, 5036:7,
5037:25, 5039:4,
5044:6, 5052:1,
5052:6
**Marcum** [12] -
5055:3, 5055:10,
5057:22, 5059:13,
5059:18, 5060:2,
5060:24, 5068:10,
5073:15, 5074:5,
5074:10, 5140:1
**Marek** [7] - 5012:5,
5026:9, 5036:17,
5036:19, 5106:12,
5109:21, 5123:9
**Mariel** [7] - 5060:4,
5060:17, 5061:8,
5062:9, 5062:20,
5067:23
**mark** [4] - 4953:22,
5101:13, 5105:21
**Mark** [1] - 4968:22
**marked** [14] -
4958:12, 4967:18,
4988:1, 4999:21,
5000:1, 5009:9,
5023:18, 5061:5,
5062:16, 5065:7,
5068:6, 5128:3,
5128:10, 5131:22
**marketing** [1] -
5088:19
**markets** [1] - 5022:9
**marks** [1] - 4953:4
**Marsilio** [10] -
4954:5, 4954:9,
4955:22, 4956:1,
4958:14, 4983:3,
4985:14, 4988:2,
4989:7, 4989:9
**MARSILIO** [2] -
4955:2, 5155:3
**Marsilo** [4] -

4967:19, 4978:21,
4978:24, 4981:22
**Martin** [50] - 4956:5,
4956:23, 4958:15,
4959:11, 4959:18,
4961:22, 4969:17,
4971:9, 4971:13,
4971:17, 4971:22,
4972:6, 4972:9,
4988:5, 4988:7,
4989:10, 4989:12,
4989:15, 5009:11,
5010:1, 5012:5,
5012:9, 5013:10,
5013:13, 5013:21,
5014:8, 5022:3,
5022:4, 5022:15,
5024:11, 5025:7,
5036:16, 5036:19,
5043:11, 5052:11,
5065:1, 5112:17,
5116:18, 5118:4,
5121:25, 5122:7,
5136:6, 5137:8,
5142:9, 5142:11,
5142:17, 5143:16,
5144:2, 5148:12
**Martin's** [9] - 5012:1,
5012:14, 5012:15,
5012:20, 5013:7,
5015:20, 5088:22,
5124:2, 5149:21
**mask** [1] - 4942:7
**masked** [1] -
5041:15
**masking** [5] -
5034:17, 5034:19,
5034:23, 5041:5,
5041:12
**Massella** [14] -
5045:1, 5060:18,
5061:9, 5062:9,
5063:21, 5090:11,
5090:18, 5091:15,
5094:22, 5098:18,
5100:13, 5101:3,
5102:21, 5126:3
**MASTRO** [6] -
4934:19, 4945:13,
4945:16, 4945:22,
4946:24, 4955:14
**Mastro** [1] - 4945:12
**match** [1] - 5134:15
**matches** [4] -
5070:17, 5071:2,
5071:24, 5133:9
**matching** [5] -
5131:25, 5133:1,
5133:20, 5134:3,
5134:12

**material** [2] -
4941:16, 4942:22
**math** [1] - 5135:23
**MATSUMOTO** [1] -
4934:10
**Matter** [1] - 5154:21
**matter** [36] -
4949:10, 4956:14,
4956:17, 4960:7,
4961:8, 4963:2,
4963:11, 4963:14,
4964:15, 4964:23,
4965:8, 4965:14,
4966:4, 4966:7,
4966:10, 4968:14,
4968:25, 4969:2,
4969:6, 4969:10,
4970:1, 4970:2,
4970:10, 4970:12,
4970:16, 4970:20,
4971:1, 4975:10,
4977:6, 4978:12,
5005:12, 5006:25,
5078:12, 5120:7,
5133:17
**matters** [14] -
4963:21, 4971:22,
4973:11, 4973:18,
4973:20, 4974:4,
4974:7, 4974:22,
4975:2, 4981:2,
4991:1, 4991:2,
4992:15, 4993:23
**mean** [18] - 4936:11,
4949:1, 4951:7,
4976:12, 4980:21,
5002:8, 5007:9,
5040:21, 5043:18,
5053:5, 5053:6,
5093:17, 5106:2,
5112:5, 5122:13,
5124:1, 5142:23,
5149:2
**meaning** [4] -
5019:3, 5022:15,
5025:18, 5145:15
**means** [3] - 5004:10,
5054:14, 5112:7
**meant** [5] - 5104:5,
5142:25, 5145:18,
5150:14, 5150:17
**meantime** [1] -
5078:15
**mechanical** [1] -
4934:25
**mechanics** [1] -
5020:15
**mechanism** [1] -
4938:12
**meet** [8] - 4935:20,

4935:24, 4940:22,
4940:24, 4941:5,
4982:5, 5027:11,
5048:25
**meeting** [7] -
4940:21, 4947:8,
5028:5, 5030:22,
5049:7, 5053:2,
5058:4
**meetings** [5] -
5033:15, 5048:21,
5056:2, 5056:4
**member** [4] -
4941:15, 4941:23,
4961:23, 4972:9
**members** [2] -
5009:5, 5152:15
**memorialize** [3] -
5012:18, 5054:6,
5074:1
**memorialized** [3] -
5054:9, 5058:20,
5058:21
**memorializing** [1] -
5055:5
**memory** [10] -
5012:3, 5044:14,
5047:24, 5053:7,
5063:14, 5075:2,
5098:15, 5134:10,
5134:13
**mentality** [1] -
5111:19
**mentioned** [1] -
5019:9
**mentioning** [1] -
4949:3
**mere** [1] - 5014:5
**merger** [2] - 5129:23,
5130:19
**Merrill** [6] - 5003:11,
5010:22, 5010:23,
5011:24, 5012:4,
5015:4
**message** [2] -
5133:4, 5134:11
**met** [9] - 5027:14,
5032:20, 5048:17,
5048:23, 5049:4,
5049:6, 5049:9,
5049:15, 5049:18
**mic** [1] - 4995:4
**Michael** [5] -
4964:25, 4990:8,
5023:10, 5065:1,
5149:18
**microphone** [1] -
5149:24
**mid** [2] - 5110:8,
5112:10

**mid-September** [2] -
5110:8, 5112:10
**middle** [1] - 5027:7
**midmorning** [1] -
4975:18
**might** [11] - 4935:6,
4939:18, 4948:11,
5004:25, 5025:13,
5034:5, 5040:23,
5042:6, 5050:1,
5130:19
**Mike** [1] - 4970:12
**million** [8] - 5012:7,
5012:8, 5013:9,
5014:5, 5014:7,
5143:2, 5143:21,
5145:16
**mind** [15] - 4949:13,
4949:22, 4953:21,
5024:22, 5025:16,
5025:23, 5038:21,
5042:7, 5054:6,
5060:4, 5077:3,
5083:13, 5084:13,
5152:18
**mindful** [1] - 5044:22
**mine** [2] - 5099:17,
5101:6
**minimum** [1] -
5152:2
**minute** [9] - 4998:8,
5016:4, 5025:22,
5076:22, 5114:18,
5114:20, 5120:20,
5121:18, 5138:18
**minutes** [25] -
4935:12, 4936:7,
4940:25, 4951:10,
4962:21, 4970:9,
5027:15, 5028:5,
5030:22, 5105:23,
5108:7, 5114:25,
5115:9, 5115:13,
5116:11, 5120:14,
5121:7, 5134:1,
5134:4, 5136:16,
5137:25, 5139:20,
5151:3, 5154:7
**misappropriated** [1]
- 4940:8
**mischaracterizes** [1]
- 5121:9
**misdemeanor** [1] -
4937:19
**missing** [5] -
4954:16, 4954:21,
5062:22, 5076:13,
5080:9, 5096:5,
5107:14, 5107:18
**misstates** [2] -

4968:16, 5030:10
**mistake** [9] -
5063:25, 5064:10,
5064:14, 5064:16,
5113:21, 5113:22,
5114:6, 5114:19,
5115:1
**mistaken** [1] -
5039:24
**Mochizuki** [1] -
4990:7
**moment** [13] -
4975:7, 4994:2,
4995:2, 5010:15,
5010:24, 5017:16,
5064:5, 5065:14,
5118:13, 5119:1,
5127:4, 5139:3,
5146:23
**Monday** [1] -
5064:18
**monetary** [2] -
5025:14, 5025:20
**money** [21] -
5010:13, 5012:6,
5017:5, 5018:22,
5021:14, 5021:15,
5021:17, 5022:9,
5022:17, 5087:17,
5087:20, 5088:22,
5089:1, 5089:15,
5089:22, 5128:25,
5129:1
**monitor** [1] -
5036:17
**month** [9] - 4963:2,
4963:4, 4963:6,
4963:8, 4963:14,
4965:12, 5039:23,
5057:24
**months** [18] -
4970:9, 5017:25,
5018:7, 5054:18,
5054:21, 5054:24,
5055:6, 5055:17,
5055:20, 5055:22,
5056:6, 5056:7,
5056:16, 5056:17,
5066:10, 5076:4,
5076:12, 5118:9
**morning** [22] -
4935:2, 4941:9,
4941:10, 4954:25,
4955:22, 4955:23,
4960:14, 5027:14,
5028:5, 5037:20,
5038:11, 5048:10,
5050:24, 5051:4,
5051:24, 5065:12,
5079:1, 5081:2,

5081:10, 5081:18,
5112:24, 5154:8
**most** [2] - 5078:24,
5137:8
**motion** [1] - 4937:1
**move** [11] - 4956:22,
4962:17, 4970:25,
5024:12, 5024:15,
5048:4, 5052:20,
5116:21, 5125:18
**moved** [3] - 5015:17,
5066:24, 5067:1
**moves** [1] - 4942:24
**moving** [3] - 5020:3,
5020:15, 5087:1
**MR** [358] - 4935:16,
4936:24, 4937:1,
4940:11, 4940:16,
4940:24, 4941:10,
4941:11, 4944:8,
4945:13, 4945:16,
4945:22, 4946:24,
4947:5, 4948:2,
4948:21, 4949:4,
4950:10, 4950:19,
4950:22, 4951:2,
4952:19, 4953:17,
4953:21, 4953:23,
4954:3, 4954:9,
4954:19, 4954:23,
4955:4, 4955:5,
4955:11, 4955:12,
4955:14, 4959:9,
4967:7, 4967:9,
4968:5, 4968:15,
4969:7, 4969:11,
4970:17, 4970:23,
4972:1, 4972:14,
4974:12, 4976:4,
4977:1, 4978:6,
4978:11, 4980:1,
4980:18, 4980:20,
4980:25, 4981:4,
4981:20, 4981:25,
4982:4, 4982:11,
4983:18, 4983:25,
4984:8, 4985:5,
4985:13, 4985:20,
4986:14, 4986:18,
4987:7, 4987:12,
4987:19, 4989:2,
4989:4, 4989:8,
4993:25, 4994:11,
4994:21, 4995:2,
4995:6, 4996:5,
4997:9, 4998:6,
4999:25, 5000:6,
5000:19, 5000:20,
5000:22, 5000:24,
5002:1, 5002:5,

5002:7, 5002:11,
5002:16, 5002:21,
5002:23, 5003:5,
5003:8, 5003:18,
5003:23, 5004:14,
5005:5, 5005:9,
5005:18, 5006:6,
5006:14, 5006:22,
5007:7, 5007:17,
5007:18, 5007:23,
5007:24, 5008:11,
5008:12, 5009:2,
5012:23, 5013:23,
5019:15, 5019:24,
5020:2, 5020:5,
5022:20, 5022:22,
5024:12, 5024:14,
5024:15, 5024:20,
5024:21, 5025:3,
5025:22, 5025:25,
5026:13, 5026:23,
5027:2, 5027:4,
5027:22, 5029:12,
5029:20, 5030:10,
5030:12, 5032:7,
5038:1, 5038:7,
5038:20, 5038:23,
5039:5, 5039:6,
5039:10, 5039:25,
5040:4, 5040:6,
5040:9, 5040:14,
5040:25, 5041:2,
5041:13, 5041:20,
5041:25, 5042:10,
5042:14, 5042:15,
5043:2, 5043:8,
5044:5, 5044:7,
5044:8, 5044:19,
5044:22, 5045:11,
5045:18, 5045:20,
5046:8, 5046:16,
5046:17, 5046:20,
5047:3, 5048:4,
5048:6, 5048:8,
5053:16, 5054:11,
5056:18, 5056:21,
5056:23, 5058:7,
5060:15, 5061:2,
5061:3, 5062:10,
5062:12, 5062:13,
5064:5, 5064:8,
5064:22, 5065:4,
5065:5, 5067:18,
5067:21, 5068:3,
5069:2, 5069:21,
5069:8, 5069:21,
5070:8, 5071:1,
5076:20, 5078:6,
5078:11, 5078:12,
5078:13, 5078:25,
5079:7, 5079:12,

5079:21, 5079:25,
5080:2, 5080:3,
5080:8, 5080:15,
5080:16, 5081:7,
5082:2, 5082:11,
5082:20, 5083:8,
5083:14, 5083:23,
5084:7, 5084:9,
5084:22, 5085:1,
5086:6, 5086:10,
5087:5, 5088:11,
5088:14, 5090:15,
5091:10, 5091:11,
5092:13, 5094:7,
5094:18, 5094:20,
5095:14, 5096:1,
5096:2, 5096:6,
5096:13, 5096:15,
5096:19, 5097:7,
5098:4, 5100:9,
5100:11, 5100:22,
5100:23, 5102:1,
5102:12, 5103:12,
5103:25, 5105:8,
5105:14, 5105:15,
5106:9, 5106:17,
5107:1, 5107:25,
5108:4, 5110:14,
5110:21, 5110:25,
5111:5, 5111:7,
5111:14, 5114:11,
5115:12, 5115:15,
5115:18, 5118:11,
5118:13, 5118:25,
5119:2, 5119:4,
5119:5, 5119:7,
5119:9, 5119:12,
5120:6, 5120:10,
5121:9, 5121:11,
5121:14, 5122:9,
5122:16, 5122:22,
5123:10, 5123:13,
5125:1, 5126:1,
5126:2, 5126:16,
5127:1, 5127:6,
5127:7, 5127:15,
5127:17, 5127:20,
5127:22, 5128:1,
5128:4, 5128:7,
5129:14, 5129:18,
5129:21, 5129:25,
5130:2, 5130:7,
5130:16, 5130:20,
5131:19, 5131:20,
5132:21, 5138:9,
5138:10, 5138:11,
5140:15, 5140:19,
5141:18, 5141:19,
5142:5, 5145:2,
5147:21, 5148:20,
5148:22, 5149:24,

5149:25, 5150:5,
5150:6, 5151:1,
5151:5, 5151:7,
5151:11, 5151:19,
5151:20, 5151:25,
5152:5, 5152:12,
5152:14, 5152:22,
5153:1, 5153:5,
5153:11, 5153:14,
5153:17, 5153:19,
5153:25, 5154:6,
5154:11, 5154:14,
5154:18
**MS** [67] - 4935:9,
4935:23, 4936:10,
4936:14, 4937:3,
4940:23, 4948:9,
4948:20, 4949:5,
4949:17, 4950:11,
4951:5, 4951:7,
4951:10, 4952:7,
4955:21, 4958:7,
4964:4, 4967:2,
4967:11, 4968:3,
4968:7, 4968:11,
4968:18, 4969:22,
4973:1, 4974:21,
4975:7, 4975:10,
4975:16, 4976:5,
4976:9, 4976:11,
4976:13, 4977:19,
4978:9, 4979:13,
4980:8, 4980:10,
4980:13, 4980:19,
4980:22, 4981:5,
4981:8, 4981:24,
4982:13, 4983:2,
4984:14, 4985:3,
4985:24, 4986:2,
4986:15, 4987:1,
4987:5, 4987:9,
4987:17, 4988:24,
4989:6, 4994:2,
4994:4, 5041:4,
5041:14, 5042:2,
5043:12, 5044:2,
5045:9, 5045:16
**MSMB** [50] -
4956:14, 4961:16,
4971:5, 4971:14,
4971:15, 4972:9,
4978:4, 4989:12,
4991:7, 4991:14,
4991:23, 4992:7,
4992:15, 4996:12,
5022:4, 5023:25,
5033:18, 5033:22,
5033:25, 5034:7,
5034:15, 5058:10,
5058:16, 5061:20,
5065:24, 5067:25,

5069:13, 5072:17, 5075:10, 5087:17, 5087:20, 5088:10, 5088:16, 5089:8, 5089:17, 5089:24, 5090:5, 5090:9, 5090:22, 5090:23, 5091:1, 5112:23, 5126:9, 5126:11, 5128:21, 5129:13, 5129:17, 5131:5, 5133:8

**Muchin** [3] - 4958:18, 4962:2, 5023:6

**Mulleady** [2] - 5026:8, 5133:4

**multi** [1] - 5078:22

**multi-week** [1] - 5078:22

**multiple** [6] - 4953:24, 4975:4, 5006:11, 5012:13, 5041:17, 5048:23

**multiplier** [5] - 5129:8, 5129:12, 5130:25, 5131:1, 5131:4

**murder** [2] - 5153:19, 5153:20

**must** [1] - 5072:10

**MYLAN** [1] - 4934:20

## N

**name** [3] - 5010:23, 5060:4, 5141:7

**named** [1] - 5086:12

**names** [3] - 4989:8, 5026:3, 5060:3

**narrow** [1] - 5028:14

**narrowed** [1] - 4972:5

**native** [3] - 5127:9, 5127:19, 5127:22

**natured** [1] - 5153:6

**near** [1] - 5087:9

**necessarily** [4] - 4938:15, 4961:7, 5007:12, 5083:24

**need** [16] - 4935:12, 4938:11, 4951:3, 4953:24, 4969:2, 4969:3, 4969:4, 4997:24, 5044:17, 5063:2, 5079:2, 5091:16, 5091:19, 5101:8, 5118:4, 5143:10

**needed** [2] - 5022:11

**needs** [3] - 4948:7, 4953:13, 5062:6

**negative** [1] - 4992:7

**negotiated** [1] - 5012:7

**negotiation** [1] - 5016:8

**never** [10] - 5016:22, 5017:2, 5017:3, 5052:21, 5052:24, 5053:3, 5054:1, 5055:24, 5058:3, 5142:2

**NEW** [1] - 4934:1

**new** [6] - 5063:15, 5086:19, 5114:16, 5114:21, 5114:23, 5115:1

**New** [10] - 4934:5, 4934:16, 4934:18, 4934:23, 5020:22, 5049:10, 5049:14, 5049:19, 5087:1

**next** [38] - 4936:7, 4941:11, 4945:6, 4959:10, 4959:15, 4959:18, 4961:21, 4966:20, 4970:25, 4986:3, 4994:9, 4995:8, 5001:5, 5008:16, 5012:11, 5013:5, 5013:12, 5026:24, 5051:15, 5064:20, 5070:11, 5070:18, 5072:24, 5079:22, 5084:2, 5085:7, 5086:25, 5087:4, 5100:8, 5106:22, 5107:6, 5109:24, 5114:11, 5122:24, 5124:5, 5140:11, 5144:9, 5146:21

**nice** [1] - 4955:1

**night** [5] - 4935:21, 4937:4, 4944:7, 5027:11, 5082:21

**nights** [1] - 5139:11

**nine** [4] - 4963:1, 4964:14, 5074:16, 5074:23

**nobody** [7] - 4949:1, 5037:13, 5037:14, 5108:21, 5136:13, 5142:7

**noise** [1] - 4975:17

**nomenclature** [1] - 5130:5

**non** [39] - 4935:18, 4936:11, 4940:12,

4940:15, 4940:21, 4943:4, 4943:9, 4943:11, 4943:13, 4943:15, 4943:18, 4943:23, 4943:25, 4944:3, 4944:4, 4944:7, 4944:20, 4945:3, 4945:6, 4945:11, 4947:9, 4947:12, 4947:18, 4948:6, 4948:23, 4950:2, 4950:8, 4950:12, 4950:23, 4951:1, 5002:4, 5005:22, 5006:8, 5006:15, 5007:1, 5007:5, 5027:20, 5037:17

**non-consent** [1] - 5037:17

**non-hearsay** [7] - 5002:4, 5005:22, 5006:8, 5006:10, 5006:15, 5007:1, 5007:5

**non-pros** [12] - 4936:11, 4940:15, 4944:7, 4944:20, 4945:3, 4945:6, 4945:11, 4950:2, 4950:8, 4950:12, 4950:23, 4951:1

**non-prosecution** [19] - 4935:18, 4940:12, 4940:21, 4943:4, 4943:9, 4943:11, 4943:13, 4943:15, 4943:18, 4943:23, 4943:25, 4944:3, 4944:4, 4947:9, 4947:12, 4947:18, 4948:6, 4948:23, 5027:20

**norm** [1] - 5010:19

**normal** [2] - 4961:1, 4961:2

**normally** [3] - 4955:8, 5139:10, 5139:12

**note** [10] - 4983:16, 4983:23, 5132:15, 5142:19, 5143:1, 5143:10, 5143:18, 5143:20, 5143:24, 5146:23

**noted** [1] - 5120:8

**notes** [12] - 4963:3, 4951:11, 4952:14, 4952:15, 5033:11, 5033:12, 5033:13,

5033:14, 5033:16, 5058:2, 5058:4

**nothing** [21] - 4977:15, 5040:18, 5051:5, 5054:23, 5057:11, 5057:13, 5059:11, 5066:12, 5071:12, 5081:11, 5083:3, 5083:4, 5096:9, 5099:13, 5099:15, 5099:23, 5104:24, 5106:6, 5137:21, 5139:25

**notice** [2] - 4949:19, 5045:23

**notifications** [1] - 4996:14

**November** [41] - 4934:7, 4952:21, 4958:16, 4960:12, 4960:23, 5003:15, 5013:16, 5013:18, 5013:19, 5013:25, 5014:3, 5014:4, 5030:19, 5080:19, 5090:12, 5090:19, 5091:16, 5094:22, 5100:13, 5101:3, 5102:21, 5105:4, 5105:12, 5105:19, 5107:20, 5108:2, 5108:12, 5108:21, 5109:9, 5110:10, 5110:11, 5110:19, 5111:3, 5111:9, 5111:11, 5111:13, 5111:21, 5113:25, 5115:11, 5154:21

**NPA** [2] - 4935:25, 4948:15

**number** [27] - 4953:1, 4961:22, 4962:23, 4963:24, 4964:6, 4976:9, 4990:23, 4991:1, 5005:9, 5006:7, 5007:23, 5042:10, 5042:22, 5049:1, 5049:3, 5049:4, 5051:10, 5067:7, 5071:22, 5078:18, 5078:20, 5093:6, 5093:17, 5096:3, 5102:1, 5149:15, 5151:13

**numbered** [2] - 5091:23, 5109:17

**numbers** [15] - 4951:14, 5096:10, 5096:11, 5096:14,

5131:15, 5131:25, 5133:1, 5133:20, 5133:25, 5134:3, 5134:12, 5134:14, 5135:6, 5135:13, 5142:17

**numerous** [1] - 4973:2

## O

**o'clock** [3] - 4934:7, 4936:6, 5077:9

**oath** [5] - 4955:19, 4994:24, 5086:4, 5118:21, 5119:18

**object** [17] - 4950:15, 4953:23, 4979:1, 4986:18, 5008:5, 5024:12, 5029:22, 5056:18, 5062:13, 5088:11, 5096:18, 5107:25, 5115:17, 5119:5, 5123:10, 5130:16, 5151:20

**objected** [4] - 4955:9, 5005:10, 5006:16, 5007:5

**objecting** [6] - 4977:1, 4979:7, 4979:9, 4982:11, 5020:2, 5110:21

**objection** [79] - 4948:3, 4958:9, 4967:7, 4968:5, 4968:6, 4968:15, 4970:17, 4970:23, 4972:1, 4972:14, 4972:16, 4974:12, 4975:11, 4976:8, 4981:10, 4982:10, 4983:18, 4983:25, 4984:8, 4985:5, 4985:20, 4986:14, 4987:7, 4987:9, 4987:12, 4987:19, 4997:9, 5000:20, 5002:1, 5002:11, 5006:3, 5006:22, 5006:23, 5008:5, 5012:23, 5019:15, 5022:20, 5027:22, 5029:12, 5030:10, 5032:7, 5038:1, 5038:7, 5038:8, 5045:22, 5048:6, 5053:16, 5054:11, 5061:3, 5065:5, 5068:4, 5069:2, 5069:8, 5091:11, 5094:18, 5096:2,

5097:7, 5100:23,
5103:12, 5105:15,
5110:14, 5111:14,
5115:12, 5118:11,
5120:6, 5121:9,
5126:16, 5127:8,
5127:24, 5128:5,
5128:7, 5129:14,
5129:15, 5131:20,
5141:19, 5142:5,
5150:6, 5151:10
**objections** [2] -
5006:9, 5008:13
**obligated** [1] -
5023:2
**observed** [1] -
5045:25
**observing** [1] -
5010:20
**obstruction** [3] -
4953:10, 4999:2,
5051:21
**obtain** [3] - 5029:10,
5047:20, 5135:19
**obtained** [3] -
5031:7, 5032:11,
5087:11
**obtaining** [2] -
5035:23, 5047:17
**obviously** [9] -
4937:3, 4937:25,
4948:4, 4951:11,
4978:16, 5004:3,
5039:19, 5044:10,
5151:22
**occasions** [6] -
5005:9, 5005:14,
5049:11, 5054:8,
5054:15, 5056:15
**occur** [1] - 5076:15
**occurred** [15] -
4958:2, 5003:3,
5054:9, 5054:21,
5054:25, 5055:17,
5055:20, 5056:6,
5056:7, 5058:15,
5059:25, 5063:22,
5075:23, 5076:4,
5076:12
**occurring** [1] -
5025:6
**occurs** [1] - 5089:6
**October** [6] - 4956:6,
4956:10, 4959:12,
4981:1, 5086:20,
5086:23
**oddly** [1] - 5096:3
**OF** [3] - 4934:1,
4934:3, 4934:9
**offense** [1] - 4937:23

**offer** [28] - 4968:4,
4977:12, 4979:21,
4982:6, 4985:3,
4987:6, 4987:17,
5000:19, 5002:3,
5002:11, 5002:13,
5006:1, 5009:2,
5061:2, 5062:12,
5065:4, 5068:3,
5091:10, 5096:1,
5100:22, 5105:14,
5127:6, 5128:4,
5131:19, 5141:18,
5150:5, 5151:19,
5152:4
**offered** [21] - 4977:5,
4987:25, 5002:14,
5002:18, 5003:9,
5003:16, 5004:7,
5004:10, 5004:21,
5005:22, 5006:2,
5006:9, 5006:15,
5006:19, 5006:24,
5007:4, 5007:16,
5007:21, 5008:3,
5008:9, 5062:11
**offering** [2] - 5007:9,
5007:10
**offers** [1] - 4987:15
**Office** [6] - 4952:22,
4953:8, 5049:21,
5050:5, 5050:10,
5051:18
**office** [11] - 5063:13,
5063:15, 5063:17,
5064:17, 5087:2,
5107:12, 5108:21,
5115:25, 5136:7,
5136:14, 5137:25
**officer** [15] -
4942:23, 5036:11,
5036:14, 5036:18,
5036:24, 5043:9,
5069:7, 5086:13,
5086:16, 5086:19,
5094:21, 5138:24,
5139:1, 5143:14,
5152:4
**Officer** [1] - 5013:9
**officers** [2] -
4971:25, 4972:13
**official** [2] - 5147:19,
5147:23
**officially** [1] -
4937:11
**often** [2] - 4977:22,
5050:3
**Once** [1] - 5044:5
**once** [3] - 5032:23,
5132:8, 5144:6

**one** [85] - 4942:14,
4942:20, 4947:5,
4948:1, 4953:20,
4953:21, 4953:23,
4954:1, 4962:6,
4971:12, 4975:7,
4976:9, 4978:7,
4982:4, 4982:12,
4985:24, 4986:25,
4994:2, 4995:2,
4997:13, 4997:16,
4998:7, 5007:24,
5007:25, 5008:8,
5011:25, 5012:17,
5015:4, 5015:21,
5017:12, 5017:17,
5019:25, 5022:12,
5025:7, 5025:22,
5026:14, 5033:18,
5033:19, 5033:20,
5033:22, 5034:10,
5034:11, 5035:17,
5035:18, 5035:21,
5056:2, 5056:4,
5057:18, 5057:19,
5057:22, 5061:12,
5061:18, 5061:19,
5064:3, 5064:5,
5064:6, 5067:16,
5068:13, 5070:3,
5072:14, 5074:22,
5078:16, 5084:11,
5094:15, 5098:9,
5100:8, 5102:13,
5107:22, 5110:4,
5112:3, 5112:8,
5112:25, 5116:22,
5118:13, 5120:14,
5132:15, 5137:20,
5142:1, 5142:20,
5143:22, 5144:7,
5147:16, 5148:14
**one-page** [1] -
4998:7
**ones** [5] - 5010:21,
5011:16, 5132:20,
5132:21, 5153:5
**oooOooo** [1] -
5154:23
**open** [11] - 4935:1,
4952:1, 4965:24,
4969:2, 5009:1,
5047:1, 5076:25,
5077:1, 5077:2,
5078:3, 5152:18
**opened** [1] - 4956:18
**opening** [2] -
4968:14, 4969:10
**openings** [1] -
5004:5

**operating** [8] -
4942:23, 5069:6,
5086:15, 5094:21,
5138:24, 5139:1,
5143:14, 5152:3
**Operating** [1] -
5013:8
**opinion** [2] -
5022:21, 5110:22
**opportunity** [4] -
4944:13, 4957:21,
4967:19, 5084:11
**opposed** [1] -
4985:18
**opposite** [2] -
4945:23, 4946:1
**optimistic** [1] -
5153:3
**option** [2] - 4982:12,
4982:13
**ordinary** [6] -
4959:6, 4983:12,
4983:23, 4984:5,
4984:11, 4984:25
**Oremland** [1] -
5153:10
**original** [3] -
4953:24, 5036:16,
5074:7
**otherwise** [4] -
4948:17, 4949:3,
4949:6, 4950:21
**out-of-court** [1] -
5006:24
**out-of-court-
statement** [1] - 4977:5
**outburst** [2] -
5046:2, 5046:5
**outbursts** [1] -
5046:11
**outcome** [1] -
4936:15
**outside** [7] - 4935:1,
4975:21, 4976:1,
5038:24, 5039:1,
5076:24, 5114:17
**overcome** [1] -
5006:17
**overrule** [1] - 5038:8
**overruled** [5] -
4970:24, 4986:20,
5012:24, 5069:9,
5120:8
**owe** [5] - 5019:7,
5021:13, 5021:15,
5021:17
**owed** [2] - 5010:2,
5010:14
**own** [7] - 4940:9,
5012:15, 5082:16,

5088:4, 5089:2,
5146:11, 5146:19
**ownership** [5] -
5142:20, 5142:24,
5145:12, 5145:15,
5145:19

## P

**p.m** [22] - 5101:4,
5105:19, 5105:25,
5111:21, 5114:15,
5115:20, 5120:11,
5120:12, 5122:12,
5122:13, 5122:21,
5123:24, 5123:25,
5133:12, 5133:16,
5142:14
**page** [80] - 4961:21,
4962:14, 4964:11,
4965:14, 4966:20,
4968:21, 4969:22,
4975:22, 4981:11,
4981:16, 4982:15,
4983:21, 4984:2,
4984:4, 4984:12,
4986:3, 4986:5,
4987:1, 4987:13,
4988:13, 4988:22,
4990:4, 4991:7,
4991:10, 4992:4,
4992:11, 4993:2,
4993:4, 4995:8,
4998:7, 5001:5,
5008:16, 5009:13,
5026:24, 5038:25,
5046:22, 5066:17,
5067:6, 5069:21,
5069:22, 5070:5,
5070:11, 5070:18,
5072:24, 5085:7,
5087:4, 5092:11,
5093:5, 5093:13,
5093:23, 5094:2,
5094:5, 5096:11,
5098:1, 5098:4,
5102:12, 5103:5,
5103:22, 5106:15,
5106:17, 5106:18,
5106:22, 5109:15,
5115:11, 5118:17,
5121:3, 5122:10,
5122:22, 5123:2,
5124:5, 5125:3,
5127:8, 5128:20,
5140:19, 5141:8,
5141:9, 5144:9,
5147:21
**pages** [16] - 5010:25,
5011:4, 5031:13,
5031:25, 5095:23,

5096:3, 5096:5, 5096:8, 5100:19, 5101:25, 5102:2, 5102:4, 5127:11, 5127:23
**paid** [9] - 5001:2, 5009:23, 5010:7, 5016:13, 5078:16, 5078:17, 5080:6, 5089:19, 5089:21
**paper** [1] - 5143:20
**paragraph** [20] - 4952:21, 4982:7, 5009:20, 5010:16, 5012:11, 5012:12, 5013:6, 5014:11, 5027:17, 5051:8, 5051:15, 5067:3, 5071:16, 5071:18, 5086:8, 5086:18, 5091:24, 5093:15, 5093:17, 5146:21
**paraphrasing** [1] - 5084:5
**pardon** [1] - 4960:18
**parenthesis** [1] - 5011:21
**Park** [1] - 4934:17
**parked** [1] - 5024:10
**part** [30] - 4942:21, 4986:15, 5013:7, 5015:13, 5016:8, 5025:16, 5037:2, 5039:18, 5062:22, 5062:23, 5063:12, 5066:21, 5080:17, 5083:8, 5083:14, 5087:18, 5087:23, 5094:7, 5095:20, 5117:10, 5117:14, 5117:15, 5120:18, 5134:23, 5145:12, 5145:15, 5145:19, 5149:7, 5149:11, 5151:24
**particular** [6] - 4939:16, 4979:4, 4980:21, 4984:2, 5074:15
**particularly** [3] - 4948:13, 4985:6, 5119:12
**parties** [11] - 4935:3, 4952:4, 4954:12, 5019:18, 5021:11, 5057:8, 5078:20, 5078:23, 5092:21, 5093:2, 5125:13
**partner** [8] - 4961:3, 4962:2, 4964:25,

4965:18, 4983:15, 4983:23, 5041:25, 5149:13
**partners** [5] - 4956:11, 4957:9, 4957:12, 4957:17, 4979:20
**party** [4] - 4956:8, 4957:2, 5109:11, 5113:14
**passed** [1] - 5014:19
**password** [4] - 4939:7, 4997:14, 5037:13, 5037:14
**passwords** [4] - 5029:5, 5033:18, 5035:2, 5035:7
**Passwords** [1] - 5035:3
**past** [6] - 5006:1, 5013:14, 5040:2, 5054:10, 5079:6, 5143:24
**pause** [4] - 4954:14, 4955:15, 5016:4, 5118:25
**Pause** [15] - 4954:18, 4954:24, 4975:9, 4987:22, 4994:3, 4994:22, 4995:3, 5064:7, 5079:18, 5080:10, 5085:6, 5118:19, 5119:14, 5127:5, 5132:24
**pay** [18] - 4978:3, 5000:16, 5001:4, 5010:2, 5010:4, 5010:12, 5012:9, 5015:15, 5016:1, 5017:11, 5087:18, 5087:21, 5088:4, 5088:24, 5089:2, 5089:16, 5138:4
**paying** [1] - 5010:24
**payment** [9] - 4957:4, 4957:13, 4971:23, 4977:23, 5089:2, 5089:13, 5089:14, 5089:18, 5089:20
**payments** [5] - 4957:10, 4958:5, 4959:8, 5088:9, 5088:9
**people** [18] - 4942:5, 4963:1, 4965:6, 4970:1, 4989:24, 5026:22, 5042:19, 5060:3, 5083:10, 5088:21, 5113:14,

5148:5, 5148:17, 5149:1, 5149:4, 5149:9, 5149:16, 5154:15
**people's** [3] - 5036:15, 5036:17, 5041:17
**per** [4] - 5067:4, 5069:25, 5071:15, 5071:18
**perceived** [2] - 5026:4, 5046:13
**percent** [4] - 4981:21, 4992:14, 4992:18, 5135:21
**perfectly** [2] - 4945:25, 5030:5
**performance** [1] - 5014:6
**performed** [3] - 4963:21, 4966:17, 5009:21
**perhaps** [3] - 4950:25, 4968:8, 5096:3
**perimeter** [1] - 4965:24
**period** [37] - 4956:11, 4957:9, 4957:12, 4960:23, 4962:16, 4962:19, 4963:4, 4963:6, 4963:8, 4964:14, 4964:19, 4964:23, 4970:8, 4971:3, 4972:18, 4972:25, 4973:8, 4973:14, 4973:24, 4974:1, 4980:3, 4986:23, 4992:1, 4999:18, 4999:23, 5010:19, 5013:23, 5013:24, 5017:23, 5018:5, 5039:3, 5040:17, 5040:24, 5048:3, 5075:3, 5120:20, 5121:18
**periods** [1] - 4974:4
**perjury** [2] - 4953:10, 5051:20
**permissible** [4] - 4936:20, 4939:2, 4942:4, 5030:5
**permission** [5] - 4940:6, 5018:10, 5018:25, 5020:19
**person** [6] - 4941:18, 4942:8, 4984:6, 5004:12, 5069:11, 5106:7

**personal** [15] - 4978:24, 4981:23, 4984:18, 4989:19, 5010:21, 5011:16, 5011:17, 5098:13, 5098:20, 5099:4, 5099:24, 5126:13, 5146:11, 5146:19
**personally** [5] - 5052:21, 5052:24, 5053:3, 5057:13, 5098:25
**perspective** [2] - 5081:22, 5088:18
**pertained** [1] - 5057:22
**pharmaceutical** [1] - 5090:1
**Phase** [1] - 5087:8
**phone** [7] - 4951:14, 5014:16, 5014:18, 5112:17, 5118:5, 5120:3, 5132:9
**photocopies** [1] - 4953:19
**phrase** [2] - 5064:2, 5064:11
**phrased** [1] - 4950:16
**pick** [1] - 5132:8
**piece** [4] - 4936:21, 4936:22, 4939:3, 5143:20
**Pierotti** [7] - 4943:8, 4943:10, 4963:21, 4964:9, 4965:15, 5026:8, 5042:2
**PITLUCK** [14] - 4934:14, 5006:6, 5007:7, 5007:23, 5008:12, 5044:22, 5045:20, 5048:6, 5078:25, 5079:7, 5079:12, 5152:22, 5153:5, 5153:11
**place** [5] - 4936:17, 4940:7, 5043:14, 5063:9, 5137:1
**placed** [4] - 4978:19, 5013:3, 5096:10, 5096:11
**Plaintiff** [1] - 4934:4
**plan** [7] - 5083:22, 5083:24, 5137:1, 5138:1, 5139:18, 5139:19, 5148:17
**planning** [1] - 4935:19
**Plasma** [6] - 4956:14, 4959:2,

4960:6, 4960:14, 4962:10, 4971:18
**play** [1] - 4946:8
**Plaza** [2] - 4934:15, 4934:23
**plea** [1] - 5154:6
**pled** [1] - 4950:8
**plus** [5] - 5010:25, 5011:4, 5019:8, 5021:15, 5142:19
**pocket** [2] - 5088:4, 5089:2
**point** [30] - 4952:20, 4953:19, 4953:25, 4978:21, 4980:6, 4980:16, 4981:17, 5004:4, 5007:7, 5008:7, 5010:14, 5016:19, 5016:23, 5032:18, 5033:8, 5045:20, 5060:5, 5069:11, 5075:20, 5076:19, 5082:24, 5098:24, 5126:20, 5130:23, 5130:24, 5132:15, 5137:3, 5151:18, 5152:6, 5154:1
**pointed** [2] - 4979:18, 4980:3
**pointing** [2] - 5111:12, 5111:15
**points** [6] - 4978:13, 4980:15, 4996:24, 5041:16, 5042:9, 5043:15
**portion** [7] - 4960:4, 4985:11, 5009:24, 5024:22, 5088:4, 5089:2, 5089:21
**position** [7] - 4937:4, 4948:4, 4949:24, 5082:17, 5142:7, 5142:20, 5142:24
**possession** [3] - 4953:18, 5011:11, 5020:9
**possibility** [4] - 4935:25, 5076:17, 5079:5, 5083:19
**possible** [5] - 4935:19, 4961:12, 4990:20, 5072:16, 5145:21
**possibly** [2] - 5042:17, 5064:17
**post** [8] - 5021:22, 5021:24, 5022:2, 5022:6, 5084:12, 5128:24, 5128:25,

5129:1
**Post** [3] - 4962:7, 4963:20, 4965:21
**post-conversion** [1] - 5128:24
**Post-it** [3] - 4962:7, 4963:20, 4965:21
**post-money** [2] - 5128:25, 5129:1
**posted** [5] - 5022:3, 5023:5, 5023:22, 5035:15, 5035:17
**posting** [3] - 5035:15, 5035:16, 5035:23
**potential** [1] - 4955:10
**power** [1] - 5142:7
**PPM** [4] - 5062:1, 5062:24, 5063:22, 5069:14
**PPMs** [3] - 5061:13, 5061:14, 5061:18
**pre** [5] - 4966:3, 4966:6, 4966:17, 5128:25, 5129:1
**pre-money** [2] - 5128:25, 5129:1
**preamble** [4] - 4985:6, 4985:10, 4985:22, 4987:8
**preclude** [3] - 4999:4, 5039:13, 5040:19
**precludes** [1] - 5005:21
**prefer** [1] - 5004:22
**prejudice** [1] - 4945:2
**preliminary** [2] - 4983:16, 5015:20
**prepared** [2] - 4994:9, 4994:11
**presence** [1] - 4935:1
**present** [10] - 4935:3, 4952:1, 4952:3, 4955:16, 4955:17, 5043:22, 5078:3, 5080:14, 5086:2, 5136:13
**presented** [1] - 4980:4
**pretty** [1] - 5143:9
**prevent** [1] - 4943:21
**previous** [1] - 5001:1
**previously** [5] - 4965:17, 4968:13, 4996:2, 5019:9, 5098:9

**price** [7] - 5015:25, 5016:2, 5019:3, 5021:7, 5063:15, 5065:20, 5147:13
**principal** [4] - 4961:7, 4963:10, 4963:16, 4965:8
**principals** [1] - 5022:12
**principled** [2] - 4946:12, 4946:13
**printed** [6] - 5096:3, 5096:6, 5096:7, 5115:10, 5127:20, 5141:3
**printing** [1] - 5115:17
**prints** [1] - 5127:19
**private** [1] - 5130:18
**privileged** [1] - 5051:2
**problem** [3] - 4943:18, 5073:20, 5132:16
**problems** [1] - 5154:1
**proceed** [5] - 4952:5, 4954:19, 4968:7, 4983:1, 5045:21
**proceeding** [7] - 4953:14, 5015:17, 5016:12, 5117:21, 5118:16, 5118:22, 5119:18
**Proceedings** [1] - 4934:25
**produced** [6] - 4934:25, 5127:9, 5127:18, 5127:21, 5140:25, 5141:1
**production** [1] - 4979:25
**professional** [4] - 4962:15, 4964:12, 4969:25, 5046:13
**profit** [1] - 5137:2
**profits** [1] - 5137:4
**program** [2] - 5025:17, 5025:18
**prohibited** [1] - 5099:21
**Project** [4] - 4962:9, 4966:7, 4967:3, 4967:12
**proof** [1] - 5044:10
**proper** [3] - 4998:4, 5018:11, 5022:17
**propose** [3] - 4979:13, 5082:1, 5082:2

**proposed** [1] - 5015:21
**pros** [12] - 4936:11, 4940:15, 4944:7, 4944:20, 4945:3, 4945:6, 4945:11, 4950:2, 4950:8, 4950:12, 4950:23, 4951:1
**prosecute** [1] - 4999:1
**prosecuted** [5] - 4943:6, 4947:13, 4948:24, 4999:3, 4999:4
**prosecution** [63] - 4935:18, 4940:12, 4940:21, 4943:4, 4943:9, 4943:11, 4943:13, 4943:15, 4943:18, 4943:23, 4943:25, 4944:3, 4944:4, 4945:20, 4945:24, 4946:3, 4946:14, 4947:2, 4947:9, 4947:12, 4947:18, 4947:24, 4948:6, 4948:23, 4953:9, 5027:11, 5027:14, 5027:20, 5027:24, 5028:6, 5028:11, 5030:7, 5030:22, 5031:5, 5032:20, 5033:5, 5033:11, 5037:20, 5038:5, 5038:11, 5039:12, 5039:14, 5039:19, 5040:15, 5045:12, 5048:21, 5048:23, 5049:1, 5049:5, 5049:9, 5049:15, 5049:18, 5051:20, 5053:2, 5053:20, 5055:24, 5056:5, 5056:9, 5057:2, 5057:15, 5058:1, 5058:12
**prosecution's** [1] - 4946:8
**prosecutors** [3] - 5033:4, 5033:12, 5058:3
**protect** [1] - 4943:23
**protected** [3] - 4937:15, 4946:20, 5042:23
**protecting** [1] - 4947:19
**protection** [5] - 4944:21, 4947:12,

4947:19, 4948:7, 4948:16
**protections** [1] - 5044:1
**protects** [5] - 4943:5, 4943:6, 4943:15, 4947:22, 4948:24
**Protocol** [1] - 5038:17
**prove** [5] - 4977:5, 4977:11, 4978:15, 5006:24, 5042:5
**provide** [1] - 4951:11, 4952:13, 5050:8
**provided** [9] - 4952:8, 4952:11, 4952:15, 5002:17, 5003:10, 5004:8, 5058:24, 5059:5, 5069:12
**provides** [2] - 4953:11, 5051:21
**providing** [1] - 5091:15
**prudent** [1] - 5084:17
**public** [6] - 5022:9, 5022:18, 5130:18, 5130:24, 5144:6
**publish** [2] - 4955:24, 4987:25
**pull** [2] - 4997:24, 5064:2
**pulled** [2] - 5033:6, 5109:24
**pulling** [1] - 5035:4
**purchase** [2] - 5147:15, 5150:20
**purportedly** [1] - 4978:5
**purpose** [12] - 4947:16, 4978:17, 5004:17, 5006:8, 5006:11, 5006:15, 5007:1, 5007:7, 5036:6, 5036:13, 5036:16
**purposes** [2] - 4940:9, 5007:5
**pursue** [1] - 4981:12
**push** [1] - 4961:1
**pushed** [2] - 5015:16, 5078:23
**put** [69] - 4937:21, 4939:24, 4958:13, 4965:21, 4976:11, 4990:2, 4993:10, 4995:6, 5005:4, 5005:11, 5005:14,

5008:1, 5026:14, 5030:12, 5043:14, 5045:11, 5045:23, 5054:17, 5054:18, 5055:19, 5055:22, 5056:6, 5057:7, 5057:8, 5058:5, 5059:5, 5061:22, 5064:3, 5065:17, 5065:20, 5065:22, 5066:9, 5070:13, 5071:2, 5071:25, 5076:4, 5076:11, 5086:6, 5102:15, 5106:9, 5108:12, 5108:15, 5108:18, 5109:11, 5109:16, 5110:10, 5110:11, 5110:12, 5110:19, 5114:11, 5114:12, 5115:4, 5116:3, 5116:15, 5116:16, 5120:10, 5121:16, 5121:17, 5122:9, 5122:10, 5128:17, 5130:10, 5133:13, 5134:1, 5134:17, 5151:6, 5151:7, 5151:23, 5152:7
**putting** [10] - 4938:13, 4946:14, 5028:4, 5028:10, 5054:24, 5056:16, 5060:10, 5102:17, 5102:18, 5139:13

### Q

**qualify** [1] - 5024:17
**quarter** [2] - 5010:5, 5010:13
**quarters** [1] - 5049:13
**QUESTION** [3] - 5080:21, 5080:24, 5081:11
**questioned** [1] - 5081:16
**questioning** [4] - 4945:20, 4945:24, 4946:3, 4946:9
**questions** [25] - 4939:10, 4947:11, 4950:15, 4952:14, 4968:9, 4975:12, 4988:24, 4989:10, 4989:24, 4990:4, 4990:23, 4993:25, 4994:4, 4996:20, 5014:22, 5026:23, 5039:23, 5041:10,

5081:23, 5082:4,
5082:8, 5082:24,
5083:18, 5083:22
**quick** [1] - 5040:25
**quickly** [3] -
4975:13, 4991:4,
5082:23
**quit** [1] - 4949:22
**quite** [2] - 4936:5,
4979:19
**quotation** [1] -
4953:4
**quote** [11] - 5038:17,
5101:6, 5101:8,
5101:11, 5145:3,
5145:5, 5145:12,
5145:21, 5150:11,
5150:12

# R

**R012810** [1] -
5109:17
**R012812** [1] -
5106:19
**raise** [3] - 5022:17,
5080:12, 5088:22
**raised** [1] - 4945:4
**raising** [2] - 5022:8,
5022:9
**RANDY** [1] - 4934:19
**range** [1] - 4974:3
**rate** [1] - 4970:5
**rates** [2] - 4967:16,
4970:7
**rather** [5] - 5008:9,
5009:7, 5042:12,
5079:14, 5114:16
**ratio** [2] - 5130:19,
5145:13
**Re** [2] - 5048:14,
5050:16
**re** [2] - 4952:22,
5109:25
**RE-021** [1] - 5087:7
**re-execute** [1] -
5109:25
**reach** [2] - 5078:10,
5079:17
**reached** [3] - 4935:8,
4952:4, 5079:19
**reaching** [1] -
4996:11
**react** [2] - 5139:24,
5139:25
**reaction** [1] - 5137:6
**read** [17] - 4938:11,
4988:16, 5009:19,
5010:9, 5012:11,
5013:5, 5013:12,

5014:4, 5044:24,
5044:25, 5082:22,
5083:3, 5119:11,
5119:16, 5120:4,
5147:17
**reading** [6] -
4937:15, 5010:16,
5063:13, 5119:13,
5119:22, 5135:4
**reads** [2] - 5051:14,
5119:2
**ready** [3] - 4936:9,
4951:15, 4954:19
**real** [4] - 4962:4,
5113:5, 5138:6,
5141:6
**realization** [1] -
5138:5
**really** [10] - 4939:20,
4942:8, 4981:11,
5044:8, 5050:23,
5051:3, 5078:23,
5081:1, 5081:8,
5137:9
**realm** [1] - 4942:4
**reason** [12] -
4943:14, 4943:17,
4947:17, 4948:15,
4949:2, 5002:4,
5007:10, 5050:6,
5075:17, 5075:19,
5095:8, 5114:2
**reasons** [3] -
5052:13, 5105:5
**recast** [1] - 5054:14
**receive** [21] -
4952:20, 4958:10,
4960:15, 5025:20,
5048:7, 5061:4,
5062:14, 5065:6,
5068:5, 5091:12,
5096:20, 5100:24,
5105:16, 5128:2,
5128:9, 5131:21,
5149:15, 5149:18,
5149:19, 5149:21,
5150:7
**received** [45] -
4947:11, 4947:18,
4948:24, 4952:19,
4959:23, 4960:2,
4960:4, 4960:13,
4997:20, 5002:9,
5002:16, 5003:24,
5003:25, 5013:1,
5013:2, 5026:4,
5026:10, 5028:15,
5030:19, 5030:21,
5035:10, 5047:8,
5047:25, 5048:9,

5052:6, 5091:13,
5096:15, 5096:16,
5096:21, 5097:20,
5097:23, 5098:23,
5099:19, 5100:25,
5105:17, 5110:17,
5111:19, 5111:20,
5111:24, 5128:1,
5129:5, 5136:3,
5148:17, 5149:16,
5150:9
**receives** [1] -
5141:20
**receiving** [13] -
4948:6, 4960:10,
4960:21, 4984:7,
5012:22, 5015:7,
5062:4, 5098:24,
5099:2, 5100:3,
5129:9, 5135:15,
5150:10
**recently** [1] -
5078:24
**Recess** [1] - 4951:16
**recess** [1] - 5077:10
**recipient** [4] -
5002:7, 5002:9,
5002:15
**recipients** [4] -
5009:8, 5026:6,
5147:9, 5148:14
**recognition** [1] -
4946:21
**recognize** [12] -
4937:24, 5030:17,
5060:19, 5065:2,
5072:22, 5092:12,
5092:15, 5092:17,
5092:19, 5095:17,
5124:2, 5151:15
**recognized** [1] -
5123:23
**recognizes** [2] -
5123:17, 5152:2
**recollection** [16] -
4981:22, 4998:11,
5000:8, 5004:17,
5004:18, 5005:3,
5006:4, 5011:24,
5023:20, 5023:23,
5040:23, 5045:5,
5074:11, 5074:21,
5074:25, 5119:3
**reconciliation** [1] -
5047:15
**record** [26] -
4976:16, 4976:18,
4976:21, 4977:10,
4978:22, 4979:5,
4979:6, 4979:9,

4979:10, 4979:12,
4979:16, 4981:13,
4981:19, 4982:5,
5000:7, 5006:18,
5024:25, 5045:11,
5062:7, 5064:25,
5083:1, 5084:5,
5090:18, 5100:12,
5105:11, 5140:19
**recorded** [12] -
4934:25, 4972:24,
4974:22, 4974:25,
4986:23, 4992:20,
4992:21, 4993:7,
4993:18, 4993:22,
5018:14, 5018:15
**recording** [1] -
4974:8
**recordkeeping** [1] -
4985:18
**records** [8] -
4976:15, 4981:17,
4984:23, 5006:17,
5010:3, 5037:16,
5047:18, 5047:20
**recross** [1] - 4994:1
**red** [1] - 5061:25
**redact** [2] - 4980:5,
4982:7
**redacted** [1] - 5141:8
**redacting** [6] -
5115:2, 5115:4,
5116:4, 5116:15,
5116:23, 5123:7
**redirect** [1] - 4989:1
**REDIRECT** [2] -
4989:3, 5155:7
**reduced** [1] - 5012:8
**REED** [1] - 4934:19
**refer** [3] - 4970:5,
4983:19, 4984:1
**reference** [6] -
4984:12, 5011:7,
5011:8, 5012:20,
5089:19, 5116:17
**references** [2] -
4938:12, 4996:16
**referred** [4] - 4977:3,
5011:3, 5011:15,
5013:17
**referring** [16] -
4968:12, 4984:3,
4984:4, 4984:13,
5026:20, 5035:24,
5055:7, 5060:12,
5074:4, 5076:5,
5076:6, 5100:7,
5108:3, 5117:23,
5135:9, 5150:22
**refers** [5] - 4958:18,

4964:9, 4969:17,
4972:23, 5013:1
**reflected** [5] -
5054:20, 5060:21,
5062:6, 5075:10,
5113:6
**reflecting** [2] -
5038:6, 5038:12
**reflects** [4] -
4967:16, 4974:1,
5066:14, 5073:21
**refresh** [8] - 5000:8,
5004:16, 5005:3,
5023:23, 5040:23,
5045:5, 5134:10,
5134:13
**refreshes** [2] -
4998:11, 5023:19
**refreshing** [2] -
5004:17, 5119:3
**refuse** [2] - 5082:7,
5083:22
**refused** [1] - 5015:22
**regard** [4] - 4940:2,
4978:2, 5007:14,
5044:3
**regarding** [13] -
4952:5, 4953:1,
4953:6, 4958:5,
4998:16, 4998:17,
5012:13, 5020:3,
5051:11, 5051:17,
5080:13, 5081:16,
5145:19
**regardless** [1] -
5090:24
**regular** [1] - 4976:19
**relate** [2] - 5012:21,
5060:21
**related** [10] -
4941:13, 4950:20,
4952:9, 4956:14,
4978:11, 4988:16,
5016:8, 5019:18,
5021:17, 5136:17
**relates** [2] - 5067:25,
5095:20
**relating** [5] -
5014:23, 5081:23,
5100:6, 5135:13,
5136:5
**relation** [2] -
5133:21, 5134:14
**relationship** [1] -
4961:10
**Relay** [51] - 4942:16,
4942:18, 4947:15,
4996:20, 4997:7,
4997:12, 4997:14,
4997:18, 4998:18,

4998:19, 5028:1,
5028:7, 5028:12,
5028:18, 5028:20,
5028:22, 5028:24,
5029:6, 5029:9,
5029:16, 5030:2,
5030:8, 5031:7,
5032:4, 5032:10,
5032:24, 5033:6,
5033:18, 5034:4,
5034:20, 5034:25,
5035:13, 5035:22,
5036:4, 5036:10,
5036:25, 5037:11,
5037:22, 5038:6,
5038:13, 5038:16,
5040:12, 5043:8,
5047:5, 5047:10,
5047:17, 5047:25,
5052:1, 5052:9,
5081:17, 5082:8

**relevance** [5] -
4980:4, 5003:23,
5003:24, 5038:7,
5069:8

**relevant** [10] -
4942:25, 4944:12,
4976:22, 4977:16,
4980:2, 4981:6,
5004:11, 5005:23,
5007:1, 5025:1

**relying** [2] - 5008:4,
5008:5

**remain** [1] - 4944:24

**remainder** [1] -
4960:15

**remember** [129] -
4955:9, 4996:21,
4997:25, 5017:16,
5021:18, 5023:8,
5026:16, 5028:9,
5029:7, 5032:3,
5032:9, 5032:12,
5032:13, 5032:15,
5032:17, 5032:19,
5033:10, 5033:15,
5033:17, 5033:19,
5033:24, 5034:9,
5034:10, 5034:11,
5034:13, 5034:14,
5034:17, 5034:19,
5034:22, 5034:23,
5035:1, 5035:2,
5035:4, 5035:6,
5035:14, 5035:15,
5035:21, 5035:22,
5036:3, 5036:5,
5037:5, 5037:24,
5038:3, 5040:7,
5040:21, 5047:14,

5047:17, 5048:2,
5048:25, 5049:8,
5052:7, 5053:5,
5053:10, 5055:10,
5055:12, 5056:1,
5056:2, 5056:4,
5057:19, 5057:24,
5058:1, 5058:12,
5058:14, 5058:23,
5059:18, 5059:23,
5060:2, 5060:9,
5063:12, 5064:20,
5072:13, 5072:16,
5073:18, 5073:19,
5076:9, 5086:12,
5087:25, 5089:3,
5090:11, 5091:1,
5091:4, 5091:5,
5091:7, 5091:8,
5093:4, 5095:11,
5095:13, 5100:3,
5100:6, 5102:17,
5102:18, 5105:6,
5112:15, 5112:24,
5113:5, 5113:7,
5115:6, 5115:7,
5115:8, 5115:9,
5115:13, 5116:13,
5116:14, 5116:15,
5117:8, 5117:11,
5117:13, 5117:15,
5117:16, 5117:17,
5117:18, 5117:22,
5119:25, 5120:20,
5121:18, 5121:23,
5122:1, 5122:3,
5126:23, 5126:25,
5131:11, 5131:12,
5131:16, 5132:2,
5132:12, 5132:18,
5133:8, 5135:8

**remembered** [4] -
5037:23, 5037:24,
5117:10, 5117:13

**remembering** [4] -
5053:13, 5053:14,
5053:18, 5053:23

**remind** [2] - 5046:8,
5046:10

**remove** [1] - 5046:4

**removed** [2] -
4978:18, 5024:25

**rendered** [2] -
4967:25, 4988:17

**reneged** [2] -
5018:24

**renew** [2] - 5120:6,
5152:9

**reorient** [1] - 5015:7

**repeat** [1] - 5038:10

**repeatedly** [2] -
4977:10, 4980:3

**rephrase** [22] -
4967:10, 4968:17,
4968:19, 4972:4,
4983:19, 4997:10,
5020:5, 5024:14,
5024:20, 5024:22,
5025:2, 5027:23,
5032:8, 5053:17,
5056:20, 5088:13,
5094:19, 5110:16,
5111:16, 5115:14,
5115:15, 5126:17

**replaced** [1] -
5119:24

**replies** [1] - 4960:9

**report** [6] - 4991:6,
4992:23, 5024:5,
5041:7, 5078:15,
5079:1

**reported** [3] -
5003:12, 5143:14,
5143:16

**Reporter** [1] -
4934:22

**reporters** [1] -
4951:14

**reporting** [1] -
4975:4

**reports** [3] -
4972:18, 4990:24,
4993:12

**represent** [2] -
4971:24, 4972:12

**representation** [10] -
4963:22, 5081:15,
5081:22, 5093:5,
5100:20, 5102:5,
5103:23, 5107:24,
5109:21, 5126:8

**representations** [2] -
5045:9, 5045:14

**represented** [6] -
4937:24, 5048:19,
5048:20, 5050:13,
5082:3, 5082:7

**representing** [1] -
5094:23

**request** [4] - 4978:3,
4985:7, 5014:11,
5079:3

**requested** [1] -
5055:12

**requests** [1] - 5001:2

**requirements** [1] -
4977:11

**rescheduled** [1] -
5078:22

**resolution** [6] -

4935:7, 4935:12,
4936:4, 5017:20,
5020:24, 5020:25

**resolve** [2] -
4975:14, 4975:15

**respect** [12] -
4977:14, 4984:18,
5027:25, 5073:3,
5076:1, 5079:3,
5080:16, 5082:4,
5088:11, 5110:23,
5130:14, 5138:1

**respectfully** [4] -
4979:15, 5004:14,
5004:22, 5006:20

**respond** [6] - 4959:1,
5015:12, 5062:5,
5062:20, 5082:11,
5082:19

**responded** [1] -
4960:17

**responding** [4] -
4960:18, 5009:14,
5059:23, 5083:24

**responds** [2] -
4959:4, 5109:4

**response** [10] -
5009:19, 5009:20,
5015:13, 5063:21,
5068:7, 5101:21,
5134:11, 5134:25,
5143:7, 5143:17

**responsibility** [1] -
4963:13

**responsible** [3] -
4963:17, 4965:11,
4979:20

**rest** [4] - 4939:24,
4959:13, 4960:21,
5010:16

**restated** [1] -
5093:21

**restricted** [3] -
5017:22, 5017:24,
5018:5

**restriction** [3] -
5018:6, 5145:4,
5145:9

**restrictions** [1] -
5013:3

**result** [3] - 5021:13,
5025:14, 5135:3

**resulted** [1] - 5019:4

**resulting** [1] -
5121:18

**results** [1] - 5129:8

**resume** [2] - 5085:5,
5086:5

**resumed** [2] -
4955:2, 4996:3

**retained** [3] -
5031:13, 5031:15,
5031:24

**Retrophin** [125] -
4938:4, 4949:21,
4952:9, 4952:11,
4953:2, 4953:3,
4971:7, 4971:9,
4971:14, 4972:7,
4978:3, 4989:15,
4991:11, 4991:14,
4991:23, 4992:5,
4992:15, 4993:1,
4993:8, 4993:17,
4993:18, 4993:23,
4996:24, 4996:25,
4997:3, 4997:19,
4999:7, 5007:15,
5009:18, 5012:9,
5016:9, 5016:20,
5017:21, 5019:22,
5020:12, 5021:4,
5021:6, 5022:8,
5024:9, 5025:10,
5025:11, 5026:2,
5026:4, 5028:16,
5029:4, 5029:10,
5029:18, 5030:1,
5030:2, 5031:16,
5031:22, 5033:6,
5033:25, 5036:8,
5047:5, 5047:9,
5047:23, 5051:12,
5052:4, 5052:10,
5052:22, 5053:4,
5058:16, 5065:15,
5066:17, 5066:21,
5068:25, 5069:7,
5069:11, 5069:25,
5073:3, 5075:6,
5075:8, 5075:9,
5075:11, 5081:24,
5082:9, 5086:12,
5086:16, 5087:11,
5087:15, 5087:18,
5087:20, 5087:21,
5087:24, 5087:25,
5088:8, 5088:16,
5089:8, 5089:9,
5089:18, 5089:24,
5090:6, 5092:3,
5097:3, 5099:8,
5099:11, 5102:4,
5102:7, 5109:8,
5109:22, 5110:1,
5110:4, 5110:20,
5111:2, 5111:3,
5111:4, 5111:9,
5111:13, 5112:4,
5112:8, 5119:25,
5126:8, 5126:15,

5126:18, 5129:20, 5139:2, 5142:3, 5146:13, 5149:11, 5152:6

**Retrophin's** [2] - 4980:16, 5035:7

**return** [5] - 4951:12, 5016:9, 5016:13, 5064:17, 5065:11

**reveal** [1] - 4941:6

**reviewing** [2] - 4963:13, 5073:22

**reward** [2] - 5025:14, 5025:20

**RGREEBEL6997** [1] - 5067:7

**Rick** [1] - 4970:4

**right-hand** [1] - 5135:11

**right?Yes** [1] - 5125:20

**rights** [1] - 4947:3

**ripe** [1] - 4950:9

**risk** [3] - 4944:22, 4945:10, 4946:21

**risky** [1] - 4945:8

**river** [1] - 5020:22

**RO** [2] - 4963:25, 5126:7

**RO2354** [1] - 5121:3

**robbery** [5] - 4941:12, 4941:13, 4942:5, 4942:10, 4942:11

**ROHDE** [1] - 4934:12

**rolling** [4] - 5045:12, 5045:13, 5046:1, 5046:14

**room** [4] - 4941:4, 5030:25, 5031:2, 5077:3

**Rosensaft** [7] - 4970:12, 4970:15, 4970:19, 4978:16, 4990:8, 5023:10, 5042:18

**rough** [2] - 5078:7, 5080:17

**route** [1] - 4944:19

**royalties** [1] - 5089:16

**royalty** [7] - 5088:4, 5088:9, 5089:2, 5089:9, 5089:13, 5089:18, 5089:20

**RTRX** [2] - 5047:14, 5072:24

**RTRX15551** [2] - 5069:21, 5069:22

**Rule** [1] - 4941:19

**rule** [6] - 4985:11, 5004:12, 5005:6, 5005:8, 5005:20, 5017:6

**ruled** [1] - 5016:24

**rules** [2] - 4947:7, 5004:24

**run** [2] - 4948:17, 4950:16

**running** [1] - 5088:1

## S

**safe** [1] - 5152:19

**salaries** [1] - 5010:24

**salary** [3] - 5010:18, 5015:14, 5149:2

**sale** [2] - 5021:10

**sales** [1] - 5019:18

**San** [1] - 5087:1

**sarcastic** [1] - 5150:19

**satisfy** [3] - 4978:24, 5010:21, 5011:17

**saved** [1] - 4986:23

**savings** [1] - 5019:5

**saw** [20] - 5012:5, 5013:23, 5013:25, 5024:9, 5044:25, 5088:19, 5090:7, 5095:7, 5108:7, 5108:10, 5113:20, 5125:7, 5125:19, 5134:22, 5135:13, 5135:16, 5135:18, 5151:12, 5151:17, 5152:5

**scan** [2] - 5115:21, 5115:24

**scanned** [7] - 5074:9, 5109:10, 5115:25, 5116:1, 5116:10, 5121:20

**scenario** [1] - 5019:21

**schedule** [7] - 4957:4, 4957:13, 5062:6, 5062:23, 5097:10, 5097:12, 5097:13

**scheduled** [2] - 5078:22, 5087:7

**scheduling** [1] - 5153:15

**Schlecht** [11] - 5060:18, 5061:8, 5062:5, 5062:9, 5062:20, 5067:23, 5068:10, 5068:22,

5069:2, 5069:5

**Schlecht's** [1] - 5068:7

**Schmidt** [6] - 5003:14, 5013:15, 5013:18, 5013:19, 5014:1, 5014:2

**Schwab** [12] - 5018:10, 5018:12, 5018:14, 5018:17, 5018:20, 5018:23, 5019:17, 5019:20, 5020:7, 5020:18, 5021:9

**scope** [7] - 4937:12, 4939:8, 4945:10, 4972:1, 4972:4, 4972:14, 4978:7

**screen** [3] - 4964:3, 4993:11, 5109:24

**scroll** [16] - 4973:1, 4973:17, 4974:21, 4991:17, 5061:13, 5061:21, 5064:9, 5066:20, 5067:6, 5069:13, 5069:14, 5070:11, 5070:12, 5094:2, 5135:11, 5147:10

**scrolling** [3] - 5058:7, 5058:8, 5066:4

**seal** [5] - 5094:10, 5103:15, 5104:6, 5104:16, 5125:11

**seat** [4] - 4935:3, 4955:18, 5078:4, 5086:3

**SEC** [32] - 4966:4, 4966:9, 4967:5, 4967:14, 4968:1, 4968:14, 4969:20, 4978:3, 4988:18, 4996:14, 5003:14, 5004:6, 5012:1, 5013:18, 5022:3, 5022:6, 5022:11, 5022:16, 5022:18, 5023:5, 5023:16, 5023:20, 5023:24, 5024:5, 5024:7, 5025:6, 5025:7, 5025:12, 5025:19, 5035:15, 5035:17, 5035:20

**Second** [4] - 4944:14, 4945:18, 4946:2, 5005:8

**second** [17] - 4940:20, 4959:16,

4977:25, 4978:18, 4991:7, 4992:4, 4993:2, 4998:10, 5009:13, 5067:6, 5070:5, 5087:6, 5093:5, 5093:15, 5109:15, 5127:8, 5141:8

**section** [1] - 5010:5

**Section** [1] - 5092:5

**Securities** [2] - 4973:25, 5013:15

**see** [85] - 4936:15, 4936:25, 4955:1, 4964:2, 4974:3, 4985:10, 4991:8, 4991:12, 4992:2, 4992:24, 4993:15, 5000:3, 5007:3, 5009:13, 5011:5, 5011:17, 5011:21, 5023:19, 5030:6, 5057:13, 5059:12, 5061:8, 5061:14, 5061:16, 5063:6, 5064:9, 5064:15, 5066:16, 5067:16, 5068:8, 5076:17, 5077:8, 5078:17, 5083:10, 5083:25, 5084:1, 5085:4, 5087:9, 5090:2, 5090:20, 5091:24, 5092:6, 5092:12, 5092:16, 5092:24, 5092:25, 5093:7, 5093:23, 5094:6, 5094:12, 5094:15, 5095:19, 5095:22, 5099:14, 5101:4, 5101:9, 5103:17, 5103:18, 5109:4, 5109:18, 5110:2, 5117:2, 5121:4, 5123:7, 5123:17, 5124:3, 5125:5, 5125:7, 5128:17, 5129:2, 5131:5, 5132:25, 5133:10, 5135:12, 5140:23, 5142:12, 5142:21, 5143:2, 5143:12, 5143:22, 5145:5, 5145:22, 5151:15, 5152:18, 5153:4

**seeing** [2] - 5058:14, 5149:9

**seek** [1] - 4977:22

**seeking** [2] - 5000:16, 5068:11

**sell** [21] - 5017:23, 5017:25, 5018:3, 5018:4, 5018:8, 5018:9, 5018:13, 5018:16, 5018:25, 5019:1, 5019:12, 5020:10, 5021:1, 5021:6, 5021:8, 5025:9, 5137:2, 5140:6, 5145:4, 5145:9

**send** [22] - 4979:3, 4984:16, 5014:20, 5015:1, 5064:16, 5072:12, 5097:23, 5114:20, 5114:21, 5114:23, 5115:1, 5115:2, 5115:19, 5115:21, 5120:11, 5133:4, 5133:14, 5133:18, 5134:4, 5147:18, 5147:23, 5148:3

**sending** [9] - 4976:17, 4976:20, 4980:5, 5061:9, 5065:8, 5090:11, 5125:23, 5133:10, 5134:10

**sends** [4] - 5126:21, 5131:8, 5133:3, 5147:8

**senior** [1] - 5089:25

**sense** [8] - 4936:10, 4942:14, 5041:9, 5119:13, 5137:13, 5137:15, 5143:15, 5152:23

**sent** [66] - 4976:22, 4979:22, 4980:1, 4980:6, 4980:9, 4980:10, 4980:25, 4981:6, 4981:8, 4981:23, 4981:25, 4982:1, 4982:2, 4982:3, 4982:8, 4982:9, 4983:12, 4983:22, 4984:19, 4988:21, 4989:10, 4989:12, 4989:15, 4989:18, 5003:5, 5004:12, 5005:7, 5005:21, 5006:16, 5014:14, 5023:8, 5070:3, 5072:5, 5072:10, 5072:11, 5073:13, 5094:21, 5095:12, 5102:21, 5109:7, 5109:10, 5109:13, 5109:15,

5110:4, 5112:3,
5112:8, 5112:15,
5112:19, 5113:15,
5115:10, 5116:8,
5116:23, 5120:9,
5121:19, 5122:25,
5123:24, 5128:11,
5132:21, 5133:22,
5133:23, 5133:24,
5134:20, 5148:4
**sentence** [9] -
4978:1, 4978:14,
4985:6, 4988:17,
5013:12, 5014:4,
5086:25, 5087:6,
5089:23
**sentences** [2] -
5012:12, 5013:5
**separately** [2] -
4980:25, 5005:19
**September** [23] -
4966:4, 4966:7,
4966:10, 4969:15,
4976:7, 4978:20,
4981:1, 4984:5,
4986:4, 4988:14,
4988:21, 5016:2,
5086:15, 5092:9,
5093:2, 5102:25,
5104:7, 5104:19,
5105:2, 5107:2,
5108:18, 5110:8,
5112:10
**Series** [1] - 5089:24
**series** [1] - 5008:1
**serious** [1] - 5007:20
**seriously** [1] -
5045:13
**services** [5] -
4962:16, 4964:12,
4967:25, 4969:25,
4988:17
**SESSION** [1] -
5078:1
**set** [15] - 5036:12,
5036:13, 5036:17,
5039:21, 5043:4,
5063:22, 5092:5,
5094:10, 5094:17,
5095:2, 5103:15,
5104:4, 5104:6,
5125:11, 5125:13
**sets** [1] - 5135:13
**settle** [1] - 5016:21
**settlement** [13] -
5003:11, 5010:23,
5012:4, 5012:8,
5012:10, 5015:4,
5015:21, 5016:22,
5016:25, 5017:2,

5017:7, 5017:8,
5017:10
**settlements** [1] -
5012:4
**seven** [4] - 4970:1,
5012:7, 5017:13,
5017:15
**seventy** [2] -
4959:19, 4960:15
**several** [4] -
5032:20, 5060:3,
5089:12, 5089:25
**shaking** [1] -
5045:12
**shall** [1] - 5092:4
**shape** [2] - 5151:17,
5152:5
**share** [24] - 5021:8,
5062:1, 5063:10,
5063:11, 5063:15,
5071:15, 5071:18,
5090:13, 5091:19,
5101:7, 5101:23,
5119:23, 5125:21,
5126:4, 5126:7,
5130:18, 5130:25,
5133:14, 5133:18,
5133:23, 5134:4,
5134:7, 5134:9,
5134:11
**shareholders** [1] -
5146:6
**shares** [91] -
5012:21, 5013:1,
5013:3, 5015:22,
5015:23, 5015:24,
5016:1, 5016:9,
5016:14, 5017:4,
5017:5, 5017:13,
5017:21, 5017:22,
5017:23, 5019:12,
5021:1, 5021:7,
5021:9, 5024:10,
5025:8, 5025:10,
5025:11, 5026:2,
5026:5, 5062:2,
5064:16, 5065:22,
5071:21, 5095:6,
5095:21, 5095:22,
5098:24, 5099:2,
5099:19, 5100:6,
5105:5, 5105:20,
5106:12, 5113:2,
5113:10, 5113:11,
5114:3, 5126:18,
5128:22, 5129:3,
5129:9, 5129:13,
5129:17, 5129:23,
5130:12, 5130:21,
5130:22, 5131:3,

5131:7, 5133:5,
5133:6, 5133:8,
5134:23, 5135:3,
5135:19, 5135:25,
5137:2, 5140:12,
5141:14, 5142:10,
5143:2, 5143:18,
5143:21, 5145:4,
5145:9, 5145:16,
5145:21, 5146:2,
5146:5, 5146:9,
5146:14, 5146:25,
5147:4, 5147:13,
5148:5, 5148:10,
5149:3, 5149:10,
5149:14, 5150:18
**sheet** [2] - 5142:19,
5152:11
**shell** [3] - 5143:20,
5144:2, 5144:5
**shifting** [1] - 5021:21
**Shkreli** [127] -
4940:7, 4942:20,
4956:6, 4956:23,
4958:16, 4959:11,
4959:16, 4959:18,
4961:22, 4967:23,
4969:17, 4971:9,
4971:13, 4971:17,
4971:22, 4972:6,
4972:9, 4976:7,
4976:17, 4977:4,
4978:18, 4980:5,
4981:6, 4981:9,
4988:5, 4988:7,
4988:21, 4989:10,
4996:9, 4999:16,
5000:13, 5003:13,
5009:11, 5013:3,
5013:19, 5014:1,
5014:15, 5014:23,
5022:3, 5022:4,
5034:4, 5041:15,
5041:22, 5042:3,
5042:6, 5042:11,
5042:16, 5042:18,
5042:25, 5043:3,
5043:11, 5043:12,
5043:13, 5052:11,
5054:2, 5054:18,
5055:19, 5056:15,
5058:18, 5058:21,
5058:24, 5059:4,
5065:1, 5065:9,
5070:3, 5070:16,
5072:3, 5076:10,
5093:9, 5094:24,
5095:9, 5098:24,
5099:6, 5099:16,
5099:20, 5101:18,
5105:2, 5106:13,

5107:12, 5108:7,
5108:24, 5109:8,
5112:19, 5112:23,
5113:11, 5113:12,
5113:17, 5113:23,
5114:2, 5116:24,
5122:1, 5122:3,
5122:24, 5126:9,
5126:18, 5126:19,
5126:20, 5128:11,
5129:13, 5129:16,
5130:1, 5130:8,
5131:8, 5131:14,
5131:23, 5132:5,
5133:5, 5133:6,
5133:7, 5134:20,
5135:18, 5135:25,
5136:6, 5136:11,
5136:20, 5136:23,
5137:1, 5137:11,
5137:16, 5138:18,
5142:10, 5142:17,
5145:15, 5145:24,
5146:4, 5147:3
**Shkreli's** [23] -
4980:11, 4989:12,
4989:15, 5003:12,
5026:4, 5042:21,
5072:22, 5092:19,
5095:21, 5098:12,
5098:20, 5099:4,
5107:8, 5107:17,
5107:22, 5122:7,
5123:18, 5123:21,
5123:23, 5125:8,
5126:13, 5133:7,
5139:18
**short** [1] - 5118:9
**shortcut** [1] - 5074:3
**shortly** [3] - 5095:12,
5146:24, 5146:25
**show** [30] - 4957:19,
4967:18, 4980:6,
4981:6, 4999:21,
5000:1, 5003:9,
5004:7, 5007:11,
5008:9, 5009:7,
5030:15, 5038:5,
5038:11, 5040:22,
5045:7, 5053:6,
5060:14, 5064:24,
5076:8, 5090:14,
5091:3, 5095:16,
5119:7, 5126:22,
5131:17, 5140:13,
5148:6, 5150:4,
5150:25
**showed** [3] - 5000:7,
5058:12, 5117:2
**showing** [8] -

4974:22, 5060:17,
5090:17, 5118:16,
5118:17, 5127:3,
5133:9, 5140:17
**shown** [5] - 4990:3,
5074:13, 5074:18,
5106:11, 5127:12
**shows** [2] - 4968:21,
4976:22
**shut** [3] - 5005:13,
5034:11, 5034:14
**side** [16] - 4965:22,
4987:15, 4987:18,
5002:24, 5002:25,
5003:3, 5006:16,
5008:15, 5016:20,
5109:16, 5109:18,
5114:12, 5134:2
**sidebar** [6] -
4975:13, 4976:1,
5038:18, 5038:22,
5039:1, 5130:3
**Sidebar** [4] -
4975:21, 4982:14,
5038:24, 5046:21
**sign** [8] - 4954:1,
5049:24, 5049:25,
5050:2, 5056:15,
5057:1, 5065:11
**sign-in** [1] - 5049:25
**signature** [23] -
4987:3, 4987:4,
5072:22, 5090:8,
5090:24, 5091:2,
5091:7, 5092:12,
5092:15, 5092:17,
5092:19, 5104:15,
5107:6, 5122:5,
5122:7, 5122:23,
5123:6, 5123:9,
5123:18, 5123:21,
5123:23, 5124:2
**signatures** [5] -
5092:16, 5116:18,
5123:4, 5123:13,
5124:1
**signed** [21] -
4952:21, 4953:12,
4953:17, 4953:18,
4953:24, 4956:20,
4961:22, 4961:25,
4968:25, 4971:17,
5017:2, 5044:11,
5050:1, 5074:8,
5092:17, 5093:2,
5112:20, 5113:17,
5122:3, 5124:4,
5125:14
**significant** [1] -
5087:14

**signing** [1] - 4953:21

**silent** [1] - 4944:24

**similar** [2] - 4946:22, 5044:25

**simply** [1] - 5043:2

**single** [2] - 4966:15, 5132:15

**sister** [1] - 5149:21

**sit** [3] - 4954:25, 5112:14, 5152:16

**sitting** [9] - 5074:21, 5075:17, 5091:4, 5098:15, 5116:13, 5120:21, 5121:6, 5121:24, 5151:25

**situation** [3] - 4946:1, 5019:21, 5020:4

**situations** [2] - 5010:24, 5011:3

**six** [5] - 5015:22, 5017:12, 5017:24, 5018:7, 5151:3

**sixty** [1] - 5017:18

**slanted** [1] - 5115:11

**slightly** [2] - 4991:22, 4993:22

**smiling** [2] - 5153:4, 5153:5

**smirking** [2] - 5046:1, 5046:14

**SMITH** [26] - 4934:13, 4935:9, 4935:23, 4936:10, 4936:14, 4937:3, 4940:23, 4948:9, 4948:20, 4949:5, 4949:17, 4950:11, 4951:5, 4951:7, 4951:10, 4952:7, 4976:11, 4980:8, 4981:8, 5041:4, 5041:14, 5042:2, 5043:12, 5044:2, 5045:9, 5045:16

**Smith** [2] - 5065:1, 5149:18

**snicker** [1] - 5046:3

**sold** [7] - 5017:24, 5018:19, 5018:21, 5018:22, 5019:2, 5019:4, 5020:9

**sole** [1] - 5003:23

**someone** [8] - 4946:14, 4950:2, 5019:9, 5042:23, 5044:15, 5078:10, 5083:8, 5115:24

**sometimes** [4] - 4961:10, 4961:11,

4961:13, 5055:19

**somewhat** [3] - 4945:8, 4950:5, 5124:2

**somewhere** [1] - 5015:25

**soon** [1] - 4935:19

**sorry** [57] - 4937:10, 4955:13, 4964:1, 4967:11, 4968:18, 4969:12, 4974:25, 4978:19, 4987:1, 4989:9, 4990:5, 4992:17, 4993:17, 4997:20, 4997:24, 4999:25, 5000:6, 5000:11, 5000:22, 5000:23, 5006:7, 5016:17, 5019:24, 5020:11, 5029:20, 5031:9, 5031:19, 5049:25, 5053:9, 5056:3, 5057:6, 5059:17, 5060:12, 5062:10, 5064:5, 5064:6, 5064:8, 5066:7, 5106:17, 5114:21, 5114:22, 5114:24, 5120:18, 5122:13, 5122:16, 5122:25, 5124:1, 5124:4, 5129:14, 5129:18, 5130:3, 5130:16, 5147:20, 5148:22, 5149:25, 5151:8

**sort** [6] - 4948:14, 4950:2, 4952:4, 4978:1, 5025:14, 5079:2

**sorts** [1] - 4948:24

**sounds** [1] - 5005:20

**source** [1] - 5096:11

**Southern** [2] - 4945:22, 5020:21

**Southwest** [1] - 4973:25

**span** [1] - 4970:13

**speaking** [7] - 4935:10, 4936:2, 4947:17, 4948:15, 4949:5, 4987:9, 5055:8

**specific** [12] - 5005:19, 5006:5, 5007:19, 5028:9, 5028:10, 5032:17, 5033:10, 5040:8, 5055:7, 5074:12, 5089:18, 5092:17

**specifically** [7] - 5008:3, 5039:15, 5052:3, 5091:8, 5144:2, 5145:18, 5146:7

**specious** [1] - 5008:4

**spillover** [1] - 4944:18

**spin** [1] - 5154:8

**split** [1] - 5137:4

**spreadsheet** [1] - 5047:15

**Spreadsheet** [2] - 5127:10, 5127:22

**stamp** [8] - 4961:22, 4962:14, 4963:24, 4964:6, 5091:23, 5093:6, 5120:12, 5140:20

**stamps** [1] - 4973:25

**stand** [18] - 4935:4, 4941:14, 4942:9, 4946:14, 4955:1, 4978:21, 5004:13, 5004:16, 5004:20, 5005:1, 5005:7, 5005:11, 5005:12, 5006:19, 5007:4, 5084:4, 5119:1, 5152:21

**start** [8] - 4954:4, 4994:15, 5049:7, 5069:23, 5086:22, 5141:22, 5153:22, 5153:23

**started** [6] - 4954:5, 4954:7, 5039:22, 5080:11, 5080:14, 5081:3

**starting** [2] - 5010:17, 5079:8

**state** [8] - 5015:15, 5015:17, 5017:19, 5083:12, 5084:13, 5153:20, 5154:4, 5154:6

**statement** [10] - 4977:5, 4978:2, 4999:12, 5006:24, 5020:3, 5061:14, 5082:18, 5083:11, 5110:22, 5120:7

**statements** [14] - 4948:10, 4953:10, 4999:2, 5003:25, 5004:1, 5004:19, 5004:20, 5005:15, 5009:7, 5014:23, 5047:23, 5051:20,

5084:15

**states** [4] - 4952:24, 4957:4, 4963:20, 4971:13

**STATES** [3] - 4934:1, 4934:3, 4934:10

**States** [9] - 4934:5, 4934:13, 4934:15, 4952:25, 4953:6, 4953:7, 5051:9, 5051:17, 5051:18

**stating** [2] - 4959:12, 5022:11

**status** [2] - 4956:12, 5078:18

**statute** [2] - 4939:11, 4939:12

**statutes** [1] - 4939:17

**stay** [1] - 5080:5

**stenography** [1] - 4934:25

**step** [5] - 4938:9, 5056:23, 5077:6, 5152:20

**Stephen** [1] - 5092:4

**Steve** [8] - 5092:18, 5097:23, 5101:6, 5101:13, 5105:20, 5142:14, 5143:16, 5149:18

**Steven** [2] - 4958:24, 5140:21

**sticky** [1] - 4965:21

**still** [20] - 4936:15, 4949:23, 4954:2, 4954:15, 4954:21, 4955:19, 4987:14, 4994:23, 4999:3, 5007:5, 5061:14, 5084:2, 5086:4, 5086:15, 5094:16, 5110:21, 5129:22, 5130:16, 5139:1, 5141:25

**stipulated** [1] - 5010:5

**stock** [51] - 5012:14, 5012:18, 5012:20, 5015:25, 5017:24, 5018:5, 5018:6, 5018:8, 5018:9, 5018:13, 5018:16, 5018:21, 5018:22, 5018:25, 5019:1, 5019:3, 5019:4, 5019:19, 5020:9, 5020:10, 5020:15, 5026:7, 5026:10, 5047:14, 5058:8,

5075:10, 5089:13, 5101:7, 5110:1, 5128:25, 5132:10, 5132:17, 5132:19, 5134:17, 5135:12, 5135:14, 5135:16, 5135:22, 5136:19, 5138:1, 5139:21, 5143:2, 5144:3, 5144:6, 5147:6, 5147:15, 5150:20, 5150:22, 5151:16, 5152:3

**stolen** [1] - 4942:22

**stop** [3] - 4960:12, 5010:9, 5081:7

**stopped** [6] - 4938:4, 4996:25, 4997:3, 4997:19, 5047:11, 5084:11

**stopping** [1] - 4952:10

**story** [1] - 5044:12

**street** [1] - 5154:11

**strike** [6] - 4986:15, 4992:17, 4997:20, 5020:3, 5024:13, 5024:15

**strikes** [1] - 5083:15

**striking** [1] - 5024:22

**strong** [3] - 4942:8, 4946:12, 5043:5

**stuck** [1] - 4935:10

**Su** [140] - 4935:21, 4935:24, 4939:23, 4940:17, 4941:3, 4942:22, 4943:19, 4947:7, 4947:8, 4947:10, 4952:6, 4952:8, 4952:13, 4952:23, 4952:24, 4953:13, 4954:8, 4994:12, 4994:23, 4996:6, 4998:10, 5000:3, 5000:7, 5000:11, 5001:1, 5003:6, 5003:12, 5003:20, 5004:11, 5004:22, 5004:25, 5006:19, 5006:20, 5007:11, 5007:13, 5008:10, 5009:10, 5023:5, 5024:1, 5025:4, 5026:1, 5026:15, 5027:5, 5027:24, 5028:3, 5028:4, 5029:8, 5029:25, 5030:17, 5036:22, 5038:9, 5040:5, 5040:7,

5042:7, 5043:13, 5043:17, 5044:3, 5044:12, 5047:4, 5048:9, 5050:17, 5050:20, 5051:1, 5051:9, 5052:9, 5052:18, 5052:19, 5053:18, 5054:15, 5054:23, 5055:9, 5056:4, 5056:24, 5060:17, 5061:9, 5062:4, 5062:8, 5062:17, 5064:25, 5067:22, 5069:17, 5072:18, 5074:3, 5077:6, 5078:6, 5078:13, 5079:24, 5082:24, 5083:2, 5084:12, 5084:16, 5086:4, 5086:11, 5090:18, 5090:20, 5093:9, 5095:18, 5096:23, 5096:25, 5100:13, 5101:2, 5102:13, 5103:19, 5104:4, 5104:24, 5105:11, 5106:6, 5108:7, 5109:4, 5110:17, 5111:8, 5113:24, 5114:14, 5115:19, 5116:22, 5118:16, 5119:17, 5120:9, 5121:15, 5121:16, 5122:14, 5123:4, 5125:2, 5125:19, 5125:20, 5128:11, 5130:7, 5130:8, 5130:13, 5130:21, 5131:23, 5140:21, 5147:20, 5150:10, 5151:13, 5151:15

**SU** [3] - 4996:1, 5140:20, 5155:8

**Su's** [9] - 4949:18, 5040:10, 5043:4, 5045:5, 5080:13, 5080:17, 5081:14, 5081:18, 5110:21

**subject** [10] - 4938:15, 4950:23, 4982:8, 4987:18, 5009:3, 5023:24, 5065:8, 5065:11, 5128:13, 5134:21

**subjects** [2] - 5042:22, 5136:18

**subpoena** [5] - 5035:17, 5035:23, 5035:24, 5036:1

**subpoenas** [1] - 5035:16

**subscriber** [2] - 5073:3, 5073:4

**Subscription** [1] - 5066:18

**subscription** [27] - 5058:19, 5058:22, 5061:19, 5061:21, 5065:15, 5065:18, 5065:24, 5066:8, 5066:9, 5066:20, 5067:11, 5068:14, 5069:24, 5070:14, 5071:4, 5073:2, 5074:13, 5074:19, 5074:23, 5075:1, 5075:2, 5075:15, 5075:21, 5076:6, 5076:11, 5076:14, 5112:23

**subsequent** [3] - 4980:18, 5103:2, 5132:2

**subsequently** [2] - 5018:19, 5089:1

**substance** [1] - 5028:10

**successful** [1] - 5014:8

**sue** [2] - 5020:14, 5042:8

**sued** [4] - 5016:5, 5020:13, 5020:16

**suffering** [1] - 4987:14

**sufficient** [1] - 4979:3

**suggest** [4] - 4938:8, 4938:16, 4948:16, 4949:6

**suggested** [1] - 5041:5

**suggesting** [5] - 4935:17, 5045:14, 5045:16, 5045:17, 5063:9

**suggestion** [6] - 4939:6, 4939:18, 4948:14, 4949:10, 4950:12, 4982:4

**suggestions** [1] - 5042:18

**suggests** [2] - 4948:11, 5075:20

**suit** [2] - 5015:14

**Sullivan** [1] - 5026:9

**sum** [2] - 5014:5, 5028:10

**summary** [5] -

4962:15, 4964:11, 4969:23, 4969:24

**Sunday** [1] - 5064:21

**Sunil** [1] - 5060:5

**Super** [2] - 5139:5, 5139:7

**support** [3] - 5059:21, 5063:2, 5068:17

**supporting** [3] - 5055:15, 5059:16, 5076:15

**suppose** [1] - 5154:2

**supposedly** [2] - 5013:21, 5062:23

**Supreme** [1] - 4939:20

**surely** [1] - 5012:17

**surprise** [2] - 5143:8, 5145:13

**Susan** [5] - 5060:18, 5062:9, 5063:5, 5100:13, 5101:3

**suspect** [1] - 5127:10

**suspicious** [1] - 4941:7

**sustain** [2] - 4968:6, 4972:15

**Sustained** [7] - 4974:13, 5027:23, 5030:11, 5032:8, 5038:2, 5097:8, 5103:13

**sustained** [8] - 4975:11, 5006:4, 5019:16, 5021:9, 5069:4, 5111:16, 5118:12, 5142:6

**switch** [1] - 4989:22

**sworn** [4] - 4996:2, 5118:9, 5118:21, 5119:17

**system** [61] - 4940:2, 4942:16, 4942:18, 4971:11, 4996:21, 4996:23, 4997:7, 4997:12, 4997:15, 4997:18, 4998:18, 4998:19, 4999:7, 5028:1, 5028:7, 5028:12, 5028:18, 5028:20, 5028:22, 5028:24, 5029:6, 5029:9, 5029:16, 5030:2, 5031:7, 5032:4, 5032:11, 5032:23, 5034:4, 5034:21, 5034:25,

5035:7, 5035:13, 5035:22, 5036:4, 5036:12, 5036:13, 5036:17, 5036:25, 5037:11, 5037:22, 5038:6, 5038:13, 5038:16, 5040:12, 5043:4, 5043:13, 5047:6, 5047:10, 5047:11, 5047:17, 5047:25, 5048:3, 5052:1, 5052:4, 5052:7, 5052:9, 5052:12

**systems** [3] - 4952:10, 4953:2, 5051:11

## T

**tab** [3] - 4993:12, 4999:20, 5023:17

**table** [22] - 5058:6, 5073:22, 5090:7, 5126:21, 5128:14, 5128:16, 5129:9, 5130:15, 5131:6, 5134:8, 5134:19, 5134:23, 5135:4, 5135:10, 5135:18, 5135:22, 5142:14, 5142:15, 5147:5, 5147:19, 5147:23, 5147:25

**tables** [2] - 5046:1, 5135:5

**talks** [2] - 5093:20, 5146:22

**tame** [1] - 4971:25

**tape** [6] - 5115:2, 5115:5, 5116:4, 5116:16, 5116:23, 5123:7

**tea** [1] - 5143:9

**team** [27] - 5027:11, 5027:14, 5027:24, 5028:6, 5028:11, 5030:7, 5030:22, 5031:6, 5033:5, 5033:11, 5037:20, 5038:5, 5038:11, 5043:10, 5049:5, 5049:9, 5049:15, 5049:18, 5053:20, 5055:24, 5056:9, 5057:3, 5057:15, 5058:1, 5058:12, 5153:4

**tear** [1] - 5096:8

**telephone** [2] -

5031:10, 5031:20

**ten** [3] - 4940:25, 5114:18, 5154:7

**ten-minute** [1] - 5114:18

**tended** [1] - 5137:16

**Tenley** [1] - 4990:7

**tenure** [1] - 5007:15

**term** [3] - 5054:12, 5056:24, 5142:19

**terminated** [8] - 4937:11, 4949:19, 5029:17, 5030:1, 5031:8, 5032:11, 5035:9, 5052:1

**termination** [7] - 5009:17, 5018:18, 5028:15, 5035:10, 5047:8, 5048:1, 5052:6

**terms** [8] - 4936:18, 4938:3, 4983:20, 4987:15, 5006:4, 5088:19, 5142:7, 5142:19

**test** [1] - 5043:20

**testified** [28] - 4942:6, 4943:20, 4944:12, 4965:17, 4996:23, 5015:6, 5026:1, 5026:7, 5029:25, 5039:10, 5045:3, 5052:15, 5053:18, 5060:9, 5078:6, 5084:3, 5088:3, 5098:23, 5099:1, 5117:19, 5117:21, 5119:17, 5123:17, 5123:18, 5137:6, 5137:9, 5138:7, 5138:13

**testify** [10] - 4944:1, 4944:2, 4944:25, 4950:25, 4985:17, 5002:21, 5002:22, 5005:13, 5084:25, 5118:24

**testifying** [7] - 5002:22, 5006:2, 5016:11, 5022:22, 5023:1, 5024:15, 5087:25

**testimony** [48] - 4952:23, 4952:25, 4953:5, 4953:9, 4968:16, 4977:21, 4979:2, 4989:23, 4996:19, 4997:17, 4998:15, 4998:24, 4998:25, 4999:1,

4999:3, 4999:4,
4999:6, 5005:17,
5022:21, 5023:4,
5027:8, 5027:25,
5028:3, 5040:20,
5043:4, 5043:23,
5050:17, 5051:9,
5051:16, 5051:19,
5051:25, 5052:14,
5052:21, 5052:23,
5053:20, 5054:1,
5080:13, 5080:17,
5081:18, 5083:2,
5106:16, 5107:11,
5114:7, 5118:6,
5118:9, 5121:10,
5134:22
  **Texas** [4] - 5049:12,
5049:13, 5049:16,
5141:6
  **text** [1] - 4980:6
  **THE** [276] - 4934:10,
4935:2, 4935:14,
4935:22, 4936:8,
4936:11, 4936:23,
4936:25, 4939:14,
4940:14, 4941:9,
4944:6, 4944:9,
4945:15, 4945:21,
4946:16, 4947:25,
4948:19, 4949:1,
4949:15, 4949:18,
4950:18, 4950:21,
4950:23, 4951:3,
4951:6, 4951:9,
4951:13, 4952:2,
4952:17, 4953:16,
4954:2, 4954:4,
4954:12, 4954:15,
4954:17, 4954:21,
4954:25, 4955:3,
4955:17, 4958:10,
4964:1, 4964:5,
4967:10, 4968:6,
4968:10, 4968:17,
4968:19, 4969:8,
4969:12, 4970:18,
4970:24, 4972:3,
4972:15, 4974:13,
4975:8, 4975:13,
4975:17, 4975:19,
4975:20, 4976:3,
4976:6, 4977:18,
4977:20, 4978:10,
4979:11, 4980:12,
4980:21, 4980:23,
4981:3, 4981:7,
4981:10, 4982:12,
4983:1, 4983:19,
4984:1, 4984:10,
4985:9, 4985:21,

4985:25, 4986:20,
4986:25, 4987:11,
4987:13, 4987:20,
4987:23, 4988:25,
4994:1, 4994:5,
4994:7, 4994:9,
4994:14, 4994:17,
4994:18, 4994:19,
4994:23, 4995:4,
4997:10, 4998:4,
4999:23, 5000:10,
5000:23, 5000:25,
5002:3, 5002:6,
5002:13, 5002:20,
5002:25, 5003:4,
5003:7, 5003:16,
5003:19, 5005:25,
5006:13, 5007:9,
5008:8, 5008:14,
5009:4, 5012:24,
5013:24, 5019:16,
5019:25, 5020:1,
5020:6, 5021:2,
5021:4, 5021:5,
5022:24, 5024:17,
5024:24, 5025:23,
5026:1, 5026:6,
5026:12, 5027:1,
5027:23, 5029:13,
5029:23, 5030:11,
5030:14, 5032:8,
5038:2, 5038:8,
5038:18, 5038:21,
5039:3, 5039:7,
5039:20, 5040:1,
5040:13, 5041:11,
5041:24, 5042:1,
5042:12, 5043:6,
5043:20, 5044:3,
5044:16, 5044:21,
5045:25, 5046:12,
5046:18, 5047:2,
5048:7, 5051:2,
5053:17, 5054:13,
5056:19, 5056:22,
5060:16, 5061:4,
5062:14, 5064:23,
5065:6, 5067:20,
5068:5, 5069:4,
5069:9, 5073:24,
5073:25, 5076:19,
5076:21, 5077:6,
5077:8, 5078:4,
5078:8, 5078:9,
5078:10, 5078:14,
5079:5, 5079:8,
5079:16, 5079:19,
5079:24, 5080:1,
5080:5, 5080:9,
5080:11, 5081:6,
5082:1, 5084:6,

5084:8, 5084:10,
5084:23, 5085:3,
5086:2, 5088:13,
5090:16, 5091:12,
5094:19, 5095:15,
5095:5, 5096:10,
5096:14, 5096:17,
5096:20, 5097:8,
5100:10, 5100:24,
5103:13, 5104:2,
5105:9, 5105:16,
5108:2, 5108:6,
5110:16, 5111:1,
5111:6, 5111:16,
5115:14, 5115:16,
5118:12, 5118:15,
5119:1, 5119:8,
5119:11, 5119:15,
5120:8, 5121:12,
5122:15, 5123:12,
5123:15, 5123:16,
5126:17, 5127:2,
5127:13, 5127:25,
5128:2, 5128:5,
5128:9, 5129:16,
5129:19, 5129:22,
5130:4, 5131:21,
5132:19, 5132:23,
5140:16, 5141:20,
5142:6, 5150:1,
5150:7, 5151:2,
5151:6, 5151:10,
5152:8, 5152:13,
5152:15, 5153:9,
5153:13, 5153:23,
5154:2, 5154:10,
5154:13, 5154:17,
5154:19
  **themselves** [1] -
4981:15
  **theory** [1] - 5025:18
  **thereof** [2] - 5071:2,
5071:3
  **they've** [2] - 4950:7,
5041:5
  **thinking** [4] -
4977:20, 5043:23,
5084:4, 5111:19
  **thinks** [1] - 5043:17
  **Third** [2] - 5067:1,
5136:9
  **third** [6] - 4992:11,
4993:4, 5093:17,
5094:5, 5109:11,
5128:20
  **third-party** [1] -
5109:11
  **thousand** [14] -
4959:19, 4960:15,
5015:22, 5017:13,

5017:15, 5017:18,
5019:6, 5072:20,
5074:16, 5074:23,
5075:7, 5075:13,
5128:22, 5131:7
  **threatened** [1] -
4942:7
  **threats** [1] - 4942:20
  **three** [21] - 4942:17,
4957:21, 4963:21,
4965:20, 4966:12,
5009:23, 5012:12,
5049:13, 5077:4,
5078:20, 5080:9,
5095:22, 5100:19,
5101:25, 5102:4,
5131:15, 5131:24,
5133:1, 5133:19,
5133:25, 5134:3
  **three-quarters** [1] -
5049:13
  **throughout** [1] -
5009:24
  **throwing** [2] -
4937:5, 5041:8
  **thrown** [1] - 4936:18
  **Thursday** [4] -
5063:18, 5063:19,
5153:11, 5153:12
  **ticket** [2] - 5149:4,
5149:5
  **Tim** [1] - 5026:8
  **timekeeper** [7] -
4972:18, 4972:23,
4990:24, 4991:6,
4992:1, 4992:23,
4993:12
  **timekeepers** [1] -
4964:14
  **timely** [1] - 5010:8
  **timing** [2] - 5136:5,
5152:24
  **title** [1] - 4997:25
  **today** [35] - 4935:6,
4947:17, 4948:10,
4960:21, 4985:17,
4998:16, 5027:17,
5027:25, 5030:19,
5030:21, 5048:9,
5048:12, 5050:8,
5055:6, 5055:24,
5057:1, 5057:16,
5074:21, 5075:17,
5077:1, 5082:4,
5083:22, 5084:4,
5091:4, 5112:15,
5116:13, 5117:16,
5117:19, 5117:24,
5120:21, 5121:6,
5121:24, 5152:8,

5153:7
  **together** [2] -
4938:11, 4992:9
  **Tom** [1] - 5026:8
  **tomorrow** [10] -
5079:1, 5143:5,
5152:10, 5152:16,
5152:18, 5152:23,
5153:10, 5153:11,
5153:19, 5153:20
  **tonight** [3] - 4994:15,
5078:25, 5152:9
  **took** [14] - 4940:7,
4940:8, 4952:14,
4999:14, 5018:25,
5024:18, 5032:24,
5033:12, 5033:14,
5033:16, 5059:4,
5063:9, 5089:1,
5146:18
  **top** [12] - 4959:25,
4960:11, 4960:20,
4965:24, 5021:18,
5069:15, 5086:7,
5100:12, 5114:13,
5125:4, 5125:5,
5140:20
  **topic** [3] - 4998:24,
5001:1, 5052:20
  **total** [15] - 4962:12,
4962:23, 4963:1,
4964:17, 4973:8,
4973:22, 4974:23,
4991:18, 4992:11,
4993:4, 4993:20,
5072:20, 5089:20
  **totally** [2] - 5067:7,
5082:15
  **toward** [1] - 4990:4
  **towards** [2] - 5027:8,
5146:7
  **Tower** [1] - 5141:4
  **track** [1] - 5021:19
  **trade** [2] - 4941:24,
5012:5
  **tradeable** [5] -
5143:2, 5143:21,
5144:3, 5144:6,
5145:8
  **trading** [4] - 4941:14,
4941:17, 4943:12,
5036:15
  **trails** [1] - 5041:19
  **trained** [1] - 5106:7
  **transaction** [8] -
5054:20, 5054:25,
5055:20, 5059:25,
5060:10, 5060:11,
5060:25, 5076:7
  **transactions** [3] -

5055:15, 5055:17,
5056:7

**TRANSCRIPT** [1] -
4934:9

**transcript** [8] -
4934:25, 5007:2,
5078:7, 5080:18,
5082:22, 5118:16,
5119:7, 5138:9

**transcription** [1] -
4934:25

**transfer** [54] -
5012:14, 5012:15,
5012:18, 5012:20,
5020:14, 5020:16,
5090:13, 5091:19,
5093:4, 5093:24,
5094:23, 5095:4,
5095:6, 5095:9,
5095:21, 5095:22,
5098:2, 5098:5,
5100:20, 5101:7,
5101:12, 5101:23,
5102:4, 5103:23,
5104:11, 5104:13,
5105:1, 5106:3,
5106:12, 5107:8,
5107:17, 5107:21,
5107:22, 5107:24,
5108:7, 5109:7,
5109:21, 5109:25,
5110:1, 5113:7,
5113:9, 5119:23,
5125:8, 5126:7,
5133:4, 5133:5,
5133:6, 5133:8,
5133:14, 5133:18,
5133:23, 5151:16,
5152:3

**transferor** [1] -
5126:19

**transferred** [5] -
5024:10, 5099:6,
5105:5, 5105:20,
5114:3

**transferring** [4] -
5101:18, 5113:10,
5113:11, 5126:8

**transfers** [11] -
5097:18, 5125:21,
5126:4, 5126:23,
5132:10, 5132:17,
5132:20, 5134:4,
5134:7, 5134:9,
5134:11

**transmittal** [1] -
5151:21

**treated** [1] - 5146:6
**trial** [10] - 4941:17,
4952:23, 4953:6,

4998:15, 5028:3,
5050:17, 5051:16,
5078:22, 5079:8,
5087:8

**TRIAL** [1] - 4934:9
**trials** [1] - 5079:9
**tried** [1] - 5078:10
**tries** [1] - 4982:5
**trip** [1] - 5152:19
**trouble** [4] - 5053:13,
5053:14, 5053:18,
5053:23

**true** [13] - 4980:20,
5003:21, 5003:22,
5004:1, 5007:12,
5022:12, 5023:2,
5031:5, 5038:15,
5042:20, 5043:18,
5054:3, 5082:6

**truth** [19] - 4941:4,
4941:5, 4943:5,
4977:6, 4977:8,
4979:22, 5002:19,
5003:17, 5006:9,
5006:24, 5007:10,
5007:16, 5007:22,
5008:3, 5008:7,
5008:9, 5009:7,
5014:9, 5022:19

**truthfulness** [4] -
4937:22, 4938:14,
4938:20, 4942:13

**try** [29] - 4935:6,
4967:10, 4972:4,
4979:14, 4983:19,
4985:22, 4987:5,
4995:4, 4997:10,
5008:13, 5018:3,
5019:12, 5028:14,
5029:23, 5053:17,
5077:3, 5080:7,
5088:13, 5094:19,
5108:4, 5111:5,
5111:7, 5126:17,
5153:2, 5153:7,
5153:8, 5153:21,
5154:8, 5154:14

**trying** [9] - 4957:9,
4969:13, 5012:24,
5022:24, 5035:6,
5039:8, 5046:3,
5079:14, 5129:15

**TSOU** [1] - 4934:21
**turn** [11] - 4959:9,
4962:14, 4963:19,
4972:6, 4972:17,
4988:13, 4999:20,
5092:11, 5109:14,
5125:3, 5134:17

**turned** [2] - 5037:13,

5037:14
**turning** [2] -
4968:21, 4973:13
**twenty** [4] - 5015:22,
5017:12, 5128:21,
5131:7
**twenty-five** [2] -
5128:21, 5131:7
**twenty-six** [2] -
5015:22, 5017:12
**twice** [1] - 5078:22
**two** [35] - 4942:16,
4952:21, 4957:6,
4962:8, 4970:6,
4976:14, 4979:13,
4980:15, 4982:12,
4982:13, 4990:20,
5027:17, 5029:5,
5033:17, 5035:16,
5053:7, 5053:10,
5053:13, 5053:19,
5078:16, 5078:18,
5079:1, 5080:3,
5093:18, 5113:14,
5124:1, 5127:23,
5128:21, 5131:7,
5135:24, 5140:19,
5143:1

**two-page** [1] -
5140:19
**two-paragraph** [1] -
5027:17
**type** [3] - 4969:5,
4969:9, 5114:17

# U

**U.S** [5] - 4952:22,
4999:5, 5049:21,
5050:5, 5050:9
**ultimate** [2] -
5020:24, 5020:25
**ultimately** [3] -
4940:9, 5022:25,
5023:13
**un-legal-trained** [1] -
5106:7
**unacceptable** [1] -
5046:6
**unclear** [2] - 4937:8,
5108:2
**undated** [2] -
5107:24, 5108:10
**under** [35] - 4936:20,
4939:11, 4939:12,
4939:13, 4941:18,
4944:22, 4946:8,
4947:1, 4955:19,
4976:14, 4981:13,
4981:15, 4985:8,

4994:23, 5003:12,
5004:24, 5006:8,
5009:21, 5014:9,
5016:6, 5022:13,
5022:15, 5083:19,
5086:4, 5091:1,
5094:10, 5097:5,
5099:17, 5103:15,
5104:6, 5104:16,
5118:21, 5119:18,
5121:11

**underlying** [2] -
4938:19, 4976:24
**underneath** [2] -
4980:8, 5090:9
**undersigned** [8] -
5067:11, 5071:3,
5071:6, 5094:9,
5103:14, 5104:5,
5104:16, 5125:10
**understandings** [1] -
5007:14
**understood** [22] -
4946:24, 5054:20,
5085:1, 5090:24,
5098:11, 5099:25,
5101:15, 5106:3,
5109:2, 5109:20,
5110:18, 5111:12,
5111:18, 5112:1,
5112:10, 5113:20,
5114:18, 5115:18,
5130:9, 5130:12,
5145:7, 5147:12
**undertake** [1] -
4977:22
**unexcused** [1] -
5011:1
**unfairly** [1] - 5146:6
**unfortunately** [5] -
4935:9, 4935:23,
4936:5, 4954:22,
4975:17
**unhappy** [1] -
5150:14
**unit** [6] - 5061:23,
5067:4, 5069:24,
5070:1, 5097:15
**Unit** [1] - 5066:18
**UNITED** [3] - 4934:1,
4934:3, 4934:10
**United** [9] - 4934:5,
4934:13, 4934:15,
4952:25, 4953:6,
4953:7, 5051:9,
5051:17, 5051:18
**units** [24] - 5058:11,
5061:22, 5061:23,
5073:5, 5075:11,
5093:10, 5097:3,

5097:11, 5097:20,
5098:12, 5099:16,
5101:19, 5102:10,
5106:13, 5107:23,
5108:8, 5109:22,
5129:5, 5129:17,
5129:18, 5129:22,
5130:12, 5130:21,
5130:22

**unless** [2] - 4949:2,
5089:12
**unrelated** [2] -
5010:21, 5011:17
**unsigned** [1] -
4952:20
**untrue** [1] - 4999:2
**untruthfulness** [3] -
4937:23, 4938:14,
4938:21
**up** [82] - 4937:20,
4938:23, 4944:21,
4947:6, 4954:25,
4958:13, 4959:9,
4959:15, 4959:22,
4983:4, 4990:2,
4993:10, 4995:7,
5011:15, 5015:7,
5017:14, 5019:3,
5023:3, 5026:14,
5026:18, 5036:12,
5036:13, 5036:17,
5038:21, 5039:3,
5039:24, 5040:17,
5042:7, 5043:4,
5043:16, 5044:11,
5046:6, 5048:8,
5058:5, 5060:3,
5061:13, 5064:2,
5066:4, 5069:13,
5070:8, 5070:9,
5070:11, 5070:13,
5078:5, 5086:6,
5086:7, 5087:5,
5094:7, 5100:4,
5101:21, 5102:22,
5102:24, 5106:9,
5109:16, 5109:25,
5112:6, 5114:11,
5114:13, 5118:5,
5120:10, 5122:9,
5122:23, 5122:24,
5123:1, 5123:2,
5125:4, 5129:15,
5131:15, 5131:25,
5132:9, 5133:1,
5133:9, 5133:13,
5133:20, 5133:25,
5134:1, 5134:3,
5134:12, 5134:15,
5134:17

**updated** [1] - 5078:20
**uploaded** [1] - 5061:15
**upstairs** [1] - 4951:13
**usual** [1] - 5154:12

## V

**vacation** [5] - 5009:24, 5010:2, 5015:15, 5017:11
**vague** [1] - 5054:12
**Vaino** [3] - 5012:15, 5012:21, 5026:9
**valid** [1] - 4942:4, 5094:25, 5095:1
**validate** [2] - 5101:12, 5104:10
**Valley** [1] - 4937:9
**value** [1] - 5144:6
**variety** [2] - 4973:11, 4976:14
**various** [17] - 4956:12, 4971:1, 4974:4, 4974:22, 4991:1, 4996:16, 5004:6, 5015:2, 5019:18, 5020:17, 5024:2, 5041:18, 5042:9, 5042:18, 5043:15, 5061:14, 5123:11
**Various** [1] - 5035:3
**vendors** [1] - 5109:11
**veracity** [2] - 5042:21, 5043:21
**verbal** [1] - 5012:16
**verbally** [1] - 5013:11
**verifying** [1] - 5073:22
**versions** [1] - 4953:25
**versus** [4] - 5111:2, 5111:4, 5117:25, 5137:14
**vest** [1] - 5094:10
**vesting** [2] - 5097:6, 5097:10
**via** [5] - 4969:17, 4980:12, 4983:10, 4983:22, 4984:16
**view** [9] - 4945:11, 5024:11, 5024:17, 5043:25, 5054:8, 5078:21, 5079:4, 5079:14, 5079:15

**vigorous** [1] - 4950:3
**violated** [2] - 4939:16, 5084:16
**violation** [1] - 4937:17
**violations** [1] - 4936:19
**visibility** [1] - 5152:23
**voice** [1] - 4942:8
**voir** [2] - 4985:7, 4985:9
**VOIR** [2] - 4985:12, 5155:5
**voluntarily** [1] - 5031:24

## W

**wait** [3] - 4954:23, 5018:8, 5078:14
**waiting** [1] - 4960:4
**walked** [6] - 4949:20, 5030:24, 5031:1, 5037:4, 5037:6, 5037:7
**wants** [5] - 4938:19, 4946:7, 4978:22, 5040:15, 5080:12
**watch** [1] - 5045:4
**watching** [1] - 5044:23
**water** [1] - 4965:25
**ways** [1] - 4944:2
**weapon** [1] - 4942:9
**week** [3] - 5078:22, 5079:2, 5079:13
**weekends** [1] - 5139:9
**weeks** [2] - 4957:7, 5009:23
**weight** [2] - 4939:19, 5023:3
**well-being** [1] - 5082:16
**whatsoever** [2] - 5038:6, 5038:12
**Whereof** [1] - 5067:10
**whereof** [6] - 5092:21, 5094:9, 5103:14, 5104:15, 5125:5, 5125:10
**whispering** [1] - 5042:13
**whistle** [1] - 5025:18
**whistleblower** [2] - 5025:15, 5025:17
**white** [1] - 4975:17
**whole** [7] - 4949:12,

4979:5, 4986:25, 5004:17, 5008:6, 5020:21, 5151:23
**wife** [2] - 4955:10, 5049:14
**wild** [2] - 5041:8, 5137:16
**wildly** [1] - 5014:8
**win** [1] - 5149:5
**WINSTON** [1] - 4934:20
**wire** [5] - 4958:18, 4958:21, 4959:13, 4959:16, 4959:23
**wish** [1] - 4983:20
**withdraw** [2] - 5045:18, 5126:2
**withdrawn** [8] - 5034:18, 5035:9, 5054:16, 5068:21, 5075:6, 5076:2, 5094:24, 5115:1
**witness** [56] - 4935:9, 4937:10, 4937:25, 4938:1, 4938:4, 4938:17, 4939:5, 4939:21, 4941:14, 4941:21, 4944:17, 4945:20, 4945:24, 4946:3, 4946:5, 4946:8, 4947:2, 4948:18, 4949:13, 4949:16, 4950:13, 4950:17, 4954:19, 4955:6, 4955:9, 4955:10, 4957:19, 4978:21, 4979:12, 4984:1, 4984:10, 4994:8, 4994:10, 4994:20, 4996:2, 5004:15, 5004:18, 5004:19, 5006:2, 5023:1, 5024:23, 5042:4, 5071:2, 5071:3, 5077:7, 5092:21, 5094:9, 5103:14, 5104:15, 5123:11, 5125:5, 5125:10, 5127:12, 5130:2, 5152:21
**Witness** [1] - 5067:10
**WITNESS** [7] - 4969:8, 4994:7, 5020:1, 5021:4, 5026:6, 5073:25, 5123:15
**witness'** [2] - 5024:18, 5083:5

**witnesses** [3] - 4955:7, 5152:25, 5153:8
**WITNESSES** [1] - 5155:2
**word** [2] - 4942:11, 4947:16, 5024:24, 5138:3, 5138:16
**words** [9] - 4947:20, 4949:10, 5016:24, 5025:4, 5028:9, 5028:10, 5112:3, 5112:5, 5137:10
**world** [1] - 5042:21
**worried** [10] - 5051:5, 5051:7, 5081:12, 5081:13, 5081:19, 5083:12, 5083:14, 5083:21, 5084:2, 5084:15
**worse** [1] - 5122:17
**worth** [1] - 5017:13
**write** [19] - 4976:19, 4984:6, 4989:25, 5103:8, 5136:20
**writes** [1] - 4983:23
**writing** [2] - 5059:8, 5063:12
**written** [6] - 4984:17, 5004:23, 5007:4, 5031:3, 5092:23, 5112:6
**wrote** [19] - 4976:19, 5010:11, 5017:3, 5063:16, 5102:22, 5103:1, 5103:3, 5103:7, 5103:10, 5103:19, 5106:15, 5106:19, 5107:2, 5107:5, 5109:23, 5116:6, 5116:15, 5150:10

## Y

**year** [18] - 4957:7, 4960:24, 4970:5, 4974:24, 4991:23, 4992:15, 4993:8, 4993:17, 4993:18, 5009:24, 5018:6, 5018:8, 5048:24, 5049:5, 5049:6, 5049:7, 5057:24, 5067:1
**years** [10] - 4970:6, 5053:7, 5053:10, 5053:13, 5053:15, 5053:19, 5091:6, 5120:21, 5121:6,

5121:7
**yes-or-no** [1] - 5036:22
**yesterday** [22] - 4939:10, 4948:10, 4954:5, 4989:23, 4996:8, 4996:19, 4998:16, 5026:7, 5027:7, 5048:17, 5048:19, 5057:3, 5058:13, 5074:14, 5081:15, 5084:16, 5087:25, 5117:10, 5117:13, 5135:24, 5138:7, 5138:16
**yesterday's** [1] - 5057:8
**YORK** [1] - 4934:1
**York** [10] - 4934:5, 4934:16, 4934:18, 4934:23, 5020:22, 5049:10, 5049:14, 5049:19, 5087:1
**yourself** [1] - 5029:5
**yourselves** [1] - 5152:17

## Z

**zero** [1] - 5047:24
**zoom** [1] - 4973:24