5156

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - -    X
3
    UNITED STATES OF AMERICA,    :    15-CR-637(KAM)
4
            Plaintiff ,          :
5                                      United States Courthouse
        -against-                :    Brooklyn, New York
6
    EVAN GREEBEL,                 :
7                                      November 15, 2017
            Defendant.           :    9:00 o'clock a.m.
8
    - - - - - - - - - - - -    X
9
                        TRANSCRIPT OF TRIAL
10           BEFORE THE HONORABLE KIYO A. MATSUMOTO
             UNITED STATES DISTRICT JUDGE, and a jury.
11
    APPEARANCES:
12
    For the Government:          BRIDGET M. ROHDE
13                               Acting United States Attorney
                                 BY: ALIXANDRA E. SMITH
14                                   DAVID PITLUCK
                                     DAVID K. KESSLER
15                               Assistant United States Attorneys
                                 271 Cadman Plaza East
16                               Brooklyn, New York

17  For the Defendant:           GIBSON DUNN & CRUTCHER
                                 200 Park Avenue, 48th Floor
18                               New York, New York

19                               BY: REED M. BRODSKY, ESQ.
                                     RANDY MASTRO, ESQ.
20                                   WINSTON Y. CHAN, ESQ.
                                     MYLAN LEE DENERSTEIN, ESQ.
21                                   JOSHUA E. DUBIN, ESQ.
                                     GRACE TSOU, ESQ.
22
    Court Reporter:              Charleane M. Heading
23                               225 Cadman Plaza East
                                 Brooklyn, New York
24                               (718) 613-2643

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.

                CMH      OCR      RMR      CRR      FCRR

5157

1              (In open court; outside the presence of the jury.)

2              THE COURT:  So, the parties have discussed the

3    progress of the trial and what's to come and I think it's

4    important for us to at some point soon advise the jurors as to

5    the projected length of the trial.  It is important for me as

6    well because I do have a trial starting December 11th and I

7    have jurors scheduled to come in for selection so if the

8    parties would kindly let me know, I would appreciate it.

9              MS. DENERSTEIN:  Your Honor, Mr. Pitluck and I spoke

10   very briefly this morning and discussed the plan.  He told me

11   what the government's plan is which I'm sure he'll convey to

12   you in a moment, but I think from the defense perspective,

13   because we just spoke about it this morning, we need a little

14   more time to confer about how much time we may need or not

15   need so I just didn't want you to have a false impression.

16             MR. PITLUCK:  I would never relay a false

17   impression.

18             MS. DENERSTEIN:  No, not you.

19             THE COURT:  That's fine.  I just want to give the

20   jurors as accurate a prediction as we can at this point.

21             MR. PITLUCK:  Yes.

22             So, Judge, I think our position, we'll stop trying

23   to be ambitious and now just based on the length of the trial

24   so far and discussions, and we have been speaking regularly

25   about schedule and length, I think, Judge, a safe estimate for

5158

1   our case to be concluded is the Tuesday after Thanksgiving.  I

2   know the Court is away that Wednesday, Thursday, Friday.  We

3   are very hopeful that we can finish by then, if not sooner.

4   We have Monday, Tuesday, Wednesday this week.  We have

5   Mr. Aselage to recall.

6            Obviously, a lot depends on what we can do over the

7   next three days, but the big variable, as the Court is aware

8   from the previous trial, is our case agent who was on the

9   stand for quite a while in the last trial and it's really just

10  a matter of how many discussions or side bars we have over

11  particular documents on either side.  We're amenable in the

12  interest of expediting things to try and confront those issues

13  in advance, through, you know, we've turned over our exhibits.

14  There are issues.  I think, you know, that we would expect

15  some reciprocity to understand the universe of the documents

16  or the potential universe of documents we're going to

17  introduce because, obviously, if we have an argument with the

18  case agent on cross about introducing exhibits through the

19  case agent and as everyone, a hearsay exception, not offered

20  for the truth, if we do that at side bar for every document,

21  Judge, we can be here a long time.

22           So, I'm putting this on the record.  We're amenable

23  to that and discussed it generally with the defense, but that

24  in our mind is really the X factor as to when we can get done.

25  If we can really expedite that, it's possible we can be done

5159

1   sooner.  If it's really a disaster, it's possible we won't be

2   done by that Tuesday.  So, that's where we kind of are.  I

3   wish I could give the Court a more firm date, but we do have

4   quite a few witnesses left and it's hard to predict how long

5   it would take.

6          MR. BRODSKY:  Your Honor, I do remember this coming

7   up and observing from Shkreli's trial.  I believe the

8   government in that trial decided not to give the identity of

9   the particular exhibits.

10          MS. SMITH:  You're wrong.  We gave a list of our

11   exhibits.  Defense gave a list.

12          MR. BRODSKY:  Oh, great.  So, if they're willing to

13   give us a list of the exhibits --

14          THE COURT:  Would you be willing to reciprocate as

15   Mr. Brafman did on behalf of Mr. Shkreli so that we could

16   streamline this process?

17          MR. BRODSKY:  Would you give us -- this is the first

18   time the government has proposed this proposal to us.  Would

19   you give us the day to think about it and discuss it with our

20   client?

21          THE COURT:  Yes.

22          MR. BRODSKY:  Thank you, Your Honor.

23          MR. PITLUCK:  Judge, that's the best we can do.

24   Obviously, it gets a little more certain after every night,

25   unfortunately, it also gets longer after every night, but

5160

1    that's our best thinking after thinking it through the last

2    few days.

3              THE COURT:  I think after the government rests, the

4    defense is going to make an oral Rule 29 motion.  Is that

5    right?

6              MR. MASTRO:  Yes, Your Honor.

7              THE COURT:  How long do you think that would take?

8    I just want to build in time.

9              MR. MASTRO:  I'm trying to be as brief as I can be,

10   but I don't think that will be a long application, Your Honor.

11   I think it's something I can do, you know, in less than an

12   hour certainly.

13             THE COURT:  All right.  And then we should set aside

14   a date for a charging conference as well.  If the defense did

15   put on a case, I would, you know, obviously schedule it at

16   some point towards the end of the defense case.

17             I would like to schedule it because I do have a lot

18   of commitments in the evening with Bar-related matters and

19   committee work, etc., and I've been moving things around, not

20   to mention my own medical appointments which I need to get

21   done before the end of the year.  They're not minor

22   appointments but important appointments and I had to take them

23   off the calendar and it's going to affect me financially and

24   it's going to affect me, perhaps not, hopefully not, but I do

25   want my medical appointments to get back on schedule.  So,

5161

1     please give me an idea as much as you can.

2              MR. MASTRO:  Certainly.

3              THE COURT:  I understand the defense doesn't want to

4     say or doesn't know right now about their case, but I think it

5     is important to schedule and have an idea not just for myself,

6     obviously, but for the 18 men and women who have given up

7     multiple weeks of their lives to be here.  So, please, try to

8     let us know by the end of today where you stand.  I'd like

9     some schedules, please.

10             MR. PITLUCK:  And, Judge, we're obviously amenable

11    to evenings, whatever the Court's schedule.  None of us are

12    sleeping anyway so we're happy to try to come in earlier,

13    shorten breaks, stay later, whatever the Court is amenable to

14    doing.  We also want to finish.

15             THE COURT:  Well, maybe the charging conference will

16    have to be in the evening, but it's an imposition also on the

17    court reporters which they've been very wonderful and generous

18    and supportive of this effort, but I, I think there are a lot

19    of moving parts.

20             Would the charging conference the first week of

21    December be a good time to hold that?

22             MR. KESSLER:  That's fine.  And we're happy to do

23    that in the evening if that works for the court reporters and

24    everyone else.

25             MR. MASTRO:  Certainly, Your Honor, that sounds

5162

1    reasonable to us during the first full week of December, yes.

2          THE COURT:  In that week, I do have other

3    conferences at 5:30 that I've, pretrial conferences that I've

4    put over that, for 5:30 that week one night and then we have

5    some Bar functions that I have to participate in on two of the

6    other nights but perhaps Tuesday.

7          So, I am going to set a hard date for any additional

8    submissions for the instructions.  That will be the Tuesday

9    after Thanksgiving, November 28th.  Any additional

10   supplemental instructions must be in by the 28th.

11         MR. MASTRO:  Your Honor?

12         THE COURT:  Yes.

13         MR. MASTRO:  I know everyone's schedules are

14   incredibly tight and, you know, Mr. Brodsky can be here on the

15   5th.  I will not be able to be here on the 5th, that court

16   date, or during that evening.  I have to make a longstanding

17   emergency trip -- "emergency" is not the right word -- I have

18   a longstanding commitment that I have to be out of town on

19   that Tuesday and I'm going to take a red eye back so I'll only

20   miss the minimum amount of court time, but if that's the only

21   time the scheduling conference can be, we understand.  I'd

22   just obviously like to be here for the scheduling, for the

23   charging conference, if possible, and I will not be able to be

24   here on the Monday and Tuesday nights because I'm flying out,

25   flying back in, like, a 24-hour trip.

5163

1          THE COURT:  Well, all right.  I have commitments.

2     You are not going to be here anyway on Monday, but I have an

3     evening pretrial conference at 5:30 Monday, I have two Bar,

4     judicial and Bar related functions on Wednesday and Thursday

5     and that leaves Friday, Friday, the 8th.

6          MR. KESSLER:  So, Your Honor, we wouldn't object to

7     Friday, the 8th, obviously if that is a, the time that makes

8     sense to have the charging conference, but my sense is if the

9     defense is not putting on a case, then --

10          THE COURT:  We can do it during the day?

11          MR. MASTRO:  Yes.

12          MR. KESSLER:  We can do it many days earlier in the

13     day.

14          THE COURT:  That's why it would be nice to know what

15     you are doing.

16          MR. KESSLER:  Because I don't think we want to be in

17     the position where we're waiting for a closing or summation

18     for several days because of the charging conference.

19          MR. MASTRO:  We will be conferring on that, Your

20     Honor, and get back to you.

21          THE COURT:  I have packed every lunch hour that week

22     with something, with other conferences.

23          MR. KESSLER:  Your Honor, are all the jurors here or

24     are we waiting?

25          THE COURT:  We are waiting for Number Five.

CMH        OCR        RMR        CRR        FCRR

5164

1      MR. KESSLER:  So, we have one quick thing we can try

2   to resolve just from the previous night.

3      MR. BRODSKY:  Yes.

4      MR. KESSLER:  I believe at the end of Mr. Su's

5   cross, there were a number of defense agreements and we put

6   the admission of those on pause to look to see if there was a

7   cover e-mail or a complete document.  There is a complete

8   document.  We all found the same document.

9      MR. BRODSKY:  He's not on it though, Your Honor, and

10  I think that since he's not on the e-mail from Evan Greebel to

11  Marek Biestek and then Marek Biestek forwarding to Mr. Greebel

12  the signed purchase agreements, he testified, I think, that he

13  had seen them in the office.  He was in the office on

14  December 12, 2012 at this time.  You know, it's just difficult

15  to give him an e-mail that, he's never seen it, he can't

16  comment on it and, you know, that's why we did it this way.

17     THE COURT:  Oh, so you did that that way on purpose?

18     MR. BRODSKY:  No, I didn't do it that way on

19  purpose, Your Honor.

20     THE COURT:  Okay.

21     MR. BRODSKY:  I assumed, of course, like any other

22  document, there must be an e-mail when I was preparing and

23  people gave me the purchase agreements.  I asked my team to

24  get me the purchase agreements that were signed which is what

25  they did.

5165

1                THE COURT:  All right.

2                MR. BRODSKY:  But looking at it now, I don't think

3      that -- I thought it's a wise decision not for us to put in a

4      cover e-mail that he's not seeing.  I'll give you a copy.

5                THE COURT:  It's says just, Attached please find?

6                MR. BRODSKY:  Yes, Your Honor.

7                THE COURT:  Thank you.

8                MR. BRODSKY:  And I'm handing up for the Court for

9      the record DX 5496 for identification which is a marked

10     defense exhibit.

11               THE COURT:  Well, you marked it and not had the

12     e-mail attached or was it marked as a different --

13               MR. BRODSKY:  Marked as a different document.

14               THE COURT:  Okay.  The documents we put in were

15     Defense Exhibit 111-131 through 137.

16               MR. KESSLER:  Your Honor, we don't see the harm in

17     having the cover e-mail and also given how many questions I

18     think both sides have been asking about, you know, the date on

19     the document versus the date of the document, it seems helpful

20     because these documents themselves do not actually have

21     handwritten dates for the date of the purchase agreement and

22     there may be multiple versions of the purchase agreement.

23     Just to have the anchoring document is helpful.  I mean, it

24     also seems a little pointless not to put it in now but put it

25     in later.

5166

1          MR. BRODSKY:  It's fine.  We'll put it in, Your

2     Honor.

3          THE COURT:  Okay.

4          MR. BRODSKY:  We'll make this easy.

5          THE COURT:  So will you --

6          MR. BRODSKY:  What I'll do is I'll offer it without

7     objection and --

8          THE COURT:  Under the original number and you'll

9     attach --

10         MR. BRODSKY:  Under this number.

11         THE COURT:  -- the purchase agreement or you will

12    offer it under 5496 and attach the purchase agreements?

13         MR. BRODSKY:  You know what I'll do?  I'll renumber

14    this now.  I'll renumber this now to 111-131-1 and this way,

15    they'll track together if that makes sense.

16         MR. KESSLER:  And that's fine.

17         THE COURT:  All right.  Thank you.

18         Would you mind refreshing me on what the fight was

19    in the Shkreli case with the agent's exhibits?  I'm just

20    trying to remember.  I'm sorry.  I can go back and look at the

21    transcript.

22         MS. SMITH:  No, that's okay.  Obviously, there were

23    a couple of different issues.

24         One was to what extent the settlement agreements for

25    the witness who didn't testify would come in and related

1    documents and there was a bunch of discussions about what

2    documents constitute co-conspirator statements and then

3    defense counsel had a bunch of hearsay objections.  And if you

4    remember, we did a whole briefing which we, hopefully, we can

5    avoid this time, but part of the agent's testimony, we

6    provided the full list that we thought we could potentially

7    introduce through the case agent because it is a, you know, a

8    substantial list and then defense counsel raised objections.

9    They did not, I believe, put in that many documents through

10   the case agent, but we were trying to sort this out ahead of

11   time.

12           So, to the extent there were documents, those were

13   resolved prior to the case agent taking the stand.  Obviously,

14   there would still be objections to questions and testimony but

15   in terms of which documents were coming in, we tried to kind

16   of get that sorted out ahead of time.

17           THE COURT:  So, the case agent is projected to

18   testify next week, is that right?

19           MS. SMITH:  I mean, that's certainly the hope at the

20   very least to start him next week.  We'll see how it goes, but

21   if you remember last time, because there were so many

22   documents, the direct took a substantial amount of time and I

23   anticipate that defense here will want to put in any number of

24   documents through the case agent potentially and so that the

25   cross could take a while just in terms of the documents going

5168

1    in.  So, that's kind of why we wanted to see if we could flush

2    it out ahead of time.

3           Also, unlike kind of more a fact witness, the case

4    agent, the cross is not sort of the same kind of traditional

5    cross.  I mean, I think we've seen with many of the witnesses

6    the defense putting in documents affirmatively, not for

7    impeachment or for cross material, and, certainly, with the

8    case agent, I would expect that the defense may want to put in

9    documents affirmatively with the case agent that are not truly

10   cross.  And we, to the extent we can get that also ahead of

11   time, I think that would just save a lot of side bars.

12          THE COURT:  All right.  So, should we set dates by

13   which the parties will define the issues and if they want to

14   make submissions, they may, otherwise I will assume there is

15   not going to be an issue or dispute?

16          MR. BRODSKY:  Your Honor, respectfully, I heard the

17   government.  I would like to confer with our team and our

18   client.

19          Traditionally, Your Honor, it is the government

20   setting forth the position that they would like to speed

21   things up which I totally understand.  They would like the

22   presentation of their evidence through the agent to be

23   efficient and productive without side bars which I completely

24   understand.

25          THE COURT:  Well, in my discretion, I can suspend

1    side bars and not have them anymore.

2              MR. BRODSKY:  Understood.

3              THE COURT:  That is what many of my colleagues do

4    when side bars are dragging down the trial and taking up

5    needless time.

6              MR. BRODSKY:  Understood, Your Honor, but one of the

7    most important parts of, as we've seen through our

8    cross-examinations, one of the most important really the only

9    mechanism for a defendant accused of a crime who doesn't have

10   any civil discovery rights to take depositions or to discover

11   evidence other than through very narrow trial subpoenas, which

12   pursuant to Nixon, as Your Honor knows, are extremely narrow,

13   the only true mechanism of uncovering the truth is through

14   cross-examination.

15             What the government is asking here, and I do want to

16   talk to our team and our client about it, is a request that we

17   foreshadow to them and provide them in advance the documents

18   we intend to cross-examine the FBI agent about and that is a

19   very significant request.  That is not something that we

20   should take as a very easy way to say, oh, sure, we'll do

21   that.  I understand the government's request to move things

22   along, but as Your Honor has seen from our cross-examinations,

23   we believe we bring out things that the government has never

24   brought out and that's part of our defense and to provide the

25   government an advance showing of how we intend to

cross-examine the FBI agent with our documents is a very, very
2 serious request.  In my view, it's unprecedented in terms of
3 disclosure by the defense.  Maybe Mr. Brafman decided that's
4 okay for him, but in the trials that I've participated in, I
5 haven't seen it done.

6         So, I do think it's important for us to confer with
7 our client and to talk to our team and to decide whether or
8 not we want to give up a very significant right which is the
9 right to cross-examine a witness without the government
10 knowing which documents we're going to use in advance.

11         MS. SMITH:  And, Your Honor, just, again, to be
12 clear, to the extent that Mr. Brodsky wants to use documents
13 for impeachment purposes for the case agent or to
14 cross-examine the case agent, they're certainly not asking for
15 those documents.  We briefed this previously.

16         To the extent the defense is affirmatively advancing
17 its case through the case agent, doing things that they would
18 be, putting documents in for their own purposes where they
19 would have to call the case agent in their own case to do this
20 or a paralegal or something along those lines and they're
21 choosing, instead, to use the government witness affirmatively
22 to put in documents, those are the documents we think we
23 should receive ahead of time.

24         If Mr. Brodsky wants to confront the case agent or
25 show them documents or cross on certain things, we're

CMH     OCR     RMR     CRR     FCRR

5171

1    certainly not asking for those.  We're simply asking for the

2    documents that the defense would otherwise put in on their own

3    case and to the extent they're not willing to preview them for

4    us, we think it's inappropriate to then use the case agent for

5    their own case, we've had this come up with a number of other

6    witnesses as well, especially, if we were going to take the

7    step to narrow and flush out issues ahead of time and reveal

8    our strategy which we think is prudent given the number of the

9    documents the case agent is going to be putting in and the

10   potential for delay and we really do not want to keep the jury

11   longer than they have.

12          So, we'll have to think about it.  Mr. Brodsky is

13   not willing to provide any documents that he's putting in

14   affirmatively but that is the distinction we're drawing.

15   We're certainly not asking for cross-examination or

16   impeachment material.

17          THE COURT:  So, you are saying you might otherwise

18   be willing to allow documents to be admitted through cross of

19   the case agent that would otherwise only be admissible in the

20   defense case?

21          MS. SMITH:  Exactly, to the extent they're putting

22   them in affirmatively.  Certainly, we would like to move the

23   trial as well.  So, if it's within the context of what the

24   case agent is, will be putting documents in for and, as you

25   know, it's pretty broad because it will be primarily, you

5172

1    know, or many of them will be statements of the defendant or a

2    co-conspirator and given what I imagine the defense may want

3    to put in in terms of statements of their own client to the

4    extent that they can, it will probably fall in that same

5    period.  And we're just kind of raising that, you know,

6    raising that issue.

7              THE COURT:  All right.  Thank you.

8              All right.  The jurors are all here.  May we bring

9    them in?

10             And Mr. Su is here, Mr. Burke?

11             MR. BURKE:  Yes.

12             THE COURT:  We can put him on the stand, if you

13   like, so that he will be on the stand.  Thank you.

14             (Pause.)

15             THE COURT:  Did you have any other exhibits that you

16   wanted to put on the witness desk so we can expedite it?  You

17   don't have to walk back and forth.  I don't know whether you

18   were going to revisit any exhibits already in evidence.  I

19   think part of the time lost is the walk and we lose the

20   ability to always hear you clearly.

21             MR. BRODSKY:  Right.  Part of the issue, Your Honor,

22   is I often, on cross-examination, I'm not exactly sure what

23   the witness is going to say and I have more documents here

24   than I use.

25             THE COURT:  Okay.  I am not saying that you should

5173

1    give him things you haven't used yet, but if you feel

2    comfortable to do that, you can leave them in a binder on the

3    desk or if there are documents that you want to revisit from

4    yesterday and they're admitted, I would put them up there as

5    well.

6                MR. BRODSKY:  Okay.  Thank you, Your Honor.

7                THE COURT:  It saves the walking.

8                MR. BRODSKY:  It happens to be my only exercise.

9                THE COURT:  Yes.  It's sad, isn't it?

10               MR. BRODSKY:  My family thinks it's a good thing.

11               (Jury enters.)

12               THE COURT:  All jurors are present.

13               Good morning, members of the jury.

14               Mr. Su, you are still under oath.

15               And, Mr. Brodsky, you may resume your cross.

16               Have a seat.

17               MR. BRODSKY:  Thank you, Your Honor.

18               (Continued on next page.)

19

20

21

22

23

24

25

Su - cross - Brodsky                           5174

1    JACKSON  SU  ,

2         the witness, having been previously duly sworn,

3         resumed as follows:

4    CROSS-EXAMINATION (Continued)

5    BY MR. BRODSKY:

6    Q    Good morning Mr. Su.

7    A    Good morning.

8    Q    We left off, Mr. Su, with the stock purchase agreements

9    DX 111-131 through 137, and I put before you -- you said you

10   had seen those in the office, they being the stock purchase

11   agreements for the purchase of Fearnow shares, you had seen

12   them in the office in December 2012?

13   A    In some shape or form, yes.

14   Q    And I have before you DX 111-131-1 which is an e-mail

15   exchange you're not on, correct?

16   A    Correct.

17   Q    And that's an e-mail exchange between Evan Greebel to

18   Marek Biestek on December 12, 2012?

19   A    Yes.

20   Q    And that Mr. Biestek forwards to Mr. Greebel signed stock

21   purchase agreements for several people, correct?

22   A    That's what I see, yes, that's what the e-mail says.

23            MR. BRODSKY:  Your Honor, we offer DX 111-131-1 and

24   then DX 111-131 through 137.

25            MR. KESSLER:  No objection with the understanding

Su - cross - Brodsky                                        5175

1    that they're all from the same e-mail.

2         THE COURT:  All right.  We will receive DX 111-131-1

3    and 111-131 through 137.

4         (So marked.)

5    Q    Great.  And Mr. Su, on Mr. Greebel's e-mail to

6    Mr. Biestek on December 12, 2012, I don't know if we have an

7    electronic copy, but does it not state that, Mr. Su:  Marek,

8    attached are purchase agreements for the acquisition of the

9    Fearnow stock?

10        Did you understand, sir, that the people who were

11   going to have the opportunity to receive Fearnow stock had to

12   purchase the stock?

13   A    That was my understanding.

14   Q    And you wanted that opportunity to purchase Fearnow

15   shares, correct?

16   A    That was discussed between me and Martin when he came

17   into my office like I said yesterday.

18   Q    Yes, and you --

19   A    If it was offered to me, I would have signed, I would

20   have participated in it.

21   Q    If it was offered to you, you would have accepted it and

22   you would have bought the shares?

23   A    Sure.

24   Q    And had you bought the shares, it was your hope that, as

25   you used the words yesterday, it was a lottery ticket which,

Su - cross - Brodsky                              5176

1    correct, you hoped it would be a lottery ticket?

2    A    It would be a lottery ticket.  Whether it increased,

3    decreased, it was a chance option.

4    Q    Because the shares were at a deeply discounted price,

5    right?  Did you remember the price at which they were being

6    offered?

7    A    No.

8    Q    And it was a lottery ticket because, had Retrophin

9    succeeded and after going public, the shares could be worth a

10   lot of money, right?

11   A    It could have.

12   Q    And that's certainly what you were -- you were hoping to

13   get the shares to buy them and then to profit one day if

14   Retrophin succeeded, correct?

15   A    If it was offered to me.

16   Q    If it was offered.  And on December 12, 2012, Mr. Greebel

17   asks Mr. Biestek, correct, to provide these stock purchase

18   agreements to Andrew Vaino, correct?

19   A    That's what this e-mail says.

20   Q    Ron Tilles?

21   A    Yes.

22   Q    Kevin Mulleady?

23   A    Yes.

24   Q    Tim Pierotti?

25   A    Yes.

Su - cross - Brodsky                          5177

1   Q     And Tom Fernandez?

2   A     Yes.

3   Q     And then in -- great.  And then in response, Mr. Biestek

4   forwards signed stock purchase agreements, correct?

5   A     Yes.

6   Q     Okay.  Let's take a look at the stock purchase agreements

7   that are forwarded.  Let's take a look at DX 111-136 as an

8   example.

9           So this is a purchase agreement, correct?

10  A     That's what it reads, yes.

11  Q     And this is for -- it says dated as of December 11, 2012,

12  right?

13  A     Yes.

14  Q     We talk about the "as of" dates, right, what that means?

15  A     Yes.

16  Q     And it's between Troy Fearnow, the seller, and Andrew

17  Vaino, the purchaser, correct?

18  A     Yes.

19  Q     And the seller, it says, is a stockholder of Desert

20  Gateway, correct, in the "whereas" clause?

21  A     He's the seller, yes.

22  Q     And the second "whereas" clause says the seller -- which

23  is Troy Fearnow, correct?

24  A     Yes.

25  Q     -- desires to sell 300,000 shares of the common stock par

CMH     OCR     RMR     CRR     FCRR

1    value, .0001 per share, right?

2    A    Yes.

3    Q    So that in paragraph one, it says that the seller is

4    selling the 300,000 shares for $300 in the aggregate, right?

5    A    Yes.

6    Q    Now, you understood at this time, I think you had said at

7    some point Mr. Huang had to take money out of his own pocket

8    to help fund the royalty payment, the final royalty payment

9    for the Ligand license in 2012, right?

10   A    Yes.

11   Q    And in your words, Retrophin was running on fumes, right?

12   A    Yes.

13   Q    And so that this was a lottery ticket of, you know, an

14   extraordinary lottery ticket in the sense of 2012, the

15   likelihood that Retrophin was going to succeed was not very

16   clear, correct?

17           MR. KESSLER:  Objection to the speculation.

18           THE COURT:  Well, he can testify as to his

19   assessment at the time what he believed.

20   A    Can you repeat the question, please?

21   Q    Mr. Su, in December of 2012, you, being the chief

22   operating officer of Retrophin LLC, you understood that the

23   likelihood of Retrophin succeeding was very low?

24   A    I didn't have an opinion.

25           (Continued on next page.)

5179

1    BY MR. BRODSKY:

2    Q    Okay.  And is it fair to say yesterday you said you had

3    two conversations with Mr. Shkreli about getting the Fearnow

4    shares, right?

5    A    Yes.

6    Q    You didn't convey what Mr. Shkreli said to you about his

7    -- well, withdrawn.

8              You dismissed his statements relating to his plan,

9    right?  According to you he made statements regarding a plan

10   and you dismissed them.

11   A    Are you talking about  -- referring to the plan for

12   allocation of Fearnow stock and then having people share in

13   that profit?

14   Q    Yes, sell the shares and then split the profits.

15   A    I dismissed it, just like everything else.

16   Q    That's the reason why you didn't tell Mr. Aselage about

17   it, because dismissed you it, in December of 2012?

18   A    I don't recall whether I told him or not.

19   Q    Let's look at your e-mail, Defendant's Exhibit 111-117 in

20   evidence.  If we can put that up.  This is Defendant's Exhibit

21   111  -- I'm sorry.  I must have given you the wrong number.

22   Let me get you the right number.

23              MR. BRODSKY:  One moment, your Honor.

24              (Pause.)

25   Q    111-18?

5180

1          And so you e-mailed  -- Mr. Su, you e-mailed

2   Mr. Aselage and copied Mr. Huang and December 4, 2012 and told

3   them about the Fearnow shares, right.

4   A    Yes.

5   Q    And this was after one of your conversations with

6   Mr. Shkreli where Mr. Shkreli told you about some plan to sell

7   the Fearnow shares and split the profit?

8          MR. KESSLER:  Objection, misstates the testimony

9   about the time.

10          MR. BRODSKY:  No.  It doesn't.  I'm asking him the

11   question.

12          THE COURT:  I think that the question may have

13   misstated the timing.  The dates on 111-18 and 111-131-1.

14   Q    I showed the capitalization table of December 3, 2012,

15   right?

16   A    That was yesterday you showed me that, yes.

17   Q    And that was the capitalization table on December 3,

18   2012, when Mr. Shkreli under the capitalization table was

19   going to receive 1,075,000 shares of Fearnow, right?

20   A    Yes.

21   Q    And that prompted you, correct me if I'm wrong  -- but

22   that's what prompted you to have a conversation or you had a

23   conversation shortly thereafter with Mr. Shkreli about

24   Mr. Shkreli's apparent plan to sell these shares and split the

25   profits?

5181

1   A    I didn't have it.  He came to me and he just told me

2   about this plan.  I don't know when the timing was.

3   Q    You don't remember the timing?

4   A    I don't know the what the time was.

5   Q    It could have been before or after this e-mail?

6   A    It could have been before or after this e-mail.

7   Q    If there was after this e-mail you certainly didn't tell

8   Mr. Aselage?

9   A    If it was before, again, I don't know when the timing of

10  that conversation was.  If the conversation was before

11  December 4, it's not on this e-mail; if it is after, again, I

12  don't know the timing of the conversation.

13  Q    Mr. Su, you know a lot about on December 4, 2012, you

14  know a lot about the Fearnow shares, don't you?

15  A    I read the note about the Fearnow shares.  So, it's

16  exactly what I read.  That's how much I knew about it.

17  Q    You knew there was a note that converted the 2.5 million

18  trade able shares, right?

19  A    Yes.

20  Q    On December 3 you get the capitalization table, right?

21  A    Yes.

22  Q    You see that Mr. Shkreli is going to get some Fearnow

23  shares, right?

24  A    Yes.

25  Q    You then go look in the office for the note?

5182

1   A    No.  It was part of the due diligence we had been doing

2   on the shell, when we were looking at Desert Gateway, the

3   shell.

4   Q    I see.  So you knew about Fearnow before December 4,

5   correct?

6   A    I knew about the note.

7   Q    You knew about the note.  And then the first time you

8   learned Mr. Shkreli is going to get 1,075,000 shares is

9   December 3?

10  A    When that cap table was sent to me.  I guess in and

11  around that time.

12  Q    You talk here about the ownership part, you're talking

13  about the capitalization table?

14  A    Yes.

15  Q    Yesterday you didn't remember but today you do remember

16  the ownership part is about the capitalization table?

17  A    The capitalization table is about ownership of the entire

18  company.

19  Q    You remember you're complaining here on the ownership

20  part is something of a surprise to you, when you say the

21  ownership part, you mean because Mr. Shkreli is going to be

22  getting the opportunity to purchase 1,075,000 shares, right?

23  A    Again, like I said yesterday, I don't know what that was

24  referencing yesterday as I look back.

25  Q    And then when it says the conversion ratio, do you know

5183

1   what that's referencing?

2   A     There was some type of conversion ratio between when  --

3   this should be when the company went from a private company to

4   a public company.

5   Q     Right.  So you had a direct line of communication to

6   Mr. Aselage, correct?

7   A     Yes, I sent him the e-mail.

8   Q     He was the chief executive officer at the time?

9   A     December 4, yes, he was.

10  Q     That's why he's asking you questions about the finances

11  and you're giving him responses, right?

12  A     Yes.

13  Q     And at no time did you ever write to Mr. Aselage, ever,

14  December 2012, January 2013, February 2013, March 2013, any

15  time in 2013 about some plan by Mr. Shkreli relating to the

16  Fearnow shares, right?

17  A     Sorry.  Can you repeat that question?  There was a lot of

18  dates.

19  Q     I'll slow it down.  December 2012, did you ever inform

20  Mr. Aselage about some plan by Mr. Shkreli to sell the Fearnow

21  shares?

22  A     Did I inform Steve Aselage about Fearnow stock being sold

23  -- the control of the shares?

24  Q     You testified Mr. Shkreli came to you with a plan to sell

25  the shares and split the profits, you remember that?

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

5184

1    A    Yes.

2    Q    Did you tell that to Mr. Aselage in December 2012?

3    A    I don't know if I had that conversation with him.

4    Q    He's the CEO of the company and on the board of

5    directors, correct?

6              MR. KESSLER:  Objection to form.

7              THE COURT:  All right.  Overruled.

8    A    He is the CEO of the company, yes.

9    Q    And if you're going to complain about something

10   Mr. Shkreli is doing in December of 2012, isn't he the person

11   to go to?

12   A    I wasn't complaining.  I think I was informing him in

13   this e-mail chain and at the same time is he the person to go

14   to?  Again Martin Shkreli is  -- has always been the

15   controller of Retrophin.  So even though Steve Aselage was the

16   CEO by name and the director, everybody knew that it was still

17   Martin's company.  It was Martin.

18   Q    My question is not that.  My question is:  If you're

19   going to complain about Mr. Shkreli about something he's doing

20   and you're not going to Mr. Shkreli to complain to Mr. Shkreli

21   about what he's doing, you're going to go to Mr. Aselage,

22   right?

23   A    I would inform Steve Aselage, yes.

24   Q    And did you inform Mr. Aselage in December of 2012 about

25   your complaint relating to Mr. Shkreli, any complaint related

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

5185

1    to Mr. Shkreli and Fearnow shares?

2              MR. KESSLER:   Objection to the statement that he had

3    a complaint.

4              THE COURT:   I think you should rephrase without the

5    word complaint.

6              MR. BRODSKY:   I'll rephrase.

7    Q    You don't remember, Mr. Su, ever going to Mr. Aselage in

8    December of 2012  -- wait until I'm done with the question,

9    please?

10             You don't remember going to Mr. Aselage in December

11   2012, at any time in December 2012, and saying to him,

12   Mr. Shkreli told me about some plan to sell the Fearnow shares

13   and split the profits, right?

14   A    I don't recall having that conversation.

15   Q    You can't point us to a single e-mail to Mr. Aselage

16   giving him this information, correct?

17   A    I wrote a letter to the board of directors.

18   Q    What the date of that letter?

19   A    In 2013.

20   Q    What month, what date?

21   A    2013, first quarter of 2013.  I don't remember.  After I

22   left.

23   Q    You addressed it to who at the board of directors?

24   A    I addressed it to the board of directors, handed it my

25   attorney at the time for the appointment agreement, asked him

5186

1    to hand it up to the board of directors.

2    Q    And your attorney didn't do it?

3    A    He didn't do it.

4    Q    I see.  We're going to get to your attorney.  This is the

5    same attorney with the arbitration?

6    A    This was from my appointment arbitration.

7    Q    We're going to get back to him in a few minutes?

8              In 2012, December 2012, you can't point us to an

9    e-mail or a document, right, where you told Mr. Aselage?

10   A    I don't recall whether I had a conversation with Steve

11   Aselage or an e-mail or anything regarding the Fearnow stock

12   allocation.

13   Q    You're certain, sir, you certainly never told Mr. Greebel

14   about Mr. Shkreli's   -- some plan Mr. Shkreli had in

15   December 2012 to sell some shares and split the profits,

16   correct?

17             MR. KESSLER:  Objection to the form.  Told him

18   December 2012 or never told him about the plan?

19             MR. BRODSKY:  I thought my question was clear.  I'll

20   rephrase it, your Honor.

21   Q    Mr. Su, in December 2012 did you ever tell  -- you

22   certainly never told Mr. Greebel in December 2012 about some

23   plan by Mr. Shkreli to sell some Fearnow shares and split the

24   profits, right?

25   A    I don't recall having a that conversation with him.

5187

1  Q     You can't point to us an e-mail or a document where you

2  told him, correct?

3  A     Correct.

4  Q     Now, let's talk about  -- can we put up GX 111-35 A in

5  evidence.  You were asked questions about this nine hundred

6  thousand dollar loan, correct?

7  A     The promissory note.

8  Q     The promissory note, correct?

9  A     Yes.

10 Q     And you answered some of those questions relating to this

11 note and the equity investment, right?

12 A     Yes.

13 Q     So you testified the equity investment from MSMB

14 Healthcare of $900,000 into Retrophin LLC was reclassified

15 into a note, correct?

16 A     Yes.

17 Q     In November 2012, right?

18 A     Yes.

19 Q     Isn't it fair to say, sir, that in May of 2012  -- we'll

20 talk a little bit about this later this morning  -- but in May

21 of 2012, four or five months into your job as chief operating

22 officer of Retrophin LLC, the private company, you filed a

23 whistleblower complaint against MSMB, right?

24 A     Correct.

25 Q     And you knew that by filing a whistleblower complaint you

5188

1    could get a percentage of any return or any damages or any  --

2    you know  -- fines or money obtained by the SEC, correct?

3    A    That is not what crossed my mind when I filed that

4    complaint.

5              MR. BRODSKY:   Your Honor, move to strike.  That

6    doesn't answer my question.

7              THE COURT:   You can try to rephrase it.  I think it

8    is responsive.  But if you don't like the response, you want

9    to strike it, you can rephrase the question and see what else

10   you get.

11   Q    Mr. Su, yes or no, you knew when you filed a

12   whistleblower complaint you could get a percentage of whatever

13   fees or whatever money or whatever property or anything of

14   value the SEC obtained, correct?

15   A    That is not what crossed my mind when I filed the

16   complaint.

17   Q    At the time you filed the whistleblower complaint  -- you

18   know it's called a whistleblower complaint, right?

19   A    I went to the SEC website  --

20   Q    Yes or no, sir, did you know it was a whistleblower

21   complaint?

22   A    I went to the website on the SEC and that's where it

23   directed me to file an on-line complaint.

24   Q    And you had been in the securities industry since 1998,

25   correct?

5189

1   A     Prior to that I did some internships,  '95,  '96.

2   Q     You had been in the securities industry since 1996 and

3   are you telling this jury that when you filed that on the SEC

4   website you didn't understand that it was called a

5   whistleblower complaint where you could get a percentage of

6   whatever is obtained by the SEC?  That's what you are saying?

7   A     If you go the SEC website, it says file complaint and the

8   I just filed that complaint.  It only leads you to one track.

9   Q     My question, sir, is not that.  I'm going to try to ask

10  you again.

11          Having been in the securities industry from 1996 to

12  May of 2012, when you filed this complaint, are you telling

13  this jury you did not know that when you filed a complaint

14  with the SEC you could get a percentage of whatever the SEC

15  obtains?  Yes or no.

16  A     I did not know that this specific case would or would

17  not.

18  Q     But you understood, sir, you understood the concept of a

19  whistleblower complaint obtaining a percentage of the profits?

20  Yes or no.

21  A     I don't know if this falls under it.  I was worried about

22  the assets and if there's no money there's nothing to get.

23  That's not what crossed my mind, again.

24  Q     When you wrote this complaint, you separated two columns,

25  you had something that you called what's wrong and something

5190

1    that you called what's right?

2    A    Yes.

3    Q    And in the what's right column you said that MSMB

4    Healthcare, PPM, said they have the right to invest in other

5    LPs and LLCs, correct?

6    A    Yes.

7    Q    And you understood then that the MSMB Healthcare private

8    placement memorandum allowed MSMB Healthcare to invest, the

9    right to invest, in other LPs and LLCs, correct?

10   A    That was my understanding.

11   Q    And that included Retrophin LLC, correct?

12   A    Yes, Retrophin, LLC was an LLC; it allowed it.

13   Q    Yes.   And you also said what's right here is that the

14   Retrophin, LLC agreement said Martin can do whatever he wants

15   with the funds as he sees fit, correct?

16   A    Can I see the piece of paper?   I want to make sure

17   that's what I said.

18   Q    I'll refresh your memory.   3500-JS-7?

19        When you filed this, correct, Mr. Su, you had to do

20   it under penalty of perjury, right?

21   A    Yes.

22   Q    Let me direct your attention to  -- if you go past page

23   eight, you'll see a chart.   Just turn to that page.   The

24   document is not in evidence, Mr. Su.   I would just ask you to

25   read bullet point number four silently to yourself.

5191

1          Okay.  If you can put it down now aside.  Would you

2    mind holding it up and putting it aside?  The document is not

3    in evidence.  All right.

4          Now, does that refresh your memory, sir, that you

5    told the SEC that what's right here was that the Retrophin,

6    LLC agreement said Martin can do whatever he wants with the

7    funds as sees fit.

8    A    Yes.

9    Q    And so, therefore, you understood that Mr. Shkreli had

10   the authority, as managing member of the MSMB Healthcare, to

11   invest $900,000 into Retrophin, LLC, correct?

12   A    Yes.

13   Q    And you understood that he had the authority to

14   reclassify that as a loan, correct?

15   A    Sorry.  I don't know whether that gives him the legal

16   right to.  I'm not a lawyer.  I don't know.

17   Q    You understood that Retrophin, LLC enabled Mr. Shkreli to

18   do whatever he wanted with the funds, correct?  That's what

19   you said, right?

20   A    That's what I understood the legal document to say.

21   Q    And you understand that encompassed within doing whatever

22   you want with the funds includes the right to take out a loan,

23   right?

24   A    He could take out a loan.

25   Q    Right.  Okay?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

5192

1          Now, in November 2012 you knew Citrin Cooperman

2    understood that the nine hundred thousand dollar investment by

3    MSMB Healthcare into Retrophin, LLC was reclassified as a

4    loan?

5    Q    Correct?

6              MR. KESSLER:  Objection to Mr. Su understanding.

7              THE COURT:  Rephrase.

8              MR. BRODSKY:   Your Honor, I'm about to prove it up.

9    I have  --

10             THE COURT:  I'm asking you to rephrase the question

11   that calls for an understanding of someone else's mind.

12             MR. BRODSKY:  Understood.

13   Q    Mr. Su, you told Citrin Cooperman in November of 2012

14   that the nine hundred thousand dollar equity investment of

15   MSMB Healthcare was reclassified into a loan, correct?

16   A    Yes.

17   Q    And you told them that before you ever even had a

18   conversation with Mr. Greebel, right?

19   A    I don't know what the timing of that was.

20   Q    You remember testifying just yesterday that the timing of

21   your conversations with Mr. Greebel were about this $900,000

22   was approximately November 27 to November 29, 2012?

23   A    The conversation I had with Evan Greebel about the loan,

24   the nine hundred thousand dollars?

25   Q    Yes.  When Mr. Shkreli dropped it off, right, you said

5193

1    you had a conversation where you called him up and he didn't

2    respond to you, right?

3    A    Yes.

4    Q    You said it was  -- you say, your testimony, Mr. Greebel

5    responded and said he hasn't paid fees so I'm not going to

6    respond, right, that's your testimony?

7    A    Yes.

8    Q    And so that conversation, according to your testimony,

9    you say occurred in late November, approximately November 27

10   and November 29?

11   A    Okay.

12   Q    All right.  Then you said you spoke to him again and you

13   thought it was between about November 30 and December 1,

14   right?

15   A    Yes.

16   Q    So you told Citrin Cooperman about the reclassification

17   of the nine hundred thousand equity investment into a loan

18   prior to that?

19   A    No.  That's not the timeline.  The first time I saw it

20   when Martin dropped it off on my desk, dropped it off on my

21   desk and I called Evan and he said he couldn't speak to me

22   about it.  That was the first time I saw it.  There was no way

23   I could give it to Citrin because I didn't have it prior.

24   That was the first time I saw it.

25   Q    Right.  And your testimony is  -- and you were clear

5194

1  about it  -- your testimony is this occurred, the first

2  conversation in late November, right?

3  A    In around November, late November.

4  Q    In or around.  How much flexibility are you giving

5  yourself, Mr. Su, with respect to in or around late November?

6           MR. KESSLER:  Objection as to the form.

7           THE COURT:  Sustained.

8  Q    Mr. Su, how many days in or around late November, plus

9  days, minus days?

10  A    Again, I don't know exact timing five years ago.

11  Q    Yet you remember the specific conversation with

12  Mr. Greebel five years ago?

13  A    I do.

14  Q    That's your testimony?

15  A    He made an impression on me for this specific piece of

16  paper that I thought was questionable.  I went to the lawyer

17  after I received it.  I asked Martin whether he talked to Evan

18  about it.  He said yes, he talked to Evan about it.  I called

19  Evan.  He said he couldn't talk to me because of the fees.

20  Okay.  He stuttered a little bit, told me he couldn't talk to

21  me because of the fees.  Hung up.  Couple of days later we

22  were talking about everything with this reverse merger and the

23  capital investment that investors wouldn't give us or

24  Retrophin and then he said it was okay.

25  Q    Right?

5195

1          And you can point us to an e-mail or a document or

2     writing in which that's what you wrote?

3     A    Wrote what?

4     Q    Where Mr. Greebel said it was okay.

5     A    It was a conversation with me and another colleague and

6     he said it was okay.

7     Q    Mr. Su, you said you had a concern about it.  That's your

8     testimony, you had a concern about it?

9     A    Yes.

10    Q    You're the chief operating officer, right?

11    A    Yes.  That was my title, yes.

12    Q    Yes.  And where is the note, where is the e-mail, where

13    is any document in which you told anybody that Mr. Greebel

14    said this to you?  Point to it.

15    A    I don't have one.

16    Q    Okay.  Let's point to some documents we do have.

17    Defendant's Exhibit 111-40.

18          MR. BRODSKY:  May I approach, your Honor?

19          THE COURT:  Yes.

20    Q    Mr. Su, let me show you Defendant's Exhibit 111-40 for

21    identification.

22          MR. BRODSKY:  For the record, it's an e-mail from

23    Jackson Su, November 12, 2012, to Corey Massella and

24    Ms. Liang, subject, note.

25          We offer it, your Honor.

5196

1          MR. KESSLER:  No objection.

2          THE COURT:   We receive in evidence Defendant's

3     Exhibit 111-40.

4          (So marked.)

5     Q    Mr. Su, this is you, correct?

6     A    Yes.

7     Q    And on November 12 you sent the promissory note to

8     Mr. Massella and Ms. Liang, right?

9     A    Yes.

10    Q    You didn't copy Mr. Greebel, correct?

11    A    No.  It's not on here.

12    Q    So by November 2012 you knew about the note, correct?

13    A    November 2012, yes.

14    Q    Isn't it true that a couple of days later Ms. Chew asked

15    you questions about it?  Mr. Su, isn't it true Ms. Chew a few

16    days later asked you some questions about it?

17    A    Is there an e-mail?  I don't see it on here.

18    Q    You don't remember?

19    A    No.

20    Q    This was a note you were concerned about and you don't

21    remember Ms. Chew's questions to you about it?

22    A    I'm sure the accountants asked me about it.

23    Q    But you don't remember?

24    A    I don't remember the specifics of the questions.

25    Q    Do you remember generally them asking about it?

5197

1    A    They would probably ask.

2              MR. BRODSKY:   Your Honor, I move to strike the

3    probably.  I'm not asking what they probably asked, your

4    Honor.

5              THE COURT:  All right.

6              Do you have any recollection as to whether the

7    accountants asked you about this document, the note?

8              THE WITNESS:  I do.  They asked me about the note.

9    Q    You generally remember now they asked you about the note?

10   A    I'm sure they asked me about the note.

11   Q    There's a difference, Mr. Su.  Do you remember them

12   asking you about the note or are you sure they must have asked

13   you about the note?

14   A    They must have asked me about the note.  They would have.

15   Q    You can't, sitting here, remember any conversations?

16   A    I don't remember the conversation.

17   Q    You don't remember the conversation because it was five

18   years ago, right?

19   A    That would be correct.

20             MR. BRODSKY:  Your Honor, may I approach?

21             THE COURT:  Yes.

22   Q    I'm showing you 111-100 for identification.

23             MR. BRODSKY:  For the record, this is an e-mail

24   exchange, the top e-mail is Ms. Chew, Susan chew, November 16,

25   2012, to Jackson Su and Corey Massella.  Subject re: Secured

5198

1  promissory note.

2          We offer it, your Honor.

3          MR. KESSLER:  Your Honor, we don't object.  It may

4  already been in evidence under a different number.  We're

5  checking that.  I don't object to their being two copies.

6          THE COURT:  All right.  If it's already in evidence

7  do you want to put it in again?

8          MR. BRODSKY:  We'll use this one and if the

9  government tells us it's in evidence as a Government's Exhibit

10  we're happy to do the Government's Exhibit.

11          MR. KESSLER:  111-14.

12          THE COURT:  Is that a Defense Exhibit or

13  Government's Exhibit?

14          MR. KESSLER:  Government Exhibit.

15          THE COURT:   Do you want to use that designation?

16          MR. BRODSKY:  I'll use the Government's Exhibit your

17  Honor.

18          THE COURT:  Okay.

19  Q    So if we go to the first page, Ms. Chew on November 15 is

20  saying she's unable to locate the thirty thousand dollar loan

21  from Mr. Huang and the nine hundred thousand dollar loan from

22  MSMB Healthcare, right?

23  A    That's correct.

24  Q    This is after you sent her the note for $900,000,

25  correct?

5199

1  A    Yes.

2  Q    And she's asking where is the bank account where the

3  money was wired into, right?

4  A    Yes.

5  Q    And you respond, Mr. Huang was wired money  -- was wired

6  -- withdrawn.

7        Mr. Huang wired the money directly to Ligand to

8  satisfy the remaining up front royalty payment, right.

9  A    Yes.

10 Q    Mr. Massella said  -- you didn't respond to the question

11 about the nine hundred thousand dollar loan, right?

12 A    Not in that part of the e-mail.

13 Q    Okay.  Mr. Massella follows up and says where is the copy

14 of the wire and acknowledgment from Ligand and you said you

15 would forward it?

16 A    Yes.

17 Q    You said the nine hundred thousand dollars was wired into

18 2527 is the bank account?

19 A    The last four digits of the bank account.

20 Q    On February 3, 2012, right?

21 A    Yes.

22 Q    And then Ms. Chew follows up with you and says there was

23 only one nine hundred thousand transaction that came in in the

24 month of February and she lays out how MSMB Healthcare

25 purchased 22500 A units at 40 dollars which was nine hundred

5200

1    thousand dollars and on the same day she says MSMB Healthcare

2    had a promissory note.  Please let me know what happened?

3    A     Yes.

4              (Continued on next page.)

1    BY MR. BRODSKY:

2    Q    So you told her, right?

3    A    Yes.

4    Q    You told her it was reclassified.

5    A    Yes.

6    Q    And did you tell Ms. Chew or Mr. Massella, "I have a

7    concern about the note"?

8              This is on November 16, sir.

9    A    Not in this e-mail, no.

10   Q    Can you point to a document anywhere where you told

11   Mr. Massella, Ms. Chew, or anyone at Citrin Cooperman, "I have

12   a concern about the note"?

13   A    As I sit here today, I can't pull out a document for you.

14   Q    But you know for a fact you told them it was

15   reclassified, correct?

16   A    Yes.

17   Q    And isn't it true that you also informed Mr. Aslage about

18   the note?

19   A    I don't recall.

20   Q    Now, you also testified, I believe, about the $200,000

21   note.  The Government showed you a promissory note for

22   $200,000; do you remember that?

23   A    Yes.

24   Q    And they asked you a very particular question yesterday,

25   or two days ago.  They asked you if you remembered the

1   $200,000 loan in July 2012.  Do you remember that question and

2   your answer?

3   A    I remember I said no, I don't remember it.

4   Q    Well, the question was about in July 2012.

5           MR. KESSLER:  Do you have the transcript?

6           MR. BRODSKY:  I don't have it, but I remember it.

7           I'm happy to have my colleague look at it while I

8   continue to ask questions.

9           THE COURT:  Okay.

10  Q    Mr. Su, do you remember the $200,000 loan at all from

11  2012?

12  A    It was given to me on my desk.  The time frame, I don't

13  know when the time frame was.

14  Q    In a prior proceeding, were you not asked about whether

15  you were aware of more than two loans?

16          In a prior proceeding did you not testify, sir, that

17  you were aware of the $900,000 note, you were aware of

18  Mr. Wang's $30,000 loan, and you weren't aware of any other

19  notes?

20  A    Not that I could recall at that time.

21  Q    So at that time, you did not remember.

22          MR. KESSLER:  Object to the form.

23          Are we talking about the testimony in the prior

24  proceeding or whatever time the question in the prior

25  proceeding was referring to?

1          MR. BRODSKY:  I'll follow up, your Honor.

2          THE COURT:  Okay.  Can you rephrase the question?

3          At the time you did not remember, I think is what

4    you need to clarify, the time.

5    Q    In July 2017, of this year -- sorry, withdrawn.

6          July 2017, you were in a prior proceeding under

7    sworn testimony, correct?

8    A    Right.

9    Q    And when you were sworn, you gave sworn testimony you did

10   not remember any other notes from 2012 other than the $900,000

11   note and the $30,000 note by Mr. Wang, correct?

12   A    As I sat there that day, if I said that, it's true.

13   Q    Let's show you the testimony.

14         MR. BRODSKY:  Transcript cite 2200 Line 24 to 2201

15   Line 2.

16   Q    Starting on Line 24, Page 2200 --

17         MR. BRODSKY:  Your Honor, do you need a copy?

18         THE COURT:  Well, are you going to read it into the

19   record?  Are you planning to read it into the record?

20         MR. BRODSKY:  I'm going to try to refresh his memory

21   and then read it into the record.

22         THE COURT:  You can hold on to it.  I trust if you

23   don't read it correctly someone will jump up.

24         MR. KESSLER:  I object to this being introduced as

25   any kind of prior inconsistency.

Su - cross - Brodsky                    5204

1          THE COURT:  Maybe we should take a break.

2          MR. BRODSKY:  I'm not introducing it yet, your

3    Honor.  It depends on what he says.

4          THE COURT:  You're objecting to having it read in,

5    Mr. Kessler?

6          MR. BRODSKY:  I'm not reading it in yet, though.

7          MR. KESSLER:  The prior question he stated his

8    testimony and the effort to read it in is improper.  I start

9    at 2200 Line 1.

10          MR. BRODSKY:  Your Honor, Mr. Kessler is making

11   speaking objections and is incorrect regarding what I asked

12   and incorrect regarding the testimony.

13          THE COURT:  No speaking objections, Mr. Kessler or

14   anyone else.

15          Why don't you ask the question?  If there is an

16   objection, Mr. Kessler will rise and say there's an objection.

17          MR. BRODSKY:  Understood.

18          THE COURT:  I don't know what you're going to be

19   doing with this.

20          MR. BRODSKY:  I was using it to refresh his memory.

21   BY MR. BRODSKY:

22   Q    Mr. Su, does that testimony in the prior proceed, Page

23   2200 Line 24 to 2201 Line 1 refresh your recollection now that

24   you testified under sworn testimony in July of 2017 that the

25   only two notes you remember from 2012 were the $900,000 note

1   and the $30,000 note?

2   A    If that's what I testified to at that time and if this

3   transcript is accurate, then that's what I remembered at that

4   time.

5           You're asking me to remember thousands of different

6   contracts sitting here today or even at the prior proceeding.

7   I just can't keep track of every single one that doesn't make

8   an impression on me.

9   Q    Okay.  So, if the transcript is accurate, it's not in

10  evidence, Mr. Su, in July of 2017, given that you can't keep

11  track of all transactions, you did -- you only remembered in

12  July of 2017 the $900,000 note and the $30,000 loan from

13  Mr. Wang, correct?

14  A    Yes.

15  Q    Now, let me show you 111 --

16          Well, isn't it a fact that you told Mr. Aslage about

17  the $200,000 note?

18  A    I don't remember.  Can you refresh my memory, please?

19  Q    Okay.  Let me show you DX 111-71 for identification.

20          MR. BRODSKY:  For the record, November 30, 2012,

21  e-mail from Mr. Su to Mr. Aslage; subject, payables.

22  Q    Mr. Su?

23  A    Yes.

24  Q    Does it refresh your memory you told Mr. Aslage about the

25  $200,000 loan?

1   A    The note's on there, yes.

2   Q    You don't remember independently of the document?

3   A    No.

4   Q    Let me show you DX 111-50.

5          MR. BRODSKY:  And as we're getting that out, let me

6   put back up on the board DX 111 -- I believe it was 1.  If we

7   can put that the back up on the screen.

8          Is that in?  That's not in evidence?  It might be in

9   as a different document.  Let me look.

10          MR. KESSLER:  If it's not in, we don't object to it

11  being in.

12          MR. BRODSKY:  I think it's in already.

13          THE COURT:  Which one is in already, the -50?

14          THE COURTROOM DEPUTY:  -1.

15  Q    Looking up on the screen, you remember this e-mail we

16  discussed on December 4, right Mr. Su?

17  A    Yes.

18  Q    And you said in the third paragraph:  I spoke with Evan

19  about the $900,000 note.

20          Do you see that?

21  A    Yes.

22  Q    So, where in there do you say Mr. Greebel said it's okay,

23  the reclassification?

24  A    It's not in there.

25  Q    This was after the second conversation you had with

Su - cross - Brodsky                                    5207

1   Mr. Greebel, right?

2          Remember the first conversation you testified to,

3   you called him up, you got the loan, you called him up, he

4   didn't answer any questions about it, right?

5   A    Yes.

6   Q    And here, he spoke to you about it?

7   A    He spoke to me, yes.

8   Q    So this has to be after the second conversation, right?

9   A    After which second conversation?

10  Q    You said you had two conversations about with Mr. Greebel

11  about $900,000 loan, correct?

12  A    Yes.

13  Q    So, this is after the second conversation, correct?

14  A    I don't know when this is.  So, again, my timeline, if

15  you're asking me about this $900,000 note and my recollection

16  of it, again, in terms of time, date, I don't know what the

17  date is.

18  Q    Mr. Su, follow me --

19  A    I'm telling you I got a piece of paper from Martin

20  dropped off at my desk --

21         MR. BRODSKY:  Your Honor, move to strike because

22  this is not responsive.

23         THE COURT:  Just try to listen to the question and

24  answer as best you can.

25  Q    Mr. Su, during your direct testimony, you said you had

Su - cross - Brodsky                              5208

1   two conversations with Mr. Greebel; correct, yes or no?

2   A    Correct.

3   Q    About the $900,000 note, correct?

4   A    Yes.

5   Q    The first conversation, he didn't answer questions about

6   it; correct, according to you?  Yes or no, sir.

7   A    Yes.

8   Q    The second conversation he spoke to you about it yes or

9   no?

10  A    Yes.

11  Q    This is after the second conversation, correct, this

12  e-mail, December 4, 2012:  I spoke with Evan about the

13  $900,000 note.

14           Correct?

15  A    Yes.

16  Q    And, sir, where in here do you say anywhere to

17  Mr. Aslage, the CEO, member of the board of directors of

18  Retrophin, LLC:  Mr. Greebel said the reclassification was

19  okay.

20  A    It's not on here.

21  Q    And isn't it true what you say is:  I spoke with Evan

22  about the $900,000 note and he didn't sound like he knew about

23  it.

24  A    That's what I thought at the time.

25  Q    And then you say:  He said -- and this is important,

LAM      OCR      RPR

Case 1:15-cr-00637-KAM   Document 688   Filed 10/17/18   Page 54 of 281 PageID #: 22632

1   Mr. Su, so let's look at this.

2           "He" is Mr. Greebel, right?  He said, "he" is

3   Mr. Greebel, correct?

4   A    Yes.

5   Q    Mr. Greebel represented to the investor attorney.

6           Now, the investor attorney at the time was somebody

7   who was representing a potential investor to put money and

8   capital into Retrophin, right?

9   A    Yes.

10  Q    Which one was it?  Which potential investor?

11  A    The investor's name was led by RA Capital and other

12  investors behind that.

13  Q    And Mr. Greebel is saying he represented to RA Capital's

14  attorney that there was no one who would get paid off from the

15  money raise, which is contrary to this note.  Mr. Greebel told

16  you that, right?

17  A    Yes.

18  Q    You didn't say that during your testimony on direct

19  examination, did you?

20  A    No, I don't think that I was asked.

21  Q    You were you asked about your conversation with

22  Mr. Greebel about the $900,000 note.  Did you say anything

23  about that?

24  A    I believe from memory, they only highlighted -- the

25  Government only asked me about the first line.  But it was

1    there.

2    Q    And then Mr. Su, it's:  Mr. Greebel expressed that once

3    the investors learn of it, it might be a show stopper.

4         Meaning once the investors learned about the

5    $900,000 note, you were telling Mr. Aslage Mr. Greebel's view

6    was this is going to end the deal, right?

7    A    Yes.

8    Q    And doesn't Mr. Greebel tell you and Mr. Wang, according

9    to you, to disclose it?

10   A    Exactly.  Everything that was said there at that time,

11   what I wrote, is the truth at that time, yes.

12   Q    Now, it says:  Mr. Greebel suggested George --

13        That's George Wang.

14   A    Yes.

15   Q    -- and you should bring that up with him.

16        Meaning the investor attorney, correct?

17   A    I don't know who "him" is referencing.

18   Q    You wrote it Mr. Su.  That's your words, correct?

19   A    That is my words, yes.

20   Q    Okay.  So, when you said "he" suggested George and I,

21   you're saying Mr. Greebel suggested George Wang and you,

22   Mr. Su, bring that up to him.

23        The "him" is the investor attorney, correct?

24   A    I don't know who I'm referencing, either Martin, investor

25   attorney.  I don't know who "him" is.  I don't talk to --

Su - cross - Brodsky                          5211

1   Q    Where is Martin Shkreli referenced in that paragraph?

2             MR. KESSLER:  I object to the form.

3             And it's more convenient for Mr. Brodsky to use the

4   microphone.

5             MR. BRODSKY:  Sometimes I like to go to the board to

6   look at it.

7             MR. KESSLER:  It's hard to hear with the noise

8   coming this way.

9             THE COURT:  I think we can certainly hear him from

10  over there.

11            MR. BRODSKY:  I'm in an excited state, your Honor.

12            THE COURT:  He said earlier he's having trouble

13  reading it.  So, he can step closer.

14            There's also a screen behind you and -- there's one

15  big one behind you and also a smaller one.  But as long as

16  week hear you, I'm going to allow you some latitude.

17            MR. BRODSKY:  Thank you, your Honor.

18  Q    Mr. Su, tell me in that paragraph where you reference

19  Mr. Shkreli.

20  A    I don't know who I'm referring to when it says "him,"

21  which we will tomorrow.

22            (Pause in proceedings.)

23  A    He suggested George and I should bring that up to him,

24  which we will tomorrow.  If you have no objections, we'll do

25  that.  I'll let you know how it goes.

LAM     OCR     RPR

Su - cross - Brodsky                    5212

1              I don't remember or recall who "him" is.  It's

2    either Martin, you're saying investor attorney.  I don't

3    recall who "him" is in that context.

4    Q    So, you don't remember sitting here today that when you

5    had the actual discussion with Mr. Greebel about the $900,000

6    note he sounded like he didn't know about it, correct?

7    A    The first time around, yes.

8    Q    The first time?  This time he's talking to you, sir,

9    right?

10   A    Yes.

11   Q    He's actually giving you content, right?

12   A    Yes.

13   Q    You said the first time you spoke to him, he wouldn't

14   speak to you at all because of legal fees, right?

15   A    Correct.

16   Q    So, this isn't the first time, right?

17   A    This would be after that, yes.

18   Q    So, after the second conversation you had with

19   Mr. Greebel, he's telling you he doesn't seem like he knows

20   about it; right, that's one, correct?

21   A    That's what I said, yes.

22   Q    He brings up that he's -- the investor attorney doesn't

23   know about the note, correct?

24   A    Yes.

25   Q    And he's suggesting to you that you and Mr. Wang better

Su - cross - Brodsky                                    5213

1   disclose it tomorrow, right?

2   A    Yes.

3   Q    And you're saying if you, Mr. Aslage, have no objections,

4   we're going to do that, right?

5   A    That's what it reads.

6   Q    And did you tell the investor attorney the next day?

7   A    I talked to the investor attorney.

8   Q    Did you tell the investor?

9   A    I didn't have direct contact with investor or investor

10  attorney.  That was not my role.

11  Q    Did Mr. Aslage?

12  A    I don't know if he did.

13  Q    And Mr. Su, there's nothing wrong with Mr. Greebel

14  advising you to disclose the $900,000 note to the prospective

15  investor, is there?

16  A    I don't believe so.

17  Q    In fact, isn't that the right thing to do, sir?

18  A    In my mind, yes.

19  Q    And prior to Mr. Greebel suggesting it, did you do it?

20  A    It wasn't my role to talk to investors or investor

21  attorneys.

22  Q    Did you suggest it to anybody?

23       Did you, yourself, as chief operating officer of

24  Retrophin, LLC, knowing the company was about to go public,

25  suggest to anybody that we better disclose the note to the

LAM      OCR      RPR

Su - cross - Brodsky                                 5214

1    prospective investors?

2    A    I didn't suggest that.  Not my role.

3    Q    Okay.  Let's talk about your role.

4         Isn't it true that in December of 2012 you sent out

5    an e-mail -- you, Mr. Su -- to Mr. Massella, to people at

6    Citrin Cooperman, to Mr. Greebel, to the people at Marcum, to

7    Mr. Shkreli assigning roles and responsibilities getting ready

8    for the Super 8K?

9    A    I sent them e-mails many times.  I'm not sure what

10   specifics are, if you could just refresh my memory.

11   Q    This was one where you sent it out saying here's what

12   people are responsible for.  That, you don't remember?

13   A    I don't.

14   Q    I'm going to show you two documents, then, 111-56 and

15   111-57.  The first one I'm showing you, Mr. Su, is a

16   December 7, 2012, e-mail from you to a number of people;

17   subject line, Retrophin Critical Issues; DX 111-56 for

18   identification.  And the second one is DX 111-57, an e-mail

19   from you to a number of people, another e-mail in the chain.

20        Do you see that, sir?

21   A    Yes.

22   Q    Do you see both of them?

23   A    Yes.

24        MR. BRODSKY:  We offer both of them, your Honor.

25        MR. KESSLER:  One minute, your Honor.  Sorry.

LAM      OCR      RPR

1          No objection.

2          THE COURT:  We receive DX 111-56 and-57.

3          (DX 111-56 and DX 111-57 so marked.)

4    Q    Mr. Su, that's you on December 7 --

5          MR. BRODSKY:  If we blow up the top part.

6          THE COURT:  This is DX 111-56 we're looking at?

7          MR. BRODSKY:  Yes.

8          (Exhibit published to the jury.)

9    Q    That's you, Mr. Su, to Ms. Schlecht at Marcum,

10   Mr. Massella and Ms. Chew at Citrin Cooperman, copy to Martin

11   Shkreli, Evan Greebel, and Mr. Hackett, right?

12   A    Yes.

13   Q    And you're saying:  I will try to classify the party

14   responsible for the points below.  If I misclassify a

15   responsibility, please point out the appropriate party.

16   A    Right.

17   Q    So, you're assigning responsibility as chief operating

18   officer of Retrophin, LLC, correct.

19   A    Yes.

20   Q    So, you had no responsibility to talk to prospective

21   investors, but you had the responsibility of assigning out

22   what to do.

23   A    Well, it was pretty obvious when they were talking about

24   accounting, which accounting firm is doing the accounting.

25   Our accountant is Citrin, which is our legal -- sorry,

1    Retrophin's legal counsel or legal firm, it's Evan.  I'm just

2    telling them who the companies, the third-party vendors, that

3    we use.

4    Q    Let's go to Ms. Schlecht's e-mail and your responses as

5    to who's responsible.  Ms. Schlecht's e-mail was subject,

6    Retrophin critical issue:  Corey, Susan, please see below the

7    critical issues identified.

8            And then you put in what's underlined, the

9    responsible party, right?

10           That's the first e-mail, DX 111-56, Mr. Su.

11   A    Right, I'm just trying to --

12   Q    You see --

13   A    -- reconcile was it me?  It's not clear to me it was

14   written by me or classified by me.

15   Q    Where you say I will try to classify the party

16   responsible for the points below, are you saying that doesn't

17   mean that you actually wrote who is responsible?

18   A    It's not clear to me if I actually did that or not.  I'm

19   not saying I didn't do it, I'm not clear that I actually put

20   Evan, Katten Muchin, for the first point.

21           These are our vendors, so it does line up.  I'm not

22   sure if I put it up there or Mariel put it up there, I don't

23   know.

24   Q    Mr. Su, putting aside your recollection about whether you

25   actually classified who is responsible, let's look at what it

1    says.  It says:  Accounting acquire analysis.  What type of a

2    transaction is occurring; business combination, acquisition,

3    recapitalization transaction.  Is this a check the box sell?

4    Evan and Katten Muchin.

5            Right.

6    A    Yes.

7    Q    The second one, complete set of financial statements with

8    footnotes, who is responsible, sir?

9    A    That would be the accountants in this case --

10   Q    Citrin Cooperman?

11   A    Yes.

12   Q    Corey Massella?

13   A    Corey with Citrin Cooperman, he worked with Citrin

14   Cooperman, yes.

15   Q    Complete set of financial statements with footnotes was

16   not the responsibility of Katten, anyone at Katten, correct?

17   A    The financial statements would not be Katten.

18   Q    Or the footnotes, sir, correct?

19   A    For financial statements, I believe there's input -- from

20   my experience, there is input --

21   Q    I'm asking about this e-mail, not your experience.  This

22   question is about this e-mail, DX 111-56.  It says complete

23   set of financial statements with footnotes.

24   A    It says Corey at Citrin Cooperman, yes.

25   Q    Not Evan Greebel, not Katten, correct?

Su - cross - Brodsky                              5218

1    A    It does not show that, correct.

2    Q    And then the mapping of the old equity to the new equity

3    from the conversion of the LLC to C Corp, not Evan Greebel

4    correct?

5    A    It says Corey and Citrin Cooperman.

6    Q    And then number four, Revised statement of stockholder

7    equity, retroactively restated for the conversion, with backup

8    of mapping as noted above.

9         Not Evan Greebel, not Katten, correct?

10   A    It says Corey and Citrin Cooperman.

11   Q    Number five, Does the company retain a purchase option on

12   the incentive units?  How does this affect the mapping of the

13   LLC to the C Corp?

14        That's Mr. Greebel and Katten, correct?

15   A    That's what it says, yes.

16   Q    Number six, How does the company determine the accounting

17   for the shares transferred from the shareholder to

18   consultants?  How are these consultant services valued?

19   Please provide the consulting agreements for transfer

20   agreements.  These transfers could have tax implications as

21   stock compensation for employees receiving shares.  This could

22   result in the withholding tax and other obligations for the

23   company.  For nonemployees receiving shares, this could result

24   in 1099 obligations of the individuals.

25        Who is responsible, sir?

Su - cross - Brodsky                                    5219

1    A    Corey at Citrin Cooperman.

2    Q    And not anyone from Katten, correct?

3    A    Not from this document, no.

4    Q    Number seven, There's a potential to reclassify the

5    related party receivables as a reduction of equity.

6         Do you understand what related party receivables

7    are?

8    A    Yes.

9    Q    They were related party transactions, correct?

10   A    Yes.

11   Q    Everybody was aware, everybody -- withdrawn.

12        Everybody sitting in the offices of Retrophin was

13   aware of related party transactions, correct?

14        MR. KESSLER:  Objection.

15        THE COURT:  Sustained.

16   Q    You were aware of the related party transactions, right?

17   A    I saw the accounting books, yes.

18   Q    Mr. Aslage was aware of related party transactions,

19   correct?

20        MR. KESSLER:  Objection.

21        THE COURT:  Sustained.

22   Q    You had conversation with Mr. Aslage about related party

23   transactions, did you not?

24   A    Yes.

25   Q    So, you understood from your conversation with Mr. Aslage

Su - cross - Brodsky                          5220

1    in December 2012 that he was aware of them, correct?

2              MR. KESSLER:  Objection.

3              THE COURT:  Sustained.  Try to rephrase.

4    Q    During your conversation with Mr. Aslage in

5    December 2012, you and he discussed how they were related

6    party transactions in general, correct?

7    A    Yes.

8    Q    And Mr. Aslage said to you, Mr. Su, in writing, that the

9    books of Retrophin and MSMB have comingled monies, correct?

10   A    Yes.

11   Q    And you understood when Mr. Aslage told you that the

12   books of Retrophin and the books of MSMB had comingled monies,

13   what you understood Mr. Aslage to be saying to you is that

14   there were related party transactions and money transfers

15   going between MSMB and Retrophin, back and forth.

16             MR. KESSLER:  Objection to the form.

17             THE COURT:  Try to rephrase.  It's compound.

18   Q    You understood when Mr. Aslage said to you that there

19   were comingled monies that the money of Retrophin was mixed in

20   with the money of MSMB, correct?

21   A    Yes.

22   Q    And then down at the bottom, it says after number

23   seven -- well, continuing on with number seven, it says, There

24   is a potential requirement to reclassify the related party

25   receivables as a reduction of equity.  Also, is there a right

                   LAM      OCR      RPR

Su - cross - Brodsky                                5221

1    to offset the related party receivables payables.

2              Who is responsible for that, sir?

3    A    It says on here Corey at Citrin Cooperman.

4    Q    Not anyone from Katten, correct, according to DX 111-56?

5    A    It just says Corey at Citrin.

6    Q    Below that it says, I've also attached the open items

7    list with various requests for the completion of our review

8    procedures.  And does it not say quote, my responsibility.

9              Doesn't that refresh your recollection, Mr. Su, that

10   that's you?

11   A    My responsibility?

12   Q    Yeah.  You wrote my responsibility, right?

13   A    My responsibility, yes, I wrote it.

14   Q    Does that refresh your recollection that you were

15   assigned these responsibilities?

16   A    Looking at this piece of paper, if that's -- yes.

17   Q    And you said, I e-mailed the documents to Marcum and

18   Citrin, but Marcum servers kicked it back to me.  Susan will

19   upload this tomorrow. Right?

20   A    Yes.

21   Q    So, the responsibility for doing all the various requests

22   for the completion of review procedures, all these open items,

23   was not Katten's correct.

24   A    It was my responsibility to get the documents.

25              (Continued on next page.)

1    BY MR. BRODSKY:

2    Q    And then down at the bottom where it talks about the

3    Super 8K filing, did you not write, We will revise the text in

4    the Super 8K?

5              That's you, correct, that's you, Mr. Su?

6    A    We will revise the text in the Super 8K.  The "we"?

7    Q    Yes, "we."

8    A    We, the company, Retrophin.

9    Q    You and Mr. Huang?

10   A    Martin worked on it.  The Super 8K was worked on by

11   Katten Muchin.  Everybody worked on it.

12   Q    Let's look at where it says there, We will revise the

13   text in the Super 8K.

14             When you said the "we" there, you meant you,

15   Mr. Huang and Mr. Shkreli, correct?

16   A    And legal.

17   Q    Well, let's go to legal.

18   A    I'm sure they were involved in the Super 8K.  It's a

19   legal document.

20   Q    And then it says, Send it to Evan and Corey, right?

21   A    Yes.

22   Q    You were going to revise it and send it to Evan and Corey

23   this afternoon where they will fill in their parts, right?

24   A    Right.

25   Q    That's what it says?

Su - cross - Brodsky                                                5223

1   A    That's what it says.

2   Q    And then you defined the parts as, i.e., merger

3   agreement, pro forma financials, et cetera, right?

4   A    Yes.

5   Q    Now, in response, if we look at DX 111-57, do you see

6   Mr. Greebel says to you:  Accounting treatment is not our

7   responsibility.  We are not qualified to give advice on that.

8         Mr. Su?

9   A    Yes.

10  Q    Was there any confusion in your mind about what

11  Mr. Greebel meant when he told you, Accounting treatment is

12  not our responsibility?

13  A    No.

14  Q    You agree with that, right?  It was not Mr. Greebel's

15  responsibility or Katten's responsibility to talk about

16  accounting treatment?

17  A    No, that would be with the party Citrin Cooperman.

18  Q    And in consultation with management, right?

19  A    Yes.

20  Q    You understood management was going to be making

21  decisions about how to, in consultation with accounting about

22  what decisions to make with respect to the financial

23  statements?

24  A    Right.

25  Q    That's not the responsibility of the outside counsel to

CMH        OCR        RMR        CRR        FCRR

1   determine what to do, right?

2   A    No, normally, no.  It's not their responsibility.

3   Q    Now, there's time to time where outside counsel at the

4   request of management can advocate on behalf of management for

5   positions, correct?

6   A    Sorry.  Can you clarify the question?

7   Q    Well, as outside counsel, as management of Retrophin LLC,

8   were there times when you asked outside counsel, your lawyers

9   at Katten, to advocate for you and take positions?

10  A    I never did so I don't, can't speak to anybody else.

11  Q    All right.  And then, Mr. Su, you respond to Mr. Greebel

12  and say:  The question is is this a check-the-box shell?  That

13  will give us an answer as to how we treat it as a merger or as

14  an acquisition.

15       You were looking for legal advice there, right?

16  A    Yes, but that's not a question that I would come up on my

17  own but that's what I was looking for, yes.

18  Q    Now, let me ask you about Kevin Mulleady.

19       In 2012, you testified you observed Mr. Shkreli and

20  Kevin Mulleady had a rocky relationship, "rocky" being my

21  word, correct?

22  A    They had a hard relationship.

23  Q    Sometimes Mr. Shkreli fired him and then rehired him and

24  then fired him?

25  A    Yes.

Su - cross - Brodsky                                        5225

1    Q    And then early on in 2012, for example, you learned that
2    Mr. Shkreli had actually terminated Mr. Mulleady for cause in
3    2011, right?
4    A    I was told that he was on -- hired, rehired, hired,
5    rehired when I got there.  Same pattern happened in 2012 as
6    well.
7    Q    And my specific question is whether you remember
8    Mr. Shkreli telling you that Mr. Mulleady was fired for cause
9    in 2011?
10   A    I don't recall that conversation with Martin specifically
11   for cause in 2011.
12   Q    Do you remember that in March of 2012, Mr. Shkreli
13   demoted Mr. Mulleady?
14   A    Yes.
15   Q    And you actually encouraged Mr. Shkreli to fire him?
16   A    Yes.
17   Q    And Mr. Mulleady was using his title on LinkedIn as the
18   CEO of MSMB and Mr. Shkreli told him he was being demoted?
19   A    I never saw LinkedIn.  That's the conversation that I
20   remember that Martin told me that he was using the title CEO
21   and he wasn't the CEO.
22   Q    Of MSMB, correct?
23   A    I don't remember which organization, no.
24   Q    Did you get it mixed up from time to time?
25   A    The organizations?

1   Q    Yes.

2   A    The companies?

3   Q    Yes.

4   A    No.  MSMB was MSMB Healthcare, MSMB Isotope and MSMB

5   Consumer and Retrophin.  Separate companies.

6   Q    Separate companies.  Okay.  We'll get back to that.  Just

7   on this though, remember that, Mr. Su, and we'll get back to

8   that in a minute.

9           Let me show you DX 111-70.  Didn't you inform Citrin

10  Cooperman in November of 2012 that Mr. Mulleady's termination

11  as an employee occurred on November 13, 2012?

12  A    I don't recall.  If you could just refresh my memory,

13  please.

14  Q    Will do.

15           (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

5227

1          MR. BRODSKY:  Why don't we show him DX 111-70 and
2     DX 111-65 and let's do DX 111-27 also.
3          THE COURT:  Are these in evidence?
4          MR. BRODSKY:  No, Your Honor.
5          THE COURT:  Are the jurors in need of a break right
6     now or would you like to keep going while they look for these
7     exhibits?
8          THE JUROR:  Yes.
9          THE COURT:  If you want a break, raise your hand.
10          Okay.  Why don't we take a mid-morning break.
11     Please don't talk about the case.  Keep an open mind.  We will
12     come back and get you in about ten minutes.  You can step off
13     also, Mr. Su, and take a break.
14          (Jury exits.)
15          All right.  Ten minutes?
16          MS. SMITH:  Yes, Your Honor.
17          MR. PITLUCK:  Thank you.
18          (Recess taken.)
19          (In open court; outside the presence of the jury.)
20          THE COURT:  Hi, everybody.
21          MR. BURKE:  Judge, just a discrete scheduling issue.
22          I spoke to the Judge this morning.  I said I can
23     make it at 12 or 2:30.  I just want to either -- I can step
24     out at 12 and make a call or maybe somebody from your chambers
25     could call and say I should be available by 2:30.

5228

1          THE COURT:  All right.  Who would you like me to

2     call?

3          MR. BURKE:  Judge Firetog.

4          THE COURT:  We will try to contact Judge Firetog.

5          (Pause.)

6          THE COURT:  There is one other issue I want to

7     remind the parties of, if I may.

8          There is a juror who is not being paid.  There has

9     been a request that I speak to her employer, however, I cannot

10    do that without knowing what the projected time is.  I would

11    intend to call the employer and ask that the juror be paid,

12    but I'm sure the employer will ask me how much longer this

13    juror may be indisposed.  I am going to propose that if we

14    can't get a clear idea so that I can make this call on behalf

15    of the juror who hasn't been paid, that we would have to

16    consider dismissing her.

17         So, please, let me know sooner rather than later so

18    that I may give her employer an idea roughly how long we may

19    be sitting.  All right?  And if I don't get an answer by this

20    evening, I am going to propose that we allow this juror to be

21    dismissed.  She is not being paid.

22         MR. DUBIN:  Your Honor, as I understood it from this

23    morning, is the government to provide us with their most

24    conservative estimate of when the trial would end by today?

25         MR. BRODSKY:  I think they did.

5229

1              THE COURT:  They did.

2              MR. BRODSKY:  They said --

3              THE COURT:  Tuesday after Thanksgiving.

4              MR. DUBIN:  All right.  We will endeavor to do the

5    same.

6              MR. BRODSKY:  We will do it.

7              MR. DUBIN:  We'll talk about it over lunch because

8    we don't want to lose her.

9              THE COURT:  I don't think we should lose jurors but,

10   on the other hand --

11             MR. DUBIN:  We understand the predicament.

12             THE COURT:  Hopefully, the employer will allow her

13   to be paid.  If he doesn't, we may lose her anyway.

14             All right.  Thank you.  Let's bring the jurors back

15   if we could, please.

16             (Jury enters.)

17             THE COURT:  All jurors are present.  Please have a

18   seat.

19             You may resume your cross.  Mr. Brodsky.

20             MR. BRODSKY:  Thank you, Your Honor.

21             May I approach?

22             THE COURT:  Yes, you may.

23             (Continued on next page.)

24

25

5230

1    BY MR. BRODSKY:   (Continuing)

2    Q    Showing you three documents, Mr. Su, DX 111-70, DX

3    111-127 and DX 111-65 for identification.

4         With respect to the first one, Mr. Su, DX 111-70 for

5    identification, do you recognize the e-mail exchange you had

6    with Mr. Shkreli and forwarding an e-mail exchange between

7    Mr. Shkreli and Mr. Mulleady in March of 2012?

8    A    Yes.

9    Q    And this was related to Mr. Mulleady's termination or

10   demotion?

11   A    Yes.

12        MR. BRODSKY:   We offer it, Your Honor.

13        MR. KESSLER:   No objection and no objection to

14   number two.

15        MR. BRODSKY:   Great.   We offer DX 111-65 and

16   DX 111-127.

17        THE COURT:   All right.   We will admit Defense

18   Exhibits 111-65, 111-70 and 111-127.

19        (So marked.)

20   Q    So if we scroll back to the last e-mail in this chain,

21   Mr. Su, this is the last e-mail.

22        So, this is Mr. Shkreli's March 18th e-mail to Kevin

23   Mulleady which he eventually forwards to you, right, Mr. Su?

24   A    Yes.

25   Q    And this is Mr. Shkreli e-mailing Mr. Mulleady saying:   I

5231

1    had noticed that you are listed as CEO on LinkedIn.  And he

2    says:  Please use the title senior vice president, investor

3    relations going forward.

4              Right?

5    A    Yes.

6    Q    And then Mr. Mulleady responds, correct?  And that

7    response is:  This creates an issue for me.  It's underneath

8    right there.

9              Did you understand this to be Mr. Mulleady's

10   response?

11   A    Yes.

12   Q    Mr. Mulleady's saying in this e-mail:  Martin, you have

13   communicated numerous times that CEO was an acceptable title.

14   It was part of my hiring negotiations.  So I do not know why

15   it is being treated as a surprise now.

16             Right?

17   A    Yes.

18   Q    He goes on to say in the third paragraph:  Must I remind

19   you that my longevity with this organization is third longest

20   among current employees and, as stated by you, I have had a

21   significant impact on its success.

22             Right?

23   A    Yes.

24   Q    In the last paragraph, he says:  I request a meeting to

25   discuss further and would appreciate being involved in

5232

1    decisions regarding my future with MSMB from this point

2    forward.  Thank you.

3            Do you see that?

4    A    Yes.

5    Q    And then scrolling over, Mr. Shkreli responds to

6    Mr. Mulleady and says, among other things, correct:  Kevin,

7    you were terminated for cause last year and lost the title of

8    CEO over six months ago, right?

9    A    Yes.

10   Q    It says:  Further, your old contract is explicit that

11   your title was COO.  Our executive committee, Marek, Jackson

12   and I, met and we are unanimous that this is an inappropriate

13   title for you.  You are being demoted if that's the way you

14   want to accept the change in title.

15           Do you see that?

16   A    Yes.

17   Q    So Mr. Biestek, you and Mr. Shkreli were on the executive

18   committee, correct?

19   A    Yes.

20   Q    And that was the executive committee of MSMB, correct?

21   A    Yes.

22   Q    And this was a decision that you, Mr. Biestek and

23   Mr. Shkreli made that Mr. Mulleady was going to be demoted,

24   right?

25   A    Yes.

5233

1   Q    And then it goes on to say:  We have hired two new

2   employees in the last year and have restructured titles with

3   nine full-time employees --

4   A    It says last week.

5   Q    It says -- I'm sorry.  Oh, in the last week.  Thank you.

6   With nine full-time employees, parenthetical, Martin.

7             That's Martin Shkreli, right?

8   A    Yes.

9   Q    Marek for Marek Biestek, correct?

10  A    Yes.

11  Q    Tom for Tom Fernandez?

12  A    Yes.

13  Q    Jackson for Jackson Su, that's you?

14  A    Yes.

15  Q    Tim Pierotti, correct?

16  A    Yes.

17  Q    Andrew Vaino?

18  A    Yes.

19  Q    Is that Chris James?

20  A    Yes.

21  Q    And you.  That's Mr. Mulleady, right?

22  A    Yes.

23  Q    And Allison Russo, right?

24  A    Yes.

25  Q    It says, Mr. Shkreli will become CEO and Jackson will

5234

1  remain COO, correct?

2  A    Yes.

3  Q    All right.  And down at the bottom, it says, in the last

4  part:  I would not worry as much about a title as I would

5  about the future of MSMB and ensuring the success of the firm.

6  While we regret that your network may view your title change

7  as a demotion, that is something we cannot avoid given your

8  prior termination and the restructuring of MSMB Capital given

9  our three new senior hires.

10         Right?

11  A    Yes.

12  Q    And you testified you didn't understand what MSMB Capital

13  was two days ago, right?

14  A    It was nothing specific.  It was the company name.

15  Q    It was the company name.  Okay.

16         Now, Mr. Mulleady responds to Mr. Shkreli here and

17  says:  Where is this coming from?  I thought I was your

18  friend.  You're messed up man and this is a screwed way to

19  communicate things to me.

20         Right?

21  A    Yes.

22  Q    And this you -- this gets forwarded from Mr. Shkreli to

23  you, right?

24  A    Yes.

25  Q    And you say:  I don't know why he has to challenge you.

5235

1    Right?

2    A    Yes.

3    Q    You were telling Mr. Shkreli:  I don't know why

4    Mr. Mulleady has to challenge you.  Right?

5    A    Yes.

6    Q    You said, Mr. Mulleady shouldn't challenge you,

7    Mr. Shkreli, your authority, right?

8    A    It says:  I don't know why he has challenged Martin.

9    Q    What you meant is Mr. Shkreli's authority?

10   A    Yes.

11   Q    Mr. Shkreli made the decisions and Mr. Mulleady should

12   follow?

13   A    Yes.

14   Q    And then you say:  You've given him a lot of

15   opportunities to turn it around.  He doesn't get it.

16            Right?

17   A    Yes.

18   Q    And you said then:  We should hang on to him till month

19   end as discussed and then terminate his consultancy with us

20   and cut ties for good.

21            Right?

22   A    Yes.

23   Q    You wanted him to fire Mr. Mulleady?

24   A    Till month end and then terminate his consultancy with

25   us.

5236

1    Q    Mr. Mulleady's job was to talk to potential investors,
2    right?
3    A    His job was fundraising to investors.
4    Q    You wanted him to fire the person who's fundraising and
5    talking to investors and you weren't going to be responsible
6    for anything to do with the investments, right?
7    A    Correct.
8    Q    And then if we turn to DX 111-65, Ms. Chew is sending you
9    an e-mail on November 29th with respect to, and copying
10   Mr. Massella and Mr. Shkreli, employment consulting agreement,
11   right?  Do you see that, Mr. Su?
12   A    Yes.  Hold on.
13   Q    Sure.  You have the hard copy too in front of you.
14        (Pause.)
15   A    So, I'm sorry.  Repeat your question, please?
16   Q    Ms. Chew, on November 29, 2012, sends you an e-mail
17   copying Mr. Massella and Mr. Shkreli about employment
18   consulting agreement?
19   A    Yes.
20   Q    Asking you with respect to yours saying:  You're employed
21   by MSMB Capital Management LLC, MSMB Healthcare Management
22   LLC, MSMB Isotope LLC, Surepoint Fund Management LLC,
23   Retrophin LLC and its affiliated entities, right?
24   A    Yes.
25   Q    And then there's a question about Mr. Aselage's start

5237

1  date on 10/1/12, right?

2  A    Yes.

3  Q    And then in response, and there's a question from her:

4  What other employment consulting agreements am I missing?  See

5  attached file for my comments.  Right?

6  A    Yes.

7  Q    You respond, Mr. Su, and you say, See attached, and then

8  you say, That's how Martin paid me.  But most of the work I've

9  done if not all has been for Retrophin.  Right?

10  A    Yes.

11  Q    And then in the attachment, you provide a date of

12  termination for Mr. Mulleady as November 13, 2012, right?

13        Do you see that in the attachment?  Go to the

14  attachment.

15  A    Which --

16        MR. BRODSKY:  Mr. Carter, it's a spreadsheet on the

17  first page.

18  Q    You see where it says, Name, it has a list of employee,

19  consultant, right, you see that on the left hand, the first

20  column?

21  A    Yes.

22  Q    And then it has, you know, the name of the person, the

23  start date and the termination date?

24  A    Yes.

25  Q    You filled in the termination dates, correct?

5238

1    A    I'm not 100 percent sure of whether I did or didn't fill

2    in those termination dates.

3    Q    When you wrote to Ms. Chew and said, See attached, you're

4    not just sure which ones you filled in and which ones were

5    filled in already?

6    A    That's right.

7    Q    And then with respect to, you know -- doesn't it have

8    three people as employees?  It says, Mr. Huang, Mr. Smith and

9    Mr. Fernandez, right?

10   A    Yes.

11   Q    Everybody else is listed as a consultant?

12   A    Yes.

13   Q    Including you?

14   A    Yes.

15   Q    And then it has, with respect to Mr. Mulleady on number

16   16, termination date of November 13, 2012, right?

17   A    That's what it reads.

18   Q    And if you go to the next document, DX 111-127, keeping

19   in mind the November 13th termination date, do you see this

20   e-mail exchange where you were requesting on November 14th to

21   take Kevin Mulleady out of the system, we're going to let him

22   go today?

23   A    Yes.

24   Q    And then you're asking to, you know, Ms. Adams from Sage

25   Realty, Should I disable his card, and you say, Disable it

5239

1   now?

2   A    Yes.

3   Q    All right.  Now, Mr. Su, let me show you -- do you

4   remember informing Mr. Massella and Ms. Chew that Marek

5   Biestek was resigning on October 11, 2012?

6   A    Who were the people, Marek and who?

7   Q    That Marek Biestek was resigning on October 11th, had

8   resigned on October 11, 2012.

9   A    No.  Can you refresh my memory, please?

10  Q    Sure.  Let me show you two documents, Mr. Su.

11       MR. BRODSKY:  May I approach?

12       THE COURT:  Yes.

13       MR. BRODSKY:  111-64 for identification.  111-21 for

14  identification.  The first one is what we'll discuss.

15  Q    All right.  Mr. Su, let me have the November 29, 2012

16  e-mail.

17       Does this refresh your recollection that you,

18  Mr. Shkreli told you Mr. Biestek was resigning on October 11,

19  2012.?

20  A    According to this e-mail, that what it says.

21  Q    You don't remember it independently?

22  A    No.

23  Q    And then DX 111-21 for identification, can you look at

24  this?

25       Do you remember this e-mail exchange with

5240

1    Mr. Greebel in June of 2012?

2    A    It's what it says.  I don't remember it.

3                MR. BRODSKY:  We offer DX 111-21.  I'm happy to

4    offer the other one too, DX 111-64, as well.

5                MR. KESSLER:  No objection.

6                THE COURT:  Okay.  We receive Defense Exhibits

7    111-64 and 111-21.

8                (So marked.)

9                MR. BRODSKY:  And DX 111-64, if we can flash that

10   up, Mr. Carter.

11               (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Su - cross - Brodsky                                    5241

1    BY MR. BRODSKY:

2    Q    This is an e-mail we just discussed, Mr. Su, where you're

3    telling Citrin Cooperman, see correction from Marek in 2012,

4    Martin informed me he resigned, 10-11-12?

5              In this one, since it's in evidence, DX 111-64,

6    there is a column that has amount owed, a number of people

7    were owed backpay, right, Mr. Su?  Do you see the column after

8    the attachment?  It's on the screen if you need to look at it

9    also.

10   A    It says amount owed.

11   Q    A lot of people like you were owed backpay in 2012,

12   right?

13   A    At times, yes.

14   Q    It was not an insignificant amount of money, correct?

15   A    No, it wasn't.

16   Q    One of the ways in which Mr. Shkreli was able to keep

17   people incentivize to work for Retrophin was to make sure they

18   got shares, correct?

19              MR. KESSLER:  Objection.

20              THE COURT:  I think you can rephrase the question,

21   Mr. Brodsky, and not draw an objection.

22   Q    In 2012 based on your observations of Mr. Shkreli you

23   understood he was arranging for transfers of stock to people

24   to incentivize them to work hard for Retrophin?

25   A    I can't speak to that, whether he did or not.  He gave me

Su - cross - Brodsky                    5242

1   10,000 shares, an additional 15,000 shares and said I did a

2   good job.  But I can't  -- I don't know why he gave it to

3   other people or what the purpose of his transfers were.  I

4   can't speak to that.

5   Q    You know he gave you the shares, the 10,000 shares,

6   because he was trying to incentivize you, right, to continue

7   to work hard?

8   A    Yes.

9   Q    You know that you were owed backpay at that time?

10  A    I don't know if I actually was owed backpay at that time.

11  Q    And  --

12  A    There were periods when I was.  I don't know if

13  specifically if that was.

14  Q    For the 15,000 shares you say Mr. Shkreli gave you, was

15  there any memorialization of that in writing?

16  A    Yes.  I signed the transfer agreement with him.

17  Q    Wasn't that in exchange for continuing to work hard for

18  Retrophin?

19  A    Yes.

20  Q    You understood he was giving you the 15,000 shares from

21  his own personal stock to incentivize you to work harder?

22  A    Yes.

23  Q    If you look at DX 111-21, do you remember this exchange,

24  in evidence, in June 21, 2012, if we go down to the bottom,

25  this is you informing Mr. Shkreli that a law firm was retained

Su - cross - Brodsky                          5243

1   by the Workers Compensation board and asking why Retrophin

2   stopped paying into workers comp, right?

3   A    Yes.  That's what the e-mail says.

4   Q    At he bottom it says should I pass there to Evan and

5   Mr. Shkreli says yes?

6   A    He said yes.

7   Q    Mr. Su, you said to Evan can you follow-up please and

8   Mr. Greebel responded have you guys stopped paying into

9   workers comp?

10  A    Yes.

11  Q    And you respond, say, everyone is on the a consultant

12  basis and gets a 1099?

13  A    Yes.

14  Q    And then after this you and Mr. Massella engaged in a

15  dialogue about designating everybody as a consultant so there

16  would be no pay in to workers comp?

17  A    Can you refresh my memory?

18  Q    You don't remember that?

19  A    No.

20  Q    You remember though that people stayed on as consultants,

21  correct, and got 1099s?

22  A    Martin paid some people 1099s and W-2s.  He assigned it.

23  I don't know why or how.  It's just the way he assigned it.

24  Q    That was outside your area as the chief operating

25  officer?

Su - cross - Brodsky                    5244

1    A    Yes.  That responsibility wasn't mine.

2    Q    You had said they were separate entities, MSMB and the

3    various entities and Retrophin, right?

4    A    The ones that I had knowledge of.

5    Q    Right?

6    A    Yes.  MSMB Healthcare, MSMB Isotope, MSMB Consumer and

7    Retrophin LLC.

8    Q    You knew there was a lot of overlap between the MSMB

9    entities and Retrophin, right?

10             MR. KESSLER:  Objection to form.

11             THE COURT:  Rephrase, please.

12   Q    You knew there was a lot of commingling of monies between

13   Retrophin and MSMB entities, right?

14             MR. KESSLER:  Asked and answered.

15             THE COURT:  I beg your pardon.

16             MR. KESSLER:  Asked and answered.

17             THE COURT:  I'll let him go one more time.  You can

18   answer the question.

19   A    Do you mind repeating it, please.

20   Q    You knew there was a lot of commingling of monies between

21   MSMB entities and Retrophin, right?

22   A    Retrophin paid for a lot of MSMB bills.

23   Q    You were hired unfortunately by MSMB entities, right?

24   A    On my contract.

25   Q    And Retrophin paid your check?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                          5245

1   A    Yes.

2   Q    You knew from your own personal experience that there was

3   commingling of monies?

4              MR. KESSLER:  Objection to the form, commingling.

5              THE COURT:  Try to rephrase, Mr. Brodsky.

6   Q    There were money transfers between entities, correct?

7   A    Retrophin paid MSMB bills when it came in, don't know

8   why, and at the same time MSMB Healthcare was an investor into

9   Retrophin.  So I don't what know your legal definition of

10  commingling is, so but that's what happened.  I'm just telling

11  you the transaction part.  That's how it happened.  I was paid

12  by Retrophin.  My contract says a different entity it went

13  through.

14  Q    When you worked there 2012 both MSMB and Retrophin shared

15  office space, right?

16  A    Yes.

17  Q    There was no defined responsibility between the entities,

18  correct?

19             MR. KESSLER:  Objection to the form.

20             THE COURT:  Try to rephrase, Mr. Brodsky.  Try to

21  define responsibilities between the entities.

22             MR. BRODSKY:  Yes, your Honor.  There was a reason

23  that I used that word.

24  Q    Mr. Massella -- I mean Mr. Su.  Sorry.

25             Is it fair to say, there was a cross between  --

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                                  5246

1   there was no defined responsibility between MSMB and

2   Retrophin?

3            MR. KESSLER:  Same objection.

4            THE COURT:  Yes, sustained.  Rephrase, please.

5   Q    Is it fair to say that several people working for MSMB

6   and Retrophin had cross duties between the two companies?

7   A    Certain people did.

8   Q    And certain people who worked for both companies did not

9   have a defined responsibility as to what work they would OD

10  for one company versus the other?

11           MR. KESSLER:  Objection to the form.

12           THE COURT:   Try to rephrase, Mr. Brodsky.

13           MR. BRODSKY:   Your Honor, my words are because of a

14  prior proceeding.  I'm just going to direct your attention,

15  your Honor, to a prior proceeding, page 2135, lines ten

16  through twelve.

17           MR. KESSLER:  Your Honor, my objection is just to

18  the form of in question being asked.

19           THE COURT:  Yes.

20           I think if you can more closely track the language

21  of what appears at page 2135 between lines ten and twelve,

22  rather than talk about duties between the companies, focusing

23  on the individuals and what they do.

24           MR. BRODSKY:  Understood, your Honor.

25           THE COURT:  I think that's the problem.

```
                    Su - cross - Brodsky                5247
```

1   BY MR. BRODSKY:

2   Q    MSMB and capital, Mr. Su, was the umbrella firm, correct?

3   A    I actually don't know what that umbrella firm was,

4   because there were so many separate entities.

5            MR. BRODSKY:  Your Honor, I would like to read the

6   transcript of a prior proceeding, 2136, lines ten through

7   twelve  -- ten through fifteen.

8            (Pause.)

9            THE COURT:  All right.  I think that's fair.

10  Q    Mr. Su, if you turn to 2136 in the prior proceeding.

11  A    What page?

12  Q    2136?

13  Q    Directing your attention to starting on line ten  --

14           MR. KESSLER:  Sorry.  Your Honor, can I ask that we

15  read to line 19 pursuant to Rule 106.

16           THE COURT:   Do you mind, Mr. Brodsky.

17           MR. BRODSKY:  Yes, your Honor, because I'm about to

18  cross-examine him with respect to the portions relating to

19  that.

20           THE COURT:  On redirect you can bring his attention

21  to the extra lines that you think ought to be read.  So you

22  want lines ten through what read?

23           MR. BRODSKY:  I'm going to get to the other lines,

24  too.

25           THE COURT:  I'm asking what lines.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                                    5248

1        MR. BRODSKY:  I'm going to start with line ten.

2        THE COURT:  Ten through what?

3        MR. BRODSKY:  Ten through fifteen.

4        THE COURT:  Thank you.

5   Q    Read along with me, Mr. Su and let me know if I'm reading

6   this correctly.  This was your sworn testimony, correct, at a

7   prior proceeding?

8   A    Yes.

9   Q    The court:  Which MSMB?  The witness:  I don't know.

10  MSMB Capital in general, the umbrella firm.

11       "QUESTION:   Just to be clear:  You perceived MSMB

12  Capital to be the umbrella firm and then there were entities

13  underneath it?

14       "ANSWER:   Correct."

15       Mr. Su, is it not true that there were a lot of

16  entities under MSMB.

17  A    A lot of monikers for MSMB.

18  Q    And you recall that MSMB Healthcare  -- those entities

19  were MSMB Healthcare as a fund, MSMB Isotope as a fund, MSMB

20  Consumer as a fund and Retrophin, LLC, correct?

21       MR. KESSLER:   Objection.

22       THE COURT:  The form is a little complex.

23       MR. BRODSKY:  Page 2124, lines eleven through

24  thirteen.

25       THE COURT:  It is your use of the word fund

Su - cross - Brodsky                              5249

1   modifying all those named entities.  That's what my confusion

2   is with your question.

3           MR. BRODSKY:  I'm just trying to use the words

4   exactly as used before.

5           MR. KESSLER:  My objection is to the form of the

6   question.

7           THE COURT:  Try to rephrase it, Mr. Brodsky.

8   BY MR. BRODSKY:

9   Q    Mr. Su, in a prior proceeding you were sworn under oath,

10  were you not asked what the entities were under MSMB and did

11  you not say that you recalled MSMB Healthcare as a fund, MSMB

12  Isotope as a fund, MSMB Consumer as a fund and Retrophin LLC?

13  A    Retrophin, LLC as a company, yes.

14  Q    You included that as an entity under MSMB, correct?

15  A    No.  Well, that's not my understanding of it.

16  Q    That's not your understanding today?  That is your

17  testimony?

18  A    Retrophin is a separate company, with separate investors.

19          MR. BRODSKY:   Your Honor, I would like to read

20  transcript page 2124 lines nine through thirteen.

21          MR. KESSLER:  Your Honor, I renew my application to

22  read the previous lines I referred to pursuant to Rule 106 or

23  this is not a prior inconsistent statement.

24          THE COURT:  May I have that transcript back and you

25  can use your copy.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                    5250

1          MR. BRODSKY:  I'll keep going, your Honor, and get

2     to that, too.

3          THE COURT:  Can you just give me a minute?

4          MR. BRODSKY:  Yes, your Honor.

5          THE COURT:  So you want him to go to 2124?  Is that

6     where we're going now?

7          MR. BRODSKY:  Yes, and then I was going to go to

8     lines 19 to 21.

9          THE COURT:  On page?

10         MR. BRODSKY:  Same page, 2124.  Then I was going to

11    go to the lines a few pages later, 2136 lines 18 to 19.  I'm

12    going to get to all three.

13         THE COURT:  If he's going to go to all these places,

14    some of which include the lines and pages that you wanted, do

15    you have an objection still?

16         MR. KESSLER:  I am asking they all be read together

17    as they are.

18         THE COURT:  I think he's going to do them

19    sequentially.

20         MR. KESSLER:  Okay.

21         THE COURT:  Go ahead, Mr. Brodsky.

22    Q    Mr. Su, in a prior proceeding on transcript page 2124,

23    were you not asked the following questions and did you not

24    give the following sworn testimony:

25              "QUESTION:   What did you learn about the entities"

Su - cross - Brodsky                    5251

1   --   Let me start with line seven.

2            "QUESTION:   So when you started working for

3   Mr. Shkreli, you just made a reference to MSMB and all its

4   entities, what did you learn about the entities?

5            "ANSWER:   There were a lot of entities under MSMB.

6            "QUESTION:   What were those entities?

7            "ANSWER:   I recall MSMB Healthcare as a fund, MSMB

8   Isotope as a fund, MSMB Consumer as a fund and Retrophin LLC."

9            Did I read that correctly?

10  A    Yes.

11  Q    And then fair to say, sir, that with respect to Retrophin

12  it was a small company that was incubated by one of the funds?

13  A    It was an investor in Retrophin LLC.

14  Q    And your testimony is that the company of Retrophin was

15  separate from MSMB, correct?

16  A    Separate, different investors, yes.

17  Q    And yet they shared office space, correct?

18  A    Yes.

19  Q    In a prior proceeding, sir, did you also testify that the

20  entities were  -- when asked whether the funds were separate

21  from Retrophin, did you say yes?

22  A    Yes.

23  Q    And I notice you were looking over at Mr. Kessler.  Is

24  there a reason you're looking over at Mr. Kessler?

25            MR. KESSLER:   Objection.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                    5252

1          THE COURT:  I didn't see what he did.
2          MR. BRODSKY:  I'm asking Mr. Su.
3     Q    Mr. Su, were you looking over to Mr. Kessler for
4     something when responded to my question?
5     A    I was not looking to him for anything.
6     Q    Okay.  You were just looking in that general direction?
7          THE COURT:   Are we going as to start characterizing
8     what your observations are?  Because I think the record is
9     going to be very contentious if this starts.
10         MR. BRODSKY:  Your Honor, I'm asking the witness a
11    question where his eyes were going and where he was looking at
12    after being asked a question.
13         THE COURT:  All right.
14    Q    Mr. Su, is it fair to say that you understood that you
15    were using the MSMB Capital e-mail for doing Retrophin work,
16    right?
17    A    That's correct.
18    Q    And if we put up DX 111-21, is this an example of your
19    signature block, if we keep scrolling, where you put chief
20    operating officer of MSMB Capital?
21    A    Yes, that's what appears.
22    Q    So fair to say this was an e-mail in connection with
23    Retrophin work, right?  Workers comp related to Retrophin?
24    A    Let me just go back to the e-mails.
25         MR. KESSLER:  Can you give him the hard copies.

Su - cross - Brodsky                    5253

1   Q    Here is DX 111-21.  You have it in front of you, Mr. Su?

2   A    Yes.  I don't see anything here that says Retrophin, but

3   --

4   Q    If you look at your e-mail on June 21, 2012, you were

5   telling Mr. Shkreli that the law firm was inquiring as to why

6   Retrophin stop paying workers comp?

7   A    Yes.  Yes, the e-mail is correct.

8   Q    And you were using your MSMB Capital e-mail address?

9   A    Correct.

10  Q    Your signature block is MSMB Capital?

11  A    Right.

12  Q    That happened more than once, that happened many times

13  where you were doing Retrophin business on MSMB Capital,

14  right?

15  A    Yes.

16  Q    And you testified on direct examination that there were

17  separate EIN numbers, right?

18  A    Yes.

19  Q    Just because you used separate EIN numbers doesn't mean

20  you didn't intermingle MSMB Capital and Retrophin business

21  together, did you?

22           MR. KESSLER:  I object to the form.

23           THE COURT:  Rephrase, Mr. Brodsky.

24  Q    The separate EIN numbers had nothing to do with how you

25  operated the business, did it, sir?

Su - cross - Brodsky                                5254

1  A    From my understanding what EINs are it's just used to pay

2  tax to the IRS as an identifier.

3  Q    Right.

4  A    That's my understanding of EIN.

5  Q    And a separate EIN number, Mr. Su, doesn't mean you don't

6  operate the business differently, correct?  You operated

7  Retrophin as you operate Retrophin regardless of what an EIN

8  number was?

9            MR. KESSLER:  Objection to the form.

10           THE COURT:  Overruled.

11 A    The EIN is issued by the IRS for separate companies.

12 Q    Right.

13 A    And it's a tax identifier.

14 Q    Correct, understood.

15           Mr. Su, does the IRS have any idea, to your

16 knowledge, does the IRS have any idea how Retrophin and MSMB

17 are operating their businesses in 2012?

18 A    I don't believe so.  But I can't speak for the IRS.

19 Q    All right?

20           Now, I wanted to do two more things and sort of talk

21 about your employment history, Mr. Su.

22           Do you remember sending to Citrin Cooperman, copying

23 Mr. Greebel, in November 2012 Mr. Pierotti's separation

24 agreement?

25 A    Can you refresh my memory, please?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                                    5255

1   Q     Sure.

2              MR. BRODSKY:  May I approach, your Honor?

3              THE COURT:  Yes.

4   Q     Let me show you DX 111-60 for identification, Mr. Su.

5              MR. BRODSKY:  For the record it is an e-mail from

6   Mr. Su to Mr. Massella, Ms. Chew and Ms. Liang, a copy to

7   Mr. Greebel, with an attachment.

8   Q     Do you remember sending the separation agreement with

9   Mr. Pierotti in November, 2012?

10  A     That's what this e-mail says.

11  Q     You don't independently remember it?

12  A     No.

13             MR. BRODSKY:   Your Honor, we offer 111-60.

14             MR. KESSLER:  No objection.

15             THE COURT:  DX 111-60 is received in evidence.

16             (So marked.)

17  Q     You told Mr. Cooperman to take Mr. Pierotti off cap table

18  per the separation agreement, right?

19  A     Yes.

20  Q     You told Citrin Cooperman that Mr. Pierotti's vested and

21  nonvested shares should be cancelled?

22  A     Yes.

23  Q     And that is pursuant to the attached agreement that you

24  sent to them, right?

25  A     Correct.

Su - cross - Brodsky                                5256

1   Q     If we scroll to the attached agreement, it has

2   termination of employment and release, right?

3   A     Yes.

4   Q     And the first paragraph it says dear Caroline.  Do you

5   see that?

6   A     Yes.

7   Q     It's addressed to Mr. Pierotti but it says dear Caroline,

8   this agreement and release  -- do you see the last page that

9   is signed by Mr. Pierotti?  Do you recognize the signature?

10  A     I don't.

11  Q     Do you recognize Mr. Shkreli's?

12  A     Yes.

13  Q     How often did you see Mr. Shkreli's signature, all the

14  time?

15  A     Often.

16  Q     Often meaning like every day, every other day?  You can't

17  remember?  Yesterday you had a recollection  --

18  A     I saw his signature a lot.  He signed a lot of documents.

19  I saw a lot of scanned things that were in the folder.  I saw

20  the things that were of the company that he shined.

21  Q     How often did you talk to Mr. Shkreli by telephone?

22  A     By what?

23  Q     By telephone.

24  A     Not often.

25  Q     Not often.  You spoke to him in the office?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - cross - Brodsky                                5257

1    A     Most of the time, yes.

2    Q     You worked at home several times, right?

3    A     I worked at nights at home and weekends.

4    Q     Mr. Shkreli traveled for the job?

5    A     No.  He was in the office a lot.  He didn't travel much.

6    Q     Okay?

7          Looking at the termination agreement, does it say

8    for Mr. Pierotti, this agreement and release, the agreement

9    will confirm the termination of your employment with MSMB

10   Healthcare Management and Retrophin, Inc., right?

11   A     Yes, that's what it reads.

12   Q     Then if you scroll over to page three, paragraph five, do

13   you see the non-disparagement provision?

14   A     Yes.

15   Q     Did you understand that this was a non-disparagement

16   agreement between Mr. Pierotti and Mr. Shkreli?

17            MR. KESSLER:  Objection, your Honor.

18            THE COURT:  I'll sustain.  I'll sustain the

19   objection.

20   Q     Do you see paragraph 5, non-disparagement in DX 111-60 in

21   evidence?

22   A     Yes.

23   Q     And you were sending this to Mr. Massella an and

24   Ms. Liang, correct, and Ms. Chew?

25   A     Yes.

Su - cross - Brodsky                    5258

1   Q    And that in paragraph five non-disparagement an agreement

2   you sent in GX 111-60 in evidence, states you agree at all

3   times you will refrain --

4              MR. KESSLER:  Your Honor, object to the question.

5              THE COURT:  Let him finish the question and then

6   I'll rule on the objection.  It's a question we have not heard

7   yet.

8   Q    You will refrain from making any statements, whether

9   publicly or privately, to anyone, including, without

10  limitation, to the press or the media, to current or

11  prospective investors in any fund or account managed or

12  advised by MSMB or its affiliates, to future employers or

13  prospective employers, or to other market participants,

14  regarding MSMB or Retrophin, or any of their respective

15  affiliates, past or current officers, managers, employers,

16  investors or principals, including, without limitation Martin

17  Shkreli, which could be interpreted to disparage, criticize or

18  defame the business, reputation, ethics or integrity of any

19  such person, or which could adversely affect the business of

20  any such person.  This restriction applies to both written and

21  oral statements, as well as to statements posted by you on the

22  internet, even if posted anonymously.  It also applies to

23  statements made by third parties at your request or on your

24  behalf.  If you are asked to offer an opinion on Retrophin,

25  MSMB, or any of its related parties you will refrain from

1   answering and may reference the restriction this agreement

2   places on you.

3            Do you see that written there? , Mr. Su.

4   A     Yes.

5            (Continued on next page.)

1  BY MR. BRODSKY:   (Continuing)

2  Q    And, Mr. Su, you sent this to, this agreement, separation

3  agreement because Citrin Cooperman needed to know what to

4  remove from the cap table, correct?

5  A    Anything that had to do with the cap table, I sent out --

6  Q    Okay.

7  A    -- to the legal team or the lawyers and the accountants

8  and it was, whatever that was relevant to other third parties.

9  Q    And, Mr. Su, before we get into your background, there's

10  one thing I wanted to follow up from yesterday.

11          Can we put up Government Exhibit 111-17-H.  This is

12  that November 29th forwarding of the agreement, the transfer

13  between Mr. Biestek and Mr. Shkreli, do you remember that?

14  A    Yes.

15  Q    And if we go to the last page, I had asked you about the

16  signature, correct, July 1, 2012, with the redacting tape?  Do

17  you remember that, Mr. Su?

18  A    Yes.

19  Q    And if we then can put up Government Exhibit 111-19.

20  This is the correction you sent out, Mr. Su, on that same day:

21  Please see attached for date of transfer.

22          Do you remember that?

23  A    Yes.

24  Q    And the last page had the signatures, correct?  If we can

25  put them side by side.

1           MR. KESSLER:  Your Honor, this entire line of

2    questioning about this document has been asked and answered.

3           THE COURT:  Sustained.

4           MR. BRODSKY:  Your Honor, I just want to follow up

5    on one thing that I thought I didn't complete.  It's just a

6    small --

7           THE COURT:  All right.  Get to the point and

8    complete.  Don't repeat what's already been covered.

9           MR. BRODSKY:  Understood.

10   Q    Based on your testimony today about your familiarity with

11   Mr. Shkreli's signature, sir, do you recognize that the

12   June 1, 2012 document was re-signed by Mr. Shkreli and

13   Mr. Biestek?

14          MR. KESSLER:  Your Honor, I object to the comparison

15   of handwriting which we objected to yesterday.

16          THE COURT:  All right.  You're asking about

17   Mr. Shkreli and Mr. Biestek?

18          MR. BRODSKY:  Just Mr. Shkreli's.

19          THE COURT:  Just Mr. Shkreli.  And asking him if he

20   could confirm that it was re-signed?

21          MR. BRODSKY:  Yes, based on his familiarity with the

22   signature.

23          THE COURT:  If you can answer the question, I will

24   allow it.

25          THE WITNESS:  I can't.

Su - cross - Brodsky                                    5262

1   Q    Nothing wrong, Mr. Su, with Mr. Shkreli and Mr. Biestek

2   re-signing a document memorializing an agreement that they

3   had?

4   A    I can't answer that.

5   Q    Let me talk about your history, Mr. Su, and then I think

6   we can conclude.  I just wanted to go over your history.

7            So, you graduated from Syracuse University in 1997?

8   A    Correct.

9   Q    You then worked for Goldman Sachs, right?

10  A    Correct.

11  Q    You worked in the analyst program for about two years,

12  correct?

13  A    Yes.

14  Q    You didn't make it the full two years because they fired

15  you?

16  A    Yes.

17  Q    And you were not in a senior position, correct?

18  A    The lowest.

19  Q    The lowest position?

20  A    Yes.

21  Q    And you filled out a FINRA questionnaire, right?

22           That's the regulatory body that regulates, that

23  partially regulates the securities industry, right?

24  A    Correct.

25  Q    And the questionnaire was a list of questions that you

Su - cross - Brodsky                                          5263

1   had to answer honestly and truthfully, right?

2   A    Yes.  It was NASDAQ at the time.

3   Q    And NASDAQ was the organization which got taken over by

4   FINRA?

5   A    Yes.

6   Q    And you filled out the firm incorrectly, you said, right?

7   A    Yes.

8   Q    And it's not your fault that you filled it out

9   incorrectly because you didn't realize you had been arrested

10  for a felony, right?

11  A    Absolutely my fault.

12  Q    Absolutely your fault.  Then, you were fired, correct?

13  A    Yes.

14  Q    And you went to Weiss, Peck & Greer?

15  A    Yes.

16  Q    You didn't tell them about your firing or you told them

17  about your firing?

18  A    They knew about it.  The hiring manager was from Goldman

19  Sachs and he hired me there.

20  Q    And you were in a trader position there, correct?

21  A    Correct.

22  Q    And you're not a senior position, correct?

23  A    No.  At that time, I was pretty --

24  Q    Junior?

25  A    Which part?  When I started or when I left?

Su - cross - Brodsky                                    5264

1   Q    Either one.  When you started and when you left, you
2   reported to a portfolio manager, correct?
3   A    Correct.
4   Q    And that portfolio manager reported to other people,
5   correct?
6   A    Yes.
7   Q    So, you were in a junior position?
8   A    Yes.
9   Q    Okay.  And you and your portfolio manager had a
10  miscommunication, I think you said?
11  A    Yes.
12  Q    And it resulted in a loss, right?
13  A    Yes.
14  Q    And you had to leave because you didn't like what they
15  asked you to do, correct?
16  A    Correct.
17  Q    And that was not your fault, correct, that you had to
18  leave?  It was a miscommunication?
19  A    There was a miscommunication in trade.  They wanted me to
20  put in a fund.  I said no.  We put the firm error account.
21  Had a conversation with me two, three weeks afterwards and
22  then we just parted way.  They gave me some money and asked me
23  to sign a document.  I said, forget the money, I don't want
24  the money, I'm not signing because I don't agree with what
25  they said.

1    Q    And then you went to Cramer Rosenthal for two years,

2    correct?

3    A    Correct.

4    Q    And were you a trader there?

5    A    Yes.

6    Q    In a junior position?

7    A    Yes.  Yes.

8    Q    And then you went to BancTec Capital in Dallas, correct?

9    A    Yes.

10   Q    2004 to 2006, right?

11   A    Yes.

12   Q    And you were a trader there as well?

13   A    Yes.

14   Q    A junior position, correct?

15   A    Not, in BancTec.  I mean, you're the trader.  They had

16   junior trader positions and they had a senior trader

17   positions.  When I was at Weiss Peck & Greer, I ended up as a

18   senior trader.  I managed the hedge fund book over there.

19   Kramer Rosenthal, the same thing, I managed the hedge fund

20   book there which was senior.

21   Q    You reported to somebody who reported to somebody who

22   reported to somebody, correct?

23   A    Who reported to somebody, yes.

24   Q    Okay.  And then you started your own fund Othello

25   Capital, right?

Su - cross - Brodsky                                    5266

1    A      Yes.

2    Q      And you shorted the Typhoon Tech stock, correct?

3    A      That was one of our investments.

4    Q      You shorted it, correct?

5    A      Typhoon Technologies, we had a short position on that.

6    Q      Yes or no.  Typhoon Technology was a highly illiquid

7    position?

8    A      Yes.

9    Q      And, yes or no, it was trading on the pink sheets?

10   A      I can't recall.

11   Q      And you suffered a loss of approximately $913,000?

12   A      I can't remember the number but I suffered a loss, the

13   firm suffered a loss.

14   Q      You suffered a loss.  And you testified you took your

15   prime broker to arbitration, right?

16   A      Yes.

17   Q      And that prime broker was Penson Financial Services,

18   correct?

19   A      Yes.

20   Q      And you testified that you won.  That's what you told the

21   jury, right?

22   A      Yes.

23   Q      Now, that's not the whole story, is it, sir?

24   A      What's the other part that I'm?

25   Q      Well, you started that litigation on October 16, 2008,

1    didn't you?  Do you remember that?

2    A      Sorry.  What was the date?

3    Q      October 16, 2008.

4    A      Around that time frame.

5    Q      And you continued that litigation for two years and

6    9 months.  Right?

7    A      Yes.

8    Q      And you sought $28 million in damages, correct?

9    A      Yes.

10   Q      And you sought $23 million in damages for your fund,

11   Othello, right?

12   A      Yes.

13   Q      And you sought personally $5.6 million for yourself?

14   A      Yes.

15   Q      And the arbitrator denied all of your claims except for

16   one, right?

17   A      Yes.

18   Q      You had alleged the series of claims, including

19   misrepresentation, fraud, breach of contract, tortious

20   interference, violations of Texas securities laws, violations

21   of Deceptive Trade Practices Act, right?

22   A      Yes.

23   Q      And that was all denied except for one claim, correct?

24   A      We got money back for it.

25   Q      Sir, yes or no.  That was all denied except for one

Su - cross - Brodsky                          5268

1  claim?

2  A    I can't remember what the claim was.  I can't remember.

3  Q    Well, yet, two days ago, you testified it was $600,000 in

4  legal fees and that's what you won, do you remember that?

5  A    I said there was $600,000 legal fees that the Penson

6  Financial spent over a short period of time which was only

7  three weeks which I thought was obscene.

8  Q    And you said you won, right?

9  A    That's what the arbitrator ruled.

10  Q    Well, the arbitrator -- there were three arbitrators,

11  weren't there?

12  A    Yes.

13  Q    And the three arbitrators ruled that you could get back

14  $250,000 of the attorneys' fees, right?

15  A    Yes.

16  Q    And that's all they granted you, correct?

17  A    Yes.

18  Q    They denied everything else?

19  A    I got 250,000, yes.

20  Q    They denied all your other claims that you asserted, the

21  misrepresentation, the tortious interference, the deceptive

22  trade practices, all that was denied?

23  A    If that's what the claim was, it was.

24  Q    Well, let me show you to refresh your memory.

25  DX 111-444.

Su - cross - Brodsky                                    5269

1         MR. BRODSKY:  May I approach, Your Honor?
2         THE COURT:  Yes.
3    Q    Showing you DX 111-144 for identification.
4         THE COURT:  This is just to refresh?
5         MR. BRODSKY:  Yes, just to refresh.
6    Q    And I'm showing you an arbitration.  I can direct your
7    attention, I can direct your attention to the fifth page,
8    Mr. Su --
9    A    Yes.
10   Q    -- where it lists out all the claims, counterclaims.
11   A    Okay.
12   Q    You can put that aside, Mr. Su.
13        Does it refresh your recollection that all your
14   other claims are claims for breach of contract,
15   misrepresentation, tortious interference, violations of
16   securities laws, Deceptive Trade Practices Act, were all
17   denied?
18   A    Yes.
19   Q    You did not get the $29 million you were seeking?
20   A    No.
21   Q    Now, you testified that in or about -- I think your
22   testimony was Mr. Shkreli reached out to you in September,
23   August, September time frame of 2011 for the job of chief
24   operating officer, right?
25   A    Yes.

1   Q    And you said you set up a couple of interviews and you

2   started in January 2012, right?

3   A    Correct.

4   Q    You left out a part that in 2009, you actually responded

5   to a posting that Mr. Shkreli put up for an executive position

6   at MSMB, correct?

7             MR. KESSLER:  Objection to "left out."

8             THE COURT:  I will sustain.

9             Can you rephrase it?

10  Q    Isn't it true, sir, that you interviewed for the job in

11  2009?

12  A    I interviewed with Martin in 2009.  That's when we first

13  met.

14  Q    Right.  So, the time frame of when Mr. Shkreli reached

15  out to you for a position was, first, in 2009, correct?

16  A    I reached out to him after I saw a posting in the sheet

17  website called Bloomberg and I interviewed with him in 2009.

18  Q    And this was after you started your litigation against

19  Penson, correct?

20  A    I can't remember the date you read off but, yes, 2008,

21  yes.

22  Q    And is it not true that by that time, 2009, Othello

23  Capital was winding down and you were looking for other

24  opportunities when you saw Mr. Shkreli's posting?

25  A    Yes.

Su - cross - Brodsky                    5271

1   Q    And then Mr. Shkreli didn't contact -- you interviewed in
2   New York, correct, in 2009?
3   A    Yes.
4   Q    And then based on this a meeting, you thought he was
5   smart, right?
6   A    Yes.
7   Q    You thought he understood the health care space?
8   A    Yes.
9   Q    You thought he understood the money management business?
10  A    Yes.
11  Q    And then you reached out, he reached out to you and two
12  years later in 2011 --
13  A    Yes.
14  Q    -- you interviewed in New York and you took the job?
15  A    Yes.
16  Q    And then a few months in, you filed your complaint with
17  the SEC, right?
18  A    I filed it in May 2012.
19  Q    And that was with respect to MSMB, correct?
20  A    Yes.
21  Q    And then you said that in December -- and then you stayed
22  on.  You filed the complaint, you said in your complaint your
23  main allegation was you were worried that the assets under
24  management weren't, might not be $100 million as advertised to
25  you, correct?

Su - cross - Brodsky                           5272

1   A    I think my thinking there was in May, I filed a complaint

2   on the SEC website, and I was concerned about the numbers that

3   were being advertised to investors over the phone.

4   Q    MSMB, correct, sir, relating to MSMB?  Yes or no?

5   A    It was for MSMB, yes.

6   Q    And your concern, yes or no, was that you were being told

7   and others were being told that the amount of assets under

8   management were anywhere between $40 million and $100 million?

9   A    It was -- some days it was 40 million.  Some days it was

10  75 million.  Some days it was 125 million.  There was no

11  consistency as to the amount of assets.

12  Q    And you don't know, one way or the other, whether that

13  same representation regarding the assets, $40 million under

14  management, was made to Katten Muchin?  Do you know that one

15  way or the other?

16  A    No.

17  Q    And you did not bring obviously the whistleblower, the

18  SEC complaint to the attention of Katten Muchin, right?

19  A    I didn't tell anybody.

20  Q    And then in December of 2012, you said you walked out,

21  right?  There was a last straw, correct?

22  A    Yes.

23  Q    And the last straw for you was the $10,000 that you saw

24  spent, correct?

25  A    That's when Martin transferred $10,000 out of the

Su - cross - Brodsky                    5273

1   remaining $20,000 in the Retrophin bank account to his own

2   personal bank account.

3   Q    And you were concerned for the shareholders, right?

4   That's your testimony?

5   A    I was concerned about that.

6   Q    Yes?

7   A    Amongst other things.

8   Q    And isn't it true that just a few weeks before, you made

9   sure you were paid on December 3rd $12,500?

10  A    For salary?

11  Q    Yes.

12  A    I don't know if I was made sure, but I got paid.

13  Q    And then isn't it true that your friend George Huang

14  received $35,000 on the same date on December 3rd?

15  A    Was this the repayment of his loan that he lent the

16  company?

17  Q    Let me refresh your recollection.

18          Do you remember on December 18, 2012, a few days

19  before you walked out, that you e-mailed yourself Chase Bank

20  account information of Retrophin?

21  A    I don't remember.

22  Q    Let me try to refresh your recollection.

23          MR. BRODSKY:  May I approach, Your Honor?

24          THE COURT:  Yes.

25  Q    DX 111-41 for identification which is an e-mail from

Su - cross - Brodsky                    5274

1   Jackson Su to Jackson Su, December 18, 2012, Attachment:

2   Chase online account activity, Chase online account activity.

3              Does it refresh your memory, Mr. Su, that you

4   e-mailed yourself December 18, 2012 the Chase online bank

5   activity of Retrophin?

6   A    If it says this on this piece of paper, then it's on this

7   piece of paper.

8              MR. BRODSKY:  Your Honor, we offer it.

9              MR. KESSLER:  No objection.

10             THE COURT:  We receive Defense Exhibit 111-41.

11             (So marked.)

12  Q    Again, you're using MSMB Capital e-mail address, right?

13  A    That is the e-mail where it came from.

14  Q    Okay.  And then if we scroll through on the attachment

15  you sent to yourself -- you sent this to your personal e-mail

16  I take it, correct?

17  A    I don't know that.  It just says Jackson Su.

18  Q    You think you went from MSMB Capital to MSMB Capital

19  e-mail address?

20  A    I don't know.

21  Q    You don't know?  Can you think of any reason today why

22  you would use Jackson@MSMBCapital.com, attach the Chase Bank

23  is the and send it to Jackson@MSMBCapital.com?

24             MR. KESSLER:  Objection.

25             THE COURT:  Overruled.  You can answer it.

Su - cross - Brodsky                    5275

1   A    Again, I don't remember this.

2   Q    Okay.  You knew you were leaving by the time you e-mailed

3   this to yourself, right?

4   A    I don't know.

5   Q    Well, you knew by then you weren't going to have the

6   opportunity to buy Fearnow shares, right?

7   A    If that was the timeline and it was allocated already,

8   then that's -- then I wouldn't have received any.

9   Q    And then if you scroll through what you attached, is it

10  fair to say that if we direct your attention to the third

11  page, RTRX2481, it shows, on December 3rd, 20124, a wire out

12  to Jackson Su of Othello Capital, Floral Park, New York, of

13  $12,500?

14  A    Yes.

15  Q    You certainly knew that because you had the bank account

16  information that you were taking 12,500 out of the remaining

17  66 -- sorry -- out of the remaining $79,295 out of Retrophin's

18  account?

19        MR. KESSLER:  Objection to the form, "you were

20  taking."

21        THE COURT:  Sustained.

22  Q    You certainly knew that you were receiving $12,500 or you

23  were wired $12,500 on December 3rd of the remaining $75,000 in

24  Retrophin's bank account, right?

25  A    I got paid by Martin $12,500 on December 3rd.

Su - cross - Brodsky                    5276

1  Q    You had no problem with that, right?

2  A    No.

3  Q    Okay.  You didn't say, Take the money back because, I'm

4  concerned that Retrophin's running out of money, did you?  I'm

5  asking, Mr. Su.

6  A    Sorry.  Can you repeat that?

7  Q    Yes.  In December 2012, did you say, when you received

8  the $12,500, Take it back, Mr. Shkreli, give it to Retrophin,

9  because we're running out of money?

10 A    I don't recall saying that.

11 Q    And then there's the online transfer there to Mr. Huang

12 for $35,000, right, right above that?

13 A    Yes.

14 Q    And that left $31,000 in Retrophin's account?

15 A    Okay.

16 Q    Do you remember Mr. Huang saying, No, take it back, I'm

17 worried about the health of Retrophin?

18 A    I was not part of that conversation if there was one.

19 Q    And then you say you walked out and you didn't turn back,

20 right?  You didn't turn back?  You didn't come back into the

21 office?

22 A    I did not come back into the office.

23 Q    And on February 12, 2013, you made a written demand to

24 Mr. Shkreli for money, correct?

25 A    Can you refresh my memory, please?

CMH       OCR       RMR       CRR       FCRR

Su - cross - Brodsky                                    5277

1    Q    Sure.

2         MR. BRODSKY:  Government Exhibit 682-B in evidence.

3    Can we put that on the screen?  And the lower e-mail.

4    Q    That's from you on February 12, 2013, 8:57 a.m.  Subject:

5    2012 performance bonus.  Right?

6    A    Yes.

7    Q    And there you say to Martin:  Hope all is well.  I'd like

8    to discuss the bonus from the funds last year during my

9    employment with MSMB and Retrophin.

10        Right?

11   A    Yes.

12   Q    There you're including MSMB and Retrophin, right?

13   A    That's what it says.

14   Q    Okay.  Attached is the contract we signed in

15   January 2012.  It calls for performance related bonus paid to

16   me every year for the next five years.  MSMB Healthcare LP

17   fund enjoyed over a 34 percent return since July 31, 2012,

18   according to an investor letter with a $100 million assets.

19   That's a great return for you and the firm.  Congrats.  Please

20   forward along the final year end numbers and date in which a

21   check will be cut.

22        You want money, right, Mr. Su?

23   A    According to my employment contract.

24   Q    And you want money based on $100 million in assets under

25   management, correct?

Su - cross - Brodsky                                    5278

1   A    Which is what I was referring to with his investor
2   letter.
3   Q    A few months ago, you told the SEC that you didn't know
4   whether he had $100 million under management, right, and you
5   were concerned, correct?
6   A    Correct.
7   Q    And now you're asking for a demand to Mr. Shkreli to get
8   a piece of whatever profits there are, correct?
9   A    Yes.
10  Q    And you know the reason you sent it on February 12th at
11  8:57 a.m., don't you?
12            Why don't you tell the jury why you sent it on that
13  date at that time.
14  A    I don't know what you're referring to.
15  Q    That's a random day that you chose, on February 12,
16  8:57 a.m.?
17            MR. KESSLER:  Objection to the form.
18            THE COURT:  Rephrase.
19            Can you just tell me what exhibit number that is?
20            MR. BRODSKY:  Yes.  That's Government Exhibit 682-B.
21            THE COURT:  Thank you.
22  Q    Mr. Su, sitting here today, can you think of a reason why
23  on February 12, 2013, at 8:57 a.m., you chose to send this
24  e-mail to Mr. Shkreli?
25  A    I can't remember or think of why sitting here today.

Su - cross - Brodsky                    5279

1   Q    Let me see if I can refresh your recollection.

2             Isn't it true, sir, that at 8:28 a.m., less than,

3   about 30 minutes before you sent your e-mail, Retrophin

4   announced on Business Wire that it had raised $10 million in

5   private money, Mr. Su?

6   A    What's the question?

7   Q    Isn't it true?

8   A    I don't know.  Can you refresh my memory?

9   Q    Sure.

10  A    And show it to me, please.

11  Q    Let me show you DX 111-126 in evidence -- sorry, not

12  evidence -- for identification.

13            MR. BRODSKY:  May I approach, Your Honor?

14            THE COURT:  Yes.

15  Q    Showing you 111-126 for identification.

16            MR. BRODSKY:  For the record, it's Business Wire

17  announcement, Retrophin raises $10 million in private

18  placement.  We offer it, Your Honor.

19            MR. KESSLER:  No objection.

20            THE COURT:  We receive Defense Exhibit 111-126.

21            (So marked.)

22  Q    Do you see, Mr. Su, that this announcement is made,

23  Retrophin raises $10 million in private placement, and the

24  date is February 12th at 8:28 a.m.?

25  A    Yes.

Su - cross - Brodsky                    5280

1    Q    Does it refresh your memory that you read this press
2    release that Retrophin was announcing it had raised
3    $10 million and then about 30 minutes later, less than
4    30 minutes later, you sent off an e-mail to Mr. Shkreli
5    demanding a performance bonus?
6    A    No.
7    Q    It's a pure coincidence, sir, that Retrophin makes this
8    announcement less than 30 minutes before you send that e-mail
9    on February 12th demanding money?
10   A    I don't know.  Coincidence?  I don't know.  It's not why
11   I sent it.
12   Q    It's not why you sent it, but so it's a coincidence then
13   that less than 30 minutes before you sent your e-mail,
14   Retrophin is announcing great news.
15   A    If you want to call it and term it coincidence, that
16   time, that's what you say.  I don't agree.
17   Q    All right.  And then you make your demand and Mr. Shkreli
18   ignores you, correct?
19   A    Correct.
20   Q    He just ignores you; he doesn't respond to your e-mail
21   and that just made you more upset, right?
22   A    No, I don't remember a time where I was actually upset.
23   Q    And then you, on March 5th, sent an e-mail.
24        MR. BRODSKY:  Sorry, Your Honor.
25   Q    So, he doesn't respond to you and you access the Global

CMH      OCR      RMR      CRR      FCRR

Su - cross - Brodsky                        5281

1    Relay system over and over and over again, copying documents.

2    A    I know I accessed the Global Relay system after I left.

3    I don't know if it was the way you phrase it, over and over

4    and over again.

5    Q    All right.  Let me see if I can refresh your memory.

6          111-48?

7          THE COURT:  Do you want this on the record, are you

8    announcing --

9          MR. BRODSKY:  Yes, Your Honor.

10         DX 111-48 for identification, DX 111-87 for

11   identification, DX 111-88 for identification, DX 111-89 for

12   identification, DX 111-90 for identification, DX 111-91 for

13   identification, DX 111-92 for identification, DX 111-93 for

14   identification, DX 111-160 for identification.  We're just

15   going to collate them.

16   Q    Let me ask you questions as they're collated for you,

17   Mr. Su.

18         You don't remember going into the Global Relay

19   system in February 2013, right?

20   A    I don't recall the number of times, the dates and what I

21   accessed in the Global Relay system.

22   Q    And then you were sent a termination letter by

23   Mr. Greebel, correct?

24   A    At some point, I did.  I don't remember the date.

25   Q    And let me show you DX 111-30 for identification.

Su - cross - Brodsky                    5282

1          MR. BRODSKY:  May I approach, Your Honor?

2          THE COURT:  Yes.

3          MR. BRODSKY:  For the record, it's an e-mail from

4   Evan Greebel, March 8, 2013, to JacksonSu@yahoo, copied to

5   Martin Shkreli, a letter.

6   Q    Is this the date that Mr. Greebel on behalf of Retrophin

7   sent you the termination letter?

8   A    It says March 8, 2013.

9   Q    Do you remember -- let's put up Government Exhibit 111-45

10  in evidence.

11         Do you remember the government showed you this long

12  e-mail which we'll go through?  That's the March 12th e-mail

13  that you sent.

14  A    Yes.

15  Q    Well, let's scroll down.  That's an e-mail that you

16  received from Mr. Greebel on March 8th, right?

17  A    Yes.

18  Q    That's the letter that we're looking at that's attached,

19  right?

20  A    Yes.

21         MR. BRODSKY:  Your Honor, I offer DX 111-30.

22         MR. KESSLER:  No objection.

23         THE COURT:  We receive 111-30.

24         (So marked.)

25  Q    So you got this letter from Retrophin and MSMB

Su - cross - Brodsky                          5283

1    essentially, all the entities, saying that you ceased to

2    perform work -- keep scrolling -- you ceased to perform work,

3    paragraph one, on or about December 21st.  Right, Mr. Su?

4    A    That's what it says.

5    Q    You received this in writing, right?

6    A    This was an attachment in an e-mail.

7    Q    Did you read it at the time?

8    A    Yes.

9    Q    And it upset you, correct?

10   A    I don't know -- I don't think it upset me.  It was just a

11   letter.  It is what it is.

12   Q    Just a letter?  Okay.  Let's go through just the letter.

13            Paragraph one:  On or about 21, 2012, you ceased to

14   perform your duties under the employment agreement.  Right?

15            THE COURT:  Did you mean to say December 21, 2012?

16            MR. BRODSKY:  I'm sorry.  December 21, 2012.

17   A    Yes.

18   Q    And it's true, you failed to come to work or interface

19   with any of the companies, right?

20   A    Yes.

21   Q    Paragraph number two says:  Pursuant to subsection A of

22   the second paragraph of section 12 of your employment

23   agreement, and as a result of your repeated and unexcused

24   absences from the workplace, the companies have asked us to

25   advise you via this letter that the companies are terminating

Su - cross - Brodsky                           5284

1   you for cause retroactive to December 21, 2012.  Right?

2   A    That's what it says.

3   Q    And then it says all payments you're entitled to are

4   terminated, right?

5   A    That's what it says, yes.

6   Q    And then just the letter says, if you go to the second

7   page, on paragraph five, it says:  We have been advised that

8   in December 2012, you and Mr. Shkreli had multiple

9   conversations about Mr. Shkreli transferring a portion of his

10  stock in Retrophin, Inc. to you.  Based on your intentional

11  and repeated unexcused absence from work, it appears that you

12  may have fraudulently induced Mr. Shkreli to deliver such

13  stock to you as it now appears that you never intended to

14  honor the services that you had contractually agreed to

15  perform.  As such, Mr. Shkreli or Retrophin may be entitled to

16  damages as a result of your fraudulently induced conveyance.

17           Right?  That's what it said to you?

18  A    That's what it says.

19  Q    It says you took 50,000, 10,000 shortly before that,

20  25,000 shares, right?

21           MR. KESSLER:  Objection.

22           THE COURT:  Sustained.

23  Q    It basically says you took a bunch of shares of stock

24  from Mr. Shkreli and you left, right?

25  A    In summary, that's what it says.

CMH      OCR      RMR      CRR      FCRR

Su - cross - Brodsky                                    5285

1    Q    And just a few short minutes ago, you said the 15,000

2    shares you received, the 10,000 shares you received from

3    Mr. Shkreli's personal holdings was to incentivize you to

4    continue to work for Retrophin, right?

5    A    I did say that.

6    Q    Did you continue to work for Retrophin after December 21,

7    2012?

8    A    Okay.  Let me add --

9    Q    Yes or no, sir.

10   A    -- that it was an award to me for me for all the hard

11   work I've done.

12   Q    Did you continue to work for Retrophin after December 21,

13   2012?

14   A    I did not.

15   Q    And then on paragraph six, it says that you've been

16   misrepresenting to third parties were you the chief operating

17   officer of Retrophin, Inc. and I'd ask you to stop.

18              Right?  Correct?

19   A    That's what it says.

20   Q    And it says you were -- and you can represent you were

21   chief operating officer of Retrophin LLC, but you can't do it

22   for Inc., right?

23   A    That's what this says.

24   Q    Okay.  And then it says, under the last paragraph:  We

25   remind you of your obligations under your employment agreement

Su - cross - Brodsky                    5286

1  specifically as they relate to the confidentiality of

2  proprietary information that you learned about any of the

3  companies.

4           It's basically saying don't use any of the stuff

5  from Retrophin and the related companies, correct?

6           MR. KESSLER:  Objection to the summarizing of the

7  document that's in evidence.

8           MR. BRODSKY:  It's cross-examination.

9           THE COURT:  Yes.  Why don't you ask -- I think you

10 could rephrase the question and avoid an objection.

11 Q    Mr. Su, you understood Mr. Greebel on behalf of Retrophin

12 and the affiliated entities was telling you you can't use our

13 proprietary information or confidential information, right?

14 A    Whatever it says in that paragraph.

15 Q    You understood that from your employment agreement,

16 right?

17 A    Whatever it says in the employment agreement.

18 Q    Well, sir, your lawyer drafted your employment agreement,

19 right?  John Bach.  Didn't he?

20 A    No.

21 Q    In January 2012, you created that employment agreement

22 and gave it to Mr. Shkreli?

23 A    No.  Martin created it and asked me to sign it but --

24 Q    You had --

25 A    -- on that template which was just my name, the salary

Su - cross - Brodsky                                    5287

1    and the performance bonus.  Then he gave it to him and he

2    signed it and I signed it.

3    Q    You had your lawyer review it, correct?

4    A    No, there was no lawyer.

5    Q    And you weren't happy that Mr. Greebel was sending you

6    this termination letter on March 8th, correct, sir?

7    A    I don't recall my feeling.

8    Q    And you -- do you remember after getting this, continuing

9    to go into Global Relay, pulling down documents, sir?

10   A    I don't remember.

11   Q    And then you sent -- Mr. Shkreli then ignores your next

12   e-mail.

13          MR. BRODSKY:  If we can put up the March 6, '82,

14   Government Exhibit 682-B, I believe.  Let's scroll up to the

15   second e-mail, Mr. Carter, the March e-mail.

16   Q    March 5th, you send this follow up e-mail, correct,

17   Mr. Su?

18   A    Yes.

19   Q    And you say in this e-mail that you worked nonstop,

20   right, Mr. Su?

21   A    Yes.

22   Q    And you're demanding, again, money, correct?

23   A    I'm asking him to follow my employment contract.

24   Q    You want money, Mr. Su, correct?

25   A    I'm asking him to follow the employment contract.

1   Q    And by following the employment contract, you're asking

2   for money, correct?  Yes or no.

3   A    It would include compensation under the employment

4   contract.

5   Q    And in the second paragraph, you say that you don't want

6   to escalate the situation to lawyers, right, meaning I don't

7   want to sue you but I will, right?

8   A    Yes.

9   Q    And when you reference Spencer Spielberg, Sarah Hassan,

10  Lindsay Rosenwald and what you say there, that's because you

11  actually went into the Global Relay system and accessed the

12  threat letters that you saw, correct?

13  A    I don't recall.

14  Q    Well, Lindsay Rosenwald, isn't it true that you went into

15  the Global Relay system and you accessed Mr. Rosenwald's

16  litigation threat against Retrophin?

17  A    I have seen a copy of it.  I don't remember the time

18  frame which I did see it.

19  Q    Well, certainly it wasn't 2012, right?

20  A    Again, I don't remember.

21            (Continued on next page.)

22

23

24

25

Su - cross - Brodsky                    5289

1    BY MR. BRODSKY:

2    Q    And then if we keep scrolling, you basically say, I don't

3    want to burn a bridge, but if we can't come to agreement and

4    settle the matter, I'd welcome a solution.

5              Right?  Correct?

6    A    That's what it reads, yes.

7    Q    And if I don't hear back from you, you say, well, you

8    give him a timeline, March 8, I'm going to assume you don't

9    care and I'll have to take next steps, right?

10   A    That's what it means, yes.

11   Q    That has nothing to do, your e-mail has nothing to do

12   with the fact that Retrophin has announced a successful

13   raising of money and is doing well, correct?

14   A    I can't connect the two.

15   Q    And then you get the response, which is the termination,

16   right, on March 8, 2013.

17             MR. BRODSKY:  If we could put up 111-45 again.  DX

18   111-45.

19             (Exhibit published to the jury.)

20   Q    And you sent this response on March 12, correct?

21             Let me refresh your recollection regarding accessing

22   Global Relay.  I'm going to show you --

23             MR. BRODSKY:  May I approach, your Honor?

24             THE COURT:  Yes.

25   Q    I'm going to show you the exhibits I listed out before,

LAM      OCR      RPR

Su - cross - Brodsky                          5290

1    which I will list out again in one moment.

2              THE COURT:  Time frame?

3              MR. BRODSKY:  I will look, your Honor.

4              THE COURT:  Forgive me, did you move in Defense

5    Exhibit 111-30?

6              You did.  Thank you.

7              MR. BRODSKY:  The time frame, your Honor, is

8    February/March 2013?

9              MR. KESSLER:  Is there a document in here from

10   December 2012?  I just want to make sure.

11             MR. BRODSKY:  December 2012.

12             THE COURT:  Okay, December 2012 through March 2013?

13             MR. BRODSKY:  There are different dates on them.

14   Let me do it this way, your Honor.

15   Q    DX 111-48 for identification, do you have that in front

16   of you, Mr. Su?

17             MR. BRODSKY:  I'm not offering it into evidence.

18   A    Sorry, what was the number again?

19   Q    DX 111-48.  Do you see that in front of you?

20   A    Yes.

21   Q    Does it refresh your recollection, sir, that -- and this

22   is a document that came from your files, correct?

23   A    It appears that way from the Bates.

24   Q    You know from the Bates stamps it came from your

25   documents, your files?

1    A    Yes.

2    Q    Does it refresh your recollection at the top that you

3    printed it from admin@msmbcapital.com on March 5, 2013?

4    A    That's what it says here.

5    Q    The same day that you sent -- that you get the

6    termination letter from -- the same day you sent the second

7    letter, the threat letter, to Mr. Shkreli, correct?

8    A    The same day as which letter?

9    Q    The e-mail that you sent, March 5.

10   A    I can't find it.  But if you're telling me that's the

11   second e-mail that I sent, if you're referring to that, then I

12   sent it.

13              THE COURT:  Exhibit 682-B?

14              MR. BRODSKY:  682-B.

15              THE COURT:  Do you have that one?

16              MR. BRODSKY:  We can match that up.

17              Mr. Carter, can you put up 682-B?

18              THE COURT:  Does somebody have Government Exhibit

19   682-B that we can put up?

20              MR. BRODSKY:  We have it now.

21   Q    March 5, correct?

22   A    March 5, 2013, okay.  Yes, I sent that e-mail.

23   Q    After you sent this e-mail, does it refresh your

24   recollection that you went into Global Relay and you took a

25   document, correct?

Su - cross - Brodsky                              5292

1    A    That's what it appears on this piece of paper.

2    Q    Well, no, the document is not in evidence, Mr. Su.  But

3    does it refresh your memory that you went into the Global

4    Relay system --

5              THE COURTROOM DEPUTY:  We can continue to put up

6    682.

7    Q    -- you went into the Global Relay system, and you

8    accessed Bank of America information?

9    A    According to this piece of paper, that's what this piece

10   of paper says.

11   Q    And then if you go to DX 111-87 for identification, does

12   it refresh your recollection that on March 5, 2013, during the

13   evening, you went into the Global Relay system and you

14   accessed a document relating to you?

15   A    On this piece of paper, yes.

16   Q    The piece of paper comes from your files, Mr. Su.

17   A    Right.

18   Q    So, you have files in your possession, printout dates,

19   from going into the Global Relay system?

20   A    Okay.

21   Q    You have no other explanation for it other than the fact

22   that you went in using your password to msmbcapital.com, admin

23   msmbcapital.com, and pulled down the information, right?

24   A    Okay.

25   Q    I'm asking you, is that yes?

Su - cross - Brodsky                    5293

1   A    That's what it appears here, yes.

2   Q    That's not what it appears, that's what you did, right?

3   A    Yes.

4   Q    And isn't it true that on your way out the door you

5   deleted your e-mail box, jackson@retrophin.com?

6   A    No, because I never had a Retrophin e-mail.

7   Q    Isn't it true -- did you delete your msmbcapital.com

8   e-mail address?

9   A    I don't recall that.

10  Q    Did you delete George Wang's e-mail box?

11  A    I don't recall that.

12  Q    And then if you look at DX 111-88 for identification,

13  does this refresh your recollection that on March 13 you went

14  into Global Relay system and you pulled down a document

15  related to Retrophin?

16  A    Yes.

17  Q    And that was a document -- you remember you pulled down

18  documents relating to Fearnow shares, people purchasing

19  Fearnow shares?

20  A    It was one of the participants in the Fearnow stock.

21  Q    Your mind was still on the fact that you had not had the

22  opportunity to get to buy Fearnow shares, correct?

23  A    No.  My mind was never on Fearnow.

24  Q    Okay.  And then if you skip over DX 111-90, you pulled

25  down a document -- does it refresh your recollection on the

LAM      OCR      RPR

Su - cross - Brodsky                                    5294

1   Global Relay system you pulled down documents relating to

2   Mr. Fernandez?

3   A    Yes.

4   Q    And then if you skip over to 111-93, did you pull down

5   document relating to Mr. Pierotti?

6   A    Mr. Who?

7   Q    Pierotti.

8   A    111-93?

9   Q    Yes.

10  A    Yes.

11  Q    What about 111-94, does that refresh your recollection

12  you pulled down a threat letter from Dr. Rosenwald threatening

13  to sue MSMB entities and Retrophin?

14            THE COURT:  I'm sorry?

15            MR. BRODSKY:  111-94 for identification.

16            THE COURT:  What date are you asking him that he

17  pulled it?

18            MR. BRODSKY:  This is on February 27, 2013.

19  A    I don't have that.

20            THE COURT:  I don't have it either.  111-94?

21            MR. BRODSKY:  Let me provide it.

22            Here's 111-94 for identification.

23            THE COURT:  Thanks.

24  Q    Mr. Su, if you scroll through, does it refresh your

25  recollection that on February 27, 2013, you copied a document

Su - cross - Brodsky                           5295

1   relating to Dr. Rosenwald's litigation threat against MSMB and

2   Retrophin?

3   A    Yes.

4        THE COURT:  I think you said February 27.  Did you

5   mean to say that date?

6        MR. BRODSKY:  It was February 27, 2013.

7        THE COURT:  I see.  Okay.  Thank you.

8   A    Yes.

9   Q    And you can't remember exactly how many times you

10  continued to access the Global Relay system, right?

11  A    Correct.

12  Q    But whatever amount of times you continued to do it,

13  right?

14  A    Sorry, what was the question?

15  Q    Even though you can't remember the exact number, you

16  continued to do it.

17       THE COURT:  After?

18  Q    You continued to access the Global Relay system without

19  authorization.

20       MR. KESSLER:  I was going to say time frame.

21       THE COURT:  I think you need a temporal frame on

22  that question.

23  Q    After you were terminated in March of 2013 retroactively

24  to December 21, you continued to go into the Global Relay

25  system and grab documents?

1    A    I accessed the system.

2    Q    And in your mind, you're telling the jury that after

3    receiving Retrophin and MSMB's termination letter retroactive

4    to December 21 you have no problem with going into the

5    electronic system, grabbing the documents, and keeping them?

6            Mr. Su?

7    A    Yes?

8    Q    No problem, right?

9    A    I was curious at the same time, nosey about my former

10   company.

11   Q    You didn't just want to read about it, you wanted to go

12   into the system, correct?

13   A    I accessed the system.

14   Q    And that included bank account information, sir, right?

15   A    Don't remember if I saw it.

16   Q    And sitting here today, you don't even have a regret

17   about doing it, do you, sir?

18   A    I regret having ever met Martin --

19   Q    My question to you --

20   A    -- the company, and everything else because I'm sitting

21   here having to deal with this.

22   Q    Mr. Su, my question is very specific.  Sitting here

23   today, you don't regret, you don't have any regret, of going

24   into the electronic Global Relay system after you received the

25   termination letter retroactive to December 21 and accessing

Su - cross - Brodsky                              5297

1    the system and looking at Retrophin information.

2    A    Again, I regret this whole situation.

3              MR. BRODSKY:  Move to strike, your Honor.  I'm

4    asking a very specific question.

5              THE COURT:  I'll strike the response and ask the

6    witness to answer specifically the question that was posed by

7    Mr. Brodsky.

8    A    Repeat the question, please.

9              MR. BRODSKY:  Would you mind reading it back.

10             (Record read.)

11   A    Regret it.

12   Q    If we look at Government Exhibit 111-45, this is your

13   March 12 e-mail.  In the last paragraph, you're demanding

14   money, correct?

15            You want $250,000 for performance fees of 2012, you

16   want a buyout for the subsequent five years, right?

17   A    That's what, I'm sorry?

18   Q    Can we put it up?

19   A    I didn't hear the last thing you said.

20   Q    You wanted a payment of $250,000 for performance fees of

21   2012 and you wanted him to buy you out of subsequent five

22   years of performance bonuses?

23   A    That related to my contract.  And if that's the numbers

24   at that time, that's the numbers.

25   Q    That's what you demanded?

Su - cross - Brodsky                          5298

1   A    According to my employment contract, yes, if it followed

2   that.

3   Q    Number two, you demanded $75,000 buyout of the remaining

4   two quarters, right?

5   A    According to my contract.

6   Q    And number three, you demanded $3,400 for unused

7   vacation, right?

8   A    According to my employment contract.

9   Q    And number four, you demanded $8,400 reimbursement for

10  healthcare insurance cost.

11  A    Yes.

12  Q    And number five, you demanded 50,000 shares of

13  free-trading, unrestricted Retrophin stock.

14  A    Yes.

15  Q    And that's because you wanted some of the Fearnow shares

16  and this is your demand for 50,000, correct?

17  A    That was one of the demands.

18  Q    Now, Mr. Kessler asked you questions on the preceding

19  paragraphs.  And in the first paragraph, you learned about

20  some of these items by going on to the system, correct, and

21  accessing information?

22  A    I don't know what I learned about every single part of it

23  or when I learned it, but --

24  Q    You testified about complete discovery.  You didn't know

25  what it was; right, you didn't remember?

1   A    Correct.

2   Q    You testified Merrill Communications had something to do

3   with forensics.  Didn't they have something to do with

4   printers?

5   A    I believe they were the forensics.  I could be wrong

6   sitting here and I could have reversed it.  I think Merrill

7   was the one doing forensic computer analysis for an SEC

8   investigation, but that could have been complete discovery or

9   co-phase.  I don't recall which company did what.

10  Q    In the third paragraph, you talk about how there was in

11  excess of $100 million and you talk about correspondence with

12  Eric Schmidt with the SEC; do you see that?

13  A    Yes.

14  Q    Do you know that in October, November of 2012 Mr. Shkreli

15  represented himself in connection with the SEC?

16  A    I don't recall.

17  Q    You saw the documentation.  You mentioned it in the

18  e-mail.

19  A    Again, I don't recall.

20  Q    You remember that it was Mr. Shkreli writing back to the

21  SEC.  Without a lawyer.

22  A    I don't recall.

23  Q    Do you know one way or the other whether Mr. Shkreli ever

24  informed Mr. Greebel in October, November 2012 there was an

25  SEC inquiry?

1   A    I wouldn't know that.

2   Q    But you knew about it, right?

3   A    The SEC inquiry?

4   Q    Yes.  You said you knew about it in October

5   November 2012.

6   A    Yes.

7   Q    You didn't tell Mr. Greebel about it.

8   A    No.

9        Was I supposed to?

10  Q    You were the chief operating officer of the MSMB entities

11  and Retrophin, right?

12  A    Yes.

13  Q    And there's an SEC request for information relating to

14  the MSMB entities, right?

15  A    There was.

16  Q    You had no involvement in how to respond, in deciding how

17  to respond to that?

18  A    Which one are we talking about specifically?

19  Q    In October, November 2012 when you're chief operating

20  officer.

21  A    For which SEC inquiry?

22  Q    There was an SEC inquiry relating to the performance of

23  MSMB, right?

24  A    Yes, from the SEC, yes.

25  Q    And it was related to MSMB, correct?

Su - cross - Brodsky                                    5301

1   A     Correct.

2   Q     It wasn't related to Retrophin.

3   A     It did not say Retrophin on it.

4   Q     And --

5   A     Sorry, can you go back to your question about my

6   involvement in it?

7   Q     Well, did you inform Mr. Aslage about it?

8   A     No.

9   Q     Did you inform Mr. Richardson?

10  A     Mr. Richardson?

11  Q     You didn't -- you don't know who Steven Richardson is?

12  A     Yes, Steven Richardson.

13  Q     He was on the board of directors of Retrophin, right?

14  A     Yes.

15  Q     And you didn't need to inform Mr. Aslage or Mr.

16  Richardson because it related to MSMB, correct?

17  A     No.

18  Q     You just didn't do it.

19  A     I just didn't do it.

20  Q     You don't know one way or the other whether you should do

21  it or shouldn't do it.

22  A     Correct.

23             I didn't think about it.  I didn't think twice about

24  it.

25  Q     But you know it was related to MSMB.

Su - cross - Brodsky                    5302

1   A    MSMB, yes.  This was from -- I assume that it was from --

2        THE COURT:  Don't assume, don't assume.

3   Q    Do you remember it was not a subpoena but it was a

4   voluntary request for information in October of 2012?

5   A    It was SEC letter, it was asking for information.  I

6   don't know what the difference would be.

7   Q    Okay.  Moving forward, you --

8        THE COURT:  Mr. Brodsky, how much more do you have?

9   Can you finish before lunch?

10       You said yesterday it was going to be an hour and a

11  half.  How much more do you have?

12       MR. BRODSKY:  Twenty minutes, fifteen minutes.

13       THE COURT:  All right.

14       Do the jurors want to hang in there for twenty

15  minutes or do you want lunch.

16       THE JUROR:  Sure, keep going.

17  Q    Mr. Su, you then launched a lawsuit against Mr. Shkreli

18  and Retrophin, right?

19  A    Does this pertain to my employment?

20  Q    Yes.

21  A    Yes.

22  Q    And in that lawsuit that you launched, eventually it goes

23  to arbitration, right?

24  A    Yes.

25  Q    And it was first in state court.  And in that lawsuit,

1   you alleged that you wanted performance fees from MSMB, right?

2   A    If that was in the suit, then it was in the suit.

3   Q    You don't remember asking for 6.8 million in management

4   fees in your lawsuit based on the fact that there were

5   $100 million in assets being managed?

6   A    I don't know what the complaint says.  But if it's in the

7   complaint, then that's what it was.

8   Q    You don't remember asking for an additional $1.7 million

9   based on the fact that you should get 25 percent of whatever

10  the management fees are?

11  A    If it's in the suit, then it's correct.

12  Q    And then in connection with arbitration, your lawyer was

13  Dan Bach, right?

14  A    Yes.

15  Q    And you say it's not your fault that Mr. Bach negotiated

16  a settlement without you knowing it, right?

17  A    Correct -- no, hold on.  Let me clarify.

18       We were going through settlement.  I didn't approve

19  a settlement or a final settlement.

20  Q    It's your lawyer's fault that he approved it, correct?

21  A    Yes.

22  Q    You're blaming your lawyer, correct, for the fact that

23  there was a settlement between you and Retrophin and

24  Mr. Shkreli, right?

25  A    Based on what he said on the e-mails, he bounded me by an

Su - cross - Brodsky                                5304

1    agreement.  He did that, yes.

2    Q    And that agreement was upheld by the arbitrator

3    eventually and meant that you were no longer the owner of

4    123,000 or so shares of Retrophin stock, correct?

5    A    126,000, yes.

6    Q    And Charles Schwab, we talked about this, sued -- you

7    said Charles Schwab sued everyone, right?

8    A    That's what I said, yes.

9    Q    That's because you in December of 2013 told -- directed

10   them to sell all the shares; correct, yes or no?

11   A    To go through the proper procedures to sell the shares

12   and sold it.

13   Q    Yes or no.  And then you ended up owing $900,000 as a

14   result -- after all that as a result of Charles Schwab's

15   lawsuit and your settlement with Charles Schwab, correct?

16   A    Yes, approximately.

17   Q    And that -- sir, is it fair to say, do you remember in

18   connection with the litigation with the arbitration that

19   Katten Muchin defended Retrophin?  Do you remember that?

20   A    Sorry, which lawsuit?

21   Q    Katten Muchin, the law firm.

22   A    Defendant who?

23   Q    Retrophin.

24   A    In which lawsuit?

25   Q    Your arbitration action.

Su - cross - Brodsky                                    5305

1   A    Yes, I do remember that.

2   Q    And you remember it was Howard Cotton and Michael Gordon

3   from Katten Muchin?

4   A    The names ring a bell, yes.

5   Q    It was not an agreement, correct?

6   A    For the employment, I don't remember.

7   Q    And then you filed suit.  After Charles Schwab filed suit

8   against you, you filed a third-party claim against, among

9   other parties, Katten Muchin, right?

10  A    Yes.

11  Q    And you wanted money from Katten Muchin, right?

12  A    I don't remember that.

13  Q    You filed a third-party claim against them, right?

14  A    Because they authorized the sale to Charles Schwab that I

15  can sell my stock.

16  Q    Let's talk about that.  I think yesterday you testified,

17  or the day before, that it was Evan Greebel who did that.  You

18  were mistaken about that, weren't you?

19  A    Katten Muchin, Evan Greebel, Evan, and Martin ran

20  Retrophin and they're the ones that say yes or no.

21       MR. BRODSKY:  Move to strike, your Honor.

22  Nonresponsive, among other things.

23       MR. KESSLER:  That was responsive.

24       THE COURT:  It does respond to your question, but

25  you're welcome to probe him further.

Su - cross - Brodsky                                    5306

1    Q    So, it's your testimony Mr. Greebel was an officer of

2    Retrophin; that's your testimony?

3    A    I didn't say he was an officer.

4    Q    He was outside counsel, right?

5    A    He was outside counsel for Retrophin.

6    Q    Right.  And after he sent you the termination letter --

7            Correct, he sent you a termination letter on behalf

8    of Retrophin?

9    A    Yes.

10   Q    -- you ended up suing Katten Muchin in 2014, correct?

11   A    I did sue Katten Muchin, yes.

12   Q    And you lost.

13   A    The lawsuit was so jumbled because of all the parties I

14   don't know if I lost.  I just know that --

15   Q    Do you remember Judge Edgardo Ramos of the Southern

16   District of New York issuing an opinion in the case?

17   A    If he did, I don't remember reading it.  And it would

18   have been handled by my lawyer.

19   Q    Mr. Su, you did not read the opinion issued by Judge

20   Ramos in connection with your lawsuit?

21   A    Sorry, no, I don't remember that.  It was summarized to

22   me by my attorney, that's very likely scenario.  But read an

23   opinion about legal terms, it's just not what I'm used to

24   doing.

25   Q    Did your lawyer summarize for you that Judge Ramos

Su - cross - Brodsky                                5307

1    criticized you --

2              MR. KESSLER:  Objection.

3              THE COURT:  Sustained.

4    Q    Did you learn that Judge Ramos criticized you --

5              MR. KESSLER:  Objection.

6    Q    From someone other than your lawyer, did you learn that

7    Judge Ramos criticized you?

8              MR. KESSLER:  Objection to the hearsay and the

9    question.

10             THE COURTROOM DEPUTY:  I'll sustain the objection on

11   hearsay grounds and, also, to the extent it may tread on

12   attorney-client communications.

13   Q    You knew Judge Ramos dismissed all your claims, sir,

14   correct?

15   A    Don't recall.  I don't know what you're referring to

16   and -- just whatever my attorney told me.

17   Q    What happened to your lawsuit against Katten Muchin?

18   A    I think they were not part of the party at some point.

19   Q    They got dismissed, correct?

20   A    I think they were was dismissed.  I can't say for sure

21   what the terminology is when they weren't part of the suit

22   anymore.

23             MR. BRODSKY:  One moment, your Honor.

24             (Pause in proceedings.)

25             MR. BRODSKY:  No further questions, your Honor.

Su - cross - Brodsky                          5308

1          THE COURT:  At this point, I'll give the jurors a

2     lunch break.  Please don't talk about the case.  Remain open

3     minded.

4          How about you come back -- we'll dismiss you today

5     at 4:30.  Can we come back by 2:20?  That's about an hour.

6     Thank you very much.

7          (Jury exits.)

8          MR. KESSLER:  Our plan, based on the idea there

9     would be an hour to hour and a half of cross, was to call

10    Sunil Jain next.  That may still be the next witness we call,

11    but I think we're looking at not starting Mr. Jain until 2:30

12    at least.  So, we need to check his travel schedule, so I just

13    want everyone to be on notice that we'll check that.

14         THE COURT:  Are you going to redirect him?

15         MR. KESSLER:  Yes, but not for that long.

16         THE COURT:  So, there might be recross and then

17    Mr. Jain and we're adjourning at 4:30.

18         MR. KESSLER:  Just because we have to now check

19    everyone's travel schedules again because of how much later

20    we'd start Mr. Jain.

21         THE COURT:  Where is he traveling from?

22         MR. KESSLER:  He came from the West Coast.  He's

23    from Chicago.  I don't know to where he's going back.

24         THE COURT:  Thank you.

25              (Luncheon recess taken.)

LAM       OCR       RPR

5309

1                      AFTERNOON SESSION

2

3           (In open court; jury not present.)

4           THE COURT:  All right.

5           MR. BRODSKY:  With respect to the court's question

6    on the length of the defense case, with the preface that we

7    obviously would ask your Honor not to promise a defense case

8    to the jury --

9           THE COURT:  Of course not.

10          MR. BRODSKY: -- we estimate five trial days and we

11   do recognize that if our client takes the witness stand then

12   that length could  -- we built in some time for that.  We

13   understand and recognize that a cross-examination of that

14   situation could go past five trial days.  But we built in some

15   time for our client to testify, with some time for

16   cross-examination, but we understand that that  -- and that

17   decision would not be made until towards the end of the

18   defense case, if we made a defense case.

19          THE COURT:  The end of the government's case?

20          MR. BRODSKY:  Certainly whether we put on a case

21   would be at the end of the government's case; whether or not

22   Mr. Greebel would testify would be a decision that he would

23   have to make at the end of our initial defense case.

24          THE COURT:  So in terms of telling the jurors when

25   they are likely to be finished, should I tell them December

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

5310

1    15?

2          MR. BRODSKY:  Five days.

3          THE COURT:  Five trial days after the government

4    anticipates resting.  They are going to rest November 27, 28.

5    We are not sitting the 29, 30 or the first and then the five

6    trial days would be the week of December 4.

7          MR. PITLUCK:  We have to build in closings and

8    deliberations, judge.  The 27th is conservative, but

9    optimistic.  We thought we would be on or done with Mr. Jane

10   by now.  It's really hard for us to predict.  I think,

11   unfortunately, December 15 is probably a pretty safe estimate.

12         Certainly at this point we don't want to give them

13   too short an estimate and have them on December 4 and December

14   8 saying this would be done and we have plans.  We have to

15   give them the likely scenario.  Closings and jury

16   deliberations with a five day case takes us to the 15th.

17         THE COURT:  I would hate unnecessarily to, one, lose

18   a juror who's employer hears that and says they can't keep

19   paying.

20         Two, tell the parties in my civil trial that is

21   supposed to start, and has already been adjourned twice, that

22   we're going to adjourn it again, if we don't have to.  I have

23   back to back criminal trials in January.  So I just wish I

24   knew better.  I don't know what to do.  I suppose  --

25         MR. BRODSKY:  Could you give them a range, your

5311

1   Honor?

2           THE COURT:  I would say right now the current

3   estimate is December 15.

4           MR. BRODSKY:  But that could change.  There's some

5   flexibility in that.

6           MR. KESSLER:  I don't think it's inappropriate to

7   let them know it might be  -- I don't know if you want to say

8   significantly  -- it could well be shorter than that.  We

9   don't want to tell them the minimum.

10          THE COURT:  I don't want to give minimums.  I

11  thought we gave the maximums before.  We told at most it would

12  go to week five.  So here we are with possibly or likely

13  another few weeks ahead of us.  I did want to call this

14  juror's employer today and I will let you know what the

15  employer says.  I don't think it's fair for the juror to be

16  here and not get paid.

17          With regard to my own trial, I have a final pretrial

18  conference coming up on Monday which they are scrambling to

19  get ready for.  I don't think it's fair for me to have them do

20  that if it's not going to be necessary or possible.  So, I may

21  reach out for them today.  But I think today then I'll tell

22  the jurors that the current estimates are December 15 and

23  we'll see where that leads us.  I don't know what else we can

24  do.

25          MR. PITLUCK:  Your Honor is correct.  We gave them

5312

1   this estimate.  They should know what we're looking at so they

2   are not questioning it.  Obviously, we can't say anything, the

3   parties.

4           MR. DUBIN:  One concern we have, and I'm sure your

5   Honor has it as well, is that it's not just going to be number

6   two now, when they hear that another two weeks.

7           THE COURT:  Of course it isn't.  It's a reality

8   whether we tell them now or later.

9           MR. DUBIN:  I agree.

10          THE COURT:  They either continue to serve or they

11  can't and certainly the juror who has not been paid, would

12  like to continue serving, but she can't afford to keep serving

13  if she's not paid.

14          MR. DUBIN:  We agree.

15          THE COURT:  Whether we tell them now or later, the

16  reality would be the same.  They are available till December

17  15 or they are not.

18          MR. PITLUCK:  Your Honor, I think you mentioned this

19  before, telling them that the week after Thanksgiving we're

20  not going to be sitting those three days may go  -- may help a

21  little bit or explain a little bit why  -- between

22  Thanksgiving and those three days why we are going

23  significantly longer.

24          THE COURT:  All right.  I will tell them that.  I'll

25  take the blame for that.  That's fine.  I don't mind doing it.

5313

1    I certainly never anticipated this was going to happen.

2            MR. DUBIN:  Do you intend to tell them at the end of

3    the day today?

4            THE COURT:  Yes.  Because I do have to reach out for

5    that juror's employer.  She is here every day not being paid.

6            MR. DUBIN:  I was unclear whether you were going to

7    do it now.

8            THE COURT:  I thought at the end of the day would be

9    fine.

10           MR. DUBIN:  So we know where to hide if there's a

11   revolt.

12           MR. PITLUCK:  4:30 today, your Honor?

13           THE COURT:  Yes, 4:30.  If the jurors are all here,

14   we'll bring them in.

15           MR. BRODSKY:  There was one issue, your Honor, I did

16   want to raise.  It's fine in front of Mr. Su.  I looked back

17   at the rough transcript.  The question I asked that prompted

18   Mr. Su I believe to say that Shkreli and Evan ran everything.

19   I believe that was nonresponsive to the question.  I was

20   asking about whether or not he had testified that Evan was

21   responsible for  -- yesterday  -- for authorizing his sales in

22   December of 2013 and when I questioned him about that he said,

23   I think, in a nonresponsive way, Martin and Evan ran

24   everything.

25           THE COURT:  He didn't say just that.  We can pull it

5314

1   out perhaps, if you have it, Mr. Brodsky.  I understand he

2   said that phrase.

3           MR. BRODSKY:  It's on the screen, your Honor.

4           THE COURT:   Put it up so everybody can see it.

5           MR. BRODSKY:  The question was:  I think yesterday

6   you testified or the day before that it was Evan Greebel who

7   did that?  That you were mistaken about that, weren't you?

8   And he said Katten Muchin, Evan Greebel, Evan an Martin ran

9   Retrophin.  They are the ones that say yes or no.

10          The question was about whether or not Evan

11  authorized the sale of his stock.  As a matter of fact, your

12  Honor, just for your information, we know it was not Evan

13  Greebel.  Everybody knows it was not Evan Greebel.  His

14  comment that Evan and Martin ran Retrophin and they are the

15  ones that say yes or no I don't believe it's responsive to the

16  question that I asked him that Evan Greebel did not authorize

17  that sale.

18          THE COURT:  I thought the sequence of the questions

19  was starting with you filed a third-party claim against them,

20  meaning Katten, right?

21          "ANSWER:  Because they authorized the sale to

22  Charles Schwab that I can sell my stock."

23          So the concept is presented by your question is the

24  filing of a third-party claim against Katten.  He's saying,

25  yes, because they authorized the sale to Charles Schwab that I

5315

1   can sell my stock.

2        "QUESTION:  Let's talk about that."  Meaning the

3   preceding subjects.

4        I think yesterday you testified -- I'm sorry --

5   let's talk about that.  I think yesterday you testified or the

6   day before that it was Evan Greebel who did that, meaning

7   authorized the sale to Charles Schwab, that I can sell my

8   stock.  You were mistaken about that, weren't you?

9        "ANSWER:  Katten, Evan Greebel -- Evan and Martin

10  ran Retrophin and they are the ones that say yes or no."

11       That was responsive to his view about who authorized

12  the sale of the stock and responsive to the question about,

13  you know, why he sued Katten.  That's the reason why I did

14  overrule the objection.  I thought it was responsive.

15  Certainly, you are free to push him on that, if you think

16  there's more or some correction.

17       MR. BRODSKY:  I understand.

18       THE COURT:  I think the context of the questions you

19  were asking had to do why he sued the Katten firm and he

20  explained it was because the Katten firm authorized the sale

21  of the stock -- I'm sorry -- authorized Schwab to allow the

22  sale of stock and then the question was whether he was

23  mistaken that Evan Greebel did that based on his prior

24  testimony and the witness said Evan and Martin.  That's why I

25  thought it was responsive even though I know it's not

5316

1    necessarily what your view is of the evidence.

2            MR. BRODSKY:  All right, your Honor.

3            THE COURT:   On recross-examination I think we

4    should allow him to probe further, even if you don't get into

5    that on redirect.

6            MR. KESSLER:  He asked the question.  He got answer

7    he doesn't like.  Katten did authorize the share transfer.

8    This was not Mr. Greebel.  It was someone else.  Mr. Greebel

9    then unauthorized it.  But Mr. Su doesn't know that, as far as

10   I know.  It's just what he said.

11           THE COURT:  What Mr. Su says is that it was Evan

12   Greebel and Martin Shkreli.  They are the ones that say yes or

13   no.  Whether Katten says yes or no, in his view, it's

14   Mr. Greebel.

15           MR. BRODSKY:   I understand, your Honor.  Thank you,

16   your Honor.

17           THE COURT:  We will get the jury.

18           MR. BRODSKY:  The part where he said they ran

19   Retrophin that I was moving to strike.  That seems

20   nonresponsive.

21           MR. KESSLER:  Why he believes.

22           THE COURT:  He's explaining his answer.  How about

23   on recross-examination you say, Mr. Greebel didn't run

24   Retrophin, did he?  I think we'll get a no, he did not.

25           MR. KESSLER:  If he wants to ask that question.

                    Su - redirect - Kessler                    5317

1          THE COURT:  I expect the witness will say he didn't

2    run it.

3          MR. KESSLER:  There was certainly plenty of

4    cross-examination after that point where he could have

5    clarified

6    JACKSON SU, resumed.

7          THE COURT:  Mr. Burke, did you get squared away with

8    your state court judge?

9          MR. BURKE:  It will work out, judge.

10         THE COURT:  Thank you.

11         I have a quick question.  Did the parties come up

12   with an acceptable briefing schedule for the post Daubert

13   hearing motions?  If so, we would like to know it.  We need to

14   schedule ourselves to give it plenty of attention.

15         MR. KESSLER:  Can we tell you at the end of the day?

16         THE COURT:  Okay.

17         (Pause.)

18         (Jury present.)

19         THE COURT:  We have all our jurors back.  Please

20   have a seat.  Mr. Su you are still under oath.  And if the

21   government would like to redirect Mr. Su they may do so.

22         MR. KESSLER:  Thank you, your Honor

23   REDIRECT EXAMINATION

24   BY MR. KESSLER:

25   Q    Mr. Su, you testified both on direct and

                ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - redirect - Kessler                          5318

1    cross-examination about a conversation you had with

2    Mr. Shkreli where he told you a plan about splitting the

3    profit of Fearnow shares that he controlled?

4    A    Yes.

5    Q    And I believe defense counsel asked you if you had told

6    Mr. Aselage about that conversation or that plan?

7    A    Yes.

8    Q    And defense counsel also asked you if you told

9    Mr. Greebel about that plan at some point?

10   A    Yes.

11   Q    Do you recall sending Evan Greebel an e-mail in June 2013

12   about Mr. Shkreli's control over the Fearnow shares?

13   A    Please, refresh my memory.

14   Q    Sure.  I'm going to show you what's been marked for

15   identification  -- it's actually in front of you up on the

16   witness stand.  There's a loose document.  It's been marked

17   for identification as Government's Exhibit 111-51?

18            Mr. Su, what I would like you to do is turn to page

19   fourteen of this document and read paragraphs 40 to 42 to

20   yourself.

21            MR. BRODSKY:  Your Honor, can we put on the record

22   what the document is?

23            MR. KESSLER:  I'm using it to refresh his

24   recollection.  I'm happy to say that.

25   Q    Mr. Su, what is the document?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - redirect - Kessler                    5319

A    Looks like the Charles Schwab lawsuit against myself,
Chun Yi George Huang, Retrophin, Inc., Standard Registrar and
Transfer Company, Inc.   So this is the Charles Schwab
complaint that I referenced earlier.

Q    Turn to page fourteen and read paragraphs 40 to 42 to
yourself?

     (Pause.)

Q    Does reading those two paragraphs refresh your
recollection about whether you sent Mr. Greebel an e-mail in
June of 2013 about control of the Fearnow stock?

A    Yes.

Q    Did you send Mr. Greebel an e-mail in June of 2103 about
Mr. Shkreli's -- strike that.

     Did you send Mr. Greebel an e-mail in June 2013
about your belief of Mr. Shkreli's control of Fearnow stock?

A    Yes.

Q    And just focusing on what you told Mr. Greebel about that
subject, what did you tell Mr. Greebel about Mr. Shkreli's
control of Fearnow stock?

A    I said Martin distributes shares to his friends and had
control of those shares and that control of Fearnow stock as
facilitated by Evan's firm.

Q    Let's move to another topic?

     You were shown an e-mail Defendant's Exhibit 111-57,
but we don't have to put it up, where there was assignments

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - redirect - Kessler                                    5320

1   given for various tasks and then either Katten Muchin or

2   Citrin Cooperman was listed next no those tasks.

3   A    Yes.

4   Q    You remember that e-mail?

5   A    Yes.

6   Q    Did those assignments reflect your view of the legal

7   responsibilities that those various third party service

8   providers had with respect to those various tasks?

9             MR. BRODSKY:  Objection to the form.

10            THE COURT:  Try to rephrase it, Mr. Kessler.

11            MR. KESSLER:  Sure.

12  Q    When you put those names next to the various tasks, what

13  was your intention?

14  A    To match up the responsibilities that each firm had

15  according to the description of the tasks.

16  Q    And those were -- sorry.  Responsibilities for what?

17  A    Whatever the task asked for in that description.

18  Q    For completing the tasks?

19  A    For completing the task.

20  Q    Then if you recall one of entries related to financial

21  statements and footnotes?

22  A    Yes.

23  Q    And I believe that Citrin Cooperman firm was next to that

24  task?

25  A    Yes.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - redirect - Kessler                                 5321

1   Q    And you started to explain your experience about the role

2   of attorneys and footnotes in financial statements; do you

3   recall that?

4   A    Yes.

5   Q    So what was the view you were trying to give?

6            MR. BRODSKY:  Objection, your Honor.

7            THE COURT:  This is something he started to say?

8   You're referring to his list testimony on cross-examination?

9            MR. KESSLER:  He got about halfway through that.

10           MR. BRODSKY:  If you look at the question, your

11  Honor, it's asking for experience as opposed to  --

12           THE COURT:  Do you want to just rephrase the

13  question then, Mr. Kessler, with reference to that prior

14  testimony?

15  Q    Do you recall that you did not put the Katten law firm's

16  name next to that task?

17  A    Yes.

18  Q    Is that because you believe that a law firm plays no role

19  in the footnotes in the financial statement?

20  A    No.

21  Q    Now, you were asked a number of questions by defense

22  counsel about your requests for money; do you remember that?

23  A    Yes.

24  Q    You were shown various documents and asked whether you

25  were asking for money?

Su - redirect - Kessler                           5322

1    A     Yes.

2    Q     At the time you stopped working for Retrophin did you

3    believe you were owed compensation pursuant to your employment

4    agreement?

5    A     Yes.

6    Q     And at the time you left -- strike that.  At the time you

7    stopped working for Retrophin in December 2012 did you believe

8    you were entitled to certain incentive payments pursuant to

9    your employment contract?

10   A     Yes.

11   Q     Do you believe there's anything wrong with asking for

12   money you believe you are owed pursuant to a contract?

13   A     No.

14   Q     You were asked a couple of questions about what you told

15   the SEC in May of 2012.  Do you remember that?

16   A     Yes.

17   Q     And some of those questions related to your statement

18   that Mr. Shkreli  -- I'm paraphrasing  -- could do what he

19   wanted with the monies for Retrophin LLC?

20   A     Yes.

21   Q     Was that statement that you made related to Retrophin

22   LLC?

23   A     Yes.

24   Q     And Retrophin LLC became Retrophin Inc. in September

25   2012?

1    A    Yes.

2    Q    And was the note reclassification you testified about

3    after September 2012?

4    A    Yes.

5    Q    You were also asked a couple of questions about which

6    organization was an umbrella for which other legal entities.

7    Do you remember that?

8    A    Yes.

9    Q    You have open in front of you a transcript from a prior

10   proceeding.  Just right in front of you.  I would like you to

11   turn to page 2136.  It may be open in front of you already.

12   Do you see that?

13   A    Yes.

14   Q    Starting on line 13, I want you to tell me if I'm reading

15   this correctly:

16        "QUESTION:   Just to be clear, you perceived MSMB

17   Capital to be the umbrella firm and then there were entities

18   underneath it?

19        "ANSWER:   Correct.

20        "QUESTION:   And the entities were the funds that we

21   discussed?

22        "ANSWER:  Correct.

23        "QUESTION:   And that was separate from Retrophin,

24   correct?

25        "ANSWER:   Correct."

Su - redirect - Kessler                           5324

1              Mr. Su, did I read that correctly.

2    A    Yes.

3    Q    Was that your testimony in the prior proceeding?

4    A    Yes.

5    Q    If we could put up Government's Exhibit -- strike that.

6              If I could have the Elmo, I'll show you what I

7    believe is in evidence as Defense Exhibit 111-1.  This is the

8    Tuesday, December 4 e-mail that you sent to Mr. Aselage at

9    12:04 a.m.

10             Do you remember this?

11   A    Yes.

12   Q    And you were asked some questions about this third

13   paragraph?

14   A    Yes.

15   Q    Was it your role to communicate with the financial firms

16   that were considering investing in Retrophin?

17   A    No.

18   Q    Do you see in the second sentence of this paragraph

19   there's a he  -- representing Mr. Greebel  -- he said he

20   represented to the investor attorney that there was no one

21   that would get paid from the money raised.

22             Do you see that?

23   A    Yes.

24   Q    Represented just means said, right?

25   A    That's what I understand it to be.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - redirect - Kessler                            5325

1    Q     Was it your understanding that Mr. Greebel was talking to

2    the investors?

3    A     Yes.

4    Q     Now, in the context of this e-mail  --

5              MR. BRODSKY:  Your Honor, objection.  I think

6    Mr. Kessler misspoke.  He said investors as opposed to

7    investor attorney.

8              MR. KESSLER:  Let me ask the question again so the

9    record is clear.

10   Q     Mr. Su was it your understanding that Mr. Greebel was

11   speaking to the attorneys for the investors considering

12   investing in Retrophin?

13   A     Yes.

14   Q     In the context of this e-mail, you were also asked some

15   questions about your testimony relating to two conversations

16   you had with Mr. Greebel about the nine hundred thousand

17   dollar note.

18              Do you remember that.

19   A     Yes.

20   Q     And I believe your testimony was that in the second

21   conversation Mr. Greebel said  -- and I'm paraphrasing  --

22   that the note was okay, something like that?

23   A     Yes.

24   Q     And you were asked whether you had written that in an

25   e-mail or a document to anyone?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - redirect - Kessler                    5326

1  A    Correct.

2  Q    If we can switch to the government laptop, I would like

3  to show you what's been marked for identification as

4  Government's Exhibit 111-32.

5           THE COURT:  Can I just be clear?  Are you talking

6  about the nine hundred thousand dollar note?

7           MR. KESSLER:  Nine hundred thousand dollar note.

8           THE COURT:  Okay.

9           MR. KESSLER:  The reclassified investment.

10           THE COURT:  Between MSMB and Retrophin?

11           MR. KESSLER:  Yes.  MSMB Healthcare.

12  Q    Mr. Su, I'm showing you what's been marked for

13  identification as Government's Exhibit 111-32.  Do you see

14  that?

15  A    Yes.

16  Q    This is an e-mail chain that culminates with your e-mail

17  to Mr. Aselage on December 4, 2012.

18           Do you see that.

19  A    Yes.

20  Q    And the time of this e-mail is 2:58 p.m.?

21  A    Yes.

22  Q    After the e-mail we just looked at?

23  A    Yes.

24  Q    And if you look in the first e-mail there's a series of

25  dots.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Su - redirect - Kessler                              5327

1              Do you see that.

2    A    Yes.

3    Q    Below those dots do you include a description of a

4    conversation you had with Mr. Greebel about the nine hundred K

5    note, nine hundred thousand dollar note?

6    A    Yes.

7              MR. KESSLER:  I offer Government's Exhibit 111-32.

8              MR. BRODSKY:  No objection, your Honor.

9              THE COURT:  We receive Government's Exhibit 111-32

10   in evidence.

11             (So marked.)

12   Q    Mr. Su, this e-mail actually reflects two conversations

13   you had with Mr. Greebel, is that right?

14   A    Yes.

15   Q    And the second conversation reflected in this e-mail is

16   below that dotted lines, is that right?

17   A    Yes.

18   Q    Could you read that paragraph right below the dotted

19   line?

20   A    Sorry.  Giving you a real time play by play.  Evan just

21   called back and now says whatever amount was paid to Katten

22   and there's a discrepancy should be marked against the nine

23   hundred thousand dollar note.  He said similarly situation for

24   the rent as he and Martin discussed where Retrophin has been

25   paying MSMB's rent.  Too many games.  I can't keep track.

Su - redirect - Kessler                                   5328

1    Call to discuss and walk through above.

2    Q    Do you understand what marked against the nine hundred

3    thousand dollar note means?

4    A    To true up against that or to offset.

5    Q    So Retrophin owes $900,000, MSMB owes some amount of

6    money to Retrophin, and you kind of somewhat cancel the debt

7    out?

8    A    Yes.

9              THE COURT:  You apply credits?

10             MR. KESSLER:  Yes.

11             THE COURT:  They are not cancelled, are they?

12             MR. KESSLER:  Right.  One is reduced by the other.

13             THE COURT:  Why don't you ask the question.

14   Q    If you scroll up, you see this top conversation refers to

15   how much, the size of the invoicing that Retrophin's received

16   for work from Katten Muchin?

17   A    Yes.

18   Q    So about how much money did Retrophin get billed for work

19   from Katten according to this e-mail, did Retrophin owe

20   Katten?

21   A    The total invoice was six hundred fifty thousand dollars

22   according to this e-mail.

23   Q    And then you wrote in the next sentence, I pointed out

24   there was a huge difference in what Retrophin Inc. paid,

25   700,000, versus what we were credited for.  Evan responded

Su - redirect - Kessler                    5329

1   "that's a whole completely different matter,"  which he

2   didn't want to get into.

3           Do you see that?

4   A    Yes.

5   Q    Is it your understanding that Retrophin had paid more

6   money to Katten than it had been billed?

7   A    Yes.

8   Q    How does that relate to the nine hundred thousand dollar

9   note discussion below?

10  A    So, anything that Retrophin paid, that was not their

11  obligation to pay, would be offset by money that Retrophin

12  owed under the note to MSMB Healthcare.

13  Q    So if Retrophin had paid $50,000 more than it owed, then

14  the nine hundred thousand dollar note you subtract $50,000,

15  right?

16  A    Yes.

17  Q    So Retrophin would end up owing less money?

18  A    Yes.

19           (Continued on next page.)

20

21

22

23

24

25

Su - redirect - Kessler                          5330

1   BY MR. KESSLER:   (Continued)

2   Q    Okay.  All right.  We can put that document aside.

3          Finally, you were asked, I think, the first thing

4   this morning about a series of share transfer documents.  Do

5   you remember that?

6   A    Yes.

7   Q    If we can switch back to the ELMO, please, for a minute.

8          So, this I'm showing you is Defense

9   Exhibit 111-131-1 in evidence.  This is the e-mail attaching

10  those share transfer agreements, Mr. Su?

11  A    Yes.

12  Q    So the bottom e-mail is from Mr. Greebel to Mr. Biestek

13  with the subject, Purchase Agreements?

14  A    Yes.

15  Q    Is anyone else on that e-mail?

16  A    No.

17  Q    Then the top e-mail is from Mr. Biestek back to

18  Mr. Greebel approximately nine hours later?

19  A    Yes.

20  Q    Is anyone else on that e-mail?

21  A    No.

22  Q    And there are a number of share transfer agreements

23  attached, is that right?

24  A    Yes.

25  Q    Is it fair to say that except for the names and the

CMH      OCR      RMR      CRR      FCRR

Su - redirect - Kessler                    5331

1   amounts of shares, the purchase agreements are the same?

2   A    Yes.

3   Q    So let's just take a look at one.

4             So, I'm showing you what's in evidence as Defense

5   Exhibit 111-134.  Do you see that?

6   A    Yes.

7   Q    And the purchase agreement in the first paragraph is

8   between Troy Fearnow and Timothy Pierotti?

9   A    Yes.

10  Q    Is Retrophin mentioned anywhere in this document?

11  A    No.

12  Q    Is Martin Shkreli mentioned anywhere in this document?

13  A    No.

14  Q    Is MSMB Capital Management LLC or LP mentioned anywhere

15  in this document?

16  A    No.

17  Q    Is any MSMB fund mentioned in this document?

18  A    No.

19  Q    Can you read the words that are in the upper right-hand

20  corner of this document on the first page?

21  A    Katten Draft 12/7/12.

22            MR. KESSLER:  One minute, Your Honor.

23            (Pause.)

24            MR. KESSLER:  No further questions.

25

CMH      OCR      RMR      CRR      FCRR

1    RECROSS-EXAMINATION

2    BY MR. BRODSKY:

3    Q    Just on the e-mail we were looking at, Mr. Su, 111-32 in

4    evidence, Government Exhibit 111-32 -- yes, 111-32.  I think

5    it's in evidence now.  If we don't have an electronic copy,

6    that's fine.

7            Mr. Su, it's the e-mail you sent about the two

8    conversations with Evan Greebel, right?

9    A    Yes.

10   Q    This is on December 4th.  So there are two more

11   conversations that you had with Mr. Greebel?

12   A    Are you referring to these two?

13   Q    Yes.  These are two additional conversations?

14           You testified about a conversation where you called

15   Mr. Greebel and you talked to him about the $900,000 note but

16   he wouldn't talk to you, right?  That's one?

17   A    Yes.

18   Q    Then you talked to him in connection with the

19   December 3rd e-mail that we looked up where you were e-mailing

20   Mr. Aselage and you said it didn't seem like he knew about it,

21   right?

22   A    Yes.

23   Q    That was December 3rd.

24   A    Okay.

25   Q    And now we've got another conversation on December 4th?

Su - recross - Brodsky                    5333

1    A    Yes.

2    Q    That would be the third conversation.  Then we have a

3    fourth conversation down here about Evan called back and now

4    says, Whatever amount was paid to Katten and there's a

5    discrepancy, mark it against the note, right?

6    A    Yes.

7    Q    Now, Mr. Aselage and Mr. Shkreli didn't mark it against

8    the note, right?  They didn't end up doing that?

9    A    I don't recall.

10   Q    Had they marked it against the note, Retrophin would have

11   paid less money out, correct?

12   A    Retrophin would have paid less money to --

13   Q    Well, you know Retrophin ended up paying the $900,000

14   plus 12 percent interest?

15   A    To MSMB Healthcare?

16   Q    Yes.  It's the $900,000 note.

17   A    Are you asking if I know that?

18   Q    Yes.  Do you know that?

19         Do you know one way or the other --

20   A    I don't.

21   Q    -- whether Retrophin ended up paying the $900,000 plus

22   12 percent interest which was more money than they would have

23   paid had they offset the note?

24         MR. KESSLER:  Objection to the form.

25         THE COURT:  Try to break it down, Mr. Brodsky.

Su - recross - Brodsky                    5334

1   Q    Do you know one way or the other whether Mr. Shkreli and

2   Mr. Aselage had taken, Mr. Aselage or Mr. Shkreli had taken

3   Mr. Greebel's advice about marking off the note, Retrophin

4   would have ended up paying less money out on the note?

5   A    I don't know.

6   Q    Okay.  And then you testified with respect to the

7   complaint Charles Schwab filed and it refreshed your

8   recollection about what you told Mr. Greebel in an e-mail

9   communication in June of 2013.  Do you remember that just a

10  few minutes ago?

11  A    Yes.

12  Q    Now, sir, look at that paragraph, again, on 42 on page 14

13  of the Charles Schwab complaint.  Do you have that?

14  A    Yes.  Sorry.  What page was it?

15  Q    It's on page 14, paragraph 42.

16  A    Yes.

17  Q    And you read it closely, right?  Your e-mail, right?  A

18  portion of it?

19  A    Yes.

20  Q    Okay.  Now put it aside.

21       You were complaining, were you not, that if, if you

22  said to Mr. Greebel your stock was, in fact, restricted for

23  12 months and you couldn't sell your shares of Retrophin, then

24  you thought it was really unfair that those who had received

25  the opportunity to buy Fearnow shares were allowed to sell it

Su - recross - Brodsky                    5335

1    first?

2    A    I'm sorry.  What was the question?

3              MR. BRODSKY:  Would the court reporter read back the

4    question, please.

5              (Record read.)

6    A    Yes, I complained about that.

7    Q    And you knew, sir, that some of the people who had

8    received the opportunity to buy Fearnow shares were selling

9    their shares, correct?

10   A    Yes.

11   Q    You knew Andy Vaino, for example, was selling his shares

12   that he received as early as December 2012, correct?

13             MR. KESSLER:  Objection.  Beyond the scope and

14   hearsay.

15             THE COURT:  I'm going to allow the question but I

16   want it rephrased.

17   Q    Mr. Su?

18             MR. BRODSKY:  I'm sorry.  You want it rephrased,

19   Your Honor?

20             THE COURT:  Yes.

21             MR. BRODSKY:  I'm sorry.  I didn't hear.

22   Q    Mr. Su, your complaint was that some people, in June of

23   2013, to Mr. Greebel, were selling their freely tradable

24   shares that they had purchased from Troy Fearnow, right?

25   A    My complaint was that I --

Su - recross - Brodsky                5336

Q     Yes or no, sir.  Yes or no, Mr. Su.

A     No.

Q     Your complaint was that if your stock was restricted for
12 months, then you felt that the people who were able to buy
Fearnow freely tradable shares and sell them, it would be
unfair?

A     Yes.

Q     Correct?

      So, you understood, sir, that some of the people
that received the Fearnow shares, who bought them, were
selling their shares, right?

A     They were selling their shares.

Q     And two of the people that were selling their shares that
you knew of were Andy Vaino and Tim Pierotti?

A     I don't recall Andy Vaino.  I think I learned at some
point that Tim Pierotti was selling shares but I don't recall
Andy Vaino.

Q     Okay.  Now, that was the Charles Schwab complaint, right,
that they just showed you, correct?

A     Yes.

      MR. BRODSKY:  May I approach, Your Honor?

      THE COURT:  Yes.

Q     Let me show you Judge Ramos' opinion and order, DX 11-108
for identification, and this is dated, this is the opinion and
order by Judge Ramos.  Do you see it?

CMH        OCR        RMR        CRR        FCRR

```
                    Su - recross - Brodsky                    5337
```

1  A     Yes.

2  Q     And Mr. Kessler showed you the Charles Schwab complaint,

3  right, before Judge Ramos just a few short minutes ago?

4  A     Yes.

5            (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Side Bar                                        5338

1   Q    And this is before you the opinion of Judge Ramos in that

2   case, correct?

3             MR. KESSLER:  Can we have a sidebar?

4             THE COURT:  We will have a sidebar.

5             One moment, please.

6             (The following occurred at side bar.)

7             MR. KESSLER:  Your Honor, so I showed the witness a

8   document to refresh his recollection about an e-mail he sent.

9   I only identified the document because Mr. Brodsky asked me to

10  identify what the document was.  I didn't ask any questions

11  about the Charles Schwab litigation.

12            So, showing the witness an opinion and order in

13  another litigation clearly to ask him questions about what's

14  in the opinion and order is beyond the scope and it's also

15  going to implicate the hearsay concerns we had with the

16  Rosenfeld arbitration because obviously Judge Ramos' opinion,

17  his conclusions about Mr. Su's credibility, the validity of

18  his claims, the facts related to the Fearnow share transfers,

19  that's all inadmissible hearsay.

20            THE COURT:  What are you -- are you going to be

21  trying to read in part of this decision?

22            MR. BRODSKY:  No.

23            MS. SMITH:  But the document, in general, should

24  not -- I mean, use the document to refresh recollection.  You

25  can identify it by government number without identifying what

CMH      OCR      RMR      CRR      FCRR

Side Bar                                           5339

1   the number is.  In fact, often it's inappropriate to identify

2   what the document is depending on what it is, for example,

3   Mr. Shkreli's trial transcript.  You can refresh with

4   anything, a piece of paper, and, you know, the idea that the

5   name of what the document was is now in the record.

6             Because Mr. Brodsky made a request and, frankly,

7   there was no reason to put the name in, does not then let him

8   use that as a jumping off point to do a recross on something

9   that's completely unrelated as to why the document was being

10  used to refresh or the questions that were asked in connection

11  with the process of refreshing recollection which were the

12  questions about whether or not Mr. Su ever told Mr. Greebel

13  about his concern with Martin controlling the Fearnow shares

14  in writing because that was a question he got on

15  cross-examination.

16            This is incredibly far afield from that, has nothing

17  do with those questions, and unless there's something in this

18  opinion that he's going to use to refresh his recollection

19  about conversations with Mr. Greebel about Fearnow shares,

20  it's beyond the scope.

21            MR. BRODSKY:  Your Honor?

22            THE COURT:  Is there something in here on that

23  subject?

24            MR. BRODSKY:  Well, first, Your Honor, respectfully

25  for the government, I think they're incorrect.  I think you

CMH      OCR      RMR      CRR      FCRR

Side Bar                                              5340

1   have to identify the document and show it to the witness, at a

2   minimum, for the appellate record and you can't -- you can

3   show a piece of paper to the witness to refresh recollection,

4   you can show 3500 material, you can show any exhibit, but my

5   understanding is under the rules of evidence, you have to

6   identify the document.  The jury has a right to know what's

7   refreshing the recollection.

8          Second, I haven't started asking questions, but what

9   I was going to do is the government introduced to Mister -- I

10  didn't, Mr. Kessler introduced to Mr. Su the Charles Schwab

11  complaint asking him if this portion, paragraph 42 of the

12  complaint, refreshed a recollection about Mr. Su's e-mail to

13  Mr. Greebel.

14         THE COURT:  Because it's referring to Mr. Su's

15  e-mail --

16         MR. BRODSKY:  Right.

17         THE COURT:  -- to Mr. Greebel.  So, it's Mr. Su's

18  own statement that's being used.  You can't use Judge Ramos'

19  statements to, you know, confront the witness about the

20  statement.

21         MR. BRODSKY:  I can use it to refresh recollection

22  just in the same way I used the Charles Schwab --

23         THE COURT:  About what though, about what he told

24  Mr. Greebel?

25         MR. BRODSKY:  Well, Your Honor --

Side Bar                                              5341

1          THE COURT:  Because --

2          MR. BRODSKY:  -- those go to credibility, that

3    Mr. Su is using the Charles Schwab complaint to refresh his

4    recollection about something.

5          THE COURT:  About whether he sent an e-mail to

6    Mr. Greebel about a certain subject.

7          MR. BRODSKY:  Correct.  And I'm entitled to show

8    that he, it's his proposition, he didn't read the complaint

9    which I'm about to say and he didn't read Judge Ramos'

10   decision.

11         MR. KESSLER:  None of that has anything to do with

12   the questions that were asked about the e-mail.  If there is

13   something in the Judge Ramos opinion that says the e-mail

14   wasn't sent or that it says something different, that might

15   theoretically go to Mr. Su's credibility, but we're not

16   hearing that there's anything like that in this document and

17   I'm certainly not aware of it.

18         MS. SMITH:  And he tried this on the cross.  This is

19   just an attempt to go back into that area.  It's not

20   appropriate for recross.

21         THE COURT:  Well, did Judge Ramos make any findings

22   about that particular e-mail statement by Mr. Su --

23         MR. BRODSKY:  Yes.

24         THE COURT:  -- and say it was invalid?

25         MR. BRODSKY:  Yes.

Side Bar                                    5342

1          THE COURT:  What page, please?

2          MR. BRODSKY:  It's on page six.  He said that the

3     claims by Mr. Su were -- he talks about how Su and Huang

4     allege that the stock transfer order as to Su's shares had not

5     been put in place prior to December 13th, the day Schwab was

6     told Su's shares were freely transferred but that,

7     nonetheless, Retrophin falsely informed Standard that the stop

8     transfer order on Su's shares had been put in place and then

9     he says what the allegations are.

10          He says -- he goes on to say, none of this has

11     clarified the timing of the stop transfer order, the reason

12     Schwab was not told of its existence, and he goes on to say,

13     In any event, what they did was, he goes on to say,

14     inexplicably, although -- in addition, although this

15     allegation is inexplicably absent from the complaint, he's

16     laying the ground work for his finding that they, they omitted

17     information to the court about their third-party counterclaim.

18          MR. KESSLER:  So, the record should now be clear

19     that there is nothing in this document about the June 30, 2013

20     e-mail.

21          MS. SMITH:  This has nothing to do with Mr. Su's

22     employment agreement, whether or not the shares were there.  I

23     mean, not to mention whether it was or was not included in the

24     complaint is not necessarily this witness's decision as

25     opposed to his lawyers.  Even if this was a fair area for

Side Bar                              5343

1    cross, it is not a fair area for recross.

2            MR. BRODSKY:  It seems to be a tradition here to be

3    blaming lawyers with Mr. Su but, Your Honor, I haven't been

4    able to give a chance to ask a question about Judge Ramos'

5    decision and I should be given a chance to ask a question in

6    connection with the document that they showed to him.

7            MR. KESSLER:  Your Honor, respectfully, nothing has

8    been proffered here that suggests any question related to

9    Judge Ramos' opinion would be proper.  There is nothing about

10   the single thing -- let me put it this way.

11           If I had shown Mr. Su the e-mail instead of the

12   excerpt of the e-mail from the Charles Schwab complaint, we

13   just didn't have the e-mail, this would obviously be improper.

14   So the only difference is that the document used is a

15   different document.  I identified it as Government

16   Exhibit 111-51.  So, the appellate record is perfectly

17   preserved even without calling it the Charles Schwab

18   complaint.  I only identified it as the Charles Schwab

19   complaint because Mr. Brodsky asked me to.  That's it.

20           There's nothing in the record, on the redirect,

21   nothing related to the Ramos decision, the stop transfer

22   order, December 2013, the validity of Mr. Su's claims.  All I

23   did was ask him about a June 2013 document and use a document

24   to refresh his recollection.

25           MS. SMITH:  Not to mention it's for a different

CMH      OCR      RMR      CRR      FCRR

Side Bar                                    5344

1   litigation although -- it's not even the Charles Schwab

2   litigation.

3           THE COURT:  The complaint?

4           MS. SMITH:  The Ramos, yes.

5           THE COURT:  All right.  Look, I don't think that it

6   fairly addresses or calls into question the refreshed

7   recollection of an e-mail that he sent that is quoted in that

8   complaint.  It was used to refresh his recollection as to

9   whether he had ever told the recipient of the e-mail certain

10  things and unless Judge Ramos made a specific finding about

11  that e-mail and its relevance to, and explains why it's

12  relevant to his decision to dismiss Mr. Su and Mr. Huang's

13  claim, I don't think it really addresses the point that the

14  government brought out on redirect which is you were

15  confronted and asked whether you ever told Mr. Greebel certain

16  facts, you didn't remember, he was then rushed, the e-mail

17  was, that he wrote was discussed in his testimony this

18  afternoon and the opinion of Judge Ramos is not really

19  directed to that point.

20          So, respectfully, I will not allow you to confront

21  Mr. Su with other parts of this opinion that may bear on Judge

22  Ramos' view of the claims themselves.

23          MR. BRODSKY:  Okay.

24          THE COURT:  Okay.

25          MR. BRODSKY:  Your Honor, specifically challenging

Side Bar                                          5345

1   then using the same document on paragraph 42 of the Charles

2   Schwab complaint going directly to Mr. Su's e-mail exchange

3   with June 2013, I was going to elicit whether or not it

4   refreshes his recollection that Charles Schwab stated in the

5   same, at the same time that Su's representations that

6   Retrophin shares were freely tradable were false.

7           MR. KESSLER:  That has nothing do with the question

8   that was asked.

9           MR. BRODSKY:  It goes directly to the e-mail.

10          MS. SMITH:  It's hearsay.

11          THE COURT:  It's an allegation by -- it's an

12  allegation.  You know, again, this is about refreshing what he

13  did, what he said on a given day.  That's a quote from the

14  e-mail that he sent.

15          MR. BRODSKY:  Okay.  Thank you, Your Honor.

16          THE COURT:  All right.

17          (Side bar conference ends.)

18          (Continued on next page.)

19

20

21

22

23

24

25

Su - recross - Brodsky                    5346

1    BY MR. BRODSKY:

2    Q    Mr. Su, by the time of June 2013, you had already

3    attempted to sell your shares -- you were trying to sell your

4    shares of Retrophin stock, right?

5    A    Yes.

6    Q    And so you tried in June of 2013 and you failed, correct?

7    A    I was told no because the restriction period was

8    12 months instead of 6.

9    Q    And then you ended up -- you were in litigation against

10   Retrophin and Mr. Shkreli and that's when your lawyer, without

11   you knowing, reached a settlement?

12             MR. KESSLER:  Objection.  Beyond the scope of the

13   redirect.

14             THE COURT:  Sustained.

15   Q    And your complaint on the Fearnow shares in June of 2013

16   was, once again, related to your disappointment about not

17   getting your own opportunity to buy Fearnow shares, right?

18   A    No.

19             MR. BRODSKY:  Can we put up Government

20   Exhibit -- yes, Government Exhibit 682-B.

21   Q    When you wrote this e-mail in Government Exhibit 682 --

22             MR. BRODSKY:  Can we scroll up a little bit,

23   Mr. Carter?

24   Q    When you wrote this e-mail on March 5, 2013, you ended it

25   with a PS:  PS, I was very disappointed you went against my

CMH      OCR      RMR      CRR      FCRR

1    recommendation by trusting and giving Tim help and all the

2    shares over me.

3            You said that, right, Mr. Su?

4    A    Yes.

5            (Continued on next page.)

5348

1          MR. BRODSKY:  No further questions, Your Honor.

2          THE COURT:  Any redirect?

3          MR. KESSLER:  No, thank you.

4          THE COURT:  All right.  Mr. Su, you are excused.

5    Thank you.  Have a safe trip back to Texas.

6          THE WITNESS:  Thank you.

7          (Witness excused.)

8          THE COURT:  Is the government prepared to call its

9    next witness?

10         MR. KESSLER:  Yes.  The government calls Sunil Jain

11   and we ask the Court's permission for just a minute or two.

12         THE COURT:  Sure.

13         If any juror needs a break, now is a good time while

14   they're shuffling exhibits.  Is everyone all right?

15         Okay.

16         Hello, sir.  Step up to the witness stand, please.

17         THE CLERK:  Raise your right hand.

18         (Witness sworn.)

19         THE CLERK:  Please have a seat and please state and

20   spell your full name.

21         THE WITNESS:  Sunil Jain, S-U-N-I-L, J-A-I-N.

22         THE COURT:  Thank you.  Please proceed, Mr. Kessler.

23   SUNIL  JAIN      ,

24      called as a witness, having been first duly sworn,

25      was examined and testified as follows:

Jain - direct - Kessler                              5349

1    DIRECT EXAMINATION

2    BY MR. KESSLER:

3    Q     Good afternoon, Mr. Jain.

4    A     Good afternoon.

5    Q     Where do you work?

6    A     Marcum LLP.

7    Q     Marcum LLP?

8    A     Yes.

9    Q     Is that an accounting firm?

10   A     Yes.

11   Q     What is your current title at Marcum LLP?

12   A     Partner.

13   Q     Can you briefly describe your education for us?

14   A     I'm a qualified charter accountant from India and

15   Bachelor's degree in accounting and CPA.

16   Q     And can you also describe your career history for us?

17   A     I started my career with an Indian charter accountancy

18   firm in 1991.  And after working for about a couple of years

19   over there, I went into emerging banking organization in India

20   and I've worked for about five, six years over there.  And

21   then I moved down to the United States and started working

22   with a small public accounting firm for about four, five years

23   and then I joined the Marcum in 2004.  And since then, I'm

24   with the Marcum.

25   Q     Do you have any experience with auditing?

Jain - direct - Kessler                    5350

1    A    Yes, sir.

2    Q    What is auditing?

3    A    Auditing is a, providing kind of assurances of, like,

4    whether the financial statements are reasonable or not on to

5    the company's prepared financial statement.

6    Q    You review the financial statements of a company and

7    determine if they're accurate?

8    A    We review and audit the account statement to ensure there

9    are no material statement into the bank statement and they are

10   prepared in accordance with the GAAP.

11   Q    What is GAAP?

12   A    General accepted accounting principles in the United

13   States.

14   Q    GAAP?

15   A    Correct.

16   Q    Are those the rules that govern the way companies account

17   for things in their financial statements?

18   A    Yes.

19   Q    How many audits have you participated in in your career?

20   A    I cannot recount the numbers but, you know, plenty.

21            THE COURT:  Can you give us an estimate?

22            THE WITNESS:  I would say about 40, around 40, 50.

23   Q    Now, in January 2011, was Marcum engaged as an auditor

24   for a company called Retrophin?

25   A    Correct.

1   Q      And what kind of company was Retrophin at that time?

2   A      That was a startup company.  That was a startup LLC at

3   that time and wanted to go public.  They were into research

4   and development of certain drugs and, I mean, this is what my

5   understanding is at that time.

6              (Continued on next page.)

Jain - direct - Kessler                    5352

1  BY MR. KESSLER:

2  Q     And I believe I misspoke.  Were you engaged in January

3  2012?

4  A     Correct.

5  Q     And so what was the scope of that initial engagement?

6  A     To perform the audit of the financial statements for the

7  period from inception to December 31, 2011.

8  Q     Do you have an understanding why you were being asked to

9  audit those financial statements?

10  A     As I was mentioning that the company was about to go

11  public and the company's required to file an 8-K and an 8-K is

12  an audited financial statement required to be filed with the

13  SEC.

14  Q     Now, did you participate in the audit of Retrophin's

15  financial statements for the fiscal year 2011?

16  A     That's right.

17  Q     Can you briefly describe how the auditing process worked?

18  A     So in performing the audit procedures we performed

19  certain test procedures on account balances based on

20  supporting corroborative evidence.  We do make an

21  understanding of the company's internal controls and based on

22  that then  -- based on our test performance of those numbers

23  we provided assurance on the audit of the financial

24  statements.

25  Q     And in working on the audit of Retrophin's fiscal 2011

Jain - direct - Kessler                    5353

1  year end financial statements, did you interact with Martin

2  Shkreli from time to time?

3  A    My interaction with Martin Shkreli during the 2011 audit

4  was very limited, maybe asking for certain documentations for

5  my audit purposes and maybe that was through the company's

6  consultant or at that time the accountant was there.

7  Q    Can you describe the team that participated in this audit

8  for Marcum?

9  A    It was consisting of Ed Hackert, who was my engagement

10  partner, the quality control partner was John Rushford.  Then

11  I was a manager on the job.  Underneath me Andrew Kleeman, he

12  was a staff and Maria Challet, she was the supervisor on the

13  engagement.

14  Q    Did you interact with Evan Greebel at all during the

15  audit for the 2011 fiscal financials?

16  A    I don't recall that.

17  Q    Did you interact with him and the any point in time?

18  A    My requirement of the documents was through the e-mails

19  and not generally with him.

20  Q    As part of the process of auditing financial statements,

21  is it standard practice to seek certain representations from

22  law firms that have done work for the company?

23  A    When we perform the audit procedures we generally at the

24  beginning of the audit procedures we ask the law firm to

25  provide us certain confirmations which relates to asking them

1   if they were aware of any pending or threatening litigations.

2         We also ask in our confirmations how much the

3   company owes you.  These are kind of our standard confirmation

4   letters we send to them.

5   Q    You asked each law firm if there are pending or

6   threatened litigations?

7   A    Yes.

8   Q    And also the outstanding balances?

9   A    Correct.

10  Q    I would like to show you what has been marked as

11  Government's Exhibit 124-1 for identification.  So you have a

12  binder in front of you.  If you turn to tab one, you should

13  find Government's Exhibit 124-1.  There's also a screen that

14  you can look at.

15  A    Hmm.

16  Q    Mr. Jain, this a letter dated July 2, 2012 from Katten

17  law firm?

18  A    Yes.

19  Q    Is this a letter you received in connection with the

20  audit of Retrophin's fiscal year 2011 financial statements?

21  A    Yes.

22  Q    There's a little red box in the upper left-hand corner of

23  the first page.  Do you see that?

24  A    Hmm.

25  Q    That red box wasn't on the letter when you received it

Jain - direct - Kessler                    5355

1    from Katten, right?

2    A    No.

3    Q    Is that something Marcum adds later?

4    A    That's right.

5         MR. KESSLER:  I offer Government's Exhibit 123-1.

6         MR. CHAN:  No objection.

7         THE COURT:   We receive Government's Exhibit 123-1.

8         (So marked.)

9    Q    Mr. Jain, is this letter an example of the kind of

10   letters you talked about a few minutes ago?

11   A    Yes.

12   Q    The kind of letter where a law firm reports pending or

13   threatened litigation or outstanding balances to an auditor?

14   A    Correct.

15   Q    If we look at this letter and we go down to the second to

16   the last paragraph on the first page.  There's a paragraph

17   that begins subject to the foregoing and to the qualifications

18   set forth in this letter?

19   A    Hmm.

20   Q    Is this the portion of the letter in which you would

21   expect to see a description of pending or threatened

22   litigations, if there are any?

23   A    That's correct.

24   Q    In the next paragraph, toward the bottom, there's a

25   discussion of matters in excess of $5,000.

1              Do you see that.

2    A    Yes.

3    Q    Can you explain what that means?

4    A    Can I read that?

5    Q    Sure?

6              (Pause.)

7              MR. CHAN:  I object to the form.

8              THE COURT:  He's asking if he sees it.  Yes.  I will

9    sustain the objection.

10   Q    Mr. Jain, would you expect to see in a letter like this

11   information about pending or threatened litigations that

12   represented less than $5,000?

13   A    Less than $5,000 would be immaterial, if the law firm is

14   not disclosing that to us, we will not consider that this is

15   something materially misstated.

16   Q    Would you expect to see disclosures for matters related

17   to more than $5,000?

18   A    Yes.

19   Q    Now, if you turn to the second page.  Do you see on the

20   second page, the second full paragraph, there's a red box with

21   some red lines underlining the text?

22   A    Yes.

23   Q    Are those lines and a box that Marcum added later?

24   A    Correct.

25   Q    This letter reads:  For the period ended December 31,

Jain - direct - Kessler                    5357

1   2011, there were no outstanding bills for services rendered

2   and disbursements and other related charges incurred by this

3   firm on behalf of the company?

4   A    Yes.

5   Q    The next sentence says:  As of audit date there were

6   outstanding bills in the amount of 187,237 dollars for

7   services rendered and other related charges incurred by this

8   firm on behalf of the company.  Do you see that?

9   A    Hmm.

10              THE COURT:  May I ask you to say yes or no rather

11  than hmm.

12              THE WITNESS:   Sorry.

13  A    Yes.

14  Q    Is this paragraph where in these representation letters

15  you would expect to see information about outstanding

16  balances?

17  A    Yes.

18  Q    If can we scroll down to the bottom.  Do you see there's

19  a signature block?

20  A    Yes.

21  Q    Who signed the letter?

22  A    The law firm.

23  Q    Is it typical for a law firm itself to sign a letter like

24  this?

25  A    Yes.

```
                      Jain - direct - Kessler              5358
```

1              MR. CHAN:  Objection.

2              THE COURT:  Well, why don't you rephrase the

3   question then.

4   Q    How many of these letters like this have you reviewed in

5   your career?

6   A    Every single time when I perform an audit, generally, in

7   an audit we see those letters.  If I performed 40 or 50

8   audits, obviously I have seen 40 or 50 letters like that.

9   Q    Do you see sometimes multiple letters like this in a

10  single audit?

11  A    From the same firm or from different firms?

12  Q    From different firms.

13  A    Yes.

14  Q    And in your experience with letters like this is it

15  typical for a law firm itself to sign the letter?

16  A    That is correct.

17  Q    We can set that aside?

18              Now, Mr. Jain, did Marcum complete an audit of the

19  fiscal year 2011 financial statements for Retrophin.

20  A    Yes.

21  Q    Take a look at what's behind tab two in your binder which

22  has been marked for identification as Government's Exhibit

23  114-5.  Do you see that?  Is this the audited financial

24  statements for Retrophin for the period of inception through

25  December 31, 2011?

Jain - direct - Kessler                         5359

1   A    Yes.

2           MR. KESSLER:  I offer Government's Exhibit 114-5.

3           MR. CHAN:  No objection.

4           THE COURT:  We receive Government's Exhibit 114-5.

5           (So marked.)

6   Q    Mr. Jain, we're looking at the first page.  Do you see

7   that it says audited financial statements right in the middle?

8   A    Yes.

9   Q    Now, if we go to the third page of the document, there's

10  something called an independent accountant's report.  Do you

11  see that?

12  A    Yes.

13  Q    What is that?

14  A    This is an opinion from Marcum after they performed their

15  audit procedures.  They give the opinion that whether the

16  financial statements are in accordance with the GAAP and are

17  not materially misstated.  This is an opinion on the financial

18  statements.

19  Q    Is this the opinion that Marcum issued related to these

20  audited financial statements?

21  A    Yes.

22  Q    We're not going to look at everything in here.  I would

23  like you to turn to the very last page of the document.  I

24  believe it's page twelve.

25           Do you see that?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

                    Jain - direct - Kessler                5360

1   A     Yes.

2   Q     There's something that says note eight subsequent events.

3         Do you see that.

4   A     Yes.

5   Q     What is a subsequent event?

6   A     Any events after the balance sheet date.  If they have

7   occurred and required disclosure into the financial statement,

8   we call them subsequent events.

9   Q     So it's the audit period  -- strike that.

10        If the financial statement period goes through

11  December 31, 2011, are subsequent events, events that occurred

12  after December 31, 2011 and before the end of the audit?

13  A     So subsequent events would be after December 31, 2011,

14  but before the date of the issuance of our financial

15  statement.

16  Q     On this page in the first full paragraph the second

17  sentence reads:  On February 1, 2012 the company issued 22,500

18  shares of class A common units, valued at $900,000 to a

19  related party MSMB Healthcare, LP?

20  A     Yes.

21  Q     Does that represent an equity investment?

22  A     Yes.

23  Q     Now, is this disclosure or this statement something that

24  Marcum audited?

25  A     Yes.

Jain - direct - Kessler                    5361

1   Q    Do you recall what sort of documents you reviewed to

2   verify that this equity investment had actually occurred?

3   A    So we obtain a stock subscription agreement from the

4   management, which supports that there was $900,000 of

5   investments made by MSMB Healthcare, LP into Retrophin.

6   Q    So was Marcum engaged again to audit Retrophin's

7   financial statements for the 2012 fiscal year?

8   A    Yes.

9   Q    That's the period from January 1 2012 to December 31,

10  2012?

11  A    Yes.

12  Q    Was an engagement letter signed in connection with that

13  engagement?

14  A    For the period from January 1, 2012 to December 31, 2012,

15  I believe that  -- sorry, just thinking about it.

16       We did an engagement for a nine month quarterly

17  period ended September 30, 2012, interim review, and then we

18  had an engagement letter for year-end audit December 31, 2012.

19  Q    So for the year-end audit, December 31, 2012, there was

20  an engagement letter?

21  A    Yes.

22  Q    If you take a look at what's behind tab four in your

23  binder and it has been marked for identification as

24  Government's Exhibit 114-13.

25  A    Yes.

Jain - direct - Kessler                    5362

1  Q    Is this the engagement letter for the fiscal year 2012

2  audit?

3  A    Yes.

4  Q    This letter is dated February 27, 2013?

5  A    Yes.

6  Q    If you look down below the heading annual audit, the

7  first full paragraph?

8  A    Yes.

9  Q    The letter states:  We will audit the consolidated

10  balance sleet of Retrophin, Inc., the company, as of December

11  31, 2012 and the related consolidated statements of the

12  operation, shareholder equities and cash flows for the years

13  ended which will be included --

14        MR. CHAN:   He is reading from a document not in

15  evidence.

16        MR. KESSLER:  I'm sorry.  I offer Government's

17  Exhibit 114-13.

18        MR. CHAN:  No objection.

19        THE COURT:   We admit Government's Exhibit 114-13.

20        (So marked.)

21  Q    Mr. Jain, if we can scroll back down to that paragraph,

22  below the heading annual audit?

23  A    Yes.

24  Q    This first paragraph below the heading annual audit

25  describes the scope of Marcum's audit for fiscal year 2012?

Jain - direct - Kessler                    5363

1    A    Yes.

2    Q    There's a reference to the company's form 10-k.

3         Do you see that.

4    A    Yes.

5    Q    What's the relationship between the audit and the form

6    10-k?

7    A    Form 10-k is a required filing for SEC registered

8    companies in which not only the audited financial statements

9    get included but then also the company's required to include

10   some of the informations required by the SEC declarations such

11   as management discussion and analysis, the company's business,

12   any risk factors.  Those are the informations also included

13   within that form 10-k and get it filed with the SEC.

14   Q    Turn to the second page.  Focus on the third full

15   paragraph.  That paragraph begins:  Our audit is designed to

16   provide reasonable assurance of detecting errors or fraud that

17   would have a material effect on the financial statements taken

18   as a whole?

19        Do you see that.

20   A    Yes.

21   Q    So what is an auditor's role in looking for fraud at a

22   company?

23   A    We are not engaged to identify or detect fraud.  We are

24   engaged to give an opinion on the financial statements,

25   whether they are materially misstated or not or whether they

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Jain - direct - Kessler                    5364

are prepared in accordance with the GAAP.

Q    If you look at the fourth line at the end there's a
sentence that reads:  Our audit is not a special audit for the
purpose of fraud detection, nor is it a detailed check of
transactions of the accounting records?

Do you see that.

A    Yes.

Q    What does that mean?

A    That means our audit is not  -- we have not been engaged
by the company to perform any  -- to perform any procedures to
identify or find any fraud in the company.  We are not
forensic auditors, like we are not detecting the frauds.

Q    If a fraud is brought to your attention, do you report
it?

A    If the fraud is brought to our attention, we will report
it to the management or the audit company.

Q    I want to ask you about one other sentence in this
paragraph.  Go a few lines down.  There's a discussion about
the risk of detecting fraud and the sentence reads:   That
risk is substantially increased when collusion or forgery
exists?

Do you see that.

A    Which line item?  I'm sorry.

Q    Still in the middle of the paragraph that is being
highlighted on your screen as well.

1    A    Yes.

2    Q    What does it mean that the risk is substantially

3    increased when collusion or forgery exists?

4    A    So my understanding on this one is when two or more

5    people get together and perpetuate a fraud intentionally, then

6    we would not be able to detect it and the risk would be more

7    for having a fraud into the company and materially misstated

8    financial statements.

9    Q    It is hard to detect a fraud if it's more than one

10   person?

11   A    Yes.

12   Q    We can take the engagement letter down.  Can you

13   generally describe the process that Marcum followed to audit

14   the 2012 financial statements for Retrophin?

15   A    Yes.

16        So, at the time when we signed the engagement

17   letter, once we signed the engagement letter we provide a

18   document request list to the management and then we provide

19   them a timeline.  This is a timeline we can perform the

20   procedures and this is our required document list and once you

21   are ready with the document request list our audit team can

22   come into the field and then commence the audit procedures.

23        Before our team goes into the field for performing

24   audit procedures we send to the management certain

25   confirmations which management needs to sign those

Jain - direct - Kessler                              5366

1   confirmations and send it back to us so we can send those

2   confirmations out to third parties.

3           We perform the audit field work and then management

4   provides us a draft of the financial statements so we can have

5   concurrent while working on the financial statement and

6   performing the audit field work.  We provide our comments on

7   to the financial statement, which management reviews our

8   comments and then they make sure that those financial

9   statements are taken care of correctly.

10          They provide us the final financial statements which

11  our partners of quality control, everyone goes through that

12  and issue an opinion on those financial statements.

13  Q    Do you review various documents provided by the company

14  in accordance with the audit?

15  A    In process of our field work and in reviewing the

16  financial statements, I review many documents, yes.

17          There's one thing that I must explain also.  Before

18  we issue an opinion we also communicate our findings and

19  results to the audit committee that what we identified during

20  the course of our audit or our engagement and results of the

21  operations then.

22  Q    In a typical audit, is one of the sets of documents you

23  review board minutes?

24  A    Yes.

25  Q    Do you review draft or final board minutes?

Jain - direct - Kessler                           5367

1    A    Combination of both.

2    Q    Can you explain that?

3    A    So generally when the board meets the company's

4    representative writes those minutes and upon our request they

5    provide us those minutes of the board meetings.  Sometimes

6    they are signed by the secretary and sometimes they are just

7    in a draft format.

8         So we get those draft minutes from the management or

9    the signed minutes of the meeting.  So we review a combination

10   of both.

11   Q    What's the significance to you if the minutes are signed?

12   A    If the minutes are signed, we assume that these minutes

13   are approved by the board, all the people who were sitting in

14   those meetings.

15   Q    Approved by the board?

16   A    Yes.

17   Q    Now, during the process for auditing the 2012 financial

18   statements for Retrophin, did Marcum receive another one of

19   those legal representation letters from the Katten law firm?

20   A    Yes.

21   Q    Can you take a look at what is behind tab five in your

22   binder and has been marked for identification as Government's

23   Exhibit 124-2.

24        Do you see that document?

25   A    Yes.

Jain - direct - Kessler                              5368

1   Q    The letter from the Katten law firm dated May 31, 2013?

2   A    Yes.

3   Q    Is a letter you received in connection with that audit of

4   the fiscal year 2012 financial statements?

5   A    Yes.

6   Q    Are there some more red boxes on it that Marcum added

7   later?

8   A    Yes.

9              MR. KESSLER:  I offer Government's Exhibit 124-2.

10             MR. CHAN:  No objection.

11             THE COURT:  We receive Government's Exhibit 124-2.

12             (So marked.)

13  Q    Mr. Jain, if we can scroll down and again look in that

14  paragraph that starts subject to the foregoing and to the

15  qualifications set forth in this letter.

16  A    Yes.

17  Q    Are any current or pending or threatened litigations

18  disclosed in this letter?

19  A    No.

20  Q    This is a disclosure as of the date of letter, May 31,

21  2013?

22  A    Yes.

23  Q    Now, if we can zoom out, there are some boxes at the top?

24  A    Yes.

25  Q    And there's a box on the right that discusses  -- that

1  refers to an attorney's discussion with Ed Hackert, the

2  engagement partner on June 12, 2013.

3          Do you see that.

4  A    Yes.

5  Q    Does this box provide additional information that wasn't

6  available on May 31, 2013?

7  A    Yes.

8  Q    It refers to two employees who were suing the company for

9  eighty thousand dollars?

10 A    Yes.

11 Q    And the box also says the eighty thousand dollars is an

12 immaterial amount?

13 A    Yes.

14 Q    What does an immaterial amount mean?

15 A    So when we commence our planning for the audit we

16 generally set up a benchmark for materiality, what the

17 threshold of the amount which is below that threshold is not

18 considered a material amount, and if there's some statement

19 that they are below the material amount that can still  -- our

20 opinions can still be good that the financial statements are

21 not materially mistaken.  Eighty thousand dollars would be

22 below the threshold and that's why we said it is not material.

23 Q    If you look at the second page of the letter.  Go to that

24 paragraph that discusses bills.  Does the letter state that

25 there are $642,129.21 outstanding?

Jain - direct - Kessler                    5370

1  A     Yes.

2  Q     Take that down?

3        Now, as part of the audit of the fiscal year 2012

4  financial statements did you also review Retrophin's legal

5  expenditures.

6  A     So I don't know whether we reviewed the legal invoices of

7  Katten Muchin.

8  Q     Sorry.  You are saying you don't know whether you

9  reviewed the invoices?

10 A     Yes.

11 Q     You mean the actual bills?

12 A     Correct.

13 Q     Did you review the expenses of Retrophin on legal fees?

14 A     Can you repeat again, please?

15 Q     Sure.  Let me do it their way:  If you take a look at

16 what is behind tab six in your binder.  There's a document

17 that has been marked for identification as Government's

18 Exhibit 114-16.

19       Do you see that.

20 A     Yes.

21 Q     Is this an e-mail you sent on June 14, 2013?

22 A     Yes.

23 Q     And if you look at the second page, does the e-mail

24 attach a memorandum you prepared about Retrophin's legal fees?

25 A     Yes.

Jain - direct - Kessler                5371

1   Q    Did this relate to the audit of the 2012 fiscal year?
2   A    Yes.
3            MR. KESSLER:  I offer Government's Exhibit 114-16.
4            MR. CHAN:  No objection.
5            THE COURT:  We receive Government's Exhibit 114-16.
6            (So marked.)
7   Q    Mr. Jain, do you see the cover e-mail here is you writing
8   to Marc Panoff?
9   A    Yes.
10  Q    In June 2013 who is Marc Panoff?
11  A    Yes.
12  Q    Who was Marc Panoff?
13  A    Marc Panoff was the chief financial officer of the
14  company.
15  Q    You write to Mr. Panoff:  Please, let me know if you
16  agree with the attached memo and arrange to get me Evan's
17  confirmation to it for our support for bad debt expense?
18           Did you write that.
19  A    Yes.
20  Q    Who is the Evan that you are referring to?
21  A    Evan is the legal  -- SEC legal counsel of Retrophin.
22  Q    Is that Evan Greebel?
23  A    Yes.
24  Q    You refer to a bad debt expense?
25  A    Yes.

Jain - direct - Kessler                        5372

1    Q    What is that?

2    A    So the expenses -- sorry.  Certain receivables which the

3    company has on it's balance sheet and if they are not

4    recoverable we call it bad debt expenses.

5    Q    A receivable is money the company expects to get?

6    A    Correct.

7    Q    So a bad debt expense is a receivable that the company

8    doesn't actually expect to get paid back for?

9    A    If those collections are doubtful, then we call it bad

10   debt expense.

11   Q    If we take a look at your memo, which is on the second

12   page of Government's Exhibit 114-16.

13   A    Yes.

14   Q    In the first paragraph, you write:  During the year 2012

15   Retrophin paid on behalf of MSMB, a related party, an

16   aggregate amount of approximately five hundred sixty three

17   thousand dollars to Katten Muchin Rosenman for legal services.

18        Do you see that.

19   A    Yes.

20   Q    What is a related party?

21   A    A party which is under common control of the same

22   management, like saying in this case for Retrophin if Martin

23   Shkreli is controlling Retrophin and he has a control of any

24   other entity that is called a related party in this case.

25   Q    The next sentence says:  MSMB is currently going under

Jain - direct - Kessler                    5373

1   dissolution process and Retrophin does not expect to collect

2   the payment from MSMB.

3           Do you see that.

4   A    Yes.

5   Q    Accordingly, Retrophin has decided to write off 563,380

6   dollars and recorded it as bad debt expense?

7   A    Yes.

8   Q    Who makes the decision to write off an expense?

9   A    Management of the company.

10  Q    What is your role in auditing a writeoff?

11  A    This is an estimate of the management of the company and

12  we rely on what management is telling us that whether we are

13  going to have a reasonable  -- whether we can collect this

14  money or we will not be able to collect this money.  So

15  management decides that.

16  Q    Do you recall whether this amount was actually written

17  off?

18  A    Yes.

19  Q    Was it?

20  A    It was written off, yes.

21  Q    Now, during the audit of the fiscal year 2012 financial

22  statements did you have any communications with Evan Greebel

23  directly?

24  A    As I mentioned before, other than asking for certain

25  documentations or agreements, contracts, there were no other

Jain - direct - Kessler                    5374

1   communications I had with Evan Greebel.

2   Q    Was a form 10-k filed for Retrophin for the fiscal year

3   2012?

4   A    Yes.

5   Q    Take a look at what's behind tab seven in your binder and

6   has been marked for identification as Government's Exhibit

7   966.

8   A    Yes.

9   Q    Is this the form 10-k that was filed?

10  A    Yes.

11          MR. KESSLER:  I offer Government's Exhibit 966.

12          MR. CHAN:  I think this is already a DX number.

13          THE COURT:  Can you give us the exhibit number,

14  please, Mr. Chan?

15          MR. CHAN:  One moment.

16          Mr. Kessler can continue while I try to find the

17  number.

18          THE COURT:  In the meantime, do you mind admitting

19  it or would you like to wait?

20          MR. CHAN:  I think if I'm right, replace.  We can

21  say referring to the Government's Exhibit.

22          MR. KESSLER:  If we can pull up Government's Exhibit

23  966 which is also a Defendant's Exhibit.

24  Q    Mr. Jain, is this an 10-k from December 2012?

25  A    Yes.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Jain - direct - Kessler                          5375

1    Q    If you go to the page 69 of the document.  We'll just put

2    it up on your screen.  If you just look on your screen.

3    A    Yes.  I can see that.

4    Q    So was this document signed on June 13, 2013?

5    A    Yes.

6    Q    That's approximately six months after the end of the

7    fiscal year?

8    A    Yes.

9    Q    If we go to page 72, a couple of pages ahead.

10   A    Yes.

11   Q    Are you on page 72?

12   A    Yes.

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Jain - direct - Kessler                              5376

1   BY MR. KESSLER:

2   Q    What is on Page 72?

3   A    It's our independent registered public accounting firm's

4   audit opinion on December 31, 2012, on the defense's

5   statements.

6   Q    If we now turn to Page 48, see there's an item number

7   three, legal proceedings?

8   A    Yes.

9   Q    The legal proceedings, that section reads, We have no

10  material proceeding pending nor are we aware of any pending

11  investigation or threatened litigation by any third party.

12  A    Yes.

13  Q    Does Marcum play any role in auditing or verifying an

14  assertion in the legal proceedings section?

15  A    This item three is not part of our financial statement,

16  which is out of our scope.  But then similar -- if there is

17  some disclosure over here in item three that there are any

18  pending or threatening litigations out, there and --

19           (Pause in proceedings.)

20  A    If in item three, if there's any pending or threatening

21  litigations are disclosed here, they would be disclosed into

22  footnotes of defense's statement also.  Since it is not here,

23  they may not be there so we don't take responsibility of this

24  sentence over here that there are any threatening or pending

25  litigations out there.

Jain - direct - Kessler                              5377

1    Q    So, moving away from this particular statement, does

2    Marcum take any steps around the time that a 10-K is finalized

3    to verify the information previously received about threatened

4    or pending litigation?

5    A    Yes.

6    Q    What steps do you take?

7    A    Before the issue of authorization to file the 10-K, we

8    ask law firm to update either through e-mail or sending us

9    another letter saying that whether they are -- there are any

10   updates to the letter which they provided us during the time

11   of the original confirmation.

12   Q    So you get a final confirmation right before the 10-K is

13   filed?

14   A    Correct.

15   Q    Finally, if we can week turn to Page 91 of 92, Note 12

16   says subsequent events; do you see that?

17   A    Yes.

18   Q    Does the subsequent events here have the same meaning as

19   the subsequent events item that we previously looked at?

20   A    Yes.

21   Q    If you take a look, you'll see there are items in

22   January, February, and May 2013.

23   A    Yes.

24   Q    Take a moment and let me know if any settlement payments

25   are disclosed in this subsequent events section.

Jain - direct - Kessler                    5378

1   A    No.

2   Q    As of June 13, 2013, when this Form 10-K had been signed,

3   had anyone brought to your attention any settlement payments

4   paid by Retrophin?

5   A    No.

6   Q    Had anyone brought to your attention any settlement

7   agreements entered into by Retrophin?

8   A    No.

9   Q    Now, after June 13, 2013 --

10           MR. CHAN:  For the record, it's DX 110-64.

11           MR. KESSLER:  DX 110-64 is also Government Exhibit

12  966.

13           THE COURT:  Thank you, Mr. Chan.  We will continue

14  to refer to this exhibit as DX 110-64.

15           MR. CHAN:  Sorry, -14.

16           THE COURT:  DX 110-14 is the exhibit number for this

17  particular document and we'll use that instead.

18  Q    After the 10-Ks were filed, Mr. Jain, did Marcum work on

19  an audit for financial statements related to the Form 10-Q for

20  the third quarter?

21  A    On the Form 10-Q, we don't perform audit, we perform

22  interim reviews.

23  Q    Did you perform such an interim review?

24  A    Yes.

25  Q    And in July 2013, do you recall whether you received an

Jain - direct - Kessler                      5379

1  additional update about pending or threatened litigation from
2  Katten?
3  A    Yes, which was in connection with our quarterly review
4  March 31, 2013.
5  Q    I'd like to show you what's marked for identification as
6  Government Exhibit 124-3.  This is behind Tab 8 in your
7  binder.
8          Is this an e-mail you received from Marc Panoff on
9  July 24, 2013?
10 A    Yes.
11 Q    Does it include an update about pending or threatened
12 litigation for Retrophin?
13 A    No.
14 Q    If you take a look at the third e-mail from the top,
15 there's an e-mail from Marc Panoff to Evan Greebel, on
16 July 24; do you see that?
17 A    On the same exhibit?
18 Q    Yes.  It's right on your screen there.
19          Do you see that e-mail from Marc Panoff to Evan
20 Greebel?
21 A    Yes.
22 Q    And above that, do you see a response from Mr. Greebel.
23 A    Yes.
24 Q    Do those e-mails relate to a litigation update?
25 A    Yes.

                    Jain - direct - Kessler                5380

1              MR. KESSLER:  I offer Government Exhibit 124-3.

2              MR. CHAN:  No objection.

3              THE COURT:  We receive Government Exhibit 124-3.

4              (Government Exhibit 124-3 so marked.)

5    Q    The first e-mail from Marc Panoff to Evan Greebel is in

6    the middle of the page; do you see that?

7    A    Yes.

8    Q    Wednesday, July 24, Mr. Panoff writes to Mr. Greebel, Can

9    you please confirm that no material litigation events have

10   occurred since the last update you gave for the 10-K?

11             Do you see that?

12   A    Yes.

13   Q    And if we scroll up, what is Mr. Greebel's response on

14   July 24, 2013?

15   A    That is correct.

16   Q    And the prior response had been there were no pending or

17   threatened litigations.

18   A    Yes.

19   Q    And if we scroll up, Mr. Panoff then forwards

20   Mr. Greebel's response to you and other individuals and writes

21   a response to Katten.

22   A    Yes.

23   Q    Now, I'd asked you some questions about settlement

24   payments.  At some point after this July 24, 2013, e-mail, did

25   settlement payments made by Retrophin come to your attention?

                    LAM      OCR      RPR

Jain - direct - Kessler                    5381

1   A    Yes.

2   Q    How did that happen?

3   A    We were engaged to perform second quarter 2013, period

4   ended June 30, 2013, interim review procedures.  And interim

5   review procedures are basically making inquiries and

6   performing analytical reviews.  And in performing analytical

7   review, we make request to the clients that they need to

8   provide us variance analysis of their statement of operations

9   for one period to the similar period for the last year, one

10  period from this quarter was as the last quarter, and

11  year-to-date this quarter was the year-to-date last quarter.

12  And, also, we are ask them to provide you also the variance

13  and analysis for the balance sheet.

14            THE COURT:  Radiance?

15            MR. KESSLER:  Variance.

16            THE COURT:  Oh, variance.

17  A    So, this request was sent to the company's controller and

18  CFO.  I don't know whether it was controller or CFO, but we

19  send it to them.  And they perform the variance analysis and

20  provide it back to us with having columns, like, going to each

21  side and then differences between one number to another number

22  and the percentages.

23            So, my staff person who received all this and, when

24  they were looking into those variances analysis, one of those

25  general and administrative expenses, they were significantly

LAM      OCR      RPR

Jain - direct - Kessler                    5382

1  higher from one period to another period and my staff person

2  brought that to my attention, Sunil, this variance is

3  significantly higher from one period to another period and we

4  need to make inquiries about it.

5  Q    Do you recall the difference, how much larger the current

6  year was?

7  A    I don't know exact numbers, but it was in the ballpark of

8  about $2 million, which was significantly higher.  When I say

9  "significantly," that was like not in general course of the

10 business we'll see for the company like Retrophin that why

11 this significant increase was there.

12 Q    So, what happened after that got brought to your

13 attention?

14 A    So, he brought to my attention, and from the inquiry

15 point of view we called the company's then controller Mike

16 Harrison that we need to know why these significant variances

17 are there.  He said he's not aware of this, you need to speak

18 to Marc Panoff, then CFO of the company.

19       We inquired with Marc Panoff about it, and he

20 mentioned, This has something to do with certain settlement

21 agreements and I don't know much details about it.

22       But then I said, Send me those though settlement

23 agreement.  I can look into those settlement agreements and

24 then we can discuss further about it.

25 Q    Did Mr. Panoff send you settlement agreements?

Jain - direct - Kessler                    5383

1   A    It took him maybe a couple of days to send it back to me,

2   the settlement agreements, but he did, yes.

3   Q    Did you review them?

4   A    I read those.

5   Q    Did you prepare -- strike that.

6         At some point, did you review a spreadsheet showing

7   the individuals in the settlement agreement and the dates of

8   the agreements and the amounts of the agreements?

9   A    Yes, at some point within the course of our interim

10  review, we reviewed the spreadsheet and what are the amounts

11  and who are these people who the settlement agreements are.

12  Q    If you take a look at what's behind Tab 9 in your binder,

13  it's been marked for identification as Government Exhibit

14  114-25.

15  A    Yes.

16  Q    Is this a spreadsheet you reviewed showing the various

17  individuals involved in those settlement agreements?

18  A    Yes.

19  Q    And they're all also a number of marks in red; do you see

20  that?

21  A    Yes.

22  Q    Are those marks that Marcum added to the spreadsheet?

23  A    Yes.

24  Q    There's also some text at the bottom.

25  A    Yes.

Jain - direct - Kessler                    5384

1   Q     Is that text that Marcum put on the spreadsheet?

2   A     Yes.

3   Q     But the black letters and numbers on the spreadsheet

4   are -- reflect the settlement payments and the individuals

5   involved in the settlement agreements.

6   A     Yes.

7              MR. KESSLER:  I offer Government Exhibit 114-25.

8              MR. CHAN:  No objection.

9              THE COURT:  We receive Government 114-25.

10             (Government Exhibit 114-25 so marked.)

11             MR. KESSLER:  Ms. Balbin, if you could blow up the

12  settlement portion at the top.

13             (Exhibit published to the jury.)

14  Q     Mr. Jain, there are five individuals listed under a

15  heading "shareholder;" do you see that?

16  A     Yes.

17  Q     Spencer Spielberg, Sarah Hassan, Richard Kocher, David

18  Geller, and Michael Lavelle?

19  A     Yes.

20  Q     As of July 2013, had any other settlement agreements been

21  brought to your attention?

22  A     Not other than these five settlement agreements.

23  Q     Did an agreement with someone named Lindsay Rosenwald

24  ever get brought to your attention?

25  A     Sorry.

Jain - direct - Kessler                5385

1   Q    Did an agreement with someone named Lindsay Rosenwald

2   ever get brought to your attention?

3   A    No.

4   Q    There's a column called "settlement date."  Is that the

5   date of each settlement agreement?

6   A    Yes.

7   Q    Then there's a column for settlement amount; do you see

8   that?

9   A    Yes.

10  Q    And is that the sum of the cash and stock used for each

11  settlement payment?

12  A    Yes.

13  Q    The total is $2.2 million?

14  A    Yes.

15          I'm sorry, I just want make sure that because

16  settlement amount $2.2 million and then the stock settlement

17  amount was $80,000, total was $2.28 million.

18  Q    Thank you.  I read that wrong.

19          Did you learn the entity that made the settlement

20  payment in each case?

21  A    There were some payments were made, but some were

22  recorded as a liability on the books which were not made.

23  Q    But some payments were made at the point you discovered

24  these and some payments had not been made?

25  A    Yes.

LAM     OCR     RPR

Jain - direct - Kessler                5386

1    Q     And did you come to learn that Retrophin and Martin
2    Shkreli and various MSMB entities were also party to these
3    settlement agreements?
4    A     Yes.
5    Q     What does it mean to restate a financial statement?
6    A     When the company files their quarterly 10-Qs and 10-Ks
7    with the SEC, and if the company auditors find out that
8    financial statements which were included with those quarterly
9    or annual financial statements were incorrect or having some
10   deficiencies in disclosures, then those statements are not
11   relied upon by the investors and those financial statements
12   are to be restated with amendments.
13   Q     With additional disclosures?
14   A     Whatever deficiencies are there, whether disclosures or
15   updating the numbers.
16   Q     So, after you discovered these settlement payments, did
17   Marcum have a view about whether Retrophin needed to restate
18   its financial statements?
19   A     Yes.
20   Q     What was that view?
21   A     So, since these settlement amounts were significant -- or
22   I say material -- and they were not disclosed into the
23   12/31/12 audited financial statements as well as March 31,
24   2013 interim statement, our view was since these numbers are
25   material, those statements should be restated.

1   Q    When we talked before about related party transactions,

2   did Marcum have a view as to whether these settlement payments

3   were related party transactions?

4   A    Yes.

5   Q    What was that?

6   A    So MSMB, Martin Shkreli, and Retrophin, all these were

7   joint and several liable for these liabilities of all these

8   settlement agreements.  Whereas MSMB was the primely obliger

9   or primary entity responsible for it, whereas Retrophin was

10  paying on behalf of MSMB, so we consider that this is a little

11  departure from the action because Retrophin is paying on

12  behalf of MSMB these liabilities.  So, these were considered

13  as related party transactions.

14  Q    You mentioned the word "material" before.  Is there a

15  materiality threshold for related party transactions?

16  A    For related party transactions, in accordance with the

17  PCOB standards, there is no materiality for related party

18  transactions.  Companies are required to disclose every single

19  related party transactions.

20  Q    Regardless of the size of the transaction.

21  A    Exactly.

22  Q    Now did you communicate this view that the financial

23  statements needed to be restated to Retrophin management?

24  A    Our engagement partner did communicate that to the

25  management of the company.

Jain - direct - Kessler                    5388

1    Q    Do you know whether that was also communicated to Evan

2    Greebel?

3              MR. CHAN:  Objection, hearsay.

4              THE COURT:  Why don't you rephrase?

5    Q    Did you participate in any conversations involving the

6    Defendant Evan Greebel when a restatement of the financial

7    statements was discussed?

8    A    I remember that there was one telephone call was there

9    between management, Evan Greebel, my firm's partners and

10   quality control already involved, and I was also being called

11   upon into that call just to hear the conversation about

12   communication of restatement and accounting in back of

13   settlement agreements.

14   Q    Do you remember what the Defendant Evan Greebel said on

15   the phone call?

16             MR. CHAN:  Can we get a time period for all of this?

17   Q    To the best of your knowledge, Mr. Jain, when did this

18   phone call take place?

19   A    Sometime while we were performing the quarterly review of

20   June 2013 10-Q, which is in the period from, I would say,

21   first week of August 2013 to the filing of the document, which

22   is, like, on September 2013.

23   Q    So, what do you recall the Defendant saying?

24   A    I'm sorry.

25   Q    What do you recall Mr. Greebel saying?

LAM      OCR      RPR

Jain - direct - Kessler                    5389

1    A    I don't recall what Mr. Greebel was saying so I cannot

2    make comment on it.

3    Q    Okay.  Now, during the period in which these -- strike

4    that.

5              Between the time that the settlement agreements

6    first came to your attention and September 2013, were there a

7    number of discussions about the restatement of the financials?

8    A    Yes.

9    Q    Were there e-mails sent back and forth about this

10   restatement?

11   A    As per my knowledge, yes.

12   Q    Was Martin Shkreli involved in these communications?

13   A    Since I was not part of those communications, I cannot

14   make a comment who were the parties involved in those

15   communications.

16   Q    Now, did Retrophin -- strike that.

17             Let me ask you this first:  At some point in August

18   of 2013, was there a discussion about Retrophin's internal

19   controls?

20   A    I don't recollect that.

21   Q    Take a look at what's behind Tab 11 in your binder.  It's

22   been marked for identification as Government Exhibit 114-29-A.

23   A    Yes.

24   Q    You know what?  Before we look further at this document,

25   another question I should have asked you before.

Jain - direct - Kessler                    5390

1           You told us that after Marcum discovered these

2   settlement payments, Marcum's view was that a restatement was

3   needed; is that right?

4   A    Yes.

5   Q    At the time Marcum communicated that to you, did you have

6   an understanding of what Retrophin management's view was about

7   if restatement was necessary?

8           MR. CHAN:  Objection hearsay.

9           THE COURT:  Try to rephrase the question.

10  Q    Did Retrophin's management agree to restate its

11  financials by the first week of August 2013?

12          MR. CHAN:  Objection, hearsay.

13          MR. KESSLER:  It's not offered for the truth.

14          MR. CHAN:  I disagree.

15          THE COURT:  Well, I guess we can have a little

16  sidebar and straighten it out.

17  Q    Let me ask it this way:  Remember, I asked you about a

18  number of communications about the restatement, the

19  restatement of the financials between July and September 2013?

20  A    Yes.

21  Q    Did those all relate to the question of whether and how

22  to restate the financials?

23  A    As I mentioning, I was not involved with all the

24  communications, so I cannot make a comment on that, whether

25  all those communications were relating to restatement or

LAM      OCR      RPR

Jain - direct - Kessler                    5391

1    something else, because I was not part of all those

2    communications.

3              But I certainly know that there was some

4    communications going on between Marcum and the management that

5    the restatements are required.

6              MR. CHAN:  Your Honor, I object to the last part as

7    hearsay and move to strike based on the witness' own answer.

8              THE COURT:  All right.  I will grant the application

9    to strike.

10             MR. KESSLER:  One minute, your Honor.

11             (Pause in proceedings.)

12   Q    Mr. Jain, focusing just on communications in which you

13   were involved, communications or e-mails, do you recall

14   discussions about whether to restate Retrophin's financials?

15   A    Yes.

16   Q    And were all the parties in those communications

17   initially in agreement that the financial statements should be

18   restated?

19             MR. CHAN:  Objection, hearsay.

20             THE COURT:  Could you rephrase the question,

21   Mr. Kessler?

22   Q    Did Marcum engage in work between July and September 2013

23   related to the restatement of Retrophin's financials?

24   A    Yes.

25   Q    And was that work the result of communications between

LAM      OCR      RPR

                        Jain - direct - Kessler                5392

1   Marcum and Retrophin's management?

2   A    I'm sorry again, could you repeat the question, please?

3   Q    Sure.  Were you involved in discussions about various

4   ways in which to restate or update Retrophin's financials

5   between July and September of 2013?

6   A    In some communications, yes, I was involved.

7   Q    And did the views communicated to you of Retrophin's

8   management affect your work in any way?

9   A    I was not at level where I can say that my work was

10  getting affected because of that, because of the management's

11  view, because I was not handling this whole issue of

12  restatement with the management.  It was my partner who was

13  handling this matter.  So, it's not that's something I can

14  say, that my work was getting affected with that.

15  Q    All right.  Take a look at what's behind Tab 11 in your

16  binder.  It's been marked for identification as Government

17  Exhibit 114-29-A.

18  A    On Exhibit 11?

19  Q    Tab 11, Government Exhibit 114-29-A?

20  A    Yeah.

21        THE COURT:  We're going to break at 4:30.

22        MR. KESSLER:  Understood.

23  Q    Is this an e-mail you received from Mr. Panoff in

24  August 2013?

25  A    Yes, I did.

1   Q    Does this relate to the matter in which -- strike that.

2        Does this relate to the discovery of the settlement

3   papers?

4   A    Yes.

5        MR. KESSLER:  I offer Government Exhibit 114-29-A.

6        MR. CHAN:  No objection.

7        THE COURT:  We receive Government's Exhibit

8   114-29-A.

9        (Government Exhibit 114-29-A so marked.)

10        (Exhibit published to the jury.)

11  Q    Is this an e-mail from Mr. Panoff to you on August 20,

12  2013?

13  A    Yes.

14  Q    There's a memorandum attached; do you see that?

15  A    Yes.

16  Q    Two files from Retrophin, Inc.; do you see that?

17  A    Yes.

18  Q    Dated August 19, 2013?

19  A    Yes.

20  Q    Now, the first paragraph reads, After extensive

21  conversations with Martin Shkreli, the founder and chief

22  executive officer of Retrophin and the managing member of MSMB

23  Capital Management, LLC, a Delaware limited liability company,

24  an entity related to the company, and in connection with our

25  preparation of our financial statement for the quarter ended

Jain - direct - Kessler                      5394

1    June 30, 2013, Retrophin determined that certain payments made

2    by the company to three individuals, pursuant to certain

3    settlement lease agreements and certain obligations accepted

4    by the company to make payments to two additional individuals

5    pursuant to certain settlement and release agreements, should

6    be reclassified as obligations that should have been borne

7    solely by MSMB and its related funds.

8              Do you see that?

9    A    Yes.

10   Q    Without getting into the content of any conversations,

11   were you aware that there had been extensive conversations

12   about this issue?

13   A    As I mentioning, that there must be some extensive

14   conversation between the management and my firm's executives,

15   like my partners.  And this memo was addressed to us, not to

16   me -- e-mail was to me, but this memo was going into my work

17   papers, which was related to Marcum.  So, they're telling

18   there was an extensive discussion.

19              It's not like with me, though, any discussions.

20              MR. CHAN:  I object and move to strike the entire

21   answer as speculation.

22

23              (Continued on next page.)

24

25

1              MR. CHAN:  The witness said that he assumes that
2     there must be.
3              THE COURT:  Well, we can talk about this at side bar
4     if you'd like.
5              MR. KESSLER:  I'll keep going through the memo.
6              THE COURT:  All right.  Can I just ask --
7              MR. KESSLER:  Sure.
8              THE COURT:  -- what I think I heard him say.
9          Did you say this particular memorandum was in your
10    work papers when you were conducting the work for Retrophin?
11             THE WITNESS:  This memo was provided to me from the
12    then current CFO of the company to Marcum, to me, so we can
13    have this memo in our work papers.
14             THE COURT:  When it was provided by the CFO, do you
15    know who that was?
16             THE WITNESS:  Mark Panoff.
17             (Continued on next page.)
18
19
20
21
22
23
24
25

                CMH      OCR      RMR      CRR      FCRR

5396

1        MR. KESSLER:  Your Honor, perhaps now is a good time

2   to stop for today.

3        THE COURT:  Members of the jury, I am going to

4   excuse you for the day.

5        We are trying to give you a good prediction as to

6   when this case will be concluded.  I know that when we

7   selected you for your service, which we are all grateful for,

8   we told you five weeks.  The best estimate at this point that

9   I can give you and it may be subject to change is it would be

10  through December 15th.

11       Now, I know that some of you have raised issues with

12  us and we will be glad to address them, but I wanted to give

13  you that prediction at this time.

14       I should also add that next week, we will not be

15  sitting Thursday or Friday and the following week, the week of

16  November 27th, we will sit only Monday and Tuesday of that

17  week but not Wednesday, Thursday and Friday, that is, November

18  29th, 30th and December 1st.  So, you will be free to go back

19  to your jobs or carry on your usual business on the dates that

20  we are not sitting, but that's the best prediction I can give

21  you at this time.

22       So, with that, I am going to excuse you for the day.

23  I would like to see you tomorrow morning at 9:00 again and we

24  will move forward.  Thank you very much for your service and

25  your attention.  Please do not talk about the case.

5397

1           (Jury exits.)

2           THE COURT:  You can be excused and step down.

3           THE WITNESS:  Thank you.

4           (Witness steps down.)

5           THE COURT:  All right.  I just wanted to put you on

6    notice Juror Number Four has a planned business trip to China

7    at the end of this month.  He would like to know whether this

8    case will still be on in advance in order for him to cancel

9    the trip.  So he has been told we will still be here at the

10   end of the month so, hopefully, he will make arrangements.

11          I think it is prudent for us to give the jurors some

12   idea about where this is so they have that information now.

13   We will see what happens.  I will also reach out to Juror

14   Number Two's employer and see if she can be paid and I will

15   let you know what I hear back.

16          All right.  Is there anything else I should address

17   before we adjourn for the day?

18          MR. KESSLER:  Just on the <u>Daubert</u> schedule, Your

19   Honor?

20          THE COURT:  Yes.

21          MR. KESSLER:  We had proposed -- we're just excusing

22   the witness.

23          THE COURT:  Sorry.  Juror Number One has also

24   informed that she will only be paid for four weeks so she is

25   currently without pay.  We're in week five, correct?

CMH      OCR      RMR      CRR      FCRR

5398

1          Is she not being paid, Ms. Jackson?

2          Juror Number Two has not been paid but Juror

3    Number One's pay will end at the four weeks.

4          MR. DUBIN:  And now, just so we're keeping track,

5    we're finishing the four-week point out, correct?

6          THE COURT:  I believe we're in week five.  We

7    selected our jury November 16th.  So we have been here, that

8    was week one.  October 25th was week two, October 30th was

9    week three, November 6th was week four and this week

10   November 13th is week five.

11         So, we have potential issues with Jurors One and Two

12   at this time.  And Juror Sixteen had indicated a Thanksgiving

13   trip next week.

14         MR. KESSLER:  Fourteen?

15         THE COURT:  I'm sorry.  Juror Fourteen?

16         THE CLERK:  It was Sixteen.

17         THE COURT:  Juror Sixteen had indicated a trip

18   during Thanksgiving week.  She may change.

19         MR. KESSLER:  On the Daubert schedule, we propose

20   that the government files Saturday and the defense files

21   Tuesday.

22         THE COURT:  That's agreeable to both sides?

23         MR. CHANG:  Yes, Your Honor.  Thank you.

24         THE COURT:  All right.  Thank you.

25         (Matter adjourned to November 17, 2017 at 9 a.m.)

5399

1                       I N D E X

2    WITNESSES:

3        JACKSON   SU

4            CROSS-EXAMINATION (Continued)        5174

5            REDIRECT EXAMINATION                 5317

6            RECROSS-EXAMINATION                  5332

7        SUNIL   JAIN

8            DIRECT EXAMINATION                   5349

9

10                       EXHIBITS:

11

12           DX 111-131-1                         5175
             DX 111-131 through 137               5175
13           DX 111-40                            5196
             DX 111-56 and DX 111-57              5215
14           DX 111-65                            5230
             DX 111-127                           5230
15           DX 111-70                            5230
             DX 111-21                            5240
16           DX 111-64                            5240
             DX 111-60                            5255
17           DX 111-41                            5274
             DX 111-126                           5279
18           DX 111-30                            5282
             GX 111-32                            5327
19           GX 114-13                            5362
             GX 124-2                             5368
20           GX 114-16                            5371
             GX 124-3                             5380
21           GX 114-25                            5384
             GX 114-29-A                          5393
22

23

24                   *     *     *     *     *

25

**$**

**$10** [4] - 5279:4, 5279:17, 5279:23, 5280:3
**$10,000** [2] - 5272:23, 5272:25
**$100** [7] - 5271:24, 5272:8, 5277:18, 5277:24, 5278:4, 5299:11, 5303:5
**$12,500** [6] - 5273:9, 5275:13, 5275:22, 5275:23, 5275:25, 5276:8
**$2.28** [1] - 5385:17
**$20,000** [1] - 5273:1
**$200,000** [6] - 5201:20, 5201:22, 5202:1, 5202:10, 5205:17, 5205:25
**$23** [1] - 5267:10
**$250,000** [3] - 5268:14, 5297:15, 5297:20
**$28** [1] - 5267:8
**$29** [1] - 5269:19
**$3,400** [1] - 5298:6
**$30,000** [4] - 5202:18, 5203:11, 5205:1, 5205:12
**$300** [1] - 5178:4
**$31,000** [1] - 5276:14
**$35,000** [2] - 5273:14, 5276:12
**$40** [2] - 5272:8, 5272:13
**$5,000** [4] - 5355:25, 5356:12, 5356:13, 5356:17
**$50,000** [2] - 5329:13, 5329:14
**$600,000** [2] - 5268:3, 5268:5
**$642,129.21** [1] - 5369:25
**$75,000** [2] - 5275:23, 5298:3
**$79,295** [1] - 5275:17
**$8,400** [1] - 5298:9
**$80,000** [1] - 5385:17
**$900,000** [26] - 5187:14, 5191:11, 5192:21, 5198:24, 5202:17, 5203:10, 5204:25, 5205:12, 5206:19, 5207:11, 5207:15, 5208:3, 5208:13, 5208:22, 5209:22, 5210:5,

5212:5, 5213:14, 5304:13, 5328:5, 5332:15, 5333:13, 5333:16, 5333:21, 5360:18, 5361:4
**$913,000** [1] - 5266:11

**'**

**'82** [1] - 5287:13
**'95** [1] - 5189:1
**'96** [1] - 5189:1

**0**

**0001** [1] - 5178:1

**1**

**1** [10] - 5193:13, 5204:9, 5204:23, 5206:6, 5206:14, 5260:16, 5261:12, 5360:17, 5361:9, 5361:14
**1,075,000** [3] - 5180:19, 5182:8, 5182:22
**1.7** [1] - 5303:8
**10,000** [4] - 5242:1, 5242:5, 5284:19, 5285:2
**10-11-12** [1] - 5241:4
**10-K** [5] - 5377:2, 5377:7, 5377:12, 5378:2, 5380:10
**10-k** [7] - 5363:2, 5363:6, 5363:7, 5363:13, 5374:2, 5374:9, 5374:24
**10-Ks** [2] - 5378:18, 5386:6
**10-Q** [3] - 5378:19, 5378:21, 5388:20
**10-Qs** [1] - 5386:6
**10/1/12** [1] - 5237:1
**100** [1] - 5238:1
**106** [2] - 5247:15, 5249:22
**1099** [2] - 5218:24, 5243:12
**1099s** [2] - 5243:21, 5243:22
**11** [8] - 5177:11, 5239:5, 5239:8, 5239:18, 5389:21, 5392:15, 5392:18, 5392:19
**11-108** [1] - 5336:23

**110-14** [1] - 5378:16
**110-64** [1] - 5378:10, 5378:11, 5378:14
**111** [3] - 5179:21, 5205:15, 5206:6
**111-1** [1] - 5324:7
**111-100** [1] - 5197:22
**111-117** [1] - 5179:19
**111-126** [4] - 5279:11, 5279:15, 5279:20, 5399:17
**111-127** [5] - 5230:3, 5230:16, 5230:18, 5238:18, 5399:14
**111-131** [5] - 5165:15, 5174:9, 5174:24, 5175:3, 5399:12
**111-131-1** [7] - 5166:14, 5174:14, 5174:23, 5175:2, 5180:13, 5330:9, 5399:12
**111-134** [1] - 5331:5
**111-136** [1] - 5177:7
**111-14** [1] - 5198:11
**111-144** [1] - 5269:3
**111-160** [1] - 5281:14
**111-17-H** [1] - 5260:11
**111-18** [2] - 5179:25, 5180:13
**111-19** [1] - 5260:19
**111-21** [8] - 5239:13, 5239:23, 5240:4, 5240:7, 5242:23, 5252:18, 5253:1, 5399:15
**111-27** [1] - 5227:2
**111-30** [5] - 5281:25, 5282:21, 5282:23, 5290:5, 5399:18
**111-32** [8] - 5326:4, 5326:13, 5327:7, 5327:9, 5332:3, 5332:4, 5399:18
**111-35** [1] - 5187:4
**111-40** [4] - 5195:17, 5195:20, 5196:3, 5399:13
**111-41** [3] - 5273:25, 5274:10, 5399:17
**111-444** [1] - 5268:25
**111-45** [4] - 5282:9, 5289:17, 5289:18, 5297:12

**111-48** [4] - 5281:6, 5281:10, 5290:15, 5290:19
**111-50** [1] - 5206:4
**111-51** [2] - 5318:17, 5343:16
**111-56** [9] - 5214:14, 5214:17, 5215:2, 5215:3, 5215:6, 5216:10, 5217:22, 5221:4, 5399:13
**111-57** [6] - 5214:15, 5214:18, 5215:3, 5223:5, 5319:24, 5399:13
**111-60** [6] - 5255:4, 5255:13, 5255:15, 5257:20, 5258:2, 5399:16
**111-64** [6] - 5239:13, 5240:4, 5240:7, 5240:9, 5241:5, 5399:16
**111-65** [6] - 5227:2, 5230:3, 5230:15, 5230:18, 5236:8, 5399:14
**111-70** [6] - 5226:9, 5227:1, 5230:2, 5230:4, 5230:18, 5399:15
**111-71** [3] - 5205:19
**111-87** [2] - 5281:10, 5292:11
**111-88** [2] - 5281:11, 5293:12
**111-89** [1] - 5281:11
**111-90** [2] - 5281:12, 5293:24
**111-91** [1] - 5281:12
**111-92** [1] - 5281:13
**111-93** [3] - 5281:13, 5294:4, 5294:8
**111-94** [4] - 5294:11, 5294:15, 5294:20, 5294:22
**114-13** [4] - 5361:24, 5362:17, 5362:19, 5399:19
**114-16** [5] - 5370:18, 5371:3, 5371:5, 5372:12, 5399:20
**114-25** [5] - 5383:14, 5384:7, 5384:9, 5384:10, 5399:21
**114-29-A** [7] - 5389:22, 5392:17, 5392:19, 5393:5, 5393:8, 5393:9, 5399:21

**114-5** [3] - 5358:23, 5359:2, 5359:4
**11th** [2] - 5157:6, 5239:7
**12** [22] - 5164:14, 5174:18, 5175:6, 5176:16, 5195:23, 5196:7, 5227:23, 5227:24, 5276:23, 5277:4, 5278:15, 5278:23, 5283:22, 5289:20, 5297:13, 5333:14, 5333:22, 5334:23, 5336:4, 5346:8, 5369:2, 5377:15
**12,500** [1] - 5275:16
**12/31/12** [1] - 5386:23
**12/7/12** [1] - 5331:21
**123,000** [1] - 5304:4
**123-1** [2] - 5355:5, 5355:7
**124-1** [2] - 5354:11, 5354:13
**124-2** [4] - 5367:23, 5368:9, 5368:11, 5399:19
**124-3** [5] - 5379:6, 5380:1, 5380:3, 5380:4, 5399:20
**125** [1] - 5272:10
**126,000** [1] - 5304:5
**12:04** [1] - 5324:9
**12th** [4] - 5278:10, 5279:24, 5280:9, 5282:12
**13** [8] - 5226:11, 5237:12, 5238:16, 5293:13, 5323:14, 5375:4, 5378:2, 5378:9
**137** [5] - 5165:15, 5174:9, 5174:24, 5175:3, 5399:12
**13th** [3] - 5238:19, 5342:5, 5398:10
**14** [4] - 5334:12, 5334:15, 5370:21, 5378:15
**14th** [1] - 5238:20
**15** [7] - 5156:7, 5198:19, 5310:1, 5310:11, 5311:3, 5311:22, 5312:17
**15,000** [5] - 5242:1, 5242:14, 5242:20, 5285:1
**15-CR-637(KAM** [1] - 5156:3

**15th** [2] - 5310:16, 5396:10
**16** [5] - 5197:24, 5201:8, 5238:16, 5266:25, 5267:3
**16th** [1] - 5398:7
**17** [1] - 5398:25
**18** [5] - 5161:6, 5250:11, 5273:18, 5274:1, 5274:4
**187,237** [1] - 5357:6
**18th** [1] - 5230:22
**19** [4] - 5247:15, 5250:8, 5250:11, 5393:18
**1991** [1] - 5349:18
**1996** [2] - 5189:2, 5189:11
**1997** [1] - 5262:7
**1998** [1] - 5188:24
**1st** [1] - 5396:18

**2**

**2** [3] - 5203:15, 5354:16, 5382:8
**2.2** [2] - 5385:13, 5385:16
**2.5** [1] - 5181:17
**20** [1] - 5393:11
**200** [1] - 5156:17
**2004** [2] - 5265:10, 5349:23
**2006** [1] - 5265:10
**2008** [3] - 5266:25, 5267:3, 5270:20
**2009** [7] - 5270:4, 5270:11, 5270:12, 5270:15, 5270:17, 5270:22, 5271:2
**2011** [18] - 5225:3, 5225:9, 5225:11, 5269:23, 5271:12, 5350:23, 5352:7, 5352:15, 5352:25, 5353:3, 5353:15, 5354:20, 5357:1, 5358:19, 5358:25, 5360:11, 5360:12, 5360:13
**2012** [136] - 5164:14, 5174:12, 5174:18, 5175:6, 5176:16, 5177:11, 5178:9, 5178:14, 5178:21, 5179:17, 5180:2, 5180:14, 5180:18, 5181:13, 5183:14, 5183:19, 5184:2, 5184:10, 5184:24,

5185:8, 5185:11, 5186:8, 5186:15, 5186:18, 5186:21, 5186:22, 5187:17, 5187:19, 5187:21, 5189:12, 5192:1, 5192:13, 5192:22, 5195:23, 5196:12, 5196:13, 5197:25, 5199:20, 5202:1, 5202:4, 5202:11, 5203:10, 5204:25, 5205:20, 5208:12, 5214:4, 5214:16, 5220:1, 5220:5, 5224:19, 5225:1, 5225:5, 5225:12, 5226:10, 5226:11, 5230:7, 5236:16, 5237:12, 5238:16, 5239:5, 5239:8, 5239:15, 5239:19, 5240:1, 5241:3, 5241:11, 5241:22, 5242:24, 5245:14, 5253:4, 5254:17, 5254:23, 5255:9, 5260:16, 5261:12, 5270:2, 5271:18, 5272:20, 5273:18, 5274:1, 5274:4, 5276:7, 5277:5, 5277:15, 5277:17, 5283:13, 5283:15, 5283:16, 5284:1, 5284:8, 5285:7, 5285:13, 5286:21, 5288:19, 5290:10, 5290:11, 5290:12, 5297:15, 5297:21, 5299:14, 5299:24, 5300:5, 5300:19, 5302:4, 5322:7, 5322:15, 5322:25, 5323:3, 5326:17, 5335:12, 5352:3, 5354:16, 5360:17, 5361:7, 5361:9, 5361:10, 5361:14, 5361:17, 5361:18, 5361:19, 5362:1, 5362:11, 5362:25, 5365:14, 5367:17, 5368:4, 5370:3, 5371:1, 5372:14, 5373:21, 5374:3, 5374:24, 5376:4
**20124** [1] - 5275:11
**2013** [71] - 5183:14, 5183:15, 5185:19, 5185:21, 5276:23,

5277:4, 5278:23, 5281:19, 5282:4, 5282:8, 5289:16, 5290:8, 5290:12, 5291:3, 5291:22, 5292:12, 5294:18, 5294:25, 5295:6, 5295:23, 5304:9, 5313:22, 5318:11, 5319:10, 5319:14, 5334:9, 5335:23, 5342:19, 5343:22, 5343:23, 5345:3, 5346:2, 5346:6, 5346:15, 5346:24, 5362:4, 5368:1, 5368:21, 5369:2, 5369:6, 5370:21, 5371:10, 5375:4, 5377:22, 5378:2, 5378:9, 5378:25, 5379:4, 5379:9, 5380:14, 5380:24, 5381:3, 5381:4, 5384:20, 5386:24, 5388:20, 5388:21, 5388:22, 5389:6, 5389:18, 5390:11, 5390:19, 5391:22, 5392:5, 5392:24, 5393:12, 5393:18, 5394:1
**2014** [1] - 5306:10
**2017** [7] - 5156:7, 5203:5, 5203:6, 5204:24, 5205:10, 5205:12, 5398:25
**21** [12] - 5242:24, 5250:8, 5253:4, 5283:13, 5283:15, 5283:16, 5284:1, 5285:6, 5285:12, 5295:24, 5296:4, 5296:25
**2103** [1] - 5319:12
**2124** [5] - 5248:23, 5249:20, 5250:5, 5250:10, 5250:22
**2135** [2] - 5246:15, 5246:21
**2136** [5] - 5247:6, 5247:10, 5247:12, 5250:11, 5323:11
**21st** [1] - 5283:3
**22,500** [1] - 5360:17
**2200** [4] - 5203:14, 5203:16, 5204:9, 5204:23
**2201** [2] - 5203:14, 5204:23

**225** [1] - 5156:23
**22500** [1] - 5199:25
**24** [8] - 5203:14, 5203:16, 5204:23, 5379:9, 5379:16, 5380:8, 5380:14, 5380:24
**24-hour** [1] - 5162:25
**25** [1] - 5303:9
**25,000** [1] - 5284:20
**250,000** [1] - 5268:19
**2527** [1] - 5199:18
**25th** [1] - 5388:8
**27** [8] - 5192:22, 5193:9, 5294:18, 5294:25, 5295:4, 5295:6, 5310:4, 5362:4
**271** [1] - 5156:15
**27th** [2] - 5310:8, 5396:16
**28** [1] - 5310:4
**28th** [2] - 5162:9, 5162:10
**29** [6] - 5160:4, 5192:22, 5193:10, 5236:16, 5239:15, 5310:5
**29th** [3] - 5236:9, 5260:12, 5396:18
**2:20** [1] - 5308:5
**2:30** [3] - 5227:23, 5227:25, 5308:11
**2:58** [1] - 5326:20

**3**

**3** [5] - 5180:14, 5180:17, 5181:20, 5182:9, 5199:20
**30** [12] - 5193:13, 5205:20, 5279:3, 5280:3, 5280:4, 5280:8, 5280:13, 5310:5, 5342:19, 5361:17, 5381:4, 5394:1
**300,000** [2] - 5177:25, 5178:4
**30th** [2] - 5396:18, 5398:8
**31** [18] - 5277:17, 5352:7, 5356:25, 5358:25, 5360:11, 5360:12, 5360:13, 5361:9, 5361:14, 5361:18, 5361:19, 5362:11, 5368:1, 5368:20, 5369:6, 5376:4, 5379:4,

5386:23
**34** [1] - 5277:17
**3500** [1] - 5340:4
**3500-JS-7** [1] - 5190:18
**3rd** [7] - 5273:9, 5273:14, 5275:11, 5275:23, 5275:25, 5332:19, 5332:23

**4**

**4** [11] - 5180:2, 5181:11, 5181:13, 5182:4, 5183:9, 5206:16, 5208:12, 5310:6, 5310:13, 5324:8, 5326:17
**40** [8] - 5199:25, 5272:9, 5318:19, 5319:5, 5350:22, 5358:7, 5358:8
**42** [6] - 5318:19, 5319:5, 5334:12, 5334:15, 5340:11, 5345:1
**48** [1] - 5376:6
**48th** [1] - 5156:17
**4:30** [5] - 5308:5, 5308:17, 5313:12, 5313:13, 5392:21
**4th** [2] - 5332:10, 5332:25

**5**

**5** [7] - 5257:20, 5291:3, 5291:9, 5291:21, 5291:22, 5292:12, 5346:24
**5.6** [1] - 5267:13
**50** [4] - 5206:13, 5350:22, 5358:7, 5358:8
**50,000** [3] - 5284:19, 5298:12, 5298:16
**5174** [1] - 5399:4
**5175** [2] - 5399:12, 5399:12
**5196** [1] - 5399:13
**5215** [1] - 5399:13
**5230** [3] - 5399:14, 5399:14, 5399:15
**5240** [2] - 5399:15, 5399:16
**5255** [1] - 5399:16
**5274** [1] - 5399:17
**5279** [1] - 5399:17
**5282** [1] - 5399:18
**5317** [1] - 5399:5

**5327** [1] - 5399:18
**5332** [1] - 5399:6
**5349** [1] - 5399:8
**5362** [1] - 5399:19
**5368** [1] - 5399:19
**5371** [1] - 5399:20
**5380** [1] - 5399:20
**5384** [1] - 5399:21
**5393** [1] - 5399:21
**5496** [2] - 5165:9, 5166:12
**563,380** [1] - 5373:5
**5:30** [3] - 5162:3, 5162:4, 5163:3
**5th** [4] - 5162:15, 5280:23, 5287:16

---

# 6

**6** [2] - 5287:13, 5346:8
**6.8** [1] - 5303:3
**613-2643** [1] - 5156:24
**66** [1] - 5275:17
**682** [2] - 5292:6, 5346:21
**682-B** [8] - 5277:2, 5278:20, 5287:14, 5291:13, 5291:14, 5291:17, 5291:19, 5346:20
**69** [1] - 5375:1
**6th** [1] - 5398:9

---

# 7

**7** [2] - 5214:16, 5215:4
**700,000** [1] - 5328:25
**718** [1] - 5156:24
**72** [3] - 5375:9, 5375:11, 5376:2
**75** [1] - 5272:10

---

# 8

**8** [6] - 5282:4, 5282:8, 5289:8, 5289:16, 5310:14, 5379:6
**8-K** [2] - 5352:11
**8:28** [2] - 5279:2, 5279:24
**8:57** [4] - 5277:4, 5278:11, 5278:16, 5278:23
**8K** [7] - 5214:8, 5222:3, 5222:4, 5222:6, 5222:10,

---

5222:13, 5222:18
**8th** [4] - 5163:5, 5163:7, 5282:16, 5287:6

---

# 9

**9** [3] - 5267:6, 5383:12, 5398:25
**91** [1] - 5377:15
**92** [1] - 5377:15
**966** [4] - 5374:7, 5374:11, 5374:23, 5378:12
**9:00** [2] - 5156:7, 5396:23

---

# A

**a.m** [9] - 5156:7, 5277:4, 5278:11, 5278:16, 5278:23, 5279:2, 5279:24, 5324:9, 5398:25
**ability** [1] - 5172:20
**able** [8] - 5162:15, 5162:23, 5181:18, 5241:16, 5336:4, 5343:4, 5365:6, 5373:14
**absence** [1] - 5284:11
**absences** [1] - 5283:24
**absent** [1] - 5342:15
**absolutely** [2] - 5263:11, 5263:12
**accept** [1] - 5232:14
**acceptable** [2] - 5231:13, 5317:12
**accepted** [3] - 5175:21, 5350:12, 5394:3
**access** [3] - 5280:25, 5295:10, 5295:18
**accessed** [8] - 5281:2, 5281:21, 5288:11, 5288:15, 5292:8, 5292:14, 5296:1, 5296:13
**accessing** [3] - 5289:21, 5296:25, 5298:21
**accordance** [5] - 5350:10, 5359:16, 5364:1, 5366:14, 5387:16
**according** [11] - 5179:9, 5193:8, 5208:6, 5210:8,

---

5221:4, 5239:20, 5277:18, 5277:23, 5320:15, 5328:19, 5328:22
**According** [4] - 5292:9, 5298:1, 5298:5, 5298:8
**accordingly** [1] - 5373:5
**account** [18] - 5199:2, 5199:18, 5199:19, 5258:11, 5264:20, 5273:1, 5273:2, 5273:20, 5274:2, 5275:15, 5275:18, 5275:24, 5276:14, 5296:14, 5350:8, 5350:16, 5352:19
**accountancy** [1] - 5349:17
**accountant** [3] - 5215:25, 5349:14, 5353:6
**accountant's** [1] - 5359:10
**accountants** [4] - 5196:22, 5197:7, 5217:9, 5260:7
**accounting** [14] - 5215:24, 5218:16, 5219:17, 5223:16, 5223:21, 5349:9, 5349:15, 5349:22, 5350:12, 5364:5, 5376:3, 5388:12
**Accounting** [3] - 5217:1, 5223:6, 5223:11
**accurate** [4] - 5157:20, 5205:3, 5205:9, 5350:7
**accused** [1] - 5169:9
**acknowledgment** [1] - 5199:14
**acquire** [1] - 5217:1
**acquisition** [3] - 5175:8, 5217:2, 5224:14
**Act** [2] - 5267:21, 5269:16
**Acting** [1] - 5156:13
**action** [2] - 5304:25, 5387:11
**activity** [3] - 5274:2, 5274:5
**actual** [2] - 5212:5, 5370:11
**Adams** [1] - 5238:24
**add** [2] - 5285:8,

---

5396:14
**added** [3] - 5356:23, 5368:6, 5383:22
**addition** [1] - 5342:14
**additional** [9] - 5162:7, 5162:9, 5242:1, 5303:8, 5332:13, 5369:5, 5379:1, 5386:13, 5394:4
**address** [6] - 5253:8, 5274:12, 5274:19, 5293:8, 5396:12, 5397:16
**addressed** [4] - 5185:23, 5185:24, 5256:7, 5394:15
**addresses** [2] - 5344:6, 5344:13
**adds** [1] - 5355:3
**adjourn** [2] - 5310:22, 5397:17
**adjourned** [2] - 5310:21, 5398:25
**adjourning** [1] - 5308:17
**admin** [1] - 5292:22
**admin@ msmbcapital.com** [1] - 5291:3
**administrative** [1] - 5381:25
**admissible** [1] - 5171:19
**admission** [1] - 5164:6
**admit** [2] - 5230:17, 5362:19
**admitted** [2] - 5171:18, 5173:4
**admitting** [1] - 5374:18
**advance** [5] - 5158:13, 5169:17, 5169:25, 5170:10, 5397:8
**advancing** [1] - 5170:16
**adversely** [1] - 5258:19
**advertised** [2] - 5271:24, 5272:3
**advice** [3] - 5223:7, 5224:15, 5334:3
**advise** [2] - 5157:4, 5283:25
**advised** [2] - 5258:12, 5284:7
**advising** [1] -

---

5213:14
**advocate** [2] - 5224:4, 5224:9
**affect** [5] - 5160:23, 5160:24, 5218:12, 5258:19, 5392:8
**affected** [2] - 5392:10, 5392:14
**affiliated** [2] - 5236:23, 5286:12
**affiliates** [2] - 5258:12, 5258:15
**affirmatively** [6] - 5168:6, 5168:9, 5170:16, 5170:21, 5171:14, 5171:22
**afford** [1] - 5312:12
**afield** [1] - 5339:16
**afternoon** [4] - 5222:23, 5344:18, 5349:3, 5349:4
**AFTERNOON** [1] - 5309:1
**afterwards** [1] - 5264:21
**agent** [23] - 5158:8, 5158:18, 5158:19, 5167:7, 5167:10, 5167:13, 5167:17, 5167:24, 5168:4, 5168:8, 5168:9, 5168:22, 5169:18, 5170:1, 5170:13, 5170:14, 5170:17, 5170:19, 5170:24, 5171:4, 5171:9, 5171:19, 5171:24
**agent's** [2] - 5166:19, 5167:5
**aggregate** [2] - 5178:4, 5372:16
**ago** [12] - 5194:10, 5194:12, 5197:18, 5201:25, 5232:8, 5234:13, 5268:3, 5278:3, 5285:1, 5334:10, 5337:3, 5355:10
**agree** [8] - 5223:14, 5258:2, 5264:24, 5280:16, 5312:9, 5312:14, 5371:16, 5390:10
**agreeable** [1] - 5398:22
**agreed** [1] - 5284:14
**agreement** [48] - 5165:21, 5165:22, 5166:11, 5177:9, 5185:25, 5190:14,

---

5191:6, 5223:3,
5236:10, 5236:18,
5242:16, 5254:24,
5255:8, 5255:18,
5255:23, 5256:1,
5256:8, 5257:7,
5257:8, 5257:16,
5258:1, 5259:1,
5260:2, 5260:3,
5260:12, 5262:2,
5283:14, 5283:23,
5285:25, 5286:15,
5286:17, 5286:18,
5286:21, 5289:3,
5304:1, 5304:2,
5305:5, 5322:4,
5331:7, 5342:22,
5361:3, 5382:23,
5383:7, 5384:23,
5385:1, 5385:5,
5391:17
  **agreements** [38] -
5164:5, 5164:12,
5164:23, 5164:24,
5166:12, 5166:24,
5174:8, 5174:11,
5174:21, 5175:8,
5176:18, 5177:4,
5177:6, 5218:19,
5218:20, 5237:4,
5330:10, 5330:22,
5331:1, 5373:25,
5378:7, 5382:21,
5382:23, 5382:25,
5383:2, 5383:8,
5383:11, 5383:17,
5384:5, 5384:20,
5384:22, 5386:3,
5387:8, 5388:13,
5389:5, 5394:3,
5394:5
  **Agreements** [1] -
5330:13
  **ahead** [9] - 5167:10,
5167:16, 5168:2,
5168:10, 5170:23,
5171:7, 5250:21,
5311:13, 5375:9
  **aided** [1] - 5156:25
  **ALIXANDRA** [1] -
5156:13
  **allegation** [4] -
5271:23, 5342:15,
5345:11, 5345:12
  **allegations** [1] -
5342:9
  **allege** [1] - 5342:4
  **alleged** [2] -
5267:18, 5303:1
  **Allison** [1] - 5233:23

  **allocated** [1] -
5275:7
  **allocation** [2] -
5179:12, 5186:12
  **allow** [9] - 5171:18,
5211:16, 5228:20,
5229:12, 5261:24,
5315:21, 5316:4,
5335:15, 5344:20
  **allowed** [3] - 5190:8,
5190:12, 5334:25
  **ambitious** [1] -
5157:23
  **amenable** [4] -
5158:11, 5158:22,
5161:10, 5161:13
  **amendments** [1] -
5386:12
  **AMERICA** [1] -
5156:3
  **America** [1] - 5292:8
  **amount** [22] -
5162:20, 5167:22,
5241:6, 5241:10,
5241:14, 5272:7,
5272:11, 5295:12,
5327:21, 5328:5,
5333:4, 5357:6,
5369:12, 5369:14,
5369:17, 5369:18,
5369:19, 5372:16,
5373:16, 5385:7,
5385:16, 5385:17
  **amounts** [4] -
5331:1, 5383:8,
5383:10, 5386:21
  **analysis** [7] - 5217:1,
5299:7, 5363:11,
5381:8, 5381:13,
5381:19, 5381:24
  **analyst** [1] - 5262:11
  **analytical** [2] -
5381:6
  **anchoring** [1] -
5165:23
  **and-57** [1] - 5215:2
  **Andrew** [4] -
5176:18, 5177:16,
5233:17, 5353:11
  **Andy** [4] - 5335:11,
5336:14, 5336:15,
5336:17
  **announced** [2] -
5279:4, 5289:12
  **announcement** [3] -
5279:17, 5279:22,
5280:8
  **announcing** [3] -
5280:2, 5280:14,
5281:8

  **annual** [4] - 5362:6,
5362:22, 5362:24,
5386:9
  **anonymously** [1] -
5258:22
  **answer** [17] - 5188:6,
5202:2, 5207:4,
5207:24, 5208:5,
5224:13, 5228:19,
5244:18, 5261:23,
5262:4, 5263:1,
5274:25, 5297:6,
5316:6, 5316:22,
5391:7, 5394:21
  **ANSWER** [8] -
5248:14, 5251:5,
5251:7, 5314:21,
5315:9, 5323:19,
5323:22, 5323:25
  **answered** [4] -
5187:10, 5244:14,
5244:16, 5261:2
  **answering** [1] -
5259:1
  **anticipate** [1] -
5167:23
  **anticipated** [1] -
5313:1
  **anticipates** [1] -
5310:4
  **anyway** [3] -
5161:12, 5163:2,
5229:13
  **apparent** [1] -
5180:24
  **APPEARANCES** [1] -
5156:11
  **appellate** [2] -
5340:2, 5343:16
  **application** [3] -
5160:10, 5249:21,
5391:8
  **applies** [2] -
5258:20, 5258:22
  **apply** [1] - 5328:9
  **appointment** [2] -
5185:25, 5186:6
  **appointments** [2] -
5160:20, 5160:22,
5160:25
  **appreciate** [2] -
5157:8, 5231:25
  **approach** [11] -
5195:18, 5197:20,
5229:21, 5239:11,
5255:2, 5269:1,
5273:23, 5279:13,
5282:1, 5289:23,
5336:21
  **appropriate** [2] -

  **5215:15, 5341:20
  **approve** [1] -
5303:18
  **approved** [3] -
5303:20, 5367:13,
5367:15
  **arbitration** [9] -
5186:5, 5186:6,
5266:15, 5269:6,
5302:23, 5303:12,
5304:18, 5304:25,
5338:16
  **arbitrator** [4] -
5267:15, 5268:9,
5268:10, 5304:2
  **arbitrators** [2] -
5268:10, 5268:13
  **area** [4] - 5243:24,
5341:19, 5342:25,
5343:1
  **argument** [1] -
5158:17
  **arrange** [1] - 5371:16
  **arrangements** [1] -
5397:10
  **arranging** [1] -
5241:23
  **arrested** [1] - 5263:9
  **Aselage** [25] -
5158:5, 5179:16,
5180:2, 5181:8,
5183:6, 5183:13,
5183:20, 5183:22,
5184:2, 5184:15,
5184:21, 5184:23,
5184:24, 5185:7,
5185:10, 5185:15,
5186:9, 5186:11,
5318:6, 5324:8,
5326:17, 5332:20,
5333:7, 5334:2
  **Aselage's** [1] -
5236:25
  **aside** [8] - 5160:13,
5191:1, 5191:2,
5216:24, 5269:12,
5330:2, 5334:20,
5358:17
  **Aslage** [18] -
5201:17, 5205:16,
5205:21, 5205:24,
5208:17, 5210:5,
5213:3, 5213:11,
5219:18, 5219:22,
5219:25, 5220:4,
5220:8, 5220:11,
5220:13, 5220:18,
5301:7, 5301:15
  **asserted** [1] -
5268:20

  **assertion** [1] -
5376:14
  **assessment** [1] -
5178:19
  **assets** [8] - 5189:22,
5271:23, 5272:7,
5272:11, 5272:13,
5277:18, 5277:24,
5303:5
  **assigned** [3] -
5221:15, 5243:22,
5243:23
  **assigning** [3] -
5214:7, 5215:17,
5215:21
  **assignments** [2] -
5319:25, 5320:6
  **Assistant** [1] -
5156:15
  **assume** [6] -
5168:14, 5289:8,
5302:1, 5302:2,
5367:12
  **assumed** [1] -
5164:21
  **assumes** [1] -
5395:1
  **assurance** [2] -
5352:23, 5363:16
  **assurances** [1] -
5350:3
  **attach** [4] - 5166:9,
5166:12, 5274:22,
5370:24
  **Attached** [1] - 5165:5
  **attached** [15] -
5165:12, 5175:8,
5221:6, 5237:5,
5237:7, 5238:3,
5255:23, 5256:1,
5260:21, 5275:9,
5277:14, 5282:18,
5330:23, 5371:16,
5393:14
  **attaching** [1] -
5330:9
  **Attachment** [1] -
5274:1
  **attachment** [7] -
5237:11, 5237:13,
5237:14, 5241:8,
5255:7, 5274:14,
5283:6
  **attempt** [1] - 5341:19
  **attempted** [1] -
5346:3
  **attention** [22] -
5190:22, 5246:14,
5247:13, 5247:20,
5269:7, 5272:18,

5275:10, 5317:14, 5364:13, 5364:15, 5378:3, 5378:6, 5380:25, 5382:2, 5382:13, 5382:14, 5384:21, 5384:24, 5385:2, 5389:6, 5396:25

**attorney** [20] - 5185:25, 5186:2, 5186:4, 5186:5, 5209:5, 5209:6, 5209:14, 5210:16, 5210:23, 5210:25, 5212:2, 5212:22, 5213:6, 5213:7, 5213:10, 5306:22, 5307:12, 5307:16, 5324:20, 5325:7

**Attorney** [1] - 5156:13

**attorney's** [1] - 5369:1

**attorney-client** [1] - 5307:12

**Attorneys** [1] - 5156:15

**attorneys** [3] - 5213:21, 5321:2, 5325:11

**attorneys'** [1] - 5268:14

**audit** [55] - 5350:8, 5352:6, 5352:9, 5352:14, 5352:18, 5352:23, 5352:25, 5353:3, 5353:5, 5353:7, 5353:15, 5353:23, 5353:24, 5354:20, 5357:5, 5358:6, 5358:7, 5358:10, 5358:18, 5359:15, 5360:9, 5360:12, 5361:6, 5361:18, 5361:19, 5362:2, 5362:6, 5362:9, 5362:22, 5362:24, 5362:25, 5363:5, 5363:15, 5364:3, 5364:9, 5364:16, 5365:13, 5365:21, 5365:22, 5365:24, 5366:3, 5366:6, 5366:14, 5366:19, 5366:20, 5366:22, 5368:3, 5369:15, 5370:3, 5371:1, 5373:21, 5376:4, 5378:19, 5378:21

**audited** [7] - 5352:12, 5358:23, 5359:7, 5359:20, 5360:24, 5363:8, 5386:23

**auditing** [8] - 5349:25, 5350:2, 5350:3, 5352:17, 5353:20, 5367:17, 5373:10, 5376:13

**auditor** [2] - 5350:23, 5355:13

**auditor's** [1] - 5363:21

**auditors** [2] - 5364:12, 5386:7

**audits** [2] - 5350:19, 5358:8

**August** [7] - 5269:23, 5388:21, 5389:17, 5390:11, 5392:24, 5393:11, 5393:18

**authority** [4] - 5191:10, 5191:13, 5235:7, 5235:9

**authorization** [2] - 5295:19, 5377:7

**authorize** [2] - 5314:16, 5316:7

**authorized** [8] - 5305:14, 5314:11, 5314:21, 5314:25, 5315:7, 5315:11, 5315:20, 5315:21

**authorizing** [1] - 5313:21

**available** [3] - 5227:25, 5312:16, 5369:6

**Avenue** [1] - 5156:17

**avoid** [3] - 5167:5, 5234:7, 5286:10

**award** [1] - 5285:10

**aware** [15] - 5158:7, 5202:15, 5202:17, 5202:18, 5219:11, 5219:13, 5219:16, 5219:18, 5220:1, 5341:17, 5354:1, 5376:10, 5382:17, 5394:11

## B

**Bach** [3] - 5286:19, 5303:13, 5303:15

**Bachelor's** [1] - 5349:15

**background** [1] - 5260:9

**backpay** [4] - 5241:7, 5241:11, 5242:9, 5242:10

**backup** [1] - 5218:7

**bad** [6] - 5371:17, 5371:24, 5372:4, 5372:7, 5372:9, 5373:6

**balance** [4] - 5360:6, 5362:10, 5372:3, 5381:13

**balances** [4] - 5352:19, 5354:8, 5355:13, 5357:16

**Balbin** [1] - 5384:11

**ballpark** [1] - 5382:7

**BancTec** [2] - 5265:8, 5265:15

**Bank** [3] - 5273:19, 5274:22, 5292:8

**bank** [10] - 5272:9, 5199:18, 5199:19, 5273:1, 5273:2, 5274:4, 5275:15, 5275:24, 5296:14, 5350:9

**banking** [1] - 5349:19

**Bar** [4] - 5160:18, 5162:5, 5163:3, 5163:4

**bar** [4] - 5158:20, 5338:6, 5345:17, 5395:3

**Bar-related** [1] - 5160:18

**bars** [5] - 5158:10, 5168:11, 5168:23, 5169:1, 5169:4

**Based** [1] - 5303:25

**based** [15] - 5157:23, 5241:22, 5261:10, 5261:21, 5271:4, 5277:24, 5284:10, 5303:4, 5303:9, 5308:8, 5315:23, 5352:19, 5352:21, 5352:22, 5391:7

**basis** [1] - 5243:12

**Bates** [3] - 5290:23, 5290:24

**bear** [1] - 5344:21

**became** [1] - 5322:24

**become** [1] - 5233:25

**BEFORE** [1] - 5156:10

**beg** [1] - 5244:15

**beginning** [1] -

5353:24

**begins** [2] - 5355:17, 5363:15

**behalf** [12] - 5159:15, 5224:4, 5228:14, 5258:24, 5282:6, 5286:11, 5306:7, 5357:3, 5357:8, 5372:15, 5387:10, 5387:12

**behind** [12] - 5209:12, 5211:14, 5211:15, 5358:21, 5361:22, 5367:21, 5370:16, 5374:5, 5379:6, 5383:12, 5389:21, 5392:15

**belief** [1] - 5319:15

**believes** [1] - 5316:21

**bell** [1] - 5305:4

**Below** [1] - 5221:6

**below** [13] - 5215:14, 5216:6, 5216:16, 5327:3, 5327:16, 5327:18, 5329:9, 5362:6, 5362:22, 5362:24, 5369:17, 5369:19, 5369:22

**benchmark** [1] - 5369:16

**best** [6] - 5159:23, 5160:1, 5207:24, 5388:17, 5396:8, 5396:20

**better** [3] - 5212:25, 5213:25, 5310:24

**Between** [1] - 5389:5

**between** [34] - 5174:17, 5175:16, 5177:16, 5183:2, 5193:13, 5220:15, 5230:6, 5244:8, 5244:12, 5244:20, 5245:6, 5245:17, 5245:21, 5245:25, 5246:1, 5246:6, 5246:21, 5246:22, 5257:16, 5260:13, 5272:8, 5303:23, 5312:21, 5326:10, 5331:8, 5363:5, 5381:21, 5388:9, 5390:19, 5391:4, 5391:22, 5391:25, 5392:5, 5394:14

**beyond** [4] - 5335:13, 5338:14, 5339:20, 5346:12

**Biestek** [19] -

5164:11, 5174:18, 5174:20, 5175:6, 5176:17, 5177:3, 5232:17, 5232:22, 5233:9, 5239:5, 5239:7, 5239:18, 5260:13, 5261:13, 5261:17, 5262:1, 5330:12, 5330:17

**big** [2] - 5158:7, 5211:15

**billed** [2] - 5328:18, 5329:6

**bills** [6] - 5244:22, 5245:7, 5357:1, 5357:6, 5369:24, 5370:11

**binder** [11] - 5173:2, 5354:12, 5358:21, 5361:23, 5367:22, 5370:16, 5374:5, 5379:7, 5383:12, 5389:21, 5392:16

**bit** [5] - 5187:20, 5194:20, 5312:21, 5346:22

**black** [1] - 5384:3

**blame** [1] - 5312:25

**blaming** [2] - 5303:22, 5343:3

**block** [3] - 5252:19, 5253:10, 5357:19

**Bloomberg** [1] - 5270:17

**blow** [2] - 5215:5, 5384:11

**board** [16] - 5184:4, 5185:17, 5185:23, 5185:24, 5186:1, 5206:6, 5208:17, 5211:5, 5243:1, 5301:13, 5366:23, 5366:25, 5367:3, 5367:5, 5367:13, 5367:15

**body** [1] - 5262:22

**bonus** [5] - 5277:5, 5277:8, 5277:15, 5280:5, 5287:1

**bonuses** [1] - 5297:22

**book** [2] - 5265:18, 5265:20

**books** [5] - 5219:17, 5220:9, 5220:12, 5385:22

**borne** [1] - 5394:6

**bottom** [9] - 5220:22, 5222:2, 5234:3, 5242:24, 5243:4,

5330:12, 5355:24, 5357:18, 5383:24
**bought** [3] - 5175:22, 5175:24, 5336:10
**bounded** [1] - 5303:25
**box** [11] - 5217:3, 5224:12, 5293:5, 5293:10, 5354:22, 5354:25, 5356:20, 5356:23, 5368:25, 5369:5, 5369:11
**boxes** [2] - 5368:6, 5368:23
**Brafman** [2] - 5159:15, 5170:3
**breach** [2] - 5267:19, 5269:14
**break** [9] - 5204:1, 5227:5, 5227:9, 5227:10, 5227:13, 5308:2, 5333:25, 5348:13, 5392:21
**breaks** [1] - 5161:13
**bridge** [1] - 5289:3
**BRIDGET** [1] - 5156:12
**brief** [1] - 5160:9
**briefed** [1] - 5170:15
**briefing** [2] - 5167:4, 5317:12
**briefly** [3] - 5157:10, 5349:13, 5352:17
**bring** [9] - 5169:23, 5172:8, 5210:15, 5210:22, 5211:23, 5229:14, 5247:20, 5272:17, 5313:14
**brings** [1] - 5212:22
**broad** [1] - 5171:25
**Brodsky** [22] - 5162:14, 5170:12, 5170:24, 5171:12, 5173:15, 5211:3, 5229:19, 5241:21, 5245:5, 5245:20, 5246:12, 5247:16, 5249:7, 5250:21, 5253:23, 5297:7, 5302:8, 5314:1, 5333:25, 5338:9, 5339:6, 5343:19
**BRODSKY** [189] - 5156:19, 5159:6, 5159:12, 5159:17, 5159:22, 5164:3, 5164:9, 5164:18, 5164:21, 5165:2, 5165:6, 5165:8, 5165:13, 5166:1,

5166:4, 5166:6, 5166:10, 5166:13, 5168:16, 5169:2, 5169:6, 5172:21, 5173:6, 5173:8, 5173:10, 5173:17, 5174:5, 5174:23, 5179:1, 5179:23, 5180:10, 5185:6, 5186:19, 5188:5, 5192:8, 5192:12, 5195:18, 5195:22, 5197:2, 5197:20, 5197:23, 5198:8, 5198:16, 5201:1, 5202:6, 5203:1, 5203:14, 5203:17, 5203:20, 5204:2, 5204:6, 5204:10, 5204:17, 5204:20, 5204:21, 5205:20, 5206:5, 5206:12, 5207:21, 5211:5, 5211:11, 5211:17, 5214:24, 5215:5, 5215:7, 5222:1, 5227:1, 5227:4, 5228:25, 5229:2, 5229:6, 5229:20, 5230:1, 5230:12, 5230:15, 5237:16, 5239:11, 5239:13, 5240:3, 5240:9, 5241:1, 5245:22, 5246:13, 5246:24, 5247:1, 5247:5, 5247:17, 5247:23, 5248:1, 5248:3, 5248:23, 5249:3, 5249:8, 5249:19, 5250:1, 5250:4, 5250:7, 5250:10, 5252:2, 5252:10, 5255:2, 5255:5, 5255:13, 5260:1, 5261:4, 5261:9, 5261:18, 5261:21, 5269:1, 5269:5, 5273:23, 5274:8, 5277:2, 5278:20, 5279:13, 5279:16, 5280:24, 5281:9, 5282:1, 5282:3, 5282:21, 5283:16, 5286:8, 5287:13, 5289:1, 5289:17, 5289:23, 5290:3, 5290:7, 5290:11, 5290:13, 5290:17, 5291:14, 5291:16, 5291:20, 5294:15,

5294:18, 5294:21, 5295:6, 5297:3, 5297:9, 5302:12, 5305:21, 5307:23, 5307:25, 5309:5, 5309:10, 5309:20, 5310:2, 5310:25, 5311:4, 5313:15, 5314:3, 5314:5, 5315:17, 5316:2, 5316:15, 5316:18, 5318:21, 5320:9, 5321:6, 5321:10, 5325:5, 5327:8, 5332:2, 5335:3, 5335:18, 5335:21, 5336:21, 5338:22, 5339:21, 5339:24, 5340:16, 5340:21, 5340:25, 5341:2, 5341:7, 5341:23, 5341:25, 5342:2, 5343:2, 5344:23, 5344:25, 5345:9, 5345:15, 5346:1, 5346:19, 5346:22, 5348:1
**broker** [2] - 5266:15, 5266:17
**Brooklyn** [3] - 5156:5, 5156:16, 5156:23
**brought** [12] - 5169:24, 5344:14, 5364:13, 5364:15, 5378:3, 5378:6, 5382:2, 5382:12, 5382:14, 5384:21, 5384:24, 5385:2
**build** [2] - 5160:8, 5310:7
**built** [2] - 5309:12, 5309:14
**bullet** [1] - 5190:25
**bunch** [3] - 5167:1, 5167:3, 5284:23
**Burke** [2] - 5172:10, 5317:7
**BURKE** [4] - 5172:11, 5227:21, 5228:3, 5317:9
**burn** [1] - 5289:3
**Business** [2] - 5279:4, 5279:16
**business** [12] - 5217:2, 5253:13, 5253:20, 5253:25, 5254:6, 5258:18, 5258:19, 5271:9, 5363:11, 5382:10,

5396:19, 5397:6
**businesses** [1] - 5254:17
**buy** [8] - 5176:13, 5275:6, 5293:22, 5297:21, 5334:25, 5335:8, 5336:4, 5346:17
**buyout** [2] - 5297:16, 5298:3
**BY** [20] - 5156:13, 5156:19, 5174:5, 5179:1, 5201:1, 5204:21, 5222:1, 5230:1, 5241:1, 5247:1, 5249:8, 5260:1, 5289:1, 5317:24, 5330:1, 5332:2, 5346:1, 5349:2, 5352:1, 5376:1

## C

**Cadman** [2] - 5156:15, 5156:23
**calendar** [1] - 5160:23
**cancel** [2] - 5328:6, 5397:8
**cancelled** [2] - 5255:21, 5328:11
**cannot** [6] - 5228:9, 5234:7, 5350:20, 5389:1, 5389:13, 5390:24
**cap** [4] - 5182:10, 5255:17, 5260:4, 5260:5
**Capital** [22] - 5209:11, 5234:8, 5234:12, 5236:21, 5248:10, 5248:12, 5252:15, 5252:20, 5253:8, 5253:10, 5253:13, 5253:20, 5265:8, 5265:25, 5270:23, 5274:12, 5274:18, 5275:12, 5323:17, 5331:14, 5393:23
**capital** [3] - 5194:23, 5209:8, 5247:2
**Capital's** [1] - 5209:13
**capitalization** [7] - 5180:14, 5180:17, 5180:18, 5181:20, 5182:13, 5182:16, 5182:17

**card** [1] - 5238:25
**care** [3] - 5271:7, 5289:9, 5366:9
**career** [4] - 5349:16, 5349:17, 5350:19, 5358:5
**Caroline** [2] - 5256:4, 5256:7
**carry** [1] - 5396:19
**Carter** [5] - 5237:16, 5240:10, 5287:15, 5291:17, 5346:23
**case** [52] - 5158:1, 5158:8, 5158:18, 5158:19, 5160:15, 5160:16, 5161:4, 5163:9, 5166:19, 5167:7, 5167:10, 5167:13, 5167:17, 5167:24, 5168:3, 5168:8, 5168:9, 5170:13, 5170:14, 5170:17, 5170:19, 5170:24, 5171:3, 5171:4, 5171:5, 5171:9, 5171:19, 5171:20, 5171:24, 5189:16, 5217:9, 5227:11, 5306:16, 5308:2, 5309:6, 5309:7, 5309:18, 5309:19, 5309:20, 5309:21, 5309:23, 5310:16, 5338:2, 5372:22, 5372:24, 5385:20, 5396:6, 5396:25, 5397:8
**cash** [2] - 5362:12, 5385:10
**ceased** [3] - 5283:1, 5283:2, 5283:13
**CEO** [11] - 5184:4, 5184:8, 5184:16, 5208:17, 5225:18, 5225:20, 5225:21, 5231:1, 5231:13, 5232:8, 5233:25
**certain** [22] - 5159:24, 5170:25, 5186:13, 5246:7, 5246:8, 5322:8, 5341:6, 5344:9, 5344:15, 5351:4, 5352:19, 5353:4, 5353:21, 5353:25, 5365:24, 5372:2, 5373:24, 5382:20, 5394:1, 5394:2, 5394:3, 5394:5
**certainly** [25] -

5160:12, 5161:2, 5161:25, 5167:19, 5168:7, 5170:14, 5171:1, 5171:15, 5171:22, 5176:12, 5181:7, 5186:13, 5186:22, 5211:9, 5275:15, 5275:22, 5288:19, 5309:20, 5310:12, 5312:11, 5313:1, 5315:15, 5317:3, 5341:17, 5391:3

**cetera** [1] - 5223:3

**CFO** [5] - 5381:18, 5382:18, 5395:12, 5395:14

**chain** [4] - 5184:13, 5214:19, 5230:20, 5326:16

**challenge** [3] - 5234:25, 5235:4, 5235:6

**challenged** [1] - 5235:8

**challenging** [1] - 5344:25

**Challet** [1] - 5353:12

**chambers** [1] - 5227:24

**Chan** [2] - 5374:14, 5378:13

**CHAN** [26] - 5156:20, 5355:6, 5356:7, 5358:1, 5359:3, 5362:14, 5362:18, 5368:10, 5371:4, 5374:12, 5374:15, 5374:20, 5378:10, 5378:15, 5380:2, 5384:8, 5388:3, 5388:16, 5390:8, 5390:12, 5390:14, 5391:6, 5391:19, 5393:6, 5394:20, 5395:1

**chance** [3] - 5176:3, 5343:4, 5343:5

**CHANG** [1] - 5398:23

**change** [5] - 5232:14, 5234:6, 5311:4, 5396:9, 5398:18

**characterizing** [1] - 5252:7

**charges** [2] - 5357:2, 5357:7

**charging** [6] - 5160:14, 5161:15, 5161:20, 5162:23,

5163:8, 5163:18

**Charleane** [1] - 5156:22

**Charles** [25] - 5304:6, 5304:7, 5304:14, 5304:15, 5305:7, 5305:14, 5314:22, 5314:25, 5315:7, 5319:1, 5319:3, 5334:7, 5334:13, 5336:18, 5337:2, 5338:11, 5340:10, 5340:22, 5341:3, 5343:12, 5343:17, 5343:18, 5344:1, 5345:1, 5345:4

**chart** [1] - 5190:23

**charter** [2] - 5349:14, 5349:17

**Chase** [5] - 5273:19, 5274:2, 5274:4, 5274:22

**check** [8] - 5217:3, 5224:12, 5244:25, 5277:21, 5308:12, 5308:13, 5308:18, 5364:4

**check-the-box** [1] - 5224:12

**checking** [1] - 5198:5

**chew** [12] - 5196:14, 5196:15, 5197:24, 5198:19, 5199:22, 5236:8, 5236:16, 5238:3, 5239:4, 5255:6, 5257:24

**Chew** [5] - 5201:6, 5201:11, 5215:10

**chew's** [1] - 5196:21

**Chicago** [1] - 5308:23

**chief** [15] - 5178:21, 5183:8, 5187:21, 5195:10, 5213:23, 5215:17, 5243:24, 5252:19, 5269:23, 5285:16, 5285:21, 5300:10, 5300:19, 5371:13, 5393:21

**China** [1] - 5397:6

**choosing** [1] - 5170:21

**chose** [2] - 5278:15, 5278:23

**Chris** [1] - 5233:19

**Chun** [1] - 5319:2

**cite** [1] - 5203:14

**Citrin** [26] - 5192:1,

5192:13, 5193:16, 5193:23, 5201:11, 5214:6, 5215:10, 5215:25, 5217:10, 5217:13, 5217:24, 5218:5, 5218:10, 5219:1, 5221:3, 5221:5, 5221:18, 5223:17, 5226:9, 5241:3, 5254:22, 5255:20, 5260:3, 5320:2, 5320:23

**civil** [2] - 5169:10, 5310:20

**claim** [9] - 5267:23, 5268:1, 5268:2, 5268:23, 5305:8, 5305:13, 5314:19, 5314:24, 5344:13

**claims** [11] - 5267:15, 5267:18, 5268:20, 5269:10, 5269:14, 5307:13, 5338:18, 5342:3, 5343:22, 5344:22

**clarified** [2] - 5317:5, 5342:11

**clarify** [3] - 5203:4, 5224:6, 5303:17

**class** [1] - 5360:18

**classified** [2] - 5216:14, 5216:25

**classify** [2] - 5215:13, 5216:15

**clause** [2] - 5177:20, 5177:22

**clear** [13] - 5170:12, 5178:16, 5186:19, 5193:25, 5216:13, 5216:18, 5216:19, 5228:14, 5248:11, 5323:16, 5325:9, 5326:5, 5342:18

**clearly** [2] - 5172:20, 5338:13

**CLERK** [3] - 5348:17, 5348:19, 5398:16

**client** [8] - 5159:20, 5168:18, 5169:16, 5170:7, 5172:3, 5307:12, 5309:11, 5309:15

**clients** [1] - 5381:7

**closely** [2] - 5246:20, 5334:17

**closer** [1] - 5211:13

**closing** [1] - 5163:17

**closings** [2] - 5310:7, 5310:15

**co** [3] - 5167:2, 5172:2, 5299:9

**co-conspirator** [2] - 5167:2, 5172:2

**co-phase** [1] - 5299:9

**Coast** [1] - 5308:22

**coincidence** [4] - 5280:7, 5280:10, 5280:12, 5280:15

**collate** [1] - 5281:15

**collated** [1] - 5281:16

**colleague** [2] - 5195:5, 5202:7

**colleagues** [1] - 5169:3

**collect** [3] - 5373:1, 5373:13, 5373:14

**collections** [1] - 5372:9

**collusion** [2] - 5364:20, 5365:3

**column** [6] - 5190:3, 5237:20, 5241:6, 5241:7, 5385:4, 5385:7

**columns** [2] - 5189:24, 5381:20

**combination** [3] - 5217:2, 5367:1, 5367:9

**comfortable** [1] - 5173:2

**coming** [5] - 5159:6, 5167:15, 5211:8, 5234:17, 5311:18

**comingled** [3] - 5220:9, 5220:12, 5220:19

**commence** [2] - 5365:22, 5369:15

**comment** [5] - 5164:16, 5314:14, 5389:2, 5389:14, 5390:24

**comments** [3] - 5237:5, 5366:6, 5366:8

**commingling** [5] - 5244:12, 5244:20, 5245:3, 5245:4, 5245:10

**commitment** [1] - 5162:18

**commitments** [2] - 5160:18, 5163:1

**committee** [5] - 5160:19, 5232:11, 5232:18, 5232:20,

5366:19

**common** [3] - 5177:25, 5360:18, 5372:21

**communicate** [5] - 5234:19, 5324:15, 5366:18, 5387:22, 5387:24

**communicated** [4] - 5231:13, 5388:1, 5390:5, 5392:7

**communication** [3] - 5183:5, 5334:9, 5388:12

**Communications** [1] - 5299:2

**communications** [16] - 5307:12, 5373:22, 5374:1, 5389:12, 5389:13, 5389:15, 5390:18, 5390:24, 5390:25, 5391:2, 5391:4, 5391:12, 5391:13, 5391:16, 5391:25, 5392:6

**comp** [5] - 5243:2, 5243:9, 5243:16, 5252:23, 5253:6

**Companies** [1] - 5387:18

**companies** [15] - 5216:2, 5226:2, 5226:5, 5226:6, 5246:6, 5246:8, 5246:22, 5254:11, 5283:19, 5283:24, 5283:25, 5286:3, 5286:5, 5350:16, 5363:8

**Company** [1] - 5319:3

**company** [59] - 5182:18, 5183:3, 5183:4, 5184:4, 5184:8, 5184:17, 5187:22, 5213:24, 5218:11, 5218:16, 5218:23, 5222:8, 5234:14, 5234:15, 5246:10, 5249:13, 5249:18, 5251:12, 5251:14, 5256:20, 5273:16, 5296:10, 5296:20, 5299:9, 5350:6, 5350:24, 5351:1, 5351:2, 5352:10, 5353:22, 5354:3, 5357:3, 5357:8, 5360:17,

5362:10, 5363:22, 5364:10, 5364:11, 5364:16, 5365:7, 5366:13, 5369:8, 5371:14, 5372:3, 5372:5, 5372:7, 5373:9, 5373:11, 5382:10, 5382:18, 5386:6, 5386:7, 5387:25, 5393:23, 5393:24, 5394:2, 5394:4, 5395:12

**company's** [10] - 5350:5, 5352:11, 5352:21, 5353:5, 5363:2, 5363:9, 5363:11, 5367:3, 5381:17, 5382:15

**comparison** [1] - 5261:14

**compensation** [3] - 5218:21, 5288:3, 5322:3

**Compensation** [1] - 5243:1

**complain** [3] - 5184:9, 5184:19, 5184:20

**complained** [1] - 5335:6

**complaining** [3] - 5182:19, 5184:12, 5334:21

**complaint** [48] - 5184:25, 5185:3, 5185:5, 5187:23, 5187:25, 5188:4, 5188:12, 5188:16, 5188:17, 5188:18, 5188:21, 5188:23, 5189:5, 5189:7, 5189:8, 5189:12, 5189:13, 5189:19, 5189:24, 5271:16, 5271:22, 5272:1, 5272:18, 5303:6, 5303:7, 5319:4, 5334:7, 5334:13, 5335:22, 5335:25, 5336:3, 5336:18, 5337:2, 5340:11, 5340:12, 5341:3, 5341:8, 5342:15, 5342:24, 5343:12, 5343:18, 5343:19, 5344:3, 5344:8, 5345:2, 5346:15

**complete** [9] - 5164:7, 5217:7, 5217:22, 5261:5,

5261:8, 5298:24, 5299:8, 5358:18

**Complete** [1] - 5217:15

**completely** [3] - 5168:23, 5329:1, 5339:9

**completing** [2] - 5320:18, 5320:19

**completion** [2] - 5221:7, 5221:22

**complex** [1] - 5248:22

**compound** [1] - 5220:17

**computer** [2] - 5156:25, 5299:7

**computer-aided** [1] - 5156:25

**concept** [2] - 5189:18, 5314:23

**concern** [7] - 5195:7, 5195:8, 5201:7, 5201:12, 5272:6, 5312:4, 5339:13

**concerned** [6] - 5196:20, 5272:2, 5273:3, 5273:5, 5276:4, 5278:5

**concerns** [1] - 5338:15

**conclude** [1] - 5262:6

**concluded** [2] - 5158:1, 5396:6

**conclusions** [1] - 5338:17

**concurrent** [1] - 5366:5

**conducting** [1] - 5395:10

**confer** [3] - 5157:14, 5168:17, 5170:6

**conference** [10] - 5160:14, 5161:15, 5161:20, 5162:21, 5162:23, 5163:3, 5163:8, 5163:18, 5311:18, 5345:17

**conferences** [3] - 5162:3, 5163:22

**conferring** [1] - 5163:19

**confidential** [1] - 5286:13

**confidentiality** [1] - 5286:1

**confirm** [3] - 5257:9, 5261:20, 5380:9

**confirmation** [4] -

5354:3, 5371:17, 5377:11, 5377:12

**confirmations** [5] - 5353:25, 5354:2, 5365:25, 5366:1, 5366:2

**confront** [4] - 5158:12, 5170:24, 5340:19, 5344:20

**confronted** [1] - 5344:15

**confusion** [2] - 5223:10, 5249:1

**congrats** [1] - 5277:19

**connect** [1] - 5289:14

**connection** [13] - 5252:22, 5299:15, 5303:12, 5304:18, 5306:20, 5332:18, 5339:10, 5343:6, 5354:19, 5361:12, 5368:3, 5379:3, 5393:24

**conservative** [2] - 5228:24, 5310:8

**consider** [3] - 5228:16, 5356:14, 5387:10

**considered** [2] - 5369:18, 5387:12

**considering** [2] - 5324:16, 5325:11

**consistency** [1] - 5272:11

**consisting** [1] - 5353:9

**consolidated** [2] - 5362:9, 5362:11

**conspirator** [2] - 5167:2, 5172:2

**constitute** [1] - 5167:2

**consultancy** [2] - 5235:19, 5235:24

**consultant** [6] - 5218:18, 5237:19, 5238:11, 5243:11, 5243:15, 5353:6

**consultants** [2] - 5218:18, 5243:20

**consultation** [2] - 5223:18, 5223:21

**consulting** [4] - 5218:19, 5236:10, 5236:18, 5237:4

**Consumer** [5] - 5226:5, 5244:6, 5248:20, 5249:12,

5251:8

**contact** [3] - 5213:9, 5228:4, 5271:1

**content** [2] - 5212:11, 5394:10

**contentious** [1] - 5252:9

**context** [5] - 5171:23, 5212:3, 5315:18, 5325:4, 5325:14

**continue** [10] - 5202:8, 5242:6, 5285:4, 5285:6, 5285:12, 5292:5, 5312:10, 5312:12, 5374:16, 5378:13

**Continued** [15] - 5173:18, 5174:4, 5178:25, 5226:15, 5229:23, 5288:21, 5330:1, 5337:5, 5345:18, 5347:5, 5394:23, 5395:17, 5399:4

**continued** [13] - 5200:4, 5221:25, 5240:11, 5259:5, 5267:5, 5295:10, 5295:12, 5295:16, 5295:18, 5295:24, 5329:19, 5351:6, 5375:13

**continuing** [4] - 5220:23, 5242:17, 5260:1, 5287:8

**Continuing** [1] - 5230:1

**contract** [17] - 5232:10, 5244:24, 5245:12, 5267:19, 5269:14, 5277:14, 5277:23, 5287:23, 5287:25, 5288:1, 5288:4, 5297:23, 5298:1, 5298:5, 5298:8, 5322:9, 5322:12

**contracts** [2] - 5205:6, 5373:25

**contractually** [1] - 5284:14

**contrary** [1] - 5209:15

**control** [12] - 5183:23, 5318:12, 5319:10, 5319:15, 5319:19, 5319:21, 5353:10, 5366:11, 5372:21, 5372:23,

5388:10

**controlled** [1] - 5318:3

**controller** [4] - 5184:15, 5381:17, 5381:18, 5382:15

**controlling** [2] - 5339:13, 5372:23

**controls** [2] - 5352:21, 5389:19

**convenient** [1] - 5211:3

**conversation** [47] - 5180:22, 5180:23, 5181:10, 5181:12, 5184:3, 5185:14, 5186:10, 5186:25, 5192:18, 5192:23, 5193:1, 5193:8, 5194:2, 5194:11, 5195:5, 5197:16, 5197:17, 5206:25, 5207:2, 5207:8, 5207:9, 5207:13, 5208:5, 5208:8, 5208:11, 5209:21, 5212:18, 5219:22, 5219:25, 5220:4, 5225:10, 5225:19, 5264:21, 5276:18, 5318:1, 5318:6, 5325:21, 5327:4, 5327:15, 5328:14, 5332:14, 5332:25, 5333:2, 5333:3, 5388:11, 5394:14

**conversations** [17] - 5179:3, 5180:5, 5192:21, 5197:15, 5207:10, 5208:1, 5284:9, 5325:15, 5327:12, 5332:8, 5332:11, 5332:13, 5339:19, 5388:5, 5393:21, 5394:10, 5394:11

**conversion** [4] - 5182:25, 5183:2, 5218:3, 5218:7

**converted** [1] - 5181:17

**convey** [2] - 5157:11, 5179:6

**conveyance** [1] - 5284:16

**COO** [2] - 5232:11, 5234:1

**Cooperman** [23] - 5192:1, 5192:13, 5193:16, 5201:11,

5214:6, 5215:10, 5217:10, 5217:13, 5217:14, 5217:24, 5218:5, 5218:10, 5219:1, 5221:3, 5223:17, 5226:10, 5241:3, 5254:22, 5255:17, 5255:20, 5260:3, 5320:2, 5320:23

**copied** [3] - 5180:2, 5282:4, 5294:25

**copies** [2] - 5198:5, 5252:25

**copy** [11] - 5165:4, 5175:7, 5196:10, 5199:13, 5203:17, 5215:10, 5236:13, 5249:25, 5255:6, 5288:17, 5332:5

**copying** [4] - 5236:9, 5236:17, 5254:22, 5281:1

**Corey** [13] - 5195:23, 5197:25, 5216:6, 5217:12, 5217:13, 5217:24, 5218:5, 5218:10, 5219:1, 5221:3, 5221:5, 5222:20, 5222:22

**corner** [2] - 5331:20, 5354:22

**Corp** [2] - 5218:3, 5218:13

**Correct** [11] - 5208:2, 5208:14, 5212:15, 5289:5, 5295:11, 5299:1, 5301:1, 5301:22, 5303:17, 5306:7, 5377:14

**correct** [221] - 5174:15, 5174:16, 5174:21, 5175:15, 5176:1, 5176:14, 5176:17, 5176:18, 5177:4, 5177:9, 5177:17, 5177:20, 5177:23, 5178:16, 5180:21, 5182:5, 5183:6, 5184:5, 5185:16, 5186:16, 5187:2, 5187:3, 5187:6, 5187:8, 5187:15, 5187:24, 5188:2, 5188:14, 5188:25, 5190:5, 5190:9, 5190:11, 5190:15, 5190:19, 5191:11, 5191:14,

5191:18, 5192:5, 5192:15, 5196:5, 5196:10, 5196:12, 5197:19, 5198:23, 5198:25, 5201:15, 5203:7, 5203:11, 5205:13, 5207:11, 5207:13, 5208:1, 5208:3, 5208:6, 5208:11, 5209:3, 5210:16, 5210:18, 5210:23, 5212:6, 5212:20, 5212:23, 5215:18, 5217:16, 5217:18, 5217:25, 5218:1, 5218:4, 5218:9, 5218:14, 5219:2, 5219:9, 5219:13, 5219:19, 5220:1, 5220:6, 5220:9, 5220:20, 5221:4, 5221:23, 5222:5, 5222:15, 5224:5, 5224:21, 5225:22, 5231:6, 5232:6, 5232:18, 5232:20, 5233:9, 5233:15, 5234:1, 5236:7, 5237:25, 5241:14, 5241:18, 5243:21, 5245:6, 5245:18, 5247:2, 5248:6, 5248:14, 5248:20, 5249:14, 5251:15, 5251:17, 5252:17, 5253:7, 5253:9, 5254:6, 5254:14, 5255:25, 5257:24, 5260:4, 5260:16, 5260:24, 5262:8, 5262:10, 5262:12, 5262:17, 5262:24, 5263:12, 5263:20, 5263:21, 5263:22, 5264:2, 5264:3, 5264:5, 5264:15, 5264:16, 5264:17, 5265:2, 5265:3, 5265:8, 5265:14, 5265:22, 5266:2, 5266:4, 5266:18, 5267:8, 5267:23, 5268:16, 5270:3, 5270:6, 5270:15, 5270:19, 5271:2, 5271:19, 5271:25, 5272:4, 5272:21, 5272:24, 5274:16, 5276:24, 5277:25, 5278:5, 5278:6, 5278:8,

5280:18, 5280:19, 5281:23, 5283:9, 5285:18, 5286:5, 5287:3, 5287:6, 5287:16, 5287:22, 5287:24, 5288:2, 5288:12, 5289:13, 5289:20, 5290:22, 5291:7, 5291:21, 5291:25, 5293:22, 5296:12, 5297:14, 5298:16, 5298:20, 5300:25, 5301:16, 5303:11, 5303:20, 5303:22, 5304:4, 5304:10, 5304:15, 5305:5, 5306:10, 5307:14, 5307:19, 5311:25, 5323:19, 5323:22, 5323:24, 5323:25, 5326:1, 5333:11, 5335:9, 5335:12, 5336:8, 5336:19, 5338:2, 5341:7, 5346:6, 5350:15, 5350:25, 5352:4, 5354:9, 5355:14, 5355:23, 5356:24, 5358:16, 5370:12, 5372:6, 5380:15, 5397:25, 5398:5

**correction** [3] - 5241:3, 5260:20, 5315:16

**correctly** [6] - 5203:23, 5248:6, 5251:9, 5323:15, 5324:1, 5366:9

**correspondence** [1] - 5299:11

**corroborative** [1] - 5352:20

**cost** [1] - 5298:10

**Cotton** [1] - 5305:2

**counsel** [13] - 5167:3, 5167:8, 5216:1, 5223:25, 5224:3, 5224:7, 5224:8, 5306:4, 5306:5, 5318:5, 5318:8, 5321:22, 5371:21

**counterclaim** [1] - 5342:17

**counterclaims** [1] - 5269:10

**couple** [9] - 5166:23, 5194:21, 5196:14, 5270:1, 5322:14,

5323:5, 5349:18, 5375:9, 5383:1

**course** [6] - 5164:21, 5309:9, 5312:7, 5366:20, 5382:9, 5383:9

**Court** [6] - 5156:22, 5158:2, 5158:7, 5159:3, 5161:13, 5165:8

**COURT** [277] - 5156:1, 5157:2, 5157:19, 5159:14, 5159:21, 5160:3, 5160:7, 5160:13, 5161:3, 5161:15, 5162:2, 5162:12, 5163:1, 5163:10, 5163:14, 5163:21, 5163:25, 5164:17, 5164:20, 5165:1, 5165:5, 5165:7, 5165:11, 5165:14, 5166:3, 5166:5, 5166:8, 5166:11, 5166:17, 5167:17, 5168:12, 5168:25, 5169:3, 5171:17, 5172:7, 5172:12, 5172:15, 5172:25, 5173:7, 5173:9, 5173:12, 5175:2, 5178:18, 5180:12, 5184:7, 5185:4, 5188:7, 5192:7, 5192:10, 5194:7, 5195:19, 5196:2, 5197:5, 5197:21, 5198:6, 5198:12, 5198:15, 5198:18, 5202:9, 5203:2, 5203:18, 5203:22, 5204:1, 5204:4, 5204:13, 5204:18, 5206:13, 5207:23, 5211:9, 5211:12, 5215:2, 5215:6, 5219:15, 5219:21, 5220:3, 5220:17, 5227:3, 5227:5, 5227:9, 5227:20, 5228:1, 5228:4, 5228:6, 5229:1, 5229:3, 5229:9, 5229:12, 5229:17, 5229:22, 5230:17, 5239:12, 5240:6, 5241:20, 5244:11, 5244:15, 5244:17, 5245:5, 5245:20, 5246:4, 5246:12,

5246:19, 5246:25, 5247:9, 5247:16, 5247:20, 5247:25, 5248:2, 5248:4, 5248:22, 5248:25, 5249:7, 5249:24, 5250:3, 5250:5, 5250:9, 5250:13, 5250:18, 5250:21, 5252:1, 5252:7, 5252:13, 5253:23, 5254:10, 5255:3, 5255:15, 5257:18, 5258:5, 5261:3, 5261:7, 5261:16, 5261:19, 5261:23, 5269:2, 5269:4, 5270:8, 5273:24, 5274:10, 5274:25, 5275:21, 5278:18, 5278:21, 5279:14, 5279:20, 5281:7, 5282:2, 5282:23, 5283:15, 5284:22, 5286:9, 5289:24, 5290:2, 5290:4, 5290:12, 5291:13, 5291:15, 5291:18, 5294:14, 5294:16, 5294:20, 5294:23, 5295:4, 5295:7, 5295:17, 5295:21, 5297:5, 5302:2, 5302:8, 5302:13, 5305:24, 5307:3, 5308:1, 5308:14, 5308:16, 5308:21, 5308:24, 5309:4, 5309:9, 5309:19, 5309:24, 5310:3, 5310:17, 5311:2, 5311:10, 5312:7, 5312:10, 5312:15, 5312:24, 5313:4, 5313:8, 5313:13, 5313:25, 5314:4, 5314:18, 5315:18, 5316:3, 5316:11, 5316:17, 5316:22, 5317:1, 5317:7, 5317:10, 5317:16, 5317:19, 5320:10, 5321:7, 5321:12, 5326:5, 5326:8, 5326:10, 5327:9, 5328:9, 5328:11, 5328:13, 5333:25, 5335:15, 5335:20, 5336:22, 5338:4, 5338:20, 5339:22, 5340:14, 5340:17,

5340:23, 5341:1,
5341:5, 5341:21,
5341:24, 5342:1,
5344:3, 5344:5,
5344:24, 5345:11,
5345:16, 5346:14,
5348:2, 5348:4,
5348:8, 5348:12,
5348:22, 5350:21,
5355:7, 5356:8,
5357:10, 5358:2,
5359:4, 5362:19,
5368:11, 5371:5,
5374:13, 5374:18,
5378:13, 5378:16,
5380:3, 5381:14,
5381:16, 5384:9,
5388:4, 5390:9,
5390:15, 5391:8,
5391:20, 5392:21,
5393:7, 5395:3,
5395:6, 5395:8,
5395:14, 5396:3,
5397:2, 5397:5,
5397:20, 5397:23,
5398:6, 5398:15,
5398:17, 5398:22,
5398:24
   **court** [12] - 5157:1,
5161:17, 5161:23,
5162:15, 5162:20,
5227:19, 5248:9,
5302:25, 5309:3,
5317:8, 5335:3,
5342:17
   **court's** [1] - 5309:5
   **Court's** [2] -
5161:11, 5348:11
   **Courthouse** [1] -
5156:5
   **COURTROOM** [3] -
5206:14, 5292:5,
5307:10
   **cover** [4] - 5164:7,
5165:4, 5165:17,
5371:7
   **covered** [1] - 5261:8
   **CPA** [1] - 5349:15
   **Cramer** [1] - 5265:1
   **created** [2] -
5286:21, 5286:23
   **creates** [1] - 5231:7
   **credibility** [3] -
5338:17, 5341:2,
5341:15
   **credited** [1] -
5328:25
   **credits** [1] - 5328:9
   **crime** [1] - 5169:9
   **criminal** [1] -

5310:23
   **Critical** [1] - 5214:17
   **critical** [2] - 5216:6,
5216:7
   **criticize** [1] -
5258:17
   **criticized** [3] -
5307:1, 5307:4,
5307:7
   **CROSS** [2] - 5174:4,
5399:4
   **cross** [33] - 5158:18,
5164:5, 5167:25,
5168:4, 5168:5,
5168:7, 5168:10,
5169:8, 5169:14,
5169:18, 5169:22,
5170:1, 5170:9,
5170:14, 5170:25,
5171:15, 5171:18,
5172:22, 5173:15,
5229:19, 5245:25,
5246:6, 5247:18,
5286:8, 5308:9,
5309:13, 5309:16,
5317:4, 5318:1,
5321:8, 5339:15,
5341:18, 5343:1
   **cross-examination**
[10] - 5169:14,
5171:15, 5172:22,
5286:8, 5309:13,
5309:16, 5317:4,
5318:1, 5321:8,
5339:15
   **CROSS-**
**EXAMINATION** [2] -
5174:4, 5399:4
   **cross-**
**examinations** [2] -
5169:8, 5169:22
   **cross-examine** [5] -
5169:18, 5170:1,
5170:9, 5170:14,
5247:18
   **crossed** [3] - 5188:3,
5188:15, 5189:23
   **CRUTCHER** [1] -
5156:17
   **culminates** [1] -
5326:16
   **curious** [1] - 5296:9
   **current** [9] -
5231:20, 5258:10,
5258:15, 5311:2,
5311:22, 5349:11,
5368:17, 5382:5,
5395:12
   **cut** [2] - 5235:20,
5277:21

**D**

   **Dallas** [1] - 5265:8
   **damages** [4] -
5188:1, 5267:8,
5267:10, 5284:16
   **Dan** [1] - 5303:13
   **date** [36] - 5159:3,
5160:14, 5162:7,
5162:16, 5165:18,
5165:19, 5165:21,
5185:18, 5185:20,
5207:16, 5207:17,
5237:1, 5237:11,
5237:23, 5238:16,
5261:21, 5267:2,
5267:2, 5270:20,
5273:14, 5277:20,
5278:13, 5279:24,
5281:24, 5282:6,
5294:16, 5295:5,
5357:5, 5360:6,
5360:14, 5368:20,
5381:11, 5385:4,
5385:5
   **dated** [5] - 5177:11,
5336:24, 5354:16,
5362:4, 5368:1
   **Dated** [1] - 5393:18
   **dates** [12] - 5165:21,
5168:12, 5177:14,
5180:13, 5183:18,
5237:25, 5238:2,
5281:20, 5290:13,
5292:18, 5383:7,
5396:19
   **Daubert** [3] -
5317:12, 5397:18,
5398:19
   **DAVID** [2] - 5156:14,
5156:14
   **David** [1] - 5384:17
   **days** [25] - 5158:7,
5160:2, 5163:12,
5163:18, 5194:8,
5194:9, 5194:21,
5196:14, 5196:16,
5201:25, 5234:13,
5268:3, 5272:9,
5272:10, 5273:18,
5309:10, 5309:14,
5310:2, 5310:3,
5310:6, 5312:20,
5312:22, 5383:1
   **deal** [2] - 5210:6,
5296:21
   **dear** [2] - 5256:4,
5256:7
   **debt** [7] - 5328:6,
5371:17, 5371:24,

5372:4, 5372:7,
5372:10, 5373:6
   **December** [100] -
5157:6, 5161:21,
5162:1, 5164:14,
5174:12, 5174:18,
5175:6, 5176:16,
5177:11, 5178:21,
5179:17, 5180:2,
5180:14, 5180:17,
5181:11, 5181:13,
5181:20, 5182:4,
5182:9, 5183:9,
5183:14, 5183:19,
5184:2, 5184:10,
5184:24, 5185:8,
5185:10, 5185:11,
5186:8, 5186:15,
5186:18, 5186:21,
5186:22, 5193:13,
5206:16, 5208:12,
5214:4, 5214:16,
5215:4, 5220:1,
5220:5, 5271:21,
5272:20, 5273:9,
5273:14, 5273:18,
5274:1, 5274:4,
5275:11, 5275:23,
5275:25, 5276:7,
5283:3, 5283:15,
5283:16, 5284:1,
5284:8, 5285:6,
5285:12, 5290:10,
5290:11, 5290:12,
5295:24, 5296:4,
5296:25, 5304:9,
5309:25, 5310:6,
5310:11, 5310:13,
5311:3, 5311:22,
5312:16, 5313:22,
5322:7, 5324:8,
5326:17, 5332:10,
5332:19, 5332:23,
5332:25, 5335:12,
5342:5, 5343:22,
5352:7, 5356:25,
5358:25, 5360:11,
5360:12, 5360:13,
5361:9, 5361:14,
5361:18, 5361:19,
5362:10, 5374:24,
5376:4, 5396:10,
5396:18
   **Deceptive** [2] -
5267:21, 5269:16
   **deceptive** [1] -
5268:21
   **decide** [1] - 5170:7
   **decided** [3] - 5159:8,
5170:3, 5373:5

   **decides** [1] -
5373:15
   **deciding** [1] -
5300:16
   **decision** [11] -
5165:3, 5232:22,
5309:17, 5309:22,
5338:21, 5341:10,
5342:24, 5343:5,
5343:21, 5344:12,
5373:8
   **decisions** [4] -
5223:21, 5223:22,
5232:1, 5235:11
   **declarations** [1] -
5363:10
   **decreased** [1] -
5176:3
   **deeply** [1] - 5176:4
   **defame** [1] - 5258:18
   **defendant** [2] -
5169:9, 5172:1
   **Defendant** [6] -
5156:7, 5156:17,
5304:22, 5388:6,
5388:14, 5388:23
   **Defendant's** [7] -
5179:19, 5179:20,
5195:17, 5195:20,
5196:2, 5319:24,
5374:23
   **defended** [1] -
5304:19
   **defense** [30] -
5157:12, 5158:23,
5159:11, 5160:4,
5160:14, 5160:16,
5161:3, 5163:9,
5164:5, 5165:10,
5167:3, 5167:8,
5167:23, 5168:6,
5168:8, 5169:24,
5170:3, 5170:16,
5171:2, 5171:20,
5172:2, 5309:6,
5309:7, 5309:18,
5309:23, 5318:5,
5318:8, 5321:21,
5398:20
   **Defense** [10] -
5165:15, 5198:12,
5230:17, 5240:6,
5274:10, 5279:20,
5290:4, 5324:7,
5330:8, 5331:4
   **defense's** [2] -
5376:4, 5376:22
   **deficiencies** [2] -
5386:10, 5386:14
   **define** [2] - 5168:13,

5245:21
**defined** [4] - 5223:2, 5245:17, 5246:1, 5246:9
**definition** [1] - 5245:9
**degree** [1] - 5349:15
**Delaware** [1] - 5393:23
**delay** [1] - 5171:10
**delete** [2] - 5293:7, 5293:10
**deleted** [1] - 5293:5
**deliberations** [2] - 5310:8, 5310:16
**deliver** [1] - 5284:12
**demand** [4] - 5276:23, 5278:7, 5280:17, 5298:16
**demanded** [5] - 5297:25, 5298:3, 5298:6, 5298:9, 5298:12
**demanding** [4] - 5280:5, 5280:9, 5287:22, 5297:13
**demands** [1] - 5298:17
**demoted** [4] - 5225:13, 5225:18, 5232:13, 5232:23
**demotion** [2] - 5230:10, 5234:7
**DENERSTEIN** [3] - 5156:20, 5157:9, 5157:18
**denied** [7] - 5267:15, 5267:23, 5267:25, 5268:18, 5268:20, 5268:22, 5269:17
**departure** [1] - 5387:11
**depositions** [1] - 5169:10
**DEPUTY** [3] - 5206:14, 5292:5, 5307:10
**describe** [5] - 5349:13, 5349:16, 5352:17, 5353:7, 5365:13
**describes** [1] - 5362:25
**description** [4] - 5320:15, 5320:17, 5327:3, 5355:21
**Desert** [2] - 5177:19, 5182:2
**designating** [1] - 5243:15

**designation** [1] - 5198:15
**designed** [1] - 5363:15
**desires** [1] - 5177:25
**desk** [6] - 5172:16, 5173:3, 5193:20, 5193:21, 5202:12, 5207:20
**detailed** [1] - 5364:4
**details** [1] - 5382:21
**detect** [3] - 5363:23, 5365:6, 5365:9
**detecting** [3] - 5363:16, 5364:12, 5364:19
**detection** [1] - 5364:4
**determine** [3] - 5218:16, 5224:1, 5350:7
**determined** [1] - 5394:1
**development** [1] - 5351:4
**dialogue** [1] - 5243:15
**difference** [5] - 5197:11, 5302:6, 5328:24, 5343:14, 5382:5
**differences** [1] - 5381:21
**different** [15] - 5165:12, 5165:13, 5166:23, 5198:4, 5205:5, 5206:9, 5245:12, 5251:16, 5290:13, 5329:1, 5341:14, 5343:15, 5343:25, 5358:11, 5358:12
**differently** [1] - 5254:6
**difficult** [1] - 5164:14
**digits** [1] - 5199:19
**diligence** [1] - 5182:1
**DIRECT** [2] - 5349:1, 5399:8
**direct** [12] - 5167:22, 5183:5, 5190:22, 5207:25, 5209:18, 5213:9, 5246:14, 5253:16, 5269:6, 5269:7, 5275:10, 5317:25
**directed** [3] - 5188:23, 5304:9, 5344:19

**directing** [1] - 5247:13
**direction** [1] - 5252:6
**directly** [4] - 5199:7, 5345:2, 5345:9, 5373:23
**director** [1] - 5184:16
**directors** [7] - 5184:5, 5185:17, 5185:23, 5185:24, 5186:1, 5208:17, 5301:13
**disable** [1] - 5238:25
**Disable** [1] - 5238:25
**disagree** [1] - 5390:14
**disappointed** [1] - 5346:25
**disappointment** [1] - 5346:16
**disaster** [1] - 5159:1
**disbursements** [1] - 5357:2
**disclose** [5] - 5210:9, 5213:1, 5213:14, 5213:25, 5387:18
**disclosed** [5] - 5368:18, 5376:21, 5377:25, 5386:22
**disclosing** [1] - 5356:14
**disclosure** [5] - 5170:3, 5360:7, 5360:23, 5368:20, 5376:17
**disclosures** [4] - 5356:16, 5386:10, 5386:13, 5386:14
**discounted** [1] - 5176:4
**discover** [1] - 5169:10
**discovered** [3] - 5385:23, 5386:16, 5390:1
**discovery** [4] - 5169:10, 5298:24, 5299:8, 5393:2
**discrepancy** [2] - 5327:22, 5333:5
**discrete** [1] - 5227:21
**discretion** [1] - 5168:25
**discuss** [6] - 5159:19, 5231:25, 5239:14, 5277:8, 5328:1, 5382:24

**discussed** [12] - 5157:2, 5157:10, 5158:23, 5175:16, 5206:16, 5220:5, 5235:19, 5241:2, 5323:21, 5327:24, 5344:17, 5388:7
**discusses** [2] - 5368:25, 5369:24
**discussion** [8] - 5212:5, 5329:9, 5355:25, 5363:11, 5364:18, 5369:1, 5389:18, 5394:18
**discussions** [7] - 5157:24, 5158:10, 5167:1, 5389:7, 5391:14, 5392:3, 5394:19
**dismiss** [2] - 5308:4, 5344:12
**dismissed** [8] - 5179:8, 5179:10, 5179:15, 5179:17, 5228:21, 5307:13, 5307:19, 5307:20
**dismissing** [1] - 5228:16
**disparage** [1] - 5258:17
**disparagement** [4] - 5257:13, 5257:15, 5257:20, 5258:1
**dispute** [1] - 5168:15
**dissolution** [1] - 5373:1
**distinction** [1] - 5171:14
**distributes** [1] - 5319:20
**DISTRICT** [3] - 5156:1, 5156:1, 5156:10
**District** [1] - 5306:16
**document** [81] - 5158:20, 5164:7, 5164:8, 5164:22, 5165:13, 5165:19, 5165:23, 5186:9, 5187:1, 5190:24, 5191:2, 5191:20, 5195:1, 5195:13, 5197:7, 5201:10, 5201:13, 5206:2, 5206:9, 5219:3, 5222:19, 5238:18, 5261:2, 5261:12, 5262:2, 5264:23, 5286:7, 5290:9, 5290:22, 5291:25,

5292:2, 5292:14, 5293:14, 5293:17, 5293:25, 5294:5, 5294:25, 5318:16, 5318:19, 5318:22, 5318:25, 5325:25, 5330:2, 5331:10, 5331:12, 5331:15, 5331:17, 5331:20, 5338:8, 5338:9, 5338:10, 5338:23, 5338:24, 5339:2, 5339:5, 5339:9, 5340:1, 5340:6, 5341:16, 5342:19, 5343:6, 5343:14, 5343:15, 5343:23, 5345:1, 5359:9, 5359:23, 5362:14, 5365:18, 5365:20, 5365:21, 5367:24, 5370:16, 5375:1, 5375:4, 5378:17, 5388:21, 5389:24
**documentation** [1] - 5299:17
**documentations** [2] - 5353:4, 5373:25
**documents** [52] - 5158:11, 5158:15, 5158:16, 5165:14, 5165:20, 5167:1, 5167:2, 5167:9, 5167:12, 5167:15, 5167:22, 5167:24, 5167:25, 5168:6, 5168:9, 5169:17, 5170:1, 5170:10, 5170:12, 5170:15, 5170:18, 5170:22, 5170:25, 5171:2, 5171:9, 5171:13, 5171:18, 5171:24, 5172:23, 5173:3, 5195:16, 5214:14, 5221:17, 5221:24, 5230:2, 5239:10, 5256:18, 5281:1, 5287:9, 5290:25, 5293:18, 5294:1, 5295:25, 5296:5, 5321:24, 5330:4, 5353:18, 5361:1, 5366:13, 5366:16, 5366:22
**dollar** [14] - 5187:6, 5192:2, 5192:14, 5198:20, 5198:21, 5199:11, 5325:17, 5326:6, 5326:7, 5327:5, 5327:23,

5328:3, 5329:8,
5329:14
  **dollars** [11] -
5192:24, 5199:17,
5199:25, 5200:1,
5328:21, 5357:6,
5369:9, 5369:11,
5369:21, 5372:17,
5373:6
  **done** [11] - 5158:24,
5158:25, 5159:2,
5160:21, 5170:5,
5185:8, 5237:9,
5285:11, 5310:9,
5310:14, 5353:22
  **door** [1] - 5293:4
  **dots** [2] - 5326:25,
5327:3
  **dotted** [2] - 5327:16,
5327:18
  **doubtful** [1] - 5372:9
  **down** [30] - 5169:4,
5183:19, 5191:1,
5220:22, 5222:2,
5234:3, 5242:24,
5270:23, 5282:15,
5287:9, 5292:23,
5293:14, 5293:17,
5293:25, 5294:1,
5294:4, 5294:12,
5333:3, 5333:25,
5349:21, 5355:15,
5357:18, 5362:6,
5362:21, 5364:18,
5365:12, 5368:13,
5370:2, 5397:2,
5397:4
  **Dr** [2] - 5294:12,
5295:1
  **draft** [4] - 5366:4,
5366:25, 5367:7,
5367:8
  **Draft** [1] - 5331:21
  **drafted** [1] - 5286:18
  **dragging** [1] -
5169:4
  **draw** [1] - 5241:21
  **drawing** [1] -
5171:14
  **dropped** [4] -
5192:25, 5193:20,
5207:20
  **drugs** [1] - 5351:4
  **DUBIN** [12] -
5156:21, 5228:22,
5229:4, 5229:7,
5229:11, 5312:4,
5312:9, 5312:14,
5313:2, 5313:6,
5313:10, 5398:4

  **due** [1] - 5182:1
  **duly** [2] - 5174:2,
5348:24
  **DUNN** [1] - 5156:17
  **During** [1] - 5220:4
  **during** [16] - 5162:1,
5162:16, 5163:10,
5207:25, 5209:18,
5277:8, 5292:12,
5353:3, 5353:14,
5366:19, 5367:17,
5372:14, 5373:21,
5377:10, 5389:3,
5398:18
  **duties** [3] - 5246:6,
5246:22, 5283:14
  **DX** [84] - 5165:9,
5174:9, 5174:14,
5174:23, 5174:24,
5175:2, 5177:7,
5205:19, 5206:4,
5206:6, 5214:17,
5214:18, 5215:2,
5215:3, 5215:6,
5216:10, 5217:22,
5221:4, 5223:5,
5226:9, 5227:1,
5227:2, 5230:2,
5230:3, 5230:4,
5230:15, 5230:16,
5236:8, 5238:18,
5239:23, 5240:3,
5240:4, 5240:9,
5241:5, 5242:23,
5252:18, 5253:1,
5255:4, 5255:15,
5257:20, 5268:25,
5269:3, 5273:25,
5279:11, 5281:10,
5281:11, 5281:12,
5281:13, 5281:14,
5281:25, 5282:21,
5289:17, 5290:15,
5290:19, 5292:11,
5293:12, 5293:24,
5336:23, 5374:12,
5378:10, 5378:11,
5378:14, 5378:16,
5399:12, 5399:12,
5399:13, 5399:13,
5399:14, 5399:14,
5399:15, 5399:15,
5399:16, 5399:16,
5399:17, 5399:17,
5399:18

# E

  **e-mail** [161] - 5164:7,
5164:10, 5164:15,
5164:22, 5165:4,

5165:12, 5165:17,
5174:14, 5174:17,
5174:22, 5175:1,
5175:5, 5176:19,
5179:19, 5181:5,
5181:6, 5181:7,
5181:11, 5183:7,
5184:13, 5185:15,
5186:9, 5186:11,
5187:1, 5195:1,
5195:12, 5195:22,
5196:17, 5197:23,
5197:24, 5199:12,
5201:9, 5205:21,
5206:15, 5208:12,
5214:5, 5214:16,
5214:18, 5214:19,
5216:4, 5216:5,
5216:10, 5217:21,
5217:22, 5230:5,
5230:6, 5230:20,
5230:21, 5230:22,
5231:12, 5236:9,
5236:16, 5238:20,
5239:16, 5239:20,
5239:25, 5241:2,
5243:3, 5252:15,
5252:22, 5253:4,
5253:7, 5253:8,
5255:5, 5255:10,
5273:25, 5274:12,
5274:13, 5274:15,
5274:19, 5277:3,
5278:24, 5279:3,
5280:4, 5280:8,
5280:13, 5280:20,
5280:23, 5282:3,
5282:12, 5282:15,
5283:6, 5287:12,
5287:15, 5287:16,
5287:19, 5289:11,
5291:9, 5291:11,
5291:22, 5291:23,
5293:5, 5293:6,
5293:8, 5293:10,
5297:13, 5299:18,
5318:11, 5319:9,
5319:12, 5319:14,
5319:24, 5320:4,
5324:8, 5325:4,
5325:14, 5325:25,
5326:16, 5326:20,
5326:22, 5326:24,
5327:12, 5327:15,
5328:19, 5328:22,
5330:9, 5330:12,
5330:15, 5330:17,
5330:20, 5332:3,
5332:7, 5332:19,
5334:8, 5334:17,
5338:8, 5340:12,

5340:15, 5341:5,
5341:12, 5341:13,
5341:22, 5342:20,
5343:11, 5343:12,
5343:13, 5344:7,
5344:9, 5344:11,
5344:16, 5345:2,
5345:9, 5345:14,
5346:21, 5346:24,
5370:21, 5370:23,
5371:7, 5377:8,
5379:8, 5379:14,
5379:15, 5379:19,
5380:5, 5380:24,
5392:23, 5393:11,
5394:16
  **e-mailed** [6] -
5180:1, 5221:17,
5273:19, 5274:4,
5275:2
  **e-mailing** [2] -
5230:25, 5332:19
  **e-mails** [7] - 5195:9,
5252:24, 5303:25,
5353:18, 5379:24,
5389:9, 5391:13
  **early** [2] - 5225:1,
5335:12
  **East** [2] - 5156:15,
5156:23
  **EASTERN** [1] -
5156:1
  **easy** [2] - 5166:4,
5169:20
  **Ed** [2] - 5353:9,
5369:1
  **Edgardo** [1] -
5306:15
  **education** [1] -
5349:13
  **effect** [1] - 5363:17
  **efficient** [1] -
5168:23
  **effort** [2] - 5161:18,
5204:8
  **eight** [2] - 5190:23,
5360:2
  **eighty** [3] - 5369:9,
5369:11, 5369:21
  **EIN** [7] - 5253:17,
5253:19, 5253:24,
5254:4, 5254:5,
5254:7, 5254:11
  **EINs** [1] - 5254:1
  **either** [9] - 5158:11,
5210:24, 5212:2,
5227:23, 5264:1,
5294:20, 5312:10,
5320:1, 5377:8
  **electronic** [4] -

5175:7, 5296:5,
5296:24, 5332:5
  **eleven** [1] - 5248:23
  **elicit** [1] - 5345:3
  **Elmo** [1] - 5324:6
  **ELMO** [1] - 5330:7
  **emergency** [2] -
5162:17
  **emerging** [1] -
5349:19
  **employed** [1] -
5236:20
  **employee** [2] -
5226:11, 5237:18
  **employees** [7] -
5218:21, 5231:20,
5233:2, 5233:3,
5233:6, 5238:8,
5369:8
  **employer** [10] -
5228:9, 5228:11,
5228:12, 5228:18,
5229:12, 5310:18,
5311:14, 5311:15,
5313:5, 5397:14
  **employers** [3] -
5258:12, 5258:13,
5258:15
  **employment** [26] -
5236:10, 5236:17,
5237:4, 5254:21,
5256:2, 5257:9,
5277:9, 5277:23,
5283:14, 5283:22,
5285:25, 5286:15,
5286:17, 5286:18,
5286:21, 5287:23,
5287:25, 5288:1,
5288:3, 5298:1,
5298:8, 5302:19,
5305:6, 5322:3,
5322:9, 5342:22
  **enabled** [1] -
5191:17
  **encompassed** [1] -
5191:21
  **encouraged** [1] -
5225:15
  **end** [27] - 5160:16,
5160:21, 5161:8,
5164:4, 5210:6,
5228:24, 5235:19,
5235:24, 5277:20,
5309:17, 5309:19,
5309:21, 5309:23,
5313:2, 5313:8,
5317:15, 5329:17,
5333:8, 5353:1,
5360:12, 5361:18,
5361:19, 5364:2,

5375:6, 5397:7,
5397:10, 5398:3
**endeavor** [1] -
5229:4
**ended** [13] - 5265:17,
5304:13, 5306:10,
5333:13, 5333:21,
5334:4, 5346:9,
5346:24, 5356:25,
5361:17, 5362:13,
5381:4, 5393:25
**ends** [1] - 5345:17
**engage** [1] - 5391:22
**engaged** [8] -
5243:14, 5350:23,
5352:2, 5361:6,
5363:23, 5363:24,
5364:9, 5381:3
**engagement** [15] -
5352:5, 5353:9,
5353:13, 5361:12,
5361:13, 5361:16,
5361:18, 5361:20,
5362:1, 5365:12,
5365:16, 5365:17,
5366:20, 5369:2,
5387:24
**enjoyed** [1] -
5277:17
**ensure** [1] - 5350:8
**ensuring** [1] - 5234:5
**entered** [1] - 5378:7
**enters** [2] - 5173:11,
5229:16
**entire** [3] - 5182:17,
5261:1, 5394:20
**entities** [31] -
5236:23, 5244:2,
5244:3, 5244:9,
5244:13, 5244:21,
5244:23, 5245:6,
5245:17, 5245:21,
5247:4, 5248:12,
5248:16, 5248:18,
5249:1, 5249:10,
5250:25, 5251:4,
5251:5, 5251:6,
5251:20, 5283:1,
5286:12, 5294:13,
5300:10, 5300:14,
5323:6, 5323:17,
5323:20, 5386:2
**entitled** [4] - 5284:3,
5284:15, 5322:8,
5341:7
**entity** [6] - 5245:12,
5249:14, 5372:24,
5385:19, 5387:9,
5393:24
**entries** [1] - 5320:20

**equities** [1] -
5362:12
**equity** [11] - 5187:11,
5187:13, 5192:14,
5193:17, 5218:2,
5218:7, 5219:5,
5220:25, 5360:21,
5361:2
**Eric** [1] - 5299:12
**error** [1] - 5264:20
**errors** [1] - 5363:16
**escalate** [1] - 5288:6
**especially** [1] -
5171:6
**ESQ** [6] - 5156:19,
5156:19, 5156:20,
5156:20, 5156:21,
5156:21
**essentially** [1] -
5283:1
**estimate** [10] -
5157:25, 5228:24,
5309:10, 5310:11,
5310:13, 5311:3,
5312:1, 5350:21,
5373:11, 5396:8
**estimates** [1] -
5311:22
**et** [1] - 5223:3
**etc** [1] - 5160:19
**ethics** [1] - 5258:18
**Evan** [60] - 5164:10,
5174:17, 5192:23,
5193:21, 5194:17,
5194:18, 5194:19,
5206:18, 5208:12,
5208:21, 5215:11,
5216:1, 5216:20,
5217:4, 5217:25,
5218:3, 5218:9,
5222:20, 5222:22,
5243:4, 5243:7,
5282:4, 5305:17,
5305:19, 5313:18,
5313:20, 5313:23,
5314:6, 5314:8,
5314:10, 5314:12,
5314:13, 5314:14,
5314:16, 5315:6,
5315:9, 5315:23,
5315:24, 5316:11,
5318:11, 5327:20,
5328:25, 5332:8,
5333:3, 5353:14,
5370:21, 5371:21,
5371:22, 5373:22,
5374:1, 5379:15,
5379:19, 5380:5,
5388:1, 5388:6,
5388:9, 5388:14

**EVAN** [1] - 5156:6
**Evan's** [2] - 5319:22,
5371:16
**evening** [7] -
5160:18, 5161:16,
5161:23, 5162:16,
5163:3, 5228:20,
5292:13
**evenings** [1] -
5161:11
**event** [2] - 5342:13,
5360:5
**events** [11] - 5360:2,
5360:6, 5360:8,
5360:11, 5360:13,
5377:16, 5377:18,
5377:19, 5377:25,
5380:9
**eventually** [3] -
5230:23, 5302:22,
5304:3
**evidence** [36] -
5168:22, 5169:11,
5172:18, 5179:20,
5187:5, 5190:24,
5191:3, 5196:2,
5198:4, 5198:6,
5198:9, 5205:10,
5206:8, 5227:3,
5241:5, 5242:24,
5255:15, 5257:21,
5258:2, 5277:2,
5279:11, 5279:12,
5282:10, 5286:7,
5290:17, 5292:2,
5316:1, 5324:7,
5327:10, 5330:9,
5331:4, 5332:4,
5332:5, 5340:5,
5352:20, 5362:15
**exact** [3] - 5194:10,
5295:15, 5382:7
**exactly** [5] - 5171:21,
5172:22, 5181:16,
5249:4, 5295:9
**Exactly** [2] -
5210:10, 5387:21
**EXAMINATION** [8] -
5174:4, 5317:23,
5332:1, 5349:1,
5399:4, 5399:5,
5399:6, 5399:8
**examination** [14] -
5169:14, 5171:15,
5172:22, 5209:19,
5253:16, 5286:8,
5309:13, 5309:16,
5316:3, 5316:23,
5317:4, 5318:1,
5321:8, 5339:15

**examinations** [2] -
5169:8, 5169:22
**examine** [5] -
5169:18, 5170:1,
5170:9, 5170:14,
5247:18
**examined** [1] -
5348:25
**example** [6] -
5177:8, 5225:1,
5252:18, 5335:11,
5339:2, 5355:9
**except** [4] - 5267:15,
5267:23, 5267:25,
5330:25
**exception** [1] -
5158:19
**excerpt** [1] - 5343:12
**excess** [2] - 5299:11,
5355:25
**exchange** [10] -
5174:15, 5174:17,
5197:24, 5230:5,
5230:6, 5238:20,
5239:25, 5242:17,
5242:23, 5345:2
**excited** [1] - 5211:11
**excuse** [2] - 5396:4,
5396:22
**excused** [3] -
5348:4, 5348:7,
5397:2
**excusing** [1] -
5397:21
**executive** [6] -
5183:8, 5232:11,
5232:17, 5232:20,
5270:5, 5393:22
**executives** [1] -
5394:14
**exercise** [1] - 5173:8
**exhibit** [7] - 5165:10,
5278:19, 5340:4,
5374:13, 5378:14,
5378:16, 5379:17
**Exhibit** [80] -
5165:15, 5179:19,
5179:20, 5195:17,
5195:20, 5196:3,
5198:9, 5198:10,
5198:12, 5198:13,
5198:14, 5198:16,
5215:8, 5260:11,
5260:19, 5274:10,
5277:2, 5278:20,
5279:20, 5282:9,
5287:14, 5289:19,
5290:5, 5291:13,
5291:18, 5297:12,
5318:17, 5319:24,

**examinations** [2] -
5324:5, 5324:7,
5326:4, 5326:13,
5327:7, 5327:9,
5330:9, 5331:5,
5332:4, 5343:16,
5346:20, 5346:21,
5354:11, 5354:13,
5355:5, 5355:7,
5358:22, 5359:2,
5359:4, 5361:24,
5362:17, 5362:19,
5367:23, 5368:9,
5368:11, 5370:18,
5371:3, 5371:5,
5372:12, 5374:6,
5374:11, 5374:21,
5374:22, 5374:23,
5378:11, 5379:6,
5380:1, 5380:3,
5380:4, 5383:13,
5384:7, 5384:10,
5384:13, 5389:22,
5392:17, 5392:18,
5392:19, 5393:5,
5393:7, 5393:9,
5393:10
**Exhibits** [2] -
5230:18, 5240:6
**EXHIBITS** [1] -
5399:10
**exhibits** [11] -
5158:13, 5158:18,
5159:9, 5159:11,
5159:13, 5166:19,
5172:15, 5172:18,
5227:7, 5289:25,
5348:14
**existence** [1] -
5342:12
**exists** [2] - 5364:21,
5365:3
**exits** [3] - 5227:14,
5308:7, 5397:1
**expect** [9] - 5158:14,
5168:8, 5317:1,
5355:21, 5356:10,
5356:16, 5357:15,
5372:8, 5373:1
**expects** [1] - 5372:5
**expedite** [2] -
5158:25, 5172:16
**expediting** [1] -
5158:12
**expenditures** [1] -
5370:5
**expense** [6] -
5371:17, 5371:24,
5372:7, 5372:10,
5373:6, 5373:8
**expenses** [4] -

5370:13, 5372:2,
5372:4, 5381:25
  **experience** [7] -
5217:20, 5217:21,
5245:2, 5321:1,
5321:11, 5349:25,
5358:14
  **explain** [5] -
5312:21, 5321:1,
5356:3, 5366:17,
5367:2
  **explained** [1] -
5315:20
  **explaining** [1] -
5316:22
  **explains** [1] -
5344:11
  **explanation** [1] -
5292:21
  **explicit** [1] - 5232:10
  **expressed** [1] -
5210:2
  **extensive** [4] -
5393:20, 5394:11,
5394:13, 5394:18
  **extent** [9] - 5166:24,
5167:12, 5168:10,
5170:12, 5170:16,
5171:3, 5171:21,
5172:4, 5307:11
  **extra** [1] - 5247:21
  **extraordinary** [1] -
5178:14
  **extremely** [1] -
5169:12
  **eye** [1] - 5162:19
  **eyes** [1] - 5252:11

**F**

  **facilitated** [1] -
5319:22
  **fact** [13] - 5168:3,
5201:14, 5205:16,
5213:17, 5289:12,
5292:21, 5293:21,
5303:4, 5303:9,
5303:22, 5314:11,
5334:22, 5339:1
  **factor** [1] - 5158:24
  **factors** [1] - 5363:12
  **facts** [2] - 5338:18,
5344:16
  **failed** [2] - 5283:18,
5346:6
  **fair** [15] - 5179:2,
5187:19, 5245:25,
5246:5, 5247:9,
5251:11, 5252:14,
5252:22, 5275:10,

5304:17, 5311:15,
5311:19, 5330:25,
5342:25, 5343:1
  **fairly** [1] - 5344:6
  **fall** [1] - 5172:4
  **falls** [1] - 5189:21
  **false** [3] - 5157:15,
5157:16, 5345:6
  **falsely** [1] - 5342:7
  **familiarity** [2] -
5261:10, 5261:21
  **family** [1] - 5173:10
  **far** [3] - 5157:24,
5316:9, 5339:16
  **fault** [6] - 5263:8,
5263:11, 5263:12,
5264:17, 5303:15,
5303:20
  **FBI** [2] - 5169:18,
5170:1
  **Fearnow** [46] -
5174:11, 5175:9,
5175:11, 5175:14,
5177:16, 5177:23,
5179:3, 5179:12,
5180:3, 5180:7,
5180:19, 5181:14,
5181:15, 5181:22,
5182:4, 5183:16,
5183:20, 5183:22,
5185:1, 5185:12,
5186:11, 5186:23,
5275:6, 5293:18,
5293:19, 5293:20,
5293:22, 5293:23,
5298:15, 5318:3,
5318:12, 5319:10,
5319:15, 5319:19,
5319:21, 5331:8,
5334:25, 5335:8,
5335:24, 5336:5,
5336:10, 5338:18,
5339:13, 5339:19,
5346:15, 5346:17
  **February** [18] -
5183:14, 5199:20,
5199:24, 5276:23,
5277:4, 5278:10,
5278:15, 5278:23,
5279:24, 5280:9,
5281:19, 5294:18,
5294:25, 5295:4,
5295:6, 5360:17,
5362:4, 5377:22
  **February/March** [1] -
5290:8
  **fees** [15] - 5188:13,
5193:5, 5194:19,
5194:21, 5212:14,
5268:4, 5268:5,

5268:14, 5297:15,
5297:20, 5303:1,
5303:4, 5303:10,
5370:13, 5370:24
  **felony** [1] - 5263:10
  **felt** [1] - 5336:4
  **Fernandez** [4] -
5177:1, 5233:11,
5238:9, 5294:2
  **few** [15] - 5159:4,
5160:2, 5186:7,
5196:15, 5250:11,
5271:16, 5273:8,
5273:18, 5278:3,
5285:1, 5311:13,
5334:10, 5337:3,
5355:10, 5364:18
  **field** [5] - 5365:22,
5365:23, 5366:3,
5366:6, 5366:15
  **fifteen** [3] - 5247:7,
5248:3, 5302:12
  **fifth** [1] - 5269:7
  **fifty** [1] - 5328:21
  **fight** [1] - 5166:18
  **file** [5] - 5188:23,
5189:7, 5237:5,
5352:11, 5377:7
  **filed** [26] - 5187:22,
5188:3, 5188:11,
5188:15, 5188:17,
5189:3, 5189:8,
5189:12, 5189:13,
5190:19, 5271:16,
5271:18, 5271:22,
5272:1, 5305:7,
5305:8, 5305:13,
5314:19, 5334:7,
5352:12, 5363:13,
5374:2, 5374:9,
5377:13, 5378:18
  **files** [8] - 5290:22,
5290:25, 5292:16,
5292:18, 5386:6,
5393:16, 5398:20
  **filing** [5] - 5187:25,
5222:3, 5314:24,
5363:7, 5388:21
  **fill** [2] - 5222:23,
5238:1
  **filled** [6] - 5237:25,
5238:4, 5238:5,
5262:21, 5263:6,
5263:8
  **final** [7] - 5178:8,
5277:20, 5303:19,
5311:17, 5366:10,
5366:12, 5366:19
  **finalized** [1] - 5377:2
  **finally** [1] - 5330:3

  **Finally** [1] - 5377:15
  **finances** [1] -
5183:10
  **financial** [62] -
5217:7, 5217:15,
5217:17, 5217:19,
5217:23, 5223:22,
5320:20, 5321:2,
5321:19, 5324:15,
5350:4, 5350:5,
5350:6, 5350:17,
5352:6, 5352:9,
5352:12, 5352:15,
5352:23, 5353:1,
5353:20, 5354:20,
5358:19, 5358:23,
5359:7, 5359:16,
5359:17, 5359:20,
5360:7, 5360:10,
5360:14, 5361:7,
5363:8, 5363:17,
5363:24, 5365:8,
5365:14, 5366:4,
5366:5, 5366:7,
5366:8, 5366:10,
5366:12, 5366:16,
5367:17, 5368:4,
5369:20, 5370:4,
5371:13, 5373:21,
5376:15, 5378:19,
5386:5, 5386:8,
5386:9, 5386:11,
5386:18, 5386:23,
5387:22, 5388:6,
5391:17, 5393:25
  **Financial** [2] -
5266:17, 5268:6
  **financially** [1] -
5160:23
  **financials** [9] -
5223:3, 5353:15,
5389:7, 5390:11,
5390:19, 5390:22,
5391:14, 5391:23,
5392:4
  **findings** [2] -
5341:21, 5366:18
  **fine** [8] - 5157:19,
5161:22, 5166:1,
5166:16, 5312:25,
5313:9, 5313:16,
5332:6
  **fines** [1] - 5188:2
  **finish** [4] - 5158:3,
5161:14, 5258:5,
5302:9
  **finished** [1] -
5309:25
  **finishing** [1] - 5398:5
  **FINRA** [2] - 5262:21,

5263:4
  **fire** [3] - 5225:15,
5235:23, 5236:4
  **fired** [5] - 5224:23,
5224:24, 5225:8,
5262:14, 5263:12
  **Firetog** [2] - 5228:3,
5228:4
  **firing** [2] - 5263:16,
5263:17
  **firm** [39] - 5159:3,
5215:24, 5216:1,
5234:5, 5242:25,
5247:2, 5247:3,
5248:10, 5248:12,
5253:5, 5263:6,
5264:20, 5266:13,
5277:19, 5304:21,
5315:19, 5315:20,
5319:22, 5320:14,
5320:23, 5321:18,
5323:17, 5349:9,
5349:18, 5349:22,
5353:24, 5354:5,
5354:17, 5355:12,
5356:13, 5357:3,
5357:8, 5357:22,
5357:23, 5358:11,
5358:15, 5367:19,
5368:1, 5377:8
  **firm's** [4] - 5321:15,
5376:3, 5388:9,
5394:14
  **firms** [4] - 5324:15,
5353:22, 5358:11,
5358:12
  **first** [50] - 5159:17,
5161:20, 5162:1,
5182:7, 5185:21,
5193:19, 5193:22,
5193:24, 5194:1,
5198:19, 5207:2,
5208:5, 5209:25,
5212:7, 5212:8,
5212:13, 5212:16,
5214:15, 5216:10,
5216:20, 5230:4,
5237:17, 5237:19,
5239:14, 5256:4,
5270:12, 5270:15,
5298:19, 5302:25,
5310:5, 5326:24,
5330:3, 5331:7,
5331:20, 5335:1,
5339:24, 5348:24,
5354:23, 5355:16,
5359:6, 5360:16,
5362:7, 5362:24,
5372:14, 5380:5,
5388:21, 5389:6,

5389:17, 5390:11, 5393:20

**fiscal** [14] - 5352:15, 5352:25, 5353:15, 5354:20, 5358:19, 5361:7, 5362:1, 5362:25, 5368:4, 5370:3, 5371:1, 5373:21, 5374:2, 5375:7

**fit** [2] - 5190:15, 5191:7

**five** [29] - 5187:21, 5194:10, 5194:12, 5197:17, 5218:11, 5257:12, 5258:1, 5277:16, 5284:7, 5297:16, 5297:21, 5298:12, 5309:10, 5309:14, 5310:2, 5310:3, 5310:5, 5310:16, 5311:12, 5349:20, 5349:22, 5367:21, 5372:16, 5384:14, 5384:22, 5396:8, 5397:25, 5398:6, 5398:10

**Five** [1] - 5163:25

**flash** [1] - 5240:9

**flexibility** [2] - 5194:4, 5311:5

**Floor** [1] - 5156:17

**Floral** [1] - 5275:12

**flows** [1] - 5362:12

**flush** [2] - 5168:1, 5171:7

**flying** [1] - 5162:24, 5162:25

**focus** [1] - 5363:14

**focusing** [3] - 5246:22, 5319:17, 5391:12

**folder** [1] - 5256:19

**follow** [9] - 5203:1, 5207:18, 5235:12, 5243:7, 5260:10, 5261:4, 5287:16, 5287:23, 5287:25

**follow-up** [1] - 5243:7

**followed** [2] - 5298:1, 5365:13

**following** [5] - 5250:23, 5250:24, 5288:1, 5338:6, 5396:15

**follows** [4] - 5174:3, 5199:13, 5199:22, 5348:25

**footnotes** [8] -

5217:8, 5217:15, 5217:18, 5217:23, 5320:21, 5321:2, 5321:19, 5376:22

**foregoing** [2] - 5355:17, 5368:14

**forensic** [2] - 5299:7, 5364:12

**forensics** [2] - 5299:3, 5299:5

**foreshadow** [1] - 5169:17

**forgery** [2] - 5364:20, 5365:3

**forget** [1] - 5264:23

**Forgive** [1] - 5290:4

**Form** [3] - 5378:2, 5378:19, 5378:21

**form** [27] - 5174:13, 5184:6, 5186:17, 5194:6, 5202:22, 5211:2, 5220:16, 5244:10, 5245:4, 5245:19, 5246:11, 5246:18, 5248:22, 5249:5, 5253:22, 5254:9, 5275:19, 5278:17, 5320:9, 5333:24, 5356:7, 5363:2, 5363:5, 5363:7, 5363:13, 5374:2, 5374:9

**forma** [1] - 5223:3

**format** [1] - 5367:7

**former** [1] - 5296:9

**forth** [6] - 5168:20, 5172:17, 5220:15, 5355:18, 5368:15, 5389:9

**forward** [6] - 5199:15, 5231:3, 5232:2, 5277:20, 5302:7, 5396:24

**forwarded** [2] - 5177:7, 5234:22

**forwarding** [3] - 5164:11, 5230:6, 5260:12

**forwards** [4] - 5174:20, 5177:4, 5230:23, 5380:19

**founder** [1] - 5393:21

**four** [11] - 5187:21, 5190:25, 5199:19, 5218:6, 5298:9, 5349:22, 5361:22, 5397:24, 5398:3, 5398:5, 5398:9

**Four** [1] - 5397:6

four-week [1] - 5398:5

**fourteen** [2] - 5318:19, 5319:5, 5398:14

**Fourteen** [1] - 5398:15

**fourth** [2] - 5333:3, 5364:2

**frame** [10] - 5202:12, 5202:13, 5267:4, 5269:23, 5270:14, 5288:18, 5290:2, 5290:7, 5295:20, 5295:21

**frankly** [1] - 5339:6

**fraud** [12] - 5267:19, 5363:16, 5363:21, 5363:23, 5364:4, 5364:11, 5364:13, 5364:15, 5364:19, 5365:5, 5365:7, 5365:9

**frauds** [1] - 5364:12

**fraudulently** [2] - 5284:12, 5284:16

**free** [3] - 5298:13, 5315:15, 5396:18

**free-trading** [1] - 5298:13

**freely** [4] - 5335:23, 5336:5, 5342:6, 5345:6

**Friday** [6] - 5158:2, 5163:5, 5163:7, 5396:15, 5396:17

**friend** [2] - 5234:18, 5273:13

**friends** [1] - 5319:20

**front** [11] - 5199:8, 5236:13, 5253:1, 5290:15, 5290:19, 5313:16, 5318:15, 5323:9, 5323:10, 5323:11, 5354:12

**full** [10] - 5162:1, 5167:6, 5233:3, 5233:6, 5262:14, 5348:20, 5356:20, 5360:16, 5362:7, 5363:14

**full-time** [2] - 5233:3, 5233:6

**fumes** [1] - 5178:11

**functions** [2] - 5162:5, 5163:4

**Fund** [1] - 5236:22

**fund** [19] - 5178:8, 5248:19, 5248:20, 5248:25, 5249:11,

5249:12, 5251:7, 5251:8, 5258:11, 5264:20, 5265:18, 5265:19, 5265:24, 5267:10, 5277:17, 5331:17

**fundraising** [2] - 5236:3, 5236:4

**funds** [9] - 5190:15, 5191:7, 5191:18, 5191:22, 5251:12, 5251:20, 5277:8, 5323:20, 5394:7

**future** [3] - 5232:1, 5234:5, 5258:12

## G

**GAAP** [5] - 5350:10, 5350:11, 5350:14, 5359:16, 5364:1

**games** [1] - 5327:25

**Gateway** [2] - 5177:20, 5182:2

**Geller** [1] - 5384:18

**general** [7] - 5220:6, 5248:10, 5252:6, 5338:23, 5350:12, 5381:25, 5382:9

**generally** [9] - 5158:23, 5196:25, 5197:9, 5353:19, 5353:23, 5358:6, 5365:13, 5367:3, 5369:16

**generous** [1] - 5161:17

**George** [8] - 5210:12, 5210:13, 5210:20, 5210:21, 5211:23, 5273:13, 5293:10, 5319:2

**GIBSON** [1] - 5156:17

**given** [13] - 5161:6, 5165:17, 5171:8, 5172:2, 5179:21, 5202:12, 5205:10, 5234:7, 5234:8, 5235:14, 5320:1, 5343:5, 5345:13

**glad** [1] - 5396:12

**Global** [19] - 5280:25, 5281:2, 5281:18, 5281:21, 5287:9, 5288:11, 5288:15, 5289:22, 5291:24, 5292:3, 5292:7, 5292:13, 5292:19, 5293:14,

5294:1, 5295:10, 5295:18, 5295:24, 5296:24

**Goldman** [2] - 5262:9, 5263:18

**Gordon** [1] - 5305:2

**govern** [1] - 5350:16

**government** [25] - 5159:8, 5159:18, 5160:3, 5168:17, 5168:19, 5169:15, 5169:23, 5169:25, 5170:9, 5170:21, 5198:9, 5198:14, 5228:23, 5277:2, 5282:11, 5310:3, 5317:21, 5326:2, 5338:25, 5339:25, 5340:9, 5344:14, 5348:8, 5348:10, 5398:20

**Government** [29] - 5156:12, 5201:21, 5209:25, 5260:11, 5260:19, 5278:20, 5282:9, 5287:14, 5291:18, 5297:12, 5332:4, 5343:15, 5346:19, 5346:20, 5346:21, 5378:11, 5379:6, 5380:1, 5380:3, 5380:4, 5383:13, 5384:7, 5384:9, 5384:10, 5389:22, 5392:16, 5392:19, 5393:5, 5393:9

**Government's** [32] - 5198:9, 5198:10, 5198:13, 5198:16, 5318:17, 5324:5, 5326:4, 5326:13, 5327:7, 5327:9, 5354:11, 5354:13, 5355:5, 5355:7, 5358:22, 5359:2, 5359:4, 5361:24, 5362:16, 5362:19, 5367:22, 5368:9, 5368:11, 5370:17, 5371:3, 5371:5, 5372:12, 5374:6, 5374:11, 5374:21, 5374:22, 5393:7

**government's** [4] - 5157:11, 5169:21, 5309:19, 5309:21

**grab** [1] - 5295:25

**grabbing** [1] - 5296:5

**GRACE** [1] - 5156:21
**graduated** [1] - 5262:7
**grant** [1] - 5391:8
**granted** [1] - 5268:16
**grateful** [1] - 5396:7
**great** [6] - 5159:12, 5175:5, 5177:3, 5230:15, 5277:19, 5280:14
**GREEBEL** [1] - 5156:6
**Greebel** [116] - 5164:10, 5164:11, 5174:17, 5174:20, 5176:16, 5186:13, 5186:22, 5192:18, 5192:21, 5192:23, 5193:4, 5194:12, 5195:4, 5195:13, 5196:10, 5206:22, 5207:1, 5207:10, 5208:1, 5208:18, 5209:2, 5209:3, 5209:5, 5209:13, 5209:15, 5209:22, 5210:2, 5210:8, 5210:12, 5210:21, 5212:5, 5212:19, 5213:13, 5213:19, 5214:6, 5215:11, 5217:25, 5218:3, 5218:9, 5218:14, 5223:6, 5223:11, 5224:11, 5240:1, 5243:8, 5254:23, 5255:7, 5281:23, 5282:4, 5282:6, 5282:16, 5286:11, 5287:5, 5299:24, 5300:7, 5305:17, 5305:19, 5306:1, 5309:22, 5314:6, 5314:8, 5314:13, 5314:16, 5315:6, 5315:9, 5315:23, 5316:8, 5316:12, 5316:14, 5316:23, 5318:9, 5318:11, 5319:9, 5319:12, 5319:14, 5319:17, 5319:18, 5324:19, 5325:1, 5325:10, 5325:16, 5325:21, 5327:4, 5327:13, 5330:12, 5330:18, 5332:8, 5332:11, 5332:15, 5334:8, 5334:22, 5335:23, 5339:12, 5339:19,

5340:13, 5340:17, 5340:24, 5341:6, 5344:15, 5353:14, 5371:22, 5373:22, 5374:1, 5379:15, 5379:20, 5379:22, 5380:5, 5380:8, 5388:2, 5388:6, 5388:9, 5388:14, 5388:25, 5389:1
**Greebel's** [6] - 5175:5, 5210:5, 5223:14, 5334:3, 5380:13, 5380:20
**Greer** [2] - 5263:14, 5265:17
**ground** [1] - 5342:16
**grounds** [1] - 5307:11
**guess** [2] - 5182:10, 5390:15
**guys** [1] - 5243:8
**GX** [9] - 5187:4, 5258:2, 5399:18, 5399:19, 5399:19, 5399:20, 5399:20, 5399:21, 5399:21

## H

**Hackert** [2] - 5353:9, 5369:1
**Hackett** [1] - 5215:11
**half** [2] - 5302:11, 5308:9
**halfway** [1] - 5321:9
**hand** [7] - 5186:1, 5227:9, 5229:10, 5237:19, 5331:19, 5348:17, 5354:22
**handed** [1] - 5185:24
**handing** [1] - 5165:8
**handled** [1] - 5306:18
**handling** [2] - 5392:11, 5392:13
**handwriting** [1] - 5261:15
**handwritten** [1] - 5165:21
**hang** [2] - 5235:18, 5302:14
**happy** [7] - 5161:12, 5161:22, 5198:10, 5202:7, 5240:3, 5287:5, 5318:24
**hard** [12] - 5159:4, 5162:7, 5211:7, 5224:22, 5236:13, 5241:24, 5242:7,

5242:17, 5252:25, 5285:10, 5310:10, 5365:9
**harder** [1] - 5242:21
**harm** [1] - 5165:16
**Harrison** [1] - 5382:16
**Hassan** [2] - 5288:9, 5384:17
**hate** [1] - 5310:17
**heading** [4] - 5362:6, 5362:22, 5362:24, 5384:15
**Heading** [1] - 5156:22
**health** [2] - 5271:7, 5276:17
**healthcare** [1] - 5298:10
**Healthcare** [25] - 5187:14, 5190:4, 5190:7, 5190:8, 5191:10, 5192:3, 5192:15, 5198:22, 5199:24, 5200:1, 5226:4, 5236:21, 5244:6, 5245:8, 5248:18, 5248:19, 5249:11, 5251:7, 5257:10, 5277:16, 5326:11, 5329:12, 5333:15, 5360:19, 5361:5
**hear** [10] - 5172:20, 5211:7, 5211:9, 5211:16, 5289:7, 5297:19, 5312:6, 5335:21, 5388:11, 5397:15
**heard** [3] - 5168:16, 5258:6, 5395:8
**hearing** [2] - 5317:13, 5341:16
**hears** [1] - 5310:18
**hearsay** [13] - 5158:19, 5167:3, 5307:8, 5307:11, 5335:14, 5338:15, 5338:19, 5345:10, 5388:3, 5390:8, 5390:12, 5391:7, 5391:19
**hedge** [2] - 5265:18, 5265:19
**hello** [1] - 5348:16
**help** [3] - 5178:8, 5312:20, 5347:1
**helpful** [2] - 5165:19, 5165:23
**hi** [1] - 5227:20

**hide** [1] - 5313:10
**higher** [3] - 5382:1, 5382:3, 5382:8
**highlighted** [2] - 5209:24, 5364:25
**highly** [1] - 5266:6
**himself** [1] - 5299:15
**hired** [5] - 5225:4, 5233:1, 5244:23, 5263:19
**hires** [1] - 5234:9
**hiring** [2] - 5231:14, 5263:18
**history** [4] - 5254:21, 5262:5, 5262:6, 5349:16
**hmm** [5] - 5354:15, 5354:24, 5355:19, 5357:9, 5357:11
**hold** [4] - 5161:21, 5203:22, 5236:12, 5303:17
**holding** [1] - 5191:2
**holdings** [1] - 5285:3
**home** [2] - 5257:2, 5257:3
**honestly** [1] - 5263:1
**honor** [1] - 5284:14
**Honor** [123] - 5157:9, 5159:6, 5159:22, 5160:6, 5160:10, 5161:25, 5162:11, 5163:6, 5163:20, 5163:23, 5164:9, 5164:19, 5165:6, 5165:16, 5166:2, 5168:16, 5168:19, 5169:6, 5169:12, 5169:22, 5170:11, 5172:21, 5173:6, 5173:17, 5174:23, 5179:23, 5186:20, 5188:5, 5192:8, 5195:18, 5195:25, 5197:2, 5197:4, 5197:20, 5198:2, 5198:3, 5198:17, 5203:1, 5203:17, 5204:3, 5204:10, 5207:21, 5211:11, 5211:17, 5214:24, 5214:25, 5227:4, 5227:16, 5228:22, 5229:20, 5230:12, 5245:22, 5246:13, 5246:15, 5246:17, 5246:24, 5247:5, 5247:14, 5247:17, 5249:19, 5249:21, 5250:1, 5250:4,

5252:10, 5255:2, 5255:13, 5257:17, 5258:4, 5261:1, 5261:4, 5261:14, 5269:1, 5273:23, 5275:20, 5279:13, 5279:18, 5280:24, 5281:9, 5282:1, 5282:21, 5289:23, 5290:3, 5290:7, 5290:14, 5297:3, 5305:21, 5307:23, 5307:25, 5309:7, 5311:1, 5311:25, 5312:5, 5312:18, 5313:12, 5313:15, 5314:3, 5314:12, 5316:2, 5316:15, 5316:16, 5317:22, 5318:21, 5321:6, 5321:11, 5325:5, 5327:8, 5331:22, 5335:19, 5336:21, 5338:7, 5339:21, 5339:24, 5340:25, 5343:3, 5343:7, 5344:25, 5345:15, 5348:1, 5391:6, 5391:10, 5396:1, 5397:19, 5398:23
**HONORABLE** [1] - 5156:10
**hope** [3] - 5167:19, 5175:24, 5277:7
**hoped** [1] - 5176:1
**hopeful** [1] - 5158:3
**hopefully** [4] - 5160:24, 5167:4, 5229:12, 5397:10
**hoping** [1] - 5176:12
**hour** [6] - 5160:12, 5163:21, 5302:10, 5308:5, 5308:9
**hours** [1] - 5330:18
**Howard** [1] - 5305:2
**Huang** [13] - 5178:7, 5180:2, 5198:21, 5199:5, 5199:7, 5222:9, 5222:15, 5238:8, 5273:13, 5276:11, 5276:16, 5319:2, 5342:3
**Huang's** [1] - 5344:12
**huge** [1] - 5328:24
**hundred** [21] - 5187:5, 5192:2, 5192:14, 5192:24, 5193:17, 5198:21, 5199:11, 5199:17,

5199:23, 5199:25,
5325:16, 5326:6,
5326:7, 5327:4,
5327:5, 5327:23,
5328:2, 5328:21,
5329:8, 5329:14,
5372:16
   **hung** [1] - 5194:21

---

**I**

**i.e** [1] - 5223:2
**idea** [9] - 5161:1,
5161:5, 5228:14,
5228:18, 5254:15,
5254:16, 5308:8,
5339:4, 5397:12
**identification** [45] -
5165:9, 5195:21,
5197:22, 5205:19,
5214:18, 5230:3,
5230:5, 5239:13,
5239:14, 5239:23,
5255:4, 5269:3,
5273:25, 5279:12,
5279:15, 5281:10,
5281:11, 5281:12,
5281:13, 5281:14,
5281:25, 5290:15,
5292:11, 5293:12,
5294:15, 5294:22,
5318:15, 5318:17,
5326:3, 5326:13,
5336:24, 5354:11,
5358:22, 5361:23,
5367:22, 5370:17,
5374:6, 5379:5,
5383:13, 5389:22,
5392:16
**identified** [5] -
5216:7, 5338:9,
5343:15, 5343:18,
5366:19
**identifier** [2] -
5254:2, 5254:13
**identify** [7] -
5338:10, 5338:25,
5339:1, 5340:1,
5340:6, 5363:23,
5364:11
**identifying** [1] -
5338:25
**identity** [1] - 5159:8
**ignores** [3] -
5280:18, 5280:20,
5287:11
**illiquid** [1] - 5266:6
**imagine** [1] - 5172:2
**immaterial** [3] -
5356:13, 5369:12,

---

5369:14
**impact** [1] - 5231:21
**impeachment** [3] -
5168:7, 5170:13,
5171:16
**implicate** [1] -
5338:15
**implications** [1] -
5218:20
**important** [8] -
5157:4, 5157:5,
5160:22, 5161:5,
5169:7, 5169:8,
5170:6, 5208:25
**imposition** [1] -
5161:16
**impression** [4] -
5157:15, 5157:17,
5194:15, 5205:8
**improper** [2] -
5204:8, 5343:13
**inadmissible** [1] -
5338:19
**inappropriate** [4] -
5171:4, 5232:12,
5311:6, 5359:1
**Inc** [10] - 5257:10,
5284:10, 5285:17,
5285:22, 5319:2,
5319:3, 5322:24,
5328:24, 5362:10,
5393:16
**incentive** [2] -
5218:12, 5322:8
**incentivize** [5] -
5241:17, 5241:24,
5242:6, 5242:21,
5285:3
**inception** [2] -
5352:7, 5358:24
**include** [5] -
5250:14, 5288:3,
5327:3, 5363:9,
5379:11
**included** [4] -
5190:11, 5249:14,
5296:14, 5342:23,
5362:13, 5363:9,
5363:12, 5386:8
**includes** [1] -
5191:22
**including** [5] -
5238:13, 5258:9,
5258:16, 5267:18,
5277:12
**inconsistency** [1] -
5203:25
**inconsistent** [1] -
5249:23
**incorrect** [4] -

---

5204:11, 5204:12,
5339:25, 5386:9
**incorrectly** [2] -
5263:6, 5263:9
**increase** [1] -
5382:11
**increased** [3] -
5176:2, 5364:20,
5365:3
**incredibly** [2] -
5162:14, 5339:16
**incubated** [1] -
5251:12
**incurred** [2] -
5357:2, 5357:7
**independent** [2] -
5359:10, 5376:3
**independently** [3] -
5206:2, 5239:21,
5255:11
**India** [2] - 5349:14,
5349:19
**Indian** [1] - 5349:17
**indicated** [2] -
5398:12, 5398:17
**indisposed** [1] -
5228:13
**individuals** [9] -
5218:24, 5246:23,
5380:20, 5383:7,
5383:17, 5384:4,
5384:14, 5394:2,
5394:4
**induced** [2] -
5284:12, 5284:16
**industry** [4] -
5188:24, 5189:2,
5189:11, 5262:23
**inexplicably** [2] -
5342:14, 5342:15
**inform** [8] - 5183:19,
5183:22, 5184:23,
5184:24, 5226:9,
5301:7, 5301:9,
5301:15
**information** [21] -
5185:16, 5273:20,
5275:16, 5286:2,
5286:13, 5292:8,
5292:23, 5296:14,
5297:1, 5298:21,
5300:13, 5302:4,
5302:5, 5314:12,
5342:17, 5356:11,
5357:15, 5369:5,
5377:3, 5397:12
**informations** [2] -
5363:10, 5363:12
**informed** [5] -
5201:17, 5241:4,

---

5299:24, 5342:7,
5397:24
**informing** [3] -
5184:12, 5239:4,
5242:25
**initial** [2] - 5309:23,
5352:5
**input** [2] - 5217:19,
5217:20
**inquired** [1] -
5382:19
**inquiries** [2] -
5381:5, 5382:4
**inquiring** [1] -
5253:5
**inquiry** [5] - 5299:25,
5300:3, 5300:21,
5300:22, 5382:14
**insignificant** [1] -
5241:14
**instead** [4] -
5170:21, 5343:11,
5346:8, 5378:17
**instructions** [2] -
5162:8, 5162:10
**insurance** [1] -
5298:10
**integrity** [1] -
5258:18
**intend** [4] - 5169:18,
5169:25, 5228:11,
5313:2
**intended** [1] -
5284:13
**intention** [1] -
5320:13
**intentional** [1] -
5284:10
**intentionally** [1] -
5365:5
**interact** [3] - 5353:1,
5353:14, 5353:17
**interaction** [1] -
5353:3
**interest** [3] -
5158:12, 5333:14,
5333:22
**interface** [1] -
5283:18
**interference** [3] -
5267:20, 5268:21,
5269:15
**interim** [7] - 5361:17,
5378:22, 5378:23,
5381:4, 5383:9,
5386:24
**intermingle** [1] -
5253:20
**internal** [2] -
5352:21, 5389:18

---

**internet** [1] - 5258:22
**internships** [1] -
5189:1
**interpreted** [1] -
5258:17
**interviewed** [5] -
5270:10, 5270:12,
5270:17, 5271:1,
5271:14
**interviews** [1] -
5270:1
**introduce** [2] -
5158:17, 5167:7
**introduced** [3] -
5203:24, 5340:9,
5340:10
**introducing** [2] -
5158:18, 5204:2
**invalid** [1] - 5341:24
**invest** [4] - 5190:4,
5190:8, 5190:9,
5191:11
**investigation** [2] -
5299:8, 5376:11
**investing** [2] -
5324:16, 5325:12
**investment** [9] -
5187:11, 5187:13,
5192:2, 5192:14,
5193:17, 5194:23,
5326:9, 5360:21,
5361:2
**investments** [3] -
5236:6, 5266:3,
5361:5
**investor** [23] -
5209:5, 5209:6,
5209:7, 5209:10,
5210:16, 5210:23,
5210:24, 5212:2,
5212:22, 5213:6,
5213:7, 5213:8,
5213:9, 5213:15,
5213:20, 5231:2,
5245:8, 5251:13,
5277:18, 5278:1,
5324:20, 5325:7
**investor's** [1] -
5209:11
**investors** [19] -
5194:23, 5209:12,
5210:3, 5210:4,
5213:20, 5214:1,
5215:21, 5236:1,
5236:3, 5236:5,
5249:18, 5251:16,
5258:11, 5258:16,
5272:3, 5325:2,
5325:6, 5325:11,
5386:11

**invoice** [1] - 5328:21
**invoices** [2] -
5370:6, 5370:9
**invoicing** [1] -
5328:15
**involved** [11] -
5222:18, 5231:25,
5383:17, 5384:5,
5388:10, 5389:12,
5389:14, 5390:23,
5391:13, 5392:3,
5392:6
**involvement** [2] -
5300:16, 5301:6
**involving** [1] -
5388:5
**IRS** [5] - 5254:2,
5254:11, 5254:15,
5254:16, 5254:18
**Isotope** [6] - 5226:4,
5236:22, 5244:6,
5248:19, 5249:12,
5251:8
**issuance** [1] -
5360:14
**issue** [13] - 5168:15,
5172:6, 5172:21,
5216:6, 5227:21,
5228:6, 5231:7,
5313:15, 5366:12,
5366:18, 5377:7,
5392:11, 5394:12
**issued** [4] - 5254:11,
5306:19, 5359:19,
5360:17
**Issues** [1] - 5214:17
**issues** [8] - 5158:12,
5158:14, 5166:23,
5168:13, 5171:7,
5216:7, 5396:11,
5398:11
**issuing** [1] - 5306:16
**item** [6] - 5364:23,
5376:6, 5376:15,
5376:17, 5376:20,
5377:19
**items** [4] - 5221:6,
5221:22, 5298:20,
5377:21
**itself** [2] - 5357:23,
5358:15

**J**

**J-A-I-N** [1] - 5348:21
**JACKSON** [3] -
5174:1, 5317:6,
5399:3
**Jackson** [11] -
5195:23, 5197:25,
5232:11, 5233:13,
5233:25, 5274:1,
5274:17, 5275:12,
5398:1
**Jackson@
MSMBCapital.com** [2]
- 5274:22, 5274:23
**jackson@retrophin
.com** [1] - 5293:5
**JacksonSu@yahoo**
[1] - 5282:4
**Jain** [20] - 5308:10,
5308:11, 5308:17,
5308:20, 5348:10,
5348:21, 5349:3,
5354:16, 5355:9,
5356:10, 5358:18,
5359:6, 5362:21,
5368:13, 5371:7,
5374:24, 5378:18,
5384:14, 5388:17,
5391:12
**JAIN** [2] - 5348:23,
5399:7
**James** [1] - 5233:19
**Jane** [1] - 5310:9
**January** [10] -
5183:14, 5270:2,
5277:15, 5286:21,
5310:23, 5350:23,
5352:2, 5361:9,
5361:14, 5377:22
**job** [9] - 5187:21,
5236:1, 5236:3,
5242:2, 5257:4,
5269:23, 5270:10,
5271:14, 5353:11
**jobs** [1] - 5396:19
**John** [2] - 5286:19,
5353:10
**joined** [1] - 5349:23
**joint** [1] - 5387:7
**JOSHUA** [1] -
5156:21
**Judge** [27] - 5157:22,
5157:25, 5158:21,
5159:23, 5161:10,
5227:22, 5228:4,
5306:15, 5306:19,
5306:25, 5307:4,
5307:7, 5307:13,
5336:23, 5336:25,
5337:3, 5338:1,
5338:16, 5340:18,
5341:9, 5341:13,
5341:21, 5343:4,
5343:9, 5344:10,
5344:18, 5344:21
**judge** [5] - 5227:21,
5228:3, 5310:8,
5317:8, 5317:9
**JUDGE** [1] - 5156:10
**judicial** [1] - 5163:4
**July** [20] - 5202:1,
5202:4, 5203:5,
5203:6, 5204:24,
5205:10, 5205:12,
5260:16, 5277:17,
5354:16, 5378:25,
5379:9, 5379:16,
5380:8, 5380:14,
5380:24, 5384:20,
5390:19, 5391:22,
5392:5
**jumbled** [1] -
5306:13
**jump** [1] - 5203:23
**jumping** [1] - 5339:8
**June** [25] - 5240:1,
5242:24, 5253:4,
5261:12, 5318:11,
5319:10, 5319:12,
5319:14, 5334:9,
5335:22, 5342:19,
5343:23, 5345:3,
5346:2, 5346:6,
5346:15, 5369:2,
5370:21, 5371:10,
5375:4, 5378:2,
5378:9, 5381:4,
5388:20, 5394:1
**junior** [5] - 5263:24,
5264:7, 5265:6,
5265:14, 5265:16
**JUROR** [2] - 5227:8,
5302:16
**Juror** [5] - 5397:6,
5397:13, 5398:2,
5398:12, 5398:15
**juror** [12] - 5228:8,
5228:11, 5228:13,
5228:15, 5228:20,
5310:18, 5311:15,
5312:11, 5348:13,
5397:23, 5398:2,
5398:17
**juror's** [2] - 5311:14,
5313:5
**jurors** [17] - 5157:4,
5157:7, 5157:20,
5163:23, 5172:8,
5173:12, 5227:5,
5229:9, 5229:14,
5229:17, 5302:14,
5308:1, 5309:24,
5311:22, 5313:13,
5317:19, 5397:11
**Jurors** [1] - 5398:11
**jury** [24] - 5156:10,
5157:1, 5171:10,
5173:11, 5173:13,
5189:3, 5189:13,
5215:8, 5227:19,
5229:16, 5266:21,
5278:12, 5289:19,
5296:2, 5309:3,
5309:8, 5310:15,
5316:17, 5317:18,
5340:6, 5384:13,
5393:10, 5396:3,
5397:2
**Jury** [3] - 5227:14,
5308:7, 5397:1

**K**

**Katten** [49] -
5216:20, 5217:4,
5217:16, 5217:17,
5217:25, 5218:9,
5218:14, 5219:2,
5221:4, 5222:11,
5224:9, 5272:14,
5272:18, 5304:19,
5304:21, 5305:3,
5305:9, 5305:11,
5305:19, 5306:10,
5306:11, 5307:17,
5314:8, 5314:20,
5314:24, 5315:9,
5315:13, 5315:19,
5315:20, 5316:7,
5316:13, 5320:1,
5321:15, 5327:21,
5328:16, 5328:19,
5328:20, 5329:6,
5331:21, 5333:4,
5354:16, 5355:1,
5367:19, 5368:1,
5370:7, 5372:17,
5379:2, 5380:21
**Katten's** [2] -
5221:23, 5223:15
**keep** [15] - 5171:10,
5205:7, 5205:10,
5227:6, 5227:11,
5241:16, 5250:1,
5252:19, 5283:2,
5289:2, 5302:16,
5310:18, 5312:12,
5327:25, 5395:5
**keeping** [3] -
5238:18, 5296:5,
5398:4
**KESSLER** [137] -
5156:14, 5161:22,
5163:6, 5163:12,
5163:16, 5163:23,
5164:1, 5164:4,
5165:16, 5166:16,
5174:25, 5178:17,
5180:8, 5184:6,
5185:2, 5186:17,
5192:6, 5194:6,
5196:1, 5198:3,
5198:11, 5198:14,
5202:5, 5202:22,
5203:24, 5204:7,
5206:10, 5211:2,
5211:7, 5214:25,
5219:14, 5219:20,
5220:2, 5220:16,
5230:13, 5240:5,
5241:19, 5244:10,
5244:14, 5244:16,
5245:4, 5245:19,
5246:3, 5246:11,
5246:17, 5247:14,
5248:21, 5249:5,
5249:21, 5250:16,
5250:20, 5251:25,
5252:25, 5253:22,
5254:9, 5255:14,
5257:17, 5258:4,
5261:1, 5261:14,
5270:7, 5274:9,
5274:24, 5275:19,
5278:17, 5279:19,
5282:22, 5284:21,
5286:6, 5290:9,
5295:20, 5305:23,
5307:2, 5307:5,
5307:8, 5308:8,
5308:15, 5308:18,
5308:22, 5311:6,
5316:6, 5316:21,
5316:25, 5317:3,
5317:15, 5317:22,
5317:24, 5318:23,
5320:11, 5321:9,
5325:8, 5326:7,
5326:9, 5326:11,
5327:7, 5328:10,
5328:12, 5330:1,
5331:22, 5331:24,
5333:24, 5335:13,
5338:3, 5338:7,
5341:11, 5342:18,
5343:7, 5345:7,
5346:12, 5348:3,
5348:10, 5349:2,
5352:1, 5355:5,
5359:2, 5362:16,
5368:9, 5371:3,
5374:11, 5374:22,
5376:1, 5378:11,
5380:1, 5381:15,
5384:7, 5384:11,
5390:13, 5391:10,
5392:22, 5393:5,
5395:5, 5395:7,
5396:1, 5397:18,

5397:21, 5398:14,
5398:19
**Kessler** [16] -
5204:5, 5204:10,
5204:13, 5204:16,
5251:23, 5251:24,
5252:3, 5298:18,
5320:10, 5321:13,
5325:6, 5337:2,
5340:10, 5348:22,
5374:16, 5391:21
**Kevin** [6] - 5176:22,
5224:18, 5224:20,
5230:22, 5232:6,
5238:21
kicked [1] - 5221:18
**kind** [13] - 5159:2,
5167:15, 5168:1,
5168:3, 5168:4,
5172:5, 5203:25,
5328:6, 5350:3,
5351:1, 5354:3,
5355:9, 5355:12
**kindly** [1] - 5157:8
**KIYO** [1] - 5156:10
**Kleeman** [1] -
5353:11
**knowing** [5] -
5170:10, 5213:24,
5228:10, 5303:16,
5346:11
**knowledge** [4] -
5244:4, 5254:16,
5388:17, 5389:11
knows [3] - 5169:12,
5212:19, 5314:13
**Kocher** [1] - 5384:17
**Kramer** [1] - 5265:19

---

# L

**language** [1] -
5246:20
laptop [1] - 5326:2
larger [1] - 5382:5
last [28] - 5158:9,
5160:1, 5167:21,
5199:19, 5230:20,
5230:21, 5231:24,
5232:7, 5233:2,
5233:4, 5233:5,
5234:3, 5256:8,
5260:15, 5260:24,
5272:21, 5272:23,
5277:8, 5285:24,
5297:13, 5297:19,
5355:16, 5359:23,
5380:10, 5381:9,
5381:10, 5381:11,
5391:6

late [5] - 5193:9,
5194:2, 5194:3,
5194:5, 5194:8
**latitude** [1] - 5211:16
launched [2] -
5302:17, 5302:22
**Lavelle** [1] - 5384:18
law [17] - 5242:25,
5253:5, 5304:21,
5321:15, 5321:18,
5353:22, 5353:24,
5354:5, 5354:17,
5355:12, 5356:13,
5357:22, 5357:23,
5358:15, 5367:19,
5381:1, 5377:8
laws [2] - 5267:20,
5269:16
lawsuit [11] -
5302:17, 5302:22,
5302:25, 5303:4,
5304:15, 5304:20,
5304:24, 5306:13,
5306:20, 5307:17,
5319:1
lawyer [12] -
5191:16, 5194:16,
5286:18, 5287:3,
5287:4, 5299:21,
5303:12, 5303:22,
5306:18, 5306:25,
5307:6, 5346:10
lawyer's [1] -
5303:20
lawyers [5] - 5224:8,
5260:7, 5288:6,
5342:25, 5343:3
laying [1] - 5342:16
lays [1] - 5199:24
leads [2] - 5189:8,
5311:23
learn [7] - 5210:3,
5250:25, 5251:4,
5307:4, 5307:6,
5385:19, 5386:1
learned [8] - 5182:8,
5210:4, 5225:1,
5286:2, 5298:19,
5298:22, 5298:23,
5336:15
lease [1] - 5394:3
least [2] - 5167:20,
5308:12
leave [3] - 5173:2,
5264:14, 5264:18
leaves [1] - 5163:5
leaving [1] - 5275:2
led [1] - 5209:11
**LEE** [1] - 5156:20
left [13] - 5159:4,

5174:8, 5185:22,
5237:19, 5263:25,
5264:1, 5270:4,
5270:7, 5276:14,
5281:2, 5284:24,
5322:6, 5354:22
**left-hand** [1] -
5354:22
legal [28] - 5191:15,
5191:20, 5212:14,
5215:25, 5216:1,
5222:16, 5222:17,
5222:19, 5224:15,
5245:9, 5260:7,
5268:4, 5268:5,
5306:23, 5320:6,
5323:6, 5367:19,
5370:4, 5370:6,
5370:13, 5370:24,
5371:21, 5372:17,
5376:7, 5376:9,
5376:14
length [5] - 5157:5,
5157:23, 5157:25,
5309:6, 5309:12
lent [1] - 5273:15
less [11] - 5160:11,
5279:2, 5280:3,
5280:8, 5280:13,
5329:17, 5333:11,
5333:12, 5334:4,
5356:12, 5356:13
letter [56] - 5185:17,
5185:18, 5277:18,
5278:2, 5281:22,
5282:5, 5282:7,
5282:18, 5282:25,
5283:11, 5283:12,
5283:25, 5284:6,
5287:6, 5291:6,
5291:7, 5291:8,
5294:12, 5296:3,
5296:25, 5302:5,
5306:6, 5306:7,
5354:16, 5354:19,
5354:25, 5355:9,
5355:12, 5355:15,
5355:18, 5355:20,
5356:10, 5356:25,
5357:21, 5357:23,
5358:15, 5361:12,
5361:18, 5361:20,
5362:1, 5362:4,
5362:9, 5365:12,
5365:17, 5368:1,
5368:3, 5368:15,
5368:18, 5368:20,
5369:23, 5369:24,
5377:9, 5377:10
letters [11] -

5288:12, 5354:4,
5355:10, 5357:14,
5358:4, 5358:7,
5358:8, 5358:9,
5358:14, 5367:19,
5384:3
level [1] - 5392:9
liabilities [2] -
5387:7, 5387:12
liability [2] -
5385:22, 5393:23
liable [1] - 5387:7
**Liang** [4] - 5195:24,
5196:8, 5255:6,
5257:24
license [1] - 5178:9
**Ligand** [3] - 5178:9,
5199:7, 5199:14
likelihood [2] -
5178:15, 5178:23
likely [4] - 5306:22,
5309:25, 5310:15,
5311:12
limitation [2] -
5258:10, 5258:16
limited [2] - 5353:4,
5393:23
**Lindsay** [4] -
5288:10, 5288:14,
5384:23, 5385:1
**Line** [6] - 5203:14,
5203:15, 5203:16,
5204:9, 5204:23
line [14] - 5183:5,
5188:23, 5209:25,
5214:17, 5216:21,
5247:13, 5247:15,
5248:1, 5251:1,
5261:1, 5323:14,
5327:19, 5364:2,
5364:23
lines [19] - 5170:20,
5246:15, 5246:21,
5247:6, 5247:21,
5247:22, 5247:23,
5247:25, 5248:23,
5249:20, 5249:22,
5250:8, 5250:11,
5250:14, 5327:16,
5356:21, 5356:23,
5364:18
**LinkedIn** [3] -
5225:17, 5225:19,
5231:1
list [13] - 5159:10,
5159:11, 5159:13,
5167:6, 5167:8,
5221:7, 5237:18,
5262:25, 5290:1,
5321:8, 5365:18,

5365:20, 5365:21
listed [5] - 5231:1,
5238:11, 5289:25,
5320:2, 5384:14
listen [1] - 5207:23
lists [1] - 5269:10
litigation [18] -
5266:25, 5267:5,
5270:18, 5288:16,
5295:1, 5304:18,
5338:11, 5338:13,
5344:1, 5344:2,
5346:9, 5355:13,
5376:11, 5377:4,
5379:1, 5379:12,
5379:24, 5380:9
litigations [9] -
5354:1, 5354:6,
5355:22, 5356:11,
5368:17, 5376:18,
5376:21, 5376:25,
5380:17
lives [1] - 5161:7
**LLC** [35] - 5178:22,
5187:14, 5187:22,
5190:11, 5190:12,
5190:14, 5191:6,
5191:11, 5191:17,
5192:3, 5208:18,
5213:24, 5215:18,
5218:3, 5218:13,
5224:7, 5236:21,
5236:22, 5236:23,
5244:7, 5248:20,
5249:12, 5249:13,
5251:8, 5251:13,
5285:21, 5322:19,
5322:22, 5322:24,
5331:14, 5351:2,
5393:23
**LLCs** [2] - 5190:5,
5190:9
**LLP** [3] - 5349:6,
5349:7, 5349:11
loan [19] - 5187:6,
5191:14, 5191:22,
5191:24, 5192:4,
5192:15, 5192:23,
5193:17, 5198:20,
5198:21, 5199:11,
5202:1, 5202:10,
5202:18, 5205:12,
5205:25, 5207:3,
5207:11, 5273:15
loans [1] - 5202:15
locate [1] - 5198:20
longest [1] - 5231:19
longevity [1] -
5231:19
longstanding [2] -

---

5162:16, 5162:18
**look** [49] - 5164:6,
5166:20, 5177:6,
5177:7, 5179:19,
5181:25, 5182:24,
5202:7, 5206:9,
5209:1, 5211:6,
5216:25, 5222:12,
5223:5, 5227:6,
5239:23, 5241:8,
5242:23, 5253:4,
5290:3, 5293:12,
5297:12, 5321:10,
5326:24, 5331:3,
5334:12, 5344:5,
5354:14, 5355:15,
5358:21, 5359:22,
5361:22, 5362:6,
5364:2, 5367:21,
5368:13, 5369:23,
5370:15, 5370:23,
5372:11, 5374:5,
5375:2, 5377:21,
5379:14, 5382:23,
5383:12, 5389:21,
5389:24, 5392:15
**looked** [4] - 5313:16,
5326:22, 5332:19,
5377:19
**Looking** [2] -
5206:15, 5221:16
**looking** [21] -
5165:2, 5182:2,
5215:6, 5224:15,
5224:17, 5251:23,
5251:24, 5252:3,
5252:5, 5252:6,
5252:11, 5257:7,
5270:23, 5282:18,
5297:1, 5308:11,
5312:1, 5332:3,
5359:6, 5363:21,
5381:24
**looks** [1] - 5319:1
**loose** [1] - 5318:16
**lose** [5] - 5172:19,
5229:8, 5229:9,
5229:13, 5310:17
**loss** [5] - 5264:12,
5266:11, 5266:12,
5266:13, 5266:14
**lost** [4] - 5172:19,
5232:7, 5306:12,
5306:14
**lottery** [6] - 5175:25,
5176:1, 5176:2,
5176:8, 5178:13,
5178:14
**low** [1] - 5178:23
**lower** [1] - 5277:3

**lowest** [2] - 5262:18,
5262:19
**LP** [4] - 5277:16,
5331:14, 5360:19,
5361:5
**LPs** [2] - 5190:5,
5190:9
**lunch** [5] - 5163:21,
5229:7, 5302:9,
5302:15, 5308:2
**Luncheon** [1] -
5308:25

# M

**mail** [161] - 5164:7,
5164:10, 5164:15,
5164:22, 5165:4,
5165:12, 5165:17,
5174:14, 5174:17,
5174:22, 5175:1,
5175:5, 5176:19,
5179:19, 5181:5,
5181:6, 5181:7,
5181:11, 5183:7,
5184:13, 5185:15,
5186:9, 5186:11,
5187:1, 5195:1,
5195:12, 5195:22,
5196:17, 5197:23,
5197:24, 5199:12,
5201:9, 5205:21,
5206:15, 5208:12,
5214:5, 5214:16,
5214:18, 5214:19,
5216:4, 5216:5,
5216:10, 5217:21,
5217:22, 5230:5,
5230:6, 5230:20,
5230:21, 5230:22,
5231:12, 5236:9,
5236:16, 5238:20,
5239:16, 5239:20,
5239:25, 5241:2,
5243:3, 5252:15,
5252:22, 5253:4,
5253:7, 5253:8,
5255:5, 5255:10,
5273:25, 5274:12,
5274:13, 5274:15,
5274:19, 5277:3,
5278:24, 5279:2,
5280:4, 5280:8,
5280:13, 5280:20,
5280:23, 5282:3,
5282:12, 5282:15,
5283:6, 5287:12,
5287:15, 5287:16,
5287:19, 5289:11,
5291:9, 5291:11,
5291:22, 5291:23,

5293:5, 5293:6,
5293:8, 5293:10,
5297:13, 5299:18,
5318:11, 5319:9,
5319:12, 5319:14,
5319:24, 5320:4,
5324:8, 5325:4,
5325:14, 5325:25,
5326:16, 5326:20,
5326:22, 5326:24,
5327:12, 5327:15,
5328:19, 5328:22,
5330:9, 5330:12,
5330:15, 5330:17,
5330:20, 5332:3,
5332:7, 5332:19,
5334:8, 5334:17,
5338:8, 5340:12,
5340:15, 5341:5,
5341:12, 5341:13,
5341:22, 5342:20,
5343:11, 5343:12,
5343:13, 5344:7,
5344:9, 5344:11,
5344:16, 5345:2,
5345:9, 5345:14,
5346:21, 5346:24,
5370:21, 5370:23,
5371:7, 5377:8,
5379:8, 5379:14,
5379:15, 5379:19,
5380:5, 5380:24,
5392:23, 5393:11,
5394:16
**mailed** [6] - 5180:1,
5221:17, 5273:19,
5274:4, 5275:2
**mailing** [2] -
5230:25, 5332:19
**mails** [7] - 5214:9,
5252:24, 5303:25,
5353:18, 5379:24,
5389:9, 5391:13
**main** [1] - 5271:23
**man** [1] - 5234:18
**managed** [4] -
5258:11, 5265:18,
5265:19, 5303:5
**Management** [6] -
5236:21, 5236:22,
5257:10, 5331:14,
5393:23
**management** [36] -
5223:18, 5223:20,
5224:4, 5224:7,
5271:9, 5271:24,
5272:8, 5272:14,
5277:25, 5278:4,
5303:3, 5303:10,
5361:4, 5363:11,

5364:16, 5365:18,
5365:24, 5365:25,
5366:3, 5366:7,
5367:8, 5372:22,
5373:9, 5373:11,
5373:12, 5373:15,
5387:23, 5387:25,
5388:9, 5390:10,
5391:4, 5392:1,
5392:8, 5392:12,
5394:14
**management's** [2] -
5390:6, 5392:10
**manager** [5] -
5263:18, 5264:2,
5264:4, 5264:9,
5353:11
**managers** [1] -
5258:15
**managing** [2] -
5191:10, 5393:22
**mapping** [3] -
5218:2, 5218:8,
5218:12
**Marc** [10] - 5371:8,
5371:10, 5371:12,
5371:13, 5379:8,
5379:15, 5379:19,
5380:5, 5382:18,
5382:19
**March** [28] - 5183:14,
5225:12, 5230:7,
5230:22, 5280:23,
5282:4, 5282:8,
5282:12, 5282:16,
5287:6, 5287:13,
5287:15, 5287:16,
5289:8, 5289:16,
5289:20, 5290:12,
5291:3, 5291:9,
5291:21, 5291:22,
5292:12, 5293:13,
5295:23, 5297:13,
5346:24, 5379:4,
5386:23
**Marcum** [35] -
5214:6, 5215:9,
5221:17, 5221:18,
5349:6, 5349:7,
5349:11, 5349:23,
5349:24, 5350:23,
5353:8, 5355:3,
5356:23, 5358:18,
5359:14, 5359:19,
5360:24, 5361:6,
5365:13, 5367:18,
5368:6, 5376:13,
5377:2, 5378:18,
5383:22, 5384:1,
5386:17, 5387:2,

5390:1, 5390:5,
5391:4, 5391:22,
5392:1, 5394:17,
5395:12
**Marcum's** [2] -
5362:25, 5390:2
**Marek** [11] - 5164:11,
5174:18, 5175:7,
5232:11, 5233:9,
5239:4, 5239:6,
5239:7, 5241:3
**Maria** [1] - 5353:12
**Mariel** [1] - 5216:22
**mark** [3] - 5333:5,
5333:7, 5395:16
**marked** [39] -
5165:9, 5165:11,
5165:12, 5165:13,
5175:4, 5196:4,
5215:3, 5230:19,
5240:8, 5255:16,
5274:11, 5279:21,
5282:24, 5318:14,
5318:16, 5326:3,
5326:12, 5327:11,
5327:22, 5328:2,
5333:10, 5354:10,
5355:8, 5358:22,
5359:5, 5361:23,
5362:20, 5367:22,
5368:12, 5370:17,
5371:6, 5374:6,
5379:5, 5380:4,
5383:13, 5384:10,
5389:22, 5392:16,
5393:9
**market** [1] - 5258:13
**marking** [1] - 5334:3
**marks** [2] - 5383:19,
5383:22
**Martin** [48] -
5175:16, 5184:14,
5184:17, 5190:14,
5191:6, 5193:20,
5194:17, 5207:19,
5210:24, 5211:1,
5212:2, 5215:10,
5222:10, 5225:10,
5225:20, 5231:12,
5233:6, 5233:7,
5235:8, 5237:8,
5241:4, 5243:22,
5258:16, 5270:12,
5272:25, 5275:25,
5277:7, 5282:5,
5286:23, 5296:18,
5305:19, 5313:23,
5314:8, 5314:14,
5315:9, 5315:24,
5316:12, 5319:20,

5327:24, 5331:12, 5339:13, 5353:1, 5353:3, 5372:22, 5386:1, 5387:6, 5389:12, 5393:21
**Martin's** [1] - 5184:17
**massella** [1] - 5255:6
**Massella** [16] - 5195:23, 5196:8, 5197:25, 5199:10, 5199:13, 5201:6, 5201:11, 5214:5, 5215:10, 5217:12, 5236:10, 5236:17, 5239:4, 5243:14, 5245:24, 5257:23
**MASTRO** [9] - 5156:19, 5160:6, 5160:9, 5161:2, 5161:25, 5162:11, 5162:13, 5163:11, 5163:19
**match** [2] - 5291:16, 5320:14
**material** [13] - 5168:7, 5171:16, 5340:4, 5350:9, 5363:17, 5369:18, 5369:19, 5369:22, 5376:10, 5380:9, 5386:22, 5386:25, 5387:14
**materiality** [3] - 5369:16, 5387:15, 5387:17
**materially** [5] - 5356:15, 5359:17, 5363:25, 5365:7, 5369:21
**MATSUMOTO** [1] - 5156:10
**matter** [7] - 5158:10, 5289:4, 5314:11, 5329:1, 5392:13, 5393:1, 5398:25
**matters** [3] - 5160:18, 5355:25, 5356:16
**maximums** [1] - 5311:11
**mean** [19] - 5165:23, 5167:19, 5168:5, 5182:21, 5216:17, 5245:24, 5253:19, 5254:5, 5265:15, 5283:15, 5295:5, 5338:24, 5342:23, 5351:4, 5364:8, 5365:2, 5369:14,

5370:11, 5386:5
**Meaning** [2] - 5210:4, 5210:16
**meaning** [6] - 5256:16, 5288:6, 5314:20, 5315:2, 5315:6, 5377:18
**means** [6] - 5177:14, 5289:10, 5324:24, 5328:3, 5356:3, 5364:9
**meant** [4] - 5222:14, 5223:11, 5235:9, 5304:3
**meantime** [1] - 5374:18
**mechanical** [1] - 5156:25
**mechanism** [2] - 5169:9, 5169:13
**media** [1] - 5258:10
**medical** [2] - 5160:20, 5160:25
**meeting** [3] - 5231:24, 5271:4, 5367:9
**meetings** [2] - 5367:5, 5367:14
**meets** [1] - 5367:3
**member** [3] - 5191:10, 5208:17, 5393:22
**members** [2] - 5173:13, 5396:3
**memo** [7] - 5371:16, 5372:11, 5394:15, 5394:16, 5395:5, 5395:11, 5395:13
**memorandum** [4] - 5190:8, 5370:24, 5393:14, 5395:9
**memorialization** [1] - 5242:15
**memorializing** [1] - 5262:2
**memory** [20] - 5190:18, 5191:4, 5203:20, 5204:20, 5205:18, 5205:24, 5209:24, 5214:10, 5226:12, 5239:9, 5243:17, 5254:25, 5268:24, 5274:3, 5276:25, 5279:8, 5280:1, 5281:5, 5292:3, 5318:13
**men** [1] - 5161:6
**mention** [3] - 5160:20, 5342:23, 5343:25

**mentioned** [9] - 5299:17, 5312:18, 5331:10, 5331:12, 5331:14, 5331:17, 5373:24, 5382:20, 5387:14
**mentioning** [3] - 5352:10, 5390:23, 5394:13
**merger** [3] - 5194:22, 5223:2, 5224:13
**Merrill** [2] - 5299:2, 5299:6
**messed** [1] - 5234:18
**met** [3] - 5232:12, 5270:13, 5296:18
**Michael** [2] - 5305:2, 5384:18
**microphone** [1] - 5211:4
**mid** [1] - 5227:10
**mid-morning** [1] - 5227:10
**middle** [3] - 5359:7, 5364:24, 5380:6
**might** [7] - 5171:17, 5206:8, 5210:3, 5271:24, 5308:16, 5311:7, 5341:14
**Mike** [1] - 5382:15
**million** [27] - 5181:17, 5267:8, 5267:10, 5267:13, 5269:19, 5271:24, 5272:8, 5272:9, 5272:10, 5272:13, 5277:18, 5277:24, 5278:4, 5279:4, 5279:17, 5279:23, 5280:3, 5299:11, 5303:3, 5303:5, 5303:8, 5382:8, 5385:13, 5385:16, 5385:17
**mind** [19] - 5158:24, 5166:18, 5188:3, 5188:15, 5189:23, 5191:2, 5192:11, 5213:18, 5223:10, 5227:11, 5238:19, 5244:19, 5247:16, 5293:21, 5293:23, 5296:2, 5297:9, 5312:25, 5374:18
**minded** [1] - 5308:3
**mine** [1] - 5244:1
**minimum** [2] - 5162:20, 5311:9, 5340:2

**minimums** [1] - 5311:10
**minor** [1] - 5160:21
**minus** [1] - 5194:9
**minute** [7] - 5214:25, 5226:8, 5260:3, 5330:7, 5331:22, 5348:11, 5391:10
**minutes** [24] - 5186:7, 5227:12, 5227:15, 5279:3, 5280:3, 5280:4, 5280:8, 5280:13, 5285:1, 5302:12, 5302:15, 5334:10, 5337:3, 5355:10, 5366:23, 5366:25, 5367:4, 5367:5, 5367:8, 5367:9, 5367:11, 5367:12
**misclassify** [1] - 5215:14
**miscommunication** [3] - 5264:10, 5264:18, 5264:19
**misrepresentation** [3] - 5267:19, 5268:21, 5269:15
**misrepresenting** [1] - 5285:16
**miss** [1] - 5162:20
**missing** [1] - 5237:4
**misspoke** [2] - 5325:6, 5352:2
**misstated** [5] - 5180:13, 5356:15, 5359:17, 5363:25, 5365:7
**misstates** [1] - 5180:8
**mistaken** [5] - 5305:18, 5314:7, 5315:8, 5315:23, 5369:21
**Mister** [1] - 5340:9
**mixed** [2] - 5220:19, 5225:24
**modifying** [1] - 5249:1
**moment** [7] - 5157:12, 5179:23, 5290:1, 5307:23, 5338:5, 5374:15, 5377:24
**Monday** [6] - 5158:4, 5162:24, 5163:2, 5163:3, 5311:18, 5396:16
**money** [50] - 5176:10, 5178:7,

5188:2, 5188:13, 5189:22, 5199:3, 5199:5, 5199:7, 5209:7, 5209:15, 5220:14, 5220:19, 5220:20, 5241:14, 5245:6, 5264:22, 5264:23, 5264:24, 5267:24, 5271:9, 5276:3, 5276:4, 5276:9, 5276:24, 5277:22, 5277:24, 5279:5, 5280:9, 5287:22, 5287:24, 5288:2, 5289:13, 5297:14, 5305:11, 5321:22, 5321:25, 5322:12, 5324:21, 5328:6, 5328:18, 5329:6, 5329:11, 5329:17, 5333:11, 5333:12, 5333:22, 5334:4, 5372:5, 5373:14
**monies** [7] - 5220:9, 5220:12, 5220:19, 5244:12, 5244:20, 5245:3, 5322:19
**monikers** [1] - 5248:17
**month** [7] - 5185:20, 5199:24, 5235:18, 5235:24, 5361:16, 5397:7, 5397:10
**months** [9] - 5187:21, 5232:8, 5267:6, 5271:16, 5278:3, 5334:23, 5336:4, 5346:8, 5375:6
**morning** [11] - 5157:10, 5157:13, 5173:13, 5174:6, 5174:7, 5187:20, 5227:10, 5227:22, 5228:23, 5330:4, 5396:23
**most** [6] - 5169:7, 5169:8, 5228:23, 5237:8, 5257:1, 5311:11
**motion** [1] - 5160:4
**motions** [1] - 5317:13
**Move** [2] - 5297:3, 5305:21
**move** [10] - 5169:21, 5171:22, 5188:5, 5197:2, 5207:21, 5290:4, 5319:23,

5391:7, 5394:20, 5396:24
**moved** [1] - 5349:21
**moving** [4] - 5160:19, 5161:19, 5316:19, 5377:1
**Moving** [1] - 5302:7
**MR** [382] - 5157:16, 5157:21, 5159:6, 5159:12, 5159:17, 5159:22, 5159:23, 5160:6, 5160:9, 5161:2, 5161:10, 5161:22, 5161:25, 5162:11, 5162:13, 5163:6, 5163:11, 5163:12, 5163:16, 5163:19, 5163:23, 5164:1, 5164:3, 5164:4, 5164:9, 5164:18, 5164:21, 5165:2, 5165:6, 5165:8, 5165:13, 5165:16, 5166:1, 5166:4, 5166:6, 5166:10, 5166:13, 5166:16, 5168:16, 5169:2, 5169:6, 5172:11, 5172:21, 5173:6, 5173:8, 5173:10, 5173:17, 5174:5, 5174:23, 5174:25, 5178:17, 5179:1, 5179:23, 5180:8, 5180:10, 5184:6, 5185:2, 5185:6, 5186:17, 5186:19, 5188:5, 5192:6, 5192:8, 5192:12, 5194:6, 5195:18, 5195:22, 5196:1, 5197:2, 5197:20, 5197:23, 5198:3, 5198:8, 5198:11, 5198:14, 5198:16, 5201:1, 5202:5, 5202:6, 5202:22, 5203:1, 5203:14, 5203:17, 5203:20, 5203:24, 5204:2, 5204:6, 5204:7, 5204:10, 5204:17, 5204:20, 5204:21, 5205:20, 5206:5, 5206:10, 5206:12, 5207:21, 5211:2, 5211:5, 5211:7, 5211:11, 5211:17, 5214:24, 5214:25, 5215:5, 5215:7, 5219:14,

5219:20, 5220:2, 5220:16, 5222:1, 5227:1, 5227:4, 5227:17, 5227:21, 5228:3, 5228:22, 5228:25, 5229:2, 5229:4, 5229:6, 5229:7, 5229:11, 5229:20, 5230:1, 5230:12, 5230:13, 5230:15, 5237:16, 5239:11, 5239:13, 5240:3, 5240:5, 5240:9, 5241:1, 5241:19, 5244:10, 5244:14, 5244:16, 5245:4, 5245:19, 5245:22, 5246:3, 5246:11, 5246:13, 5246:17, 5246:24, 5247:1, 5247:5, 5247:14, 5247:17, 5247:23, 5248:1, 5248:3, 5248:21, 5248:23, 5249:3, 5249:5, 5249:8, 5249:19, 5249:21, 5250:1, 5250:4, 5250:7, 5250:10, 5250:16, 5250:20, 5251:25, 5252:2, 5252:10, 5252:25, 5253:22, 5254:9, 5255:2, 5255:5, 5255:13, 5255:14, 5257:17, 5258:4, 5260:1, 5261:1, 5261:4, 5261:9, 5261:14, 5261:18, 5261:21, 5269:1, 5269:5, 5270:7, 5273:23, 5274:8, 5274:9, 5274:24, 5275:19, 5277:2, 5278:17, 5278:20, 5279:13, 5279:16, 5279:19, 5280:24, 5281:9, 5282:1, 5282:3, 5282:21, 5282:22, 5283:16, 5284:21, 5286:6, 5286:8, 5287:13, 5289:1, 5289:17, 5289:23, 5290:3, 5290:7, 5290:9, 5290:11, 5290:13, 5290:17, 5291:14, 5291:16, 5291:20, 5294:15, 5294:18, 5294:21, 5295:6, 5295:20, 5297:3,

5297:9, 5302:12, 5305:21, 5305:23, 5307:2, 5307:5, 5307:8, 5307:23, 5307:25, 5308:8, 5308:15, 5308:18, 5308:22, 5309:5, 5309:10, 5309:20, 5310:2, 5310:7, 5310:25, 5311:4, 5311:6, 5311:25, 5312:4, 5312:9, 5312:14, 5312:18, 5313:2, 5313:6, 5313:10, 5313:12, 5313:15, 5314:3, 5314:5, 5315:17, 5316:2, 5316:6, 5316:15, 5316:18, 5316:21, 5316:25, 5317:3, 5317:9, 5317:15, 5317:22, 5317:24, 5318:21, 5318:23, 5320:9, 5320:11, 5321:6, 5321:9, 5321:10, 5325:5, 5325:8, 5326:7, 5326:9, 5326:11, 5327:7, 5327:8, 5328:10, 5328:12, 5330:1, 5331:22, 5331:24, 5332:2, 5333:24, 5335:3, 5335:13, 5335:18, 5335:21, 5336:21, 5338:3, 5338:7, 5338:22, 5339:21, 5339:24, 5340:16, 5340:21, 5340:25, 5341:2, 5341:7, 5341:11, 5341:23, 5341:25, 5342:2, 5342:18, 5343:2, 5343:7, 5344:23, 5344:25, 5345:7, 5345:9, 5345:15, 5346:1, 5346:12, 5346:19, 5346:22, 5348:1, 5348:3, 5348:10, 5349:2, 5352:1, 5355:5, 5355:6, 5356:7, 5358:1, 5359:2, 5359:3, 5362:14, 5362:16, 5362:18, 5368:9, 5368:10, 5371:3, 5371:4, 5374:11, 5374:12, 5374:15, 5374:20, 5374:22, 5376:1, 5378:10,

5378:11, 5378:15, 5380:1, 5380:2, 5381:15, 5384:7, 5384:8, 5384:11, 5388:3, 5388:16, 5390:8, 5390:12, 5390:13, 5390:14, 5391:6, 5391:10, 5391:19, 5392:22, 5393:5, 5393:6, 5394:20, 5395:1, 5395:5, 5395:7, 5396:1, 5397:18, 5397:21, 5398:4, 5398:14, 5398:19, 5398:23
**MS** [14] - 5157:9, 5157:18, 5159:10, 5166:22, 5167:19, 5170:11, 5171:21, 5227:16, 5338:23, 5341:18, 5342:21, 5343:25, 5344:4, 5345:10
**MSMB** [117] - 5187:13, 5187:23, 5190:3, 5190:7, 5190:8, 5191:10, 5192:3, 5192:15, 5198:22, 5199:24, 5200:1, 5220:9, 5220:12, 5220:15, 5220:20, 5225:18, 5225:22, 5226:4, 5232:1, 5232:20, 5234:5, 5234:8, 5234:12, 5236:21, 5236:22, 5244:2, 5244:6, 5244:8, 5244:13, 5244:21, 5244:22, 5244:23, 5245:7, 5245:8, 5245:14, 5246:1, 5246:5, 5247:2, 5248:9, 5248:10, 5248:11, 5248:16, 5248:17, 5248:18, 5248:19, 5249:10, 5249:11, 5249:12, 5249:14, 5251:3, 5251:5, 5251:7, 5251:8, 5251:15, 5252:15, 5252:20, 5253:8, 5253:10, 5253:13, 5253:20, 5254:16, 5257:9, 5258:12, 5258:14, 5258:25, 5270:6, 5271:19, 5272:4, 5272:5, 5274:12, 5274:18, 5277:9,

5277:12, 5277:16, 5282:25, 5294:13, 5295:1, 5300:10, 5300:14, 5300:23, 5300:25, 5301:16, 5301:25, 5302:1, 5303:1, 5323:16, 5326:10, 5326:11, 5328:5, 5329:12, 5331:14, 5331:17, 5333:15, 5360:19, 5361:5, 5372:15, 5372:25, 5373:2, 5386:2, 5387:6, 5387:8, 5387:10, 5387:12, 5393:22, 5394:7
**MSMB's** [2] - 5296:3, 5327:25
**msmbcapital.com** [3] - 5292:22, 5292:23, 5293:7
**Muchin** [19] - 5216:20, 5217:4, 5222:11, 5272:14, 5272:18, 5304:19, 5304:21, 5305:3, 5305:9, 5305:11, 5305:19, 5306:10, 5306:11, 5307:17, 5314:8, 5320:1, 5328:16, 5370:7, 5372:17
**Mulleady** [22] - 5176:22, 5224:18, 5224:20, 5225:2, 5225:8, 5225:13, 5225:17, 5230:7, 5230:23, 5230:25, 5231:6, 5232:6, 5232:23, 5233:21, 5234:16, 5235:4, 5235:6, 5235:11, 5235:23, 5237:12, 5238:15, 5238:21
**Mulleady's** [5] - 5226:10, 5230:9, 5231:9, 5231:12, 5236:1
**multiple** [4] - 5161:7, 5165:22, 5284:8, 5358:9
**must** [9] - 5162:10, 5164:22, 5179:21, 5197:12, 5197:14, 5231:18, 5366:17, 5394:13, 5395:2
**MYLAN** [1] - 5156:20

**N**

**name** [10] - 5184:16, 5209:11, 5234:14, 5234:15, 5237:22, 5286:25, 5321:16, 5339:5, 5339:7, 5348:20
**Name** [1] - 5237:18
**named** [3] - 5249:1, 5384:23, 5385:1
**names** [3] - 5305:4, 5320:12, 5330:25
**narrow** [3] - 5169:11, 5169:12, 5171:7
**NASDAQ** [2] - 5263:2, 5263:3
**necessarily** [2] - 5316:1, 5342:24
**necessary** [2] - 5311:20, 5390:7
**need** [16] - 5157:13, 5157:14, 5157:15, 5160:20, 5203:4, 5203:17, 5227:5, 5241:8, 5295:21, 5301:15, 5308:12, 5317:13, 5381:7, 5382:4, 5382:16, 5382:17
**needed** [4] - 5260:3, 5386:17, 5387:23, 5390:3
**needless** [1] - 5169:5
**needs** [2] - 5348:13, 5365:25
**negotiated** [1] - 5303:15
**negotiations** [1] - 5231:14
**network** [1] - 5234:6
**never** [12] - 5157:16, 5164:15, 5169:23, 5186:13, 5186:18, 5186:22, 5224:10, 5225:19, 5284:13, 5293:6, 5293:23, 5313:1
**new** [3] - 5218:2, 5233:1, 5234:9
**NEW** [1] - 5156:1
**New** [9] - 5156:5, 5156:16, 5156:18, 5156:23, 5271:2, 5271:14, 5275:12, 5306:16
**news** [1] - 5280:14
**next** [38] - 5158:7, 5167:18, 5167:20,

5173:18, 5178:25, 5200:4, 5213:6, 5221:25, 5226:15, 5229:23, 5238:18, 5240:11, 5259:5, 5277:16, 5287:11, 5288:21, 5289:9, 5308:10, 5320:2, 5320:12, 5320:23, 5321:16, 5328:23, 5329:19, 5337:5, 5345:18, 5347:5, 5348:9, 5351:6, 5355:24, 5357:5, 5372:25, 5375:13, 5394:23, 5395:17, 5396:14, 5398:13
**nice** [1] - 5163:14
**night** [4] - 5159:24, 5159:25, 5162:4, 5164:2
**nights** [3] - 5162:6, 5162:24, 5257:3
**nine** [24] - 5187:5, 5192:2, 5192:14, 5192:24, 5193:17, 5198:21, 5199:11, 5199:17, 5199:23, 5199:25, 5233:3, 5233:6, 5249:20, 5325:16, 5326:6, 5326:7, 5327:4, 5327:5, 5327:22, 5328:2, 5329:8, 5329:14, 5330:18, 5361:16
**Nixon** [1] - 5169:12
**noise** [1] - 5211:7
**non** [4] - 5257:13, 5257:15, 5257:20, 5258:1
**non-disparagement** [4] - 5257:13, 5257:15, 5257:20, 5258:1
**none** [3] - 5161:11, 5341:11, 5342:10
**nonemployees** [1] - 5218:23
**nonetheless** [1] - 5342:7
**nonresponsive** [3] - 5313:19, 5313:23, 5316:20
**Nonresponsive** [1] - 5305:22
**nonstop** [1] - 5287:19
**nonvested** [1] - 5255:21

**normally** [1] - 5224:2
**nosey** [1] - 5296:9
**Note** [1] - 5377:15
**note** [69] - 5181:15, 5181:17, 5181:25, 5182:6, 5182:7, 5187:7, 5187:8, 5187:11, 5187:15, 5195:12, 5195:24, 5196:7, 5196:12, 5196:20, 5197:7, 5197:8, 5197:9, 5197:10, 5197:12, 5197:13, 5197:14, 5198:1, 5198:24, 5200:2, 5201:7, 5201:12, 5201:18, 5201:21, 5202:17, 5203:11, 5204:25, 5205:1, 5205:12, 5205:17, 5206:19, 5207:15, 5208:3, 5208:13, 5208:22, 5209:15, 5209:22, 5210:5, 5212:6, 5212:23, 5213:14, 5213:25, 5323:2, 5325:17, 5325:22, 5326:6, 5326:7, 5327:5, 5327:23, 5328:3, 5329:9, 5329:12, 5329:14, 5332:15, 5333:5, 5333:8, 5333:10, 5333:16, 5333:23, 5334:3, 5334:4, 5360:2
**note's** [1] - 5206:1
**noted** [1] - 5218:8
**notes** [3] - 5202:19, 5203:10, 5204:25
**nothing** [15] - 5189:22, 5213:13, 5234:14, 5253:24, 5262:1, 5289:11, 5339:16, 5342:19, 5342:21, 5343:7, 5343:9, 5343:20, 5343:21, 5345:7
**notice** [3] - 5251:23, 5308:13, 5397:6
**noticed** [1] - 5231:1
**November** [47] - 5156:7, 5162:9, 5187:17, 5192:1, 5192:13, 5192:22, 5193:9, 5193:10, 5193:13, 5194:2, 5194:3, 5194:5, 5194:8, 5195:23,

5196:7, 5196:12, 5196:13, 5197:24, 5198:19, 5201:8, 5205:20, 5226:10, 5226:11, 5236:9, 5236:16, 5237:12, 5238:16, 5238:19, 5238:20, 5239:15, 5254:23, 5255:9, 5260:12, 5299:14, 5299:24, 5300:5, 5300:19, 5310:4, 5396:16, 5396:17, 5398:7, 5398:9, 5398:10, 5398:25
**Number** [10] - 5163:25, 5218:11, 5218:16, 5219:4, 5298:3, 5397:6, 5397:14, 5397:23, 5398:2, 5398:3
**number** [44] - 5164:5, 5166:8, 5166:10, 5167:23, 5171:5, 5171:8, 5179:21, 5179:22, 5190:25, 5198:4, 5214:16, 5214:19, 5218:6, 5220:22, 5220:23, 5230:14, 5238:15, 5241:6, 5254:5, 5254:8, 5266:12, 5278:19, 5281:20, 5283:21, 5290:18, 5295:15, 5298:6, 5298:9, 5298:12, 5312:5, 5321:21, 5330:22, 5338:25, 5339:1, 5374:12, 5374:13, 5374:17, 5376:6, 5378:16, 5381:21, 5383:19, 5389:7, 5390:18
**numbers** [13] - 5253:17, 5253:19, 5253:24, 5272:2, 5277:20, 5297:23, 5297:24, 5350:20, 5352:22, 5382:7, 5384:3, 5386:15, 5386:24
**numerous** [1] - 5231:13

**O**

**o'clock** [1] - 5156:7
**oath** [3] - 5173:14, 5249:9, 5317:20
**Object** [1] - 5202:22

**object** [12] - 5163:6, 5198:3, 5198:5, 5203:24, 5206:10, 5211:2, 5253:22, 5258:4, 5261:14, 5356:7, 5391:6, 5394:20
**objected** [1] - 5261:15
**objecting** [1] - 5204:4
**Objection** [11] - 5219:14, 5219:20, 5220:2, 5220:16, 5307:2, 5307:5, 5307:8, 5388:3, 5390:8, 5390:12, 5391:19
**objection** [62] - 5166:7, 5174:25, 5178:17, 5180:8, 5184:6, 5185:2, 5186:17, 5192:6, 5194:6, 5196:1, 5204:16, 5215:1, 5230:13, 5240:5, 5241:19, 5241:21, 5244:10, 5245:4, 5245:19, 5246:3, 5246:11, 5246:17, 5248:21, 5249:5, 5250:15, 5251:25, 5254:9, 5255:14, 5257:17, 5257:19, 5258:6, 5270:7, 5274:9, 5274:24, 5275:19, 5278:17, 5279:19, 5282:22, 5284:21, 5286:6, 5286:10, 5307:10, 5315:14, 5320:9, 5321:6, 5325:5, 5327:8, 5333:24, 5335:13, 5346:12, 5355:6, 5356:9, 5358:1, 5359:3, 5362:18, 5368:10, 5371:4, 5380:2, 5384:8, 5393:6
**objections** [7] - 5167:3, 5167:8, 5167:14, 5204:11, 5204:13, 5211:24, 5213:3
**obligation** [1] - 5329:11
**obligations** [5] - 5218:22, 5218:24, 5285:25, 5394:3, 5394:6

**obliger** [1] - 5387:8
**obscene** [1] - 5268:7
**observations** [2] - 5241:22, 5252:8
**observed** [1] - 5224:19
**observing** [1] - 5159:7
**obtain** [1] - 5361:3
**obtained** [3] - 5188:2, 5188:14, 5189:6
**obtaining** [1] - 5189:19
**obtains** [1] - 5189:15
**obvious** [1] - 5215:23
**obviously** [15] - 5158:6, 5158:17, 5160:15, 5161:6, 5161:10, 5162:22, 5163:7, 5166:22, 5167:13, 5272:17, 5309:7, 5312:2, 5338:16, 5343:13, 5358:8
**Obviously** [1] - 5159:24
**occurred** [8] - 5193:9, 5194:1, 5226:11, 5338:6, 5360:7, 5360:11, 5361:2, 5380:10
**occurring** [1] - 5217:2
**October** [13] - 5239:5, 5239:7, 5239:8, 5239:18, 5266:25, 5267:3, 5299:14, 5299:24, 5300:4, 5300:19, 5302:4, 5398:8
**OD** [1] - 5246:9
**OF** [3] - 5156:1, 5156:3, 5156:9
**offer** [25] - 5166:6, 5166:12, 5174:23, 5195:25, 5198:2, 5214:24, 5230:12, 5230:15, 5240:3, 5240:4, 5255:13, 5258:24, 5274:8, 5279:18, 5282:21, 5327:7, 5355:5, 5359:2, 5362:16, 5368:9, 5371:3, 5374:11, 5380:1, 5384:7, 5393:5
**offered** [7] - 5158:19, 5175:19, 5175:21,

5176:6, 5176:15, 5176:16, 5390:13
**offering** [1] - 5290:17
**office** [12] - 5164:13, 5174:10, 5174:12, 5175:17, 5181:25, 5245:15, 5251:17, 5256:25, 5257:5, 5276:21, 5276:22
**officer** [17] - 5178:22, 5183:8, 5187:22, 5195:10, 5213:23, 5215:18, 5243:25, 5252:20, 5269:24, 5285:17, 5285:21, 5300:10, 5300:20, 5306:1, 5306:3, 5371:13, 5393:22
**officers** [1] - 5258:15
**offices** [1] - 5219:12
**offset** [4] - 5221:1, 5328:4, 5329:11, 5333:23
**often** [8] - 5172:22, 5256:13, 5256:15, 5256:16, 5256:21, 5256:24, 5256:25, 5339:1
**old** [2] - 5218:2, 5232:10
**omitted** [1] - 5342:16
**on-line** [1] - 5188:23
**once** [6] - 5210:2, 5210:4, 5253:12, 5346:16, 5365:17, 5365:20
**one** [82] - 5162:4, 5164:1, 5166:24, 5169:6, 5169:8, 5176:13, 5178:3, 5179:23, 5180:5, 5189:8, 5195:15, 5198:8, 5199:23, 5205:7, 5206:13, 5209:10, 5209:14, 5211:14, 5211:15, 5212:20, 5214:11, 5214:15, 5214:18, 5217:7, 5228:6, 5230:4, 5239:14, 5240:4, 5241:5, 5241:16, 5244:17, 5246:10, 5251:12, 5260:10, 5261:5, 5264:1, 5266:3, 5267:16, 5267:23, 5267:25, 5272:12, 5272:14, 5276:18,

5283:3, 5283:13, 5290:1, 5291:15, 5293:20, 5298:17, 5299:7, 5299:23, 5300:18, 5301:20, 5310:17, 5312:4, 5313:15, 5320:20, 5324:20, 5328:12, 5331:3, 5331:22, 5332:16, 5333:19, 5334:1, 5338:5, 5354:12, 5364:17, 5365:4, 5365:9, 5366:17, 5366:22, 5367:18, 5374:15, 5381:9, 5381:21, 5381:24, 5382:1, 5382:3, 5388:8, 5398:8
**One** [5] - 5214:25, 5307:23, 5391:10, 5397:23, 5398:11
**One's** [1] - 5398:3
**ones** [8] - 5238:4, 5244:4, 5305:20, 5314:9, 5314:15, 5315:10, 5316:12
**online** [4] - 5274:2, 5274:4, 5276:11
**open** [9] - 5157:1, 5221:6, 5221:22, 5227:11, 5227:19, 5308:2, 5309:3, 5323:9, 5323:11
**operate** [2] - 5254:6, 5254:7
**operated** [2] - 5253:25, 5254:6
**operating** [13] - 5178:22, 5187:21, 5195:10, 5213:23, 5215:17, 5243:24, 5252:20, 5254:17, 5269:24, 5285:16, 5285:21, 5300:10, 5300:19
**operation** [1] - 5362:12
**operations** [2] - 5366:21, 5381:8
**opinion** [24] - 5178:24, 5258:24, 5306:16, 5306:19, 5306:23, 5336:23, 5336:24, 5338:1, 5338:12, 5338:14, 5338:16, 5339:18, 5341:13, 5343:9, 5344:18, 5344:21, 5359:14, 5359:15,

5359:17, 5359:19, 5363:24, 5366:12, 5366:18, 5376:4
**opinions** [1] - 5369:20
**opportunities** [2] - 5235:15, 5270:24
**opportunity** [8] - 5175:11, 5175:14, 5182:22, 5275:6, 5293:22, 5334:25, 5335:8, 5346:17
**opposed** [3] - 5321:11, 5325:6, 5342:25
**optimistic** [1] - 5310:9
**option** [2] - 5176:3, 5218:11
**oral** [2] - 5160:4, 5258:21
**order** [9] - 5336:23, 5336:25, 5338:12, 5338:14, 5342:4, 5342:8, 5342:11, 5343:22, 5397:8
**organization** [5] - 5225:23, 5231:19, 5263:3, 5323:6, 5349:19
**organizations** [1] - 5225:25
**original** [2] - 5166:8, 5377:11
**Othello** [4] - 5265:24, 5267:11, 5270:22, 5275:12
**otherwise** [4] - 5168:14, 5171:2, 5171:17, 5171:19
**ought** [1] - 5247:21
**ourselves** [1] - 5317:14
**outside** [9] - 5157:1, 5223:25, 5224:3, 5224:7, 5224:8, 5227:19, 5243:24, 5306:4, 5306:5
**outstanding** [6] - 5354:8, 5355:13, 5357:1, 5357:6, 5357:15, 5369:25
**overlap** [1] - 5244:8
**overrule** [1] - 5315:14
**overruled** [3] - 5184:7, 5254:10, 5274:25
**owe** [1] - 5328:19
**owed** [10] - 5241:6,

5241:7, 5241:10, 5241:11, 5242:9, 5242:10, 5322:3, 5322:12, 5329:12, 5329:13
**owes** [3] - 5328:5, 5354:3
**owing** [4] - 5304:13, 5329:17
**own** [16] - 5160:20, 5170:18, 5170:19, 5171:2, 5171:5, 5172:3, 5178:7, 5224:17, 5242:21, 5245:2, 5265:24, 5273:1, 5311:17, 5340:18, 5346:17, 5391:7
**owner** [1] - 5304:3
**ownership** [5] - 5182:12, 5182:16, 5182:17, 5182:19, 5182:21

**P**

**p.m** [1] - 5326:20
**packed** [1] - 5163:21
**Page** [5] - 5203:16, 5204:22, 5376:2, 5376:6, 5377:15
**page** [62] - 5173:18, 5178:25, 5190:22, 5190:23, 5198:19, 5200:4, 5221:25, 5226:15, 5229:23, 5237:17, 5240:11, 5246:15, 5246:21, 5247:11, 5248:23, 5249:20, 5250:9, 5250:10, 5250:22, 5256:8, 5257:12, 5259:5, 5260:15, 5260:24, 5269:7, 5275:11, 5284:7, 5288:21, 5318:18, 5319:5, 5323:11, 5329:19, 5331:20, 5334:12, 5334:14, 5334:15, 5337:5, 5342:1, 5342:2, 5345:18, 5347:5, 5351:6, 5354:23, 5355:16, 5356:19, 5356:20, 5359:6, 5359:9, 5359:23, 5359:24, 5360:16, 5363:14, 5369:23, 5370:23, 5372:12, 5375:1, 5375:9,

5375:11, 5375:13, 5380:6, 5394:23, 5395:17
**pages** [3] - 5250:11, 5250:14, 5375:9
**paid** [38] - 5193:5, 5209:14, 5228:8, 5228:11, 5228:15, 5228:21, 5229:13, 5237:8, 5243:22, 5244:22, 5244:25, 5245:7, 5245:11, 5273:9, 5273:12, 5275:25, 5277:15, 5311:16, 5312:11, 5312:13, 5313:5, 5324:21, 5327:21, 5328:24, 5329:5, 5329:10, 5329:13, 5333:4, 5333:11, 5333:12, 5333:23, 5372:8, 5372:15, 5378:4, 5397:14, 5397:24, 5398:1, 5398:2
**Panoff** [17] - 5371:8, 5371:10, 5371:12, 5371:13, 5371:15, 5379:8, 5379:15, 5379:19, 5380:5, 5380:8, 5380:19, 5382:18, 5382:19, 5382:25, 5392:23, 5393:11, 5395:16
**paper** [13] - 5190:16, 5194:16, 5207:19, 5221:16, 5274:6, 5274:7, 5292:1, 5292:9, 5292:10, 5292:15, 5292:16, 5339:4, 5340:3
**papers** [4] - 5393:3, 5394:17, 5395:10, 5395:13
**par** [1] - 5177:25
**paragraph** [47] - 5178:3, 5206:18, 5211:1, 5211:18, 5231:18, 5231:24, 5256:4, 5257:12, 5257:20, 5258:1, 5283:3, 5283:13, 5283:21, 5283:22, 5284:7, 5285:15, 5285:24, 5286:14, 5288:5, 5297:13, 5298:19, 5299:10, 5324:13, 5324:18, 5327:18, 5331:7, 5334:12, 5334:15,

5340:11, 5345:1, 5355:16, 5355:24, 5356:20, 5357:14, 5360:16, 5362:7, 5362:21, 5362:24, 5363:15, 5364:18, 5364:24, 5368:14, 5369:24, 5372:14, 5393:20
**paragraphs** [4] - 5298:19, 5318:19, 5319:5, 5319:8
**paralegal** [1] - 5170:20
**paraphrasing** [2] - 5322:18, 5325:21
**pardon** [1] - 5244:15
**parenthetical** [1] - 5233:6
**Park** [2] - 5156:17, 5275:12
**part** [29] - 5167:5, 5169:24, 5172:19, 5172:21, 5182:1, 5182:12, 5182:16, 5182:20, 5182:21, 5199:12, 5215:5, 5231:14, 5234:4, 5245:11, 5263:25, 5266:24, 5270:4, 5276:18, 5298:22, 5307:18, 5307:21, 5316:18, 5338:21, 5353:20, 5370:3, 5376:15, 5389:13, 5391:1, 5391:6
**parted** [1] - 5264:22
**partially** [1] - 5262:23
**participants** [2] - 5258:13, 5293:20
**participate** [3] - 5162:5, 5352:14, 5388:5
**participated** [4] - 5170:4, 5175:20, 5350:19, 5353:7
**particular** [7] - 5158:11, 5159:9, 5201:24, 5341:22, 5377:1, 5378:17, 5395:9
**parties** [16] - 5157:2, 5157:8, 5168:13, 5228:7, 5258:23, 5258:25, 5260:8, 5285:16, 5305:9, 5306:13, 5310:20, 5312:3, 5317:11, 5366:2, 5389:14,

5391:16
**partner** [6] - 5349:12, 5353:10, 5369:2, 5387:24, 5392:12
**partners** [3] - 5366:11, 5388:9, 5394:15
**parts** [5] - 5161:19, 5169:7, 5222:23, 5223:2, 5344:21
**party** [38] - 5215:13, 5215:15, 5216:2, 5216:9, 5216:15, 5219:5, 5219:6, 5219:9, 5219:13, 5219:16, 5219:18, 5219:22, 5220:6, 5220:14, 5220:24, 5221:1, 5223:17, 5305:8, 5305:13, 5307:18, 5314:19, 5314:24, 5320:7, 5342:17, 5360:19, 5372:15, 5372:20, 5372:21, 5372:24, 5376:11, 5386:2, 5387:1, 5387:3, 5387:13, 5387:15, 5387:16, 5387:17, 5387:19
**pass** [1] - 5243:4
**password** [1] - 5292:22
**past** [3] - 5190:22, 5258:15, 5309:14
**pattern** [1] - 5225:5
**pause** [1] - 5164:6
**Pause** [13] - 5172:14, 5179:24, 5211:22, 5228:5, 5236:14, 5247:8, 5307:24, 5317:17, 5319:7, 5331:23, 5356:6, 5376:19, 5391:11
**pay** [5] - 5243:16, 5254:1, 5329:11, 5397:25, 5398:3
**payables** [2] - 5205:21, 5221:1
**paying** [10] - 5243:2, 5243:8, 5253:6, 5310:19, 5327:25, 5333:13, 5333:21, 5334:4, 5387:10, 5387:11
**payment** [7] - 5178:8, 5199:8, 5297:20, 5373:2, 5385:11, 5385:20

**payments** [15] - 5284:3, 5322:8, 5377:24, 5378:3, 5380:24, 5380:25, 5384:4, 5385:21, 5385:23, 5385:24, 5386:16, 5387:2, 5390:2, 5394:1, 5394:4
**PCOB** [1] - 5387:17
**Peck** [2] - 5263:14, 5265:17
**penalty** [1] - 5190:20
**pending** [15] - 5354:1, 5354:5, 5355:12, 5355:21, 5356:11, 5368:17, 5376:10, 5376:18, 5376:20, 5376:24, 5377:4, 5379:1, 5379:11, 5380:16
**Penson** [3] - 5266:17, 5268:5, 5270:19
**people** [31] - 5164:23, 5174:21, 5175:10, 5179:12, 5214:5, 5214:6, 5214:12, 5214:16, 5214:19, 5238:8, 5239:6, 5241:6, 5241:11, 5241:17, 5241:23, 5242:3, 5243:20, 5243:22, 5246:5, 5246:7, 5246:8, 5264:4, 5293:18, 5335:7, 5335:22, 5336:4, 5336:9, 5336:13, 5365:5, 5367:13, 5383:11
**per** [3] - 5178:1, 5255:18, 5389:11
**perceived** [2] - 5248:11, 5323:16
**percent** [5] - 5238:1, 5277:17, 5303:9, 5333:14, 5333:22
**percentage** [5] - 5188:1, 5188:12, 5189:5, 5189:14, 5189:19
**percentages** [1] - 5381:22
**perfectly** [1] - 5343:16
**perform** [16] - 5283:2, 5283:14, 5284:15, 5352:6, 5353:23, 5358:6,

5364:10, 5365:19, 5366:3, 5378:21, 5378:23, 5381:3, 5381:19
**performance** [10] - 5277:5, 5277:15, 5280:5, 5287:1, 5297:15, 5297:20, 5297:22, 5300:22, 5303:1, 5352:22
**performed** [3] - 5352:18, 5358:7, 5359:14
**performing** [6] - 5352:18, 5365:23, 5366:6, 5381:6, 5388:19
**perhaps** [4] - 5160:24, 5162:6, 5314:1, 5396:1
**period** [22] - 5172:5, 5268:6, 5346:7, 5352:7, 5356:25, 5358:24, 5360:9, 5360:10, 5361:9, 5361:14, 5361:17, 5381:3, 5381:9, 5381:10, 5382:1, 5382:3, 5388:16, 5388:20, 5389:3
**periods** [1] - 5242:12
**perjury** [1] - 5190:20
**permission** [1] - 5348:11
**perpetuate** [1] - 5365:5
**person** [9] - 5184:10, 5184:13, 5236:4, 5237:22, 5258:19, 5258:20, 5365:10, 5381:23, 5382:1
**personal** [5] - 5242:21, 5245:2, 5273:2, 5274:15, 5285:3
**personally** [1] - 5267:13
**perspective** [1] - 5157:12
**pertain** [1] - 5302:19
**phase** [1] - 5299:9
**phone** [3] - 5272:3, 5388:15, 5388:18
**phrase** [2] - 5281:3, 5314:2
**piece** [14] - 5190:16, 5194:15, 5207:19, 5221:16, 5274:6, 5274:7, 5278:8, 5292:1, 5292:9,

5292:15, 5292:16, 5339:4, 5340:3
**Pierotti** [13] - 5176:24, 5233:15, 5255:9, 5255:17, 5256:7, 5256:9, 5257:8, 5257:16, 5294:5, 5294:7, 5331:8, 5336:14, 5336:16
**Pierotti's** [2] - 5254:23, 5255:20
**pink** [1] - 5266:9
**Pitluck** [1] - 5157:9
**PITLUCK** [10] - 5156:14, 5157:16, 5157:21, 5159:23, 5161:10, 5227:17, 5310:7, 5311:25, 5312:18, 5313:12
**place** [3] - 5342:5, 5342:8, 5388:18
**placement** [3] - 5190:8, 5279:18, 5279:23
**places** [2] - 5250:13, 5259:2
**Plaintiff** [1] - 5156:4
**plan** [19] - 5157:10, 5157:11, 5179:8, 5179:9, 5179:11, 5180:6, 5180:24, 5181:2, 5183:15, 5183:20, 5183:24, 5185:12, 5186:14, 5186:18, 5186:23, 5308:8, 5318:2, 5318:6, 5318:9
**planned** [1] - 5397:6
**planning** [2] - 5203:19, 5369:15
**plans** [1] - 5310:14
**play** [3] - 5327:20, 5376:13
**plays** [1] - 5321:18
**Plaza** [2] - 5156:15, 5156:23
**plenty** [3] - 5317:3, 5317:14, 5350:20
**plus** [3] - 5194:8, 5333:14, 5333:21
**pocket** [1] - 5178:7
**point** [35] - 5157:4, 5157:20, 5160:16, 5178:7, 5185:15, 5186:8, 5187:1, 5190:25, 5195:1, 5195:14, 5195:16, 5201:10, 5215:15, 5216:20, 5232:1,

5261:7, 5281:24, 5307:18, 5308:1, 5310:12, 5317:4, 5318:9, 5336:16, 5339:8, 5344:13, 5344:19, 5353:17, 5380:24, 5382:15, 5383:6, 5383:9, 5385:23, 5389:17, 5396:8, 5398:5
**pointed** [1] - 5328:23
**pointless** [1] - 5165:24
**points** [2] - 5215:14, 5216:16
**portfolio** [3] - 5264:2, 5264:4, 5264:9
**portion** [5] - 5284:9, 5334:18, 5340:11, 5355:20, 5384:12
**portions** [1] - 5247:18
**posed** [1] - 5297:6
**position** [14] - 5157:22, 5163:17, 5168:20, 5262:17, 5262:19, 5263:20, 5263:22, 5264:7, 5265:6, 5265:14, 5266:5, 5266:7, 5270:5, 5270:15
**positions** [4] - 5224:5, 5224:9, 5265:16, 5265:17
**possession** [1] - 5292:18
**possible** [4] - 5158:25, 5159:1, 5162:23, 5311:20
**possibly** [1] - 5311:12
**post** [1] - 5317:12
**posted** [2] - 5258:21, 5258:22
**posting** [3] - 5270:5, 5270:16, 5270:24
**potential** [8] - 5158:16, 5171:10, 5209:7, 5209:10, 5219:4, 5220:24, 5236:1, 5398:11
**potentially** [2] - 5167:6, 5167:24
**PPM** [1] - 5190:4
**practice** [1] - 5353:21
**Practices** [2] - 5267:21, 5269:16
**practices** [1] -

5268:22
**preceding** [2] - 5298:18, 5315:3
**predicament** [1] - 5229:11
**predict** [2] - 5159:4, 5310:10
**prediction** [4] - 5157:20, 5396:5, 5396:13, 5396:20
**preface** [1] - 5309:6
**preparation** [1] - 5393:25
**prepare** [1] - 5383:5
**prepared** [5] - 5348:8, 5350:5, 5350:10, 5364:1, 5370:24
**preparing** [1] - 5164:22
**presence** [2] - 5157:1, 5227:19
**present** [4] - 5173:12, 5229:17, 5309:3, 5317:18
**presentation** [1] - 5168:22
**presented** [1] - 5314:23
**preserved** [1] - 5343:17
**president** [1] - 5231:2
**press** [2] - 5258:10, 5280:1
**pretrial** [3] - 5162:3, 5163:3, 5311:17
**pretty** [4] - 5171:25, 5215:23, 5263:23, 5310:11
**preview** [1] - 5171:3
**previous** [3] - 5158:8, 5164:2, 5249:22
**previously** [4] - 5170:15, 5174:2, 5377:3, 5377:19
**price** [2] - 5176:4, 5176:5
**primarily** [1] - 5171:25
**primary** [1] - 5387:9
**prime** [2] - 5266:15, 5266:17
**primely** [1] - 5387:8
**principals** [1] - 5258:16
**principles** [1] - 5350:12
**printed** [1] - 5291:3

**printers** [1] - 5299:4
**printout** [1] - 5292:18
**private** [6] - 5183:3, 5187:22, 5190:7, 5279:5, 5279:17, 5279:23
**privately** [1] - 5258:9
**pro** [1] - 5223:3
**probe** [2] - 5305:25, 5316:4
**problem** [4] - 5246:25, 5276:1, 5296:4, 5296:8
**procedures** [14] - 5221:8, 5221:22, 5304:11, 5352:18, 5352:19, 5353:23, 5353:24, 5359:15, 5364:10, 5365:20, 5365:22, 5365:24, 5381:4, 5381:5
**proceed** [2] - 5204:22, 5348:22
**proceeding** [17] - 5202:14, 5202:16, 5202:24, 5202:25, 5203:6, 5205:6, 5246:14, 5246:15, 5247:6, 5247:10, 5248:7, 5249:9, 5250:22, 5251:19, 5323:10, 5324:3, 5376:10
**proceedings** [7] - 5211:22, 5307:24, 5376:7, 5376:9, 5376:14, 5376:19, 5391:11
**Proceedings** [1] - 5156:25
**process** [8] - 5159:16, 5339:11, 5352:17, 5353:20, 5365:13, 5366:15, 5367:17, 5373:1
**produced** [1] - 5156:25
**productive** [1] - 5168:23
**proffered** [1] - 5343:8
**profit** [4] - 5176:13, 5179:13, 5180:7, 5318:3
**profits** [8] - 5179:14, 5180:25, 5183:25, 5185:13, 5186:15, 5186:24, 5189:19, 5278:8

**program** [1] - 5262:11
**progress** [1] - 5157:3
**projected** [3] - 5157:5, 5167:17, 5228:10
**promise** [1] - 5309:7
**promissory** [6] - 5187:7, 5187:8, 5196:7, 5198:1, 5200:2, 5201:21
**prompted** [3] - 5180:21, 5180:22, 5313:17
**proper** [2] - 5304:11, 5343:9
**property** [1] - 5188:13
**proposal** [1] - 5159:18
**propose** [3] - 5228:13, 5228:20, 5398:19
**proposed** [2] - 5159:18, 5397:21
**proposition** [1] - 5341:8
**proprietary** [2] - 5286:2, 5286:13
**prospective** [5] - 5213:14, 5214:1, 5215:20, 5258:11, 5258:13
**prove** [1] - 5192:8
**provide** [19] - 5169:17, 5169:24, 5171:13, 5176:17, 5218:19, 5228:23, 5237:11, 5294:21, 5353:25, 5363:16, 5365:17, 5365:18, 5366:6, 5366:10, 5367:5, 5369:5, 5381:8, 5381:12, 5381:20
**provided** [6] - 5167:6, 5352:23, 5366:13, 5377:10, 5395:11, 5395:14
**providers** [1] - 5320:8
**provides** [1] - 5366:4
**providing** [1] - 5350:3
**provision** [1] - 5257:13
**prudent** [2] - 5171:8, 5397:11
**PS** [2] - 5346:25

**public** [7] - 5176:9, 5183:4, 5213:24, 5349:22, 5351:3, 5352:11, 5376:3
**publicly** [1] - 5258:9
**published** [4] - 5215:8, 5289:19, 5384:13, 5393:10
**pull** [4] - 5201:13, 5294:4, 5313:25, 5374:22
**pulled** [7] - 5292:23, 5293:14, 5293:17, 5293:24, 5294:1, 5294:12, 5294:17
**pulling** [1] - 5287:9
**purchase** [22] - 5164:12, 5164:23, 5164:24, 5165:21, 5165:22, 5166:11, 5166:12, 5174:8, 5174:10, 5174:11, 5174:21, 5175:8, 5175:12, 5175:14, 5176:17, 5177:4, 5177:6, 5177:9, 5182:22, 5218:11, 5331:1, 5331:7
**Purchase** [1] - 5330:13
**purchased** [2] - 5199:25, 5335:24
**purchaser** [1] - 5177:17
**purchasing** [1] - 5293:18
**pure** [1] - 5280:7
**purpose** [4] - 5164:17, 5164:19, 5242:3, 5364:4
**purposes** [3] - 5170:13, 5170:18, 5353:5
**pursuant** [10] - 5169:12, 5247:15, 5249:22, 5255:23, 5283:21, 5322:3, 5322:8, 5322:12, 5394:2, 5394:5
**push** [1] - 5315:15
**put** [63] - 5160:15, 5162:4, 5164:5, 5165:3, 5165:14, 5165:24, 5166:1, 5167:9, 5167:23, 5168:8, 5170:22, 5171:2, 5172:3, 5172:12, 5172:16, 5173:4, 5174:9, 5179:20, 5187:4,

5191:1, 5198:7, 5206:6, 5206:7, 5209:7, 5216:8, 5216:19, 5216:22, 5252:18, 5252:19, 5260:11, 5260:19, 5260:25, 5264:20, 5269:12, 5270:5, 5277:3, 5282:9, 5287:13, 5289:17, 5291:17, 5291:19, 5292:5, 5297:18, 5309:20, 5314:4, 5318:21, 5319:25, 5320:12, 5321:15, 5324:5, 5330:2, 5334:20, 5339:7, 5342:5, 5342:8, 5343:10, 5346:19, 5375:1, 5384:1, 5397:5
**putting** [10] - 5158:22, 5163:9, 5168:6, 5170:18, 5171:9, 5171:13, 5171:21, 5171:24, 5191:2, 5216:24

# Q

**qualifications** [2] - 5355:17, 5368:15
**qualified** [2] - 5223:7, 5349:14
**quality** [3] - 5353:10, 5366:11, 5388:10
**quarter** [8] - 5185:21, 5378:20, 5381:3, 5381:10, 5381:11, 5393:25
**quarterly** [5] - 5361:16, 5379:3, 5386:6, 5386:8, 5388:19
**quarters** [1] - 5298:4
**QUESTION** [8] - 5248:11, 5250:25, 5251:2, 5251:6, 5315:2, 5323:16, 5323:20, 5323:23
**questionable** [1] - 5194:16
**questioned** [1] - 5313:22
**questioning** [2] - 5261:2, 5312:2
**questionnaire** [2] - 5262:21, 5262:25
**questions** [35] - 5165:17, 5167:14,

5183:10, 5187:5, 5187:10, 5196:15, 5196:16, 5196:21, 5196:24, 5202:8, 5207:4, 5208:5, 5250:23, 5262:25, 5281:16, 5298:18, 5307:25, 5314:18, 5315:18, 5321:21, 5322:14, 5322:17, 5323:5, 5324:12, 5325:15, 5331:24, 5338:10, 5338:13, 5339:10, 5339:12, 5339:17, 5340:8, 5341:12, 5348:1, 5380:23
**quick** [2] - 5164:1, 5317:11
**quite** [2] - 5158:9, 5159:4
**quote** [2] - 5221:8, 5345:13
**quoted** [1] - 5344:7

# R

**RA** [2] - 5209:11, 5209:13
**Radiance** [1] - 5381:14
**raise** [4] - 5209:15, 5227:9, 5313:16, 5348:17
**raised** [5] - 5167:8, 5279:4, 5280:2, 5324:21, 5396:11
**raises** [2] - 5279:17, 5279:23
**raising** [3] - 5172:5, 5172:6, 5289:13
**Ramos** [15] - 5306:15, 5306:20, 5306:25, 5307:4, 5307:7, 5307:13, 5336:25, 5337:3, 5338:1, 5341:13, 5341:21, 5343:21, 5344:4, 5344:10, 5344:18
**Ramos'** [7] - 5336:23, 5338:16, 5340:18, 5341:9, 5343:4, 5343:9, 5344:22
**ran** [7] - 5305:19, 5313:18, 5313:23, 5314:8, 5314:14, 5315:10, 5316:18
**random** [1] - 5278:15

**RANDY** [1] - 5156:19
**range** [1] - 5310:25
**rather** [3] - 5228:17, 5246:22, 5357:10
**ratio** [2] - 5182:25, 5183:2
**re** [4] - 5197:25, 5261:12, 5261:20, 5262:2
**re-signed** [2] - 5261:12, 5261:20
**re-signing** [1] - 5262:2
**reach** [3] - 5311:21, 5313:4, 5397:13
**reached** [6] - 5269:22, 5270:14, 5270:16, 5271:11, 5346:11
**read** [39] - 5181:15, 5181:16, 5190:25, 5203:18, 5203:19, 5203:21, 5203:23, 5204:4, 5204:8, 5247:5, 5247:15, 5247:21, 5247:22, 5248:5, 5249:19, 5249:22, 5250:16, 5251:9, 5270:20, 5280:1, 5283:7, 5296:11, 5297:10, 5306:19, 5306:22, 5318:19, 5319:5, 5324:1, 5327:18, 5331:19, 5334:17, 5335:3, 5335:5, 5338:21, 5341:8, 5341:9, 5356:4, 5383:4, 5385:18
**reading** [8] - 5204:6, 5211:13, 5248:5, 5297:9, 5306:17, 5319:8, 5323:14, 5362:14
**reads** [11] - 5177:10, 5213:5, 5238:17, 5257:11, 5289:6, 5356:25, 5360:17, 5364:3, 5364:19, 5376:9, 5393:20
**ready** [3] - 5214:7, 5311:19, 5365:21
**real** [1] - 5327:20
**reality** [2] - 5312:7, 5312:16
**realize** [1] - 5263:9
**really** [10] - 5158:9, 5158:24, 5158:25, 5159:1, 5169:8, 5171:10, 5310:10,

5334:24, 5344:13, 5344:18
**Realty** [1] - 5238:25
**reason** [9] - 5179:16, 5245:22, 5251:24, 5274:21, 5278:10, 5278:22, 5315:13, 5339:7, 5342:11
**reasonable** [4] - 5162:1, 5350:4, 5363:16, 5373:13
**recalled** [1] - 5249:11
**recapitalization** [1] - 5217:3
**receivable** [2] - 5372:5, 5372:7
**receivables** [5] - 5219:5, 5219:6, 5220:25, 5221:1, 5372:2
**receive** [19] - 5170:23, 5175:2, 5175:11, 5180:19, 5196:2, 5215:2, 5240:6, 5274:10, 5279:20, 5282:23, 5327:9, 5355:7, 5359:4, 5367:18, 5368:11, 5371:5, 5380:3, 5384:9, 5393:7
**received** [23] - 5194:17, 5255:15, 5273:14, 5275:8, 5276:7, 5282:16, 5283:5, 5285:2, 5296:24, 5328:15, 5334:24, 5335:8, 5335:12, 5336:10, 5354:19, 5354:25, 5368:3, 5377:3, 5378:25, 5379:8, 5381:23, 5392:23
**receiving** [4] - 5218:21, 5218:23, 5275:22, 5296:3
**recess** [1] - 5308:25
**Recess** [1] - 5227:18
**recipient** [1] - 5344:9
**reciprocate** [1] - 5159:14
**reciprocity** [1] - 5158:15
**reclassification** [4] - 5193:16, 5206:23, 5208:18, 5323:2
**reclassified** [7] - 5187:14, 5192:3, 5192:15, 5201:4,

5201:15, 5326:9, 5394:6
**reclassify** [3] - 5191:14, 5219:4, 5220:24
**recognize** [6] - 5230:5, 5256:9, 5256:11, 5261:11, 5309:11, 5309:13
**recollect** [1] - 5389:20
**recollection** [37] - 5197:6, 5204:23, 5207:15, 5216:24, 5221:9, 5221:14, 5239:17, 5256:17, 5269:13, 5273:17, 5273:22, 5279:1, 5289:21, 5290:21, 5292:12, 5293:13, 5293:25, 5294:11, 5294:25, 5318:24, 5319:9, 5334:8, 5338:8, 5338:24, 5339:11, 5339:18, 5340:3, 5340:7, 5340:12, 5340:21, 5341:4, 5343:24, 5344:7, 5344:8, 5345:4
**recommendation** [1] - 5347:1
**reconcile** [1] - 5216:13
**record** [22] - 5158:22, 5165:9, 5195:22, 5197:23, 5203:19, 5203:21, 5205:20, 5252:8, 5255:5, 5279:16, 5281:7, 5282:3, 5318:21, 5325:9, 5335:5, 5339:5, 5340:2, 5342:18, 5343:16, 5343:20, 5378:10
**Record** [1] - 5297:10
**recorded** [3] - 5156:25, 5373:6, 5385:22
**records** [1] - 5364:5
**recount** [1] - 5350:20
**recoverable** [1] - 5372:4
**RECROSS** [2] - 5332:1, 5399:6
**recross** [6] - 5308:16, 5316:3, 5316:23, 5339:8,

5341:20, 5343:1
**recross-examination** [2] - 5316:3, 5316:23
**RECROSS-EXAMINATION** [2] - 5332:1, 5399:6
**red** [7] - 5162:19, 5354:22, 5354:25, 5356:20, 5356:21, 5368:6, 5383:19
**redacting** [1] - 5260:16
**redirect** [8] - 5247:20, 5308:14, 5316:5, 5317:21, 5343:20, 5344:14, 5346:13, 5348:2
**REDIRECT** [2] - 5317:23, 5399:5
**reduced** [1] - 5328:12
**reduction** [2] - 5219:5, 5220:25
**REED** [1] - 5156:19
**refer** [2] - 5371:24, 5378:14
**reference** [6] - 5211:18, 5251:3, 5259:1, 5288:9, 5321:13, 5363:2
**referenced** [2] - 5211:1, 5319:4
**referencing** [4] - 5182:24, 5183:1, 5210:17, 5210:24
**referred** [1] - 5249:22
**referring** [12] - 5179:11, 5202:25, 5211:20, 5278:1, 5278:14, 5291:11, 5307:15, 5321:8, 5332:12, 5340:14, 5371:20, 5374:21
**refers** [3] - 5328:14, 5369:1, 5369:8
**reflect** [2] - 5320:6, 5384:4
**reflected** [1] - 5327:15
**reflects** [1] - 5327:12
**refrain** [3] - 5258:3, 5258:8, 5258:25
**refresh** [50] - 5190:18, 5191:4, 5203:20, 5204:20, 5204:23, 5205:18, 5205:24, 5214:10, 5221:9, 5221:14,

5226:12, 5239:9, 5239:17, 5243:17, 5254:25, 5268:24, 5269:4, 5269:5, 5269:13, 5273:17, 5273:22, 5274:3, 5276:25, 5279:1, 5279:8, 5280:1, 5281:5, 5289:21, 5290:21, 5291:2, 5291:23, 5292:3, 5292:12, 5293:13, 5293:25, 5294:11, 5294:24, 5318:13, 5318:23, 5319:8, 5338:8, 5338:24, 5339:3, 5339:10, 5339:18, 5340:3, 5340:21, 5341:3, 5343:24, 5344:8
**refreshed** [3] - 5334:7, 5340:12, 5344:6
**refreshes** [1] - 5345:4
**refreshing** [4] - 5166:18, 5339:11, 5340:7, 5345:12
**regard** [1] - 5311:17
**regarding** [8] - 5179:9, 5186:11, 5204:11, 5204:12, 5232:1, 5258:14, 5272:13, 5289:21
**Regardless** [1] - 5387:20
**regardless** [1] - 5254:7
**registered** [2] - 5363:7, 5376:3
**Registrar** [1] - 5319:2
**Regret** [1] - 5297:11
**regret** [6] - 5234:6, 5296:16, 5296:18, 5296:23, 5297:2
**regularly** [1] - 5157:24
**regulates** [2] - 5262:22, 5262:23
**regulatory** [1] - 5262:22
**rehired** [3] - 5224:23, 5225:4, 5225:5
**reimbursement** [1] - 5298:9
**relate** [7] - 5286:1, 5329:8, 5371:1, 5379:24, 5390:21, 5393:1, 5393:2

**related** [54] - 5160:18, 5163:4, 5166:25, 5184:25, 5219:5, 5219:6, 5219:9, 5219:13, 5219:16, 5219:18, 5219:22, 5220:5, 5220:14, 5220:24, 5221:1, 5230:9, 5252:23, 5258:25, 5277:15, 5286:5, 5293:15, 5297:23, 5300:25, 5301:2, 5301:16, 5301:25, 5320:20, 5322:17, 5322:21, 5338:18, 5343:8, 5343:21, 5346:16, 5356:16, 5357:2, 5357:7, 5359:19, 5360:19, 5362:11, 5372:15, 5372:20, 5372:24, 5378:19, 5387:1, 5387:3, 5387:13, 5387:15, 5387:16, 5387:17, 5387:19, 5391:23, 5393:24, 5394:7, 5394:17
**relates** [1] - 5353:25
**relating** [15] - 5179:8, 5183:15, 5184:25, 5187:10, 5247:18, 5272:4, 5292:14, 5293:18, 5294:1, 5294:5, 5295:1, 5300:13, 5300:22, 5325:15, 5390:25
**relations** [1] - 5231:3
**relationship** [3] - 5224:20, 5224:22, 5363:5
**Relay** [19] - 5281:1, 5281:2, 5281:18, 5281:21, 5287:9, 5288:11, 5288:15, 5289:22, 5291:24, 5292:4, 5292:7, 5292:13, 5292:19, 5293:14, 5294:1, 5295:10, 5295:18, 5295:24, 5296:24
**relay** [1] - 5157:16
**release** [5] - 5256:2, 5256:8, 5257:8, 5280:2, 5394:5
**relevance** [1] - 5344:11
**relevant** [2] - 5260:8, 5344:12

**relied** [1] - 5386:11
**rely** [1] - 5373:12
**Remain** [1] - 5308:2
**remain** [1] - 5234:1
**remaining** [6] - 5199:8, 5273:1, 5275:16, 5275:17, 5275:23, 5298:3
**Remember** [2] - 5207:2, 5390:17
**remember** [110] - 5159:6, 5166:20, 5167:4, 5167:21, 5176:5, 5181:3, 5182:15, 5182:19, 5183:25, 5185:7, 5185:10, 5185:21, 5192:20, 5194:11, 5196:18, 5196:21, 5196:23, 5196:24, 5196:25, 5197:9, 5197:11, 5197:15, 5197:16, 5197:17, 5201:22, 5202:1, 5202:3, 5202:6, 5202:10, 5202:21, 5203:3, 5203:10, 5204:25, 5205:5, 5205:18, 5206:2, 5206:15, 5212:1, 5212:4, 5214:12, 5225:7, 5225:12, 5225:20, 5225:23, 5226:7, 5239:4, 5239:21, 5239:25, 5240:2, 5242:23, 5243:18, 5243:20, 5252:4, 5255:8, 5255:11, 5256:17, 5260:13, 5260:17, 5260:22, 5266:12, 5267:1, 5268:2, 5268:4, 5270:20, 5273:18, 5273:21, 5275:1, 5276:16, 5278:25, 5280:22, 5281:18, 5281:24, 5282:9, 5282:11, 5287:8, 5287:10, 5288:17, 5288:20, 5293:17, 5295:9, 5295:15, 5296:19, 5298:25, 5299:20, 5302:3, 5303:3, 5303:8, 5304:17, 5304:19, 5305:1, 5305:2, 5305:6, 5305:12, 5306:15, 5306:17, 5306:21, 5320:4, 5321:22,

5322:15, 5323:7, 5324:10, 5325:18, 5330:5, 5334:9, 5344:16, 5388:8, 5388:14
**remembered** [3] - 5201:25, 5205:3, 5205:11
**remind** [3] - 5228:7, 5231:18, 5285:25
**remove** [1] - 5260:4
**rendered** [2] - 5357:1, 5357:7
**renew** [1] - 5249:21
**rent** [2] - 5327:24, 5327:25
**renumber** [2] - 5166:13, 5166:14
**repayment** [1] - 5273:15
**Repeat** [1] - 5297:8
**repeat** [7] - 5178:20, 5183:17, 5236:15, 5261:8, 5276:6, 5370:14, 5392:2
**repeated** [2] - 5283:23, 5284:11
**repeating** [1] - 5244:19
**rephrase** [27] - 5185:4, 5185:6, 5186:20, 5188:7, 5188:9, 5192:7, 5192:10, 5203:2, 5220:3, 5220:17, 5241:20, 5244:11, 5245:5, 5245:20, 5246:4, 5246:12, 5249:7, 5253:23, 5270:9, 5278:18, 5286:10, 5320:10, 5321:12, 5358:2, 5388:4, 5390:9, 5391:20
**rephrased** [2] - 5335:16, 5335:18
**replace** [1] - 5374:20
**report** [3] - 5359:10, 5364:13, 5364:15
**reported** [6] - 5264:2, 5264:4, 5265:21, 5265:22, 5265:23
**Reporter** [1] - 5156:22
**reporter** [1] - 5335:3
**reporters** [2] - 5161:17, 5161:23
**reports** [1] - 5355:12
**represent** [2] -

5285:20, 5360:21
**representation** [3] - 5272:13, 5357:14, 5367:19
**representations** [2] - 5345:5, 5353:21
**representative** [1] - 5367:4
**represented** [6] - 5209:5, 5209:13, 5299:15, 5324:20, 5324:24, 5356:12
**representing** [2] - 5209:7, 5324:19
**reputation** [1] - 5258:18
**request** [16] - 5169:16, 5169:19, 5169:21, 5170:2, 5224:4, 5228:9, 5231:24, 5258:23, 5300:13, 5302:4, 5339:6, 5365:18, 5365:21, 5367:4, 5381:7, 5381:17
**requesting** [1] - 5238:20
**requests** [3] - 5221:7, 5221:21, 5321:22
**required** [9] - 5352:11, 5352:12, 5360:7, 5363:7, 5363:9, 5363:10, 5365:20, 5387:18, 5391:5
**requirement** [2] - 5220:24, 5353:18
**research** [1] - 5351:3
**resigned** [2] - 5239:8, 5241:4
**resigning** [3] - 5239:5, 5239:7, 5239:18
**resolve** [1] - 5164:2
**resolved** [1] - 5167:13
**respect** [13] - 5194:5, 5223:22, 5230:4, 5236:9, 5236:20, 5238:7, 5238:15, 5247:18, 5251:11, 5271:19, 5309:5, 5320:8, 5334:6
**respectfully** [4] - 5168:16, 5339:24, 5343:7, 5344:20
**respective** [1] - 5258:14

**respond** [12] - 5193:2, 5193:6, 5199:5, 5199:10, 5224:11, 5237:7, 5243:11, 5280:20, 5280:25, 5300:16, 5300:17, 5305:24
**responded** [5] - 5193:5, 5243:8, 5252:4, 5270:4, 5328:25
**responds** [3] - 5231:6, 5232:5, 5234:16
**response** [14] - 5177:3, 5188:8, 5223:5, 5231:7, 5231:10, 5237:3, 5289:15, 5289:20, 5297:5, 5379:22, 5380:13, 5380:16, 5380:20, 5380:21
**responses** [2] - 5183:11, 5216:4
**responsibilities** [6] - 5214:7, 5221:15, 5245:21, 5320:7, 5320:14, 5320:16
**responsibility** [22] - 5215:15, 5215:17, 5215:20, 5215:21, 5217:16, 5221:8, 5221:11, 5221:12, 5221:13, 5221:21, 5221:24, 5223:7, 5223:12, 5223:15, 5223:25, 5224:2, 5244:1, 5245:17, 5246:1, 5246:9, 5376:23
**responsible** [13] - 5214:12, 5215:14, 5216:5, 5216:9, 5216:16, 5216:17, 5216:25, 5217:8, 5218:25, 5221:2, 5236:5, 5313:21, 5387:9
**responsive** [8] - 5188:8, 5207:22, 5305:23, 5314:15, 5315:11, 5315:12, 5315:14, 5315:25
**rest** [1] - 5310:4
**restate** [6] - 5386:5, 5386:17, 5390:10, 5390:22, 5391:14, 5392:4
**restated** [5] - 5218:7, 5386:12, 5386:25,

5387:23, 5391:18
**restatement** [11] - 5388:6, 5388:12, 5389:7, 5389:10, 5390:2, 5390:7, 5390:18, 5390:19, 5390:25, 5391:23, 5392:12
**restatements** [1] - 5391:5
**resting** [1] - 5310:4
**restricted** [2] - 5334:22, 5336:3
**restriction** [1] - 5258:20, 5259:1, 5346:7
**restructured** [1] - 5233:2
**restructuring** [1] - 5234:8
**rests** [1] - 5160:3
**result** [7] - 5218:22, 5218:23, 5283:23, 5284:16, 5304:14, 5391:25
**resulted** [1] - 5264:12
**results** [2] - 5366:19, 5366:20
**resume** [2] - 5173:15, 5229:19
**resumed** [2] - 5174:3, 5317:6
**retain** [1] - 5218:11
**retained** [1] - 5242:25
**retroactive** [3] - 5284:1, 5296:3, 5296:25
**retroactively** [2] - 5218:7, 5295:23
**Retrophin** [189] - 5176:8, 5176:14, 5178:11, 5178:15, 5178:22, 5178:23, 5184:15, 5187:14, 5187:22, 5190:11, 5190:12, 5190:14, 5191:5, 5191:11, 5191:17, 5192:3, 5194:24, 5208:18, 5209:8, 5213:24, 5214:17, 5215:18, 5216:6, 5219:12, 5220:9, 5220:12, 5220:15, 5220:19, 5222:8, 5224:7, 5226:5, 5236:23, 5237:9, 5241:17, 5241:24, 5242:18,

5243:1, 5244:3, 5244:7, 5244:9, 5244:13, 5244:21, 5244:22, 5244:25, 5245:7, 5245:9, 5245:12, 5245:14, 5246:2, 5246:6, 5248:20, 5249:12, 5249:13, 5249:18, 5251:8, 5251:11, 5251:13, 5251:14, 5251:21, 5252:15, 5252:23, 5253:2, 5253:6, 5253:13, 5253:20, 5254:7, 5254:16, 5257:10, 5258:14, 5258:24, 5273:1, 5273:20, 5274:5, 5276:8, 5276:17, 5277:9, 5277:12, 5279:3, 5279:17, 5279:23, 5280:2, 5280:7, 5280:14, 5282:6, 5282:25, 5284:10, 5284:15, 5285:4, 5285:6, 5285:12, 5285:17, 5285:21, 5286:5, 5286:11, 5288:16, 5289:12, 5293:6, 5293:15, 5294:13, 5295:2, 5296:3, 5297:1, 5298:13, 5300:11, 5301:2, 5301:3, 5301:13, 5302:18, 5303:23, 5304:4, 5304:19, 5304:23, 5305:20, 5306:2, 5306:5, 5306:8, 5314:9, 5314:14, 5315:10, 5316:19, 5316:24, 5319:2, 5322:2, 5322:7, 5322:19, 5322:21, 5322:24, 5323:23, 5324:16, 5325:12, 5326:10, 5327:24, 5328:5, 5328:6, 5328:18, 5328:19, 5328:24, 5329:5, 5329:10, 5329:11, 5329:13, 5329:17, 5331:10, 5333:10, 5333:12, 5333:13, 5333:21, 5334:3, 5334:23, 5342:7, 5345:6, 5346:4, 5346:10, 5350:24, 5351:1, 5358:19, 5358:24, 5361:5,

5362:10, 5365:14,
5367:18, 5370:13,
5371:21, 5372:15,
5372:22, 5372:23,
5373:1, 5373:5,
5374:2, 5378:4,
5378:7, 5379:12,
5380:25, 5382:10,
5386:1, 5386:17,
5387:6, 5387:9,
5387:11, 5387:23,
5389:16, 5390:6,
5393:16, 5393:22,
5394:1, 5395:10
**Retrophin's** [19] -
5216:1, 5275:17,
5275:24, 5276:4,
5276:14, 5328:15,
5352:14, 5352:25,
5354:20, 5361:6,
5370:4, 5370:24,
5389:18, 5390:10,
5391:14, 5391:23,
5392:1, 5392:4,
5392:7
**return** [3] - 5188:1,
5277:17, 5277:19
**reveal** [1] - 5171:7
**reverse** [1] - 5194:22
**reversed** [1] - 5299:6
**review** [22] - 5221:7,
5221:22, 5287:3,
5350:6, 5350:8,
5361:17, 5366:13,
5366:16, 5366:23,
5366:25, 5367:9,
5370:4, 5370:13,
5378:23, 5379:3,
5381:4, 5381:5,
5381:7, 5383:3,
5383:6, 5383:10,
5388:19
**reviewed** [6] -
5358:4, 5361:1,
5370:6, 5370:9,
5383:10, 5383:16
**reviewing** [1] -
5366:15
**reviews** [3] - 5366:7,
5378:22, 5381:6
**revise** [4] - 5222:3,
5222:6, 5222:12,
5222:22
**Revised** [1] - 5218:6
**revisit** [2] - 5172:18,
5173:3
**revolt** [1] - 5313:11
**Richard** [1] -
5384:17
**Richardson** [5] -

5301:9, 5301:10,
5301:11, 5301:12,
5301:16
**right-hand** [1] -
5331:19
**rights** [1] - 5169:10
**ring** [1] - 5305:4
**rise** [1] - 5204:16
**risk** [5] - 5363:12,
5364:19, 5364:20,
5365:2, 5365:6
**rocky** [2] - 5224:20
**ROHDE** [1] - 5156:12
**role** [10] - 5213:10,
5213:20, 5214:2,
5214:3, 5321:1,
5321:18, 5324:15,
5363:21, 5373:10,
5376:13
**roles** [1] - 5214:7
**Ron** [1] - 5176:20
**Rosenfeld** [1] -
5338:16
**Rosenman** [1] -
5372:17
**Rosenthal** [2] -
5265:1, 5265:19
**Rosenwald** [5] -
5288:10, 5288:14,
5294:12, 5384:23,
5385:1
**Rosenwald's** [2] -
5288:15, 5295:1
**rough** [1] - 5313:17
**roughly** [1] - 5228:18
**royalty** [3] - 5178:8,
5199:8
**RTRX2481** [1] -
5275:11
**Rule** [1] - 5160:4,
5247:15, 5249:22
**rule** [1] - 5258:6
**ruled** [2] - 5268:9,
5268:13
**rules** [2] - 5340:5,
5350:16
**run** [2] - 5316:23,
5317:2
**running** [3] -
5178:11, 5276:4,
5276:9
**rushed** [1] - 5344:16
**Rushford** [1] -
5353:10
**Russo** [1] - 5233:23

### S

**Sachs** [2] - 5262:9,
5263:19

**sad** [1] - 5173:9
**safe** [3] - 5157:25,
5310:11, 5348:5
**Sage** [1] - 5238:24
**salary** [2] - 5273:10,
5286:25
**sale** [9] - 5305:14,
5314:11, 5314:17,
5314:21, 5314:25,
5315:7, 5315:12,
5315:20, 5315:22
**sales** [1] - 5313:21
**Sarah** [2] - 5288:9,
5384:17
**sat** [1] - 5203:12
**satisfy** [1] - 5199:8
**Saturday** [1] -
5398:20
**save** [1] - 5168:11
**saves** [1] - 5173:7
**saw** [14] - 5193:19,
5193:22, 5193:24,
5219:17, 5225:19,
5256:18, 5256:19,
5270:16, 5270:24,
5272:23, 5288:12,
5296:15, 5299:17
**scanned** [1] -
5256:19
**scenario** [2] -
5306:22, 5310:15
**schedule** [11] -
5157:25, 5160:15,
5160:17, 5160:25,
5161:5, 5161:11,
5308:12, 5317:12,
5317:14, 5397:18,
5398:19
**scheduled** [1] -
5157:7
**schedules** [3] -
5161:9, 5162:13,
5308:19
**scheduling** [3] -
5162:21, 5162:22,
5227:21
**Schlecht** [1] - 5215:9
**Schlecht's** [2] -
5216:4, 5216:5
**Schmidt** [1] -
5299:12
**Schwab** [27] -
5304:6, 5304:7,
5304:15, 5305:7,
5305:14, 5314:22,
5314:25, 5315:7,
5315:21, 5319:1,
5319:3, 5334:7,
5334:13, 5336:18,
5337:2, 5338:11,

5340:10, 5340:22,
5341:3, 5342:5,
5342:12, 5343:12,
5343:17, 5343:18,
5344:1, 5345:2,
5345:4
**Schwab's** [1] -
5304:14
**scope** [7] - 5335:13,
5338:14, 5339:20,
5346:12, 5352:5,
5362:25, 5376:16
**scrambling** [1] -
5311:18
**screen** [11] - 5206:7,
5206:15, 5211:14,
5241:8, 5277:3,
5314:3, 5354:13,
5364:25, 5375:2,
5379:18
**screwed** [1] -
5234:18
**scroll** [15] - 5230:20,
5256:1, 5257:12,
5274:14, 5275:9,
5282:15, 5287:14,
5294:24, 5328:14,
5346:22, 5357:18,
5362:21, 5368:13,
5380:13, 5380:19
**scrolling** [4] -
5232:5, 5252:19,
5283:2, 5289:2
**seat** [4] - 5173:16,
5229:18, 5317:20,
5348:19
**SEC** [32] - 5188:2,
5188:14, 5188:19,
5188:22, 5189:3,
5189:6, 5189:7,
5189:14, 5191:5,
5271:17, 5272:2,
5272:18, 5278:3,
5299:7, 5299:12,
5299:15, 5299:21,
5299:25, 5300:3,
5300:13, 5300:21,
5300:22, 5300:24,
5302:5, 5322:15,
5352:13, 5363:7,
5363:10, 5363:13,
5371:21, 5386:7
**second** [30] -
5177:22, 5206:25,
5207:8, 5207:9,
5207:13, 5208:8,
5208:11, 5212:18,
5214:18, 5217:7,
5283:22, 5284:6,
5287:15, 5288:5,

5291:6, 5291:11,
5324:18, 5325:20,
5327:15, 5340:8,
5355:15, 5356:19,
5356:20, 5360:16,
5363:14, 5369:23,
5370:23, 5372:11,
5381:3
**secretary** [1] -
5367:6
**section** [4] -
5283:22, 5376:9,
5376:14, 5377:25
**secured** [1] -
5197:25
**securities** [6] -
5188:24, 5189:2,
5189:11, 5262:23,
5267:20, 5269:16
**See** [2] - 5237:7,
5238:3
**see** [101] - 5164:6,
5165:16, 5167:20,
5168:1, 5174:22,
5181:22, 5182:4,
5186:4, 5188:9,
5190:16, 5190:23,
5196:17, 5206:20,
5214:20, 5214:22,
5216:6, 5216:12,
5223:5, 5232:3,
5232:15, 5236:11,
5237:4, 5237:13,
5237:18, 5237:19,
5238:19, 5241:3,
5241:7, 5252:1,
5253:2, 5256:5,
5256:8, 5256:13,
5257:13, 5257:20,
5259:3, 5260:21,
5279:1, 5279:22,
5281:5, 5288:18,
5290:19, 5295:7,
5299:12, 5311:23,
5314:4, 5323:12,
5324:18, 5324:22,
5326:13, 5326:18,
5327:1, 5328:14,
5329:3, 5331:5,
5336:25, 5354:23,
5355:21, 5356:1,
5356:10, 5356:16,
5356:19, 5357:8,
5357:15, 5357:18,
5358:7, 5358:9,
5358:23, 5359:6,
5359:11, 5359:25,
5360:3, 5363:3,
5363:19, 5364:6,
5364:22, 5367:24,

5369:3, 5370:19, 5371:7, 5372:18, 5373:3, 5375:3, 5376:6, 5377:16, 5377:21, 5379:16, 5379:19, 5379:22, 5380:6, 5380:11, 5382:10, 5383:19, 5384:15, 5385:7, 5393:14, 5393:16, 5394:8, 5396:23, 5397:13, 5397:14

**seeing** [1] - 5165:4

**seek** [1] - 5353:21

**seeking** [1] - 5269:19

**seem** [2] - 5212:19, 5332:20

**sees** [3] - 5190:15, 5191:7, 5356:8

**selected** [2] - 5396:7, 5398:7

**selection** [1] - 5157:7

**sell** [21] - 5177:25, 5179:14, 5180:6, 5180:24, 5183:20, 5183:24, 5185:12, 5186:15, 5186:23, 5217:3, 5300:14, 5304:11, 5305:15, 5314:22, 5315:1, 5315:7, 5334:23, 5334:25, 5336:5, 5346:3

**seller** [5] - 5177:16, 5177:19, 5177:21, 5177:22, 5178:3

**selling** [8] - 5178:4, 5335:8, 5335:11, 5335:23, 5336:11, 5336:12, 5336:13, 5336:16

**Send** [2] - 5222:20, 5382:22

**send** [14] - 5222:22, 5274:23, 5278:23, 5280:8, 5287:16, 5319:12, 5319:14, 5354:4, 5365:24, 5366:1, 5381:19, 5382:25, 5383:1

**sending** [7] - 5236:8, 5254:22, 5255:8, 5257:23, 5287:5, 5318:11, 5377:8

**sends** [1] - 5236:16

**senior** [7] - 5231:2, 5234:9, 5262:17, 5263:22, 5265:16,

5265:18, 5265:20

**sense** [4] - 5163:8, 5166:15, 5178:14

**sent** [47] - 5182:10, 5183:7, 5196:7, 5198:24, 5214:4, 5214:9, 5214:11, 5255:24, 5258:2, 5260:2, 5260:5, 5260:20, 5274:15, 5278:10, 5278:12, 5279:3, 5280:4, 5280:11, 5280:12, 5280:13, 5280:23, 5281:22, 5282:7, 5282:13, 5287:11, 5289:20, 5291:5, 5291:6, 5291:9, 5291:11, 5291:12, 5291:22, 5291:23, 5306:6, 5306:7, 5319:9, 5324:8, 5332:7, 5338:8, 5341:5, 5341:14, 5344:7, 5345:14, 5370:21, 5381:17, 5389:9

**sentence** [9] - 5324:18, 5328:23, 5357:5, 5360:17, 5364:3, 5364:17, 5364:19, 5372:25, 5376:24

**separate** [15] - 5226:5, 5226:6, 5244:2, 5247:4, 5249:18, 5251:15, 5251:16, 5251:20, 5253:17, 5253:19, 5253:24, 5254:5, 5254:11, 5323:23

**separated** [1] - 5189:24

**separation** [4] - 5254:23, 5255:8, 5255:18, 5260:2

**September** [10] - 5269:22, 5269:23, 5322:24, 5323:3, 5361:17, 5388:22, 5389:6, 5390:19, 5391:22, 5392:5

**sequence** [1] - 5314:18

**sequentially** [1] - 5250:19

**series** [3] - 5267:18, 5326:24, 5330:4

**serious** [1] - 5170:2

**serve** [1] - 5312:10

**servers** [1] - 5221:18

**service** [3] - 5320:7, 5396:7, 5396:24

**services** [5] - 5218:18, 5284:14, 5357:1, 5357:7, 5372:17

**Services** [1] - 5266:17

**serving** [2] - 5312:12

**SESSION** [1] - 5309:1

**set** [11] - 5160:13, 5162:7, 5168:12, 5217:7, 5217:15, 5217:23, 5270:1, 5355:18, 5358:17, 5368:15, 5369:16

**sets** [1] - 5366:22

**setting** [1] - 5168:20

**settle** [1] - 5289:4

**settlement** [44] - 5166:24, 5303:16, 5303:18, 5303:19, 5303:23, 5304:15, 5346:11, 5377:24, 5378:3, 5378:6, 5380:23, 5380:25, 5382:20, 5382:22, 5382:23, 5382:25, 5383:2, 5383:7, 5383:11, 5383:17, 5384:4, 5384:5, 5384:12, 5384:20, 5384:22, 5385:4, 5385:5, 5385:7, 5385:11, 5385:16, 5386:3, 5386:16, 5386:21, 5387:2, 5387:8, 5388:13, 5389:5, 5390:2, 5393:2, 5394:3, 5394:5

**seven** [5] - 5219:4, 5220:23, 5251:1, 5374:5

**several** [5] - 5163:18, 5174:21, 5246:5, 5257:2, 5387:7

**shape** [1] - 5174:13

**share** [7] - 5178:1, 5179:12, 5316:7, 5330:4, 5330:10, 5330:22, 5338:18

**shared** [2] - 5245:14, 5251:17

**shareholder** [3] - 5218:17, 5362:12, 5384:15

**shareholders** [1] - 5273:3

**shares** [83] - 5174:11, 5175:15, 5175:22, 5175:24, 5176:4, 5176:9, 5176:13, 5177:25, 5178:4, 5179:4, 5179:14, 5180:3, 5180:7, 5180:19, 5180:24, 5181:14, 5181:15, 5181:18, 5181:23, 5182:8, 5182:22, 5183:16, 5183:21, 5183:23, 5183:25, 5185:1, 5185:12, 5186:15, 5186:23, 5218:17, 5218:23, 5241:18, 5242:1, 5242:5, 5242:14, 5242:20, 5255:21, 5275:6, 5284:20, 5284:23, 5285:2, 5293:18, 5293:19, 5293:22, 5298:12, 5298:15, 5304:4, 5304:10, 5304:11, 5318:3, 5318:12, 5319:20, 5319:21, 5331:1, 5334:23, 5334:25, 5335:8, 5335:9, 5335:11, 5335:24, 5336:5, 5336:10, 5336:11, 5336:12, 5336:13, 5336:16, 5339:13, 5339:19, 5342:4, 5342:6, 5342:8, 5342:22, 5345:6, 5346:3, 5346:4, 5346:15, 5346:17, 5347:2, 5360:18

**sheet** [4] - 5270:16, 5360:6, 5372:3, 5381:13

**sheets** [1] - 5266:9

**shell** [3] - 5182:2, 5182:3, 5224:12

**shined** [1] - 5256:20

**Shkreli** [111] - 5159:15, 5166:19, 5179:3, 5179:6, 5180:6, 5180:18, 5180:23, 5181:22, 5182:8, 5182:21, 5183:15, 5183:20, 5183:24, 5184:10, 5184:14, 5184:19, 5184:20, 5184:25,

5185:1, 5185:12, 5186:14, 5186:23, 5191:9, 5191:17, 5192:25, 5211:1, 5211:19, 5214:7, 5215:11, 5222:15, 5224:19, 5224:23, 5225:2, 5225:8, 5225:12, 5225:15, 5225:18, 5230:6, 5230:7, 5230:25, 5232:5, 5232:17, 5232:23, 5233:7, 5233:25, 5234:16, 5234:22, 5235:3, 5235:7, 5235:11, 5236:10, 5236:17, 5239:18, 5241:16, 5241:22, 5242:14, 5242:25, 5243:5, 5251:3, 5253:5, 5256:21, 5257:4, 5257:16, 5258:17, 5260:13, 5261:12, 5261:17, 5261:19, 5262:1, 5269:22, 5270:5, 5270:14, 5271:1, 5276:8, 5276:24, 5278:7, 5278:24, 5280:4, 5280:17, 5282:5, 5284:8, 5284:9, 5284:12, 5284:15, 5284:24, 5286:22, 5287:11, 5291:7, 5299:14, 5299:20, 5299:23, 5302:17, 5303:24, 5313:18, 5316:12, 5318:2, 5322:18, 5331:12, 5333:7, 5334:1, 5334:2, 5346:10, 5353:2, 5353:3, 5372:23, 5386:2, 5387:6, 5389:12, 5393:21

**Shkreli's** [16] - 5159:7, 5180:24, 5186:14, 5230:22, 5235:9, 5256:11, 5256:13, 5261:11, 5261:18, 5270:24, 5285:3, 5318:12, 5319:13, 5319:15, 5319:18, 5339:3

**short** [5] - 5266:5, 5268:6, 5285:1, 5310:13, 5337:3

**shorted** [2] - 5266:2, 5266:4

**shorten** [1] - 5161:13

**shorter** [1] - 5311:8
**shortly** [2] - 5180:23, 5284:19
**show** [31] - 5170:25, 5195:20, 5203:13, 5205:15, 5205:19, 5206:4, 5210:3, 5214:14, 5218:1, 5226:9, 5227:1, 5239:3, 5239:10, 5255:4, 5268:24, 5279:10, 5279:11, 5281:25, 5289:22, 5289:25, 5318:14, 5324:6, 5326:3, 5336:23, 5340:1, 5340:3, 5340:4, 5341:7, 5354:10, 5379:5
**showed** [8] - 5180:14, 5180:16, 5201:21, 5282:11, 5336:19, 5337:2, 5338:7, 5343:6
**showing** [13] - 5169:25, 5197:22, 5214:15, 5230:2, 5269:3, 5269:6, 5279:15, 5326:12, 5330:8, 5331:4, 5338:12, 5383:6, 5383:16
**shown** [3] - 5319:24, 5321:24, 5343:11
**shows** [1] - 5275:11
**shuffling** [1] - 5348:14
**Side** [1] - 5345:17
**side** [12] - 5158:10, 5158:11, 5158:20, 5168:11, 5168:23, 5169:1, 5169:4, 5260:25, 5338:6, 5381:21, 5395:3
**sidebar** [3] - 5338:3, 5338:4, 5390:16
**sides** [2] - 5165:18, 5398:22
**sign** [5] - 5264:23, 5286:23, 5357:23, 5358:15, 5365:25
**signature** [9] - 5252:19, 5253:10, 5256:9, 5256:13, 5256:18, 5260:16, 5261:11, 5261:22, 5357:19
**signatures** [1] - 5260:24
**signed** [23] -

5164:12, 5164:24, 5174:20, 5175:19, 5177:4, 5242:16, 5256:9, 5256:18, 5261:12, 5261:20, 5277:14, 5287:2, 5357:21, 5361:12, 5365:16, 5365:17, 5367:6, 5367:9, 5367:11, 5367:12, 5375:4, 5378:2
**significance** [1] - 5367:11
**significant** [6] - 5169:19, 5170:8, 5231:21, 5382:11, 5382:16, 5386:21
**significantly** [6] - 5311:8, 5312:23, 5381:25, 5382:3, 5382:8, 5382:9
**signing** [2] - 5262:2, 5264:24
**silently** [1] - 5190:25
**similar** [2] - 5376:16, 5381:9
**similarly** [1] - 5327:23
**simply** [1] - 5171:1
**single** [7] - 5185:15, 5205:7, 5298:22, 5343:10, 5358:6, 5358:10, 5387:18
**sit** [2] - 5201:13, 5396:16
**Sitting** [1] - 5296:22
**sitting** [15] - 5197:15, 5205:6, 5212:4, 5219:12, 5228:19, 5278:22, 5278:25, 5296:16, 5296:20, 5299:6, 5310:5, 5312:20, 5367:13, 5396:15, 5396:20
**situation** [4] - 5288:6, 5297:2, 5309:14, 5327:23
**six** [8] - 5218:16, 5232:8, 5285:15, 5328:21, 5342:2, 5349:20, 5370:16, 5375:6
**Sixteen** [3] - 5398:12, 5398:16, 5398:17
**sixty** [1] - 5372:16
**size** [2] - 5328:15, 5387:20
**skip** [2] - 5293:24,

5294:4
**sleeping** [1] - 5161:12
**sleet** [1] - 5362:10
**slow** [1] - 5183:19
**small** [3] - 5251:12, 5261:6, 5349:22
**smaller** [1] - 5211:15
**smart** [1] - 5271:5
**SMITH** [13] - 5156:13, 5159:10, 5166:22, 5167:19, 5170:11, 5171:21, 5227:16, 5338:23, 5341:18, 5342:21, 5343:25, 5344:4, 5345:10
**Smith** [1] - 5238:8
**sold** [2] - 5183:22, 5304:12
**solely** [1] - 5394:7
**solution** [1] - 5289:4
**someone** [6] - 5192:11, 5203:23, 5307:6, 5316:8, 5384:23, 5385:1
**Sometime** [1] - 5388:19
**Sometimes** [1] - 5211:5
**sometimes** [4] - 5224:23, 5358:9, 5367:5, 5367:6
**somewhat** [1] - 5328:6
**soon** [1] - 5157:4
**sooner** [3] - 5158:3, 5159:1, 5228:17
**sorry** [38] - 5166:20, 5179:21, 5183:17, 5191:15, 5203:5, 5215:25, 5224:6, 5233:5, 5236:15, 5245:24, 5247:14, 5267:2, 5275:17, 5276:6, 5279:11, 5280:24, 5283:16, 5294:14, 5297:17, 5315:4, 5315:21, 5320:16, 5327:20, 5334:14, 5335:2, 5335:18, 5335:21, 5357:12, 5361:15, 5362:16, 5364:23, 5370:8, 5372:2, 5385:15, 5388:24, 5392:2, 5397:23, 5398:15
**Sorry** [8] - 5214:25, 5290:18, 5295:14,

5301:5, 5304:20, 5306:21, 5378:15, 5384:25
**sort** [4] - 5167:10, 5168:4, 5254:20, 5361:1
**sorted** [1] - 5167:16
**sought** [3] - 5267:8, 5267:10, 5267:13
**sound** [1] - 5208:22
**sounded** [1] - 5212:6
**sounds** [1] - 5161:25
**Southern** [1] - 5306:15
**space** [3] - 5245:15, 5251:17, 5271:7
**speaking** [4] - 5157:24, 5204:11, 5204:13, 5325:11
**special** [1] - 5364:3
**specific** [8] - 5189:16, 5194:11, 5194:15, 5225:7, 5234:14, 5296:22, 5297:4, 5344:10
**specifically** [6] - 5225:10, 5242:13, 5286:1, 5297:6, 5300:18, 5344:25
**specifics** [2] - 5196:24, 5214:10
**speculation** [2] - 5178:17, 5394:21
**speed** [1] - 5168:20
**spell** [1] - 5348:20
**Spencer** [2] - 5288:9, 5384:17
**spent** [2] - 5268:6, 5272:24
**Spielberg** [2] - 5288:9, 5384:17
**split** [7] - 5179:14, 5180:7, 5180:24, 5183:25, 5185:13, 5186:15, 5186:23
**splitting** [1] - 5318:2
**spreadsheet** [7] - 5237:16, 5383:6, 5383:10, 5383:16, 5383:22, 5384:1, 5384:3
**squared** [1] - 5317:7
**staff** [3] - 5353:12, 5381:23, 5382:1
**stamps** [1] - 5290:24
**stand** [8] - 5158:9, 5161:8, 5167:13, 5172:12, 5172:13, 5309:11, 5318:16, 5348:16

**Standard** [2] - 5319:2, 5342:7
**standard** [2] - 5353:21, 5354:3
**standards** [1] - 5387:17
**start** [9] - 5167:20, 5204:8, 5236:25, 5237:23, 5248:1, 5251:1, 5252:7, 5308:20, 5310:21
**started** [12] - 5251:2, 5263:25, 5264:1, 5265:24, 5266:25, 5270:2, 5270:18, 5321:1, 5321:7, 5340:8, 5349:17, 5349:21
**Starting** [1] - 5203:16
**starting** [5] - 5157:6, 5247:13, 5308:11, 5314:19, 5323:14
**starts** [2] - 5252:9, 5368:14
**startup** [2] - 5351:2
**state** [6] - 5175:7, 5211:11, 5302:25, 5317:8, 5348:19, 5369:24
**statement** [28] - 5185:2, 5218:6, 5249:23, 5321:19, 5322:17, 5322:21, 5340:18, 5340:22, 5341:22, 5350:5, 5350:8, 5350:9, 5352:12, 5360:7, 5360:10, 5360:15, 5360:23, 5366:5, 5366:7, 5369:18, 5376:15, 5376:22, 5377:1, 5381:8, 5386:5, 5386:24, 5393:25
**statements** [63] - 5167:2, 5172:1, 5172:3, 5179:8, 5179:9, 5217:7, 5217:15, 5217:17, 5217:19, 5217:23, 5223:23, 5258:8, 5258:21, 5258:23, 5320:21, 5321:2, 5349:19, 5350:4, 5350:6, 5350:17, 5352:6, 5352:9, 5352:15, 5352:24, 5353:1, 5353:20, 5354:20, 5358:19,

5358:24, 5359:7, 5359:16, 5359:18, 5359:20, 5361:7, 5362:11, 5363:8, 5363:17, 5363:24, 5365:8, 5365:14, 5366:4, 5366:9, 5366:10, 5366:12, 5366:16, 5367:18, 5368:4, 5369:20, 5370:4, 5373:22, 5376:5, 5378:19, 5386:8, 5386:9, 5386:10, 5386:11, 5386:18, 5386:23, 5386:25, 5387:23, 5388:7, 5391:17

**STATES** [3] - 5156:1, 5156:3, 5156:10

**states** [2] - 5258:2, 5362:9

**States** [5] - 5156:5, 5156:13, 5156:15, 5349:21, 5350:13

**stay** [1] - 5161:13

**stayed** [2] - 5243:20, 5271:21

**stenography** [1] - 5156:25

**step** [6] - 5171:7, 5211:13, 5227:12, 5227:23, 5348:16, 5397:2

**steps** [4] - 5289:9, 5377:2, 5377:6, 5397:4

**Steve** [4] - 5183:22, 5184:15, 5184:23, 5186:10

**Steven** [2] - 5301:11, 5301:12

**still** [12] - 5167:14, 5173:14, 5184:16, 5250:15, 5293:21, 5308:10, 5317:20, 5364:24, 5369:19, 5369:20, 5397:8, 5397:9

**stock** [42] - 5174:8, 5174:10, 5174:20, 5175:9, 5175:11, 5175:12, 5176:17, 5177:4, 5177:6, 5177:25, 5179:12, 5183:22, 5186:11, 5218:21, 5241:23, 5242:21, 5266:2, 5284:10, 5284:13, 5284:23, 5293:20, 5298:13, 5304:4,

5305:15, 5314:11, 5314:22, 5315:1, 5315:8, 5315:12, 5315:21, 5315:22, 5319:10, 5319:15, 5319:19, 5319:21, 5334:22, 5336:3, 5342:4, 5346:4, 5361:3, 5385:10, 5385:16

**stockholder** [2] - 5177:19, 5218:6

**stop** [7] - 5157:22, 5253:6, 5285:17, 5342:7, 5342:11, 5343:21, 5396:2

**stopped** [4] - 5243:2, 5243:8, 5322:2, 5322:7

**stopper** [1] - 5210:3

**story** [1] - 5266:23

**straighten** [1] - 5390:16

**strategy** [1] - 5171:8

**straw** [2] - 5272:21, 5272:23

**streamline** [1] - 5159:16

**strike** [19] - 5188:5, 5188:9, 5197:2, 5207:21, 5297:3, 5297:5, 5305:21, 5316:19, 5319:13, 5322:6, 5324:5, 5360:9, 5383:5, 5389:3, 5389:16, 5391:7, 5391:9, 5393:1, 5394:20

**stuff** [1] - 5286:4

**stuttered** [1] - 5194:20

**Su** [146] - 5172:10, 5173:14, 5174:6, 5174:8, 5175:5, 5175:7, 5178:21, 5180:1, 5181:13, 5185:7, 5186:21, 5188:11, 5190:19, 5190:24, 5192:6, 5192:13, 5194:5, 5194:8, 5195:7, 5195:20, 5195:23, 5196:5, 5196:15, 5197:11, 5197:25, 5202:10, 5204:22, 5205:10, 5205:21, 5205:22, 5206:16, 5207:18, 5207:25, 5209:1, 5210:2, 5210:18, 5210:22,

5211:18, 5213:13, 5214:5, 5214:15, 5215:4, 5215:9, 5216:10, 5216:24, 5220:8, 5221:9, 5222:5, 5223:8, 5224:11, 5226:7, 5227:13, 5230:2, 5230:4, 5230:21, 5230:23, 5233:13, 5236:11, 5237:7, 5239:3, 5239:10, 5239:15, 5241:2, 5241:7, 5243:7, 5245:24, 5247:2, 5247:10, 5248:5, 5248:15, 5249:9, 5250:22, 5252:3, 5252:3, 5252:14, 5253:1, 5254:5, 5254:15, 5254:21, 5255:4, 5255:6, 5259:3, 5260:2, 5260:9, 5260:17, 5260:20, 5262:1, 5262:5, 5269:8, 5269:12, 5274:1, 5274:3, 5274:17, 5275:12, 5276:5, 5277:22, 5278:22, 5279:5, 5279:22, 5281:17, 5283:3, 5283:11, 5287:17, 5287:20, 5287:24, 5290:16, 5292:2, 5292:16, 5294:24, 5296:6, 5296:22, 5302:17, 5306:19, 5313:16, 5313:18, 5316:9, 5316:11, 5317:20, 5317:21, 5317:25, 5318:18, 5318:25, 5324:1, 5325:10, 5326:12, 5327:12, 5330:10, 5332:3, 5332:7, 5335:17, 5335:22, 5336:1, 5339:12, 5340:10, 5341:3, 5341:22, 5342:3, 5343:3, 5343:11, 5344:12, 5344:21, 5346:2, 5347:3, 5348:4

**SU** [3] - 5174:1, 5317:6, 5399:3

**Su's** [13] - 5164:4, 5338:17, 5340:12, 5340:14, 5340:17, 5341:15, 5342:4, 5342:6, 5342:8,

5342:21, 5343:22, 5345:2, 5345:5

**Subject** [1] - 5277:4

**subject** [12] - 5195:24, 5197:25, 5205:21, 5214:17, 5216:5, 5319:18, 5330:13, 5339:23, 5341:6, 5355:17, 5368:14, 5396:9

**subjects** [1] - 5315:3

**submissions** [2] - 5162:8, 5168:14

**subpoena** [1] - 5302:3

**subpoenas** [1] - 5169:11

**subscription** [1] - 5361:3

**subsection** [1] - 5283:21

**subsequent** [11] - 5297:16, 5297:21, 5360:2, 5360:5, 5360:8, 5360:11, 5360:13, 5377:16, 5377:18, 5377:19, 5377:25

**substantial** [2] - 5167:8, 5167:22

**substantially** [2] - 5364:20, 5365:2

**subtract** [1] - 5329:14

**succeed** [1] - 5178:15

**succeeded** [2] - 5176:9, 5176:14

**succeeding** [1] - 5178:23

**success** [2] - 5231:21, 5234:5

**successful** [1] - 5289:12

**sue** [3] - 5288:7, 5294:13, 5306:11

**sued** [4] - 5304:6, 5304:7, 5315:13, 5315:19

**suffered** [4] - 5266:11, 5266:12, 5266:13, 5266:14

**suggest** [3] - 5213:22, 5213:25, 5214:2

**suggested** [4] - 5210:12, 5210:20, 5210:21, 5211:23

**suggesting** [2] - 5212:25, 5213:19

**suggests** [1] - 5343:8

**suing** [2] - 5306:10, 5369:8

**suit** [6] - 5303:2, 5303:11, 5305:7, 5307:21

**sum** [1] - 5385:10

**summarize** [1] - 5306:25

**summarized** [1] - 5306:21

**summarizing** [1] - 5286:6

**summary** [1] - 5284:25

**summation** [1] - 5163:17

**SUNIL** [3] - 5348:21, 5348:23, 5399:7

**Sunil** [4] - 5308:10, 5348:10, 5348:21, 5382:2

**Super** [7] - 5214:8, 5222:3, 5222:4, 5222:6, 5222:10, 5222:13, 5222:18

**supervisor** [1] - 5353:12

**supplemental** [1] - 5162:10

**support** [1] - 5371:17

**supporting** [1] - 5352:20

**supportive** [1] - 5161:18

**supports** [1] - 5361:4

**suppose** [1] - 5310:24

**supposed** [2] - 5300:9, 5310:21

**Surepoint** [1] - 5236:22

**surprise** [2] - 5182:20, 5231:15

**Susan** [3] - 5197:24, 5216:6, 5221:18

**suspend** [1] - 5168:25

**sustain** [5] - 5257:18, 5270:8, 5307:10, 5356:9

**Sustained** [4] - 5219:15, 5219:21, 5220:3, 5307:3

**sustained** [6] - 5194:7, 5246:4, 5261:3, 5275:21,

5284:22, 5346:14
**switch** [2] - 5326:2, 5330:7
**sworn** [10] - 5174:2, 5203:7, 5203:9, 5204:24, 5248:6, 5249:9, 5250:24, 5348:18, 5348:24
**Syracuse** [1] - 5262:7
**system** [23] - 5238:21, 5281:1, 5281:2, 5281:19, 5281:21, 5288:11, 5288:15, 5292:4, 5292:7, 5292:13, 5292:19, 5293:14, 5294:1, 5295:10, 5295:18, 5295:25, 5296:1, 5296:5, 5296:12, 5296:13, 5296:24, 5297:1, 5298:20

# T

**tab** [6] - 5354:12, 5358:21, 5361:22, 5367:21, 5370:16, 5374:5
**Tab** [5] - 5379:6, 5383:12, 5389:21, 5392:15, 5392:19
**table** [11] - 5180:14, 5180:17, 5180:18, 5181:20, 5182:10, 5182:13, 5182:16, 5182:17, 5255:17, 5260:4, 5260:5
**talks** [2] - 5222:2, 5342:3
**tape** [1] - 5260:16
**task** [4] - 5320:17, 5320:19, 5320:24, 5321:16
**tasks** [6] - 5320:1, 5320:2, 5320:8, 5320:12, 5320:15, 5320:18
**tax** [4] - 5218:20, 5218:22, 5254:2, 5254:13
**team** [8] - 5164:23, 5168:17, 5169:16, 5170:7, 5260:7, 5353:7, 5365:21, 5365:23
**Tech** [1] - 5266:2
**Technologies** [1] - 5266:5

**Technology** [1] - 5266:6
**telephone** [3] - 5256:21, 5256:23, 5388:8
**template** [1] - 5286:25
**temporal** [1] - 5295:21
**ten** [11] - 5227:12, 5227:15, 5246:15, 5246:21, 5247:6, 5247:7, 5247:13, 5247:22, 5248:1, 5248:2, 5248:3
**term** [1] - 5280:15
**terminate** [2] - 5235:19, 5235:24
**terminated** [4] - 5225:2, 5232:7, 5284:4, 5295:23
**terminating** [1] - 5283:25
**termination** [21] - 5226:10, 5230:9, 5234:8, 5237:12, 5237:23, 5237:25, 5238:2, 5238:16, 5238:19, 5256:2, 5257:7, 5257:9, 5281:22, 5282:7, 5287:6, 5289:15, 5291:6, 5296:3, 5296:25, 5306:6, 5306:7
**terminology** [1] - 5307:21
**terms** [7] - 5167:15, 5167:25, 5170:2, 5172:3, 5207:16, 5306:23, 5309:24
**test** [2] - 5352:19, 5352:22
**testified** [26] - 5164:12, 5183:24, 5187:13, 5201:20, 5204:24, 5205:2, 5207:2, 5224:19, 5234:12, 5253:16, 5266:14, 5266:20, 5268:3, 5269:21, 5298:24, 5299:2, 5305:16, 5313:20, 5314:6, 5315:4, 5315:5, 5317:25, 5323:2, 5332:14, 5334:6, 5348:25
**testify** [7] - 5166:25, 5167:18, 5178:18, 5202:16, 5251:19,

5309:15, 5309:22
**testifying** [1] - 5192:20
**testimony** [36] - 5167:5, 5167:14, 5180:8, 5193:4, 5193:6, 5193:8, 5193:25, 5194:1, 5194:14, 5195:8, 5202:23, 5203:7, 5203:9, 5203:13, 5204:8, 5204:12, 5204:22, 5204:24, 5207:25, 5209:18, 5248:6, 5249:17, 5250:24, 5251:14, 5261:10, 5269:22, 5273:4, 5306:1, 5306:2, 5315:24, 5321:8, 5321:14, 5324:3, 5325:15, 5325:20, 5344:17
**Texas** [2] - 5267:20, 5348:5
**text** [6] - 5222:3, 5222:6, 5222:13, 5356:21, 5383:24, 5384:1
**Thanksgiving** [7] - 5158:1, 5162:9, 5229:3, 5312:19, 5312:22, 5398:12, 5398:18
**THE** [294] - 5156:10, 5157:2, 5157:19, 5159:14, 5159:21, 5160:3, 5160:7, 5160:13, 5161:3, 5161:15, 5162:2, 5162:12, 5163:1, 5163:10, 5163:14, 5163:21, 5163:25, 5164:17, 5164:20, 5165:1, 5165:5, 5165:7, 5165:11, 5165:14, 5166:3, 5166:5, 5166:8, 5166:11, 5166:17, 5167:17, 5168:12, 5168:25, 5169:3, 5171:17, 5172:7, 5172:12, 5172:15, 5172:25, 5173:7, 5173:9, 5173:12, 5175:2, 5178:18, 5180:12, 5184:7, 5185:4, 5188:7, 5192:7, 5192:10, 5194:7, 5195:19, 5196:2, 5197:5,

5197:8, 5197:21, 5198:6, 5198:12, 5198:15, 5198:18, 5202:9, 5203:2, 5203:18, 5203:22, 5204:1, 5204:4, 5204:13, 5204:18, 5206:13, 5206:14, 5207:23, 5211:9, 5211:12, 5215:2, 5215:6, 5219:15, 5219:21, 5220:3, 5220:17, 5227:3, 5227:5, 5227:8, 5227:9, 5227:20, 5228:1, 5228:4, 5228:6, 5229:1, 5229:3, 5229:9, 5229:12, 5229:17, 5229:22, 5230:17, 5239:12, 5240:6, 5241:20, 5244:11, 5244:15, 5244:17, 5245:5, 5245:20, 5246:4, 5246:12, 5246:19, 5246:25, 5247:9, 5247:16, 5247:20, 5247:25, 5248:2, 5248:4, 5248:22, 5248:25, 5249:7, 5249:24, 5250:3, 5250:5, 5250:9, 5250:13, 5250:18, 5250:21, 5252:1, 5252:7, 5252:13, 5253:23, 5254:10, 5255:3, 5255:15, 5257:18, 5258:5, 5261:3, 5261:7, 5261:16, 5261:19, 5261:23, 5261:25, 5269:2, 5269:4, 5270:8, 5273:24, 5274:10, 5274:25, 5275:21, 5278:18, 5278:21, 5279:14, 5279:20, 5281:7, 5282:2, 5282:23, 5283:15, 5284:22, 5286:9, 5289:24, 5290:2, 5290:4, 5290:12, 5291:13, 5291:15, 5291:18, 5292:5, 5294:14, 5294:16, 5294:20, 5294:23, 5295:4, 5295:7, 5295:17, 5295:21, 5297:5, 5302:2, 5302:8, 5302:13, 5302:16, 5305:24,

5307:3, 5307:10, 5308:1, 5308:14, 5308:16, 5308:21, 5308:24, 5309:4, 5309:9, 5309:19, 5309:24, 5310:3, 5310:17, 5311:2, 5311:10, 5312:7, 5312:10, 5312:15, 5312:24, 5313:4, 5313:8, 5313:13, 5313:25, 5314:4, 5314:18, 5315:18, 5316:3, 5316:11, 5316:17, 5316:22, 5317:1, 5317:7, 5317:10, 5317:16, 5317:19, 5320:10, 5321:7, 5321:12, 5326:5, 5326:8, 5326:10, 5327:9, 5328:9, 5328:11, 5328:13, 5333:25, 5335:15, 5335:20, 5336:22, 5338:4, 5338:20, 5339:22, 5340:14, 5340:17, 5340:23, 5341:1, 5341:5, 5341:21, 5341:24, 5342:1, 5344:3, 5344:5, 5344:24, 5345:11, 5345:16, 5346:14, 5348:2, 5348:4, 5348:6, 5348:8, 5348:12, 5348:17, 5348:19, 5348:21, 5348:22, 5350:21, 5350:22, 5355:7, 5356:8, 5357:10, 5357:12, 5358:2, 5359:4, 5362:19, 5368:11, 5371:5, 5374:13, 5374:18, 5378:13, 5378:16, 5380:3, 5381:14, 5381:16, 5384:9, 5388:4, 5390:9, 5390:15, 5391:8, 5391:20, 5392:21, 5393:7, 5395:3, 5395:6, 5395:8, 5395:11, 5395:14, 5395:16, 5396:3, 5397:2, 5397:3, 5397:5, 5397:20, 5397:23, 5398:6, 5398:15, 5398:16, 5398:17, 5398:22, 5398:24
**themselves** [2] -

5165:20, 5344:22
**theoretically** [1] - 5341:15
**thereafter** [1] - 5180:23
**therefore** [1] - 5191:9
**they've** [1] - 5161:17
**thinking** [4] - 5160:1, 5272:1, 5361:15
**thinks** [1] - 5173:10
**third** [23] - 5206:18, 5216:2, 5231:18, 5231:19, 5258:23, 5260:8, 5275:10, 5285:16, 5299:10, 5305:8, 5305:13, 5314:19, 5314:24, 5320:7, 5324:12, 5333:2, 5342:17, 5359:9, 5363:14, 5366:2, 5376:11, 5378:20, 5379:14
**third-party** [6] - 5216:2, 5305:8, 5305:13, 5314:19, 5314:24, 5342:17
**thirteen** [2] - 5248:24, 5249:20
**thirty** [1] - 5198:20
**thousand** [24] - 5187:6, 5192:2, 5192:14, 5192:24, 5193:17, 5198:20, 5198:21, 5199:11, 5199:17, 5199:23, 5200:1, 5325:16, 5326:6, 5326:7, 5327:5, 5327:23, 5328:3, 5328:21, 5329:8, 5329:14, 5369:9, 5369:11, 5369:21, 5372:17
**thousands** [1] - 5205:5
**threat** [5] - 5288:12, 5288:16, 5291:7, 5294:12, 5295:1
**threatened** [10] - 5354:6, 5355:13, 5355:21, 5356:11, 5368:17, 5376:11, 5377:3, 5379:1, 5379:11, 5380:17
**threatening** [5] - 5294:12, 5354:1, 5376:18, 5376:20, 5376:24
**three** [20] - 5158:7, 5230:2, 5234:9,

5238:8, 5250:12, 5257:12, 5264:21, 5268:7, 5268:10, 5268:13, 5298:6, 5312:20, 5312:22, 5372:16, 5376:7, 5376:15, 5376:17, 5376:20, 5394:2, 5398:9
**threshold** [4] - 5369:17, 5369:22, 5387:15
**Thursday** [4] - 5158:2, 5163:4, 5396:15, 5396:17
**ticket** [6] - 5175:25, 5176:1, 5176:2, 5176:8, 5178:13, 5178:14
**ties** [1] - 5235:20
**tight** [1] - 5162:14
**Tilles** [1] - 5176:20
**Tim** [5] - 5176:24, 5233:15, 5336:14, 5336:16, 5347:1
**timeline** [6] - 5193:19, 5207:14, 5275:7, 5289:8, 5365:19
**timing** [9] - 5180:13, 5181:2, 5181:3, 5181:9, 5181:12, 5192:19, 5192:20, 5194:10, 5342:11
**Timothy** [1] - 5331:8
**title** [12] - 5195:11, 5225:17, 5225:20, 5231:2, 5231:13, 5232:7, 5232:11, 5232:13, 5232:14, 5234:4, 5234:6, 5349:11
**titles** [1] - 5233:2
**today** [21] - 5161:8, 5182:15, 5201:13, 5205:6, 5212:4, 5228:24, 5238:22, 5249:16, 5261:10, 5274:21, 5278:22, 5278:25, 5296:16, 5296:23, 5308:4, 5311:14, 5311:21, 5313:3, 5313:12, 5396:2
**together** [4] - 5166:15, 5250:16, 5253:21, 5365:5
**Tom** [3] - 5177:1, 5233:11
**tomorrow** [5] -

5211:21, 5211:24, 5213:1, 5221:19, 5396:23
**took** [7] - 5167:22, 5266:14, 5271:14, 5284:19, 5284:23, 5291:24, 5383:1
**top** [8] - 5197:24, 5215:5, 5291:2, 5328:14, 5330:17, 5368:23, 5379:14, 5384:12
**topic** [1] - 5319:23
**tortious** [3] - 5267:19, 5268:21, 5269:15
**total** [3] - 5328:21, 5385:13, 5385:17
**totally** [1] - 5168:21
**toward** [1] - 5355:24
**towards** [2] - 5160:16, 5309:17
**town** [1] - 5162:18
**track** [7] - 5166:15, 5189:8, 5205:7, 5205:11, 5246:20, 5327:25, 5398:4
**tradable** [3] - 5335:23, 5336:5, 5345:6
**trade** [3] - 5181:18, 5264:19, 5268:22
**Trade** [2] - 5267:21, 5269:16
**trader** [7] - 5263:20, 5265:4, 5265:12, 5265:15, 5265:16, 5265:18
**trading** [2] - 5266:9, 5298:13
**tradition** [1] - 5343:2
**traditional** [1] - 5168:4
**traditionally** [1] - 5168:19
**transaction** [5] - 5199:23, 5217:2, 5217:3, 5245:11, 5387:20
**transactions** [16] - 5205:11, 5219:9, 5219:13, 5219:16, 5219:18, 5219:23, 5220:6, 5220:14, 5364:5, 5387:1, 5387:3, 5387:13, 5387:15, 5387:16, 5387:18, 5387:19
**TRANSCRIPT** [1] - 5156:9

**Transcript** [1] - 5203:14
**transcript** [12] - 5156:25, 5166:21, 5202:5, 5205:3, 5205:9, 5247:6, 5249:20, 5249:24, 5250:22, 5313:17, 5323:9, 5339:3
**transcription** [1] - 5156:25
**transfer** [13] - 5218:19, 5242:16, 5260:12, 5260:21, 5276:11, 5316:7, 5330:4, 5330:10, 5330:22, 5342:4, 5342:8, 5342:11, 5343:21
**Transfer** [1] - 5319:3
**transferred** [3] - 5218:17, 5272:25, 5342:6
**transferring** [1] - 5284:9
**transfers** [6] - 5218:20, 5220:14, 5241:23, 5242:3, 5245:6, 5338:18
**travel** [3] - 5257:5, 5308:12, 5308:19
**traveled** [1] - 5257:4
**traveling** [1] - 5308:21
**tread** [1] - 5307:11
**treat** [1] - 5224:13
**treated** [1] - 5231:15
**treatment** [3] - 5223:6, 5223:11, 5223:16
**trial** [19] - 5157:3, 5157:5, 5157:6, 5157:23, 5158:8, 5158:9, 5159:7, 5159:8, 5169:4, 5169:11, 5171:23, 5228:24, 5309:10, 5309:14, 5310:3, 5310:6, 5310:20, 5311:17, 5339:3
**TRIAL** [1] - 5156:9
**trials** [2] - 5170:4, 5310:23
**tried** [3] - 5167:15, 5341:18, 5346:6
**trip** [7] - 5162:17, 5162:25, 5348:5, 5397:6, 5397:9, 5398:13, 5398:17
**trouble** [1] - 5211:12

**Troy** [4] - 5177:16, 5177:23, 5331:8, 5335:24
**true** [19] - 5169:13, 5196:14, 5196:15, 5201:17, 5203:12, 5208:21, 5214:4, 5248:15, 5270:10, 5270:22, 5273:8, 5273:13, 5279:2, 5279:7, 5283:18, 5288:14, 5293:4, 5293:7, 5328:4
**truly** [1] - 5168:9
**trust** [1] - 5203:22
**trusting** [1] - 5347:1
**truth** [4] - 5158:20, 5169:13, 5210:11, 5390:13
**truthfully** [1] - 5263:1
**Try** [3] - 5220:3, 5220:17, 5390:9
**try** [20] - 5158:12, 5161:7, 5161:12, 5164:1, 5188:7, 5189:9, 5203:20, 5207:23, 5215:13, 5216:15, 5228:4, 5245:5, 5245:20, 5246:12, 5249:7, 5273:22, 5320:10, 5333:25, 5374:16
**trying** [11] - 5157:22, 5160:9, 5166:20, 5167:10, 5216:11, 5242:6, 5249:3, 5321:5, 5338:21, 5346:3, 5396:5
**TSOU** [1] - 5156:21
**Tuesday** [11] - 5158:1, 5158:4, 5159:2, 5162:6, 5162:8, 5162:19, 5162:24, 5229:3, 5324:8, 5396:16, 5398:21
**turn** [15] - 5190:23, 5235:15, 5236:8, 5247:10, 5276:19, 5276:20, 5318:18, 5319:5, 5323:11, 5354:12, 5356:19, 5359:23, 5363:14, 5376:6, 5377:15
**turned** [1] - 5158:13
**twelve** [4] - 5246:16, 5246:21, 5247:7, 5359:24
**Twenty** [1] - 5302:12

**twenty** [1] - 5302:14
**twice** [2] - 5301:23, 5310:21
**two** [45] - 5162:5, 5163:3, 5179:3, 5189:24, 5198:5, 5201:25, 5202:15, 5204:25, 5207:10, 5208:1, 5214:14, 5230:14, 5233:1, 5234:13, 5239:10, 5246:6, 5254:20, 5262:11, 5262:14, 5264:21, 5265:1, 5267:5, 5268:3, 5271:11, 5283:21, 5289:14, 5298:3, 5298:4, 5310:20, 5312:6, 5319:8, 5325:15, 5327:12, 5332:7, 5332:10, 5332:12, 5332:13, 5336:13, 5348:11, 5358:21, 5365:4, 5369:8, 5394:4, 5398:8
**Two** [3] - 5393:16, 5398:2, 5398:11
**Two's** [1] - 5397:14
**type** [2] - 5183:2, 5217:1
**Typhoon** [3] - 5266:2, 5266:5, 5266:6
**typical** [3] - 5357:23, 5358:15, 5366:22

### U

**umbrella** [6] - 5247:2, 5247:3, 5248:10, 5248:12, 5323:6, 5323:17
**unable** [1] - 5198:20
**unanimous** [1] - 5232:12
**unauthorized** [1] - 5316:9
**unclear** [1] - 5313:6
**uncovering** [1] - 5169:13
**under** [30] - 5166:8, 5166:10, 5166:12, 5173:14, 5180:18, 5189:21, 5190:20, 5198:4, 5203:6, 5204:24, 5248:16, 5249:9, 5249:10, 5249:14, 5251:5, 5271:23, 5272:7,

5272:13, 5277:24, 5278:4, 5283:14, 5285:24, 5285:25, 5288:3, 5317:20, 5329:12, 5340:5, 5372:21, 5372:25, 5384:14
**underlined** [1] - 5216:8
**underlining** [1] - 5356:21
**underneath** [4] - 5231:7, 5248:13, 5323:18, 5353:11
**Understood** [3] - 5192:12, 5204:17, 5392:22
**understood** [29] - 5169:2, 5169:6, 5178:6, 5178:22, 5189:18, 5190:7, 5191:9, 5191:13, 5191:17, 5191:20, 5192:2, 5219:25, 5220:11, 5220:13, 5220:18, 5223:20, 5228:22, 5241:23, 5242:20, 5246:24, 5252:14, 5254:14, 5261:9, 5271:7, 5271:9, 5286:11, 5286:15, 5336:9
**unexcused** [2] - 5283:23, 5284:11
**unfair** [2] - 5334:24, 5336:6
**unfortunately** [3] - 5159:25, 5244:23, 5310:11
**UNITED** [3] - 5156:1, 5156:3, 5156:10
**United** [5] - 5156:5, 5156:13, 5156:15, 5349:21, 5350:12
**units** [3] - 5199:25, 5218:12, 5360:18
**universe** [2] - 5158:15, 5158:16
**University** [1] - 5262:7
**unless** [2] - 5339:17, 5344:10
**unlike** [1] - 5168:3
**unnecessarily** [1] - 5310:17
**unprecedented** [1] - 5170:2
**unrelated** [1] - 5339:9
**unrestricted** [1] -

5298:13
**unused** [1] - 5298:6
**up** [83] - 5159:7, 5161:6, 5165:8, 5168:21, 5169:4, 5170:8, 5171:5, 5173:4, 5179:20, 5186:1, 5187:4, 5191:2, 5192:8, 5193:1, 5194:21, 5199:8, 5199:13, 5199:22, 5203:1, 5203:23, 5206:6, 5206:7, 5206:15, 5207:3, 5210:15, 5210:22, 5211:23, 5212:22, 5215:5, 5216:21, 5216:22, 5224:16, 5225:24, 5234:18, 5240:10, 5243:7, 5252:18, 5260:10, 5260:11, 5260:19, 5261:4, 5265:17, 5270:1, 5270:5, 5282:9, 5287:13, 5287:14, 5287:16, 5289:17, 5291:16, 5291:17, 5291:19, 5292:5, 5297:18, 5304:13, 5306:10, 5311:18, 5314:4, 5317:11, 5318:15, 5319:25, 5320:14, 5324:5, 5328:4, 5328:14, 5329:17, 5332:19, 5333:8, 5333:13, 5333:21, 5334:4, 5346:9, 5346:19, 5346:22, 5348:16, 5369:16, 5374:22, 5375:2, 5380:13, 5380:19, 5384:11
**update** [6] - 5377:8, 5379:1, 5379:11, 5379:24, 5380:10, 5392:4
**updates** [1] - 5377:10
**updating** [1] - 5386:15
**upheld** [1] - 5304:2
**upload** [1] - 5221:19
**upper** [2] - 5331:19, 5354:22
**upset** [4] - 5280:21, 5280:22, 5283:9, 5283:10
**usual** [1] - 5396:19

### V

**vacation** [1] - 5298:7
**Vaino** [7] - 5176:18, 5177:17, 5233:17, 5335:11, 5336:14, 5336:15, 5336:17
**validity** [2] - 5338:17, 5343:22
**value** [2] - 5178:1, 5188:14
**valued** [2] - 5218:18, 5360:18
**variable** [1] - 5158:7
**Variance** [1] - 5381:15
**variance** [5] - 5381:8, 5381:12, 5381:16, 5381:19, 5382:2
**variances** [2] - 5381:24, 5382:16
**various** [2] - 5221:7, 5221:21, 5244:3, 5320:1, 5320:7, 5320:8, 5320:12, 5321:24, 5366:13, 5383:16, 5386:2, 5392:3
**vendors** [2] - 5216:2, 5216:21
**verify** [2] - 5361:2, 5377:3
**verifying** [1] - 5376:13
**versions** [1] - 5165:22
**versus** [3] - 5165:19, 5246:10, 5328:25
**vested** [1] - 5255:20
**via** [1] - 5283:25
**vice** [1] - 5231:2
**view** [18] - 5170:2, 5210:5, 5234:6, 5315:11, 5316:1, 5316:13, 5320:6, 5321:5, 5344:22, 5382:15, 5386:17, 5386:20, 5386:24, 5387:2, 5387:22, 5390:2, 5390:6, 5392:11
**views** [1] - 5392:7
**violations** [3] - 5267:20, 5269:15
**voluntary** [1] - 5302:4

### W

**W-2s** [1] - 5243:22
**wait** [2] - 5185:8, 5374:19
**waiting** [3] - 5163:17, 5163:24, 5163:25
**walk** [3] - 5172:17, 5172:19, 5328:1
**walked** [3] - 5272:20, 5273:19, 5276:19
**walking** [1] - 5173:7
**Wang** [6] - 5203:11, 5205:13, 5210:8, 5210:13, 5210:21, 5212:25
**Wang's** [2] - 5202:18, 5293:10
**wants** [5] - 5170:12, 5170:24, 5190:14, 5191:6, 5316:25
**ways** [2] - 5241:16, 5392:4
**website** [6] - 5188:19, 5188:22, 5189:4, 5189:7, 5270:17, 5272:2
**Wednesday** [5] - 5158:2, 5158:4, 5163:4, 5380:8, 5396:17
**week** [32] - 5158:4, 5161:20, 5162:1, 5162:2, 5162:4, 5163:21, 5167:18, 5167:20, 5211:16, 5233:4, 5233:5, 5310:6, 5311:12, 5312:19, 5377:15, 5388:21, 5390:11, 5396:14, 5396:15, 5396:17, 5397:25, 5398:5, 5398:6, 5398:8, 5398:9, 5398:10, 5398:13, 5398:18
**weekends** [1] - 5257:3
**weeks** [9] - 5161:7, 5264:21, 5268:7, 5273:8, 5311:13, 5312:6, 5396:8, 5397:24, 5398:3
**Weiss** [2] - 5263:14, 5265:17
**welcome** [2] - 5289:4, 5305:25
**West** [1] - 5308:22
**Whereas** [1] - 5387:8

**whereas** [3] - 5177:20, 5177:22, 5387:9

**whistleblower** [9] - 5187:23, 5187:25, 5188:12, 5188:17, 5188:18, 5188:20, 5189:5, 5189:19, 5272:17

**whole** [6] - 5167:4, 5266:23, 5297:2, 5329:1, 5363:18, 5392:11

**willing** [5] - 5159:12, 5159:14, 5171:3, 5171:13, 5171:18

**winding** [1] - 5270:23

**WINSTON** [1] - 5156:20

**Wire** [2] - 5279:4, 5279:16

**wire** [2] - 5199:14, 5275:11

**wired** [6] - 5199:3, 5199:5, 5199:7, 5199:17, 5275:23

**wise** [1] - 5165:3

**wish** [2] - 5159:3, 5310:23

**withdrawn** [4] - 5179:7, 5199:6, 5203:5, 5219:11

**withholding** [1] - 5218:22

**WITNESS** [9] - 5197:8, 5261:25, 5348:6, 5348:21, 5350:22, 5357:12, 5395:11, 5395:16, 5397:3

**witness** [28] - 5166:25, 5168:3, 5170:9, 5170:21, 5172:16, 5172:23, 5174:2, 5248:9, 5252:10, 5297:6, 5308:10, 5309:11, 5315:24, 5317:1, 5318:16, 5338:7, 5338:12, 5340:1, 5340:3, 5340:19, 5348:7, 5348:9, 5348:16, 5348:18, 5348:24, 5395:1, 5397:4, 5397:22

**witness'** [1] - 5391:7

**witness's** [1] - 5342:24

**WITNESSES** [1] -

5399:2

**witnesses** [3] - 5159:4, 5168:5, 5171:6

**women** [1] - 5161:6

**won** [3] - 5266:20, 5268:4, 5268:8

**wonderful** [1] - 5161:17

**word** [6] - 5162:17, 5185:5, 5224:21, 5245:23, 5248:25, 5387:14

**words** [7] - 5175:25, 5178:11, 5210:18, 5210:19, 5246:13, 5249:3, 5331:19

**Workers** [1] - 5243:1

**workers** [5] - 5243:2, 5243:9, 5243:16, 5252:23, 5253:6

**workplace** [1] - 5283:24

**works** [1] - 5161:23

**worried** [3] - 5189:21, 5271:23, 5276:17

**worry** [1] - 5234:4

**worth** [1] - 5176:9

**write** [7] - 5183:13, 5222:3, 5371:15, 5371:18, 5372:14, 5373:5, 5373:8

**writeoff** [1] - 5373:10

**writes** [3] - 5367:4, 5380:8, 5380:20

**writing** [7] - 5195:2, 5220:8, 5242:15, 5283:5, 5299:20, 5339:14, 5371:7

**written** [7] - 5216:14, 5258:20, 5259:3, 5276:23, 5325:24, 5373:16, 5373:20

**wrote** [14] - 5185:17, 5189:24, 5195:2, 5195:3, 5210:11, 5210:18, 5216:17, 5221:12, 5221:13, 5238:3, 5328:23, 5344:17, 5346:21, 5346:24

## Y

**year** [27] - 5160:21, 5203:5, 5232:7, 5233:2, 5277:8, 5277:16, 5277:20, 5352:15, 5353:1,

5354:20, 5358:19, 5361:7, 5361:18, 5361:19, 5362:1, 5362:25, 5368:4, 5370:3, 5371:1, 5372:14, 5373:21, 5374:2, 5375:7, 5381:9, 5381:11, 5382:6

**year-end** [2] - 5361:18, 5361:19

**year-to-date** [2] - 5381:11

**years** [15] - 5194:10, 5194:12, 5197:18, 5262:11, 5262:14, 5265:1, 5267:5, 5271:12, 5277:16, 5297:16, 5297:22, 5349:18, 5349:20, 5349:22, 5362:12

**yesterday** [19] - 5173:4, 5175:17, 5175:25, 5179:2, 5180:16, 5182:15, 5182:23, 5182:24, 5192:20, 5201:24, 5256:17, 5260:10, 5261:15, 5302:10, 5305:16, 5313:21, 5314:5, 5315:4, 5315:5

**Yi** [1] - 5319:2

**YORK** [1] - 5156:1

**York** [9] - 5156:5, 5156:16, 5156:18, 5156:23, 5271:2, 5271:14, 5275:12, 5306:16

**yourself** [10] - 5190:25, 5194:5, 5213:23, 5267:13, 5273:19, 5274:4, 5274:15, 5275:3, 5318:20, 5319:6

## Z

**zoom** [1] - 5368:23