5400

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
      - - - - - - - - - - - -    X
3
     UNITED STATES OF AMERICA,    :    15-CR-637(KAM)
4
              Plaintiff ,         :
5
                                 :    United States Courthouse
      -against-                   :    Brooklyn, New York
6
     EVAN GREEBEL,                :
7
                                 :    November 16, 2017
              Defendant.          :    9:00 o'clock a.m.
8
      - - - - - - - - - - - -    X
9
                        TRANSCRIPT OF TRIAL
10              BEFORE THE HONORABLE KIYO A. MATSUMOTO
               UNITED STATES DISTRICT JUDGE, and a jury.
11
     APPEARANCES:
12
     For the Government:          BRIDGET M. ROHDE
13                                Acting United States Attorney
                                  BY: ALIXANDRA E. SMITH
14                                    DAVID PITLUCK
                                      DAVID K. KESSLER
15                                Assistant United States Attorneys
                                  271 Cadman Plaza East
16                                Brooklyn, New York

17   For the Defendant:          GIBSON DUNN & CRUTCHER
                                  200 Park Avenue, 48th Floor
18                                New York, New York

19                                BY: REED M. BRODSKY, ESQ.
                                      RANDY MASTRO, ESQ.
20                                    WINSTON Y. CHAN, ESQ.
                                      MYLAN LEE DENERSTEIN, ESQ.
21                                    JOSHUA E. DUBIN, ESQ.
                                      GRACE TSOU, ESQ.
22
     Court Reporter:             Charleane M. Heading
23                                225 Cadman Plaza East
                                  Brooklyn, New York
24                                (718) 613-2643

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

                CMH       OCR       RMR       CRR       FCRR

5401

1                (In open court; outside the presence of the jury.)

2                THE COURT:  Is everything fine?  No issues?

3                MR. KESSLER:  Yes.

4                THE COURT:  We will check to see if all the jurors

5    are here.  I have not had a chance to talk to the Juror

6    Number Two's employer yet.  I guess I have to make an inquiry

7    of Juror Number One's employer.

8                MR. DUBIN:  That's what I was going to ask.  If she

9    says she wasn't getting paid beyond four weeks --

10               THE COURT:  Yes.

11               MR. DUBIN:  -- if you can give her the option

12   speaking with the employer, we're fine with that.

13               THE COURT:  Yes.  Some are fine with that and some

14   are not so we'll see.

15               MR. DUBIN:  Understood.

16               THE COURT:  All the jurors are here.

17               I will give you a brief update on Juror Number Two.

18   Her employer is a small business.  It's a dentist.  He said

19   his practice has not been busy, his rent has been raised, he

20   must find a new lease.  It is a terrible hardship on his

21   practice.  He cannot afford to keep paying her and if there's

22   a way to excuse her, he'd like that to happen.  That's from

23   her employer.

24               Now, he also needs to speak with Ms. Cruz because I

25   think he has been reaching out to her asking her how much

5402

1    longer and she has not been able to give him an answer.  So

2    now that we have been able to give our jurors an answer, I

3    think that, you know, they may or may not have conversations

4    with their employers, but this is his perspective from a small

5    dental practice, that it has been a tremendous burden on his

6    practice to have her out this far.  And when I said

7    December 15th, he was very concerned and said he really can't

8    afford to keep her on the payroll with no work.  I also

9    explained to him there are three days during the last week of

10   November where she could come in, but he said the overall

11   hardship thus far has been very significant.  I don't know

12   whether Juror Number One needs to call her employer, but she

13   has a similar issue, as you know.

14           So, that is a decision that we have to reach and I

15   think in fairness to the jurors who are not being paid, think

16   about hardships on them.  With that, I should say think about

17   it, confer, maybe during a break, the morning break or lunch

18   break, we can decide a way forward.

19           MR. DUBIN:  Okay.

20           THE COURT:  Thank you.

21           So, we will bring the jurors in at this time.

22           (Jury enters.)

23           THE COURT:  All our jurors are present.  Good

24   morning.  Please have a seat.

25           Mr.  Jain, you are still under oath.

Jain - direct - Kessler                    5403

1          Mr. Kessler, you may continue.

2          MS. SMITH:  Thank you, Your Honor.

3    SUNIL   JAIN     ,

4        the witness, having been previously duly sworn,

5        resumed as follows:

6    DIRECT EXAMINATION (Continued)

7    BY. MR. KESSLER:

8    Q    Mr. Jain, before we go back to where we are yesterday, I

9    had two brief areas I wanted to follow up on from earlier in

10   your testimony.

11         First, you recall we discussed the kind of

12   information that are in a Form 10-K?

13   A    Yes.

14   Q    Are you familiar with incentive compensation in the form

15   of stock?

16   A    Yes.

17   Q    So if a company arranges for stock to be given to someone

18   as incentive compensation, do you expect that to be in the

19   financial statements?

20   A    Yes.

21   Q    We also talked yesterday about a phone call that you

22   participated in in August about the restatement of the 2012

23   10-K.  Do you recall that?

24   A    Yes.

25   Q    And I believe yesterday you couldn't recall exactly when

Jain - direct - Kessler                    5404

1   that call had taken place?

2   A    Yesterday when you asked me the question that, do I know

3   what Mr. Evan Greebel said on the call --

4   Q    Let me just ask you, first of all, do you recall the

5   exact date of that call?

6   A    Exact date was sometime in August of 2013.

7   Q    Okay.  Let me just show you a document that's been marked

8   for identification as Government Exhibit 114-33.

9           Mr.  Jain, if you could just take a look at

10  Government Exhibit 114-33 and let me know if that refreshes

11  your recollection as to when the phone call that involved

12  Mr. Greebel took place?

13  A    August 8, 2013.

14  Q    Who participated in that call?

15  A    Greg Giugliano who is our quality control person, David

16  Buzkin who is the relationship partner on this engagement, Ed

17  Hackert, Evan Greebel, Marc Panoff and myself, and I did

18  recollect that Martin Shkreli was on the call there as well.

19  Q    Was the restatement of the 2012 financials discussed on

20  the call?

21  A    Yes.

22  Q    And what was the -- what did Mr. Greebel say about that

23  issue?

24  A    So the call was to discuss about restatement of the

25  financial statement for nondisclosure of settlement agreements

Jain - direct - Kessler                          5405

1   into the master 2013 quarterly statement as well as the

2   12/31/2012 annual financial statement and there was a pushback

3   on our recommendations of restatement of this financial

4   statement from Mr. Greebel.

5   Q    Pushback against restating?

6   A    Exactly.

7   Q    Meaning he did not want there to be --

8            MR. CHAN:  Objection.  Leading.

9            THE COURT:  Yes.  Sustained.

10  Q    Was Mr. Greebel in favor or opposed to restating?

11  A    He was opposed to restate.

12  Q    All right.  Now, if we can go back to the document we

13  were looking at yesterday, Government Exhibit 114-29-A in

14  evidence.  It's behind tab 11 in your binder.  If you can go

15  to the second page.

16  A    Yes.

17  Q    All right.  So, Mr. Jain, yesterday we talked about the

18  first paragraph.  Do you remember that?

19  A    Yes.

20  Q    The next two paragraphs discuss the various parties to

21  the settlement agreement.  Is that right?

22  A    Yes.

23  Q    All right.  Then I want to go to the fourth paragraph.

24  This is the paragraph that begins, "The company does not

25  have."  Do you see where I'm reading?

Jain - direct - Kessler                    5406

1   A     Yes.

2   Q     Look at the second sentence in that paragraph.  Does it

3   read:  Following the company's determination that the payments

4   and obligations should not have been assumed by the company,

5   the company determined that any future agreement that includes

6   the company and MSMB or one of its related funds will require

7   the signature of the chief financial officer of the company?

8   Do you see that?

9   A     Yes.

10  Q     And in that sentence, there's a reference to payments and

11  obligations.  Do you see that?

12  A     Yes.

13  Q     Is that a reference to the settlement payments?

14  A     Yes.

15  Q     Okay.  Then the next sentence reads:  In order to reflect

16  the repayment obligation, MSMB and its related funds delivered

17  promissory notes to the company and entered into

18  indemnification agreements with the company, pursuant to which

19  MSMB and its related funds have agreed to indemnify and hold

20  harmless the company for any costs, charges or damages

21  incurred by the company in connection with the settlement and

22  release agreements.

23          Do you see that?

24  A     Yes.

25  Q     Were you, in fact, provided with indemnification and

Jain - direct - Kessler                    5407

1   promissory notes related to these settlement payments?

2   A    We were being provided with this indemnification and the

3   promissory note, yes.

4   Q    What's the difference between a promissory note and an

5   indemnification agreement?

6   A    Promissory note is to promise to pay and I am not

7   100 percent sure on the indemnification that, what exactly

8   that indemnification means to me.

9   Q    All right.  If you turn to tab 13 in your binder, I'd

10  like you to look at what had been marked for identification as

11  the following, Government Exhibit 114-30-A.

12  A    Yes.

13  Q    114-30-B through 114-30-H.

14       Do you see that?

15  A    Yes.

16  Q    Are these the indemnification and promissory notes that

17  you were provided with in August 2013?

18  A    Indemnification and promissory notes were not provided to

19  Marcum in August 2013.

20  Q    When were they provided to Marcum?  I'm sorry.

21  A    My recollection is that they were provided at a much

22  later date than we were provided the settlement agreements.

23       MR. KESSLER:  All right.  I offer Government

24  Exhibits 114-30-A through H.

25       MR. CHAN:  No objection.

Jain - direct - Kessler                    5408

1          THE COURT:  We will receive Government's 114-30-A

2    through 114-30-H.

3          Were you offering the whole range?

4          MR. KESSLER:  Yes, A, B, C, D, E and so forth.

5          THE COURT:  All right.  (So marked).

6    Q    Just take a look at 114-30-A.  Mr. Jain, you see on your

7    screen, is this one of the indemnification agreements you

8    received?

9    A    Yes.

10   Q    Do you see the agreement is dated as of April 25, 2013?

11   A    Yes.

12   Q    You didn't receive it in April 2013?

13   A    No.

14   Q    The agreement is addressed to Retrophin, Inc.

15   A    Yes.

16   Q    And then in the first paragraph, you see that the

17   agreement says:  This letter shall serve as confirmation of

18   our mutual understanding that MSMB Capital Management LP, a

19   Delaware limited partnership, MSMB Capital Management LLC, and

20   then a series of other entities, shall jointly and severally

21   indemnify, defend and hold harmless Retrophin, and its

22   officer, directors, employees, from and against all direct

23   liabilities and so forth, suffered, sustained or incurred by

24   any indemnified party in connection with, arising from or

25   relating to the settlement and release agreement, dated as of

Jain - direct - Kessler                         5409

1    April 25, 2013, by and between Sarah Hassan, Martin Shkreli,

2    the MSMB entities and Retrophin due to the management of the

3    MSMB entities and its or their investments in record.

4               Do you see that?

5    A    Yes.

6    Q    And are the other agreements similarly formatted but with

7    different names?

8    A    Yes.

9    Q    And I'm just going to look at the signature page.  You

10   see there are 1, 2, 3, 4, 5 signatures?

11   A    Yes.

12   Q    Who is signing in each case?

13   A    Mr. Martin Shkreli.

14   Q    And is Martin Shkreli the individual who signed all these

15   signatures in all of these indemnification agreements?

16   A    I can see on this indemnification he signed it and I can

17   check again on who all signed it.

18   Q    Sure.  I won't ask you to do that.  They're in evidence.

19              All right.  Now, after Marcum received these

20   indemnification and promissory note agreements, did Marcum

21   determine whether or not the entities in the agreements were

22   likely to pay the agreements?

23   A    My understanding is that MSMB and those related entities

24   were in the process of dissolution or they were, like, not in

25   a capacity to pay back to Retrophin.  As such, these

Jain - direct - Kessler                     5410

1    promissory notes were, like, not recorded on to the Retrophin

2    books of accounts as receivable from MSMB and they were, you

3    know, they were written it off.

4    Q    We talked yesterday about a receivable.  A receivable is

5    when the company expects to receive money from the party?

6    A    That is correct.

7    Q    And so just to be clear, did Marcum have a view about

8    whether or not these agreements were receivables, should have

9    been listed as receivables?

10   A    Our view was that these receivables are not collectible.

11   Q    Okay.  So, after there was a discussion about restating

12   the financial statements, did Marcum prepare what's sometimes

13   known as an SAS 61 letter for the board of directors?

14   A    Yes, we did.

15   Q    And was that letter in connection with the restatement of

16   the 2012 10-K?

17   A    Yes.

18   Q    If you could look at tab 14 in your binder, we'll show

19   you what is already in evidence, I'm sorry, as Government

20   Exhibit 247.

21            And Mr. Jain, this is an e-mail you received.  Do

22   you see that under the cc field?

23   A    Yes.

24   Q    Okay.  I'd like you to turn to page 66 of the document.

25   For the record, it's Bates number ending 397.

1    A    Yes.

2    Q    Is this the SAS 61 letter we were just talking about?

3    A    That is correct.

4    Q    So what's the purpose of this letter?

5    A    Before we conclude our reviews or audits, we are required

6    to communicate with the company's audit committee on the

7    results and findings of any engagements we entered into and

8    the company was expecting to restate and file with SEC on or

9    about September 13th these restatements and about a couple of

10   days or maybe three four days before, we need to communicate

11   our findings.

12   Q    So this is a communication to the board of directors?

13   A    A committee which is formed by the board of directors

14   which is called audit committee.

15   Q    Some of the directors?

16   A    Yes.

17   Q    All right.  Now, in preparing this letter, is it typical

18   for Marcum to have had discussions with company management and

19   company counsel before presenting this letter to the board of

20   directors?

21   A    We are not required to present this to the management and

22   the attorney to review this letter before we present it to the

23   audit committee, but our policy was we were sending it to

24   management and the management was forwarding it to the audit

25   committee members.

Jain - direct - Kessler                    5412

1  Q    Is the purpose of this letter to provide business advice

2  to the directors?

3  A    This is not to provide business advice to the directors.

4  This is to provide them what we found in our engagements and

5  what exactly it the results of our findings.

6  Q    Is the purpose to provide legal advice to the directors?

7  A    No.

8  Q    If we turn to the next page, the third page of the

9  letter, the Bates number ending 399 --

10  A    Yes.

11  Q    -- there's a field for significant unusual transactions.

12  Do you see that?

13  A    Yes.

14  Q    And then there are several significant unusual

15  transactions listed?

16  A    Yes.

17  Q    If we look at item number two, there's a discussion of

18  settlement agreements for $2,286,511?

19  A    Yes.

20  Q    Does this discussion relate to the settlement agreements

21  that we talked about?

22  A    Yes.

23  Q    Okay.  Who drafted the text that's in this item number

24  two?

25  A    This particular text you're talking about?

Jain - direct - Kessler                          5413

1    Q    Yes.

2    A    I don't recollect that who drafted it.  Maybe my staff,

3    maybe myself, so someone between our engagement team has

4    drafted it.

5    Q    And then does it get reviewed by someone before

6    it's submitted?

7    A    So, anyone drafts it.  I review it and my engagement

8    partner reviews it.

9    Q    If we turn to the next page, you see the disclosure

10   continues.  If you look at the last paragraph of this

11   disclosure, it's a paragraph that begins, MSMB?

12   A    Yes.

13   Q    That first sentence says, MSMB is currently in the

14   process of dissolving its operations.  Do you see that?

15   A    Yes.

16   Q    Is that what you were referring to before when we were

17   talking about the indemnification promissory agreements?

18   A    Yes.

19   Q    And the next sentence says:  In accordance with the new

20   adopted accounting standard update 2013-04, the company has

21   recorded the full amount of the settlements as a charge to its

22   operations due to uncertainty as to whether the affiliate will

23   have sufficient liquidity to repay the company.

24        Do you see that?

25   A    Yes.

Jain - direct - Kessler                    5414

1   Q    What is that accounting standard that's being referenced?

2   A    This accounting standard refers to joint and several

3   liabilities when two or more entities entered into settle the

4   liabilities.

5   Q    Was there a change in the way that, those sorts of

6   agreements should be accounted?

7   A    Prior to this accounting standard update 2013-04, there

8   was no same guidance into the U.S. GAAP accounting that how

9   the joint and several liabilities are required to be recorded.

10  It seems this is a new accounting update came and the company

11  decided to adopt it.

12  Q    Did this accounting standard have to do with how to

13  determine whether or not the settlement payments were

14  related-party transactions?

15          MR. CHAN:  Objection.  Leading.

16          THE COURT:  Try to rephrase the question,

17  Mr. Kessler.

18  Q    Did this updated accounting standard address the concept

19  of related-party transactions?

20  A    No.

21  Q    If you move forward in the letter several pages to the

22  page ending Bates stamp 403, there's an item number 13.

23          Do you see that?

24  A    Yes.

25  Q    This, the section is called, Fraud and Illegal Acts?

1    A    Yes.

2    Q    And what's written is:  No fraud or illegal acts were

3    noted.

4    A    Yes.

5    Q    Was that a determination based on the information you had

6    available to you at the time?

7    A    We made inquiries with the management that are there any

8    fraud or illegal acts, whether they have identified or they

9    aware of it and if they said no, then we just document it.

10   Q    You're documenting the response you get from them?

11   A    Yes.

12   Q    Was this actually presented at a board meeting or an

13   audit committee meeting of the board of directors?

14   A    We provide a draft of this letter first to the audit

15   committee, to the management and then when the formal

16   telephone communication takes place, we go over this letter

17   with the audit committee.

18   Q    Now, do you recall whether you participated in that

19   telephone conversation about this audit letter?

20   A    As a manager on the engagement, I participated on to all

21   the calls, yes.

22   Q    Do you remember specifically what was discussed on this

23   September 2013 call?

24   A    Generally, what we communicate into the draft of the

25   letter, we discuss with the audit committee.  If there are

1    some other things which comes up on the call, you know, like

2    while we are discussing, we communicate that, but I don't

3    recall what exactly was discussed other than this letter.

4    Q    All right.  Now, did Retrophin issue an amended Form 10-K

5    for the 2012 financials?

6    A    Yes.

7    Q    If you look what's behind tab 15 in your binder, I'll

8    show you what's been marked for identification, I believe, as

9    Government Exhibit 968.

10          Is this the amended 10-K for Retrophin?

11   A    Yes.

12          MR. KESSLER:  I offer Government Exhibit 968.

13          MR. CHAN:  No objection.

14          THE COURT:  We receive Government Exhibit 968.

15          (So marked.)

16   Q    If we can first go to page 14 of the document.

17          Do you see this document was signed on September 13,

18   2013?

19   A    Yes.

20   Q    It's also dated September 13, 2013?

21   A    Yes.

22   Q    Okay.  If you look at page 38 of the document, there are

23   little page numbers on the bottom, right?

24   A    Yes.

25   Q    Do you see there's a heading for subsequent events?

1    A    Yes.

2    Q    And if we follow that to the next page where it

3    continues -- I'm sorry, to the -- yes, to the next page where

4    it continues, if you blow up those top three paragraphs?

5    A    Yes.

6    Q    Is this a discussion of the settlement agreements that

7    we've been talking about here?

8    A    Yes.

9    Q    And if we can go to -- that's it.  We can take that

10   document out.

11              (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jain - direct - Kessler                              5418

1   BY MR. KESSLER:

2   Q    Now, in September 2013 did Marcum also receive an

3   additional update about pending or threatened litigation?

4   A    Yes.

5   Q    Take a look at what's behind tab 16 in your binder.  It's

6   been marked for identification as Government's Exhibit

7   124-4-A.

8        Do you see that document?

9   A    Yes.

10  Q    Is this an e-mail chain from Marc Panoff to you on

11  September 13, 2013?

12  A    Yes.

13  Q    Does it contain information provided by Evan Greebel

14  about litigation updates?

15  A    Yes.

16       MR. KESSLER:  I offer Government's Exhibit 125-4-A.

17       MR. CHAN:  No objection.

18       THE COURT:  We receive Government's Exhibit 124-4-A.

19       (So marked.)

20  Q    Mr. Jain, if you can focus on e-mail near the bottom or

21  the e-mail from Evan Greebel to Marc Panoff, September 13,

22  2013 at 10:52.

23       Do you have that.

24  A    Yes.

25  Q    It's copied to Ed Hackert.  Do you see that also?

Jain - direct - Kessler                          5419

1    A    Yes.

2    Q    What did Mr. Greebel write to Mr. Panoff?

3    A    He's saying that there are no material updates on legal

4    matters or additional litigation services from what he has

5    provided this in the past to us.

6    Q    I think you said legal matters.  Does the e-mail say

7    litigation matters?

8    A    Yes.

9    Q    Mr. Panoff sent this to you?

10   A    Yes.

11   Q    Take that down?

12        You mentioned yesterday that Marcum was also

13   involved in auditing certain information related to

14   Retrophin's third father 10-Q.

15   A    Yes.  I just want to clarify.  Third quarter 2013?

16   Q    Yes.

17   A    Yes.

18   Q    Not an amended filing.  The third quarter 2013 10-Q?

19   A    Yes.

20   Q    And in connection with that audit did Marcum prepare

21   another SAS 61 letter?

22   A    Yes.

23   Q    I would like to show you what's in evidence as

24   Government's Exhibit's 251.  If we turn to page three of the

25   document.  Is this the draft SAS 61 letter that Marcum

1  prepared in connection with its review for the 2013 third

2  quarter?

3  A    Yes.

4  Q    Is this letter similarly formatted to the previous SAS 61

5  letter we looked at?

6  A    Yes.

7  Q    If you go to the third page of the letter ending in Bates

8  number 717?

9  A    Yes.

10 Q    About two-thirds down the page there's an entry for

11 accounting for full exposure of settlement agreement.  Do you

12 see that?

13 A    Yes.

14 Q    And then there's a large paragraph followed by a small

15 paragraph?

16 A    Yes.

17 Q    This paragraph discuss the 2.28 million dollars in

18 settlement we previously discussed?

19 A    Yes.

20 Q    Could you read the small paragraph?

21 A    In August 2013, the company entered an additional

22 settlement agreement for $300,000 and made payment on August

23 29, 2013 to settle such agreement.

24 Q    Were you provided with that settlement agreement by

25 management?

Jain - direct - Kessler                    5421

1   A    We were provided, yes.

2   Q    Now, the previous settlements were classified as related

3   party transactions between the company's chief executive

4   officer and MSMB Capital and Retrophin; do you remember that?

5   A    Yes.

6   Q    Was this settlement agreement classified as a related

7   party transaction?

8   A    Yes.

9   Q    Well, the disclosure says the company entered an

10  additional settlement agreement.  Do you see that?

11  A    Yes.

12  Q    Is that different than the company and its chief

13  executive and MSMB Capital entering?

14  A    My recollection is that this was not different, but I'm

15  not 100 percent sure.

16  Q    Do you recall the name of the individual who was a party

17  to this settlement agreement along with the company?

18  A    I don't recall at this moment.

19  Q    We can take that down?

20       Now, was a 10-Q for the third quarter of 2013 issued

21  by Retrophin.

22  A    Yes.

23  Q    If you could look at what's behind tab 18 in your binder.

24  There's what's been marked for identification as Government's

25  Exhibit 972.

Jain - direct - Kessler                          5422

1    A    Yes.

2    Q    Is that the 10-Q that was issued for the third quarter of

3    2013?

4    A    Yes.

5              MR. KESSLER:  I offer Government's Exhibit 972.

6              MR. CHAN:  No objection.

7              THE COURT:  We receive Government's Exhibit 972.

8              (So marked.)

9    Q    If we can go first to the very last page of the document,

10   page 49.  Mr. Jain, when was this document signed?

11   A    November 12, 2013.

12   Q    If we can turn next to page 38.

13   A    Page 38 of this Q?

14   Q    Yes, the bottom right page numbering.  There's some tiny

15   letters and tiny numbers.

16   A    Yes.

17   Q    Do you see there's a section called liquidity capital

18   resources?

19   A    Yes.

20   Q    And then the section continues to the next page and then

21   to the page after that.  Then, do you see in the middle of the

22   page still under the liquidity and capital resources

23   disclosures there are several paragraphs that begin in the

24   second quarter of 2013?

25   A    Yes.

Jain - direct - Kessler                    5423

1  Q     Is this another disclosure related to the settlement

2  payments similar to the ones we've seen before?

3  A     Yes.

4  Q     And does it also refer to that new payment of $300,000?

5  A     Yes.

6  Q     Finally, if we can go to page 46 of this document.

7  There's an item number one legal proceeding.  Do you see that?

8  A     Yes.

9  Q     Could you read what's written under item number one,

10 legal proceeding?

11 A     We have no material proceedings pending, nor are we aware

12 of any pending investigation or threatened litigation by any

13 third party.

14 Q     Is this a statement that Marcum audits?

15 A     This is not in the financial statement, so we don't audit

16 nonfinancial information included into the 10-Q.

17 Q     Typically who prepares this litigation proceedings

18 section?

19 A     10-Q is being provided to us by the management.  In

20 general practice management prepares  --

21        MR. CHAN:  Your Honor, I object to this testimony.

22 A     I'm not like sure who prepares the second part of the

23 10-Q, whether management or somebody else.

24 Q     But it's not the auditor?

25 A     No.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    Q    All right.  We can take that down?

2         So we've been talking about the 2012 finances and

3    the quarterly reports for 2013.  Was Marcum also engaged to

4    audit the company's financial statements in connection with

5    the 2013 form 10-k.

6    A    Yes.

7    Q    And did that auditing process -- strike that.

8         Was that auditing process similar to the process we

9    discussed for the 10-k which would be the 2012 10-k?

10   A    Yes.

11   Q    As part of that process did you receive another

12   litigation update from the Katten firm?

13   A    Yes.

14   Q    Turn to what's been mark as Government's Exhibit 124-5,

15   behind tab 19 in your binder.

16   A    Yes.

17   Q    Is this the litigation update you received from Katten?

18   A    Yes.  This litigation confirmations we received from

19   Katten Muchin.

20             MR. KESSLER:  I offer Government's Exhibit 124-5.

21             MR. CHAN:  No objection.

22             THE COURT:  We receive Government's Exhibit 124-5.

23             (So marked.)

24   Q    Mr. Jain, again, are there some red boxes with on this

25   letter?

                    Jain - direct - Kessler                    5425

1    A    Yes.

2    Q    Those are boxes Marcum created?

3    A    Yes.

4    Q    The letter is dated peculiar 12, 2014?

5    A    Yes.

6    Q    If we go down to the bottom several paragraphs of this

7    first page, there's that paragraph we've seen before that

8    discusses pending and threatened litigation?

9    A    Yes.

10   Q    Now, there are some indented paragraphs below that

11   paragraph.  Do you see that?

12   A    Yes.

13   Q    Can you read what's written in the first indented

14   paragraph?

15   A    We currently represent in three active litigations, two

16   in New York Supreme Court and the third in an arbitration

17   before the American Arbitration Association.  These actions

18   and relevant allegations are:

19   Q    And the first litigation listed is Retrophin v. Pierotti.

20   Do you see that?

21   A    Yes.

22   Q    And the description on this page is that the company is

23   suing a former employee in connection with the employee

24   agreeing to work for the company in exchange for acquiring 400

25   K shares of RPRX stock at a deeply discounted price.  Do you

1    see that?

2    A     Yes.

3    Q     Did you understand 400 K to be 400,000?

4    A     Yes.

5    Q     And the second litigation is Huang versus a number of

6    entities and Martin Shkreli and Marek Biestek?

7    A     Yes.

8    Q     And the third litigation is Su versus a large list of

9    entities and Marek Biestek and Martin Shkreli?

10   A     Yes.

11   Q     Is there any other pending or threatened litigations

12   listed here?

13   A     No.

14   Q     Go to the third page of the document and we'll look at

15   the paragraph about outstanding bills.  What was the amount of

16   the outstanding bills for services rendered as of the date of

17   this audit?

18   A     $843,334.02.

19   Q     Again, was this letter signed on behalf of the law firm?

20   A     Yes.

21   Q     Take that down?

22         Finally, Mr. Jain, in connection with the audit

23   related to the 2013 10-k did Marcum again prepare a SAS 61

24   letter for the Retrophin audit committee.

25   A     Yes.

Jain - direct - Kessler                    5427

1   Q    I would like to show you what's behind tab 21 in your

2   binder, what's been marked for identification as Government's

3   Exhibit 1114-31.

4   A    Yes.

5   Q    Do you see that?  Is that the SAS 61 letter?

6   A    Yes.

7           MR. KESSLER:  I offer Government's Exhibit 114-31.

8           MR. CHAN:  No objection.

9           THE COURT:  We receive Government's Exhibit 114-31

10  in evidence.

11          (So marked.)

12  Q    Mr. Jain, if we go to the fifth page of the document and

13  look at item number two.

14  A    Yes.

15  Q    Is this again a similar disclosure about the 2.28 million

16  dollars in settlement payments?

17  A    Yes.

18  Q    And if we go to page eleven of the document, do you see

19  there's item number 15, fraud and illegal acts?

20  A    Yes.

21  Q    This item states no fraud or illegal acts were noted?

22  A    Yes.

23  Q    And was that included in similarly  ---did you reach that

24  conclusion based on information provided to you by management?

25  A    Yes.

1          THE COURT:  I will I'm sorry.  Your voice dropped

2     off.

3     Q    Did you reach that conclusion based on information you

4     received from management?

5     A    Yes.

6     Q    One more question.

7          Was the 2013 10-Q approved by the board.

8     A    Yes.

9          MR. KESSLER:  I have no further questions, your

10    Honor.

11         THE COURT:  All right.  Thank you.

12         MR. CHAN:  Your Honor, may I proceed?

13         THE COURT:  Yes.

14    CROSS-EXAMINATION

15    BY MR. CHAN:

16    Q    Good morning, Mr. Jain.  Thank you for being here today.

17    A    Good morning.

18    Q    I want to start by going back to some testimony you gave

19    yesterday about your interactions with my client, Mr. Evan

20    Greebel.  You've never met him before, right?

21    A    No.

22    Q    You have no idea who he is sitting in this courtroom here

23    today?

24    A    Now, I know him.

25    Q    Well, as a result of this trial you know him.  But prior

1   to today, you never knew who he was?

2   A    No, I never met him before.

3   Q    And you testified I believe yesterday that you had all

4   but just a handful of interactions with him during your time

5   doing work for Retrophin, correct?

6   A    That's correct.

7   Q    And indeed sitting here now five years later you don't

8   remember the substance of those interactions with him, right?

9   A    I know the substance of one interactions which we had on

10  a conference call, but I don't know the word to word of

11  interactions I had with him or on the call.

12  Q    Other than that conversation call you testified to just

13  now, that's it, correct?

14  A    I used to have communications with Mr. Greebel on the

15  phone or on the e-mail and those were all relating to getting

16  the documents for the company from him.

17  Q    What I am saying is you don't remember the details of

18  those conversations today, correct?

19  A    No.

20  Q    As to the one call that you testified about, I'll get to

21  that a little bit later.  But yesterday do you remember

22  testifying when asked about that call that you didn't remember

23  what Mr. Greebel said?

24  A    Today Mr. David asked me the questions that do I remember

25  that what Mr. Greebel said over the phone and I meant that he

1    wants to know that word by word what Mr. Greebel said on the

2    phone and I said I don't recall what exactly he said on the

3    phone.

4    Q    Okay.  So even now today you can't say what he said word

5    for word in that call?

6    A    I cannot say word to word what he said on the call.

7    Q    I'll get to that in a little bit?

8              But Mr. Greebel wasn't your main point of the

9    contact with respect to Retrophin, correct.

10   A    Mr. Greebel was not my main person of the contact at

11   Retrophin.

12   Q    It was actually the finance people at the company, those

13   were your main points of contact?

14   A    That's right.

15   Q    Over the years there were different people in that

16   finance group, right?

17   A    Yes.

18   Q    Can you tell us who was your first finance point of

19   contact at Retrophin?

20   A    Before Mike Harrison there was an accountant called

21   Jackson Su.  If I recollect correctly his name was Jackson Su

22   and there was a third-party consultant also involved into that

23   first year audit.

24   Q    Do you remember the name of that third-party consultant?

25   A    I'm sorry.  I knew about the name but now I forgot at

1    this moment in time.

2    Q    Is that third-party consultant was somebody who was not a

3    direct employee of Retrophin but was an outside consultant on

4    financial matters?

5    A    Exactly.

6    Q    Which audit did that third-party consultant help with, as

7    far as you remember?

8    A    2011 year-end audit and I believe March  -- sorry,

9    September 30, 2012 quarterly review.

10   Q    And then following him who was the next person that was

11   your main point of contact?

12   A    Mike Harrison was a controller and later on Marc Panoff

13   joined the company and then he was my contact person.

14   Q    Do you remember someone by the name of Ron Tilles?

15   A    Ron.

16   Q    Ron Tilles, T I L L E S?

17   A    No, I don't remember that name.

18   Q    Do you remember the name Corey Massella?

19   A    Yes, he was third-party consultant.

20   Q    And Citrin Cooperman?

21   A    That was the firm he belongs to.

22   Q    Now, one of the other things that you said about

23   Mr. Greebel was that you said that you understood that he was

24   SEC company counsel for Retrophin.

25            Do you remember that.

1  A    My understanding is that Mr. Greebel was SEC counsel for

2  Retrophin.

3  Q    Okay.  What do you mean when you say SEC counsel?

4  A    The counsel who provides guidance to the company on SEC

5  matters, whether it is filing of the 10-Q, 10-k, additional

6  registration statements or any of the SEC requirements that

7  the SEC counsel provides guidance to the company.

8  Q    What is your understanding based on?  Did you ever

9  actually talk to Mr. Greebel about what his role was?

10 A    No, I never spoke to Mr. Greebel what his role is.

11 Q    No one ever told you and used the words Mr. Greebel was

12 the company's SEC company counsel, right?

13 A    I don't recollect whether anybody told me or not.  I'm

14 saying my understanding was this.

15 Q    That understanding could also be based on an assumption,

16 right?

17 A    Not necessary.  Maybe my engagement partner told me or

18 maybe the management of the company told me.

19 Q    Turning to the settlement agreements in this case, you

20 testified yesterday that the first time that you came to know

21 about these settlement agreements happened sometime after the

22 2012 year audit was filed, right?

23 A    Yes.

24 Q    And that audit was filed with the SEC on June 13, 2013,

25 correct?

1    A    Yes, sometime in June 2013.

2    Q    And the manner in which you came to learn about the

3    settlement agreements, the way you described it, was that Mike

4    Harrison told you about them, right?

5    A    No.  I said yesterday that when I was reviewing variance

6    analysis provided by Mike Harrison to my team member and they

7    brought to my attention that there's significant variances

8    there between one period to another period.  Then I made

9    inquiries with Mike Harrison.  He was not aware of the

10   variances there and he told me to discuss with Marc Panoff.

11   Q    The first step was that there was this financial analysis

12   that was done, right?

13   A    Yes.

14   Q    And that financial analysis is something that is routine

15   in audits, right?

16   A    That is a requirement for audits and reviews, yes.

17   Q    And in this case it was Marcum asking the company to do

18   that financial analysis, right?

19   A    The company does the analysis and they provide it to us.

20   Q    So the company is the one that goes out, gets the numbers

21   that you want and produces a report to you, the auditor,

22   right?

23   A    Yes.

24   Q    And but you give them the parameters of what it is that

25   you want to see, right?

Jain - cross - Chan                                    5434

1   A    Yes.

2   Q    What that is designed to do is to give you guys a sense

3   as the auditors of the fluctuations in spending, correct?

4   A    Not only in spending, but in any account balances.

5   Q    So Retrophin did this analysis gave it to you, right?

6   A    Yes.

7   Q    Do you remember who at Retrophin did the analysis?

8   A    I don't know.

9   Q    Do you remember who at Retrophin was asked to do the

10  analysis?

11  A    We sent our document request list to Marc Panoff and Mike

12  Harrison that we need these all informations to commence our

13  either audit or review procedures.

14  Q    You got that back from them?

15  A    Yes.

16  Q    And when you asked them to do it, did Mr. Panoff or

17  Mr. Harrison say, no, we don't want to do that?

18  A    No.

19  Q    They did it?

20  A    They did it.

21  Q    And they gave them to you?

22  A    Yes.

23  Q    When your team got it the amounts of money that you came

24  to later learn were settlement payments these were in the

25  financial analysis?

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

Jain - cross - Chan                                    5435

1    A    Yes.

2    Q    Right there for you guys to see?

3    A    Yes.

4    Q    Is that what causes you to ask the question, right?

5    A    Yes.

6    Q    And those numbers were large number, they were

7    significant enough that they were hard to miss?

8    A    Yes.

9    Q    In fact, you testified it showed a big swing between the

10   prior year and the current year that you were looking at,

11   right?

12   A    Yes.

13   Q    So you got the numbers and you followed up, right?

14   A    Yes.

15   Q    And is it fair to say in the work that you do as an

16   auditor you often get information that requires you to follow

17   up on?

18   A    That is one of the requirements to making inquiries.

19   Q    When you followed up I think you testified that the chain

20   was you first went to Mike Harrison, right?

21   A    Yes.

22   Q    He directed you to Mr. Panoff, right?

23   A    Yes.

24   Q    And Mr. Panoff told you that they were related to

25   settlement payments, right?

1   A    Mr. Panoff said that they are  -- this swing or this

2   change in the numbers is because of certain settlement

3   agreements and I asked him about the details of those

4   settlement agreements and he said that he's not fully aware of

5   it but then he can provide me the copy of those agreements and

6   that we requested that.

7   Q    Dn he did, right?

8   A    He arranged that, yes.

9   Q    He didn't say I'm not going tell you, right?

10  A    No, he didn't say that.

11  Q    He didn't say I can't tell you about those settlement

12  agreements because I don't want to?

13  A    My understanding was that like Mr. Panoff was not fully

14  aware of these settlement agreements.

15  Q    He may not have been fully aware.  He was not reluctant

16  to tell you as much as he could?

17  A    He told me everything he could.

18  Q    He was not reluctant to go find out more to tell you,

19  right?

20  A    Yes.

21  Q    And he was not reluctant to give you the actual

22  settlement agreements, correct?

23  A    Yes.

24  Q    He didn't ask you not to mention the settlement

25  agreements to anyone else, correct?

1   A    Yes.

2   Q    He didn't ask you to keep a secret, right?

3   A    Yes, he did not.

4   Q    He didn't say don't tell the board no matter what you do,

5   right?

6   A    No.

7   Q    He went and got them and gave them to you?

8   A    Yes.

9   Q    You looked at them?

10  A    Yes.

11  Q    You read them?

12  A    Yes.

13  Q    You shared them with your team?

14  A    I shared with my engagement partner.

15  Q    And he read them, as far as you know?

16  A    Yes.

17  Q    You didn't feel there was any reason for you not to talk

18  about the settlement agreements freely with whoever you felt

19  like you should talk about them with?

20  A    Since Retrophin was a public company I'm not supposed to

21  be discussing any documents of the public companies with

22  anyone.  So I'm supposed to be talking to my partner and the

23  team members who are part of the engagement team.

24  Q    You are supposed to be talking about it internally,

25  correct?

Jain - cross - Chan                      5438

1   A    Within my engagement team internally.

2   Q    Now you get them and you put them in your work papers,

3   right, the settlement agreements?

4   A    I don't recall that I put them into my work papers

5   immediately because we were in the process of reviewing it.

6   But, yes, at some point those agreements went into my work

7   papers.

8   Q    At this point you have not discussed the settlement

9   agreements with Mr. Greebel yet?

10  A    I never discussed with Mr. Greebel those settlement

11  agreements.

12  Q    Did you ever discuss the settlement agreements with

13  Mr. Shkreli?

14  A    Yes.  I discussed with Shkreli these settlement

15  agreements.

16  Q    Around this early time or later on?

17  A    When I received the settlement agreements.

18  Q    What did you discuss with Mr. Shkreli?

19  A    I mean what is the nature of the settlement agreements

20  and he was not one hundred percent sure of the settlement

21  agreements.  So that's all my conversation.  I don't know much

22  about it but I can get back to you on those.

23            THE COURT:  Who said that?

24            THE WITNESS:   CFO of the company, Marc Panoff.

25  Q    Panoff, Mr. Panoff?  I thought you were talking about

1    Mr. Shkreli?

2    A    No.  No.  No.  I never had my discussion with either

3    Mr. Shkreli or Mr. Greebel.

4    Q    Okay.  Now that you have the settlement agreements, it

5    sounds like one of the first people that you -- strike that.

6            Do you recall like when you discussed the settlement

7    agreements with Mr. Panoff he told you that he just missed the

8    issue?

9    A    Yes, he did.

10   Q    At that time, you understood by the way that Retrophin

11   was a brand new public company, right?

12   A    Yes.

13   Q    And, in fact, Mr. Panoff just started working as the CFO

14   for Retrophin just a few months before this, right?

15   A    Around that time.

16   Q    It was a start-up company, right?

17   A    Yes.

18   Q    Mr. Panoff was, in fact, the company's first CFO, right?

19   A    Yes.

20   Q    In your experience when Mr. Panoff told you that he just

21   missed the issue, you understood that maybe a mistake had

22   happened at most, correct?

23           MR. KESSLER:  Objection to the form, speculation

24   about Mr. Panoff.

25           THE COURT:  He's asking for his understanding, is he

Jain - cross - Chan                    5440

1    not?

2              MR. CHAN:  Yes, your Honor.

3              THE COURT:  You can answer the question.

4    A    Can you repeat the question, please?

5              MR. CHAN:  Can you read it back, please.

6              (Record read.)

7    A    My understanding not only these settlement agreements but

8    in general the company was like not giving us the documents on

9    a timely basis and they were missing many times.  It was not

10   the first time.

11   Q    But in your understanding it was a product of

12   inadvertence as opposed to a conscious effort to conceal

13   things from you, correct?

14   A    I don't think so that they were hiding anything from me.

15   Q    And, in fact, if you thought that they were hiding from

16   you actively, that would have been a flag for you?

17   A    Definitely.

18   Q    A flag that would have triggered certain obligations on

19   your part, correct?

20   A    Yes.

21   Q    You didn't report them from having concealed things from

22   you, correct?

23   A    I'm sorry.

24   Q    You didn't report to the board that you thought that the

25   company management was actively trying to conceal things from

Jain - cross - Chan                    5441

1    you, correct?

2    A     No.

3    Q     In your experience doing public accounting work for other

4    companies, sometimes companies forget to get you things,

5    right?

6    A     I mean, you know, yes and no.  Some companies are very

7    organized companies and some companies are, you know, not

8    organized and miss to provide the information.

9    Q     This was a disorganized company, right, Mr. Jain?

10   A     Yes.

11   Q     And, you know, people make mistakes, right?

12   A     Yes.

13   Q     And in your experience working with companies doing

14   accounting work for them those companies sometimes make

15   mistakes, right?

16   A     Yes.

17   Q     All right.  So as not to leave any kind of misconception

18   with this jury, sitting here now, you have no basis to testify

19   --

20           MR. KESSLER:  Objection to the initial part of that

21   question.

22           THE COURT:  Please don't.  Just ask your question,

23   please.

24           MR. CHAN:  Yes, your Honor.

25   Q     Sitting here now, Mr. Jain, you have no basis to testify

Jain - cross - Chan                    5442

1   that you believe anybody at the company sought to actively

2   conceal these settlement agreements from you, correct?

3   A    Yes.

4   Q    And you have no basis to testify here today that you

5   believed the settlements agreements were improper agreements

6   in and of themselves?

7   A    I don't believe so, that they were improper.

8   Q    All right.  When you did find out about these settlement

9   agreements?  It sounds like your purpose as the auditor was to

10  focus on how to characterize these settlement agreements on

11  the financial statements under the accounting rules, correct?

12  A    Yes.

13  Q    And to do that you had to gather information and one of

14  the things you testified about is you obtained the settlement

15  agreements themselves and you read them, right?

16  A    Yes.

17  Q    I want to put up, please, Government Exhibit 114-25 that

18  was admitted yesterday and that was presented to you,

19  Mr. Jain.

20  A    Can you guide me under what tab it is, so I can read it.

21  Q    It is also on the screen that you can refer.

22  A    It's very tiny for me to read this.

23  Q    I don't know the government's tab.  It was 114-25.

24          MR. KESSLER:  Nine.

25  Q    Tab nine, please, sir.

Jain - cross - Chan                                5443

1           MR. CHAN:  Thank you.

2  A    Yes.

3  Q    Do you recognize this document?

4  A    Yes.

5  Q    So after obtaining the settlement agreements this spread

6  sheet was created to sort of summarize the ones that you were

7  aware of, correct?

8  A    This was summarized by the management.

9  Q    This actual spreadsheet, was this created by Marcum or

10 was it created by Retrophin?

11 A    By Retrophin.

12 Q    I take it with the comments on it, Marcum took the

13 document and added Marcum's own comments on it and put this

14 record into its work papers?

15 A    Yes.

16 Q    Was this the only versions of the spreadsheet that Marcum

17 received?

18 A    I don't recollect that, but it was the only version of

19 the multiple versions.

20 Q    I'm showing you what's been marked for identification as

21 Defendant's Exhibit 118-46.  Do you recognize this document?

22 Do you recognize this document as an additional version of the

23 same spreadsheet that is contained in Marcum's work papers?

24 A    Yes.

25           MR. CHAN:  I offer DX 118-46.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Jain - cross - Chan                                      5444

1          MR. KESSLER:  No objection.

2          THE COURT:  We receive Defendant's Exhibit 118-46.

3     Q    Can you compare the two please, Mr. Carter.

4          (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS EXAMINATION

2    BY MR. CHAN:  (Continuing)

3    Q    Comparing the two, Mr. Jain, you agree with me that DX

4    118-46 has an additional settlement agreement listed on it;

5    correct?

6    A    Yes.

7    Q    That one is the one labeled Marshall Schuyler; correct?

8    A    Yes.

9    Q    And in addition, I want to -- now, going back to the

10   Government Exhibit, 114-25, do you recall that the Government

11   asked you if you were aware of a settlement agreement

12   involving someone by the name of Lindsay Rosenwald?

13   A    I don't recollect that settlement agreement.

14   Q    You don't know that name one way or the other?

15   A    No.

16   Q    But focusing on the language in red at the bottom, and of

17   the first paragraph --

18             THE COURT:  Can you identify the exhibit please?

19             MR. CHAN:  That is GX 114-25.

20   Q    In the first paragraph, focusing on the sentence at the

21   end starting "in addition," and it says, does it not:

22             "In addition, the chief executive officer also

23   agreed to provide one of the counter parties with 47,128

24   shares of his common stock in the company as a separate

25   component of one of the settlement agreements.  Accordingly,

1   the Company does not believe it is required to record a

2   liability for the share-based component of this specific

3   agreement during the second quarter ended June 30, 2013.

4   There is uncertainty as to whether the related party will have

5   sufficient liquidity to repay the Company or fund."

6           Do you remember this language?

7   A    Yes.

8   Q    Explain what this language meant to you.

9   A    So, one of the settlement agreements in which the CEO of

10  the company agreed to pay to the counter party from his own

11  holding shares about 47,000 shares to that counter party.  So

12  this was not the company's liability and the company was not

13  required to record that liability.

14  Q    And, so, in that case, if the Lindsay Rosenwald

15  settlement agreement was a settlement agreement that involved

16  Mr. Shkreli personally paying that settlement --

17  A    Yes.

18  Q    -- that wouldn't be like the other ones on this chart;

19  correct?

20          MR. KESSLER:  Just objection to the speculation.

21          THE COURT:  If there is a way to rephrase.

22          MR. CHAN:  Sure, I will rephrase.

23          THE COURT:  Okay.

24  Q    For purposes of what you were doing, because you agreed

25  with this language in red here, which said when the settlement

1    -- strike that.

2           You agree, as the auditor, that if a settlement

3    agreement had became an obligation that was the personal

4    payment obligation of Mr. Shkreli as opposed to the company,

5    that wasn't a settlement agreement whose obligation had to be

6    reported as an obligation of the company; correct?

7           MR. KESSLER:  Still object to the speculation.

8           THE COURT:  I am going to overrule that.

9           You can answer it if you can, sir.

10   A    It seems this 47,000 shares were in direct responsibility

11   of the company's CEO.  The company is not required to take the

12   liability onto their books, this was our understanding.

13   Q    I want to show you what has been admitted into evidence

14   already as Government Exhibit 51.  It is on the screen.

15          Do you see this is titled Settlement and Release

16   Agreement?

17   A    Yes.

18   Q    You see that involves somebody named Lindsay Rosenwald?

19   A    Yes.

20          MR. KESSLER:  Your Honor, before there are further

21   questions about this document, may I ask one voir dire

22   question?

23          MR. CHAN:  No, it's already in evidence.  How can

24   you voir dire something that's not being offered into

25   evidence?

1           MR. KESSLER:  Then I object to showing the witness

2    the document without establishing he has seen it.

3           THE COURT:  Why don't you just lay a foundation.

4    Q    Mr. Jain, didn't the Government ask you yesterday if you

5    were aware of a settlement involving Mr. Rosenwald?

6    A    I was not aware of this settlement agreement -- I mean, I

7    didn't know about the name of the Lindsay Rosenwald because it

8    was not sounding to me yesterday.

9           MR. CHAN:  So now I would like to ask him questions

10   about this agreement that the Government asked him about.

11          THE COURT:  All right.  You may do so, Mr. Chan.

12          MR. CHAN:  Thank you, Your Honor.

13   Q    But focusing on paragraph one of the agreement, where it

14   says settlement payment, Mr. Shkreli agrees to deliver or

15   cause to be delivered to Rosenwald the total amount of 80,000

16   shares of common stock of Retrophin.  Sir, doesn't this

17   agreement relate to a financial obligation of Mr. Shkreli as

18   opposed to the company?

19          MR. KESSLER:  Objection to the speculation about the

20   agreement.

21          THE COURT:  Well, are you asking him to interpret

22   the language in this agreement that he's not familiar with?

23          MR. CHAN:  I am asking to see if he understands what

24   this language says.

25   A    The language is saying --

Jain - cross - Chan                    5449

1           THE COURT:  Wait, wait, wait.

2           MR. KESSLER:  I object to asking the witness to

3   interpret a document he has never seen.

4           THE COURT:  Have you seen this document before, sir?

5           Can you show him the whole document?

6           THE WITNESS:  I don't recall, Your Honor.

7           THE COURT:  I think then it may not be appropriate.

8           MR. CHAN:  All right, Your Honor.  I will move on.

9   Q    Mr. Jain, you would agree that where there is a

10  settlement agreement where Retrophin has no obligation to pay

11  anything, as pursuant to that settlement agreement, that, in

12  your mind, was not the same kind of settlement agreement as

13  the ones on this chart that required disclosure in the

14  financial statements; correct?

15  A    If Retrophin is not the party to the settlement

16  agreements, we as an auditor has no obligation to record -- to

17  provide the guidance to the company to put that liability on

18  to their books.

19          THE COURT:  So when you said "this chart," just for

20  the record, was it DX-118-46 or Government Exhibit 114-25?

21          MR. CHAN:  Both, Your Honor.  They're the same

22  version of the same chart -- or different versions of the same

23  chart, I should say.

24  Q    Now, putting that chart back on the screen --

25          THE COURT:  Which one?

Jain - cross - Chan                                           5450

1          MR. CHAN:  Sorry, Your Honor.

2     Q    Putting DX-118-46 on the screen, do you recall, sir, that

3     the Marshall Schuyler settlement agreement was the settlement

4     agreement that you learned about sort of in the second wave of

5     settlement agreements?

6     A    Yes.

7     Q    And that's the one that gets disclosed in the third

8     quarter filings; correct?

9     A    Yes.

10    Q    And you would agree that you learned about that Schuyler

11    settlement agreement in a timely way; correct?

12    A    Yes.

13    Q    You learned about it in time to put it into the financial

14    statement; right?

15    A    In the subsequent events, yes.

16    Q    And, again, that additional settlement agreement wasn't

17    hidden from you; correct?

18    A    No.

19    Q    It was given to you when it happened; right?

20    A    Yes.

21    Q    You got the actual hard copy of it; right?

22    A    Yes.

23    Q    And you reviewed it; right?

24    A    Yes.

25    Q    When you got it, nobody said don't tell anybody about

1   these; right?

2   A     Yes.

3   Q     Nobody said don't tell the board about these; right?

4   A     Yes.

5   Q     So in terms of the additional information that you got

6   from Retrophin, you also got a pretty detailed memorandum that

7   the Government showed you, both yesterday and today, setting

8   forth some of the facts in relation to the settlement

9   agreements; right?

10  A     Yes.

11          MR. CHAN:  Let's put up Government Exhibit 114-29-A.

12  And then go to the memorandum itself, please.  And let's blow

13  up the second paragraph, please.

14  Q     So this memorandum, which is being provided to you by the

15  company; right?

16  A     Yes.

17  Q     The company is telling you that, with respect to the

18  settlement agreements in April and May of 2013, certain

19  investors in funds affiliated with MSMB advised MSMB that they

20  objected to the number and/or value of the shares of common

21  stock in the company that they received as a distribution from

22  such funds, it says that; right?

23  A     Yes.

24  Q     So it's telling you that the people involved in the

25  settlement agreements were investors in certain MSMB funds;

Jain - cross - Chan                                         5452

1  right?

2  A     Yes.

3  Q     And it's telling you that they had objections with

4  respect to a distribution that they got from those funds;

5  right?

6  A     That's what the memorandum says, yes.

7  Q     And going on to the next sentence, that sentence said

8  that the company was advised of such investors' objections and

9  the company, MSMB and its related funds, and such investors

10 entered into settlement and release agreements, right?  These

11 are the agreements that you now have; correct?

12 A     Yes.

13 Q     And in the settlement agreements, it says, the memo says:

14 "The Company and MSMB and it's related funds agree to make

15 certain payments to such investors in consideration for a full

16 release from such investors to MSMB, its related funds and the

17 Company, any claims that such investor has had or may have

18 against the company MSMB or its related funds."

19         It says that; right?

20 A     Yes.

21 Q     It says that the settlement agreements contain releases

22 that when -- that released the company, MSMB, and the related

23 funds; right?

24 A     Yes.

25 Q     For claims that those investors might have against,

MDL   RPR

Jain - cross - Chan                              5453

1    including the company; right?

2    A    Yes.

3              MR. CHAN:  Let's highlight the next paragraph,

4    please.

5    Q    The first sentence says:  "The objections raised by the

6    investors related solely to actions undertaken by MSMB and its

7    related funds."

8              That says that; right?

9    A    Yes.

10   Q    What was your understanding, based on this memo, as to

11   the -- strike that.

12             What is your understanding of this sentence?

13   A    This memo was provided to us by management and, my focus,

14   when I was understanding this memo, was that these settlement

15   agreements were properly accounted for or not in accordance

16   with the GAAP.  My focus was not that that's what exactly the

17   reason behind all those settlement agreements, so my focus was

18   more on the accounting of this, the proper accounting and

19   disclosure into the financial statements.

20   Q    Right.  So, in other words, your concern as an auditor

21   was not whether or not the investor actually had some kind of

22   claim against the company; correct?

23   A    Yes.

24   Q    And you also weren't concerned as to whether or not the

25   company should or should not have settled that claim; correct?

Jain - cross - Chan                                        5454

1    A     Yes.

2    Q     Those are legal decisions that aren't in your purview;

3    correct?

4    A     Yes.

5    Q     Those are business judgment decisions of the company, not

6    you; correct?

7    A     Yes.

8    Q     Your focus, as the auditor, was simply on these things

9    happened, how do I categorize them; correct?

10   A     Yeah, these settlement agreements were entered into,

11   whether they were properly accounted into the financial

12   statement or not and whether they're in accordance with the

13   GAAP or not.

14             MR. CHAN:  You can take out the highlight, please.

15   Q     Can you flip to the next page?

16   A     Nothing on the next page.

17   Q     Then we are done with that one.

18             So you had the settlement agreements themselves, you

19   had this memorandum laying out some of the facts, and it

20   sounds like what you're saying is at that point you went about

21   trying to analyze how to characterize these; right?

22   A     How to characterize the settlement agreements and whether

23   the company is required to have a restatement of previously

24   filed 10-K and 10-Qs, or not, because they were not disclosed

25   into the SEC filings.

1  Q    And one of the issues that you've talked about having to

2  deal with was whether or not the transaction should be -- the

3  settlement agreements should be characterized as related party

4  transactions; right?

5  A    Yes.

6  Q    Who was it, in this instance, in which you believe

7  constituted the related party?

8  A    The entities which are under common control and, in this

9  case, Martin Shkreli was controlling Retrophin, as well as he

10 was the controlling member of MSMB.  This is what is my

11 understanding.

12 Q    So because Martin Shkreli was one of the parties to the

13 settlement agreement, you considered these to be related party

14 transactions?

15 A    Yes.

16 Q    What that meant was they had to go in the financial

17 statements under the category of related party transactions;

18 right?

19 A    Yes.

20 Q    You weren't making a judgment call as to sort of the

21 merits of the settlement agreements; correct?

22 A    I'm sorry.

23 Q    You weren't making a judgment call as to the merits of

24 the settlement agreements; right?

25 A    I don't understand your question.

1  Q    Well, in other words, there is no -- there is no problem

2  inherently with the company entering into a related party

3  transaction; correct?

4  A    No, there's no problem.

5  Q    It's just a matter that, if you do it, you have to put it

6  in one bucket; right?

7  A    Yes.

8          THE COURT:  Mr. Chan, is now a good time to give the

9  jurors a midmorning break?

10         MR. CHAN:  Certainly.

11         THE COURT:  Ladies and gentleman, I will give you a

12  midmorning break.  Please don't talk about the case, have some

13  coffee, and we will come get you in about ten minutes.  Thank

14  you.

15         You can step down too.

16         (Jury exits the courtroom.)

17         THE COURT:  Let's take ten minutes and would the

18  parties mind conferring about Juror No. 2?

19         MR. BRODSKY:  We will do that now.

20         MR. PITLUCK:  Depending how much Mr. Chan has left,

21  there is one small issue to raise before our next witness, Amy

22  Merrill.  There's documents and we can do that in ten minutes,

23  if you would like, or five minutes.

24         THE COURT:  Right now?

25         MR. PITLUCK:  If we are going to go seamlessly into

1    this --

2              THE COURT:  Yes, I'd like to.  Seamless is good.

3              MR. PITLUCK:  So, Your Honor, we conferred over Ms.

4    Merrill, who you will recall is the Standard Registrar

5    witness, and as you probably remember from the previous trial,

6    she introduces a lot of exhibits that Standard Registrar had

7    as business records.  In an attempt to streamline this, we

8    conferred, I gave Mr. Chan a list of documents that we intend

9    to introduce through Ms. Merrill's business records.  We

10   reached agreement on most.  There are two documents we haven't

11   agreed on, which are payments made by Standard Registrar -- or

12   shares issues by Standard Registrar in response to receiving

13   settlement paperwork for Spencer Spielberg and Michael

14   Lavelle, both of whom have been discussed at this trial, and

15   we intend to introduce them to show that, in fact, Retrophin

16   issued shares based on them.  That's all Ms. Merrill will be

17   presenting is the document showing the shares that were issued

18   and that she was provided with the agreements.

19              We understand, as the Court is aware, this issue

20   came up in the last trial and what happened was they were

21   admitted subject to connection, and then, at the end of trial,

22   they were ultimately admitted without the testimony of Mr.

23   Spielberg or Mr. Lavelle.  We think the same treatment here is

24   appropriate, that they should be admitted directly, not

25   subject to connection because, one, they're relevant, they are

1    settlement agreements, they don't require the witness to

2    testify.  Separating a little bit from the consulting

3    agreements.  But, most importantly, there has been evidence

4    placed in front of the jury already, as recently as this

5    morning, about those agreements and we think that it is

6    appropriate to put in the fact that those were paid.

7            And it's not a dispute, but the only other thing we

8    intend to do, with the defense's agreement, is documents

9    related to shares issued to Allan Geller, who received a

10   consulting agreement from the company, we will admit subject

11   to connection to Mr. Geller's testimony looking like next

12   week.

13           THE COURT:  All right, Mr. Chan.

14           MR. CHAN:  Sure, Judge, with respect to Mr. Geller,

15   we agree.  To the extent that there are trading -- or transfer

16   records that are going to come in through Ms. Merrill that

17   reference Mr. Geller's consulting agreement, because that is

18   attached to some of the records, we consent to it being

19   admitted subject to connection to Mr. Geller actually

20   testifying, which, as I understand from the Government, is

21   inevitable.  But just in case it doesn't happen for whatever

22   reason, we will consent to it coming it in subject to

23   connection to that.  For the reason that we agree to that, is

24   the same reason we want to seek a similar arrangement with

25   respect to settlement documents of Ms. Merrill that contain

1   copies of the settlement agreements for Mr. Spielberg and Mr.

2   Lavelle, since, in our view, there has not been any connection

3   made in this case of those people to settlement agreements

4   that were part of a fraud.  True, the evidence in this case

5   has shown that settlement payments were made, but until there

6   is a showing that those settlement agreements have some

7   connection to the broad, we would say that those agreements,

8   if admitted at all -- I don't think they should be, but if

9   admitted at all, should be admitted subject to connection of

10  the Government's development of that connection.  I mean, then

11  we can argue at the end of the case whether or not we think

12  the connection has been made and, if not, the Court can make

13  its ruling.  If so, the Court can make its ruling.

14          THE COURT:  All right.  Well, you are not disputing

15  that those agreements would be admissible under the rules of

16  evidence?  Because they are records that were kept by the --

17          MR. CHAN:  I agree, Your Honor.

18          THE COURT:  What about they are admissible through

19  this witness?

20          MR. CHAN:  My objection is not to the hearsay

21  nature, it is really just the relevance at this point in time,

22  because if they are not going to be able to show that those

23  settlements are part of this case, they shouldn't come in.

24          MR. PITLUCK:  Your Honor, the agreements are clearly

25  relevant to this case.  There has been testimony related to

1    those agreements and the fact that they were paid by

2    Retrophin.  If there's -- so they are relevant and admissible.

3    If they come in and there is no other evidence related to

4    fraud, then obviously the Government can't argue that they

5    were fraudulent transactions, but we need to have the records

6    come in to show that the records were paid.  If we can and if

7    we do chose to advance evidence or testimony that those were

8    fraudulent, then we can argue that.  If not, there is no

9    prejudice, the agreements have been shown to be here.  What I

10   just heard was they're relevant, they are admissible, they are

11   business records, or we'll lay the foundation for business

12   records, therefore, they should be admitted.

13              MR. CHAN:  Well, I never said that they were

14   relevant because I think the Government hasn't said that they

15   were actually -- they've put in, at most, evidence that these

16   were settlement agreements that were paid.  The company had

17   settlements with, for example, Paul Weiss in this case, it

18   doesn't mean just because there was a settlement, it's

19   relevant.

20              And second of all, there is prejudice and the

21   prejudice is as follows:  As the Court knows from our case,

22   our defense is that these were actual litigation threats and

23   the people who got the settlement agreements made actual

24   litigation threats.  The Government cannot just argue to the

25   jury these are improper settlement agreements without calling

Jain - cross - Chan                    5461

1   the underlying investors because we have no opportunity to

2   cross-examine them and say you made these litigation threats.

3   It's the same principle with the consultants, Your Honor,

4   where the principle is this:  The Government can't just argue

5   a consulting agreement is a sham without having to call the

6   consultant to say I did no work.  We think, A, it's not

7   relevant, which I think, frankly, Your Honor, is the easier

8   issue at this point to deal with.  But secondly, apart from

9   that, there is a confrontation issue for them to be able to

10  just argue to the jury a settlement agreement is a fraud

11  without having the underlying person come in and answer the

12  question as to whether or not, in fact, they made a litigation

13  threat or not.

14          MR. PITLUCK:  Judge.

15          THE COURT:  I don't know, how do you prove or what

16  is your proof that the Spielberg and Lavelle settlement

17  agreements are fraudulent?

18          MR. PITLUCK:  Well, Judge, we may seek to introduce

19  documentary evidence that shows that.  This is the exact issue

20  that came up in the prior trial and the Court admitted them.

21  There was testimony from Jackson Su that the -- or through a

22  document that the Spielberg settlement agreement was part of

23  the fraud, the document that Jackson Su sent to Evan Greebel.

24  So, Judge, whether or not --

25          THE COURT:  What did Jackson Su say specifically

Jain - cross - Chan                                    5462

1    about the Spielberg and Lavelle agreements being fraudulent?

2              MR. PITLUCK:  It was listed in his e-mail.

3              THE COURT:  Are you talking about the Su -- but

4    that's your proof, Mr. Su's opinion these were fraudulent?

5              MR. PITLUCK:  Judge, there may be more.  The point

6    is, if they're admitted and -- they are relevant, they are

7    admissible.

8              THE COURT:  They are admissible.

9              MR. PITLUCK:  Yes, and they are relevant.  They are

10   settlement agreements that were paid by Retrophin to these

11   investors.  Now, if we can't or don't advance evidence that

12   says these are fraudulent, then we can't argue that they are

13   fraudulent, but that doesn't mean they can't be admitted

14   through Ms. Merrill as business records.

15             THE COURT:  They can be admitted in terms of the

16   business records exception.  They are taking issue with the

17   relevance of these documents without -- I guess you are

18   arguing insufficient proof of their fraudulent nature.

19             MR. CHAN:  Yes, as of this moment in time, there is

20   not sufficient proof.  There is no proof.  Just because Mr. Su

21   said they were fraudulent that's not enough.

22             MR. PITLUCK:  That's not true.

23             MR. CHAN:  I will also add that the -- Mr. Pitluck

24   made me lose my train of thought.

25             MR. PITLUCK:  I am sorry.

1           MR. CHAN:  Okay, I will think of it.

2           MR. PITLUCK:  I was just going to say Ms. Merrill is

3    not going to testify these agreements are fraudulent.  She is

4    going to testify that she had received the agreements and, in

5    her role at Standard Registrar, advanced payments to --

6           THE COURT:  She issued Retrophin shares?

7           MR. PITLUCK:  Yes, that's it.

8           THE COURT:  So are you going to introduce the

9    documents that I think we saw before regarding litigation

10   threats?

11          MR. PITLUCK:  We are going -- if we introduce

12   documents, it will be documentary evidence, much of which was

13   admitted at the last trial, to show the e-mail correspondence

14   between relevant parties related to those transactions.  It is

15   admissible -- it is relevant.  We don't believe, as the Court

16   held last time, that we have to call the investors.

17          THE COURT:  No, not necessarily.  If you can admit

18   the litigation threats, and I do remember Mr. Lavelle's quite

19   clearly, I am not able to recollect with any specificity Mr.

20   Spielberg's threats, but there were e-mails threatening

21   litigation.  So Spielberg -- I think Lavelle, his settlement

22   agreement is certainly admissible.  I'll go back to try to

23   recollect Spielberg.  Maybe, Ms. Smith, you can remind me what

24   it was.

25          MS. SMITH:  Your Honor, first of all, obviously

1   there is a wealth of evidence that is already in about the

2   Spielberg and Lavelle settlements.  And again, as Mr. Brodsky

3   has said, the bar for 401 is incredibly low.  There is no

4   question they're relevant.

5           The question of whether or not we can show fraud is,

6   of course, the ultimate question for the jury.

7           THE COURT:  Right.

8           MS. SMITH:  As you remember last time, the

9   settlement agreements are relevant and admissible for a number

10  of evidentiary bases, and we can go over again.  Already in

11  evidence as evidence are bank records of the investments that

12  were made into the funds and then the payments out from

13  Retrophin.

14          There have been e-mail communications, some of which

15  have been put in by the defense, particularly about the

16  Spencer Spielberg settlement.  There's a whole document that

17  was put in with Mr. Massella that had an entry from QuickBooks

18  related to Spencer Spielberg's payment, and there was argument

19  that that settlement was disclosed, so clearly the defense has

20  been inserting Mr. Spielberg's settlement agreement already

21  into the case.

22          I have a list of additional documents that either

23  the defense or the Government has put in, including the Marcum

24  documents, that lists -- that that is the basis for the $2.294

25  million number that is part of this document disclosure.

1          And the question of whether or not the investors

2   sought to threaten litigation against Retrophin is obviously a

3   defense argument.  The real question is whether there was a

4   fraud on Retrophin and they claim that because there was

5   threatened litigation there wasn't in part.  We say that is

6   not a relevant consideration for whether or not there was, in

7   fact, a fraud on the board and it was disclosed.  So that's

8   something we can argue about.

9          But in terms of admissibility, I think we are so far

10  past that point.  Obviously, there are going to be additional

11  communications with Mr. Shkreli and Mr. Greebel and Mr.

12  Spielberg, and then with Mr. Lavelle, that we will be putting

13  in through the case agent that discussed the settlement

14  agreements.  To the extent that the defense wants to argue

15  that there was threatened litigation, I believe those

16  communications would allow them to do so, so we're not at a

17  relevance threshold at this point at all.

18          MR. BRODSKY:  Your Honor, Mr. Chan is getting ready

19  for his Mr. Jain's continuation.  But Your Honor may recall

20  from Mr. Shkreli's trial that the Lavelle and the Spielberg

21  settlements came in because they were related to Counts One

22  through Six.  Mr. Shkreli's counsel understood that and did

23  not argue because they knew that, one, Mr. Shkreli is on all

24  those e-mail communications with Mr. Lavelle and Mr.

25  Spielberg.  Mr. Greebel is not on them.

1          MS. SMITH:  That's not true, he is on them.

2          MR. BRODSKY:  With respect to the ones that came

3     into evidence.

4          Two, the principal argument that Mr. Shkreli had

5     that Your Honor found persuasive with respect to Mr. Shkreli's

6     trial and the consulting agreements, was because Mr. Shkreli

7     was saying these were not sham agreements and consultants did

8     work.  Your Honor ruled they had to call those witnesses or

9     they could not put in, for example, Mr. Geller's agreement as

10    a sham consulting agreement unless they put Mr. Geller on the

11    stand and Mr. Shkreli's counsel had the right to confront him

12    about his work.  In this case, the Government is not calling

13    Mr. Yaffe, and so the Government will not be able to argue

14    that Mr. Yaffe's agreement is a sham.  The similarly -- we are

15    now talking two counts where we have a very similar

16    confrontation problem.  We need to be able to confront Mr.

17    Spielberg, we need to be able to confront Mr. Lavelle, and we

18    need to be able to cross-examine them to show, one, what their

19    communications were with Evan Greebel.  The Government is

20    going to put in a snippet of communications of e-mails, but no

21    telephone communications, no communications between Mr.

22    Greebel and Mr. Lavelle, no communications between Mr. Greebel

23    and Mr. Spielberg.  And we need to be able to cross-examine

24    them about what they told Mr. Greebel, if anything, and what

25    their telephone communications were and what the message was,

1    because what Mr. Greebel's mens rea was is at issue here, not

2    Mr. Shkreli's.

3              So we have a confrontation problem that we are

4    arguing Mr. Lavelle's settlement was not a fraud in part

5    because there was a litigation threat.  And the Government can

6    put in some set of e-mails, but we believe they have a

7    confrontation problem if they don't call Mr. Lavelle.

8              In the last trial, Counts One through Six enabled

9    them to put in the settlement agreements.  We believe, for the

10   same problem they have on the consulting agreement, they can't

11   put in the settlement agreements.

12             I would respectfully note with Mr. Su, the

13   Government says Mr. Su said his opinion was it was a fraud.

14             And if Your Honor remembers the e-mail, and I

15   believe it's Government Exhibit 682-B, it was a March -- about

16   a March 5, 2013 e-mail in which Mr. Shkreli didn't say they

17   were fraud.  What Mr. Shkreli said was, he was going to alert

18   people who were MSMB investors and he included their names.

19             (Continued on next page.)

20

21

22

23

24

25

5468

1        MR. BRODSKY:  (Continued)  We established that he

2   had no idea about these people until after he went into the

3   Global Relay system and accessed documents.  So, Mr. Su's

4   opinion of whether or not there was fraud related to Lavelle,

5   and he did not say it was fraud, is completely irrelevant.

6        The government has established zero evidence that

7   Mr. Greebel had any knowledge of any particular fraud of any

8   kind related to Mr. Lavelle or to Mr. Spielberg and it is

9   incredibly prejudicial.  I would say even if they overcame the

10  401 hurdle, they can't overcome Rule 403 without calling

11  Lavelle and without calling Spielberg because it is

12  extraordinarily prejudicial to us that we are unable to

13  cross-examine them.  They're on their witness list.  They can

14  call them.  They have the power to call them and they should

15  do so.

16        THE COURT:  All right.  This is not a ten-minute

17  conversation and we have to get the jury back.  Maybe we'll

18  deal with this over lunch.

19        MS. SMITH:  That's fine.  And then I can respond to

20  some of the arguments.

21        THE COURT:  Yes.

22        MS. SMITH:  I will just say Mr. Brodsky is

23  characterized what happened at the Shkreli trial, but remember

24  defense counsel wanted to keep out all the evidence relating

25  to Lavelle and Spielberg and the arguments were not confined

5469

1  to Count Six.

2       THE COURT:  Yes, I know the were also subject both

3  to Count Seven.

4       And, you know, I do think the jury has certainly

5  heard plenty about the Spielberg and Spielberg settlement and

6  Lavelle as well.  I think that, ultimately, the issue is

7  whether Mr. Greebel agreed with Mr. Shkreli and others to

8  misappropriate Retrophin funds in Count Seven and so that is

9  really the issue.  The government has proof or doesn't have

10 proof of that.

11      It does seem that these are, these names are in the

12 record before this jury and they have heard plenty, both on

13 cross and direct, about these settlements and the way both the

14 auditors and the accountants were probing and asking questions

15 about the settlements and we have evidence that the agreements

16 were given to the auditors and they were the subjects of

17 e-mails.

18      So, you know, I think at this point -- when is she

19 coming in, this afternoon?

20      MR. PITLUCK:  Whenever Mr. Chan is done with his

21 cross of Mr. Jain and any redirect that there is.

22      THE COURT:  Okay.  Let's get the jury back.  Do you

23 expect that you are going to continue with this witness

24 through lunch, the lunch hour, Mr. Chan?

25      MR. CHAN:  I think I have an hour.

Jain - cross - Chan                        5470

1          THE COURT:  An hour?

2          MR. CHAN:  At most.

3          MR. BRODSKY:  May Mr. Greebel use the restroom?  He

4   was here for the oral argument.

5          THE COURT:  Mr. Greebel?  Sure.  The rest of you, if

6   you are going to take a break now for yourselves, do it now,

7   please.

8          (Recess taken.)

9          (In open court; outside the presence of the jury.)

10         THE COURT:  Okay.  We are ready to bring the jury

11  back.

12         (Jury enters.)

13         THE COURT:  All jurors are present.  Please have a

14  seat.

15         Mr. Chan, you may resume.

16         MR. CHAN:  Thank you, Your Honor.

17         Mr. Carter, can you put up Government Exhibit 124-2,

18  please.

19  BY MR. CHAN:  (Continuing)

20  Q    Mr. Jain, do you remember that the government asked you a

21  series of questions about letters and e-mails, letters from

22  the Katten firm and e-mails from Mr. Greebel connected to the

23  question of reporting threatened or pending litigation?

24  A    Yes.

25  Q    There's a series of letters and e-mails.  Do you remember

1    that?

2    A    Yes.

3    Q    And this is one of the letters that's from the Katten law

4    firm.  Do you remember talking about this letter during the

5    government's examination?

6    A    Yes.

7    Q    And the government, you know, zeroed you in on the

8    language going down in the fifth paragraph starting with the

9    subject in the box.  Do you remember that?

10   A    Yes.

11   Q    They asked you was there reported in this paragraph any

12   pending or threatened litigation.  Do you remember that?

13   A    That's correct.

14   Q    And your answer was no, right?

15   A    Yes.

16   Q    You agree with me this is a very long way of saying there

17   is no threatened and pending litigation, right?

18   A    I'm sorry?

19   Q    You agree with me that this is a very long way of saying

20   there is no threatened or pending litigation?

21   A    When you say "long way," I don't understand that.

22   Q    This is a very long sentence, right?

23   A    Oh, yes.

24   Q    It doesn't just say no threatened or pending litigation,

25   right?

1   A    Yes.

2   Q    In fact, it says, "Subject to the foregoing and to the

3   qualifications set forth in this letter," right?

4   A    Yes.

5   Q    So there are certain qualifications to this paragraph,

6   right?

7   A    Yes.

8   Q    "This is to advise you that we have not been engaged to

9   give substantive attention to," right?

10            So there's another qualification there, right?

11  A    Yes.

12  Q    "Or to represent the company in connection with," right?

13  A    Yes.

14  Q    "Material loss contingencies," right?

15  A    Yes.

16  Q    "Coming within the scope of clause A of paragraph five of

17  the American Bar Association statement," et cetera et cetera,

18  right?

19  A    Yes.

20  Q    Do you know what that clause A says?

21  A    No.

22  Q    All right.  And in parentheses for the clause A, it says

23  relating to overtly threatened or pending litigation, right?

24  A    Yes.

25  Q    Okay.  By the way, this letter is written by the Katten

1   law firm, not any particular person, right?

2   A    Yes.

3   Q    And it says, on paragraph three of this letter:  In

4   preparing this response, we have made inquiry of those lawyers

5   presently in our firm who, according to our records, rendered

6   legal services on behalf of the company during the year on the

7   audit date or at any time from the audit date to the date of

8   this letter.

9          It says that, right?

10  A    Yes.

11  Q    So it is saying that it asks every lawyer at Katten

12  working on anything for the company in answering this letter,

13  right?

14  A    Yes.

15  Q    It doesn't say we just talked to one person, does it?

16  A    No.

17  Q    I also want -- now, what's the date of this letter?

18  A    May 31, 2013.

19  Q    Okay.  I want to also put up and compare it to another

20  exhibit that the government talked about, Government

21  Exhibit 114-25, and let's zoom in on the dates, please, and

22  the names.  And let's also put up a box that zooms in on the

23  date of the letter.

24          So, the Government Exhibit 114-25, if you will

25  remember, is the chart summarizing the settlement agreements

1   that you had, right?

2   A    Yes.

3   Q    And it lists the date, Mr. Spielberg, April 30th, right?

4   A    Yes.

5   Q    Ms. Hassan, April 25th, right?

6   A    Uh-huh.

7   Q    Richard Kocher, May 13th, right?

8   A    Yes.

9   Q    David Geller, May 30th, right?

10  A    Yes.

11  Q    Those are all before May 31st, right?

12  A    Yes.

13  Q    So as of May 31st, these were settled, right?

14  A    Yes.

15  Q    They weren't pending litigation at that point, correct?

16  A    No.

17  Q    Certainly not threatened anymore?

18  A    No.

19  Q    And definitely not litigation of any kind?

20  A    No.

21  Q    All right.  So the only one that's after May 31st is this

22  Michael Lavelle dated 6/10?

23  A    Yes.

24  Q    Ten days after May 31st, right?

25  A    Yes.

Jain - cross - Chan                                    5475

1   Q    And the date refers to the date of the execution of the

2   settlement agreement, correct?

3   A    Yes.

4   Q    So you don't know sitting here now whether or not there

5   was an agreement in principle before 6/10, right?

6   A    I don't know that.

7   Q    And you don't know whether or not the threat was no

8   longer a threat as of, as of 5/31, correct?

9   A    Yes.

10  Q    And in any event, after June 10th, you would agree that

11  none of these five settlement agreements would ever be

12  threatened or pending anymore, correct?

13  A    Not threatened and pending.

14  Q    So, in these subsequent letters and e-mails of

15  Mr. Greebel or the firm's letters talking about threatened or

16  pending litigation, these settlement agreements wouldn't count

17  under that, correct?

18  A    Not as part of threatened and pending litigations.

19  Q    All right.  Now, going back to the settlement agreement

20  sort of accounting issue you were talking about, you testified

21  this morning when you first got on the stand about your

22  recollection of this phone call that happened with a large

23  group of people.  Do you remember that?

24  A    Yes.

25  Q    And it was your testimony, was it not, that during the

1  call, Mr. Greebel was, as you put it, opposed to restatement,

2  right?

3  A    Yes.

4  Q    Now, restatement was the issue about whether or not you

5  had to go back in time and redo the prior filings, right?

6  A    Yes.

7  Q    And to redo them to put in the settlement agreement

8  language describing the settlement agreements, right?

9  A    If we are issuing a new opinion on the audited financial

10 statement, we need to make sure that they are not having any

11 deficiency into the disclosures or financial statement.

12 Q    Okay.  But so this is about correcting something in the

13 past, correcting a filing that has been already filed,

14 correct?

15 A    Yes.

16 Q    That's separate and apart from the issue of going forward

17 for our new and future filings, what do we say, right?

18 A    Yes.

19 Q    And so you're not saying that Mr. Greebel was opposed to

20 discussing the settlement agreements going forward; you're

21 saying that he was opposed to the fact of redoing the past

22 ones?

23 A    Yes.

24 Q    And as you know, restating financial statements is an

25 important decision for the company, right?

Jain - cross - Chan                                      5477

1    A    I don't know that, whether it is important or not.

2    Q    Well, it's, even at Marcum, at your accounting firm,

3    that's a decision that requires a lot of thought, correct?

4    A    Requires what?

5    Q    A lot of thought by you, the auditor, to suggest it,

6    right?

7    A    Yes.

8    Q    And consideration by the company to do it, right?

9    A    I would say that this is based on, again, the materiality

10   whether the financial statements are previously filed or

11   previously restated or not.

12   Q    And in your experience, the fact of a restatement is

13   something, of course, that the investing public will see,

14   right?

15   A    The investors are going to see, the potential investors

16   are going to see and also the SEC and the management.

17   Q    And during this call, as far as you can recall,

18   Mr. Greebel's, the way you put his, quote, "opposition," it

19   wasn't about we need to hide these settlement agreements from

20   people, right?

21   A    I cannot say that what was the reason behind it.

22   Q    Okay.  But it was him on the call as a lawyer taking a

23   position, correct?

24   A    Yes.

25   Q    He was advocating on behalf of a position for a client,

1    correct?

2    A    Yes.

3    Q    And he disagreed with your analysis of the applicable

4    accounting principles, correct?

5    A    Yes.

6    Q    You disagreed with him, right, or Marcum disagreed with

7    him?

8    A    As far as accounting is concerned, it's not the legal

9    team where lawyers are going to decide that what is right and

10   what is wrong.  As an accountant, if we were looking into the

11   financial statement, it's accountants or these people that's

12   going to advise what is right or what is wrong.  So, if we

13   were advising to the company that what is the right way of

14   doing the accounting auditing statement, I know that

15   Mr. Greebel was this is not material, and this is material, so

16   he is not going to decide from Marcum point of view what is

17   material and what is not material.

18   Q    Apart from deciding your thinking for you, it would be

19   fair, would it not, for someone to ask you what your reasoning

20   is, right?

21   A    Definitely we going to explain the reasoning for it that

22   why we explaining that it just need to be restated.

23   Q    And it would be fair to test your assumptions, correct?

24   A    I'm sorry?

25   Q    It would be fair to test your assumptions that you used

1  to reach your conclusions, correct?

2  A    Yes.

3  Q    And it would be fair to ask you to explain the accounting

4  principles and how you're applying them, correct?

5  A    Yes.

6  Q    And I take it that happens from time to time in the

7  course of your other clients, your clients ask why do you want

8  to do a particular thing, right?

9  A    Yes.

10 Q    They probe your logic, right?

11 A    Yes.

12 Q    And in this case, Mr. Greebel wasn't, as you say, the

13 decisionmaker, right?

14 A    He was advisor.

15 Q    And, ultimately, what was decided was to do the

16 restatement, correct?

17 A    Yes.

18 Q    He didn't try to stop you from doing the restatement

19 after that was decided, right?

20 A    Yes.

21 Q    And then it went to the board, correct?

22 A    Yes.

23 Q    Now, do you remember the positions of any other

24 participants of this call, for example, Mr. Panoff?

25 A    My recollection is that management, including the Martin

1    Shkreli and Mr. Marc Panoff were not into the pushing back on

2    like they were opposed to it.  My recollection is that it was

3    more coming from Evan Greebel that he was opposing the

4    restatement.

5    Q    Okay.  Now, in terms of the issue, issue of what

6    Mr. Greebel was focused on, as we talked about, it was the

7    distinction between what to do about the past filings versus

8    what to do about future filings, correct?

9    A    We -- my recollection, again, is that on that call, it

10   was not a discussion on the future filing.  It was more on to

11   the restatement and the past filings.

12   Q    Okay.  Now, in terms of the way that you remember

13   Mr. Greebel discussing the issue, he didn't say that we

14   shouldn't restate because we hid these from investors and we

15   should keep hiding them, correct?

16   A    The reason was not that we hidden this one or we don't

17   need to disclose that.

18   Q    He agreed with the disclosure aspects of it, correct?

19   A    Yes.

20   Q    As opposed to the restatement aspect of it which is

21   different?

22   A    Yes.

23   Q    Now, so that call happened and it was ultimately --

24   everyone adopted the Marcum view, right?

25   A    When you say everyone, who everyone you're talking about?

1    Q    The company adopted the Marcum's recommendation, correct?

2    A    Yes.

3    Q    And that led to the presentation of your recommendation

4    to the board, right?

5    A    Yes.

6    Q    And that was in the form initially of a letter, correct?

7    A    Which letter are you talking about?

8    Q    The SAS 61 letter?

9    A    Yes.  Yes.

10   Q    Let's put up Government Exhibit 116-21.  And you were

11   saying earlier during your direct testimony that Marcum

12   drafted this letter, right?

13   A    Yes, we draft these letters.

14   Q    And you don't remember if you specifically wrote the

15   words or a staff member wrote the words, correct?

16   A    Yes.  Someone from our team draft this letter.  It could

17   be me or it could be my staff people.

18   Q    And the very purpose of this letter is to apprise the

19   board of the issue of the settlement agreements, correct?

20   A    Just not only the settlement agreements, but in terms of

21   overall engagement we were engaged for.

22   Q    Okay.  You would have written this letter no matter what?

23   A    I'm sorry?

24   Q    You would have written this letter no matter what,

25   correct?

Jain - cross - Chan                                        5482

1   A    Yes.

2   Q    Because it summarizes the audit work you have done?

3   A    Yes.

4   Q    But because of the settlement issues that had happened,

5   you included what had happened in this letter?

6   A    Yes, one of the unusual transaction or you could say we

7   also include like that disclosure into this letter.

8   Q    Okay.  The government also showed you Government

9   Exhibit 247 which is the e-mail that transmitted your draft

10  version of this letter to the board, correct?

11  A    Yes.

12  Q    Before, what I showed you was the finalized version,

13  correct?

14  A    Yes.

15  Q    But in Government Exhibit 247, the e-mail is dated

16  September 9th, correct?

17  A    Yes.

18  Q    And your draft of the letter is dated September 9th,

19  correct?

20  A    Let me check.

21          (Pause.)

22  A    Yes.

23  Q    So the same day you wrote it, the same day, the board

24  gets it, right?

25  A    So we draft the letter maybe, you know, on this

CMH      OCR      RMR      CRR      FCRR

1    September 9th morning, we reviewed it and then we provided to

2    the management and this was sent to the board on the same day

3    as the management.

4    Q    And as you were saying, the company transmits it on your

5    behalf, correct?

6    A    Yes.

7    Q    But the company doesn't rewrite it?

8    A    No.

9    Q    The company doesn't edit it?

10   A    No.

11   Q    This went to the board as you wrote it or Marcum wrote

12   it?

13   A    Yes.

14   Q    Nobody at the company said don't send this, correct?

15   A    Don't send it to whom?

16   Q    To the board.

17   A    We did not send it to the board.  We asked management to

18   send it to the board.

19   Q    I see.  No one at the company refused to send it to the

20   board?

21   A    Yes, nobody refused.

22   Q    Mr. Greebel didn't say, Don't send that to the board?

23   A    No.

24   Q    Mr. Greebel didn't say, Please take out the whole section

25   on settlement agreements?

1    A    No.

2    Q    And so going to some of the provisions of this letter,

3    let's just use this while it's up, or page five, or it's

4    paragraph four that I want to get to, Significant Unusual

5    Transactions.

6    A    You mean page three?

7    Q    Yes.  My pages might be different from yours.  But let's

8    go to paragraph four, Significant Unusual Transactions.

9    A    Yes.

10   Q    And actually number 2 under that?

11   A    Uh-huh.

12   Q    And this is the language that summarizes the settlement

13   agreement issue, right?

14   A    Yes.

15   Q    And, again, it's drafted by Marcum, right?

16   A    Yes.

17   Q    It says:  During the quarter ended June 30, 2013, the

18   company, its chief executive officer and MSMB became parties

19   to a series of agreements settling up to approximately

20   $2 million of liabilities which company management believes

21   are the primary obligation of MSMB.

22        You see that, right?

23   A    Yes.

24   Q    And you, you understood that that was management's view

25   that the settlement agreements were the primary obligation of

1    MSMB, correct?

2    A    Yes.

3    Q    You agree with me that primary does not mean exclusive,

4    correct?

5    A    No.  Primary and secondary, yes.

6    Q    And then it talks about the amounts.  At the bottom it

7    talks about, "There's uncertainty as to whether MSMB will have

8    sufficient liquidity to repay the company or funding the

9    indemnification agreements should it become necessary."

10           And you remember that Mr. Kessler asked you about a

11   series of indemnification agreements and promissory notes

12   connected to the settlement agreements, right?

13   A    Yes.

14   Q    And you testified that you didn't recall when you

15   physically received copies of those agreements,

16   indemnification agreements, do you remember that?

17   A    I don't recall exact date but I know that they were not

18   provided to us at the time the settlement agreements were

19   provided to us.  They were provided much later to us.

20   Q    Okay.  But you would agree you would have had to had them

21   before drafting this SAS letter, correct?

22   A    Yes.

23   Q    And then the paragraph below that, starting with

24   "Concurrent," and it talks about the expectation, the

25   reasonable expectation of the company to get paid back on

1  these settlement agreements, correct?

2  A    Yes.

3  Q    And it was Marcum's view that there was not such a

4  reasonable expectation of being paid back?

5  A    Yes.

6  Q    Based, in part, on the financial condition of the

7  company, correct?

8  A    Yes.

9  Q    And obviously, Marcum, as the accounting firm, auditing

10 firm, had a lot of access to the financial condition of

11 Retrophin at the time, right?

12           MR. KESSLER:  Sorry.  Objection to the form.

13           THE COURT:  Sustained.

14           MR. KESSLER:  Which company are we talking about

15 with the notes?

16           THE COURT:  Sustained.

17           MR. CHAN:  Sorry.  I'll withdraw that.

18 Q    How did Marcum go about determining that these

19 indemnification agreements were not likely to be paid back by

20 MSMB?

21 A    My understanding is based on my discussions with my

22 partner Ed Hackert, that the company -- sorry -- MSMB is in

23 the process of dissolution, they don't have any more funds to

24 pay back to Retrophin, and that is why my, my understanding

25 was based on that, that MSMB is not in the position to pay

Jain - cross - Chan                      5487

1   back then these indemnification or promissory notes are not

2   good.

3   Q     And that, as you testified before, that's one of the core

4   accounting issues that you were trying to grapple with,

5   correct?

6   A     Yes.

7   Q     How to classify the amounts that may or may not be due

8   back to Retrophin?

9   A     Yes.

10  Q     Now, continuing on with the letter, let's turn to number

11  nine.

12  A     Number nine paragraph?

13  Q     Paragraph nine, "Disagreements With Management."

14        Mr.  Jain, what's the purpose of this part of this

15  kind of letter?

16  A     So, if we have any disagreements with the management on

17  any accounting matters, then we will communicate that with the

18  auditing committee members.

19  Q     Why does -- why do auditors need to report whether or not

20  there are any disagreements with management to the board?

21  A     If the management does not agree on to recording certain

22  transactions in accordance with the GAAP and we disagree with

23  the management on that, our management disagree with that and,

24  ultimately, it does not go into those financial statement,

25  then we need to report to the audit committee.

1   Q    And by the way, you don't work for the company, right?

2   A    No.

3   Q    You guys are independent auditors, right?

4   A    Yes.

5   Q    And what did you write in response to number nine?  It's

6   also on the screen.

7   A    There were no such disagreements.

8   Q    In fact, there were none, right?

9   A    No.

10  Q    Management agreed with your assessment about how to

11  account for these settlement agreements, correct?

12  A    And restating the financial statement.

13  Q    And to restate them?

14  A    Yes.

15  Q    Number ten -- sorry.  Number 11, the accountant's

16  evaluation of going concern.  It was Marcum's view that

17  Retrophin was a going concern at the time, correct?

18  A    It is management's view and we concurred with the

19  management.

20  Q    Okay.  What's a going concern?

21  A    When the company does not have enough liquidity on or, I

22  would say, cash position into the company that they can

23  sustain their operations for 12 months from the date of the

24  filing of these documents, then we say that the company may

25  have a substantial doubt of continuing as a going concern.

Jain - cross - Chan                    5489

Q     All right.  Then number 12, Difficulties Encountered in
Performing the Review.  What's the purpose of informing the
board about this?
A     If we have any experience or difficulties in performing
our procedures, then we inform the audit committee that we had
all these difficulties.
Q     Right.  And what did you write in response to that in
this draft letter?
A     We have not experienced any significant difficulties in
performing the review or matters that are contentious for
which the accountant consulted outside the engagement team.
Q     And that's true, right?
A     Yes.
Q     Now, let's flip to the finalized version of this letter
which is Government Exhibit 114-21.
          Anyway, going to the same paragraph in the final
version --
          MR. CHAN:  Mr. Kessler, I'm not sure, is this in
evidence already?
          MR. KESSLER:  I don't think so but no objection.
          MR. CHAN:  Sorry.  I thought it was.
          Your Honor, I move to admit government
Exhibit 114-21.
          THE COURT:  All right.  We will do that.  Government
Exhibit 114-21 is in evidence.

Jain - cross - Chan                                    5490

1              (So marked.)

2    Q    Mr. Jain, what's your practice in terms of finalizing

3    the SAS 61 letter?

4    A    So we provide the draft, like, maybe about, I would say

5    on or about the date of the filing of the document, and then

6    after the filing of the document, we issue the final version

7    of the SAS 61 letter.

8    Q    Okay.  And this is the final version of your letter to

9    Retrophin?

10   A    Which tab?  Maybe I can't see that.

11   Q    I don't have any extra copies of it.

12   A    That's okay.  You can enlarge on here.

13   Q    Enlarge the very first page of it, please.

14   A    Okay.  Now I can see that.

15   Q    And do you want to see the signature page too?

16   A    Yes, if I can see that.

17            Yes.

18   Q    Okay.  So, now going to paragraph 12 of the final letter,

19   would you agree that you expanded a little bit on the answer

20   to this one, right?

21   A    Yes.

22   Q    From the draft?

23   A    Uh-huh.

24   Q    And let me read it for you and tell me if I read it

25   right:  We did not encounter any client-imposed difficulty

1    during our review, however the company itself experienced

2    significant difficulty analyzing the settlement agreements

3    discussed in item three establishing the proper accounting for

4    such agreements in determining how best to address the related

5    disclosure omitted from previously issued financial

6    statements.

7            Do you see that?

8    A    Yes.

9    Q    The company, A, did not originally identify a requirement

10   to disclose these agreements at the time of its previous

11   filings, B, required assistance in applying the recent

12   accounting standard for joint and several liability

13   arrangements during the quarterly period ended June 30, 2013,

14   and, C, did not properly account for the registration payment

15   arrangement during the quarterly period ended March 31, 2013.

16           Do you see that?

17   A    Yes.

18   Q    These matters extended the duration of the review well

19   beyond the originally planned time frame.  Right?

20   A    Yes.

21   Q    And:  With the significance of these issues to the

22   company and the extent of the consultations required resulted

23   in the form 10-Q for the six-month period ending June 30, 2013

24   not being filed on a timely basis.  Correct?

25   A    Yes.

1  Q    By the way, it makes a reference to, under B, required

2  assistance, that one:  Required assistance in applying the

3  recent accounting standard for joint and several liability.

4           How recent was that new accounting standard?

5  A    This was issued sometime in early 2013.  This is an

6  accounting pronouncement.  And the company was not --

7  management was not into the position to analyze that, the

8  accounting pronouncement, how to adopt and how to account

9  these settlement agreements into that.

10 Q    Brand new rule, right?

11 A    Even if it is a brand new rule, but if the company has a

12 competent CFO who knows the U.S. GAAP, he should be able to

13 analyze these.

14 Q    But the CFO started just two months before, correct?

15 A    Even if he started two months before doesn't mean that he

16 was not a qualified person.

17 Q    Okay.  But you would agree that this answer doesn't say

18 you experienced difficulties because the company tried to hide

19 the settlement agreements from you, correct?

20 A    No, we are not saying they were trying to hide the

21 settlement agreements from us.

22 Q    They had a problem analyzing it, right?

23 A    They had problem analyzing it and giving it to us on a

24 timely manner.

25 Q    Now, paragraph 13, Fraud and Illegal Acts, right?

Jain - cross - Chan                                5493

1    A    Yes.

2    Q    And the question here is or the requirement here is

3    stated:  The audit committee should be adequately informed of

4    fraud and illegal acts coming to the accountant's attention

5    during the course of the review.  Do you see that?

6    A    Yes.

7    Q    And the written answer was:  No fraud or illegal acts

8    were noted.

9    A    Yes.

10   Q    And when Mr. Kessler asked you about this, it sounded

11   like you are saying that this answer was solely based on the

12   fact that management told you there are no fraud or illegal

13   acts for us to tell you about?

14   A    So, we make inquiries of the management about are there

15   any litigations or threatening litigations you are aware of.

16   Q    Right.

17   A    We also get updates from the legal counsels also, that

18   are there any illegal -- sorry -- are there any illegal

19   matters or anything outstanding, but within the company, if

20   there any fraud or illegal acts are there, the company's

21   management has to tell us.  It's not our responsibility to

22   detect it.

23   Q    Well, you're not the police, correct?

24   A    Yes.

25   Q    But if you are aware or suspect --

CMH       OCR       RMR       CRR       FCRR

Jain - cross - Chan                                   5494

1    A    Yes.

2    Q    -- fraud to have occurred, you would have to report that

3    here, right?

4    A    Yes.

5    Q    So it's, this is not a question about, you're not simply

6    saying management told us they didn't do a crime, correct?

7    A    Yes.

8    Q    If you were aware or suspected a crime had occurred or

9    fraud had occurred, you would have to write whatever you

10   suspected at the time?

11   A    Yes.

12   Q    And that's an auditing principle, correct?

13   A    Yes.

14   Q    You are required in that situation to report that

15   suspicion to the board or to the audit committee first,

16   correct?

17   A    It depends on the severity of the fraud or illegal acts

18   like if it is very immaterial, you are going to inform to the

19   management.  If it is material, then you inform to the board

20   about it.

21   Q    And indeed, if the board doesn't act on what you report

22   to them, you're required to go directly to the SEC?

23   A    Yes.

24   Q    Here you wrote:  No fraud or illegal acts were noted.

25   Right?

Jain - cross - Chan                    5495

1    A    Yes.

2    Q    Because you had no suspicion of fraud or illegal acts at

3    that time, correct?

4    A    Yes.

5    Q    And you still don't, right?

6            MR. KESSLER:  Objection.

7    A    I cannot say that.

8            MR. KESSLER:  Objection.

9            THE COURT:  Sustained.  Sustained.

10           MR. CHAN:  I withdraw it.

11   Q    Final page.  Let's use this exhibit.  Segregation of

12   Duties, which is after paragraph 16.  Segregation of Duties.

13   You guys wrote:  The company, as a startup operation, has

14   limited capital resources, which limits the extent to which it

15   can segregate incompatible duties.  Right?

16   A    Yes.

17   Q    And then you move on, the next paragraph:  Through

18   June 30, 2013, the company had no internal accounting staff

19   and a significantly limited financial reporting structure.

20   Correct?

21   A    Yes.

22   Q    And towards the bottom:  The absence of a system and

23   sufficiently trained finance staff prior to this period of

24   time was detrimental to the company's ability to prepare

25   accurate and timely financial reports.  Correct?

1   A     Yes.

2   Q     And you go on to repeat some of the observations you

3   noted about the difficulties in analyzing the accounting

4   standards, correct?

5   A     Yes.

6   Q     All right.  So, this letter was drafted, submitted to the

7   board and then there was a board meeting that took place

8   shortly thereafter, right?

9   A     The board meetings -- I don't necessarily remember that

10  when the board meeting took place after this final letter or

11  in between of the final letter and the draft letter.

12  Q     Okay, but you participated in the board meeting?

13  A     Yes.

14  Q     And during, I think you testified that during the board

15  meeting, this letter was presented orally, correct?

16  A     The draft letter.

17  Q     The draft letter?

18  A     Yes.

19                (Continued on next page.)

20

21

22

23

24

25

Jain - cross - Chan                                   5497

BY MR. CHAN:

Q    Did you do that?  Did you do the discussion?  Did you

lead that discussion?

A    No.  I just sit in to those presentations, all the calls

and Ed Hackert my partner discussed all this.

THE COURT:  This is a telephone board meeting?

THE WITNESS:  Yes.

Q    After presenting what you guys had determined and learned

about the settlement agreements do you recall if any of the

directors had any questions or comments?

A    I don't recall.

Q    Do you know a director named Steven Richardson?

MR. KESSLER:  Objection, your Honor, eliciting

hearsay.

MR. CHAN:  I'm asking if he knows a director named

Steven Richardson.

THE COURT:  You can answer the question.

A    Can you repeat the question?

Q    Do you know someone named Steven Richardson?

A    Steven Richardson, no.

Q    Steven Aselage?

A    I believe they were the board members.

Q    But you don't recall whether or not they said anything

one way or the other?

A    I don't recall.

1  Q    Do you recall whether anybody during that call expressed

2  surprise about the settlement agreements?

3  A    I don't recall that.

4  Q    Do you recall if anybody said, wait a minute, nobody

5  authorized these?

6  A    I don't recall the exact how those discussions took

7  place.

8  Q    Would it be fair to say that if a director had said I

9  didn't authorize these agreements during that call you would

10 have remembered that?

11 A    I don't think so, this kind of discussion was taking

12 place.

13 Q    You don't think that discussion took place?

14 A    No, I don't think so.

15         THE COURT:  Did you discuss the agreements at the

16 board meeting?

17         THE WITNESS:   We explained these settlement

18 agreements in our communications and we discussed those.

19 Q    Now, in connection with the board meetings in general,

20 the government asked you about as part of your audit work

21 whether or not you reviewed minutes of meetings, correct?

22 A    Yes.

23 Q    And you said that you reviewed both unsigned and signed

24 minute meetings?

25 A    Yes.

Jain - cross - Chan                           5499

1    Q    You did that in this case, correct?

2    A    Yes.

3    Q    You obtained  -- you received the minutes, whether

4    unsigned or signed, of Retrophin board meetings, correct?

5    A    Yes.

6    Q    You had no problem getting them when you needed them,

7    right?

8    A    It was not, you know  -- when we are asking and it's not

9    coming right after we're asking, it takes time.

10   Q    But you the got them?

11   A    Yes, we got them.

12   Q    You as part of your auditing work relying on those

13   meeting minutes, right?

14   A    Yes.

15   Q    You incorporate them into your work papers, correct?

16   A    Yes.

17   Q    Do you remember who provided them to you, to Marcum?

18   A    I believe it was coming from Evan Greebel's office or

19   from the management.

20   Q    Anyone in particular from management?

21   A    Either Mike Harrison or Marc Panoff.

22   Q    You as the auditing firm could not do your work in the

23   absence of the meeting minutes, correct?

24   A    Minutes of the meetings are telling us what are the key

25   transactions are either discussed in those meetings or when

1    they were taking place.  It does not mean that's telling me

2    whether I can do my accounting or not.

3    Q    You got them in this case, right?

4    A    Which case?

5    Q    Sorry.  In the case of your work for Retrophin?

6    A    Yes.

7    Q    I want to show you what has been marked for

8    identification as DX 118-4?

9    Q    Sir, do you recognize this document?

10   A    Excuse me.

11   Q    Do you recognize this document?

12   A    Yes.

13   Q    What is it?

14   A    This is the abstracts of the meetings of December 31,

15   2012.

16   Q    Prepared boy Marcum, right?

17   A    Yes.

18   Q    Contained your work papers, right?

19   A    Yes.

20   Q    What's the purpose of this document?

21   A    The purpose of this abstract is that the partners or the

22   quality control people don't need to read all those details of

23   the minutes, rather than they can just understand the gist of

24   those meetings.

25   Q    Turn to page three of the document, please.  Does that

Jain - cross - Chan                      5501

1   refresh your recollection as to the date of the board meeting

2   in which the settlement agreements were discussed?

3   A    Yes.

4   Q    What date was that?

5   A    August 9, 2013.

6   Q    Are you sure?

7   A    You are showing me the minutes of the meetings, right?

8   Q    I'm asking if this document refreshes your memory as to

9   when the board meeting happened at which the settlement

10  agreements were discussed.

11  A    I can only say from reading this document.

12  Q    Okay.  What date was that?

13  A    This is August 9  --

14          MR. KESSLER:  Objection, your Honor, if he's reading

15  the document.  It's not refreshing his recollection and I

16  object to that.

17          THE COURT:  Why don't you just ask him.

18          MR. CHAN:  First of you will all, I offer the

19  exhibit, your Honor.

20          MR. KESSLER:  Can we have a sidebar?

21          THE COURT:  Yes.

22          (Sidebar.)

23          MR. KESSLER:  So, I don't object to the document

24  coming in not for the truth to show the work that Marcum

25  prepared.  That's not my objection, if that's the purpose.  I

Jain - cross - Chan                    5502

1   want to make sure we had this discussion at sidebar not in

2   front of the jury.

3            MR. CHAN:  It is Marcum's business record so it can

4   come in for the truth.

5            MR. KESSLER:  This is a summary by someone.

6            THE COURT:   At Marcum.

7            MR. KESSLER:  Of various documents that they

8   received that were drafted by the defendant.  The defense is

9   now attempting to offer Marcum's summary of a document the

10  defendant drafted for the truth of what the defendant said in

11  his underlying drafts.  That is not permissible under the

12  hearsay rule.

13           This could be admitted to show that this is what

14  Mr. Jain or his team, we don't know who did it, took from the

15  documents they received.  So, for example, what the defense is

16  now going to try to argue is, you know, just picking an

17  example --

18           THE COURT:  Focus on August 9.

19           MR. KESSLER:  I think he's focusing on September 9.

20           MR. CHAN:  Should have been, yes.  He looked they

21  wrong date.

22           MR. KESSLER:  The point is, for example, the first

23  bullet here, Mr. Panoff advises the company restate the 2012

24  10-k financials.  This document cannot be used to prove that

25  on September 9, 2013, Mr. Panoff in fact advised the company.

Jain - cross - Chan                    5503

1   What this document shows is that Marcum has another document,

2   the board minutes, that say this happened.  But what actually

3   happened at the meeting is obviously in dispute and the board

4   minutes, unless there are other minutes I am not aware of,

5   were drafted by the defendant.  So essentially the defense is

6   trying to get  -- use Marcum's summary of a piece of paper

7   they received from the defendant or Mr. Panoff to validate

8   that what the defendant wrote is in fact true.

9          THE COURT:   I got you.

10          MR. KESSLER:  That is improper.  I don't object to

11   testimony that Mr. Jain received pieces of paper that were

12   called board minutes and he read them and reviewed them and

13   typed up some things from what were on those pieces of paper.

14   That's not my objection.

15          MS. SMITH:  Is this based on board minutes that were

16   signed or unsigned?  We have a combination.

17          MR. CHAN:  Everything that they just said is

18   irrelevant.  It is about admissibility, not whether or not the

19   weight of the evidence goes one way or the other.  These are

20   classic business records.  The government has already admitted

21   through this witness other pieces of Marcum's work papers

22   which have multiple layers of hearsay which recount what

23   Mr. Greebel told them, which recount what Mr. Shkreli

24   reported.  The fact that these documents have hearsay in them

25   is irrelevant once we determine that they are business

1    records.   That's the whole point.

2         The next witness the government is going to put on

3    is going to put on the business records of the transfer agent

4    with e-mails attached from Mr. Greebel, with underlying

5    consulting agreements from the company.   Those are all

6    hearsay, but they are being admitted as business records and

7    being admitted for the truth.   This is no different than the

8    dozens of exhibits the government has put in.

9         THE COURT:   I don't know if the attachments are

10   being admitted for the truth.   I'm sorry.   The transfer agent

11   documents.

12        MR. KESSLER:   It depends on which document.   But the

13   point here is  --

14        MR. CHAN:   Let's be clear.   The government is

15   offering them all for their truth.   I have not been told

16   otherwise.

17        MR. KESSLER:   Business records.   The issue here is

18   the business record exception gets this document in which

19   would otherwise be nonadmissible at all as hearsay.   The

20   business record exception does not cure the underlying hearsay

21   problem that this document relies on another document.

22        Frankly, the defense wants to offer the minutes not

23   for their truth that Mr. Greebel e-mailed them, that would be

24   -- that might be fine.   The problem here is using Marcum's

25   summary of a document to prove the truth of the underlying

Jain - cross - Chan                          5505

1   document.  The fact that Marcum summarizes minutes doesn't

2   mean that the minutes are true.  It just means that Marcum's

3   summary is a accurated summary of the document they received.

4         MR. CHAN:  That's incorrect.  All the other business

5   records that have been admitted thus far have hearsay upon

6   hearsay.  We have had exhibits come in from Marcum's work

7   papers where Marcum is summarizing documents they found, where

8   they are summarizing their views of financial statements they

9   found, where they are summarizing conversations with other

10  members of the Marcum's staff.

11        MR. KESSLER:  I'm aware of no case that says

12  someone's summary of a document can be admitted for the fact

13  that the words in the underlying document are themselves true.

14        MR. CHAN:  Under this scenario we should go back.

15        MR. KESSLER:  There was no objection to the other

16  Marcum documents that came in.

17        MR. CHAN:  We didn't object because there's no

18  principle basis for objecting, not because we are waiving

19  objection.

20        THE COURT:  If you don't object, it's either because

21  the document is admissible or it would be objectionable but

22  you are waiving your objection.

23        MR. CHAN:  I didn't waive that objection.

24        THE COURT:  Okay.

25        MR. CHAN:  Because there is no basis to object.  It

Jain - cross - Chan                    5506

1  is business record and a business record comes in.  We would

2  have to parse every single business record that comes in, if

3  it says and reports information that is not contained in the

4  four corners of the document.

5           THE COURT:  What are you proposing, before we get

6  too far down the road?

7           MR. KESSLER:  I don't know the relevance.

8           THE COURT:  What are you asking?

9           MR. KESSLER:  I don't know the relevance of the

10 document other than as an effort to prove the truth of the

11 underlying minutes.  If there is another purpose for the

12 document, for example, to show that Marcum makes summaries of

13 documents they have and that's what they do or to refresh his

14 recollection about a date.  That might all be a proper basis

15 for admitting this document not for the truth.

16          THE COURT:  My initial reaction to this document it

17 was being offered to show that, in fact, Mr. Greebel did give

18 minutes to the Retrophin board and that those minutes were

19 available within the company for the board to review.  There

20 was a big fight about whether or not he ever did that.  I

21 didn't understand this is being offered for the truth of the

22 underlying board minutes.  Is that what you are saying to say?

23 Where are the board minutes?  Why not just have the board

24 minutes come in?

25          MR. CHAN:  I think we want to do both.  We want to

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Jain - cross - Chan                    5507

1   offer the board minutes and the summary of the board minutes.

2        MR. KESSLER:  I don't know what the independent

3   relevance is to the summary of the board minutes.  My only

4   point is my objection is solely to this coming in to prove

5   that things in this summary, which are summarizing board

6   minutes, actually happened, for the underlying truth of that,

7   because that's not the purpose of this document.  The purpose

8   of this document is to say we have other documents and here is

9   what they say.

10        MR. CHAN:  Mr. Jain attended these meetings.

11        THE COURT:  Not all of them.  He attended one.

12        MR. CHAN:  More than one.

13        THE COURT:  You can talk to him about those meetings

14  where he was in attendance and certainly ask him based on his

15  own summary and review of the board minutes whether the

16  minutes accurately reflect, as he best recalls, what happened

17  at the meetings where he was present.

18        MR. CHAN:  Right.

19        THE COURT:   So what meetings with throws be, August

20  9 and September 9.

21        MR. KESSLER:  The August 9 is September.  September

22  9 and November 9.

23        MS. SMITH:  He's just mistaken about August 9.

24        MR. CHAN:  There may be some other ones.  Right now

25  I'm focused on those.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Jain - cross - Chan                    5508

1           THE COURT:  Focus on September 9 where he testified

2    he was present and ask him whether these bullet points to the

3    best of his recollection occurred.  I think that's all right

4    to do.

5           MR. CHAN:  So we'll admit them not for the truth and

6    I'll ask him about them.

7           THE COURT:  We could just have the minutes

8    identified if you would rather do it that way if there's an

9    issue about his summary  -- I'm not getting a sense,

10   Mr. Kessler, what exact instruction you want.

11          MR. KESSLER:  The relevance of this document has not

12   been established and the real questions are what he remembers

13   and he can state what he remembers.

14          THE COURT:  Just use the minutes.

15          Counsel, did you want to go back on the record?

16          MR. KESSLER:  No.  We were just waiting for them.

17          THE COURT:  The issue is  -- his argument is hearsay

18   within hearsay, right?  So if the actual summary itself is not

19   hearsay, his contention is the underlying statements in the

20   documents upon which he relied are hearsay.  His objection is

21   to the underlying statements.  I think, Mr. Chan, if you use

22   the minutes to refresh and to probe his memory about what

23   happened, I think that would be all right.

24          MR. BRODSKY: Understood.

25          MR. KESSLER:  I don't object to using this document

Jain - cross - Chan                    5509

1   to refresh his recollection.  He can use whatever he wants,

2   whatever is more convenient.

3              (In open court.)

4   BY MR. CHAN:

5   Q    Mr. Jain, directing your attention in this document to

6   the third page.

7   A    Yes.

8   Q    September 9, 2013.  I ask you to read the summary there

9   to yourself and see if it refreshes your recollection as to

10  the date of the board meeting where Marcum discussed the

11  settlement agreements with the board.

12  A    I see September 9, 2013 and the first bullet says  --

13  Q    Don't read it out loud.

14             Does it remind you of what the date was for the

15  meeting?

16  A    I don't remember the date of the meeting was September 9

17  or not.  If it is noted into this document September 9, my

18  understanding is that the meeting took place on September 9.

19  Q    Okay.  You testified that you reviewed the minutes of the

20  board meetings at Retrophin in connection with your audit

21  work, correct?

22  A    Yes.

23  Q    I'm showing you what has been marked for identification

24  as Defendant's Exhibit 118-26.  This is an e-mail from

25  Mr. Greebel to you and Ed Hackert attaching board meeting

Jain - cross - Chan                    5510

1   minutes of Retrophin, correct?

2   A    Yes.

3            MR. CHAN:  Your Honor, I offer it.

4            MR. KESSLER:  I have no objection, subject to the

5   limitations we discussed at sidebar.

6            THE COURT:  All right.  I guess we can talk about

7   what to do with that limitation.  We could admit it subject to

8   limitations.

9            MR. CHAN:  Your Honor, I'm admitting it under the

10  same principle as we discussed.

11           THE COURT:  All right.  I will admit it as we

12  discussed at sidebar.

13           (So marked.)

14           THE COURT:  This will help clarify some of the

15  issues.

16           MR. CHAN:  What I meant to say not under the same

17  limitations the government sought.  This took care of an issue

18  that the government had.

19           THE COURT:  I don't think it does.  I think we

20  talked about how you could utilize this document.

21           MR. CHAN:  Okay.

22  BY MR. CHAN:

23  Q    You would take these minutes from these board meeting and

24  you would store them in your work papers, correct?

25  A    We gave the minutes of the board meetings and we add into

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Jain - cross - Chan                    5511

1   our work papers and we create abstracts of those minutes.

2   Q    If you look through this document you'll notice that, at

3   least in the way that this document appears, some of the board

4   meeting minutes have redactions in them, correct?

5   A    I'm sorry.  What they have?

6         THE COURT:  Redactions.

7   A    Yes, it does.

8   Q    When you received them, they didn't have redactions,

9   correct?

10  A    I don't recollect that.

11  Q    You would have remembered that the board meeting minutes

12  didn't contain all of the information that you needed, right?

13  A    As of now I don't recollect whether everything was there

14  in that or there was anything was missing.

15  Q    You would agree that whatever is saved in Marcum's work

16  papers, those would be the board meeting minutes that you got?

17  A    Yes.

18        MR. CHAN:  May I approach, your Honor?

19        THE COURT:  Yes.

20  Q    I'm showing you what has been marked as Defendant's

21  Exhibit 118-55, 118-56, 118-57, 118-58, 118-59, 118-60 and

22  118-61?

23        Mr. Jain, do those exhibits correspond to the

24  attachments to the e-mail that I previously showed you.

25  A    I'm sorry.  Would you repeat your question again?

                            Jain - cross - Chan                    5512

1                MR. KESSLER:  Can we have copies of these exhibits?

2                MR. CHAN:  Sorry.  The government produced these

3        originally though.

4                MR. KESSLER:  Your Honor, we need a sidebar about

5        this.

6                THE COURT:  All right.

7                How about the lunch period for the jurors?

8                Please, don't discuss the case.  Keep an open mind.

9        Have a nice lunch.  Please, come back 1:35.  Thank you.

10               (Jury excused.)

11               THE COURT:  Sir, you can step down and have a lunch

12       break yourself.

13               (Witness excused.)

14               MR. KESSLER:  Mr. Jain advised me that he has to

15       leave here by 2:00 o'clock to catch a flight back to the West

16       Coast.

17               THE COURT:  Maybe you'll work that out with

18       Mr. Jain's lawyer.

19               MR. KESSLER:  We'll see what we can do.

20               So the concern, your Honor, is the minutes attached

21       to the e-mail that Mr. Chan admitted they have redactions in

22       them and they were produced in discovery.  We didn't object to

23       that except for the hearsay concern.  These minutes I don't

24       know exactly where they came from.  I assume they came from a

25       Marcum laptop that everyone had access to.

Jain - cross - Chan                    5513

1          My understanding from Mr. Chan is that these

2    documents do not have the redactions in them that were in the

3    exhibit that's now in evidence and so the reason we asked for

4    the sidebar was we don't actually know if there's a privilege

5    waiver over all the redactions that were in here.  My

6    understanding is at least some of the subjects in the minutes

7    have absolutely nothing to do with this case at all.

8          We just wanted to make sure that before the defense

9    puts documents in evidence that have none of the redactions

10   Retrophin has waived the privilege on all the redactions.

11         MS. SMITH:  In addition, we have a general concern.

12   To the extent that there are redactions in the case and we are

13   going to be submitting an instruction, because there's a

14   privilege waiver asserted or the party agrees that something

15   should be redacted.  I'm concerned about this line of

16   cross-examination calling into question whether there may or

17   may not have been redactions.  If Retrophin has waived all of

18   the minutes, we ask for the documents with no redactions.  We

19   don't want the jury to question whether he received a copy

20   that had redactions or didn't have redactions and we should be

21   pretending the redactions don't exist.

22         MR. CHAN:  Your Honor, this is ridiculous.  This is

23   the government trying to keep out admissible evidence.  These

24   minutes were given to Marcum.  It is black letter law.  There

25   can be no privilege on an item that is given to an independent

Jain - cross - Chan                    5514

1   auditor.  That is black letter law.  They cannot stand here

2   and say that there's any attorney-client privilege to this

3   document.

4            Number two, they have called board directors here to

5   testify as to what happened in the meeting.  These are minutes

6   of what happened in the meetings that the two witnesses have

7   testified about and as to which the company has not claimed a

8   privilege.  There can be no argument that this document has

9   any privilege in any way.  Whether or not Retrophin redacted

10  it I don't know.  We didn't get a privilege log.  We don't

11  know why they did it.  We are not trying to admit something

12  that's coming from Retrophin.  We are here to admit a series

13  of documents that come from Marcum, Marcum's work papers and

14  they were unredacted when they got them.

15           THE COURT:  Let's look at the first one, Defendant's

16  Exhibit 118-55.  There is a redaction on Defense Exhibit

17  118-26 at page number R 57684.  I'm assuming  -- tell me if

18  I'm wrong  -- the R designation on Defendant's Exhibit 118-26

19  came from Retrophin.

20           MR. CHAN:  Correct.

21           THE COURT:  All right.  Now if you look at Defense

22  Exhibit 118-55, which appears to be the same board meeting on

23  July 3, 2013, the last two paragraphs of page one are redacted

24  and I don't know who made those redactions.  If the Defense

25  Exhibit 118-55 through 61 series came from Marcum, Marcum

Jain - cross - Chan                  5515

1   obviously did not make these redactions but Retrophin did.  So

2   I think that's something that should be sorted out because

3   Retrophin for whatever reason did redact.  It could be this

4   was some other business or some other matter that for whatever

5   reason they redacted from their own production.  I'm not sure

6   what happened.

7            MR. KESSLER:  Your Honor, to be clear, we're not

8   trying to keep the content under the redactions out.  We just

9   wanted to raise the issue.

10           MR. BRODSKY:  I can inform you, your Honor, with

11  respect to this one on July 3, 2013, our team had a

12  communication with Retrophin's counsel with respect to the

13  last paragraph that was redacted in Defense Exhibit 118-26, RO

14  57684, that's unredacted in DX 118-55 and that is the

15  paragraph that talks about the insider trading policy and the

16  code of ethics.

17           We had asked Retrophin to produce that as part of

18  the complete package of the board materials that went to

19  Retrophin board members prior to July 3.  They did that.  So

20  they included that, with the understanding that we were not

21  waiving privilege.  We were not going to argue a broad subject

22  matter waiver.

23           So I know with respect to this last paragraph that

24  has been waived.  We do not know why Retrophin produced to the

25  government certain documents that were redacted and, again, as

Jain - cross - Chan                    5516

1    Mr. Chan said, we never got a privilege log from the

2    government that Retrophin provided to the government with

3    respect to their redactions.  So that's what we know about

4    this last paragraph.

5              THE COURT:  All right.  Why don't you use this one

6    hour to get in touch with Retrophin counsel and sort this out.

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5517

1          MR. KESSLER:  The other thing, Your Honor, is just

2    because we have time constraints involving the witness, if

3    there is nothing that Mr. Chan was going to ask this witness

4    about that had been redacted, then we can work the rest of it

5    out even after the witness is done.  The only potential

6    concern could be if we are going to show to the jury in the

7    next hour or hour and a half something that was redacted and

8    now there's a question about the redaction.  I assume Mr. Jain

9    was not at this July 23, 2013 board meeting.

10          MR. CHAN:  Let me answer that question.  Yes, I do

11   plan to ask him, because the September 9th board minutes are

12   redacted and that have to do obviously with this meeting about

13   the settlement agreements.  Curiously Retrophin redacted parts

14   that summarize the discussion about the settlement agreements.

15   So I would be asking this witness about them.

16          MR. KESSLER:  In that case, I think the best thing

17   is defense counsel has not been shy about asking Retrophin to

18   waive privilege about things at any point in this trial.  So

19   it's not clear, why if they had a specific discussion about

20   other documents, the privilege over other documents that are

21   addressed in these board minutes, so that wasn't addressed

22   earlier and instead it was brought up in front of the jury to

23   suggest something had been concealed.  But it seems like the

24   fastest thing to do is to just ask Retrophin.  And assuming

25   Retrophin is going to waive the privilege, there is no

5518

1    problem.

2            MS. SMITH:  And I think the concern is there is a

3    suggestion that there was something wrong with the version

4    that was produced by Retrophin, which is completely

5    inappropriate.  If this is something that thought should have

6    been waived -- we take no position on Retrophin's waiver.  We

7    don't care to the extent that we have had questions that we

8    have asked.  So if the document is going to in and there is no

9    remaining privilege waiver, then put in the document without

10   the redactions and don't question the redactions in front of

11   the jury because I don't know what the purpose of that was,

12   and I think that's what is really concerning to us.  On top of

13   the fact that they have asked again, as Mr. Kessler said,

14   sometimes during a witness' testimony, for Retrophin to

15   unredact documents.  So if they wanted the version that was

16   sent to Mr. Panoff in December -- or I don't know actually

17   when the e-mail was sent -- to have the unredacted version

18   attached to it, they could have asked Retrophin.  We are not

19   objecting.  We're more than happy to have the unredacted

20   version go into evidence.  But to put the redacted version and

21   they question why Marcum might have gotten the redacted or

22   unredacted is completely inappropriate.

23           THE COURT:  Especially because this witness does not

24   seem to have personal knowledge about the redactions at all.

25           MR. CHAN:  I wasn't going to ask the witness to

5519

1   compare redactions versus unredactions.

2          THE COURT:  But I think you did focus the witness on

3   the redactions and ask him whether he received the documents.

4          MR. CHAN:  Your Honor, it was my effort to try to

5   connect these documents together.  The e-mail that we got with

6   the minutes attached sent to him has only been produced to us

7   with redactions.  So I had to put in the e-mail to show him

8   you got this e-mail, right, with the minutes, which he got

9   without redactions at the top.

10         THE COURT:  They are also unsigned.

11         MR. CHAN:  Well, they're all signed.  First of all,

12  they're all signed.

13         THE COURT:  Okay, but I'm saying the cover e-mail

14  lists the board minutes as being unsigned and Mr. Jain asks

15  Mr. Greebel in an e-mail dated December 12th for executed

16  minutes, I guess, and then on December 12th, he gets the

17  executed minutes, but --

18         MR. KESSLER:  I think the attachments to Defense

19  Exhibit 118-26 are signed.

20         THE COURT:  Are signed and they're redacted.  I

21  think Mr. Jain said he didn't recall the redactions when he

22  got them.

23         MS. SMITH:  That's right, because when Retrophin

24  produced this to the Government, they put redactions in.

25  Again, if the defense wants the redactions out, then they

MDL   RPR

5520

1    should have just asked Retrophin and made these arguments, and

2    if they objected to whatever the redactions were, they should

3    have brought it to the Court.  My only point is we shouldn't

4    be litigating this in front everybody the jury.

5           THE COURT:  Somebody could get clearance from

6    Retrophin.  I'm not going to admit anything if there is a

7    privilege at stake and Retrophin should be heard.

8           MR. CHAN:  I think this is the way we can proceed.

9    I have just been informed that Retrophin produced to us an

10   unredacted version, and the Government, an unredacted version

11   of the September 9th, in the past, so they have waived

12   privilege over the redactions on September 9th.

13          MR. KESSLER:  Let's use that one.

14          MR. CHAN:  We can proceed with that one.

15          The November 1 has no redactions, which is the other

16   meeting that references settlement agreements.  So I will

17   focus the examination today on the unredacted meeting minutes.

18   We will still seek to try to resolve the issue of the ones

19   that are redacted to get Retrophin to waive privilege over the

20   unredacted ones.  I assume after this witness testified and is

21   gone, I assume the Government doesn't object to the remainder

22   of the ones unredacted.

23          MS. SMITH:  We would like to place Defense Exhibit

24   1062 with whatever the version is that is completely

25   consistent with Retrophin's current privilege waiver and what

5521

 1    the defense wants.  This e-mail with the attachments should go

 2    in with as much unredacted as possible.  Again, I'm concerned

 3    about the suggestion of what the redactions are, if they are

 4    appropriate.

 5          We are fine with Mr. Chan focusing on the actual

 6    minutes, you know, the other version and just replacing this

 7    with a version that has fewer redactions or no redactions

 8    depending on what the outcome is.

 9          THE COURT:  Somebody needs to confirm from Retrophin

10    what they have agreed to and waived.

11          I think you also need to talk about Mr. Jain's

12    schedule.  He needs to leave here by 2:00 to get his flight.

13    What are we doing about that?

14          MR. KESSLER:  I don't know how much longer the cross

15    is.  The redirect is about two minutes.

16          MR. CHAN:  How long did you give the jury?

17          THE COURT:  I gave them an hour, 1:30, 1:35.

18          MR. KESSLER:  Let me confer with Mr. Jain's

19    schedule.

20          THE COURT:  I didn't know about Mr. Jain's schedule.

21          MS. SMITH:  We went on the assumption at 11:10 that

22    Mr. Chan said he had an hour left so we didn't actually think

23    there was going to be an issue, but we will check.

24          MR. CHAN:  Our preference would be to continue.  30

25    minutes is short.  I don't think, though, I will be an hour.

5522

1  If he can stay an additional 30 minutes, to 2:30.

2          MR. KESSLER:  We will check and report back quickly.

3          THE COURT:  Whatever his flight arrangement is, I

4  don't have control over that.

5          In the meantime, during the lunch hour, you will

6  contact Retrophin and Mr. Chan get back to me as to what is

7  admissible.  Thank you.

8          I also would like an answer on Juror No. 2.  Juror

9  No. 2 would like to stay on.  I told you what her employer

10  said.

11          MR. DUBIN:  The Government and the defense agreed,

12  Your Honor, that it is up to her.  If she wants to stay,

13  that's fine.  I think one of the suggestions that we were

14  going to make was to at least let her -- either Your Honor or

15  have the juror let her employer know there is going to be a

16  few days where she will be able to work.

17          THE COURT:  I have already told her employer that.

18          MR. DUBIN:  Okay, Your Honor, I didn't know that.

19          THE COURT:  I said that this morning that I advised

20  her employer she would be able to return the Wednesday and

21  Friday the week after Thanksgiving.

22          MR. DUBIN:  I'm sorry.  I missed that, Your Honor.

23          THE COURT:  So he expressed his concerns about the

24  cost, his rising rent, that he has to find a new lease,

25  business is slow, it is a terrible financial hardship.  He

5523

1    wants to do the right thing, but it is financially very

2    difficult for him.

3              MR. DUBIN:  I understand, Your Honor.

4              THE COURT:  I guess the choice is that she can stay

5    if she doesn't mind not getting paid and we will see what

6    happens.  I think she doesn't want to be in a tough position

7    with her employer.  He does understand that he would not let

8    her go.

9              MR. DUBIN:  Right.

10             THE COURT:  But he does have to hire someone to fill

11   in.  It is a small office.  There is the reception, the

12   dentist and Juror No. 2.  That's it for his office.  It is a

13   three-person office.

14             MR. DUBIN:  Another suggestion might be at the end

15   of the day, if we could have her stay and have Your Honor talk

16   to her briefly and just make sure that she doesn't feel like

17   she is in a tough spot.

18             THE COURT:  We can talk to her at any time.  What I

19   did tell her is that her boss wants her to call him.

20   Hopefully she will do that during the lunch period and

21   hopefully we will have an idea of what, if anything, they

22   worked out.

23             MR. DUBIN:  Thank you.

24             MR. KESSLER:  I talked to Mr. Jain's attorney.  It

25   seems likely we will be able to squeeze out more time after

5524

1   2:00.  I'm optimistic we can make this work.

2           THE COURT:  Is he on Government travel?

3           MR. KESSLER:  I don't believe so.  He is flying with

4   his wife and California.  I think they are going to be able to

5   work this out.  I'm just not absolutely certain yet.

6           THE COURT:  Thank you.

7           MR. DUBIN:  Thank you.

8           (Lunch recess.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5525

1          A F T E R N O O N   S E S S I O N

2          (In open court - jury not present.)

3          THE COURT:  Mr. Brodsky wanted to advise me of

4    something.

5          MR. BRODSKY:  During the break, I looked at the

6    transcript of Mr. Shkreli's trial related to Lavelle and

7    Spielberg.  Your Honor did rule.  It came in under Count Seven

8    and not Counts One through Six.  I was wrong this morning

9    about that.  I wanted to make sure Your Honor knew on the

10   transcript at pages -- had ruled that --

11         THE COURT:  It's all right, Mr. Brodsky.  You are

12   totally forgiven.  These things happen.  Thank you for your

13   candor.

14         MR. BRODSKY:  I wanted to make sure you knew I was

15   mistaken on that.  I am going to look at the arguments made

16   and see if we have an argument that Mr. Brafman did not make.

17   And if we have an argument that Mr. Brafman did not make, we

18   will raise it to Your Honor.

19         THE COURT:  I think we did consider some of your

20   confrontational clause argument.

21         MR. BRODSKY:  That argument was considered.  Mr.

22   Brafman made that same argument.

23         THE COURT:  Thank you.

24         Was there anything else you --

25         MR. KESSLER:  Mr. Chan and I were working out the

MDL   RPR

5526

1  logistics of which pieces of paper will be shown to this

2  witness during this examination.  I think we worked it out.

3  It may be after this witness is done, we are going to have to

4  reconcile which is the final unredacted version that goes in

5  the record.

6           MR. CHAN:  Because Ian Shapiro is on trial now.

7           THE COURT:  Counsel for Retrophin.

8           MR. CHAN:  But I will only refer to things that are

9  unredacted.

10           THE COURT:  Thank you, Mr. Chan.

11           MR. PITLUCK:  Just to make sure, because I am hoping

12  we can go seamlessly into Ms. Merrill, we can just enter into

13  those into evidence, the Spielberg and the Lavelle agreements.

14           THE COURT:  Yes, one, they are admissible and, two,

15  I do believe they are relevant.

16           MR. PITLUCK:  Thank you.  Just making sure, Judge.

17           THE COURT:  We will see if all of the jurors are

18  back and we will bring them in.

19           (Jury enters the courtroom.)

20           THE COURT:  All the jurors are present.  Please have

21  a seated.

22           Sir, you are still under oath.

23           You may resume your cross, Mr. Chan.

24           MR. CHAN:  Thank you, Your Honor.

25  CROSS EXAMINATION

MDL   RPR

Jain - cross - Chan                              5527

1    BY MR. CHAN:  (Continuing)

2    Q    Good afternoon, Mr. Jain.

3    A    Good afternoon.

4    Q    We left off with Defense Exhibit 118-26, which is in

5    evidence.

6                THE COURT:  Could you put the microphone closer,

7    please.

8    Q    We left off with Defense Exhibit 118-26 in evidence.  I

9    had asked you to look at this.  This was an e-mail where Mr.

10   Greebel transmits to you certain board minutes on December 12,

11   2013; correct?

12   A    Yes.

13               MR. CHAN:  And, Your Honor, from the group of

14   exhibits that I was dealing with before the lunch break, of

15   those, at this time the defense only seeks to move into

16   evidence defense 118-58.

17               THE COURT:  Without objection from the Government.

18               MR. KESSLER:  Without objection.

19               THE COURT:  We will receive Defense 118-58.

20               (Government's Exhibit 118-58 was received in

21   evidence.)

22               MR. CHAN:  Would you put up 118-58.

23   Q    Sir, these are the minutes that you received in that

24   e-mail relating to the Retrophin board meeting on September 9,

25   2013; correct?

1    A    Yes.

2    Q    And going through the meeting minutes, as it states, the

3    following members of the board were present in person or by

4    telephone, Martin Shkreli, Steven Aselage, and Steven

5    Richardson.  Sitting here now, do you recall whether or not

6    those three people were in attendance at this board meeting?

7    A    As noted in this minutes of the meetings, I understand

8    that they were sitting on the board call.

9    Q    What about Mr. Panoff?

10   A    Yes.

11   Q    And you were there?

12          MR. KESSLER:  Your Honor, I'm sorry, I would ask

13   that Mr. Jain's statement be stricken because he is reading

14   from the board minutes, not testifying about his own

15   recollection.

16          THE COURT:  Well, listen to the question.  He is

17   asking about your recollection I think with reference to this

18   whether this helps refresh his recollection as to who was at

19   the meeting.

20   A    My recollection is that all these members who are

21   explaining into this meeting they were present in the meeting.

22   Q    Including you and your colleague, Mr. Hackert?

23   A    Yes.

24   Q    The minutes go on to describe that Mr. Shkreli asked Mr.

25   Panoff to advise the board on the financial condition of the

Jain - cross - Chan                    5529

1    company and reaching accounting determination.  Mr. Panoff

2    advised the board that management of the company determined

3    that it is appropriate to restate the audited financials for

4    the year ended December 31, 2012 and the three months ended

5    March 21, 2013, et cetera.

6              Does that comport with your recollection of what

7    happened during that meeting?

8    A    Yes.

9    Q    And it goes on to state that Mr. Panoff explained that it

10   would be necessary to restate the subsequent events and

11   liquidity footnotes in the audited financials for 2012 and the

12   financial statements for the three months ended March 30,

13   2012, as well as amend management's discussion and analysis of

14   financial condition and results of operation in the 2012 10-K

15   and the first quarter 2013 10-Q, a draft of which was

16   previously provided to the board.

17             Is that what you remember too?

18   A    Yes.

19   Q    And Mr. Panoff, it says, also explained that such

20   restatements and amendments were due to non-cash changes

21   required by the accounting rules as a result of various

22   settlement agreements entered into by the company.  Do you

23   recall that?

24   A    Yes.

25   Q    Then it says Mr. Shkreli asked Mr. Hackert to advise the

1   board on recent changes to GAAP.  Do you recall that?

2   A    Yes.

3   Q    And Mr. Panoff advised the board that management believes

4   that the company should be an early adopter of Accounting

5   Standards Update ASU 2013-04, et cetera.  During that

6   discussion?

7   A    Yes.

8   Q    So you were there in person or there on the phone?

9   A    We were there on the phone.

10  Q    You and Mr. Hackert?

11  A    Yes.

12  Q    You were physically together with Mr. Hackert?

13  A    Yes.

14  Q    Where were you calling in from?

15  A    Mr. Hackert's office.

16  Q    And who did the talking on behalf of Marcum during that?

17  A    Mr. Hackert.

18  Q    Do you recall yourself talking at any point?

19  A    No.

20               (Continued on next page.)

21

22

23

24

25

1    BY MR. CHAN:

2    Q    After the discussion about the settlement agreements --

3    sorry, continuing on.

4         It says next:  The board reviewed and discussed the

5    draft of the amendments of the 2012 10-K, the audited

6    financial statements of the year ended December 31, 2012, the

7    first quarter 2013 10-Q, and the financial statements for the

8    three months ended March 31, 2013.  The board also discussed

9    the following issues with management and Marcum:  Critical

10   accounting and auditing principles and practices, the adequacy

11   of internal controls, reports to be submitted to the board

12   under Section 10(a) of the Securities Exchange Act, 1934 as

13   amended, and any disagreement or difficulties with management

14   but none reported.

15        Mr.  Jain, do you remember that discussion?

16   A    Yes.

17   Q    And the bullet points here, do they correlate to your

18   categories in your SAS 61 letter?

19   A    Yes.

20   Q    During the meeting, do you remember what Mr. Shkreli

21   said, if anything, about the settlement agreements?

22   A    I don't recollect what Mr. Shkreli said.

23   Q    And I think you've testified you don't remember anything

24   from any of the board members?

25   A    No, I don't remember.

1    Q    One way or the other?

2    A    No, I don't remember.

3    Q    Do you remember that at the conclusion of the board

4    meeting, the board adopted Marcum's recommendations?

5    A    When you say at the conclusion of the meeting whether the

6    board adopted Marcum's conclusion, I don't know whether they

7    adopted our conclusion or not, but we communicated our

8    communication.

9    Q    But if you look at the, further, the resolutions in the

10   minutes starting at the bottom on page two:  Now, therefore,

11   it is hereby resolved that the restatement of the audited

12   financials for the year ended December 31, 2012 and the

13   financial statements for the quarter ended March 31, 2013 be

14   and hereby is approved in all material respects.

15            It continued:  Further resolved, that the amendments

16   to the 2012 10-K and the first quarter 2013 10-Q be and they

17   hereby are approved for filing with the SEC, subject to final

18   review by members of the board and other editorial comments

19   and other minor changes deemed necessary or desirable by the

20   chief executive officer of the company and the chief financial

21   officer of the company, each an authorized officer, filing

22   such report and the mailing of same to the company

23   stockholders.  And it continues with a few more resolutions

24   related to the filings.

25            Do you remember this occurring during the meeting?

1    A    Yes.  I'm sorry.  When you asked me the question before,

2    did approve the amended 10-K and 10-Q restatements.

3    Q    Okay.  In addition, if you go back to page two, in the

4    paragraph that starts, "Mr. Shkreli asked Mr. Panoff," the

5    final sentence of that paragraph in the minutes states:

6    Mr. Panoff also reviewed the terms of the consulting

7    agreements offered to Al Geller and Ken Banta.

8            Do you recall a discussion of Mr. Al Geller's

9    consulting agreements during that board meeting?

10   A    I don't recall that.

11   Q    One way or the other?

12   A    No, I don't recall that.

13   Q    And at the end of this, of these minutes, on page

14   three -- sorry -- in the middle of page three where it says:

15   Further resolved, that the consulting agreements for Al Geller

16   and Ken Banta in, or substantially in the, the form and

17   containing substantially the terms and provisions of the

18   consulting agreements attached hereto, be and they hereby are

19   ratified, et cetera.

20           Do you remember that happening in the board meeting

21   that you amended?

22   A    I just want to clarify one thing about the board meeting

23   which you are discussing about September 9th.

24           Once we communicated or SAS 100 communication, it's

25   not necessary that we remain there onto the board call.  After

1    the recommendations, we may get off the call and the board

2    meeting may continue.

3    Q    But in this particular meeting, do you remember if you

4    got off or did not get off?

5    A    I don't remember that.

6    Q    Either way?

7    A    Either way.

8    Q    And, sir, looking at the last page of these minutes, you

9    see that they're signed?  There's a signature on the top of

10   Evan Greebel, correct?

11   A    Yes.

12   Q    Earlier, you testified, I think yesterday you testified

13   that you, you make a certain assumption with respect to signed

14   meeting minutes.  You testified about that, right?

15   A    Yes.

16   Q    You said that your assumption is that if meeting minutes

17   are signed, they have been approved?

18   A    Yes.

19   Q    But if you look at these meeting minutes, does it say

20   anything about the prior meetings or any other prior meeting

21   minutes having been presented to you and approved by the board

22   in this meeting?

23   A    You mean in these minutes?

24   Q    Correct.

25   A    I have to read this whole minutes then again.

1   Q    Sure.  Usually, in your experience, that would be one of

2   the first items of business, correct?

3   A    So, when these meetings take place, the management ask

4   the audit committee to approve any past meetings which they

5   had into the minutes.

6   Q    Okay.  So, looking at the, sort of the start of this, of

7   these meeting minutes, do you see any such language about

8   board approval of prior meeting minutes?

9         (Pause.)

10  A    In the first few paragraphs, I don't see that.

11  Q    Okay.  So when you say that you assume that signed

12  meeting minutes were approved by the board, that's an

13  assumption that you're making on your own internally, correct?

14  A    But I'm talking about -- you, you're discussing about

15  that in this meeting, whether any past minutes were approved

16  or not.

17  Q    Right.

18  A    So I'm not saying that about this minute because this is

19  a signed minutes I'm seeing over here.

20  Q    Right.

21  A    And our hypothesis that if this is signed by the

22  secretary or the management or the people who's writing these

23  minutes, that means they had approved them.

24  Q    But you didn't go to Mr. Greebel and say these were

25  approved by the board?

1    A    We did not.

2    Q    You assumed that, correct?

3    A    Yes.

4    Q    In fact, if you look at, going back to Defense

5    Exhibit 118-26.

6    A    Okay.

7    Q    And go to the meeting minutes for the meeting that

8    happened after September 9th, so September 12th meeting

9    minutes which is at page R057704?

10   A    Yes.

11   Q    Do you see any indication in there that the board was

12   presented with and approved the prior meeting minutes on

13   September 9th?

14            THE COURT:  Did you say 744?

15            MR. BRODSKY:  57704.

16            THE COURT:  57704.  Thank you.

17   A    I don't see in the first few paragraph.

18   Q    To be clear, this e-mail is giving you a whole bunch of

19   meeting minutes at the same time, correct?

20   A    Yes.

21   Q    So you could, if you wanted to, look through all of the

22   meeting minutes to see if one meeting minute cross-references

23   notes being approved for a prior meeting, correct?

24   A    Yes.

25   Q    And you got this all the same time when you got this by

Jain - cross - Chan                    5537

1  e-mail?

2  A     Yes.

3  Q     Now, another exhibit that I put before you and still for

4  identification purposes is Defense Exhibit 118-4.

5  A     Okay.

6  Q     You had said that this were summaries that Marcum

7  maintains in its working papers about the meeting, correct?

8  A     These are abstracts of the meetings, yes.

9  Q     And "abstracts" is another word for "summaries"?

10 A     Yes.

11 Q     By the way, when you use meeting minutes to do your audit

12 work, you said unsigned and signed versions, correct?

13 A     Yes.

14 Q     So that means you use draft versions?

15 A     Yes.

16 Q     What is the purpose of having this abstract of the

17 meeting minutes for purposes of the auditing work?

18 A     So, these are like just only the summary way.  We don't

19 necessarily need to go all these hundreds of pages of the

20 meeting.  Rather, that we have a summary in front of us and we

21 can see that what are the key transactions discussed or taking

22 place during those meetings.

23 Q     Okay.  So, in order to prepare the abstract, you've got

24 to read the meeting minutes and abstract out what you find

25 most relevant and put it into a document, right?

1    A    Yes.

2         MR. CHAN:  Your Honor, I offer DX 118-4 pursuant to

3    the conversation that we had at side bar.

4         MR. KESSLER:  No objection.

5         THE COURT:  We will receive 118-4 under the

6    conditions discussed at side bar.

7         (So marked.)

8    Q    So, as you see, there are different sections that relate

9    to particular meeting dates, right?

10   A    Yes.

11   Q    If we scroll down, we'll see it for the September 9th or

12   September 9th meeting we talked about, 2013.

13   A    Yes.

14   Q    Right.  September 9th.  So this is your, Marcum's sort of

15   abstract of the meeting minutes from that date, right?

16   A    Yes.

17   Q    And I take it that when you reviewed the meeting minutes

18   and created this abstract, reviewed the abstract, having been

19   at the meeting --

20   A    Yes.

21   Q    -- you did not note any inconsistencies with your memory

22   of what happened on that date, correct?

23        MR. KESSLER:  Objection to the form and to

24   foundation about "created the abstract.

25        THE COURT:  Try to rephrase your question, please.

Jain - cross - Chan                                          5539

1           MS. SMITH:  Sure.

2    Q    Well, you know, you were at the September 9th, 2013

3    meeting, right?

4    A    I attended the meeting, yes.

5    Q    And then you get the minutes of the meeting, right?

6    A    Yes.

7    Q    And so you got the minutes of the meeting in December of

8    2013, right, or at least the signed version?

9    A    December 12th.

10   Q    December 12, 2013.

11          So, in reading the minutes at that time, if it

12   didn't match what you remembered, you would have noticed,

13   right?

14   A    Not necessary that I would have noticed it because this

15   communication, this abstract was done by my, maybe a staff

16   person or somebody.

17   Q    Right.

18   A    And I was there at the meeting.  It's not necessary that

19   I'm there at the whole meeting which took place, that maybe we

20   auditors might have jumped up from the meeting after a

21   communication.

22   Q    But certainly as to the parts that you were there for,

23   you would have remembered what happened and what didn't

24   happen, right?

25   A    Yes and no, not necessary that I would remember every

1  single thing.

2  Q    Even just three months later?

3  A    Not necessary that I would remember every single thing.

4  Q    But if you remembered and it wasn't consistent with your

5  recollection, you would have said something, correct?

6  A    Yes.

7  Q    You wouldn't have just let the record stand with an

8  inaccuracy, correct?

9  A    It happens sometimes.

10  Q    But that you would let the record stand with an

11  inaccuracy?

12  A    No.  I'm saying the idea, what you just said, like, in

13  the past, that, okay, we are human, we make mistakes, it could

14  be a mistake that we missed something.

15  Q    But if you knew, you would have said something?

16  A    Yes.

17        MR. CHAN:  Now, just keeping this up on the screen,

18  can you go down a little bit further on September 9th?  It's

19  right there, you had it, the part that refers to the

20  consulting agreements.

21  Q    And it says -- can't see it on that but maybe in front of

22  you -- it says:  Mr. Panoff also reviewed the terms of the

23  consulting agreements offered to Al Geller and Ken Banta.

24        Apart from the discussion at the board meeting which

25  you don't recall, do you recall being aware of the Al Geller

Jain - cross - Chan                    5541

1    consulting agreement?

2    A    I'm trying -- okay.  Mr. Panoff also reviewed the terms

3    of consulting agreements offered to Al Geller and Ken Banta.

4    Q    So, apart from what was discussed about the Al Geller

5    consulting agreement and the board meeting which you don't

6    recall --

7              MR. KESSLER:  Objection to the form of that question

8    which assumes facts not in evidence.

9    Q    Well, apart from any discussion about an Al Geller

10   consulting agreement at the board meeting, which you don't

11   recall if it happened either way, do you remember otherwise

12   having knowledge about the Al Geller consulting agreement at

13   that time?

14             THE COURT:  At the time of this abstract or the

15   meeting?

16             MR. CHAN:  At the time of fall 2013.

17   A    I have -- I don't recollect every single of those

18   consulting agreements because the company used to enter into

19   various consulting agreements into the general course of the

20   business.

21   Q    But do you remember doing an analysis about the, an

22   accounting analysis of the Al Geller consulting agreement?

23   A    If it is there in my work papers, then yes, there must be

24   some analysis performed by me and my team.

25             MR. CHAN:  One moment.

1          (Pause.)

2               MR. CHAN:  May I approach, Your Honor?

3               THE COURT:  Yes.

4   Q    I'm showing you what's been marked as Defense

5   Exhibit 118-41 and please take a look.

6          (Pause.)

7   Q    Mr. Jain, I'm not going to get into the details of this

8   agreement with you, but is it fair to say this is an analysis

9   that you conducted of the Al Geller consulting agreement?

10  A    Yes, I think accounting analysis of this consulting

11  agreement.

12  Q    And you transmitted it to Michael Harrison and Marc

13  Panoff at Retrophin?

14  A    Yes.

15  Q    You copied some of your Marcum colleagues, correct?

16  A    Yes.

17               MR. CHAN:  Your Honor, I offer defense

18  Exhibit 118-41.

19               MR. KESSLER:  No objection.

20               THE COURT:  We receive in evidence Defense Exhibit

21  118-41.

22               (So marked.)

23  Q    Mr. Jain, is it fair to say in order to do an analysis

24  of the consulting agreement terms, you had to have received

25  it?

Jain - cross - Chan                              5543

1   A     Yes.

2   Q     And you obviously had to be aware of it?

3   A     Yes.

4   Q     And sitting here now, do you recall the point of your

5   analysis?

6   A     Point of my analysis?

7   Q     Yes.  Why were you doing this accounting analysis?

8   A     Just to ensure that the accounting of these consulting

9   agreements are in accordance with the GAAP.

10  Q     And was that focused on how to account for the

11  compensation elements of it?

12  A     Exactly.

13  Q     And looking at the cover e-mail, was any of this

14  motivated by you, in part, to educate the finance team at

15  Retrophin about how to go about doing this?

16  A     So, this is, like, accounting items we generally provide

17  to our clients that in case if they are not aware of it, that

18  this accounting guidance, any transactions need to be

19  accounted for.

20  Q     Okay.  All right.  We'll put that aside.

21        All right.  So what, the board had -- you had the

22  board meeting and then the board agreed to file the restated

23  2012 audit filing, the first quarter 2013 filing to amend that

24  one, and also approve the second quarter 2013 filing which was

25  the ones up for filing at that time, right?

1    A    Yes.

2    Q    And that resulted in -- well, so all three of those

3    filings were made at the same time?

4    A    Yes.

5              MR. CHAN:  And rather than go through all three, why

6    don't we put up the filing for the second quarter of 2013

7    which I think that -- did the government put that into

8    evidence in its direct?  No?  Okay.  So then defense

9    Exhibit 116-A-1.

10   Q    Mr. Jain, do you recognize this as the Retrophin filing

11   for June 30, for the quarter ended June 30, 2013?

12   A    Yes.

13             MR. CHAN:  Your Honor, I offer it.

14             MR. KESSLER:  No objection.

15             THE COURT:  We receive Defense Exhibit 116-81.

16             (So marked.)

17   Q    And if you turn to -- you agree there are a number of

18   places in this filing that reference the settlement

19   agreements, correct?

20   A    Yes.

21   Q    And note nine -- scroll down -- at page 16 of 38, note

22   number nine, third paragraph:  In the second quarter of 2013,

23   the company, its chief executive officer, and a related party

24   became party to a series of agreements to settle up to

25   $2,286,511 of liabilities, and it goes on.

Jain - cross - Chan                    5545

1        Mr. Jain, you agree that this is the language or it
2  would appear discussing the settlement agreements closely
3  tracks the language discussing settlement agreements in your
4  SAS 61 letter, right?
5  A    It's not necessary that it's going to be exactly the same
6  word to word language, but the substance of my language in
7  SAS 61 is to communicate the accounting and what is exactly
8  the consulting agreements are.
9  Q    And before this filing or any of the three filings we're
10 talking about were actually filed, you were given the
11 opportunity to review them in advance, right?
12 A    What we need, given the opportunity to?
13 Q    To review the filings bore they were actually filed?
14 A    Yes.
15 Q    And that's part of the process, right?
16 A    Yes.
17 Q    What's the point of that process?
18 A    That we review whether the footnotes are properly
19 disclosed or not and whether the accounting of all the indexes
20 are properly calculated or not.
21 Q    And before Marcum can sign off on this filing, you had to
22 review this footnote and be satisfied that it was accurate,
23 correct?
24 A    Yes.
25 Q    And you did that?

1  A    Yes.

2  Q    In fact, do you remember providing some line edits to the

3  language here?

4  A    We do provide our comments to the management back.

5  Q    And do you remember for this particular, for this

6  particular --

7  A    I don't remember for this particular.

8  Q    Okay.  I'm going to show you what's been marked as

9  Defense Exhibit 118-47.  I think we accidentally stapled two

10 documents together.

11           THE COURT:  Two different exhibits, you mean?

12           MR. CHAN:  Yes.  This one should stop at R051206.

13 Q    All right.  Mr. Jain, looking at that, does this refresh

14 your recollection that you sent comments of the draft over to,

15 the draft of the June 30, 2013 filing back to Retrophin?

16 A    Yes.

17           MR. CHAN:  Your Honor, I offer it.

18           MR. KESSLER:  No objection.

19           THE COURT:  All right.  We will admit Defense

20 Exhibit 118-47.

21           MR. CHAN:  Correct.

22           (So marked.)

23 Q    Now, turning to note nine which is on Bates R051189, and

24 you'll see throughout that section on note nine some

25 black-lining, correct?

1    A    Yes.

2    Q    Those edits were proposed by you to Retrophin, correct?

3    A    From our Marcum teams, yes.

4    Q    So, ultimately, when this, by the time this filing and

5    the other two filings were filed, you know, all together,

6    Marcum had a chance to review the footnote language about the

7    settlement agreements and it was satisfied as to the

8    completeness and accuracy of that language, right?

9    A    Yes.

10   Q    You obviously wouldn't have given your consent to file

11   them if you had some problems with the language, right?

12   A    Yes.

13   Q    Now, do you recall that there was, after this time --

14   well, so before that, before I get to that, that dealt with

15   the restatement for 2012, the restatement for Q-1 2013 and for

16   Q-2 2013, right?

17   A    No restatement of Q-2 2013.

18   Q    Correct, but up until now, we've been talking about the

19   filings for those three time periods, correct?

20   A    Yes.

21   Q    You then went on to do Q-3 2013, right?

22   A    Yes.

23   Q    And that process involved sort of the same sets you

24   talked about; you did a SAS 61 letter that was sent to the

25   board, right?

Jain - cross - Chan                    5548

1    A    Yes.

2    Q    And it summarized many of the same settlement,

3    discussions about the settlement agreements we've talked

4    about?

5    A    Yes.

6    Q    Then there was a board meeting, correct?

7    A    Yes.

8    Q    You attended the board meeting, right?

9    A    Yes.

10   Q    And the SAS letter and the settlement agreements were

11   discussed at that meeting?

12   A    Yes.

13   Q    And then the board authorized the filing and you received

14   drafts of the filing and then they were filed?

15   A    Yes.

16   Q    And you agree that the disclosure language in that filing

17   is very similar to the disclosure language in the settlement

18   agreements in the prior filings, right?

19   A    Similar to the one that was filed in the prior filings.

20   Q    Just putting up the SAS letter that you put in in

21   connection with that, that is --

22   A    Do I need to still hold onto this document which you just

23   gave me?

24   Q    Put that aside.  Thank you.

25        It was put into evidence as Government

Jain - cross - Chan                                    5549

1    Exhibit 114-22.

2              MR. CHAN:  In case it hasn't been put into the

3    evidence as Government, we'll offer it as DX 118-39.

4              MR. KESSLER:  No objection.

5              THE COURT:  We will receive DX 118-39.

6              (So marked.)

7    Q    It's the same document so you can hold on to that.

8              I just wanted to point out one thing about this is

9    one additional thing that was added to your SAS 61 letter

10   discussion about the settlement agreements on page three, at

11   the bottom, is you added that in August 2013, the company

12   entered an additional settlement agreement for $300,000 and

13   made payment on August 29, 2013 to settle such agreement.

14             Do you recall that?

15   A    Yes.

16   Q    And that -- you were able to sort of provide that

17   additional information because when the settlement agreement

18   happened, you were apprised and then given a copy of it,

19   correct?

20   A    Yes.

21   Q    It was your understanding it was similar to the prior

22   ones that had happened involving the MSMB investors, right?

23   A    Yes.

24             MR. CHAN:  One moment, Your Honor.

25             (Pause.)

CMH        OCR        RMR        CRR        FCRR

Jain - redirect - Kessler                    5550

1        MR. CHAN:  No further questions, Your Honor.

2        THE COURT:  Okay.  Do you want to redirect?

3        MR. KESSLER:  Yes.

4        THE COURT:  Mr. Chan, can you provide copies of

5   Defense Exhibit 118-39 to my clerk?

6        MR. CHAN:  Of course.

7        THE COURT:  Thank you.

8        MR. KESSLER:  May I proceed?

9        THE COURT:  Yes.

10  REDIRECT EXAMINATION

11  BY MR. KESSLER:

12  Q    Mr. Jain, you were just asked some questions about the

13  September 9, 2013 board minutes?

14  A    Do I need to open any document?

15  Q    Do you remember those questions though?

16  A    Yes.

17  Q    Do you remember that the minutes were signed by

18  Mr. Greebel?

19  A    Yes.

20  Q    You don't recall the details of everything that was

21  discussed during the portions of the meeting when you were

22  present, right?

23  A    I don't recall every single word by word of the

24  discussion.

25  Q    And you don't know whether these were minutes that were

1    reviewed by the board?

2    A    I don't remember that.

3    Q    And you don't know whether they were approved by the

4    board?

5    A    I don't know whether they were approved by the board.

6    Q    And you don't know whether Evan Greebel put things in the

7    minutes that didn't happen, right?

8              MR. CHAN:  Objection, Your Honor.

9              THE COURT:  Try to rephrase it, Mr. Kessler.

10   Q    Do you know whether everything in the minutes actually

11   occurred at the board meeting?

12   A    I don't know.

13             MR. KESSLER:  All right.  If we can switch to the

14   prosecution laptop.

15   Q    Mr. Jain, you were asked some questions about Government

16   Exhibit 114-29-A and we'll put it up for you.  This is the --

17   if we go to the second page, this is a memo you got about the

18   change in controls as a result of the settlement agreement.

19             Do you remember that?

20   A    Yes.

21   Q    If we look at that third paragraph, the first sentence

22   says:  The objections raised by the investors related solely

23   to actions undertaken by MSMB and its related funds.

24             Do you see that?

25   A    Yes.

                       Jain - redirect - Kessler              5552

1   Q    The memo doesn't say that the investors objected to

2   anything Retrophin had done, is that right?

3   A    It doesn't say that.

4   Q    If we go up one paragraph, the first sentence in the

5   second paragraph reads:  In April and May of 2013, certain

6   investors funds affiliated with MSMB advised MSMB that they

7   objected to the number and/or value of the shares of common

8   stock in the company that they received as a distribution from

9   such funds.

10           Do you see that?

11  A    Yes.

12  Q    And that was management's communication to you about

13  what, what had occurred to give rise to the settlement

14  agreements?

15  A    I'm sorry?

16  Q    This is management's explanation to you of why there had

17  been settlement agreements?

18  A    Yes.

19  Q    Did management tell you that Mr. Shkreli had lied to any

20  of these investors?

21  A    No, I don't remember that.

22  Q    That's not in the memo?

23  A    No.

24  Q    You were asked some questions about Government

25  Exhibit 114-25.  Do you remember, this is the chart of some of

1    the settlement agreements?

2    A    Yes.

3    Q    And defense counsel directed your attention to the bigger

4    box that has all the text lower down on the page and there

5    were sentences at the end about, The chief executive officer

6    agreed to provide a counterparty with 47,128 shares of his

7    common stock in the company as a separate component in one of

8    settlement agreements.  Accordingly, the company does not

9    believe it is required to record a liability for the

10   share-based component.  Is that right?

11   A    Yes.

12   Q    So the company told you -- let me ask you this.  Did this

13   text come from you or from the company?

14   A    This text was analyzed by us in the agreement and our

15   communication was with the management to corroborate that as

16   well.

17   Q    But originally it came from them?

18   A    Yes.

19   Q    And the text says that the chief executive officer agreed

20   to provide one of the counterparties with a number of shares

21   of his common stock, right?

22   A    Yes.

23   Q    So they're talking about Mr. Shkreli's stock?

24   A    He's personally liable for that.

25            (Continued on next page.)

Jain - redirect - Kessler                    5554

1    BY MR. KESSLER:

2    Q    And then in the next sentence there's a sentence --

3    strike that?

4         Then there's a statement that the company is not

5    required to record a liability.  Do you see that.

6    A    Yes.

7    Q    So recording a liability means putting a liability on the

8    financial statement, right?

9    A    Yes.

10   Q    That is different than whether a company has to disclose

11   the transaction, right?

12   A    Disclosing a transaction it's just disclosing.  It is not

13   necessarily adding on balance sheet or financial statement.

14   Q    You can be required to disclose something even if it

15   doesn't affect the balance sheet?

16   A    Yes.

17   Q    And, in fact, if we pull up Government's Exhibit 968 and

18   go to page 39.

19   A    Under which tab, please?

20   Q    We'll put it up on the screen.  This is the amended 10-k,

21   page 39.  Zoom in on the top paragraph.  At the end there's a

22   -- after August 2013, about two-thirds down the paragraph,

23   there's a sentence that begins the counterparties to these

24   agreements?

25   A    Yes.

Jain - redirect - Kessler                    5555

1    Q     The next line, the chief executive officer also agreed to

2    deliver or cause to be delivered 47,127 shares of common

3    stock.  Do you see that?

4    A     Yes.

5    Q     So that was disclosed?

6    A     Yes.

7    Q     It's just not recorded to liabilities?

8    A     Yes.

9    Q     And was any transaction related to Lindsay Rosenwald

10   disclosed?

11   A     Not in this document.

12   Q     And, finally, if you go back to Government's Exhibit

13   114-25 and we can now focus on the top.  Do you remember

14   Mr. Chan asked you some questions about the dates of the

15   settlement agreements?

16   A     Yes.

17   Q     And you agreed that five of the six had occurred before

18   May 31, 2013?

19   A     Four of these five, yes.

20   Q     Four of the five?

21   A     Yes.

22   Q     You'll agree with me that those same four occurred

23   between December 31, 2012 and May 31, 2013?

24   A     Based on the settlement agreements, yes, they were before

25   May 31.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Jain - redirect - Kessler                    5556

1    Q     Now, if we can go to Government's Exhibit 124-2.  This is

2    the litigation representation letter from Katten.  Do you

3    recall that?

4    A     Yes.

5    Q     And you were asked some questions about the text in the

6    red box that begins subject to the foregoing?

7    A     Yes.

8    Q     If we just look at the very last part of that paragraph

9    following, everything you see the disclosure applies to

10   material loss contingencies that exist at the audit date or

11   any time from the audit date to the date of the letter.  Do

12   you see that?

13   A     Yes.

14   Q     The date of the letter is May 31, right?

15   A     Yes.

16   Q     If you scroll up to the first paragraph?

17         What's the audit date?

18   A     The audit inquiry letter date is April 2, 2013, whereas

19   my audit date is December 31, 2012.

20   Q     If we go back down to the other paragraph with the box

21   around it, to that statement or any time from the audit date

22   to the date of this letter.  That means from December 31, 2012

23   to May 31, 2013, right?

24   A     That is correct.

25   Q     And all those settlement agreements occurred between May

Merrill - direct - Pitluck                    5557

1    31 and December 31, 2013?

2    A    Out of five, four of them, yes.

3              MR. KESSLER:  No further questions.

4              THE COURT:  Anything else, Mr. Chan?

5              MR. CHAN:  No.  Thank you, your Honor.

6              THE COURT:  All right.  So you are excused.  Have a

7    safe flight back.  Thank you.

8              THE WITNESS:  Thank you.

9              (Witness excused.)

10             THE CLERK:  Raise your right hand and be sworn.

11   A M Y    M E R R I L L,

12             having been duly sworn was examined and

13                  testified as follows:

14             THE CLERK:  State your name your name for the

15   record.

16             THE WITNESS:  Amy Merrill.  A M Y, M E R R I L L.

17             THE COURT:  Please, proceed, Mr. Pitluck.  I note we

18   can do without a formality.  You are calling your next witness

19   and whom, please.

20             MR. PITLUCK:  The government caution Amy Merrill.

21             THE COURT:  Ms. Merrill has been sworn and she

22   stated her name for the record, you may proceed.

23             MR. PITLUCK:  Thank you, your Honor

24   DIRECT EXAMINATION

25   BY MR. PITLUCK:

1   Q    Ms. Merrill, where do you live?

2   A    In Salt Lake City, Utah.

3   Q    Where do you currently work?

4   A    Standard Registrar and Transfer Company.

5   Q    What's your position at Standard Registrar and Transfer

6   Company?

7   A    I'm the president.

8   Q    What is Standard Registrar?

9   A    We're a stock transfer company.

10  Q    Do you have a supervisory role at Standard Registrar?

11  A    Yes.

12  Q    How many people do you supervise?

13  A    Three.

14  Q    What is a stock transfer company?

15  A    We issue and transfer stock for companies.

16  Q    What kinds of companies do you work for, does Standard

17  Registrar work for?

18  A    Typically smaller companies, some public and some

19  private.

20  Q    Now, you just testified that a stock transfer company

21  issues transfer of shares, is that correct?

22  A    Yes, that's correct.

23  Q    Can you explain the process for issuing new shares?

24  A    The issuing new share company or the company's counsel

25  presents documents, board resolutions to issue shares to

Merrill - direct - Pitluck                    5559

1    specific individuals.

2    Q    And you said company or company counsel.  Who at the

3    company is authorized to issue shares of a stock?

4    A    Officers of the company.

5    Q    And you said that you have to received some sort of

6    instruction and I think you mentioned board resolutions?

7    A    Yes.

8    Q    Can instruction take any other form?

9    A    Yes.  We can get it by e-mail.

10   Q    Or a letter?

11   A    Or a letter, yes.

12   Q    And is it required to specify whether the shares are

13   restricted or not?

14   A    Yes, it should.

15   Q    What does it mean to have restricted shares?

16   A    Restricted shares can't be sold on the open market.

17   Q    Does the transfer of stock operate under similar

18   procedures?

19   A    Yes.

20   Q    What happens in that situation when somebody wants to

21   transfer stock?

22   A    If you're transferring you would present your stock

23   certificate with a letter of instruction for the transfer of

24   shares.

25   Q    Now, these documents you've been talking about a little

1  bit, letters of instruction, board resolutions, things like

2  that, the does Standard Registrar maintain those documents?

3  A    Yes, we do.

4  Q    Is that in the company's files?

5  A    Yes.

6  Q    How are those files organized within Standard Registrar?

7  A    Each transaction has a transmittal number or an item

8  number that we track those by and we give those  -- their

9  numbers as we receive the documents and prepare the

10 transactions.

11 Q    And how soon after a request for a stock transfer are

12 Standard Registrar's files created?

13 A    As soon as we have a complete file, typically within 24

14 hours.

15 Q    And how quickly does Standard Registrar process the

16 issuance or transfer of stock?

17 A    If it's in good order, 72 hours.

18 Q    What are the different ways in which stock certificates

19 can be issued?

20 A    Electronically and book entry or in certificate form.

21 Q    You said electronically and book entry are throws

22 different things or the same?

23 A    It's the same.

24 Q    Typically the certificate is in certificate form?

25 A    Yes.

                    Merrill - direct - Pitluck              5561

1    Q    Do you issue them in both formats?

2    A    Yes, we do.

3    Q    Does your company, Standard Registrar, do stock transfers

4    after two entities merge?

5    A    Yes.

6    Q    In your experience does it sometimes take time to change

7    the company's name after a merger?

8    A    Yes.

9    Q    And in your experience does Standard Registrar conduct

10   stock transfers before that name change is final?

11   A    Yes.

12   Q    During your time at Standard Registrar did you work on an

13   account for a company called Retrophin?

14   A    Yes.

15   Q    Who are the main individuals that you communicated with

16   at Retrophin or connected to Retrophin?

17   A    Martin Shkreli and Evan Greebel.

18   Q    Who is Martin Shkreli, if you remember?

19   A    He was an officer of the company.

20   Q    Did you communicate Martin Shkreli in person or e-mail or

21   over the phone?

22   A    Phone and e-mail.

23   Q    What about Evan Greebel, who is he?

24   A    He was the company counsel.

25   Q    And did you communicate Evan Greebel in person?

Merrill - direct - Pitluck                5562

1    A    No.

2    Q    Did you communicate with him over the phone?

3    A    Yes.

4    Q    Or over e-mail?

5    A    Yes.

6    Q    How frequently?

7    A    Rather frequently.

8    Q    Did you over the course of your time working with

9    Retrophin and Standard Registrar, did you communicate with

10   other people there as well?

11   A    Yes.

12             THE COURT:  There where?

13             MR. PITLUCK:  I'm sorry.  Retrophin.

14   Q    Other people at Retrophin?

15   A    Yes.

16   Q    And were both Mr. Shkreli and Mr. Greebel authorized to

17   approve share issuances or transfers of stock as you testified

18   to before?

19   A    Yes.

20   Q    Are you familiar with the name Desert Gateway?

21   A    Yes.

22   Q    How are you familiar with Desert Gateway?

23   A    That was a company that we transferred for that Retrophin

24   merged with.

25   Q    Desert Gateway and Retrophin merge together?

Merrill - direct - Pitluck                    5563

1    A    Yes.

2    Q    Was Desert Gateway a client of Standard Registrar before

3    the merger?

4    A    Yes.

5    Q    Did you do stock transfers for Retrophin after the

6    merger?

7    A    Yes.

8    Q    Before you testified today, did you collect documents

9    from Standard Registrar's files for this case?

10   A    Yes.

11   Q    There's a large binder of materials in front of you.

12   Have you had a chance to look at that binder?

13   A    Yes.

14        MR. PITLUCK:  Your Honor, this binder contains

15   Exhibits marked for identification containing Government's

16   Exhibit 115-1 through 115-14, 115-16, through 115-28, 115-30

17   through 115-31, 115-34 to 115-36, 115-38, 115-40, 115-43 to

18   115-46 and 115-48 to 115-51.

19   Q    Now, Ms. Merrill, are these stock transfers related to

20   Desert Gateway and Retrophin?

21   A    Yes.

22   Q    Generally what do these files contain?

23   A    Transfer and issue documents.

24   Q    Along the lines of what you testified to before?

25   A    Yes.

Merrill - direct - Pitluck                5564

1   Q    Backup documents for each stock issuance and transfer

2   that Standard Registrar processed for these companies?

3   A    Yes.

4   Q    And were these records made at or near the time of the

5   relevant stock transfer activity?

6   A    Yes.

7   Q    Were these records kept in the ordinary course of

8   Standard Registrar's business?

9   A    Yes.

10          MR. PITLUCK:  Your Honor, we would move the list of

11   exhibits I read a moment ago into evidence.

12          MR. CHAN:  Your Honor, the only ones I object to are

13   as follows:  GX 115-1, -three, -five, -seven, -26, -51.

14   Sorry.  48 through 51.

15          THE COURT:  Do you want to give me one word to state

16   the basis or should we have a sidebar?

17          MR. PITLUCK:  Judge, I think we need to have a

18   sidebar.

19          THE COURT:  Okay.  Let's do that.

20          (Sidebar.)

21          THE COURT:  So.

22          MR. CHAN:  My objection is the ones that I have

23   listed aren't produced by Standard Registrar.  They were

24   produced by either Retrophin or Katten or others.  So I'm not

25   sure how she can say that she collected them and these are

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Merrill - direct - Pitluck                5565

1    part of her work files.

2            MR. PITLUCK:  Judge, I have been relying on an

3    e-mail from Mr. Chan saying he didn't object to these before.

4    I'm not totally prepared for it.  115-1 is something that was

5    produced by Standard Registrar and given to Retrophin.  This

6    is a stock transfer.

7            MR. CHAN:  Lay the foundation.  I was not aware of

8    that at this time.

9            MR. PITLUCK:  I did.

10            MR. CHAN:  What I told you in the e-mail I would not

11    object to laying a foundations for her exhibits.  All the ones

12    I don't object to have Standard Registrar Bates stamps on

13    them.

14            THE COURT:  One is not objected to?

15            MR. CHAN:  I object to that.  How does she know that

16    those are  --

17            MR. PITLUCK:  I will lay the foundation.  What's the

18    next one?

19            THE COURT:  The next one is three.

20            MR. PITLUCK:  This is an e-mail that she received

21    which is also attached to an exhibit.  We just had it broken

22    out.  I will lay the foundation for three.

23            THE COURT:  Okay.  Right now do you want to move

24    everything except these exhibits?

25            MS. SMITH:  Let's go through the rest of them.

Merrill - direct - Pitluck                    5566

1          THE COURT:  Five is the next one.

2          MR. CHAN:  My objection is the same for all of them.

3     I am not saying  -- I will object to the whole in mass on a

4     business records basis.  The only ones that are fair that come

5     from her own files.

6          MS. SMITH:  Are you objecting to the other ones on

7     another basis?

8          MR. CHAN:  All the bases.

9          MS. SMITH:  One is a business record  --

10         MR. CHAN:  I think we need to test them one by one,

11    based on her foundation first.  If I think the foundation is

12    sufficient, I won't object.  If not, I will object.

13         THE COURT:   Right now you are objecting to 115-1,

14    3, 5, 7, 26 and 48 through 51, is that correct?

15         MS. SMITH:  So we have a list of the ones you don't

16    object to.

17         THE COURT:  I think everything else.

18         MS. SMITH:  Just for the record.

19         THE COURT:  I'll try to do it and you'll correct me

20    if I'm wrong.

21         Do you want me to just admit what you don't object

22    to right now?

23         MR. CHAN:  Fine.  The ones I don't object to,

24    subject to the discussions we had out of the presence of the

25    jury.

1           MR. PITLUCK:  30 and 41.

2           THE COURT:   You did move 30.

3           MR. PITLUCK:   I moved 30 and 41.

4           MS. SMITH:  30 and 41 are Spielberg and LaValle.

5  The judge ruled those were coming in.  Mr. Chan just wanted to

6  preserve his objection to throws two.

7           THE COURT:  Okay.

8           MS. SMITH:  Then the Al Geller transfers that are

9  coming in subject to connection were not on the list that

10  Mr. Pitluck read.  So he'll do those separately as well.

11           THE COURT:  I want to note that 41 is not on this

12  list that Mr. Pitluck read.  He said 115-40.

13           MR. PITLUCK:  I'm sorry.  30 and 34 were the

14  Spielberg and LaValle.  41 is not on the list.

15           THE COURT:   I'm going to try to dance around these

16  objected to exhibits.

17           (In open court.)

18           THE COURT:  All right.  The court is prepared to

19  admit Government Exhibits' 115-2, -4, -6, -8 through 14,

20  Government's Exhibit 115-16 through 25 and 115-27 and 28,

21  115-30 through 31, 115-34 through 36, 115-38, 115-40, 115-43

22  through 46.  And that's it for now.

23           MR. PITLUCK:  Thank you, your Honor.

24           (So marked.)

25  Q    Ms. Merrill, can you turn to tab one of your binder,

Merrill - direct - Pitluck                    5568

1  which is Government's Exhibit 115-1 for identification only.

2  Do you see that document?

3  A    Yes.

4  Q    What is that document?

5  A    That's a transfer activity report.

6  Q    What is included in the transfer activity report?

7  A    It's all transfer and issue activity through a specific

8  time frame.

9  Q    What's the specific time frame on this?

10  A    December 1, 2012 through November 12, 2014.

11  Q    And is this something that was prepared by Standard

12  Registrar?

13  A    Yes.

14  Q    And is this a collection of all of the stock issuances

15  from Retrophin that date?

16  A    Yes.

17  Q    Is this a document that's prepared in the ordinary course

18  of the business?

19  A    Yes.

20  Q    Are the entries in these documents prepared at or  near

21  the time they were recorded?

22  A    Yes.

23           MR. PITLUCK:  We would move 115-1 into evidence.

24           MR. CHAN:  No objection.

25           THE COURT:  Received Government Exhibit 115-1 in

1    evidence.

2    Q    Ms. Merrill, looking at the top page of this document, do

3    you see where it says at the top prepared by Standard

4    Registrar and Transfer Company.  Is this the Retrophin stock

5    transfer report?

6    A    Yes.

7    Q    Going to the first entry here, can you focus in on the

8    bottom table, please.  Can you just explain to the jury what's

9    here?

10   A    This is a transaction for Desert Gateway.

11   Q    Do you see the number in the top left, 79738?

12   A    Yes.

13   Q    What is that?

14   A    That's a transmittal of stock.

15   Q    Does every stock issuance have a unique transmittal

16   number?

17   A    Yes, it does.

18   Q    What's the date for this transaction?

19   A    12-13-2012.

20   Q    Which company was this for?

21   A    This was for Desert Gateway.

22   Q    Do you see where it says certificates issued and

23   transferred?

24   A    Yes.

25   Q    What are those?

Merrill - direct - Pitluck                    5570

1   A    Those are the certificates that we issued to specific
2   individuals.
3   Q    So all of those and some continuing on the next page are
4   certificates that were issued on December 12  -- December 13,
5   2012?
6   A    Yes.
7   Q    Can we go back to the first page.  Do you see the top
8   entry there?
9   A    Yes.
10  Q    Mr. Shkreli's book entry?
11  A    Yes.
12  Q    Do you see the number to the right where it says R 1555?
13  A    Yes.
14  Q    What does that mean?
15  A    That is a certificate number and the R represents
16  restricted shares.
17  Q    And the number to the right of it?
18  A    That's the share amount.
19  Q    So each of those are individual shares that are issued in
20  connection with that transaction?
21  A    Yes.
22  Q    Do you see where it says book entry?
23  A    Yes.
24  Q    Can you explain what that means?
25  A    That means the shares were issued electronically rather

Merrill - direct - Pitluck                    5571

1   than by certificate.

2   Q    So let's look at the specific transfer report for this

3   document.  Can you flip to tab two, which is Government's

4   Exhibit 115-2 in your binder.  Do you see at the top there the

5   item number, is that the same item number we just looked at?

6   A    Yes.

7   Q    And the date, December 13, 2012?

8   A    Yes.

9   Q    And so this is the same transaction we looked at but this

10  is the detailed breakdown, correct?

11  A    That's correct.

12  Q    Can we go as to the third page of this exhibit, please?

13       What is this document?

14  A    It's an e-mail.

15  Q    Who is it from?

16  A    Evan Greebel.

17  Q    And is it sent to you?

18  A    Yes, it is.

19  Q    Who is copied?

20  A    Jackson Su and George Huang.

21  Q    Are those two people that you dealt with at Retrophin

22  while you were at Standard Registrar?

23  A    They are names that I recognize.

24  Q    What's the subject of this e-mail?

25  A    Shares of DGTE stock to be issued.

1  Q    The body of the e-mail says, Amy, as you may be aware

2  Desert Gateway (DGTE) and Retrophin executed the attached

3  merger agreement and filed the attached certificate of merger

4  yesterday.  In connection with that merger restricted stock

5  should be issued to the people set forth in the attached

6  spreadsheets in the amounts set forth thereon.  Do you prefer

7  to issue the stock in book entry or certificate form?  Please

8  confirm that stock DGTE will be issued and advise the timing

9  for issue.  This was sent  -- do you see where it says do you

10 prefer to issue the stock in book entry or certificate form?

11 A    Yes.

12 Q    What does that mean?

13 A    It's asking us if we want to put them in electronic form

14 or certificate form.

15 Q    What did you take this e-mail  -- how did you interpret

16 this e-mail?

17 A    It's a letter of instruction to issue shares.

18 Q    And going to the next page of the document, Standard 425,

19 what do we see here?

20 A    This is the list of shareholders to be issued shares to

21 and the amounts to issue.

22 Q    Was that attached to Mr. Greebel's e-mail?

23 A    Yes.

24 Q    Did Standard Registrar issue shares on this basis?

25 A    Yes.

Merrill - direct - Pitluck                    5573

1    Q    Can we go to the next page, Standard 426.  Do you see the

2    e-mail at the bottom?

3    A    Yes.

4    Q    Is that the same e-mail we just saw from Mr. Greebel

5    about the merger of the Desert Gateway?

6    A    Yes.

7    Q    Between Desert Gateway way and Retrophin?

8    A    Yes.

9    Q    Can you read your response as to Mr. Greebel that day?

10   A    Okay.  It says, I'll review the documents and the let you

11   know if we need additional information.  We must issue the

12   stock as directed.  So please specify if you would like the

13   stock certificate or held in book entry form.  We can't hold

14   certificates here longer than 72 hours.  Please advise.

15   Q    What was Mr. Greebel's response?

16   A    Please do book entry.

17   Q    Going to page 428, the Standard Registrar 428, two pages

18   ahead.  What is this document?

19   A    It's a merger agreement.

20   Q    Why was it important to Standard Registrar or was it

21   important to Standard Registrar to receive this document?

22   A    Yes.

23   Q    Why?

24   A    It gives us the detail of the merger and it's part of the

25   document we like to have for the issuance.

Merrill - direct - Pitluck                5574

1    Q     Is it kept in Standard Registrar's file?

2    A     Yes.

3    Q     Was this document attached to Mr. Greebel's e-mail?

4    A     Yes.

5    Q     So if you could go forward to page standard 460.

6    A     Okay.

7    Q     Again, the e-mail at the bottom, is that the same e-mail

8    we saw from Mr. Greebel about the merger between Desert

9    Gateway and Retrophin?

10   A     Yes.

11   Q     And can you just read your response to this version of

12   the e-mail on December 13, 2012?

13   A     In reviewing the documents I noticed that fractional

14   shares are being requested and we do not do fractional shares.

15   Please, revise the instructions and round up or down.  Then

16   provide us with a revised request.  Thank you very much.

17   Q     Can you go up to the next e-mail, please, where it says,

18   please, see attached.  The table that we just looked at, did

19   that have fractional shares?

20   A     No, it didn't.

21   Q     So you received a version from Mr. Greebel about

22   fractional shares and added it as to the file?

23   A     Yes.

24   Q     Can you read the next sentence, please?

25   A     You will be getting a 41 opinion from Greg Jackson

Merrill - direct - Pitluck                    5575

1    shortly relating to the delegending of the stock under line

2    three, Fearnow's note.  It is imperative that the certs for

3    the delegended shares be sent to me for delivery tomorrow.

4    Will you be able to accommodate that?

5    Q    Do you see the reference to a 41 opinion?

6    A    Yes.

7    Q    Do you know what a 41 opinion is?

8    A    A legal opinion.

9    Q    What is the legal opinion related to?

10   A    It's for restriction removal.

11   Q    What does that mean, restriction removal?

12   A    It's taking the restriction from the share certificates

13   so they will be freely tradeable.

14   Q    Okay?

15        I would like to direct your attention to

16   Government's Exhibit 115-4 in evidence.  Is this another stock

17   transfer report.

18   A    Yes.

19   Q    What's the item number here?

20   A    79761.

21   Q    And the date?

22   A    December 14, 2012.

23             (Continued on next page.)

24

25

1   DIRECT EXAMINATION

2   BY MR. PITLUCK:  (Continuing)

3   Q    And this is also for Desert Gateway?

4   A    Yes, it is.

5   Q    Now, calling your attention to the middle of the table

6   there, are these additional certificates that were issued for

7   Desert Gateway?

8   A    Yes.

9   Q    What was the total number of shares delivered?

10  A    2,400,000 shares.

11  Q    Are these restricted shares of Retrophin?

12  A    No, they are not.

13  Q    They are free-trading shares?

14  A    Yes, they are.

15  Q    And who are the recipients of these free-trading shares?

16  A    Kevin Mulleady, Thomas E. Fernandez, Marek Biestek,

17  Timothy Pierotti, Claridge Capital, Andrew Vaino, Andrew

18  Sullivan, and Troy Fearnow.

19  Q    Now, if you could go to Government Exhibit 115-5 for

20  identification.

21  A    What tab are we on?

22  Q    Tab 5.  I'm sorry, Ms. Merrill.

23       Is this an e-mail sent from somebody named Jennifer

24  Zammit to you on December 14, 2012?

25  A    Yes.

Merrill - direct - Pitluck                5577

1   Q    And is there an attachment to this letter from Anslow and

2   Jaclin -- I'm sorry, attached to this e-mail?

3   A    Yes.

4   Q    Is the attachment to this e-mail included in Standard

5   Registrar's files that we saw in Government Exhibit 115-4?

6   A    Yes.

7          MR. PITLUCK:  Your Honor, we would offer Government

8   Exhibit 115-5.

9          MR. CHAN:  No objection.

10         THE COURT:  We receive Government Exhibit 115-5.

11         (Government's Exhibit 115-5 was received in

12   evidence.)

13   Q    So, Ms. Merrill, this is an e-mail from Jennifer Zammet

14   to you, jzammet@anslowlaw.  Who was copied on this e-mail?

15   A    Mike Gopublic, Troy Fearnow, Gregg Jaclin, Evan Greebel,

16   and Martin.

17   Q    And that's Martin at msmbcapital.com?

18   A    Yes.

19   Q    Does the text of the e-mail read:  "Amy, please see

20   attached letter of instruction for transfer of Desert Gateway

21   shares"?

22   A    Yes.

23   Q    Now, going to the next page, do you recognize this

24   document?

25   A    Yes.

Merrill - direct - Pitluck                    5578

1   Q    What is this document?

2   A    This is a legal opinion.

3   Q    Is this the 4(1) Legal Opinion you referenced before?

4   A    Yes.

5   Q    And in your job at Standard Registrar, how frequently do

6   you get these letters?

7   A    All the time.

8   Q    What is the date on this letter?

9   A    December 14, 2012.

10  Q    Do you see the first paragraph, it says we represent Troy

11  Fearnow?

12  A    Yes.

13  Q    And then there's series of language, it says:  "Related

14  to an Oklahoma case No. CJ-12-94, styled Troy Fearnow versus

15  Desert Gateway, (Judgment), awarded and directed the issuance

16  of the 2,400,000 shares, (Subject Shares) of the company to

17  Fearnow pursuant to the conversion of promissory note dated

18  the 1st day of November."

19          And then, if did you skip down a little bit, it

20  says:  "This legal opinion is being rendered with respect to

21  the subject shares which are being issued to Fearnow.  A copy

22  of the judgment is enclosed herewith."

23          Can you just generally explain to the jury what you

24  interpreted this letter to mean?

25  A    This is telling us to issue shares to Troy Fearnow.

Merrill - direct - Pitluck                    5579

1    Q    2.4 million shares?

2    A    Yes.

3    Q    Can we go to the next page, which is Bates stamped

4    R049711.

5           Do you see the paragraph where it says:  "In the

6    present case"?

7    A    Yes.

8    Q    Can you just read that paragraph.  Please?

9    A    "In the present case, the company is the issuer of the

10   shares.  The above named shareholders represent that they are

11   not an officer, not a director, and not a holder of 10 percent

12   or more of the outstanding equity securities of the issuer and

13   does not alone or together with any other person exercise

14   control over the issuer.  Based on my review and

15   investigation, the shareholders have no affiliation with the

16   issuer other than as an investor.  The shareholders are in no

17   position to issue or propose to issue any security relating to

18   the company."

19   Q    So let's go to two pages ahead to R049713.

20          Do you see there is a conclusion section there?

21   A    Yes.

22   Q    It says:  "Based on the above and subject to the

23   assumptions and qualifications set forth below, we have the

24   opinion and hereby direct you to issue the subject shares to

25   the following book entry without a restrictive legend."

MDL   RPR

1          Does it say that?

2    A    Yes.

3    Q    What does without a restrictive legend mean?

4    A    It means it is free trading.

5    Q    Does it direct you to issue the shares to Kevin P.

6    Mulleady, 350,000; Thomas E. Fernandez, 300,000; Marek Lucjan

7    Biestek, 300,000; Timothy J. Pierotti, 350,000; Claridge

8    Capital LLC, 350,000; Andrew R. Vaino, 250,000; Edmund J.

9    Sullivan, 100,000, and then the first sentence says the

10   additional 400,00 shares should be issued in 'book entry' in

11   the name of Troy Fearnow"?

12   A    Yes.

13   Q    Are those the instructions that you relied on?

14   A    Yes.

15   Q    Can we go back to Government Exhibit 114-4.  I'm sorry,

16   115-4.  I'm sorry.

17          And the first page, does the share issuance match

18   what we just saw on the opinion letter?

19   A    Yes, it does.

20   Q    Can you just go to the next page, please, which is

21   Standard 466?  Can you just read -- and is this the new

22   issuance instructions form?

23   A    Yes.

24   Q    What does this tell you, this document?

25   A    It's telling us to issue shares in Desert Gateway.

Merrill - direct - Pitluck                 5581

1    Q    And the bottom part, are those the recipients?

2    A    Yes.

3    Q    Are those the address to where the recipients live?

4    A    That's what they should be, yes.

5    Q    Was stock sent to those address for these recipients?

6    A    Well, I would have to read the instructions.

7    Q    Let me direct you to page 488 of the same exhibit.

8         Is this a Fed Ex mailing label?

9    A    Yes.

10   Q    Why is there a Fed Ex mailing label in this share

11   transfer report?

12   A    We keep the Fed Ex labels of where we have sent the stock

13   certificates.

14   Q    Where was this stock certificate sent?

15   A    To Marek Biestek.

16   Q    What's the address?

17   A    59 Denton Avenue, East Rockaway New York 11518.

18   Q    And can you go to the next page.

19        Is this a Fed Ex label for Edmund Sullivan?

20   A    Yes.

21   Q    What address was this one sent to?

22   A    45 Pineapple Street, Apartment 8-B, Brooklyn, New York

23   11201.

24   Q    Can you flip ahead to page Standard 494.

25        Is this also a document that was kept in Standard

Merrill - direct - Pitluck                    5582

1    Registrar's file?

2    A    Yes.

3    Q    Can you see the bottom e-mail there?

4    A    Yes.

5    Q    Who is it from and who is it to?

6    A    From Evan Greebel to me.

7    Q    And the date?

8    A    December 14, 2012.

9    Q    Can you just read that e-mail?

10   A    Yes.

11        "Hi Amy.  You will be receiving the opinion for the

12   stock underlying the Fearnow note now.  Please send the

13   certificates to me.  I am company counsel.  The certificates

14   should be sent to Evan Greebel at Katten Muchin Rosenman LLP,

15   16th floor.

16   Q    Can you go up to the next e-mail.  Is that your response

17   to Mr. Greebel?

18   A    Yes.

19   Q    Can you just read what you wrote to Mr. Greebel -- that

20   was on the same day?

21   A    Yes.

22   Q    Can you read what you wrote to Mr. Greebel?

23   A    "Evan, each of the shareholders are requesting that the

24   shares be delivered to them directly by Fed Ex, Saturday

25   delivery.  Can you please verify that you approve.  Also, the

1  legal opinion states that the shares should be put in book

2  entry.  Please have Anslow and Jaclin send us a statement that

3  the shares can be certificated.  Thank you, Amy."

4  Q    You wrote that the legal opinion states that the shares

5  should be in book entry.  What did you mean by that?

6  A    It requested that we put the shares in electronic format

7  rather than certificates.

8  Q    Why did you ask Mr. Greebel to have Anslow and Jaclin

9  send you a statement that the shares can be certificated?

10  A    Because they were the ones that directed us to put them

11  in book entry.

12  Q    What was Mr. Greebel's response?

13  A    I don't see it there.

14  Q    I'm sorry, it is, just go further.

15  A    "I am fine with it going to the shareholders for

16  Saturday."

17         THE COURT:  May I ask a question?

18         MR. PITLUCK:  Please, Your Honor.

19         THE COURT:  If the shares are in book entry, would

20  you still Fed Ex the certificates?

21         THE WITNESS:  No.

22         THE COURT:  Because your e-mail -- well, there is a

23  discussion here about the shares going via Fed Ex for Saturday

24  delivery, the certificates, and then there is also something

25  about a book entry, so it would be one or the other but not

1    both?

2              THE WITNESS:  That's right.

3              MR. PITLUCK:  Judge, I am going to get to that on

4    the next page.  I'm sorry, you got ahead of me.

5    Q    Can you go to Standard 501, please, which is a few pages

6    ahead.

7              Starting with the full e-mail that's on the page

8    from Evan Greebel to Jennifer Zammet are you copied on this?

9    A    Yes.

10   Q    And it is December 14, 2012?

11   A    Yes.

12   Q    Can you just read what Mr. Greebel wrote to the

13   recipients?

14   A    "The stockholders would like the stock certificated.

15   Please send an e-mail to Standard Registrar asking them to

16   certificate the shares.

17   Q    Did someone from Anslow and Jaclin send you an e-mail to

18   certificate the shares?

19   A    I don't see the rest of the e-mail.

20   Q    We will go up to the response.

21             MR. PITLUCK:  Thank you.

22   Q    Can you just read that?

23   A    "Amy, please send the shares in certificate form and send

24   all to Evan at the address below via Fed Ex, except for Troy

25   Fearnow's which should be sent to my office.  Thanks."

Merrill - direct - Pitluck                    5585

1   Q    Was this a direction you received that allowed you to put

2   the stock into certificated form?

3   A    Yes.

4   Q    And mail them to the recipients?

5   A    Yes.

6   Q    I would like to go back a couple pages to Standard 495.

7   And did you receive requests as to where to send the shares

8   for the recipients in this stock transfer?

9   A    Did I -- I'm sorry?

10  Q    Did the recipients for the stock transfer, did they send

11  you addresses where they wanted the stock sent?

12  A    Yes.

13  Q    Do you see your e-mail here on December 14, 2012 to Evan

14  Greebel, it says:  "Evan, do you want the shares for Claridge

15  Capital sent to you?"

16  A    Yes.

17  Q    What did Mr. Greebel respond?

18  A    "If they did not provide contrary instructions, please

19  send to me for Monday delivery."

20  Q    So that e-mail is December 14, 2012?

21  A    Yes.

22  Q    So I'd like to direct your attention to tab 51, all the

23  way in the back.  Government Exhibit 115-51.

24        MR. PITLUCK:  This is for identification.  We will

25  go to the ELMO.

Merrill - direct - Pitluck                    5586

1   Q    Can you read that?

2   A    From Standard Registrar to Evan Greebel.

3   Q    Is this an e-mail that you sent to Mr. Greebel on

4   December 28, 2012?

5   A    Yes.

6   Q    Subject line:  Totals?

7   A    Yes.

8   Q    And this is two weeks after the share certificate e-mails

9   we just saw a moment ago in the previous exhibit?

10  A    Yes.

11  Q    Is there an attachment to this e-mail?

12  A    Yes.

13  Q    And is this something -- the document that is attached,

14  is the e-mail something that is compiled in the regular course

15  of Standard Registrar's business?

16  A    Yes.

17  Q    And did you create it at or near the time that is

18  indicated on this document?

19  A    Yes.

20         MR. PITLUCK:  Your Honor, the Government offers

21  Exhibit 115-51 in evidence.

22         MR. CHAN:  No objection.

23         THE COURT:  We receive Government Exhibit 115-51.

24         (Government's Exhibit 115-51 was received in

25  evidence.)

Merrill - direct - Pitluck                    5587

1    Q    So this is the cover e-mail, Ms. Merrill, it is December

2    28, 2012?

3    A    Yes.

4    Q    What's the subject line?

5    A    Totals.

6    Q    Going to the attachment, let's see if I can zoom in a

7    little.

8            Can you just explain for the jury what this is,

9    please?

10   A    This is the totals page from the shareholder list, the

11   company's totals, the total number of shareholders, the total

12   shares issued and outstanding, the total restricted shares,

13   and the number of authorized shares to be issued.

14   Q    And when was this shareholder listing as of?  Do you see

15   it up there at the top?

16   A    Yes, 12/27/2012.

17   Q    Do you see where it says total shareholders?

18   A    Yes.

19   Q    What does that number mean?

20   A    It means there is 230 shareholders of record.

21   Q    What does the next line down, "total common certs," mean?

22   A    That's the number of certificates that have been created.

23   Q    What does it mean there is a difference for the number of

24   certificates and number of shareholders?

25   A    Somebody might have more than one certificate, so they

Merrill - direct - Pitluck                    5588

1   could have multiple.

2   Q    Do you see total common shares?

3   A    Yes.

4   Q    What does that mean?

5   A    That's the total number of shares issued.

6   Q    Does that include both restricted and unrestricted?

7   A    Yes, it does.

8   Q    Do you see total control shares?

9   A    Yes.

10  Q    What is that here?

11  A    Zero.

12  Q    What does total control shares mean?

13  A    That should be the number of shares held by officers of

14  the company.

15  Q    And where do you get the information to report something

16  that is a control share?

17  A    The company or their counsel.

18  Q    What are -- do you see where it says total restricted

19  shares?

20  A    Yes.

21  Q    Is that just the number of restricted shares that the

22  company has?

23  A    Yes.

24  Q    What is the total authorized shares?

25  A    That's the number of shares they can issue up to.

Merrill - direct - Pitluck                    5589

1    Q    Do you see some handwriting down there at the bottom?

2    A    Yes.

3    Q    Is that your handwriting?

4    A    Yes.

5    Q    You wrote "float" and then a number?

6    A    Yes.

7    Q    What is the float?

8    A    That's the number of free-trading shares.

9    Q    Did you calculate the float?

10   A    Yes.

11   Q    How did you do that?

12   A    That's the difference of the restricted shares and the

13   common shares.

14   Q    So those are the number of shares that are freely trading

15   in the market?

16   A    Yes.

17   Q    Thank you.

18             MR. PITLUCK:  If we can switch back to the laptop,

19   that would be great.

20   Q    I would just like to show you briefly Government Exhibit

21   115-10, which is in evidence.

22   A    What tab is this?

23   Q    Tab 10.  Is this another share transfer report?

24   A    Yes.

25   Q    What item number is this?

Merrill - direct - Pitluck                      5590

1    A    79926.

2    Q    What is the date of this one?

3    A    January 3, 2013.

4    Q    Can you just explain to the jury what is being documented

5    in this share transfer report?

6    A    Yes.  We received certificate No. 1603 for transfer in

7    the name of Timothy Pierotti for 350,000 shares and

8    transferred it to Cede & Co.

9    Q    What is Cede & Co.?

10   A    It's the street name for Depository Trust.

11   Q    What does it mean when certificates are deposited with

12   Depository Trust?

13   A    They are a depository that holds free-trading shares for

14   the open market.

15   Q    What does that mean when free-trading shares are held at

16   the Depository Trust or Cede & Co.?

17   A    It means that they are freely tradeable in the market.

18   Q    Prior to receiving this, had the shares been deposited at

19   Cede & Co.?

20   A    Prior to receiving...

21   Q    Prior to Standard Registrar receiving this.

22   A    No.

23   Q    I would like to direct your attention to Tab 2, which is

24   Government Exhibit 115-2.  I'm sorry, let's go to Tab 7,

25   115-7.

Merrill - direct - Pitluck                     5591

1              Is this an e-mail that you received at Standard

2    Registrar?

3    A    Yes.

4    Q    And is it from Martin Shkreli?

5    A    Yes.

6    Q    And is it on December 20, 2012?

7    A    Yes.

8    Q    And does it include instructions for share transfers?

9    A    Yes.

10   Q    Was this ultimately included in a share transfer report

11   for -- was this something that was collected in the ordinary

12   course of Standard Registrar's business?

13   A    Yes.

14   Q    Was this something that would have been processed in

15   Standard Registrar's records at or near the time it was

16   compiled?

17   A    Yes.

18              MR. PITLUCK:  Your Honor, we offer 115-7.

19              MR. CHAN:  No objection.

20              THE COURT:  We will receive 115-7 in evidence.

21              (Government's Exhibit 115-7 was received in

22   evidence.)

23   Q    Do you see Mr. Shkreli wrote:  "To whom it may concern,

24   my name is Martin Shkreli.  I am the new CEO of Desert

25   Gateway, Inc.  I am requesting the mailing by Federal Express

Merrill - direct - Pitluck                    5592

1   of the stock certificates owned by myself, individually, as

2   well as by two entities I control, MSMB Capital Healthcare LP

3   and MSMB Capital Management LP.  Your records should indicate

4   that I own 2,531,920 shares individually and 375,000 shares of

5   DGTE through MSMB Capital Management LP, 433,274 shares

6   through MSMB Healthcare LP and 413 shares through MSMB

7   Healthcare Investors LP."  And then he provides an address.

8           Did you see this e-mail?

9   A    Yes.

10  Q    Do you know if these shares were actually transferred in

11  stock form, in certificate form?

12  A    They should have been.

13  Q    Let's go to tab 14, which is Government Exhibit 115-14,

14  which is in evidence.

15          Is this another transmittal report?

16  A    Yes.

17  Q    What is the item number?

18  A    80187.

19  Q    And the date?

20  A    January 28, 2013.

21  Q    And do you see in the top that you acknowledge receipt of

22  certificates book entry MSMB Capital Management LP 375,000

23  shares?

24  A    Yes.

25  Q    Does that mean that the shares were still held in book

Merrill - direct - Pitluck                5593

1  entry at that point?

2  A    Yes.

3  Q    What does that tell you about whether the actual

4  certificates were sent?

5  A    It wouldn't have been the certificate.

6  Q    Can we go to the next page, please?  Is this the

7  instructions that Standard Registrar received?

8  A    Yes.

9  Q    How did you receive them?

10  A    By e-mail.

11  Q    From whom?

12  A    Martin Shkreli.

13  Q    What did Mr. Shkreli -- and this is dated January 28,

14  2013?

15  A    Yes.

16  Q    What did Mr. Shkreli request in this e-mail?

17  A    He requested a breakdown of his shares into different

18  increments.

19  Q    The 375,000 shares for which entity?

20  A    For MSMB Capital Management.

21  Q    And do you see that there is five numbers broken down

22  there:  160,318, 24,046, 58,306, 37,309, and 94,521?

23  A    Yes.

24  Q    Did he ask you to Fed Ex the certificates to MSMB Capital

25  Management?

Merrill - direct - Pitluck                          5594

1    A    Yes.

2    Q    To his attention?

3    A    Yes.

4    Q    And as we saw in the previous page, were those

5    certificates sent to MSMB Capital Management?

6    A    Yes.

7    Q    Can we go to tab 18, which is Government Exhibit 115-18

8    in evidence.

9              What item number is this?

10   A    80439.

11   Q    And the date?

12   A    February 19, 2013.

13   Q    So a few weeks after the previous exhibit we looked at?

14   A    Yes.

15   Q    What's happening in this exhibit -- I'm sorry, in this

16   transmittal report.  I apologize.

17   A    A transfer of shares of MSMB Capital Management to new

18   individuals.

19   Q    Okay.  Do the shares, those top shares from MSMB Capital

20   Management, were they actually sent to Standard Registrar?

21   A    Yes.

22   Q    Do those amounts that are there for each individual

23   certificate match the certificates that you sent -- that

24   Standard Registrar sent three weeks earlier?

25   A    Yes.

Merrill - direct - Pitluck                        5595

1    Q    And were those certificates then sent to other

2    individuals in the same denominations?

3    A    Yes.

4    Q    Okay.  Can we go to page 585, the third page of this

5    exhibit.

6              And what is this?

7    A    A letter of instruction.

8    Q    Who is it from?

9    A    Martin Shkreli.

10   Q    What entity is written at the top?

11   A    MSMB Capital Management LP.

12   Q    Does it read:  "We wish to transfer the shares owned by

13   this fund to the individual limited partners of the fund as

14   the fund is dissolving.  Please send the certificates by Fed

15   Express to the following addresses"?

16   A    Yes.

17   Q    Is the first one Darren Blanton at c/o Colt Ventures?

18   A    Yes.

19   Q    And the next one Lindsay Rosenwald?

20             I'm sorry, did you say yes?

21   A    Yes, I'm sorry.

22   Q    The next one Sara Hassan, care of Dynagrow Capital LLP?

23   A    Yes.

24   Q    The next one John Neill?

25   A    Yes.

Merrill - direct - Pitluck                    5596

1   Q     The last one Schuyler Marshall, care of Rosewood?

2   A     Yes.

3   Q     Going forward two pages to 587, is that the schedule of

4   shares for the number of shares that were to be sent to each

5   stockholder?

6   A     Yes.

7   Q     And do those match what we saw on the first page of this

8   exhibit?

9   A     Yes.

10  Q     So if we can go ahead one tab to Tab 19, is this the

11  stock transfer report related to MSMB Healthcare?

12  A     Yes.

13  Q     What item number is this?

14  A     80626.

15  Q     And the date?

16  A     March 7th, 2013.

17  Q     What's happening in this transmittal report, what is

18  being documented?

19  A     A transfer of shares that are in book entry to physical

20  certificates.

21  Q     For MSMB Healthcare LP and MSMB Investors, LLC?

22  A     Yes.

23  Q     Can we go to the third page, which is, for the record,

24  Standard 601.

25        Is this an e-mail from Martin Shkreli to you dated

Merrill - direct - Pitluck                    5597

1   February 18, 2013?

2   A    Yes.

3   Q    Does it read:  "Please Fed Ex me all MSMB Healthcare LP,

4   Desert Gateway certificates.  These certificates will be

5   distributed to the fund's underlying limited partner.  The

6   correct address is Martin Shkreli at MSMB Capital, 777 Third

7   Avenue"?

8   A    Yes.

9   Q    Were those shares actually sent is to Mr. Shkreli?

10  A    Yes.

11  Q    On March 8th, 2010, according to the second page,

12  Standard 600, the Fed Ex label?

13  A    On March 8th, yes.

14  Q    I'm sorry, March 8th.  Thank you.

15       Going to the first page of this exhibit, were these

16  shares restricted or free trade?

17  A    Restricted.

18  Q    So let's go ahead one tab to Tab 20, which is Government

19  Exhibit 115-20 in evidence.

20       Is this another share transmittal report?

21  A    Yes.

22  Q    What is the item number?

23  A    80689.

24  Q    And the date?

25  A    March 12, 2013.

Merrill - direct - Pitluck                    5598

1    Q    And what's the stock called?

2    A    Retrophin.

3    Q    Retrophin?

4    A    Retrophin.

5    Q    And it reads:  "We acknowledge receipt of certificates of

6    stock in the above company as follows."

7              What's written there?

8    A    Certificate 1721 MSMB Capital Healthcare LP 473,274

9    shares.

10   Q    Do that number match the number of shares that were

11   certificated a couple weeks earlier in Government Exhibit

12   115-19?

13   A    Yes.

14   Q    Do you see the -- and these are all restricted shares;

15   correct?

16   A    Yes.

17   Q    Let's go to the fourth page of this exhibit, Standard

18   609.

19              Is this a document from MSMB Capital Healthcare LP?

20   A    Yes.

21   Q    Who wrote it?

22   A    Martin Shkreli.

23   Q    Can you just read what it says?

24   A    "MSMB Healthcare LP is a private Limited Partnership

25   which is divesting its stake in MSMB Healthcare LP to its

1    underlying limited partners.  Therefore, as its sole managing

2    member, I am requesting you to transfer ownership of the

3    certificate enclosed to the underlying partners with the

4    attached stock power and assignment attached and medallion

5    certified.  Please call us if you have any questions."

6    Q    Then going to the next page, is that a handwritten

7    schedule of the people who are -- the recipients of the

8    shares?

9    A    Yes.

10   Q    Who is the first stockholder?

11   A    Alan Geller.

12   Q    The third one there?

13   A    Richard Kocher.

14   Q    Do you see, three lines from the bottom, David Geller?

15   A    Yes.

16   Q    And below that, Michael Lavelle?

17   A    Yes.

18   Q    And were those -- were those shares sent out as requested

19   by Martin Shkreli?

20   A    Yes.

21            (Continued on next page.)

22

23

24

25

```
                      Merrill - direct - Pitluck                    5600
```

1   BY MR. PITLUCK:   (Continuing)

2   Q     Where were they sent?

3   A     To Martin Shkreli, MSMB Healthcare LP, 777 Third Avenue,

4   22nd floor, New York, New York, 10017.

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5601

1          THE COURT:  Are you at a good stopping point for the
2    mid afternoon break?
3          MR. PITLUCK:  Perfect, Judge.
4          THE COURT:  So I'd ask the jurors please don't talk
5    about the case.  Be reminded.  Retire to the jury room.  Have
6    yourself a cup of tea or coffee and we'll come get you soon.
7          (Jury exits.)
8          THE COURT:  You may step down.
9          (Witness steps down.)
10          THE COURT:  Is there anything we need to address or
11    would you like to take a few minutes?
12          Okay.  Let's take ten minutes.  Thank you.
13          (Recess taken.)
14          (In open court; jury present.)
15          THE COURT:  All right.  All jurors are present.
16    Have a seat.
17          And you can resume your direct.
18          MR. PITLUCK:  Thank you, Judge.
19          (Continued on next page.)
20
21
22
23
24
25

Merrill - direct - Pitluck                    5602

1    BY MR. PITLUCK:

2    Q    Ms. Merrill, can you turn to tab 23 in your binder of

3    Government Exhibit 115-23 and can we look at the first page.

4             Is this another stock transmittal report?

5    A    Yes.

6    Q    And is this number 80957?

7    A    Yes.

8    Q    What's the date?

9    A    April 4, 2013.

10   Q    And according to this transmittal report, what's the

11   stock transfer that's taking place here?

12   A    We're transferring Troy Fearnow's shares to Lindsay

13   Rosenwald and a remainder book entry for Troy Fearnow.

14   Q    And how many shares are supposed to be transferred to

15   Lindsay Rosenwald on this document?

16   A    100,000.

17   Q    Okay.  Can we go to page Standard-633.

18             This is the transmittal report for this transfer?

19   A    I'm sorry?

20   Q    This document, this e-mail was contained in the

21   transmittal report for this stock transfer?

22   A    Yes.

23   Q    And the top e-mail, is it from Michael Fearnow to

24   Standard Registrar?

25   A    Yes.

CMH      OCR      RMR      CRR      FCRR

Merrill - direct - Pitluck                    5603

1    Q      Who's copied on that e-mail?

2    A      Evan Greebel, Martin Shkreli and Gregg Jaclin.

3    Q      What's the subject?

4    A      Amendments to purchase agreements, Troy Fearnow.

5    Q      Are there two attachments on this e-mail?

6    A      Yes.

7    Q      Purchase Agreement Amendment Sullivan and Purchase

8    Agreement Amendment Biestek.

9    A      Yes.

10   Q      And does e-mail read:  Attached are instructions to

11   deliver 100,000 shares in the 400,000 certificate in the name

12   of Troy Fearnow.  Please hold the remaining 300,000 shares in

13   book entry until further instructions.  Troy Fearnow is

14   sending a medallion stock power by Fed Ex.  Gregg Jaclin's

15   office will send the certificate.  Thanks, Mike.

16   A      Yes.

17   Q      And going to page 629, four pages earlier, it's a letter

18   from Troy Fearnow dated April 3, 2013?

19   A      Yes.

20   Q      It says:  Attached is a medallion guaranteed stock power

21   for the 400,000 shares of Desert Gateway which you should

22   receive from my attorney, Gregg Jaclin.  Please issue the

23   100,000 shares per the attached instruction letter from the

24   original buyers Edmund Sullivan and Marek Lucjan Biestek.

25   Hold the remaining 300,000 shares for me in book entry form.

Merrill - direct - Pitluck                    5604

1    A    Yes.

2    Q    And were the -- did the purchase agreement amendments

3    that were attached to that e-mail, is that something that

4    Standard Registrar would use to allocate the shares as

5    requested?

6    A    Yes.

7              MR. PITLUCK:  Can we go to Standard-623.01.

8    Q    Is this document entitled Purchase Agreement Amendment?

9    A    Yes.

10   Q    It's an amendment to the purchase agreement.  The first

11   paragraph:  This amendment to the purchase agreement, the

12   amendment, dated as of March 11, 2013 by and between Troy

13   Fearnow and Marek Lucjan Biestek, the purchaser.

14             Do you see that?

15   A    Yes.

16   Q    And in the second "whereas" paragraph, it says:  On

17   December 11, 2012, the purchaser and seller entered into a

18   purchase agreement in which the seller agreed to sell 350,000

19   shares of common stock, a par value of .0001 per share of the

20   company to the purchase.

21             Do you see that?

22   A    Yes.

23   Q    Can we go to the second -- sorry -- the third "whereas"

24   clause on that same page.  It says:  Whereas, following

25   execution of the purchase agreement, the purchaser delivered,

CMH        OCR        RMR        CRR        FCRR

Merrill - direct - Pitluck                    5605

1   to the purchase price set forth in the agreement, the seller

2   delivered 300,000 shares to the purchaser and, at the request

3   of the purchaser, the seller continued to hold 50,000 shares,

4   the remaining shares, which it had agreed to deliver to the

5   purchaser.

6            Do you see that?

7   A    Yes.

8   Q    And then can we go to the next page where it says number

9   two.  Can you read that paragraph, number two?

10  A    The certificate evidencing the number of the remaining

11  shares set forth below shall be issued in the name of Lindsay

12  A. Rosenwald, M.D., and such shares shall be delivered to

13  Katten Muchin Rosenman LLP.

14  Q    Attention Evan L. Greebel, Esquire?

15  A    Yes.

16  Q    Is there another purchase agreement that starts at page

17  626, Standard-626?

18  A    Yes.

19            MR. PITLUCK:  I'm sorry.  Can we go back one page,

20  please, to 625.

21  Q    Is that agreement signed?

22  A    By Edmund Sullivan.

23  Q    Does it match the name on the first page of this which is

24  Marek Lucjan Biestek?

25  A    The signer?

1   Q     Yes.

2   A     No.

3   Q     So there's a mistake in this document?

4   A     Yes.

5         MR. PITLUCK:  Can we go to the, back to 626.

6   Q     This is another purchase agreement amendment between Troy

7   Fearnow and Marek Lucjan Biestek.

8         Does it include the similar language about the

9   purchase agreement and the remaining shares?

10  A     Yes.

11  Q     And can you go to the second page of this, paragraph two.

12  The certificates -- it reads:  The certificates evidencing the

13  number of the remaining shares set forth below shall be issued

14  in the names specified below and delivered as set forth below.

15  A     Yes.

16  Q     And 30,000 shares being delivered to Lindsay Rosenwald,

17  M.D.?

18  A     Yes.

19  Q     And 20,000 shares being delivered to Thomas Koestler?

20  A     Yes.

21  Q     Both of those shares being delivered to the Katten Muchin

22  Rosenman LLP, attention Evan Greebel?

23  A     Yes.

24        MR. PITLUCK:  And can we go to the third page of

25  this document.

Merrill - direct - Pitluck                     5607

1  Q    Is this one signed by Marek or appear to be signed by

2  Marek Lucjan Biestek?

3  A    Yes.

4  Q    So, according to these two documents, there were supposed

5  to be 80,000 shares sent to Lindsay Rosenwald and 20,000

6  shares to someone named Thomas Koestler?

7  A    Right.

8  Q    Does that match?

9         THE COURT:  You said 80,000?

10        MR. PITLUCK:  Yes.

11 A    No.

12 Q    So did, did the -- did a subsequent transaction take

13 place?

14 A    There must have been.

15 Q    Okay.  Can I show you Government Exhibit 115-25 in

16 evidence -- I'm sorry -- 115-24.  I apologize.  Tab 24.

17        Is this another transmittal report?

18 A    Yes.

19 Q    Item 81070?

20 A    Yes.

21 Q    What's the date?

22 A    April 15, 2013.

23 Q    What's happening here?

24 A    There's a transfer of 100,000 shares from Lindsay

25 Rosenwald breaking it down to 80,000 in Lindsay Rosenwald and

1    Thomas Koestler gets 20,000.

2    Q    And the handwriting below says, "Goes with 80957"?

3    A    Yes.

4    Q    Is that the previous exhibit we just looked at?

5    A    Yes.

6              MR. PITLUCK:  Can we look at the next page, please?

7    Q    Do you see the e-mail at the bottom?

8    A    Yes.

9    Q    Who is that from and who is it to?

10   A    It's from Evan Greebel to Michael Fearnow and Martin

11   Shkreli.

12   Q    And does it break down the shares along the lines of what

13   we discussed below or what we discussed a moment ago in the

14   purchase agreements?

15   A    Yes.

16   Q    50,000 shares that were owed to Marek Biestek being

17   delivered to Lindsay Rosenwald and Thomas Koestler?

18   A    Yes.

19   Q    And 50,000 shares for Edmund Sullivan issued to Lindsay

20   Rosenwald?

21   A    Yes.

22   Q    Was that document forwarded to you?

23   A    Yes.

24   Q    By -- who forwarded it to you?

25   A    Michael Fearnow.

1   Q     On April 10, 2013?

2   A     Yes.

3   Q     And what did Mr. Fearnow write?

4   A     This should conform to the purchase agreements.

5         MR. PITLUCK:  Now, can we go back to Government

6   Exhibit 123 or 115-23 and go to page 632, Standard-632.

7   Sorry.

8   Q     Do you see the middle e-mail there?

9   A     Yes.

10  Q     Who sent it -- was it sent to you?

11  A     Sent to Standard.

12  Q     Standard Registrar?

13  A     Yes.

14  Q     It's from Michael Fearnow?

15  A     Yes.

16  Q     And who's copied?

17  A     Evan Greebel.

18  Q     And what did Michael Fearnow write?

19  A     Marcia, the company has agreed to pay the transfer fees

20  for Troy Fearnow, Evan, corporate council will okay.

21  Q     And did Mr. Greebel respond to that e-mail?

22  A     Yes.

23  Q     What did he write?

24  A     Yes.

25        MR. PITLUCK:  Can we go to tab 28, Government

```
                    Merrill - direct - Pitluck              5610
```

1    Exhibit 115-28 in evidence.

2    Q    What's the item number here?

3    A    81549.

4    Q    The date?

5    A    May 23, 2013.

6    Q    And what -- what's being documented in this transmittal

7    report?

8    A    They're transferring shares of Troy Fearnow to Richard

9    Kocher and Martin Shkreli and a remainder of book entry

10   certificates to Troy Fearnow.

11   Q    How many shares were going to Richard Kocher?

12   A    47,128.

13   Q    And how many to Martin Shkreli?

14   A    2,872.

15   Q    And if we go to Standard page 679 and going to the top

16   e-mail, who is that from?

17   A    Evan Greebel.

18   Q    What's the date?

19   A    Wednesday, May 22, 2013.

20   Q    Who is it to?

21   A    To me.

22   Q    What's the subject?

23   A    Stock issuance.

24   Q    Is there an attachment?

25   A    Yes.

Merrill - direct - Pitluck                                    5611

1   Q    Is it a purchase agreement TF Andrew Vaino?

2   A    Yes.

3   Q    Can you just read Mr. Greebel's e-mail?

4   A    Amy, pursuant to the attached agreement, please send me a

5   stock certificate for 47,128 shares in the name of Richard

6   Kocher and 2,872 shares in the name of Martin Shkreli.  The

7   shares for Richard Kocher should be unrestricted.  Please send

8   them via Fed Ex and confirm that I will receive them by

9   Friday, May 24th.  If you have any questions, please call me.

10  Q    And was the purchase agreement attached?

11  A    Yes.

12  Q    And is it -- is it a similar agreement to the one we saw

13  before, can you go to page 673, another purchase agreement

14  amendment?

15  A    Yes.

16  Q    In this, the purchaser is Andrew Vaino, is that right?

17  A    Yes.

18  Q    And going to the second page, where were the remaining

19  shares to be sent?

20  A    The 47,128?

21  Q    Yes.

22  A    To Katten Muchin and Rosenman.

23  Q    So, the shares for both Richard Kocher and Martin Shkreli

24  were sent to Evan Greebel of Katten Muchin?

25  A    Yes.

1  Q    I'd like to direct your attention to Government

2  Exhibit 115-48 for identification.  This document consists of

3  an e-mail exchange between yourself, Evan Greebel and on a

4  couple of e-mails; Michelle Griswold?

5  A    Yes.

6  Q    Are these dated between December 10th and December 17th,

7  2013?

8  A    Yes.

9        MR. PITLUCK:  Your Honor, the government offers

10  Exhibit 115-48 in evidence.

11        MR. CHAN:  No objection.

12        THE COURT:  We admit Government Exhibit 11-48.

13        (So marked.)

14        MR. PITLUCK:  Can we go to the last page, the third

15  page of this exhibit?

16  Q    This is an e-mail you sent Evan Greebel December 10, 2013

17  entitled Escrow Shares?

18  A    Yes.

19  Q    It says:  Evan, the attached shareholder contacted me

20  today regarding 50,000 shares he has that were held in escrow.

21  He wants to know when he will be receiving the additional

22  shares.  Please advise.

23  A    Yes.

24  Q    Do you remember the name of the shareholder that

25  contacted you in December 2013?

1    A    I don't.

2    Q    And going up one e-mail which starts on the previous

3    page, December 12, 2013, which you sent to Evan Greebel and

4    copied someone named Michelle Griswold, do you see that?

5    A    Yes.

6    Q    It says:  Can you please advise on my inquiry below.

7    A    Yes.

8    Q    Do you know -- you added Michelle Griswold to that

9    e-mail?

10   A    Yes.

11   Q    Do you know who Michelle Griswold is?

12   A    She was a contact for Retrophin.

13   Q    Do you know where she works?

14   A    No.

15   Q    Do you remember why you added her to this e-mail?

16   A    Just for backup.

17   Q    And did Mr. Greebel respond to your e-mail on

18   December 12, 2013?

19   A    Yes.

20   Q    What did he write?

21   A    That shareholder is in the middle of a lawsuit with the

22   company.

23   Q    And did you respond to Mr. Greebel's e-mail the same day?

24   A    Yes.

25   Q    And is Mr. Griswold copied on this e-mail?

1    A    No.

2    Q    What did you write?

3    A    Evan, he keeps calling me.  What would you like me to

4    tell him?

5    Q    Okay.  And did Mr. Greebel respond to that e-mail on

6    December 12, 2013?

7    A    Yes.

8    Q    What did he write?

9    A    I will discuss with my litigation partners and advise.

10   In the meantime, please place a stop transfer on the remaining

11   150K of stock.

12   Q    And then it continues on the next page?

13   A    Held by Troy Fearnow.

14   Q    What is a hold or a stop transfer?

15   A    It's -- we put a hold on the certificate so it can't be

16   transferred.

17   Q    Is that -- who can do that?  Who is qualified to do that?

18   A    The company, the shareholder, the company counsel.

19   Q    And did Mr. Greebel follow up on that e-mail on

20   December 17, 2013?

21   A    Yes.

22   Q    What did he write?

23   A    Amy, please confirm that you have placed the hold

24   referenced below.

25   Q    And did you respond to that e-mail?

1    A    Yes.  I have placed a hold on number 1847 for 200,000

2    shares in the name of Troy Fearnow.

3    Q    Do you recall if that shareholder that contacted you

4    reached out again after the hold was placed?

5    A    I don't recall.

6    Q    Was that stop transfer order ever lifted, the hold?

7    A    I believe so.

8    Q    I show you Government Exhibit 115-49 for identification.

9         Is this an e-mail exchange between yourself and Evan

10   Greebel in May of 2014?

11   A    Yes.

12        MR. PITLUCK:  Your Honor, we offer 115-49.

13        MR. CHAN:  No objection.

14        THE COURT:  We receive 115-49.

15        (So marked.)

16   Q    The bottom e-mail, e-mail chain is between yourself and

17   Evan Greebel copying somebody named John Heskett?

18   A    Yes.

19   Q    What's the date of that e-mail?

20   A    May 27, 2014.

21   Q    Is the subject, Fearnow stop transfer?

22   A    Yes.

23   Q    It reads:  Hi, Amy.  Please lift the stop transfer that I

24   previously placed on the 200,000 shares held by Troy Fearnow

25   concurrently with your receipt of a letter of instruction from

Merrill - direct - Pitluck                  5616

1    Mr. Heskett.  The dispute that was underlying such shares has

2    been resolved.  Please confirm that you will lift the Fearnow

3    stop transfer once you receive the letter.

4              Do you see that?

5    A    Yes.

6    Q    What did you respond to Mr. Greebel?

7    A    Evan, thank you.  I will let you know when I receive the

8    letter.

9    Q    Did you receive a letter from, a letter of instruction

10   from Mr. Heskett?

11   A    I assume so.

12   Q    Okay.  I'm going to show you Government Exhibit 115-50

13   for identification.

14             Is this an e-mail between, sent by John Heskett to

15   you copying Evan Greebel and Debbie Crain --

16   A    Yes.

17   Q    -- dated May 30, 2014?

18   A    Yes.

19   Q    Is there an attachment to this document?

20   A    Yes.

21             MR. PITLUCK:  Your Honor, we would offer 115-50 in

22   evidence.

23             MR. CHAN:  No objection.

24             THE COURT:  We receive Government Exhibit 150-50.

25             (So marked.)

CMH      OCR      RMR      CRR      FCRR

Merrill - direct - Pitluck                    5617

1    Q    And in this e-mail, did John Heskett write:  Amy, please

2    see the attached instructions.  I would appreciate your

3    letting Evan and myself know when the certificates have been

4    sent?

5    A    Yes.

6              MR. PITLUCK:  Can we go to the second page of the

7    document which is R019595.

8    Q    What's the date of this letter?

9    A    May 30, 2014.

10   Q    And it's addressed to you?

11   A    Yes.

12   Q    Does it read:  As we previously discussed with you, Troy

13   Fearnow has on file with your firm an executed stock power

14   relating to his disposition of his remaining 200,000 shares of

15   Retrophin, Fearnow shares, wherein, these shares are common

16   stock held in book entry form.  Previously, there was a stop

17   transfer request in place by the company, which was removed by

18   their counsel, Evan Greebel, earlier this week.  We are in

19   agreement with Mr. Greebel that all issues have been resolved

20   and we are now ready to make the final and complete

21   disposition of the Fearnow shares.  Please issue from the

22   Fearnow shares in the amounts indicated below and deliver the

23   new certificates to the following persons.

24              Can you read the recipients of the 200,000 shares?

25   A    Yes.  Claridge Capital.

CMH      OCR      RMR      CRR      FCRR

Merrill - direct - Pitluck                    5618

1   Q     How many shares did they receive?

2   A     37,500.  Marek Biestek, 12,500.  Marek Biestek, 25,000.

3   Tom Fernandez, 75,000.

4   Q     And the next page?

5   A     And Martin Shkreli, 50,000 shares.

6   Q     Were all those shares sent to the care of Retrophin,

7   Incorporated?

8   A     Yes.

9   Q     777 Third Avenue.

10          Can you turn just to Government Exhibit 115-43 which

11   is tab 43 and that's in evidence.

12          Is this a transmittal report?

13   A     Yes.

14   Q     Dated May 30, 2014?

15   A     Yes.

16   Q     Is this documenting the transmittal of shares that we saw

17   in the previous exhibit in the instruction letter?

18   A     Yes.

19   Q     And those shares were actually sent out by Fed Ex?

20   A     Yes.

21   Q     All right.  Let's look at a few more, please.

22          MR. PITLUCK:  Can we go to Government

23   Exhibit 115-30.

24   Q     This is a stock transfer report item number 81586 dated

25   May 28, 2013?

Merrill - direct - Pitluck                          5619

1   A    Yes.

2   Q    Who requested this stock issuance?

3   A    It appears Retrophin did.

4   Q    And what is the transaction?

5   A    It's an issuance of shares to Spencer Spielberg.

6   Q    How many shares?

7   A    6,000.

8   Q    Are these restricted or free-trading shares?

9   A    Restricted.

10           MR. PITLUCK:  Can we go to the fourth page of this,

11  Standard-687.

12  Q    Is this the instruction letter for the issuance of those

13  shares?

14  A    Yes.

15  Q    And is it an e-mail from Evan Greebel to yourself dated

16  May 28, 2013?

17  A    Yes.

18  Q    Can you just read the first two sentences?

19  A    Amy, following up on our prior e-mail and pursuant to the

20  attached agreement, Spencer Spielberg is to be issued 6,000

21  restricted shares of Retrophin common stock.  Please send the

22  stock certificate to me by Thursday, May 30, 2013, so I can

23  deliver it to Spencer.

24  Q    And was there an agreement attached to this on the next

25  page, Standard-688?

1    A    Yes.

2    Q    Is this a settlement and release agreement?

3    A    Yes.

4    Q    By and between Spencer Spielberg, Martin Shkreli and a

5    host of MSMB entities as well as Retrophin, Incorporated?

6    A    Yes.

7    Q    Was that the basis on which Standard Registrar issued

8    those shares?

9    A    Yes.

10   Q    And, again, that stock certificate was actually sent out

11   by Federal Express?

12   A    Yes.

13   Q    Page 685.  And who was it sent to?

14   A    Retrophin or Evan Greebel, I'm sorry.

15   Q    575 MADISO Avenue?

16   A    Yes.

17   Q    So let's go to Government Exhibit 115-34 which is at tab

18   34 in your binder.

19        Is this another stock transfer report dated

20   October 22, 2013?

21   A    Yes.

22   Q    Now, are there a series of certificates issued in

23   connection with this stock transfer report?

24   A    Yes.

25   Q    Let's focus on the first one, Michael Lavelle.  Do you

Merrill - direct - Pitluck                     5621

1   see that?

2   A    Yes.

3   Q    How many shares were issued to Mr. Lavelle?

4   A    5,000.

5   Q    Were those restricted or free-trading?

6   A    Restricted.

7         MR. PITLUCK:  Can we go to page 194, Standard-194.

8   Q    Is this a letter from Retrophin dated -- it doesn't have

9   a date -- Retrophin signed by Marc Panoff, chief financial

10  officer?

11  A    Yes.

12  Q    After "Dear Amy," it says:  This letter serves as an

13  authorization and instruction for Standard Registrar and

14  Transfer Company, Inc. To make the following changes to

15  shareholders accounts for Retrophin, Incorporated.

16         Do you see that?

17  A    Yes.

18  Q    Can you read number two?

19  A    Please issue 5,000 shares of restricted common stock to

20  Michael Lavelle.  Michael signed an agreement with Retrophin

21  in June of 2013 that required payment of 5,000 shares of

22  common stock.  Michael Lavelle's settlement and release

23  agreement is attached.

24  Q    And is the settlement and release agreement attached at

25  page, starting at page Standard-198?

Merrill - direct - Pitluck                    5622

1    A    Yes.

2    Q    Again, this was an issuance of stock from Retrophin?

3    A    Yes.

4         MR. PITLUCK:  Can we go to Government Exhibit 115-38

5    which is tab 38 in your binder.

6    Q    Is this another Standard Registrar report?

7    A    Yet.

8    Q    Dated March 7, 2014?

9    A    Yes.

10   Q    Who were these shares issued to and how many?

11   A    To Colt Ventures, Ltd. for 200,000.

12   Q    Are these restricted or free-trading?

13   A    Restricted.

14        MR. PITLUCK:  Can we go to page Standard-757.

15   Q    It's an e-mail from Evan Greebel to yourself?

16   A    Yes.

17   Q    Copied to Marc Panoff?

18   A    Yes.

19   Q    Did you interact with Marc Panoff at Retrophin?

20   A    On occasion, yes.

21   Q    And does it read:  Hi, Amy.  Please issue 200,000 shares

22   of RTRx common stock to Colt Ventures, who is a new consultant

23   to RTRx.  The stock is restricted and should have the

24   appropriate legend placed on it.

25   A    Yes.

Merrill - direct - Pitluck                    5623

1   Q    Do you see that?

2   A    Yes.

3   Q    Is there a consulting agreement and release attached to

4   that document, Standard-758?

5   A    Yes.

6   Q    And that's an agreement between Retrophin and Darren

7   Blanton?

8   A    Yes.

9   Q    And in response to that, did Standard Registrar issue the

10  shares as requested?

11  A    Yes.

12         MR. PITLUCK:  Can you just quickly go to tab 115-40.

13  Q    Is this a March 27, 2014 issuance?

14  A    Yes.

15  Q    Item 85150?

16  A    Yes.

17  Q    How many shares were issued here?

18  A    200,000.

19  Q    And this is approximately three weeks after the previous

20  exhibit we saw issuing 200,000 shares to Colt Ventures,

21  correct?

22  A    Yes.

23  Q    And do you see the -- let's go to Standard-779, please.

24         Is that the same e-mail we just saw from Mr. Greebel

25  dated March 7, 2014?

Merrill - direct - Pitluck                    5624

1   A    Yes.

2   Q    What does that tell you, Ms. Merrill?

3   A    We duplicated the issuance.

4   Q    Issued twice as many shares?

5   A    Yes.

6   Q    Is that a common occurrence?

7   A    Not common.  It happens on occasion.

8   Q    What happens in an instance when there's a duplicate

9   issuance?

10  A    Typically, the company would let us know that we've

11  double issued and then we would help to get the shares back

12  for cancellation.

13  Q    And what do you do at Standard Registrar if there's a

14  duplicate issuance?

15  A    We would typically put a hold on the certificate, the

16  second certificate, so it couldn't be transferred.

17  Q    Could you go to Government Exhibit 115-55 which is tab 55

18  in your document.  This is for identification.

19       Is this an e-mail exchange between yourself, Evan

20  Greebel and somebody named Michael Harrison?

21  A    Yes.

22  Q    Dated, e-mailed on April 14, 2014?

23  A    Yes.

24       MR. PITLUCK:  Your Honor, we offer Government

25  Exhibit 115-55 into evidence.

Merrill - direct - Pitluck                    5625

1          MR. CHAN:  No objection.

2          THE COURT:  We receive Government Exhibit 115-15.

3          (So marked.)

4     Q    Look at the bottom e-mail, please.  It's from Michael

5     Harrison to you and Evan Greebel?

6     A    Yes.

7     Q    Dated April 14, 2014?

8     A    Yes.

9     Q    What's the subject line?

10    A    Duplicate Darren Blanton issuance.

11    Q    Does it read:  Can you provide correspondence or

12    documentation that the issuance to Colt Ventures is a

13    duplicate and there should have only been 200,000 shares

14    issued?

15    A    Yes.

16    Q    Is Michael Harrison listed as controller for Retrophin?

17    A    Yes.

18    Q    What was your response?

19    A    Michael, I researched the two transactions this afternoon

20    and the second transaction should not have been issued.  This

21    was a duplicate transaction that needs to be canceled.  I will

22    reverse all charges for the second issuance of shares.  Please

23    let me know if you have any questions and sorry for the

24    inconvenience.

25    Q    And what was Michael Harrison's response?

CMH      OCR      RMR      CRR      FCRR

Merrill - direct - Pitluck                    5626

1   A    Please confirm you need the stock returned for

2   cancellation.   Thank you.

3   Q    I'd like to show you Government Exhibit 115-56 which is

4   the next tab, 56.

5           And is this a continuation of a previous exhibit or

6   part of the previous exhibit that we just saw in evidence?

7   A    Yes.

8   Q    Is it an e-mail from Evan Greebel to you and Michael

9   Harrison?

10  A    Yes.

11          MR. PITLUCK:   Your Honor, we offer 115-56 in

12  evidence.

13          MR. CHAN:   No objection.

14          THE COURT:   We admit 115-56.

15          (So marked.)

16  Q    So, Ms. Merrill, the bottom two e-mails are the same as

17  the previous exhibit we saw before, is that right?

18  A    Yes.

19  Q    What was the top e-mail?   What date was that sent?

20  A    May 12, 2014.

21  Q    And from Evan Greebel to you and Michael Harrison?

22  A    Yes.

23  Q    What did it read?

24  A    Amy, was Darren Blanton's second stock certificate ever

25  returned to you?

Merrill - direct - Pitluck                5627

1    Q    Do you recall if you responded this e-mail?

2    A    I don't.

3    Q    Finally, I'd like to show you Government Exhibit 115-57

4    for identification.

5          Is this a continuation of the e-mail chain that we

6    just looked at in Government Exhibit 115-56?

7    A    Yes.

8          (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Merrill - direct - Pitluck                5628

1           MR. PITLUCK:  Your Honor, we offer 115-17.

2           MR. CHAN:  No objection.

3           THE COURT:   We receive Government Exhibit 115-7.

4    Q    The bottom e-mail on the page, May 15, 2012, that was the

5    one we just looked at in the previous exhibit, 115-56?

6    A    Yes.

7    Q    What's the next e-mail up?

8    A    From Michael Harrison to Marc Panoff and myself.

9    Q    What's the date?

10   A    October 21, 2014.

11   Q    And what does Michael Harrison write?

12   A    Hi Amy, see below, was Darren Blanton's second stock

13   certificate returned?

14   Q    And what was your response?

15   A    Michael, we have not received the certificate back for

16   cancellation.  The shares have a stop placed against them.

17   Q    So does that mean as of October 21, 2014 Standard

18   Registrar had not received the second issuance back?

19   A    That's correct.

20   Q    Final subject for you this afternoon, Ms. Merrill:  Can

21   you turn to Government's Exhibit 115-22 for identification.

22   Is this a stock issuance report?

23   A    Yes.

24   Q    I'm sorry.  115-22 is in evidence.  I apologize?

25           Is this a stock transfer issuance report for date

Merrill - direct - Pitluck                              5629

1    April 3, 2013.

2    A    Yes.

3    Q    What is documented on this transaction?

4    A    Transferring book entry shares in the name of Allen

5    Geller to certificate for Allen Geller.

6    Q    How many shares?

7    A    108,500 shares.

8    Q    Going to the fourth page of this exhibit, it is an e-mail

9    exchange between yourself and Pamela Jones?

10   A    Yes, sir.

11   Q    Do you see that?  Is Pamela Jones a Retrophin employee

12   that you dealt with?

13   A    It appears to be.

14   Q    Do you recall her?

15   A    I don't remember, no.

16   Q    What's the bottom e-mail say?

17   A    Pamela, I have attached two listings for Allen.  The

18   108,500 have not yet been certificated.  The other list was

19   sent out last year.

20   Q    Can you go to Government's Exhibit 115-54, which is

21   behind tab 54, for identification.  The bottom e-mail is the

22   only e-mail on this page, the same e-mail we just saw in the

23   previous exhibit?

24   A    Yes.

25   Q    Another attachment there attached to this one?

```
                  Merrill - direct - Pitluck              5630
```

1   A    Yes.

2        MR. PITLUCK:  Your Honor, we offer Government's

3   Exhibit 115-54.

4        MR. CHAN:  No objection.

5        THE COURT:   We receive Government Exhibit 115-54.

6        (So marked.)

7   Q    This e-mail is the same one we just saw in the last

8   exhibit?

9   A    Yes.

10  Q    Can you go to the second page.  What is this that we are

11  looking at?

12  A    It's a book entry statement.

13  Q    And what is shown on this statement?

14  A    It's showing Allen Geller had, 108,500 shares in book

15  entry.

16  Q    And when were they issued?

17  A    Issued on 12-13-2012.

18  Q    And they were restricted the same day?

19  A    Yes.

20  Q    Can you go to the second page.  What does this one show?

21  A    This shows Allen Geller certificate number 1726 for

22  156,968 shares.

23  Q    When were those issued?

24  A    March 12, 2013.

25  Q    When were they restricted?

Merrill - direct - Pitluck                    5631

1   A    12-13-2012.

2   Q    Can you go to tab 33, Government's Exhibit 115-33 for

3   identification.  Is this another stock refer report dated

4   October 1, 2013?

5   A    Yes.

6   Q    Item 825954?

7   A    Yes.

8        MR. PITLUCK:  Your Honor, we offer Government's

9   Exhibit 115-33 subject to connection, as discussed previously.

10       MR. CHAN:  No objection.

11       THE COURT:  We receive Government's Exhibit 115-33.

12       (So marked.)

13  Q    How many shares were issued in connection with this

14  transaction?

15  A    181,500.

16  Q    And who were they issued to?

17  A    Allen Geller.

18  Q    Can we go to the fourth page of this document, Standard

19  340.  Is this an e-mail from Evan Greebel?

20  A    Yes.

21  Q    To yourself, copying Marc Panoff?

22  A    Yes.

23  Q    What's the subject line?

24  A    RCRX issuance.

25  Q    And does it read, Hi Amy, pursuant to the attached please

Merrill - direct - Pitluck                    5632

1   issue Allen Geller 181,500 shares of the restricted common

2   stock of Retrophin.  The stock should include Retrophin's

3   legend.  Please send the stock certificate to Allen Geller.

4   And then there's an address.  And it says please advise after

5   it was sent.  Please let me know if you have any questions.

6   Thanks, Evan?

7   A    Yes.

8   Q    Was this the instruction letter that was used for these

9   shares?

10  A    Yes.

11  Q    What was attached to it, if you look at the next page?

12  A    A consulting agreement.

13  Q    Between Retrophin and Allen Geller?

14  A    Yes.

15  Q    And in response to that did Standard Registrar issue

16  181,500 shares to Allen Geller?

17  A    Yes.

18  Q    Go to tab 52.  I'm sorry.  Stay on this one?

19       Can you go to Standard page number 349, the last

20  page of the exhibit.

21       The bottom e-mail is the instruction e-mail we just

22  saw from Mr. Greebel.

23  A    Yes.

24  Q    What did you write in response?

25  A    Evan, please confirm price per share.

Merrill - direct - Pitluck                    5633

1    Q     Why did you ask for the price per share?

2    A     Because we're required to collect cost basis.

3    Q     Can you go over to tab 52, which is Government's Exhibit

4    115-52.  Is this an e-mail exchange between yourself and Evan

5    Greebel, which is a continuation of the last e-mail we just

6    saw?

7    A     Yes.

8    Q     Dated September 30, 2013?

9    A     Yes.

10          MR. PITLUCK:  Your Honor, we offer Government's

11   Exhibit 115-52.

12          MR. CHAN:  No objection.

13          THE COURT:  We receive Government Exhibit 115-52.

14   Q     On the second page of the document here, is that the

15   e-mail in the middle, please confirm price per share, the one

16   he just sent?

17   A     Yes.

18   Q     Going to the first page, Mr. Greebel responds to your

19   e-mail?

20   A     Yes.

21   Q     On the same day?

22   A     I'm sorry.  I didn't pay attention.

23   Q     I'll go back.

24   A     Yes.

25   Q     What did Mr. Greebel write?

Merrill - direct - Pitluck                    5634

1   A    It's not being sold, he is receiving it as payment for

2   services.

3   Q    What was your response to that e-mail?

4   A    Yes.  But we have to record the cost basis.  Isn't there

5   a value for the services rendered?

6   Q    I would like to just show you for identification

7   Government's Exhibit 115-52 and Government's Exhibit 115  --

8   I'm sorry  -- 115-42 and 115-44.  Are these both transmittal

9   -- share transmittal reports for issuance of shares to Allen

10  Geller?

11  A    Yes.

12  Q    Is 115-42 dated April 3, 2014 and 115-44 dated July 7,

13  2014?

14  A    Hmm.

15         MR. PITLUCK:  Your Honor, we offer both of these

16  exhibits into evidence, subject to connection, as discussed

17  previously.

18         MR. CHAN:  No objection.

19         THE COURT:  We will receive Government Exhibits

20  115-42 and  -44 subject to connection.

21         (So marked.)

22  Q    Finally, Ms. Merrill, can you go to tab one, which is

23  Government's Exhibit 115-1 in evidence.  The first entry in

24  this dated December 13, 2012?

25  A    Yes.

Merrill - direct - Pitluck                    5635

1  Q    How many shares does Martin Shkreli have in Desert

2  Gateway at this point?

3  A    2,577,755.

4  Q    I'm going to ask you to go to Bates number 012100 towards

5  the back, to the 80 page.  It's up on the screen  if that

6  helps.

7  A    Yes.

8  Q    You see it's item number 840165?

9  A    Yes.

10 Q    What's the date of this entry?

11 A    1-15-2014.

12 Q    January 15, 2014?

13 A    Yes.

14 Q    As of that date, how many shares did Martin Shkreli have

15 in Retrophin?

16 A    2,577,755.

17 Q    Is that the same number we saw in December of 2012?

18 A    Yes.

19          MR. PITLUCK:  Your Honor, I have nothing further.

20          THE COURT:  Can I just ask about those other

21 exhibits?  You are not moving them in?

22          MR. PITLUCK:  No, your Honor, if I have not moved

23 them in.  Thank you.

24          THE COURT:  Okay.

25          Maybe you can square up with Ms. Jackson  --

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

                    Merrill - cross - Chan                5636

1              MR. PITLUCK:  I'm sorry.

2              THE COURT:  Can you confer with Ms. Jackson at some

3    point which additional exhibits went in.

4              MR. PITLUCK:  Absolutely.

5              MR. CHAN: May I proceed?

6              THE COURT:   Yes.

7    CROSS-EXAMINATION

8    BY MR. CHAN:

9    Q    Good afternoon, Ms. Merrill.

10   A    Hi.

11   Q    Ms. Merrill, you testified today about a lot of shares

12   moving between one person and another, correct?

13   A    Yes.

14   Q    I take it that's a common thing to happen that shares

15   move from one person to another?

16   A    Yes.

17   Q    In fact, your whole business is designed around that

18   fact, that shares move between people, correct?

19   A    Yes, we transfer shares.

20   Q    Your function is to facilitate the transference of shares

21   between people and entities, correct?

22   A    Yes.

23   Q    And as to all the share transfers you testified to today,

24   you didn't testify about a single share transfer involving my

25   client Evan Greebel, correct?

1              MR. PITLUCK:  Objection.

2   Q    Personally, correct?

3   A    Right.

4   Q    The share transfers that you testified to you don't

5   really know the substance behind or the context behind, you

6   just know from the standpoint of the entity that facilitated

7   the movement of the shares, correct?

8   A    Right.

9   Q    And as to the share transfers you testified about today,

10  the direction that you got to do that share transfer didn't

11  always come from Evan Greebel, correct?

12  A    I don't believe so, no.

13  Q    Sometimes they came from people directly from the company

14  at Retrophin, correct?

15  A    Yes.

16  Q    Sometimes they came from other lawyers, correct?

17  A    Yes.

18  Q    Sometimes three came from the people who were supposed to

19  get the shares themselves, correct?

20  A    Yes.

21  Q    And sometimes they came from the people who owned the

22  shares, correct?

23  A    Yes.

24  Q    Let's turn your attention to Government's Exhibit in

25  evidence GX 115-7.  Do you remember testifying about this

1    instruction?

2    A    Yes.

3    Q    This is Mr. Shkreli asking for movement of his shares,

4    correct, to him, how he can receive his shares, correct?

5    A    Yes.

6    Q    Evan Greebel is not copied on this, right?

7    A    No.

8    Q    He's asking to do this on his own, correct?

9    A    Yes.

10   Q    Government's Exhibit 115-14.  The second page.  Again,

11   another request about how to break down shares owned by or

12   controlled by Martin Shkreli, correct?

13   A    Yes.

14   Q    Mr. Greebel is not copied on this, right?

15   A    No, he's not.

16   Q    This direction is coming solely from Martin Shkreli,

17   correct?

18   A    Yes.

19   Q    Government's Exhibit 115-18.  Page three.  These were the

20   instructions that accompanied this particular share transfer,

21   correct?

22   A    Yes.

23   Q    Again, the letter from Mr. Shkreli without any mention of

24   Evan Greebel, correct?

25   A    Right.

Merrill - cross - Chan                    5639

1    Q    And if you look at the next page, the e-mail follow-up as

2    to how to Fedex them again, Mr. Shkreli alone, right?

3    A    Yes.

4    Q    Government's Exhibit 115-19.  Third page.  Martin Shkreli

5    giving you an instruction all on his own, correct?

6    A    Yes.

7    Q    Government's Exhibit 115-20.  Page four.  Martin Shkreli

8    alone, correct?

9    A    Yes.

10   Q    Government's Exhibit 115-4.  Page three.  Do you remember

11   this exhibit?

12   A    Yes.

13   Q    Here the instruction is coming from not Mr. Shkreli, not

14   Mr. Greebel but a different lawyer altogether, correct?

15   A    Yes.

16   Q    The lawyer in this case is  -- well, the law firm in this

17   case is Anslow & Jackson, correct?

18   A    Yes.

19   Q    And this letter I think you described this letter or

20   referred to this letter as a Rule 61 letter?

21   A    It's a legal opinion.

22   Q    This legal opinion had to do with transferring the shares

23   between Mr. Troy Fearnow and whoever he wanted to transfer to,

24   correct?

25   A    I believe it was issuance of shares to Troy Fearnow.

Merrill - cross - Chan                    5640

1   Q    From Troy Fearnow to the people listed on page two of the

2   letter, correct?

3   A    Okay, yes.

4   Q    So the person, the lawyer representing the person who

5   owned the shares is giving the instructions on how to transfer

6   the shares away from the owner of the shares?

7   A    Yes.

8   Q    Although some shares the owner was keeping for himself,

9   correct?

10  A    Yes.

11  Q    The instruction did not come from Evan Greebel, correct?

12  A    Right.

13  Q    Now, continuing in this exhibit, going to the e-mail

14  marked 495, Standard 495, you'll remember with respect to all

15  the people receiving the shares they eventually got it by

16  Fedex to themselves, correct?

17  A    Yes.

18  Q    And we looked at some e-mails where originally they may

19  have been sent to Mr. Greebel but in the end they were all

20  sent to the individual owners themselves, correct?

21  A    Yes.

22  Q    And, in fact, that was both the individual owner's

23  request and also the  -- the new owner's request and also the

24  person transferring he also asked for the same thing, that

25  they be sent directly to the new owners, correct?

Merrill - cross - Chan                    5641

1   A    I don't recall that part.  I know the shareholders wanted

2   the shares.

3   Q    If you go to the next page, that's a record of that

4   recipient Marek Biestek, his desire to get them physically

5   himself, is that correct?

6   A    Yes.

7   Q    On the next page, the same for Mr. Vaino, correct?

8   A    Yes.

9   Q    And on the next page the same for Mr. Pierotti, correct?

10  A    Yes.

11  Q    The next page, the same for Mr. Fernandez, correct?

12  A    Yes.

13  Q    Next page, same for Mr. Mulleady?

14  A    Yes.

15  Q    Let's turn to Government's Exhibit 115-23.  Do you

16  remember this exhibit that you discussed in your direct

17  examination?

18  A    Yes.

19  Q    Now, this one, if you turn to 632, Standard 632.  I'm

20  sorry.  633.  The instructions commence at the bottom of 633

21  with an e-mail from Debbie Crane, correct, dated March 27,

22  2013?

23  A    Yes.

24  Q    And again the original instruction for the transfer does

25  not come from Evan Greebel, correct?

Merrill - cross - Chan                     5642

1    A    Right.

2    Q    He's not even copied?

3    A    Right.

4    Q    This is coming from the law firm Haskett & Haskett, which

5    represents the owner of the shares at that time, correct?

6    A    Yes.

7    Q    And attached is two purchase agreement amendments  --

8    your record attaches two purchase agreement amendments?

9    A    Yes.

10   Q    One was at page 623.01 and that's the one involving

11   Mr. Biestek, correct?

12   A    The one I'm receiving is for Edmund Sullivan 623.01.

13   Q    This is the page, involves Mr. Biestek, correct?

14   A    Yes.

15   Q    And if we go through the pages, the next page, keep

16   scrolling, please, is page two of that agreement, right?

17   A    Yes.

18   Q    Next page.  That's the signature page for Mr. Biestek,

19   correct?

20   A    Yes.

21   Q    The next page, the share certificate itself?

22   A    Yes.

23   Q    Now, let's go to the one in this packet that corresponds

24   to Mr. Sullivan.  What's the next page after that?  Page two

25   of the agreement and what's the next page after that?  The

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Merrill - cross - Chan                        5643

1  signature of Mr. Sullivan, correct?

2  A    Yes.

3  Q    So in this package you have the entire agreement for

4  Mr. Sullivan and Mr. Biestek?

5  A    Yes.

6  Q    With their signatures, correct?

7  A    Yes.

8  Q    GX 115-43.  Let's turn to the third page of this

9  document, please.  Again, this is an instruction to transfer

10 from Haskett & Haskett, the law firm representing Mr. Troy

11 Fearnow, correct?

12 A    Yes.

13 Q    And the instructions say to distribute the shares as is

14 set forth and it says  -- there's a reference to Mark Biestek,

15 12,500 and to Marek Biestek, 25,000, is that a typo?

16 A    I don't know if that's a typo.

17 Q    If you look at the actual transfer summary on the first

18 page of this exhibit, don't those shares both go to someone

19 named Marek Biestek?

20 A    Yes.

21 Q    Again this instruction did not involve Evan Greebel,

22 correct?

23 A    It doesn't appear to be.

24 Q    In asking for the transfer?

25 A    Right.

Merrill - cross - Chan                          5644

1    Q    There is a reference in this same document to a stop

2    transfer instruction.  Do you remember testifying about stop

3    transfers?

4    A    Yes.

5    Q    You testified about the stop transfer instruction that

6    was in place with respect to certain Fearnow shares, correct?

7    A    Yes.

8    Q    And also with respect to that double granting of the

9    shares for I think it was Mr. Geller, is that right?

10   A    I don't remember which shareholder, but we had a double

11   issuance where I put a hold on the shares, yes.

12   Q    So you can get that mistaken issuance back, correct?

13   A    Yes.

14   Q    Do you recall once telling Mr. Greebel that the stop hold

15   order would render those shares worthless because you couldn't

16   do anything with them?

17   A    Not worthless, no.

18   Q    What do you recall saying?

19   A    I don't recall what I would say.  But we don't declare

20   value on shares.  So I don't think I would say that.

21   Q    Did you have any discussions about the shares not being

22   usable because there's a stop order?

23   A    They would be nontransferable.

24   Q    That was in connection with giving assurance even though

25   you hadn't gotten it back yet, nothing could really be done

Merrill - cross - Chan                    5645

1   with those shares?

2   A    They couldn't be transferred to someone else.

3   Q    Or sold, correct?

4   A    Right.

5   Q    Now, this is my last area of questioning.  If you look at

6   -- the government showed you Government's Exhibit 115-8.  Can

7   we put that up, please?

8            I want to ask you some questions about a record like

9   this where the record reflects that you are receiving shares

10  in book form relating to Andrew Vaino or an investor, in this

11  case, Andrew Vaino, and that the shares are being issued to

12  something called Cede & Co.

13  A    They are physical shares, not book.

14  Q    Apart from that it reflects shares going from somebody to

15  Cede & Co.?

16  A    Yes.

17  Q    Explain again what Cede & Co. is?

18  A    They are a depository.

19  Q    What is that?

20  A    A clearing firm.  They hold the shares for brokers and

21  shareholders.

22  Q    So in this instance Andrew Vaino is actually keeping the

23  shares for himself, right?

24  A    I don't know what happened to the shares once they go

25  into Cede & Co.

1   Q    You have to put the shares into a place like Cede & Co.

2   in order to trade them with a broker?

3   A    To be able to sell on the market they have to go into

4   DCC.

5   Q    If you have a physical certificate it's literally just a

6   piece of paper in your hands, right?

7   A    I would say it was more than a piece of paper in your

8   hands but.

9   Q    You can't trade it on an exchange when it's a physical

10  certificate in your hands, can you?

11  A    No.  It has to go into the depository.

12  Q    So if you're an investor and you have this physical share

13  that's been issued to you and you want to sell it, in your

14  Charles Schwab account, for example, you have to deposit the

15  physical certificate into the custody and control of a company

16  like Cede & Co., correct?

17  A    Yes.

18  Q    And they sort of hold it there and the electronic version

19  of that stock is reflected in your Charles Schwab account,

20  correct?

21  A    Yes.

22  Q    And then you can sell it if you want, correct?

23  A    Yes.

24  Q    You would agree with me then that if you want to sell

25  your shares and you own them in physical form you have to

1  register them with a depository trust company like Cede & Co.

2  A    I agree they had need to be deposit with a brokerage

3  firm, yes.

4  Q    If you look at page 521 of this exhibit, can you tell

5  from the records here the particular brokerage firm that

6  Mr. Vaino in this exhibit wanted to deposit his shares at?

7  A    It appears that it would be Charles Schwab.

8  Q    Again, these are the steps necessary in order to be able

9  to sell them on the market, correct?

10  A    Yes.

11             MR. CHAN:  One moment, your Honor.

12             (Pause.)

13  Q    Couple of more questions?

14             Can we put up Government's Exhibit 115-51, which is

15  in evidence.

16             You do not have it.  Can we switch to the Elmo,

17  please.

18             Do you remember there exhibit.

19  A    Yes.

20  Q    And the attachment to this exhibit was this shareholder

21  share record.  Do you remember that?

22  A    Yes.

23  Q    And the government asked you some questions, asked you to

24  describe the different categories listed?

25  A    Yes.

Merrill - cross - Chan                         5648

1   Q    And he asked you about this category that says total

2   control share.  Do you remember that?

3   A    Yes.

4   Q    What category is that about?

5   A    That's for controlling shares for officers of the

6   company.

7   Q    So these categories, these buckets, who picks these

8   buckets to keep records of?

9   A    Who picks the buckets?  The company would.

10  Q    You mean so Retrophin  --

11  A    They are authorized.

12  Q    In other words, this is a shareholder summary report,

13  right?

14  A    Right.

15  Q    Who made the decision to classify the different shares

16  into these particular categories of shareholders, common

17  shares, control shares, restricted shares and authorized

18  shares?

19  A    Those are just common totals that companies need.

20  Q    But these are records  -- these are your records, right?

21  A    They are my records, yes.

22  Q    This is not a record of you going out into the world

23  finding out those numbers and then recording them here,

24  correct?

25  A    These are company records that we hold.

Merrill - cross - Chan                    5649

1    Q    With respect to control shares, how do you know how many

2    shares to put down as a control share or not?

3    A    The company's responsible to let us know who their

4    controlling parties are.

5    Q    Is that pursuant to your agreement with the company?

6    A    You know I can't say.  I would have to look at the

7    agreement.  But that would typically be recorded by the

8    company.

9    Q    You said your understanding of what qualifies as a

10   control share is what shares are owned by officers?

11   A    Or 10 percent shareholders.

12   Q    For purposes of entering into this category?

13   A    Yes.

14   Q    Through what mechanism does the company report to you

15   when a particular share that comes in qualifies as a control

16   share?

17   A    They should let us know who is a controlling party.

18   Q    In this situation you knew that Martin Shkreli was the

19   CEO of Retrophin and Desert Gateway?

20   A    Yes.

21   Q    With that information couldn't you have populated this

22   category as to how many shares were owned by an officer?

23   A    That's not my responsibility to determine that.

24   Q    The data that you have as to how many control shares

25   there are, what happens to that data, what do you do with

Merrill - cross - Chan                    5650

1    that?

2    A    If it's given it would be reflected in that report.  It

3    would be put in the record.

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Merrill - cross - Chan                                    5651

1    CROSS EXAMINATION

2    BY MR. CHAN:   (Continuing)

3    Q    Your own records; right?

4    A    Yes.

5    Q    You aren't reporting your records to any Government

6    agency on a regular basis; correct?

7    A    No.

8    Q    This is solely for purposes of your own records if the

9    company, your customer seeks to access those records; correct?

10   A    We are the company record holder.  We hold the records

11   for the sake of the company.

12   Q    Okay.  And that's part of the reason why you weren't

13   interested to follow up with the company to make sure that the

14   total control shares number was right or wrong; correct?

15   A    I'm sorry, say that again.

16   Q    In other words, because these records are being

17   maintained for the company, whether or not the company updated

18   that information, if it had to, wasn't your concern; correct?

19   A    Well, we would prefer that they do that, but it's not our

20   responsibility to do the follow up on that.

21   Q    Okay.

22            Government Exhibit 114-42.  This is a record

23   relating to a share transfer to Allan Geller.  Do you remember

24   that?

25   A    Yes.

1    Q    And attached to it is a series of e-mails.  Let's turn to

2    the fourth page, which is 798, where you write, in the middle

3    e-mail, "I need the cost basis.  Can you please provide this

4    information"?  Do you see that?

5    A    Yes.

6    Q    Mark Panoff forwards that to Michael Harrison?

7    A    Yes.

8    Q    And Michael Harrison is the one who provided you with the

9    figure; correct?

10   A    Yes.

11   Q    And then the next page is the consulting agreement

12   itself; correct?

13   A    Yes.

14   Q    And on the last page of the consulting agreement, it is

15   signed by Mark Panoff, am I right?

16   A    I don't see that yet.

17        Yes.

18        MR. CHAN:  Thank you very much.  No further

19   questions.

20        MR. PITLUCK:  No redirect.

21        THE COURT:  Can I ask one question?  Can you explain

22   the difference between the terminology some of these

23   transactions have stocks issued and stocks transferred?  What

24   is the difference?

25        And if it's transferred, it's between one party to

1   another?  If it's issued, what is the source?

2           THE WITNESS:  An issue is a new issue of shares

3   typically from the company.

4           THE COURT:  Thank you.

5           MR. PITLUCK:  Thank you, Judge.  No redirect.

6           THE COURT:  Thank you, ma'am.  You are excused.

7   Have a nice trip back.

8           THE WITNESS:  Thank you.

9           (Witness leaves the stand.)

10          THE COURT:  Does the Government have another witness

11  ready today?

12          MR. PITLUCK:  We do, Judge, if you would like us to

13  start.

14          THE COURT:  I'm sorry, jury, can you sit for another

15  half hour or would you rather be dismissed today?  Another

16  half hour?  Perfect.  Thank you.

17          THE JURY:  Good.  Keep going.

18          THE COURT:  5:30.  Thank you.

19          Who's your next witness?

20          MR. PITLUCK:  The Government calls Deborah Oremland.

21          Your Honor, the parties have agreed to two

22  stipulations that we are going to read into the record before

23  we put Ms. Oremland on the stand.

24          THE COURT:  Do you want to read them before she

25  takes the stand or do you not want her here?

5654

1          MR. PITLUCK:  I think it is useful for her to hear

2     it because she is going to be referring to the document.

3          THE COURTROOM DEPUTY:  Raise your right hand.

4          (Witness sworn.)

5          THE COURTROOM DEPUTY:  Please state and spell your

6     full name.

7          THE WITNESS:  Deborah Oremland.  D-E-B-O-R-A-H

8     O-R-E-M-L-A-N-D.

9          MR. PITLUCK:  Your Honor, before we examine Ms.

10    Oremland, the parties have agreed to two stipulations that we

11    are going to read into the record.  The first one is marked

12    Government Exhibit 1001.  It reads Stipulation:  It is hereby

13    stipulated and agreed by and between the undersigned parties

14    that Government Exhibit 950 is a true and accurate copy of

15    Blue Sheet data for Desert Gateway and Retrophin, Incorporated

16    maintained by the Securities and Exchange Commission, or SEC,

17    for the period November 14, 2012 to February 20, 2013.

18          Government Exhibit 951 is a true and accurate copy

19    of Blue Sheet data for Retrophin, Inc. maintained by the SEC

20    for the period February 21, 2013 to November 29, 2013.

21          Government Exhibit 953 is a true -- I'm sorry,

22    Government Exhibit 952 is a true and accurate copy of Blue

23    Sheet data for Retrophin, Inc. maintained by the SEC for the

24    period December 2, 2013 to February 28, 2014.

25          Government Exhibit 953 is a true and accurate copy

5655

1   of Blue Sheet data for Retrophin, Inc. maintained by the SEC

2   for the period March 3, 2014 to May 15, 2014.

3          Government Exhibit 954 is a true and accurate copy

4   of Blue Sheet data for Retrophin, Inc. maintained by the SEC

5   for the period May 16, 2014, to September 19, 2014.

6          No one at Katten Muchin Rosenman, LLP, including

7   Evan Greebel, had any authority to access the Blue Sheet data

8   as maintained by the SEC as reflected in Government Exhibits

9   950 through 954.

10          Government Exhibits 950 through 954 are compilations

11   of market data pursuant to Federal Rule of Evidence 803(17)

12   are admissible as evidence at trial.

13          Stipulation marked Government Exhibit 1001 is

14   admissible as evidence at trial and it is signed by both

15   parties.

16          Finally, Government Exhibit 1002 is another

17   stipulation.  It agrees by and between the undersigned parties

18   Government Exhibit 955 is a true and accurate copy of data

19   Bloomberg L.P. detailing its report of the daily closing price

20   and share volume of shares of Retrophin for the period

21   December 17, 2012 to September 30, 2014.

22          Government Exhibit 956 is a true and accurate copy

23   of data from Bloomberg L.P. detailing its report of the daily

24   opening intraday high, intraday low, and daily closing prices

25   of shares of Retrophin, Inc. for the period December 17, 2012

1    to September 30, 2014.

2            Government Exhibits 955 and 956 are reported

3    compilations of market data pursuant to Federal Rule of

4    Evidence 803(17) are admissible in evidence at trial.  This

5    stipulation marked Government Exhibit 1002 is admissible at

6    trial.

7            So we would move those to admit, 1001 and 1002.

8            THE COURT:  Both Government Exhibits 1001 and 1002

9    are admitted, as well as the --

10           MR. PITLUCK:  The underlying documents.

11           THE COURT:  -- exhibits contained therein.

12           MR. PITLUCK:  Thank you, Your Honor.

13           (Government's Exhibits 1001 and 1002 was received in

14   evidence.)

15   **DEBORAH OREMLAND,**

16       called by the Government, having been duly

17       sworn, was examined and testified as follows:

18   DIRECT EXAMINATION

19   BY MR. PITLUCK:

20   Q    Good afternoon, Ms. Oremland.

21   A    Good afternoon.

22   Q    Where do you work?

23   A    I work at FINRA.

24   Q    And what does FINRA stand for?

25   A    FINRA is the Financial Industry Regulatory Authority.

Oremland - direct - Pitluck                    5657

1   Q     What does FINRA do?

2   A     FINRA is what's called a self-regulatory organization and

3   it regulates certain aspects of the securities industry.  It's

4   private.  It's a membership organization and our members are

5   comprised of broker-dealers and their employees.

6   Q     When you say it's private, does that mean it is not a

7   part of the Government?

8   A     That's right.

9   Q     You just mentioned broker-dealers, what is a

10  broker-dealer?

11  A     A broker-dealer is an entity that is in the business of

12  buying and selling stock, either for themselves or for

13  customers.

14  Q     And how does FINRA regulate broker-dealers?

15  A     FINRA writes rules to regulate its members' behavior.  It

16  conduct exams to make sure that they are following the rules

17  and it can also discipline its members if they are not

18  following rules.

19  Q     And if -- I'm sorry.

20  A     FINRA also oversees trading in a lot of the equities

21  markets and most of the options markets.

22  Q     Does anybody oversee FINRA?

23  A     Yes.

24  Q     Who oversees FINRA?

25  A     The Securities and Exchange Commission or the SEC.

Oremland - direct - Pitluck                    5658

1   Q    What is the SEC?

2   A    The SEC is the Government agency.  They are tasked with

3   enforcing the Federal Securities laws, which provide

4   transparency to the public and investors into public companies

5   after the disclosure of information.

6   Q    And what is your current position at FINRA?

7   A    I am a senior attorney with the criminal prosecution

8   assistance group or CPAG.

9   Q    What is CPAG?

10  A    CPAG is a small group within FINRA that solely provides

11  assistance to the Government in its investigations and

12  prosecutions involving securities fraud and related offenses.

13  Q    What are your responsibilities within that group?

14  A    They range, depending on the type of case that I am asked

15  to help out on, but generally I review a lot of trading data,

16  either from public sources or from our member firms, analyze

17  the trading data, and from time to time I put them into a

18  summary form or a chart, and then occasionally I testify to

19  those charts at trials.

20  Q    So how long have you worked at FINRA?

21  A    I've worked at FINRA for 16 years.

22  Q    And how long have you been in the group that you are

23  currently assigned to?

24  A    11 years.

25  Q    Where were you before you joined that group?

Oremland - direct - Pitluck                    5659

1    A     I started in what's called the Market Regulation

2    Department and the Fraud Surveillance Section of FINRA.  Now

3    it's called the Office of Fraud Detection and Marketing

4    Intelligence.  In that capacity, I review trading of public

5    companies on either what's called the over-the-counter market

6    or the NASDAQ for potential violations of the federal

7    securities laws.

8    Q     And how long were you in what you called the, I believe

9    it's the Fraud Surveillance Section?

10   A     Right.

11   Q     How long were you in that group?

12   A     Three-and-a-half years.

13   Q     During the 16 years that you have been at FINRA, have you

14   conducted training for law enforcement agencies?

15   A     Yes.

16   Q     Which agencies?

17   A     The FBI and the IRS.

18   Q     And could you describe your educational background?

19   A     I have an undergraduate degree from the University of

20   Michigan and a law degree from the American University.

21   Q     During your 16 years at FINRA, have you become familiar

22   with the securities industry?

23   A     Yes.

24   Q     Have you worked on and understood the operations of

25   public securities exchanges?

1    A    Yes.

2    Q    And are you familiar with and utilized terminology in SEC

3    filings in the securities industry?

4    A    Yes.

5         MR. PITLUCK:  Your Honor, at this time the

6    Government would move to qualify Ms. Oremland as an expert in

7    securities terminology and SEC disclosure requirements,

8    regulations and forms.

9         MS. DENERSTEIN:  Objection, Your Honor.

10         THE COURT:  All right.  Is this necessary to have a

11    sidebar?

12         MS. DENERSTEIN:  Yes, it is, Your Honor.

13         THE COURT:  All right.

14         (Sidebar held outside the hearing of the jury.)

15         (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Sidebar                                    5661

1          (The following sidebar held outside of the hearing

2     of the jury.)

3          THE COURT:  You wanted to qualify her as an expert

4     in what?

5          MR. PITLUCK:  Securities terminology and SEC

6     disclosure requirements, regulations and forms.

7          THE COURT:  Yes, ma'am.

8          MS. DENERSTEIN:  Your Honor, we respectfully object

9     to Ms. Oremland's testimony as an expert on various matters

10    that Mr. Pitluck has suggested.  To qualify her, she is going

11    to be discussing the purposes of the regulations and the

12    meaning of the regulations and various definitions, like

13    beneficial owner, affiliate, and those are all things that are

14    within the province of the Court.  This will permit jurors to

15    give greater weight to an expert's testimony on the law than

16    the Court.  The Court should be describing the law to the

17    jurors.

18          As the Court noted in the Shkreli trial, as long as

19    the witness does not testify about the purpose of the regs,

20    paint scenarios about why the regs would be necessary to

21    present certain problems that affect the market and the

22    investing public, I think that testimony would be appropriate.

23    Here, she is going to be qualified as an expert and be able to

24    paint scenarios and discuss the purpose of the law and

25    essentially what she has testified to is her experience is in

Sidebar                                          5662

1   working on investigations and analyzing trades for the last

2   some-odd-years, not as an expert in securities law or the

3   regulations.  She doesn't work for the SEC.  She works for

4   FINRA.  It is a private organization.  And as Your Honor is

5   aware, FINRA's policy is to not permit typically their staff

6   to testify as experts.

7           MR. PITLUCK:  Your Honor, this has been the subject

8   of extensive briefing, as Your Honor is aware, and the issue

9   in the Shkreli trial, she hadn't been noticed as an expert --

10          THE COURT:  Had not.

11          MR. PITLUCK:  Had not.  We did, in an abundance of

12  caution, notice her in this trial.  So our view is that we've

13  raised this in advance.  We've briefed this.  We don't think

14  that she's offering opinion testimony but because of Your

15  Honor's ruling, in abundance of caution, when she explains the

16  purposes of the regs, the regulations, which she has an

17  abundance experience doing, more than 16 years at FINRA at

18  market regulations, trading analysis.  This is what she does.

19  She testifies in trials.  CPAG witnesses are occasionally

20  qualified as expert.  There is precedent to do so.

21          It is more that she is offering the testimony that

22  Your Honor deemed as expert opinion and she has the

23  qualifications to do so, even though we believe that it's not

24  in the expert category, we would like for her to offer the

25  same testimony that was briefed before Your Honor extensively

Sidebar                                        5663

1    in Shkreli and here.  We think it is appropriate and she is

2    qualified to do so.

3           MS. DENERSTEIN:  Mr. Pitluck said what she has done

4    is extensive analysis on the trading and the data.  We are not

5    objecting to her testifying about looking at the Blue Sheet

6    data, we are objecting to her testifying on the law.  I don't

7    think she has been an expert.  It is not clear to me she has

8    ever filled out a 13-D Form in her life.  She hasn't worked in

9    the private sector.  She's not a corporate attorney.  She's

10   not a practitioner.  She's basing her experience solely on

11   working at FINRA for the criminal prosecutions and

12   investigations unit.  That's not an appropriate basis for her

13   to be an expert before the jury.  We don't want the jury to

14   give greater weight to her testimony than the Court on an area

15   that is in great dispute in this trial about whether certain

16   forms were filled out properly.

17          Mr. Kessler, in his opening, noted that the 13-D

18   Form was not filled out properly.  And so that was going to be

19   part of the conspiracy.  To have her then opine on this is

20   inappropriate and is going to be very prejudicial to Mr.

21   Greebel, my client, under 403.  It could confuse the jury

22   because who's in charge of the law and it is unduly

23   prejudicial.

24          MR. PITLUCK:  So, Your Honor, if Ms. Oremland was

25   going to testify to whether a specific 13-D was filled out

Sidebar                                              5664

1   properly, that would constitute opinion testimony.  She is not

2   going to do that.  She is going to explain the 13-D, which she

3   regularly reviews in her job at FINRA, explain the form and

4   purposes and explain the general purpose behind the Form 13-D.

5   This has been all set out very clearly for the Court on this

6   trial and the last one.  She is not going to look at it and

7   say this 13-D is false.

8           THE COURT:  Is she going to actually refer to the

9   13-Ds in this case or is she generally going to talk about

10  terms in the 13-D?

11          MR. PITLUCK:  As she did in the Shkreli trial, which

12  was not opinion testimony, she is going to look at the 13-D

13  and say what does that column mean, what's listed there, what

14  does that column mean.  She's not going to say is that

15  accurate, is that fraud, is that a lie.  That's exactly what

16  she did in the last trial.

17          MS. SMITH:  That was not even in the realm of expert

18  testimony in the last trial.

19          THE COURT:  She cannot opine on the ultimate issues

20  that the jury is charged with determining, but I do think her

21  testimony -- first of all, I do think she has the adequate

22  experience and training to qualify as someone who is well

23  versed in the terminology and the requirements.  And second of

24  all, I think to the extent she is going to avoid giving

25  ultimate opinions about the facts in dispute here, we

1    shouldn't have a problem.

2         MR. PITLUCK:  She is not going to give an ultimate

3    opinion about the facts in dispute here.

4         THE COURT:  I do think her testimony would be

5    helpful to the jury as lay people who have heard a lot of

6    terms and the numerous SEC filings are in evidence and some of

7    those terms and concepts I think have to be explained to the

8    jury so that they can understand the evidence better.  It will

9    help with the jurors' understanding.

10        And just to be clear, are you planning to go

11   anywhere beyond what she did in the Shkreli case?

12        MR. PITLUCK:  A little bit.  As we briefed in

13   Shkreli in which the Court says because there hasn't been

14   notice, so she's going to testify to the general purposes of

15   the SEC regulations, which the defense hasn't noticed an

16   expert on.  Not just on that issue, but there are a lot of

17   issues that she is offering an opinion on to that.

18        THE COURTROOM DEPUTY:  Excuse me, would you want to

19   dismiss the jury?

20        THE COURT:  I think we might as well.

21        MR. PITLUCK:  That's fine, Judge.

22        (Sidebar concluded.)

23

24

25

5666

1              (In open court - jury present.)

2              THE COURT:  I will dismiss you for the evening

3    because, unfortunately, I think it is going to take a little

4    more than just a few minutes.  Please don't talk about the

5    case.  Please don't expose yourself to any possible media

6    attention on this.

7              Thank you very much.  Remain open-minded.  I

8    appreciate your service.  Have a good night.

9              (Jury exits the courtroom.)

10             THE COURT:  Ms. Oremland, I am going to also excuse

11   you for the evening.  You can step down.  We will see you

12   tomorrow at 9 o'clock.  Thank you.  Have a good night.

13             (Witness leaves stand.)

14             THE COURT:  All right.

15             MR. CHAN:  Before you go back into the expert

16   issues, I would just note for the record, we heard back from

17   Cooley.  They've waived the privilege as to the document with

18   the redactions.  And so we can replace, for purposes of the

19   record, the same exhibit, same exhibit number but with the

20   unredacted minute notes attached.  That's DX-118-26-A.

21             THE COURT:  DX-118-26-A.

22             MR. CHAN:  That's right, Your Honor.

23             THE COURT:  It is admitted without redactions.

24             MR. KESSLER:  And subject to the same limitations as

25   the previous one.

5667

1        MR. CHAN:  Yes.

2        (Defendant's Exhibit 118-26-A was received in

3   evidence.)

4        THE COURT:  All right.

5        MS. DENERSTEIN:  Your Honor, it is entirely the

6   Court's responsibility to instruct the jury on the law and to

7   have Ms. Oremland, who is basically a fact witness converted

8   into an expert so that she can explain the purposes of 13-D,

9   which the Government has not disclosed to us in writing or to

10  any other regulation as to what her opinion is going to be

11  other than to generically say to me, oh, it's going to be

12  transparency.  That violates Rule 16.  They have an

13  affirmative obligation to comply with their disclosure

14  requirements about experts and they did not do that in this

15  case.  Yes, they may have said we will make her an expert if

16  the Court lets us, but that is not the same as disclosing what

17  exactly she is going to testify to.

18        And she is not qualified to do so.  She is a

19  practitioner at FINRA who makes charts for criminal cases and

20  analyzes significant trading activity and lectures to law

21  enforcement.  That does not make her an expert for purposes of

22  the regulations.  She has not proffered any experience in

23  understanding the SEC and the corporate rules and all of the

24  process that is involved in that and it is really going to

25  confuse and mislead the jury because she is not going to be --

5668

1    -- to have her be an expert, she is basically telling the jury

2    13-D the purpose is this, and this is why that purpose exists,

3    and then Your Honor is going to be instructing them on the law

4    but they will have already heard from Ms. Oremland what she

5    thinks the purpose is.

6            Your Honor, did exclude -- I know this a different

7    trial, but Your Honor excluded this testimony at the Shkreli

8    trial.  I don't believe it was -- I wasn't there -- solely

9    because notice wasn't given.

10           THE COURT:  Well, it was they had not identified her

11   as an expert, so I didn't think it was fair for her to be

12   offering opinions.

13           I am troubled that the Government hasn't provided

14   disclosures about the opinion and the bases of her opinions.

15           MR. PITLUCK:  Your Honor, we don't think she is

16   offering opinion testimony.  We are qualifying her as an

17   expert so that she can offer what we think is layperson

18   testimony based on her experience and knowledge.  We briefed

19   this in August.  There was no request until late last week, at

20   which point the Court ordered us to confer, which we did.  I

21   provided the only testimony -- I actually told them what she

22   was going to say -- the only testimony that's going to be at

23   all different on these issues, to the defense.  There was no

24   request and we didn't -- so we briefed this extensively, both

25   in this trial and in the Shkreli trial.  There were hundreds

5669

1   of pages of briefing in the last trial.  It was all about

2   timing.

3           Judge, we respectfully acknowledge the Court's

4   opinion, but she is not going to opine on ultimate issues or

5   anything particular to the facts of the case.  We noticed her

6   as an expert because of the Court's ruling that some of this

7   is veering into areas that I think it might be based on her

8   opinion.  But this isn't a lack of disclosure.  This has been

9   out there for months.

10          MS. DENERSTEIN:  Your Honor, respectfully, they have

11  an affirmative obligation to disclose their expert's opinions

12  in writing.  They asked us to do so.  We did so.  On December

13  15th in 2015 they said they would do so.

14          I submitted a letter to Mr. Pitluck on November 12,

15  2017 asking exactly for this, for a summary of any expert

16  opinions and the basis and reasons for those opinions that Ms.

17  Oremland may offer in connection with her explanation.

18          While Mr. Pitluck thinks it's sufficient to say

19  things generically to me, I think it is more appropriate and

20  the Court should hear what these opinions are, because if they

21  come out and they do go to an ultimate issue, then we are in

22  the position where the Court has not evaluated what the expert

23  opinions are going to be in this particular area and it does

24  -- an expert can't testify to the ultimate issues in the case.

25          THE COURT:  They are not going to have her do that.

5670

1          MS. DENERSTEIN:  But testifying to the purposes

2    comes dangerously close to doing exactly that.  If you are

3    starting to say that 13-D needs this, that a beneficial owner

4    means this and that, you are getting dangerously close to

5    telling the jury what they should be considering when they are

6    going to deliberate.  That Your Honor's job.

7          THE COURT:  How is that different from a defense

8    expert who's going to testify about whether an investor has

9    colorable claim?  That's a lawyer.  They are going to be

10   giving opinions about whether there is a sustainable,

11   colorable or viable legal claim that should have been a

12   concern when Retrophin entered these agreements.

13          Moreover, I think your expert, Mr. Dean Ferrulo is

14   going to touch on some of these issues.  It's an issue that

15   will help the jury understand some of the complexities of the

16   terminology.  They are offering her to opine or to give

17   information about securities terminology and SEC disclosure

18   requirements, regulations and forms.  They're not going to

19   have her go through the forms at issue and say here's a

20   problem, here's where it's deficient.  They have heard the

21   evidence.  They have seen the forms and they are going to

22   understand better through this witness what the terminology

23   means and they will make the findings whether or not the forms

24   are sufficient.

25          (Continued on next page.)

5671

1          THE COURT:  (Continuing)  It's not telling the jury

2     what result to reach.

3          The Second Circuit, I understand, will not condone

4     or uphold an expert who opines on an ultimate issue, but

5     that's not what is happening here.  She is helping the jurors'

6     understanding of the terms that have been, you know, raised

7     and they appear in the documents and they have been certainly

8     before the jury at the trial.

9          So, I do not think that this treads into forbidden

10    territory if, in fact, the only additional testimony she is

11    going to give is, based on her training and experience, the

12    purpose of the regulations.  I am just not convinced that her

13    testimony should be forbidden.

14         I don't know what Mr. Pitluck has told you in the

15    way of disclosures, but, you know, if you have been clear with

16    the defense about what you intend to have this witness

17    discuss, you know, I wasn't there.  Ms. Denerstein claims you

18    haven't really been forthcoming.

19         MR. PITLUCK:  Judge, we've -- I believe we've been

20    forthcoming.  I think the most important issue is that the

21    opinion testimony was raised in briefing in August and there

22    was no request until November 12th at which point I told them

23    the only areas that were different.

24         I mean, I'm reluctant to even characterize it as

25    opinion testimony.  So I just, I don't see the issue, Judge.

CMH        OCR        RMR        CRR        FCRR

5672

1   I think that as Your Honor has told us, there's nothing close

2   to applying her opinions to the facts in this case.  It's just

3   generally.

4           THE COURT:  I want to point out an August 11th

5   letter, document number 311 in the docket, in which the

6   government advised the parties that:

7           The government anticipates it will call as a fact

8   witness Deborah Oremland as a witness of the regulatory

9   agency.  Ms. Oremland's anticipated testimony will include an

10  explanation of certain Securities and Exchange Commission

11  rules, regulations and forms including Rule 144 which governs

12  the holding and sale of restricted securities and Schedule

13  13(d) forms which require the disclosure of ownership

14  including beneficial ownership of stock of a publicly traded

15  company.  To the extent that the defendant may argue that some

16  or all of Ms. Oremland's anticipated testimony constitutes

17  expert testimony, the government disagrees.  Nevertheless, the

18  government is prepared to qualify Ms. Oremland as an expert on

19  those areas of testimony, if necessary.

20          So, I mean, there's been months prior to the trial

21  and certainly prior to her testimony today which I think,

22  again, through the motion practice that we had in this case,

23  and it has been a tremendous amount, I think these issues have

24  been fully vetted.

25          I am surprised to hear this now at this point

5673

1    because there was a hint of it, I think.  Certainly, it was

2    clear in August what the government intended to do.  There was

3    some discussion of it, I think, last week or early this week,

4    but there was no other issue presented and I think that the

5    opportunities have been abundant for the parties to fully vet

6    their differences.

7         I feel that I have been more than indulgent of

8    submissions even during the trial, before the trial, weekends

9    in the trial, nights in the trial, and this, frankly, is not

10   something that is new or unfamiliar and I don't think it

11   violates any Second Circuit mandates as far as I can tell.  I

12   just don't see any legal authority for disallowing

13   Ms. Oremland's testimony in this area.

14        It will be helpful to the jury to understand these

15   terms.

16        MS. DENERSTEIN:  Respectfully, Your Honor, I

17   disagree and I think that if the government has violated

18   Rule 16 by not providing their basis, because they noticed

19   that they intended to do this doesn't relieve them of their

20   obligations to disclose their opinions.  They did not say what

21   the opinions were in their August submission.  They simply

22   said that they intended to do this.  And I also think it has

23   not given Your Honor an opportunity to evaluate those opinions

24   and especially since they relate to the law, I think it's

25   appropriate for the Court to hear exactly what they are before

5674

1    they're presented to a jury.

2         THE COURT:  Well, I think what the defense is asking

3    about is the, what is she going to say regarding SEC rules,

4    regulations and forms and, in particular, the forms you

5    outlined in your letter of August 11th.

6         MR. PITLUCK:  Well, Judge, I would also -- I'm

7    actually looking for the citation, but there was an actual

8    briefing on this beyond our expert notice in which we very

9    clearly set forth what she was going to testify to in our

10   response and the Court then ruled on that and there was no --

11   I mean, there was opposition, but there was no opposition to

12   the actual testimony.  And I'm just looking for the page cite.

13        But in a nutshell, Judge, because it is very brief,

14   she is going to testify that the purpose behind Form 4 and

15   Rule 13(d) is transparency to the market for various reasons

16   as to the ownership of majority shareholders or controlling

17   shareholders or insiders, and that that's, that the market,

18   that those regulations were designed to give transparency to

19   those kinds of people or, by trading to those kinds of people.

20   That's it.  And she's also going to testify that, as we

21   disclosed in our brief, that people who control a large amount

22   of shares can have an influence on price and volume, in the

23   abstract, not applied to any facts.

24        MS. DENERSTEIN:  I think saying that the purpose of

25   a reg. is for transparency is, and then having her say various

5675

1   reasons and not describing what those reasons are or leaving

2   it for the jury to figure out, it's just not necessary.

3          You know, a 13(d) form, I actually think it's clear

4   when it gets filed and what the purpose is.  To have

5   Ms. Oremland testify about the purposes is going into an area

6   that is entirely not appropriate and, I mean, and she's a fact

7   witness.  FINRA typically doesn't permit their employees to

8   testify as experts and it's for a reason, because they're not

9   qualified to do so.

10         MR. PITLUCK:  Judge, I just patently disagree with

11   that.  She's been working at FINRA for 16 years conducting

12   investigations on this very topic, the review of SEC terms.

13         I can't believe we're arguing about this again but I

14   think the point again, Judge, the jury looking at forms, a

15   brief explanation from someone who's experienced in this is

16   helpful.

17         Judge, we've gone over this so many times.

18         THE COURT:  No, I understand.  And, look, I don't

19   know what else to say except that I think it has been fully

20   vetted.

21         Her testimony is going to be fairly circumscribed

22   based on Mr. Pitluck's representation about what she will say

23   and she has gotten specific authority based on the

24   government's representation to testify beyond just her

25   analysis and I believe that given her extensive experience in

5676

1    reviewing activity and working in this area, that she has

2    sufficient training, knowledge and experience in the financial

3    industry regulations and can be helpful ultimately to the

4    jury.

5         Those are the tests that I apply and think govern

6    and would warrant and permit her to be, to be a witness who

7    will explain some of these terms to the jury.  It can only

8    help them understand, as long as she does not opine on an

9    ultimate issue which I'm getting the representation that she

10   will not.

11        MR. PITLUCK:  She will not, Judge.

12        THE COURT:  I mean, if you've read her testimony in

13   the Shkreli case, she didn't go anywhere near that.

14        MR. PITLUCK:  She's not.

15        THE COURT:  She didn't go anywhere near anything

16   like that and all she's going to do that's different from the

17   Shkreli case is explain some terms that I didn't allow her to

18   do in the Shkreli case.

19        MS. DENERSTEIN:  Your Honor, I respectfully, I do

20   intend to do some voir dire tomorrow prior to Your Honor

21   making the decision and I have read the Shkreli trial and what

22   concerns me is there is going to be her testimony in the

23   Shkreli trial and there is going to be a difference because

24   she's going to be permitted to testify about why and the

25   purposes and I don't think that the government's met their

5677

1    obligations under Rule 16.

2         MR. PITLUCK:  Judge, we object to the voir dire.

3    The Court's made the decision.  They have the opportunity to

4    cross-examine her.

5         THE COURT:  Well, you are going to voir dire her for

6    the purpose of challenging whether she's got sufficient

7    training, education and experience --

8         MS. DENERSTEIN:  Yes.

9         THE COURT:  -- to testify in this area?

10        MS. DENERSTEIN:  Yes.

11        MR. PITLUCK:  Judge, she testified based on her

12   training and experience at the last trial.  She testified to

13   it here.  Your Honor has already found that she has, you just

14   on the record stated that she has the relevant experience.

15   She can cross-examine her and to challenge her as to the basis

16   of what she believes the regulations are.  That's the

17   appropriate route.

18        MS. DENERSTEIN:  I respectfully disagree.  Voir dire

19   is appropriate for somebody that the government used as a fact

20   witness in a prior trial and wants to qualify as an expert in

21   this trial.  It's entirely appropriate.  It will be focused

22   and appropriate.  I respectfully disagree with Mr. Pitluck's

23   determination that because he thinks she has the relevant

24   experience means that the defense has to agree.

25        THE COURT:  Well, I'm just curious about how lengthy

5678

1  your voir dire is likely to be.

2          MS. DENERSTEIN:  I don't know exactly, Your Honor,

3  because I want to think about it carefully but it will not be

4  long.

5          THE COURT:  I want you to think about it carefully

6  because I may, one, not allow it, two, if I do allow it, it

7  will need to be targeted.

8          MS. DENERSTEIN:  It will be targeted.

9          THE COURT:  And, three, it's not going to take a lot

10  of time because the defense has had ample opportunity

11  throughout this trial to raise these issues.  This has been

12  fully vetted and decided.  A lot of time and effort has been

13  invested by both sides getting this issue resolved and I am

14  just concerned about further, further rehashing of issues that

15  have been decided.

16          MR. PITLUCK:  Judge, respectfully, we filed months

17  of briefing --

18          THE COURT:  I know.

19          MR. PITLUCK:  -- for this whole thing on the

20  experts.  We followed the schedule.  We had a Daubert hearing

21  last night.

22          If this is the tact, then we are going to voir dire

23  each and every one of their experts that are going to be

24  called in the defense case, even though we followed the

25  appropriate briefing schedule, and it's going to waste jury

5679

1  time for what is ultimately brief testimony that's been

2  disclosed and we'll seek to do the same thing.  We tried to

3  follow the channels, but if this is the course the Court's

4  going to open, we're entitled to do the same thing as well.

5          MR. DENERSTEIN:  That is --

6          THE COURT:  This is not how we're going to have this

7  case evolve --

8          MR. PITLUCK:  I agree.

9          THE COURT:  -- that an eye for an eye and a tooth

10 for a tooth, that is not how it's going to go down here.  All

11 right?

12         If it is appropriate and there is a good faith basis

13 to do it, it may be permitted, but if I believe that with some

14 of these issues it has been fully vetted, I may not permit it.

15 I am not sure what experts will cause the government to want

16 to voir dire, but I am telling you now that I am not going to

17 permit it just because you want to get even or settle a score

18 on this issue.

19         So, we will see tomorrow.  I don't know whether you

20 have specific areas of voir dire.  I can tell you now whether

21 or not I will permit it or if you want to just wait and see

22 what questions come out, I can decide then.  Whatever you want

23 to do, but I'm telling you that I don't really know what other

24 voir dire issues would have to come up.  I think she's, as I

25 said, I think she's qualified in this area, frankly.

5680

1        MR. PITLUCK:  Judge, we're certainly concerned, and

2   respectfully, Judge, we wouldn't, this wouldn't be an eye for

3   an eye.

4        THE COURT:  I know.  It just sounded --

5        MR. PITLUCK:  There are certainly qualification

6   issues that we raised as to relevance and for the ones that we

7   really believed it, we asked for a <u>Daubert</u> hearing.  That's

8   the appropriate course.  And we have real concerns about voir

9   dire in front of a jury for somebody who is going to be

10  testifying on very basic principles.

11       MS. DENERSTEIN:  That's the purpose of voir dire.

12  It's in front of the jury.  Mr. Pitluck may not like it, but

13  he is the government, he has the burden of proof, he has the

14  obligation to comply with Rule 16 and not make this an eye for

15  an eye.  It's entirely inappropriate.

16       We are defending a man's liberty and I have -- I

17  don't take this lightly.  We will voir dire.  It will be

18  narrow.  I will tell the Court in the morning.  You will make

19  the decision but, you know, I am, I, regretfully, am offended

20  by Mr. Pitluck's comments and to the extent he wants to voir

21  dire our experts because he thinks they're not qualified, then

22  he has that right too, but he shouldn't try to play the game

23  of limiting the defense's right to do things because then the

24  government will do this.  That's entirely inappropriate.

25       THE COURT:  I agree.

5681

1          All right.  So I will see you in the morning.

2          MR. PITLUCK:  Your Honor, there is one other issue

3     to raise.

4          THE COURT:  Yes.

5          MR. PITLUCK:  We anticipate that if we get to a

6     second witness tomorrow, it will be Timothy Pierotti.

7          THE COURT:  Okay.

8          MR. PITLUCK:  And as the Court is aware, in pretrial

9     briefing, defense filed a motion to preclude or prevent

10    Mr. Pierotti from testifying to his belief that Mr. Greebel

11    receive shares in Retrophin and the Fearnow transaction is

12    factually inaccurate and as the court is aware, that's what

13    Mr. Pierotti testified to in the first trial.

14         We didn't oppose it, not because, mostly because we

15    agreed that Mr. Greebel never received Fearnow shares,

16    although we have, we did voice concern about editing people's

17    testimony as we have continued to do throughout this trial.

18    And I raise the issue because a few days ago, I don't remember

19    when, we received an e-mail from Mr. Brodsky saying that they

20    may intend to cross-examine him on that belief that

21    Mr. Greebel received Fearnow shares.

22         THE COURT:  Well, are you going to be asking

23    Mr. Pierotti not to go into that area?

24         MR. PITLUCK:  Well, we had, Your Honor, based on the

25    Court's ruling and we were going to carefully elicit that

5682

1    testimony.

2            So that -- I mean, it's as Mr. Pierotti testified

3    under oath, that was his belief.  I certainly am not in a

4    position to tell somebody what is right or wrong in their

5    view, but we were preparing him to not say that.  But now,

6    we've heard that they may want to cross-examine him on it so

7    now we are, you know, contemplating how we want to elicit the

8    testimony certainly under oath because we don't want him to

9    get confronted on something he said before that he didn't say

10   it this time.  So, we wanted to raise it to the Court because

11   to elicit that testimony would be in violation of a court

12   order as it stood after the pretrial motions, and we didn't

13   want you to be surprised if you heard it, that there is,

14   there's a reason for doing it.

15           So, we haven't decided what we're going to do, but

16   if that testimony does come out, it's not in violation of a

17   court order, it's not because Mr. Pierotti did something that

18   he was instructed not to do or asked not to do.  It's because

19   that's his belief and we decided to elicit that testimony

20   because he may be crossed on it.

21           (Continued on next page.)

22

23

24

25

5683

1          MR. BRODSKY:  Yes, your Honor.  What we decided was

2     that Mr. Pierotti's mistaken belief and I think the government

3     would stipulate that factually, because we all know it's

4     factually false.  Mr. Pierotti's belief that Mr. Greebel

5     received Fearnow shares is false.

6          We believe it goes to his credibility.  We want to

7     cross-examine him about that.  And we wanted to notify the

8     government about it because we did want to give them advance

9     notice and the opportunity to elicit it on direct.  They can

10    correct it through Mr. Pierotti.  Mr. Pierotti can explain how

11    he got it wrong or Mr. Pierotti can stick with his view and

12    his belief.

13         But we think Mr. Pierotti's credibility is

14    outweighs, you know, from our perspective any concern we have

15    that he's going to testify that Mr. Greebel received Fearnow

16    shares.

17         THE COURT:  I understand your motive may be to call

18    into question his credibility.  But there's a tremendous risk

19    that something quite prejudicial will be believed by the jury.

20         I mean the government had agreed not to elicit this

21    testimony of his belief which is incorrect, that Mr. Greebel

22    received Fearnow shares.  But if you bring it out on

23    cross-examination and he insists that that's his belief and

24    explains why he believes, that will come out on redirect I

25    would imagine it would have to, you run the risk that the jury

5684

1  will believe him.  And then the jury will be left with a
2  mistaken impression about these shares.

3       I think everyone is in agreement that it sounds like
4  the government agrees with you that Mr. Greebel did not get
5  Fearnow shares.  It's almost like poking  -- I don't know what
6  the right analogy is.  I don't know.  I don't understand
7  because they have agreed to avoid it like the plague and you
8  want to throw it out before the jury, they may believe him.

9       MR. BRODSKY:  In light of your comments, your Honor,
10 we will talk to our client about it.  We did want to give them
11 notice that we had made the plan.  We hear your comments.

12      MR. DUBIN:  I'm sorry.  Our client just advised me
13 about he about how he wants to proceed.  I just want to tell
14 Mr. Brodsky.

15      THE COURT:  Okay.

16      MR. BRODSKY:   Your Honor, I think our client has
17 heard your comments and we will not cross-examine on it and
18 Mr. Pitluck will stay with the pretrial motions.  I think our
19 client has heard your Honor.

20      THE COURT:  We don't know who they are going to
21 believe and what they are going to believe and there's always
22 a risk.

23      MR. BRODSKY:  Understood.  Thank you, your Honor.
24 Sorry to have raised the issue.  Your comments were helpful.

25      THE COURT:  If you change your mind, I'm sure you'll

5685

1    let us know.  I'm not saying you shouldn't.  It's just my

2    concern.  The same thing with the Fifth Amendment adverse

3    inference.  I'm trying so hard to keep the jury focused on the

4    notion people take the Fifth and it's their right and it has

5    nothing to do with guilt or honesty or anything else.

6              MR. BRODSKY:  One day you would tell us how you

7    would rule on the issue of the Fifth Amendment.

8              MR. PITLUCK:  We received an e-mail from the

9    defendant that there was an additional Rule 17 subpoena issued

10   to Retrophin today and it appears from our review of it to be

11   directed to documents related to Mr. Pierotti, who is going on

12   the stand tomorrow.

13             Obviously, we have been providing the defense our

14   witness list to try to have an open dialogue and what appears

15   to be during his direct testimony or after his direct

16   testimony seeking very specifics documents, that there's an

17   effort to get documents that we won't have at the time of  --

18   won't be in the government's possession at the time of his

19   direct examination.

20             THE COURT:  If that is the timing, then we'll have

21   to deal with a corrective measure.  If there are documents

22   that are going to be  -- I would imagine you would present

23   these in your case in chief.  Is that what your plan is?

24             MR. BRODSKY:  Either cross-examine with them.  If

25   there were not inconsistent statements and your Honor decided

5686

1  we could not admit them and they were not inconsistent, then

2  we would present them in our case in chief, if we put on a

3  case in chief.  We hope to get them tonight.

4          THE COURT:  I'm hoping you can get them

5  electronically from Retrophin's counsel, if they would be

6  willing to share it with the government.

7          MS. SMITH:  I believe there are like twelve

8  requests.

9          MR. BRODSKY:  There are twelve specific e-mails.

10          MR. KESSLER:  These are more examples where the

11  defendant is requesting specific e-mails from Retrophin that

12  they may already have in their possession and have not

13  produced and are now seeking to get from Retrophin.

14          MR. PITLUCK:  Before we can obtain them as well

15  before our direct examination.

16          MR. KESSLER:  We'll see.

17          MR. BRODSKY:  We don't have in our possession

18  documents we can use for cross-examination.  So we need to do

19  is use the appropriate measure of Rule 17.  We have to be

20  narrow.  We have to be targeted.  And that's what we have

21  done.  We've given you the notice of it.  You have the

22  requests.  There are specific dates and we've done the best we

23  can to be as narrow as possible, your Honor.  And they will

24  get the documents at the same time we do.

25          MS. SMITH:  We have noticed Mr. Pierotti I believe

5687

1    for last week possibly.

2         THE COURT:  You noticed what?

3         MS. SMITH:  We noticed Mr. Pierotti for last week

4    and certainly for this week.  If there were twelve documents

5    they want to use they could have served the subpoena last

6    week, instead they served it 2:15 this afternoon.  They are in

7    Mr. Brodsky's possession because his client took documents

8    from Retrophin and had them in his possession, therefore, they

9    don't want to authenticate them through their client, they

10   have to go to Retrophin.  We believe it's an end run around

11   Rule 16 and certainly if they are going to take that approach

12   they can do that the week before, not the day before such that

13   we run into this issue where we may get documents after he

14   begins to testify.  I don't know.

15        Obviously, I'm sure Retrophin will do its best to

16   get us the documents tonight.  We'll look at them.  We wanted

17   to put that on the record for your Honor because that is the

18   witness we have available after Ms. Oremland tomorrow.

19        MR. BRODSKY:  The government has no basis to say

20   that we have documents in  -- Mr. Greebel took documents, that

21   Mr. Greebel took any of these documents.  They are throwing

22   around accusations without any evidence.

23        With respect to Mr. Su, they ran to his defense and

24   said there's no evidence Mr. Su took anything even though in

25   the face of explicit evidence Mr. Su went into the Global

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

5688

1   Relay system without authorization and exceeding authorization

2   took information.   But now with respect to our client because

3   we put some documents on our trial exhibit list which are not

4   these and we removed and we told them those came from our

5   client, they are now suggesting that all documents we request

6   are based on information that our client took and that is

7   inappropriate for the government to do, without evidence and

8   it's really just not right.

9            THE COURT:   Okay.   Good night everybody.

10           I think everybody ought to take a big deep breath

11   tonight and just try to come back and lower the temperature a

12   little bit.   I understand it's a very highly-contested case.

13   You should step back and calm down a little bit.

14           (Case adjourned to Friday, November 17, 2017 at

15   9:00.)

16

17

18

19

20

21

22

23

24

25

5689

```
 1                    I N D E X

 2   WITNESSES:

 3

 4       SUNIL  JAIN

 5           DIRECT EXAMINATION (Continued)    5403

 6           CROSS-EXAMINATION                 5428

 7           REDIRECT EXAMINATION             5550

 8       AMY  MERRILL

 9           DIRECT EXAMINATION               5557

10           CROSS-EXAMINATION               5636

11       DEBORAH OREMLAND

12           DIRECT EXAMINATION              5656

13

14                     EXHIBITS:

15           968                              5416
             GX 124-4-A                       5418
16           GX 972                           5422
             GX 114-31                        5427
17           DX 118-46                        5444
             114-21                           5489
18           DX 118-26                        5509
             GX 118-58                        5527
19           118-4                            5538
             118-41                           5542
20           116-81                           5544
             118-47                           5546
21           DX 118-39                        5549
             GX 115-2, -4, -6, -8 through 14, 5567
22           Government's Exhibit 115-16
             through 25 and 115-27 and 28,
23           115-30 through 31, 115-34
             through 36, 115-38, 115-40,
24           115-43 through 46
             GX 115-1                         5568
25           GX 115-5                         5577
             GX 115-51                        5586
```

5690

EXHIBITS (Continued):

```
GX 115-7                    5591
11-48                       5612
115-49                      5615
150-50                      5616
115-15                      5625
115-56                      5626
GX 115-7                    5628
GX 115-54                   5630
GX 115-33                   5631
GX 115-52                   5633
GX 115-42 and  -44          5634
GX 1001 and 1002            5656
DX 118-26-A                 5667
```

                    *     *     *     *

**$**

**$2,286,511** [2] - 5412:18, 5544:25
**$2.294** [1] - 5464:24
**$300,000** [3] - 5420:22, 5423:4, 5549:12
**$843,334.02** [1] - 5426:18

**'**

**'book** [1] - 5580:10

**0**

**0001** [1] - 5604:19
**012100** [1] - 5635:4

**1**

**1** [4] - 5409:10, 5520:15, 5568:10, 5631:4
**1-15-2014** [1] - 5635:11
**10** [5] - 5579:11, 5589:23, 5609:1, 5612:16, 6649:11
**10(a** [1] - 5531:12
**10-K** [10] - 5403:12, 5403:23, 5410:16, 5416:4, 5416:10, 5454:24, 5529:14, 5531:5, 5532:16, 5533:2
**10-k** [7] - 5424:5, 5424:9, 5426:23, 5432:5, 5502:24, 5554:20
**10-Q** [14] - 5419:14, 5419:18, 5421:20, 5422:2, 5423:16, 5423:19, 5423:23, 5428:7, 5432:5, 5491:23, 5529:15, 5531:7, 5532:16, 5533:2
**10-Qs** [1] - 5454:24
**100** [3] - 5407:7, 5421:15, 5533:24
**100,000** [5] - 5580:9, 5602:16, 5603:11, 5603:23, 5607:24
**1001** [6] - 5654:12, 5655:13, 5656:7, 5656:8, 5656:13, 5690:8
**10017** [1] - 5600:4

**1002** [6] - 5655:16, 5656:5, 5656:7, 5656:8, 5656:13, 5690:8
**1062** [1] - 5520:24
**108,500** [3] - 5629:7, 5629:18, 5630:14
**10:52** [1] - 5418:22
**10th** [2] - 5475:10, 5612:6
**11** [5] - 5405:14, 5488:15, 5604:12, 5416:17, 5658:24
**11-48** [2] - 5612:12, 5690:3
**1114-31** [1] - 5427:3
**11201** [1] - 5581:23
**114-21** [4] - 5489:15, 5489:23, 5489:25, 5689:17
**114-22** [1] - 5549:1
**114-25** [9] - 5442:17, 5442:23, 5445:10, 5445:19, 5449:20, 5473:21, 5473:24, 5552:25, 5555:13
**114-29-A** [3] - 5405:13, 5451:11, 5551:16
**114-30-A** [4] - 5407:11, 5407:24, 5408:1, 5408:6
**114-30-B** [1] - 5407:13
**114-30-H** [2] - 5407:13, 5408:2
**114-31** [3] - 5427:7, 5427:9, 5689:16
**114-33** [2] - 5404:8, 5404:10
**114-4** [1] - 5580:15
**114-42** [1] - 5651:22
**115** [1] - 5634:7
**115-1** [5] - 5563:16, 5564:13, 5565:4, 5566:13, 5568:1, 5568:23, 5568:25, 5634:23, 5689:24
**115-10** [1] - 5589:21
**115-14** [3] - 5563:16, 5592:13, 5638:10
**115-15** [2] - 5625:2, 5690:4
**115-16** [3] - 5563:16, 5567:20, 5689:22
**115-17** [1] - 5628:1
**115-18** [2] - 5594:7, 5638:19
**115-19** [2] - 5598:12, 5639:4

**115-2** [4] - 5567:19, 5571:4, 5590:24, 5689:21
**115-20** [2] - 5597:19, 5639:7
**115-22** [2] - 5628:21, 5628:24
**115-23** [1] - 5602:3, 5609:6, 5641:15
**115-24** [1] - 5607:16
**115-25** [1] - 5607:15
**115-27** [2] - 5567:20, 5689:22
**115-28** [2] - 5563:16, 5610:1
**115-30** [4] - 5563:16, 5567:21, 5618:23, 5689:23
**115-31** [1] - 5563:17
**115-33** [4] - 5631:2, 5631:9, 5631:11, 5690:6
**115-34** [4] - 5563:17, 5567:21, 5620:17, 5689:23
**115-36** [1] - 5563:17
**115-38** [4] - 5563:17, 5567:21, 5622:4, 5689:23
**115-4** [4] - 5575:16, 5577:5, 5580:16, 5639:10
**115-40** [5] - 5563:17, 5567:12, 5567:21, 5623:12, 5689:23
**115-42** [4] - 5634:8, 5634:12, 5634:20, 5690:7
**115-43** [5] - 5563:17, 5567:21, 5618:10, 5643:8, 5689:24
**115-44** [2] - 5634:8, 5634:12
**115-46** [1] - 5563:18
**115-48** [3] - 5563:18, 5612:2, 5612:10
**115-49** [4] - 5615:8, 5615:12, 5615:14, 5690:3
**115-5** [5] - 5576:19, 5577:8, 5577:10, 5577:11, 5689:25
**115-50** [2] - 5616:12, 5616:21
**115-51** [7] - 5563:18, 5585:23, 5586:21, 5586:23, 5586:24, 5647:14, 5689:25
**115-52** [5] - 5633:4, 5633:11, 5633:13,

**5634:7, 5690:7**
**115-54** [4] - 5629:20, 5630:3, 5630:5, 5690:6
**115-55** [2] - 5624:17, 5624:25
**115-56** [6] - 5626:3, 5626:11, 5626:14, 5627:6, 5628:5, 5690:5
**115-57** [1] - 5627:3
**115-7** [8] - 5590:25, 5591:18, 5591:20, 5591:21, 5628:3, 5637:25, 5690:2, 5690:5
**115-8** [1] - 5645:6
**11518** [1] - 5581:17
**116-21** [1] - 5481:10
**116-81** [2] - 5544:15, 5689:20
**116-A-1** [1] - 5544:9
**11-26** [9] - 5509:24, 5514:17, 5514:18, 5515:13, 5519:19, 5527:4, 5527:8, 5536:5, 5689:18
**118-26-A** [2] - 5667:2, 5690:8
**118-39** [4] - 5549:3, 5549:5, 5550:5, 5689:21
**118-4** [5] - 5500:8, 5537:4, 5538:2, 5538:5, 5689:19
**118-41** [4] - 5542:5, 5542:18, 5542:21, 5689:19
**118-46** [5] - 5443:21, 5443:25, 5444:2, 5445:4, 5689:17
**118-47** [3] - 5546:9, 5546:20, 5689:20
**118-55** [5] - 5511:21, 5514:16, 5514:22, 5514:25, 5515:14
**118-56** [1] - 5511:21
**118-57** [1] - 5511:21
**118-58** [6] - 5511:21, 5527:16, 5527:19, 5527:20, 5527:22, 5689:18
**118-59** [1] - 5511:21
**118-60** [1] - 5511:21
**118-61** [1] - 5511:22
**11:10** [1] - 5521:21
**11th** [2] - 5672:4, 5674:5
**12** [16] - 5422:11, 5425:4, 5488:23,

**5489:1, 5490:18, 5527:10, 5539:10, 5568:10, 5570:4, 5597:25, 5613:3, 5613:18, 5614:6, 5626:20, 5630:24, 5669:14
**12,500** [2] - 5618:2, 5643:15
**12-13-2012** [3] - 5569:19, 5630:17, 5631:1
**12/27/2012** [1] - 5587:16
**12/31/2012** [1] - 5405:2
**123** [1] - 5609:6
**124-2** [2] - 5470:17, 5556:1
**124-4-A** [3] - 5418:7, 5418:18, 5689:15
**124-5** [3] - 5424:14, 5424:20, 5424:22
**125-4-A** [1] - 5418:16
**12th** [5] - 5519:15, 5519:16, 5536:8, 5539:9, 5671:22
**13** [12] - 5407:9, 5414:22, 5416:17, 5416:20, 5418:11, 5418:21, 5432:24, 5492:25, 5570:4, 5571:7, 5574:12, 5634:24
**13(d** [3] - 5672:13, 5674:15, 5675:3
**13-D** [11] - 5663:8, 5663:17, 5663:25, 5664:2, 5664:4, 5664:7, 5664:10, 5664:12, 5667:8, 5668:2, 5670:3
**13-Ds** [1] - 5664:9
**13th** [2] - 5411:9, 5474:7
**14** [15] - 5410:18, 5416:16, 5567:19, 5575:22, 5576:24, 5578:9, 5582:8, 5584:10, 5585:13, 5585:20, 5592:13, 5624:22, 5625:7, 5654:17, 5689:21
**144** [1] - 5672:11
**15** [6] - 5416:7, 5427:19, 5607:22, 5628:4, 5635:12, 5655:2
**15-CR-637(KAM** [1] - 5400:3

**150-50** [2] - 5616:24, 5690:4
**150K** [1] - 5614:11
**1555** [1] - 5570:12
**156,968** [1] - 5630:22
**15th** [2] - 5402:7, 5669:13
**16** [15] - 5400:7, 5418:5, 5495:12, 5544:21, 5655:5, 5658:21, 5659:13, 5659:21, 5662:17, 5667:12, 5673:18, 5675:11, 5677:1, 5680:14, 5687:11
**160,318** [1] - 5593:22
**1603** [1] - 5590:6
**16th** [1] - 5582:15
**17** [6] - 5614:20, 5655:21, 5655:25, 5685:9, 5686:19, 5688:14
**1721** [1] - 5598:8
**1726** [1] - 5630:21
**17th** [1] - 5612:6
**18** [3] - 5421:23, 5594:7, 5597:1
**181,500** [1] - 5631:15, 5632:1, 5632:16
**1847** [1] - 5615:1
**19** [4] - 5424:15, 5594:12, 5596:10, 5655:5
**1934** [1] - 5531:12
**194** [1] - 5621:7
**1:30** [1] - 5521:17
**1:35** [2] - 5512:9, 5521:17
**1st** [1] - 5578:18

## 2

**2** [10] - 5409:10, 5456:18, 5484:10, 5484:20, 5522:8, 5522:9, 5523:12, 5556:18, 5590:23, 5654:24
**2,400,000** [2] - 5576:10, 5578:16
**2,531,920** [1] - 5592:4
**2,577,755** [2] - 5635:3, 5635:16
**2,872** [2] - 5610:14, 5611:6
**2.28** [2] - 5420:17, 5427:15
**2.4** [1] - 5579:1

**20** [3] - 5591:6, 5597:18, 5654:17
**20,000** [3] - 5606:19, 5607:5, 5608:1
**200** [1] - 5400:17
**200,000** [9] - 5615:1, 5615:24, 5617:14, 5617:24, 5622:11, 5622:21, 5623:18, 5623:20, 5625:13
**2010** [1] - 5597:11
**2011** [1] - 5431:8
**2012** [44] - 5403:22, 5404:19, 5410:16, 5416:5, 5424:2, 5424:9, 5431:9, 5432:22, 5500:15, 5502:23, 5529:4, 5529:11, 5529:13, 5529:14, 5531:5, 5531:6, 5532:12, 5532:16, 5543:23, 5547:15, 5555:23, 5556:19, 5556:22, 5568:10, 5570:5, 5571:7, 5574:12, 5575:22, 5576:24, 5578:9, 5582:8, 5584:10, 5585:13, 5585:20, 5586:4, 5587:2, 5591:6, 5604:17, 5628:4, 5634:24, 5635:17, 5654:17, 5655:21, 5655:25
**2013** [114] - 5404:6, 5404:13, 5405:1, 5407:17, 5407:19, 5408:10, 5408:12, 5409:1, 5415:23, 5416:18, 5416:20, 5418:2, 5418:11, 5418:22, 5419:15, 5419:18, 5420:1, 5420:21, 5420:23, 5421:20, 5422:3, 5422:11, 5422:24, 5424:3, 5424:5, 5426:23, 5428:7, 5432:24, 5433:1, 5446:3, 5451:18, 5467:16, 5473:18, 5484:17, 5491:13, 5491:15, 5491:23, 5492:5, 5495:18, 5501:5, 5502:25, 5509:8, 5509:12, 5514:23, 5515:11, 5517:9, 5527:11, 5527:25, 5529:5,

5529:15, 5531:7, 5531:8, 5532:13, 5532:16, 5538:12, 5539:2, 5539:8, 5539:10, 5541:16, 5543:23, 5543:24, 5544:6, 5544:11, 5544:22, 5546:15, 5547:15, 5547:16, 5547:17, 5547:21, 5549:11, 5549:13, 5550:13, 5552:5, 5554:22, 5555:18, 5555:23, 5556:18, 5556:23, 5557:1, 5590:3, 5592:20, 5593:14, 5594:12, 5596:16, 5597:1, 5597:25, 5602:9, 5603:18, 5604:12, 5607:22, 5609:1, 5610:5, 5610:19, 5612:7, 5612:16, 5612:25, 5613:3, 5613:18, 5614:6, 5614:20, 5618:25, 5619:16, 5619:22, 5620:20, 5621:21, 5629:1, 5630:24, 5631:4, 5633:8, 5641:22, 5654:17, 5654:20, 5654:24
**2013-04** [3] - 5413:20, 5414:7, 5530:5
**2014** [25] - 5425:4, 5568:10, 5615:10, 5615:20, 5616:17, 5617:9, 5618:14, 5622:8, 5623:13, 5623:25, 5624:22, 5625:7, 5626:20, 5628:10, 5628:17, 5634:12, 5634:13, 5635:12, 5654:24, 5655:2, 5655:5, 5655:21, 5656:1
**2015** [1] - 5669:13
**2017** [3] - 5400:7, 5669:15, 5688:14
**21** [5] - 5427:1, 5529:5, 5628:10, 5628:17, 5654:20
**22** [2] - 5610:19, 5620:20
**225** [1] - 5400:23
**22nd** [1] - 5600:4
**23** [3] - 5517:9, 5602:2, 5610:5
**230** [1] - 5587:20

**24** [2] - 5560:13, 5607:16
**24,046** [1] - 5593:22
**247** [1] - 5410:20, 5482:9, 5482:15
**24th** [1] - 5611:9
**25** [4] - 5408:10, 5409:1, 5567:20, 5689:22
**25,000** [2] - 5618:2, 5643:15
**250,000** [1] - 5580:8
**251** [1] - 5419:24
**25th** [1] - 5474:5
**26** [2] - 5564:13, 5566:14
**27** [3] - 5615:20, 5623:13, 5641:21
**271** [1] - 5400:15
**28** [10] - 5567:20, 5586:4, 5587:2, 5592:20, 5593:13, 5609:25, 5618:25, 5619:16, 5654:24, 5689:22
**29** [3] - 5420:23, 5549:13, 5654:20
**2:00** [3] - 5512:15, 5521:12, 5524:1
**2:15** [1] - 5687:6
**2:30** [1] - 5522:1

## 3

**3** [10] - 5409:10, 5514:23, 5515:11, 5515:19, 5566:14, 5590:3, 5603:18, 5629:1, 5634:12, 5655:2
**30** [24] - 5431:9, 5446:3, 5484:17, 5491:13, 5491:23, 5495:18, 5521:24, 5522:1, 5529:12, 5544:11, 5546:15, 5567:1, 5567:2, 5567:3, 5567:4, 5567:13, 5616:17, 5617:9, 5618:14, 5619:22, 5633:8, 5655:21, 5656:1
**30,000** [1] - 5606:16
**300,000** [5] - 5580:6, 5580:7, 5603:12, 5603:25, 5605:2
**30th** [2] - 5474:3, 5474:9
**31** [20] - 5473:18, 5491:15, 5500:14,

**29** 5529:4, 5531:6, 5531:8, 5532:12, 5532:13, 5555:18, 5555:23, 5555:25, 5556:14, 5556:19, 5556:22, 5556:23, 5557:1, 5567:21, 5689:23
**311** [1] - 5672:5
**31st** [4] - 5474:11, 5474:13, 5474:21, 5474:24
**33** [1] - 5631:2
**34** [2] - 5567:13, 5620:18
**340** [1] - 5631:19
**349** [1] - 5632:19
**350,000** [3] - 5580:6, 5580:7, 5580:8, 5590:7, 5604:18
**36** [2] - 5567:21, 5689:23
**37,309** [1] - 5593:22
**37,500** [1] - 5618:2
**375,000** [3] - 5592:4, 5592:22, 5593:19
**38** [5] - 5416:22, 5422:12, 5422:13, 5544:21, 5622:5
**39** [2] - 5554:18, 5554:21
**397** [1] - 5410:25
**399** [1] - 5412:9

## 4

**4** [5] - 5409:10, 5567:19, 5602:9, 5674:14, 5689:21
**4(1** [1] - 5578:3
**400** [2] - 5425:24, 5426:3
**400,00** [1] - 5580:10
**400,000** [3] - 5426:3, 5603:11, 5603:21
**401** [2] - 5464:3, 5468:10
**403** [3] - 5414:22, 5468:10, 5663:21
**41** [8] - 5483:1, 5567:3, 5567:4, 5567:11, 5567:14, 5574:25, 5575:5, 5575:7
**413** [1] - 5592:6
**425** [1] - 5572:18
**426** [1] - 5573:1
**428** [2] - 5573:17
**43** [1] - 5618:11
**433,274** [1] - 5592:5

**44** [2] - 5634:20, 5690:7
**45** [1] - 5581:22
**46** [3] - 5423:6, 5567:22, 5689:24
**460** [1] - 5574:5
**466** [1] - 5580:21
**47,000** [2] - 5446:11, 5447:10
**47,127** [1] - 5555:2
**47,128** [5] - 5445:23, 5553:6, 5610:12, 5611:5, 5611:20
**473,274** [1] - 5598:8
**48** [2] - 5564:14, 5566:14
**488** [1] - 5581:7
**48th** [1] - 5400:17
**49** [1] - 5422:10
**494** [1] - 5581:24
**495** [3] - 5585:6, 5640:14

**5**

**5** [4] - 5409:10, 5467:16, 5566:14, 5576:22
**5,000** [3] - 5621:4, 5621:19, 5621:21
**5/31** [1] - 5475:8
**50,000** [5] - 5605:3, 5608:16, 5608:19, 5612:20, 5618:5
**501** [1] - 5584:5
**51** [5] - 5447:14, 5564:13, 5564:14, 5566:14, 5585:22
**52** [2] - 5632:18, 5633:3
**521** [1] - 5647:4
**54** [1] - 5629:21
**5403** [1] - 5689:5
**5416** [1] - 5689:15
**5418** [1] - 5689:15
**5422** [1] - 5689:16
**5427** [1] - 5689:16
**5428** [1] - 5689:6
**5444** [1] - 5689:17
**5489** [1] - 5689:17
**55** [1] - 5624:17
**5509** [1] - 5689:18
**5527** [1] - 5689:18
**5538** [1] - 5689:19
**5542** [1] - 5689:19
**5544** [1] - 5689:20
**5546** [1] - 5689:20
**5549** [1] - 5689:21
**5550** [1] - 5689:7
**5557** [1] - 5689:9

**5567** [1] - 5689:21
**5568** [1] - 5689:24
**5577** [1] - 5689:25
**5586** [1] - 5689:25
**5591** [1] - 5690:2
**56** [1] - 5626:4
**5612** [1] - 5690:3
**5615** [1] - 5690:3
**5616** [1] - 5690:4
**5625** [1] - 5690:4
**5626** [1] - 5690:5
**5628** [1] - 5690:5
**5630** [1] - 5690:6
**5631** [1] - 5690:6
**5633** [1] - 5690:7
**5634** [1] - 5690:7
**5636** [1] - 5689:10
**5656** [2] - 5689:12, 5690:8
**5667** [1] - 5690:8
**575** [1] - 5620:15
**57684** [2] - 5514:17, 5515:14
**57704** [2] - 5536:15, 5536:16
**58,306** [1] - 5593:22
**585** [1] - 5595:4
**587** [1] - 5596:3
**59** [1] - 5581:17
**5:30** [1] - 5653:18

**6**

**6** [2] - 5567:19, 5689:21
**6,000** [2] - 5619:7, 5619:20
**6/10** [2] - 5474:22, 5475:5
**600** [1] - 5597:12
**601** [1] - 5596:24
**609** [1] - 5598:18
**61** [17] - 5410:13, 5411:2, 5419:21, 5419:25, 5420:4, 5426:23, 5427:5, 5481:8, 5490:3, 5490:7, 5514:25, 5531:18, 5545:4, 5545:7, 5547:24, 5549:9, 5639:20
**613-2643** [1] - 5400:24
**623.01** [2] - 5642:10, 5642:12
**625** [1] - 5605:20
**626** [2] - 5605:17, 5606:5
**629** [1] - 5603:17
**632** [3] - 5609:6,

5641:19
**633** [2] - 5641:20
**66** [1] - 5410:24
**673** [1] - 5611:13
**679** [1] - 5610:15
**682-B** [1] - 5467:15
**685** [1] - 5620:13

**7**

**7** [5] - 5566:14, 5590:24, 5622:8, 5623:25, 5634:12
**717** [1] - 5420:8
**718** [1] - 5400:24
**72** [2] - 5560:17, 5573:14
**744** [1] - 5536:14
**75,000** [1] - 5618:3
**777** [3] - 5597:6, 5600:3, 5618:9
**79738** [1] - 5569:11
**79761** [1] - 5575:20
**798** [1] - 5652:2
**79926** [1] - 5590:1
**7th** [1] - 5596:16

**8**

**8** [3] - 5404:13, 5567:19, 5689:21
**8-B** [1] - 5581:22
**80** [1] - 5635:5
**80,000** [4] - 5448:15, 5607:5, 5607:9, 5607:25
**80187** [1] - 5592:18
**803(17** [2] - 5655:11, 5656:4
**80439** [1] - 5594:10
**80626** [1] - 5596:14
**80689** [1] - 5597:23
**80957** [2] - 5602:6, 5608:2
**81070** [1] - 5607:19
**81549** [1] - 5610:3
**81586** [1] - 5618:24
**825954** [1] - 5631:6
**840165** [1] - 5635:8
**85150** [1] - 5623:15
**8th** [3] - 5597:11, 5597:13, 5597:14

**9**

**9** [20] - 5501:5, 5501:13, 5502:18, 5502:19, 5502:25, 5507:20, 5507:21, 5507:22, 5507:23,

5508:1, 5509:8, 5509:12, 5509:16, 5509:17, 5509:18, 5527:24, 5550:13, 5666:12
**94,521** [1] - 5593:22
**950** [2] - 5654:14, 5655:9, 5655:10
**951** [1] - 5654:18
**952** [1] - 5654:22
**953** [2] - 5654:21, 5654:25
**954** [3] - 5653:3, 5655:9, 5655:10
**955** [2] - 5655:18, 5656:2
**956** [2] - 5655:22, 5656:2
**968** [5] - 5416:9, 5416:12, 5416:14, 5554:17, 5689:15
**972** [4] - 5421:25, 5422:5, 5422:7, 5689:16
**9:00** [2] - 5400:7, 5688:15
**9th** [14] - 5482:16, 5482:18, 5483:1, 5517:11, 5520:11, 5520:12, 5533:23, 5536:8, 5536:13, 5538:11, 5538:12, 5538:14, 5539:2, 5540:18

**A**

**a.m** [1] - 5400:7
**ability** [1] - 5495:24
**able** [20] - 5402:1, 5402:2, 5459:22, 5461:9, 5463:19, 5466:13, 5466:16, 5466:17, 5466:18, 5466:23, 5492:12, 5522:16, 5522:20, 5523:25, 5524:4, 5549:16, 5575:4, 5646:3, 5647:8, 5661:23
**absence** [2] - 5495:22, 5499:23
**absolutely** [3] - 5513:7, 5524:5, 5636:4
**abstract** [1] - 5500:21, 5537:16, 5537:23, 5537:24, 5538:15, 5538:18, 5538:24, 5539:15,

**5541**:14, 5674:23
**abstracts** [4] - 5500:14, 5511:1, 5537:8, 5537:9
**abundance** [3] - 5662:11, 5662:15, 5662:17
**abundant** [1] - 5673:5
**access** [4] - 5486:10, 5512:25, 5651:9, 5655:7
**accessed** [1] - 5468:3
**accidentally** [1] - 5546:9
**accommodate** [1] - 5575:4
**accompanied** [1] - 5638:20
**accordance** [5] - 5413:19, 5453:15, 5454:12, 5487:22, 5543:9
**according** [4] - 5473:5, 5597:11, 5602:10, 5607:4
**Accordingly** [1] - 5553:8
**accordingly** [1] - 5445:25
**account** [8] - 5434:4, 5488:11, 5491:14, 5492:8, 5543:10, 5561:13, 5646:14, 5646:19
**accountant** [3] - 5430:20, 5478:10, 5489:11
**accountant's** [2] - 5488:15, 5493:4
**accountants** [2] - 5469:14, 5478:11
**accounted** [4] - 5414:6, 5453:15, 5454:11, 5543:19
**Accounting** [1] - 5530:4
**accounting** [43] - 5413:20, 5414:1, 5414:2, 5414:7, 5414:8, 5414:10, 5414:12, 5414:18, 5420:11, 5441:3, 5441:14, 5442:11, 5453:18, 5475:20, 5477:2, 5478:4, 5478:8, 5478:14, 5479:3, 5486:9, 5487:4, 5487:17,

5491:3, 5491:12,
5492:3, 5492:4,
5492:6, 5492:8,
5495:18, 5496:3,
5500:2, 5529:1,
5529:21, 5531:10,
5541:22, 5542:10,
5543:7, 5543:8,
5543:16, 5543:18,
5545:7, 5545:19
**accounts** [2] -
5410:2, 5621:15
**accuracy** [1] -
5547:8
**accurate** [10] -
5495:25, 5545:22,
5654:14, 5654:18,
5654:22, 5654:25,
5655:3, 5655:18,
5655:22, 5664:15
**accurated** [1] -
5505:3
**accurately** [1] -
5507:16
**accusations** [1] -
5687:22
**acknowledge** [3] -
5592:21, 5598:5,
5669:3
**acquiring** [1] -
5425:24
**act** [1] - 5494:21
**Act** [1] - 5531:12
**Acting** [1] - 5400:13
**actions** [3] -
5425:17, 5453:6,
5551:23
**active** [1] - 5425:15
**actively** [3] -
5440:16, 5440:25,
5442:1
**activity** [6] - 5564:5,
5568:5, 5568:6,
5568:7, 5667:20,
5676:1
**Acts** [2] - 5414:25,
5492:25
**acts** [11] - 5415:2,
5415:8, 5427:19,
5427:21, 5493:4,
5493:7, 5493:13,
5493:20, 5494:17,
5494:24, 5495:2
**actual** [11] - 5436:21,
5443:9, 5450:21,
5460:22, 5460:23,
5508:18, 5521:5,
5593:3, 5643:17,
5674:7, 5674:12
**add** [2] - 5462:23,

5510:25
**added** [6] - 5443:13,
5549:9, 5549:11,
5574:22, 5613:8,
5613:15
**adding** [1] - 5554:13
**addition** [5] - 5445:9,
5445:21, 5445:22,
5513:11, 5533:3
**additional** [22] -
5418:3, 5419:4,
5420:21, 5421:10,
5432:5, 5443:22,
5445:4, 5450:16,
5451:5, 5464:22,
5465:10, 5522:1,
5549:9, 5549:12,
5549:17, 5573:11,
5576:6, 5580:10,
5612:21, 5636:3,
5671:10, 5685:9
**address** [11] -
5414:18, 5491:4,
5581:3, 5581:5,
5581:16, 5581:21,
5584:24, 5592:7,
5597:6, 5601:10,
5632:4
**addressed** [4] -
5408:14, 5517:21,
5617:10
**addresses** [2] -
5585:11, 5595:15
**adequacy** [1] -
5531:10
**adequate** [1] -
5664:21
**adequately** [1] -
5493:3
**adjourned** [1] -
5688:14
**admissibility** [2] -
5465:9, 5503:18
**admissible** [17] -
5459:15, 5459:18,
5460:2, 5460:10,
5462:7, 5462:8,
5463:15, 5463:22,
5464:9, 5505:21,
5513:23, 5522:7,
5526:14, 5655:12,
5655:14, 5656:4,
5656:5
**admit** [16] - 5458:10,
5463:17, 5489:22,
5508:5, 5510:7,
5510:11, 5514:11,
5514:12, 5520:6,
5546:19, 5566:21,
5567:19, 5612:12,

5626:14, 5656:7,
5686:1
**admitted** [25] -
5442:18, 5447:13,
5457:21, 5457:22,
5457:24, 5458:19,
5459:8, 5459:9,
5460:12, 5461:20,
5462:6, 5462:13,
5462:15, 5463:13,
5502:13, 5503:20,
5504:6, 5504:7,
5504:10, 5505:5,
5505:12, 5512:21,
5656:9, 5666:23
**admitting** [2] -
5506:15, 5510:9
**adopt** [2] - 5414:11,
5492:8
**adopted** [6] -
5413:20, 5480:24,
5481:1, 5532:4,
5532:6, 5532:7
**adopter** [1] - 5530:4
**advance** [5] -
5460:7, 5462:11,
5545:11, 5662:13,
5683:8
**advanced** [1] -
5463:5
**adverse** [1] - 5685:2
**advice** [3] - 5412:1,
5412:3, 5412:6
**advise** [11] - 5472:8,
5478:12, 5525:3,
5528:25, 5529:25,
5572:8, 5573:14,
5612:22, 5613:6,
5614:9, 5632:4
**advised** [10] -
5451:19, 5452:8,
5502:25, 5512:14,
5522:19, 5529:2,
5530:3, 5552:6,
5672:6, 5684:12
**advises** [1] - 5502:23
**advising** [1] -
5478:13
**advisor** [1] - 5479:14
**advocating** [1] -
5477:25
**affect** [2] - 5554:15,
5661:21
**affiliate** [2] -
5413:22, 5661:13
**affiliated** [2] -
5451:19, 5552:6
**affiliation** [1] -
5579:15
**afford** [2] - 5401:21,

5402:8
**afternoon** [10] -
5469:19, 5527:2,
5527:3, 5601:2,
5625:19, 5628:20,
5636:9, 5656:20,
5656:21, 5687:6
**agencies** [2] -
5659:14, 5659:16
**agency** [3] - 5651:6,
5658:2, 5672:9
**agent** [3] - 5465:13,
5504:3, 5504:10
**ago** [4] - 5564:11,
5586:9, 5608:13,
5681:18
**agree** [26] - 5445:3,
5447:2, 5449:9,
5450:10, 5452:14,
5458:15, 5458:23,
5459:17, 5471:16,
5471:19, 5475:10,
5485:3, 5485:20,
5487:21, 5490:19,
5492:17, 5511:15,
5544:17, 5545:1,
5548:16, 5555:22,
5646:24, 5647:2,
5677:24, 5679:8,
5680:25
**agreed** [24] -
5406:19, 5445:23,
5446:10, 5446:24,
5457:11, 5469:7,
5480:18, 5488:10,
5521:10, 5522:11,
5543:22, 5553:6,
5553:19, 5555:1,
5555:17, 5604:18,
5605:4, 5609:19,
5653:21, 5654:10,
5654:13, 5681:15,
5683:20, 5684:7
**agreeing** [1] -
5425:24
**agreement** [105] -
5405:21, 5406:5,
5407:5, 5408:10,
5408:14, 5408:17,
5408:25, 5420:11,
5420:22, 5420:23,
5420:24, 5421:6,
5421:10, 5421:17,
5445:4, 5445:11,
5445:13, 5446:3,
5446:15, 5447:3,
5447:5, 5448:6,
5448:10, 5448:13,
5448:17, 5448:20,
5448:22, 5449:10,

5449:11, 5449:12,
5450:3, 5450:4,
5450:11, 5450:16,
5455:13, 5457:10,
5458:8, 5458:10,
5458:17, 5461:5,
5461:10, 5461:22,
5463:22, 5464:20,
5466:9, 5466:10,
5466:14, 5467:10,
5475:2, 5475:5,
5475:19, 5476:7,
5484:13, 5541:1,
5541:5, 5541:10,
5541:12, 5541:22,
5542:9, 5542:9,
5542:11, 5542:24,
5549:12, 5549:13,
5549:17, 5551:18,
5553:14, 5572:3,
5573:19, 5604:2,
5604:10, 5604:11,
5604:18, 5604:25,
5605:1, 5605:16,
5605:21, 5606:6,
5606:9, 5611:1,
5611:4, 5611:10,
5611:12, 5611:13,
5617:19, 5619:20,
5619:24, 5620:2,
5621:20, 5621:23,
5621:24, 5623:3,
5623:6, 5632:12,
5642:7, 5642:8,
5642:16, 5642:25,
5643:3, 5649:5,
5649:7, 5652:11,
5652:14, 5684:3
**Agreement** [4] -
5447:16, 5603:7,
5603:8, 5604:8
**agreements** [166] -
5404:25, 5406:18,
5406:22, 5407:22,
5408:7, 5409:6,
5409:15, 5409:20,
5409:21, 5409:22,
5410:8, 5412:18,
5412:20, 5413:17,
5414:6, 5417:6,
5432:19, 5432:21,
5433:3, 5436:3,
5436:4, 5436:5,
5436:12, 5436:14,
5436:22, 5436:25,
5437:18, 5438:3,
5438:6, 5438:9,
5438:11, 5438:12,
5438:15, 5438:17,
5438:19, 5438:21,
5439:4, 5439:7,

5440:7, 5442:2, 5442:5, 5442:9, 5442:10, 5442:15, 5443:5, 5445:25, 5446:9, 5449:16, 5450:5, 5451:9, 5451:18, 5451:25, 5452:10, 5452:11, 5452:13, 5452:21, 5453:15, 5453:17, 5454:10, 5454:18, 5454:22, 5455:3, 5455:21, 5455:24, 5457:18, 5458:1, 5458:3, 5458:5, 5459:1, 5459:3, 5459:6, 5459:7, 5459:15, 5459:24, 5460:1, 5460:9, 5460:16, 5460:23, 5460:25, 5461:17, 5462:1, 5462:10, 5463:3, 5463:4, 5464:9, 5465:14, 5466:6, 5466:7, 5467:9, 5467:11, 5469:15, 5473:25, 5475:11, 5475:16, 5476:8, 5476:20, 5477:19, 5481:19, 5481:20, 5483:25, 5484:19, 5484:25, 5485:9, 5485:11, 5485:12, 5485:15, 5485:16, 5485:18, 5486:1, 5486:19, 5488:11, 5491:2, 5491:4, 5491:10, 5492:9, 5492:19, 5492:21, 5497:9, 5498:2, 5498:9, 5498:15, 5498:18, 5501:2, 5501:10, 5504:5, 5509:11, 5517:13, 5517:14, 5520:16, 5526:13, 5529:22, 5531:2, 5531:21, 5533:7, 5533:9, 5533:15, 5533:18, 5540:20, 5540:23, 5541:3, 5541:18, 5541:19, 5543:9, 5544:19, 5544:24, 5545:2, 5545:3, 5545:8, 5547:7, 5548:3, 5548:10, 5548:18, 5549:10, 5552:14, 5552:17, 5553:1, 5553:8, 5554:24, 5555:15, 5555:24,

5556:25, 5603:4, 5608:14, 5609:4, 5670:12
  **agrees** [4] - 5448:14, 5513:14, 5655:17, 5684:4
  **ahead** [7] - 5573:18, 5579:19, 5581:24, 5584:4, 5584:6, 5596:10, 5597:18
  **aided** [1] - 5400:25
  **AI** [12] - 5533:7, 5533:8, 5533:15, 5540:23, 5540:25, 5541:3, 5541:4, 5541:9, 5541:12, 5541:22, 5542:9, 5567:8
  **Alan** [1] - 5599:11
  **alert** [1] - 5467:17
  **ALIXANDRA** [1] - 5400:13
  **Allan** [2] - 5458:9, 5651:23
  **allegations** [1] - 5425:18
  **Allen** [11] - 5629:4, 5629:5, 5629:17, 5630:14, 5630:21, 5631:17, 5632:1, 5632:3, 5632:13, 5632:16, 5634:9
  **allocate** [1] - 5604:4
  **allow** [4] - 5465:16, 5676:17, 5678:6
  **allowed** [1] - 5585:1
  **almost** [1] - 5684:5
  **alone** [3] - 5579:13, 5639:2, 5639:8
  **altogether** [1] - 5639:14
  **amend** [2] - 5529:13, 5543:23
  **amended** [7] - 5416:4, 5416:10, 5419:18, 5531:13, 5533:2, 5533:21, 5554:20
  **Amendment** [5] - 5603:7, 5603:8, 5604:8, 5685:2, 5685:7
  **amendment** [5] - 5604:10, 5604:11, 5604:12, 5606:6, 5611:14
  **amendments** [7] - 5529:20, 5531:5, 5532:15, 5603:4, 5604:2, 5642:7,

5642:8
  **AMERICA** [1] - 5400:3
  **American** [3] - 5425:17, 5472:17, 5659:20
  **amount** [6] - 5413:21, 5426:15, 5448:15, 5570:18, 5672:23, 5674:21
  **amounts** [7] - 5434:23, 5485:6, 5487:7, 5572:6, 5572:21, 5594:22, 5617:22
  **ample** [1] - 5678:10
  **AMY** [1] - 5689:8
  **Amy** [18] - 5456:21, 5557:16, 5557:20, 5572:1, 5577:19, 5582:11, 5583:3, 5584:23, 5611:4, 5614:23, 5615:23, 5617:1, 5619:19, 5621:12, 5622:21, 5626:24, 5628:12, 5631:25
  **analogy** [1] - 5684:6
  **analysis** [23] - 5433:6, 5433:11, 5433:14, 5433:18, 5433:19, 5434:5, 5434:7, 5434:10, 5434:25, 5478:3, 5529:13, 5541:21, 5541:22, 5541:24, 5542:8, 5542:10, 5542:23, 5543:5, 5543:6, 5543:7, 5662:18, 5663:4, 5675:25
  **analyze** [4] - 5454:21, 5492:7, 5492:13, 5658:16
  **analyzed** [1] - 5553:14
  **analyzes** [1] - 5667:20
  **analyzing** [5] - 5491:2, 5492:22, 5492:23, 5496:3, 5662:1
  **Andrew** [8] - 5576:17, 5580:8, 5611:1, 5611:16, 5645:10, 5645:11, 5645:22
  **annual** [1] - 5405:2
  **Anslow** [5] - 5577:1, 5583:2, 5583:8,

5584:17, 5639:17
  **answer** [13] - 5402:1, 5402:2, 5440:3, 5447:9, 5461:11, 5471:14, 5490:19, 5492:17, 5493:7, 5493:11, 5497:17, 5517:10, 5522:8
  **answering** [1] - 5473:12
  **anticipate** [1] - 5681:5
  **anticipated** [2] - 5672:9, 5672:16
  **anticipates** [1] - 5672:7
  **anyway** [1] - 5489:16
  **apart** [7] - 5461:8, 5476:16, 5478:18, 5540:24, 5541:4, 5541:9, 5645:14
  **Apartment** [1] - 5581:22
  **apologize** [3] - 5594:16, 5607:16, 5628:24
  **appear** [4] - 5545:2, 5607:1, 5643:23, 5671:7
  **APPEARANCES** [1] - 5400:11
  **applicable** [1] - 5478:3
  **applied** [1] - 5674:23
  **applies** [1] - 5556:9
  **apply** [1] - 5676:5
  **applying** [4] - 5479:4, 5491:11, 5492:2, 5672:2
  **appreciate** [2] - 5617:2, 5666:8
  **apprise** [1] - 5481:18
  **apprised** [1] - 5549:18
  **approach** [3] - 5511:18, 5542:2, 5687:11
  **appropriate** [20] - 5449:7, 5457:24, 5458:6, 5521:4, 5529:3, 5622:24, 5661:22, 5663:1, 5663:12, 5669:19, 5673:25, 5675:6, 5677:17, 5677:19, 5677:21, 5677:22, 5678:25, 5679:12, 5680:8, 5686:19
  **approval** [1] - 5535:8
  **approve** [5] - 5533:2,

5535:4, 5543:24, 5562:17, 5582:25
  **approved** [13] - 5428:7, 5532:14, 5532:17, 5534:17, 5534:21, 5535:12, 5535:15, 5535:23, 5535:25, 5536:12, 5536:23, 5551:3, 5551:5
  **April** [16] - 5408:10, 5408:12, 5409:1, 5451:18, 5474:3, 5474:5, 5552:5, 5556:18, 5602:9, 5603:18, 5607:22, 5609:1, 5624:22, 5625:7, 5629:1, 5634:12
  **arbitration** [1] - 5425:16
  **Arbitration** [1] - 5425:17
  **area** [9] - 5645:5, 5663:14, 5669:23, 5673:13, 5675:5, 5676:1, 5677:9, 5679:25, 5681:23
  **areas** [5] - 5403:9, 5669:7, 5671:23, 5672:19, 5679:20
  **argue** [14] - 5459:11, 5460:4, 5460:8, 5460:24, 5461:4, 5461:10, 5462:12, 5465:8, 5465:14, 5465:23, 5466:13, 5502:16, 5515:21, 5672:15
  **arguing** [3] - 5462:18, 5467:4, 5675:13
  **argument** [11] - 5464:18, 5465:3, 5466:4, 5470:4, 5508:17, 5514:8, 5525:16, 5525:17, 5525:20, 5525:21, 5525:22
  **arguments** [4] - 5468:20, 5468:25, 5520:1, 5525:15
  **arising** [1] - 5408:24
  **arranged** [1] - 5436:8
  **arrangement** [3] - 5458:24, 5491:15, 5522:3
  **arrangements** [1] - 5491:13

**arranges** [1] - 5403:17

**Aselage** [2] - 5497:21, 5528:4

**aside** [2] - 5543:20, 5548:24

**aspect** [1] - 5480:20

**aspects** [2] - 5480:18, 5657:3

**asserted** [1] - 5513:14

**assessment** [1] - 5488:10

**assigned** [1] - 5658:23

**assignment** [1] - 5599:4

**assistance** [5] - 5491:11, 5492:2, 5658:8, 5658:11

**Assistant** [1] - 5400:15

**Association** [2] - 5425:17, 5472:17

**assume** [6] - 5512:24, 5517:8, 5520:20, 5520:21, 5535:11, 5616:11

**assumed** [2] - 5406:4, 5536:2

**assumes** [1] - 5541:8

**assuming** [2] - 5514:17, 5517:24

**assumption** [5] - 5432:15, 5521:21, 5534:13, 5534:16, 5535:13

**assumptions** [3] - 5478:23, 5478:25, 5579:23

**assurance** [1] - 5644:24

**ASU** [1] - 5530:5

**attached** [38] - 5458:18, 5504:4, 5512:20, 5518:18, 5519:6, 5533:18, 5565:21, 5572:2, 5572:3, 5572:5, 5572:22, 5574:3, 5574:18, 5577:2, 5577:20, 5586:13, 5599:4, 5603:10, 5603:20, 5603:23, 5604:3, 5611:4, 5611:10, 5612:19, 5617:2, 5619:20, 5619:24, 5621:23, 5621:24, 5623:3,

5629:17, 5629:25, 5631:25, 5632:11, 5642:7, 5652:1, 5666:20

**attaches** [1] - 5642:8

**attaching** [1] - 5509:25

**attachment** [8] - 5577:1, 5577:4, 5586:11, 5587:6, 5610:24, 5616:19, 5629:25, 5647:20

**attachments** [5] - 5504:9, 5511:24, 5519:18, 5521:1, 5603:5

**attempt** [1] - 5457:7

**attempting** [1] - 5502:9

**attendance** [2] - 5507:14, 5528:6

**attended** [4] - 5507:10, 5507:11, 5539:4, 5548:8

**attention** [16] - 5433:7, 5472:9, 5493:4, 5509:5, 5553:3, 5575:15, 5576:5, 5585:22, 5590:23, 5594:2, 5605:14, 5606:22, 5612:1, 5633:22, 5637:24, 5666:6

**Attorney** [1] - 5400:13

**attorney** [6] - 5411:22, 5514:2, 5523:24, 5603:22, 5658:7, 5663:9

**attorney-client** [1] - 5514:2

**Attorneys** [1] - 5400:15

**audit** [39] - 5411:6, 5411:14, 5411:23, 5411:24, 5415:13, 5415:14, 5415:17, 5415:19, 5415:25, 5419:20, 5423:15, 5424:4, 5426:17, 5426:22, 5426:24, 5430:23, 5431:6, 5431:8, 5432:22, 5432:24, 5434:13, 5473:7, 5482:2, 5487:25, 5489:5, 5493:3, 5494:15, 5498:20, 5509:20, 5535:4, 5537:11, 5543:23, 5556:10,

5556:11, 5556:17, 5556:18, 5556:19, 5556:21

**audited** [5] - 5476:9, 5529:3, 5529:11, 5531:5, 5532:11

**auditing** [11] - 5419:13, 5424:7, 5424:8, 5478:14, 5486:9, 5487:18, 5494:12, 5499:12, 5499:22, 5531:10, 5537:17

**auditor** [10] - 5423:24, 5433:21, 5435:16, 5442:9, 5447:2, 5449:16, 5453:20, 5454:8, 5477:5, 5514:1

**auditors** [6] - 5434:3, 5469:14, 5469:16, 5487:19, 5488:3, 5539:20

**audits** [4] - 5411:5, 5423:14, 5433:15, 5433:16

**August** [22] - 5403:22, 5404:6, 5404:13, 5407:17, 5407:19, 5420:21, 5420:22, 5501:5, 5501:13, 5502:18, 5507:19, 5507:21, 5507:23, 5549:11, 5549:13, 5554:22, 5668:19, 5671:21, 5672:4, 5673:2, 5673:21, 5674:5

**authenticate** [1] - 5687:9

**authority** [3] - 5655:7, 5673:12, 5675:23

**Authority** [1] - 5656:25

**authorization** [3] - 5621:13, 5688:1

**authorize** [1] - 5498:9

**authorized** [9] - 5498:5, 5532:21, 5548:13, 5559:3, 5562:16, 5587:13, 5588:24, 5648:11, 5648:17

**available** [3] - 5415:6, 5506:19, 5687:18

**Avenue** [6] - 5400:17, 5581:17,

5597:7, 5600:3, 5618:9, 5620:15

**avoid** [2] - 5664:24, 5684:7

**awarded** [1] - 5578:15

**aware** [25] - 5415:9, 5423:11, 5433:9, 5436:4, 5436:14, 5436:15, 5443:7, 5445:11, 5448:5, 5448:6, 5457:19, 5493:15, 5493:25, 5494:8, 5503:4, 5505:11, 5540:25, 5543:2, 5543:17, 5565:7, 5572:1, 5662:5, 5662:8, 5681:8, 5681:12

## B

**background** [1] - 5659:18

**backup** [2] - 5564:1, 5613:16

**balance** [2] - 5554:13, 5554:15

**balances** [1] - 5434:4

**bank** [1] - 5464:11

**Banta** [4] - 5533:7, 5533:16, 5540:23, 5541:3

**Bar** [1] - 5472:17

**bar** [3] - 5464:3, 5538:3, 5538:6

**based** [27] - 5415:5, 5427:24, 5428:3, 5432:8, 5432:15, 5446:2, 5453:10, 5457:16, 5477:9, 5486:6, 5486:21, 5486:25, 5493:11, 5503:15, 5507:14, 5553:10, 5555:24, 5566:11, 5579:14, 5668:18, 5669:7, 5671:11, 5675:22, 5675:23, 5677:11, 5681:24, 5688:6

**Based** [1] - 5579:22

**bases** [1] - 5464:10, 5566:8, 5668:14

**basic** [1] - 5680:10

**basing** [1] - 5663:10

**basis** [24] - 5440:9, 5441:18, 5441:25, 5442:4, 5464:24, 5491:24, 5505:18,

5505:25, 5506:14, 5564:16, 5566:4, 5566:7, 5572:24, 5620:7, 5633:2, 5634:4, 5651:6, 5652:3, 5663:12, 5669:16, 5673:18, 5677:15, 5679:12, 5687:19

**Bates** [8] - 5410:25, 5412:9, 5414:22, 5420:7, 5546:23, 5565:12, 5579:3, 5635:4

**became** [3] - 5447:3, 5484:18, 5544:24

**become** [2] - 5485:9, 5659:21

**BEFORE** [1] - 5400:10

**begin** [1] - 5422:23

**begins** [5] - 5405:24, 5413:11, 5554:23, 5556:6, 5687:14

**behalf** [5] - 5426:19, 5473:6, 5477:25, 5483:5, 5530:16

**behavior** [1] - 5657:15

**behind** [13] - 5405:14, 5416:7, 5418:5, 5421:23, 5424:15, 5427:1, 5453:17, 5477:21, 5629:21, 5637:5, 5664:4, 5674:14

**belief** [9] - 5681:10, 5681:20, 5682:3, 5682:19, 5683:2, 5683:4, 5683:12, 5683:21, 5683:23

**believes** [4] - 5484:20, 5530:3, 5677:16, 5683:24

**belongs** [1] - 5431:21

**below** [15] - 5425:10, 5485:23, 5579:23, 5584:24, 5599:16, 5605:11, 5606:13, 5606:14, 5608:2, 5608:13, 5613:6, 5614:24, 5617:22, 5628:12

**beneficial** [3] - 5661:13, 5670:3, 5672:14

**best** [6] - 5491:4, 5507:16, 5508:3, 5517:16, 5686:22,

Case 1:15-cr-00637-KAM   Document 689   Filed 10/17/18   Page 298 of 334 PageID #: 23157

5687:15
**better** [2] - 5665:8, 5670:22
**between** [36] - 5407:4, 5409:1, 5413:3, 5421:3, 5433:8, 5435:9, 5463:14, 5466:21, 5466:22, 5480:7, 5496:11, 5555:23, 5556:25, 5573:7, 5574:8, 5604:12, 5606:6, 5612:3, 5612:6, 5615:9, 5615:16, 5616:14, 5620:4, 5623:6, 5624:19, 5629:9, 5632:13, 5633:4, 5636:12, 5636:18, 5636:21, 5639:23, 5652:22, 5652:25, 5654:13, 5655:17
**beyond** [5] - 5401:9, 5491:19, 5665:11, 5674:8, 5675:24
**Biestek** [22] - 5426:6, 5426:9, 5576:16, 5580:7, 5581:15, 5603:8, 5603:24, 5604:13, 5605:24, 5606:7, 5607:2, 5608:16, 5618:2, 5641:4, 5642:11, 5642:13, 5642:18, 5643:4, 5643:14, 5643:15, 5643:19
**big** [3] - 5435:9, 5506:20, 5688:10
**bigger** [1] - 5553:3
**bills** [2] - 5426:15, 5426:16
**binder** [16] - 5405:14, 5407:9, 5410:18, 5416:7, 5418:5, 5421:23, 5424:15, 5427:2, 5563:11, 5563:12, 5563:14, 5567:25, 5571:4, 5602:2, 5620:18, 5622:5
**bit** [10] - 5429:21, 5430:7, 5458:2, 5490:19, 5540:18, 5560:1, 5578:19, 5665:12, 5688:12, 5688:13
**black** [3] - 5513:24, 5514:1, 5546:25
**black-lining** [1] -

5546:25
**Blanton** [3] - 5595:17, 5623:7, 5625:10
**Blanton's** [2] - 5626:24, 5628:12
**Bloomberg** [2] - 5655:19, 5655:23
**blow** [2] - 5417:4, 5451:12
**Blue** [7] - 5654:15, 5654:19, 5654:22, 5655:1, 5655:4, 5655:7, 5663:5
**board** [119] - 5410:13, 5411:12, 5411:13, 5411:19, 5415:12, 5415:13, 5428:7, 5437:4, 5440:24, 5451:3, 5465:7, 5479:21, 5481:4, 5481:19, 5482:10, 5482:23, 5483:2, 5483:11, 5483:16, 5483:17, 5483:18, 5483:20, 5483:22, 5487:20, 5489:3, 5494:15, 5494:19, 5494:21, 5496:7, 5496:9, 5496:10, 5496:12, 5496:14, 5497:6, 5497:22, 5498:16, 5498:19, 5499:4, 5501:1, 5501:9, 5503:2, 5503:3, 5503:12, 5503:15, 5506:18, 5506:19, 5506:22, 5506:23, 5507:1, 5507:3, 5507:5, 5507:15, 5509:10, 5509:11, 5509:20, 5509:25, 5510:23, 5510:25, 5511:3, 5511:11, 5511:16, 5514:4, 5514:22, 5515:18, 5515:19, 5517:9, 5517:11, 5517:21, 5519:14, 5527:10, 5527:24, 5528:3, 5528:6, 5528:8, 5528:14, 5528:25, 5529:2, 5529:16, 5530:1, 5530:3, 5531:4, 5531:8, 5531:11, 5531:24, 5532:3, 5532:4, 5532:6, 5532:18, 5533:9, 5533:20,

5533:22, 5533:25, 5534:1, 5534:21, 5535:8, 5535:12, 5535:25, 5536:11, 5540:24, 5541:5, 5541:10, 5543:21, 5543:22, 5547:25, 5548:6, 5548:8, 5548:13, 5550:13, 5551:1, 5551:4, 5551:5, 5551:11, 5558:25, 5559:6, 5560:1
**body** [1] - 5572:1
**book** [27] - 5560:20, 5560:21, 5570:10, 5570:22, 5572:7, 5572:10, 5573:13, 5573:16, 5579:25, 5583:1, 5583:5, 5583:11, 5583:19, 5583:25, 5592:22, 5592:25, 5596:19, 5602:13, 5603:13, 5603:25, 5610:9, 5617:16, 5629:4, 5630:12, 5630:14, 5645:10, 5645:13
**books** [3] - 5410:2, 5447:12, 5449:18
**bore** [1] - 5545:13
**boss** [1] - 5523:19
**bottom** [25] - 5416:23, 5418:20, 5422:14, 5425:6, 5445:16, 5485:6, 5495:22, 5532:10, 5549:11, 5569:8, 5573:2, 5574:7, 5581:1, 5582:3, 5589:1, 5599:14, 5608:7, 5615:16, 5625:4, 5626:16, 5628:4, 5629:16, 5629:21, 5632:21, 5641:20
**box** [5] - 5471:9, 5473:22, 5553:4, 5556:6, 5556:20
**boxes** [3] - 5424:24, 5425:2
**boy** [1] - 5500:16
**Brafman** [3] - 5525:16, 5525:17, 5525:22
**brand** [3] - 5439:11, 5492:10, 5492:11
**break** [12] - 5402:17, 5402:18, 5456:9, 5456:12, 5470:6,

5512:12, 5525:5, 5527:14, 5601:2, 5608:12, 5638:11
**breakdown** [2] - 5571:10, 5593:17
**breaking** [1] - 5607:25
**breath** [1] - 5688:10
**BRIDGET** [1] - 5400:12
**brief** [6] - 5401:17, 5403:9, 5674:13, 5674:21, 5675:15, 5679:1
**briefed** [5] - 5662:13, 5662:25, 5665:12, 5668:18, 5668:24
**briefing** [7] - 5662:8, 5669:1, 5671:21, 5674:8, 5678:17, 5678:25, 5681:9
**briefly** [2] - 5523:16, 5589:20
**bring** [4] - 5402:21, 5470:10, 5526:18, 5683:22
**broad** [2] - 5459:7, 5515:21
**Brodsky** [6] - 5464:2, 5468:22, 5525:3, 5525:11, 5681:19, 5684:14
**BRODSKY** [21] - 5400:19, 5456:19, 5465:18, 5466:2, 5468:1, 5470:3, 5508:24, 5515:10, 5525:5, 5525:14, 5525:21, 5536:15, 5683:1, 5684:9, 5684:16, 5684:23, 5685:6, 5685:24, 5686:9, 5686:17, 5687:19
**Brodsky's** [1] - 5687:7
**broken** [2] - 5565:21, 5593:21
**broker** [6] - 5646:2, 5657:5, 5657:9, 5657:10, 5657:11, 5657:14
**broker-dealer** [2] - 5657:10, 5657:11
**broker-dealers** [3] - 5657:5, 5657:9, 5657:14
**brokerage** [2] - 5647:2, 5647:5
**brokers** [1] - 5645:20

**Brooklyn** [4] - 5400:5, 5400:16, 5400:23, 5581:22
**brought** [3] - 5433:7, 5517:22, 5520:3
**bucket** [1] - 5456:6
**buckets** [3] - 5648:7, 5648:8, 5648:9
**bullet** [4] - 5502:23, 5508:2, 5509:12, 5531:17
**bunch** [1] - 5536:18
**burden** [2] - 5402:5, 5680:13
**business** [34] - 5401:18, 5412:1, 5412:3, 5454:5, 5457:7, 5457:9, 5460:11, 5462:14, 5462:16, 5502:3, 5503:20, 5503:25, 5504:3, 5504:6, 5504:17, 5504:18, 5504:20, 5505:4, 5506:1, 5506:2, 5515:4, 5522:25, 5535:2, 5541:20, 5564:8, 5566:4, 5566:9, 5568:18, 5586:15, 5591:12, 5636:17, 5657:11
**busy** [1] - 5401:19
**buyers** [1] - 5603:24
**buying** [1] - 5657:12
**Buzkin** [1] - 5404:16
**BY** [21] - 5400:13, 5400:19, 5403:7, 5418:1, 5428:15, 5445:2, 5470:19, 5497:1, 5509:4, 5510:22, 5527:1, 5531:1, 5550:11, 5554:1, 5557:25, 5576:2, 5600:1, 5602:1, 5636:8, 5651:2, 5656:19

### C

**c/o** [1] - 5595:17
**Cadman** [2] - 5400:15, 5400:23
**calculate** [1] - 5589:9
**calculated** [1] - 5545:20
**California** [1] - 5524:4
**calm** [1] - 5688:13
**canceled** [1] -

5625:21

**cancellation** [3] - 5624:12, 5626:2, 5628:16

**candor** [1] - 5525:13

**cannot** [8] - 5401:21, 5430:6, 5460:24, 5477:21, 5495:7, 5502:24, 5514:1, 5664:19

**capacity** [2] - 5409:25, 5659:4

**Capital** [22] - 5408:18, 5408:19, 5421:4, 5421:13, 5576:17, 5580:8, 5585:15, 5592:2, 5592:3, 5592:5, 5592:22, 5593:20, 5593:24, 5594:5, 5594:17, 5594:19, 5595:11, 5595:22, 5597:6, 5598:8, 5598:19, 5617:25

**capital** [3] - 5422:17, 5422:22, 5495:14

**care** [5] - 5510:17, 5518:7, 5595:22, 5596:1, 5618:6

**carefully** [3] - 5678:3, 5678:5, 5681:25

**Carter** [2] - 5444:3, 5470:17

**case** [56] - 5409:12, 5432:19, 5433:17, 5446:14, 5455:9, 5456:12, 5458:21, 5459:3, 5459:4, 5459:11, 5459:23, 5459:25, 5460:17, 5460:21, 5464:21, 5465:13, 5466:12, 5479:12, 5499:1, 5500:3, 5500:4, 5500:5, 5505:11, 5512:8, 5513:7, 5513:12, 5517:16, 5543:17, 5549:2, 5563:9, 5578:14, 5579:6, 5579:9, 5601:5, 5639:16, 5639:17, 5645:11, 5658:14, 5664:9, 5665:11, 5666:5, 5667:15, 5669:5, 5669:24, 5672:2, 5672:22, 5676:13, 5676:17, 5676:18, 5678:24, 5679:7,

5685:23, 5686:2, 5686:3, 5688:12, 5688:14

**cases** [1] - 5667:19

**cash** [2] - 5488:22, 5529:20

**catch** [1] - 5512:15

**categories** [4] - 5531:18, 5647:24, 5648:7, 5648:16

**categorize** [1] - 5454:9

**category** [6] - 5455:17, 5648:1, 5648:4, 5649:12, 5649:22, 5662:24

**causes** [1] - 5435:4

**caution** [3] - 5557:20, 5662:12, 5662:15

**cc** [1] - 5410:22

**Cede** [11] - 5590:8, 5590:9, 5590:16, 5590:19, 5645:12, 5645:15, 5645:17, 5645:25, 5646:1, 5646:16, 5647:1

**CEO** [4] - 5446:9, 5447:11, 5591:24, 5649:19

**certain** [18] - 5419:13, 5436:2, 5440:18, 5451:18, 5451:25, 5452:15, 5472:5, 5487:21, 5515:25, 5524:5, 5527:10, 5534:13, 5552:5, 5644:6, 5657:3, 5661:21, 5663:15, 5672:10

**certainly** [15] - 5456:10, 5463:22, 5469:4, 5474:17, 5507:14, 5539:22, 5671:7, 5672:21, 5673:1, 5680:1, 5680:5, 5682:3, 5682:8, 5687:4, 5687:11

**certificate** [42] - 5559:23, 5560:20, 5560:24, 5570:15, 5571:1, 5572:3, 5572:7, 5572:10, 5572:14, 5573:13, 5581:14, 5584:16, 5584:18, 5584:23, 5586:8, 5587:25, 5590:6, 5592:11, 5593:5, 5594:23,

5598:8, 5599:3, 5603:11, 5603:15, 5605:10, 5611:5, 5614:15, 5619:22, 5620:10, 5624:15, 5624:16, 5626:24, 5628:13, 5628:15, 5629:5, 5630:21, 5632:3, 5642:21, 5646:5, 5646:10, 5646:15

**certificated** [6] - 5583:3, 5583:9, 5584:14, 5585:2, 5598:11, 5629:18

**certificates** [34] - 5560:18, 5569:22, 5570:1, 5570:4, 5573:14, 5575:12, 5576:6, 5581:13, 5582:13, 5583:7, 5583:20, 5583:24, 5587:22, 5587:24, 5590:11, 5592:1, 5592:22, 5593:4, 5593:24, 5594:5, 5594:23, 5595:1, 5595:14, 5596:20, 5597:4, 5598:5, 5606:12, 5610:10, 5617:3, 5617:23, 5620:22

**certified** [1] - 5599:5

**certs** [2] - 5575:2, 5587:21

**cetera** [5] - 5472:17, 5529:5, 5530:5, 5533:19

**CFO** [5] - 5438:24, 5439:13, 5439:18, 5492:12, 5492:14

**chain** [4] - 5418:10, 5435:19, 5615:16, 5627:5

**challenge** [1] - 5677:15

**challenging** [1] - 5677:6

**CHAN** [137] - 5400:20, 5405:8, 5407:25, 5414:15, 5416:13, 5418:17, 5422:6, 5423:21, 5424:21, 5427:8, 5428:12, 5428:15, 5440:2, 5440:5, 5441:24, 5443:1, 5443:25, 5445:2, 5445:19, 5446:22, 5447:23, 5448:9,

5448:12, 5448:23, 5449:8, 5449:21, 5450:1, 5451:11, 5453:3, 5454:14, 5456:10, 5458:14, 5459:17, 5459:20, 5460:13, 5462:19, 5462:23, 5463:1, 5469:25, 5470:2, 5470:16, 5470:19, 5486:17, 5489:18, 5489:21, 5495:10, 5497:1, 5497:15, 5501:18, 5502:3, 5502:20, 5503:17, 5504:14, 5505:4, 5505:14, 5505:17, 5505:23, 5505:25, 5506:25, 5507:10, 5507:12, 5507:18, 5507:24, 5508:5, 5509:4, 5510:3, 5510:9, 5510:16, 5510:21, 5510:22, 5511:18, 5512:2, 5513:22, 5514:20, 5517:10, 5518:25, 5519:4, 5519:11, 5520:8, 5520:14, 5521:16, 5521:24, 5526:6, 5526:8, 5526:24, 5527:1, 5527:13, 5527:22, 5531:1, 5538:2, 5540:17, 5541:16, 5541:25, 5542:2, 5542:17, 5544:5, 5544:13, 5546:12, 5546:17, 5546:21, 5549:2, 5549:24, 5550:1, 5550:6, 5551:8, 5557:5, 5564:12, 5564:22, 5565:7, 5565:10, 5565:15, 5566:2, 5566:8, 5566:10, 5566:23, 5568:24, 5577:9, 5586:22, 5591:19, 5612:11, 5615:13, 5616:23, 5625:1, 5626:13, 5628:2, 5630:4, 5631:10, 5633:12, 5634:18, 5636:5, 5636:8, 5647:11, 5651:2, 5652:18, 5666:15, 5666:22, 5667:1

**Chan** [25] - 5448:11, 5456:8, 5456:20, 5457:8, 5458:13,

5465:18, 5469:20, 5469:24, 5470:15, 5508:21, 5512:21, 5513:1, 5516:1, 5517:3, 5521:5, 5521:22, 5522:6, 5525:25, 5526:10, 5526:23, 5550:4, 5555:14, 5557:4, 5565:3, 5567:5

**chance** [3] - 5401:5, 5547:6, 5563:12

**change** [5] - 5414:5, 5436:2, 5551:18, 5561:6, 5561:10, 5684:25

**changes** [4] - 5529:20, 5530:1, 5532:19, 5621:14

**channels** [1] - 5679:3

**characterize** [4] - 5442:10, 5454:21, 5454:22, 5671:24

**characterized** [2] - 5455:3, 5468:23

**charge** [2] - 5413:21, 5663:22

**charged** [1] - 5664:20

**charges** [2] - 5406:20, 5625:22

**Charleane** [1] - 5400:22

**Charles** [3] - 5646:14, 5646:19, 5647:7

**chart** [9] - 5446:18, 5449:13, 5449:19, 5449:22, 5449:23, 5449:24, 5473:25, 5552:25, 5658:18

**charts** [2] - 5658:19, 5667:19

**check** [5] - 5401:4, 5409:17, 5482:20, 5521:23, 5522:2

**chief** [15] - 5406:7, 5421:3, 5421:12, 5445:22, 5484:18, 5532:20, 5544:23, 5553:5, 5553:19, 5555:1, 5621:9, 5685:23, 5686:2, 5686:3

**choice** [1] - 5523:4

**chose** [1] - 5460:7

**Circuit** [2] - 5671:3, 5673:11

**circumscribed** [1] -

5675:21
**citation** [1] - 5674:7
**cite** [1] - 5674:12
**Citrin** [1] - 5431:20
**City** [1] - 5558:2
**CJ-12-94** [1] -
5578:14
**claim** [5] - 5453:22,
5453:25, 5465:4,
5670:9, 5670:11
**claimed** [1] - 5514:7
**claims** [3] - 5452:17,
5452:25, 5671:17
**Claridge** [4] -
5576:17, 5580:7,
5585:14, 5617:25
**clarify** [3] - 5419:15,
5510:14, 5533:22
**classic** [1] - 5503:20
**classified** [2] -
5421:2, 5421:6
**classify** [2] - 5487:7,
5648:15
**clause** [5] - 5472:16,
5472:20, 5472:22,
5525:20, 5604:24
**clear** [10] - 5410:7,
5504:14, 5515:7,
5517:19, 5536:18,
5663:7, 5665:10,
5671:15, 5673:2,
5675:3
**clearance** [1] -
5520:5
**clearing** [1] -
5645:20
**clearly** [5] - 5459:24,
5463:19, 5464:19,
5664:5, 5674:9
**CLERK** [2] -
5557:10, 5557:14
**clerk** [1] - 5550:5
**client** [16] - 5428:19,
5477:25, 5490:25,
5514:2, 5563:2,
5636:25, 5663:21,
5684:10, 5684:12,
5684:16, 5684:19,
5687:7, 5687:9,
5688:2, 5688:5,
5688:6
**client-imposed** [1] -
5490:25
**clients** [3] - 5479:7,
5543:17
**close** [3] - 5670:2,
5670:4, 5672:1
**closely** [1] - 5545:2
**closer** [1] - 5527:6
**closing** [2] -

5655:19, 5655:24
**Co** [11] - 5590:8,
5590:9, 5590:16,
5590:19, 5645:12,
5645:15, 5645:17,
5645:25, 5646:1,
5646:16, 5647:1
**Coast** [1] - 5512:16
**code** [1] - 5515:16
**coffee** [2] - 5456:13,
5601:6
**colleague** [1] -
5528:22
**colleagues** [1] -
5542:15
**collect** [2] - 5563:8,
5633:2
**collected** [2] -
5564:25, 5591:11
**collectible** [1] -
5410:10
**collection** [1] -
5568:14
**colorable** [2] -
5670:9, 5670:11
**Colt** [5] - 5595:17,
5622:11, 5622:22,
5623:20, 5625:12
**column** [2] -
5664:13, 5664:14
**combination** [1] -
5503:16
**coming** [15] -
5458:22, 5469:19,
5472:16, 5480:3,
5493:4, 5499:9,
5499:18, 5501:24,
5507:4, 5514:12,
5567:5, 5567:9,
5638:16, 5639:13,
5642:4
**commence** [2] -
5434:12, 5641:20
**comments** [11] -
5443:12, 5443:13,
5497:10, 5532:18,
5546:4, 5546:14,
5680:20, 5684:9,
5684:11, 5684:17,
5684:24
**Commission** [3] -
5654:16, 5657:25,
5672:10
**committee** [16] -
5411:6, 5411:13,
5411:14, 5411:23,
5411:25, 5415:13,
5415:15, 5415:17,
5415:25, 5426:24,
5487:18, 5487:25,

5489:5, 5493:3,
5494:15, 5535:4
**common** [23] -
5445:24, 5448:16,
5451:20, 5455:8,
5552:7, 5553:7,
5553:21, 5555:2,
5587:21, 5588:2,
5589:13, 5604:19,
5617:15, 5619:21,
5621:19, 5621:22,
5622:22, 5624:6,
5624:7, 5632:1,
5636:14, 5648:16,
5648:19
**communicate** [10] -
5411:6, 5411:10,
5415:24, 5416:2,
5487:17, 5545:7,
5561:20, 5561:25,
5562:2, 5562:9
**communicated** [3] -
5532:7, 5533:24,
5561:15
**communication** [9] -
5411:12, 5415:16,
5515:12, 5532:8,
5533:24, 5539:15,
5539:21, 5552:12,
5553:15
**communications**
[12] - 5429:14,
5464:14, 5465:11,
5465:16, 5465:24,
5466:19, 5466:20,
5466:21, 5466:22,
5466:25, 5498:18
**companies** [15] -
5437:21, 5441:4,
5441:6, 5441:7,
5441:13, 5441:14,
5558:15, 5558:16,
5558:18, 5564:2,
5648:19, 5658:4,
5659:5
**company** [165] -
5403:17, 5405:24,
5406:4, 5406:5,
5406:6, 5406:7,
5406:17, 5406:18,
5406:20, 5406:21,
5410:5, 5411:8,
5411:18, 5411:19,
5413:20, 5413:23,
5421:9, 5421:12,
5421:17, 5425:22,
5425:24, 5429:16,
5430:12, 5431:13,
5431:24, 5432:4,

5432:7, 5432:12,
5432:18, 5433:17,
5433:19, 5433:20,
5437:20, 5438:24,
5439:11, 5439:16,
5440:8, 5440:25,
5441:9, 5442:1,
5445:24, 5446:10,
5446:12, 5447:4,
5447:6, 5447:11,
5448:18, 5449:17,
5451:15, 5451:17,
5451:21, 5452:8,
5452:9, 5452:18,
5452:22, 5453:1,
5453:22, 5453:25,
5454:5, 5454:23,
5456:2, 5458:10,
5460:16, 5472:12,
5473:6, 5473:12,
5476:25, 5477:8,
5478:13, 5481:1,
5483:4, 5483:7,
5483:9, 5483:14,
5483:19, 5484:18,
5484:20, 5485:8,
5485:25, 5486:7,
5486:14, 5486:22,
5488:1, 5488:21,
5488:22, 5488:24,
5491:1, 5491:9,
5491:22, 5492:6,
5492:11, 5492:18,
5493:19, 5495:13,
5495:18, 5502:23,
5502:25, 5504:5,
5506:19, 5514:7,
5529:1, 5529:2,
5529:22, 5530:4,
5532:20, 5532:21,
5532:22, 5541:18,
5544:23, 5549:11,
5552:8, 5553:7,
5553:8, 5553:12,
5553:13, 5554:4,
5554:10, 5558:9,
5558:14, 5558:20,
5558:24, 5559:2,
5559:3, 5559:4,
5561:3, 5561:13,
5561:19, 5561:24,
5562:23, 5569:20,
5578:16, 5579:9,
5579:18, 5582:13,
5588:14, 5588:17,
5588:22, 5598:6,
5604:20, 5609:19,
5613:22, 5614:18,
5617:17, 5624:10,
5637:13, 5646:15,
5647:1, 5648:6,

5648:9, 5648:25,
5649:5, 5649:8,
5649:14, 5651:9,
5651:10, 5651:11,
5651:13, 5651:17,
5653:3, 5672:15
**Company** [8] -
5446:1, 5446:5,
5452:14, 5452:17,
5558:4, 5558:6,
5569:4, 5621:14
**company's** [15] -
5406:3, 5411:6,
5421:3, 5424:4,
5432:12, 5439:18,
5446:12, 5447:11,
5493:20, 5495:24,
5558:24, 5560:4,
5561:7, 5587:11,
5649:3
**compare** [3] -
5444:3, 5473:19,
5519:1
**comparing** [1] -
5445:3
**compensation** [3] -
5403:14, 5403:18,
5543:11
**competent** [1] -
5492:12
**compilations** [2] -
5655:10, 5656:3
**compiled** [2] -
5586:14, 5591:16
**complete** [3] -
5515:18, 5560:13,
5617:20
**completely** [4] -
5468:5, 5518:4,
5518:22, 5520:24
**completeness** [1] -
5547:8
**complexities** [1] -
5670:15
**comply** [2] -
5667:13, 5680:14
**component** [4] -
5445:25, 5446:2,
5553:7, 5553:10
**comport** [1] - 5529:6
**comprised** [1] -
5657:5
**computer** [1] -
5400:25
**computer-aided** [1] -
5400:25
**conceal** [3] -
5440:12, 5440:25,
5442:2
**concealed** [2] -

5440:21, 5517:23

**concept** [1] - 5414:18

**concepts** [1] - 5665:7

**concern** [16] - 5453:20, 5488:16, 5488:17, 5488:20, 5488:25, 5512:20, 5512:23, 5513:11, 5517:6, 5518:2, 5591:23, 5651:18, 5670:12, 5681:16, 5683:14, 5685:2

**concerned** [7] - 5402:7, 5453:24, 5478:8, 5513:15, 5521:2, 5678:14, 5680:1

**concerning** [1] - 5518:12

**concerns** [3] - 5522:23, 5676:22, 5680:8

**conclude** [1] - 5411:5

**concluded** [1] - 5665:22

**conclusion** [7] - 5427:24, 5428:3, 5532:3, 5532:5, 5532:6, 5532:7, 5579:20

**conclusions** [1] - 5479:1

**concurred** [1] - 5488:18

**Concurrent** [1] - 5485:24

**concurrently** [1] - 5615:25

**condition** [4] - 5486:6, 5486:10, 5528:25, 5529:14

**conditions** [1] - 5538:6

**condone** [1] - 5671:3

**conduct** [2] - 5561:9, 5657:16

**conducted** [2] - 5542:9, 5659:14

**conducting** [1] - 5675:11

**confer** [4] - 5402:17, 5521:18, 5636:2, 5668:20

**conference** [1] - 5429:10

**conferred** [2] - 5457:3, 5457:8

**conferring** [1] - 5456:18

**confined** [1] - 5468:25

**confirm** [8] - 5521:9, 5572:8, 5611:8, 5614:23, 5616:2, 5626:1, 5632:25, 5633:15

**confirmation** [1] - 5408:17

**confirmations** [1] - 5424:18

**conform** [1] - 5609:4

**confront** [3] - 5466:11, 5466:16, 5466:17

**confrontation** [4] - 5461:9, 5466:16, 5467:3, 5467:7

**confrontational** [1] - 5525:20

**confronted** [1] - 5682:9

**confuse** [2] - 5663:21, 5667:25

**connect** [1] - 5519:5

**connected** [3] - 5470:22, 5485:12, 5561:16

**connection** [32] - 5406:21, 5408:24, 5410:15, 5420:19, 5420:1, 5424:4, 5425:23, 5426:22, 5457:21, 5457:25, 5458:11, 5458:19, 5458:23, 5459:2, 5459:7, 5459:9, 5459:10, 5459:12, 5472:12, 5498:19, 5509:20, 5548:21, 5567:9, 5570:20, 5572:4, 5620:23, 5631:9, 5631:13, 5634:16, 5634:20, 5644:24, 5669:17

**conscious** [1] - 5440:12

**consent** [3] - 5458:18, 5458:22, 5547:10

**consider** [1] - 5525:19

**consideration** [3] - 5452:15, 5465:6, 5477:8

**considered** [2] - 5455:13, 5525:21

**considering** [1] -

5670:5

**consistent** [2] - 5520:25, 5540:4

**consists** [1] - 5612:2

**conspiracy** [1] - 5663:19

**constitute** [1] - 5664:1

**constituted** [1] - 5455:7

**constitutes** [1] - 5672:16

**constraints** [1] - 5517:2

**consultant** [8] - 5430:22, 5430:24, 5431:2, 5431:3, 5431:6, 5431:19, 5461:6, 5622:22

**consultants** [2] - 5461:3, 5466:7

**consultations** [1] - 5491:22

**consulted** [1] - 5489:11

**consulting** [31] - 5458:2, 5458:10, 5458:17, 5461:5, 5466:6, 5466:10, 5467:10, 5504:5, 5533:6, 5533:9, 5533:15, 5533:18, 5540:20, 5540:23, 5541:1, 5541:3, 5541:5, 5541:10, 5541:12, 5541:18, 5541:19, 5541:22, 5542:9, 5542:10, 5542:24, 5543:8, 5545:8, 5623:3, 5632:12, 5652:11, 5652:14

**contact** [8] - 5430:9, 5430:10, 5430:13, 5430:19, 5431:11, 5431:13, 5522:6, 5613:12

**contacted** [3] - 5612:19, 5612:25, 5615:3

**contain** [5] - 5418:13, 5452:21, 5458:25, 5511:12, 5563:22

**contained** [5] - 5443:23, 5500:18, 5506:3, 5602:20, 5656:11

**containing** [2] - 5533:17, 5563:15

**contains** [1] - 5563:14

**contemplating** [1] - 5682:7

**content** [1] - 5515:8

**contention** [1] - 5508:19

**contentious** [1] - 5489:10

**contested** [1] - 5688:12

**context** [1] - 5637:5

**contingencies** [2] - 5472:14, 5556:10

**continuation** [4] - 5465:19, 5626:5, 5627:5, 5633:5

**continue** [4] - 5403:1, 5469:23, 5521:24, 5534:2

**continued** [11] - 5417:11, 5444:4, 5496:19, 5516:7, 5532:15, 5575:23, 5605:3, 5627:8, 5650:4, 5681:17, 5682:21

**Continued** [12] - 5403:6, 5467:19, 5468:1, 5530:20, 5553:25, 5599:21, 5600:5, 5601:19, 5660:15, 5670:25, 5689:5, 5690:1

**continues** [6] - 5413:10, 5417:3, 5417:4, 5422:20, 5532:23, 5614:12

**continuing** [9] - 5445:2, 5487:10, 5488:25, 5527:1, 5531:3, 5570:3, 5576:2, 5640:13, 5651:2

**Continuing** [3] - 5470:19, 5600:1, 5671:1

**contrary** [1] - 5585:18

**control** [19] - 5404:15, 5455:8, 5500:22, 5522:4, 5579:14, 5588:8, 5588:12, 5588:16, 5592:2, 5646:15, 5648:2, 5648:17, 5649:1, 5649:2, 5649:10, 5649:15, 5649:24, 5651:14, 5674:21

**controlled** [1] - 5638:12

**controller** [2] - 5431:12, 5625:16

**controlling** [6] - 5455:9, 5455:10, 5648:5, 5649:4, 5649:17, 5674:16

**controls** [2] - 5531:11, 5551:18

**convenient** [1] - 5509:2

**conversation** [5] - 5415:19, 5429:12, 5438:21, 5468:17, 5538:3

**conversations** [3] - 5402:3, 5429:18, 5505:9

**conversion** [1] - 5578:17

**converted** [1] - 5667:7

**convinced** [1] - 5671:12

**Cooley** [1] - 5666:17

**Cooperman** [1] - 5431:20

**copied** [13] - 5418:25, 5542:15, 5571:19, 5577:14, 5584:8, 5603:1, 5609:16, 5613:4, 5613:25, 5622:17, 5638:6, 5638:14, 5642:2

**copies** [5] - 5459:1, 5485:15, 5490:11, 5512:1, 5550:4

**copy** [12] - 5436:5, 5450:21, 5513:19, 5549:18, 5578:21, 5654:14, 5654:18, 5654:22, 5654:25, 5655:3, 5655:18, 5655:22

**copying** [3] - 5615:17, 5616:15, 5631:21

**core** [1] - 5487:3

**Corey** [1] - 5431:18

**corners** [1] - 5506:4

**corporate** [3] - 5609:20, 5663:9, 5667:23

**correct** [190] - 5410:6, 5411:3, 5429:5, 5429:6, 5429:13, 5429:18, 5430:9, 5432:25,

5434:3, 5436:22, 5436:25, 5437:25, 5439:22, 5440:13, 5440:19, 5440:22, 5441:1, 5442:2, 5442:11, 5443:7, 5445:5, 5445:7, 5446:19, 5447:6, 5449:14, 5450:8, 5450:11, 5450:17, 5452:11, 5453:22, 5453:25, 5454:3, 5454:6, 5454:9, 5455:21, 5456:3, 5471:13, 5474:15, 5475:2, 5475:8, 5475:12, 5475:17, 5476:14, 5477:3, 5477:23, 5478:1, 5478:4, 5478:23, 5479:1, 5479:4, 5479:16, 5479:21, 5480:8, 5480:15, 5480:18, 5481:1, 5481:6, 5481:15, 5481:19, 5481:25, 5482:10, 5482:13, 5482:16, 5482:19, 5483:5, 5483:14, 5485:1, 5485:4, 5485:21, 5486:1, 5486:7, 5487:5, 5488:11, 5488:17, 5491:24, 5492:14, 5492:19, 5493:23, 5494:6, 5494:12, 5494:16, 5495:3, 5495:20, 5495:25, 5496:4, 5496:15, 5498:21, 5499:1, 5499:4, 5499:15, 5499:23, 5509:21, 5510:1, 5510:24, 5511:4, 5511:9, 5514:20, 5527:11, 5527:25, 5534:10, 5534:24, 5535:2, 5535:13, 5536:2, 5536:19, 5536:23, 5537:7, 5537:12, 5538:22, 5540:5, 5540:8, 5542:15, 5544:19, 5545:23, 5546:21, 5546:25, 5547:2, 5547:18, 5547:19, 5548:6, 5549:19, 5556:24, 5558:21, 5558:22, 5566:14, 5566:19, 5571:10, 5571:11, 5597:6, 5598:15,

5623:21, 5628:19, 5636:12, 5636:18, 5636:21, 5636:25, 5637:2, 5637:7, 5637:11, 5637:14, 5637:16, 5637:19, 5637:22, 5638:4, 5638:8, 5638:12, 5638:17, 5638:21, 5638:24, 5639:5, 5639:8, 5639:14, 5639:17, 5639:24, 5640:2, 5640:9, 5640:11, 5640:16, 5640:20, 5640:25, 5641:5, 5641:7, 5641:9, 5641:11, 5641:21, 5641:25, 5642:5, 5642:11, 5642:13, 5642:19, 5643:1, 5643:6, 5643:11, 5643:22, 5644:6, 5644:12, 5645:3, 5646:16, 5646:20, 5646:22, 5647:9, 5648:24, 5651:6, 5651:9, 5651:14, 5651:18, 5652:9, 5652:12, 5683:10

**correcting** [2] - 5476:12, 5476:13
**corrective** [1] - 5685:21
**correctly** [1] - 5430:21
**correlate** [1] - 5531:17
**correspond** [1] - 5511:23
**correspondence** [2] - 5463:13, 5625:11
**corresponds** [1] - 5642:23
**corroborate** [1] - 5553:15
**cost** [4] - 5522:24, 5633:2, 5634:4, 5652:3
**costs** [1] - 5406:20
**council** [1] - 5609:20
**counsel** [24] - 5411:19, 5431:24, 5432:1, 5432:3, 5432:4, 5432:7, 5432:12, 5465:22, 5466:11, 5468:24, 5508:15, 5515:12, 5516:6, 5517:17, 5526:7, 5553:3,

5558:24, 5559:2, 5561:24, 5582:13, 5588:17, 5614:18, 5617:18, 5686:5
**counsels** [1] - 5493:17
**Count** [4] - 5469:1, 5469:3, 5469:8, 5525:7
**count** [1] - 5475:16
**counter** [4] - 5445:23, 5446:10, 5446:11, 5659:5
**counterparties** [2] - 5553:20, 5554:23
**counterparty** [1] - 5553:6
**Counts** [3] - 5465:21, 5467:8, 5525:8
**counts** [1] - 5466:15
**couple** [5] - 5411:9, 5585:6, 5598:11, 5612:4, 5647:13
**course** [13] - 5464:6, 5477:13, 5479:7, 5493:5, 5541:19, 5550:6, 5562:8, 5564:7, 5568:17, 5586:14, 5591:12, 5679:3, 5680:8
**COURT** [247] - 5400:1, 5401:2, 5401:4, 5401:10, 5401:13, 5401:16, 5402:20, 5402:23, 5405:9, 5408:1, 5408:5, 5414:16, 5416:14, 5418:18, 5422:7, 5424:22, 5427:9, 5428:1, 5428:11, 5428:13, 5438:23, 5439:25, 5440:3, 5441:22, 5444:2, 5445:18, 5446:21, 5446:23, 5447:8, 5448:3, 5448:11, 5448:21, 5449:1, 5449:4, 5449:7, 5449:19, 5449:25, 5456:8, 5456:11, 5456:17, 5456:24, 5457:2, 5458:13, 5459:14, 5459:18, 5461:15, 5461:25, 5462:3, 5462:8, 5462:15, 5463:6, 5463:8, 5463:17, 5464:7, 5468:16, 5468:21,

5469:2, 5469:22, 5470:1, 5470:5, 5470:10, 5470:13, 5486:13, 5486:16, 5489:24, 5495:9, 5497:6, 5497:17, 5498:15, 5501:17, 5501:21, 5502:6, 5502:18, 5503:9, 5504:9, 5505:20, 5505:24, 5506:5, 5506:8, 5506:16, 5508:2, 5508:14, 5508:17, 5510:6, 5510:11, 5510:14, 5510:19, 5511:6, 5511:19, 5511:6, 5512:11, 5512:17, 5514:15, 5514:21, 5516:5, 5518:23, 5519:2, 5519:10, 5519:13, 5519:20, 5520:5, 5521:9, 5521:17, 5521:20, 5522:19, 5522:23, 5523:4, 5523:10, 5523:18, 5524:2, 5524:6, 5525:3, 5525:11, 5525:19, 5525:23, 5526:7, 5526:10, 5526:14, 5526:17, 5526:20, 5527:6, 5527:17, 5527:19, 5528:16, 5536:14, 5536:16, 5538:5, 5538:25, 5541:14, 5542:3, 5542:20, 5544:15, 5546:11, 5546:19, 5549:5, 5550:2, 5550:4, 5550:7, 5550:9, 5551:9, 5557:4, 5557:6, 5557:17, 5557:21, 5562:12, 5564:15, 5564:19, 5564:21, 5565:14, 5565:19, 5565:23, 5566:1, 5566:13, 5566:17, 5566:19, 5567:2, 5567:7, 5567:11, 5567:15, 5567:18, 5568:25, 5577:10, 5583:17, 5583:19, 5583:22, 5586:23, 5591:20, 5601:1, 5601:4, 5601:8, 5601:10, 5601:15,

5607:9, 5612:12, 5615:14, 5616:24, 5625:2, 5626:14, 5628:3, 5630:5, 5631:11, 5633:13, 5634:19, 5635:20, 5635:24, 5636:2, 5636:6, 5652:21, 5653:4, 5653:6, 5653:10, 5653:14, 5653:18, 5653:24, 5656:8, 5656:11, 5660:10, 5660:13, 5661:3, 5661:7, 5662:10, 5664:8, 5664:19, 5665:4, 5665:20, 5666:2, 5666:10, 5666:14, 5666:21, 5666:23, 5667:4, 5668:10, 5669:25, 5670:7, 5671:1, 5672:4, 5674:2, 5675:18, 5676:12, 5676:15, 5677:5, 5677:9, 5677:25, 5678:5, 5678:9, 5678:18, 5679:6, 5679:9, 5680:4, 5680:25, 5681:4, 5681:7, 5681:22, 5683:17, 5684:15, 5684:20, 5684:25, 5685:20, 5686:4, 5687:2, 5688:9
**Court** [25] - 5400:22, 5425:16, 5457:19, 5459:12, 5459:13, 5460:21, 5461:20, 5463:15, 5520:3, 5661:14, 5661:16, 5661:18, 5663:14, 5664:5, 5665:13, 5667:16, 5668:20, 5669:20, 5669:22, 5673:25, 5674:10, 5680:18, 5681:8, 5682:10
**court** [11] - 5401:1, 5470:9, 5509:3, 5525:2, 5567:17, 5567:18, 5601:14, 5666:1, 5681:12, 5682:11, 5682:17
**Court's** [6] - 5667:6, 5669:3, 5669:6, 5677:3, 5679:3, 5681:25
**Courthouse** [1] - 5400:5

**COURTROOM** [3] - 5654:3, 5654:5, 5665:18

**courtroom** [4] - 5428:22, 5456:16, 5526:19, 5666:9

**cover** [3] - 5519:13, 5543:13, 5587:1

**CPAG** [4] - 5658:8, 5658:9, 5658:10, 5662:19

**Crain** [1] - 5616:15

**Crane** [1] - 5641:21

**create** [2] - 5511:1, 5586:17

**created** [8] - 5425:2, 5443:6, 5443:9, 5443:10, 5538:18, 5538:24, 5560:12, 5587:22

**credibility** [3] - 5683:6, 5683:13, 5683:18

**crime** [2] - 5494:6, 5494:8

**criminal** [3] - 5658:7, 5663:11, 5667:19

**critical** [1] - 5531:9

**cross** [19] - 5461:2, 5466:18, 5466:23, 5468:13, 5469:13, 5469:21, 5513:16, 5521:14, 5526:23, 5536:22, 5677:4, 5677:15, 5681:20, 5682:6, 5683:7, 5683:23, 5684:17, 5685:24, 5686:18

**CROSS** [7] - 5428:14, 5445:1, 5526:25, 5636:7, 5651:1, 5689:6, 5689:10

**cross-examination** [3] - 5513:16, 5683:23, 5686:18

**CROSS-EXAMINATION** [4] - 5428:14, 5636:7, 5689:6, 5689:10

**cross-examine** [11] - 5461:2, 5466:18, 5466:23, 5468:13, 5677:4, 5677:15, 5681:20, 5682:6, 5683:7, 5684:17, 5685:24

**cross-references** [1] - 5536:22

**crossed** [1] -

5682:20

**CRUTCHER** [1] - 5400:17

**Cruz** [1] - 5401:24

**cup** [1] - 5601:6

**cure** [1] - 5504:20

**curious** [1] - 5677:25

**curiously** [1] - 5517:13

**current** [3] - 5435:10, 5520:25, 5658:6

**custody** [1] - 5646:15

**customer** [1] - 5651:9

**customers** [1] - 5657:13

# D

**daily** [3] - 5655:19, 5655:23, 5655:24

**damages** [1] - 5406:20

**dance** [1] - 5567:15

**dangerously** [2] - 5670:2, 5670:4

**Darren** [3] - 5595:17, 5623:6, 5625:10, 5626:24, 5628:12

**data** [16] - 5649:24, 5649:25, 5654:15, 5654:19, 5654:23, 5655:1, 5655:4, 5655:7, 5655:11, 5655:18, 5655:23, 5656:3, 5658:15, 5658:17, 5663:4, 5663:6

**date** [57] - 5404:5, 5404:6, 5407:22, 5426:16, 5473:7, 5473:17, 5473:23, 5474:3, 5475:1, 5485:17, 5488:23, 5490:5, 5501:1, 5501:4, 5501:12, 5502:21, 5506:14, 5509:10, 5509:14, 5509:16, 5538:15, 5538:22, 5556:10, 5556:11, 5556:14, 5556:17, 5556:18, 5556:19, 5556:21, 5556:22, 5568:15, 5569:18, 5571:7, 5575:21, 5578:8, 5582:7, 5590:2, 5592:19, 5594:11,

5596:15, 5597:24, 5602:8, 5607:21, 5610:4, 5610:18, 5615:19, 5617:8, 5621:9, 5626:19, 5628:9, 5628:25, 5635:10, 5635:14

**dated** [30] - 5408:10, 5408:25, 5416:20, 5425:4, 5474:22, 5482:15, 5482:18, 5519:15, 5578:17, 5593:13, 5596:25, 5603:18, 5604:12, 5612:6, 5616:17, 5618:14, 5618:24, 5619:15, 5620:19, 5621:8, 5622:8, 5623:25, 5624:22, 5625:7, 5631:3, 5633:8, 5634:12, 5634:24, 5641:21

**dates** [4] - 5473:21, 5538:9, 5555:14, 5686:22

**Daubert** [2] - 5678:20, 5680:7

**DAVID** [2] - 5400:14, 5400:14

**David** [1] - 5404:15, 5429:24, 5474:9, 5599:14

**days** [6] - 5402:9, 5411:10, 5474:24, 5522:16, 5681:18

**DCC** [1] - 5646:4

**deal** [4] - 5455:2, 5461:8, 5468:18, 5685:21

**dealer** [2] - 5657:10, 5657:11

**dealers** [3] - 5657:5, 5657:9, 5657:14

**dealing** [1] - 5527:14

**dealt** [3] - 5547:14, 5571:21, 5629:12

**Dean** [1] - 5670:13

**Dear** [1] - 5621:12

**Debbie** [2] - 5616:15, 5641:21

**Deborah** [3] - 5653:20, 5654:7, 5672:8

**DEBORAH** [3] - 5654:7, 5656:15, 5689:11

**December** [46] - 5402:7, 5500:14, 5518:16, 5519:15, 5519:16, 5527:10,

5529:4, 5531:6, 5532:12, 5539:7, 5539:9, 5539:10, 5555:23, 5556:19, 5556:22, 5557:1, 5568:10, 5570:4, 5571:7, 5574:12, 5575:22, 5576:24, 5578:9, 5582:8, 5584:10, 5585:13, 5585:20, 5586:4, 5587:1, 5591:6, 5604:17, 5612:6, 5612:16, 5612:25, 5613:3, 5613:18, 5614:6, 5614:20, 5634:24, 5635:17, 5654:24, 5655:21, 5655:25, 5669:12

**decide** [4] - 5402:18, 5478:9, 5478:16, 5679:22

**decided** [9] - 5414:11, 5479:15, 5479:19, 5678:12, 5678:15, 5682:15, 5682:19, 5683:1, 5685:25

**deciding** [1] - 5478:18

**decision** [7] - 5402:14, 5476:25, 5477:3, 5648:15, 5676:21, 5677:3, 5680:19

**decisionmaker** [1] - 5479:13

**decisions** [2] - 5454:2, 5454:5

**declare** [1] - 5644:19

**deemed** [2] - 5532:19, 5662:22

**deep** [1] - 5688:10

**deeply** [1] - 5425:25

**defend** [1] - 5408:21

**defendant** [9] - 5502:8, 5502:10, 5503:5, 5503:7, 5503:8, 5672:15, 5685:9, 5686:11

**Defendant** [2] - 5400:7, 5400:17

**Defendant's** [7] - 5443:21, 5444:2, 5509:24, 5511:20, 5514:15, 5514:18, 5667:2

**defending** [1] - 5680:16

**defense** [32] -

5460:22, 5464:15, 5464:19, 5464:23, 5465:3, 5465:14, 5468:24, 5502:8, 5502:15, 5503:5, 5504:22, 5513:8, 5517:17, 5519:25, 5521:1, 5522:11, 5527:15, 5527:16, 5542:17, 5544:8, 5553:3, 5665:15, 5668:23, 5670:7, 5671:16, 5674:2, 5677:24, 5678:10, 5678:24, 5681:9, 5685:13, 5687:23

**Defense** [17] - 5514:16, 5514:21, 5514:24, 5515:13, 5519:18, 5520:23, 5527:4, 5527:8, 5527:19, 5536:4, 5537:4, 5542:4, 5542:20, 5544:15, 5546:9, 5546:19, 5550:5

**defense's** [2] - 5458:8, 5680:23

**deficiency** [1] - 5476:11

**deficient** [1] - 5670:20

**definitely** [3] - 5440:17, 5474:19, 5478:21

**definitions** [1] - 5661:12

**degree** [2] - 5659:19, 5659:20

**Delaware** [1] - 5408:19

**delegended** [1] - 5575:3

**delegending** [1] - 5575:1

**deliberate** [1] - 5670:6

**deliver** [6] - 5448:14, 5555:2, 5603:11, 5605:4, 5617:22, 5619:23

**delivered** [13] - 5406:16, 5448:15, 5555:2, 5576:9, 5582:24, 5604:25, 5605:2, 5605:12, 5606:14, 5606:16, 5606:19, 5606:21, 5608:17

**delivery** [4] - 5575:3,

5582:25, 5583:24, 5585:19

**DENERSTEIN** [18] - 5400:20, 5660:9, 5660:12, 5661:8, 5663:3, 5667:5, 5669:10, 5670:1, 5673:16, 5674:24, 5676:19, 5677:8, 5677:10, 5677:18, 5678:2, 5678:8, 5679:5, 5680:11

**Denerstein** [1] - 5671:17

**denominations** [1] - 5595:2

**dental** [1] - 5402:5

**dentist** [2] - 5401:18, 5523:12

**Denton** [1] - 5581:17

**Department** [1] - 5659:2

**deposit** [3] - 5646:14, 5647:2, 5647:6

**deposited** [2] - 5590:11, 5590:18

**Depository** [3] - 5590:10, 5590:12, 5590:16

**depository** [4] - 5590:13, 5645:18, 5646:11, 5647:1

**DEPUTY** [3] - 5654:3, 5654:5, 5665:18

**describe** [3] - 5528:24, 5647:24, 5659:18

**described** [2] - 5433:3, 5639:19

**describing** [3] - 5476:8, 5661:16, 5675:1

**description** [1] - 5425:22

**Desert** [22] - 5562:20, 5562:22, 5562:25, 5563:2, 5563:20, 5569:10, 5569:21, 5572:2, 5573:5, 5573:7, 5574:8, 5576:3, 5576:7, 5577:20, 5578:15, 5580:25, 5591:24, 5597:4, 5603:21, 5635:1, 5649:19, 5654:15

**designation** [1] - 5514:18

**designed** [3] - 5434:2, 5636:17, 5674:18

**desirable** [1] - 5532:19

**desire** [1] - 5641:4

**detail** [1] - 5573:24

**detailed** [2] - 5451:6, 5571:10

**detailing** [2] - 5655:19, 5655:23

**details** [5] - 5429:17, 5436:3, 5500:22, 5542:7, 5550:20

**detect** [1] - 5493:22

**Detection** [1] - 5659:3

**determination** [4] - 5406:3, 5415:5, 5529:1, 5677:23

**determine** [4] - 5409:21, 5414:13, 5503:25, 5649:23

**determined** [3] - 5406:5, 5497:8, 5529:2

**determining** [3] - 5486:18, 5491:4, 5664:20

**detrimental** [1] - 5495:24

**development** [1] - 5459:10

**DGTE** [4] - 5571:25, 5572:2, 5572:8, 5592:5

**dialogue** [1] - 5685:14

**difference** [6] - 5407:4, 5587:23, 5589:12, 5652:22, 5652:24, 5676:23

**differences** [1] - 5673:6

**different** [22] - 5409:7, 5421:12, 5421:14, 5430:15, 5449:22, 5480:21, 5484:7, 5504:7, 5538:8, 5546:11, 5554:10, 5560:18, 5560:22, 5593:17, 5639:14, 5647:24, 5648:15, 5668:6, 5668:23, 5670:7, 5671:23, 5676:16

**difficult** [1] - 5523:2

**Difficulties** [1] - 5489:1

**difficulties** [6] -

**designed** column continues

5489:4, 5489:6, 5489:9, 5492:18, 5496:3, 5531:13

**difficulty** [2] - 5490:25, 5491:2

**dire** [15] - 5447:21, 5447:24, 5676:20, 5677:2, 5677:5, 5677:18, 5678:1, 5678:22, 5679:16, 5679:20, 5679:24, 5680:9, 5680:11, 5680:17, 5680:21

**direct** [20] - 5408:22, 5431:3, 5447:10, 5469:13, 5481:11, 5544:8, 5575:15, 5579:24, 5580:5, 5581:7, 5585:22, 5590:23, 5601:17, 5612:1, 5641:16, 5683:9, 5685:15, 5685:19, 5686:15

**DIRECT** [7] - 5403:6, 5557:24, 5576:1, 5656:18, 5689:5, 5689:9, 5689:12

**directed** [6] - 5435:22, 5553:3, 5573:12, 5578:15, 5583:10, 5685:11

**directing** [1] - 5509:5

**direction** [3] - 5585:1, 5637:10, 5638:16

**directly** [5] - 5457:24, 5494:22, 5582:24, 5637:13, 5640:25

**director** [4] - 5497:12, 5497:15, 5498:8, 5579:11

**directors** [12] - 5408:22, 5410:13, 5411:12, 5411:13, 5411:15, 5411:20, 5412:2, 5412:3, 5412:6, 5415:13, 5497:10, 5514:4

**disagree** [6] - 5487:22, 5487:23, 5673:17, 5675:10, 5677:18, 5677:22

**disagreed** [3] - 5478:3, 5478:6

**disagreement** [1] - 5531:13

**Disagreements** [1] - 5487:13

**disagreements** [3] -

5487:16, 5487:20, 5488:7

**disagrees** [1] - 5672:17

**disallowing** [1] - 5673:12

**discipline** [1] - 5657:17

**disclose** [6] - 5480:17, 5491:10, 5554:10, 5554:14, 5669:11, 5673:20

**disclosed** [10] - 5450:7, 5454:24, 5464:19, 5465:7, 5545:19, 5555:5, 5555:10, 5667:9, 5674:21, 5679:2

**disclosing** [3] - 5554:12, 5667:16

**disclosure** [21] - 5413:9, 5413:11, 5421:9, 5423:1, 5427:15, 5449:13, 5453:19, 5464:25, 5480:18, 5482:7, 5491:5, 5548:16, 5548:17, 5556:9, 5658:5, 5660:7, 5661:6, 5667:13, 5669:8, 5670:17, 5672:13

**disclosures** [4] - 5422:23, 5476:11, 5668:14, 5671:15

**discounted** [1] - 5425:25

**discovery** [1] - 5512:22

**discuss** [12] - 5404:24, 5405:20, 5415:25, 5420:17, 5433:10, 5438:12, 5438:18, 5498:15, 5512:8, 5614:9, 5661:24, 5671:17

**discussed** [35] - 5403:11, 5404:19, 5415:22, 5416:3, 5420:18, 5424:9, 5438:8, 5438:10, 5438:14, 5439:6, 5457:14, 5465:13, 5491:3, 5497:5, 5498:18, 5499:25, 5501:2, 5501:10, 5509:10, 5510:5, 5510:10, 5510:12, 5531:4, 5531:8, 5537:21, 5538:6,

**discussed** column continues

5487:16, 5487:20, 5488:7

**disagrees** [1] -

5541:4, 5548:11, 5550:21, 5608:13, 5617:12, 5631:9, 5634:16, 5641:16

**discusses** [1] - 5425:8

**discussing** [9] - 5416:2, 5437:21, 5476:20, 5480:13, 5533:23, 5535:14, 5545:2, 5545:3, 5661:11

**discussion** [24] - 5410:11, 5412:17, 5412:20, 5417:6, 5439:2, 5480:10, 5497:2, 5497:3, 5498:11, 5498:13, 5502:1, 5517:14, 5517:19, 5529:13, 5530:6, 5531:2, 5531:15, 5533:8, 5540:24, 5541:9, 5549:10, 5550:24, 5583:23, 5673:3

**discussions** [6] - 5411:18, 5486:21, 5498:6, 5548:3, 5566:24, 5644:21

**dismiss** [2] - 5665:19, 5666:2

**dismissed** [1] - 5653:15

**disorganized** [1] - 5441:9

**disposition** [2] - 5617:14, 5617:21

**dispute** [6] - 5458:7, 5503:3, 5616:1, 5663:15, 5664:25, 5665:3

**disputing** [1] - 5459:14

**dissolution** [2] - 5409:24, 5486:23

**dissolving** [2] - 5413:14, 5595:14

**distinction** [1] - 5480:7

**distribute** [1] - 5643:13

**distributed** [1] - 5597:5

**distribution** [3] - 5451:21, 5452:4, 5552:8

**DISTRICT** [3] - 5400:1, 5400:1, 5400:10

**divesting** [1] -

5598:25
**dn** [1] - 5436:7
**docket** [1] - 5672:5
**document** [114] -
5404:7, 5405:12,
5410:24, 5415:9,
5416:16, 5416:17,
5416:22, 5417:10,
5418:8, 5419:25,
5422:9, 5422:10,
5423:6, 5426:14,
5427:12, 5427:18,
5434:11, 5443:3,
5443:13, 5443:21,
5443:22, 5447:21,
5448:2, 5449:3,
5449:4, 5449:5,
5457:17, 5461:22,
5461:23, 5464:16,
5464:25, 5490:5,
5490:6, 5500:9,
5500:11, 5500:20,
5500:25, 5501:8,
5501:11, 5501:15,
5501:23, 5502:9,
5502:24, 5503:1,
5504:12, 5504:18,
5504:21, 5504:25,
5505:1, 5505:3,
5505:12, 5505:13,
5505:21, 5506:4,
5506:10, 5506:12,
5506:15, 5506:16,
5507:7, 5507:8,
5508:11, 5508:25,
5509:5, 5509:17,
5510:20, 5511:2,
5511:3, 5514:3,
5514:8, 5518:8,
5518:9, 5537:25,
5548:22, 5549:7,
5550:14, 5555:11,
5568:2, 5568:4,
5568:17, 5569:2,
5571:3, 5571:13,
5572:18, 5573:18,
5573:21, 5573:25,
5574:3, 5577:24,
5578:1, 5580:24,
5581:25, 5586:13,
5586:18, 5598:19,
5602:15, 5602:20,
5604:8, 5606:3,
5606:25, 5608:22,
5612:2, 5616:19,
5617:7, 5623:4,
5624:18, 5631:18,
5633:14, 5643:9,
5644:1, 5654:2,
5666:17, 5672:5
**documentary** [2] -

5461:19, 5463:12
**documentation** [1] -
5625:12
**documented** [4] -
5590:4, 5596:18,
5610:6, 5629:3
**documenting** [2] -
5415:10, 5618:16
**documents** [63] -
5429:16, 5437:21,
5440:8, 5456:22,
5457:8, 5457:10,
5458:8, 5458:25,
5462:17, 5463:9,
5463:12, 5464:22,
5464:24, 5468:3,
5488:24, 5502:7,
5502:15, 5503:24,
5504:11, 5505:7,
5505:16, 5506:13,
5507:8, 5508:20,
5513:2, 5513:9,
5513:18, 5514:13,
5515:25, 5517:20,
5518:15, 5519:3,
5519:5, 5546:10,
5558:25, 5559:25,
5560:2, 5560:9,
5563:8, 5563:23,
5564:1, 5568:20,
5573:10, 5574:13,
5607:4, 5656:10,
5671:7, 5685:11,
5685:16, 5685:17,
5685:21, 5686:18,
5686:24, 5687:4,
5687:7, 5687:13,
5687:16, 5687:20,
5687:21, 5688:3,
5688:5
**dollars** [2] - 5420:17,
5427:16
**done** [12] - 5433:12,
5454:17, 5469:20,
5482:2, 5517:5,
5526:3, 5539:15,
5552:2, 5644:25,
5663:3, 5686:21,
5686:22
**double** [3] - 5624:11,
5644:8, 5644:10
**doubt** [1] - 5488:25
**down** [30] - 5419:11,
5420:10, 5421:19,
5424:1, 5425:6,
5426:21, 5456:15,
5471:8, 5506:6,
5512:11, 5538:11,
5540:18, 5544:21,
5553:4, 5554:22,

5556:20, 5574:15,
5578:19, 5587:21,
5589:1, 5593:21,
5601:8, 5601:9,
5607:25, 5608:12,
5638:11, 5649:2,
5666:11, 5679:10,
5688:13
**dozens** [1] - 5504:8
**draft** [19] - 5415:14,
5415:24, 5419:25,
5481:13, 5481:16,
5482:9, 5482:18,
5482:25, 5489:8,
5490:4, 5490:22,
5496:11, 5496:16,
5496:17, 5529:15,
5531:5, 5537:14,
5546:14, 5546:15
**drafted** [9] - 5412:23,
5413:2, 5413:4,
5481:12, 5484:15,
5496:6, 5502:8,
5502:10, 5503:5
**drafting** [1] -
5485:21
**drafts** [3] - 5413:7,
5502:11, 5548:14
**dropped** [1] - 5428:1
**DUBIN** [14] -
5400:21, 5401:8,
5401:11, 5401:15,
5402:19, 5522:11,
5522:18, 5522:22,
5523:3, 5523:9,
5523:14, 5523:23,
5524:7, 5684:12
**due** [4] - 5409:2,
5413:22, 5487:7,
5529:20
**duly** [3] - 5403:4,
5557:12, 5656:16
**DUNN** [1] - 5400:17
**duplicate** [5] -
5624:8, 5624:14,
5625:10, 5625:13,
5625:21
**duplicated** [1] -
5624:3
**duration** [1] -
5491:18
**during** [36] - 5402:9,
5402:17, 5429:4,
5446:3, 5471:4,
5473:6, 5475:25,
5477:17, 5481:11,
5484:17, 5491:1,
5491:13, 5491:15,
5493:5, 5496:14,
5498:1, 5498:9,

5518:14, 5522:5,
5523:20, 5525:5,
5526:2, 5529:7,
5530:5, 5530:16,
5531:20, 5532:25,
5533:9, 5537:22,
5550:21, 5561:12,
5659:13, 5659:21,
5673:8, 5685:15
**Duties** [2] - 5495:12
**duties** [1] - 5495:15
**DX** [11] - 5443:25,
5445:3, 5500:8,
5515:14, 5538:2,
5549:3, 5549:5,
5689:17, 5689:18,
5689:21, 5690:8
**DX-118-26-A** [2] -
5666:20, 5666:21
**DX-118-46** [2] -
5449:20, 5502:17
**Dynagrow** [1] -
5595:22

# E

**e-mail** [134] -
5410:21, 5418:10,
5418:20, 5418:21,
5419:6, 5429:15,
5462:2, 5463:13,
5464:14, 5465:24,
5467:14, 5467:16,
5482:9, 5482:15,
5509:24, 5511:24,
5512:21, 5518:17,
5519:5, 5519:7,
5519:8, 5519:13,
5519:15, 5521:1,
5527:9, 5527:24,
5536:18, 5537:1,
5543:13, 5559:9,
5561:20, 5561:22,
5562:4, 5565:3,
5565:10, 5565:20,
5571:14, 5571:24,
5572:1, 5572:15,
5572:16, 5572:22,
5573:2, 5573:4,
5574:3, 5574:7,
5574:12, 5574:17,
5576:23, 5577:2,
5577:4, 5577:13,
5577:14, 5577:19,
5582:3, 5582:9,
5582:16, 5583:22,
5584:7, 5584:15,
5584:17, 5584:19,
5585:13, 5585:20,
5586:3, 5586:11,
5586:14, 5587:1,

5591:1, 5592:8,
5593:10, 5593:16,
5596:25, 5602:20,
5602:23, 5603:1,
5603:5, 5603:10,
5604:3, 5608:7,
5609:8, 5609:21,
5610:16, 5611:3,
5612:3, 5612:16,
5613:2, 5613:9,
5613:15, 5613:17,
5613:23, 5613:25,
5614:5, 5614:19,
5614:25, 5615:9,
5615:16, 5615:19,
5616:14, 5617:1,
5619:15, 5619:19,
5622:15, 5623:24,
5624:19, 5625:4,
5626:8, 5626:19,
5627:1, 5627:5,
5628:4, 5628:7,
5629:8, 5629:16,
5629:21, 5629:22,
5630:7, 5631:19,
5632:21, 5633:4,
5633:5, 5633:15,
5633:19, 5634:3,
5639:1, 5640:13,
5641:21, 5652:3,
5681:19, 5685:8
**e-mailed** [2] -
5504:23, 5624:22
**e-mails** [16] -
5463:20, 5466:20,
5467:6, 5469:17,
5470:21, 5470:22,
5470:25, 5475:14,
5504:4, 5586:8,
5612:4, 5626:16,
5640:18, 5652:1,
5686:9, 5686:11
**early** [4] - 5438:16,
5492:5, 5530:4,
5673:3
**easier** [1] - 5461:7
**East** [3] - 5400:15,
5400:23, 5581:17
**EASTERN** [1] -
5400:1
**Ed** [5] - 5404:16,
5418:25, 5486:22,
5497:5, 5509:25
**edit** [1] - 5483:9
**editing** [1] - 5681:16
**editorial** [1] -
5532:18
**edits** [2] - 5546:2,
5547:2
**Edmund** [6] -

5580:8, 5581:19, 5603:24, 5605:22, 5608:19, 5642:12

**educate** [1] - 5543:14

**education** [1] - 5677:7

**educational** [1] - 5659:18

**effort** [5] - 5440:12, 5506:10, 5519:4, 5678:12, 5685:17

**either** [15] - 5434:13, 5439:2, 5464:22, 5499:21, 5499:25, 5505:20, 5522:14, 5534:6, 5534:7, 5541:11, 5564:24, 5657:12, 5658:16, 5659:5, 5685:24

**electronic** [3] - 5572:13, 5583:6, 5646:18

**electronically** [4] - 5560:20, 5560:21, 5570:25, 5686:5

**elements** [1] - 5543:11

**eleven** [1] - 5427:14

**elicit** [6] - 5681:25, 5682:7, 5682:11, 5682:19, 5683:9, 5683:20

**eliciting** [1] - 5497:13

**Elmo** [1] - 5647:16

**ELMO** [1] - 5585:25

**employee** [4] - 5425:23, 5431:3, 5629:11

**employees** [3] - 5408:22, 5657:5, 5675:7

**employer** [11] - 5401:6, 5401:7, 5401:12, 5401:18, 5401:23, 5402:12, 5522:9, 5522:15, 5522:17, 5522:20, 5523:7

**employers** [1] - 5402:4

**enabled** [1] - 5467:8

**enclosed** [2] - 5578:22, 5599:3

**encounter** [1] - 5490:25

**Encountered** [1] - 5489:1

**end** [10] - 5431:8,

5445:21, 5457:21, 5459:11, 5523:14, 5533:13, 5553:5, 5554:21, 5640:19, 5687:10

**ended** [12] - 5446:3, 5484:17, 5491:13, 5491:15, 5529:4, 5529:12, 5531:6, 5531:8, 5532:12, 5532:13, 5544:11

**ending** [5] - 5410:25, 5412:9, 5414:22, 5420:7, 5491:23

**enforcement** [2] - 5659:14, 5667:21

**enforcing** [1] - 5658:3

**engaged** [3] - 5424:3, 5472:8, 5481:21

**engagement** [10] - 5404:16, 5413:3, 5413:7, 5415:20, 5432:17, 5437:14, 5437:23, 5438:1, 5481:21, 5489:11

**engagements** [2] - 5411:7, 5412:4

**enlarge** [2] - 5490:12, 5490:13

**ensure** [1] - 5543:8

**enter** [2] - 5526:12, 5541:18

**entered** [11] - 5406:17, 5411:7, 5414:3, 5420:21, 5421:9, 5452:10, 5454:10, 5529:22, 5549:12, 5604:17, 5670:12

**entering** [3] - 5421:13, 5456:2, 5649:12

**enters** [3] - 5402:22, 5470:12, 5526:19

**entire** [1] - 5643:3

**entirely** [5] - 5667:5, 5675:6, 5677:21, 5680:15, 5680:24

**entities** [13] - 5408:20, 5409:2, 5409:3, 5409:21, 5409:23, 5414:3, 5426:6, 5426:9, 5455:8, 5561:4, 5592:2, 5620:5, 5636:21

**entitled** [3] - 5604:8, 5612:17, 5679:4

**entity** [4] - 5593:19, 5595:10, 5637:6, 5657:11

**entries** [1] - 5568:20

**entry** [31] - 5420:10, 5464:17, 5560:20, 5560:21, 5569:7, 5570:8, 5570:10, 5570:22, 5572:7, 5572:10, 5573:13, 5573:16, 5579:25, 5583:2, 5583:5, 5583:11, 5583:19, 5583:25, 5592:22, 5593:1, 5596:19, 5602:13, 5603:13, 5603:25, 5610:9, 5617:16, 5629:4, 5630:12, 5630:15, 5634:23, 5635:10

**entry'** [1] - 5580:10

**equities** [1] - 5657:20

**equity** [1] - 5579:12

**Escrow** [1] - 5612:17

**escrow** [1] - 5612:20

**especially** [2] - 5518:23, 5673:24

**ESQ** [6] - 5400:19, 5400:19, 5400:20, 5400:20, 5400:21, 5400:21

**Esquire** [1] - 5605:14

**essentially** [2] - 5503:5, 5661:25

**established** [3] - 5468:1, 5468:6, 5508:12

**establishing** [2] - 5448:2, 5491:3

**et** [5] - 5472:17, 5529:5, 5530:5, 5533:19

**ethics** [1] - 5515:16

**evaluate** [1] - 5673:23

**evaluated** [1] - 5669:22

**evaluation** [1] - 5488:16

**EVAN** [1] - 5400:6

**Evan** [62] - 5404:3, 5404:17, 5418:13, 5418:21, 5428:19, 5461:23, 5466:19, 5480:3, 5499:18, 5534:10, 5551:6, 5561:17, 5561:23, 5561:25, 5571:16, 5577:15, 5582:6,

5582:14, 5582:23, 5584:8, 5584:24, 5585:13, 5585:14, 5586:2, 5603:2, 5605:14, 5606:22, 5608:10, 5609:17, 5609:20, 5610:17, 5611:24, 5612:3, 5612:16, 5612:19, 5613:3, 5614:3, 5615:9, 5615:17, 5616:7, 5616:15, 5617:3, 5617:18, 5619:15, 5620:14, 5622:15, 5624:19, 5625:5, 5626:8, 5626:21, 5631:19, 5632:6, 5632:25, 5633:4, 5636:25, 5637:11, 5638:6, 5638:24, 5640:11, 5641:25, 5643:21, 5655:7

**evening** [2] - 5666:2, 5666:11

**event** [1] - 5475:12

**events** [3] - 5416:25, 5450:15, 5529:10

**eventually** [1] - 5640:15

**evidence** [79] - 5405:14, 5409:18, 5410:19, 5419:23, 5427:10, 5447:13, 5447:23, 5447:25, 5458:3, 5459:4, 5459:16, 5460:3, 5460:7, 5460:15, 5461:19, 5462:11, 5463:12, 5464:1, 5464:11, 5466:3, 5468:6, 5468:24, 5469:15, 5489:19, 5489:25, 5503:19, 5513:3, 5513:9, 5513:23, 5518:20, 5526:13, 5527:5, 5527:8, 5527:16, 5527:21, 5541:8, 5542:20, 5544:8, 5548:25, 5549:3, 5564:11, 5568:23, 5569:1, 5575:16, 5577:12, 5586:21, 5586:25, 5589:1, 5591:20, 5591:22, 5592:14, 5594:8, 5597:19, 5607:16, 5610:1, 5612:10, 5616:22, 5618:11,

5624:25, 5626:6, 5626:12, 5628:24, 5634:16, 5634:23, 5637:25, 5647:15, 5655:12, 5655:14, 5656:4, 5656:14, 5665:6, 5665:8, 5667:3, 5670:21, 5687:22, 5687:24, 5687:25, 5688:7

**Evidence** [2] - 5655:11, 5656:4

**evidencing** [2] - 5605:10, 5606:12

**evidentiary** [1] - 5464:10

**evolve** [1] - 5679:7

**Ex** [14] - 5581:8, 5581:10, 5581:12, 5581:19, 5582:24, 5583:20, 5583:23, 5584:24, 5593:24, 5597:3, 5597:12, 5603:14, 5611:8, 5618:19

**exact** [6] - 5404:5, 5404:6, 5461:19, 5485:17, 5498:6, 5508:10

**exactly** [18] - 5403:25, 5405:6, 5407:7, 5412:5, 5416:3, 5430:2, 5431:5, 5453:16, 5512:24, 5543:12, 5545:5, 5545:7, 5664:15, 5667:17, 5669:15, 5670:2, 5673:25, 5678:2

**examination** [9] - 5471:5, 5513:16, 5520:17, 5526:2, 5641:17, 5683:23, 5685:19, 5686:15, 5686:18

**EXAMINATION** [16] - 5403:6, 5428:14, 5445:1, 5526:25, 5550:10, 5557:24, 5576:1, 5636:7, 5651:1, 5656:18, 5689:5, 5689:6, 5689:7, 5689:9, 5689:10, 5689:12

**examine** [12] - 5461:2, 5466:18, 5466:23, 5468:13, 5654:9, 5677:4, 5677:15, 5681:20, 5682:6, 5683:7,

5684:17, 5685:24
**examined** [2] -
5557:12, 5656:17
**example** [8] -
5460:17, 5466:9,
5479:24, 5502:15,
5502:17, 5502:22,
5506:12, 5646:14
**examples** [1] -
5686:10
**exams** [1] - 5657:16
**exceeding** [1] -
5688:1
**except** [4] - 5512:23,
5565:24, 5584:24,
5675:19
**exception** [3] -
5462:16, 5504:18,
5504:20
**Exchange** [4] -
5531:12, 5654:16,
5657:25, 5672:10
**exchange** [7] -
5425:24, 5612:3,
5615:9, 5624:19,
5629:9, 5633:4,
5646:9
**exchanges** [1] -
5659:25
**exclude** [1] - 5668:6
**excluded** [1] -
5668:7
**exclusive** [1] -
5485:3
**excuse** [4] - 5401:22,
5500:10, 5665:18,
5666:10
**excused** [5] -
5512:10, 5512:13,
5557:6, 5557:9,
5653:6
**executed** [4] -
5519:15, 5519:17,
5572:2, 5617:13
**execution** [2] -
5475:1, 5604:25
**executive** [9] -
5421:3, 5421:13,
5445:22, 5484:18,
5532:20, 5544:23,
5553:5, 5553:19,
5555:1
**exercise** [1] -
5579:13
**Exhibit** [147] -
5404:8, 5404:10,
5405:13, 5407:11,
5410:20, 5416:9,
5416:12, 5416:14,
5418:6, 5418:16,

5418:18, 5421:25,
5422:5, 5422:7,
5424:14, 5424:20,
5424:22, 5427:3,
5427:7, 5427:9,
5442:17, 5443:21,
5444:2, 5445:10,
5447:14, 5449:20,
5451:11, 5467:15,
5470:17, 5473:21,
5473:24, 5481:10,
5482:9, 5482:15,
5489:15, 5489:23,
5489:25, 5509:24,
5511:21, 5514:16,
5514:18, 5514:22,
5514:25, 5515:13,
5519:19, 5520:23,
5527:4, 5527:8,
5527:20, 5536:5,
5537:4, 5542:5,
5542:18, 5542:20,
5544:9, 5544:15,
5546:9, 5546:20,
5549:1, 5550:5,
5551:16, 5552:25,
5554:17, 5555:12,
5556:1, 5563:16,
5567:20, 5568:1,
5568:25, 5571:4,
5575:16, 5576:19,
5577:5, 5577:8,
5577:10, 5577:11,
5580:15, 5585:23,
5586:21, 5586:23,
5586:24, 5589:20,
5590:24, 5591:21,
5592:13, 5594:7,
5597:19, 5598:11,
5602:3, 5607:15,
5609:6, 5610:1,
5612:2, 5612:10,
5612:12, 5615:8,
5616:12, 5616:24,
5618:10, 5618:23,
5620:17, 5622:4,
5624:17, 5624:25,
5625:2, 5626:3,
5627:3, 5627:6,
5628:3, 5628:21,
5629:20, 5630:3,
5630:5, 5631:2,
5631:9, 5631:11,
5633:3, 5633:11,
5633:13, 5634:7,
5634:23, 5637:24,
5638:10, 5638:19,
5639:4, 5639:7,
5639:10, 5641:15,
5645:6, 5647:14,
5651:22, 5654:12,

5654:14, 5654:18,
5654:21, 5654:22,
5654:25, 5655:3,
5655:13, 5655:16,
5655:18, 5655:22,
5656:5, 5667:2,
5689:22
**exhibit** [39] -
5445:18, 5473:20,
5495:11, 5501:19,
5513:3, 5537:3,
5565:21, 5571:12,
5581:7, 5586:9,
5594:13, 5594:15,
5595:5, 5596:8,
5597:15, 5598:17,
5608:4, 5612:15,
5618:17, 5623:20,
5626:5, 5626:6,
5626:17, 5628:5,
5629:8, 5629:23,
5630:8, 5632:20,
5639:11, 5640:13,
5641:16, 5643:18,
5647:4, 5647:6,
5647:18, 5647:20,
5666:19, 5688:3
**Exhibit's** [1] -
5419:24
**EXHIBITS** [2] -
5689:14, 5690:1
**Exhibits** [8] -
5407:24, 5563:15,
5634:19, 5655:8,
5655:10, 5656:2,
5656:8, 5656:13
**exhibits** [15] -
5457:6, 5504:8,
5505:6, 5511:23,
5512:1, 5527:14,
5546:11, 5564:11,
5565:11, 5565:24,
5567:16, 5634:16,
5635:21, 5636:3,
5656:11
**Exhibits'** [1] -
5567:19
**exist** [2] - 5513:21,
5556:10
**exists** [1] - 5668:2
**exits** [3] - 5456:16,
5601:7, 5666:9
**expanded** [1] -
5490:19
**expect** [2] - 5403:18,
5469:23
**expectation** [3] -
5485:24, 5485:25,
5486:4
**expecting** [1] -

5411:8
**expects** [1] - 5410:5
**experience** [21] -
5439:20, 5441:3,
5441:13, 5477:12,
5489:4, 5535:1,
5561:6, 5561:9,
5661:25, 5662:17,
5663:10, 5664:22,
5667:22, 5668:18,
5671:11, 5675:25,
5676:2, 5677:7,
5677:12, 5677:14,
5677:24
**experienced** [4] -
5489:9, 5491:1,
5492:18, 5675:15
**expert** [31] - 5660:6,
5661:3, 5661:9,
5661:23, 5662:2,
5662:9, 5662:20,
5662:22, 5662:24,
5663:7, 5663:13,
5664:17, 5665:16,
5666:15, 5667:8,
5667:15, 5667:21,
5668:1, 5668:11,
5668:17, 5669:6,
5669:15, 5669:22,
5669:24, 5670:8,
5670:13, 5671:4,
5672:17, 5672:18,
5674:8, 5677:20
**expert's** [2] -
5661:15, 5669:11
**experts** [7] - 5662:6,
5667:14, 5675:8,
5678:20, 5678:23,
5679:15, 5680:21
**explain** [18] - 5446:8,
5478:21, 5479:3,
5558:23, 5569:8,
5570:24, 5578:23,
5587:8, 5590:4,
5645:17, 5652:21,
5664:2, 5664:3,
5664:4, 5667:8,
5676:7, 5676:17,
5683:10
**explained** [5] -
5402:9, 5498:17,
5529:9, 5529:19,
5665:7
**explaining** [2] -
5478:22, 5528:21
**explains** [2] -
5662:15, 5683:24
**explanation** [4] -
5552:16, 5669:17,
5672:10, 5675:15

**explicit** [1] - 5687:25
**expose** [1] - 5666:5
**exposure** [1] -
5420:11
**Express** [3] -
5591:25, 5595:15,
5620:11
**expressed** [2] -
5498:1, 5522:23
**extended** [1] -
5491:18
**extensive** [3] -
5662:8, 5663:4,
5675:25
**extensively** [2] -
5662:25, 5668:24
**extent** [9] - 5458:15,
5465:14, 5491:22,
5495:14, 5513:12,
5518:7, 5664:24,
5672:15, 5680:20
**extra** [1] - 5490:11
**extraordinarily** [1] -
5468:12
**eye** [6] - 5679:9,
5680:2, 5680:3,
5680:14, 5680:15

## F

**face** [1] - 5687:25
**facilitate** [1] -
5636:20
**facilitated** [1] -
5637:6
**fact** [33] - 5406:25,
5435:9, 5439:13,
5439:18, 5440:15,
5457:15, 5458:6,
5460:1, 5461:12,
5465:7, 5472:2,
5476:21, 5477:12,
5488:8, 5493:12,
5502:25, 5503:8,
5503:24, 5505:1,
5505:12, 5506:17,
5518:13, 5536:4,
5546:2, 5554:17,
5636:17, 5636:18,
5640:22, 5667:7,
5671:10, 5672:7,
5675:6, 5677:19
**facts** [8] - 5451:8,
5454:19, 5541:8,
5664:25, 5665:3,
5669:5, 5672:2,
5674:23
**factually** [3] -
5681:12, 5683:3,
5683:4

**fair** [10] - 5435:15, 5478:19, 5478:23, 5478:25, 5479:3, 5498:8, 5542:8, 5542:23, 5566:4, 5668:11
**fairly** [1] - 5675:21
**fairness** [1] - 5402:15
**faith** [1] - 5679:12
**fall** [1] - 5541:16
**false** [3] - 5664:7, 5683:4, 5683:5
**familiar** [6] - 5403:14, 5448:22, 5562:20, 5562:22, 5659:21, 5660:2
**far** [10] - 5402:6, 5402:11, 5431:7, 5437:15, 5465:9, 5477:17, 5478:8, 5505:5, 5506:6, 5673:11
**fastest** [1] - 5517:24
**father** [1] - 5419:14
**favor** [1] - 5405:10
**FBI** [1] - 5659:17
**Fearnow** [46] - 5576:18, 5577:15, 5578:11, 5578:14, 5578:17, 5578:21, 5578:25, 5580:11, 5582:12, 5602:13, 5602:23, 5603:4, 5603:12, 5603:13, 5603:18, 5604:13, 5606:7, 5608:10, 5608:25, 5609:3, 5609:14, 5609:18, 5609:20, 5610:8, 5610:10, 5614:13, 5615:2, 5615:21, 5615:24, 5616:2, 5617:13, 5617:15, 5617:21, 5617:22, 5639:23, 5639:25, 5640:1, 5643:11, 5644:6, 5681:11, 5681:15, 5681:21, 5683:5, 5683:15, 5683:22, 5684:5
**Fearnow's** [3] - 5575:2, 5584:25, 5602:12
**February** [5] - 5594:12, 5597:1, 5654:17, 5654:20, 5654:24
**Fed** [15] - 5581:8, 5581:10, 5581:12,

5581:19, 5582:24, 5583:20, 5583:23, 5584:24, 5593:24, 5595:14, 5597:3, 5597:12, 5603:14, 5611:8, 5618:19
**federal** [1] - 5659:6
**Federal** [5] - 5591:25, 5620:11, 5655:11, 5656:3, 5658:3
**Fedex** [2] - 5639:2, 5640:16
**fees** [1] - 5609:19
**felt** [1] - 5437:18
**Fernandez** [4] - 5576:16, 5580:6, 5618:3, 5641:11
**Ferrulo** [1] - 5670:13
**few** [11] - 5439:14, 5522:16, 5532:23, 5535:10, 5536:17, 5545:3, 5594:13, 5601:11, 5618:21, 5666:4, 5681:18
**fewer** [1] - 5521:7
**field** [2] - 5410:22, 5412:11
**Fifth** [3] - 5685:2, 5685:4, 5685:7
**fifth** [2] - 5427:12, 5471:8
**fight** [1] - 5506:20
**figure** [2] - 5652:9, 5675:2
**file** [8] - 5411:8, 5543:22, 5547:10, 5560:13, 5574:1, 5574:22, 5582:1, 5617:13
**filed** [15] - 5432:22, 5432:24, 5454:24, 5476:13, 5477:10, 5491:24, 5545:10, 5545:13, 5547:5, 5548:14, 5548:19, 5572:3, 5675:4, 5678:16, 5681:9
**files** [8] - 5560:4, 5560:6, 5560:12, 5563:9, 5563:22, 5565:1, 5566:5, 5577:5
**filing** [23] - 5419:18, 5432:5, 5476:13, 5480:10, 5488:24, 5490:5, 5490:6, 5532:17, 5532:21, 5543:23, 5543:24, 5543:25, 5544:6,

5544:10, 5544:18, 5545:9, 5545:21, 5546:15, 5547:4, 5548:13, 5548:14, 5548:16
**filings** [18] - 5450:8, 5454:25, 5476:5, 5476:17, 5480:7, 5480:8, 5480:11, 5491:11, 5532:24, 5544:3, 5545:9, 5545:13, 5547:5, 5547:19, 5548:18, 5548:19, 5660:3, 5665:6
**fill** [1] - 5523:10
**filled** [4] - 5663:8, 5663:16, 5663:18, 5663:25
**final** [13] - 5489:16, 5490:6, 5490:8, 5490:18, 5495:11, 5496:10, 5496:11, 5526:4, 5532:17, 5533:5, 5561:10, 5617:20, 5628:20
**finalized** [2] - 5482:12, 5489:14
**finalizing** [1] - 5490:2
**finally** [6] - 5423:6, 5426:22, 5555:12, 5627:3, 5634:22, 5655:16
**finance** [5] - 5430:12, 5430:16, 5430:18, 5495:23, 5543:14
**finances** [1] - 5424:2
**financial** [45] - 5403:19, 5404:25, 5405:2, 5405:3, 5406:7, 5410:12, 5423:15, 5424:4, 5431:4, 5433:11, 5433:14, 5433:18, 5434:25, 5442:11, 5448:17, 5444:14, 5450:13, 5453:19, 5454:11, 5455:16, 5476:9, 5476:11, 5476:24, 5477:10, 5478:11, 5486:6, 5486:10, 5487:24, 5488:12, 5491:5, 5495:19, 5495:25, 5505:8, 5522:25, 5528:25, 5529:12, 5529:14, 5531:6, 5531:7, 5532:13,

5532:20, 5554:8, 5554:13, 5621:9, 5676:2
**Financial** [1] - 5656:25
**financially** [1] - 5523:1
**financials** [6] - 5404:19, 5416:5, 5502:24, 5529:3, 5529:11, 5532:12
**findings** [4] - 5411:7, 5411:11, 5412:5, 5670:23
**fine** [10] - 5401:2, 5401:12, 5401:13, 5468:19, 5504:24, 5521:5, 5522:13, 5566:23, 5583:15, 5665:21
**FINRA** [24] - 5656:23, 5656:24, 5656:25, 5657:1, 5657:2, 5657:14, 5657:15, 5657:20, 5657:22, 5657:24, 5658:6, 5658:10, 5658:20, 5658:21, 5659:2, 5659:13, 5659:21, 5662:4, 5662:17, 5663:11, 5664:3, 5667:19, 5675:7, 5675:11
**FINRA's** [1] - 5662:5
**firm** [18] - 5424:12, 5426:19, 5431:21, 5470:22, 5471:4, 5473:1, 5473:5, 5477:2, 5486:9, 5486:10, 5499:22, 5617:13, 5639:16, 5642:4, 5643:10, 5645:20, 5647:3, 5647:5
**firm's** [1] - 5475:15
**firms** [1] - 5658:16
**first** [62] - 5403:11, 5404:4, 5405:18, 5408:16, 5413:13, 5415:14, 5416:16, 5422:9, 5425:7, 5425:13, 5425:19, 5430:18, 5430:23, 5432:20, 5433:11, 5435:20, 5439:5, 5439:18, 5440:10, 5445:17, 5465:20, 5453:5, 5463:25, 5475:21, 5490:13, 5494:15, 5501:18,

5502:22, 5509:12, 5514:15, 5519:11, 5529:15, 5531:7, 5532:16, 5535:2, 5535:10, 5536:17, 5543:23, 5551:21, 5552:4, 5556:16, 5566:11, 5569:7, 5570:7, 5578:10, 5580:9, 5580:17, 5595:17, 5596:7, 5597:15, 5599:10, 5602:3, 5604:10, 5605:23, 5619:18, 5620:25, 5633:18, 5634:23, 5643:17, 5654:11, 5664:21, 5681:13
**five** [12] - 5429:7, 5456:23, 5472:16, 5475:11, 5484:3, 5555:17, 5555:19, 5555:20, 5557:2, 5564:13, 5566:1, 5593:21
**flag** [2] - 5440:16, 5440:18
**flight** [4] - 5512:15, 5521:12, 5522:3, 5557:7
**flip** [5] - 5454:15, 5489:14, 5571:3, 5581:24
**float** [3] - 5589:5, 5589:7, 5589:9
**floor** [2] - 5582:15, 5600:4
**Floor** [1] - 5400:17
**fluctuations** [1] - 5434:3
**flying** [1] - 5524:3
**focus** [13] - 5418:20, 5442:10, 5453:13, 5453:16, 5453:17, 5454:8, 5502:18, 5508:1, 5519:2, 5520:17, 5555:13, 5569:7, 5620:25
**focused** [5] - 5480:6, 5507:25, 5543:10, 5677:21, 5685:3
**focusing** [5] - 5445:16, 5445:20, 5448:13, 5502:19, 5521:5
**follow** [8] - 5403:9, 5417:2, 5435:16, 5614:19, 5639:1, 5651:13, 5651:20, 5679:3

**follow-up** [1] - 5639:1
**followed** [5] - 5420:14, 5435:13, 5435:19, 5678:20, 5678:24
**following** [16] - 5406:3, 5407:11, 5431:10, 5528:3, 5531:9, 5556:9, 5579:25, 5595:15, 5604:24, 5617:23, 5619:19, 5621:14, 5657:16, 5657:18, 5660:15, 5661:1
**follows** [6] - 5403:5, 5460:21, 5557:13, 5564:13, 5598:6, 5656:17
**footnote** [2] - 5545:22, 5547:6
**footnotes** [2] - 5529:11, 5545:18
**forbidden** [2] - 5671:9, 5671:13
**foregoing** [2] - 5472:2, 5556:6
**forget** [1] - 5441:4
**forgiven** [1] - 5525:12
**forgot** [1] - 5430:25
**Form** [6] - 5403:12, 5416:4, 5663:8, 5663:18, 5664:4, 5674:14
**form** [29] - 5403:14, 5424:5, 5439:23, 5481:6, 5486:12, 5491:23, 5533:16, 5538:23, 5541:7, 5559:8, 5560:20, 5560:24, 5572:7, 5572:10, 5572:13, 5572:14, 5573:13, 5580:22, 5584:23, 5585:2, 5592:11, 5603:25, 5617:16, 5645:10, 5646:25, 5658:18, 5664:3, 5675:3
**formal** [1] - 5415:15
**formality** [1] - 5557:18
**format** [1] - 5583:6
**formats** [1] - 5561:1
**formatted** [2] - 5409:6, 5420:4
**formed** [1] - 5411:13
**former** [1] - 5425:23
**forms** [12] - 5660:8,

5661:6, 5663:16, 5670:18, 5670:19, 5670:21, 5670:23, 5672:11, 5672:13, 5674:4, 5675:14
**forth** [13] - 5408:4, 5408:23, 5451:8, 5472:3, 5572:5, 5572:6, 5579:23, 5605:1, 5605:11, 5606:13, 5606:14, 5643:14, 5674:9
**forthcoming** [2] - 5671:18, 5671:20
**forward** [6] - 5402:18, 5414:21, 5476:16, 5476:20, 5574:5, 5596:3
**forwarded** [2] - 5608:22, 5608:24
**forwarding** [1] - 5411:24
**forwards** [1] - 5652:6
**foundation** [8] - 5448:3, 5460:11, 5538:24, 5565:7, 5565:17, 5565:22, 5566:11
**foundations** [1] - 5565:11
**four** [11] - 5401:9, 5411:10, 5484:4, 5484:8, 5506:4, 5555:19, 5555:20, 5555:22, 5557:2, 5603:17, 5639:7
**fourth** [6] - 5405:23, 5598:17, 5619:10, 5629:8, 5631:18, 5652:2
**fractional** [4] - 5574:13, 5574:14, 5574:19, 5574:22
**frame** [3] - 5491:19, 5568:8, 5568:9
**frankly** [4] - 5461:7, 5504:22, 5673:9, 5679:25
**Fraud** [5] - 5414:25, 5492:25, 5659:2, 5659:3, 5659:9
**fraud** [28] - 5415:2, 5415:8, 5427:19, 5427:21, 5454:9, 5460:4, 5461:10, 5461:23, 5464:5, 5465:4, 5465:7, 5467:4, 5467:13, 5467:17, 5468:4,

5468:5, 5468:7, 5493:4, 5493:7, 5493:12, 5493:20, 5494:2, 5494:9, 5494:17, 5494:24, 5495:2, 5658:12, 5664:15
**fraudulent** [10] - 5460:5, 5460:8, 5461:17, 5462:1, 5462:4, 5462:12, 5462:13, 5462:18, 5462:21, 5463:3
**free** [10] - 5576:13, 5576:15, 5580:4, 5589:8, 5590:13, 5590:15, 5597:16, 5619:8, 5621:5, 5622:12
**free-trading** [8] - 5576:13, 5576:15, 5589:8, 5590:13, 5590:15, 5619:8, 5621:5, 5622:12
**freely** [4] - 5437:18, 5575:13, 5589:14, 5590:17
**frequently** [3] - 5562:6, 5562:7, 5578:5
**Friday** [3] - 5522:21, 5611:9, 5688:14
**front** [10] - 5458:4, 5502:2, 5517:22, 5518:10, 5520:4, 5537:20, 5540:21, 5563:11, 5680:9, 5680:12
**full** [5] - 5413:21, 5420:11, 5452:15, 5584:7, 5654:6
**fully** [8] - 5436:4, 5436:13, 5436:15, 5672:24, 5673:5, 5675:19, 5678:12, 5679:14
**function** [1] - 5636:20
**fund** [4] - 5446:5, 5595:13, 5595:14
**fund's** [1] - 5597:5
**funding** [1] - 5485:8
**funds** [19] - 5406:6, 5406:16, 5406:19, 5451:19, 5451:22, 5451:25, 5452:4, 5452:9, 5452:14, 5452:16, 5452:18, 5452:23, 5453:7, 5464:12, 5469:8,

5486:23, 5551:23, 5552:6, 5552:9
**future** [4] - 5406:5, 5476:17, 5480:8, 5480:10

# G

**GAAP** [7] - 5414:8, 5453:16, 5454:13, 5487:22, 5492:12, 5530:1, 5543:9
**game** [1] - 5680:22
**Gateway** [22] - 5562:20, 5562:22, 5562:25, 5563:2, 5563:20, 5569:10, 5569:21, 5572:2, 5573:5, 5573:7, 5574:9, 5576:3, 5576:7, 5577:20, 5578:15, 5580:25, 5591:25, 5597:4, 5603:21, 5635:2, 5649:19, 5654:15
**gather** [1] - 5442:13
**Geller** [30] - 5458:9, 5458:14, 5458:19, 5466:10, 5474:9, 5533:7, 5533:15, 5540:23, 5540:25, 5541:3, 5541:4, 5541:9, 5541:12, 5541:22, 5542:9, 5567:8, 5599:11, 5599:14, 5629:5, 5630:14, 5630:21, 5631:17, 5632:1, 5632:3, 5632:13, 5632:16, 5634:10, 5644:9, 5651:23
**Geller's** [4] - 5458:11, 5458:17, 5466:9, 5533:8
**general** [7] - 5423:20, 5440:8, 5498:19, 5513:11, 5541:19, 5664:4, 5665:14
**generally** [7] - 5415:24, 5543:16, 5563:22, 5578:23, 5658:15, 5664:9, 5672:3
**generically** [2] - 5667:11, 5669:19
**gentleman** [1] - 5456:11
**George** [1] - 5571:20
**GIBSON** [1] -

5400:17
**gist** [1] - 5500:23
**Giugliano** [1] - 5404:15
**given** [15] - 5403:17, 5450:19, 5469:16, 5513:24, 5513:25, 5545:10, 5545:12, 5547:10, 5549:18, 5565:5, 5650:2, 5668:9, 5673:23, 5675:25, 5686:21
**Global** [2] - 5468:3, 5687:25
**Gopublic** [1] - 5577:15
**govern** [1] - 5676:5
**Government** [114] - 5400:12, 5404:8, 5404:10, 5405:13, 5407:11, 5407:23, 5410:19, 5416:9, 5416:12, 5416:14, 5442:17, 5445:10, 5447:14, 5448:4, 5448:10, 5449:20, 5451:7, 5451:11, 5458:20, 5460:4, 5460:14, 5460:24, 5461:4, 5464:23, 5466:12, 5466:13, 5466:19, 5467:5, 5467:13, 5467:15, 5470:17, 5473:20, 5473:24, 5481:10, 5482:8, 5482:15, 5489:15, 5519:24, 5520:10, 5520:21, 5522:11, 5524:2, 5527:17, 5548:25, 5549:3, 5551:15, 5552:24, 5567:19, 5568:25, 5576:19, 5577:5, 5577:7, 5577:10, 5580:15, 5585:23, 5586:20, 5586:23, 5589:20, 5590:24, 5592:13, 5594:7, 5597:18, 5598:11, 5602:3, 5607:15, 5609:5, 5609:25, 5612:1, 5612:12, 5615:8, 5616:12, 5616:24, 5618:10, 5618:22, 5620:17, 5622:4, 5624:17, 5624:24, 5625:2, 5626:3, 5627:3, 5627:6, 5628:3, 5630:5,

5633:13, 5634:19, 5651:5, 5651:22, 5653:10, 5653:20, 5654:12, 5654:14, 5654:18, 5654:21, 5654:22, 5654:25, 5655:3, 5655:8, 5655:10, 5655:13, 5655:16, 5655:18, 5655:22, 5656:2, 5656:5, 5656:8, 5656:16, 5657:7, 5658:2, 5658:11, 5660:6, 5667:9, 5668:13

**government** [42] - 5468:6, 5469:9, 5470:20, 5471:7, 5473:20, 5482:8, 5489:22, 5489:24, 5498:20, 5503:20, 5504:2, 5504:8, 5504:14, 5510:17, 5510:18, 5512:2, 5513:23, 5515:25, 5516:2, 5544:7, 5557:20, 5612:9, 5645:6, 5647:23, 5672:6, 5672:7, 5672:17, 5672:18, 5673:2, 5673:17, 5677:19, 5679:15, 5680:13, 5680:24, 5683:2, 5683:8, 5683:20, 5684:4, 5686:6, 5687:19, 5688:7

**Government's** [49] - 5408:1, 5418:6, 5418:16, 5418:18, 5419:24, 5421:24, 5422:5, 5422:7, 5424:14, 5424:20, 5424:22, 5427:2, 5427:7, 5427:9, 5459:10, 5527:20, 5554:17, 5555:12, 5556:1, 5563:15, 5567:20, 5568:1, 5571:3, 5575:16, 5577:11, 5586:24, 5591:21, 5628:21, 5629:20, 5630:2, 5631:2, 5631:8, 5631:11, 5633:3, 5633:10, 5634:7, 5634:23, 5637:24, 5638:10, 5638:19, 5639:4, 5639:7, 5639:10, 5641:15, 5645:6, 5647:14,

5656:13, 5689:22
**government's** [5] - 5442:23, 5471:5, 5675:24, 5676:25, 5685:18
**governs** [1] - 5672:11
**GRACE** [1] - 5400:21
**granting** [1] - 5644:8
**grapple** [1] - 5487:4
**great** [2] - 5589:19, 5663:15
**greater** [2] - 5661:15, 5663:14
**Greebel** [134] - 5404:3, 5404:12, 5404:17, 5404:22, 5405:4, 5405:10, 5418:13, 5418:21, 5419:2, 5428:20, 5429:14, 5429:23, 5429:25, 5430:1, 5430:8, 5430:10, 5431:23, 5432:1, 5432:9, 5432:10, 5432:11, 5438:9, 5438:10, 5439:3, 5461:23, 5465:11, 5465:25, 5466:19, 5466:22, 5466:24, 5468:7, 5469:7, 5470:3, 5470:5, 5470:22, 5475:15, 5476:1, 5476:19, 5478:15, 5479:12, 5480:3, 5480:6, 5480:13, 5483:22, 5483:24, 5503:23, 5504:4, 5504:23, 5506:17, 5509:25, 5519:15, 5527:10, 5534:10, 5535:24, 5550:18, 5551:6, 5561:17, 5561:23, 5561:25, 5562:16, 5571:16, 5573:4, 5573:9, 5574:8, 5574:21, 5577:15, 5582:6, 5582:14, 5582:17, 5582:19, 5582:22, 5583:8, 5584:8, 5584:12, 5585:14, 5585:17, 5586:2, 5586:3, 5603:2, 5605:14, 5606:22, 5608:10, 5609:17, 5609:21, 5610:17, 5611:24, 5612:3, 5612:16, 5613:3, 5613:17,

5614:5, 5614:19, 5615:10, 5615:17, 5616:6, 5616:15, 5617:18, 5617:19, 5619:15, 5620:14, 5622:15, 5623:24, 5624:20, 5625:5, 5626:8, 5626:21, 5631:19, 5632:22, 5633:5, 5633:18, 5633:25, 5636:25, 5637:11, 5638:6, 5638:14, 5638:24, 5639:14, 5640:11, 5640:19, 5641:25, 5643:21, 5644:14, 5655:7, 5663:21, 5681:10, 5681:15, 5681:21, 5683:4, 5683:15, 5683:21, 5684:4, 5687:20, 5687:21
**GREEBEL** [1] - 5400:6
**Greebel's** [9] - 5467:1, 5477:18, 5499:18, 5572:22, 5573:15, 5574:3, 5583:12, 5611:3, 5613:23
**Greg** [2] - 5404:15, 5574:25
**Gregg** [4] - 5577:15, 5603:2, 5603:14, 5603:22
**Griswold** [5] - 5612:4, 5613:4, 5613:8, 5613:11, 5613:25
**group** [9] - 5430:16, 5475:23, 5527:13, 5658:8, 5658:10, 5658:13, 5658:22, 5658:25, 5659:11
**guaranteed** [1] - 5603:20
**guess** [5] - 5401:6, 5462:17, 5510:6, 5519:16, 5523:4
**guidance** [5] - 5414:8, 5432:4, 5432:7, 5449:17, 5543:18
**guide** [1] - 5442:20
**guilt** [1] - 5665:5
**guys** [5] - 5434:2, 5435:2, 5488:3, 5495:13, 5497:8
**GX** [19] - 5445:19, 5564:13, 5637:25,

5643:8, 5689:15, 5689:16, 5689:16, 5689:18, 5689:21, 5689:24, 5689:25, 5689:25, 5690:2, 5690:5, 5690:6, 5690:6, 5690:7, 5690:7, 5690:8

## H

**Hackert** [10] - 5404:17, 5418:25, 5486:22, 5497:5, 5509:25, 5528:22, 5529:25, 5530:10, 5530:12, 5530:17
**Hackert's** [1] - 5530:15
**half** [4] - 5517:7, 5653:15, 5653:16, 5659:12
**hand** [2] - 5557:10, 5654:3
**handful** [1] - 5429:4
**hands** [3] - 5646:6, 5646:8, 5646:10
**handwriting** [3] - 5589:1, 5589:3, 5608:2
**handwritten** [1] - 5599:6
**happy** [1] - 5518:19
**hard** [3] - 5435:7, 5450:21, 5685:3
**hardship** [3] - 5401:20, 5402:11, 5522:25
**hardships** [1] - 5402:16
**harmless** [2] - 5406:20, 5408:21
**Harrison** [19] - 5430:20, 5431:12, 5433:4, 5433:6, 5433:9, 5434:12, 5434:17, 5435:20, 5499:21, 5542:12, 5624:20, 5625:5, 5625:16, 5626:9, 5626:21, 5628:8, 5628:11, 5652:6, 5652:8
**Harrison's** [1] - 5625:25
**Haskett** [4] - 5642:4, 5643:10
**Hassan** [3] - 5409:1, 5474:5, 5595:22
**heading** [1] -

5416:25
**Heading** [1] - 5400:22
**Healthcare** [11] - 5592:2, 5592:6, 5592:7, 5596:11, 5596:21, 5597:3, 5598:8, 5598:19, 5598:24, 5598:25, 5600:3
**hear** [5] - 5654:1, 5669:20, 5672:25, 5673:25, 5684:11
**heard** [12] - 5460:10, 5469:5, 5469:12, 5520:7, 5665:5, 5666:16, 5668:4, 5670:20, 5682:6, 5682:13, 5684:17, 5684:19
**hearing** [4] - 5660:14, 5661:1, 5678:20, 5680:7
**hearsay** [15] - 5459:20, 5497:14, 5502:12, 5503:22, 5503:24, 5504:6, 5504:19, 5504:20, 5505:5, 5505:6, 5508:17, 5508:18, 5508:19, 5508:20, 5512:23
**held** [11] - 5463:16, 5573:13, 5588:13, 5590:15, 5592:25, 5612:20, 5614:13, 5615:24, 5617:16, 5660:14, 5661:1
**help** [7] - 5431:6, 5510:14, 5624:11, 5658:15, 5665:9, 5670:15, 5676:8
**helpful** [5] - 5665:5, 5673:14, 5675:16, 5676:3, 5684:24
**helping** [1] - 5671:5
**helps** [2] - 5528:18, 5635:6
**hereby** [6] - 5532:11, 5532:14, 5532:17, 5533:18, 5579:24, 5654:12
**hereto** [1] - 5533:18
**herewith** [1] - 5578:22
**Heskett** [5] - 5615:17, 5616:1, 5616:10, 5616:14, 5617:1
**Hi** [3] - 5622:21,

5628:12, 5631:25
**hi** [3] - 5582:11,
5615:23, 5636:10
**hid** [1] - 5480:14
**hidden** [2] - 5450:17,
5480:16
**hide** [3] - 5477:19,
5492:18, 5492:20
**hiding** [3] - 5440:14,
5440:15, 5480:15
**high** [1] - 5655:24
**highlight** [2] -
5453:3, 5454:14
**highly** [1] - 5688:12
**highly-contested** [1]
- 5688:12
**himself** [3] - 5640:8,
5641:5, 5645:23
**hint** [1] - 5673:1
**hire** [1] - 5523:10
**hmm** [1] - 5634:14
**hold** [21] - 5406:19,
5408:21, 5548:22,
5549:7, 5573:13,
5603:12, 5603:25,
5605:3, 5614:14,
5614:15, 5614:23,
5615:1, 5615:4,
5615:6, 5624:15,
5644:11, 5644:14,
5645:20, 5646:18,
5648:25, 5651:10
**holder** [2] - 5579:11,
5651:10
**holding** [2] -
5446:11, 5672:12
**holds** [1] - 5590:13
**honesty** [1] - 5685:5
**Honor** [118] - 5403:2,
5423:21, 5428:10,
5428:12, 5440:2,
5441:24, 5447:20,
5448:12, 5449:6,
5449:8, 5449:21,
5450:1, 5457:3,
5459:17, 5459:24,
5461:3, 5461:7,
5463:25, 5465:18,
5465:19, 5466:5,
5466:8, 5467:14,
5470:16, 5489:22,
5497:13, 5501:14,
5501:19, 5510:3,
5510:9, 5511:18,
5512:4, 5512:20,
5513:22, 5515:7,
5515:10, 5517:1,
5519:4, 5522:12,
5522:14, 5522:18,
5522:22, 5523:3,

5523:15, 5525:7,
5525:9, 5525:18,
5526:24, 5527:13,
5528:12, 5538:2,
5542:2, 5542:17,
5544:13, 5546:17,
5549:24, 5550:1,
5551:8, 5557:5,
5557:23, 5563:14,
5564:10, 5564:12,
5567:23, 5577:7,
5583:18, 5586:20,
5591:18, 5612:9,
5615:12, 5616:21,
5624:24, 5626:11,
5628:1, 5630:2,
5631:8, 5633:10,
5634:15, 5635:19,
5635:22, 5647:11,
5653:21, 5654:9,
5656:12, 5660:5,
5660:9, 5660:12,
5661:8, 5662:4,
5662:7, 5662:8,
5662:22, 5662:25,
5663:24, 5666:22,
5667:5, 5668:3,
5668:6, 5668:7,
5668:15, 5669:10,
5672:1, 5673:16,
5673:23, 5676:19,
5676:20, 5677:13,
5678:2, 5681:2,
5681:24, 5683:1,
5684:9, 5684:16,
5684:19, 5684:23,
5685:25, 5686:23,
5687:17
**Honor's** [2] -
5662:15, 5670:6
**HONORABLE** [1] -
5400:10
**hope** [1] - 5686:3
**hopefully** [2] -
5523:20, 5523:21
**hoping** [2] - 5526:11,
5686:4
**host** [1] - 5620:5
**hour** [12] - 5469:24,
5469:25, 5470:1,
5516:6, 5517:7,
5521:17, 5521:22,
5521:25, 5522:5,
5653:15, 5653:16
**hours** [3] - 5560:14,
5560:17, 5573:14
**Huang** [2] - 5426:5,
5571:20
**human** [1] - 5540:13
**hundred** [1] -

5438:20
**hundreds** [2] -
5537:19, 5668:25
**hurdle** [1] - 5468:10
**hypothesis** [1] -
5535:21

---

**I**

**Ian** [1] - 5526:6
**idea** [4] - 5428:22,
5468:2, 5523:21,
5540:12
**identification** [23] -
5404:8, 5407:10,
5416:8, 5418:6,
5421:24, 5427:2,
5443:20, 5500:8,
5509:23, 5537:4,
5563:15, 5568:1,
5576:20, 5585:24,
5612:2, 5615:8,
5616:13, 5624:18,
5627:4, 5628:21,
5629:21, 5631:3,
5634:6
**identified** [3] -
5415:8, 5508:8,
5668:10
**identify** [2] -
5445:18, 5491:9
**Illegal** [2] - 5414:25,
5492:25
**illegal** [13] - 5415:2,
5415:8, 5427:19,
5427:21, 5493:4,
5493:7, 5493:12,
5493:18, 5493:20,
5494:17, 5494:24,
5495:2
**imagine** [2] -
5683:25, 5685:22
**immaterial** [1] -
5494:18
**immediately** [1] -
5438:5
**imperative** [1] -
5575:2
**important** [5] -
5476:25, 5477:1,
5573:20, 5573:21,
5671:20
**importantly** [1] -
5458:3
**imposed** [1] -
5490:25
**impression** [1] -
5684:2
**improper** [4] -
5442:5, 5442:7,

5460:25, 5503:10
**inaccuracy** [2] -
5540:8, 5540:11
**inaccurate** [1] -
5681:12
**inadvertence** [1] -
5440:12
**inappropriate** [6] -
5518:5, 5518:22,
5663:20, 5680:15,
5680:24, 5688:7
**Inc** [8] - 5408:14,
5591:25, 5621:14,
5654:19, 5654:23,
5655:1, 5655:4,
5655:25
**incentive** [2] -
5403:14, 5403:18
**include** [6] - 5482:7,
5588:6, 5591:8,
5606:8, 5632:2,
5672:9
**included** [8] -
5423:16, 5427:23,
5467:18, 5482:5,
5515:20, 5568:6,
5577:4, 5591:10
**includes** [1] - 5406:5
**including** [7] -
5453:1, 5464:23,
5479:25, 5528:22,
5655:6, 5672:11,
5672:14
**incompatible** [1] -
5495:15
**inconsistencies** [1] -
5538:21
**inconsistent** [2] -
5685:25, 5686:1
**inconvenience** [1] -
5625:24
**incorporate** [1] -
5499:15
**Incorporated** [4] -
5618:7, 5620:5,
5621:15, 5654:15
**incorrect** [2] -
5505:4, 5683:21
**incredibly** [1] -
5464:3, 5468:9
**increments** [1] -
5593:18
**incurred** [2] -
5406:21, 5408:23
**indeed** [2] - 5429:7,
5494:21
**indemnification** [18]
- 5406:18, 5406:25,
5407:2, 5407:5,
5407:7, 5407:8,

5407:16, 5407:18,
5408:7, 5409:15,
5409:16, 5409:20,
5413:17, 5485:9,
5485:11, 5485:16,
5486:19, 5487:1
**indemnified** [1] -
5408:24
**indemnify** [2] -
5406:19, 5408:21
**indented** [2] -
5425:10, 5425:13
**independent** [3] -
5488:3, 5507:2,
5513:25
**indexes** [1] -
5545:19
**indicate** [1] - 5592:3
**indicated** [2] -
5586:18, 5617:22
**indication** [1] -
5536:11
**individual** [7] -
5409:14, 5421:16,
5570:19, 5594:22,
5595:13, 5640:20,
5640:22
**individually** [2] -
5592:1, 5592:4
**individuals** [5] -
5559:1, 5561:15,
5570:2, 5594:18,
5595:2
**indulgent** [1] -
5673:7
**Industry** [1] -
5656:25
**industry** [4] - 5657:3,
5659:22, 5660:3,
5676:3
**inevitable** [1] -
5458:21
**inference** [1] -
5685:3
**influence** [1] -
5674:22
**inform** [4] - 5489:5,
5494:18, 5494:19,
5515:10
**information** [23] -
5403:12, 5415:5,
5418:13, 5419:13,
5423:16, 5427:24,
5428:3, 5435:16,
5441:8, 5442:13,
5451:5, 5506:3,
5511:12, 5549:17,
5573:11, 5588:15,
5649:21, 5651:18,
5652:4, 5658:5,

5670:17, 5688:2, 5688:6

**informations** [1] - 5434:12

**informed** [2] - 5493:3, 5520:9

**informing** [1] - 5489:2

**inherently** [1] - 5456:2

**initial** [2] - 5441:20, 5506:16

**inquiries** [4] - 5415:7, 5433:9, 5435:18, 5493:14

**inquiry** [4] - 5401:6, 5473:4, 5556:18, 5613:6

**inserting** [1] - 5464:20

**insider** [1] - 5515:15

**insiders** [1] - 5674:17

**insists** [1] - 5683:23

**instance** [3] - 5455:6, 5624:8, 5645:22

**instead** [2] - 5517:22, 5687:6

**instruct** [1] - 5667:6

**instructed** [1] - 5682:18

**instructing** [1] - 5668:3

**instruction** [26] - 5508:10, 5513:13, 5559:6, 5559:8, 5559:23, 5560:1, 5572:17, 5577:20, 5595:7, 5603:23, 5615:25, 5616:9, 5618:17, 5619:12, 5621:13, 5632:8, 5632:21, 5638:1, 5639:5, 5639:13, 5640:11, 5641:24, 5643:9, 5643:21, 5644:2, 5644:5

**instructions** [14] - 5574:15, 5580:13, 5580:22, 5581:6, 5585:18, 5591:8, 5593:7, 5603:10, 5603:13, 5617:2, 5638:20, 5640:5, 5641:20, 5643:13

**insufficient** [1] - 5462:18

**Intelligence** [1] - 5659:4

**intend** [6] - 5457:8, 5457:15, 5458:8, 5671:16, 5676:20, 5681:20

**intended** [3] - 5673:2, 5673:19, 5673:22

**interact** [1] - 5622:19

**interactions** [5] - 5428:19, 5429:4, 5429:8, 5429:9, 5429:11

**interested** [1] - 5651:13

**internal** [2] - 5495:18, 5531:11

**internally** [3] - 5437:24, 5438:1, 5535:13

**interpret** [3] - 5448:21, 5449:3, 5572:15

**interpreted** [1] - 5578:24

**intraday** [1] - 5655:24

**introduce** [5] - 5457:9, 5457:15, 5461:18, 5463:8, 5463:11

**introduces** [1] - 5457:6

**invested** [1] - 5678:13

**investigation** [2] - 5423:12, 5579:15

**investigations** [4] - 5658:11, 5662:1, 5663:12, 5675:12

**investing** [2] - 5477:13, 5661:22

**investments** [2] - 5409:3, 5464:11

**investor** [6] - 5452:17, 5453:21, 5579:16, 5645:10, 5646:12, 5670:8

**Investors** [2] - 5592:7, 5596:21

**investors** [21] - 5451:19, 5451:25, 5452:9, 5452:15, 5452:16, 5452:25, 5453:6, 5461:1, 5462:11, 5463:16, 5465:1, 5467:18, 5477:15, 5480:14, 5549:22, 5551:22, 5552:1, 5552:6, 5552:20, 5658:4

**investors'** [1] - 5452:8

**involve** [1] - 5643:21

**involved** [7] - 5404:11, 5419:13, 5430:22, 5446:15, 5451:24, 5547:23, 5667:24

**involves** [2] - 5447:18, 5642:13

**involving** [7] - 5445:12, 5448:5, 5517:2, 5549:22, 5636:24, 5642:10, 5658:12

**irrelevant** [3] - 5468:5, 5503:18, 5503:25

**IRS** [1] - 5659:17

**issuance** [27] - 5560:16, 5564:1, 5569:15, 5573:25, 5578:15, 5580:17, 5580:22, 5610:23, 5619:2, 5619:5, 5619:12, 5622:2, 5623:13, 5624:3, 5624:9, 5624:14, 5625:10, 5625:12, 5625:22, 5628:18, 5628:22, 5628:25, 5631:24, 5634:9, 5639:25, 5644:11, 5644:12

**issuances** [2] - 5562:17, 5568:14

**issue** [76] - 5402:13, 5404:23, 5416:4, 5439:8, 5439:21, 5456:21, 5457:19, 5461:8, 5461:9, 5461:19, 5462:16, 5467:1, 5469:6, 5469:9, 5475:20, 5476:4, 5476:16, 5480:5, 5480:13, 5481:19, 5484:13, 5490:6, 5504:17, 5508:9, 5508:17, 5510:17, 5515:9, 5520:18, 5521:23, 5558:15, 5558:25, 5559:3, 5561:1, 5563:23, 5568:7, 5572:7, 5572:9, 5572:10, 5572:17, 5572:21, 5572:24, 5573:11, 5578:25, 5579:17, 5579:24, 5580:5, 5580:25,

5588:25, 5603:22, 5617:21, 5621:19, 5622:21, 5623:9, 5632:1, 5632:15, 5653:2, 5662:8, 5665:16, 5669:21, 5670:14, 5670:19, 5671:4, 5671:20, 5671:25, 5673:4, 5676:9, 5678:13, 5679:18, 5681:2, 5681:18, 5684:24, 5685:7, 5687:13

**issued** [47] - 5421:20, 5422:2, 5457:16, 5457:17, 5458:9, 5463:6, 5491:5, 5492:5, 5560:19, 5569:22, 5570:1, 5570:4, 5570:19, 5570:25, 5571:25, 5572:5, 5572:8, 5572:20, 5576:6, 5578:21, 5580:10, 5587:12, 5587:13, 5588:5, 5605:11, 5606:13, 5608:19, 5619:20, 5620:7, 5620:22, 5621:3, 5622:10, 5623:17, 5624:4, 5624:11, 5625:14, 5625:20, 5630:16, 5630:17, 5630:23, 5631:13, 5631:16, 5645:11, 5646:13, 5652:23, 5653:1, 5685:9

**issuer** [4] - 5579:9, 5579:12, 5579:14, 5579:16

**issues** [23] - 5401:2, 5455:1, 5457:12, 5482:4, 5487:4, 5491:21, 5510:15, 5531:9, 5558:21, 5617:19, 5664:19, 5665:17, 5666:16, 5668:23, 5669:4, 5669:24, 5670:14, 5672:23, 5678:11, 5678:14, 5679:14, 5679:24, 5680:6

**issuing** [4] - 5476:9, 5558:23, 5558:24, 5623:20

**item** [25] - 5412:17, 5412:23, 5414:22, 5423:7, 5423:9, 5427:13, 5427:19,

5427:21, 5491:3, 5513:25, 5560:7, 5571:5, 5575:19, 5589:25, 5592:17, 5594:9, 5596:13, 5597:22, 5607:19, 5610:2, 5618:24, 5623:15, 5631:6, 5635:8

**items** [2] - 5535:2, 5543:16

**itself** [5] - 5451:12, 5491:1, 5508:18, 5642:21, 5652:12

---

**J**

**Jackson** [10] - 5430:21, 5461:21, 5461:23, 5461:25, 5571:20, 5574:25, 5635:25, 5636:2, 5639:17

**Jaclin** [7] - 5577:2, 5577:15, 5583:2, 5583:8, 5584:17, 5603:2, 5603:22

**Jaclin's** [1] - 5603:14

**Jain** [40] - 5402:25, 5403:8, 5404:9, 5405:17, 5408:6, 5410:21, 5418:20, 5422:10, 5424:24, 5426:22, 5427:12, 5428:16, 5441:9, 5441:25, 5442:19, 5445:3, 5448:4, 5449:9, 5469:21, 5470:20, 5487:14, 5490:2, 5502:14, 5503:11, 5507:10, 5509:5, 5511:23, 5512:14, 5517:8, 5519:14, 5519:21, 5527:2, 5531:15, 5542:7, 5542:23, 5544:10, 5545:1, 5546:13, 5550:12, 5551:15

**JAIN** [2] - 5403:3, 5689:4

**Jain's** [7] - 5465:19, 5512:18, 5521:11, 5521:18, 5521:20, 5523:24, 5528:13

**January** [4] - 5590:3, 5592:20, 5593:13, 5635:12

**Jennifer** [3] - 5576:23, 5577:13,

5584:8
  **job** [3] - 5578:5,
5664:3, 5670:6
  **John** [4] - 5595:24,
5615:17, 5616:14,
5617:1
  **joined** [2] - 5431:13,
5658:25
  **joint** [4] - 5414:2,
5414:9, 5491:12,
5492:3
  **jointly** [1] - 5408:20
  **Jones** [2] - 5629:9,
5629:11
  **JOSHUA** [1] -
5400:21
  **JUDGE** [1] - 5400:10
  **Judge** [19] - 5458:14,
5461:14, 5461:18,
5461:24, 5462:5,
5526:16, 5584:3,
5601:3, 5601:18,
5653:5, 5653:12,
5665:21, 5669:3,
5671:25, 5674:6,
5674:13, 5675:14,
5676:11, 5680:2
  **judge** [10] - 5564:17,
5565:2, 5567:5,
5671:19, 5675:10,
5675:17, 5677:2,
5677:11, 5678:16,
5680:1
  **Judgment** [1] -
5578:15
  **judgment** [4] -
5454:5, 5455:20,
5455:23, 5578:22
  **July** [5] - 5514:23,
5515:11, 5515:19,
5517:9, 5634:12
  **jumped** [1] - 5539:20
  **June** [12] - 5432:24,
5433:1, 5446:3,
5475:10, 5484:17,
5491:13, 5491:23,
5495:18, 5544:11,
5546:15, 5621:21
  **juror** [1] - 5522:15
  **Juror** [8] - 5401:5,
5401:7, 5401:17,
5402:12, 5456:18,
5522:8, 5523:12
  **jurors** [15] - 5401:4,
5401:16, 5402:2,
5402:15, 5402:21,
5402:23, 5456:9,
5470:13, 5512:7,
5526:17, 5526:20,
5601:4, 5601:15,

5661:14, 5661:17
  **jurors'** [2] - 5665:9,
5671:5
  **Jury** [2] - 5456:16,
5666:9
  **jury** [65] - 5400:10,
5401:1, 5402:22,
5441:18, 5458:4,
5460:25, 5461:10,
5464:6, 5468:17,
5469:4, 5469:12,
5469:22, 5470:9,
5470:10, 5470:12,
5502:2, 5512:10,
5513:19, 5517:6,
5517:22, 5518:11,
5520:4, 5521:16,
5525:2, 5526:19,
5566:25, 5569:8,
5578:23, 5587:8,
5590:4, 5601:5,
5601:7, 5601:14,
5653:14, 5660:14,
5661:2, 5663:13,
5663:21, 5664:20,
5665:5, 5665:8,
5665:19, 5666:1,
5667:6, 5667:25,
5668:1, 5670:5,
5670:15, 5671:1,
5671:8, 5673:14,
5674:1, 5675:2,
5675:14, 5676:4,
5676:7, 5678:25,
5680:9, 5680:12,
5683:19, 5683:25,
5684:1, 5684:8,
5685:3
  **JURY** [1] - 5653:17
  **jzammet@**
**anslowlaw** [1] -
5577:14

## K

  **Katten** [15] -
5424:12, 5424:17,
5424:19, 5470:22,
5471:3, 5472:25,
5473:11, 5556:2,
5564:24, 5582:14,
5605:13, 5606:21,
5611:22, 5611:24,
5655:6
  **keep** [13] - 5401:21,
5402:8, 5437:2,
5468:24, 5480:15,
5512:8, 5513:23,
5515:8, 5581:12,
5642:15, 5648:8,
5653:17, 5685:3

  **keeping** [3] -
5540:17, 5640:8,
5645:22
  **keeps** [1] - 5614:3
  **Ken** [4] - 5533:7,
5533:16, 5540:23,
5541:3
  **kept** [4] - 5459:16,
5564:7, 5574:1,
5581:25
  **Kessler** [9] - 5403:1,
5414:17, 5485:10,
5489:18, 5493:10,
5508:10, 5518:13,
5551:9, 5663:17
  **KESSLER** [81] -
5400:14, 5401:3,
5403:7, 5407:23,
5408:4, 5416:12,
5418:1, 5418:16,
5422:5, 5424:20,
5427:7, 5428:9,
5439:23, 5441:20,
5442:24, 5444:1,
5446:20, 5447:7,
5447:20, 5448:1,
5448:19, 5449:2,
5486:12, 5486:14,
5489:20, 5495:6,
5495:8, 5497:13,
5501:14, 5501:20,
5501:23, 5502:5,
5502:7, 5502:19,
5502:22, 5503:10,
5504:12, 5504:17,
5505:11, 5505:15,
5506:7, 5506:9,
5507:2, 5507:21,
5508:11, 5508:16,
5508:25, 5510:4,
5512:1, 5512:4,
5512:14, 5512:19,
5515:7, 5517:1,
5517:16, 5519:18,
5520:13, 5521:14,
5521:18, 5522:2,
5523:24, 5524:3,
5525:25, 5527:18,
5528:12, 5538:4,
5538:23, 5541:7,
5542:19, 5544:14,
5546:18, 5549:4,
5550:3, 5550:8,
5550:11, 5551:13,
5554:1, 5557:3,
5666:24, 5686:10,
5686:16
  **Kevin** [2] - 5576:16,
5580:5
  **key** [1] - 5499:24,

5537:21
  **kind** [8] - 5403:11,
5441:17, 5449:12,
5453:21, 5468:8,
5474:19, 5487:15,
5498:11
  **kinds** [3] - 5558:16,
5674:19
  **KIYO** [1] - 5400:10
  **knowledge** [5] -
5468:7, 5518:24,
5541:12, 5668:18,
5676:2
  **known** [1] - 5410:13
  **knows** [3] - 5460:21,
5492:12, 5497:15
  **Kocher** [7] - 5474:7,
5599:13, 5610:9,
5610:11, 5611:6,
5611:7, 5611:23
  **Koestler** [4] -
5606:19, 5607:6,
5608:1, 5608:17

## L

  **L.P** [2] - 5655:19,
5655:23
  **label** [4] - 5581:8,
5581:10, 5581:19,
5597:12
  **labeled** [1] - 5445:7
  **labels** [1] - 5581:12
  **lack** [1] - 5669:8
  **ladies** [1] - 5456:11
  **Lake** [1] - 5558:2
  **language** [23] -
5445:16, 5446:6,
5446:8, 5446:25,
5448:22, 5448:24,
5448:25, 5471:8,
5476:8, 5484:12,
5535:7, 5545:1,
5545:3, 5545:6,
5546:3, 5547:6,
5547:8, 5547:11,
5548:16, 5548:17,
5578:13, 5606:8
  **laptop** [3] - 5512:25,
5551:14, 5589:19
  **large** [6] - 5420:14,
5426:8, 5435:6,
5475:22, 5563:11,
5674:21
  **last** [34] - 5402:9,
5413:10, 5422:9,
5457:20, 5463:13,
5463:16, 5464:8,
5467:8, 5514:23,
5515:13, 5515:23,

5516:4, 5534:8,
5556:8, 5596:1,
5612:14, 5629:19,
5630:7, 5632:19,
5633:5, 5645:5,
5652:14, 5662:1,
5664:6, 5664:16,
5664:18, 5668:19,
5669:1, 5673:3,
5677:12, 5678:21,
5687:1, 5687:3,
5687:5
  **late** [1] - 5668:19
  **LaValle** [2] - 5567:4,
5567:14
  **Lavelle** [25] -
5457:14, 5457:23,
5459:2, 5461:16,
5462:1, 5463:21,
5464:2, 5465:12,
5465:20, 5465:24,
5466:17, 5466:22,
5467:7, 5468:4,
5468:8, 5468:11,
5468:25, 5469:6,
5474:22, 5525:6,
5526:13, 5599:16,
5620:25, 5621:3,
5621:20
  **Lavelle's** [3] -
5463:18, 5467:4,
5621:22
  **law** [20] - 5426:19,
5471:3, 5473:1,
5513:24, 5514:1,
5639:16, 5642:4,
5643:10, 5659:14,
5659:20, 5661:15,
5661:16, 5661:24,
5662:2, 5663:6,
5663:22, 5667:6,
5667:20, 5668:3,
5673:24
  **laws** [2] - 5658:3,
5659:7
  **lawsuit** [1] - 5613:21
  **lawyer** [7] - 5473:11,
5477:22, 5512:18,
5639:14, 5639:16,
5640:4, 5670:9
  **lawyers** [3] - 5473:4,
5478:9, 5637:16
  **lay** [6] - 5448:3,
5460:11, 5565:7,
5565:17, 5565:22,
5665:5
  **layers** [1] - 5503:22
  **laying** [2] - 5454:19,
5565:11
  **layperson** [1] -

5668:17
**lead** [1] - 5497:3
**leading** [2] - 5405:8, 5414:15
**learn** [2] - 5433:2, 5434:24
**learned** [4] - 5450:4, 5450:10, 5450:13, 5497:8
**lease** [2] - 5401:20, 5522:24
**least** [4] - 5511:3, 5513:6, 5522:14, 5539:8
**leave** [3] - 5441:17, 5512:15, 5521:12
**leaves** [2] - 5653:9, 5666:13
**leaving** [1] - 5675:1
**lectures** [1] - 5667:20
**led** [1] - 5481:3
**LEE** [1] - 5400:20
**left** [6] - 5456:20, 5521:22, 5527:4, 5527:8, 5569:11, 5684:1
**legal** [19] - 5412:6, 5419:3, 5419:6, 5423:7, 5423:10, 5454:2, 5473:6, 5478:8, 5493:17, 5575:8, 5575:9, 5578:2, 5578:20, 5583:1, 5583:4, 5639:21, 5639:22, 5670:11, 5673:12
**Legal** [1] - 5578:3
**legend** [4] - 5579:25, 5580:3, 5622:24, 5632:3
**lengthy** [1] - 5677:25
**letter** [109] - 5408:17, 5410:13, 5410:15, 5411:2, 5411:4, 5411:17, 5411:19, 5411:22, 5412:1, 5412:9, 5414:21, 5415:14, 5415:16, 5415:19, 5415:25, 5416:3, 5419:21, 5419:25, 5420:4, 5420:5, 5420:7, 5424:25, 5425:4, 5426:19, 5426:24, 5427:5, 5471:4, 5472:3, 5472:25, 5473:3, 5473:8, 5473:12, 5473:17, 5473:23, 5481:6,

5481:7, 5481:8, 5481:12, 5481:16, 5481:18, 5481:22, 5481:24, 5482:5, 5482:7, 5482:10, 5482:18, 5482:25, 5484:2, 5485:21, 5487:10, 5487:15, 5489:8, 5489:14, 5490:3, 5490:7, 5490:8, 5490:18, 5496:6, 5496:10, 5496:11, 5496:15, 5496:16, 5496:17, 5513:24, 5514:1, 5531:18, 5545:4, 5547:24, 5548:10, 5548:20, 5549:9, 5556:2, 5556:11, 5556:14, 5556:18, 5556:22, 5559:10, 5559:11, 5559:23, 5572:17, 5577:1, 5577:20, 5578:8, 5578:24, 5580:18, 5595:7, 5603:17, 5603:23, 5615:25, 5616:3, 5616:8, 5616:9, 5617:8, 5618:17, 5619:12, 5621:8, 5621:12, 5632:8, 5638:23, 5639:19, 5639:20, 5640:2, 5669:14, 5672:5, 5674:5
**letters** [10] - 5422:15, 5470:21, 5470:25, 5471:3, 5475:14, 5475:15, 5481:13, 5560:1, 5578:6
**letting** [1] - 5617:3
**liabilities** [7] - 5408:23, 5414:3, 5414:4, 5414:9, 5484:20, 5544:25, 5555:7
**liability** [11] - 5446:2, 5446:12, 5446:13, 5447:12, 5449:17, 5491:12, 5492:3, 5553:9, 5554:5, 5554:7
**liable** [1] - 5553:24
**liberty** [1] - 5680:16
**lie** [1] - 5664:15
**lied** [1] - 5552:19
**life** [1] - 5663:8
**lift** [2] - 5615:23, 5616:2

**lifted** [1] - 5615:6
**light** [1] - 5684:9
**lightly** [1] - 5680:17
**likely** [4] - 5409:22, 5486:19, 5523:25, 5678:1
**limitation** [1] - 5510:7
**limitations** [4] - 5510:5, 5510:8, 5510:17, 5666:24
**Limited** [1] - 5598:24
**limited** [6] - 5408:19, 5495:14, 5495:19, 5595:13, 5597:5, 5599:1
**limiting** [1] - 5680:23
**limits** [1] - 5495:14
**Lindsay** [15] - 5445:12, 5446:14, 5447:18, 5448:7, 5555:9, 5595:19, 5602:12, 5602:15, 5605:11, 5606:16, 5607:5, 5607:24, 5607:25, 5608:17, 5608:19
**line** [9] - 5513:15, 5546:2, 5555:1, 5575:1, 5586:6, 5587:4, 5587:21, 5625:9, 5631:23
**lines** [3] - 5563:24, 5599:14, 5608:12
**lining** [1] - 5546:25
**liquidity** [7] - 5413:23, 5422:17, 5422:22, 5446:5, 5485:8, 5488:21, 5529:11
**list** [15] - 5426:8, 5434:11, 5457:8, 5464:22, 5468:13, 5564:10, 5566:15, 5567:9, 5567:12, 5567:14, 5572:20, 5587:10, 5629:18, 5685:14, 5688:3
**listed** [11] - 5410:9, 5412:15, 5425:19, 5426:12, 5445:4, 5462:2, 5564:23, 5625:16, 5640:1, 5647:24, 5664:13
**listen** [1] - 5528:16
**listing** [1] - 5587:14
**listings** [1] - 5629:17
**lists** [3] - 5464:24, 5474:3, 5519:14
**literally** [1] - 5646:5

**litigating** [1] - 5520:4
**litigation** [35] - 5418:3, 5418:14, 5419:4, 5419:7, 5423:12, 5423:17, 5424:12, 5424:17, 5424:18, 5425:8, 5425:19, 5426:5, 5426:8, 5460:22, 5460:24, 5461:2, 5461:12, 5463:9, 5463:18, 5463:21, 5465:2, 5465:5, 5465:15, 5467:5, 5470:23, 5471:12, 5471:17, 5471:20, 5471:24, 5472:23, 5474:15, 5474:19, 5475:16, 5556:2, 5614:9
**litigations** [5] - 5425:15, 5426:11, 5475:18, 5493:15
**live** [2] - 5558:1, 5581:3
**LLC** [3] - 5408:19, 5580:8, 5596:21
**LLP** [5] - 5582:14, 5595:22, 5605:13, 5606:22, 5655:6
**log** [2] - 5514:10, 5516:1
**logic** [1] - 5479:10
**logistics** [1] - 5526:1
**look** [42] - 5404:9, 5406:2, 5407:10, 5408:6, 5409:9, 5410:18, 5412:17, 5413:10, 5416:7, 5416:22, 5418:5, 5421:23, 5426:14, 5427:13, 5511:2, 5514:15, 5514:21, 5525:15, 5527:9, 5532:9, 5534:19, 5536:4, 5536:21, 5542:5, 5551:21, 5556:8, 5563:12, 5571:2, 5602:3, 5608:6, 5618:21, 5625:4, 5632:11, 5639:1, 5643:17, 5645:5, 5647:4, 5649:6, 5664:6, 5664:12, 5675:18, 5687:16
**looked** [12] - 5420:5, 5437:9, 5502:20, 5525:5, 5571:5, 5571:9, 5574:18,

5594:13, 5608:4, 5627:6, 5628:5, 5640:18
**looking** [14] - 5405:13, 5435:10, 5458:11, 5478:10, 5534:8, 5535:6, 5543:13, 5546:13, 5569:2, 5630:11, 5663:5, 5674:7, 5674:12, 5675:14
**lose** [1] - 5462:24
**loss** [2] - 5472:14, 5556:10
**loud** [1] - 5509:13
**low** [2] - 5464:3, 5655:24
**lower** [2] - 5553:4, 5688:11
**LP** [15] - 5408:18, 5592:2, 5592:3, 5592:5, 5592:6, 5592:7, 5592:22, 5595:11, 5596:21, 5597:3, 5598:8, 5598:19, 5598:24, 5598:25, 5600:3
**Ltd** [1] - 5622:11
**Lucjan** [6] - 5580:6, 5603:24, 5604:13, 5605:24, 5606:7, 5607:2
**Lunch** [1] - 5524:8
**lunch** [10] - 5402:17, 5468:18, 5469:24, 5512:7, 5512:9, 5512:11, 5522:5, 5523:20, 5527:14

**M**

**M.D** [2] - 5605:12, 5606:17
**ma'am** [2] - 5653:6, 5661:7
**MADISO** [1] - 5620:15
**mail** [135] - 5410:21, 5418:10, 5418:20, 5418:21, 5419:6, 5429:15, 5462:2, 5463:13, 5464:14, 5465:24, 5467:14, 5467:16, 5482:9, 5482:15, 5509:24, 5511:24, 5512:21, 5518:17, 5519:5, 5519:7, 5519:8, 5519:13, 5519:15, 5521:1, 5527:9,

5527:24, 5536:18, 5537:1, 5543:13, 5559:9, 5561:20, 5561:22, 5562:4, 5565:3, 5565:10, 5565:20, 5571:14, 5571:24, 5572:1, 5572:15, 5572:16, 5572:22, 5573:2, 5573:4, 5574:3, 5574:7, 5574:12, 5574:17, 5576:23, 5577:2, 5577:4, 5577:13, 5577:14, 5577:19, 5582:3, 5582:9, 5582:16, 5583:22, 5584:7, 5584:15, 5584:17, 5584:19, 5585:4, 5585:13, 5585:20, 5586:3, 5586:11, 5586:14, 5587:1, 5591:1, 5592:8, 5593:10, 5593:16, 5596:25, 5602:20, 5602:23, 5603:1, 5603:5, 5603:10, 5604:3, 5608:7, 5609:8, 5609:21, 5610:16, 5611:3, 5612:3, 5612:16, 5613:2, 5613:9, 5613:15, 5613:17, 5613:23, 5613:25, 5614:5, 5614:19, 5614:25, 5615:9, 5615:16, 5615:19, 5616:14, 5617:1, 5619:15, 5619:19, 5622:15, 5623:24, 5624:19, 5625:4, 5626:8, 5626:19, 5627:1, 5627:5, 5628:4, 5628:7, 5629:8, 5629:16, 5629:21, 5629:22, 5630:7, 5631:19, 5632:21, 5633:4, 5633:5, 5633:15, 5633:19, 5634:3, 5639:1, 5640:13, 5641:21, 5652:3, 5681:19, 5685:8
   **mailed** [2] - 5504:23, 5624:22
   **mailing** [4] - 5532:22, 5581:8, 5581:10, 5591:25
   **mails** [16] - 5463:20, 5466:20, 5467:6, 5469:17, 5470:21,

5470:22, 5470:25, 5475:14, 5504:4, 5586:8, 5612:4, 5626:16, 5640:18, 5652:1, 5686:9, 5686:11
   **main** [5] - 5430:8, 5430:10, 5430:13, 5431:11, 5561:15
   **maintain** [1] - 5560:2
   **maintained** [7] - 5651:17, 5654:16, 5654:19, 5654:23, 5655:1, 5655:4, 5655:8
   **maintains** [1] - 5537:7
   **majority** [1] - 5674:16
   **man's** [1] - 5680:16
   **management** [47] - 5409:2, 5411:18, 5411:21, 5411:24, 5415:7, 5415:15, 5420:25, 5423:19, 5423:20, 5423:23, 5427:24, 5428:4, 5432:18, 5440:25, 5443:8, 5453:13, 5477:16, 5479:25, 5483:2, 5483:3, 5483:17, 5484:20, 5487:16, 5487:20, 5487:21, 5487:23, 5488:10, 5488:19, 5492:7, 5493:12, 5493:14, 5493:21, 5494:6, 5494:19, 5499:19, 5499:20, 5529:2, 5530:3, 5531:9, 5531:13, 5535:3, 5535:22, 5546:4, 5552:19, 5553:15
   **Management** [12] - 5408:18, 5408:19, 5487:13, 5592:3, 5592:5, 5592:22, 5593:20, 5593:25, 5594:5, 5594:17, 5594:20, 5595:11
   **management's** [5] - 5484:24, 5488:18, 5529:13, 5552:12, 5552:16
   **manager** [1] - 5415:20
   **managing** [1] - 5599:1
   **mandates** [1] -

5673:11
   **manner** [2] - 5433:2, 5492:24
   **Marc** [15] - 5404:17, 5418:10, 5418:21, 5431:12, 5433:10, 5434:11, 5438:24, 5480:1, 5499:21, 5542:12, 5621:9, 5622:17, 5622:19, 5628:8, 5631:21
   **March** [20] - 5431:8, 5467:15, 5467:16, 5491:15, 5529:5, 5529:12, 5531:8, 5532:13, 5596:16, 5597:11, 5597:13, 5597:14, 5597:25, 5604:12, 5622:8, 5623:13, 5623:25, 5630:24, 5641:21, 5655:2
   **Marcia** [1] - 5609:19
   **Marcum** [52] - 5407:19, 5407:20, 5409:19, 5409:20, 5410:7, 5410:12, 5411:18, 5418:2, 5419:12, 5419:20, 5419:25, 5423:14, 5424:3, 5425:2, 5426:23, 5433:17, 5443:9, 5443:12, 5443:16, 5464:23, 5477:2, 5478:6, 5478:16, 5480:24, 5481:11, 5483:11, 5484:15, 5486:9, 5486:18, 5499:17, 5500:16, 5501:24, 5502:6, 5503:1, 5505:1, 5505:7, 5505:16, 5506:12, 5509:10, 5512:25, 5513:24, 5514:13, 5514:25, 5518:21, 5530:16, 5531:9, 5537:6, 5542:15, 5545:21, 5547:3, 5547:6
   **Marcum's** [18] - 5443:13, 5443:23, 5481:1, 5486:3, 5488:16, 5502:3, 5502:9, 5503:6, 5503:21, 5504:24, 5505:2, 5505:6, 5505:10, 5511:15, 5514:13, 5532:4, 5532:6, 5538:14

   **Marek** [17] - 5426:6, 5426:9, 5576:16, 5580:6, 5581:15, 5603:24, 5604:13, 5605:24, 5606:7, 5607:1, 5607:2, 5608:16, 5618:2, 5641:4, 5643:15, 5643:19
   **Mark** [2] - 5643:14, 5652:15
   **mark** [2] - 5424:14, 5652:6
   **marked** [39] - 5404:7, 5407:10, 5408:5, 5416:8, 5416:15, 5418:6, 5418:19, 5421:24, 5422:8, 5424:23, 5427:2, 5427:11, 5443:20, 5490:1, 5500:7, 5509:23, 5510:13, 5511:20, 5538:7, 5542:4, 5542:22, 5544:16, 5546:8, 5546:22, 5549:6, 5563:15, 5567:24, 5612:13, 5615:15, 5616:25, 5625:3, 5626:15, 5630:6, 5631:12, 5634:21, 5640:14, 5654:11, 5655:13, 5656:5
   **market** [13] - 5559:16, 5589:15, 5590:14, 5590:17, 5646:3, 5647:9, 5655:11, 5656:3, 5659:5, 5661:21, 5662:18, 5674:15, 5674:17
   **Market** [1] - 5659:1
   **Marketing** [1] - 5659:3
   **markets** [2] - 5657:21
   **Marshall** [3] - 5445:7, 5450:3, 5596:1
   **Martin** [39] - 5404:18, 5409:1, 5409:13, 5409:14, 5426:6, 5426:9, 5455:9, 5455:12, 5479:25, 5528:4, 5561:17, 5561:18, 5561:20, 5577:16, 5577:17, 5591:4, 5591:24, 5593:12,

5595:9, 5596:25, 5597:6, 5598:22, 5599:19, 5600:3, 5603:2, 5608:10, 5610:9, 5610:13, 5611:6, 5611:23, 5618:5, 5620:4, 5635:1, 5635:14, 5638:12, 5638:16, 5639:4, 5639:7, 5649:18
   **mass** [1] - 5566:3
   **Massella** [2] - 5431:18, 5464:17
   **master** [1] - 5405:1
   **MASTRO** [1] - 5400:19
   **match** [7] - 5539:12, 5580:17, 5594:23, 5596:7, 5598:10, 5605:23, 5607:8
   **material** [10] - 5419:3, 5423:11, 5472:14, 5478:15, 5478:17, 5494:19, 5532:14, 5556:10
   **materiality** [1] - 5477:9
   **materials** [2] - 5515:18, 5563:11
   **MATSUMOTO** [1] - 5400:10
   **matter** [6] - 5437:4, 5456:5, 5481:22, 5481:24, 5515:4, 5515:22
   **matters** [10] - 5419:4, 5419:6, 5419:7, 5431:4, 5432:5, 5487:17, 5489:10, 5491:18, 5493:19, 5661:9
   **mean** [41] - 5432:3, 5438:19, 5441:6, 5448:6, 5459:10, 5460:18, 5462:13, 5484:6, 5485:3, 5492:15, 5500:1, 5505:2, 5534:23, 5546:11, 5559:15, 5570:14, 5572:12, 5575:11, 5578:24, 5580:3, 5583:5, 5587:19, 5587:21, 5587:23, 5588:4, 5588:12, 5590:11, 5590:15, 5592:25, 5628:17, 5648:10, 5657:6, 5664:13, 5664:14, 5671:24,

5672:20, 5674:11, 5675:6, 5676:12, 5682:2, 5683:20
**meaning** [2] - 5405:7, 5661:12
**means** [14] - 5407:8, 5505:2, 5535:23, 5537:14, 5554:7, 5556:22, 5570:24, 5570:25, 5580:4, 5587:20, 5590:17, 5670:4, 5670:23, 5677:24
**meant** [4] - 5429:25, 5446:8, 5455:16, 5510:16
**meantime** [2] - 5522:5, 5614:10
**measure** [2] - 5685:21, 5686:19
**mechanical** [1] - 5400:25
**mechanism** [1] - 5649:14
**medallion** [3] - 5599:4, 5603:14, 5603:20
**media** [1] - 5666:5
**meeting** [88] - 5415:12, 5415:13, 5496:7, 5496:10, 5496:12, 5496:15, 5497:6, 5498:16, 5499:13, 5499:23, 5501:1, 5501:9, 5503:3, 5509:10, 5509:15, 5509:16, 5509:18, 5509:25, 5510:23, 5511:4, 5511:11, 5511:16, 5514:5, 5514:22, 5517:9, 5517:12, 5520:16, 5520:17, 5527:24, 5528:2, 5528:6, 5528:19, 5528:21, 5529:7, 5531:20, 5532:4, 5532:5, 5532:25, 5533:9, 5533:20, 5533:22, 5534:2, 5534:3, 5534:14, 5534:16, 5534:19, 5534:20, 5534:22, 5535:7, 5535:8, 5535:12, 5535:15, 5536:7, 5536:8, 5536:12, 5536:19, 5536:22, 5536:23, 5537:7, 5537:11, 5537:17, 5537:20,

5537:24, 5538:9, 5538:12, 5538:15, 5538:17, 5538:19, 5539:3, 5539:4, 5539:5, 5539:7, 5539:18, 5539:19, 5539:20, 5540:24, 5541:5, 5541:10, 5541:15, 5543:22, 5548:6, 5548:8, 5548:11, 5550:21, 5551:11
**meetings** [23] - 5496:9, 5498:19, 5498:21, 5498:24, 5499:4, 5499:24, 5499:25, 5500:14, 5500:24, 5501:7, 5507:10, 5507:13, 5507:17, 5507:19, 5509:20, 5510:25, 5514:6, 5528:7, 5534:20, 5535:3, 5535:4, 5537:8, 5537:22
**member** [5] - 5433:6, 5455:10, 5481:15, 5599:2, 5658:16
**members** [12] - 5411:25, 5437:23, 5487:18, 5497:22, 5505:10, 5515:19, 5528:3, 5528:20, 5531:24, 5532:18, 5657:4, 5657:17
**members'** [1] - 5657:15
**membership** [1] - 5657:4
**memo** [7] - 5452:13, 5453:10, 5453:13, 5453:14, 5551:17, 5552:1, 5552:22
**memorandum** [5] - 5451:6, 5451:12, 5451:14, 5452:6, 5454:19
**memory** [3] - 5501:8, 5508:22, 5538:21
**mens** [1] - 5467:1
**mention** [2] - 5436:24, 5638:23
**mentioned** [3] - 5419:12, 5559:6, 5657:9
**merge** [2] - 5561:4, 5562:25
**merged** [1] - 5562:24
**merger** [10] - 5561:7, 5563:3, 5563:6,

5572:3, 5572:4, 5573:5, 5573:19, 5573:24, 5574:8
**merits** [2] - 5455:21, 5455:23
**MERRILL** [1] - 5689:8
**Merrill** [25] - 5456:22, 5457:4, 5457:16, 5458:16, 5458:25, 5462:14, 5463:2, 5526:12, 5557:16, 5557:20, 5557:21, 5558:1, 5563:19, 5567:25, 5569:2, 5576:22, 5577:13, 5587:1, 5602:2, 5642:4, 5626:16, 5628:20, 5634:22, 5636:9, 5636:11
**Merrill's** [1] - 5457:9
**message** [1] - 5466:25
**met** [3] - 5428:20, 5429:2, 5676:25
**Michael** [25] - 5457:13, 5474:22, 5542:12, 5599:16, 5602:23, 5608:10, 5608:25, 5609:14, 5609:18, 5620:25, 5621:20, 5621:22, 5624:20, 5625:4, 5625:16, 5625:19, 5625:25, 5626:8, 5626:21, 5628:8, 5628:11, 5628:15, 5652:6, 5652:8
**Michelle** [4] - 5612:4, 5613:4, 5613:8, 5613:11
**Michigan** [1] - 5659:20
**microphone** [1] - 5527:6
**mid** [1] - 5601:2
**middle** [7] - 5422:21, 5533:14, 5576:5, 5609:8, 5613:21, 5633:15, 5652:2
**midmorning** [2] - 5456:9, 5456:12
**might** [10] - 5452:25, 5484:7, 5504:24, 5506:14, 5518:21, 5523:14, 5539:20, 5587:25, 5665:20, 5669:7
**Mike** [9] - 5430:20,

5431:12, 5433:3, 5433:6, 5433:9, 5434:11, 5435:20, 5499:21, 5603:15
**mike** [1] - 5577:15
**million** [5] - 5420:17, 5427:15, 5464:25, 5484:20, 5579:1
**mind** [5] - 5449:12, 5456:18, 5512:8, 5523:5, 5684:25
**minded** [1] - 5666:7
**minor** [1] - 5532:19
**minute** [6] - 5468:16, 5498:4, 5498:24, 5535:18, 5536:22, 5666:20
**minutes** [104] - 5456:13, 5456:17, 5456:22, 5456:23, 5498:21, 5499:3, 5499:13, 5499:23, 5499:24, 5500:23, 5501:7, 5503:2, 5503:4, 5503:12, 5503:15, 5504:22, 5505:1, 5505:2, 5506:11, 5506:18, 5506:22, 5506:23, 5506:24, 5507:1, 5507:3, 5507:6, 5507:15, 5507:16, 5508:7, 5508:14, 5508:22, 5509:19, 5510:1, 5510:23, 5510:25, 5511:1, 5511:4, 5511:11, 5511:16, 5512:20, 5512:23, 5513:6, 5513:18, 5513:24, 5514:5, 5517:11, 5517:21, 5519:6, 5519:8, 5519:14, 5519:16, 5519:17, 5520:17, 5521:6, 5521:15, 5521:25, 5522:1, 5527:10, 5527:23, 5528:2, 5528:7, 5528:14, 5528:24, 5532:10, 5533:5, 5533:13, 5534:8, 5534:14, 5534:16, 5534:19, 5534:21, 5534:23, 5534:25, 5535:5, 5535:7, 5535:8, 5535:12, 5535:15, 5535:19, 5535:23, 5536:7, 5536:9, 5536:12, 5536:19,

5536:22, 5537:11, 5537:17, 5537:24, 5538:15, 5538:17, 5539:5, 5539:7, 5539:11, 5550:13, 5550:17, 5550:25, 5551:7, 5551:10, 5601:11, 5601:12, 5666:4
**misappropriate** [1] - 5469:8
**misconception** [1] - 5441:17
**mislead** [1] - 5667:25
**miss** [2] - 5435:7, 5441:8
**missed** [4] - 5439:7, 5439:21, 5522:22, 5540:14
**missing** [2] - 5440:9, 5511:14
**mistake** [3] - 5439:21, 5540:14, 5606:3
**mistaken** [5] - 5507:23, 5525:15, 5644:12, 5683:2, 5684:2
**mistakes** [3] - 5441:11, 5441:15, 5540:13
**moment** [9] - 5421:18, 5431:1, 5462:19, 5541:25, 5549:24, 5564:11, 5586:9, 5608:13, 5647:11
**Monday** [1] - 5585:19
**money** [2] - 5410:5, 5434:23
**month** [1] - 5491:23
**months** [11] - 5439:14, 5488:23, 5492:14, 5492:15, 5529:4, 5529:12, 5531:8, 5540:2, 5669:9, 5672:20, 5678:16
**moreover** [1] - 5670:13
**morning** [11] - 5402:17, 5402:24, 5428:16, 5428:17, 5458:5, 5475:21, 5483:1, 5522:19, 5525:8, 5680:18, 5681:1
**most** [8] - 5439:22,

5457:10, 5458:3,
5460:15, 5470:2,
5537:25, 5657:21,
5671:20
  **mostly** [1] - 5681:14
  **motion** [2] - 5672:22,
5681:9
  **motions** [2] -
5682:12, 5684:18
  **motivated** [1] -
5543:14
  **motive** [1] - 5683:17
  **move** [13] - 5414:21,
5449:8, 5489:22,
5495:17, 5527:15,
5564:10, 5565:23,
5567:2, 5568:23,
5636:15, 5636:18,
5656:7, 5660:6
  **moved** [2] - 5567:3,
5635:22
  **movement** [2] -
5637:7, 5638:3
  **moving** [2] -
5635:21, 5636:12
  **MR** [364] - 5401:3,
5401:8, 5401:11,
5401:15, 5402:19,
5403:7, 5405:8,
5407:23, 5407:25,
5408:4, 5414:15,
5416:12, 5416:13,
5418:1, 5418:16,
5418:17, 5422:5,
5422:6, 5423:21,
5424:20, 5424:21,
5427:7, 5427:8,
5428:9, 5428:12,
5428:15, 5439:23,
5440:2, 5440:5,
5441:20, 5441:24,
5442:24, 5443:1,
5443:25, 5444:1,
5445:2, 5445:19,
5446:20, 5446:22,
5447:7, 5447:20,
5447:23, 5448:1,
5448:9, 5448:12,
5448:19, 5448:23,
5449:2, 5449:8,
5449:21, 5450:1,
5451:11, 5453:3,
5454:14, 5456:10,
5456:19, 5456:20,
5456:25, 5457:3,
5458:14, 5459:17,
5459:20, 5459:24,
5460:13, 5461:14,
5461:18, 5462:2,
5462:5, 5462:9,

5462:19, 5462:22,
5462:23, 5462:25,
5463:1, 5463:2,
5463:7, 5463:11,
5465:18, 5466:2,
5468:1, 5469:20,
5469:25, 5470:2,
5470:3, 5470:16,
5470:19, 5486:12,
5486:14, 5486:17,
5489:18, 5489:20,
5489:21, 5495:6,
5495:8, 5495:10,
5497:1, 5497:13,
5497:15, 5501:14,
5501:18, 5501:20,
5501:23, 5502:3,
5502:5, 5502:7,
5502:19, 5502:20,
5502:22, 5503:10,
5503:17, 5504:12,
5504:14, 5504:17,
5505:4, 5505:11,
5505:14, 5505:15,
5505:17, 5505:23,
5505:25, 5506:7,
5506:9, 5506:25,
5507:2, 5507:10,
5507:12, 5507:18,
5507:21, 5507:24,
5508:5, 5508:11,
5508:16, 5508:24,
5508:25, 5509:4,
5510:3, 5510:4,
5510:9, 5510:16,
5510:21, 5510:22,
5511:18, 5512:1,
5512:2, 5512:4,
5512:14, 5512:19,
5513:22, 5514:20,
5515:7, 5515:10,
5517:1, 5517:10,
5517:16, 5518:25,
5519:4, 5519:11,
5519:18, 5520:8,
5520:13, 5520:14,
5521:14, 5521:16,
5521:18, 5521:24,
5522:2, 5522:11,
5522:18, 5522:22,
5523:3, 5523:9,
5523:14, 5523:23,
5523:24, 5524:3,
5524:7, 5525:5,
5525:14, 5525:21,
5525:25, 5526:6,
5526:8, 5526:11,
5526:16, 5526:24,
5527:1, 5527:13,
5527:18, 5527:22,
5528:12, 5531:1,

5536:15, 5538:2,
5538:4, 5538:23,
5540:17, 5541:7,
5541:16, 5541:25,
5542:2, 5542:17,
5542:19, 5544:5,
5544:13, 5544:14,
5546:12, 5546:17,
5546:18, 5546:21,
5549:2, 5549:4,
5549:24, 5550:1,
5550:3, 5550:6,
5550:8, 5550:11,
5551:8, 5551:13,
5554:1, 5557:3,
5557:5, 5557:20,
5557:23, 5557:25,
5562:13, 5563:14,
5564:10, 5564:12,
5564:17, 5564:22,
5565:2, 5565:7,
5565:9, 5565:10,
5565:15, 5565:17,
5565:20, 5566:2,
5566:8, 5566:10,
5566:23, 5567:1,
5567:3, 5567:13,
5567:23, 5568:23,
5568:24, 5576:2,
5577:7, 5577:9,
5583:18, 5584:3,
5584:21, 5585:24,
5586:20, 5586:22,
5589:18, 5591:18,
5591:19, 5600:1,
5601:3, 5601:18,
5602:1, 5604:7,
5605:19, 5606:5,
5606:24, 5607:10,
5608:6, 5609:5,
5609:25, 5612:9,
5612:11, 5612:14,
5615:12, 5615:13,
5616:21, 5616:23,
5617:6, 5618:22,
5619:10, 5621:7,
5622:4, 5622:14,
5623:12, 5624:24,
5625:1, 5626:11,
5626:13, 5628:1,
5628:2, 5630:2,
5630:4, 5631:8,
5631:10, 5633:10,
5633:12, 5634:15,
5634:18, 5635:19,
5635:22, 5636:1,
5636:4, 5636:5,
5636:8, 5637:1,
5647:11, 5651:2,
5652:18, 5652:20,
5653:5, 5653:12,

5653:20, 5654:1,
5654:9, 5656:10,
5656:12, 5656:19,
5660:5, 5661:5,
5662:7, 5662:11,
5663:24, 5664:11,
5665:2, 5665:12,
5665:21, 5666:15,
5666:22, 5666:24,
5667:1, 5668:15,
5671:19, 5674:6,
5675:10, 5676:11,
5676:14, 5677:2,
5677:11, 5678:16,
5678:19, 5679:5,
5679:8, 5680:1,
5680:5, 5681:2,
5681:5, 5681:8,
5681:24, 5683:1,
5684:9, 5684:12,
5684:16, 5684:23,
5685:6, 5685:8,
5685:24, 5686:9,
5686:10, 5686:14,
5686:16, 5686:17,
5687:19
  **MS** [41] - 5403:2,
5463:25, 5464:8,
5466:1, 5468:19,
5468:22, 5503:15,
5507:23, 5513:11,
5518:2, 5519:23,
5520:23, 5521:21,
5539:1, 5565:25,
5566:6, 5566:9,
5566:15, 5566:18,
5567:4, 5567:8,
5660:9, 5660:12,
5661:8, 5663:3,
5664:17, 5667:5,
5669:10, 5670:1,
5673:16, 5674:24,
5676:19, 5677:8,
5677:10, 5677:18,
5678:2, 5678:8,
5680:11, 5686:7,
5686:25, 5687:3
  **MSMB** [58] - 5406:6,
5406:16, 5406:19,
5408:18, 5408:19,
5409:2, 5409:3,
5409:23, 5410:2,
5413:11, 5413:13,
5421:4, 5421:13,
5451:19, 5451:25,
5452:9, 5452:14,
5452:16, 5452:18,
5452:22, 5453:6,
5455:10, 5467:18,
5484:18, 5484:21,
5485:1, 5485:7,

5486:20, 5486:22,
5486:25, 5549:22,
5551:23, 5552:6,
5592:2, 5592:3,
5592:5, 5592:6,
5592:22, 5593:20,
5593:24, 5594:5,
5594:17, 5594:19,
5595:11, 5596:11,
5596:21, 5597:3,
5597:6, 5598:8,
5598:19, 5598:24,
5598:25, 5600:3,
5620:5
  **msmbcapital.com**
[1] - 5577:17
  **Muchin** [7] -
5424:19, 5582:14,
5605:13, 5606:21,
5611:22, 5611:24,
5655:6
  **Mulleady** [3] -
5576:16, 5580:6,
5641:13
  **multiple** [3] -
5443:19, 5503:22,
5588:1
  **must** [4] - 5401:20,
5541:23, 5573:11,
5607:14
  **mutual** [1] - 5408:18
  **MYLAN** [1] - 5400:20

## N

  **name** [29] - 5421:16,
5430:21, 5430:24,
5430:25, 5431:14,
5431:17, 5431:18,
5445:12, 5445:14,
5448:7, 5557:14,
5557:22, 5561:7,
5561:10, 5562:20,
5580:11, 5590:7,
5590:10, 5591:24,
5603:11, 5605:11,
5605:23, 5611:5,
5611:6, 5612:24,
5615:2, 5629:4,
5654:6
  **named** [11] -
5447:18, 5497:12,
5497:15, 5497:19,
5576:23, 5579:10,
5607:6, 5613:4,
5615:17, 5624:20,
5643:19
  **names** [6] - 5409:7,
5467:18, 5469:11,
5473:22, 5571:23,

5606:14
**narrow** [3] - 5680:18, 5686:20, 5686:23
**NASDAQ** [1] - 5659:6
**nature** [3] - 5438:19, 5459:21, 5462:18
**near** [7] - 5418:20, 5564:4, 5568:20, 5586:17, 5591:15, 5676:13, 5676:15
**necessarily** [4] - 5463:17, 5496:9, 5537:19, 5554:13
**necessary** [15] - 5432:17, 5485:9, 5529:10, 5532:19, 5533:25, 5539:14, 5539:18, 5539:25, 5540:3, 5545:5, 5647:8, 5660:10, 5661:20, 5672:19, 5675:2
**need** [31] - 5411:10, 5434:12, 5460:5, 5466:16, 5466:17, 5466:18, 5466:23, 5476:10, 5477:19, 5478:22, 5480:17, 5487:19, 5487:25, 5500:22, 5512:4, 5521:11, 5537:19, 5543:18, 5545:12, 5548:22, 5550:14, 5564:17, 5566:10, 5573:11, 5601:10, 5626:1, 5647:2, 5648:19, 5652:3, 5678:7, 5686:18
**needed** [2] - 5499:6, 5511:12
**needs** [6] - 5401:24, 5402:12, 5521:9, 5521:12, 5625:21, 5670:3
**Neill** [1] - 5595:24
**never** [10] - 5428:20, 5429:1, 5429:2, 5432:10, 5438:10, 5439:2, 5449:3, 5460:13, 5516:1, 5681:15
**nevertheless** [1] - 5672:17
**NEW** [1] - 5400:1
**new** [22] - 5401:20, 5413:19, 5414:10, 5423:4, 5439:11, 5476:9, 5476:17, 5492:4, 5492:10,

5492:11, 5522:24, 5558:23, 5558:24, 5580:21, 5591:24, 5594:17, 5617:23, 5622:22, 5640:23, 5640:25, 5653:2, 5673:10
**New** [10] - 5400:5, 5406:16, 5400:18, 5400:23, 5425:16, 5581:17, 5581:22, 5600:4
**next** [79] - 5405:20, 5406:15, 5412:8, 5413:9, 5413:19, 5417:2, 5417:3, 5417:11, 5422:12, 5422:20, 5431:10, 5444:4, 5452:7, 5453:3, 5454:15, 5454:16, 5456:21, 5458:11, 5467:19, 5467:17, 5496:19, 5504:2, 5516:7, 5517:7, 5530:20, 5531:4, 5553:25, 5554:2, 5555:1, 5557:18, 5565:18, 5565:19, 5566:1, 5570:3, 5572:18, 5573:1, 5574:17, 5574:24, 5575:23, 5577:23, 5579:3, 5580:20, 5581:18, 5582:16, 5584:4, 5587:21, 5593:6, 5595:19, 5595:22, 5595:24, 5599:6, 5599:21, 5600:5, 5601:19, 5605:8, 5608:6, 5614:12, 5618:4, 5619:24, 5626:4, 5627:8, 5628:7, 5632:11, 5639:1, 5641:3, 5641:7, 5641:9, 5641:11, 5641:13, 5642:15, 5642:18, 5642:21, 5642:24, 5642:25, 5650:4, 5652:11, 5653:19, 5670:25, 5682:21
**nice** [2] - 5512:9, 5653:7
**night** [4] - 5666:8, 5666:12, 5678:21, 5688:9
**nights** [1] - 5673:9
**nine** [10] - 5442:24, 5442:25, 5487:11,

5487:12, 5487:13, 5488:5, 5544:21, 5544:22, 5546:23, 5546:24
**nobody** [5] - 5450:25, 5451:3, 5483:14, 5483:21, 5498:4
**non** [1] - 5529:20
**non-cash** [1] - 5529:20
**nonadmissible** [1] - 5504:19
**nondisclosure** [1] - 5404:25
**none** [4] - 5475:11, 5488:8, 5513:9, 5531:14
**nonfinancial** [1] - 5423:16
**nontransferable** [1] - 5644:23
**note** [16] - 5407:3, 5407:4, 5407:6, 5409:20, 5467:12, 5538:21, 5544:21, 5546:23, 5546:24, 5557:17, 5567:11, 5575:2, 5578:17, 5582:12, 5666:16
**noted** [9] - 5415:3, 5427:21, 5493:8, 5494:24, 5496:3, 5509:17, 5528:7, 5661:18, 5663:17
**notes** [10] - 5406:17, 5407:1, 5407:16, 5407:18, 5410:1, 5485:11, 5486:15, 5487:1, 5536:23, 5666:20
**nothing** [7] - 5454:16, 5513:7, 5517:3, 5635:19, 5644:25, 5672:1, 5685:5
**notice** [8] - 5511:2, 5662:12, 5665:14, 5668:9, 5674:8, 5683:9, 5684:11, 5686:21
**noticed** [10] - 5539:12, 5539:14, 5574:13, 5662:9, 5665:15, 5669:5, 5673:18, 5686:25, 5687:2, 5687:3
**notify** [1] - 5683:7
**notion** [1] - 5685:4
**November** [12] -

5400:7, 5402:10, 5422:11, 5507:22, 5520:15, 5568:10, 5578:18, 5654:17, 5654:20, 5669:14, 5671:22, 5688:14
**Number** [4] - 5401:6, 5401:7, 5401:17, 5402:12
**number** [77] - 5410:25, 5412:9, 5412:17, 5412:23, 5414:22, 5420:8, 5423:7, 5423:9, 5426:5, 5427:13, 5427:19, 5435:6, 5451:20, 5464:9, 5464:25, 5484:10, 5487:10, 5487:12, 5488:5, 5488:15, 5489:1, 5514:4, 5514:17, 5544:17, 5544:22, 5552:7, 5553:20, 5560:7, 5560:8, 5569:11, 5569:16, 5570:12, 5570:15, 5570:17, 5571:5, 5575:19, 5576:9, 5587:11, 5587:13, 5587:19, 5587:22, 5587:23, 5587:24, 5588:5, 5588:13, 5588:21, 5588:25, 5589:5, 5589:8, 5589:14, 5589:25, 5592:17, 5594:9, 5596:4, 5596:13, 5597:22, 5598:10, 5602:6, 5605:8, 5605:9, 5605:10, 5606:13, 5610:2, 5615:1, 5618:24, 5621:18, 5630:21, 5632:19, 5635:4, 5635:8, 5635:17, 5651:14, 5666:19, 5672:5
**numbering** [1] - 5422:14
**numbers** [9] - 5416:23, 5422:15, 5433:20, 5435:6, 5435:13, 5436:2, 5560:9, 5593:21, 5648:23
**numerous** [1] - 5665:6
**nutshell** [1] - 5674:13

**O**

**o'clock** [3] - 5400:7, 5512:15, 5666:12
**O-R-E-M-L-A-N-D** [1] - 5654:8
**oath** [4] - 5402:25, 5526:22, 5682:3, 5682:8
**object** [26] - 5423:21, 5447:7, 5448:1, 5449:2, 5501:16, 5501:23, 5503:10, 5505:17, 5505:20, 5505:25, 5508:25, 5512:22, 5520:21, 5564:12, 5565:3, 5565:11, 5565:12, 5565:15, 5566:3, 5566:12, 5566:16, 5566:21, 5566:23, 5661:8, 5677:2
**objected** [6] - 5451:20, 5520:2, 5552:1, 5552:7, 5565:14, 5567:16
**objecting** [6] - 5505:18, 5518:19, 5566:6, 5566:13, 5663:5, 5663:6
**objection** [58] - 5405:8, 5407:25, 5414:15, 5416:13, 5418:17, 5422:6, 5424:21, 5427:8, 5439:23, 5441:20, 5444:1, 5446:20, 5448:19, 5459:20, 5486:12, 5489:20, 5495:6, 5495:8, 5497:13, 5501:14, 5501:25, 5503:14, 5505:15, 5505:19, 5505:22, 5505:23, 5507:4, 5508:20, 5510:4, 5527:17, 5527:18, 5538:4, 5538:23, 5541:7, 5542:19, 5544:14, 5546:18, 5549:4, 5551:8, 5564:22, 5566:2, 5567:6, 5568:24, 5577:9, 5586:22, 5591:19, 5612:11, 5615:13, 5616:23, 5625:1, 5626:13, 5628:2, 5630:4, 5631:10, 5633:12, 5634:18, 5637:1, 5660:9

**objectionable** [1] - 5505:21

**objections** [4] - 5452:3, 5452:8, 5453:5, 5551:22

**obligation** [13] - 5406:16, 5447:3, 5447:4, 5447:5, 5447:6, 5448:17, 5449:10, 5449:16, 5484:21, 5484:25, 5667:13, 5669:11, 5680:14

**obligations** [5] - 5406:4, 5406:11, 5440:18, 5673:20, 5677:1

**observations** [1] - 5496:2

**obtain** [1] - 5686:14

**obtained** [2] - 5442:14, 5499:3

**obtaining** [1] - 5443:5

**obviously** [12] - 5460:4, 5463:25, 5465:2, 5465:10, 5486:9, 5503:3, 5515:1, 5517:12, 5543:2, 5547:10, 5685:13, 5687:15

**occasion** [2] - 5622:20, 5624:7

**occasionally** [2] - 5658:18, 5662:19

**occurred** [9] - 5494:2, 5494:8, 5494:9, 5508:3, 5551:11, 5552:13, 5555:17, 5555:22, 5556:25

**occurrence** [1] - 5624:6

**occurring** [1] - 5532:25

**October** [4] - 5620:20, 5628:10, 5628:17, 5631:4

**odd** [1] - 5662:2

**OF** [3] - 5400:1, 5400:3, 5400:9

**offended** [1] - 5680:19

**offenses** [1] - 5658:12

**offer** [31] - 5407:23, 5416:12, 5418:16, 5422:5, 5424:20, 5427:7, 5443:25, 5501:18, 5502:9,

5504:22, 5507:1, 5510:3, 5538:2, 5542:17, 5544:13, 5546:17, 5549:3, 5577:7, 5591:18, 5615:12, 5616:21, 5624:24, 5626:11, 5628:1, 5630:2, 5631:8, 5633:10, 5634:15, 5662:24, 5668:17, 5669:17

**offered** [6] - 5447:24, 5506:17, 5506:21, 5533:7, 5540:23, 5541:3

**offering** [8] - 5408:3, 5504:15, 5662:14, 5662:21, 5665:17, 5668:12, 5668:16, 5670:16

**offers** [2] - 5586:20, 5612:9

**office** [7] - 5499:18, 5523:11, 5523:12, 5523:13, 5530:15, 5584:25, 5603:15

**Office** [1] - 5659:3

**officer** [16] - 5406:7, 5408:22, 5421:4, 5445:22, 5484:18, 5532:20, 5532:21, 5544:23, 5553:5, 5553:19, 5555:1, 5561:19, 5579:11, 5621:10, 5649:22

**officers** [4] - 5559:4, 5588:13, 5648:5, 5649:10

**often** [1] - 5435:16

**Oklahoma** [1] - 5578:14

**omitted** [1] - 5491:5

**once** [5] - 5503:25, 5533:24, 5616:3, 5644:14, 5645:24

**one** [121] - 5406:6, 5408:7, 5423:7, 5423:9, 5428:6, 5429:9, 5429:20, 5431:22, 5432:11, 5433:8, 5433:20, 5435:18, 5438:20, 5439:5, 5442:13, 5445:7, 5445:14, 5445:23, 5445:25, 5446:9, 5447:21, 5448:13, 5449:25, 5450:7, 5454:17, 5455:1, 5455:12, 5456:6, 5456:21,

5457:25, 5465:23, 5466:18, 5471:3, 5473:15, 5474:21, 5480:16, 5482:6, 5483:19, 5487:3, 5490:20, 5492:2, 5497:24, 5503:19, 5507:11, 5507:12, 5514:15, 5514:23, 5515:11, 5516:5, 5520:13, 5520:14, 5522:13, 5526:14, 5532:1, 5533:11, 5533:22, 5535:1, 5536:22, 5541:25, 5543:24, 5546:12, 5548:19, 5549:8, 5549:9, 5549:24, 5552:4, 5553:7, 5553:20, 5564:15, 5565:14, 5565:18, 5565:19, 5566:1, 5566:9, 5566:10, 5567:25, 5581:21, 5583:25, 5587:25, 5590:2, 5595:17, 5595:19, 5595:22, 5595:24, 5596:1, 5596:10, 5597:18, 5599:12, 5605:19, 5607:1, 5611:12, 5613:2, 5620:25, 5628:5, 5629:25, 5630:7, 5630:20, 5632:18, 5633:15, 5634:22, 5636:12, 5636:15, 5641:19, 5642:10, 5642:12, 5642:23, 5647:11, 5652:8, 5652:21, 5652:25, 5654:11, 5655:6, 5664:6, 5666:25, 5678:6, 5678:23, 5681:2, 5685:6

**One** [4] - 5402:12, 5465:21, 5467:8, 5525:8

**One's** [1] - 5401:7

**ones** [21] - 5423:2, 5443:6, 5446:18, 5449:13, 5466:2, 5476:22, 5507:24, 5520:18, 5520:20, 5520:22, 5543:25, 5549:22, 5564:12, 5564:22, 5565:11, 5566:4, 5566:6, 5566:15, 5566:23, 5583:10, 5680:6

**open** [14] - 5401:1,

5470:9, 5509:3, 5512:8, 5525:2, 5550:14, 5559:16, 5567:17, 5590:14, 5601:14, 5666:1, 5666:7, 5679:4, 5685:14

**open-minded** [1] - 5666:7

**opening** [2] - 5655:24, 5663:17

**operate** [1] - 5559:17

**operation** [2] - 5495:13, 5529:14

**operations** [4] - 5413:14, 5413:22, 5488:23, 5659:24

**opine** [5] - 5663:19, 5664:19, 5669:4, 5670:16, 5676:8

**opines** [1] - 5671:4

**Opinion** [1] - 5578:3

**opinion** [31] - 5462:4, 5467:13, 5468:4, 5476:9, 5574:25, 5575:5, 5575:7, 5575:8, 5575:9, 5578:2, 5578:20, 5579:24, 5580:18, 5582:11, 5583:1, 5583:4, 5639:21, 5639:22, 5662:14, 5662:22, 5664:1, 5664:12, 5665:3, 5665:17, 5667:10, 5668:14, 5668:16, 5669:4, 5669:8, 5671:21, 5671:25

**opinions** [13] - 5664:25, 5668:12, 5668:14, 5669:11, 5669:16, 5669:20, 5669:23, 5670:10, 5672:2, 5673:20, 5673:21, 5673:23

**opportunities** [1] - 5673:5

**opportunity** [7] - 5461:1, 5545:11, 5545:12, 5673:23, 5677:3, 5678:10, 5683:9

**oppose** [1] - 5681:14

**opposed** [10] - 5405:10, 5405:11, 5440:12, 5447:4, 5448:18, 5476:1, 5476:19, 5476:21, 5480:2, 5480:20

**opposing** [1] - 5480:3

**opposition** [3] - 5477:18, 5674:11

**optimistic** [1] - 5524:1

**option** [1] - 5401:11

**options** [1] - 5657:21

**oral** [1] - 5470:4

**orally** [1] - 5496:15

**order** [11] - 5406:15, 5537:23, 5542:23, 5560:17, 5615:6, 5644:15, 5644:22, 5646:2, 5647:8, 5682:12, 5682:17

**ordered** [1] - 5668:20

**ordinary** [3] - 5564:7, 5568:17, 5591:11

**Oremland** [15] - 5653:20, 5653:23, 5654:7, 5654:10, 5656:20, 5660:6, 5663:24, 5666:10, 5667:7, 5668:4, 5669:17, 5672:8, 5672:18, 5675:5, 5687:18

**OREMLAND** [2] - 5656:15, 5689:11

**Oremland's** [4] - 5661:9, 5672:9, 5672:16, 5673:13

**organization** [3] - 5657:2, 5657:4, 5662:4

**organized** [3] - 5441:7, 5441:8, 5560:6

**original** [2] - 5603:24, 5641:24

**originally** [5] - 5491:9, 5491:19, 5512:3, 5553:17, 5640:18

**otherwise** [3] - 5504:16, 5504:19, 5541:11

**ought** [1] - 5688:10

**outcome** [1] - 5521:8

**outlined** [1] - 5674:5

**outside** [6] - 5401:1, 5431:3, 5470:9, 5489:11, 5660:14, 5661:1

**outstanding** [5] - 5426:15, 5426:16, 5493:19, 5579:12,

5587:12
**outweighs** [1] - 5683:14
**over-the-counter** [1] - 5659:5
**overall** [2] - 5402:10, 5481:21
**overcame** [1] - 5468:9
**overcome** [1] - 5468:10
**overrule** [1] - 5447:8
**oversee** [1] - 5657:22
**oversees** [2] - 5657:20, 5657:24
**overtly** [1] - 5472:23
**owed** [1] - 5608:16
**own** [13] - 5443:13, 5446:10, 5507:15, 5515:5, 5528:14, 5535:13, 5566:5, 5592:4, 5638:8, 5639:5, 5646:25, 5651:3, 5651:8
**owned** [7] - 5592:1, 5595:12, 5637:21, 5638:11, 5640:5, 5649:10, 5649:22
**owner** [5] - 5640:6, 5640:8, 5642:5, 5661:13, 5670:3
**owner's** [2] - 5640:22, 5640:23
**owners** [2] - 5640:20, 5640:25
**ownership** [4] - 5599:2, 5672:13, 5672:14, 5674:16

**P**

**package** [2] - 5515:18, 5643:3
**packet** [1] - 5642:23
**page** [165] - 5405:15, 5409:9, 5410:24, 5412:8, 5413:9, 5414:22, 5416:16, 5416:22, 5416:23, 5417:2, 5417:3, 5417:11, 5419:24, 5420:7, 5420:10, 5422:9, 5422:10, 5422:12, 5422:13, 5422:14, 5422:20, 5422:21, 5422:22, 5423:6, 5425:7, 5425:22, 5426:14, 5427:12, 5427:18,

5444:4, 5454:15, 5454:16, 5467:19, 5484:3, 5484:6, 5490:13, 5490:15, 5495:11, 5496:19, 5500:25, 5509:6, 5514:17, 5514:23, 5516:7, 5530:20, 5532:10, 5533:3, 5533:13, 5533:14, 5534:8, 5536:9, 5544:21, 5549:10, 5551:17, 5553:4, 5553:25, 5554:18, 5554:21, 5569:2, 5570:3, 5570:7, 5571:12, 5572:18, 5573:1, 5573:17, 5574:5, 5575:23, 5577:23, 5579:3, 5580:17, 5580:20, 5581:7, 5581:18, 5581:24, 5584:4, 5584:7, 5587:10, 5593:6, 5594:4, 5595:4, 5596:7, 5596:23, 5597:11, 5597:15, 5598:17, 5599:6, 5599:21, 5600:5, 5601:19, 5602:3, 5602:17, 5603:17, 5604:24, 5605:8, 5605:16, 5605:19, 5605:23, 5606:11, 5606:24, 5608:6, 5609:6, 5610:15, 5611:13, 5611:18, 5612:14, 5612:15, 5613:3, 5614:12, 5617:6, 5618:4, 5619:10, 5619:25, 5620:13, 5621:7, 5621:25, 5622:14, 5627:8, 5628:4, 5629:8, 5629:22, 5630:10, 5630:20, 5631:18, 5632:11, 5632:19, 5632:20, 5633:14, 5633:18, 5635:5, 5638:10, 5638:19, 5639:1, 5639:4, 5639:7, 5639:10, 5640:1, 5641:3, 5641:7, 5641:9, 5641:11, 5641:13, 5642:10, 5642:13, 5642:15, 5642:16, 5642:18, 5642:21, 5642:24, 5642:25, 5643:8, 5643:18,

5647:4, 5650:4, 5652:2, 5652:11, 5652:14, 5660:15, 5670:25, 5674:12, 5682:21
**pages** [12] - 5414:21, 5484:7, 5525:10, 5537:19, 5573:17, 5579:19, 5584:5, 5585:6, 5596:3, 5603:17, 5642:15, 5669:1
**paid** [11] - 5401:9, 5402:15, 5458:6, 5460:1, 5460:6, 5460:16, 5462:10, 5485:25, 5486:4, 5486:19, 5523:5
**paint** [2] - 5661:20, 5661:24
**Pamela** [3] - 5629:9, 5629:11, 5629:17
**Panoff** [46] - 5404:17, 5418:10, 5418:21, 5419:2, 5419:9, 5431:12, 5433:10, 5434:11, 5434:16, 5435:24, 5435:24, 5436:1, 5436:13, 5438:24, 5438:25, 5439:7, 5439:13, 5439:18, 5439:20, 5439:24, 5479:24, 5480:1, 5499:21, 5502:23, 5502:25, 5503:7, 5518:16, 5528:9, 5528:25, 5529:1, 5529:9, 5529:19, 5530:3, 5533:4, 5533:6, 5540:22, 5541:2, 5542:13, 5543:4, 5540:22, 5533:6, 5540:22, 5541:2, 5542:13, 5543:4, 5540:22, 5540:22, 5541:2, 5542:13, 5543:4, 5540:22, 5540:22
**paper** [6] - 5503:6, 5503:11, 5503:13, 5526:1, 5646:6, 5646:7
**papers** [15] - 5438:2, 5438:4, 5438:7, 5443:14, 5443:23, 5499:15, 5500:18, 5503:21, 5505:7, 5510:24, 5511:1, 5511:16, 5514:13, 5537:7, 5541:23
**paperwork** [1] - 5457:13

**par** [1] - 5604:19
**paragraph** [58] - 5405:18, 5405:23, 5405:24, 5406:2, 5408:16, 5413:10, 5413:11, 5420:14, 5420:15, 5420:17, 5420:20, 5425:7, 5425:11, 5425:14, 5426:15, 5445:17, 5445:20, 5448:13, 5451:13, 5453:3, 5471:8, 5471:11, 5472:5, 5472:16, 5473:3, 5484:4, 5484:8, 5485:23, 5487:12, 5487:13, 5489:16, 5490:18, 5492:25, 5495:12, 5495:17, 5515:13, 5515:15, 5515:23, 5516:4, 5533:4, 5533:5, 5536:17, 5544:22, 5551:21, 5552:4, 5552:5, 5554:21, 5554:22, 5556:8, 5556:16, 5556:20, 5578:10, 5579:5, 5579:8, 5604:11, 5604:16, 5605:9, 5606:11
**paragraphs** [7] - 5405:20, 5417:4, 5422:23, 5425:6, 5425:10, 5514:23, 5535:10
**parameters** [1] - 5433:24
**parentheses** [1] - 5472:22
**Park** [1] - 5400:17
**parse** [1] - 5506:2
**part** [29] - 5423:22, 5424:11, 5437:23, 5440:19, 5441:20, 5459:4, 5459:23, 5461:22, 5464:25, 5465:5, 5467:4, 5475:18, 5486:6, 5487:14, 5498:20, 5499:12, 5515:17, 5540:19, 5543:14, 5545:15, 5556:8, 5565:1, 5573:24, 5581:1, 5626:6, 5641:1, 5651:12, 5657:7, 5663:19
**participants** [1] - 5479:24
**participated** [5] -

5403:22, 5404:14, 5415:18, 5415:20, 5496:12
**particular** [17] - 5412:25, 5468:7, 5473:1, 5479:8, 5499:20, 5534:3, 5538:9, 5546:5, 5546:6, 5546:7, 5638:20, 5647:5, 5648:16, 5649:15, 5669:5, 5669:23, 5674:4
**particularly** [1] - 5464:15
**parties** [14] - 5405:20, 5445:23, 5455:12, 5456:18, 5463:14, 5484:18, 5649:4, 5653:21, 5654:10, 5654:13, 5655:15, 5655:17, 5672:6, 5673:5
**partner** [8] - 5404:16, 5413:8, 5432:17, 5437:14, 5437:22, 5486:22, 5497:5, 5597:5
**partners** [5] - 5500:21, 5595:13, 5599:1, 5599:3, 5614:9
**partnership** [1] - 5408:19
**Partnership** [1] - 5598:24
**parts** [2] - 5517:13, 5539:22
**party** [27] - 5408:24, 5410:5, 5414:14, 5414:19, 5421:3, 5421:7, 5421:16, 5423:13, 5430:22, 5430:24, 5431:2, 5431:6, 5431:19, 5446:4, 5446:10, 5446:11, 5449:15, 5455:3, 5455:7, 5455:13, 5455:17, 5456:2, 5513:14, 5544:23, 5544:24, 5649:17, 5652:25
**past** [10] - 5419:5, 5465:10, 5476:13, 5476:21, 5480:7, 5480:11, 5520:11, 5535:4, 5535:15, 5540:13
**patently** [1] - 5675:10

**Paul** [1] - 5460:17
**Pause** [6] - 5482:21, 5535:9, 5542:1, 5542:6, 5549:25, 5647:12
**pay** [9] - 5407:6, 5409:22, 5409:25, 5446:10, 5449:10, 5486:24, 5486:25, 5609:19, 5633:22
**paying** [2] - 5401:21, 5446:16
**payment** [9] - 5420:22, 5423:4, 5447:4, 5448:14, 5464:18, 5491:14, 5549:13, 5621:21, 5634:1
**payments** [14] - 5406:3, 5406:10, 5406:13, 5407:1, 5414:13, 5423:2, 5427:16, 5434:24, 5435:25, 5452:15, 5457:11, 5459:5, 5463:5, 5464:12
**payroll** [1] - 5402:8
**peculiar** [1] - 5425:4
**pending** [16] - 5418:3, 5423:11, 5423:12, 5425:8, 5426:11, 5470:23, 5471:12, 5471:17, 5471:20, 5471:24, 5472:23, 5474:15, 5475:12, 5475:13, 5475:16, 5475:18
**people** [34] - 5430:12, 5430:15, 5439:5, 5441:11, 5451:24, 5459:3, 5460:23, 5467:18, 5468:2, 5475:23, 5477:20, 5478:11, 5481:17, 5500:22, 5528:6, 5535:22, 5558:12, 5562:10, 5562:14, 5571:21, 5572:5, 5599:7, 5636:18, 5636:21, 5637:13, 5637:18, 5637:21, 5640:1, 5640:15, 5665:5, 5674:19, 5674:21, 5685:4
**people's** [1] - 5681:16
**per** [5] - 5603:23, 5604:19, 5632:25, 5633:1, 5633:15

**percent** [5] - 5407:7, 5421:15, 5438:20, 5579:11, 5649:11
**perfect** [2] - 5601:3, 5653:16
**performed** [1] - 5541:24
**Performing** [1] - 5489:2
**performing** [2] - 5489:4, 5489:10
**period** [15] - 5433:8, 5491:13, 5491:15, 5491:23, 5495:23, 5512:7, 5523:20, 5654:17, 5654:20, 5654:24, 5655:2, 5655:5, 5655:20, 5655:25
**periods** [1] - 5547:19
**permissible** [1] - 5502:11
**permit** [7] - 5661:14, 5662:5, 5675:7, 5676:6, 5679:14, 5679:17, 5679:21
**permitted** [2] - 5676:24, 5679:13
**person** [20] - 5404:15, 5430:10, 5431:10, 5431:13, 5461:11, 5473:1, 5473:15, 5492:16, 5523:13, 5528:3, 5530:8, 5539:16, 5561:20, 5561:25, 5579:13, 5636:12, 5636:15, 5640:4, 5640:24
**personal** [2] - 5447:3, 5518:24
**personally** [3] - 5446:16, 5553:24, 5637:2
**persons** [1] - 5617:23
**perspective** [2] - 5402:4, 5683:14
**persuasive** [1] - 5466:5
**phone** [12] - 5403:21, 5404:11, 5429:15, 5429:25, 5430:2, 5430:3, 5475:22, 5530:8, 5530:9, 5561:21, 5561:22, 5562:2
**physical** [7] - 5596:19, 5645:13, 5646:5, 5646:9,

5646:12, 5646:15, 5646:25
**physically** [3] - 5485:15, 5530:12, 5641:4
**picking** [1] - 5502:16
**picks** [2] - 5648:7, 5648:9
**piece** [3] - 5503:6, 5646:6, 5646:7
**pieces** [4] - 5503:11, 5503:13, 5503:21, 5526:1
**Pierotti** [17] - 5425:19, 5576:17, 5580:7, 5590:7, 5641:9, 5681:6, 5681:10, 5681:13, 5681:23, 5682:2, 5682:17, 5683:10, 5683:11, 5685:11, 5686:25, 5687:3
**Pierotti's** [3] - 5683:2, 5683:4, 5683:13
**Pineapple** [1] - 5581:22
**Pitluck** [11] - 5462:23, 5557:17, 5567:10, 5567:12, 5661:10, 5663:3, 5669:14, 5669:18, 5671:14, 5680:12, 5684:18
**PITLUCK** [115] - 5400:14, 5456:20, 5456:25, 5457:3, 5459:24, 5461:14, 5461:18, 5462:2, 5462:5, 5462:9, 5462:22, 5462:25, 5463:2, 5463:7, 5463:11, 5469:20, 5526:11, 5526:16, 5557:20, 5557:23, 5557:25, 5562:13, 5563:14, 5564:10, 5564:17, 5565:2, 5565:9, 5565:17, 5565:20, 5567:1, 5567:3, 5567:13, 5567:23, 5568:23, 5576:2, 5577:7, 5583:18, 5584:3, 5584:21, 5585:24, 5586:20, 5589:18, 5591:18, 5600:1, 5601:3, 5601:18, 5602:1, 5604:7, 5605:19, 5606:5,

5606:24, 5607:10, 5608:6, 5609:5, 5609:25, 5612:9, 5612:14, 5615:12, 5616:21, 5617:6, 5618:22, 5619:10, 5621:7, 5622:4, 5622:14, 5623:12, 5624:24, 5626:11, 5628:1, 5630:2, 5631:8, 5633:10, 5634:15, 5635:19, 5635:22, 5636:1, 5636:4, 5637:1, 5652:20, 5653:5, 5653:12, 5653:20, 5654:1, 5654:9, 5656:10, 5656:12, 5656:19, 5660:5, 5661:5, 5662:7, 5662:11, 5663:24, 5664:11, 5665:2, 5665:12, 5665:21, 5668:15, 5671:19, 5674:6, 5675:10, 5676:11, 5676:14, 5677:2, 5677:11, 5678:16, 5678:19, 5679:8, 5680:1, 5680:5, 5681:2, 5681:5, 5681:8, 5681:24, 5685:8, 5686:14
**Pitluck's** [3] - 5675:22, 5677:22, 5680:20
**place** [20] - 5404:1, 5404:12, 5415:16, 5496:7, 5496:10, 5498:7, 5498:12, 5498:13, 5500:1, 5509:18, 5520:23, 5535:3, 5537:22, 5539:19, 5602:11, 5607:13, 5614:10, 5617:17, 5644:6, 5646:1
**placed** [7] - 5458:4, 5614:23, 5615:1, 5615:4, 5615:24, 5622:24, 5628:16
**places** [1] - 5544:18
**plague** [1] - 5684:7
**Plaintiff** [1] - 5400:4
**plan** [3] - 5517:11, 5684:11, 5685:23
**planned** [1] - 5491:19
**planning** [1] - 5665:10

**play** [1] - 5680:22
**Plaza** [2] - 5400:15, 5400:23
**plenty** [2] - 5469:5, 5469:12
**point** [34] - 5430:8, 5430:18, 5431:11, 5438:6, 5438:8, 5454:20, 5459:21, 5461:8, 5462:5, 5465:10, 5465:17, 5469:18, 5474:15, 5478:16, 5502:22, 5504:1, 5504:13, 5507:4, 5517:18, 5520:3, 5530:18, 5543:4, 5543:6, 5545:17, 5549:8, 5593:1, 5601:1, 5635:2, 5636:3, 5668:20, 5671:22, 5672:4, 5672:25, 5675:14
**points** [3] - 5430:13, 5508:2, 5531:17
**poking** [1] - 5684:5
**police** [1] - 5493:23
**policy** [3] - 5411:23, 5515:15, 5662:5
**populated** [1] - 5649:21
**portions** [1] - 5550:21
**position** [12] - 5477:23, 5477:25, 5486:25, 5488:22, 5492:7, 5518:6, 5523:6, 5558:5, 5579:17, 5658:6, 5669:22, 5682:4
**positions** [1] - 5479:23
**possession** [5] - 5685:18, 5686:12, 5686:17, 5687:7, 5687:8
**possible** [3] - 5521:2, 5666:5, 5686:23
**possibly** [1] - 5687:1
**potential** [3] - 5477:15, 5517:5, 5659:6
**power** [5] - 5468:14, 5599:4, 5603:14, 5603:20, 5617:13
**practice** [7] - 5401:19, 5401:21, 5402:5, 5402:6, 5423:20, 5490:2,

5672:22
**practices** [1] - 5531:10
**practitioner** [2] - 5663:10, 5667:19
**precedent** [1] - 5662:20
**preclude** [1] - 5681:9
**prefer** [3] - 5572:6, 5572:10, 5651:19
**preference** [1] - 5521:24
**prejudice** [3] - 5460:9, 5460:20, 5460:21
**prejudicial** [5] - 5468:9, 5468:12, 5663:20, 5663:23, 5683:19
**prepare** [6] - 5410:12, 5419:20, 5426:23, 5495:24, 5537:23, 5560:9
**prepared** [10] - 5420:1, 5500:16, 5501:25, 5565:4, 5567:18, 5568:11, 5568:17, 5568:20, 5569:3, 5672:18
**prepares** [3] - 5423:17, 5423:20, 5423:22
**preparing** [3] - 5411:17, 5473:4, 5682:5
**presence** [3] - 5401:1, 5470:9, 5566:24
**present** [20] - 5402:23, 5411:21, 5411:22, 5470:13, 5507:17, 5508:2, 5525:2, 5526:20, 5528:3, 5528:21, 5550:22, 5559:22, 5579:6, 5579:9, 5601:14, 5601:15, 5661:21, 5666:1, 5685:22, 5686:2
**presentation** [1] - 5481:3
**presentations** [1] - 5497:4
**presented** [7] - 5415:12, 5442:18, 5496:15, 5534:21, 5536:12, 5673:4, 5674:1
**presenting** [3] - 5411:19, 5457:17,

5497:8
**presently** [1] - 5473:5
**presents** [1] - 5558:25
**preserve** [1] - 5567:6
**president** [1] - 5558:7
**pretending** [1] - 5513:21
**pretrial** [3] - 5681:8, 5682:12, 5684:18
**pretty** [1] - 5451:6
**prevent** [1] - 5681:9
**previous** [17] - 5420:4, 5421:2, 5457:5, 5491:10, 5586:9, 5594:4, 5594:13, 5608:4, 5613:2, 5618:17, 5623:19, 5626:5, 5626:6, 5626:17, 5628:5, 5629:23, 5666:25
**previously** [13] - 5403:4, 5420:18, 5454:23, 5477:10, 5477:11, 5491:5, 5511:24, 5529:16, 5615:24, 5617:12, 5617:16, 5631:9, 5634:17
**price** [7] - 5425:25, 5605:1, 5632:25, 5633:1, 5633:15, 5655:19, 5674:22
**prices** [1] - 5655:24
**primary** [4] - 5484:21, 5484:25, 5485:3, 5485:5
**principal** [1] - 5466:4
**principle** [6] - 5461:3, 5461:4, 5475:5, 5494:12, 5505:18, 5510:10
**principles** [4] - 5478:4, 5479:4, 5531:10, 5680:10
**private** [6] - 5558:19, 5598:24, 5657:4, 5657:6, 5662:4, 5663:9
**privilege** [19] - 5513:4, 5513:10, 5513:14, 5513:25, 5514:2, 5514:8, 5514:9, 5514:10, 5515:21, 5516:1, 5517:18, 5517:20, 5517:25, 5518:9,

5520:7, 5520:12, 5520:19, 5520:25, 5666:17
**probe** [2] - 5479:10, 5508:22
**probing** [1] - 5469:14
**problem** [14] - 5456:1, 5456:4, 5466:16, 5467:3, 5467:7, 5467:10, 5492:22, 5492:23, 5499:6, 5504:21, 5504:24, 5518:1, 5665:1, 5670:20
**problems** [2] - 5547:11, 5661:21
**procedures** [3] - 5434:13, 5489:5, 5559:18
**proceed** [8] - 5428:12, 5520:8, 5520:14, 5550:8, 5557:17, 5557:22, 5636:5, 5684:13
**proceeding** [2] - 5423:7, 5423:10
**Proceedings** [1] - 5400:25
**proceedings** [2] - 5423:11, 5423:17
**process** [14] - 5409:24, 5413:14, 5424:7, 5424:8, 5424:11, 5438:5, 5486:23, 5545:15, 5545:17, 5547:23, 5558:23, 5560:15, 5667:24
**processed** [2] - 5564:2, 5591:14
**produce** [1] - 5515:17
**produced** [12] - 5400:25, 5512:2, 5512:22, 5515:24, 5518:4, 5519:6, 5519:24, 5520:9, 5564:23, 5564:24, 5565:5, 5686:13
**produces** [1] - 5433:21
**product** [1] - 5440:11
**production** [1] - 5515:5
**proffered** [1] - 5667:22
**promise** [1] - 5407:6
**promissory** [13] -

5406:17, 5407:1, 5407:3, 5407:4, 5407:6, 5407:16, 5407:18, 5409:20, 5410:1, 5413:17, 5485:11, 5487:1, 5578:17
**pronouncement** [2] - 5492:6, 5492:8
**proof** [8] - 5461:16, 5462:4, 5462:18, 5462:20, 5469:9, 5469:10, 5680:13
**proper** [3] - 5453:18, 5491:3, 5506:14
**properly** [8] - 5453:15, 5454:11, 5491:14, 5545:18, 5545:20, 5663:16, 5663:18, 5664:1
**propose** [1] - 5579:17
**proposed** [1] - 5547:2
**proposing** [1] - 5506:5
**prosecution** [2] - 5551:14, 5658:7
**prosecutions** [2] - 5658:12, 5663:11
**prove** [5] - 5461:15, 5502:24, 5504:25, 5506:10, 5507:4
**provide** [22] - 5412:1, 5412:3, 5412:4, 5412:6, 5415:14, 5433:19, 5436:5, 5441:8, 5445:23, 5449:17, 5490:4, 5543:16, 5546:4, 5549:16, 5550:4, 5553:6, 5553:20, 5574:16, 5585:18, 5625:11, 5652:3, 5658:3
**provided** [27] - 5406:25, 5407:2, 5407:17, 5407:18, 5407:20, 5407:21, 5407:22, 5418:13, 5419:5, 5420:24, 5421:1, 5423:19, 5427:24, 5433:6, 5451:14, 5453:13, 5457:18, 5483:1, 5485:18, 5485:19, 5499:17, 5516:2, 5529:16, 5652:8, 5668:13, 5668:21
**provides** [4] -

5432:4, 5432:7, 5592:7, 5658:10
**providing** [3] - 5546:2, 5673:18, 5685:13
**province** [1] - 5661:14
**provisions** [2] - 5484:2, 5533:17
**public** [12] - 5437:20, 5437:21, 5439:11, 5441:3, 5477:13, 5558:18, 5658:4, 5658:16, 5659:4, 5659:25, 5661:22
**publicly** [1] - 5672:14
**pull** [1] - 5554:17
**purchase** [19] - 5603:4, 5603:7, 5604:2, 5604:10, 5604:11, 5604:18, 5604:20, 5604:25, 5605:1, 5605:16, 5606:6, 5606:9, 5608:14, 5609:4, 5611:1, 5611:10, 5611:13, 5642:7, 5642:8
**Purchase** [2] - 5603:7, 5604:8
**purchaser** [7] - 5604:13, 5604:17, 5604:25, 5605:2, 5605:3, 5605:5, 5611:16
**purpose** [27] - 5411:4, 5412:1, 5412:6, 5442:9, 5481:18, 5487:14, 5489:2, 5500:20, 5500:21, 5501:25, 5506:11, 5507:7, 5518:11, 5537:16, 5661:19, 5661:24, 5664:4, 5668:2, 5668:5, 5671:12, 5674:14, 5674:24, 5675:4, 5677:6, 5680:11
**purposes** [15] - 5446:24, 5537:4, 5537:17, 5649:12, 5651:8, 5661:11, 5662:16, 5664:4, 5665:14, 5666:18, 5667:8, 5667:21, 5670:1, 5675:5, 5676:25
**pursuant** [10] -

5406:18, 5449:11,
5538:2, 5578:17,
5611:4, 5619:19,
5631:25, 5649:5,
5655:11, 5656:3
 **purview** [1] - 5454:2
 **pushback** [2] -
5405:2, 5405:5
 **pushing** [1] - 5480:1
 **put** [65] - 5438:2,
5438:4, 5442:17,
5443:13, 5449:17,
5450:13, 5451:11,
5456:5, 5458:6,
5460:15, 5464:15,
5464:17, 5464:23,
5466:9, 5466:10,
5466:20, 5467:6,
5467:9, 5467:11,
5470:17, 5473:19,
5473:22, 5476:1,
5476:7, 5477:18,
5481:10, 5504:2,
5504:3, 5504:8,
5518:9, 5518:20,
5519:7, 5519:24,
5527:6, 5527:22,
5537:3, 5537:25,
5543:20, 5544:6,
5544:7, 5548:20,
5548:24, 5548:25,
5549:2, 5551:6,
5551:16, 5554:20,
5572:13, 5583:1,
5583:6, 5583:10,
5585:1, 5614:15,
5624:15, 5644:11,
5645:7, 5646:1,
5647:14, 5649:2,
5650:3, 5653:23,
5658:17, 5686:2,
5687:17, 5688:3
 **puts** [1] - 5513:9
 **putting** [5] - 5449:24,
5450:2, 5465:12,
5548:20, 5554:7

### Q

 **Q-1** [1] - 5547:15
 **Q-2** [2] - 5547:16,
5547:17
 **Q-3** [1] - 5547:21
 **qualification** [2] -
5472:10, 5680:5
 **qualifications** [4] -
5472:3, 5472:5,
5579:23, 5662:23
 **qualified** [9] -
5492:16, 5614:17,

5661:23, 5662:20,
5663:2, 5667:18,
5675:9, 5679:25,
5680:21
 **qualifies** [2] -
5649:9, 5649:15
 **qualify** [6] - 5660:6,
5661:3, 5661:10,
5664:22, 5672:18,
5677:20
 **qualifying** [1] -
5668:16
 **quality** [2] - 5404:15,
5500:22
 **quarter** [18] -
5419:15, 5419:18,
5420:2, 5421:20,
5422:2, 5422:24,
5446:3, 5450:8,
5484:17, 5529:15,
5531:7, 5532:13,
5532:16, 5543:23,
5543:24, 5544:6,
5544:11, 5544:22
 **quarterly** [5] -
5405:1, 5424:3,
5431:9, 5491:13,
5491:15
 **questioning** [1] -
5645:5
 **questions** [26] -
5428:9, 5429:24,
5447:21, 5448:9,
5469:14, 5470:21,
5497:10, 5508:12,
5518:7, 5550:1,
5550:12, 5550:15,
5551:15, 5552:24,
5555:14, 5556:5,
5557:3, 5599:5,
5611:9, 5625:23,
5632:5, 5645:8,
5647:13, 5647:23,
5652:19, 5679:22
 **QuickBooks** [1] -
5464:17
 **quickly** [3] - 5522:2,
5560:15, 5623:12
 **quite** [2] - 5463:18,
5683:19
 **quote** [1] - 5477:18

### R

 **R019595** [1] - 5617:7
 **R049711** [1] - 5579:4
 **R049713** [1] -
5579:19
 **R051189** [1] -
5546:23

 **R051206** [1] -
5546:12
 **R057704** [1] - 5536:9
 **raise** [9] - 5456:21,
5515:9, 5525:18,
5557:10, 5654:3,
5678:11, 5681:3,
5681:18, 5682:10
 **raised** [8] - 5401:19,
5453:5, 5551:22,
5662:13, 5671:6,
5671:21, 5680:6,
5684:24
 **ran** [1] - 5687:23
 **RANDY** [1] - 5400:19
 **range** [2] - 5408:3,
5658:14
 **rather** [8] - 5500:23,
5508:8, 5537:20,
5544:5, 5562:7,
5570:25, 5583:7,
5653:15
 **ratified** [1] - 5533:19
 **RCRX** [1] - 5631:24
 **rea** [1] - 5467:1
 **reach** [5] - 5402:14,
5427:23, 5428:3,
5479:1, 5671:2
 **reached** [2] -
5457:10, 5615:4
 **reaching** [2] -
5401:25, 5529:1
 **reaction** [1] -
5506:16
 **read** [54] - 5406:3,
5420:20, 5423:9,
5425:13, 5437:11,
5437:15, 5440:5,
5440:6, 5442:15,
5442:20, 5442:22,
5490:24, 5500:22,
5503:12, 5509:8,
5509:13, 5534:25,
5537:24, 5564:11,
5567:10, 5567:12,
5573:9, 5574:11,
5574:24, 5577:19,
5579:8, 5580:21,
5581:6, 5582:9,
5582:19, 5582:22,
5584:12, 5584:22,
5586:1, 5595:12,
5597:3, 5598:23,
5603:10, 5605:9,
5611:3, 5617:12,
5617:24, 5619:18,
5621:18, 5622:21,
5625:11, 5626:13,
5631:25, 5653:22,
5653:24, 5654:11,

5676:12, 5676:21
 **reading** [5] -
5405:25, 5501:11,
5501:14, 5528:13,
5539:11
 **reads** [6] - 5406:15,
5552:5, 5598:5,
5606:12, 5615:23,
5654:12
 **ready** [4] - 5465:18,
5470:10, 5617:20,
5653:11
 **real** [3] - 5465:3,
5508:12, 5680:8
 **really** [11] - 5402:7,
5459:21, 5469:9,
5518:12, 5637:5,
5644:25, 5667:24,
5671:18, 5679:23,
5680:7, 5688:8
 **realm** [1] - 5664:17
 **reason** [13] -
5437:17, 5453:17,
5458:22, 5458:23,
5458:24, 5477:21,
5480:16, 5513:3,
5515:3, 5515:5,
5651:12, 5675:8,
5682:14
 **reasonable** [2] -
5485:25, 5486:4
 **reasoning** [2] -
5478:19, 5478:21
 **reasons** [4] -
5669:16, 5674:15,
5675:1
 **receipt** [3] - 5592:21,
5598:5, 5615:25
 **receivable** [3] -
5410:2, 5410:4
 **receivables** [3] -
5410:8, 5410:9,
5410:10
 **receive** [39] - 5408:1,
5408:12, 5410:5,
5416:14, 5418:2,
5418:18, 5422:7,
5424:11, 5424:22,
5427:9, 5444:2,
5527:19, 5538:5,
5542:20, 5544:15,
5549:5, 5560:9,
5573:21, 5577:10,
5585:7, 5586:23,
5591:20, 5593:9,
5603:22, 5611:8,
5615:14, 5616:3,
5616:7, 5616:9,
5616:24, 5618:1,
5625:2, 5628:3,

5630:5, 5631:11,
5633:13, 5634:19,
5638:4, 5681:11
 **received** [48] -
5408:8, 5409:19,
5410:21, 5424:17,
5424:18, 5428:4,
5438:17, 5443:17,
5451:21, 5458:9,
5463:4, 5485:15,
5499:3, 5502:8,
5502:15, 5503:7,
5503:11, 5505:3,
5511:8, 5513:19,
5519:3, 5527:20,
5527:23, 5542:24,
5548:13, 5552:8,
5559:5, 5565:20,
5568:25, 5574:21,
5577:11, 5585:1,
5586:24, 5590:6,
5591:1, 5591:21,
5593:7, 5628:15,
5628:18, 5656:13,
5667:2, 5681:15,
5681:19, 5681:21,
5683:5, 5683:15,
5683:22, 5685:8
 **receiving** [9] -
5457:12, 5582:11,
5590:18, 5590:21,
5612:21, 5634:1,
5640:15, 5642:12,
5645:9
 **receiving..** [1] -
5590:20
 **recent** [4] - 5491:11,
5492:3, 5492:4,
5530:1
 **recently** [1] - 5458:4
 **reception** [1] -
5523:11
 **Recess** [2] - 5470:8,
5601:13
 **recess** [1] - 5524:8
 **recipient** [1] - 5641:4
 **recipients** [10] -
5576:15, 5581:1,
5581:3, 5581:5,
5584:13, 5585:4,
5585:8, 5585:10,
5599:7, 5617:24
 **recognize** [8] -
5443:3, 5443:21,
5443:22, 5500:9,
5500:11, 5544:10,
5571:23, 5577:23
 **recollect** [12] -
5404:18, 5413:2,
5430:21, 5432:13,

5443:18, 5445:13, 5463:19, 5463:23, 5511:10, 5511:13, 5531:22, 5541:17
**recollection** [20] - 5404:11, 5407:21, 5421:14, 5475:22, 5479:25, 5480:2, 5480:9, 5501:1, 5501:15, 5506:14, 5508:3, 5509:1, 5509:9, 5528:15, 5528:17, 5528:18, 5528:20, 5529:6, 5540:5, 5546:14
**recommendation** [2] - 5481:1, 5481:3
**recommendations** [3] - 5405:3, 5532:4, 5534:1
**reconcile** [1] - 5526:4
**record** [43] - 5409:3, 5410:25, 5440:6, 5443:14, 5446:1, 5446:13, 5449:16, 5449:20, 5469:12, 5502:3, 5504:18, 5504:20, 5506:1, 5506:2, 5508:15, 5526:5, 5540:7, 5540:10, 5553:9, 5554:5, 5557:15, 5557:22, 5566:9, 5566:18, 5587:20, 5596:23, 5634:4, 5641:3, 5642:8, 5645:8, 5645:9, 5647:21, 5648:22, 5650:3, 5651:10, 5651:22, 5653:22, 5654:11, 5666:16, 5666:19, 5677:14, 5687:17
**recorded** [7] - 5400:25, 5410:1, 5413:21, 5414:9, 5555:7, 5568:21, 5649:7
**recording** [3] - 5487:21, 5554:7, 5648:23
**records** [36] - 5457:7, 5457:9, 5458:16, 5458:18, 5459:16, 5460:5, 5460:6, 5460:11, 5460:12, 5462:14, 5462:16, 5464:11, 5473:5, 5503:20,

5504:1, 5504:3, 5504:6, 5504:17, 5505:5, 5564:4, 5564:7, 5566:4, 5591:15, 5592:3, 5647:5, 5648:8, 5648:20, 5648:21, 5648:25, 5651:3, 5651:5, 5651:8, 5651:9, 5651:10, 5651:16
**recount** [2] - 5503:22, 5503:23
**red** [4] - 5424:24, 5445:16, 5446:25, 5556:6
**redact** [1] - 5515:3
**redacted** [14] - 5513:15, 5514:9, 5514:23, 5515:5, 5515:13, 5515:25, 5517:4, 5517:7, 5517:12, 5517:13, 5518:20, 5518:21, 5519:20, 5520:19
**redaction** [2] - 5514:16, 5517:8
**redactions** [36] - 5511:4, 5511:6, 5511:8, 5512:21, 5513:2, 5513:5, 5513:9, 5513:10, 5513:12, 5513:17, 5513:18, 5513:20, 5513:21, 5514:24, 5515:1, 5515:8, 5516:3, 5518:10, 5518:24, 5519:1, 5519:3, 5519:7, 5519:9, 5519:21, 5519:24, 5519:25, 5520:2, 5520:12, 5520:15, 5521:3, 5521:7, 5666:18, 5666:23
**redirect** [6] - 5469:21, 5521:15, 5550:2, 5652:20, 5653:5, 5683:24
**REDIRECT** [2] - 5550:10, 5689:7
**redo** [2] - 5476:5, 5476:7
**redoing** [1] - 5476:21
**REED** [1] - 5400:19
**refer** [5] - 5423:4, 5442:21, 5526:8, 5631:3, 5664:8
**reference** [9] - 5406:10, 5406:13,

5458:17, 5492:1, 5528:17, 5544:18, 5575:5, 5643:14, 5644:1
**referenced** [3] - 5414:1, 5578:3, 5614:24
**references** [2] - 5520:16, 5536:22
**referred** [1] - 5639:20
**referring** [2] - 5413:16, 5654:2
**refers** [3] - 5414:2, 5475:1, 5540:19
**reflect** [2] - 5406:15, 5507:16
**reflected** [3] - 5646:19, 5650:2, 5655:8
**reflects** [2] - 5645:9, 5645:14
**refresh** [6] - 5501:1, 5506:13, 5508:22, 5509:1, 5528:18, 5546:13
**refreshes** [3] - 5404:10, 5501:8, 5509:9
**refreshing** [1] - 5501:15
**refused** [2] - 5483:19, 5483:21
**reg** [1] - 5674:25
**regarding** [3] - 5463:9, 5612:20, 5674:3
**register** [1] - 5647:1
**Registrar** [47] - 5457:4, 5457:6, 5457:11, 5457:12, 5463:5, 5558:4, 5558:5, 5558:8, 5558:10, 5558:17, 5560:2, 5560:6, 5560:15, 5561:3, 5561:9, 5561:12, 5562:9, 5563:2, 5564:2, 5564:23, 5565:5, 5565:12, 5568:12, 5569:4, 5571:22, 5572:24, 5573:17, 5573:20, 5573:21, 5578:5, 5584:15, 5586:2, 5590:21, 5591:2, 5593:7, 5594:20, 5594:24, 5602:24, 5604:4, 5609:12, 5620:7, 5621:13,

5622:6, 5623:9, 5624:13, 5628:18, 5632:15
**Registrar's** [9] - 5560:12, 5563:9, 5564:8, 5574:1, 5577:5, 5582:1, 5586:15, 5591:12, 5591:15
**registration** [2] - 5432:6, 5491:14
**regretfully** [1] - 5680:19
**regs** [3] - 5661:19, 5661:20, 5662:16
**regular** [2] - 5586:14, 5651:6
**regularly** [1] - 5664:3
**regulate** [2] - 5657:14, 5657:15
**regulates** [1] - 5657:3
**regulation** [1] - 5667:10
**Regulation** [1] - 5659:1
**regulations** [16] - 5660:8, 5661:6, 5661:11, 5661:12, 5662:3, 5662:16, 5662:18, 5665:15, 5667:22, 5670:18, 5671:12, 5672:11, 5674:4, 5674:18, 5676:3, 5677:16
**Regulatory** [1] - 5656:25
**regulatory** [2] - 5657:2, 5672:8
**rehashing** [1] - 5678:14
**relate** [4] - 5412:20, 5448:17, 5538:8, 5673:24
**related** [47] - 5406:6, 5406:16, 5406:19, 5407:1, 5409:23, 5414:14, 5414:19, 5419:13, 5421:2, 5421:6, 5423:1, 5426:23, 5435:24, 5446:4, 5452:9, 5452:14, 5452:16, 5452:18, 5452:22, 5453:6, 5453:7, 5455:3, 5455:7, 5455:13, 5455:17, 5456:2, 5458:9, 5459:25, 5460:3, 5463:14, 5464:18,

5465:21, 5468:4, 5468:8, 5491:4, 5525:6, 5532:24, 5544:23, 5551:22, 5551:23, 5555:9, 5563:19, 5575:9, 5578:13, 5596:11, 5658:12, 5685:11
**related-party** [2] - 5414:14, 5414:19
**relating** [10] - 5408:25, 5429:15, 5468:24, 5472:23, 5527:24, 5575:1, 5579:17, 5617:14, 5645:10, 5651:23
**relation** [1] - 5451:8
**relationship** [1] - 5404:16
**Relay** [2] - 5468:3, 5688:1
**release** [8] - 5406:22, 5408:25, 5452:10, 5452:16, 5620:2, 5621:22, 5621:24, 5623:3
**Release** [1] - 5447:15
**released** [1] - 5452:22
**releases** [1] - 5452:21
**relevance** [8] - 5459:21, 5462:17, 5465:17, 5506:7, 5506:9, 5507:3, 5508:11, 5680:6
**relevant** [20] - 5425:18, 5457:25, 5459:25, 5460:2, 5460:10, 5460:14, 5460:19, 5461:7, 5462:6, 5462:9, 5463:14, 5463:15, 5464:4, 5464:9, 5465:6, 5526:15, 5537:25, 5564:5, 5677:14, 5677:23
**relied** [2] - 5508:20, 5580:13
**relies** [1] - 5504:21
**relieve** [1] - 5673:19
**reluctant** [4] - 5436:15, 5436:18, 5436:21, 5671:24
**relying** [2] - 5499:12, 5565:2
**remain** [2] - 5533:25, 5666:7
**remainder** [3] -

5520:21, 5602:13, 5610:9

**remaining** [10] - 5518:9, 5603:12, 5603:25, 5605:4, 5605:10, 5606:9, 5606:13, 5611:18, 5614:10, 5617:14

**remember** [76] - 5405:18, 5415:22, 5421:4, 5429:8, 5429:17, 5429:21, 5429:22, 5429:24, 5430:24, 5431:7, 5431:14, 5431:17, 5431:18, 5431:25, 5434:7, 5434:9, 5446:6, 5457:5, 5463:18, 5464:8, 5468:23, 5470:20, 5470:25, 5471:4, 5471:9, 5471:12, 5473:25, 5475:23, 5479:23, 5480:12, 5481:14, 5485:10, 5485:16, 5496:9, 5499:17, 5509:16, 5529:17, 5531:15, 5531:20, 5531:23, 5531:25, 5532:2, 5532:3, 5532:25, 5533:20, 5534:3, 5534:5, 5539:25, 5540:3, 5541:11, 5541:21, 5546:2, 5546:5, 5546:7, 5550:15, 5550:17, 5551:2, 5551:19, 5552:21, 5552:25, 5555:13, 5561:18, 5612:24, 5613:15, 5629:15, 5637:25, 5639:10, 5640:14, 5641:16, 5644:2, 5644:10, 5647:18, 5647:21, 5648:2, 5651:23, 5681:18

**remembered** [5] - 5498:10, 5511:11, 5539:12, 5539:23, 5540:4

**remembers** [3] - 5467:14, 5508:12, 5508:13

**remind** [2] - 5463:23, 5509:14

**reminded** [1] - 5601:5

**removal** [2] - 5575:10, 5575:11

**removed** [2] - 5617:17, 5688:4

**render** [1] - 5644:15

**rendered** [4] - 5426:16, 5473:5, 5578:20, 5634:5

**rent** [2] - 5401:19, 5522:24

**repay** [3] - 5413:23, 5446:5, 5485:8

**repayment** [1] - 5406:16

**repeat** [4] - 5440:4, 5496:2, 5497:18, 5511:25

**rephrase** [5] - 5414:16, 5446:21, 5446:22, 5538:25, 5551:9

**replace** [1] - 5666:18

**replacing** [1] - 5521:6

**report** [44] - 5433:21, 5440:21, 5440:24, 5487:19, 5487:25, 5494:2, 5494:14, 5494:21, 5522:2, 5532:22, 5568:5, 5568:6, 5569:5, 5571:2, 5575:17, 5581:11, 5588:15, 5589:23, 5590:5, 5591:10, 5592:15, 5594:16, 5596:11, 5596:17, 5597:20, 5602:4, 5602:10, 5602:18, 5602:21, 5607:17, 5610:7, 5618:12, 5618:24, 5620:19, 5620:23, 5622:6, 5628:22, 5628:25, 5631:3, 5648:12, 5649:14, 5650:2, 5655:19, 5655:23

**reported** [5] - 5447:6, 5471:11, 5503:24, 5531:14, 5656:2

**Reporter** [1] - 5400:22

**reporting** [3] - 5470:23, 5495:19, 5651:5

**reports** [5] - 5424:3, 5495:25, 5506:3, 5531:11, 5634:9

**represent** [4] - 5425:15, 5472:12, 5578:10, 5579:10

**representation** [4] - 5556:2, 5675:22, 5675:24, 5676:9

**representing** [2] - 5640:4, 5643:10

**represents** [2] - 5570:15, 5642:5

**request** [13] - 5434:11, 5560:11, 5574:16, 5593:16, 5605:2, 5617:17, 5638:11, 5640:23, 5668:19, 5668:24, 5671:22, 5688:5

**requested** [8] - 5436:6, 5574:14, 5583:6, 5593:17, 5599:18, 5604:5, 5619:2, 5623:10

**requesting** [4] - 5582:23, 5591:25, 5599:2, 5686:11

**requests** [3] - 5585:7, 5686:8, 5686:22

**require** [3] - 5406:6, 5458:1, 5672:13

**required** [21] - 5411:5, 5411:21, 5414:9, 5446:1, 5446:13, 5447:11, 5449:13, 5454:23, 5491:11, 5491:22, 5492:1, 5492:2, 5494:14, 5494:22, 5529:21, 5553:9, 5554:5, 5554:14, 5559:12, 5621:21, 5633:2

**requirement** [3] - 5433:16, 5491:9, 5493:2

**requirements** [7] - 5432:6, 5435:18, 5660:7, 5661:6, 5664:23, 5667:14, 5670:18

**requires** [3] - 5435:16, 5477:3, 5477:4

**researched** [1] - 5625:19

**resolutions** [5] - 5532:9, 5532:23, 5558:25, 5559:6, 5560:1

**resolve** [1] - 5520:18

**resolved** [6] - 5532:11, 5532:15, 5533:15, 5616:2,

5617:19, 5678:13

**resources** [3] - 5422:18, 5422:22, 5495:14

**respect** [19] - 5430:9, 5451:17, 5452:4, 5458:14, 5458:25, 5466:2, 5466:5, 5515:11, 5515:12, 5515:23, 5516:3, 5534:13, 5578:20, 5640:14, 5644:6, 5644:8, 5649:1, 5687:23, 5688:2

**respectfully** [10] - 5467:12, 5661:8, 5669:3, 5669:10, 5673:16, 5676:19, 5677:18, 5677:22, 5678:16, 5680:2

**respects** [1] - 5532:14

**respond** [8] - 5468:19, 5585:17, 5609:21, 5613:17, 5613:23, 5614:5, 5614:25, 5616:6

**responded** [1] - 5627:1

**responds** [1] - 5633:18

**response** [19] - 5415:10, 5457:12, 5473:4, 5488:5, 5489:7, 5573:9, 5573:15, 5574:11, 5582:16, 5583:12, 5584:20, 5623:9, 5625:18, 5625:25, 5628:14, 5632:15, 5632:24, 5634:3, 5674:10

**responsibilities** [1] - 5658:13

**responsibility** [5] - 5447:10, 5493:21, 5649:23, 5651:20, 5667:6

**responsible** [1] - 5649:3

**rest** [4] - 5470:5, 5517:4, 5565:25, 5584:19

**restate** [7] - 5405:11, 5411:8, 5480:14, 5488:13, 5502:23, 5529:3, 5529:10

**restated** [3] - 5477:11, 5478:22,

5543:22

**restatement** [18] - 5403:22, 5404:19, 5404:24, 5405:3, 5410:15, 5454:23, 5476:1, 5476:4, 5477:12, 5479:16, 5479:18, 5480:4, 5480:11, 5480:20, 5532:11, 5547:15, 5547:17

**restatements** [3] - 5411:9, 5529:20, 5533:2

**restating** [5] - 5405:5, 5405:10, 5410:11, 5476:24, 5488:12

**restricted** [28] - 5559:13, 5559:15, 5559:16, 5570:16, 5572:4, 5576:11, 5587:12, 5588:6, 5588:18, 5588:21, 5589:12, 5597:16, 5597:17, 5598:14, 5619:8, 5619:9, 5619:21, 5621:5, 5621:6, 5621:19, 5622:12, 5622:13, 5622:23, 5630:18, 5630:25, 5632:1, 5648:17, 5672:12

**restriction** [3] - 5575:10, 5575:11, 5575:12

**restrictive** [2] - 5579:25, 5580:3

**restroom** [1] - 5470:3

**result** [4] - 5428:25, 5529:21, 5551:18, 5671:2

**resulted** [2] - 5491:22, 5544:2

**results** [3] - 5411:7, 5412:5, 5529:14

**resume** [3] - 5470:15, 5526:23, 5601:17

**resumed** [1] - 5403:5

**Retire** [1] - 5601:5

**Retrophin** [143] - 5408:14, 5408:21, 5409:2, 5409:25, 5410:1, 5416:4, 5416:10, 5421:4, 5421:21, 5425:19, 5426:24, 5429:5, 5430:9, 5430:11,

5430:19, 5431:3, 5431:24, 5432:2, 5434:5, 5434:7, 5434:9, 5437:20, 5439:10, 5439:14, 5443:10, 5443:11, 5448:16, 5449:10, 5449:15, 5451:6, 5455:9, 5457:15, 5460:2, 5462:10, 5463:6, 5464:13, 5465:2, 5465:4, 5469:8, 5486:11, 5486:24, 5487:8, 5488:17, 5490:9, 5499:4, 5500:5, 5506:18, 5509:20, 5510:1, 5513:10, 5513:17, 5514:9, 5514:12, 5514:19, 5515:1, 5515:3, 5515:17, 5515:19, 5515:24, 5516:2, 5516:6, 5517:13, 5517:17, 5517:24, 5517:25, 5518:4, 5518:14, 5518:18, 5519:23, 5520:1, 5520:6, 5520:7, 5520:9, 5520:19, 5521:9, 5522:6, 5526:7, 5527:24, 5542:13, 5543:15, 5544:10, 5546:15, 5547:2, 5552:2, 5561:13, 5561:16, 5562:9, 5562:13, 5562:14, 5562:23, 5562:25, 5563:5, 5563:20, 5564:24, 5565:5, 5568:15, 5569:4, 5571:21, 5572:2, 5573:7, 5574:9, 5576:11, 5598:2, 5598:3, 5598:4, 5613:12, 5617:15, 5618:6, 5619:3, 5619:21, 5620:5, 5620:14, 5621:8, 5621:9, 5621:15, 5621:20, 5622:2, 5622:19, 5623:6, 5625:16, 5629:11, 5632:2, 5632:13, 5635:15, 5637:14, 5648:10, 5649:19, 5654:15, 5654:19, 5654:23, 5655:1, 5655:4, 5655:20, 5655:25, 5670:12, 5681:11,

5685:10, 5686:11, 5686:13, 5687:8, 5687:10, 5687:15
**Retrophin's** [6] - 5419:14, 5515:12, 5518:6, 5520:25, 5632:2, 5686:5
**return** [1] - 5522:20
**returned** [3] - 5626:1, 5626:25, 5628:13
**reverse** [1] - 5625:22
**Review** [1] - 5489:2
**review** [23] - 5411:22, 5413:7, 5420:1, 5431:9, 5434:13, 5489:10, 5491:1, 5491:18, 5493:5, 5506:19, 5507:15, 5532:18, 5545:11, 5545:13, 5545:18, 5545:22, 5547:6, 5573:10, 5579:14, 5658:15, 5659:4, 5675:12, 5685:10
**reviewed** [14] - 5413:5, 5450:23, 5483:1, 5498:21, 5498:23, 5503:12, 5509:19, 5531:4, 5533:6, 5538:17, 5538:18, 5540:22, 5541:2, 5551:1
**reviewing** [4] - 5433:5, 5438:5, 5574:13, 5676:1
**reviews** [4] - 5411:5, 5413:8, 5433:16, 5664:3
**revise** [1] - 5574:15
**revised** [1] - 5574:16
**rewrite** [1] - 5483:7
**Richard** [7] - 5474:7, 5599:13, 5610:8, 5610:11, 5611:5, 5611:7, 5611:23
**Richardson** [5] - 5497:12, 5497:16, 5497:19, 5497:20, 5528:5
**ridiculous** [1] - 5513:22
**rise** [1] - 5552:13
**rising** [1] - 5522:24
**risk** [3] - 5683:18, 5683:25, 5684:22
**RO** [1] - 5515:13
**road** [1] - 5506:6
**Rockaway** [1] -

5581:17
**ROHDE** [1] - 5400:12
**role** [4] - 5432:9, 5432:10, 5463:5, 5558:10
**Ron** [3] - 5431:14, 5431:15, 5431:16
**room** [1] - 5601:5
**Rosenman** [5] - 5582:14, 5605:13, 5606:22, 5611:22, 5655:6
**Rosenwald** [17] - 5445:12, 5446:14, 5447:18, 5448:5, 5448:7, 5448:15, 5555:9, 5595:19, 5602:13, 5602:15, 5605:12, 5606:16, 5607:5, 5607:25, 5608:17, 5608:20
**Rosewood** [1] - 5596:1
**round** [1] - 5574:15
**route** [1] - 5677:17
**routine** [1] - 5433:14
**RPRX** [1] - 5425:25
**RTRx** [2] - 5622:22, 5622:23
**Rule** [13] - 5468:10, 5639:20, 5655:11, 5656:3, 5667:12, 5672:11, 5673:18, 5674:15, 5677:1, 5680:14, 5685:9, 5686:19, 5687:11
**rule** [5] - 5492:10, 5492:11, 5502:12, 5525:7, 5685:7
**ruled** [4] - 5466:8, 5525:10, 5567:5, 5674:10
**rules** [9] - 5442:11, 5459:15, 5529:21, 5657:15, 5657:16, 5657:18, 5667:23, 5672:11, 5674:3
**ruling** [5] - 5459:13, 5662:15, 5669:6, 5681:25
**run** [3] - 5683:25, 5687:10, 5687:13

---

**S**

**safe** [1] - 5557:7
**sake** [1] - 5651:11
**sale** [1] - 5672:12
**Salt** [1] - 5558:2
**Sara** [1] - 5595:22

**Sarah** [1] - 5409:1
**SAS** [19] - 5410:13, 5411:2, 5419:21, 5419:25, 5420:4, 5426:23, 5427:5, 5481:8, 5485:21, 5490:3, 5490:7, 5531:18, 5533:24, 5545:4, 5545:7, 5547:24, 5548:10, 5548:20, 5549:9
**satisfied** [2] - 5545:22, 5547:7
**Saturday** [3] - 5582:24, 5583:16, 5583:23
**saved** [1] - 5511:15
**saw** [19] - 5463:9, 5573:4, 5574:8, 5577:5, 5580:18, 5586:9, 5594:4, 5596:7, 5611:12, 5618:16, 5623:20, 5623:24, 5626:6, 5626:17, 5629:22, 5630:7, 5632:22, 5633:6, 5635:17
**scenario** [1] - 5505:14
**scenarios** [2] - 5661:20, 5661:24
**Schedule** [1] - 5672:12
**schedule** [7] - 5521:12, 5521:19, 5521:20, 5596:3, 5599:7, 5678:20, 5678:25
**Schuyler** [4] - 5445:7, 5450:3, 5450:10, 5596:1
**Schwab** [3] - 5646:14, 5646:19, 5647:7
**scope** [1] - 5472:16
**score** [1] - 5679:17
**screen** [9] - 5408:7, 5442:21, 5447:14, 5449:24, 5450:2, 5488:6, 5540:17, 5554:20, 5635:5
**scroll** [3] - 5538:11, 5544:21, 5556:16
**scrolling** [1] - 5642:16
**seamless** [1] - 5457:2
**seamlessly** [2] - 5456:25, 5526:12
**seat** [3] - 5402:24,

5470:14, 5601:16
**seated** [1] - 5526:21
**SEC** [32] - 5411:8, 5431:24, 5432:1, 5432:3, 5432:4, 5432:6, 5432:7, 5432:12, 5432:24, 5454:25, 5477:16, 5494:22, 5532:17, 5654:16, 5654:19, 5654:23, 5655:1, 5655:4, 5655:8, 5657:25, 5658:1, 5658:2, 5660:2, 5660:7, 5661:5, 5662:3, 5665:6, 5665:15, 5667:23, 5670:17, 5674:3, 5675:12
**second** [32] - 5405:15, 5406:2, 5422:24, 5423:22, 5426:5, 5446:3, 5450:4, 5451:13, 5460:20, 5543:24, 5544:6, 5544:22, 5551:17, 5552:5, 5597:11, 5604:16, 5604:23, 5606:11, 5611:18, 5617:6, 5624:16, 5625:20, 5625:22, 5626:24, 5628:12, 5628:18, 5630:10, 5630:20, 5633:14, 5638:10, 5664:23, 5681:6
**Second** [2] - 5671:3, 5673:11
**secondary** [1] - 5485:5
**secondly** [1] - 5461:8
**secret** [1] - 5437:2
**secretary** [1] - 5535:22
**section** [7] - 5414:25, 5422:17, 5422:20, 5423:18, 5483:24, 5546:24, 5579:20
**Section** [3] - 5531:12, 5659:2, 5659:9
**sections** [1] - 5538:8
**sector** [1] - 5663:9
**Securities** [5] - 5531:12, 5654:16, 5657:25, 5658:3, 5672:10
**securities** [12] -

5579:12, 5657:3, 5658:12, 5659:7, 5659:22, 5659:25, 5660:3, 5660:7, 5661:5, 5662:2, 5670:17, 5672:12

**security** [1] - 5579:17

**see** [131] - 5401:4, 5401:14, 5405:25, 5406:8, 5406:11, 5406:23, 5407:14, 5408:6, 5408:10, 5408:16, 5409:4, 5409:10, 5409:16, 5410:22, 5412:12, 5413:9, 5413:14, 5413:24, 5414:23, 5416:17, 5416:25, 5418:8, 5418:25, 5420:12, 5421:10, 5422:17, 5422:21, 5423:7, 5425:11, 5425:20, 5426:1, 5427:5, 5427:18, 5433:25, 5435:2, 5447:15, 5447:18, 5448:23, 5477:13, 5477:15, 5477:16, 5483:19, 5484:22, 5490:10, 5490:14, 5490:15, 5490:16, 5491:7, 5491:16, 5493:5, 5509:9, 5509:12, 5512:19, 5523:5, 5525:16, 5526:17, 5534:9, 5535:7, 5535:10, 5536:11, 5536:17, 5536:22, 5537:21, 5538:8, 5538:11, 5540:21, 5546:24, 5551:24, 5552:10, 5554:5, 5555:3, 5556:9, 5556:12, 5568:2, 5569:3, 5569:11, 5569:22, 5570:7, 5570:12, 5570:22, 5571:4, 5572:9, 5572:19, 5573:1, 5574:18, 5575:5, 5577:19, 5578:10, 5579:5, 5579:20, 5582:3, 5583:13, 5584:19, 5585:13, 5587:6, 5587:14, 5587:17, 5588:2, 5588:8, 5588:18, 5589:1, 5591:23, 5592:8, 5592:21, 5593:21,

5598:14, 5599:14, 5604:14, 5604:21, 5605:6, 5608:7, 5609:8, 5613:4, 5616:4, 5617:2, 5621:1, 5621:16, 5623:1, 5623:23, 5628:12, 5629:11, 5635:8, 5652:4, 5652:16, 5666:11, 5671:25, 5673:12, 5679:19, 5679:21, 5681:1, 5686:16

**seeing** [1] - 5535:19

**seek** [4] - 5458:24, 5461:18, 5520:18, 5679:2

**seeking** [2] - 5685:16, 5686:13

**seeks** [2] - 5527:15, 5651:9

**seem** [2] - 5469:11, 5518:24

**segregate** [1] - 5495:15

**segregation** [2] - 5495:11, 5495:12

**self** [1] - 5657:2

**self-regulatory** [1] - 5657:2

**sell** [6] - 5604:18, 5646:3, 5646:13, 5646:22, 5646:24, 5647:9

**seller** [4] - 5604:17, 5604:18, 5605:1, 5605:3

**selling** [1] - 5657:12

**send** [22] - 5483:14, 5483:15, 5483:17, 5483:18, 5483:19, 5483:22, 5582:12, 5583:2, 5583:9, 5584:15, 5584:17, 5584:23, 5585:7, 5585:10, 5585:19, 5595:14, 5603:15, 5611:4, 5611:7, 5619:21, 5632:3

**sending** [2] - 5411:23, 5603:14

**senior** [1] - 5658:7

**sense** [2] - 5434:2, 5508:9

**sent** [53] - 5419:9, 5434:11, 5461:23, 5483:2, 5518:16, 5518:17, 5519:6, 5546:14, 5547:24, 5571:17, 5572:9,

5575:3, 5576:23, 5581:5, 5581:12, 5581:14, 5581:21, 5582:14, 5584:25, 5585:11, 5585:15, 5586:3, 5593:4, 5594:5, 5594:20, 5594:23, 5594:24, 5595:1, 5596:4, 5597:9, 5599:18, 5600:2, 5607:5, 5609:10, 5609:11, 5611:19, 5611:24, 5612:16, 5613:3, 5616:14, 5617:4, 5618:6, 5618:19, 5620:10, 5620:13, 5626:19, 5629:19, 5632:5, 5633:16, 5640:19, 5640:20, 5640:25

**sentence** [19] - 5406:2, 5406:10, 5406:15, 5413:13, 5413:19, 5445:20, 5452:7, 5453:5, 5453:12, 5471:22, 5533:5, 5551:21, 5552:4, 5554:2, 5554:23, 5574:24, 5580:9

**sentences** [2] - 5553:5, 5619:18

**separate** [3] - 5445:24, 5476:16, 5553:7

**separately** [1] - 5567:10

**separating** [1] - 5458:2

**September** [40] - 5411:9, 5415:23, 5416:17, 5416:20, 5418:2, 5418:11, 5418:21, 5431:9, 5482:16, 5482:18, 5483:1, 5502:19, 5502:25, 5507:20, 5507:21, 5508:1, 5509:8, 5509:12, 5509:16, 5509:17, 5509:18, 5517:14, 5520:11, 5520:12, 5527:24, 5533:23, 5536:8, 5536:13, 5538:11, 5538:12, 5538:14, 5539:2, 5540:18, 5550:13, 5633:8, 5655:5, 5655:21, 5656:1

**series** [11] - 5408:20, 5470:21, 5470:25, 5484:19, 5485:11, 5514:12, 5514:25, 5544:24, 5578:13, 5620:22, 5652:1

**serve** [1] - 5408:17

**served** [2] - 5687:5, 5687:6

**serves** [1] - 5621:12

**service** [1] - 5666:8

**services** [5] - 5419:4, 5426:16, 5473:6, 5634:2, 5634:5

**set** [12] - 5467:6, 5472:3, 5572:5, 5572:6, 5579:23, 5605:1, 5605:11, 5606:13, 5606:14, 5643:14, 5664:5, 5674:9

**sets** [1] - 5547:23

**setting** [1] - 5451:7

**settle** [5] - 5414:3, 5420:23, 5544:24, 5549:13, 5679:17

**settled** [2] - 5453:25, 5474:13

**settlement** [168] - 5404:25, 5405:21, 5406:13, 5406:21, 5407:1, 5407:22, 5408:25, 5412:18, 5412:20, 5414:13, 5417:6, 5420:11, 5420:18, 5420:22, 5420:24, 5421:6, 5421:10, 5421:17, 5423:1, 5427:16, 5432:19, 5432:21, 5433:3, 5434:24, 5435:25, 5436:2, 5436:4, 5436:11, 5436:14, 5436:22, 5436:24, 5437:18, 5438:3, 5438:8, 5438:10, 5438:12, 5438:14, 5438:17, 5438:19, 5438:20, 5439:4, 5439:6, 5440:7, 5442:2, 5442:8, 5442:10, 5442:14, 5443:5, 5445:4, 5445:11, 5445:13, 5445:25, 5446:9, 5446:15, 5446:16, 5446:25, 5447:2, 5447:5, 5448:5, 5448:6,

5448:14, 5449:10, 5449:11, 5449:12, 5449:15, 5450:3, 5450:5, 5450:11, 5450:16, 5451:8, 5451:18, 5451:25, 5452:10, 5452:13, 5452:21, 5453:14, 5453:17, 5454:10, 5454:18, 5454:22, 5455:3, 5455:13, 5455:21, 5455:24, 5457:13, 5458:1, 5458:25, 5459:1, 5459:3, 5459:5, 5459:6, 5460:16, 5460:18, 5460:23, 5460:25, 5461:10, 5461:16, 5461:22, 5462:10, 5463:21, 5464:9, 5464:16, 5464:19, 5464:20, 5465:13, 5467:4, 5467:9, 5467:11, 5469:5, 5473:25, 5475:2, 5475:11, 5475:16, 5475:19, 5476:8, 5476:20, 5477:19, 5481:19, 5481:20, 5482:4, 5483:25, 5484:12, 5484:25, 5485:12, 5485:18, 5486:1, 5488:11, 5491:2, 5492:9, 5492:19, 5492:21, 5497:9, 5498:2, 5498:17, 5501:2, 5501:9, 5509:11, 5517:13, 5517:14, 5520:16, 5529:22, 5531:2, 5531:21, 5544:18, 5545:2, 5545:3, 5547:7, 5548:2, 5548:3, 5548:10, 5548:17, 5549:10, 5549:12, 5549:17, 5551:18, 5552:13, 5552:17, 5553:1, 5553:8, 5555:15, 5555:24, 5556:25, 5620:2, 5621:22, 5621:24

**Settlement** [1] - 5447:15

**settlements** [9] - 5413:21, 5421:2, 5442:5, 5459:23, 5460:17, 5464:2, 5465:21, 5469:13, 5469:15

**settling** [1] - 5484:19
**Seven** [3] - 5469:3, 5469:8, 5525:7
**seven** [1] - 5564:13
**several** [8] - 5412:14, 5414:2, 5414:9, 5414:21, 5422:23, 5425:6, 5491:12, 5492:3
**severally** [1] - 5408:20
**severity** [1] - 5494:17
**shall** [5] - 5408:17, 5408:20, 5605:11, 5605:12, 5606:13
**sham** [4] - 5461:5, 5466:7, 5466:10, 5466:14
**Shapiro** [1] - 5526:6
**share** [37] - 5446:2, 5553:10, 5558:24, 5562:17, 5570:18, 5575:12, 5580:17, 5581:10, 5586:8, 5588:16, 5589:23, 5590:5, 5591:8, 5591:10, 5597:20, 5604:19, 5632:25, 5633:1, 5633:15, 5634:9, 5636:23, 5636:24, 5637:4, 5637:9, 5637:10, 5638:20, 5642:21, 5646:12, 5647:21, 5648:2, 5649:2, 5649:10, 5649:15, 5649:16, 5651:23, 5655:20, 5686:6
**share-based** [2] - 5446:2, 5553:10
**shared** [2] - 5437:13, 5437:14
**shareholder** [10] - 5587:10, 5587:14, 5612:19, 5612:24, 5613:21, 5614:18, 5615:3, 5644:10, 5647:20, 5648:12
**shareholders** [17] - 5572:20, 5579:10, 5579:15, 5579:16, 5582:23, 5583:15, 5587:11, 5587:17, 5587:20, 5587:24, 5621:15, 5641:1, 5645:21, 5648:16, 5649:11, 5674:16, 5674:17
**shares** [249] -

5425:25, 5445:24, 5446:11, 5447:10, 5448:16, 5451:20, 5457:12, 5457:16, 5457:17, 5458:9, 5463:6, 5552:7, 5553:6, 5553:20, 5555:2, 5558:21, 5558:23, 5558:25, 5559:3, 5559:12, 5559:15, 5559:16, 5559:24, 5570:16, 5570:19, 5570:25, 5571:25, 5572:17, 5572:20, 5572:24, 5574:14, 5574:19, 5574:22, 5575:3, 5576:9, 5576:10, 5576:11, 5576:13, 5576:15, 5577:21, 5578:16, 5578:21, 5578:25, 5579:1, 5579:10, 5579:24, 5580:5, 5580:10, 5580:25, 5582:24, 5583:1, 5583:3, 5583:4, 5583:6, 5583:9, 5583:19, 5583:23, 5584:16, 5584:18, 5584:23, 5585:7, 5585:14, 5587:12, 5587:13, 5588:2, 5588:5, 5588:8, 5588:12, 5588:13, 5588:19, 5588:21, 5588:24, 5588:25, 5589:8, 5589:12, 5589:13, 5589:14, 5590:7, 5590:13, 5590:15, 5590:18, 5592:4, 5592:5, 5592:6, 5592:10, 5592:23, 5592:25, 5593:17, 5593:19, 5594:17, 5594:19, 5595:12, 5596:4, 5596:19, 5597:9, 5597:16, 5598:9, 5598:10, 5599:14, 5599:8, 5599:18, 5602:12, 5602:14, 5603:11, 5603:12, 5603:21, 5603:23, 5603:25, 5604:4, 5604:19, 5605:2, 5605:3, 5605:4, 5605:11, 5605:12, 5606:9, 5606:13, 5606:16, 5606:19, 5606:21, 5607:5, 5607:6,

5607:24, 5608:12, 5608:16, 5608:19, 5610:8, 5610:11, 5611:5, 5611:6, 5611:7, 5611:19, 5611:23, 5612:20, 5612:22, 5615:2, 5615:24, 5616:1, 5617:14, 5617:15, 5617:21, 5617:22, 5617:24, 5618:1, 5618:5, 5618:6, 5618:16, 5618:19, 5619:5, 5619:6, 5619:8, 5619:13, 5619:21, 5620:8, 5621:3, 5621:19, 5621:21, 5622:10, 5622:21, 5623:10, 5623:17, 5623:20, 5624:4, 5624:11, 5625:13, 5625:22, 5626:8, 5629:4, 5629:6, 5629:7, 5630:14, 5630:22, 5631:13, 5632:1, 5632:9, 5632:16, 5634:9, 5635:1, 5635:14, 5636:11, 5636:14, 5636:18, 5636:19, 5636:20, 5637:7, 5637:19, 5637:22, 5638:3, 5638:4, 5638:11, 5639:22, 5639:25, 5640:5, 5640:6, 5640:8, 5640:15, 5641:2, 5642:5, 5643:13, 5643:18, 5644:6, 5644:9, 5644:11, 5644:15, 5644:20, 5644:21, 5645:1, 5645:9, 5645:11, 5645:13, 5645:14, 5645:20, 5645:23, 5645:24, 5646:1, 5646:25, 5647:6, 5648:5, 5648:15, 5648:17, 5648:18, 5649:1, 5649:2, 5649:10, 5649:22, 5649:24, 5651:14, 5653:2, 5655:20, 5655:25, 5674:22, 5681:11, 5681:15, 5681:21, 5683:5, 5683:16, 5683:22, 5684:2, 5684:5
**Shares** [2] - 5578:16, 5612:17

**sheet** [3] - 5443:6, 5554:13, 5554:15
**Sheet** [7] - 5654:15, 5654:19, 5654:23, 5655:1, 5655:4, 5655:7, 5663:5
**Shkreli** [83] - 5404:18, 5409:1, 5409:13, 5409:14, 5426:6, 5426:9, 5438:13, 5438:14, 5438:18, 5439:1, 5439:3, 5446:16, 5447:4, 5448:14, 5448:17, 5455:9, 5455:12, 5465:11, 5465:23, 5466:4, 5466:6, 5467:16, 5467:17, 5468:23, 5469:7, 5480:1, 5503:23, 5528:4, 5528:24, 5529:25, 5531:20, 5531:22, 5533:4, 5552:19, 5561:17, 5561:18, 5561:20, 5562:16, 5591:4, 5591:23, 5591:24, 5593:12, 5593:13, 5593:16, 5595:9, 5596:25, 5597:6, 5597:9, 5598:22, 5599:19, 5600:3, 5603:2, 5608:11, 5610:9, 5610:13, 5611:6, 5611:23, 5618:5, 5620:4, 5635:1, 5635:14, 5638:3, 5638:12, 5638:16, 5638:23, 5639:2, 5639:4, 5639:7, 5639:13, 5649:18, 5661:18, 5662:9, 5663:1, 5664:11, 5665:11, 5665:13, 5668:7, 5668:25, 5676:13, 5676:17, 5676:18, 5676:21, 5676:23
**Shkreli's** [8] - 5465:20, 5465:22, 5466:5, 5466:11, 5467:2, 5525:6, 5553:23, 5570:10
**short** [1] - 5521:25
**shortly** [2] - 5496:8, 5575:1
**show** [29] - 5404:7, 5410:18, 5416:8, 5419:23, 5427:1,

5447:13, 5449:5, 5457:15, 5459:22, 5460:6, 5463:13, 5464:5, 5466:18, 5500:7, 5501:24, 5502:13, 5506:12, 5506:17, 5517:6, 5519:7, 5546:8, 5589:20, 5607:15, 5615:8, 5616:12, 5626:3, 5627:3, 5630:20, 5634:6
**showed** [6] - 5435:9, 5451:7, 5482:8, 5482:12, 5511:24, 5645:6
**showing** [9] - 5443:20, 5448:1, 5457:17, 5459:6, 5501:7, 5509:23, 5511:20, 5542:4, 5630:14
**shown** [4] - 5459:5, 5460:9, 5526:1, 5630:13
**shows** [3] - 5461:19, 5503:1, 5630:21
**shy** [1] - 5517:17
**side** [2] - 5538:3, 5538:6
**sidebar** [10] - 5501:20, 5502:1, 5510:5, 5510:12, 5512:4, 5513:4, 5564:16, 5564:18, 5660:11, 5661:1
**Sidebar** [4] - 5501:22, 5564:20, 5660:14, 5665:22
**sides** [1] - 5678:13
**sign** [1] - 5545:21
**signature** [6] - 5406:7, 5409:9, 5490:15, 5534:9, 5642:18, 5643:1
**signatures** [3] - 5409:10, 5409:15, 5643:6
**signed** [29] - 5409:14, 5409:16, 5409:17, 5416:17, 5422:10, 5426:19, 5498:23, 5499:4, 5503:16, 5519:11, 5519:12, 5519:19, 5519:20, 5534:9, 5534:13, 5534:17, 5535:11, 5535:19, 5535:21, 5537:12, 5539:8, 5550:17,

5605:21, 5607:1, 5621:9, 5621:20, 5652:15, 5655:14

**signer** [1] - 5605:23

**significance** [1] - 5491:21

**significant** [8] - 5402:11, 5412:11, 5412:14, 5433:7, 5435:7, 5489:9, 5491:2, 5667:20

**Significant** [2] - 5484:4, 5484:8

**significantly** [1] - 5495:19

**signing** [1] - 5409:12

**similar** [12] - 5402:13, 5423:2, 5424:8, 5427:15, 5458:24, 5466:15, 5548:17, 5548:19, 5549:21, 5559:17, 5606:8, 5611:12

**similarly** [4] - 5409:6, 5420:4, 5427:23, 5466:14

**simply** [3] - 5454:8, 5494:5, 5673:21

**single** [6] - 5506:2, 5540:1, 5540:3, 5541:17, 5550:23, 5636:24

**sit** [2] - 5497:4, 5653:14

**sitting** [8] - 5428:22, 5429:7, 5441:18, 5441:25, 5475:4, 5528:5, 5528:8, 5543:4

**situation** [3] - 5494:14, 5559:20, 5649:18

**Six** [4] - 5465:22, 5467:8, 5469:1, 5525:8

**six** [2] - 5491:23, 5555:17

**six-month** [1] - 5491:23

**skip** [1] - 5578:19

**slow** [1] - 5522:25

**small** [7] - 5401:18, 5402:4, 5420:14, 5420:20, 5456:21, 5523:11, 5658:10

**smaller** [1] - 5558:18

**Smith** [1] - 5463:23

**SMITH** [26] - 5400:13, 5403:2, 5463:25, 5464:8,

5466:1, 5468:19, 5468:22, 5503:15, 5507:23, 5513:11, 5518:2, 5519:23, 5520:23, 5521:21, 5539:1, 5565:25, 5566:6, 5566:9, 5566:15, 5566:18, 5567:4, 5567:8, 5664:17, 5686:7, 5686:25, 5687:3

**snippet** [1] - 5466:20

**sold** [3] - 5509:16, 5634:1, 5645:3

**sole** [1] - 5599:1

**solely** [9] - 5453:6, 5493:11, 5507:4, 5551:22, 5638:16, 5651:8, 5658:10, 5663:10, 5668:8

**some-odd-years** [1] - 5662:2

**someone** [17] - 5403:17, 5413:3, 5413:5, 5431:14, 5445:12, 5478:19, 5481:16, 5497:19, 5502:5, 5523:10, 5584:17, 5607:6, 5613:4, 5643:18, 5645:2, 5664:22, 5675:15

**sometime** [4] - 5404:6, 5432:21, 5433:1, 5492:5

**sometimes** [10] - 5410:12, 5441:4, 5441:14, 5518:14, 5540:9, 5561:6, 5637:13, 5637:16, 5637:18, 5637:21

**soon** [3] - 5560:11, 5560:13, 5601:6

**sorry** [63] - 5407:20, 5410:19, 5417:3, 5428:1, 5430:25, 5431:8, 5440:23, 5455:22, 5462:25, 5471:18, 5478:24, 5481:23, 5486:12, 5486:17, 5486:22, 5488:15, 5489:21, 5493:18, 5500:5, 5504:10, 5511:5, 5511:25, 5512:2, 5522:22, 5528:12, 5531:3, 5533:1, 5533:14, 5552:15, 5562:13, 5564:14, 5567:13, 5576:22,

5577:2, 5580:15, 5580:16, 5583:14, 5584:4, 5585:9, 5590:24, 5594:15, 5595:20, 5595:21, 5597:14, 5602:19, 5604:23, 5605:19, 5607:16, 5609:7, 5620:14, 5625:23, 5628:24, 5632:18, 5633:22, 5634:8, 5636:1, 5641:20, 5651:15, 5653:14, 5654:21, 5657:19, 5684:12, 5684:24

**Sorry** [1] - 5450:1

**sort** [11] - 5443:6, 5450:4, 5455:20, 5475:20, 5516:6, 5535:6, 5538:14, 5547:23, 5549:16, 5559:5, 5646:18

**sorted** [1] - 5515:2

**sorts** [1] - 5414:5

**sought** [3] - 5442:1, 5465:2, 5510:17

**sounded** [2] - 5493:10, 5680:4

**sounding** [1] - 5448:8

**sounds** [4] - 5439:5, 5442:9, 5454:20, 5684:3

**source** [1] - 5653:1

**sources** [1] - 5658:16

**speaking** [1] - 5401:12

**specific** [13] - 5446:2, 5517:19, 5559:1, 5568:7, 5568:9, 5570:1, 5571:2, 5663:25, 5675:23, 5679:20, 5686:9, 5686:11, 5686:22

**specifically** [3] - 5415:22, 5461:25, 5481:14

**specificity** [1] - 5463:19

**specifics** [1] - 5685:16

**specified** [1] - 5606:14

**specify** [2] - 5559:12, 5573:12

**speculation** [4] - 5439:23, 5446:20, 5447:7, 5448:19

**spell** [1] - 5654:5

**Spencer** [7] - 5457:13, 5464:16, 5464:18, 5619:5, 5619:20, 5619:23, 5620:4

**spending** [2] - 5434:3, 5434:4

**Spielberg** [28] - 5457:13, 5457:23, 5459:1, 5461:16, 5461:22, 5462:1, 5463:21, 5463:23, 5464:2, 5464:16, 5465:12, 5465:20, 5465:25, 5466:17, 5466:23, 5468:8, 5468:11, 5468:25, 5469:5, 5474:3, 5525:7, 5526:13, 5567:4, 5567:14, 5619:5, 5619:20, 5620:4

**Spielberg's** [3] - 5463:20, 5464:18, 5464:20

**spot** [1] - 5523:17

**spread** [1] - 5443:5

**spreadsheet** [3] - 5443:9, 5443:16, 5443:23

**spreadsheets** [1] - 5572:6

**square** [1] - 5635:25

**squeeze** [1] - 5523:25

**staff** [8] - 5413:2, 5481:15, 5481:17, 5495:18, 5495:23, 5505:10, 5539:15, 5662:5

**stake** [2] - 5520:7, 5598:25

**stamp** [1] - 5414:22

**stamped** [1] - 5579:3

**stamps** [1] - 5565:12

**stand** [11] - 5466:11, 5475:21, 5514:1, 5540:7, 5540:10, 5653:9, 5653:23, 5653:25, 5656:24, 5666:13, 5685:12

**Standard** [71] - 5457:4, 5457:6, 5457:11, 5457:12, 5463:5, 5558:4, 5558:5, 5558:8, 5558:10, 5558:16, 5560:2, 5560:6, 5560:12, 5560:15,

5561:3, 5561:9, 5561:12, 5562:9, 5563:2, 5563:9, 5564:2, 5564:8, 5564:23, 5565:5, 5565:12, 5568:11, 5569:3, 5571:22, 5572:18, 5572:24, 5573:1, 5573:17, 5573:20, 5573:21, 5574:1, 5577:4, 5578:5, 5580:21, 5581:24, 5581:25, 5584:5, 5584:15, 5585:6, 5586:2, 5586:15, 5590:21, 5591:1, 5591:12, 5591:15, 5593:7, 5594:20, 5594:24, 5596:24, 5597:12, 5598:17, 5602:24, 5604:4, 5609:11, 5609:12, 5610:15, 5620:7, 5621:13, 5622:6, 5623:9, 5624:13, 5628:17, 5631:18, 5632:15, 5632:19, 5640:14, 5641:19

**standard** [10] - 5413:20, 5414:1, 5414:2, 5414:7, 5414:12, 5414:18, 5491:12, 5492:3, 5492:4, 5574:5

**Standard-194** [1] - 5621:7

**Standard-198** [1] - 5621:25

**Standard-623.01** [1] - 5604:7

**Standard-626** [1] - 5605:17

**Standard-632** [1] - 5609:6

**Standard-633** [1] - 5602:17

**Standard-687** [1] - 5619:11

**Standard-688** [1] - 5619:25

**Standard-757** [1] - 5622:14

**Standard-758** [1] - 5623:4

**Standard-779** [1] - 5623:23

**standards** [1] - 5496:4

**Standards** [1] -

5530:5
**standpoint** [1] - 5637:6
**stapled** [1] - 5546:9
**start** [4] - 5428:18, 5439:16, 5535:6, 5653:13
**start-up** [1] - 5439:16
**started** [4] - 5439:13, 5492:14, 5492:15, 5659:1
**starting** [7] - 5445:21, 5471:8, 5485:23, 5532:10, 5584:7, 5621:25, 5670:3
**starts** [3] - 5533:4, 5605:16, 5613:2
**startup** [1] - 5495:13
**state** [5] - 5508:13, 5529:9, 5557:14, 5564:15, 5654:5
**statement** [24] - 5404:25, 5405:1, 5405:2, 5405:4, 5423:14, 5423:15, 5450:14, 5454:12, 5472:17, 5476:10, 5476:11, 5478:11, 5478:14, 5487:24, 5488:12, 5528:13, 5554:4, 5554:8, 5554:13, 5556:21, 5583:2, 5583:9, 5630:12, 5630:13
**statements** [19] - 5403:19, 5410:12, 5424:4, 5432:6, 5442:11, 5449:14, 5453:19, 5455:17, 5476:24, 5477:10, 5491:6, 5505:8, 5508:19, 5508:21, 5529:12, 5531:6, 5531:7, 5532:13, 5685:25
**states** [5] - 5427:21, 5528:2, 5533:5, 5583:1, 5583:4
**STATES** [3] - 5400:1, 5400:3, 5400:10
**States** [3] - 5400:5, 5400:13, 5400:15
**stay** [7] - 5522:1, 5522:9, 5522:12, 5523:4, 5523:15, 5632:18, 5684:18
**stenography** [1] - 5400:25

**step** [6] - 5433:11, 5456:15, 5512:11, 5601:8, 5666:11, 5688:13
**steps** [2] - 5601:9, 5647:8
**Steven** [7] - 5497:12, 5497:16, 5497:19, 5497:20, 5497:21, 5528:4
**stick** [1] - 5683:11
**still** [10] - 5402:25, 5422:22, 5447:7, 5495:5, 5520:18, 5526:22, 5537:3, 5548:22, 5583:20, 5592:25
**stipulate** [1] - 5683:3
**stipulated** [1] - 5654:13
**stipulation** [3] - 5655:13, 5655:17, 5656:5
**Stipulation** [1] - 5654:12
**stipulations** [2] - 5653:22, 5654:10
**stock** [93] - 5403:15, 5403:17, 5425:25, 5445:24, 5448:16, 5451:21, 5552:8, 5553:7, 5553:21, 5553:23, 5555:3, 5558:9, 5558:14, 5558:15, 5558:20, 5559:3, 5559:17, 5559:21, 5559:22, 5560:11, 5560:16, 5560:18, 5561:3, 5561:10, 5562:17, 5563:5, 5563:19, 5564:1, 5564:5, 5565:6, 5568:14, 5569:4, 5569:14, 5569:15, 5571:25, 5572:4, 5572:7, 5572:8, 5572:10, 5573:12, 5573:13, 5575:1, 5575:16, 5575:5, 5581:12, 5581:14, 5582:12, 5584:14, 5585:2, 5585:8, 5585:10, 5585:11, 5592:1, 5592:11, 5596:11, 5598:1, 5598:6, 5599:4, 5602:4, 5602:11, 5602:21, 5603:14, 5603:20, 5604:19, 5610:23,

5611:5, 5614:11, 5617:13, 5617:16, 5618:24, 5619:2, 5619:21, 5619:22, 5620:10, 5620:19, 5620:23, 5621:19, 5621:22, 5622:2, 5622:22, 5622:23, 5626:1, 5626:24, 5628:12, 5628:22, 5628:25, 5631:3, 5632:2, 5632:3, 5646:19, 5657:12, 5672:14
**stockholder** [2] - 5596:5, 5599:10
**stockholders** [2] - 5532:23, 5584:14
**stocks** [2] - 5652:23
**stood** [1] - 5682:12
**stop** [15] - 5479:18, 5546:12, 5614:10, 5614:14, 5615:16, 5615:21, 5615:23, 5616:3, 5617:16, 5628:16, 5644:1, 5644:2, 5644:5, 5644:14, 5644:22
**stopping** [1] - 5601:1
**store** [1] - 5510:24
**streamline** [1] - 5457:7
**Street** [1] - 5581:22
**street** [1] - 5590:10
**stricken** [1] - 5528:13
**strike** [5] - 5424:7, 5439:5, 5447:1, 5453:11, 5554:3
**structure** [1] - 5495:19
**styled** [1] - 5578:14
**Su** [14] - 5426:8, 5430:21, 5461:21, 5461:23, 5461:25, 5462:3, 5462:20, 5467:12, 5467:13, 5571:20, 5687:23, 5687:24, 5687:25
**Su's** [2] - 5462:4, 5468:3
**Subject** [2] - 5472:2, 5578:16
**subject** [32] - 5457:21, 5457:25, 5458:10, 5458:19, 5458:22, 5459:9, 5469:2, 5471:9, 5510:4, 5510:7, 5515:21, 5532:17,

5556:6, 5566:24, 5567:9, 5571:24, 5578:21, 5579:22, 5579:24, 5586:6, 5587:4, 5603:3, 5610:22, 5615:21, 5625:9, 5628:20, 5631:9, 5631:23, 5634:16, 5634:20, 5662:7, 5666:24
**subjects** [2] - 5469:16, 5513:6
**submission** [1] - 5673:21
**submissions** [1] - 5673:8
**submitted** [4] - 5413:6, 5496:6, 5531:11, 5669:14
**submitting** [1] - 5513:13
**subpoena** [2] - 5685:9, 5687:5
**subsequent** [5] - 5416:25, 5450:15, 5475:14, 5529:10, 5607:12
**substance** [4] - 5429:8, 5429:9, 5545:6, 5637:5
**substantial** [1] - 5488:25
**substantially** [2] - 5533:16, 5533:17
**substantive** [1] - 5472:9
**suffered** [1] - 5408:23
**sufficient** [9] - 5413:23, 5446:5, 5462:20, 5485:8, 5566:12, 5669:18, 5670:24, 5676:2, 5677:6
**sufficiently** [1] - 5495:23
**suggest** [2] - 5477:5, 5517:23
**suggested** [1] - 5661:10
**suggesting** [1] - 5688:5
**suggestion** [3] - 5518:3, 5521:3, 5523:14
**suggestions** [1] - 5522:13
**suing** [1] - 5425:23
**Sullivan** [11] - 5576:18, 5580:9,

5581:19, 5603:7, 5603:24, 5605:22, 5608:19, 5642:12, 5642:24, 5643:1, 5643:4
**summaries** [3] - 5506:12, 5537:6, 5537:9
**summarize** [2] - 5443:6, 5517:14
**summarized** [2] - 5443:8, 5548:2
**summarizes** [3] - 5482:2, 5484:12, 5505:1
**summarizing** [5] - 5473:25, 5505:7, 5505:8, 5505:9, 5507:5
**summary** [20] - 5502:5, 5502:9, 5503:6, 5504:25, 5505:3, 5505:12, 5507:1, 5507:3, 5507:5, 5507:15, 5508:9, 5508:18, 5509:8, 5537:18, 5537:20, 5643:17, 5648:12, 5658:18, 5669:15
**SUNIL** [2] - 5403:3, 5689:4
**supervise** [1] - 5558:12
**supervisory** [1] - 5558:10
**supposed** [6] - 5437:20, 5437:22, 5437:24, 5602:14, 5607:4, 5637:18
**Supreme** [1] - 5425:16
**surprise** [1] - 5498:2
**surprised** [2] - 5672:25, 5682:13
**Surveillance** [2] - 5659:2, 5659:9
**suspect** [1] - 5493:25
**suspected** [2] - 5494:8, 5494:10
**suspicion** [2] - 5494:15, 5495:2
**sustain** [1] - 5488:23
**sustainable** [1] - 5670:10
**sustained** [6] - 5405:9, 5408:23, 5486:13, 5486:16, 5495:9

**swing** [2] - 5435:9, 5436:1
**switch** [3] - 5551:13, 5589:18, 5647:16
**sworn** [6] - 5403:4, 5557:10, 5557:12, 5557:21, 5654:4, 5656:17
**system** [3] - 5468:3, 5495:22, 5688:1

**T**

**Tab** [4] - 5590:23, 5590:24, 5596:10, 5597:18
**tab** [38] - 5405:14, 5407:9, 5410:18, 5416:7, 5418:5, 5421:23, 5424:15, 5427:1, 5442:20, 5442:23, 5442:25, 5490:10, 5554:19, 5567:25, 5571:3, 5576:21, 5576:22, 5585:22, 5589:22, 5589:23, 5592:13, 5594:7, 5596:10, 5597:18, 5602:2, 5607:16, 5609:25, 5618:11, 5620:17, 5622:5, 5623:12, 5624:17, 5626:4, 5629:21, 5631:2, 5632:18, 5633:3, 5634:22
**table** [3] - 5569:8, 5574:18, 5576:5
**tact** [1] - 5678:22
**talks** [4] - 5485:6, 5485:7, 5485:24, 5515:15
**targeted** [3] - 5678:7, 5678:8, 5686:20
**tasked** [1] - 5658:2
**tea** [1] - 5601:6
**team** [14] - 5413:3, 5433:6, 5434:23, 5437:13, 5437:23, 5438:1, 5478:9, 5481:16, 5489:11, 5502:14, 5515:11, 5541:24, 5543:14
**teams** [1] - 5547:3
**telephone** [6] - 5415:16, 5415:19, 5466:21, 5466:25, 5497:6, 5528:4
**temperature** [1] - 5688:11

**ten** [7] - 5456:13, 5456:17, 5456:22, 5468:16, 5474:24, 5488:15, 5601:12
**ten-minute** [1] - 5468:16
**terminology** [8] - 5652:22, 5660:2, 5660:7, 5661:5, 5664:23, 5670:16, 5670:17, 5670:22
**terms** [20] - 5451:5, 5462:15, 5465:9, 5480:5, 5480:12, 5481:20, 5490:2, 5533:6, 5533:17, 5540:22, 5541:2, 5542:24, 5664:10, 5665:6, 5665:7, 5671:6, 5673:15, 5675:12, 5676:7, 5676:17
**terrible** [2] - 5401:20, 5522:25
**territory** [1] - 5671:10
**test** [3] - 5478:23, 5478:25, 5566:10
**testified** [35] - 5429:3, 5429:12, 5429:20, 5432:20, 5435:9, 5435:19, 5442:14, 5475:20, 5485:14, 5487:3, 5496:14, 5508:1, 5509:19, 5514:7, 5520:20, 5531:23, 5534:12, 5534:14, 5557:13, 5558:20, 5562:17, 5563:8, 5563:24, 5636:11, 5636:23, 5637:4, 5637:9, 5644:5, 5656:17, 5661:25, 5677:11, 5677:12, 5681:13, 5682:2
**testifies** [1] - 5662:19
**testify** [26] - 5441:18, 5441:25, 5442:4, 5458:2, 5463:3, 5463:4, 5514:5, 5636:24, 5658:18, 5661:19, 5662:6, 5663:25, 5665:14, 5667:17, 5669:24, 5670:8, 5674:9, 5674:14, 5674:20, 5675:5, 5675:8, 5675:24, 5676:24,

5677:9, 5683:15, 5687:14
**testifying** [10] - 5429:22, 5458:20, 5528:14, 5637:25, 5644:2, 5663:5, 5663:6, 5670:1, 5680:10, 5681:10
**testimony** [53] - 5403:10, 5423:21, 5428:18, 5457:22, 5458:11, 5459:25, 5460:7, 5461:21, 5475:25, 5481:11, 5503:11, 5518:14, 5661:9, 5661:15, 5661:22, 5662:14, 5662:21, 5662:25, 5663:14, 5664:1, 5664:12, 5664:18, 5664:21, 5665:4, 5668:7, 5668:16, 5668:18, 5668:21, 5668:22, 5671:10, 5671:13, 5671:21, 5671:25, 5672:9, 5672:16, 5672:17, 5672:19, 5672:21, 5673:13, 5674:12, 5675:21, 5676:12, 5676:22, 5679:1, 5681:17, 5682:1, 5682:8, 5682:11, 5682:16, 5682:19, 5683:21, 5685:15, 5685:16
**tests** [1] - 5676:5
**text** [8] - 5412:23, 5412:25, 5553:4, 5553:13, 5553:14, 5553:19, 5556:5, 5577:19
**TF** [1] - 5611:1
**Thanksgiving** [1] - 5522:21
**THE** [264] - 5400:10, 5401:2, 5401:4, 5401:10, 5401:13, 5401:16, 5402:20, 5402:23, 5405:9, 5408:1, 5408:5, 5414:16, 5416:14, 5418:18, 5422:7, 5424:22, 5427:9, 5428:1, 5428:11, 5428:13, 5438:23, 5438:24, 5439:25, 5440:3, 5441:22, 5444:2, 5445:18, 5446:21, 5446:23,

5447:8, 5448:3, 5448:11, 5448:21, 5449:1, 5449:4, 5449:6, 5449:7, 5449:19, 5449:25, 5456:8, 5456:11, 5456:17, 5456:24, 5457:2, 5458:13, 5459:14, 5459:18, 5461:15, 5461:25, 5462:3, 5462:8, 5462:15, 5463:6, 5463:8, 5463:17, 5464:7, 5468:16, 5468:21, 5469:2, 5469:22, 5470:1, 5470:5, 5470:10, 5470:13, 5486:13, 5486:16, 5489:24, 5495:9, 5497:6, 5497:7, 5497:17, 5498:15, 5498:17, 5501:17, 5501:21, 5502:6, 5502:18, 5503:9, 5504:9, 5505:20, 5505:24, 5506:5, 5506:8, 5506:16, 5507:11, 5507:13, 5507:19, 5508:1, 5508:7, 5508:14, 5508:17, 5510:6, 5510:11, 5510:14, 5510:19, 5511:6, 5511:19, 5512:6, 5512:11, 5512:17, 5514:15, 5514:21, 5516:5, 5518:23, 5519:2, 5519:10, 5519:13, 5519:20, 5520:5, 5521:9, 5521:17, 5521:20, 5522:3, 5522:17, 5522:19, 5522:23, 5523:4, 5523:10, 5523:18, 5524:2, 5524:6, 5525:3, 5525:11, 5525:19, 5525:23, 5526:7, 5526:10, 5526:14, 5526:17, 5526:20, 5527:6, 5527:17, 5527:19, 5528:16, 5536:14, 5536:16, 5538:5, 5538:25, 5541:14, 5542:3, 5542:20, 5544:15, 5546:11, 5546:19, 5549:5, 5550:2, 5550:4, 5550:7, 5550:9, 5551:9, 5557:4,

5557:6, 5557:8, 5557:10, 5557:14, 5557:16, 5557:17, 5557:21, 5562:12, 5564:15, 5564:19, 5564:21, 5565:14, 5565:19, 5565:23, 5566:1, 5566:13, 5566:17, 5566:19, 5567:2, 5567:7, 5567:11, 5567:15, 5567:18, 5568:25, 5577:10, 5583:17, 5583:19, 5583:21, 5583:22, 5584:2, 5586:23, 5591:20, 5601:1, 5601:4, 5601:8, 5601:10, 5601:15, 5607:9, 5612:12, 5615:14, 5616:24, 5625:2, 5626:14, 5628:3, 5630:5, 5631:11, 5633:13, 5634:19, 5635:20, 5635:24, 5636:2, 5636:6, 5652:21, 5653:2, 5653:4, 5653:6, 5653:8, 5653:10, 5653:14, 5653:17, 5653:18, 5653:24, 5654:3, 5654:5, 5654:7, 5656:8, 5656:11, 5660:10, 5660:13, 5661:3, 5661:7, 5662:10, 5664:8, 5664:19, 5665:4, 5665:18, 5665:20, 5666:2, 5666:10, 5666:14, 5666:21, 5666:23, 5667:4, 5668:10, 5669:25, 5670:7, 5671:1, 5672:4, 5674:2, 5675:18, 5676:12, 5676:15, 5677:5, 5677:9, 5677:25, 5678:5, 5678:9, 5678:18, 5679:6, 5679:9, 5680:4, 5680:25, 5681:4, 5681:7, 5681:22, 5683:17, 5684:15, 5684:20, 5684:25, 5685:20, 5686:4, 5687:2, 5688:9
**themselves** [8] - 5442:6, 5442:15, 5454:18, 5505:13, 5637:19, 5640:16,

5640:20, 5657:12

**thereafter** [1] - 5496:8

**therefore** [4] - 5460:12, 5532:10, 5599:1, 5687:8

**therein** [1] - 5656:11

**thereon** [1] - 5572:6

**they've** [2] - 5460:15, 5666:17

**thinking** [1] - 5478:18

**thinks** [4] - 5668:5, 5669:18, 5677:23, 5680:21

**Third** [3] - 5597:6, 5600:3, 5618:9

**third** [30] - 5412:8, 5419:14, 5419:15, 5419:18, 5420:1, 5420:7, 5421:20, 5422:2, 5423:13, 5425:16, 5426:8, 5426:14, 5430:22, 5430:24, 5431:2, 5431:6, 5431:19, 5450:7, 5509:6, 5544:22, 5551:21, 5571:12, 5595:4, 5596:23, 5599:12, 5604:23, 5606:24, 5612:14, 5639:4, 5643:8

**third-party** [5] - 5430:22, 5430:24, 5431:2, 5431:6, 5431:19

**thirds** [2] - 5420:10, 5554:22

**Thomas** [6] - 5576:16, 5580:6, 5606:19, 5607:6, 5608:1, 5608:17

**threat** [4] - 5461:13, 5467:5, 5475:7, 5475:8

**threaten** [1] - 5465:2

**threatened** [17] - 5418:3, 5423:12, 5425:8, 5426:11, 5465:5, 5465:15, 5470:23, 5471:12, 5471:17, 5471:20, 5471:24, 5472:23, 5474:17, 5475:12, 5475:13, 5475:15, 5475:18

**threatening** [2] - 5463:20, 5493:15

**threats** [6] - 5460:22,

5460:24, 5461:2, 5463:10, 5463:18, 5463:20

**three** [35] - 5402:9, 5411:10, 5417:4, 5419:24, 5425:15, 5473:3, 5484:6, 5491:3, 5500:25, 5523:13, 5528:6, 5529:4, 5529:12, 5531:8, 5533:14, 5540:2, 5544:2, 5544:5, 5545:9, 5547:19, 5549:10, 5558:13, 5564:13, 5565:19, 5565:22, 5575:2, 5594:24, 5599:14, 5623:19, 5637:18, 5638:19, 5639:10, 5659:12, 5678:9

**three-and-a-half** [1] - 5659:12

**three-person** [1] - 5523:13

**threshold** [1] - 5465:17

**throughout** [3] - 5546:24, 5678:11, 5681:17

**throw** [1] - 5684:8

**throwing** [1] - 5687:21

**throws** [3] - 5507:19, 5560:21, 5567:6

**Thursday** [1] - 5619:22

**Tilles** [2] - 5431:14, 5431:16

**timely** [2] - 5440:9, 5450:11, 5491:24, 5492:24, 5495:25

**timing** [3] - 5572:8, 5669:2, 5685:20

**Timothy** [4] - 5576:17, 5580:7, 5590:7, 5681:6

**tiny** [3] - 5422:14, 5422:15, 5442:22

**titled** [1] - 5447:15

**today** [18] - 5428:16, 5428:23, 5429:1, 5429:18, 5429:24, 5430:4, 5442:4, 5451:7, 5520:17, 5563:8, 5612:20, 5636:11, 5636:23, 5637:9, 5653:11, 5653:15, 5672:21, 5685:10

**together** [6] - 5519:5, 5530:12, 5546:10, 5547:5, 5562:25, 5579:13

**Tom** [1] - 5618:3

**tomorrow** [7] - 5575:3, 5666:12, 5676:20, 5679:19, 5681:6, 5685:12, 5687:18

**tonight** [3] - 5686:3, 5687:16, 5688:11

**took** [16] - 5404:12, 5443:12, 5496:7, 5496:10, 5498:6, 5498:13, 5502:14, 5509:18, 5510:17, 5539:19, 5687:7, 5687:20, 5687:21, 5687:24, 5688:2, 5688:5

**tooth** [2] - 5679:9, 5679:10

**top** [18] - 5417:4, 5518:12, 5519:9, 5534:9, 5554:21, 5555:13, 5569:2, 5569:3, 5569:11, 5570:7, 5571:4, 5587:15, 5592:21, 5594:19, 5595:10, 5602:23, 5610:15, 5626:19

**topic** [1] - 5675:12

**total** [15] - 5448:15, 5576:9, 5587:11, 5587:12, 5587:17, 5587:21, 5588:2, 5588:5, 5588:8, 5588:12, 5588:18, 5588:24, 5648:1, 5651:14

**totally** [2] - 5525:12, 5565:4

**totals** [5] - 5586:6, 5587:5, 5587:10, 5587:11, 5648:19

**touch** [2] - 5516:6, 5670:14

**tough** [2] - 5523:6, 5523:17

**towards** [2] - 5495:22, 5635:4

**track** [1] - 5560:8

**tracks** [1] - 5545:3

**trade** [3] - 5597:16, 5646:2, 5646:9

**tradeable** [2] - 5575:13, 5590:17

**traded** [1] - 5672:14

**trades** [1] - 5662:1

**trading** [20] - 5458:15, 5515:15, 5576:13, 5576:15, 5580:4, 5589:8, 5589:14, 5590:13, 5590:15, 5619:8, 5621:5, 5622:12, 5657:20, 5658:15, 5658:17, 5659:4, 5662:18, 5663:4, 5667:20, 5674:19

**train** [1] - 5462:24

**trained** [1] - 5495:23

**training** [6] - 5659:14, 5664:22, 5671:11, 5676:2, 5677:7, 5677:12

**transaction** [19] - 5421:7, 5455:2, 5456:3, 5462:6, 5554:11, 5554:12, 5555:9, 5560:7, 5569:10, 5569:18, 5570:20, 5571:9, 5607:12, 5619:4, 5625:20, 5625:21, 5629:3, 5631:14, 5681:11

**transactions** [17] - 5412:11, 5412:15, 5414:14, 5414:19, 5421:3, 5455:4, 5455:14, 5455:17, 5460:5, 5463:14, 5487:22, 5499:25, 5537:21, 5543:18, 5560:10, 5625:19, 5652:23

**Transactions** [2] - 5484:5, 5484:8

**transcript** [3] - 5400:25, 5525:6, 5525:10

**TRANSCRIPT** [1] - 5400:9

**transcription** [1] - 5400:25

**transfer** [65] - 5458:15, 5504:3, 5504:10, 5558:9, 5558:14, 5558:15, 5558:20, 5558:21, 5559:17, 5559:21, 5559:23, 5560:11, 5560:16, 5563:23, 5564:1, 5564:5, 5565:6, 5568:5, 5568:6, 5568:7, 5569:5, 5571:2,

5575:17, 5577:20, 5581:11, 5585:8, 5585:10, 5589:23, 5590:5, 5590:6, 5591:10, 5594:17, 5595:12, 5596:11, 5596:19, 5599:2, 5602:11, 5602:18, 5602:21, 5607:24, 5609:19, 5614:10, 5614:14, 5615:6, 5615:21, 5615:23, 5616:3, 5617:17, 5618:24, 5620:19, 5620:23, 5628:25, 5636:19, 5636:24, 5637:10, 5638:20, 5639:23, 5640:5, 5641:24, 5643:9, 5643:17, 5643:24, 5644:2, 5644:5, 5651:23

**Transfer** [4] - 5558:4, 5558:5, 5569:4, 5621:14

**transference** [1] - 5636:20

**transferred** [10] - 5562:23, 5569:23, 5590:8, 5592:10, 5602:14, 5614:16, 5624:16, 5645:2, 5652:23, 5652:25

**transferring** [6] - 5559:22, 5602:12, 5610:8, 5629:4, 5639:22, 5640:24

**transfers** [11] - 5561:3, 5561:10, 5562:17, 5563:5, 5563:19, 5567:8, 5591:8, 5636:23, 5637:4, 5637:9, 5644:3

**transmits** [2] - 5483:4, 5527:10

**transmittal** [17] - 5560:7, 5569:14, 5569:15, 5592:15, 5594:16, 5596:17, 5597:20, 5602:4, 5602:10, 5602:18, 5602:21, 5607:17, 5610:6, 5618:12, 5618:16, 5634:8, 5634:9

**transmitted** [2] - 5482:9, 5542:12

**transparency** [5] - 5658:4, 5667:12,

5674:15, 5674:18,
5674:25
**travel** [1] - 5524:2
**treads** [1] - 5671:9
**treatment** [1] -
5457:23
**tremendous** [3] -
5402:5, 5672:23,
5683:18
**trial** [46] - 5428:25,
5457:5, 5457:14,
5457:20, 5457:21,
5461:20, 5463:13,
5465:20, 5466:6,
5467:8, 5468:23,
5517:18, 5525:6,
5526:6, 5655:12,
5655:14, 5656:4,
5656:6, 5661:18,
5662:9, 5662:12,
5663:15, 5664:6,
5664:11, 5664:16,
5664:18, 5668:7,
5668:8, 5668:25,
5669:1, 5671:8,
5672:20, 5673:8,
5673:9, 5676:21,
5676:23, 5677:12,
5677:20, 5677:21,
5678:11, 5681:13,
5681:17, 5688:3
**TRIAL** [1] - 5400:9
**trials** [2] - 5658:19,
5662:19
**tried** [2] - 5492:18,
5679:2
**triggered** [1] -
5440:18
**trip** [1] - 5653:7
**troubled** [1] -
5668:13
**Troy** [26] - 5576:18,
5577:15, 5578:10,
5578:14, 5578:25,
5580:11, 5584:24,
5602:12, 5602:13,
5603:4, 5603:12,
5603:13, 5603:18,
5604:12, 5606:6,
5609:20, 5610:8,
5610:10, 5614:13,
5615:2, 5615:24,
5617:12, 5639:23,
5639:25, 5640:1,
5643:10
**true** [15] - 5459:4,
5462:22, 5466:1,
5489:12, 5503:8,
5505:2, 5505:13,
5654:14, 5654:18,

5654:21, 5654:22,
5654:25, 5655:3,
5655:18, 5655:22
**Trust** [3] - 5590:10,
5590:12, 5590:16
**trust** [1] - 5647:1
**truth** [13] - 5501:24,
5502:4, 5502:10,
5504:7, 5504:10,
5504:15, 5504:23,
5504:25, 5506:10,
5506:15, 5506:21,
5507:6, 5508:5
**try** [13] - 5414:16,
5463:22, 5479:18,
5502:16, 5519:4,
5520:18, 5538:25,
5551:9, 5566:19,
5567:15, 5680:22,
5685:14, 5688:11
**trying** [10] - 5440:25,
5454:21, 5487:4,
5492:20, 5503:6,
5513:23, 5514:11,
5515:8, 5541:2,
5685:3
**TSOU** [1] - 5400:21
**turn** [19] - 5407:9,
5410:24, 5412:8,
5413:9, 5419:24,
5422:12, 5424:14,
5487:10, 5500:25,
5544:17, 5567:25,
5602:2, 5618:10,
5628:21, 5637:24,
5641:15, 5641:19,
5643:8, 5652:1
**turning** [2] -
5432:19, 5546:23
**twelve** [1] - 5686:7,
5686:9, 5687:4
**twice** [1] - 5624:4
**two** [53] - 5403:9,
5405:20, 5412:17,
5412:24, 5414:3,
5420:10, 5425:15,
5427:13, 5444:3,
5445:3, 5457:10,
5466:4, 5466:15,
5492:14, 5492:15,
5514:4, 5514:6,
5514:23, 5521:15,
5526:14, 5532:10,
5533:3, 5546:9,
5546:11, 5547:5,
5554:22, 5561:4,
5567:6, 5571:3,
5571:21, 5573:17,
5579:19, 5586:8,
5592:2, 5596:3,

5603:5, 5605:9,
5606:11, 5607:4,
5619:18, 5621:18,
5625:19, 5626:16,
5629:17, 5640:1,
5642:7, 5642:8,
5642:16, 5642:24,
5653:21, 5654:10,
5678:6
**Two** [1] - 5401:17
**Two's** [1] - 5401:6
**two-thirds** [2] -
5420:10, 5554:22
**type** [1] - 5658:14
**typed** [1] - 5503:13
**typical** [1] - 5411:17
**typically** [10] -
5423:17, 5558:18,
5560:13, 5560:24,
5624:10, 5624:15,
5649:7, 5653:3,
5662:5, 5675:7
**typo** [2] - 5643:15,
5643:16

## U

**U.S** [2] - 5414:8,
5492:12
**ultimate** [9] - 5464:6,
5664:19, 5664:25,
5665:2, 5669:4,
5669:21, 5669:24,
5671:4, 5676:9
**ultimately** [9] -
5457:22, 5469:6,
5479:15, 5480:23,
5487:24, 5547:4,
5591:10, 5676:3,
5679:1
**unable** [1] - 5468:12
**uncertainty** [3] -
5413:22, 5446:4,
5485:7
**under** [28] - 5402:25,
5410:22, 5422:22,
5423:9, 5442:11,
5442:20, 5455:8,
5455:17, 5459:15,
5475:17, 5484:10,
5492:1, 5502:11,
5505:14, 5510:9,
5510:16, 5515:8,
5525:7, 5526:22,
5531:12, 5538:5,
5554:19, 5559:17,
5575:1, 5663:21,
5677:1, 5682:3,
5682:8
**undergraduate** [1] -

5659:19
**underlying** [18] -
5461:1, 5461:11,
5502:11, 5504:4,
5504:20, 5504:25,
5505:13, 5506:11,
5506:22, 5507:6,
5508:19, 5508:21,
5582:12, 5597:5,
5599:1, 5599:3,
5616:1, 5656:10
**undersigned** [2] -
5654:13, 5655:17
**Understood** [1] -
5508:24
**understood** [8] -
5401:15, 5431:23,
5439:10, 5439:21,
5465:22, 5484:24,
5659:24, 5684:23
**undertaken** [2] -
5453:6, 5551:23
**unduly** [1] - 5663:22
**unfamiliar** [1] -
5673:10
**unfortunately** [1] -
5666:3
**unique** [1] - 5569:15
**unit** [1] - 5663:12
**UNITED** [3] - 5400:1,
5400:3, 5400:10
**United** [3] - 5400:5,
5400:13, 5400:15
**University** [2] -
5659:19, 5659:20
**unless** [2] - 5466:10,
5503:4
**unredact** [1] -
5518:15
**unredacted** [14] -
5514:14, 5515:14,
5518:17, 5518:19,
5518:22, 5520:10,
5520:17, 5520:20,
5520:22, 5521:2,
5526:4, 5526:9,
5666:20
**unredactions** [1] -
5519:1
**unrestricted** [2] -
5588:6, 5611:7
**unsigned** [6] -
5498:23, 5499:4,
5503:16, 5519:10,
5519:14, 5537:12
**unusual** [3] -
5412:11, 5412:14,
5482:6
**Unusual** [2] - 5484:4,
5484:8

**up** [52] - 5403:9,
5416:1, 5417:4,
5435:13, 5435:17,
5435:19, 5439:16,
5442:17, 5451:11,
5451:13, 5457:20,
5461:20, 5470:17,
5473:19, 5473:22,
5481:10, 5484:3,
5484:19, 5503:13,
5517:22, 5522:12,
5527:22, 5539:20,
5540:17, 5543:25,
5544:6, 5544:24,
5547:18, 5548:20,
5551:16, 5552:4,
5554:17, 5554:20,
5556:16, 5574:15,
5574:17, 5582:16,
5584:20, 5587:15,
5588:25, 5613:2,
5614:19, 5619:19,
5628:7, 5635:5,
5635:25, 5639:1,
5645:7, 5647:14,
5651:13, 5651:20,
5679:24
**Update** [1] - 5530:5
**update** [7] - 5401:17,
5413:20, 5414:7,
5414:10, 5418:3,
5424:12, 5424:17
**updated** [2] -
5414:18, 5651:17
**updates** [3] -
5418:14, 5419:3,
5493:17
**uphold** [1] - 5671:4
**usable** [1] - 5644:22
**useful** [1] - 5654:1
**Utah** [1] - 5558:2
**utilize** [1] - 5510:20
**utilized** [1] - 5660:2

## V

**Vaino** [9] - 5576:17,
5580:8, 5611:1,
5611:16, 5641:7,
5645:10, 5645:11,
5645:22, 5647:6
**validate** [1] - 5503:7
**value** [5] - 5451:20,
5552:7, 5604:19,
5634:5, 5644:20
**variance** [1] - 5433:5
**variances** [2] -
5433:7, 5433:10
**various** [8] -
5405:20, 5502:7,

5529:21, 5541:19, 5661:9, 5661:12, 5674:15, 5674:25
**veering** [1] - 5669:7
**Ventures** [5] - 5595:17, 5622:11, 5622:22, 5623:20, 5625:12
**verify** [1] - 5582:25
**versed** [1] - 5664:23
**version** [24] - 5443:18, 5443:22, 5449:22, 5482:10, 5482:12, 5489:14, 5489:17, 5490:6, 5490:8, 5518:3, 5518:15, 5518:17, 5518:20, 5520:10, 5520:24, 5521:6, 5521:7, 5526:4, 5539:8, 5574:11, 5574:21, 5646:18
**versions** [5] - 5443:16, 5443:19, 5449:22, 5537:12, 5537:14
**versus** [5] - 5426:5, 5426:8, 5480:7, 5519:1, 5578:14
**vet** [1] - 5673:5
**vetted** [4] - 5672:24, 5675:20, 5678:12, 5679:14
**via** [3] - 5583:23, 5584:24, 5611:8
**viable** [1] - 5670:11
**view** [12] - 5410:7, 5410:10, 5459:2, 5478:16, 5480:24, 5484:24, 5486:3, 5488:16, 5488:18, 5662:12, 5682:5, 5683:11
**views** [1] - 5505:8
**violated** [1] - 5673:17
**violates** [2] - 5667:12, 5673:11
**violation** [2] - 5682:11, 5682:16
**violations** [1] - 5659:6
**voice** [2] - 5428:1, 5681:16
**voir** [15] - 5447:21, 5447:24, 5676:20, 5677:2, 5677:5, 5677:18, 5678:1, 5678:22, 5679:16, 5679:20, 5679:24,

5680:8, 5680:11, 5680:17, 5680:20
**volume** [2] - 5655:20, 5674:22

## W

**wait** [5] - 5449:1, 5498:4, 5679:21
**waiting** [1] - 5508:16
**waive** [4] - 5505:23, 5517:18, 5517:25, 5520:19
**waived** [7] - 5513:10, 5513:17, 5515:24, 5518:6, 5520:11, 5521:10, 5666:17
**waiver** [6] - 5513:5, 5513:14, 5515:22, 5518:6, 5518:9, 5520:25
**waiving** [3] - 5505:18, 5505:22, 5515:21
**wants** [14] - 5430:1, 5465:14, 5504:22, 5509:1, 5519:25, 5521:1, 5522:12, 5523:1, 5523:19, 5559:20, 5612:21, 5677:20, 5680:20, 5684:13
**warrant** [1] - 5676:6
**waste** [1] - 5678:25
**wave** [1] - 5450:4
**ways** [1] - 5560:18
**wealth** [1] - 5464:1
**Wednesday** [2] - 5522:20, 5610:19
**week** [12] - 5402:9, 5458:12, 5522:21, 5617:18, 5668:19, 5673:3, 5687:1, 5687:3, 5687:4, 5687:6, 5687:12
**weekends** [1] - 5673:8
**weeks** [6] - 5401:9, 5586:8, 5594:13, 5594:24, 5598:11, 5623:19
**weight** [3] - 5503:19, 5661:15, 5663:14
**Weiss** [1] - 5460:17
**West** [1] - 5512:15
**whereas** [4] - 5556:18, 5604:16, 5604:23, 5604:24
**wherein** [1] - 5617:15

**whole** [11] - 5408:3, 5449:5, 5464:16, 5483:24, 5504:1, 5534:25, 5536:18, 5539:19, 5566:3, 5636:17, 5678:19
**wife** [1] - 5524:4
**willing** [1] - 5686:6
**WINSTON** [1] - 5400:20
**wish** [1] - 5595:12
**withdraw** [2] - 5486:17, 5495:10
**witness** [41] - 5403:4, 5448:1, 5449:2, 5456:21, 5457:5, 5458:1, 5459:19, 5468:13, 5469:23, 5503:21, 5504:2, 5512:13, 5517:2, 5517:3, 5517:5, 5517:15, 5518:23, 5518:25, 5519:2, 5520:20, 5526:2, 5526:3, 5527:9, 5557:18, 5601:9, 5653:10, 5653:19, 5654:4, 5661:19, 5666:13, 5667:7, 5670:22, 5671:16, 5672:8, 5675:7, 5676:6, 5677:20, 5681:6, 5685:14, 5687:18
**WITNESS** [11] - 5438:24, 5449:6, 5497:7, 5498:17, 5557:8, 5557:16, 5583:21, 5584:2, 5653:2, 5653:8, 5654:7
**Witness** [1] - 5653:9
**witness'** [1] - 5518:14
**witnesses** [3] - 5466:8, 5514:6, 5662:19
**WITNESSES** [1] - 5689:2
**word** [14] - 5429:10, 5430:1, 5430:4, 5430:5, 5430:6, 5537:9, 5545:6, 5550:23, 5564:15
**words** [8] - 5432:11, 5453:20, 5456:1, 5481:15, 5505:13, 5648:12, 5651:16
**works** [2] - 5613:13, 5662:3

**world** [1] - 5648:22
**worthless** [2] - 5644:15, 5644:17
**write** [16] - 5419:2, 5488:5, 5489:7, 5494:9, 5609:3, 5609:18, 5609:23, 5613:20, 5614:2, 5614:8, 5614:22, 5617:1, 5628:11, 5632:24, 5633:25, 5652:2
**writes** [1] - 5657:15
**writing** [3] - 5535:22, 5667:9, 5669:12
**written** [10] - 5410:3, 5415:2, 5423:9, 5425:13, 5472:25, 5481:22, 5481:24, 5493:7, 5595:10, 5598:7
**wrote** [15] - 5481:14, 5481:15, 5482:23, 5483:11, 5494:24, 5495:13, 5503:8, 5582:19, 5582:22, 5583:4, 5584:12, 5589:5, 5591:23, 5598:21

## Y

**Yaffe** [1] - 5466:13
**Yaffe's** [1] - 5466:14
**year** [10] - 5430:23, 5431:8, 5432:22, 5435:10, 5473:6, 5529:4, 5531:6, 5532:12, 5629:19
**year-end** [1] - 5431:8
**years** [10] - 5429:7, 5430:15, 5658:21, 5658:24, 5659:12, 5659:13, 5659:21, 5662:2, 5662:17, 5675:11
**yesterday** [19] - 5403:8, 5403:21, 5403:25, 5404:2, 5405:13, 5405:17, 5410:4, 5419:12, 5428:19, 5429:3, 5429:21, 5432:20, 5433:5, 5442:18, 5448:4, 5448:8, 5451:7, 5534:12, 5572:4
**YORK** [1] - 5400:1
**York** [10] - 5400:5, 5400:16, 5400:18,

5400:23, 5425:16, 5581:17, 5581:22, 5600:4
**yourself** [14] - 5509:9, 5512:12, 5530:18, 5601:6, 5612:3, 5615:9, 5615:16, 5619:15, 5622:15, 5624:19, 5629:9, 5631:21, 5633:4, 5666:5
**yourselves** [1] - 5470:6

## Z

**Zammet** [2] - 5577:13, 5584:8
**Zammit** [1] - 5576:24
**zero** [2] - 5468:6, 5588:11
**zeroed** [1] - 5471:7
**zoom** [3] - 5473:21, 5554:21, 5587:6
**zooms** [1] - 5473:22

Case 1:15-cr-00637-KAM   Document 689   Filed 10/17/18   Page 334 of 334 PageID #: 23193