5691

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - -    X
3
UNITED STATES OF AMERICA,     :   15-CR-637(KAM)
4
            Plaintiff ,        :
5                                 United States Courthouse
        -against-              :  Brooklyn, New York
6
EVAN GREEBEL,                  :
7                                 November 17, 2017
            Defendant.         :   9:00 o'clock a.m.
8
    - - - - - - - - - - - -    X
9
                    TRANSCRIPT OF TRIAL
10          BEFORE THE HONORABLE KIYO A. MATSUMOTO
            UNITED STATES DISTRICT JUDGE, and a jury.
11
APPEARANCES:
12
For the Government:           BRIDGET M. ROHDE
13                            Acting United States Attorney
                              BY: ALIXANDRA E. SMITH
14                                DAVID PITLUCK
                                  DAVID K. KESSLER
15                            Assistant United States Attorneys
                              271 Cadman Plaza East
16                            Brooklyn, New York

17  For the Defendant:        GIBSON DUNN & CRUTCHER
                              200 Park Avenue, 48th Floor
18                            New York, New York

19                            BY: REED M. BRODSKY, ESQ.
                                  RANDY MASTRO, ESQ.
20                                WINSTON Y. CHAN, ESQ.
                                  MYLAN LEE DENERSTEIN, ESQ.
21                                JOSHUA E. DUBIN, ESQ.
                                  GRACE TSOU, ESQ.
22
Court Reporter:               Charleane M. Heading
23                            225 Cadman Plaza East
                              Brooklyn, New York
24                            (718) 613-2643

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.

5692

1          (In open court; outside the presence of the jury.)

2          THE COURT:  Let's go on the record.

3          I have Juror Number Two.

4          Please, sit in the witness stand.

5          As you know, this is Juror Number Two and she is had

6     a conversation with her boss and I think it is important for

7     the parties to hear what the outcome of the conversation was.

8     So, if there are additional questions, we can ask her.

9          Ms. Cruz, if you don't mind, please tell us the

10    nature of the conversation and what your views are as a result

11    of that conversation.

12         THE JUROR:  To be honest, I didn't have a verbal

13    conversation with him.  We communicated by e-mail.

14         THE COURT:  Okay.

15         THE JUROR:  Basically, the e-mail was letting me

16    know that he was surprised to hear from you as far as the

17    extension and the trial being extended.  He expressed that it

18    would interfere with the flow of the practice and that he

19    felt -- I'm trying to remember verbatim what he might have

20    said, but something to the effect of the Judge mentioned that

21    you may be able to be dismissed from the case.  So, my

22    response was I have spent a lot of time here already, I would

23    like to see it through and that as far as I knew, coverage in

24    the office was going well.  So he asked me to call him last

25    night and I thought about it and I didn't know if -- I just

5693

1    decided not to speak to him because I was really confused on

2    what to do and I told him that I would speak to you today.  I

3    sent him a text that I would speak to you today.

4           THE COURT:  All right.

5           Just to be clear for the record, what I told the

6    doctor is that, he asked me what would happen if she no longer

7    is in the case, if she quits the jury.  I said she can't

8    really just quit the jury.  When a juror tells me that they

9    may not get paid, that is something that I would convey to the

10   parties and it would not be just my decision, I would have to

11   evaluate the juror's situation, I said I would be very mindful

12   of his situation and I would also hear from the lawyers before

13   deciding.  He said, Well, would the trial just stop?  And I

14   said, No, we do have alternates for that very reason.

15          That's probably what he's discussing, but I said the

16   dismissal is not something that anyone makes unilaterally.

17   It's a very deliberate, careful thought that we give based on

18   input from everybody who may be affected by this decision.

19          So, he did not say for sure that he was not going to

20   pay you, but he did say it was a terrible financial hardship.

21   I don't know what he told you about your status with regard to

22   being paid going forward or for the past, you know, few weeks.

23          THE JUROR:  Well, he has continued to be very vague

24   about it and what I mean by that is when I initially mentioned

25   to him that I had been called for jury duty, we were here

5694

1    during selection and I -- I do the payroll.  I did put through

2    to be paid and I indicated that I would give him the hours

3    back.  That's a practice that, you know, that's something that

4    we do in the practice where someone can work back the hours so

5    they're not hurt financially by having to take excessive time

6    off like that.

7              So, when I was chosen, what I decided to do was to

8    discuss it with him and he did not want to commit to making an

9    arrangement with me so I decided to -- those first few weeks,

10   we did have a few days off.  I worked those days and I gave

11   myself one additional day of pay.  So I, at least -- I work

12   four days a week.  I would at least have half a salary.  And

13   he indicated to me, you know, whatever, whatever you want to

14   do, whatever you're comfortable with, you do what's best for

15   you.  So I thought, okay, that's something that I can do.

16             I can manage with at least half my salary being able

17   to work a Saturday if we have a full week here and so far,

18   that is what I've been doing, but even as far as his e-mail

19   last night, he still just was, again, very vague and said, you

20   know, whatever you're comfortable doing as far as how I was

21   calculating the hours, you know, that I would work something

22   out with you.  I don't consider you just an employee but

23   family but I just still have no answer.

24             He's just been very, very vague.  So it puts me in a

25   situation where I never wanted to assume that I would receive

1  full pay and just work something out with him because I didn't

2  want him to think that I was abusing, you know, my position

3  with him.  And for him to say, oh, you know, she doesn't

4  really care how long she's going to be there, she's getting

5  paid, I wanted to be very careful with that.

6           So, again, he's just been very vague.  He's not

7  committing to anything.  Though he says he's open to whatever

8  I am comfortable doing, I don't want to cross the line either

9  where I feel I'm going to owe him 200 hours that I would take

10  forever to work back, but I was willing to still try to manage

11  with the full time.  That would have been less time for me to

12  owe him.  And then in the future, we have those few days off

13  that you indicated and I thought that was an option for me to

14  be able to stay and complete this, but I am just left feeling

15  with those questions he asked you, you know, and I just want

16  to be honest, I just feel that the door has been opened to the

17  possibility that I could be dismissed and -- he may think that

18  I'm just avoiding that option.

19           THE COURT:  All right.

20           Does anyone have any questions?  Mr. Dubin?

21           MR. DUBIN:  Yes.

22           The last thing we want to do is put you in a

23  position where you feel, you know, stuck between choosing this

24  and being in fear of, you know, losing your job.

25           So, do you feel -- I'm just trying to listen to you

5696

1  and read your concern and, you know, being very mindful of it.

2  Are you concerned about that?

3           THE JUROR:  I'm not concerned about losing my job,

4  no.

5           THE COURT:  I will say that he did assure me that

6  she would not lose her job.

7           MR. DUBIN:  Okay.  Good.

8           THE COURT:  Yes.

9           MR. DUBIN:  And I guess the only other question that

10  I have is we also don't want to, I think I speak for everyone

11  but nobody wants to put you in a position that it's such a

12  financial hardship that you're feeling like being here is

13  making it so difficult on you financially.

14           So are you able to manage if you were to remain?

15           THE JUROR:  I think we could if we had that deadline

16  for sure.  I know that that's not something you can, you know,

17  say for sure.  I understand that.

18           MR. DUBIN:  Okay.

19           THE JUROR:  But I thought about that on my way here

20  today, I said, you know, I also risk that if it goes past

21  that, he -- you know, I may suffer the wrath of whatever.  You

22  know, he, he'll be very upset.

23           MR. DUBIN:  Understood.

24           THE JUROR:  And, you know, it's a hard decision for

25  me.

5697

1          MR. DUBIN:  Right.  I mean, do you think that it

2    would be something that you wanted to think about over the

3    weekend and get back to the Judge about?  We'd be fine with at

4    that and I'm sure Your Honor would talk, maybe have a

5    conversation with your boss and then get back to us.

6          THE JUROR:  Okay.  Well, after spoken with the Judge

7    this morning and getting a little bit more of the conversation

8    that took place with him, it did make me want to rethink a

9    little bit on having a conversation with him now that I have

10   all the information.

11         THE COURT:  My sense from your boss was that he

12   would like to have an actual conversation versus maybe an

13   e-mail to really talk about it.  You know, I told him it was

14   the latest and it was the best news I had and it was the first

15   news I had about a December 15th ending.

16         So, he seemed dismayed, I mean, he seemed

17   disappointed, but he also said, I've never had a call from a

18   judge before, is this out of the ordinary?  I said, Well, you

19   know, I'm doing this because the parties suggested it and we

20   also have concerns as to whether Ms. Cruz will continue to be

21   paid.  And he didn't commit to me either whether he would, but

22   he said he would have to have a conversation with you in order

23   to reach a decision.

24         So, that's why I encourage you to speak to him, but

25   the notion of the alternatives arose when he said, What if I

5698

1  just tell her she has to come back and she's gone?  And I

2  said, Well, dismissal is something that is not just at the,

3  you know, it's not necessarily a decision that anyone makes

4  unilaterally.  It's a very difficult decision and one that we

5  consider carefully.

6          So, I think that at this point, it would be best, as

7  Mr. Dubin suggests, that you speak with your boss and really

8  find out what he's willing to do for you given the kind of

9  arrangement that you have with trying to make up days.  I did

10 tell him we were off the trial on the 24th, which is a Friday,

11 and Wednesday, Thursday and Friday, the 29th, 30th and 1st.

12         So, I would just encourage you to have an actual

13 conversation and decide what you think is best and let us know

14 on Monday.

15              THE JUROR:  Okay.  Okay.

16              THE COURT:  All right.  Thank you.  And please don't

17 discuss this with your fellow jurors.

18              THE JUROR:  No.  No.

19              THE COURT:  All right.  Thank you.  So we will let

20 you go back there.  Thank you very much.

21              (Juror exits.)

22              THE COURT:  Let me just bring you up to date, have a

23 seat, on Juror Number Two.

24         She told me she is a single mom and the sole

25 breadwinner in her family.  She works, as you may recall, at

5699

1    the Hospital for Special Surgery.  She was told that she has

2    four weeks of pay.  What she does is she's going to work the

3    Friday after Thanksgiving, she's going to work this weekend

4    and next weekend, and she's going to work the 29th, 30th and

5    31st.  She said she's got prescheduled days, but she's trying

6    to make up time so that she doesn't lose pay but she would

7    like me to call.

8              I have tried to call on successive days during

9    breaks the compensation person there.  I've just gotten his

10   voicemail and I am reluctant to leave this type of a

11   voicemail.  So I am going to try to reach out for someone

12   above his, his level and see if I can speak to him.  He is

13   only in today, this other individual, the head, and I'll try

14   to reach him during a break or, you know, even if, if all the

15   jurors aren't here, I can try now, but she is concerned about

16   the financial responsibilities she has and the possibility

17   that her pay, even with trying to juggle extra shifts -- she's

18   working 24/7 basically, you know, at the Hospital and here

19   giving attention and trying to manage her family.

20             So, that is her situation.

21             MR. DUBIN:  Your Honor, we just wanted to, on behalf

22   of Mr. Greebel, express from us, thank you Your Honor for the

23   attention you're paying to this and the care you're giving it

24   because it's important and we really do appreciate it.

25             THE COURT:  Obviously, we have concern for everybody

5700

1   in this trial and everybody who is involved and I don't want

2   the jurors to be distracted by the stress, but I do appreciate

3   the parties finally giving me a date, you know, and so that

4   will give us some guideline as to what we might be able to

5   tell employers when I have to make these calls.

6            So, is there anything else that anyone wants me to

7   raise with either the jurors or the employers who come

8   forward?

9            MR. PITLUCK:  Judge, is there still -- there was an

10  alternate who was talking about a vacation next week.  Is that

11  still a pressing issue?

12           THE COURT:  I don't know.  She had indicated -- I'll

13  tell you what she said recently to Ms. Jackson is, I might be

14  able to arrange things but don't tell anyone yet because I

15  don't know if I can.  So we haven't heard anything more from

16  her.  This is Juror Number 16.  So, I am assuming she is here

17  until she tells us otherwise.

18           MR. PITLUCK:  Okay.  Thank you.

19           THE COURT:  Thanks.  All right.  So, if all the

20  jurors are here, let me know.  If not, I'll try to make a call

21  to Juror Number One's employer.

22           Are the parties ready to proceed?

23           MR. MASTRO:  Yes, Your Honor.

24           MR. PITLUCK:  Judge, just with regard to

25  Ms. Oremland, I don't know what the Judge is considering or

5701

1    how the Judge, how the Court would like to proceed, but we, we

2    were talking internally about it last night and I think as we

3    expressed repeatedly, we don't intend for Ms. Oremland to

4    offer what is traditionally expert opinion and I think perhaps

5    the terminology of the question might be what's, or the answer

6    might be what's kind of weighing on the Court's mind.

7         I think what we would propose is to just make things

8    not even in the gray area.  Instead of asking Ms. Oremland the

9    purpose of specific rules, which we do think she's certainly

10   qualified to talk about, we would ask her what role they play

11   in her analysis of the market and what role they play in the

12   market generally and why they're important to her analysis

13   which is certainly not a legal opinion.  It's certainly not an

14   opinion underlying the, you know, creation of the rule, but

15   it's her opinion, it's her testimony about how they play a

16   role in the market and her analysis.

17        THE COURT:  Well, not in this case though.

18        MR. PITLUCK:  No, of course not, not in this case,

19   just generally.  And, you know, because we're -- while we

20   certainly think she's an expert, and we intend to qualify her

21   as such consistent with the Court's order --

22        THE COURT:  Juror Number Two wants to come back in.

23   So, we can either do that now.  Would you like to do this now?

24        MR. PITLUCK:  Let's do this now.

25        THE COURT:  And then I'll continue but I'm hearing

5702

1    you.  So sorry about the interruption.

2              MR. PITLUCK:  No, that's okay.  She wants to come

3    back in?

4              THE COURT:  She wants to come back in and talk to us

5    further.

6              You can bring her in.  She did tell me -- come on

7    in.

8              (Juror enters.)

9              THE COURT:  Juror Number Two is back in the

10   courtroom.

11             Have a seat, please.  Yes, ma'am.

12             THE JUROR:  I do apologize.  I do not want to take

13   up any more time.

14             I just can't take a chance with any backlash that I

15   may go through.

16             THE COURT:  So.  Are you --

17             THE JUROR:  I would ask if I can be dismissed.  If

18   you will discuss it, if you need to discuss it, I, I just --

19   I'm so torn and this is something that I have to go back to,

20   this is an employer that I still have to see, and I know him

21   and I know from the questions he asked, he would want me to

22   maybe take the opportunity to be dismissed.

23             I know that might not be a valid reason or maybe it

24   is.  I don't know.  I can't say it would be a hardship because

25   I know that I could manage if I need to, but I, I just feel

5703

1    I'm in a spot where he knows that there's the opportunity.

2            THE COURT:  All right.  Well, why don't I ask you to

3    return to the jury room.  Again, please don't mention this.  I

4    will discuss this with counsel and we will bring you back in

5    with a decision.

6            THE JUROR:  Okay.

7            THE COURT:  Okay?  Thank you.

8            THE JUROR:  Thank you.  I apologize.

9            THE COURT:  Were there any other questions that

10   anybody wanted to ask?

11           All right.  Thank you.

12           THE JUROR:  Thank you.

13           (Juror exits.)

14           THE COURT:  Have a seat.

15           What I started to say as she was coming in was she

16   told me that last night, she didn't sleep and she's just been

17   in agony and she just doesn't know what to do because she said

18   she definitely wants to stay, she feels that she's invested a

19   lot of time, she finds the case interesting, but she's just

20   not sure what her boss are do.

21           So, I would leave this up to you.  You have been

22   able to get a glimpse of her and I think I had like to hear

23   from the parties as to how they would like to proceed.

24           MR. DUBIN:  Your Honor, if I may, what I'm

25   struggling with and I think the defense team is struggling

5704

1   with is she's so thoughtful.  We've been watching her

2   throughout the trial.  She's been taking notes and she's one

3   of the jurors who is paying real close attention so it's a

4   real shame.

5              I think that what we're hearing, and I'm being so

6   mindful of the fact that we never want to put someone in a

7   position where they feel they might lose their job because of

8   jury service --

9              THE COURT:  I don't think she will.  I really don't

10  think she will because, one, her employer said to me, I would

11  never think about terminating her.  He referred to her in the

12  same terms.  He said she is like family and, in fact, she is

13  family.  So I don't know what that's about, but he assured me

14  he would not terminate her.

15             MR. DUBIN:  What I was just -- because I heard that

16  earlier too and what I was just hearing from her is that she's

17  concerned about what she called backlash.  Maybe it just would

18  take the assurance that she is not going to be terminated.

19  That was why I suggested maybe it would be useful to speak to

20  her employer and get that reassurance that, look, this, the

21  situation is not optimal, but I'm not going to fire you, and

22  if maybe she heard from Your Honor that he expressed that he

23  is not going to terminate her, she might feel like, you know,

24  a little bit more comfortable about at least having the

25  conversation over the weekend because, like I said, even

5705

1  watching her, she just seems like she feels awful about having

2  to leave after having invested this much time.

3       So, we would just ask that, Your Honor, we would

4  just ask if Your Honor wouldn't mind just calling her back in

5  and/or if you want to do it in private and explaining her --

6       THE COURT:  I have told her that at least twice.

7       MR. DUBIN:  Okay.

8       THE COURT:  Yes.  After my conversation when I said

9  please go talk to your boss and he's assured me he will not

10 terminate you.  And then this morning before I brought her in,

11 I said, You're -- to be clear, he was very clear with me and

12 assuring me that your job is not in jeopardy.

13      So, I think what he's seizing on, if I understand

14 it, is that in response to the question to me what if she just

15 leaves, what happens, does the trial just stop, and I said,

16 no, it doesn't, and I explained that, you know, we do have the

17 alternates but it's not an automatic.  He shouldn't assume

18 that just because there are alternates, that that's a reason

19 to excuse a jury.

20      MR. DUBIN:  Right.  Right.

21      If Your Honor wouldn't mind, what I would like to do

22 is just ask her, if she's comfortable with it and if Your

23 Honor is comfortable with it, is to ask her if -- even though

24 she has been told by Your Honor that she wouldn't get, that

25 her employer has expressed to her that he would not terminate

5706

1    her, it still seems to be on her mind.

2         So, the only thing that I would propose asking her,

3    if Your Honor wouldn't mind, is if she might feel better about

4    the situation if she does have a conversation with her boss

5    and tell him, you know, if she's comfortable with it, tell him

6    that she's concerned about, you know, whatever backlash it is,

7    whether he's going to be angry at her and take it out on her

8    or he is going to terminate her and if after speaking to him,

9    if he assures her or reassures her that that's not the case

10   and she takes the weekend to at least go through that

11   exercise, if she'd feel better about the possibility of coming

12   back.

13        THE COURT:  Yes, Mr. Pitluck?

14        MR. PITLUCK:  I think our view is consistent with

15   that.  She's here today.  I mean, we did hear her kind of

16   emotional request and I don't think we want, anybody wants to

17   be dismissive about, but I do agree with Mr. Dubin that it

18   would probably be useful for her to speak with her boss and

19   think about it over the weekend.  I think, plus, it's not a,

20   you know, a juror leaving on Friday, then everybody else has

21   the weekend, you know, all the other jurors spend the weekend

22   thinking about it.

23        We prefer the Court do it.  If the Court, in

24   chambers, the jury room or privately, says, we hear your

25   request, we understand the reasons behind it, we think it

5707

1    would be useful, you have a chance to speak with your boss and

2    clear it up in your mind what any of the effects would be and

3    if you still want to serve, if you want to serve or you don't

4    want to serve, you can clarify it in your mind.  But I think

5    coming in and coming out without having a chance to speak to

6    her boss it's probably not totally clear in her mind.

7            THE COURT:  That's the difficulty because when I

8    spoke to her boss he said, look, I've been trying to get in

9    touch with her to see what's going on and she hasn't told me

10   everything which is good, she followed our instructions, but

11   I'm just trying to find out, you know, how much longer.  I

12   said, I want you to know until now, we had no idea and we've

13   just been given that information today and that's why I'm

14   calling you.  I didn't want to call you before then and this

15   is the date we've been given, December 15th.

16           From what I can glean, it's more of an interpersonal

17   issue.  She's in a small office.  He said there is himself, a

18   receptionist and Juror Number Two.  And he said although

19   they're like family, she has expressed concern that he can be

20   difficult and that I think because of those sort of

21   complexities, both professionally and if there's a family or

22   some sort of interpersonal relationship, that she -- the

23   backlash, to me, I'm interpreting based on what she said, is

24   more, yes, it might be pay and it might just be tension in the

25   office.  She's clear in her mind and I am clear based on what

5708

1     this employer has told me that she will not lose her job.

2          I can ask her to please call him.  I had urged her

3     to do that after I spoke to her boss because he said I would

4     like to have a conversation.  So I was disappointed to hear it

5     was just an e-mail communication because I think a lot gets

6     misinterpreted from time to time in e-mails.

7          MR. DUBIN:  I agree.

8          THE COURT:  For whatever reason, she seems reluctant

9     to have that conversation.

10          MR. PITLUCK:  So, I guess, Judge, I mean, there's

11     obviously something there and I think we're not in a position

12     to judge, and she did kind of emotionally ask to be dismissed

13     so we don't want to disregard that.  I mean, this trial has

14     gone on a lot longer.  There are hardship issues.  I think

15     it's just worth it to clarify with her boss in her mind.

16          THE COURT:  I said, We really can't come to a

17     decision until after you have a conversation with your boss

18     and have, you know, understand from his point of view and your

19     point of view what possible arrangements you can make.  If

20     there are no arrangements, then you can let us know that.  But

21     I think it is, in my mind, still not entirely clear to me

22     what, whether she'll be paid.  She doesn't know and I think

23     she should have that conversation.

24          There seems to be a resistance to having that

25     conversation, I don't know what's behind it, but I think the

5709

1  term "backlash," I don't know what that means but my sense is

2  it does not have to do with job security.

3          MR. DUBIN:  That was my sense also.  That is why I

4  asked.  Maybe she'll be more candid with Your Honor if she's

5  not on the witness stand.

6          THE COURT:  All right.  I'll have her speak to me in

7  my robing room and I'll have a quick conversation with her.

8          MR. DUBIN:  Thank you.

9          THE COURT:  But what I will tell her is that today,

10  we're not going to make any decisions until she has a

11  conversation, an actual conversation with her boss and reports

12  back.

13          MR. DUBIN:  Very well.

14          THE COURT:  Thank you.  Just give me one minute.

15          (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

5710

1             (In open court; jury not present.)

2        THE COURT:  Juror No. Two did agree to have a

3   conversation with her boss this weekend.  We are going to line

4   up the jurors.  Is there something we need to resolve now

5   regarding Ms. Oremland?  I'll hold them.

6        MR. PITLUCK:  Yes, your Honor.  She's going on the

7   stand right now.

8        THE COURT:  So, given your position and your

9   intentions, is the defense still having issues with the

10  proposed limitation that the government is putting on itself?

11       MS. DENERSTEIN:  Yes, your Honor, in part, because I

12  don't think she is a market expert on market analysis and

13  that's never been disclosed to us before and Mr. Pitluck did

14  not proffer what she was going to say.  We have the same

15  objection that she's not qualified to testify about what

16  impact this has on the market, the rules.

17       MR. PITLUCK:  Judge, the court held three times

18  yesterday that she was qualified to offer this.  We were

19  simply advancing this to give comfort to the court that this

20  was not going to be anywhere in the purview of opining on

21  anything relating to a legal issue, which we didn't think was

22  going to happen anyway.  The court is familiar with Ms.

23  Oremland's qualifications.  This was in an effort to try to

24  explain to your Honor and revise the way the questions are

25  asked a little bit to make it clear this is just based on her

5711

1    experience and analysis and her belief is when she conducts

2    investigations related to trading in the market.

3              The court heard she has 16 years of experience doing

4    this.  Judge, this is substantially the same testimony she

5    offered in the Shkreli case with a few differences and we have

6    agreed to make those differences away from anything relating

7    to legal interpretations.  This is just us trying to be clear

8    and to address the court's concerns which I don't think the

9    court had any.  We're certainly trying to clarify.

10             THE COURT:  Yes.

11             You know, I did make rulings on this issue.  I did

12   also decide that Ms. Denerstein could ask some voir dire.  My

13   view is her job is to analyze and review market information

14   and look for fraud in the market.  She's not going to opine on

15   any ultimate issues.  I believe she is qualified, but I will

16   give you an opportunity for some voir dire.

17             MS. DENERSTEIN:  Your Honor, we're not going to voir

18   dire.  With respect to what Mr. Pitluck just said, first of

19   all, she doesn't conduct investigations, actually she

20   testified to that at the last trial.

21             Second, she can certainly discuss how this impacted

22   her analysis, her understanding of the market impacts her

23   analysis.  I don't think it's appropriate for her to testify

24   to the broad market.

25             THE COURT:  You did say that she  --

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

5712

1          MS. DENERSTEIN:  She can obviously testify to how

2     her understanding of the market impacts her analysis.  It's

3     the broad proclamations she's now going to testify how these

4     Rules affect the market we object to because the disclosure

5     just happened this morning.

6          THE COURT:  It's based on her experience and her

7     training and knowledge.  She's been doing this for 16 years.

8     So it's my view that her testimony will be discussing

9     generally and not specifically with regard to this case her

10    knowledge and experience and what she has  -- the opinions

11    that she's formulated on how those rules do impact the market.

12          I don't think it's outside of her area and certainly

13    I think it would be helpful to the jury to understand because

14    we've heard so many numbers and terms and provisions within

15    10-Qs and 10-ks and the other filing documents, the 13s and it

16    will just be helpful to the jury to understand what is

17    demanded of a public company with regard to its filings and

18    what some of these terms mean and why they may be important in

19    her view based on her experience as she conducts the analysis

20    that she does over the past decade and more, decade and a

21    half.

22          So, certainly you're not being precluded from voir

23    dire if you think it's appropriate.  If you change your mind,

24    pop up and let me know.  I think at this point, you know,

25    having had the opportunity to hear her, read the transcript,

5713

1   understand what her testimony will be, the only difference

2   being that she'll offer a few limited opinions.  I think that

3   it should not  -- her testimony should not be circumscribed in

4   the way that you may propose and the way that you've

5   previously brought to my attention in your motions.  Okay.

6           MS. DENERSTEIN:  Your Honor, we are objecting as I

7   noted.  We will abide by the court's ruling and we are not

8   going to voir dire.

9           THE COURT:  Thank you.

10          MR. PITLUCK:  In light of the that, I think where we

11  left before the jury was that we have moved to qualify her as

12  an expert.  It's just pending the court's ruling.

13          THE COURT:  I will do that in front of the jury, if

14  you want to repose the question.

15          MR. PITLUCK:  Thank you, your Honor.

16          THE COURT:  Thank you.

17          THE COURT:  All right.

18          We'll get the jury back in here.

19          MR. PITLUCK:  Okay.

20          (Pause.)

21          (Jury present.)

22          THE COURT:  Good morning, members of the jury.  All

23  jurors are present.  Please, have a seat.  Mr. Pitluck, you

24  may continue with your direct of Ms. Oremland.

25          MR. PITLUCK:  Thank you, your Honor.

Oremland - direct - Pitluck                    5714

1          your Honor, at the point we broke yesterday the

2    government had moved to qualify Ms. Oremland as an expert in

3    securities terminology, SEC disclosure requirements,

4    regulations and forms.

5              MS. DENERSTEIN:  Pursuant to our prior conversation,

6    we can proceed.

7              THE COURT:  Ms. Oremland will be qualified as an

8    expert in the SEC terminology, disclosure requirements,

9    regulations and forms, with recognition of our prior sidebars.

10             MR. PITLUCK:  Thank you, your Honor.

11   DEBORAH OREMLAND, resumed.

12   DIRECT EXAMINATION (Continued)

13

14   Q    Ms. Oremland, do you know the defendant Evan Greebel?

15   A    No.

16   Q    In relation to this case, were you asked to conduct and

17   analysis and prepare summary charts?

18   A    Yes.

19   Q    Who asked you to do that?

20   A    The government.

21   Q    Did you create summary charts in relation to this case?

22   A    Yes, I did.

23   Q    Were you paid by the United States Attorney's Office to

24   do so?

25   A    No.

Oremland - direct - Pitluck                    5715

1   Q    Other than your salary at FINRA, did you receive any

2   additional payment to conduct this analysis?

3   A    No.

4   Q    Approximately how many hours did you spend on your

5   analysis in this case?

6   A    I would say around fifteen.

7   Q    Did you rely on certain materials to prepare your

8   analysis and summary charts?

9   A    Yes.

10  Q    I'm going to ask you to take a look at the binder in

11  front of you.  Do you recognize the exhibits in that binder?

12  A    Yes.

13  Q    Are these the documents you used to prepare the chart?

14  A    Yes, most of them, except for the blue sheet data.

15  Q    Can you just describe what's in that binder?

16  A    There are some SEC filings, there is trace and volume

17  information for Retrophin from Bloomberg and there's some

18  information from the transfer agent.

19  Q    You mentioned something about blue sheet data that's not

20  in there, correct?

21  A    Yes.

22  Q    Did you review blue sheet data?

23  A    Yes.

24  Q    Was it contained on a separate CD?

25  A    Yes.

Oremland - direct - Pitluck                5716

1    Q    Let's go through some of that.  Tab six contains what's

2    been admitted into evidence as Government Exhibit 955,

3    pursuant to stipulation.  Can you just tell the jury what this

4    is?

5    A    This is daily closing price and volume data for Retrophin

6    from Bloomberg.  It's for the period December 17, 2012 through

7    September 30, 2014.

8    Q    Can you just explain to the jury the three columns?

9    A    Sure.  The first column is the trade date.  The second

10   column is it price of the stock at the end of the trading day.

11   And the third column is the share volume.  So that's the

12   number of shares that were traded that day.

13   Q    We're going to go through this in a little bit more

14   detail in a moment.  Can you flip back to tab five, which

15   contains Government's Exhibit 115-31 in evidence.

16   A    Yes.

17   Q    Are these the transfer agent documents you testified to a

18   moment ago?

19   A    Yes.

20   Q    Which company are these for?

21   A    For Retrophin.

22   Q    Did you rely on these as part of your analysis?

23   A    I did.

24   Q    Tabs one through three contain Government Exhibits' 960,

25   behind tab one, 962, behind tab two, and 964 behind tab three.

Oremland - direct - Pitluck                    5717

1  Can you tell the jury what each of those documents are?

2  A    Sure.  The first is a form 8-k for Desert Gateway.  It's

3  an SEC filing.  The second is a form schedule 13D, another SEC

4  filing for Retrophin and the third is another form schedule

5  13D.

6  Q    Did you review all these documents prior to your

7  analysis?

8  A    Yes.

9          MR. PITLUCK:  Your Honor, at this time we would move

10 Government Exhibits' 960, 962 and 964 into evidence.

11         MS. DENERSTEIN:  No objection.

12         THE COURT:  We receive in evidence Government's

13 Exhibits 960, 962 and 964.

14         (So marked.)

15 Q    I'm showing you a CD that's been labeled United States

16 vs. Evan Greebel, blue sheet data containing Government

17 Exhibits 950 to 954.

18         Did you review the contents of this CD.

19 A    Yes.

20 Q    What are they?

21 A    These are the blue sheets.

22 Q    What is blue sheets?

23 A    Blue sheet data is a special type of trading data from

24 what's called a clearing firm.  It contains all the trades in

25 a stock for a particular period of time and it also includes

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Oremland - direct - Pitluck                    5718

1    information about the customers behind the trades.

2    Q    And is blue sheet data voluminous?

3    A    Yes.

4    Q    Do you see initials and a date on there?

5    A    Yes.

6    Q    What does that signify?

7    A    Those are my initials and it signifies that I reviewed

8    what's on the CDs.

9    Q    Did you rely on this evidence in preparing your summary

10   charts?

11   A    Yes.

12          MR. PITLUCK:  Your Honor, Government Exhibits 950

13   through 54 have been admitted pursuant to stipulation.

14          THE COURT:   All right.  Thank you.

15   Q    Who provided the underlying data for you to review?

16   A    The government provided some of the data, just the blue

17   sheets and the transfer agent records.  And I obtained some of

18   the other information from public sources.

19   Q    I would like to show you what's been marked for

20   identification as Government Exhibits 990, 992 and 995.  Those

21   are behind tab eight, ten and eleven in your binder.  These

22   are for identification?

23          Do you recognize these Ms. Oremland.

24   A    Yes.

25   Q    What are they?

Oremland - direct - Pitluck                5719

1    A    These are the charts that I created.

2    Q    Do these summary charts fairly and accurately represent

3    the voluminous data that we discussed a moment ago?

4    A    Yes.

5             MR. PITLUCK:  The government movers to admit

6    Government Exhibits 990, 992 and 995 an into evidence.

7             MS. DENERSTEIN:  Are they demonstratives to aid the

8    jury?

9             MR. PITLUCK:  They are.  They are summary charts.

10   They are summaries of the blue sheet data.

11            MS. DENERSTEIN:  No objection to demonstratives.

12            THE COURT:   We receive in evidence Government's

13   Exhibits 990, 992 and 995.

14            (So marked.)

15   Q    Ms. Oremland, from with your work at FINRA are you

16   familiar with what a stock is?

17   A    Yes.

18   Q    Can you tell us what a stock I guess?

19   A    A stock is a type of security that represents an

20   ownership interest in a company.

21   Q    Does it have another name?

22   A    It's often called an equity.

23   Q    Can you buy and sell shares of stock?

24   A    Yes.

25   Q    How do you do that?

Oremland - direct - Pitluck                5720

1   A     You do that on the stock market.

2   Q     What is a shareholder?

3   A     A shareholder is an individual who owns shares or stock

4   in a company.

5   Q     Are you familiar with the term short sale?

6   A     Yes.

7   Q     What is a short sale?

8   A     A short sale is kind of a complicated trade.  It's when

9   you're betting essentially that the market is going to go

10  down.  You have to sell shares that you don't already own in

11  the hopes that the price of the stock is going to fall and

12  then you can make the money off of the difference.  It's

13  complex, so I like to use an analogy.  Let's say there's going

14  to be a drought for a month and I find out that the current

15  price for umbrellas is around ten bucks and I find someone who

16  has a ton of umbrellas and I borrow one of their umbrellas and

17  I sell it immediately for $10.  Now, the drought hits and lo

18  and behold of the price of umbrellas fall to three dollars.

19  So I go into the marketplace for umbrellas and I buy one for

20  three dollars and I get to return that umbrella to who I

21  borrowed it from but I get to keep the difference, the seven

22  dollars.  That's really how short selling works.

23  Q     So as part of that does somebody who looks into short

24  sell have to locate a stock to purchase?

25  A     Yes.  You have to make sure there are shares to borrow.

Oremland - direct - Pitluck                    5721

1    Q      Are you familiar with the term cover as it relates to a

2    short sale?

3    A      Yes.

4    Q      What is that?

5    A      That pertains to when you close out your position, when

6    you buy the shares in the market.

7    Q      You testified an moment ago about stock markets?

8    A      Yes.

9    Q      Are there different kinds of stock markets and securities

10   exchanges?

11   A      Yes.

12   Q      Can you just describe the different kinds of the

13   securities exchanges?

14   A      Sure.

15          There's what are known as national securities

16   exchanges.  Those are the New York Stock Exchange, the NASDAQ.

17   Generally companies that trade on those markets are big.  They

18   have to go through a stringent listing process.  They have to

19   file extensive documents with the SEC.  They have to be a

20   certain size, have a certain amount of assets amongst other

21   criteria.  But there are some other tiers of marketplaces

22   where stocks can trade and one of those is the Over The

23   Counter Markets.  Their companies are much smaller.  They

24   don't have to go through a listing process.  Sometimes they

25   don't even need to file reports with the SEC.  But a lot of

Oremland - direct - Pitluck                    5722

1   them do have to.  And they don't have to maintain a certain

2   price to be quoted.  They are generally smaller, lower price,

3   start-up companies trade on the on the Over The Counter

4   Market.

5   Q    If a company is listed on one of these Over The Counter

6   Markets but they want to move to one of the national exchanges

7   that you mentioned, are there requirements they have to go

8   through?

9   A    Yes.

10  Q    What are those requirements?

11  A    Well, if the company became a company through what's

12  called a reverse merger, that company has to trade on the Over

13  The Counter Market for at least a year and it also has to file

14  periodic reports with the SEC.  It also has to maintain a

15  closing price of four dollars for 30 of the last 60 days prior

16  to the uplisting to the let's say the NASDAQ market.

17  Q    You said uplisting.  Can you tell the jury what uplisting

18  means?

19  A    It's when your company goes from the Over The Counter

20  Market to one of the bigger marketplaces, one of the national

21  security exchanges like the NASDAQ.

22  Q    As part of your work do you follow the stock price

23  movement of publicly traded companies?

24  A    Yes.

25  Q    You mentioned a term reverse merger.  Can you tell the

1   jury what a reverse merger is?

2   A    Reverse merger is when a private company goes public by

3   trading with a publically traded shell company.  So at the end

4   of the day the private company becomes the public company.

5   Q    And in your experience with reverse mergers, does the

6   publicly traded shell company have significant assets?

7   A    A shell has very little assets, no real business, but

8   it's currently trading probably very infrequently on the Over

9   The Counter Market.  But there's really nothing to it.

10  Q    Now, in this case, in particular, did you review

11  materials that were related to a reverse merger?

12  A    Yes.

13  Q    Which one?

14  A    The reverse merger between the Desert Gateway and

15  Retrophin.

16  Q    When did that take place?

17  A    December 12, 2012.

18  Q    What was the new company called after the reverse merger?

19  A    Retrophin.

20  Q    What market did Retrophin trade on after the reverse

21  merger?

22  A    On the Over The Counter QB, OTCQB.

23  Q    Is that a particular tier or particular kind of Over The

24  Counter Market?

25  A    Yes.  It's one of the tiers of the OTC markets group.  It

Oremland - direct - Pitluck                5724

1   does require the companies to file periodic reports with the

2   SEC.

3   Q    So on the OTCQB was Retrophin required to make filings

4   with the SEC?

5   A    Yes.

6   Q    And did Retrophin ever move to a different market?

7   A    Yes.

8   Q    Which one did it move to?

9   A    To the NASDAQ.

10  Q    When did that merger  -- was that an uplisting?

11  A    Yes.

12  Q    When did that uplisting take place?

13  A    In January 2014.

14  Q    Is there a time requirement for how long a company must

15  be traded on the OTCQB before it can uplist to the NASDAQ?

16  A    Yes.  It has to trade for a year.

17  Q    Now, are there any SEC filings that need to be made when

18  a reverse merger occurs?

19  A    Yes.

20  Q    What kind of filings?

21  A    It's the form 8-K.

22  Q    What is a form 8-K?

23  A    The form 8-K is a form that's required to be filed any

24  time there's what's called a material event with the company,

25  any kind of big, major change, any event that needs to be

1  disclosed to the public.

2  Q    And what kind of information is included in an 8-K after

3  a reverse merger?

4  A    An 8-K, after a reverse merger, has a lot of information

5  about the new publicly traded company.  It has audited

6  financial information, information about the company's

7  business and it's a very extensive document.  It goes through

8  what happened with the  -- in the reverse merger,

9  shareholders, owners, ownership information.

10  Q    A description of business?

11  A    Yes.

12  Q    I would like to direct your attention to Government's

13  Exhibit 960 in evidence.  And that's behind tab one in your

14  binder.  Is this the 8-K for the Dessert Gateway Retrophin

15  reverse merger?

16  A    Yes.

17  Q    Is this about an 80 page document?

18  A    Yes.

19  Q    When was this document filed?

20  A    The date of the report is December 12, 2012.

21  Q    Can we go to the second page.  Are these the items that

22  are included within this 8-K towards the top?

23  A    Yes.

24  Q    And can you just describe for the jury what they are,

25  read to the jury what they are, please?

Oremland - direct - Pitluck                    5726

1   A     The first item is the entry into the material definitive

2   agreement.  The second is completion of acquisition or

3   disposition of assets.  The third is unregistered sales of the

4   equity securities.  The Fifth -- item 5.01 is changes in

5   control of registrant.  The next item is departure of the

6   directors or principal officers, election of directors,

7   appointment of the principal officers, compensatory

8   arrangements of certain officers.  Next is change in shell

9   company status.  And the final is financial statements and

10  exhibits.

11  Q     I would like to direct your attention to page 75 of 80

12  towards the back.  That's on the bottom in the corner, your

13  Honor.  Do you see the section under which it says shares

14  eligible for future sale?  What does that say, how many shares

15  are eligible for future sale?

16  A     It says there are 8,338,837 shares of the common stock.

17  Q     And then what's it say after that?

18  A     Of these shares 5,838,837 are restricted securities under

19  Rule 144.

20  Q     What is a restricted security?

21  A     A restricted security is a security that has restrictions

22  on resale.  You can't immediately turn around and sell these

23  securities into the market.  They are usually obtained

24  directly from the company.  They are held by  -- oftentimes by

25  people closely associated with the company.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Oremland - direct - Pitluck                    5727

1  Q     How can you tell if a security is restricted?

2  A     There's a large legend on the stock certificate.

3              (Continued on next page.)

Oremland - direct - Pitluck                              5728

1    BY MR. PITLUCK:   (Continuing)

2    Q    And you testified a moment ago that you reviewed records

3    from a transfer agent?

4    A    Yes.

5    Q    Can you explain what a transfer agent is?

6    A    A transfer agent is a company that is, maintains a lot of

7    different things for a, for public companies, including

8    shareholder lists, issuances and cancellations of stock

9    certificates, and they also are the ones who are able to lift

10   the restrictions off of restricted securities.

11   Q    How does one go about doing that, lifting restrictions

12   off of restricted securities?

13   A    Well, you have to have an attorney opinion letter in

14   order to do so to make the determination that the shares are

15   now eligible to be free-trading shares.

16   Q    And the sentence that we just saw in Government

17   Exhibit 960 said, mentioned Rule 44.

18        Can you tell the jury what Rule 44 is?

19   A    Sure.   Rule 44 is an SEC rule that governs the resale of

20   restricted securities.   So, really, any time a company wants

21   to sell its shares, it's supposed to register those shares

22   with the SEC.   Now, there are certain exemptions that a

23   company can use.   One of them is to do what's called a private

24   offering, to offer shares to a limited amount of people, not a

25   widespread group.

Oremland - direct - Pitluck                    5729

1          So -- so, in those cases, the company doesn't have

2    to file a lengthy, what's called a registration statement.

3    They don't have to go through that process.  Now, the

4    recipient of those shares has to abide by the rules under

5    Rule 44 before they can turn around and sell their shares.

6    Q    So you just mentioned something called a registration

7    statement.  Is that also known as an S-1?

8    A    Yes, that's a type of registration statement.

9    Q    Can you just explain to the jury briefly what a

10   registration statement is?

11   A    Registration statement is another really lengthy SEC

12   filing.  It contains a lot of information about the company

13   and it's a very extensive disclosure wherein shares are

14   registered to be sold.

15   Q    So, if you don't have a registration statement, then

16   Rule 44 applies?

17   A    Yes.  Rule 44 applies to some holders of securities all

18   the time.

19   Q    And what holders of securities does the Rule 44 apply to

20   all the time?

21   A    Well, if you're what's known as an affiliate of a

22   company.

23   Q    What is an affiliate of a company?

24   A    An affiliate is someone who can exert control over a

25   company.  There's not one definition.  It's really determined

Oremland - direct - Pitluck                5730

1   on a case by case basis.  Generally, if you're an officer or

2   director, you own 10 percent or more of shares, you're

3   considered an affiliate, but, really, it's anyone who can

4   control the company directly or indirectly or is in common

5   control with the company.  It's a case by case determination.

6   Q    So, what are the restrictions on affiliates trading their

7   shares in a company?

8   A    Affiliates, they can't sell as many shares as they want.

9   There are several itemized restrictions on to the quantity of

10  shares that they can sell into the market.

11  Q    So, can we -- going back to what we just saw on

12  Government Exhibit 960, so there are approximately 8.3 million

13  shares for the company of common stock and approximately 5.8

14  of them are restricted.  What's the status of the remaining

15  2.5 million shares?

16  A    Those are what's called free-trading shares.

17  Q    What does that mean?

18  A    That means that they could be freely sold, freely traded.

19  Q    And have you heard of the expression the float --

20  A    Yes.

21  Q    -- in the context of securities?  What is a float?

22  A    The float is the amount of free-trading shares.

23  Q    Are you familiar with something called a Form 4?

24  A    Yes.

25  Q    What is a Form 4?

Oremland - direct - Pitluck                    5731

1  A    A Form 4 is another SEC disclosure document and that is

2  used -- it's required when an officer or director or a major

3  shareholder of 10 percent or more makes a transaction in the

4  market.  Either when they buy shares or sell them, they have

5  to file a Form 4 with the SEC.

6            THE COURT:  Form 4, you said?

7            THE WITNESS:  Yes.

8  Q    And what's a Form 3?

9  A    The Form 3 is the initial form that the insider has to

10 file with the SEC to indicate how many shares they owned.

11 Q    And Form 4 if those shares changed?

12 A    Yes.

13 Q    In your experience, what role does the Form 4 play in the

14 market?

15 A    Well, it informs investors of when it, the insiders are

16 trading.  So if you're trying to make an investment decision

17 and you see that there, that the insiders are selling a fair

18 amount of the stock, you might not want to buy the stock and

19 vice versa.

20 Q    And what is a 10-K filing?

21 A    A 10-K is the annual report that companies need to file

22 with the SEC and the key element of those filings is that the,

23 their financials need to be audited.

24 Q    What does that mean, to be audited?

25 A    By -- an accountant has to certify and review the

Oremland - direct - Pitluck                    5732

1   financial statements.

2   Q     And what is a 10-Q, finally?

3   A     The 10-Q is kind of like a quarterly update that the

4   company has to file with the SEC.

5   Q     Does that include audited financial statements?

6   A     No, it doesn't have to.

7   Q     In your experience, what role do the 10-Q and 10-K

8   filings play in the market?

9   A     Again, it's, it provides the investor with a lot of

10  information as to the company's health.  It gives them insight

11  into what's on the balance sheet, what's going on in the

12  business, who the owners of the companies are.  Sometimes

13  there's really nothing else that the public can rely on

14  besides those filings, there's no other information that gives

15  you quite as much data.

16  Q     Are you familiar with Rule 13D of the Securities and

17  Exchange Act of 1934?

18  A     Yes.

19  Q     And what is that?

20  A     Rule 13D requires shareholders who own about 5 percent or

21  more of a class of stock to file a disclosure document with

22  the SEC indicating how many shares they own.

23  Q     And the 5 percent threshold you mentioned, is that direct

24  and indirect or just direct ownership?

25  A     No, that's direct and indirect.  That's what's called a,

Oremland - direct - Pitluck                    5733

1   a beneficial owner.  It's an individual who owns 5 percent or

2   more, either directly or indirectly.  You can't sidestep

3   filing a 13D by making some sort of contract or arrangement to

4   hide your ownership.  If you own any shares, you have to file

5   the 13D.

6   Q    And in your experience, what role does the form, the Rule

7   13D form play in the market?

8   A    Again, it provides the investor with really key

9   transparency into the company.  You see who the major

10  investors are.  These are people who can have an affect on the

11  company, either by their, what's called their voting power,

12  their power to vote and control the company's corporate

13  actions or what's called their investing power, their power to

14  sell shares and affect the market of that stock.

15  Q    So, going to the free-trading shares of Retrophin that

16  are, that we saw referenced in the 8-K, based on your review

17  of documents that are admitted into evidence in this case, do

18  you know how those shares were distributed around the time of

19  the reverse merger?

20  A    Yes.

21  Q    How do you know that?

22  A    By review of the transfer agent records.

23  Q    And did you prepare a summary chart of the share

24  distribution of these, of some of these shares for the jury?

25  A    Yes.

Oremland - direct - Pitluck                  5734

1   Q    Can you go to Government Exhibit 990 which is tab eight

2   in your binder?

3          THE COURT:  May I just ask one question before you

4   get into this area?

5          MR. PITLUCK:  Please, Judge.

6          THE COURT:  You talked about the Form 13D and you

7   said shareholders who own more than 5 percent are required to

8   report.  Is that -- does that include both restricted and

9   unrestricted shares?  Because you talked about the potential

10  effect that the 5 percent and above would have on the market,

11  but if their shares are restricted, would they not --

12         THE WITNESS:  Your Honor, that's where the voting

13  power comes into play.

14         THE COURT:  Yes.

15         THE WITNESS:  So, if you own shares, you can

16  still -- you have votes even if you can't sell them.

17         THE COURT:  So, the 13D is required for anybody who

18  owns 5 percent of restricted or unrestricted shares?

19         THE WITNESS:  Yes, it's technically of a certain

20  class of stock.  So if you own 5 percent or more of the common

21  stock, you have to file the 13D.

22         THE COURT:  Thank you.

23  Q    Regardless of whether it's unrestricted or restricted?

24  A    Right.

25         MR. PITLUCK:  Thank you, Judge.

1    Q    So, going to Government Exhibit 990, can you just explain

2    for the jury what's shown on this chart?

3    A    Sure.  This shows a distribution of the free-trading

4    shares as of December 17, 2012.

5    Q    And can you read for the jury who they went to?

6    A    Sure.  350,000 shares went to Kevin Mulleady; 300,000

7    shares went to Thomas Fernandez; 300,000 shares to Marek

8    Biestek; 350,000 shares to Tim Pierotti; 350,000 shares to

9    Claridge Capital LLC; 250,000 shares to Andrew Vaino; and

10   100,000 shares to Edmund Sullivan.

11   Q    And is Martin Shkreli listed on that start?

12   A    No.

13   Q    And of those, those names you just read, what is the

14   total number of shares distributed to the, to this group of

15   individuals?

16   A    2 million shares.

17   Q    What percentage of that is it of the total free-trading

18   shares?

19   A    80 percent.

20   Q    Based on your review of the transfer records, were you

21   able to determine the remainder of, who had the remainder of

22   the free-trading Retrophin shares at this point in time?

23   A    Yes.

24   Q    And who was that?

25   A    Michael Fearnow and Ruth Shepley.

1    Q    And I'm just going to have you go to Government

2    Exhibit 115-31 in evidence.

3              Are these the transfer agent records?

4    A    Yes.  I'm sorry.  Troy Fearnow and Ruth Shepley.

5    Q    If we go to page Standard-698, please, is that the

6    distribution at the bottom there?

7    A    Yes.

8    Q    And then Ruth Shepley is underneath that?

9    A    Yes.

10   Q    And do you know of a connection between Ruth Shepley and

11   anybody else?

12   A    I think she is a partner of Michael Fearnow.

13   Q    And in connection with Retrophin, did you also review 13D

14   filings?

15   A    Yes.

16   Q    Can we go to Government Exhibit 962 which is tab two in

17   your binder and this is in evidence.  What is this?

18   A    This is a 13D, Form 13D for Retrophin filed by Martin

19   Shkreli.

20   Q    Is this one of the forms we were talking about before,

21   the statement of beneficial ownerships?

22   A    Yes.

23   Q    What date was this filed?

24   A    December 20, 2012.

25   Q    So, let's go to the next page.  Can you see the entities

Oremland - direct - Pitluck                    5737

1    that are in the middle there?

2    A    Yes.

3    Q    What does that signify?

4    A    That's who, who is reporting.  These are the owners who

5    are reporting.

6    Q    In this 13D?

7    A    Yes.

8    Q    Is it Martin Shkreli, MSMB Healthcare Management LLC,

9    MSMB Healthcare LP, MSMB Healthcare Investors LLC, MSMB

10   Capital Management LLC, MSMB Capital Management LP and Desert

11   Gateway?

12   A    Yes.

13   Q    All listed in an address at 777 Third Avenue?

14   A    Yes.

15   Q    Let's go to the next page, to the third page of the

16   document.

17             What are we looking at here?

18   A    This is the information regarding MSMB Capital Management

19   LP.

20   Q    What kind of information is reported here?

21   A    It's the number of shares that are beneficiary owned.

22   Q    So box number one was the name of the entity, correct?

23   A    Yes.

24   Q    You see where, box number four where it says, Source of

25   Funds?

1   A    Yes.

2   Q    What does that mean?

3   A    The source of the funds to pay for the acquisition of the

4   shares.

5   Q    And what does "WC" stand for?

6   A    Working capital.

7   Q    So what, generally what does that mean?

8   A    That's the company's money capital that they use to buy

9   the stock.

10   Q    So this is MSMB Capital Management's money used to buy

11   stock in Retrophin?

12   A    Yes.

13   Q    And you see where it says, Sole Voting Power?

14   A    Yes.

15   Q    And 375,000 shares?

16   A    Yes.

17   Q    What does that mean, "Sole Voting Power"?

18   A    That this entity has voting power over 375,000 shares.

19   Q    Do you see the box below where it says, Share voting

20   power?

21   A    Yes.

22   Q    What does that mean?

23   A    That means that it's shared -- well, in this instance,

24   it's zero shares so they don't share voting power with

25   anybody, but it would indicate if you shared voting power and

1    how many shares.

2    Q    And then --

3    A    Or shared.

4    Q    The bottom right below that, Sole Dispositive Power.

5    What does that mean?

6    A    That indicates, you know, how many shares that you could

7    sell.

8    Q    And --

9    A    That you own, that you could possibly sell.  And in this

10   case, it's 375,000.

11   Q    And Box 11, the aggregate amount beneficiary owned by

12   each reporting person, what number is listed there?

13   A    375,000.

14   Q    And finally, where it says, Percent of class represented

15   by amount in row?

16   A    Yes.

17   Q    What number is that?

18   A    13 -- I'm sorry, 4.5 percent.

19   Q    And what does that number mean?

20   A    That's the percentage of the amount of stock that this

21   entity owns.

22   Q    Okay.  So there is -- if we can just go to the next page

23   briefly.  This is MSMB Capital Management LLC.

24          What's listed as the source of funds here?

25   A    They're "O" which is "other."

1   Q    Generally, what are some of the things in "other"?

2   A    Other forms of consideration, stock.  You see this with

3   various mergers.

4   Q    And this one has shared voting power, correct?

5   A    Yes.

6   Q    And that's what you talked about before?

7   A    Yes.

8   Q    Is that the same amount of shares that MSMB Capital

9   Management LP owned?

10  A    Yes.

11  Q    So, briefly, let's go to the next page.  It says, MSMB

12  Healthcare LP.

13         What was the source of funds that MSMB Healthcare

14  used to purchase shares in Retrophin?

15  A    Working capital.

16  Q    How many shares of sole voting power does it have?

17  A    473,274 shares.

18  Q    What percent of the shareholder class is represented by

19  that amount?

20  A    5.68 percent.

21  Q    And MSMB Healthcare Investors LLC is the next page.  What

22  is the source of funds listed there?

23  A    Working capital and other.

24  Q    And this one has sole voting power of 413 shares?

25  A    Yes.

1    Q    And how much shared voting power does it have?

2    A    473,274 shares.

3    Q    Is that the same amount as we saw in the previous exhibit

4    for MSMB Healthcare LP?

5    A    Yes.

6    Q    Let's go ahead two pages to Martin Shkreli.  And how many

7    shares does Martin Shkreli have ownership over, I'm sorry,

8    sole voting power over?

9    A    2,531,920 shares.

10   Q    And shared voting power?

11   A    848,687 shares.

12   Q    So, what's the aggregate amount of beneficiary-owned

13   shares by each reporting person?

14   A    3,380,607 shares.

15   Q    And what percent of the ownership class?

16   A    40.54 percent.

17   Q    You see the source of funds?  What source of funds did,

18   according to this document, what source of funds did Martin

19   Shkreli use to purchase these shares?

20   A    It says "PF" which is personal funds and other.

21   Q    Finally on the bottom, you see where it says, Type of

22   Reporting Person, "IN"?

23   A    Yes.

24   Q    Is that an insider?

25   A    It's an individual.

Oremland - direct - Pitluck                    5742

1   Q    I'm sorry.  Individual.

2        Based on your transfer records that we just saw in

3   evidence, are these shares that Martin Shkreli owns restricted

4   or free trading?

5   A    Restricted.

6   Q    So let's go to page 9, two pages ahead.

7        Do you see at the top, there's some language that

8   says, Immediately Effective, Immediately Prior to the

9   Effective Time?

10  A    Yes.

11  Q    Can you read the last sentence -- the last two sentences

12  in that paragraph that says, "As a result"?

13  A    Sure.  As a result of the merger, Mr. Shkreli's Retrophin

14  common stock and unvested shares of Retrophin common stock

15  converted into 2,531,920 shares of common stock.  The shares

16  of Retrophin common stock held by Mr. Shkreli prior to the

17  merger were purchased by Mr. Shkreli with his personal funds.

18  Q    And can we go down four paragraphs to the one that

19  starts, "Mr. Shkreli disclaims."

20  A    Mr. Shkreli disclaims beneficial ownership of the shares

21  held by MSMB Healthcare LP, MSMB Healthcare Investors LLC and

22  MSMB Capital Management LP.

23  Q    And can we go to the, to the second to last page of this

24  document.  Do you see where it says, item six, Contracts,

25  arrangements, understandings or relationships with respect to

Oremland - direct - Pitluck                    5743

1    securities of the issuer?

2    A    Yes.

3    Q    Can you just read that sentence.

4    A    There are no contracts, arrangements, understandings or

5    relationships, legal or otherwise, between the reporting

6    persons and any person with respect to securities of the

7    issuer.

8    Q    Okay.  Can we go to the last page, the signature.  Did

9    Martin Shkreli sign for every entity?

10   A    Yes.

11   Q    Including himself?

12   A    Yes.

13   Q    And if you could flip to tab three which is Government

14   Exhibit 964.  What is this?

15        MR. PITLUCK:  This is in evidence, I'm sorry, Judge.

16   A    This is an amendment to the 13D we were just reviewing.

17   Q    What is an amendment to the 13D?

18   A    Well, there is a change to --

19   Q    What date was this filed?

20   A    February 19, 2013.

21   Q    Who does it say it was filed by?

22   A    Martin Shkreli.

23   Q    And what was -- why was there an amended 13D issued in

24   February of 2013?

25   A    Because the company had a private placement in February.

1    Q    What is a private placement?

2    A    That's a, when the company has a private offering of

3    shares to raise money.

4    Q    Can we just go to the next page briefly.  Do you see the

5    entities listed there?

6              Has Retrophin replaced Desert Gateway on this?

7    A    Yes.

8    Q    Why is that?

9    A    The name changed at this time.

10   Q    I'm going to briefly walk through some of the changes.

11   Can we go to the next page.  This is the report for MSMB

12   Capital Management.

13             According to this, how many shares does MSMB Capital

14   Management own?

15   A    Zero shares.

16   Q    Same thing for MSMB Capital Management LLC on the next

17   page?

18   A    Yes.

19   Q    And on the third page, for MSMB LP, how many shares does

20   MSMB have sole voting power over -- sorry -- MSMB Healthcare

21   LP have sole voting power over?

22   A    473,274 shares.

23   Q    It's the same as what we saw in the original 13D?

24   A    Yes.

25   Q    And you see where it says, Percent of class represented

1  by amount?  In row one, it says 4.05 percent?

2  A    Yes.

3  Q    Is that greater or smaller than the amount we saw in the

4  previous exhibit for the percent of class owned?

5  A    It's smaller.

6  Q    Why is that?

7  A    Because there are more shares that were just offered.

8  There are now more shares so the percentage of ownership

9  drops.

10  Q    And let's go to Martin Shkreli disclosure which is on

11  page, I believe it's 8.  Sorry, the one more.  There we go.

12          You see how there are 3,187,200 shares?

13  A    Yes.

14  Q    And what's the percent of class represented by amount in

15  that row?

16  A    27.17 percent.

17  Q    Is that less than we saw before?

18  A    Yes.

19  Q    Okay.  Let's go to the next page, please.  It says, item

20  three, The source and amount of funds or other considerations.

21  It says, item three of the schedule 13D is hereby amended and

22  supplemented as follows.

23          Can you just read that for the jury?

24  A    Sure.  On February 14, 2013, Mr. Shkreli purchased

25  120,000 shares of common stock and common stock purchase

Oremland - direct - Pitluck                    5746

1   warrants to purchase 60,000 shares of common stock, the

2   warrants, from the issuer for an aggregate purchase price of

3   $360,000.   The warrants are exercisable at any time upon the

4   election of the holder, beginning on the date of issuance and

5   ending of the fifth anniversary of the date of issuance, an

6   initial exercise price per share of $3.60, subject to

7   adjustment as provided therein.   The source of funds used by

8   Mr. Shkreli to purchase such securities was his personal

9   funds.

10  Q    Can you just explain for the jury what a warrant is?

11  A    A warrant is a type of security that gives you the right

12  but not the obligation to buy a certain amount of shares at a

13  set price.

14  Q    Okay.   And let's go ahead to the next page, item five,

15  Interest in securities of issuers.

16          Can you -- you see where there's a star there and it

17  says, "based on," and there's a number.   Can you read that for

18  the jury?

19  A    Sure.   Based on 11,672,167 shares of common stock

20  outstanding, following the private placement, which figure

21  reflects, I, 8,338,836 shares of common stock as reported in

22  the issuer's current report on form 8-K, filed on December 19,

23  2012, and, two, an aggregate 3,333,331 shares of common stock

24  issued subsequent thereto, as reported in the issuer's current

25  report on form 8-K filed by the issuer on February 19, 2013,

Oremland - direct - Pitluck                5747

1  consisting of 272,221 shares of common stock issued in certain

2  private placement transactions in January 2013 and 3,061,110

3  shares of common stock issued in connection with the private

4  placement.

5  Q    So, in plain English, can you explain to the jury what's

6  disclosed in item two there?

7  A    That's -- it's the number of shares that were reported as

8  outstanding on the 8-K, plus the additional shares issued in

9  the private placements in January and February.

10  Q    Okay.  And, finally, in item six on the next page, where

11  it says, Contracts arrangements, understandings or

12  relationships, can we go to the next page, you see that line

13  at the bottom of the disclosure.  You see where it says, "In

14  connection with" in the second line under item six?

15  A    Yes.

16  Q    It says, In connection with the closing of the private

17  placement on February 14, 2013, the issuer entered into a

18  registration rights agreement with the purchase of the issuer

19  securing the private placement including Mr. Shkreli.

20        What's a registration rights agreement?

21  A    This is an agreement between the purchasers of the stock

22  that I think indicates that they're going to, that the company

23  will file a registration statement.

24  Q    What does that mean, when the company files a

25  registration statement?

Oremland - direct - Pitluck                    5748

1    A    That means that the shares will be registered and if

2    you're not under other restrictions, you would be able to sell

3    those shares.

4    Q    So those shares would become free trading after the

5    registration statement was filed?

6    A    Yes.

7    Q    Now, did you review the trading activity in Retrophin

8    after the reverse merger?

9    A    Yes.

10   Q    What data did you rely on for your review?

11   A    Bloomberg price line data and the blue sheet data.

12        THE COURT:  Again, you tend to drop your voice at

13   the end so please try to keep up the volume.

14        THE WITNESS:  Okay.  Thank you.

15        THE COURT:  Thank you.

16   Q    And let's start with Bloomberg price and trading data.

17   What is Bloomberg data?

18   A    Bloomberg is a subscription service.  It's widely used by

19   the financial industry.  It has a lot of information about

20   public companies including historical price and volume

21   information.

22   Q    Is that, is that information reported to the public?

23   A    Yes.

24   Q    Is that information widely used within the financial

25   industry?

1    A    Yes.

2    Q    What is -- what is blue sheet data?  You talked about it

3    a little bit before.

4    A    That's a certain type of training data that's obtained

5    from what's called a clearing firm and it has trading

6    information about a stock for a particular period, but it

7    includes who's behind the trade so the names of the customers,

8    their address, it has their account number, it has a lot, even

9    sometimes has their tax ID number or Social Security number

10   and it indicates how much they bought and sold of the stock on

11   any given day.

12   Q    And is blue sheet data available to the public?

13   A    Absolutely not.

14   Q    And on any given day, do the amount of shares on the blue

15   sheet data for a specific stock always match the publicly

16   available Bloomberg data?

17   A    No.

18   Q    Why not?

19   A    Because the blue sheet data includes trades that are made

20   by intermediary firms that are called market makers.

21   Q    What is a market maker?

22   A    A market maker is a special type of broker-dealer that

23   commits itself, really, to facilitating trading of a stock in

24   the market.  It stands always ready to buy and sell the stock

25   if there's an interest.  So, they're, they're like a

1    middleman.  They're the ones who put together the buyers and

2    the sellers in the market.

3    Q    And are the shares that are traded by these market making

4    firms included in the publicly available reported share

5    volume?

6    A    No.

7    Q    Why not?

8    A    Because it would be, like, it would be double counting or

9    maybe sometimes triple counting because sometimes the market

10   makers have to get shares from other firms in order to put the

11   buyer and the seller together.  What's reported to the public

12   is the true transaction amount between buyer and seller.

13   Q    Okay.  Did you create a summary chart of your analysis of

14   the trading in Retrophin around, following the reverse merger?

15   A    Yes.

16   Q    I'd like you to look at Government Exhibit 995 in

17   evidence.  It's at tab 11 in your binder.  It's also on the

18   screen.

19        All right.  What's the title of the chart?

20   A    Retrophin, Incorporated, RTRX, daily closing prices and

21   volume comparison, December 17, 2012 through February 28,

22   2013.

23        (Continued on next page.)

24

25

Oremland - direct - Pitluck                    5751

1    BY MR. PITLUCK:

2    Q      Okay.  So what's on the bottom?

3    A      The bottom is the trade date.

4    Q      And what's on the right-hand side of the chart, on the

5    right axis of the chart?

6    A      That is the closing price of the stock.

7    Q      Where did you obtain the data for the closing price of

8    the stock?

9    A      From Bloomberg.

10   Q      Is the blue line there tracing the closing price of the

11   stock?

12   A      Yes.

13   Q      What's on the left side of the chart?

14   A      That refers to the share volume, the volume of shares

15   traded.

16   Q      Are those represented by the bar charts of different

17   colors there?

18   A      Yes.

19   Q      Where did the underlying data to prepare those bar charts

20   come from?

21   A      This came from Bloomberg and from the blue sheet data.

22   Q      What do the different colors in the chart signify?

23   A      Well, the green part of the bar represents trading by

24   certain selected accounts which are identified in the green

25   box to the right of the chart.

Oremland - direct - Pitluck                5752

1    Q    Who are those accounts?

2    A    Martin Shkreli, Kevin Mulleady, Andrew Vaino and Mark

3    Biestek.

4    Q    Who is in the purple?

5    A    That's Tim Pierotti.

6    Q    What about the red?

7    A    The red shows the other market volume, everyone else in

8    the market.

9    Q    Can you explain to the jury how you determine the volume

10   of shares traded by each of those entities on any given date?

11   A    Sure.  I reviewed the blue sheet data and I found the

12   trades made by these individuals, added them up and days where

13   they did trade subtracted it  -- that number from the total

14   market volume.

15   Q    As reported on Bloomberg?

16   A    Yes.

17   Q    Can we go back to Government's Exhibit 990 for a second.

18   Put them side by side?

19          So 990 was the chart we looked at previously, was

20   some of the recipients of the free trading shares, correct.

21   A    Yes.

22   Q    In the green account  -- sorry  -- in the green chart on

23   Governments' Exhibit's 995, you included he select, Martin

24   Shkreli, Kevin Mulleady, Andre Vaino and Marek Biestek.  Are

25   Kevin Mulleady and Andrew Vaino and Marek Biestek some of the

```
                    Oremland - direct - Pitluck              5753

1   recipients of the free trading shares?

2   A    Yes.

3   Q    Is Tim Pierotti there?

4   A    Yes.

5   Q    Why didn't you include the other recipients of the free

6   trading shares that are not on the chart, Thomas Fernandez,

7   Claridge Capital and Edmund Sullivan?

8   A    Because they didn't trade during this time period.

9   Q    Not at all?

10  A    Not at all.

11  Q    Can we focus on 995, please.

12       You testified a moment ago that the reverse merger

13  took place on December 12, 2012, correct?

14  A    Yes.

15  Q    What was the first day of trading after date where you

16  identified trading in Retrophin?

17  A    December 17, 2012.

18  Q    And how much was traded on that day?

19  A    100 shares.

20  Q    And who traded those shares?

21  A    Martin Shkreli.

22  Q    Did he purchase shares?

23  A    Yes.

24  Q    What was the purchase price?

25  A    Seven dollars and 69 cents.
```

Oremland - direct - Pitluck                 5754

1    Q    Did anyone else trade shares in Retrophin on that day?

2    A    No.

3              THE COURT:  Sorry.  The purchase prices is $7.69 per

4    share or for aggregate shares purchased?  You said $7.69?

5              THE WITNESS:   That was the price and he purchased

6    100 shares.

7    Q    That was the price per share?

8    A    Yes.

9              THE COURT:  So bought 100 shares for  --

10             THE WITNESS:  Seven hundred sixty-nine dollars worth

11   of shares.

12             THE COURT:  Thank you.

13   Q    Did you learn from the blue sheet data whether Martin

14   Shkreli traded shares on December 12, 2012, the day of the

15   reverse merger?

16   A    Yes.

17   Q    Was that the last trade prior to the reverse merger?

18   A    Yes.

19   Q    On that day did Martin Shkreli buy or sell shares?

20   A    He sold shares.

21   Q    For how much?

22   A    Two dollars and 50 cents.

23   Q    On December 12 he sold for $2.50 and on December 17 he

24   purchased for $7.69 cents?

25   A    That's right.

Oremland - direct - Pitluck                    5755

1   Q    What happened to the stock price in the days following

2   Mr. Shkreli's purchase on December 17, 2012?

3   A    In the days following the stock price dropped.   In

4   general, during this period the stock price remained around

5   -- it ranged from around three dollars to maybe a little over

6   five dollars at some point.

7   Q    Now, I would like to direct your attention to the dates

8   December 27 and 28, 2012 on that chart.  On those dates did

9   you identify trading by Timothy Pierotti?

10  A    Yes.

11  Q    What was his trading activity?

12  A    He sold shares.

13  Q    Approximately how many?

14  A    In total, both days?

15  Q    On each day, approximately how many?

16  A    Around nineteen thousand one day, twenty-four thousand

17  the next.

18  Q    Was that according to this chart a large portion of the

19  volume on that date?

20  A    Yes.

21  Q    What happened to the closing price on the days of those

22  sales?

23  A    The price dropped.

24  Q    What was the lowest closing price you identified during

25  this time period?

Oremland - direct - Pitluck                5756

1    A    It was less than three dollars.

2    Q    Was it on December 28, 2012?

3    A    Yes.

4    Q    Now, in the week following December 28, 2012, did you see

5    any of the individuals in the green box, the select accounts,

6    trading in Retrophin shares?

7    A    No, no.

8    Q    When was the next day that you saw trading by members of

9    the select account?

10   A    January 8.

11   Q    You see on January 2, 2013, that there was a trade by

12   Mr. Pierotti?

13   A    Yes.

14   Q    After that trade when was the next trade that you

15   identified for Mr. Pierotti?

16   A    January 30, 2013.

17   Q    Did Mr. Pierotti buy or sell on that date?

18   A    He sold.

19   Q    During the period of time identified in this chart,

20   December 17, 2012 to February 28, 2013, did the individuals in

21   the select accounts and Mr. Pierotti buy more stock or sell

22   more stock?

23   A    They sold more.

24   Q    By a lot?

25   A    Yes.

Oremland - direct - Pitluck                    5757

1    Q    And other than Martin Shkreli did anybody buy shares?

2    A    Yes.

3    Q    Who?

4    A    Kevin Mulleady.

5    Q    Were you able to identify instances where Mr. Mulleady

6    bought and sold shares on the same day?

7    A    Yes.

8    Q    Approximately how many times?

9    A    Around three times.

10   Q    On those days did Mr. Mulleady purchase more than he sold

11   or did he purchase more that he bought?

12            MS. DENERSTEIN:  Can we have the date, please?

13            THE COURT:  Please break it down by dates.

14   Q    Do you have anything that would refresh your recollection

15   on dates?

16   A    I recall.

17   Q    Okay.

18   A    January 8, 2013; January 15, 2013; January 24, 2013.

19   Q    On those three dates did Mr. Mulleady buy some more

20   shares than he purchased or sell more shares -- I withdraw

21   that question.

22            On those dates did Mr. Mulleady buy more shares or

23   sell more shares.

24   A    He sold more shares.

25   Q    What, if anything, did you notice about the price at

Oremland - direct - Pitluck                5758

1  which Mr. Mulleady purchased and sold shares on those three

2  days?

3  A    He sold for less than he bought.  He bought at a higher

4  price than what he sold it.

5  Q    What does that mean?

6  A    It doesn't really make economic sense.

7  Q    What effect, if any, would there be on the liquidity of a

8  stock if somebody purchased and sold on the same day?

9  A    Well, it would  --

10              MS. DENERSTEIN:  Objection.

11              MR. PITLUCK:  Generally.

12              THE COURT:  All right.  So just generally in the

13  market, if somebody buys and sells on the same day?

14              MR. PITLUCK:  Yes.

15  Q    What would be the effect on the liquidity of a stock?

16              MS. DENERSTEIN:  Objection.

17              THE COURT:  Overruled.

18  A    There would be more volume.  Liquidity refers to volume,

19  to the ease at which you're able to buy and sell shares.  So

20  if you have someone buying and selling, there's going to be

21  more volume.

22  Q    Now, we looked at the share volumes a moment ago and in

23  your experience was Retrophin a heavily traded stock during

24  this time period?

25  A    No.  It was thinly traded.

1    Q     What does that mean thinly traded?

2    A     There were not a lot of shares that were traded.

3              THE COURT:  Is there a definition of heavily traded

4    and thinly traded?

5    Q     Is there an exact definition?

6    A     There's no exact definition.  But you know, some big

7    companies on the NASDAQ trade millions of shares a day.  So

8    that's heavily traded.  And here just from my experience

9    shares some days barely 5,000 shares traded.  So it's a very

10   thinly traded stock at this time period.

11   Q     What's the importance, if any, on the Over The Counter

12   Markets to a trading volume of a stock?

13             MS. DENERSTEIN:  Objection.

14             THE COURT:   Overruled.

15   A     Well, it informs the public that there's an interest in

16   this company, that there's a market for the stock.  It also

17   can have an effect on the price.

18   Q     Generally, what's the relationship between the price and

19   volume of a stock?

20   A     Well, the price of a stock can depend on how many shares

21   are available to be traded.  Under normal market conditions it

22   operates under the principle of supply and demand.  So say you

23   have a stock and there's a really high demand for it, a lot of

24   people want to buy it for whatever reason, it's a good

25   company, but there's not a lot of shares that are available to

Oremland - direct - Pitluck                5760

1   be traded, in that instance generally you would see the price

2   would increase.

3          And, on the other hand, if you have a stock and

4   there's an excess of supply of shares and not a lot of

5   interest in buyers, generally the price would decline.

6   Q    So other things remaining equal, what's the effect on

7   price if there are less shares available for sale in the

8   market?

9          MS. DENERSTEIN:   Objection.

10          THE COURT:   Overruled.

11   A    Well, there's more of a chance that the price will remain

12   stable.

13   Q    So based on that, generally, I guess it is beneficial for

14   a controlling shareholder to limit the amount of the shares

15   available for sale?

16   A    Yes.

17   Q    Why?

18   A    Because then you have less likelihood that the share

19   price can decline if there's too much stock in the market and

20   not as much interest.

21   Q    Did you compare the trading activity for the select

22   accounts in green and Tim Pierotti, those two accounts

23   together, and compare it to the total trading of Retrophin

24   stock over this time period that's on Government's Exhibit

25   995?

Oremland - direct - Pitluck                5761

1   A    Yes.

2   Q    And how did you make that comparison?

3   A    I added up all the shares that were traded by these

4   parties and then added up the total volume of shares.

5   Q    What, if anything, did you determine from that

6   calculation?

7   A    That these select accounts and Tim Pierotti accounted for

8   67.7 percent of the market activity during this time.

9   Q    So those accounts accounted for over two-thirds of the

10  market activity during this time?

11  A    Yes, that's right.

12  Q    This exhibit 995 focuses on December 17, 2012 to February

13  28, 2013, correct?

14  A    Yes.

15  Q    Did you review the trading in Retrophin shares over a

16  longer period of time?

17  A    Yes.

18  Q    Let's just show you Government's Exhibit 992, which is in

19  evidence, tab 10 in your binder?

20        Can you just explain for the jury what's in this

21  chart.

22  A    Sure.

23        This is a daily closing price and share volume for

24  Retrophin from December 17, 2012 through September 30, 2014.

25  Q    And can you just compare the 2013 and 2014 time periods

Oremland - direct - Pitluck                 5762

1   as it relates to volume and price?

2   A    Sure.  From the period of December 17, 2012 through the

3   end of 2013, the price is relatively stable.  It varies from

4   three dollars up to maybe eight dollars  -- less than ten

5   dollars and the volume is low.  But once you get into 2014 the

6   volume increases substantially and the price also increases.

7   Q    What, if anything, happened in 2014 that you testified to

8   earlier that would explain that change in price and volume?

9   A    Well, the company became  -- started trading on the

10  NASDAQ and there was also the registration statement, a

11  registration statement that went into effect at that time from

12  the private placement.

13  Q    What was the highest share price you identified during

14  this time period, approximately?

15  A    Twenty-three dollars.

16  Q    Is that in 2014?

17  A    Yes.

18          MR. PITLUCK:  Your Honor, can I have one moment,

19  please?

20          THE COURT:  Yes.

21          (Pause.)

22          MR. PITLUCK:  I have nothing further, your Honor.

23          THE COURT:   All right.  Would the jurors like a

24  mid-morning break before we start the cross-examination?

25          All right.  Let's take a few minutes and, please,

5763

1   don't talk about the case.  We will come and retrieve you

2   soon.

3          Ma'am, you can also step down, if you would like to

4   take a break.

5          (Jury excused.)

6          (Witness excused.)

7          THE COURT:  All right.

8          Let's take a few minutes.  Thank you.

9          I'm going to go and call Juror No. One's employer

10  and I'll report back.

11         (Recess taken.)

12         (In open court; jury not present.)

13         THE COURT:  Have a seat.  So I did speak to Juror

14  No. One  -- one of the supervisors, the director of services.

15  He didn't have an answer for me, a clear answer, but he said

16  he would find the right person in human resources to give me

17  some more feedback.

18         What Juror No. One has been doing is going into the

19  office whenever she is not on trial with us and trying to make

20  up shifts and he said that that arrangement would be

21  acceptable.  As we know in early December we will be going

22  five days, every day for the first two weeks of December.  So,

23  the question is whether she can make up the time and money on

24  the weekends.  And he'll be getting back to me on that.  I'll

25  report as soon as I hear something.

Oremland - cross - Denerstein                5764

1          MR. DUBIN:  Thank you, your Honor.

2          THE COURT:  Are we ready to bring in the jury now?

3          MR. PITLUCK:  Yes, your Honor.

4          I'll advise the jury that we will dismiss them today

5     at 4:30.

6          MR. PITLUCK:  Thank you, your Honor.

7          THE COURT:  Ms. Denerstein, do you think we should

8     try to get through the lunch hour or will you need to have a

9     break in between?  I'm not sure how much cross-examination you

10    have.  We can go until 1:00 o'clock.

11         MS. DENERSTEIN:  Okay.  Let's try it.

12         THE COURT:  Thank you.

13         (Pause.)

14         (Jury present.)

15         THE COURT:  All right.  All jurors are present.

16    Please, have a seat.  You may commence your cross-examination.

17    Thank you.

18    CROSS-EXAMINATION

19    BY MS. DENERSTEIN:

20    Q    Good morning, Ms. Oremland.

21    A    Good morning.

22    Q    I want to make this absolutely clear:  You don't know

23    Evan Greebel?

24    A    No.

25    Q    You've never talk to Evan Greebel?

Oremland - cross - Denerstein                5765

1   A    No.

2   Q    You've never even probably seen him before?

3   A    No.

4   Q    And you have no idea what Evan Greebel knew or didn't

5   know about any of the stock transactions that you have

6   testified about today?

7   A    That's right.

8   Q    And you have no idea what Martin Shkreli told him or

9   didn't tell him about any reason for any stock transfers,

10  correct?

11  A    Yes.

12  Q    In truth, you have absolutely no idea what Martin Shkreli

13  told Evan Greebel about anything?

14  A    Yes.

15  Q    Can we please put up Government's Exhibit 990.

16       The government directed you to analyze the

17  individuals' accounts on this chart, correct, the trading?

18  A    I started in the transfer agent records that these were

19  the recipients of the shares.

20  Q    Then you went on in your chart 922, 995 to analyze some

21  of their trading, correct?

22  A    In my exhibit with the price and volume.

23       MS. DENERSTEIN:  Do you want to give us the tab?

24       MR. PITLUCK:  Yes.  It is tab eleven.

25  Q    Tab eleven?

Oremland - cross - Denerstein                    5766

1    A    Yes.

2    Q    So Kevin Mulleady, three hundred fifty thousand shares of

3    free trading stock, correct?

4    A    Yes.

5    Q    Thomas Fernandez, 300,000 shares of free trading stock?

6    A    Yes.

7    Q    Marek Biestek, 300,000 shares of free trading stock?

8    A    Yes.

9    Q    Tim Pierotti, three hundred fifty thousand shares of free

10   trading stock?

11   A    Yes.

12   Q    Claridge capital three hundred fifty thousand free

13   trading shares of stock?

14   A    Yes.

15   Q    Andrew Vaino, 250,000 shares of free trading stock?

16   A    Yes.

17   Q    Edmund Sullivan, 100,000 shares of free trading stock,

18   correct?

19   A    Yes.

20   Q    Evan Greebel's name is not on that chart at all, is it?

21   A    No.

22   Q    In fact, Evan Greebel's name doesn't appear on any of

23   your charts, isn't that correct?

24   A    That's right.

25   Q    You also have never spoken to any of those individuals on

Oremland - cross - Denerstein                    5767

1   990, correct, that you have listed?

2   A    I have not.

3   Q    You don't know them, correct?

4   A    I do not.

5   Q    And you don't know why they chose to do what they did or

6   didn't do with respect to any trades?

7   A    That's right.

8   Q    Again, Mr. Greebel's name does not appear anywhere on 990

9   because he did not receive any of the free trading stock;

10  isn't that correct?

11  A    That's right, not to my knowledge.

12  Q    Didn't you testify earlier today about where the trades

13  went that are listed on this, do you remember that testimony

14  about Troy Fearnow and another woman's name?

15  A    Yes.

16  Q    Those names are not on there either?

17  A    No.

18  Q    So Evan Greebel didn't receive any of those free trading

19  shares, correct?

20  A    Yes.

21  Q    Let's talk briefly about your job.  You work at FINRA?

22  A    Yes.

23  Q    And FINRA is overseen by the Securities & Exchange

24  Commission?

25  A    Yes.

Oremland - cross - Denerstein                5768

1   Q     And the SEC is a government agency?

2   A     Yes.

3   Q     And FINRA is accountable to the SEC?

4   A     FINRA is overseen by the SEC.

5   Q     The SEC is their regulator?

6   A     Yes.

7   Q     You are an attorney at FINRA?

8   A     Yes.

9   Q     And you've worked there for 16 years, the majority of

10  your legal career?

11  A     Yes.

12  Q     And you've worked in your current group for about eleven

13  years?

14  A     Yes.

15  Q     It's called the Criminal Prosecution Assistance Group,

16  correct?

17  A     Right.

18  Q     Your responsibilities involve assisting the government in

19  prosecuting cases?

20  A     Yes.

21  Q     You do not conduct investigations?

22  A     I don't.

23  Q     Your group is dedicated to assisting the government in

24  securities related investigations and prosecutions, correct?

25  A     That is right.

Oremland - cross - Denerstein                5769

1   Q    And you've testified many times before in prior cases on
2   behalf of the prosecution?
3   A    Yes.
4   Q    And that's your job?
5   A    That's part of my job is to testify at trials.
6   Q    Now, in preparing for your testimony here today, you
7   conducted the analysis that the government told you that they
8   wanted you to conduct, correct?
9   A    Yes.  I conducted analysis at the government's request.
10  Q    So the government told you what dates to analyze,
11  correct?
12  A    Yes.  They gave a general idea of the time frame.
13  Q    The government told you which select accounts to analyze?
14  A    Yes.
15  Q    And you limited your analysis to what the government
16  asked you to do?
17  A    Well, yes, in some ways.  But in  -- on my review I had
18  input as well to the time frame that I looked at.
19  Q    But that input was really based on your analysis of the
20  data, some of which was provided by the government, blue
21  sheets, the Bloomberg charts, which you prepared and the other
22  SEC filings you reviewed?
23  A    Yes.
24  Q    And the transfer agent records?
25  A    Right.

Oremland - cross - Denerstein                    5770

1    Q    So you did what the government asked?

2    A    Yes.

3    Q    And you limited the time period from December 17 to

4    February 28, 2013; isn't that correct?

5    A    For this  -- for one portion of my analysis, yes.

6    Q    So let's turn to that.  Let's show 995.  On this chart

7    the time period, December 17 to February 28, 2013, correct?

8    A    Yes.

9    Q    Okay.  Can you publish that next to 992.  Can you

10   highlight what period of time this 995 covers on 992.  We're

11   going to go to February 28, 2013?

12        So you covered a very small period of time of the

13   trading, correct, in this chart?

14   A    I covered this period of time trading in the chart, yes.

15   Q    This period of time is much more limited  -- let's flip

16   back to 992  -- than the period in 992, correct, which goes

17   all the way to September 2014, correct?

18   A    Yes.

19   Q    And let's go back.  So the period you covered is up to

20   February 28?

21        Can you Mr. Carter, highlight that in yellow,

22   please?

23               (Continued on next page.)

24

25

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Oremland - cross - Denerstein                    5771

1    BY MS. DENERSTEIN:   (Continuing)

2    Q    Okay.  So my point is you analyzed trades for a very

3    select period of time on this chart, February, up to

4    February 28th from December 17th, 2012.

5    A    Yes.

6    Q    But 992 goes way past that, all the way to

7    September 30th, 2014?

8    A    Yes.

9    Q    But we don't have the analysis for that time period, do

10   we?

11   A    No.  I focused on that time frame because it really was

12   the most critical time frame for this company.  This was a

13   startup company, it had a reverse merger and then this was the

14   time before it secured its financing.  It got its private

15   placement in February and that was a pretty significant amount

16   of funding.

17   Q    Ms. Oremland, I understand, but going to January, didn't

18   something tremendous happen in January of 2014 to this

19   company --

20            MR. PITLUCK:  Objection to the form.

21   Q    -- that was incredibly important?  Tremendous?  Big?

22            THE COURT:  I will allow the question.

23   A    In January of 2014, as I testified before, it went on,

24   the company moved on to the NASDAQ.

25   Q    That's the second largest exchange in the world, correct?

Oremland - cross - Denerstein                5772

1   A     It's a large exchange.

2   Q     So it's not the second largest or you don't know?

3   A     I'm not sure.  I think it is.

4   Q     It's a huge exchange and any company that is going to be

5   publicly listed -- and if we can point to January of 2014,

6   just that time frame -- that is a big deal, wouldn't you agree

7   with that?  Yes or no.

8   A     It is -- what do you mean, it's a big deal?

9   Q     For a startup company to become public and meet the

10  requirements to be able to list it on NASDAQ, which you said

11  was substantial, is a big deal?

12  A     It's very positive for this company, yes.

13  Q     Isn't it fair to say that would be an important time

14  period for this company and for the stock?

15  A     Yes.  At this time it's trading on the NASDAQ, it's doing

16  really well.  There's a market.  There's a lot of people who

17  want to buy and sell the stock.  It's quite different from

18  what we saw in the beginning of the time period where it's

19  very, very thinly traded.  There wasn't financing yet.  It

20  was, it was just a startup from a reverse merger.  So, it's

21  like -- it's comparing apples and oranges.

22  Q     Doesn't your chart compare it?

23          In other words, you're showing daily share price

24  between December 17th -- you're showing share volume between

25  December 17, 2012, all the way to September 30, 2014, correct?

CMH     OCR     RMR     CRR     FCRR

Oremland - cross - Denerstein                    5773

1   A    Yes.

2   Q    And you're also showing the volume during that same time

3   period, correct?

4   A    Yes.

5   Q    And so you're not saying that your chart's not important,

6   are you?

7   A    No, I'm not.  I'm saying that this is a different chart.

8   This is showing all of the trading in the company for the time

9   period involved at this time, this case.

10  Q    Yes or no:  This chart does not show the selected

11  accounts activity during any of this time period, does it?

12  A    That's right.

13  Q    That --

14  A    This is purely Bloomberg pricing line data through that

15  whole --

16          MS. DENERSTEIN:  Your Honor, I'm going you to

17  instruct the witness just to answer "yes" or "no."

18          THE COURT:  All right.  When the question is posed

19  to you as a "yes" or "no" question, try to answer "yes" or

20  "no" or if you can't do that, let the lawyer know that you

21  can't answer "yes" or "no."

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Okay.  Did you want to repose your

24  question or not?

25          MS. DENERSTEIN:  No.

Oremland - cross - Denerstein                5774

1    Q    So let's, let's just talk about one other thing while
2    we're looking at this chart on 992.
3             The share volume goes up tremendously after the
4    company is publicly traded, correct?
5             There are way more shares traded once the company is
6    listed on NASDAQ, correct?
7    A    That's right.
8    Q    I mean, look at the highest point, I think, is in April,
9    if I can see, 2014, and look at -- what's the share volume, if
10   you can tell?  I know it's hard to read.
11   A    You're pointing to the price.
12            MS. DENERSTEIN:  The line underneath, Mr. Carter,
13   the straight line.
14   A    It is over 3 million shares.
15   Q    Okay.  Now, let's go to the first half of the time period
16   of the chart.  So, 3 million shares, trades, share volume.  A
17   lot of action on that particular day for this company?
18   A    Yes.
19   Q    And if you go to the beginning time period, let's go to
20   December 17, 2013 through January 2013, you can't even see the
21   share volume on the chart, correct?
22   A    Yes.
23   Q    And that's because there was far fewer trades occurring
24   during that time period, correct?
25   A    Yes.

Oremland - cross - Denerstein                 5775

1   Q    And that's, in part, because it wasn't listed on a public

2   exchange so it's not as readily accessible as after

3   January 2014 when it becomes public?

4   A    It was public at that time.  It was traded on the

5   over-the-counter QB.  That's a public market.

6   Q    Correct.  But that public market is not the same or

7   nearly as well known as NASDAQ or the New York Stock Exchange,

8   correct?

9   A    It's one of the other markets where stock is traded.  I

10  can't speak to whether it's well known or not.

11  Q    Okay.  So let's talk about, let's talk about blue sheets.

12       You testified about the accuracy of blue sheet data,

13  correct?  You testified that the blue sheets contain all of

14  the trades?

15  A    The blue sheets -- I can't answer "yes" or "no."

16       THE COURT:  She can't answer "yes" or "no."

17  Q    Your testimony this morning was "the blue sheets contains

18  all of the trades."  Do you recall that testimony?  Yes or no.

19  A    Yes, I -- yes, it contains all the trades from the

20  clearing firms --

21  Q    And let's --

22  A    -- for a stock for a particular period of time.

23  Q    And you relied on the blue sheets for part of your

24  analysis, correct?

25  A    Yes.

Oremland - cross - Denerstein                    5776

1   Q    And you know that the blue sheet data provides regulatory

2   agencies with the ability to analyze a firm's trading,

3   correct?

4   A    Yes.

5   Q    And you know that firms are expected to provide complete

6   and accurate and timely blue sheet data in response to

7   regulatory requests, correct?

8   A    Yes.

9   Q    And you know that FINRA tells clearing brokers and the

10  public that they use and rely on blue sheet data to identify

11  individual insider trading, for example?

12  A    Blue sheet data is used in insider trading

13  investigations.

14  Q    And actually, FINRA fines firms for failing to provide

15  complete and accurate blue sheet trade data, is that correct?

16  A    Yes.

17  Q    And let's just talk about who maintains the blue sheet

18  data.  It's the SEC, isn't that correct?

19  A    Well, it depends on who requests it.  The SEC can request

20  blue sheets and FINRA can as well.

21  Q    And in this case, the blue sheet data was maintained by

22  the SEC, isn't that correct?

23  A    Yes.

24  Q    And it was provided to you by the government, correct?

25  A    Yes.

Oremland - cross - Denerstein                5777

1   Q    So let's go to your chart, 995.

2        Okay.  So let's look at a particular day -- well,

3   let's first discuss for your total share volume on this chart.

4        You rely on trading data maintained by Bloomberg,

5   correct?

6   A    Yes.

7   Q    And so the top of each bar reflects that, correct?

8   A    The top of each bar reflects the total number of shares

9   traded.

10  Q    And that's based on the Bloomberg data, correct?

11  A    Well, in the bar, it distinguishes from red, purple

12  green.  The red is the rest of the volume.  The purple is

13  priority.  The green is the select accounts.

14  Q    Right, but you got the top of the chart -- your highest

15  point, you testified, was from the Bloomberg data, correct?

16       So, you decided that, for example, on December 21st,

17  that the volume was 2,100.  That was the total you chose from

18  the Bloomberg -- that was what was reported on Bloomberg,

19  correct?

20  A    That's the Bloomberg reported volume.

21  Q    Right.  And then what you did -- and you used the blue

22  sheet data for the green and purple portion of the bars,

23  correct?

24  A    Yes.

25  Q    And you took the 2,100 and you did the difference, right?

Oremland - cross - Denerstein                    5778

1   The bar -- when you went from, the red begins -- you added

2   blue sheet data in green to blue sheet data in purple and then

3   you subtracted from the red?

4   A    Right.

5   Q    Okay.  So you're using two different sources of data on

6   this chart?

7   A    Yes.

8   Q    And the one that has the more detailed information about

9   who is actually doing what that you relied on in this chart is

10  the blue sheets, correct?

11  A    Yes.

12  Q    Now, I want you to take a look at Government Exhibit 955

13  in evidence.  I'm sorry, I don't know the tab.  If Mr. Pitluck

14  can provide it, I would appreciate it.

15        MR. PITLUCK:  It's tab six, Your Honor.

16  Q    Do you have tab six?

17  A    Yes.

18  Q    Thank you, Ms. Oremland.

19        Now, this is the chart that shows, in evidence, that

20  shows the daily closing price and share volume of Retrophin.

21  So you took the numbers from this chart on the share volume

22  column and transferred it on to Government Exhibit 995, right?

23  A    Yes.

24  Q    Okay.  Now, if you look on this, let's go to December

25  21st.  It's not too far in.

                    Oremland - cross - Denerstein              5779

1            So, the share volume on that day is 2,100, correct?
2    A    Yes.
3            MS. DENERSTEIN:  Okay.  So now let's go to 995.
4    995, sorry, Mr. Carter.  It's confusing, not 955.
5
6    Q    Okay.  Great.  Can I direct your attention to December
7    21st?  Okay.  If you draw a line across on December 21st,
8    you're at the 2,100, correct?
9    A    Yes.
10   Q    And that's almost halfway to the 5,000 line?
11   A    Right.
12   Q    And that share volume, again, comes from the Bloomberg
13   table that we just looked at in Government Exhibit 955,
14   correct?
15   A    Yes.
16   Q    And, again, the green activity, the green portion of the
17   bar did not come from the Bloomberg table, correct?
18   A    Right.
19   Q    It came from the blue sheet data that was provided to you
20   by the government, correct?
21   A    Yes.
22   Q    And that was maintained by the SEC, correct?
23   A    Yes.
24   Q    And so your blue sheets, let's go to -- the blue sheets
25   contain all of Retrophin's trading data for a period, right?

Oremland - cross - Denerstein                5780

1    A    Right.

2    Q    They show every buy, every sale, every short,

3    cancellations, date of the trade, price per share, number of

4    shares and identifying information about an account holder

5    making a trade?

6    A    Yes.

7    Q    So, you used the blue sheets to create the, again, the

8    green portion of this chart for the select accounts of Martin

9    Shkreli, Kevin Mulleady, Andrew Vaino and Marek Biestek,

10   correct?

11   A    Yes.

12   Q    Okay.  So, and you thought they contained accurate

13   information; that's why you relied on it, correct?

14   A    Yes.

15   Q    Okay.

16        MS. DENERSTEIN:  Your Honor, may we publish

17   Government Exhibit 950 in evidence which is the blue sheet

18   data?

19        THE COURT:  Yes.

20   Q    This is in evidence, the blue sheet data that covers the

21   period, maintained by the SEC that covers the period from

22   November 14, 2012 to February 20, 2013, correct?  It's in the

23   stipulation in any event.

24        The SEC, again, requires companies to submit

25   accurate blue sheet data, correct?

```
                    Oremland - cross - Denerstein              5781
```

1    A    Requires clearing firms.

2    Q    Clearing firms to submit accurate blue sheet data,

3    correct?

4    A    Yes.

5    Q    Ms. Oremland?  I'm sorry.  I didn't hear your last

6    answer.

7    A    I said yes.

8    Q    Now, this is laid out in a Microsoft Excel spreadsheet,

9    right?  It's the same exhibit that you looked, reviewed.

10   A    Right.

11   Q    And column A -- Mr. Carter, please zoom in on column A --

12   is the date of a trade, correct?

13   A    Yes.

14   Q    And volume B is the buy/sell description?

15   A    Yes.

16   Q    Column C is the price?

17   A    Yes.

18   Q    And then if we go to column D, it lists the quantity of

19   shares, correct?

20   A    Correct.

21   Q    And then if you go, continue all the way over to J,

22   that's the account holder, correct?

23   A    Yes.

24   Q    And Microsoft Excel, as you know, you can search it and

25   filter it and do lots of different things with it, correct?

1   A     Yes.

2   Q     So, if we filter A, the date, to show only December 21,

3   2012 --

4           MS. DENERSTEIN:  Can you please do that, Mr. Carter?

5   Can we filter for December 21, 2012?

6   Q     And if you -- and if you see, there are buys between row

7   88 and row 109, correct?

8   A     Yes.

9   Q     And if you calculate the sum of all the shares bought on

10  December 21st, that total is right at the bottom.  First, it

11  says "Average" and then it says "Count 22," it's kind of tiny,

12  and then it says "Save," in the right-hand corner?

13  A     You're just adding up all the buys in that column.

14  Q     Correct.  And it's 5,800, is that correct?

15  A     That's what that says.

16  Q     Well, it's blue sheet data that the parties have

17  stipulated to as accurate?

18          MR. PITLUCK:  Objection, Your Honor.  The -- it's

19  not the data.  It's the sum that I think Ms. Oremland is

20  saying that's what it says.

21  Q     Are you, Ms. Oremland, it's -- we can certainly give you

22  a calculator to add them if that's what you're requesting.

23  A     No.

24  Q     So the summary reflected on Government Exhibit 950 is

25  5,800, correct?

Oremland - cross - Denerstein                    5783

1    A    Yes.

2    Q    And you said this represents the buys.

3              MS. DENERSTEIN:  Let's do the sales there, Carter.

4    Q    And the sum for the sale is 5,000?

5    A    Yes.

6    Q    Okay.  Let's go back to your Exhibit 995.

7              So, the blue sheet data shows a share volume of

8    5,000 for December 21, 2012, correct?

9    A    Yes.

10   Q    And that's not --

11             MS. DENERSTEIN:  So, can we draw a line on 50,

12   please, go up from December 21st, straight, and then go over

13   to the left, please, to the 5,000:

14   Q    So this number is much greater than the number that you

15   used on your chart, correct?

16   A    Yes.

17   Q    Okay.  It's more than double the number you used,

18   correct?

19   A    Yes.

20   Q    Okay.  Let's go to -- so you relied on one set of data to

21   show total share volume, but you relied on a completely

22   different set of data to calculate the share volume for the

23   select accounts, right?

24   A    Right.  As I explained, the blue sheets contain market

25   maker data so that's why you see a double count.

Oremland - cross - Denerstein                    5784

1   Q    You're speculating.  You didn't check that, did you?

2   A    Yes, I, I reviewed the blue sheet data.

3   Q    And you know that each one of those is a market maker?

4   A    I know that they were trades and they were market maker

5   firms that put together the buyers and the sellers and what's

6   reported to the public where it was the actual trades that

7   were transacted and the other trades were the intermediary

8   trades between the market makers and the trading firms in

9   order to connect the buyers and the sellers together.

10  Q    But you just testified that the blue sheets provide

11  regulatory agencies with the ability to analyze a firm's

12  trading activity, isn't that correct?  Yes or no.

13  A    Yes.

14  Q    So, you're picking and choosing what you think you should

15  be using from the blue sheet data, correct?

16  A    No.

17  Q    You chose --

18  A    I --

19  Q    Wait.  You said no.  Thank you.

20       You chose to only use the volume from Bloomberg

21  because that's what you believe is a better thing, not because

22  you checked every trade?

23  A    Bloomberg is the source of data --

24  Q    Yes or no.

25  A    -- that's relied upon by the public.  That's what the

Oremland - cross - Denerstein                    5785

1   public sees.

2   Q    Okay.  So you thought the fact that the public relied on

3   the data, that that's why you chose Bloomberg data, correct?

4   Yes or no.

5   A    No, I always use Bloomberg data.  That's the source of

6   the market volume of shares traded.

7   Q    It's, it's also -- the blue sheets are also a reflection

8   of the shares traded, correct?

9   A    The blue sheets show all of the trades, but that data is

10  not available to the public.

11  Q    Correct.  But it doesn't mean it doesn't exist or it

12  didn't happen, correct?

13  A    Yes, sure.  There has to be market makers that connect

14  the buyers and the sellers.  That's how the market works.

15  Q    And the chart doesn't -- and isn't it misleading to use

16  one set of data for the green bars for the select accounts to

17  compare it to another set of data for the share volume?  Yes

18  or no.

19  A    No.

20  Q    And didn't you do it this way because you thought you

21  made it look better for the government?  Yes or no.

22  A    No.

23       MS. DENERSTEIN:  And let's just go back to the blue

24  sheets on Government Exhibit 950 and if we sort for column

25  J -- on December 21st, please, can we sort for Andrew Vaino.

Oremland - cross - Denerstein                5786

1   Q    So, on December 21st, Andrew Vaino had two sales and he

2   sold 500 shares, correct?

3   A    Yes.

4   Q    And 500 shares on your chart represents, going back to

5   995, almost 25 percent of the 2,100 share volume on that day,

6   correct?

7   A    Were there other -- I'm not, I don't remember if there

8   were other select accounts that traded that day.  I don't know

9   if Vaino was the only one.

10  Q    I'm just talking about the Vaino amount which was 500

11  shares.  I'm sorry.  It was 1,000 shares.

12            Let's go, let's go back to that same day,

13  December 21, 2012.

14            THE COURT:  Is this Government Exhibit 950 we are

15  looking at?

16            MS. DENERSTEIN:  Yes, Government Exhibit 950.

17            Can you sort?  Can you go across?

18  Q    So, in column D, Mr. Vaino, it's a total of 500, correct?

19  A    Yes.

20  Q    Okay.  And how much -- 500 represents approximately

21  25 percent of the 2,100 share volume on your chart, correct?

22  A    Yes.

23  Q    And on that same day, can we sort for -- so, we're at

24  December 21, 2012, Marek Biestek and he sold, if you go down

25  to the sum in the corner, it's 1,000 total shares on

1    December 21st?

2    A    Yes.

3    Q    And that represents almost 50 percent of the share volume

4    if you go back to your Government Exhibit 995, correct?

5    A    Yes.

6    Q    And if you compare that to the blue sheet data, the total

7    share volume would be 5,800, correct, or 5,000?

8              MR. PITLUCK:  Objection to the form.

9              THE COURT:  Try to rephrase that, Ms. Denerstein,

10   please.

11   Q    If you compare the sales of Mr. Vaino and Mr. Biestek to

12   the blue sheet data, they are a smaller portion of the sales

13   that day, correct?  Yes or no.

14             MR. PITLUCK:  Objection to the form, Your Honor.

15             THE COURT:  A smaller percentage of the overall, is

16   that what you are asking?

17             MS. DENERSTEIN:  Yes.

18             THE COURT:  Do you just want to rephrase the

19   question, please?

20   Q    If you include the blue sheet data, it no longer makes up

21   25 percent, correct?  The percentage is much lower?  Yes or

22   no.

23   A    If you include all the intermediate trades, that would be

24   like double counting.

25             MS. DENERSTEIN:  Your Honor, I'm going to ask you to

Oremland - cross - Denerstein                5788

1    direct the witness to answer "yes" or "no," please.

2         THE COURT:  All right.  You will have an opportunity

3    to explain further.  If she asks you for a "yes" or "no"

4    answer, the response is either "yes," "no" or you can't answer

5    it "yes" or "no."

6         THE WITNESS:  Okay.

7    Q    Okay.  Supply and demand for a stock is not always

8    balanced, correct?

9    A    I don't understand your question.

10   Q    Sometimes there is more demand to buy shares of a stock,

11   correct, than there is supply?

12   A    Yes.

13   Q    Sometimes there's more supply from people wanting to sell

14   their shares than there is to demand, correct?

15   A    Yes.

16   Q    And buying and selling are distinguishable; they're

17   different?

18   A    Yes.

19   Q    So, let's go back to Government Exhibit 995.

20        The green portions of the bars represent share

21   volume from the select accounts from the blue sheets, correct?

22   A    Yes.

23   Q    And so now it's for Martin Shkreli, Kevin Mulleady,

24   Andrew Vaino and Marek Biestek, correct?

25   A    Yes.

1    Q    And if you look at, again, December 21st, your green bar

2    does not indicate who did anything or what they did, isn't

3    that correct, for the select accounts?

4    A    I'm not sure I understand your question.

5    Q    Your chart does not make clear that on December 21, 2012,

6    two select accounts did something that day, correct?

7    A    Right.

8    Q    Only two of the select accounts that you analyzed did

9    anything and on that particular day; Andy Vaino and Marek

10   Biestek sold, correct?

11   A    Yes.

12   Q    And they sold shares, but your chart doesn't distinguish

13   that, does it?

14   A    It just shows their activity.

15              (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

1   BY MS. DENERSTEIN:

2   Q    It doesn't show their activity.  It just shows the share

3   volume, correct?

4   A    Yes.  It shows their volume.

5   Q    As compared with the purple, if you go to December 28,

6   just the purple portion of the chart.

7           That shows the activity for one individual, correct.

8   A    Yes.

9   Q    Mr. Pierotti?

10  A    That's right.

11  Q    So you chose to break out and show what Mr. Pierotti did

12  in one bar, the purple bar, correct?

13  A    Yes.

14  Q    But you combined everything of the select accounts in the

15  green bar?

16  A    Yes.

17  Q    And in the green bar you don't explain that on December

18  21 Kevin Mulleady didn't do anything, he did not buy or sell?

19  A    Correct.

20  Q    That Martin Shkreli didn't do anything, he didn't buy or

21  sell?

22  A    Right.

23  Q    And you don't make clear that Andrew Vaino or Marek

24  Biestek weren't buying?

25  A    Right.

1   Q    If I'm looking at the chart I have no idea whether the

2   select accounts are buying or selling, correct?

3            MR. PITLUCK:  Objection to the form.

4            MS. DENERSTEIN:  I can take out I have no idea.

5            THE COURT:  Okay.  Just rephrase it without that.

6   Q    If you're looking at the green bar you have no idea what

7   the select accounts, Martin Shkreli, Kevin Mulleady, Andrew

8   Vaino and Marek Biestek are doing, correct?

9   A    Yes.

10  Q    And you don't know whether they are buying, correct?

11  Sorry.

12  A    Yes.

13  Q    You don't know whether they are selling, correct?

14  A    Yes.

15  Q    And you don't know whether they are holding the stock and

16  doing nothing, correct?

17  A    No.  If it's green it means they traded.

18  Q    No.  But it doesn't mean all four traded, correct?

19  A    It means one  -- one in the group traded.

20  Q    Where is that written on this chart?

21  A    In the right corner.

22  Q    Where does it say one of them are trading on this chart?

23  A    It indicates that the select accounts are comprised of

24  the individuals.

25  Q    But isn't this kind of misleading to combine the select

Oremland - cross - Denerstein                5792

1   accounts without distinguishing whether they are buying or

2   selling or not doing anything at all?

3   A    No.

4   Q    You could have done that, you had the data, correct?

5   A    Yes.

6   Q    But you chose not to, correct?

7   A    Yes.

8   Q    Did the government tell you not to do that?

9   A    No.

10  Q    You just on your own decided let me combine these four

11  accounts and not display what they are doing as individuals?

12  A    Yes.

13  Q    And let's compare that to what Tim Pierotti is doing as

14  an individual?

15  A    Yes.  That was in conjunction with the government

16  request.

17  Q    They asked you to break out Tim Pierotti?

18  A    Yes.

19  Q    And they asked you to make him his own bar but you chose

20  to collapse everybody else?

21  A    Yes.

22  Q    So to understand this chart and what actually happened on

23  it, you have to go to the date, correct, first, if you want to

24  know what a select account activity did, you would have to go

25  to a particular date, correct?

Oremland - cross - Denerstein                    5793

1   A    Yes.

2   Q    Then you would actually have to go to the blue sheet

3   data, correct?

4   A    I don't think I understand your question.

5   Q    I'll rephrase?

6        For the select accounts to know what they did on a

7   particular day you can't tell from this chart what they did?

8   You only are showing that trading happened for somebody in the

9   select accounts.

10  A    Yes.

11  Q    So if you wanted to know what happened on December 28,

12  2012 with the select accounts you'd actually have to go to the

13  blue sheet data, which is in evidence, and look up the trade,

14  correct, for the select account, because if you went to

15  December 28, 2012, then you would know which of the select

16  accounts did anything, Martin Shkreli, Kevin Mulleady, Andrew

17  Vaino, Marek Biestek, you have to go there to figure that out,

18  you can't do it from the chart, right?

19  A    Right.

20  Q    Just go back to 990 for one minute?

21       Let's look at this for one second.  Now, there are

22  three of these select accounts that don't trade at all during

23  the time period on 995, correct?  They are not part of select

24  accounts?

25  A    Yes.

1  Q    Thomas Fernandez didn't trade all between 12-17 and

2  February 28, 2013, correct?

3  A    Yes.

4  Q    Claridge Capital didn't trade at all between December 17,

5  2012 to February 28, 2013, correct?

6  A    Yes.

7  Q    Edmund Sullivan didn't trade at all between December 17,

8  2012 and February 28, 2013?

9  A    Yes.

10  Q    And going back to your chart, again, 995, for the purple,

11  which is Mr. Pierotti, correct?

12  A    Yes.

13  Q    He only sells, correct?

14  A    Yes.

15  Q    So on some days in this chart Mr. Pierotti's selling and

16  so are some of the select accounts, correct?

17  A    Yes.

18  Q    So let's look at January 30, 2013 in Government's Exhibit

19  950.  This is January 30.  And then let's  -- so this is

20  trading activity on January 30, 2013, in the blue sheets,

21  correct?

22  A    Yes.

23  Q    So let's go  -- column A for January 30, 2013, let's

24  filter column A for Kevin Mulleady, please?

25            Okay.  So on this date, January 30, 2013, Kevin

1    Mulleady buys 100 shares, correct.

2    A    Buys 400 shares.

3    Q    Total, correct?

4    A    Yes.

5    Q    And he sells 10,400 shares, correct?

6    A    Yes.

7    Q    And let's now filter for Andrew Vaino.  So on January 30,

8    2013 Andrew Vaino sale is 3500 shares down in the corner,

9    correct?

10   A    Yes.

11   Q    So on January 30 Andrew Vaino sells 3500 shares, Kevin

12   Mulleady sells 10,400 shares, correct?

13   A    Yes.

14   Q    And let's filter for Mr. Pierotti, please, and he

15   sometimes spells his name differently?

16           How many shares does  -- how many shares does

17   Mr. Pierotti sell?

18   A    Well, there's a cancel here.  So he sells 6,000 out of

19   this account.  There might be  --

20   Q    Okay.  So he sells 6,000 shares on the same day that

21   Andrew Vaino sells 3500 and Kevin Mulleady sells 10,400,

22   correct?

23   A    Yes.

24   Q    So Kevin Mulleady sells more shares than Timothy

25   Pierotti, correct?

Oremland - cross - Denerstein                    5796

1   A    There might be more than one Pierotti account.  Wait.
2   Let me see.  Yes, that's right.
3   Q    So, again, Kevin Mulleady sells more shares on that day
4   than Timothy Pierotti, correct?
5   A    Yes.
6   Q    And Kevin Mulleady combined with Andy Vaino to sell more
7   shares that day than Timothy Pierotti, correct?
8   A    Yes.
9   Q    But, again, of course, if you go back to January 30,
10  2013, your chart on 995, when we get to January 30, 2013, you
11  can't tell who does what in the select account trading
12  activity, correct?
13  A    Yes.
14  Q    And your share volume that day is, draw a line across, is
15  that about 22,000?
16  A    Roughly, yes.
17  Q    And Mr. Carter the share volume in the blue sheets for
18  January 30, isolate for all five?
19          So, the sum listed there is 74 thousand  -- over 74
20  thousand, correct.
21  A    Yes.
22  Q    As we discussed that number is different than your
23  number, going back to January 30 on 995?  Yes or no.
24  A    Yes.
25  Q    So Pierotti was not the only one selling shares during

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Oremland - cross - Denerstein                    5797

1    the limited time period in your chart on Government's Exhibit

2    996, correct?

3    A    Yes.

4    Q    For example, let's look at Government's Exhibit 950 and

5    filter column J for Andy Vaino.

6              So on January 30, 2013, Andy Vaino sells 3500.

7              Mr. Carter, let's filter for the whole time period.

8    Just put in Andy Vaino's name for the blue sheet data which

9    covers Exhibit 950, which covers November 14, 2012 to February

10   20, 2013.

11             What's the total?

12   A    Sixty-seven thousand.

13   Q    During this period of time between November and February

14   20, 2013, which the blue sheet data covered, Mr. Vaino sells

15   sixty-seven thousand shares?

16   A    Yes.

17   Q    Let's just filter column J for this whole time period for

18   Kevin Mulleady.  During this time period Kevin Mulleady is

19   buying and selling shares as well, correct?

20   A    Yes.

21   Q    You can get out of this exhibit, Mr. Carter?

22             Pierotti was not the only one selling shares after

23   the time period that ends in Government's Exhibit 995,

24   correct, ended on February 28, 2013?  Trading continued after

25   February 28, 2013?

Oremland - cross - Denerstein                    5798

1   A    Yes.

2   Q    Yes?

3        Tim Pierotti continued selling shares after February

4   2013, correct.

5   A    I'm not sure.

6   Q    Okay.  Kevin Mulleady continued selling shares after

7   February 28, 2013?

8   A    I don't know.

9   Q    Andy Vaino continued selling shares after February 28,

10  2013, correct?

11  A    I don't know.

12  Q    Marek Biestek also continued selling shares, correct?

13  A    I don't know.

14  Q    Okay.  Now, you reviewed the blue sheet data, correct?

15  A    Yes.

16  Q    So let's go to Government's Exhibit 951 in evidence,

17  which covers the time period from February 21, 2013 to

18  November 29, 2013.  And let's filter for Kevin Mulleady?

19        So he sold 112,961 shares.

20  A    Yes.

21  Q    During this time period, correct?

22  A    Yes.

23  Q    And let's filter for the same time period in column J for

24  Marek Biestek?

25        So he on various dates in March 2013 and in February

Oremland - cross - Denerstein                    5799

1    2013 sells 10,350 shares, correct.

2    A    Yes.

3    Q    And none of this information is included in Government's

4    Exhibit 995, correct?

5    A    Right.  This exhibit covers December 17, 2012 through

6    February 28, 2013.

7    Q    Actually there's a brief period which the blue sheet data

8    is divided up to February 20?

9    A    Yes.

10   Q    The bottom line is the select account holders are doing

11   different things on different days, correct?  Different

12   trading activity on different days, correct?

13   A    Can you clarify your question?

14   Q    The select account holders are engaging in different

15   trading activity, if any, on different days?  Yes or no.

16   A    Yes.

17   Q    They are not doing the same thing on each day, select

18   account holders, correct?

19           MR. PITLUCK:  Objection to the form, your Honor.

20           THE COURT:  Try to rephrase your question,

21   Ms. Denerstein, please.

22   Q    Well, on March 6, 2013, Martin Shkreli buys 100 shares,

23   correct?

24   A    I don't know.

25   Q    On March 6, 2013, Andrew Vaino sells 1,000 shares,

Oremland - cross - Denerstein                    5800

1   correct?

2   A    I don't know.

3        MR. PITLUCK:  Objection, your Honor.

4   Q    On March 6, 2013, Kevin Mulleady sells twenty-five

5   hundred shares, correct?

6        THE COURT:  Go ahead, Mr. Pitluck.

7        MR. PITLUCK:  This is an exhibit that the witness is

8   looking at that doesn't cover that time period.

9        MS. DENERSTEIN:  It's not on the board.  We have

10  this other chart.

11       THE COURT:  Can you refer her so she can answer yes

12  or no.

13       MS. DENERSTEIN:  Yes.  I'm just establishing she

14  doesn't know and I'm going to go back to the Government

15  Exhibit that provides the information, I'll go back now.

16  Q    Let's go to Government's Exhibit 951 in evidence.  That's

17  the blue sheets for the period February 21 to November 29,

18  2013.

19       Mr. Carter, could we filter for column J for Andrew

20  Vaino, Kevin Mulleady, Marek Biestek and Martin Shkreli.

21       THE COURT:  For all dates within that period?

22       MS. DENERSTEIN:  Yes.  Thank you, your Honor.  I'm

23  sorry.  Actually I meant to say for March 6, 2013.  I

24  apologize.

25       March 6, Martin Shkreli, Andy Vaino, Kevin Mulleady

Oremland - cross - Denerstein                 5801

1   and Marek Biestek.  On the first column there's a buy for 100

2   shares and if you go across to J, that's Martin Shkreli

3   purchasing, correct?

4   A     Yes.

5   Q     And if you go down there's a sale for 1,000 shares and

6   that is the same day by Andy Vaino, correct?

7   A     Yes.

8   Q     And if you go to the third, that is a sale of twenty-five

9   hundred shares by Kevin Mulleady, correct?

10  A     Yes.

11  Q     So on that day Martin Shkreli is buying, Andrew Vaino and

12  Kevin Mulleady are selling, correct?

13  A     Yes.

14  Q     Selects account holders are selling on different days,

15  correct?

16  A     Can you rephrase your question?

17  Q     Sure?

18          The select account holders on different days are

19  buying or selling or holding, correct?

20  A     I don't understand your question.

21  Q     On each day in the blue sheets the select account holders

22  are doing different things, correct?

23  A     On every day?  I don't understand the question.

24  Q     For the example on March 6 of 2013, Kevin Mulleady  --

25  Kevin Mulleady sold twenty-five hundred shares, correct?

1    A    Yes.

2    Q    That's a different amount from how many shares Andy Vaino

3    sells, correct?

4    A    Yes.

5    Q    He sells a thousand shares?

6    A    Yes.

7    Q    And that's Vaino and Mulleady selling 1,000 shares for

8    Andy Vaino and twenty-five hundred for Kevin Mulleady is

9    different than Martin Shkreli buying 100 shares, correct?

10    A    Yes.

11    Q    And Marek Biestek doesn't trade on that day at all?  You

12    remember his name in the blue sheets.  We filtered for it.  He

13    doesn't come up at all on that day, correct?

14    A    Yes.

15    Q    So the select account holders on March 6, 2013, are all

16    doing different things, they are selling different amounts,

17    they are buying or they are not doing anything at all on March

18    6, 2013?

19    A    Yes.

20    Q    I guess it is fair to say that many factors can influence

21    a company's stock price?

22    A    Yes.

23    Q    Let's go to Government's Exhibit 992 and this is your

24    chart tracking daily closing price and share volume based on

25    Bloomberg data, correct?

Oremland - cross - Denerstein                    5803

1    A    Yes.

2    Q    So the stock price changes day-to-day pretty much, fair

3    to say?  I'll rephrase?

4         The stock price is based on Bloomberg the chart and

5    whatever dates there it goes up and down over this period of

6    time.

7    A    Yes.

8    Q    Sometimes it goes up, stock price?

9    A    Yes.

10   Q    Sometimes it goes down?

11   A    Yes.

12   Q    I want to show you what's been marked as Defendant's

13   Exhibit 13085 for identification?

14        Ms. Oremland, can you take a look at this.

15        (Pause.)

16   Q    Let me know when you are ready.

17   A    I'm ready.

18   Q    Did this tell you the date about when Retrophin was

19   uplisted to NASDAQ?

20   A    It says it includes a date for the offering and it also

21   indicates that it received approval to list on the NASDAQ.  I

22   don't see a date for the  --

23   Q    On the left-hand-top corner can you see the date?

24   A    Yes.

25        MS. DENERSTEIN:  At this time the defense moves to

Oremland - cross - Denerstein                    5804

1    offer Defendant's Exhibit 13085.

2              MR. PITLUCK:  No objection, your Honor.

3              THE COURT:  We receive Defendant's Exhibit 13085.

4              (So marked.)

5    Q    This press release announces a public offering of 4.7

6    million shares of Retrophin stock, correct?

7    A    Yes.

8    Q    And it describes that the company received approval to

9    list its common stock on the NASDAQ common market under the

10   sticker RTRX?

11   A    Yes.

12   Q    The date of this is January 2014?

13   A    Yes.

14   Q    And going back to 992, around January 2014, again, you

15   see the share price increasing?

16   A    Yes.

17   Q    Mr. Carter can you do the second half of the chart.

18              And this is after the company in January  -- that's

19   when the company lists on NASDAQ.

20   A    Yes.

21              (Continued on next page.)

22

23

24

25

Oremland - cross - Denerstein                    5805

1    BY MS. DENERSTEIN:  (Continuing)

2    Q    And the share price increases dramatically?

3    A    Yes.  During this time frame, it increases and also

4    decreases.

5    Q    Correct.  It lands at about 10 -- you are going a little

6    below 10 if you are going to the end of your chart on

7    September 29, 2014, right?

8    A    Right.

9    Q    So -- and the volume has, the share volume has increased

10   again tremendously, correct?

11   A    Yes.

12   Q    Millions of shares are now being traded, correct?

13   A    Yes.

14   Q    Way more shares are available than in the period prior to

15   the uplisting, correct?

16   A    Yes.

17   Q    The other thing I wanted to just review with you is

18   closing price is not the only measure of price, correct?

19           Closing price is not the only measure of price?

20   A    I don't understand your question.

21   Q    Well, on your chart, you use the end of the day price

22   from the Bloomberg data, correct?

23   A    Yes.

24   Q    Price can fluctuate throughout the day?

25   A    Yes.

1   Q     Price can go up and price can go down on the very same

2   day?

3   A     Yes.

4   Q     I want to show you what's in evidence as Government

5   Exhibit 956.

6           Ms. Oremland, this table in evidence shows Bloomberg

7   data for opening days, intra-day high price, intra-day low

8   price and closing price?

9   A     Yes.

10  Q     Intra-day price means the highest price during the day

11  according to Bloomberg, correct?

12  A     "Intra-day high price," yes.

13  Q     Means the highest price during the day?

14  A     Yes.

15  Q     "Intra-day low price" means the lowest price during the

16  day?

17  A     Yes.

18  Q     So if you look at December 26th, the opening price was

19  3.75, correct?

20  A     Yes.

21  Q     It rose to a high of 4.50, correct?

22  A     Yes.

23  Q     It dropped to a low of 3.50, correct?

24  A     Yes.

25  Q     And it closed at $4, correct?

Oremland - cross - Denerstein                    5807

1    A    Yes.

2    Q    So, throughout that single day, the stock price changed

3    by $1?

4    A    Yes.

5    Q    Directing your attention to row, the column for

6    January 14, 2013, Retrophin opened at 3.95, correct?

7    A    Yes.

8    Q    It rose to a high of 4 -- the intra-day high price was

9    4.95, correct?

10   A    Yes.

11   Q    And it dropped to the intra-day low price of $3.70,

12   correct?

13   A    Yes.

14   Q    And it closed at $3.70, correct?

15   A    Yes.

16   Q    That's a fluctuation of greater than $1 during a day?

17   A    Yes.

18   Q    It's fair to say that looking at closing price alone does

19   not always reflect all the price changes that may have

20   occurred throughout the day, correct?

21   A    Yes.

22   Q    And Government Exhibit 992 and 995, they only show

23   closing price, correct?

24   A    Yes.

25   Q    Now, you've worked at FINRA for a vast majority of your

Oremland - cross - Denerstein                    5808

1    legal career, correct?

2    A    Yes.

3    Q    And you're testifying based on your experience there?

4    A    Yes.

5    Q    And your legal experience is limited to FINRA?

6              They've been your employer for 16 of the 17 years

7    that you've been a lawyer, correct?

8    A    Yes.

9    Q    Your legal experience is limited to FINRA, correct?

10   A    Yes.

11   Q    And you've never worked as a lawyer in private practice,

12   correct?

13   A    Yes.

14   Q    You're not a corporate lawyer at a firm?

15   A    No.

16   Q    You've never worked in house at a company?

17   A    No.

18   Q    And you've never worked as a lawyer at a law firm, as a

19   lawyer at a law firm?

20   A    Right.

21   Q    And you've never served as outside counsel to a company,

22   correct?

23   A    Right.

24   Q    And you've never counseled a company through the reverse

25   merger process?

Oremland - cross - Denerstein                    5809

1    A     Right.

2    Q     And you don't advise start-ups in filing the, all the

3    forms that are required with the SEC?

4    A     Right.

5    Q     And you've never provided legal advice to a client on how

6    to fill out various forms, correct?

7    A     Right.

8    Q     You understand that the signatory is responsible for the

9    accuracy of the filing, isn't that true?

10           THE COURT:  On what form?

11           MS. DENERSTEIN:  That's a good point.

12   Q     You understand that lawyers rely on information provided

13   by their clients?

14   A     I don't know.

15   Q     And that's because you have not been, you have no

16   experience in counseling companies, correct?

17   A     Right.

18   Q     So let's turn to Government Exhibit 960 in evidence and I

19   want to start on page 80.  That's the last page.  And I

20   want --

21           MS. DENERSTEIN:  Is this page 80 at the bottom,

22   Mr. Carter?  There you go.

23   Q     This form is signed by Martin Shkreli, correct?

24   A     Yes.

25   Q     And the date is December 18, 2012, correct?

Oremland - cross - Denerstein                5810

1    A    Yes.

2    Q    This form is not signed by Mr. Greebel, correct?

3    A    Right.

4    Q    And let's talk about this, the 8-K.  The 8-K, if we could

5    turn to page 23, please, let me know when you're there.

6          At the very top, what does it say?

7    A    Risk factors:  Our business, as well as our shares of

8    common stock, are highly speculative and involve a high degree

9    of risk.  Investing in our common stock involves a high degree

10   of risk.  Our securities should be purchased only by persons

11   who can afford to lose their entire investment.  You should

12   carefully consider the risks and uncertainties described

13   below, together with all of the other information included

14   herein, including the financial statements and related notes,

15   before deciding to invest in our common stock.  If any of the

16   following risks actually occur, they would materially harm our

17   business, prospects, financial condition and results of

18   operations.

19          MS. DENERSTEIN:  Okay.  Let's keep going,

20   Mr. Carter.

21   Q    If we can go back to -- I'm not going to ask you to read

22   everything under it, but if you could scroll down, it states,

23   The company is still in the development stage and has not

24   generated any revenues.

25          Correct, Ms. Oremland?  Just the header.

Oremland - cross - Denerstein                5811

1   A    Oh, yes.

2        MS. DENERSTEIN:  And if you scroll down further,

3   Mr. Carter, if we could highlight:  Risks related to our

4   financial position and need for additional capital.

5   Q    Correct, Ms. Oremland?

6   A    Yes.

7   Q    And if you scroll to the next page, it talks about --

8   stop there.  There's a header "no operating history," correct?

9   A    Yes.

10  Q    And then if you go down, it says, "Future profitability

11  uncertain," correct?

12  A    Yes.

13  Q    And then there is a page on, the next page, legal risks,

14  correct?

15  A    Yes.

16  Q    And then there's a page -- keep going -- on future

17  capital requirements, correct?

18  A    Yes.

19  Q    And underneath it, it says:  We will need substantial

20  additional funding and may be unable to raise the capital we

21  needed which would force us to delay, reduce or eliminate our

22  product development programs or commercialization efforts.

23  A    Yes.

24  Q    Let's go to page 29.  This talks about risks related to

25  our intellectual property, correct?

Oremland - cross - Denerstein                    5812

1    A    Yes.

2    Q    And the sentence underneath states:  If we are unable to

3    obtain and maintain protection for the intellectual property

4    relating to our technology and products, the value of our

5    technology and products will be adversely affected.  Correct?

6    A    Yes.

7    Q    And the risk factors are a fairly large portion of this

8    document, is that fair to say?

9             MR. PITLUCK:  Objection to the form, Your Honor.

10            THE COURT:  Try to rephrase, Ms. Denerstein.

11   Q    The risk factors are described at pages 23 to 58,

12   approximately, of this document, is that fair to say?  We can

13   even say over 20 pages?

14   A    Yes.

15   Q    So the company is describing the risk that, in buying its

16   stock.  This is available to the public, correct?

17   A    Yes.

18   Q    So when they're reading this document, this is what they

19   would see, correct?

20            MR. PITLUCK:  Objection, Your Honor.

21   Q    If the public chose to read this document, they would see

22   there are substantial risks disclosed, correct?

23   A    Yes.

24   Q    Okay.  Let's go to, let's go to directing your attention

25   to Government Exhibit 962 in evidence, Retrophin's 2012

1   Schedule 13D dated December 20, 2012.

2           MS. DENERSTEIN:  Okay.  Can we go to the last page,

3   Mr. Carter, the second to last page?

4   Q    That states:  After reasonable inquiry and to the best of

5   my knowledge and belief, I certify that the information set

6   forth in this statement is true and complete.  I don't know

7   what's missing, complete and correct.  Right?

8   A    I don't know what that word is but ...

9   Q    I believe it's "complete" but we can just -- it says,

10  "true, complete and correct."  I'm sure we can find a copy

11  that has that in there.

12  A    Yes.

13  Q    And that's dated December 20, 2012, correct?

14  A    Yes.

15  Q    And it's signed by who?

16  A    Martin Shkreli.

17  Q    This is not signed by Evan Greebel, isn't that correct?

18  A    Yes.

19  Q    And Martin Shkreli is attesting to:  After reasonable

20  inquiry and to the best of my knowledge and belief, I certify

21  that the information set forth in this statement is true and

22  correct?

23  A    Yes.

24          MS. DENERSTEIN:  Can we go to Government Exhibit 964

25  and can we go to the last page.

Oremland - cross - Denerstein                    5814

1  Q    This says:  After reasonable inquiry and to the best of

2  my knowledge and belief, I certify that the information set

3  forth in this statement is true and correct.

4  A    Yes.

5  Q    And it's dated February 19, 2013?

6  A    Yes.

7  Q    And it's signed by Martin Shkreli, correct?

8  A    Yes.

9  Q    Okay.  You testified that this form was filed because of

10  a February 2013 PIPE, correct?

11  A    Yes.

12  Q    And "PIPE" means what?

13  A    Private investment of public equity.  It's a private

14  placement.

15  Q    Isn't it the case from this 13D that there were several

16  reasons this form was amended?

17  A    I don't know.

18  Q    Well, isn't the first reason that MSMB Capital no longer

19  had any shares?  If you look at page three.

20  A    Right.  Yes.

21  Q    And isn't the second reason that Mr. Shkreli participated

22  in the PIPE and purchased 120,000 shares and 60,000 warrants?

23  A    Yes.

24  Q    Fair to say Mr. Shkreli was buying in the PIPE aligning

25  his financial interests with the company?

Oremland - cross - Denerstein                5815

1  A    Yes.  He bought shares in the PIPE.

2  Q    Is it fair to say Mr. Shkreli from December 2012 through

3  September 2014 didn't sell his Retrophin shares?

4  A    I don't know.

5  Q    And the third reason for filing, if you see above item

6  six, is Martin Shkreli purchased three times, correct?

7  A    Yes.

8  Q    Do you know one way or the other whether a Katten

9  attorney named Michelle Griswold prepared this 13D?

10  A    I have no idea.

11  Q    But you do know that Martin Shkreli certified that the

12  information in this 13D was true, complete and accurate,

13  correct?

14  A    Yes.

15  Q    And let's just talk about the 13D's, the two government

16  Exhibits 962 and 964.

17          MS. DENERSTEIN:  On page 8, row 11, 962, Mr. Carter,

18  and row 13.

19  Q    Now, anybody who looks at this 13D form knows that Martin

20  Shkreli disclosed his, that he owned more than 40 percent of

21  the stock, correct?

22  A    If they know -- I don't know.  If they know how to read

23  it, yes, they could see how much he owned and that it was

24  40 percent of the stock.

25  Q    That's a pretty significant holding, is it not?

Oremland - cross - Denerstein                5816

1   A    Yes.

2   Q    Can we look at the next Government Exhibit, 964, the

3   amended 13D, page eight, row 11.

4         Martin Shkreli disclosed his ownership of more than

5   3.18 million shares, correct?

6   A    Yes.

7   Q    And in row 13, there's been, I think, the PIPE that you

8   talked about.  He now owns more than 27 percent, correct?

9   A    Yes.

10  Q    That's still a large portion of the stock, correct?

11  A    Yes.

12  Q    Now, you said earlier, somebody knows how to read these

13  forms, correct?

14  A    Yes.

15  Q    Hard to read, huh?

16  A    Actually, not really.

17  Q    So now they're easy to read?

18  A    Yes.

19  Q    So, if somebody looked at this form, they would be able

20  to tell that Martin Shkreli owned a significant amount of the

21  stock, correct?

22  A    They could see how much he owned.

23  Q    And it's not insignificant, is it?

24  A    No.

25  Q    Okay.  FINRA requires members to disclose civil judicial

Oremland - cross - Denerstein                    5817

1    proceedings, correct?

2    A    Yes.

3    Q    And it also requires members to disclose employment

4    terminations?

5    A    Yes.

6              THE COURT:  When you say "members," are you talking

7    about companies?

8              MS. DENERSTEIN:  I'm talking about companies and

9    individuals, both.

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Oremland - cross - Denerstein                5818

1            MS. DENERSTEIN:  Your Honor, may I have one moment?

2            THE COURT:  Yes.

3            (Pause.)

4            MS. DENERSTEIN:  Your Honor, with your permission

5     and, of course, the jury's, would it be okay if we broke for

6     lunch?  I think I only have 5 or 10 minutes left, but it would

7     give me an opportunity to tighten it up.

8            THE COURT:  We can take a lunch break now if the

9     jurors are ready to have lunch.

10           THE JURY:  Yes.

11           THE COURT:  So, thank you.  Please don't talk about

12    the case.  Keep an open mind.  Please try to come back if you

13    could at 2:10, 2:05.  You will be dismissed today at 4:30.

14    Thank you.

15           (Jury exits.)

16           THE COURT:  You can step down and have lunch as

17    well.

18           THE WITNESS:  Thank you.

19           (Witness steps down.)

20           THE COURT:  All right.  Let's take an hour and I

21    will see you back here at 10 after 2:00.

22           (Luncheon recess.)

23           (Continued on next page.)

24

25

5819

1                   AFTERNOON SESSION

2

3           (In open court; jury not present.)

4           THE COURT:  Good afternoon.  Is everybody back?  I

5    thought I said quarter of.  Have a seat everybody.

6           (Pause.)

7           THE COURT:  All right.  Let's get started.  Defense

8    counsel are in the room and Mr. Greebel is here.  Yes,

9    Ms. Smith or who has the issue?

10          MR. KESSLER:  Sure.  So, your Honor, we wanted to

11   come back this early anticipating potentially several issues.

12   I think almost all of those issues are now not issues because

13   we have been told that Mr. Brodsky is not going to

14   cross-examine Mr. Pierotti.  Mr. Dubin will do that instead.

15   Most of the concerns we wanted to talk through related to

16   Mr. Brodsky doing the cross-examination.  A lot of concerns

17   have been obviated.

18          THE COURT:  Why didn't anyone call me?

19          MR. KESSLER:  We still have one more thing to talk

20   to.  As the court is aware there are 302 reports related to

21   various discussions with Mr. Pierotti and there's also an

22   unsigned NPA documents.  Nonprosecution agreement, NPA.

23   Mr. Dubin has suggested to the extent any of these documents

24   are used that the  -- I don't know that Mr. Brodsky's name or

25   all the names can be redacted.  We don't object to the

5820

1    redaction of Mr. Brodsky's name or other attorneys' names.  We

2    do object to the extent any of the documents, of those

3    documents, the 302's or the NPA would be offered into

4    evidence.

5            The 302's we've discussed in the past.  They are not

6    a witness's statement.  The NPA is unsigned and so it's not

7    Mr. Pierotti's statement or his adopted statement and there

8    would be no other basis to admit an unsigned NPA in evidence.

9    So that's I think the one remaining thing we wanted to talk

10   about.

11           THE COURT:  So the one document that could be

12   offered would be the NPA, but you certainly not going to be

13   offering 302s.

14           MR. DUBIN:  Never suggested I would, never.

15           MR. KESSLER:  We are not suggesting the NPA could be

16   offered.  That's the remaining document I don't think we have

17   resolved.

18           MR. DUBIN:  The NPA is no different than the NPA

19   that was admitted into evidence with respect to Mr. Su.  Under

20   the best evidence rule, this is the best evidence.  The

21   Southern District produced that.  Mr. Pierotti is going to

22   claim that he can't find it and I will lay the appropriate

23   foundation and authenticate it.  Just because his signature

24   isn't on it  -- his signature is on one somewhere that was in

25   his possession at some point.  He claims to have lost it or

5821

1    misplaced it.

2           I'll lay the appropriate foundation.  We can deal

3    with it when he takes the stand.  Just because he hasn't

4    signed it doesn't make it inadmissible.

5           MR. KESSLER:  The NPA that we have is a document

6    from the files of the Southern District of New York.  There is

7    no evidence that it reflects exactly what the final NPA was.

8    It is not signed by Mr. Pierotti, so it's not his statement

9    and furthermore there's no basis to admit the NPA anyway.

10          MR. DUBIN:  Your Honor, there is a basis.

11          THE COURT:  Did anyone sign this version?  The one

12   that I have is blank.  Is there one that Mr. Brodsky signed?

13          MR. KESSLER:  My understanding of the record is

14   Mr. Pierotti remembers signing one.  He doesn't have it.  We

15   don't have it.  The Southern District doesn't have it.

16   Defense counsel doesn't have it.

17          MR. DUBIN:  I will lay the appropriate foundation

18   with Mr. Pierotti and we can deal with it when he testifies.

19   Frankly, I have a basis to believe that the one he signed is

20   identical to the one that we got.

21          THE COURT:  So you will want to admit it?

22          MR. DUBIN:  Absolutely.

23          THE COURT:  And if they do want to admit it you

24   don't want Mr. Brodsky's name redacted.

25          MR. KESSLER:  I believe we all agree that

5822

1    Mr. Brodsky's name should be redacted from the document.

2              MR. DUBIN:  It already has been.

3              MR. KESSLER:  That is if the court admits the

4    document, we agree the name should be redacted.  We are

5    objecting to the admission of it.  It's not a prior

6    inconsistent statement.  It's not probative.  That document is

7    not probative of anything.  It's certainly not probative that

8    Mr. Pierotti did in fact commit a crime.  That's not what the

9    nonprosecution agreement says.  It's not inconsistent with his

10   statement that he signed a nonprosecution agreement because he

11   said that.

12             THE COURT:  You would not object to Mr. Dubin

13   probing the witness about the fact that he did enter into a

14   nonprosecution agreement?

15             MR. KESSLER:  No.  We don't object to that.

16             MR. DUBIN:  I am going to seek to admit it.  I know

17   it's admissible, at least from my analysis.  I will lay the

18   proper foundation with him.  I don't want to give up too much

19   of where I'm going with it in advance.  This is the one that

20   he signed and if he denies that then I think they might have a

21   basis to object.  Simply because his signature didn't land on

22   this one, this is the best evidence.  Under the best evidence

23   rule they can't now say that because the Southern District

24   could not find in their files, respectfully, your Honor, or

25   because he can't find it in his files, which I think calls

5823

1    into question his credibility in the first place, an important

2    document that you would expect him to have a copy of.  I think

3    that we'll be able to establish its admissibility once he

4    takes the stand.

5         MR. KESSLER:  The only reason we're raising this

6    issue now is to avoid a sidebar about this later.  The best

7    evidence rule says that you can't prove the contents of a

8    writing with evidence about the document other than the

9    writing in most circumstances.  This is not a best evidence

10   issue.

11        The question is whether, first of all, this document

12   is actually identical to the final one that was signed and,

13   second of all, even if it were signed it would not be

14   admissible.

15        MR. DUBIN:  The Jackson Su nonpros, there was no

16   objection to it.  It went right into evidence.

17        THE COURT:  Well, because it was just a matter of

18   his lawyer having the document in his briefcase and not being

19   available to enter it and as soon as it was provided by

20   Mr. Burke it was copied and given to the parties and that

21   signed version was substituted for that exhibit.  There's a

22   material difference.

23        MR. DUBIN:  Your Honor, the government had this

24   nonpros for weeks.  They had this for weeks.  They have been

25   in possession of this for weeks.  The fact that he doesn't

5824

1  have the signed version is really neither here nor there

2  because I believe that he will concede  --

3           THE COURT:  I'll have to instruct the jury we don't

4  know whether this is the agreement that was signed.

5           MR. DUBIN:  No.  I agree.  Unless he concedes that

6  it in fact is.

7           MR. KESSLER:  Your Honor, even if he signed it,  --

8  let me put it this way.  There is no basis to admit it.

9           MR. DUBIN:  We disagree, your Honor.

10           THE COURT:  Okay.  Typically I think these kinds of

11  agreements are often admitted by the government when they

12  present a witness who may have a document or an agreement like

13  this.  They are often admitted by stipulation.  I'm very

14  uncomfortable with admitting an unsigned document.  I mean

15  it's just odd that nobody, neither the government nor the

16  defendant, has signed this document.  So we'll see what he

17  says.

18           MR. DUBIN:  You meant Mr. Pierotti not the

19  defendant, right.

20           THE COURT:  Yes.  I'm sorry.

21           MR. DUBIN:  That's all right.

22           Your Honor, I think that we shouldn't be placed in a

23  position of having an otherwise admissible document now be

24  deemed nonadmissible because the witness who is on the stand

25  is going to claim to have misplaced a copy and apparently when

5825

1  the court ordered the government to get this from the Southern

2  District they somehow -- their file keeping system is such

3  that they just can't locate the signed copy of it.  I think

4  that he will concede on the stand that this is indeed the very

5  document that he signed.

6           THE COURT:  I guess my view is that he could testify

7  as to what his understanding was of the agreement.  I mean the

8  government is not objecting to that.  But to admit a document

9  as the actual document without any indication that it is, in

10 fact, that, is not really appropriate.  You will be able to

11 get the witness fully to discuss the terms of the agreement.

12          MR. DUBIN:  My point, your Honor, is that I think he

13 will concede on the stand  -- he will concede that this is the

14 very document that he signed word for word.  The only thing

15 missing from this is his signature and the government's

16 signature because neither of them could find it.  So I guess

17 the problem that I'm having, your Honor, and the reason why I

18 feel like we're being put in a position that, you know, is

19 prejudicial to my client, is because due to no fault of ours

20 --

21          THE COURT:  Or the government's.

22          MR. DUBIN:  I'm not suggesting it is the

23 government's.

24          THE COURT:  Or this team.  I should say the Southern

25 District.  I can't comment on their recordkeeping.

5826

1          MR. MASTRO:  I object.

2          THE COURT:  I just don't know why they wouldn't have

3     a copy.  It just seems odd.  But neither the defense team nor

4     this team of prosecutors is at fault and nobody should be

5     benefited or punished one way or the other and I don't believe

6     that having Mr. Pierotti review this document and state what

7     he recalls about the terms of this document would in any way

8     prejudice the defense.

9          I'm just talking about it from a court perspective.

10          MR. DUBIN:  Understood.

11          THE COURT:  You're proffering something as an

12     agreement but nobody has a signed copy and I'm very reluctant

13     to admit a document like that as the agreement when it is not

14     signed by either party.

15          MR. DUBIN:  Understood.

16          THE COURT:  I would tilt in favor of doing it if at

17     least one party had signed it, with the idea this was what was

18     agreed to orally and here is one party signing off and

19     proffering it to the other for signature, but we don't have

20     that here.

21          MR. DUBIN:  What I will do is while I have him on

22     the stand and take him through the agreement, unless I think

23     it's absolutely necessary because he's giving testimony that I

24     think contradicts or is somehow inconsistent with the general

25     terms that we all know that he signed, I won't need to offer

5827

1    it and in that case I won't.  As long has he's adopting the

2    terms, the general terms of it, and that comes in through his

3    testimony.

4            But I would ask your Honor to at least reserve until

5    you hear him on the stand.  If he reads this and he says, you

6    know what, looking at this this is exactly the document that I

7    signed and I know that the only thing missing is my signature,

8    if that's his testimony, I might then ask to move it in.  If

9    he can't confirm that and he just concedes the general terms

10   then I won't.

11           Is that fair?

12           MR. KESSLER:  I don't think we object to showing him

13   the document and saying is this the NPA you signed.  What our

14   concern is is that in taking him through the terms, what will

15   happen is the entire document will be read to the jury in an

16   effort to get Mr. Pierotti to confirm.

17           MR. DUBIN:  I will proffer to the court right now

18   that I am not going to do that.  There's only really one

19   relevant paragraph that I want to read word for word.

20           THE COURT:  The third one?

21           MR. DUBIN:  That I can do without having to waste

22   the court's or the jury's time reading it.  It's really the

23   first one.  That's critical.

24           MR. KESSLER:  That's just going to be impeaching

25   with collateral evidence.

MR. DUBIN: Your Honor, with all respect I understand the government doesn't want this in simply because he agrees not to be criminally prosecuted in direct connection with an insider trade that he admits that he made. So of course I have to be able to get into the substance of this, especially if I'm making a good-faith proffer to the court that I won't seek to admit the document as long as I can get in the critical substance of it. It's critical that I read that.

MR. KESSLER: Your Honor, we're not objecting to cross-examination about the nature of the NPA. The point is Mr. Dubin is now saying he's going to take a document that is not in evidence read it out loud in front of the jury and ask Mr. Pierotti if that's the NPA he signed. It will be in front of the jury.

THE COURT: What would be wrong with Mr. Dubin asking Mr. Pierotti whether he was -- he entered into an agreement with the Southern District under which the Southern District agreed not to prosecute him criminally for his participation in trades of securities of JM Smucker on a given date did?

MR. KESSLER: Nothing.

THE COURT: That's not reading it in. It's basically stating the essence of what's in paragraph one.

MR. DUBIN: Correct, your Honor. I'll change a few

5829

1    words.

2              THE COURT:  Don't read it.

3              MR. DUBIN:  Okay.

4              THE COURT:  All right.  Is Ms. Oremland ready and

5    we'll check to see if our jurors are here.

6              (Pause.)

7              THE COURT:  I have not yet heard from Juror No.

8    One's HR people.  So I just spoke to Juror No. One and said,

9    please, try to get ahold of them yourself.  My understanding

10   from the director is that if she can work something out with

11   HR he would be fine with it.  The policy is 20 days out for

12   jury service paid.  And the idea was that if she works on the

13   weekends and holidays she could build up the time rather than

14   lose it.  But the 20 days is what they have as their policy.

15   So I did encourage her to reach out herself to HR and I hope

16   she'll be able to do that.  The fellow I spoke to today is

17   apparently going to be out until after Thanksgiving.  So I

18   don't know what the outcome will be.

19             MR. BRODSKY:  Thank you, your Honor, for the update.

20             MR. PITLUCK:  Just from a logistical standpoint, I

21   know we're stopping at 4:30 today.  Did you want to try to

22   push through without an afternoon break?

23             THE COURT:  I'm always happy to do that.  Ms.

24   Jackson watches the jurors and if somehow they communicate

25   silently and she tells me when it's time.

Oremland - cross - Denerstein                5830

1          MR. PITLUCK:  If the court interrupts me and calls

2    for a break, that's fine.  I wanted to raise that possibility

3    because it's only a couple of hours.

4          THE COURT:  I'm happy to push for two hours if they

5    can do it.  I have a court function at 3:45, but I will just

6    arrive late.  We were missing a juror.  That's why they have

7    not come in yet.

8          MR. PITLUCK:  For the court function, do you want us

9    to stop earlier or do you want to go until 4:30?  Judge

10   Gleeson will wait.

11         THE COURT:  They don't have to wait for me.  I did

12   miss a colleague's induction.  That's too bad.  It's fine.

13   It's what we have to do.

14         (Pause.)

15         (Jury present.)

16         THE COURT:   All our jurors are present.  Please,

17   have a seat.  Ms. Oremland, you are still under oath and

18   Ms. Denerstein may resume her cross-examination.

19   CROSS-EXAMINATION

20   BY MS. DENERSTEIN:  (Continued)

21   Q    Going briefly back to Government's Exhibit 995.  On some

22   days following a share price decline the select accounts

23   actually sold shares?  By select accounts I mean Martin

24   Shkreli, Kevin Mulleady and Andrew Vaino and Marek Biestek?

25   A    Yes.

Oremland - cross - Denerstein                   5831

1    Q     Directing your attention to December 26, 2012 and

2    Government's Exhibit 955, Bloomberg chart, page one.  If we

3    can go to December 26.  The share price closed at four

4    dollars, correct?

5    A     Yes.

6    Q     And the very next day the share price closed at 3.10,

7    correct?

8    A     Yes.

9    Q     That's a decline of 90 cents on a four dollar stock?

10   A     Yes.

11   Q     Almost a quarter of the price?

12   A     Yes.

13   Q     Can we go to Government's Exhibit 9 oh in evidence.  And

14   can we filter for column A the date for December 28, 2012.

15   And now can we go to column J and filter for the select

16   accounts, Andrew Vaino, Kevin Mulleady, Marek Biestek and

17   Martin Shkreli and can we also include Tim Pierotti?

18         So if you look at rows 425 through 36 and you go all

19   the way across to J, that is Andrew Vaino, correct?

20   A     Yes.

21   Q     And if you go back to column C, he is selling, correct?

22   A     Yes.

23   Q     And he sells about 4,000 shares?

24   A     Yes.

25   Q     If you go to row 455, Tim Pierotti, go to column J.  On

Oremland - cross - Denerstein                    5832

1    the same date, December 28, 2012, and he sells 24,700 shares,

2    correct?

3    A    Yes.

4    Q    So the day after the price has dropped in Retrophin Tim

5    Pierotti and Andrew Vaino are both selling, so they are

6    selling stock in a company at a low price, when the price is

7    dropping?  The price decreased from the day before, correct?

8    A    Yes.

9    Q    So they sold at a lower price than the day before?

10   A    Yes.

11   Q    Turning back to your testimony that you didn't take the

12   volume from the blue sheets, Government's Exhibit 950 I think

13   through 954 in evidence, because that was market making

14   activity and not actual trades, correct?

15   A    They are trades, but they are the trades that are

16   facilitating the buyer and the sellers.  They are facilitating

17   the market.  They are putting together the buy activity and

18   the sell activity.

19   Q    But that's also because in your view you assume every

20   trade corresponding to a firm that might be a market maker was

21   done for a market making purposes, correct?

22   A    I don't understand your question.

23   Q    You don't actually know whether a firm was executing the

24   trade as a market maker or for a client, correct?  Yes or no.

25   A    They are market maker firms.

Oremland - cross - Denerstein                5833

1    Q    A market maker firm can execute trades for clients,

2    correct?

3    A    Generally, they don't.  They are wholesale market makers.

4    They don't have clients.

5    Q    Generally they don't, but sometimes they do have clients,

6    correct?

7    A    You know, I think it's very rarely that they'll execute

8    or clear orders for other trading accounts.  They don't have

9    customers at their firms.  They are a special type of broker

10   dealer that exists really to facilitate the trading.  That's

11   how they make their money.  They don't make it from clients.

12   Q    But you didn't determine whether there was an entity or a

13   person behind each of these trades that you concluded was a

14   market maker, correct?  Yes or no.

15   A    No.

16   Q    And you have subpoena power, correct?

17   A    No.

18   Q    The SEC has subpoena power, correct?

19   A    Yes.

20   Q    And certainly the government has subpoena power, correct?

21   A    Yes.

22   Q    They could have subpoenaed the information to make sure

23   that the trades that you discounted who they were for or were

24   not for, correct?

25          MR. PITLUCK:  Objection, your Honor.

Oremland - cross - Denerstein                5834

1           THE COURT:  Overruled.

2    Q    Yes or no, please.

3    A    Yes.

4    Q    During your direct testimony you testified that it's

5    beneficial for a controlling shareholder to limit the amount

6    of the shares available for sale, correct?  Controlling

7    shareholder would -- you said it's beneficial for a

8    controlling shareholder to limit amounts, to limit the amount

9    of the shares available for sale, correct?

10   A    I don't remember.

11   Q    That was just this morning, right?

12   A    Yes.

13   Q    And you were saying that a controlling shareholder would

14   want to limit the amount of the shares available for sale, in

15   response to Mr. Pitluck's question?  You don't remember that?

16   A    No.

17   Q    Isn't it true that the individuals in the select accounts

18   sold more stock than they purchased on your chart in 995?

19   A    Yes.

20   Q    They were net sellers?

21   A    Yes.

22   Q    And that contradicts your testimony that you don't

23   remember that it's beneficial for a controlling shareholder to

24   limit the amount of shares available for sale?

25           MR. PITLUCK:  Objection to the form, your Honor.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Oremland - redirect - Pitluck                    5835

1              THE COURT: Sustained.

2    Q    They sold more than they bought, correct?

3    A    Yes.

4    Q    That shows they weren't aligned with management, correct?

5    A    I don't know.

6    Q    Evan Greebel was not a recipient of any of the free

7    trading shares, correct?

8    A    Correct.

9              MS. DENERSTEIN:  One moment, your Honor.

10             (Pause.)

11             MS. DENERSTEIN:  No further questions.

12             THE COURT:  All right.  Thank you.  Do you have any

13   redirect, Mr. Pitluck?

14             MR. PITLUCK:  Very briefly, your Honor.

15   REDIRECT EXAMINATION

16   BY MR. PITLUCK:

17   Q    Good afternoon, Ms. Oremland?

18   A    Good afternoon.

19   Q    You testified a lot about blue sheet data on both direct

20   and cross-examination.  Do you remember that?

21   A    Yes.

22   Q    Is blue sleet data pubically available?

23   A    Yes.

24   Q    Why isn't blue sheet data used for public volume

25   calculation?

1           MS. DENERSTEIN:  Objection.

2    Q    Why didn't you use blue sheet data in your calculation of

3    the publicly available volume?

4    A    I never use it to calculate total volume.

5    Q    Why not?

6    A    Because that's not what is available to the public.

7    Investors see what's available to the public and that's

8    reflected in the Bloomberg price and volume data.

9           (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Oremland - redirect - Pitluck                    5837

1   BY MR. PITLUCK:   (Continued)

2   Q    So in your view, the chart that calculated the public

3   volume of a stock being traded that included blue sheet data

4   would be inaccurate?

5   A    Yes.

6   Q    Including blue sheet data for the publicly available

7   volume?

8   A    Yes.

9   Q    Now, we looked at Government Exhibit 995 which is the

10  chart with all the different colored bars.  Do you remember

11  that?

12  A    Yes.

13  Q    Why did you focus on the period in that chart that's from

14  December to February, December 2012 to February 2013?

15  A    It really was the key period for this company --

16         MS. DENERSTEIN:  Objection.  Move to strike.

17         MR. PITLUCK:  Judge, this was raised on cross.

18         THE COURT:  And she's explaining what was asked of

19  her on cross about the focus on this limited period.  She is

20  explaining why she did it.  I will overrule the objection.

21  Q    So why did you chose that time period to conduct your

22  analysis on the share price and trading volume?

23  A    Well, it had just completed a reverse merger.  It's a

24  startup company.  It's a new company.  There wasn't a lot of

25  stock that was trading, not a lot of information.  It was

Oremland - redirect - Pitluck                      5838

1   really kind of the make-it-or-break-it time for this company.

2   It was before they secured --

3            MS. DENERSTEIN:  Objection.

4   A    -- $10 million of financing and --

5            THE COURT:  I am going to overrule the objection.

6   Q    You can continue.

7   A    Once they secured the financing in mid-February, then, as

8   you can tell by the chart, the price really continues to be

9   relatively stable, continues to rise, and things, very

10  positive things start to happen for the company.

11  Q    And when Bloomberg reports public volume, that would

12  capture any trades that were conducted by for, by a brokerage

13  firm for a client, right?

14  A    Yes.

15  Q    Now, you testified about the relationship between price

16  and volume, correct?

17  A    Yes.

18  Q    And is it the publicly available volume that affects the

19  price?

20  A    Yes.

21  Q    Not the private blue sheet data that affects the price,

22  correct?

23  A    Right.

24           MR. PITLUCK:  Nothing further, Judge.  Thank you.

25           THE COURT:  All right.  Ms. Denerstein.

CMH      OCR      RMR      CRR      FCRR

1   RECROSS-EXAMINATION

2   BY MS. DENERSTEIN:

3   Q    Ms. Oremland, you don't work at Retrophin, do you?

4   A    No.

5   Q    And you have no idea what is key or not key for

6   Retrophin, correct?

7        Are you an expert on Retrophin?

8   A    No.

9   Q    So you have no idea what is key or not key to Retrophin?

10  A    No.

11       (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5840

1          MS. DENERSTEIN:  No further questions.

2          THE COURT:  All right.  Anything else?

3          MR. PITLUCK:  No, Your Honor.

4          THE COURT:  Ms. Oremland, you are excused.  Have a

5    nice weekend.

6          (Witness excused.)

7          THE COURT:  Do you have your next witness?

8          MR. PITLUCK:  We do, Your Honor.

9          THE CLERK:  Please raise your right hand.

10          (Witness sworn.)

11          THE CLERK:  Please have a seat and state and spell

12    your full name for the record, please.

13          THE WITNESS:  My name is Timothy Joseph Pierotti.

14          THE COURT:  Would you spell --

15          MR. PITLUCK:  Spell your last name.

16          THE WITNESS:  P-I-E-R-O-T-T-I.

17          THE COURT:  Please proceed.

18          MR. PITLUCK:  Thank you, Your Honor.

19          (Continued on next page.)

20

21

22

23

24

25

Pierotti - direct - Pitluck                5841

1   TIMOTHY JOSEPH PIEROTTI   ,

2        called as a witness, having been first duly sworn,

3        was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MR. PITLUCK:

6   Q    Good afternoon, Mr. Pierotti?

7   A    Good afternoon.

8   Q    How old are you?

9   A    Forty-six.

10  Q    Are you married?

11  A    I am.  I've been married 22 years.

12  Q    Do you have any children?

13  A    I have four kids.

14  Q    Where do you live?

15  A    I live in Summit, New Jersey.

16  Q    What's your current job?

17  A    I work for Deutsche Bank.  I am the research, the equity

18  research product manager.

19  Q    And how long have you worked at Deutsche Bank?

20  A    Three and a half years.

21  Q    What does the product manager for equity research do?

22  A    So, I help work with all the analysts, all the research

23  analysts in equity at Deutsche Bank write their pieces, come

24  up with thesis on the stocks, and then I help sales understand

25  those stock recommendations.

Pierotti - direct - Pitluck                         5842

1    Q     And did you go to college?

2    A     I did.

3    Q     Where did you go to college?

4    A     I went to Boston College.

5    Q     What year did you graduate?

6    A     1994.

7    Q     What was your first job out of college?

8    A     I was, I was renting apartments first job out of college.

9    Q     And what did you do after that?

10   A     And then after that, I -- shortly after that, I got a job

11   at Morgan Stanley.  I was a sales assistant in private wealth

12   management.

13   Q     What did you do there?

14   A     As a sales assistant, I checked trades, things like that.

15   I mean, you're talking about for the whole seven years I was

16   at Morgan Stanley?

17   Q     You were at Morgan Stanley for seven years?

18   A     Yes.

19   Q     What were the different jobs?

20   A     So, I started as a sales assistant, then I became a

21   salesman and then I moved to the equity capital markets area

22   where I was a junior deal captain and then I left in 2002.

23   Q     When you left Morgan Stanley, where did you go?

24   A     I went to a small family office hedge fund called

25   Victoire Finance.

CMH      OCR      RMR      CRR      FCRR

Pierotti - direct - Pitluck                          5843

1    Q    What was your -- what were your job responsibilities at

2    Victoire Finance?

3    A    It was a small office so you kind of wore many hats.  I

4    was an analyst and a trader and portfolio manager.

5    Q    And did you analyze stocks when you were there?

6    A    I did.

7    Q    And what kind of industries did you analyze stocks in at

8    Victoire?

9    A    Mostly consumer but anything that came up on deals,

10   anything, and secondaries, but a generalist.  I've always kind

11   of stayed out of technology and health care but other than

12   that, consumer and then some generalist.

13   Q    What do you stay out of technology and health care?

14   A    I'm really more of kind of a macro investor which means I

15   think about economics and the whole macro, macro environment,

16   and to be successful in health care and technology, you really

17   have to have a very strong kind of bottoms-up understanding of

18   the companies.

19   Q    Now, how long were you at Victoire Finance?

20   A    I was at Victoire Finance from 2002 to 2005, three years.

21   Q    Where did you go after you left there?

22   A    I went to the Galleon Group.

23   Q    What was the Galleon Group?

24   A    It was an $8 billion hedge fund out of New York.

25          MR. DUBIN:  Can we have a year on that?

Pierotti - direct - Pitluck                    5844

1   Q     I believe you testified a moment ago, what year did you

2   leave Victoire?

3   A     2005.

4   Q     Did you start at Galleon the same year?

5   A     Yes.

6           MR. DUBIN:  Thank you.

7   Q     How long were you at Galleon?

8   A     I was at Galleon a little under four years.

9   Q     Did you have different jobs while you were at Galleon?

10  A     I was a consumer analyst for the first two years and then

11  I became a consumer portfolio manager and then I was the head

12  of the consumer research group.

13  Q     And what caused you to leave Galleon in 2009?

14  A     I actually left, I think it was JAN 1, 2009 or DEC 1,

15  2008.  We mutually agreed -- Galleon was a hedge fund.

16  Remember, 2008, the world kind of melted down a little bit.

17  Galleon was shrinking.  They were asking many of the portfolio

18  managers to give up their portfolios and just be analysts for

19  the larger fund.  I didn't want to do that, I wanted to

20  continue to be a portfolio manager.  So I -- we mutually

21  agreed that I would leave.

22  Q     Now, while you were working at Galleon, did you ever make

23  a trade that concerned you?

24  A     I did.

25  Q     What was the trade that concerned you?

CMH      OCR      RMR      CRR      FCRR

Pierotti - direct - Pitluck                5845

1   A    It was a trade in Smucker's, you know, the jelly company.

2   Q    And why did that trade in Smucker's concern you?

3   A    I knew that the people who came to me internally at

4   Galleon were privy to information that had come from an

5   insider at another company.

6   Q    So, you had nonpublic inside information that had been

7   communicated to you?

8   A    Yes.

9   Q    And who told you that nonpublic information?

10  A    Two guys came to me at the same time, a guy named John

11  O'Connor and a guy named R.K. Rajaratnam.

12  Q    And did you learn the source of that nonpublic

13  information from those two gentlemen?

14  A    I did.

15  Q    Who was the source?

16  A    The source was a guy name Rajat Gupta.

17  Q    Who was Rajat Gupta?

18  A    Rajat Gupta had been the global head of the McKinsey

19  Group.  He was also a board member of Goldman Sachs and

20  Procter & Gamble.

21  Q    Now, did anybody ask you to make that trade in Smucker's?

22  A    Nobody directly asked me to make that trade, no.

23  Q    Did you discuss that trade with anybody at Galleon?

24  A    I did.

25  Q    Who did you discuss it with?

Pierotti - direct - Pitluck                    5846

1   A    I discussed it with Raj Rajaratnam, R.K. Rajaratnam John

2   O'Connor, and Mike Cardillo.

3   Q    And what specifically did you say to Raj Rajaratnam about

4   the trade in Smucker's?

5   A    I thought it was -- one, I thought it was a trade that

6   they shouldn't do because it was coming from an insider, but I

7   also thought it was immaterial or non-impactful to each of the

8   two stocks.

9   Q    What do you mean by that?

10  A    Well, it was a reverse mortgage stress transaction

11  where -- everybody knows the Folgers brand, Folgers coffee.

12  Procter & Gamble was trying to sell assets that were slower

13  growing.

14           Smucker's is a very slow growing company.  An old

15  coffee brand fit in with Smucker's, kind of an old slow growth

16  jelly brand, better than it did with Procter & Gamble.  And it

17  was clear to me that this was a transaction that would be a

18  bit of a wash for both sides.  In other words, Smucker's would

19  get this asset, but it was a non-growth asset, but they would

20  only do it if it would be a couple cents positive for them for

21  their earnings.  I just thought it wouldn't be impactful.

22  Q    When you say impactful, do you mean on the stock price?

23  A    Yes.

24  Q    Was this based on your analysis of that company at

25  Galleon?

Pierotti - direct - Pitluck                5847

1      MR. DUBIN:  Your Honor, I object to the leading.

2      MR. PITLUCK:  I'll rephrase, Judge.

3  Q    What was your conclusion based upon?

4  A    My conclusion was just based on knowing Procter & Gamble

5  very well, knowing the food industry well.  This is what I

6  did.  I covered staples companies mostly, staples being, you

7  know, CPG, consumer products.

8  Q    Did you make that trade in Smucker's?

9  A    I did.

10 Q    Why did you make the trade?

11 A    I actually felt pressured by Raj to be involved in the

12 trade.

13 Q    And who was Raj Rajaratnam at Galleon?

14 A    Raj Rajaratnam was the founder and CIO, he was a

15 billionaire, of the Galleon Group.

16 Q    When you made that trade, did you believe you committed

17 insider trading?

18 A    I didn't.

19 Q    Why not?

20 A    Because I just didn't think it was material.  I just did

21 not think that it would have any impact on the share price.  I

22 just felt like there was no intention really to try to make

23 any money and it didn't.

24 Q    How many shares did you trade?

25 A    As I recall, it was 20,000 shares, and you're talking --

Pierotti - direct - Pitluck                     5848

1   go ahead.

2   Q     Excuse me.  And after you made that trade, did you ever

3   bring concerns about the trade to anyone?

4   A     Ultimately, I did, yes.

5   Q     Who did you bring the concerns to?

6   A     To, to federal authorities.

7   Q     Which federal agency did you first report your concerns

8   to?

9   A     I believe the first call was to the SEC.

10  Q     Securities and Exchange Commission?

11  A     Yes.

12  Q     And what information did you provide to the SEC?

13  A     I just told them everything I knew, I told them

14  everything I knew surrounding that trade and other things I

15  had observed while at Galleon.

16  Q     And when you reported your concerns to the SEC, were you

17  still employed at Galleon?

18  A     I was not.

19  Q     Was Raj Rajaratnam still working at Galleon?

20  A     No.  Raj, I think Raj had already been arrested.

21  Q     Now, after you spoke to the SEC, did other law

22  enforcement agencies contact you about the trade in Smucker's?

23  A     Yes.

24  Q     Which agency was that?

25  A     I spoke to the Southern District of New York, I spoke to

Pierotti - direct - Pitluck                    5849

1    the FBI and the SEC.

2    Q    Now, the Southern District of New York, do you mean the

3    U.S. Attorney's Office within the Southern District of

4    New York?

5    A    Yes, yes.

6    Q    What did you tell prosecutors -- withdrawn.

7         When did you first speak to prosecutors in the

8    Southern District of New York?

9    A    Mid -- so it would have been mid-2009, maybe kind of fall

10   2009.

11   Q    Now, let me show you something to -- is there a document

12   that might refresh your recollection as to the exact date that

13   you spoke to them?

14   A    I'm sure there are.

15   Q    We'll come back to this in a moment.

16   A    Okay.

17   Q    At the time -- so where did you go after you worked,

18   after you left Galleon Group?

19   A    So, after I worked at the Galleon Group, I started at a

20   place called Incremental Capital in early 2009.

21   Q    And what did you do at Incremental Capital?

22   A    I was a trader and portfolio manager.

23   Q    And how long did you work there?

24   A    Only about eight months.

25   Q    And what happened that you left Incremental Capital?

Pierotti - direct - Pitluck                          5850

1    A    The -- a number of people who left Galleon went to

2    Incremental.  One of the guys who had been a founder of

3    Incremental had briefly worked with us at Galleon.  He wasn't

4    technically a Galleon employee.  And then those guys were

5    caught up in the insider trading issues with Raj come like

6    November 2009.

7    Q    Now, were you involved in any insider trading in

8    Incremental?

9    A    No, zero.

10   Q    What did you do after you left Incremental?

11   A    After Incremental collapsed with those guys getting

12   arrested, I started my own prop. trading firm hiring a number

13   of former traders at Galleon and former traders at

14   Incremental.

15            MR. DUBIN:  Can we have a time period, please?

16            THE WITNESS:  Yes.  I would have started working on

17   that right at the end of 2009 and worked on it, and it had a

18   couple different iterations until, you know, mid-2011.

19   Q    I want to go back a moment to your discussions with the

20   federal prosecutors in the Southern District of New York.

21   A    Yes.

22   Q    Did you meet with them and with FBI agents?

23   A    I did.

24   Q    Once or more than once?

25   A    Oh, more than once.

Pierotti - direct - Pitluck                5851

1   Q    And did there come a time that you were asked to testify

2   at a trial by federal prosecutors in the Southern District of

3   New York?

4   A    I was.

5   Q    Which trial were you asked to testify against?

6   A    The trial of Rajat Gupta.

7   Q    Now, in connection with your anticipated testimony, did

8   you enter into any agreement with the government, the

9   prosecutors in the Southern District of New York?

10  A    I did.

11  Q    What kind of agreement did you enter?

12  A    It was called a non-prosecution agreement.

13  Q    Did you ask for the non-prosecution agreement?

14  A    Not that I recall.

15  Q    And generally, in your -- if you remember, what did that

16  agreement provide for?

17  A    It just provided that there would be no prosecution on

18  the Smucker's transaction and that I would testify truthfully.

19  Q    And so if you believed that you didn't commit insider

20  trading, why did you sign that agreement?

21  A    I didn't see any downside to it and it was offered to me.

22  Q    Did you have a lawyer present when you met with the

23  Southern District of New York?

24  A    At no point, no.

25  Q    Did you have a lawyer with you when you signed the

1  non-prosecution agreement?

2  A    No.

3  Q    Did you, in fact, testify in that case against Rajat

4  Gupta?

5  A    I did not.

6  Q    And were you expecting to testify?

7  A    The day I signed the non-prosecution agreement, the

8  prosecutor said, You could expect to be on tomorrow.

9  Q    So you signed the non-prosecution agreement the day

10 before you were expected to testify?

11 A    Yes.

12 Q    So, are you familiar with an individual named Martin

13 Shkreli?

14 A    I am.

15 Q    How did you first meet Martin Shkreli?

16 A    I was, I was put together with Martin by a guy who I'm

17 friends with in Summit, New Jersey.

18 Q    And what were the circumstances that connect, that

19 connected you to Martin Shkreli?

20 A    My friend in Summit is a guy named Tom Quinn and Tom is a

21 CFO, COO for hedge funds and he helps to raise monies for

22 hedge funds.

23       He had met with Martin and when he met with Martin,

24 Martin said, I'm really looking for a consumer portfolio

25 manager.  And my friend Tom said, I got the guy for you.  We

Pierotti - direct - Pitluck                    5853

1  were friends and he knew I was struggling with my -- it's

2  called a proprietary trading business.  It's a little

3  different.  It's, like, a small hedge fund.  He knew that was

4  struggling and said, You ought to meet my friend Tim Pierotti,

5  and we put it together, we met.

6  Q    So, where was your first meeting with Mr. Shkreli?

7  A    First meeting was at the temporary office space that MSMB

8  had on Madison Avenue.

9  Q    Who attended that first meeting?

10 A    I believe -- oh, just Martin and I.  It's possible Kevin

11 Mulleady was there as well.

12 Q    What were the -- what was the topic of discussion at that

13 first meeting?

14 A    Martin just said that he was, could raise money for a

15 consumer fund, that he thought that my background would work

16 to raise money.  He liked my track record, I had good numbers

17 and he wanted to hire me right off the bat.

18 Q    In that first meeting, did you ever discuss a company

19 called Retrophin?

20 A    No.

21 Q    Do you remember approximately when this first meeting

22 was?

23 A    You know, it would have been like August, September

24 maybe, a little earlier than that probably even, maybe July,

25 August of 2011.

Pierotti - direct - Pitluck                5854

1    Q    Did you accept the job after that first meeting?

2    A    No.  We, we had dinner maybe a week or so after that

3    first meeting.

4    Q    Who attended that dinner?

5    A    That dinner was Martin Shkreli, Marek Biestek and Kevin

6    Mulleady and myself.

7    Q    And was that -- where was that dinner?

8    A    It was at an Italian restaurant somewhere on the Upper

9    East Side.

10   Q    And what did you discuss at that first meeting or that

11   dinner meeting on the Upper East Side?

12   A    We just talked about how it would work.  They wanted me

13   to do it.  I asked them a lot of questions and they asked me a

14   lot of questions and I remember, I took a car service with

15   Martin back down, you know, towards Midtown and he laid out

16   the numbers that he could offer me and we shook hands on it.

17   Q    And by numbers, what do you mean?

18   A    Salary or upfront money.

19   Q    Now, during your initial meetings with Martin Shkreli,

20   did you tell him about your experience at Galleon?

21   A    He knew, he knew all about my experiences at Galleon.  He

22   had already checked my references and he knew other Galleon

23   people.

24   Q    Did you decide to take the job with Martin Shkreli?

25   A    I did.

1    Q    Why did you decide to take the job?

2    A    It was the best opportunity I had at the time.

3    Q    What was the name of the hedge fund that Martin Shkreli

4    asked you to run?

5    A    We ended up naming it MSMB Consumer.

6    Q    And was it named as of your first meeting or was it more

7    amorphous than that?

8    A    It was more amorphous than that.

9    Q    So it was named after you accepted the job?

10    A    Yes.

11    Q    So, Mr. Pierotti, there's a binder of documents in there

12    in front of you.  If you could, I'd like you to open tab one

13    which is Government Exhibit 112-1 for identification.

14          Do you recognize that document, Mr. Pierotti?

15    A    Yes, sir.

16    Q    What is that document?

17    A    It was just the agreement, like the employment agreement

18    that I signed with Kevin Mulleady and Martin Shkreli to get

19    started at MSMB.

20    Q    And on the last page of that document, Pierotti-035, is

21    that your signature?

22    A    Yes, it is.

23          MR. PITLUCK:  Your Honor, we offer Government

24    Exhibit 112-1.

25          MR. DUBIN:  No objection, Your Honor.

Pierotti - direct - Pitluck                 5856

1          THE COURT:  We receive Government Exhibit 112-1.

2          (So marked.)

3    Q    Can we highlight the first paragraph.

4          What date was this agreement entered into?  You can

5    see it in the top paragraph.  It's also on your screen.

6    A    Oh, August 9, 2011.

7    Q    And can you just read after the date who the agreement is

8    between?

9    A    Timothy Pierotti, MSMB Healthcare Management LLC and

10   Timothy Pierotti.

11   Q    And is the address of MSMB Healthcare Management LLC 330

12   Madison Avenue, sixth floor?

13   A    Yes, it was at that time.

14   Q    Now, did you know at the time -- withdrawn.

15         This agreement was entered into on August 9, 2011,

16   correct?

17   A    Yes.

18   Q    Approximately how long after your first meeting with

19   Martin Shkreli did you sign this agreement?

20   A    I mean, I don't remember exactly but maybe a month.

21   Q    Now, did you have an understanding of what MSMB

22   Healthcare Management was when you signed this agreement?

23   A    Kind of a vague understanding.

24   Q    What was your understanding of how the MSMB entities were

25   structured when you first joined?

Pierotti - direct - Pitluck                5857

1  A    There were a lot of entities and they were all Martin's

2  entities so they were all just basically Martin's different

3  proxies, entities, but Martin controlled all of them.

4  Q    Now, let's go to, let's go to the second page of this

5  document or -- I'm sorry.  Sorry.

6           Can we go back up and could you read the first

7  "whereas" clause, please?

8  A    Whereas, the company is the investment manager of MSMB

9  Consumer Fund LP, a Delaware limited partnership, the fund,

10  and in such capacity, is responsible for making all investment

11  and trading decisions on behalf of the fund.

12  Q    And the company is a reference back up to MSMB Healthcare

13  Management LLC?

14  A    Yes.

15  Q    Can you just read the next "whereas" paragraph as well?

16  A    Whereas, the company desires to employ the portfolio

17  manager to provide portfolio management services to the

18  company regarding the fund under the supervision of the

19  company on the terms set forth herein, and the portfolio

20  manager desires to be so employed by the company and act as a

21  portfolio manager for the company on such terms.

22  Q    Now, can we just go to the next page, please.

23           Do you see there's some defined terms there.  Do you

24  see I and J?

25  A    Yes.

Pierotti - direct - Pitluck                5858

1    Q    One MSMB entity I and J is MSMB Fund?

2    A    Yes.

3    Q    Do you see Retrophin mentioned in there at all?

4    A    I do not.

5    Q    Did you know what Retrophin was at the time you started

6    working at MSMB Healthcare?

7    A    No.

8    Q    Or MSMB Consumer?

9    A    No.

10   Q    Now, let's go to the third page.

11        What compensation did you discuss with Martin

12   Shkreli?

13   A    You can see there on number three, Compensation, $30,000

14   was given to me up front and then I got a $10,000 monthly

15   salary.

16   Q    Are those the dates that you were given the $30,000 in

17   two pieces?

18   A    I guess.  I don't recall.

19   Q    But what dates are written next to --

20   A    Yes.

21   Q    What dates are written next to the 250,000?

22   A    8/9/11 and 8/22/11.

23   Q    Did you sign over there on the right?

24   A    Yes.

25   Q    And how much were you supposed to be paid a month as part

CMH        OCR        RMR        CRR        FCRR

1    of this portfolio agreement?

2    A    $10,000.

3    Q    Now, you see, going to the next page, page four of the

4    document, do you see there's a, those are termination

5    sections?

6    A    Yes.

7    Q    There's a Section B, Voluntary Termination, Termination

8    For Cause?

9    A    Yes.

10   Q    And termination E is Termination Without Cause?

11   A    Yes.

12   Q    Did you pay -- did you review those and pay attention to

13   them when you were signing them?

14   A    Probably not particularly carefully.

15   Q    Now, page seven of this document has a clause at the

16   bottom called "Nondisparagement," do you see that?

17   A    Yes.

18   Q    Can you read the first half of that paragraph at the

19   bottom?

20   A    The portfolio manager agrees that he will not, at any

21   time, during and after his employment, directly or indirectly,

22   make any public comments about and including, without

23   limitation, by way of news interviews or expression of

24   personal views, opinions or judgments to the media or any

25   other person outside the company, any MSMB entity, any

Pierotti - direct - Pitluck                5860

1   then-current or former officer, director or employee of MSMB

2   entity, together with MSMB entities, the MSMB group, or any

3   client, or disparage, criticize, ridicule or make any negative

4   comments about the MSMB group to any person within the MSMB

5   group.

6          Continue on?

7   Q    Yes, please.

8   A    Any client or any other person with whom the MSMB group

9   has or may have a business personal relationship including any

10  current former or prospective client or employee.  In bold

11  letters, communication with or through the media in any manner

12  is strictly prohibited.

13         (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Pierotti - direct - Pitluck                5861

1    BY MR. PITLUCK:

2    Q    Now, based on your reading of that, Mr. Pierotti, was

3    MSMB required to do anything under this nondisparagement

4    clause?

5    A    No.

6    Q    Were all those obligations related to you?

7    A    Yes.

8    Q    Finally, on the last page is that your signature at the

9    bottom?

10   A    Yes, sir.

11   Q    Who signed on behalf of MSMB Healthcare Management LLC?

12   A    Kevin Mulleady.

13   Q    What title is given there?

14   A    CEO.

15   Q    When you started working in  -- did you start working

16   soon after you signed this agreement?

17   A    I did.

18   Q    When you first started in August of 2011 who else was

19   working in the MSMB office?

20   A    Allison Russo.

21   Q    Who was Allison Russo?

22   A    She was really Martin's assistant or secretary, Marek

23   Biestek, Kevin Mulleady.  There was a guy that Martin had

24   hired who was a commodity trader whose name I'm not going to

25   come up with.  He was only there briefly.

Pierotti - direct - Pitluck                5862

1    Q     Anybody else that you remember?

2    A     Andy Vaino wasn't in the offices but was an employee,

3    lived in San Diego.

4    Q     Anybody else you remember?

5    A     I think that's everybody at the outset.

6    Q     What was the office set up like when you first started?

7    A     It was temporary office space.  There was a small office.

8    There were four desks, two opposing, and I was directly

9    opposing Martin and then to my left I can't remember if it was

10   Marek or Kevin that was there at first.  Each one of them

11   occupied that particular desk.  And then cater corner to me

12   and next to Martin would have been Allison Russo.

13   Q     Approximately how big was the office?

14   A     I mean small, like a big bedroom size, 20 by 20,

15   something like that.

16   Q     Now, after you started working at MSMB Consumer, did you

17   learn about a company named Retrophin?

18   A     At some point I did.

19   Q     Approximately, if you can estimate, approximately how

20   long after you worked at Retrophin?

21   A     I don't know.  A few months.

22   Q     And what, if anything, did you learn about Retrophin when

23   you first started?

24   A     When I first started and again I don't remember that it

25   was Retrophin, but I knew that Martin, my understanding was

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Pierotti - direct - Pitluck                    5863

1    Martin had his hedge fund, whether it was MSMB Healthcare or

2    MSMB Capital.  But then he also endeavored to buy this drug

3    that was for Duchenne Muscular Dystrophy.  It was really more

4    of a concept I believe at this point and so he had almost a

5    side business and I guess that is what became Retrophin.

6    Q    Did Mr. Shkreli ever give you stock in Retrophin?

7    A    Yes, at a much later point.

8    Q    When was that?

9    A    December of 2012.

10   Q    Prior to December 2012 did he ever tell you about giving

11   you any stock or stock options in Retrophin?

12   A    He said  -- I remember him making an comment at one point

13   that both Allison and I had some de minimis share in what was

14   a private entity.

15   Q    Did you ever know how much you had?

16   A    I remember a number of 28 shares, but not knowing

17   anything about what that would mean and that it was a private

18   company and I didn't know what the share count was and all

19   that.  I just knew it to be a laughably small number because

20   he thought it was laughably small.

21   Q    He being Martin Shkreli?

22   A    Yes.  I'm sorry.

23   Q    You testified that you started work at MSMB Consumer in

24   about August 2011, correct?

25   A    Yes.

Pierotti - direct - Pitluck                    5864

1   Q    Now, did you first meet with the Southern District of New

2   York, the prosecution of the Southern District, before or

3   after you started working at MSMB Consumer?

4   A    I remember making a phone call to the SEC in those

5   offices.  So it had to be after August of 2011.

6   Q    I would like to show you what's been marked as Government

7   Exhibit 112-35 for identification.

8         Mr. Pierotti, what's contained on this document.

9   A    Allison, Martin's assistant, is speaking to  --

10  Q    I'm sorry, just generally are these e-mails between you,

11  Allison Russo and others?

12  A    Yes.

13  Q    Are these dated December 27, 2011?

14  A    They start December 8 and go to December 27.

15        MR. PITLUCK:  Your Honor, we offer Government's

16  Exhibit 112-35 in evidence.

17        MR. DUBIN:  No objection.

18        THE COURT:  All right.  We will receive Government

19  Exhibit-112-35.

20        (So marked.)

21  Q    As you testified a moment ago, Allison Russo was the

22  executive assistant at MSMB Capital?

23  A    Yes.

24  Q    What was your understanding of the relationship between

25  MSMB Capital and MSMB Healthcare?

Pierotti - direct - Pitluck                5865

1   A    I have no idea the differences between all the entities.

2   There were a bunch of them.

3   Q    Let's focus on the bottom e-mail, please?

4   A    Okay.

5   Q    It is an e-mail from Allison Russo on December 8, 2011?

6   A    Yes.

7   Q    And is it to Prem B. Jacob, Aneesh Nair and the next to

8   it says NAV Consulting?

9   A    Yes.

10  Q    Did you know NAV Consulting is?

11  A    It's a hedge fund administrator.  They consigned to do

12  all the admin work for a hedge fund, back office stuff.

13  Q    Now, were you paid directly by MSMB Consumer?

14  A    Well, I was paid from wherever I got a check from.  But

15  in these it looks like they set up a direct deposit for MSMB

16  Consumer, yes.

17  Q    So in that first e-mail it says:  As per our revised PPM

18  for MSMB Consumer LP, can we please request a payment for 15K

19  to be paid to Tim Pierotti?

20  A    Yes.

21  Q    And it has the wiring instructions?

22  A    Yes.

23  Q    Going up Ms. Russo says, just to you and is anybody

24  copied there?

25  A    Martin Shkreli.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Pierotti - direct - Pitluck                    5866

1   Q    What does Ms. Russo write?

2   A    She wrote payment to Tim Pierotti per revised PPM-MSMB

3   Consumer LP.  You're owed 10,000 for December, right.  I'll

4   request that NAV sets up automatic payment for 5K for the

5   first and fifteenth.

6   Q    What was your response to Ms. Russo?

7   A    I wrote perfect.  Thank you.

8   Q    So were you paid by direct deposit on the first and

9   fifteenth of every month?

10  A    For awhile, yes.

11  Q    During the period that you were paid was it net of tax or

12  gross of tax?

13  A    It was gross.

14  Q    What does that mean?

15  A    There were no taxes taken out.

16  Q    Did you have to pay taxes yourself?

17  A    Yes.

18  Q    Did you have healthcare when you were working at MSMB

19  Consumer?

20  A    It was part of the agreement and eventually I did get

21  healthcare, yes.  I remember it being a big of a hassle to get

22  started.

23  Q    Now did there come a time that  -- during your time at

24  MSMB Consumer did you meet an individual named Evan Greebel?

25  A    I did.

Pierotti - direct - Pitluck                    5867

1   Q    When do you recall first meeting Evan Greebel?

2   A    I don't remember exactly the first time we met.  I think

3   it was probably after a couple of months or a month maybe.  I

4   just don't remember.

5   Q    Who introduced you to Mr. Greebel?

6   A    Martin Shkreli.

7   Q    Where did you first meet Mr. Greebel?

8   A    You know, I can remember all of these things from the

9   time frame of being in that office and then we moved to

10  another office and I know I met him in that first office.

11  Q    Approximately how often did you see Mr. Greebel in that

12  first office?

13  A    A few times.

14  Q    And at the time you met him who did you think Mr. Greebel

15  represented?

16  A    I thought he was an attorney for Martin and for MSMB.

17  Q    Turning back to MSMB Consumer, the fund that you had.

18  A    Yes.

19  Q    Was there any money in the fund when you first started

20  working in approximately August 2011?

21  A    Not when I first started.  It was not funded until I

22  think the end of October 2011.

23  Q    Approximately how much money was put into the fund?

24  A    I want to say maybe in the neighborhood of three million

25  dollars, which was significantly less than it was supposed to

Pierotti - direct - Pitluck                    5868

1    be.

2    Q    When you say significantly less than it was supposed to

3    be, what is that based on?

4    A    Martin had assured me when I started he could start me

5    with $10 million.

6    Q    Why was that important to you?

7    A    Well, the salary was really only going to come out of the

8    management fees and if you don't have a meaningful amount of

9    capital then there are going to be no management fees even if

10   you have great performance.

11   Q    And did you learn where the approximately three million

12   dollars came from to start MSMB Consumer?

13   A    My understanding was that it came out of some other MSMB

14   entity.  My understanding was that there were larger MSMB

15   entities.

16   Q    Were there any actual investors directly into MSMB

17   Consumer?

18   A    The only other investor besides Marek, you know, Martin.

19   When it was Capital Healthcare was Steve Richardson.

20   Q    Do you remember how big Steve Richardson's investment in

21   MSMB Consumer was?

22   A    I think it was $50,000.

23   Q    Did you actually meet with Steve Richardson when you were

24   trying to raise money for MSMB Consumer?

25   A    I did.

Pierotti - direct - Pitluck                     5869

1    Q    After that meeting did he invest?

2    A    I don't remember if he made that investment just on

3    Martin's, you know, advice before or after.

4    Q    Did you meet with other individuals and entities to try

5    to raise money or capital for MSMB Consumer?

6    A    I did.

7    Q    Was Martin Shkreli with you at those meetings?

8    A    Yes.  Not at every single one.  The vast majority of

9    them, yes.

10   Q    And did any of those other meetings result in direct

11   investments in MSMB?

12   A    No.

13   Q    Do you know if Martin Shkreli sent out solicitation

14   material to potential investors?

15   A    He did.

16   Q    What did those solicitation materials consist of?

17   A    It would have been  -- it was three separate documents.

18   It would be like the PMB.

19   Q    What's a PMB?

20   A    Like a portfolio.  I forget what PMB stands nor.

21   Q    Can you describe what it is?

22   A    It describes the rules of the funds.  It would say this

23   manager is allowed to buy stocks, short stocks.  He's not

24   allowed to trade in currency.  So it just gives you the rules

25   of what is allowed, the parameters of the fund.

Pierotti - direct - Pitluck                    5870

1    Q    What were the other documents?

2    A    It would have been the marketing effect.

3    Q    What's a marketing effects?

4    A    It just an advertisement for the fund and a solicitation,

5    why somebody should invest in the fund, who I am, what the

6    structure is around it, what the risk management process is,

7    my track record, things like that.

8    Q    So it included a section on you and your background?

9    A    Yes.

10   Q    Did that section discuss your employment at Galleon?

11   A    Yes.

12   Q    It's included your trading track record at Galleon?

13   A    Yes.

14   Q    Did you put that marketing deck I think you called it,

15   did you put that together?

16   A    Martin mostly helped me put it together.

17   Q    Did you review it before it went out?

18   A    Yes.

19   Q    You testified a moment ago that money came into the fund

20   in about October 2011, correct?

21   A    Yes.

22   Q    Did you start investing money after that?

23   A    Yes.

24   Q    What was the fund's performance between when you first

25   started investing in October of 2011 and the end of 2011?

Pierotti - direct - Pitluck                    5871

1  A    I don't remember exactly what it was.

2  Q    Generally?

3  A    It was very good.  My biggest position was bought by

4  another company.  It was a small supermarket company, Winn

5  Dixie down in the southeast United States.

6  Q    And what about in 2012, how was the performance in early

7  2012?

8  A    It was flat for the first few months of the year and then

9  we changed strategies to  -- because there was so little

10  capital we decided to change strategies and just invest in one

11  particular entity.

12  Q    And when you say so little capital, what do you mean?

13  A    We never raised any money and Martin had reduced, had

14  taken money back from the original investment.  So I think we

15  only had about $2 million which is not  -- sounds like a lot

16  of money but is not a viable hedge fund.

17  Q    When you said we changed strategies, who the we?

18  A    I'm sorry.  Martin and I.

19  Q    What strategy did you adopt after the fund size got

20  reduced to $2 million?

21  A    We decided we would be an activist investor in a company

22  that we felt like we could make some noise and force

23  management to make different decisions.

24  Q    Can you explain to the jury what an activist investor is?

25  A    So an activist investor makes an investment in a company

1    and then makes a lot of noise, either in the public or through

2    a proxy, through a formal process, to say we think management

3    is doing the wrong things.  We think they ought to do this.  I

4    won't get ahead of myself.  In this case we thought there was

5    a lot management should do differently.

6    Q    Did you choose a company to pursue this strategy with?

7    A    Yes.

8    Q    What company was that?

9    A    The name of the company is Rick's Cabaret.

10   Q    What was Rick's Cabaret?

11   A    Rick's Cabaret is, was at the time 35 different strip

12   clubs around Texas, New York, Minnesota, Florida.

13   Q    Why was Rick's Cabaret the target for your new activist

14   strategy?

15   A    For one, that business generates a tremendous amount of

16   cash flow and it was a poorly understood business.  In other

17   words, you wouldn't ever want to own one strip club because

18   you are subject to local changes.  Usually in most strip clubs

19   you have to renew your license actively every year.  But if

20   you own 30 of them in all these states and jurisdictions it's

21   actually an incredibly consistent cash flow in recessions, any

22   kind of weather, it's a good business and it's a business that

23   you don't have to reinvest in the business much.  These

24   businesses don't change.

25               Well, the management of this company, it was a

Pierotti - direct - Pitluck                5873

1    fairly small entity, it was like a 90 million dollar market

2    cap at the time.  The CEO had two planes.  He had a general

3    manager who I believe was skimming a tremendous amount of cash

4    off the business.  I thoughts there were very easy things we

5    could do to make the stock go up by quite a bit.

6    Q    Did you discuss this idea with Mr. Shkreli?

7    A    He loved it.

8    Q    He loved it?

9    A    Yes, sir.

10   Q    After you discussed it with Mr. Shkreli did he tell you

11   to speak to anybody outside of MSMB Consumer about investing

12   in Rick's Cabaret?

13   A    He told me to speak to Evan.

14   Q    Why did you-- did you speak to Evan Greebel?

15   A    I did.

16   Q    Why?

17   A    Well, frankly, I had never been an activist investor

18   before.  I had just been a consumer portfolio manager and I

19   needed to understand the dynamics of how we could force our

20   will upon management.  So I needed somebody who was an

21   attorney who understood how the business was incorporated,

22   where it was incorporated what the rules were in terms of

23   forcing a proxy vote, etcetera.

24   Q    Did you talk at that Evan Greebel about investing in

25   Rick's Cabaret?

Pierotti - direct - Pitluck                    5874

1    A    I did.

2    Q    What do you remember him saying?

3    A    I remember him calling me back and saying, so do you want

4    the good news or the good news.

5    Q    What did he tell you after that?

6    A    He said the good news was the fact that it was Texas

7    incorporated it meant that we only had to own five percent of

8    the total shares outstanding in order to force a proxy vote.

9    Q    Now, --

10   A    I frankly don't remember what the other good news was,

11   but I remember that.

12   Q    Did the you actually  -- did MSMB Consumer actually make

13   a investment in Rick's Cabaret?

14   A    We did.

15   Q    How did that turn out?

16   A    Martin took the money back, so we had all of the assets

17   in Rick's Cabaret.  For what it's worth it was a seven dollar

18   stock.  It is a 31 dollar stock today and but Martin took all

19   the money, pulled all the money out.

20   Q    Now, you just testified that Martin pulled all the money

21   out.  What did you mean by that?

22   A    I just mean he pulled all the money.  He said I need the

23   money.  You've got to sell all the stock.

24   Q    To pull the money out of MSMB Consumer?

25   A    Yes.

1   Q    Did he tell you why he needed all the money out of MSMB

2   Consumer?

3   A    Not that I recall.

4   Q    Do you remember approximately when this was?

5   A    It would have been July issue 2012.

6            MR. DUBIN:  Your Honor, would have been, was it, or?

7            THE WITNESS:   My best recollection it was around

8   July 2012.

9            THE COURT:  When you say it would have been, you're

10   meaning to say it was my best recollection?

11            THE WITNESS:  Yes.  I'm sorry.

12            THE COURT:  It's just a pattern of speech that we

13   all now understand.  Okay.  Proceed.

14            MR. PITLUCK:  Thank you, your Honor.

15   Q    Did Mr. Shkreli tell you why he was taking money out of

16   the MSMB Consumer?

17   A    No.

18   Q    What steps did you take to start shutting down MSMB

19   Consumer?

20   A    Martin wanted me to sell all the stock immediately.

21   Q    And did you start selling the stock?

22   A    I did.

23   Q    How did you start selling it?

24   A    Slowly, because we had over $2 million worth of stock and

25   the stock would trade on an average day about 70 thousand, 80

Pierotti - direct - Pitluck                    5876

1    thousand dollars worth of stock.  So if you want to sell two

2    million shares you're going to put tremendous pressure on the

3    stock.

4    Q    Did you continue to sell all of MSMB Consumer stock and

5    Rick's Cabaret slowly?

6    A    Yes, until Martin said I need the money tomorrow, sell it

7    all.

8    Q    Did you do that?

9    A    I did.

10   Q    Did he tell you why he needed all the money tomorrow?

11   A    No, sir.

12   Q    Now, after all the money was taken out of MSMB Consumer,

13   what did you believe your job was going to be?

14   A    The idea was we were going to start looking at special

15   projects and we started looking at a project.  An investment

16   banker showed us an asset in Northern Wisconsin, the company

17   that made laboratory cabinets and laboratory  -- really basic

18   mill work laboratory equipment.

19   Q    How did you get this understanding of what your job was

20   going to be going forward?

21   A    He told me either by e-mail or personally.  But, yes,

22   that was  --

23   Q    Who is the he?

24   A    I'm sorry.  Martin Shkreli.

25   Q    Were you working on your own in these kind of projects or

Pierotti - direct - Pitluck                5877

1    were you working with other people?

2    A    I was working with Marek.

3    Q    Who is Marek?

4    A    Marek would be th MB of MSMB and sort of been Martin's

5    partner.

6    Q    What was his name?

7    A    Biestek.

8    Q    Approximately what was the date that you started working

9    on the different projects?

10   A    To my best recollection, September of 2012.

11   Q    At that time were you working out of MSMB offices?

12   A    I was.

13   Q    Which offices were you working out of in that time in

14   2012?

15   A    It was still 330 Madison Ave.  It would be  -- sorry.  I

16   don't remember exactly when he moved from 330 Madison Ave to

17   the office on Third Avenue.  As I can recall it was around the

18   beginning of 2012.

19   Q    The summer of 2012 or the beginning of 2012?

20   A    The beginning of 2012.

21   Q    And so going back to the summer of 2012 after MSMB

22   Consumer shut down, who was working in the offices with you?

23   A    I think Jackson Su was definitely there at the time.

24   Kevin Mulleady was there, Marek Biestek.  Andy Vaino was

25   living in San Diego but would spend a week a month in New

1   York.  That was guy named Dr. Chris James who was in the

2   offices.  Allison Russo would have ended her employment

3   probably by the end of 2011.

4   Q    What kind of projects  -- you were all selling in the

5   same small office, correct?

6   A    Yes.

7   Q    What kind of projects did you see Martin Shkreli working

8   on at this time?

9   A    Did I see him working on?

10  Q    Yes.

11  A    He was working on  -- when we say this time, I think

12  we're talking somewhat broadly sort of around the end of 2001,

13  beginning of 2012.

14  Q    Let's start there?

15  A    Okay.  I remember him working on the Duchenne Muscular

16  Dystrophy drug that he was trying to either get or license

17  from a couple of midwestern universities.

18          At some point he bought the Ligand asset, the one

19  million drug from Ligand pharmaceuticals.  And then I remember

20  this cabinet company.

21  Q    Did you know if he was working through Retrophin on these

22  projects?

23  A    I wouldn't have known what entity he was working out of.

24  You know, they were all interchangeable to me.

25  Q    Let's fast forward to the summer of 2012 at the time MSMB

Pierotti - direct - Pitluck                5879

1   Consumer shut down.

2   A    Yes.

3   Q    What was Martin Shkreli working on at that time?

4   A    Yes.  Martin Shkreli at that time was working on raising

5   money for Retrophin.

6   Q    And  --

7   A    Which was those drugs, which was the Ligand drug and the

8   Duchenne Muscular Dystrophy concept.

9   Q    And after this medical cabinet company what else did you

10  work on in the fall of 2012?

11  A    I found an asset in Heber Springs, Arkansas called

12  Garreco which makes dental gypsum for denture moulds.

13  Q    And how did you find Garreco?

14  A    I'm originally from Memphis Tennessee and a lot of people

15  who like to fly fish go do Heber Springs, Arkansas to fly

16  fish, it's some of the best fly fishing in the world.  We

17  happened to be going through business broker books.  Business

18  brokers are like local guys who sell anything from like a

19  restaurant or gas station, but small businesses.  It caught my

20  eye because it was in Heber Springs, Arkansas.

21       As we got to look hat it it was a great, great

22  business.  The way people make denture moulds hasn't changed

23  in 50 years and it won't change for another 50 years.  Gypsum

24  is the same thing you make drywall out of.  It was this really

25  cheap input material.  They had awesome market share.  It had

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1   been a real well run business.  I loved it.

2   Q    Who were you working on this project with?

3   A    Marek and I had decided with Martin's blessing to work on

4   this project.

5   Q    Now, were you still technically employed by MSMB Consumer

6   at this time?

7   A    Yes, until at some point in the fall of 2012.

8   Q    At this point in time were you getting regularly paid by

9   MSMB Consumer?

10  A    I was getting regularly paid but the checks were starting

11  to come late and they were coming from different entities and

12  there was no more direct deposit through MSMB Consumer.

13  Q    When you say they were coming from different entities,

14  where do you remember them coming from?

15  A    It didn't matter to me.  It could have been MSMB

16  Healthcare.  It could have been MSMB Capital.  It could have

17  been Retrophin.

18  Q    What was your financial situation personally like at the

19  time?

20  A    I was broke.

21  Q    Now, are you familiar with company called Wentworth?

22  A    Yes.

23  Q    What was Wentworth?

24  A    Wentworth was just the name of the entity that we created

25  in our effort to buy Garreco.

Pierotti - direct - Pitluck                    5881

1    Q     When you say we, what do you mean?

2    A     Marek Biestek and I were going to be the two partners.

3    We were the two partners in Wentworth Capital or Wentworth

4    whatever we called it, Wentworth corporation or something like

5    that.

6    Q     Where did the Wentworth name come from?

7    A     Wentworth is the street I lived on in Summit, New Jersey

8    for the last 12 or 13 years.

9    Q     What role, if any, did you see Martin Shkreli having in

10   Wentworth?

11   A     Well, Martin originally said that he could make an equity

12   investment.  He fairly soon thereafter fell down on that

13   equity investment.  But he had been paying Marek and at least

14   he had been paying me a salary for a couple of months.  We

15   felt like even though he had in fallen down on his equity

16   capital we would give him some kind of sweat equity piece of

17   the business.

18   Q     What does that mean sweat equity?

19   A     He owned something even though he had not made a direct

20   capital investment in it.

21   Q     Showing the witness what has been marked Government's

22   Exhibit 112-36 for identification.  Mr. Pierotti, this is this

23   an e-mail exchange involving you, Evan Greebel and Martin

24   Shkreli and Marek Biestek?

25   A     Yes, sir.

Pierotti - direct - Pitluck                    5882

1    Q     Series of e-mails?

2    A     Yes.  I'm not on the first one, but I'm on the top one

3    here.  I'm not on the first two.  But I'm on the top one.

4    Q     And these are dated on August 30, 2012?

5    A     Yes, sir.

6              MR. PITLUCK:  Your Honor, we offer Government's

7    Exhibit 112-36.

8              MR. DUBIN:  No objection.

9              THE COURT:  We receive Government's Exhibit 112-36.

10             (So marked)

11   Q     Let's start on the bottom e-mail from Martin Shkreli to

12   Evan Greebel, copy to Marek Biestek.  You are not on this

13   e-mail, correct, sir?

14   A     No, sir.

15   Q     The subject is new project?

16   A     Yes, so Martin writes to  --

17   Q     Can you read it?

18   A     Yes.  We are starting a medical technology company,

19   Wentworth Medical.  It will be LLC like Retrophin and will

20   probably sell some preferred stock to Retrophin and some other

21   investors at a five to 20 million dollars valuation.  It will

22   buy a private company called Garreco in Arkansas.  Can you

23   prepare an engagement and we can send some funds?

24   Q     This is Wentworth Medical the company that you were just

25   discussing that you had set up with Marek?

Pierotti - direct - Pitluck                5883

1    A    Yes.

2    Q    Garreco, that the gypsum company?

3    A    Yes.

4    Q    What was Mr. Greebel's response?

5    A    Great.  Is there a term sheet on the acquisition?  I

6    assume this will not be an affiliate of the Retrophin.  How

7    much will you acquire it for?

8    Q    Were you copied on this e-mail?

9    A    No.

10   Q    To Martin Shkreli was copied to Marek Biestek?

11   A    Yes.

12   Q    What did Mr. Shkreli respond?

13   A    Not an affiliate.  Acquire it for 9 million.  Jarhrmarkt

14   -- he's referring to an investor  -- Jahrmarkt seems to have

15   committed the financing if we put in two million.

16   Q    What was your understanding of what Mr. Shkreli meant by

17   not an affiliate?

18   A    It wouldn't in any way affiliated with Retrophin.  It was

19   a separate entity.

20   Q    Were you familiar with something called Jahrmarkt that

21   had committed financing if we put in $2 million?

22   A    I met with him, his name is Jahrmarkt or Harmar.  He is

23   leverage debtor.

24   Q    Did you discussions with Mr. Shkreli about putting two

25   $2 million?

Pierotti - direct - Pitluck                    5884

1    A     I believe I had, yes.

2              MR. PITLUCK:  Your Honor, now might be a good time

3    for a quick midafternoon break.  I apologize.

4              THE COURT:  All right.

5              We'll allow the jurors to take a break.  Five to ten

6    minutes.  We will retrieve you as soon as we can.

7              Thank you very much.

8              (Jury excused.)

9              THE COURT:  You can also step out and stretch if you

10   like.

11             (Witness excused.)

12             THE COURT:  All right.  Let's take ten.  No more.

13   No more than ten.  Thank you.

14             (Recess taken.)

15             (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Pierotti - direct - Pitluck                5885

1              (In open court.)

2              (Judge KIYO A. MATSUMOTO enters the courtroom.)

3              (Jury enters.)

4              THE COURT:  All jurors are present.  Please have a

5      seat.

6              You may resume Mr. Pitluck.

7              MR. PITLUCK:  Thank you, Your Honor.

8      BY MR. PITLUCK:

9      Q    Mr. Pierotti, before we broke you were talking about

10     Wentworth; correct?

11     A    Okay, yes.

12     Q    Around that time that you had formed Wentworth, were you

13     working on any other projects with Marek Biestek?

14     A    No, that was it.  We were just trying to figure out how

15     to pay for Garreco.  The guy's name was Garrett.  So they

16     called it Garreco.

17     Q    Where were you working from during this Garreco -- the

18     early parts of this Garreco transaction?

19     A    I was working mostly in the office on Third Avenue, but I

20     was also working from home, and I was going back and forth to

21     Arkansas quite a bit.

22     Q    And at that point in time, when you were working on

23     Garreco, who else was working out of the offices out of MSMB

24     offices?

25     A    So, Marek and I were at the end of row in one room

Pierotti - direct - Pitluck                5886

1    together.  Guy named Ron Tilles was in the office next.

2    Q    What was Ron Tilles's role?

3    A    Ron Tilles had been a guy who raised money for hedge

4    funds.  He had come aboard to work for Martin, I thought, to

5    raise money for MSMB Capital or Healthcare, whichever, entity.

6              And then as you go down, there was a guy named

7    George Huang, might be another office in there, but then there

8    was Martin Shkreli in the corner.  Next to him was Tom

9    Fernandez and then Kevin Mulleady.

10             And then there was a Michael Smith who had replaced

11   Allison as Martin's assistant, and then, very late in the

12   game, Martin's sister came to work there as well.

13   Q    What was her role in the company?

14   A    I couldn't really tell you.  It was more office manager,

15   I think.

16   Q    Now, did you -- did there come a time around this period

17   that Martin Shkreli formally notified investors that he was

18   winding down his hedge fund operations?

19   A    Yes.

20   Q    And how were they notified?

21   A    I remember seeing an e-mail.

22             MR. PITLUCK:  Can you flip to tab 32.  It's marked

23   for identification as Government's Exhibit 112-32.

24             THE COURT:  Pause for one second.

25             (Pause in the proceedings.)

Pierotti - direct - Pitluck                    5887

1            THE COURT:  Let's start over, please, from -- with
2    the exhibit.
3            MR. PITLUCK:  Yes.  It's Government's Exhibit 112-32
4    for identification.
5    BY MR. PITLUCK:
6    Q    Do you recognize that document, Mr. Pierotti?
7    A    Yes.
8    Q    And is this the e-mail that you recall that you received
9    about winding down MSMB hedge funds?
10   A    Yes.
11           MR. PITLUCK:  Your Honor, we offer Government's
12   Exhibit 112-32 into evidence.
13           MR. DUBIN:  No objection.
14           THE COURT:  All right.  We receive 112-32.
15           (Government's Exhibit 112-32 received in evidence.)
16           (Exhibit published to jury.)
17   BY MR. PITLUCK:
18   Q    What's the date of this e-mail, Mr. Pierotti?
19   A    September 9, 2012.
20   Q    And who's it from?
21   A    From Martin Shkreli.
22   Q    And what's the subject line?
23   A    Message from MSMB Capital.
24   Q    Now, at this point in time, in September 2012, there is
25   no money in MSMB Consumer; correct?

                    VB      OCR      CRR

Pierotti - direct - Pitluck                    5888

1    A    Correct.

2    Q    Okay.  Can you read the first paragraph please.

3    A    I have decided to wind down our hedge fund partnerships

4    with a goal of completing the liquidation of the funds by

5    November or December 1st, 2012.  As you know, MSMB has found

6    increasingly compelling opportunities in private equity.  We

7    are going to focus our efforts on managing money in a hybrid

8    public private structure, one which is not generally amenable

9    to the open-ended private hedge funds partnership structure.

10   Q    And excuse me, can you read the next paragraph, too,

11   please.

12   A    We have decided the best structure for such an entity is

13   a public company or private corporation.  Retrophin LLC, our

14   MSMB founded biotechnology operation, will be that company.

15   Retrophin has made a lot of progress since its inception in

16   2011.  Today, the company has a full pipeline and several

17   marketed (cash generating) products.  Retrophin is currently

18   valued at a modest $80 million, but I personally feel the

19   shares are worth closer to $1 billion and will reach that

20   lofty number when all is said and done.  We anticipate taking

21   the company public in the first half of 2013.  We will see

22   what the market thinks then.

23   Q    Now, at this point in time, had you ever done any work

24   related to Retrophin?

25   A    No.

Pierotti - direct - Pitluck                      5889

1   Q     Did you know anything about Retrophin?

2   A     As I've said, I knew that he had -- that we were trying

3   to get that Duchenne Muscular Dystrophy asset and he had

4   bought the Ligand asset.

5   Q     But you learned of that by being in the office?

6   A     Yes.

7   Q     But you hadn't done anything else for Retrophin?

8   A     No..

9   Q     Now, the e-mail goes on to describe some of the people

10  who are working with Martin Shkreli.

11          Can you read the -- from where it says the most

12  senior hire.

13  A     Beginning paragraph 3?

14  Q     Yes please.

15  A     The most senior hire we have made is that of Thomas

16  Fernandez, who joins after ten plus years with the Galleon

17  Group, where he was the original COO, chief operating officer,

18  of the company, and headed up the IR effort.  Tom will hold

19  the title of president at MSMB.

20  Q     And you saw the reference there to Tom Fernandez spending

21  ten plus years at Galleon Group.

22          Did you know Tom Fernandez prior to his joining

23  MSMB?

24  A     I did and I introduced him to Martin.

25  Q     And then it goes on.  Many of you have met Jackson Su,

Pierotti - direct - Pitluck                    5890

1   our current COO.  Jackson handles all operational matters

2   including HR, IT, and finance.

3              Can you read what it says from Marek Biestek please.

4   A    Marek Biestek, my co-founder and partner and I, round out

5   MSMB's executive committee.  This four-person team will manage

6   MSMB's operations going forward and even though we will not be

7   running, quote unquote, outside money, we will still have

8   activities independent of Retrophin.

9   Q    And excuse me, can you read the next paragraph, too, with

10  another key hire?

11  A    Another key hire at MSMB is that of George Huang, Ph.D.

12  who comes to us from the recently shuttered Tiger Cub

13  Sabretooth.  We have very high hopes for George.  He, and a

14  new hire, Dr. Christopher James, an actual brain surgeon, join

15  the biotechnology with Dr. Andrew Vaino, who has been with

16  MSMB for some time.  These three pedigreed individuals

17  contribute in a great way to our firm.

18  Q    You testified a moment ago about Mr. Huang being in the

19  office, and you testified about the other two people as well.

20             Did you know what kind of tasks they are doing at

21  MSMB during this time period?

22  A    I know George Huang, I worked with, when we were trying

23  to do that cabinet thing.  But he was a guy who had real

24  investment banking background.  So he could do corporate

25  finance work for Martin.

Pierotti - direct - Pitluck                    5891

1   Q    Okay.  And finally, can you read the last paragraph on

2   this page.

3   A    Tim Pierotti, who manages MSMB's consumer investing

4   efforts, is broadening his role in teaming up with Marek

5   Biestek in looking at medical technology assets.

6              Kevin Mulleady, our original CEO and investor

7   relations head, is doing well.  He has expanded his role into

8   business development across the capital structure and

9   continues to manage client relationships.

10  Q    Is that consistent with what you believed your role was

11  at the time?

12  A    Yes.

13  Q    And then it continues on from there, but I think we read

14  enough.

15  A    Yeah, Retrophin has hired --

16  Q    That's okay.

17  A    Oh, okay.

18  Q    Now, did there come a time that you began discussing your

19  formal termination from MSMB Consumer with Martin Shkreli?

20  A    Yes.

21  Q    And how did that come about?

22  A    Well, as the fund -- as there was no money in the funds,

23  and Marek and I recall going down the path of Wentworth, and

24  Martin was forming Retrophin as the focus of all of his

25  attention, he said, you guys, you know, you can't be in this

                    VB      OCR      CRR

Pierotti - direct - Pitluck                    5892

1    office space anymore.  And we agreed with that.  There was no

2    reason for us to still be there.

3              And he said, let's sign a termination agreement, or

4    let's, you know, I'll give you -- he offered me a severance

5    and termination.

6    Q    And at that point in time, were you getting paid

7    regularly?

8    A    I was getting some money, reduced money, late money.  So

9    not super regularly, but it was better than nothing.

10             MR. PITLUCK:  So I'd like to have you open to tab 4,

11   which is marked for identification as Government's

12   Exhibit 112-4.

13   Q    Do you recognize this document?

14   A    Yes.

15   Q    Is this an e-mail between you and Martin Shkreli dated

16   October 10th, 2012?

17   A    Yes.

18             MR. PITLUCK:  Your Honor, we offer Government's

19   Exhibit 112-4.

20             MR. DUBIN:  No objection.

21             THE COURT:  We receive Government's Exhibit 112-4.

22             (Government's Exhibit 112-4 received in evidence.)

23             (Exhibit published to jury.)

24   BY MR. PITLUCK:

25   Q    What's the subject line of this e-mail, Mr. Pierotti?

Pierotti - direct - Pitluck                    5893

1   A    Offer is still good.

2   Q    And can you read the first sentence.

3   A    I would be happy to take half of the 45,000 now, versus

4   waiting for the deal to close.  I heard you say --

5   Q    I'm going to stop you right there.

6        You said I would be happy to take half of the 45K

7   now, what does that mean?

8   A    In terms of he had offered me $45,000 severance to be

9   paid at a later date.

10  Q    $45,000 severance as part of departure from

11  MSMB Consumer?

12  A    Yes, sir.

13  Q    And the reference to waiting for the deal to close, what

14  does that mean?

15  A    I honestly don't know what deal he was talking about at

16  that point.

17  Q    I'm sorry.  You wrote that, Mr. Pierotti?

18  A    Versus waiting for the deal to close.  I heard you say

19  you have had some success in the recent friends and family

20  round, so I hope you will take me up on the offer.

21       Yeah, I guess I thought he was closing some private

22  financing.

23  Q    And did you reach a deal with Martin Shkreli related to

24  severance payments?

25  A    We did.

VB        OCR        CRR

Pierotti - direct - Pitluck                    5894

1    Q    How much did you actually decide on with Mr. Shkreli?

2    A    20,000.

3    Q    And did you receive it all the ones?

4    A    No.  I received four checks for $5,000 as I recall.

5    Q    And where did the money come from for each of those?

6    A    I guess various entities.

7              THE COURT:  Do not guess.

8              MR. BRODSKY:  I'm sorry.

9              THE WITNESS:  I'm sorry.

10   A    I don't recall exactly.

11   Q    And do you recall who -- withdrawn.

12             What was your financial situation like at this time?

13   A    Yeah, I didn't have any money.  I was hanging on.

14             MR. PITLUCK:  I'd like to show you what's

15   Government's Exhibit 112-5 for identification.  It's tab five

16   in your binder.

17   Q    Is this an e-mail exchange, series of e-mails, between

18   yourself and Mr. Shkreli?

19   A    Yes, sir.

20   Q    And they're all dated October 11th, 2012?

21   A    Yes.

22             MR. KESSLER:  Your Honor, we offer Government's

23   Exhibit 112-5 in evidence.

24             MR. DUBIN:  No objection, Your Honor.

25             THE COURT:  We receive Government's Exhibit 112-5.

                    VB      OCR      CRR

Pierotti - direct - Pitluck                    5895

1              (Government's Exhibit 112-5 received in evidence.)

2              (Exhibit published to jury.)

3    BY MR. PITLUCK:

4    Q     Let's start with the bottom e-mail.

5    A     Do you want me to read it?

6    Q     It's an e-mail from you to Mr. Shkreli on October 11th,

7    2012?

8    A     Yes.

9    Q     Is that the day following the day after the previous

10   e-mail we just saw in Government's Exhibit 112-4?

11   A     That one was October 10th?  Yup, sure is.

12   Q     And what did you write in that e-mail?

13   A     I wrote:  Firstly, thanks I thinks for making the

14   introduction to Bausch & Lomb.  Secondly, I just want to

15   confirm that we are going to do 5K today, and 5K a week for

16   the following three weeks, to satisfy the severance.  Thanks

17   again.

18   Q     You see the reference to Bausch & Lomb?

19   A     Yes.

20   Q     Do you recall what that was in reference to?

21   A     I don't.  I don't.

22   Q     And when you wrote, secondly, I just want to confirm we

23   are going do 5K today and 5K a week for the following three

24   weeks.

25              Is that a reference to the $20,000 you agreed to?

VB        OCR        CRR

1    A    Yes.

2    Q    And going up from there, to the next e-mail, what did

3    Mr. Shkreli write?

4    A    He wrote -- I will -- do you have a resume or can you put

5    one together?

6         Do you agree that 5K today and 5K a week for three

7    weeks will satisfy your severance?

8    Q    Do you know why Mr. Shkreli was asking for your resume?

9    A    I'm assuming it's in reference to Bausch & Lomb, but I

10   don't know.

11        THE COURT:  Do not assume, to the best of your

12   recollection.

13        THE WITNESS:  I don't know.

14   Q    Okay.  And what was your response?

15   A    Not sure my account is set up.

16   Q    Sorry.  One more up.

17   A    Okay, I will drop a document -- no, that's him.

18        I will get you a resume.  I agree that 20K over four

19   weeks, and starting today, will satisfy the severance.

20   Q    What was Mr. Shkreli's response?

21   A    Okay.  I will draw up the document, but will send some

22   funds right now.

23   Q    Did you know, at that time, what kind of document he was

24   talking about?

25        MR. DUBIN:  Your Honor, I think that the witness

Pierotti - direct - Pitluck                    5897

1   misread that.

2           THE WITNESS:  Okay.  Which line?

3           THE COURT:  Do you want to just read your response

4   one more time.

5           Was it Mr. Shkreli's response?

6           MR. DUBIN:  No.  The witness said, I will drop the

7   document.  The document says, okay, I will draw up a document.

8   BY MR. PITLUCK:

9   Q    So, Mr. Pierotti, just to make sure the record's clear,

10  can you read Martin Shkreli's e-mail from October 11th 2012 at

11  1:15 p.m. again, please.

12  A    Okay.  I will draw up a document, but will send some

13  funds right now.

14  Q    And what was your response to that?

15  A    Not sure my account is set up with Retrophin.  Probably

16  needs to be a check.

17  Q    And when you wrote not sure my account is set up with

18  Retrophin.  What did you mean?

19  A    Direct deposit.

20  Q    And what do you mean direct deposit?

21  A    I had a direct deposit set up with MSMB, but I didn't

22  have any other direct deposit.  And if he was going to send me

23  money, that's why I said it's going to have to be a check.

24  Q    And what was Mr. Shkreli's response?

25  A    Just put it on your desk.

VB      OCR      CRR

Pierotti - direct - Pitluck                    5898

1   Q    And did you receive the other three severance payments

2   following that?

3   A    I did.

4   Q    Now, at that point in time, in October of 2012, did you

5   know if Retrophin was a public or a private company?

6   A    It was private.

7   Q    Now, there was a reference in that last e-mail to drawing

8   up a document.

9           Did you ultimately sign a document formalizing your

10  termination from MSMB Consumer?

11  A    Yes.

12  Q    And who asked you to sign that document?

13  A    Martin.

14  Q    Who gave you the document?

15  A    Martin.

16  Q    You know who drafted the document?

17  A    I don't.

18          MR. PITLUCK:  I'd like to show you Government's

19  Exhibit 112-10 for identification.  It's tab ten in your

20  binder.

21          THE WITNESS:  Got it.

22  Q    Do you recognize this document?

23  A    I do.

24  Q    And is that your -- can you flip to the last page.

25          That's your signature at the bottom?

1   A    Yes, it is.

2        MR. PITLUCK:  Your Honor, we offer Government's

3   Exhibit 112-10 into evidence.

4        MR. DUBIN:  No objection.

5        THE COURT:  We receive Government's Exhibit 112-10.

6        (Government's Exhibit 112-10 received in evidence.)

7        (Exhibit published to jury.)

8   BY MR. PITLUCK:

9   Q    What's the date of this agreement?

10  A    November 12th, 2012.

11  Q    And the letterhead at the top, what agreement -- excuse

12  me, what entity is providing this agreement?

13  A    MSMB Healthcare Management LLC.

14  Q    And the re line is termination of employment and release?

15  A    Yes.

16  Q    Can you read the top paragraph please.

17  A    This agreement and release will confirm the termination

18  of your employment with MSMB Healthcare Management LLC and

19  Retrophin.  Your signature, at the end of this agreement, will

20  signify your acceptance of and agreement to the provisions set

21  forth herein.

22  Q    At the time that you got this agreement, did you notice

23  it had MSMB and Retrophin on it?

24  A    Not that I recall, no.

25  Q    Would it have mattered to you?

Pierotti - direct - Pitluck                    5900

1   A    I probably still would have signed it, but I never worked
2   for Retrophin.
3   Q    Now, going down to the first paragraph it says
4   termination of employment.  Your employment with MSMB and
5   Retrophin terminated as of the close of business on
6   November 12th, 2012, the effective date, regardless of whether
7   you fail to sign or sign and later revoke this agreement.
8         Do you see that?
9   A    Yes.
10  Q    Then the next paragraph is payment.
11        And can you just read A there.
12  A    You acknowledge receipt of $20,000 as a one-time
13  severance payment.  All payment shall be subject to
14  withholding for all applicable taxes.
15  Q    And is that the $20,000 severance payment that you
16  discussed a moment ago?
17  A    Yes, sir.
18  Q    Finally, can you read on this page, can you read the
19  first two sentences of paragraph 2C.
20  A    You acknowledge and agree that upon your receipt of the
21  severance payment, neither MSMB nor Retrophin will owe you any
22  additional compensation of any nature, including, without
23  limitation, salary, bonus, commissions, accrued vacation pay
24  or sick time.
25  Q    Can you read the next one, too, please.

Pierotti - direct - Pitluck                           5901

1   A    In addition, you acknowledge and agree that you forfeited

2   and surrendered to Retrophin all of your equity, including

3   vested and unvested performance units, and stock, other

4   ownership, and financial interests in Retrophin as of the

5   effective date, and that you are not entitled to any

6   compensation or other payments in connection therewith.

7   Q    At the time you signed this agreement, did you know if

8   you had any equity in Retrophin?

9   A    I didn't.

10  Q    I think you testified a moment ago that you -- Martin

11  Shkreli had -- not a moment ago, before the break -- Martin

12  Shkreli had told you about some shares?

13  A    Yes.

14  Q    Do you know how many you had at that point?

15  A    No.

16  Q    Did it matter to you that you were agreeing to forfeit

17  them?

18  A    No.

19       MR. PITLUCK:   Now, let's go to page 3, paragraph 5.

20  Q    Do you see that nondisparagement clause there?

21  A    I do.

22  Q    Can you read it please.

23  A    You agree that at all times you will refrain from making

24  any statements, whether publicly or privately, to anyone,

25  including without limitation, to the press or the media, to

Pierotti - direct - Pitluck                    5902

1   current or prospective investors, in any fund or account

2   managed or advised by MSMB, or its affiliates, to future

3   employers or prospective employers, or to other market

4   participants, regarding MSMB or Retrophin, or any of their

5   respective affiliates, past or current officers, managers,

6   clients, investors or principals, including, without

7   limitation Martin Shkreli, which could be interpreted to

8   disparage, criticize, defame the business reputation, ethics

9   or integrity of any such person, or which could adversely

10  affect the business of any such person.  This restriction

11  applies to both written and oral statements, as well as to

12  statements posted by you on the Internet, even if posted

13  anonymously.

14          It also applies to statements made by third-parties

15  at your request, or on your behalf.  If you are asked to offer

16  an opinion on Retrophin, MSMB, or any of its related parties,

17  you will refrain from answering and may reference the

18  restriction this agreement places on you.

19  Q    What do you interpret that to mean, Mr. Pierotti?

20  A    I interpret it to mean that you're not allowed to talk to

21  anybody about MSMB or Retrophin.

22  Q    And on your reading, does this section require anything

23  of Martin Shkreli?

24  A    No.

25  Q    Or MSMB?

VB      OCR      CRR

1    A    No.

2    Q    Or Retrophin?

3    A    No, sir.

4         MR. PITLUCK:  Let's go to the last page.

5    Q    Is that your signature at the bottom?

6    A    Yes, sir.

7    Q    And what's the date?

8    A    Nov 12, 2012.

9    Q    Who signed on behalf of MSMB Healthcare Management and

10   Retrophin?

11   A    Martin Shkreli.

12   Q    Now, prior to this agreement, had you performed any work

13   for Retrophin?

14   A    No.

15   Q    Had you ever discussed working for Retrophin with Martin

16   Shkreli?

17   A    No.

18   Q    Had you ever considered working for Retrophin?

19   A    No.

20   Q    Why not?

21   A    There was no role for me at Retrophin.  Obviously, I'm a

22   just -- it's a biotech.  I was a political science major from

23   Boston College.

24   Q    Now, after you signed this termination agreement, did you

25   make any other agreement to work for Retrophin?

Pierotti - direct - Pitluck                5904

1   A    No.

2   Q    Did Martin Shkreli ever offer you a position at Retrophin

3   after you signed this agreement?

4   A    No, sir.

5   Q    Did you ever discuss the possibility of working at

6   Retrophin after signing this agreement?

7   A    No.

8   Q    What did you believe your relationship with Martin

9   Shkreli was going to be going forward, after you signed this

10  agreement?

11  A    Nothing, unless we gave him some interest in Wentworth.

12  Q    Now, other than the $20,000 in severance payments, did

13  Martin Shkreli give you, personally, any money after you

14  signed the termination agreement?

15  A    He did.

16  Q    How much did he give you?

17  A    As I recall, $5,000.

18  Q    Why did he give it to you?

19  A    I don't know.

20  Q    Did you need it at the time?

21  A    I did.

22  Q    And after you signed the -- withdrawn.

23       After you signed the termination agreement, what did

24  you plan to do for employment?

25  A    I planned to work at Garreco.

VB        OCR        CRR

1   Q    With Marek Biestek?

2   A    Yes.

3   Q    And after you signed that agreement, November 2012, did

4   you have an actual place to work?

5   A    No.

6   Q    Where -- were you able to work anywhere?

7   A    Was I able to?

8   Q    Were you able to stay in Retrophin's offices?

9   A    Oh, no.

10  Q    Why not?

11  A    Martin had told Marek and I we needed to be out of those

12  offices, and I didn't -- it made all the sense for us not to

13  be in those offices.

14  Q    Did Martin Shkreli tell you why you and Marek needed to

15  move out of Retrophin?

16  A    Yeah, he was going to need it for Retrophin people.

17  Q    What was your understanding of what was going on at

18  Retrophin at this time in November 2012?

19  A    They were trying to raise money still for a series A

20  round to fund the business.

21  Q    What does that mean, raise the money for a series A

22  round?

23  A    Series A is sort of the first step in raising money for a

24  small private company, in this case, kind of a concept

25  biotech.

Pierotti - direct - Pitluck                    5906

1   Q    And after you signed your termination agreement

2   November 2012, who were the other people who were, in your

3   mind, working at Retrophin?

4   A    Who was still working at Retrophin?  Martin, his sister,

5   Steve Aselage, George Huang, Andy Vaino, Chris James was gone

6   by that time.  That's about it.

7   Q    Now, did there come a time when there was a plan to

8   take -- when you learned of a plan to take Retrophin public?

9   A    Yes.

10  Q    What was your understanding of how Retrophin was going to

11  become a public company?

12  A    They were going to buy a public shell company and do

13  what's called a reverse merger.

14          MR. DUBIN:  Objection.  Based on hearsay,

15  Your Honor.

16          THE COURT:  Were you still --

17  Q    Were you still in the office at this time when you

18  learned this?

19  A    Occasionally.  But not consistently, but occasionally.

20          MR. PITLUCK:  Your Honor --

21          THE COURT:  Why don't you follow up with a different

22  question so you do not draw the same objection.

23  Q    How did you learn of the plan to take Retrophin public

24  through a reverse merger?

25  A    I can't say I remember exactly.  I can't say I remember

1   who told me first.

2   Q     But as of November 2012, that was your understanding?

3   A     Yes.

4              MR. DUBIN:  I object, Your Honor.

5              THE COURT:  All right.  Well, I will sustain the

6   objection.

7   Q     Now, did there come a time that you learned how the --

8   how a reverse merger was going to work?

9              MR. DUBIN:  I object, Your Honor.  Same objection.

10             MR. PITLUCK:  Your Honor, could we have a brief

11  side-bar.

12             THE COURT:  All right.  Better be brief because we

13  are ending at 4:30.

14

15             (Continued on following page.)

16

17

18

19

20

21

22

23

24

25

Pierotti - direct - Pitluck                5908

1          (Sidebar.)

2          MR. PITLUCK:  Your Honor, this is not --.

3          MR. DUBIN:  It was my objection.

4          MR. PITLUCK:  I'm sorry.

5          MR. DUBIN:  I just wanted to state the basis of it.

6   There is no foundation for his knowledge other than hearsay.

7   They ran into this same exact problem when he testified at the

8   prior trial.  He has no basis for this knowledge at all other

9   than allegedly hearing it from others.

10          MR. PITLUCK:  It's not being offered for the truth.

11  It's being offered for what he did next, which is being

12  offered and purchasing starters Desert Gateway the shell

13  company.

14          THE COURT:  Who offered?

15          MR. PITLUCK:  We're going to get to that.  Looking

16  at the clock, it's a whole other line of questioning and this

17  is not being offered for the truth of.  There have been

18  fourteen witnesses who testified that there was a reverse

19  merger.  It's based on his understanding of being in the

20  office and why he was able to and jumped on the opportunity to

21  purchase shares in Desert Gateway.

22          MR. DUBIN:  That doesn't obviate the need for a

23  foundation for the testimony.

24          THE COURT:  If you get to that point, you can elicit

25  the background of the offer and who offered him the

1   opportunity and I don't know who was the person.

2        MR. PITLUCK:  Mr. Shkreli offered him.  If you ask

3   him did there come a time when you bought shares in Desert

4   Gateway.

5        THE COURT:   And who offered you the opportunity.

6        MR. PITLUCK:  Then you have to go back all the way.

7        THE COURT:  And what were you told.  That is what he

8   you to do.

9        MR. PITLUCK:  He learned of it much earlier.  It's

10  not being offered for the truth of the fact that there was a

11  reverse merger because that's been established as recently as

12  a hour ago.

13       THE COURT:  If Martin Shkreli was the person who

14  told him about the reverse merger maybe you could get to the

15  point in time when that occurred.

16       MR. PITLUCK:  When Martin Shkreli told him about the

17  reverse merger and the opportunity to buy shares he already

18  knew about it.  He didn't sit down and explain.

19       THE COURT:  He told you said Martin Shkreli was the

20  one who told him about the reverse merger.

21       MR. PITLUCK:  Martin Shkreli was the person who gave

22  the opportunity to buy the shares.  When he had that

23  opportunity he already knew about the reverse merger.  This

24  came up in Mr. Shkreli's trial.  It's not being offered for

25  the truth.  So I don't know  --

1      THE COURT:  Just to show  --

2      MR. PITLUCK:  To show what happened, why he did what

3 he did.  He's offered for background which is a totally proper

4 basis for the hearsay testimony.  It's offered for what he did

5 next.  It's framing for the jury.  He's not going to testify

6 about being an expert in a shell company, just his

7 understanding of what was going on in the office and why he

8 was offered that opportunity.

9      MR. DUBIN:  Your Honor, I think that your questions

10 get to what my concern is.  My concern is that what he hears

11 going on in the office quote unquote is going to be based on

12 hearsay and it is critically important to us that if he's told

13 by Martin Shkreli that he has the opportunity to buy shares I

14 wouldn't object.  There's no foundation for his knowledge as

15 to there being a reverse merger other than hearsay.  He has

16 not laid any foundation.

17      THE COURT:  What I was thinking is he's in a small

18 office, he's sitting directly across the desk from Mr. Shkreli

19 and Mr. Shkreli  -- I didn't know whether he was the source.

20 He couldn't remember whether Mr. Shkreli was the one who told

21 him about the reverse merger.  I don't know that.

22      MR. DUBIN:  At that time they had moved offices.

23 They were not in that little shoe box office.  They moved into

24 other offices where there were big offices.  If Mr. Shkreli

25 told him about the reverse merger that's information for this

Pierotti - direct - Pitluck                    5911

1   jury to have.  I don't want them left with a misimpression

2   this was general knowledge floating around the office and

3   being blurted out.  That's the misimpression the jury will

4   get, by him saying I knew there was a reverse merger without

5   laying a foundation for the basis of his knowledge.

6            THE COURT:  So he left sometime in November.

7            MR. PITLUCK:  Judge, I think we have to let the jury

8   go.  This whole line of questioning will take longer than five

9   minutes.

10           MR. KESSLER:  The entire point is it's not being

11  offered for the truth of the matter.  No one is going to argue

12  that there was a reverse merger because Tim Pierotti testified

13  there was a reverse merger.  That is the only hearsay concern

14  and it's not being implicated here.

15           THE COURT:  They want you to adhere to hearsay

16  rules.  Let's let the jury go.  Now it's twenty-five after the

17  hour and we can straighten this out.

18           MR. DUBIN:  Mr. Pierotti is standing up and trying

19  to listen into the conversation.

20           MR. PITLUCK:  He's not listening to the

21  conversation.

22           MR. DUBIN:  I don't know what he's doing.

23           MR. PITLUCK:  I think he's standing up stretching.

24           THE COURT:  I'm going to excuse the jury and I'll

25  excuse Mr. Pierotti.

Pierotti - direct - Pitluck                      5912

1          (In open court.)

2          THE COURT:  Members of the jury, I'm going to

3    dismiss you now because we have some issues to discuss.  I

4    want to thank you again for your attention.  Don't discuss the

5    case at all.  Report back to us on Monday.  Don't read about

6    the case and thank you for your service.  Have a pleasant

7    weekend.

8          (Jury excused.)

9          THE COURT:  Mr. Pierotti, you can step down and you

10   are excused for the day.  We will see you Monday morning at

11   nine.

12         THE WITNESS:  Nine?

13         THE COURT:  At nine, yes.

14         (Witness excused.)

15         THE COURT:  Come up, please.

16         MR. DUBIN:  Your Honor, it is four minutes prior to

17   when we're going to break.  The reason we're breaking is

18   Mr. Greebel is an Sabbath observer and needs to leave.  Can we

19   take this up first thing Monday morning.

20         THE COURT:  Can we resolve this now in four minutes?

21   I promised he can leave at 4:30.  We've been through this and

22   I guess my question was whether the knowledge of this witness

23   about reverse merger was gleaned from Mr. Shkreli's comments

24   about the reverse merger.

25         MR. PITLUCK:  Judge, I think the point, I have

Pierotti - direct - Pitluck                    5913

1    obviously reviewed the transcript of the last trial too and we

2    tried to make sure the testimony adhered to the hearsay rules

3    which is obviously a statement offered for its truth, an out

4    of court statement offered for its truth.  Mr. Pierotti had

5    knowledge that he obtained through the office.  He doesn't

6    remember specifically where it's from, that there was a

7    reverse merger going on, that it would be done through a shell

8    company and that there would be  -- Retrophin would become a

9    public company after that and it's in that context which he is

10   offered the opportunity to purchase shares.

11            So we are not  -- this is not testimony that's being

12   offered for its truth that a reverse merger was in fact going

13   on.  It's offered for Mr. Pierotti's state of mind as he's

14   offered this opportunity and the days and weeks leading up to

15   the opportunity.  There is no hearsay issue because we are not

16   going to argue you heard about the reverse merger, that there

17   was  -- that it was being talked about in the offices because

18   Tim Pierotti told you that, it's simply that Tim Pierotti had

19   knowledge.  That's our only point.  We should be entitled to

20   elicit that to provide the jury with the necessary background

21   and Mr. Pierotti's state of knowledge at the time these shares

22   were offered to him.  That is it.

23            THE COURT:  Mr. Dubin, do you have anything else to

24   add to your argument that this is hearsay?

25            MR. DUBIN:  Yes.  I think it does not obviate the

Pierotti - direct - Pitluck                5914

1   need for them to lay a foundation.  They are trying to back

2   door their hearsay problem by saying he just generally

3   learned.  If Martin Shkreli is the one that told him, let him

4   ask that.  If he doesn't remember, he doesn't remember.  You

5   can't just get knowledge from nowhere.  There has to be basis

6   for it.  They have to lay a foundation.

7           THE COURT:  I'm going to propose, if this comes out,

8   that you ask this witness at the time he was offered shares

9   what he knew about  -- what did Mr. Shkreli tell him about the

10  opportunity to buy the shares, and I would think that it would

11  come up in a conversation about a reverse merger, that had

12  happened or was about to happen; is that correct?

13          MR. PITLUCK:  No, your Honor.  It's different than

14  that.  Mr. Pierotti's understanding was that he knew about it.

15  So when he offered that it was not Mr. Shkreli sitting him

16  down and explaining a reverse merger.  It was a very different

17  conversation from that.  I can say  -- I can do it in reverse

18  order.  It's confusing and it's much clearer for him to say

19  that he learned this and knew it prior to that opportunity.

20          MR. DUBIN:  It's the how that's critically important

21  and it is important because if you read it somewhere and I

22  think that there's a real good chance he did, in a

23  communication he received or somewhere else, but if that's the

24  case, let him ask.  It's the how that's important and they are

25  trying to get around the how he learned.  You can't just get

Pierotti - direct - Pitluck                    5915

1    knowledge from nowhere.  There has to be a foundation laid

2    that forms the basis of his knowledge.

3              MR. PITLUCK:  It's not being offered for the truth.

4    It's offered for his state of mind.

5              MR. DUBIN:  Hearsay or not you can't just testify to

6    things you became aware of.  There has to be a how you became

7    aware of it.

8              MR. PITLUCK:  Sure you can.  He's not attributing a

9    source.  He's not saying Kevin Mulleady told me about this.  I

10   remember it and then we would offer it for its truth.  This is

11   simply related to his state of mind.  He testified very

12   clearly that he was in the office occasionally and he heard it

13   there.  So there's no hearsay, your Honor.

14             THE COURT:  They are not offering it for its truth.

15   There's an abundance of evidence that has come in prior to

16   this testimony that there was a reverse merger with Desert

17   Gateway and certain transactions occurred as part of that

18   transaction, including the offering of certain shares to

19   certain individuals.  We heard that from Mr. Su.  We heard it

20   from many people.

21             To the extent it's not being offered for its truth,

22   but rather what is Mr. Pierotti's state of mind, what does he

23   understand at the time he's being offered this opportunity to

24   buy Fearnow shares, I think it would be an appropriate way to

25   admit evidence of Mr. Pierotti's understanding and state of

1    mind.

2              MR. DUBIN:  If we could have this consistent with

3    prior situations like this throughout the trial, instruct the

4    jury, inform the jury that it's not being offered for the

5    truth.

6              THE COURT:  I will say it's being offered to explain

7    Mr. Pierotti's state of mind and understanding.

8              MR. DUBIN:  Perfect.  Thank you, your Honor.

9              MR. PITLUCK:  Obviously, we want to move on.  There

10   are instances going forward in which things are not being

11   offered for the truth where we may seek the same objection

12   because it's important for the same reasons.

13             THE COURT:   We will certainly try to be even-handed

14   to both sides.

15             MR. PITLUCK:  Thank you, your Honor.

16             THE COURT:  Have a nice weekend.

17             MS. DENERSTEIN:  Your Honor, can we get the witness

18   list for next week and know if things changed?

19             MR. PITLUCK:  We've got to confer and consult.

20             MS. DENERSTEIN:  It's Friday.  Usually we get it

21   Thursday.

22             MR. PITLUCK:  Usually you get it Thursday because we

23   are not sitting on Friday.  We have to consult Mr. Pierotti's

24   travel schedule.

25             MR. MASTRO:  I'm waiting for Mr. Geller.  I am all

Pierotti - direct - Pitluck                    5917

1    suited up.

2          THE COURT:  This can't be on the record, if you guys

3    are all talking at once.

4          So can we go off the record then.  Thank you.

5          Have a good weekend.

6          (Case adjourned to Monday, November 20, 2017 at 9:00

7    a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5918

```
1                    I N D E X

2  WITNESSES:

3

4      DEBORAH OREMLAND, resumed.

5          DIRECT EXAMINATION              5714

6          CROSS-EXAMINATION               5764

7          REDIRECT EXAMINATION            5835

8          RECROSS-EXAMINATION             5839

9      TIMOTHY JOSEPH PIEROTTI

10         DIRECT EXAMINATION              5841

11

12

13                   EXHIBITS:

14

15     GX 960, 962 and 964        5717
       DX 13085                   5804
16     GX 112-1                   5856
       GX 112-35                  5864
17     GX 112-36                  5882
       GX 112-32                  5887
18     GX 112-4                   5892
       GX 112-5                   5895
19     GX 112-10                  5899

20

21

22                *    *    *    *

23

24

25
```

CMH      OCR      RMR      CRR      FCRR

## $

**$10** [3] - 5720:17, 5838:4, 5868:5
**$10,000** [2] - 5858:14, 5859:2
**$2.50** [1] - 5754:23
**$20,000** [4] - 5895:25, 5900:12, 5900:15, 5904:12
**$3.60** [1] - 5746:6
**$3.70** [2] - 5807:11, 5807:14
**$30,000** [2] - 5858:13, 5858:16
**$360,000** [1] - 5746:3
**$45,000** [2] - 5893:8, 5893:10
**$5,000** [2] - 5894:4, 5904:17
**$50,000** [1] - 5868:22
**$7.69** [3] - 5754:3, 5754:4, 5754:24
**$80** [1] - 5888:18

## 1

**1** [5] - 5807:3, 5807:16, 5844:14, 5888:19
**1,000** [5] - 5786:11, 5786:25, 5799:25, 5801:5, 5802:7
**10** [7] - 5730:2, 5731:3, 5761:19, 5805:5, 5805:6, 5818:6, 5818:21
**10,000** [1] - 5866:3
**10,350** [1] - 5799:1
**10,400** [3] - 5795:5, 5795:12, 5795:21
**10-K** [3] - 5731:20, 5731:21, 5732:7
**10-ks** [1] - 5712:15
**10-Q** [3] - 5732:2, 5732:3, 5732:7
**10-Qs** [1] - 5712:15
**100** [7] - 5753:19, 5754:6, 5754:9, 5795:1, 5799:22, 5801:1, 5802:9
**100,000** [2] - 5735:10, 5766:17
**109** [1] - 5782:7
**10th** [2] - 5892:16, 5895:11
**11** [4] - 5739:11, 5750:17, 5815:17, 5816:3
**11,672,167** [1] - 5746:19
**112,961** [1] - 5798:19
**112-1** [4] - 5855:13, 5855:24, 5856:1, 5918:16
**112-10** [5] - 5898:19, 5899:3, 5899:5, 5899:6, 5918:19
**112-32** [6] - 5886:23, 5887:3, 5887:12, 5887:14, 5887:15, 5918:17
**112-35** [3] - 5864:7, 5864:16, 5918:16
**112-36** [4] - 5881:22, 5882:7, 5882:9, 5918:17
**112-4** [6] - 5892:12, 5892:19, 5892:21, 5892:22, 5895:10, 5918:18
**112-5** [5] - 5894:15, 5894:23, 5894:25, 5895:1, 5918:18
**115-31** [2] - 5716:15, 5736:2
**11th** [3] - 5894:20, 5895:6, 5897:10
**12** [7] - 5723:17, 5725:20, 5753:13, 5754:14, 5754:23, 5881:8, 5903:8
**12-17** [1] - 5794:1
**120,000** [2] - 5745:25, 5814:22
**12th** [2] - 5899:10, 5900:6
**13** [4] - 5739:18, 5815:18, 5816:7, 5881:8
**13085** [4] - 5803:13, 5804:1, 5804:3, 5918:15
**13D** [25] - 5717:3, 5717:5, 5732:16, 5732:20, 5733:3, 5733:5, 5733:7, 5734:6, 5734:17, 5734:21, 5736:13, 5736:18, 5737:6, 5743:16, 5743:17, 5743:23, 5744:23, 5745:21, 5813:1, 5814:15, 5815:9, 5815:12, 5815:19, 5816:3
**13D's** [1] - 5815:15
**13s** [1] - 5712:15
**14** [5] - 5745:24, 5747:17, 5780:22, 5797:9, 5807:6
**144** [1] - 5726:19
**15** [1] - 5757:18
**15-CR-637(KAM** [1] - 5691:3
**15K** [1] - 5865:18
**15th** [2] - 5697:15, 5707:15
**16** [5] - 5700:16, 5711:3, 5712:7, 5768:9, 5808:6
**17** [19] - 5691:7, 5716:6, 5735:4, 5750:21, 5753:17, 5754:23, 5755:2, 5756:20, 5761:12, 5761:24, 5762:2, 5770:3, 5770:7, 5772:25, 5774:20, 5794:4, 5794:7, 5799:5, 5808:6
**17th** [2] - 5771:4, 5772:24
**18** [1] - 5809:25
**19** [4] - 5743:20, 5746:22, 5746:25, 5814:5
**1934** [1] - 5732:17
**1994** [1] - 5842:6
**1:00** [1] - 5764:10
**1:15** [1] - 5897:11
**1st** [2] - 5698:11, 5888:5

## 2

**2** [7] - 5735:16, 5756:11, 5871:15, 5871:20, 5875:24, 5883:21, 5883:25
**2,100** [6] - 5777:17, 5777:25, 5779:1, 5779:8, 5786:5, 5786:21
**2,531,920** [2] - 5741:9, 5742:15
**2.5** [1] - 5730:15
**20** [14] - 5736:24, 5780:22, 5797:10, 5797:14, 5799:8, 5812:13, 5813:1, 5813:13, 5829:11, 5829:14, 5862:14, 5882:21, 5917:6
**20,000** [2] - 5847:25, 5894:2
**200** [2] - 5691:17, 5695:9
**2001** [1] - 5878:12
**2002** [2] - 5842:22, 5843:20
**2005** [2] - 5843:20, 5844:3
**2008** [2] - 5844:15, 5844:16
**2009** [6] - 5844:13, 5844:14, 5849:10, 5849:20, 5850:6, 5850:17
**2011** [15] - 5853:25, 5856:6, 5856:15, 5861:18, 5863:24, 5864:5, 5864:13, 5865:5, 5867:20, 5867:22, 5870:20, 5870:25, 5878:3, 5888:16
**2012** [75] - 5716:6, 5723:17, 5725:20, 5735:4, 5736:24, 5746:23, 5750:21, 5753:13, 5753:17, 5754:14, 5755:2, 5755:8, 5756:2, 5756:4, 5756:20, 5761:12, 5761:24, 5762:2, 5771:4, 5772:25, 5780:22, 5782:3, 5782:5, 5783:8, 5786:13, 5786:24, 5789:5, 5793:12, 5793:15, 5794:5, 5794:8, 5797:9, 5799:5, 5809:25, 5812:25, 5813:1, 5813:13, 5815:2, 5831:1, 5831:14, 5832:1, 5837:14, 5863:9, 5863:10, 5871:6, 5871:7, 5875:5, 5875:8, 5877:10, 5877:14, 5877:18, 5877:19, 5877:20, 5877:21, 5878:13, 5878:25, 5879:10, 5880:7, 5882:4, 5887:19, 5887:24, 5888:5, 5892:16, 5894:20, 5895:7, 5897:10, 5898:4, 5899:10, 5900:6, 5903:8, 5905:3, 5905:18, 5906:2, 5907:2
**2013** [58] - 5743:20, 5743:24, 5745:24, 5746:25, 5747:2, 5747:17, 5750:22, 5756:11, 5756:16, 5756:20, 5757:18, 5761:13, 5761:25, 5762:3, 5770:4, 5770:7, 5770:11, 5774:20, 5780:22, 5794:2, 5794:5, 5794:8, 5794:18, 5794:20, 5794:23, 5794:25, 5795:8, 5796:10, 5797:6, 5797:10, 5797:14, 5797:24, 5797:25, 5798:4, 5798:7, 5798:10, 5798:17, 5798:18, 5798:25, 5799:1, 5799:6, 5799:22, 5799:25, 5800:4, 5800:18, 5800:23, 5801:24, 5802:15, 5802:18, 5807:6, 5814:5, 5814:10, 5837:14, 5888:21
**2014** [19] - 5716:7, 5724:13, 5761:24, 5761:25, 5762:5, 5762:7, 5762:16, 5770:17, 5771:7, 5771:18, 5771:23, 5772:5, 5772:25, 5774:9, 5775:3, 5804:12, 5804:14, 5805:7, 5815:3
**2017** [2] - 5691:7, 5917:6
**20K** [1] - 5896:18
**21** [9] - 5782:2, 5782:5, 5783:8, 5786:13, 5786:24, 5789:5, 5790:18, 5798:17, 5800:17
**21st** [10] - 5777:16, 5778:25, 5779:7, 5782:10, 5783:12, 5785:25, 5786:1, 5787:1, 5789:1
**22** [2] - 5782:11, 5841:11
**22,000** [1] - 5796:15
**225** [1] - 5691:23
**23** [2] - 5810:5, 5812:11
**24** [1] - 5757:18
**24,700** [1] - 5832:1
**24/7** [1] - 5699:18
**24th** [1] - 5698:10
**25** [3] - 5786:5, 5786:21, 5787:21
**250,000** [3] - 5735:9, 5766:15, 5858:21

| CMH | OCR | RMR | CRR | FCRR | 2 |
|---|---|---|---|---|---|

**CMH**

**26** [2] - 5831:1, 5831:3
**26th** [1] - 5806:18
**27** [4] - 5755:8, 5816:8, 5864:13, 5864:14
**27.17** [1] - 5745:16
**271** [1] - 5691:15
**272,221** [1] - 5747:1
**28** [24] - 5750:21, 5755:8, 5756:2, 5756:4, 5756:20, 5761:13, 5770:4, 5770:7, 5770:11, 5770:20, 5790:5, 5793:11, 5793:15, 5794:2, 5794:5, 5794:8, 5797:24, 5797:25, 5798:7, 5798:9, 5799:6, 5831:14, 5832:1, 5863:16
**28th** [1] - 5771:4
**29** [4] - 5798:18, 5800:17, 5805:7, 5811:24
**29th** [2] - 5698:11, 5699:4
**2:00** [1] - 5818:21
**2:05** [1] - 5818:13
**2:10** [1] - 5818:13
**2C** [1] - 5900:19

**3**

**3** [6] - 5731:8, 5731:9, 5774:14, 5774:16, 5889:13, 5901:19
**3,061,110** [1] - 5747:2
**3,187,200** [1] - 5745:12
**3,333,331** [1] - 5746:23
**3,380,607** [1] - 5741:14
**3.10** [1] - 5831:6
**3.18** [1] - 5816:5
**3.50** [1] - 5806:23
**3.75** [1] - 5806:19
**3.95** [1] - 5807:6
**30** [19] - 5716:7, 5722:15, 5756:16, 5761:24, 5772:25, 5794:18, 5794:19, 5794:20, 5794:23, 5794:25, 5795:7, 5795:11, 5796:9, 5796:10, 5796:18, 5796:23, 5797:6, 5872:20, 5882:4
**300,000** [4] - 5735:6,

**OCR**

5735:7, 5766:5, 5766:7
**302** [1] - 5819:20
**302's** [2] - 5820:3, 5820:5
**302s** [1] - 5820:13
**30th** [3] - 5698:11, 5699:4, 5771:7
**31** [1] - 5874:18
**31st** [1] - 5699:5
**32** [1] - 5886:22
**330** [3] - 5856:11, 5877:15, 5877:16
**35** [1] - 5872:11
**350,000** [3] - 5735:6, 5735:8
**3500** [4] - 5795:8, 5795:11, 5795:21, 5797:6
**36** [1] - 5831:18
**375,000** [4] - 5738:15, 5738:18, 5739:10, 5739:13
**3:45** [1] - 5830:5

**4**

**4** [10] - 5730:23, 5730:25, 5731:1, 5731:5, 5731:6, 5731:11, 5731:13, 5806:25, 5807:8, 5892:10
**4,000** [1] - 5831:23
**4.05** [1] - 5745:1
**4.5** [1] - 5739:18
**4.50** [1] - 5806:21
**4.7** [1] - 5804:5
**4.95** [1] - 5807:9
**40** [2] - 5815:20, 5815:24
**40.54** [1] - 5741:16
**400** [1] - 5795:2
**413** [1] - 5740:24
**425** [1] - 5831:18
**44** [7] - 5728:17, 5728:18, 5728:19, 5729:5, 5729:16, 5729:17, 5729:19
**45,000** [1] - 5893:3
**455** [1] - 5831:25
**45K** [1] - 5893:6
**473,274** [3] - 5740:17, 5741:2, 5744:22
**48th** [1] - 5691:17
**4:30** [6] - 5764:5, 5818:13, 5829:21, 5830:9, 5907:13, 5912:21

**RMR**

**5**

**5** [9] - 5732:20, 5732:23, 5733:1, 5734:7, 5734:10, 5734:18, 5734:20, 5818:6, 5901:19
**5,000** [6] - 5759:9, 5779:10, 5783:4, 5783:8, 5783:13, 5787:7
**5,800** [3] - 5782:14, 5782:25, 5787:7
**5,838,837** [1] - 5726:18
**5.01** [1] - 5726:4
**5.68** [1] - 5740:20
**5.8** [1] - 5730:13
**50** [5] - 5754:22, 5783:11, 5787:3, 5879:23
**500** [5] - 5786:2, 5786:4, 5786:10, 5786:18, 5786:20
**54** [1] - 5718:13
**5714** [1] - 5918:5
**5717** [1] - 5918:15
**5764** [1] - 5918:6
**58** [1] - 5812:11
**5804** [1] - 5918:15
**5835** [1] - 5918:7
**5839** [1] - 5918:8
**5841** [1] - 5918:10
**5856** [1] - 5918:16
**5864** [1] - 5918:16
**5882** [1] - 5918:17
**5887** [1] - 5918:17
**5892** [1] - 5918:18
**5895** [1] - 5918:18
**5899** [1] - 5918:19
**5K** [7] - 5866:4, 5895:15, 5895:23, 5896:6

**6**

**6** [8] - 5799:22, 5799:25, 5800:4, 5800:23, 5800:25, 5801:24, 5802:15, 5802:18
**6,000** [2] - 5795:18, 5795:20
**60** [1] - 5722:15
**60,000** [2] - 5746:1, 5814:22
**613-2643** [1] - 5691:24
**67.7** [1] - 5761:8
**69** [1] - 5753:25

**CRR**

**7**

**70** [1] - 5875:25
**718** [1] - 5691:24
**74** [2] - 5796:19
**75** [1] - 5726:11
**777** [1] - 5737:13

**8**

**8** [7] - 5745:11, 5756:10, 5757:18, 5815:17, 5843:24, 5864:14, 5865:5
**8,338,836** [1] - 5746:21
**8,338,837** [1] - 5726:16
**8-k** [1] - 5717:2
**8-K** [13] - 5724:21, 5724:22, 5724:23, 5725:2, 5725:4, 5725:14, 5725:22, 5733:16, 5746:22, 5746:25, 5747:8, 5810:4
**8.3** [1] - 5730:12
**8/22/11** [1] - 5858:22
**8/9/11** [1] - 5858:22
**80** [6] - 5725:17, 5726:11, 5735:19, 5809:19, 5809:21, 5875:25
**848,687** [1] - 5741:11
**88** [1] - 5782:7

**9**

**9** [6] - 5742:6, 5831:13, 5856:6, 5856:15, 5883:13, 5887:19
**90** [2] - 5831:9, 5873:1
**922** [1] - 5765:20
**950** [1] - 5717:17, 5718:12, 5780:17, 5782:24, 5785:24, 5786:14, 5786:16, 5794:19, 5797:4, 5797:9, 5832:12
**951** [2] - 5798:16, 5800:16
**954** [2] - 5717:17, 5832:13
**955** [5] - 5716:2, 5778:12, 5779:4, 5779:13, 5831:2
**956** [1] - 5806:5
**960** [8] - 5716:24, 5717:10, 5717:13,

**FCRR**

5725:13, 5728:17, 5730:12, 5809:18, 5918:15
**962** [8] - 5716:25, 5717:10, 5717:13, 5736:16, 5812:25, 5815:16, 5815:17, 5918:15
**964** [8] - 5716:25, 5717:10, 5717:13, 5743:14, 5813:24, 5815:16, 5816:2, 5918:15
**990** [11] - 5718:20, 5719:6, 5719:13, 5734:1, 5735:1, 5752:17, 5752:19, 5765:15, 5767:1, 5767:8, 5793:20
**992** [13] - 5718:20, 5719:6, 5719:13, 5761:18, 5770:9, 5770:10, 5770:16, 5771:6, 5774:2, 5802:23, 5804:14, 5807:22
**995** [29] - 5718:20, 5719:6, 5719:13, 5750:16, 5752:23, 5753:11, 5760:25, 5761:12, 5765:20, 5770:6, 5770:10, 5777:1, 5778:22, 5779:3, 5779:4, 5783:6, 5786:5, 5787:4, 5788:19, 5793:23, 5794:10, 5796:10, 5796:23, 5797:23, 5799:4, 5807:22, 5830:21, 5834:18, 5837:9
**996** [1] - 5797:2
**9:00** [2] - 5691:7, 5917:6

**A**

**a.m** [2] - 5691:7, 5917:7
**abide** [2] - 5713:7, 5729:4
**ability** [2] - 5776:2, 5784:11
**able** [22] - 5692:21, 5694:16, 5695:14, 5696:14, 5700:4, 5700:14, 5703:22, 5728:9, 5735:21, 5748:2, 5757:5, 5758:19, 5772:10,

CMH          OCR          RMR          CRR          FCRR                          3

5816:19, 5823:3, 5825:10, 5828:5, 5829:16, 5905:6, 5905:7, 5905:8, 5908:20
**aboard** [1] - 5886:4
**absolutely** [5] - 5749:13, 5764:22, 5765:12, 5821:22, 5826:23
**abundance** [1] - 5915:15
**abusing** [1] - 5695:2
**accept** [1] - 5854:1
**acceptable** [1] - 5763:21
**acceptance** [1] - 5899:20
**accepted** [1] - 5855:9
**accessible** [1] - 5775:2
**according** [4] - 5741:18, 5744:13, 5755:18, 5806:11
**account** [21] - 5749:8, 5752:22, 5756:9, 5780:4, 5781:22, 5792:24, 5793:14, 5795:19, 5796:1, 5796:11, 5799:10, 5799:14, 5799:18, 5801:14, 5801:18, 5801:21, 5802:15, 5896:15, 5897:15, 5897:17, 5902:1
**accountable** [1] - 5768:3
**accountant** [1] - 5731:25
**accounted** [2] - 5761:7, 5761:9
**accounts** [38] - 5751:24, 5752:1, 5756:5, 5756:21, 5760:22, 5761:7, 5761:9, 5765:17, 5769:13, 5773:11, 5777:13, 5780:8, 5783:23, 5785:16, 5786:8, 5788:21, 5789:3, 5789:6, 5789:8, 5790:14, 5791:2, 5791:7, 5791:23, 5792:1, 5792:11, 5793:6, 5793:9, 5793:12, 5793:16, 5793:22, 5793:24, 5794:16, 5830:22, 5830:23, 5831:16, 5833:8,

5834:17
**accrued** [1] - 5900:23
**accuracy** [2] - 5775:12, 5809:9
**accurate** [7] - 5776:6, 5776:15, 5780:12, 5780:25, 5781:2, 5782:17, 5815:12
**accurately** [1] - 5719:2
**acknowledge** [3] - 5900:12, 5900:20, 5901:1
**acquire** [2] - 5883:7, 5883:13
**acquisition** [3] - 5726:2, 5738:3, 5883:5
**act** [1] - 5857:20
**Act** [1] - 5732:17
**Acting** [1] - 5691:13
**action** [1] - 5774:17
**actions** [1] - 5733:13
**actively** [1] - 5872:19
**activist** [5] - 5871:21, 5871:24, 5871:25, 5872:13, 5873:17
**activities** [1] - 5890:8
**activity** [19] - 5748:7, 5755:11, 5760:21, 5761:8, 5761:10, 5773:11, 5779:16, 5784:12, 5789:14, 5790:2, 5790:7, 5792:24, 5794:20, 5796:12, 5799:12, 5799:15, 5832:14, 5832:17, 5832:18
**actual** [9] - 5697:12, 5698:12, 5709:11, 5784:6, 5825:9, 5832:14, 5868:16, 5890:14, 5905:4
**add** [2] - 5782:22, 5913:24
**added** [4] - 5752:12, 5761:3, 5761:4, 5778:1
**adding** [1] - 5782:13
**addition** [1] - 5901:1
**additional** [7] - 5692:8, 5694:11, 5715:2, 5747:8, 5811:4, 5811:20, 5900:22
**address** [4] - 5711:8, 5737:13, 5749:8, 5856:11
**adhere** [1] - 5911:15
**adhered** [1] - 5913:2

**adjourned** [1] - 5917:6
**adjustment** [1] - 5746:7
**admin** [1] - 5865:12
**administrator** [1] - 5865:11
**admissibility** [1] - 5823:3
**admissible** [3] - 5822:17, 5823:14, 5824:23
**admission** [1] - 5822:5
**admit** [11] - 5719:5, 5820:8, 5821:9, 5821:21, 5821:23, 5822:16, 5824:8, 5825:8, 5826:13, 5828:7, 5915:25
**admits** [2] - 5822:3, 5828:4
**admitted** [6] - 5716:2, 5718:13, 5737:17, 5820:19, 5824:11, 5824:13
**admitting** [1] - 5824:14
**adopt** [1] - 5871:19
**adopted** [1] - 5820:7
**adopting** [1] - 5827:1
**advance** [1] - 5822:19
**advancing** [1] - 5710:19
**adversely** [2] - 5812:5, 5902:9
**advertisement** [1] - 5870:4
**advice** [2] - 5809:5, 5869:3
**advise** [2] - 5764:4, 5809:2
**advised** [1] - 5902:2
**affect** [4] - 5712:4, 5733:10, 5733:14, 5902:10
**affected** [2] - 5693:18, 5812:5
**affects** [2] - 5838:18, 5838:21
**affiliate** [7] - 5729:21, 5729:23, 5729:24, 5730:3, 5883:6, 5883:13, 5883:17
**affiliated** [1] - 5883:18
**affiliates** [4] - 5730:6, 5730:8, 5902:2, 5902:5
**afford** [1] - 5810:11
**AFTERNOON** [1] - 5819:1

**afternoon** [6] - 5819:4, 5829:22, 5835:17, 5835:18, 5841:6, 5841:7
**agencies** [3] - 5776:2, 5784:11, 5848:22
**agency** [3] - 5768:1, 5848:7, 5848:24
**agent** [10] - 5715:18, 5716:17, 5718:17, 5728:3, 5728:5, 5728:6, 5733:22, 5736:3, 5765:18, 5769:24
**agents** [1] - 5850:22
**aggregate** [5] - 5739:11, 5741:12, 5746:2, 5746:23, 5754:4
**ago** [14] - 5716:18, 5719:3, 5721:7, 5728:2, 5753:12, 5758:22, 5844:1, 5864:21, 5870:19, 5890:18, 5900:16, 5901:10, 5901:11, 5909:12
**agony** [1] - 5703:17
**agree** [12] - 5706:17, 5708:7, 5710:2, 5772:6, 5821:25, 5822:4, 5824:5, 5896:6, 5896:18, 5900:20, 5901:1, 5901:23
**agreed** [7] - 5711:6, 5826:18, 5828:19, 5844:15, 5844:21, 5892:1, 5895:25
**agreeing** [1] - 5901:16
**agreement** [56] - 5726:2, 5747:18, 5747:20, 5747:21, 5819:22, 5822:9, 5822:10, 5822:14, 5824:4, 5824:12, 5825:7, 5825:11, 5826:12, 5826:13, 5826:22, 5828:18, 5851:8, 5851:11, 5851:12, 5851:13, 5851:16, 5851:20, 5852:1, 5852:7, 5852:9, 5855:17, 5856:4, 5856:7, 5856:15, 5856:19, 5856:22, 5859:1, 5861:16, 5866:20, 5892:3, 5899:9, 5899:11, 5899:12,

5899:17, 5899:19, 5899:20, 5899:22, 5900:7, 5901:7, 5902:18, 5903:12, 5903:24, 5903:25, 5904:3, 5904:6, 5904:10, 5904:14, 5904:23, 5905:3, 5906:1
**agreements** [1] - 5824:11
**agrees** [2] - 5828:3, 5859:20
**ahead** [6] - 5741:6, 5742:6, 5746:14, 5800:6, 5848:1, 5872:4
**ahold** [1] - 5829:9
**aid** [1] - 5719:7
**aided** [1] - 5691:25
**aligned** [1] - 5835:4
**aligning** [1] - 5814:24
**ALIXANDRA** [1] - 5691:13
**allegedly** [1] - 5908:9
**Allison** [1] - 5861:20, 5861:21, 5862:12, 5863:13, 5864:9, 5864:11, 5864:21, 5865:5, 5878:2, 5886:11
**allow** [2] - 5771:22, 5884:5
**allowed** [4] - 5869:23, 5869:24, 5869:25, 5902:20
**almost** [6] - 5779:10, 5786:5, 5787:3, 5819:12, 5831:11, 5863:4
**alone** [1] - 5807:18
**alternate** [1] - 5700:10
**alternates** [3] - 5693:14, 5705:17, 5705:18
**alternatives** [1] - 5697:25
**amenable** [1] - 5888:8
**amended** [4] - 5743:23, 5745:21, 5814:16, 5816:3
**amendment** [2] - 5743:16, 5743:17
**AMERICA** [1] - 5691:3
**amorphous** [2] - 5855:7, 5855:8
**amount** [30] - 5721:20, 5728:24, 5730:22, 5731:18, 5739:11, 5739:15, 5739:20,

CMH          OCR          RMR          CRR          FCRR

CMH          OCR          RMR          CRR          FCRR          4

5740:8, 5740:19,
5741:3, 5741:12,
5745:1, 5745:3,
5745:14, 5745:20,
5746:12, 5749:14,
5750:12, 5760:14,
5771:15, 5786:10,
5802:2, 5816:20,
5834:5, 5834:8,
5834:14, 5834:24,
5868:8, 5872:15,
5873:3
**amounts** [2] -
5802:16, 5834:8
**analogy** [1] - 5720:13
**analysis** [26] -
5701:11, 5701:12,
5701:16, 5710:12,
5711:1, 5711:22,
5711:23, 5712:2,
5712:19, 5714:17,
5715:2, 5715:5,
5715:8, 5716:22,
5717:7, 5750:13,
5769:7, 5769:9,
5769:15, 5769:19,
5770:5, 5771:9,
5775:24, 5822:17,
5837:22, 5846:24
**analyst** [2] - 5843:4,
5844:10
**analysts** [3] - 5841:22,
5841:23, 5844:18
**analyze** [9] - 5711:13,
5765:16, 5765:20,
5769:10, 5769:13,
5776:2, 5784:11,
5843:5, 5843:7
**analyzed** [2] - 5771:2,
5789:8
**Andre** [1] - 5752:24
**Andrew** [23] - 5735:9,
5752:2, 5752:25,
5766:15, 5780:9,
5785:25, 5786:1,
5788:24, 5790:23,
5791:7, 5793:16,
5795:7, 5795:8,
5795:11, 5795:21,
5799:25, 5800:19,
5801:11, 5830:24,
5831:16, 5831:19,
5832:5, 5890:15
**Andy** [13] - 5789:9,
5796:6, 5797:5,
5797:6, 5797:8,
5798:9, 5800:25,
5801:6, 5802:2,
5802:8, 5862:2,
5877:24, 5906:5

**Aneesh** [1] - 5865:7
**angry** [1] - 5706:7
**anniversary** [1] -
5746:5
**announces** [1] -
5804:5
**annual** [1] - 5731:21
**anonymously** [1] -
5902:13
**answer** [14] - 5694:23,
5701:5, 5763:15,
5773:17, 5773:19,
5773:21, 5775:15,
5775:16, 5781:6,
5788:1, 5788:4,
5800:11
**answering** [1] -
5902:17
**anticipate** [1] -
5888:20
**anticipated** [1] -
5851:7
**anticipating** [1] -
5819:11
**anyway** [2] - 5710:22,
5821:9
**apartments** [1] -
5842:8
**apologize** [4] -
5702:12, 5703:8,
5800:24, 5884:3
**appear** [2] - 5766:22,
5767:8
**APPEARANCES** [1] -
5691:11
**apples** [1] - 5772:21
**applicable** [1] -
5900:14
**applies** [4] - 5729:16,
5729:17, 5902:11,
5902:14
**apply** [1] - 5729:19
**appointment** [1] -
5726:7
**appreciate** [3] -
5699:24, 5700:2,
5778:14
**appropriate** [7] -
5711:23, 5712:23,
5820:22, 5821:2,
5821:17, 5825:10,
5915:24
**approval** [2] -
5803:21, 5804:8
**April** [1] - 5774:8
**area** [4] - 5701:8,
5712:12, 5734:4,
5842:21
**argue** [2] - 5911:11,
5913:16

**argument** [1] -
5913:24
**Arkansas** [5] -
5879:11, 5879:15,
5879:20, 5882:22,
5885:21
**arose** [1] - 5697:25
**arrange** [1] - 5700:14
**arrangement** [4] -
5694:9, 5698:9,
5733:3, 5763:20
**arrangements** [6] -
5708:19, 5708:20,
5726:8, 5742:25,
5743:4, 5747:11
**arrested** [2] - 5848:20,
5850:12
**arrive** [1] - 5830:6
**Aselage** [1] - 5906:5
**asset** [7] - 5846:19,
5876:16, 5878:18,
5879:11, 5889:3,
5889:4
**assets** [7] - 5721:20,
5723:6, 5723:7,
5726:3, 5846:12,
5874:16, 5891:5
**Assistance** [1] -
5768:15
**assistant** [7] -
5842:11, 5842:14,
5842:20, 5861:22,
5864:9, 5864:22,
5886:11
**Assistant** [1] -
5691:15
**assisting** [2] -
5768:18, 5768:23
**associated** [1] -
5726:25
**assume** [5] - 5694:25,
5705:17, 5832:19,
5883:6, 5896:11
**assuming** [2] -
5700:16, 5896:9
**assurance** [1] -
5704:18
**assure** [1] - 5696:5
**assured** [3] - 5704:13,
5705:9, 5868:4
**assures** [1] - 5706:9
**assuring** [1] - 5705:12
**attended** [2] - 5853:9,
5854:4
**attention** [14] -
5699:19, 5699:23,
5704:3, 5713:5,
5725:12, 5726:11,
5755:7, 5779:6,
5807:5, 5812:24,

**attesting** [1] - 5813:19
**attorney** [5] - 5728:13,
5768:7, 5815:9,
5867:16, 5873:21
**Attorney** [1] - 5691:13
**Attorney's** [2] -
5714:23, 5849:3
**Attorneys** [1] -
5691:15
**attorneys'** [1] - 5820:1
**attributing** [1] -
5915:8
**audited** [4] - 5725:5,
5731:23, 5731:24,
5732:5
**August** [2] - 5853:23,
5853:25, 5856:6,
5856:15, 5861:18,
5863:24, 5864:5,
5867:20, 5882:4
**authenticate** [1] -
5820:23
**authorities** [1] -
5848:6
**automatic** [2] -
5705:17, 5866:4
**available** [21] -
5749:12, 5749:16,
5750:4, 5759:21,
5759:25, 5760:7,
5760:15, 5765:10,
5805:14, 5812:16,
5823:19, 5834:6,
5834:9, 5834:14,
5834:24, 5835:22,
5836:3, 5836:6,
5836:7, 5837:6,
5838:18
**Ave** [2] - 5877:15,
5877:16
**Avenue** [6] - 5691:17,
5737:13, 5853:8,
5856:12, 5877:17,
5885:19
**average** [1] - 5875:25
**Average** [1] - 5782:11
**avoid** [1] - 5823:6
**avoiding** [1] - 5695:18
**aware** [3] - 5819:20,
5915:6, 5915:7
**awesome** [1] -
5879:25
**awful** [1] - 5705:1
**awhile** [1] - 5866:10
**axis** [1] - 5751:5

**B**

**background** [6] -
5853:15, 5870:8,
5890:24, 5908:25,
5910:3, 5913:20
**backlash** [5] -
5702:14, 5704:17,
5706:6, 5707:23,
5709:1
**bad** [1] - 5830:12
**balance** [1] - 5732:11
**balanced** [1] - 5788:8
**Bank** [3] - 5841:17,
5841:19, 5841:23
**banker** [1] - 5876:16
**banking** [1] - 5890:24
**bar** [16] - 5751:16,
5751:19, 5751:23,
5777:7, 5777:8,
5777:11, 5778:1,
5779:17, 5789:1,
5790:12, 5790:15,
5790:17, 5791:6,
5792:19, 5907:11
**barely** [1] - 5759:9
**bars** [4] - 5777:22,
5785:16, 5788:20,
5837:10
**based** [25] - 5693:17,
5707:23, 5707:25,
5710:25, 5712:6,
5712:19, 5733:16,
5735:20, 5742:2,
5746:17, 5746:19,
5760:13, 5769:19,
5777:10, 5802:24,
5803:4, 5808:3,
5846:24, 5847:3,
5847:4, 5862:1,
5868:3, 5906:14,
5908:19, 5910:11
**basic** [1] - 5876:17
**basis** [13] - 5730:1,
5820:8, 5821:9,
5821:10, 5821:19,
5822:21, 5824:8,
5908:5, 5908:8,
5910:4, 5911:5,
5914:5, 5915:2
**bat** [1] - 5853:17
**Bausch** [3] - 5895:14,
5895:18, 5896:9
**became** [7] - 5722:11,
5762:9, 5842:20,
5844:11, 5863:5,
5915:6
**become** [4] - 5748:4,
5772:9, 5906:11,
5913:8

CMH        OCR        RMR        CRR        FCRR        5

**becomes** [2] - 5723:4, 5775:3
**bedroom** [1] - 5862:14
**BEFORE** [1] - 5691:10
**began** [1] - 5891:18
**beginning** [8] - 5746:4, 5772:18, 5774:19, 5877:18, 5877:19, 5877:20, 5878:13, 5889:13
**begins** [1] - 5778:1
**behalf** [6] - 5699:21, 5769:2, 5857:11, 5861:11, 5902:15, 5903:9
**behind** [10] - 5706:25, 5708:25, 5716:25, 5718:1, 5718:21, 5725:13, 5749:7, 5833:13
**behold** [1] - 5720:18
**belief** [4] - 5711:1, 5813:5, 5813:20, 5814:2
**below** [4] - 5738:19, 5739:4, 5805:6, 5810:13
**beneficial** [7] - 5733:1, 5736:21, 5742:20, 5760:13, 5834:5, 5834:7, 5834:23
**beneficiary** [3] - 5737:21, 5739:11, 5741:12
**beneficiary-owned** [1] - 5741:12
**benefited** [1] - 5826:5
**best** [20] - 5694:14, 5697:14, 5698:6, 5698:13, 5813:4, 5813:20, 5814:1, 5820:20, 5822:22, 5823:6, 5823:9, 5855:2, 5875:7, 5875:10, 5877:10, 5879:16, 5888:12, 5896:11
**better** [7] - 5706:3, 5706:11, 5784:21, 5785:21, 5846:16, 5892:9, 5907:12
**betting** [1] - 5720:9
**between** [24] - 5695:23, 5723:14, 5736:10, 5743:5, 5747:21, 5750:12, 5759:18, 5764:9, 5772:24, 5782:6, 5784:8, 5794:1,

5794:4, 5794:7, 5797:13, 5838:15, 5856:8, 5864:10, 5864:24, 5865:1, 5870:24, 5892:15, 5894:17
**Biestek** [33] - 5735:8, 5752:3, 5752:24, 5752:25, 5766:7, 5780:9, 5786:24, 5787:11, 5788:24, 5789:10, 5790:24, 5791:8, 5793:17, 5798:12, 5798:24, 5800:20, 5801:1, 5802:11, 5830:24, 5831:16, 5854:5, 5861:23, 5877:7, 5877:24, 5881:2, 5881:24, 5882:12, 5883:10, 5885:13, 5890:3, 5890:4, 5891:5, 5905:1
**big** [12] - 5721:17, 5724:25, 5759:6, 5771:21, 5772:6, 5772:8, 5772:11, 5862:13, 5862:14, 5866:21, 5868:20, 5910:24
**bigger** [1] - 5722:20
**biggest** [1] - 5871:3
**billion** [2] - 5843:24, 5888:19
**billionaire** [1] - 5847:15
**binder** [12] - 5715:10, 5715:11, 5715:15, 5718:21, 5725:14, 5734:2, 5736:17, 5750:17, 5761:19, 5855:11, 5894:16, 5898:20
**biotech** [2] - 5903:22, 5905:25
**biotechnology** [2] - 5888:14, 5890:15
**bit** [10] - 5697:7, 5697:9, 5704:24, 5710:25, 5716:13, 5749:3, 5844:16, 5846:18, 5873:5, 5885:21
**blank** [1] - 5821:12
**blessing** [1] - 5880:3
**Bloomberg** [32] - 5715:17, 5716:6, 5748:11, 5748:16, 5748:17, 5748:18, 5749:16, 5751:9,

5751:21, 5752:15, 5769:21, 5773:14, 5777:4, 5777:10, 5777:15, 5777:18, 5777:20, 5779:12, 5779:17, 5784:20, 5784:23, 5785:3, 5785:5, 5802:25, 5803:4, 5805:22, 5806:6, 5806:11, 5831:2, 5836:8, 5838:11
**blue** [78] - 5715:14, 5715:19, 5715:22, 5717:16, 5717:21, 5717:22, 5717:23, 5718:2, 5718:16, 5719:10, 5748:11, 5749:2, 5749:12, 5749:14, 5749:19, 5751:10, 5751:21, 5752:11, 5754:13, 5769:20, 5775:11, 5775:12, 5775:13, 5775:15, 5775:17, 5775:23, 5776:1, 5776:6, 5776:10, 5776:12, 5776:15, 5776:17, 5776:20, 5776:21, 5777:21, 5778:2, 5778:10, 5779:19, 5779:24, 5780:7, 5780:17, 5780:20, 5780:25, 5781:2, 5782:16, 5783:7, 5783:24, 5784:2, 5784:10, 5784:15, 5785:7, 5785:9, 5785:23, 5787:6, 5787:12, 5787:20, 5788:21, 5793:2, 5793:13, 5794:20, 5796:17, 5797:8, 5797:14, 5798:14, 5799:7, 5800:17, 5801:21, 5802:12, 5832:12, 5835:19, 5835:22, 5835:24, 5836:2, 5837:3, 5837:6, 5838:21
**blurted** [1] - 5911:3
**board** [2] - 5800:9, 5845:19
**bold** [1] - 5860:10
**bonus** [1] - 5900:23
**books** [1] - 5879:17
**borrow** [2] - 5720:16, 5720:25
**borrowed** [1] -

5720:21
**boss** [16] - 5692:6, 5697:5, 5697:11, 5698:7, 5703:20, 5705:9, 5706:4, 5706:18, 5707:1, 5707:6, 5707:8, 5708:3, 5708:15, 5708:17, 5709:11, 5710:3
**Boston** [2] - 5842:4, 5903:23
**bottom** [18] - 5726:12, 5736:6, 5739:4, 5741:21, 5747:13, 5751:2, 5751:3, 5782:10, 5799:10, 5809:21, 5859:16, 5859:19, 5861:9, 5865:3, 5882:11, 5895:4, 5898:25, 5903:5
**bottoms** [1] - 5843:17
**bottoms-up** [1] - 5843:17
**bought** [13] - 5749:10, 5754:9, 5757:6, 5757:11, 5758:3, 5782:9, 5815:1, 5835:2, 5871:3, 5878:18, 5889:4, 5909:3
**box** [6] - 5737:22, 5737:24, 5738:19, 5751:25, 5756:5, 5910:23
**Box** [1] - 5739:11
**brain** [1] - 5890:14
**brand** [3] - 5846:11, 5846:15, 5846:16
**breadwinner** [1] - 5698:25
**break** [15] - 5699:14, 5757:13, 5762:24, 5763:4, 5764:9, 5790:11, 5792:17, 5818:8, 5829:22, 5830:2, 5838:1, 5884:3, 5884:5, 5901:11, 5912:17
**breaking** [1] - 5912:17
**breaks** [1] - 5699:9
**BRIDGET** [1] - 5691:12
**brief** [3] - 5799:7, 5907:10, 5907:12
**briefcase** [1] - 5823:18
**briefly** [10] - 5729:9, 5739:23, 5740:11,

5744:4, 5744:10, 5767:21, 5830:21, 5835:14, 5850:3, 5861:25
**bring** [6] - 5698:22, 5702:6, 5703:4, 5764:2, 5848:3, 5848:5
**broad** [2] - 5711:24, 5712:3
**broadening** [1] - 5891:4
**broadly** [1] - 5878:12
**Brodsky** [3] - 5819:13, 5819:16, 5821:12
**BRODSKY** [3] - 5691:19, 5829:19, 5894:8
**Brodsky's** [4] - 5819:24, 5820:1, 5821:24, 5822:1
**broke** [4] - 5714:1, 5818:5, 5880:20, 5885:9
**broker** [3] - 5749:22, 5833:9, 5879:17
**broker-dealer** [1] - 5749:22
**brokerage** [1] - 5838:12
**brokers** [2] - 5776:9, 5879:18
**Brooklyn** [3] - 5691:5, 5691:16, 5691:23
**brought** [2] - 5705:10, 5713:5
**bucks** [1] - 5720:15
**build** [1] - 5829:13
**bunch** [1] - 5865:2
**Burke** [1] - 5823:20
**business** [26] - 5723:7, 5725:7, 5725:10, 5732:12, 5810:7, 5810:17, 5853:2, 5860:9, 5863:5, 5872:15, 5872:16, 5872:22, 5872:23, 5873:4, 5873:21, 5879:17, 5879:22, 5880:1, 5881:17, 5891:8, 5900:5, 5902:8, 5902:10, 5905:20
**businesses** [2] - 5872:24, 5879:19
**buy** [34] - 5719:23, 5720:19, 5721:6, 5731:4, 5731:18, 5738:8, 5738:10, 5746:12, 5749:24,

5754:19, 5756:17,
5756:21, 5757:1,
5757:19, 5757:22,
5758:19, 5759:24,
5772:17, 5780:2,
5788:10, 5790:18,
5790:20, 5801:1,
5832:17, 5863:2,
5869:23, 5880:25,
5882:22, 5906:12,
5909:17, 5909:22,
5910:13, 5914:10,
5915:24
**buy/sell** [1] - 5781:14
**buyer** [3] - 5750:11,
5750:12, 5832:16
**buyers** [5] - 5750:1,
5760:5, 5784:5,
5784:9, 5785:14
**buying** [13] - 5758:20,
5788:16, 5790:24,
5791:2, 5791:10,
5792:1, 5797:19,
5801:11, 5801:19,
5802:9, 5802:17,
5812:15, 5814:24
**buys** [7] - 5758:13,
5782:6, 5782:13,
5783:2, 5795:1,
5795:2, 5799:22
**BY** [21] - 5691:13,
5691:19, 5728:1,
5751:1, 5764:19,
5771:1, 5790:1,
5805:1, 5830:20,
5835:16, 5837:1,
5839:2, 5841:5,
5861:1, 5885:8,
5887:5, 5887:17,
5892:24, 5895:3,
5897:8, 5899:8

---

## C

**Cabaret** [9] - 5872:9,
5872:10, 5872:11,
5872:13, 5873:12,
5873:25, 5874:13,
5874:17, 5876:5
**cabinet** [3] - 5878:20,
5879:9, 5890:23
**cabinets** [1] - 5876:17
**Cadman** [2] - 5691:15,
5691:23
**calculate** [3] - 5782:9,
5783:22, 5836:4
**calculated** [1] -
5837:2
**calculating** [1] -
5694:21

**calculation** [3] -
5761:6, 5835:25,
5836:2
**calculator** [1] -
5782:22
**cancel** [1] - 5795:18
**cancellations** [2] -
5728:8, 5780:3
**candid** [1] - 5709:4
**cap** [1] - 5873:2
**capacity** [1] - 5857:10
**Capital** [25] - 5735:9,
5737:10, 5737:18,
5738:10, 5739:23,
5740:8, 5742:22,
5744:12, 5744:13,
5744:16, 5753:7,
5794:4, 5814:18,
5849:20, 5849:21,
5849:25, 5863:2,
5864:22, 5864:25,
5868:19, 5880:16,
5881:3, 5886:5,
5887:23
**capital** [16] - 5738:6,
5738:8, 5740:15,
5740:23, 5766:12,
5811:4, 5811:17,
5811:20, 5842:21,
5868:9, 5869:5,
5871:10, 5871:12,
5881:16, 5881:20,
5891:8
**captain** [1] - 5842:22
**capture** [1] - 5838:12
**car** [1] - 5854:14
**Cardillo** [1] - 5846:2
**care** [5] - 5695:4,
5699:23, 5843:11,
5843:13, 5843:16
**career** [2] - 5768:10,
5808:1
**careful** [2] - 5693:17,
5695:5
**carefully** [3] - 5698:5,
5810:12, 5859:14
**Carter** [16] - 5770:21,
5774:12, 5779:4,
5781:11, 5782:4,
5783:3, 5796:17,
5797:7, 5797:21,
5800:19, 5804:17,
5809:22, 5810:20,
5811:3, 5813:3,
5815:17
**case** [31] - 5692:21,
5693:7, 5701:17,
5701:18, 5703:19,
5706:9, 5711:5,
5712:9, 5714:16,

5714:21, 5715:5,
5723:10, 5730:1,
5730:5, 5733:17,
5739:10, 5763:1,
5773:9, 5776:21,
5814:15, 5818:12,
5827:1, 5852:3,
5872:4, 5905:24,
5912:5, 5912:6,
5914:24, 5917:6
**cases** [3] - 5729:1,
5768:19, 5769:1
**cash** [4] - 5872:16,
5872:21, 5873:3,
5888:17
**cater** [1] - 5862:11
**caught** [2] - 5850:5,
5879:19
**caused** [1] - 5844:13
**CD** [3] - 5715:24,
5717:15, 5717:18
**CDs** [1] - 5718:8
**cents** [5] - 5753:25,
5754:22, 5754:24,
5831:9, 5846:20
**CEO** [3] - 5861:14,
5873:2, 5891:6
**certain** [14] - 5715:7,
5721:20, 5722:1,
5726:8, 5728:22,
5734:19, 5746:12,
5747:1, 5749:4,
5751:24, 5915:17,
5915:18, 5915:19
**certainly** [13] - 5701:9,
5701:13, 5701:20,
5711:9, 5711:21,
5712:12, 5712:22,
5782:21, 5820:12,
5822:7, 5833:20,
5916:13
**certificate** [1] - 5727:2
**certificates** [1] -
5728:9
**certified** [1] - 5815:11
**certify** [4] - 5731:25,
5813:5, 5813:20,
5814:2
**CFO** [1] - 5852:21
**chambers** [1] -
5706:24
**CHAN** [1] - 5691:20
**chance** [5] - 5702:14,
5707:1, 5707:5,
5760:11, 5914:22
**change** [9] - 5712:23,
5724:25, 5726:8,
5743:18, 5762:8,
5828:25, 5871:10,
5872:24, 5879:23

**changed** [7] -
5731:11, 5744:9,
5807:2, 5871:9,
5871:17, 5879:22,
5916:18
**changes** [5] - 5726:4,
5744:10, 5803:2,
5807:19, 5872:18
**Charleane** [1] -
5691:22
**chart** [67] - 5715:13,
5733:23, 5735:2,
5750:13, 5750:19,
5751:4, 5751:5,
5751:13, 5751:22,
5751:25, 5752:19,
5752:22, 5753:6,
5755:8, 5755:18,
5756:19, 5761:21,
5765:17, 5765:20,
5766:20, 5770:6,
5770:13, 5770:14,
5771:3, 5772:22,
5773:7, 5773:10,
5774:2, 5774:16,
5774:21, 5777:1,
5777:3, 5777:14,
5778:6, 5778:9,
5778:19, 5778:21,
5780:8, 5783:15,
5785:15, 5786:4,
5786:21, 5789:5,
5789:12, 5790:6,
5791:1, 5791:20,
5791:22, 5792:22,
5793:7, 5793:18,
5794:10, 5794:15,
5796:10, 5797:1,
5800:10, 5802:24,
5803:4, 5804:17,
5805:6, 5805:21,
5831:2, 5834:18,
5837:2, 5837:10,
5837:13, 5838:8
**chart's** [1] - 5773:5
**charts** [11] - 5714:17,
5714:21, 5715:8,
5718:10, 5719:1,
5719:2, 5719:9,
5751:16, 5751:19,
5766:23, 5769:21
**cheap** [1] - 5879:25
**check** [5] - 5784:1,
5829:5, 5865:14,
5897:16, 5897:23
**checked** [3] - 5784:22,
5842:14, 5854:22
**checks** [2] - 5880:10,
5894:4
**chief** [1] - 5889:17

**children** [1] - 5841:12
**choose** [1] - 5872:6
**choosing** [2] -
5695:23, 5784:14
**chose** [10] - 5767:5,
5777:17, 5784:17,
5784:20, 5785:3,
5790:11, 5792:6,
5792:19, 5812:21,
5837:21
**chosen** [1] - 5694:7
**Chris** [2] - 5878:1,
5906:5
**Christopher** [1] -
5890:14
**CIO** [1] - 5847:14
**circumscribed** [1] -
5713:3
**circumstances** [2] -
5823:9, 5852:18
**civil** [1] - 5816:25
**claim** [2] - 5820:22,
5824:25
**claims** [1] - 5820:25
**Claridge** [4] - 5735:9,
5753:7, 5766:12,
5794:4
**clarify** [4] - 5707:4,
5708:15, 5711:9,
5799:13
**class** [8] - 5732:21,
5734:20, 5739:14,
5740:18, 5741:15,
5744:25, 5745:4,
5745:14
**clause** [4] - 5857:7,
5859:15, 5861:4,
5901:20
**clear** [17] - 5693:5,
5705:11, 5707:2,
5707:6, 5707:25,
5708:21, 5710:25,
5711:7, 5763:15,
5764:22, 5789:5,
5790:23, 5833:8,
5846:17, 5897:9
**clearer** [1] - 5914:18
**clearing** [6] - 5717:24,
5749:5, 5775:20,
5776:9, 5781:1,
5781:2
**clearly** [1] - 5915:12
**CLERK** [2] - 5840:9,
5840:11
**client** [8] - 5809:5,
5825:19, 5832:24,
5838:13, 5860:3,
5860:8, 5860:10,
5891:9
**clients** [6] - 5809:13,

| CMH | OCR | RMR | CRR | FCRR | 7 |

5833:1, 5833:4, 5833:5, 5833:11, 5902:6
**clock** [1] - 5908:16
**close** [6] - 5704:3, 5721:5, 5893:4, 5893:13, 5893:18, 5900:5
**closed** [4] - 5806:25, 5807:14, 5831:3, 5831:6
**closely** [1] - 5726:25
**closer** [1] - 5888:19
**closing** [18] - 5716:5, 5722:15, 5747:16, 5750:20, 5751:6, 5751:7, 5751:10, 5755:21, 5755:24, 5761:23, 5778:20, 5802:24, 5805:18, 5805:19, 5806:8, 5807:18, 5807:23, 5893:21
**club** [1] - 5872:17
**clubs** [2] - 5872:12, 5872:18
**co** [1] - 5890:4
**co-founder** [1] - 5890:4
**coffee** [2] - 5846:11, 5846:15
**collapse** [1] - 5792:20
**collapsed** [1] - 5850:11
**collateral** [1] - 5827:25
**colleague's** [1] - 5830:12
**college** [4] - 5842:1, 5842:3, 5842:7, 5842:8
**College** [2] - 5842:4, 5903:23
**colored** [1] - 5837:10
**colors** [2] - 5751:17, 5751:22
**column** [23] - 5716:9, 5716:10, 5716:11, 5778:22, 5781:11, 5781:16, 5781:18, 5782:13, 5785:24, 5786:18, 5794:23, 5794:24, 5797:5, 5797:17, 5798:23, 5800:19, 5801:1, 5807:5, 5831:14, 5831:15, 5831:21, 5831:25
**columns** [1] - 5716:8
**combine** [2] -

5791:25, 5792:10
**combined** [2] - 5790:14, 5796:6
**comfort** [1] - 5710:19
**comfortable** [7] - 5694:14, 5694:20, 5695:8, 5704:24, 5705:22, 5705:23, 5706:5
**coming** [8] - 5703:15, 5706:11, 5707:5, 5846:6, 5880:11, 5880:13, 5880:14
**commence** [1] - 5764:16
**comment** [2] - 5825:25, 5863:12
**comments** [3] - 5859:22, 5860:4, 5912:23
**commercialization** [1] - 5811:22
**Commission** [2] - 5767:24, 5848:10
**commissions** [1] - 5900:23
**commit** [4] - 5694:8, 5697:21, 5822:8, 5851:19
**commits** [1] - 5749:23
**committed** [3] - 5847:16, 5883:15, 5883:21
**committee** [1] - 5890:5
**committing** [1] - 5695:7
**commodity** [1] - 5861:24
**common** [21] - 5726:16, 5730:4, 5730:13, 5734:20, 5742:14, 5742:15, 5742:16, 5745:25, 5746:1, 5746:19, 5746:21, 5746:23, 5747:1, 5747:3, 5804:9, 5810:8, 5810:9, 5810:15
**communicate** [1] - 5829:24
**communicated** [2] - 5692:13, 5845:7
**communication** [3] - 5708:5, 5860:11, 5914:23
**companies** [16] - 5721:17, 5721:23, 5722:3, 5722:23, 5724:1, 5728:7,

5731:21, 5732:12, 5748:20, 5759:7, 5780:24, 5809:16, 5817:7, 5817:8, 5843:18, 5847:6
**company** [115] - 5712:17, 5716:20, 5719:20, 5720:4, 5722:5, 5722:11, 5722:12, 5722:19, 5723:2, 5723:3, 5723:4, 5723:6, 5723:18, 5724:14, 5724:24, 5725:5, 5726:9, 5726:24, 5726:25, 5728:6, 5728:20, 5728:23, 5729:1, 5729:12, 5729:22, 5729:23, 5729:25, 5730:4, 5730:5, 5730:7, 5730:13, 5732:4, 5733:9, 5733:11, 5743:25, 5744:2, 5747:22, 5747:24, 5759:16, 5759:25, 5762:9, 5771:12, 5771:13, 5771:19, 5771:24, 5772:4, 5772:9, 5772:12, 5772:14, 5773:8, 5774:4, 5774:5, 5774:17, 5804:8, 5804:18, 5804:19, 5808:16, 5808:21, 5808:24, 5810:23, 5812:15, 5814:25, 5832:6, 5837:15, 5837:24, 5838:1, 5838:10, 5845:1, 5845:5, 5846:14, 5846:24, 5853:18, 5857:8, 5857:12, 5857:16, 5857:18, 5857:19, 5857:20, 5857:21, 5859:25, 5862:17, 5863:18, 5871:4, 5871:21, 5871:25, 5872:6, 5872:8, 5872:9, 5872:25, 5876:16, 5878:20, 5879:9, 5880:21, 5882:18, 5882:22, 5882:24, 5883:2, 5886:13, 5888:13, 5888:14, 5888:16, 5888:21, 5889:18, 5898:5, 5905:24, 5906:11, 5906:12, 5908:13, 5910:6, 5913:8,

5913:9
**company's** [5] - 5725:6, 5732:10, 5733:12, 5738:8, 5802:21
**compare** [8] - 5760:21, 5760:23, 5761:25, 5772:22, 5785:17, 5787:6, 5787:11, 5792:13
**compared** [1] - 5790:5
**comparing** [1] - 5772:21
**comparison** [2] - 5750:21, 5761:2
**compelling** [1] - 5888:6
**Compensation** [1] - 5858:13
**compensation** [4] - 5699:9, 5858:11, 5900:22, 5901:6
**compensatory** [1] - 5726:7
**complete** [8] - 5695:14, 5776:5, 5776:15, 5813:6, 5813:7, 5813:9, 5813:10, 5815:12
**completed** [1] - 5837:23
**completely** [1] - 5783:21
**completing** [1] - 5888:4
**completion** [1] - 5726:2
**complex** [1] - 5720:13
**complexities** [1] - 5707:21
**complicated** [1] - 5720:8
**comprised** [1] - 5791:23
**computer** [1] - 5691:25
**computer-aided** [1] - 5691:25
**concede** [4] - 5824:2, 5825:4, 5825:13
**concedes** [2] - 5824:5, 5827:9
**concept** [2] - 5863:4, 5879:8, 5905:24
**concern** [8] - 5696:1, 5699:25, 5707:19, 5827:14, 5845:2, 5910:10, 5911:13
**concerned** [2] - 5696:2, 5696:3,

5699:15, 5704:17, 5706:6, 5844:23, 5844:25
**concerns** [8] - 5697:20, 5711:8, 5819:15, 5819:16, 5848:3, 5848:5, 5848:7, 5848:16
**concluded** [1] - 5833:13
**conclusion** [2] - 5847:3, 5847:4
**condition** [1] - 5810:17
**conditions** [1] - 5759:21
**conduct** [6] - 5711:19, 5714:16, 5715:2, 5768:21, 5769:8, 5837:21
**conducted** [3] - 5769:7, 5769:9, 5838:12
**conducts** [2] - 5711:1, 5712:19
**confer** [1] - 5916:19
**confirm** [5] - 5827:9, 5827:16, 5895:15, 5895:22, 5899:17
**confused** [1] - 5693:1
**confusing** [2] - 5779:4, 5914:18
**conjunction** [1] - 5792:15
**connect** [3] - 5784:9, 5785:13, 5852:18
**connected** [1] - 5852:19
**connection** [8] - 5736:10, 5736:13, 5747:3, 5747:14, 5747:16, 5828:3, 5851:7, 5901:6
**consider** [3] - 5694:22, 5698:5, 5810:12
**consideration** [1] - 5740:2
**considerations** [1] - 5745:20
**considered** [2] - 5730:3, 5903:18
**considering** [1] - 5700:25
**consigned** [1] - 5865:11
**consist** [1] - 5869:16
**consistent** [5] - 5701:21, 5706:14, 5872:21, 5891:10,

CMH        OCR        RMR        CRR        FCRR                    8

5916:2
**consistently** [1] -
5906:19
**consisting** [1] -
5747:1
**consult** [2] - 5916:19,
5916:23
**Consulting** [2] -
5865:8, 5865:10
**consumer** [10] -
5843:9, 5843:12,
5844:10, 5844:11,
5844:12, 5847:7,
5852:24, 5853:15,
5873:18, 5891:3
**Consumer** [35] -
5855:5, 5857:9,
5858:8, 5862:16,
5863:23, 5864:3,
5865:13, 5865:16,
5865:18, 5866:3,
5866:19, 5866:24,
5867:17, 5868:12,
5868:17, 5868:21,
5868:24, 5869:5,
5873:11, 5874:12,
5874:24, 5875:2,
5875:16, 5875:19,
5876:4, 5876:12,
5877:22, 5879:1,
5880:5, 5880:9,
5880:12, 5887:25,
5891:19, 5893:11,
5898:10
**contact** [1] - 5848:22
**contain** [4] - 5716:24,
5775:13, 5779:25,
5783:24
**contained** [3] -
5715:24, 5780:12,
5864:8
**containing** [1] -
5717:16
**contains** [6] - 5716:1,
5716:15, 5717:24,
5729:12, 5775:17,
5775:19
**contents** [2] -
5717:18, 5823:7
**context** [2] - 5730:21,
5913:9
**continue** [8] -
5697:20, 5701:25,
5713:24, 5781:21,
5838:6, 5844:20,
5860:6, 5876:4
**Continued** [8] -
5714:12, 5817:10,
5818:23, 5837:1,
5839:11, 5840:19,

5884:15, 5907:15
**continued** [15] -
5693:23, 5709:15,
5727:3, 5750:23,
5770:23, 5789:15,
5797:24, 5798:3,
5798:6, 5798:9,
5798:12, 5804:21,
5830:20, 5836:9,
5860:13
**continues** [4] -
5838:8, 5838:9,
5891:9, 5891:13
**Continuing** [3] -
5728:1, 5771:1,
5805:1
**contract** [1] - 5733:3
**Contracts** [2] -
5742:24, 5747:11
**contracts** [1] - 5743:4
**contradicts** [2] -
5826:24, 5834:22
**contribute** [1] -
5890:17
**control** [5] - 5726:5,
5729:24, 5730:4,
5730:5, 5733:12
**controlled** [1] - 5857:3
**controlling** [6] -
5760:14, 5834:5,
5834:6, 5834:8,
5834:13, 5834:23
**conversation** [28] -
5692:6, 5692:7,
5692:10, 5692:11,
5692:13, 5697:5,
5697:7, 5697:9,
5697:12, 5697:22,
5698:13, 5704:25,
5705:8, 5706:4,
5708:4, 5708:9,
5708:17, 5708:23,
5709:7, 5709:17,
5709:11, 5710:3,
5714:5, 5911:19,
5911:21, 5914:11,
5914:17
**converted** [1] -
5742:15
**convey** [1] - 5693:9
**COO** [3] - 5852:21,
5889:17, 5890:1
**copied** [4] - 5823:20,
5865:24, 5883:8,
5883:10
**copy** [7] - 5813:10,
5823:2, 5824:25,
5825:3, 5826:3,
5826:12, 5882:12
**corner** [8] - 5726:12,

5782:12, 5786:25,
5791:21, 5795:8,
5803:23, 5862:11,
5886:8
**corporate** [3] -
5733:12, 5808:14,
5890:24
**corporation** [2] -
5881:4, 5888:13
**correct** [247] -
5715:20, 5737:22,
5740:4, 5752:20,
5753:13, 5761:13,
5765:10, 5765:17,
5765:21, 5766:3,
5766:18, 5766:23,
5767:1, 5767:3,
5767:10, 5767:19,
5768:16, 5768:24,
5769:8, 5769:11,
5770:4, 5770:7,
5770:13, 5770:16,
5770:17, 5771:25,
5772:25, 5773:3,
5774:4, 5774:6,
5774:21, 5774:24,
5775:6, 5775:8,
5775:13, 5775:24,
5776:3, 5776:7,
5776:15, 5776:18,
5776:22, 5776:24,
5777:5, 5777:7,
5777:10, 5777:15,
5777:19, 5777:23,
5778:10, 5779:1,
5779:8, 5779:14,
5779:17, 5779:20,
5779:22, 5780:10,
5780:13, 5780:22,
5780:25, 5781:3,
5781:12, 5781:19,
5781:20, 5781:22,
5781:25, 5782:7,
5782:14, 5782:25,
5783:8, 5783:15,
5783:18, 5784:12,
5784:15, 5785:3,
5785:8, 5785:11,
5785:12, 5786:2,
5786:6, 5786:18,
5786:21, 5787:4,
5787:7, 5787:13,
5787:21, 5788:8,
5788:11, 5788:14,
5788:21, 5788:24,
5789:3, 5789:6,
5789:10, 5790:3,
5790:7, 5790:12,
5790:19, 5791:2,
5791:8, 5791:10,
5791:13, 5791:16,

5791:18, 5792:4,
5792:6, 5792:23,
5792:25, 5793:3,
5793:14, 5793:23,
5794:2, 5794:5,
5794:11, 5794:13,
5794:16, 5794:21,
5795:1, 5795:3,
5795:5, 5795:9,
5795:12, 5795:22,
5795:25, 5796:4,
5796:7, 5796:12,
5796:20, 5797:2,
5797:19, 5797:24,
5798:4, 5798:10,
5798:12, 5798:14,
5798:21, 5799:1,
5799:4, 5799:11,
5799:12, 5799:18,
5799:23, 5800:1,
5800:5, 5801:3,
5801:6, 5801:9,
5801:12, 5801:15,
5801:19, 5801:22,
5801:25, 5802:3,
5802:9, 5802:13,
5802:25, 5804:6,
5805:5, 5805:10,
5805:12, 5805:15,
5805:18, 5805:22,
5806:11, 5806:19,
5806:21, 5806:23,
5806:25, 5807:6,
5807:9, 5807:12,
5807:14, 5807:20,
5807:23, 5808:1,
5808:7, 5808:9,
5808:12, 5808:22,
5809:6, 5809:16,
5809:23, 5809:25,
5810:2, 5810:25,
5811:5, 5811:8,
5811:11, 5811:14,
5811:17, 5811:25,
5812:5, 5812:16,
5812:19, 5812:22,
5813:7, 5813:10,
5813:13, 5813:17,
5813:22, 5814:3,
5814:7, 5814:10,
5815:6, 5815:13,
5815:21, 5816:5,
5816:8, 5816:10,
5816:13, 5816:21,
5817:1, 5828:25,
5831:4, 5831:7,
5831:19, 5831:21,
5832:2, 5832:7,
5832:14, 5832:21,
5832:24, 5833:2,
5833:6, 5833:14,

5833:16, 5833:18,
5833:20, 5833:24,
5834:6, 5834:9,
5835:2, 5835:4,
5835:7, 5835:8,
5838:16, 5838:22,
5839:6, 5856:16,
5863:24, 5870:20,
5878:5, 5882:13,
5885:10, 5887:25,
5888:1, 5914:12
**corresponding** [1] -
5832:20
**counsel** [4] - 5703:4,
5808:21, 5819:8,
5821:16
**counseled** [1] -
5808:24
**counseling** [1] -
5809:16
**Count** [1] - 5782:11
**count** [2] - 5783:25,
5863:18
**counter** [1] - 5775:5
**Counter** [9] - 5721:23,
5722:3, 5722:5,
5722:13, 5722:19,
5723:9, 5723:22,
5723:24, 5759:11
**counting** [3] - 5750:8,
5750:9, 5787:24
**couple** [6] - 5830:3,
5846:20, 5850:18,
5867:3, 5878:17,
5881:14
**course** [4] - 5701:18,
5796:9, 5818:5,
5828:5
**COURT** [181] - 5691:1,
5692:2, 5692:14,
5693:4, 5695:19,
5696:5, 5696:8,
5697:11, 5698:16,
5698:19, 5698:22,
5699:25, 5700:12,
5700:19, 5701:17,
5701:22, 5701:25,
5702:4, 5702:9,
5702:16, 5703:2,
5703:7, 5703:9,
5703:14, 5704:9,
5705:6, 5705:8,
5706:13, 5707:7,
5708:8, 5708:16,
5709:6, 5709:9,
5709:14, 5710:2,
5710:8, 5711:10,
5711:25, 5712:6,
5713:9, 5713:13,
5713:16, 5713:17,

CMH        OCR        RMR        CRR        FCRR

5713:22, 5714:7,
5717:12, 5718:14,
5719:12, 5731:6,
5734:3, 5734:6,
5734:14, 5734:17,
5734:22, 5748:12,
5748:15, 5754:3,
5754:9, 5754:12,
5757:13, 5758:12,
5758:17, 5759:3,
5759:14, 5760:10,
5762:20, 5762:23,
5763:7, 5763:13,
5764:2, 5764:7,
5764:12, 5764:15,
5771:22, 5773:18,
5773:23, 5775:16,
5780:19, 5786:14,
5787:9, 5787:15,
5787:18, 5788:2,
5791:5, 5799:20,
5800:6, 5800:11,
5800:21, 5804:3,
5809:10, 5812:10,
5817:6, 5818:2,
5818:8, 5818:11,
5818:16, 5818:20,
5819:4, 5819:7,
5819:18, 5820:11,
5821:11, 5821:21,
5821:23, 5822:12,
5823:17, 5824:3,
5824:10, 5824:20,
5825:6, 5825:21,
5825:24, 5826:2,
5826:11, 5826:16,
5827:20, 5828:16,
5828:23, 5829:2,
5829:4, 5829:7,
5829:23, 5830:4,
5830:11, 5830:16,
5834:1, 5835:1,
5835:12, 5837:18,
5838:5, 5838:25,
5840:2, 5840:4,
5840:7, 5840:14,
5840:17, 5856:1,
5864:18, 5875:9,
5875:12, 5882:9,
5884:4, 5884:9,
5884:12, 5885:4,
5886:24, 5887:1,
5887:14, 5892:21,
5894:7, 5894:25,
5896:11, 5897:3,
5899:5, 5906:16,
5906:21, 5907:5,
5907:12, 5908:14,
5908:24, 5909:5,
5909:7, 5909:13,
5909:19, 5910:1,

5910:17, 5911:6,
5911:15, 5911:24,
5912:2, 5912:9,
5912:13, 5912:15,
5912:20, 5913:23,
5914:7, 5915:14,
5916:6, 5916:13,
5916:16, 5917:2
**Court** [4] - 5691:22,
5701:1, 5706:23
**court** [21] - 5692:1,
5710:1, 5710:17,
5710:19, 5710:22,
5711:3, 5711:9,
5763:12, 5819:3,
5819:20, 5822:3,
5825:1, 5826:9,
5827:17, 5828:6,
5830:1, 5830:5,
5830:8, 5885:1,
5912:1, 5913:4
**Court's** [2] - 5701:6,
5701:21
**court's** [4] - 5711:8,
5713:7, 5713:12,
5827:22
**Courthouse** [1] -
5691:5
**courtroom** [2] -
5702:10, 5885:2
**cover** [2] - 5721:1,
5800:8
**coverage** [1] -
5692:23
**covered** [5] - 5770:12,
5770:14, 5770:19,
5797:14, 5847:6
**covers** [7] - 5770:10,
5780:20, 5780:21,
5797:9, 5798:17,
5799:5
**CPG** [1] - 5847:7
**create** [3] - 5714:21,
5750:13, 5780:7
**created** [2] - 5719:1,
5880:24
**creation** [1] - 5701:14
**credibility** [1] - 5823:1
**crime** [1] - 5822:8
**Criminal** [1] - 5768:15
**criminally** [2] -
5828:3, 5828:19
**criteria** [1] - 5721:21
**critical** [4] - 5771:12,
5827:23, 5828:8
**critically** [2] - 5910:12,
5914:20
**criticize** [2] - 5860:3,
5902:8
**CROSS** [3] - 5764:18,

5830:19, 5918:6
**cross** [11] - 5695:8,
5762:24, 5764:9,
5764:16, 5819:14,
5819:16, 5828:11,
5830:18, 5835:20,
5837:17, 5837:19
**cross-examination**
[7] - 5762:24, 5764:9,
5764:16, 5819:16,
5828:11, 5830:18,
5835:20
**CROSS-**
**EXAMINATION** [3] -
5764:18, 5830:19,
5918:6
**cross-examine** [1] -
5819:14
**CRUTCHER** [1] -
5691:17
**Cruz** [2] - 5692:9,
5697:20
**Cub** [1] - 5890:12
**currency** [1] - 5869:24
**current** [10] - 5720:14,
5746:22, 5746:24,
5768:12, 5841:16,
5860:1, 5860:10,
5890:1, 5902:1,
5902:5
**customers** [3] -
5718:1, 5749:7,
5833:9

---

# D

**daily** [6] - 5716:5,
5750:20, 5761:23,
5772:23, 5778:20,
5802:24
**data** [88] - 5715:14,
5715:19, 5715:22,
5716:5, 5717:16,
5717:23, 5718:2,
5718:15, 5718:16,
5719:3, 5719:10,
5732:15, 5748:10,
5748:11, 5748:16,
5748:17, 5749:2,
5749:4, 5749:12,
5749:15, 5749:16,
5749:19, 5751:7,
5751:19, 5751:21,
5752:11, 5754:13,
5769:20, 5773:14,
5775:12, 5776:1,
5776:6, 5776:10,
5776:12, 5776:15,
5776:18, 5776:21,
5777:4, 5777:10,

5777:15, 5777:22,
5778:2, 5778:5,
5779:19, 5779:25,
5780:18, 5780:20,
5780:25, 5781:2,
5782:16, 5782:19,
5783:7, 5783:20,
5783:22, 5783:25,
5784:2, 5784:15,
5784:23, 5785:3,
5785:5, 5785:9,
5785:16, 5785:17,
5786:22, 5787:12,
5787:20, 5792:4,
5793:3, 5793:13,
5797:8, 5797:14,
5798:14, 5799:7,
5802:25, 5805:22,
5806:7, 5835:19,
5835:22, 5835:24,
5836:2, 5836:8,
5837:3, 5837:6,
5838:21
**date** [41] - 5698:22,
5700:3, 5707:15,
5716:9, 5718:4,
5725:20, 5736:23,
5743:19, 5746:4,
5746:5, 5751:3,
5752:10, 5753:15,
5755:19, 5756:17,
5757:12, 5780:3,
5781:12, 5782:2,
5792:23, 5792:25,
5794:25, 5803:18,
5803:20, 5803:22,
5803:23, 5804:12,
5809:25, 5828:21,
5831:14, 5832:1,
5849:12, 5856:4,
5856:7, 5877:8,
5887:18, 5893:9,
5899:9, 5900:6,
5901:5, 5903:7
**dated** [7] - 5813:1,
5813:13, 5814:5,
5864:13, 5882:4,
5892:15, 5894:20
**dates** [13] - 5755:7,
5755:8, 5757:13,
5757:15, 5757:19,
5757:22, 5769:10,
5798:25, 5800:21,
5803:5, 5858:16,
5858:19, 5858:21
**DAVID** [2] - 5691:14,
5691:14
**day-to-day** [1] -
5803:2
**days** [28] - 5694:10,

5694:12, 5695:12,
5698:9, 5699:5,
5699:8, 5722:15,
5752:12, 5755:1,
5755:3, 5755:14,
5755:21, 5757:10,
5758:2, 5759:9,
5763:22, 5794:15,
5799:11, 5799:12,
5799:15, 5801:14,
5801:18, 5806:7,
5829:11, 5829:14,
5830:22, 5913:14
**de** [1] - 5863:13
**deadline** [1] - 5696:15
**deal** [11] - 5772:6,
5772:8, 5772:11,
5821:2, 5821:18,
5842:22, 5893:4,
5893:13, 5893:15,
5893:18, 5893:23
**dealer** [2] - 5749:22,
5833:10
**deals** [1] - 5843:9
**DEBORAH** [2] -
5714:11, 5918:4
**debtor** [1] - 5883:23
**DEC** [1] - 5844:14
**decade** [2] - 5712:20
**December** [72] -
5697:15, 5707:15,
5716:6, 5723:17,
5725:20, 5735:4,
5736:24, 5746:22,
5750:21, 5753:13,
5753:17, 5754:14,
5754:23, 5755:2,
5755:8, 5756:2,
5756:4, 5756:20,
5761:12, 5761:24,
5762:2, 5763:21,
5763:22, 5770:3,
5770:7, 5771:4,
5772:24, 5772:25,
5774:20, 5777:16,
5778:24, 5779:6,
5779:7, 5782:2,
5782:5, 5782:10,
5783:8, 5783:12,
5785:25, 5786:1,
5786:13, 5786:24,
5787:1, 5789:1,
5789:5, 5790:5,
5790:17, 5793:11,
5793:15, 5794:4,
5794:7, 5799:5,
5806:18, 5809:25,
5813:1, 5813:13,
5815:2, 5831:1,
5831:3, 5831:14,

CMH        OCR        RMR        CRR        FCRR                    10

5832:1, 5837:14,
5863:9, 5863:10,
5864:13, 5864:14,
5865:5, 5866:3,
5888:5
**decide** [5] - 5698:13,
5711:12, 5854:24,
5855:1, 5894:1
**decided** [10] - 5693:1,
5694:7, 5694:9,
5777:16, 5792:10,
5871:10, 5871:21,
5880:3, 5888:3,
5888:12
**deciding** [2] -
5693:13, 5810:15
**decision** [9] -
5693:10, 5693:18,
5696:24, 5697:23,
5698:3, 5698:4,
5703:5, 5708:17,
5731:16
**decisions** [3] -
5709:10, 5857:11,
5871:23
**deck** [1] - 5870:14
**decline** [4] - 5760:5,
5760:19, 5830:22,
5831:9
**decreased** [1] -
5832:7
**decreases** [1] - 5805:4
**dedicated** [1] -
5768:23
**deemed** [1] - 5824:24
**defame** [1] - 5902:8
**Defendant** [2] -
5691:7, 5691:17
**defendant** [3] -
5714:14, 5824:16,
5824:19
**Defendant's** [3] -
5803:12, 5804:1,
5804:3
**defense** [7] - 5703:25,
5710:9, 5803:25,
5819:7, 5821:16,
5826:3, 5826:8
**defined** [1] - 5857:23
**definitely** [2] -
5703:18, 5877:23
**definition** [4] -
5729:25, 5759:3,
5759:5, 5759:6
**definitive** [1] - 5726:1
**degree** [2] - 5810:8,
5810:9
**Delaware** [1] - 5857:9
**delay** [1] - 5811:21
**deliberate** [1] -

5693:17
**demand** [5] - 5759:22,
5759:23, 5788:7,
5788:10, 5788:14
**demanded** [1] -
5712:17
**demonstratives** [2] -
5719:7, 5719:11
**Denerstein** [7] -
5711:12, 5764:7,
5787:9, 5799:21,
5812:10, 5830:18,
5838:25
**DENERSTEIN** [57] -
5691:20, 5710:11,
5711:17, 5712:1,
5713:6, 5714:5,
5717:11, 5719:7,
5719:11, 5757:12,
5758:10, 5758:16,
5759:13, 5760:9,
5764:11, 5764:19,
5765:23, 5771:1,
5773:16, 5773:25,
5774:12, 5779:3,
5780:16, 5782:4,
5783:3, 5783:11,
5785:23, 5786:16,
5787:17, 5787:25,
5790:1, 5791:4,
5800:9, 5800:13,
5800:22, 5803:25,
5805:1, 5809:11,
5809:21, 5810:19,
5811:2, 5813:2,
5813:24, 5815:17,
5817:8, 5818:1,
5818:4, 5830:20,
5835:9, 5835:11,
5836:1, 5837:16,
5838:3, 5839:2,
5840:1, 5916:17,
5916:20
**denies** [1] - 5822:20
**dental** [1] - 5879:12
**denture** [2] - 5879:12,
5879:22
**departure** [2] - 5726:5,
5893:10
**deposit** [7] - 5865:15,
5866:8, 5880:12,
5897:19, 5897:20,
5897:21, 5897:22
**describe** [5] -
5715:15, 5721:12,
5725:24, 5869:21,
5889:9
**described** [2] -
5810:12, 5812:11
**describes** [2] -

5804:8, 5869:22
**describing** [1] -
5812:15
**description** [2] -
5725:10, 5781:14
**Desert** [8] - 5717:2,
5723:14, 5737:10,
5744:6, 5908:12,
5908:21, 5909:3,
5915:16
**desires** [2] - 5857:16,
5857:20
**desk** [3] - 5862:11,
5897:25, 5910:18
**desks** [1] - 5862:8
**Dessert** [1] - 5725:14
**detail** [1] - 5716:14
**detailed** [1] - 5778:8
**determination** [2] -
5728:14, 5730:5
**determine** [4] -
5735:21, 5752:9,
5761:5, 5833:12
**determined** [1] -
5729:25
**Deutsche** [3] -
5841:17, 5841:19,
5841:23
**development** [3] -
5810:23, 5811:22,
5891:8
**Diego** [2] - 5862:3,
5877:25
**difference** [5] -
5713:1, 5720:12,
5720:21, 5777:25,
5823:22
**differences** [3] -
5711:5, 5711:6,
5865:1
**different** [41] - 5721:9,
5721:12, 5724:6,
5728:7, 5751:16,
5751:22, 5772:17,
5773:7, 5778:5,
5781:25, 5783:22,
5788:17, 5796:22,
5799:11, 5799:12,
5799:14, 5799:15,
5801:14, 5801:18,
5801:22, 5802:2,
5802:9, 5802:16,
5820:18, 5837:10,
5842:19, 5844:9,
5850:18, 5853:3,
5857:2, 5871:23,
5872:11, 5877:9,
5880:11, 5880:13,
5906:21, 5914:13,
5914:16

**differently** [2] -
5795:15, 5872:5
**difficult** [2] - 5696:13,
5698:4, 5707:20
**difficulty** [1] - 5707:7
**dinner** [5] - 5854:2,
5854:4, 5854:5,
5854:7, 5854:14
**dire** [5] - 5711:12,
5711:16, 5711:18,
5712:23, 5713:8
**direct** [21] - 5713:24,
5725:12, 5726:11,
5732:23, 5732:24,
5732:25, 5755:7,
5779:6, 5788:1,
5828:3, 5834:4,
5835:19, 5865:15,
5866:8, 5869:10,
5880:12, 5881:19,
5897:19, 5897:20,
5897:21, 5897:22
**DIRECT** [4] - 5714:12,
5841:4, 5918:5,
5918:10
**directed** [1] - 5765:16
**directing** [3] - 5807:5,
5812:24, 5831:1
**directly** [9] - 5726:24,
5730:4, 5733:2,
5845:22, 5859:21,
5862:8, 5865:13,
5868:16, 5910:18
**director** [5] - 5730:2,
5731:2, 5763:14,
5829:10, 5860:1
**directors** [2] - 5726:6
**disagree** [1] - 5824:9
**disappointed** [2] -
5697:17, 5708:4
**disclaims** [2] -
5742:19, 5742:20
**disclose** [2] - 5816:25,
5817:3
**disclosed** [6] -
5710:13, 5725:1,
5747:6, 5812:22,
5815:20, 5816:4
**disclosure** [8] -
5712:4, 5714:3,
5714:8, 5729:13,
5731:1, 5732:21,
5745:10, 5747:13
**discounted** [1] -
5833:23
**discuss** [18] - 5694:8,
5698:17, 5702:18,
5703:4, 5711:21,
5777:3, 5825:11,
5845:23, 5845:25,

5853:18, 5854:10,
5858:11, 5870:10,
5873:6, 5904:5,
5912:3, 5912:4
**discussed** [7] -
5719:3, 5796:22,
5820:5, 5846:1,
5873:10, 5900:16,
5903:15
**discussing** [4] -
5693:15, 5712:8,
5882:25, 5891:18
**discussion** [1] -
5853:12
**discussions** [3] -
5819:21, 5850:19,
5883:24
**dismayed** [1] -
5697:16
**dismiss** [2] - 5764:4,
5912:3
**dismissal** [2] -
5693:16, 5698:2
**dismissed** [6] -
5692:21, 5695:17,
5702:17, 5702:22,
5708:12, 5818:13
**dismissive** [1] -
5706:17
**disparage** [2] -
5860:3, 5902:8
**display** [1] - 5792:11
**disposition** [1] -
5726:3
**Dispositive** [1] -
5739:4
**disregard** [1] -
5708:13
**distinguish** [1] -
5789:12
**distinguishable** [1] -
5788:16
**distinguishes** [1] -
5777:11
**distinguishing** [1] -
5792:1
**distracted** [1] - 5700:2
**distributed** [2] -
5733:18, 5735:14
**distribution** [3] -
5733:24, 5735:3,
5736:6
**District** [18] - 5820:21,
5821:6, 5821:15,
5822:23, 5825:2,
5825:25, 5828:18,
5828:19, 5848:25,
5849:2, 5849:3,
5849:8, 5850:20,
5851:2, 5851:9,

5851:23, 5864:1,
5864:2
**DISTRICT** [3] - 5691:1,
5691:1, 5691:10
**divided** [1] - 5799:8
**Dixie** [1] - 5871:5
**doctor** [1] - 5693:6
**document** [61] -
5725:7, 5725:17,
5725:19, 5731:1,
5732:21, 5737:16,
5741:18, 5742:24,
5812:8, 5812:12,
5812:18, 5812:21,
5820:11, 5820:16,
5821:5, 5822:1,
5822:4, 5822:6,
5823:2, 5823:8,
5823:11, 5823:18,
5824:12, 5824:14,
5824:16, 5824:23,
5825:5, 5825:8,
5825:9, 5825:14,
5826:6, 5826:7,
5826:13, 5827:6,
5827:13, 5827:15,
5828:7, 5828:12,
5849:11, 5855:14,
5855:16, 5855:20,
5857:5, 5859:4,
5859:15, 5864:8,
5887:6, 5892:13,
5896:17, 5896:21,
5896:23, 5897:7,
5897:12, 5898:8,
5898:9, 5898:12,
5898:14, 5898:16,
5898:22
**documents** [14] -
5712:15, 5715:13,
5716:17, 5717:1,
5717:6, 5721:19,
5733:17, 5819:22,
5819:23, 5820:2,
5820:3, 5855:11,
5869:17, 5870:1
**dollar** [4] - 5831:9,
5873:1, 5874:17,
5874:18
**dollars** [19] - 5720:18,
5720:20, 5720:22,
5722:15, 5753:25,
5754:10, 5754:22,
5755:5, 5755:6,
5756:1, 5762:4,
5762:5, 5762:15,
5831:4, 5867:25,
5868:12, 5876:1,
5882:21
**done** [6] - 5792:4,

5832:21, 5888:20,
5888:23, 5889:7,
5913:7
**door** [2] - 5695:16,
5914:2
**double** [4] - 5750:8,
5783:17, 5783:25,
5787:24
**down** [32] - 5720:10,
5742:18, 5757:13,
5763:3, 5786:24,
5795:8, 5801:5,
5803:5, 5803:10,
5806:1, 5810:22,
5811:2, 5811:10,
5818:16, 5818:19,
5844:16, 5854:15,
5871:5, 5875:18,
5877:22, 5879:1,
5881:12, 5881:15,
5886:6, 5886:18,
5887:9, 5888:3,
5891:23, 5900:3,
5909:18, 5912:9,
5914:16
**downside** [1] -
5851:21
**Dr** [3] - 5878:1,
5890:14, 5890:15
**drafted** [1] - 5898:16
**dramatically** [1] -
5805:2
**draw** [7] - 5779:7,
5783:11, 5796:14,
5896:21, 5897:7,
5897:12, 5906:22
**drawing** [1] - 5898:7
**drop** [3] - 5748:12,
5896:17, 5897:6
**dropped** [5] - 5755:3,
5755:23, 5806:23,
5807:11, 5832:4
**dropping** [1] - 5832:7
**drops** [1] - 5745:9
**drought** [2] - 5720:14,
5720:17
**drug** [4] - 5863:2,
5878:16, 5878:19,
5879:7
**drugs** [1] - 5879:7
**drywall** [1] - 5879:24
**Dubin** [9] - 5695:20,
5698:7, 5706:17,
5819:14, 5819:23,
5822:12, 5828:12,
5828:16, 5913:23
**DUBIN** [70] - 5691:21,
5695:21, 5696:7,
5696:9, 5696:18,
5696:23, 5697:1,

5699:21, 5703:24,
5704:15, 5705:7,
5705:20, 5708:7,
5709:3, 5709:8,
5709:13, 5764:1,
5820:14, 5820:18,
5821:10, 5821:17,
5821:22, 5822:2,
5822:16, 5823:15,
5823:23, 5824:5,
5824:9, 5824:18,
5824:21, 5825:12,
5825:22, 5826:10,
5826:15, 5826:21,
5827:17, 5827:21,
5828:1, 5828:25,
5829:3, 5843:25,
5844:6, 5847:1,
5850:15, 5855:25,
5864:17, 5875:6,
5882:8, 5887:13,
5892:20, 5894:24,
5896:25, 5897:6,
5899:4, 5906:14,
5907:4, 5907:9,
5908:3, 5908:5,
5908:22, 5910:9,
5910:22, 5911:18,
5911:22, 5912:16,
5913:25, 5914:20,
5915:5, 5916:2,
5916:8
**Duchenne** [4] -
5863:3, 5878:15,
5879:8, 5889:3
**due** [1] - 5825:19
**duly** [1] - 5841:2
**DUNN** [1] - 5691:17
**during** [31] - 5694:1,
5699:8, 5699:14,
5753:8, 5755:4,
5755:24, 5756:19,
5758:23, 5761:8,
5761:10, 5762:13,
5773:2, 5773:11,
5774:24, 5793:22,
5796:25, 5797:13,
5797:18, 5798:21,
5805:3, 5806:10,
5806:13, 5806:15,
5807:16, 5834:4,
5854:19, 5859:21,
5866:11, 5866:23,
5885:17, 5890:21
**duty** [1] - 5693:25
**DX** [1] - 5918:15
**dynamics** [1] -
5873:19
**Dystrophy** [4] -
5863:3, 5878:16,

5879:8, 5889:3

**E**

**e-mail** [27] - 5692:13,
5692:15, 5694:18,
5697:13, 5708:5,
5865:3, 5865:5,
5865:17, 5876:21,
5881:23, 5882:11,
5882:13, 5883:8,
5886:21, 5887:8,
5887:18, 5889:9,
5892:15, 5892:25,
5894:17, 5895:4,
5895:6, 5895:10,
5895:12, 5896:2,
5896:9, 5897:10,
5898:7, 5898:7
**e-mails** [4] - 5708:6,
5864:10, 5882:1,
5894:17
**early** [5] - 5763:21,
5819:11, 5849:20,
5871:6, 5885:18
**earnings** [1] - 5846:21
**ease** [1] - 5758:19
**East** [4] - 5691:15,
5691:23, 5854:9,
5854:11
**EASTERN** [1] - 5691:1
**easy** [2] - 5816:17,
5873:4
**economic** [1] - 5758:6
**economics** [1] -
5843:15
**Edmund** [4] - 5735:10,
5753:7, 5766:17,
5794:7
**effect** [8] - 5692:20,
5734:10, 5758:7,
5758:15, 5759:17,
5760:6, 5762:11,
5870:2
**effective** [2] - 5900:6,
5901:5
**Effective** [2] - 5742:8,
5742:9
**effects** [2] - 5707:2,
5870:3
**effort** [4] - 5710:23,
5827:16, 5880:25,
5889:18
**efforts** [3] - 5811:22,
5888:7, 5891:4
**eight** [5] - 5718:21,
5734:1, 5762:4,
5816:3, 5849:24
**either** [13] - 5695:8,
5697:21, 5700:7,
5701:23, 5731:4,

5879:8, 5889:3

5733:2, 5733:11,
5767:16, 5788:4,
5826:14, 5872:1,
5876:21, 5878:16
**election** [2] - 5726:6,
5746:4
**element** [1] - 5731:22
**eleven** [4] - 5718:21,
5765:24, 5765:25,
5768:12
**elicit** [2] - 5908:24,
5913:20
**eligible** [3] - 5726:14,
5726:15, 5728:15
**eliminate** [1] -
5811:21
**emotional** [1] -
5706:16
**emotionally** [1] -
5708:12
**employ** [1] - 5857:16
**employed** [3] -
5848:17, 5857:20,
5880:5
**employee** [5] -
5694:22, 5850:4,
5860:1, 5860:10,
5862:2
**employer** [8] -
5700:21, 5702:20,
5704:10, 5704:20,
5705:25, 5708:1,
5763:9, 5808:6
**employers** [4] -
5700:5, 5700:7,
5902:3
**employment** [10] -
5817:3, 5855:17,
5859:21, 5870:10,
5878:2, 5899:14,
5899:18, 5900:4,
5904:24
**encourage** [3] -
5697:24, 5698:12,
5829:15
**end** [13] - 5716:10,
5723:3, 5748:13,
5762:3, 5805:6,
5805:21, 5850:17,
5867:22, 5870:25,
5878:3, 5878:12,
5885:25, 5899:19
**endeavored** [1] -
5863:2
**ended** [4] - 5797:24,
5855:5, 5878:2,
5888:9
**ending** [3] - 5697:15,
5746:5, 5907:13
**ends** [1] - 5797:23

**CRR**

5879:8, 5889:3

**FCRR**

CMH        OCR      RMR      CRR      FCRR                    12

**enforcement** [1] - 5848:22
**engagement** [1] - 5882:23
**engaging** [1] - 5799:14
**English** [1] - 5747:5
**enter** [4] - 5822:13, 5823:19, 5851:8, 5851:11
**entered** [4] - 5747:17, 5828:17, 5856:4, 5856:15
**enters** [3] - 5702:8, 5885:2, 5885:3
**entire** [3] - 5810:11, 5827:15, 5911:10
**entirely** [1] - 5708:21
**entities** [14] - 5736:25, 5744:5, 5752:10, 5856:24, 5857:1, 5857:2, 5857:3, 5860:2, 5865:1, 5868:15, 5869:4, 5880:11, 5880:13, 5894:6
**entitled** [2] - 5901:5, 5913:19
**entity** [18] - 5737:22, 5738:18, 5739:21, 5743:9, 5833:12, 5858:1, 5859:25, 5860:2, 5863:14, 5868:14, 5871:11, 5873:1, 5878:23, 5880:24, 5883:19, 5886:5, 5888:12, 5899:12
**entry** [1] - 5726:1
**environment** [1] - 5843:15
**equal** [1] - 5760:6
**equipment** [1] - 5876:18
**equity** [15] - 5719:22, 5726:4, 5814:13, 5841:17, 5841:21, 5841:23, 5842:21, 5881:11, 5881:13, 5881:15, 5881:16, 5881:18, 5888:6, 5901:2, 5901:8
**especially** [1] - 5828:6
**ESQ** [6] - 5691:19, 5691:19, 5691:20, 5691:20, 5691:21, 5691:21
**essence** [1] - 5828:24
**essentially** [1] - 5720:9

**establish** [1] - 5823:3
**established** [1] - 5909:11
**establishing** [1] - 5800:13
**estimate** [1] - 5862:19
**etcetera** [1] - 5873:23
**ethics** [1] - 5902:8
**evaluate** [1] - 5693:11
**Evan** [18] - 5714:14, 5717:16, 5764:23, 5764:25, 5765:4, 5765:13, 5766:20, 5766:22, 5767:18, 5813:17, 5835:6, 5866:24, 5867:1, 5873:13, 5873:14, 5873:24, 5881:23, 5882:12
**EVAN** [1] - 5691:6
**even-handed** [1] - 5916:13
**event** [3] - 5724:24, 5724:25, 5780:23
**eventually** [1] - 5866:20
**evidence** [52] - 5716:2, 5716:15, 5717:10, 5717:12, 5718:9, 5719:6, 5719:12, 5725:13, 5733:17, 5736:2, 5736:17, 5742:3, 5743:15, 5750:17, 5761:19, 5778:13, 5778:19, 5780:17, 5780:20, 5793:13, 5798:16, 5800:16, 5806:4, 5806:6, 5809:18, 5812:25, 5820:4, 5820:8, 5820:19, 5820:20, 5821:7, 5822:22, 5823:7, 5823:8, 5823:9, 5823:16, 5827:25, 5828:13, 5831:13, 5832:13, 5864:16, 5887:12, 5887:15, 5892:22, 5894:23, 5895:1, 5899:3, 5899:6, 5915:15, 5915:25
**exact** [4] - 5759:5, 5759:6, 5849:12, 5908:7
**exactly** [8] - 5821:7, 5827:6, 5856:20, 5867:2, 5871:1, 5877:16, 5894:10, 5906:25

**EXAMINATION** [11] - 5714:12, 5764:18, 5830:19, 5835:15, 5839:1, 5841:4, 5918:5, 5918:6, 5918:7, 5918:8, 5918:10
**examination** [7] - 5762:24, 5764:9, 5764:16, 5819:16, 5828:11, 5830:18, 5835:20
**examine** [1] - 5819:14
**examined** [1] - 5841:3
**example** [4] - 5776:11, 5777:16, 5797:4, 5801:24
**Excel** [2] - 5781:8, 5781:24
**except** [1] - 5715:14
**excess** [1] - 5760:4
**excessive** [1] - 5694:5
**exchange** [6] - 5771:25, 5772:1, 5772:4, 5775:2, 5881:23, 5884:17
**Exchange** [5] - 5721:16, 5732:17, 5767:23, 5775:7, 5848:10
**exchanges** [5] - 5721:10, 5721:13, 5721:16, 5722:6, 5722:21
**excuse** [7] - 5705:19, 5848:2, 5880:9, 5890:9, 5899:11, 5911:24, 5911:25
**excused** [9] - 5763:5, 5763:6, 5840:4, 5840:6, 5884:8, 5884:11, 5912:8, 5912:10, 5912:14
**execute** [2] - 5833:1, 5833:7
**executing** [1] - 5832:23
**executive** [2] - 5864:22, 5890:5
**exemptions** [1] - 5728:22
**exercisable** [1] - 5746:3
**exercise** [2] - 5706:11, 5746:6
**exert** [1] - 5729:24
**Exhibit** [79] - 5716:2, 5716:15, 5725:13, 5728:17, 5730:12, 5734:1, 5735:1,

5736:2, 5736:16, 5743:14, 5750:16, 5752:17, 5760:24, 5761:18, 5765:15, 5778:12, 5778:22, 5779:13, 5780:17, 5782:24, 5783:6, 5785:24, 5786:14, 5786:16, 5787:4, 5788:19, 5794:18, 5797:1, 5797:4, 5797:9, 5797:23, 5798:16, 5799:4, 5800:15, 5800:16, 5802:23, 5803:13, 5804:1, 5804:3, 5806:5, 5807:22, 5809:18, 5812:25, 5813:24, 5816:2, 5830:21, 5831:2, 5831:13, 5832:12, 5837:9, 5855:13, 5855:24, 5856:1, 5864:7, 5864:16, 5881:22, 5882:7, 5882:9, 5886:23, 5887:3, 5887:12, 5887:15, 5887:16, 5892:12, 5892:19, 5892:21, 5892:22, 5892:23, 5894:15, 5894:23, 5894:25, 5895:1, 5895:2, 5895:10, 5898:19, 5899:3, 5899:5, 5899:6, 5899:7
**exhibit** [10] - 5741:3, 5745:4, 5761:12, 5765:22, 5781:9, 5797:21, 5799:5, 5800:7, 5823:21, 5887:2
**Exhibit's** [1] - 5752:23
**Exhibit-112-35** [1] - 5864:19
**EXHIBITS** [1] - 5918:13
**exhibits** [2] - 5715:11, 5726:10
**Exhibits** [7] - 5717:13, 5717:17, 5718:12, 5718:20, 5719:6, 5719:13, 5815:16
**Exhibits'** [2] - 5716:24, 5717:10
**exist** [1] - 5785:11
**exists** [1] - 5833:10
**exits** [3] - 5698:21, 5703:13, 5818:15
**expanded** [1] - 5891:7

**expect** [2] - 5823:2, 5852:8
**expected** [2] - 5776:5, 5852:10
**expecting** [1] - 5852:6
**experience** [16] - 5711:1, 5711:3, 5712:6, 5712:10, 5712:19, 5723:5, 5731:13, 5732:7, 5733:6, 5758:23, 5759:8, 5808:3, 5808:5, 5808:9, 5809:16, 5854:20
**experiences** [1] - 5854:21
**expert** [8] - 5701:4, 5701:20, 5710:12, 5713:12, 5714:2, 5714:8, 5839:7, 5910:6
**explain** [15] - 5710:24, 5716:8, 5728:5, 5729:9, 5735:1, 5746:10, 5747:5, 5752:9, 5761:20, 5762:8, 5788:3, 5790:17, 5871:24, 5909:18, 5916:6
**explained** [2] - 5705:16, 5783:24
**explaining** [4] - 5705:5, 5837:18, 5837:20, 5914:16
**express** [1] - 5699:22
**expressed** [5] - 5692:17, 5701:3, 5704:22, 5705:25, 5707:19
**expression** [2] - 5730:19, 5859:23
**extended** [1] - 5692:17
**extension** [1] - 5692:17
**extensive** [3] - 5721:19, 5725:7, 5729:13
**extent** [3] - 5819:23, 5820:2, 5915:21
**extra** [1] - 5699:17
**eye** [1] - 5879:20

**F**

**facilitate** [1] - 5833:10
**facilitating** [3] - 5749:23, 5832:16
**fact** [13] - 5704:6, 5704:12, 5766:22,

CMH     OCR     RMR     CRR     FCRR                    13

5785:2, 5822:8,
5822:13, 5823:25,
5824:6, 5825:10,
5852:3, 5874:6,
5909:10, 5913:12
**factors** [4] - 5802:20,
5810:7, 5812:7,
5812:11
**fail** [1] - 5900:7
**failing** [1] - 5776:14
**fair** [10] - 5731:17,
5772:13, 5802:20,
5803:2, 5807:18,
5812:8, 5812:12,
5814:24, 5815:2,
5827:11
**fairly** [4] - 5719:2,
5812:7, 5873:1,
5881:12
**faith** [1] - 5828:6
**fall** [5] - 5720:11,
5720:18, 5849:9,
5879:10, 5880:7
**fallen** [1] - 5881:15
**familiar** [9] - 5710:22,
5719:16, 5720:5,
5721:1, 5730:23,
5732:16, 5852:12,
5880:21, 5883:20
**family** [9] - 5694:23,
5698:25, 5699:19,
5704:12, 5704:13,
5707:19, 5707:21,
5842:24, 5893:19
**far** [7] - 5692:16,
5692:23, 5694:17,
5694:18, 5694:20,
5774:23, 5778:5
**fast** [1] - 5878:25
**fault** [2] - 5825:19,
5826:4
**favor** [1] - 5826:16
**FBI** [2] - 5849:1,
5850:22
**fear** [1] - 5695:24
**Fearnow** [5] -
5735:25, 5736:4,
5736:12, 5767:14,
5915:24
**February** [38] -
5743:20, 5743:24,
5743:25, 5745:24,
5746:25, 5747:9,
5747:17, 5750:21,
5756:20, 5761:12,
5770:4, 5770:7,
5770:11, 5770:20,
5771:3, 5771:4,
5771:15, 5780:22,
5794:2, 5794:5,

5794:8, 5797:9,
5797:13, 5797:24,
5797:25, 5798:3,
5798:7, 5798:9,
5798:17, 5798:25,
5799:6, 5799:8,
5800:17, 5814:5,
5814:10, 5837:14,
5838:7
**federal** [4] - 5848:6,
5848:7, 5850:20,
5851:2
**feedback** [1] - 5763:17
**fees** [2] - 5868:8,
5868:9
**fell** [1] - 5881:12
**fellow** [2] - 5698:17,
5829:16
**felt** [5] - 5692:19,
5847:11, 5847:22,
5871:22, 5881:15
**Fernandez** [8] -
5735:7, 5753:6,
5766:5, 5794:1,
5886:9, 5889:16,
5889:20, 5889:22
**few** [12] - 5693:22,
5694:9, 5694:10,
5695:12, 5711:5,
5713:2, 5762:25,
5763:8, 5828:25,
5862:21, 5867:13,
5871:8
**fewer** [1] - 5774:23
**fifteen** [1] - 5715:6
**fifteenth** [2] - 5866:5,
5866:9
**Fifth** [1] - 5726:4
**fifth** [1] - 5746:5
**fifty** [3] - 5766:2,
5766:9, 5766:12
**figure** [3] - 5746:20,
5793:17, 5885:14
**file** [14] - 5721:19,
5721:25, 5722:13,
5724:1, 5729:2,
5731:5, 5731:10,
5731:21, 5732:4,
5732:21, 5733:4,
5734:21, 5747:23,
5825:2
**filed** [10] - 5724:23,
5725:19, 5736:18,
5736:23, 5743:19,
5743:21, 5746:22,
5746:25, 5748:5,
5814:9
**files** [4] - 5747:24,
5821:6, 5822:24,
5822:25

**filing** [9] - 5712:15,
5717:3, 5717:4,
5729:12, 5731:20,
5733:3, 5809:2,
5809:9, 5815:5
**filings** [10] - 5712:17,
5715:16, 5724:3,
5724:17, 5724:20,
5731:22, 5732:8,
5732:14, 5736:14,
5769:22
**fill** [1] - 5809:6
**filter** [14] - 5781:25,
5782:2, 5782:5,
5794:24, 5795:7,
5795:14, 5797:5,
5797:7, 5797:17,
5798:18, 5798:23,
5800:19, 5831:14,
5831:15
**filtered** [1] - 5802:12
**final** [3] - 5726:9,
5821:7, 5823:12
**finally** [8] - 5700:3,
5732:2, 5739:14,
5741:21, 5747:10,
5861:8, 5891:1,
5900:18
**finance** [2] - 5890:2,
5890:25
**Finance** [4] - 5842:25,
5843:2, 5843:19,
5843:20
**financial** [16] -
5693:20, 5696:12,
5699:16, 5725:6,
5726:9, 5732:1,
5732:5, 5748:19,
5748:24, 5810:14,
5810:17, 5811:4,
5814:25, 5880:18,
5894:12, 5901:4
**financially** [2] -
5694:5, 5696:13
**financials** [1] -
5731:23
**financing** [7] -
5771:14, 5772:19,
5838:4, 5838:7,
5883:15, 5883:21,
5893:22
**fine** [4] - 5697:3,
5829:11, 5830:2,
5830:12
**fines** [1] - 5776:14
**FINRA** [14] - 5715:1,
5719:15, 5767:21,
5767:23, 5768:3,
5768:4, 5768:7,
5776:9, 5776:14,

5776:20, 5807:25,
5808:5, 5808:9,
5816:25
**fire** [1] - 5704:21
**firm** [11] - 5717:24,
5749:5, 5808:14,
5808:18, 5808:19,
5832:20, 5832:23,
5833:1, 5838:13,
5850:12, 5890:17
**firm's** [2] - 5776:2,
5784:11
**firms** [12] - 5749:20,
5750:4, 5750:10,
5775:20, 5776:5,
5776:14, 5781:1,
5781:2, 5784:5,
5784:8, 5832:25,
5833:9
**first** [68] - 5694:9,
5697:14, 5711:18,
5716:9, 5717:2,
5726:1, 5753:15,
5763:22, 5774:15,
5777:3, 5782:10,
5792:23, 5801:1,
5814:18, 5823:1,
5823:11, 5827:23,
5841:2, 5842:7,
5842:8, 5844:10,
5848:7, 5848:9,
5849:7, 5852:15,
5853:6, 5853:7,
5853:9, 5853:13,
5853:18, 5853:21,
5854:1, 5854:3,
5854:10, 5855:6,
5856:3, 5856:18,
5856:25, 5857:6,
5859:18, 5861:18,
5862:6, 5862:10,
5862:23, 5862:24,
5864:1, 5865:17,
5866:5, 5866:8,
5867:1, 5867:2,
5867:7, 5867:10,
5867:12, 5867:19,
5867:21, 5870:24,
5871:8, 5882:2,
5882:3, 5888:2,
5888:21, 5893:2,
5900:3, 5900:19,
5905:23, 5907:1,
5912:19
**firstly** [1] - 5895:13
**fish** [2] - 5879:15,
5879:16
**fishing** [1] - 5879:16
**fit** [1] - 5846:15
**five** [15] - 5716:14,

5746:14, 5755:6,
5763:22, 5796:18,
5800:4, 5801:8,
5801:25, 5802:8,
5874:7, 5882:21,
5884:5, 5894:15,
5911:8, 5911:16
**flat** [1] - 5871:8
**flip** [5] - 5716:14,
5743:13, 5770:15,
5886:22, 5898:24
**float** [3] - 5730:19,
5730:21, 5730:22
**floating** [1] - 5911:2
**floor** [1] - 5856:12
**Floor** [1] - 5691:17
**Florida** [1] - 5872:12
**flow** [3] - 5692:18,
5872:16, 5872:21
**fluctuate** [1] - 5805:24
**fluctuation** [1] -
5807:16
**fly** [2] - 5879:15,
5879:16
**focus** [6] - 5753:11,
5837:13, 5837:19,
5865:3, 5888:7,
5891:24
**focused** [1] - 5771:11
**focuses** [1] - 5761:12
**Folgers** [2] - 5846:11
**follow** [2] - 5722:22,
5906:21
**followed** [1] - 5707:10
**following** [12] -
5746:20, 5750:14,
5755:1, 5755:3,
5756:4, 5810:16,
5830:22, 5895:9,
5895:16, 5895:23,
5898:2, 5907:15
**follows** [2] - 5745:22,
5841:3
**food** [1] - 5847:5
**force** [4] - 5811:21,
5871:22, 5873:19,
5874:8
**forcing** [1] - 5873:23
**forever** [1] - 5695:10
**forfeit** [1] - 5901:16
**forfeited** [1] - 5901:1
**forget** [1] - 5869:20
**Form** [11] - 5730:23,
5730:25, 5731:1,
5731:5, 5731:6,
5731:8, 5731:9,
5731:11, 5731:13,
5734:6, 5736:18
**form** [26] - 5717:2,
5717:3, 5717:4,

frame [7] - 5769:12, 5769:18, 5771:11, 5771:12, 5772:6, 5805:3, 5867:9
framing [1] - 5910:5
frankly [3] - 5821:19, 5873:17, 5874:10
fraud [1] - 5711:14
free [22] - 5728:15, 5730:16, 5730:22, 5733:15, 5735:3, 5735:17, 5735:22, 5742:4, 5748:4, 5752:20, 5753:1, 5753:5, 5766:3, 5766:5, 5766:7, 5766:9, 5766:12, 5766:15, 5766:17, 5767:9, 5767:18, 5835:6
free-trading [7] - 5728:15, 5730:16, 5730:22, 5733:15, 5735:3, 5735:17, 5735:22
freely [2] - 5730:18
Friday [6] - 5698:10, 5698:11, 5699:3, 5706:20, 5916:20, 5916:23
friend [3] - 5852:20, 5852:25, 5853:4
friends [3] - 5852:17, 5853:1, 5893:19
front [6] - 5713:13, 5715:11, 5828:13, 5828:14, 5855:12, 5858:14
full [5] - 5694:17, 5695:1, 5695:11, 5840:12, 5888:16
fully [1] - 5825:11
function [2] - 5830:5, 5830:8
Fund [2] - 5857:9, 5858:1
fund [27] - 5842:24, 5843:24, 5844:15, 5844:19, 5853:3, 5853:15, 5855:3, 5857:9, 5857:11, 5857:18, 5863:1, 5865:11, 5865:12, 5867:17, 5867:19, 5867:23, 5869:25, 5870:4, 5870:5, 5870:19, 5871:16, 5871:19, 5886:18, 5888:3, 5891:22, 5902:1, 5905:20

fund's [1] - 5870:24
funded [1] - 5867:21
funding [2] - 5771:16, 5811:20
Funds [1] - 5737:25
funds [23] - 5738:3, 5739:24, 5740:13, 5740:22, 5741:17, 5741:18, 5741:20, 5742:17, 5745:20, 5746:7, 5746:9, 5852:21, 5852:22, 5869:22, 5882:23, 5886:4, 5887:9, 5888:4, 5888:9, 5891:22, 5896:22, 5897:13
furthermore [1] - 5821:9
Future [1] - 5811:10
future [5] - 5695:12, 5726:14, 5726:15, 5811:16, 5902:2

## G

Galleon [31] - 5843:22, 5843:23, 5844:4, 5844:7, 5844:8, 5844:9, 5844:13, 5844:15, 5844:17, 5844:22, 5845:4, 5845:23, 5846:25, 5847:13, 5847:15, 5848:15, 5848:17, 5848:19, 5849:18, 5849:19, 5850:1, 5850:3, 5850:4, 5850:13, 5854:20, 5854:21, 5854:22, 5870:10, 5870:12, 5889:16, 5889:21
Gamble [4] - 5845:20, 5846:12, 5846:16, 5847:4
game [1] - 5886:12
Garreco [11] - 5879:12, 5879:13, 5880:25, 5882:22, 5883:2, 5885:15, 5885:16, 5885:17, 5885:18, 5885:23, 5904:25
Garrett [1] - 5885:15
gas [1] - 5879:19
Gateway [5] - 5717:2, 5723:14, 5725:14, 5737:11, 5744:6, 5908:12, 5908:21,

5909:4, 5915:17
Geller [1] - 5916:25
general [7] - 5755:4, 5769:12, 5826:24, 5827:2, 5827:9, 5873:2, 5911:2
generalist [2] - 5843:10, 5843:12
generally [7] - 5701:12, 5701:19, 5712:9, 5721:17, 5722:2, 5730:1, 5738:7, 5740:1, 5758:11, 5758:12, 5759:18, 5760:1, 5760:5, 5760:10, 5833:3, 5833:5, 5851:15, 5864:10, 5871:2, 5888:8, 5914:2
generated [1] - 5810:24
generates [1] - 5872:15
generating [1] - 5888:17
gentlemen [1] - 5845:13
George [5] - 5886:7, 5890:11, 5890:13, 5890:22, 5906:5
GIBSON [1] - 5691:17
given [12] - 5698:8, 5707:13, 5707:15, 5710:8, 5749:11, 5749:14, 5752:10, 5823:20, 5828:20, 5858:14, 5858:16, 5861:13
glean [1] - 5707:16
gleaned [1] - 5912:23
Gleeson [1] - 5830:10
glimpse [1] - 5703:22
global [1] - 5845:18
goal [1] - 5888:4
Goldman [1] - 5845:19
good-faith [1] - 5828:6
Government [39] - 5691:12, 5716:2, 5716:24, 5717:10, 5717:16, 5718:12, 5718:20, 5719:6, 5728:16, 5730:12, 5734:1, 5735:1, 5736:1, 5736:16, 5743:13, 5750:16, 5778:12, 5778:22, 5779:13, 5780:17,

5782:24, 5785:24, 5786:14, 5786:16, 5787:4, 5788:19, 5800:14, 5806:4, 5807:22, 5809:18, 5812:25, 5813:24, 5816:2, 5837:9, 5855:13, 5855:23, 5856:1, 5864:6, 5864:18
government [29] - 5710:10, 5714:2, 5714:20, 5718:16, 5719:5, 5765:16, 5768:1, 5768:18, 5768:23, 5769:7, 5769:10, 5769:13, 5769:15, 5769:20, 5770:1, 5776:24, 5779:20, 5785:21, 5792:8, 5792:15, 5815:15, 5823:23, 5824:11, 5824:15, 5825:1, 5825:8, 5828:2, 5833:20, 5851:8
government's [4] - 5769:9, 5825:15, 5825:21, 5825:23
Government's [41] - 5716:15, 5717:12, 5719:12, 5725:12, 5752:17, 5760:24, 5761:18, 5765:15, 5794:18, 5797:1, 5797:4, 5797:23, 5798:16, 5799:3, 5800:16, 5802:23, 5830:21, 5831:2, 5833:1, 5832:12, 5864:15, 5881:21, 5882:6, 5882:9, 5886:23, 5887:3, 5887:11, 5887:15, 5892:11, 5892:18, 5892:21, 5892:22, 5894:15, 5894:22, 5894:25, 5895:1, 5895:10, 5898:18, 5899:2, 5899:5, 5899:6
Governments' [1] - 5752:23
governs [1] - 5728:19
GRACE [1] - 5691:21
graduate [1] - 5842:5
gray [1] - 5701:8
great [6] - 5779:6, 5868:10, 5879:21, 5883:5, 5890:17

formal [2] - 5872:2, 5891:19
formalizing [1] - 5898:9
formally [1] - 5886:17
formed [1] - 5885:12
former [4] - 5850:13, 5860:1, 5860:10
forming [1] - 5891:24
forms [8] - 5714:4, 5714:9, 5736:20, 5740:2, 5809:3, 5809:6, 5816:13, 5915:2
formulated [1] - 5712:11
forth [6] - 5813:6, 5813:21, 5814:3, 5857:19, 5885:20, 5899:21
forty [1] - 5841:9
forty-six [1] - 5841:9
forward [7] - 5693:22, 5700:8, 5876:20, 5878:25, 5890:6, 5904:9, 5916:10
foundation [12] - 5820:23, 5821:2, 5821:17, 5822:18, 5908:6, 5908:23, 5910:14, 5910:16, 5911:5, 5914:1, 5914:6, 5915:1
founded [1] - 5888:14
founder [3] - 5847:14, 5850:2, 5890:4
four [19] - 5694:12, 5699:2, 5722:15, 5737:24, 5742:18, 5755:16, 5791:18, 5792:10, 5831:3, 5831:9, 5841:13, 5844:8, 5859:3, 5862:8, 5890:5, 5894:4, 5896:18, 5912:16, 5912:20
four-person [1] - 5890:5
fourteen [1] - 5908:18

**greater** [3] - 5745:3, 5783:14, 5807:16
**Greebel** [23] - 5699:22, 5714:14, 5717:16, 5764:23, 5764:25, 5765:4, 5765:13, 5767:18, 5810:2, 5813:17, 5819:8, 5835:6, 5866:24, 5867:1, 5867:5, 5867:7, 5867:11, 5867:14, 5873:14, 5873:24, 5881:23, 5882:12, 5912:18
**GREEBEL** [1] - 5691:6
**Greebel's** [4] - 5766:20, 5766:22, 5767:8, 5883:4
**green** [20] - 5751:23, 5751:24, 5752:22, 5756:5, 5760:22, 5777:12, 5777:13, 5777:22, 5778:2, 5779:16, 5780:8, 5785:16, 5788:20, 5789:1, 5790:15, 5790:17, 5791:6, 5791:17
**Griswold** [1] - 5815:9
**gross** [2] - 5866:12, 5866:13
**Group** [9] - 5768:15, 5843:22, 5843:23, 5845:19, 5847:15, 5849:18, 5849:19, 5889:17, 5889:21
**group** [11] - 5723:25, 5728:25, 5735:14, 5768:12, 5768:23, 5791:19, 5844:12, 5860:2, 5860:4, 5860:5, 5860:8
**growing** [2] - 5846:13, 5846:14
**growth** [2] - 5846:15, 5846:19
**guess** [13] - 5696:9, 5708:10, 5719:18, 5760:13, 5802:20, 5825:6, 5825:16, 5858:18, 5863:5, 5893:21, 5894:6, 5894:7, 5912:22
**guideline** [1] - 5700:4
**Gupta** [5] - 5845:16, 5845:17, 5845:18, 5851:6, 5852:4
**guy** [12] - 5845:10, 5845:11, 5845:16,

5852:16, 5852:20, 5852:25, 5861:23, 5878:1, 5886:1, 5886:3, 5886:6, 5890:23
**guys** [7] - 5845:10, 5850:2, 5850:4, 5850:11, 5879:18, 5891:25, 5917:2
**GX** [8] - 5918:15, 5918:16, 5918:16, 5918:17, 5918:17, 5918:18, 5918:18, 5918:19
**gypsum** [3] - 5879:12, 5879:23, 5883:2

## H

**half** [10] - 5694:12, 5694:16, 5712:21, 5774:15, 5804:17, 5841:20, 5859:18, 5888:21, 5893:3, 5893:6
**halfway** [1] - 5779:10
**hand** [5] - 5751:4, 5760:3, 5782:12, 5803:23, 5840:9
**handed** [1] - 5916:13
**handles** [1] - 5890:1
**hands** [1] - 5854:16
**hanging** [1] - 5894:13
**happy** [4] - 5829:23, 5830:4, 5893:3, 5893:6
**hard** [3] - 5696:24, 5774:10, 5816:15
**hardship** [4] - 5693:20, 5696:12, 5702:24, 5708:14
**harm** [1] - 5810:16
**Harmar** [1] - 5883:22
**hassle** [1] - 5866:21
**hat** [1] - 5879:21
**hats** [1] - 5843:3
**head** [4] - 5699:13, 5844:11, 5845:18, 5891:7
**headed** [1] - 5889:18
**header** [2] - 5810:25, 5811:8
**Heading** [1] - 5691:22
**health** [4] - 5732:10, 5843:11, 5843:13, 5843:16
**healthcare** [2] - 5866:18, 5866:21
**Healthcare** [24] - 5737:8, 5737:9,

5740:12, 5740:13, 5740:21, 5741:4, 5742:21, 5744:20, 5856:9, 5856:11, 5856:22, 5857:12, 5858:6, 5861:11, 5863:1, 5864:25, 5868:19, 5880:16, 5886:5, 5899:13, 5899:18, 5903:9
**hear** [11] - 5692:7, 5692:16, 5693:12, 5703:22, 5706:15, 5706:24, 5708:4, 5712:25, 5763:25, 5781:5, 5827:5
**heard** [13] - 5700:15, 5704:15, 5704:22, 5711:3, 5712:14, 5730:19, 5829:7, 5893:4, 5893:18, 5913:16, 5915:12, 5915:19
**hearing** [4] - 5701:25, 5704:5, 5704:16, 5908:9
**hears** [1] - 5910:10
**hearsay** [13] - 5906:14, 5908:6, 5910:4, 5910:12, 5910:15, 5911:13, 5911:15, 5913:2, 5913:15, 5913:24, 5914:2, 5915:5, 5915:13
**heavily** [1] - 5758:23, 5759:3, 5759:8
**Heber** [3] - 5879:11, 5879:15, 5879:20
**hedge** [16] - 5842:24, 5843:24, 5844:15, 5852:21, 5852:22, 5853:3, 5853:5, 5863:1, 5865:11, 5865:12, 5871:16, 5886:3, 5886:18, 5887:9, 5888:3, 5888:9
**held** [4] - 5710:17, 5726:24, 5742:16, 5742:21
**help** [2] - 5841:22, 5841:24
**helped** [1] - 5870:16
**helpful** [2] - 5712:13, 5712:16
**helps** [1] - 5852:21
**hereby** [1] - 5745:21
**herein** [3] - 5810:14, 5857:19, 5899:21

**herself** [1] - 5829:15
**hide** [1] - 5733:4
**high** [9] - 5759:23, 5806:7, 5806:12, 5806:21, 5807:8, 5810:8, 5810:9, 5890:13
**higher** [1] - 5758:3
**highest** [5] - 5762:13, 5774:8, 5777:14, 5806:10, 5806:13
**highlight** [4] - 5770:10, 5770:21, 5811:3, 5856:3
**highly** [1] - 5810:8
**himself** [2] - 5707:17, 5743:11
**hire** [6] - 5853:17, 5889:12, 5889:15, 5890:10, 5890:11, 5890:14
**hired** [2] - 5861:24, 5891:15
**hiring** [1] - 5850:12
**historical** [1] - 5748:20
**history** [1] - 5811:8
**hits** [1] - 5720:17
**hold** [2] - 5710:5, 5889:18
**holder** [3] - 5746:4, 5780:4, 5781:22
**holders** [5] - 5729:17, 5729:19, 5799:10, 5799:14, 5799:18, 5801:14, 5801:18, 5801:21, 5802:15
**holding** [3] - 5791:15, 5801:19, 5815:25
**holidays** [1] - 5829:13
**home** [1] - 5885:20
**honest** [2] - 5692:12, 5695:16
**honestly** [1] - 5893:15
**Honor** [95] - 5697:4, 5699:21, 5699:22, 5700:23, 5703:24, 5704:22, 5705:3, 5705:4, 5705:21, 5705:23, 5705:24, 5706:3, 5709:4, 5710:6, 5710:11, 5710:24, 5711:17, 5713:6, 5713:15, 5713:25, 5714:1, 5714:10, 5717:9, 5718:12, 5726:13, 5734:12, 5762:18, 5762:22, 5764:1, 5764:3, 5764:6,

5773:16, 5773:22, 5778:15, 5780:16, 5782:18, 5787:14, 5787:25, 5799:19, 5800:3, 5800:22, 5804:2, 5812:9, 5812:20, 5818:1, 5818:4, 5819:10, 5821:10, 5822:24, 5823:23, 5824:7, 5824:9, 5824:22, 5825:12, 5825:17, 5827:4, 5828:1, 5828:10, 5828:25, 5829:19, 5833:25, 5834:25, 5835:9, 5835:14, 5840:3, 5840:8, 5840:18, 5847:1, 5855:23, 5855:25, 5864:15, 5875:6, 5875:14, 5882:6, 5884:2, 5885:7, 5887:11, 5892:18, 5894:22, 5894:24, 5896:25, 5899:2, 5906:15, 5906:20, 5907:4, 5907:9, 5907:10, 5908:2, 5910:9, 5912:16, 5914:13, 5915:13, 5916:8, 5916:15, 5916:17
**HONORABLE** [1] - 5691:10
**hope** [2] - 5829:15, 5893:20
**hopes** [2] - 5720:11, 5890:13
**Hospital** [2] - 5699:1, 5699:18
**hour** [4] - 5764:8, 5818:20, 5909:12, 5911:17
**hours** [7] - 5694:2, 5694:4, 5694:21, 5695:9, 5715:4, 5830:3, 5830:4
**house** [1] - 5808:16
**HR** [4] - 5829:8, 5829:11, 5829:15, 5890:2
**Huang** [5] - 5886:7, 5890:11, 5890:18, 5890:22, 5906:5
**huge** [1] - 5772:4
**human** [1] - 5763:16
**hundred** [8] - 5754:10, 5766:2, 5766:9, 5766:12, 5800:5, 5801:9, 5801:25,

5802:8
**hurt** [1] - 5694:5
**hybrid** [1] - 5888:7

**I**

**ID** [1] - 5749:9
**idea** [16] - 5707:12,
5765:4, 5765:8,
5765:12, 5769:12,
5791:1, 5791:4,
5791:6, 5815:10,
5826:17, 5829:12,
5839:5, 5839:9,
5865:1, 5873:6,
5876:14
**identical** [2] -
5821:20, 5823:12
**identification** [11] -
5718:20, 5718:22,
5803:13, 5855:13,
5864:7, 5881:22,
5886:23, 5887:4,
5892:11, 5894:15,
5898:19
**identified** [6] -
5751:24, 5753:16,
5755:24, 5756:15,
5756:19, 5762:13
**identify** [3] - 5755:9,
5757:5, 5776:10
**identifying** [1] -
5780:4
**immaterial** [1] -
5846:7
**immediately** [3] -
5720:17, 5726:22,
5875:20
**Immediately** [2] -
5742:8
**impact** [3] - 5710:16,
5712:11, 5847:21
**impacted** [1] -
5711:21
**impactful** [3] - 5846:7,
5846:21, 5846:22
**impacts** [2] - 5711:22,
5712:2
**impeaching** [1] -
5827:24
**implicated** [1] -
5911:14
**importance** [1] -
5759:11
**important** [14] -
5692:6, 5699:24,
5701:12, 5712:18,
5771:21, 5772:13,
5773:5, 5823:1,
5868:6, 5910:12,

5914:20, 5914:21,
5914:24, 5916:12
**IN** [1] - 5741:22
**inaccurate** [1] -
5837:4
**inadmissible** [1] -
5821:4
**inception** [1] -
5888:15
**include** [6] - 5732:5,
5734:8, 5753:5,
5787:20, 5787:23,
5831:17
**included** [9] - 5725:2,
5725:22, 5750:4,
5752:23, 5799:3,
5810:13, 5837:3,
5870:8, 5870:12
**includes** [4] -
5717:25, 5749:7,
5749:19, 5803:20
**including** [14] -
5728:7, 5743:11,
5747:19, 5748:20,
5810:14, 5837:6,
5859:22, 5860:9,
5890:2, 5900:22,
5901:2, 5901:25,
5902:6, 5915:18
**inconsistent** [3] -
5822:6, 5822:9,
5826:24
**incorporated** [3] -
5873:21, 5873:22,
5874:7
**Incorporated** [1] -
5750:20
**increase** [1] - 5760:2
**increased** [1] - 5805:9
**increases** [4] - 5762:6,
5805:2, 5805:3
**increasing** [1] -
5804:15
**increasingly** [1] -
5888:6
**incredibly** [2] -
5771:21, 5872:21
**Incremental** [9] -
5849:20, 5849:21,
5849:25, 5850:2,
5850:3, 5850:8,
5850:10, 5850:11,
5850:14
**indeed** [1] - 5825:4
**independent** [1] -
5890:8
**indicate** [3] - 5731:10,
5738:25, 5789:2
**indicated** [4] - 5694:2,
5694:13, 5695:13,

5700:12
**indicates** [5] - 5739:6,
5747:22, 5749:10,
5791:23, 5803:21
**indicating** [1] -
5732:22
**indication** [1] - 5825:9
**indirect** [2] - 5732:24,
5732:25
**indirectly** [3] - 5730:4,
5733:2, 5859:21
**individual** [10] -
5699:13, 5720:3,
5733:1, 5741:25,
5742:1, 5776:11,
5790:7, 5792:14,
5852:12, 5866:24
**individuals** [12] -
5735:15, 5752:12,
5756:5, 5756:20,
5766:25, 5791:24,
5792:11, 5817:9,
5834:17, 5869:4,
5890:16, 5915:19
**individuals'** [1] -
5765:17
**induction** [1] -
5830:12
**industries** [1] - 5843:7
**industry** [3] - 5748:19,
5748:25, 5847:5
**influence** [1] -
5802:20
**inform** [1] - 5916:4
**information** [41] -
5697:10, 5707:13,
5711:13, 5715:17,
5715:18, 5718:1,
5718:18, 5725:2,
5725:4, 5725:6,
5725:9, 5729:12,
5732:10, 5732:14,
5737:18, 5737:20,
5748:19, 5748:21,
5748:22, 5748:24,
5749:6, 5778:8,
5780:4, 5780:13,
5799:3, 5800:15,
5809:12, 5810:13,
5813:5, 5813:21,
5814:2, 5815:12,
5833:22, 5837:25,
5845:4, 5845:6,
5845:9, 5845:13,
5848:12, 5910:25
**informs** [2] - 5731:15,
5759:15
**infrequently** [1] -
5723:8
**initial** [3] - 5731:9,

5746:6, 5854:19
**initials** [2] - 5718:4,
5718:7
**input** [4] - 5693:18,
5769:18, 5769:19,
5879:25
**inquiry** [3] - 5813:4,
5813:20, 5814:1
**inside** [1] - 5845:6
**insider** [11] - 5731:9,
5741:24, 5776:11,
5776:12, 5828:4,
5845:5, 5846:6,
5847:17, 5850:5,
5850:7, 5851:19
**insiders** [2] - 5731:15,
5731:17
**insight** [1] - 5732:10
**insignificant** [1] -
5816:23
**instance** [2] -
5738:23, 5760:1
**instances** [2] -
5757:5, 5916:10
**instead** [2] - 5701:8,
5819:14
**instruct** [3] - 5773:17,
5824:3, 5916:3
**instructions** [2] -
5707:10, 5865:21
**integrity** [1] - 5902:9
**intellectual** [2] -
5811:25, 5812:3
**intend** [2] - 5701:3,
5701:20
**intention** [1] - 5847:22
**intentions** [1] - 5710:9
**interchangeable** [1] -
5878:24
**interest** [6] - 5719:20,
5749:25, 5759:15,
5760:5, 5760:20,
5904:11
**Interest** [1] - 5746:15
**interesting** [1] -
5703:19
**interests** [2] -
5814:25, 5901:4
**interfere** [1] - 5692:18
**intermediary** [2] -
5749:20, 5784:7
**intermediate** [1] -
5787:23
**internally** [2] - 5701:2,
5845:3
**Internet** [1] - 5902:12
**interpersonal** [2] -
5707:16, 5707:22
**interpret** [2] - 5902:19,
5902:20

**interpretations** [1] -
5711:7
**interpreted** [1] -
5902:7
**interpreting** [1] -
5707:23
**interruption** [1] -
5702:1
**interrupts** [1] - 5830:1
**interviews** [1] -
5859:23
**intra** [7] - 5806:7,
5806:10, 5806:12,
5806:15, 5807:8,
5807:11
**intra-day** [7] - 5806:7,
5806:10, 5806:12,
5806:15, 5807:8,
5807:11
**introduced** [2] -
5867:5, 5889:24
**introduction** [1] -
5895:14
**invest** [4] - 5810:15,
5869:1, 5870:5,
5871:10
**invested** [2] - 5703:18,
5705:2
**investigations** [5] -
5711:2, 5711:19,
5768:21, 5768:24,
5776:13
**investing** [7] -
5733:13, 5810:9,
5870:22, 5870:25,
5873:11, 5873:24,
5891:3
**investment** [15] -
5731:16, 5810:11,
5814:13, 5857:8,
5857:10, 5868:20,
5869:2, 5871:14,
5871:25, 5874:13,
5876:15, 5881:12,
5881:13, 5881:20,
5890:24
**investments** [1] -
5869:14
**investor** [10] - 5732:9,
5733:8, 5843:14,
5868:18, 5871:21,
5871:24, 5871:25,
5873:17, 5883:14,
5891:6
**Investors** [3] - 5737:9,
5740:21, 5742:21
**investors** [9] -
5731:15, 5733:10,
5836:7, 5868:16,
5869:14, 5882:21,

5886:17, 5902:1, 5902:6
**involve** [2] - 5768:18, 5810:8
**involved** [4] - 5700:1, 5773:9, 5847:11, 5850:7
**involves** [1] - 5810:9
**involving** [1] - 5881:23
**IR** [1] - 5889:18
**isolate** [1] - 5796:18
**issuance** [2] - 5746:4, 5746:5
**issuances** [1] - 5728:8
**issue** [9] - 5700:11, 5707:17, 5710:21, 5711:11, 5819:9, 5823:6, 5823:10, 5875:5, 5913:15
**issued** [5] - 5743:23, 5746:24, 5747:1, 5747:3, 5747:8
**issuer** [6] - 5743:1, 5743:7, 5746:2, 5746:25, 5747:17, 5747:18
**issuer's** [2] - 5746:22, 5746:24
**issuers** [1] - 5746:15
**issues** [8] - 5708:14, 5710:9, 5711:15, 5819:11, 5819:12, 5850:5, 5912:3
**IT** [1] - 5890:2
**Italian** [1] - 5854:8
**item** [11] - 5726:1, 5726:4, 5726:5, 5742:24, 5745:19, 5745:21, 5746:14, 5747:6, 5747:10, 5747:14, 5815:5
**itemized** [1] - 5730:9
**items** [1] - 5725:21
**iterations** [1] - 5850:18
**itself** [2] - 5710:10, 5749:23

## J

**Jackson** [6] - 5700:13, 5823:15, 5829:24, 5877:23, 5889:25, 5890:1
**Jacob** [1] - 5865:7
**Jahrmarkt** [1] - 5883:14, 5883:20, 5883:22
**James** [3] - 5878:1,

5890:14, 5906:5
**JAN** [1] - 5844:14
**January** [31] - 5724:13, 5747:2, 5747:9, 5756:10, 5756:11, 5756:16, 5757:18, 5771:17, 5771:18, 5771:23, 5772:5, 5774:20, 5775:3, 5794:18, 5794:19, 5794:20, 5794:23, 5794:25, 5795:7, 5795:11, 5796:9, 5796:10, 5796:18, 5796:23, 5797:6, 5804:12, 5804:14, 5804:18, 5807:6
**Jarhrmarkt** [1] - 5883:13
**jelly** [2] - 5845:1, 5846:16
**jeopardy** [1] - 5705:12
**Jersey** [3] - 5841:15, 5852:17, 5881:7
**JM** [1] - 5828:20
**job** [22] - 5695:24, 5696:3, 5696:6, 5704:7, 5705:12, 5708:1, 5709:2, 5711:13, 5767:21, 5769:4, 5769:5, 5841:16, 5842:7, 5842:8, 5842:10, 5843:1, 5854:1, 5854:24, 5855:1, 5855:9, 5876:13, 5876:19
**jobs** [2] - 5842:19, 5844:9
**John** [2] - 5845:10, 5846:1
**join** [16] - 5890:14
**joined** [1] - 5856:25
**joining** [1] - 5889:22
**joins** [1] - 5889:16
**Joseph** [1] - 5840:13
**JOSEPH** [2] - 5841:1, 5918:9
**JOSHUA** [1] - 5691:21
**Judge** [13] - 5692:20, 5697:3, 5697:6, 5700:25, 5701:1, 5708:10, 5734:5, 5734:25, 5743:15, 5830:9, 5838:24, 5847:2, 5885:2
**JUDGE** [1] - 5691:10
**judge** [9] - 5697:18, 5700:9, 5700:24,

5708:12, 5710:17, 5711:4, 5837:17, 5911:7, 5912:25
**judgments** [1] - 5859:24
**judicial** [1] - 5816:25
**juggle** [1] - 5699:17
**July** [3] - 5853:24, 5875:5, 5875:8
**jumped** [1] - 5908:20
**junior** [1] - 5842:22
**jurisdictions** [1] - 5872:20
**Juror** [15] - 5692:3, 5692:5, 5698:23, 5700:16, 5700:21, 5701:22, 5702:8, 5702:9, 5707:18, 5710:2, 5763:9, 5763:13, 5763:18, 5829:7, 5829:8
**juror** [5] - 5693:8, 5698:21, 5703:13, 5706:20, 5830:6
**JUROR** [15] - 5692:12, 5692:15, 5693:23, 5696:3, 5696:15, 5696:19, 5696:24, 5697:6, 5698:15, 5698:18, 5702:12, 5702:17, 5703:6, 5703:8, 5703:12
**juror's** [1] - 5693:11
**jurors** [17] - 5698:17, 5699:15, 5700:2, 5700:7, 5700:20, 5704:3, 5706:21, 5710:4, 5713:23, 5762:23, 5764:15, 5818:9, 5829:5, 5829:24, 5830:16, 5884:5, 5885:4
**jury** [65] - 5691:10, 5692:1, 5693:7, 5693:8, 5693:25, 5703:3, 5704:8, 5705:19, 5706:24, 5710:1, 5712:13, 5712:16, 5713:11, 5713:13, 5713:18, 5713:21, 5713:22, 5716:3, 5716:8, 5717:1, 5719:8, 5722:17, 5723:1, 5725:24, 5725:25, 5728:18, 5729:9, 5733:24, 5735:2, 5735:5, 5745:23, 5746:10, 5746:18, 5747:5, 5752:9,

5761:20, 5763:5, 5763:12, 5764:2, 5764:4, 5764:14, 5819:3, 5824:3, 5827:15, 5828:13, 5828:15, 5829:12, 5830:15, 5871:24, 5884:8, 5887:16, 5892:23, 5895:2, 5899:7, 5910:5, 5911:1, 5911:3, 5911:7, 5911:16, 5911:24, 5912:2, 5912:8, 5913:20, 5916:4
**JURY** [1] - 5818:10
**Jury** [2] - 5818:15, 5885:3
**jury's** [2] - 5818:5, 5827:22

## K

**Katten** [1] - 5815:8
**keep** [5] - 5720:21, 5748:13, 5810:19, 5811:16, 5818:12
**keeping** [1] - 5825:2
**KESSLER** [17] - 5691:14, 5819:10, 5819:19, 5820:15, 5821:5, 5821:13, 5821:25, 5822:3, 5822:15, 5823:5, 5824:7, 5827:12, 5827:24, 5828:10, 5828:22, 5894:22, 5911:10
**Kevin** [42] - 5735:6, 5752:2, 5752:24, 5752:25, 5757:4, 5766:2, 5780:9, 5788:23, 5790:18, 5791:7, 5793:16, 5794:24, 5794:25, 5795:11, 5795:21, 5795:24, 5796:3, 5796:6, 5797:18, 5798:6, 5798:18, 5800:4, 5800:20, 5800:25, 5801:9, 5801:12, 5801:24, 5801:25, 5802:8, 5830:24, 5831:16, 5853:10, 5854:5, 5855:18, 5861:12, 5861:23, 5862:10, 5877:24, 5886:9, 5891:6, 5915:9
**key** [9] - 5731:22,

5733:8, 5837:15, 5839:5, 5839:9, 5890:10, 5890:11
**kids** [1] - 5841:13
**kind** [32] - 5698:8, 5701:6, 5706:15, 5708:12, 5720:8, 5723:23, 5724:20, 5724:25, 5725:2, 5732:3, 5737:20, 5782:11, 5791:25, 5838:1, 5843:3, 5843:7, 5843:10, 5843:14, 5843:17, 5844:16, 5846:15, 5849:9, 5851:11, 5856:23, 5872:22, 5876:25, 5878:4, 5878:7, 5881:16, 5890:20, 5896:23, 5905:24
**kinds** [3] - 5721:9, 5721:12, 5824:10
**KIYO** [2] - 5691:10, 5885:2
**knowing** [3] - 5847:4, 5847:5, 5863:16
**knowledge** [18] - 5712:7, 5712:10, 5767:11, 5813:5, 5813:20, 5814:2, 5908:6, 5908:8, 5910:14, 5911:2, 5911:5, 5912:22, 5913:5, 5913:19, 5913:21, 5914:5, 5915:1, 5915:2
**known** [6] - 5721:15, 5729:7, 5729:21, 5775:7, 5775:10, 5878:23
**knows** [4] - 5703:1, 5815:19, 5816:12, 5846:11

## L

**labeled** [1] - 5717:15
**laboratory** [3] - 5876:17, 5876:18
**laid** [4] - 5781:8, 5854:15, 5910:16, 5915:1
**land** [1] - 5822:21
**lands** [1] - 5805:5
**language** [1] - 5742:7
**large** [5] - 5727:2, 5755:18, 5772:1, 5812:7, 5816:10
**larger** [2] - 5844:19,

5868:14
**largest** [2] - 5771:25, 5772:2
**last** [26] - 5692:24, 5694:19, 5695:22, 5701:2, 5703:16, 5711:20, 5722:15, 5742:11, 5742:23, 5743:8, 5754:17, 5781:5, 5809:19, 5813:2, 5813:3, 5813:25, 5840:15, 5855:20, 5861:8, 5881:8, 5891:1, 5898:7, 5898:24, 5903:4, 5913:1
**late** [4] - 5830:6, 5880:11, 5886:11, 5892:8
**latest** [1] - 5697:14
**laughably** [2] - 5863:19, 5863:20
**law** [3] - 5808:18, 5808:19, 5848:21
**lawyer** [9] - 5773:20, 5808:7, 5808:11, 5808:14, 5808:18, 5808:19, 5823:18, 5851:22, 5851:25
**lawyers** [2] - 5693:12, 5809:12
**lay** [6] - 5820:22, 5821:2, 5821:17, 5822:17, 5914:1, 5914:6
**laying** [1] - 5911:5
**leading** [2] - 5847:1, 5913:14
**learn** [6] - 5754:13, 5845:12, 5862:17, 5862:22, 5868:11, 5906:23
**learned** [8] - 5889:5, 5906:8, 5906:18, 5907:7, 5909:9, 5914:3, 5914:19, 5914:25
**least** [11] - 5694:11, 5694:12, 5694:16, 5704:24, 5705:6, 5706:10, 5722:13, 5822:17, 5826:17, 5827:4, 5881:13
**leave** [8] - 5699:10, 5703:21, 5705:2, 5844:2, 5844:13, 5844:21, 5912:18, 5912:21
**leaves** [1] - 5705:15
**leaving** [1] - 5706:20

**LEE** [1] - 5691:20
**left** [17] - 5695:14, 5713:11, 5751:13, 5783:13, 5803:23, 5818:6, 5842:22, 5842:23, 5843:21, 5844:14, 5849:18, 5849:25, 5850:1, 5850:10, 5862:9, 5911:1, 5911:6
**left-hand-top** [1] - 5803:23
**legal** [10] - 5701:13, 5710:21, 5711:7, 5743:5, 5768:10, 5808:1, 5808:5, 5808:9, 5809:5, 5811:13
**legend** [1] - 5727:2
**lengthy** [2] - 5729:2, 5729:11
**less** [9] - 5695:11, 5745:17, 5756:1, 5758:3, 5760:7, 5760:18, 5762:4, 5867:25, 5868:2
**letter** [1] - 5728:13
**letterhead** [1] - 5899:11
**letters** [1] - 5860:11
**letting** [1] - 5692:15
**level** [1] - 5699:12
**leverage** [1] - 5883:23
**license** [2] - 5872:19, 5878:16
**lift** [1] - 5728:9
**lifting** [1] - 5728:11
**Ligand** [4] - 5878:18, 5878:19, 5879:7, 5889:4
**light** [1] - 5713:10
**likelihood** [1] - 5760:18
**limit** [6] - 5760:14, 5834:5, 5834:8, 5834:14, 5834:24
**limitation** [5] - 5710:10, 5859:23, 5900:23, 5901:25, 5902:7
**limited** [10] - 5713:2, 5728:24, 5769:15, 5770:3, 5770:15, 5797:1, 5808:5, 5808:9, 5837:19, 5857:9
**line** [20] - 5695:8, 5710:3, 5747:12, 5747:14, 5748:11, 5751:10, 5773:14,

5774:12, 5774:13, 5779:7, 5779:10, 5783:11, 5796:14, 5799:10, 5887:22, 5892:25, 5897:2, 5899:14, 5908:16, 5911:8
**liquidation** [1] - 5888:4
**liquidity** [3] - 5758:7, 5758:15, 5758:18
**list** [4] - 5772:10, 5803:21, 5804:9, 5916:18
**listed** [13] - 5722:5, 5735:11, 5737:13, 5739:12, 5739:24, 5740:22, 5744:5, 5767:1, 5767:13, 5772:5, 5774:6, 5775:1, 5796:19
**listen** [2] - 5695:25, 5911:19
**listening** [1] - 5911:20
**listing** [2] - 5721:18, 5721:24
**lists** [3] - 5728:8, 5781:18, 5804:19
**live** [2] - 5841:14, 5841:15
**lived** [2] - 5862:3, 5881:7
**living** [1] - 5877:25
**LLC** [16] - 5735:9, 5737:8, 5737:9, 5737:10, 5739:23, 5740:21, 5742:21, 5744:16, 5856:9, 5856:11, 5857:13, 5861:11, 5882:19, 5888:13, 5899:13, 5899:18
**lo** [1] - 5720:17
**local** [2] - 5872:18, 5879:18
**locate** [2] - 5720:24, 5825:3
**lofty** [1] - 5888:20
**logistical** [1] - 5829:20
**Lomb** [3] - 5895:14, 5895:18, 5896:9
**look** [22] - 5704:20, 5707:8, 5711:14, 5715:10, 5750:16, 5774:8, 5774:9, 5777:2, 5778:12, 5778:24, 5785:21, 5789:1, 5793:13, 5793:21, 5794:18,

5797:4, 5803:14, 5806:18, 5814:19, 5816:2, 5831:18, 5879:21
**looked** [7] - 5752:19, 5758:22, 5769:18, 5779:13, 5781:9, 5816:19, 5837:9
**looking** [13] - 5737:17, 5774:2, 5786:15, 5791:1, 5791:6, 5800:8, 5807:18, 5827:6, 5852:24, 5876:14, 5876:15, 5891:5, 5908:15
**looks** [3] - 5720:23, 5815:19, 5865:15
**lose** [6] - 5696:6, 5699:6, 5704:7, 5708:1, 5810:11, 5829:14
**losing** [2] - 5695:24, 5696:3
**lost** [1] - 5820:25
**loud** [1] - 5828:13
**loved** [3] - 5873:7, 5873:8, 5880:1
**low** [6] - 5762:5, 5806:7, 5806:15, 5806:23, 5807:11, 5832:6
**lower** [3] - 5722:2, 5787:21, 5832:9
**lowest** [2] - 5755:24, 5806:15
**LP** [13] - 5737:9, 5737:10, 5737:19, 5740:9, 5740:12, 5741:4, 5742:21, 5742:22, 5744:19, 5744:21, 5857:9, 5865:18, 5866:3
**lunch** [5] - 5764:8, 5818:6, 5818:8, 5818:9, 5818:16
**luncheon** [1] - 5818:22

**M**

**ma'am** [2] - 5702:11, 5763:3
**macro** [3] - 5843:14, 5843:15
**Madison** [4] - 5853:8, 5856:12, 5877:15, 5877:16
**mail** [2] - 5692:13, 5692:15, 5694:18, 5697:13, 5708:5,

5865:3, 5865:5, 5865:17, 5876:21, 5881:23, 5882:11, 5882:13, 5883:8, 5886:21, 5887:8, 5887:18, 5889:9, 5892:15, 5892:25, 5895:4, 5895:6, 5895:10, 5895:12, 5896:2, 5897:10, 5898:7
**mails** [4] - 5708:6, 5864:10, 5882:1, 5894:17
**maintain** [3] - 5722:1, 5722:14, 5812:3
**maintained** [4] - 5776:21, 5777:4, 5779:22, 5780:21
**maintains** [2] - 5728:6, 5776:17
**major** [4] - 5724:25, 5731:2, 5733:9, 5903:22
**majority** [3] - 5768:9, 5807:25, 5869:8
**make-it-or-break-it** [1] - 5838:1
**maker** [10] - 5749:21, 5749:22, 5783:25, 5784:3, 5784:4, 5832:20, 5832:24, 5832:25, 5833:1, 5833:14
**makers** [5] - 5749:20, 5750:10, 5784:8, 5785:13, 5833:3
**manage** [7] - 5694:16, 5695:10, 5696:14, 5699:19, 5702:25, 5890:5, 5891:9
**managed** [1] - 5902:2
**Management** [18] - 5737:8, 5737:10, 5737:18, 5739:23, 5740:9, 5742:22, 5744:12, 5744:14, 5744:16, 5856:9, 5856:22, 5857:13, 5861:11, 5899:13, 5899:18, 5903:9
**management** [11] - 5835:4, 5842:12, 5857:17, 5868:8, 5868:9, 5870:6, 5871:23, 5872:2, 5872:5, 5872:25, 5873:20
**Management's** [1] -

5738:10
**manager** [16] -
5841:18, 5841:21,
5843:4, 5844:11,
5844:20, 5849:22,
5852:25, 5857:8,
5857:17, 5857:20,
5857:21, 5859:20,
5869:23, 5873:3,
5873:18, 5886:14
**managers** [2] -
5844:18, 5902:5
**manages** [1] - 5891:3
**managing** [1] - 5888:7
**manner** [1] - 5860:11
**March** [9] - 5798:25,
5799:22, 5799:25,
5800:4, 5800:23,
5800:25, 5801:24,
5802:15, 5802:17
**Marek** [42] - 5735:7,
5752:24, 5752:25,
5766:7, 5780:9,
5786:24, 5788:24,
5789:9, 5790:23,
5791:8, 5793:17,
5798:12, 5798:24,
5800:20, 5801:1,
5802:11, 5830:24,
5831:16, 5854:5,
5861:22, 5862:10,
5868:18, 5877:2,
5877:3, 5877:4,
5877:24, 5880:3,
5881:2, 5881:13,
5881:24, 5882:12,
5882:25, 5883:10,
5885:13, 5885:25,
5890:3, 5890:4,
5891:4, 5891:23,
5905:1, 5905:11,
5905:14
**Mark** [1] - 5752:2
**marked** [12] - 5717:14,
5718:19, 5719:14,
5803:12, 5804:4,
5856:2, 5864:6,
5864:20, 5881:21,
5882:10, 5886:22,
5892:11
**Market** [5] - 5722:4,
5722:13, 5722:20,
5723:9, 5723:24
**market** [69] - 5701:11,
5701:12, 5701:16,
5710:12, 5710:16,
5711:2, 5711:13,
5711:14, 5711:22,
5711:24, 5712:2,
5712:4, 5712:11,

5720:1, 5720:9,
5721:6, 5722:16,
5723:20, 5724:6,
5726:23, 5730:10,
5731:4, 5731:14,
5732:8, 5733:7,
5733:14, 5734:10,
5749:20, 5749:21,
5749:22, 5749:24,
5750:2, 5750:3,
5750:9, 5752:7,
5752:8, 5752:14,
5758:13, 5759:16,
5759:21, 5760:8,
5760:19, 5761:8,
5761:10, 5772:16,
5775:5, 5775:6,
5783:24, 5784:3,
5784:4, 5784:8,
5785:6, 5785:13,
5785:14, 5804:9,
5832:13, 5832:17,
5832:20, 5832:21,
5832:24, 5832:25,
5833:1, 5833:3,
5833:14, 5873:1,
5879:25, 5888:22,
5902:3
**marketed** [1] -
5888:17
**marketing** [3] -
5870:2, 5870:3,
5870:14
**marketplace** [1] -
5720:19
**marketplaces** [2] -
5721:21, 5722:20
**markets** [6] - 5721:7,
5721:9, 5721:17,
5723:25, 5775:9,
5842:21
**Markets** [3] - 5721:23,
5722:6, 5759:12
**married** [2] - 5841:10,
5841:11
**Martin** [121] - 5735:11,
5736:18, 5737:8,
5741:6, 5741:7,
5741:18, 5742:3,
5743:9, 5743:22,
5745:10, 5752:2,
5752:23, 5753:21,
5754:13, 5754:19,
5757:1, 5765:8,
5765:12, 5788:6,
5788:23, 5790:20,
5791:7, 5793:16,
5799:22, 5800:20,
5800:25, 5801:2,
5801:11, 5802:9,

5809:23, 5813:16,
5813:19, 5814:7,
5815:6, 5815:11,
5815:19, 5816:4,
5816:20, 5830:23,
5831:17, 5852:12,
5852:15, 5852:16,
5852:19, 5852:23,
5852:24, 5853:10,
5853:14, 5854:5,
5854:15, 5854:19,
5854:24, 5855:3,
5855:18, 5856:19,
5857:3, 5858:11,
5861:23, 5862:9,
5862:12, 5862:25,
5863:1, 5863:21,
5865:25, 5867:6,
5867:16, 5868:4,
5868:18, 5869:7,
5869:13, 5870:16,
5871:13, 5871:18,
5874:16, 5874:18,
5874:20, 5875:20,
5876:6, 5876:24,
5878:7, 5879:3,
5879:4, 5881:9,
5881:11, 5881:23,
5882:11, 5882:16,
5883:10, 5886:4,
5886:8, 5886:17,
5887:21, 5889:10,
5889:24, 5890:25,
5891:19, 5891:24,
5892:15, 5893:23,
5897:10, 5898:13,
5898:15, 5901:10,
5901:11, 5902:7,
5902:23, 5903:11,
5903:15, 5904:2,
5904:8, 5904:13,
5905:11, 5905:14,
5906:4, 5909:13,
5909:16, 5909:19,
5909:21, 5910:13,
5914:3
**Martin's** [9] - 5857:1,
5857:2, 5861:22,
5864:9, 5869:3,
5877:4, 5880:3,
5886:11, 5886:12
**MASTRO** [4] -
5691:19, 5700:23,
5826:1, 5916:25
**match** [1] - 5749:15
**material** [6] - 5724:24,
5726:1, 5823:22,
5847:20, 5869:14,
5879:25
**materially** [1] -

5810:16
**materials** [3] - 5715:7,
5723:11, 5869:16
**MATSUMOTO** [2] -
5691:10, 5885:2
**matter** [4] - 5823:17,
5880:15, 5901:16,
5911:11
**mattered** [1] - 5899:25
**matters** [1] - 5890:1
**MB** [1] - 5877:4
**McKinsey** [1] -
5845:18
**mean** [46] - 5693:24,
5697:1, 5697:16,
5706:15, 5708:10,
5708:13, 5712:18,
5730:17, 5731:24,
5738:2, 5738:7,
5738:17, 5738:22,
5739:5, 5739:19,
5747:24, 5758:5,
5759:1, 5772:8,
5774:8, 5785:11,
5791:18, 5824:14,
5825:7, 5830:23,
5842:15, 5846:9,
5846:22, 5849:2,
5854:17, 5856:20,
5862:14, 5863:17,
5866:14, 5871:12,
5874:21, 5874:22,
5881:1, 5881:18,
5893:7, 5893:14,
5897:18, 5897:20,
5902:19, 5902:20,
5905:21
**meaning** [1] - 5875:10
**meaningful** [1] -
5868:8
**means** [12] - 5709:1,
5722:18, 5730:18,
5738:23, 5748:1,
5791:17, 5791:19,
5806:10, 5806:13,
5806:15, 5814:12,
5843:14
**meant** [4] - 5800:23,
5824:18, 5874:7,
5883:16
**measure** [2] -
5805:18, 5805:19
**mechanical** [1] -
5691:25
**media** [3] - 5859:24,
5860:11, 5901:25
**medical** [3] - 5879:9,
5882:18, 5891:5
**Medical** [2] - 5882:19,
5882:24

**meet** [9] - 5772:9,
5850:22, 5852:15,
5853:4, 5864:1,
5866:24, 5867:7,
5868:23, 5869:4
**meeting** [14] - 5853:6,
5853:7, 5853:9,
5853:13, 5853:18,
5853:21, 5854:1,
5854:3, 5854:10,
5854:11, 5855:6,
5856:18, 5867:1,
5869:1
**meetings** [3] -
5854:19, 5869:7,
5869:10
**melted** [1] - 5844:16
**member** [1] - 5845:19
**members** [6] -
5713:22, 5756:8,
5816:25, 5817:3,
5817:6, 5912:2
**Memphis** [1] - 5879:14
**mention** [1] - 5703:3
**mentioned** [9] -
5692:20, 5693:24,
5715:19, 5722:7,
5722:25, 5728:17,
5729:6, 5732:23,
5858:3
**merger** [49] - 5722:12,
5722:25, 5723:1,
5723:2, 5723:11,
5723:14, 5723:18,
5723:21, 5724:10,
5724:18, 5725:3,
5725:4, 5725:8,
5725:15, 5733:19,
5742:13, 5742:17,
5748:8, 5750:14,
5753:12, 5754:15,
5754:17, 5771:13,
5772:20, 5808:25,
5837:23, 5906:13,
5906:24, 5907:8,
5908:19, 5909:11,
5909:14, 5909:17,
5909:20, 5909:23,
5910:15, 5910:21,
5910:25, 5911:4,
5911:12, 5911:13,
5912:23, 5912:24,
5913:7, 5913:12,
5913:16, 5914:11,
5914:16, 5915:16
**mergers** [2] - 5723:5,
5740:3
**message** [1] - 5887:23
**met** [9] - 5851:22,
5852:23, 5853:5,

5867:2, 5867:10, 5867:14, 5883:22, 5889:25

**Michael** [3] - 5735:25, 5736:12, 5886:10

**Michelle** [1] - 5815:9

**Microsoft** [2] - 5781:8, 5781:24

**mid** [3] - 5762:24, 5838:7, 5849:9

**mid-2009** [1] - 5849:9

**mid-2011** [1] - 5850:18

**mid-February** [1] - 5838:7

**mid-morning** [1] - 5762:24

**midafternoon** [1] - 5884:3

**middle** [1] - 5737:1

**middleman** [1] - 5750:1

**Midtown** [1] - 5854:15

**midwestern** [1] - 5878:17

**might** [20] - 5692:19, 5700:4, 5700:13, 5701:5, 5701:6, 5702:23, 5704:7, 5704:23, 5706:3, 5707:24, 5731:18, 5795:19, 5796:1, 5822:20, 5827:8, 5832:20, 5849:12, 5884:2, 5886:7

**Mike** [1] - 5846:2

**mill** [1] - 5876:18

**million** [23] - 5730:12, 5730:15, 5735:16, 5774:14, 5774:16, 5804:6, 5816:5, 5838:4, 5867:24, 5868:5, 5868:11, 5871:15, 5871:20, 5873:1, 5875:24, 5876:2, 5878:19, 5882:21, 5883:13, 5883:15, 5883:21, 5883:25, 5888:18

**millions** [2] - 5759:7, 5805:12

**mind** [21] - 5692:9, 5701:6, 5705:4, 5705:21, 5706:1, 5706:3, 5707:2, 5707:4, 5707:6, 5707:25, 5708:15, 5708:21, 5712:23, 5818:12, 5906:3, 5913:13, 5915:4, 5915:11, 5915:22,

5916:1, 5916:7

**mindful** [3] - 5693:11, 5696:1, 5704:6

**minimis** [1] - 5863:13

**Minnesota** [1] - 5872:12

**minute** [2] - 5709:14, 5793:20

**minutes** [7] - 5762:25, 5763:8, 5818:6, 5884:6, 5911:9, 5912:16, 5912:20

**misimpression** [2] - 5911:1, 5911:3

**misinterpreted** [1] - 5708:6

**misleading** [2] - 5785:15, 5791:25

**misplaced** [2] - 5821:1, 5824:25

**misread** [1] - 5897:1

**miss** [1] - 5830:12

**missing** [4] - 5813:7, 5825:15, 5827:7, 5830:6

**modest** [1] - 5888:18

**mom** [1] - 5698:24

**moment** [19] - 5716:14, 5716:18, 5719:3, 5721:7, 5728:2, 5753:12, 5758:22, 5762:18, 5818:1, 5835:9, 5844:1, 5849:15, 5850:19, 5864:21, 5870:19, 5890:18, 5900:16, 5901:10, 5901:11

**Monday** [5] - 5698:14, 5912:5, 5912:10, 5912:19, 5917:6

**money** [48] - 5720:12, 5738:8, 5738:10, 5744:3, 5763:23, 5833:11, 5847:23, 5853:14, 5853:16, 5854:18, 5867:19, 5867:23, 5868:24, 5869:5, 5870:19, 5870:22, 5871:13, 5871:14, 5871:16, 5874:16, 5874:19, 5874:20, 5874:22, 5874:23, 5874:24, 5875:1, 5875:15, 5876:6, 5876:10, 5876:12, 5879:5, 5886:3, 5886:5, 5887:25, 5888:7, 5890:7, 5891:22,

5892:8, 5894:5, 5894:13, 5897:23, 5904:13, 5905:19, 5905:21, 5905:23

**monies** [1] - 5852:21

**month** [6] - 5720:14, 5856:20, 5858:25, 5866:9, 5867:3, 5877:25

**monthly** [1] - 5858:14

**months** [5] - 5849:24, 5862:21, 5867:3, 5871:8, 5881:14

**Morgan** [4] - 5842:11, 5842:16, 5842:17, 5842:23

**morning** [11] - 5697:7, 5705:10, 5712:5, 5713:22, 5762:24, 5764:20, 5764:21, 5775:17, 5834:11, 5912:10, 5912:19

**mortgage** [1] - 5846:10

**most** [7] - 5715:14, 5771:12, 5819:15, 5823:9, 5872:18, 5889:11, 5889:15

**mostly** [4] - 5843:9, 5847:6, 5870:16, 5885:19

**motions** [1] - 5713:5

**moulds** [2] - 5879:12, 5879:22

**move** [8] - 5717:9, 5722:6, 5724:6, 5724:8, 5827:8, 5837:16, 5905:15, 5916:9

**moved** [8] - 5713:11, 5714:2, 5771:24, 5842:21, 5867:9, 5877:16, 5910:22, 5910:23

**movement** [1] - 5722:23

**movers** [1] - 5719:5

**moves** [1] - 5803:25

**MR** [196] - 5695:21, 5696:7, 5696:9, 5696:18, 5696:23, 5697:1, 5699:21, 5700:9, 5700:18, 5700:23, 5700:24, 5701:18, 5701:24, 5702:2, 5703:24, 5704:15, 5705:7, 5705:20, 5706:14, 5708:7, 5708:10, 5709:3, 5709:8,

5709:13, 5710:6, 5710:17, 5713:10, 5713:15, 5713:19, 5713:25, 5714:10, 5717:9, 5718:12, 5719:5, 5719:9, 5728:1, 5734:5, 5734:25, 5743:15, 5751:1, 5758:11, 5758:14, 5762:18, 5762:22, 5764:1, 5764:3, 5764:6, 5765:24, 5771:20, 5778:15, 5782:18, 5787:8, 5787:14, 5791:3, 5799:19, 5800:3, 5800:7, 5804:2, 5812:9, 5812:20, 5819:10, 5819:19, 5820:14, 5820:15, 5820:18, 5821:5, 5821:10, 5821:13, 5821:17, 5821:22, 5821:25, 5822:2, 5822:3, 5822:15, 5822:16, 5823:5, 5823:15, 5823:23, 5824:5, 5824:7, 5824:9, 5824:18, 5824:21, 5825:12, 5825:22, 5826:1, 5826:10, 5826:15, 5826:21, 5827:12, 5827:17, 5827:21, 5827:24, 5828:1, 5828:10, 5828:22, 5828:25, 5829:3, 5829:19, 5829:20, 5830:1, 5830:8, 5833:25, 5834:25, 5835:14, 5835:16, 5837:1, 5837:17, 5838:24, 5840:3, 5840:8, 5840:15, 5840:18, 5841:5, 5843:25, 5844:6, 5847:1, 5847:2, 5850:15, 5855:23, 5855:25, 5861:1, 5864:15, 5864:17, 5875:6, 5875:14, 5882:6, 5882:8, 5884:2, 5885:7, 5885:8, 5886:22, 5887:3, 5887:5, 5887:11, 5887:13, 5887:17, 5892:10, 5892:18, 5892:20, 5892:24, 5894:8, 5894:14, 5894:22, 5894:24,

5895:3, 5896:25, 5897:6, 5897:8, 5898:18, 5899:2, 5899:4, 5899:8, 5901:19, 5903:4, 5906:14, 5906:20, 5907:4, 5907:9, 5907:10, 5908:2, 5908:3, 5908:4, 5908:5, 5908:10, 5908:15, 5908:22, 5909:2, 5909:6, 5909:9, 5909:16, 5909:21, 5910:2, 5910:9, 5910:22, 5911:7, 5911:10, 5911:18, 5911:20, 5911:22, 5911:23, 5912:16, 5912:25, 5913:25, 5914:13, 5914:20, 5915:3, 5915:5, 5915:8, 5916:2, 5916:8, 5916:9, 5916:15, 5916:19, 5916:22, 5916:25

**MS** [56] - 5710:11, 5711:17, 5712:1, 5713:6, 5714:5, 5717:11, 5719:7, 5719:11, 5757:12, 5758:10, 5758:16, 5759:13, 5760:9, 5764:11, 5764:19, 5765:23, 5771:1, 5773:16, 5773:25, 5774:12, 5779:3, 5780:16, 5782:4, 5783:3, 5783:11, 5785:23, 5786:16, 5787:17, 5787:25, 5790:1, 5791:4, 5800:9, 5800:13, 5800:22, 5803:25, 5805:1, 5809:11, 5809:21, 5810:19, 5811:2, 5813:2, 5813:24, 5815:17, 5817:8, 5818:1, 5818:4, 5830:20, 5835:9, 5835:11, 5836:1, 5837:16, 5838:3, 5839:2, 5840:1, 5916:17, 5916:20

**MSMB** [114] - 5737:8, 5737:9, 5737:10, 5737:18, 5738:10, 5739:23, 5740:8, 5740:11, 5740:13, 5740:21, 5741:4,

**CMH**

5742:21, 5742:22, 5744:11, 5744:13, 5744:16, 5744:19, 5744:20, 5814:18, 5853:7, 5855:5, 5855:19, 5856:9, 5856:11, 5856:21, 5856:24, 5857:8, 5857:12, 5858:1, 5858:6, 5858:8, 5859:25, 5860:1, 5860:2, 5860:4, 5860:8, 5861:3, 5861:11, 5861:19, 5862:16, 5863:1, 5863:2, 5863:23, 5864:3, 5864:22, 5864:25, 5865:13, 5865:15, 5865:18, 5866:2, 5866:18, 5866:24, 5867:16, 5867:17, 5868:12, 5868:13, 5868:14, 5868:16, 5868:21, 5868:24, 5869:5, 5869:11, 5873:11, 5874:12, 5874:24, 5875:1, 5875:16, 5875:18, 5876:4, 5876:12, 5877:4, 5877:11, 5877:21, 5878:25, 5880:5, 5880:9, 5880:12, 5880:15, 5880:16, 5885:23, 5886:5, 5887:9, 5887:23, 5887:25, 5888:5, 5888:14, 5889:19, 5889:23, 5890:11, 5890:16, 5890:21, 5891:19, 5893:11, 5897:21, 5898:10, 5899:13, 5899:18, 5899:23, 5900:4, 5900:21, 5902:2, 5902:4, 5902:16, 5902:21, 5902:25, 5903:9

**MSMB's** [3] - 5890:5, 5890:6, 5891:3

**Mulleady** [47] - 5735:6, 5752:2, 5752:24, 5752:25, 5757:4, 5757:5, 5757:10, 5757:19, 5757:22, 5758:1, 5766:2, 5780:9, 5788:23, 5790:18, 5791:7, 5793:16, 5794:24, 5795:1, 5795:12, 5795:21,

5795:24, 5796:3, 5796:6, 5797:18, 5798:6, 5798:18, 5800:4, 5800:20, 5800:25, 5801:9, 5801:12, 5801:24, 5801:25, 5802:7, 5802:8, 5830:24, 5831:16, 5853:11, 5854:6, 5855:18, 5861:12, 5861:23, 5877:24, 5886:9, 5891:6, 5915:9

**Muscular** [4] - 5863:3, 5878:15, 5879:8, 5889:3

**must** [1] - 5724:14

**mutually** [2] - 5844:15, 5844:20

**MYLAN** [1] - 5691:20

**N**

**Nair** [1] - 5865:7

**name** [27] - 5719:21, 5737:22, 5744:9, 5766:20, 5766:22, 5767:8, 5767:14, 5795:15, 5797:8, 5802:12, 5819:24, 5820:1, 5821:24, 5822:1, 5822:4, 5840:12, 5840:13, 5840:15, 5845:16, 5855:3, 5861:24, 5872:9, 5877:6, 5880:24, 5881:6, 5883:22, 5885:15

**named** [12] - 5815:9, 5845:10, 5845:11, 5852:12, 5852:20, 5855:6, 5855:9, 5862:17, 5866:24, 5878:1, 5886:1, 5886:6

**names** [5] - 5735:13, 5749:7, 5767:16, 5819:25, 5820:1

**naming** [1] - 5855:5

**NASDAQ** [16] - 5721:16, 5722:16, 5722:21, 5724:9, 5724:15, 5759:7, 5762:10, 5771:24, 5772:10, 5772:15, 5774:6, 5775:7, 5803:19, 5803:21, 5804:9, 5804:19

**national** [3] - 5721:15, 5722:6, 5722:20

**nature** [3] - 5692:10, 5828:11, 5900:22

**NAV** [3] - 5865:8, 5865:10, 5866:4

**nearly** [1] - 5775:7

**necessarily** [1] - 5698:3

**necessary** [2] - 5826:23, 5913:20

**need** [17] - 5702:18, 5702:25, 5710:4, 5721:25, 5724:17, 5731:21, 5731:23, 5764:8, 5811:4, 5811:19, 5826:25, 5874:22, 5876:6, 5904:20, 5905:16, 5908:22, 5914:1

**needed** [7] - 5811:21, 5873:19, 5873:20, 5875:1, 5876:10, 5905:11, 5905:14

**needs** [3] - 5724:25, 5897:16, 5912:18

**negative** [1] - 5860:3

**neighborhood** [1] - 5867:24

**net** [2] - 5834:20, 5866:11

**never** [20] - 5694:25, 5697:17, 5704:6, 5704:11, 5710:13, 5764:25, 5765:2, 5766:25, 5808:11, 5808:16, 5808:18, 5808:21, 5808:24, 5809:5, 5820:14, 5836:4, 5871:13, 5873:17, 5900:1

**new** [6] - 5723:18, 5725:5, 5837:24, 5872:13, 5882:15, 5890:14

**NEW** [1] - 5691:1

**New** [23] - 5691:5, 5691:16, 5691:18, 5691:23, 5721:16, 5775:7, 5821:6, 5841:15, 5843:24, 5848:25, 5849:2, 5849:4, 5849:8, 5850:20, 5851:3, 5851:9, 5851:23, 5852:17, 5864:1, 5872:12, 5877:25, 5881:7

**news** [7] - 5697:14, 5697:15, 5859:23, 5874:4, 5874:6, 5874:10

**next** [55] - 5699:4, 5700:10, 5709:15, 5726:5, 5726:8, 5727:3, 5736:25, 5737:15, 5739:22, 5740:11, 5740:21, 5744:4, 5744:11, 5744:16, 5745:19, 5746:14, 5747:10, 5747:12, 5750:23, 5755:17, 5756:8, 5756:14, 5770:9, 5770:23, 5799:15, 5804:21, 5811:7, 5811:13, 5816:2, 5817:10, 5818:23, 5831:6, 5836:9, 5839:11, 5840:7, 5840:19, 5857:15, 5857:22, 5858:19, 5858:21, 5859:3, 5860:13, 5862:12, 5865:7, 5884:15, 5886:1, 5886:8, 5888:10, 5890:9, 5896:2, 5900:10, 5900:25, 5908:11, 5910:5, 5916:18

**nice** [2] - 5840:5, 5916:16

**night** [4] - 5692:25, 5694:19, 5701:2, 5703:16

**nine** [4] - 5754:10, 5912:11, 5912:12, 5912:13

**nineteen** [1] - 5755:16

**no.** [1] - 5889:8

**nobody** [5] - 5696:11, 5824:15, 5826:4, 5826:12, 5845:22

**noise** [2] - 5871:22, 5872:1

**non** [7] - 5846:7, 5846:19, 5851:12, 5851:13, 5852:1, 5852:7, 5852:9

**non-growth** [1] - 5846:19

**non-impactful** [1] - 5846:7

**non-prosecution** [5] - 5851:12, 5851:13, 5852:1, 5852:7, 5852:9

**nonadmissible** [1] - 5824:24

**Nondisparagement** [1] - 5859:16

**nondisparagement** [2] - 5861:3, 5901:20

**none** [1] - 5799:3

**nonpros** [2] - 5823:15, 5823:24

**nonprosecution** [4] - 5819:22, 5822:9, 5822:10, 5822:14

**nonpublic** [3] - 5845:6, 5845:9, 5845:12

**normal** [1] - 5759:21

**Northern** [1] - 5876:16

**noted** [1] - 5713:7

**notes** [2] - 5704:2, 5810:14

**nothing** [8] - 5723:9, 5732:13, 5762:22, 5791:16, 5828:22, 5838:24, 5892:9, 5904:11

**notice** [2] - 5757:25, 5899:22

**notified** [2] - 5886:17, 5886:20

**notion** [1] - 5697:25

**Nov** [1] - 5903:8

**November** [16] - 5691:7, 5780:22, 5797:9, 5797:13, 5798:18, 5800:17, 5850:6, 5888:5, 5899:10, 5900:6, 5905:3, 5905:18, 5906:2, 5907:2, 5911:6, 5917:6

**nowhere** [2] - 5914:5, 5915:1

**NPA** [15] - 5819:22, 5820:3, 5820:6, 5820:8, 5820:12, 5820:15, 5820:18, 5821:5, 5821:7, 5821:9, 5827:13, 5828:11, 5828:14

**Number** [8] - 5692:3, 5692:5, 5698:23, 5700:16, 5700:21, 5701:22, 5702:9, 5707:18

**number** [27] - 5716:12, 5735:14, 5737:21, 5737:22, 5737:24, 5739:12, 5739:17, 5739:19, 5746:17, 5747:7, 5749:8, 5749:9, 5752:13, 5777:8, 5780:3, 5783:14, 5783:17, 5796:22, 5796:23, 5850:1,

| CMH | OCR | RMR | CRR | FCRR | 22 |

5850:12, 5858:13,
5863:16, 5863:19,
5888:20
**numbers** [5] -
5712:14, 5778:21,
5853:16, 5854:16,
5854:17

## O

**o'clock** [2] - 5691:7,
5764:10
**O'Connor** [2] -
5845:11, 5846:2
**oath** [1] - 5830:17
**object** [12] - 5712:4,
5819:25, 5820:2,
5822:12, 5822:15,
5822:21, 5826:1,
5827:12, 5847:1,
5907:4, 5907:9,
5910:14
**objecting** [4] - 5713:6,
5822:5, 5825:8,
5828:10
**Objection** [1] - 5760:9
**objection** [37] -
5710:15, 5717:11,
5719:11, 5758:10,
5758:16, 5759:13,
5771:20, 5782:18,
5787:8, 5787:14,
5791:3, 5799:19,
5800:3, 5804:2,
5812:9, 5812:20,
5823:16, 5833:25,
5834:25, 5836:1,
5837:16, 5837:20,
5838:3, 5838:5,
5855:25, 5864:17,
5882:8, 5887:13,
5892:20, 5894:24,
5899:4, 5906:14,
5906:22, 5907:6,
5907:9, 5908:3,
5916:11
**obligation** [1] -
5746:12
**obligations** [1] -
5861:6
**observed** [1] -
5848:15
**observer** [1] - 5912:18
**obtain** [2] - 5751:7,
5812:3
**obtained** [4] -
5718:17, 5726:23,
5749:4, 5913:5
**obviate** [2] - 5908:22,
5913:25

**obviated** [1] - 5819:17
**obviously** [7] -
5699:25, 5708:11,
5712:1, 5903:21,
5913:1, 5913:3,
5916:9
**occasionally** [3] -
5906:19, 5915:12
**occupied** [1] -
5862:11
**occur** [1] - 5810:16
**occurred** [3] -
5807:20, 5909:15,
5915:17
**occurring** [1] -
5774:23
**occurs** [1] - 5724:18
**October** [9] - 5867:22,
5870:20, 5870:25,
5892:16, 5894:20,
5895:6, 5895:11,
5897:10, 5898:4
**odd** [2] - 5824:15,
5826:3
**OF** [3] - 5691:1,
5691:3, 5691:9
**offer** [20] - 5701:4,
5710:18, 5713:2,
5728:24, 5804:1,
5826:25, 5854:16,
5855:23, 5864:15,
5882:6, 5887:11,
5892:18, 5893:1,
5893:20, 5894:22,
5899:2, 5902:15,
5904:2, 5908:25,
5915:10
**offered** [38] - 5711:5,
5745:7, 5820:3,
5820:12, 5820:16,
5851:21, 5892:4,
5893:8, 5908:10,
5908:11, 5908:12,
5908:14, 5908:17,
5908:25, 5909:2,
5909:5, 5909:10,
5909:24, 5910:3,
5910:4, 5910:8,
5911:11, 5913:3,
5913:4, 5913:10,
5913:12, 5913:13,
5913:14, 5913:22,
5914:8, 5914:15,
5915:3, 5915:4,
5915:21, 5915:23,
5916:4, 5916:6,
5916:11
**offering** [7] - 5728:24,
5744:2, 5803:20,
5804:5, 5820:13,

5915:14, 5915:18
**office** [35] - 5692:24,
5707:17, 5707:25,
5763:19, 5842:24,
5843:3, 5853:7,
5861:19, 5862:6,
5862:7, 5862:13,
5865:12, 5867:9,
5867:10, 5867:12,
5877:17, 5878:5,
5885:19, 5886:1,
5886:7, 5886:14,
5889:5, 5890:19,
5892:1, 5906:17,
5908:20, 5910:7,
5910:11, 5910:18,
5910:23, 5911:2,
5913:5, 5915:12
**Office** [2] - 5714:23,
5849:3
**officer** [4] - 5730:1,
5731:2, 5860:1,
5889:17
**officers** [4] - 5726:6,
5726:7, 5726:8,
5902:5
**offices** [15] - 5862:2,
5864:5, 5877:11,
5877:13, 5877:22,
5878:2, 5885:23,
5885:24, 5905:8,
5905:12, 5905:13,
5910:22, 5910:24,
5913:17
**often** [4] - 5719:22,
5824:11, 5824:13,
5867:11
**oftentimes** [1] -
5726:24
**old** [3] - 5841:8,
5846:14, 5846:15
**once** [8] - 5762:5,
5774:5, 5823:3,
5838:7, 5850:24,
5850:25, 5917:3
**one** [103] - 5694:11,
5698:4, 5704:2,
5704:10, 5709:14,
5716:24, 5716:25,
5720:16, 5720:19,
5721:22, 5722:5,
5722:6, 5722:20,
5723:13, 5723:25,
5724:8, 5725:13,
5728:11, 5728:23,
5729:25, 5734:3,
5736:20, 5737:22,
5740:4, 5740:24,
5742:18, 5745:1,
5745:11, 5755:16,

5762:18, 5763:14,
5763:18, 5770:5,
5774:1, 5775:9,
5778:8, 5783:20,
5784:3, 5785:16,
5786:9, 5790:7,
5790:12, 5791:19,
5791:22, 5793:20,
5793:21, 5796:1,
5796:25, 5797:22,
5815:8, 5818:1,
5819:19, 5820:9,
5820:11, 5820:24,
5821:11, 5821:12,
5821:14, 5821:19,
5821:20, 5822:19,
5822:22, 5823:12,
5826:5, 5826:17,
5826:18, 5827:18,
5827:20, 5827:23,
5828:24, 5829:8,
5831:2, 5835:9,
5846:5, 5850:2,
5855:12, 5858:1,
5862:10, 5863:12,
5869:8, 5871:10,
5872:15, 5872:17,
5878:18, 5882:2,
5882:3, 5885:25,
5886:24, 5888:8,
5895:11, 5896:5,
5896:16, 5897:4,
5900:12, 5900:25,
5909:20, 5910:20,
5911:11, 5914:3
**One's** [1] - 5700:21
**one's** [2] - 5763:9,
5829:8
**one-time** [1] - 5900:12
**ones** [3] - 5728:9,
5750:1, 5894:3
**open** [11] - 5692:1,
5695:7, 5710:1,
5763:12, 5818:12,
5819:3, 5855:12,
5885:1, 5888:9,
5892:10, 5912:1
**open-ended** [1] -
5888:9
**opened** [2] - 5695:16,
5807:6
**opening** [2] - 5806:7,
5806:18
**operates** [1] - 5759:22
**operating** [2] - 5811:8,
5889:17
**operation** [1] -
5888:14
**operational** [1] -
5890:1

**operations** [3] -
5810:18, 5886:18,
5890:6
**opine** [1] - 5711:14
**opining** [1] - 5710:20
**opinion** [6] - 5701:4,
5701:13, 5701:14,
5701:15, 5728:13,
5902:16
**opinions** [3] -
5712:10, 5713:2,
5859:24
**opportunities** [1] -
5888:6
**opportunity** [21] -
5702:22, 5703:1,
5711:16, 5712:25,
5788:2, 5818:7,
5855:2, 5908:20,
5909:1, 5909:5,
5909:17, 5909:22,
5909:23, 5910:8,
5910:13, 5913:10,
5913:14, 5913:15,
5914:10, 5914:19,
5915:23
**opposing** [1] - 5862:8,
5862:9
**optimal** [1] - 5704:21
**option** [2] - 5695:13,
5695:18
**options** [1] - 5863:11
**oral** [1] - 5902:11
**orally** [1] - 5826:18
**oranges** [1] - 5772:21
**order** [7] - 5697:22,
5701:21, 5728:14,
5750:10, 5784:9,
5874:8, 5914:18
**ordered** [1] - 5825:1
**orders** [1] - 5833:8
**ordinary** [1] - 5697:18
**OREMLAND** [2] -
5714:11, 5918:4
**Oremland** [25] -
5700:25, 5701:3,
5701:8, 5710:5,
5713:24, 5714:2,
5714:7, 5714:14,
5718:23, 5719:15,
5764:20, 5771:17,
5778:18, 5781:5,
5782:19, 5782:21,
5803:14, 5806:6,
5810:25, 5811:5,
5829:4, 5830:17,
5835:17, 5839:3,
5840:4
**Oremland's** [1] -
5710:23

**original** [4] - 5744:23, 5871:14, 5889:17, 5891:6
**originally** [2] - 5879:14, 5881:11
**OTC** [1] - 5723:25
**OTCQB** [3] - 5723:22, 5724:3, 5724:15
**otherwise** [3] - 5700:17, 5743:5, 5824:23
**ought** [2] - 5853:4, 5872:3
**outcome** [2] - 5692:7, 5829:18
**outset** [1] - 5862:5
**outside** [6] - 5692:1, 5712:12, 5808:21, 5859:25, 5873:11, 5890:7
**outstanding** [3] - 5746:20, 5747:8, 5874:8
**over-the-counter** [1] - 5775:5
**overall** [1] - 5787:15
**overrule** [2] - 5837:20, 5838:5
**Overruled** [3] - 5759:14, 5760:10, 5834:1
**overruled** [1] - 5758:17
**overseen** [2] - 5767:23, 5768:4
**owe** [3] - 5695:9, 5695:12, 5900:21
**owed** [1] - 5866:3
**own** [17] - 5720:10, 5730:2, 5732:20, 5732:22, 5733:4, 5734:7, 5734:15, 5734:20, 5739:9, 5744:14, 5792:10, 5792:19, 5860:12, 5872:17, 5872:20, 5874:7, 5876:25
**owned** [11] - 5731:10, 5737:21, 5739:11, 5740:9, 5741:12, 5745:4, 5815:20, 5815:23, 5816:20, 5816:22, 5881:19
**owner** [1] - 5733:1
**owners** [3] - 5725:9, 5732:12, 5737:4
**ownership** [10] - 5719:20, 5725:9, 5732:24, 5733:4, 5741:7, 5741:15,

**ownerships** [1] - 5736:21
**owns** [6] - 5720:3, 5733:1, 5734:18, 5739:21, 5742:3, 5816:8

**P**

**P-I-E-R-O-T-T-I** [1] - 5840:16
**p.m** [1] - 5897:11
**page** [65] - 5709:15, 5725:17, 5725:21, 5726:11, 5727:3, 5736:5, 5736:25, 5737:15, 5739:22, 5740:11, 5740:21, 5742:6, 5742:23, 5743:8, 5744:4, 5744:11, 5744:17, 5744:19, 5745:11, 5745:19, 5746:14, 5747:10, 5747:12, 5750:23, 5770:23, 5789:15, 5804:21, 5809:19, 5809:21, 5810:5, 5811:7, 5811:13, 5811:16, 5811:24, 5813:2, 5813:3, 5813:25, 5814:19, 5815:17, 5816:3, 5817:10, 5818:23, 5831:2, 5836:9, 5839:11, 5840:19, 5855:20, 5857:4, 5857:22, 5858:10, 5859:3, 5859:15, 5860:13, 5861:8, 5884:15, 5891:2, 5898:24, 5900:18, 5901:19, 5903:4, 5907:15
**pages** [4] - 5741:6, 5742:6, 5812:11, 5812:13
**paid** [18] - 5693:9, 5693:22, 5694:2, 5695:5, 5697:21, 5708:22, 5714:23, 5829:12, 5858:25, 5865:13, 5865:14, 5865:19, 5866:8, 5866:11, 5880:8, 5880:10, 5892:6, 5893:9
**paragraph** [17] - 5742:12, 5827:19, 5828:24, 5856:3,

**pause** [4] - 5713:20, 5764:13, 5835:10, 5886:24
**pay** [13] - 5693:20, 5694:11, 5695:1, 5699:2, 5699:6, 5699:17, 5707:24, 5738:3, 5859:12, 5866:16, 5885:15, 5900:23
**paying** [4] - 5699:23, 5704:3, 5881:13, 5881:14
**payment** [9] - 5715:2, 5865:18, 5866:2, 5866:4, 5900:10, 5900:13, 5900:15, 5900:21
**payments** [4] - 5893:24, 5898:1, 5901:6, 5904:12
**payroll** [1] - 5694:1
**pedigreed** [1] - 5890:16
**pending** [1] - 5713:12
**people** [18] - 5726:25, 5728:24, 5733:10, 5759:24, 5772:16, 5788:13, 5829:8, 5845:3, 5850:1, 5854:23, 5877:1, 5879:14, 5879:22, 5889:9, 5890:19, 5905:16, 5906:2, 5915:20
**per** [6] - 5746:6, 5754:3, 5754:7, 5780:3, 5865:17, 5866:2
**Percent** [2] - 5739:14, 5744:25
**percent** [28] - 5730:2, 5731:3, 5732:20, 5732:23, 5733:1, 5734:7, 5734:10, 5734:18, 5734:20, 5735:19, 5739:18, 5740:18, 5740:20, 5741:15, 5741:16, 5745:1, 5745:4, 5745:14, 5745:16, 5761:8, 5786:5, 5786:21, 5787:3, 5787:21, 5815:20, 5815:24, 5816:8, 5874:7
**percentage** [5] - 5735:17, 5739:20, 5745:8, 5787:15,

**paragraphs** [1] - 5742:18
**parameters** [1] - 5869:25
**Park** [1] - 5691:17
**part** [13] - 5710:11, 5716:22, 5720:23, 5722:22, 5751:23, 5769:5, 5775:1, 5775:23, 5793:23, 5858:25, 5866:20, 5893:10, 5915:17
**participants** [1] - 5902:4
**participated** [1] - 5814:21
**participation** [1] - 5828:20
**particular** [13] - 5717:25, 5723:10, 5723:23, 5749:6, 5774:17, 5775:22, 5777:2, 5789:9, 5792:25, 5793:7, 5862:11, 5871:11
**particularly** [1] - 5859:14
**parties** [11] - 5692:7, 5693:10, 5697:19, 5700:3, 5700:22, 5703:23, 5761:4, 5782:16, 5823:20, 5902:14, 5902:16
**partner** [3] - 5736:12, 5877:5, 5890:4
**partners** [2] - 5881:2, 5881:3
**partnership** [2] - 5857:9, 5888:9
**partnerships** [1] - 5888:3
**parts** [1] - 5885:18
**party** [3] - 5826:14, 5826:17, 5826:18
**past** [6] - 5693:22, 5696:20, 5712:20, 5771:6, 5820:5, 5902:5
**path** [1] - 5891:23
**pattern** [1] - 5875:12
**Pause** [7] - 5762:21, 5803:15, 5818:3, 5819:6, 5829:6,

**5787:21
**perfect** [2] - 5866:7, 5916:8
**performance** [4] - 5868:10, 5870:24, 5871:6, 5901:3
**performed** [1] - 5903:12
**perhaps** [1] - 5701:4
**period** [59] - 5716:6, 5717:25, 5749:6, 5753:8, 5755:4, 5755:25, 5756:19, 5758:24, 5759:10, 5760:24, 5761:16, 5762:2, 5762:14, 5770:3, 5770:7, 5770:10, 5770:12, 5770:14, 5770:15, 5770:16, 5770:19, 5771:3, 5771:9, 5772:14, 5772:18, 5773:3, 5773:9, 5773:11, 5774:15, 5774:19, 5774:24, 5775:22, 5779:25, 5780:21, 5793:23, 5797:1, 5797:7, 5797:13, 5797:17, 5797:18, 5797:23, 5798:17, 5798:21, 5798:23, 5799:7, 5800:8, 5800:17, 5800:21, 5803:5, 5805:14, 5837:13, 5837:15, 5837:19, 5837:21, 5850:15, 5866:11, 5886:16, 5890:21
**periodic** [2] - 5722:14, 5724:1
**periods** [1] - 5761:25
**permission** [1] - 5818:4
**person** [15] - 5699:9, 5739:12, 5741:13, 5743:6, 5763:16, 5833:13, 5859:25, 5860:4, 5860:8, 5890:5, 5902:9, 5902:10, 5909:1, 5909:13, 5909:21
**Person** [1] - 5741:22
**personal** [5] - 5741:20, 5742:17, 5746:8, 5859:24, 5860:9
**personally** [4] - 5876:21, 5880:18, 5888:18, 5904:13

**persons** [2] - 5743:6, 5810:10
**perspective** [1] - 5826:9
**pertains** [1] - 5721:5
**PF** [1] - 5741:20
**Ph.D** [1] - 5890:11
**pharmaceuticals** [1] - 5878:19
**phone** [1] - 5864:4
**picking** [1] - 5784:14
**piece** [1] - 5881:16
**pieces** [2] - 5841:23, 5858:17
**Pierotti** [67] - 5735:8, 5752:5, 5753:3, 5755:9, 5756:12, 5756:15, 5756:17, 5756:21, 5760:22, 5761:7, 5766:9, 5790:9, 5790:11, 5792:13, 5792:17, 5794:11, 5795:14, 5795:17, 5795:25, 5796:1, 5796:4, 5796:7, 5796:25, 5797:22, 5798:3, 5819:14, 5819:21, 5820:21, 5821:8, 5822:8, 5824:18, 5826:6, 5827:16, 5828:14, 5828:17, 5831:17, 5831:25, 5832:5, 5840:13, 5841:6, 5853:4, 5855:11, 5855:14, 5856:9, 5856:10, 5861:2, 5864:8, 5865:19, 5866:2, 5881:22, 5885:9, 5887:6, 5887:18, 5891:3, 5892:25, 5893:17, 5897:9, 5902:19, 5911:12, 5911:18, 5911:25, 5912:9, 5913:4, 5913:18
**PIEROTTI** [2] - 5841:1, 5918:9
**Pierotti's** [9] - 5794:15, 5820:7, 5913:13, 5913:21, 5914:14, 5915:22, 5915:25, 5916:7, 5916:23
**Pierotti-035** [1] - 5855:20
**PIPE** [6] - 5814:10, 5814:12, 5814:22,

5814:24, 5815:1, 5816:7
**pipeline** [1] - 5888:16
**Pitluck** [8] - 5706:13, 5710:13, 5711:18, 5713:23, 5778:13, 5800:6, 5835:13, 5885:6
**PITLUCK** [107] - 5691:14, 5700:9, 5700:18, 5700:24, 5701:18, 5701:24, 5702:2, 5706:14, 5708:10, 5710:6, 5710:17, 5713:10, 5713:15, 5713:19, 5713:25, 5714:10, 5717:9, 5718:12, 5719:5, 5719:9, 5728:1, 5734:5, 5734:25, 5743:15, 5751:1, 5758:11, 5758:14, 5762:18, 5762:22, 5764:3, 5764:6, 5765:24, 5771:20, 5778:15, 5782:18, 5787:8, 5787:14, 5791:3, 5799:19, 5800:3, 5800:7, 5804:2, 5812:9, 5812:20, 5829:20, 5830:1, 5830:8, 5833:25, 5834:25, 5835:14, 5835:16, 5837:1, 5837:17, 5838:24, 5840:3, 5840:8, 5840:15, 5840:18, 5841:5, 5847:2, 5855:23, 5861:1, 5864:15, 5875:14, 5882:6, 5884:2, 5885:7, 5885:8, 5886:22, 5887:3, 5887:5, 5887:11, 5887:17, 5892:10, 5892:18, 5892:24, 5894:14, 5895:3, 5897:8, 5898:18, 5899:2, 5899:8, 5901:19, 5903:4, 5906:20, 5907:10, 5908:2, 5908:4, 5908:10, 5908:15, 5909:2, 5909:6, 5909:9, 5909:16, 5909:21, 5910:2, 5911:7, 5911:20, 5911:23, 5912:25, 5914:13, 5915:3, 5915:8, 5916:9,

5916:15, 5916:19, 5916:22
**Pitluck's** [1] - 5834:15
**place** [7] - 5697:8, 5723:16, 5724:12, 5753:13, 5823:1, 5849:20, 5905:4
**placed** [1] - 5824:22
**placement** [10] - 5743:25, 5744:1, 5746:20, 5747:2, 5747:4, 5747:17, 5747:19, 5762:12, 5771:15, 5814:14
**placements** [1] - 5747:9
**places** [1] - 5902:18
**plain** [1] - 5747:5
**Plaintiff** [1] - 5691:4
**plan** [4] - 5904:24, 5906:7, 5906:8, 5906:23
**planes** [1] - 5873:2
**planned** [1] - 5904:25
**play** [7] - 5701:10, 5701:11, 5701:15, 5731:13, 5732:8, 5733:7, 5734:13
**Plaza** [2] - 5691:15, 5691:23
**pleasant** [1] - 5912:6
**plus** [4] - 5706:19, 5747:8, 5889:16, 5889:21
**PMB** [3] - 5869:18, 5869:19, 5869:20
**point** [35] - 5698:6, 5708:18, 5708:19, 5712:24, 5714:1, 5735:22, 5755:6, 5771:2, 5772:5, 5774:8, 5777:15, 5809:11, 5820:25, 5825:12, 5828:11, 5851:24, 5862:18, 5863:4, 5863:7, 5863:12, 5878:18, 5880:7, 5880:8, 5885:22, 5887:24, 5888:23, 5892:6, 5893:16, 5898:4, 5901:14, 5908:24, 5909:15, 5911:10, 5912:25, 5913:19
**pointing** [1] - 5774:11
**policy** [2] - 5829:11, 5829:14
**political** [1] - 5903:22
**poorly** [1] - 5872:16
**pop** [1] - 5712:24

**portfolio** [14] - 5843:4, 5844:11, 5844:17, 5844:20, 5849:22, 5852:24, 5857:16, 5857:17, 5857:19, 5857:21, 5859:1, 5859:20, 5869:20, 5873:18
**portfolios** [1] - 5844:18
**portion** [9] - 5755:18, 5770:5, 5777:22, 5779:16, 5780:8, 5787:12, 5790:6, 5812:7, 5816:10
**portions** [1] - 5788:20
**posed** [1] - 5773:18
**position** [12] - 5695:2, 5695:23, 5696:11, 5704:7, 5708:11, 5710:8, 5721:5, 5811:4, 5824:23, 5825:18, 5871:3, 5904:2
**positive** [3] - 5772:12, 5838:10, 5846:20
**possession** [2] - 5820:25, 5823:25
**possibility** [5] - 5695:17, 5699:16, 5706:11, 5830:2, 5904:5
**possible** [2] - 5708:19, 5853:10
**possibly** [1] - 5739:9
**posted** [2] - 5902:12
**potential** [2] - 5734:9, 5869:14
**potentially** [1] - 5819:11
**Power** [3] - 5738:13, 5738:17, 5739:4
**power** [20] - 5733:11, 5733:12, 5733:13, 5734:13, 5738:18, 5738:20, 5738:24, 5738:25, 5740:4, 5740:16, 5740:24, 5741:1, 5741:8, 5741:10, 5744:20, 5744:21, 5833:16, 5833:18, 5833:20
**PPM** [2] - 5865:17, 5866:2
**PPM-MSMB** [1] - 5866:2
**practice** [4] - 5692:18, 5694:3, 5694:4, 5808:11
**precluded** [1] -

5712:22
**prefer** [1] - 5706:23
**preferred** [1] - 5882:20
**prejudice** [1] - 5826:8
**prejudicial** [1] - 5825:19
**Prem** [1] - 5865:7
**prepare** [6] - 5714:17, 5715:7, 5715:13, 5733:23, 5751:19, 5882:23
**prepared** [2] - 5769:21, 5815:9
**preparing** [2] - 5718:9, 5769:6
**prescheduled** [1] - 5699:5
**presence** [1] - 5692:1
**present** [12] - 5710:1, 5713:21, 5713:23, 5763:12, 5764:14, 5764:15, 5819:3, 5824:12, 5830:15, 5830:16, 5851:22, 5885:4
**president** [1] - 5889:19
**press** [2] - 5804:5, 5901:25
**pressing** [1] - 5700:11
**pressure** [1] - 5876:2
**pressured** [1] - 5847:11
**pretty** [3] - 5771:15, 5803:2, 5815:25
**previous** [3] - 5741:3, 5745:4, 5895:9
**previously** [2] - 5713:5, 5752:19
**price** [97] - 5716:5, 5716:10, 5720:11, 5720:15, 5720:18, 5722:2, 5722:15, 5722:22, 5746:2, 5746:6, 5746:13, 5748:11, 5748:16, 5748:20, 5751:6, 5751:7, 5751:10, 5753:24, 5754:5, 5754:7, 5755:1, 5755:3, 5755:4, 5755:21, 5755:23, 5755:24, 5757:25, 5758:4, 5759:17, 5759:18, 5759:20, 5760:1, 5760:5, 5760:7, 5760:11, 5760:19, 5761:23, 5762:1, 5762:3,

CMH       OCR       RMR       CRR       FCRR                    25

5762:6, 5762:8, 5762:13, 5765:22, 5772:23, 5774:11, 5778:20, 5780:3, 5781:16, 5802:21, 5802:24, 5803:2, 5803:4, 5803:8, 5804:15, 5805:2, 5805:18, 5805:19, 5805:21, 5805:24, 5806:1, 5806:7, 5806:8, 5806:10, 5806:12, 5806:13, 5806:15, 5806:18, 5807:2, 5807:8, 5807:11, 5807:18, 5807:19, 5807:23, 5830:22, 5831:3, 5831:6, 5831:11, 5832:4, 5832:6, 5832:7, 5832:9, 5836:8, 5837:22, 5838:8, 5838:15, 5838:19, 5838:21, 5846:22, 5847:21
**prices** [2] - 5750:20, 5754:3
**pricing** [1] - 5773:14
**principal** [2] - 5726:6, 5726:7
**principals** [1] - 5902:6
**principle** [1] - 5759:22
**priority** [1] - 5777:13
**private** [31] - 5705:5, 5723:2, 5723:4, 5728:23, 5743:25, 5744:1, 5744:2, 5746:20, 5747:2, 5747:3, 5747:9, 5747:16, 5747:19, 5762:12, 5771:14, 5808:11, 5814:13, 5838:21, 5842:11, 5863:14, 5863:17, 5882:22, 5888:6, 5888:8, 5888:9, 5888:13, 5893:21, 5898:5, 5898:6, 5905:24
**privately** [2] - 5706:24, 5901:24
**privy** [1] - 5845:4
**probative** [3] - 5822:6, 5822:7
**probing** [1] - 5822:13
**problem** [3] - 5825:17, 5908:7, 5914:2
**proceed** [6] - 5700:22, 5701:1, 5703:23, 5714:6, 5840:17,

5875:13
**proceedings** [2] - 5817:1, 5886:25
**Proceedings** [1] - 5691:25
**process** [6] - 5721:18, 5721:24, 5729:3, 5808:25, 5870:6, 5872:2
**proclamations** [1] - 5712:3
**Procter** [4] - 5845:20, 5846:12, 5846:16, 5847:4
**produced** [2] - 5691:25, 5820:21
**product** [3] - 5811:22, 5841:18, 5841:21
**products** [4] - 5812:4, 5812:5, 5847:7, 5888:17
**professionally** [1] - 5707:21
**proffer** [3] - 5710:14, 5827:17, 5828:6
**proffering** [2] - 5826:11, 5826:19
**profitability** [1] - 5811:10
**programs** [1] - 5811:22
**progress** [1] - 5888:15
**prohibited** [1] - 5860:12
**project** [4] - 5876:15, 5880:2, 5880:4, 5882:15
**projects** [5] - 5876:15, 5876:25, 5877:9, 5878:4, 5878:7, 5878:22, 5885:13
**promised** [1] - 5912:21
**prop** [1] - 5850:12
**proper** [2] - 5822:18, 5910:3
**property** [2] - 5811:25, 5812:3
**propose** [4] - 5701:7, 5706:2, 5713:4, 5914:7
**proposed** [1] - 5710:10
**proprietary** [1] - 5853:2
**prosecute** [1] - 5828:19
**prosecuted** [1] - 5828:3
**prosecuting** [1] -

5768:19
**Prosecution** [1] - 5768:15
**prosecution** [8] - 5769:2, 5851:12, 5851:13, 5851:17, 5852:1, 5852:7, 5852:9, 5864:2
**prosecutions** [1] - 5768:24
**prosecutor** [1] - 5852:8
**prosecutors** [6] - 5826:4, 5849:6, 5849:7, 5850:20, 5851:2, 5851:9
**prospective** [3] - 5860:10, 5902:1, 5902:3
**prospects** [1] - 5810:17
**protection** [1] - 5812:3
**prove** [1] - 5823:7
**provide** [8] - 5776:5, 5776:14, 5778:14, 5784:10, 5848:12, 5851:16, 5857:17, 5913:20
**provided** [10] - 5718:15, 5718:16, 5746:7, 5769:20, 5776:24, 5779:19, 5809:5, 5809:12, 5823:19, 5851:17
**provides** [4] - 5732:9, 5733:8, 5776:1, 5800:15
**providing** [1] - 5899:12
**provisions** [2] - 5712:14, 5899:20
**proxies** [1] - 5857:3
**proxy** [3] - 5872:2, 5873:23, 5874:8
**pubically** [1] - 5835:22
**public** [44] - 5712:17, 5718:18, 5723:2, 5723:4, 5725:1, 5728:7, 5732:13, 5748:20, 5748:22, 5749:12, 5750:11, 5759:15, 5772:9, 5775:1, 5775:3, 5775:4, 5775:5, 5775:6, 5776:10, 5784:6, 5784:25, 5785:1, 5785:2, 5785:10, 5804:5, 5812:16, 5812:21,

5814:13, 5835:24, 5836:6, 5836:7, 5837:2, 5838:11, 5859:22, 5872:1, 5888:8, 5888:13, 5888:21, 5898:5, 5906:8, 5906:11, 5906:12, 5906:23, 5913:9
**publically** [1] - 5723:3
**publicly** [11] - 5722:23, 5723:6, 5725:5, 5749:15, 5750:4, 5772:5, 5774:4, 5836:3, 5837:6, 5838:18, 5901:24
**publish** [2] - 5770:9, 5780:16
**published** [4] - 5887:16, 5892:23, 5895:2, 5899:7
**pull** [1] - 5874:24
**pulled** [3] - 5874:19, 5874:20, 5874:22
**punished** [1] - 5826:5
**purchase** [16] - 5720:24, 5740:14, 5741:19, 5745:25, 5746:1, 5746:2, 5746:8, 5747:18, 5753:22, 5753:24, 5754:3, 5755:2, 5757:10, 5757:11, 5908:21, 5913:10
**purchased** [12] - 5742:17, 5745:24, 5754:4, 5754:5, 5754:24, 5757:20, 5758:1, 5758:8, 5810:10, 5814:22, 5815:6, 5834:18
**purchasers** [1] - 5747:21
**purchasing** [2] - 5801:3, 5908:12
**purely** [1] - 5773:14
**purple** [9] - 5752:4, 5777:11, 5777:12, 5777:22, 5778:22, 5790:5, 5790:6, 5790:12, 5794:10
**purpose** [1] - 5701:9
**purposes** [1] - 5832:21
**pursuant** [3] - 5714:5, 5716:3, 5718:13
**pursue** [1] - 5872:6
**purview** [1] - 5710:20
**push** [2] - 5829:22,

5830:4
**put** [23] - 5694:1, 5695:22, 5696:11, 5704:6, 5750:1, 5750:10, 5752:18, 5765:15, 5784:5, 5797:8, 5824:8, 5825:18, 5852:16, 5853:5, 5867:23, 5870:14, 5870:15, 5870:16, 5876:2, 5883:15, 5883:21, 5896:4, 5897:25
**puts** [1] - 5694:24
**putting** [3] - 5710:10, 5832:17, 5883:24

### Q

**QB** [2] - 5723:22, 5775:5
**qualifications** [1] - 5710:23
**qualified** [5] - 5701:10, 5710:15, 5710:18, 5711:15, 5714:7
**qualify** [3] - 5701:20, 5713:11, 5714:2
**quantity** [2] - 5730:9, 5781:18
**quarter** [2] - 5819:5, 5831:11
**quarterly** [1] - 5732:3
**questioning** [2] - 5908:16, 5911:8
**questions** [11] - 5692:8, 5695:15, 5695:20, 5702:21, 5703:9, 5710:24, 5835:11, 5840:1, 5854:13, 5854:14, 5910:9
**quick** [2] - 5709:7, 5884:3
**Quinn** [1] - 5852:20
**quit** [1] - 5693:8
**quite** [4] - 5732:15, 5772:17, 5873:5, 5885:21
**quits** [1] - 5693:7
**quote** [2] - 5890:7, 5910:11
**quoted** [1] - 5722:2

### R

**R.K** [2] - 5845:11, 5846:1
**raise** [13] - 5700:7,

CMH       OCR       RMR       CRR       FCRR

5744:3, 5811:20,
5830:2, 5840:9,
5852:21, 5853:14,
5853:16, 5868:24,
5869:5, 5886:5,
5905:19, 5905:21
**raised** [1] - 5837:17,
5871:13, 5886:3
**raising** [3] - 5823:5,
5879:4, 5905:23
**Raj** [9] - 5846:1,
5846:3, 5847:11,
5847:13, 5847:14,
5848:19, 5848:20,
5850:5
**Rajaratnam** [7] -
5845:11, 5846:1,
5846:3, 5847:13,
5847:14, 5848:19
**Rajat** [5] - 5845:16,
5845:17, 5845:18,
5851:6, 5852:3
**ran** [1] - 5908:7
**RANDY** [1] - 5691:19
**ranged** [1] - 5755:5
**rarely** [1] - 5833:7
**rather** [2] - 5829:13,
5915:22
**re** [1] - 5899:14
**reach** [6] - 5697:23,
5699:11, 5699:14,
5829:15, 5888:19,
5893:23
**read** [45] - 5696:1,
5712:25, 5725:25,
5735:5, 5735:13,
5742:11, 5743:3,
5745:23, 5746:17,
5774:10, 5810:21,
5812:21, 5815:22,
5816:12, 5816:15,
5816:17, 5827:15,
5827:19, 5828:8,
5828:13, 5829:2,
5856:7, 5857:6,
5857:15, 5859:18,
5882:17, 5888:2,
5888:10, 5889:11,
5890:3, 5890:9,
5891:1, 5891:13,
5893:2, 5895:5,
5897:3, 5897:10,
5899:16, 5900:11,
5900:18, 5900:25,
5901:22, 5912:5,
5914:21
**readily** [1] - 5775:2
**reading** [5] - 5812:18,
5827:22, 5828:23,
5861:2, 5902:22

**reads** [1] - 5827:5
**ready** [7] - 5700:22,
5749:24, 5764:2,
5803:16, 5803:17,
5818:9, 5829:4
**real** [6] - 5704:3,
5704:4, 5723:7,
5880:1, 5890:23,
5914:22
**really** [41] - 5693:1,
5693:8, 5695:4,
5697:13, 5698:7,
5699:24, 5704:9,
5708:16, 5720:22,
5723:9, 5728:20,
5729:11, 5729:25,
5730:3, 5732:13,
5733:8, 5749:23,
5758:6, 5759:23,
5769:19, 5771:11,
5772:16, 5816:16,
5824:1, 5825:10,
5827:18, 5827:22,
5833:10, 5837:15,
5838:1, 5838:8,
5843:14, 5843:16,
5847:22, 5852:24,
5861:22, 5863:3,
5868:7, 5876:17,
5879:24, 5886:14
**reason** [13] - 5693:14,
5702:23, 5705:18,
5708:8, 5759:24,
5765:9, 5814:18,
5814:21, 5815:5,
5823:5, 5825:17,
5892:2, 5912:17
**reasonable** [3] -
5813:4, 5813:19,
5814:1
**reasons** [3] - 5706:25,
5814:16, 5916:12
**reassurance** [1] -
5704:20
**reassures** [1] - 5706:9
**receipt** [2] - 5900:12,
5900:20
**receive** [16] - 5694:25,
5715:1, 5717:12,
5719:12, 5767:9,
5767:18, 5804:3,
5856:1, 5864:18,
5882:9, 5887:14,
5892:21, 5894:3,
5894:25, 5898:1,
5899:5
**received** [9] - 5803:21,
5804:8, 5887:8,
5887:15, 5892:22,
5894:4, 5895:1,

5899:6, 5914:23
**recent** [1] - 5893:19
**recently** [2] - 5700:13,
5890:12, 5909:11
**receptionist** [1] -
5707:18
**recess** [3] - 5763:11,
5818:22, 5884:14
**recessions** [1] -
5872:21
**recipient** [2] - 5729:4,
5835:6
**recipients** [4] -
5752:20, 5753:1,
5753:5, 5765:19
**recognition** [1] -
5714:9
**recognize** [6] -
5715:11, 5718:23,
5855:14, 5887:6,
5892:13, 5898:22
**recollection** [6] -
5757:14, 5849:12,
5875:7, 5875:10,
5877:10, 5896:12
**recommendations** [1]
- 5841:25
**record** [9] - 5692:2,
5693:5, 5821:13,
5840:12, 5853:16,
5870:7, 5870:12,
5917:2, 5917:4
**record's** [1] - 5897:9
**recorded** [1] - 5691:25
**recordkeeping** [1] -
5825:25
**records** [8] - 5718:17,
5728:2, 5733:22,
5735:20, 5736:3,
5742:2, 5765:18,
5769:24
**RECROSS** [2] -
5839:1, 5918:8
**RECROSS-**
**EXAMINATION** [2] -
5839:1, 5918:8
**red** [6] - 5752:6,
5752:7, 5777:11,
5777:12, 5778:1,
5778:3
**redacted** [4] -
5819:25, 5821:24,
5822:1, 5822:4
**redaction** [1] - 5820:1
**redirect** [1] - 5835:13
**REDIRECT** [2] -
5835:15, 5918:7
**reduce** [1] - 5811:21
**reduced** [3] - 5871:13,
5871:20, 5892:8

**REED** [1] - 5691:19
**refer** [1] - 5800:11
**reference** [9] -
5857:12, 5889:20,
5893:13, 5895:18,
5895:20, 5895:25,
5896:9, 5898:7,
5902:17
**referenced** [1] -
5733:16
**references** [1] -
5854:22
**referred** [1] - 5704:11
**referring** [1] - 5883:14
**refers** [2] - 5751:14,
5758:18
**reflect** [1] - 5807:19
**reflected** [2] -
5782:24, 5836:8
**reflection** [1] - 5785:7
**reflects** [4] - 5746:21,
5777:7, 5777:8,
5821:7
**refrain** [2] - 5901:23,
5902:17
**refresh** [2] - 5757:14,
5849:12
**regard** [4] - 5693:21,
5700:24, 5712:9,
5712:17
**regarding** [4] -
5710:5, 5737:18,
5857:18, 5902:4
**regardless** [2] -
5734:23, 5900:6
**register** [1] - 5728:21
**registered** [2] -
5729:14, 5748:1
**registrant** [1] - 5726:5
**registration** [13] -
5729:2, 5729:6,
5729:8, 5729:10,
5729:11, 5729:15,
5747:18, 5747:20,
5747:23, 5747:25,
5748:5, 5762:10,
5762:11
**regularly** [4] - 5880:8,
5880:10, 5892:7,
5892:9
**regulations** [2] -
5714:4, 5714:9
**regulator** [1] - 5768:5
**regulatory** [3] -
5776:1, 5776:7,
5784:11
**reinvest** [1] - 5872:23
**related** [13] - 5711:2,
5723:11, 5768:24,
5810:14, 5811:3,

5811:24, 5819:15,
5819:20, 5861:6,
5888:24, 5893:23,
5902:16, 5915:11
**relates** [2] - 5721:1,
5762:1
**relating** [3] - 5710:21,
5711:6, 5812:4
**relation** [2] - 5714:16,
5714:21
**relations** [1] - 5891:7
**relationship** [6] -
5707:22, 5759:18,
5838:15, 5860:9,
5864:24, 5904:8
**relationships** [4] -
5742:25, 5743:5,
5747:12, 5891:9
**relatively** [2] - 5762:3,
5838:9
**release** [3] - 5804:5,
5899:14, 5899:17
**relevant** [1] - 5827:19
**relied** [7] - 5775:23,
5778:9, 5780:13,
5783:20, 5783:21,
5784:25, 5785:2
**reluctant** [3] -
5699:10, 5708:8,
5826:12
**rely** [8] - 5715:7,
5716:22, 5718:9,
5732:13, 5748:10,
5776:10, 5777:4,
5809:12
**remain** [2] - 5696:14,
5760:11
**remainder** [2] -
5735:21
**remained** [1] - 5755:4
**remaining** [4] -
5730:14, 5760:6,
5820:9, 5820:16
**remember** [45] -
5692:19, 5767:13,
5786:7, 5802:12,
5834:10, 5834:15,
5834:23, 5835:20,
5837:10, 5844:16,
5851:15, 5853:21,
5854:14, 5856:20,
5862:1, 5862:4,
5862:9, 5862:24,
5863:12, 5863:16,
5864:4, 5866:21,
5867:2, 5867:4,
5867:8, 5868:20,
5869:2, 5871:1,
5874:2, 5874:3,
5874:10, 5874:11,

5875:4, 5877:16, 5878:15, 5878:19, 5880:14, 5886:21, 5906:25, 5910:20, 5913:6, 5914:4, 5915:10
**remembers** [1] - 5821:14
**renew** [1] - 5872:19
**renting** [1] - 5842:8
**repeatedly** [1] - 5701:3
**rephrase** [9] - 5787:9, 5787:18, 5791:5, 5793:5, 5799:20, 5801:16, 5803:3, 5812:10, 5847:2
**replaced** [2] - 5744:6, 5886:10
**report** [10] - 5725:20, 5731:21, 5734:8, 5744:11, 5746:22, 5746:25, 5763:10, 5763:25, 5848:7, 5912:5
**reported** [12] - 5737:20, 5746:21, 5746:24, 5747:7, 5748:22, 5750:4, 5750:11, 5752:15, 5777:18, 5777:20, 5784:6, 5848:16
**Reporter** [1] - 5691:22
**reporting** [5] - 5737:4, 5737:5, 5739:12, 5741:13, 5743:5
**Reporting** [1] - 5741:22
**reports** [6] - 5709:11, 5721:25, 5722:14, 5724:1, 5819:20, 5838:11
**repose** [2] - 5713:14, 5773:23
**represent** [2] - 5719:2, 5788:20
**represented** [6] - 5739:14, 5740:18, 5744:25, 5745:14, 5751:16, 5867:15
**represents** [6] - 5719:19, 5751:23, 5783:2, 5786:4, 5786:20, 5787:3
**reputation** [1] - 5902:8
**request** [8] - 5706:16, 5706:25, 5769:9, 5776:19, 5792:16, 5865:18, 5866:4,

5902:15
**requesting** [1] - 5782:22
**requests** [2] - 5776:7, 5776:19
**require** [1] - 5724:1, 5902:22
**required** [7] - 5724:3, 5724:23, 5731:2, 5734:7, 5734:17, 5809:3, 5861:3
**requirement** [1] - 5724:14
**requirements** [6] - 5714:3, 5714:8, 5722:7, 5722:10, 5772:10, 5811:17
**requires** [5] - 5732:20, 5780:24, 5781:1, 5816:25, 5817:3
**resale** [2] - 5726:22, 5728:19
**research** [5] - 5841:17, 5841:18, 5841:21, 5841:22, 5844:12
**reserve** [1] - 5827:4
**resistance** [1] - 5708:24
**resolve** [2] - 5710:4, 5912:20
**resolved** [1] - 5820:17
**resources** [1] - 5763:16
**respect** [6] - 5711:18, 5742:25, 5743:6, 5767:6, 5820:19, 5823:7
**respectfully** [1] - 5822:24
**respective** [1] - 5902:5
**respond** [1] - 5883:12
**response** [13] - 5692:22, 5705:14, 5776:6, 5788:4, 5834:15, 5866:6, 5883:4, 5896:14, 5896:20, 5897:3, 5897:5, 5897:14, 5897:24
**responsibilities** [3] - 5699:16, 5768:18, 5843:1
**responsible** [2] - 5809:8, 5857:10
**rest** [1] - 5777:12
**restaurant** [2] - 5854:8, 5879:19
**restricted** [14] -

5726:18, 5726:20, 5726:21, 5727:1, 5728:10, 5728:12, 5728:20, 5730:14, 5734:8, 5734:11, 5734:18, 5734:23, 5742:3, 5742:5
**restriction** [2] - 5902:10, 5902:18
**restrictions** [6] - 5726:21, 5728:10, 5728:11, 5730:6, 5730:9, 5742:2
**result** [4] - 5692:10, 5742:12, 5742:13, 5869:10
**results** [1] - 5810:17
**resume** [5] - 5830:18, 5885:6, 5896:4, 5896:8, 5896:18
**resumed** [2] - 5714:11, 5918:4
**rethink** [1] - 5697:8
**retrieve** [2] - 5763:1, 5884:6
**Retrophin** [98] - 5715:17, 5716:5, 5716:21, 5717:4, 5723:15, 5723:19, 5723:20, 5724:3, 5724:6, 5725:14, 5733:15, 5735:22, 5736:13, 5736:18, 5738:11, 5740:14, 5742:13, 5742:14, 5742:16, 5744:6, 5748:7, 5750:14, 5750:20, 5753:16, 5754:1, 5756:6, 5758:23, 5760:23, 5761:15, 5761:24, 5778:20, 5803:18, 5804:6, 5807:6, 5815:3, 5832:4, 5839:3, 5839:6, 5839:7, 5839:9, 5853:19, 5858:3, 5858:5, 5862:17, 5862:20, 5862:22, 5862:25, 5863:5, 5863:6, 5863:11, 5878:21, 5879:5, 5880:17, 5882:19, 5882:20, 5883:6, 5883:18, 5888:13, 5888:15, 5888:17, 5888:24, 5889:1, 5889:7, 5890:8, 5891:15, 5891:24, 5897:15, 5897:18,

5898:5, 5899:19, 5899:23, 5900:2, 5900:5, 5900:21, 5901:2, 5901:4, 5901:8, 5902:4, 5902:16, 5902:21, 5903:2, 5903:10, 5903:13, 5903:15, 5903:18, 5903:21, 5903:25, 5904:2, 5904:6, 5905:15, 5905:16, 5905:18, 5906:3, 5906:4, 5906:8, 5906:10, 5906:23, 5913:8
**Retrophin's** [3] - 5779:25, 5812:25, 5905:8
**return** [2] - 5703:3, 5720:20
**revenues** [1] - 5810:24
**reverse** [49] - 5722:12, 5722:25, 5723:1, 5723:2, 5723:5, 5723:11, 5723:14, 5723:18, 5723:20, 5724:18, 5725:3, 5725:4, 5725:8, 5725:15, 5733:19, 5748:8, 5750:14, 5753:12, 5754:15, 5754:17, 5771:13, 5772:20, 5808:24, 5837:23, 5846:10, 5906:13, 5906:24, 5907:8, 5908:18, 5909:11, 5909:14, 5909:17, 5909:20, 5909:23, 5910:15, 5910:21, 5910:25, 5911:4, 5911:12, 5911:13, 5912:23, 5912:24, 5913:7, 5913:12, 5913:16, 5914:11, 5914:16, 5914:17, 5915:16
**review** [19] - 5711:13, 5715:22, 5717:6, 5717:18, 5718:15, 5723:10, 5731:25, 5733:16, 5733:22, 5735:20, 5736:13, 5748:7, 5748:10, 5761:15, 5769:17, 5805:17, 5826:6, 5859:12, 5870:17
**reviewed** [5] - 5718:7, 5728:2, 5752:11, 5769:22, 5781:9,

5784:2, 5798:14, 5913:1
**reviewing** [1] - 5743:16
**revise** [1] - 5710:24
**revised** [2] - 5865:17, 5866:2
**revoke** [1] - 5900:7
**Richardson** [2] - 5868:19, 5868:23
**Richardson's** [1] - 5868:20
**Rick's** [9] - 5872:9, 5872:10, 5872:11, 5872:13, 5873:12, 5873:25, 5874:13, 5874:17, 5876:5
**ridicule** [1] - 5860:3
**right-hand** [2] - 5751:4, 5782:12
**rights** [2] - 5747:18, 5747:20
**rise** [1] - 5838:9
**risk** [8] - 5696:20, 5810:7, 5810:9, 5810:10, 5812:7, 5812:11, 5812:15, 5870:6
**risks** [5] - 5810:12, 5810:16, 5811:13, 5811:24, 5812:22
**Risks** [1] - 5811:3
**robing** [1] - 5709:7
**ROHDE** [1] - 5691:12
**role** [13] - 5701:10, 5701:11, 5701:16, 5731:13, 5732:7, 5733:6, 5881:9, 5886:2, 5886:13, 5891:4, 5891:7, 5891:10, 5903:21
**Ron** [3] - 5886:1, 5886:2, 5886:3
**room** [5] - 5703:3, 5706:24, 5709:7, 5819:8, 5885:25
**rose** [2] - 5806:21, 5807:8
**roughly** [1] - 5796:16
**round** [4] - 5890:4, 5893:20, 5905:20, 5905:22
**row** [12] - 5739:15, 5745:1, 5745:15, 5782:6, 5782:7, 5807:5, 5815:17, 5815:18, 5816:3, 5816:7, 5831:25, 5885:25
**rows** [1] - 5831:18

CMH        OCR        RMR        CRR        FCRR        28

**RTRX** [2] - 5750:20, 5804:10

**Rule** [11] - 5726:19, 5728:17, 5728:18, 5728:19, 5729:5, 5729:16, 5729:17, 5729:19, 5732:16, 5732:20, 5733:6

**rule** [5] - 5701:14, 5728:19, 5820:20, 5822:23, 5823:7

**Rules** [1] - 5712:4

**rules** [9] - 5701:9, 5710:16, 5712:11, 5729:4, 5869:22, 5869:24, 5873:22, 5911:16, 5913:2

**ruling** [2] - 5713:7, 5713:12

**rulings** [1] - 5711:11

**run** [2] - 5855:4, 5880:1

**running** [1] - 5890:7

**Russo** [10] - 5861:20, 5861:21, 5862:12, 5864:11, 5864:21, 5865:5, 5865:23, 5866:1, 5866:6, 5878:2

**Ruth** [4] - 5735:25, 5736:4, 5736:8, 5736:10

## S

**S-1** [1] - 5729:7

**Sabbath** [1] - 5912:18

**Sabretooth** [1] - 5890:13

**Sachs** [1] - 5845:19

**salary** [8] - 5694:12, 5694:16, 5715:1, 5854:18, 5858:15, 5868:7, 5881:14, 5900:23

**sale** [17] - 5720:5, 5720:7, 5720:8, 5721:2, 5726:14, 5726:15, 5760:7, 5760:15, 5780:2, 5783:4, 5795:8, 5801:5, 5801:8, 5834:6, 5834:9, 5834:14, 5834:24

**sales** [10] - 5726:3, 5755:22, 5783:3, 5786:1, 5787:11, 5787:12, 5841:24, 5842:11, 5842:14, 5842:20

**salesman** [1] - 5842:21

**San** [2] - 5862:3, 5877:25

**satisfy** [3] - 5895:16, 5896:7, 5896:19

**Saturday** [1] - 5694:17

**Save** [1] - 5782:12

**saw** [12] - 5728:16, 5730:11, 5733:16, 5741:3, 5742:2, 5744:23, 5745:3, 5745:17, 5756:8, 5772:18, 5889:20, 5895:10

**schedule** [4] - 5717:3, 5717:4, 5745:21, 5916:24

**Schedule** [1] - 5813:1

**science** [1] - 5903:22

**screen** [2] - 5750:18, 5856:5

**scroll** [3] - 5810:22, 5811:2, 5811:7

**search** [1] - 5781:24

**seat** [10] - 5698:23, 5702:11, 5703:14, 5713:23, 5763:13, 5764:16, 5819:5, 5830:17, 5840:11, 5885:5

**SEC** [39] - 5714:3, 5714:8, 5715:16, 5717:3, 5721:19, 5721:25, 5722:14, 5724:2, 5724:4, 5724:17, 5728:19, 5728:22, 5729:11, 5731:1, 5731:5, 5731:10, 5731:22, 5732:4, 5732:22, 5768:1, 5768:3, 5768:4, 5768:5, 5769:22, 5776:18, 5776:19, 5776:22, 5779:22, 5780:21, 5780:24, 5809:3, 5833:18, 5848:9, 5848:12, 5848:16, 5848:21, 5849:1, 5864:4

**second** [17] - 5711:21, 5716:9, 5717:3, 5725:21, 5726:2, 5742:23, 5747:14, 5752:17, 5771:25, 5772:2, 5793:21, 5804:17, 5813:3, 5814:21, 5823:13, 5857:4, 5886:24

**secondaries** [1] - 5843:10

**secondly** [2] - 5895:14, 5895:22

**secretary** [1] - 5861:22

**section** [4] - 5726:13, 5870:8, 5870:10, 5902:22

**Section** [1] - 5859:7

**sections** [1] - 5859:5

**secured** [3] - 5771:14, 5838:2, 5838:7

**securing** [1] - 5747:19

**Securities** [3] - 5732:16, 5767:23, 5848:10

**securities** [20] - 5714:3, 5721:9, 5721:13, 5721:15, 5726:4, 5726:18, 5726:23, 5728:10, 5728:12, 5728:20, 5729:17, 5729:19, 5730:21, 5743:1, 5743:6, 5746:8, 5746:15, 5768:24, 5810:10, 5828:20

**security** [8] - 5709:2, 5719:19, 5722:21, 5726:20, 5726:21, 5727:1, 5746:11

**Security** [1] - 5749:9

**see** [61] - 5692:23, 5699:12, 5702:20, 5707:9, 5718:4, 5726:13, 5731:17, 5733:9, 5736:25, 5737:24, 5738:13, 5738:19, 5740:2, 5741:17, 5741:21, 5742:7, 5742:24, 5744:4, 5744:25, 5745:12, 5746:16, 5747:12, 5747:13, 5756:4, 5756:11, 5760:1, 5774:9, 5774:20, 5782:6, 5783:25, 5796:2, 5803:22, 5803:23, 5804:15, 5812:19, 5812:21, 5815:5, 5815:23, 5816:22, 5818:21, 5824:16, 5829:5, 5836:7, 5851:21, 5856:5, 5857:23, 5857:24, 5858:3, 5858:13, 5859:3, 5859:4, 5859:16, 5867:11,

5878:7, 5878:9, 5881:9, 5888:21, 5895:18, 5900:8, 5901:20, 5912:10

**seeing** [1] - 5886:21

**seek** [3] - 5822:16, 5828:7, 5916:11

**sees** [1] - 5785:1

**seizing** [1] - 5705:13

**select** [42] - 5752:23, 5756:5, 5756:9, 5756:21, 5760:21, 5761:7, 5769:13, 5771:3, 5777:13, 5780:8, 5783:23, 5785:16, 5786:8, 5788:21, 5789:3, 5789:6, 5789:8, 5790:14, 5791:2, 5791:7, 5791:23, 5791:25, 5792:24, 5793:6, 5793:9, 5793:12, 5793:14, 5793:15, 5793:22, 5793:23, 5794:16, 5796:11, 5799:10, 5799:14, 5799:17, 5801:18, 5801:21, 5802:15, 5830:22, 5830:23, 5831:15, 5834:17

**selected** [2] - 5751:24, 5773:10

**selection** [1] - 5694:1

**selects** [1] - 5801:14

**sell** [38] - 5719:23, 5720:10, 5720:17, 5720:24, 5726:22, 5728:21, 5729:5, 5730:8, 5730:10, 5731:4, 5733:14, 5734:16, 5739:7, 5739:9, 5748:2, 5749:24, 5754:19, 5756:17, 5756:21, 5757:20, 5757:23, 5758:19, 5772:17, 5788:13, 5790:18, 5790:21, 5795:17, 5796:6, 5815:3, 5832:18, 5846:12, 5874:23, 5875:20, 5876:1, 5876:4, 5876:6, 5879:18, 5882:20

**seller** [2] - 5750:11, 5750:12

**sellers** [6] - 5750:2, 5784:5, 5784:9, 5785:14, 5832:16,

5834:20

**selling** [26] - 5720:22, 5731:17, 5758:20, 5788:16, 5791:2, 5791:13, 5792:2, 5794:15, 5796:25, 5797:19, 5797:22, 5798:3, 5798:6, 5798:9, 5798:12, 5801:12, 5801:14, 5801:19, 5802:7, 5802:16, 5831:21, 5832:5, 5832:6, 5875:21, 5875:23, 5878:4

**sells** [20] - 5758:13, 5794:13, 5795:5, 5795:11, 5795:12, 5795:18, 5795:20, 5795:21, 5795:24, 5796:3, 5797:6, 5797:14, 5799:1, 5799:25, 5800:4, 5802:3, 5802:5, 5831:23, 5832:1

**send** [4] - 5882:23, 5896:21, 5897:12, 5897:22

**senior** [2] - 5889:12, 5889:15

**sense** [5] - 5697:11, 5709:1, 5709:3, 5758:6, 5905:12

**sent** [2] - 5693:3, 5869:13

**sentence** [5] - 5728:16, 5742:11, 5743:3, 5812:2, 5893:2

**sentences** [2] - 5742:11, 5900:19

**separate** [3] - 5715:24, 5869:17, 5883:19

**September** [11] - 5716:7, 5761:24, 5770:17, 5771:7, 5772:25, 5805:7, 5815:3, 5853:23, 5877:10, 5887:19, 5887:24

**series** [5] - 5882:1, 5894:17, 5905:19, 5905:21, 5905:23

**serve** [3] - 5707:3, 5707:4

**served** [1] - 5808:21

**service** [5] - 5704:8, 5748:18, 5829:12, 5854:14, 5912:6

CMH        OCR        RMR        CRR        FCRR

services [2] - 5763:14, 5857:17
SESSION [1] - 5819:1
set [17] - 5746:13, 5783:20, 5783:22, 5785:16, 5785:17, 5813:5, 5813:21, 5814:2, 5857:19, 5862:6, 5865:15, 5882:25, 5896:15, 5897:15, 5897:17, 5897:21, 5899:20
sets [1] - 5866:4
seven [9] - 5720:21, 5753:25, 5754:10, 5797:12, 5797:15, 5842:15, 5842:17, 5859:15, 5874:17
several [4] - 5730:9, 5814:15, 5819:11, 5888:16
severance [12] - 5892:4, 5893:8, 5893:10, 5893:24, 5895:16, 5896:7, 5896:19, 5898:1, 5900:13, 5900:15, 5900:21, 5900:4:12
shall [1] - 5900:13
shame [1] - 5704:4
Share [1] - 5738:19
share [48] - 5716:11, 5733:23, 5738:24, 5746:6, 5750:4, 5751:14, 5754:4, 5754:7, 5758:22, 5760:18, 5761:23, 5762:13, 5772:23, 5772:24, 5774:3, 5774:9, 5774:16, 5774:21, 5777:3, 5778:20, 5778:21, 5779:1, 5779:12, 5780:3, 5783:7, 5783:21, 5783:22, 5785:17, 5786:5, 5786:21, 5787:3, 5787:7, 5788:20, 5790:2, 5796:14, 5796:17, 5802:24, 5804:15, 5805:2, 5805:9, 5830:22, 5831:3, 5831:6, 5837:22, 5847:21, 5863:13, 5863:18, 5879:25
shared [6] - 5738:23, 5738:25, 5739:3, 5740:4, 5741:1, 5741:10

shareholder [11] - 5720:2, 5720:3, 5728:8, 5731:3, 5740:18, 5760:14, 5834:5, 5834:7, 5834:8, 5834:13, 5834:23
shareholders [3] - 5725:9, 5732:20, 5734:7
shares [232] - 5716:12, 5719:23, 5720:3, 5720:10, 5720:25, 5721:6, 5726:13, 5726:14, 5726:16, 5726:18, 5728:14, 5728:15, 5728:21, 5728:24, 5729:4, 5729:5, 5729:13, 5730:2, 5730:7, 5730:8, 5730:10, 5730:13, 5730:15, 5730:16, 5730:22, 5731:4, 5731:10, 5731:11, 5732:22, 5733:4, 5733:14, 5733:15, 5733:18, 5733:24, 5734:9, 5734:11, 5734:15, 5734:18, 5735:4, 5735:6, 5735:7, 5735:8, 5735:9, 5735:10, 5735:14, 5735:16, 5735:18, 5735:22, 5737:21, 5738:4, 5738:15, 5738:18, 5738:24, 5739:1, 5739:6, 5740:8, 5740:14, 5740:16, 5740:17, 5740:24, 5741:2, 5741:7, 5741:9, 5741:11, 5741:13, 5741:14, 5741:19, 5742:3, 5742:14, 5742:15, 5742:20, 5744:3, 5744:13, 5744:15, 5744:19, 5744:22, 5745:7, 5745:8, 5745:12, 5745:25, 5746:1, 5746:12, 5746:19, 5746:21, 5746:23, 5747:1, 5747:3, 5747:7, 5747:8, 5748:1, 5748:3, 5748:4, 5749:14, 5750:3, 5750:10, 5751:14, 5752:10, 5752:20, 5753:1, 5753:6, 5753:19,

5753:20, 5753:22, 5754:1, 5754:4, 5754:6, 5754:9, 5754:11, 5754:14, 5754:19, 5754:20, 5755:12, 5756:6, 5757:1, 5757:6, 5757:20, 5757:22, 5757:23, 5757:24, 5758:1, 5758:19, 5759:2, 5759:7, 5759:9, 5759:20, 5759:25, 5760:4, 5760:7, 5760:14, 5761:3, 5761:4, 5761:15, 5765:19, 5766:2, 5766:5, 5766:7, 5766:9, 5766:13, 5766:15, 5766:17, 5767:19, 5774:5, 5774:14, 5774:16, 5777:8, 5780:4, 5781:19, 5782:9, 5785:6, 5785:8, 5786:2, 5786:4, 5786:11, 5786:25, 5788:10, 5788:14, 5789:12, 5795:1, 5795:2, 5795:5, 5795:8, 5795:11, 5795:12, 5795:16, 5795:20, 5795:24, 5796:3, 5796:7, 5796:25, 5797:15, 5797:19, 5797:22, 5798:3, 5798:6, 5798:9, 5798:12, 5798:19, 5799:1, 5799:22, 5799:25, 5800:5, 5801:2, 5801:5, 5801:9, 5801:25, 5802:2, 5802:5, 5802:7, 5802:9, 5804:6, 5805:12, 5805:14, 5810:7, 5814:19, 5814:22, 5815:1, 5815:3, 5816:5, 5830:23, 5831:23, 5832:1, 5834:6, 5834:9, 5834:14, 5834:24, 5835:7, 5847:24, 5847:25, 5863:16, 5874:8, 5876:2, 5888:19, 5901:12, 5908:21, 5909:3, 5909:17, 5909:22, 5910:13, 5913:10, 5913:21, 5914:8, 5914:10, 5915:18,

5915:24
sheet [52] - 5715:14, 5715:19, 5715:22, 5717:16, 5717:23, 5718:2, 5719:10, 5732:11, 5748:11, 5749:2, 5749:12, 5749:15, 5749:19, 5751:21, 5752:11, 5754:13, 5775:12, 5776:1, 5776:6, 5776:10, 5776:12, 5776:15, 5776:17, 5776:21, 5777:22, 5778:2, 5779:19, 5780:17, 5780:20, 5780:25, 5781:2, 5782:16, 5783:7, 5784:2, 5784:15, 5787:6, 5787:12, 5787:20, 5793:2, 5793:13, 5797:8, 5797:14, 5798:14, 5799:7, 5835:19, 5835:24, 5836:2, 5837:3, 5837:6, 5838:21, 5883:5
sheets [26] - 5717:21, 5717:22, 5718:17, 5769:21, 5775:11, 5775:13, 5775:15, 5775:17, 5775:23, 5776:20, 5778:10, 5779:24, 5780:7, 5783:24, 5784:10, 5785:7, 5785:9, 5785:24, 5788:21, 5794:20, 5796:17, 5800:17, 5801:21, 5802:12, 5832:12
shell [8] - 5723:3, 5723:6, 5723:7, 5726:8, 5906:12, 5908:12, 5910:6, 5913:7
Shepley [4] - 5735:25, 5736:4, 5736:8, 5736:10
shifts [2] - 5699:17, 5703:20
Shkreli [117] - 5711:5, 5735:11, 5736:19, 5737:8, 5741:6, 5741:7, 5741:19, 5742:3, 5742:16, 5742:17, 5742:19, 5742:20, 5743:9, 5743:22, 5745:10, 5745:24, 5746:8, 5747:19, 5752:2,

5752:24, 5753:21, 5754:14, 5754:19, 5757:1, 5765:8, 5765:12, 5780:9, 5788:23, 5790:20, 5791:7, 5793:16, 5799:22, 5800:20, 5800:25, 5801:2, 5801:11, 5802:9, 5809:23, 5813:16, 5813:19, 5814:7, 5814:21, 5814:24, 5815:2, 5815:6, 5815:11, 5815:20, 5816:4, 5816:20, 5830:24, 5831:17, 5852:13, 5852:15, 5852:19, 5853:6, 5854:5, 5854:19, 5854:24, 5855:3, 5855:18, 5856:19, 5858:12, 5863:6, 5863:21, 5865:25, 5867:6, 5869:7, 5869:13, 5873:6, 5873:10, 5875:15, 5876:24, 5878:7, 5879:3, 5879:4, 5881:9, 5881:24, 5882:11, 5883:10, 5883:12, 5883:16, 5883:24, 5886:8, 5886:17, 5887:21, 5889:10, 5891:19, 5892:15, 5893:23, 5894:1, 5894:18, 5895:6, 5896:3, 5896:8, 5901:11, 5901:12, 5902:7, 5902:23, 5903:11, 5903:16, 5904:2, 5904:9, 5904:13, 5905:14, 5909:2, 5909:13, 5909:16, 5909:19, 5909:21, 5910:13, 5910:18, 5910:19, 5910:20, 5910:24, 5914:3, 5914:9, 5914:15
Shkreli's [8] - 5742:13, 5755:2, 5896:20, 5897:5, 5897:10, 5897:24, 5909:24, 5912:23
shoe [1] - 5910:23
shook [1] - 5854:16
short [8] - 5720:5, 5720:7, 5720:8, 5720:22, 5720:23, 5721:2, 5780:2, 5869:23

**shortly** [1] - 5842:10
**show** [19] - 5718:19, 5761:18, 5770:6, 5773:10, 5780:2, 5782:2, 5783:21, 5785:9, 5790:2, 5790:11, 5803:12, 5806:4, 5807:22, 5849:11, 5864:6, 5894:14, 5898:18, 5910:1, 5910:2
**showed** [1] - 5876:16
**showing** [8] - 5717:15, 5772:23, 5772:24, 5773:2, 5773:8, 5793:8, 5827:12, 5881:21
**shown** [1] - 5735:2
**shows** [11] - 5735:3, 5752:7, 5778:19, 5778:20, 5783:7, 5789:14, 5790:2, 5790:4, 5790:7, 5806:6, 5835:4
**shrinking** [1] - 5844:17
**shut** [2] - 5877:22, 5879:1
**shuttered** [1] - 5890:12
**shutting** [1] - 5875:18
**sick** [1] - 5900:24
**Side** [2] - 5854:9, 5854:11
**side** [6] - 5751:4, 5751:13, 5752:18, 5863:5, 5907:11
**side-bar** [1] - 5907:11
**sidebar** [1] - 5823:6
**Sidebar** [1] - 5908:1
**sidebars** [1] - 5714:9
**sides** [2] - 5846:18, 5916:14
**sidestep** [1] - 5733:2
**sign** [10] - 5743:9, 5821:11, 5851:20, 5856:19, 5858:23, 5892:3, 5898:9, 5898:12, 5900:7
**signatory** [1] - 5809:8
**signature** [13] - 5743:8, 5820:23, 5820:24, 5822:21, 5825:15, 5825:16, 5826:19, 5827:7, 5855:21, 5861:8, 5898:25, 5899:19, 5903:5
**signed** [46] - 5809:23, 5810:2, 5813:15,

5813:17, 5814:7, 5821:4, 5821:8, 5821:12, 5821:19, 5822:10, 5822:20, 5823:12, 5823:13, 5823:21, 5824:1, 5824:4, 5824:7, 5824:16, 5825:3, 5825:5, 5825:14, 5826:12, 5826:14, 5826:17, 5826:25, 5827:7, 5827:13, 5828:14, 5851:25, 5852:7, 5852:9, 5855:18, 5856:22, 5861:11, 5861:16, 5900:1, 5901:7, 5903:9, 5903:24, 5904:3, 5904:9, 5904:14, 5904:22, 5904:23, 5905:3, 5906:1
**significant** [4] - 5723:6, 5771:15, 5815:25, 5816:20
**significantly** [2] - 5867:25, 5868:2
**signifies** [1] - 5718:7
**signify** [4] - 5718:6, 5737:3, 5751:22, 5899:20
**signing** [4] - 5821:14, 5826:18, 5859:13, 5904:6
**silently** [1] - 5829:25
**simply** [5] - 5710:19, 5822:21, 5828:2, 5913:18, 5915:11
**single** [3] - 5698:24, 5807:2, 5869:8
**sister** [2] - 5886:12, 5906:4
**sit** [2] - 5692:4, 5909:18
**sitting** [3] - 5910:18, 5914:15, 5916:23
**situation** [8] - 5693:11, 5693:12, 5694:25, 5699:20, 5704:21, 5706:4, 5880:18, 5894:12
**situations** [1] - 5916:3
**six** [8] - 5716:1, 5742:24, 5747:10, 5747:14, 5778:15, 5778:16, 5815:6, 5841:9
**sixth** [1] - 5856:12
**sixty** [3] - 5754:10, 5797:12, 5797:15

**sixty-nine** [1] - 5754:10
**sixty-seven** [2] - 5797:12, 5797:15
**size** [3] - 5721:20, 5862:14, 5871:19
**skimming** [1] - 5873:3
**sleep** [1] - 5703:16
**sleet** [1] - 5835:22
**slow** [2] - 5846:14, 5846:15
**slower** [1] - 5846:12
**slowly** [2] - 5875:24, 5876:5
**small** [15] - 5707:17, 5770:12, 5842:24, 5843:3, 5853:3, 5862:7, 5862:14, 5863:19, 5863:20, 5871:4, 5873:1, 5878:5, 5879:19, 5905:24, 5910:17
**smaller** [6] - 5721:23, 5722:2, 5745:3, 5745:5, 5787:12, 5787:15
**SMITH** [1] - 5691:13
**Smith** [2] - 5819:9, 5886:10
**Smucker** [1] - 5828:20
**Smucker's** [10] - 5845:1, 5845:2, 5845:21, 5846:4, 5846:14, 5846:15, 5846:18, 5847:8, 5848:22, 5851:18
**Social** [1] - 5749:9
**sold** [25] - 5729:14, 5730:18, 5749:10, 5754:20, 5754:23, 5755:12, 5756:18, 5756:23, 5757:6, 5757:10, 5757:24, 5758:1, 5758:3, 5758:4, 5758:8, 5786:2, 5786:24, 5789:10, 5789:12, 5798:19, 5801:25, 5830:23, 5832:9, 5834:18, 5835:2
**sole** [6] - 5698:24, 5740:16, 5740:24, 5741:8, 5744:20, 5744:21
**Sole** [3] - 5738:13, 5738:17, 5739:4
**solicitation** [3] - 5869:13, 5869:16, 5870:4
**someone** [6] - 5694:4,

5699:11, 5704:6, 5720:15, 5729:24, 5758:20
**sometime** [1] - 5911:6
**sometimes** [11] - 5721:24, 5732:12, 5749:9, 5750:9, 5788:10, 5788:13, 5795:15, 5803:8, 5803:10, 5833:5
**somewhat** [1] - 5878:12
**somewhere** [4] - 5820:24, 5854:8, 5914:21, 5914:23
**soon** [6] - 5763:2, 5763:25, 5823:19, 5861:16, 5881:12, 5884:6
**sorry** [30] - 5702:1, 5736:4, 5739:18, 5741:7, 5742:1, 5743:15, 5744:20, 5745:11, 5752:22, 5754:3, 5778:13, 5779:4, 5781:5, 5786:11, 5791:11, 5800:23, 5824:20, 5857:5, 5863:22, 5864:10, 5871:18, 5875:11, 5876:24, 5877:15, 5893:17, 5894:8, 5894:9, 5896:16, 5908:4
**sort** [6] - 5707:20, 5707:22, 5733:3, 5785:24, 5785:25, 5786:17, 5786:23, 5877:4, 5878:12, 5905:23
**sounds** [1] - 5871:15
**Source** [1] - 5737:24
**source** [16] - 5738:3, 5739:24, 5740:13, 5740:22, 5741:17, 5741:18, 5745:20, 5746:7, 5784:23, 5785:5, 5845:12, 5845:15, 5845:16, 5910:19, 5915:9
**sources** [2] - 5718:18, 5778:5
**southeast** [1] - 5871:5
**Southern** [18] - 5820:21, 5821:6, 5821:15, 5822:23, 5825:1, 5825:24, 5828:18, 5848:25, 5849:2, 5849:3, 5849:8, 5850:20,

5851:2, 5851:9, 5851:23, 5864:1, 5864:2
**space** [3] - 5853:7, 5862:7, 5892:1
**speaking** [2] - 5706:8, 5864:9
**Special** [1] - 5699:1
**special** [4] - 5717:23, 5749:22, 5833:9, 5876:14
**specific** [2] - 5701:9, 5749:15
**specifically** [3] - 5712:9, 5846:3, 5913:6
**speculating** [1] - 5784:1
**speculative** [1] - 5810:8
**speech** [1] - 5875:12
**spell** [3] - 5840:11, 5840:14, 5840:15
**spells** [1] - 5795:15
**spend** [3] - 5706:21, 5715:4, 5877:25
**spending** [1] - 5889:20
**spent** [1] - 5692:22
**spoken** [2] - 5697:6, 5766:25
**spot** [1] - 5703:1
**spreadsheet** [1] - 5781:8
**Springs** [3] - 5879:11, 5879:15, 5879:20
**stable** [3] - 5760:12, 5762:3, 5838:9
**stage** [1] - 5810:23
**stand** [11] - 5692:4, 5709:5, 5710:7, 5738:5, 5821:3, 5823:4, 5824:24, 5825:4, 5825:13, 5826:22, 5827:5
**Standard-698** [1] - 5736:5
**standing** [2] - 5911:18, 5911:23
**standpoint** [1] - 5829:20
**stands** [2] - 5749:24, 5869:20
**Stanley** [4] - 5842:11, 5842:16, 5842:17, 5842:23
**staples** [2] - 5847:6
**star** [1] - 5746:16
**start** [21] - 5722:3, 5735:11, 5748:16,

| CMH | OCR | RMR | CRR | FCRR | 31 |
|---|---|---|---|---|---|

**CMH**

5762:24, 5809:2, 5809:19, 5838:10, 5844:4, 5861:15, 5864:14, 5868:4, 5868:12, 5870:22, 5875:18, 5875:21, 5875:23, 5876:14, 5878:14, 5882:11, 5887:1, 5895:4

**start-up** [1] - 5722:3

**start-ups** [1] - 5809:2

**started** [25] - 5703:15, 5762:9, 5765:18, 5819:7, 5842:20, 5849:19, 5850:12, 5850:16, 5855:19, 5858:5, 5861:15, 5861:18, 5862:6, 5862:16, 5862:23, 5862:24, 5863:23, 5864:3, 5866:22, 5867:19, 5867:21, 5868:4, 5870:25, 5876:15, 5877:8

**starters** [1] - 5908:12

**starting** [3] - 5880:10, 5882:18, 5896:19

**starts** [1] - 5742:19

**startup** [4] - 5771:13, 5772:9, 5772:20, 5837:24

**state** [10] - 5826:6, 5840:11, 5908:5, 5913:13, 5913:21, 5915:4, 5915:11, 5915:22, 5915:25, 5916:7

**statement** [23] - 5729:2, 5729:7, 5729:8, 5729:10, 5729:11, 5729:15, 5736:21, 5747:23, 5747:25, 5748:5, 5762:10, 5762:11, 5813:6, 5813:21, 5814:3, 5820:6, 5820:7, 5821:8, 5822:6, 5822:10, 5913:3, 5913:4

**statements** [8] - 5726:9, 5732:1, 5732:5, 5810:14, 5901:24, 5902:11, 5902:12, 5902:14

**STATES** [3] - 5691:1, 5691:3, 5691:10

**states** [4] - 5810:22, 5812:2, 5813:4, 5872:20

**States** [6] - 5691:5,

**OCR**

5691:13, 5691:15, 5714:23, 5717:15, 5871:5

**stating** [1] - 5828:24

**station** [1] - 5879:19

**status** [3] - 5693:21, 5726:9, 5730:14

**stay** [4] - 5695:14, 5703:18, 5843:13, 5905:8

**stayed** [1] - 5843:11

**stenography** [1] - 5691:25

**step** [5] - 5763:3, 5818:16, 5884:9, 5905:23, 5912:9

**steps** [2] - 5818:19, 5875:18

**Steve** [4] - 5868:19, 5868:20, 5868:23, 5906:5

**sticker** [1] - 5804:10

**still** [27] - 5694:19, 5694:23, 5695:10, 5700:9, 5700:11, 5702:20, 5706:1, 5707:3, 5708:21, 5710:9, 5734:16, 5810:23, 5816:10, 5819:19, 5830:17, 5848:17, 5848:19, 5877:15, 5880:5, 5890:7, 5892:2, 5893:1, 5900:1, 5905:19, 5906:4, 5906:16, 5906:17

**stipulated** [1] - 5782:17

**stipulation** [4] - 5716:3, 5718:13, 5780:23, 5824:13

**Stock** [2] - 5721:16, 5775:7

**stock** [120] - 5716:10, 5717:25, 5719:16, 5719:18, 5719:19, 5719:23, 5720:1, 5720:3, 5720:11, 5720:24, 5721:7, 5721:9, 5722:22, 5726:16, 5727:2, 5728:8, 5730:13, 5731:18, 5732:21, 5733:14, 5734:20, 5734:21, 5738:9, 5738:11, 5739:20, 5740:2, 5742:14, 5742:15, 5742:16, 5745:25, 5746:1, 5746:19, 5746:21,

**RMR**

5746:23, 5747:1, 5747:3, 5747:21, 5749:6, 5749:10, 5749:15, 5749:23, 5749:24, 5751:6, 5751:8, 5751:11, 5755:1, 5755:3, 5755:4, 5756:21, 5756:22, 5758:8, 5758:15, 5758:23, 5759:10, 5759:12, 5759:16, 5759:19, 5759:20, 5759:23, 5760:3, 5760:19, 5760:24, 5765:5, 5765:9, 5766:3, 5766:5, 5766:7, 5766:10, 5766:13, 5766:15, 5766:17, 5767:9, 5772:14, 5772:17, 5775:9, 5775:22, 5788:7, 5788:10, 5791:15, 5802:21, 5803:2, 5803:4, 5803:8, 5804:6, 5804:9, 5807:2, 5810:8, 5810:9, 5810:15, 5812:16, 5815:21, 5815:24, 5816:10, 5816:21, 5831:9, 5832:6, 5834:18, 5837:3, 5837:25, 5841:25, 5846:22, 5863:6, 5863:11, 5873:5, 5874:18, 5874:23, 5875:20, 5875:21, 5875:24, 5875:25, 5876:1, 5876:3, 5876:4, 5882:20, 5901:3

**stocks** [7] - 5721:22, 5841:24, 5843:5, 5843:7, 5846:8, 5869:23

**stop** [5] - 5693:13, 5705:15, 5811:8, 5830:9, 5893:5

**stopping** [1] - 5829:21

**straight** [2] - 5774:13, 5783:12

**straighten** [1] - 5911:17

**strategies** [3] - 5871:9, 5871:10, 5871:17

**strategy** [3] - 5871:19, 5872:6, 5872:14

**street** [1] - 5881:7

**stress** [2] - 5700:2,

**CRR**

5846:10

**stretch** [1] - 5884:9

**stretching** [1] - 5911:23

**strictly** [1] - 5860:12

**strike** [1] - 5837:16

**stringent** [1] - 5721:18

**strip** [3] - 5872:11, 5872:17, 5872:18

**strong** [1] - 5843:17

**structure** [3] - 5870:6, 5888:8, 5888:9, 5888:12, 5891:8

**structured** [1] - 5856:25

**struggling** [4] - 5703:25, 5853:1, 5853:4

**stuck** [1] - 5695:23

**stuff** [1] - 5865:12

**Su** [5] - 5820:19, 5823:15, 5877:23, 5889:25, 5915:19

**subject** [6] - 5746:6, 5872:18, 5882:15, 5887:22, 5892:25, 5900:13

**submit** [2] - 5780:24, 5781:2

**subpoena** [3] - 5833:16, 5833:18, 5833:20

**subpoenaed** [1] - 5833:22

**subscription** [1] - 5748:18

**subsequent** [1] - 5746:24

**substance** [2] - 5828:5, 5828:8

**substantial** [3] - 5772:11, 5811:19, 5812:22

**substantially** [2] - 5711:4, 5762:6

**substituted** [1] - 5823:21

**subtracted** [2] - 5752:13, 5778:3

**success** [1] - 5893:19

**successful** [1] - 5843:16

**successive** [1] - 5699:8

**suffer** [1] - 5696:21

**suggested** [4] - 5697:19, 5704:19, 5819:23, 5820:14

**suggesting** [2] - 5820:15, 5825:22

**FCRR**

**suggests** [1] - 5698:7

**suited** [1] - 5917:1

**Sullivan** [4] - 5735:10, 5753:7, 5766:17, 5794:7

**sum** [5] - 5782:9, 5782:19, 5783:4, 5786:25, 5796:19

**summaries** [1] - 5719:10

**summary** [9] - 5714:17, 5714:21, 5715:8, 5718:9, 5719:2, 5719:9, 5733:23, 5750:13, 5782:24

**summer** [3] - 5877:19, 5877:21, 5878:25

**Summit** [4] - 5841:15, 5852:17, 5852:20, 5881:7

**super** [1] - 5892:9

**supermarket** [1] - 5871:4

**supervision** [1] - 5857:18

**supervisors** [1] - 5763:14

**supplemented** [1] - 5745:22

**supply** [5] - 5759:22, 5760:4, 5788:7, 5788:11, 5788:13

**supposed** [4] - 5728:21, 5858:25, 5867:25, 5868:2

**surgeon** [1] - 5890:14

**Surgery** [1] - 5699:1

**surprised** [1] - 5692:16

**surrendered** [1] - 5901:2

**surrounding** [1] - 5848:14

**sustain** [1] - 5907:5

**Sustained** [1] - 5835:1

**sweat** [2] - 5881:16, 5881:18

**sworn** [2] - 5840:10, 5841:2

**system** [1] - 5825:2

---

**T**

**tab** [23] - 5716:1, 5716:14, 5716:25, 5718:21, 5725:13, 5734:1, 5736:16, 5743:13, 5750:17, 5761:19, 5765:23,

5765:24, 5765:25,
5778:13, 5778:15,
5778:16, 5855:12,
5886:22, 5892:10,
5894:15, 5898:19
**table** [3] - 5779:13,
5779:17, 5806:6
**tabs** [1] - 5716:24
**talks** [2] - 5811:7,
5811:24
**target** [1] - 5872:13
**tasks** [1] - 5890:20
**tax** [3] - 5749:9,
5866:11, 5866:12
**taxes** [3] - 5866:15,
5866:16, 5900:14
**team** [5] - 5703:25,
5825:24, 5826:3,
5826:4, 5890:5
**teaming** [1] - 5891:4
**technically** [3] -
5734:19, 5850:4,
5880:5
**technology** [7] -
5812:4, 5812:5,
5843:11, 5843:13,
5843:16, 5882:18,
5891:5
**temporary** [2] -
5853:7, 5862:7
**ten** [9] - 5718:21,
5720:15, 5762:4,
5884:5, 5884:12,
5884:13, 5889:16,
5889:21, 5898:19
**tend** [1] - 5748:12
**Tennessee** [1] -
5879:14
**tension** [1] - 5707:24
**term** [5] - 5709:1,
5720:5, 5721:1,
5722:25, 5883:5
**terminate** [5] -
5704:14, 5704:23,
5705:10, 5705:25,
5706:8
**terminated** [2] -
5704:18, 5900:5
**terminating** [1] -
5704:11
**termination** [13] -
5859:4, 5859:10,
5891:19, 5892:3,
5892:5, 5898:10,
5899:14, 5899:17,
5900:4, 5903:24,
5904:14, 5904:23,
5906:1
**Termination** [3] -
5859:7, 5859:10

**terminations** [1] -
5817:4
**terminology** [3] -
5701:5, 5714:3,
5714:8
**terms** [18] - 5704:12,
5712:14, 5712:18,
5825:11, 5826:7,
5826:25, 5827:2,
5827:9, 5827:14,
5857:19, 5857:21,
5857:23, 5873:22,
5893:8
**terrible** [1] - 5693:20
**testified** [30] -
5711:20, 5716:17,
5721:7, 5728:2,
5753:12, 5762:7,
5765:6, 5769:1,
5771:23, 5775:12,
5775:13, 5777:15,
5784:10, 5814:9,
5834:4, 5835:19,
5838:15, 5841:3,
5844:1, 5863:23,
5864:21, 5870:19,
5874:20, 5890:18,
5890:19, 5901:10,
5908:7, 5908:18,
5911:12, 5915:11
**testifies** [1] - 5821:18
**testify** [15] - 5710:15,
5711:23, 5712:1,
5712:3, 5767:12,
5769:5, 5825:6,
5851:1, 5851:5,
5851:18, 5852:3,
5852:6, 5852:10,
5910:5, 5915:5
**testifying** [1] - 5808:3
**testimony** [21] -
5701:15, 5711:4,
5712:8, 5713:1,
5713:3, 5767:13,
5769:6, 5775:17,
5775:18, 5826:23,
5827:3, 5827:8,
5832:11, 5834:4,
5834:22, 5851:7,
5908:23, 5910:4,
5913:2, 5913:11,
5915:16
**Texas** [2] - 5872:12,
5874:6
**text** [1] - 5693:3
**th** [1] - 5877:4
**Thanksgiving** [2] -
5699:3, 5829:17
**THE** [219] - 5691:10,
5692:2, 5692:12,

5692:14, 5692:15,
5693:4, 5693:23,
5695:19, 5696:3,
5696:5, 5696:8,
5696:15, 5696:19,
5696:24, 5697:6,
5697:11, 5698:15,
5698:16, 5698:18,
5698:19, 5698:22,
5699:25, 5700:12,
5700:19, 5701:17,
5701:22, 5701:25,
5702:4, 5702:9,
5702:12, 5702:16,
5702:17, 5703:2,
5703:6, 5703:7,
5703:8, 5703:9,
5703:12, 5703:14,
5704:9, 5705:6,
5705:8, 5706:13,
5707:7, 5708:8,
5708:16, 5709:6,
5709:9, 5709:14,
5710:2, 5710:8,
5711:10, 5711:25,
5712:6, 5713:9,
5713:13, 5713:16,
5713:17, 5713:22,
5714:7, 5717:12,
5718:14, 5719:12,
5731:6, 5731:7,
5734:3, 5734:6,
5734:12, 5734:14,
5734:15, 5734:17,
5734:19, 5734:22,
5748:12, 5748:14,
5748:15, 5754:3,
5754:5, 5754:9,
5754:10, 5754:12,
5757:13, 5758:12,
5758:17, 5759:3,
5759:14, 5760:10,
5762:20, 5762:23,
5763:7, 5763:13,
5764:2, 5764:7,
5764:12, 5764:15,
5771:22, 5773:18,
5773:22, 5773:23,
5775:16, 5780:19,
5786:14, 5787:9,
5787:15, 5787:18,
5788:2, 5788:6,
5791:5, 5799:20,
5800:6, 5800:11,
5800:21, 5804:3,
5809:10, 5812:10,
5817:6, 5818:2,
5818:8, 5818:10,
5818:11, 5818:16,
5818:18, 5818:20,
5819:4, 5819:7,

5819:18, 5820:11,
5821:11, 5821:21,
5821:23, 5822:12,
5823:17, 5824:3,
5824:10, 5824:20,
5825:6, 5825:21,
5825:24, 5826:2,
5826:11, 5826:16,
5827:20, 5828:16,
5828:23, 5829:2,
5829:4, 5829:7,
5829:23, 5830:4,
5830:11, 5830:16,
5834:1, 5835:1,
5835:12, 5837:18,
5838:5, 5838:25,
5840:2, 5840:4,
5840:7, 5840:9,
5840:11, 5840:13,
5840:14, 5840:16,
5840:17, 5850:16,
5856:1, 5864:18,
5875:7, 5875:9,
5875:11, 5875:12,
5882:9, 5884:4,
5884:9, 5884:12,
5885:4, 5886:24,
5887:1, 5887:14,
5892:21, 5894:7,
5894:9, 5894:25,
5896:11, 5896:13,
5897:2, 5897:3,
5898:21, 5899:5,
5906:16, 5906:21,
5907:5, 5907:12,
5908:14, 5908:24,
5909:5, 5909:7,
5909:13, 5909:19,
5910:1, 5910:17,
5911:6, 5911:15,
5911:24, 5912:2,
5912:9, 5912:12,
5912:13, 5912:15,
5912:20, 5913:23,
5914:7, 5915:14,
5916:6, 5916:13,
5916:16, 5917:2
**then-current** [1] -
5860:1
**thereafter** [1] -
5881:12
**therein** [1] - 5746:7
**thereto** [1] - 5746:24
**therewith** [1] - 5901:6
**thesis** [1] - 5841:24
**they've** [1] - 5808:6
**thinking** [2] - 5706:22,
5910:17
**thinks** [2] - 5888:22,
5895:13

**thinly** [5] - 5758:25,
5759:1, 5759:4,
5759:10, 5772:19
**Third** [3] - 5737:13,
5877:17, 5885:19
**third** [10] - 5716:11,
5717:4, 5726:3,
5737:15, 5744:19,
5801:8, 5815:5,
5827:20, 5858:10,
5902:14
**third-parties** [1] -
5902:14
**thirds** [1] - 5761:9
**Thomas** [5] - 5735:7,
5753:6, 5766:5,
5794:1, 5889:15
**thoughtful** [1] -
5704:1
**thoughts** [1] - 5873:4
**thousand** [12] -
5755:16, 5766:2,
5766:9, 5766:12,
5796:19, 5796:20,
5797:12, 5797:15,
5802:5, 5875:25,
5876:1
**three** [33] - 5710:17,
5716:8, 5716:24,
5716:25, 5720:18,
5720:20, 5743:13,
5745:20, 5745:21,
5755:5, 5756:1,
5757:9, 5757:19,
5758:1, 5762:4,
5762:15, 5766:2,
5766:9, 5766:12,
5793:22, 5814:19,
5815:6, 5841:20,
5843:20, 5858:13,
5867:24, 5868:11,
5869:17, 5890:16,
5895:16, 5895:23,
5896:6, 5898:1
**threshold** [1] -
5732:23
**throughout** [5] -
5704:2, 5805:24,
5807:2, 5807:20,
5916:3
**Thursday** [3] -
5698:11, 5916:21,
5916:22
**tier** [1] - 5723:23
**tiers** [2] - 5721:21,
5723:25
**Tiger** [1] - 5890:12
**tighten** [1] - 5818:7
**Tilles** [2] - 5886:1,
5886:3

**Tilles's** [1] - 5886:2
**tilt** [1] - 5826:16
**Tim** [19] - 5735:8, 5752:5, 5753:3, 5760:22, 5761:7, 5766:9, 5792:13, 5792:17, 5798:3, 5831:17, 5831:25, 5832:4, 5853:4, 5865:19, 5866:2, 5891:3, 5911:12, 5913:18
**timely** [1] - 5776:6
**Timothy** [7] - 5755:9, 5795:24, 5796:4, 5796:7, 5840:13, 5856:9, 5856:10
**TIMOTHY** [2] - 5841:1, 5918:9
**tiny** [1] - 5782:11
**title** [3] - 5750:19, 5861:13, 5889:19
**today** [20] - 5693:2, 5693:3, 5696:20, 5699:13, 5706:15, 5707:13, 5709:9, 5764:4, 5765:6, 5767:12, 5769:6, 5818:13, 5829:16, 5829:21, 5874:18, 5888:16, 5895:15, 5895:23, 5896:6, 5896:19
**together** [14] - 5750:1, 5750:11, 5760:23, 5784:5, 5784:9, 5810:13, 5832:17, 5852:16, 5853:5, 5860:2, 5870:15, 5870:16, 5886:1, 5896:5
**Tom** [7] - 5852:20, 5852:25, 5886:8, 5889:18, 5889:20, 5889:22
**tomorrow** [3] - 5852:8, 5876:6, 5876:10
**ton** [1] - 5720:16
**took** [7] - 5697:8, 5753:13, 5777:25, 5778:21, 5854:14, 5874:16, 5874:18
**top** [12] - 5725:22, 5742:7, 5777:7, 5777:8, 5777:14, 5803:23, 5810:6, 5856:5, 5882:2, 5882:3, 5899:11, 5899:16

**topic** [1] - 5853:12
**torn** [1] - 5702:19
**total** [18] - 5735:14, 5735:17, 5752:13, 5755:14, 5760:23, 5761:4, 5777:3, 5777:8, 5777:17, 5782:10, 5783:21, 5786:18, 5786:25, 5787:6, 5795:3, 5797:11, 5836:4, 5874:8
**totally** [2] - 5707:6, 5910:3
**touch** [1] - 5707:9
**towards** [3] - 5725:22, 5726:12, 5854:15
**trace** [1] - 5715:16
**tracing** [1] - 5751:10
**track** [3] - 5853:16, 5870:7, 5870:12
**tracking** [1] - 5802:24
**trade** [52] - 5716:9, 5720:8, 5721:17, 5721:22, 5722:3, 5722:12, 5723:20, 5724:16, 5749:7, 5751:3, 5752:13, 5753:8, 5754:1, 5754:17, 5756:11, 5756:14, 5759:7, 5776:15, 5780:3, 5780:5, 5781:12, 5784:22, 5793:13, 5793:22, 5794:1, 5794:4, 5794:7, 5802:11, 5828:4, 5832:20, 5832:24, 5844:23, 5844:25, 5845:1, 5845:2, 5845:21, 5845:22, 5845:23, 5846:4, 5846:5, 5847:8, 5847:10, 5847:12, 5847:16, 5847:24, 5848:2, 5848:3, 5848:14, 5848:22, 5869:24, 5875:25
**traded** [39] - 5716:12, 5722:23, 5723:3, 5723:6, 5724:15, 5725:5, 5730:18, 5750:3, 5751:15, 5752:10, 5753:18, 5753:20, 5754:14, 5758:23, 5758:25, 5759:1, 5759:2, 5759:3, 5759:4, 5759:8, 5759:9, 5759:10, 5759:21,

5760:1, 5761:3, 5772:19, 5774:4, 5774:5, 5774:4, 5775:9, 5777:9, 5785:6, 5785:8, 5786:8, 5791:17, 5791:18, 5791:19, 5805:12, 5837:3
**trader** [3] - 5843:4, 5849:22, 5861:24
**traders** [2] - 5850:13
**trades** [27] - 5717:24, 5718:1, 5749:19, 5752:12, 5767:6, 5767:12, 5771:2, 5774:16, 5774:23, 5775:14, 5775:18, 5775:19, 5784:4, 5784:6, 5784:7, 5784:8, 5785:9, 5787:23, 5828:20, 5832:14, 5832:15, 5833:1, 5833:13, 5833:23, 5838:12, 5842:14
**trading** [78] - 5711:2, 5716:10, 5717:23, 5723:3, 5723:8, 5728:15, 5730:6, 5730:16, 5730:22, 5731:16, 5733:15, 5735:3, 5735:17, 5735:22, 5742:4, 5748:4, 5748:7, 5748:16, 5749:5, 5749:23, 5750:14, 5751:23, 5752:20, 5753:1, 5753:6, 5753:15, 5753:16, 5755:9, 5755:11, 5756:6, 5756:8, 5759:12, 5760:21, 5760:23, 5761:15, 5762:9, 5765:17, 5765:21, 5766:3, 5766:5, 5766:7, 5766:10, 5766:13, 5766:15, 5766:17, 5767:9, 5767:18, 5770:13, 5770:14, 5772:15, 5773:8, 5776:2, 5776:11, 5776:12, 5777:4, 5779:25, 5784:8, 5784:12, 5791:22, 5793:8, 5794:20, 5796:11, 5797:24, 5799:12, 5799:15, 5833:8, 5833:10, 5835:7, 5837:22, 5837:25, 5847:17,

5850:5, 5850:7, 5850:12, 5851:20, 5853:2, 5857:11, 5870:12
**traditionally** [1] - 5701:4
**training** [2] - 5712:7, 5749:4
**transacted** [1] - 5784:7
**transaction** [7] - 5731:3, 5750:12, 5846:10, 5846:17, 5851:18, 5885:18, 5915:18
**transactions** [3] - 5747:2, 5765:5, 5915:17
**TRANSCRIPT** [1] - 5691:9
**transcript** [3] - 5691:25, 5712:25, 5913:1
**transcription** [1] - 5691:25
**transfer** [12] - 5715:18, 5716:17, 5718:17, 5728:3, 5728:5, 5728:6, 5733:22, 5735:20, 5736:3, 5742:2, 5765:18, 5769:24
**transferred** [1] - 5778:22
**transfers** [1] - 5765:9
**transparency** [1] - 5733:9
**travel** [1] - 5916:24
**tremendous** [5] - 5771:18, 5771:21, 5872:15, 5873:3, 5876:2
**tremendously** [2] - 5774:3, 5805:10
**TRIAL** [1] - 5691:9
**trial** [16] - 5692:17, 5693:13, 5698:10, 5700:1, 5704:2, 5705:15, 5708:13, 5711:20, 5763:19, 5851:2, 5851:5, 5851:6, 5908:8, 5909:24, 5913:1, 5916:3
**trials** [1] - 5769:5
**tried** [2] - 5699:8, 5913:2
**triple** [1] - 5750:9
**Troy** [2] - 5736:4, 5767:14

**true** [8] - 5750:12, 5809:9, 5813:6, 5813:10, 5813:21, 5814:3, 5815:12, 5834:17
**truth** [15] - 5765:12, 5908:10, 5908:17, 5909:10, 5909:25, 5911:11, 5913:3, 5913:4, 5913:12, 5915:3, 5915:10, 5915:14, 5915:21, 5916:5, 5916:11
**truthfully** [1] - 5851:18
**try** [19] - 5695:10, 5699:11, 5699:13, 5699:15, 5700:20, 5710:23, 5748:13, 5764:8, 5764:11, 5773:19, 5787:9, 5799:20, 5812:10, 5818:12, 5829:9, 5829:21, 5847:22, 5869:4, 5916:13
**trying** [22] - 5692:19, 5695:25, 5698:9, 5699:5, 5699:17, 5699:19, 5707:8, 5707:11, 5711:7, 5711:9, 5731:16, 5763:19, 5846:12, 5868:24, 5878:16, 5885:14, 5889:2, 5890:22, 5905:19, 5911:18, 5914:1, 5914:25
**TSOU** [1] - 5691:21
**turn** [6] - 5726:22, 5729:5, 5770:6, 5809:18, 5810:5, 5874:15
**turning** [2] - 5832:11, 5867:17
**twenty** [7] - 5755:16, 5762:15, 5800:4, 5801:8, 5801:25, 5802:8, 5911:16
**twenty-five** [5] - 5800:4, 5801:8, 5801:25, 5802:8, 5911:16
**twenty-four** [1] - 5755:16
**twenty-three** [1] - 5762:15
**twice** [1] - 5705:6
**two** [33] - 5710:2, 5716:25, 5736:16, 5741:6, 5742:6, 5742:11, 5746:23,

5747:6, 5754:22, 5760:22, 5761:9, 5763:22, 5778:5, 5786:1, 5789:6, 5789:8, 5815:15, 5830:4, 5844:10, 5845:10, 5845:13, 5846:8, 5858:17, 5862:8, 5873:2, 5876:1, 5881:2, 5881:3, 5882:3, 5883:15, 5883:24, 5890:19, 5900:19

**Two** [6] - 5692:3, 5692:5, 5698:23, 5701:22, 5702:9, 5707:18

**two-thirds** [1] - 5761:9

**Type** [1] - 5741:21

**type** [8] - 5699:10, 5717:23, 5719:19, 5729:8, 5746:11, 5749:4, 5749:22, 5833:9

**typically** [1] - 5824:10

## U

**U.S** [1] - 5849:3

**ultimate** [1] - 5711:15

**ultimately** [2] - 5848:4, 5898:9

**umbrella** [1] - 5720:20

**umbrellas** [5] - 5720:15, 5720:16, 5720:18, 5720:19

**unable** [2] - 5811:20, 5812:2

**uncertain** [1] - 5811:11

**uncertainties** [1] - 5810:12

**uncomfortable** [1] - 5824:14

**under** [16] - 5726:13, 5726:18, 5729:4, 5747:14, 5748:2, 5759:21, 5759:22, 5804:9, 5810:22, 5820:19, 5822:22, 5828:18, 5830:17, 5844:8, 5857:18, 5861:3

**underlying** [3] - 5701:14, 5718:15, 5751:19

**underneath** [4] - 5736:8, 5774:12, 5811:19, 5812:2

**understandings** [3] -

---

**understood** [5] - 5696:23, 5826:10, 5826:15, 5872:16, 5873:21

**unilaterally** [2] - 5693:16, 5698:4

**UNITED** [3] - 5691:1, 5691:3, 5691:10

**United** [6] - 5691:5, 5691:13, 5691:15, 5714:23, 5717:15, 5871:5

**units** [1] - 5901:3

**universities** [1] - 5878:17

**unless** [3] - 5824:5, 5826:22, 5904:11

**unquote** [2] - 5890:7, 5910:11

**unregistered** [1] - 5726:3

**unrestricted** [3] - 5734:9, 5734:18, 5734:23

**unsigned** [4] - 5819:22, 5820:6, 5820:8, 5824:14

**unvested** [2] - 5742:14, 5901:3

**up** [70] - 5698:9, 5698:22, 5699:6, 5702:13, 5703:21, 5707:2, 5710:4, 5712:24, 5722:3, 5748:13, 5752:12, 5761:3, 5761:4, 5762:4, 5763:20, 5763:23, 5765:15, 5770:19, 5771:3, 5774:3, 5782:13, 5783:12, 5787:20, 5793:13, 5799:8, 5802:13, 5803:5, 5803:8, 5806:1, 5818:7, 5822:18, 5829:13, 5841:24, 5843:9, 5843:17, 5844:18, 5850:5, 5855:5, 5857:6, 5857:12, 5858:14, 5861:25, 5862:6, 5865:15, 5865:23, 5866:4, 5873:5, 5882:25, 5889:18, 5891:4, 5893:20, 5896:2, 5896:15, 5896:16, 5896:21, 5897:7, 5897:12,

---

5897:15, 5897:17, 5897:21, 5898:8, 5906:21, 5909:24, 5911:18, 5911:23, 5912:15, 5912:19, 5913:14, 5914:11, 5917:1

**update** [2] - 5732:3, 5829:19

**upfront** [1] - 5854:18

**uplist** [1] - 5724:15

**uplisted** [1] - 5803:19

**uplisting** [6] - 5722:16, 5722:17, 5724:10, 5724:12, 5805:15

**Upper** [2] - 5854:8, 5854:11

**ups** [1] - 5809:2

**upset** [1] - 5696:22

**urged** [1] - 5708:2

**useful** [3] - 5704:19, 5706:18, 5707:1

## V

**vacation** [2] - 5700:10, 5900:23

**vague** [5] - 5693:23, 5694:19, 5694:24, 5695:6, 5856:23

**Vaino** [42] - 5735:9, 5752:2, 5752:24, 5752:25, 5766:15, 5780:9, 5785:25, 5786:1, 5786:9, 5786:10, 5786:18, 5787:11, 5788:24, 5789:9, 5790:23, 5791:8, 5793:17, 5795:7, 5795:8, 5795:11, 5795:21, 5796:6, 5797:5, 5797:6, 5797:14, 5798:9, 5799:25, 5800:20, 5800:25, 5801:6, 5801:11, 5802:2, 5802:7, 5802:8, 5830:24, 5831:16, 5831:19, 5832:5, 5862:2, 5877:24, 5890:15, 5906:5

**Vaino's** [1] - 5797:8

**valid** [1] - 5702:23

**valuation** [1] - 5882:21

**value** [1] - 5812:4

**valued** [1] - 5888:18

**varies** [1] - 5762:3

---

**various** [5] - 5740:3, 5798:25, 5809:6, 5819:21, 5894:9

**vast** [2] - 5807:25, 5869:8

**verbal** [1] - 5692:12

**verbatim** [1] - 5692:19

**versa** [1] - 5731:19

**version** [3] - 5821:11, 5823:21, 5824:1

**versus** [3] - 5697:12, 5893:3, 5893:18

**vested** [1] - 5901:3

**viable** [1] - 5871:16

**vice** [1] - 5731:19

**Victoire** [6] - 5842:25, 5843:2, 5843:8, 5843:19, 5843:20, 5844:2

**view** [9] - 5706:14, 5708:18, 5708:19, 5711:13, 5712:8, 5712:19, 5825:6, 5832:19, 5837:2

**views** [2] - 5692:10, 5859:24

**voice** [1] - 5748:12

**voicemail** [2] - 5699:10, 5699:11

**voir** [5] - 5711:12, 5711:16, 5711:17, 5712:22, 5713:8

**volume** [69] - 5715:16, 5716:5, 5716:11, 5748:13, 5748:20, 5750:5, 5750:21, 5751:14, 5752:7, 5752:9, 5752:14, 5755:19, 5758:18, 5758:21, 5759:12, 5759:19, 5761:4, 5761:23, 5762:1, 5762:5, 5762:6, 5762:8, 5765:22, 5772:24, 5773:2, 5774:3, 5774:9, 5774:16, 5774:21, 5777:3, 5777:12, 5777:17, 5777:20, 5778:20, 5778:21, 5779:1, 5779:12, 5781:14, 5783:7, 5783:21, 5783:22, 5784:20, 5785:6, 5785:17, 5786:5, 5786:21, 5787:3, 5787:7, 5788:21, 5790:3, 5790:4, 5796:14, 5796:17, 5802:24, 5805:9,

---

5832:12, 5835:24, 5836:3, 5836:4, 5836:8, 5837:3, 5837:7, 5837:22, 5838:11, 5838:16, 5838:18

**volumes** [1] - 5758:22

**voluminous** [2] - 5718:2, 5719:3

**Voluntary** [1] - 5859:7

**vote** [5] - 5733:12, 5873:23, 5874:8

**votes** [1] - 5734:16

**Voting** [2] - 5738:13, 5738:17

**voting** [14] - 5733:11, 5734:12, 5738:18, 5738:19, 5738:24, 5738:25, 5740:4, 5740:16, 5740:24, 5741:1, 5741:8, 5741:10, 5744:20, 5744:21

**vs** [1] - 5717:16

## W

**wait** [4] - 5784:19, 5796:1, 5830:10, 5830:11

**waiting** [4] - 5893:4, 5893:13, 5893:18, 5916:25

**walk** [1] - 5744:10

**wants** [8] - 5696:11, 5700:6, 5701:22, 5702:2, 5702:4, 5703:18, 5706:16, 5728:20

**warrant** [2] - 5746:10, 5746:11

**warrants** [4] - 5746:1, 5746:2, 5746:3, 5814:22

**wash** [1] - 5846:18

**waste** [1] - 5827:21

**watches** [1] - 5829:24

**watching** [2] - 5704:1, 5705:1

**ways** [1] - 5769:17

**WC** [1] - 5738:5

**wealth** [1] - 5842:11

**weather** [1] - 5872:22

**Wednesday** [1] - 5698:11

**week** [10] - 5694:12, 5694:17, 5700:10, 5756:4, 5854:2, 5877:25, 5895:15, 5895:23, 5896:6,

**CMH**       **OCR**       **RMR**       **CRR**       **FCRR**                    **35**

5916:18
**weekend** [13] -
  5697:3, 5699:3,
  5699:4, 5704:25,
  5706:10, 5706:19,
  5706:21, 5710:3,
  5840:5, 5912:7,
  5916:16, 5917:5
**weekends** [2] -
  5763:24, 5829:13
**weeks** [12] - 5693:22,
  5694:9, 5699:2,
  5763:22, 5823:24,
  5823:25, 5895:16,
  5895:24, 5896:7,
  5896:19, 5913:14
**weighing** [1] - 5701:6
**Wentworth** [15] -
  5880:21, 5880:23,
  5880:24, 5881:3,
  5881:4, 5881:6,
  5881:7, 5881:10,
  5882:19, 5882:24,
  5885:10, 5885:12,
  5891:23, 5904:11
**whereas** [4] - 5857:7,
  5857:8, 5857:15,
  5857:16
**wherein** [1] - 5729:13
**whichever** [1] - 5886:5
**whole** [7] - 5773:15,
  5797:7, 5797:17,
  5842:15, 5843:15,
  5908:16, 5911:8
**wholesale** [1] - 5833:3
**widely** [2] - 5748:18,
  5748:24
**widespread** [1] -
  5728:25
**willing** [2] - 5695:10,
  5698:8
**wind** [1] - 5888:3
**winding** [2] - 5886:18,
  5887:9
**Winn** [1] - 5871:4
**WINSTON** [1] -
  5691:20
**wiring** [1] - 5865:21
**Wisconsin** [1] -
  5876:16
**withdraw** [1] -
  5757:20
**withdrawn** [4] -
  5849:6, 5856:14,
  5894:11, 5904:22
**withholding** [1] -
  5900:14
**Witness** [1] - 5840:6
**WITNESS** [20] -
  5731:7, 5734:12,

5734:15, 5734:19,
5748:14, 5754:5,
5754:10, 5773:22,
5788:6, 5818:18,
5840:13, 5840:16,
5850:16, 5875:7,
5875:11, 5894:9,
5896:13, 5897:2,
5898:21, 5912:12
**witness** [22] - 5692:4,
  5709:5, 5763:6,
  5773:17, 5788:1,
  5800:7, 5818:19,
  5822:13, 5824:12,
  5824:24, 5825:11,
  5840:7, 5840:10,
  5841:2, 5881:21,
  5884:11, 5896:25,
  5897:6, 5912:14,
  5912:22, 5914:8,
  5916:17
**witness's** [1] - 5820:6
**witnesses** [1] -
  5908:18
**WITNESSES** [1] -
  5918:2
**woman's** [1] - 5767:14
**word** [5] - 5813:8,
  5825:14, 5827:19
**words** [4] - 5772:23,
  5829:1, 5846:18,
  5872:17
**wore** [1] - 5843:3
**works** [4] - 5698:25,
  5720:22, 5785:14,
  5829:12
**world** [3] - 5771:25,
  5844:16, 5879:16
**worth** [6] - 5708:15,
  5754:10, 5874:17,
  5875:24, 5876:1,
  5888:19
**wrath** [1] - 5696:21
**write** [4] - 5841:23,
  5866:1, 5895:12,
  5896:3
**writes** [1] - 5882:16
**writing** [2] - 5823:8,
  5823:9
**written** [4] - 5791:20,
  5858:19, 5858:21,
  5902:11
**wrote** [7] - 5866:2,
  5866:7, 5893:17,
  5895:13, 5895:22,
  5896:4, 5897:17

## Y

**year** [8] - 5722:13,

5724:16, 5842:5,
5843:25, 5844:1,
5844:4, 5871:8,
5872:19
**years** [17] - 5711:3,
  5712:7, 5768:9,
  5768:13, 5808:6,
  5841:11, 5841:20,
  5842:15, 5842:17,
  5843:20, 5844:8,
  5844:10, 5879:23,
  5881:8, 5889:16,
  5889:21
**yellow** [1] - 5770:21
**yesterday** [2] -
  5710:18, 5714:1
**YORK** [1] - 5691:1
**York** [20] - 5691:5,
  5691:16, 5691:18,
  5691:23, 5721:16,
  5775:7, 5821:6,
  5843:24, 5848:25,
  5849:2, 5849:4,
  5849:8, 5850:20,
  5851:3, 5851:9,
  5851:23, 5864:2,
  5872:12, 5878:1
**yourself** [3] - 5829:9,
  5866:16, 5894:18
**yup** [1] - 5895:11

## Z

**zero** [3] - 5738:24,
  5744:15, 5850:9
**zoom** [1] - 5781:11