```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3   ------------------------------------X
                                         :
 4   UNITED STATES OF AMERICA,           :  15-CR-00637 (KAM)
                                         :
 5                v.                     :  225 Cadman Plaza East
                                         :  Brooklyn, New York
 6   EVAN GREEBEL,                       :
                                         :  April 11, 2018
 7                     Defendant.        :
     ------------------------------------X
 8

 9        TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONIC CONFERENCE
              BEFORE THE HONORABLE KIYO A. MATSUMOTO
10                UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Government:        ALIXANDRA ELEIS SMITH, ESQ.
                                DAVID C. PITLUCK, ESQ.
13                              DAVID K. KESSLER, ESQ.
                                United States Attorney's Office
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15
     For the Defendant:         REED M. BRODSKY, ESQ.
16                              Gibson, Dunn & Crutcher, LLP
                                200 Park Avenue
17                              New York, New York 10166

18                              LUKE RONIGER, ESQ.
                                King & Spalding
19                              500 West 2nd Street
                                Austin, Texas 78701
20
     For Katten Muchin:         MICHAEL I. VERDE, ESQ.
21                              Katten Muchin Rosenman, LLP
                                575 Madison Avenue
22                              New York, New York 10022

23   Court Transcriber:         RUTH ANN HAGER, C.E.T.**D-641
                                Typewrite Word Processing Service
24                              211 North Milton Road
                                Saratoga Springs, New York 12866
25


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
```

2

1    (Proceedings began at 1:32 p.m.)

2              THE COURT:  Hello.  Good afternoon.  This is Judge

3    Matsumoto.  The case is United States v. Evan Greebel, 15-CR-

4    00637.  May I have the appearances starting first with the

5    Government?

6              MS. SMITH:  Good afternoon, Your Honor.  It's Eleis

7    Smith, David Pitluck and David Kessler for the Government.

8              THE COURT:  All right, and good afternoon.

9              Who do we have for Mr. Greeble?

10             MR. BRODSKY:  Your Honor, it's Reed Brodsky on the

11   phone.  My colleague, Erica Gallager -- Gallaher [ph.], who I

12   don't think has been in since the commencement of the case now

13   may also be on the phone.

14             THE COURT:  All right.  I under -- good afternoon.

15   Mr. Brodsky, I understand you were at the dentist.  Thanks for

16   making yourself available.  I did have concerns about

17   Ms. Gallagher [ph.] appearing just because I'm understanding

18   that she's not admitted, at least in the Eastern District, and

19   I think that for a case like this we need to have a licensed

20   lawyer on the phone.  So thank you for making your appearance.

21             Is Mr. Greeble on the line?

22             MR. BRODSKY:  No, Your Honor.  We waived his

23   appearances for the purposes of this call.

24             THE COURT:  All right.  Do we have the

25   representatives of Katten Muchin on the phone?

3

1          MR. VERDE:  Yes, Your Honor.  It's Michael Verde,
2   general counsel of Katten.

3          THE COURT:  All right.  Thank you, sir.  Mr. Verde,
4   I don't know whether you've received a copy of the subpoena
5   that the Gibson firm would like to serve on behalf of
6   Mr. Greeble on your firm requesting certain --

7          MR. VERDE:  I have not.

8          THE COURT:  -- material.  All right.  Just so you
9   are aware, Mr. Brodsky, would you arrange to have this emailed
10  to Mr. Verde, right now if you can?  Can you ask someone to
11  email it?

12         MR. BRODSKY:  [Inaudible].

13         THE COURT:  Thank you.  Now, Mr. Verde, the subpoena
14  seeks from your firm emails sent by or on behalf of Vincent
15  Sergi, S-E-R-G-I, or Ross Silverman to income partners in or
16  about late December or early January 2012, 2013, 2014 and 2015
17  regarding the income partner compensation memoranda.  That is
18  what is requested.

19         And Mr. Brodsky, I was a little bit concerned
20  because I wasn't understanding how this data regarding other
21  income partners could be relevant to the forfeiture that the
22  Government is seeking against Mr. Greeble.

23         MR. BRODSKY:  The emails we're seeking, I think
24  it's -- I'm going to estimate it's probably like a single
25  email that we understand was sent out by somebody on behalf of

4

1   the non-equity compensation committee telling the non-equity

2   partners -- the income partners what they should include in

3   their memoranda regarding compensation.

4           So our understanding is that this email will

5   generally describe the factors involved in compensation at a

6   very general level and a [indiscernible] would support our

7   view of the disconnect between the forfeiture of the

8   Government seeks illegal proceeds and the independent

9   determination, multi-factor basis by a non-equity partnership

10  compensation committee of Katten.

11          THE COURT:  Well, okay.  I understand what you're

12  saying.  So are you seeking only a single email for each of

13  the years specified that was sent to all income partners

14  regarding income partner compensation, but you're not seeking,

15  for example, Mr. Sergi or Mr. Silverman's emails to those

16  income partners regarding their compensation.  Is that

17  correct?

18          MR. BRODSKY:  Correct.  Correct, Your Honor.  It's

19  a -- as I understand it, there's a single email that would go

20  out to all the equity partners regarding the memorandum.

21          THE COURT:  All right.

22          MR. BRODSKY:  I apologize if we didn't articulate it

23  clearly enough.

24          THE COURT:  Well, I thought it was just grossly over

25  broad and I was going to deny the subpoena, but I thought

1  rather than do that it would be worthwhile to speak to you and

2  see if we could agree with input from Katten as to more

3  precise parameters.

4          So if I understand your subpoena correctly, again,

5  it's a single email sent by either of these two gentlemen who

6  are named in the subpoena to all income partners regarding

7  factors or criterion for income partner compensation during

8  calendar years.  Did you want December 2012 or are you meaning

9  to say early 2012 -- January 2012?

10          MR. BRODSKY:  I think we meant to say December 2012

11  or early January 2013.

12          THE COURT:  Okay.  Okay.

13          MR. BRODSKY:  That it would go out then for the year

14  2012 and then it would go out for the year in the late 2013 or

15  early 2014 for the year 2013.

16          THE COURT:  So you're seeking compensation memos for

17  the years 2012 through 2015 and it was that single email sent

18  by either Mr. Sergi or Mr. Silverman.  Now --

19          MR. BRODSKY:  There should be three emails

20  essentially, the three years, three periods of time.

21          THE COURT:  All right.  And are these all -- well,

22  you're asking for four years, correct?

23          MR. BRODSKY:  For four years.  I apologize, Your

24  Honor.

25          THE COURT:  Okay.  2012 through 2015.  And you're

1    only seeking the memo if Mr. Greeble got it, right?

2              MR. BRODSKY:  Correct, correct.

3              THE COURT:  And he wasn't income partner during all

4    these years, is that correct?

5              MR. BRODSKY:  Correct.

6              THE COURT:  So he would have received these memos,

7    is that your view?

8              MR. BRODSKY:  Correct.

9              THE COURT:  All right.  So, Mr. Verde, I know this

10   is a little bit last minute, but frankly we got this last

11   night I think quite late or I became aware of it around

12   quarter to 11:00 last night and I'm on trial so I was not able

13   to deal with it until now, and I'm sorry that this is somewhat

14   short notice.  It's not so much short notice; it's very short

15   notice.  But I didn't know whether you and your firm had a

16   view on this request.

17             MR. VERDE:  Well, two things, Your Honor.  One is

18   I'm not sure we still have them because we have an email

19   retention policy.  These are going back.  One of them I think

20   is [indiscernible] seven years.  So I don't know if we have

21   them and if we have them it's bit of a test trying to identify

22   and find them.  And I understand that -- I did follow the

23   briefing.  I understand there's a hearing scheduled for Friday

24   and I can't say for certain we'd be able to lay hands on it

25   Friday.

7

1          Substantively, though, I can tell you that these
2  memos have always said the same thing, which is don't bother
3  reciting what kind of billings you had or what kind of
4  revenues you've generated.  We have that information already.
5  This is an opportunity to say anything else about your
6  contributions to the firm that would not be reflected in
7  things like billing.
8          And as I understand the Government's position, they
9  picked this number based upon the increase in Mr. Greeble's
10 compensation attributed to Retrophin and that's exactly the
11 kind of thing.
12         Now, it might have been in Mr. Greeble's memos,
13 which I think were already made available on both sides of the
14 trial, but the instruction I don't think is going to shed any
15 light on this because the instruction doesn't say -- it
16 actually tells people that that information was not helpful to
17 the memo because the firm already records that stuff.  They
18 don't need to have it cut back in a memo format.
19         So I'm not really sure.  It's going to take us a
20 fair bit of work to try and find six and seven-year-old emails
21 and frankly, I'm not really sure what that has to do with
22 anything that is before the Court on Friday.
23         THE COURT:  Well, I would agree with you, sir, that
24 I'm stretching a little bit to try to glean any relevant
25 relevance, but I -- and again, I think there was quite a bit

8

1   of data through testimony and exhibits at the trial regarding

2   compensation of income partners which probably is far more

3   informative than anything that any of these memos might direct

4   the income partners to do with regard to their compensation.

5          Did we have any of those exhibits admitted at trial

6   to the best of anyone's recollection who tried the case?

7          MS. SMITH:  Yes, Your Honor.

8          MR. BRODSKY:  Not the --

9          MS. SMITH:  All of the compensation memos were --

10  just what Mr. Verde mentioned of the compensation memos that

11  Mr. Greeble submitted to Katten, and then the memo that went

12  from Katten to Mr. Greeble regarding what the compensation

13  would be for each of those years.  Those were all in.

14         THE COURT:  What about the memo that the partnership

15  Mr. Silverman or Mr. Sergi sent to the income partners asking

16  them to submit information relevant to their compensation?

17         MS. SMITH:  That I think was not admitted on a

18  document that was produced in connection with this case, so we

19  didn't know about the exhibit [inaudible].

20         THE COURT:  All right.  I am just a little

21  concerned.  I mean, Mr. Verde, whatever your firm could do to

22  try to relocate this, I would appreciate it.  Perhaps search

23  terms would be helpful.  I don't dain to know what those might

24  be, but, you know, looking for time frames when the partner,

25  Mr. Silverman or Mr. Sergi, typically sends these out to

9

1  income partners, looking through their emails during that time
2  frame, looking for emails sent to income partners during that
3  time period, hopefully it won't be too onerous.  And if you
4  can provide those emails to the defendant and the Government's
5  counsel, that would be greatly appreciated.
6       I believe the subpoenas are returnable to my
7  courtroom as of Friday, but I think obviously they'd probably
8  like to see it in advance.  And yeah, it's Friday at 1:00 --
9  at 9:00 a.m., which I'm so sorry is very short notice.  But
10 would you be able to undertake that search without a lot of
11 burden, expense and delay?
12      MR. VERDE:  Well, no, but we'll do it anyway.  I
13 just want to be clear with everyone that these are emails and
14 that we don't any retain any emails for more than a year
15 unless they're specifically saved.  And over the years it
16 would have be different places it could be saved, so it's not
17 a one-stop database we have we can do search terms.  We
18 have -- there's a lot of different -- there's a lot of
19 different servers that we're going to have to query in order
20 to try and track these memos down.  We'll do the best we can,
21 but we don't have a lot of time.  And again, we may be looking
22 for something that was deleted from our servers many years
23 ago, but we'll do our best to see if we can find everything.
24      THE COURT:  I'm very grateful.
25      Mr. Verde, what I would ask you do maybe by some

1  point Thursday evening, perhaps at 7:00 or 8:00 if that's not

2  too late, just submit an ECF letter updating the parties on

3  the progress of your search and if you do in fact find those

4  memos, just attaching those memos to your submission.

5          Are these deemed confidential in any way or should

6  they be filed with some protection or do you mind if they're

7  on the public docket?  I would give you permission to file it

8  for attorney's eyes only and the court's eyes only if you

9  wanted to do it that way.

10          MR. VERDE:  I would prefer that, Your Honor.  I

11  think that we treated some of the other internal patent

12  documents about compensation, et cetera, so I would appreciate

13  it here, although when I go back and actually read the

14  language, frankly I'm not so sure it's going to be materially

15  different than what every other law firm sends out to their

16  partners about compensation.

17          THE COURT:  Well, I'm very grateful.  I'm sure

18  Mr. Brodsky is as well.  And hopefully, we'll have this no

19  longer than seven or eight and -- on Thursday and if we don't

20  receive it by then we'll have a letter saying that you made a

21  diligent search on short notice and haven't been able to

22  locate it under your document retention and after searching

23  multiple servers.

24          MR. VERDE:  Okay, Your Honor.  We will do that.

25  While I'm on the phone with both sides, is there anyone who

1   anticipates there's going to be anything else requested of

2   Katten or is that -- is this it?

3           THE COURT:  I think there was a reference to having

4   someone testify.  Is that right, Mr. Brodsky?

5           MR. BRODSKY:  We put in our letter, Your Honor, that

6   based on prior conversations with Mr. Rosensaft, who had

7   testified at the trial, as you may recall, Your Honor, the

8   very prominent and able Mr. Rosensaft, who is a former federal

9   prosecutor, he -- based on our conversations with him last

10  year we had understood that he -- we profited, you would say,

11  Mr. Greeble had told him sometime shortly after Mr. Rosensaft

12  joined Katten Muchin that the compensation system for income

13  partners was black box, meaning that it was unknown to him how

14  compensation was determined and calculated having been there a

15  number of years as an income partner.  And to us that -- the

16  relevance of that is that the state of mind of Mr. Greeble

17  that he didn't know how the income partner compensation

18  committee calculated and determined -- made determinations on

19  compensation is relevant to our -- one of our defenses for the

20  Government's motion for forfeiture.

21          So we were hoping, not to inconvenience

22  Mr. Rosensaft and if the Government would agree to stipulate

23  that if called as a witness Mr. Rosensaft would say that, then

24  we wouldn't need to take up this sort of the time on Friday.

25  I understand he has a very -- he has a busy schedule on

1  Friday.  He will obviously comply -- I'm told this through his

2  counsel, John Lash, who will comply with whatever order the

3  Court issues, but I'm told he does have a busy calendar.

4         THE COURT:  I'm just not sure if this is hearsay.

5  You're offering Mr. Greeble's statements to Mr. Rosensaft and

6  are you saying it's not for the truth, i.e., it's really

7  opaque or --

8         MR. BRODSKY:  I think it goes to the exception of

9  the state of mind.  And I think in a forfeiture hearing, Your

10  Honor, I do believe that Your Honor has the discretion to

11  allow for hearsay, but even if Your Honor was supplying

12  strictly the hearsay rules, the exception we would rely on for

13  the admissibility of his statement is it goes to Mr. Greeble's

14  state of mind what he told -- not for the truth of the matter

15  asserted, but for the fact that Mr. Greeble made the statement

16  and reflected his understanding of the black box nature of how

17  income partner compensation is determined.

18         THE COURT:  So your theory is because Mr. Greeble

19  indicated that he didn't know how income partner compensation

20  was determined, that he would not have been motivated by his

21  billings and receipts, vis-a-vis the MSMB entities,

22  Mr. Shkreli or Retrophin?

23         MR. BRODSKY:  Right.  So it's if Mr. Greeble's

24  understanding was that it was a multi-factored process that

25  the income partner compensation made a determination it was a

1  compensation.  And his understanding was he couldn't figure

2  out how they came up with their number in terms of the

3  compensation, then it would help us.  One of our points would

4  be that it can't be a basis for thinking that he would get a

5  calculable amount of money if more business or Mr. Shkreli

6  sent more legal business to Katten.

7          THE COURT:  I think the black box reference is

8  generally a concept used to say that nobody at a particular

9  firm knows what the other is making.  It's not -- "black box"

10 doesn't refer to not knowing how compensation is determined.

11 My understanding was that "black box" meant I don't know what

12 my LO income [ph.] partners are making.

13         MR. BRODSKY:  We followed up with Mr. Rosensaft

14 during our conversations with him and he explained that by

15 "black box" he understood in the context of the conversation

16 that Mr. Greeble was explaining to Mr. Rosensaft that trying

17 to figure out how the income partner can determine your

18 compensation was impossible because he just didn't know what

19 factors drove the compensation.  He didn't know what you could

20 do in particular given the multitude of factors involved.

21         THE COURT:  But don't you have that already from

22 Mr. Silverstein who testified at length that it was a

23 holistic, non-rigid set of criteria that the compensation

24 committee decided after review and discussion on a number of

25 different factors?  Isn't that all in the record without

14

1    having to trouble Mr. Rosensaft to come back?

2         MR. BRODSKY:  Well, we agree, Your Honor, with

3    respect to Mr. Silverman's testimony.  I'll just respectfully

4    note that the Government takes one line from Mr. Silverman's

5    testimony and said, in this drawing you're relying on that for

6    the proposition that business generation is the primary driver

7    and realization is the primary driver for compensation and,

8    therefore, primary driver for his increase in compensation was

9    the Retrophin's payment of money for legal services.

10        And so one of the ways we are trying to combat that

11   and, yes, we haven't resolved some of the testimony, as you

12   point out, with respect to the holistic view, but we also

13   think Mr. Silverman couldn't get [indiscernible] on

14   Mr. Greeble's state of mind.  We believe it's relevant that

15   Mr. Greeble can tell SBMI [ph.] that, yes, it's a holistic

16   multitude of factors.  We can't figure out what factor it is.

17        So we haven't -- we would argue to you, Your Honor,

18   we have the evidence both ways.  We have the evidence with

19   Mr. Silverman's testimony and then at the [indiscernible]

20   evidence what Mr. Greeble told Mr. Rosensaft in or about 2012

21   when -- after Mr. Rosensaft joined the firm.

22        THE COURT:  Well, I guess we need to hear from the

23   Government whether they would stipulate.

24        MS. SMITH:  Your Honor, this is Eleis Smith.  So

25   we're not in a position where we can stipulate.  We just never

15

1  had these conversations with Mr. Rosensaft and so I just --
2  and I'm unclear as to whether or not there are other things
3  that we want to explore with him.  But I think the more
4  significant issue here is that we do not believe that is
5  relevant to the forfeiture question the defendant's knowledge
6  here -- the new knowledge component to forfeiture.  And so
7  what Mr. Greeble may or may not have believed, which we're not
8  sure Mr. Rosensaft is actually capable in testifying to what
9  Mr. Greeble believed as opposed to what Mr. Greeble said, but
10 in any event, it's not actually relevant to the question of
11 forfeiture that's before the court.
12          THE COURT:  All right.  Well, I suppose I -- this
13 subpoena was not seeking Mr. Rosensaft's appearance, correct?
14 It's just for the document.
15          MR. BRODSKY:  We did not submit the subpoena, Your
16 Honor.  We were notifying you who we would propose and proffer
17 to the subpoena if the Government did not stipulate to the --
18 to the proposed path [ph.] and --
19          THE COURT:  But --
20          MR. BRODSKY:  -- obviously depending on you're Your
21 Honor's determination as to whether it's relevant and whether
22 or not the Government would agree to [indiscernible].
23          THE COURT:  Well, why don't you make the case --
24          MR. BRODSKY:  The Government argues -- yeah.
25          THE COURT:  Why don't you make the case for

1  relevance?  I mean, I don't think that the -- the defendant's

2  state of mind in a forfeiture analysis is relevant to what

3  proceeds may be forfeited.

4      MR. BRODSKY:  The Government already spent a lot of

5  time arguing [indiscernible] notice and that if you spend a

6  lot of time establishing Mr. Greeble's intent and state of

7  mind.

8      Now, if the Government is going to drop the argument

9  regarding Mr. Greeble's [indiscernible] and they're just going

10 to let that go and agree that it's not relevant, then --

11 unless relevant.  But if the Government is going to argue

12 about risk and incentive of Mr. Greeble to [indiscernible]

13 business from [indiscernible], which I believe they're

14 arguing, then the counter-evidence of Mr. Greeble's state of

15 mind in late 2012 when he had no idea that the Government is

16 charged with [indiscernible] and a new partner going into the

17 firm, and he tells that new partner there's no way to figure

18 out how compensation is determined I would argue is relevant,

19 which is a very low standard, to prove Mr. Greeble certainly

20 didn't believe he had the ability to figure out and raise his

21 compensation through any particular method.  And he did

22 everything to try to increase his compensation.

23     THE COURT:  But what the Government's letter

24 reflects is that they believe that the trial evidence is

25 sufficient to show the nexus between Mr. Greeble's criminal

1   actions of which he was convicted and his salary.  And then

2   they set forth an estimate as to how they would calculate the

3   forfeiture portion of his salary.  I don't believe they are

4   arguing intent or motive and I think those issues were

5   resolved at trial.  They're not really relevant in the

6   forfeiture context.  Do you think so, Mr. Greeble -- I mean,

7   Mr. Brodsky.  Excuse me.  I'm just not seeing how --

8           MR. BRODSKY:  I -- Your Honor, respectfully I think

9   these are relevant to this, Your Honor.  You can make that

10  determination and then we'll -- you know, if you make the

11  determination it's not relevant then we'll respect that and

12  argue accordingly on Friday.

13          THE COURT:  Yeah.  I think -- I mean, the forfeiture

14  is *in personam*.  Once there's a conviction the Government

15  needs to show is the nexus between the act of conviction and

16  the proceeds received by the convicted defendant.  Issues of

17  intent and motive have been resolved through the verdict and I

18  don't think that it's relevant through -- with all due respect

19  at this stage.

20          MR. BRODSKY:  All right, Your Honor.  If you don't

21  mind, Your Honor, on Friday we'd just note that for the record

22  and we won't argue -- we won't argue the state-of-mind point.

23          THE COURT:  All right.  I mean, I'm recording this

24  call so it's in the record.  We'll make it part of the record

25  and anybody can have this in the record.

1          MR. BRODSKY:  Oh, I [inaudible] --

2          THE COURT:  Yeah, just because it's a criminal

3     matter and it's disputed I'm recording it.  I'm sorry.  I

4     should have told you in the beginning.  In any event --

5          MR. BRODSKY:  No worries [ph.].

6          THE COURT:  Okay.  Well, I think we're then have a

7     game plan.  Mr. Verde will advise us all by Thursday.  Is 8:00

8     p.m. all right, Mr. Verde?

9          MR. VERDE:  Yes, Your Honor.  If -- but if I could

10    just ask you.  My understanding is we're looking for these

11    memos because they go to Mr. Greeble's state of mind as to

12    what he understood.  This is basically the other side of the

13    same coin with Mr. Rosensaft, which is Mr. Greeble saying,

14    this is what I understood the compensation would be.

15          If you're ruling that his state of mind really

16    doesn't matter for a forfeiture hearing can I ask you to

17    reconsider whether we need to find the memos which are just

18    going to say -- and as a matter of fact, you'll note that

19    Mr. Silverman is actually the one who has sent these memos.

20    Mr. Silverman already testified about this and have had an

21    opportunity to examine and cross-examine by both sides is what

22    the criteria were.  I'm not really sure what any evidence

23    about, well, what -- what Mr. Greeble was told about what the

24    memo should be contain has any probative value other than

25    Mr. Greeble's state of mind which I think just establishes is

1   really not an issue in this case.

2           THE COURT:  Well, I'll ask Mr. Brodsky if he'd like

3   to take the opportunity to establish why the subpoenas seek

4   relevant information.

5           MR. BRODSKY:  I think that Mr. Silverman and

6   Mr. Sergi's email communication regarding the factors that are

7   involved in compensation would corroborate and buttress

8   Mr. Silverman's testimony that we rely on, which is the

9   holistic approach.  I do believe it's going to be reflective

10  of Mr. Silverman's testimony, but I believe that the

11  Government takes issue with that and they rely on a particular

12  statement or two by Mr. Silverman regarding the -- what they

13  believe truly are the primary drivers of compensation.  And so

14  I think it corroborates our theory as to what Mr. Silverman's

15  testimony was.  We do believe it's consistent with the

16  Mr. Silverman's testimony.

17          THE COURT:  I mean, the memos -- again, I'm sorry I

18  don't have a specific recall of what they said, but it may

19  establish the nexus between performance and origination and

20  compensation and realization.  I don't know -- I just don't

21  remember what those memos said.  It's the only reason I

22  thought maybe they were relevant.  Irrespective of motive, I

23  think there's a view that -- at least my understanding of the

24  defense view is that the compensation that Mr. Greeble

25  received during the time that he was representing MSMB,

20

1  Mr. Shkreli and Retrophin was not directly tethered to the

2  work that he did for them, but rather it was a broader, more

3  holistic -- maybe it was the Vinklevosses [ph.] or some other,

4  you know, factor that led to his 300 percent raise from one

5  year to another in his compensation.

6          So that was my --

7          MR. VERDE:  I can clarify, Your Honor.

8          THE COURT:  Yes, Mr. Verde.

9          MR. VERDE:  I'm sorry, Your Honor, but if I could

10  clarify, what these memos -- all these memos are, is they're

11  soliciting the partners that submit memos for the compensation

12  committee and they suggest what the partner may want to

13  include about ways of bringing in additional clients,

14  expanding relationships, but they all say -- and they've only

15  been doing these for about 20 years -- they all say that, you

16  know, you really don't need to put in anything about the

17  numbers you brought in or, you know, how much you bill the

18  clients or collect from clients.  We already have that

19  information.  This is your opportunity to speak about other

20  things.

21          So this is all about -- this is not an explanation

22  of how the process works or what the numbers are.  It's just

23  as Silverman said, it's not a science.  It's not mathematics.

24  You know, he has every factor but it's the holistic

25  combination.

1          All that we'd be looking for is the memo that's sent

2    out basically year after year which -- you know, not that many

3    changes saying, here are the things that you may want to cover

4    in your compensation memo.

5          THE COURT:  Would you be able to have those in

6    storage on your server just -- I mean, if they haven't changed

7    that much would you be able to search for the current memo and

8    see if you can search that drive as to whether or not that

9    memo that is currently in effect was changed in any material

10   way and make a representation if you can't find the actual

11   memos?  I'm just hoping that you can find them but maybe that

12   would be helpful and then the parties could agree that

13   according to the Katten -- Katten's lawyers that this memo is

14   a fair representation of what was sent to income partners

15   including Mr. Greeble during the relevant time period.

16         MR. VERDE:  We could certainly do that.  I find it a

17   little odd that Greeble's counsel wants this.  If the memos

18   have -- as they usually say, we don't need to recite the

19   numbers, so it would say exactly that.  If Mr. Greeble who

20   recited those numbers in his memo, I'm not sure that's helpful

21   to Mr. Greeble but if that's what they want us to do that's

22   what we'll do.

23         THE COURT:  All right.  Again -- you know, again, I

24   don't have a clear recollection of what those memos requested,

25   but -- just one moment.  I'm sorry.


1                    [Pause in the proceedings.]

2            I guess I'm not as faulty in my memory as I thought.

3    My clerk reminded me that they're not in evidence and I never

4    saw that and so I don't not recall them.  I just never saw

5    them.  Mr. Verde has made a representation as an officer of

6    the court about what they say, but I think that if you were to

7    provide the current memo that is sent to income partners and

8    if somebody there can identify what, if any, changes were made

9    in the event you don't find the 2012 through 2015 memos I

10   think that is the best we can all do and hope for at this

11   point.

12           MR. VERDE:  All right.  We'll try and find the

13   originals, Your Honor, and if we can't find that we'll find

14   the most recent version that we -- the -- I should say, the

15   oldest version of it that we can and I'll try and get some

16   understanding of how much -- if it's changed in any material

17   way over the years.

18           THE COURT:  I mean, since Mr. Silverman was the

19   center of all these memos, maybe he could be consulted to just

20   give some input.  I just want to clarify that Mr. Brodsky and

21   Mr. Verde, you're not going to need a revised subpoena for me

22   to sign and serve or would you prefer that Mr. Brodsky revise

23   the subpoena pursuant to this discussion and re-serve -- or

24   serve a subpoena on Katten.  Do you need a subpoena, sir?

25           MR. VERDE:  No, Your Honor.  I think -- with

23

1    Mr. Brodsky's clarifications on the record I understand what

2    they're looking for and we'll what we can do about finding

3    them.

4                THE COURT:  All right.  Well, thank you, counsel.  I

5    appreciate your availability on short notice and I will see

6    you Friday.  Thank you, all.

7                ATTORNEYS:  Thank you, Your Honor.

8                THE COURT:  All right.  Have a nice day.  All right.

9    Thank you.  Bye.

10               (Proceedings concluded at 2:04 p.m.)

11                            *  *  *  *  *  *

24

1          I certify that the foregoing is a court transcript
2    from an electronic sound recording of the proceedings in the
3    above-entitled matter.
4
5
6    _____
7          Ruth Ann Hager, C.E.T.**D-641
8    Dated:   September 19, 2018
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25