1

1           UNITED STATES DISTRICT COURT.
            EASTERN DISTRICT OF NEW YORK
2
 - - - - - - - - - - - -    X
3
UNITED STATES OF AMERICA,    :    15-CR-637(KAM)
4
         Plaintiff ,         :
5
                             :    United States Courthouse
    -against-                :    Brooklyn, New York
6
EVAN GREEBEL,                :
7
                                  August 17, 2018, Friday
        Defendant.           :    1:30 p.m.
8
 - - - - - - - - - - - -    X
9

10        TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
          BEFORE THE HONORABLE KIYO A. MATSUMOTO
11            UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:

13   For the Government:        RICHARD P. DONOGHUE
                                United States Attorney
14                              Eastern District of New York
                                271 Cadman Plaza East
15                              Brooklyn, New York 11201
                                BY: ALIXANDRA E. SMITH
16                                  DAVID PITLUCK
                                    DAVID K. KESSLER
17                              Assistant United States Attorneys

18
     For the Defendant:         GIBSON DUNN & CRUTCHER, LLP
19                              200 Park Avenue, 48th Floor
                                New York, New York
20                              BY: REED M. BRODSKY, ESQ.
                                    RANDY MASTRO, ESQ.
21                                  MYLAN LEE DENERSTEIN, ESQ.
                                    JOSHUA E. DUBIN, ESQ.
22                                  ERIN GALLIHER, ESQ.

23   Court Reporter:  Michele D. Lucchese, RPR, CRR, CSR
                       Official Court Reporter
24                     E-mail:  MLuccheseEDNY@gmail.com

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

Proceedings                                    2

1          THE COURTROOM DEPUTY:  Criminal cause for

2    sentencing, 15-CR-637, USA versus Evan Greebel.

3          Will the Government's attorneys please state your

4    appearances, please.

5          MS. SMITH:  Good afternoon, Your Honor.

6          Alixandra Smith, David Pitluck, and David Kessler

7    for the United States, and then also sitting at counsel table

8    are Special Agents Matthew Mahaffey and Sean Sweeney.

9          THE COURT:  Good afternoon.  Thank you.

10          THE COURTROOM DEPUTY:  And on behalf of Mr. Greebel.

11          MR. BRODSKY:  Good morning, Your Honor.  Reed

12   Brodsky, Gibson, Dunn & Crutcher.  With us, of course, is Evan

13   Greebel, and my partners, Mylan Denerstein and Randy Mastro;

14   and our colleagues, Josh Dubin and Erin Galliher.

15          THE COURT:  Good afternoon, everybody.

16          I will ask Mr. Greebel to raise his right hand and

17   take an oath to tell the truth.

18          (Defendant sworn.)

19          THE COURT:  Thank you.  As you can see, Mr. Greebel,

20   this proceeding has a court reporter who is making a

21   transcript of today's proceedings and the transcript will be

22   part of the official court record if you choose to file an

23   appeal.

24          I'd like to confirm that the Government has notified

25   any victims regarding this proceeding and has also advised

Proceedings                                                    3

1    them of their right to restitution.

2              MS. SMITH:  Yes, Your Honor.

3              THE COURT:  Thank you.

4              As the parties know, I previously issued an order on

5    August 14, 2018 respectfully denying Mr. Greebel's Rule 29 and

6    33 motions for a judgment of acquittal and a new trial.  In

7    preparation for that particular decision, I did review

8    extensively the trial record.  I have also considered the

9    trial testimony, the exhibits, the materials submitted in

10   connection with the parties' motions regarding sentencing, the

11   parties' forfeiture submissions and the parties' previous

12   arguments on issues relative to sentencing, including the

13   Fatico hearing, the transcript, the exhibits, and the

14   submissions of the parties regarding the loss amount.

15             I have also reviewed the Probation Department's

16   pre-sentence report dated May 7, 2018, its sentencing

17   recommendation dated May 7, 2018, and two PSR addenda dated

18   July 7th and July 17, 2018.  I have also reviewed Mr.

19   Greebel's objections to the PSR dated June 8, 2018, his

20   sentencing memorandum and exhibits, including 182 letters of

21   support from Mr. Greebel's family members, friends, former

22   colleagues, and clients dated July 16, 2018, as well

23   additional letters submitted in support of Mr. Greebel dated

24   July 20th, July 24th, July 26th, and August 1st, and August 8,

25   2018.  I have also reviewed the letter that Mr. Greebel

Proceedings                                              4

1    submitted to the Court on August 15, 2018.

2              In addition, I reviewed the Government's response to

3    defendant's objections to the PSR dated June 22, 2018, the

4    parties' submissions on the appropriate loss calculation for

5    purposes of the United States Sentencing Guidelines, and the

6    Government's sentencing submissions.

7              Finally, I have reviewed the submissions and

8    evidence and the transcripts from the two-day Fatico hearing

9    on June 1, 2018 and June 18, 2018, as well as the submissions

10   regarding forfeiture.

11             Have I overlooked any submissions?

12             MS. SMITH:  No, Your Honor.

13             MR. BRODSKY:  No, Your Honor.

14             THE COURT:  I'd like to confirm that Mr. Greebel is

15   a United States citizen so we may not address ICE

16   notification, is that correct?

17             MR. BRODSKY:  Yes, Your Honor.

18             THE COURT:  Mr. Greebel, are you satisfied with your

19   attorneys, including Reed Brodsky?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  Are there any unresolved conflicts,

22   contentions, motions, or issues that I should address, Mr.

23   Brodsky?

24             MR. BRODSKY:  Your Honor, I believe you will be

25   addressing the loss and the sentencing guidelines and

```
                        Proceedings                        5
```

1    forfeiture and restitution.

2         THE COURT:  Yes, I will.

3         Mr. Greebel appears to me to be fully aware and

4    following these proceedings closely.

5         Do you agree with that observation, Mr. Brodsky?

6         MR. BRODSKY:  Yes, Your Honor.

7         THE COURT:  Do you know of any reason why he should

8    not be sentenced today?

9         MR. BRODSKY:  No, Your Honor.

10        THE COURT:  You can remain seated when you address

11   me.  That's fine.  If it's more comfortable.

12        Mr. Greebel, have you had the chance to read the

13   pre-sentence report and all the addenda, as well as the

14   filings by your attorneys and the Government regarding your

15   sentencing today?

16        THE DEFENDANT:  Yes, Your Honor.

17        THE COURT:  Did you have any difficulty

18   understanding those submissions?

19        THE DEFENDANT:  No, Your Honor.

20        THE COURT:  Did you have a chance to discuss those

21   submissions with your lawyers?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE COURT:  Are you ready to be sentenced?

24        THE DEFENDANT:  Yes, Your Honor.

25        THE COURT:  As we know, a Fatico fact-finding

Proceedings                                                    6

1   hearing was held June 1st of 18th of this year, at which the

2   parties had the opportunity to offer evidence relevant to the

3   loss amounts for purposes of the guidelines calculation.

4        At this time, Mr. Greebel is entitled, if he wishes,

5   to be heard.  If he wishes to make a statement, I am happy to

6   hear from you, sir.  I will assure you that I have read your

7   letter.

8        MR. BRODSKY:  Your Honor, in a prior proceeding with

9   respect to Mr. Shkreli, would we be able to proceed in the

10  same way, which is arguments by counsel, and then hear from

11  Mr. Greebel before imposition of the sentence?  I think he

12  would like to say a few words.

13       THE COURT:  That's fine.  Whenever is comfortable.

14  What I would like to say, though, is I have read all of the

15  submissions, and so, you need not repeat what you have already

16  submitted to me.  However, if you wish to emphasize certain

17  points in your submissions, I'm happy to hear from you.

18       Would you like to be heard, then, Mr. Brodsky?

19       MR. BRODSKY:  Yes, Your Honor.

20       May I speak from here, Your Honor?

21       THE COURT:  Of course.  Just pull the microphone

22  close to you.

23       MR. BRODSKY:  I would like to say a few words, Your

24  Honor, and then turn it over to my partner, Mylan Denerstein

25  who will speak for the sentencing factors in Section 3553(a).

Proceedings                                    7

1       Your Honor, leading up to this day, it is a

2   difficult day, for Evan, of course, for Evan's family and

3   loved-ones, Evan's former law firm partners, colleagues, and

4   friends, many of whom are in court here today, and who have

5   sent us, who couldn't make it, have sent us their thoughts and

6   prayers.  And for our entire defense team and for me

7   personally, we want to thank the Court for all of its time and

8   attention to this matter.  We know the Court has many matters.

9   All cases are important.  This case, given the shear volume of

10  motions and applications, given two trials, we want to express

11  thanks, Your Honor, for taking the time and the attention for

12  over two years to a very important matter to Mr. Greebel.

13       Following Evan's arrest and through this very day,

14  we believe in Evan passionately and with all of our heart and

15  sole.  While we all sleep prior to and during the trial and in

16  preparation of trial, since the jury's verdict, we have lost

17  many more nights of sleep.  The conviction didn't change our

18  belief in Evan, but we struggled through many days and through

19  many sleepless nights.  I personally couldn't sleep many

20  nights and have spent a lot of time asking questions about the

21  jury's verdict and those questions will forever plague us and

22  our team will carry those questions with us forever.

23       One of the things in my thoughts in the middle of

24  the night that has given me comfort and our entire defense

25  team comfort as this sentencing day has approached with great

Proceedings                                        8

1   trepidation, with great angst and anxiety, particularly for

2   Evan and Evan's family, is knowing Your Honor and knowing the

3   fairness and the care that Your Honor has given to each and

4   every sentencing that we have seen and we have spoken to many

5   people about.  Knowing, although, there were moments of

6   advocacy on our part which were raw and had touched nerves,

7   and our team's passionate advocacy, my personal advocacy

8   knowing that that will not be considered by the Court in

9   imposing sentence on Evan gives us some comfort.

10          Your Honor, we, with full conviction and every

11  breath and every ounce of our energy, have believed in Evan

12  and we have developed a special relationship with him because

13  for many months, for nearly two years, he has come to our

14  office and he has spent a lot of time with us.  We have gotten

15  to know him.  We have gotten to know his family.  We know his

16  great character, which is reflected in the many sentencing

17  letters that Your Honor has seen, more sentencing letters than

18  I have ever seen in any criminal case before.

19          THE COURT:  I would agree.

20          MR. BRODSKY:  We have gotten to know many of his

21  family members, and his former law partners, colleagues, and

22  friends.  So, our belief in Evan and his family and our

23  concern for him is heartfelt, and at this very difficult time,

24  overwhelming.  So I'd like to turn it over to my partner Mylan

25  Denerstein, who will talk about the sentencing factors.

Proceedings                                              9

1          MS. DENERSTEIN:  Thank you, Your Honor.  We

2    appreciate the opportunity to be able to speak to you about

3    Evan Greebel.

4          I have been lying awake at night contemplating what

5    we could say that, in addition to the voluminous materials

6    that have been submitted to the Court, would persuade Your

7    Honor that a non-custodial sentence is warranted based on the

8    factors set forth in Section 3553(a).  It boils down to one

9    word:  Compassion.  Each of us is so much more than the worst

10   thing we have done.  In this case, that is particularly true

11   when considering the individual Evan Greebel and the

12   consequences of a custodial sentence.  Evan is much more than

13   this case and can do much more out of prison than in prison.

14   We respectfully submit that in weighing all of the factors, a

15   non-custodial sentence is in the interest of justice.  Evan's

16   history and character should be measured based on his life,

17   which represents a life of doing so many good things and being

18   such a wonderful person, including being such a wonderful

19   person in his family.

20         Evan plays a pivotal and vital role in his family.

21   He is an exemplary son, husband, father, brother,

22   brother-in-law, cousin, and the list of family members who

23   Evan has supported goes on and on, as Your Honor is aware.

24   Evan's family needs him.  He is the rock and he has been the

25   rock for all of them.  Removing Evan will be devastating to

Proceedings                    10

1    his family.  Evan's three young children and his wife Jodi

2    need him.  It's not that they simply want him around; they

3    need him around.

4           Sadly, Evan's family has suffered tremendously.

5    Nobody can minimize the loss of Jodi's brother, Evan's wife,

6    at the age of 27, in 2015, four months before Evan's arrest.

7    Jodi brother's death has naturally had a negative impact on

8    Jodi and the kids.  This is not a fact that anybody would wish

9    would happen to them or anyone else or can be disputed.

10          Since her brother's death, Jodi has increasingly

11   relied on Evan as her "sole source of strength."  As Jodi has

12   stated, she was devastated following the loss of her brother

13   and did not know how she would survive, getting out of bed to

14   take care of three children seemed too much to bear.  Evan was

15   my lifeline and helped me to get up and put one foot in front

16   of the other each day.  In true Evan form, he offered to

17   permit my parents to come live with us and he thought that it

18   would be better for their mental state, to be around all of us

19   all the time.  Not once did he think of himself and the

20   impacts on him.  I was bearing functioning in the weeks and

21   months after Mark's death and was only able to survive because

22   I was able to lean on Evan.  Lisa Malter, a very close friend

23   of Evan and Jodi Greebel, explained as a stay-at-home mom,

24   Jodi kept track of day-to-day activities of her busy family.

25   But during this tragic time, Evan stepped in to offload so

1  many of Jodi's responsibilities so she could be there for her

2  grieving parents and sister, as well as tend to their

3  children.  I can safely say that while Jodi has an extensive

4  network of family and friends, she could not have persevered

5  through this tragedy without Evan at her side.

6         The last three years of this poor woman's life has

7  been decimated by the tragedies that have struck her.  Not a

8  day goes by when I don't question how she was given this lot

9  in life.  I cannot imagine the thought of her losing Evan

10 after the calamity she has faced today.  And I think there are

11 so many other letters that reflect that same sentiment and the

12 fact that Evan is both a rock, a pillar of strength and

13 comfort to the family.  A family friend wrote that Evan is a

14 role model of a father, a devoted, loving, hands-on dad who

15 would do anything for his kids, his family and his friends.

16        Evan's mother, Nancy Citrin, wrote Evan is the kind

17 of husband that any parent would hope their for daughter,

18 loving, respectful, conscientious and very supportive.

19        Evan's children have already suffered the loss of an

20 uncle.  Losing a father will be equally devastating.  Evan's

21 family needs him here to care for them.  He cannot do that

22 from prison.

23        I'm not even speaking to the loss to Evan's parents,

24 siblings, brothers, cousins, friends, which have already been

25 submitted to the Court for Court's consideration.

Proceedings                                        12

1        I submit, Your Honor, removing Evan from his

2   children and Jodi's lives at this particular time given their

3   individual circumstances and what they have offered suffered

4   is just not warranted under 3553(a).

5        Second, Evan has been, over the course of 40 years,

6   a compassionate, caring friend.  This is truly a testament to

7   who Evan is as a person.  Evan's friends would feel his loss

8   deeply.  He is committed to them.  He has helped so many of

9   this in so many different ways.  He cares for people and gives

10  to them naturally as part of his character in ways that are

11  worthy of consideration and recognition.

12        A law school classmate explained how Evan helped her

13  when they attended Georgetown.  During her first semester of

14  law school, she was the victim of a crime in her apartment

15  building in Washington, D.C.  "Not wanting to remain in my

16  apartment after the incident, I tried to find alternative

17  living arrangements as quickly as possible.  I was alone in a

18  strange city far away from my family and I suddenly found

19  myself needing a new apartment.  Evan, overhearing my

20  situation from a mutual friend, reached out and notified me

21  that there was an apartment available in his building.

22  Without really knowing me at all, he helped facilitate the

23  rental, boxed up my apartment, and moved my belongings from my

24  old apartment to the new one.  And anybody who has moved,

25  knows that moving is incredibly difficult.  And as if this

Proceedings                          13

1    wasn't enough, Evan also walked me to my car in my parking

2    garage for months so I didn't have to walk there alone.  All

3    of those efforts from someone who barely knew me and it was

4    all done out of the goodness of his heart.

5              Time and time again, Evan has proven himself to be a

6    wonderful and caring human being.

7              Evan's college friend, Mike Weiskopf wrote that it

8    was because of Evan that he sought treatment for his lung

9    cancer at an early stage because Evan sat him down and

10   insisted that he go to the doctor and seek medical attention.

11   Michael stressed that Evan was not only "instrumental in

12   pushing me to seek the medical help that I needed, but he

13   constantly called to check on me to see how I was doing and

14   what I might need."

15             As Your Honor is aware from the numerous letters

16   that were also submitted, Evan has hosted so many people at

17   his home and opened his home to anybody in need.

18             Karen Grill who, together with her sister, are

19   welcomed into the Greebel home each holiday season after the

20   Grills tragically lost both their parents, describing this

21   dedication to others as simply, "The Greebel way."

22             I know the Court received a lot of letters about

23   what Evan has meant to these individuals.  These letters are

24   heartfelt, thoughtful, and reflective, and they are written by

25   many people who know Evan better than any of us.  What they

1   demonstrate is that over Evan has done so much good and aided

2   his family in so many different ways.  Evan is compassionate.

3           Evan also has an extensive history of community

4   service, which is also detailed in the PSR and throughout

5   submissions to the Court.  Even during the most trying times

6   in Evan's and his family's lives, which has been missed in the

7   last three years, he has pushed forward with his commitment to

8   giving of himself and his time to benefit those in need.

9           We can name any number of examples of Evan's

10  lifelong commitment to community service.  I want to just

11  highlight a very small sample here to demonstrate Evan's

12  strong commitment to helping others and helping those who are

13  less fortunate than himself.  Some of the things Evan has done

14  is collecting and delivering food for the poor and homeless in

15  Westchester as a young man, establishing a fund for college

16  students who needed financial assistance to travel home for

17  family emergencies, helping homeless individuals to develop

18  job skills with his work with Hero Organization during and

19  after college, creating a Jewish fellowship group through

20  Hillel of Greater D.C. so that people could get together and

21  communicate and feel more comfortable, regularly volunteering

22  as a coach, which is also a very difficult job, raising nearly

23  15,000 for the SPCA of Westchester.  And as Your Honor is

24  aware, he is currently involved in dedicating himself to

25  establishing a 30- to 40-bed drug and alcohol inpatient

1  facility.

2          There is no doubt in any of our minds at this table

3  and a large part of this courtroom that if Evan remains in his

4  community, he will continue to support his family and friends.

5  He will continue to give of himself to others and will be an

6  asset to the community, not a detriment.

7          I know the Court is required to consider the need to

8  protect the public and whether training is necessary.  This

9  was not a violent crime.  Evan has never been convicted of a

10  violent crime or any other crime outside of this matter.

11          As Evan's uncle, Charles Citrin, noted this crime

12  was an aberration, contrary to his normal character.  The

13  public is at no risk because Evan will lose his law license.

14  His reputation has been destroyed and a felony conviction is

15  no easy bar for him to overcome.  He will be severely limited

16  in his options.  There is no doubt that his felony convictions

17  alone will adequately deter him from committing any crimes in

18  the future.

19          Evan does not need training.  Evan is a highly

20  educated who is determined to go forward and rebuild his life.

21  He is not going to re-offend.  He is not going to put his

22  family, friends, and his community at risk.  There is

23  absolutely no way.

24          We know the Court is very familiar with the nature

25  and circumstances of the offense since you presided over the

Proceedings                                              16

1   trial in this matter, so it has not been my focus.

2          We respectfully submit Evan does not deserve to be

3   sentenced to prison because he grew up in an intact, loving

4   family and friends and with certain opportunities.  Evan

5   worked hard in college.  Evan worked hard in law school.  He

6   worked hard to become an Eagle Scout, which is no easy feat.

7   He worked hard for many of his clients and his colleagues, who

8   have written to the Court in great detail to describe how

9   Evan's work was impeccable.

10         The conduct for which Evan Greebel has been

11  convicted and for which Evan Greebel will be forever

12  remembered simply does not tell the whole story of Evan or

13  provide a complete picture.  Evan has done many good things as

14  a lawyer and will continue to do many good things if he

15  remains in the community.

16         The need for deterrence and just punishment has been

17  served.  Evan's conviction has clearly shattered his life.  It

18  has destroyed his career and his plans for the future and it

19  has done so in an extremely public fashion.  You need only

20  look at the press coverage surrounding Evan's conviction to

21  understand that he will forever be a marked man and his

22  reputation will be tarnished forever.

23         There is simply no chance that Evan will ever find

24  himself again in this situation.  This alone is enough to

25  satisfy the need for specific and general deterrence.  The

Proceedings                                                    17

1   consequences that Evan has already suffered accomplishes the

2   goals of specific deterrence.  As I have stated, Evan will

3   lose his license and his reputation has been extremely damaged

4   and will be unable to work in the legal world for the

5   remainder of his career.  That is substantial.  This is

6   meaningful.

7          As Evan's father wrote, Evan will not be able to

8   practice law and it is unclear how he will support his family.

9   The study and practice of law was Evan's lifelong passion and

10  all he wanted to do since he was a young child.  Losing his

11  law license is a punishment he will suffer from every day for

12  the rest of his life and directly links to the very conduct

13  for which he has been tried and convicted.  Depriving him of

14  the ability to help clients is an ongoing and extremely

15  impactful punishment for Evan.

16         A former client noted the charges of conviction have

17  already punished him severely, adequately by destroying his

18  reputation forever and through the loss of his law license,

19  along with that reputation, his primary means of income and

20  family support.  He has also suffered extreme public shame and

21  upheaval as the press has broadcast his darkest moments from

22  arrest to trial to today to the world and general deterrence

23  has been accomplished.

24         The conviction of former Katten Muchin Rosenman, LLP

25  partner Evan Greebel for conspiring with Pharma Bro Martin

Proceedings                          18

1   Shkreli to defraud Retrophin and its investors is a harsh

2   reminder to lawyers of the importance of knowing when to walk

3   away from a dangerous client.  Greebel's fall from a one-time

4   promising corporate attorney for Katten and later Kaye Scholer

5   to a convicted criminal serves as a lesson for lawyers that

6   they need to be ready to let go of even lucrative client

7   engagements.  That is Law360 from January 2, 2018.

8               Quoting the statement of the Acting U.S. Attorney

9   for EDNY at the time of Evan's conviction, "The verdict has

10  sent a message to lawyers that they will be held accountable

11  when they use their legal expertise to facilitate the

12  commission of a crime."

13              Evan has suffered.  His family has suffered.  The

14  collateral consequences of his conviction are just punishment

15  enough.  The experience of arrest, trial and conviction has

16  been devastating to him and his family.  Everybody knows he

17  will not be able to practice law.  We understand he has lost

18  the only way he has ever provided for his family.  He may not

19  even be able to help his wife run her small business which she

20  is currently doing to help support them.

21              I would like to close by reading a part of Evan's

22  mother, Barbara Greebel's letter, which to me sums up best why

23  a non-custodial sentence in this case is warranted.

24              "December 15th changed all of our lives.  Charles

25  and I were in Florida and then the unthinkable happened, our

Proceedings                          19

1    son was arrested.  That morning we returned to Brooklyn to

2    stand with our son.  As the charges were explained, I choked

3    up and almost fainted when I signed the document that pledged

4    our home as collateral.

5           "Evan has always worked admirably with his

6    colleagues and for the best interest of his clients.  He is

7    not a kidnaper, murderer, embezzler, or drug kingpin.

8           "I love my son dearly and everyone he meets wants to

9    be his friend.  While this may sound unorthodox, it is with

10   tears in my eyes that I beg you to allow me to carry out his

11   sentence in place of my wonderful son Evan.  I am 72 years old

12   and I have had a fabulous life.  Fortunately the recipient of

13   unconditional love and support from my whole family.

14          "When Charles and I needed financial help, Evan

15   provided assistance for years even though he went with less.

16   Evan's family needs him.  His three young children need his

17   excellence guidance and love.  His wife Jodi needs his support

18   and care.

19          "I'm a good cook, organizer, and very competent

20   reading, learning disability teacher.  I would be an asset to

21   spread the light.  I could run an educational program, teach

22   computer research or work in a library.

23          "If you truly believe in your mind and heart that he

24   must be punished, please be extremely lenient.  Evan has lost

25   so much already.  He has resigned from his law firm and has

Proceedings                           20

1    worked sporadically for the past two and a half years never as

2    an attorney.

3              "Due to his felony conviction, you know he will be

4    disbarred and a dismal future looms over him.  Please use

5    discretion and consider probation.  Our society may be better

6    served if he is allowed to remain at home doing community

7    service to aid the poor, write grants for non-profits, help

8    Governor Cuomo's project in Puerto Rico, assist with public

9    housing, et cetera.

10             "Evan is not a danger to the public and he needs to

11   be able to earn a living in order to keep his family healthy,

12   rather than the federal government wasting a substantial

13   amount of tax payer money on his room, clothing,

14   transportation, personal items, medical treatment,

15   supervision.  Please let him stay with his family and serve

16   those in need and support those he loves.  Please show your

17   compassion and impose a sentence that will not tear his family

18   apart.  You will not be disappointed.

19             "We respectfully submit that this Court should

20   impose a non-custodial sentence imposed on Evan.  That is

21   sufficient to justly punish Evan and accomplish the goals of

22   sentencing.  If Your Honor is inclined to impose a prison

23   term, we respectfully request a sentence of home confinement

24   given his family circumstances, with the combination of

25   community service.

Proceedings                              21

1          "Thank you, Your Honor, for allowing me to be heard."
2          THE COURT:  Thank you.
3          Does the Government wish to be heard?
4          MS. SMITH:  Yes, Your Honor, just briefly.
5          I want to start by also thanking the Court for your
6     attention to detail and for the incredible amount of work that
7     Your Honor, Your Honor's clerk and your chambers staff have
8     put into this case over the past almost three years.  I know
9     that having presided over two trials, multiple hearings,
10    thousands and thousands pages of briefing that Your Honor is
11    very familiar with the facts of this case.  So what I would
12    like to do is just take this time to very briefly respond to
13    some of the arguments the defendant has made regarding the
14    3553(a) factors and to highlight what the Government believes
15    are the most important considerations in that analysis and to
16    explain why the Government has proposed a five-year sentence
17    of incarceration for this defendant.
18          As an initial matter, the guidelines range is
19    supposed to be the starting point, the initial benchmark for
20    any sentence.  The Government and Probation have calculated
21    that range to be 108 to 135 months.  The Government's
22    recommendation of 5 years or 60 months is therefore half of
23    the recommended guidelines range.
24          As the Court is aware, our office generally
25    recommends a sentence within the guidelines range.  The

Proceedings                                        22

1    decision to recommend a below-guideline sentence is not one

2    that we do often and it is not a decision that we take

3    lightly.  I emphasize this because the defense has argued at

4    length for a non-incarceratory sentence and has suggested that

5    any sentence of incarceration ignores key facts or legal

6    precedent or somehow improperly balances the 3553(a) factors.

7              To the contrary, we have arrived at a

8    below-guidelines sentence of five years, of half the

9    recommended guidelines range, because we have carefully

10   weighed those 3553(a) factors in the context of the facts of

11   this trial, as well as the existing case law.  That is to say

12   the five-year recommendation already accounts for a lot of the

13   factors that the defense has discussed, such as the

14   defendant's lack of a criminal history, his role relative to

15   his co-conspirators, and particularly, Martin Shkreli, who

16   received seven years, and his contributions to the community.

17             It is the defendant's proposed sentence, a sentence

18   of probation which cannot be squared with the facts or the

19   law.  It is an extraordinary deviation from the guidelines and

20   particularly in a case like this.  It can't be squared with

21   the serious nature of the crimes or the defendant's repeated

22   decisions to commit those crimes over a period of years.

23             (Continued on following page.)

24

25

Proceedings                                          23

1   (Continuing)

2           MS. SMITH:  It cannot be squared with the

3   defendant's use of his law license to commit and conceal those

4   crimes, and the repeated abuse of his position of trust as

5   Retrophin's attorney and the violations also of his ethical

6   duties to his client.  And it cannot be squared with the need

7   for the sentence to impose and promote respect for the law to

8   send a message both to the legal community and to this

9   defendant, who we believe has failed to take any

10  responsibility for his actions, that corrupt lawyers who

11  commit crimes will face significant punishment.

12          Starting with the nature and circumstances of the

13  offense, there is no dispute that the crimes the defendant

14  committed were serious, stealing millions of dollars in cash

15  and stock and manipulating the price and trading volume of the

16  shares of a public company.

17          What I want to focus on is the nature of the

18  defendant's participation in those crimes, which is why this

19  factor, I think, weighs heavily in favor of an incarceratory

20  sentence.

21          First, it's significant that the crimes did not

22  constitute a one-time lapse in judgment.  There has been a lot

23  of discussion of aberrant behavior, but this was a series of

24  decisions made by the defendant over a period of years.

25          With respect to Count Seven, we have settlement

Proceedings                                                    24

1   agreement after settlement agreement, the control memo, the

2   settlement agreements that were paid after that, the

3   distribution of shares pursuant to those agreements, and then

4   the shift and the drafting of the consulting agreements and

5   the misleading language in the SEC filings.  Each of those

6   decisions was made over a period of months and years again and

7   again, and at any point the defendant could have chosen not to

8   continue with the criminal conspiracy.

9          And with Count Eight there is a similar set of

10  decisions over a similar amount of time.  The initial

11  distribution of shares, the false Form 13D, the attempt to

12  control the shares.  So, again, a decision after decision,

13  year after year.

14         Second, it's important to keep in mind that the

15  defendant was essential to each conspiracy.  Neither of those

16  conspiracies could have succeeded without the defendant.  It's

17  not only because of the specific steps that he took in

18  furtherance of those frauds, drafting agreements or

19  distributing shares, but it's also because of the trust that

20  was placed in him, not just by Retrophin's board, but, for

21  example, by the defrauded MSMB investors when they were

22  negotiating those settlements.  There was the testimony from

23  Al Geller and David Geller that Mr. Greebel, himself,

24  reassured them that the settlements were above board.  And it

25  was his position as a lawyer at a prominent law firm that made

1   them feel comfortable moving forward.  And so without that

2   kind of appearance of legitimacy, the frauds could not have

3   succeeded.

4            And third, one of the points we've made in

5   connection with the sentencing guidelines is that the

6   defendant did not play a minor role in the crimes.  As we just

7   said, he's essential to the crimes.  But there's plenty of

8   evidence that he was not merely Shkreli's pawn, but in a lot

9   of situations he was actually sort of the problem-solver, the

10  issue-spotter and he would see an issue and actually

11  affirmatively take steps to resolve it in a way that would

12  further the conspiracy.  So the control memo is one example.

13  Drafting a memo to make the auditors comfortable, and then

14  suggesting splitting up the Marshall agreement into two parts

15  in order to get around the control memo.

16           There are also examples when the shares are being

17  redistributed in respect to Count Eight where Mr. Greebel is

18  problem solving.  He's saying, I'm going to figure out a way

19  to get rid of the Pierotti problem or to save you from a

20  hostage situation.  So there are plenty of examples where

21  Mr. Greebel, himself, is masterminding certain aspects of the

22  conspiracy.  And so for these reasons, the nature of his

23  participation in the conspiracy committed over a long period

24  of time, the fact that his role was essential and the abuse of

25  trust was essential, and the fact that he, in fact, was

Proceedings                                    26

1  directing certain behavior are all reasons why that factor

2  weighs in favor of an incarceratory sentence.

3          I also just want to touch briefly on the history and

4  characteristics of the defendant.  Starting with the community

5  service.

6          As we said in our sentencing memorandum, the Court

7  should certainly consider the defendant's community service.

8  And, again, in reaching a below-guidelines sentence we have,

9  ourselves, weighed that as part of our consideration, but I

10 think as the caselaw we cited in our brief makes clear, and

11 it's caselaw that the defendant really did not address in his

12 reply, the kinds of community services the defendant has

13 performed, while they are admirable and should be taken into

14 consideration, are not extraordinary enough to warrant a

15 departure of this magnitude to a probationary sentence.

16         And we did also note in our memorandum that we were

17 disturbed by the fact that there were certain things included

18 in that roster of community service that really should not

19 have been listed there, including work that was considered

20 business development for Retrophin and was -- excuse me, while

21 he was working at Katten and was included in his compensation

22 memos as a reason to receive higher pay and is now being

23 characterized as community service.

24         And we also noted that one of the through lines, I

25 think, of our sentencing memorandum is the abuse of the law

1    license to commit crimes.  There was also no use of the law

2    license for the better of the community.  And so despite many

3    years at a law firm, there was no pro bono work done at the

4    law firm.  I know in the reply brief there was some mention of

5    letters from friends that on certain occasions the defendant

6    provided legal advice in the context of a friend wanting to

7    start a business, but there was no actual concerted pro bono

8    work actually done at his law firm.

9            The next factor I just want to touch on are family

10   circumstances.  This is always a difficult factor to talk

11   about because the unfortunate reality is that when a defendant

12   chooses to commit a crime, the consequences of that decision

13   are often borne most heavily by others, including the

14   defendant's innocent family and friends.  We do not dispute

15   that it is incredibly painful for the loved ones of any

16   defendant to lose that person's presence, their financial

17   support, their emotional support, because they're sent to

18   prison.  And we do not dispute that it is particularly

19   difficult for a defendant's children who may not understand

20   why their parent is being taken away from them.  And for that

21   reason, the impact of a defendant's incarceration on their

22   family is something that the Government always takes into

23   account when weighing the 3553(a) factors, and we expect that

24   the Court should and will take it into account here.  And,

25   again, we have taken it into account in proposing a

Proceedings                                    28

1    below-guidelines sentence.  But the question is given that the

2    family of any defendant before this Court will be negatively

3    impacted by that defendant going to jail, what weight should

4    it be afforded?

5            And I think the answer that's given by the caselaw

6    and the guidelines is to look at whether the harm suffered by

7    the family of a particular defendant is far outside the

8    heartland of the kinds of harm inflicted on any defendant who

9    is taken away from their family.  And --

10           THE COURT:  I do object to the term harm inflicted

11   on the defendant suggesting that the Court inflicts harm by

12   sentencing a defendant to an incarceratory sentence.

13           It has been my view that defendants know or should

14   know that when they engage in criminal conduct, they run the

15   risk their conduct will be detected.  They will be prosecuted.

16   And ultimately, if convicted, they will have to be sentenced,

17   perhaps to an incarceratory term, perhaps not, but it is their

18   own deeds, their own bad decisions, their own actions that

19   lead them to be taken from their families.  It is not the

20   Court.

21           MS. SMITH:  Your Honor, I apologize for phrasing it

22   in that way.

23           THE COURT:  No, I just have heard that many times

24   and I do wish more defendants would be cognizant before they

25   make decisions that lead them before me at sentencing that

Proceedings                                   29

1    they consider the implications and the collateral consequences

2    of their conduct on their families.

3              MS. SMITH:  I appreciate, Your Honor --

4              THE COURT:  They suffer the most.

5              MS. SMITH:  And I agree with that, and I do think we

6    were a little more eloquent in our brief to make it clear that

7    the decision, the harm inflicted on a defendant's family is

8    the result of the defendant's bad decisions.  And I believe we

9    talked in our memo about the decision to sort of gamble away

10   sort of a beautiful life, and the consequences then are

11   visited on people who were not a part of that bad

12   decision-making.

13             And like I said, it is a hard factor to talk about,

14   and I think the question really is, is the effects felt by the

15   family as the result of the defendant's bad decision, that

16   those fall within the heartland of the kind of effects that

17   are felt by any family or is there something truly

18   extraordinary about them.  And the caselaw that we focused on,

19   a lot of it is pre Booker, and that's because, as Your Honor

20   knows, pre Booker there wasn't the opportunity to use the

21   3553(a) factors to go above or below guidelines.  But that

22   caselaw is still good because it talks about what does a

23   heartland case look like and what does an extraordinary case

24   look like.  And I think when you look at those cases it's very

25   clear that the family circumstances here cannot be categorized

Proceedings                                          30

1    as sort of the extraordinary cases that are talked about where

2    probation is appropriate.

3              By contrast to those cases, a lot of which involve

4    concerns that a defendant's children will be left homeless or

5    be sent to foster care or the family would be unable to

6    provide for themselves, here the defendant's family are

7    fortunate to have an incredible support network and financial

8    resources far beyond that of most defendants.

9              I have addressed the sort of report at length in our

10   sentencing memo.  I am happy to answer any questions about it,

11   but otherwise I think that's what we wanted to say about the

12   family circumstances.

13             I also just wanted to touch on with respect to the

14   defendant's character, the defendant's ethical violations in

15   the course of his representation for Retrophin.  And the

16   reason why we think this is so important and we spent a lot of

17   time on it in our sentencing memorandum is because we do think

18   it goes to the defendant's character.  The Court has received

19   many letters from family and friends who know him in other

20   contexts and have spoken to his reputation for honesty and

21   ethical behavior, and we know that the Court is going to take

22   those into consideration, as it should, but the trial record

23   in this case is replete with clear evidence of deliberate

24   repeated ethical violations in connection with the crimes.

25   And the failures of character show that when the defendant

1   thought that no one was watching and believed he would not get

2   caught, he was willing to repeatedly violate his duty of

3   loyalty and to sacrifice his integrity.  And we included a

4   whole list of those in our sentencing memorandum, but it

5   includes lying to the Board of Directors about the true nature

6   of the settlement and consulting agreements, telling the

7   external accountants that there was a misprint or a typo in

8   Mr. Shkreli's Employment Agreement in order to get Mr. Shkreli

9   additional money, the lies that were told in connection with

10  the overbilling to Katten.  Katten overbilled Retrophin for

11  work that had actually been done for MSMB entities.  When

12  Mr. Greebel was confronted about that he refused to answer,

13  even though he knew that the MSMB entities didn't have any

14  money and that they had been paid by Retrophin.

15          It actually stands in stark contrast to an example

16  in one of the letters submitted on behalf of Mr. Greebel of a

17  case where Katten had overbilled a client.  I believe the

18  letter was Mr. Auerbach, and Mr. Greebel took immediate steps

19  to remedy that situation.

20          Well, in a situation where he was working with

21  Mr. Shkreli, he allowed $600,000 to be overbilled and refused

22  to acknowledge it, refused to deal with the external

23  accountant and then had it written off as bad debt.

24          There was, you know, at the end of kind of

25  Mr. Shkreli's tenure at Retrophin, there were the instances

Proceedings                                      32

1   where Mr. Greebel was helping Mr. Shkreli plan to overthrow

2   his own client's board, the board of Retrophin and then lied

3   about it in an e-mail to Mr. Aselage.

4          So, you know, these are the kind of ethical

5   violations that we think, again, when no one is looking, when

6   you don't think you're going to get caught, do speak to the

7   defendant's actual nature for honesty and for ethical

8   behavior.

9          And I do want to address just very briefly sort of

10  the deceit of his Katten partners because there were some

11  letters submitted after our sentencing memorandum from various

12  partners.  You know, obviously, Your Honor heard, as we did,

13  the testimony at trial and it became very clear that there

14  were many things that Mr. Greebel had withheld from his

15  colleagues.  And there were instances, particularly with

16  Mr. Rosensaft where Mr. Greebel had outwardly or affirmatively

17  lied.  In particular, with respect to the billing for the

18  indemnification bill.

19         I recognize that those partners have put in letters

20  that they have never seen Mr. Greebel commit any ethical

21  violations.  You know, I respectfully submit that as we know,

22  we have more information than they do.  So they didn't

23  necessarily know the information that Mr. Greebel was

24  withholding from them and they don't necessarily know what

25  they didn't know.  And so it's very clear from the record, and

Proceedings                                    33

1    I believe the jury saw it as well, all of the information that

2    was not conveyed about the crimes that he was committing to

3    his law partners.

4              I also want to just touch briefly on this idea of

5    the loss of the law license should be a basis for probationary

6    sentence, because Ms. Denerstein talked about that at length

7    and it was also in the sentencing memo.  We believe this runs

8    counter to the law and to the guidelines and amounts to a

9    request for special treatment.  A defendant fortunate enough

10   to have a professional license should not be treated more

11   leniently at sentencing because he used that license to commit

12   a crime and now might lose it.  To the contrary, the

13   guidelines talk about the abuse of that kind of privilege as

14   an aggravating factor, that's why there is the guidelines

15   enhancement for abuse of trust for special skill.

16             And second, the loss of the license is an

17   appropriate consequence of the actions and it's not a

18   substitute for punishment.  Losing your law license is a

19   disciplinary mechanism and it's designed to protect the public

20   from corrupt lawyers, so that when they go to use a lawyer

21   they can be assured that that person is going to, in fact, act

22   in their best interest.  Given the defendant's egregious

23   ethical lapses, whether or not he was convicted of a crime in

24   this courtroom he should have lost his license for the number

25   of times that he lied to and deceived his own client.

1           And third, there is a lot of discussion in both of

2    our memorandum of the kind of caselaw around this point.  I

3    think the defendant didn't respond to a lot of the cases that

4    we cited, especially in this own courthouse, Sampson and Flom

5    where Judges Irizarry and Mauskopf talked at length about the

6    special duties owed by a lawyer and how, again, violation of

7    those duties is actually an aggravating factor.

8           The one case that was addressed was the Schulman

9    case and, again, I think we've been very straightforward that

10   we disagree with some of the language in that case, but

11   critically that case, which is also a district court case so

12   not precedential, involved a one-time lapse of judgment.  It

13   was a insider trading case where the defendant over dinner one

14   night made one statement, that was the one tip.  There was --

15   he received a small amount of money, $30,000, and that was it.

16   It was literally a crime that occurred in a 30-second time

17   period and it was the only one.  The defendant also was much

18   older and was in a much different stage of life.  And I think

19   so even setting aside our disagreement with the sort of

20   broader statement in that case, the case is strongly

21   distinguishable and the guidelines were half of what they are

22   here.  They were somewhere around 46 to 57.

23           So the bottom line, I think, is that there should be

24   no separate justice system for attorneys.  There should be no

25   special treatment.  They should be treated just as anybody

1   else and the loss of a law license is not, in and of itself, a

2   basis for a probationary sentence.

3          And the last two things I just want to touch on are

4   specific and general deterrence.  With respect to specific

5   deterrence, we feel that the defendant's sentencing submission

6   and his letter, and obviously we have not yet heard from the

7   defendant today, still demonstrates a lack of taking

8   responsibility for any of his actions.  It is one thing for a

9   defendant to maintain his innocence and preserve his appellate

10  rights, which he has every right to do, but it is quite

11  another for a defendant when faced with this multi-year record

12  of ethical violations to fail to acknowledge any mistake, any

13  lapse of judgment, any poor choices.  He knew that he owed his

14  client a duty of undivided loyalty and he violated that duty

15  repeatedly.  And while he can maintain that those did not rise

16  to the level of criminal conduct, it is hard for us that he

17  still has not admitted that those violations have occurred.

18  And I think that just speaks volumes to where the defendant is

19  in terms of understanding the mistakes that he's made.  And he

20  has gone even a step further characterizing himself as the

21  only victim of the frauds that he's committed.  His reply

22  memorandum says that the largest losses were suffered by him,

23  himself.  It's a very self-centered view.  Obviously, we have

24  a victim company.  We have witnesses who had to come for not

25  just one, but two trials, whose lives were, in fact, upended

Proceedings                                    36

1   by these frauds, whether or not any of them or some of them

2   lost money.  And I think it's significant, as we've said, that

3   even after all of this occurred and Mr. Shkreli left Retrophin

4   that the defendant continued to work with Mr. Shkreli right up

5   until the time that he was arrested at KaloBios.  So even

6   knowing everything that had happened and knowing what had

7   occurred and knowing how his client felt about what had

8   happened, he continued to work with Mr. Shkreli.

9         And then the last point I just want to touch on is

10  general deterrence, which Ms. Denerstein talked about a little

11  as well.  And I think there's been the suggestion that because

12  this case has been covered in the press and there's been a lot

13  of publicity, that that, in and of itself, is sufficient for

14  general deterrence.  You know, lawyers understand that if they

15  do the wrong thing, then they are going to be punished.  And I

16  think we take issue with that for a couple of reasons.

17        One is that the way that's been characterized by the

18  defense all the way through and including today is that sort

19  of that Mr. Shkreli was -- he was a dangerous client, as

20  Ms. Denerstein said.  He was a bad egg.  He was a bad person.

21  And Mr. Greebel had the bad luck to work with him and his life

22  has been destroyed as a result.  And it suggests that there is

23  no agency on the part of Mr. Greebel.  And that is kind of the

24  specific deterrence that I was talking about, but in terms of

25  general deterrence, the legal community is watching this case

Proceedings                                    37

1   very closely and leniency would send the wrong message, which

2   is that, you know, if you have the opportunity to follow a

3   corporate officer and to commit a crime with them, you know,

4   that you should stand up and do the right thing and live up to

5   your ethical responsibilities, that you have an obligation to

6   your client to act with full transparency and honesty and to

7   not do that is something that is deserving of punishment.

8   White collar crime is often talked about as a crime that's

9   deterrable.  First of all, general deterrence is necessary

10  because it's hard to detect, but more importantly it's a

11  rational crime.  It's not a crime of passion, it's not a crime

12  of necessity, it's a crime that can be deterred.  And a

13  non-incarceratory sentence here would send the wrong message

14  to the legal community about using your law license in this

15  way and violating your duties to your client and using it to

16  commit crimes.  And we think that it's not enough that there's

17  been publicity about the case or that there was a verdict, but

18  that a sentence of incarceration is something that truly sends

19  that message to the community.

20          So just in conclusion, the five-year sentence that

21  we've recommended we think is one that properly balances all

22  of the 3553(a) factors.  It punishes the defendant for his

23  participation in serious crimes.  It serves the goal of

24  sending a message to other professionals who may be tempted to

25  place their own interests above others who they have the duty

Proceedings                                              38

1   to protect, and shows them that they will face consequences

2   for using their privileged status to commit crimes.  It serves

3   specifically to deter the defendant who has not taken

4   responsibility.  It avoids unwarranted sentencing disparities,

5   especially with Mr. Shkreli, who was sentenced to seven years.

6           And I think we had expected to do the minor role

7   argument first, but with respect to Mr. Shkreli I think we

8   have weighed that in recommending a lower sentence.  And,

9   obviously, Mr. Shkreli bears a lot of responsibility for what

10  happened, but when we talked about the nature and

11  circumstances of the offense and the defendant's prominent

12  role and necessary role and abuse of trust and steps that he

13  affirmatively took in furtherance of those crimes, he's not

14  significantly less culpable than Mr. Shkreli of the two crimes

15  for which he's been convicted.  And we believe that our

16  sentence takes into consideration the defendant's family

17  circumstances and community services, but gives those factors

18  the weight they deserve and not the extraordinary weight that

19  the defense asked for.

20          THE COURT:  Thank you.

21          Did you have anything else to add, Mr. Brodsky, and,

22  Ms. Denerstein?

23          MR. BRODSKY:  No, Your Honor.  I think at this time

24  Mr. Greebel, Evan, would like to say a few words.

25          THE COURT:  All right, sir, I am happy to hear from

1   you, Mr. Greebel.

2           THE DEFENDANT:  Thank you for the opportunity to

3   address the Court.  I know that I speak quickly and do not

4   always properly enunciate my words.  It's worse when I'm

5   nervous.  I am going to try my best, but I apologize in

6   advance.

7           THE COURT:  No worries, just take your time.

8           THE DEFENDANT:  I want to first publicly address my

9   wife and my children and my family, as well as my friends and

10  former colleagues and clients.

11          I said this to many of you privately, but I want to

12  say it here in front of this Court, thank you.  I will never

13  be able to express to you how much your support and loyalty

14  has meant to me over the last few years.  I also want to thank

15  all of the Court personnel for all of the consideration and

16  respect they have shown to my entire family throughout this

17  trial.  And I thank Your Honor, for the care and attention

18  that Your Honor gave to this case.

19          Never in my life did I think I would be standing in

20  a federal courtroom in my own criminal sentencing proceeding.

21  The way I feel to be standing before the Court and my family

22  and friends as a convicted man defies words.  Suffice it to

23  say, that it is the deepest shame I've ever experienced in my

24  life.  I am so sorry for putting all of you through this

25  ordeal.

Proceedings                                              40

1        I understand that now Your Honor will sentence me.

2   I do not want to go to prison.  I do not want to leave my wife

3   and my three young children.  I do not want to leave my

4   elderly parents.  I am afraid what will happen to all of them.

5   And while I know Your Honor is a human being and undoubtedly

6   has compassion for my family, I also understand that you have

7   an obligation to fulfill.

8        I will regret every day of my life the day that I

9   met Martin Shkreli; however, I want to be clear, I only hold

10  myself responsible for my family's sufferings.  As I stand

11  before you now, years after these events occurred, it is still

12  so difficult for me to make sense of it all.  Starting with

13  the day I was arrested, I felt like I have been losing pieces

14  of myself.  I lost a piece of myself that day.  I lost another

15  piece of myself the day I left the practice of law.  I lost a

16  piece of myself each day that I heard people say that I

17  conspired to harm a client.  And I lost a piece of myself the

18  day the jury convicted of me of those crimes.  Whatever

19  sentence Your Honor imposes, I will lose another piece of

20  myself today.

21       My shame and sense of loss deepens every time I look

22  at my wife and children in the eye as I think about the pain,

23  suffering and humiliation that I have brought upon them.  I

24  dread the day when my children decide to search my name on the

25  Internet.  The shame and regret I feel for what my actions

Proceedings                                             41

1   have done to my wife and children is something that will never

2   go away, no matter what sentence I receive.

3            I am begging for this Court's mercy in asking Your

4   Honor with the utmost humility and respect to give me the

5   lowest possible sentence that Your Honor can impose.  I cannot

6   change the past, I can only promise Your Honor, the people,

7   and the government of the United States, my family, friends

8   and colleagues, that I am committed to leading a law-abiding

9   life, continuing to improve my community and doing the very

10  best I can to protect and care for my family.

11           Thank you, Your Honor.

12           THE COURT:  Thank you, Mr. Greebel.

13           Now, I appreciate the statements of counsel and

14  Mr. Greebel.  I do recognize that he has here in court today a

15  number of friends and family who are here in his support.

16  They appear to be too numerous to acknowledge, but I do

17  recognize many of them from the trial as parents, siblings,

18  in-laws and other close friends.

19           I have read every single one of the letters.  They

20  have, as Mr. Brodsky's suggests, given me a far more holistic

21  picture of Mr. Greebel beyond what I heard at trial and beyond

22  the verdict that the jury found when they determined that the

23  Government had proven him guilty beyond a reasonable doubt as

24  to both Counts Seven and Eight.

25           So thank you for taking the time, not only to write

Proceedings                42

1    the Court, but also to be present.

2            The pre-sentence report calculated Mr. Greebel's

3    advisory guidelines total adjusted offense level at 31.

4    Because he had no prior criminal convictions, he falls in

5    Criminal History Category I, and the corresponding advisory

6    guideline range of imprisonment is between 108 and 135 months.

7            The PSR notes that the statutory maximum sentence

8    for Count Seven is twenty years and for Count Eight is five

9    years, for a maximum total of 25 years if I were to impose the

10   sentence to run consecutively.

11           Mr. Greebel has made numerous objections to the PSR.

12   And with regard to the PSR sentencing guidelines calculation,

13   Mr. Greebel objects to application of several sentencing

14   enhancements as follows:

15           First, and probably most significantly, is the loss

16   enhancement.  Mr. Greebel objects to the PSR's use of a 20-

17   level enhancement to the offense level for a loss amount and

18   argues that there is no loss to Retrophin or, alternatively,

19   that the loss is no more than $477,329.

20           For the reasons stated below and based upon the

21   parties' submissions and the Fatico hearing and all the

22   evidence and testimony submitted during that hearing, I find

23   that Mr. Greebel has caused Retrophin a loss of $10,447,979 as

24   a result of his conduct underlying Count Seven.  Mr. Greebel

25   is also responsible for $4 million in intentional loss as a

Proceedings                                          43

1    result of his conduct underlying Count Eight.  Under Guideline

2    2B1.1(b)(1)(K), the loss falls in the range of 9.5 million to

3    25 million in losses and results in a 20-level increase in the

4    base offense level.  In reviewing the sentence of

5    Mr. Greebel's co-conspirator Mr. Shkreli, the Court utilized

6    the same loss calculation methodology to calculate the

7    $4 million loss for Count Eight in the instant case, as was

8    used in Mr. Shkreli's sentencing.

9            In Mr. Greebel's objections to the PSR and

10   elsewhere, he argued that Retrophin suffered no loss with

11   respect to Count Seven, essentially arguing that because the

12   settlement agreements and consulting agreements benefited

13   Retrophin in avoiding litigation exposure, there was no loss.

14   Mr. Greebel argued that the Government has failed to meet its

15   burden of showing a reasonably foreseeable loss with regards

16   to the settlement and consulting agreements as Mr. Greebel

17   "held a reasonable belief that the investors would bring suit

18   against Retrophin."  In doing so, Mr. Greebel intends to

19   relitigate a basic question that was resolved by the jury

20   based on substantial evidence that convicted him of Count

21   Seven, whether he engaged in a conspiracy to commit wire fraud

22   involving the fraudulent use of Retrophin's funds and assets

23   through settlement agreements and sham consulting agreements

24   with investors in the MSMB entities and, thereby,

25   intentionally caused foreseeable losses to Retrophin.

Proceedings                                              44

1   Mr. Greebel also argues that the Government has failed to
2   prove loss with regard to Count Eight, as the Government
3   failed to prove Mr. Greebel had the intent to cause loss as
4   required under the sentencing guidelines.  Mr. Greebel's
5   sentencing memorandum argues that the maximum appropriate loss
6   amount can be determined by taking the total loss to Retrophin
7   due to the settlement and sham consulting agreements and
8   subtracting $9,970,650, which defendant calculates is the
9   total exposure to Retrophin from hypothetical lawsuits that
10  might have been brought by defrauded MSMB investors.
11  Mr. Greebel challenges the loss calculation of the Probation
12  Department and the Government for Count Seven arguing that he
13  invariably believed that a settlement in consulting agreements
14  would prevent harm to Retrophin if MSMB investors sued
15  Retrophin.  Defendant further argues that the Government did
16  not prove reasonably foreseeable loss as to each agreement,
17  that the jury did not identify whether each settlement and
18  consulting agreement included in Count Seven was fraudulent,
19  and that the jury could have convicted Mr. Greebel of Count
20  Seven if only one settlement agreement or consulting agreement
21  was fraudulent.  Thus, he argues the Court cannot simply rely
22  on the jury's verdict on Count Seven to conclude that all of
23  the settlement and consulting agreements were fraudulent.
24          Finally, Mr. Greebel argues that because each
25  settlement was fact-specific and "Mr. Greebel believed that

Proceedings                45

1    each of the individuals who entered into a settlement

2    agreement with Retrophin had a colorable legal claim," the

3    Government cannot include the settlement agreements in the

4    loss calculation because the loss was not foreseeable to him.

5            As is the case here, a defendant who commits an

6    offense involving fraud or deceit will be held accountable for

7    the greater of the actual or the intended loss.  That is

8    Guideline 2b1.1 comment note 3(A).  Actual loss is defined as

9    "the reasonably foreseeable pecuniary harm that resulted from

10   the offense," and intended loss is defined as the "pecuniary

11   harm that the defendant purposely sought to inflict" and

12   includes "intended pecuniary harm that would have been

13   impossible or unlikely to occur."  The Guidelines further

14   define "pecuniary harm" as "harm that is monetary or that

15   otherwise is readily measurable in money."  "Reasonably

16   foreseeable pecuniary harm" is defined as that harm that the

17   "defendant knew or, under the circumstances, reasonably should

18   have known, was a potential result of the offense."

19           The amount of loss attributable to defendant at

20   sentencing is the loss attributable to all relevant conduct

21   for which that defendant is responsible.  Under Guidelines

22   1B1.3(a), relevant conduct at sentencing consists of:  (1)(A)

23   all acts and omissions committed, aided, abetted, counseled,

24   commanded, induced, procured or willfully caused by the

25   defendant; and (B) in the case of a jointly undertaken

Proceedings                                              46

1   criminal activity (a criminal plan, scheme, endeavor or

2   enterprise undertaken by the defendant in concert with others,

3   whether or not charged as a conspiracy), all acts and

4   omissions of others that were within the scope of the jointly

5   undertaken criminal activity, in furtherance of that criminal

6   activity, and reasonably foreseeable in connection with that

7   criminal activity.  It is Guideline 1B1.3(a), comment note 2.

8          Although the scope of an individual's relevant

9   conduct includes all criminal conduct by the defendant, aided

10  by the defendant, or that was foreseeable to the defendant,

11  under the Guidelines, a party convicted of a conspiracy is

12  only held accountable for the loss that that party, that

13  defendant, could reasonably foresee.  It is United States

14  versus Perrone, 936 F.2d 1403 et 1416, decided by the Second

15  Circuit in 1991.

16         To calculate the loss amount, a court must make a

17  reasonable estimate of the loss amount attributable to the

18  defendant's offenses.  United States versus Abiodun, 536 F.3d

19  162 et 167, decided in 2008.  At sentencing, the court must

20  determine the loss amount by a preponderance of the evidence.

21  United States versus Coppola, 671 F.3d 220 et 250 decided by

22  the Second Circuit in 2012.  However, "the sentencing court is

23  not required to calculate the amount of loss with certainty or

24  precision."  United States versus Norman 776 F.3d 67 at

25  page 79 decided in 2015.  "The sentencing court, in

Proceedings                          47

1   calculating a defendant's offense level, may estimate the loss

2   resulting from his offenses by extrapolating the average

3   amount of loss from known data and applying the average to

4   transactions where the exact amount of loss is unknown.

5   United States versus Bryant 128 F.3d 74 at page 76, decided by

6   the Second Circuit in 1997.  U.S. Sentencing Guidelines

7   Section 2B1.1.  The loss may "be based on the approximate

8   number of victims and an estimate of the average loss to each

9   victim."  United States versus Sutton, 13 F.3d 595, decided by

10  the Second Circuit in 1994.

11

12            (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Proceedings                                    48

1          THE COURT:  (Continuing) with respect to Count

2     Seven, at trial, the government presented evidence sufficient

3     to find by at least a preponderance of the evidence, that it

4     was reasonably foreseeable to Mr. Greebel that the settlement

5     agreements and sham consulting agreements used Retrophin funds

6     and/or assets to pay MSMB investors defrauded by Mr. Shkreli.

7     The loss to Retrophin due to it paying for a liability that it

8     did not incur, as Mr. Greebel acknowledged, was reasonably

9     foreseeable to Mr. Greebel.  The majority of the money and

10    shares used to fulfill the settlement and sham consulting

11    agreements were fraudulently taken directly from Retrophin.

12    Numerous Government exhibits support this view, and many of

13    those exhibits were cited in the government's submissions and

14    those exhibits were admitted at trial and considered by the

15    jury.

16          The Second Circuit, in *United States versus Studley*,

17    47 F.3d 569 at 575, decided in 1995, discussed the guidelines

18    and case law in the context of "jointly undertaken criminal

19    activity" and noted that the Court may consider the following

20    factors:  First, any explicit or implicit agreement fairly

21    inferred by the defendant and others.  Here, there was

22    abundant evidence that defendant and Mr. Shkreli and Mr.

23    Panoff discussed using Retrophin assets and money to placate

24    MSMB investors.  Factors two and three, articulated by

25    *Studley*, whether the Defendant assisted in designing and

Proceedings                                49

1   executing the illegal scheme and the role of the defendant in

2   that scheme.  Here, the defendant not only drafted the

3   agreements, he advised that the consulting agreements could be

4   used to avoid issues with the auditors, who were raising red

5   flags when they detected the settlement agreements in or about

6   late July or early August.  Fourth, whether the participants

7   pooled profits and resources or whether they worked

8   independently.  Here, although none of the participants

9   actually profited because their goal was to defraud Retrophin

10  and avoid liability for Mr. Shkreli, they did not work

11  independently, but rather in close coordination.  The Court

12  finds that the loss amount that resulted from Mr. Greebel's

13  participation in Count Seven, that was reasonably foreseeable

14  to him from the settlement agreements and sham consulting

15  agreements, is approximately $10,447,997.  Many of those

16  settlement agreements and the consulting agreements used the

17  same pattern, the same language, the same machinations to move

18  assets from Retrophin to the settling MSMB investors.  The

19  Court finds that more than a preponderance of the evidence

20  established that Mr. Greebel, in furtherance of the conspiracy

21  charged in Count Seven, participated or aided in the execution

22  of the settlement and consulting agreements and that he was

23  directly involved in distributing 2.4 million Fearnow shares

24  to associates of Mr. Shrekli, and using those shares to pay

25  MSMB investors pursuant to those settlement and consulting

Proceedings                    50

1   agreements and to funnel some of those shares back to Mr.

2   Shkreli directly.  All of this was foreseeable to Mr. Greebel

3   and was in furtherance of the charged conspiracy.  The amount

4   is calculated by adding the value of money taken directly from

5   Retrophin's bank accounts and the value of shares transferred

6   from Retrophin to MSMB investors via their settlement and

7   consulting agreements.

8          Mr. Greebel supposes an alternate loss calculation

9   for Count Seven resulting in losses of $477,329 in losses.  By

10  deducting from the total loss that defendant caused from the

11  settlement agreements and sham consulting agreements, the

12  $1,107,850 in fees that Ms. Klein, defendant's Fatico Hearing

13  settlement expert calculated for the cost of defending one

14  litigation, multiplied by the nine potential lawsuits, would

15  result in a lower loss amount.  Essentially, Mr. Greebel seeks

16  to calculate the loss as though the settlement agreements were

17  legitimate and not fraudulent.  This is not supported by the

18  evidence in the record.

19         First, Mr. Greebel, acknowledged, in the Control

20  Memo that he drafted, that Mr. Shkreli and the MSMB entities,

21  not Retrophin, were responsible for paying the settlement and

22  consulting agreements arising from the MSMB investors to

23  satisfaction.  There is no evidence in the trial record that

24  Mr. Greebel ever considered a threat of litigation against

25  Retrophin.  That evidence, and we looked for it carefully,

1  does not exist in the record.  Contrary to defense counsel's

2  argument, the trial evidence established that Mr. Greebel

3  never advised the Retrophin board of any litigation threats

4  against Retrophin, a duty that as outside counsel he was

5  particularly charged with fulfilling.  Moreover, there was

6  trial evidence that Mr. Greebel never discussed or sought

7  approval for the MSMB investors' settlement agreements.  Mr.

8  Greebel helped prepare Retrophin's 2013 10-Q filing for the

9  second quarter of 2013, which described the settlement

10  agreements as a series of agreements involving a related

11  party, but did not identify in the forms to the public the

12  related party as MSMB, nor did the form identify the purpose

13  for recipients of the settlement agreements.  That is

14  Government Exhibit 247, the transcript at pages 1922 to 1926.

15  The jury rejected the defense counsel's argument at trial that

16  the limited and misleading statements about the settlement

17  agreements in the SEC filings informed the Board of Directors

18  of the nature of the agreements.  The 10-Q also stated that

19  "Retrophin has no material proceedings pending, nor are we

20  aware of any pending investigation or threatened litigation by

21  any third party."  That is contrary to the defense theory that

22  Mr. Greebel considered litigation threat.  As outside counsel

23  for Retrophin, Mr. Greebel did not disclose any known or

24  threatened litigation by a third party in the Retrophin 10-Q

25  or to the Board.  On May 31, 2013, Mr. Greebel's firm, Katten,

Proceedings                                      52

1   issued a letter to Marcum, as auditors of Retrophin, stating

2   that from January 1, 2012 to May 31, 2013, the firm had not

3   worked on "any material loss contingencies" relating to

4   "overtly pending or threatened litigation."  Government

5   Exhibit 124-2.  And on July 24, 2013, Mr. Greebel stated to

6   Mr. Panoff that no material litigation events had occurred

7   since the last update to the 10-K.  Government Exhibit 124-3.

8            Further, there is abundant evidence in the record

9   that the parties to the settlement agreements and consulting

10  agreements either did not threaten litigation, or at least did

11  not do so until Mr. Shkreli failed to fulfill his promises to

12  redeem the MSMB investor shares or otherwise compensate them

13  for their investments in the MSMB funds.  In fact, as detailed

14  in the Court's order denying Mr. Greebel's Rule 29 and Rule 33

15  Motions, multiple settlement recipients testified that they

16  had never threatened to take action against Retrophin.  The

17  trial transcript at page 2017 to -- I'm sorry, 2716 through

18  2717 indicates that Richard Kocher testified that although the

19  agreement released any claim against Retrophin, he did not

20  have any claims against Retrophin and had not threatened to

21  sue Retrophin and had not directed his lawyer to sue

22  Retrophin.

23           At page 1489 of the trial transcript, Sarah Hassan

24  testified that she never threatened to sue Mr. Shkreli and was

25  surprised to see a settlement agreement drafted by Mr. Greebel

Proceedings                                                        53

1    that included Retrophin.  Her attorney removed Retrophin from

2    the agreement drafted by Mr. Greebel, but Mr. Greebel

3    reinserted the reference to Retrophin.  The trial transcript,

4    at page 3638 through 3646, shows that Darren Blanton testified

5    that he never threatened to sue Retrophin.  The trial

6    transcript at page 2909 through 2911 indicates that David

7    Geller testified that he did not threaten to sue Mr. Shkreli,

8    MSMB or Retrophin, until almost a month after the settlement

9    agreement drafted by Mr. Greebel was executed, when Mr.

10   Shkreli failed to meet the settlement obligations.

11           In addition, in the trial evidence was Government

12   Exhibit 106-27, an e-mail from Mr. Geller to Mr. Shkreli, on

13   June 12, 2013, stating that he would "pursue all means to

14   fulfill the settlement agreement," and that "there are plenty

15   of lawyers who will take this case on a contingency basis."

16   There is no reference that he intended to include Retrophin.

17           Further, there is no evidence in the record that Mr.

18   Greebel's belief that there was commingling of assets between

19   the MSMB funds and Retrophin affected his decision to draft

20   the settlement agreements.  The Court addressed Mr. Greebel's

21   claims in this regard in its August 14, 2018 Order denying Mr.

22   Greebel's Rule 29 and Rule 33 Motions.  And that's at page

23   127, note 26 of my Order.  Indeed, the Court requested

24   specific evidence Mr. Greebel considered veil piercing and

25   alter ego on April 13, 2018.

Proceedings                54

1        In addition, the transcript at page 8813, in

2    response to counsel's assertion that commingling was

3    definitely part of Mr. Greebel's state of mind in 2013, the

4    Court explained that with regard to this argument, "the key

5    that you are missing is that there isn't evidence about what

6    was in Mr. Greebel's head."  Evidence that MSMB and Retrophin

7    assets were commingled is not evidence that Mr. Greebel

8    believed that Retrophin was vulnerable to suit through an

9    alter ego or veil-piercing theory.

10        Finally, Mr. Greebel cites to expert testimony by

11    Gayle Klein at the Fatico Hearing to support his argument that

12    Retrophin would have been responsible for a portion of the

13    settlements.  Ms. Klein is a litigation partner at McKool

14    Smith and relied on her twenty years of experience as

15    litigator to estimate general costs of a "typical" litigation

16    and her own personal experience drafting settlement

17    agreements.

18        The Court was not persuaded by Ms. Klein's testimony

19    as to her evaluation of a litigation release.  Even assuming,

20    contrary to the trial evidence, that any of the MSMB investors

21    would have sued Retrophin, it is not likely that any of the

22    lawsuits would have proceeded to trial and incurred $1.1

23    million in litigation costs for each lawsuit.  As the

24    government points out in its sentencing memorandum, Ms. Klein

25    testified on cross-examination that 98 percent of civil cases

Proceedings                                                    55

1    settle, making it likely that none of the hypothetical cases

2    against Retrophin would have gone to trial.  Moreover, Ms.

3    Klein's estimate did not factor in any settlement at any stage

4    of any imagery lawsuit, or any insurance that would likely

5    cover litigation costs.  Nor did Ms. Klein account for any

6    litigation recovery that Retrophin could achieve by suing Mr.

7    Shkreli for fraud.  The Court accords Ms. Klein's little, if

8    any, weight.  To extrapolate the cost of a full trial in lieu

9    of fraudulent settlement agreements and to assert that

10   Retrophin received the benefit of avoiding multiple trials,

11   when there is evidence that only one MSMB investor admitted at

12   trial that he considered litigation against Retrophin, strains

13   credulity.  The trial evidence summarized by the Government

14   and in the PSR at paragraph 39 establishes loss amounts that

15   were foreseeable to Mr. Greebel by a preponderance of the

16   evidence in the amount of $10,447,979.  I note particularly

17   that the Yaffe agreement, listed on page 15 of the PSR, is not

18   included in the Court's calculations.  And I don't believe it

19   was included in the government's calculations, either, given

20   the government's acknowledgment that it was not going to

21   present evidence of the Yaffe agreement.

22          With respect to Count Eight, as supported by the

23   evidence at trial and during the Fatico Hearing, defendant was

24   convicted of conspiracy to commit securities fraud due to his

25   role in the negotiation and structure of the reverse merger

Proceedings                                    56

1    with Desert Gateway in which Retrophin purchased, among other

2    things, 2.5 million free-trading shares, the allocation of the

3    free-trading to Mr. Greebel's friends and associates, and

4    assisting Mr. Shkreli with controlling those shares, and

5    concealing the control of almost all of the free-trading

6    shares of Retrophin, also known as the Fearnow shares.

7            The government's proposed estimate of intended loss

8    on Count Eight is appropriate, reasonable and practicable

9    under the circumstances and supported by a preponderance of

10   the evidence, as provided in Guideline 3B-1.1 at application

11   Note 3(F)(ix).  The government reasonably estimates the loss

12   that was foreseeable to Mr. Greebel as approximately $4

13   million, which represents the difference between the valuation

14   of the average artificial high price of $5 per Retrophin share

15   on the open market due to the conspiracy between December 17,

16   2012 through February 13, 2013, and the $3 per share price of

17   the shares paid by PIPE investors.  Multiplying the $2

18   differential by the 2 million shares controlled by Mr. Greebel

19   and Mr. Shkreli results in a reasonable and practical loss

20   estimate of $4 million.  Mr. Greebel and Mr. Shkreli attempted

21   to control the trading of shares by Mr. Pierotti and the other

22   hand-selected Fearnow shareholders to prevent depression of

23   the stock price during the PIPEs in early 2013.  In their

24   scheme to control the price of the free-trading shares, the

25   defendants, as the government explains, together with others,

1   demonstrates that Mr. Greebel was aware that Mr. Shkreli was

2   concerned about the falling price of Retrophin shares and the

3   need to maintain a $5 share price during the critical PIPE

4   offerings in January and February 2013.  Moreover, defendant's

5   own expert, Dean Ferrulo confirmed that the stock price is

6   important to a PIPE investor's assessment of the value and

7   benefits of a PIPE investment.  That was testimony at the June

8   18 Fatico Hearing at pages 274 to 275.  The Court agrees with

9   the Government and Probation that the 2 million Fearnow shares

10  are the proper basis for measuring loss because they are the

11  very shares that the defendant and Mr. Shkreli and others

12  tried to being make it look like free-trading shares in the

13  market when, in fact, they were controlled by Mr. Shkreli and

14  were not traded.  As the Fearnow shares were the proxy and the

15  mechanism for the fraud, they are an appropriate basis to

16  measure loss.

17          I next turn to restitution.  The PSR calculates and

18  recommends restitution to Retrophin in the amount of

19  $10,447,979.  That is the amount of loss to Retrophin for

20  which Mr. Greebel is accountable.  Mr. Greebel objects to the

21  restitution, arguing that the government failed to meet its

22  burden of establishing that Retrophin was a victim

23  contemplated under the Mandatory Victims Restitution Act, and

24  also failed to prove that the loss calculated by the

25  government was an offense against property.  Defendant cites

Proceedings                                              58

1    the recent Supreme Court case in *Lagos versus the United*
2    *States*, 138 Supreme Court 1684, at page 1689 decided in 2018.
3    Based on *Lagos*, he argues that the term victim "necessarily
4    excludes corporate entities."  Mr. Greebel also argues that a
5    $2,452,373 State Court judgment obtained by Retrophin against
6    the MSMB entities, based on the indemnification agreement that
7    Mr. Greebel himself crafted with the intention that Retrophin
8    would simply write off any loss, should be deducted from the
9    restitution to which Retrophin is entitled.  This argument is
10   respectfully rejected because there is no evidence that the
11   judgment has been paid or will be paid.  Mr. Greebel also
12   argues that a release entered into between Katten and
13   Retrophin in 2016, "in which Retrophin released Katten and all
14   present partners, which would also include Mr. Greebel, from
15   any and all claims" precludes restitution.

16          Under the Mandatory Victims Restitution Act,
17   restitution is mandatory for crimes involving an offense
18   against property under this title, including any offense
19   committed by fraud or deceit in which an identifiable victim
20   or victims has suffered a pecuniary loss; 18 United States
21   Code, Section 3363A(c)(1)(A)(ii), and 3363(A)(c)(1)(B); see
22   also *United States versus Batista*, as 575 F.3d 226 at page
23   230, decided by the Second Circuit in 2009.

24          Courts have consistently held that the offenses of
25   wire fraud and wire fraud conspiracy are offenses against

Proceedings                                    59

1    property that are committed by fraud or deceit, such that

2    restitution is mandatory under the Mandatory Victims

3    Restitution Act if such criminal conduct results in a

4    pecuniary loss to an identifiable victim.  *United States*

5    *versus Donaghy*, 570 F.Supp 2d 411, decided by a judge in this

6    district in 2008, and affirmed in *United States versus*

7    *Batista,* 575 F.3d 226 in 2009.  There, the Second Circuit

8    noted conspiracy to commit wire fraud, in violation of 18

9    U.S.C. Section 1349, is an offense against property within the

10   meaning of the MVRA because it is an offense committed by

11   fraud or deceit.  In *United States versus Kinny*, 610 Federal

12   Appendix 49 at 51 to 52, decided by the Second Circuit in

13   2015, the Court noted, under the terms of the MVRA,

14   restitution for Lancia's single count of wire fraud

15   encompasses all losses arising from his criminal conduct in

16   the course of the fraudulent schemes charged in that count,

17   and in *United States versus Quatrella*, 722 Federal Appendix 64

18   at page 69, decided by the Second Circuit in 2018, the Court

19   held that an award of restitution under the MVRA was proper

20   where the offense against property was wire fraud.

21          Defendant's assertion that the MVRA's definition of

22   victims necessarily excludes corporations is based on a

23   misinterpretation of the text of the MVRA and Supreme Court

24   precedent.  Defendant cites the MVRA's reference to victims

25   under the age of 18 and the omission of corporations in the

Proceedings                                                    60

1    MVRA's legislative history as proof that corporations are not

2    contemplated as victims under the MVRA.  However, the United

3    States Criminal Code -- I'm sorry, however, the United States

4    Code at Title 1, Section 1, provides that "in determining the

5    meaning of any Act of Congress, unless the context indicates

6    otherwise, the words person and whoever include corporations,

7    companies, associations, firms, partnerships, societies and

8    joint stock companies, as well as individuals."  The fact that

9    the MVRA makes special provision for child victims does not

10   preclude its application to non-child and non-human victims.

11   Moreover, the case defendant cites in support of the

12   inapplicability of the MVRA actually involves an award of

13   restitution under the MVRA to General Electric, a corporation,

14   and forecloses the defendant's argument that Retrophin's

15   corporate status excludes it from restitution as a victim.  In

16   *United States versus Lagos*, the defendant pleaded guilty to

17   wire fraud in connection with his scheme to defraud a lender.

18   After restitution was ordered pursuant to the MVRA, the

19   defendant challenged the portion of the restitution order that

20   required the defendant to reimburse General Electric for the

21   costs of its private investigation and legal fees and other

22   costs in the matter.  The challenged Fifth Circuit's opinion

23   -- the defendant challenged and -- challenged the district

24   court and brought the matter to the Fifth Circuit.  The Fifth

25   Circuit explained that the district court ordered the

Proceedings                    61

1   defendant to pay General Electric $15,970,000 in restitution.

2   On appeal, the defendant challenged the portion of the

3   restitution order not because it was ordered in favor of

4   General Electric, but rather because parts of the restitution

5   related to the costs of General Electric's private

6   investigation, including legal and consulting fees, which the

7   Supreme Court acknowledged totaled approximately $5 million.

8   The petitioner did not challenge the balance of over $10

9   million awarded to GE under the MVRA.  The Supreme Court

10  concluded that the defendant was not obligated to pay the

11  portion of restitution to GE that related to the costs of GE's

12  private investigation, including legal and consulting fees,

13  but left intact the remainder of the award to GE.  As such,

14  the Supreme Court's determination upheld the payment

15  restitution under the MVRA to General Electric, a corporate

16  entity, except to the extent it represented expenditures for

17  private investigation of the fraud upon which the MVRA award

18  was predicated.  In the Second Circuit, corporations are

19  regularly found to be victims under the MVRA and are entitled

20  to restitution.  In *United States versus Finazzo*, 850 F3d 94

21  at page 116 to 119, the Second Circuit in 2017 found that the

22  MVRA allowed for recovery of restitution by a corporation.  In

23  *United States versus Simmons*, 544 Federal Appendix 21 at pages

24  22 to 23, decided by the Second Circuit in 2013, the Court

25  found two corporations to be victims eligible for restitution

Proceedings                                            62

1   under the MVRA.  And the same is true in *United States versus*

2   *Zangari*, 677 F.3d 86 at page 97, decided by the Second Circuit

3   in 2012, they are upholding restitution to victim banks.

4   Defendant's position regarding corporate victims and their

5   entitlement to restitution has no basis in law, and the Court

6   respectfully overrules his objection that Retrophin is not a

7   victim entitled to restitution under the MVRA.

8           Additionally, the alleged Katten Release does not

9   release Mr. Greebel of his responsibility to pay restitution.

10  Even though Retrophin has not undertaken any legal action

11  against Mr. Greebel, it is a proper recipient of mandatory

12  restitution pursuant to the MVRA.  Retrophin, and not the

13  government, executed the limited release.

14          Further, even if Retrophin renounced the restitution

15  funds, Section 3663A requires restitution regardless of the

16  consent of the victims.  And as we know, it is the United

17  States that bears primary responsibility for collecting

18  restitution, even on behalf of non-governmental victims.

19          A district court may -- indeed must -- impose orders

20  of restitution on defendants convicted of crimes identified in

21  the MVRA even if their victims decline to receive restitution.

22  To hold otherwise would be inconsistent with the MVRA's

23  statutory scheme of mandatory restitution, and it would

24  undermine the power of the criminal justice system to punish

25  defendants, where appropriate, through orders of restitution.

Proceedings                                    63

1    *United States versus Johnson*, 378 F3d 230 at page 245, decided

2    by the Second Circuit in 2004, and citing *United States versus*

3    *Brown*, 744 F.2d 905 at page 909, decided in 1994.  Restitution

4    may be paid to the government's Crime Victims Fund, or

5    elsewhere, if the victim is not willing to accept restitution.

6            (Continued on following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    64

1   (Continuing)

2        THE COURT:  As defendant's argument against

3   restitution are not supported by the facts in the record, or

4   by the law, defendant's arguments are respectfully denied.

5   Retrophin is entitled to restitution in the amount of the loss

6   it suffered from defendant's conspiracy to commit wire fraud,

7   specifically $10,447,979.

8        Defendant objects to the PSR's application of a two-

9   point "sophisticated means" enhancement under Guideline

10  2B1.1(b)(10)(C).  Under that guideline, the "sophisticated

11  means" enhancement is applicable if "the offense involved

12  sophisticated means and the defendant engaged in or caused the

13  conduct constituting the sophisticated means."  Mr. Greebel's

14  conduct satisfies both factors.  That is, the use of

15  sophisticated means and the defendant's utilization in the

16  sophisticated means and causing the conduct.  The Sentencing

17  Guidelines define "sophisticated means" as "especially complex

18  or especially intricate offense conduct pertaining to the

19  execution or concealment of an offense," Guideline

20  2B1.1(b)(10) comment note 9(B).  I respectfully disagree with

21  the defendant's argument that his offense conduct was neither

22  complex nor sophisticated and that all securities fraud and

23  wire fraud convictions are vulnerable to this enhancement.

24  With regard to Count Seven, Mr. Greebel used his position, his

25  special position as a licensed attorney for Retrophin in the

Proceedings                           65

1   conspiracy to commit wire fraud against his client by

2   drafting, negotiating and executing a series of settlement

3   agreements and sham consulting agreements that were used to

4   obtain Retrophin's shares and money to satisfy the obligations

5   of Mr. Shkreli and the MSMB entities, and to conceal the

6   transactions from the Retrophin board, its auditors and the

7   investing public.  Retrophin funds were used to repay the

8   investors of MSMB Capital and MSMB Healthcare, to conceal the

9   conduct of Mr. Shkreli charged in Counts One through Six of

10  the Superseding Indictment.  Mr. Greebel concealed the true

11  nature of the settlement and sham consulting agreements from

12  the Board, its external auditors, and the public and, indeed,

13  his own law firm partner, Michael Rosensaft.  Mr. Greebel

14  suggested and then drafted sham consulting agreements to

15  Mr. Shkreli as a means to continue the transfer of assets from

16  Retrophin to MSMB investors and avoid scrutiny and concern of

17  Retrophin's auditors.  Together with other conspirators,

18  Mr. Greebel also utilized the Fearnow shares held by

19  designated associates of Mr. Shkreli who had paid nominal

20  amounts for their shares despite Retrophin 's purchase of

21  those very same shares in the reverse merger of Desert

22  Gateway.

23          With regard to Count Eight, defendant conspired with

24  Mr. Shkreli and others to obtain and selectively distribute

25  and control $2.4 million free-trading shares in a reverse

Proceedings                                    66

1    merger between Retrophin and Desert Gateway, in part to permit

2    Mr. Shkreli to acquire control over those free-trading shares

3    referred to at trial at Fearnow shares.  Mr. Greebel and

4    Mr. Shkreli attempted to control those shares held nominally

5    by Mr. Shkreli's designees, who had received those shares for

6    nominal amounts well below any conceivable market price,

7    through a series of transactions in which the Retrophin shares

8    were purchased at nominal cost and distributed by the transfer

9    agent, at Mr. Greebel's direction, to a select group of

10   individuals at their home addresses or, indeed, to

11   Mr. Greebel's address.  There was a conscious effort not to

12   send those shares to the Retrophin address.  The shares were

13   then transferred at Mr. Shkreli's and Mr. Greebel's discretion

14   from Fearnow shareholders to disgruntled MSMB investors and to

15   Mr. Shkreli, himself.  Mr. Shkreli and Mr. Greebel carefully

16   orchestrated the distribution of the shares to the

17   shareholders, the Fearnow shareholders, and the subsequent

18   transfer of shares using sophisticated means to avoid

19   detection of the connection between the MSMB investors,

20   Retrophin and the straw purchasers.  These complex

21   transactions by Mr. Greebel and his co-conspirators qualify as

22   "sophisticated means."

23         Defense counsel objects to an enhancement for

24   sophisticated means asserting that the enhancement is only

25   appropriate where there is "an especially complex or

Proceedings                                67

1   especially intricate offense conduct pertaining to the

2   execution or concealment of an offense."  He further asserts

3   under Application Note 9 of Guideline 2b1.1, the application

4   of the enhancement is appropriate when defendants use

5   fictitious or offshore accounts to hide assets or transactions

6   or purposely divide unlawful conduct among different

7   jurisdictions.  The list in Application Note 9 is not

8   exhaustive and the Court finds that the complex ongoing and

9   intricate transactions employed by Mr. Greebel constitute

10  sophisticated means.

11         The pre-sentence report applies, and Mr. Greebel

12  also objects to, a two-point enhancement to Sentencing

13  Guideline Section 3B1.1(a) because the Probation Department

14  concluded that Mr. Greebel "abused a position of public or

15  private trust, or used a special skill, in a manner that

16  significantly facilitated the commission or the concealment of

17  the offense."  Pursuant to Guideline 3B1.3.

18         Mr. Greebel argues that he is entitled to a

19  two-point reduction because he was irrefutably a minor

20  participant in the criminal activity in Counts Seven and

21  Eight.  In support of his argument that the abuse of trust

22  enhancement should not apply, Mr. Greebel asserts that the

23  evidence has not demonstrated that the defendant possessed

24  unsupervised professional or managerial control.  Citing

25  United States versus Capoccia, 247 Federal Appendix 311 et

Proceedings                                          68

1   311, decided by the Second Circuit in 2007 and quoting

2   Guideline 3B1.3 comment 1.  He asserts that he used the

3   discretion and control entrusted to him by his victim to

4   commit the offense.  <u>United States versus Broderson</u>, 67 F.3d

5   452, 456 decided by the Second Circuit in 1995.  Defendant

6   argues that the Government has failed to demonstrate the

7   above, and has not shown that he used his position as counsel

8   to significantly facilitate the commission or concealment of

9   the offense.

10          I find that the "abuse of trust" enhancement applied

11  in this case is appropriate.  The evidence at trial

12  established abundantly that the defendant occupied a position

13  of trust with respect to his client, Retrophin, here the true

14  victim, and owed a fiduciary duty to Retrophin as its outside

15  counsel.  In <u>C.I.R. versus Banks</u>, 543 U.S. 426, 436 decided by

16  the Supreme Court in 2005, the Supreme Court noted that, "The

17  relationship between the client and attorney, regardless of

18  the variations in particular compensation agreements or the

19  amount of skill and effort the attorney contributes, is a

20  quintessential principal agent relationship."  The restatement

21  (Second) of Agency at Section 1 comment e, states similar

22  principles.  In addition, Dean Ferrulo, called to testify as

23  an expert by Mr. Greebel during the June 18, 2018 Fatico

24  hearing, stated that outside counsel to a company owes the

25  company a duty of loyalty.  The evidence established that

Proceedings                                              69

1   Mr. Greebel occupied a position of trust at Retrophin, and

2   Retrophin's Board members trusted and relied on him to act in

3   Retrophin's best interests.  Two Board members, Steven

4   Richardson and Stephen Aselage, testified that they relied on

5   Mr. Greebel for legal advice and trusted that he would

6   disclose the necessary relevant information to them.  Trial

7   transcript 1921 through 1922, 1965 through 1968, 2072 to 73;

8   and 2594, that's the Richardson testimony, and 4408 to 09 and

9   4580, explaining that Mr. Aselage relied on Mr. Greebel's

10  expertise and his integrity.  The Guidelines identify

11  "lawyers" as individuals with "special skill not possessed by

12  members of the general public and usually requiring

13  substantial education, training or licensing."  Guideline

14  3B1.1, comment note 4.

15         Mr. Greebel prepared settlement and consulting

16  agreements knowing that these agreements would result in

17  substantial financial losses to his client Retrophin.  In so

18  doing, Mr. Greebel not only abused and violated Retrophin's

19  trust and his obligations as its outside counsel, but he

20  utilized his special legal skills and experience.  As

21  reflected in the trial evidence, Mr. Greebel was aware of his

22  obligations as Retrophin's outside counsel to act in his

23  client's best interest.  He used his position of trust to

24  conceal facts underlying the settlement agreements and sham

25  consulting agreements from the Board on multiple occasions.

Proceedings                                          70

1    When the auditors discovered and reported the settlement

2    agreements to the Retrophin board, Mr. Greebel drafted a

3    control memo acknowledging that Retrophin was not responsible

4    for compensating the MSMB investors.  He also drafted and

5    caused to be executed by the MSMB entities and Mr. Shkreli,

6    indemnification agreements and promissory notes in favor of

7    Retrophin, but Mr. Greebel privately assured Mr. Shkreli that

8    Retrophin could merely write off the obligations if they were

9    not honored.  At the time, in August 2013, Mr. Greebel had

10   been aware that the MSMB entities were defunct and lacked the

11   ability to pay, but new at the same time that Mr. Shkreli was

12   capable of doing so, yet he protected Mr. Shkreli at the

13   expense of his client.

14          With respect to Mr. Greebel's request for a minor

15   role reduction, Mr. Greebel bears the burden of establishing

16   by a preponderance of the evidence that he was a minor

17   participant.  United States versus Brunshtein, 344 F.3d 91 at

18   page 102, decided by the Second Circuit in 2003.  Mr. Greebel

19   has not carried his burden, where, as described above, the

20   evidence established that Mr. Greebel was critical and an

21   equal participant in the furtherance of the intricate

22   conspiracies charged in Count Seven and Count Eight.

23   Accordingly, the Court respectfully denies Mr. Greebel's

24   request for a minor role reduction.

25          In addition to the above, Mr. Greebel also makes

SAM       OCR       RMR       CRR       RPR

1    numerous objections to statements regarding his offense

2    conduct as reported in the PSR.  The majority of Mr. Greebel's

3    objections are argument regarding facts clearly established at

4    trial or otherwise argued by Mr. Greebel and the Government in

5    the parties' post-trial submissions and hearings on loss,

6    forfeiture and in the defendant's Rule 29 and 33 motions.  To

7    the extent that Mr. Greebel's objections or factual assertions

8    merely reiterate those same arguments or argue for a different

9    interpretation of the facts already presented to and decided

10   by the jury at trial, or in the Order denying Mr. Greebel's 29

11   and Rule 33 motions, or are merely argument, the paragraphs in

12   the PSR will remain unchanged.  For the foregoing reasons, the

13   Court denies Mr. Greebel's objections to the following

14   numbered paragraphs:  5, 7, 8 through 21, 23, 24, 26 through

15   30, 32, 33, 36 through 38, 39, 41, 44 through 47, 51 and 54.

16   Paragraph 53 regarding restitution and loss is addressed

17   above.  Paragraph 55 addressing defendant's request for a

18   minor role reduction has also been addressed.  Probation has

19   incorporated Mr. Greebel's factual objections and corrections

20   in paragraphs 77, 81, 82, 83, 85, 105 and 108 in the first

21   addendum to the PSR and the Court accepts and incorporates

22   those changes.

23          Paragraph 6 of the PSR provides a factual

24   description of the background related to the charged offense

25   conduct.  Mr. Greebel objects on the basis that references to

Proceedings                                              72

1   Mr. Shkreli and Marek Biestek are irrelevant.  Mr. Greebel

2   also asks that the paragraph include additional information

3   regarding Mr. Greebel's lack of signatory authority.  The

4   Court finds that the facts provided in paragraph 6 are

5   relevant as they provide the necessary background to

6   understand the offense conduct in this case, and in so doing,

7   necessarily and accurately reference Mr. Shkreli and

8   Mr. Biestek.

9          Mr. Greebel also objects to the description of

10  Mr. Shkreli's position at Retrophin in paragraph 6.  The

11  Government does not object to noting that Mr. Shkreli served

12  as the CEO for Retrophin, LLC, a private company, which was

13  the predecessor to Retrophin, Inc., between February 2011 and

14  September 2012.  Accordingly, the Court incorporates the

15  details regarding Mr. Shkreli's additional roles and the times

16  he served in them as amendments to paragraph 6 of the PSR.

17         Paragraph 22 draws Mr. Greebel's disagreement with

18  the proposed loss calculation, and asserts the mention of Elea

19  Capital should be stricken.  As noted, the Government has

20  agreed, and the Court has not considered, any references to

21  the Elea Capital investment and the recovery by Lee Yaffe.

22  Those numbers are not included in loss calculation.  The

23  particular notation and reference to Mr. Yaffe or Elea Capital

24  is stricken insofar as it appears in the PSR.  The loss

25  calculation remains unchanged because it never included Elea

Proceedings                                        73

1   and Mr. Yaffe's recovery.

2           In paragraph 25 Mr. Greebel asks the PSR incorporate

3   a statement that Dr. Rosenwald and others threatened, in words

4   and substance, to file a lawsuit against Retrophin, as well as

5   the MSMB entities and Mr. Shkreli.  The Court acknowledges the

6   following testimony of Mr. Rosenwald at page 3495 of the trial

7   transcript:

8           Question:  You threatened to bring litigation in

9   February of 2013, correct?

10          Answer:  Correct.

11          Question:  You threatened to sue Mr. Shkreli, MSMB,

12  Retrophin, all of them, correct?

13          Answer:  Correct.

14          The Probation Department amended paragraph 25 as

15  follows:

16          The following sentence is inserted after the second

17  sentence of paragraph 25 of the PSR:

18          "In addition, defrauded investor Lindsay Rosenwald

19  threatened, in words and substance, to file a lawsuit against

20  Retrophin, the MSMB entities and/or Mr. Shkreli."  That is the

21  addendum at page 2.

22          I accept this additional fact to paragraph 2 that

23  one investor did admit at trial that he threatened Retrophin

24  with litigation.

25          Mr. Greebel objects to paragraph 35 because he

Proceedings                                          74

1    "disagrees with the assumption in the PSR relating to the

2    defendant's legal obligations to overrule Mr. Shkreli's

3    decision about whether to raise the consulting agreement with

4    Mr. Blanton to the Board."  The PSR states:  "Shkreli and

5    Greebel, who participated in all relevant Board meetings,

6    never presented Blanton's sham consulting agreement to the

7    Board for discussion or approval."  I find this statement is

8    factually supported by the record and I, therefore, deny

9    Mr. Greebel's request to strike it.

10            With regard to Mr. Greebel's additional objection to

11   paragraph 35 regarding the evidence before the Board related

12   to Al Geller's consulting agreement and the shares that

13   Mr. Geller received from Mr. Shkreli, I accept and adopt the

14   modified language proposed by the Government as it accurately

15   reflects the facts in the record and incorporates

16   Mr. Greebel's assertion about certain Retrophin shares

17   transferred to Mr. Geller.  So paragraph 35 will be modified

18   with an addition as follows:

19            "And while a draft of Al Geller's sham consulting

20   agreement was circulated to the Board, members of the

21   Retrophin board testified at trial that such agreement was

22   never discussed or approved by the Board; however, in an

23   e-mail to Alan Geller, the defendant relayed that the Board

24   had discussed and approved the agreement.  Furthermore,

25   Shkreli and Greebel concealed from the Board that the purpose

Proceedings                                                    75

1   of the consulting agreement was to resolve Alan Geller's

2   complaints about his MSMB Healthcare investment.  And

3   continuing:  "At the same time that the defendant and Shkreli

4   forced Retrophin to enter into a sham consulting agreement

5   with Alan Geller, the defendant and Shkreli also arranged for

6   Shkreli and Alan Geller to enter into an option agreement

7   drafted by Mr. Greebel whereby Shkreli would sell 300,000 of

8   his own Retrophin shares directly to Alan Geller."

9           At paragraph 84, the Probation Department

10  incorporated additional details regarding two of Mr. Greebel's

11  children's verified evaluations of medical conditions in the

12  first addendum to the PSR.

13          Paragraph 87 drew an objection from Mr. Greebel to

14  the description of his home as "neatly maintained and

15  furnished" because he contends that his home is "in disrepair"

16  and has "leaks."  As the Government notes, "The description of

17  the defendant's home in paragraph 87 is based on the home

18  visit conducted by Probation several months ago" and "the

19  defendant does not contend that these observations are

20  inaccurate."  The Probation Department has incorporated the

21  defendant's statements regarding the leak into the first

22  addendum to the PSR insofar as the PSR is revised to reflect

23  that defendant provided photos of water damage to the attic,

24  basement and a bedroom wall at the defendant's home.  However,

25  neither the Court nor the Government can evaluate the

Proceedings                                      76

1    defendant's statement that he has insufficient finances to

2    repair the leaks to his home as his financial disclosures to

3    the Court through the Probation Department is incomplete and

4    he continues to challenge the evaluation of his financial

5    circumstances by the Probation Department.  Probation also

6    declined to incorporate Mr. Greebel's assertion regarding his

7    financial condition.  The Court agrees that the defendant's

8    assertion regarding his finances cannot be accepted without a

9    complete sworn financial statement.

10          Paragraph 88 has been amended in the first addendum

11   to the PSR to reflect that Mr. Shkreli was helping children

12   with orphan diseases.  To the extent that the paragraph

13   reflects Mrs. Greebel's characterization of Mr. Shkreli as her

14   husband's client, the defendant's objection is respectfully

15   overruled.  Again, that paragraph merely recounts

16   Mr. Greebel's description of the relationship between

17   Mr. Shkreli and Mr. Greebel.

18          Paragraph 89 draws defendant's objection because he

19   claims it is "not a complete list" of the defendant's

20   community service.  There is no explanation provided by

21   Mr. Greebel's counsel for why the defendant withheld such

22   information until sentencing.  The Court is now in receipt of

23   Exhibit A to Mr. Greebel's Sentencing Memorandum, which lists

24   defendant's extensive and commendable community service, and

25   has considered that service, among other factors, in

Proceedings                                                77

1    determining Mr. Greebel's sentence.

2           Mr. Greebel objects to the accounting at

3    paragraph 112 of the PSR of his assets and liabilities because

4    he claims certain assets are owned by his wife, such as the

5    BMW, and that certain assets are "jointly owned," and that

6    only half of their shared assets should be attributed to the

7    defendant.  He further argues that certain assets are not

8    properly valued.

9           The defendant's objections are respectfully denied

10   because Mr. Greebel had not provided a complete sworn

11   financial statement, as all defendants who appear before the

12   Court in this district are required to do, Probation cannot

13   properly and completely assess Mr. Greebel's financial

14   conditions.  The Probation Department requires disclosure of

15   jointly-owned assets and assets held by family members from

16   which the defendant receives a benefit in the assessment of a

17   defendant's financial condition.  As such, the BMW, even if

18   owned solely by his wife, and the house where defendant lives,

19   even if owned jointly with his wife, are properly included in

20   the accounting of his assets, or at least in determining his

21   financial condition.  The Court notes that Mr. Greebel failed

22   to provide information as requested by Probation about other

23   assets held by his wife, including bank accounts, retirement

24   accounts and a trust in her name, which prevented the

25   Probation Department and this Court from fully assessing

Proceedings                              78

1   Mr. Greebel's financial condition.  The PSR utilized the

2   market value for Mr. Greebel's properties as determined by

3   Accurint, as opposed to Mr. Greebel's unsupported statement in

4   his objection that he looked at comparable properties.  As

5   such, I deny Mr. Greebel's objections to paragraph 112, except

6   insofar as it corrects typographical errors.  Further, I find

7   that to accurately determine Mr. Greebel's ability to pay a

8   fine, Mr. Greebel must truthfully and completely disclose any

9   assets owned by his wife that he enjoys the benefit of.

10              Mr. Greebel will be ordered as a condition of his

11  supervised release to submit information to Probation,

12  complete information, for the purpose of determining his

13  financial condition and whether a payment schedule should be

14  amended to provide for greater payments for his restitution

15  and forfeiture.

16              Here there is a significant restitution and

17  forfeiture judgment that will be imposed and, thus, a complete

18  and truthful financial disclosure is and will remain a

19  condition of supervised release.

20              Are there any other objections I have not resolved

21  regarding the PSR, Mr. Brodsky, or, Ms. Smith?

22              MR. BRODSKY:  No, Your Honor.  I did want to point

23  out Mr. Greebel did submit a personal financial statement

24  form, which he filled out.

25              THE COURT:  I know he filled it out, but it was not

Proceedings                                          79

1    complete, that's my point.

2              MR. BRODSKY:  I understand.

3              MS. SMITH:  No, Your Honor, no other objections.

4              THE COURT:  All right.

5              Mr. Greebel has calculated his Total Offense Level

6    as 17 and his Criminal History Category as I, resulting in a

7    Guideline range of imprisonment between 24 and 30 months.

8    Mr. Greebel requests a non-incarceratory sentence based on his

9    proposed calculations.

10             Both the Government and Probation request a sentence

11   of 60 months, which is significantly below the Guideline range

12   calculated in the PSR.  Probation recommends a sentence of

13   60 months for Counts Seven and Eight based on its calculations

14   in the PSR and recommends that they be served concurrently.

15             I make the following findings of fact and law:

16             On December 27th, 2017 Mr. Greebel was found guilty

17   by a jury's verdict of the two counts with which he was

18   charged, specifically, Counts Seven and Eight of an

19   eight-count superseding indictment.  Because the defendant's

20   trial was severed from Mr. Shkreli's, the Court and the

21   parties agreed that Counts Seven and Eight would be referred

22   to at trial as Counts One and Two to avoid speculation or

23   confusion by the jury.

24             Count Seven of the indictment charged Mr. Greebel,

25   together with Mr. Shkreli and others, with conspiracy to

Proceedings                              80

1    commit wire fraud pursuant to 18 U.S. Code Section 1349, a

2    Class C felony, in connection with the fraudulent settlement

3    agreements and consulting agreements that defrauded Retrophin

4    of funds and assets.

5                (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    81

1          THE COURT:  (Continuing) Count Eight of the

2    indictment charged Mr. Shkreli, together with Mr. Greebel and

3    others, with Conspiracy to Commit Securities Fraud in relation

4    to an entity known as Retrophin in violation of 18 U.S. Code

5    Section 1349, a Class D felony.

6          The PSR calculated a base offense level of 7, and

7    added a 20-level enhancement for a loss greater than $9.5

8    million and less than $25 million.  In addition, the PSR added

9    the enhancements for sophisticated means and abuse of trust

10   for two points each, as I discussed earlier, for a Total

11   Offense Level of 31.

12         I have given respectful consideration of the

13   Advisory Guidelines and have independently computed Mr.

14   Greebel's offense level and adjustments as follows:

15         Under Sentencing Guideline Section 3D1.2, I grouped

16   the two counts of conviction for sentencing purposes, because

17   "the offense level for each count is determined largely on the

18   basis of the total amount of loss."  Guideline 3D1.2.  This

19   Guideline also specifically instructs the offenses under

20   Section 2B1.1 are to be grouped.

21         Under Sentencing Guideline 2B1 .1(a)(1), Mr.

22   Greebel's base offense level for grouped Count Seven and Eight

23   is seven.  For the reasons I have already discussed in

24   addressing Mr. Greebel's objections to the PSR, the

25   enhancements I will apply as follows:

Proceedings                                82

1          Under Guideline 3D1.3(b), I apply the intended loss

2     enhancement corresponding to the aggregated quantity of loss

3     for Count Seven, which, as I previously explained, is

4     $10,447,979.  For Count Eight, the loss is $4 million, leaving

5     a total of -- a total loss of $14,447,979.  Under Guideline

6     2B-1.1(b)(1)(K), loss amounts between $9.5 million and $25.5

7     million increase the offense level by 20.  Under Guideline

8     2B1.1(b)(10), the use of sophisticated means warrants an

9     enhancement of two points.

10          Under Sentencing Guideline Section 3B1.1(a), because

11     Mr. Greebel abused his position of trust in carrying out his

12     criminal conduct, the offense level is increased by two

13     points.

14          The PSR reports that Mr. Greebel has no prior

15     criminal history, and accordingly, under the Sentencing Table

16     for the Advisory Guidelines, I find that Mr. Greebel falls

17     into Criminal History Category I.

18          Have I overlooked anything, other than respectfully

19     disagreeing with the objections regarding the Guidelines

20     calculations, Ms. Smith?

21          MS. SMITH:  No, Your Honor.

22          THE COURT:  Mr. Brodsky?

23          MR. BRODSKY:  No, Your Honor.

24          THE COURT:  I next consider the sentencing options,

25     both under the Criminal Code and under the Advisory

Proceedings                83

1   Guidelines.  On Count Seven, the maximum term of imprisonment

2   is 20 years pursuant to Title 18, United States Code Section

3   1349.  On Count Eight, the maximum term of imprisonment is

4   five years under Title 18, United States Code Section 371.

5   Under the Advisory Guidelines, the range of sentence for a

6   Total Offense Level of 31 and a Criminal History Category of I

7   is between 108 and 135 months.  And as we know, I have

8   discretion to impose a sentence that is more severe or less

9   severe than that called for by the Guidelines, so long as I do

10  not violate the statutory maximums or minimums.

11          Supervised release for Count Seven and Eight allows

12  the Court to impose a term of not more than three years under

13  Title 18, U.S. Code Section 3583(b)(2) on each count.

14  Generally, however, multiple terms of supervised release

15  should run concurrently as provided in 18 U.S. Code Section

16  1324(e).

17          Under Title 18, United States Code Section 3559,

18  Count Seven is a Class C felony and Count Eight is a Class D

19  felony.  Under Guideline Section 5D1.2(a)(2), the ^ guidelines

20  range ^ guideline range for supervised release for each count

21  is at least one year, but not more than three years.

22          Under 18 U.S. Code Section 3561(c)(1), because Count

23  Seven and Eight are C and D Felonies, respectively, the

24  defendant would be eligible for not less than one nor more

25  than five years of probation on each count, as provided in

Proceedings                              84

1   3561(c)(1).  One of the following must be imposed as a

2   condition of such probation, unless extraordinary

3   circumstances exist:  a fine, restitution or community

4   service, as provided in 3563(a)(2).  Multiple terms of

5   probation shall run concurrently, under Section 3534(b).

6           The Advisory Guidelines provide that Mr. Greebel is

7   not eligible for probation because the applicable Sentencing

8   Guidelines range is in Zone D of the Sentencing Table.  That

9   is Guideline Section 5B1.1, comment note two.

10          As noted, 18 U.S. Code Section 3363A provides for

11  mandatory restitution in the total amount of $10,447,979.  The

12  restitution will be paid to Retrophin, but may be enforced by

13  the United States and should be payable to the Clerk of this

14  Court.  All payments should be sent to the Clerk of the Court

15  at the United States District Court of the Eastern District of

16  New York, 225 Cadman Plaza East in Brooklyn, and reference Mr.

17  Greebel's name and docket number.  Restitution is due and

18  owing immediately to Retrophin.

19          He is solely responsible for restitution arising out

20  of Count Seven.

21          On Count Seven and Eight, the maximum fine is

22  $250,000 on each count as provided by 18 U.S. Code Section

23  3571(b).

24          Under Guideline 5E1.2(c)(3) and (4), and 5E1.2(h),

25  the applicable fine range for Mr. Greebel is between $30,000

Proceedings                                        85

1   to $300,000.  As noted, Mr. Greebel has not submitted a

2   complete sworn financial statement and thus has not

3   established his inability to pay a fine.  Accordingly, I

4   would, within my discretion, be able to impose a fine, but

5   because Mr. Greebel is required to pay both a restitution and

6   a forfeiture judgment, I will not impose a fine.

7          Pursuant to 18 U.S. Code Section 3013, Mr. Greebel

8   must pay a mandatory special assessment of $100 for each count

9   of conviction, for a total of $200.  Again, that amount is due

10  and payable immediately.

11         Finally, I will impose a forfeiture money judgment

12  in the amount of $116,462.03.

13         Federal Rule of Criminal Procedure 32.2(b)(1)(A)

14  requires that a trial court, as soon as practical after a

15  verdict of guilty against a defendant, determine what property

16  is subject to forfeiture under the applicable statute.  *United

17  States versus Peters*, 732 F.3d 93 at 98, decided by the Second

18  Circuit in 2013.  If the government seeks a personal money

19  judgment, the Court must determine the amount of money that

20  the defendant will be ordered to pay, and if the Government

21  seeks forfeiture of specific real or personal property, the

22  Court must determine whether the government has established

23  the requisite nexus between the real and personal property

24  sought to be forfeited and the offense; Federal Rule of

25  Criminal Procedure 32.2(b)(1)(A).  The government bears the

Proceedings                                          86

1    burden of establishing that forfeiture is warranted by a

2    preponderance of the evidence; *United States versus Finazzo*,

3    682 F, Appendix 6 at 14, decided in 2017, citing *United States*

4    *versus Daugerdas*, 837 F.3d 212 at 231, decided by the Second

5    Circuit in 2016; in *United States versus Capoccia*, 503 F.3d

6    103 at 116, decided in 2007, and citing *United States versus*

7    *Fruchter*, 411 F.3d 377 at 383, decided by the Second Circuit

8    in 2005.  Under Rule 32.2(b)(1)(B), "The Court's determination

9    may be based on evidence already in the record and on any

10   additional evidence or information submitted by the parties

11   and accepted by the Court as relevant and reliable."

12          As established in the Second Circuit, pursuant to

13   Title 18, United States Code Section 981(a)(1)(c), a court may

14   order the forfeiture of any property which constitutes or is

15   derived from proceeds of criminal securities fraud; *United*

16   *States versus Contorinis*, 692 F.3d 136 at 145, note 2, decided

17   2012.  18 U.S. Code Section 981(a)(1)(C) authorizes forfeiture

18   for any offense constituting specified unlawful activity as

19   defined in 18 U.S. Code Section 1956(c)(7).  In *United States*

20   *versus Contorinis*, the Court found "Section 1956(c)(7)(A)

21   incorporates any act or activity constituting an offense

22   listed in 18 U.S. Code Section 1961(1).  1961(1)(D) lists any

23   offense involving fraud in the sale of securities.  While

24   Section 981(a)(1)(C) is a civil forfeiture provision, it has

25   been integrated into criminal proceedings via 28 U.S. Code

Proceedings                                87

1  Section 2461(c), and again citing *United States versus*

2  *Contorinis*.

3           In cases involving illegal goods, illegal services,

4  unlawful activities, and telemarketing and healthcare fraud

5  schemes, the term proceeds is defined to include property of

6  any kind obtained directly or indirectly as the result of the

7  commission of an offense giving rise to the forfeiture; 18

8  U.S. Code Section 981(a)(2)(A).  For cases, as here, involving

9  lawful goods or lawful services that are sold or provided in

10  an illegal manner, proceeds means the amount of money acquired

11  through the illegal transactions resulting in the forfeiture,

12  less the direct costs incurred in providing the goods and

13  services; 18 U.S. Code Section 981(a)(2)(B).  Such direct

14  costs shall not include any part of the overhead expenses of

15  the entity or any part of the income taxes paid by at the

16  entity.

17           The procedures in Title 21 U.S. Code Section 853

18  regarding the treatment of substitute assets apply to criminal

19  forfeitures; 28 U.S. Code Section 2461(c), *United States*

20  *versus Capoccia*, 402 Federal Appendix 639 at 641, citing *U.S.*

21  *versus Kalish*, 626 F.3d 165, decided in 2010.  Under Section

22  853(p), if, because of acts or omissions of the defendant,

23  property subject to forfeiture cannot be located, has been

24  transferred, has been placed beyond the jurisdiction of the

25  court, has been substantially diminished in value, or has been

1   commingled with other property which cannot be divided without

2   difficulty, the court shall order the forfeiture of any other

3   property of the defendant, up to the value of the forfeitable

4   property; 21 U.S. Code Section 853(p).

5        I find that the evidence at trial supports

6   forfeiture.

7        On Count Seven, the evidence at trial showed that

8   Mr. Shkreli, Mr. Greebel and others conspired to commit wire

9   fraud against Retrophin by causing Retrophin shares to be

10  transferred to -- shares and funds to be transferred to MSMB

11  Capital, even though MSMB Capital had not invested in

12  Retrophin; causing Retrophin to enter into and pay for the

13  settlement agreements with disgruntled MSMB Capital and MSMB

14  Healthcare investors; causing Retrophin to enter into sham

15  consulting agreements with disgruntled investors in MSMB

16  Capital and MSMB Healthcare as a mechanism to settle

17  liabilities the investors claim were owed to them by Mr.

18  Shkreli or his MSMB hedge funds.

19       With regard to Count Eight, the evidence at trial

20  showed that Mr. Greebel, Mr. Shkreli, and others, conspired to

21  commit securities fraud through control of the price and

22  trading of shares of Retrophin.  In order to achieve this

23  control, Mr. Shkreli and Mr. Greebel directed the distribution

24  of the Fearnow shares to various Retrophin insiders, or

25  Shkreli associates.  As noted in the Rule 29 and 33 Memorandum

Proceedings                                89

1   and Order, there is ample evidence in the record that Mr.

2   Greebel was aware of and actively participated in the charged

3   conspiracy.  The evidence established that Mr. Greebel helped

4   Mr. Shkreli engineer a reverse merger with Desert Gateway,

5   itself not an illegal act, and knew that Mr. Shkreli selected

6   that particular shell because of the 2.5 million free-trading

7   shares underlying the Fearnow note.  Despite the fact that Mr.

8   Greebel's actual client, Retrophin, funded the reverse merger

9   with Desert Gateway, Mr. Greebel arranged for and coordinated

10  the Fearnow share distributions and purchases by Mr. Shrekli's

11  selected insiders.  Mr. Greebel helped Mr. Shkreli control the

12  escrowed Fearnow shares nominally owned by the other Fearnow

13  shareholders and redistributed those shares to MSMB investors

14  in a manner that did not disclose or obtain consent of

15  Retrophin's board or the nominal owners of those shares.  When

16  one of those nominal share purchasers, Mr. Tim Pierotti, did

17  not comply with the plan, Mr. Greebel assisted Mr. Shkreli in

18  his efforts to stop Mr. Pierotti and to gain control over the

19  escrowed stock purchased by and held in Mr. Pierotti's name.

20  However, when Mr. Greebel drafted Retrophin's Form 13D, he

21  failed to disclose Mr. Shrekli's control of the Fearnow shares

22  to the investing public despite the fact that those shares

23  represented the vast majority of the company's 2.5 million

24  free-trading shares.  As a direct result of the frauds in

25  Counts Seven and Eight, Retrophin was able to stave off

Proceedings                                    90

1   financial disaster and pay millions of dollars in fees to Mr.

2   Greebel's firm in 2013 and 2014.  Mr. Greebel, as proven at

3   trial, was an income partner at Katten who received a salary

4   calculated in large part based on, one, the total amount of

5   revenue the partner generated for the firm, and two, his or

6   her realization rate or the percentage of a client's bills for

7   which money was actually collected; trial transcript at 1225,

8   and 6596 through 6957.  By the fall of 2012, Mr. Greebel

9   became the Principal Attorney for all matters related to his

10  clients, Retrophin, MSMB and his co-conspirator Mr. Shkreli.

11  Mr. Greebel's distributions from the firm rose and fell during

12  the relevant period during the charged offense at a rate that

13  closely correlated with the amount he billed and was able to

14  collect from Retrophin.

15       The Court considered the methodology for determining

16  forfeiture in accordance with the Second Circuit's guidance,

17  which establishes that the Government is not required to

18  provide a precise calculation of the amount of money a

19  defendant is required to forfeit.

20       As the Circuit stated, the law does not demand

21  mathematical exactitude in calculating the proceeds subject to

22  forfeiture.  Indeed, because the purpose of forfeiture is

23  punitive rather than restitutive, district courts are not

24  required to conduct an investigative audit to ensure that a

25  defendant is not deprived of a single farthing more than his

Proceedings                                        91

1   criminal acts produced.  Rather, district courts may use

2   general points of reference as a starting point for a

3   forfeiture calculation and make reasonable extrapolations

4   supported by a preponderance of the evidence; *United States*

5   *versus Roberts*, 660 F.3d 149 at 166, decided in 2011.

6   Quotations are omitted, but citing *Libretti versus United*

7   *States,* 516 U.S. 29 at 41, decided by the Supreme Court in

8   1995; and *United States versus Lizza Industries, Incorporated*,

9   775 F.2d 492 at 498, decided in 1985, and making the

10  observation in the context of forfeiture of racketeering

11  proceeds.

12          (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                          92

1    (Continuing)

2            THE COURT:  A conservative estimate of forfeiture

3    based on the record will suffice.  United States versus

4    Basciano, number 03-CR-929, 2000 Westlaw 29439, at 5, Eastern

5    District of New York, January 4th, 2007.

6            The applicable definition of "proceeds" for

7    forfeiture in this case is set forth at Title 18 U.S. Code

8    Section 981(a)(2)(B), which governs forfeiture for lawful

9    goods or lawful services sold or provided in an illegal manner

10   as provided at 981(a)(2)(B).  For such transactions, "the term

11   'proceeds' means the amount of money acquired through the

12   illegal transactions resulting in the forfeiture, less the

13   direct costs incurred in providing the goods or services."

14   The Second Circuit has explained that Section 981(a)(2)(B)

15   "supplies the definition of 'proceeds' in cases involving

16   fraud in the purchase or sale of securities," whereas

17   Section 981(a)(2)(A) is reserved for cases involving

18   "inherently unlawful" activity, such as "the sale of food

19   stamps or a robbery."  United States versus Contorinis, 692

20   F.3d at 145 note 3.

21           The Second Circuit has held that no particular

22   tracing analysis is required where the Government seeks an in

23   personam forfeiture money judgment against a convicted

24   defendant based on his gains derived from his crimes.  United

25   States versus Awad, 598 F.3d 76, at pages 78 to 79, Second

Proceedings                                          93

1    Circuit 2010, citations omitted and stating:  "The forfeiture

2    constitutes a sanction against the individual defendant rather

3    than a judgment against the property itself.  Consequently,

4    criminal forfeiture need not be traced to identifiable assets

5    in a defendant's possession."

6              United States versus Diallo, 461 Federal Appendix 27

7    et 31, decided by the Second Circuit in 2012, and holding that

8    tracing is not an issue when there is no question the

9    defendant reaped a benefit from his charged illegal conduct

10   and an in personam forfeiture money judgment is sought.

11             Further, it is firmly established in the Second

12   Circuit that even if the proceeds of a forfeiture "pass

13   through" another party, the defendant's "own portion of those

14   proceeds could eventually be subject to forfeiture despite its

15   payment first to an innocent party."  United States versus

16   Torres, 703 F.3d 194, et page 202, decided by the Second

17   Circuit in 2012.  See also United States versus Daugerdas, 837

18   F.3d 212, et page 231, decided by the Second Circuit in 2016

19   and finding that the district court did not err when it

20   required an attorney to forfeit compensation that he had

21   received from his law firm's account where the attorney had

22   earned the funds paid by the client to his law firm as a

23   result of his criminal activity; United States versus

24   Mahaffey, 693 F.3d 113, et page 138, Second Circuit 2012,

25   noting that the proper measure of forfeiture for a defendant

Proceedings                                    94

1   that committed securities fraud would be the net commissions

2   the defendant earned off of profits generated as a result of

3   the fraud.  United States versus Shabudin, 701 Federal

4   Appendix 599, et 601, decided by the Ninth Circuit in 2017,

5   and affirming the district court's order of forfeiture where

6   the Court order the defendant to forfeit a year of his salary

7   as it represented a gain from his fraud offenses stating:

8   "The district court opined, without explanation, that Shabudin

9   'would not have received the salary, but for his unlawful

10  conduct.'  We affirm Shabudin's sentence because the district

11  court did not commit clear error in using Shabudin's salary as

12  an ultimate measure of loss."

13        The Government requests forfeiture of $476,249 on

14  Counts Seven and Eight.  This amount is based on the total

15  amount of Retrophin payments of legal fees to Katten and paid

16  to Mr. Greebel.  According to the government, "the proposed

17  forfeiture of $476,249 represents a conservative estimate of

18  the money that the defendant personally received as a result

19  of his participation in the criminal frauds, which both

20  enabled Retrophin to remain in business so that it could

21  continue to pay hundreds of thousands of dollars of

22  outstanding Katten bills, and ingratiated the defendant with

23  Shkreli in order to receive more Retrophin business at

24  Mr. Shkreli's direction."

25        Mr. Greebel argues that no forfeiture is appropriate

Proceedings                          95

1    on either count because, first, Retrophin paid its legal bills

2    entirely to Katten; (2), an independent Compensation Committee

3    at Katten determined Mr. Greebel's salary; and (3), the

4    Compensation Committee considered a variety of factors in

5    determining Mr. Greebel's compensation.  In support of his

6    argument that no forfeiture is warranted, he provides only

7    bare citations to various government exhibits with minimal

8    analysis.  In the alternative, Mr. Greebel argues that any

9    forfeiture amount for Counts Seven and Eight should be

10   significantly reduced to encompass only those amounts directly

11   attributable via billable hours to the conduct charged in

12   Counts Seven and Eight and for which he was convicted.  He

13   argues, and the Court agrees, that a forfeiture accounting

14   that directly attributes all amounts billed to Retrophin as

15   the fruits of illegal activity is overly broad.

16          The Government acknowledges that there are alternate

17   methods for calculating forfeiture.  By using the defendant's

18   own accounting of billable hours and defendant's proposed

19   methodology in conjunction with a thorough evaluation of

20   billing entries to determine the billings that are related to

21   the conduct charged in Counts Seven and Eight, the Government

22   ameliorates the concern that all amounts billed to Retrophin

23   during the relevant period of 2012 through 2014 are

24   categorized as fruits of illegal activity.

25          I agree with the parties' suggestion that a proper

Proceedings                                                    96

1   measure of forfeiture can be calculated by determining the

2   percentage of hours billed to work-related to the conduct

3   charged in Counts Seven and Eight and applying that percentage

4   to the amount of Mr. Greebel's salary reasonably derived from

5   the work billed to Retrophin.

6          Katten billed a total of 7101.9 hours to Retrophin

7   between November 2012 and March 2014.  The Government

8   identified a total of 157.4 hours clearly billed by the

9   defendant and other Katten attorneys to activities related to

10  the conduct underlying Count Seven.  That is the alternate

11  calculation letter at ECF 585-2.  The 157.4 hours make up

12  approximately 2.3 percent of the hours that Mr. Greebel's firm

13  billed to Retrophin between November 2012 and March 2014.  The

14  Government identified 1583.6 hours billed to activities

15  related to the conduct underlying Count Eight, which

16  constituted approximately 22.3 percent of all hours billed to

17  Retrophin during the relevant time period.  Many of the hours

18  were billed to the Pierotti litigation.  And despite

19  defendant's assertion to the contrary, the evidence at trial

20  proved, by a preponderance of the evidence, that Mr. Greebel

21  and Mr. Shkreli supported and encouraged the Katten firm to

22  commence the Pierotti litigation as a measure to prevent

23  Mr. Pierotti from disrupting the conspiracy and to continue

24  control of the price and trading volume of the Retrophin

25  shares.  That analysis was discussed in my Memorandum and

Proceedings                                    97

1    Order on Rule 29 and 33 motion at pages 53 to 54 and pages 88

2    to 96.

3              In an April 2018 letter, Mr. Greebel points out,

4    belatedly, that certain amounts billed to Retrophin for the

5    Pierotti litigation were not always, in fact, related to the

6    Pierotti litigation.  That's ECF 592 filed April 21st, 2018 in

7    response to the alternate calculation.

8              Defendant relies solely on the argument of his

9    counsel to support this claim and provides no evidence in

10   support.  However, in the interest of fairness, we will deduct

11   the entries that Mr. Greebel identified in the April 21, 2018

12   letter from the total hours attributable to Count Eight.

13   Those entries include a total of 4.3 hours of hours attributed

14   to Count Eight.  Subtracting those hours from the total hours

15   billed for activities related to Count Eight, we are left with

16   1579.3 hours related to the conduct charged in Count Eight,

17   and a total of 1736.7 hours billed to the conduct charged in

18   Count Seven and Eight.

19             Based on the above calculation, a total of

20   24.454 percent of the hours that Mr. Greebel's firm billed to

21   Retrophin in the relevant period was related to the conduct

22   underlying the counts of conviction and represents gains

23   derived from Mr. Greebel's role in the charged conspiracy.

24   Approximately $476,249 of Mr. Greebel's salary in fiscal year

25   2015 was derived from his work, and his firm's derivative

Proceedings                                                98

1    work, for Retrophin.  Defendant acknowledged this figure in

2    his proposed forfeiture calculation.  Defendant also submitted

3    a billing entries chart utilizing the amount of $476,249 as

4    the starting salary or the starting amount from which the

5    percentage of forfeiture is derived.

6           In fiscal year 2013 Mr. Greebel's salary was

7    $355,000 as established at trial in Government's

8    Exhibit 121-6.  In fiscal year 2014 Mr. Greebel's salary

9    nearly tripled to $900,000 as established in Government

10   Exhibit 121-8.  This increase corresponded with a revenue

11   increase for Mr. Greebel of more than 300 percent and a

12   realization rate of 95.8 percent, with Retrophin accounting

13   for more than $2 million of the $3.5 million in fees collected

14   from Mr. Greebel's clients.  This is in Government

15   Exhibit 121-7 and 122-4.

16          Mr. Greebel had a realization rate of 101.65 percent

17   for Retrophin.  As then chairman of the Compensation Committee

18   testified, the exponential increase in Mr. Greebel's salary

19   from fiscal year 2013 to fiscal year 2014 was driven by

20   dramatic increase in revenue and realization rates.  That's

21   the trial transcript at 6614 and 1225 to 26, also the

22   testimony of Ms. Davida describing the importance of the

23   realization rate as a "major factor" in the determination of

24   compensation.

25          Mr. Silverman also testified that although Greebel's

SAM     OCR     RMR     CRR     RPR

Proceedings                                          99

1   work with other clients, particularly in the virtual currency

2   space, also played a role in his salary increase, the increase

3   was due primarily to Retrophin, encompassing both the

4   increased business from Retrophin and the higher realization

5   rate for its bills.  Trial transcript at page 6615.

6            However, Retrophin's realization rate dropped

7   significantly when Retrophin terminated Katten as its counsel

8   in fiscal year 2015, and Mr. Greebel's salary was reduced

9   commensurate with his lower realization rate in billing to

10  $423,751 as established in Government Exhibit 121-10.

11           I know that although Bitcoin matters, which

12  Mr. Greebel asserts drove his salary increase in fiscal year

13  2014, accounted for approximately 25 percent of Mr. Greebel's

14  fees in fiscal year 2014, and in fiscal year 2015 Bitcoin

15  accounted for a similarly high percentage of Mr. Greebel's

16  billable hours, Mr. Greebel's income was still reduced from

17  fiscal year 2014 to fiscal year 2015.  And that is evident in

18  Government Exhibits 122-4 and 122-5.  This evidence, presented

19  on the record at trial, establishes a causal nexus between

20  Mr. Greebel's fraud and the compensation he earned as a

21  partner at Katten during the years at issue.

22           The Government calculated the difference between

23  Mr. Greebel's salary at Katten for fiscal year 2014 and fiscal

24  year 2015 as approximately $476,249, which the Court finds, by

25  a preponderance of the evidence, is a reasonable approximation

Proceedings                    100

1   of a salary that Mr. Greebel received as a result of his work

2   for Retrophin.  As such, the defendant is ordered to forfeit a

3   total of $116,462.03, which represents a forfeiture of

4   $10,555.15 for Count Seven and a forfeiture amount of

5   $105,906.88 for Count Eight.  The Court finds this figure is a

6   conservative, practicable and reasonable approximation of

7   Mr. Greebel's ill-gotten gains.

8            I would like to advise Mr. Greebel at this time that

9   he does have the right to appeal his sentence and any appeal

10  must be filed within 14 days of judgment being entered.  If

11  you cannot afford to pay the cost of an appeal, you may apply

12  for leave to file an appeal if you can establish that you are

13  indigent.  Given what is disclosed in the pre-sentence report,

14  I do not believe you could establish indigency, but,

15  nonetheless, you are free to apply.  If you do request the

16  clerk of the Court to do so, he will file and prepare a notice

17  of appeal on your behalf.  And I would ask defense counsel to

18  take all necessary steps to protect Mr. Greebel's right to

19  appeal and to have counsel on appeal.

20           Would you do that, Mr. Brodsky?

21           MR. BRODSKY:  Yes, Your Honor.

22           THE COURT:  Thank you.

23           Is there any property that the Government seized

24  from Mr. Greebel at the time of his arrest that should be

25  returned in order to avoid unnecessary subsequent civil

1   proceedings?

2                MS. SMITH:  No, Your Honor.

3                THE COURT:  Will you confirm that, Mr. Brodsky?

4                MR. BRODSKY:  Yes, Your Honor.

5                THE COURT:  Is there anything else that I should

6    address before we move forward?

7                MR. BRODSKY:  No, Your Honor.

8                THE COURT:  In addition to giving respectful

9    consideration to the Guidelines which are not mandatory, I

10   have the authority, and I recognize I have the authority, to

11   depart from the Guidelines.  As noted before, Mr. Greebel's

12   advisory Guideline range of custody is between 108 and

13   135 months given an adjusted offense level of 31 and a

14   Criminal History Category of I.

15               In addition to those guidelines, and as provided in

16   Title 18 U.S. Code Section 3661, there is no limitation on the

17   information concerning the background, character and conduct

18   that I may receive and consider for the purpose of imposing an

19   appropriate sentence.

20               In determining Mr. Greebel's sentence, in addition

21   to the advisory Guidelines, I have also considered all of the

22   submissions by the parties, the trial record and the facts

23   contained in the PSR, its addenda, and the materials regarding

24   loss amounts and forfeiture.  I have also given respectful

25   consideration to those Guidelines, and I now consider the

Proceedings                              102

1    factors set forth at 18 U.S. Code Section 3553(a).

2          I have also reviewed and, again, appreciate the

3    numerous sentencing letters sent to the Court by Mr. Greebel's

4    family, friends and former colleagues and supporters.  This

5    is, indeed, a very difficult sentence, difficult for

6    Mr. Greebel and his loved ones, and difficult for the

7    Government, and it has been a challenge for the Court to try

8    to be as complete and thorough as possible given all of the

9    voluminous submissions and the seemingly endless cascade of

10   submissions by the parties, but we are here today to sentence

11   Mr. Greebel.

12         I have considered the nature and circumstances of

13   Mr. Greebel's offenses, and I find them to be extremely

14   serious.  Mr. Greebel using his law degree was convicted of

15   one count of conspiracy to submit wire fraud and one count of

16   conspiracy to commit securities fraud, and he caused

17   substantial losses to his victim, Retrophin.

18         Starting in 2009, Mr. Shkreli, and this is just

19   background, he defrauded investors in his MSMB Capital hedge

20   fund through multiple misrepresentations of material fact

21   about the size, nature, investment approach and strategy,

22   personal investing experience and success, educational

23   background, and the extent of third-party oversight, such as

24   auditors, of the fund's operations.

25         (Continued on the following page.)

SAM      OCR      RMR      CRR      RPR

Proceedings                          103

1          THE COURT:   (Continuing) Mr. Shkreli induced

2    investments and convinced investors to keep their money in the

3    MSMB Capital fund by circulating periodic performance reports

4    to investors that materially misstated the value of their

5    investments and the fund's performance.  After Mr. Shkreli

6    lost all of the MSMB Capital fund's money on a failed

7    investment in February of 2011, he hid that loss from

8    investors and began a new fund, MSMB Healthcare.  Just as with

9    MSMB Capital, he solicited investments based on multiple lies

10   about the size and nature of the funds and his experience.  He

11   also misled MSMB Healthcare investors about the performance of

12   their investments.

13          In February of 2011, Mr. Shkreli began working to

14   create Retrophin, a pharmaceutical company.  Unbeknownst to

15   the MSMB Healthcare investors, Mr. Shkreli used significant

16   amounts of their money that they had invested in MSMB

17   Healthcare to fund Retrophin.  Mr. Shkreli redirected over a

18   million dollars from MSMB Healthcare into Retrophin, and then

19   used those funds to pay off unrelated professional and

20   personal obligations of Mr. Shkreli.

21          In September of 2012, Mr. Shkreli told his MSMB

22   investors that he was winding down both the Capital and

23   Healthcare hedge funds to focus on Retrophin.  He falsely

24   represented to those investors that they could redeem their

25   investments in cash within 30 days.  In his wind-down letter

Proceedings                                            104

1   to Ms. Hassan, Government Exhibit 103-13, which was similar to

2   the other wind-down letters that he sent to the MSMB

3   investors, he promised that investors could be cashed out by

4   October 31, 2012.  When the investors in the MSMB funds became

5   suspicious about Mr. Shkreli's failure to redeem their funds

6   for cash, Mr. Shkreli strung them along by ultimately ignoring

7   them, referring them to Mr. Greebel, pretending to work on

8   paying them back, or delaying their redemptions for months, if

9   not years.

10          In the fall and early winter of 2012, Mr. Shkreli

11  worked closely with Mr. Greebel and others to take Retrophin

12  public through what is known as the reverse merger with the

13  shell company Desert Gateway.  Again, there is nothing illegal

14  about the reverse merger itself, and Mr. Shkreli clearly

15  explained his choice of Desert Gateway to his co-conspirator

16  Mr. Greebel.  Although Mr. Greebel noted to Mr. Shkreli that

17  Desert Gateway was a more expensive option than other

18  available reverse merger options, Mr. Shkreli and Mr. Greebel

19  understood that the $2.5 million in free-trading shares of

20  Desert Gateway inspired Mr. Shkreli's choice.  Together, they

21  conspired to ensure that 2.4 million of the 2.5 million

22  free-trading shares would be purchased for nominal amounts by

23  a select group of Mr. Shkreli's employees and friends.  He

24  selected seven associates to receive those shares; Marek

25  Biestek, Tim Pierotti, Andrew Vaino, Thomas Fernandez, Kevin

Proceedings                                    105

1   Mulleady, Ron Tilles and Edmund Sullivan, with the

2   understanding that Mr. Shkreli would control those shares.

3   Mr. Greebel and Mr. Shkreli then arranged for those associates

4   to purchase the 2.4 million free-trading shares for nominal

5   amounts from Troy Fearnow, the sole stockholder of Desert

6   Gateway.  Again, Retrophin had entered into the reverse merger

7   and funded the reverse merger with its funds, reasonably

8   expecting as part of the bargain that it would receive all

9   shares.  Mr. Greebel documented the sales between Mr. Fearnow

10  and the select group.  Retrophin lacked sufficient funds to

11  pay the full $200,000 for the Desert Gateway merger, so Mr.

12  Greebel and Mr. Shkreli arranged for Mr. Fearnow to hold back

13  in escrow 400,000 free-trading shares that had already been

14  purchased as part of the reverse merger, but then later sold

15  to the individual purchasers with the expectation that

16  Retrophin would the pay the balance.  Mr. Greebel and Mr.

17  Shkreli agreed to use the Fearnow shares in order to benefit

18  Mr. Shkreli, even though the shares were nominally owned by

19  others.  First, Mr. Shkreli and Mr. Greebel tried to control

20  the sales of the Fearnow shares in order to prevent the

21  Retrophin share price from falling during two critical PIPEs

22  in January and February 2013.

23          Again, when one Fearnow shareholder, Mr. Pierotti,

24  began to sell his shares against Mr. Shkreli's instructions,

25  Mr. Greebel and Mr. Shkreli discussed the trading and

Proceedings                                        106

1    determined it was Mr. Pierotti.  Mr. Greebel and Mr. Shkreli

2    were able to deduce that Mr. Pierotti was the seller because

3    of Mr. Shkreli's control over the free-trading shares.  On

4    December 28, 2012, Mr. Shkreli wrote an e-mail to Mr. Greebel

5    stating the stock is trading like crazy, someone is selling

6    the shit out of it.  Mr. Greebel responded:  I don't know,

7    there is no freely trading stock other than you guys and the

8    500,000 that Mr. Fearnow has.  It is Government Exhibit 510,

9    Mr. Shkreli tried to stop Mr. Pierotti from selling his

10   shares, and made serious and really shocking threats directed

11   at Mr. Pierotti's family.  After discussing with Mr. Greebel

12   his plan, Mr. Shkreli's plan, to send an e-mail to the Fearnow

13   shareholders in an attempt to bring them over the wall and

14   prevent them from trading their Fearnow shares, Mr. Shkreli

15   sent an e-mail, nonetheless, to those shareholders to bring

16   them over the wall.  In fact, the tag line, the subject line

17   was "over the wall."

18           Mr. Shkreli also wrote a threatening letter -- not

19   to Mr. Pierotti, but to his wife, harshly disparaging Mr.

20   Pierotti and threatening to make the Pierotti family,

21   including their four young children, homeless.  Mr. Shkreli

22   later boasted in an interview about what he had done, stating:

23   "I threatened that dude and his fucking kids" and repeated, "I

24   threatened that fucking guy and his fucking kids because he

25   fucking took $3 million from me and he ended up paying it

1   back.  I had two guys parked outside of his house for six

2   months watching his every fucking move.  I can get down."

3           Mr. Greebel did not send that letter, but he became

4   aware of that letter and did not try to neutralize the effect

5   of that threat.  Mr. Greebel and Mr. Shkreli worked together

6   and took escalating steps to regain control of Mr. Pierotti's

7   shares.  Mr. Greebel became aware of Mr. Shkreli's threats

8   against and harassment of Mr. Pierotti and his family, and

9   although Mr. Shkreli was a Retrophin employee and a CEO of

10  Retrophin, Mr. Greebel concealed this information from the

11  Retrophin Board.  This is obviously behavior that put

12  Retrophin at great risk.  When the Pierotti litigation,

13  instituted by Mr. Shkreli and Mr. Greebel, came before the

14  board in May 2013, Mr. Greebel remained silent as Mr. Shkreli

15  misled the board and stated that the dispute concerned shares

16  that Mr. Shkreli had given Mr. Pierotti when Mr. Pierotti was

17  dealing with financial troubles, and which contradicted Mr.

18  Shkreli's e-mails to Mr. Pierotti acknowledging that Mr.

19  Pierotti had purchased his Fearnow shares from Mr. Fearnow.

20  And, again, Mr. Greebel was fully aware of the circumstance

21  under which Mr. Pierotti and others obtained Fearnow shares.

22          Additionally, Mr. Greebel and Mr. Shkreli purposely

23  concealed Mr. Shkreli's beneficial control of those

24  free-trading shares from the Retrophin Board, and did not

25  disclose it in the Form 13-Ds that were prepared by Mr.

Proceedings                                    108

1   Greebel and filed with the SEC on December 20, 2012 and

2   February 19, 2013.  They also failed to report Mr. Shkreli's

3   control over the 2.4 million free-trading shares in the 13-D

4   and to the board.  Eventually, after Retrophin raised

5   additional investments through the PIPEs in January and

6   February of 2013, Mr. Greebel and Mr. Shkreli used Retrophin

7   money to compensate complaining MSMB investors, using

8   fraudulent settlement and consulting agreements.  This was all

9   very sophisticated, complex and ongoing over a course of years

10  and, thus, a very serious offense.

11           Second, I considered Mr. Greebel's personal history,

12  characteristics and circumstances which I find very

13  compelling.  Mr. Greebel was born in New York on July 2, 1973.

14  He has a younger brother and a younger sister, both of whom

15  live in New York and with whom he shares a very close

16  relationship.  Mr. Greebel's father Charles is an attorney and

17  his mother Barbara is a retired teacher.  He had the good

18  fortune of being raised in a middle-income household in the

19  New York suburbs, and earned the rank of Eagle Scout while in

20  high school, and also worked as a lifeguard and swim

21  instructor in order to help pay for his education.

22           Mr. Greebel throughout his teenage years up through

23  the present has shown an impressive dedication to community

24  service, commencing long before his charged criminal conduct

25  and indictment.  I acknowledge that long history and consider

Proceedings                                            109

1    it in determining his sentence.

2           Mr. Greebel attended college at the University of

3    Michigan, where he earned a Bachelor's degree in Political

4    Science, and then earned a Juris Doctor degree from the

5    Georgetown University Law Center.  He began his legal career

6    at the prestigious law firm of Fried, Frank, Harris, Shriver &

7    Jacobson in New York City.  He married his wife, Jodi, eleven

8    years ago and they have three healthy children.  His friends

9    and family consistently report that, as a father and a

10   husband, Mr. Greebel is dedicated beyond extraordinary measure

11   to his wife and children.  He devotes significant amounts of

12   time to activities with his children such as coaching his

13   son's basketball and little league teams.  His father-in-law

14   described him -- and Ms. Denerstein had reviewed some of this

15   already, but I have considered it -- as the kind of husband

16   that any parent would hope for their daughter; loving,

17   respectful, conscientious and very supportive.

18          Mr. Greebel's wife and her immediate family

19   tragically lost her brother in 2015, their brother, son and

20   his children's uncle.  Jodi Greebel submitted a statement to

21   the Court describing the difficulty she faced in coping with

22   life and raising three young children after the tragedy, and

23   emphasized her dependence on her husband.  Mr. Greebel appears

24   to have made his family a priority during this time, and even

25   before, and he and his wife continue to host weekly Shabbat

Proceedings                                    110

1    and annual holiday dinners for their extended family and many

2    friends.

3            The PSR describes Mr. Greebel's financial status,

4    based on his tax returns from 2007 through 2016 and an

5    incomplete Personal Financial Statement dated April 18.  Based

6    on these sources, the PSR, as amended July 17, 2018, states

7    that Mr. Greebel has assets of over $3 million and liabilities

8    of over $2 million, resulting in a net worth of just over a

9    million dollars.  Mr. Greebel, as we noted, did not provide

10   Probation, and accordingly this Court, with the requested

11   report regarding his wife's independent assets, which are

12   factored into an assessment of any defendant's financial

13   condition.

14           Mr. Greebel has not had a stable source of income

15   since his departure from his law firm, but reports that he

16   helps his wife deliver meals for her business, Greebel Grown

17   Meals.  He reports household monthly expenses of over $32,000,

18   and reports, for himself, $800 in monthly income from his

19   wife's business.

20           (Continued on next page.)

21

22

23

24

25

1    (Continuing)

2          THE COURT:  Since the fall of 2015, Mr. Greebel has

3    worked pro bono to establish a 30-bed inpatient facility in

4    Masonville, a rehab facility for people who have opioid and

5    other drug and substance abuse related issues.  The PSR

6    recommends, based on the financial statement, that Mr. Greebel

7    not be ordered to pay a fine in light of his significant

8    restitution and forfeiture obligations, and I agree with that

9    recommendation.

10          With regard to Mr. Greebel's mental and physical

11   condition, Mr. Greebel has no history of serious medical or

12   mental issues.  It is reported in the PSR that he does appear

13   to use alcohol as an outlet for his stress, and Ms. Greebel

14   reports to Probation that her husband drinks daily and

15   consumes more alcohol on weekends.  She also reports that she

16   believes Mr. Greebel self-medicates with alcohol.

17          I have considered the numerous letters written on

18   Mr. Greebel's behalf.  Almost 200 people submitted letters

19   supporting Mr. Greebel.  The fact that so many of

20   Mr. Greebel's family, friends and colleagues spent their time

21   and took the effort to write these letters and appear here

22   today speaks very well of Mr. Greebel.  The letters focus

23   uniformly on his concern and kindness to family and friends,

24   as well as those in his religious community and beyond.  These

25   letters depict a patient, warm and generous family man who

Proceedings                    112

1    spends his time focused on his children's social, religious

2    and moral development.  He has spent extensive amounts of time

3    ^ playing ^ plague with his children and accompanying them to

4    music and sports classes when he wasn't coaching his son's

5    little league.  Letters from Mr. Greebel's friends and family

6    submitted also describe how he provided significant and

7    necessary support to his wife and children following the

8    tragic loss of Mrs. Greebel's brother.  His mother-in-law,

9    Nancy Citrin, explained, and we discussed this, Ms. Denerstein

10   described that when tragedy struck Jodi and her family two

11   years ago, she witnessed Evan's compassion and strength

12   firsthand.  He stepped up to care for their newborn child

13   while shielding his young sons from the difficult

14   circumstances.  Most importantly, he was a loving, caring and

15   supportive partner to Jodi.  And letters from Mr. Greebel's

16   former colleagues and clients also attest to Mr. Greebel's

17   strength of character, hard work and skills as an attorney.

18   Some of the letters from former clients and co-workers

19   describe their belief in Mr. Greebel's strong sense of

20   integrity.  Joel Cooperman, a friend and client of

21   Mr. Greebel, wrote that he had "worked closely with Evan on

22   several clients and I have always found his advice to be

23   thoughtful and professional.  I truly believe that Evan is a

24   man of integrity and I know my partners and our common clients

25   would agree."  David Hennes, a partner at the law firm of

Proceedings                    113

1   Ropes & Gray, wrote, "I always knew Evan to be a

2   straight-shooter, who wanted to succeed but was not driven by

3   money, and who was, at his core, a good and kind person, and,

4   most fundamentally, an ethical lawyer.

5          I do also, however, consider the Government's point

6   that all of these letters of individuals who love and support

7   Mr. Greebel describe Mr. Greebel as they know him and not in

8   the context of the evidence at trial.

9          I have considered as mitigation under 3553

10  Mr. Greebel's charitable and community contributions, which

11  are substantial and long-standing.  Since childhood he was

12  involved extensively in volunteer work and community service.

13  He also as a young child and through his teenhood took care to

14  watch out for the underdog and those who were alone.

15  Mr. Greebel, along with his wife and children, following his

16  brother-in-law's death, raised nearly $15,000 for the SPCA of

17  Westchester and donated hundreds of pounds of dog food.

18  Elizabeth and Benjamin Brucker, longtime friends of

19  Mr. Greebel, wrote that "Evan has demonstrated the importance

20  of giving back to the community when he brought his kids to

21  volunteer at a UJA event in the Bronx, at a facility where his

22  grandmother used to live.  My husband and Evan spent the

23  afternoon with senior citizens ^ playing ^ plague card games

24  and chatting with them.  He was not just telling his children

25  how to be charitable, but he showed them firsthand."

1        Notably, much of Mr. Greebel's volunteer work

2   occurred prior to his arrest for the instant conduct, and so

3   one can assume it was not done to make himself appear a better

4   person.  I think that this long-standing commitment to

5   community service and humanitarian causes demonstrates that

6   his interests are genuine.

7        Nonetheless, as the Government notes, some of the

8   activities that Mr. Greebel characterizes as community

9   service, including coaching his children's sports teams and

10  assisting his wife Jodi with her business that provides

11  income, presumably, as described in the PSR, are not truly

12  community service as Mr. Greebel asserts.  And in the case of

13  his wife's business, that activity results in quantifiable

14  benefits to them.  But I commend their hard work, their

15  creativity and their compelling need to provide to meet the

16  financial needs of their family.

17       I, again, thank all of those who took time to share

18  their perspectives.  I certainly have a better view and sense

19  of who Mr. Greebel is that goes far beyond the trial evidence.

20  I believe that he is truly personally generous, giving and

21  kind.  All of the letters provide consistent accounts with the

22  critical role that Mr. Greebel plays in his wife and

23  children's lives, in particularly assisting his wife as she

24  grieves the loss of her brother.  A therapist named Simone

25  Gordon recounts Ms. Greebel's description of the trauma she

Proceedings                                    115

1    suffered and the important role Mr. Greebel plays in her

2    recovery and in supporting his children.  I believe that these

3    circumstances are extraordinary and outside the heartland.

4    Those circumstances provide the basis to impose a

5    non-guidelines sentence.  In essence, though, I cannot ignore

6    that this case is about Mr. Greebel's utilization of his legal

7    status to commit an egregious multitude of deceptive acts in

8    furtherance of the wire fraud conspiracy and securities fraud

9    conspiracy, and his repeated breaches over the course of years

10   of his client's trust, his abuse of his position of trust and

11   special skills, and his critical role in the conspiracy to

12   manipulate the price and trading of a publicly-traded company.

13            As required by 3553, I consider the need for the

14   sentence imposed to reflect the seriousness of the offense, to

15   promote respect for the law, and to provide just punishment

16   for the offense.  And to afford adequate deterrence, not just

17   individually to Mr. Greebel, but to the general public.  I

18   also consider the need to protect the public from further

19   crimes by Mr. Greebel and to avoid unwarranted sentencing

20   disparities for similarly-situated defendants.

21            In imposing a sentence that reflects the seriousness

22   of the offense, I am mindful that more than half of the total

23   offense level in this case is driven by the loss amount

24   calculations as now Circuit Judge Lynch and then District

25   Judge Lynch wrote, loss "is certainly a relevant sentencing

Proceedings                                          116

1   factor:  All else being equal, large thefts damage society

2   more than small ones . . . But the Guidelines provisions

3   for . . . fraud place excessive weight on this single factor.

4   <u>United States versus Emmenegger</u>, 329 F.Supp. 2d 416 et 427,

5   decided in 2004.  In addition, in United States versus aid he

6   will son, 441 F.Supp. 2d 506 et 509, decided by Judge Rakoff

7   of the Southern District in 2006.  He described the

8   "inordinate emphasis" that the Guidelines place on the amount

9   of loss in fraud cases.  In part for this reason, the sentence

10  I impose will be significantly below the sentencing guideline

11  range of 108 to 135 months.  I also note that both the

12  Probation Department and the Government have requested a

13  significant reduction from the advisory Guideline range in

14  requesting a 60-month sentence, which is well below the

15  Guideline range.

16          Mr. Greebel's facilitation of Mr. Shkreli's repeated

17  lies to his Retrophin board and his direct and critical role

18  in drafting sham consulting and settlement agreements, his

19  direct role in the manipulation and control of Retrophin

20  stock, are precisely the types of conduct that Congress sought

21  to prohibit in enacting our securities laws.  Unlike many

22  defendants, Mr. Greebel has enjoyed the good fortune of a

23  loving and supportive family and an excellent education.  His

24  status as a while collar defendant who will lose his law

25  license and has suffered reputational harm does not, itself,

Proceedings                                    117

1    entitle him to a lighter, non-incarceratory sentence on those

2    bases.  Federal law and the Guidelines require that the Court

3    maintain neutrality as to socio-economic status and counsels

4    district courts not to put weight, if any, on educational and

5    vocational skills and employment history.  Guideline 5H1.2,

6    5H1.5 and 5H1.10.  Although the collateral consequences of

7    Mr. Greebel's conviction are not unique to him, the Court does

8    find that his wife and children's circumstances arising from

9    the tragic death of Ms. Greebel's brother cannot be ignored.

10            In imposing a sentence, I have considered the

11   Congressional view that general deterrence in white collar

12   crimes is particularly important.  Fraud and manipulation of

13   financial transactions are serious offenses that will incur

14   correspondingly serious penalties.  Mr. Greebel employed his

15   highly specialized legal skills and experience and exploited

16   his position of trust and respect to conspire with Mr. Shkreli

17   and others in executing the fraudulent schemes repeatedly over

18   the course of two years, and Mr. Greebel's own client

19   Retrophin was defrauded of funds and assets in excess of

20   $10 million as a result.

21            My highly regarded colleague, Judge Jack B.

22   Weinstein, has observed that "individuals who engage in

23   financial fraud . . . choose to engage in white collar crime

24   because they believe that the potential for significant

25   financial benefits outweighs the risk that they will be

Proceedings                                    118

1    punished."  United States versus Marsh, 10-CR-480, 2011,

2    Westlaw, 5325410, at note 1, decided in October of 2011.

3    White collar offenders like Mr. Greebel use their intelligence

4    and acumen to avoid detection of their crimes.  In United

5    States versus Flom, 256 F.Supp. 3d 253, decided by my

6    colleague Judge Roslynn Mauskopf in 2017, imposed a sentence

7    on an attorney convicted of money laundering of 48 months,

8    despite the fact that no victim of the charged criminal

9    conduct lost money.  She explained her sentence by noting

10   that, "lawyers need to be deterred when they abuse their

11   license, their skill, their position of trust, to help

12   fraudsters carry out their fraud . . . fraud is hard enough to

13   detect, it's even harder when a lawyer is willing to abuse his

14   position of trust to shield that fraud from detection, the

15   crime is exacerbated when a defendant uses his appearance of

16   trust to lure people to it."

17          Mr. Greebel used his knowledge of securities and

18   transactional law, as well as his legal credentials, to lend

19   an air of legitimacy to fraudulent settlement and consulting

20   agreements.  Mr. Greebel's position as outside counsel to

21   Retrophin enabled him to conceal Mr. Shkreli's use of

22   Retrophin as his personal piggy bank, by submitting misleading

23   and incomplete information to the Board in meetings and in

24   Board minutes, submitting false representations to auditors

25   and regulatory agencies and the public regarding Retrophin's

Proceedings                                    119

1   liabilities and litigation risks, and preventing the detection

2   of and dissemination of information regarding the fraud by

3   auditors who sought to make the Board aware of the numerous

4   settlement agreements.

5           In doing so, Mr. Greebel disregarded the ethical

6   obligations incumbent upon him as a lawyer.  Rather than show

7   an acknowledgement of his actions, and I do not fault him for

8   not doing so given that he intends to appeal his conviction

9   and sentence, I believe that his expression of remorse focuses

10  on the collateral consequences to his family.  And, again, as

11  I expressed earlier, it is always disheartening to me that

12  defendants who appear here realize at sentencing that their

13  families, more than themselves, will suffer the consequences

14  of that individual defendant's judgments and decisions and

15  actions.

16

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

Proceedings                    120

1          THE COURT:   (Continuing) I consider both the need to

2    deter Mr. Greebel specifically, and to promote respect for the

3    law and to also deter, in a general manner, attorneys who

4    might be tempted to follow their client's lead to commit

5    crimes.  Despite favorable letters from his former colleagues

6    and clients, Mr. Greebel's actions and subsequent statements

7    are at odds with those characterizations.  Unlike his

8    co-conspirator, Mr. Shkreli, who acknowledged some level of

9    responsibility for his actions at his sentencing, although

10   that acknowledgment was minimal, Mr. Greebel expresses remorse

11   primarily, if not exclusively, for the affect of his actions

12   on his family.  His sentencing memorandum describes him as a

13   man deceived by a master manipulator who was led astray with

14   little to no control over his own actions.  Mr. Greebel is

15   highly intelligent.  He had a top-rate legal education and he

16   has substantial experience and, thus, had an obligation to

17   Retrophin.  Mr. Greebel is equally responsible, if not more

18   educated and experienced in the legal parameters of the acts

19   that he took with his co-conspirators.  He worked his way up

20   through his excellent hard work to become an income partner at

21   Katten and earned substantial sums as a result of his legal

22   work.  He is not feckless, he is not naive, he is not

23   inexperienced and he was not led astray by a young brash CEO.

24          Mr. Greebel made a conscious decision to join Mr.

25   Shkreli and others in the fraud conspiracies, and was rewarded

Proceedings                                        121

1   for a time with a nearly threefold increase of his

2   compensation, and was able to attain the relationship partner

3   status for this attention and media-grabbing and, to some

4   members of the public, charismatic partner in crime.  Mr.

5   Greebel did not just make one aberrational poor choice,

6   instead he engaged in a sophisticated pattern and practice of

7   deceit over the duration of the period charged in the

8   indictment.  In convicting Mr. Greebel of Counts Seven and

9   Eight, the jury found that the evidence supported a finding

10  that he intentionally conspired to defraud his client,

11  Retrophin, the individual investors, the investing public, the

12  federal regulatory agencies, all in service of Mr. Shrekli's

13  fraudulent financial schemes.

14        I acknowledge that Mr. Greebel's sentencing

15  submission states that "a verdict cost him his reputation and

16  the end of a career in a profession that had always been his

17  dream," but all of those consequences were the result of Mr.

18  Greebel's own actions, and not the prosecutors, the FBI, or

19  anyone else.  These results were certainly foreseeable.

20        Based on Mr. Greebel's actions and statements, the

21  Court cannot be confident that a non-incarceratory sentence

22  requested by the defendant will adequately serve the goals of

23  sentencing.  Thus, the sentence I impose reflects the need to

24  promote respect for the law and deter Mr. Greebel,

25  specifically, and the public generally, from illegal conduct

Proceedings                                         122

1   as required by 3553.  I believe the sentence will also avoid

2   unwarranted and unfair sentencing disparities and I have

3   considered extensively sentences in similar cases, both those

4   before me personally and others in this circuit.

5           After giving respectful consideration to the

6   guidelines and all of the submissions, the request of the

7   parties, and all of the factors set forth in 3553(a) (1)

8   through (7), for all of the reasons stated above, I will

9   impose a sentence that is below the range of 108 to 135 months

10  and is sufficient but not greater than necessary for

11  punishment and deterrence.

12          Again, the mitigating factors of his unique family

13  circumstances and his long history of charitable work, I

14  believe motivate a sentence as follows:

15          I sentence Mr. Greebel to a sentence of 18 months on

16  each of Counts Seven and Eight to run concurrently.

17          Supervised release will be imposed for three years

18  on each count, also to run concurrently, with the following

19  special conditions:

20          Mr. Greebel shall comply with payment of his

21  Restitution and Forfeiture Orders.

22          Mr. Greebel shall maintain full-time verifiable

23  employment and refrain from engaging in any self-employment

24  which involves access to clients' assets, investments, or

25  money, or solicitation of assets, investments, or money, and

Proceedings                                              123

1    he shall assist the Probation Department in verifying any

2    employment he secures while under supervision.  For the

3    purposes of this order, self-employment includes companies or

4    entities in which Mr. Greebel has a financial interest,

5    derives a benefit, or is a controlling or majority shareholder

6    or otherwise controls or directs the operations.

7              Community service shall be imposed in the amount of

8    20 hours per week for any period that Mr. Greebel is not

9    employed full-time.

10             Mr. Greebel shall provide the Probation Department

11   and the U.S. Attorney's Office with complete and truthful

12   disclosure of his financial records, including commingled

13   income, expenses, assets and liabilities to include yearly

14   income tax returns.  With the exception of the financial

15   accounts reported and noted within the pre-sentence report,

16   the defendant is prohibited from maintaining and/or opening

17   any additional individual or joint checking, savings or other

18   financial accounts for either personal or business purposes

19   without the knowledge and prior approval of the Probation

20   Department.  The defendant shall cooperate with the probation

21   officer in the investigation of his financial condition and

22   dealings and shall provide truthful and complete monthly

23   statements of his income and expenses.  The defendant shall

24   cooperate in the signing of any necessary authorization to

25   release information forms prohibiting the Probation Department

1   to access his financial information and records.

2           Restitution is mandatory and will be imposed in

3   favor of Retrophin, the victim of Count Seven, in the amount

4   of $10,447,979.  That amount is due and payable immediately

5   and may be enforced by the Government.  If that amount cannot

6   be recovered immediately, it shall be payable at a rate of $25

7   per quarter while Mr. Greebel is in custody.  And starting on

8   the first day of the first month after his release, Mr.

9   Greebel will pay a minimum amount of restitution of at least

10  15 percent of his gross monthly income after deductions

11  required by law, or $500 per month, whichever is greater.  He

12  must pay this amount until paid in full.  Restitution has a

13  priority over any other financial obligations, like

14  forfeiture.

15          Failure to comply with his restitution payments and

16  forfeiture payments will provide grounds for a violation of

17  supervised release.

18          Mr. Greebel must pay a $200 mandatory special

19  assessment for the two counts of conviction.

20          I will not impose a fine given the amount and the

21  priority of restitution.

22          Mr. Greebel must also pay forfeiture in the amount

23  of $10,555.15 for Count Seven and $105,906.88 for Count Eight,

24  for a total forfeiture of $116,462.03.  The forfeiture shall

25  also be paid in full, if Mr. Greebel has assets to do so, or

Proceedings                                           125

1  at the same rate and under the same conditions as he should

2  pay restitution.  If he can do so simultaneously, he shall pay

3  both the restitution and forfeiture simultaneously.  And if he

4  can not do so, he will pay his forfeiture after he completes

5  his restitution, or if he becomes able to pay both

6  simultaneously on a regular monthly payment schedule.

7          I'd like to discuss with counsel any recommendations

8  as to his designation and a surrender date.

9          MR. BRODSKY:  Your Honor, in light of your sentence,

10 would you give us a few days to make a recommendation on a

11 sentencing facility on a designation?

12         THE COURT:  Yes, I can hold the judgment until

13 Monday, would that be all right?

14         MR. BRODSKY:  Would you make it Tuesday, just

15 because today is the end of the day?

16         THE COURT:  Okay.  Do you also want to discuss with

17 your client a surrender date?  I am assuming he will self

18 surrender, which will give him better stead within the Bureau

19 of Prisons.

20         MR. BRODSKY:  He certainly would, Your Honor.

21 Before that, we would ask for bail pending appeal under the

22 statute for bail pending appeal, which is, as Your Honor

23 knows, Title 18 United States Code 3143.

24         THE COURT:  Does the Government object?

25         MS. SMITH:  Yes, Your Honor, and given that this

Proceedings                                        126

1    wasn't raised before today and we don't believe that the

2    defense can show there is a substantial question of law or

3    fact likely to result in a reversal on both counts, if the

4    Court is going to consider it and the motion is made before

5    the Court, we would like the opportunity to brief it.

6             THE COURT:  Well, I am not going to remand him

7    today.

8             MS. SMITH:  I recognize that.  Next week is fine.

9             THE COURT:  Why don't you both put in your

10   submissions on whether he should be remanded by Tuesday.

11            MS. SMITH:  Your Honor, can we respond to the

12   defense motion, because we don't know what they are claiming

13   is a substantial issue of law; in fact, it is hard for us to

14   take a position.

15            THE COURT:  I will ask for responses by Wednesday.

16   All right?

17            MS. SMITH:  Yes.

18            THE COURT:  Submissions by Tuesday, responses by

19   Wednesday.

20            MR. BRODSKY:  My understanding, Your Honor, is the

21   Government is not opposing self surrender in 45 days, or

22   whenever it may be; I think they are opposing bail pending

23   appeal.  So, in light of that -- I think that's my

24   understanding.

25            MS. SMITH:  That's correct.  We would like the

Proceedings                                    127

1   opportunity to brief bail pending appeal that needs to be

2   defended in the District Court, but we do not object to self

3   surrender.

4            MR. BRODSKY:  And since there is no objection to

5   self surrender, we are happy to submit on Tuesday our motion

6   paperwork, but perhaps you can give us a week, Your Honor, for

7   the bail pending appeal.  Your Honor can issue the judgment

8   with the designation before that, but the issue of bail appeal

9   is separate from the judgment.

10           THE COURT:  Do the parties need more than a week?  I

11  mean, do the parties need more than Tuesday to brief this?

12           MR. BRODSKY:  More than Tuesday, probably.  We would

13  ask for one week from today, that would be fine.

14           THE COURT:  On Friday, next Friday, August 24th?

15           MR. BRODSKY:  Yes, Your Honor.

16           THE COURT:  The problem is I have a business trip

17  the last week of August, out of state, so I would want to be

18  able to deal with this before I leave.

19           MR. BRODSKY:  Do you want us to do next Thursday?

20           THE COURT:  Well, that gives me 24 hours.  You have

21  put me through the paces, Mr. Brodsky, I would like more time

22  because I believe this is an important issue.  Could you put

23  it in by, at the latest, close of business Tuesday?

24           MR. BRODSKY:  We could, Your Honor.  May I suggest

25  this?  I mean, we certainly will do it, Your Honor, since the

Proceedings                          128

1    self surrender would be 45 days out or 60 days out, we would

2    ask for 60 days, and, therefore, that -- the key issue is the

3    self surrender date.  Technically speaking, Your Honor, would

4    have to make a decision before that self surrender date as to

5    whether or not he needs to self surrender on that date or he

6    is entitled to bail pending appeal.

7            THE COURT:  Generally, from my experience, the BOP

8    doesn't designate anybody for six weeks generally, and I am

9    assuming Mr. Greebel is going to request a designation to a

10   facility close to the New York City area so that, if he wishes

11   to have family visits, they can be made.

12           What is the Government's view on briefing?  I don't

13   want to let something lurk.

14           MS. SMITH:  I agree with Mr. Brodsky, the judgment

15   can be issued and we can brief bail pending appeal.  I think

16   if the defense put in their submission by the 24th, we can

17   respond by the 31st, and then Your Honor could issue a

18   decision the following week which would give, depending on the

19   outcome, either party sufficient time to appeal to the Second

20   Circuit before the surrender date would happen since they do

21   do that on an expedited basis.

22           THE COURT:  So Mr. Greebel's motion for bail pending

23   appeal would be submitted by August 24th and the Government

24   would respond by August 31st.

25           MR. BRODSKY:  Will we have an opportunity for reply,

Proceedings                                    129

1   Your Honor?  I hate to ask.

2           THE COURT:  Fine.  If you have a reply, don't raise

3   new issues though.

4           MR. BRODSKY:  I will not.

5           THE COURT:  That just kept happening.

6           MR. BRODSKY:  I apologize, Your Honor, I will not.

7           THE COURT:  Just tell me everything you need to tell

8   me.

9           Is there anything else?

10          MR. BRODSKY:  What date would you like us to submit

11  the reply?

12          THE COURT:  Well, we are going to start running into

13  Labor Day and the holidays, let's just say September 7th,

14  that's more than enough time.

15          MR. BRODSKY:  Thank you.  Would you recommend, Your

16  Honor, Mr. Greebel's admission to the RDAP program, the

17  alcohol treatment program, in light of his history of --

18          THE COURT:  Do you want me to recommend it, also, as

19  a condition of his supervised release?  I've thought about it,

20  given some concerning information in the PSR.

21          MR. BRODSKY:  Yes, Your Honor.

22          THE COURT:  All right.  So I will also order that

23  Mr. Greebel submit to -- I don't think we have any drug

24  issues, but alcohol abuse?

25          MR. BRODSKY:  Yes, Your Honor.

Proceedings                         130

1          THE COURT:  Counseling and treatment?

2          MR. BRODSKY:  Yes.

3          THE COURT:  And as a condition of probation?

4          MR. BRODSKY:  The prison has a program for it and he

5     may need to continue it into supervised release.

6          THE COURT:  I'm sorry I said probation, but I meant

7     as a condition of supervised release, and RDAP program with

8     the BOP.

9          MR. BRODSKY:  Thank you, Your Honor.

10          THE COURT:  I don't know what facilities have that

11     program within the tri-state area.

12          MR. BRODSKY:  That's one of the things that we

13     wanted to check to make sure.

14          THE COURT:  All right.

15          (Continued on following page.)

16

17

18

19

20

21

22

23

24

25

```
                        Proceedings                    131
```

1    (Continuing)

2            MS. SMITH:  And then, Your Honor, since the defense

3    has suggested 60 days for surrender date, that would be

4    October 17th.

5            THE COURT:  He will self-surrender, sir?

6            MR. BRODSKY:  Yes.

7            THE COURT:  All right.

8            I recognize that this is very difficult for the

9    Greebel family, but I do wish everybody well.

10           MR. BRODSKY:  Thank you, Your Honor.

11

12           (Matter adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25