# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

June 12, 2020

<u>VIA ECF</u>

The Honorable Kiyo Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   <u>United States v. Greebel</u>, S1 15 Cr. 637 (E.D.N.Y.) (KAM)

Dear Judge Matsumoto:

As counsel for Mr. Greebel in the above-referenced matter, we write to provide the Court Mr. Greebel's formal written objection, pursuant to 28 U.S.C. § 3205(c)(5), to the Answer of the Garnishee, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), dated December 19, 2018 and the Answer of the Garnishee, Charles Schwab Retirement Plan Services ("Charles Schwab"), dated January 1, 2019.  We respectfully request that the Court hold a hearing on this matter.

On or about November 19, 2018, a Writ of Garnishment was issued to Merrill Lynch, based on a Judgment entered against Mr. Greebel on August 24, 2018.  The Writ of Garnishment was served on Merrill Lynch, which maintains custody, control or possession of Mr. Greebel's 401(k) Plan account titled "Fried, Frank, Harris, Shriver & Jacobson LLP 401(k) Incentive Savings Plan Greebel, Evan" (the "Fried Frank Plan").

On or about December 19, 2018, a Writ of Garnishment was issued to Charles Schwab, based on a Judgment entered against Mr. Greebel on August 24, 2018.  The Writ of Garnishment was served on Charles Schwab, which maintains custody, control or possession of Mr. Greebel's 401(k) Plan account titled "Katten Muchin Rosenman LLP Defined Contribution Plan" (the "Katten Plan").  We respectfully submit that the funds at issue are not subject to garnishment for a number of reasons as set forth below.

June 12, 2020
Page 2

### Argument

The Petitioner cannot reach the funds at issue because Mr. Greebel does not have a current, unilateral right to receive payments under the terms of the Fried Frank Plan, which is attached hereto as Exhibit A, or the Katten Plan, which is attached hereto as Exhibit B.

Pursuant to the Mandatory Victims Restitution Action of 1996 ("MVRA"), there must be a "current, unilateral right to receive payments under the terms of the retirement plan" to garnish a criminal defendant's retirement benefits. *United States v. Novak*, 476 F.3d 1041, 1043 (9th Cir. 2007); *see also United States v. Feldman*, No. 14-CR-6092-FPG, 2017 WL 3866024, at *7 (W.D.N.Y. Sept. 5, 2017), *vacated and remanded*, 939 F.3d 182 (2d Cir. 2019); *United States v. Hotte*, No. 97 CR 669 SJ RML, 2007 WL 2891313, at *3 (E.D.N.Y. Sept. 28, 2007), *decision clarified on reconsideration*, No. 97 CR 669 (SJ)(RML), 2007 WL 3124676 (E.D.N.Y. Oct. 23, 2007).

The Katten Plan and the Fried Frank Plan are retirement plans and are protected by the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* Katten Plan §§ 11(q); 15.2; 15.13; Fried Frank Plan § 8.01. As such, the Petitioner must "step into the shoes" of Mr. Greebel and can only garnish portions of the Plans to which Mr. Greebel has a current, unilateral right. *Feldman*, 2017 WL 3866024 at *6–7 (citing *Novak*, 476 F.3d at 1060–64). Because Mr. Greebel does not have an unambiguous right to the funds in the Katten Plan or the Fried Frank Plan at this time, the Petitioner cannot reach the funds at issue.

**A.    Mr. Greebel Does Not Have A Current, Unilateral Right To Receive Payments Under The Terms Of The Fried Frank Plan.**

Mr. Greebel does not have a current, unilateral right to receive payments under the terms of the Fried Frank Plan, and will not have such a right until at least he is sixty-two years old, which will occur on July 2, 2035.

Section 6.02 dictates the mechanics for a payment to be made to Mr. Greebel. Section 6.02(a) states that "except as provided in Subsection (b) or (c), the distribution of a Participant's Account Balance shall occur upon the earliest practicable date after the Investment Date of the Plan Year in which his Separation from Service occurs." *Id.* § 6.02(a). Mr. Greebel's separation from service at Fried Frank occurred in 2002. However, Section 6.02(b) states that if Mr. Greebel's vested account balance exceeds $1,000—which it does—"his vested Account balance shall not be distributed until he reaches his sixty-second (62nd) birthday unless he elects within the period between thirty (30) days and one hundred and eighty (180) after he receives the notice required by Treasury Regulation Section 1.411(a)-11(c) to receive his benefits prior to that date." *Id.* Mr. Greebel did not make the election required by section 6.02(b). Therefore, pursuant to the Fried Frank Plan, Mr.

June 12, 2020
Page 3

Greebel is not eligible to have his balance distributed to him until he turns sixty-two years old. Thus, were the Petitioner to step into the shoes of Mr. Greebel, it would not be able to garnish the funds until July 2, 2035.

Petitioner may argue that Mr. Greebel is entitled to a distribution pursuant to section 6.01. Regardless of whether this interpretation is correct, the mechanics of this distribution are governed by the aforementioned section 6.02(b) and section 6.03.

Petitioner may also argue Mr. Greebel is not a "Participant" and that section 6.02(b) is thus inapplicable to Mr. Greebel. However, Section 6.01 and Section 6.02(a) imply that a "Participant," at least for purposes of Section 6.01 and Section 6.02, also refers to someone who has had a Separation from Service. *Id.* at § 6.02(a) (the distribution of a ***Participant's*** Account balance shall occur upon the earliest practicable date ***after*** the Investment Date of the Plan Year in which ***his Separation from Service*** occurs); *see also id.* § 6.01 ("Each Participant shall be furnished a statement as soon as practicable after each Investment Date . . ."). Sections 6.01, 6.02 and 6.03 refer to a "Participant" or a "Participant's Account" simply to identify the account at issue—the term does not correlate to whether that person has experienced a "Separation of Service."

**B.     Mr. Greebel Does Not Have A Current, Unilateral Right To Receive Payments Under The Terms Of The Katten Plan.**

While the Katten Plan is internally inconsistent and ambiguous, a review of the two applicable sections—Article VII, which is titled "Withdrawals," and Article VIII, which is titled "Forms of Benefit and Payment Dates for An Inactive Participant"—demonstrate that Mr. Greebel is not entitled to receive the funds in the Plan until he is over seventy-and-one-half years old.

**1.     Article VII**

Article VII addresses withdrawals, including withdrawals from Rollover Accounts and Roth Rollover Accounts (§ 7.1); withdrawals for hardship (§ 7.2); withdrawals after an Active Participant[1] has attained age 59 ½ (§ 7.3); partial withdrawals by an Inactive Participant (§ 7.4), and participant loans (§ 7.6).

---

[1] Mr. Greebel is an "Inactive Participant," rather than an "Active Participant," because he is not a current employee of Katten Muchin Rosenman LLP. *See id.* § 1.42 ("'Inactive Participant' means a Participant who is not an Active Participant."); *id.* § 1.3 ("'Active Participant' means a Participant who is also an Employee.").

June 12, 2020
Page 4

Section 7.4 of the Plan, which is oddly entitled "*Partial* Withdrawals by Inactive Participants" explains that an Inactive Participant must "apply[] to the Applicable Administrative Named Fiduciary in the form and manner prescribed by such Applicable Administrative Named Fiduciary" in order to make a partial or full withdrawal from the Plan. § 7.04 (emphasis added). Nowhere in the Plan does it say that an Inactive Participant is entitled to the money upon request, or that the Applicable Administrative Named Fiduciary is required to deliver the money following Mr. Greebel's application. Rather, it says that Mr. Greebel may *apply*. Furthermore, Article VII states that Mr. Greebel cannot reach the funds at issue until the Applicable Administrative Named Fiduciary approves his application for withdrawal (*see id.* § 7.5(c-d)). Because an application and the approval of a third party are required, Mr. Greebel does not have a current, unilateral right to the money at this time.

Additionally, the Plan requires that a Participant[2] follow certain "Withdrawal Processing Rules." *See id.* § 7.5. It states that "[a] Participant must submit a withdrawal request in accordance with procedures established by the Applicable Administrative Named Fiduciary." *Id.* § 7.5(c). Other parts of the Plan contemplate that the Applicable Administrative Named Fiduciary is not obligated to accept an application. *See e.g.*, *id.* § 7.2 (evincing that in connection with a Hardship Withdrawal, the withdrawal application may be rejected). Thus, Mr. Greebel will only become eligible for distributions after his application is approved by the Applicable Administrative Named Fiduciary, and therefore does not have a unilateral right to the funds in the Plan. *Compare United States v. Ibianski*, No. 07-20632, 2016 WL 3995938, at *6 (E.D. Mich. July 26, 2016) ("Without knowing Ibianski's eligibility for these benefit [*sic*], the Court cannot determine if Ibianski is entitled to receive a Deferred Vested Termination Benefit under section 3.8(a) of the Plan. Because eligibility for an Immediate Vested Termination Benefit under section 3.8(b) is dependant [*sic*] upon satisfying section 3.8(a), ThyssenKrupp has not shown that Ibianski has a current, unilateral right to his benefits under the Plan. Under the rule of Novak, Thyssen is not entitled to relief without presenting more information."); *United States v. Taylor*, No. 11-51597, 2012 WL 1309863, at *2–3 (E.D. Mich. Mar. 16, 2012), *report and recommendation adopted*, No. 2:11MC51597, 2012 WL 1339081 (E.D. Mich. Apr. 17, 2012) (finding that account holder did not have a unilateral right where "all of the other eligibility requirements for a separation benefit [were not yet] met"); *with United States v. Samuel*, No. 2:15-MC-16-JAM-KJN, 2016 WL 632806, at *6 (E.D. Cal. Feb. 17, 2016) (finding unilateral right where account holder was "eligible to withdraw").

---

[2] Mr. Greebel is a "Participant." *See id.* § 1.56 ("'Participant' means an Eligible Employee who beings to participant in the Plan after completing the eligibility requirements. A Participant's participation continues until his Termination of Employment **and** withdrawal or forfeiture of his entire Account Balance."). (emphasis added). As such, he is simultaneously an Inactive Participant and a Participant.

**GIBSON DUNN**

June 12, 2020
Page 5


Any withdrawals by Mr. Greebel under Article VII would also be governed by Section 7.7. *See generally id.* Art. VII (placing Section 7.7 at the end of the Article after descriptions for each type of withdrawal).[3]  Section 7.7(a)(2) states that "[a]ll distributions[4] required under this Section 7.7 shall be determined and made in accordance with the Treasury Regulations issued and in effect under code Section 401(a)(9)."  These Treasury Regulations state that the "Required beginning date"—i.e. the date on which Mr. Greebel's distributions are to begin— is "April 1 of the calendar year following the *later of* . . . the calendar year in which the employee attains age 72, or the calendar year in which the employee retires."  26 U.S.C. 401(a)(9)(C) (emphasis added); *see also* Katten Plan § 7.7(b)(1) (providing the same requirement).  When these distributions occur, they will be periodic distributions as described in Section 7.7(c) and the Lifetime Table set forth in Treasury Regulation § 1.401(a)(9), which is explicitly referenced in Section 7.7.

Article VII plainly states that Mr. Greebel is required to apply to receive the funds at issue.  There is no corresponding language stating that he is entitled to the funds or that the Applicable Administrative Named Fiduciary is required to approve his application.  As such, Mr. Greebel does not have a current, unilateral right to payment.  Even if his application is approved by the Applicable Administrative Named Fiduciary, any distribution of the money is not required to occur until Mr. Greebel is 70 ½.  *See id.* § 7.7(a)(2).

---

[3] Note that Section 7.7(a)(1) states that "[t]he requirements of this Section 7.7 shall take precedence over any inconsistent provisions of the Plan."

[4] The Katten Plan does not define "distribution" or "withdrawal," but it is clear that any payment of funds from the Plan is a "distribution" regardless of whether it was made pursuant to a "withdrawal" or other mechanism.  Article VII is titled "Withdrawals," but contains sections discussing "loans" (§ 7.6), and "distribution[s]" (§ 7.7).  Merriam-Webster defines a "distribution" as "1a: the act or process of distributing . . . [e.g.] profit distribution . . . 3a: something distributed . . . [e.g.] charitable distribution: such as (1): a sum of money withdrawn from a fund (such as a retirement fund) and given to the beneficiary . . . .or holder of the fund[.]"  *Distribution*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/distribution (last visited June 11, 2010); *see also Distribution*, Black's Law Dictionary (11th ed. 2019) (defining "distribution" as, inter alia, "[t]he act or process of apportioning or giving out . . . [t]he cash or other property paid or credited to a trust beneficiary").  Merriam-Webster defines "withdrawal" as " the act of taking back or away something that has been granted or possessed . . . removal from a place of deposit or investment . . . the act of drawing someone or something back from or out of a place or position[.]"  Withdrawal, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/withdrawal (last visited June 11, 2010); see also *Withdrawal*, Black's Law Dictionary (11th ed. 2019) (defining "withdrawal" as, inter alia, "[t]he removal of money from a depository <withdrawal of funds from the checking account>.").  Thus, payments under the Katten Plan are "distributions" and are governed by Section 7.7.

**GIBSON DUNN**

June 12, 2020
Page 6


    **2.**    **Article VIII**

Article VIII is titled "Forms of Benefit and Payment Dates For An Inactive Participant" and provides procedures that an Inactive Participant must follow to receive the funds in the Plan but which are inconsistent with Article VII.  *See generally id.* Art. VIII.  Article VIII further demonstrates that Mr. Greebel does not have a current, unilateral right to the funds at issue.

Section 8.1(a) limits the times at which an Inactive Participant may choose to receive funds from the Plan.  It states that "an Inactive Participant may elect to have all or a portion of his Account Balance paid to him beginning upon any Settlement Date following his termination of Employment in a form of payment allowed hereunder."  *Id.* § 8.1(a).  This of course differs from and is inconsistent with the language in Section 7.04 discussed above.  The Plan defines a "Settlement Date" as the date a "financial transaction is effected."  *Id.* §1.70, 1.75.  Mr. Greebel has not initiated any financial transaction and would not know how to initiate one.  Given that no "Settlement Date" has occurred, the language of Section 8.1(a) suggests that Mr. Greebel cannot presently make a withdrawal.  The language in Sections 7.4 and 8.1 are inconsistent in that each section sets forth different parameters and requirements for withdrawal.  It is not clear which of these different requirements applies.  If a Settlement Date is deemed to occur, the other provisions of Article VIII would be applicable.

Section 8.2, which is titled "Deadline for Withdrawal," states that "[a]n Inactive Participant must make a request for payment before payment may commence" and explicitly references the distribution rules set forth in Section 7.7.  *Id.* § 8.1(b).  Thus, Section 7.7 applies to Section 8.2 such that even if Mr. Greebel's request under Section 8.1(a) is approved, he would not receive payments until he reaches age 70 ½.  *See id.* § 7.7(a)(2).  Under Section 8.2, the earliest Mr. Greebel would be permitted to receive the funds in the Plan is when he reaches Normal Retirement Age.[5]  However, that language once again conflicts with Section 7.4 and 7.7.  Due to the overt inconsistencies in the Plan, it is not clear which of the two sections apply.  As such, at no point prior to age 70 ½ would Mr. Greebel have a clear, unilateral right to the money.

    **3.**    **The Plan Summary**

Due to the significant inconsistencies and ambiguities in Articles VII and Article VIII, the Court should consider the Plan Summary as extrinsic evidence.

As explained above, these inconsistencies include that Section 7.4 purports to discuss "Partial Withdrawals," but also states that an Inactive Participant can withdraw the entire

---

[5] "Normal Retirement Age" is defined as age fifty-five.  *Id.* § 1.53.

value of his Accounts. Katten Plan § 7.4. Furthermore, Section 7.4 is governed by the "Withdrawal Processing Rules" in Section 7.5 and the payment schedule in Section 7.7. Conversely, Section 8.1 also discusses withdrawals by an "Inactive Participant." *See id.* § 8.1. But Section 8.1 states that payments are to commence "upon any Settlement Date following [] Termination of Employment," i*d.* § 8.1(a), and provides a "Deadline for Withdrawal," *id.* § 8.2. Both of these requirements are absent from Section 7.4 and, if applicable, would completely contradict Sections 7.5 and 7.7. In addition, Section 7.4 clearly requires an application to, and the approval of, the Applicable Administrative Named Fiduciary. There is nothing in the Katten Plan to suggest whether Sections 7.4, 7.5, and 7.7 or Sections 8.1, 8.2, and 8.3 apply and/or govern the role of the Applicable Administrative Named Fiduciary. Given these inherent contradictions and ambiguities, the Court should consider the Plan Summary as extrinsic evidence. *See Quinio v. Aala*, 344 F. Supp. 3d 464, 473–74 (E.D.N.Y. 2018); *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 765 (2018).

The Katten Plan's accompanying "Summary Plan Description" (the "Plan Summary"), which is attached hereto as Exhibit C, states that Mr. Greebel cannot make a withdrawal until he reaches age 59 ½, which will occur on January 2, 2033. Plan Summary at 14 ("Once you reach age 59 ½, you may withdraw all or a part of your Plan Account for any reason"). Because Mr. Greebel must wait until 59 ½ to make a withdrawal per the Plan Summary, he will be unable to make a timely request pursuant to Section 8.2 of the Katten Plan. Katten Plan § 8.2 (stating that the Mr. Greebel must submit his request no later than sixty days after the close of the plan year in which Mr. Greebel reaches Normal Retirement Age, which the Plan defines as 55).[6] Thus, were the Petitioner to step into the shoes of Mr. Greebel, it would be forced to make an application under Section 7.4, and would not be able to garnish the funds until Mr. Greebel turns 70 ½ years-old on January 2, 2044. *See id.* § 7.7. At this point, distributions would be periodic and calculated pursuant to the Treasury Regulations under Code Section 401(a)(9). *See id.* § 7.7(a)(2).

This is consistent with the provision that "no benefit provided by the Plan may be anticipated, assigned or alienated, except to create, assign or recognize a right to any benefit with respect to a Participant pursuant to a QDRO."[7] Katten Plan §15.1.

---

[6] The other dates in 8.2 are the tenth anniversary of Mr. Greebel commencing participation in the plan, which would have been on or about September 10, 2012 and the date that Mr. Greebel's employment at Katten terminated, which was on or about June 30, 2015. Both of these dates are earlier than the year in which Mr. Greebel turns age 55, which is July 2, 2028.

[7] A QDRO is an order that creates or recognizes the right of an alternate payee, e.g. Mr. Greebel's spouse, to receive all or a portion of the benefits payable under the Plan. *See* Katten Plan § 1.65 (QDRO is "a domestic relations order that the Applicable Administrative Named Fiduciary has determined to be a qualified domestic relations order within the meaning of Code Section 414(p)"); 26 U.S. Code § 414 (p)(1)(A)(i) (a QDRO "creates or recognizes the existence of an alternate payee's right to, or assigns to

June 12, 2020
Page 8

C. **The Consumer Credit Protection Act Restricts Garnishment To Only 25% Of The Funds At Issue.**

Even if Mr. Greebel had a current, unilateral right to receive payments under the terms of the Katten Plan and the Fried Frank Plan—which he does not—the Consumer Credit Protection Act bars Petitioner from garnishing more than twenty-five percent of Mr. Greebel's amount in the Plans.

    a. **The Federal Debt Collection Procedures Act and the Consumer Credit Protection Act**

Under the Federal Debt Collection Procedures Act ("FDCPA"), "[a] court may issue a writ of garnishment against property (including ***nonexempt disposable earnings***) in which the debtor has a substantial nonexempt interest and which is in the possession, custody, or control of a person other than the debtor, in order to satisfy the judgment against the debtor." 28 U.S.C. § 3205(a) (emphasis added).

The FDCPA defines "nonexempt disposable earnings" as "***25 percent of disposable earnings***, subject to . . . the Consumer Credit Protection Act." *Id.* § 3002(9) (emphasis added). The Consumer Credit Protection Act ("CCPA") states:

> Except as provided in subsection (b) and in section 1675 of this title, the maximum part of the aggregate disposable earnings of an individual for any workweek which is subjected to garnishment may not exceed
>
> (1) 25 per centum of his disposable earnings for that week, or
>
> (2) the amount by which his disposable earnings for that week exceed thirty times the Federal minimum hourly wage prescribed by section 206(a)(1) of Title 29 in effect at the time the earnings are payable, whichever is less.

15 U.S.C. § 1673(a).

Under the CCPA, "earnings" are defined as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments ***pursuant to a pension or retirement program***." *Id.* § 1672(a) (emphasis added). "Disposable earnings" are "that part of the earnings of any individual

---

    an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan[.]").

remaining after the deduction from those earnings of any amounts required by law to be withheld." *Id.* § 1672(b).

        **b.**        **The Applicability of the Consumer Credit Protection Act to the Katten Plan and the Fried Frank Plan**

The CCPA's 25% cap on garnishment explicitly applies to "a pension or retirement program." 15 U.S.C. § 1672(a); *see also United States v. Belfort*, 340 F. Supp. 3d 265, 268 (E.D.N.Y. 2018) (stating the Federal Debt Collection Procedures Act explicitly references the applicability of the Consumer Credit Protection Act to "earnings," and that the CCPA applies to "a pension or retirement program").

Furthermore, the CCPA's 25% cap is applicable to garnishment ordered pursuant to the MVRA. *See United States v. Lee,* 659 F.3d 619, 622 (7th Cir. 2011) ("Where a pension or retirement program authorizes payments, the payments are made 'pursuant to' the fund and therefore constitute 'earnings.' Hence, the Petitioner cannot garnish more than 25% of pension distributions."); *United States v. DeCay*, 620 F.3d 534, 544 (5th Cir. 2010) ("the United States may not garnish more than twenty-five percent of Barre's monthly pension benefits under the CCPA"); *see also United States v. Ashcraft*, 732 F.3d 860, 864 (8th Cir. 2013) ("disability payments constitute 'earnings'" under the CCPA).

For the avoidance of doubt, the CCPA applies to all distributions made pursuant to the Katten Plan and the Fried Frank Plan, whether periodic or lump sum. In this regard, *United States v. Ashcraft* and *United States v. DeCay* are instructive. In *DeCay*, the court considered whether the CCPA applied to garnishment of a pension plan pursuant to the MVRA. 620 F.3d at 536. The court stated:

> The statute explicitly defines "earnings" to include "periodic payments made *pursuant to* a pension or retirement program." 15 U.S.C. § 1672(a) (emphasis added). The term "pursuant to" is generally defined as "in compliance with; in accordance with; under [or] ... as authorized by ... [or] in carrying out." . . . Because the United States does not dispute that the terms of the pension plan authorize Barre to receive monthly pension benefits, we conclude that the payments are being made "pursuant to" the pension fund and therefore constitute "earnings" under the CCPA. Accordingly, we conclude that the United States may not garnish more than twenty-five percent of Barre's monthly pension benefits under the CCPA.

*Id.* at 544 (citation omitted).

June 12, 2020
Page 10

In *Ashcraft*, the court considered whether disability payments constitute "earnings" under the CCPA. *Ashcraft*, 732 F.3d at 861. In holding that the disability payments were "earnings," the *Ashcraft* court reasoned that "[t]he statute Congress passed ***does not restrict itself to periodic payments***. It includes payments 'denominated as wages, salary, commission, bonus, or otherwise,' ***contemplating a wide variety of payment structures***. Indeed, bonuses (and payments in the 'otherwise' category) are frequently not periodic. Congress defines the only test as whether the payment is 'compensation paid or payable for personal services.'" *Id*. at 863 n.4 (emphasis added).

The Court added that "[b]y defining 'earnings' as 'compensation paid or payable for personal services, ***whether denominated as*** wages, salary, commission, bonus, or otherwise,' the Act prioritizes the character of the payment over its label. Thus, although Ashcraft's evidence that the IRS lists her disability payments as wages may support her claim, ***whether or not the disability payments are labeled as wages is not the central issue; the central issue is whether the disability payments are 'compensation paid or payable for personal services.'*** We hold they are." *Id.* at 864 (some emphasis in original and some emphasis added).

Regardless of whether the distributions are lump sum or periodic, the portions of Mr. Greebel's salary that went into his employers' 401(k) plans, as well as the contributions into the plans from his employers, were "compensation paid or payable for [Mr. Greebel's] personal services" *id.* at 864, and that they will be made "pursuant to" the Katten Plan, *DeCay*, 620 F.3d at 544. As such, they fall squarely within the ambit of the CCPA.

### D. The Department Of Labor Holds That The Consumer Credit Protection Act Applies To Lump Sum 401(K) Payments.

The U.S. Department of Labor, which is statutorily charged with enforcing the garnishment provisions of the CCPA, interprets the CCPA's definition of "earnings" to apply to lump sum payments from pension plans and 401(k) plans. Thus, to the extent the funds in the Katten Plan are subject to garnishment, Petitioner can only garnish 25% of the funds regardless of whether they are distributed in lump sum or periodic payments.

#### 1. The Department of Labor Opinion Letter

On April 12, 2018 the Department of Labor issued an opinion letter (the "Opinion Letter") attached hereto as Exhibit D, concluding that lump sum payments constitute earnings under the CCPA. The Opinion Letter demonstrates that the CCPA applies to the funds at issue.

The "General Legal Principles" section of the Opinion Letter explains "that lump-sum payments may occur only occasionally or one time does not alone render them outside the

**GIBSON DUNN**

June 12, 2020
Page 11

scope of earnings under the CCPA.  Indeed, bonuses are often infrequent or given only one time, but the statute plainly includes them as earnings." Opinion Letter at 3 (citing 15 U.S.C. § 1672(a)).  The Opinion Letter explains that "the compensatory nature of the payment, i.e., whether the payment is for services provided by the employee, rather than the frequency of the payment, is determinative under 15 U.S.C. § 1672(a)." *Id.* at 3.  This language is applicable to Mr. Greebel because the money owed to Mr. Greebel under the Katten Plan and the Fried Frank Plan is "compensation paid or payable for personal services." *See*, *e.g.*, Exhibit E (2014 Schedule K-1) at 3 (showing Katten Plan's 401(k) pre-tax contribution of $17,500 and profit sharing contribution of $23,751 being treated as yearly income).[8]  Katten and Fried Frank created the Plans, contributed to the Plans, and administered the Plans in order to provide Mr. Greebel compensation for his services to the firm.  *See*, *e.g.*, Katten Plan §§ 1.28; 1.57; 1.64; Fried Frank Plan §§ 3.05; 9.03(c); *id.* at 3-4 (providing definitions of "Compensation," "Employer Contributions," "Base Salary," and "Basic Salary Reduction Contribution").

Furthermore, the Opinion Letter states that "a profit sharing payment is compensation for the employee's service and is similar in nature to a bonus." Opinion Letter at 4; *see also id.* at 6.).  The Katten Plan and Fried Frank Plan are profit sharing plans or pay-based accounts. *See* Katten Plan § 7.5(g); Fried Frank Plan §§ 3.05; 9.03(c); *id.* at 3-4.  According to the Opinion Letter, there is only one type of lump-sum payment that does not qualify as "earnings" under the CCPA—the buyback of company shares—which the Katten Plan and Fried Frank Plan are not.  *See* Exhibit E at 3; Transcript of Record at 10745, 10790–91, *United States v. Greebel*, No. 15-CR-637 (E.D.N.Y. December 22, 2017) (showing government's repeated references to the amount of earnings Mr. Greebel was "paid" for his services, and which included the amounts that Katten deducted from Mr. Greebel's salary and put into the Plan).

Moreover, the Supreme Court has held that individual retirement accounts ("IRAs"), pension plans, annuity plans, and profit sharing plans "provide a substitute for wages," are "compensation earned as hourly or salary income . . . and not mere savings accounts." *Rousey v. Jacoway*, 544 U.S. 320, 329 (2005); *see also* IRC § 72(t)(1) (providing 10% penalty for early withdrawal from qualified retirement plan, which is a fundamental difference between retirement account and "mere savings accounts").  Under *Rousey*, regardless of when and how distributions are made, the key consideration is whether they are "income" as a "substitute for wages." *Rousey*, at 330–32.  As discussed above, the funds in the Katten Plan and the Fried Frank Plan are a substitute for the compensation that Katten and Fried Frank, respectively, paid Mr. Greebel for his services.

---

[8] The 2014 Schedule K-1 is representative of Mr. Greebel's other Schedule K-1s, which similarly show that the funds at issue in the Katten Plan and the Fried Frank Plan were part of Mr. Greebel's compensation.

June 12, 2020
Page 12

Petitioner has only argued against the Opinion Letter on one prior occasion, which was in the context of stock payments that were made *after* the Defendant's conviction, not earnings paid by an employer into a 401(k) on behalf of an employee *before* any conviction. In that case, the court did not address the government's argument on the Opinion Letter. *See Belfort*, 340 F. Supp. 3d at 269. The Petitioner argued that the Opinion Letter was "not entirely consistent with the government's arguments" because "the CCPA definitions of 'earnings' and 'disposable earnings' apply only to money." Brief for Gov't at 2, *United States v. Belfort*, 340 F. Supp. 3d 265 (E.D.N.Y. 2018), ECF 237. Thus, Petitioner has previously conceded that the CCPA's definition of earnings and disposable earnings applies to the Katten Plan and the Fried Frank Plan, which contain money.

The Petitioner may argue that the Opinion Letter is based exclusively on the facts presented by the requester of the opinion. However, the Court should note that the facts of the Opinion Letter include "follow up correspondence" wherein the requester sought guidance on "eighteen specific examples," which included "discretionary bonuses," "nondiscretionary bonuses," and "profit sharing." Opinion Letter at 2–3. The Court should also note that the Opinion Letter includes a section titled "General Legal Principles," which discusses the CCPA generally. *See* Opinion Letter at 3. This section, on which Mr. Greebel primarily relies, provides citations to various caselaw, and as such, is not cabined to the facts presented by the requester of the opinion. *See* Opinion Letter at 3.

The Petitioner may argue the Opinion Letter is inconsistent with *Kokoszka v. Belford*, 417 U.S. 642 (1974), and subsequent federal case law relying on *Kokoszka*. However, such an argument would misunderstand how *Kokoszka* applies to the case at bar. In *Kokoszka*, the Supreme Court held that "the terms 'earnings' and 'disposable earnings,' as used in 15 U.S.C. §§ 1672, 1673, did not include a tax refund, but were limited to periodic payments of compensation and [did] not pertain to every asset that is traceable in some way to such compensation." *Kokoszka*, 417 U.S. at 651 (citation and quotation marks omitted). The Opinion Letter is consistent with the Supreme Court's holding that "earnings" do not pertain to every asset traceable in some way to such compensation. To be clear, Mr. Greebel's argument is not that the funds in the Katten Plan and the Fried Frank Plan are "traceable in some way to such compensation." Rather, Mr. Greebel argues that the funds <u>are</u> compensation because they were paid for services Mr. Greebel performed while an associate and partner at Katten and Fried Frank. *See, e.g.*, Exhibit E at 3.

Additionally, *Kokoszka* related to tax refunds, which differ from the compensation discussed in the Opinion Letter and the compensation Mr. Greebel received from Katten and Fried Frank. *See Lee*, 659 F.3d at 621–22 ("[T]he issue in *Kokoszka* was whether an income tax refund check was subject to the 25% garnishment limitation. Neither the statutory

June 12, 2020
Page 13

language nor the legislative history or purpose supported treating the tax refund as earnings even though it was traceable to earnings.") (citation omitted).

## 2. Deference to the Department of Labor Opinion Letter

The Court should give significant weight to the Department of Labor Opinion Letter. It is well-settled that courts can consider an agency's interpretation of the statutes it enforces. "[T]he rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see generally United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) ("[A]gencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered."). Courts routinely take into consideration opinion letters and other interpretative guidance provided by the agencies on the statutes they enforce. *See, e.g.*, *Harp v. Starline Tours of Hollywood, Inc.*, No. 2:14-cv-07704, 2015 WL 4589736, at *6 (C.D. Cal. July 27, 2015); *Abadeer v. Tyson Foods, Inc.*, 14 F. Supp. 3d 1062, 1073 n.3 (M.D. Tenn. 2014); *King v. Heritage Enters., Inc.*, No. 10-3039, 2010 WL 3433292, at *3 (C.D. Ill. Aug. 25, 2010); *Miller v. Heller,* 915 F.Supp. 651, 658-661 (S.D.N.Y. Feb. 14, 1996).

The Department of Labor states that "[o]n occasion, the Wage and Hour Division may issue opinion letters addressing fact-specific questions arising under some of the other federal wage and hour laws enforced by the agency, including . . . the Consumer Credit Protection Act (CCPA). These opinion letters are provided to help employers, employees, and other members of the public understand their rights and responsibilities under the law." *See* https://www.dol.gov/whd/opinion/guidance.htm (last visited June 12, 2020). While the Court is not required to follow an opinion letter issued by the agency responsible for enforcing the statute, such an opinion letter "constitute[s] a body of experience and informed judgment," which this Court can use for guidance. *Skidmore,* 323 U.S. at 140.

There are several factors courts have considered in determining the weight to give an agency's interpretation of a statute. First, "an interpretation made at the time of the statute's enactment by administrators who were especially informed of the legislative intent," so-called "contemporaneous construction," may be given greater weight. *Brennan v. Gen. Tel. Co. of Fla.*, 488 F.2d 157, 160 (5th Cir. 1973) (citing *Zuber v. Allen*, 396 U.S. 168, 192 (1969)); *accord Capitano v. Sec'y of Health & Human Servs.*, 732 F.2d 1066, 1075 (2d Cir. 1984) (citing *United States v. Nat'l Ass'n of Sec. Dealers*, 422 U.S. 694, 717–19 (1975)). Second, courts may look to whether there has been "reenactment of the statute in circumstances which indicate legislative approval" of the agency's interpretation. *Brennan*,

**GIBSON DUNN**

June 12, 2020
Page 14

488 F.2d at 160 (citations omitted); *accord Capitano*, 732 F.2d at 1075 (citation omitted). Third, an agency's "longstanding" interpretation may be given "authoritative effect." *Capitano*, 732 F.2d at 1075 (citing *United States v. Clark*, 454 U.S. 555, 565 (1982)); *accord Brennan*, 488 F.2d at 160 (citations omitted). Fourth, an agency's interpretation "merit[s] great weight if there is special agency expertise and lack of court expertise." *Brennan*, 488 F.2d at 160 (citations omitted); *accord Capitano*, 732 F.2d at 1075–76 (citation omitted). A review of each of these factors demonstrates that the Court should defer to the Opinion Letter.

Regarding the first factor, the Supreme Court's interpretation of the legislative intent behind the CCPA suggests that the CCPA was meant to protect persons in Mr. Greebel's position:

> Congress' concern was not the administration of a bankrupt's estate but the prevention of bankruptcy in the first place by eliminating an essential element in the predatory extension of credit resulting in a disruption of employment, production, as well as consumption and a consequent increase in personal bankruptcies. Noting that the evidence before the Committee 'clearly established a causal connection between harsh garnishment laws and high levels of personal bankruptcies,' the House Report concluded: 'The limitations on the garnishment of wages adopted by your committee, while permitting the continued orderly payment of consumer debts, will relieve countless honest[9] debtors driven by economic desperation from plunging into bankruptcy[10] in order to preserve their employment and insure a continued means of support for themselves and their families.'"

*Kokoszka*, 417 U.S. at 650–51 (quoting H.R. Rep. No. 1040, 90th Cong., 1st Sess., 21 (1967) (citation and some quotation marks omitted)).

Regarding the second factor, since the Opinion Letter's publication in April 12, 2018, no court has struck down the letter or issued a ruling undermining the letter. Congress also has not amended the CCPA to remove, for example, the protections for "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus *or otherwise*"

---

[9] To the extent the Petitioner argues the Court should disregard the Supreme Court's reliance on this language because of Mr. Greebel's criminal history, it should be noted that the CCPA's is applicable to garnishment under the MVRA. *See Lee*, 659 F.3d at 622; *DeCay*, 620 F.3d at 544; *Ashcraft*, 732 F.3d at 864.

[10] Note also that were the Petitioner to step into Mr. Greebel's shoes to withdraw the funds at issue for garnishment, Mr. Greebel may be required to pay taxes on those funds, which would be a massive tax burden on Mr. Greebel and would effectively increase Mr. Greebel's restitution beyond the amount mandated by the MVRA.

**GIBSON DUNN**

June 12, 2020
Page 15

or for "a pension or retirement program."  15 U.S. Code § 1672(a) (emphasis added); *Brennan*, 488 F.2d at 160 (citations omitted); *accord Capitano*, 732 F.2d at 1075 (citation omitted).

Regarding the third factor, while the *Belfort* opinion—which was silent regarding the Opinion Letter—was authored only months after the Opinion Letter was released, over two years have now elapsed such that the Department of Labor's opinion is "longstanding" and should be given "authoritative effect."  *Capitano*, 732 F.2d at 1075.

Regarding the fourth factor, the Department of Labor is statutorily charged with enforcing garnishment provisions of the CCPA, *see* 15 U.S.C. § 1676, and is thus among the most qualified to interpret the CCPA's definition of "earnings."  *See Long Island Tr. Co. v. U.S. Postal Serv.*, 647 F.2d 336, 341 (2d Cir. 1981) ("Our conclusion is reinforced by the manner in which §1673 has been construed by the Secretary of Labor, who is charged with enforcing the provisions of the Act.").

## Conclusion

We respectfully request that the Court find that: (a) Mr. Greebel does not have a current, unilateral right to the funds in the Katten Plan or the Fried Frank Plan; and if and when Mr. Greebel does become entitled to the funds in the Katten Plan or the Fried Frank Plan, the Consumer Credit Protection Act would limit garnishment of such funds to 25% of the aggregate funds at the time of garnishment; or (b) if Mr. Greebel does have a current, unilateral right to the funds in the Katten Plan or the Fried Frank Plan, the Consumer Credit Protection Act would limit garnishment of such funds to 25% of the aggregate funds at the time of garnishment.

Respectfully submitted,

*/s/ Reed Brodsky*

Reed Brodsky


cc:  All Counsel of Record (Via ECF)