

U.S. Department of Justice

United States Attorney
Eastern District of New York

*610 Federal Plaza*
*Central Islip, New York 11722*

October 12, 2020

<u>By ECF</u>

The Honorable Kiyo Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>*United States v. Greebel*, 15-CR-00637 (KAM)</u>

Dear Judge Matsumoto:

      The government respectfully submits this letter-brief in opposition to the defendant, Evan Greebel's ("Defendant"), letter motion ("Motion") [Dkt 736] and request for a hearing to contest the garnishment of retirement funds held by garnishees Merrill Lynch, Pierce, Fenner & Smith Inc., and Charles Schwab Retirement Plan Services (collectively, "the Garnishees"), and, for the reason set forth below, respectfully requests that the Court deny Defendant's Motion in its entirety and instead issue Orders of Garnishment to the Garnishees, in favor of the government, for the full balance of Defendant's accounts in their possession. The government avers to the relevant procedural history set forth on page one of Defendant's Motion.

      As set forth in more detail below, Defendant's objections[1] to the government's garnishment of retirement funds held by the Garnishees repeatedly ignores and misstates clear statutory language and binding precedent addressing the garnishment of funds held in retirement accounts. Instead, Defendant relies upon cherry-picked language from case law that is either irrelevant or else actually supportive of the government's position, tortured readings of the unambiguous retirement plan documents, and an expressly irrelevant opinion letter from the U.S. Department of Labor. *See* Motion, *see also* Motion Exhibits ("Exhs.") A-D. Defendant's arguments, seeking to exempt the corpus of his retirement accounts from garnishment, or to limit any garnishment to 25% of the value of the accounts under the Consumer Credit Protection Act

---

[1] As an initial matter, Defendant's June 12, 2020 Motion, styled as an "objection, pursuant to 28 U.S.C. § 3205(c)(5)," fails to actually object to the answers of either Garnishee, and it appears that Defendant did not serve his objection and request for a hearing on the Garnishees, as required by the statute. *See* Motion; § 3205(c)(5). As such, since the Garnishees did not raise any objections to the garnishments, and Defendant has not objected to the Garnishees' answers, or cited any other authority for filing the present Motion, the Court should deny Defendant's motion *ab initio*.

("CCPA"), are contrary to the controlling statutes and well-established precedent and must be rejected. Mr. Greebel has vested property interests in the full balance of both retirement plans at issue here, and the right to demand payment of those balances, in full, from both Garnishees. Therefore, the government is entitled to "step into the shoes" of Defendant and demand payment of the corpus of those accounts in full and without limitation. *U.S. v. Feldman*, 2017 WL 3866024 (W.D.N.Y. Sept. 5, 2017) ("[T]o enforce a restitution order under the MVRA, the government may 'step into the shoes' of the defendant and garnish the defendant's interest in a retirement plan covered by ERISA.").

## Background

Mr. Greebel was found guilty of violating 18 U.S.C. § 1349, Conspiracy to Commit Wire Fraud, and 18 U.S.C. § 371, Conspiracy to Commit Securities Fraud, and subsequently sentenced by this Court to, *inter alia*, pay restitution in the amount of $10,447,979.00, which is "due and payable immediately from available assets . . . until paid in full," in accordance with the requirements of the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3613. Dkt. 674 (Judgment), pp. 5-7.

The MVRA provides, in relevant part[2]:

(a) ENFORCEMENT.—The United States may enforce a judgment imposing a fine in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law. Notwithstanding any other Federal law (including section 207 of the Social Security Act), a judgment imposing a fine may be enforced against **all property or rights to property of the person fined**, except that—
(3) the provisions of section 303 of the Consumer Credit Protection Act (15 U.S.C. § 1673) shall apply to enforcement of the judgment under Federal law or State law. 18 U.S.C. § 3613(a) (emphasis added).

Section 303 of the CCPA provides in relevant part:

(a) MAXIMUM ALLOWABLE GARNISHMENT – Except as provided in subsection (b) and in section 1675 of this title, the maximum part of the aggregate disposable earnings of an individual for any workweek which is subjected to garnishment may not exceed (1) 25 per centum of his disposable earnings for that week. 15 U.S.C. § 1673.

The CCPA defines (1) "earnings" as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes **periodic payments pursuant to a pension or retirement program**," and (2) "disposable earnings" as "that part of earnings remaining after all deductions required by law have been withheld." 15 U.S.C. § 1672(a) and (b) (emphasis added). Finally, "garnishment" is defined as "any legal or equitable procedure through which **the earnings of any individual** are required to be withheld for payment of any debt." § 1672(c).

---

[2] Mr. Greebel has not asserted that his retirement accounts are exempt under either subsection (1) or (2).

*United States v. Greebel*, 15-CR-00637 (KAM)

**Argument**

Mr. Greebel has both a vested interest in, and unilateral right to demand withdrawal of, the entire balance of the funds held in each of his retirement accounts by the Garnishees. Unlike periodic distributions from a retirement account, the corpuses of the retirement accounts held by the Garnishees are not "earnings," as defined by the CCPA, and thus they are not subject to the limitations of the CCPA when garnished in a lump-sum. As a result, the government is entitled garnish the entire balance of all accounts held by the Garnishees on behalf of Mr. Greebel.

**The Clear and Unambiguous Language of the Fried Frank
And Katten Munchin Plans are Not Rendered Ambiguous by
Defendant's Tortured Interpretations of those Plans**

Both the Fried Frank and Katten Munchin retirement plans ("FFP" and "KMP," respectively, collectively, "the Plans") clearly and unambiguously establish that Defendant has the right to demand payment of the entire balance of his respective accounts. *See* Motion Exhibits A and B. However, in an effort to avoid garnishment, Defendant attempts to create an illusion of ambiguity, where there simply isn't any, by misquoting language of the plans, reading plan provisions in a piece-meal manner, and attempting to introduce parole evidence where none is needed. *See* Motion pp. 2-7. However, Defendant's misleading and conclusory assertions of ambiguity are insufficient to overcome the clear and consistent language of the Plans that is evident when they are read properly, as a whole, as they must be. *See Burke v. Eaton Associates, Inc.*, 2012 WL 267982, at *6-7 (W.D.N.Y., January 30, 2012) ("In adjudicating agreements like [ERISA Agreements], the Second Circuit has instructed courts to apply 'traditional rules of contract interpretation.'") (quoting *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp., Pratt &Whitney*, 230 F.3d 569, 576 (2d Cir. 2000)); *see also Corral v. Outer Marker LLC*, 2012 WL 243318, at * (E.D.N.Y. January 24, 2012) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation") (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)); *In re New York Skyline, Inc.* 471 B.R. 69, 87 (Bkrtcy. S.D.N.Y. 2012) ("a contract is not ambiguous where the interpretation urged by one party would 'strain[ ] the contract language beyond its reasonable and ordinary meaning.'"); *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, 957 F.Supp.2d 316, 331 (S.D.N.Y. 2013) ("That a text is complex or imperfect does not mean it is ambiguous.") (citing *Aramony v. United Way of Am.*, 254 F.3d 403, 411 (2d. Cir. 2001)); *In re Lehman Brothers Inc.*, 478 B.R. 570, 586 (S.D.N.Y. June 05, 2012) ("Ambiguity, like intent, is determined by looking at the integrated agreement(s) 'as a whole.'").

As the government demonstrates below, contrary to Defendant's assertions, both plan documents are capable of being read in a clear, consistent, and unambiguous manner when read as a whole, and therefore the Court must adopt the interpretation set forth by the government. *See Westminster Securities Corp. v. Petrocom Energy Ltd.*, 2012 WL 147917, at *2 (2d Cir. Jan. 19, 2012) ("The rules of contract construction require us to adopt an interpretation which gives meaning to every provision of the contract."); *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d. Cir. 2005) (A contract interpretation that "has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.");

3

*Galli v. Metz*, 973 F.2d 145, 149 (2d. Cir. 1992) ("when interpreting this contract we must consider the entire contract and choose the interpretation . . . which best accords with the sense of the remainder of the contract."). Moreover, the Court must not adopt an interpretation that would produce an absurd result, which would be the case if the Court were to adopt Defendant's interpretation of the Plans. *See Oppenheimer & Co. v Trans Energy, Inc.*, 2013 WL 2302439 (S.D.N.Y. May 23, 2013) ("[A] court must avoid any interpretation that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'") (*quoting Landmark Ventures, Inc. v. Wave Sys. Corp.*, 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012)).

### Mr. Greebel Has a Current, Unilateral Right to Demand a Lump-Sum Payment from the Fried Frank Plan

The Fried Frank Plan allows Mr. Greebel to unilaterally withdraw all funds from his account. *See* Motion Exhibit A. The operative language of the Fried Frank Plan is found in § 6.01 of Article VI (Payments of Benefits and Withdrawals; Loans), which states, "Upon a Participant's Separation from Service, other than by death, **he shall be entitled to a distribution of his interest in his Account balance in a single lump sum** or shall be entitled to effect a no-load transfer of the Investment Fund share held in his Account to an [IRA] established by [Merrill Lynch]." (emphasis added). Significantly, a Participant is "**fully (100%) vested** in his Elective Deferral Account, Matching Contribution Account, Rollover Account, Roth Contribution Account and Roth Rollover Account **at all times**." *Id.* § 5.01 (emphasis added). Defendant, apparently conceding the point that § 6.01 clearly grants him the right to demand immediate payment, does not even bother to argue differently, but instead asserts that other sections regarding the "mechanics of distribution" somehow negate these rights. Motion at p.3. Defendant does not provide any support for his contention that a substantive right, clearly expressed in the plan document, can be negated by language addressing only the "mechanics of distribution." Regardless, under the MVRA, it is Defendant's right to property that is transferred to the government, not an obligation to follow the "mechanics of distribution," which in this case would be an order from this Court, and not the process set forth in the plan itself.

Moreover, contrary to Defendant's unsupported, conclusory assertion that § 6.02 and § 6.03 are in conflict with, and somehow negate, the express right guaranteed to Defendant by § 6.01, read properly, and as a whole, it is clear that § 6.02 and § 6.03 merely address the statutory and contractual default procedures that apply when a Participant, like Defendant, does not make an affirmative election to withdraw their funds after separation from the firm. Specifically, §§ 6.02 and 6.03, respectively, establish the minimum age at which a Participant can start taking distributions and maximum age at which a Participant must begin taking distributions, under normal circumstances. Neither, however, alters the right granted by § 6.01 to a Participant who has separated from service to decide to take a distribution from his account balance in a single lump sum. Notably, the "except as provided in Subsection (b) or (c)" language only applies to subsections of § 6.02, and does not purport to create an exception to § 6.01. As such, the fact that Mr. Greebel "did not make the election required by section 6.02(b)" has no bearing upon whether or not he has a right to a distribution of the balance of the funds in his account under § 6.01. Motion at p.2. Additionally, although the FFP does define "Participant" as "any Employee who participates in this Plan **and who has not experienced a Separation From Service**," the government does not contend that Defendant is not a "Participant" in regard to §§ 6.01 to 6.03, but

rather, merely contends that those sections address different issues, and treat Participants who have separated from service differently than those who are still employed by the firm. Specifically, § 6.01 creates an unfettered right for a Participant who has separated from service to demand immediate payment of his account balance, while §§ 6.02 and 6.03 address the withdrawal deadlines applicable to both Participants who remain in service with the firm, as well as those who separate from service but elect to keep their funds in their Fried Frank accounts. The difference in the garnishment setting applicable here is that, because Defendant has the right to an immediate withdrawal, the government gets to step in and demand that withdrawal, and Defendant no longer has the right to elect to keep his funds in his Fried Frank account. *See U.S. v Jon Lawrence Frank*, 2020 U.S. Dist. LEXIS 81084, at *23 (E.D. Va., March 4, 2020), *report and recommendation adopted by, U.S. v Frank*, 2020 U.S. Dist. LEXIS 80336 (E.D.Va., May 6, 2020) ("The 'present right' to a lump-sum withdrawal required here '**is not based upon the rights [the defendant] would** *prefer* **to exercise**, **rather, it is based upon the rights [the defendant] possesses.**") (bold emphasis added).

Finally, even if Defendant were correct, which he is not, that he is only able to "have his balance distributed to him [when] he turns sixty-two years old," on July 2, 2035, the government is nonetheless entitled to have the continuing writs of garnishment stay in place until that time, which is within the 20-year limit on collecting restitution under the MVRA, and to garnishment of the entire balance at that time.

### Mr. Greebel Has a Current, Unilateral Right to Demand a Lump-Sum Payment from the Katten Munchin Plan

The Katten Munchin Plan also clearly allows Mr. Greebel to unilaterally withdraw all funds from his account. *See* Motion, Exh. B. The operative language of the KMP is found in § 7.4, which states that "an Inactive Participant may make a withdrawal from all Accounts of any amount, up to the entire value, of his Accounts." Defendant does not dispute that Mr. Greebel is an "Inactive Participant" under the terms of the KMP. *See* Motion at pp. 4-6; *see also* § 1.42 ("'Inactive Participant' means a Participant who is not an Active Participant.") & § 1.3 ("'Active Participant' means a Participant who is also an Employee."). As an Inactive Participant, Mr. Greebel's right to demand payment is clearly established by §§ 7.4 and 3.5, the latter of which states that "Participants shall be **one hundred percent (100%) vested** in their Account Balances **at all times**." (emphasis added).

Notwithstanding the clear and unambiguous language of the KMP, Defendant asserts, as he did in regard to the FFP, that because he must follow an administrative process to have his funds distributed he somehow, inexplicably loses the unilateral right to his vested account balances. Motion at p.4. Defendant cites no authority for such an obviously flawed argument, nor could the government find any such authority. Instead, Defendant wrongly asserts that § 7.4 "says that Mr. Greebel may *apply*," to make a withdrawal when, in fact, § 7.4 says that Mr. Greebel "may *make a withdrawal*." There is nothing that limits his right to merely applying, but instead he has a clear right to withdraw funds "of any amount, up to the entire value, of his Accounts." *Id.* Defendant goes on to assert that because the approval of a third-party is needed, Mr. Greebel does not have a unilateral right to his money. Motion at p.4. Again, this is simply not correct. Section 7.5 merely addresses "Processing Rules," and does not alter substantive rights. *See Capital*

*Ventures Int'l v. Republic of Argentina*, 652 F.3d 266, 272 (2d. Cir. 2011) ("[A] specific provision . . . governs the circumstances to which it is directed, even in the face of a more general provision."). Moreover, the responsibility of the "Applicable Administrative Named Fiduciary" ("Fiduciary") is expressly limited to "determining that a withdrawal request **conforms to the requirements described in this Section**," and said Fiduciary "**shall process all withdrawal requests and make payment to the Participant as soon as is administratively possible**." § 7.5(d) and (e). Together, these two subsections clearly do not give the Fiduciary any discretion to deny a request that was submitted in accordance with the plans requirements, and instead explicitly requires that applications be processed, and payments be made, expeditiously.

The remainder of Defendant's numerous assertions in this section are equally unavailing, such as Defendant's attempt to create ambiguity by referring to irrelevant sections of the KMP, like the process for hardship withdrawals, to assert that the "Fiduciary is not obligated to accept an application." Motion p.4. However, even if the Fiduciary has discretion in the specific instance of a hardship withdrawal, which is not at issue here, because § 7.4 unambiguously allows Defendant to demand full payment, and § 7.5 requires the Fiduciary to process and pay properly submitted demands, there is no need to invoke or consider the hardship process. Defendant goes on to cite *United States v. Ibianski*, No. 07-20632, 2016 WL 39995938, at *6 (E.D. Mich. Mar. 16, 2012) without providing relevant context. Motion at p.4. *Ibianksi* is inapplicable. There, the court found that it hadn't been presented with the relevant portions of the plan documents to enable it to decide if the defendant had a non-forfeitable right to his benefits. *Id*. Here, the Court has all of the relevant plan documents, which clearly establish that Mr. Greebel is, and was, "one hundred percent (100%) vested in [his] Account Balances at all times," and has the unilateral right to demand payment. KMP §§ 3.5, 7.4-7.5.

Similarly, Defendant cites *U.S. v. Taylor*, No. 11-51597, 2012 WL 1309863, at *2-3 (E.D. Mich. Mar. 16, 2012), *report and recommendation adopted*, No. 2:11MC51597, 2012 WL 1339081 (E.D. Mich. Apr. 17, 2012), again without necessary context. Motion at p.4. In *Taylor*, the defendant had an accrued benefit account with a balance of $10,626.84, which the government sought to garnish. 2012 WL 1309863, at 2-3*. However, under the relevant terms of defendant's union contract, he was not eligible to receive his benefit until he was "separated" from the union for twelve consecutive months. *Id*. Although Taylor was incarcerated, he was scheduled to be released four days before the twelve month deadline and could therefore potentially obtain work with the union before the deadline expired and thus never have an entitlement to the funds at issue. *Id*. The *Taylor* court therefore denied the government's request to immediately garnish the account, but left the continuing garnishment in place for the government to seek execution at the appropriate time. *Id*. Again, this case is simply inapplicable to Mr. Greebel who has "at all times," been vested in his account balance, and has a unilateral right to withdraw that full balance. *See* KMP §§ 3.5, 7.4 – 7.5. Defendant also cites *U.S. v. Samuel*, No. 2:15-MC-16-JAM-KJN, 2016 WL 632806, at *6 (E.D. Cal. Feb. 17, 2016), a case where, in relevant part, defendant was eligible to withdraw a lump sum from his IRA at any time, and thus the court granted the government's request to garnish that account in full, just as should happen in this matter. Defendant cited *Ibianski*, *Taylor*, and *Samuel* for his proposition that, "Mr. Greebel will only become eligible for distributions after his application is approved by the [Fiduciary], and therefore does not have a unilateral right to the funds in the Plan." Motion at p.4. However, as just addressed, none of those

cases turned on, or even presented an issue of, administrative approval being necessary to create a unilateral right to property in a retirement fund. Nor does the KMP create any such issue here.

Defendant next attempts to create ambiguity by asserting that § 7.7 ("Minimum Distribution Requirements"), in combination with § 8.1 ("Request for Withdrawal") and § 8.2 ("Deadline for Withdrawal"), dictates that, even if Defendant's request to have funds distributed to him was approved, "he would not receive payments until he reaches age 70 ½." Motion at p.6. This is simply wrong, and frankly dumbfounding. *See* § 7.5(e) ("the [Fiduciary] shall process all withdrawal requests and make payment to the Participant as soon as is administratively possible."). Instead, those sections, which Defendant acknowledges implement "Treasury Regulations issued and in effect under code Section 401(9)," merely address the statutorily established age at which a participant in a covered plan MUST begin taking distributions if he or she has not elected to do so previously. *See 26 U.S.C.* § 401 *et seq.* This section is nothing more than standard, age-based, distribution requirements under ERISA, similar to the provisions discussed above in regard to the FFP. Nothing in this general section negates Defendant's specific vested right in the funds in his accounts, or his right under § 7.4 to withdraw the full balance of those funds. *See Capital Ventures Int'l*, 652 F.3d at 272 (general provisions do not override specific provisions).

Moreover, far from being inconsistent, § 8.1(a) actually reiterates Defendant's vested right to withdrawal all of the funds from his account, specifically saying that "an Inactive Participant may elect to have all or a portion of his Account Balance paid to him beginning upon any Settlement Date following his Termination of Employment." The only difference here is the reference to "Settlement Date," the definition of which Defendant then misquotes. *See* Motion p.6. Properly stated, "Settlement Date" is defined as "the date on which a financial transaction **from a corresponding Trade Date is settled**, in cash or kind." § 1.70. A "Trade Date," is defined as "the Business Day as of which a financial transaction is effected." § 1.75. It is frankly incredible for Defendant, who was an apparently successful corporate attorney, to assert that this language is ambiguous, or that he "would not know how to initiate [a financial transaction]," or that "at no point prior to age 70-1/2 would [he] have a clear unilateral right to the money." Motion p.6. These sections clearly refer to settling a trade, as would be necessary in order for Mr. Greebel, or the government, to receive funds from his account, because those funds are primarily held in stocks or similar assets that would first need to be sold, or "traded," before funds could be released. Regardless, even if the clear terms of the KPM are too complex for Defendant to decipher, complexity does not mean that the terms are ambiguous. *See Chesapeake Energy Corp*, 957 F.Supp.2d 316 ("That a text is complex or imperfect does not mean it is ambiguous.").

Defendant nonetheless attempts to bolster his interpretation of §§ 7.7, 8.1 and 8.2 by asserting that it is consistent with § 15.1 of the KMP, which provides that "no benefit provided by the Plan may be anticipated, assigned or alienated, except to create, assign or recognize a right to any benefit with respect to a Participant pursuant to a QDRO." Motion p.7. Section 15.1 is the "Anti-Alienation" provision of the KPM plan. However, apparently every court to have addressed this issue has concluded that ERISA anti-alienation provisions do not apply to garnishment of wages under the MVRA. *See e.g. U.S. v Irving*, 452 F.3d 110 (2d Cir. 2006) ("District courts across the country have found 18 U.S.C. § 3613(a) permits courts to consider ERISA protected assets in determining appropriate fines and restitution (internal citation omitted). **We adopt this understanding of § 3613(a)** . . .") (emphasis added); *U.S. v Hotte,* No. 97-CR-669 (EDNY 2007)

(MJ Levy), *report and recommendation adopted by U.S. v Hotte,* 2007 U.S. Dist. LEXIS 72489 (EDNY 2007) (J. Johnson) ("[c]ourts have repeatedly held that 29 U.S.C. § 1056(d) and 26 U.S.C. § 401(13)(A) – provisions of ERISA and the Internal Revenue Code, respectively, that generally preclude the assignment or alienation of pension benefits – do not apply to the United States in its efforts to collect on a judgment of restitution.") (*citing United States v. Novak,* 476 F.3d 1041, 1043 (9th Cir. 2007) ("criminal restitution orders can be enforced by garnishing retirement funds" where "the defendant has a current, unilateral right to receive payments under the terms of the retirement plan.")); *see also U.S. v. DeCay*, 620 F.3d 534 (5th Cir. 2010) (""We conclude that the language in § 3613(a) authorizing the United States to enforce a garnishment order against 'all property or rights to property' of the debtor, '[n]otwithstanding any other Federal law,' is sufficient to override the anti-alienation provision of the IRC."). Thus, the KMP's anti-alienation provision does not exempt Defendant's KMP accounts from garnishment by the government, provide any support for Defendant's strained interpretations of the plan, or create any ambiguity as to the meaning of the KMP or Defendant's rights thereunder.

### Plan Summary Should Not be Considered Because There is No Ambiguity

Defendant next attempts to introduce "The Plan Summary" ("Summary") as extrinsic evidence of the meaning of the KMP. However, as established above, the KMP is not ambiguous when read properly, and as a whole. Therefore, because there is no ambiguity in the KMP, the Court should not consider the Summary. *See In re Lehman Brothers Inc.*, 478 B.R. 570 ("As the New York Court of Appeals admonished, extrinsic evidence should never 'be considered in order to create an ambiguity in the agreement.'") (internal citation omitted); *Eagle Indus., Inc. v DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (When a contract is unambiguous, "extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or create an ambiguity.").

Although the Summary should not be considered, should the Court decide to review the Summary, it will find nothing more than the same misstatements and misdirection employed by Defendant in his attempt to manufacture ambiguity in the terms of the KMP. *See e.g.* Motion p.7 (categorically claiming that the Summary "states that Mr. Greebel **cannot make a withdrawal until he reaches age 59 ½**" (emphasis added)). The provision that Defendant refers to actually states, "Once you reach age 59 ½, you may withdraw all or part of your Plan Account for any reason." Summary p. 14. Nothing about that statement suggests that Defendant cannot make a withdrawal before age 59 ½. More significantly, Defendant ignores the sentence immediately preceding the one quoted, which states, "**Amounts withdrawn before at 59 ½** are generally subject to income tax, plus a 10% penalty tax," which clearly establishes that withdraws can be made before age 59 ½. *Id.* (emphasis added); *see also Frank*, 2020 U.S. Dist. LEXIS 81084, at *23 (rejecting defendant's contention that having to pay taxes and a 10% penalty for early withdrawal of funds from his retirement account meant that he did not have a present right to the funds). Defendant also ignores language on page 15, which states, "You may request **payment of your entire Plan Account** . . . **at any time after you leave the Firm**," and . . . "At the time of retirement **or after you otherwise leave the Firm**, you may receive your Plan Account . . . If you elect to receive distribution of your Plan Account, you may request one total distribution or you may make multiple, partial distribution requests." (emphasis added). Clearly, a Participant, regardless of age, is able to withdraw their entire account balance any time after leaving the firm.

Given the above, Defendant's interpretations of the terms of the Plans and the Summary cannot be viewed as a case of reasonable minds disagreeing and offering differing but justifiable interpretations of an ambiguous contract. Instead, they are clearly blatant attempts at creating ambiguity where none exists. The government has offered an interpretation of the KMP that gives effect and meaning to all of its terms, and is consistent with relevant precedent and statutes, while the Defendant has offered a tortured analysis of the KMP, and incomplete and misleading analysis of precedent, in order to try to manufacture ambiguity where none exists. Moreover, in order for the Court to accept Defendant's interpretation, it would have to ignore and render ineffective multiple plan provisions that grant participants, like Defendant, substantive property rights, which it must not do. *See supra Westminster Securities Corp.,* 2012 WL 147917; *Galli*, 973 F.2d at 149; *LaSalle Bank Nat. Ass'n*, 424 F.3d at 206.

For all of the above reasons, the Court should hold that the FFP and KMP are not ambiguous, that the interpretation put forth by the government are the correct interpretations of the Plans, that Defendant has present, unilateral rights to demand full payment from both Plans, and that the government is therefore entitled to "step into" Defendant's shoes and demand the immediate payment of the full balance of Defendant's FFP and KMP accounts.

### Defendant's Retirement Accounts are not "Earnings" Under the CCPA and are not Subject to the CCPA's 25% Limitation

As set forth in detail above, the CCPA expressly defines "earnings" (in relevant part) to include, "**periodic payments** pursuant to a pension or retirement account." § 1672(a) (emphasis added). Although Congress could have included lump-sum withdrawals from retirement accounts within the scope of the CCPA, it did not, and thus the CCPA does not reach the corpus of such accounts. *See Id; see also Waggoner v Gonzales*, 488 F.3d 632, 636 (5th Cir. 2007) ("The canon of statutory construction '*expressio unius est exclusion alterius* (the expression of one thing is the exclusion of another)' indicates that [the listed ground] is the only requirement."). Moreover, Courts that have addressed the issue of whether the CCPA's 25% limitation applies to lump-sum garnishments from retirement accounts have consistently held that it does not, and Defendant has not accurately cited any case to the contrary. *See Kokaszka v. Belford*, 417 U.S. 642, 651 (1974) (stating that "earnings" under § 303 of the CCPA "are **limited to periodic payments of compensation** and do not pertain to every asset that is traceable in some way to such compensation."); *U.S. v. Novak*, 476 F.3d 1041, 1063 (9th Cir. 2007) ("[W]e hold the government can immediately garnish the corpus of a retirement plan to satisfy a MVRA judgment – rather than merely obtain post-retirement payments that otherwise would have gone to the defendant – if, but only if, the terms of the plan allow the defendant to demand a lump sum payment at the present time."); *U.S. v. Blondeau*, 2011 WL 6000499, at * 10, (E.D.N.C. 2011) ("It appears that **in accordance with the weight of the case law**, the 25% limit on garnishment of disposable earnings found in section 303 of the [CCPA] would not apply to the [lump-sum] garnishment of Defendant's Ameritrade Account.") (emphasis added) (cited approvingly in *U.S. v Belfort*, 340 F.Supp.3d 265, 268 (E.D.N.Y. 2018) (Donnelly, J)).

The case of *U.S. v DeCay*, 620 F.3d 534, 544-45 (5th Cir. 2010), is particularly instructive in this regard because it involved two defendants, Kerry DeCay and Stanford Barre, the former of whom had a present right to demand a lump-sum payment of $77,898.00 from his

contributory pension plan, and the latter of whom only had a right to receive monthly payments from a non-contributory pension plan that had no lump-sum value. *Id.* Consistent with the express language of the CCPA, the *DeCay* court affirmed the lower court's decision that DeCay's present interest could be garnished by the government in full in one lump-sum, but reversed the lower court and held that Barre's monthly pension payments were subject to the CCPA's 25% cap. *Id.* Notably, Defendant also cites *DeCay* as an "instructive" case for his assertion that, "the CCPA **applies to all distributions** made pursuant to the [Plans], **whether periodic or lump sum**." Motion at p.9 (emphasis added). Defendant's recitation of the case however only refers to the court's decision that the 25% cap applied to Barre's monthly pension payments, and fails to address the court's holding that the full amount of DeCay's pension account could be garnished. *See Id.*

Defendant also cites *Belfort*, 340 F.Supp.3d at 268, for the proposition that "[t]he CCPA's 25% cap on garnish applies to 'a pension or retirement program,'" when in fact the *Belfort* case and decision had absolutely nothing to do with pension or retirement programs. Instead, the misquoted language from *Belfort*, which again leaves out the key words "**periodic payments pursuant to**" a pension or retirement program, is taken from that court's recitation of the language of the CCPA, which it set out prior to determining that the company shares at issue there did not fit within the plain language of the CCPA. *See Id.* Therefore, in this context, *Belfort* is completely irrelevant to the present matter, and Defendant's application of the case is just wrong. Next, Defendant fails to accurately represent the holding in *U.S. v Lee*, 659 F.3d 619, 622 (7th Cir. 2011), just as he did with the *DeCay* holding, upon which the *Lee* holding was based. Notably, the parties in *Lee* had agreed that once the defendant had a right to receive funds from his retirement accounts, "any lump sum distribution he may receive from the plans is subject to turnover." *See Id.* The actual issue in *Lee* was whether or not fixed, annual payments that Lee was to receive from two different retirement plans were available for turnover or subject to the CCPA's 25% cap. *Id.* The lower court had held that the annual payments were not subject to the cap because "the CCPA was not intended to protect retirement distributions because they are not wages." *Id.* at 621. The *Lee* court found the lower court's ruling to be inexplicable given the express language of § 1762(a), which includes "periodic payments pursuant to a pension or retirement program," and the 5th Circuit's decision in *DeCay*, and thus reversed the lower court's decision. Thus, *Lee* merely confirms that periodic payments from a retirement account are subject to the CCPA's 25% cap, while lump-sum distributions are not. *See U.S. v Sayyed*, 862 F.3d 615, 618 (7th Cir. 2017) (rejecting defendant's argument that *Lee* "held that all retirement funds are 'earnings' subject to the 25% garnishment cap," and stating that, "we only held that periodic payments from the defendant's retirement accounts met the definition of 'earnings,' subject to the 25% garnishment cap, as the CCPA expressly defines.").

Finally, Defendant cites *U.S. v Ashcroft*, 732 F.3d 860, 861 (8th Cir. 2013) for his contention that all payments, and not just periodic payments, count as "earnings" under the CCPA. Motion p.10. The issue in *Ashcroft* was whether or not defendant's recurring disability payments fit within the "or otherwise" category of "earnings" under the CCPA. *See Ashcroft*, 732 F.3d 860. *Ashcroft* did not involve, nor render any holding regarding, lump-sum payments generally, or lump-sum payments from retirement accounts specifically. *See Id.* Defendant's reliance on dicta from footnote 4, that "[t]he statute Congress passed does not restrict itself to periodic payments," is misplaced because that statement did not address the portion of the CCPA that includes, "**periodic payments pursuant to a pension or retirement program**." *Id.* at FN4. Instead, when

10

it comes to distributions from retirement accounts, Congress did in fact expressly restrict itself to periodic payments, and thus only periodic payments from such accounts are subject to the CCPA's 25% cap. *See Waggoner*, 488 F.3d at 636 ("*expressio unius est exclusion alterius* (the expression of one thing is the exclusion of another)."); *see also Sayyed*, 862 F.3d at 619 ("A lump-sum distribution of funds is clearly not compensation paid for personal services or periodic payments pursuant to a retirement program.").

Defendant has not identified one case where a court actually held that a lump-sum distribution from the corpus of a retirement account was subject to the CCPA's 25% limitation, and the government is not aware of any such case. *See* Motion. Instead, apparently every court to have addressed the issue has come to the same conclusion, which is that the CCPA's 25% cap does not apply to lump-sum distributions from retirement accounts when the defendant has a present right to demand withdrawal, as is the case here.

### The Department of Labor Has Not Interpreted the Consumer Credit Protection Act's 25% Limitation to Apply to the Corpus of Funds Held by a Defendant in any Pension or Retirement Account

In a last-ditch attempt to counter the express language of the CCPA, and the holdings of every circuit and district court to address the relevant issues, Defendant devotes the final five pages of his fifteen-page Motion to a completely, and expressly, irrelevant Department of Labor ("DOL") opinion letter dated April 12, 2018 (the "Letter"). *See* Exhibit D. Even if the DOL Letter were not completely irrelevant, which it is, it most definitely does not "interpret[] the CCPA's definition of 'earnings' to apply to lump sum payments from pension plans and 401(k) plans," as Defendant asserts. Motion at p.10. Instead, the DOL merely opines that, "[i]n response to the facts posed in your opinion letter request," certain lump-sum payments "from an employer to an employee are earnings under the CCPA." Letter p.4. The DOL's opinion simply does not address the specific issue in this case, nor does it go anywhere near as far as Defendant asserts. Instead, what it does do is reinforces the fact that you must look at the express language of the CCPA when interpreting the CCPA, which Defendant has repeatedly refused to do.

The opinion of the DOL stated in the Letter is, by its express terms, "based exclusively on the facts [ ] submitted." DOL p.1. In that instance, the requester was inquiring about the treatment of "lump-sum payments and garnishment limits relating to withholdings for child support," under § 1673(b). *Id.* Specifically, the requestor alleged that states were inconsistently applying the CCPA's definition of earnings when it came to lump-sum payments, while payments that were clearly "wages" received consistent treatment. Letter p.1. Additionally, the requestor submitted "eighteen specific examples of the types of common lump-sum payments from employers to employees," and asked that DOL "opine on each **fact-specific example** to determine if each is earnings under the CCPA." *Id.* (emphasis added).[3]

---

[3] Specifically, the requestor asked about: commissions, discretionary bonuses, nondiscretionary bonuses, productivity or performance bonuses, profit sharing, referral bonuses, sign-on bonuses, moving or relocation incentive payments, attendance awards, safety awards, cash service awards, retroactive merit increases, payment for working during a holiday, worker's compensation, termination pay, severance pay, insurance settlements, and buybacks of company shares. *Id.*

Given the above, it is clear that what the requestor was asking, and what the DOL opined upon, was the meaning of the phrase "or otherwise," in the CCPA's definition of "earnings." *See* Letter. The DOL was not asked to opine upon the application of the CCPA to lump-sum distributions from a pension or retirement plan, or to interpret the clear language limiting the CCPA's application, in relevant part, to "periodic payments pursuant to a pension or retirement program," nor did the DOL do so *sua sponte*. *See Id*. Moreover, neither the request, nor the DOL response, addresses the MVRA, which DOL has no purview over. As such, there is simply nothing contained within the DOL Letter that is directly, or even indirectly, relevant to the matter at hand. Defendant's reliance on *Rousey v Jacoway*, 544 U.S. 320, 329 (2005), which similarly dealt with interpreting a catch-all term in a different statute, is unavailing. Motion p.11. *Rousey* dealt with the question of whether the petitioners could exempt IRA accounts from their bankruptcy estate under a provision which exempted certain enumerated types of financial accounts, as well as "similar plan[s] or contract[s] on account of . . . age." *Id.* at 323-24. Nothing in *Rousey* addresses the CCPA's definition of "earnings," the CCPA's 25% cap, or garnishment under the MVRA. Instead, Defendant focuses on the court's statement, in dicta, that "[t]he common feature of all of these plans is that they provide income that substitutes for wages earned as salary or hourly compensation." *Id. at 331;* Motion at p.11. However, that language was merely part of the court's reasoning in concluding that IRAs were "age-based" accounts that would allow them to be exempted as a "similar plan," under the bankruptcy code, which simply has nothing to do with the case at hand.

Moreover, the DOL letter, were it at all relevant, is not entitled to deference in this matter because, *inter alia*, deference to an agency opinion is only applicable when the agency's interpretation of a regulation is required due to ambiguity in the regulation and a "lack of court expertise" on a particular statute, neither of which apply here. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984) (The first question in reviewing an agency's construction of a statute, "is whether Congress has spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." The second question, "whether the agency's answer is based on a permissible construction of the statute," is only asked, "if the statute is silent or ambiguous with respect to the specific issue."); *Brennan v. Gen.Tel. Co. of Fla*., 488 F.2d 157, 160 (5th Cir. 1973) (An agency's interpretation "merits great weight if there is special agency expertise and lack of court experience"). The specific issue addressed by the DOL was the application of the "or otherwise" language of the CCPA, in the context of 18 specific lump-sum payment types, none of which includes lump-sum payments from retirement accounts, which is the specific issue relevant to this matter. Thus, the DOL does not offer any relevant interpretation for the Court to consider. More importantly, the fact that Congress included "periodic payments pursuant to" retirement accounts within the CCPA's definition of "earnings," clearly demonstrates that Congress gave specific consideration to retirement programs when it drafted the CCPA and intentionally chose to only include periodic distributions from those accounts within its meaning, so the statute is neither silent nor ambiguous on the specific issue present in this matter. Additionally, as numerous citations herein demonstrate, the courts are well-versed in interpreting and applying the CCPA. Thus, because: 1) the DOL addressed a different specific issue, 2) Congress' intent to only include periodic payments from retirement accounts is clear, and 3) the courts have expertise in applying the specific statute to the specific issue present here, the Court should not even consider the agency opinion in deciding this matter or, at least, should not grant deference or great weight to it.

### Defendant's Assertion that "Earnings" Contributed to a Retirement Plan are to be Forever Considered "Earnings" Under the CCPA is Incorrect and Has Been Rejected by the Courts

Defendant's next argument is his unsupported contention that, because the money that went into his retirement accounts came from wages or compensation paid to him by his prior employers, they were, and always will be, considered "earnings" subject to the CCPA's 25% cap. Motion at p.12. However, that argument is necessarily implicitly rejected by every case cited herein which held that the corpus of a retirement account is not subject to the cap. Additionally, it has also been expressly rejected by courts that have considered the issue. *See U.S. v Sayyed*, 862 F.3d 615, 618 (7th Cir. 2017) (rejecting defendant's argument that "because his retirement funds derive directly from his earned wages, i.e. his employer deposits a portion of his earned wages in his retirement account each paycheck, the funds should be considered 'earnings' under the CCPA," and holding that "a lumpsum (sic) distribution of retirement funds does not qualify as earnings.")*; Frank*, 2020 U.S. Dist. LEXIS 81084, at *23 (rejecting defendant's contention that lump-sum distributions from his retirement account were "actually 'compensation.'"); *Aetna Cas. & Sur. v Rodco Autobody*, 965 F.Supp. 104, (D.M.A. 1996) ("[V]oluntary contributions of monies by the employee/debtor to an individual retirement account do not fall within the definition of 'earnings' and, hence, do not have the protection afforded by the 25% maximum in 15 U.S.C. § 1673.").

Defendant also asserts that the "profit-sharing" nature of the Plans makes them "earnings" under the CCPA, subject to the 25% limitation. Motion p.11. However, even if Defendant is correct that profit-sharing contributions are "earnings" prior to going into his retirement account, there is no reason that such compensation would be treated any differently than wages that are contributed to a retirement plan, and thus, as just shown, the CCPA's 25% limitation would still not apply to funds being distributed from those accounts. Moreover, Defendant's argument ignores the differences between "profit-sharing" as used in his retirement Plans and the example opined upon in the DOL Letter. Specifically, both of the Plans are governed, in relevant part, by the Internal Review Code ("IRC" or "the Code"), which addresses the "profit-sharing" aspect of such plans. *See* 26 U.S.C. § 401. As the Code and the Plans make clear, profit-sharing under such plans "need not be based on profits," and instead generally refers to contributions employers may make to their employees accounts, other than the deduction from wages. § 401(a)(27); *see also* FFP at p.9 ("'Matching Contributions' means the annual contribution made by an Employer on behalf of the Participant . . . in an amount determined from time to time by the Firm in its discretion"); KMP § 1.21(e) ("'Profit Sharing' means a discretionary amount contributed by the Employer in an amount of up to six percent (6%) of Compensation."). In contrast, the DOL Letter dealt with a true profit-sharing situation involving "payments to employees **based upon the employer's profits**. For example, a chief executive officer receives, in addition to a salary, a profit sharing payment of **five percent of the company profits**." Letter p.2 (emphasis added). Defendant ignores these significant differences and simply assumes, without any analysis, that the DOL's interpretation of "profit-sharing" based upon a fact-specific request, could be applied to the FFP and KMP Plans. It can't. Once again, it is clear that Defendant's reliance on the Letter is misplaced, and that the Letter has no relevance to the matter at hand.

Finally, Defendant's assertion that the government has "previously conceded that the CCPA's definition of earnings and disposable earnings applies to the Katten Plan and the Fried

13

Frank Plan," because those plans "contain money," misconstrues and misstates the government's position in its opposition brief in *Belfort*, and is simply incorrect. Motion p.12. The government's position in that brief simply argued, *inter alia*, that one reason that the shares at issue in that case were not covered by the CCPA's definition of earnings, as the defendant there claimed they were, was that they did not consist of money. However, even if the government took the position in that case that the CCPA only applies to monetary accounts, it does not as a matter of logic or law mean that the government takes the position that all monetary accounts are covered by the CCPA's definition of earnings, which is what Defendant seems to be wrongly asserting.

## Conclusion

For all of the reasons set forth herein, Plaintiff respectfully requests that the Court deny Defendant's Motion in its entirety and instead issue Orders of Garnishment to the Garnishees requiring that they turn over to the government all of the funds held in Defendant's retirement accounts under their control. The government will submit proposed Orders of Garnishment should the Court so direct.

    Respectfully submitted,

    SETH D. DUCHARME
    Acting United States Attorney

By:   /s/ *Thomas R. Price*
       THOMAS R. PRICE
       Assistant U.S. Attorney
       (631) 718-7893