# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Reed Brodsky
Direct: +1 212.351.5334
Fax: +1 212.351.6235
RBrodsky@gibsondunn.com

November 6, 2020

<u>VIA ECF</u>

The Honorable Kiyo Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Greebel*, S1 15 Cr. 637 (E.D.N.Y.) (KAM)

Dear Judge Matsumoto:

As set forth in Mr. Greebel's June 12, 2020 Objection ("Obj.") to the Court's Writs of Garnishment and to the Answers of Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") and Charles Schwab Retirement Plan Services ("Schwab") ("Garnishees"), the garnishment sought by the Petitioner is improper.  Petitioner's Opposition dated October 12, 2020 ("Opposition" or "Opp.") misstates and mischaracterizes the facts and the law.  Mr. Greebel respectfully requests that the Court not issue Orders of Garnishment to Garnishees. Should the Court issue such Orders, Mr. Greebel requests that the Orders garnish not more than 25% of the funds in the accounts.  Mr. Greebel respectfully requests that the Court hold a hearing on this matter.

## Argument

Petitioner is seeking to garnish funds held in Mr. Greebel's 401(k) Plan account titled "Fried, Frank, Harris, Shriver & Jacobson LLP 401(k) Incentive Savings Plan Greebel, Evan" (the "Fried Frank Plan"), and the "Katten Muchin Rosenman LLP Defined Contribution Plan" (the "Katten Plan") (the "Plans").  However, the Petitioner cannot reach these funds because Mr. Greebel does not have "a current, unilateral right to receive payments under the terms of the retirement plan."  *United States v. Novak*, 476 F.3d 1041, 1043 (9th Cir. 2007). Furthermore, even if the Petitioner could reach the funds, the Federal Debt Collection Procedures Act ("FDCPA") and Consumer Credit Protection Act ("CCPA") would limit the garnishment of these funds to only 25% of the account balances.  *See* Obj. at 8–10.

**GIBSON DUNN**

November 6, 2020
Page 2

### A.      The Fried Frank Plan Does Not Give Mr. Greebel A Current, Unilateral Right To Withdraw The Funds.

Petitioner's claim that Mr. Greebel's interpretation of the Plans is "tortured," Opp. at 1, 3, fails because Petitioner only refers to a portion of the Fried Frank Plan, while ignoring the operative sections.  In relying solely on Section 6.01, Petitioner ignores the cases it cited, which hold that "[t]he rules of contract construction require us to adopt an interpretation which gives meaning to every provision of the contract," *Westminster Securities Corp. v. Petrocom Energy Ltd.*, 2012 WL 147917, at *2 (2d Cir. Jan. 19, 2012), and "when interpreting this contract we must consider the entire contract and choose the interpretation . . . which best accords with the sense of the remainder of the contract," *Galli v. Metz*, 973 F.2d 145, 149 (2d. Cir. 1992).  We cannot simply stop at Section 6.01.

Under Section 6.02(b), "if the value of the Participant's vested Account balance is more than $1,000, then his vested Account balance shall not be distributed until he reaches his sixty-second (62nd) birthday unless he elects within the period between thirty (30) days and one hundred and eighty (180) after he receives the notice required by Treasury Regulation Section 1.411(a)-11(c) to receive his benefits prior to that date."  Obj. Ex. A § 6.02(b).  This section augments Section 6.01 and clarifies that, following his departure from Fried Frank in 2002, Mr. Greebel was able to withdraw his money from the Fried Frank Plan, but he had to do so between 30–180 days after receiving the notice required by the Treasury regulation. Because Mr. Greebel did not make this election, he now cannot withdraw the money in his account (which exceeds $1,000) until he reaches age 62.  *See* Obj. at 2–3.

Petitioner's attempt to refute the clear language of the Fried Frank Plan by claiming that 6.02 does not apply, Opp. at 4, is conclusory and unsupported.  As an initial matter, Petitioner is incorrect that Mr. Greebel is arguing that Sections 6.01, 6.02, and 6.03 are in conflict. Instead, Mr. Greebel believes the provisions work in harmony: Section 6.01 states that when an employee leaves the firm, he is entitled to withdraw his money, and Sections 6.02 and 6.03 explain those withdrawals are to be paid.  *See* Obj. at 2–3.  Were the Court to accept Petitioner's claim that Section 6.01 allows Mr. Greebel to withdraw his funds now, despite that he failed to make an election within the 30–180 day window, Section 6.02 would be rendered meaningless.  As Petitioner states, "[a] contract interpretation that 'has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.'"  Opp. at 3 (quoting *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d. Cir. 2005)).

Petitioner argues that "a Participant is fully (100%) vested in his Elective Deferral Account, Matching Contribution Account, Rollover Account, Roth Contribution Account and Roth Rollover Account at all times."  Opp. at 4 (quoting Obj. Ex. A § 5.01).  But Petitioner does

**GIBSON DUNN**

November 6, 2020
Page 3

not define "vested" or explain the significance of this section.  Even if Petitioner is correct, it does not change that, per Section 6.02, Mr. Greebel does not have a current, unilateral right to withdraw the money as required under *Novak*.  *See Novak* at 1043; see also Ex. A ¶ 4 (Dkt. 707, Merrill Lynch Answer) ("[Merrill] serves as a record keeper of the Account and is not the plan administrator.  This means that [Merrill] does not control the funds and takes direction from the plan administrator.  The plan administrator, Fried, Frank, Harris, Shriver & Jacobson LLP, may need to be part of any turnover order regarding the funds in the Account to the extent they are not exempt.").

Additionally, Petitioner is not entitled to a continuing writ while it waits to ascertain whether Mr. Greebel is or will ever become eligible for withdrawal.  *See U.S. v. Cullenward*, 2014 WL 4361553 at *4 (E.D. Cal. Apr. 9, 2014) ("Even assuming, without deciding, that the United States may one day be entitled to garnish a portion or all of Ms. Cullenward's retirement account funds, there is no indication that the United States will be able to do so in the foreseeable future.").

B.      **The Katten Plan Does Not Give Mr. Greebel A Current, Unilateral Right To Withdraw The Funds.**

While the Fried Frank Plan is clear that Mr. Greebel cannot withdraw the proceeds until age 62 at the earliest, the Katten Plan is less clear, internally inconsistent, and ambiguous.

Petitioner argues the "operative language" is in Section 7.4, which states that "'an Inactive Participant may make a withdrawal from all Accounts of any amount, up to the entire value, of his Accounts.'"  Opp. at 5 (quoting Obj. Ex. B § 7.4 (Katten Plan)).  However, Petitioner omits the crucial language of Section 7.4: "By applying to the Applicable Administrative Named Fiduciary in the form and manner prescribed by the Applicable Administrative Named Fiduciary. . . ."  Obj. Ex. B § 7.4; *see also* §§ 7.1, 7.5(c–d).  Petitioner's primary response is that "[t]here is nothing that limits [Mr. Greebel's] right to merely applying, but instead he has a clear right to withdraw funds[.]"  Opp. at 5.  This ignores the plain language of the Katten Plan.

To obscure these requirements, Petitioner attempts to either distinguish the cases cited by Mr. Greebel or argue that they are inapplicable.  These arguments misunderstand Mr. Greebel's citation to these cases.  Petitioner argues that "*Ibianski* is inapplicable" because "[h]ere, the Court has all of the relevant plan documents."  Opp. at 6.  However, Mr. Greebel cites *Ibianski* to show that "[w]ithout knowing [Mr. Greebel's] eligibility for these benefit [sic], the Court cannot determine if [Mr. Greebel] is entitled to receive a [payment] under [] the Plan," and thus Petitioner "has not shown that [Mr. Greebel] has a current, unilateral right to his benefits under the Plan."  *United States v. Ibianski*, 2016 WL 39995938, at *6 (E.D. Mich. Mar. 16, 2012).  In *Ibianski*, the court could not determine whether the Defendant was

**GIBSON DUNN**

November 6, 2020
Page 4

eligible to withdraw because the court lacked the plan documents.  Here, the Court cannot determine whether Mr. Greebel is eligible to withdraw because the Fiduciary has the sole and unilateral right to approve Mr. Greebel's application.  The rule in either situation is clear: garnishment is improper when the court cannot determine that the defendant has a current, unilateral right to the funds.

The seminal case on which both parties rely, *United States v. Novak*, holds that the government must "identify *with precision* the rights to payment provided under a retirement plan when determining the scope of the government's garnishment rights under MVRA." *Novak* at 1064 (emphasis added).  The government has failed to do so.  In fact, it cannot do so because the Katten Plan does not explain what the Fiduciary will require in an application or when consent may be refused.  *See* Obj. Ex. B §§ 7.4, 7.1, and 7.5 (c–d).  Furthermore, Schwab's Answer does not state that it has "custody, possession, or control," as required by 28 USC 3205(4)(a), and explains that "Schwab serves only as a record keeper and directed Trustee for the Plan and has no independent authority to distribute assets from the Plan's trust or from Mr. Greebel's account under the Plan's Trust.  In the event a distribution is contemplated, the plan sponsor must direct Schwab to make the distribution."  Ex. B at 1 (Dkt. 709-1, Schwab Answer).

Petitioner is incorrect that Section 8.1(a) is favorable to its position.  Opp. at 7.  Petitioner ignores that when Sections 8.1(a), 1.70, and 1.75 are read together, they are unclear as to when a withdrawal is to be paid.  *See* Obj. 6.  These sections suggest that Mr. Greebel may only elect to be paid on "the Business Day as of which a financial transaction is effected."  The Plan does not explain how to determine which day or days a withdrawal may occur. Petitioner's interpretation of these sections is as follows:

> It is frankly incredible for Defendant, who was an apparently successful corporate attorney, to assert that this language is ambiguous, or that he "would not know how to initiate [a financial transaction]," or that "at no point prior to age 70-1/2 would [he] have a clear unilateral right to the money." Motion p.6. These sections clearly refer to settling a trade, as would be necessary in order for Mr. Greebel, or the government, to receive funds from his account, because those funds are primarily held in stocks or similar assets that would first need to be sold, or "traded," before funds could be released. Regardless, even if the clear terms of the KPM are too complex for Defendant to decipher, complexity does not mean that the terms are ambiguous.

> Opp. at 7.

**GIBSON DUNN**

November 6, 2020
Page 5

Mr. Greebel disagrees with Petitioner that these sections "***clearly*** refer to settling a trade . . . because those funds are primarily held in stocks." While it is possible that Petitioner's interpretation is correct, there are a near infinite number of equally plausible alternate meanings. And this *ad hominem* attack on Mr. Greebel is unnecessary and in poor taste given the parties have spent several months in cordial and professional negotiations. Despite that Petitioner is confident that it is sure of the meaning of these sections, there is nothing in the text to support Petitioner's interpretation, which is more accurately termed a guess.

The above makes clear that Petitioner may not garnish the Katten Plan because Mr. Greebel does not have a current, unilateral right to the funds. Furthermore, Petitioner is not entitled to a continuing writ while it waits to ascertain whether Mr. Greebel is or will ever become eligible for withdrawal. *See Cullenward* at *4.

**C.     Consideration Of Extrinsic Evidence Is Warranted By The Ambiguity Around The Fiduciary's Approval And The Inconsistency Highlighted By Both Parties.**

Petitioner argues that the Fried Frank and Katten Plans are "clear and consistent," Opp. at 3., and as a result, the Court should not consider the Katten Plan Summary or any other evidence. As discussed above, any reasonable reader would find the language of the Katten Plan far from clear or consistent.

Petitioner argues that "[i]n adjudicating agreements like [ERISA Agreements], the Second Circuit has instructed courts to apply traditional rules of contract interpretation." Opp. at 3 (quoting *Burke v. Eaton Associates, Inc.*, 2012 WL 267982 at *6–7 (W.D.N.Y., January 30, 2012)). Petitioner ignores that *Burke* also states that the entire contract must be read, and that provisions should not be rendered superfluous. 2012 WL 267982 at *4–5. Petitioner's interpretation would render superfluous a number of the Katten Plan's provisions.

Petitioner claims that "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." Opp. at 3 (quoting *Corral v. Outer Marker LLC*, 2012 WL 243318, at *3 (E.D.N.Y. January 24, 2012)). The *Corral* case differs from the instant case because *Corral* involved simple, clear language that was unambiguous: "Although the parties dispute whether 'this date' refers to October 1, 2009—the date printed on the contract's first page-or January 12, 2010—the date Jackson signed the contract—this dispute is ultimately irrelevant because the Hangar Contract was 'issued to' Jackson on August 28, 2009, well before either date."). The dispute in *Corral* was vastly simpler and clearer than the terms of the Katten Plan, and is an instructive example of the what is and what is not ambiguous.

Petitioner cites *In re New York Skyline, Inc.*, 471 B.R. 69 (Bkrtcy. S.D.N.Y. 2012), but omits that the court found the contract language to be ambiguous. In *Skyline*, a company entered

**GIBSON DUNN**

November 6, 2020
Page 6

into an agreement stating that certain employees must "be salaried employees and not
working on commission or other sales incentive." *Id.* at 86. The parties disputed whether
the provision "absolutely prohibits any compensation based on ticket sales" or "only
prohibits compensating employee ticket sellers on an individual commission basis based
upon the number of sales that employee makes." *Id.* at 87. The court found "that both
interpretations are reasonable, and the provision is, therefore, ambiguous." *Id.* The disputed
provision in *Skyline* is not unlike the provisions disputed in the instant matter.

As Petitioner's own cases make clear, the language in the Katten Plan is susceptible to
multiple interpretations is therefore ambiguous.

### D. Extrinsic Evidence Shows That The Katten Plan Does Not Give Mr. Greebel A Current, Unilateral Right To Withdraw The Funds.

The ambiguity in the Plans allows the Court to consider extrinsic evidence. *See BF Advance,
LLC v. Sentinel Ins. Co., Ltd.*, 2018 WL 4210209, at *7 n.6 (E.D.N.Y. Mar. 20, 2018) (citing
*Scholastic, Inc. v. Harris*, 259 F. 3d 73, 83 (2d Cir. 2001)).

In addition to the Katten Plan Summary, which is discussed in Mr. Greebel's opening
objections, Obj. at 6–7, the Katten Exit Summary provided to employees upon their
termination states "[i]f you desire a distribution, you must contact Schwab at 800/724-7526 if
your account balance does not [sic] exceeds $1,000 within two months of your Termination
Date. If your account balance does not exceed $1,000 during such period and you take no
action, you will automatically receive the distribution from your account balance." Ex. C at
4 (Katten Exit Summary).[1] Based on the paragraphs before and after this language, it seems
the first sentence contains a typo, and should say "if your account *balance exceeds*" as
opposed to "if your account balance *does not exceeds*." This is similar to the requirement in
Section 6.02 of the Fried Frank Plan, and shows that Mr. Greebel does not have a current,
unilateral right to the proceeds in the Katten Plan.

The Katten Exit Summary also states "[i]f you are under age 59½, you will have to pay the
10% additional income tax on early distributions for any payment from the Plan (including
amounts withheld for income tax) that you do not roll over, unless one of the exceptions
applies below. This tax is in addition to the regular income tax on the payment not rolled
over." Ex. C at 7; *see also* Ex. D at 4 (Schwab Notice) (providing similar language). This
10% penalty negates a current, unilateral right to the funds. *See Rousey v. Jacoway*, 544 U.S.

---

[1] This document is dated after Mr. Greebel left Katten. The version that Mr. Greebel received will need to
be unearthed during discovery.

**GIBSON DUNN**

November 6, 2020
Page 7

320, 328 (2005) (holding that a 10% withdrawal penalty "effectively prevents access to the entire balance" of the account and does not give "an unrestricted right to payment of the balance").

**E.     Summary Judgment For Petitioner Is Inappropriate Given The Numerous Defects In And Uncertainty Created By The Plans.**

The above discussion of the Plans shows that summary judgment for Petitioner is inappropriate. Based on the plain language of the Plans, Mr. Greebel is conclusively ineligible to withdraw the funds. However, if the Court disagrees with this interpretation, it can, at best, find that the Plans are unclear and ambiguous. Under *Novak*, this too would prevent Petitioner from garnishing the Plans. Further, if the Court deems the Plans to be ambiguous, it may review parol evidence, *see BF Advance* at *7 n.6, which would require discovery, including depositions regarding the formation and understanding of the contractual terms and their application.

**F.     The Text Of The CCPA And Related Case Law Make Clear That If Garnishment Were Proper, Petitioner Can Garnish Not More Than 25%.**

Petitioner's argument that Congress could have included lump-sum withdrawals in the CCPA but chose not to, Opp. at 9, does not withstand scrutiny. The relevant portion of the statute reads: "The term 'earnings' means compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, *or otherwise*, and *includes* periodic payments pursuant to a pension or retirement program." 15 U.S. Code § 1672(a). As is the case with many statutes, Congress could have enumerated a number of things covered by the statute, but chose to instead provide examples and use phrases "or otherwise" and "includes" to allow for interpretations by the designated administrative agency (in this case the Department of Labor, *see* Obj. at 15). Petitioner's argument taken to its logical conclusion, is that *only* "wages, salary, commission, bonus[es] or [] periodic payments pursuant to a pension or retirement program" are covered by the CCPA. But the language of the statute makes clear that those are exemplars and that the list was not exhaustive—the term "earnings" was expansive and meant to include far more than just wages, salary, commission, bonuses, or periodic payments.

Petitioner cites *United States v. DeCay*, 620 F.3d 534 (5th Cir. 2010), claiming "the *DeCay* court rejected that the CCPA applies to lump sum payments. Opp. at 10. However, *DeCay* was decided in 2010, several years before the Department of Labor's ("DOL") Opinion Letter provided a clarification of the CCPA in 2018. *See* Obj. at 10–11. Further, *DeCay* did not address periodic versus lump sum payments. The issue was simply whether payments made "pursuant to" a retirement plan were "earnings." The *DeCay* court found that they

**GIBSON DUNN**

November 6, 2020
Page 8

were earnings.  *DeCay* at 544 ("The statute explicitly defines 'earnings' to include 'periodic payments made *pursuant to* a pension or retirement program.  The term 'pursuant to' is generally defined as 'in compliance with; in accordance with; under [or] . . . as authorized by . . . [or] in carrying out.'. . . Because the United States does not dispute that the terms of the pension plan authorize Barre to receive monthly pension benefits, we conclude that the payments are being made 'pursuant to' the pension fund and therefore constitute 'earnings' under the CCPA.")  (emphasis added by the *DeCay* court) (citations omitted).

Petitioner argues that *DeCay* "is particularly instructive," and we agree.  *DeCay* clearly explains that the issue facing the Court is whether the funds in the Plans are being paid "pursuant to" a retirement plan.  Although the parties dispute whether the terms of the Plans currently entitle Mr. Greebel to withdraw the funds, neither party would dispute that if Mr. Greebel does receive lump sum or periodic distributions, they would be "pursuant to a pension or retirement program" and thus subject to the CCPA's 25% cap.

The reasoning in *DeCay* makes sense.  The method of payout, e.g. whether periodic, all at once, or in a few irregular payments has no bearing on whether the money was "earned." When Mr. Greebel was paid his salary, Katten required that a portion might be deposited into the Katten Plan.  *See* Ex. E at § 12.9 (Katten Partnership Agreement, 9th Amendment) (stating that a partner's compensation is subject to withholding for, *inter alia*, contributions to retirement plans).  Petitioner's argument that the salary deposited into the Katten Plan was not "earnings," Opp. at 13, overlooks that people are compensated in different ways.  Many are paid through "wages," while others are paid through "salary."  15 U.S. Code § 1672(a). Others receive a "commission," and some receive a "bonus."  *Id.*  And there are "other[]" forms of earnings as well.  *Id.*  The key denominator is that these are all forms of "compensation" for "personal services," *i.e.*, they are all "earnings."  *Id.*  Petitioner cannot argue that periodic payments, such as a weekly salary or monthly pension payment, is earnings, whereas a one-off bonus, an unusually large one-time commission, or an irregular pension payment is not.

Further, the Katten Plan's 10% penalty discussed *supra* shows that the funds in the Katten Plan are "earnings" and subject to the CCPA. On this point, *Rousey* is instructive.  Similarly to the instant dispute, in *Rousey*, the issue was whether money derived from IRAs was "income that substitutes for wages."  *Rousey* at 331.  The Supreme Court found that it was.  *Id.*  The Court's reasoning is crucial:

> First, the minimum distribution requirements, as discussed above,
> require distribution to begin at the latest in the calendar year after
> the year in which the accountholder turns 70 ½. Thus,
> accountholders must begin to withdraw funds when they are likely

**GIBSON DUNN**

November 6, 2020
Page 9

> to be retired and lack wage income. Second, the Internal Revenue
> Code defers taxation of money held in accounts qualifying as IRAs
> under 26 U.S.C. § 408(a) (2000 ed. and Supp. II) until the year in
> which it is distributed, treating it as income only in such years. §§
> 219, 408(e) (2000 ed. and Supp. II). This tax treatment further
> encourages accountholders to wait until retirement to withdraw the
> funds: The later withdrawal occurs, the longer the taxes on the
> amounts are deferred.  Third, absent the applicability of other
> exceptions discussed above, withdrawals before age 59 ½ are
> subject to a tax penalty, restricting preretirement access to the
> funds.  Finally, to ensure that the beneficiary uses the IRA in his
> retirement years, an accountholder's failure to take the requisite
> minimum distributions results in a 50–percent tax penalty on funds
> improperly remaining in the account. § 4974(a).  All of these
> features show that IRA income substitutes for wages lost upon
> retirement and distinguish IRAs from typical savings accounts.
>
> *Id.* at 331–32.

This language can be applied nearly verbatim to proceeds held in the Katten Plan.  First, the
"minimum distribution requirements" in *Rousey* track with Section 7.7 of the Katten
Plan.  Second, the 26 U.S.C. § 408(a) deferred taxation in Rousey tracks with Section 1.32 of
the Katten Plan.  Third, the tax penalty for early withdrawals in *Rousey*, and fourth, the
attempt to ensure the *Rousey* beneficiary used the IRA in his retirement years, track with the
10% penalty in the Katten Exit Summary.  *See Rousey v. Jacoway*, 544 U.S. 320, 327 (2005)
("That right is restricted by a 10–percent tax penalty that applies to withdrawals from IRAs
made before the accountholder turns 59 ½.  Contrary to Jacoway's contention, this tax
penalty is substantial.  The deterrent to early withdrawal it creates suggests that Congress
designed it to preclude early access to IRAs.").

**G.     The Department Of Labor Opinion Letter Applies To The Katten And Fried
         Frank Plans And Is Entitled Significant Deference.**

Petitioner's argument that the DOL Opinion Letter is irrelevant and does not address the
specific issue in this case, Opp. at 11–12, does not make sense.  Petitioner ignores that the
"or otherwise" and "includes" language in the CCPA necessarily means that not every issue
will be covered in the statute, and the cases or opinion letters discussing the statute.

Furthermore, Petitioner overlooks that the Opinion Letter *actually is* on point.  The letter
begins: "This letter responds to your request for an opinion letter from the Wage and Hour
Division (WHD) regarding whether certain lump-sum payments from employers to

**GIBSON DUNN**

November 6, 2020
Page 10

employees are earnings for garnishment purposes under Title III of the Consumer Credit Protection Act (CCPA)."  Obj. Ex. D at 1; *see also id.* ("Accordingly, you request that WHD opine on whether the CCPA's garnishment limits apply to lump-sum payments.").  This is exactly the issue in the instant dispute.

Petitioner also argues that the Opinion Letter should not be considered because it does not address the MVRA.  Opp. at 12.  However, Petitioner fails to grasp that Mr. Greebel is not citing the Opinion Letter to interpret the *MVRA*; it is being used to interpret the *CCPA*.

Petitioner argues "the DOL letter, were it at all relevant, is not entitled to deference in this matter because, *inter alia*, deference to an agency opinion is only applicable when the agency's interpretation of a regulation is required due to ambiguity in the regulation and a 'lack of court expertise' on a particular statute, neither of which apply here."  Opp. at 12 (citing *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984)).  However, as previously discussed, the "or otherwise" and "includes" language in the CCPA shows that Congress left this issue open, and the statute is, indeed, ambiguous as to what is covered.  The DOL has particular expertise in the area given it is charged with enforcing provisions of the CCPA.  *See* Obj. at 15.  The DOL stepped in to provide this expertise as a result of some courts discussing the CCPA incorrectly.

### H.     Mr. Greebel Has Served The Garnishees.

After numerous attempts to serve the Garnishees were thwarted by the closure of offices due to the COVID-19 pandemic, Mr. Greebel served Merrill Lynch and Schwab on November 3 and November 4, 2020, respectively.  Ex. F (Affidavits of Service).  Mr. Greebel disagrees with Petitioner's characterization in footnote 1 of its Opposition.  It is simply incorrect to claim that because Mr. Greebel did not serve Garnishees before Petitioner filed its Opposition brief, that this means that "Garnishees did not raise any objections to the garnishments."  Opp. at 1 n.1.  Regarding Petitioner's claim that Defendant has not objected to the Garnishees' answers, Opp. at 1 n.1, Mr. Greebel, has, in fact, now filed two briefs objecting to the Garnishees' answers.

Furthermore, regardless of how the objections were styled, communications with the Court and negotiations between the parties make clear that Mr. Greebel is also objecting to the Writs of Garnishment issued by the Court,[2] and is claiming that based on the law and the facts, the writs are improper and the government lacks the authority to garnish Mr. Greebel's funds in the Plans.

---

[2]  In Dkt. 708, counsel for Mr. Greebel moved for "time to respond to the Government's Writ of Continuing Garnishment."  Several other docket entries refer to this dispute as regarding Defendant's "opposition" or "objections" "to writs of continuing garnishment by the Court."  *See*, *e.g.*, Dkt. 740; Dkt. 742; Dkt. 743.

**GIBSON DUNN**

November 6, 2020
Page 11

In addition, despite providing a 20-day deadline for defendant to object and a 10-day deadline for a hearing to be set, 28 U.S.C. § 3205(c)(5) does not provide a deadline for service on the Garnishees.  Thus, Mr. Greebel did not breach section 3205(c)(5) by serving on November 3 and November 4, 2020.  Indeed, Mr. Greebel could have waited to serve the Garnishees when he filed his Reply or when a hearing date was set—the statute does not state that any of those dates are disallowed.

Finally, the government did not notify Mr. Greebel or his counsel that it expected Mr. Greebel to serve the Garnishees by a certain date.  It chose instead to wait until it filed its brief to bring it to our attention.[3]

### Conclusion

We respectfully request that the Court find that garnishment is improper because Mr. Greebel does not have a current, unilateral right to the funds in the Fried Frank or the Katten Plan; and if Mr. Greebel does become entitled to the funds in the Fried Frank or the Katten Plan, the Consumer Credit Protection Act would limit any garnishment to 25%.

Respectfully submitted,

*/s/ Reed Brodsky*

Reed Brodsky

cc:  All Counsel of Record (Via ECF)

---

[3]  Given that the parties had numerous discussions with the government to resolve this matter, and that we made clear our strong opposition, we do not appreciate that the government stood by and waited until it filed its opposition before raising the issue of service on the Garnishees.  That sharp practice should not be rewarded or countenanced, particularly when it is the government who should want the Court to resolve the matter on the merits.