```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------------x
     UNITED STATES OF AMERICA
 3                                       15 CR 637(KAM)
              versus
 4                                       U.S. Courthouse
     EVAN GREEBEL,                       225 Cadman Plaza East
 5                                       Brooklyn, NY 11201
                        Defendant.       January 28, 2021
 6   ------------------------------------x 9:00 a. m.

 7      TRANSCRIPT OF VIDEO CRIMINAL CAUSE FOR GARNISHMENT HEARING
                  BEFORE THE HONORABLE KIYO MATSUMOTO
 8                  UNITED STATES DISTRICT JUDGE

 9
                             APPEARANCES
10
     For the Government:    SETH DUCHARME
11                          UNITED STATES ATTORNEY
                            EASTERN DISTRICT OF NEW YORK
12                          271 Cadman Plaza East
                            Brooklyn, New York 11201
13                          BY: THOMAS PRICE, ESQ.
                            Assistant United States Attorney
14
     For the Defendant:     GIBSON DUNN & CRUTCHER
15                          200 Park Avenue, 48th Floor
                            New York, New York 10166
16                          BY:  REED BRODSKY,ESQ.
                                 MARC TAKAGAKI, ESQ.
17

18   Also Present:  MICHAEL VERDE, ESQ.

19

20

21   Court Reporter:        LISA SCHMID, CCR, RMR
                            Official Court Reporter
22                          225 Cadman Plaza East
                            Brooklyn, New York 11201
23                          Phone:  718-613-2644
                            Fax:  718-613-2379
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

PROCEEDINGS

```
 1              THE CLERK:  Good morning, everyone.
 2              This is a Garnishment Hearing as to Mr. Evan Greebel
 3    in 15 CR 637.
 4              Will the Government's attorney please state your
 5    appearance, please?
 6              MR. PRICE:  Assistant U.S. Attorney Thomas Price for
 7    the United States.
 8              THE COURT:  Good morning.
 9              MR. PRICE:  Good morning.
10              THE CLERK:  On behalf of the defendant?
11              MR. TAKAGAKI:  Yes, Marc Takagaki on behalf of Evan
12    Greebel, as well.
13              THE COURT:  All right.  We are having trouble
14    hearing everybody, but I would ask anyone who is not speaking
15    to mute themselves.  Then when you do want to speak, you can
16    unmute.
17              So, all right.  Good morning, Mr. Takagaki.
18              Mr. Reed Brodsky, did you want to state your
19    appearance?
20              MR. BRODSKY:  Yes, Your Honor.  Reed Brodsky on
21    behalf of Mr. Greebel, as well.
22              We would note that Mr. Greebel is present for the
23    hearing.
24              THE COURT:  All right.  Good morning.
25              And we had talked -- we issued an order last evening
```

LISA SCHMID, CCR, RMR

PROCEEDINGS

1    that any witness who had not yet testified should not join the

2    call, either by audio or video.

3            (Court reporter seeks clarification.)

4            THE COURT:  All right.  We issued an order last

5    night that witnesses who have not yet testified would not be

6    joining either by audio or video on this call, but once the

7    attorney presenting that witness was ready to present the

8    witness, then they should reach out and make sure that the

9    witness joined the call or the video, the video preferably.

10           So, Mr. Price, did you want to start with the

11   presentation of evidence?

12           MR. PRICE:  That -- if that's how Your Honor would

13   like to proceed, that's fine.  We had -- I had anticipated,

14   since this was Mr. Greebel's hearing and he has the burden to,

15   you know, establish that garnishment isn't applicable, he

16   would actually begin.

17           THE COURT:  All right.  Well, I'm happy to start

18   with Mr. Greebel.  I agree with you that the burden is on the

19   person objecting to the garnishment, and he did request a

20   hearing.

21           So I'm happy, Mr. Brodsky or Mr. Takagaki, to hear

22   from your witnesses first.  Who would you like to call?

23           MR. TAKAGAKI:  Yes, Your Honor.  Before we call any

24   witnesses, I would like to state that at some point -- I don't

25   think this is going to -- Mr. Greebel may switch to the phone

PROCEEDINGS

 1  instead of video, because his children need the internet

 2  bandwidth for school.

 3          THE COURT:  All right.  Well, He's welcome to

 4  participate in any manner that he wishes.  All right?

 5          MR. TAKAGAKI:  Thank you, Your Honor.

 6          Also before I call the first witness, I'd like to

 7  make a brief opening statement just about what we'd like to do

 8  today so that I can frame the issues like, you know, how long

 9  I expect the direct examinations to take.

10          THE COURT:  All right.  Well, that would be helpful,

11  but, Mr. Takagaki, I'm trusting that you are familiar with the

12  orders that the Court had issued regarding some of the matters

13  that the parties have submitted as to the proper scope of the

14  hearing, the issues that are relevant to the hearing, and both

15  parties have had a full opportunity to advise me which

16  witnesses and documents they wanted me to consider.  But go

17  ahead.

18          MR. TAKAGAKI:  Yes.  Thank you, your Honor.

19          As you know, there are two issues.  The first is the

20  plain language of the 401(k) plans; and second has to do with,

21  even assuming the Government is correct about the timeline of

22  the plans -- which we don't agree with -- then whether the

23  Government is limited to 25 percent garnishment under the

24  Consumer Credit Protection Act which today I'll refer to as

25  the CCPA.

PROCEEDINGS

```
 1              As for the first issue regarding the plain language
 2    of the plans, we agree with the Government that the plans are
 3    for the Court to review and to make legal determinations based
 4    on their plain language.  So we're not asking the witnesses
 5    for their interpretation of the plans.  Having spoken to the
 6    witness, we don't believe it's within the scope of their
 7    duties to interpret the plans, and they did not write the
 8    provisions at issue.  But I do have a few questions that are
 9    fact-specific that help us prove our positions.
10              Without accounting for cross or redirect, I
11    anticipate needing --
12              THE COURT:  Sir, you're breaking up.
13              MR. TAKAGAKI:  My apologies.
14              Just to somewhat -- we don't plan on asking the
15    witnesses for their interpretations of the plans.  I don't
16    believe that that's within the scope of their duties, and they
17    did not write those provisions.  We do have a few
18    fact-specific questions we plan to ask.
19              Without accounting for cross or redirect, I
20    anticipate needing 25 to 45 minutes per witness, and I
21    anticipate the entire proceeding may last 1-1/2 or 2 hours
22    based on our conversations with the witnesses.  That's what
23    I'm anticipating and thank you.
24              THE COURT:  How many witnesses will you be
25    presenting today, Mr. Takagaki?
```

PROCEEDINGS

```
1              MR. TAKAGAKI:  We're planning on calling three

2    witnesses.

3              THE COURT:  Who are they, please?

4              MR. TAKAGAKI:  James Berge of Katten Muchin.

5              THE COURT:  Okay.

6              MR. TAKAGAKI:  The same witnesses that the

7    Government listed.

8              THE COURT:  All right.  Who else?

9              MR. TAKAGAKI:  Mark Broutman of Katten Muchin and

10   Karl Groskaufmanis of Fried Frank.

11             THE COURT:  Who do you want to start with, sir?

12             MR. TAKAGAKI:  If it please the Court, I'll start

13   with James Berge, Katten Muchin.  I can get him on the call

14   and tell him to join.

15             MR. PRICE:  Your Honor, if I may?

16             THE COURT:  Yes.

17             MR. PRICE:  I just, along with the Katten witnesses,

18   Michael Verde, who is the general counsel of Katten, will be

19   appearing as well.  He's simply going to be here to make sure

20   that there are no issues of privilege that come up.

21             THE COURT:  All right.  Has he joined us yet?

22             MR. PRICE:  He has not joined as yet.  I'll let him

23   know to join as well.

24             THE COURT:  All right.  He'll not be testifying,

25   correct?
```

PROCEEDINGS

```
 1              MR. PRICE:  That is correct, Your Honor.

 2              THE COURT:  All right.  He's just appearing as

 3    counsel for the firm.

 4              MR. PRICE:  Yes, Your Honor.

 5              THE COURT:  All right.  Mr. Takagaki, I didn't get

 6    the name of the witness you are going to call from Fried

 7    Frank.  Was it Ms. Warren or Mr. Groskaufmanis?

 8              MR. TAKAGAKI:  Mr. Groskaufmanis, I believe.

 9              THE COURT:  Okay.  Thank you.

10              MR. TAKAGAKI:  So, Your Honor, with your permission,

11    may I call Mr. Berge to join?

12              THE COURT:  Yes.

13              MR. TAKAGAKI:  Thank you.  I'll try to call him

14    right now.  Thank you.

15              THE COURT:  All right.

16              MR. TAKAGAKI:  So Your Honor, I did speak to

17    Mr. Berge and he should be dialing in momentarily via video,

18    so just to let --

19              THE COURT:  All right.  I neglected to ask the

20    Government whether he wanted to make an opening statement on

21    behalf of the Government, but if you want to reserve that

22    until you respond to the defendant's case, that's fine, too,

23    but I didn't mean to overlook you, Mr. Price.

24              MR. PRICE:  Thank you, Your Honor.

25              The Government will reserve its right.
```

LISA SCHMID, CCR, RMR

PROCEEDINGS

```
 1              THE COURT:  All right.  I wanted to just say hello
 2   to Mr. Verde.  How are you, sir?  Nice to see you again.
 3              MR. VERDE:  Nice to see you, too, Judge Matsumoto.
 4   Thank you.
 5              THE COURT:  All right.  Do we have your witness yet,
 6   sir, Mr. Takagaki?
 7              MR. TAKAGAKI:  Yes, I believe I see Mr. Berge's
 8   window, but I'm not seeing --
 9              THE COURT:  Mr. Berge, you need to turn on your
10   audio and video if you could, please.  We see a square with
11   your name in it.  Mr. Berge, we have our technical expert
12   here.
13              Is there anything that we should suggest to
14   Mr. Berge to make sure we can see and hear him?  Because we
15   can't see or hear him at this time.
16              (Discussion off the record.)
17              MR. TAKAGAKI:  It is 312-577-8010.
18              THE CLERK:  I think he's in.
19              THE COURT:  Okay.  Did he just join us?  Yes.  Okay.
20              Good morning, Mr. Berge.
21              MR. BERGE:  Good morning.  I apologize.
22              THE COURT:  No.  We're sorry you're having
23   difficulties.  I am going to ask you to take an oath to tell
24   the truth.
25              Ms. Jackson, would you swear this witness, please?
```

BERGE/DIRECT/TAKAGAKI

```
 1              (Witness sworn.)
 2              THE CLERK:  Thank you.
 3              Please state your name for record, please.
 4              THE WITNESS:  My name is James Berge, B, as in
 5  "boy," E-R-G-E.
 6              THE COURT:  Thank you.
 7              Please proceed, Mr. Takagaki.
 8              MR. TAKAGAKI:  Thank you, Your Honor.
 9                        DIRECT EXAMINATION
10  BY MR. TAKAGAKI:
11  Q    Good morning, Mr. Berge.  Thank you for joining us.
12              I would like to start with some questions about your
13  background.  What is your occupation?
14  A    So, I'm a human resources manager for Katten Muchin
15  Rosenman.
16  Q    And how long have you worked at Katten?
17  A    So I started with Katten in December of 1992, which is a
18  little over 28 years.
19  Q    And are you a lawyer?
20  A    I am not.
21  Q    And do you have any legal training?
22  A    The only training I have is for -- in our benefit plans.
23              (Court reporter seeks clarification.)
24  A    The training that I have had is regarding our benefit
25  plans from our lawyers, but I'm not a lawyer, no.
```

```
 1   BY MR. TAKAGAKI:
 2   Q    And what are your responsibilities at Katten currently?
 3   A    So I am in charge of the firm's what we call welfare
 4   benefit plans, which are plans that govern health insurance,
 5   dental insurance, life insurance, disability.  And I'm also in
 6   charge of the firm's qualified retirement plans, which include
 7   the Katten Muchin Rosenman Defined Contribution Plan.
 8             MR. TAKAGAKI:  And, Your Honor, if I may ask the
 9   clerk or whoever is controlling the exhibits on the record to
10   please show a document at this point.  It's I think --
11             THE COURT:  Sir, you're controlling your exhibits.
12   All right?  So, you can show the document.
13             MR. TAKAGAKI:  Oh, understood.  Apologies.  I was
14   under the impression -- are the exhibits in the system?  I
15   have them on my computer, but I have to log them in.  I'm not
16   quite sure I could do that.
17             (Discussion off the record.)
18             MR. TAKAGAKI:  Understood.  Okay.  Thank you.  I
19   will pull up the exhibits now.  Please bear with me a second.
20   As I said, I thought they were already in the system.  That's
21   my mistake.
22             THE COURT:  Would you kindly identify the exhibit by
23   letter or number, so we have a clean record, please?  You can
24   refer to the exhibit that you used in the docket so we don't
25   have any cross-confusion.
```

BERGE/DIRECT/TAKAGAKI

```
 1              Sir, you're muted.  Mr. Takagaki, you're muted.
 2              MR. TAKAGAKI:  As I pull up the document now, as
 3    it's loading, I'll tell the Court it's going to be docket
 4    number --
 5              THE COURT:  You're breaking apart.  Would you repeat
 6    the exhibit number again, please?  Docket number what?
 7              MR. TAKAGAKI:  Docket Number 736-2.
 8              THE COURT:  736-2?
 9              MR. TAKAGAKI:  Yes.
10              THE COURT:  And this will be a defendant exhibit.
11              Thank you.
12              MR. TAKAGAKI:  Yes.  It's loading now.
13    BY MR. TAKAGAKI:
14    Q    Okay.  I believe I have just shared my screen.  You
15    should see a document that starts with Exhibit B.
16              MR. TAKAGAKI:  Your Honor, please let me know if
17    you're not seeing that on your screen.
18              THE COURT:  All right.  We can see the document that
19    says, "Exhibit B."
20              MR. TAKAGAKI:  Thank you.
21    BY MR. TAKAGAKI:
22    Q    So I'll turn to the second page.
23              So, Mr. Berge, I'm showing you what's been marked as
24    Exhibit 1.  It's a 158-page document, titled, "Katten Muchin
25    Rosenman, LLP, Defined Contribution Plan."
```

LISA SCHMID, CCR, RMR

1          Do you see this document on your screen?

2     A     Yes.

3     Q     And are you aware that Mr. Greebel has a 401(k) plan that

4     he began participating in while he was employed by Katten?

5     A     Yes, I am.

6     Q     And do you recognize Exhibit 1 here?

7     A     Yes, I do.

8     Q     Do you recognize this is the plan that Mr. Greebel

9     participated in?

10    A     Yes, I do.

11    Q     As manager of human resources, are you familiar with the

12    purpose of this document?

13    A     Yes, I am.

14    Q     And as manager of human resources, are you responsible

15    for interpreting the provisions of this document?

16    A     Yes, I am.

17    Q     And can I ask you now to -- I'll turn to page 43 of the

18    PDF.  Please direct your attention to Article 7.  What is this

19    article titled?

20    A     Withdrawals, Article 7 Withdrawals.

21    Q     And did you ever draft this article?

22    A     I did not, no.

23    Q     And do you have any legal training that would help you in

24    interpreting this article?

25    A     So, with our profit and retirement plans, the people that

BERGE/DIRECT/TAKAGAKI

1    are on our committees go through fiduciary training so our

2    attorneys, for instance, or on the ERISA side train the human

3    resources on how to interpret these plans.

4              (Court reporter seeks clarification.)

5    A    In human resources, we have our internal attorneys who

6    are our counsel who train the human resources on the qualified

7    retirement plans, including this plan.

8    BY MR. TAKAGAKI:

9    Q    So, if I'm understanding you correctly, you rely on other

10   people to help interpret this plan?

11   A    Correct.  Yes, attorneys at Katten Muchin.

12   Q    And if I could now turn to the next page, page 44 of the

13   PDF, please direct your attention to Section 7.4, which should

14   be up on your screen now.  What is this section titled?

15   A    So, Section 7.4 are partial withdrawals for any inactive

16   participants.

17   Q    And if you could, please read that paragraph.

18   A    Sure.

19   Q    Mr. Berge, it looks like you may be reading something

20   offscreen.

21   A    I apologize.  Yep.  Okay.

22             "By applying to the applicable administrative named

23   fiduciary in the form and manner prescribed by the applicable

24   administrative named fiduciary, an inactive participant may

25   make a withdrawal from all accounts of any amount up to the

BERGE/DIRECT/TAKAGAKI

1    entire value of his accounts."

2    Q    And what is the applicable administrative named fiduciary

3    mentioned here?

4    A    Charles Schwab.

5    Q    And what does the applicable administrative named

6    fiduciary do?

7    A    So Charles Schwab is the day-to-day administrator for the

8    Katten Muchin Rosenman Defined Contribution Plan.

9    Q    Does the firm, Katten, contract with Schwab for these

10   services?

11   A    Yes, we do have a contract with Schwab.

12   Q    Does the firm pay Schwab for those services?

13   A    The plan pays -- the fees are paid by the plan, which are

14   the participants in the plan.

15   Q    Is it fair to say that Charles Schwab is responsible for

16   interpreting the plan's terms and provisions?

17   A    Yes, that is a correct statement.

18   Q    Please direct your attention to Section 7.5, the next

19   section.  It's at the bottom of the page.  Which is this

20   section titled?

21   A    So, this is, "Withdrawal Processing Rules."

22   Q    Did you help draft this section at all?

23   A    I did not, no.

24   Q    And I'm going to turn to the next page, now, page 46 of

25   the PDF.  Please read Section 7.5(c), which is at the top of

BERGE/DIRECT/TAKAGAKI

1    the page.

2    A    "Application by participants:  A participant must submit

3    a withdrawal request in accordance with procedures established

4    by the applicable administrative named fiduciary."

5    Q    Thank you.  I'm going to turn now to page 21 of this PDF.

6    It is the "definition" section.  Please direct your attention

7    to Section 1.56 which has the definition of "participant."

8    Could you please read this definition?

9    A    Sure.  1.56.  "Participant means a knowledgeable employee

10   who begins to participate in the plan after completing the

11   eligibility requirements.  A participant's participation

12   continues until his termination of employment and withdrawal

13   or forfeiture of his entire account balance."

14   Q    Thank you.  So, turning back now to the section we were

15   just looking at, 7.5(c), which is now at the top, should be at

16   the top your screen.  In this section, 7.5(c), it refers to

17   procedures established by the applicable administrative named

18   fiduciary, which I believe you said was Charles Schwab.  Are

19   you aware of these procedures, what they are?

20   A    Yes, I am.

21   Q    And what are those procedures?

22   A    So, a participant would contact Charles Schwab by calling

23   their 800 number or on the website, on Schwab's -- excuse

24   me -- on Charles Schwab's website that is established for our

25   plan.

BERGE/DIRECT/TAKAGAKI

1    Q    And is it possible that Schwab may have other procedures

2    for perhaps after someone contacts them that you may not be

3    aware of?

4    A    No, not to my knowledge, no.

5    Q    So when somebody contacts Schwab -- or have you ever been

6    a part of receiving a call or receiving that contact from the

7    Schwab site?

8    A    I have not, no.

9    Q    I'm going to ask you now to please direct your attention

10   to the next paragraph, 7.5(d).  Could you please read this

11   paragraph?

12   A    "Approval by the applicable administrative named

13   fiduciary.  The applicable administrative named fiduciary is

14   responsible for determining that a withdrawal request conforms

15   to the requirements described in this section."

16   Q    Thank you.

17        Have you been present when the applicable

18   administrative named fiduciary was determining whether a

19   request conformed to requirements referenced in 7.5(d)?

20   A    I have not been present, no.

21   Q    Are you aware of every request that has been submitted to

22   the applicable administrative named fiduciary?

23        MR. PRICE:  Objection, Your Honor.  Relevance.

24        THE COURT:  All right.  I'm going to overrule the

25   objection.  I do have a follow-on question for Mr. Berge.

1              You can go ahead and answer it.

2              Do you mean is he personally aware, or was somebody

3    in the HR at Katten aware, made aware?

4              MR. TAKAGAKI:  I'm asking whether he is personally

5    aware of each of the requests.

6              THE WITNESS:  We have access to reporting that

7    Charles Schwab provides us of all the distributions.  So, it's

8    part of our reporting that is provided to Katten Muchin, yes.

9    BY MR. TAKAGAKI:

10   Q    Is it possible someone could have contacted them for a

11   withdrawal and that would not have been part of that reporting

12   or you would not have been made aware of it?

13   A    No.

14   Q    Are you aware of how the applicable administrative named

15   fiduciary responded to each of these requests?

16   A    My answer would be, yes, because through the reporting we

17   would have access to see who has requested a distribution.

18   Q    And are you aware of what considerations Schwab may make

19   when responding to such a request?

20   A    Yes.  So, Schwab would look at the plan documents to

21   determine the type of distribution we requested.

22   Q    And have you ever been present when they looked at the

23   document?

24   A    So when we enrolled with Schwab in November of 2009, they

25   sat with us to go through the plan document and ask questions.

1    So, back in November of 2009 is when we would have done this.

2    Q    Understood.

3            THE COURT:  May I ask a question, Mr. Berge?  If

4    somebody wants to make a withdrawal from the Katten plan, does

5    Katten have the authority to disapprove the withdrawal

6    request?

7            THE WITNESS:  Not to my knowledge.  If the person

8    does not meet the qualifications, so if myself as an active

9    participant, if I were to call up Schwab and ask for at age

10   59-1/2 a service withdrawal, because I don't meet that age

11   requirement, Schwab would not allow it.

12           THE COURT:  All right.  As you're aware, there was

13   the garnishment placed by the Government.  So, would Katten be

14   aware of that garnishment, the writ of garnishment, or would

15   Charles Schwab advise you of that writ of garnishment?

16           THE WITNESS:  Yes, that document was provided to

17   Schwab and then Schwab -- excuse me -- Charles Schwab and then

18   Charles Schwab submitted it to Katten.

19           THE COURT:  All right.  Thank you.

20           So, as we sit here today, has any withdrawal request

21   from Mr. Greebel's Katten retirement plan been made?

22           THE WITNESS:  No, it has not.

23           THE COURT:  All right.  Thank you.

24   BY MR. TAKAGAKI:

25   Q    Mr. Berge, these rules that we have discussed in certain

1  points, 7.4 and 7.5 --

2          (Court reporter seeks clarification.)

3  BY MR. TAKAGAKI:

4  Q   Mr. Berge, have you ever seen these rules that we just

5  discussed, 7.4 and 7.5, not be followed?

6  A   No.

7          MR. TAKAGAKI:  Thank you.  So I would like to now

8  show another document which hopefully will load quicker than

9  the last one.

10          THE COURT:  For clarification, Mr. Takagaki, you

11  referred to this as Defense Exhibit 1, but you previously

12  referred to it as Exhibit B to Document 736-2.  Can we agree

13  for clarity of the record that Defense Exhibit 1 is Exhibit B

14  to Document No. 736-2 in the docket?

15          MR. TAKAGAKI:  Yes, I'm happy to agree to that and

16  apologies.  I'll try to refer to the documents just based by

17  their docket number going forward.

18          THE COURT:  No, that's all right.  I think it's fine

19  to assign a new exhibit number to it if you'd like, but I just

20  want to make sure we cross-reference it, because I don't have

21  a separate packet of exhibits.  So, it would help me find

22  those exhibits.  I may ask the parties to submit large copies

23  of the exhibits after this hearing, but for now I think it

24  would just help the record.  Thank you.

25          MR. TAKAGAKI:  Understood.

BERGE/DIRECT/TAKAGAKI

```
 1            So next, I plan to use Docket Number 736-3.  It
 2  should be loading now momentarily.
 3            THE COURT:  One other question.  Did you intend to
 4  move in Defense Exhibit 1 into evidence?  Because I think you
 5  forgot to do that.
 6            MR. TAKAGAKI:  Yes.  Apologies.  I'd like to move
 7  Defense Exhibit 1 into evidence.
 8            THE COURT:  Does the Government object?
 9            MR. PRICE:  No objections, Your Honor.
10            THE COURT:  All right.  We will receive in evidence,
11  Defense Exhibit 1.
12            (Defense Exhibit 1 was received in evidence.)
13            MR. TAKAGAKI:  Okay.  Your Honor, I now have on the
14  screen Docket Number 736-3.  The first page says, "Exhibit C,"
15  on it, and I'll mark it at Exhibit 2.  It should be titled,
16  "Exhibit C," to 736.
17  BY MR. TAKAGAKI:
18  Q    Mr. Berge, do you see this document on your screen?
19  A    Yes, I do.
20  Q    What I'm showing you has been marked as Exhibit 2.  It's
21  a 31-page document entitled the, "Katten Muchin Rosenman, LLP,
22  Defined Contribution Plan As Amended and Restated Effective
23  January 1, 2007.  Summary Plan description."
24            Do you see that?
25  A    Yes, I do.
```

BERGE/DIRECT/TAKAGAKI

1    Q     Do you recognize this document?

2    A     Yes, I do.

3    Q     And what is this document?

4    A     That is a plan, a description we give to all participants

5    in the Katten Muchin Rosenman Defined Contribution Plan.  It's

6    a shortened summary of the terms and the provisions of the

7    plan.

8    Q     And as HR manager, how would you use this document?

9    A     So, that's a plan -- it's a summary meant for the

10   participants to help them understand the plan versus the

11   115-page full plan documents.

12   Q     Understood.  I'm going to turn to page 19 and --

13              THE COURT:  Do you want to move the exhibit into

14   evidence first?  That's usually something you do at the

15   beginning, once you lay your foundations, and then we'll hear

16   of any objections and then I'll decide whether to admit it.

17              MR. TAKAGAKI:  Yes, of course.  Apologies, Your

18   Honor.

19              I'd like to move Exhibit 2 into evidence.

20              THE COURT:  Does the Government object?

21              MR. PRICE:  No, Your Honor.

22              THE COURT:  All right.  We will receive Defense

23   Exhibit 2.

24              Thank you.  You may proceed.

25              (Defense Exhibit 2 was received in evidence.)

BERGE/DIRECT/TAKAGAKI

```
 1              MR. TAKAGAKI:  Thank you, Your Honor.  I'm turning
 2    to page 19 of the PDF.
 3    BY MR. TAKAGAKI:
 4    Q    In the middle of the page, Mr. Berge, do you see a header
 5    titled, "Withdrawals After Age 59-1/2"?
 6    A    Yes, I do.
 7    Q    And there's language underneath that header.  It starts
 8    with the phrase, once you have reached age 59-1/2."  Would you
 9    mind reading that into the record, please?
10    A    Sure.
11              "Withdrawals after age 59-1/2.  Once you reach age
12    59-1/2, you may withdraw all or any part of your plan account
13    for any reason.  Amounts withdrawn on or after age 59-1/2 are
14    generally subject to income tax.  Please consult your tax
15    advisor for more information."
16    Q    Thank you.  Now there's another header a little bit lower
17    inside the larger letters titled, "Receiving Your Plan
18    Account."  Do you see that header?
19    A    Yes, I do.
20    Q    And there's a sentence directly above that that says,
21    "Implementation of a withdrawal."  It starts with that phrase.
22    Would you mind reading that into the record, please?
23    A    "Implementation of a withdrawal is not under the control
24    of, nor the responsibility of the firm, its employees, or its
25    partners."
```

1  Q     Thank you, Mr. Berge.  I'd like to now move on to

2  discussing the contributions that went into the Katten

3  retirement plan.  Are you aware of whether Mr. Greebel made

4  contributions into his 401(k) plan at Katten?

5  A     Yes, I am.

6  Q     And did he make contributions?

7  A     Yes, he did.

8  Q     Are you familiar with the types of contributions he made?

9  A     Yes, I am.

10  Q     Was Mr. Greebel an associate at Katten during part of the

11  time he worked there?

12  A     Yes, he was.

13  Q     When he was an associate, did he make pretax

14  contributions into his 401(k)?

15  A     Yes, he made pretax 401(k) contributions.

16  Q     Were these voluntary contributions?

17  A     Yes, the pretax 401(k) is voluntary.

18  Q     And how are these contributions made?

19  A     As an associate, they're W-2 employees.  So 401(k)

20  deductions are taken from each semimonthly -- were taken from

21  each semimonthly paycheck based on the amount that he had

22  elected.

23  Q     And were these contributions capped?

24  A     Yes, according to IRS regulations.

25  Q     Did Mr. Greebel become a partner while he worked at

BERGE/DIRECT/TAKAGAKI

1    Katten?

2    A    Yes, he did.

3    Q    And when he became a partner, did he also make pretax

4    401(k) contributions?

5    A    Yes, he did.

6    Q    And when were these contributions made?

7    A    So, partners are paid on a K-1 basis on the first

8    business day of each month.  Those deductions were taken for

9    what we called his draw.

10   Q    Thank you.  And you said that was the first day of each

11   month?

12   A    First business day of each month.

13   Q    Thank you.  And when Mr. Greebel became a partner, did he

14   make any other types of contributions?

15   A    Yes.

16   Q    And what types of contributions were those?

17   A    So, the plan requires noncapital partners, which was his

18   title, to make an integrated employer contribution to their

19   own account, subject to IRS regulations.

20   Q    And when were these contributions made?

21   A    So, those contributions are made each April.

22   Q    And how was the amount of the integrated contributions

23   determined?

24   A    So, there's a formula defined within the plan document

25   for the integrated employer contribution.

BERGE/DIRECT/TAKAGAKI

1   Q    And was Mr. Greebel ever able to change that formula?

2   A    No.  The employer -- the -- excuse me.  Excuse me.  The

3   integrated employer contribution is a mandatory amount, and he

4   did not have any control over the amount of it.

5   Q    And Mr. Greebel's contributions into the 401(k) plan,

6   were these deducted from his paychecks?

7   A    Yes.

8   Q    Okay.  And so to break that down a bit, so Mr. Greebel

9   was paid by Katten for services, is that right?

10  A    Yes.  Yes.

11  Q    And these payments were periodic at times?

12  A    Yes.  So for bonuses, the bonus would be periodic.  The

13  salary when he an associate was paid semimonthly.  When he

14  was a partner, it was paid on the first business day of each

15  month.

16  Q    And so Mr. Greebel's contributions into his 401(k) came

17  out of his salary, it sounds like you're saying?

18  A    Correct.  Yes.  Correct.

19  Q    Did Mr. Katten match any of these contributions?

20  A    No, Katten does not match 401(k) contributions.

21  Q    Turning now to withdrawals from the plan, are

22  participants in the plan allowed to make withdrawals?

23  A    Yes.

24  Q    Could these sometimes be lump sum withdrawals?

25  A    Yes, depending on your status, your active or inactive

1    status at the firm, yes.

2    Q    And could these also at times be --

3            THE COURT:  I'm sorry.  What?  What did you say?

4    BY MR. TAKAGAKI:

5    Q    Could these also be non-lump sum withdrawals?

6    A    No.  The only types of withdrawals are on a lump sum

7    basis.

8    Q    And I believe you said that Katten also makes bonus

9    payments to attorneys at the firm.  Did I hear you correctly?

10   A    Yes, correct.

11   Q    Are these bonuses paid in lump sum payments?

12   A    Yes.  Typically each April.

13   Q    And when the firm gives a bonus, is it committing to --

14   given in April, is it committing to give another bonus the

15   next April?

16   A    No.

17   Q    And are these bonuses part of the attorney's compensation

18   for work done at the firm?

19   A    Yes.

20           MR. TAKAGAKI:  Thank you.

21           I believe I have no other questions on direct at

22   this time, your Honor.

23           THE COURT:  All right.  Does the Government wish to

24   examine this witness?

25           MR. PRICE:  Yes, Your Honor.

BERGE/CROSS/PRICE

1            THE COURT:  All right.  Mr. Takagaki, can you please
2    mute your mic, unless you need to speak?  Thank you.
3            MR. TAKAGAKI:  Of course.
4            THE COURT:  Mr. Price?
5            MR. PRICE:  Thank you, Your Honor.
6                        CROSS-EXAMINATION
7    BY MR. PRICE:
8    Q    Mr. Berge, good morning.
9    A    Good morning.
10   Q    Can you tell me at what time does an employee become
11   vested in their funds?
12   A    So, under the Katten Defined Contribution Plan, all
13   participants are 100 percent vested as soon as the
14   contribution is made.  Whether that develops for the voluntary
15   401(k) or firm contribution for business professionals or for
16   a partner under the integrated employment, it's all 100
17   percent vested.
18   Q    Okay.  And you mentioned a couple of times a distinction
19   between active participants and inactive participants.  Which
20   of those would Mr. Greebel qualify as?
21   A    When he was working at Katten, he was an active
22   participant.  After his last workday at Katten, he became an
23   inactive or terminated participant.
24           MR. TAKAGAKI:  Your Honor, I have an objection.  I'm
25   not sure if it came through in time or if I was still muted.

LISA SCHMID, CCR, RMR

BERGE/CROSS/PRICE

```
 1              THE COURT:  It did not come through.
 2              MR. TAKAGAKI:  Apologies.  I wanted to object to
 3   this for lack of foundation.
 4              THE COURT:  Overruled.  He's with HR.
 5              Well, you can lay a foundation if you want,
 6   Mr. Price, but I think Mr. Berge is capable of answering
 7   whether an employee is active or inactive.
 8   BY MR. PRICE:
 9   Q    Mr. Berge, as an HR manager, are you aware of who are
10   active or inactive employees in your firm?
11   A    Yes.
12   Q    Would Mr. Greebel be an active or an inactive employee?
13              THE COURT:  As of when, sir, as of when?  Now?
14              MR. PRICE:  As of today, yes.
15              THE WITNESS:  Yes, as of today, he's an inactive or
16   terminated participant.
17   BY MR. PRICE:
18   Q    So, as an inactive employee with a 401(k) through your
19   firm, what are Mr. Greebel's rights in regard to withdrawing
20   funds from the Schwab account?
21              MR. TAKAGAKI:  Objection, Your Honor.  Relevance.
22   The document speaks for itself, but the witness testified he
23   doesn't have legal training to interpret the document.
24              MR. PRICE:  I'm not calling for an interpretation of
25   any document, Your Honor.
```

BERGE/CROSS/PRICE

```
1              THE COURT:  I'm going to overrule the objection,
2   sir.  I think the witness does have an understanding and
3   knowledge of whether an inactive participant in the plan -- I
4   believe it was whether they can make withdrawals.
5              Is that correct, Mr. Price?
6              MR. PRICE:  What their rights to withdraw funds are,
7   yes, Your Honor.
8              THE COURT:  All right.  You may answer, Mr. Berge.
9              THE WITNESS:  Would you ask the question again, sir?
10  BY MR. PRICE:
11  Q    Sure.  For an inactive participant, what right do they
12  have to access, to withdraw money from their Schwab accounts?
13             MR. TAKAGAKI:  Objection.  Again, Your Honor, we
14  don't think the witness has the experience or training to
15  opine what was going on with someone's rights.
16             MR. PRICE:  I'll ask it a different way, Your Honor,
17  so we're not using the word "rights."
18             THE COURT:  All right.
19  BY MR. PRICE:
20  Q    As HR manager, in your experience, Mr. Berge, have you
21  seen inactive participants withdraw funds from the Schwab
22  accounts?
23  A    Yes.
24             MR. TAKAGAKI:  Objection.  Vague.
25  BY MR. PRICE:
```

BERGE/CROSS/PRICE

1   Q    And to your knowledge, under the plan, are there any

2   limitations on the amount of money that an inactive

3   participant can withdraw from their account?

4   A    No.

5   Q    You previously testified regarding the types of funds

6   that can be used to put money into an account.  Is there any

7   limitation on the amount of funds that an inactive participant

8   can withdraw based upon a specific type of contribution that

9   it was -- that funded it?

10   A    No.

11   Q    Is there any limitation for an inactive participant based

12   upon age to withdraw funds from their Schwab account?

13   A    No.

14   Q    You mentioned that Schwab was what is a referred to as

15   the -- let me make sure I get this right here -- the

16   applicable administrative named fiduciary.

17   A    Yes.

18   Q    As the applicable administrative named fiduciary, does

19   Schwab have any discretion in whether or not to approve an

20   inactive participant's request to withdraw funds?

21             MR. TAKAGAKI:  Objection.  The document speaks for

22   itself.

23             THE COURT:  You mean the document that you've

24   admitted as Defense Exhibit 2 or Defense Exhibit 1 or the

25   Schwab documents under their agreement with Katten?  What

1    document speaks for itself, Mr. Takagaki?

2            MR. TAKAGAKI:  Exhibit 1, the plan document, which

3    was --

4            (Court reporter seeks clarification.)

5            MR. TAKAGAKI:  Referring to Exhibit 1, the plan

6    document, which lists the rights and powers of the applicable

7    named fiduciary, which we think governs this entire line of

8    questioning and speaks for itself and it's a document for

9    which the witness does not have legal expertise or experience

10   to testify about.

11           MR. PRICE:  Again, Your Honor, I'm not asking the

12   witness to interpret the document.  I'm asking in his

13   experience and his knowledge as the HR manager who's testified

14   that he deals with Charles Schwab on a daily basis and has

15   been, you know, working with them for years, to his knowledge,

16   does the fiduciary have any discretion in whether or not to

17   approve a properly submitted request from an inactive

18   participant to withdraw funds.

19           MR. TAKAGAKI:  I think -- my objection, Your Honor,

20   I think the witness has stated he wouldn't have that

21   knowledge.  He's not there when they make the decisions.  He

22   can only read what the plan states, which the Court has now

23   seen, and I don't think he can add anything on that.

24           THE COURT:  Why don't you do this, Mr. Takagaki,

25   since you're so convinced that the document speaks for itself?

BERGE/CROSS/PRICE

1  With regard to this particular question, what provision of

2  Exhibit 1 speaks to that issue?  Regarding the discretion of

3  Schwab to approve or disapprove the withdrawal by an inactive

4  participant, what provision?

5           MR. TAKAGAKI:  I believe the provisions we looked at

6  earlier, 7.4 and 7.5, state that a participant must submit an

7  application for withdrawal and the fiduciary reviews that

8  application within its procedures and makes a determination.

9  Our understanding is that is the extent of what the plan says

10 and what the witness would know about the plan.  Anything else

11 would have to be asked of Schwab.

12          THE COURT:  Well, Mr. Price was asking a question

13 based on Mr. Berge's knowledge and experience, whether he's

14 aware of whether Schwab has approved or disapproved a

15 withdrawal by a nonparticipating plan contributor.

16          MR. TAKAGAKI:  Your Honor, I believe the witness

17 testified this would be from communications -- anything he

18 would know about this would be communications from Schwab.  I

19 don't believe he can testify to conversations he has had with

20 Schwab or communications they've had that seem to be hearsay.

21          THE COURT:  He's not testifying about the

22 conversations, sir.  He's testifying about his knowledge and

23 experience.  He gets regular communications or reports from

24 Schwab, and he would be aware, independent of Katten, whether

25 Schwab has discretion to approve or disapprove.  So I'm

BERGE/CROSS/PRICE

 1    overruling the objection.

 2              And, Mr. Berge, you may answer the question.

 3              THE WITNESS:  Would you please ask the question

 4    again?

 5    BY MR. PRICE:

 6    Q    Mr. Berge, in your experience, in the position that

 7    you're in, to your knowledge, does Schwab have any discretion

 8    in whether or not to approve a properly-submitted request from

 9    an inactive participant seeking to withdraw funds from their

10    account?

11    A    Schwab would not, no.

12    Q    To your knowledge, are there any limitations whatsoever

13    on the amount of money that an inactive participant can

14    withdraw from the Schwab accounts?

15    A    The only limitation would be up to their current balance.

16              MR. PRICE:  Your Honor, I have no further questions

17    for Mr. Berge.

18              THE COURT:  Do you have any other questions,

19    Mr. Takagaki?

20              MR. TAKAGAKI:  Yes, a few very brief questions.  I

21    will share my screen, if I can, again.

22              THE COURT:  Is this within the scope of cross,

23    Mr. Takagaki, or are you going to show him any provision?

24              MR. TAKAGAKI:  It will be the same provision we

25    discussed already that Mr. Price was asking about.  I'm

LISA SCHMID, CCR, RMR

1  sharing it now, if that's okay with you.

2  　　　　　THE COURT:  Please.

3  　　　　　　　　　　REDIRECT EXAMINATION

4  BY MR. TAKAGAKI:

5  Q　Okay.  Mr. Berge, please let me know when the document

6  comes up.  It's the same document --Exhibit 1 --

7  　　　　　THE COURT:  Sir, I'm sorry.  You broke up.  What are

8  we looking at?  Is this Exhibit 1 or 2?

9  　　　　　MR. TAKAGAKI:  This is Exhibit 1, Docket Number

10  736-1, Exhibit B.

11  　　　　　(Court reporter seeks clarification.)

12  　　　　　MR. TAKAGAKI:  I'm now showing the document on --

13  the first page on the screen, so the parties can see.  That's

14  Exhibit 1, Docket Number 736-1.  I will now scroll onto the

15  page that I want to ask questions about.

16  　　　　　THE COURT:  I think you meant to say 736-2, did you

17  not?

18  　　　　　MR. TAKAGAKI:  Yes.  I apologize if I said "dash,

19  1."

20  BY MR. TAKAGAKI:

21  Q　736-2 is what's on the screen now.  It's Exhibit 1, the

22  document we looked at earlier, Mr. Berge, and I would just

23  like to ask you, sir, to read Section 7.3 into the record.

24  A　"7.3.  Withdrawals from accounts on or after age 59-1/2.

25  By applying to the applicable administrative named fiduciary

1    in the form and manner prescribed by the applicable

2    administrative named fiduciary, an active participant who has

3    attained age 59-1/2 may elect to withdraw any portion up to

4    the entire value of his accounts."

5    Q    Will you now please read Section 7.4 which is the next

6    section?

7    A    "7.4.  Partial withdrawal by inactive participants.  By

8    applying to the applicable administrative named fiduciary in

9    the form and manner prescribed by the applicable

10   administrative named fiduciary, an inactive participant may

11   make a withdrawal from all accounts of any amount up to the

12   entire value of his accounts."

13   Q    Thank you.  And I'll just go down to the next page, so

14   that you can read 7.5(c), which would now be on at the top of

15   your screen.  Can you please just read that?

16   A    Sure.  "Application by participant:  A participant must

17   submit a withdrawal request in accordance with procedures

18   established by the applicable administrative named fiduciary."

19   Q    Thank you.  Could you please read --

20        MR. PRICE:  Your Honor, I'm sorry.  I do need to

21   object.  This is where the document speaks for itself, and I

22   know Mr. Takagaki earlier had Mr. Berge read these provisions

23   in.  To the extent that he is seeking to have Mr. Berge

24   interpret the provision, as opposed to testify as to his

25   actual knowledge as a practicing HR manager, this line of

BERGE/REDIRECT/TAKAGAKI

1    questioning is improper.

2              THE COURT:  Well, I would just urge Mr. Takagaki,

3    since you promised to spend no more than 45 minutes per

4    witness, I think you've had this witness read some of these

5    provisions already.  This is not really proper redirect to

6    have him go back and read it again.  So, if you want to ask

7    him questions, that's fine.  If you want to refer him to

8    provisions that are relevant to your redirect, provided it

9    doesn't exceed the scope of the cross-examination, you may do

10   so, but I don't quite understand what you're doing here.

11             MR. TAKAGAKI:  Your Honor, I understand.  I only

12   have one or two more questions.  I'll try to wrap this up

13   quickly.

14   BY MR. TAKAGAKI:

15   Q    Mr. Berge, the sections you just read and had read

16   earlier during your exam, 7.5(c) and 7.5(d), anywhere do these

17   provisions mention the applicable fiduciary not having

18   discretion to carry out their tasks for these provisions?

19   A    No.

20   Q    And I think my final question is just -- when a

21   participant withdraws from the fund, Charles Schwab keeps some

22   of the money, is that correct?

23   A    No.  No.

24             MR. TAKAGAKI:  I believe I have no further

25   questions, Your Honor.

LISA SCHMID, CCR, RMR

BERGE/REDIRECT/TAKAGAKI

```
 1              THE COURT:  All right.  Mr. Price, do you have
 2   anything else?
 3              MR. PRICE:  No, Your Honor.  I have no further
 4   questions.
 5              THE COURT:  All right.  Mr. Berge, thank you for
 6   your time today.  It was nice to see you.  Have a good day.
 7   Please stay healthy.  Thank you.
 8              THE WITNESS:  Sure.
 9              THE COURT:  Who's your next witness, Mr. Takagaki?
10              MR. TAKAGAKI:  Your Honor, we'd like to call Mark
11   Broutman.  He's also an employee at Katten.  He's on the
12   Government's list of witnesses.
13              THE COURT:  All right.  Do you want to reach out to
14   him and have him dial in, please?
15              MR. TAKAGAKI:  Yes.
16              THE COURT:  I'd like to see him on video, too, if I
17   could, please.
18              MR. TAKAGAKI:  Sure.  Understood, Your Honor.
19              (Court reporter seeks clarification.)
20              MR. TAKAGAKI:  Your Honor, I just spoke to the
21   witness, and he is joining momentarily.  He said he would need
22   about one or two minutes to get the link up.  I did hear some
23   discussion of the witness's name.  Please let me know if you
24   need any of that from me now that I'm back.
25              THE COURT:  We'll have the witness state and spell
```

BROUTMAN/DIRECT/TAKAGAKI

```
 1    his name for the record.  I think the court reporter had asked
 2    that you state the name and spelling.  I gave her the
 3    information based on the submissions of the party, but if you
 4    want to confirm the spelling of his name, that would be
 5    appreciated.
 6              MR. TAKAGAKI:  Yes.  My understanding is that it's
 7    spelled the way it was submitted, M-A-R-K, B-R-O-U-T-M-A-N,
 8    but I can also ask the witness when he joins, just so there's
 9    no doubt.
10              THE COURT:  All right.  Thank you.
11              MR. BROUTMAN:  Good morning, everybody.
12              Good morning, Your Honor.
13              THE COURT:  Good morning, Mr. Broutman.  Thank you
14    for being with us here today.  I'm going ask my case manager,
15    Ms. Jackson, to swear you in today before we get started.
16              Ms. Jackson?
17              (Witness sworn.)
18              THE WITNESS:  Yes, I do.
19              THE CLERK:  Please state and spell your full name,
20    please, for the record.
21              THE WITNESS:  Mark, M-A-R-K, Philip, P-H-I-L-I-P
22    Broutman, B-R-O-U-T-M-A-N.
23              THE COURT:  Thank you.
24              You may proceed, Mr. Takagaki.
25              MR. TAKAGAKI:  Thank you, Your Honor.
```

BROUTMAN/DIRECT/TAKAGAKI

```
 1                      DIRECT EXAMINATION
 2   BY MR. TAKAGAKI:
 3   Q    Good afternoon, I believe at this point, Mr. Broutman.
 4   Thank you for appearing here today.
 5   A    Good morning.
 6   Q    I would like to start just with a little bit of
 7   background.  What is your occupation?
 8   A    I'm an accountant.
 9   Q    And where are you currently employed?
10   A    Katten Muchin Rosenman.
11   Q    And what is your position or title at Katten?
12   A    Director of Partnership Accounting.
13   Q    How long have you worked at Katten?
14   A    Thirty-five years.
15   Q    And are you a lawyer?
16   A    No, I'm not.
17   Q    Do you have any legal training?
18   A    No.
19   Q    And just generally, what are your responsibilities at
20   Katten?
21   A    I'm in charge of partnership reporting for partner
22   compensation.
23            Pardon me.  Let me turn off my phone.  Sorry about
24   that.
25            I'm in charge of accounting for partner compensation
```

BROUTMAN/DIRECT/TAKAGAKI

1    and tax reporting and other duties, but those are the two big

2    ones.

3    Q     Thank you.

4          MR. TAKAGAKI:  Your Honor, now I would like to show

5    the witness what's been marked as Exhibit 1.  It's Docket

6    Number 736-2.  With your permission, I'll share my screen now.

7          THE COURT:  Yes.  Go ahead.

8          (Publishes exhibit.)

9    BY MR. TAKAGAKI:

10   Q     So, Mr. Broutman, you should see a document on your

11   screen now.  It says, "Exhibit B," in bold letters.

12         Do you see that document?

13   A     Yes, I do.

14   Q     Okay.  And just for the record, this document says the

15   docket number is 736-2.  This is Exhibit 1 we marked earlier,

16   and it's a 158-page document.  The second page is entitled,

17   "Katten Muchin Rosenman, LLP, Defined Contribution Plan."  Do

18   you see that here?

19   A     Yes, I do.

20   Q     And are you aware Mr. Greebel has a 401(k) plan he began

21   participating in while he was employed by Katten?

22   A     Yes.

23   Q     And do you recognize Exhibit 1 here as being the plan

24   that governs this 401(k)?

25   A     Yes.  That's the plan document.  Of course, there have

 1   been many amendments since 2007, but that was the last time

 2   we --

 3              (Court reporter seeks clarification.)

 4   A     That's the last time we did a restatement of the plan as

 5   I recollect.  We've done numerous amendments since then.

 6   BY MR. TAKAGAKI:

 7   Q     Do you happen to know how many amendments since 2007 have

 8   been done on the plan?

 9   A     I'm sure a dozen or more.  Usually there's one a year.

10   Often it involves technicalities in the law, adding loan

11   provisions, that sort of stuff.

12   Q     And as the director of partnership accounting, are you

13   familiar with the purpose of this document?

14   A     Yes.

15   Q     And what's the purpose of this document?

16   A     It is to provide for profit sharing and 401(k) for

17   eligible participants of the firm.

18   Q     And you're not responsible for interpreting the

19   provisions of this plan.

20   A     Correct.  I'm not an attorney.

21   Q     I would like to now turn to page 43 of this document.

22   Please direct your attention to Article 7 here.  What is this

23   article titled?

24   A     "Withdrawals."

25   Q     And you did not help draft this document or this article.

1   A    Correct.

2   Q    And moving down to the next page is Section 7.4.  What is

3   this section titled?

4   A    "Partial withdrawals by inactive participants."

5   Q    If you could, please, just read that paragraph into the

6   record?

7   A    "By applying to the applicable administrative named

8   fiduciary in the form and manner prescribed by the applicable

9   administrative named fiduciary, an inactive participant may

10  make a withdrawal of all accounts of any amount up to the

11  entire value of his accounts."

12  Q    Thank you.  And what is the applicable administrative

13  named fiduciary?

14  A    That would currently be Schwab, Charles Schwab.

15  Q    And what are the duties of the applicable administrative

16  named fiduciary?

17  A    Well, they're the custodian for the plan.  They receive

18  distribution requests.  People who register for the plan for,

19  you know, for their contributions like 401(k), they do that

20  directly through Schwab.  They handle their distributions

21  directly through Schwab.  They make changes to their

22  investment allocations directly with Schwab.

23  Q    And does the firm contract with Schwab for these

24  services?

25  A    Yes, the fees payable to Schwab come out of the plan

BROUTMAN/DIRECT/TAKAGAKI

1   assets, though, not from the firm.

2   Q    Understood.  And is Charles Schwab responsible for

3   interpreting the terms of this plan?

4   A    I'm not sure how to answer that.  Obviously, there would

5   be some interpretation, but if there was differences or

6   thoughts, they might go to firm's counsel for questions.

7   Q    Do you consider yourself part of the firm's counsel that

8   they would go to?

9   A    No.

10            MR. TAKAGAKI:  I'd like to turn now to Section 1.4.

11   It's page number 11 of the PDF.  (Exhibit published.)

12   BY MR. TAKAGAKI:

13   Q    Do you see Section 1.4 here as the definition of

14   administrative named fiduciary?

15   A    Yes.

16   Q    Could you just please read this definition into the

17   record?

18   A    "Administrative named fiduciary means a named fiduciary

19   who has the authority to control and manage the operation and

20   administration of the plan or the trust within the meaning of

21   ERISA, Section 402(a)(1).  (B) Has the discretion or authority

22   or discretionary responsibility to administer the plan or the

23   trust within the meaning of ERISA Section 3" -- it's like

24   being in the eye doctor's office -- 3(21)(a) -- small -- thank

25   you very much -- "(iii) or exercise its discretionary

LISA SCHMID, CCR, RMR

BROUTMAN/DIRECT/TAKAGAKI

1    authority or discretionary control with respect to the plan or

2    trust management within the meaning of ERISA Section

3    3(21)(a)(i), other than trustee responsibilities within the

4    meaning of ERISA Section 405(c)(3)."

5              MR. TAKAGAKI:  Just for the record, the witness made

6    a comment about being at the eye doctor's office.  I believe

7    that was just in regards to having trouble reading the

8    text-sized screen which I made larger in the middle of his

9    reading, just to clarify that.

10   BY MR. TAKAGAKI:

11   Q    Thank you for reading that.

12        Is Charles Schwab the administrative named fiduciary

13   referenced here?

14   A    I believe so.

15   Q    Thank you.  I would like to turn now back to the pages we

16   were on.  I believe it's page 45 or page 44 of the PDF.  Do

17   you see Section 5 here?  Can you please read the title of the

18   section?

19             THE COURT:  Do you mean 7.5?

20             MR. TAKAGAKI:  Yes.  7.5.  Apologies.

21             THE COURT:  Okay.

22             THE WITNESS:  "Withdrawal process."

23             THE COURT:  I just want to confirm that Mr. Takagaki

24   wants to ask this witness to read provisions that have been

25   previously read into the record.

1              Is that what you want him to do, sir?

2              MR. TAKAGAKI:  Yes, that's what I was planning to

3   do.

4              THE COURT:  All right.  We're getting kind of on the

5   border of being cumulative here.  You want the witness to read

6   out loud the provisions?

7              MR. TAKAGAKI:  I'll cut this short.  I'll skip

8   having him read it.  I'll just ask him a few discreet

9   questions and move on as quickly as I can.

10             THE COURT:  All right.  So, take your time to read

11  the provisions that you're being directed to answer questions

12  about.

13             But I don't think we need to take time to have him

14  read everything in the record, as the last witness did.  Go

15  ahead, sir, Mr. Takagaki.

16             Do you want to take time to read, Mr. Broutman?

17             THE WITNESS:  Your Honor, that is Section 7.5?

18             THE COURT:  I believe.  It's partly cut off.

19             You might want to scroll a little bit, Mr. Takagaki,

20  so he can see what comes after "B."  All right.  There we go.

21  BY MR. TAKAGAKI:

22  Q    Really you can read anything you want me to direct you

23  to, but really 7.5(c) and (d) are the two that I'd like you to

24  read and I'll ask you a question on that.

25  A    A participant -- I'm sorry.  "Application by participant:

BROUTMAN/DIRECT/TAKAGAKI

```
 1    A participant must submit a withdrawal request in accordance
 2    with procedures established by the applicable administrative
 3    named fiduciary."
 4    Q    Thank you.  I didn't -- you did not need to read it out
 5    loud, just to yourself, but thank you for doing that.
 6              So having now read 7.5(c) and (d), does it say that
 7    to withdraw, a participant must apply to the applicable
 8    administrative named fiduciary?
 9    A    I'm sorry.  I don't quite understand.
10    Q    Does 7.5(c) state that a participant must --
11              MR. PRICE:  Objection, Your Honor.  The document
12    speaks for itself.
13              THE COURT:  Whether he reads it to himself or out
14    loud, you're asking him to confirm whether or not the document
15    says what it says, is that right, Mr. Takagaki?
16              MR. TAKAGAKI:  Yes.  That's right.  I don't want to
17    waste time.  I can move on to another one.
18              THE COURT:  I mean, if you wanted to ask him in his
19    capacity as the accountant and person in charge of this plan
20    specific questions based on his experience and knowledge,
21    that's fine, but I don't see the point of having him read and
22    then asking him to confirm that it says what it says.
23              MR. TAKAGAKI:  Understood.
24    BY MR. TAKAGAKI:
25    Q    Well, Mr. Broutman, to your knowledge, when participants
```

BROUTMAN/DIRECT/TAKAGAKI

1   want to withdraw, do they have to contact Charles Schwab?

2   A    Correct.

3   Q    And does Charles Schwab review their request to determine

4   whether it should be granted?

5   A    Well, they would review the application submitted in

6   whatever form it's submitted.  It would go directly through

7   Charles Schwab, not through the firm.

8   Q    Okay.  Thank you.

9         I would like to now move on to discuss contributions

10  into the plan, the 401(k) plan.  Did Mr. Greebel make

11  contributions into the 401(k) plan?

12  A    Yes, he did.

13  Q    And what types -- was he an associate while he was at

14  Katten?

15  A    He was an associate when he joined.

16  Q    And when he was an associate, what type of contributions

17  did he make?

18  A    Pretax 401(k).

19  Q    And were these voluntary?

20  A    401(k) is always voluntary employee-directed.

21  Q    And when were these made?

22  A    They would have been made through withholding from his

23  compensation as pay to him based on his elections.

24  Q    And did Mr. Greebel become a partner at some point when

25  he was employed by Katten?

BROUTMAN/DIRECT/TAKAGAKI

1   A     Yes, he did.

2   Q     And when he was a partner, did he also make these pretax

3   401(k) contributions?

4   A     Correct.

5   Q     And were these made at the same time that you just

6   described as when he was an associate?

7   A     Yes.  Employees/partners select the percentage of their

8   pay to be contributed.

9   Q     And did he make any other types of -- Mr. Greebel make

10  any other types of contributions when he became partner or as

11  a partner?

12  A     As a partner he became an eligible participant for a

13  profit sharing feature called the integrated contribution.

14  Q     And when did he make these contributions?

15  A     The contributions would have been made in April, after

16  the close of the calendar plan year.

17  Q     And how were the amount of the integrated contributions

18  integrated?

19  A     By formula.

20  Q     And was Mr. Greebel able to alter this formula or the

21  outcome of the formula?

22  A     No.

23          THE COURT:  May I ask a question, please?

24          Did the formula depend in part on what the partner

25  was able to bring in, in the way of fees paid?

```
 1              THE WITNESS:  The formula is based on compensation
 2   as defined in the Internal Revenue Code, which for a partner,
 3   it's self-employment income with a cap.  Currently, the cap is
 4   290.  In the years Mr. Greebel was a partner, it would, of
 5   course, have been lower amounts.
 6              THE COURT:  Thank you.
 7              MR. TAKAGAKI:  Thank you, Your Honor.  I believe I
 8   have no further questions at this time.
 9              THE COURT:  Mr. Price, would you like to
10   cross-examine or to examine, I should say?
11              MR. PRICE:  Yes, Your Honor.
12                         CROSS-EXAMINATION
13   BY MR. PRICE:
14   Q    Mr. Broutman, good afternoon or good morning to you in
15   Chicago.
16   A    Good afternoon, Mr. Price.
17   Q    Based upon your position, are you aware of whether or not
18   Mr. Greebel is still employed with Katten?
19   A    No, he is not.
20   Q    Okay.  As someone who is no longer employed by Katten,
21   would Mr. Greebel be considered an inactive participant under
22   the plan that you were just discussing, testifying about?
23              MR. TAKAGAKI:  Your Honor, we'll just have an
24   objection that the witness is not qualified to interpret the
25   plan.  He doesn't have legal training or expertise to read a
```

BROUTMAN/CROSS/PRICE

 1    plan provision.

 2                  THE COURT:  All right.  Thank you.

 3                  Mr. Broutman, do you know the difference between an

 4    active and an inactive participant within the meaning of the

 5    Katten plan, based on your experience?

 6                  THE WITNESS:  Your Honor, I believe so.  An active

 7    participant would be someone who is currently working for the

 8    firm.  An inactive participant would be someone who is no

 9    longer employed by the firm.

10                  THE COURT:  All right.  Thank you.

11    BY MR. PRICE:

12    Q    Mr. Broutman, in your experience as a director of

13    partnership accounts, are you familiar with the rights of

14    withdrawal that apply to an inactive participant under the

15    plan?

16    A    I have some experience, but not in the form of being

17    legally trained.

18    Q    Certainly.  And your experience, from what you've

19    actually observed at Katten, are there any limitations on the

20    amount of money that an inactive participant can withdraw from

21    their Schwab accounts?

22    A    An inactive participant, someone who is terminated from

23    the firm can fully access any amount in their Schwab defined

24    contribution plan account.

25    Q    And when you say can fully access, do you mean they can

BROUTMAN/CROSS/PRICE

1    withdraw those full amounts?

2              MR. TAKAGAKI:  Objection, Your Honor.

3              THE COURT:  Overruled.  I think the objection might

4    have been spoken over the -- Mr. Price's question or

5    Mr. Broutman's answer.  Can we just, so we have a good record,

6    have the witness speak?

7              Were you answering at the time of the objection,

8    Mr. Broutman?

9              THE WITNESS:  Um, I think so, if the question could

10   be repeated.

11             THE COURT:  All right.  Mr. Price, would you please

12   repeat your question or we can ask the court reporter to read

13   it back.  Do you want --

14             MR. PRICE:  If the court reporter could please read

15   back my last question.

16             THE COURT:  Okay.  Thank you.

17             Ms. Schmid, would you do that, please?  Thank you.

18             (Record read.)

19   A    The answer would be yes.

20   BY MR. PRICE:

21   Q    And in your position with Katten, are you familiar with

22   the vesting provisions of the Katten plan?

23   A    Yes.

24   Q    And so could you tell us when a participant in the Katten

25   plan is vested in the amounts within their plan?

 1    A    They're always a hundred percent vested.

 2    Q    You previously testified about different types of

 3    contributions that can be made to the Katten plan.  Does the

 4    ability of an inactive participant to withdraw funds, is it

 5    dependent in anyway on the type of contribution that initially

 6    was made into the plan?

 7    A    No.

 8    Q    You were asked about a provision earlier with the age of

 9    59-1/2.  I take that back.  That may not have been directed to

10    you.

11         To your knowledge, are there any age restrictions on

12    an inactive participant's ability to withdraw funds from the

13    Katten plan?

14         MR. BRODSKY:  Objection, Your Honor.  It's

15    interpreting the plan.  The document speaks for itself.

16         MR. PRICE:  I'm sorry, Your Honor.  I think you're

17    muted.

18         THE COURT:  I apologize.  I believe that on direct,

19    this witness was asked about specific provisions regarding the

20    age, and I think that this cross addresses or is within the

21    scope of the direct.  And I would say this witness can answer

22    the question, because it is framed on based on his knowledge

23    and experience, as I recall.

24         MR. PRICE:  Yes, Your Honor.

25         THE COURT:  You can answer the question, sir, if you

BROUTMAN/CROSS/PRICE

```
 1   can.
 2               THE WITNESS:  I'm sorry.  If you could, repeat it?
 3   BY MR. PRICE:
 4   Q     Sure.  So based upon your knowledge and experience with
 5   Katten, does the age of an inactive participant have any
 6   impact on whether or not they can withdraw funds from their
 7   account?
 8   A     No.
 9   Q     Based on your experience with the plan, does Schwab as
10   the named fiduciary have any discretion in whether or not to
11   approve a properly submitted request for withdrawal?
12               MR. TAKAGAKI:  Objection.  Asked and answered.
13               THE COURT:  Actually, sir, I think you asked it, but
14   I don't believe this lawyer asked it on cross.  So the
15   asked-and-answered objection applies when the same lawyer asks
16   the same question that's already been answered.  I don't
17   believe that Mr. Price asked this question.  If he did, I'm
18   sorry.
19               MR. PRICE:  Not of this witness, Your Honor.
20               THE COURT:  All right.  I didn't think so.
21   Overruled.
22               THE WITNESS:  Okay.  If you could repeat the
23   question, please?
24   BY MR. PRICE:
25   Q     Based on your knowledge and experience at Katten, does
```

LISA SCHMID, CCR, RMR

1    Charles Schwab as the named fiduciary have any discretion on

2    whether or not to approve a properly submitted withdrawal

3    request from an inactive participant?

4    A    I am not aware of any, unless there is some kind of

5    freeze or something against the account like in a divorce

6    situation.

7    Q    But to be clear --

8    A    I'm not aware.

9    Q    -- you're not aware of anything like that, a divorce

10   situation, in this specific case?

11   A    No.

12        THE COURT:  Sir, when you say a "divorce situation,"

13   are you talking about a situation where a judge has ordered

14   that funds not be withdrawn because there's a pending divorce

15   and they're still figuring out how to dispose of assets?  Is

16   that what you're referring to, or something else?

17        THE WITNESS:  Yes, Your Honor, like when a domestic

18   relations order is submitted to the firm and sent to Schwab,

19   the account may be frozen at that time.

20        THE COURT:  And another example would be a

21   garnishment, a writ of garnishment, is that correct?

22        THE WITNESS:  I believe so, but we're out of my

23   area.  This is more --

24        THE COURT:  Okay.

25        THE WITNESS:  -- out of my area of knowledge.

BROUTMAN/CROSS/PRICE

```
 1              THE COURT:  All right.  We'll strike that question
 2   and the answer.  All right.
 3              Mr. Price, do you have any other questions?
 4              MR. PRICE:  Just one, Your Honor.
 5   BY MR. PRICE:
 6   Q    Mr. Broutman, just based upon your knowledge and
 7   experience with the plan, are there any limitations that
 8   you're aware of imposed upon an inactive participant that
 9   would prevent them from taking out the full amount of their
10   funds?
11   A    No.
12   Q    I'm sorry.  I didn't quite hear that.
13   A    None.
14              MR. PRICE:  No further questions, Your Honor.
15              THE COURT:  Did you have a pending question?
16   Because he didn't hear it and we didn't get an answer or are
17   you withdrawing the question?
18              MR. PRICE:  My question was whether or not
19   Mr. Broutman was aware of any restrictions in the plan that
20   would prevent an inactive participant from withdrawing the
21   full amount of their funds, and his response, I believe, was
22   none.
23              THE COURT:  All right.  So, if you're finished with
24   your examination, does Mr. Takagaki have any other questions?
25              MR. TAKAGAKI:  Just a few very brief questions.
```

BROUTMAN/REDIRECT/TAKAGAKI

```
 1                          REDIRECT EXAMINATION
 2   BY MR. TAKAGAKI:
 3   Q    Mr. Broutman, you testified about situations where Schwab
 4   has discretion such as in a divorce.
 5               MR. PRICE:  Objection.  I don't believe he testified
 6   that that was discretionary.
 7               THE COURT:  I don't think he said that, either.
 8               MR. TAKAGAKI:  I can withdraw.  I must have misheard
 9   you.
10               (Court reporter seeks clarification.)
11               MR. TAKAGAKI:  I can withdraw the first question I
12   asked.  I have a new question.
13   BY MR. TAKAGAKI:
14   Q    In Section 1.4 of the plan that you read earlier, it
15   expressly stated that Schwab has discretion in carrying out
16   its duties, did it not?
17   A    Correct.
18   Q    And I believe you're -- I don't remember if I asked you
19   this, but you're not present when Schwab is making decisions
20   about what's within their discretion, is that right?
21   A    Correct.
22               MR. TAKAGAKI:  Okay.  Thank you.  No further
23   questions.
24               THE COURT:  Mr. Price, did you have any other
25   questions?
```

BROUTMAN/RECROSS/PRICE

1              MR. PRICE:  Just one, Your Honor.

2                      RECROSS-EXAMINATION

3    BY MR. PRICE:

4    Q    Mr. Broutman, if you know, based upon your experience,

5    Section 1.4 that Mr. Takagaki just asked you about, does that

6    give any discretion to the fiduciary in deciding whether or

7    not to approve a properly presented request for withdrawal?

8    A    I don't believe so.  They have to make sure that the form

9    is properly prepared.  They will review the content of the

10   application submitted to make sure it's properly prepared.

11             MR. PRICE:  Thank you.  I have no other questions,

12   Your Honor.

13             THE COURT:  All right.  Thank you, Mr. Broutman.

14   You are excused.  Thank you for being here today.  Please stay

15   safe.  Thank you.  It was nice to see you.

16             THE WITNESS:  Thank you, Your Honor.  Nice to meet

17   you also.  Take care.

18             THE COURT:  Have a great day.

19             THE WITNESS:  You, too.

20             THE COURT:  Does Mr. Takagaki have another witness

21   he's like to call?

22             MR. TAKAGAKI:  Yes.  We'd like to call our final

23   witness, we believe.  It would be Mr. Karl Groskaufmanis of

24   Fried Frank, who is also listed on the Government's list.

25   With your permission, I can call him and see if he's available

PROCEEDINGS

 1   to join.

 2            THE COURT:  Sure.

 3            (Discussion off the record.)

 4            THE COURT:  All right.  I usually want to

 5   accommodate the court reporter because they're the ones who

 6   are really having to be under the gun to get an accurate

 7   record.  If she doesn't need a break, I'm happy to keep going.

 8            MR. VERDE:  Your Honor, this is Mike Verde.  I just

 9   would be leaving the conference, since this is not a Katten

10   witness.  We did the two Katten witnesses.

11            THE COURT:  All right.  Nice to see you, Mr. Verde.

12   Take care.

13            MR. VERDE:  Nice to see you, Judge.

14            THE COURT:  All right.  Be well.

15            MR. PRICE:  Your Honor, the Government has no

16   problem proceeding.

17            THE COURT:  All right.  Mr. Takagaki, if you could

18   call your next witness, I'd appreciate it.

19            MR. TAKAGAKI:  Yes, I'll call him now.  Thank you.

20            THE COURT:  Thank you.

21            MR. TAKAGAKI:  I just spoke to Mr. Groskaufmanis,

22   and he is waiting.

23            THE COURT:  Thank you.

24            MR. PRICE:  Your Honor, while we're waiting, just to

25   confirm, was Defense Exhibit 2 moved into evidence?

PROCEEDINGS

 1              THE COURT:  Yes.

 2              MR. PRICE:  Okay.  And just assuming Mr. Takagaki

 3    will be seeking to introduce 736-1, Exhibit A, which is the

 4    Fried Frank plan, the Government has no objection to admitting

 5    that as well.

 6              THE COURT:  I think, if I'm correct, Mr. Takagaki,

 7    you had submitted two exhibits on behalf of Mr. Greebel.  The

 8    first was Exhibit 1, Document Number 736-2, and then Exhibit 2

 9    was 736-3.  Did you want to submit 736-1?

10              MR. TAKAGAKI:  Yes, Your Honor, that's correct.

11              THE COURT:  All right.  We'll admit 736-1, as well.

12              Thank you for catching that.

13              (Defense Exhibit 3 was received in evidence.)

14              THE COURT:  So that would be admitted as Defense

15    Exhibit 3, correct?

16              MR. TAKAGAKI:  I believe that's correct.

17              (Court reporter seeks clarification.)

18              MR. BRODSKY:  Your Honor, this is Reed Brodsky.

19              We received a message from Mr. Groskaufmanis that he

20    is signed in, but getting a message that nobody is sending

21    video.  So it seems he needs some technology support.

22              THE COURT:  All right.  We'll try to do that.  It

23    doesn't appear that he has signed in yet.

24              THE CLERK:  He needs to check video.  He should be

25    sending video.

PROCEEDINGS

```
 1              THE COURT:  So, he should click on, you know, the

 2   microphone and the video camera, rather than stopping it, but

 3   I don't think he's even signed on yet.

 4              Do you see him there yet, Sandy?  I don't think he's

 5   signed on yet.  Sandy, maybe we can get Anthony to help him

 6   out, if there's a phone number.  I think Anthony's not with us

 7   at the moment.

 8              Is there a phone number where we can have our tech

 9   witness call?

10              THE CLERK:  A phone number for the witness, please.

11              MR. TAKAGAKI:  He can be reached at 202-639-7314.

12              (Discussion off the record.)

13              MR. TAKAGAKI:  I think he's on now.

14              THE COURT:  Hi.  Good morning.  How are you?

15              MR. GROSKAUFMANIS:  Hi.  How are you?

16              THE COURT:  I'm well, thanks.  Thank you for joining

17   us.

18              I'm going to ask Ms. Jackson to administer an oath

19   to you to tell the truth before we hear from you, please.  So,

20   raise your right hand.

21              (WITNESS SWORN.)

22              THE WITNESS:  I do.

23              THE CLERK:  Thank you.  Please state and spell your

24   full name for the record, please.

25              THE WITNESS:  My name is Karl, K-A-R-L,
```

1  Groskaufmanis, G-R-O-S-K-A-U-F-M-A-N-I-S.

2           THE COURT:  Thank you.

3           Please proceed, Mr. Takagaki.

4           MR. TAKAGAKI:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6  BY MR. TAKAGAKI:

7  Q    Good afternoon, Mr. Groskaufmanis.  Thanks for joining us

8  today.

9  A    Good afternoon.

10 Q    I'd like to start with some questions about your

11 background.  So, first, what is your occupation?

12 A    I'm a lawyer.  I practice at Fried Frank Harris Shriver &

13 Jacobson.

14 Q    And how long have you worked at Fried Frank?

15 A    I've worked at Fried Frank for 32 years.

16 Q    And what type of practice do you have, generally?

17 A    Generally, I grew up at the firm as a securities,

18 regulatory, and SEC enforcement lawyer, and then five years

19 ago, I became the firm's general counsel.  So, while I

20 continue to practice to some extent, most of my time is

21 devoted to being the firm's lawyer.

22 Q    Thank you.  And moving on now to why we're here today,

23 are you aware that Mr. Greebel has a 401(k) at Fried Frank?

24 A    I am aware of that, yes.

25 Q    And are you aware that he joined the firm as an

1    associate?

2    A     Yes.  My understanding is Mr. Greebel joined the firm as

3    an associate in 1998, and I believe my recollection is that he

4    left in 2002.

5    Q     And when he left, did he leave as an associate?

6    A     He was an associate when he left the firm, yes.

7    Q     Thank you.

8             MR. TAKAGAKI:  I'd like to now show the witness what

9    has been marked as Defense Exhibit Number 3.  That's Docket

10   Number 736-1.  I will now share my screen for the witness.

11   BY MR. TAKAGAKI:

12   Q     Mr. Groskaufmanis, you should have a document come up on

13   your screen shortly.  Please let me know when you can see it.

14   A     I don't yet see it.  I see that it indicates that you're

15   sharing content.  (Brief pause).  I now see the document.

16   Q     Thank you.  So for the record, this is Docket Number

17   736-1.  It's been admitted into evidence as Exhibit 3.  The

18   first page says, "Exhibit A," on it in the all bold.  I'm

19   going to go to the second page now and zoom in a bit.

20            Mr. Groskaufmanis, please let me know if you're

21   having trouble seeing, if it's too small.

22            So this is a 76-page document, and it's entitled,

23   "Amendment and Restatement of Fried Frank Harris Shriver &

24   Jacobson, LLP, 401 Incentive Savings Plan, Effective as of

25   January 1, 2013."  Do you see that?

GROSKAUFMANIS/DIRECT/TAKAGAKI

```
1    A    Yes, I do see that, yes.

2    Q    And do you recognize this document?

3    A    As a document, that is the plan document for our firm's

4    401(k) plan, subject to a number of amendments that have been

5    made since 2013.

6    Q    Do you happen to know how many amendments have been made

7    since 2013?

8    A    I believe that there --

9    Q    Sorry.  You broke up at least for me.  Could you repeat

10   the number again?

11   A    I believe that there have been six amendments.  The

12   document speaks for itself, but I believe that there have been

13   six amendments.

14   Q    Okay.  Thank you.  And was this 401(k) plan in place

15   during Mr. Greebel's employment at Fried Frank?

16   A    This document postdates his employment at Fried Frank,

17   but there was a 401(k) plan in place at Fried Frank throughout

18   Mr. Greebel's employment.

19            (Court reporter seeks clarification.)

20   A    Okay.  Thank you.  Can you hear me now?  I will speak

21   louder.  If anyone finds it offensive and loud, just let me

22   know.

23            The document, I believe your question -- I'm sorry,

24   counselor.  Remind me what your question was.

25            MR. TAKAGAKI:  If the court reporter could read back
```

LISA SCHMID, CCR, RMR

1    the question, that would be helpful to me.

2                THE COURT:  One thing.  I think if anyone has a cell

3    phone near their microphone on their laptop or their computer

4    or their PC, that sometimes causes interference.  There's a

5    little bit of woofing and feedback.  I don't know where it's

6    coming from, but we're all going to mute our mics, except for

7    the witness and the examining attorney and Ms. Schmid, who's

8    now going to read back the question.  Thank you.

9                (Record read.)

10   A    The answer is, yes, the 401(k) plan was in place during

11   Mr. Greebel's employment at Fried Frank from 1998 to 2002.

12   This exhibit postdates his employment.  So this document did

13   not exist during his employment, but the plan did exist during

14   Mr. Greebel's employment at Fried Frank.

15   Q    Are you aware of how this current plan that we're looking

16   at differs from any previous versions?

17   A    I can't speak to -- to the extent there are differences

18   between the plan as it existed from 1998 to 2002, I can't

19   speak to -- I can't speak to what these differences would be.

20   I can tell you, counsel, that we've had a 401(k) plan

21   throughout that time period.  So, I don't know that there

22   would be material changes.  Obviously, there's plan --

23   document and amendments have been made, but the 401(k) plan

24   was operative and in place when Mr. Greebel was at the firm.

25   Q    And do you know whether this plan that we're looking at

1   now applies to any withdrawal Mr. Greebel would want to make

2   today?

3   A     This is a document that, in our firm's view, would govern

4   any action by Mr. Greebel to withdraw his 401(k), the assets

5   from his 401(k) plan.

6   Q     And as general counsel, are you familiar with the purpose

7   of this document?

8   A     As a witness in this proceeding, I have taken steps to

9   become more familiar with the document.  So in the normal

10  course as general counsel, I'm not managing the 401(k) plan on

11  a day-to-day basis, but after being designated as the

12  individual who would speak on the firm's behalf for purposes

13  of this proceeding, I have taken steps to inform myself.

14          We have a pension committee which consists of

15  several partners who are more directly involved in the

16  day-to-day management of the program.  We have administrative

17  staff that do that and the overall oversight and management of

18  the program.

19  Q     Who is on the pension committee, if you know?

20  A     There are six partners and/or retired partners on the

21  committee, I believe.  And from memory they are Amy Blackman,

22  who is a partner; Ken Blackman, a retired partner; Meyer Last,

23  a current partner; Andy Varney, V-A-R-N-E-Y, a current

24  partner; Matt Soran, S-O-R-A-N, a current partner; and Don

25  Carleen, C-A-R-L-E-E-N.  From memory, counsel, those are the

```
 1    current members.
 2    Q    And thank you.
 3              Are those partners or anyone else who is involved in
 4    the day-to-day operations of the pension committee?
 5    A    I'm sorry.  I didn't understand your question.
 6    Q    I'll break it down.  So, of those six partners you named,
 7    are any of them involved in the day-to-day operation of the
 8    pension committee?
 9    A    Well, the six partners compose the pension committee.  So
10    to the extent the committee meets, all are involved.  I think,
11    without purporting to, you know, explain your question, I
12    think you were asking, I understood you to be asking whether
13    any of the partners are managing the program on a day-to-day
14    basis.  The answer to that would be no.  We have a benefits
15    staff who manage the program on a day-to-day basis and we
16    don't have partners who serve on the partner -- on the pension
17    committee doing that.  They all have practices, and this is
18    part of their contribution to the management of the firm.
19    Q    And are you a member of the benefits staff who handles
20    more of the day-to-day?
21    A    I am not a member of the benefits staff, no.
22    Q    Okay.  I think I'd like now to turn to the exhibit that's
23    up on the screen, Exhibit 3.  I'm going to turn to page 34 of
24    the PDF.  This is Article 6, titled, "Payment of Benefits and
25    Withdrawals/Loans."  Did I read that correctly?
```

GROSKAUFMANIS/DIRECT/TAKAGAKI

1   A     Payment of Benefits and Withdrawals/Loans, yes.  That is

2   correct.

3   Q     And you didn't draft this article, is that right?

4   A     I did not, no.

5   Q     So I'd like to direct you to 6.01.  Could you just read

6   the very first sentence only?

7   A     The very first sentence reads, "Upon a participant's

8   separation from service, other than by reason of his death, he

9   shall be entitled to a distribution of his interest in his

10  account balance in a single lump sum or shall be entitled to

11  effect a no-load transfer of the investment fund shares held

12  in his account to an individual retirement account established

13  by Merrill Lynch, Pierce, Fenner & Smith, Incorporated."

14  Q     And please direct your attention to Section 6.2(a), which

15  is right below it.  I'll scroll down a bit so you can see it.

16  Could you please just read 6.2(a)?

17  A     6.02(a) reads, "Except as provided in subsection (b) or

18  (c), the distribution of a participant's account balance shall

19  occur upon the earliest practicable date after the investment

20  date of the plan year in which his separation from service

21  occurs."

22  Q     Thank you.  Now, first, 6.02(b), could you just read the

23  first sentence only?

24  A     Okay.  The first sentence of Section 6.02(b) reads,

25  "Notwithstanding Subsection (a), if the value of the

LISA SCHMID, CCR, RMR

GROSKAUFMANIS/DIRECT/TAKAGAKI

1   participant's vested account balance is more than $1,000, then

2   his vested account balance shall not be distributed until he

3   reaches his 62nd birthday, unless he elects within the period

4   between 30 days and 180 days after he receives the notice

5   required by Treasury Regulation 1.411(a)-11(c) to receive his

6   benefits prior to that date."

7   Q     Thank you.  To your knowledge is Mr. Greebel's account

8   balance currently more than $1,000?

9   A     My understanding is that his account balance is more than

10  $1,000, yes.

11  Q     And is it -- to your knowledge, did Mr. Greebel elect

12  within a period of 30 days and 180 days after he received the

13  notice referenced in that paragraph you just read to receive

14  his benefits?

15  A     I'm not aware of Mr. Greebel ever making an election with

16  respect to any movement of the benefits in his account.

17  Q     And when a formal associate asks for a withdrawal from

18  the plan, that person must apply to the Fried Frank Pension

19  Committee, is that correct?

20  A     I don't know that it has to -- that mechanically, that

21  goes to the pension committee.  I think in practice what

22  happens is our administrative staff facilitate that.  I don't

23  think members of the pension committee would be managing the

24  day-to-day transfer of funds.

25  Q     And when you refer to this staff, is that the same

1    benefits staff you mentioned earlier who you said runs the

2    fund when the pension committee is not working on it?

3    A    Right.  They run the fund and on matters of policy and

4    administration, they take direction from the pension

5    committee, but the benefits staff, our human resources

6    benefits staff, are managing the 401(k) plan on a day-to-day

7    basis.

8    Q    Does the Fried Frank Pension Committee make the ultimate

9    decision as the whether someone can withdraw, notwithstanding

10   what the staff is doing?

11   A    Well, the pension committee has ultimate -- under the

12   terms of the plan, the pension committee has ultimate

13   authority to exercise discretion and interpret the plan.  But

14   in the normal course -- in the -- so to the extent there's a

15   question of interpretation of the plan document, it would go

16   to the pension committee.  The pension committee has broad

17   discretion under the provision of the document you have marked

18   as this exhibit, but to answer your specific question, the

19   pension committee would not be in the normal course involved

20   in that.  In the normal course this is a process administered

21   by benefits staff.

22   Q    Thank you.  So I'd next like to discuss the contributions

23   into the plan.  Did Mr. Greebel make contributions into this

24   401(k) plan?

25   A    He did make contributions into the plan, yes.

GROSKAUFMANIS/DIRECT/TAKAGAKI

1   Q    Are you familiar with the mechanics or the types of

2   contributions he made?

3   A    I'm familiar with -- in prior correspondence with

4   yourself and Mr. Brodsky, you had requested information about

5   the level of his contributions and I sent a responsive email

6   last night, detailing the levels of those contributions.  If

7   you'd like, I can read that into the record, if that's --

8             (Court reporter seeks clarification.)

9   A    I believe my last sentence was, counsel had asked about

10  whether Mr. Greebel had made contributions to the plan, and I

11  confirmed that.  It was my understanding he had provided

12  contribution to the plan and that counsel for the defendant,

13  for Mr. Greebel had requested information about the levels of

14  those contributions and I sent that information last night in

15  an email to counsel.  And I think where we -- where my last

16  sentence was, if counsel wishes me to read that into the

17  record, I can do so.

18  BY MR. TAKAGAKI:

19  Q    I don't think you need to read that in the record.  I can

20  just ask, to your knowledge, did Mr. Greebel make voluntary

21  contributions into the 401(k) plan?

22  A    Yes.  My understanding is that his contributions were

23  made on a voluntary basis.

24  Q    And was there a cap on the amount that he could

25  contribute?

1   A    My experience as a plan participant, since that time and

2   after, is that there is a cap.  As to how that cap is

3   determined and how it works, I can't speak to, but based on my

4   experience as a plan participant, I would infer, well, not on

5   subject matter on the regulatory structure that governs 401(k)

6   plans, but based on my experience, I believe there was a cap.

7   I don't know what that cap was in the 1998 to 2002 time

8   period.

9   Q    Fair enough.  And did Mr. Greebel make any mandatory

10  contributions to your knowledge?

11  A    I don't believe -- no, I have no information to suggest

12  that he made any contributions on any basis other than a

13  voluntary basis.  In other words, he elected to participate in

14  the plan, and we facilitated his election.

15  Q    And were Mr. Greebel's contributions deducted from his

16  paycheck?

17  A    I don't know the mechanics of it with respect to Mr.

18  Greebel's personal, like, his finances with respect to the

19  firm during that time period.  So I don't have firsthand

20  knowledge as to whether they were, in fact, deducted.  I would

21  just say that in the normal course an employee's 401(k)

22  contributions are deducted as one, you know, one part of the,

23  you know, sort of bimonthly payment process.  I'm basing that

24  on prior experience, having seen, you know, paystubs for a

25  variety of reasons.  So I don't know specifically.  I don't

1   know specifically with respect to Mr. Greebel from firsthand

2   knowledge, but my assumption would be that, yes, in fact, they

3   were deducted from his paycheck.

4   Q    So, is it fair to say that with his regular paycheck

5   would have also come regular contributions into the plan?

6   A    Again, I don't have firsthand knowledge in terms of

7   having reviewed those specific records, but in the normal

8   course of operation, that is my understanding as to how it

9   would work for an employee.  I have no reason or no

10  information to believe in Mr. Greebel's case, it would work

11  differently.  Our, you know, our benefits staff were able to

12  compile data from his contribution.  You know, that leads me

13  to believe, without having firsthand knowledge, that it was

14  deducted in the normal course.

15  Q    Are you aware whether Fried Frank matched any of these

16  contributions?

17  A    I don't believe -- again, I don't have a firsthand review

18  of his individual financial documents, but I don't believe --

19  I have no basis to believe that there was any Fried Frank

20  match for any of the contributions made by Mr. Greebel.

21  Q    I would like to now just discuss withdrawals from the

22  plan.  Is it your understanding that withdrawals from the plan

23  could be done lump sum?

24  A    Yes, my understanding is that certainly with respect to a

25  former participant, a former participant could give a

GROSKAUFMANIS/DIRECT/TAKAGAKI

1  direction to effect a lump sum withdrawal or transfer of his

2  or her remaining balance and that request would be honored,

3  subject to any penalties the person would be imposed just by

4  virtue of gaining access to the funds before the person

5  reached the requisite retirement age.

6  Q    And under the terms of the plan, is it possible to also

7  withdraw in a non-lump sum format?

8  A    I think earlier, you had me read Section 601, and so I

9  believe that 601 provides for a lump sum withdrawal.  It

10  refers to a Merrill Lynch, I believe its IRA account.  So I

11  think that there is -- at least the terms of the plan presents

12  an alternative to the lump sum distribution.

13            (Court reporter seeks clarification.)

14  BY MR. TAKAGAKI:

15  Q    Thank you.  Does Fried Frank give out bonuses to

16  attorneys?

17  A    Today, Fried Frank does give out bonuses to attorneys,

18  yes, subject to certain criteria, but, yes, bonus compensation

19  is part of our attorneys' compensation.

20  Q    What would that criteria be?

21  A    In terms of how the bonus -- how bonuses are allocated

22  today, there is a formula that is followed.  An individual has

23  to be in good standing at the firm at the time that the bonus

24  decision is made.  There is -- there are bonus levels tied to

25  an individual's productivity, which is to say hours Billed,

1  and there is a formula to arrive at.  So, some of that is the

2  time billed to clients.  Our firm gives -- for purposes of

3  bonuses calculation, we credit 300 hours each year for pro

4  bono work that counts toward bonus calculations.  There's what

5  we call billable hours.  There's certain hours that

6  associates' counsel can --

7          THE COURT:  Sir, you broke up again when you were

8  talking about hours.  I think you need to back up a little

9  bit.

10 A     Okay.  So, I was saying that the bonus calculation

11 considers billable hours, gives credit to a 300-hour level for

12 pro bono hours.  There's some qualified non-billable hours

13 that can also be counted.  There's essentially a scale, and

14 bonus levels are determined.  So someone who works an enormous

15 number of hours would get a larger bonus than someone who

16 worked a smaller number of hours.

17          And there's some qualitative aspect to it, as well,

18 because the practice groups make judgments about individual

19 circumstances, but in a nutshell, counsel, that would be how

20 we administer our bonus program.

21 BY MR. TAKAGAKI:

22 Q     And are these bonuses --

23          THE COURT:  May I ask a question?  Because I think

24 we should be focusing on the time period 1998 through 2002,

25 what goes on now is less relevant, I think, to what the

1    situation was during the timeframe that Mr. Greebel was there.

2    One question I had was whether or not as an associate, he

3    would be eligible for bonuses in 1998 through 2002.

4            THE WITNESS:  In 1998 through 2002, I just don't --

5    sitting here today, I don't remember whether we paid bonuses

6    to associates.  I believe we probably did, but I just don't

7    have an immediate recollection of what the bonus was during

8    that time.

9            THE COURT:  Thank you.

10           Mr. Takagaki, if you have a reason to tell me why

11   it's relevant what they do with associates now, bonuses now,

12   I'm happy to hear from you, but I'm just wondering what the

13   relevance would be of the bonus structure now.

14           MR. TAKAGAKI:  It's not particularly important, and

15   I actually think with your question, that's probably our last

16   question for direct.

17           THE COURT:  Okay.  Thank you.

18           Does Mr. Price want to examine the witness?

19           Mr. Price, are you there?

20           MR. PRICE:  Yes, Your Honor.

21           THE COURT:  Okay.  Thank you.

22                        CROSS-EXAMINATION

23   BY MR. PRICE:

24   Q    Good afternoon, Mr. Groskaufmanis.

25   A    Good afternoon.

```
 1  Q    You mentioned earlier that you familiarized yourself with
 2  the plan that was just shown to you.  Could you just briefly
 3  explain what you did to familiarize yourself with the plan?
 4  A    In terms of familiarizing myself with the plan and the
 5  questions that counsel indicated I might be asked, I spent
 6  some time reviewing the plan.  I spent time discussing the
 7  plan and its operations with a member of the firm's pension
 8  committee.  A member of our firm's pension committee discussed
 9  some of the issues relevant to this litigation with outside
10  counsel that we use for benefits purposes.  I'm not going to
11  discuss what the substance of that advice was but that was
12  part of our -- part of preparing for this.
13          I communicated with benefits staff, both who
14  administer the plan today, but also for a retired employee who
15  was most directly involved in administering the plan from 1998
16  to 2002.  He agreed to speak with us.
17          (Court reporter seeks clarification.)
18  A    The retired employee agreed to meet with us and, as part
19  of my familiarization with the plan and its operation,
20  participated in my conversation.
21          And, counsel, sort of cumulatively those were the
22  steps, coupled with I have reviewed the publicly available
23  correspondence involved in connection with this proceeding.
24          MR. TAKAGAKI:  You Honor, I'd like to object to this
25  testimony.  It appears the witness will be discussing hearsay
```

1    conversations with members of the pension plan or former

2    members or would be discussing privileged conversations, and

3    he should not be able to testify about that.

4            THE COURT:  Well, I don't believe the witness said

5    that.  I think he specifically said he's not going to discuss

6    his discussions, his privileged conversations, and he was just

7    describing what he did generally to familiarize himself.  So

8    I'm respectfully overruling your objection which I believe

9    comes too late because the witness has already testified, but

10   I don't think the basis for your objection is borne out by the

11   witness's testimony, respectfully.

12           MR. TAKAGAKI:  Just going forward, we don't believe

13   he can testify -- he's going to explain what they told him,

14   what he learned.  I believe during my direct he said he's, you

15   know, general counsel, I believe, a litigator.  So, most of

16   his understanding here if not all of it would have to come

17   from what the pension committee told him, what somebody who

18   used to work at the firm told him or what, you know, firm's

19   counsel told him.

20           THE COURT:  You know, I really don't want to argue

21   with you, sir, but I think that what he said just now was how

22   he prepared for his testimony today.  So, I think whatever he

23   described in the way of his preparation, it also applies to

24   what he testified to under your examination, and your

25   examination involved more than just having him read verbatim

GROSKAUFMANIS/CROSS/PRICE

```
 1   the plan excerpt that you wanted to focus him on.
 2             So, again, I'm overruling your objection.  Can we
 3   please not keeping arguing, please?
 4             Go ahead, Mr. Price.  Ask your next question,
 5   please.
 6             MR. PRICE:  Thank you, Your Honor.
 7   BY MR. PRICE:
 8   Q    Besides the preparation for today, in your role as
 9   general counsel, have you had an opportunity to, you know,
10   address the plan in anyway?
11   A    Not -- there have not been many occasion on which I have
12   had to address the plan.  From time to time, there are
13   administrative issues that are addressed as to the operation
14   of either the plan or other retirement benefits, and I might
15   get involved.  But in the normal course, for example, the
16   pension committee will decide on the menu of mutual fund
17   offerings that will be made available to the plan
18   participants, including myself.  I don't -- they make those
19   judgments.  I see the options, but I'm not involved in those
20   other recommendations.
21   Q    Okay.  You stated that Mr. Greebel worked there, worked
22   in Fried Frank from around 1998 to 2002.  Is it your
23   understanding he's no longer an employee of Fried Frank?
24   A    Yes, it's my understanding Mr. Greebel ended his Fried
25   Frank employment at some point in the year 2002.
```

```
 1   Q    Based upon your experience then, would the terms of the

 2   plan that you read in, in particular in Article 6 dealing with

 3   participants who had separated, would that apply to Mr.

 4   Greebel?

 5            MR. TAKAGAKI:  Objection to the witness giving a

 6   legal opinion.

 7            THE COURT:  Overruled.

 8   A    Yes, the plan that was introduced previously as an

 9   exhibit would govern mister -- the withdrawal of

10   Mr. Greebel -- the funds from Mr. Greebel's account.

11   BY MR. PRICE:

12   Q    So, based upon your understanding of the plan, are there

13   any limitations for someone, a participant who has separated

14   from Fried Frank, are there any limitations on their ability

15   to withdraw funds from the Merrill Lynch account?

16            MR. TAKAGAKI:  Your Honor, objection.  It calls for

17   a legal opinion.

18            (Court reporter seeks clarification.)

19            MR. TAKAGAKI:  It calls for a legal opinion, and

20   it's based on his conversations with lawyers, pension

21   committee members.  It's privileged.

22            MR. PRICE:  I'm not asking for anything privileged.

23   I'm just asking about his understanding of the plan and how it

24   affects the rights of separated participants.

25            THE COURT:  The objection is overruled.  I note that
```

GROSKAUFMANIS/CROSS/PRICE

1    the witness has already said he's not going to testify about

2    any privileged conversations.  I think, if we hear hearsay,

3    you'll have an objection and I'll strike it, but I don't

4    believe this witness has testified to any hearsay and he

5    talked about how he familiarized himself by reading the plan,

6    reading documents, et cetera.  So, again, I'm overruling the

7    objection.

8            You may answer the question.  Do you need it read

9    back, sir?

10           THE WITNESS:  If that were possible, yes, please.

11           THE COURT:  All right.

12           (Record read.)

13   A    My answer is that the plan that sets the -- sort of the

14   terms on which a participant who has left the firm can effect

15   a transfer of the assets from his fund.  So it essentially

16   sets the parameters for how that worked.  To the extent there

17   are limits, there are limits embedded in the plan, but, I

18   mean, as a general principle, both in its interpretation and

19   its operation, former participants are able and have been able

20   to withdraw the assets from their accounts at the firm.

21           THE COURT:  I'm sorry.  You said they have withdrawn

22   and can withdraw assets from their accounts?  Is that what you

23   said, sir?

24           THE WITNESS:  Yes, that's what I said.

25           THE COURT:  Okay.  Thank you.

GROSKAUFMANIS/CROSS/PRICE

```
1   BY MR. PRICE:
2   Q    And would they be allowed to withdraw assets up to the
3   full balance of the account?
4   A    Yes, they could.
5   Q    Based upon your experience, are you familiar with the
6   vesting of the benefits, the vesting rights?
7   A    The plan makes for a provision for vesting, but I can't
8   speak to those specifics as to how the vesting process works
9   and so forth.
10          THE COURT:  Do you know if Mr. Greebel was vested by
11  the time he left Fried Frank or during the course of his
12  employment at Fried Frank?
13          THE WITNESS:  Again, I'm just, you know, in terms of
14  the point in time at which he became vested, I can't speak to
15  when that happened.  I believe he had to be fully vested into
16  the firm effective today but, Your Honor, to say at which
17  point in time that happened --
18          THE COURT:  I'm sorry.  You broke up.  At which
19  point in time that happened what?
20          THE WITNESS:  I said I understand him to be fully
21  vested, but if the question was at which point in time it
22  happened, I'm not in a position to provide that answer.
23          THE COURT:  Thank you.
24  BY MR. PRICE:
25  Q    There was testimony earlier regarding different types of
```

GROSKAUFMANIS/CROSS/PRICE

1  contributions that can go into the Merrill Lynch account.  To

2  your knowledge, does the type of contribution affect whether

3  or not a separated employee can withdraw those funds from the

4  Merrill Lynch account?

5  A    I'm not aware of anything in the plan that would --

6  Q    I'm sorry.  Could you restate that?

7  A    I said that I'm not aware of anything in the plan that

8  would impose such a restriction.

9  Q    Are you aware of any age limitations for a separated

10  employee to withdraw their funds from their Merrill Lynch

11  account?

12  A    No, I don't understand the plan to impose an age

13  restriction, or put another way, a former participant can

14  effect a withdrawal at any point after the person has left.

15  Q    You testified earlier that there are administrative staff

16  at Fried Frank that handle the actual applications.  To the

17  extent that you know, do the administrative staff have any

18  discretion in whether or not to allow withdrawal of funds if

19  the request has been properly submitted by a former

20  participant?

21  A    No, I don't believe the plan provides for our

22  administrative staff to exercise discretion.  The plan maps

23  out how it should work, and the administrative staff effect

24  that.  To the extent there was an interpretative decision, the

25  plan by its terms vests that interpretative decision to the

1  pension plan.

2  Q    You were asked about Section 6.02, and in particular to

3  read a section regarding a thousand-dollar limit.  Do you have

4  an understanding of what Section 6.02 is intended to address?

5  A    It's my understanding that Section 6.02 is intended to

6  address a provision in the Internal Revenue Code that

7  addresses withdrawal rights from the 401(k) plan.  The

8  structure of 6.02, at least as -- parts of 602 at least track

9  those Internal Revenue Code provisions.

10  Q    Is it your understanding that 6.02 imposes any

11  limitations on a prior participant's right to withdraw their

12  funds as you previously testified?

13         Can you hear me?

14  A    I can hear you, but I think counsel for Mr. Greebel is

15  speaking up.

16         MR. TAKAGAKI:  I was muted.

17         Your Honor, I would like to object here.  He's

18  calling for a legal interpretation.

19         THE COURT:  You know -- Mr. Price, do you want to

20  try to reframe your question?

21         MR. PRICE:  Your Honor, I don't think it's

22  important.  I can just withdraw the question.

23         THE COURT:  Okay.

24         MR. PRICE:  Your Honor, I don't have any other

25  further questions at this time.

GROSKAUFMANIS/REDIRECT/TAKAGAKI

```
 1                    THE COURT:  Mr. Takagaki, would you like to
 2    reexamine this witness?
 3                    MR. TAKAGAKI:  Yes, I have a few questions.
 4                         REDIRECT EXAMINATION
 5    BY MR. TAKAGAKI:
 6    Q     Okay.  Sir, when you testified about the discretion that
 7    the pension committee has, was that based on your
 8    conversations with people on the pension committee?
 9    A     It is based on conversations with --
10                    MR. PRICE:  Objection, Your Honor.
11                    Mr. Takagaki is the one who's inquiring into the
12    specifics of discussions.
13                    THE COURT:  Yes, what is the justification for your
14    question, asking him about the conversations, Mr. Takagaki?
15    Because you did just lodge an objection to this type of
16    question regarding discussions.
17                    MR. TAKAGAKI:  So, I believe, Your Honor, our
18    objection earlier was that he shouldn't be allowed to testify
19    on topics he may have learned from folks on the pension
20    committee.  This is just seeking to establish to what extent
21    he talked to folks on the pension committee to answer these
22    questions.  I'm not going to ask him what they told him.
23                    THE COURT:  Well, are you suggesting we go back
24    through both your examination and the Government's examination
25    and ask him what the source of his knowledge is?  Because he
```

GROSKAUFMANIS/REDIRECT/TAKAGAKI

```
 1    talked generally about how he prepared to testify here today,

 2    and I'm not sure whether your objection is targeted towards

 3    certain questions and responses, some of which I think were

 4    questions that you yourself asked and responses that the

 5    witness gave.

 6              I think this witness has been pretty careful about

 7    not disclosing privileged conversations, and I haven't heard

 8    him testify that he is stating answers based on hearsay.  I

 9    think, you know, I am concerned about this approach, because

10    he has been testifying at length under examination by both the

11    Government and by Mr. Greebel's counsel, and I think if you're

12    going back to try to target specific Q and As that you now

13    want to lodge an objection to, I'm not going to permit that.

14              MR. BRODSKY:  Your Honor may I ask -- say something

15    here to follow up on what Mr. Takagaki said?

16              THE COURT:  Mr. Brodsky, yes.  Go ahead.

17              MR. BRODSKY:  On cross-examination, the Government

18    asked a particular question of the witness after asking him

19    generally how he's familiar with the plan.  He testified he's

20    generally familiar with the plan based on recent

21    conversations, in part.  Then the Government asked a specific

22    question about discretion, but the Government did not ask the

23    basis of the knowledge.  Mr. Takagaki objected, but the

24    objection was overruled.

25              On cross-examination, isn't it fair that we can ask
```

```
 1   not what was said but what is the specific basis of his

 2   knowledge for his testimony for the Government as to

 3   discretion?  Because if the basis of his knowledge about

 4   discretion, which we believe to be true based on what he's

 5   told us, is based outside the context of today, is based on

 6   his conversations with the pension committee, and/or his

 7   conversations with the lawyer, which he's asserting privilege

 8   to, then our objection would be we're establishing a record

 9   that it's hearsay.  It's inadmissible hearsay, and he is

10   testifying and using the privilege as a sword and a shield.

11   That is the basis for the reason why we're asking this

12   question.

13              MR. PRICE:  Your Honor --

14              THE COURT:  First of all, he is a not a party

15   witness.  He is here by agreement to testify.  Both sides

16   wanted to call him, and your colleague asked a number of

17   questions that both asked him to read provisions of the plan

18   but also were generally directed at his knowledge of the plan.

19   I mean, he communicated certain knowledge about the plan and

20   certain lack of knowledge about the plan as it existed in 1998

21   to 2002.  He either got that knowledge through talking to

22   people, but he didn't tell us the substance of the

23   conversation or by comparing plans.  He also said that he

24   communicated or that he has knowledge that Mr. Greebel made

25   contributions to the plan.
```

1              Again, you know, I think what you're doing is
2    cherrypicking what you think is objectionable and possibly
3    based on hearsay, but much of the type of question and answer
4    that you're objecting to is the very same type of question and
5    answer that you yourself elicited.
6              So, I believe this witness is being quite careful.
7    I don't think that anybody is asking him to reveal privileged
8    information or to reveal -- or to testify about hearsay.  I
9    know you have done this in the past and I just, you know, want
10   to say that I don't agree with it, Mr. Brodsky, but you're
11   always complaining about fairness.  I have been pretty lenient
12   here about the Q and A and, leading up to this hearing, the
13   many missed deadlines the defendant had to get his information
14   so we could be ready.
15             I really don't want to hear about fairness.  Okay?
16   I'm trying to be fair, but for you to ask a series of
17   questions and then go back when he's being examined by the
18   Government and start objecting to the very same types of Q and
19   A that you yourself elicited, that's not fair.  All right?
20   Nobody is asking him to testify to hearsay, and nobody's
21   asking him to testify to privileged information.
22             MR. PRICE:  Your Honor, for the record, the
23   Government would also object to the question based upon the
24   fact that the Government asked about discretion of
25   administrative staff, whereas the question just posed to the

GROSKAUFMANIS/REDIRECT/TAKAGAKI

1    witness I believe was involving discretion of the compensation

2    committee, which was not addressed on my cross.

3              THE COURT:  So, the basis of the objection is that

4    it exceeds the scope of the direct, is that correct?

5              MR. PRICE:  Yes, Your Honor.

6              THE COURT:  All right.  Usually, as you know, in a

7    real courtroom, we'd have these discussions at sidebar outside

8    the hearing of the witness.

9              Both, I think, Mr. Takagaki and Mr. Brodsky, you've

10   given long speaking objections which generally is never

11   allowed in a courtroom.  We're trying to do our best with this

12   remote arrangement and I suppose I could ask the witness to

13   sign off and then sign back on, but I'm trying to complete

14   this hearing in a way that is going to be smooth and

15   efficient.  All of you are very busy people.

16             And I'd like to see whether there are any other

17   questions that either the Government or the defense have, but

18   as you well know, the questions on redirect should not exceed

19   the scope of the questions that the Government asked.  So, I

20   would sustain that objection on that ground, but I think we

21   should just move forward so that this witness can be excused.

22             MR. BRODSKY:  Your Honor, I think, given your

23   ruling, I don't think we can ask any further questions.  We

24   were going to ask questions following up on his testimony in

25   response to Government's questions as to just the basis of his

LISA SCHMID, CCR, RMR

1    knowledge, responding to the Government's questions, but if

2    we're not permitted to ask the basis of his knowledge --

3                THE COURT:  I didn't say that.  If he's going to

4    testify to the basis of his knowledge, he should do it with

5    respect to all of his testimony here.

6                MR. BRODSKY:  Your Honor, we have no objection to

7    that.

8                THE COURT:  All right.  Mr. Takagaki, do you want to

9    ask the witness the question then?

10               MR. TAKAGAKI:  Yes.

11   BY MR. TAKAGAKI:

12   Q    So earlier, you testified about your understanding of the

13   pension committee and the benefits staff who support the

14   committee.  Was that testimony based on conversations with

15   people on the pension committee?

16   A    So, in preparation for this testimony, I did have

17   conversations with one member of the pension committee, and

18   that does inform my understanding of how the 401(k) plan

19   works.  I also reviewed the plan with respect to discretion of

20   the pension committee.  It is addressed expressly in the four

21   corners of the document you previously introduced as an

22   exhibit.  And that review of that section addressing the

23   pension committee's discretion also informed my understanding

24   of how the plan works.

25   Q    Thank you.

PROCEEDINGS

1          MR. TAKAGAKI:  Just bear with me.  I believe we have

2    no further questions.

3          THE COURT:  Does the Government have any further

4    questions?

5          MR. PRICE:  No, Your Honor, I don't.  I do not.

6          THE COURT:  All right, sir.  You are excused.  Thank

7    you.  It was a very nice to meet you today.  Please stay well.

8          THE WITNESS:  Thank you.

9          THE COURT:  All right.

10          THE WITNESS:  You, too.

11          THE COURT:  Have a nice day.

12          THE WITNESS:  You as well.  Thank you.

13          THE COURT:  All right.  Would you like to call any

14    other witnesses, Mr. Takagaki?

15          MR. TAKAGAKI:  No, Your Honor.  That was our last

16    witness.  Thank you.

17          THE COURT:  All right.  Does the Government have any

18    witnesses that it would like to call?

19          MR. PRICE:  No additional witnesses, Your Honor.

20          THE COURT:  All right.  I have gotten a number of

21    submissions prior to this hearing.  I don't know whether the

22    parties want to try to submit post-hearing submissions.  I'm

23    happy to work with the parties.  How would you like to move

24    forward?

25          MR. BRODSKY:  Your Honor, for our part, on behalf of

LISA SCHMID, CCR, RMR

PROCEEDINGS

```
1  Mr. Greebel, whom the Government says we bear the burden, we
2  would like to make a post-hearing submission after we get the
3  transcript.  We are trying to be conservative in our spend of
4  money, given Mr. Greebel's financial situation.  Therefore, we
5  would like to get a transcript of the hearing when available
6  at the cheapest possible rate, and then we would like to
7  submit something to Your Honor based on the transcript and
8  having that information.
9          THE COURT:  The post-hearing submissions will be
10  based on the exhibits in evidence and the transcript.
11          (Confers with the court reporter.)
12          THE COURT:  All right.  So, 30 days from today would
13  bring us into next month, and we will set a date by which the
14  parties will make submissions.  I appreciate the parties'
15  efforts to cite to the transcript.  Let's see.  Today is
16  January 28th.  30 days would bring us to February -- I guess
17  I'll give you the weekend.  So let's say March 1.
18          MR. BRODSKY:  Your Honor, do we get the transcript
19  on March 1 or is it that when our -- when we'd have the
20  transcripts before March 1?
21          THE COURT:  (Consults with the court reporter.)
22          MR. PRICE:  I'm sorry, Your Honor.  I think you're
23  muted.
24          THE COURT:  Please let Ms. Schmid know what you
25  would like to do.
```

LISA SCHMID, CCR, RMR

PROCEEDINGS

```
 1              MR. PRICE:  The Government's preference would be to
 2   just go with the 30-day rate and then set a date for the
 3   submissions approximately 30 days after February 28th.  I have
 4   a trial that I'll be preparing for towards the end of
 5   February.  The trial is beginning in March.  So, I'd prefer to
 6   have the additional time to get the transcripts and then to
 7   work on the submissions if we're going to submit post-hearing
 8   briefs.
 9              THE COURT:  Is it a jury trial?
10              MR. PRICE:  It's a bench trial, Your Honor.
11              THE COURT:  Okay.  I was just going to say.
12              MR. PRICE:  No.  It's a remote bench trial.
13              THE COURT:  Okay.  All right.  So, does that work
14   for the defendant, that timeframe?
15              MR. BRODSKY:  Yes, Your Honor.  Thank you.
16              THE COURT:  All right.  All right.  So, Ms. Schmid,
17   I suppose they want the 30-day rate.  That would mean
18   February 28th.  They want 30 days thereafter to submit their
19   papers.  So, that would bring us to March.  Let's say
20   March 29th.
21              Will the parties make simultaneous submissions,
22   please?
23              MR. PRICE:  Yes, Your Honor.
24              THE COURT:  All right.
25              MR. BRODSKY:  Yes, Your Honor.
```

PROCEEDINGS

```
 1              THE COURT:  And then what we'll do is, if you want
 2    to respond, I mean, I don't think there's a whole lot to say,
 3    but I'd like any responses by April 5th.
 4              All right.  Is there anything else I should address
 5    at this time?
 6              MR. PRICE:  The Government has nothing, Your Honor.
 7              THE COURT:  Anything from Mr. Greebel's counsel?
 8              MR. TAKAGAKI:  Yes, Your Honor, if possible, I'd
 9    like to make a very brief closing statement about some of the
10    evidence we've heard today.
11              THE COURT:  All right.
12              MR. TAKAGAKI:  Thank you, Your Honor.
13              As Your Honor knows, as a threshold matter, we have
14    to determine whether the Government can reach the money in the
15    401(k) plans.  Under the case law cited in both briefs, the
16    Government must show that if it steps into Mr. Greebel's
17    shoes, it would have a --
18              (Court reporter seeks clarification.)
19              MR. TAKAGAKI:  Under the case law, the Government
20    must show that if it steps into Greebel's shoes, it would have
21    a current uniliteral right to withdraw.  If another entity
22    must consent to that withdrawal, then the participant does not
23    have a current right, and it's not unilaterally.
24              The witnesses, the testimony today, and the evidence
25    submitted today shows that for both plans, Mr. Greebel does
```

PROCEEDINGS

1   not have a unilateral right to withdraw.  In the case of the

2   Katten plan, Charles Schwab has to receive and approve the

3   application.  In the case of the Fried Frank plan, the pension

4   committee or its benefits staff have to use their discretion

5   or otherwise approve a withdrawal.

6          Further, the plain language of the Fried Frank plan,

7   as we discussed in Section 6.02, shows that Mr. Greebel cannot

8   withdraw --

9          THE COURT:  Sir, you're breaking up.  You're

10  breaking up.  Fried Frank 6.02 what?

11         MR. TAKAGAKI:  Says that, shows that Mr. Greebel

12  cannot withdraw until age 62.  This is supported by testimony

13  from Mr. Groskaufmanis as to -- stated Mr. Greebel does have

14  over a thousand dollars in his account and has not submitted

15  the necessary election under the paragraph.

16         Then just finally regarding the CCPA issue, it's our

17  position that the money held in these funds is very clearly

18  earnings.  The CCPA defines earnings as compensation paid or

19  payable for personal services.

20         First off, the money was contributed into the plan

21  on a periodic basis, and, therefore, to quote the statute,

22  these were periodic payments pursuant to a pension or

23  retirement program.

24         Second, the way the money is withdrawn should not

25  change the nature of the money.  When the contributions were

PROCEEDINGS

1    earned by Mr. Greebel and contributed into the plan, they were

2    compensation.  As they sit in the plan right now, they're

3    compensation.  If they were to be withdrawn periodically

4    tomorrow, they would be compensation.  The Government's

5    position is that if they were withdrawn lump sum, they would

6    be no longer compensation.  There's nothing to explain why

7    they would suddenly change --

8              (Court reporter seeks clarification.)

9              MR. TAKAGAKI:  That's nothing to suggest that

10   withdrawing a lump sum would suddenly transform the funds into

11   non-compensation.  As we know from the statute, lump sum

12   compensation exists.  Commissions and bonuses are listed in

13   the statute, and the Secretary of Labor has stated in his

14   Department of Labor opinion letter attached to our brief that

15   lump sum payments are covered.  And 15 USC 1676, I believe,

16   tasks the Secretary of Labor with enforcing CCPA.  So, it's

17   clearly an authority on the subject.

18             Just a few quick points.  In that letter, it states

19   that the fact that the money can be withdrawn occasionally or

20   one time doesn't change it's character.  What's important is

21   the compensatory nature of the payment, and it gives examples

22   of what should be covered.  These include nondiscretionary

23   bonuses, profit sharing, move or relocation, incentive

24   payments, or payments for working on a holiday.

25             It's our position that 401(k) plans are no different

PROCEEDINGS

1  from these types of compensation.  They're all offered by an

2  employer as part of the compensation package.

3          THE COURT:  All right.  You can flesh this out

4  further in your briefing.

5          Is there anything else you wanted to say?

6          MR. TAKAGAKI:  No, Your Honor.

7          THE COURT:  You've made these arguments in your

8  initial submissions, and I'm familiar with those arguments.

9  You're certainly welcome to make them again in your

10  post-hearing briefing.  You've made them again here in the

11  closing statements.  As I said, you know, I think we'll hear

12  more from you when you make your submissions at the end of

13  March.

14          Is there anything else?

15          Does the Government want to make a post-hearing

16  closing statement?

17          MR. PRICE:  Your Honor, given that we will be

18  submitting the post-hearing briefs, the Government will rest

19  on its current brief and the brief to follow.

20          THE COURT:  All right.  You will both have an

21  opportunity to respond to the other's post-hearing submissions

22  as well.

23          All right.  Well, thank you, everybody, for your

24  time and your efforts today.

25          Mr. Brodsky, it was nice to see you again and to

PROCEEDINGS

1    meet Mr. Takagaki and Mr. Price.

2              MR. PRICE:  Thank you, Your Honor.

3              THE COURT:  And everybody stay well.  Thank you.

4              MR. PRICE:  You too.  Thank you.

5              MR. BRODSKY:  Thank you so much for your time today.

6              THE COURT:  All right.  Thank you.  Goodbye.

7              (Proceedings adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25