**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Marc Aaron Takagaki
Direct: +1 213.229.7523
Fax: +1 213.229.6523
MTakagaki@gibsondunn.com

March 29, 2021

VIA ECF

The Honorable Kiyo Matsumoto
United States District Judge
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *United States v. Greebel*, S1 15 Cr. 637 (E.D.N.Y.) (KAM)

Dear Judge Matsumoto:

Following the hearing held on January 28, 2021, the facts necessary to resolve this dispute are clear. Regarding the first question facing the Court—whether the Katten Muchin Rosenman LLP Defined Contribution Plan (the "Katten Plan") (Dkt. 736-2) and the Amendment and Restatement of Fried, Frank, Harris, Shriver & Jacobson LLP 401(k) Incentive Savings Plan (the "Fried Frank Plan") (Dkt. 736-1) (together, the "Plans") allow Mr. Greebel to withdraw—the evidence and testimony show Mr. Greebel does not have a current, unilateral right to withdrawal. Regarding the second question facing the Court—whether the Consumer Credit Protection Act ("CCPA") applies to the funds in the Plans—testimony shows the funds in the Plans are "compensation paid or payable" to Mr. Greebel for personal services. 15 U.S.C. § 1672(a) (defining "earnings"). Thus, the CCPA, the Department of Labor's Opinion Letter (Dkt. 736-4), and applicable caselaw bar the government from ever garnishing more than twenty-five percent of the funds in the Plans.

### A.   Mr. Greebel Does Not Have A Current, Unilateral Right to Withdraw.

#### 1.   Katten Plan

The government's witnesses from Katten Muchin—James Berge and Mark Broutman—testified that Mr. Greebel's ability to withdraw from the Katten Plan was subject to approval from the Plan's administrative named fiduciary, Charles Schwab. Mr. Berge, a Human Resources Manager, Ex. A (hereinafter referred to as "Hr'g. Tr.") at 9:14, testified that Charles Schwab was the day-to-day administrator of the Katten Plan and was responsible for interpreting its terms and provisions, Hr'g. Tr. 14:2–17. Mr. Broutman, the Director of Partnership Accounting, Hr'g. Tr. 39:6–12, testified that Charles Schwab is the custodian of the Plan and handles distribution requests such that everything is done "directly through

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
March 29, 2021
Page 2

Schwab," Hr'g. Tr. 42:15–22. Mr. Broutman testified that Charles Schwab was the fiduciary referenced in Section 1.4 of the Plan, Hr'g. Tr. 44:12–14, meaning Charles Schwab has the "authority to control and manage the operation and administration of the Plan" and the "discretionary authority or discretionary responsibility to administer the Plan." Dkt. 736-2 § 1.4.

The government may cite testimony that suggests that Mr. Greebel can currently withdraw or that Charles Schwab lacks discretion to determine whether Mr. Greebel can withdraw. Mr. Greebel's position is that these witnesses have neither the experience nor expertise to testify on these issues. For example, Mr. Berge testified that in his "experience" he has "seen inactive participants withdraw," Hr'g. Tr. 29:20–23, but anecdotal observations cannot overcome the language of the Plan. Further, Mr. Berge is a Human Resources manager, not a lawyer, and he required legal counsel to interpret the Plan. Hr'g. Tr. 9:14–20, 13:5–11. Regarding the procedures listed in Section 7.5(c) of the Plan, Mr. Berge was only aware that participants would contact Charles Schwab by phone or through Charles Schwab's website. Hr'g. Tr. 15:14–25. He was otherwise unaware of how Charles Schwab interpreted the Plan's requirements for withdrawal, and was not present when persons contacted Charles Schwab to apply for a withdrawal, nor when Charles Schwab made a determination regarding whether a application conformed to the Plan's requirements. Hr'g. Tr. 16:5–20. His only experience with this process was over a decade ago when Charles Schwab sat down with Katten to review the Plan. Hr'g. Tr. 17:18–25. Mr. Broutman provided similar testimony. Hr'g. Tr. 39:15–18; 41:18–20; 50:12–17; 56:14–21.

The discretion held by the administrative fiduciary, Charles Schwab, is inconsistent with Mr. Greebel's alleged current, unilateral right to withdraw. *See* Dkt. 736 at 4; Dkt. 744 at 3–4.

### 2. Katten Plan Summary

The parties dispute the relevance and substance of the Katten Plan Summary (Dkt. 736-3). On this point, Mr. Berge's testimony would seem dispositive. Mr. Berge testified that the Katten Plan Summary is given to all Katten Plan participants, is "a shortened summary of the terms and the provisions of the plan," and is "meant for the participants to help them understand the plan versus the 115-page full plan documents." Hr'g. Tr. 21:4–11. Mr. Berge also read into the record language from the Katten Plan Summary stating "[o]nce you reach age 59-1/2, you may withdraw all or any part of your plan account for any reason." Hr'g. Tr. 22:11–15. Mr. Berge also read into the record that "[i]mplementation of a withdrawal is not under the control of, nor the responsibility of the firm, its employees, or its partners." Hr'g. Tr. 22:23–25.

GIBSON DUNN

The Honorable Kiyo Matsumoto
March 29, 2021
Page 3

Given this testimony, the Katten Plan Summary is certainly relevant to resolving the vague and ambiguous language in the Katten Plan, and the confusion amongst the witnesses regarding the role and discretion of Charles Schwab.

### 3. Fried Frank Plan

The language of Section 6.02(b) of the Fried Frank Plan states that Mr. Greebel cannot withdraw until he reaches age sixty-two if two criteria are met: (1) his balance exceeds $1,000; and (2) he failed to elect to withdraw during the period between thirty and one hundred and eighty days after receiving the notice required by Treasury Regulation Section 1.411(a)-11(c). *See* Dkt. 736 at 2–3; Dkt. 744 at 2. The government's witness from Fried Frank, Karl Groskaufmanis, testified that Mr. Greebel meets both criteria. Hr'g. Tr. 68:9–16. Mr. Groskaufmanis, the firm's General Counsel, also testified that Mr. Greebel does not have a *unilateral* right to withdraw. *See* Hr'g. Tr. 69:8–18 (regarding withdrawal, "the pension committee has broad discretion"). Respectfully, either of Mr. Groskaufmanis' admissions should end the dispute.

The government may argue that Mr. Groskaufmanis testified that in his experience, former participants are able to withdraw at any time. *See* Hr'g. Tr. 80:18–20; 82:13–14. However, Mr. Groskaufmanis also testified that the Plan document "sets the parameters" for withdrawal and that "there are limits embedded in the plan." Hr'g. Tr. 80:15–17. Section 6.02(b) is one such limit.

Further, portions of Mr. Groskaufmanis' testimony were unclear and incomplete in describing situations where withdrawals have been allowed, and even if his testimony was accurate, it describes instances wherein the Pension Committee *overruled* the Plan—those decisions are *prima facie* evidence that a beneficiary does not have a unilateral right to withdraw. *See* Dkt. 736 at 4; Dkt. 744 at 3–4. Past instances of the firm allowing beneficiaries to withdraw notwithstanding Section 6.02(b) cannot overcome the clear language in the Plan, and Mr. Groskaufmanis' anecdotal observations hardly demonstrate expertise on the matter. Mr. Groskaufmanis is not on the Pension Committee, Hr'g. Tr. 65:19–66:1, and the Pension Committee has "the ultimate authority to exercise discretion and interpret the plan," Hr'g. Tr. 69:12–13. Next, Mr. Groskaufmanis is not a member of the administrative staff, Hr'g. Tr. 66:19–21, who monitor the plan on a day-to-day basis and who facilitate withdrawals, Hr'g. Tr. 66:13–67:24. Finally, Mr. Groskaufmanis is a securities lawyer and does not deal with 401(k) plans as the firm's General Counsel. Hr'g. Tr. at 61:16–21; 65:8–13; 78:11–12. Given Mr. Groskaufmanis' incompetence to testify regarding the proper or historical interpretations of the Fried Frank Plan, he had to speak with the

**GIBSON DUNN**

The Honorable Kiyo Matsumoto
March 29, 2021
Page 4

firm's benefits staff, a retired employee who administered the plan from 1998–2002[1], and members of the Pension Committee, one of whom also spoke to outside counsel. Hr'g. Tr. 76:5–23.[2] But regardless of what Mr. Groskaufmanis believes he was told by these persons, it does not change that the plain language of the Plan precludes Mr. Greebel from withdrawing until age sixty-two and that the Pension Committee's apparent discretionary power vitiates a participant's unilateral right to withdraw.

**B.     The Credit Consumer Protection Act Applies to Withdrawals from The Plans.**

The parties dispute whether certain distributions from the Katten Plan and Fried Frank Plan would be "earnings" under the CCPA. Witness testimony shows that distributions from both Plans would be "earnings" because they are "compensation paid or payable for personal services." 15 U.S.C. § 1672(a).

Regarding the Katten Plan, it was a form of "profit sharing." Hr'g. Tr. at 41:15–17. Mr. Greebel made "pretax 401(k) contributions" that were taken out of paychecks, and both the paychecks and contributions were *paid periodically*. Hr'g. Tr. 23:15–24. The contributions were "withholding from [Mr. Greebel's] *compensation*." Hr'g. Tr. 47:22–23.

Mr. Greebel also made *mandatory* "integrated contributions" as a noncapital partner, which were deducted from Mr. Greebel's "draw." Hr'g. Tr. 24:3–21. These were "profit sharing," Hr'g. Tr. 48:12–13, and were calculated through a "formula [] based on compensation." Hr'g. Tr. 49:1–4; 24:24–25:7. The integrated contributions were *paid periodically*. Hr'g. Tr. 24:17–21; 48:9–16.

Both types of Mr. Greebel's contributions were deducted from his salary. Hr'g. Tr. 25:16–18.

Regarding the Fried Frank Plan, contributions are deducted as part of the "bimonthly payment process" and appear on an associate's "paystubs." Hr'g. Tr. 71:17–25. Drawing the money directly out of an employee's paycheck before he ever receives the money makes clear that the funds in the Plan are no different from salary in that both would be compensation from Fried Frank to Mr. Greebel for services rendered by Mr. Greebel.

---

[1] An employee who administered the Plan in 1998-2002 likely would not have information pertinent to whether Mr. Greebel can withdraw *today*, especially given that the terms of the Fried Frank Plan have undergone several amendments. Hr'g. Tr. 63:6–13.

[2] The government selected Mr. Groskaufmanis to testify. Mr. Greebel was unable to determine whether other persons may have been more appropriate to testify regarding the interpretation of the Plan.

The Honorable Kiyo Matsumoto
March 29, 2021
Page 5


Contributions paid into the Fried Frank Plan were *paid periodically*, Hr'g. Tr. 72:4–9, which shows they were "periodic payments pursuant to a pension or retirement program." 15 U.S.C. § 1672(a).

Regarding both Plans, the key question is "whether payments made from an employer's retirement program to an employee are too attenuated to be considered 'earnings' under the CCPA." *United States v. DeCay*, 620 F.3d 534, 543 (5th Cir. 2010). The witness testimony makes clear that the connection between Mr. Greebel's compensation and his 401(k) Plans is not "attenuated" at all. Rather, the firms created the Plans and contracted with third parties to administer the Plans for the *sole purpose* of compensating their employees. If the Plans are not *related* to compensation, it would only be because they themselves *are* compensation. They were a "benefit of employment" to be paid as part of earnings for personal services and were a "direct component of the compensation" from Mr. Greebel's employers. *United States v. Ashcraft*, 732 F.3d 860, 864 (8th Cir. 2013). It does not matter that Mr. Greebel performed services well before he will receive the compensation in the Plans, *id.* at 864–65; all that matters is that the Plans were established by Mr. Greebel's employers, *Rousey v. Jacoway*, 544 U.S. 320, 331 (2005) ("Employers establish and contribute to stock bonus, profitsharing, and pension plans or contracts. . . . What all of these plans have in common is that they provide income that substitutes for wages.").

Consider also that the amounts that Mr. Greebel contributed were either capped (assumedly by IRS regulations) or were determined by a formula used by the firm. Hr'g. Tr. 23:23–24; 24:17–25:4; 71:1–8. In either instance, the amount of the contributions was a percentage of Mr. Greebel's compensation. Thus, far from being "attenuated," the Plans are *directly tied* to the amount of his compensation. Put another way, if Mr. Greebel worked hard and the firms wanted to compensate him for this hard work, they could increase his pay, which would *necessarily* increase the contributions into his 401(k). Finally, because Mr. Greebel paid the fiduciaries to administer the Plans, *see, e.g.*, Hr'g. Tr. 42:23–43:1, and faced tax penalties for early withdrawal, the Plans were clearly different from "typical savings accounts." *See Rousey*, 544 U.S. at 331–2.

In enacting the CCPA, Congress "acted principally not to protect the rights of creditors, but to limit the ills that flowed from the unrestricted garnishment of wages." *Long Island Tr. Co. v. U.S. Postal Serv.*, 647 F.2d 336, 339 (2d Cir. 1981).

### Conclusion

Based on the briefing submitted by the parties, and the evidence and testimony presented at the Court's hearing on January 28, we respectfully request that the Court find that garnishment is improper because Mr. Greebel does not have a current, unilateral right to the

GIBSON DUNN

The Honorable Kiyo Matsumoto
March 29, 2021
Page 6

funds in the Fried Frank Plan or the Katten Plan.  Although we do not believe that Mr. Greebel has a current, unilateral right to the funds, when, and if, Mr. Greebel does become entitled to the funds in the Fried Frank Plan or the Katten Plan, the Consumer Credit Protection Act would limit any garnishment to twenty-five percent of the amounts that Mr. Greebel receives.

Respectfully submitted,

/s/ *Marc Aaron Takagaki*

cc:  All Counsel of Record (*Via ECF*)