# EXHIBIT A

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------------x
    UNITED STATES OF AMERICA
3                                        15 CR 637(KAM)
                versus
4                                        U.S. Courthouse
    EVAN GREEBEL,                        225 Cadman Plaza East
5                                        Brooklyn, NY 11201
                    Defendant.           January 28, 2021
6   ------------------------------------x 9:00 a. m.

7     TRANSCRIPT OF VIDEO CRIMINAL CAUSE FOR GARNISHMENT HEARING
                BEFORE THE HONORABLE KIYO MATSUMOTO
8                 UNITED STATES DISTRICT JUDGE

9                         APPEARANCES

10
    For the Government:    SETH DUCHARME
11                         UNITED STATES ATTORNEY
                           EASTERN DISTRICT OF NEW YORK
12                         271 Cadman Plaza East
                           Brooklyn, New York 11201
13                         BY: THOMAS PRICE, ESQ.
                           Assistant United States Attorney
14
    For the Defendant:     GIBSON DUNN & CRUTCHER
15                         200 Park Avenue, 48th Floor
                           New York, New York 10166
16                         BY:  REED BRODSKY,ESQ.
                                MARC TAKAGAKI, ESQ.
17

18  Also Present:  MICHAEL VERDE, ESQ.

19

20

21  Court Reporter:        LISA SCHMID, CCR, RMR
                           Official Court Reporter
22                         225 Cadman Plaza East
                           Brooklyn, New York 11201
23                         Phone:  718-613-2644
                           Fax:  718-613-2379
24
    Proceedings recorded by mechanical stenography.  Transcript
25  produced by computer-aided transcription.

BERGE/DIRECT/TAKAGAKI

```
 1                  (Witness sworn.)
 2             THE CLERK:  Thank you.
 3             Please state your name for record, please.
 4             THE WITNESS:  My name is James Berge, B, as in
 5  "boy," E-R-G-E.
 6             THE COURT:  Thank you.
 7             Please proceed, Mr. Takagaki.
 8             MR. TAKAGAKI:  Thank you, Your Honor.
 9                      DIRECT EXAMINATION
10  BY MR. TAKAGAKI:
11  Q    Good morning, Mr. Berge.  Thank you for joining us.
12             I would like to start with some questions about your
13  background.  What is your occupation?
14  A    So, I'm a human resources manager for Katten Muchin
15  Rosenman.
16  Q    And how long have you worked at Katten?
17  A    So I started with Katten in December of 1992, which is a
18  little over 28 years.
19  Q    And are you a lawyer?
20  A    I am not.
21  Q    And do you have any legal training?
22  A    The only training I have is for -- in our benefit plans.
23             (Court reporter seeks clarification.)
24  A    The training that I have had is regarding our benefit
25  plans from our lawyers, but I'm not a lawyer, no.
```

LISA SCHMID, CCR, RMR

BERGE/DIRECT/TAKAGAKI

1  are on our committees go through fiduciary training so our

2  attorneys, for instance, or on the ERISA side train the human

3  resources on how to interpret these plans.

4          (Court reporter seeks clarification.)

5  A    In human resources, we have our internal attorneys who

6  are our counsel who train the human resources on the qualified

7  retirement plans, including this plan.

8  BY MR. TAKAGAKI:

9  Q    So, if I'm understanding you correctly, you rely on other

10 people to help interpret this plan?

11 A    Correct.  Yes, attorneys at Katten Muchin.

12 Q    And if I could now turn to the next page, page 44 of the

13 PDF, please direct your attention to Section 7.4, which should

14 be up on your screen now.  What is this section titled?

15 A    So, Section 7.4 are partial withdrawals for any inactive

16 participants.

17 Q    And if you could, please read that paragraph.

18 A    Sure.

19 Q    Mr. Berge, it looks like you may be reading something

20 offscreen.

21 A    I apologize.  Yep.  Okay.

22          "By applying to the applicable administrative named

23 fiduciary in the form and manner prescribed by the applicable

24 administrative named fiduciary, an inactive participant may

25 make a withdrawal from all accounts of any amount up to the

 1    entire value of his accounts."

 2    Q    And what is the applicable administrative named fiduciary

 3    mentioned here?

 4    A    Charles Schwab.

 5    Q    And what does the applicable administrative named

 6    fiduciary do?

 7    A    So Charles Schwab is the day-to-day administrator for the

 8    Katten Muchin Rosenman Defined Contribution Plan.

 9    Q    Does the firm, Katten, contract with Schwab for these

10    services?

11    A    Yes, we do have a contract with Schwab.

12    Q    Does the firm pay Schwab for those services?

13    A    The plan pays -- the fees are paid by the plan, which are

14    the participants in the plan.

15    Q    Is it fair to say that Charles Schwab is responsible for

16    interpreting the plan's terms and provisions?

17    A    Yes, that is a correct statement.

18    Q    Please direct your attention to Section 7.5, the next

19    section.  It's at the bottom of the page.  Which is this

20    section titled?

21    A    So, this is, "Withdrawal Processing Rules."

22    Q    Did you help draft this section at all?

23    A    I did not, no.

24    Q    And I'm going to turn to the next page, now, page 46 of

25    the PDF.  Please read Section 7.5(c), which is at the top of

 1    the page.

 2    A    "Application by participants:  A participant must submit

 3    a withdrawal request in accordance with procedures established

 4    by the applicable administrative named fiduciary."

 5    Q    Thank you.  I'm going to turn now to page 21 of this PDF.

 6    It is the "definition" section.  Please direct your attention

 7    to Section 1.56 which has the definition of "participant."

 8    Could you please read this definition?

 9    A    Sure.  1.56.  "Participant means a knowledgeable employee

10    who begins to participate in the plan after completing the

11    eligibility requirements.  A participant's participation

12    continues until his termination of employment and withdrawal

13    or forfeiture of his entire account balance."

14    Q    Thank you.  So, turning back now to the section we were

15    just looking at, 7.5(c), which is now at the top, should be at

16    the top your screen.  In this section, 7.5(c), it refers to

17    procedures established by the applicable administrative named

18    fiduciary, which I believe you said was Charles Schwab.  Are

19    you aware of these procedures, what they are?

20    A    Yes, I am.

21    Q    And what are those procedures?

22    A    So, a participant would contact Charles Schwab by calling

23    their 800 number or on the website, on Schwab's -- excuse

24    me -- on Charles Schwab's website that is established for our

25    plan.

1    Q    And is it possible that Schwab may have other procedures

2    for perhaps after someone contacts them that you may not be

3    aware of?

4    A    No, not to my knowledge, no.

5    Q    So when somebody contacts Schwab -- or have you ever been

6    a part of receiving a call or receiving that contact from the

7    Schwab site?

8    A    I have not, no.

9    Q    I'm going to ask you now to please direct your attention

10   to the next paragraph, 7.5(d).  Could you please read this

11   paragraph?

12   A    "Approval by the applicable administrative named

13   fiduciary.  The applicable administrative named fiduciary is

14   responsible for determining that a withdrawal request conforms

15   to the requirements described in this section."

16   Q    Thank you.

17        Have you been present when the applicable

18   administrative named fiduciary was determining whether a

19   request conformed to requirements referenced in 7.5(d)?

20   A    I have not been present, no.

21   Q    Are you aware of every request that has been submitted to

22   the applicable administrative named fiduciary?

23        MR. PRICE:  Objection, Your Honor.  Relevance.

24        THE COURT:  All right.  I'm going to overrule the

25   objection.  I do have a follow-on question for Mr. Berge.

BERGE/DIRECT/TAKAGAKI

```
 1              You can go ahead and answer it.
 2              Do you mean is he personally aware, or was somebody
 3    in the HR at Katten aware, made aware?
 4              MR. TAKAGAKI:  I'm asking whether he is personally
 5    aware of each of the requests.
 6              THE WITNESS:  We have access to reporting that
 7    Charles Schwab provides us of all the distributions.  So, it's
 8    part of our reporting that is provided to Katten Muchin, yes.
 9    BY MR. TAKAGAKI:
10    Q    Is it possible someone could have contacted them for a
11    withdrawal and that would not have been part of that reporting
12    or you would not have been made aware of it?
13    A    No.
14    Q    Are you aware of how the applicable administrative named
15    fiduciary responded to each of these requests?
16    A    My answer would be, yes, because through the reporting we
17    would have access to see who has requested a distribution.
18    Q    And are you aware of what considerations Schwab may make
19    when responding to such a request?
20    A    Yes.  So, Schwab would look at the plan documents to
21    determine the type of distribution we requested.
22    Q    And have you ever been present when they looked at the
23    document?
24    A    So when we enrolled with Schwab in November of 2009, they
25    sat with us to go through the plan document and ask questions.
```

BERGE/DIRECT/TAKAGAKI

1   Q     Do you recognize this document?

2   A     Yes, I do.

3   Q     And what is this document?

4   A     That is a plan, a description we give to all participants

5   in the Katten Muchin Rosenman Defined Contribution Plan.  It's

6   a shortened summary of the terms and the provisions of the

7   plan.

8   Q     And as HR manager, how would you use this document?

9   A     So, that's a plan -- it's a summary meant for the

10  participants to help them understand the plan versus the

11  115-page full plan documents.

12  Q     Understood.  I'm going to turn to page 19 and --

13             THE COURT:  Do you want to move the exhibit into

14  evidence first?  That's usually something you do at the

15  beginning, once you lay your foundations, and then we'll hear

16  of any objections and then I'll decide whether to admit it.

17             MR. TAKAGAKI:  Yes, of course.  Apologies, Your

18  Honor.

19             I'd like to move Exhibit 2 into evidence.

20             THE COURT:  Does the Government object?

21             MR. PRICE:  No, Your Honor.

22             THE COURT:  All right.  We will receive Defense

23  Exhibit 2.

24             Thank you.  You may proceed.

25             (Defense Exhibit 2 was received in evidence.)

1          MR. TAKAGAKI:  Thank you, Your Honor.  I'm turning

2     to page 19 of the PDF.

3     BY MR. TAKAGAKI:

4     Q    In the middle of the page, Mr. Berge, do you see a header

5     titled, "Withdrawals After Age 59-1/2"?

6     A    Yes, I do.

7     Q    And there's language underneath that header.  It starts

8     with the phrase, once you have reached age 59-1/2."  Would you

9     mind reading that into the record, please?

10    A    Sure.

11             "Withdrawals after age 59-1/2.  Once you reach age

12    59-1/2, you may withdraw all or any part of your plan account

13    for any reason.  Amounts withdrawn on or after age 59-1/2 are

14    generally subject to income tax.  Please consult your tax

15    advisor for more information."

16    Q    Thank you.  Now there's another header a little bit lower

17    inside the larger letters titled, "Receiving Your Plan

18    Account."  Do you see that header?

19    A    Yes, I do.

20    Q    And there's a sentence directly above that that says,

21    "Implementation of a withdrawal."  It starts with that phrase.

22    Would you mind reading that into the record, please?

23    A    "Implementation of a withdrawal is not under the control

24    of, nor the responsibility of the firm, its employees, or its

25    partners."

1    Q      Thank you, Mr. Berge.  I'd like to now move on to

2    discussing the contributions that went into the Katten

3    retirement plan.  Are you aware of whether Mr. Greebel made

4    contributions into his 401(k) plan at Katten?

5    A      Yes, I am.

6    Q      And did he make contributions?

7    A      Yes, he did.

8    Q      Are you familiar with the types of contributions he made?

9    A      Yes, I am.

10   Q      Was Mr. Greebel an associate at Katten during part of the

11   time he worked there?

12   A      Yes, he was.

13   Q      When he was an associate, did he make pretax

14   contributions into his 401(k)?

15   A      Yes, he made pretax 401(k) contributions.

16   Q      Were these voluntary contributions?

17   A      Yes, the pretax 401(k) is voluntary.

18   Q      And how are these contributions made?

19   A      As an associate, they're W-2 employees.  So 401(k)

20   deductions are taken from each semimonthly -- were taken from

21   each semimonthly paycheck based on the amount that he had

22   elected.

23   Q      And were these contributions capped?

24   A      Yes, according to IRS regulations.

25   Q      Did Mr. Greebel become a partner while he worked at

BERGE/DIRECT/TAKAGAKI

```
 1  Katten?
 2  A     Yes, he did.
 3  Q     And when he became a partner, did he also make pretax
 4  401(k) contributions?
 5  A     Yes, he did.
 6  Q     And when were these contributions made?
 7  A     So, partners are paid on a K-1 basis on the first
 8  business day of each month.  Those deductions were taken for
 9  what we called his draw.
10  Q     Thank you.  And you said that was the first day of each
11  month?
12  A     First business day of each month.
13  Q     Thank you.  And when Mr. Greebel became a partner, did he
14  make any other types of contributions?
15  A     Yes.
16  Q     And what types of contributions were those?
17  A     So, the plan requires noncapital partners, which was his
18  title, to make an integrated employer contribution to their
19  own account, subject to IRS regulations.
20  Q     And when were these contributions made?
21  A     So, those contributions are made each April.
22  Q     And how was the amount of the integrated contributions
23  determined?
24  A     So, there's a formula defined within the plan document
25  for the integrated employer contribution.
```

BERGE/DIRECT/TAKAGAKI

1   Q    And was Mr. Greebel ever able to change that formula?

2   A    No.  The employer -- the -- excuse me.  Excuse me.  The

3   integrated employer contribution is a mandatory amount, and he

4   did not have any control over the amount of it.

5   Q    And Mr. Greebel's contributions into the 401(k) plan,

6   were these deducted from his paychecks?

7   A    Yes.

8   Q    Okay.  And so to break that down a bit, so Mr. Greebel

9   was paid by Katten for services, is that right?

10  A    Yes.  Yes.

11  Q    And these payments were periodic at times?

12  A    Yes.  So for bonuses, the bonus would be periodic.  The

13  salary when he an associate was paid semimonthly.  When he

14  was a partner, it was paid on the first business day of each

15  month.

16  Q    And so Mr. Greebel's contributions into his 401(k) came

17  out of his salary, it sounds like you're saying?

18  A    Correct.  Yes.  Correct.

19  Q    Did Mr. Katten match any of these contributions?

20  A    No, Katten does not match 401(k) contributions.

21  Q    Turning now to withdrawals from the plan, are

22  participants in the plan allowed to make withdrawals?

23  A    Yes.

24  Q    Could these sometimes be lump sum withdrawals?

25  A    Yes, depending on your status, your active or inactive

1              THE COURT:  I'm going to overrule the objection,

2    sir.  I think the witness does have an understanding and

3    knowledge of whether an inactive participant in the plan -- I

4    believe it was whether they can make withdrawals.

5              Is that correct, Mr. Price?

6              MR. PRICE:  What their rights to withdraw funds are,

7    yes, Your Honor.

8              THE COURT:  All right.  You may answer, Mr. Berge.

9              THE WITNESS:  Would you ask the question again, sir?

10   BY MR. PRICE:

11   Q    Sure.  For an inactive participant, what right do they

12   have to access, to withdraw money from their Schwab accounts?

13             MR. TAKAGAKI:  Objection.  Again, Your Honor, we

14   don't think the witness has the experience or training to

15   opine what was going on with someone's rights.

16             MR. PRICE:  I'll ask it a different way, Your Honor,

17   so we're not using the word "rights."

18             THE COURT:  All right.

19   BY MR. PRICE:

20   Q    As HR manager, in your experience, Mr. Berge, have you

21   seen inactive participants withdraw funds from the Schwab

22   accounts?

23   A    Yes.

24             MR. TAKAGAKI:  Objection.  Vague.

25   BY MR. PRICE:

```
 1                    DIRECT EXAMINATION
 2  BY MR. TAKAGAKI:
 3  Q    Good afternoon, I believe at this point, Mr. Broutman.
 4  Thank you for appearing here today.
 5  A    Good morning.
 6  Q    I would like to start just with a little bit of
 7  background.  What is your occupation?
 8  A    I'm an accountant.
 9  Q    And where are you currently employed?
10  A    Katten Muchin Rosenman.
11  Q    And what is your position or title at Katten?
12  A    Director of Partnership Accounting.
13  Q    How long have you worked at Katten?
14  A    Thirty-five years.
15  Q    And are you a lawyer?
16  A    No, I'm not.
17  Q    Do you have any legal training?
18  A    No.
19  Q    And just generally, what are your responsibilities at
20  Katten?
21  A    I'm in charge of partnership reporting for partner
22  compensation.
23           Pardon me.  Let me turn off my phone.  Sorry about
24  that.
25           I'm in charge of accounting for partner compensation
```

BROUTMAN/DIRECT/TAKAGAKI

1    been many amendments since 2007, but that was the last time

2    we --

3              (Court reporter seeks clarification.)

4    A    That's the last time we did a restatement of the plan as

5    I recollect.  We've done numerous amendments since then.

6    BY MR. TAKAGAKI:

7    Q    Do you happen to know how many amendments since 2007 have

8    been done on the plan?

9    A    I'm sure a dozen or more.  Usually there's one a year.

10   Often it involves technicalities in the law, adding loan

11   provisions, that sort of stuff.

12   Q    And as the director of partnership accounting, are you

13   familiar with the purpose of this document?

14   A    Yes.

15   Q    And what's the purpose of this document?

16   A    It is to provide for profit sharing and 401(k) for

17   eligible participants of the firm.

18   Q    And you're not responsible for interpreting the

19   provisions of this plan.

20   A    Correct.  I'm not an attorney.

21   Q    I would like to now turn to page 43 of this document.

22   Please direct your attention to Article 7 here.  What is this

23   article titled?

24   A    "Withdrawals."

25   Q    And you did not help draft this document or this article.

BROUTMAN/DIRECT/TAKAGAKI

1    A     Correct.

2    Q     And moving down to the next page is Section 7.4.  What is

3    this section titled?

4    A     "Partial withdrawals by inactive participants."

5    Q     If you could, please, just read that paragraph into the

6    record?

7    A     "By applying to the applicable administrative named

8    fiduciary in the form and manner prescribed by the applicable

9    administrative named fiduciary, an inactive participant may

10   make a withdrawal of all accounts of any amount up to the

11   entire value of his accounts."

12   Q     Thank you.  And what is the applicable administrative

13   named fiduciary?

14   A     That would currently be Schwab, Charles Schwab.

15   Q     And what are the duties of the applicable administrative

16   named fiduciary?

17   A     Well, they're the custodian for the plan.  They receive

18   distribution requests.  People who register for the plan for,

19   you know, for their contributions like 401(k), they do that

20   directly through Schwab.  They handle their distributions

21   directly through Schwab.  They make changes to their

22   investment allocations directly with Schwab.

23   Q     And does the firm contract with Schwab for these

24   services?

25   A     Yes, the fees payable to Schwab come out of the plan

BROUTMAN/DIRECT/TAKAGAKI

```
 1   authority or discretionary control with respect to the plan or

 2   trust management within the meaning of ERISA Section

 3   3(21)(a)(i), other than trustee responsibilities within the

 4   meaning of ERISA Section 405(c)(3)."

 5             MR. TAKAGAKI:  Just for the record, the witness made

 6   a comment about being at the eye doctor's office.  I believe

 7   that was just in regards to having trouble reading the

 8   text-sized screen which I made larger in the middle of his

 9   reading, just to clarify that.

10   BY MR. TAKAGAKI:

11   Q    Thank you for reading that.

12             Is Charles Schwab the administrative named fiduciary

13   referenced here?

14   A    I believe so.

15   Q    Thank you.  I would like to turn now back to the pages we

16   were on.  I believe it's page 45 or page 44 of the PDF.  Do

17   you see Section 5 here?  Can you please read the title of the

18   section?

19             THE COURT:  Do you mean 7.5?

20             MR. TAKAGAKI:  Yes.  7.5.  Apologies.

21             THE COURT:  Okay.

22             THE WITNESS:  "Withdrawal process."

23             THE COURT:  I just want to confirm that Mr. Takagaki

24   wants to ask this witness to read provisions that have been

25   previously read into the record.
```

LISA SCHMID, CCR, RMR

BROUTMAN/DIRECT/TAKAGAKI

```
 1   want to withdraw, do they have to contact Charles Schwab?
 2   A    Correct.
 3   Q    And does Charles Schwab review their request to determine
 4   whether it should be granted?
 5   A    Well, they would review the application submitted in
 6   whatever form it's submitted.  It would go directly through
 7   Charles Schwab, not through the firm.
 8   Q    Okay.  Thank you.
 9            I would like to now move on to discuss contributions
10   into the plan, the 401(k) plan.  Did Mr. Greebel make
11   contributions into the 401(k) plan?
12   A    Yes, he did.
13   Q    And what types -- was he an associate while he was at
14   Katten?
15   A    He was an associate when he joined.
16   Q    And when he was an associate, what type of contributions
17   did he make?
18   A    Pretax 401(k).
19   Q    And were these voluntary?
20   A    401(k) is always voluntary employee-directed.
21   Q    And when were these made?
22   A    They would have been made through withholding from his
23   compensation as pay to him based on his elections.
24   Q    And did Mr. Greebel become a partner at some point when
25   he was employed by Katten?
```

LISA SCHMID, CCR, RMR

BROUTMAN/DIRECT/TAKAGAKI

```
 1    A    Yes, he did.

 2    Q    And when he was a partner, did he also make these pretax

 3    401(k) contributions?

 4    A    Correct.

 5    Q    And were these made at the same time that you just

 6    described as when he was an associate?

 7    A    Yes.  Employees/partners select the percentage of their

 8    pay to be contributed.

 9    Q    And did he make any other types of -- Mr. Greebel make

10    any other types of contributions when he became partner or as

11    a partner?

12    A    As a partner he became an eligible participant for a

13    profit sharing feature called the integrated contribution.

14    Q    And when did he make these contributions?

15    A    The contributions would have been made in April, after

16    the close of the calendar plan year.

17    Q    And how were the amount of the integrated contributions

18    integrated?

19    A    By formula.

20    Q    And was Mr. Greebel able to alter this formula or the

21    outcome of the formula?

22    A    No.

23              THE COURT:  May I ask a question, please?

24              Did the formula depend in part on what the partner

25    was able to bring in, in the way of fees paid?
```

BROUTMAN/CROSS/PRICE

```
 1              THE WITNESS:  The formula is based on compensation
 2   as defined in the Internal Revenue Code, which for a partner,
 3   it's self-employment income with a cap.  Currently, the cap is
 4   290.  In the years Mr. Greebel was a partner, it would, of
 5   course, have been lower amounts.
 6              THE COURT:  Thank you.
 7              MR. TAKAGAKI:  Thank you, Your Honor.  I believe I
 8   have no further questions at this time.
 9              THE COURT:  Mr. Price, would you like to
10   cross-examine or to examine, I should say?
11              MR. PRICE:  Yes, Your Honor.
12                      CROSS-EXAMINATION
13   BY MR. PRICE:
14   Q    Mr. Broutman, good afternoon or good morning to you in
15   Chicago.
16   A    Good afternoon, Mr. Price.
17   Q    Based upon your position, are you aware of whether or not
18   Mr. Greebel is still employed with Katten?
19   A    No, he is not.
20   Q    Okay.  As someone who is no longer employed by Katten,
21   would Mr. Greebel be considered an inactive participant under
22   the plan that you were just discussing, testifying about?
23              MR. TAKAGAKI:  Your Honor, we'll just have an
24   objection that the witness is not qualified to interpret the
25   plan.  He doesn't have legal training or expertise to read a
```

LISA SCHMID, CCR, RMR

BROUTMAN/CROSS/PRICE

1   plan provision.

2            THE COURT:  All right.  Thank you.

3            Mr. Broutman, do you know the difference between an

4   active and an inactive participant within the meaning of the

5   Katten plan, based on your experience?

6            THE WITNESS:  Your Honor, I believe so.  An active

7   participant would be someone who is currently working for the

8   firm.  An inactive participant would be someone who is no

9   longer employed by the firm.

10           THE COURT:  All right.  Thank you.

11  BY MR. PRICE:

12  Q    Mr. Broutman, in your experience as a director of

13  partnership accounts, are you familiar with the rights of

14  withdrawal that apply to an inactive participant under the

15  plan?

16  A    I have some experience, but not in the form of being

17  legally trained.

18  Q    Certainly.  And your experience, from what you've

19  actually observed at Katten, are there any limitations on the

20  amount of money that an inactive participant can withdraw from

21  their Schwab accounts?

22  A    An inactive participant, someone who is terminated from

23  the firm can fully access any amount in their Schwab defined

24  contribution plan account.

25  Q    And when you say can fully access, do you mean they can

LISA SCHMID, CCR, RMR

```
 1                        REDIRECT EXAMINATION
 2   BY MR. TAKAGAKI:
 3   Q    Mr. Broutman, you testified about situations where Schwab
 4   has discretion such as in a divorce.
 5            MR. PRICE:  Objection.  I don't believe he testified
 6   that that was discretionary.
 7            THE COURT:  I don't think he said that, either.
 8            MR. TAKAGAKI:  I can withdraw.  I must have misheard
 9   you.
10            (Court reporter seeks clarification.)
11            MR. TAKAGAKI:  I can withdraw the first question I
12   asked.  I have a new question.
13   BY MR. TAKAGAKI:
14   Q    In Section 1.4 of the plan that you read earlier, it
15   expressly stated that Schwab has discretion in carrying out
16   its duties, did it not?
17   A    Correct.
18   Q    And I believe you're -- I don't remember if I asked you
19   this, but you're not present when Schwab is making decisions
20   about what's within their discretion, is that right?
21   A    Correct.
22            MR. TAKAGAKI:  Okay.  Thank you.  No further
23   questions.
24            THE COURT:  Mr. Price, did you have any other
25   questions?
```

```
 1    Groskaufmanis, G-R-O-S-K-A-U-F-M-A-N-I-S.

 2              THE COURT:  Thank you.

 3              Please proceed, Mr. Takagaki.

 4              MR. TAKAGAKI:  Thank you, Your Honor.

 5                         DIRECT EXAMINATION

 6    BY MR. TAKAGAKI:

 7    Q    Good afternoon, Mr. Groskaufmanis.  Thanks for joining us

 8    today.

 9    A    Good afternoon.

10    Q    I'd like to start with some questions about your

11    background.  So, first, what is your occupation?

12    A    I'm a lawyer.  I practice at Fried Frank Harris Shriver &

13    Jacobson.

14    Q    And how long have you worked at Fried Frank?

15    A    I've worked at Fried Frank for 32 years.

16    Q    And what type of practice do you have, generally?

17    A    Generally, I grew up at the firm as a securities,

18    regulatory, and SEC enforcement lawyer, and then five years

19    ago, I became the firm's general counsel.  So, while I

20    continue to practice to some extent, most of my time is

21    devoted to being the firm's lawyer.

22    Q    Thank you.  And moving on now to why we're here today,

23    are you aware that Mr. Greebel has a 401(k) at Fried Frank?

24    A    I am aware of that, yes.

25    Q    And are you aware that he joined the firm as an
```

```
 1   A     Yes, I do see that, yes.

 2   Q     And do you recognize this document?

 3   A     As a document, that is the plan document for our firm's

 4   401(k) plan, subject to a number of amendments that have been

 5   made since 2013.

 6   Q     Do you happen to know how many amendments have been made

 7   since 2013?

 8   A     I believe that there --

 9   Q     Sorry.  You broke up at least for me.  Could you repeat

10   the number again?

11   A     I believe that there have been six amendments.  The

12   document speaks for itself, but I believe that there have been

13   six amendments.

14   Q     Okay.  Thank you.  And was this 401(k) plan in place

15   during Mr. Greebel's employment at Fried Frank?

16   A     This document postdates his employment at Fried Frank,

17   but there was a 401(k) plan in place at Fried Frank throughout

18   Mr. Greebel's employment.

19              (Court reporter seeks clarification.)

20   A     Okay.  Thank you.  Can you hear me now?  I will speak

21   louder.  If anyone finds it offensive and loud, just let me

22   know.

23              The document, I believe your question -- I'm sorry,

24   counselor.  Remind me what your question was.

25              MR. TAKAGAKI:  If the court reporter could read back
```

1  now applies to any withdrawal Mr. Greebel would want to make

2  today?

3  A     This is a document that, in our firm's view, would govern

4  any action by Mr. Greebel to withdraw his 401(k), the assets

5  from his 401(k) plan.

6  Q     And as general counsel, are you familiar with the purpose

7  of this document?

8  A     As a witness in this proceeding, I have taken steps to

9  become more familiar with the document.  So in the normal

10  course as general counsel, I'm not managing the 401(k) plan on

11  a day-to-day basis, but after being designated as the

12  individual who would speak on the firm's behalf for purposes

13  of this proceeding, I have taken steps to inform myself.

14          We have a pension committee which consists of

15  several partners who are more directly involved in the

16  day-to-day management of the program.  We have administrative

17  staff that do that and the overall oversight and management of

18  the program.

19  Q     Who is on the pension committee, if you know?

20  A     There are six partners and/or retired partners on the

21  committee, I believe.  And from memory they are Amy Blackman,

22  who is a partner; Ken Blackman, a retired partner; Meyer Last,

23  a current partner; Andy Varney, V-A-R-N-E-Y, a current

24  partner; Matt Soran, S-O-R-A-N, a current partner; and Don

25  Carleen, C-A-R-L-E-E-N.  From memory, counsel, those are the

GROSKAUFMANIS/DIRECT/TAKAGAKI

 1   current members.

 2   Q     And thank you.

 3          Are those partners or anyone else who is involved in

 4   the day-to-day operations of the pension committee?

 5   A     I'm sorry.  I didn't understand your question.

 6   Q     I'll break it down.  So, of those six partners you named,

 7   are any of them involved in the day-to-day operation of the

 8   pension committee?

 9   A     Well, the six partners compose the pension committee.  So

10   to the extent the committee meets, all are involved.  I think,

11   without purporting to, you know, explain your question, I

12   think you were asking, I understood you to be asking whether

13   any of the partners are managing the program on a day-to-day

14   basis.  The answer to that would be no.  We have a benefits

15   staff who manage the program on a day-to-day basis and we

16   don't have partners who serve on the partner -- on the pension

17   committee doing that.  They all have practices, and this is

18   part of their contribution to the management of the firm.

19   Q     And are you a member of the benefits staff who handles

20   more of the day-to-day?

21   A     I am not a member of the benefits staff, no.

22   Q     Okay.  I think I'd like now to turn to the exhibit that's

23   up on the screen, Exhibit 3.  I'm going to turn to page 34 of

24   the PDF.  This is Article 6, titled, "Payment of Benefits and

25   Withdrawals/Loans."  Did I read that correctly?

1  A    Payment of Benefits and Withdrawals/Loans, yes.  That is

2  correct.

3  Q    And you didn't draft this article, is that right?

4  A    I did not, no.

5  Q    So I'd like to direct you to 6.01.  Could you just read

6  the very first sentence only?

7  A    The very first sentence reads, "Upon a participant's

8  separation from service, other than by reason of his death, he

9  shall be entitled to a distribution of his interest in his

10  account balance in a single lump sum or shall be entitled to

11  effect a no-load transfer of the investment fund shares held

12  in his account to an individual retirement account established

13  by Merrill Lynch, Pierce, Fenner & Smith, Incorporated."

14  Q    And please direct your attention to Section 6.2(a), which

15  is right below it.  I'll scroll down a bit so you can see it.

16  Could you please just read 6.2(a)?

17  A    6.02(a) reads, "Except as provided in subsection (b) or

18  (c), the distribution of a participant's account balance shall

19  occur upon the earliest practicable date after the investment

20  date of the plan year in which his separation from service

21  occurs."

22  Q    Thank you.  Now, first, 6.02(b), could you just read the

23  first sentence only?

24  A    Okay.  The first sentence of Section 6.02(b) reads,

25  "Notwithstanding Subsection (a), if the value of the

GROSKAUFMANIS/DIRECT/TAKAGAKI

1   participant's vested account balance is more than $1,000, then

2   his vested account balance shall not be distributed until he

3   reaches his 62nd birthday, unless he elects within the period

4   between 30 days and 180 days after he receives the notice

5   required by Treasury Regulation 1.411(a)-11(c) to receive his

6   benefits prior to that date."

7   Q    Thank you.  To your knowledge is Mr. Greebel's account

8   balance currently more than $1,000?

9   A    My understanding is that his account balance is more than

10  $1,000, yes.

11  Q    And is it -- to your knowledge, did Mr. Greebel elect

12  within a period of 30 days and 180 days after he received the

13  notice referenced in that paragraph you just read to receive

14  his benefits?

15  A    I'm not aware of Mr. Greebel ever making an election with

16  respect to any movement of the benefits in his account.

17  Q    And when a formal associate asks for a withdrawal from

18  the plan, that person must apply to the Fried Frank Pension

19  Committee, is that correct?

20  A    I don't know that it has to -- that mechanically, that

21  goes to the pension committee.  I think in practice what

22  happens is our administrative staff facilitate that.  I don't

23  think members of the pension committee would be managing the

24  day-to-day transfer of funds.

25  Q    And when you refer to this staff, is that the same

LISA SCHMID, CCR, RMR

GROSKAUFMANIS/DIRECT/TAKAGAKI

1  benefits staff you mentioned earlier who you said runs the
2  fund when the pension committee is not working on it?
3  A    Right.  They run the fund and on matters of policy and
4  administration, they take direction from the pension
5  committee, but the benefits staff, our human resources
6  benefits staff, are managing the 401(k) plan on a day-to-day
7  basis.
8  Q    Does the Fried Frank Pension Committee make the ultimate
9  decision as the whether someone can withdraw, notwithstanding
10 what the staff is doing?
11 A    Well, the pension committee has ultimate -- under the
12 terms of the plan, the pension committee has ultimate
13 authority to exercise discretion and interpret the plan.  But
14 in the normal course -- in the -- so to the extent there's a
15 question of interpretation of the plan document, it would go
16 to the pension committee.  The pension committee has broad
17 discretion under the provision of the document you have marked
18 as this exhibit, but to answer your specific question, the
19 pension committee would not be in the normal course involved
20 in that.  In the normal course this is a process administered
21 by benefits staff.
22 Q    Thank you.  So I'd next like to discuss the contributions
23 into the plan.  Did Mr. Greebel make contributions into this
24 401(k) plan?
25 A    He did make contributions into the plan, yes.

1    A    My experience as a plan participant, since that time and

2    after, is that there is a cap.  As to how that cap is

3    determined and how it works, I can't speak to, but based on my

4    experience as a plan participant, I would infer, well, not on

5    subject matter on the regulatory structure that governs 401(k)

6    plans, but based on my experience, I believe there was a cap.

7    I don't know what that cap was in the 1998 to 2002 time

8    period.

9    Q    Fair enough.  And did Mr. Greebel make any mandatory

10   contributions to your knowledge?

11   A    I don't believe -- no, I have no information to suggest

12   that he made any contributions on any basis other than a

13   voluntary basis.  In other words, he elected to participate in

14   the plan, and we facilitated his election.

15   Q    And were Mr. Greebel's contributions deducted from his

16   paycheck?

17   A    I don't know the mechanics of it with respect to Mr.

18   Greebel's personal, like, his finances with respect to the

19   firm during that time period.  So I don't have firsthand

20   knowledge as to whether they were, in fact, deducted.  I would

21   just say that in the normal course an employee's 401(k)

22   contributions are deducted as one, you know, one part of the,

23   you know, sort of bimonthly payment process.  I'm basing that

24   on prior experience, having seen, you know, paystubs for a

25   variety of reasons.  So I don't know specifically.  I don't

1    know specifically with respect to Mr. Greebel from firsthand

2    knowledge, but my assumption would be that, yes, in fact, they

3    were deducted from his paycheck.

4    Q    So, is it fair to say that with his regular paycheck

5    would have also come regular contributions into the plan?

6    A    Again, I don't have firsthand knowledge in terms of

7    having reviewed those specific records, but in the normal

8    course of operation, that is my understanding as to how it

9    would work for an employee.  I have no reason or no

10   information to believe in Mr. Greebel's case, it would work

11   differently.  Our, you know, our benefits staff were able to

12   compile data from his contribution.  You know, that leads me

13   to believe, without having firsthand knowledge, that it was

14   deducted in the normal course.

15   Q    Are you aware whether Fried Frank matched any of these

16   contributions?

17   A    I don't believe -- again, I don't have a firsthand review

18   of his individual financial documents, but I don't believe --

19   I have no basis to believe that there was any Fried Frank

20   match for any of the contributions made by Mr. Greebel.

21   Q    I would like to now just discuss withdrawals from the

22   plan.  Is it your understanding that withdrawals from the plan

23   could be done lump sum?

24   A    Yes, my understanding is that certainly with respect to a

25   former participant, a former participant could give a

1  Q    You mentioned earlier that you familiarized yourself with

2  the plan that was just shown to you.  Could you just briefly

3  explain what you did to familiarize yourself with the plan?

4  A    In terms of familiarizing myself with the plan and the

5  questions that counsel indicated I might be asked, I spent

6  some time reviewing the plan.  I spent time discussing the

7  plan and its operations with a member of the firm's pension

8  committee.  A member of our firm's pension committee discussed

9  some of the issues relevant to this litigation with outside

10 counsel that we use for benefits purposes.  I'm not going to

11 discuss what the substance of that advice was but that was

12 part of our -- part of preparing for this.

13         I communicated with benefits staff, both who

14 administer the plan today, but also for a retired employee who

15 was most directly involved in administering the plan from 1998

16 to 2002.  He agreed to speak with us.

17         (Court reporter seeks clarification.)

18 A    The retired employee agreed to meet with us and, as part

19 of my familiarization with the plan and its operation,

20 participated in my conversation.

21         And, counsel, sort of cumulatively those were the

22 steps, coupled with I have reviewed the publicly available

23 correspondence involved in connection with this proceeding.

24         MR. TAKAGAKI:  You Honor, I'd like to object to this

25 testimony.  It appears the witness will be discussing hearsay

1  the plan excerpt that you wanted to focus him on.

2          So, again, I'm overruling your objection.  Can we

3  please not keeping arguing, please?

4          Go ahead, Mr. Price.  Ask your next question,

5  please.

6          MR. PRICE:  Thank you, Your Honor.

7  BY MR. PRICE:

8  Q    Besides the preparation for today, in your role as

9  general counsel, have you had an opportunity to, you know,

10 address the plan in anyway?

11 A    Not -- there have not been many occasion on which I have

12 had to address the plan.  From time to time, there are

13 administrative issues that are addressed as to the operation

14 of either the plan or other retirement benefits, and I might

15 get involved.  But in the normal course, for example, the

16 pension committee will decide on the menu of mutual fund

17 offerings that will be made available to the plan

18 participants, including myself.  I don't -- they make those

19 judgments.  I see the options, but I'm not involved in those

20 other recommendations.

21 Q    Okay.  You stated that Mr. Greebel worked there, worked

22 in Fried Frank from around 1998 to 2002.  Is it your

23 understanding he's no longer an employee of Fried Frank?

24 A    Yes, it's my understanding Mr. Greebel ended his Fried

25 Frank employment at some point in the year 2002.

GROSKAUFMANIS/CROSS/PRICE

```
 1   the witness has already said he's not going to testify about
 2   any privileged conversations.  I think, if we hear hearsay,
 3   you'll have an objection and I'll strike it, but I don't
 4   believe this witness has testified to any hearsay and he
 5   talked about how he familiarized himself by reading the plan,
 6   reading documents, et cetera.  So, again, I'm overruling the
 7   objection.
 8            You may answer the question.  Do you need it read
 9   back, sir?
10            THE WITNESS:  If that were possible, yes, please.
11            THE COURT:  All right.
12            (Record read.)
13   A    My answer is that the plan that sets the -- sort of the
14   terms on which a participant who has left the firm can effect
15   a transfer of the assets from his fund.  So it essentially
16   sets the parameters for how that worked.  To the extent there
17   are limits, there are limits embedded in the plan, but, I
18   mean, as a general principle, both in its interpretation and
19   its operation, former participants are able and have been able
20   to withdraw the assets from their accounts at the firm.
21            THE COURT:  I'm sorry.  You said they have withdrawn
22   and can withdraw assets from their accounts?  Is that what you
23   said, sir?
24            THE WITNESS:  Yes, that's what I said.
25            THE COURT:  Okay.  Thank you.
```

1   contributions that can go into the Merrill Lynch account.  To

2   your knowledge, does the type of contribution affect whether

3   or not a separated employee can withdraw those funds from the

4   Merrill Lynch account?

5   A    I'm not aware of anything in the plan that would --

6   Q    I'm sorry.  Could you restate that?

7   A    I said that I'm not aware of anything in the plan that

8   would impose such a restriction.

9   Q    Are you aware of any age limitations for a separated

10  employee to withdraw their funds from their Merrill Lynch

11  account?

12  A    No, I don't understand the plan to impose an age

13  restriction, or put another way, a former participant can

14  effect a withdrawal at any point after the person has left.

15  Q    You testified earlier that there are administrative staff

16  at Fried Frank that handle the actual applications.  To the

17  extent that you know, do the administrative staff have any

18  discretion in whether or not to allow withdrawal of funds if

19  the request has been properly submitted by a former

20  participant?

21  A    No, I don't believe the plan provides for our

22  administrative staff to exercise discretion.  The plan maps

23  out how it should work, and the administrative staff effect

24  that.  To the extent there was an interpretative decision, the

25  plan by its terms vests that interpretative decision to the