

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

610 Federal Plaza
Central Islip, New York 11722

April 5, 2021

By ECF
The Honorable Kiyo Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *United States v. Greebel*, 15-CR-00637 (KAM)

Dear Judge Matsumoto:

      The government respectfully submits this letter-brief in response to defendant, Evan Greebel's ("Defendant") post-hearing brief, submitted on March 29, 2021. Dkt. 765 ("Def. Brief") On January 28, 2021, this Court held an evidentiary hearing regarding defendant, Evan Greebel's ("Defendant") letter motion ("Motion") [Dkt 736] and request for a hearing to contest the garnishment of retirement funds held by garnishees Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") and Charles Schwab Retirement Plan Services ("Charles Schwab") (collectively, "the Garnishees"). For the reason set forth below, and those set forth in the government's prior briefing (ECF 743, 747, 751, 756 and 766), the government respectfully requests that the Court deny Defendant's Motion in its entirety and instead enter orders of garnishment to the Garnishees, in favor of the government, for the full balance of Defendant's accounts in their possession up to the full amount of the judgment imposed against him.

### Defendant has a Current, Unilateral Right to Withdraw

#### Katten Plan

      As set forth in the government's post-hearing brief ("Govt. Brief"), both of the witnesses from Katten Muchin, James Berge and Mark Broutman, testified that Charles Schwab, the "Administrative Named Fiduciary" for the Katten plan, had no discretion in determining whether to approve a request to withdraw funds held in the retirement plan that was properly submitted by a former employee, such as Defendant. Govt. Brief at 2-3. Moreover, the testimony of these witnesses is consistent with the express terms of the Katten plan. *See* Dkt. 736-2 ("Katten Plan") § 7.5. Specifically, § 7.5, which addresses "Withdrawal Processing Rules," expressly limits the responsibility of the "Applicable Named Fiduciary" to "determining that a withdrawal request **conforms to the requirements in this Section**," and requiring the Fiduciary to "**process all withdrawal requests and make payment to the Participant as soon as is administratively possible**." §§ 7.5(d) and (e); *see also* Government's Opposition to Defendant's Motion [Dkt. 743]

("Opposition" or "Opp.") at pp. 5-6.  Additionally, § 7.5(c) requires that, "[a] Participant must submit a withdrawal request in accordance with procedures established by the Applicable Administrative Named Fiduciary," in order to withdraw funds.  As such, once a withdrawal request is made, the function of the Applicable Named Fiduciary is merely to ensure that the request conforms to the requirements of the plan, and its procedures, and then to expeditiously pay over the amounts requested.  There is simply no discretion granted to the Applicable Named Fiduciary to decline to process and pay a properly submitted claim.  In other words, this is merely an administrative task that needs to be performed prior to funds being distributed, and in no way impedes Defendant's right to demand payment, in full, of the funds in his Katten retirement plan.[1]  Again, Defendant has not provided even one case wherein a court found that merely having to comply with an administrative withdrawal process negated a defendant's "unilateral right" to withdraw funds, nor has the government has been unable to find any such case. *See* Motion, *see also* Defendant's Reply to the government's Opposition [Dkt. 744]; Defs. Brief.

Defendant's assertion that Mr. Berge and Mr. Broutman, "testified that Mr. Greebel's ability to withdraw from the Katten Plan was **subject to approval** from the Plan's administrative named fiduciary, Charles Schwab," misstates the witnesses' testimony. Def. Brief at p.1.  Specifically, Mr. Berge testified:

> Q: Mr. Berge, in your experience, in the position that you're in, to your knowledge, does Schwab have any discretion in whether or not to approve a properly-submitted request from an inactive participant seeking to withdraw funds from their account?
>
> A: Schwab would not, no.  Record of Hearing ("R.") at 33:6-10.

Similarly, Mr. Broutman testified, in relevant part:

> Q: Based upon your knowledge and experience at Katten, does Charles Schwab as the named fiduciary have any discretion on whether or not to approve a properly submitted withdrawal request from an inactive participant?
>
> A: I am not aware of any. R. at 53:25 – 54:4.

Defendant goes on to question the witnesses' competence to testify as to these issues, while relying on the mischaracterization of the witnesses' testimony for his own position. Def. Brief at p. 2 ("[T]hese witnesses have neither the experience nor expertise to testify on these issues."). However, Mr. Berge's testimony was based upon his having worked at Katten for over 28 years, including currently being a Human Resources Manager with responsibilities that included being in charge of "the firm's qualified retirement plans, which include the Katten Muchin Rosenman Defined Contribution Plan." R. at 9:16 – 10:7.  Similarly, Mr. Broutman's

---

[1] Defendant's position appears to be that, unless he immediately receives his money upon request, he does not have a current, unilateral right to his funds.  Any requirement that he submit a request to withdraw his funds, which necessarily requires that someone process that request, would automatically defeat his right to access his money.

2

testimony was based upon his having worked at Katten for 35 years, including currently being the Director of Partnership Accounting, which includes being "in charge of accounting for partnership compensation and tax reporting and other duties." R. at 39:13 – 40:1.  Both of these witnesses testified as to their knowledge and experience, built up over decades of working at the same firm and based on duties directly related to the Katten Plan.  Moreover, the testimony of these witnesses was not only relevant but, as set forth above, it was fully consistent with the express language of the Katten Plan.  Thus, Defendant's objection that, "anecdotal observations cannot overcome the language of the Plan," is irrelevant. Def. Brief at p.2.  Similarly, Defendant's objection to Mr. Berge's testimony because he "is a Human Resource manager, not a lawyer, and he required legal counsel to interpret the Plan," ignores the fact that as the Human Resource manager he was in charge of the firm's retirement plans, including the defined contribution plan at issue here.  Moreover, as Defendant's counsel stated during the hearing, the witnesses were not called to interpret the plan (R. at 5:1-5), as that is solely within the Court's purview, but instead to provide testimony regarding their knowledge and experience with the actual operation of the plan, which both did.  As such, these witnesses' testimony should be given full consideration to assist the Court in interpreting the Katten Plan, and determining that the Defendant has the current, unilateral right to withdraw funds from his Katten retirement account.

**Katten Plan Summary**

The government maintains its position that the Katten Plan Summary ("Summary") should not be considered because the language of the Katten Plan itself is clear and unambiguous. *See* Opp. at pp. 8-9.  Moreover, the Katten Plan is controlling, and takes precedence over anything in the Summary. *See* Summary at p.2 ("The plan administrator and other plan fiduciaries will rely upon the complete text of the plan document – not this booklet – in deciding questions about the plan.").  Finally, the fact that Mr. Berge "read into the record," language from the Summary does not make the Summary any more relevant, nor does the fact that he testified that the purpose was to "help [participants] understand the plan versus the 115-page full plan document," as that was already made clear from the Summary itself. *Id.*  In short, nothing about the testimony given on January 28, 2021, makes the Summary relevant to this matter, nor is anything that Mr. Berge testified to "dispositive" on that point. Def. Brief at p.2.

**Fried Frank Plan**

Section 6.01 of the Fried Frank Plan is the operative provision in determining what right Defendant has to demand payment from his Fried Frank retirement account. *See* Opp. at pp. 4-5.  Specifically, § 6.01 states, in relevant part, that, "[u]pon a Participant's Separation from Service, other than by reason of his death, he shall be entitled to a distribution of his interest in his Account balance in a single lump sum."  This is fully consistent with Mr. Groskaufmanis' testimony on January 28, 2021. R. at 79:12 – 80:20 ("[F]ormer participants are able to and have been able to withdraw the assets from their accounts at the firm.").  Defendant ignores the operative language of § 6.01 and instead relies upon the fact that Mr. Groskaufmanis read into the record the language of § 6.02(b), and confirmed that Mr. Greebel had more than $1,000.00 in his account at the time that he left the firm, to argue that Defendant cannot withdraw funds until he reaches age 62-1/2. Def. Brief at p.3. However, § 6.02(b) is merely an exception to the default distribution

requirement set forth in § 6.02(a), and it does not, nor does it purport to, alter the rights set forth in § 6.01 in any way. *See* § 6.02; *see also* Opp. at pp. 4-5.

Defendant also grossly misstates Mr. Groskaufmanis' testimony by asserting that, "Mr. Groskaufmanis, the firm's General Counsel, also testified that Mr. Greebel does not have a *unilateral* right to withdraw." Def. Brief at p.3 (citing testimony at 69:8-18). Mr. Groskaufmanis said nothing of the sort. Instead, his testimony was that any former employee, such as Mr. Greebel, could withdraw the funds from their account at any time after they left the firm, without limitation and without condition. *See* Govt. Brief at pp. 2-3. Defendant's egregious mischaracterization of Mr. Groskaufmanis' testimony relies upon his statement that, "the pension committee has broad discretion," which is taken completely out of context. Def. Brief at p.3. Instead, Mr. Groskaufmanis testified:

> Q: Does the Fried Frank Pension Committee make the ultimate decision as [to] whether someone can withdraw, notwithstanding what the staff is doing?
>
> A: [U]nder the terms of the plan, the pension committee has ultimate authority to exercise discretion and interpret the plan. But in the normal course – in the – so to the extent there's a question of interpretation of the plan document, it would go to the pension committee. The pension committee has broad discretion under the provision of the document you have marked as this exhibit, **but to answer your specific question, the pension committee would not be in the normal course involved in that.** In the normal course this is a process administered by the benefits staff. R. at 69:8-21.

Notably, the citation provided by Defendant stops just before Mr. Groskaufmanis stated that the pension committee would **not** be involved in making the ultimate decision as to whether a former employee can withdraw funds. *See* Def. Brief at p.3; R. at 69:18-20.

Defendant also grossly misstates Mr. Groskaufmanis' testimony in asserting that instances in which a former employee withdrew funds were "instances wherein the Pension Committee *overruled* the Plan." Def. Brief at p.3. Again, the witness made no such statement, nor can his testimony, looked at as a whole, be read to infer anything like what Defendant has asserted. *See* R. at 61:1 – 90:12. Instead, the witness's testimony was that any former employee could withdraw the funds in their account without limitation and without condition. *See Id.*; *see also* Govt. Brief at pp. 2-3.

Finally, Defendant asserts that Mr. Groskaufmanis, Fried Frank's General Counsel, was not competent to testify because, *inter alia*, he was not a member of the Pension Committee or administrative staff, and he had to speak with members of the Pension Committee and administrative staff to provide his testimony. Def. Brief at pp. 3-4. However, Mr. Groskaufmanis, who had worked at Fried Frank for 32 years, and been General Counsel for five years, testified about the lengths that he went to in order to familiarize himself with provisions of the Fried Frank Plan. Specifically, Mr. Groskaufmanis testified that:

> As a witness in this proceeding, I have taken steps to become more familiar with the documents. So in the normal course as general counsel, I'm not managing the 401(k) plan on a day-to-day basis, but after being designated as the individual who would speak on the firm's behalf for purposes of this proceeding, I have taken steps to inform myself. R. at 65:8-13.
>
> In terms of familiarizing myself with the plan and the questions that counsel indicated I might be asked, I spent some time reviewing the plan. I spent time discussing the plan and its operations with a member of the firm's pension committee. A member of our firm's pension committee discussed some of the issues relevant to this litigation with outside counsel that we use for benefits purposes. I'm not going to discuss what the substance of that advice was but that was part of our -- part of preparing for this. I communicated with benefits staff, both who administer the plan today, but also for a retired employee who was most directly involved in administering the plan from 1998 to 2002. He agreed to speak with us. The retired employee agreed to meet with us and, as part of my familiarization with the plan and its operation, participated in my conversation. And, counsel, sort of cumulatively those were the steps, coupled with I have reviewed the publicly available correspondence involved in connection with this proceeding. R. at 76:4:23.

In other words, Mr. Groskaufmanis properly prepared himself to testify just as any Rule 30(b)(6) witness would do, and his testimony, coupled with the clear and unambiguous language of the Fried Frank Plan, make clear that Mr. Greebel has a current, unilateral right to withdraw the full amount of funds held in his Fried Frank account.

### The Consumer Credit Protection Act Does Not Apply to Lump-Sum Withdrawals from the Plans

Defendant's argument that periodic payments **into** a retirement account makes the corpus of that account, and any withdrawal from that account, "earnings" under the CCPA is specious. *See* Govt. Brief at pp. 3-4. By its express terms, the CCPA, in relevant part, deals with garnishment of distributions being made from retirement accounts, not into them. *See Id.*; *see also* 15 U.S.C. §§ 1672 and 1673. Thus, it is irrelevant, and uncontested, that the monies that went into Defendant's retirement accounts were periodic in nature, and would have been considered to be "earnings" at the time that they were earned and paid into those accounts years ago. *See* Govt. Brief at pp. 3-4; *see also U.S. v Clark*, No. 19-10186, 2021 WL 822647 (5th Cir. March 4, 2021) (concluding that the corpus of a retirement account is an asset, not income, for purposes of garnishment under the MVRA).

Retirement accounts are generally funded by periodic payments and every court that has addressed this issue, including every court of appeals, has concluded that the corpus of a retirement account is not "earnings" under the CCPA, and that the corpus of such accounts are subject to garnishment in full. *See Kokaszka v. Belford*, 417 U.S. 642, 651 (1974) (stating that "earnings" under § 303 of the CCPA "are limited to periodic payments of compensation and do not pertain to every asset that is traceable in some way to such compensation."); *In re Kokoska*,

5

479 F.2d 990, 997 (2d Cir. 1973) (same); *U.S. v. King*, Crim. No. 08-66-01, 2012 U.S. Dist. LEXIS 45949, *9-10 (E.D.P.A. April 2, 2012) ("In this case, the Government seeks the corpus of the retirement accounts; not the weekly earnings. Thus, the CCPA is not implicated."); *Clark*, 2021 WL 822647; *U.S. v. Decay*, 620 F.3d 534, 545-46 (5th Cir. 2010) (affirming garnishment, in full, of the cash-out value of Decay's retirement account); *U.S. v Sayyed*, 862 F.3d 615, 618 (7th Cir. 2017) (stating that only "periodic payments from the defendant's retirement accounts met the definition of 'earnings' subject to the 25% garnishment cap, **as the CCPA expressly defines**.") (emphasis added); ( *U.S. v. Novak*, 476 F.3d 1041, 1063 (9th Cir. 2007) ("[W]e hold the government can immediately garnish the corpus of a retirement plan to satisfy a MVRA judgment – rather than merely obtain post-retirement payments that otherwise would have gone to the defendant."); *U.S. v. Blondeau*, 2011 WL 6000499, at * 10, (E.D.N.C. 2011) ("It appears that **in accordance with the weight of the case law**, the 25% limit on garnishment of disposable earnings found in section 303 of the [CCPA] would not apply to the [lump-sum] garnishment of Defendant's Ameritrade Account.") (emphasis added) (cited approvingly in *U.S. v Belfort*, 340 F.Supp.3d 265, 268 (E.D.N.Y. 2018) (Donnelly, J)); *see also* Opp. Again, Plaintiff does not cite one case in which a court applied the CCPA's 25% cap to the garnishment of the corpus of a retirement account when the defendant had the right to a lump-sum withdraw of funds in the account.

Defendant's reliance upon *Decay* is misplaced. First, as noted above, the *Decay* court affirmed the garnishment, in full, of the cash-out value of Decay's retirement account. *See* 620 F.3d 534; *see also* Opp. at pp. 9-10. Second, the *Decay* court relied upon the express language of the CCPA, specifically that the definition of "earnings" expressly included "periodic payments made *pursuant to* a pension or retirement program," in concluding that defendant Barre's **monthly pension payments**[2] were covered by the CCPA's 25% cap. 620 F.3d at 544. Nothing in the *Decay* holding supports Defendant's argument in this matter. *See* Opp. at 9-10.

Similarly, Defendant's citations to *U.S. v. Ashcroft*, 732 F.3d 860, 864 (8th Cir. 2013) and *Rousey v. Jacoway*, 544 U.S. 320, 331 (2005) are inaccurate, and do not support Defendant's argument here. *See* Opp. at pp. 10-12. Finally, Defendant's assertion that having to pay taxes and penalties for early withdrawals from his retirement account somehow exempts those accounts from garnishment is also incorrect. *See U.S. v Jon Lawrence Frank*, 2020 U.S. Dist. LEXIS 81084, at *23 (E.D. Va., March 4, 2020), *report and recommendation adopted by, U.S. v Frank*, 2020 U.S. Dist. LEXIS 80336 (E.D.Va., May 6, 2020) (rejecting defendant's contention that having to pay taxes and a 10% penalty for early withdrawal of funds from his retirement account meant that he did not have a present right to the funds, and holding that "The 'present right' to a lump-sum withdrawal required here '**is not based upon the rights [the defendant] would *prefer* to exercise**, **rather, it is based upon the rights [the defendant] possesses.**").

"Congress adopted the garnishment limitation in the CCPA to 'relieve countless **honest debtors** driven by economic desperation from plunging into bankruptcy in order to preserve their employment and insure a continued means of support for themselves and their families.'" *Belfort*, 340 F.Supp.3d at 268. However, as Judge Donnelly concluded in *Belfort*, nothing about Defendant's situation here is consistent with that goal. Defendant is not currently receiving distributions from his retirement accounts, and thus cannot, and does not, claim to be

---

[2] Barre's pension only allowed for monthly distributions and did not have any cash-out value.

relying upon those funds to support his family. *See Id.* at 269-70 (stating that the purpose of the CCPA is to "enable the wage earner to support himself and his family on a periodic basis."). More importantly, Defendant is not an "honest debtor," but is in fact a convicted criminal who owes a debt to his victims under the Mandatory Victims Restitution Act. As such, applying the cap to the garnishment of the corpus of Defendant's retirement accounts, which would be an expansion of, and contrary to, the clear and express language of the CCPA, "would frustrate 'the primary and overarching goal' of the [MVRA], 'which is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being."). *Id.* at 270 (quoting *U.S. v. Simmonds*, 235 F.3d 826, 831 (3d Cir. 2000) and *Dolan v. U.S.*, 560 U.S. 605, 612 (2010) ("The MVRA 'seeks primarily to ensure that victims of a crime receive full restitution.").

As the clear and unambiguous language of the relevant retirement plans, and the testimony of the witnesses, make clear, the corpuses of Defendant's retirement accounts are his assets, or property, in which he has a vested interest, and possesses the current, unilateral right to demand payment of. Thus, under the MVRA, the government is entitled to garnish those accounts, in full. *See* 18 U.S.C. § 3613(a) ("[A] judgment imposing a fine may be enforced against all property or rights to property of the person fined.").

## Conclusion

For all of the reasons set forth herein, along with the government's prior briefing, the government respectfully requests that the Court deny Defendant's Motion in its entirety and instead issue Orders of Garnishment to the Garnishees requiring that they turn over to the government all of the funds held in Defendant's retirement accounts under their control, up to the full amount of the restitution balance owed by Defendant.

Respectfully submitted,

MARK J. LESKO
Acting United States Attorney

By:   /s/ *Thomas R. Price*
THOMAS R. PRICE
Assistant U.S. Attorney
(631) 718-7893