UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X

UNITED STATES OF AMERICA,

**MEMORANDUM AND ORDER**

      - against -

15-cr-637(KAM)

EVAN GREEBEL,

           Defendant.

-----------------------------------X

**MATSUMOTO, United States District Judge:**

Evan Greebel ("Mr. Greebel") has objected, pursuant to 28 U.S.C. § 3205(c)(5), to the answers filed by two garnishees in response to the Government's writs of garnishment of two retirement accounts.  The writs of garnishment were issued by the court, upon applications by the Government, to enforce a criminal judgment against Mr. Greebel, which ordered him to pay restitution to his victims in the amount of $10,447,979.  The court held an evidentiary hearing on Mr. Greebel's objections on January 28, 2021, and the court has considered the parties' submissions.  For the reasons herein, Mr. Greebel's objections are OVERRULED, and the Government's request for orders of garnishment is GRANTED.

**Background**

The court assumes familiarity with Mr. Greebel's criminal trial and conviction.  In short, Mr. Greebel was

1

convicted by a jury in December 2017 of two counts: conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.  (ECF No. 501, Minute Entry.)  In August 2018, this court sentenced Mr. Greebel: to 18 months of imprisonment on each count to run concurrently, to three years of supervised release with special conditions to follow his incarceration, including the payment of $10,447,979 in restitution pursuant to the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, and to forfeit $116,462.03.  (ECF No. 674, Judgment.)  The Second Circuit affirmed Mr. Greebel's conviction.  (ECF No. 719, Mandate.)

As relevant to the objections presently before the court, prior to his conviction, Mr. Greebel worked as an attorney at Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") and Katten Muchin Rosenman LLP ("Katten").  During his tenure working at both firms, he made contributions to retirement accounts pursuant to the firms' respective retirement plans.

After Mr. Greebel was sentenced, in order to enforce the monetary aspects of the judgment, the Government filed two applications for writs of garnishment against Mr. Greebel's interest in the two retirement accounts, pursuant to 28 U.S.C. § 3205(b).  (ECF Nos. 693, 694.)  One writ was directed to Charles

2

Schwab & Co., Inc., and the other to Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), as garnishees. (*Id.*) On November 19, 2019, the Clerk of Court approved the two writs. (ECF Nos. 695, 696.) Subsequently, the Government asked the court to vacate the writ directed to Charles Schwab & Co., Inc., and to instead issue the writ to Charles Schwab Retirement Plan Services ("Charles Schwab"), which the court did. (*See* ECF Nos. 703, 704, 705, 706.) The writs of garnishment, notices, and instructions were duly served on the garnishees and on Mr. Greebel.

Merrill Lynch filed its answer to the writ on December 20, 2018, stating that it held a 401(k) plan related to Mr. Greebel's employment at Fried Frank, titled "Fried, Frank, Harris, Shriver & Jacobson LLP 401(k) Incentive Savings Plan Greebel, Evan" (the "Fried Frank plan"). (ECF No. 707, Answer of Merrill Lynch.) At the time of Merrill Lynch's answer, the value of Mr. Greebel's interest in the Fried Frank plan was $133,283.05. (*Id.* at 2.) On January 7, 2019, Charles Schwab filed its answer, stating that it held funds related to Mr. Greebel's employment at Katten in a plan titled, "Katten Muchin Rosenman LLP Defined Contribution Plan" (the "Katten plan"). (ECF No. 709-1, Letter from Charles Schwab.) At the time of the answer, Mr. Greebel's interest in the Katten plan was approximately $788,086. (*Id.*)

On June 12, 2020, Mr. Greebel filed written objections to the two answers pursuant to 28 U.S.C. § 3205(c)(5), and requested a hearing. (ECF No. 736, Written Objections ("Def. Obj.").) The Government responded (ECF No. 743, Government Opposition), and Mr. Greebel filed a reply (ECF No. 744, Reply).

On January 28, 2021, at the request of Mr. Greebel, the court held an evidentiary hearing by videoconference regarding Mr. Greebel's objections. (ECF Minute Entry Jan. 28, 2021; ECF No. 764, Transcript of Jan. 28, 2021 Hearing ("H'ring Tr.").) Three witnesses testified at the hearing regarding the two retirement plans: for the Katten plan, Mark Broutman (Director of Partnership Accounting) and Jim Berge (Human Resources Manager) of Katten; and for the Fried Frank plan, Karl Groskaufmanis, Esq. (General Counsel) of Fried Frank.

Following the hearing, both Mr. Greebel and the Government submitted further briefing regarding Mr. Greebel's objections. (ECF No. 765, Defendant's Post-Hearing Brief ("Def. Mem."); ECF No. 766, Government's Post-Hearing Brief; ECF No. 767, Defendant's Reply; ECF No. 768, Government's Reply.)

**Legal Standard**

The Government "shall be responsible for collection of an unpaid fine or restitution," 18 U.S.C. § 3612(c), and "may enforce a judgment . . . against all property or rights to property of the person fined," 18 U.S.C. § 3613(a), or against

4

the property or rights to property of a person ordered to pay

restitution, 18 U.S.C. § 3664(m).  "The [G]overnment may enforce

restitution orders arising from criminal convictions using the

practices and procedures for the enforcement of a civil judgment

under federal or state law as set forth in the Federal Debt

Collection Procedures Act ('FDCPA')."  *United States v. Cohan*,

798 F.3d 84, 89 (2d Cir. 2015).

When the Government seeks to enforce a judgment

through a garnishment, "[a] court may issue a writ of

garnishment against property (including nonexempt disposable

earnings) in which the debtor has a substantial nonexempt

interest and which is in the possession, custody, or control of

a person other than the debtor, in order to satisfy the judgment

against the debtor."  28 U.S.C. § 3205(a).  After the court

issues a writ of garnishment, the Government serves the

garnishee and the judgment debtor with a copy of the writ, and

the garnishee files a written answer indicating what property

belonging to the debtor it holds.  *See* 28 U.S.C. § 3205(c)(1)-

(4).

"[T]he judgment debtor . . . may file a written

objection to the [garnishee's] answer and request a hearing."

28 U.S.C. § 3205(c)(5).  "The issues at such hearing shall be

limited (1) to the probable validity of any claim of exemption

by the judgment debtor; (2) to compliance with any statutory

requirement for the issuance of the postjudgment remedy granted;

and (3) if the judgment is by default and only to the extent

that the Constitution or another law of the United States

provides a right to a hearing on the issue, to (A) the probable

validity of the claim for the debt which is merged in the

judgment; and (B) the existence of good cause for setting aside

such judgment."   28 U.S.C. § 3202(d)(1)-(3).

"The party objecting shall . . . bear the burden of

proving such grounds."   28 U.S.C. § 3205(c)(5).

## Discussion

Construed liberally, Mr. Greebel's objections are

predicated on the first of the limited possible grounds: "the

probable validity of any claim of exemption by the judgment

debtor."  28 U.S.C. § 3202(d)(1).  First, he argues that he does

not have a current, unilateral right to withdraw the funds from

either retirement account, and thus the accounts are not

currently susceptible to garnishment by the Government.  (*See*

Def. Obj. at 2-7; Def. Mem. at 1-4.)  Second, Mr. Greebel argues

that if the Government can garnish the funds held in the

accounts, the Consumer Credit Protection Act precludes the

Government from garnishing any more than 25 percent of the

funds.  (*See* Def. Obj. at 8-15; Def. Mem. at 4-5.)  As explained

below, Mr. Greebel has failed to meet his burden to sustain

either ground for his objections.

I. **Mr. Greebel's Rights to the Funds in the Retirement Accounts**

The Mandatory Victims Restitution Act "provides that a restitution award may be enforced against 'all property or rights to property of the person,' except for property that falls within the exemptions set forth in Section 6334(a)(1)-(8),(10) and (12) of the Internal Revenue Code." *United States v. Jaffe*, 417 F.3d 259, 265 (2d Cir. 2005) (quoting 18 U.S.C. § 3613(a)). These exceptions, as defined in the Internal Revenue Code, include "[a]nnuity or pension payments under the Railroad Retirement Act, benefits under the Railroad Unemployment Insurance Act, special pension payments received by a person whose name has been entered on the Army, Navy, Air Force, and Coast Guard Medal of Honor roll, and annuities based on retired or retainer pay under" the Retired Serviceman's Family Protection plan. 28 U.S.C. § 6334(a)(6). The foregoing exceptions do not include private retirement accounts, like the ones at issue here. Moreover, "courts have repeatedly held that [the] provisions of ERISA and the Internal Revenue Code, respectively, that generally preclude the assignment or alienation of pension benefits do not apply to the United States in its efforts to collect on a judgment of restitution." *United States v. Hotte*, No. 97-cr-669 (SJ), 2007 WL 2891313, at *3 (E.D.N.Y. Sept. 28, 2007) (collecting cases).

Thus, there is no doubt that the Government can garnish Mr. Greebel's retirement accounts, so long as the funds are the property of Mr. Greebel, or he has "rights to" the funds in the accounts.  A recent decision of the Second Circuit confirms this: In *United States v. O'Brien*, the Government sought to garnish two retirement accounts to which the defendant contributed while working at a law firm, in order to enforce a judgment of restitution following his criminal conviction.  No. 19-3895-CR, 2021 WL 1051540, at *1 (2d Cir. Mar. 19, 2021) (summary order).  The Second Circuit affirmed the district court's overruling of the defendant's procedural and substantive objections, finding that nothing limited the Government's ability to garnish lump sums from both law firm retirement accounts.  *See id.* at *3.  Here, Mr. Greebel argues, relying on creative, if not tortured, constructions of both retirement plan documents, that he does not have a current right to the funds in the accounts.  His arguments are without merit.

A.    The Fried Frank Plan

The document governing the Fried Frank plan states: "Upon a Participant's Separation from Service, other than by reason of his death, he *shall be entitled to a distribution of his interest in his Account balance in a single lump sum* or shall be entitled to effect a no-load transfer of the Investment Fund shares held in his Account to an Individual Retirement

8

Account established by Merrill Lynch[.]" (Def. Obj., Ex. A at

31 (Section 6.01) (emphasis added).) This language clearly and

unambiguously entitled Mr. Greebel a right to withdraw his

entire account balance in a single lump sum from the Fried Frank

plan after his employment with the firm ended. The General

Counsel for Fried Frank, Karl Groskaufmanis, Esq., testified at

the evidentiary hearing, and confirmed as much:

> Q. So, based upon your understanding of the plan,
> are there any limitations for someone, a
> participant who has separated from Fried Frank, are
> there any limitations on their ability to withdraw
> funds from the Merrill Lynch account?
>
> . . .
>
> A. My answer is that the plan that sets the --
> sort of the terms on which a participant who has
> left the firm can effect a transfer of the assets
> from his fund. So it essentially sets the
> parameters for how that worked. To the extent there
> are limits, there are limits embedded in the plan,
> but, I mean, as a general principle, both in its
> interpretation and its operation, former
> participants are able and have been able to
> withdraw the assets from their accounts at the
> firm.

(H'ring Tr. at 79:12-80:20.)

Based on the unambiguous plan language, there is no

doubt that Mr. Greebel has unfettered rights to withdraw from

the Fried Frank retirement account *all* funds in which he has an

interest. Despite the clear plan language, Mr. Greebel argues

that a subsequent provision in the document governing the Fried

Frank plan prevents him from requesting an immediate lump sum

from the account.   In support of his argument, Mr. Greebel

relies on the subsequent provision in the plan, which states

that the "balance shall not be distributed until he reaches his

sixty-second (62nd) birthday unless he elects within the period

between thirty (30) days and one hundred and eighty (180) after

he receives the notice required by Treasury Regulation Section

1.411(a)-11(c) to receive his benefits prior to that date."

(Def. Obj., Ex. A at 31 (Section 6.02(b)).)   However, the

clearest and most logical interpretation of Section 6.02(b) is

that it establishes the minimum age at which distributions will

begin for participants in the plan who have not separated from

the firm, or who have separated but have not requested a lump

sum.   In those instances, Section 6.02(b) directs that

distributions will begin when the participant turns 62.   The

provision does not purport to alter or supersede the preceding

provision, Section 6.01, which states that the participant is

entitled to a distribution of the entire balance in a single

lump sum after separation from the firm.[1]   Thus, Mr. Greebel's

objection that he does not have a current, unilateral right to

---

[1] Mr. Greebel also argues that Fried Frank's Pension Committee may have the
discretion to overrule the language of the document governing the Fried Frank
plan.  (*See* Def. Mem. at 3.)   To the contrary, Fried Frank's General Counsel
credibly testified that the Pension Committee only becomes involved in
interpreting the governing plan document when there is a dispute about how a
provision ought to be interpreted; the Pension Committee does not have the
authority to deny a valid claim for the funds (nor would the Pension
Committee become involved in such a request in the normal course).  (*See*
H'ring Tr. at 69:8-21.)

withdraw the funds in the Fried Frank plan is respectfully overruled.

B.    The Katten Plan

Mr. Greebel's objections to the garnishment of funds in which he has an interest, held pursuant to the Katten plan, also lack merit.  The governing Katten plan document states, in the relevant part: "By applying to the Applicable Administrative Named Fiduciary in the form and manner prescribed by the Applicable Administrative Named Fiduciary, an Inactive Participant *may make a withdrawal from all Accounts of any amount, up to the entire value, of his Accounts*."  (Def. Obj., Ex. B at 35 (Section 7.4) (emphasis added).)  Mr. Greebel concedes that he is an "Inactive Participant."  (*See* Def. Obj. at 3 n.1.)  Despite the clear language that he "may make a withdrawal . . . of any amount, up to the entire value" from the account, Mr. Greebel argues that he does not have an immediate right to do so, because he is required to "apply," and to follow a certain process.  (*Id.* at 4-6.)

Notwithstanding that an inactive participant must follow some administrative procedures in order to effect a withdrawal of any amount of the participant's funds, there is nothing in the governing plan document that alters the participant's right to make a withdrawal of the full balance

11

from the account.[2]  At the evidentiary hearing before the court,

the Director of Partnership Accounting for Katten, Mark

Broutman, credibly confirmed that the plain reading of this

language is applied in practice:

> Q.  .  .  . And your experience, from what you've
> actually observed at Katten, are there any
> limitations on the amount of money that an inactive
> participant can withdraw from their Schwab
> accounts?
>
> A.  An inactive participant, someone who is
> terminated from the firm can fully access any
> amount in their Schwab defined contribution plan
> account.
>
> Q.  And when you say can fully access, do you mean
> they can withdraw those full amounts?
>
> . . .
>
> A.  The answer would be yes.

(H'ring Tr. at 50:18-24.)

Mr. Greebel cannot plausibly argue that he lacks

"rights to" funds which he is able to "fully access."[3]  Mr.

---

[2] Mr. Greebel argues that Charles Schwab has the authority to deny any request
to withdraw funds.  (See Def. Mem. at 1-2.)  But nothing in the documents
gives Charles Schwab a substantive, rather than an administrative, role over
the Katten plan.  Both witnesses from Katten testified at the hearing that
they were not aware of Charles Schwab having any discretion to deny a
properly-submitted request for funds.  (See H'ring Tr. at 33:6-10; 53:25-
54:4.)

[3] Mr. Greebel also argues that Section 8.1(a) of the document governing the
Katten plan "suggests that Mr. Greebel cannot presently make a withdrawal."
(Def. Obj. at 6.)  To the contrary, Section 8.1(a) states: "Subject to the
other requirements of this Article, an Inactive Participant may elect to have
all or a portion of his Account Balance paid to him beginning upon any
Settlement Date following his Termination of Employment in a form of payment
allowed hereunder."  (Def. Obj., Ex. B at 43 (Section 8.1(a)).)  The
"Settlement Date" merely refers to the date on which the transactions are
completed in order for any securities to be converted, as would be necessary
for a participant to receive funds from the plan.  Consequently, this

Greebel relies on a separate document that provides a summary of

the Katten plan, which states: "Once [a participant] reach[es]

age 59 1/2, [he] may withdraw all or a part of [his] Plan

Account for any reason."  (Def. Obj., Ex. C at 14.)  Mr. Greebel

argues that because he is required to wait until he is 59 and a

half years old, he will not be able to withdraw his funds

pursuant to the process described in the Katten plan (which

lists dates that do not align with the purported 59 and a half

requirement), and thus, he will not have access to the funds

until distributions begin, when he turns 70 and a half.  (*See*

Def. Obj. at 7.)  As an initial matter, the document relied upon

by Mr. Greebel is merely a summary, and does not govern, much

less override, the Katten plan, or bear on the court's decision.

In any event, the court does not read the summary as altering

any of the rights in the Katten plan's governing document,

including that an inactive participant "may make a withdrawal

from all Accounts of any amount, up to the entire value, of his

Accounts."

   In conclusion, the plain language of the documents

governing the two retirement plans both state that a former

---

provision confirms that Mr. Greebel has a right to the funds.  Mr. Greebel
also cites the assignment and alienation provision of the document governing
the Katten plan (*see* Def. Obj. at 7), but courts have consistently held that
anti-alienation provisions do not apply to restitution garnishments, and the
Second Circuit has held that courts may "consider ERISA protected assets in
determining appropriate fines and restitution," *United States v. Irving*, 452
F.3d 110, 126 (2d Cir. 2006).

employee has unlimited access to the funds in the retirement

accounts.   The witnesses from both law firms confirmed as much.

Mr. Greebel thus has "rights to" these funds, and they are

subject to garnishment under the Mandatory Victims Restitution

Act.

## II.   The Consumer Credit Protection Act

Mr. Greebel next argues that even if the Government

can garnish his funds in the retirement accounts, it is limited

to garnishing 25 percent of the funds, pursuant to a statutory

cap contained in the Consumer Credit Protection Act ("CCPA").

Section 303 of the CCPA[4] provides that "the maximum

part of the aggregate disposable earnings of an individual for

any workweek which is subjected to garnishment may not exceed 25

per centum of his disposable earnings for that week."   15 U.S.C.

§ 1673(a)(1).   "Earnings" are defined as "compensation paid or

payable for personal services, whether denominated as wages,

salary, commission, bonus, or otherwise, and includes periodic

payments pursuant to a pension or retirement program."   15

U.S.C. § 1672(a).

Though the plain language of the statute directs that

the 25 percent cap applies to garnishments of "periodic payments

pursuant to a pension or retirement program," the statute does

---

[4] Section 303 of the CCPA, 15 U.S.C. § 1673, applies to collections under the FDCPA.   18 U.S.C. § 3613(a)(3).

not explicitly limit the Government's ability to garnish a
retirement account when it does so by garnishing the entire
account at once, before periodic distributions to the recipient
have begun.  In holding that the CCPA's 25 percent cap does not
apply to tax refunds, the Supreme Court instructed that the cap
was intended to apply only to "periodic payments of compensation
needed to support the wage earner and his family on a week-to-
week, month-to-month basis."  *Kokoszka v. Belford*, 417 U.S. 642,
651 (1974).  Courts have subsequently interpreted the cap
consistently with that guidance.  *See United States v. Belfort*,
340 F. Supp. 3d 265, 268 (E.D.N.Y. 2018) (holding that the cap
did not apply to the defendant's ownership interest in a
company).  The intent of the cap was to limit the amount of
money the Government could garnish where the individual was
receiving periodic payments that he or she might be using to
cover living expenses.  It was not meant to apply to the
garnishment of a debtor's interest in the entire balance of an
asset that may be withdrawn in a lump sum.

Mr. Greebel argues that the funds in his retirement
accounts must be considered "earnings," because he made
contributions to the accounts that were deducted from his
salary.  (*See* Def. Mem. at 4-5.)  It is true that the funds in
the accounts can be traced back to Mr. Greebel's law firm
salaries, but he has not cited any authority holding that

15

retirement account contributions are still classified as earnings, rather than as assets or investments, once in the fund.  The purpose of these funds was to transform an employee's fund contributions into investment assets that accumulate and grow.  Thus, at the point that the money went into the accounts, that money ceased to be "earnings," and instead became an investment vehicle.  Consider a hypothetical: If Mr. Greebel had put a portion of his paychecks toward the purchase of a beach house, no lawyer could reasonably argue that the beach house constituted "earnings" which could not be seized by the Government merely because Mr. Greebel contributed money that he earned toward the purchase of the house.  *See Kokoszka*, 417 U.S. at 651 (agreeing with lower court holding that "earnings" means "periodic payments of compensation" but not "every asset that is traceable in some way to such compensation").

Mr. Greebel relies on a nonbinding 2018 opinion letter from the United States Department of Labor that states, in part: "The fact that lump-sum payments may occur only occasionally or one time does not alone render them outside the scope of earnings under the CCPA.  Indeed, bonuses are often infrequent or given only one time, but the statute plainly includes them as earnings."  (Def. Obj., Ex. D at 4.)  The context of the Department of Labor opinion letter was a question to the Department about "lump-sum payments and garnishment limits

16

relating to withholdings for child support under the CCPA."
(*Id.* at 2.)  The opinion has no persuasive weight in the context
of restitution owed by a convicted criminal defendant to his
victims, an area in which the Department of Labor has no
responsibility.  Even if the Department of Labor were considered
to have the expertise to interpret the CCPA in this context, the
court need not afford its opinion any deference, because "[t]he
intent of Congress is clear," and the court "must reject
administrative constructions which are contrary to clear
congressional intent."  *Chevron, U.S.A., Inc. v. Nat. Res. Def.
Council, Inc.*, 467 U.S. 837, 842 & n.9 (1984).

The CCPA is clear that the cap applies to
"compensation paid or payable for personal services," 15 U.S.C.
§ 1672(a), and the Supreme Court has held that this language was
intended to apply to "periodic payments of compensation needed
to support the wage earner and his family on a week-to-week,
month-to-month basis," *Kokoszka*, 417 U.S. at 651.  Accordingly,
the cap does not apply to the Government's garnishment of Mr.
Greebel's two retirement accounts under the circumstances
presented here.

The court has considered the cases cited by the
parties and is persuaded that the majority of decisions weigh in
favor of the Government's authority to garnish the entire corpus
of Mr. Greebel's retirement accounts.

17

## Conclusion

For the foregoing reasons, the court finds that Mr. Greebel's objections to the garnishments are without merit.  The objections are overruled, and the writs of garnishment are affirmed.  The Government shall submit orders of garnishment directing the garnishees as to the disposition of the funds in the garnished accounts, by April 21, 2021.

**SO ORDERED.**

Dated:     April 16, 2021
           Brooklyn, New York

                                         /s/
                                    _____
                                    **Hon. Kiyo A. Matsumoto**
                                    United States District Judge
                                    Eastern District of New York